UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

AMGEN INC.,                          )
                                     )
                    Plaintiff,       )
                                     )      Civil Action No.: 05-cv-12237 WGY
          v.                         )
                                     )
F. HOFFMANN-LAROCHE LTD.,            )
ROCHE DIAGNOSTICS GMBH, and          )
HOFFMANN LAROCHE INC.,               )
                                     )
                    Defendants.      )
_____)


**AMGEN INC.'S OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION AND
FAILURE TO STATE A CLAIM FOR WHICH RELIEF MAY BE GRANTED**

Dockets.Justia.com

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................................ 1

II.   BACKGROUND ................................................................................................ 4
      A.    Amgen's Patented Inventions and Roche's Infringement ..................... 4
      B.    Roche Has Made Meaningful Preparations To Market Pegylated EPO In
            The Face Of Its Knowledge Of The Lin Claims And Amgen's Threat To
            Sue.......................................................................................................... 6
            1.    Roche has continued to systematically meet regulatory
                  requirements to commercialize Pegylated EPO........................... 6
            2.    Roche is also making meaningful commercial preparations to
                  infringe Lin's patents ................................................................ 6
            3.    Roche intends to commercialize pegylated EPO even in the face of
                  Amgen's statements that a suit would be forthcoming.............. 7
      C.    FDA's Policies and practices Do Not Suggest a Protracted Approval for
            Roche's Pending Application .................................................................. 8

III.  THE COURT HAS AND SHOULD EXERCISE ITS SUBJECT MATTER
      JURISDICTION OVER THIS CASE ............................................................... 11
      A.    The Facts Establish Declaratory Relief Jurisdiction Over Roche......... 11
            1.    Legal Standard ......................................................................... 11
            2.    Roche's Activities Constitute Meaningful Preparation For
                  Infringement Of The Patents-In-Suit ....................................... 12
            3.    The Controversy Between Defendants And Plaintiff Is Definite
                  And Concrete And Roche Has Refused To Halt Its
                  Commercialization Course........................................................ 15
      B.    Because Roche Has Certified To The FDA That Its Pegylated EPO
            Product Is Safe, Efficacious, And Ready For Approval, This Court Should
            Exercise Its Discretion To Hear Amgen's Declaratory Judgment Action
            Now...................................................................................................... 15

IV.   AMGEN'S COMPLAINT STATES A CLAIM UPON WHICH RELIEF CAN
      BE GRANTED ................................................................................................. 19

V.    IN THE ALTERNATIVE, DISCOVERY SHOULD BE GRANTED ............. 19

VI.   CONCLUSION................................................................................................. 20

## TABLE OF AUTHORITIES

Page

**Cases**

*Abbott Labs. v. Zenith Labs., Inc.*
  934 F. Supp. 925 (N.D. Ill. 1995) .......................................................................... 13

*Amgen Inc. v. Chugai Pharma. Co.*
  927 F.2d 1200 (Fed. Cir. 1991) ................................................................................5

*Amgen Inc. v. Chugai Pharma. Co.*
  13 U.S.P.Q.2d 1737 (D. Mass. 1989) *aff'd in part and vacated in part*, 927 F.2d 1200
  (Fed. Cir. 1991) .......................................................................................................... 5

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*
  314 F.3d 1313 (Fed. Cir. 2003) ............................................................................4, 5

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*
  3 F. Supp. 2d 104 (D. Mass. 1998) ........................................... 13, 15, 16, 17

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*
  126 F. Supp. 2d 69 (D. Mass. 2001) *aff'd in part and vacated in part*, 314 F.3d 1313
  (Fed. Cir. 2003) ...................................................................................................... 4, 5

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*
  339 F. Supp. 2d 202 (D. Mass. 2004) ...................................................................... 5

*BP Chems. v. Union Carbide Corp.*
  4 F.3d 975 (Fed. Cir. 1993) .................................................................................... 11

*Capo, Inc. v. Dioptics Med. Prods.*
  387 F.3d 1352 (Fed. Cir. 2004) .............................................................................. 11

*Connell v. Sears, Roebuck & Co.*
  722 F.2d 1542 (Fed. Cir. 1983) .............................................................................. 18

*Eli Lilly & Co. v. Medtronic, Inc.*
  496 U.S. 661 (1990) ................................................................................................ 16

*Glass Equip. Dev., Inc. v. Besten, Inc.*
  174 F.3d 1337 (Fed. Cir. 1999) .............................................................................. 18

*Glaxo, Inc. v. Novopharm Ltd.*
  110 F.3d 1562 (Fed. Cir. 1997) ........................................................................ *passim*

*Gulf Oil Corp. v. Gilbert,*
  330 U.S. 501 (1947) ................................................................................................ 18

*Hybritech, Inc. v. Abbott Labs.*
  849 F.2d 1446 (Fed. Cir. 1988) .............................................................................. 16

*Intermedics, Inc. v. Ventritex, Inc.*
  775 F. Supp. 1269 (N.D. Cal. 1991) ................................................................. 16, 17

*J.J. Reidy & Co. v. Airwater Corp.,*
  2005 U.S. Dist. LEXIS 40291 (D. Mass. 2005) .................................................... 18

*Lang v. Pacific Marine & Supply Co.*
  895 F.2d 761 (Fed. Cir. 1990) .......................................................................... *passim*

*McCuin v. Texas Power and Light Co.,*
  714 F.2d 1255 (5th Cir. 1983) ................................................................................ 18

## TABLE OF AUTHORITIES
### (continued)

Page

*Pharmachemie B.V. v. Pharmacia S.p.A.*,
   934 F. Supp. 484 (D. Mass. 1996) ................................................................6
*Polymer Techs. v. Bridwell*
   103 F.3d 970 (Fed. Cir. 1996)................................................................ 16
*Telectronics Pacing Sys., Inc. v. Ventritex, Inc.*
   982 F.2d 1520 (Fed. Cir. 1992)................................................................ 14
*Toxgon Corp. v. BNFL, Inc.*
   312 F.3d 1379 (Fed. Cir. 2002)................................................................ 3
*Valentin v. Hospital Bella Vista*
   254 F.3d 358 (1st Cir. 2001) ................................................................ 3
*Walker Process Equipment, Inc. v. Food Machine & Chemical Corp.*
   382 U.S. 172, 86 S. Ct. 347, 15 L. Ed. 2d 247 (1965)................................ 18

**Statutes**
28 U.S.C. § 2201 ................................................................ 18
35 U.S.C. § 261................................................................18
35 U.S.C. § 271(e)(1)................................................................ *passim*
35 U.S.C. § 271(e)(2)................................................................ 12

**Rules**
Fed. R. Civ. P. 12(b)(1)................................................................ 3, 20
Fed. R. Civ. P. 12(b)(6)................................................................ 3, 19, 20

## I.    INTRODUCTION

The facts relevant to the Hoffman-LaRoche, *et al.* ("Roche") motion are not meaningfully in dispute. Roche has admitted that it filed its Biologics License Application ("BLA") with the Food and Drug Administration ("FDA") last week and that it has taken many, if not all, of the commercial acts alleged in Amgen's originally-filed Complaint. Rather, Roche's motion presents a single legal question, the resolution of which is dispositive here:  Does § 271(e)(1) preclude this Court from exercising jurisdiction where, as here, Roche has performed all of the steps which Roche believes are necessary to obtain FDA approval to sell its accused PEG-EPO product in the United States?

Roche contends that Amgen is without judicial recourse to uphold its patent rights until Roche markets its accused product in the United States.  According to Roche, the defense to liability created under 35 U.S.C. § 271(e)(1) precludes an action for declaratory judgment, even after Roche has filed its application for approval to market and sell an infringing product and is avidly preparing to do so.  But contrary to Roche's contention, the Federal Circuit has stated that § 271(e)(1) does not deprive a court of subject matter jurisdiction under the Declaratory Judgment Act where, as here, the infringing party is well advanced in the regulatory process.[1] Exercising jurisdiction under such circumstances is not only appropriate, but necessary to effectuate the statutory rights granted a patentee, while simultaneously respecting the limited defense created under § 271(e)(1).

Not only has Roche taken all steps necessary to obtain FDA approval, but it has triggered a regulatory process that is most likely to culminate in a regulatory decision within the next twelve months on Roche's application to market and sell PEG-EPO in the U.S.  Thus, if as

---

[1] *Glaxo, Inc. v. Novopharm Ltd.*, 110 F.3d 1562, 1571 (Fed. Cir. 1997).

Roche requests, the Court were to decline to exercise its jurisdiction at this juncture, Amgen would effectively be precluded from any judicial determination of its rights until a point in time well after Roche had already entered the market, and the protection provided by § 271(e)(1) had long since expired. The result Roche seeks would thus ensure that its infringing product would enter the United States market, in derogation of Amgen's patent rights, before Amgen could avail itself of any judicial remedy to uphold and enforce its patent rights.

As Roche informed the Court last week, it already has filed its BLA for approval to market and sell PEG-EPO in the U.S.[2] Roche's filing constitutes its representation to the FDA that it has completed sufficient clinical testing and analysis of its PEG-EPO product to obtain FDA approval to market and sell the product. Under these circumstances, Roche's infringement is sufficiently certain and imminent to warrant declaratory adjudication.

In deciding whether to exercise the subject matter jurisdiction conferred by the Declaratory Judgment Act, the Court should consider: (1) whether the defendant is making meaningful preparations to infringe; and (2) whether the defendant has refused to change course in the face of acts by the patentee sufficient to create a reasonable apprehension of suit.[3] On both counts, the answer is "yes." Roche's BLA filing reflects Roche's belief that its PEG-EPO product is safe, efficacious, and ready for commercial approval. Roche's regulatory filing further demonstrates Roche's belief that no further alterations or modifications to the product or its process of manufacture will be required to obtain regulatory approval. Roche's filing also

---

[2] Suh Suppl. Decl. Ex. A. Amgen's original Complaint predicted Roche's recent BLA filing. Complaint ¶¶ 27-28. To formally allege this fact, confirming Roche's intent to proceed with commercialization of pegylated EPO, Amgen files herewith its Amended Complaint. Amended Complaint ¶ 27.

[3] *Glaxo,* 110 F.3d at 1571.

demonstrates that Roche itself is entering the final stages of its preparations to commercialize and sell PEG-EPO in the U.S., presumably within the next twelve months.

While Roche suggests that the average time to approval can run 22 to 25 months from filing, the facts applicable to Roche's filing demonstrate that the likely time to approval is more likely 10 months from filing. That is why Roche has already devoted significant resources to preparing to market pegylated EPO, including hiring a sales and marketing team and engaging marketing consultants, and why Roche refuses to change course despite repeated warnings from Amgen.

Because the undisputed facts plainly establish this Court's subject matter jurisdiction, the only remaining question is whether the Court should exercise its discretion to accept that jurisdiction. Roche contends that doing so will undermine the purpose of § 271(e)(1) to shield on-going clinical and development activities from infringement liability. But this action is not aimed at Roche's clinical development activities — it is aimed at the imminent threat of infringement *after* PEG-EPO is approved for commercial sale and use in the U.S.

Roche tells this Court that dismissal is warranted because the litigation will be distracting and costly. But Roche tells its investors that it *"does not view the patent infringement litigation initiated by Amgen in the US as an impediment to the development and launch of CERA* in the United States."[4]  Roche also criticizes the timing and venue of this suit. Amgen's timing reflects

---

[4] Gottfried Decl. Ex. 1 at 29. A motion to dismiss under Rule 12(b)(1) or 12(b)(6) is decided on the four corners of the complaint. But where, as here, the defendant challenges the factual allegations of the complaint or comes forward with evidence, facts outside the four corners of the complaint may be considered. *Valentin v. Hospital Bella Vista*, 254 F.3d 358, 362-63 (1st Cir. 2001); *Toxgon Corp. v. BNFL, Inc.*, 312 F.3d 1379, 1382-83 (Fed. Cir. 2002). Even if constrained by the four corners of Amgen's Complaint, the factual allegations therein establish *prima facie* jurisdiction.

nothing more than its well-founded concern over Roche's impending market entry and Roche does not contest that the venue requirements are met in this district.

By delaying judicial recourse until regulatory approval is achieved, Roche hopes to transform the limited defense provided under § 271(e)(1) into an extended opportunity to infringe Amgen's patents until well after regulatory approval is achieved. But the statute was not intended to deprive patentees like Amgen of the opportunity to assert their patent rights before irreparable harm is done. Nor was it intended to deprive the courts of the power and means necessary to prevent irreparable harm before it occurs, or to remedy infringement as soon as it occurs. The Court should exercise its jurisdiction to provide prompt, full, and fair adjudication of this dispute sufficiently in advance of any regulatory decision to preserve its ability to effectuate whatever remedy may prove to be warranted under the circumstances.

## II.    BACKGROUND

### A.    AMGEN'S PATENTED INVENTIONS AND ROCHE'S INFRINGEMENT

Following decades of failures by others, Amgen's Dr. Fu-Kuen Lin developed the first therapeutically effective human erythropoietin ("EPO") composition, the first vertebrate cells capable of producing EPO in abundance in culture, and the first useful processes for producing EPO. Dr. Lin's inventions revolutionized the treatment of anemic patients, dramatically improving the quality of life for millions of people around the world.[5] Amgen successfully commercialized these inventions in the U.S. through its EPOGEN® product. Recognizing the pioneering nature of Lin's inventions, this Court and others have repeatedly upheld and enforced

---

[5] *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 126 F. Supp. 2d 69, 116 (D. Mass. 2001) *aff'd in part and vacated in part*, 314 F.3d 1313 (Fed. Cir. 2003); *see, e.g.*, Gottfried Decl. Ex. 2 at 20; Gottfried Decl. Ex. 3 at 60 ("In 1985, the cloning of the human gene for EPO was achieved by Lin *et al.* Production of recombinant human EPO (rhEPO) followed and, soon after, the efficacy of rhEPO treatment in dialysis patients was first demonstrated in clinical trials. Since then, rhEPO has become an integral part in the treatment of patients with CRF.")

the Lin patents against a variety of would-be infringers, including Roche's licensor, Genetics

Institute ("GI").[6]

Scientific publications and Roche's investor communications state plainly that Roche's

accused product is nothing more than GI's form of recombinant human erythropoietin, called

"epoetin beta," bound to a single PEG molecule:

> A pegylated version (i.e. the covalent addition of the water soluble
> polyethylene glycol moiety) of epoetin beta, Ro 50-3821, has been
> recently synthesized and is under evaluation in a phase II clinical
> trial. Its aminoacid [sic] sequence is identical to EPO.[7]

This was confirmed in news reports last week:

> Roche describes its drug as a manmade molecule of glycosylated
> erythropoietin, chemically modified by a specific long linear chain
> of polyethylene glycol.[8]

Because PEG, by itself, is an inert polymer, the only active ingredient in Roche's

pegylated EPO is Lin's recombinant human erythropoietin.[9]  This EPO consists of the entire,

intact amino acid sequence disclosed and claimed by Dr. Lin.  Roche produces that active

ingredient in Germany using Dr. Lin's claimed cells and EPO production processes.  Roche's

---

[6] See Amgen Inc. v. Chugai Pharma. Co., 13 U.S.P.Q.2d 1737 (D. Mass. 1989) aff'd in part and vacated in part, 927 F.2d 1200 (Fed. Cir. 1991); Amgen Inc. v. Chugai Pharma. Co., 927 F.2d 1200 (Fed. Cir. 1991); Amgen, 126 F. Supp. 2d at 116; Amgen Inc. v. Hoechst Marion Roussel, Inc., 314 F.3d 1313, 1321 (Fed. Cir. 2003); Amgen Inc. v. Hoechst Marion Roussel, Inc., 339 F. Supp. 2d 202, 325-36 (D. Mass. 2004).

[7] Gottfried Decl. Ex. 4 at 464 ("Ro 50-3821" is another Roche designation for the PEG-EPO product it now calls "CERA."); Gottfried Decl. Ex. 5 at 6 (Roche's representative Dr. Iain McDougall during Roche's November 17, 2003 Investor Conference Call: "There are no differences in the amino acid structure . . . ."); Gottfried Decl. Ex. 3 at 64 ("In rats with CRF, Ro 50-3821, rhEPO conjugated with a single PEG molecule, is capable of correcting anemia. It increases crucial parameters such as hemoglobin levels, erythrocyte and reticulocyte count, and hematocrit to acceptable levels.").

[8] Gottfried Decl. Ex. 6 at 1.

[9] As Dr. Iain McDougall explained at Roche's November 17, 2003 Investor Conference Call, "[o]n the left there you see CERA which is a much, much larger molecule, with a huge big polymer molecule chain to the left-hand side but yet retaining the receptor-binding component of the molecule obviously in order to stimulate [erythropoiesis] . . . ." Gottfried Decl. Ex. 5 at 2.

attachment of an inert PEG polymer to Lin's recombinant human erythropoietin hardly gives rise to a fundamentally new and different EPO molecule.

As Roche has conceded, its pegylated human recombinant EPO possesses the *in vivo* biological activity of increasing of reticulocytes and red blood cells of Lin's claimed EPO compositions.[10] It also satisfies every other limitation of Lin's claimed inventions.[11]

**B.    ROCHE HAS MADE MEANINGFUL PREPARATIONS TO MARKET PEGYLATED EPO IN THE FACE OF ITS KNOWLEDGE OF THE LIN CLAIMS AND AMGEN'S THREAT TO SUE**

**1.    Roche Has Continued To Systematically Meet Regulatory Requirements To Commercialize Pegylated EPO**

Roche has now filed for regulatory approval to import and sell pegylated EPO in the United States.[12]   Contrary to Roche's suggestion, that filing has now triggered a regulatory process that could culminate in a decision by the FDA anywhere from 10 to 13 months after April 19, 2006, the date on which Roche filed its BLA.   The steps Roche took in preparation of its April 19th filing are detailed in the declaration of Roche's Medical Director, Dr. Iris Kingma-Johnson.[13]   Notably, Dr. Kingma-Johnson does not report any material changes to PEG-EPO's composition or manufacturing process during the six years of clinical trials.

**2.    Roche Is Also Making Meaningful Commercial Preparations To Infringe Lin's Patents**

Roche has made meaningful preparations to market and sell pegylated EPO by:[14]

---

[10] Br. at 4; Gottfried Decl. Ex. 7 at 436.

[11] It is this product that Roche asserts is superior.  Br. at 4-5; Suh Suppl. Decl. Ex. A.  But this very assertion impeaches Roche's contention that there is a reasonable likelihood that the FDA may refuse to approve or require changes to this product.

[12] Suh Suppl. Decl. Ex. A.  *Pharmachemie B.V. v. Pharmacia S.p.A.*, 934 F. Supp. 484, 489 (D. Mass. 1996) ("When a plaintiff files an Amended Complaint, the date of that second filing becomes the controlling date for determining subject mater jurisdiction.").

[13] Kingma-Johnson Decl. ¶¶ 7-11.

[14] *See* Complaint ¶ 28.  Roche does not dispute the validity of these factual allegations, it just argues that these activities also support its BLA filing.  Br. at 14-15.

- Hiring management, support, and sales personnel to market and sell PEG-EPO;[15]

- Contacting potential customers to solicit interest in PEG-EPO;[16]

- Hosting a global anemia expert meeting for 800 nephrologists;[17] and

- Completing construction of a new facility in Penzberg, Germany to manufacture PEG-EPO.[18]

In short, Roche is in "full launch mode."[19]

### 3.     Roche Intends To Commercialize Pegylated EPO Even In The Face Of Amgen's Statements That A Suit Would Be Forthcoming

Notwithstanding Amgen's repeated warnings that it will enforce its patent rights against Roche's infringing product, Roche has persisted in pursuing regulatory approval to import and sell pegylated EPO in the U.S., and in seeding the market for an early commercial launch of pegylated EPO.[20]

In 2003, Amgen's CEO and CFO publicly stated that Amgen intends to enforce its patents against pegylated EPO:

Q:     "Did I hear you correctly that Roche's SERRA [sic.] compound may infringe on your issued patent?"  (Joel Sendek)

A:     "We're quite certain it does."  (Amgen's Response)[21]

* * *

"We are confident in our patents.  We'll defend them vigorously . . . As we wrap up TKT, we'll get ready for these guys, if that's what it takes. . . ."[22]

---

[15] *See also,* Gottfried Decl. Exs. 8-10.

[16] *See* Br. at 15.

[17] Gottfried Decl. Ex. 11.

[18] *See* Br. at 15-16.

[19] Gottfried Decl. Exs. 12, 13.

[20] *See* Complaint ¶ 30; Amended Complaint ¶¶ 27-31.

[21] Gottfried Decl. Ex. 14 at 12.

[22] Gottfried Decl. Ex. 14 at 6.

Refusing to change course, Roche proceeded with Phase III Clinical Trials in March 2004.[23]  Shortly thereafter, in early 2004, Amgen again indicated its intent to defend the Lin patents against Roche's pegylated EPO:

> "We've defended our patents before, and I'm sure that CERA won't be the last, and we're confident we've got the right patent [e]state but I'm sure that eventually we'll have to probably defend it again and we sure as heck will very vigorously, and I can just look at the track record we have for some confidence for the future."[24]

And, in November 2005, Amgen filed this lawsuit.

The biotechnology industry has been bracing for this suit for years.  Analysts have been reporting on this expected "battle royale" since at least 2003.[25]  Even Roche's Pharmaceuticals Head stated, as early as 2003, that Roche "should expect [Amgen] will take us to court."[26] Nevertheless, Roche has refused to change course and, by all accounts, is poised to market and sell pegylated EPO immediately upon approval.[27]

### C.    FDA'S POLICIES AND PRACTICES DO NOT SUGGEST A PROTRACTED APPROVAL FOR ROCHE'S PENDING APPLICATION

Filing a BLA for a new product is the culmination of years of research and development and is the basis for the FDA allowing the drug to be marketed.[28]  Such a filing signifies that the sponsor believes the subject therapeutic is finalized and ready to be considered for marketing.[29] Having filed its BLA, Roche is essentially representing to the FDA that it believes its pegylated

---

[23] Kingma-Johnson Decl. ¶ 30.
[24] Gottfried Decl. Ex. 15 at 6.
[25] *Id.* at Exs. 16-18.
[26] Gottfried Decl. Ex. 19.
[27] *Id.* at Exs. 1, 12 ,20.
[28] Goldman Decl. ¶ 18 n.9.
[29] *See id.*

product is safe and efficacious to treat humans, and that its manufacturing process and product's characteristics are ready to be inspected by the FDA and finalized for marketing.[30]

The likely period for FDA review and decision of Roche's pending application is more likely 10 to 13 months, not the 22 to 25 months depicted by Roche. The two-year estimate offered by Roche is based on an average of all applications for approval, including previously rejected applications and those filed on behalf of companies who have never previously produced or sold a licensed biologic.[31] Since old or refiled BLAs have significantly longer approval times than new BLAs, Roche's data do not accurately reflect current approval rates for new BLAs.[32]

Roche also ignores the fact that the FDA is meeting its performance goals, resulting in faster approval times.[33] The FDA's Prescription Drug User Fee Act ("PDUFA") performance goals require the FDA to review and act on 90% of all "Standard" new drug applications (including BLAs) in 10 months and 90% of all "Priority" new drug applications in six months.[34] The FDA's first action on a newly filed application can include approval, the issuance of an "approvable" letter, or a denial of the application.[35] Recent FDA statistics show that the FDA has met its performance goals 100% of the time for Priority and Standard applications.[36] For Standard applications 90% of the new applications filed were approved or designated as

---

[30] *Id.*

[31] *See* Br. 1, 7; Goldman Decl. ¶ 10.

[32] Goldman Decl. ¶ 13, Ex. 3;

[33] Goldman Decl. ¶ 11, Ex. 2; Suh Decl. Exs. 2-6.

[34] *Id.*

[35] *Id.* ¶ 12.

[36] Goldman Decl. ¶ 11, Ex. 2.

approvable and only 10% either "not approvable" or "withdrawn."[37]  Moreover, the median time

to approval for new Standard applications (as compared to all applications) is 13.8 months.[38]

Further, Roche's sophistication suggests that it will enjoy a relatively fast rate of

approval.[39]  Companies having established, experienced regulatory departments are more likely

to submit a complete BLA application to the FDA in the first instance than companies that do not

have regulatory experience.[40]  Other things being equal, more experienced companies like Roche

enjoy a higher and faster rate of approval on their BLA.[41]

Furthermore, where the FDA is experienced with the disease state addressed by the BLA,

as is the case here, it is more likely that an application will be complete and reviewed more

quickly.[42]  Indeed, the FDA and the sponsor understand the clinical end points that must be met,

the requisite showing to support product approval, and likely have appropriately designed the

clinical trials to meet these clinical end points.[43]

This litigation should not prevent approval of Roche's BLA if it is treated as a Standard

application.[44]  Given recent FDA data for new BLA applications, Roche's sophistication in

regulatory matters, Roche's and FDA's experience with EPO for the treatment of chronic kidney

disease, Roche thus could obtain approval as early as February 2007 if granted Standard review

status and possibly earlier if treated as a Priority application.[45]

---

[37] *Id.* ¶ 12.
[38] *Id.* ¶ 13.
[39] *Id.* ¶ 16.
[40] *Id.*
[41] *Id.* Ex. 4 at iii, 10.
[42] *Id.* ¶17.
[43] *Id.* ¶ 17.
[44] *Id.* ¶ 20.
[45] *Id.* ¶¶ 12, 18.

## III.  THE COURT HAS AND SHOULD EXERCISE ITS SUBJECT MATTER JURISDICTION OVER THIS CASE

### A.  THE FACTS ESTABLISH DECLARATORY RELIEF JURISDICTION OVER ROCHE

#### 1.  Legal Standard

Under the Declaratory Judgment Act, a patentee is entitled to early and definitive resolution of infringement of its property rights. The Act was intended to provide relief to entities at a legal risk from an unresolved dispute to obtain immediate judicial resolution of that dispute, especially when the other party wishes to delay the litigation.[46] When this objective is served, dismissal is rarely proper.[47]

In *Lang v. Pacific Marine Supply*, the Federal Circuit articulated a two-prong test to meet the case or controversy requirement for declaratory judgment against a patentee for alleged future infringement.[48] The patentee must show that:

> (1) the defendant must be engaged in activity directed toward . . . an infringement charge . . . or be making meaningful preparation for such activity; and (2) acts of defendant must indicate a refusal to change the course of its actions in the face of acts by the patentee sufficient to create a reasonable apprehension that a suit will be forthcoming.[49]

Amgen's original and amended complaints meet the *Lang* prongs.

---

[46] *BP Chems. v. Union Carbide Corp.*, 4 F.3d 975, 977 (Fed. Cir. 1993) ("The purpose of the Act is to enable a person who is reasonably at legal risk because of an unresolved dispute, to obtain judicial resolution of that dispute without having to await the commencement of legal action by the other side. It accommodates the practical situation wherein the interests of one side to the dispute may be served by delay in taking legal action.").

[47] *Capo, Inc. v. Dioptics Med. Prods.*, 387 F.3d 1352, 1355 (Fed. Cir. 2004) ("The court must determine whether hearing the case would 'serve the objectives for which the Declaratory Judgment Act was created.' However, when these objectives are served, dismissal is rarely proper, as illustrated in those circumstances in which dismissal was sustained") (internal citation omitted).

[48] *See Lang v. Pacific Marine & Supply Co.*, 895 F.2d 761, 764 (Fed. Cir. 1990). Tellingly, Roche fails to apply the *Lang* test and instead argues in generalities that this controversy is not sufficiently imminent and real. *See* Br. at 12.

[49] *Id.* at 764.

2.    **Roche's Activities Constitute Meaningful Preparation For Infringement Of The Patents-In-Suit**

Roche argues that its "hypothetical future actions" cannot support jurisdiction.[50] Not so. Roche's argument is founded on the premise that its activities allegedly are either non-infringing or fall under the Section 271(e)(1) exemption.[51] Even if that were true, those activities show meaningful preparation for infringement in this suit directed to acts of infringement *after* expiration of the safe harbor.[52] As the Federal Circuit stated in *Glaxo v. Novopharm*, considering arguments similar to those Roche advances here:

> The protected status of Novopharm's activities leading to its submissions to the FDA does not by itself prevent the district court from considering Glaxo's request for declaratory relief because such relief is directed to the time after the ANDA is approved, when §271(e)(1) no longer provides a shelter against infringement liability.[53]

In *Glaxo,* the declaratory relief action was filed in July 1994 following Novopharm's April 1994 filing of an Abbreviated New Drug Application. The suit was aimed at Novopharm's infringement of manufacturing and process patents based on its intended sale of the pharmaceutical 18 months after approval.[54] The Federal Circuit found that Novopharm's threat "was not years away," that "Novopharm was systematically attempting to meet the applicable

---

[50] Br. at 12.

[51] *Id.*

[52] The safe harbor was enacted as part of a statutory scheme that contemplates infringement lawsuits before product approval. *Glaxo, Inc. v. Novopharm, Ltd.*, 110 F.3d 1562, 1568-69 (Fed Cir. 1997). Litigation of this dispute while the exemption is in effect does not destroy the benefit Section 271(e)(1) because (1) the accused infringer is never liable for its exempted activities; and (2) patentee cannot enjoin the accused infringer from its exempted activities.

[53] *Glaxo*, 110 F.3d at 1571.

[54] *Glaxo* arose in the context of an ANDA, not a BLA filing. This is not a material difference because at issue in *Glaxo* were manufacturing patents not implicated under Section 271(e)(2).

regulatory requirements while preparing to import its product," and upheld the district court's determination of declaratory relief jurisdiction.[55]

Like *Glaxo*, this Court's application of *Lang* in *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, shows that subject matter jurisdiction exists here. Due to defendant HMR/TKT's intent and capacity to market the accused product upon FDA approval, its future infringement was found to be sufficiently imminent and real for purposes of declaratory relief jurisdiction under *Lang* even though clinical trials had not yet begun and approval was years away.[56]

Here, Roche is making meaningful preparations – it has now filed its application for regulatory approval and is also preparing to launch by hiring key management, support and sales personnel, and building a commercial manufacturing facility.[57] Roche's undisputed actions show that it is "systematically attempting to meet applicable regulatory requirements" in preparation for importation and sale of pegylated EPO in the United States, thus satisfying the first prong of *Lang*.

Instead of analyzing the relevant facts in the context of the legal framework set forth in *Lang*, Roche relies on *Telectronics* to posit that its actual infringement is too remote and uncertain for purposes of declaratory relief jurisdiction.[58] Roche's reliance on *Telectronics* is misplaced.[59] There, regulatory approval was years away and there were meaningful prospects for significant change to the experimental device. That is not the case here: Roche has filed its

---

[55] *Id.*

[56] *Amgen Inc. v. Hoecsht Marion Roussel, Inc.*, 3 F. Supp. 2d 104, 112 (D. Mass. 1998).

[57] Complaint ¶ 28; Amended Complaint ¶ 29.

[58] Br. at 13. This argument goes to imminence, which is determined by application of the first *Lang* prong. *Telectronics Pacing Sys., Inc. v. Ventritex, Inc.*, 982 F.2d 1520, 1527 (Fed. Cir. 1992).

[59] *Abbott Laboratories v. Zenith Laboratories, Inc.*, 934 F. Supp. 925 (N.D. Ill. 1995), on which Roche relies, is similarly unavailing. In *Abbott*, unlike here, there were not sufficient facts to show that the defendant planned to enter the market with the accused drug. 934 F. Supp. at 938.

- 13 -

BLA describing in detail the final product for which it seeks authorization to market. Moreover, *Glaxo* distinguished *Telectronics*, noting that there, infringement was years away. Even the *Telectronics* court explicitly acknowledged that a declaratory judgment suit for future infringement was not precluded.[60]

Roche's speculations about the delays it could encounter during the approval process due to product changes do not defeat the showing here. As a practical matter, there is no likelihood of any change to the EPO in pegylated EPO during the regulatory process. Roche advances no evidence that the FDA will fundamentally alter pegylated EPO to strip out the patented EPO or require new cell lines and processes to manufacture it. Roche's speculations of what the FDA might do are insufficient to defeat jurisdiction.[61]

Furthermore, Roche's insistence that approval will take 22 to 25 months is highly misleading. Roche's figures rely on average approval times for new, old and refiled applications. That is not the appropriate data set here. New applications are typically approved in the first cycle of review.[62] Under FDA guidelines, the FDA must act on Roche's BLA within 10 months of filing.[63] Recent statistics show that the FDA has met its goal of completing first cycle of review for all new applications, regardless of priority status.[64] Moreover, larger, experienced pharmaceutical companies like Roche enjoy faster and more likely approvals than less experienced applicants.[65] Thus, if pegylated EPO is granted Standard review status,

---

[60] *Telectronics,* 982 F.2d at 1527.

[61] *See Lang*, 895 F.2d at 764 ("A concern that the alleged future infringer might alter its course of conduct or discontinue it altogether should not cause a dismissal any more than it should in a suit by the accused infringer.")

[62] Goldman Decl. ¶ 16; Ex. 4.

[63] Goldman Decl. ¶ 18; Ex. 1.

[64] Goldman Decl. ¶ 16.

[65] *Id.*

approval could possibly occur in 10 to 13 months if not sooner.[66]  If this case is not allowed to proceed now, there is little likelihood that Amgen could obtain adjudication of its infringement claims before market entry absent entry.[67]

Roche's authority, inapposite approval data and speculation about the FDA's response to its BLA are insufficient to defeat the showing of meaningful preparation here.

> **3.    The Controversy Between Defendants And Plaintiff Is Definite And Concrete And Roche Has Refused To Halt Its Commercialization Course**

Roche has refused to change course, rendering the controversy definite and concrete under the second prong of *Lang.*[68]  Amgen repeatedly warned Roche it would assert the Lin patents against pegylated EPO.[69]  Even in the face of this suit, Roche has continued forward with its commercialization efforts.

> **B.    BECAUSE ROCHE HAS REPRESENTED TO THE FDA THAT ITS PEGYLATED EPO PRODUCT IS SAFE, EFFICACIOUS, AND READY FOR APPROVAL, THIS COURT SHOULD EXERCISE ITS DISCRETION TO HEAR AMGEN'S DECLARATORY JUDGMENT ACTION NOW**

Amgen's right to obtain relief before Roche receives FDA approval and begins to market pegylated EPO is fundamental to Amgen's granted patent rights.  This Court recognizes the importance of having a patentee's rights settled authoritatively at the earliest stage.[70]  Amgen

---

[66] *Id.*

[67] Subsequent to filing this suit, in view of Roche's threat to Amgen's patent rights, Amgen filed a complaint with the International Trade Commission seeking an exclusion order against Roche's importation of pegylated EPO.  The Commission has not indicated whether it will institute an action against Roche on Amgen's Complaint.

[68] *See Lang*, 895 F.2d at 764.

[69] *See supra* Section II.B.2.

[70] *Amgen*, 3 F. Supp. 2d at 113 ("[T]his Court recognizes the importance of Amgen's desire to have the infringement question settled authoritatively at the earliest stage.")

will be without an adequate remedy and irreparably harmed unless the Court hears this dispute now.[71]

Citing both the *Intermedics* decision and this Court's 1998 *Amgen v. HMR/TKT* decision, Roche argues that declaratory relief jurisdiction is inconsistent with the policy embodied in § 271(e)(1).[72] But this declaratory relief action is not directed at activities falling within the 271(e)(1) exemption. Nevertheless, Roche asks the Court to decline to hear this case. The public policy underlying the 271(e)(1) safe harbor does not require the Court to wait for FDA approval of pegylated EPO in derogation of Amgen's patent rights.[73]

In enacting the 271(e)(1) exemption Congress struck a balance between the right of patentees to enjoy the full benefit of their patent estate and the right of second-comers to enter the market once the patentees' rights are exhausted.[74] Section 271(e)(1) was not intended to limit the patentee's ability to enjoy its patent rights. In the case of biologics, declaratory judgment is therefore the appropriate means to protect the full scope of the patentee's property rights.

Recognizing this, the Court has acknowledged that "[t]here may be, in addition, events prior to FDA approval that would constitute good cause" to proceed with a declaratory judgment claim like the one at issue here.[75] Moreover, the Federal Circuit in *Glaxo v. Novopharm*

---

[71] *Hybritech, Inc. v. Abbott Labs.*, 849 F.2d 1446, 1456-57 (Fed. Cir. 1988) ("It is well-settled that, because the principal value of a patent is its statutory right to exclude, the nature of the patent grant weighs against holding that monetary damages will always suffice to make the patentee whole. The patent statute provides injunctive relief to preserve the legal interests of the parties against future infringement which may have market effects never fully compensable in money."); *see also Polymer Techs. v. Bridwell*, 103 F.3d 970, 975 (Fed. Cir. 1996).

[72] Br. at 17-18.

[73] *Glaxo*, 110 F.3d at 1571 (Fed. Cir. 1997).

[74] *Eli Lilly & Co. v Medtronic, Inc.*, 496 U.S. 661, 669 (1990).

[75] *Amgen*, 3 F. Supp. 2d at 113.

explicitly approved of the exercise of discretion to hear a declaratory relief action before regulatory approval.[76]

Roche asserts that the Court's discretion should be exercised in favor of dismissal because of the burdens imposed by this litigation.[77]  Roche's reliance on *Intermedics* for this argument in misplaced.  The *Intermedics* court was focused on the burden of litigation on the defendant, a small start-up.[78]  Roche, on the contrary, is a global pharmaceutical company that has told investors that this litigation will not hamper development or launch of pegylated EPO:

> Roche does not view the patent infringement litigation initiated by
> Amgen in the US as an impediment to the development and launch
> of CERA in the United States.[79]

With the filing of its BLA, Roche's regulatory preparation is essentially complete.  Its argument that it will be distracted from its regulatory preparation by this litigation rings hollow.  Roche cannot credibly argue that this litigation will undermine the policy behind the 271(e)(1) exemption, thereby thwarting it efforts to obtain regulatory approval.

Roche's reliance on this Court's 1998 *HMR/TKT* is similarly misplaced.  In *HMR/TKT*, the Court worried about the risk that HMR/TKT's product might be altered before approval.[80]  Here, Roche has deemed its product sufficiently final to file its BLA.  Roche has an established process for manufacturing recombinant human EPO, a process that uses cells and processes claimed in the patents-in-suit.  Roche has made no showing that its speculated  "significant changes" to "manufacturing processes" are likely or relevant to the infringement of Amgen's

---

[76] *Glaxo,* 110 F.3d at 1571.

[77] Br. at 17-18.

[78] *Intermedics, Inc. v. Ventritex*, Inc. 775 F. Supp. 1269, 1281 (N.D. Cal. 1991).

[79] Gottfried Decl. Ex 1 at 29.

[80] *Amgen,* 3 F. Supp. 2d at 112.

claims. [81]  Equally unlikely is Roche's assertion that revisions to product labels and safety statements, which are negotiated with the FDA during the approval process, will materially impact the timing of or have any bearing on infringement.  Roche's argument that approval at this point is too uncertain to warrant the Court's exercise of jurisdiction over this case is unavailing.

Roche's accusations that Amgen filed its Complaint to "forum shop" betray its intent to delay judicial resolution of this legitimate dispute over Amgen's patent rights.  Amgen simply seeks just, speedy and efficient resolution of this matter. It is axiomatic that duly issued and presumptively valid patents may be lawfully asserted to exclude others from entering the market for a patented product or process.[82] Here, the timing of Amgen's filing reflects nothing more than its well-founded concern – confirmed by the BLA filing last week – regarding Roche's impending market entry.

As plaintiff and patentee, Amgen has every right to choose its forum.  Plaintiffs may file their lawsuits in any district in which the court has jurisdiction and where venue is proper.[83]  The declaratory judgment statute allows "any court of the United States" with jurisdiction to "declare

---

[81] Br. at 6.

[82] *Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1548 (Fed. Cir. 1983) ("Under the statute, 35 U.S.C. § 261, a patent is a form of property right, and the right to exclude recognized in a patent is but the essence of the concept of property."); *Glass Equip. Dev., Inc. v. Besten, Inc.*, 174 F.3d 1337, 1343 (Fed. Cir. 1999) ("A patent owner who brings a lawsuit to enforce the statutory right to exclude others from making, using or selling the claimed invention is exempt from the antitrust laws, even though such a suit may have an anticompetitive effect, unless the infringement defendant 'proves (1) that the asserted patent was obtained through knowing and willful fraud within the meaning of *Walker Process Equipment, Inc. v. Food Machine & Chemical Corp.*, 382 U.S. 172, 177, 86 S. Ct. 347, 15 L. Ed. 2d 247 (1965), or (2) that the infringement suit was a mere sham to cover what is actually no more than an attempt to interfere directly with the business relationships of a competitor.'"(internal citation omitted)).  Roche does not accuse Amgen of *Walker Process* fraud or sham litigation.

[83] *J.J. Reidy & Co. v. Airwater Corp.*, 2005 U.S. Dist. LEXIS 40291 at *22 (D. Mass. 2005) (*quoting Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947) ("[T]he 'plaintiff's choice of forum should rarely be disturbed . . . '") (attached hereto as Appendix A); *see also McCuin v. Texas Power and Light Co.*, 714 F.2d 1255, 1261 (5th Cir. 1983).

the rights and other legal relations of any interested party seeking such declaration."[84]   Having

conceded venue and personal jurisdiction (as to Roche New Jersey) in this District, Roche

confirms that it is a proper forum to resolve this matter.

## IV.   AMGEN'S COMPLAINT STATES A CLAIM UPON WHICH RELIEF CAN BE GRANTED

Roche's argument that Amgen's Complaint fails to state a claim for which relief can be

granted is meritless.[85]   The Complaint (and First Amended Complaint) sounds in declaratory

relief for future infringement.   Thus, Roche's complaints about Amgen's failure to allege actual

infringement and that Roche's activities all fall within protection of the § 271(e)(1) safe harbor

are irrelevant.   Moreover, contrary to Roche's assertion, Amgen has never conceded that Roche's

meaningful preparations to infringe fall within the safe harbor.

Moreover, Roche's activities show an entity "systematically attempting to meet the

applicable regulatory requirements" so that it can commercialize pegylated EPO, subjecting it to

declaratory relief jurisdiction.[86]   There is no doubt that Roche plans to market pegylated EPO at

the earliest opportunity and that it has made meaningful commercial preparations to do so.[87]

These are the types of activities that courts have found to warrant exercise of declaratory relief

jurisdiction.[88]   Roche therefore makes no viable argument that the Complaint should be

dismissed for failure to state a claim under Fed. R. Civ. P. 12(b)(6).

## V.   IN THE ALTERNATIVE, DISCOVERY SHOULD BE GRANTED

In the alternative, if the Court is inclined to consider Roche's motion, the Court should

continue it and grant discovery on:

---

[84] 28 U.S.C. § 2201.

[85] *See* Br. at 9-12.

[86] *See Glaxo*, 110 F.3d at 1571.

[87] Complaint ¶ 28; Amended Complaint ¶ 29; Gottfried Decl. Exs. 12, 13.

[88] *Glaxo,* 110 F.3d at 1571.

- The IND and BLA Roche filed with the FDA;

- Roche's preparations to launch pegylated EPO

- Any communications with the FDA regarding priority status and for timing of approval including but not limited to minutes from the pre-BLA filing meeting; and

- Roche's efforts to solicit interest in pegylated EPO.

The IND and BLA will confirm whether the composition of, and manufacturing processes for, Roche's pegylated EPO have changed during clinical trial, which is relevant to Roche's assertion that the FDA might require future changes to pegylated EPO. The remaining proposed discovery goes to Roche's expectations about  timing to approval and its preparation to import and sell pegylated EPO.

## VI.    CONCLUSION

Amgen respectfully request that this Court deny Roche's motion to dismiss under Rule 12(b)(1) and 12(b)(6).

April 25, 2006

Respectfully Submitted,

AMGEN INC.,
By its attorneys,

/s/ Michael R. Gottfried
D. DENNIS ALLEGRETTI (BBO#545511)
MICHAEL R. GOTTFRIED (BBO#542156)
DUANE MORRIS LLP
470 Atlantic Avenue, Suite 500
Boston, MA 02210
Telephones: (617) 289-9200
Facsimile:   (617) 289-9201

Of Counsel:

STUART L. WATT
WENDY A. WHITEFORD
MONIQUE L. CORDRAY
MARYSUSAN HOWARD
KIMBERLIN MORLEY
DARRELL DOTSON
AMGEN INC.
One Amgen Center Drive
Thousand Oaks, CA 91320-1789
Telephone: (805) 447-5000

LLOYD R. DAY, JR. (*pro hac vice*)
DAVID M. MADRID (*pro hac vice*)
LINDA A. BAXLEY (*pro hac vice*)
DAY CASEBEER MADRID &
BATCHELDER LLP
20300 Stevens Creek Boulevard, Suite 400
Cupertino, CA 95014
Telephone: (408) 873-0110
Facsimile:  (408) 873-0220

WILLIAM G. GAEDE III (*pro hac vice*)
McDERMOTT WILL & EMERY
3150 Porter Drive
Palo Alto, CA 94304
Telephone: (650) 813-5000
Facsimile:  (650) 813-5100

MICHAEL F. BORUN (*pro hac vice*)
KEVIN M. FLOWERS (*pro hac vice*)
MARSHALL, GERSTEIN & BORUN LLP
233 South Wacker Drive
6300 Sears Tower
Chicago IL 60606
Telephone: (312) 474-6300
Facsimile:  (312) 474-0448

## CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on April 25, 2006.

/s/ Michael R. Gottfried