# EXHIBIT C

Dockets.Justia.com

Page 944

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

VOLUME IX

----------------------------------

THE TRUSTEES OF COLUMBIA
UNIVERSITY IN THE CITY OF
NEW YORK,

    Plaintiff

    v.

ROCHE DIAGNOSTICS GmbH,
formerly known as
BOEHRINGER MANNHEIM GmbH,

    Defendant

Civil No. 93-11512-NG

Boston, Massachusetts
July 18, 2001

----------------------------------

TRANSCRIPT OF TRIAL DAY 9
BEFORE HON. NANCY GERTNER,
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:    Rodney E. Gould, Esq.
                      RUBIN HAY & GOULD, P.C.
                      205 Newbury Street
                      P.O. Box 786
                      Framingham, MA  01701

                      John P. White, Esq.
                      Norman H. Zivin, Esq.
                      COOPER & DUNHAM LLP
                      1185 Avenue of the Americas
                      New York, NY  10036

(Continued)

CU 03789

Page 945

1  (Continued)
2  For the Defendant:   Peter F. Felfe, Esq.
                        David Fox, Ph.D., Esq.
3                       John Bauer, Esq.
                        Robert J. Koch, Esq.
4                       James Zubok, Esq.
                        Leon Medzhibovsky, Esq.
5                       FULBRIGHT & JAWORSKI
                        666 Fifth Avenue
6                       New York, NY 10103
7  Court Reporters:     Harold M. Hagopian, RDR, CRR
                        Cheryl B. Palanchian, RMR, CRR
8                       U.S. District Court
                        1 Courthouse Way, Suite 3204
9                       Boston, MA 02210

Proceedings recorded by stenotype with
computer-aided transcription.

Page 946

INDEX
VOLUME IX

WITNESSES FOR THE PLAINTIFF                       Page
ROBERT WEINBERG, RESUMED
  Cross-examination continued by Mr. Bauer         947
  Redirect Examination by Mr. White                964

BRUCE EISEN, RESUMED
  Redirect Examination by Mr. Zivin               1052
  Recross-examination by Mr. Koch                 1071

WITNESSES FOR THE DEFENDANT
TUAN HA-NGOC
  Direct Examination by Mr. Koch                   989
  Cross-examination by Mr. Zivin                  1032
  Redirect Examination by Mr. Koch                1049
  Recross-examination by Mr. Zivin                1051

EXHIBITS

(All agreed upon exhibits were admitted in evidence.)

Deft's Exh. 520, Page 10 of Plf. Exh. 141                        1074
Deft's Exh. 521, Bates number 063687 of Plf. Exh. 161            1074
Deft's Exh. 522, Fig. 7 of PCT application of Genetics           1075
   Institute, Plf's Exhibit 169
Deft's Exh. 523, Bates number 003879 of Plf. Exh. 171            1075
Deft's Exh. 524, hand-drawn figure by Dr. Fritsch                1075
Deft's Exh. 525, hand-drawn figure by Dr. Fritsch                1075

Page 947

PROCEEDINGS
NINTH DAY OF TRIAL
(The following proceedings were held in open court before the Honorable Nancy Gertner, United States District Judge, United States District Court, District of Massachusetts, at the United States Courthouse, 1 Courthouse Way, Boston, Massachusetts, on July 18, 2001, at 9:20 a.m.)
  THE CLERK: All rise.
  THE COURT: You can be seated. Good morning.
  (Replies of "Good morning.")
  Dr. Weinberg.
      ROBERT WEINBERG, RESUMED
      CROSS-EXAMINATION, CONTINUED
BY MR. BAUER:
Q. Good morning, Dr. Weinberg.
A. Good morning, Mr. Bauer.
Q. After your testimony yesterday, did you meet with your attorneys?
A. Actually, I didn't, no.
Q. Now, you testified that the technique of protoplast fusion cannot be used to perform unlinked cotransformation; correct?
A. Unlinked cotransformation as defined by me, but not as defined by this Court.
Q. All right. I'm just -- only asking you on your knowledge, what you consider to be unlinked cotransformation. I'm not

Page 948

asking you to defer to the Court.
  THE COURT: Dr. Weinberg, if you remind me of that one more time, I will recite your testimony.
  Go on.
BY MR. BAUER:
Q. So, you agree that the technique of protoplast fusion cannot be used to perform unlinked cotransformation?
A. Yes.
Q. Okay. When one performs protoplast fusion, one does not insert purified DNA; isn't that correct?
A. That is correct.
Q. Yesterday you testified that Claim 28 of the '216 patent was infringed. Do you remember that?
A. Allow me, please, to refer to it.
  (Pause.)
  Yes.
Q. Now, doesn't the first part of that claim say a process for inserting purified DNA 1?
A. It does, and that would be inconsistent with the process that GI undertook.
Q. So, are you now saying that GI does not infringe Claim 1 -- or Claim 28?
A. Yes. In the sense that they did not use purified DNA, I would agree with what you said.
Q. You made a statement at the Markman hearing, and I just

2 (Pages 945 to 948)

Page 993

1  arrival, for example, Recombinant Factor VIII was licensed on a
2  technology basis to Baxter International, where our role at
3  that time was only to develop the cell line and deliver that to
4  Baxter.
5      Another example prior to my arrival is the -- in this
6  case of erythropoietin, is the arrangement we had with Chugai,
7  where we would be developing the technology in the cell line to
8  develop for Chugai.
9      And, as I say, before that particular compound,
10 erythropoietin, my first task was to search for and enter into
11 an agreement with a European partner to market our product in
12 Europe.
13 Q. So, was it your objective to do the same kind of
14 arrangement with the European partner as you had done with
15 Chugai, as the company had done with Chugai before you arrived
16 there?
17 A. No. The arrangement we would like to enter with the
18 European partner would be on the basis where we would be
19 delivering the bulk product, for them to take that to market --
20 to obtain regulatory approval and to market the product in it's
21 territory.
22 Q. And why was there a difference?
23 A. So that we can retain additional value to the product,
24 commercial value to the product.
25 Q. And where would that value have come from?

Page 994

1 A. From manufacturing.
2 Q. Manufacturing the bulk product?
3 A. That's correct.
4 Q. Did you have any manufacturing rights in the -- was -- did
5 GI retain any manufacturing rights under the Chugai agreement?
6 A. No, it did not.
7 Q. Did GI retain any manufacturing rights under the
8 Boehringer Mannheim agreement?
9 A. Yes, it did.
10 Q. And that was one of the significant differences between
11 the two agreements?
12 A. That's correct.
13 Q. How did that difference impact the GI business plan in
14 terms of the GI business plan?
15 A. That corresponds exactly to our business plan as we moved
16 to our second phase of our strategy, where we would like to
17 retain a higher portion of the commercial value of the product
18 beyond just a royalty on the technology.
19 Q. Okay. And was there a reason why that wasn't the business
20 plan before you arrived?
21     MR. ZIVIN: Objection.
22 BY MR. KOCH:
23 Q. Or was there a reason -- you say when you arrived it was
24 part of your objective to put it into the second phase. Why
25 was that? Why did you want to have a different, a second phase

Page 995

1  to the business plan?
2      THE WITNESS: Your Honor, can I answer?
3      THE COURT: You may answer.
4      THE WITNESS: Okay.
5  A. When I arrived in the spring of 1984, the company really
6  was at that time only about two years in its true operations.
7  It's very hard for a company, in its infancy, to retain more
8  rights than the rights to the technology, the royalty derived
9  from technology.
10     The reason why I joined the company is that the CEO
11 and myself judged that by that time the company has built
12 enough of their platform so that we can -- and technology, so
13 that we can move to the next phase.
14 Q. And why did you want to move to the next phase?
15 A. Again, as you build a company, you want to retain more
16 value than just the royalty base.
17 Q. Okay. Was there further development, a further phase, as
18 well?
19 A. Yes, your right. Beyond the phase II, where we retained
20 manufacturing rights, we would eventually move into our third
21 phase, which is our ultimate goal, where we would retain
22 marketing rights to our product, in which case we would retain
23 the whole commercial value of the product.
24 Q. You keep saying -- you keep mentioning the commercial
25 value. Can you put that in terms of what kind of -- what do

Page 996

1  you mean by that, commercial value? What kind of income does
2  the company get during the various phases, as you've identified
3  them?
4  A. This is nothing secret to Genetics Institute. In the
5  industry, a pure royalty base would be 10% or less; to provide
6  bulk product you'd get another 10 to 20%; and then, if you
7  retain marketing rights, then you keep the rest of it minus
8  your marketing and sales expenses.
9  Q. Okay. Can, then, you also tell me what -- correlate what
10 the abilities of the company of Genetics Institute was at the
11 various stages?
12 A. I said before, during the first phase, where we only
13 licensed technology, we only essentially have scientists
14 involved in discovery. As we move to manufacturing phase, we
15 start building our own manufacturing capacity. And, obviously,
16 as we attain the third phase, we and I put in the place the
17 marketing and sales infrastructure.
18 Q. And the phases that you mentioned, is -- you mentioned
19 different percentages. Are you saying that one phase is more
20 profitable than the other phases?
21 A. Yes. I think that's why we try to build the company, is
22 to move from -- phase III will be more profitable than phase
23 II, and phase II will be more profitable than phase I.
24 Q. Okay. Thank you.
25     Do you have any familiarity with the agreement, the

Page 997

1  1985 agreement between Genetics Institute and Boehringer
2  Mannheim?
3  A. Yes, I do.
4  Q. Can you tell me what parts of that agreement -- the
5  1985, did I say? Can you tell me what parts of that agreement
6  you're aware of? What parts you negotiated, or did you
7  negotiate any parts of that agreement?
8  A. I was the principal negotiator of the whole agreement.
9  Q. And what did you achieve by that agreement, in your own
10 words?
11 A. We achieved what we set out to do, which is, number one,
12 to retain a capable marketing partner for the European
13 territory; number two is to retain a larger share of commercial
14 value by being the bulk manufacturer for our partner; and we
15 got going within the time frame that we set out to do.
16 Q. Okay. And according to that agreement, did GI provide
17 technology to Boehringer Mannheim?
18 A. I would say that the arrangement, the agreement, provides
19 for GI to manufacture the bulk exclusively for a certain period
20 of time, and then, subsequently, to allow Boehringer Mannheim
21 to manufacture a portion of the demand as part of the -- their
22 right to manufacture a portion of the demand, and there was
23 certain manufacturing technology transferred to Boehringer
24 Mannheim.
25 Q. Why was there this change in, at first, GI providing the

Page 998

1  bulk EPO, and then later, Boehringer Mannheim producing it's
2  own?
3  A. It was a concession by Genetics Institute as part of
4  negotiation. We start out in our position to retain 100%
5  manufacturing right all throughout the agreement term.
6  However, Boehringer Mannheim insist that they don't want to be
7  100% dependent on the supplier across the Atlantic. So, they
8  would like to establish local manufacturing. And that's why it
9  moved from 100% exclusive supply position for Genetics
10 Institute into a shared supply situation for Boehringer
11 Mannheim.
12 Q. Did Genetics Institute seek or use the assistance of
13 Boehringer Mannheim to assist it in making the cells for
14 production of commercial quantities of EPO?
15 A. Excuse me, you're talking about making the cells or making
16 the actual product?
17 Q. Well, let's make it two parts; both the cells and the bulk
18 EPO?
19 A. Boehringer Mannheim has no involvement in Genetics
20 Institute making the cell, the cell line that we use to produce
21 the bulk product. Boehringer Mannheim was consulted in terms
22 of the specifications that would be in place in order to
23 produce the bulk product. So, I don't know whether you call
24 that -- I forgot the part of your question.
25 Q. Okay. Well, what do you mean by specifications?

Page 999

1  A. Regulatory specifications. Obviously, we wanted to have
2  our product that we Boehringer Mannheim to be in compliance
3  with the regulatory specifications for its approval in European
4  territory.
5  Q. Okay. Thank you.
6     Mr. Ha-Ngoc, I'd like to focus on the relationship
7  between GI and Boehringer Mannheim regarding EPO. When did you
8  first become involved with the EPO project?
9  A. When I first become involved, that was my first task when
10 I first joined the company in May of 1984.
11 Q. And at that time you had full authority for seeking out a
12 marketing partner in Europe; is that what you've already
13 testified to?
14 A. That's correct.
15 Q. Okay. How did you go about seeking a partner in Europe?
16 A. We were looking at a marketing partner that would have the
17 presence in the marketplace for erythropoietin, which is the
18 dialysis centers, so we looked into companies having direct
19 sales into that particular market sector.
20    In addition, based on my past employer, Baxter, I
21 also have knowledge of who are the thought leaders in the area
22 dialysis. So, I went to meet with certain of them in Europe to
23 ask them who they would consider, from the market standpoint,
24 the people that they respect, in terms of the potential
25 commercial partner.

Page 1000

1  Q. Can you tell me how it came about that you came in contact
2  with Boehringer Mannheim, specifically?
3  A. Yes. Specifically, among the thought leaders that I
4  consulted was Prof. Gurland at the clinic outside of Munich, in
5  Germany, where I discussed erythropoietin and also asked
6  Prof. Gurland who he could recommend as a potential European
7  commercial partner for us.
8  Q. And why did you contact Prof. Gurland?
9  A. He is one of the recognized thought leaders in the field
10 of dialysis in Europe.
11 Q. And then what happened after that?
12 A. I don't remember exactly, but after my visit -- several
13 weeks after my visit I received a letter from the executive in
14 charge of licensing at Boehringer Mannheim that stipulated that
15 pursuant to my discussion with Prof. Gurland they became aware
16 of our interest of searching for a European marketing partner,
17 and would we consider them as a potential candidate.
18 Q. Did -- when -- and then did you consider them as a
19 potential candidate?
20 A. Yes, I did.
21 Q. Were you considering anyone else at that time?
22 A. Yes. We were obviously -- I wanted to make sure that we
23 had the best partner and the best terms, so we entertained
24 simultaneous discussions with other companies in Europe, as
25 well.

15 (Pages 997 to 1000)

Page 1005

1 Boehringer Mannheim, did Boehringer Mannheim want GI to make
2 the bulk EPO?
3 A. No. As I said before, their position at the beginning of
4 the negotiation was that they would rather be the one
5 manufacturing the product in Europe because they have a
6 biological facility in Europe. And our position, as I stated
7 before, was that we are the one who would supply exclusively
8 the bulk EPO to the European marketing partner.
9 Q. Okay. And so -- and that's why you reached the compromise
10 on the plan for delivery of bulk EPO?
11 A. That's correct.
12 Q. And that was done in the 1985 agreement; correct?
13 A. That's correct.
14 Q. Okay. What about technology transfer? Who was to provide
15 the technology, according to that 1985 agreement?
16 A. To the degree that technology is required to be
17 transferred for Boehringer Mannheim to -- to obtain regulatory
18 approval to the product and to be in position to manufacture
19 its share of the demand, GI was responsible for delivering
20 those technologies.
21 Q. And was that set out in the agreement, itself?
22 A. It was spelled out in the 1985 agreement.
23 Q. If you would look at Plaintiff's Exhibit 29?
24 A. Where would I find it?
25 Q. I believe it's in one of the books up there. Let me help

Page 1006

1 you.
2 A. Which --
3 Q. They're numbered. There's a number of books.
4 (Pause.)
5 A. Which number?
6 Q. 29?
7 A. 29. Yes.
8 Q. Can you tell me where that is set forth in the -- in this
9 agreement?
10 A. Where what is set forth?
11 Q. I'm sorry, where the compromise between who was -- or
12 compromise that you had reached with Boehringer Mannheim on
13 supply of bulk EPO?
14 A. Spelled out in Schedule G.
15 Q. Schedule G. Okay. And can you tell me a little bit more
16 about that negotiation and why that served your purpose and how
17 that came about that you agreed to that with Boehringer
18 Mannheim?
19 A. I said before, we start out with retaining -- our desire
20 to retain 100% of the manufacturing right. They would like to
21 also manufacture the product. So that's why the first three
22 years, year 1, 2, 3, GI is to be the sole supplier of the
23 demand, of the requirements. And starting with year 4,
24 Boehringer Mannheim would have the ability to supply, first,
25 15%; and year 5, 35%; and year 6 and thereafter, 50% of the

Page 1007

1 requirements.
2 Q. Now, what was the -- what was Boehringer Mannheim required
3 to do by this agreement, under this agreement? What was their
4 task?
5 A. There task was to conduct clinical trials in Europe, to
6 obtain regulatory approval to market the product, and to market
7 the product.
8 Q. So, was it conceived at this time, at the time of
9 executing the agreement, that they would need a cell line to do
10 that?
11 A. May I complete my answer to the previous question?
12 Q. Sure.
13 A. There is one more thing that they're obligated to perform
14 under this agreement. It's obviously, according to Schedule G,
15 they would start manufacturing a portion of their -- of the
16 requirement, and, therefore, they also need to perform the
17 manufacturing supply of that portion that they had retained the
18 right to.
19 Q. Okay.
20 A. So, could you repeat the question again?
21 Q. So, was it contemplated that they were to receive -- that
22 you were to supply them with the cell line?
23 A. In order for them to be positioned to produce their share
24 of the requirement, yes, they would need a cell line delivered
25 by us to them.

Page 1008

1 Q. Was it also contemplated that you would supply them with
2 bulk EPO?
3 A. Yes.
4 Q. And what was the purpose of that bulk EPO?
5 A. It's to formulate into the final product for marketing.
6 Q. Now, was that to include the clinical studies, as well as
7 the final product?
8 A. That's correct.
9 Q. Is the -- does the agreement speak to the territory of the
10 market you're referring to?
11 A. Yes, it did.
12 Q. And what is that territory?
13 A. If you go to the agreement in Schedule B and C -- in other
14 words, Schedule B and C listed out the territory that they had
15 included in the agreement.
16 Q. Can you be more precise as to the --
17 A. Yes. Schedule B lists out the countries, A, of the
18 territory, which is essentially Europe; countries B, which is
19 essentially Central and South America and Africa; and Schedule
20 C lists out the ComEcon countries, which are the Eastern
21 European countries.
22 Q. Now, who was responsible for selecting these countries?
23 Was that Genetics Institute or Boehringer Mannheim?
24 A. It was a negotiated process.
25 Q. Does that -- did that territory include the United States

17 (Pages 1005 to 1008)

CU 03805

Page 1025

1  order to effectuate unlinked. So if the Court makes the
2  construction that unlinked means going in separately, then
3  under equivalence, there would be none because one couldn't
4  perform that procedure.
5      And the second point is that Dr. Weinberg basically
6  conceded that in terms of whether a gene goes in linked or
7  unlinked, he said that the result may be the same, but he
8  clearly admitted that the means was different.
9      THE COURT: I understand. All I'm saying is that I
10  want to make it clear that that's in play now. That's all.
11      MR. BAUER: Thank you, your Honor.
12      THE COURT: And you can address it. I may wind up
13  where I wound up before. But I promised myself when I put on
14  these robes that I would admit when I goofed. And I'm not sure
15  it's a goof yet, but it seems to me I'm prepared to reconsider
16  it.
17      So proceed with the testimony.
18      MR. BAUER: Thank you, your Honor.
19  BY MR. KOCH:
20  Q. Okay. Mr. Ha-Ngoc, this morning you testified with regard
21  to Paragraph 510 of the DNL agreement of October, that's
22  Plaintiff's Exhibit 29.
23      Would you look at that section again, 510? I think
24  your testimony was -- I just want to clear this up. I think
25  your testimony was it referred to an Amgen patent that was

Page 1026

1  corresponding to a United States patent. But I want to ask
2  you, is it referring to the United States patent or to the
3  European patent?
4  A. It refers to the European patent.
5  Q. Okay. And is that because the territory of the agreement
6  is Europe or that the patent concerned is of the territory of
7  the agreement; is that correct?
8  A. That's correct.
9  Q. Okay. Did you attend meetings or hearings in Europe
10  regarding the Amgen patent issue at any time?
11  A. The hearing with whom?
12  Q. Meetings or conferences or hearings of any kind in Europe
13  regarding the Amgen European patent situation?
14  A. I believe I attended some high-level discussions with
15  regards to the Amgen patent.
16  Q. And was that with regard --
17  A. Or potential patent.
18  Q. Was that with regard to the Amgen European patents?
19  A. With regards to focussed primarily with the European
20  patent applications of Amgen.
21  Q. Okay. Did -- at any of those meetings in Europe, did the
22  subject of the Axel patents come up?
23  A. I don't recall.
24  Q. Okay. Now, were there changes to this 1985 agreement or
25  additions or modifications of that 1985 agreement at any time?

Page 1027

1  A. Subsequent to this agreement we did enter into another
2  agreement which I believe got finalized in 1988. It pertains
3  to various conditions surrounding the supply of erythropoietin
4  by Genetics Institute to Boehringer Mannheim.
5  Q. And why was there a subsequent agreement in 1988?.
6  A. It was contemplated in 1985 that there should be
7  additional agreements to cover the specific aspects of whether
8  it is on the issue of forecasting an order, on the issue of
9  specifications of the bulk compound to be sent to Boehringer
10  Mannheim, and on additional issues that -- that was
11  contemplated in 1985 but we did not have sufficient facts at
12  that time to enter into a more definitive understanding.
13  Q. Like with respect to supply or amounts or anything?
14  A. Amounts, you know, ordering procedures, regulatory
15  specifications. And I believe in '88 we also add on or
16  addressed additional manufacturing capacity, that I alluded to
17  earlier this morning.
18  Q. Was the '88 agreement part of -- did you consider that to
19  come under the 1985 agreement or the umbrella of it?
20  A. The way I viewed it, is the 1985 agreement is a master
21  agreement, and the '88, it just more specific agreement that
22  address aspects that were not fully defined in the '85
23  agreement.
24  Q. Okay. Before we're off of the '85 agreement that you have
25  in front of you, are there any quantity -- supplied quantity

Page 1028

1  requirements in that agreement?
2  A. In the '85 agreement?
3  Q. '85 agreement. In terms of amount.
4  A. I believe in Schedule F, list out the amount of materials
5  to be supplied, different quality of material to be supplied.
6  First a 20 milligram of non-GMP material, and then next 400
7  milligram of GMP material, then it covers the pricing for
8  additional material to be supplied.
9  Q. Okay. And then any additional material was spoken of in
10  for example, in Schedule G in terms of percentages, not
11  amounts; is that correct?
12  A. That's correct.
13  Q. Then in the 1988 agreement, was there any -- did that
14  agreement address amounts with any more specificity?
15  A. I believe so, but I may need to take a look at that.
16  Q. Okay. Let me refer you to Plaintiff's Exhibit 44. It's
17  in the same book you have. If you'd like to refresh your
18  recollection with that.
19  A. Yes. I think that in the 1988 agreement, Section 3
20  spelled out the conditions surrounding the initial order of
21  130 grams, the first 130 grams of bulk material.
22  Q. And does the -- does the Section 3, does that also address
23  the issue of the Amgen European patents once again?
24  A. It would -- again, refers to the Amgen PCT application.
25  Q. Okay. And why does it refer to that in this agreement?

22 (Pages 1025 to 1028)

CU 03810

Page 1041

1 Section 5.10. In fact, this particular provision is not just
2 limited to Amgen, is it?
3 A. You're referring to the Section 5.10?
4 Q. Yes, sir.
5 A. I thought that both the title and the content of this
6 section refers to the Amgen PCT application.
7 Q. But it also refers to, quote, patent positions of third
8 parties, end quote, doesn't it?
9 A. I'm not sure that that has any significance other than the
10 drafting.
11 Q. And it also says, quote, including but not limited to, end
12 quote, does it not?
13 A. Yes, it does.
14 Q. At the time this license agreement was being negotiated in
15 1985, was there any discussion at GI with respect to Columbia's
16 Axel patents?
17     MS. SHANAHAN: Objection.
18     THE COURT: Again, non-attorney-client issues.
19 Internal discussions among executives in the company are not
20 privileged.
21     Go on. You can answer only with respect to
22 discussions not involving attorney advice.
23     THE WITNESS: As I mentioned before, we are ongoing
24 business, senior management had discussions about various
25 technology that we may use from time to time. I cannot recall

Page 1042

1 specifically whether or not Axel patent or any of the specific,
2 technology patent was part of discussion back in 1985.
3 Q. Isn't it true that Genetics Institute also had an
4 agreement with Boehringer Mannheim regarding a serum-free
5 product?
6 A. Yes.
7 Q. And under that agreement, was Genetics Institute going to
8 make the product for Boehringer?
9     MR. BAUER: Objection; it's beyond the direct.
10     THE COURT: No. You may answer.
11     THE WITNESS: I think I have to go back to the
12 agreement to recollect whether there was specific supply
13 section.
14 BY MR. ZIVIN:
15 Q. Let's look at Exhibit P72, if you would.
16     (Witness reviewed document.)
17 A. Looks like this serum-free agreement does not contemplate
18 for GI to supply the serum-free product to Boehringer Mannheim.
19 Q. All right. Was Boehringer Mannheim going to make the
20 product?
21 A. I believe so.
22 Q. And by the time this agreement was signed, and I believe
23 it has a date at the end, signed by you on May 30th, 1991; is
24 that correct?
25 A. May 30th, 1991; yes.

Page 1043

1 Q. Right. By that time, there was already an injunction in
2 place precluding Genetic Institute from making EPO in the
3 United States; was that correct?
4 A. Was that the case? Again, I don't remember exact
5 chronology of the timing, but at one point in time there was an
6 injunction ordered by the Court.
7 Q. And after that injunction issued, did Genetics Institute
8 make any EPO in the United States?
9 A. No, we don't.
10 Q. And after that time, did Genetics Institute ship any EPO
11 out of the United States?
12 A. No.
13 Q. And after that time, was any EPO received by Genetics
14 Institute from Boehringer Mannheim?
15 A. I don't recollect whether such event exist.
16 Q. In the period shortly before this injunction issued, which
17 I believe was in 1991, did Genetics Institute try very hard to
18 ship as much EPO as possible to Boehringer Mannheim, bulk EPO?
19 A. In the period preceding?
20 Q. Yes?
21 A. -- the injunction?
22 Q. Yes.
23 A. We were wrapping up our manufacturing capacity and tried
24 to produce as much as we can, that's our source of revenue;
25 yes.

Page 1044

1 Q. Right. So you -- is it fair to say that in the period
2 shortly before the entry of that injunction in 1991, that
3 Genetics Institute shipped about three years' worth of bulk EPO
4 to Boehringer Mannheim?
5 A. Uhm, I don't remember the specifics, whether it's three
6 years or whether -- whatever it is the requirement of the order
7 that we receive Boehringer Mannheim.
8 Q. Did there come a time when the agreement between Genetics
9 Institute and Boehringer Mannheim was modified so as to provide
10 that Boehringer Mannheim would have the rights to sell EPO in
11 the United States?
12 A. I don't remember specifically, but I do recall discussions
13 about Boehringer Mannheim exploring whether or not it would be
14 legally feasible for Boehringer Mannheim to sell erythropoietin
15 in market -- in United States market.
16 Q. Why don't you look at Exhibit 93, sir, P93. And is that
17 an agreement that you signed on October 22, 1996?
18 A. October 1996, yes.
19 Q. And is that an agreement whereby you gave Boehringer
20 Mannheim the right to sell EPO in the United States?
21 A. I need to reread, I don't recall specifically. But let
22 me --
23 Q. Why don't you look at the bottom of page 4.
24 A. Okay. Yes, this say United States. Yes.
25 Q. Did Boehringer Mannheim and Genetics Institute have a

CU 03814

Page 1045

1 worldwide patent strategy?
2 A. I think we have -- I think we have discussions with
3 Boehringer Mannheim about -- about both companies' positions
4 vis-a-vis Amgen's patent in the territory that Boehringer
5 Mannheim is interested in; yes.
6 Q. Did your worldwide patent strategy discussions concern
7 Columbia's patents?
8    MS. SHANAHAN: Objection.
9    MR. ZIVIN: This is a conversation between two
10 different companies.
11   THE COURT: Overruled.
12   THE WITNESS: It may or may not have been the part I
13 was involved with directly. I can speak to I was focussing
14 mostly on the -- primarily on the Amgen patent aspects.
15 BY MR. ZIVIN:
16 Q. Well, are you aware of what the discussions were between
17 the two companies?
18 A. On the specific subject, I'm not -- I don't remember
19 whether there was any specific discussion or not.
20 Q. You are aware that Genetics Institute took a license from
21 Columbia; is that correct?
22 A. Yes. I believe I was informed by our chief patent counsel
23 that we did enter into that agreement. I don't recall the
24 date, however.
25 Q. And were you aware that that license agreement excluded

Page 1046

1 EPO?
2 A. Again, I don't remember the specifics of it. It may or
3 may not, I don't -- I don't remember.
4 Q. Are you aware that American Home Products was also a
5 licensee of Columbia under the Axel patents?
6 A. Were they? I don't know.
7 Q. Do you know whether American Home Products paid any
8 royalties to Columbia under the Axel patents?
9 A. I'm not aware.
10 Q. Were you aware of whether Genetics Institute paid
11 royalties to Columbia under the Axel patents?
12 A. I don't remember the specific arrangement that Genetics
13 Institute had with University of Columbia. Again, all those
14 matters are handled by appropriate department in our company
15 and mostly stay below my radar screen.
16 Q. Were you aware, was it a total of $23 million that
17 Genetics Institute --
18   THE COURT: If he's not aware of any of this, he
19 wouldn't be aware of a particular number. Go on, Mr. Zivin.
20 BY MR. ZIVIN:
21 Q. Were you aware that pursuant to the development and
22 license agreement, Genetics Institute sent the master cell bank
23 to Boehringer Mannheim?
24 A. I don't remember specifically whether we sent the master
25 cell bank or master working cell bank. Those are technical

Page 1047

1 details that I don't pay attention to.
2    THE COURT: As to which there's already been
3 testimony. Go on, Mr. Zivin.
4    MR. ZIVIN: That's the predicate for my next
5 question.
6 BY MR. ZIVIN:
7 Q. But you're aware that at least something, either master
8 cell bank or master working cell bank, was sent; is that
9 correct?
10 A. That's correct.
11 Q. And were you aware that after you sent that, either that
12 master cell bank or that master working cell bank, to
13 Boehringer Mannheim, that your company was going to receive
14 additional payments from Boehringer Mannheim for the use of
15 those cell banks or working cell banks; is that correct?
16 A. I don't remember specifically, but if that is in a part of
17 the agreement, that would have triggered that. But I don't
18 remember exactly whether that was any benchmark of the license.
19 Q. Well, did you anticipate -- did you anticipate, sir, that
20 Genetics Institute would receive substantial amounts of money
21 from Boehringer Mannheim after they met the benchmarks of that
22 development and license agreement?
23 A. Was that a benchmark of the license and development
24 agreement?
25 Q. Wasn't it? Do you want to look at it? It's Exhibit 29.

Page 1048

1    THE COURT: Isn't it matter of record whether or not
2 GI received substantial amounts of money from BMG?
3    MR. ZIVIN: I'm asking whether he anticipated
4 receiving it.
5    THE COURT: What --
6    MR. ZIVIN: Because I think that falls under the case
7 law.
8    THE COURT: What different does it make?
9    MR. ZIVIN: It's a question of damages that we would
10 receive.
11   THE COURT: If the money is contemplated by the
12 agreement, then he obviously anticipated it. In other words,
13 why is this not a question of documents? What does it matter
14 if he remembers now that money would come after the master cell
15 bank was sent there?
16   MR. ZIVIN: Well, I think it's -- I don't think it's
17 really in dispute, but if -- I'd like to hear his answer.
18   THE COURT: Is it in dispute?
19   MR. KOCH: I think the agreement speaks for itself.
20 It has the benchmark, so it lays it out.
21   THE COURT: In other words, the question is: Did you
22 anticipate that Genetics institute would receive substantial
23 amounts of money from BMG after they met the benchmarks for
24 that development and license agreement?
25   Isn't that in the agreement? So why do we need

27 (Pages 1045 to 1048)

Page 1049

1  testimony on this?
2      MR. ZIVIN: All right. I'll go on.
3      THE COURT: All right.
4  BY MR. ZIVIN:
5  Q. Isn't it fair to say, sir, that the master cell bank and
6  master working cell bank sent by Genetics Institute to
7  Boehringer Mannheim were extremely valuable items?
8  A. Yes.
9      MR. ZIVIN: I don't have any further questions.
10     MR. KOCH: Just a couple real quick ones.
11          REDIRECT EXAMINATION
12 BY MR. KOCH:
13 Q. You referred to a license agreement with Columbia that you
14 were aware of, vaguely aware of. Is it possible that that
15 license was the Chasin license that you were aware of?
16 A. I don't remember the details.
17 Q. Okay. You also testified about some transfer of
18 information from GI to Boehringer Mannheim in the time period
19 from the confidential disclosure agreement before the DNL
20 agreement was executed.
21     Did you personally attend any meeting or discussions
22 when that information was transferred?
23 A. I attend some of the meetings, but not all of them.
24 Q. Did you, uhm -- were you -- would you have been one who
25 was transferring some of that information?

Page 1050

1  A. No.
2  Q. Who would have been, or who was? Who was the person that
3  transferred the information?
4  A. I think most of the discussions on disclosure at that time
5  that would -- as part of the normal process of negotiating a
6  partnership, came from our various scientists. And one name is
7  Dr. Fritsch.
8  Q. Dr. Fritsch, thank you.
9      You mentioned also in your testimony, you talked
10 about a -- a requirement or an order from Boehringer Mannheim.
11 I just want to clarify.
12     Any requirement for bulk EPO from Boehringer Mannheim
13 or order from Boehringer Mannheim, would that have been --
14 would that come under the 1985 agreement, any such order or
15 requirement that you were referring to?
16 A. The 1985 agreement contemplated we would be supplying
17 Boehringer Mannheim. The specific ordering process and
18 quantities were subject of the 1988 agreement that spelled out
19 more clearly what the 1985 agreement contemplated.
20 Q. And did the 1988 agreement come under the master
21 agreement, 1985 agreement?
22 A. Yes.
23 Q. So the requirement would be under the master agreement?
24 Were there any requirements from Boehringer Mannheim that were
25 not under the master agreement, is what I'm asking?

Page 1051

1  A. Ah, requirements came under 1985 because, as I say, this
2  is master agreement. However, the specificity, the specific
3  clarification were spelled out in 1988 agreement.
4  Q. Okay. And my last question: You were referred to this
5  1990 -- to a subsequent agreement that contained an option for
6  Boehringer Mannheim to -- to operate in the United States. Do
7  you know if that was -- option was ever exercised?
8  A. To my knowledge, it's never been exercised.
9      MR. KOCH: Thank you. No further questions.
10     THE COURT: Thank you very much.
11     MR. ZIVIN: Can I just ask a follow-up question now?
12     THE COURT: One follow-up question.
13         RECROSS-EXAMINATION
14 BY MR. ZIVIN:
15 Q. Isn't it true, sir, that disclosure of technical
16 information was also by Dr. Kaufmann and Dr. Kamen, who were
17 your scientists at the time?
18 A. That's possible, yes.
19     MR. ZIVIN: Thank you.
20     THE COURT: Thank you very much. I hope we didn't
21 make you too late.
22     Now, is it possible to finish Mr. Eisen's testimony
23 today? Could we do that?
24     MR. ZIVIN: Right now?
25     MS. SHANAHAN: Mr. Eisen has the time, yes.

Page 1052

1      THE COURT: Parties, can we try to do that today? We
2  will take a five-minute break to switch reporters, and we'll
3  continue with Mr. Eisen.
4      (Recess.)
5      THE CLERK: All rise.
6      THE COURT: You can all be seated.
7      THE CLERK: Doctor, you're still under oath.
8      MR. ZIVIN: Were they finished with their
9  cross-examination?
10     MR. BAUER: Yes, we were.
11     THE COURT: Go ahead.
12         BRUCE EISEN, RESUMED
13         REDIRECT EXAMINATION
14 BY MR. ZIVIN:
15 Q. During your cross-examination, Mr. Eisen, you referred to
16 a license agreement that you said belonged to Dr. Chasin of
17 Columbia?
18 A. Yes.
19 Q. Did that license agreement say anything about the Axel
20 patents?
21 A. No, I don't believe it said anything specifically.
22 Q. And did that say anything about cotransformation?
23 A. I don't believe so.
24 Q. In fact, did that license agreement bear any signature
25 from Columbia University other than Dr. Chasin, himself?

28 (Pages 1049 to 1052)

CU 03816