# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington D.C. 20549

## Form 10-K

EXHIBIT 5

(Mark One)

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2005

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

Commission file number 000-12477

# Amgen Inc.
(Exact name of registrant as specified in its charter)

| Delaware | 95-3540776 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| One Amgen Center Drive, Thousand Oaks, California | 91320-1799 |
| (Address of principal executive offices) | (Zip Code) |

(805) 447-1000
(Registrant's telephone number, including area code)

**Securities registered pursuant to Section 12(g) of the Act:**
**Common stock, $0.0001 par value; preferred share purchase rights;**
**Contractual contingent payment rights**
(Title of class)

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities act. Yes ☒ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filed. See definition of "accelerated filer" and "large accelerated filer" in Rule 12b-2 of the Exchange Act.

Large accelerated filed. ☒    Accelerated Filer ☐    Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act) Yes ☐ No ☒

The approximate aggregate market value of voting and non-voting stock held by non-affiliates of the registrant was $74,237,828,127 as of June 30, 2005(A)

---

(A) Excludes 2,740,144 shares of common stock held by directors and officers, and any stockholders whose ownership exceeds five percent of the shares outstanding, at June 30, 2005. Exclusion of shares held by any person should not be construed to indicate that such person possesses the power, directly or indirectly, to direct or cause the direction of the management or policies of the registrant, or that such person is controlled by or under common control with the registrant.

**1,184,633,787**
(Number of shares of common stock outstanding as of February 28, 2006)

**DOCUMENTS INCORPORATED BY REFERENCE**

Specified portions of the registrant's Proxy Statement with respect to the 2006 Annual Meeting of stockholders to be held May 10, 2006 are incorporated by reference into Part III of this annual report.

In December 2005, we signed a definitive merger agreement under which we will pay shareholders of Abgenix $22.50 in cash per common share for a total value of approximately $2.2 billion and will assume Abgenix's outstanding debt. The Federal Trade Commission approved the merger on January 19, 2006 and we expect to close the merger, subject to Abgenix shareholder approval, by April 2006. If and when the merger is closed, the terms of the above-noted business relationship will terminate.

**Government Regulation**

Regulation by governmental authorities in the United States and other countries is a significant factor in the production and marketing of our products and our ongoing R&D activities.

In order to clinically test, manufacture, and market products for therapeutic use, we must satisfy mandatory procedures and safety and effectiveness standards established by various regulatory bodies. In the United States, the Public Health Service Act and the Federal Food, Drug, and Cosmetic Act, as amended, and the regulations promulgated there under, and other federal and state statutes and regulations govern, among other things, the raw materials and components used in the production of, testing, manufacture, labeling, storage, record keeping, approval, advertising, and promotion of our products on a product-by-product basis. Product development and approval within this regulatory framework takes a number of years and involves our expenditure of substantial resources and, after approval, such approval remains costly for us to maintain. After laboratory analysis and preclinical testing in animals, we file an investigational new drug application with the FDA to begin human testing. Typically, we undertake a three-phase human clinical testing program. In phase 1, we conduct small clinical trials to determine the safety and proper dose ranges of our product candidates. In phase 2, we conduct clinical trials to assess safety and gain preliminary evidence of the efficacy of our product candidates. In phase 3, we conduct clinical trials to provide sufficient data for the statistically valid proof of safety and efficacy. The time and expense required for us to perform this clinical testing can vary and is substantial. For example, our late-stage product candidate denosumab requires large trials that require substantial time and resources to recruit patients and significant expense to execute. Historically, our products have required smaller, shorter trials. We cannot take any action to market any new drug or biologic product in the United States until our appropriate marketing application has been approved by the FDA. Even after we have obtained initial FDA approval, we may be required to conduct further clinical trials and provide additional data on safety and effectiveness and are required to gain clearance for the use of a product as a treatment for indications other than those initially approved. In addition, side effects or adverse events that are reported during clinical trials can delay, impede, or prevent marketing approval. Similarly, adverse events that are reported after marketing approval can result in additional limitations being placed on the product's use and, potentially, withdrawal of the product from the market. Any adverse event, either before or after marketing approval, can result in product liability claims against us.

In addition to regulating and auditing human clinical trials, the FDA regulates and inspects equipment, facilities, laboratories, and processes used in the manufacturing and testing of such products prior to providing approval to market a product. If after receiving clearance from the FDA, we make a material change in manufacturing equipment, location, or process, additional regulatory review may be required. We also must adhere to current Good Manufacturing Practice (GMP) regulations and product-specific regulations enforced by the FDA through its facilities inspection program. The FDA also conducts regular, periodic visits to re-inspect our equipment, facilities, laboratories, and processes following the initial approval. If, as a result of these inspections, the FDA determines that our equipment, facilities, laboratories, or processes do not comply with applicable FDA regulations and conditions of product approval, the FDA may seek civil, criminal, or administrative sanctions and/or remedies against us, including the suspension of our manufacturing operations.

In the European countries, Canada, and Australia, regulatory requirements and approval processes are similar in principle to those in the United States. Additionally, depending on the type of drug for which