# EXHIBIT 14
# Part 1 of 2

Dockets.Justia.com

IN THE UNITED STATES PATENT
AND TRADEMARK OFFICE

| | | |
|---|---|---|
| Application of: | ) | "PRODUCTION OF |
| FU-KUEN LIN | ) | ERYTHROPOIETIN" |
| Serial No: 675,298 | ) | Group No. 127 |
| Filed: November 30, 1984 | ) | Examiners - J. M. Giesser |
| | ) | T. G. Wiseman |

Applicant's Amendment and Reply
Under 35 U.S.C. §§1.111 and 1.115

Hon. Commissioner of Patents
and Trademarks
Washington, D.C.  20231

RECEIVED
OCT 3 1986
GROUP 120

Sir:

This is in response to the Office Action dated July 3, 1986 in the above-identified application wherein applicant provisionally elected claims (14, 15, 17-36, 58 and 61-72) were variously rejected under one or more of the provisions of 35 U.S.C. §§101, 112 (paragraphs 1 and 2), 102 and 103 and non-elected claims (1-13, 16, 37-57 and 59-60) were withdrawn from consideration.

Reconsideration and allowance of all pending claims is respectfully requested in view of the following amendments and remarks.

IN THE SPECIFICATION

Please enter into the application the attached new Figures 5 through 8 which duplicate original Tables V, VI, XIV and XXI.

At page 25, line 5, please insert the following sentences after the period.

--Reference is made to Figures 1 through 8, wherein: FIG. 1 is a graphic representation of a

AM670140587
AM-ITC 00925254

radioimmunoassay analysis of products of the invention; FIGS 2 through 4 illustrate vector constructions according to the invention; and, FIGS. 5 through 8 are DNA sequences according to the invention.--

At page 37, line 6, after the term "Table V", please insert --, duplicated as FIGURE 5 comprising portions 5A, 5B and 5C--.

At page 42, lines 25, after the term "Table VI", please insert --, duplicated as FIGURE 6 comprising portions 6A, 6B, 6C, 6D and 6E--.

At page 73, line 33, after the designation "XIV", please insert --, duplicated as FIGURE 7--.

At page 75, line 28, after the designation "XXI", please insert --(the last-mentioned Table being duplicated as FIGURE 8).

IN THE CLAIMS

Please amend claim 14 as follows:

--14.  (Amended)  A _purified and isolated_ DNA sequence for use in securing expression in a procaryotic or eucaryotic host cell of a polypeptide product having at least a part of the primary structural conformation and one or more of the biological [properties] _activities_ of natur-ally-occurring erythropoietin, said DNA sequence selected from [among] _the group consisting of_:

(a)  the DNA sequences set out in [Tables V and VI] _Figures 5 and 6_ or their complementary strands;

(b)  DNA sequences which hybridize to the DNA sequences defined in (a) or fragments thereof; and

- 2 -

204  226

AM670140588    AM-ITC 00925255

(c) DNA sequences which, but for the degeneracy of the genetic code, would hybridize to the DNA sequences defined in (a) and (b).--

In claim 17, line 4, please delete "properties" and insert --activities-- in place thereof.

In claim 20, line 2, please delete "Table V" and insert --Figure 5-- in place thereof.

In claim 23, line 2, please delete "Table VI" and insert --Figure 6-- in place thereof.

In claim 24, line 2, please delete "14" and insert --17-- in place thereof.

In claim 27, line 3, please delete "Table XIV" and insert --Figure 7-- in place thereof.

In claim 30, line 3, please delete "Table XXI" and insert --Figure 8-- in place thereof.

In claim 34, line 1, please insert --purified and isolated-- before the term, "DNA".

In claim 58, line 2, please delete "Table V or VI" and insert --Figure 5 or 6-- in place thereof.

In claim 69, line 3, please delete "properties" and insert --activities-- in place thereof.

In claim 69, line 7, please insert --62-- after the word "claim".

In claim 70, line 3, please delete "properties" and insert --activities-- in place thereof.

In claim 71, line 3, please delete "properties" and insert --activities-- in place thereof.

In claim 72, line 3, please delete "properties" and insert --activities-- in place thereof.

- 1 -

<u>REMARKS</u>

Upon entry of the above-requested amendments, claims 14 (Amended), 15, 16-36, 58 and 61-72 will remain in the application.

Applicant acknowledges with thanks the interview kindly granted by Examiners Wisemen and Giesser to Applicant's counsel, Mr. Borun and Mr. Odre, on July 30, 1986. Attached hereto as Exhibit No. 1 are copies of the documents referred to as Exhibits "A" and "B" in the Examiner Interview Summary Record prepared by Examiner Giesser.

A.   <u>The Claimed Subject Matter</u>

The present invention reflects Applicant's discovery of DNA sequences encoding erythropoietin. This discovery, in turn, has allowed the first determination ever made of the entire primary structural conformation of erythropoietin. Significantly, this discovery has allowed recombinant methods to be brought to bear in the development of DNA vectors and transformed and transfected host cells useful to secure large scale production of polypeptide products sharing in the biological activities of erythropoietin.

The present claims are accordingly directed to DNA sequences, DNA vectors, transformed and transfected host cells and processes for the use of these materials in the preparation of erythropoietin products including, e.g., polypeptide fragments and polypeptide analogs of erythropoietin. Independent claim 14 is thus generally directed to purified and isolated DNA sequence defined by reference to the DNA sequences revealed in Figures 4 and 6. Dependent claims 15, 16, 62 and 69 respectively relate to host cells transformed or transfected with DNA of claim 14, vectors

- 5 -
~~206~~ 228

including the DNA of claim 14, hosts transformed with such
vectors, and production processes employing such hosts.
Independent claim 17 is directed generally to DNA sequences
which code for procaryotic or eucaryotic host polypeptides
having erythropoietin amino acid sequences and having one or
more of erythropoietin's biological activities.  Dependent
claims 18-33, 63-64 and 70 are directed to presently pre-
ferred forms of DNA sequences, vectors, transformed or
transfected hosts and production processes based on the
claim 17 DNA sequences.  Independent claim 34 is generally
directed to DNA sequences of the invention which encode
polypeptide fragments and analogs of erythropoietin and
dependent claims 35, 36, 65-68, 71 and 72 are likewise dir-
ected to preferred forms of sequences, vectors, transformed
and transfected hosts and production processes.  Finally,
independent claim 58 is directed to the specific human and
monkey erythropoietin-encoding purified and isolated DNA
sequences as revealed in Figures 5 and 6 (previously Tables
V and VI).

B.  The Outstanding Office Action, The Rejections
    of the Claims and Applicant's Responses Thereto

        In the Action dated July 3, 1986, the Examiner
noted that the full text of the Chirgwin, et al. reference
(Ref. C8) did not accompany Applicant's Information
Disclosure Statement filed April 24, 1986.  Attached hereto
as Exhibit No. 2 is a full text copy.  Applicant respect-
fully solicits the Examiner's consideration of the same.
and notation of such consideration on the previously sub-
mitted Form PTO-1449.

        Due to the number and variety of objections and
rejections set forth in the Action dated July 3, 1986,

- 5/ -

Applica... ...bmits that the issues raised therein are best treated by responses which precisely "track" the order of their appearance in the Action.

    1. The Rejection of Claims 14, 15, 17-36,
       58 and 61-72 Under The First Paragraph of
       35 U.S.C. §112 May Property Be Withdrawn

At page 4 of the Action, the Examiner lodged a rejection of all claims under 35 U.S.C. §112 (first paragraph) based on a corresponding objection to the specification wherein the absence of an "assurance" of potential replacement of A.T.C.C. Budapest Treaty microorganism deposits was noted. While Applicant specifically disagrees with the Examiner's assertion to the effect that the "invention depends on certain specific plasmids/microorganisms", he has attached hereto as Exhibit No. 3 a Declaration by an officer of his Assignee, Kirin-Amgen, Inc., assuring replacement of deposited cultures if lost or destroyed during the 30-year Budapest Treaty deposit period. This Declaration is of the general form presented in Wiseman, T. "Biotechnology Patents", pp. 33-42 appearing in "Biotechnology Patent Conference Workbook" (American Type Culture Collection, Rockville, MD., 1986).

Applicant respectfully submits that all requirements of the first paragraph of Section 112 are met, that the objection to the specification should be withdrawn, and that the corresponding rejection of claims 14, 15 17-36, 58 and 61-72 may properly be withdrawn.

- 5 -

208 230

AM670140592    AM-ITC 00925259

2. The Rejection of Claims 14, 15, 17-36,
58 and 61-72 Under The Second Paragraph
of 35 U.S.C. §112 May Properly Be Withdrawn

Bridging pages 4 and 5 of the Action, the Examiner lodged a rejection of all claims under 35 U.S.C. §112 (second paragraph) based on multiple assertions of indefiniteness of claim terminology. Each specific objection, designated (a) through (f), is discussed below.

(a) Applicant respectfully disagrees with the Examiner's assertion of indefiniteness for the term "procaryotic or eucaryotic" as employed to describe host cells in claims 14, 15 62, 64, 66, 68 and in claims dependent thereon. While Applicant agrees in general that unduly alternative language may not be in conformity with Section 112 requirements and that wholly non-equivalent terms ought not to be presented as equivalents in claims, it is respectfully submitted that the claim term "procaryotic or eucaryotic" quite accurately (i.e., "duly") specifies well known alternatives in selection of available host cell types for the application of recombinant DNA methods in polypeptide production. The Examiner's attention is directed to M.P.E.P. §706.03(d) wherein it is noted that:

> "Generally speaking, the inclusion of (1) negative limitations and (2) alternative expressions, provided that the alternatively expressed elements are basically equivalents for purposes of the invention, are permitted if there is no uncertainty or ambiguity with respect to the question of scope or breadth of claim is presented."

It is thus the case that the kind of invention claimed, together with the "purposes of the invention" are

- 7 -

both properly considered in determining the propriety of
alternative language within any given claim.*

In this instance, support for the conclusion that
"procaryotic or eucaryotic" is <u>duly</u> alternative and unam-
biguous may be found upon consideration of the nature of the
"expression" process by which cells produce a polypeptide
based on a DNA sequence as claimed, together with the con-
text of the teachings of the present specification with
regard to production of erythropoietin polypeptides.
Whether a host cell is procaryotic or eucaryotic, the
general cellular process by which any given (DNA) codon
gives rise to the disposition of a given amino acid residue
within a polypeptide is the same.  The ATG codon, for
example, codes, via mRNA and tRNA, for disposition of a
methionine residue whether it is within a procaryotic or
eucaryotic host, and no DNA codon directs a different amino
acid residue simply depending on the procaryotic or
eucaryotic nature of the host it is in.  This concept is
clearly reflected in the present specification wherein, at
page 19, lines 6-11, it is noted that:

> "These polypeptides are also uniquely charac-
> terized by being the product of procaryotic
> or eucaryotic host expression (e.g., by bac-
> terial, yeast and mammalian cells in culture)
> of exogenous DNA sequences obtained by
> genomic or cDNA cloning or by gene syn-
> thesis".

Specific examples within the specification describe the
actual results of genomic, cDNA and synthetic DNA expression
in mammalian, E.coli, and yeast systems.  Thereafter, the

---

\* As an example, while "black or white" might appear
unduly alternative or ambiguous, <u>in vacuo</u>, the term is
quite properly employed when describing an invention
related to squares of a chess board.

- ∤ -

2+0  232

AM670140594                    AM-ITC 00925261

specification goes on to state, at page 92, line 33 through
page 93, line 5:

> "Put another way, DNA sequences provided by
> the invention are useful in generating new
> and useful viral and circular plasmid DNA
> vectors, new and useful transformed and
> transfected microbial procaryotic and
> eucaryotic host cells (including bacterial
> and yeast cells and mammalian cells grown in
> culture), and new and usef⸱ me⸱hods for
> cultured growth of such microbi⸱ host cells
> capable of expression of EPO and EPO
> products".

Applicant respectfully submits that the term,
"procaryotic or eucaryotic" is completely in keeping with
the nature and purposes of the present invention as fully
described in the specification and that the outstanding
rejection of claims 14, 15, 62, 64, 66, 68 and claims depen-
dent thereon may properly be withdrawn.

(b) The Examiner has alleged that claims 14, 17,
34, 58, 69-72 and claims dependent thereon are indefinite
for failure to specify a "fragment" size and are thus "⸱o
vague as to read on single base pairs". Applicant respect-
fully disagrees. Whether the Examiner is referring to a DNA
or polypeptide "fragment" is unclear, but it is clear from
the context of the claims under consideration that a poly-
peptide is encoded (necessitating the presence of multiple
3-base pair codons) and that the polypeptide encoded must
possess at least one of the biological properties of natur-
ally-occurring erythropoietin. Within this context Appli-
cant's claims certainly do not read on single base pairs
(which "encode" nothing). Rather, they include specific and
readily understood structural and functional limitations as
to the length of the DNA sequences claimed which in turn
allows for production of useful, biologically active mate-

- 9 -

233

rials.  The outstanding rejection of claims 14, 17, 34, 58,
69-72 and claims dependent thereon may thus properly be
withdrawn.

(c)  The Examiner also objected to claims 14, 17,
69-72 and claims dependent thereon for their recitation of
"biological properties".  This term is alleged to be "so
indefinite as to be meaningless".  Applicant disagrees.
While the "biological properties" of erythropoietin may be
varied, they are not indefinite.  The term, as used in ref-
erence to erythropoietin, is essentially defined at specifi-
cation page 19, lines 3-5, by the recitation:

> "...one or more of the biological properties
> (e.g., immunological properties and in vivo
> and in vitro biological activity) of natur-
> ally-occurring erythropoietin...".

The presently known in vivo and in vitro activities of
erythropoietin are well described in the prior art cited in
the specification's "Background", beginning at page 9, line
33 and continuing through page 12, line 19.  Moreover, at
page 86, lines 21-32, certain of the major reported in vivo
biological activities of erythropoietin are again recited:

> "...stimulation of reticulocyte response,
> development of ferrokinetic effects (such as
> plasma iron turnover effects and marrow
> transit time effects), erythrocyte mass
> changes, stimulation of hemoglobin C syn-
> thesis...increasing hematocrit levels in
> mammals".

Applicant thus respectfully submits that the term
"biological properties", as used in the specification, is
definite and meaningful and that its use in the claims is
fully in keeping with the requirements of Section 112.  For
purposes of advancing prosecution of this application, how-
ever, and without waiver of any right to pursue claims of

- 10 -

212 234

AM670140596

AM-ITC 00925263

the same or similar scope ... a duly filed continuing appli-
cation, claims 14, 17 and 69-72 have been amended to refer
to biological activities of polypeptides encoded rather than
biological properties. This term is widely employed in the
literature of recombinant technologies and is fully sup-
ported in the present specification by, e.g., the above-
cited disclosures of the biological activities of erythro-
poietin. Applicant thus respectfully submits that the out-
standing objection to, and rejection of, claims 14, 17 and
69-72 is mooted and may properly be withdrawn.

        (d)  Claims 14, 20, 23, 27, 30, 58 and claims
dependent thereon were rejected on grounds of reference to
figures, with the assertion that the DNA sequences of the
figures "can be adequately expressed in words". Applicant
respectfully disagrees. Applicant first notes that while
the DNA sequences set forth are alphabetical in nature, they
are not "words" in the ordinary sense. Rather, they are
"diagrams" reciting the relationship of many nucleic acids
and the amino acids encoded thereby. It has always been the
case that the requirements of Section 112 could be satisfied
by a diagramatic, rather than verbal, presentation in the
claims where, as here, prolixity is avoided and clarity of
description is preserved. See, e.g., In re Faust, 86
U.S.P.Q. 114, 115 (1943) and Ex parte Squires, 133 U.S.P.Q.
598, 600 (Bd. App. 1961).* In issued U.S. Patents relating
to inventions in biotechnology, it has been found appro-
priate to identify novel microorgansims and cell lines in
the claims through reference to a deposit accession
numbers. As an example, in recently issued U.S. Patent No.

_____
*    In the last-mentioned decision, the claim on appeal was
     "1. A font of numerals as shown in Fig. 1".

- x -

213 235

AM670140597                                    AM-ITC 00925264

4,530,901, specific DNA sequences encoding interferon poly-
peptides were also claimed by reference to unspecified (but
presumably "knowable") DNA sequences present as plasmid
inserts contained in deposited microorganisms.

Reference to figures of the drawing herein is in
full conformity with the "particularity" and "distinctness"
requirements of the second paragraph of Section 112 and such
reference clearly avoids prolixity without introducing
ambiguity.  It is thus respectfully submitted that the out-
standing rejection of claims 14, 20, 23, 27, 30, 58 and
claims dependent thereon may properly be withdrawn.

(e)  The above-requested amendment of the language
of claim 14 (to specify selection "from the group consisting
of") is believed to moot the outstanding rejection of the
claim on grounds of "improper Markush language".

(f)  The requested amendment of claim 69 to
reflect dependence on claim 62 is believed to moot the out-
standing rejection thereof.

3.  The "Provisional" Rejections of Claims
14, 15, 17-36, 58 and 61-72 Under 35
U.S.C. §101 Based on Applicant's Co-pending
Applications May Properly Be Withdrawn

Applicant acknowledges with thanks the Examiner's
provisional notation of the possibility of "double patent-
ing" grounds for rejection should the present claims issue
and all original claims also issue in "parent" U.S. Patent
Application Serial Nos. 561,024, 582,185 and 655,841.  This
notation will be kept in mind in any subsequent prosecution
of said applications.  Applicant submits, however, that the
provisional notation does not provide a basis for present
rejection of the claims or otherwise constitute a bar to
allowance of the claims.

-22- 236

4. The Rejection of Claims 14, 24, 34
   and 36 Under 35 U.S.C. §101 May
   Properly Be Withdrawn

Amendment of claims 14 and 34 to include the reci-
tation of "purified and isolated" with reference to the
claimed DNA sequences is believed to moot the outstanding
rejection of claims 14, 24, 34 and 26 wherein the Examin r
suggested that non-statutory subject matter (non-isolated
erythropoietin genes in cells naturally producing erythro-
poietin) might be embraced by the claims.

5. The Rejection of Claims 14, 24, 34
   and 36 Under 35 U.S.C. §§102(b) or 103
   Over the Sugimoto et al. Reference
   May Properly Be Withdrawn

Amendment of claims 14 and 34 to include the reci-
tation of "purified and isolated" with reference to the
claimed DNA sequences is believed to render moot the out-
standing rejection of claims 14, 24, 34 and 36.  Under no
circumstance can the claims be urged to "read on" non-
isolated DNA present in the erythropoietin-producing lympho-
blastoid cells of the Sugimoto et al. reference.

6. The Rejection of Claims 14, 15, 17, 18, 20,
   24-27, 33, 34, 61-66, 69, 70 and 71 Under
   35 U.S.C. §§102(a)/103 Based on the Lee-Huang
   (PNAS) Reference May Properly Be Withdrawn

It was the Examiner's position that the DNA
sequences described in claims 14, 15 17, 18, 20, 24-27, 33,
34, 61-66, 69, 70 and 71 "appear to be the same as those
made by Lee-Huang et al." [referring to PTO Reference "R";
Applicant's Reference C-68; Lee-Huang, P.N.A.S., 81, 2708-12
(1984)] and that these claims should therefore be rejected
as anticipated or obvious under 35 U.S.C. §§102(a)/103.
Applicant respectfully disagrees.

237

Applicant notes at the outset that the Lee-Huang article was published in May, 1984, a date which is well after the filing dates of "parent" U.S. Patent Application Serial Nos. 561,024 (December 12, 1983) and 582,185 (February 21, 1984).*

Applicant maintains that, irrespective of the publication date of the Lee-Huang P.N.A.S. article, it is not "legally" available as a reference under 35 U.S.C. §102(a) or (b).  As set out in detail below, this is so because the publication's disclosure is conspicuously insufficient to allow a person ordinarily skilled in the art, armed with the publication and his own knowledge, to duplicate the alleged cloning and expression of a human erythropoietin gene.

> (a)  The Legal Requirements for a
>      Publication to Qualify As a
>      Reference Bar Under 35 U.S.C. §102

Applicant submits that no publication may serve as a bar to the patentability of a discovery under Section 102 if the reference does not itself substantially "enable" the duplication of the claimed discovery.  For over a century the courts have maintained that for a publication to be such a bar, the account published must be of a complete and operable invention capable of being put into practical operation.  See Seymour v. Osborne, 78 U.S. 516, 555 (U.S. 1870).  This position was uniformly adopted and applied by the former Court of Customs and Patent Appeals.  The Court's decision in In re LeGrice, 301 F.2d 929 (CCPA 1962) is directly in point.

---

* Note, also, that the December 13, 1983 filing date of Serial No. 561,024 precedes the January 11, 1984 filing date of U.S. Serial No. 570,040, referred to on the face of Reference B-13, the Lee-Huang PCT published PCT Application.

- 14 -

> "We think it is sound law, consistent
> with public policy underlying our patent law,
> that before any publication can amount to a
> statutory bar to the grant of a patent, its
> disclosure must be such that a skilled
> artisan could take its teachings in combina-
> tion with his own knowledge of the particular
> art and be in possession of the invention"
> Id, at page 936.

* * * * *

> "...the proper test of description in a bar
> to a patent as the clause is used in section
> 102(b) requires a determination of whether
> one skilled in the art to which the invention
> pertains could take the description of the
> invention in the printed publication and
> combine it with his own knowledge of the
> particular art and from this combination be
> put in possession of the invention on which
> the patent is sought." Id, at page 939.

See also, In re Sasse, 629 F.2d 675, 681 (CCPA, 1980).

This position concerning the "enablement" require-

ment of a reference has been carried forward by the Patent

Office Board of Appeals with respect to a variety of tech-

nologies, including those involving microbiology. Thus,

while the CCPA decision in In re Argoudelis et al., 434 F.2d

1390, (1970) is frequently cited for its holding concerning

an applicant's "enablement" requirements, the Board of

Appeals decision which gave rise to the CCPA decision

clearly applied the ruling of In re LeGrice to eliminate

from consideration under Section 102 two Japanese "prior

art" references disclosing the same antibiotic as claimed,

but disclosing the means for obtaining it in a manner which

could not be duplicated by an ordinarily skilled worker.

See, Ex parte Argoudelis et al., 157 U.S.P.Q. 437, 443-4

(Bd. App., 1967).

- VS-39
239
219

(b)    The Lee-Huang (P.N.A.S.) Reference
Is Not Susceptible to Duplication
By Exercise of Ordinary Skill

Applicant submits that it is manifest from the four corners of the Lee-Huang publication that a person of ordinary skill in the art could not duplicate its disclosures to obtain cDNA encoding human erythropoietin -- principally because the monoclonal antibody designated "7A7" which was used in the work reported was not publicly available at the time of the publication and could not have been obtained by an ordinarily skilled artisan at that time. Moreover, the highly purified immunogen used by Lee-Huang to generate the 7A7-producing hybridoma cell line could not be obtained by "non-inventive" means.

The work represented in the Lee-Huang publication can be fairly summarized by reference to page 2708 and the paragraph bridging its two columns, which states:

"Recently, we have been engaged in the purification of human EP. Progress has been made in the development of effective techniques for improved Ep purification (10). This has enabled us to prepare sufficient quantities of purified materials for the production of monoclonal antibodies to human Ep. (11) These antibodies provide a specific means for identifying Ep mRNA and for screening recombinant plasmids containing Ep gene [DNA] sequences." (Emphasis supplied)

In the "Materials and Methods" section on page 2708 of the publication reveals that:

"Monoclonal antibody to human Ep was prepared according to the hybridoma technique of Kohler and Milstein (17). Purified IgG was used for all experiments described in the present work. The particular antibody used in all these studies was designated monoclonal 7A7. It reacts specifically with our purified Ep. Our purified Ep gives a single polypeptide band of Mr 34,000 by silver stain on NaDodSO$_4$/polyacrylamide gel (see Fig. 2A, lane 3). It has a specific activity of 66,000 units/mg." (Emphasis supplied.)

240 $\frac{-16-}{248}$

Commencing with the second full paragraph of the "Results" section on page 2709, it is stated that:

> "To determine whether the poly(A)+ RNA isolated from the Ep-rich human renal carcinomas indeed contained Ep message, in vitro translation was carried out. The labelled translation products were immunoprecipitated with monoclonal antibody to human Ep." (Emphasis supplied.)

In the description of isolation of messenger RNA from renal carcinoma cells* and of use of the messenger to generate cDNA, the publication states, at page 2710:

> "The majority of Ep mRNA was resolved in fraction 11 (Fig. 3, lane 11) as detected by immunoprecipitation with anti-Ep 7A7... This fraction was used to synthesize $^{32}$P-labelled single-stranded cDNA..."

> * * * * *

> "Positive recombinants from colony hybridization were picked and grown on gridded nitrocellulose filters in a registered fashion for immunological screening. This procedure relies on expression of the cDNA inserted in the pBR322 β-lactamase operon to produce a fused polypeptide containing the appropriate epitope for the anti-Ep recognition. From 1.4 x 10⁵ screened transformants, three positive clones were identified that reacted consistently with 7A7. These were designated pEp1, -2, and -3." (Emphasis added.)

In the penultimate paragraph of the "Discussion on page 2712, it is stated that:

> "Several monoclonal antibodies to human Ep have been isolated; only one (7A7) was chosen for routine screening of the cDNA

_____

\* There is at least a serious question concerning the public availability of the "Ep-rich human renal carcinomas" used by Lee-Huang. In the first paragraph of the "Results" section on page 2709, Lee-Huang describes an "extensive search" for such carcinomas. Only 2 of 36 renal carcinoma extracts tested qualified as "Ep-rich" sources for messenger RNA.

- 17 -

AM670140603
AM-ITC 00925270

library, because it has the highest antigen
binding affinity. Since these monoclonal
antibodies do not complete with each other
for Ep binding (unpublished results) and they
most likely recognize different epitopes, a
mixture of them may identify additional Ep
cDNA clones as well as other Ep-related poly-
peptides.  I have also not screened for the
presence of additional Ep cDNA clones con-
taining other inserts that would have
remained undetected by the immunological
screening." (Emphasis supplied.)

Based on the above-quoted portions of the
Lee-Huang text, it is apparent that duplicatation of the
erythropoietin cDNA isolation work described in the pub-
lication is not merely a formidable task, it is an imposs-
ible one.

Clearly, the key to Lee-Huang's initial mRNA iso-
lation and subsequent cDNA isolation (resulting in 3 cDNA
clones isolated from among 140,000 prepared) was the use of
monoclonal antibody 7A7.  Other monoclonals mentioned by
Lee-Huang were described as having lower affinity and as
reacting with different epitopes, not even alleged to be
specific for erythropoietin.  There is no notation in the
P.N.A.S. article of public availability for antibody 7A7 or
the hybridoma cells which produce it.  If the skilled worker
were to examine the "reference" (No. 11) cited by Lee-Huang
as describing the monoclonal antibodies used in the pub-
lished work, the worker would find only an abstract (pre-
viously submitted as Applicant's reference C-69) which des-
cribes three positive hybridoma cell lines, none of which
are identified as producing antibody 7A7, and none of which
are noted to be available from any public depository.  More-
over, it is clear from the text that while the well-known
Kohler and Milstein techniques may have been employed to
generate 7A7 and the other monoclonal antibodies, the highly

- 18 -

pure immunogen used in the hybridoma development process was one which assertedly could only be "enabled" by practice of certain "improved" purification techniques.  If the skilled worker were to examine the "reference" (No. 10) cited by Lee-Huang as relating to techniques for "improved Ep purification" which "enabled us to prepare sufficient quantities of purified material for the production of monoclonal antibodies to human Ep", the worker would find only a 1980 paper on hydrophobic interaction chromatography (HIC) (Applicant's Reference C-136).  None of the erythropoietin preparations in the paper demonstrate the high specific activity of 66,000 units/mg which characterized the erythropoietin immunogen used to make the 7A7 antibody.

Without a public source for the 7A7 antibody, without a public description even of the purified immunogen used to raise the antibody, the skilled worker is simply without the wherewithal to take possession of the "discovery" related in the Lee-Huang publication.

The above conclusion as to unavailability to the ordinarily skilled worker of either the 7A7 antibody or the purified immunogen used to generate it is specifically confirmed by the statements of Dr. Lee-Huang in her PCT Application WO 85/03079 published July 18, 1985 (submitted as Applicant's Reference B-13).  On page 1 of the published application, reference is first made to an alleged invention in cDNA clones of human erythropoietin, than to an "Anti-Ep Patent Application" (Serial No. 570,039, filed January 11, 1984) which relates to monoclonal antibodies to human erythropoietin, and finally to an "Ep Purification Patent Application" (Serial No. 570,075, filed January 11, 1984) which is said to relate to a novel method for purifying

- 18 -

human erythropoietin.  The interrelationship between these
patent applications is set forth at page 2, lines 14-20 of
the published PCT Application:

> "The progress made by the present inven-
> tor in native human Ep purification (des-
> cribed in the Ep Purification Patent Applica-
> tion) by direct and reverse immunochromatog-
> raphy, and in preparation of monoclonal
> Anti-Ep (described in the Anti-Ep Patent
> Application) has made it possible to attempt
> cloning of human Ep gene which, upon
> expression, can produce Ep protein."

Clearly, Lee-Huang's position was that an "inven-
tion" in means for purifying erythropoietin was needed to
secure the immunogen employed in practice of an "invention"
in monoclonal, anti-erythropoietin antibody production,
which, in turn allowed for a third "invention" in the isola-
tion of an erythropoietin gene.  Neither of the "enabling"
inventions in erythropoietin purification and monoclonal
antibody production is disclosed in the P.N.A.S. article.
This conclusion is further borne out by the text of the
published application at pages 29 through 36 and 37 through
42 which respectively describes "Ep Purification" and
"Monoclonal Anti-Ep".

In the "Ep Purification" section, an erythro-
poietin purification process is set out wherein the erythro-
poietin obtained by hydrophobic interaction chromatography
(HIC) according to the 1980 Lee-Huang publication (C-136)
serves as the starting material of the process.  The mate-
rial is subjected to further processing by direct immuno-
affinity chromatography (DIAC) and then by reversed immuno-
affinity chromatography (RIAC) to secure the final pro-
duct.  The HIC/DIAC/RIAC purification process is not found
in the P.N.A.S. publication.

- 20 -

In the "Monoclonal Anti-Ep" section, the erythro-
poietin preparation, purified by HIC, DIAC and RIAC, is used
as an immunogen to generate hybridomas secreting monoclonal
antibodies including, specifically, the antibodies produced
by clone "7A7". At page 38, lines 3-16, the immunization
protocol is described. The required performance character-
istics are set forth with the notation:

> "These performance characteristics are rather
> formidable, considering the weak immunogenic
> properties of Ep. Accordingly, the EP used
> for immunization should be the purest poss-
> ible and the number of mice immunized should
> be relatively large. Generally, assuming
> careful selection and execution of the
> immunization protocol, about one mouse in six
> immunized will exhibit an acceptable immune
> response."

While the P.N.A.S. paper refers generally to the
1975 Kohler and Milstein procedures, page 38, lines 28-33
refer to a different reference for the fusion procedure and
also refer to "modifications" of the procedure as actually
applied by Lee-Huang. As noted at page 39, lines 14-17, the
7A7-producing clone was one of <u>three</u> stable clones isolated
from a total of <u>6460</u> hybridomas generated from a total of 10
fusions.* At page 41, lines 11-13, the 7A7 clone was noted
as a 10-fold higher producer than the other two clones. In
the published patent application, the 7A7 antibody was dis-
tinguished from the others by type (IgG2a/k as versus
IgG1/k) but the P.N.A.S. reference is wholly silent on this
matter.

Support for the above conclusion that the skilled
worker would not have been able to prepare the pure immuno-

---

*     This appears to be the type of "discovery" which has
      been characterized as patentable in <u>Ex parte Old</u>, 229
      U.S.P.Q. 196 (Bd. App. & Int., 1985).

AM670140607                                                    AM-ITC 00925274

gen employed to generate the 7A7 antibody without "inventive skill" is found in the recent issuance of U.S. Letters Patent 4,568,488 to Lee-Huang (Applicant's Reference A-22) based on the "Ep Purification Patent Application" Serial No. 570,075. Presumably, the U.S. Patent Office was convinced that extraordinary skill -- indeed a patentable invention -- was involved in the preparation of highly purified erythro-poietin having a specific activity of 66,000 U/mg as des-cribed in column 15, lines 43-45. (This activity corres-ponds exactly to that ascribed to the starting material used in immunizations for monoclonal antibody 7A7 preparation set out in the Lee-Huang P.N.A.S. publication.) It is not known whether Lee-Huang's Application Serial No. 570,039 is still pending, and whether it claims an invention in the specific 7A7 antibody. The clear implication derived from the pub-lished PCT application, however, is that extraordinary skill in the art would be needed to produce the antibody.

Additional support for the conclusion that the 7A7 antibody was not publicly available to skilled workers at the time of the P.N.A.S. publication is provided by Appli-cant's attached Declaration (Exhibit No. 4 hereto) relating to attempts to secure a sample of the antibody. As set out in the Declaration, Applicant recently sought to obtain a sample of the 7A7 antibody from Dr. Lee-Huang and, after a long delay, his request was denied upon his refusal to assure that it would be used only for personal purposes, unrelated to work for his employer. As of this day, the high affinity, 7A7 antibody whose use was asserted to be critical to the practice of the isolation procedures of the Lee-Huang P.N.A.S. article remains unavailable to the public at large.

- 22 -

Because the record clearly demonstrates that the cDNA isolation work described in the Lee-Huang reference could not be duplicated without exercise of extraordinary skill, the publication is not properly urged as a bar to patentability of the present invention and the rejection of the claims under 35 U.S.C. §102(a)/103 may properly be withdrawn.

7.  The Rejection of Claims 14, 15, 17-20, 24, 33, 34, 36, 58, 61-66, 69, 70 and 71 Under 35 U.S.C. §§102(a)/103 Based on Publications by Applicant and His Co-Workers May Properly Be Withdrawn

It was the Examiner's position that the prohibitions of Sections 102(a) and/or 103 dictate rejection of essentially all pending claims based on a 1984 Abstract jointly authored by Applicant and his co-workers [J.Cell. Bioch., Suppl. 8B, p. 45 (1984)]. As noted by Applicant's counsel in the Interview Outline, this Abstract and another of substantially the same caliber [appearing in Exp.Hematol., 12, 357 (1984)] do not provide any basis for ignoring Applicant's Declaration as to prior sole inventorship of the claimed subject matter filed in this and his "parent" applications dating back to December 13, 1983. Nonetheless, Applicant has attached hereto as Exhibit Nos. 5 and 6 two separate Declarations, consistent with the decision of In re Katz, 215 U.S.P.Q. 14 (CCPA, 1982), establishing sole inventorship of the claimed subject matter. Applicant submits that no basis exists for the continued rejection of claims 14, 15, 17-20, 24, 33, 36, 58, 61-66, 69, 70 and 71 based on Applicant's publications and that the outstanding rejection may properly be withdrawn.

- 25 -

8.  The Rejections of All Claims Under 35
    U.S.C. §103 Based Variously on Sugimoto,
    et al., Cohen, et al., Paddock, Farber,
    et al., Bennetzen, et al., Gouy, et al.,
    and Lewin May Property Be Withdrawn

It was the Examiner's position that the subject
matter of claims 14, 15, 17, 18, 20-24, 34-36, 58 and 61-72
was statutorily obvious upon consideration of Sugimoto, et
al. (PTO Reference A, U.S. 4,377,513; Applicant's Reference
A-8), in view of the disclosures of Paddock (PTO Reference
B, U.S. 4,563,151; Applicant's Reference A-18), and Cohen,
et al. (PTO Reference C, U.S. 4,468,464; Applicant's
Reference A-17).  The Examiner specific position was as
follows:

> "Sugimoto, et al. teach cells from which
> erythropoietin RNA can be isolated, as they
> have a high erythropoietin production.
> Paddock teaches making cDNA from RNA, and
> Cohen, et al. teach cloning of a desired
> strand of DNA.  Further, Sugimoto, et al.
> suggest that the erythropoietin gene could be
> so cloned.  Thus it would be obvious to one
> or ordinary skill in the art to isolate and
> clone the erythropoietin gene, as the tech-
> niques for doing so are well known in the art
> and the expected result is obtained."

Claim 19, specifically directed to monkey species
erythropoietin DNA, was rejected on the same grounds as
above, in further view of the Farber, et al. Abstract
appearing in Exp.Hematol. VII, Suppl. 4, Abstract 101 (PTO
Reference T; Applicant's Reference C-32).

Finally, claims "25-30" (sic, 33?) were rejected
based on Sugimoto, et al., Paddock and Cohen, et al., in
further view of Bennetzen, et al. [J.Biol.Chem., 257(6),
3026-31 (1982); PTO Reference R[1]; Applicant's Reference
C-133], Gouy, et al., [Nucleic Acids Res., 10, 7055-7074
(1982); PTO Reference U] and Lewin, [page 307 in Genes, John
Wiley & Sons (1983); PTO Reference S[1]].

- 24 -

Applicant respectfully disagrees with the Examiner's conclusions of obviousness for the claimed subject matter and affirmatively submits that the Examiner's position is without factual support. The references relied upon neither disclose nor suggest the making of the invention claimed. As set forth with greater particularity below, it is Applicant's position that the "primary" Sugimoto, et al. reference provides no teaching of a source for erythropoietin RNA and the "secondary" references by Cohen, et al. and Paddock are wholly uninformative with respect to the correct methods and materials means for identifying erythropoietin encoding genetic material so as to allow the present invention to be attained. The remaining, "tertiary" references fail to bar patentability because the primary and secondary references do not suggest the invention. Finally, Applicant submits that the Lee-Huang P.N.A.S. article appears to describe a "failed experiment" which constitutes evidence of patentability of the present claims.

Turning first to the Sugimoto, et al. reference, at the outset of its text it is noted that the alleged invention resides in means for obtaining erythropoietin from human lymphoblastoid cells in culture. Beginning at column 1, line 55, the reference proposes culturing <u>any</u> erythropoietin-producing lymphoblastoid cells and goes on to note that such cells could include "human lymphoblastoid cells in which there has been <u>introduced</u> the human erythropoietin genetic sites" from a variety of normal and neoplastic cells. The reference then states that:

> "These erythropoietin production govern-
> ing genetic sites may be introduced by means
> of cell fusion using polyethylene glycol or

- 25 -

Sendai virus, or by genetic recombination
techniques using DNA ligase, nuclease and DNA
polymerase." (Emphasis supplied.)

It is thus clear that the authors of the Sugimoto,
et al. reference do <u>not</u> suggest that lymphoblastoid cells
are a potential <u>source</u> of genetic material. Rather, the
cells are proposed as a <u>host</u> for insertion of "genetic
sites" borrowed (e.g., by cell fusion) from other cell
sources. There is no mention at all of RNA or of the
reverse transcriptase enzyme needed to secure cDNA from
messenger RNA. Contrary to the Examiner's position, then
there is no suggestion in Sugimoto, et al. that the erythro-
poietin gene could be cloned, nor any "teaching" of "cells
from which erythropoietin RNA can be isolated, as they have
a high erythropoietin production".* Even if there had been
a direct disclosure in Sugimoto, et al. of a potential
source of "high levels" of erythropoietin-encoding messenger
RNA (such as might be attributed, for example, to the
Farber, et al. disclosure of isolated kidney cells from
phenylhydrazine-treated baboons), it still remains the case
that neither Sugimoto, et al. nor any of the secondary
references disclose any means whatever for ascertaining
which message (from among the innumerable "messages" present
in the cells) would encode erythropoietin or which reverse
transcript (cDNA) of such a message would encode erythro-
poietin.

---

\*    The Examiner will also recall that the "effect" of
being able to isolate high levels of a secreted
polypeptide from a culture may result from a variety of
"causes" other than high levels of mRNA in the cells.
As examples, one may note the possibility of more
efficient translation of the same quantity of RNA, or
of more efficient secretion of an essentially fixed
quantity of RNA translation product, or even less
efficient activity of destructive proteolytic enzymes
in the cells or medium.

- 26 -

Even a most casual analysis of the secondary references to Cohen, et al. and Paddock reveals that the skilled worker can obtain no help from them in solving the problem of erythropoietin gene identification and isolation from erythropoietin-producing cells. One must note, for example, that the methods of the Cohen, et al. reference p__sume the independent existence of a means for identifying and isolating the "second DNA segment foreign to said cell and having at least one intact gene". Likewise, Paddock or any other reference which might address the successful "reverse transcription" of RNA to generate cDNA, also presumes either a means for isolating only the desired messenger RNA (prior to reverse transcription) or a means for isolating the desired cDNA sequences (following transcription and amplification of multiple messages).

Applicant submits that two separate pieces of evidence further support the conclusion that the Sugimoto, et al., Cohen, et al. and Paddock references do not "combine" to render the presently claimed invention obvious. The first source of evidentiary support is provided by consideration of the specific examples of the specification which describe how Applicant actually made his discovery. The second piece of evidence is provided upon analysis of the Lee-Huang reference previously distinguished.

It is highly pertinent to the issue of whether the cited references render Applicant's invention obvious that his isolation of DNA encoding human erythropoietin did not proceed by cDNA techniques attributed to the references and that his isolation of monkey cDNA encoding erythropoietin employed DNA/DNA hybridization methods and materials nowhere described or suggested by the references. As conspicuously

- 28 -

251 ~~225~~

noted in the present specification, Applicant's isolation of
human EPO-encoding DNA was by screening of a human genomic
library of 1,5000,000 viral plaques in order to isolate what
is now generally recognized as a single copy gene in the
human genome.  The improved methodology employed by
Applicant is itself the subject of non-elected claim 60
which describes use of multiple mixed probes, specific sub-
strates, protease enzyme treatment, specific probe concen-
trations and specific hybridization conditions.  The success
achieved by Applicant through practice of these procedures
must be viewed in the context of the essentially concurrent
pronouncement of the Anderson, et al. reference (Applicant's
Reference C-2) that such screening methods are "...imprac-
tical for isolation of mammalian protein genes when corres-
ponding RNA's are unavailable".  It is also noteworthy that
PCT Application 85/01961, published May 9, 1985 (Applicant's
Reference B-15) relates the opinion of its authors that, as
of its 1984 filing date (and perhaps as of the earlier
priority dates listed), a patentable invention resided in
mixed probe genomic library screening to isolate the human
gene for Factor VIII:C.  See, e.g., claims 21, through 31 of
the application.  The genomic library screening process
employed by Applicant is nowhere "taught" in the cited ref-
erence.

As further conspicuously noted in the specifica-
tion, Applicant's isolation of monkey cDNA involved hybridi-
zation screening as described above and the use of DNA
probes whose sequences were determined by Applicant based on
information unavailable from any published source, much less
from the cited references to Sugimoto, et al., Cohen, et al.
and Paddock.

- 28 -

outside the scope of the disclosure of the cited references
is thus believed to support the conclusion of non-obvious-
ness of the claimed invention.

Applicant next submits that non-obviousness is
still further established by analysis of the Lee-Huang
P.N.A.S. publication. A substantial basis exists for con-
cluding that none of the cDNA sequences whose isolation is
reported in the Lee-Huang publication actually encoded the
polypeptide sequence of erythropoietin and, therefore, that
the work of the publication constitutes a "failed attempt"
to clone and express DNA encoding human erythropoietin. The
principal indicators of failure are found in the publica-
tion's reports concerning the size and restriction enzyme
digestion characteristics of the cDNA inserts alleged to
encode erythropoietin, and in its reports concerning the
molecular weights of the products of in vitro translation of
messenger RNA used to generate the cDNA inserts.

It will be recalled at the outset that the publi-
cation's author concluded that erythropoietin cDNA had been
cloned and expressed on the basis of following types of
experimental evidence:

(1) polypeptide products of in vitro translation
of a particular (sized) fraction of mRNA isolated from human
renal carcinoma cells were immunologically reactive with a
monoclonal antibody ("7A7") against human erythropoietin;

(2) the size ($M_r$) of these polypeptide translation
products was about 29,000 and 15,000, and the larger of
these appeared to correspond in size to the molecular weight

- 28 -

of "aglycosylated" erythropoietin as projected by the author*; and

(3) cDNA derived from the same fraction of mRNA provided for three "positive" clones which (a) upon "expression" provided β-lactamase fusion products immuno-reactive with the 7A7 antibody, and (b) hybridized "back" to the mRNA fraction which had yielded the immunoreactive _in vitro_ expression products.

While the publication purports to address the "cloning and expression" of human erythropoietin cDNA, no expression product of the cDNA was ever isolated and sequenced, nor were any of the cloned cDNAs analyzed for their nucleic acid sequence constitution. Restriction enzyme digestion of the three separate "positive" clones (designated by Lee-Huang as pEp1, pEp2 and pEp3) revealed that the three cDNA inserts had approximate sizes of 1,400 base pairs, 600 base pairs and 200 base pairs, respec-tively. It was Lee-Huang's conclusion (at page 2712) that:

> "Judging from the $M_r$ of the native urinary Ep, the cDNA insert of pEp1 is probably close to the coding size, while those of clones pEp2 and pEp3 are too short to encode the complete sequence of Ep." (Emphasis supplied.)

Applicant respectfully submits that knowledge of the nucleic acid sequence of the human erythropoietin gene as provided by the present application and as substantiated by later analytical work (including the independent work of

---

\* Please refer to the publication text beginning with the second paragraph of the "Results" section on page 2709. Immunoreactive polypeptide product of _in vitro_ mRNA expression in a system incapable of glycosylation were sized at $M_r$ 29,000 and 15,000. A series of comparative tests using crude and purified natural EPO were said to confirm that the $M_r$ 29,000 polypeptide "may represent the aglycosylated form of Ep."

- 30 -

254
252

AM670140616    AM-ITC 00925283

others) indicates that it is highly doubtful that the Lee-Huang actually succeeded in cloning a DNA sequence that encoded human erythropoietin. This is the case despite the fact that mRNA translation products and cDNA fusion gene expression products described by Lee-Huang were noted to be immunoreactive with a particular monoclonal, anti-erythropoietin antibody.

Applicant has attached hereto as Exhibit No. 7 his Declaration relating to a computer-assisted restriction mapping analysis of cDNA sequence encoding human erythropoietin and to his experiments in restriction enzyme digestion of the cDNA. As described in the Declaration, computer analysis of the 1772 base pair cDNA reveals that there are a total of four 6-base pair recognition sites (5'-CTGCAG-3'), allowing for potential cleavage of the DNA by the restriction endonuclease enzyme PstI at four distinct sites. These occur at nucleotide numbers 218, 801, 976, and 1185. [Attached hereto as Exhibit No. 8 is a photocopy of Table VI of the present application whereupon red boxes enclose the four recognition sites. For comparative purposes, attached hereto as Exhibit No. 9 is a photocopy of Figures 2 and 3 of Jacobs et al., Nature, 313, 806-810 (1985) upon which the same recognition sites in the same locations, have been noted.] The Declaration further reveals that actual digestion of a human erythropoietin cDNA-containing circular plasmid with PstI in fact generated the expected total of four fragments. These comprise a large plasmid DNA fragment and three small fragments of sizes quite precisely corresponding in size to those predicted by the computer generated restriction map.

- 31 -

255 255

AM670140617                                        AM-ITC 00925284