FRITSCH ET AL v LIN
Interference Nos. 102,097

concerning the authority of the Patent Office to determine priority of invention must be viewed in the context of the statutory charge to the Federal Circuit to review such decisions for errors in fact and law. Fritsch et al's reference to the unpublished opinion in Piher Sociedad Anomina v. CTS Corp., No. S. 78-174 (N.D.Ind. 1979) as "following" Sinko is without significance to the issues involved here. In that decision, the Indiana District Court, ruling in an action under 35 U.S.C. 146, remanded the case to the Patent Office for a decision on 102(g) issues which the Board had refused to determine on collateral estoppel grounds even though the parties had stipulated in an earlier district court action that 102(g) issues were to be determined in the first instance by the Patent Office.

Likewise, Fritsch et al's reference to Childers Foods, Inc. v. Rockingham Poultry Co-Op, Inc., 203 F.Supp. 794, 133 USPQ 648, 650 (W.D.Va. 1962) is both inapt and misleading. That case involved the denial of a stay of an infringement action pending interference proceedings. In quoting from the district court decision, Fritsch et al cropped the court's notation that it was the moving party's counsel who commented on the lack of influence of a district court determination on the conclusion to be reached in the interference. Moreover, in quoting the court's notation on the "particular expertise" of the Patent Office in determination of priority of invention, Fritsch et al failed to quote the very next sentence wherein the court denied any binding effect of such a determination, stating:

> [t]he conclusion reached on this question in the Interference Proceeding, while not binding on this court, would certainly be most helpful.

32

Dockets.Justia.com

Fritsch et al's argument that, "[i]n this proceeding, however, Fritsch will prevail if he can prove prior conception by a preponderance of evidence" is legally unsound. It disregards the clearcut ruling of the Federal Circuit. The law of the case is that the invention of a purified and isolated DNA sequence encoding human EPO involved simultaneous conception and reduction to practice. Fritsch et al admit that this DNA sequence was reduced to practice in their hands long *after* Lin's reduction to practice. Thus, a "conception" of the DNA sequence by Fritsch et al prior to Lin's *cannot* be shown by *any* evidence, whether the standard of proof is by a preponderance of the evidence or on a clear and convincing basis.

Furthermore, Fritsch et al's arguments on the evidentiary showing which purportedly would allow them to prevail in this proceeding wholly ignores the District Court's evidentiary findings concerning priority of invention *if* it could have been possible to form a conception of the purified and isolated EPO gene without actually reducing it to practice, i.e. if proposing a possible cloning strategy amounted to conception of the gene. The District Court specifically found a corroborated conception of the same cloning strategy by Lin in October, 1981, i.e. two months before any date of conception alleged for Edward Fritsch (13 USPQ2d at page 1763). Thus, Fritsch et al cannot here establish prior conception by a preponderance of evidence when Edward Fritsch did not develop the idea of his cloning strategy until after Lin's corroborated conception of the same. Furthermore, the District Court specifically found that, even in the absence of proof of Lin's earlier conception of a cloning strategy, plaintiff (Lin's assignee) had proven lack of diligence by Edward Fritsch in reducing the strategy to practice (pages 1763-1764).

FRITSCH ET AL v LIN
Interference Nos. 102,097

Fritsch et al cannot, therefore, establish by a preponderance of evidence diligence towards reduction to practice before Lin when it has already been proven that Edward Fritsch was guilty of lapses in diligence virtually throughout the period between December 1981, through to contracting with Miyake for additional EPO protein in May of 1984, long after Lin had cloned the EPO gene (see again pages 1763-1764, 13 USPQ2d). While Fritsch et al have provided some additional evidence regarding the proposed diligence by Fritsch, they have failed to provide any evidence to rebut the lapses in diligence found by the District Court.

Fritsch et al cannot logicallay argue in opposition to Lin's motion that the present interference involves a different invention (expression process) from that involved in the litigation. They earlier said that the subject matter at issue in Interference No. 102,096 and the present case represent "different manifestations of the same invention". Additionally, the litigation addressed priority of invention of Lin's '008 claims to host cells transformed with the isolated EPO gene. Consideration of such claims is tantamount to consideration of the present process count, particularly in view of the District Court's findings on the in vivo biological activity of the products of those host cells.

In attempting to distinguish the District Court's determination, the Fritsch et al opposition tries to equate the "isolating" step of the count with "purifying". There is no valid basis for this. Isolating in the context of the count obviously means nothing more than separating the product from the cells (LR 229, 975). The culture media samples tested by Dr. Egrie were frequently referred to as isolates. It is also noted that Fritsch et al, when presenting their claims 72 and 73, which correspond to the count, referred

34

to page 6, lines 18-20; page 27, line 23 through page 29, line 16 (i.e. Examples 6 and 7) and page 32, line 11 through page 34, line 23 (i.e. Examples 10-12) of their disclosure as support for these claims. See page 2, Paper No. 16 in the Fritsch et al application file. Nowhere in these portions of the Fritsch disclosure is there any indication that the expression product is purified. The examples refer (see Example 6, page 28, line 5) to harvesting and use of the supernatant media for assay (page 33, lines 1-3). This is exactly the process Lin discloses and the process shown in Lin's proofs. It involves isolation but not purification. Interestingly, page 6, lines 18-20 of the Fritsch et al specification, which Fritsch et al referred to for support, refers to "the production of EPO by in vitro expression of those genes". This is what the District Court found Lin was the first to do. The disclosure statement also goes completely contrary to the Fritsch et al arguments that expression without purification does not satisfy the count language.[12]

In presenting his motion for judgment with respect to patentability as well as priority issues, Lin is mindful of the holding in Perkins v. Kwon, 886 F.2d 325, 12 USPQ 1308 (Fed. Cir. 1989). However, the present situation is fundamentally different from that

---

[12]    See also the following cross-examination testimony by Lin which clearly and unequivocably distinguishes between isolation and purification (LR229):

BY MR. RICHTER:

Q.    What did Dr. Browne or Ralph Smalling do to isolate the glycosylated polypeptide?
A.    In this case isolating does not mean purify. It means that glycosylate EPO is produced in the medium, is present in the medium, they isolate this medium and they use for the assay.
Q.    Used for?
A.    Used for the in vivo assay or in vitro assay, whatever we have to do with the products.
Q.    And that's your understanding of the term "isolating"?
A.    Yeah. That's right. Yes.

35

in the Kwon case. A key difference is that Kwon involved the issue of whether or not priority should be determined at final hearing after the subject matter had been found unpatentable to a party. Disregarding priority in Kwon would have meant that the later inventor would obtain a patent because of an on-sale bar against the first inventor. In the present case, the Courts have already determined priority favorably to Lin. The present position is, therefore, the exact reverse of the Kwon situation. Moreover, the Courts have decided the same priority and best mode issues favorably to Lin based on the record before the Board. As reflected by the Fritsch et al briefs, the obviousness issue is not substantively different from that decided in the litigation. Issues dealt with and determined in the litigation should not be relitigated in the present proceedings. In re Katz, supra. See also Amoco Company v. Zarb, 402 F.Supp. 1001 (D.C. D.C., 1975); Nixon v. Richey, 513 F.2d 430, 438 (note 75) (D.C. Cir. 1975); IB Moore's Federal Practice, ¶ 0.416[3] at 523 (2nd Ed.).

The Lin motion for judgment should be granted for the reasons noted. No substantive issues remain for interference consideration.

### (b)     Lin Is the Prior Inventor of the Subject Matter at Issue

Since the Federal Circuit has found that Lin was the first to have a conception of the DNA sequence (upon reduction to practice), and it has not been questioned that Lin produced in vivo biologically active recombinant human EPO before Fritsch et al even conceived of the DNA sequence, it follows that Lin is entitled on the record to priority as to the present count. The argument presented by Fritsch et al in

favor of priority based on his version of a probing method for possible use (FB 21-31)
totally disregard the Courts' finding that conception of the purified and isolated EPO gene
did not occur until the gene was reduced to practice.  Fritsch had no concept of the
constitution of the gene before the gene was isolated and identified.  By that time, Lin had
expressed recombinant human EPO and found it to have in vivo biological activity.

The Fritsch argument that he was diligent (FB 28-31) also bypasses the
fundamental point that diligence is of no consequence until there is conception of an
invention which Fritsch did not have until he actually reduced the EPO gene to practice.
Lin does not believe Fritsch has established diligence over the time period he has alleged,
particularly in view of the numerous time spaces of unexplained inactivity.

The Federal Circuit decision dealt squarely with the Fritsch et al arguments
in affirming the District Court's finding that Lin was the first inventor of the EPO DNA gene
on the basis of simultaneous conception and reduction to practice.  Thus, the Court
decision reads (18 USPQ2d at 1020):

> *Defendants assert error in the district court's legal conclusion that
> in this case Lin's conception occurred simultaneously with reduction
> to practice.  See, e.g. Hybritech Inc. v. Monoclonal Antibodies, Inc.,
> 802 F.2d 1367, 1376, 231 USPQ 81, 87 (Fed. Cir. 1988), cert. denied,
> 480 U.S. 947 (1987).  They claim that Fritsch was first to conceive a
> probing strategy of using two sets of fully-degenerate cDNA probes
> of two different regions of the EPO gene to screen a gDNA library,
> which was the strategy which the district court found eventually
> resulted in the successful identification and isolation of the EPO gene.
> Defendants further claim that Fritsch conceived this strategy in 1981,
> was diligent until he reduced the invention to practice in May of 1984,
> and thus should be held to be a 102(g) prior inventor over Lin, who
> reduced the invention to practice in September of 1983.*

FRITSCH ET AL. v. LIN
Interference Nos. 102,097

The Federal Circuit then went on to agree with the District Court's position regarding simultaneous conception and reduction to practice, stating (page 1021):

> The invention recited in claim 2 (the count) is a 'purified and isolated DNA sequence' encoding human EPO.  The structure of this DNA sequence was unknown until 1983, <u>when the gene was cloned by Lin; Fritsch was unaware of it until 1984</u>.  As Dr. Sadler, an expert for GI, testified in his deposition: 'You have to clone it first to get the sequence'... .  Prior to 1983, the amino acid sequence for EPO was uncertain, and in some positions the sequence envisioned was incorrect.  Thus, until Fritsch had a complete mental conception of a purified and isolated DNA sequence encoding EPO and a method for its preparation, in which the precise identity of the sequence is envisioned, or in terms of other characteristics sufficient to distinguish it from other genes, all he had was an objective to make an invention which he could not then adequately describe or define.  (Matter in parenthesis and underscoring added.)

It is to be noted that the argument considered by the Federal Circuit, and dismissed, is the exact approach that Fritsch et al attempt to again treat here as a <u>de novo</u> matter.  However, Lin's priority case begins with the recognition by the Federal Circuit that Lin was the first to conceive and reduce to practice the purified and isolated DNA sequence encoding human EPO.  Fritsch et al have not challenged this finding.  It is also unchallenged by Fritsch that this sequence was used by Lin in transformed mammalian cells for expression to obtain <u>in vivo</u> biologically active recombinant human EPO and that all of this work was done by Lin <u>before Fritsch et al even conceived the sequence</u>, according to the Federal Circuit and District Court decisions.  See pages 1020-1022 of the Federal Circuit decision and pages 1759-1764 of the District Court decision

The expression and isolation of the expression product as required to test for in vivo biological activity clearly meet the limitations of the present process count.[3] Hence, it is not necessary to go beyond the undisputed facts as found by the District Court and left unchanged by the Federal Circuit to determine that Lin's expression and determination of in vivo biological activity of the expressed product satisfies all of the limitations of the count of the present interference and represents reduction to practice by Lin well prior to the Fritsch et al conception date. However, the present Lin record also includes further confirmation that the expression and testing referred to by the District Court constituted reduction to practice of the process of the count. See, for example, the testimony of Drs. Browne and Egrie that the work which they did on Lin's behalf involved all of the features of the count (LR 30, 67, 68). Lin also confirmed this (LR 5).

It is important to recognize that the record in this interference contains no evidence on the issue of simultaneous conception and reduction to practice that was not before the District Court and the Federal Circuit. The testimony of Fritsch et al and his co-workers is, at best, duplicative of the Rule 608(b) testimony that was in evidence in the District Court and argued in the trial to establish prior conception of Edward Fritsch.[4]

---

[3]    As noted earlier, there is no basis whatsoever for Fritsch et al to argue that "isolating" in the claim means "purifying". The term "isolating" as used is obviously generic in nature and contemplates harvesting the expression media from the cells as done for test purposes. See again Lin's testimony (LR 229).

[4]    If anything, Fritsch et al's 608(b) evidence was significantly weakened by cross-examination of these witnesses who were brought up to provide live testimony. Cross-examination established numerous instances of work previously credited to the GI EPO projects was actually for other GI projects and work on projects that had nothing to do with the two degenerate probe genomic library screening strategy allegedly conceived by Edward Fritsch in December, 1981. Likewise the Fritsch et al declaration testimony

39

Fritsch et al persist in characterizing the invention of the count as a strategy for isolating the EPO gene, which strategy was allegedly conceived by Edward Fritsch or by Fritsch et al at some time prior to Lin.[*] The Federal Circuit's ruling completely disposes of this argument (18 USPQ2d at page 1021):

> Fritsch had a goal of obtaining the isolated EPO gene, whatever its identity, and even had an idea of a possible method of obtaining it, but he did not conceive a purified and isolated DNA sequence encoding EPO and a viable method for obtaining it *until after Lin*. It is important to recognize that neither Fritsch nor Lin invented EPO or the EPO gene. The subject matter of claim 2 was the novel *purified and isolated* sequence which codes for EPO, and neither Fritsch nor Lin knew the structure or physical characteristics of it and had a viable method of obtaining that subject matter until it was actually obtained and characterized. Underscoring added.)

The Court disagreed completely with Fritsch's argument that Fritsch was the first inventor because of his probing strategy. Thus, the Court stated:

> Defendants further argue that because the trial court found that the probing and screening method employed by Lin is what distinguished the invention of the '008 patent over the prior art, Fritsch's strategy in 1981 had priority over Lin's use of that strategy. We disagree. The trial court found that Fritsch's alleged conception in 1981 of an approach that might result in cloning the gene was mere speculation. Conception of a generalized approach for screening a DNA library that might be used to identify and clone the EPO gene of then unknown constitution is not conception of a "purified and isolated DNA sequence" encoding human EPO. It is not "a definite and permanent idea of the complete and operative invention". Fritsch's conception of a process had to be sufficiently specific that one skilled in the relevant art would succeed in cloning the EPO gene. See, <u>Coleman</u>, 754 F.2d at 359. 224 USPQ at 862. Clearly, he did not have that conception because he did not know the structure of EPO or the EPO gene.

---

[*] The Fritsch et al brief (page 20) actually invites the Board to pick from among <u>five</u> dates for completeness of the Fritsch et al cloning strategy.

Commenting further on the inadequacy of the Fritsch et al position, the
Federal Circuit held that (pages 1021-1022):

> The record indicates that several companies, as well as Amgen and
> GI, were unsuccessful using Fritsch's approach. As the trial court
> correctly summarized:
>
>> 'Given the utter lack of experience in probing genomic libraries
>> with fully degenerate probes and the crudeness of the
>> techniques available in 1981, it would have been mere
>> speculation or at most a probable deduction from facts then
>> known by Dr. Fritsch that his generalized approach would
>> result in cloning the EPO gene.' 13 USPQ2d at 1760.
>
> As expert testimony from both sides indicated, success in cloning
> the EPO gene was not assured until the gene was in fact isolated
> and its sequence known. Based on the uncertainties of the method
> and lack of information concerning the amino acid sequence of the
> EPO protein, the trial court was correct in
> concluding that neither party had an adequate conception of the
> DNA sequence until reduction to practice had been achieved; Lin
> was first to accomplish that goal.
>
> Defendants also argue that the court failed to consider that 1983,
> just prior to Lin's conception, was the relevant time for determining
> the completeness of Fritsch's conception, not 1981. However, the
> record shows that the court did consider what occurred in 1983.
> Moreover, Fritsch had no more of a conception in 1983 than he
> did in 1981, because he did not then know the sequence of the gene
> encoding EPO. (Underscoring added.)

This means that all of the evidence from the District Court proceedings,
which Fritsch et al have reintroduced into these proceedings, including his alleged
strategy involving a possible method of probing suitable for cloning the DNA sequence,
is of no consequence and can be dismissed as irrelevant to priority. According to the
Federal Circuit decision, Fritsch et al could not have a conception of the DNA sequence
until they had actually reduced to practice the DNA sequence. By that time, according

FRITSCH ET AL v LIN
interference Nos  102.097

to the undisputed facts, Lin had not only purified and isolated the DNA sequence but he

or others at his request had used it to produce in vivo biologically active rcombinant

human EPO.

While the foregoing is believed to be dispositive of the priority issue as

between Fritsch et al and Lin, it is useful to separately set out the District Court's

undisputed findings as to the work done by Lin and Fritsch in reducing the invention to

practice as this serves to underscore Lin's priority position.  Thus, the District Court

found, the Federal Circuit did not question, and Fritsch et al have not challenged, the

following findings of facts as to Lin's work (at page 1748, 13 USPQ2d):

> *The successful cloning of the EPO gene took place in September or early October 1983. (Tr. 4, 64-66; 5, 123-124). This was the first time that Lin ever designed, ordered and used two sets of probes, both fully degenerate, from two different regions of the EPO gene to screen a genomic library. (Tr. 5, 91, 124). Amgen (someone other than Dr. Lin) sequenced the gene to confirm it was the EPO gene (Tr. 4,74).*
>
> *In late October, 1983, Lin cloned the monkey cDNA EPO sequence. (Tr. 4, 72).  On December 3, 1983, Lin also hybridized the human EPO gene to monkey EPO cDNA so that he could determine from an electron micrograph which area of the human DNA consisted of introns, and what the sizes of the exons and introns were. (Tr. 4, 68-72; PX 63-38).*
>
> * * * * * * * * * * * * *
>
> *By January 10, 1984, Amgen had expressed human EPO in human embryonic kidney cells called "293" cells and in COS cells, which are monkey kidney cells. (Tr. 4-75-77; PX 63-39; PX 63-41). Someone other than Dr. Lin did the work with the mammalian expression system. (Tr. 5, 51-52). Lin was personally involved in the E. Coli expression of EPO. (Tr. 5,52). On February 13 and 14, 1984, Amgen conducted experiments to show that the*

43

recombinant human EPO produced in the COS cell
was biologically active. (Tr. 4, 80).

* * * * * * * * * * * * *

From March 1-9, 1984, Amgen conducted an in vivo
bioassay and determined that the recombinant EPO
was biologically active. (Tr. 4, 82-83).

On March 15, 1984, Lin obtained the human full length
EPO cDNA gene. (Tr. 4, 83; 5, 28).

* * * * * * * * * * * * *

By May 2, 1984, human rEPO had been expressed in
CHO cells. (Tr. 4, 86). Jeff Browne and Ralph Smalling
worked together on the EPO project team, which Lin
continued to head through 1984...

As for Fritsch et al, the District Court noted that Fritsch et al were

unsuccessful in cloning the EPO gene prior to August, 1984 summarizing the Fritsch et

al position as follows (page 1751):

On May 30, 1984, the genomic library for isolating the EPO gene
was plated and hybridized using two sets of probes, both fully
degenerate, from different regions of the amino acid sequence. (Tr.
26, 96-98). This process resulted in the identification of two clones
in July, 1984, both of which were the full gene for EPO. (Tr. 26, 100-
102). This was the first time that GI used two sets of fully degenerate
probes based on the correct amino acid sequence for EPO. (Tr. 31,
46). Also, Dr. Fritsch used a hybridization solution called TMAC,
which had not been used by Dr. Lin when he cloned the EPO gene.
(Tr. 7, 101; 26, 86).

The positive clones were then used to construct a single long probe
to screen a cDNA library constructed from human fetal liver, and on
August 6, 1984, cDNA clones were successfully isolated. (Tr. 26,
104-106). GI transfected a CHO cell with a cDNA clone for EPO; this
was the expression system with which GI was most familiar. (Tr. 26,
107).

44

FRITSCH ET AL v. LIN
Interference Nos. 102,097

The District Court's uncontested factual findings can thus be summarized
in the following chronology:

FRITSCH ET AL v LIN
Interference Nos. 102,097

| **ACTIVITY** | **DATE** |
|---|---|
| Lin clones human EPO gene | Sept.-Oct. 1983 |
| Amgen (for Lin) confirms EPO gene by sequencing | Sept.-Oct. 1983 |
| Lin clones monkey EPO gene | Late Oct. 1983 |
| Amgen (for Lin) expresses human EPO gene in 293 and COS cells | Jan. 10, 1984 |
| Amgen (for Lin) determines biological activity of recombinant human EPO gene expression product | Feb. 13-14, 1984 |
| Amgen (for Lin) determines in vivo biological activity of recombinant human EPO gene expression product | March 1-9, 1984 |
| Amgen (for Lin) expresses human EPO gene in CHO cells | May 2, 1984 |
| Fritsch identifies two clones | July 1984 |
| Fritsch expresses human EPO gene in CHO cells | after Aug. 1984 |

The above undisputed factual summary from the District Court decision thus clearly and unequivocally shows that Lin made the invention at issue, i.e., he expressed in vivo biologically active recombinant human EPO by a process involving culturing (or growing) a mammalian host cell transformed with the isolated EPO DNA

46

FRITSCH ET AL. v. LIN
Interference Nos. 102,097

sequence and isolating an in vivo biologically active expression product, before Fritsch et al even conceived of the essential DNA sequence[*].

It is appreciated that the Court decisions use shorthand language (e.g. "expressed") concerning the preparation process rather than reciting the specific language of the present count. However, there can be no distinction between Lin's expression of in vivo biologically active recombinant human EPO using 293, COS cells and CHO cells and the determination of its activity as found by the Courts and the specific language of the count. Glycosylation is necessary to provide in vivo biological activity. This is art-recognized and the Examiner-in-Chief has noted that Fritsch et al have not challenged this. See Paper No. 44, sentence bridging pages 2-3. Transforming or transfecting a mammalian host cell (e.g. 293, COS or CHO) with the DNA sequence of the Lin '008 patent and growing (or culturing) this transformed cell under nutrient condition necessarily and inherently involves transcription, translation and glycosylation as specified in steps (a)(i)(ii)(iii) of the Count to provide the in vivo biologically active recombinant EPO. Fritsch et al cannot challenge this as their claims corresponding to the Count simply recite culturing and isolating. Furthermore, they recognized the identity of the respectively claimed processes by not bringing a motion urging no interference in fact. This leave step (b) for consideration and Lin notes that determination of the in vivo biological activity obviously requires isolation (b) of the product from the host cells.

_____

[*]While it is not necessary to do so in view of the Federal Circuit's simultaneous conception/reduction to practice position, it is noted that the District Court also found that Lin conceived the probing method in October, 1981, i.e. before Fritsch et al (13 USPQ2d at 1763). Hence, as noted earlier, Fritsch et al could not prevail even if, in theory, conception could occur prior to reduction to practice on the basis of the probing method.

47

Fritsch et al cannot validly argue the contrary.  The isolation step (b) means nothing more than separating the expressed product from the cells (LR 229) and would obviously be necessary to determine the in vivo biological activity of the expression product.  Any effort by Fritsch et al to argue that the isolation step of the Count means purification is nothing more than an afterthought which is inconsistent with Fritsch et al's own disclosure, as noted earlier.

Manifestly, the Lin evidence shows that Browne carried out the process of the count using COS cells transfected with Lin's isolated human EPO encoding gene and that Dukes should that the expressed product to be in vivo biologically active by March 1984 (expression products E3 and E7) and that Browne's CHO cell expressed human EPO (H3 and B11) was found to have in vivo activity by June 1984.  All of this is prior to Fritsch et al's conception date.

Furthermore, it is noted that Fritsch et al have not proven an actual reduction to practice as they have  not established that their expression product had in vivo biological activity.  See discussion under "The Fritsch Priority Evidence".

In view of the foregoing, it is submitted that Lin is entitled to priority as to the count.

## (c)    Lin Has Satisfied Best Mode Requirements

The Fritsch et al argument (FB 35-44) that Lin has failed to meet best mode requirements is nothing more than a re-hash of the arguments which were met head on by Lin before the District Court and Federal Circuit and on which these Courts ruled

favorably for Lin. No new evidence has been adduced by Fritsch et al in this proceeding.

Fritsch et al sought no discovery on this issue when their motion I was deferred for final

hearing. The same record which prompted the District Court to observe that:

> [T]here is no evidence that Dr. Lin knew of a better
> mode which he failed to disclose at all...

and thus

> those of ordinary skill in the art could produce
> mammalian cells with similar levels of [EPO]
> production identified in Example 10...

is presented to the Board. The attempt by Fritsch et al to secure a different result from

the Board must fail.

In affirming the District Court on best mode with respect to the same

arguments as now urged by Fritsch, the Federal Circuit decision states (18 USPQ 2d at

page 1023):

> Defendants argue that the district court erred in failing to hold the
> '008 patent invalid under 35 U.S.C. §112, asserting that Lin failed to
> disclose the best mammalian host cells known to him as of
> November 30, 1984, the date he filed his fourth patent application.
>
> The district court found that the "best mode" of practicing the claimed
> invention was by use of a specific genetically-heterogeneous strain
> of Chinese hamster ovary (CHO) cells, which produced EPO at a rate
> greater than that of other cells. It further found that this strain was
> disclosed in Example 10 and that Lin knew of no better mode. GI
> argues that Lin's best mode was not adequately disclosed in Example
> 10 because one skilled in the art could not duplicate Lin's best mode
> without his having first deposited a sample of the specific cells in a
> public depository. The issue before us therefore is whether the
> district court erred in concluding that Example 10 of the '008 patent
> satisfied the best mode requirement as to the invention of the
> challenged claims and that a deposit of the preferred CHO cells was
> not necessary.

49

After commenting on the relevant case law, the Court went on to state:

> We agree that the district court did not err in finding that defendants have not met their burden of proving a best mode violation.
>
> As noted above, the district court found that the best mode of making the CHO cells was set forth in Example 10. As the district court stated, while it was not clear which of two possible strains Lin considered to be the best, the cell strain subjected to 1000 nanomolar MTX (methotrexate) or that subjected to 100 nanomolar MTX, the best mode was disclosed because both were disclosed.[6] Defendants argue that this disclosure is not enough, that a deposit of the cells was required.
>
> \* \* \* \* \*
>
> The district court found that the claims at issue require the use of biological materials that were capable of being prepared in the laboratory from readily available biological cells, using the description in Example 10. The court also found that there were no starting materials that were not publicly available, that were not described, or that required undue experimentation for their preparation in order to carry out the best mode. The court noted that Lin testified that the isolation of the preferred strain was a "routine limited dilution cloning procedure[]" well known in the art. Dr. Simonsen, GI's own expert, testified that the disclosed procedures were "standard" and that: with the vectors and the sequences shown in Example 10, I have no doubt that someone eventually could reproduce -- well, could generate cell lines [sic, strains] making some level of EPO, and they could be better, they could be worse in terms of EPO production.
>
> The district court relied on this testimony, and, upon review, we agree with its determination. The testimony accurately reflects that the invention, as it relates to the <u>best</u> <u>mode</u> host cells, could be practiced by one skilled in the art following Example 10. Thus, the best mode was disclosed and it was adequately enabled

---

6    In its opinion, the district court stated that "the best way to express EPO was from mammalian cells ... and that a cell line derived from 11 possible clones from the CHO B11. 3.1 cell strain was to be used for Amgen's master working cell bank, which was expected to be started on November

FRITSCH ET AL v LIN
Interference Nos. 102,097

26, 1984". 13 USPQ 2d at 1772. At another point, the court stated that Amgen "did disclose the best mode in Example 10 of the invention, when it described the production rates of the 100 nanomolar-amplified cells (the B11 3.1 cell strain) and one micromolar-treated cells." Id.

The Court then went on to distinguish the case from the situation where biological cells were obtained from unique soil samples, noting at page 1025:

> On the other hand, when, as is the case here, the organism is created by insertion of genetic material into a cell obtained from generally available sources, then all that is required is a description of the best mode and an adequate description, not deposit of the cells. If the cells can be prepared without undue experimentation from known materials, based on the description in the patent specification, a deposit is not required. See Feldman v. Aunstrup, 517 F.2d 1351, 1354, 186 USPQ 108, 111 (CCPA 1975), ("No problem exists when the microorganisms used are known and readily available to the public".), cert. denied, 424 U.S. 912 [188 USPQ 720] (1976). Since the court found that that is the case here, we therefore hold that there is no failure to comply with the best mode requirement for lack of a deposit of the CHO cells, when the best mode of preparing the cells has been disclosed and the best mode cells have been enabled, i.e., they can be prepared by one skilled in the art from known materials using the description in the specification.

The Court also dealt with the Fritsch argument regarding the possibility of "duplicating" Lin's example (at 1026-1027) as follows:

> Defendants also assert that the record shows that scientists were unable to duplicate Lin's genetically-heterogeneous best mode cell strain. However, we have long held that the issue is whether the disclosure is "adequate", not that an exact duplication is necessary. Indeed, the district court stated that
>
> > [t]he testimony is clear that no scientist could ever duplicate exactly the best mode used by Amgen, but that those of ordinary skill in the art could produce mammalian host cell strains or lines with similar levels of production identified in Example 10.
>
> 13 USPQ 2d at 1774. What is required is an adequate disclosure of the best mode, not a guarantee that every aspect of the specification

51

*be precisely and universally reproducible. See In re Gay, 309 F.2d
769, 773, 135 USPQ 311, 316 (CCPA 1962).*

Regarding Lin's deposits, the Court noted (at 1026):

*Defendants finally argue that Lin's failure to deposit the transfected
cells notwithstanding the fact that he was willing to deposit
essentially worthless cell material was evidence of deliberate
concealment. We have already stated that deposit of the host cells
containing the rEPO gene was not necessary to satisfy the best mode
requirement of Section 112. The best mode was disclosed and a
deposit was not necessary to carry it out. Therefore, the fact that
some cells were deposited, but not others, is irrelevant.*

Thus, each and every point argued in the Fritsch et al brief regarding Lin's

best mode has already been fully dealt with and determined in Lin's favor by the District

Court and Federal Circuit. There is no evidence, as pointed out by the District Court and

affirmed by the Federal Circuit, that Lin held back or concealed information necessary for

the practice of his invention as disclosed in each of his applications. To show that best

mode requirements have not been satisfied, there must be clear evidence that the

preferred mode contemplated by the inventor at the time of filing of the patent application

was held back or concealed. There is no such evidence here.

As the Court stated in Hybritech, Inc. v. Monoclonal Antibodies, Inc., 231

USPQ 81, 94 (Fed.Cir. 1986):

*Because not complying with the best mode
requirements amounts to concealing the
preferred mode contemplated by applicant at
the time of filing, in order to find that the best
mode requirement is not satisfied, it must be
shown that the applicant knew of and concealed
a better mode than he disclosed. (emphasis
supplied)*

52

The Federal Circuit and District Court found Lin's Example 10 satisfied best mode requirements.[19] Lin viewed the Example 10 host cells as his best mode and Fritsch has offered no evidence that Lin contemplated a better mode of practicing or carrying out his invention than that disclosed in Example 10. Lin has satisfied best mode requirements, and Fritsch et al have not at all met their burden of establishing the contrary.[20]

### (d)    Lin's Claims Are Patentable Under 35 USC 103

The Fritsch argument (FB 44-51) is also, in essence, nothing more than a re-hash of the arguments against Lin's DNA and host cell claims advanced by Fritsch's assignee and dismissed by the Courts. The record before the Board is no different than that which prompted the District Court and the Federal Circuit to find that Lin's DNA and host cell inventions were unobvious. It is noteworthy that the Fritsch et al brief presents exactly the same argument on obviousness of the present count as was presented in its

---

[19]    The 11 clones developed as candidates for Amgen's prospective master working cell bank were from the CHO B11 3.1 cell strain, and Lin's knowledge as to these, was included in the Court's consideration. See District Court review (page 1772).

[20]    Attention is also called to the footnote 5 of the Federal Circuit decision (18 USPQ2d at 1023) which reads:

> Defendants assert that all the claims should be invalid for failure to disclose the best mode. We perceive that the best mode issue only relates to the host cell claims 4, 6, 23-27 and 29. Absent inequitable conduct, a best mode defense only affects those claims covering subject matter the practice of which has not been disclosed in compliance with the best mode requirement. See Northern Telecom, Inc. v. Datapoint Corp., 908 F2d 931, 940, 15 USPQ 2d 1321, 1328 (Fed. Cir.) cert. denied _____ U.S. _____, 111 S.Ct. 296 (1990).

53

arguyment in the 102,096 interference except for two sentences beginning at the bottom of FB 49 and another two sentences in the penultimate paragraph of FB 49. The cryptic reference at FB 47 to "General Finding 2-3 et seq." simply invites attention to proposed findings III-36 to III-44 concerning Lin's prosecution. The FB 49 citation to proposed finding III-49 is an attempt to invest the Toole et al patent with significance.

Fritsch et al state (FR 46) that _if_ the cloning approach was "obvious to try" and there was a reasonable chance of success, then the preparation of the host cells would be obvious. However, the Federal Circuit rejected this argument and affirmed that the EPO DNA sequence and host cells transformed therewith are not obvious from the prior art, including the Toole et al patent. Thus, the Federal Circuit, in agreeing with the District Court's position that the Lin '008 patent claims were valid over the prior art, including the Toole patent, stated (1022):

> The district court specifically found that, as of 1983, none of the prior art references "suggest[s] that the probing strategy of using two fully-redundant [sic] sets of probes, of relatively high degeneracy [sic], to screen a human genomic library would be likely to succeed in pulling out the gene of interest." 13 USPQ2d at 1768. While it found that defendants had shown that these procedures were "obvious to try", the references did not show that there was a reasonable expectation of success. See _In re O'Farrell_, 853 F.2d 894, 903-04, 7 USPQ2d 1673, 1680-81 (Fed. Cir. 1988).

> Defendants challenge the district court's determination, arguing that, as of September 1983, one of ordinary skill in the art would have had a reasonable expectation of success in screening a gDNA library by Lin's method in order to obtain EPO. We agree with the district court's conclusion, which was supported by convincing testimony. One witness, Dr. Davies of Biogen, another biotechnology company that had worked on EPO, stated that he could not say whether Biogen scientists would have succeeded in isolating the EPO gene if Biogen had the EPO fragments that were available to Lin in 1983.

FRITSCH ET AL v LIN
Interference Nos. 102,097

> Dr. Wall, a professor at UCLA, testified that it would have been
> "difficult" to find the gene in 1983, and that there would have been no
> more than a fifty percent chance of success. He said, "you couldn't
> be certain where in genomic DNA your probe might fall". The
> court found that no one had successfully screened a genomic library
> using fully-degenerate probes of such high redundancy as the probes
> used by Lin. In the face of this and other evidence on both sides of
> the issue, it concluded that defendants had not shown by clear and
> convincing evidence that the procedures used by Lin would have
> been
> obvious in September 1983. We are not persuaded that the court
> erred in its decision.

The Federal Circuit then summarized its opinion on the obviousness issue
as follows:

> Hindsight is not a justifiable basis on which to find that ultimate
> achievement of a long sought and difficult scientific goal was
> obvious. The district court thoroughly examined the evidence and
> the testimony. We see no error in its result. Moreover, if the DNA
> sequence was not obvious, host cells containing such sequence, as
> claimed in claims 4 and 6, could not have been obvious. We
> conclude that the district court did not err in holding that the claims
> of the patent are not invalid under Section 103.

Clearly, in the circumstances, there is no merit whatsoever in the Fritsch

argument under Section 103. The Primary Examiner recognized that the subject matter

at issue was patentable and quite properly so. Significantly, Fritsch et al do not say that

the process is unpatentable to them, only to Lin, and it is evident that their arguments are

pitched primarily on the idea that obtaining the EPO DNA sequence was obvious (FB 47,

48). However, the Federal Circuit decision clearly confirms that the Fritsch et al position

is incorrect and, in light of the Federal Circuit holding that the DNA sequence and host

cells transfected therewith are unobvious, it follows that Lin's process claims should also

define unobvious and patentable subject matter. The DNA sequence and host cells

transformed or transfected therewith were not available in the prior art and the process at issue could not be performed. Furthermore, it was not obvious that in vivo biologically active recombinant human EPO could be made by the claimed process. Until Lin obtained the sequence, Browne used it in expression and Egrie with Dukes found the product had in vivo biological activity, the process at best was only a wish.

While it is probably unnecessary to do so, it is noted for emphasis that the Toole et al patent (U.S. 4,757,006), on which Fritsch relies, is concerned with a fundamentally different protein (Factor VIII) and says nothing about EPO. The Toole patent was considered by the District Court on the arguments presented by Fritsch et al at, for example, FB 51 and properly dismissed. It is further noted that Fritsch et al were not able to isolate the EPO gene and prepare recombinant EPO without a great deal of work independent of, and notwithstanding, the availability of the Toole et al disclosure. All of this, of course, underscores the unobviousness of the invention.

Finally, it is noted that while the District Court addressed the Factor VIII work at GI in the context of representation in the Toole et al patent, the status of the patent as a 102(e)/103 prior art reference against Lin has not been established. The undisputed finding of the District Court was that, with respect to Lin, "[T]he successful cloning of the EPO gene took place in September or early October, 1983" (relying on the testimony and laboratory notebooks of Lin). The Toole et al patent, on the other hand is based on an application filed October 28, 1983, and has an effective date for purposes of 35 U.S.C. 102(e) after Lin's reduction to practice of the EPO gene. Hence, the Toole

56

et al patent is not citable as prior art."  Fritsch et al's references to the alleged

September, 1983, dates of cloning work at GI are not relevant to obviousness of Lin's

invention because the secret work on Factor VIII is not prior art to Lin.

(e)    **Lin Is the True Inventor of the Process At Issue**

Lin is the true inventor of the process defined by the count and his claims

corresponding to the count.  Fritsch admits as much when he states in his brief (FB 24)

that "as in the '096 interference, priority turns upon the first conception of the purified and

isolated EPO gene".  Clearly, priority and inventorship go hand-in-hand.  Thus, if Lin is

the first to conceive the purified and isolated gene, as the Federal Circuit has affirmed,

priority and inventorship of the count of this interference, and the invention represented

thereby go to Lin.

Fritsch et al argue that Lin is not the inventor of the process involving

expression of recombinant EPO because Lin did not presently carry out any of the

process steps (culturing and isolating).  However, this argument clearly has no merit.  It

is not essential for the inventor himself to carry out the steps involved.  Furthermore, by

the acknowledgement of Fritsch et al, the isolated DNA sequence is the novel feature of

the process claims and Lin's inventorship with regard to the sequence has not been

challenged.

---

[21]    The Examiner-in-Chief visualized this possibility in his decision on motions (Paper No. 35) and the reference back to motion A in Interference No. 102,096 in the discussions regarding Fritsch et al motion H.

FRITSCH ET AL v LIN
Interference Nos 102,097

The Lin record shows that the expression of EPO in mammalian cells (293 cells, COS cells and CHO cells) using the DNA sequence isolated by Dr. Lin was carried out by Dr. Jeff Browne at Dr. Lin's request (LR 3, 10, 41). Clearly, the whole purpose of isolating the DNA sequence was to use the sequence in expression to obtain in vivo biologically active recombinant EPO. Dr. Lin provided the DNA sequence which he had isolated to Dr. Browne for such expression (LR 3) and the recombinant EPO obtained by Dr. Browne was determined by Dr. Egrie to have in vivo biological activity (LR 4, 10, 67, 68). The production process is not obvious but the process is properly attributable to Lin as the one who succeeded in isolating the DNA sequence and requested its use in expression to give recombinant human EPO. The expression and isolation of the recombinant EPO did not involve separate inventive input by anyone other than Lin. Clearly, Lin is the true inventor since he obtained the sequence to use in the production of recombinant human EPO.

As for the isolating step, there is clearly nothing separately inventive in this. Fritsch et al again try to equate isolation with purification but, as noted earlier, these two are not the same, as Fritsch et al obviously recognized when they referred to their own disclosure for support for their claims corresponding to the count.

(f)    The Fritsch et al Motion to Correct Inventorship
       Should be Denied

With regard to the Fritsch argument that he is the sole inventor (FB 32-34), Lin submits that Fritsch should not be permitted to correct the inventorship of the Fritsch

58

et al application and the Fritsch et al preliminary statement for the reasons noted in the Lin opposition to the Fritsch et al motion to correct (Paper Nos. 63, 64), the Lin opposition being incorporated herein by reference. In brief, Fritsch et al have not shown that the alleged misjoinder of the latecomers Hewick and Jacobs occurred through error and without deceptive intent. They also have not shown how the error occurred nor have they adequately demonstrated when the error was discovered or that they proceeded diligently when the error was discovered.

The Lin opposition to the Fritsch et al motion, to correct inventorship points out in detail how, prior to the Fritsch et al motion, Fritsch et al attested that they were joint inventors of the subject matter disclosed and claimed in the Fritsch et al '258 and '688[22] applications at least ten times. Many of these attestations overlapped in time with arguments which were being advanced by his assignee's trial counsel in the District Court litigation to the effect that Edward F. Fritsch alone ("Fritsch sole") was the inventor of this subject matter. Inventorship was discussed with trial counsel in a context from which it is clear that at least Dr. Fritsch considered himself the sole inventor. See FR 2787-2794, especially at 2790 and 2793. However, Fritsch et al took no action herein to correct inventorship until 10 months after the District Court decision. No newly discovered facts have been presented as forming the basis of this determination. No

---

[22] The '258 application (Serial No. 693,258) is the subject of the motions to correct inventorship filed by Fritsch et al in Interference Nos. 102,096 and 102,097. The '688 application (Serial No. 824,688) is involved in motion to correct filed in Interference No. 102,334

FRITSCH ET AL. v. LIN
Interference No. 102,097

light is shed on how, in view of repeated analysis of the same facts by the originally named inventors and their counsel, there could have been so many "erroneous" declarations of joint inventorship. Instead, statements are now made to the effect that, until the motion to correct was filed, no lawyer or scientist possessed a sufficient understanding of the technology or the standards of inventorship to properly determine who "invented" the subject matter of the counts at issue here and in the related interferences. Under such circumstances, correction of inventorship designations in the Fritsch et al applications should not be permitted, particularly when the proposed correction is based on the erroneous assumption that there could be conception of the isolated EPO gene separate from its reduction to practice.

As for when the error was discovered, it is manifest that the "error" could have been, and should have been, discovered when at least one of the Fritsch et al. applications was filed or at the latest when the Rule 608(b) showing was filed. The Fritsch testimony on discussions with counsel concerning the work of his co-inventors for purposes of the 608(b) showing reveals that nothing new factually was provided to counsel for purposes of the motions for correction. Compare FR 2716-2721 with 2714-2715 and 2753-2759.

The Fritsch et al attorney must have been aware of the late arrival of Jacobs on the scene (1983) when he prepared the Rule 608(b) showing. This did not require any knowledge as to biotechnology. At least as of the date when the Rule 608(b) showing was prepared, the attorney had to know, or should have known, that the Fritsch et al. inventorship was wrong if the Fritsch et al. allegations as to dates of invention in the

60

FRITSCH ET AL v LIN
Interference Nos 102,097

Rule 608(b) were considered reasonably based.  Moreover, when the Fritsch et al attorney prepared the preliminary statement herein and in the other two interferences, he also prepared preliminary motions addressing complex issues of biotechnology and inventorship.  Clearly, the attorney must have considered the Fritsch et al., "inventive contribution" evidence said to be the basis for the present motion when the preliminary statements and motions were prepared and he also had to be familiar with the litigation proceedings and the issues there involved[23].  All of this knowledge on the attorney's part clearly negates the required diligence to correct inventorship at this stage.

For all of the above reasons, it is submitted that the Fritsch et al motion to correct inventorship and the related motion to correct their preliminary statement, should be denied.

(g)    **Lin Is Entitled to Priority on the Basis of His Earlier Filing Dates**

At least two of Lin's applications Serial No. 561,024, filed December 13, 1983 and Serial No. 582,185, filed February 21, 1984 are prior to any possible date

---

[23]    Rule 11 of the Federal Rules of Civil Procedure mandates inter alia that:

"...The signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation..." (emphasis supplied)

61

Fritsch may rely on taking into account the Federal Circuit position regarding simultaneous conception and reduction to practice. Fritsch et al have not challenged the adequacy of these earlier applications at final hearing. Since Lin has satisfied best mode requirements, Lin is entitled to priority on the basis of his earlier applications on constructive reduction to practice.

## IV. CONCLUSION

The Lin motion for judgment should be granted and all Fritsch et al claims should be found unpatenteable under 35 USC 102(g) in view of the Federal Circuit ruling as to Lin's prior work. Priority should be awarded to Lin for the reasons indicated herein with a holding that Lin is entitled to his claims corresponding to the count and that Fritsch et al are not entitled to their claims corresponding to the count.

62

FRITSCH ET AL. v. LIN
Interference Nos. 102,097

The Fritsch et al motion to correct inventorship should be denied.

Respectfully submitted,

CUSHMAN, DARBY & CUSHMAN

By _____
Paul N. Kokulis
Reg. No. 16,773

1615 L Street, N.W.
Washington, D. C. 20036
Phone: (202) 861-3503

63