EXHIBIT 2

Dockets.Justia.com

Watt, Stuart (Confidential) 3/29/2007 8:08:00 AM

1      UNITED STATES DISTRICT COURT
2        DISTRICT OF MASSACHUSETTS
3
       ----------------------------x
4   AMGEN INC.,              )
                             )
5                            )
           Plaintiff,  )
6                      )
           vs.          ) No. 05 Civ. 12237 WGY
7                      )
                       )
8   F. HOFFMAN-LA ROCHE LTD,   )
    ROCHE DIAGNOSTICS, GmbH, and )
9   HOFFMAN-LA ROCHE INC.,      )
                     )
10                    )
           Defendants. )
11  ----------------------------x
12
13
14
15         CONFIDENTIAL VIDEOTAPED
16         DEPOSITION OF STUART WATT
17         Westlake Village, California
18         Thursday, March 29, 2007
19
20      (This transcript contains testimony
        designated confidential as per Section 5(c)
21      of the Amended Protective Order.  Please
        treat the entire transcript in accordance
22      with the protective order.)
23
24      Reported By Susan A. Sullivan, CSR No. 3522
        PRS Job No. 118-372540
25

1    would be happy to --

2    Q    That's actually pretty accurate.  My only

3    followup question is do you also understand that the

4    double patenting immunity also applies to District

5    Court proceedings?

6        MR. FLOWERS:  Same instruction as to --

7    A    I don't know whether that's in Section 121

8    or not.  If you represent that it is, I have no

9    reason to doubt your representation.

10       MR. SUH:  I'm not going to mark this as an

11       exhibit but I'm going to read into the record

12       35 U.S.C. Section 121 from www.usptl.gov and it

13       is an excerpt and it states, "The patent

14       issuing on an application with respect to which

15       a requirement for restriction under this

16       section has been made, or on an application

17       filed as a result of such requirement, shall

18       not be used as a reference either in the Patent

19       and Trademark Office or in the courts against

20       the additional application or against the

21       original application."

22    Q    So based upon that, Mr. Watt, do you

23    understand Section 121 is offering an applicant

24    immunity from a double patent attack both in the

25    patent office and in District Court proceedings?

Watt, Stuart (Confidential)  3/29/2007  8:08:00 AM

1        MR. FLOWERS:  I will object to the preamble

2     to the question.  I can't tell what you are

3     reading from, Mr. Suh.  Also I will repeat my

4     prior instruction to Mr. Watt that to the

5     extent the answer to that question would

6     require you to reveal any mental impressions

7     formed during or in anticipation of litigation

8     at any point, or any other work product, I

9     would instruct you not to include any such

10    information in your answer.

11       I would also note that this is not included

12    within any 30(b)(6) topic before which Mr. Watt

13    has been designated as a designee by Amgen, and

14    I think we're straying from any 30(b)(6) topic

15    or Mr. Watt's role here as a fact witness.

16       If you understand the instruction, then

17    provide what answer you can, Mr. Watt.

18    A   Thank you.

19       I believe that that's consistent with the

20    statute as I understand it.  I have no reason to

21    doubt that that's the language of the statute and it

22    does provide immunity in District Court proceedings

23    as well as in the patent office.

24    Q   Now, Mr. Watt, looking at Exhibit Number 2

25    which is Amgen's supplemental responses to Roche's

1    interrogatory, if you look at Page 3, the third

2    paragraph, it is the paragraph that starts with

3    "Amgen will assert at trial."  Do you see that?

4        A    Yes, I do.

5        Q    Okay.  So based upon this particular

6    paragraph do you see that Amgen is asserting the

7    '868 patent, the '698 patent, the '349 patent, the

8    '422 patent, the '933 patent and the '080 patent

9    against Roche in this case?

10       A    Yes.

11       Q    Okay.  Now on that same exhibit if you

12   could go to Page 31, and under "Supplemental

13   Response To Interrogatory No. 10," it is the second

14   paragraph, it states, there are some objections in

15   the prior paragraph but the second paragraph states

16   U.S. Patents Nos. '933, '080, '349, '698 and '422

17   are exempt by action of 35 U.S.C. Section 121

18   because later issued claims were subject to a

19   restriction requirement during the prosecution of

20   the application which later issued as U.S. Patent

21   No. '008 and the later issued claims are consonant

22   with the examiner's restriction requirement.  Do you

23   see that?

24       A    Yes, I do see what.

25       Q    Do you see that the '868 patent is not

1    listed among the patents in the second paragraph?

2        A    I believe that you are correct, it is not

3    listed.

4        Q    Do you have an understanding as to whether

5    Amgen is relying upon Section 121 in response to a

6    double patent attack on the '868 patent?

7            MR. FLOWERS:  I will instruct Mr. Watt, I

8        believe that invades the attorney-client

9        privilege and attorney work product doctrine

10       protection and I will instruct Mr. Watt not to

11       answer that question on that basis.

12           MR. SUH:  I think it is discoverable

13       information to the extent that he was asked in

14       a discovery request.  I know the parties have

15       been trying to negotiate supplemental

16       responses.  To the extent that the witness

17       today can actually provide supplementation

18       through discoverable subject matter, I would

19       like to get that information.

20           MR. FLOWERS:  I understand what you may

21       like to get but my instruction stands.  Mr.

22       Watt is not here to provide an explanation of

23       all of Amgen's or any of Amgen's contentions in

24       the litigation, he is here as a fact witness.

25       If there's a 30(b)(6) topic that Roche

1        THE VIDEOGRAPHER:  This is the end of Tape

2        Number 1 of the videotaped deposition of Stuart

3        Watt.  The time on the video monitor is 10:07

4        a.m.

5          (Recess)

6        THE VIDEOGRAPHER:  This is the start of

7        Tape Number 2 of the videotaped deposition of

8        Stuart Watt.  Going back on the record, the

9        time on the video monitor is 10:17 a.m.

10    BY MR. SUH:

11        Q    Mr. Watt, Exhibit 6 is the prosecution file

12    history of the '868 patent.  Were you involved at

13    one point in the prosecution of the '868 patent?

14        A    Yes.

15        Q    Okay.  And by virtue of your involvement in

16    the prosecution of the '868 patent, did you become

17    familiar with the file history?

18        MR. FLOWERS:  Objection; vague and

19        ambiguous.

20        A    Well, I certainly was familiar with the

21    parts that I was involved with.  If you are asking

22    did I go back and look at the complete file history

23    from the beginning, I don't remember that I did.  I

24    may have, but I don't remember that I did.

25        Q    Okay.  And I'm just going to ask you a

1          MR. FLOWERS: Objection to the extent it

2     mischaracterizes his prior testimony.

3          MR. SUH: That wasn't my intent.

4     A    I appreciate that you are trying to

5     summarize my prior testimony.

6     Q    Yes.

7          Do you recall that in the course of your

8     involvement of the '868 patent file history the

9     issue of an obligate glycoprotein was raised in the

10    context of a double patenting rejection issued by

11    the patent office on the current pending application

12    based upon an earlier issued '008 patent?

13    A    Yes, I think I recall that happening.

14    Q    Before we actually get to the office action

15    rejection based on double patenting, do you recall

16    that in the course of the prosecution of the '868

17    patent that Amgen informed the patent office that

18    numerous other mammalian cells capable of effecting

19    glycosylation of the expressed polypeptides were

20    known to those skilled in the art at the time of the

21    '868 invention?

22         MR. FLOWERS: Vague and ambiguous to the

23    extent it lacks foundation. You are just

24    asking for his recollection?

25    Q    Yes.

1    A    I don't disagree that we might have made

2    that statement but I have no recollection that that

3    was the precise language that was used in any

4    particular file history.

5    Q    Sure.  Sticking with the '868 file history,

6    it is behind Tab 33, it is another amendment that

7    Amgen proffered to the patent office and I want to

8    direct your attention, sir, to it is Page 5 of the

9    amendment.

10    A    Yes.

11    Q    And here Amgen is responding to rejection

12    based upon Sections 101 and 112 and under Point 2,

13    Paragraph 2, Amgen is attempting to traverse the

14    non-enablement and indefiniteness objections under

15    Section 112.  Do you see that?

16        MR. FLOWERS:  Objection to the extent you

17        mischaracterized the document.

18    A    I see that the page that you referenced me

19    to, I see that we are responding to Section 101 and

20    112 rejections.

21    Q    And within that paragraph, Paragraph 2, do

22    you see that Amgen is telling the patent office that

23    its patent specification discloses examples of

24    expression in mammalian cells, in both CHO cells and

25    COS cells, do you see that?

Watt, Stuart (Confidential) 3/29/2007 8:08:00 AM

1     MR. FLOWERS: Objection; lacks foundation

2     to the extent you mischaracterized the

3     document. The document speaks for itself.

4     A    I see the sentence which I think you are

5     referring to which Amgen has disclosed the

6     production of in vivo biologically active

7     erythropoietin in mammalian cells and has

8     specifically exemplified the production of in vivo

9     biologically active monkey and human species

10    erythropoietin in monkey (COS) and Chinese Hamster

11    Ovary (CHO) cells.

12    Q    The next statement says, "Numerous other

13    mammalian cells capable of effecting glycosylation

14    of expressed polypeptides were known to those

15    skilled in the art at the time of the present

16    invention."

17         Do you see that?

18    A    Yes, I see that sentence.

19    Q    Do you believe that was an accurate

20    statement at the time it was made?

21    A    Yes.

22    Q    Do you believe it is still an accurate

23    statement?

24    A    Based on my understanding of the skill and

25    the art, yes, I believe it is accurate.

1    withdrawn because (a) Process claims are not obvious

2    over host cell" -- I'm sorry, "process claims are

3    not obvious over those claims because of necessary

4    proper glycosylation of EPO for activity. Applicant

5    indicated that documentation to this effect is in

6    the record. (b) Product, host, and process claims

7    were involved in separate interferences in PTO,

8    hence claims are patently distinct. Examiner did

9    not comment on patentability of claims."

10        Did I read that statement correctly?

11    A    I believe so, yes.

12    Q    So based upon this statement, does it

13    indicate to you that during this examiner interview

14    Amgen's representatives, which included yourself,

15    Mr. Borun and Mr. Odre, were explaining to the

16    patent examiner that the '008, the obviousness-type

17    double patenting rejection should not apply because,

18    among other things, the '008 patent claims were the

19    subject of a particular interference and the claims

20    that were pending in the '868 application were the

21    subject of a different interference?

22        MR. FLOWERS: Mr. Suh, are you asking

23        whether he recollects that --

24    Q    Uh-huh.

25    A    -- or just on his statement?

Watt, Stuart (Confidential) 3/29/2007 8:08:00 AM

1    Q    Both.

2         MR. FLOWERS: I will object to the extent

3    the question requires Mr. Watt to formulate a

4    legal opinion about the statement right now.

5    If you are asking about his recollection,

6    that's fine.

7    A    Yes, I recall that we argued the patent

8    office, probably discussed with the examiner in this

9    interview as indicated in the record, that the

10   product, process and DNA were in separate

11   interferences in the PTO.

12   Q    Then if we go to Tab 43, just the next

13   paper, I believe it is Applicant's Amendment And

14   Remarks.  On Page 4 of that document there begins a

15   discussion on heading "The Double Patenting

16   Rejection May Properly Be Withdraw" and Amgen

17   presents its -- I believe Amgen is presenting its

18   arguments as to why the double patenting rejection

19   should be withdrawn, and I want to direct your

20   attention to Page 7.

21   A    Okay.

22   Q    Okay?

23        And it states, "In proceedings before the

24   Board of Patent Appeals and Interferences, separate

25   interferences were drawn for the DNA-related subject

1    Amgen had used those words.

2    Q   Do you recall whether those particular

3    words were ever used in a document that was authored

4    by Amgen?

5    A . I think that they were, yes.

6    Q   Which documents were they?

7    A   Perhaps some briefs that were filed in the

8    interference.

9    Q . Do you believe at the time that statement

10   was made in briefs that were filed in the

11   interference that Amgen was trying to be as truthful

12   and accurate as possible?

13       MR. FLOWERS:  Objection; vague and

14       ambiguous.

15   A   I have no reason to question the truth or

16   accuracy of representations made by Amgen before I

17   arrived so I have really no basis to know that, but

18   I have no reason to doubt the truth or accuracy of

19   the statement.

20   Q   Did Amgen ever tell the patent office that

21   despite the fact that there were two different

22   interferences declared with respect to the host cell

23   claims and the process claims, that Amgen made

24   arguments that the -- to the Board of Patent Appeals

25   that these two particular counts were merely

Watt, Stuart (Confidential) 3/29/2007 8:08:00 AM

1    different manifestations of the same invention?

2        MR. FLOWERS:  Objection; vague and

3        ambiguous, outside the scope of the 30(b)(6)

4        topics.

5    A    I don't remember using those words.  I do

6    remember that Amgen argued that the patent office

7    had, one, already determined that they were separate

8    inventions according to the law of unity of

9    invention, perhaps is the word, and one of the

10   arguments on behalf of that was the institution of

11   the separate interferences.

12       MR. SUH:  I would like to mark as Exhibit 8

13       a document bearing Bates stamp Number AM-ITC

14       00337649 to 7715.

15       (Exhibit 8 marked)

16   Q    Mr. Watt, the court reporter has placed

17   before you Exhibit 8, and Exhibit 8 is the Brief For

18   The Senior Party Lin in Interference No. 102,097.

19       Have you ever reviewed this document

20   before?

21   A    Yes, I believe I have.

22   Q    When was the last time you reviewed this

23   document?

24   A    It has been a number of years.  I couldn't

25   tell you exactly when it was, but it has been a

1      A     I think this is, as I mentioned before,

2    this is in reference to the Fritsch position which

3    you read out which is quoted there.

4      Q    Uh-huh.

5      A     And I would understand this to say simply

6    that the applications are related and I think on

7    both sides the claims at issue stem from a common

8    specification.

9      Q     Do you recall that Amgen was arguing within

10   this particular document that because the patent

11   board had already resolved issues in favor of Amgen

12   in the '096 interference and in District Court

13   proceedings, that that should also bind the board of

14   interference with respect to finding priority for

15   Amgen in the '097 interference?

16        MR. FLOWERS:  Objection.  It is vague and

17        ambiguous.  It is unclear whether you are

18        asking for his recollection.

19      A     I recall that, again, based on the facts as

20   put forward by the parties in that Lin was the first

21   to actually clone the gene, express the gene in host

22   cells, detect its biological activity prior to

23   Fritsch cloning the gene, it was clear that priority

24   was clear to Amgen.

25      Q     And when you mean Lin, you mean party Lin?

1    Are you referring to party Lin or to Dr. Lin

2    himself?

3        A    It is the same person.

4        Q    You are absolutely right, it is the same

5    person.

6        Do you recall whether Dr. Lin had any

7    involvement in the preparation of this document?

8        MR. FLOWERS:  Objection; vague and

9    ambiguous.

10       A    This document was filed before I joined

11    Amgen so I wouldn't know whether Dr. Lin had any

12    involvement in its preparation.

13       Q    Okay.  I want to direct your attention to

14    Page 24 of this document and there's a heading

15    there, B, "Summary of Lin's Position."  Do you see

16    that?

17       A    Yes.

18       Q    And under small (iii) on Page 25, I'm going

19    to read this into the record.  It states, "While the

20    count is directed to a process for preparing in vivo

21    biological active EPO using a mammalian host cell

22    transfected or transformed with an isolated DNA

23    sequence in coding human EPO, and the litigation was

24    directed to the purified and isolated DNA sequence

25    and host cells transfected or transformed thereby,

1    Q    Derived from consistent inventive actions.

2    Let's take it one at a time.

3        Mr. Watt, it does say that this statement

4    was acknowledged by Fritsch, et al., but hasn't

5    Amgen actually adopted this statement by putting it

6    as part of their summary of Dr. Lin's position for

7    reference of this interference?

8        MR. FLOWERS:  Objection; vague and

9        ambiguous, lacks foundation, outside the scope

10       of 30(b)(6) topics, and argumentative.

11   A    I don't think I would characterize it that

12   way.

13   Q    Isn't Amgen arguing the same position that

14   Fritsch acknowledged?

15       MR. FLOWERS:  Same objections.

16   A    Amgen is using Fritsch's position against

17   Fritsch, yes.

18   Q    Yes.  And Amgen is using Fritsch's position

19   that the count to be '097 and the DNA and host cell

20   claims of the District Court litigation were

21   different manifestations of the same invention;

22   isn't that correct?

23       MR. FLOWERS:  Objection; vague and

24       ambiguous, lacks foundation, outside the scope

25       of the 30(b)(6) topics.

1    A    Well, the document says what it says and I

2    think I gave you my understanding.  I was, you know,

3    not involved in its drafting, I was not there, and I

4    can only tell you how I read the document today.

5    Q    Sure.  I believe that the words you had

6    used is that this particular statement was

7    consistent, it is derived from consistent inventive

8    actions.  Right?

9        MR. FLOWERS:  Objection; mischaracterizes

10    his prior testimony.  That's not what he said.

11    A    I'm not certain that's what I said and now

12    that you repeat it back to me, I can understand this

13    is not very clear in itself.

14    Q    And I apologize, you know.  It is not my

15    intention to mischaracterize your testimony, but

16    perhaps I could ask you again, with respect to this

17    particular statement on the top of Page 26 where

18    Amgen is stating "It is evident that these are only

19    different manifestations of the same invention,"

20    what did Amgen mean when it said that?

21        MR. FLOWERS:  Same objections.

22    A    Well, it is hard for me to give a meaning

23    when Amgen wrote the document or Amgen submitted the

24    document --

25    Q    What does it mean to you?

1    Q    Okay.  So here Amgen is -- is it your

2    understanding that Amgen by this statement is saying

3    that the whole purpose of the claims of the '008

4    patent is to actually express and to make in vivo

5    biologically active human EPO?

6        MR. FLOWERS:  Objection; vague and

7        ambiguous, lacks foundation.  It is also

8        outside of the 30(b)(6) document.

9    A    I see the words that you have called my

10    attention to.  I'm not certain I can give them any

11    more meaning other than just what they say.  So if

12    you are asking me to interpret this, I'm not certain

13    I can add much to this.

14    Q    You cannot add much to it?

15    A    No.

16    Q    Okay.

17    A    I don't think so.

18    Q    Well, let's try the next statement.  It

19    says, "Stated otherwise, the process language of the

20    Lin patent claims at issue in the litigation

21    ('encoding human EPO') is, for all intents and

22    purposes, a description of the present count," and

23    stop there.

24        Can you tell me what your understanding of

25    this statement is?

1    A    I don't have much understanding of this, it

2    doesn't make much sense to me because the process

3    claims were not at issue in the litigation.

4    Q    That's right.  In fact, when it is talking

5    about the litigation, it is talking about the '008

6    patent, correct?

7    A    That's what I understand it is referring

8    to.  Since I wasn't involved in drafting this it

9    could be referring to something else, but I

10   understand it to be referring to the District Court

11   litigation on the '008 patent.

12   Q    That's right.

13        And doesn't this statement indicate that

14   Amgen is arguing that the encoding human EPO

15   language within the DNA and host cell claims of the

16   '008 patent is for all intents and purposes a

17   description of the process for making recombinant

18   EPO that is the subject of the '097 interference?

19        MR. FLOWERS:  Objection; vague and

20        ambiguous, lacks foundation, outside the scope

21        of 30(b)(6) topics.  Also appears to call for

22        Mr. Watt to formulate a legal opinion as he

23        sits here which I would instruct you not to do,

24        Mr. Watt.

25   A    I would not understand the language to

Watt, Stuart (Confidential) 3/29/2007 8:08:00 AM

1    sitting here today?

2        MR. FLOWERS:  Objection; vague and

3        ambiguous, lacks foundation, outside the scope

4        of the 30(b)(6).  Also I would caution Mr. Watt

5        not to formulate legal opinions on the spot.

6        A    Given the factual record that was found in

7    the District Court action, Lin was certainly the

8    first to clone the gene and the first to express the

9    recombinant EPO product.

10       Q    I understand.  But is that your

11   understanding of what this statement is saying?

12       MR. FLOWERS:  Same objections.

13       A    Well, I understand the statement.  Again,

14   perhaps I should put in the qualifiers that we had

15   put in place with all these other statements that we

16   have been talking about that occurred prior to my

17   joining Amgen, but -- so I'm looking at this from a

18   perspective of years later as opposed to being

19   involved at the time and understanding what the

20   intent was at the time.  My understanding of this

21   statement is based on that factual record and I

22   think the District Court decision was cited and

23   perhaps even submitted with this.  So, yes, I think

24   it is referring to those factual findings that were

25   included in the District Court decision.

Watt, Stuart (Confidential) 3/29/2007 8:08:00 AM

1    Q    But focusing just on the underlined portion

2    of this language which I assume was underlined for

3    point of emphasis, isn't Amgen telling the patent

4    board that because Lin was the first to invent the

5    DNA sequence claims as well as host cells in a

6    manner allowing it to express the recombinant EPO as

7    was the subject of the '008 patent, he is, quote,

8    "of necessity the first to invent the process for

9    making the recombinant EPO," isn't that what this

10    statement is saying?

11        MR. FLOWERS:  Objection; lacks foundation,

12        vague and ambiguous, outside 30(b)6, and

13        argumentative.

14    A    Yes.  Words to those effect appear on the

15    page but my understanding is that it is in the

16    context of not only the factual record which I just

17    described, but also the issues that and the position

18    that Fritsch was taking which again we discussed

19    previously that Fritsch's whole case turned on prior

20    conception of the DNA and that issue was resolved in

21    Amgen's favor in the District Court litigation.

22    Q    Sure.

23    A    So based on, you know, again, in the

24    context of Fritsch's position on priority, this --

25    and the facts that were found, this statement is