```
                                                              Page 1
                                                       EXHIBIT 3
            UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF MASSACHUSETTS

                                    Civil Action
                                    No. 05-12237-WGY

* * * * * * * * * * * * * * * * *
                                *
AMGEN, INC.,                    *
                                *
        Plaintiff,              *
                                *
v.                              *   MARKMAN HEARING
                                *
F. HOFFMANN-LA ROCHE LTD,       *
ROCHE DIAGNOSTICS GmbH and      *
HOFFMANN-LA ROCHE, INC.,        *
                                *
        Defendants.             *
                                *
* * * * * * * * * * * * * * * * *

          BEFORE:  The Honorable William G. Young,
                   District Judge

APPEARANCES:

        DUANE MORRIS LLP (By Michael R. Gottfried,
   Esq.), 470 Atlantic Avenue, Suite 500, Boston,
   Massachusetts 02210
            - and -
        DAY CASEBEER MADRID & BATCHELDER, LLP (By
   Lloyd R. Day, Jr., Esq., Linda A. Sasaki-Baxley,
   Esq. and Jonathan Loeb, Ph.D.) 20300 Stevens Creek
   Boulevard, Suite 400, Cupertino, California 95014
            - and -
        McDERMOTT WILL & EMERY (By William G.
   Gaede, III, Esq.), 3150 Porter Drive, Palo Alto,
   California 94304
            - and -
        WENDY A. WHITEFORD, ESQ., Of Counsel,
   Amgen, Inc., One Amgen Center Drive, Thousand
   Oaks, California 91320-1789, on behalf of the
   Plaintiff


                                    1 Courthouse Way
                                    Boston, Massachusetts

                                    April 17, 2007
```

6da73dea-6884-48d2-9148-93a9c2849937

Dockets.Justia.com

Page 26

1  MR. DAY: That's correct. She will, she will
2  disagree. It has been many, many years since this invention
3  was made and nobody has yet found another way to do what Lin
4  did. So, in the case of a pioneering patent, then in a
5  pioneering patent claims are ordinarily entitled to a
6  broader scope. Amgen's claims are both broad and they are
7  narrow. They are not uniformly broad. The impulse to claim
8  broad is not unchecked. There is also a reason to claim
9  narrowly, and Amgen claims narrowly as well.
10  THE COURT: To, to avoid anticipation.
11  MR. DAY: Not to avoid anticipation. By claiming
12  narrowly, you can delimit what it is that an accused
13  embodiment must have in order to infringe. If you claim a
14  lot then the accused embodiment has to have all of those
15  things. And that, of course, is what's going on here.
16  Roche is trying to blow this claim out to include more and
17  more things in the meaning of human EPO in order to argue we
18  don't have this, we don't have that, we don't have that.
19  So you can claim both broadly and you can claim
20  narrowly. So the question is in the context of this claim,
21  '422, claim 1, where you have to look at the entire claim
22  language, in the context of this claim what does the claim
23  term human erythropoietin mean. That's the issue for the
24  Court.
25  I have some binders, too, that I would like to hand

Page 27

1  up to the Court, if I may. Could you give them some to
2  opposing counsel.
3  Okay. And these are simply the slides that I will
4  be talking about.
5  The first thing that I want to illustrate for the
6  Court is the difference in the claim construction that Roche
7  proposes and Amgen proposes.
8  Amgen's construction is a protein having the amino
9  acid sequence of human EPO, such as the amino acid sequence
10  of EPO isolated from human urine.
11  Now, the question for the Court in considering
12  that, is that consistent with the other claim language, is
13  that consistent with the specification, is that consistent
14  with the prosecution history, as to what that term human
15  erythropoietin means in the context of the entire claim,
16  '422, claim 1.
17  Roche's construction differs. And I've highlighted
18  on the right what is importantly different about Roche's
19  construction. First of all, they say it's not a protein.
20  They say it's a glycoprotein. That means that it must have
21  glycosylation. It has the amino acid sequence of
22  erythropoietin isolated from human urine. So they agree
23  with us about the amino acid sequence. This argument you
24  just heard from Ms. Ben-Ami, which was not in their papers,
25  was made for the first time this morning on oral argument,

Page 28

1  is predicated on an expert report not before the Court, is
2  inconsistent with what they acknowledge. This --
3  THE COURT: Well, we're trying to get at the best
4  construction.
5  MR. DAY: I understand.
6  THE COURT: You do have, you do have a problem with
7  that position 166. I mean, her argument does resonate.
8  MR. DAY: No, we don't have a problem with that.
9  THE COURT: All right, tell me why.
10  MR. DAY: And the reason we don't have -- because
11  these are -- this is human erythropoietin purified from
12  mammalian cells grown in culture. And the cells cleave off
13  the 166 amino acids. And Lin produced and made and had in
14  his possession an EPO that was produced by mammalian cells
15  grown in culture. So he possessed a 165 species of human
16  erythropoietin when he filed his application.
17  THE COURT: But he didn't know it.
18  MR. DAY: Oh, did he, did he know it?
19  THE COURT: Well --
20  MR. DAY: He possessed it.
21  THE COURT: Well, let's just go back.
22  MR. DAY: But, no, your Honor, this is an
23  important point.
24  THE COURT: Go ahead.
25  MR. DAY: You asked a very good question and it's

Page 29

1  an important point. But it's irrelevant. It's irrelevant
2  whether he knew it. What is relevant is whether he
3  possessed it and he taught others how to get the same thing.
4  That it was later discovered to be 165 and not 166, not what
5  he had deduced it to be, is irrelevant.
6  THE COURT: Well, I understand that's your
7  position.
8  MR. DAY: Okay. The second thing is, that Roche
9  seeks to add to this claim is having the structure that
10  would be produced in mammalian cells as of the invention
11  date.
12  Now, let me ask you to turn the page and I'll
13  illustrate for you what the difference is first of all
14  between these two constructions.
15  On the left you have a picture of Amgen's
16  construction. Amgen construes human erythropoietin as
17  referring to the amino acid sequence of human erythropoietin
18  as isolated from urine. Roche construes human
19  erythropoietin as referring not only to the amino acid
20  sequence but also to all of the glycosylation that's
21  attached to that sequence by the cells. And they say there
22  is one structure. They call it the structure. And so
23  there's only one such structure.
24  Now, what's wrong with Roche's construction? Why
25  is it inconsistent with the other claims, with the

Page 30

1  specification, with the prosecution history?
2        Okay, the first thing is they would require that
3  the human erythropoietin be glycosylated. That, that
4  structure is not provided by the term human erythropoietin
5  as the Court will see. That structure is provided by the
6  fact that it's produced in mammalian cells. And that's why
7  the source limitation in this claim is so important. As
8  Roche's own expert, Dr. Kadesh, in the declaration that
9  Roche submitted in support of their claim construction,
10 describes in detail glycosylation is a cell by cell
11 dependent function. The cell determines what glycosylation
12 goes on a protein. The glycosylation that will be put on a
13 protein varies by cell species. Different species of cells
14 will glycosylate proteins differently. That's all laid out
15 very clearly by Dr. Kadesh. This was well understood by
16 those of ordinary skill in the art. It's the fact that the
17 protein is produced in a mammalian cell that gives it
18 certain types of glycosylation. A certain structure beyond
19 the amino acid sequence.
20       Roche then says it must have the identical
21 glycosylation as originally attached by the cell. So, in
22 other words, there can't be any post-expression changes in
23 the molecule. That's the other thing they're trying to do.
24 They're trying to narrow the scope of this claim so that
25 human erythropoietin, that amino acid sequence, which is

Page 31

1  then glycosylated by the cell, can't be modified in any way,
2  has to be exactly as produced by the cell.
3        And then what they're trying to do, then what they
4  say is that it must be produced in cells that were available
5  as of 1983. In other words, any mammalian cell that was
6  adapted for growth in culture after 1983 couldn't be used.
7  Couldn't be used to make this product. And if it was, if it
8  was it wouldn't infringe according to that.
9        And then they say that there has to be no
10 alteration in the secreted glycoprotein due to
11 post-expression modification. It's a point I made earlier.
12       Now, what's wrong with all that? Why is all of
13 that not correct as a matter of law and as a matter of claim
14 construction? Claim construction. Construing what this
15 claim means.
16       Well, the first thing is that their construction
17 would be inconsistent with Lin's other claims. When Lin
18 claimed a human erythropoietin that was a glycoprotein he
19 said so expressly. Take a look at '933, claim 4 where he
20 refers to human erythropoietin glycoprotein. Roche's
21 construction would render the word glycoprotein irrelevant.
22 And for that reason it is erroneous as a matter of law.
23 Every word in a claim must be given meaning. Where related
24 claims from a single application use the same terms they
25 should be given consistent meanings. The use of human

Page 32

1  erythropoietin glycoprotein shows that when Lin is referring
2  to human erythropoietin he is saying nothing about whether
3  it's glycosylated or not.
4        The second thing is that Lin's specification makes
5  clear that the polypeptides of the invention may or may not
6  be glycosylated. There's no necessary requirement. The
7  only thing that requires in '422, claim 1 the human
8  erythropoietin to be glycosylated is the fact that it is
9  produced in mammalian cells and purified from mammalian
10 cells grown in culture. And that step, that source from
11 which the EPO's obtained imparts a structure in addition to
12 the amino acid sequence of human erythropoietin.
13       The last thing in the specification that is
14 critical to understand is that when Lin took his DNA, he did
15 not express it only in mammalian cells. As described in
16 Examples 11 and 12 of the patent he also expressed it in
17 E.coli. E.coli does not glycosylate. There is no
18 glycosylation on human erythropoietin. And yet Lin still
19 describes that as human erythropoietin. The human
20 erythropoietin that Lin is talking about in his patent is
21 the amino acid sequence that is produced by the DNA that
22 encodes human erythropoietin. And when that DNA is placed
23 into a mammalian cell and the cells are produced in
24 mammalian cell culture, the cells cleave off the 166 and
25 they may or may not glycosylate the cell, the protein.

Page 33

1        This was all brought out in the prosecution history
2  specifically with reference to the amendment of an allowance
3  of '422, claim 1. In Exhibit 8 of Amgen's original claim
4  submission, claim brief, we attached the prosecution history
5  for this claim. And in that prosecution history Amgen
6  explained what human erythropoietin means. It defined the
7  term. Human erythropoietin is understood to include any
8  polypeptide having amino acid sequence of EPO isolated from
9  human urine and may be produced in human cells or other
10 mammalian cells.
11       And so, what does that necessarily mean? That
12 language means that human EPO includes any, any polypeptide
13 having the amino acid sequence of EPO. If a polypeptide has
14 the amino acid sequence of EPO it is by definition human
15 erythropoietin as the claim term reads.
16       Having is open-ended. It's a tern of art in patent
17 law, which means an open-ended construct. It's not limited.
18 And so it doesn't exclude additional elements. There's no
19 reference to glycosylation in the prosecution history, let
20 alone any specific glycosylation, any statement that it must
21 have the structure. And there's no limitation on the
22 mammalian cells that can be used to produce it.
23       THE COURT: All right, I think I have it.
24       Brief rebuttal, Ms. Ben-Ami.
25       MS. BEN-AMI: Well, I have an extensive rebuttal.

Page 38

1     What if we modified yours, I'm still working with
2  Amgen's, but called it a glycoprotein.  Is that a problem?
3  Isn't that -- that's the, that's the most accurate and we're
4  going to hear a lot about glycosylation.  So it would seem
5  to me that that would be both accurate and fair.
6     MR. DAY:  Your Honor, I think it would be -- I
7  don't think it's a problem.  I think it would be an
8  erroneous claim construction.  And I think it would be
9  erroneous for the reasons I cited.  Because the claims
10 differentiation -- and your Honor may have noticed when,
11 when Ms. Ben-Ami flashed that specification up, she
12 didn't point to the fact that it denominates the EPO as
13 hEPO.  H stands for human.
14    THE COURT:  Well, no, she said it was a different
15 --
16    MR. DAY:  No.  No.  H, little h stands for human.
17 Amgen identified the EPO that's being produced in this
18 E.coli as human EPO, and then it made a number of
19 alterations to the amino acid sequence.  It made a number of
20 analogs to that human sequence and said, well, we take this
21 out, we put this in, we take this out, we put this in.
22 These are all the changes from the human EPO.  It would be
23 wrong as a matter of claim construction, your Honor, because
24 you would be reading out of the definition of human EPO
25 human EPO produced in E.coli cells.  It would be wrong as a

Page 39

1  matter of claim construction because you would be construing
2  human EPO in a way that renders human erythropoietin
3  glycoproteins redundant and unnecessary.  So as a matter of
4  claim construction you would be making a mistake.  That's
5  Amgen's position.
6     THE COURT:  Thank you.
7     Here's what we're going to do.  At this stage and
8  for these purposes we're going to adopt Amgen's proposed
9  construction.  I'll reflect on whether I'll add the
10 glycoprotein before the word, substitute it for protein.
11    Turning now to purified from mammalian cells grown
12 in culture.  Now, Roche's proposed construction comes
13 straight out of this Court's own analysis of this subject.
14 And why ought I not stick with it?  I've analyzed this and I
15 see -- so I'll hear from you, Mr. Day.  What's the matter
16 with that?
17    MR. DAY:  Okay.  First of all, I don't think
18 Roche's construction comes right out of the Court's
19 construction.  I will certainly grant you that the first
20 part of their construction is a verbatim recitation and
21 Amgen offered an alternative, if this is to be a jury trial,
22 Amgen offered an alternative statement of that which I think
23 says the same thing.
24    The difference between the parties in claim
25 construction here is what I have highlighted.  And that is

Page 40

1  Roche's contention that the limitation cannot define the
2  structure of the claim product.  And let me --
3     THE COURT:  Well, I'm not, I'm not proposing that.
4  What I'm proposing is the Court's language.
5     MR. DAY:  That's fine.
6     THE COURT:  Purified from mammalian cells grown in
7  culture means obtained in substantially homogenous form from
8  mammalian cells, using the word "from" in the sense that it
9  originates in mammalian cells, without limitation to,
10 without limitation to it only taking it directly out of the
11 interior of the cells which have been grown in the in vitro
12 culture.
13    MR. DAY:  And that's fine.  And we merely offered
14 an alternative --
15    THE COURT:  All right.
16    MR. DAY:  -- clarifying statement to that.
17    THE COURT:  Then we'll stick with my language for
18 now.  But that's without prejudice to revisiting it if I
19 think I can explain it to the jury better.
20    Then, next, a non-naturally occurring glycoprotein
21 product of the expression, et cetera.  Now, here it seems
22 that Amgen's proposal makes the most sense.  And of course
23 we're bound by the Federal Circuit.  Non-naturally occurring
24 means not occurring in nature, but that makes perfect sense
25 and we'll follow it.  And that's, that's in the Amgen

Page 41

1  proposal.
2     What's the matter with that, Ms. Ben-Ami?  They're
3  a glycoprotein product not occurring in nature that is
4  expressed in a mammalian cell from a DNA sequence that does
5  not originate in the genome of the host and comprises a DNA
6  sequence encoding human erythropoietin.
7     MS. BEN-AMI:  Well, first of all, your Honor, I
8  think non-naturally occurring is a separate element.  And so
9  I do think that's important.
10    THE COURT:  Well, non-naturally occurring, aren't
11 we bound by the Federal Circuit?  It means not occurring in
12 nature.
13    MS. BEN-AMI:  I agree with that, but that's a
14 separate element than glycoprotein product of the expression
15 of a mammalian cell.  That's all I'm saying.  In other
16 words, you'd have to break down the claim.  And I think
17 non-naturally occurring is one element.  Glycoprotein
18 product of the expression of mammalian host cell, et cetera,
19 is a different product.  Element.  That's my first
20 fundamental difference.
21    THE COURT:  Well, all right.  But in trying to
22 explain it to the jury I say, I come to this and I say, now,
23 non-naturally occurring, what that means is it does not
24 occur in nature.  Now --
25    MS. BEN-AMI:  That means --

11 (Pages 38 to 41)