

EXHIBIT 4

```
IN THE HIGH COURT OF JUSTICE        HC 1999 Nos. 02916/02917
CHANCERY DIVISION                   HC 1999 No. 03241
PATENTS COURT


                                    Royal Courts of Justice
                                    Tuesday, 5th February 2002


                      Before:

                MR. JUSTICE NEUBERGER

                    - - - - - - -


             HOECHST MARION ROUSSEL
                                    Claimants/Petitioners

                          v.

             KIRIN-AMGEN INC. & OTHERS
                                    Defendants/Patentees

                    - - - - - - -


       (Computer-aided transcript of the Stenograph Notes of
            Marten Walsh Cherer Limited, Midway House
            27/29 Cursitor Street, London EC4A 1LT
       Telephone Number 0207 405 5010. Fax Number 0207 405 5026)


                    - - - - - - -


MR. ANTONY WATSON QC and MR. ANDREW WAUGH QC and
  MR. TOM HINCHLIFFE (instructed by Messrs.
  Taylor Joynson Garrett) appeared on behalf of Kirin-Amgen.

MR. DAVID KITCHIN QC and MR. RICHARD MEADE and MISS LINDSAY LANE
  (instructed by Messrs. Bird & Bird) appeared on behalf of the
  TKT parties.



                    - - - - - - -
                       PROCEEDINGS
                         DAY 2
                    - - - - - - -
```

HOECHST v KIRIN            6 FEBRUARY 2002            DAY 3

**Page 449**

BORUN - KITCHIN
2  A. Auxiliary request 11 was formulated and it was accepted.
3  Q. Who formulated it? Again, I do not want you to waive
4     privilege, save in so far as you are entirely happy to do so.
5  A. That is good, because I do not recall who formulated it.
6  Q. Presumably you would have been involved?
7  A. Presumably I would have been involved.
8  Q. You say in paragraph 27 of your statement that the scientists
9     were not shielding. What does that mean?
10 A. There was an implication in one of the papers you filed that
11    the insertion of SDS-PAGE as a limitation was done purposely
12    without the knowledge or consent, to the extent that they
13    could have consented, of Dr. Egrie, for example, and the only
14    point I am making there is that while they were to my
15    recollection involved in the formulation of those 15 sets of
16    auxiliary sets of claims, there was nothing that kept them
17    from having a copy, and in fact they probably did have a copy
18    when they were handed up.
19 Q. The next day?
20 A. I know Mr. Brown is very clear on this. I will defer to his
21    recollection. Mine is certainly not inconsistent. I knew
22    the board got them the next day. It might have been the case
23    that they were done right there in the large appeal room and
24    distributed to other parties overnight, but I think it is
25    more likely than that Mr. Brown's recollection is correct

**Page 450**

BORUN - KITCHIN
2     that the board, as well as the other parties, got those on
3     the morning of the third day. That would make more sense in
4     terms of getting copies made and things like that. I doubt
5     that there were the facilities to do 15 different things and
6     make a couple of sets for each opposing party and have some
7     for ourselves.
8  Q. Looking at bundle A2, tab 2, page 146, you knew, did you not,
9     that the passage from line 17 to 26 was wrong and could not
10    be relied upon?
11 A. 17 to 26. Some of it was wrong.
12 Q. And you knew you could not rely upon that passage.
13 A. We knew we could not rely on it if you are referring to the
14    carbohydrate data. We knew we could not rely on the hexose
15    value to establish a difference because there was a question
16    about the validity. It just was a bad experiment. There
17    was too much material out rather than came in. We certainly
18    did not want to rely on the data reflecting fucose content.
19    There the data was wrong both with respect to urinary and
20    recombinant EPO. That was completely missed on
21    O-glycosylation. That was not the difference. We would not
22    have relied on it in any event. 0 and 0 are the same; not
23    different. We could not rely on the hexose.
24 Q. The only other paragraph upon which you could rely was the
25    one immediately above it, the SDS-PAGE comparison.

**Page 451**

BORUN - KITCHIN
2  A. As well as the generalized statement. 20/20 hindsight tells
3     me that in 1984 I should have gone to Lin or somebody and
4     say, "Well, we are going to say there are differences in
5     every carbohydrate composition. We have got these
6     preliminary tests. Give me some more so I can put them down
7     - linkages, tetraantennary structure and the like. They will
8     probably be supportable." If I had done that, we would have
9     had tetraantennary structure to put into the claim instead of
10    SDS. We would have had linkage differences which even
11    Dr. Cumming (GI's expert glycobiologist) said were entirely
12    different between human and CHO cells. If that is the bad
13    practice I am accusable of, I accept that too.
14 Q. So in practice then you would have had a claim which was
15    really to CHO cells; is that right?
16 A. No. We would have had a claim that addressed the difference;
17    for example, some of those differences were with bovine and
18    hamster kidney cells.
19 Q. I understand. The point you have just made would have been a
20    distinction between human cells on the one hand and CHO or
21    COS cells on the other; is that right?
22 A. It would have been between urinary EPO and recombinant EPO of
23    whatever strike as long as you got a glycoprotein coming out.
24 Q. That would have raised, no doubt, its own interesting
25    questions of infringement?

**Page 452**

BORUN - KITCHIN
2  A. I am at a loss to understand your question.
3  Q. I will leave it. At any rate, there is no basis in terms of
4     textual description of any such distinction in the patent, is
5     there?
6  MR. JUSTICE NEUBERGER: Once you have taken out lines 16 onwards.
7  MR. KITCHIN: Yes. The board had indicated —
8  A. There are no experiments to describe. I will give you that.
9     There are no experiments to describe.
10 Q. The board had indicated that relying upon average
11    carbohydrate composition as a whole was not acceptable. We
12    have looked at all those general distinctions sought to be
13    drawn by Dr. Cumming, have we not?
14 A. I am trying to remember whether or not there was a reference
15    to a difference in molecular weight for the yeast-produced
16    material.
17 Q. But you were left as a practical matter —
18 A. In that section certainly.
19 Q. Relying upon and having to rely upon the paragraph from line
20    6 through 10, which concerned SDS. Is that not right?
21 A. I am looking now, that you have invited me to look to, see if
22    there is something that addresses the apparent molecular
23    weight of the yeast-produced material.
24 MR. JUSTICE NEUBERGER: While he is looking, Mr. Kitchin, how are
25    we doing in terms of time? We are running quite slowly.

32 (Pages 449 to 452)

MARTEN WALSH CHERER LTD        27/29 CURSITOR STREET        LONDON EC4A 1LT
TELEPHONE: 020 7405 5010       E-MAIL: martenwc@aol.com      FAX: 020 7405 5026

AM670290489                                                    AM-ITC 01075105