# Exhibit C

# Declaration of Howard S. Suh in Support of Roche's Motion for Summary Judgment that the Asserted Claims of the '933 Patent are Invalid for Indefiniteness and Lack of Written Description

Dockets.Justia.com

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

AMGEN INC.,                                  )
                                             )
    Plaintiff,                          )
                                             )    Civil Action No.: 05-12237 WGY
v.                                           )
                                             )
                                             )
F. HOFFMANN-LA ROCHE                         )
LTD., a Swiss Company, ROCHE                 )
DIAGNOSTICS GmbH, a German                   )
Company and HOFFMANN-LA ROCHE                )
INC., a New Jersey Corporation,              )
                                             )
    Defendants.                         )
_____)


**REBUTTAL EXPERT REPORT OF AJIT VARKI, MD**


*SUBJECT TO PROTECTIVE ORDER*
*CONTAINS BOTH ROCHE AND AMGEN CONFIDENTIAL MATERIAL*
*CONTAINS ROCHE BLA MATERIAL*

occurring" in the asserted claims of the '933 and '080 patents renders them indefinite.

45.    I have been informed that a patent claim must be definite to be patentable. The words of the claim must describe the metes and bounds of what is claimed, so that a potential competitor can determine if he or she would infringe the claim. I have been informed that a patent claim is only invalid for indefiniteness if it is insolubly ambiguous. If the meaning of the claim is discernable, even if the task is formidable, then the claim is not invalid as indefinite.

46.    As Dr. Bertozzi admits,[23] this Court has previously interpreted the claim term "non-naturally occurring" to mean "not occurring in nature."[24] In fact, I understand that on April 17 of this year, the Court again stated that "non-naturally occurring" means "not occurring in nature" and Roche did not contest the Court's interpretation of this term nor argue that the meaning of the term was not discernable.

47.    Given the fact that the Court was able to interpret "non-naturally occurring" without difficulty or protest from Roche's attorneys, I do not understand how Dr. Bertozzi could now argue that the term is indefinite.

48.    I further note that there is an unstated assumption underlying Dr. Bertozzi's indefiniteness argument that is inconsistent with the Federal Circuit Court of Appeals' analysis of the term "non-naturally occurring." Dr. Bertozzi states that:

---

[23] Bertozzi Report ¶ 7.

[24] *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 126 F.Supp. 2d 91 (D. Mass. 2001) *aff'd.* 314

19

existence.

55.        I have also been informed that a prior art reference that discloses a genus still does not inherently disclose all species within that broad category.

56.        Lastly, I have been informed that isolated materials necessarily differ from less pure or impure materials, and if the latter are the only ones existing and available as a standard of reference, the more pure materials are novel with respect to the impure materials.

**B.      DR. BERTOZZI'S ANTICIPATION AND OBVIOUSNESS ARGUMENTS**

57.        I understand that Roche and its expert Dr. Bertozzi assert that the asserted product claims of Dr. Lin's inventions are invalid because they are anticipated by prior art urinary EPO.  In other words, Roche contends that urinary EPO is identical to the claimed EPO products.  Dr. Bertozzi goes on to contend that Amgen's pharmaceutical composition and method of treatment claims are obvious in light of the urinary EPO prior art.

58.        I further understand that as a legal matter, Roche asserts that the process and source limitations of Dr. Lin's product claims are not properly considered for determining whether the claimed products are novel, or whether they were previously found in the prior art.  I am informed that Roche's legal analysis is incorrect.  In any event, Dr. Bertozzi argues at length that "[l]imiting the claimed product to a human erythropoietin product from a recombinant source does not distinguish the claimed product from human EPO described and existing in the prior art.[27]  Contrary to Dr. Bertozzi's arguments, it is my opinion that these process and source

---

[27] Bertozzi Report ¶ 71.

limitations confer specific structures to the claimed products and that those specific structures are different from the structure of the EPO that was purified from human urine before Dr. Lin made his inventions.

59.     Before addressing the particulars of the differences between Lin's claimed recombinant EPO and prior art urinary EPO, I must comment on Dr. Bertozzi's overall rationale. At several points in her report, Dr. Bertozzi asserts that Dr. Lin's product claims are anticipated because "the glycoforms of human erythropoietin expressed in at least some mammalian host cells are all encompassed within the naturally occurring human erythropoietin glycoforms found in human urinary erythropoietin."[28] Because she was informed that "a generic claim is anticipated by prior art that describes any particular example or species that would be included in the claimed genus,"[29] Dr. Bertozzi reasons from this (incorrect) factual assertion that Dr. Lin's claims to certain recombinant EPO products are anticipated. Putting aside the incorrectness of the factual assertion that recombinant EPO glycoforms are a subset of prior art urinary EPO glycoforms, which I will address at length below, Dr. Bertozzi's argument is also logically flawed. Dr. Bertozzi considers uEPO a genus of which rEPO constitutes a sub-group or species, not the other way around, so the rule she invokes is not appropriate. Assuming Dr. Bertozzi's factual assertions are correct then the circumstance would be one where the prior art is a genus, and the claim is to a selection from the genus. It cannot be that patent claims to selections from complex mixtures are anticipated by the complex mixture itself. If this were the case, then there

---

[28] Bertozzi Report ¶ 15. *See also* ¶¶ 72, 75.

[29] Bertozzi Report ¶ 72.

23

further damage the structure of the EPO or it could select a particular subset of the EPO

structures present in the unpurified urine. For example, the first step of Miyake's procedure

involves a very harsh treatment with phenol, which might alter the three dimensional structure of

the protein part of the urinary EPO.

### D.    DR. LIN'S RECOMBINANT ERYTHROPOIETIN

80.    I understand that in 1983 and 1984, Dr. Fu-Kuen and his colleagues at Amgen

first cloned the human gene for erythropoietin and subsequently expressed it in functional form

in mammalian host cells. These ground-breaking inventions led to the commercial human

erythropoietin products, known as the epoetins.

81.    Each of Dr. Lin's product claims require that the erythropoietin product be

produced in cells other than the cells in the kidney that naturally produce EPO. This is so

because the cells that make EPO in the kidney have never been isolated and grown in culture, so

they cannot be used as host cells for the recombinant production of EPO.

82.    Expression and isolation of a recombinant protein in a cultured cell line

exposes the protein to different array of physiological and environmental conditions than

expression and isolation from cells resident in a human being. These differences can affect the

structure of the resulting product. First, the host cell used for expression affects the specific

post-translational modifications (such as glycosylation) which are imparted to the recombinant

protein. Second, cells suitable for transfection followed by growth in culture have undergone

genetic changes to allow immortal cell growth, which leads to further differences in the suite of

---

455.

glycosyltransferases defining the specific glycan structures present on the recombinantly produced protein. Third, the environment in which the cells are grown and into which the recombinant product is secreted affects the structure of the protein. No recombinant host cell can precisely duplicate the environment in which EPO is produced in the body. Specifically, the region of the kidney (the medulla) wherein EPO is produced, in either the tubular or interstitial cells, is a very unusual environment even within the human body. For example, the salt concentrations can be very high and the pH can be relatively low as compared to other parts of the body *and* standard *in vitro* culture conditions.

83.     Generally, the culture conditions used to grow mammalian cells *in vitro* are simpler than those within an animal's body. For example, animals have multiple cell types which secrete various enzymes that can modify or degrade circulating proteins. These cells (and their circulating products) are absent from cell cultures. Also, the metabolism of cells in an animal's body is dramatically affected by the other cell types in the body. Contact with different cell types influences cell behavior. And even cells that are not in proximity can influence a cell's behavior through the action of hormones and other long-range signals. Cells in culture lack these complex influences from their environment. In fact, cells in culture are almost always grown in a "monoculture" where there are no other cell types present. Lastly, the purification procedures are generally different between purification of minute quantities from natural sources and from recombinant culture sources where the desired product is abundant.

84.     Thus, it is not surprising that no recombinant EPO can accurately reproduce the precise structure the mixture of glycoforms in naturally-occurring prior art EPO. When a

35

gene for a secreted glycoprotein is removed from its normal cellular environment, and inserted into a different type of cell — often from a different species — which is grown under far different conditions than its *in situ* environment in the body, it is completely unsurprising that the glycoprotein that is produced has different glycan structures than the naturally-occurring glycoprotein. One would have understood that it would have been extremely unlikely and practically impossible to reproduce the glycosylation found on naturally occurring EPO because of both the difficulty in reproducing the cell type that normally makes EPO and the difficulty in reproducing the environment in which those cells normally grow.

85.    As stated by Dr. Dale Cumming in a 1991 review article: "In biotechnological applications where heterologous cell expression systems are employed, cell-specific glycosylation features will yield protein-linked glycan structures distinct from the 'natural' protein."[53]

E.    **BECAUSE GOLDWASSER'S URINARY EPO AND RECOMBINANT EPO DIFFER FUNCTIONALLY, THEY ARE INEVITABLY DIFFERENT STRUCTURALLY**

1.    **Differences in Specific Activity Between Urinary and Recombinant EPO**

86.    Specific activity is a way to describe the potency of a biological molecule. More precisely, it is the measure of activity (any measurable function of the molecule) per the quantity of the molecule present. The higher the specific activity, the more potent the molecule is at performing its function. For any biological molecule, the specific activity is directly related

---

[53] Cumming, "Glycosylation of recombinant protein therapeutics: control and functional implications," *Glycobiology* 1:115-130 (1991) at 118.

to the structure and chemical characteristics of the molecule. Thus if one observes differences between the specific activities of two preparations of related molecules, those preparations *must* contain substances with different structures.

87.     As an analogy, compare white glue with superglue. It only takes a tiny drop of superglue to hold as well as a very large dollop of white glue. Thus, the specific activity for stickiness of the superglue is higher. It follows that the reason for superglue's far stickier "activity" is that it has a different chemical structure than white glue. On the other hand, two bottles of white glue would have the same specific activity for stickiness, because they have the same chemical structure.

88.     The scientific literature has consistently reported that the specific activity of Goldwasser's uEPO is considerably lower than that of recombinant EPO. The Miyake paper reported the maximum specific activity of their purified urinary EPO as 70,400 U/mg.[54] Commercial preparations of recombinant EPO have specific activities at least in excess of 200,000 U/mg:

> The recombinant protein displays an *in vivo* specific activity of greater than 200,000 units/mg polypeptide when assayed in a murine model system. This value is nearly 3-fold higher than all values previously reported for human uEPO, which range from 70,400 units/mg polypeptide (Miyake et al, 1977) to 81,600 units/mg polypeptide (Yanagawa *et al.*, 1984, Krystal *et al.*, 1986).[55]

---

[54] Miyake *et al.*, "Purification of Human Erythropoietin," *J. Biol. Chem.* 252(15):5558-64 at 5563 (1977) ("U/mg" means units per milligram, where the activity of the EPO preparation was measured using an *in vivo* assay measuring the stimulation of iron uptake into red blood cells in mice.).

[55] Recny *et al.*, "Structural Characterization of Natural Human Urinary and Recombinant DNA-derived Erythropoietin; Identification of des-Arginine 166 Erythropoietin," *J. Biol. Chem.*

**TABLE II Effects of Removal of Carbohydrates
on Apparent Molecular Weights Recombinant and
Urinary Erythropoietin**

| | r-epo | | u-epo | |
| | $M_r$ kd | $AM_r$ kd | $M_r$ kd | $AM_r$ kd |
|---|---|---|---|---|
| Native | 38.2 | — | 37.0 | — |
| Asialo | 34.8 | 3.4 | 32.9 | 4.1 |
| O-glycanase | 31.9 | 2.9 | 31.9 | 1.0 |
| N-glycanase | 21.6 | 10.3 | 21.6 | 10.3 |

**AM refers to the difference in apparent molecular weights after
treatment with each enzyme**

210.    Kung and Goldwasser conclude:

The data in Table II suggest a difference in O-linked carbohydrate and possibly in
sialic acid content with u-epo having less O-linked oligosaccharide and more
sialic acid than r-epo in agreement with other reported values.[154]

## G.    PLASMA OR SERUM EPO HAVE NON-RECOMBINANT GLYCOSYLATION PATTERNS

211    I understand that Roche's experts have opined that prior administration of

plasma or serum from one animal to another or from one human to another anticipates or renders

obvious Amgen's product claims. I further understand that Roche's expert Dr. Spinowitz has

recently supplemented his report on this point. Thus, I reserve my right to supplement my

opinion on this topic after I have had an opportunity to carefully review Dr. Spinowitz's

arguments. I can comment, however, on Roche's argument at a high level. As I have explained,

the glycosylation structures imparted by cells grown in culture are inherently different than those

imparted by the cells in the kidney that naturally produce EPO. Therefore, the same logic that

leads to my opinion that urinary EPO is different from recombinant EPO applies with equal force

---

[154] *Id.*

113

to plasma preparations that may or may not contain EPO.

**H.    NO STATEMENT BY AMGEN ESTABLISHES THAT PRIOR ART URINARY EPO AND RECOMBINANT EPO ARE THE SAME**

**1.    Amgen's PLA Statements Do Not Disprove the Differences Between Recombinant and Urinary EPO.**

212.    Dr. Bertozzi argues that statements made in Amgen's Product License Application ("PLA") for Epogen® are evidence that uEPO is indistinguishable from rEPO.[155] I disagree with Dr. Bertozzi for several reasons.

213.    First, Dr. Bertozzi selectively quotes and thus mischaracterizes Amgen's statements in its PLA. For example, in paragraph 85, Dr. Bertozzi reproduces two statements stating that rEPO is "immunologically and biologically indistinguishable" from uEPO. First, the issue here is whether the uEPO structure is the same or different than rEPO, not its function. Second, Bertozzi omits the statement elsewhere in the PLA where Amgen makes explicit the differences in specific activity between uEPO and rEPO: "The specific activity of purified r-HuEPO is approximately 160,000 units/A280 using either the RIA or bioassay data for the calculation of units. In contrast, the specific activity of purified u-EPO isolated from aplastic anemia patients as described by Miyake et al. (1977) is 70,400 units/A278. Although the basis for this difference is not clear, it is possible that the harsh conditions required for the purification of erythropoietin from concentrated urine are responsible for its decreased specific activity."[156]

---

[155] Bertozzi Report at ¶¶ 82-86

[156] AM-ITC 00963324, see also AM-ITC 00963341, AM-ITC 00963302 ("With the exception of a difference in the specific activity (units/mg protein) of the purified proteins, r-HuEPO and u-HuEPO are indistinguishable in their biological and immunological properties.").

## I.     DEMONSTRATIVE EXHIBITS

1.          In addition to the figures and charts in this report, I may use additional demonstrative exhibits to illustrate various parts of my opinion.  Attached as Exhibit C are graphics that I may use at trial.  I may prepare additional demonstrative exhibits to help illustrate portions of my testimony or to respond to new arguments raised by Roche's experts.

Executed this 11th day of May, 2007 at San Diego, California.


_____

AJIT VARKI, MD