# EXHIBIT 1

Dockets.Justia.com

```
 1              UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF MASSACHUSETTS
 2
                        Civil Action
 3                     No. 05-12237-WGY
 4    * * * * * * * * * * * * * * * * *
                              *
 5    AMGEN, INC.,            *
                              *
 6          Plaintiff,        *
                              *
 7    v.                 *   MARKMAN HEARING
                              *
 8    F. HOFFMANN-LA ROCHE LTD,     *
      ROCHE DIAGNOSTICS GmbH and     *
 9    HOFFMANN-LA ROCHE, INC.,     *
                              *
10          Defendants.       *
                              *
11    * * * * * * * * * * * * * * * * *
12          BEFORE:  The Honorable William G. Young,
                   District Judge
13
      APPEARANCES:
14
            DUANE MORRIS LLP (By Michael R. Gottfried,
15    Esq.), 470 Atlantic Avenue, Suite 500, Boston,
      Massachusetts 02210
16          - and -
            DAY CASEBEER MADRID & BATCHELDER, LLP (By
17    Lloyd R. Day, Jr., Esq., Linda A. Sasaki-Baxley,
      Esq. and Jonathan Loeb, Ph.D.) 20300 Stevens Creek
18    Boulevard, Suite 400, Cupertino, California 95014
            - and -
19          McDERMOTT WILL & EMERY (By William G.
      Gaede, III, Esq.), 3150 Porter Drive, Palo Alto,
20    California 94304
            - and -
21          WENDY A. WHITEFORD, ESQ., Of Counsel,
      Amgen, Inc., One Amgen Center Drive, Thousand
22    Oaks, California 91320-1789, on behalf of the
      Plaintiff
23
24                1 Courthouse Way
                  Boston, Massachusetts
25
                  April 17, 2007
```

1    call it that, by saying they continued to try to get bigger

2    and bigger and bigger and they got so big that they claimed

3    something they didn't invent.  Or that --

4        THE COURT:  What do you mean they got bigger and

5    bigger and bigger?

6        MS. BEN-AMI:  In other words, the original claim of

7    the '008 is the DNA sequence.  And they knew what the DNA

8    sequence was and they claimed it.  Right?  Then they go

9    ahead and they say we're claiming human EPO.  That they had

10   not sequenced.  So they didn't know what that was.  Other

11   than its three-dimensional total package of structure.

12       And that's what I'm saying to your Honor.  I want

13   to be clear about this.  I'm not saying you must define

14   human EPO as being limited to the 166 amino acids.  I'm not

15   saying that.  Quite frankly --

16       THE COURT:  And that's not true in the real world.

17       MS. BEN-AMI:  I'm not saying that.  I think that

18   the patent is ambiguous because they did not know.  But what

19   I'm saying is, if you're going to do an analysis that says

20   it's a specific amino acid sequence then it has to be 166.

21       The alternative approach, which I think takes into

22   account somewhat more of your views on seminal patent, how

23   do you deal with it, is to say human EPO must be everything

24   that is human EPO.  It must be the amino acid sequence, it

25   must be the secondary structure, it must be the tertiary

1    structure, it must have the three-dimensional structure, it

2    must be human EPO.

3        What Amgen's construction is -- and I can go

4    through this in more detail, because that was the next part

5    of my presentation -- what Amgen's construction is it's only

6    the specific amino acid sequence of 1 to 165.

7        THE COURT:  I follow you.

8        MS. BEN-AMI:  No glycosylation, no secondary

9    formulation, no tertiary structure, no three-dimensional

10   conformation.  And what I'm saying is it can't be 1 to 165

11   alone.  If it's going to be human EPO, it means human EPO,

12   then it's got to be all human EPO.  Where --

13       THE COURT:  Well, I don't know that your proposed

14   instruction -- construction is helpful here.  I have to

15   explain this to a jury.  And I take that very seriously.  If

16   you want this construed -- and, you know, I'm not going to

17   be tautological.  Human EPO is human EPO.  That doesn't mean

18   anything, to a jury.  And at one time it didn't mean

19   anything to me.

20       MS. BEN-AMI:  Well, your Honor, our construction

21   says it has to have all the structure of human EPO, which

22   is, and we can continue going through, I will show you that

23   the patent tells you what these various structures are.

24       THE COURT:  Well, now, not, not in your first slide

25   here.  It doesn't say all the structure.

1        MS. BEN-AMI:  It says the structure.  It says the

2    structure that would be produced in mammalian cells as of

3    the invention date.

4        THE COURT:  Well, I --

5        MS. BEN-AMI:  It's not the amino acid sequence,

6    it's the structure of human EPO.

7        THE COURT:  Well, suppose we were to take Amgen's

8    then and say a protein having the structure of human EPO

9    such as the amino acid.  Just have the same such as.

10        MS. BEN-AMI:  So it no longer says amino acid

11    sequence.  It says --

12        THE COURT:  Well, I'm just talking here.

13        MS. BEN-AMI:  I understand in theory.

14        THE COURT:  So what do you think about that?

15        MS. BEN-AMI:  If it had all the structure of the

16    human EPO.

17        THE COURT:  Well, I'm not saying all.  A protein

18    having the structure of human EPO, such as the amino acid

19    sequence of EPO isolated from human urine.

20        MS. BEN-AMI:  No, I don't think that's right, your

21    Honor.  Because such as is now saying if you only have the

22    amino acid sequence that's out.

23        THE COURT:  That's an embodiment-- that's an aspect

24    of it.

25        MS. BEN-AMI:  That's including them rather than

1      such as, your Honor.

2          THE COURT:  Well, it is including them.  You would

3      be happy, though, if I simply said human erythropoietin was

4      a protein having the structure of human EPO.

5          MS. BEN-AMI:  Yes, the total structure of human

6      EPO.

7          THE COURT:  Well, the structure.  All right.

8          MS. BEN-AMI:  I think, your Honor, when it says

9      such as the amino acid sequence, that's saying if you just

10     have the amino acid sequence that's not, and I don't believe

11     that's correct.

12         THE COURT:  Grammatically you may be, you may be

13     right there.

14         All right, let's hear from Mr. Day and we'll be

15     back to you.

16         Mr. Day, she made some headway here.  What -- how

17     do you feel about a protein having, human erythropoietin is

18     a protein having the structure -- maybe we should call it

19     DNA structure, if that means anything -- having the

20     structure of human erythropoietin.

21         MR. DAY:  That would be an erroneous construction,

22     your Honor.

23         THE COURT:  Okay.  I'll hear you.

24         MR. DAY:  And your Honor was right to go to

25     Phillips.  And the reason you're right to go to Phillips is

1    because the process of claim construction is a highly

2    structured analysis.  It's not a walk through the forest.

3    It begins with a very structured set of principles that have

4    been repeatedly laid out by the Federal Circuit to guide a

5    Court through the difficult question of figuring out what

6    does a claim mean.  And the Court well appreciates the

7    mantra.  Judge Michel laid it out very clearly in Medtronic.

8    You start with the claims.  You look at the other claims in

9    the patent.  You look at the specification.  You look at the

10   prosecution history.  You don't begin where Ms. Ben-Ami

11   began with an expert report that hasn't even been submitted

12   to the Court.

13        THE COURT:  Well, try -- what do you say about my

14   reading of Phillips?  Do you think that's right?

15        MR. DAY:  Pardon me?

16        THE COURT:  What do you say about my reading of

17   Phillips?  Do you think that's right?

18        MR. DAY:  Yes, I do think that's right.  I think

19   that Phillips, if I understand your point correctly, I think

20   Phillips says that in the case of a seminal patent where you

21   have a pioneering patent, which is what these patents are --

22        THE COURT:  Well, she may give you '008.

23        MR. DAY:  She will disagree.

24        THE COURT:  But the others in her view you're just

25   getting bigger and bigger.

1    MR. DAY:  That's correct.  She will, she will

2    disagree.  It has been many, many years since this invention

3    was made and nobody has yet found another way to do what Lin

4    did.  So, in the case of a pioneering patent, then in a

5    pioneering patent claims are ordinarily entitled to a

6    broader scope.  Amgen's claims are both broad and they are

7    narrow.  They are not uniformly broad.  The impulse to claim

8    broad is not unchecked.  There is also a reason to claim

9    narrowly, and Amgen claims narrowly as well.

10    THE COURT:  To, to avoid anticipation.

11    MR. DAY:  Not to avoid anticipation.  By claiming

12    narrowly, you can delimit what it is that an accused

13    embodiment must have in order to infringe.  If you claim a

14    lot then the accused embodiment has to have all of those

15    things.  And that, of course, is what's going on here.

16    Roche is trying to blow this claim out to include more and

17    more things in the meaning of human EPO in order to argue we

18    don't have this, we don't have that, we don't have that.

19    So you can claim both broadly and you can claim

20    narrowly.  So the question is in the context of this claim,

21    '422, claim 1, where you have to look at the entire claim

22    language, in the context of this claim what does the claim

23    term human erythropoietin mean.  That's the issue for the

24    Court.

25    I have some binders, too, that I would like to hand

1       up to the Court, if I may.  Could you give them some to

2       opposing counsel.

3           Okay.  And these are simply the slides that I will

4       be talking about.

5           The first thing that I want to illustrate for the

6       Court is the difference in the claim construction that Roche

7       proposes and Amgen proposes.

8           Amgen's construction is a protein having the amino

9       acid sequence of human EPO, such as the amino acid sequence

10      of EPO isolated from human urine.

11          Now, the question for the Court in considering

12      that, is that consistent with the other claim language, is

13      that consistent with the specification, is that consistent

14      with the prosecution history, as to what that term human

15      erythropoietin means in the context of the entire claim,

16      '422, claim 1.

17          Roche's construction differs.  And I've highlighted

18      on the right what is importantly different about Roche's

19      construction.  First of all, they say it's not a protein.

20      They say it's a glycoprotein.  That means that it must have

21      glycosylation.  It has the amino acid sequence of

22      erythropoietin isolated from human urine.  So they agree

23      with us about the amino acid sequence.  This argument you

24      just heard from Ms. Ben-Ami, which was not in their papers,

25      was made for the first time this morning on oral argument,

1    is predicated on an expert report not before the Court, is

2    inconsistent with what they acknowledge.  This --

3        THE COURT:  Well, we're trying to get at the best

4    construction.

5        MR. DAY:  I understand.

6        THE COURT:  You do have, you do have a problem with

7    that position 166.  I mean, her argument does resonate.

8        MR. DAY:  No, we don't have a problem with that.

9        THE COURT:  All right, tell me why.

10        MR. DAY:  And the reason we don't have -- because

11    these are -- this is human erythropoietin purified from

12    mammalian cells grown in culture.  And the cells cleave off

13    the 166 amino acids.  And Lin produced and made and had in

14    his possession an EPO that was produced by mammalian cells

15    grown in culture.  So he possessed a 165 species of human

16    erythropoietin when he filed his application.

17        THE COURT:  But he didn't know it.

18        MR. DAY:  Oh, did he, did he know it?

19        THE COURT:  Well --

20        MR. DAY:  He possessed it.

21        THE COURT:  Well, let's just go back.

22        MR. DAY:  But, no, your Honor, this is an

23    important point.

24        THE COURT:  Go ahead.

25        MR. DAY:  You asked a very good question and it's

1    an important point.  But it's irrelevant.  It's irrelevant

2    whether he knew it.  What is relevant is whether he

3    possessed it and he taught others how to get the same thing.

4    That it was later discovered to be 165 and not 166, not what

5    he had deduced it to be, is irrelevant.

6        THE COURT:  Well, I understand that's your

7    position.

8        MR. DAY:  Okay.  The second thing is, that Roche

9    seeks to add to this claim is having the structure that

10   would be produced in mammalian cells as of the invention

11   date.

12       Now, let me ask you to turn the page and I'll

13   illustrate for you what the difference is first of all

14   between these two constructions.

15       On the left you have a picture of Amgen's

16   construction.  Amgen construes human erythropoietin as

17   referring to the amino acid sequence of human erythropoietin

18   as isolated from urine.  Roche construes human

19   erythropoietin as referring not only to the amino acid

20   sequence but also to all of the glycosylation that's

21   attached to that sequence by the cells.  And they say there

22   is one structure.  They call it the structure.  And so

23   there's only one such structure.

24       Now, what's wrong with Roche's construction?  Why

25   is it inconsistent with the other claims, with the

1      specification, with the prosecution history?

2          Okay, the first thing is they would require that

3      the human erythropoietin be glycosylated.  That, that

4      structure is not provided by the term human erythropoietin

5      as the Court will see.  That structure is provided by the

6      fact that it's produced in mammalian cells.  And that's why

7      the source limitation in this claim is so important.  As

8      Roche's own expert, Dr. Kadesh, in the declaration that

9      Roche submitted in support of their claim construction,

10     describes in detail glycosylation is a cell by cell

11     dependent function.  The cell determines what glycosylation

12     goes on a protein.  The glycosylation that will be put on a

13     protein varies by cell species.  Different species of cells

14     will glycosylate proteins differently.  That's all laid out

15     very clearly by Dr. Kadesh.  This was well understood by

16     those of ordinary skill in the art.  It's the fact that the

17     protein is produced in a mammalian cell that gives it

18     certain types of glycosylation.  A certain structure beyond

19     the amino acid sequence.

20         Roche then says it must have the identical

21     glycosylation as originally attached by the cell.  So, in

22     other words, there can't be any post-expression changes in

23     the molecule.  That's the other thing they're trying to do.

24     They're trying to narrow the scope of this claim so that

25     human erythropoietin, that amino acid sequence, which is

1    then glycosylated by the cell, can't be modified in any way,

2    has to be exactly as produced by the cell.

3        And then what they're trying to do, then what they

4    say is that it must be produced in cells that were available

5    as of 1983.  In other words, any mammalian cell that was

6    adapted for growth in culture after 1983 couldn't be used.

7    Couldn't be used to make this product.  And if it was, if it

8    was it wouldn't infringe according to that.

9        And then they say that there has to be no

10    alteration in the secreted glycoprotein due to

11    post-expression modification.  It's a point I made earlier.

12        Now, what's wrong with all that?  Why is all of

13    that not correct as a matter of law and as a matter of claim

14    construction?  Claim construction.  Construing what this

15    claim means.

16        Well, the first thing is that their construction

17    would be inconsistent with Lin's other claims.  When Lin

18    claimed a human erythropoietin that was a glycoprotein he

19    said so expressly.  Take a look at '933, claim 4 where he

20    refers to human erythropoietin glycoprotein.  Roche's

21    construction would render the word glycoprotein irrelevant.

22    And for that reason it is erroneous as a matter of law.

23    Every word in a claim must be given meaning.  Where related

24    claims from a single application use the same terms they

25    should be given consistent meanings.  The use of human

1   erythropoietin glycoprotein shows that when Lin is referring

2   to human erythropoietin he is saying nothing about whether

3   it's glycosylated or not.

4        The second thing is that Lin's specification makes

5   clear that the polypeptides of the invention may or may not

6   be glycosylated.  There's no necessary requirement.  The

7   only thing that requires in '422, claim 1 the human

8   erythropoietin to be glycosylated is the fact that it is

9   produced in mammalian cells and purified from mammalian

10  cells grown in culture.  And that step, that source from

11  which the EPO's obtained imparts a structure in addition to

12  the amino acid sequence of human erythropoietin.

13        The last thing in the specification that is

14  critical to understand is that when Lin took his DNA, he did

15  not express it only in mammalian cells.  As described in

16  Examples 11 and 12 of the patent he also expressed it in

17  E.coli.  E.coli does not glycosylate.  There is no

18  glycosylation on human erythropoietin.  And yet Lin still

19  describes that as human erythropoietin.  The human

20  erythropoietin that Lin is talking about in his patent is

21  the amino acid sequence that is produced by the DNA that

22  encodes human erythropoietin.  And when that DNA is placed

23  into a mammalian cell and the cells are produced in

24  mammalian cell culture, the cells cleave off the 166 and

25  they may or may not glycosylate the cell, the protein.

1          This was all brought out in the prosecution history

2     specifically with reference to the amendment of an allowance

3     of '422, claim 1.  In Exhibit 8 of Amgen's original claim

4     submission, claim brief, we attached the prosecution history

5     for this claim.  And in that prosecution history Amgen

6     explained what human erythropoietin means.  It defined the

7     term.  Human erythropoietin is understood to include any

8     polypeptide having amino acid sequence of EPO isolated from

9     human urine and may be produced in human cells or other

10    mammalian cells.

11         And so, what does that necessarily mean?  That

12    language means that human EPO includes any, any polypeptide

13    having the amino acid sequence of EPO.  If a polypeptide has

14    the amino acid sequence of EPO it is by definition human

15    erythropoietin as the claim term reads.

16         Having is open-ended.  It's a tern of art in patent

17    law, which means an open-ended construct.  It's not limited.

18    And so it doesn't exclude additional elements.  There's no

19    reference to glycosylation in the prosecution history, let

20    alone any specific glycosylation, any statement that it must

21    have the structure.  And there's no limitation on the

22    mammalian cells that can be used to produce it.

23         THE COURT:  All right, I think I have it.

24         Brief rebuttal, Ms. Ben-Ami.

25         MS. BEN-AMI:  Well, I have an extensive rebuttal.

1       THE COURT:  Well, you may but --

2       MS. BEN-AMI:  I won't go through everything, but I

3   think there's a lot of points here and I think I really do

4   need to discuss this a little bit more.

5       THE COURT:  While you're getting set let me talk to

6   the clerks.

7       MS. BEN-AMI:  Okay.

8       (Pause in proceedings.)

9       THE COURT:  Go ahead.

10      MS. BEN-AMI:  Your Honor, when I say extensive it

11  might still be brief.  But I would like to start with this.

12      If you look at your screen, your Honor, this is

13  what Amgen told you human EPO meant in the Markman hearing

14  in the TKT case.  Now, I'm not collaterally estopped and we

15  can argue about what the meaning is in terms of claim

16  construction.  But Amgen was here before your Honor defining

17  human EPO as a glycoprotein having a specific sequence of

18  amino acids -- it doesn't say they're 1 through 165 -- and

19  the ability to stimulate formation of red blood cells.

20      So Mr. Day is now telling you that human EPO isn't

21  a glycoprotein.  And if you want me to go through every

22  slide here where the specification says it's a glycoprotein,

23  and the testimony of Dr. Lodish and Dr. Goldwasser and

24  everyone else, I can.  But it's in your binder going through

25  slide 21, slide 22.  We can just go to slide 21 as

1    representative.

2        This is Dr. Lodish's tutorial.  EPO is a

3    glycoprotein.  Human EPO in the body is a glycoprotein.

4    It's a glycoprotein.  The way they got over obviousness was

5    to say what's unique about this molecule is that it's an

6    obligate, is a term they phrase, glycoprotein.  And your

7    Honor can look at all the slides so that we don't spend as

8    time.  But it is throughout the specification and throughout

9    the prosecution history.

10        THE COURT:  But suppose I, suppose I adopted that

11    and said, but modified their definition and called it a

12    glycoprotein, and then everything else the same, having the

13    amino acid sequence.  That doesn't get you anywhere.

14        MS. BEN-AMI:  Well, I don't know if it gets me

15    anywhere or not --

16        THE COURT:  No, but you --

17        MS. BEN-AMI:  -- but it's not what I think is

18    right.  I think it has to have the structure of human EPO.

19        THE COURT:  All right, I understand.

20        MS. BEN-AMI:  That's part of the structure.  But

21    it's not all of the structure.

22        THE COURT:  All right.  All right.

23        MS. BEN-AMI:  Mr. Day really went through many of

24    these points.  But he said something that I think is

25    incorrect here about the E.coli.  I think that is earlier

1    on.  Can you -- he said, you know, they showed that with

2    E.coli you wouldn't get glycosylation.

3        It's 153.  Can I have that, please?

4        We must be very careful when we have a patent that

5    is trying to trying to claim analogs and derivatives.  And

6    your Honor will remember that the Federal Circuit said they

7    couldn't claim analogs, many years ago; that they didn't

8    have sufficient description for analogs.

9        So we can't look at a specification that says I'm

10   claiming EPO, I'm claiming analogs of EPO, I'm claiming

11   parts of EPO, I'm claiming everything in the world, and then

12   say all that means human EPO.

13       But let's look at this part of the prosecution --

14   of the specification where it says about making this E.coli

15   product.  It doesn't call it human EPO.  It's called des Ala

16   EPO.

17       THE COURT:  Excuse me.

18       MS. BEN-AMI:  That's all right.

19       THE COURT:  Go ahead, Ms. Ben-Ami.

20       MS. BEN-AMI:  I'm sorry, your Honor.

21       THE COURT:  All right.  But --

22       MS. BEN-AMI:  This, this is important.  Because

23   when they talk about the E.coli product they're saying that

24   E.coli product has not only 166 but it has an additional, an

25   additional at the front.

1          THE COURT:  What is this I'm reading from now?

2          MS. BEN-AMI:  This is the specification of the

3   patent at column 33.  Mr. Day just said to you, well, your

4   Honor, it talks about making EPO in E.coli and they're not

5   glycosylated.  But what I'm saying when they talk about that

6   E.coli, they're saying it's not human EPO.  Because what

7   they say is the expression product is -- I'll write it on

8   the back here, your Honor -- the expression product of the

9   specification at that point is Met -- I'm sorry -- Met-166.

10  And then they say by processing the Met comes off so you're

11  left with 166.  And if it's not just the Met that comes off,

12  amino acid 1 comes off as well.  So now you have 165.  But

13  it's not the same 165 as human EPO.  Because human EPO is 2

14  through 166.  I mean, this EPO, I'm sorry, is 2 through 166.

15  Human EPO --

16          THE COURT:  Is 1 through 165.

17          MS. BEN-AMI:  -- is 1 through 165.

18          THE COURT:  Right.

19          MS. BEN-AMI:  So now we have something that they're

20  calling a variant, a des, whatever it says, right, product.

21  And they're saying it's 167 or 166, or if it's 165, it's a

22  different 165 than Amgen says EPO is.

23          THE COURT:  Right.

24          MS. BEN-AMI:  Human or otherwise.

25          THE COURT:  Let me ask Mr. Day a question.

1       What if we modified yours, I'm still working with

2    Amgen's, but called it a glycoprotein.  Is that a problem?

3    Isn't that -- that's the, that's the most accurate and we're

4    going to hear a lot about glycosylation.  So it would seem

5    to me that that would be both accurate and fair.

6       MR. DAY:  Your Honor, I think it would be -- I

7    don't think it's a problem.  I think it would be an

8    erroneous claim construction.  And I think it would be

9    erroneous for the reasons I cited.  Because the claims

10    differentiation -- and your Honor may have noticed when,

11    when Ms. Ben-Ami flashed that specification up, she

12    didn't point to the fact that it denominates the EPO as

13    hEPO.  H stands for human.

14       THE COURT:  Well, no, she said it was a different

15    --

16       MR. DAY:  No.  No.  H, little h stands for human.

17    Amgen identified the EPO that's being produced in this

18    E.coli as human EPO, and then it made a number of

19    alterations to the amino acid sequence.  It made a number of

20    analogs to that human sequence and said, well, we take this

21    out, we put this in, we take this out, we put this in.

22    These are all the changes from the human EPO.  It would be

23    wrong as a matter of claim construction, your Honor, because

24    you would be reading out of the definition of human EPO

25    human EPO produced in E.coli cells.  It would be wrong as a

1    matter of claim construction because you would be construing

2    human EPO in a way that renders human erythropoietin

3    glycoproteins redundant and unnecessary.  So as a matter of

4    claim construction you would be making a mistake.  That's

5    Amgen's position.

6          THE COURT:  Thank you.

7          Here's what we're going to do.  At this stage and

8    for these purposes we're going to adopt Amgen's proposed

9    construction.  I'll reflect on whether I'll add the

10   glycoprotein before the word, substitute it for protein.

11         Turning now to purified from mammalian cells grown

12   in culture.  Now, Roche's proposed construction comes

13   straight out of this Court's own analysis of this subject.

14   And why ought I not stick with it?  I've analyzed this and I

15   see -- so I'll hear from you, Mr. Day.  What's the matter

16   with that?

17         MR. DAY:  Okay.  First of all, I don't think

18   Roche's construction comes right out of the Court's

19   construction.  I will certainly grant you that the first

20   part of their construction is a verbatim recitation and

21   Amgen offered an alternative, if this is to be a jury trial,

22   Amgen offered an alternative statement of that which I think

23   says the same thing.

24         The difference between the parties in claim

25   construction here is what I have highlighted.  And that is

1    Roche's contention that the limitation cannot define the

2    structure of the claim product.  And let me --

3        THE COURT:  Well, I'm not, I'm not proposing that.

4    What I'm proposing is the Court's language.

5        MR. DAY:  That's fine.

6        THE COURT:  Purified from mammalian cells grown in

7    culture means obtained in substantially homogenous form from

8    mammalian cells, using the word "from" in the sense that it

9    originates in mammalian cells, without limitation to,

10   without limitation to it only taking it directly out of the

11   interior of the cells which have been grown in the in vitro

12   culture.

13       MR. DAY:  And that's fine.  And we merely offered

14   an alternative --

15       THE COURT:  All right.

16       MR. DAY:  -- clarifying statement to that.

17       THE COURT:  Then we'll stick with my language for

18   now.  But that's without prejudice to revisiting it if I

19   think I can explain it to the jury better.

20       Then, next, a non-naturally occurring glycoprotein

21   product of the expression, et cetera.  Now, here it seems

22   that Amgen's proposal makes the most sense.  And of course

23   we're bound by the Federal Circuit.  Non-naturally occurring

24   means not occurring in nature, but that makes perfect sense

25   and we'll follow it.  And that's, that's in the Amgen

1    proposal.

2        What's the matter with that, Ms. Ben-Ami?  They're

3    a glycoprotein product not occurring in nature that is

4    expressed in a mammalian cell from a DNA sequence that does

5    not originate in the genome of the host and comprises a DNA

6    sequence encoding human erythropoietin.

7        MS. BEN-AMI:  Well, first of all, your Honor, I

8    think non-naturally occurring is a separate element.  And so

9    I do think that's important.

10        THE COURT:  Well, non-naturally occurring, aren't

11    we bound by the Federal Circuit?  It means not occurring in

12    nature.

13        MS. BEN-AMI:  I agree with that, but that's a

14    separate element than glycoprotein product of the expression

15    of a mammalian cell.  That's all I'm saying.  In other

16    words, you'd have to break down the claim.  And I think

17    non-naturally occurring is one element.  Glycoprotein

18    product of the expression of mammalian host cell, et cetera,

19    is a different product.  Element.  That's my first

20    fundamental difference.

21        THE COURT:   Well, all right.  But in trying to

22    explain it to the jury I say, I come to this and I say, now,

23    non-naturally occurring, what that means is it does not

24    occur in nature.  Now --

25        MS. BEN-AMI:  That means --