Amgen Inc. v. F. Hoffmann-LaRoche LTD et al
Case 1:05-cv-12237-WGY     Document 534-40     Filed 06/20/2007     Page 1 of 46
Doc. 534 Att. 39

# EXHIBIT 25

Dockets.Justia.com

UNITED STATES DEPARTMENT OF COMMERCE
Patent and Trademark Office
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| SERIAL NUMBER | FILING DATE | FIRST NAMED APPLICANT | ATTORNEY/DOCKET NO |
|---|---|---|---|

MICHAEL F. BORUN
MARSHALL, O'TOOLE & BICKNELL
TWO FIRST NATIONAL PLAZA
SUITE 2100
CHICAGO, IL 60603

| EXAMINER |
|---|
| |

| ART UNIT | PAPER NUMBER |
|---|---|
| | 4 |

DATE MAILED:

This is a communication from the examiner in charge of your application.
COMMISSIONER OF PATENTS AND TRADEMARKS

☐ This application has been examined    ☐ Responsive to communication filed on _____    ☐ This action is made final.

A shortened statutory period for response to this action is set to expire **3** month(s), _____ from the date of this letter.
Failure to respond within the period for response will cause the application to become abandoned. 35 U.S.C. 133

Part I  THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:
1. ☒ Notice of References Cited by Examiner, PTO-892.    2. ☐ Notice of Patent Drawing, PTO-948.
3. ☐ Notice of Art Cited by Applicant, PTO-1449    4. ☐ Notice of Informal Patent Application, Form PTO-152
5. ☐ Information on How to Effect Drawing Changes, PTO-1474    6. ☐ _____

Part II  SUMMARY OF ACTION

1. ☐ Claims _1-13, 16, 39-41, 47-49, 55-7_ are pending in the application.

    Of the above, claims _____ are withdrawn from consideration.

2. ☐ Claims _14-15, 17, 38, 42-6, 50-4, 58-60_ have been cancelled.

3. ☐ Claims _____ are allowed.

4. ☒ Claims _1-13, 16, 39-41, 47-49, and 55-57_ are rejected.

5. ☐ Claims _____ are objected to.

6. ☐ Claims _____ are subject to restriction or election requirement.

7. ☒ This application has been filed with informal drawings which are acceptable for examination purposes until such time as allowable subject matter is indicated.

8. ☐ Allowable subject matter having been indicated, formal drawings are required in response to this Office action.

9. ☐ The corrected or substitute drawings have been received on _____. These drawings are ☐ acceptable; ☐ not acceptable (see explanation).

10. ☐ The ☐ proposed drawing correction and/or the ☐ proposed additional or substitute sheet(s) of drawings, filed on _____ has (have) been ☐ approved by the examiner. ☐ disapproved by the examiner (see explanation).

11. ☐ The proposed drawing correction, filed _____, has been ☐ approved. ☐ disapproved (see explanation). However, the Patent and Trademark Office no longer makes drawing changes. It is now applicant's responsibility to ensure that the drawings are corrected. Corrections MUST be effected in accordance with the instructions set forth on the attached letter "INFORMATION ON HOW TO EFFECT DRAWING CHANGES", PTO-1474.

12. ☐ Acknowledgment is made of the claim for priority under 35 U.S.C. 119. The certified copy has ☐ been received ☐ not been received ☐ been filed in parent application, serial no. _____; filed on _____.

13. ☐ Since this application appears to be in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under Ex parte Quayle, 1935 C.D. 11; 453 O.G. 213.

14. ☐ Other

PTOL-326 (Rev. 7-82)    EXAMINER'S ACTION

156

AM-ITC 00941090

Serial No. 113178                                      -2-

Art Unit    183


The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that form the basis for the rejections under this section made in this Office action:

A person shall be entitled to a patent unless—

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent.

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of application for patent in the United States.

(e) the invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for patent, or on an international application by another who has fulfilled the requirements of paragraphs (1), (2), and (4) of section 371(c) of this title before the invention thereof by the applicant for patent.

The following is a quotation of 35 U.S.C. 103 which forms the basis for all obviousness rejections set forth in this Office action:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

Subject matter developed by another person, which qualifies as prior art only under subsection (f) and (g) of section 102 of this title, shall not preclude patentability under this section where the subject matter and the claimed invention were, at the time the invention was made, owned by the same person or subject to an obligation of assignment to

157

AM670156424                                    AM-ITC 00941091

Serial No.  113178                              -3-

Art Unit    183


35 U.S.C. 101 reads as follows:

Whoever invents or discovers any new and useful
process, machine, manufacture, or composition of
matter or any new and useful improvement thereof,
may obtain a patent therefor, subject to the con-
ditions and requirements of this title.

Claims 1-7, 9-13, 16, 40-41 and 47-49 provisionally
rejected under 35 U.S.C. 101 as claiming the same inven-
tion as that of claims 1-12 and 25-26 of copending
application Serial No. 113178.

This is a provisional double patenting rejection
since the conflicting claims have not·in fact been
patented.

Claims 1-13, 16, 39-41, 47-49 and 55-57 are
rejected under 35 U.S.C. 112, first and second
paragraphs, as the claimed invention is not described in
such full, clear, concise and exact terms as to enable
any person skilled in the art to make and use the same,
and/or for failing to particularly point out and
distinctly claim the subject matter which applicant
regards as the invention.

The use of alternate terms in the claim language
renders the cited claims indefinite, and presents
questions of enablement and scope.  With respect to the
actual physical properties, such as amino acid sequence
and degree and locations of glycosylation, the actual
physical characteristic in question should be presented.
The terms "part or all of," "sufficiently duplicative

158

AM670156425                                    AM—ITC 00941092

Serial No.  113178                    -4-
Art Unit    183

of," and "average carbohydrate composition which differs
from," do not particularly nor adequately point out the
distinctions from native erythropoietin (EPO).  The
actual physical properties which clearly define the pro-
tein claimed should be used in the claim language.  For
example, the "parts" of EPO which are contemplated and
supported by the disclosure (in terms of amino acid
sequence) and the sites and extent of glycosylation and
how they "differ" from native EPO should be pointed out.
Note that the glycosylation of EPO is an important
aspect of its activity and not every form of EPO is
biologically equivalent.  With respect to the term
having "one or more of the biological properties of
naturally occurring" EPO, applicant must point out which
biological properties are contemplated.  As currently et
forth, any protein or peptide showing any biological
property of EPO (e.g. "self" recognition of the protein
by host) is encompassed.  Applicant cannot support this
assertion with the current disclosure.

     Claims directed toward methods of therapy using the
recombinant protein are not enabled.  No in vivo results
supporting these claims is presented which show the
recombinant varient working in an identical manner as
the native protein.  The slight difference in glycosyla-
tion presented in the specification is not sufficiently

159

AM670156426                                    AM-ITC 00941093

Serial No.  113178                          -5-
Art Unit    183

discussed with respect to its effect on the in vivo
activity of rEPO.  For example, does the glycosylation
render the human protein antigenic in humans?  In vitro
assays do not provide clearly relevant support without
some type of convincing display to correlate the two.
The particular mode of treatment which is contemplated
should be set forth.  Simply stating administration is
not sufficient.

The claims must particularly point out the essen-
tial aspects of the disclosed invention.  The broadest
limitations must also be supported by the disclosure.
As currently set forth, the claims are indefinite and to
an extent, non-enabled.  The particular biological acti-
vities and physical properties which can be used to
define the rEPO should be reflected in the claim
language to adequately define the invention.  The par-
ticulars concerning the actual method(s) of treatment
and support for the claimed effectiveness of said
treatment(s) must be shown.

Claims to "synthetic polypeptides" are not enabled
by this disclosure.  "Synthetic," as opposed to
"recombinant," is an art recognized term which indicates
a chemically derived rather than genetically engineered
protein.  No support for chemical synthesis of EPO or
EPO fragments is shown by this disclosure.  These claims

160

Serial No. 113178                    -6-

Art Unit    183


are also confusing with respect to the intent of the
term "synthetic."

Support for the data concerning the glycosylation
of the recombinant EPO is found only in the parent
application.  Support for the contemplated therapy using
rEPO is also only found in the parent application of
this application.

Claims 1-11, 16, 39 and 47-49 are rejected under 35
U.S.C. 102(b) as anticipated by or, in the alternative,
under 35 U.S.C. 103 as obvious over Chiba et al or
Takezawa et al.

As currently set forth, the cited claims define any
protein having at least one of the biological properties
of EPO.  The limitations of claims 7 and 8 do not
further limit this definition.  The cited disclosures
each show production of human EPO in substantially
purified form having EPO activity.  This protein is
inherently identical to the claimed EPO by virtue of the
same amino acid sequence (or an allelic variant thereof)
and the same type of biological activity.  The recom-
binant protein has not been shown to behave in a
distinct and unobvious manner with respect to the
naturally occurring EPO, and in any case the claims
clearly encompass the naturally produced EPO shown by
the cited art.  The burden of proving the claimed rEPO

161

Serial No.  113178                    -7-

Art Unit    183


distinct and unobvious over the cited prior art is
shifted to the applicant.

    Claims 1-11, 16, 39 and 47-49 are rejected under 35
U.S.C. 102(e) as anticipated by or, in the alternative,
under 35 U.S.C. 103 as obvious over Sugimoto et al or
Takezawa et al (H).

    For the reasons presented in the immediately pre-
ceding art based rejection, the cited claims are rejected
as defining a protein which is inherently identical to
the naturally derived EPO disclosed by the cited art.
The burden of proving the claimed rEPO distinct and
unobvious is shifted to the applicant.

    Claims 1-13, 16, 39 and 47-49 are rejected under 35
U.S.C. 102 b as anticipated by or, in the alternative,
under 35 U.S.C. 103 as obvious over Roh et al.

    As previously shown, the claims directed to rEPO as
currently set forth are anticipated by a disclosure
showing purified biologically active EPO from native
sources.  Roh et al disclose this, and also show $^{125}I$-
radiolabeled EPO.  This disclosure anticipates the
claimed radiolabeled rEPO of applicant as disclosing an
inherently identical radiolabeled EPO composition.  The
burden of proving otherwise is shifted to the applicant.

    Claims 1-13, 16, 39 and 47-49 are rejected under 35
U.S.C. 103 as being unpatentable over Chiba et al

**162**

AM670156429                                    AM-ITC 00941096

Serial No. 113178          -8-

Art Unit  183

Takezawa et al (D or H) or Sugimoto et al in view of Roh et al further in view of Hunter et al.

EPO produced by various means is known in the art and is explicitly shown by the cited primary references. The disclosure of Roh et al provide a utility for radio labeled EPO, and thus establishes motivation for one of ordinary skill in the art to produce radiolabeled EPO. Hunter et al describe a means of radiolabeling proteins which has been successfully used by Roh et al in producing radiolabeled EPO. In view of these references, the claimed radiolabeled rEPO is obvious.

Claims 1-13, 16, 39-41 and 47-49 are rejected under 35 U.S.C. 102 b as anticipated by or, in the alternative, under 35 U.S.C. 103 as obvious over Miyake et al.

The disclosure of Miyake et al shows isolation and purification of naturally derived human EPO. These authors show that two forms of glycosylated EPO exist, and further show production of asialo-EPO. Production of $125_I$ radiolabeled human EPO is also shown. This disclosure anticipates the recombinant EPO as set forth in the cited claims. The definitions set forth are met by the human EPO and derivatives therefrom, which are disclosed by Miyake. Note especially that the varients of human EPO with the amino acid sequence, biological activity

163

AM670156430                              AM-ITC 00941097

Serial No. 113178                -9-

Art Unit   183

and difference in degree of carbohydrate composition as
claimed by applicant are shown by Miyake et al. In view
of applicant's failure to clearly define the precise
physical nature of the recombinant EPO, examiner
believes the native and recombinant forms of human EPO
to be inherently identical. With respect to claim 8,
the limitation of being an allelic variant of simian EPO
is also met. The burden of proving otherwise is shifted
to the applicant.

Claims 1-13, 16, 39-41, 47-49 and 55-57 are
rejected under 35 U.S.C. 103 as being unpatentable over
Miyake et al Takezawa et al (D or H) Chiba et al or
Sugimoto et al in view of Papayannopoulo et al.

Each of the primary references cited above would
enable one of ordinary skill in the art to prepare
biologically active, homogeneous human EPO.
Papayannopoulo et al describe in detail the effect of
EPO in vivo in a murine model. Note especially the
abstract and introduction of this latter reference which
summarizes the content of the paper. The effect of EPO
on the rate of hemoglobin synthesis is recognized to
be one of the most significant contributors to the
hematocrit of an animal. In view of the cited art one
would find it obvious to use EPO in a treatment to
restore hemoglobin concentration in vivo, as the in vivo

164

AM670156431                                    AM-ITC 00941098

Serial No.  113178                    -10-
Art Unit    183


effects of EPO administration have been shown and
explained.  Note also that the primary references
suggest use of EPO in therapy (Takezawa et al
"Background" section).

    The claimed method is also considered to be obvious
because the recombinant and native derived EPO are
biologically equivalent.  In other words, both forms
show the same _in vitro_ and _in vivo_ activities as asserted
by applicant.  Use of an agent from a different source
which behaves in a manner identical to its known analog
would suggest to one skilled in the art that similar
results could be obtained using the biologically equiva-
lent analog.  The expected result would make obvious the
use of the new analog as its activity and effects would
be expected (note in re Durden, 226 USPQ 359).  In the
instant case, use of recombinant EPO, which has been
asserted to show the same biological activity as native
EPO, in the treatment of an animal to achieve the same
known effect of EPO in said animal would be obvious to
one skilled in the art.

    The art not used above made of record indicates and
expands on the nature and utility of EPO.

    Any inquiry concerning this communication should be
directed to Jeff Kushan at telephone number
703-557-0664.

HOWARD E. SCHAIN
PATENT EXAMINER
GROUP 180 - ART UNIT 183

Kushan:meb
5/18/88:Retype 5/23/88

165

AM670156432                                    AM-ITC 00941099



RECEIVED GROUP 180

DEC 08 1988

#7
B.Whi
12/9/:

<u>PATENT</u>

IN THE UNITED STATES PATENT
AND TRADEMARK OFFICE

| | | |
|---|---|---|
| Application of | ) | "PRODUCTION OF |
| | ) | ERYTHROPOIETIN" |
| FU-KUEN LIN | ) | |
| | ) | |
| Serial No. 113,178 | ) | Group Art Unit 183 |
| | ) | |
| Filed: October 23, 1987 | ) | Examiner - H. E. Schain |

<u>DECLARATION PURSUANT TO 37 C.F.R. §1.132</u>

Hon. Commissioner of Patents
   and Trademarks
Washington, D.C.  20231

Sir:

        I, THOMAS WAYNE STRICKLAND, solemnly declare as ·
follows:

        1.  Since April, 1984, I have been employed by
Amgen Inc., Thousand Oaks, California and currently hold the
position of Research Scientist.

        2.  From February, 1981 to March 1984, I held the
position of Assistant Research Biological Chemist,
Department of Biological Chemistry, University of
California, Los Angeles.  My research activities included
studies on biosynthesis and protein folding of glycoprotein
hormones; chemical modification, isolation and receptor
cross-linking of glycoprotein hormones.

        3.  I have read United States Patent Application
Serial No. 113,178 ("USSN 113,178") entitled "Production of
Erythropoietin".

        4.  On page 19, lines 26-32 of USSN 113,178, it is
stated that:

493

AM670156453

AM-ITC 00941120

"Novel glycoprotein products of the
invention include those having a primary
structural conformation sufficiently
duplicative of that of a naturally-occurring
(e.g., human) erythropoietin to allow
possession of one or more of the biological
properties thereof and having an average
carbohydrate composition which differs from
that of naturally-occurring (e.g., human)
erythropoietin."

5.  A series of experimental procedures were con-
ducted under my direction to illustrate some of the
differences between the carbohydrate composition, specifi-
cally differences relating to the carbohydrate structure, of
recombinant human erythropoietin ("r-HuEPO") prepared
according to the procedures of USSN 113,178 and naturally-
occurring human erythropoietin isolated from urine
("u-EPO").

6.  The r-HuEPO for use in the experimental
procedures was prepared in accordance with the general pro-
cedures described in Example 10 of USSN 113,178, purified in
accordance with the procedures described in my U.S. Patent
4,667,016 (Exhibit "A"), and the specific samples were drawn
from two GMP lots (Nos. 514 and 516) of material prepared
for FDA clinical trial applications.

7.  The u-EPO employed in the procedures of para-
graphs 8 and 9 hereof was purified in 1984 from urine of
aplastic anemia patients using a modification of the
procedure of Miyake et al., JBC., 252, 5558, 1977 (Exhibit
"B") as follows and was stored until use at -70°C following
purification:

[a]  Concentrated urine was treated with phenol/-
p-aminosalicylate essentially as described by Chiba et al.,
Biochem.Biophys.Res.Comm., 47,, 1372 (1972) (Exhibit "C");

- 2 -

184

AM670156454

AM-ITC 00941121

(b)  Treated urine was subjected to ethanol preci-
pitation essentially as described by Miyake et al. (1977);

(c)  The 75-90% ETOH precipitation fraction was
subjected to DEAE-Agarose chromatography essentially as
described by Miyake et al. (1977);

(d)  The fraction from the DEAE-Agarose at 10mM
Tris·HCl, 30mM CaCl$_2$ was dialyzed against 5mM calcium
acetate, pH 7.2, adjusted to pH 4.5 with 1% acetic acid, and
subjected to chromatography on sulfopropyl-Sephadex
essentially as described by Miyake et al. (1977), except
that the column was developed (in succession) with 5mM
calcium acetate, pH 4.5 (equilibration buffer); 15mM calcium
acetate/20% ethylene glycol, pH 5.5, and 0.1M calcium
acetate/20% ethylene glycol, pH 7.0 instead of the solutions
described by Miyake et al. (1977);

(e)  The fraction eluting from the sulfopropyl-
Sephadex column at 15mM calcium acetate/20% ethylene glycol,
pH 5.5 was solvent exchanged into a buffer consisting of
0.15M NaCl/10mM Tris·HCl, pH 7.0/5mM CaCl$_2$ and applied to a
column of wheat germ agglutinin agarose (WGA-agarose)
equilibrated with 0.15M NaCl/10mM Tris·HCl, pH 7.0/5mM
CaCl$_2$, and the unbound fraction was washed through the
column with the equilibration buffer and the column was
developed with a 10 mg/ml solution of chitotriose (oligo-N-
acetyl-glucosamine) in 0.15M NaCl/10mM Tris·HCl, pH 7.0/5mM
CaCl$_2$;

(f)  The fraction eluting from WGA-agarose with
the chitotriose solution was dialyzed against 0.25mM
potassium phosphate, pH 7.5 and subjected to hydroxylapatite
chromatography essentially as described by Miyake et al.
(1977), except that the column was developed (successively)

- 3 -

185

with 0.25mM potassium phosphate (equilibration buffer),
0.75mM potassium phosphate pH 7.5, 6mM potassium phos-
phate/10% ethylene glycol, pH 9.0, and 20mM potassium
phosphate/10% ethylene glycol, pH 9.0 instead of the
solutions described by Miyake et al. (1977); and,

     (g)  The material eluting from the hydroxylapatite
column at 0.75mM potassium phosphate was concentrated using
a stirred cell ultrafiltration device to yield u-EPO.

     8.  Separate aliquots of r-HuEPO and u-EPO, each
containing approximately 5 ug of the respective protein,
were subjected to isoelectric focusing in a polyacrylamide
gel in the presence of 5M urea essentially in accordance
with the procedure described by LKB Technical Bulletin #2217
(Exhibit "D").  The nominal pH range was from about 3 to 5
and a Coomassie Blue stain was used to stain the gel.  A
photograph of the gel was taken under visible light and a
copy of the photograph is set out immediately below.




- 4 -

186

The r-HuEPO is present in lane #1 designated
"r-HuEPO" and the u-EPO is present in lane #2 marked
"u-EPO". The pH values measured on the gel using a surface
electrode are indicated on the right side of the photo-
graph.

Analysis of the isoforms of r-HuEPO and u-EPO in
lane #1 and lane #2, respectively, demonstrates that the
u-EPO isoforms exhibit lower (more acidic) isoelectric
points.

9.  To determine whether the more acidic nature of
u-EPO is due to differences in the protein (amino acid) or
carbohydrate composition of the molecule, r-HuEPO and u-EPO
were subjected to enzymatic digestion with N-glycanase or a
mixture of N-glycanase and sialidase as follows:

(a)  r-HuEPO and u-EPO samples that were analyzed
and reagents employed were prepared as follows:

(1)  r-HuEPO

GMP Lot 516 solvent exchanged into $H_2O$,
$A_{280}$=3.8, make 1:20 dilution into $H_2O$
and dry 24 μl (0.0045 $A_{280}$) aliquots in
Speed Vac without heating.

(2)  u-EPO

6/19/84 preparation as in paragraph 7(a)
through (g), dry 28 μl (0.005 $A_{280}$)
aliquots in Speed Vac without heating.

(3)  N-glycanase

Genzyme Lot #12761, 250 U/ml.

- 5 -

187

AM670156457

AM-ITC 00941124

(4)  <u>Sialidase</u>

1 U vial of Arthrobacter ureafaciens

sialidase (Calbiochem) reconstituted to

1 ml $H_2O$

(b) the following incubation mixtures were

prepared:

- 6 -

188

AM670156458

AM-ITC 00941125

| Incubation Mixture | Sample | $H_2O$ | N-glycanase | Sialidase | 75 mM CHAPS |
|---|---|---|---|---|---|
| r-HuEPO | r-HuEPO | 10 ul | -- | -- | 1 ul |
| r-HuEPO/N-glycanase | r-HuEPO | -- | 10 ul | -- | 1 ul |
| r-HuEPO/N-glycanase/sialidase | r-HuEPO | -- | 10 ul | 1 ul | 1 ul |
| u-EPO | u-EPO | 10 ul | -- | -- | 1 ul |
| u-EPO/N-glycanase | u-EPO | -- | 10 ul | -- | 1 ul |
| u-EPO/N-glycanase/sialidase | u-EPO | -- | 10 ul | 1 ul | 1 ul |
| N-glycanase | -- | -- | 10 ul | 1 ul | 1 ul |
| N-glycanase/sialidase | -- | -- | 10 ul | 1 ul | 1 ul |

- 7 -

189

AM670156459

AM-ITC 00941126

(c) The mixtures were incubated overnight (14-16 hr.) at 37°C. A 1 microliter sample was removed from each incubation mixture and subjected to polyacrylamide gel electrophoresis in the presence of SDS to monitor for complete enzyme digestion. The samples were reduced with dithiothreitol and heated to 65°C for 5 minutes prior to application to the gel.

The standards and incubation mixtures that were loaded to each lane marked on the gel are indicated as follows:

| Lane | Sample Loaded |
|------|---------------|
| (1) | Molecular weight standards |
| (2) | r-HuEPO |
| (3) | r-HuEPO/N-glycanase |
| (4) | r-HuEPO/N-glycanase/sialidase |
| (5) | u-EPO |
| (6) | u-EPO/N-glycanase |
| (7) | u-EPO/N-glycanase/sialidase |
| (8) | N-glycanase |
| (9) | N-glycanase/sialidase |

The gel was stained by the silver staining method. A photograph of this SDS-PAGE gel was taken under visible light and a copy of the photograph is set out immediately following.

- 8 -

190

AM670156460

AM-ITC 00941127

RECEIVED GROUP 180

DEC 8 1988



As shown by the photograph of the gel, there are substantial decreases in molecular weight of r-HuEPO and u-EPO upon digestion with N-glycanase (which gives rise to removal of N-linked oligosaccharides) and an additional further slight decrease in molecular weight when the N-glycanase-treated r-HuEPO and u-EPO samples are digested with sialidase (which gives rise to removal of sialic acid from O-linked carbohydrate). The gel demonstrates that the enzymatic reactions went to completion.

The remainder of each incubation mixture was loaded on a pH 3-10 range isoelectric focusing gel. The incubation mixtures were subjected to isoelectric focusing in a polyacrylamide gel in the presence of 5M urea essentially in accordance with the procedure described by LKB Technical Bulletin #2217.

The incubation mixtures were loaded to each lane marked on the gel are indicated as follows:

- 9 -

191

AM670156461

AM-ITC 00941128

RECEIVED GROUP 180

MAY 0 6 1988

| Lane | Sample Loaded |
|------|---------------|
| (1) | r-HuEPO |
| (2) | r-HuEPO/N-glycanase |
| (3) | r-HuEPO/N-glycanase/sialidase |
| (4) | u-EPO |
| (5) | u-EPO/N-glycanase |
| (6) | u-EPO/N-glycanase/sialidase |
| (7) | N-glycanase |
| (8) | N-glycanase/sialidase |

The nominal pH range was from 3 to 10 and a Coomassie Blue stain was used to stain the gel. A photograph of the gel was taken under visible light and a copy of the photograph is set out immediately below.



- 10 -

192

As shown in the photograph of the gel, N-glycanase digestion of r-HuEPO [Lane (2)] results in two forms which are less acidic than the starting material. These two forms are most probably molecules with O-linked oligosaccharides containing one and two sialic acid residues. Sialidase digestion of the N-glycanase-treated r-HuEPO [Lane (3)] results in one major and one minor isoform. The less acidic nature of the major form is consistent with an O-linked oligosaccharide devoid of sialic acid. The minor form thus appears to contain a single sialic acid residue on its O-linked carbohydrate.

N-glycanase digestion of u-EPO [Lane (5)] results in a major isoform which migrates with the r-HuEPO form believed to contain two sialic acid residues per O-linked carbohydrate and a small amount of a more acidic isoform which may represent a form containing 3 sialic acid residues per O-linked oligosaccharide. Additional evidence that r-HuEPO exists in two forms containing one or two sialic acid residues per O-linked oligosaccharide is demonstrated by the photograph of the SDS-PAGE gel of these reaction mixtures, shown previously, where two slightly different molecular weight forms can be discerned for N-glycanase-treated r-HuEPO, while only one molecular weight form is apparent for u-EPO. Sialidase digestion of N-glycanase-treated u-EPO [Lane (6)] results in a less acidic form which co-migrates with the major form of N-glycanase/sialidase-treated r-HuEPO [Lane (3)]. The equivalent isoelectric points of N-glycanase/sialidase treated r-HuEPO [Lane (3)] and u-EPO [Lane (6)] demonstrates that the more acidic isoelectric point of u-EPO is due to differences in the carbohydrate composition of the molecule and not the protein (amino acid) composition.

- 11 -

193

AM670156463

AM-ITC 00941130

10.  To determine whether the more negative iso-
electric point of u-EPO is due to the different sialic acid
linkages present in the glycoprotein [as reported by
Takeuchi et al., J.Biol.Chem., 263, 3657 (1988) (Exhibit
"E"], wherein it was disclosed that u-EPO contains both 2->3
and 2->6 sialic acid linkages while r-HuEPO produced accord-
ing to the Amgen method contains only 2->3 sialic acid
linkages] r-HuEPO and u-EPO were digested with sialidase
alone.  The sialidase used, (a sialidase obtained from
Arthrobacter ureafaciens), removes both 2->3 and 2->6 linked
sialic acids.  The procedure employed is as follows:

(a)  The r-HuEPO and u-EPO samples that were
analyzed and reagents employed were prepared as follows:

(1)  r-HuEPO
GMP Lot 516 solvent exchanged into $H_2O$,
$A_{280}$=3.8, make 1:10 dilution into $H_2O$
and dry 10 µl (0.0038 $A_{280}$) aliquots in
Speed Vac without heating.

(2)  u-EPO
Received from E. Goldwasser (prepared in
1976 by the authors and according to the
procedure of Miyake et al.), 0.36 mg/ml,
designated s-EPO, HT 7-27-76 (3), dry 10
µl aliquots in Speed Vac without
heating.

(3)  Sialidase
1 U vial of Arthrobacter ureafaciens
sialidase (Calbiochem) reconstituted to
1 ml $H_2O$.

(b)  The following incubation mixtures were
employed:

- 12 -

194

AM670156464                                                    AM-ITC 00941131

| Incubation Mixture | Dried Protein | H₂O | Sialidase | 75 mM CHAPS |
|---|---|---|---|---|
| r-HuEPO | r-HuEPO | 10 μl | -- | 1 μl |
| r-HuEPO/sialidase | r-HuEPO | 10 μl | 1 μl | 1 μl |
| u-EPO/sialidase | u-EPO | 10 μl | 1 μl | 1 μl |
| r-HuEPO/sialidase | r-HuEPO | 10 μl | 1 μl | 1 μl |

- 13 -

195

AM670156465

AM-ITC 00941132

RECEIVED GROUP 180
DEC 08 1988

(c)  The mixtures were incubated overnight (14-16 hrs.) at 37°C.  The entire reaction mixture was then applied to an isoelectric focusing gel.  The incubation mixtures were subjected to isoelectric focusing in a polyacrylamide gel in the presence of 5M urea essentially in accordance with the procedure described by LKB Technical Bulletin #2217.

The incubation mixtures that were loaded to each lane marked on the gel are indicated as follows:

| Lane | Sample Loaded |
|------|---------------|
| (1) | r-HuEPO |
| (2) | r-HuEPO/sialidase |
| (3) | u-EPO/sialidase |
| (4) | r-HuEPO/sialidase |

The nominal pH range was from 3 to 10 and a silver staining method was used.  A photograph of the gel was taken under visible light and a copy of the photograph is set out immediately below.



- 14 -

196

As shown by the photograph of the gel, sialidase digested r-HuEPO [Lanes (2), (4)] and u-EPO [Lane (3)] each contain several different isoforms. The sialidase-treated u-EPO isoforms [Lane (3)] are more acidic than the sialidase-treated r-HuEPO [Lanes (2), (4)] isoforms. The greater negativity of the sialidase-treated u-EPO isoforms [Lane (3)] when compared to the sialidase-treated r-HuEPO isoforms [Lanes (2), (4)] indicates that u-EPO contains sialidase resistant negative charges not found on r-HuEPO. These charges may be sulfate residues as suggested by Takeuchi et al., J.Biol.Chem., 263, 3657 (1988), or additional sialidase resistant sialic acid residues.

11. The above analysis of r-HuEPO and u-EPO demonstrate that the differences shown by the isoelectric focusing experiments, specifically, the more acidic nature of the u-EPO isoforms compared to the r-HuEPO isoforms, is due to the differences in carbohydrate composition, in particular carbohydrate structure, of r-HuEPO and u-EPO. This analysis indicates that recombinant erythropoietin as described by Serial No. 113,178 has a different carbohydrate composition than naturally occurring urinary erythropoietin.

- 15 -

197

AM670156467

AM-ITC 00941134

I further declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further, that these statements were made with the knowledge that willful, false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful, false statements may jeopardize the validity of the application or any patent issuing thereon.

*Thomas Wayne Strickland*
THOMAS WAYNE STRICKLAND

Date: ___11-30___ , 1988

- 16 -

198

AM670156468

AM-ITC 00941135

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicant: Fu-Kuen Lin        )    Group Art Unit: 186

Serial No.: 113,178           )    Examiner: J. Kushan

Filed: October 23, 1987       )

For: "PRODUCTION OF           )
      ERYTHROPOIETIN"          )

AMENDMENT UNDER RULE 116

Honorable Commissioner of Patents
  and Trademarks
Washington, D.C. 20231

Dear Sir:

Responsive to the Final Official Action dated February 10, 1989,
kindly amend the above-identified application as follows:

In The Claims:

Kindly cancel Claims 41, 55-57 and 61-66 without prejudice,
and add the following new claims 67-75:

--67. A glycoprotein product of the expression of an
exogenous DNA sequence in a eucaryotic host cell, said product
having a primary structural conformation and glycosylation
sufficiently duplicative of that of a naturally occurring human
erythropoietin to allow possession of the in vivo biological
property of causing bone marrow cells to increase production of
reticulocytes and red blood cells and having an average
carbohydrate composition which differs from that of naturally
occurring human erythropoietin.

1411a

224

AM670156498                                    AM-ITC 00941165

68.   A glycoprotein product according to Claim 67 wherein the exogenous DNA sequence is a cDNA sequence.

69.   A glycoprotein product according to Claim 67 wherein the exogenous DNA sequence is a genomic sequence.

70.   A glycoprotein according to Claim 67, 68 or 69 wherein the host cell is a mammalian cell.

71.   A glycoprotein product according to Claim 70 wherein the host cell is a COS cell.

72.   A glycoprotein product according according to Claim 70 wherein the host cell is a CHO cell.

73.   A pharmaceutical composition comprising an effective amount of a glycoprotein product according to Claim 67 and a pharmaceutically acceptable diluent, adjuvant or carrier.

74.   A method for providing erythropoietin therapy to a mammal comprising administering an effective amount of a glycoprotein product to Claim 67.

75.   A method according to Claim 74 wherein the therapy comprises enhancing hematocrit levels.--

AM670156499                        AM-ITC 00941166

<u>Remarks</u>

Applicant wishes to express appreciation to Examiners Kushan and Schain for their time and thoughtful consideration of the issues during the interview of May 24, 1989, with Mr. Steven Odre and the undersigned. It is earnestly believed that the interview materially advanced prosecution of the subject application (a copy of the Interview Summary is attached).

Entry of this Amendment and reconsideration and allowance of the subject application are respectfully requested. The amendments proposed herein are believed to place the application in condition for allowance.

The art cited in the subject Official Action has been carefully considered by the Applicant together with the Examiner's comments relevant thereto and, in response, new independent Claim 67, which combines previously pending Claims 41 and 61, is presented in an effort to more particularly point out and distinctly claim the subject invention. New Claims 68-75 correspond to previously pending Claims 62-66 and 55-57.

Claims 41, 55-57, and 61-66 were rejected under 35 U.S.C. 112, first and second paragraphs. Reconsideration is requested in view of the above-noted new claims and the remarks which follow.

All product claims in the subject application are now product-by-process claims. Independent Claim 67, and thus all of the pending claims, specifically define the erythropoietin of the subject invention as a "glycoprotein product of the expression of

1411a                        - 3 -

226

an exogenous DNA sequence in a eucaryotic host cell...." These
product-by-process claims are presented in an effort to
positively recite the physical properties of recombinant
erythropoietin, and to further define the product of the subject
invention since the recombinant erythropoietin claimed cannot be
precisely defined except by the process by which it is
produced.  It is submitted that the claims now pending herein
fully meet the requirements of 35 USC 112.

Claims 41 and 61-66 were rejected under 35 USC 103 as being
unpatentable over Miyaki et al., Chiba et al., Takezawa et al.
(D or H) or Sugimoto et al.  Reconsideration is requested in view
of the above-noted new claims and the remarks which follow.

All of the references cited by the Examiner in this
rejection relate to naturally occurring erythropoietin.  The
claims of the subject invention relate to erythropoietin which is
produced through recombinant DNA techniques.  Recombinant
erythropoietin is different from naturally occurring
erythropoietin (for a description of the differences, see the
response filed December 5, 1988). Moreover, naturally occurring
human erythropoietin is not a viable human therapeutic product;
human recombinant erythropoietin, on the other hand, has been
proven to be clinically effective, and is the first therapeutic
product which can be used to effectively treat the hundreds of
thousands of patients who suffer from anemia and other disorders
involving low red blood cell counts.

1411a              - 4 -

227

AM670156501

AM-ITC 00941168

In determining whether the subject claims are obvious under 35 USC 103, all evidence bearing on the subject must be considered. The proof of unobviousness of a claimed product can be through evidence that the product solves a long felt need, through evidence of the failure of others, or through evidence of its commercial success. Evidence of these Graham v. John Deere "secondary considerations" must always be taken into account in connection with the determination of obviousness (see Hybritech Inc. v. Monoclonal Antibodies, Inc. 231 USPQ 81 (Fed. Cir. 1986)).

The International Trade Commission recently applied the Graham v. John Deere "secondary considerations" in ITC Investigation No. 337-TA-281, involving commonly owned U.S. Patent 4,703,008, covering erythropoietin DNA, vectors and host cells (which resulted from the parent application to the subject application). The ITC upheld the validity of the '008 patent. Judge Harris, in his Initial Determination, used the Graham v. John Deere "secondary considerations" and found that these indicia supported a finding of unobviousness. The Initial Determination is attached for the Examiner's convenience.

In the subject invention, the Graham v. John Deere "secondary considerations" establish the unobviousness of recombinant erythropoietin. As to the "long felt need", Judge Learned Hand viewed "the length of time the art, though needing the invention, went without it" as the best nontechnical guidepost for inferring nonobviousness (see Safety Car Heating and Light Co. v. General Electric Co. 69 USPQ 401 (2nd Cir. 1946)). Indisputably, prior to the subject invention, there

1411a                    - 5 -

228

AM670156502                           AM-ITC 00941169

was a long felt need for a compound which could be used for treating patients suffering from anemia. The "long felt need" was solved by recombinant erythropoietin, which can and is being used in the treatment of patients (see also pgs. 50-52 of the ITC Initial Determination). Judge Barris states at page 52 of the Initial Determination:

> Thus it is evident that since at least the early 1960's the medical community felt a need for a supply of exogenous EPO as an alternative treatment of the anemia suffered by patients with advanced renal disease. In 1983, it had not been possible to meet this need by isolating natural EPO or by recombinant methods...

In contrast to recombinant erythropoietin, naturally occurring human erythropoietin is not used to treat patients. In the past, efforts were made to obtain purified erythropoietin from natural sources such as the urine of patients with aplastic anemia. The results of these efforts however yielded only a small amount of material which was far too little for clinical research. Similarly, a program to purify natural erythropoietin from non-anemic persons failed because of impurities in the urine, and the resulting product made patients sick (see pgs. 51-52 of the ITC Initial Determination). In a statement (copy attached) announcing the FDA approval of recombinant erythropoietin, Commissioner Frank Young noted:

> Although there is not enough naturally occurring erythropoietin produced to collect it from healthy persons for use in treatment, gene splicing techniques have permitted its production.

1411a                      - 6 -

229

AM670156503                      AM-ITC 00941170

Other "failure of others" were the efforts made by others to produce recombinant erythropoietin (see pgs. 52-54 and 153-160 of the ITC Initial Determination). In summary, there was a long felt need solved by recombinant erythropoietin and, prior to the subject invention, others failed in attempts to produce compounds, including recombinant erythropoietin, which could be used to treat patients.

Regarding commercial success, it is estimated that recombinant erythropoietin sales will be several hundred million dollars annually (see also pgs. 49-50 of the ITC Initial Determination). The product license application for recombinant erythropoietin was approved by the FDA on June 1, 1989. In contrast, no application has been filed at the FDA for naturally occurring human erythropoietin, and it is unlikely that one will ever be filed.

Applicant respectfully submits that none of the cited art of record, either taken alone or in combination, discloses, suggests or renders obvious the invention as claimed herein.

Claims 41, 55-57, and 61-66 were rejected under 35 USC 103 as being unpatentable over Miyaki et al., Chiba et al., Takezawa et al. (D or H) or Sugimoto et al. in view of Papsyannopoulo et al. Reconsideration is requested.

This rejection includes the same references as the above noted prior art rejection with the addition of the Papsyannopoulo et al. reference which relates to increasing the hematocrit of animals. The subject matter of the claims is unobvious in view of these references for the reasons noted above in response to the first prior art rejection.

1411a                    - 7 -

230

<u>Conclusions</u>

In view of the above, Applicant respectfully submits that all claims now pending herein fully and patentable define the present invention over the applied art of record. As such, entry of the Amendment and early receipt of the Official Notice of Allowance is awaited.

Should any small matters remain outstanding, the Examiner is encouraged to telephone Applicant's undersigned attorney collect at (805) 499-5725 ext. 3161, so that same can be resolved without the necessity of an additional action and response thereto.

Respectfully submitted,

AMGEN INC.

Thomas E. Byrne    6/2/89
Reg. No. 32,205

TEB:jlm

Attachments

Amgen Inc.
1900 Oak Terrace Lane
Thousand Oaks, CA 91320

1411a                    - 8 -

231

AM670156505

AM-ITC 00941172

PATENT APPLICATION
ATTORNEY DOCKET NO. 11009/32695

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| Application of: | ) | "EXPRESS MAIL" mailing label No. |
| | ) | EG 473 138 519 US |
| Fu-Kuen Lin | ) | |
| | ) | Date of Deposit: |
| Serial No: 08/487,774 | ) | December 20, 1995 |
| | ) | |
| Filed: June 7, 1995 | ) | I hereby certify that this paper (or |
| | ) | fee) is being deposited with the |
| For: PRODUCTION OF | ) | United States Postal Service |
| ERYTHROPOIETIN | ) | "EXPRESS MAIL POST OFFICE |
| | ) | TO ADDRESSEE" service under 37 |
| | ) | C.F.R. §1.10 on the date indicated |
| Group Art Unit: 1815 | ) | above and is addressed to the |
| | ) | Assistant Commissioner for Patents |
| Examiner: Martinell | ) | Washington, DC 20231 |
| | ) | |
| | ) | |
| | ) | *Mark Bonadonna* |
| | ) | Mark Bonadonna |

SECOND PRELIMINARY AMENDMENT AND REMARKS

Assistant Commissioner for Patents
Washington, DC 20231

Sirs:

      This is a second preliminary amendment of the claims in the above-identified application, made following an October 18, 1995 interview kindly granted to the undersigned by Examiner Martinell. As noted in the Examiner Interview Summary Record, agreement on patentability of the subject matter claimed was not reached, but the Examiner agreed to consider certain amendments and arguments concerning the rejections propounded in the Office Action dated May 17, 1995 in parent U.S. patent application Serial No. 08/202,874 (abandoned in favor of the present Rule 62 application).

521

AM670156877

AM-ITC 00941544

## AMENDMENT

In the Claims

Please cancel pending claims 87-90, 93-96, 98 and 99 without prejudice.

Please enter new claims 100-110.

100. A non-naturally occurring erythropoietin glycoprotein product having the *in vivo* biological activity of causing bone marrow cells to increase production of reticulocytes and red blood cells and having glycosylation which differs from that of human urinary erythropoietin.

101. The non-naturally occurring EPO glycoprotein product according to claim 100 wherein said product has a higher molecular weight than human urinary EPO as measured by SDS-PAGE.

102. A non-naturally occurring glycoprotein product of the expression in a mammalian host cell of an exogenous DNA sequence comprising a DNA sequence encoding human erythropoietin said product possessing the *in vivo* biological property of causing bone marrow cells to increase production of reticulocytes and red blood cells.

103. A non-naturally occurring human erythropoietin glycoprotein possessing the *in vivo* biological property of causing bone marrow cells to increase production of reticulocytes and red blood cells which is the product of the process comprising the steps of:

(a) growing, under suitable nutrient conditions, mammalian host cells transformed or transfected with an isolated DNA sequence

522

AM670156878                    AM-ITC 00941545

encoding the human erythropoietin amino acid sequence set out in FIG

6 or a fragment thereof; and

      (b) isolating a glycosylated erythropoietin polypeptide therefrom.

    5̶. A non-naturally occurring human erythropoietin glycoprotein

possessing the *in vivo* biological property of causing bone marrow cells to increase

production of reticulocytes and red blood cells which is the product of the process

comprising the steps of:

      (a) growing, under suitable nutrient conditions, mammalian host

cells transformed or transfected with an isolated DNA sequence

comprising a sequence encoding the leader sequence of human

erythropoietin set out in FIG 6; and

      (b) isolating a glycosylated erythropoietin polypeptide therefrom.

    6̶. A non-naturally occurring glycoprotein product of the expression

in a non-human eucaryotic host of an exogenous DNA sequence comprising consisting essentially

of a DNA sequence encoding human erythropoietin, said product possessing the *in*

*vivo* biological property of causing human bone marrow cells to increase production

of reticulocytes and red blood cells and having an average carbohydrate composition

which differs from that of naturally occurring erythropoietin.

    7̶. The glycoprotein product according to claim 1̶0̶2̶. 1̶0̶3̶. 1̶0̶4̶. 1̶0̶5̶

or 1̶0̶6̶ wherein the host cell is a non-human mammalian cell.

    8̶. The glycoprotein product according to claim 1̶0̶7̶ wherein the

non-human mammalian cell is a CHO cell.

AM670156879

AM-ITC 00941546

108. A pharmaceutical composition comprising an effective amount of a glycoprotein product effective for erythropoietin therapy according to claim 100. 101, 102, 103, 104, 105 or 106 and a pharmaceutically acceptable diluent, adjuvant or carrier.

109. A method for providing erythropoietin therapy to a mammal comprising administering an effective amount of a pharmaceutical composition of claim 109.

110. A method for treating a kidney dialysis patient which comprises administering a pharmaceutical composition of claim 108 in an amount effective to increase the hematocrit level of said patient.--

## REMARKS

A.   The Pending Claims

Upon entry of the above-requested amendments, claims 100-110 will be under examination. The general correspondence of claims 100-110 to prior claims 87, 88, 89, 90, 93, 94, 95, 96, 98 and 99 is as noted in the following Table.

TABLE

| PRIOR CLAIM | NEW CLAIM |
|---|---|
| 87 (Independent) | 100 |
| 88 (Independent) | 102 |
| 89 (Independent) | 103 |
| 90 (Independent) | 104 |
| 93 (Dependent) | 106 |
| 94 (Dependent) | 107 |
| 95 (Dependent) | 108 |
| 96 (Dependent) | 109 |
| 98 (Dependent) | 110 |
| 99 (Independent) | 105 |

524

New product claim 101 is dependent on claim 100 (prior claim 87 as amended) and further characterizes the claim 100 subject matter in terms of apparent molecular weight on SDS-PAGE *vis-a-vis* human urinary EPO. This dependent claim recitation finds written descriptive support in the specification at page 64, line 20 through page 65, line 3 wherein glycosylated COS and CHO cell products were noted to have higher SDS-PAGE molecular weights than the human urinary isolate--the molecular weights of the deglycosylated products being the same.

B.   The Rejections of Previously Pending Claims

In the Office Action of May 17, 1995 in parent U.S. Serial No. 08/202,874, none of pending claims 87-90, 93-96 and 98 was allowed. The specification was objected to and all claims were variously rejected under 35 U.S.C. §112, first and second paragraphs and under 35 U.S.C. §102(b) or, in the alternative 35 U.S.C. §103 in view of the disclosures of Sugimoto *et al.*, (U.S. 4,377,512), Chiba *et al.* (U.S. 4,465,624), Miyake *et al.*, *J. Biol. Chem.*, 252:5558-5564 (1977), Espada *et al.*, *Federation Proceedings*, 41:1159 (1982), or Papayannopoulou *et al.*, *J. Clin. Invest.*, 51:1179-1185 (1972).

C.   Response and Remarks Supporting Patentability

1.   Section 112 Issues

(a)   The Examiner's objection to the inappropriate reference "to mammal" in prior claim 96 is mooted by its cancellation. The error does not occur in new claim 109.

(b)   The objection to the specification text at page 9, line 20 was the subject of discussion at the above-noted interview wherein it was explained that "Citations omitted" referred to the fact that literature citation cross references in the passage quoted had not been included in the text of the quote.

- 5 -

525

(c)    Applicant would appreciate the Examiner's assistance in Correction by Examiner's Amendment of the word "how" to "show" in the amendment referring to Figure 5 requested February 22, 1995.

(d)    At the above-noted interview, counsel explained that Figure 6 provided no new matter in view of the fact that it merely replaced prior Table 6.

(e)    Likewise, counsel explained that Figure 14 involved no new matter because it merely replaced prior Table XII.

(f)    Applicant solicits the Examiner's assistance in correction of the description of Figure 17 in the amendment of February 22, 1995 to replace "SPCEPO" with --SCEPO-- by Examiner's amendment.

(g)    At the above-noted interview, the Examiner agreed that reference to "fragment" in prior claim 89 (corresponding to claim 103) was definite and supported by the specification.

(h)    At the interview it was agreed that the negative limitation, "non-naturally occurring" would, when combined with the notation of glycosylation differences in prior claims 87 and 99 (corresponding to new claims 100 and 105) meet Section 112 specificity requirements.. All of independent claims 100-105 are similarly limited.

(i)    As agreed at the above-noted interview, reference to the EPO gene "signal" sequence has been replaced by reference to the "leader" sequence in claim 104 (corresponding to prior claim 90).

- 6 -

526

AM670156882

AM-ITC 00941549

2.    Prior Art Issues

Consistent with the discussions at the above-noted interview. Applicants
incorporation of "non-naturally occurring" in all independent claims operates to
distinguish the subject matter claimed from all prior art reference relating to
erythropoietin isolates (Chiba et al., Miyake et al., Espada et al. and
Papayannopoulou et al.), leaving only the Sugimoto et al. reference available for
consideration on Section 102(b)/Section 103 issues.

Applicant reiterates its prior position that no isolated protein having
biological activity is described or characterized by Sugimoto et al. Biological activity
is attributed to ascites fluids and only a prospective notation is made that highly
purified products can easily be obtained if desired. In view of the lack of any
disclosure in Sugimoto et al. of: (1) any repeatable means for producing the
hybridomas which allegedly generate a product with erythropoietin activity (the
human tumor cells assertedly employed in hybridoma formation are nowhere
identified, characterized, deposited or otherwise enabled); or (2) isolation of any
actual protein product to which the activity can be attributed. there is simply no
factual basis whatever for maintaining that the presently claimed human erythropoietin
glycoproteins, pharmaceutical compositions and treatment methods are rendered
obvious by, much less anticipated by, the cited reference.

In further support of the above position, Applicant notes that it has
contacted the named proprietors of the Sugimoto et al. reference in an attempt to
secure materials relevant to determining precisely what "erythropoietin" product was
described in the document. Attached as Exhibit A hereto is a copy of correspondence
sent by Applicant's assignee. Exhibit B hereto is a copy of the recently-received
response wherein the proprietor has refused to provide either cells described in the
reference or the "erythropoietin" assertedly produced by those cells. Applicant thus
maintains that the erythropoietin product mentioned in the Sugimoto et al. reference is

- 7 -

527

AM670156883

AM-ITC 00941550

not a available material susceptible to analysis and correspondingly respectfully
submits that no rejection based on the indefinite disclosures of the Sugimoto *et al.*
reference may properly be propounded.

### CONCLUSION

The foregoing amendments and remarks are believed to establish that
claims 100-110 are in condition for allowance and an early notice thereof is solicited.

Respectfully submitted,

MARSHALL, O'TOOLE, GERSTEIN,
MURRAY & BORUN

BY: _____
Michael F. Borun
Registration No. 25,447
6300 Sears Tower
233 S. Wacker Drive
Chicago, IL 60606-6402
(312) 474-6300

Chicago, Illinois
December 20, 1995

- 8 -

**528**

AM670156884                     AM-ITC 00941551