UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| AMGEN INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | CIVIL ACTION No.: 05-CV-12237WGY |
| F. HOFFMANN-LA ROCHE LTD, | ) | |
| ROCHE DIAGNOSTICS GmbH, | ) | |
| and HOFFMANN-LA ROCHE INC. | ) | |
| | ) | |
| Defendants. | ) | |

**Exhibits C, D, E, F to the Declaration of Peter Fratangelo, Esq. in Support of
Roche's Motion for Summary Judgment that Claim 1 of U.S. Patent No. 5, 955, 422
Is Invalid For Indefiniteness and Lack Of Written Description**

Amgen has assented to these documents being filed publicly and will not be filing a motion with the Court seeking to have the documents deemed confidential.  Thus, pursuant to paragraph 14 of the Protective Order, Roche is filing these documents in the public record.  Roche's previously filed Notice of Service of Confidential Documents In Support of its Motion for Summary Judgment that Claim 1 of U.S. Patent No. 5, 955, 422 Is Invalid For Indefiniteness and Lack of Written Description (Docket No. 618) is therefore moot.

Dated:  July 3, 2007

/s/ Nicole A. Rizzo
Lee Carl Bromberg (BBO# 058480)
Julia Huston (BBO# 562160)
Keith E. Toms (BBO# 663369)
Nicole A. Rizzo (BBO# 663853)
BROMBERG & SUNSTEIN LLP
125 Summer Street
Boston, MA 02110
Tel. (617) 443-9292
nrizzo@bromsun.com

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on the above date.

/s/ Nicole A. Rizzo
Nicole A. Rizzo

EXHIBIT C

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

AMGEN INC.,                                     )
                                                )
     Plaintiff,                                )
                                                )   Civil Action No.: 05-12237 WGY
v.                                              )
                                                )
                                                )
F. HOFFMANN-LA ROCHE                            )
LTD., a Swiss Company, ROCHE                    )
DIAGNOSTICS GmbH, a German                      )
Company and HOFFMANN-LA ROCHE                   )
INC., a New Jersey Corporation,                 )
                                                )
     Defendants.                               )
_____ )


## REBUTTAL EXPERT REPORT OF AJIT VARKI, MD


### *SUBJECT TO PROTECTIVE ORDER*
### *CONTAINS BOTH ROCHE AND AMGEN CONFIDENTIAL MATERIAL*
### *CONTAINS ROCHE BLA MATERIAL*



58.     I further understand that as a legal matter, Roche asserts that the process and source limitations of Dr. Lin's product claims are not properly considered for determining whether the claimed products are novel, or whether they were previously found in the prior art. I am informed that Roche's legal analysis is incorrect. In any event, Dr. Bertozzi argues at length that "[l]imiting the claimed product to a human erythropoietin product from a recombinant source does not distinguish the claimed product from human EPO described and existing in the prior art.[27] Contrary to Dr. Bertozzi's arguments, it is my opinion that these process and source

---

[27] Bertozzi Report ¶ 71.

limitations confer specific structures to the claimed products and that those specific structures are different from the structure of the EPO that was purified from human urine before Dr. Lin made his inventions.

REDACTED

REDACTED

84.     Thus, it is not surprising that no recombinant EPO can accurately reproduce the precise structure the mixture of glycoforms in naturally-occurring prior art EPO.  When a

35

gene for a secreted glycoprotein is removed from its normal cellular environment, and inserted into a different type of cell — often from a different species — which is grown under far different conditions than its *in situ* environment in the body, it is completely unsurprising that the glycoprotein that is produced has different glycan structures than the naturally-occurring glycoprotein. One would have understood that it would have been extremely unlikely and practically impossible to reproduce the glycosylation found on naturally occurring EPO because of both the difficulty in reproducing the cell type that normally makes EPO and the difficulty in reproducing the environment in which those cells normally grow.



36



### G.    PLASMA OR SERUM EPO HAVE NON-RECOMBINANT GLYCOSYLATION PATTERNS

211    I understand that Roche's experts have opined that prior administration of

plasma or serum from one animal to another or from one human to another anticipates or renders

obvious Amgen's product claims.  I further understand that Roche's expert Dr. Spinowitz has

recently supplemented his report on this point.  Thus, I reserve my right to supplement my

opinion on this topic after I have had an opportunity to carefully review Dr. Spinowitz's

arguments.  I can comment, however, on Roche's argument at a high level.  As I have explained,

the glycosylation structures imparted by cells grown in culture are inherently different than those

imparted by the cells in the kidney that naturally produce EPO.  Therefore, the same logic that

leads to my opinion that urinary EPO is different from recombinant EPO applies with equal force

to plasma preparations that may or may not contain EPO.

REDACTED



Executed this 11th day of May, 2007 at San Diego, California.

_____
AJIT VARKI, MD

# UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

EXHIBIT D

| | |
|---|---|
| AMGEN INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) Civil Action No.: 05-12237 WGY |
| v. | ) |
| | ) |
| | ) |
| F. HOFFMANN-LA ROCHE | ) |
| LTD., a Swiss Company, ROCHE | ) |
| DIAGNOSTICS GmbH, a German | ) |
| Company and HOFFMANN-LA ROCHE | ) |
| INC., a New Jersey Corporation, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## EXPERT REPORT OF DON H. CATLIN, M.D.

### *SUBJECT TO PROTECTIVE ORDER*

### *CONTAINS AMGEN CONFIDENTIAL MATERIAL*

26.      Every protein molecule has a characteristic pI.  pI is a reflection of all the

charged groups[11] attached to the protein molecule.  These charged groups can include certain

amino acids.[12]  These charged groups can also include post-translational modifications that carry

a charge, such as some sugar groups like sialic acid.  Often, particular proteins like

erythropoietin are made up of a mixture of molecules which differ in their composition of these

charged groups.  Individual members of such a molecular mixture are known as isoforms.  Such

proteins and their isoforms can be distinguished by differences in their pI.



---

[11] Certain chemicals, known as "ions" can gain or lose atoms or electrons in such a way to attain
either a positive or negative electrical charge.  A protein molecule can have numerous different
charged groups, some of which may be negative, and others positive.

[12] Of the twenty amino acids which make up proteins, aspartic acid and glutamic acid are acidic.



58.     The details of the methods used to generate the data herein are fully described

in the peer-reviewed literature.  The IEF method for EPO was first described by Lasne in a letter

to Nature in 2000.[20]  My colleagues and I have published peer-reviewed scientific articles

concerned with the detection of darbepoetin alfa and recombinant human EPO in human urine,[21]



---

[20] Lasne,F., de Ceaurriz, J., "Recombinant erythropoietin in urine," *Nature* 405: 635 (2000).

[21] Catlin, D.H., Breidbach, A., Elliott, S., Glaspy, J., "Comparison of the isoelectric focusing patterns of darbepoetin alfa, recombinant human erythropoietin, and endogenous erythropoietin from human urine. *Clin. Chem* 48:2057-2059 (2002); Breidbach, A., Catlin, D.H., Green, G.A., Tregub, I., Truong, H., Gorzek, J., "Detection of rHuEPO I urine by isoelectric focusing," *Clin. Chem.* 49:901-907 (2003).

22

and an extensive review of the history, practice, and detection of doping with EPOs.[22] Exhibits H and I describe the methods we used in further detail.

59.    The samples of EPO pharmaceutical products obtained from India, China, Mexico, Argentina, and Korea, as well as the samples of Epogen® and the uEPO standard were prepared for spotting according to the protocol described in Exhibit H.



---

[22] Catlin, D.H., Hatton, C.K., Lasne, F., "Abuse of Recombinant Erythropoietins by Athletes," In: Molineux G, Foote MA, Elliott S, eds. Erythropoietins and erythropoiesis: Molecular, Cellular, Preclinical, and Clinical Biology. Birkhäuser Verlag, 2003:205-227.



    69.    Based on these data, my learning, and experience, I make the following conclusions:

        (i) The EPO isoforms observed in purified urinary EPO standard obtained from the NIBSC are almost indistinguishable from the EPO isoforms observed in the whole urine of a normal individual.

26

(ii) All recombinant EPOs tested could clearly be distinguished from both EPO in normal urine and the international standard for urinary EPO. The difference in each case is the presence of several isoforms in urinary EPO which are lacking for each recombinant EPO.

(iii) Amgen's unpurified recombinant EPO contains all of the same glycoform bands as Epogen®, except that it has a lower proportion of the most acidic isoforms and it appears to have 3 additional basic isoforms. Unpurified recombinant EPO could also readily be distinguished from both EPO in normal urine and the international standard for purified urinary EPO.

Executed this 11th day of May, 2007 at Los Angeles, California.

DON H. CATLIN M.D.

27

EXHIBIT E

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

AMGEN INC.,                                    )
                                               )
      Plaintiff,                           )
                                               )    Civil Action No.: 05-12237 WGY
v.                                             )
                                               )
                                               )
F. HOFFMANN-LA ROCHE                           )
LTD., a Swiss Company, ROCHE                   )
DIAGNOSTICS GmbH, a German                     )
Company and HOFFMANN-LA ROCHE                  )
INC., a New Jersey Corporation,                )
                                               )
      Defendants.                          )
                                               )
_____)


## SUPPLEMENTAL EXPERT REPORT OF AJIT VARKI, MD


*Contains Amgen/Roche Confidential Material and Roche Restricted Access Confidential*
*BLA/IND Information Subject to Protective Order*



27.      Dr. Imperiali's statement that it has not been shown that "*all* recombinant EPO has glycosylation which differs from *all* naturally occurring EPO"[46] sets an unrealistically high and practically impossible standard. It is not possible to test all hypothetically possible recombinant EPOs. However, all of the comparison experiments that have been performed on real recombinant EPOs that have actually been produced support my opinion that such differences do exist. Neither Dr. Bertozzi nor Dr. Imperiali has identified any data on any rEPO that contradicts my conclusions.



---

[46] Imperiali Report ¶ 102 (emphasis added).

REDACTED

Executed this 1st day of June, 2007 at La Jolla, California.



_____
AJIT VARKI, MD

REDACTED

5/31/2007  Goldwasser, Eugene

EXHIBIT F

```
1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF MASSACHUSETTS

3

4    Amgen, INC.,                    )

5                   Plaintiff,       )

6              vs.                   )   No. 05-12237

7    F. HOFFMAN-LA ROCHE LTD., a     )   WGY

8    Swiss Company, ROCHE DIAGNOSTICS )

9    GmbH, a German Company, and     )

10   HOFFMAN-LA ROCHE INC., a        )

11   New Jersey Corporation,         )

12                   Defendants.     )

13

14        The CONFIDENTIAL videotaped Deposition of

15   EUGENE GOLDWASSER, called by the Defendants for

16   examination, taken pursuant to notice, agreement

17   and under the Rules of Civil Procedure for the

18   United States District Courts pertaining to the

19   taking of Depositions, taken before Richard H.

20   Dagdigian, CSR No.084-000035, a notary public

21   within and for the County of Cook, State of

22   Illinois, and a Certified Shorthand reporter of

23   said State, at the offices of Kaye Scholer LLP,

24   Chicago, Illinois, on the 31st day May 2007,
```

1

5/31/2007  Goldwasser, Eugene

1    between urinary EPO and recombinant EPO, and based

2    upon some differences, you suggested that that

3    could be a reason for the differences in potency,

4    is that correct?

5            MR. MADRID:   Objection.   That misstates the

6    article.

7            A    The significant word there is "could be".

8    We didn't establish it firmly.

9        BY MR. SUH:

10           Q    Why could you not establish it firmly?

11           A    Because we don't know the conformation of

12   urinary erythropoietin at all, and at the time this

13   paper was published, something was known of the

14   folded up structure of the recombinant.

15           Q    So in 1987, did anyone know what the --

16   I'm sorry?

17           A    97.

18           Q    In 1997, did anyone know what the folded

19   up structure of urinary EPO was?

20           MR. MADRID:   Objection, outside the scope.

21           A    I didn't know.   I don't know whether

22   anyone else knew.   I knew the literature.

23       BY MR. SUH:

24           Q    Do people know now?

**5/31/2007 Goldwasser, Eugene**

1      A    No, not to my knowledge.

2      Q    And why is that?

3      A    Nobody has determined a three-dimensional

4    structure of urinary EPO.  And it's probably

5    because nobody has ever crystalized it.

6      Q    Why hasn't anyone tried to determine the

7    three-dimensional structure of urinary EPO?

8      MR. MADRID:   Objection, calls for

9    speculation.  Outside the scope.

10     A    I -- I don't know why someone didn't do

11    something.  That's impossible for me to know.

12          I can know why we didn't.

13   BY MR. SUH:

14     Q    Can you tell me why you didn't?

15     A    We never had any success in crystallizing

16    it.  I tried and tried and tried.

17     Q    In -- do you know what the term

18    "microheterogeneity" is?

19     A    Yes.

20     Q    In any particular sample of urinary EPO,

21    do you expect that to be a heterogeneous sample or

22    a homogeneous sample?

23          MR. MADRID:   Objection, outside the scope,

24    leading.

**5/31/2007  Goldwasser, Eugene**

1    respect to what's stated here.

2            So this is vague and ambiguous, it lacks

3    foundation and it's unfair.

4        A   The way you state that, I think, is

5    incorrect.  The evidence may have been complete as

6    far as it went in 1989.

7            The way you put it is as though someone

8    was not taking into account any of the evidence,

9    all of the evidence that was there.

10           With all of the evidence that was there,

11   that may be a reasonable statement.  But our

12   knowledge has changed since then.

13   BY MR. SUH:

14       Q   Do you think someone in 1983 or 1984

15   would have known whether a urinary EPO and

16   recombinant EPO were the same product or not?

17       MR. MADRID:   Objection, vague and ambiguous.

18       A   I'm unclear what you mean by the same

19   product.

20   BY MR. SUH:

21       Q   Okay.  Let me see if I can clarify that.

22           Do you think they would have known of any

23   differences in secondary structure?

24       A   In secondary structure?

```
1              Q    Uh hum.

2              A    I don't think anyone would have known it.

3              Q    How about today?

4              A    Today, yes.  Well, no.  We know a good

5    deal about the secondary structure recombinant EPO.

6    We don't know anything about the secondary

7    structure -- what we know is very scant about the

8    secondary structure of urinary EPO.

9              Q    So even today, one would not know for

10   sure what the differences are between the secondary

11   structure of recombinant EPO and urinary EPO?

12             MR. MADRID:   Objection, vague and ambiguous,

13   misstates the testimony.

14             A    It's -- it's logical, if you don't know

15   something, you can't compare it with something you

16   do know.

17        BY MR. SUH:

18             Q    Okay.  Okay, Doctor, you can put this

19   document aside for now.

20             A    Let's say we break for lunch.

21             MR. SUH:   Oh, sure, that's fine.   This is

22   a good time.

23             A    Yes, it's lunchtime.

24             THE VIDEOGRAPHER:   Going off the record at
```