**EXHIBIT 54**

```
 1              UNITED STATES DISTRICT COURT
 2              DISTRICT OF MASSACHUSETTS
 3              Civil Action No. 05-12237 WGY
 4
    AMGEN, INC.,                    ) DEPOSITION OF:
 5                                  ) JOHN J. KEEFE
              Plaintiff             )
 6                                  )
         vs.                        ) **HIGHLY CONFIDENTIAL**
 7                                  ) ***RESTRICTED ACCESS***
    F. HOFFMANN-LA ROCHE LTD., a    )
 8  Swiss Company, ROCHE            )
    DIAGNOSTICS GmbH, a German      )
 9  Company, and HOFFMANN-LA        )
    ROCHE, INC., A New Jersey       )
10  Corporation,                    )
                                    )
11            Defendants.           )
12          TRANSCRIPT of the stenographic notes of the
13  proceedings in the above-entitled matter, as taken by and
14  before MARGARET M. REIHL, RPR, CRR, CSR, Notary Public, held
15  at the offices of GIBBONS, One Gateway Center, Newark, New
16  Jersey, on Wednesday, March 14, 2007, commencing at 9:07 a.m.
17
18
            (This transcript has been designated
19      as Highly Confidential as per the Amended
        Protective Order.  Please treat the entire
20      transcript in accordance with the Protective
        Order.)
21
22
23
24
25
```

1  Q.     Is -- is -- so there -- there's an annual
2  meeting among senior marketing people that occurs in
3  Basel?
4  A.     That's the one that I'm thinking of. I don't
5  know if that's the one you're talking of.
6  Q.     Have you ever attended?
7  A.     No.
8  Q.     Topic Number 25 of your deposition notice,
9  it's Keefe Exhibit 1, this is the 30(b)(6) deposition
10 notice, it asks for the identity of every potential
11 dialysis customer and every potential non-dialysis
12 customer for Mircera in the United States with whom
13 Roche has met to discuss the potential use or purchase
14 of Mircera.
15        Are you prepared to talk about that?
16 A.     Yes.
17 Q.     What customers or potential customers has
18 Roche had such meetings?
19 A.     Meetings -- meetings to discuss the purchase
20 of Mircera, I would say none.
21 Q.     And did you discuss this with the field
22 personnel that you mentioned to start with?
23 A.     Yes, I did.
24 Q.     And what did you discuss with them to prepare
25 for this topic?

1  A.  I asked them specifically to tell me the
2  guidance that they have given to their field
3  organization relative to their profiling activities.
4  Q.  And what did they tell you?
5  A.  They told me that they instructed them,
6  according to the profiling questions that were put
7  together, that was their script, and there are --
8  there's a question and answer -- an approved question
9  and answer document that they can use to handle
10 questions. All of their questions related to Mircera
11 should be directed to the medical side of our
12 organization.
13 Q.  And did you discuss it with anybody on the
14 medical side as to whether there had been discussions
15 about potential use or purchase of Mircera?
16 A.  With the medical folks -- did not speak to the
17 medical side of our organization specifically relative
18 to my role as a 30(b)(6) witness. However, I have a
19 knowledge of the interactions that have taken place on
20 that side of our organization.
21 Q.  So Roche has not solicited any customer for
22 the purchase of Mircera at this point?
23 A.  Correct.
24 Q.  And you haven't discussed the terms of the
25 purchase of Mircera with potential customers?

1   A.       Correct.
2   Q.       You have not told them what the price of
3   Mircera would be?
4   A.       Correct.
5   Q.       Have not told them what the discounts would
6   be?
7   A.       Correct.
8   Q.       Have not told them what the WAC price would
9   be?
10  A.       Correct.
11  Q.       You have not discussed the cost recovery they
12  might obtain?
13  A.       Correct.
14  Q.       You've not shown them a draft contract?
15  A.       Correct.
16  Q.       You've not negotiated any potential
17  relationships with them?
18  A.       Correct.
19  Q.       You've not -- they have not told you that
20  they're interested in buying Mircera?
21  A.       Say that -- can you repeat that one.
22  Q.       Have customers told you that they are not
23  interested in buying Mircera?
24  A.       Customers told us that they're not interested
25  in buying Mircera.

1  Q.      Let me -- have customers told you that they
2  are interested in buying Mircera?
3  A.      Based on information that's available in the
4  public domain, they may -- they may be aware of
5  Mircera.  We've never had the conversations about
6  whether they'd be willing to buy it or not.
7  Q.      So there's been no purchase order sent to
8  customers?
9  A.      No.
10 Q.      And would you expect that those types of
11 things would have to happen before you could sell the
12 product to customers?
13              MR. MAYELL:  Objection, vague.
14              THE WITNESS:  All of those things you
15 asked me?
16 BY MR. DUBROW:
17 Q.      Some of them?
18              MR. MAYELL:  Objection.
19              THE WITNESS:  Would some of those
20 things have to occur before we could sell product to a
21 customer; that's your question?
22 BY MR. DUBROW:
23 Q.      Yes.
24              MR. MAYELL:  Reiterate the objection.
25              THE WITNESS:  So, for example, would

1   there have to be a price?  Yes.
2   BY MR. DUBROW:
3   Q.      Do you understand that you're the designee for
4   Topic Number 26, Mr. Keefe, Roche's most current
5   understanding and expectation regarding specific
6   customers who will purchase Mircera for use in the
7   United States, contract terms under which such
8   customers will purchase Mircera and any discounts,
9   rebates or other incentives Roche has offered or will
10  offer such customers to purchase or use Mircera?
11  A.      Yes.
12  Q.      Is it your testimony that there are no
13  customers -- no specific customers that Roche has an
14  understanding they will purchase Mircera?
15  A.      Correct.  We've had no discussions about the
16  purchase of Mircera with customers.
17  Q.      Going back to Topic Number 28, which is the
18  communications with DaVita, I had asked a series of
19  questions about -- which ended with the March 2006
20  meeting that you did say happened?
21  A.      Yeah.
22  Q.      What communications have there been with
23  DaVita that would fit within category 28 since
24  March 2006, if any?
25  A.      Relative to purchasing, dosing, pricing,

1  discounts, rebates, reimbursements, we've had no
2  conversations on those -- those topics since, to my
3  knowledge.
4  Q.      And, to your knowledge, you had none -- Roche
5  has had none at any point in time?
6  A.      Discussions around the purchase of Mircera,
7  no.
8  Q.      Topic Number 29 is communications between
9  Roche and small dialysis operators or nephrology
10 clinics regarding potential Mircera purchases, dosing,
11 pricing, discounts and so on.
12         Is your testimony the same; that there have
13 been no such communications?
14 A.      Correct.
15              MR. DUBROW:  I'd like to take a break
16 now for five or ten minutes.
17              MR. MAYELL:  Okay.
18              MR. DUBROW:  I may be done on the
19 30(b)(6) topics.  I may have some cleanup.
20              MR. MAYELL:  Okay.
21              MR. DUBROW:  But then I will continue
22 into the individual portion.
23              MR. MAYELL:  Okay.
24              THE VIDEOGRAPHER:  This is the end of
25 Tape 4, Volume 1 in the videotape deposition of John