# EXHIBIT D

Bradshaw, Ph. D., Ralph                               6/19/2007
Amgen Confidential and Roche Restricted Access - BLA/IND Material

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

--ooOoo--

```
AMGEN INC.,                       )
                                  )
        Plaintiff,                )
                                  )
vs.                               )   No. 05-CV-12237 WGY
                                  )
F. HOFFMAN-LA ROCHE, LTD.,        )
ROCHE DIAGNOSTICS, GmbH, and      )
HOFFMAN-LA ROCHE, INC.,           )
                                  )
        Defendants.               )
_____ )
```

Videotaped Deposition of

RALPH BRADSHAW, Ph.D.

TUESDAY, JUNE 19, 2007


(Contains Amgen Confidential and Roche Restricted

Access Confidential Information BLA/IND Material

Subject To Protective Order.)   **REDACTED**



SHEILA CHASE & ASSOCIATES
REPORTING ON BEHALF OF LIVENOTE WORLD SERVICE
221 Main Street, Suite 1250
San Francisco, CA 94105


Reported by:
DIANA NOBRIGA, CSR, CRR
LICENSE NO. 7071

Bradshaw, Ph. D., Ralph                                6/19/2007
Amgen Confidential and Roche Restricted Access - BLA/IND Material

Page 2

```
 1              I N D E X
 2  DEPOSITION OF RALPH BRADSHAW, Ph.D.
 3  TUESDAY, JUNE 19, 2007
 4  EXAMINATION BY:                    Page
 5     MR. JAGOE                      7, 296
 6     MS. CARTER                      294
 7           E X H I B I T S
 8                                    Page
 9  Exhibit 1  (Contains Amgen Confidential
10             Information Subject to
11             Protective Order) Rebuttal Report
12             of Ralph A. Bradshaw, Ph.D.     40
13  Exhibit 2  (Contains Amgen Confidential and
14             Roche Restricted Access
15             Confidential Information BLA/IND
16             Material Subject to Protective
17             Order) Rebuttal Report of Ralph A.
18             Bradshaw, Ph.D. to New
19             Non-Infringement Arguments Raised in
20             the Rebuttal Reports of Defendants'
21             Experts                          40
22  Exhibit 3  The Amino Acid Sequence of the
23             y-Subunit of Mouse Submaxillary
24             Gland 7 S Nerve Growth Factor    97
25
```

Page 4

```
 1       BE IT REMEMBERED that, pursuant to Notice of
 2  Taking Deposition, and on TUESDAY, JUNE 19, 2007,
 3  commencing at the hour of 9:06 a.m., thereof at
 4  LiveNote, 221 Main Street, Suite 1250, San Francisco, CA
 5  94105, before me, DIANA NOBRIGA, a Certified Shorthand
 6  Reporter in and for the State of California, personally
 7  appeared
 8
 9       RALPH BRADSHAW, Ph.D.,
10
11  called as a witness by the defendants, who being by me
12  first duly sworn, was thereupon examined and testified
13  as hereinafter set forth.
14
15              ---
```

Page 3

```
 1  Exhibit 4   United States Patent No. 4,667,016   177
 2  Exhibit 5   Purification of Human Erythropoietin 258
 3  Exhibit 6   Sugar profiling proves that human
 4              serum erythropoietin differs from
 5              recombinant human erythropoietin    278
 6  Exhibit 7   United States Patent No. 4,703,008   295
 7  Exhibit 8   United States Patent No. 5,621,080   295
 8  Exhibit 9   United States Patent No. 5,618,698   296
 9  Exhibit 10  United States Patent No. 5,756,349   296
10  Exhibit 11  United States Patent No. 5,441,868   296
11  Exhibit 12  United States Patent No. 5,955,422   296
12  Exhibit 13  United States Patent No. 5,547,933   296
13              ---oOo---
```

Page 5

```
 1              APPEARANCES
 2
 3  FOR THE PLAINTIFF AND WITNESS:
 4       KRISTA CARTER, ESQ.
 5       DAY CASEBEER MADRID & BATCHELDER, LLP
 6       20300 Stevens Creek Blvd., Suite 400
 7       Cupertino, CA 95014
 8       (408) 342-4534
 9       kcarter@daycasebeer.com
10
11  FOR THE DEFENDANTS:
12       CHRISTOPHER T. JAGOE, ESQ.
13       KAYE SCHOLER, LLP
14       425 Park Avenue
15       New York, NY 10022-3598
16       (212) 836-7800
17       cjagoe@kayescholer.com
18
19  ALSO PRESENT: JAKE KROHN, VIDEOGRAPHER
```

                                      2 (Pages 2 to 5)

Bradshaw, Ph. D., Ralph                                  6/19/2007
Amgen Confidential and Roche Restricted Access - BLA/IND Material

Page 6

1    VIDEOGRAPHER: Here begins the videotaped
2  deposition of Ralph Bradshaw, tape one, Volume I, in the
3  matter of Amgen, Inc. versus F. Hoffman-La Roche
4  Limited, et al., in the United States District Court,
5  District of Massachusetts, Case No. 05-12237 WGY.
6  Today's date is June 19th, 2007 and the time on the
7  video monitor is 9:06.
8    The video operator today is Jake Krohn,
9  representing LiveNote World Service, located at 221 Main
10 Street, Suite 1250, San Francisco, California 94105,
11 phone number 415 321-2300. The court reporter is Diane
12 Nobriga of Sheila Chase, reporting on behalf of LiveNote
13 World Service.
14   Today's deposition is being taken on behalf of
15 the defendant and is taking place at 221 Main Street,
16 Suite 1250, San Francisco, California 94105.
17   Counsel, please introduce yourselves and state
18 whom you represent.
19   MR. JAGOE: Christopher Jagoe from Kaye
20 Scholer, representing the defendants.
21   MS. CARTER: Krista Carter of Day Casebeer on
22 behalf of Amgen and Dr. Bradshaw.
23   VIDEOGRAPHER: Okay. You can swear the
24 witness.
25

Page 7

1    RALPH BRADSHAW, Ph.D.,
2  having been duly sworn, testified as follows:
3    EXAMINATION BY MR. JAGOE
4    MR. JAGOE: Q. Dr. Bradshaw, is Ms. Carter
5  representing you today?
6    A. Yes, she is.
7    Q. Are you paying her for that representation?
8    MS. CARTER: Objection.
9    THE WITNESS: No, I'm not.
10   MR. JAGOE: Q. When did you first understand
11 that she was representing you?
12   MS. CARTER: Objection; calls for a legal
13 conclusion.
14   THE WITNESS: I think about a month ago.
15   MR. JAGOE: Q. Was that before you served
16 your first expert report in this case, signed your first
17 expert report in this case?
18   MS. CARTER: Objection; I don't know that he
19 understands the meaning of me representing him.
20   THE WITNESS: Yes. Could you qualify the
21 question.
22   MR. JAGOE: What's the pending question that
23 I'm qualifying?
24   (Record read as follows: QUESTION: Was that
25   before you served your first expert report in

Page 8

1  this case, signed your first expert report in
2  this case?)
3    MR. JAGOE: Do you need clarification of that?
4    MS. CARTER: Dr. Bradshaw is here as an
5  independent expert. Day Casebeer represents Amgen.
6    THE WITNESS: I'm trying to remember the
7  chronology. My initial contact with this case was with
8  Linda Baxley. At what point I also began to deal with
9  counselor, I don't remember exactly. Sometime in the
10 last two months, I would say.
11   MR. JAGOE: Q. Did you make any arrangements
12 with the Day Casebeer law firm where they would act as
13 your attorneys during the pendency of this case?
14   A. Day Casebeer contracted with me to be an
15 expert witness in this case.
16   Q. And are you acting as an expert on behalf of
17 Amgen?
18   MS. CARTER: Objection.
19   THE WITNESS: I was contracted with Day
20 Casebeer under the understanding that I am representing
21 Amgen, yes.
22   MR. JAGOE: Q. The testimony you are giving
23 in this deposition is testimony on behalf of Amgen;
24 correct?
25   MS. CARTER: Objection; Dr. Bradshaw is an

Page 9

1  independent expert.
2    THE WITNESS: I'm giving an expert opinion
3  based on the information that Day Casebeer asked me to
4  opine on.
5    MR. JAGOE: Q. And Day Casebeer is paying you
6  to give the opinions that you're going to give; right?
7    A. I'm being reimbursed for my services, yes.
8    Q. You are being reimbursed by Day Casebeer; is
9  that correct?
10   A. Since I haven't been reimbursed, I'm not
11 actually sure who is writing the checks.
12   Q. You have an agreement with Day Casebeer that
13 you will be reimbursed by them for giving your opinions
14 in this case?
15   MS. CARTER: Objection; he's not being
16 reimbursed for his opinions. It's for his time.
17   THE WITNESS: I'm being reimbursed for my time
18 in this case, yes.
19   MR. JAGOE: Q. By whom?
20   A. Could you clarify the question, by whom?
21   Q. By whom will you be reimbursed for the time
22 spent giving opinions in this case?
23   MS. CARTER: Asked and answered.
24   THE WITNESS: I don't have any information who
25 will write the actual check.

3 (Pages 6 to 9)

Bradshaw, Ph. D., Ralph                                      6/19/2007
Amgen Confidential and Roche Restricted Access - BLA/IND Material

Page 170

1     MS. CARTER: Objection; outside the scope of
2  his expert report.
3     THE WITNESS: I just don't have an opinion.
4     MR. JAGOE: Q. Do you agree with the
5  statement that treatment of urinary EPO with phenol will
6  reduce the number of branches of each of the asparagine
7  type sugar chains?
8     MS. CARTER: Objection; outside the scope of
9  his expert report, incomplete hypothetical.
10    THE WITNESS: I have no personal knowledge
11 about that. I couldn't answer that question.
12    MR. JAGOE: Q. Do you have any expert opinion
13 about that?
14    A. Beyond the scope of anything I've ever done.
15 I may be an expert, but it doesn't mean I have done
16 everything there is to do, including chemistry. And
17 I've never used a phenol extraction to make a protein
18 cell. I really have no idea whether phenol affects
19 glycoproteins.
20    Q. But you are offering an opinion about the
21 Miyake procedure which used a phenol extraction method?
22    A. The opinion I offered, I believe, if you check
23 what I said, was that Dr. Goldwasser felt that's what
24 phenol did.
25    Q. Do you have an opinion whether phenol will

Page 171

1  cause a reduction in the number of branches of the
2  asparagine type sugar chains on the erythropoietin?
3     MS. CARTER: Objection; outside the scope of
4  his expert report.
5     THE WITNESS: I don't have any opinion at all.
6  I'm not familiar with phenol and glycoprotein stability,
7  so I don't know what the effect of phenol is on
8  glycoprotein stability of N-linked glycosylation.
9     MR. JAGOE: Q. So you don't know whether or
10 not when someone applies the Miyake method they are
11 actually changing the carbohydrate structure of the
12 carbohydrates on erythropoietin?
13    MS. CARTER: Objection; outside the scope of
14 his expert report, asked and answered.
15    THE WITNESS: I do not have any notion whether
16 phenol changes glyco portions of N-linked carbohydrates
17 on a protein if used in a purification procedure.
18    MR. JAGOE: Q. Prior to 1984, prior to
19 November 30th of 1984, are you aware of any literature
20 references where a protein has been purified on a C4
21 column using an ethanol gradient?
22    A. I can't cite any personal experience. I never
23 bothered to look in the literature. Whether or not that
24 was done, C4 columns were certainly well known at this
25 time, ethanol gradients were certainly known at this

Page 172

1  time. I can't give you a specific example of another
2  application of this type.
3     Q. So before forming your opinion that the
4  statement in the Lin patent that a C4 column could be
5  used to purify EPO, you never checked the prior art
6  literature on the use of C4 columns to purify proteins?
7     A. I didn't need to. C4 columns were used to
8  purify proteins. Just because I can't cite you an
9  example doesn't mean I'm not aware they were used.
10    Q. Did you cite any articles in your expert
11 report where a protein was purified by a C4 column?
12    A. I don't believe I did, no.
13    Q. Would you agree with the statement that prior
14 to 1985 only a single reference is known to exist
15 disclosing the elution of a protein with ethanol from a
16 C4 column?
17    MS. CARTER: Objection. Could you read the
18 question again.
19    MR. JAGOE: Can you read it, please.
20    (Record read as follows: QUESTION: Would you
21    agree with the statement that prior to 1985
22    only a single reference is known to exist
23    disclosing the elution of a protein with
24    ethanol from a C4 column?)
25    MS. CARTER: Objection; outside the scope of

Page 173

1  the expert report and lacks foundation.
2     THE WITNESS: I can't comment on the
3  statement, because I have no knowledge to know whether
4  the statement is true or not.
5     MR. JAGOE: Q. You just submitted a
6  declaration about the Lai '016 patent; right?
7     A. Yes, that's correct.
8     Q. Did you read the Lai '016 patent before you
9  submitted the declaration?
10    A. Yes, I did.
11    Q. Did the Lai '016 patent say anything about the
12 state of the art of eluting proteins from C4 columns
13 with ethanol gradients?
14    MS. CARTER: Objection. I don't think Dr.
15 Bradshaw was required to memorize the materials he
16 reviewed.
17    THE WITNESS: I did not read the Lai patent
18 with respect to the previous literature. He cites some
19 previous literature, he cites the Lin patents. But I
20 did not bother to read the backgrounds with respect to
21 other possible applications of C4 prior to the Lai or
22 Lin patents.
23    MR. JAGOE: Q. So you formed the opinion that
24 the Lai patent was a novel, nonobvious method, and you
25 didn't review what prior art existed about purification

44 (Pages 170 to 173)

Bradshaw, Ph. D., Ralph                                    6/19/2007
Amgen Confidential and Roche Restricted Access - BLA/IND Material

Page 174

1  of proteins?
2       MS. CARTER: Objection; mischaracterizes his
3  testimony.
4       THE WITNESS: I did not review all the prior
5  art for the Lai patent. But in my experience, the urea,
6  acid urea treatment was unique. I did not do a
7  literature search, but I had never encountered that
8  before.
9       Whereas, I certainly had encountered use of C4
10 columns. We use C4 columns in my laboratory to purify
11 proteins. Even though we may never have published it,
12 we certainly did. So I was well familiar with C4
13 columns.
14      I was not familiar with a urea DEAE column, so
15 in my opinion this was a novel step. I wasn't a patent
16 examiner and I didn't look at the prior art.
17      MR. JAGOE: Q. Did you read the discussion of
18 the prior art in the Lai patent before you formed your
19 opinion about its novelty or nonobviousness?
20   A. I read it very briefly, yes.
21   Q. Do you recall anything in there that you
22 disagreed with?
23      MS. CARTER: Objection. I don't think he can
24 answer it without looking at the document.
25      THE WITNESS: I would have to look at the Lai

Page 175

1  patent before answering that question. If you want me
2  to look at the Lai patent, I will be happy to do it.
3       MR. JAGOE: Q. Would you agree with the
4  statement that recovery procedures for erythropoietin
5  from urinary fluid sources have generally been very
6  complex, costly and labor intensive?
7       MS. CARTER: Objection; outside the scope of
8  his expert report, vague as to time.
9       MR. JAGOE: Q. Prior to 1985.
10      MS. CARTER: Incomplete hypothetical, that is
11 taken out of context.
12      THE WITNESS: It is a statement taken out of
13 context.
14      And things like efficiency and so forth all
15 have to do relative to what it is you're trying to
16 accomplish. I would have to know what that statement
17 was in reference to and the context before I could tell
18 whether I agreed with it or not. You've taken it out of
19 context and I have no idea where it came from.
20      MR. JAGOE: Q. But to make a pharmaceutical
21 composition?
22      MS. CARTER: What is the question?
23      MR. JAGOE: Q. The procedures for isolating
24 erythropoietin for urinary fluids is very complex,
25 costly and labor intensive if you want to make it into a

Page 176

1  pharmaceutical composition?
2       MS. CARTER: Objection; outside the scope of
3  his expert report.
4       MR. JAGOE: Q. In 1985.
5    A. Once again, that requires me to know something
6  about a pharmaceutical composition. If I simply focus
7  on your ability to get urinary EPO, based on the
8  relative scarcity of starting material, the complexity
9  of the Miyake procedure, the statement probably
10 certainly has some validity, to the extent that the
11 statement would have to be analyzed in the context for
12 which it is written.
13   Q. In the 1985 time frame, was it true that there
14 continues to exist a need in the art for rapid and
15 efficient preparatory procedures suitable for recovery
16 of biologically active proteins from recombinant
17 sources?
18      MS. CARTER: Objection; outside the scope of
19 his expert report.
20      THE WITNESS: That's clearly somebody's
21 assessment of a situation. And taken out of context,
22 how could I possibly answer the question?
23      Furthermore, it requires knowledge that I
24 didn't have in 1985, nor do I have now with respect to
25 preparing an economically viable erythropoietin

Page 177

1  pharmaceutical composition. And so I can't answer that
2  question.
3       MR. JAGOE: Q. Is it fair to say you don't
4  know the state of the art of preparing pure preparations
5  of human erythropoietin as of 1985?
6       MS. CARTER: Objection; mischaracterizes his
7  testimony.
8       THE WITNESS: I have no idea what that
9  question is supposed to mean, so you will have to
10 rephrase it.
11      MR. JAGOE: Q. Do you know what the state of
12 the art was in terms of efforts to purify human
13 erythropoietin from recombinant cells as of 1985?
14   A. My knowledge of this is based on the Lin
15 patents, and I have really no other information as of
16 1985 for purifying recombinant erythropoietin from
17 anybody else.
18      MR. JAGOE: I will give you a copy of the
19 Lai/Strickland patent.
20          (Exhibit 4 marked for
21           identification.)
22      MR. JAGOE: Q. I would like you to look at
23 Claim 10 of the '016 patent. Is Claim 10 something you
24 are offering opinions about in your declaration that you
25 submitted recently?

45 (Pages 174 to 177)

Bradshaw, Ph. D., Ralph                                              6/19/2007
Amgen Confidential and Roche Restricted Access - BLA/IND Material

Page 298

1  expert reports are, just the two expert reports.
2       (Whereupon, at 5:40 p.m. the deposition of
3  RALPH BRADSHAW, Ph.D. was adjourned.)
4
5
6       I declare under penalty of perjury that the
7  foregoing is true and correct.
8
9
10
11
12  Dated:_____ _____
                    RALPH BRADSHAW, Ph.D.
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 299

1  STATE OF CALIFORNIA    )
2                         )
3  COUNTY OF ALAMEDA      )
4       I, DIANA NOBRIGA, hereby certify that the
5  witness in the foregoing deposition was by me duly sworn
6  to testify to the truth, the whole truth, and nothing
7  but the truth in the within-entitled cause; that said
8  deposition was taken at the time and place therein
9  stated; that the testimony of said witness was reported
10 by me, a Certified Shorthand Reporter and disinterested
11 person, and was thereafter transcribed into typewriting,
12 and that the pertinent provisions of the applicable code
13 or rules of civil procedure relating to the notification
14 of the witness and counsel for the parties hereto of the
15 availability of the original transcript of the
16 deposition for reading, correcting and signing have been
17 met.
18      And I further certify that I am not of counsel
19 or attorney for either or any of the parties to said
20 deposition, nor in any way interested in the outcome of
21 the cause named in said action.
22      DATED: _____
23
24         _____
25         DIANA  NOBRIGA, CSR NO. 7071