between this investigation and McDermott's representation of Roche – which Amgen nowhere denies – precludes enforcement of McDermott's December 2004 waiver letter in this case.

Moreover, McDermott cannot reasonably believe that, despite its self-inflicted conflict, it "will be able to provide competent and diligent representation to each affected client," as the Model Rules of Professional Conduct require as a prerequisite for any conflict waiver. Roche has an ongoing need to consult with McDermott lawyers about the intra-company transfers, and, significantly, may have the need to consult with those lawyers to respond to Amgen's prosecution of this case, including its discovery demands. The McDermott lawyers with whom Roche may need to consult on these points include James Riedy, who has just submitted a declaration against Roche in this matter on behalf of Amgen. In these circumstances, it is not reasonable for McDermott to believe – if it ever did – that its representation of Roche will not be significantly impaired by McDermott's present conflicting representation of Amgen in litigation against Roche.

The December 2004 letter is also ineffective as a waiver because McDermott failed to disclose to Roche what it actually knew at that time about its likely future conflict with Roche. Absent such disclosure, informed consent by Roche was impossible. As is evident from the time line of events described in Amgen's motion papers, McDermott almost certainly knew in December 2004 that it might represent Amgen in patent litigation against Roche's CERA product because it was likely discussing a position with William Gaede, who had been representing Amgen in preparation for this patent infringement matter against Roche's CERA product since the spring of 2004 while he was still at Cooley Godward LLP. Mr. Gaede officially resigned his Cooley partnership on January 31, 2005, – just weeks after McDermott had Roche execute the waiver letters. Given the realities of lateral partnership moves, it is highly likely that McDermott was discussing employment with Mr. Gaede and his potential book of business, including Amgen's

3

contemplated patent litigation against Roche concerning CERA, by December 2004, or having such discussions with Amgen itself. Yet, McDermott failed to advise Roche that the conflict for which it was seeking a waiver was actually a specific case – this one.

Because its representation of Amgen here is directly adverse to its other client, Roche, and there is no effective waiver of that conflict, McDermott must be disqualified from representing Amgen in this proceeding. Sherman L. Cohn, a distinguished professor of legal ethics at Georgetown University School of Law who has reviewed McDermott's motion and the circumstances surrounding its conflicting representations, has submitted a detailed declaration on behalf of Roche concluding that McDermott has "violated ethical duties" to Roche which preclude it from representing Amgen in these proceedings. (Cohn Decl. ¶ 7.) It is true that disqualification of a party's chosen counsel is not favored, and Roche does not take this step lightly, particularly given its ongoing relationship with the McDermott firm on important matters. But the significant relationship between McDermott's advice to Roche and the issues here, as well as McDermott's lack of disclosure, gives Roche no choice but to seek McDermott's disqualification now. Significantly, Amgen will not be prejudiced by this disqualification, given that the investigation is just beginning and it is ably represented by three other major law firms, experienced in patent infringement litigation and 337 proceedings in particular, which thus far have been vigorously litigating this case.

## II. STATEMENT OF FACTS

### A. McDermott's Representation of Roche

Since at least the late 1980s, McDermott has advised Roche and its related entities on a variety of matters. McDermott lawyers in its D.C. and Chicago offices, among others, have obtained confidential information about Roche's business operations and have advised on

employee benefits matters, as well as regulatory and drug reimbursement matters. (Nagle Decl. ¶ 3; D'Angelo Decl. ¶ 4.)

Most significantly to this dispute, James Riedy and other McDermott lawyers in Washington, D.C. have for many years advised Roche about [         ] (D'Angelo Decl. ¶ 3.) Indeed, McDermott is Roche's key advisor on [    ] (D'Angelo Decl. ¶¶ 2-3.) Riedy first advised Roche as a partner of Lee Twomey & Kent, a firm that later merged into McDermott. Riedy continued his representation of Roche at McDermott, and, over the years, Roche has been advised by numerous other McDermott lawyers on these matters. (*Id.*)

The sensitive and confidential information that Roche provides McDermott in connection with its tax and corporate counseling is broad and far-reaching. It includes information about [                  ] (D'Angelo Decl. ¶ 4.) Among the categories of sensitive information that Roche discusses with McDermott on this subject are [                  ] (*Id.*)

The advice McDermott provides on [                  ] At no time has any Roche employee told McDermott lawyers that it no longer needed this counseling, nor has any McDermott lawyer even intimated that McDermott might withdraw from this needed representation. (*See* D'Angelo Decl. ¶¶ 3, 6.) McDermott is also currently handling tax audit litigation for Roche Diagnostics GmbH in Germany, another respondent in this investigation.

B.   **The December 2004 Letters**

In late 2004, Mr. Riedy, the McDermott partner in Washington, D.C., approached individuals at Roche with whom he dealt in connection with McDermott's employee benefits and corporate structuring work asking Roche to waive conflicts that might arise with respect to McDermott's work for Amgen. (D'Angelo Decl. ¶ 5; Nagle Decl. ¶¶ 4, 5.) Although he indicated that future adverse positions might involve litigation, Mr. Riedy said nothing about any possibility that McDermott might represent Amgen in patent litigation about Roche's CERA product. (D'Angelo Decl. ¶ 7; Nagle Decl. ¶ 6.) Mr. Riedy was also silent about any discussions that McDermott may have had with Mr. Gaede about his joining the firm. (D'Angelo Decl. ¶ 7.) Mr. Riedy did not explain to either Roche contact the circumstances in which a future Amgen matter could be related to a matter on which McDermott was counseling Amgen. (*Id.*) In fact, the Roche contacts questioned Mr. Riedy to make sure that any future conflict would not affect Roche's ability to continue using McDermott and were assured it would not. (D'Angelo Decl. ¶ 6; Nagle Decl. ¶ 5.)[3]

On or around December 22, 2004, Roche's General Counsel, F.C. Kentz, III, received a letter drafted by McDermott in which McDermott requested that Roche waive future conflicts. At that same time a similar letter was received by Frank J. D'Angelo, President of Roche Finance USA Inc., the Roche affiliate primarily involved in the tax-related corporate structuring work performed for Roche by McDermott. Even though Mr. Riedy never told Roche that McDermott's future Amgen work might be related to its Roche work, much less explain this relationship, the

---

[3] McDermott alleges in its memorandum (Amgen Br. at 5) that it told Roche that it would withdraw from its representation of Roche if it did not supply the waiver. If any such threat had been made, that itself would have been improper and would have invalidated the waiver. *See Restatement 3d of the Law Governing Lawyers*, § 122, comment b ("A client's consent will not be effective" unless it is "free of coercion").