letters sent to Messrs. Kentz and D'Angelo included within the purported waiver, "matters that actually or arguably are substantially related to the subject matter of services that we have provided or are providing to you." (Ben-Ami Decl. Ex. B.) On or around December 23, 2004, Messrs. Kentz and D'Angelo initialed the letters and faxed them back to McDermott. (The letter to Mr. D'Angelo was also initialed by Carol Fiederlein on behalf of Roche Holdings Inc.)[4] Since late December 2004, McDermott has not discussed with Roche any potential conflict or change in circumstances with respect to Amgen.

### C. Mr. Gaede and McDermott

At the time it signed the waiver letters, Roche did not know that McDermott lawyers would claim in the future that Roche infringed Amgen patents with respect to its CERA pharmaceutical, one of Roche's most significant new products. (Nagle Decl. ¶ 6; D'Angelo Decl. ¶ 7.) The same cannot be said for McDermott.

William Gaede officially gave notice that he was leaving his old firm, Cooley Godward, on January 31, 2005, where he had been preparing for Amgen's multi-forum assault on Roche's CERA product. He obviously explored moving to McDermott at some point before resigning his Cooley Godward partnership. Given the realities of such lateral moves, it is virtually certain that Mr. Gaede's discussions with McDermott preceded Roche's signing of the waiver letters. However, McDermott's likely true reason for sending waivers when it did – to clear the way for Mr. Gaede to come to McDermott and lead the assault against one of its client's most important products – was never disclosed to Roche.

---

[4] McDermott does not even claim to have a waiver from Roche Diagnostics GmbH, let alone a written waiver as required by Model Rule 1.7(b)(4).

7

### D. The Current Investigation

Amgen commenced this investigation on April 11, 2006, filing a complaint against multiple Roche entities with the Commission represented by two prominent law firms, Day Casebeer Madrid & Batchelder and Howrey LLP. Shortly afterwards, those firms served Roche with extensive discovery, which include demands for information that go to the heart of McDermott's representation of Roche. Among Amgen's demands is a request for documents "relating to any contract or agreement between the ROCHE respondents . . . regarding the importation of PEG-EPO or any component of PEG-EPO into the United States." *See* Amgen Inc.'s First Set of Requests for Production of Documents and Things to Respondents No. 7 (D'Angelo Decl. Ex. A.) Another request asked for documents "relating to any agreement or contract between the Respondents or any of their affiliates regarding the manufacture, use, sale, offer for sale, reimbursement, or transfer of PEG-EPO or any component of PEG-EPO intended for use in the United States."

Documents are not all Amgen seeks on the issue of the transfer of product among Roche corporate entities; it also demands that Roche produce a witness to testify about "[a]ll facts and circumstances regarding the transfer or sale of PEG-EPO or any component of PEG-EPO *between any of the ROCHE entities*." *See* Amgen Inc.'s Notice of Deposition to Respondents Topic 4 (D'Angelo Decl. Ex. B) (emphasis added). The witness(es) Roche would offer to testify about this topic could potentially be someone who consults regularly with McDermott on those subjects. Moreover, in the normal course of business, if McDermott were not now representing Roche's adversary, Roche would likely consult directly with McDermott attorneys in preparation for such depositions. (D'Angelo Decl. ¶ 12.)

On May 27, 2006, during a meet and confer regarding document production, Cecilia Gonzalez of Howrey LLP, counsel for Amgen, stated for the first time that the McDermott firm was being added to the case, as well as another firm, Marshall Gerstein & Borun LLP. Roche's counsel, Leora Ben-Ami of Kaye Scholer LLP, immediately indicated that there was a conflict issue. On May 30, 2006, McDermott entered a notice of appearance in this investigation. The next day, through its counsel Ms. Ben-Ami, Roche reiterated to Amgen's counsel that it was objecting to McDermott's appearance because McDermott represents Roche, creating a conflict that the December 2004 letters did not waive. A series of correspondence and discussions followed, including a letter dated June 6, 2006, from Ms. Ben-Ami requesting certain basic information, including the date on which McDermott began discussions with Mr. Gaede, to enable Roche to evaluate its position. Rather than provide this critical information, Amgen and McDermott scampered to the courthouse with an unusual motion seeking a declaration that McDermott is not conflicted. Significantly, nowhere in that motion or in any of the preceding correspondence has the critical information requested by Roche been provided – leading to the inevitable conclusion that, as stated above, it is highly likely that McDermott – but not Roche – knew in late December 2004 that McDermott intended (or at least hoped) to take on Mr. Gaede as a partner and, with him, his existing representation of Amgen against Roche.

### III. ARGUMENT

#### A. MCDERMOTT MUST BE DISQUALIFIED BECAUSE THIS INVESTIGATION IS SUBSTANTIALLY RELATED TO THE MATTERS ON WHICH IT COUNSELS ROCHE

##### 1. The Applicable Ethical Standards Prohibit Future Waivers to Permit a Firm to Sue its Current Client in Substantially Related Matters

When presented with motions to disqualify, the ITC generally refers to the American Bar Association's Model Rules of Professional Conduct ("Model Rules"), as well as the practices of

various jurisdictions in the United States, including the District of Columbia, to determine the applicable ethical standards. *In re Certain Salinomycin Biomass and Preparations Containing Same* Inv. No. 337-TA-370, Order No. 13, 1995 WL 945673, at *3 (May 25, 1995) ("the Commission should follow the American Bar Association and the well-established practice among the various jurisdictions of the United States, including the District of Columbia, to apply the Model Rules to determine the qualifications of attorneys to practice before it.") Amgen contends that the text of Model Rule 1.7(b) governs the issue of whether the December 2004 letters effectively waive the McDermott conflict. However, Rule 1.7(b) itself says nothing about prospective waivers and the circumstances under which they can be valid. Rule 1.7(b)(4) applies generally to all consents, requiring that they be "informed." The text of the rule does not distinguish between consents to waive specific, known conflicts and consents, as here, to unspecified future conflicts. As to the latter, it has long been recognized that by virtue of their uncertain and prospective nature, making full disclosure and informed consent especially difficult, such waivers require "special scrutiny." *Restatement 3d of the Law Governing Lawyers*, § 122, comment d.

Model Rule 1.7 discusses prospective waivers only in one of its comments, Comment 22, which describes circumstances in which a prospective waiver is likely to be effective. Specifically, it provides that "if the client is an experienced user of the legal services involved and is reasonably informed regarding the risk that a conflict may arise, such consent is more likely to be effective particularly if, e.g., the client is independently represented by other counsel in giving consent and the consent is limited to future conflicts *unrelated to the subject matter of the representation*." ABA Model Rule 1.7, Comment 22 (emphasis added); *see also* ABA Formal Op. 05-436, at 3 (May 11, 2005) (stating that prospective waiver more likely to be effective where "client is an