# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| AMGEN, INC., | ) |
|  | ) |
| *Plaintiff,* | ) |
|  | ) |
| v. | ) C.A. No. 05-CV-12237-WGY |
|  | ) |
| F. HOFFMAN-LA ROCHE LTD., | ) |
| ROCHE DIAGNOSTICS GmbH, | ) |
| and HOFFMAN-LA ROCHE INC., | ) |
|  | ) |
| *Defendants.* | ) |

**NON-PARTY FRESENIUS' MEMORANDUM IN SUPPORT OF ITS UNOPPOSED MOTION FOR LEAVE TO FILE UNDER SEAL DOCUMENTS CONTAINING FRESENIUS' TRADE SECRETS, BY DEFENDANT ROCHE, OR IN THE ALTERNATIVE, FOR A STAY PENDING APPEAL OR RESOLUTION OF THE PATENT TRIAL**

## I.    INTRODUCTION

This Motion seeks leave to file under seal certain trade secrets contained in documents of non-party Fresenius Medical Care Holdings, Inc. d/b/a Fresenius Medical Care North America ("Fresenius") that were filed without Fresenius' knowledge by Roche on June 29, 2007 as part of Exhibit 85 to the Declaration of David L. Cousineau in Support of Roche's Opposition to Amgen's Motion for Summary Judgment on Roche's Antitrust and State Law Counterclaims (Docket No. 589), and on July 16, 2007 as part of Exhibits 257 and 259 to the Supplemental Declaration of David L. Cousineau in Further Support of Roche's Opposition to Amgen's Motion for Summary Judgment on Roche's Antitrust and State Law Counterclaims (Docket No. 745).

Dockets.Justia.com

Even if the Court cannot, at this stage of the proceedings, grant Fresenius' motion to seal on a permanent basis, in the alternative, Fresenius seeks to have public disclosure of such information stayed (1) pending appeal or (2) at least until after resolution of the patent trial. The balance of the harms requires such a stay, particularly as resolution of the patent issues could, as the Court has recognized, moot the need for the exhibits in which the trade secrets are contained. As long as such an outcome remains reasonably possible, non-parties like Fresenius should not be made to suffer the economic and competitive harms that will result from publication of its confidential trade secrets.

The subject matter of this motion has not been considered previously by this Court.

## II. THIS COURT SHOULD GRANT LEAVE FOR FRESENIUS TO FILE UNDER SEAL ITS TRADE SECRETS CONTAINED IN PAPERS THAT WERE FILED BY ROCHE

### A. Background

#### 1. This Motion Is Timely Filed As Fresenius Just Found Out About Roche's Filing of The Information Fresenius Is Seeking to Protect

Under subpoena and subject to the Protective Order entered into by this Court (Docket No. 189), as well as additional agreements that Fresenius entered into with the parties to the above-captioned action, Fresenius produced certain documents relating to its confidential business dealings with Amgen, Inc. ("Amgen") and in particular its purchase of Epogen™ from Amgen. (Hebert Decl. ¶¶ 3-4.[1]) As part of the agreements that counsel for Fresenius reached with counsel for both Roche and Amgen as a condition to producing its documents, if either Roche or Amgen was going to use Fresenius' confidential information in a Court filing, in addition to following the procedures of the Court for filing redacted copies of such documentation, the filing

---

[1] "Hebert Decl." as used herein refers to the Declaration of Mark J. Hebert filed concurrently herewith.

party was supposed to inform Fresenius of such filing in advance and give it the opportunity to seek leave of Court to have such documents filed under seal. *Id.* at ¶ 3 and Ex. A and B. This arrangement appeared to work well:  However, less than four business days ago Fresenius first learned from counsel for Amgen that Roche may have filed confidential information of Fresenius without informing Fresenius.  Such information was contained in documents produced independently by each Fresenius and Amgen and used by Roche under Amgen's production numbers.

In particular, on July 24, 2007 Mark Hebert, counsel for Fresenius, had a conversation with Dan Curto, counsel for Amgen, in which Mr. Curto advised Mr. Hebert that on July 16, 2007 Roche had filed two Amgen produced documents that appeared to include Fresenius' trade secrets and confidential information.  (Hebert Decl. ¶ 5.)  These documents were Exhibits 257 and 259 to the Supplemental Declaration of David L. Cousineau in Further Support of Roche's Opposition to Amgen's Motion for Summary Judgment on Roche's Antitrust and State Law Counterclaims (Docket No. 745) (hereinafter "Roche Exhibits 257 and 259").  Roche Exhibits 257 and 259 were documents originally prepared by Fresenius and sent to Amgen as part of confidential supply agreement negotiations that were thereafter apparently annotated with handwritten notes by Amgen and produced to Roche by Amgen as Highly Confidential under this Court's protective order.[2]  As these documents were redacted from the public filing and were identified by Roche only by their Amgen production numbers, Fresenius did not know and could not have known that its confidential trade secret information was in danger of being exposed until the telephone call between Mr. Curto and Mr. Hebert.  (Hebert Decl. ¶ 5.)

---

[2] The version of Roche Exhibits 257 and 259 provided by Roche upon Fresenius' request were represented to be the exhibits filed temporarily under seal with the Court but for redaction of handwritten notes of Amgen.  See Hebert Decl. ¶ 6.

Furthermore, neither counsel for Fresenius nor Fresenius itself was actually able to see any part of Roche's Exhibits 257 and 259 until July 25, 2007 at which point the trade secret status of the information therein was uncovered.  (Hebert Decl. ¶ 6.)  It was also at this point that Fresenius discovered that the documents (except for annotations apparently added by Amgen) were identical to documents that Fresenius had produced to Roche in March 2007 pursuant to the subpoena and under the protective order designation of "Contains FMCNA Highly Confidential Information — Outside Counsel's Eyes Only."  The Fresenius produced copy was also used on March 30, 2007 by Roche's counsel Mr. Cousineau during the deposition of Fresenius employee Robert McGorty.  (Hebert Decl. ¶ 8.)

Later in the afternoon of July 25, 1997, in a further conversation among Mr. Cutro, Mr. Hebert and Nicole Gage (also counsel for Fresenius), Mr. Curto advised Fresenius' counsel that Fresenius confidential and trade secret information may have also been filed by Roche on June 29, 2007 as part of one of its expert reports included at Roche Exhibit 85 to the Declaration of David L. Cousineau in Support of Roche's Opposition to Amgen's Motion for Summary Judgment on Roche's Antitrust and State Law Counterclaims (Docket No. 589) (hereinafter "Roche Exhibit 85").  (Gage Decl. ¶ 5.[3])  Roche Exhibit 85 is currently redacted from public viewing.  Counsel for Fresenius was given pages 55 and 57 of this document by Manvin Mayell, counsel for Roche, on July 26, 2007 with the representation that those were the only pages of the document as filed that contained Fresenius confidential information.  (*Id*. at ¶ 6.)  Again this information was filed under temporary seal and was not described in a manner to provide Fresenius with any way of knowing the concerning contents therein.

---

[3] "Gage Decl." refers to the Declaration of Nicole E. Gage filed concurrently herewith.

Although neither Fresenius nor its counsel have been provided with the entire report as filed, it is clear that these two pages do clearly contain Fresenius confidential and trade secret terms from the 2006 Epogen™ Sourcing & Supply Agreement between Amgen and Fresenius previously designated by each Amgen and Fresenius as containing highly confidential information.  (*Id*. at ¶¶ 6-7.)

The Protective Order in effect in this case, as amended, requires that a motion to seal be filed within 4 court days of the subject information being filed with the Court.  (Docket No. 189 at ¶ 14.)  However, that protective order also contemplates that the party whose confidential information is being filed will know of the filing at that time.  Here, Fresenius did not know and could not have known that its confidential information was filed until last week.  Moreover, Fresenius is filing this motion to seal within the requisite four (4) court days of first learning about the filing of its confidential information.

Accordingly, as Fresenius only learned of, and was able to review, these documents over the last few days, this motion is timely.

**2.      The Trade Secret Information Requiring Protection From Public Disclosure**

Only a small portion of eight pages of documents are even in question, the last two pages of Roche Exhibits 257 and 259 and pages 55 and 57 to Roche Exhibit 85.  While these six pages clearly contain large amounts of information that is confidential to Fresenius and even has been maintained to date as trade secret information, Fresenius files this motion only to protect the few data points within those pages concerning volume discounts.  These are the values that are an absolute competitive necessity to Fresenius.  (*See* McGorty Decl. and Exhibit thereto.[4])  In

_____

    [4] "McGorty Decl." refers to the "Declaration of Robert J. McGorty in Support of Non-Party Fresenius' Unopposed Motion for Leave to File Under Seal Documents Containing

particular, Fresenius asks this Court to maintain as confidential, and thus withhold from public disclosure, only the data found in the rows labeled "Volume Growth Tiers (over 2005 purchases, annualized)" as well as those in the next row labeled "Totals" on AM44 2024587 and AM44 2024594 in Roche Exhibits 257 and 259 (the requested redactions are indicated on Exhibit A hereto[5]).  Also on page 57 of Roche Exhibit 85, Fresenius asks this Court to maintain the confidentiality of the percentage data following "Because the withheld rebates and discounts total" at the top of the page (see redaction indicated on Exhibit B hereto).

As described further below, Fresenius has taken numerous steps to maintain the confidentiality of this trade secret data, as it believes the continued confidential nature of the same is required to maintain Fresenius' competitive edge in the highly competitive dialysis services industry.

**B.    The Information At Issue Is Entitled To Trade Secret Protection**

Under Massachusetts law, a trade secret is defined as:

anything tangible or intangible or electronically kept or stored, which constitutes, represents, evidences or records a secret scientific, technical, merchandising, production or management information, design, process, procedure, formula invention or improvement.

MASS. GEN. LAWS ch. 255, § 30(4).  A trade secret may consist of "any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it."  *Eastern Marble Products Corp. v. Roman Marble, Inc*., 364 N.E.2d 799, 801 (1977) (quoting RESTATEMENT OF TORTS § 757, comment b).

---

Fresenius' Trade Secrets, Filed by Roche, or in the Alternative, For a Stay Pending Appeal or Resolution of the Patent Trial" filed concurrently herewith.

[5] Counsel for Amgen and Roche each consented to the filing of Exhibits A and B hereto.

Moreover, under Massachusetts law, trade secret status is confirmed through examination of multiple factors, including:

> 1) the extent to which the information is known outside of the business; 2) the extent to which it is known by employees and others involved in the business; 3) the extent of measures taken by the employer to guard the secrecy of the information; 4) the value of the information to the employer and to his competitors; 5) the amount of effort or money expended by the employer in developing the information; and 6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*TouchPoint Solutions, Inc. v. Eastman Kodak Co.,* 345 F. Supp. 2d 23, 29 (D. Mass. 2004) (citing *American Science and Engineering, Inc. v. Kelly,* 69 F. Supp. 2d 227, 238 (D. Mass. 1999)).  Under these criteria, the subject Fresenius discount term information is clearly a trade secret.

The information at issue here is a "compilation of information."  More specifically the trade secrets are certain confidential discounts on the purchase of Epogen™ from Amgen, allowing Fresenius to obtain an important cost advantage over its competitors who do not have access to this information.[6]  (*See* McGorty Declaration at ¶¶ 9-10, 13-16.)

In fact, the type of information Fresenius seeks to protect has been widely protected as trade secrets by numerous courts.  *See United Rug Auctioneers, Inc. v. Araslen*, 2003 WL 21527545 (Mass Super. Ct. Apr. 11, 2003) (finding that pricing information and finances were confidential trade secrets); *SI Handling Sys., Inc. v. Heisley*, 753 F.2d 1244, 1260 (3d Cir. 1985) (noting internal information related to pricing and profit margin "is not information that is readily obtainable by anyone in the industry" and thus "qualifies for trade secret protection");

---

[6] Fresenius previously sought protection of related information found in paragraph 8 of the Wahlstrom Declaration filed by Amgen in connection with its Motion for Summary Judgment on Roche's Antitrust and State Law Counterclaims (Exhibit 4, Docket No. 521). Although this Court denied Fresenius' motion to seal the terms in the Wahstrom Declaration, Amgen and Roche subsequently agreed that the specific values in that paragraph were not essential to their cases, and they agreed to redact the same from the Amgen filing.  Accordingly, this information remains confidential.

*Corporate Relocation, Inc. v. Martin*, 2006 WL 4101944 (N.D. Tex. Sept. 12, 2006) (holding pricing and profit information warrant protection from public disclosure); *Star Scientific v. Carter*, 204 F.R.D. 410, 414-15 (S.D. Ind. 2001) (holding that pricing information may constitute a protectable trade secret if kept secret).

The discount terms available under the 2006 Epogen™ Sourcing & Supply Agreement were not known outside Fresenius and Amgen (who owed a duty of confidentially to Fresenius). (McGorty Decl. ¶ 10 and ¶¶ 7-8 in Exhibit A thereto.)  Only a limited number of top level employees knew the discount terms negotiated with Amgen and the final discount terms available in the 2006 Epogen™ Sourcing & Supply Agreement.  (McGorty Decl. ¶ 10.)

Strong measures were also taken to ensure that the terms of the 2006 Epogen™ Sourcing & Supply Agreement remained confidential:  Discussions and negotiations regarding the agreement with Amgen were held behind closed doors (McGorty ¶ 10); email and written discussions of contract terms were limited (*id.*); confidentiality clauses were inserted into the final agreement by both parties; no discount term information was ever mentioned in press releases concerning the 2006 Epogen™ Sourcing & Supply Agreement (*id.*); Fresenius and Amgen designated the information as "Highly Confidential" under the protective order in this case (Hebert Decl. ¶¶ 3-4, 8; Gage Decl. ¶ 7); and Fresenius immediately made a motion for leave to file the discount term information under seal when it became apparent that such information was going to be filed with this Court.  Furthermore, Fresenius even sought and obtained a confidentiality order from the Securities Exchange Commission under Section (b) (4) of Rule 80 of Organization; Conduct and Ethics; and Information and Requests (17 C.F.R. §200.80) with respect to SEC filings containing the discount term information, thus, excluding

the information from disclosure under the Freedom of Information Act. (Gage Decl. at Exs. A and B.)

Finally, the competitive benefit of the information Fresenius seeks to protect was obtained at great cost to Fresenius in lengthy negotiations with Amgen. This information is highly valuable to Fresenius, capturing Fresenius' competitive edge in the highly competitive dialysis services market in the United States. (McGorty Decl. ¶¶ 8, 14 and 16.) If the information at issue was released into the public domain, Fresenius expects it would be used by its competitors to unfairly gain an advantage by informing their negotiation positions with Amgen and instructing the formulation of pricing and other competitive strategies. (McGorty Decl. ¶ 11 and ¶ 6 in Ex. A thereto.) The discount terms in the 2006 Epogen™ Sourcing & Supply Agreement cannot be replicated by outside competitors of Fresenius unless those competitors somehow gain access to the trade secrets through a public disclosure of the confidential information.

The fact that these discount terms are to be found in a purchasing contract shared, necessarily, with the supplier, Amgen, does not vitiate the trade secret status of the information so long as both parties privy to information maintain it in confidence as a trade secret. *See*, *Burlington Northern R. Co. v. Omaha Public Power Dist.*, 888 F.2d 1228 (8th Cir 1989) (affirming trade secret protection for pricing information in a supply agreement).

In a case with issues similar to the one at hand involving supplier/purchaser contract and negotiations relating thereto, the United States District Court for the Southern District of Indiana found, under a trade secret law like that of Massachusetts,[7] found that negotiations with vendors

---

[7] Indiana Trade Secret Act 14 U.LA. § 438 (1984) defines trade secret as: "information, including a formula, pattern, compilation, program, device, method, technique, or process that: (1) derives independent economic value, actual or potential, from not being generally known to,

and suppliers pursuant to which buyer receives special discounts not offered to other customers are trade secrets in as are the actual discount terms negotiated. *KnowledgeAZ, Inc. v. DeFosset*, 2006 WL 3201932 at *2 (S.D. Ind. 2006). As in the *KnowledgeAZ* case, here the information at issue was kept confidentially by both Fresenius and Amgen. (McGorty Decl. ¶ 10.) *See Burten v. Milton Bradley Co.*, 763 F.2d 461, 463 (1st Cir. 1985) ("Where the facts demonstrate that a disclosure was made in order to promote a specific relationship, e.g., disclosure to a prospective purchaser to enable him to appraise the value of the secret, the parties will be bound to receive the information in confidence.").

Additionally, the *Knowledge AZ* court maintained the confidential pricing information at issue as a trade secret under seal despite its concern that filing documents under seal has become "an unfortunately all-too-common practice." 2006 WL 3201932 at *2. Fresenius is quite aware of such concerns and thus asks this Court only to protect very limited amounts of information.

Accordingly, where Fresenius has properly preserved its Epogen™ volume discount information as a trade secret, and has made a very limited request, it requests that this Court not undo its efforts.

C.     **This Court Must Balance The Harm In Disclosure Against The Public Interest In Access**

While the common law presumes a right of public access to judicial records, (*see Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597 (1978); *Anderson v. Cryovac, Inc.*, 805 F.2d 1, 13 (1st Cir.1986)), this presumption is not without limits, (*see Siedle v. Putnam Investments, Inc.*, 147 F.3d 7, 10 (1st Cir. 1998)). The public's right to materials filed with a court is overcome where important countervailing interests are present. *See id.* A trial court is vested

—————————————————

and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."

with discretion to prevent the public disclosure of information where it might "become a vehicle for an improper purpose," such as revealing "business information that might harm a litigant's competitive standing." *Nixon*, 435 U.S. at 598.

Accordingly, when a party requests a seal order, the court must carefully balance the competing interests that are at stake in the particular case. *See Siedle*, 147 F.3d at 10 ("It follows that when a party requests a seal order, or, as in this case, objects to an unsealing order, a court must carefully balance the competing interests that are at stake in the particular case."). This Court, therefore, having received non-party Fresenius' request to prevent the disclosure of its confidential trade secret information, must now weigh the harm that disclosure of such information will cause Fresenius against the relevance and the necessity of disclosure of the information to the public. *See id*.

## 1.     Fresenius Will Be Irreparably Harmed By Disclosure

There is no doubt that disclosure of the specific data that Fresenius has identified as trade secret information, and over which it seeks protection, will result in irreparable harm to Fresenius.

First, the loss of a trade secret is generally found to constitute irreparable harm. *Picker Int'l Corp. v. Imaging Equipment Services, Inc.*, 931 F. Supp. 18, 44 (D. Mass. 1995). This is in recognition of the fact that, "once the trade secret is lost, it is gone forever." *TouchPoint Solutions, Inc. v. Eastman Kodak Co.*, 345 F. Supp. 2d 23, 32 (D. Mass. 2004) (quoting *FMC Corp. v. Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir. 1984)). Thus, if Fresenius' volume discount information is divulged the value to Fresenius of that information as a trade secret is gone forever.

More importantly, the trade secret information at issue is at the core of Fresenius'

business as a major supplier dialysis products and services, where relative advantages in the cost

of materials dictate almost the entire difference between profitable and unprofitable operation.

(McGorty Decl. ¶ 8.)  Epogen™ is one of the largest costs to Fresenius in its provision of

dialysis services, and the purchase price and discounting advantages that it has under the 2006

Epogen™ Sourcing and Supply Agreement with Amgen compared to its competitors goes to is

the heart of Fresenius' corporate success.  This valuable information in the hands of a competitor

provider of dialysis services would allow them to gain immediate leverage to demand the same

or similar rates as Fresenius from Amgen, and would destroy Fresenius' competitive advantage

in the marketplace.  *Id.*

> **2.    The Public Interest In Access To This Minimal Amount Of Information Is Limited At Best**

The public interest in gaining access to this very limited amount of sensitive information

is limited at best.  Fresenius is not a litigant seeking to obtain or avoid an injunction, but rather it

is a non-party to this action.  In fact, all that Fresenius did was its duty in responding to

subpoenas issued by this Court, and it did so in a way to presumably preserve its highly

confidential trade secrets under the Protective Order.  Indeed, in connection with its production,

Fresenius sought and obtained from both Amgen and Roche additional protections regarding its

highly sensitive pricing information that went above and beyond the protections afforded by the

Protective Order in this case.  *See* Hebert Decl. ¶¶ 3-4.

Moreover, the public has a second interest – one that favors protection of trade secrets

such as those at issue – namely, the assurance that cooperation with a Court will not

disadvantage legitimate business interests.  As stated in *Zenith Radio Corp. v. Matsushita Elec.*

*Indus. Co., Ltd.*, 529 F. Supp. 866, 905 (D.C. Pa. 1981):

First, there can be no doubt that society in general is interested in the protection of trade secrets and other valuable commercial information.  That interest is recognized, for example, in Rule 26(c)(7), in our copyright, trademark, and patent statutes, and in the common law of business torts.  These policies recognize a coincidence of public and private interests.  Second, we think that orderly management of complex litigation is in the public interest.  Enormous cases like this one cannot be fairly and expeditiously adjudicated unless parties are assured that their legitimate interests will be protected.  Often that assurance cannot be given unless parties are permitted to rely on guarantees of confidentiality.

Fresenius is not seeking to protect reams of information or even all of the discount information from its agreement with Amgen.  The information it needs to protect does not even fill a single page.  Rather, Fresenius is merely seeking to protect particular values representing the specific volume discounts received from Amgen.  Fresenius was careful to identify and request only the redaction of material that is clearly ***protectable*** as a trade secret ***and*** which it felt was ***crucial*** to its business to retain as such.  It has not attempted to protect information that is merely confidential or for which the harm in disclosure would not be significant.  This restraint is calculated to honor the public's interest in access to judicial materials while protecting only the barest minimum necessary to respect Fresenius' most sensitive business information.

Furthermore, Fresenius is not trying to withhold from the public the fact that it has and does receive discounts and that such discounts are significant.  It only wants to protect the actual numbers that are both unobtainable and yet highly sought after by Fresenius' competitors.  In fact, such information has so little merit to the underlying action that neither party felt the values themselves were significant enough to cite in their briefs submitted in relation to the pending motion for summary judgment on the antitrust and related state law counterclaims.

Here, the public is better served by a stay maintaining the confidentiality of the information.  Fresenius acted in cooperation with the parties to the litigation and made every effort to maintain its confidential information in the interest of its business, and the specific information sought to be protected against public disclosure is apparently not highly relevant to

the issues in the case.  As the subject information certainly is not needed by the public at large for any non-competitive purpose, its public disclosure has no real value.  On the other hand, if the stay is not granted, disclosure is a bell that cannot be un-rung and Fresenius will have forever lost the protections it was so careful to maintain.

### III.    IN THE ALTERNATIVE THIS COURT SHOULD GRANT A STAY OF DISCLOSURE WITH RESPECT TO FRESENIUS' TRADE SECRETS THAT WERE FILED BY ROCHE PENDING APPEAL

Because the public disclosure of the two rows of information from Roche Exhibits 257 and 259 and the one number from page 57 of Roche Exhibit 85 would irreparably harm Fresenius and divulge its trade secrets to its competitors, non-party Fresenius intends to file an appeal should this Court not grant this Motion to Seal.  Consequently, as alternative relief, Fresenius asks the Court to stay any Order that would disclose the trade secrets herein pending review by the Circuit Court of Appeals.[8]

In determining whether to grant a stay pending appeal, a court should consider:  (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.  *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987).  Here, consideration of these factors weighs in favor of granting Fresenius' requested stay.

### A.    <u>Fresenius Has Presented A Substantial Case On The Merits</u>

With regard to the first prong of the *Hilton* test, a moving party need not show an "absolute probability of success" on its claim.  *See Providence Journal Co. v. Federal Bureau of*

---

[8]As a third party that does not have control over the documents sought to be disclosed, Fresenius can seek immediate appellate review of the Court's interlocutory order under the collateral order doctrine or the *Perlman* rule.  *See Gill v. Gulfstream Park Racing Ass'n., Inc.*, 399 F.3d 391, 397-400 (1st Cir. 2005).

*Investigation*, 595 F.2d 889, 890 (1st Cir. 1979).  A movant need only present a substantial case

on the merits when a serious legal question is involved and show that the balance of the equities

weighs heavily in favor of granting the stay.  *See Exxon Corp. v. Esso Worker's Union, Inc.*, 963

F. Supp. 58, 60 (D. Mass. 1997).  Here, Fresenius has shown that it has a substantial case in

favor of allowing its proprietary and highly sensitive trade secrets to remain out of the view of its

competitors.

**B.      Fresenius Will Be Irreparably Injured Absent A Stay, And Others Will Only
Be Marginally Affected**

In determining whether to grant a stay, courts give paramount consideration to whether

the applicant will be irreparably injured by a failure to grant the stay and whether other parties

will suffer any harm.  *See Hilton*, 481 U.S. at 776.  Typically, where a court finds the risk to the

movant to be outweighed by the harm to other parties and the public, the stay will be granted.

With respect to the propriety of granting such a temporary stay to allow an appeal to go

forward, the First Circuit has stated:

> Failure to grant a stay will entirely destroy appellants' rights to secure meaningful
> review.  On the other hand, the granting of a stay will be detrimental to the Journal (and
> to the public's interest in disclosure) only to the extent that it postpones the moment of
> disclosure assuming the Journal prevails by whatever period of time may be required for
> us to hear and decide the appeals.  Weighing this latter hardship against the ***total and
> immediate divestiture of appellants' rights*** to have effective review in this court, we find
> the balance of hardship to favor the issuance of a stay.

*Providence Journal*, 595 F.2d at 890 (emphasis added).

The circumstances presented here are analogous to those in *Providence Journal* and the

result should be the very same.  Here, as explained above and in the McGorty Declaration,

receipt of pricing and discount information by Fresenius' competitors will seriously undermine

Fresenius' ability to perform in the highly competitive dialysis services industry.  On the other

hand, neither Roche nor Amgen opposes Fresenius' motion to keep the documents under seal.

15

With respect to the public's interest in viewing the documents, the only harm arising from the imposition of a stay would be, as explained in *Providence Journal*, a "postpone[ment] of the moment of disclosure," 595 F.2d at 890, assuming the Court's Order is affirmed by the appellate court. Given these circumstances, where a denial of the stay request would demolish the status quo and irreparably harm Fresenius, the Court should grant the instant request.

## IV.    IN THE FURTHER ALTERNATIVE, IN LIGHT OF THE COURT'S BIFURCATION ORDER, THIS COURT SHOULD GRANT A LIMITED STAY

On July 17, 2007 this Court issued its case management order in which it bifurcated the antitrust case from the patent case, and deferred a trial on the antitrust case until after completion of the trial on the patent issues. The outcome of the patent trial may well make the entire antitrust case moot (*See* Docket No. 687).

The specific information Fresenius seeks to protect as trade secret does not relate to the patent case and was submitted by Roche in opposition to Amgen's Summary Judgment Motion on the Antitrust and State Law Counterclaims. Accordingly, the disclosure of Fresenius' trade secrets should be completely unnecessary if the antitrust case becomes moot.[9] Under these circumstances, given the need to balance Fresenius' interests as a non-party in this case with the public's right to know, Fresenius respectfully submits that the Court should stay the disclosure of Fresenius' trade secrets at least until there is a decision in the patent trial and the Court is able to determine whether the antitrust case will even go forward.

---

[9] Fresenius notes that the Court denied its prior motion to seal partly on the basis that the information that motion sought to protect might be relevant to the issue of whether Amgen should be entitled to an injunction if it ultimately prevails in the patent trial. While Fresenius does not agree that such information would be relevant to the question of an injunction, in the event that the Court does see some relevance, Fresenius notes that the question of an injunction will not be reached until after completion of the patent trial. This is a further reason why the Court should at the very least grant this temporary stay.

## V.    CONCLUSION

WHEREFORE, Fresenius respectfully submits that the Court should grant this Motion and (1) grant leave for Fresenius to file under seal its trade secrets that were filed by Roche, or (2) in the alternative, grant a stay pending appeal, or (3) in the further alternative, temporarily stay the disclosure of Fresenius' trade secret information at least until after completion of the patent trial in this matter.

Respectfully submitted,

Dated:  July 30, 2007                By:    /s/ Nicole E. Gage
                                            Mark J. Hebert (BBO No. 546,712)
                                            Nicole E. Gage (BBO No. 633219)
                                            FISH & RICHARDSON P.C.
                                            225 Franklin Street
                                            Boston, MA 02110-2804
                                            Telephone: (617) 542-5070
                                            Facsimile: (617) 542-8906
                                            *Counsel for Non-Party Fresenius Medical
                                            Care Holdings, Inc.*

## CERTIFICATE PURSUANT TO LOCAL RULE 7.1(a)(2)

Counsel for Fresenius certifies that Fresenius has conferred in good faith with counsel for Amgen and Roche in an effort to resolve or narrow the issues raised by this motion in telephone conferences on July 25, 2007, July 26 and 27.  Manvin Mayell, counsel for Roche, stated that

Roche will not oppose this Motion, and Daniel Curto, counsel for Amgen, stated that Amgen consented to this motion.

/s/ Nicole E. Gage
Nicole E. Gage

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on this 30th day of July, 2007.

/s/ Nicole E. Gage
Nicole E. Gage

21697148.doc

# EXHIBIT A

06/22/2008 14:25 FAX 615 345 5535          RCC MED OFFICE                          ☎003

# Amgen Contract Term Summary

| | CURRENT | / PROPOSED |
|---|---|---|
| Off Invoice Discount EPO | 2.0% | 2.0% |
| Sub-11 Requirement for Outcome Incentives | ≤25% patients Sub-11 Hgb | ≤25% patients Sub-11 Hgb |
| Volume Requirement for Outcome | 102% growth over prior year | None |
| PIP-Data Discount | 2.5% | 2.5% |
| PIP-Process Improvement | 2.0% | 2.0% |
| Time Below II Process Integration | 2.0% | 2.0% |
| Bone Metabolism | 2.0% | 2.0% |
| Volume Growth Tiers (over 2005 purchases, annualized) | | |
| | REDACTED | |
| Totals | | |

AM44 2024594

**Highly Confidential
Outside Counsel's Eyes Only**

05/18/2006 13:43 FAX 615 345 5535     RCG MED OFFICE     @003

# Amgen Contract Term Summary

| | CURRENT | PROPOSED |
|---|---|---|
| Off Invoice Discount EPO | 2.0% | 2.0% |
| Sub-11 Requirement for Outcome Incentives | ≤25% patients Sub-11 Hgb | ≤25% patients Sub-11 Hgb |
| Volume Requirement for Outcome | 102% growth over prior year | None |
| PIP-Data Discount | 2.5% | 2.5% |
| PIP-Process Improvement | 2.0% | 2.0% |
| Time Below H Process Integration | 2.0% | 2.0% |
| Bone Metabolism | 2.0% | 2.0% |
| Volume Growth Tiers (over 2005 purchases, annualized) | | |
| Totals | | |

REDACTED

AM44 2024587

Highly Confidential
Outside Counsel's Eyes Only

# EXHIBIT B

REDACTED

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

99% of purchases it would continue to buy from Amgen.  Because the withheld rebates and discounts total ▎% – accounting for all of the rebates relating to data collection and achieving lower patient hemoglobin as well – the total price penalty would be $267.3 million, for switching $10 million in purchases to Roche.

113.  But these are not the only rebates in the contract.  For agreeing to exclusively buy from Amgen, the contract also gave Fresenius an "Annual Incremental Rebate" that has large back-end payments if Fresenius purchases either as much ESAs from Amgen as it purchased the prior year or if it purchases as much ESAs as its 2006 purchases minus $13 million.[209]  These rebates increase over time, as shown on the following table:

| | |
|---|---|
| Oct. 1, 2006-Dec. 31, 2006 | $10 million |
| 2007 | $25 million |
| 2008 | $25 million |
| 2009 | $25 million |
| 2010 | $55 million |
| 2011 | $85 million |
| Source: AM44 0723980. | |

Like the volume growth rebate, this annual incremental rebate has a huge foreclosing effect because it means that violating its exclusivity obligation would cost Fresenius a huge loss of rebates.  Worse, this penalty increases over time.  Through this rebate, Amgen anticompetitively links the current sales of its ESAs to Fresenius (when it has a monopoly in the ESRD ESA market) to the future sales of its ESAs to Fresenius (when Roche will enter) through 2011.

---

[209] AM44 0723980.  For October 1, 2006-December 31, 2006, purchases are compared to purchases made over the same period in 2005.  AM44 0723979-80.  For 2008 and 2009, the purchases need only be last year's purchases minus $4 million for Fresenius to receive this payout.  AM44 0723980.