UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| AMGEN INC., | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) CIVIL ACTION No.: 05-CV-12237WGY |
| F. HOFFMANN-LA ROCHE LTD | ) |
| ROCHE DIAGNOSTICS GmbH | ) |
| and HOFFMANN-LA ROCHE INC. | ) |
|  | ) |
| Defendants. | ) |
|  | ) |

**MEMORANDUM IN SUPPORT OF ROCHE'S MOTION *IN LIMINE* TO PRECLUDE
AMGEN INC. FROM CONTRADICTING ARGUMENTS IT MADE IN
PRIOR ADMINISTRATIVE AND JUDICIAL PROCEEDINGS**

Leora Ben-Ami (*pro hac vice*)
Mark S. Popofsky (*pro hac vice*)
Patricia A. Carson (*pro hac vice*)
Thomas F. Fleming (*pro hac vice*)
Howard S. Suh (*pro hac vice*)
Christopher T. Jagoe (*pro hac vice*)
Peter Fratangelo (BBO# 639775)
Krista M. Rycroft (*pro hac vice*)
Kaye Scholer LLP
425 Park Avenue
New York, New York  10022
Tel. (212) 836-8000

Lee Carl Bromberg (BBO# 058480)
Timothy M. Murphy (BBO# 551926)
Julia Huston (BBO# 562160)
Keith E. Toms (BBO# 663369)
Nicole A. Rizzo (BBO# 663853)
Bromberg & Sunstein LLP
125 Summer Street
Boston, MA  02110
Tel. (617) 443-9292

*Counsel for Defendants
F. Hoffmann-La Roche Ltd,
Roche Diagnostics GmbH, and
Hoffmann-La Roche Inc.*

Dated: Boston, Massachusetts
        August 10, 2007

**TABLE OF CONTENTS**

I.    INTRODUCTION ........................................................................................................... 1

II.   FACTUAL BACKGROUND ......................................................................................... 1

III.  ARGUMENT ................................................................................................................. 8

IV.   CONCLUSION ............................................................................................................ 11

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*A.I. Trade Finance, Inc. v. Centro Internationale Handelsbank AG*, 926 F. Supp. 378 (S.D.N.Y. 1996) ...................................................................................................................... 10

*Alternative Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23 (1st Cir. 2004) ................... 8, 9, 10

*Amgen v. Chugai Pharm. Co.*, 13 U.S.P.Q.2d 1737 (D. Mass. 1989), *aff'd in relevant part*, 927 F.2d 1200 (Fed. Cir. 1991) ......................................................................................................... 3

*Analog Devices, Inc. v. Linear Tech. Corp.*, 479 F. Supp. 2d 202 (D. Mass. 2007) .................... 10

*Fritsch v. Lin*, 21 U.S.P.Q.2d 1731 (B.P.A.I. 1991) ................................................................. 1, 2

*Fritsch v. Lin*, 21 U.S.P.Q.2d 1737 (B.P.A.I. 1991) ............................................................ 2, 5, 9

*Hyatt Int'l Corp. v. Coco*, 302 F.3d 707 (7th Cir. 2002) ............................................................ 10

*InterGen N.V. v. Grina*, 344 F.3d 134 (1st Cir. 2003) .................................................................. 9

*McSherry v. Giannuzzi*, 717 F. Supp. 238 (S.D.N.Y. 1989) ....................................................... 10

*Mitchell v. Washingtonville Cent. School Dist.*, 190 F.3d 1  (2d Cir. 1999) ............................... 10

*Patriot Cinemas, Inc. v. Gen. Cinemas Corp.*, 834 F.2d 208 (1st Cir. 1987) ............................ 8, 9

*Portela-Gonzalez v. Sec. of the Navy*, 109 F.3d 74 (1st Cir. 1997) ............................................. 10

**OTHER AUTHORITIES**

M.P.E.P. § 2001.05 (5th ed. Rev. 3, May 1986) ........................................................................... 6

## I.    INTRODUCTION

Plaintiff Amgen Inc. ("Amgen") intends to offer evidence, expert testimony and attorney argument at trial in support of its current assertion that the claims of the patents-in-suit are not obvious variations of the claims of the expired U.S. Patent No. 4,703,008 ("the '008 patent").[1] Its arguments and purported evidence squarely contradict arguments and representations Amgen successfully relied upon in prior administrative and judicial proceedings -- namely, during Interference No. 102,097 ("the '097 Interference") between Fritsch and Lin and proceedings in Europe -- to its benefit.   Courts, including this Court, have consistently prohibited parties from making such intentionally contradictory assertions through the application of the doctrine of judicial estoppel.   Accordingly, Roche respectfully requests that this Court invoke that doctrine and preclude Amgen from offering evidence, testimony or attorney argument that contradicts assertions made in procuring favorable judgments in prior judicial proceedings.

## II.    FACTUAL BACKGROUND

Over the last two decades, Amgen has been involved in numerous judicial proceedings in both the United States and foreign jurisdictions relating to the patentability of the patents-in-suit and foreign counterparts.   Now faced with a challenge to patentability from Roche, Amgen is making arguments that directly contradict arguments made in these prior proceedings.

After issuance, the '008 patent was the subject of Interference No. 102,096 ("the '096 Interference") between Amgen (via Lin) and Genetics Institute (via Fritsch).   *See Fritsch v. Lin*, 21 U.S.P.Q.2d 1731 (B.P.A.I. 1991).   The sole count of the '096 Interference was identical to

---

[1]    The asserted claims consist of claims 1 and 2 of the '868 patent, claims 3, 7-9, 11-12 and 14 of the '933 patent, claims 4-9 of the '698 patent, claim 7 of the '349 patent and claim 1 of the '422 patent.

claim 2 of the '008 patent: "A purified and isolated DNA sequence consisting essentially of a DNA sequence encoding human erythropoietin." *Id.* at 1732. During prosecution of Ser. No. 113,179 ("the '179 application"), which led to U.S. Patent No. 5,441,868 ("the '868 patent"), another interference, the '097 Interference, was declared between Fritsch and Lin, with its sole count being:

> A process for the preparation of an *in vivo* biologically active glycosylated polypeptide comprising the steps of:
>
> (a) growing a mammalian host cell which is capable of effecting post-translational glycosylation of polypeptides expressed therein and which is transformed or transfected with an isolated DNA sequence encoding a polypeptide having a primary structural conformation sufficiently duplicative of that of naturally occurring human erythropoietin to allow possession of the *in vivo* biological property of causing bone marrow cells to increase production of reticulocytes and red blood cells, or the progeny thereof, under nutrient conditions suitable to allow, in sequence,
>
>> (i) transcription within said host cell of said DNA to mRNA in the sequence of transcription reactions directed by the nucleotide sequence of said DNA;
>>
>> (ii) translation within said host cell of said mRNA to a polypeptide in the sequence of translation reactions directed by the nucleotide sequence of said transcribed mRNA;
>>
>> (iii) glycosylation within said host cell of said polypeptide in a pattern directed by the amino acid sequence of said translated polypeptide and sufficiently duplicative of the pattern of glycosylation of naturally occurring human erythropoietin to allow possession by the translated glycosylated polypeptide product of the  in vivo biological property of causing bone marrow cells to increase production of reticulocytes and red blood cells; and
>
> (b) isolating the glycosylated polypeptide so produced.

*Fritsch v. Lin*, 21 U.S.P.Q.2d 1737, 1738 (B.P.A.I. 1991).

Importantly, the Lin process claims had originally been elected by Amgen for prosecution along with the claims that issued as the '008 patent (Ex. 1, '298 Application, Paper

6a, Preliminary Amendment Accompanying Petition to Make Special, R008891872-78)[2];
however, Amgen voluntarily removed the process claims (Ex. 2, '298 Application, Paper 15,
Amendment and Reply R008892011-38 at R008892037) and filed the '179 application to
prosecute the claims thereby triggering the '097 Interference with Fritsch.

To win the '097 Interference, Amgen argued that the Board should adopt the findings of
the District Court and the Federal Circuit in *Amgen v. Chugai Pharm. Co.*, 13 U.S.P.Q.2d 1737
(D. Mass. 1989), *aff'd in relevant part*, 927 F.2d 1200 (Fed. Cir. 1991), in which this Court
found, and the Federal Circuit affirmed, that Amgen (via Dr. Lin) was the first to invent the
claimed DNA sequence and host cells of the '008 patent.  Amgen reasoned that even though the
'097 Interference was directed to process claims and the court litigation concerned DNA and
host cell claims, both sets of claims were to the same invention.  For example, in Amgen's Reply
to Fritsch's Opposition to Amgen's Motion to Terminate Interferences, Amgen argued:

> It is submitted that the Federal Court Decision is fully dispositive of the real
> issues in the subject interferences.  The count of Interference 102,096 is the
> same as claim 2 of the Lin '008 patent which was upheld in the Court.
> Clearly Lin is entitled to priority on the record as to this matter.  The same is
> true with regard to the count of Interference 102,097 since, <u>if Lin was the
> first to invent a host cell containing a DNA sequence in a manner allowing
> the host cell to express rEPO as determined by the Court, he is of necessity
> the first to invent the process of making rEPO using such host cell</u> (see
> the count of Interference 102,097).

(Ex. 3, Lin Reply at 3 (AM-ITC 00328343) (emphasis in original)).  Amgen further stated:

> Fritsch errs in saying that the District Court case did not involve the count
> (process for making EPO) of Interference No. 102,097.  <u>The Court assessed
> the priority evidence regarding the DNA sequence used to make EPO and</u>

---

[2]    "Ex. __" refers to exhibits attached to the accompanying Declaration of Krista M.
Rycroft in Support of Roche's Motion *In Limine* to Preclude Amgen Inc. From
Contradicting Arguments Made in Prior Administrative and Judicial Proceedings.

the reduction to practice of the sequence necessarily and inherently includes
the use of that sequence to make EPO according to the count of Interference
No. 102,097.

(Ex. 3, Lin Reply at 9 (AM-ITC 00328349) (emphasis in original)).

Moreover, in Amgen's Brief for the '097 Interference, under the heading "Summary of

Lin's Position," Amgen stated:

> While the count is directed to a process for preparing in vivo biologically
> active EPO using a mammalian host cell transfected or transformed with an
> isolated DNA sequence encoding human EPO, and the litigation was
> directed to the purified and isolated DNA sequence and host cells transfected
> or transformed thereby, it is evident that these are only different
> manifestations of the same invention as acknowledged by Fritsch et al in
> their Motion Q here (and in Motion G in Interference No. 102,096). Clearly,
> the whole purpose and intent of the purified and isolated DNA sequence
> encoding human EPO (and host cells transfected therewith) at issue in the
> litigation was to express in vivo biologically active human EPO. Stated
> otherwise, the process language of the Lin patent claims at issue in the
> litigation ("encoding human EPO") is, for all intents and purposes, a
> description of the present count. One cannot be sure he has the sequence
> until he has successfully expressed in vivo biologically active human EPO.
> This involves culturing the transfected cells and isolating the expression
> product to determine whether or not it has the required in vivo activity.
> Hence, the priority holding in the litigation is directly on point,
> notwithstanding the different statutory class of claims involved.

(Ex. 4, Brief for the Senior Party Lin ('097 Interference) at 25-26 (AM-ITC 00337677-78)

(emphasis modified)).  In fact, to counter Fritsch's inventorship attack of the process claims,

Amgen unequivocally admitted that:

> …the isolated DNA sequence is *the* novel feature of the process claims and
> Lin's inventorship with regard to the sequence has not been challenged ….
> Clearly, the whole purpose of isolating the DNA sequence was to use the
> sequence in expression to obtain in vivo biologically active recombinant
> EPO …. The expression and isolation of the recombinant EPO did not
> involve separate inventive input by anyone other than Lin.
>
> As for the isolating step, there is clearly nothing separately inventive in this.

4

(Ex. 4, Brief for the Senior Party Lin ('097 Interference) at 57-58 (AM-ITC 00337709-10) (emphasis added)).

In short, to win priority to the process claims over Fritsch, Amgen consistently asserted -- as evidenced by its '097 Interference submissions -- that the novel feature of its invention was the DNA sequence and anything else, including the process for making biologically active glycosylated EPO, would have been obvious to one of skill in the art.

Critically, the Board agreed with Amgen and determined that the issues in the '096 and '097 Interferences were one and the same:

> Of the issues enumerated above, all except issue No. 8 [Lin inventorship] are essentially identical to the issues already considered in related Interference No. 102, 096 …. With regard to the issue of prior inventorship in particular, we note that Fritsch conceded at the final hearing that priority in each of the related interferences turns on isolation of the EPO gene, i.e., determination of priority in Interference No. 102,096 is dispositive on the issue of priority in the present interference.

21 U.S.P.Q.2d at 1738-39 (emphasis added).  In rejecting Fritsch's inventorship attack under § 102(f) to Lin's benefit, the Board stated "[w]e agree with Lin" that there is "no evidence that the work done at Amgen relating to the expression of the EPO gene in mammalian host cells and isolation of the resulting glycoprotein product involved anything other than the exercise of ordinary skill by practitioners in that field."  *Id.* at 1739 (emphasis added).  In adopting these positions before the Board, Amgen succeeded in procuring a favorable judgment.  Therefore, Amgen cannot now be heard to change its story simply because it is faced with a new defendant and a new invalidity challenge.  Clearly Amgen argued that the process steps for making biologically active EPO and the use of host cells for making biologically active EPO was not inventive and was victorious in this argument.  It can not now -- nearly 18 years later and having

successfully defeated Fritsch's inventorship claim -- switch its position and argue that including these limitations in the asserted claims of the patents-in-suit somehow confer patentability.

During discovery in this litigation, Amgen has argued that the above statements by Amgen were not its arguments to the Board, but rather mere recitations of Fritsch's arguments. This hollow argument absolutely has no merit. First of all, as noted above, Amgen's statement regarding "different manifestations of the same invention" appears in the "Summary of Lin's Position." Amgen never said this was Fritsch's argument and indeed stated that the position was "acknowledged" by Fritsch, meaning that Fritsch agreed with Lin. Moreover, to the extent that Amgen now asserts that it also argued to the Board that the inventions were not obvious, this is of no consequence. The bottom line is that the Board specifically adopted Amgen's position that the subject matter of the '096 and '097 Interferences were all part of the "same invention" and that the process steps of the '097 count did not involve inventive skill. Indeed, the Board specifically noted that it "agree[d] with Lin" in rendering its decision. As such, Amgen should be estopped from now taking a contrary position. If Amgen was not truly adopting the positions that the Board relied on in rendering its decision in Amgen's favor, Amgen had a duty to correct the Board as to its true position at that time, not now. (*See* Ex. 5, M.P.E.P. § 2001.05 (5th ed. Rev. 3, May 1986) (duty of candor and good faith applies to Board of Interferences)).

Furthermore, Amgen's contentions are completely belied by its own actions in subsequent proceedings in Europe to preserve the patentability of EP 0 148 605 -- a foreign counterpart to the patents-in-suit. During trial proceedings in the United Kingdom, Amgen stated:

> Whether termed "a guide rope to the peak," a "blueprint," "keys to the kingdom," or the "combination for the lock," the importance of the EPO DNA and amino acid sequences are the same. Whether or not the patentee's

> methodology is adopted, the rest of the world is then enabled to use that information to secure expression of that which was not previously available -- namely, recombinant EPO -- and thereby secure the therapeutic benefits which have served to transform the lives of hundreds of thousands of patients who would otherwise be severely anemic.

(Ex. 6, Written Opening Submission of Amgen for Trial (January 15, 2001) at ¶ 30).  Amgen also argued, quoting the Dutch Court of Appeal, that "[b]y demonstrating the exons the inventor therefore provides the essential genetic information for obtainment at the object aimed at:  the production of EPO by recombinant means."  (Ex. 6, Written Opening Submission of Amgen for Trial (January 15, 2001) at ¶ 128).  During appellate proceedings before the British House of Lords, Amgen maintained the same point:

> What we have here, just to encapsulate it, what the invention then is, in the light of what this contribution has been declared to be, the invention here is the DNA of EPO, manipulated or engineered, otherwise made suitable, however you want to make it suitable, in such a way that it will express EPO in a host cell when it would not otherwise….

(Ex. 7, Transcript from Appeal Before the House of Lords (July 2004) at 606).  Moreover, Amgen's own expert in the UK proceedings, Dr. Sydney Brenner, admitted the same point:

> I understand that the parties have raised various allegations, such that because of the non-availability of certain specific plasmids referred to in the '605 Patent, it may be difficult for the skilled man to rework the '605 Patent.  Whilst I understand that Professor Randolph Wall and Dr Michael Gait will be dealing with these issues in detail, I would just like to comment that <u>as of 1983, once you were given all the exons for a particular gene, getting expression of the protein was frankly routine.  As I have said the exons are the template, it is all the scientist would have required to make a clone capable of producing the protein</u>.

(Ex. 8, Expert Report of Sydney Brenner (November 22, 2000) at ¶ 66 (AM-ITC 01049003)).

During Opposition Proceedings on EP 0 411 678[3] in Europe in another attempt to knock out a Fritsch patent, Amgen told the European Patent Office that "the particular type of glycosylation linkages was simply a result of the type of host cell used to produce the recombinant erythropoietin," further acknowledging that the process claims and the resultant biologically active erythropoietin were merely an obvious result of expressing the DNA sequence in a host cell. (Ex. 9, EP 0 411 678 Opposition Proceedings, 10/8/92 Statement of Grounds submitted by Amgen). Following all of these European proceedings, Amgen succeeded in maintaining patent coverage of process claims, evidencing that the respective judicial and administrative bodies were persuaded by Amgen's assertions.

## III.    ARGUMENT

In accordance with the well-established law of the First Circuit, Amgen should be judicially estopped from presenting evidence and arguments that contradict the aforementioned arguments used by Amgen to procure favorable judgments in prior proceedings.

Judicial estoppel, unlike other forms of estoppel, applies as a sanction for placing at risk the integrity of the court. The doctrine, which has been consistently recognized by the courts of this Circuit, "precludes a party from asserting a position in one legal proceeding which is contrary to a position it has already asserted in another." *Patriot Cinemas, Inc. v. Gen. Cinemas Corp.*, 834 F.2d 208, 212 (1st Cir. 1987); *see also Alternative Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 32-33 (1st Cir. 2004). "Judicial estoppel should be employed when a litigant is 'playing fast and loose with the courts.'" *Patriot Cinemas*, 834 F.2d at 212. While "[t]he contours of the doctrine are hazy," there are essentially two requirements for its application: (1)

---

[3] EP 0 411 678 to inventor Edward Fritsch is entitled "Method for Production of Erythropoietin."

the estopping position and the estopped position must be directly inconsistent and (2) the party being estopped must have succeeded in persuading the tribunal of its prior position. *Alternative Sys.*, 374 F.3d at 33. Prejudice "is not an invariable prerequisite to judicial estoppel….Unlike equitable estoppel, which requires such prejudice, the function of judicial estoppel is to protect the integrity of the courts." *Patriot Cinemas*, 834 F.2d at 214. In short, the question here is whether Amgen "has adopted one position, secured a favorable decision, and then taken a contrary position in search of legal advantage." *InterGen N.V. v. Grina*, 344 F.3d 134, 144 (1st Cir. 2003).

This case is precisely the case for which the doctrine of judicial estoppel was created. As outlined in detail above, in prior proceedings, Amgen has consistently maintained that the point of novelty of its "invention" was the DNA sequence. Everything beyond that, including expression and isolation of the biologically active glycosylated protein, required no inventive skill and was routine and obvious to a person of ordinary skill in the art. Amgen's arguments successfully persuaded the Board of Patent Appeals and Interferences to reject Fritsch's attack on Lin's inventorship under 35 U.S.C. §102(f) and to award Lin priority to the claims. 21 U.S.P.Q.2d at 1739. For Amgen to now assert that the claims of the patents-in-suit are not routine and would not have been obvious over the expired claims of the '008 patent is the exact type of direct contradiction that surpasses the bounds of fairness and judicial integrity that judicial estoppel was intended to protect.

Moreover, the evidence is clear that Amgen persuaded the Board and the European tribunals of its position and succeeded in obtaining and maintaining process claims in its U.S. patents and foreign counterparts. As the First Circuit has noted, "it is the court's acceptance of the party's argument, not the benefit flowing from the acceptance, that primarily implicates

judicial integrity." *Alternative Sys.*, 374 F.3d at 33. Yet even if benefit was required, Amgen has indisputably done so here. Indeed, but for Amgen obtaining patents expiring after the expiration of the '008 patent, Amgen would currently have no patent to assert and this litigation would not be happening.

Finally, it is of no consequence that Amgen's prior assertions were made before the Board of Patent Appeals and Interferences and various European tribunals. "Ascertaining the truth is as important in an administrative inquiry as in judicial proceedings." *Mitchell v. Washingtonville Cent. School Dist.*, 190 F.3d 1, 6 (2d Cir. 1999). Recognizing this, courts, including this Court, have made clear that the doctrine of judicial estoppel applies equally to prior statements made in an administrative context. *See Portela-Gonzalez v. Sec. of the Navy*, 109 F.3d 74, 78 (1st Cir. 1997) ("Equitable doctrines of estoppel apply in administrative and judicial fora, … and a party cannot take one position in an underlying administrative proceeding and then disclaim it in a subsequent suit…."); *Analog Devices, Inc. v. Linear Tech. Corp.*, 479 F. Supp. 2d 202, 212 (D. Mass. 2007) (applying judicial estoppel in the context of Patent Office proceedings); *McSherry v. Giannuzzi*, 717 F. Supp. 238, 243 (S.D.N.Y. 1989) (assessing judicial estoppel based on statements made during interference proceedings). Moreover, courts have applied judicial estoppel based on statements made in foreign proceedings. *See A.I. Trade Finance, Inc. v. Centro Internationale Handelsbank AG*, 926 F. Supp. 378, 388-90 (S.D.N.Y. 1996); *see also Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 717 (7th Cir. 2002) (noting that where concurrent suits were pending in the U.S. and Italy, "[i]f Coco prevails in one case on the basis

of a position inconsistent with one he takes later, judicial estoppel would potentially apply").[4]
Accordingly, this case is the prototypical case for applying the doctrine of judicial estoppel.

## IV.    CONCLUSION

In accordance with the facts and the principles of law set forth above, Roche respectfully requests that this Court preclude Amgen from offering evidence, testimony or argument that contradicts the assertions relied upon by Amgen to secure favorable rulings in prior proceedings, including that Amgen be precluded from arguing:

(1) that the Lin process claims of the '868, '698 and '349 patents are not obvious over the '008 patent claims;

(2) that the use of mammalian host cells for expression of EPO confers patentability to the asserted claims of the patents-in-suit;

(3) that isolation of the EPO glycoprotein product from mammalian host cell expression confers patentability to the asserted claims of the patents-in-suit;

(4) that purported differences in glycosylation linkages confers patentability to the asserted claims of the patents-in-suit; and

(5) that the asserted claims are patentable because production of a biologically active protein was an "unexpected result."

---

[4]    Even if this Court concludes that judicial estoppel should not apply with respect to inconsistent positions taken in foreign proceedings, despite clear law to the contrary, Amgen's contradictory positions in Europe, at a minimum, provide conclusive evidence that Amgen was consistently asserting the position that the novel feature of its "invention" was the DNA sequence.  Accordingly, Amgen cannot be heard to argue that its arguments made during the '097 Interference were unique and based on special circumstances.  The consistency of Amgen's arguments in proceedings around the world only confirms that Amgen is playing fast and loose with this Court to adopt a position that suits its current legal predicament.

Dated:  August 10, 2007
       Boston, Massachusetts

Respectfully submitted,

F. HOFFMANN-LA ROCHE LTD,
ROCHE DIAGNOSTICS GMBH, and
HOFFMANN-LA ROCHE INC.

*By their Attorneys*

/s/  Kregg T. Brooks
Lee Carl Bromberg (BBO# 058480)
Timothy M. Murphy (BBO# 551926)
Julia Huston (BBO# 562160)
Keith E. Toms (BBO# 663369)
Nicole A. Rizzo (BBO# 663853)
Kregg T. Brooks (BBO# 667348)
BROMBERG & SUNSTEIN LLP
125 Summer Street
Boston, MA 02110
Tel. (617) 443-9292
kbrooks@bromsun.com

Leora Ben-Ami (*pro hac vice*)
Mark S. Popofsky (*pro hac vice*)
Patricia A. Carson (*pro hac vice*)
Thomas F. Fleming (*pro hac vice*)
Howard S. Suh (*pro hac vice*)
Christopher T. Jagoe (*pro hac vice*)
KAYE SCHOLER LLP
425 Park Avenue
New York, New York 10022
Tel. (212) 836-8000

## CERTIFICATE OF SERVICE

    I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on the above date.

/s/  Kregg T. Brooks
Kregg T. Brooks

03099/00501 722191.1

12

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMGEN INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) CIVIL ACTION No.: 05-CV-12237WGY |
| F. HOFFMANN-LA ROCHE LTD | ) |
| ROCHE DIAGNOSTICS GmbH | ) |
| and HOFFMANN-LA ROCHE INC. | ) |
| | ) |
| Defendants. | ) |
| | ) |

**MEMORANDUM IN SUPPORT OF ROCHE'S MOTION *IN LIMINE* TO PRECLUDE AMGEN INC. FROM CONTRADICTING ARGUMENTS IT MADE IN PRIOR ADMINISTRATIVE AND JUDICIAL PROCEEDINGS**

Leora Ben-Ami (*pro hac vice*)
Mark S. Popofsky (*pro hac vice*)
Patricia A. Carson (*pro hac vice*)
Thomas F. Fleming (*pro hac vice*)
Howard S. Suh (*pro hac vice*)
Christopher T. Jagoe (*pro hac vice*)
Peter Fratangelo (BBO# 639775)
Krista M. Rycroft (*pro hac vice*)
Kaye Scholer LLP
425 Park Avenue
New York, New York  10022
Tel. (212) 836-8000

Lee Carl Bromberg (BBO# 058480)
Timothy M. Murphy (BBO# 551926)
Julia Huston (BBO# 562160)
Keith E. Toms (BBO# 663369)
Nicole A. Rizzo (BBO# 663853)
Bromberg & Sunstein LLP
125 Summer Street
Boston, MA  02110
Tel. (617) 443-9292

*Counsel for Defendants*
*F. Hoffmann-La Roche Ltd,*
*Roche Diagnostics GmbH, and*
*Hoffmann-La Roche Inc.*

Dated: Boston, Massachusetts
August 10, 2007

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................................ 1

II.     FACTUAL BACKGROUND ..................................................................................... 1

III.    ARGUMENT ............................................................................................................. 8

IV.     CONCLUSION ......................................................................................................... 11

# TABLE OF AUTHORITIES

Page(s)

## CASES

*A.I. Trade Finance, Inc. v. Centro Internationale Handelsbank AG*, 926 F. Supp. 378 (S.D.N.Y. 1996) .......................................................................................................................10

*Alternative Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23 (1st Cir. 2004) ................... 8, 9, 10

*Amgen v. Chugai Pharm. Co.*, 13 U.S.P.Q.2d 1737 (D. Mass. 1989), *aff'd in relevant part*, 927 F.2d 1200 (Fed. Cir. 1991) ......................................................................................................3

*Analog Devices, Inc. v. Linear Tech. Corp.*, 479 F. Supp. 2d 202 (D. Mass. 2007) ...................10

*Fritsch v. Lin*, 21 U.S.P.Q.2d 1731 (B.P.A.I. 1991).................................................................1, 2

*Fritsch v. Lin*, 21 U.S.P.Q.2d 1737 (B.P.A.I. 1991)...........................................................2, 5, 9

*Hyatt Int'l Corp. v. Coco*, 302 F.3d 707 (7th Cir. 2002) ...........................................................10

*InterGen N.V. v. Grina*, 344 F.3d 134 (1st Cir. 2003)..................................................................9

*McSherry v. Giannuzzi*, 717 F. Supp. 238 (S.D.N.Y. 1989) ......................................................10

*Mitchell v. Washingtonville Cent. School Dist.*, 190 F.3d 1  (2d Cir. 1999)...............................10

*Patriot Cinemas, Inc. v. Gen. Cinemas Corp.*, 834 F.2d 208 (1st Cir. 1987)............................8, 9

*Portela-Gonzalez v. Sec. of the Navy*, 109 F.3d 74 (1st Cir. 1997).............................................10

## OTHER AUTHORITIES

M.P.E.P. § 2001.05 (5th ed. Rev. 3, May 1986) .........................................................................6

## I.     INTRODUCTION

Plaintiff Amgen Inc. ("Amgen") intends to offer evidence, expert testimony and attorney argument at trial in support of its current assertion that the claims of the patents-in-suit are not obvious variations of the claims of the expired U.S. Patent No. 4,703,008 ("the '008 patent").[1] Its arguments and purported evidence squarely contradict arguments and representations Amgen successfully relied upon in prior administrative and judicial proceedings -- namely, during Interference No. 102,097 ("the '097 Interference") between Fritsch and Lin and proceedings in Europe -- to its benefit.  Courts, including this Court, have consistently prohibited parties from making such intentionally contradictory assertions through the application of the doctrine of judicial estoppel.  Accordingly, Roche respectfully requests that this Court invoke that doctrine and preclude Amgen from offering evidence, testimony or attorney argument that contradicts assertions made in procuring favorable judgments in prior judicial proceedings.

## II.     FACTUAL BACKGROUND

Over the last two decades, Amgen has been involved in numerous judicial proceedings in both the United States and foreign jurisdictions relating to the patentability of the patents-in-suit and foreign counterparts.  Now faced with a challenge to patentability from Roche, Amgen is making arguments that directly contradict arguments made in these prior proceedings.

After issuance, the '008 patent was the subject of Interference No. 102,096 ("the '096 Interference") between Amgen (via Lin) and Genetics Institute (via Fritsch).  *See Fritsch v. Lin*, 21 U.S.P.Q.2d 1731 (B.P.A.I. 1991).  The sole count of the '096 Interference was identical to

---

[1]     The asserted claims consist of claims 1 and 2 of the '868 patent, claims 3, 7-9, 11-12 and 14 of the '933 patent, claims 4-9 of the '698 patent, claim 7 of the '349 patent and claim 1 of the '422 patent.

claim 2 of the '008 patent: "A purified and isolated DNA sequence consisting essentially of a DNA sequence encoding human erythropoietin." *Id.* at 1732. During prosecution of Ser. No. 113,179 ("the '179 application"), which led to U.S. Patent No. 5,441,868 ("the '868 patent"), another interference, the '097 Interference, was declared between Fritsch and Lin, with its sole count being:

> A process for the preparation of an *in vivo* biologically active glycosylated polypeptide comprising the steps of:
>
> (a) growing a mammalian host cell which is capable of effecting post-translational glycosylation of polypeptides expressed therein and which is transformed or transfected with an isolated DNA sequence encoding a polypeptide having a primary structural conformation sufficiently duplicative of that of naturally occurring human erythropoietin to allow possession of the *in vivo* biological property of causing bone marrow cells to increase production of reticulocytes and red blood cells, or the progeny thereof, under nutrient conditions suitable to allow, in sequence,
>
>> (i) transcription within said host cell of said DNA to mRNA in the sequence of transcription reactions directed by the nucleotide sequence of said DNA;
>>
>> (ii) translation within said host cell of said mRNA to a polypeptide in the sequence of translation reactions directed by the nucleotide sequence of said transcribed mRNA;
>>
>> (iii) glycosylation within said host cell of said polypeptide in a pattern directed by the amino acid sequence of said translated polypeptide and sufficiently duplicative of the pattern of glycosylation of naturally occurring human erythropoietin to allow possession by the translated glycosylated polypeptide product of the  in vivo biological property of causing bone marrow cells to increase production of reticulocytes and red blood cells; and
>
> (b) isolating the glycosylated polypeptide so produced.

*Fritsch v. Lin*, 21 U.S.P.Q.2d 1737, 1738 (B.P.A.I. 1991).

Importantly, the Lin process claims had originally been elected by Amgen for prosecution along with the claims that issued as the '008 patent (Ex. 1, '298 Application, Paper

6a, Preliminary Amendment Accompanying Petition to Make Special, R008891872-78)[2];
however, Amgen voluntarily removed the process claims (Ex. 2, '298 Application, Paper 15,
Amendment and Reply R008892011-38 at R008892037) and filed the '179 application to
prosecute the claims thereby triggering the '097 Interference with Fritsch.

     To win the '097 Interference, Amgen argued that the Board should adopt the findings of
the District Court and the Federal Circuit in *Amgen v. Chugai Pharm. Co.*, 13 U.S.P.Q.2d 1737
(D. Mass. 1989), *aff'd in relevant part*, 927 F.2d 1200 (Fed. Cir. 1991), in which this Court
found, and the Federal Circuit affirmed, that Amgen (via Dr. Lin) was the first to invent the
claimed DNA sequence and host cells of the '008 patent. Amgen reasoned that even though the
'097 Interference was directed to process claims and the court litigation concerned DNA and
host cell claims, both sets of claims were to the same invention. For example, in Amgen's Reply
to Fritsch's Opposition to Amgen's Motion to Terminate Interferences, Amgen argued:

> It is submitted that the Federal Court Decision is fully dispositive of the real
> issues in the subject interferences. The count of Interference 102,096 is the
> same as claim 2 of the Lin '008 patent which was upheld in the Court.
> Clearly Lin is entitled to priority on the record as to this matter. The same is
> true with regard to the count of Interference 102,097 since, <u>if Lin was the
> first to invent a host cell containing a DNA sequence in a manner allowing
> the host cell to express rEPO as determined by the Court, he is of necessity
> the first to invent the process of making rEPO using such host cell</u> (see
> the count of Interference 102,097).

(Ex. 3, Lin Reply at 3 (AM-ITC 00328343) (emphasis in original)). Amgen further stated:

> Fritsch errs in saying that the District Court case did not involve the count
> (process for making EPO) of Interference No. 102,097. <u>The Court assessed
> the priority evidence regarding the DNA sequence used to make EPO and</u>

---

[2]    "Ex. __" refers to exhibits attached to the accompanying Declaration of Krista M.
Rycroft in Support of Roche's Motion *In Limine* to Preclude Amgen Inc. From
Contradicting Arguments Made in Prior Administrative and Judicial Proceedings.

> the reduction to practice of the sequence necessarily and inherently includes
> the use of that sequence to make EPO according to the count of Interference
> No. 102,097.

(Ex. 3, Lin Reply at 9 (AM-ITC 00328349) (emphasis in original)).

Moreover, in Amgen's Brief for the '097 Interference, under the heading "Summary of

Lin's Position," Amgen stated:

> While the count is directed to a process for preparing in vivo biologically
> active EPO using a mammalian host cell transfected or transformed with an
> isolated DNA sequence encoding human EPO, and the litigation was
> directed to the purified and isolated DNA sequence and host cells transfected
> or transformed thereby, it is evident that these are only different
> manifestations of the same invention as acknowledged by Fritsch et al in
> their Motion Q here (and in Motion G in Interference No. 102,096). Clearly,
> the whole purpose and intent of the purified and isolated DNA sequence
> encoding human EPO (and host cells transfected therewith) at issue in the
> litigation was to express in vivo biologically active human EPO. Stated
> otherwise, the process language of the Lin patent claims at issue in the
> litigation ("encoding human EPO") is, for all intents and purposes, a
> description of the present count. One cannot be sure he has the sequence
> until he has successfully expressed in vivo biologically active human EPO.
> This involves culturing the transfected cells and isolating the expression
> product to determine whether or not it has the required in vivo activity.
> Hence, the priority holding in the litigation is directly on point,
> notwithstanding the different statutory class of claims involved.

(Ex. 4, Brief for the Senior Party Lin ('097 Interference) at 25-26 (AM-ITC 00337677-78)

(emphasis modified)).  In fact, to counter Fritsch's inventorship attack of the process claims,

Amgen unequivocally admitted that:

> …the isolated DNA sequence is *the* novel feature of the process claims and
> Lin's inventorship with regard to the sequence has not been challenged ….
> Clearly, the whole purpose of isolating the DNA sequence was to use the
> sequence in expression to obtain in vivo biologically active recombinant
> EPO …. The expression and isolation of the recombinant EPO did not
> involve separate inventive input by anyone other than Lin.
>
> As for the isolating step, there is clearly nothing separately inventive in this.

(Ex. 4, Brief for the Senior Party Lin ('097 Interference) at 57-58 (AM-ITC 00337709-10) (emphasis added)).

In short, to win priority to the process claims over Fritsch, Amgen consistently asserted -- as evidenced by its '097 Interference submissions -- that the novel feature of its invention was the DNA sequence and anything else, including the process for making biologically active glycosylated EPO, would have been obvious to one of skill in the art.

Critically, the Board agreed with Amgen and determined that the issues in the '096 and '097 Interferences were one and the same:

> Of the issues enumerated above, all except issue No. 8 [Lin inventorship] <u>are essentially identical</u> to the issues already considered in related Interference No. 102, 096 …. With regard to the issue of prior inventorship in particular, we note that Fritsch conceded at the final hearing that <u>priority in each of the related interferences turns on isolation of the EPO gene, i.e., determination of priority in Interference No. 102,096 is dispositive on the issue of priority in the present interference</u>.

21 U.S.P.Q.2d at 1738-39 (emphasis added). In rejecting Fritsch's inventorship attack under § 102(f) to Lin's benefit, the Board stated "[w]e agree with Lin" that there is "no evidence that the work done at Amgen relating to the expression of the EPO gene in mammalian host cells and isolation of the resulting glycoprotein product involved anything other than the exercise of ordinary skill by practitioners in that field." *Id.* at 1739 (emphasis added). In adopting these positions before the Board, Amgen succeeded in procuring a favorable judgment. Therefore, Amgen cannot now be heard to change its story simply because it is faced with a new defendant and a new invalidity challenge. Clearly Amgen argued that the process steps for making biologically active EPO and the use of host cells for making biologically active EPO was not inventive and was victorious in this argument. It can not now -- nearly 18 years later and having

successfully defeated Fritsch's inventorship claim -- switch its position and argue that including these limitations in the asserted claims of the patents-in-suit somehow confer patentability.

During discovery in this litigation, Amgen has argued that the above statements by Amgen were not its arguments to the Board, but rather mere recitations of Fritsch's arguments. This hollow argument absolutely has no merit. First of all, as noted above, Amgen's statement regarding "different manifestations of the same invention" appears in the "Summary of <u>Lin's</u> Position." Amgen never said this was Fritsch's argument and indeed stated that the position was "acknowledged" by Fritsch, meaning that Fritsch agreed with Lin. Moreover, to the extent that Amgen now asserts that it also argued to the Board that the inventions were not obvious, this is of no consequence. The bottom line is that the Board specifically adopted Amgen's position that the subject matter of the '096 and '097 Interferences were all part of the "same invention" and that the process steps of the '097 count did not involve inventive skill. Indeed, the Board specifically noted that it "agree[d] with Lin" in rendering its decision. As such, Amgen should be estopped from now taking a contrary position. If Amgen was not truly adopting the positions that the Board relied on in rendering its decision in Amgen's favor, Amgen had a duty to correct the Board as to its true position at that time, not now. (*See* Ex. 5, M.P.E.P. § 2001.05 (5th ed. Rev. 3, May 1986) (duty of candor and good faith applies to Board of Interferences)).

Furthermore, Amgen's contentions are completely belied by its own actions in subsequent proceedings in Europe to preserve the patentability of EP 0 148 605 -- a foreign counterpart to the patents-in-suit. During trial proceedings in the United Kingdom, Amgen stated:

> Whether termed "a guide rope to the peak," a "blueprint," "keys to the kingdom," or the "combination for the lock," the importance of the EPO DNA and amino acid sequences are the same. Whether or not the patentee's

> methodology is adopted, the rest of the world is then enabled to use that
> information to secure expression of that which was not previously available --
> namely, recombinant EPO -- and thereby secure the therapeutic benefits which
> have served to transform the lives of hundreds of thousands of patients who
> would otherwise be severely anemic.

(Ex. 6, Written Opening Submission of Amgen for Trial (January 15, 2001) at ¶ 30).  Amgen

also argued, quoting the Dutch Court of Appeal, that "[b]y demonstrating the exons the inventor

therefore provides the essential genetic information for obtainment at the object aimed at:  the

production of EPO by recombinant means."  (Ex. 6, Written Opening Submission of Amgen for

Trial (January 15, 2001) at ¶ 128).  During appellate proceedings before the British House of

Lords, Amgen maintained the same point:

> What we have here, just to encapsulate it, what the invention then is, in the light
> of what this contribution has been declared to be, the invention here is the DNA
> of EPO, manipulated or engineered, otherwise made suitable, however you want
> to make it suitable, in such a way that it will express EPO in a host cell when it
> would not otherwise….

(Ex. 7, Transcript from Appeal Before the House of Lords (July 2004) at 606).  Moreover,

Amgen's own expert in the UK proceedings, Dr. Sydney Brenner, admitted the same point:

> I understand that the parties have raised various allegations, such that because of
> the non-availability of certain specific plasmids referred to in the '605 Patent, it
> may be difficult for the skilled man to rework the '605 Patent.  Whilst I
> understand that Professor Randolph Wall and Dr Michael Gait will be dealing
> with these issues in detail, I would just like to comment that <u>as of 1983, once
> you were given all the exons for a particular gene, getting expression of the
> protein was frankly routine.  As I have said the exons are the template, it is all
> the scientist would have required to make a clone capable of producing the
> protein</u>.

(Ex. 8, Expert Report of Sydney Brenner (November 22, 2000) at ¶ 66 (AM-ITC 01049003)).

During Opposition Proceedings on EP 0 411 678[3] in Europe in another attempt to knock out a Fritsch patent, Amgen told the European Patent Office that "the particular type of glycosylation linkages was simply a result of the type of host cell used to produce the recombinant erythropoietin," further acknowledging that the process claims and the resultant biologically active erythropoietin were merely an obvious result of expressing the DNA sequence in a host cell.  (Ex. 9, EP 0 411 678 Opposition Proceedings, 10/8/92 Statement of Grounds submitted by Amgen).  Following all of these European proceedings, Amgen succeeded in maintaining patent coverage of process claims, evidencing that the respective judicial and administrative bodies were persuaded by Amgen's assertions.

## III.    ARGUMENT

In accordance with the well-established law of the First Circuit, Amgen should be judicially estopped from presenting evidence and arguments that contradict the aforementioned arguments used by Amgen to procure favorable judgments in prior proceedings.

Judicial estoppel, unlike other forms of estoppel, applies as a sanction for placing at risk the integrity of the court.  The doctrine, which has been consistently recognized by the courts of this Circuit, "precludes a party from asserting a position in one legal proceeding which is contrary to a position it has already asserted in another."  *Patriot Cinemas, Inc. v. Gen. Cinemas Corp.*, 834 F.2d 208, 212 (1st Cir. 1987); *see also Alternative Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 32-33 (1st Cir. 2004).  "Judicial estoppel should be employed when a litigant is 'playing fast and loose with the courts.'"  *Patriot Cinemas*, 834 F.2d at 212.  While "[t]he contours of the doctrine are hazy," there are essentially two requirements for its application: (1)

---

[3] EP 0 411 678 to inventor Edward Fritsch is entitled "Method for Production of Erythropoietin."

the estopping position and the estopped position must be directly inconsistent and (2) the party

being estopped must have succeeded in persuading the tribunal of its prior position. *Alternative*

*Sys.*, 374 F.3d at 33. Prejudice "is not an invariable prerequisite to judicial estoppel….Unlike

equitable estoppel, which requires such prejudice, the function of judicial estoppel is to protect

the integrity of the courts." *Patriot Cinemas*, 834 F.2d at 214. In short, the question here is

whether Amgen "has adopted one position, secured a favorable decision, and then taken a

contrary position in search of legal advantage." *InterGen N.V. v. Grina*, 344 F.3d 134, 144 (1st

Cir. 2003).

This case is precisely the case for which the doctrine of judicial estoppel was created. As

outlined in detail above, in prior proceedings, Amgen has consistently maintained that the point

of novelty of its "invention" was the DNA sequence. Everything beyond that, including

expression and isolation of the biologically active glycosylated protein, required no inventive

skill and was routine and obvious to a person of ordinary skill in the art. Amgen's arguments

successfully persuaded the Board of Patent Appeals and Interferences to reject Fritsch's attack

on Lin's inventorship under 35 U.S.C. §102(f) and to award Lin priority to the claims. 21

U.S.P.Q.2d at 1739. For Amgen to now assert that the claims of the patents-in-suit are not

routine and would not have been obvious over the expired claims of the '008 patent is the exact

type of direct contradiction that surpasses the bounds of fairness and judicial integrity that

judicial estoppel was intended to protect.

Moreover, the evidence is clear that Amgen persuaded the Board and the European

tribunals of its position and succeeded in obtaining and maintaining process claims in its U.S.

patents and foreign counterparts. As the First Circuit has noted, "it is the court's acceptance of

the party's argument, not the benefit flowing from the acceptance, that primarily implicates

judicial integrity." *Alternative Sys.*, 374 F.3d at 33. Yet even if benefit was required, Amgen has indisputably done so here. Indeed, but for Amgen obtaining patents expiring after the expiration of the '008 patent, Amgen would currently have no patent to assert and this litigation would not be happening.

Finally, it is of no consequence that Amgen's prior assertions were made before the Board of Patent Appeals and Interferences and various European tribunals. "Ascertaining the truth is as important in an administrative inquiry as in judicial proceedings." *Mitchell v. Washingtonville Cent. School Dist.*, 190 F.3d 1, 6 (2d Cir. 1999). Recognizing this, courts, including this Court, have made clear that the doctrine of judicial estoppel applies equally to prior statements made in an administrative context. *See Portela-Gonzalez v. Sec. of the Navy*, 109 F.3d 74, 78 (1st Cir. 1997) ("Equitable doctrines of estoppel apply in administrative and judicial fora, … and a party cannot take one position in an underlying administrative proceeding and then disclaim it in a subsequent suit…."); *Analog Devices, Inc. v. Linear Tech. Corp.*, 479 F. Supp. 2d 202, 212 (D. Mass. 2007) (applying judicial estoppel in the context of Patent Office proceedings); *McSherry v. Giannuzzi*, 717 F. Supp. 238, 243 (S.D.N.Y. 1989) (assessing judicial estoppel based on statements made during interference proceedings). Moreover, courts have applied judicial estoppel based on statements made in foreign proceedings. *See A.I. Trade Finance, Inc. v. Centro Internationale Handelsbank AG*, 926 F. Supp. 378, 388-90 (S.D.N.Y. 1996); *see also Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 717 (7th Cir. 2002) (noting that where concurrent suits were pending in the U.S. and Italy, "[i]f Coco prevails in one case on the basis

of a position inconsistent with one he takes later, judicial estoppel would potentially apply").[4] Accordingly, this case is the prototypical case for applying the doctrine of judicial estoppel.

## IV.   CONCLUSION

In accordance with the facts and the principles of law set forth above, Roche respectfully requests that this Court preclude Amgen from offering evidence, testimony or argument that contradicts the assertions relied upon by Amgen to secure favorable rulings in prior proceedings, including that Amgen be precluded from arguing:

(1) that the Lin process claims of the '868, '698 and '349 patents are not obvious over the '008 patent claims;

(2) that the use of mammalian host cells for expression of EPO confers patentability to the asserted claims of the patents-in-suit;

(3) that isolation of the EPO glycoprotein product from mammalian host cell expression confers patentability to the asserted claims of the patents-in-suit;

(4) that purported differences in glycosylation linkages confers patentability to the asserted claims of the patents-in-suit; and

(5) that the asserted claims are patentable because production of a biologically active protein was an "unexpected result."

---

[4]      Even if this Court concludes that judicial estoppel should not apply with respect to inconsistent positions taken in foreign proceedings, despite clear law to the contrary, Amgen's contradictory positions in Europe, at a minimum, provide conclusive evidence that Amgen was consistently asserting the position that the novel feature of its "invention" was the DNA sequence.  Accordingly, Amgen cannot be heard to argue that its arguments made during the '097 Interference were unique and based on special circumstances.  The consistency of Amgen's arguments in proceedings around the world only confirms that Amgen is playing fast and loose with this Court to adopt a position that suits its current legal predicament.

Dated:  August 10, 2007
        Boston, Massachusetts

Respectfully submitted,

F. HOFFMANN-LA ROCHE LTD,
ROCHE DIAGNOSTICS GMBH, and
HOFFMANN-LA ROCHE INC.

*By their Attorneys*

/s/  Kregg T. Brooks
Lee Carl Bromberg (BBO# 058480)
Timothy M. Murphy (BBO# 551926)
Julia Huston (BBO# 562160)
Keith E. Toms (BBO# 663369)
Nicole A. Rizzo (BBO# 663853)
Kregg T. Brooks (BBO# 667348)
BROMBERG & SUNSTEIN LLP
125 Summer Street
Boston, MA 02110
Tel. (617) 443-9292
kbrooks@bromsun.com

Leora Ben-Ami (*pro hac vice*)
Mark S. Popofsky (*pro hac vice*)
Patricia A. Carson (*pro hac vice*)
Thomas F. Fleming (*pro hac vice*)
Howard S. Suh (*pro hac vice*)
Christopher T. Jagoe (*pro hac vice*)
KAYE SCHOLER LLP
425 Park Avenue
New York, New York 10022
Tel. (212) 836-8000

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on the above date.

/s/  Kregg T. Brooks
Kregg T. Brooks

03099/00501  722191.1