

Exhibit D

[1997] R.P.C. 489                                                                                                           Page 1
1997 WL 1104043 (CA (Civ Div)), (1997) 20(6) I.P.D. 20,051, [1997] R.P.C. 489
**(Cite as: [1997] R.P.C. 489)**

**\*489** Beloit Technologies Inc. and Another v. Valmet Paper Machinery Inc. and Another

In the Court of Appeal
CA (Civ Div)
Before:Lord Justice Hirst Lord Justice Aldous Lord Justice Schiemann
12 February 1997

Patent - European patent (UK) - Revocation - Jurisdiction - Whether national courts prevented from revoking patent during pendency of opposition proceedings in European Patent Office - Whether to stay national proceedings - Construction of claim - Obviousness - Common general knowledge - Addressee not having benefit of advanced information service.

Practice - Appeal - Amendment of notice of appeal - Amendment allowed to raise question of statutory construction not affecting matters other than relief granted below.

Patents Act 1977, sections 3, 77(1), (2), 125(3).

European Patent Convention, Protocol on the Interpretation of Article 69.

In an action in the Patents Court for infringement of two European patents (UK), Jacob J. in a judgment dated 28 April 1995 [FN1] construed a significant claim of the second patent not to be infringed and found both patents invalid for obviousness. He ordered them to be revoked.

FN1 [1995] R.P.C. 705

The plaintiffs appealed to the Court of Appeal on both issues. On construction, they contended that strict compliance with the primary meaning of the claim had not been intended. On obviousness they said the judge had wrongly concluded that a certain concept formed part of the common general knowledge when it was a paper curiosity that had never been used.

The defendants had opposed both patents in the European Patent Office (EPO). The oppositions dated from 1992 on one patent and 1993 on the other. Appeals were pending in both and would not be determined before the end of 1997.

In their appeal to the Court of Appeal the plaintiffs sought to amend their notice of appeal to challenge the court's jurisdiction. They submitted that **\*490** having regard to section 77(2) of the Patents Act 1977 the English courts could not revoke the patents until after the EPO heard the opposition appeals. The plaintiffs would otherwise be deprived of the opportunity to amend the patents in the EPO.

Held, , concluding that both patents were invalid and affirming the order revoking them:-

JURISDICTION

  (1) Leave to amend the notice of appeal would be given because the issue was one of law which raised an important question of statutory construction and would only affect the relief granted and not the other issues considered by the court below. (page 501)
  (2) Section 77(2) of the Patents Act 1977 preserved the operation of the European Patent Convention but did not remove the right of the national courts under section 72 to revoke an invalid European patent (UK) at any time after grant. (page 503)
  (3) A patentee should bring before the court all the issues which needed to be determined. He had ample opportunity to amend his patent in national proceedings. He should formulate his amendment at the earliest possible time so that the court could determine validity and infringement with the proposed amendment in mind. (page 503)
  (4) The Patents Court would stay proceedings in England pending a final resolution of EPO proceedings if the latter could be resolved quickly and a stay would not inflict injustice on a party or be against the public interest. (page 503)

CONSTRUCTION

  (5) Purposive construction was necessary to arrive at the middle ground between literal and liberal construction required by the Protocol on the Interpretation of Article 69. The best approach was to use the questions suggested in Improver. The skilled reader here would have believed that the patentee intended strict compliance with the primary meaning

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1997] R.P.C. 489                                                                                                                    Page 2

1997 WL 1104043 (CA (Civ Div)), (1997) 20(6) I.P.D. 20,051, [1997] R.P.C. 489

**(Cite as: [1997] R.P.C. 489)**

to be an essential requirement of the invention, namely that third meant third, even though he would not have known why that limitation had been introduced. (pages 500, 501)

Improver Corp v. Remington Consumer Products Ltd., [1990] F.S.R. 181 at 189 (Hoffmann J.), followed.

OBVIOUSNESS

(6) The information in a patent specification was addressed to an ordinary skilled man, rather than employees of large companies who with the use of libraries and patent departments would become aware of information soon after publication in a variety of documents. It must contain sufficient details for him to understand and apply the invention. It would only lack an inventive step if it was obvious to such a man. (page 494)

***491** (7) Evidence that a fact was known or even well known to a witness did not establish that that fact formed part of the common general knowledge. Neither did it follow that it would form part of the common general knowledge if it was recorded in a document. The first and most important step was to look at the sources from which the notional skilled addressee could have acquired his information, varying from instruction at university to description in obscure patent specifications. Whatever the source, it was necessary to have in mind the observations of the Court of Appeal in General Tire. The mere fact that a concept had not been used did not mean that it could not have formed part of the common general knowledge, but it made it unlikely. (pages 494, 497)

General Tire & Rubber Co. v. Firestone Tyre & Rubber Co. Ltd., [1972] R.P.C. 457 at 482 (C.A.), referred to.

(8) It was right to adopt the structured approach suggested by Oliver L.J. in Windsurfing but the summary set out in Mölnlycke could be misleading. (page 495)

Windsurfing International Inc. v. Tabur Marine (Great Britain) Ltd., [1985] R.P.C. 59 at 73 (C.A.), applied. Mölnlycke AB v. Procter & Gamble Ltd., [1994] R.P.C. 49 at 112 (C.A.), considered.

The following authorities were referred to in the decision:

General Tire & Rubber Co. v. Firestone Tyre & Rubber Co. Ltd. [1972] R.P.C. 457, C.A.

Improver Corporation v. Remington Consumer Products Ltd. [1990] F.S.R. 181.

Mölnlycke AB v. Procter & Gamble Ltd. [1994] R.P.C. 49, C.A.

Windsurfing International Inc. v. Tabur Marine (Great Britain) Ltd. [1985] R.P.C. 59, C.A.

This was an appeal by the plaintiffs against the judgment in the Patents Court of Jacob J. dated 28 April 1995 ([1995] R.P.C. 705) in an action by Beloit Technologies Inc. and Beloit Walmsley Ltd. against Valmet Paper Machinery Inc. and Valmet Paper Machinery (UK) Ltd. for infringement of European patents (UK) Nos. 0334899 and 0345266 with a counterclaim for revocation of the patents and with a petition by the first defendant to revoke the first patent, when the judge held both patents invalid and ordered that they should be revoked. The order was stayed pending appeal.

**Representation**

Simon Thorley Q.C. and Colin Birss, instructed by Bird & Bird, appeared for the appellants (plaintiffs). David Kitchin Q.C. and Richard Meade, instructed by Bristows Cooke & Carpmael, appeared for the respondents (defendants).

Aldous L.J.:

The parties in these proceedings are Beloit Technologies Inc. and Beloit Walmsley Ltd. (the appellants) and Valmet Paper Machinery Inc. and Valmet ***492** Paper Machinery (UK) Ltd. (the respondents). There is no need to differentiate between those groups and I will therefore refer to them respectively as Beloit and Valmet.

Beloit are the registered proprietors of two patents relating to apparatus for drying a paper web. The first, European patent (UK) 0334 899 which I will refer to as 899 was applied for on 12 November 1987 and claimed priority from a Japanese patent application filed on 2 December 1986. The second European patent (UK) 0345 266, which I will refer to as 266, was applied for on 18 December 1987 and claimed priority from a US application of 13 February 1987.

In October 1993 Beloit alleged that the dryer of certain machinery which had been offered by Valmet to SCA Aylesford Ltd. infringed 899. Valmet were

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1997] R.P.C. 489    Page 3
1997 WL 1104043 (CA (Civ Div)), (1997) 20(6) I.P.D. 20,051, [1997] R.P.C. 489
**(Cite as: [1997] R.P.C. 489)**

concerned that the existence of that patent would affect their commercial operations and therefore petitioned for its revocation. That was met by an action for infringement in which Beloit alleged that the dryer to be supplied by Valmet, known as the Aylesford Mk I, infringed 899. Valmet denied infringement and counter-claimed for revocation of the patent. In June 1994 Beloit amended their pleadings to add an allegation of infringement of 266. By a consequential amendment of their pleading in August 1994, Valmet denied infringement of that patent, introduced a counterclaim for revocation of 266 and added a claim for a declaration of non-infringement in respect of a revised version of dryer known as the Aylesford Mk II.

The combined proceedings came to trial before Jacob J. in March 1995. In his judgment of 28 April 1995 [FN2] he held both patents invalid. He also held that the Aylesford Mk II would not have infringed even if the patents had been valid, but the Mk I would have. He ordered that the patents should be revoked, but stayed that order pending appeal. Against that judgment Beloit appealed and Valmet served a Respondents' Notice.

FN2 [1995] R.P.C. 705.

To arrive at his decision the Judge had to deal with a considerable number of issues. Our task has been simplified by the clarity of his judgment and by the practical approach of the parties who have accepted many of the findings of the judge, in particular the acceptance by Beloit that many of the claims of the patents are invalid. Thus the only issues remaining for decision on this appeal are:

A. Patent 899

(1) Is claim 2 novel over US Patent 4359 827 (Thomas)?

(2) Is claim 2 obvious?

B. Patent 266

(1) Is claim 12 obvious?

(2) Does the Aylesford Mk I fall within claim 12?

*493 (3) If the Aylesford Mk I falls within claim 12, is it anticipated by the application for 899?

C. The Relief

Beloit sought to amend their Notice of Appeal so as to challenge the court's jurisdiction to order revocation of the patents during the period when they are under opposition in the European Patent Office.

Valmet opposed both patents and in October 1994 the Opposition Division of the European Patent Office concluded that 899 was invalid and ordered its revocation. The subsequent appeal by Beloit suspended the EPO's decision. In October 1995 the EPO upheld 266 upon certain amended claims. That decision has been appealed by Beloit and Valmet. Thus there are before the EPO appeals relating to the validity of both patents which will not be determined until the end of this year. In those circumstances Beloit submitted that having regard to section 77(2) of the Patents Act 1977 the English courts have no jurisdiction to revoke the patents until after the appeals have been heard. The appropriate relief, upon the judge's conclusion, was declarations confined to the issues decided by the court.

Valmet resisted the amendment to the Notice of Appeal and challenged the submission of Beloit. Thus this court has to decide:
  1. Should Beloit be given leave to amend their Notice of Appeal?
  2. If so, was the judge right to order revocation of the patents?

*Aldous L.J. described the background to the action in more detail and the first of the patents in suit, endorsed the judge's conclusion that claim 2 was not anticipated, and continued:*

*Is claim 2 obvious?*

As stated by Sir Donald Nicholls V-C in Mölnlycke AB v. Procter & Gamble Ltd. [1994] R.P.C. 49 at page 112:
  "Under the statutory code (which is further confirmed in its completeness by sections 74 and 72) the criterion for deciding whether or not the claimed invention involves an inventive step is wholly objective. It is an objective criterion defined in statutory terms, that is to say whether the step was obvious to a person skilled in the art having regard to any matter which forms part of the state of the art as defined in section 2(2). We do not consider that it assists to ask whether the patent discloses something

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

sufficiently inventive to deserve the grant of a monopoly. Nor is it useful to extract from older judgments expressions such as .that scintilla of invention necessary to support a patent'. The statute has laid down what the criterion is to be: it is a qualitative not a quantitative test. The warning against coining phrases given by the Court of Appeal in General Tire & Rubber Co ... is even more apt under the 1977 Act. (See also the rejection of semantic arguments by the Court of Appeal in Hallen v. Brabantia [1991] R.P.C. 195 at 211 to 212).

*494 The Act requires the court to make a finding of fact as to what was, at the priority date, included in the state of the art and then to find again as a fact whether, having regard to that state of the art, the alleged inventive step would be obvious to a person skilled in the art."

That question of fact is a jury type question which inevitably requires the court and usually the witnesses to look back with knowledge of the invention. Such an advantage was not available to the inventor and therefore, when deciding the jury type question, the court must be careful not to be wise after the event. The court must put on 'the spectacles' of the notional skilled addressee at the priority date of the patent and, using such contemporary evidence as there may be, make sure that any conclusion reached is not the result of hindsight.

As stated in section 3 of the Patents Act 1977 the invention, to be patentable, must not be obvious to "a person skilled in the art". That person is the notional addressee of the patent. He lacks inventive capacity, but is deemed to have the common knowledge in the field to which the invention relates. That knowledge has come to be called the common general knowledge in the art.

It has never been easy to differentiate between common general knowledge and that which is known by some. It has become particularly difficult with the modern ability to circulate and retrieve information. Employees of some companies, with the use of libraries and patent departments, will become aware of information soon after it is published in a whole variety of documents; whereas others, without such advantages, may never do so until that information is accepted generally and put into practice. The notional skilled addressee is the ordinary man who may not have the advantages that some employees of large companies may have. The information in a patent specification is addressed to such a man and must contain sufficient details for him to understand and apply the invention. It will only lack an inventive step if it is obvious to such a man.

It follows that evidence that a fact is known or even well-known to a witness does not establish that that fact forms part of the common general knowledge. Neither does it follow that it will form part of the common general knowledge if it is recorded in a document. As stated by the Court of Appeal in General Tire & Rubber Co. v. Firestone Tyre & Rubber Co. Ltd. [1972] R.P.C. 457, at page 482, line 33:

"The two classes of documents which call for consideration in relation to *common general knowledge* in the instant case were individual patent specifications and .widely read publications'.

As to the former, it is clear that individual patent specifications and their contents do not normally form part of the relevant *common general knowledge*, though there may be specifications which are so well known amongst those versed in the art that upon evidence of that state of affairs they form part of such knowledge, and also there may occasionally be particular industries (such as that of colour photography) in which the evidence may show that all specifications form part of the relevant knowledge.

As regards scientific papers generally, it was said by Luxmoore, J. in British Acoustic Films (53 R.P.C. 221 at 250): *495

"In my judgment it is not sufficient to prove common general knowledge that a particular disclosure is made in an article, or series of articles, in a scientific journal, no matter how wide the circulation of that journal may be, in the absence of any evidence that the disclosure is accepted generally by those who are engaged in the art to which the disclosure relates. A piece of particular knowledge as disclosed in a scientific paper does not become common general knowledge merely because it is widely read, and still less because it is widely circulated. Such a piece of knowledge only becomes general knowledge when it is generally known and accepted without question by the bulk of those who are engaged in the particular art; in other words, when it becomes part of their common stock of knowledge relating to the art."

And a little later, distinguishing between what has been written and what has been used, he said:

"It is certainly difficult to appreciate how the use of something which has in fact never been used in a particular art can ever be held to be common general

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1997] R.P.C. 489                                                                                                                    Page 5

1997 WL 1104043 (CA (Civ Div)), (1997) 20(6) I.P.D. 20,051, [1997] R.P.C. 489
**(Cite as: [1997] R.P.C. 489)**

knowledge in the art."

Those passages have often been quoted, and there has not been cited to us any case in which they have been criticised. We accept them as correctly stating in general the law on this point, though reserving for further consideration whether the words 'accepted without question' may not be putting the position rather high: for the purposes of this case we are disposed, without wishing to put forward any full definition, to substitute the words 'generally regarded as a good basis for further action'."

In this case the judge rightly adopted the structured approach suggested by Oliver L.J. in Windsurfing International Inc. v. Tabur Marine (Great Britain) Ltd. [1985] R.P.C. 59 at page 73. Unfortunately he adopted the summary set out in Mölnlycke [FN3] which, if one does not have in mind what Oliver L.J. said, can mislead. Oliver L.J. said:

"There are, we think, four steps which require to be taken in answering the jury question. The first is to identify the inventive concept embodied in the patent in suit. Thereafter, the court has to assume the mantle of the normally skilled but unimaginative addressee in the art at the priority date and to impute to him what was, at that date, common general knowledge in the art in question. The third step is to identify what, if any, differences exist between the matter cited as being "known or used" and the alleged invention. Finally, the court has to ask itself whether, viewed without any knowledge of the alleged invention, those differences constitute steps which would have been obvious to the skilled man or whether they require any degree of invention."

FN3 [1994] R.P.C. 49 at page 115

Mr. Thorley who appeared for Beloit submitted that the judgment of the judge contained three basic misconceptions. First the judge failed, when considering what was obvious, to differentiate between the two types of single felted dryers, namely the single tier Bel Run type dryers and the double their machines **\*496** of which the Uno Run was an example. Second the judge wrongly concluded that the concept of inversion by group formed part of the common general knowledge. That concept was, he submitted, a paper curiosity that had never been used. Third, the judge's conclusion was marred by hindsight. I will deal with those submissions as they arise when considering the issue of obviousness using the structured approach suggested in Windsurfing.

(a) What is the inventive concept embodied in the patent?

The judge said [FN4]:

"In both patents it is broadly the same. Both patents acknowledge, *inter alia*, the Bel Run as prior art, the problems caused by one-sided drying (curl), the desirability of drying on alternate sides and the problems associated with open draws. The solution is inversion of dryer groups using a transfer of two suction rolls to provide a felt-web-felt sandwich, thus avoiding an open draw."

FN4 [1995] R.P.C. 705 at page 747

Neither party criticised the substance of that conclusion. The judge was in my view right. The Bel Run solution is used to eradicate open draw with a change to bottom felting (inversion) to dry the other side of the paper. Suction rolls produce positive transfer.

(b) Adoption of the mantle of the skilled addressee so as to clothe him with the common general knowledge.

Mr. Thorley submitted that the judge misunderstood the second step of Windsurfing when he characterised it as "What was the state of the art?" he submitted that he then failed to distinguish between what was known to some designers from what was common general knowledge. He also criticised the way that the judge considered in this part of his judgment what the skilled addressee would take from Thomas and Soininen.

That criticism is to an extent justified in that the judge appears to have elided step 3 of Windsurfing with step 2. However he did itemise 11 matters which he held to be common general knowledge. No substantial criticism was directed at items 1-10. I can therefore concentrate on item 11 which was as follows [FN5]:

"11. The *concept* or *idea* of inversion of a group of dryers to dry the other side of a web was known to designers."

FN5 [1995] R.P.C. 705 at page 748

I am quite satisfied that this is so on the cross-examination of Mr. Wedel. For example he accepted he knew of a Beloit patent (Mahoney) which showed this, that a Mr. Edgar had mentioned that patent in a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1997] R.P.C. 489                                                                                                                Page 6
1997 WL 1104043 (CA (Civ Div)), (1997) 20(6) I.P.D. 20,051, [1997] R.P.C. 489
**(Cite as: [1997] R.P.C. 489)**

widely read journal. There were a number of other proposals put to him which also showed inversion. In the end his evidence boiled down to this: that the concept was well known but no-one had actually done it."

**\*497** Mr. Thorley submitted that the evidence established that inversion by group had never been used in a machine of the type disclosed in the patent. It had, he accepted, been proposed in three patent specifications none of which disclosed a practical machine. He also accepted that it had been mentioned in two articles with the result that the best informed, such as Mr. Wedel, knew of the concept. But he submitted that did not establish that the concept was part of the common general knowledge.

Mr. Kitchin, who appeared for Valmet, accepted that prior to Beloit producing machines using the invention, inversion in a single felted machine to dry the other side of the web had never been put into practice, but that he submitted was not material. A concept could form part of the common general knowledge even if it had not been put into use and the judge was right to hold that the cross-examination of Mr. Wedel did establish that the concept formed part of the common general knowledge.

When deciding whether something forms part of the common general knowledge the first and most important step is to look at the sources from which the notional skilled addressee could acquire his information. Such sources can vary from instruction at university to description in obscure patent specifications. Whatever the source, it is necessary to have in mind the observations of the Court of Appeal in General Tire. I accept Mr. Kitchin's submission that the mere fact that the concept of inversion by group had not been used does not mean that it could not form part of the common general knowledge, but it makes it unlikely. I therefore turn to the sources from which the notional skilled man could have obtained his knowledge.

Inversion by group is shown in three patents. The first is the 1970 US Patent 350 3139 of Mahoney. That showed a two tier arrangement with the first section having a top felt and the adjacent section with a bottom felt. That construction was referred to in an article in 'Paper Trade Journal' of 15 January 1977 written by Clement Edgar which drew attention to the advance made by single felting and in particular the Uno Run machine. It said:

"In 1968, Mahoney patented a scheme for improved drying and web stabilisation (fig 2). In this patent the concept of a single dryer fabric covering both top and bottom dryers was introduced in conjunction with a high velocity, high temperature air cap. The idea involved utilisation of high velocity, high temperature air to compensate for the loss in drying that would occur with the fabric insulating the sheet from the hot dryer.

The Mahoney patent contemplated use of the bottom fabric, which included top dryers (reverse Uno Run) alternating with the top fabric, which included bottom dryers. These ideas were never tried commercially to our knowledge, possibly because of the high capital cost. Also it does appear to us that there would be broke removal problems - especially with the reverse Uno Run."

The Mahoney patent was followed by the 1975 US patent No 3868 780 of Soininen which was assigned to Valmet. That contains nine figures and figures 5 - 9 show inversion of groups. Figure 9 is appendix 6 to this judgment. [FN6]

FN6 appendices 1 to 5 not reproduced in this report.

**\*498** The US patent of Thomas which was assigned to Weyerhauser Co. was published in 1982. That also showed inversion.

Finally there is the Linderott article published in August 1986 in Wochenblatt für Papierfabrikation. That article reviewed 10 years experience with closed web guidance. It ends with ideas for further development and concludes:

"If one wants to exhaust all avoidable possibilities for increasing the speed it is impossible to avoid using closed guidance, even if the dry content after the presses can be increased up to 50%. It is much more likely that closed guidance will be necessary at speeds above 1300 m/min in all drying groups. In certain types of paper this may require close guidance to be installed alternately above and below to avoid two sidedness."

The evidence established that inversion by group had not been put into practice before to the priority date of the patent. Mr. Wedel, the inventor, knew of Mahoney, Thomas and Soininen. He accepted that the concept of inversion of the type shown in two tier two felt dryers was well-known. That of course is not inversion in the sense in which the word has been used in this case to denote inversion of a single tier

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

group. He also accepted that engineers within the industry would have seen some of the patents. The judge's conclusion was based upon this passage in his cross-examination. (Evidence 3, 114)

Q. and that inversion was well-known as a concept of groups?

A. But, again, as I suggested, never practised to my knowledge, so there were with it corresponding concerns.

Jacob J.: I think Mr. Kitchin's question was: Was it well-known? I think you qualified it by saying, in effect, that it had never been done, but it was known. Is that right?

A. That is what I had said, Yes.

Taking Mr. Wedel's evidence as a whole it is clear that he obtained his knowledge of inversion by group from the patents and that he was of the view that engineers knew of that concept.

Valmet called Mr. Mackay as an expert witness. He was an engineer who had worked in the paper industry since 1948. He started with Alex Pirie and soon became involved in modernising paper machinery. He moved to Reed & Smith and then on to a subsidiary of the Spicer Paper Group where he worked as Chief Engineer. In 1969 he joined an American firm of Consulting Engineers to the paper industry and in 1982 set up his own consultancy. I would have expected him to be aware of the concept of inversion by group in the particular field if it was common general knowledge.

In his statement Mr. Mckay said that the concept of inverting single felted dryer groups had been known for a long time. That was challenged in cross-examination. It appeared that before becoming concerned with the action he had not seen Mahoney, Thomas, Soininen, or Linderott. He may not have seen Edgar. He was asked: (Ev 4 at 149). *499

Q. ... When you say: '... the concept of inverting single felted dryer groups having been known for a long time' you are not pretending that that was known to the man as being part of the tools of the trade of a newsprint dryer design.

A. No. I would think any self-respecting paper mill machinery manufacturer must know of other machines irrespective of whether he is trapped in newsprint or what have you. Here we are looking at newsprint which I still say is rubbish and it is limited as to how much correction you have to do because of the so-called curl problem. You only keep a newspaper for 24 hours and you are not worried. Certainly you cannot turn the sheet of paper on its back so you have to turn the machine on its back to invert part of the machine. I am saying that I had seen the concept with bottom felting.

Q. You have if I may respectfully say so a very eclectic background in paper-making machines.

A. I have been around a lot longer than some of the others, Yes.

Mr. Mackay's knowledge of inversion appeared to come from cigarette paper-making machines and perhaps an article which he was unable to identify. There is no evidence to suggest that persons like Mr. Wedel would have knowledge of such machines.

Taking the evidence as a whole, it appears that inversion by group was part of the state of the art as it had been published. Further, a number of persons skilled in the art would have read the patents which used it and were familiar with the concept even though it had not been put into practice. But those who had not read the patents, perhaps because they worked for Companies without a patent department, would not know of the concept unless they had experience outside the field of newspaper print production. The concept was well-known to some, but it was not shown to form part of the common general knowledge in that the evidence did not establish that the concept was known to the bulk of those skilled in the art, let alone that it had been accepted without question by them.

In my view the judge was right to hold that "The concept or idea of inversion of a group of dryers to dry the other side of the web was known to designers". However he was not right to go on to conclude from that that it had been established that it formed part of the common general knowledge.

There is no dispute as to the other matters which were part of the common general knowledge. As set out in the judgment of the judge, the notional skilled addressee would know of the history starting from single felting in the mid-1970's through to the Uno Run. He would have been aware of the difficulties that open-draws could produce. He would be familiar with felts, suction rolls, drying rollers, and all the mechanical parts needed to make the invention.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 1104043 (CA (Civ Div)), (1997) 20(6) I.P.D. 20,051, [1997] R.P.C. 489
**(Cite as: [1997] R.P.C. 489)**

*Aldous L.J. dealt with the differences between the pleaded prior art and the alleged invention, and continued:*

**\*500** Bearing in mind the need to avoid being wise after the event I have come to the conclusion that claim 2 was obvious. The need to eliminate all open-draws became apparent after the introduction of the Bel Run in 1985 and it was obvious to do that by extending the single tier single felt arrangement through the entire dryer section, and maintaining two-sided drying. The obvious way to do that was inversion by group. Thereafter positive transfer was the obvious choice in that it could be achieved by suitable adjustment and provision of suction rollers. I conclude, not without some hesitation, that the judge came to the right decision. Claim 2 was obvious.

*Aldous L.J. dealt briefly with further points on obviousness, and continued with respect to patent 266.*

*Does the Aylesford Mk I fall within claim 12?*

As an invalid patent cannot be infringed, the question of infringement by the Aylesford Mk I does not arise. If it had, I would have arrived at the same conclusion as the judge for the same reasons.

To arrive at the middle ground between literal and liberal construction required by the Protocol on Interpretation of Claims, purposive construction is necessary and the best approach is to use the questions suggested by Hoffmann J. in Improver Corporation v. Remington Consumer Products Ltd. [1990] F.S.R. 181 at page 189.
   (1) "Does the variant have a material effect upon the way the invention works? If yes, the variant is outside the claim.
   If no -
   (2) Would this (*i.e.* that the variant had no material effect have been obvious at the date of publication of the patent to a reader skilled in the art? If no, the variant is outside the claim.
   If yes -
   (3) Would the reader skilled in the art nevertheless have understood from the language of the claim that the patentee intended that strict compliance with the primary meaning was an essential requirement of the invention. If yes, the variant is outside the claim.
   On the other hand, a negative answer to the last question would lead to the conclusion that the patentee was intending the word or phrase to have not a literal but a figurative meaning (the figure being a form of synecdoche or metonymy) denoting a class of things which included the variant and the literal meaning, the latter being perhaps the most perfect, best-known or striking example of the class."

The variant in this case is the change from having an inverted group as the third group, as stated in claim 12, to a position further downstream as used in the Aylesford Mk I.

**\*501** Would the reader skilled in the art have understood from the language of the claim that the patentee intended that strict compliance with the primary meaning, namely that third meant third, was an essential requirement of the invention? For myself I believe that he would. The requirement that it be the third section which is inverted appears as the primary limitation in claim 12 which is appendant to claim 11. Without that feature I cannot believe that the claim would be seen as adding limitation. Thus the skilled reader would believe that the patentee intended that third meant third even though he would not know why that limitation had been introduced. In any case Beloit never established that it would have been obvious to a reader skilled in the art that the variant had no effect upon the way the invention worked.

*Aldous L.J. explained why he found it unnecessary to consider anticipation of claim 12, and continued:*

*C. The Relief*

Beloit sought to amend their Notice of Appeal so as to contend that, because the patents were still under opposition in the EPO, the judge had no jurisdiction to order revocation of the patents, as he did, until those proceedings were concluded. That amendment was resisted by Valmet upon the ground that the submission had not been raised before the judge and therefore it was not open to Beloit on appeal.

This court was reluctant to shut out the submission that the judge's order was in part *ultra vires* as it was based upon construction of the Patents Act 1977 and, if right, would have a considerable impact upon the procedure in other cases that were likely to come before the Patents Court. We therefore heard submissions both upon the question of whether leave to amend should be granted and the issue of construction raised.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1997] R.P.C. 489                                                                                                                                    Page 9

1997 WL 1104043 (CA (Civ Div)), (1997) 20(6) I.P.D. 20,051, [1997] R.P.C. 489
**(Cite as: [1997] R.P.C. 489)**

The issue of jurisdiction should have been raised before the judge so that we would have had the advantage of the judge's views upon it. However, I would give leave to Beloit to amend the Notice of Appeal because the issue is one of law; it only affects the relief granted and not the other issues considered by the judge and it raises an important question of statutory construction. I therefore turn to the substance of the matter raised by amendment.

The Patents Act 1977 was in part enacted to give effect to the European Patent Convention. That Convention amongst other things enables applicants to secure a European patent having effect in selected Convention countries. The procedure provides for filing at the EPO in Munich, followed by examination, publication and grant. Article 99 of the Convention provides for belated opposition within nine months of the grant. If the patent is opposed, procedure set out in the regulations comes into effect to enable the parties to establish their cases. Thereafter the opposition is decided by the Opposition Division which has the power to reject it, allow it with an order revoking the patent or to allow amendments to validate it. The Convention also provides for an appeal to a Board of Appeal. An appeal has the effect of suspending any order made by the Opposition Division until after the appeal has been concluded.

**\*502** The Patents Act 1977 provides an alternative route to obtain a national patent starting with an application to the United Kingdom Patent Office and proceeding to examination, publication and grant. The fact of grant has to be published in the journal (see section 24). It is at that stage that the Act treats granted European patents in the same way as granted national patents. That is accomplished by section 77(1) in this way:

"77(1) Subject to the provisions of this Act, a European patent (UK) shall, as from the publication of the mention of its grant in the European Patent Bulletin, be treated for the purposes of Parts I and III of this Act as if it were a patent under this Act granted in pursuance of an application made under this Act and as if notice of the grant of the patent had, on the date of that publication, been published under section 24 above in the journal; and -

(a) the proprietor of a European patent (UK) shall accordingly as respects the United Kingdom have the same rights and remedies, subject to the same conditions, as the proprietor of a patent under this Act;

(b) references in parts I and III of this Act to a patent shall be construed accordingly; and

(c) any statement made and any certificate filed for the purposes of the provision of the convention corresponding to section 2(4)(c) above shall be respectively treated as a statement made and written evidence filed for the purposes of the said paragraph (c)."

The dispute turns on the construction of the next subsection which is in this form:

"77(2) Subsection (1) above shall not affect the operation in relation to a European patent (UK) of any provisions of the European Patent Convention relating to the amendment or revocation of such a patent in proceedings before the European Patent Office."

Beloit submitted that the effect of that subsection was to prevent the United Kingdom courts from making any order which would affect the operation of the provisions of the Convention relating to amendment and revocation. It followed that an order for revocation during a period of opposition could not be made as it affected that operation. Valmet submitted that the subsection only preserved the operation of the proceedings stemming from the Convention. To appreciate the purpose of those submissions, it is necessary to return to the facts.

On 2 October 1992 Valmet started belated opposition proceedings in the EPO to revoke 899. By letter of 5 October 1993, solicitors acting for Beloit wrote to Valmet citing 899 as the basis of a potential claim. On 26 October 1993 Valmet petitioned to revoke 899 and later that month started belated opposition proceedings in the EPO to revoke 266. In December 1993 Beloit issued the writ in these proceedings alleging infringement of 899 which they subsequently amended so as to include an allegation of infringement of 266. Valmet counterclaimed for revocation of 266.

**\*503** On 20 October 1994 the Opposition Division held that 899 was invalid and ordered its revocation. Beloit appealed. On 28 April 1995 the judge held the patents invalid and ordered their revocation. Beloit appealed. On 11 October 1995 the Opposition Division upheld 266 but on an amended claim. Both Beloit and Valmet appealed.

Before the Appeal Boards of the EPO, Beloit have an opportunity to challenge the orders of the Opposition

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1997] R.P.C. 489    Page 10
1997 WL 1104043 (CA (Civ Div)), (1997) 20(6) I.P.D. 20,051, [1997] R.P.C. 489
**(Cite as: [1997] R.P.C. 489)**

Division and to put forward amended claims. Thus it is possible that the Appeal Boards will reject the claim for revocation upon the basis of amended claims, being claims as amended which were never considered in these proceedings. Beloit accept that they could have sought amendment in this country, but wish to avail themselves of the indulgent approach of the EPO to amendment applications as opposed to the practice in this country which requires that the party seeking amendment should formulate the amendment he seeks at an early stage of the proceedings.

The position as it stands at the moment is that the patents, in so far as they relate to the United Kingdom, have been revoked by the order of Jacob J. on consideration of the claims as granted. The effect of that order is to preclude Beloit from choosing the European route to amend the European patents (UK) in the opposition proceedings, although any amendment obtained will apply to patents in other designated countries. According to Beloit, the result of the order revoking the patents is that the operation of the provisions of the Convention, which give them the ability to amend has been affected. Thus revocation provided for in section 72 of the Act, is excluded by section 77(2) and the English Court has no power, whilst opposition proceedings are before the EPO, to revoke a patent. I do not believe that section 77 has that meaning. Subsection 1 brings a European patent within those sections of the Act which relate generally to patents. Thus there attach to European patents (UK) the same rights as attach to national patents and they are treated in the same way in this country. Subsection (2) enables the provisions of the Convention, relating to amendment and revocation, also to operate. The fact that there may be proceedings both in the national courts and before the EPO is inevitable as patent rights, both under the Convention and under the Act, are national rights to be enforced by the national courts with revocation and amendment being possible in both the national courts and in certain circumstances before the EPO. That overlap can mean that there are parallel proceedings in this country and the EPO with the potential for conflict. It is desirable for that to be avoided. Therefore the Patents Court will stay the English proceedings pending a final resolution of the European proceedings, if they can be resolved quickly and a stay will not inflict injustice on a party or be against the public interest. Unfortunately that is not always possible as resolution of opposition proceedings in the EPO takes from about 4 - 8 years.

Section 77(2) cannot have been meant to remove the right of the English courts under section 72 to revoke invalid patents pending expiry of the opposition period and resolution of opposition proceedings which could last up to eight years. If patents are invalid, then the national courts have the power to revoke them at any time after grant. That causes no injustice. A patentee has ample opportunity to amend his patent in this country and it is right that he should bring before the court all the issues which need to be determined. If he wishes to seek **\*504** amendment, he should formulate his amendment at the earliest possible time so that the court can determine validity and infringement with the proposed amendment in mind. Section 77(2) preserves the operation of the Convention but does not curtail the jurisdiction of the Patents Court to revoke an invalid patent.

*Conclusion*

I conclude that both patents are invalid. I would dismiss this appeal.

Schiemann L.J.:-

I agree.

Hirst L.J.:-

I also agree.

**\*505** *APPENDIX 6*

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

(c)Crown Copyright. Published by Sweet & Maxwell on behalf of the Patent Office.

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.