# EXHIBIT 3

Dockets.Justia.com



CONFIDENTIAL MATERIAL OMITTED AND
FILED SEPARATELY WITH THE SECURI-
TIES AND EXCHANGE COMMISSION.
ASTERISKS DENOTE SUCH OMISSIONS

AGREEMENT

between

GENETICS INSTITUTE INC.

and

<u>Chugai Pharmaceutical Co. Ltd.</u>

05029193

A 32205

AM-ITC 00078873

## TABLE OF CONTENTS

INTRODUCTION ..................................................

ARTICLE I.  DEFINITIONS

    1.1    Additional Expenses .............................
    1.2    Affiliate ......................................
    1.3    Benchmarks .....................................
    1.4    Confidential Information .......................
    1.5    Effective Date .................................
    1.6    Final Benchmark ................................
    1.7    Genetics Know-How...............................
    1.8    Genetics Patent Rights .........................
    1.9    Government Approval.............................
    1.10   Joint Technology ...............................
    1.11   Know-How........................................
    1.12   Licensed Compounds.............................
    1.13   Licensed Products ..............................
    1.14   Net Sales ......................................
    1.15   Party ..........................................
    1.16   Patent Rights ..................................
    1.17   Principal Investigator ........................
    1.18   Project ........................................
    1.19   Project Know-How ...............................
    1.20   Project Patent Rights .........................
    1.21   Project Period .................................
    1.22   Research Fee ...................................
    1.23   Sole Technology ................................
    1.24   Territory ......................................
    1.25   Total Technology ...............................

ARTICLE II.  THE PROJECT

    2.1    General ........................................
    2.2    Staffing .......................................
    2.3    Inspection .....................................
    2.4    Patent and Confidential Information
            Agreements .................................
    2.5    Quarterly Reports .............................
    2.6    Completion of Benchmarks ......................
    2.7    Best Effort ....................................
    2.8    Flexibility ....................................
    2.9    Technology Transfer ...........................
    2.10   Technology Assistance .........................
    2.11   Agreement With Third Party ....................
    2.12   Disclosure .....................................

ARTICLE III.  PROJECT FUNDING

    3.1    Research Fee ...................................
    3.2    Reimbursement of Additional Expenses...........
    3.3    Termination ....................................

ARTICL[E]
    4.1
    4.2
    4.3
    4.4
    4.5
    4.6

ARTICL[E]
    5.1
    5.2

ARTICL[E]
    6.1
    6.2
    6.3
    6.4
    6.5
    6.6
    6.7

ARTICL[E]
    7.1
    7.2

ARTICL[E]
    8.1
    8.2

ARTICL[E]
    9.1
    9.2
    9.3

ARTICLE
    10.1
    10.2
    10.3
    10.4
    10.5
    10.6

- i -

050529194

A 32206

AM-ITC 00078874

ARTICLE IV.  INTELLECTUAL PROPERTY RIGHTS

   4.1     Sole Technology ................................... 17
   4.2     Licensee Technology ............................... 17
   4.3     Joint Technology .................................. 17
   4.4     Filing and Prosecution of Patent Applications ... 17
   4.5     Right of Genetics to Prosecute Applications ..... 19
   4.6     Genetics Assistance  ............................. 20

ARTICLE V.  PATENT AND KNOW-HOW LICENSES

   5.1     Patent Licenses .................................. 20
   5.2     Know-How Licenses ................................ 21

ARTICLE VI.  PATENT AND KNOW-HOW ROYALTIES

   6.1     Royalties  ....................................... 22
   6.2     Minimum Royalty  ................................. 23
   6.3     Dominant Patents ................................. 24
   6.4     Reports and Payments ............................. 24
   6.5     Foreign Royalties  ............................... 25
   6.6     Records .......................................... 25
   6.7      .............................................. 25

ARTICLE VII.  PATENT AND KNOW-HOW INFRINGEMENT

   7.1     Infringement ..................................... 26
   7.2     Claimed Infringement ............................. 29

ARTICLE VIII.  COMMERCIALIZATION

   8.1     Commercialization  ............................... 30
   8.2     Reporting ........................................ 31

ARTICLE IX.  CONFIDENTIAL INFORMATION

   9.1     Treatment of Confidential Information ........... 31
   9.2     Release From Restrictions  ...................... 32
   9.3     Publications ..................................... 33

ARTICLE X.  TERMINATION

   10.1    Term ............................................. 34
   10.2    Termination for Breach ........................... 34
   10.3    Termination by Licensee .......................... 34
   10.4    Termination by Genetics of Exclusivity ........... 34
   10.5    Disposition of Licensed Products ................. 35
   10.6    Survival of Obligation: Return of
          Confidential Information  ...................... 36

- ii -

A 32207

AM-ITC 00078875

## ARTICLE XI. MISCELLANEOUS

| | | |
|---|---|---|
| 11.1 | Withholding Tax | ................................. |
| 11.2 | Publicity | ................................. |
| 11.3 | Assignment | ................................. |
| 11.4 | Governing Law | ................................. |
| 11.5 | Force Majeure | ................................. |
| 11.6 | Waiver | ................................. |
| 11.7 | Notice | ................................. |
| 11.8 | No Agency | ................................. |
| 11.9 | Headings | ................................. |
| 11.10 | Entire Agreement | ................................. |
| 11.11 | Severability | ................................. |
| 11.12 | Successors and Assigns | ................................. |
| 11.13 | Counterparts | ................................. |

## SCHEDULES

Schedule A - Benchmarks
Schedule B - Research Fee
Schedule C - Territory
Schedule D - Patent Rights
Schedule E - Performance Bonuses
Schedule F - Royalties/Minimum Royalties

- iii -

A 32208

AM-ITC 00078876

## AGREEMENT

AGREEMENT dated as of ✱ 1984 between GENETICS INSTITUTE, INC., a Delaware corporation, having its principal place of business at 225 Longwood Avenue, Boston, Massachusetts 02115 (hereinafter referred to as "Genetics") and CHUGAI PHARMACEUTICAL CO., LTD., a corporation having its principal place of business at No. 5-1, 5-chome Ukima, Kita-ku, Tokyo, Japan (hereinafter referred to as "Licensee").

## INTRODUCTION

1. Genetics has research and development facilities and experienced scientists, research associates and assistants and other personnel which enables it to conduct research and development activities in the area of recombinant DNA technology and the application thereof to the development, production and processing of recombinant DNA and to the production and expression of the products using that technology.

2. Licensee desires that Genetics, on behalf of and in collaboration with Licensee, undertake a research and development project utilizing recombinant DNA technology for producing erythropoietin on a commercially feasible basis.

- 1 -

A 32209

05029197

AM-ITC 00078877

3.   Genetics is willing, for the consideration and on the te...
set forth herein, to use its research and development facilities ...
scientists, research associates and technicians and other personne...
conduct the Project (as defined below).

In consideration of the mutual covenants and promises cont...
in this Agreement and other good and valuable consideration, Gen...
and Licensee agree as follows:

### Article I. DEFINITIONS

As used in this Agreement, the following terms, whether use...
the singular or plural, shall have the following meanings:

1.1   "Additional Expenses" means (a) costs incurred by Gen...
in carrying out activities pursuant to Section 2.10 of this Agreem...
including without limitation reasonable travel and living expenses...
Genetics' staff when away from their normal place of business, t...
costs of direct materials and equipment, and other reasonab...
expenses incurred by Genetics which are allocable to such activitie...
and (b) the related salaries of the professional staff and personnel...
Genetics and quantifiable fringe benefits associated therewit...
multiplied, in the case of costs and expenses described in (a) abov...
by       and in the case of costs and expenses described in (t...
above by

1.2.   "Affiliate" means a corporation, company, partnership, join...
venture and/or firm which controls, is controlled by or is under...
common control with Licensee.  For purposes of this Section 1.3...

- 2 -

A 32210

05029198

AM-ITC 00078878

"control"
indirect
shares e
case of :
fifty per
managem

1.3
Project

1.4
Section
disclosir
to the
Licensec

1.5

1.6
steps o:

1.7
Genetic:
Product
erythro
used in
Genetic

and on the terms

ment facilities and

other personnel to

romises contained

deration. Genetics

. whether used in

ngs:

rred by Genetics

f this Agreement

ving expenses of

of business, the

other reasonable

o such activities

and personnel of

iated therewith.

bed in (a) above

described in (b

artnership, joint

by or is under

is Section 1.2.

trol" shall mean (a) in the case of corporate entities, direct or indirect ownership of at least fifty percent (50%) of the stock or shares entitled to vote for the election of directors; and (b) in the case of non-corporate entities, direct or indirect ownership of at least fifty percent (50%) of the equity interest with the power to direct the management and policies of such non-corporate entities.

1.3. "Benchmarks" means the sequential research steps of the Project as set forth on Schedule A to this Agreement.

1.4. "Confidential Information" means Know-How, as defined in Section 1.11 below, and any other information designated by the disclosing Party as confidential or proprietary, whether or not related to the production or expression of Licensed Compounds and/or Licensed Products (hereinafter defined).

1.5. "Effective Date" means 🟊 , 1984.

1.6. "Final Benchmark" means the last of the sequential research steps of the Project set forth on Schedule A hereto.

1.7. "Genetics Know-How" means all technical information of Genetics, patentable or otherwise, relating to the expression and production of erythropoietin, the cloning of genes coding for erythropoietin or precursors thereof, and/or procedures and products used in developing such a cloned gene, which information is used by Genetics in the Project or is required for Licensee, its Affiliates and

- 3 -

A 32211

05029199

AM-ITC 00078879

sublicensees to manufacture and/or sell Licensed Compounds and/or Licensed Products hereunder, but not specifically developed for and in the course of the Project, including without limitation (a) any information which is licensed or sublicensed to Genetics (to the extent that Genetics is entitled to license or sublicense such information to others); and (b) all inventions, cell sources, cultures, strains, organisms and parts thereof, plasmids, clones, vectors, progeny, derivatives and parts thereof, formulae, methods, procedures, processes, materials, reagents, components, equipment, equipment design, and animal studies, clinical or other evaluations, analyses, results, and quality control or safety procedures relating to the production, use or manufacture of erythropoietin and/or to the development of cloned genes coding for erythropoietin or precursors thereof.

1.8 "Genetics Patent Rights" means all patents, patent applications, inventor's certificates and applications therefor throughout the territory, based on subject matter used in the Project or required for Licensee, its Affiliates and sublicensees to manufacture and/or sell Licensed Compounds and/or Licensed Products hereunder, but not specifically developed for and in the course of the Project, including any substitutions, extensions, reissues, renewals, division, continuations or continuations-in-part, which Genetics owns or controls or under which Genetics has the right to grant sublicenses to Licensee.
                    Licensees.

- 4 -

A 32212

AM-ITC 00078880

1.9. "Governmental Approval" means any license, registration, authorization or approval (including reimbursement price approval) which is required to be issued by the government authorities, including the Food and Drug Administration in the United States and Ministry of Health and Welfare in Japan, in each country of the Territory for manufacture, import, use and/sale of Licensed Compounds and/or Licensed Products.

1.10. "Joint Technology" is defined in Section 4.3 hereof.

1.11. "Know-How" means Genetics Know-How and Project Know-How, collectively. ( As used in this Agreement, "Know-How" of ~~Genetics shall have the meaning stated in this Section 1.11, but as~~ ~~applied to Licensee rather than Genetics.~~ )

1.12. "Licensed Compounds" means any and all kinds of erythropoietin consisting of a polypeptide chain, the amino acid sequence of which is derived from erythropoietin encoding cDNA or genomic DNA sequence isolated from human tissues or cell lines, expressed and produced in mammalian cells and/or other host-vector means (s) which, or the making or use of which, is covered by any of the Patent Rights and/or embodies any Know-How, and/or (b) which is made from a cloned gene or any other genetically engineered product which, or the making or use of which, is covered by any of the Patent Rights and/or embodies any Know-How, and/or (c) which is produced from a cloned gene or any other genetically engineered

- 5 -

A 32213

AM-ITC 00078881

05029201

product developed by the use of any procedure, product or any technology which is covered by any of the Patent Rights and, embodies any Know-How.

Licensed Compounds do not include proteins composed of amino acid sequences encoded by deliberately altered erythropoietin encoding DNA sequences and which have significantly improved or altered physical, chemical or therapeutic characteristics compared to erythropoietin.

1.13 "Licensed Products" means any and all kinds of formulations, mixtures and/or compositions for whatever use which contain Licensed Compounds.

1.14 "Net Sales" means (a) in the case of Licensed Products sold in ⬛ the total invoice price billed or otherwise charged by Licensee, its Affiliates and sublicensees from or on account of the sale of Licensed Products whether such sales are made directly to end users or to wholesalers (other than Distributors, as defined below), and (b) in the case of the Licensed Products sold in other countries or territories within the Territory, the total invoice price billed or otherwise charged (F.O.B. Japanese port) by Licensee, its Affiliates and sublicensees from or on account of the sale of Licensed Products, whether such sales are made directly to end users or to Distributors or wholesalers, in each case less price adjustments, returned goods, billing corrections,

- 6 -

05062920

A 32214

AM-ITC 00078882

duct or other
Rights and/or

of amino acid
pietin encoding
ved or altered
compared to

cinds of formu-
se which contains

ed Products sold
the total invoice
ts Affiliates are
.censed Products
or to wholesalers
b) in the case of
ritories within the
e charged (F.O.B
censees from or by
er such sales to
holesalers, in no
billing corrections

cash, trade and contract discounts, and excises and sales taxes imposed upon and paid with respect to such sales.  As used in this Agreement, the term "Distributor" means an individual, corporation or other entity which imports Licensed Products (whether in finished or semi-finished form) for resale under an agreement (written or oral) with Licensee or its Affiliates and which is independent from Licensee and any of its Affiliates (i.e., if the Distributor is a corporation or other entity, Licensee and its Affiliates hold no interest direct or indirect, in such corporation or entity and, if the distributor is an individual, such individual holds no equity interest in, and is not an officer, director, employee or agent of, Licensee or any of its Affiliates).  With respect to Licensed Products containing Licensed Compounds in combination with other active ingredients ("Combination Products") or containing Licensed Compounds as components for diagnostic products ("Diagnostic Kits"), Net Sales shall be appropriately adjusted by the Parties in each case to reflect the relative independent value and research cost of the Licensed Compounds embodied in the Combination Product or Diagnostic Kit as compared with the independent value and research cost of the other ingredients or components.  Net Sales shall not include any transfer between Licensee and any of its Affiliates or sublicensees for resale, but shall include the resale from an Affiliate or sublicensee to a third party.

1.15.  "Party" means Genetics or Licensee; "Parties" means Genetics and Licensee.

- 7 -

A 32215

AM-ITC 00078883

1.16. "Patent Rights" means Genetics Patent Rights and Process Patent Rights, collectively.

1.17. "Principal Investigator" means Dr. Edward Fritsch or such other senior scientist designated from time to time by Genetics.

1.18. "Project" means the research program conceived, planned, organized, controlled and performed by Genetics for development production technology of Licensed Compound by means of recombinant DNA and specifically directed toward attainment of Benchmarks specified in Schedule A hereto, provided that in no event shall Genetics undertake any research and development activities in the area of in vivo and in vitro assessment, detection, determination or diagnosis of human health conditions , including physical and mental disease, illness, impairment of normal function or agents infectious to humans.

1.19. "Project Know-How" means all technical information of Genetics, patentable or otherwise, relating to the expression or production of erythropoietin, the cloning of genes coding for erythropoietin or precursors thereof, and/or procedures and products used in developing such a cloned gene, which information is developed for and in the course of the Project, including without limitation (a) such information which is licensed or sublicensed to Genetics (to the extent that Genetics is entitled to license or sublicense such information to others); (b) any organism, cell source

- 8 -

A 32216

AM-ITC 00078884

plasmid, vector, virus or parts thereof, which are or have been developed, isolated, purified, constructed or improved by Genetics, as well as progeny and derivatives thereof; and (c) all inventions, cell sources, cultures, strains, organisms and part thereof, plasmids, clones, vectors, progeny, derivatives and parts thereof, formulae, methods, procedures, processes, materials, reagents, components, equipment, equipment design, animal studies, clinical or other evaluations, analytical results, and quality control or other safety procedures relating to the production, use or manufacture of erythropoietin and/or to the development of cloned genes coding for erythropoietin or precursors thereof.

1.20. "Project Patent Rights" means all patents, patent applications, inventor's certificates and applications therefor, throughout the Territory, based on subject matter developed, conceived or reduced to practice for and in the course of the Project, including any substitutions, extensions, reissues, renewals, divisions, continuations or continuations-in-part, which Genetics owns or controls or under which Genetics has the right to grant sublicenses.

1.21. "Project Period" means the period commencing from the Effective Date until the completion of Final Benchmark as specified in Schedule A hereto.

1.22. "Research Fee" means the agreed-upon research cost of the Project to be supported by Licensee, as set forth on Schedule B

- 9 -

A 32217

AM-ITC 00078885

hereto, such Research Fee having been based upon an estimate of the costs to be incurred by Genetics in carrying out the Pro including without limitation salaries of the professional staff personnel of Genetics assigned to the Project and quantifiable benefits associated therewith, costs of direct materials and equipment used in the Project and general overhead costs.

1.23. "Sole Technology" is defined in Section 4.1. hereof.

1.24. "Territory" means the countries and territories specified on Schedule C hereto.

1.25. "Total Technology" means the Sole Technology and the Technology, collectively.

Article II.  THE PROJECT

2.1. General.  Subject to the terms and conditions contained this Agreement. Genetics agrees, as of the Effective Date, undertake the Project, with due diligence and efficiency with objective of completing each Benchmark within the estimated frame specified on Schedule A for each such Benchmark.

2.2. Staffing.  The Project shall be conducted at the facilities Genetics by a team of scientists, research associates and/or assistants

- 10 -

A 32218

AM-ITC 00078886

under the supervision and direction of the Principal Investigator. Genetics shall be responsible for the administrative management and fiscal control of the Project.

n estimate of the
out the Project
.sional staff and
uantifiable fringe
ds and equipment.

**1.3. Inspection.** Licensee shall have the right to arrange for its employees and outside consultants involved in the Project to visit Genetics at its offices and laboratories and to discuss Project work and its results in detail with the technical personnel and consultants of Genetics; provided that such visits shall be during normal business hours and shall not unreasonably interrupt the operations of Genetics.

.1. hereof.

rritories specified

**1.4. Patent and Confidential Information Agreements.** Genetics shall require the Principal Investigator, and all scientists, research associates and assistants, technicians and technical personnel assigned to the Project to execute an agreement for the assignment of inventions and for the protection of Confidential Information in such reasonable form as may from time to time be used by Genetics for such purpose. Licensee shall require all scientific and other employees working on or involved in the Project to execute an agreement for the protection of Confidential Information in such reasonable form as may from time to time be used by Licensee for such purpose.

hnology and Joe-

litions contained in
Effective Date. in
efficiency with the
the estimated cost
mark.

d at the facilities
es and/or associat

**1.5. Quarterly Reports.** Genetics shall provide Licensee with written progress reports summarizing the technological progress of the Project within 30 days after the end of each calendar quarter

- 11 -

A 32219

050029207

AM-ITC 00078887

during the Project Period. For a quarter in which a Benchmark
completed, the quarterly report will include a final report on
attainment of such Benchmark.

2.6. **Completion of Benchmarks.** Promptly after the completion
each Benchmark, Genetics shall notify Licensee of such completion a
shall provide to Licensee the materials specified on Schedule A her
in order to permit Licensee to evaluate the completion of such
Benchmark. Licensee may, pursuant to Section 2.3 hereof, arrange
for an inspection and consultation at the premises of Genetics
Unless Licensee otherwise notifies Genetics in writing within 30 d
after the receipt of the notice of completion and related materia
pertaining to any Benchmark, such Benchmark shall be deemed
have been satisfactorily achieved for all purposes of this Agreement

2.7. **Best Effort.** Genetics shall use its best efforts to comple
each Benchmark within the estimated time frame specified on Schedu
**A.** In the event that Genetics fails to complete any Benchmark with
the anticipated completion date as specified in Schedule A hereo
Genetics shall send Licensee an immediate notice by telex to the
effect, indicating the reasons for such delay and a proposal of
completion date of such Benchmark to be best estimated.

2.8. **Flexibility.** In carrying out the research which Genetics
will conduct in the course of the Project, Genetics shall have an
maintain sufficient flexibility to shift effort and emphasis within the

- 12 -

A 32220

AM-ITC 00078888

overall scope of the Project in a manner that will, in the opinion of the Principal Investigator, after consultation with and giving due consideration to the advice of Licensee, best result in the development of useful technology for the production of Licensed Compound.

**2.9. Technology Transfer.** Genetics shall disclose from time to time during Project Period, Know-How in confidence to Licensee to the extent necessary to enable Licensee to produce Licensed Compounds as specified in the Final Benchmark. Within 60 days after completion of the Final Benchmark, Genetics shall supply Licensee with a technical documentation package of sufficient detail and completeness to permit Licensee to verify and produce Licensed Compounds on a 10-litre scale and purification procedures on a bench scale. Genetics understands that these procedures will be appropriate for subsequent scale-up to produce Licensed Compounds in a quantity and quality reasonably sufficient for Licensee to initiate the pre-clinical and clinical studies of Licensed Products for Government Approval.

**2.10. Technical Assistance.** During the twelve months following the completion of the Final Benchmark (such period being subject to extension by mutual agreement of the Parties), Genetics shall, upon request from Licensee, make available to Licensee the Principal Investigator (to the extent available) and members of the technical staff of Genetics assigned to the Project in order to assist Licensee and contractors in the Technology Transfer as specified in Section 2.9, provided that such assistance shall not be required to be in

- 13 -

A 32221

AM-ITC 00078889

excess of 40 man hours per month per person (such hours being subject to extension by mutual agreement of the parties). Licensee shall reimburse Genetics for the Additional Expenses incurred rendering such assistance.

2.11. Arrangements with Third Parties. Genetics shall have right to contract with third parties approved by Licensee for performance of work in connection with the Project, provided the Licensee shall have the opportunity to review and comment on such proposed contract prior to its execution. Approval of any subcontract shall not be unreasonably withheld. Upon the request Licensee, Genetics will provide Licensee with a complete copy of such executed contract. It is specifically understood that any and of expenses incurred by Genetics for the performance of any part Project under such contracts with third parties shall be regarded as part of the Research Fee.

2.12. Disclosure. Licensee shall disclose in confidence Genetics all necessary information, including all pre-clinical clinical study data, for use by Genetics or any licensees in obtaining regulatory approvals for marketing Licensed Products outside of Territory.

Article III. PROJECT FUNDING

3.1. Research Fee. In consideration of the research conducted by Genetics with regard to the Project, Licensee shall pay to Genetics

- 14 -

A 32222

AM-ITC 00078890

such hours being
arties).  Licensee
nses incurred in

ics shall have the
Licensee for the
ct, provided that
d comment on any
proval of any such
on the request by
plete copy of each
od that any and all
nce of any part of
ll be regarded as a

in confidence a
ll pre-clinical and
ensees in obtaining
ucts outside of the

research conducted
shall pay to Genetics

the Research Fee in the amount and on the periodic installments set
forth in Schedule B hereto, it being understood that:



1.2  Reimbursement of Additional Expenses.  Genetics shall be
reimbursed by Licensee for its Additional Expenses incurred as
described in Section 2.10, payable by Licensee within 15 days after
notice therefor.  Genetics shall keep true and accurate records to
substantiate all Additional Expenses invoiced to Licensee.  Upon
request from Licensee, Genetics shall permit Licensee or its
authorized representatives to inspect such records in confidence in
order to verify the amount of Additional Expenses invoiced
hereunder.

1.3.  Termination.

- 15 -

A 32223

AM-ITC 00078891

(a) At any time prior to or within two weeks from receipt of the materials specified in Schedule A evidencing completion of Benchmark I, Licensee may terminate this Agreement any reason by giving Genetics a written notice, such termination be effective immediately with no further payments by Licensee (except for the payments specified in Section 3.1 (a) above).

(b) At any time after the receipt of the materials specific Schedule A evidencing the completion of Benchmark I and prior to completion of the Final Benchmark, Licensee may terminate the Agreement by:

(i) giving Genetics at least 30 days' prior notice in writing when Licensee elects to do so for the reason of failure or delay for more than three months in achievement by Genetics of anticipated completion date of Benchmark II as specified Schedule A hereto, provided that Licensee shall continue to pay Genetics Research Fee during the 30 day notice period in amount equal to that become due during the 30 day period immediately prior to the date of notice.

(ii) giving Genetics at least 120 days' prior notice in writing when Licensee elects to do so for any reasons other than as set forth under (i) of this paragraph (b), provided that Licensee shall continue to pay Genetics its Research Fee during the 120-day notice period Research Fee in an amount equal to that become due during the 120 day period immediately prior to the date of notice.

Article IV. IN

4.1. Sole and interest i developed solel term of this A Licensed Produ

4.2. Lice title and inter solely by empl Agreement, w Products,

4.3. Join shall own th technology in during the Compounds "Joint Tech hereunder.

05029212

- 16 -

A 32224

## Article IV.  INTELLECTUAL PROPERTY RIGHTS

4.1. Sole Technology.  Genetics shall own the entire right, title and interest in and to any and all technology invented and/or developed solely by employees or consultants of Genetics during the term of this Agreement, which relates to Licensed Compounds and/or Licensed Products (hereinafter referred to as "Sole Technology").

4.2. Licensee Technology.  Licensee shall own the entire right, title and interest in any and all technology invented and/or developed solely by employees or consultants of Licensee during the term of this Agreement, which relates to Licensed Compounds and/or Licensed Products.

4.3. Joint Technology.  Unless otherwise agreed upon, Genetics shall own the entire right, title and interest in and any and all technology invented and/or developed jointly by Genetics and Licensee during the term of this Agreement, which relates to Licensed Compounds and/or Licensed Products (hereinafter referred to as "Joint Technology"), subject to the license granted Licensee hereunder.

4.4. Filing and Prosecution of Patent Applications.

(a) Unless otherwise agreed upon, Licensee shall have the right of first refusal:

- 17 -

A 32225

AM—ITC 00078893

(i) to elect to file patent applications, in the name of Genetics and in the countries to be selected by Licensee in its sole discretion, for any and all of Sole Technology which Genetics may propose to Licensee for patenting from time to time during the term of this Agreement.

(ii) to elect to file patent applications in the name of Genetics in the countries to be selected by Licensee at its sole discretion for any and all of Joint Technology.

(b) Genetics hereby authorizes and empowers Licensee, and hereby grants to Licensee its permission and consent for Licensee or its authorized attorneys, agents or representatives, to assume the foregoing responsibilities in the name of Genetics. Licensee agrees to assume such responsibilities and to pay all costs and expenses incurred in carrying out such responsibilities. Copies of all communications to and from patent offices regarding applications, patents or certificates of invention on any Total Technology shall be provided to Genetics promptly after the receipt thereof; copies of proposed communications to such patent offices shall be provided to Genetics in sufficient time before the due date in order to enable Genetics an opportunity to comment on the content thereof.

(c) All current Genetics Patent Rights are specified on Schedule D hereto and Genetics shall from time to time enter all future Genetics Patent Rights developed by it onto Schedule D. Licensee shall enter all patent applications and applications for certificates of invention, as it elects to file such applications, onto Schedule D. Any of Patent Rights which licensee has elected to abandon shall no longer be

regarded as a P
expense and res

4.5  Right

elects not to :
protection on
Territory. Gene
procure, mainta
Technology. Li
under this Ar
application or s
a patent or ce
application or a
advise Genetic:
shall have the
application, ma
continuing to
disclosed in su

Notwithstandin
application in
elects not to
Total Technolc
application in .

- 18 -

A 32226

AM-ITC 00078894

the name of
icensee at its
nology which
m time to time

the name of
see at its sole

Licensee, and
or Licensee and
to assume the
ensee agrees to
and expenses
Copies of all
g applications.
nology shall be
reof; copies of
be provided to
order to enable
reof.
fied on Schedule
future Genetics
nsee shall enter
of invention, as
Any of Patent
it no longer be

regarded as a part of Patent Rights unless Genetics maintains it at its expense and responsibility.

4.5 **Right of Genetics to Prosecute Applications.** If Licensee elects not to seek or continue to seek, use or maintain patent protection on any Total Technology in any country within the Territory, Genetics shall have the right, at its expense, to file, procure, maintain and enforce in such countries patents on such Total Technology. Licensee agrees to advise Genetics of all decisions taken under this Article 4. If Licensee elects not to file a patent application or application for a certificate of invention, not to maintain a patent or certificate of invention, or to abandon a pending patent application or application for a certificate of invention, Licensee shall advise Genetics of such election in a timely manner, and Genetics shall have the right, at the expense of Genetics, of filing such application, maintaining such patent or certificate of invention or continuing to attempt to obtain protection of the subject matter disclosed in such pending application.

Notwithstanding the foregoing, with respect to the filing of a patent application in Japan, Licensee shall notify Genetics in writing if it elects not to file a patent application in Japan with respect to any Total Technology, and Genetics shall be entitled to file a patent application in Japan pursuant to this Section 4.5.

- 19 -

A 32227

AM-ITC 00078895

4.6. Genetics Assistance. Genetics shall make avail~~
Licensee or its authorized attorneys, agents or representatives
of Genetics' employees whom Licensee in its reasonable ~~
deems necessary in order to assist Licensee in obtaining ~~
protection for the Total Technology. Each Party shall sign or ~~
best efforts to have signed all legal documents necessary to ~~
prosecute patent applications or applications for certific~~
invention or to obtain or maintain patents or certificates of inv~~
at no charge to the other Party.

## Article V. PATENT AND KNOW-HOW LICENSES

5.1. Patent Licenses. Subject to the payment of the roy~~
provided in Article VI and the fulfillment of the other terms ~~
conditions of this Agreement, Genetics hereby grants to Licensee ~~
its Affiliates:

   (a) an exclusive license (even as to Genetics) in the Territory
under the Project Patent Rights, and

   (b) a non-exclusive license in the Territory under the Gene~~
Patent Rights,
including the right to grant sublicenses, for the sole and exclus~~
purpose of manufacturing, having manufactured for Licensee and ~~
Affiliates, using and selling Licensed Compounds and/or Licens~~
Products in the Territory; provided, however ✳

                                                    The licens~~

- 20 -

A 32228

AM-ITC 00078896

granted pursuant to this Section 5.1 shall continue in effect until the expiration of the last patent licensed to the Licensee hereunder.

5.2. _Know-How Licenses._  Subject to the payment of the royalty provided in Article VI and the fulfillment of the other terms and conditions of this Agreement, Genetics hereby grants to Licensee and its Affiliates:

(a) an exclusive license (even as to Genetics) to use the Project Know-How in the Territory, and

(b) a non-exclusive license to use the Genetics Know-How in the Territory,

including the right to grant sublicenses, for the sole and exclusive purpose of manufacturing, having manufactured for Licensee and its Affiliates, using and selling Licensed Compounds and/or Licensed Products in the Territory; provided, however, ✳

The licenses granted pursuant to this Section 5.2 shall continue in effect for a period of ✳ from the date of the completion of the Final Benchmark set forth on _Schedule A_ hereto.

- 21 -

A 32229

050029217

AM-ITC 00078897

### Article VI. PATENT AND KNOW-HOW ROYALTIES

#### 6.1. Royalties

(a) Licensee shall pay to Genetics during the term of the license granted in Section 5.1 above earned royalties at the rate set forth on **Schedule F** hereto on all Net Sales by Licensee and its Affiliates of Licensed Products which fall within the definition of Licensed Products under Section 1.13 by virtue of involving Patent Rights (whether or not such Licensed Products also fall within the definition of Licensed Products under Section 1.13 by virtue of involving Know-How). Royalties shall be payable on a country by country basis with respect to Net Sales (i) in each country in which there is a claim under Patent Rights, and (ii) in each country where the Licensed Products being sold were manufactured or are to be used in which there is a claim under Patent Rights.

(b) Licensee shall pay to Genetics earned royalties at the rate set forth on **Schedule F** hereto on all Net Sales anywhere in the Territory by Licensee and its Affiliates of Licensed Products which fall within the definition of Licensed Products under Section 1.13 by virtue of involving Know-How.

(c) For purposes of determining the date of the Final Benchmark as set forth on **Schedule F**, the date shall be deemed to be the date on which Genetics has shipped, as evidenced by an appropriate document, to Licensee (in Japan or the U.S.) the materials relating to the Final Benchmark specified in **Schedule A** hereto pursuant to Section 2.6 hereof.

- 22 -

A 32230

AM-ITC 00078898

(d) Under no circumstances shall Licensee be obligated to pay royalties under both paragraph (a) and (b); only one royalty shall be due with respect to each sale of a Licensed Product.

(e) Upon the expiration of the royalty obligations set forth in Section 6.1(b) with respect to any Know-How in any country, the licenses granted under Section 5.2. with respect to such Know-How in such country shall become fully paid non-exclusive licenses. Licensee may upon such expiration elect to continue in effect the exclusive nature of the license of any Know-How in any country by paying to Genetics the royalty specified on Schedule F hereto. Such exclusive license shall remain in effect so long as Licensee pays such royalty; and when such royalty payments are terminated, the license shall become a fully paid non-exclusive license with respect to such Know-How in such country.

6.2 Minimum Royalty. Beginning with ▟

Licensee shall pay to Genetics royalties at the rate set forth on Schedule F hereto; provided, however, that Licensee shall be required to pay to Genetics no less than the minimum annual royalty set forth on Schedule F hereto. Such minimum annual royalty payments shall be made within 45 days from the last day of the applicable twelve-month period. In the event that the minimum royalty is not paid within such 45-day period, the provisions of Section 10.4 shall apply.

- 23 -

A 32231

AM-ITC 00078899

6.3  Dominant Patents.  If Licensee, its Affiliates or sublicen...
in order to operate under or exploit the licenses granted und...
Article V of this Agreement in any country in the Territory, ...
make payments (including without limitation royalties, option fees ...
license fees) to one or more third parties to obtain a license ...
similar right in the absence of which the Licensed Products could ...
legally be manufactured or sold in such country, Licensee may dec...
from royalties thereafter payable to Genetics on Net Sales in su...
country an amount equal to up to ✱ of such third party payment
provided that the total royalties otherwise due to Genetics on N...
Sales in such country in any year shall not be reduced by more th...
✱ as a result of such deduction.

6.4  Reports and Payments.  Licensee shall deliver to Genetic...
within 45 days after the end of each calendar quarter a writt...
report showing its computation of royalties due under this Agreem...
upon Net Sales by Licensee, its Affiliates and sublicense...
during such calendar quarter.  All Net Sales shall be segmented i...
each such report according to sales by Licensee and each Affiliat...
and sublicensees as well as on a country-by-country basis, includin...
the rates of exchange used to convert such royalties to United Stat...
dollars from the currency in which such sales were made.  For th...
purposes hereof, the rates of exchange to be used for converting...
royalties hereunder to United States dollars shall be those in effec...
on the day of purchase of dollars at Tokyo, Japan.  Licensee...
simultaneously with the delivery of each such report, shall tende...
payment in U.S. dollars of all royalties shown to be due thereon.

6.5  Fo...
hereunder fo...
reason of eu...
or illegal for...
payments to...
shall be dep...
entity not ...
Genetics in ...
Genetics.

6.6.  R...
Affiliates ar...
accounts an...
may be ne...
hereunder...
one year fo...
time to tin...
inspect, or...
such books...

- 24 -

A 32232

AM-ITC 00078900

6.5  Foreign Royalties.  Where royalties are due Genetics hereunder for sales of Licensed Products in a country where, by reason of currency regulations or taxes of any kind, it is impossible or illegal for Licensee, any Affiliate or sublicensee to transfer royalty payments to Genetics for Net Sales in that country, such royalties shall be deposited in whatever currency is allowable by the person or entity not able to make the transfer for the benefit or credit of Genetics in an accredited bank in that country that is acceptable to Genetics.

6.6.  Records.  Licensee shall keep, and shall require all Affiliates and sublicensees to keep, full, true and accurate books of accounts and other records containing all information and data which may be necessary to ascertain and verify the royalties payable hereunder.  During the term of this Agreement and for a period of one year following its termination, Genetics shall have the right from time to time (not to exceed twice during each calendar year) to inspect, or have an agent, accountant or other representative inspect such books, records and supporting data.

- 25 -

A 32233

AM-ITC 00078901



## Article VII.  PATENT AND KNOW-HOW INFRINGEMENT

### 7.1  Infringement

(a)  Each Party shall promptly report in writing to the other Party during the term of this Agreement any (i) known infringement or suspected infringement of any of the Patent Rights, or (ii) unauthorized use or misappropriation of Know-How or Confidential Information by a third party of which it becomes aware, and shall provide the other Party with all available evidence supporting said infringement, suspected infringement or unauthorized use or misappropriation.

(b)  Except as provided in paragraph (d) below, Licensee shall have the right and responsibility to initiate an infringement or other appropriate suit anywhere in the Territory against any third party who at any time has infringed, or is suspected of infringing, any of the Project Patent Rights or of using without proper authorization all or any portion of Project Know-How.  Licensee shall give Genetics

- 26 -

A 32234

AM-ITC 00078902

sufficient advance notice of its intent to file said suit and the reasons therefor, and shall provide Genetics with an opportunity to make suggestions and comments regarding such suit. Genetics agrees to take all the necessary steps to lawfully authorize Licensee to initiate and prosecute the said infringement or other suit. Licensee shall keep Genetics promptly informed, and shall from time to time consult with Genetics regarding the status of any such suit, and shall provide Genetics with a copy of all documents filed in, and all relevant communications relating to, such suit.

(c) Licensee shall have the sole and exclusive right to select counsel for any suit referred to in paragraph (b) above and shall, except as provided below, pay all expenses of the suit, including without limitation attorneys' fees and court costs. Genetics, in its sole discretion, may elect, within sixty days after the commencement of such litigation, to contribute to the costs incurred by Licensee in connection with such litigation and, if it so elects, any damages, royalties, settlement fees or other consideration received by Licensee or any of its Affiliates as a result of such litigation shall be shared by Licensee and Genetics pro rata based on their respective sharing of the costs of such litigation. In the event that Genetics elects not to contribute to the costs of such litigation, Licensee and/or its Affiliates shall be entitled to retain any damages, royalties, settlement fees or other consideration resulting therefrom. If necessary, Genetics shall join as a party to the suit but shall be under no obligation to participate except to the extent that such participation is required as the result of being a named party to the suit. Genetics

- 27 -

A 32235

AM-ITC 00078903

shall offer reasonable assistance to Licensee in connection therewith, no charge to Licensee. Genetics shall have the right to participate and be represented in any such suit by its own counsel at its own expense. Licensee shall not settle any such suit involving rights of Genetics without obtaining the prior written consent of Genetics which consent shall not be unreasonably withheld.

(d) In the event that Licensee elects not to initiate a infringement or other appropriate suit pursuant to paragraph (c) above, Licensee shall promptly advise Genetics of its intent not to initiate such suit, and Genetics shall have the right, at the expense of Genetics, of initiating an infringement or other appropriate suit against any third party who at any time has infringed, or is suspected of infringing, any of Project Patent Rights or of using without proper authorization all or any portion of Project Know-How. In exercising its rights pursuant to this paragraph (d), Genetics shall have the sole and exclusive right to select counsel and shall, except as provided below, pay all expenses of the suit including without limitation attorneys' fees and court costs. Licensee, in its sole discretion, may elect, within sixty days after the commencement of such litigation, to contribute to the costs incurred by Genetics in connection with such litigation and, if it so elects, any damages, royalties, settlement fees or other consideration received by Genetics as a result of such litigation shall be shared by Genetics and Licensee pro rata based on their respective sharing of the costs of such litigation. In the event that Licensee elects not to contribute to the costs of such litigation, Genetics shall be entitled to retain any

- 28 -

A 32236

AM-ITC 00078904

damages, royalties, settlement fees or other consideration resulting therefrom. If necessary, Licensee shall join as a party to the suit but shall be under no obligation to participate except to the extent that such participation is required as a result of being a named party to the suit. At Genetics' request, Licensee shall offer reasonable assistance to Genetics in connection therewith at no charge to Genetics. Licensee shall have the right to participate and be represented in any suit by its own counsel at its own expense.

7.2 Claimed Infringement.

(a) In the event that a third party at any time brings suit against Licensee, its Affiliates, or sublicensees anywhere in the territory claiming infringement of its patent rights or unauthorized use or misappropriation of its technology, based on a claim arising out of the manufacture, use or sale by Licensee, its Affiliates, or sublicensees of Licensed Compound and/or Licensed Products, Licensee shall have sole and exclusive responsibility for the selection of counsel and the control of the suit, and shall keep Genetics informed of the current status of the suit.

(b) Licensee shall, after receipt of notification of a third party claim or notice of commencement of any action, suit or proceeding of the type described in paragraph (a) above, notify Genetics of such claim or the commencement of said action, suit or proceeding, enclosing a copy of all papers served. Genetics may participate in

- 29 -

A 32237

AM-ITC 00078905

the conduct of the suit at its own expense.  Licensee shall no ap.
any such suit involving rights of Genetics without obtaining the pa.
written consent of Genetics, which consent shall not be unreaso.
withheld.

(c)  Irrespective of the decision of Genetics to participate : ~
suit or not pursuant to the preceeding subsection (b), Gen.
agrees to extend Licensee, at no charge, its best possible techn.
assistance and support to enable Licensee to defend and/or prosec.
any action, suit or proceeding by any third party.

## Article VIII.  COMMERCIALIZATION

8.1  Commercialization.  Promptly and diligently upon co
completion of the Final Benchmark, Licensee shall exert its bes
effort, at its own expense, to:

(a)  conduct all necessary and appropriate animal and huma
testing on the Licensed Compounds and Licensed Products, g:
control the manner and extent of such testing;

(b)  provide for commercial scale production of the License
Compounds and Licensed Products;

- 30 -

A 32238

AM-ITC 00078906

(c) obtain Government Approvals necessary to produce, manufacture, distribute and market the Licensed Compounds and/or Licensed Products in the Territory; and

(d) market the Licensed Compounds and/or Licensed Products in the Territory on a diligent commercial basis on a country-by-country basis after Government Approval.

8.2 Reporting. Licensee shall send Genetics from time to time a report in writing on progress in the development and marketing of Licensed Compounds and/or Licensed Products in the Territory.

## Article IX. CONFIDENTIAL INFORMATION

9.1 Treatment of Confidential Information. Each Party hereto shall maintain the Confidential Information of the other Party in confidence, and shall not disclose, divulge or otherwise communicate such Confidential Information to others, or use it for any purpose, except pursuant to, and in order to carry out, the terms and objectives of this Agreement and hereby agrees to exercise every reasonable precaution to prevent and restrain the unauthorized disclosure of such Confidential Information by any of its directors, officers, employees, consultants, Affiliates, subcontractors, sublicensees, distributors or agents. Notwithstanding the foregoing, parties may disclose Confidential Information pertaining to the Project, the obtaining of regulatory approvals and the development of

- 31 -

A 32239

05029227

AM-ITC 00078907

Licensed Products in confidence to other licensees or _____ sponsors in the field of erythropoietin for use outside the Territory

9.2 **Release from Restrictions.** The provisions of Section ____ shall not apply to any Confidential Information disclosed hereunder which:

(a) was known or used by the receiving Party prior to its ____ of disclosure to the receiving Party, as evidenced by the ____ written records of the receiving Party; or

(b) either before or after the date of the disclosure to ____ receiving Party is lawfully disclosed to the receiving Party by ____ independent, unaffiliated third party rightfully in possession of ____ Confidential Information; or

(c) either before or after the date of the disclosure to ____ receiving Party becomes published or generally known to the ____ through no fault or omission on the party of the receiving Party ____ its Affiliates; or

(d) is required to be disclosed by the receiving Party to ____ with applicable laws, to defend or prosecute litigation or to ____ with governmental regulations, **provided** **that** the receiving ____ provides prior written notice of such disclosure to the other ____ and takes reasonable and lawful actions to avoid and/or minimize ____ degree of such disclosure.

- 32 -

A 32240

AM-ITC 00078908

es or research
the Territory.

of Section 9.1

losed hereunder

prior to its date
d by the prior

disclosure to the
ng Party by a
possession of the

disclosure to the
wn to the public
sceiving Party a

g Party to comp
ion or to comp
receiving Par
the other Par
d/or minimize

9.3  Publications.  The following restrictions shall apply with respect to the disclosure in scientific journals or publications by any party or any Affiliate, employee, sublicensee, consultant, or agent of any Party relating to any scientific work performed as part of the project:

(a)  A Party (the "publishing Party") shall provide the other party with an advance copy of any proposed publications of results arising from the Project, and such other Party shall have a reasonable opportunity to recommend any changes it reasonably believes are necessary to preserve Patent Rights or Know-How belonging in whole or in part to Genetics or Licensee, and the incorporation of such recommended changes shall not be unreasonably refused; and

(b)  If such other Party informs the publishing Party, within 30 days of receipt of an advance copy of a proposed publication, that such publication in its reasonable judgment could be expected to have a material adverse effect on any Patent Rights or Know-How belonging in whole or in part to Genetics and/or Licensee, the publishing Party shall, to the extent permitted by its agreements with its employees and consultants, delay or prevent such publication as proposed.  In the case of inventions, the delay shall be sufficiently long to permit the timely preparation and filing of a patent application(s) on the information involved.

- 33 -

A 32241

## Article X.  TERMINATION

10.1  Term.  This Agreement shall remain in effect until terminated in accordance with the provisions of Section 3.3, this Article X or until the last to expire of the licenses granted pursuant to Section 5.1. and 5.2. hereof.

10.2  Termination for Breach.  Each Party shall be entitled to terminate this Agreement by written notice to the other Party in the event that the other Party shall be in default of any of its obligations hereunder, and shall fail to remedy any such default within 60 days after notice thereof by the non-breaching Party.  Upon termination of this Agreement pursuant to this Section 10.2. neither Party shall be relieved of any obligations incurred prior to such termination.

10.3 Termination by Licensee.  Licensee shall be entitled to terminate this Agreement pursuant to the provisions of Section 3.3.

10.4  Termination by Genetics of Exclusivity.  In the event that (a) Licensee fails to make any required minimum royalty payment within 30 days of the date such payment is due, or (b) Licensee fails to comply with Section 8.1 of this Agreement, or (c) Licensee, any of its affiliates or any of its sublicensees fails to

- 34 -

A 32242

5029230



(i)   Genetics shall receive from Licensee non-exclusive rights in and to Licensee Technology (as described in Section 4.2.), animal and human data, and to such other information in Licensee's possession that Genetics may require in order to obtain Government Approval to manufacture and market the Licensed Compounds and/or Licensed Products;

(ii)  All licenses granted herein by Genetics to Licensee shall become non-exclusive; and

(iii) All other terms and conditions of the Agreement not inconsistent with this Section 10.4. including the royalty provisions, shall remain in effect.

10.5  Disposition of Licensed Products.  Upon any termination of the Agreement pursuant to Sections 10.2. Licensee shall within 30 days of the effective date of such termination notify Genetics in writing of the amount of Licensed Compounds and/or Licensed Products which Licensee and its Affiliates and sublicensees then have completed on hand, the sale of which would, but for the termination, be subject to royalty, and Licensee, its Affiliates and

- 35 -

A 32243

AM-ITC 00078911

sublicensees shall thereupon be permitted during the six
following such termination to sell that amount of Licensed Comp...
and/or Licensed Products, provided that Licensee shall pay b
aggregate royalty thereon at the conclusion of the earlier of the e...
such sale or such six months period.  Except as provided above...
sublicenses granted by Licensee shall forthwith terminate upon...
termination of this Agreement.

10.6  Survival of Obligations:  Return of Confidential

Information.  Notwithstanding any termination of th...
Agreement, the obligations of the Parties with respect to th...
protection and non-disclosure of Confidential Information shall surv...
and continue to be enforceable.  Upon any termination of th...
Agreement pursuant to Section 10.2., 10.3. or 10.4, each Party sha...
promptly return to the other Party all written Confiden...
Information, and all copies thereof, of the other Party.  If Licens...
elects to terminate this Agreement pursuant to Section 10.3. or...
Genetics elects to terminate this Agreement pursuant to Section 10....
all rights in the Total Technology shall remain and vest in Genetic...
If Licensee elects to terminate this Agreement pursuant to Section...
10.2, Licensee shall be entitled to use the Joint Technology and sh...
not be obligated to pay a royalty to Genetics for such use.

Article XI.  ...

11.1  ...
imposed by t...
fee and/or...
therefrom.  ...
Licensee sha...
tax office ...
evidencing ...

11.2  ...
news relea...
to this Ag...
between th...
Party exce...

11.3  ...
or obligati...
prior writ...
acquires a...
by merger...

11.4  ...
interprete...
Massachu...

- 36 -

050292932

A 32244

AM-ITC 00078912

Article XI.  MISCELLANEOUS

11.1  Withholding Tax.  If any income or other taxes are imposed by the Japanese government on the payments of the Research fee and/or of the royalties and are required to be withheld therefrom, such taxes shall be withheld for the account of Genetics. Licensee shall pay such taxes on behalf of Genetics to the appropriate tax office of Japan and shall furnish Genetics with the certificate evidencing each payment of tax so made by Licensee.

11.2  Publicity.  Neither Party shall originate any publicity, news release or other public announcement, written or oral, relating to this Agreement, the Project of the existence of an arrangement between the Parties, without the prior written approval of the other Party except as otherwise required by law.

11.3  Assignment.  Neither this Agreement nor any of the rights or obligations hereunder may be assigned by either Party without the prior written consent of the other Party, except to a party who acquires all or substantially all of the business of the assigning Party by merger, sale of assets or otherwise.

11.4  Governing Law.  This Agreement shall be governed by and interpreted in accordance with the laws of the Commonwealth of Massachusetts.

- 37 -

A 32245

AM-ITC 00078913

11.5 <u>Force Majeure</u>. In the event that Genetics is prevented from performing or is unable to perform any of its obligations under this Agreement due to any act of God; fire; casualty; flood; strike; lockout, failure of public utilities; injunction or any other exercise, assertion or requirement of governmental authority, including any governmental law, order or regulation permanently or temporarily prohibiting or reducing the level of research, development or production work hereunder epidemic; inability to procure materials labor, equipment, transportation or energy sufficient to meet experimentation; or any other cause beyond the reasonable control of Genetics, if Genetics shall have used its best efforts to avoid such occurrence, Genetics shall give notice to Licensee in writing promptly, and thereupon the performance by Genetics shall be excused and the time for performance shall be extended for the period of delay or inability to perform due to such occurrence. Upon receipt of such notice from Genetics, Licensee may extend the <u>Payment Schedule B</u> hereto for the period of delay or inability of Genetics to perform its obligations under this Agreement or terminate this Agreement with immediate effect, without liability to Genetics as a result thereof.

11.6 <u>Waiver</u>. The waiver by either Party of a breach or default of any provision of this Agreement by the other Party shall not be construed as a waiver of any succeeding breach of the same or any other provision, nor shall any delay or omission on the part of either party to exercise or avail itself of any right, power or

privilege that any right, po...

11.7 No... with this Ag... sall. return to the addre... the addressee addressor.

If to G
  G
  2:
  B
  A

If to

11.8
either Pa
both Pa
c...

A 32246

AM—ITC 00078914

privilege that it has or may have hereunder operate as a waiver of any right, power or privilege by such Party.

11.7  Notice.  Any notice or other communication in connection with this Agreement must be in writing and if by mail, by certified mail, return receipt requested, and shall be effective when delivered to the addressee at the address listed below or such other address as the addressee shall have specified in a notice actually received by the addressor.

If to Genetics:

> Genetics Institute, Inc.
>
> 225 Longwood Avenue
>
> Boston, Massahcusetts  02115
>
> Attention:  President

If to Licensee:

> Chugai Pharmaceutical Co., Ltd.
>
> 1-9, Kyobashi 2-chome, Chuo-ku,
>
> Tokyo, 104 Japan
>
> Attention:_____

11.8  No Agency.  Nothing herein shall be deemed to constitute either Party as the agent or representative of the other Party, or both Parties as joint venturers or partners for any purpose. Genetics shall be an independent contractor, not an employee or partner Licensee, and the manner in which Genetics renders its

- 39 -

A 32247

AM-ITC 00078915

services under this Agreement shall be within Genetic's discretion. Neither Party shall be responsible for the acts or omissions of the other Party, and neither Party will have authority to speak for, represent or obligate the other Party in any way without prior written authority from the other Party.

11.9  Headings.  The headings contained in this Agreement are for convenience of reference only and shall not be considered in construing this Agreement.

11.10  Entire Agreement.  This Agreement and the Schedules hereto (which Schedules are deemed to be a part of this Agreement for all purposes) contain the full understanding of the Parties with respect to the subject matter hereof and supersede all prior understandings and writings relating thereto.  No waiver, alteration or modification of any of the provisions hereof shall be binding unless made in writing and signed by the Parties by their respective officers thereunto duly authorized.

11.11  Severability.  In the event that any provision of this Agreement is held by a court of competent jurisdiction to be unenforceable because it is invalid or in conflict with any law of any relevant jurisdiction, the validity of the remaining provisions shall not be effected, and the rights and obligations of the Parties shall be construed and enforced as if the Agreement did not contain the particular provisions held to be unenforceable.

- 40 -

A 32248

05029236

AM-ITC 00078916

11.12   Successors and Assigns.   This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their successors and permitted assigns.

11.13   Counterparts.   This Agreement may be executed in any number of counterparts, each of which shall be deemed an original but all which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as a sealed instrument in their names by their properly and duly authorized officers or representatives as of the date first above written.

(SEAL)                    GENETICS INSTITUTE, INC.

                          By: Gabriel Schmergel

(SEAL)                    CHUGAI PHARMACEUTICAL CO., LTD.

                          By: Kinio Uyeno
                              President

- 41 -

A 32249

05029237

AM-ITC 00078917



**SCHEDULE A**

**BENCHMARKS**

| Benchmark Identification Number | Description of Benchmark | Anticipated Completion Date |
|---|---|---|

Acknowledged:
GENETICS INSTITUTE INC.

By: _Gabriel Schmergel_
CHUGAI PHARMACEUTICAL CO., LTD.

By: _Kisin Uyeno_
President

A 32250

AM-ITC 00078918



SCHEDULE B

RESEARCH FEE

Total Amount:

Payment Schedule:

Materials to be
Delivered to
Licensee upon
Completion

ACKNOWLEDGED:

GENETICS INSTITUTE, INC.

by _Gabriel Schmergel_

CHUGAI PHARMACEUTICAL CO., LTD.

by _Kimio Uyeno_
   President

A 32251

AM-ITC 00078919

## SCHEDULE C

### TERRITORY

Japan
United States of America
Canada
Mexico
India
Nepal
Sri Lanka
Bhutan
Sikkim
Bangladesh
Burma
Thailand
Laos
Kampuchea (Cambodia)
Vietnam
Malaysia
Singapore
North Korea
South Korea
Hong Kong
Phillipines
Taiwan
Indonesia
Pakistan

Acknowledged:
GENETICS INSTITUTE, INC.

By: _Gabriel Schwegel_

CHUGAI PHARMACEUTICAL CO., LTD.

By: _Kimio Uyeno_
      President

A 32252

05029240

AM-ITC 00078920

## SCHEDULE D

## PATENT RIGHTS

List of Genetics Patent Rights



Acknowledged:
GENETICS INSTITUTE, INC.

By: _Gabriel Schweigel_

CHUGAI PHARMACEUTICAL CO., LTD

By: _Kimio Uyeno_
President

05029241

A 32253

AM-ITC 00078921

SCHEDULE E

PERFORMANCE BONUSES

Not applicable.

Acknowledged:
GENETICS INSTITUTE, INC.

By: _Gabriel Schmergel_

CHUGAI PHARMACEUTICAL CO., LTD.

By: _Kimio Ueno_
      President

05029242

A 32254

AM-ITC 00078922

## SCHEDULE F

### ROYALTIES/MINIMUM ROYALTIES

1. <u>Royalties-Patent Rights and Know-How</u>



2. <u>Project Know-How Exclusivity Royalty (Section 6.1 (e)):</u>



3. <u>Minimum royalties</u>



Acknowledged:
ZENETICS INSTITUTE, INC.

By: *Gabriel Schmugel*

JRGAI PHARMACEUTICAL CO., LTD.
By: *Kinio Ugeno*
President

A 32255

05029243