Amgen Inc. v. F. Hoffmann-LaRoche LTD et al Doc. 878 Att. 8

# EXHIBIT 8

Dockets.Justia.com





CONFIDENTIAL MATERIAL OMITTED AND FILED SEPARATELY WITH THE SECURITIES AND EXCHANGE COMMISSION. ASTERISKS DENOTE SUCH OMISSIONS

# DEVELOPMENT AND LICENSE AGREEMENT

Between

BOEHRINGER MANNHEIM GMBH
Sandhofer Strasse 116
D-6800 Mannheim 31
Federal Republic of Germany

(in the following referred to as "BM")

And

GENETICS INSTITUTE, INC.
87 CambridgePark Drive
Cambridge, Massachusetts 02140
U.S.A.

(in the following referred to as "GI")

A 73220

TABLE OF CONTENTS

Introduction ..........................................

Article 1. DEFINITIONS

1.1 Affiliate ..........................................
1.2 Chugai..........................................
1.3 * ..........................................
1.4 ..........................................
1.5 Chugai Research Project..........................................
1.6 Benchmark ..........................................
1.7 COMECON Countries..........................................
1.8 Confidential Information ..........................................
1.9 Effective Date ..........................................
1.10 Final Benchmark ..........................................
1.11 Know-How ..........................................
1.12 Patent Rights ..........................................
1.13 GMP Materials ..........................................
1.14 Government Regulatory Agency ..........................................
1.15 Improvements ..........................................
1.16 Licensed Compounds ..........................................
1.17 Licensed Products ..........................................
1.18 Net Sales ..........................................
1.19 Party ..........................................
1.20 Principal Investigator ..........................................
1.21 Project ..........................................
1.22 Research Fee ..........................................
1.23 Sole Technology ..........................................
1.24 Territory ..........................................
1.25 Valid Claim ..........................................

Article 2. THE PROJECT

2.1 General ..........................................
2.2 Inspection ..........................................
2.3 Laboratory Facilities ..........................................
2.4 Patent and Confidential Information Agreements..........
2.5 Progress Reports ..........................................
2.6 Disclosure ..........................................
2.7 Flexibility ..........................................
2.8 Commercialization ..........................................
2.9 Completion of Benchmarks ..........................................
2.10 Arrangements with Third Parties ..........................................

Article
3.1
3.2
Article
4.
4.
4.
Article
5.1
5.2
5.3
5.4
5.5
5.6
5.7
5.8
5.9
5.1
Article
6.1
6.2
6.3
Article
7.1
7.2
7.3
7.4
7.5
7.6
Article
8.1
8.2
8.3
Article
9.1
9.2
9.3
9.4

A 73221

Article 3. PROJECT FUNDING

3.1 Research Fee ....................................7
3.2 Reimbursement of Additional Expenses ............8

Article 4. CONFIDENTIAL INFORMATION

4.1 Treatment of Confidential Information ...........8
4.2 Release from Restrictions .......................8
4.3 Publications ....................................9

Article 5. INTELLECTUAL PROPERTY RIGHTS

5.1 Sole Technology .................................9
5.2 Licensee Technology .............................9
5.3 Joint Technology ................................9
5.4 Improvements ....................................10
5.5 Responsibility for Protection of Technology .....10
5.6 Right of BM to Prosecute Applications ...........10
5.7 Mutual Assistance ...............................11
5.8 Infringement ....................................11
5.9 Claimed Infringement ............................13
5.10 * ..............................................14

Article 6. PATENT AND KNOW-HOW LICENSES

6.1 Patent Licenses .................................14
6.2 Know-How Licenses................................15
6.3 Sublicenses .....................................15

Article 7. PATENT AND KNOW-HOW ROYALTIES

7.1 Royalties .......................................15
7.2 Minimum Royalty..................................16
7.3 Reports and Payment .............................16
7.4 Certain Foreign Royalties .......................17
7.5 Records .........................................17
7.6 Dominant Patents ................................17

Article 8. MANUFACTURING RIGHTS

8.1 Pre-Commercialization Rights.....................17
8.2 Commercial Supply of Licensed Products ..........18
8.3 Technical Assistance ............................18

Article 9. TERMINATION

9.1 Term.............................................19
9.2 Termination for Breach ..........................19
9.3 Termination by GI of Exclusivity.................19
9.4 Survival of Obligations; Return of Confidential Information.........................20

A 73222

Article 10. MISCELLANEOUS

10.1 Product Liability Indemnification..............

10.2 Publicity ..........................................

10.3 Assignment ........................................

10.4 Governing Law......................................

10.5 Force Majeure......................................

10.6 Waiver ..............................................

10.7 Notices ..............................................

10.8 No Agency..........................................

10.9 Entire Agreement..................................

10.10 Headings ...........................................

10.11 Severability .......................................

10.12 Successors and Assigns...........................

10.13 Counterparts.......................................

SCHEDULE A Benchmarks

SCHEDULE B Territory

SCHEDULE C COMECON Countries

SCHEDULE D Minimum Royalty

SCHEDULE E Bonus Payment

SCHEDULE F Pre-Commercialization Supply of Licensed Compound

SCHEDULE G Production Schedule

AGREEMENT dated as of October 8, 1985 between GENETICS INSTITUTE, INC., a Delaware corporation, having its principal place of business at 87 CambridgePark Drive, Cambridge, Massachusetts 02140, U.S.A. (hereinafter referred to as "GI"), and BOEHRINGER MANNHEIM GMBH, a corporation having its principal place of business at Sandhofer Strasse 116, D-6800 Mannheim 31, Federal Republic of Germany, (hereinafter referred to as "BM").

INTRODUCTION

GI has and maintains research and development facilities and experienced scientists, research associates and assistants and other personnel which enables it to conduct research and development activities in the area of recombinant DNA technology and the application thereof to the development, production and processing of recombinant DNA and to the production and expression of products using that technology.

Licensed

BM desires that GI, on behalf of and in collaboration with BM, undertake a research and development project utilizing recombinant DNA technology for producing erythropoietin on a commercially feasible basis for use in humans. In return for certain rights under the patents and Know-how developed by GI, BM will financially support the research and development activities of GI and will pay GI the royalties provided for herein.

GI is willing, for the consideration and on the terms set forth herein, to use its research and development facilities and scientists as well as GI patents and Know-how, research associates and technicians and other personnel to conduct the Project (as defined below).

In consideration of the mutual covenants and promises contained in this Agreement and other good and valuable considerations, GI and BM agree as follows:

Article 1. Definitions

As used in this Agreement, the following terms, whether used in the singular or plural, shall have the following meanings:

A 73224

1.1 "Affiliate" means any corporation, company, partnership, joint venture and/or firm which controls, is controlled by or is under common control with either Party or with either Party's shareholders; without limiting the generality of the foregoing, control shall mean:

a) in the case of corporate entities, direct or indirect ownership of at least fifty percent (50%) of the stock or shares entitled to vote for the election of directors, and

b) in the case of non-corporate entities, direct or indirect ownership of at least fifty percent (50%) of the equity interest with the power to direct the management and policies of such non-corporate entities.

1.2 "Chugai" shall mean Chugai Pharmaceutical Co. Ltd. with whom GI has entered into an agreement relating to the development of erythropoietin.

1.3*

1.4*

1.5 "Chugai Research Project" shall mean the research program conducted by GI and Chugai pursuant to the terms of the agreement dated as of June 29, 1984.

1.6 "Benchmarks" shall mean the sequential research and development steps of the Project, as set forth in Schedule A to this Agreement.

1.7 "COMECON Countries" shall mean the countries and territories specified in Schedule C hereto.

1.8 "Confidential Information" shall mean Know-how as defined in Section 1.11 below, and any other information designated by the disclosing party as confidential or proprietary, whether or not related to the production or expression of Licensed Compound and/or Licensed Products.

1.9 "Effective Date" shall mean the date on which this agreement is executed and completely signed by both parties.

1.10 "Final Benchmark" shall mean the last of the sequential research and development steps of the Project as set forth in Schedule A hereto.

1.1 ... pat... producti... erythrop... products... informat... enable ... Licensed... a) ... b)

1. ... Territo... World ... to enal... or Lic... contin... extens...

1 the st... in qua... agreed Benchm...

1 govern... respon... market...

1 or no... during in the

A 73225

A073225 AM-ITC 00119898

1.11 "Know-How" shall mean all technical information of GI, patentable or otherwise, relating to the expression and production of erythropoietin, the cloning of genes coding for erythropoietin or precursors thereof, and/or procedures and products used in developing such a cloned gene, which information is used by GI in the Project and is required to enable BM to manufacture and/or sell the Licensed Compound or Licensed Product, including without limitation:

a) such information which is licensed or sublicensed to or obtained by GI including

(to the extent that GI is entitled to license or sublicense such information to others); and

b) all inventions, cell sources, cultures, strains, organisms and parts thereof, plasmids, clones, vectors, progeny, derivatives and parts thereof, formulae, methods, procedures, processes, materials, reagents, components, equipment, equipment design, animal studies, clinical or other evaluations, analytical results, and quality control or safety procedures which have been, are or shall be developed, isolated, purified, constructed or improved by GI relating to the production, use or manufacture of the Licensed Compound and/or to the development of cloned genes coding for erythropoietin or precursors thereof.

1.12 "Patent Rights" shall mean all patent rights in the Territory

and all patents throughout the world based on subject matter used in the Project and required to enable BM to manufacture and/or sell the Licensed Compound or Licensed Product, including any additions, divisions, continuations, continuations-in-part, substitutions, extensions, renewals or reissues thereof or therefore.

1.13 "GMP Materials" shall mean erythropoietin meeting the standards of "good manufacturing practice" and sufficient in quality for use in connection with clinical trials, as agreed upon by the parties separately before conclusion of Benchmark II.

1.14 "Government Regulatory Agency" shall mean the governmental agency in each country in the Territory responsible for reviewing and approving the development or marketing of Licensed Products.

1.15 "Improvements" shall mean any information, whether or not patentable, developed or acquired by either Party during the term of this Agreement which is used by such party in the manufacture of Licensed Compound. With regard to GI,

the term "Improvements" shall refer only to inform... developed or acquired by GI following the completion o... Final Benchmark.

With regard to BM, "Improvement" shall mea... information directly related to the established product... Licensed Compound at BM's facilities and developed after ... establishment.

1.16 "Licensed Compounds" shall mean any and all kind... human erythropoietin consisting *

which, or the making or ... which, is covered by a Valid Claim of any of the Patent ... and/or embodies any Know-how.

1.17 "Licensed Products" shall mean any and all kinds ... formulations, mixtures and/or compositions for whatever ... which contain Licensed Compound.

1.18 "Net Sales" shall mean the amount inv... (exclusive of value added taxes) by BM to wholesalers or ... users of Licensed Products and Licensed Compounds, less ... lump sum of * to cover all usual deduct... such as credits for returns, cash, trade or other discou... transportation charges, allowances, etc.

In case of distribution of the Licensed Products ... Affiliates or sublicensees of BM, Net Sales shall have ... meaning as defined above.

For countries where BM is only represented by unrel... distributors supplied by BM with finished goods, the royal... shall be calculated on BM's Net Sales to such distributor.

Net Sales shall not include any transfer between BM ... any of its Affiliates or sublicensees for resale but sh... include the resale from an Affiliate or sublicensee to ... independent third party or use by the Affiliate ... sublicensee.

Any commercial use of the Licensed Compounds or Lic... Products by BM, its Affiliates or sublicensees in a commerc... transaction with a third party, in which no invoice is issue... shall be considered a sale hereunder for royalty ... accounting purposes and Net Sales for such use shall be ... average price of arms' length sales by BM, its Affiliates o... sublicensees during the royalty reporting period in which ... use occurs, or if no such sales occurred in such period, ... the last period in which such arms' length sales occurred.

1.19 "Party" shall mean GI or BM; "Parties shall mean ... and BM".

1.20 "Pri... scientist, res... of any other P...

1.21 "Pro... the effect... the Final Ben... and performed... as well as... recombinant E... PO.

1.22 "Re... the Project ... accordance wi...

1.23 "S...

1.24 "T... specified in...

1.25 "V... patent or i... withdrawn, ... court of ... unappealable...

2.1 G... contained i... Date, to ur... the objecti... in the comp...

2.2 I... arrange for... the Projec... laboratorie... in detail ... other Part... business ... operations...

2.3 ... suitable ... be perform...

2.4 ... shall re... scientists... and techn... agreement...

A 73227

1.20 "Principal Investigator" shall mean the senior scientist, responsible vice president for process development, or any other person agreed upon between the parties.

1.21 "Project" shall mean the research program commencing on the effective date and terminating with the completion of the Final Benchmark conceived, planned, organized, controlled and performed by GI for development of production technology as well as manufacture of Licensed Compound by means of recombinant DNA following the latest standard of science and art.

1.22 "Research Fee" shall mean the agreed upon cost of the Project to be paid by BM to GI in the manner and in accordance with the schedule set forth in Article 3 hereof.

1.23 "Sole Technology" is defined in Section 5.1 hereof.

1.24 "Territory" shall mean the countries and territories specified in Schedule B and C hereto.

1.25 "Valid Claim" shall mean a claim of an unexpired patent or inventor's certificate which shall not have been withdrawn, cancelled or disclaimed, nor held invalid by a court of competent jurisdiction in an unappealed or unappealable decision.

Article 2 THE PROJECT

2.1 General. Subject to the terms and conditions contained in this Agreement, GI agrees, as of the Effective Date, to undertake the Project on a best efforts basis, with the objective of completing each Benchmark and/or assisting BM in the completion of each Benchmark, as the case may be.

2.2 Inspection. Each Party shall have the right to arrange for its employees and outside consultants involved in the Project to visit the other Party at its offices and laboratories, and to discuss the Project work and its results in detail with the technical personnel and consultants of the other Party; provided that such visits shall be during normal business hours and shall not unreasonably interrupt the operations of the other Party.

2.3 Laboratory Facilities. GI agrees to furnish suitable laboratory facilities and equipment for the work to be performed in connection with the Project.

2.4 Patent and Confidential Information Agreements. GI shall require the Principal Investigator, and all GI scientists, research associates and assistants, technicians and technical personnel assigned to the Project to execute an agreement for the assignment of inventions and for the

A 73228

AM-ITC 00119901

A073228

protection of Know-How and Confidential Information in ... reasonable form as may from time to time be used by G... such purpose.

BM shall require all scientific and other emp... working on or involved in the Project, to be similarly ... by written agreement.

2.5 Progress Reports. Each Party shall provide ... other Party with written progress reports summarizing ... technological, clinical testing and marketing progress of ... Project within 30 days after the end of each six ... period, starting with January 1, 1986.

For a six months period in which a Benchmark is comple... the report of the applicable Party will include a final re... on the attainment of such Benchmark.

2.6 Disclosure. GI shall disclose all Know-How as ... as the production clone in confidence to BM 30 days follow... the signature of the Agreement or immediately after obtai... them to enable BM to manufacture and produce Licensed Compo... as well as Licensed Products.

BM shall disclose in confidence to GI all animal stud... human studies and other tests or submissions to Govern... Regulatory Agencies arising from the Project, after hav... obtained such data, results and documents. GI may uti... such information outside the Territory only if agreed upo... writing between the Parties case by case.

2.7 Flexibility. In carrying out the research which ... will conduct in the course of the Project, GI shall have ... maintain sufficient flexibility to shift effort and emphas... within the overall scope of such Project in a manner ... will, in the opinion of the Principal Investigator, af... consultation with and giving due consideration to the adv... of BM, best result in the development of useful technolog... the production of the Licensed Compound.

2.8 Commercialization. Promptly and diligently af... GI's supply of GMP-material in an amount of at least ... BM shall exert its best efforts, at its own expense, to:

a) undertake and complete galenical developments ... the formulations to be used for clinical trials;

b) conduct all necessary and appropriate animal ... human testing and clinical trials on the Licens... Products, and control the manner and extent of ... testing;

c) provide for commercial scale production of ... Licensed Products;

d) ...

e) ...

2.9 ... completion ... Benchmark ... of such ... sufficient ... such othe... Such othe... Benchmark

2.10 ... right to ... performanc... for the ... provided ... comment o... If GI in ... Affiliate ... commercia... productio... Schedule ... Appro... withheld. ... such exec...

3.1 ... developme... regard to ... the amoun... Schedule ... non-refur... Paym... such none...

A 73229

d) prepare, file and prosecute all governmental applications for approvals necessary to produce, manufacture, distribute and market the Licensed Products in the Territory; and

e) market the Licensed Products in the Territory on a diligent commercial basis after approval by the applicable Government Regulatory Agency.

BM shall provide information to GI upon its reasonable request as to the status of its commercialization efforts under subsections a) through e) above.

2.9 Completion of Benchmarks. Promptly after the completion of each Benchmark, the Party completing such Benchmark (the "Notifying Party") shall notify the other Party of such completion and shall provide to such other Party sufficient written materials and samples in order to permit such other Party to evaluate completion of such Benchmark. Such other Party shall comment on the completion of such Benchmark within 45 days after receipt of such notice.

2.10 Arrangements with Third Parties. GI shall have the right to contract with third parties approved by BM for the performance of work in connection with the Project, as well as for the production of Licensed Compound for commercial use, provided that BM shall have the opportunity to review and comment on any such proposed contract prior to its execution. If GI intends to contract with third parties who are not affiliates of GI, the production of Licensed Compound for commercial use, then BM reserves the right to take over such production as set forth in this Agreement. In this event, Schedule G does not apply.

Approval of any such contract shall not be unreasonably withheld. GI will provide BM with a complete copy of each such executed contract.

## Article 3. PROJECT FUNDING

3.1 Research Fee. In consideration of the research, development and related activities undertaken by GI with respect to the Project, BM shall pay to GI the Research Fee in the amount and in the periodical installments set forth in Schedule A below, all such amounts to be firm and non-refundable.

Payments for each Benchmark shall be due only in case the Benchmark is satisfactorily completed.

A 73230

3.2 Reimbursement of Additional Expenses. In the ... that the transfer of technology from GI to BM to produce License Compound in quality as agreed upon exceeds projected time and cost budget as described in Article ... then GI shall be reimbursed by BM for its additional expenses to be agreed upon in writing case by case. GI shall keep ... and accurate records to substantiate all Additional Expenses invoiced to BM, including the date incurred and the nature thereof. Upon request from BM, GI shall permit BM ... authorized representatives to inspect such records ... confidence in order to verify the amount of Additional Expenses invoiced hereunder.

## Article 4. CONFIDENTIAL INFORMATION

4.1 Treatment of Confidential Information. Each Party hereto shall maintain the Confidential Information of the other Party in confidence, and shall not disclose, divulge or otherwise communicate such Confidential Information to others or use it for any purpose, except pursuant to, and in order to carry out, the terms and objectives of this Agreement, and hereby agrees to exercise every reasonable precaution to prevent and restrain the unauthorized disclosure of such Confidential Information by any of its directors, officers, employees, consultants, subcontractors, sublicensees or agents.

4.2 Release from Restrictions. The provisions of Section 4.1 shall not apply to any Confidential Information disclosed hereunder which:

a) was known or used by the receiving Party prior to its date of disclosure to the receiving Party, as evidenced by the prior written records of the receiving Party; or

b) either before or after the date of the disclosure to the receiving Party is lawfully disclosed to the receiving Party by an independent, unaffiliated third party rightfully in possession of the Confidential Information; or

c) either before or after the date of the disclosure to the receiving Party becomes published or generally known to the public through no fault or omission on the part of the receiving Party or its Affiliates; or

d) the receiving Party is required to disclose to comply with applicable laws, to defend or prosecute litigation or to comply with governmental regulations, provided that the receiving Party provides prior written notice of such disclosure ...

A 73231

the ... actio... discl...

4.3 Publi... ...ply with resp... ...plications by ... party relating ... project:

a) A Pa... othe... publ... such oppo... beli... Know... and sha...

b) If wit... pro... rea... mat... Kno... the... del... the... su... an... ti... in...

A...

5.1 Sc... title and I... developed (hereinafte...

5.2 L... title and I... and Know-H... consultants... Products an...

5.3 ... particular ... right, tit... rights in ... to practic... the Projec...

the other Party and takes reasonable and lawful actions to avoid and/or minimize the degree of such disclosure.

4.3 Publications. The following restrictions shall apply with respect to the disclosure in scientific journals or publications by any Party or any employee or consultant of any party relating to any scientific work performed as part of the project:

a) A Party (the "Publishing Party") shall provide the other Party with an advance copy of any proposed publication of results arising from the Project, and such other Party shall have a reasonable opportunity to recommend any changes it reasonably believes are necessary to preserve Patent Rights or Know-How belonging in whole or in part to GI or BM, and the incorporation of such recommended changes shall not be unreasonably refused; and

b) If such other Party informs the Publishing Party, within 30 days of receipt of an advance copy of a proposed publication, that such publication in its reasonable judgment could be expected to have a material adverse effect on any Patent Rights or Know-How belonging in whole or in part to GI or BM, the Publishing Party shall use its best efforts to delay or prevent such publications as proposed. In the case of inventions, the delay shall be sufficiently long to permit the timely preparation and filing of a patent application(s) or application(s) for a certificate of invention on the information involved.

Article 5. INTELLECTUAL PROPERTY RIGHTS

5.1 Sole Technology. GI shall own the entire right, title and interest in and to all Patent Rights and Know-How developed solely by employees or consultants of GI (hereinafter "Sole Technology").

5.2 Licensee Technology. BM shall own the entire right, title and interest in and to all patents, patent applications and Know-How of BM developed solely by employees or consultants of BM at any time which relate to Licensed Products and/or the Licensed Compound.

5.3 Joint Technology. Unless otherwise agreed in particular instances, the Parties shall own jointly the entire right, title and interest in and to all patent and other rights in any product, method or apparatus conceived, reduced to practice or developed jointly by GI and BM in the course of the Project (hereinafter "Joint Technology").

5.4 Improvements. To the extent that the Party develop an Improvement or otherwise acquire the right to grant a license covering any Improvements, each Party grants to the other a nonexclusive, non-transferable license, to make, have made and sell such Improvements solely in connection with the manufacture of Licensed Compound for the Territory in the Party's and its Affiliates' production facilities.

5.5 Responsibility for Protection of Technology.

a) Except as otherwise provided in this Agreement, GI shall have the responsibility on its own account to:

(i) maintain patent protection in any country within the Territory on any Sole Technology;

(ii) file for, procure and maintain patents in any country within the Territory on such Sole Technology; and

(iii) protect and enforce in the Territory any patents issued on any Sole Technology, subject to Section 5.8 below.

b) Copies of all substantive communications to and from United States and foreign patent offices regarding applications, patents or certificates of invention on any Sole Technology shall be provided to BM promptly after the receipt thereof; copies of proposed substantive communications to such patent offices shall, if practicable, be provided to BM sufficient time before the due date in order to enable BM to comment on the content thereof.

5.6 Right of BM to Prosecute Applications. If GI elects not to seek or continue to seek, use or maintain patent protection on any Sole Technology in any country within the Territory, BM shall have the right to file, procure, maintain and enforce in such countries patents on such Sole Technology. GI agrees to advise BM of all decisions taken under Section 5.5 (a) i)-iii) in a timely manner in order to allow BM to protect its rights under this Section 5.6.

If GI elects not to file a patent application or application for a certificate of invention, not to maintain a patent or certificate of invention, or to abandon a pending patent application or application for a certificate of invention, GI shall advise BM, and BM shall have the right but not the obligation, to file such application, maintain such patent or certificate of invention or continue to attempt to obtain protection on the subject matter disclosed in such pending application. GI shall pay the reasonable expenses of such activities for the countries A listed in Schedule B.

5.7 Mutual Assistance. Each Party shall make available to the other Party or its respective authorized attorneys, agents or representatives, such of its employees whom the other Party in its reasonable judgment deems necessary in order to assist such Party in obtaining patent protection for the Sole Technology and Joint Technology.

Each Party shall sign or use its best efforts to have signed all legal documents necessary to file and prosecute patent applications or applications for certificates of invention or to obtain or maintain patents or certificates of invention at no charge to the other Party.

5.8 Infringement.

a) Each Party shall promptly report in writing to the other Party during the term of this Agreement any (i) known infringement or suspected infringement of any of the Patent Rights, or (ii) unauthorized use or misappropriation of Know-How or Confidential Information by a third party of which it becomes aware, and shall provide the other Party with all available evidence supporting said infringement, suspected infringement or unauthorized use or misappropriation.

b) Except as provided in paragraph d) below, GI shall have the right to initiate an infringement or other appropriate suit anywhere in the Territory against any third party who at any time has infringed or is suspected of infringing, any of the Patent Rights or of using without proper authorization all or any portion of the Know-How. GI shall give BM sufficient advance notice of its intent to file said suit and the reasons therefor, and shall provide BM with an opportunity to make suggestions and comments regarding such suit. GI shall keep BM promptly informed, and shall from time to time consult with BM regarding the status of any such suit and shall provide BM with copies of all documents filed in, and all written communications relating to, such suit.

c) GI shall have the sole and exclusive right to select counsel for any suit referred to in paragraph b) above and shall, except as provided below, pay all expenses of the suit, including without limitation attorney's fees and court cost.

BM, in its sole discretion, may elect within 60 days after the commencement of litigation, to contribute to the costs incurred by GI in connection with such litigation and, if it so elects, any damages, royalties, settlement fees or other consideration received by GI, its Affiliates or sublicensees as a result of such litigation shall be shared by BM and GI pro rata their respective sharing of the costs of such litigation. In the event that BM elects not to contribute to the costs of such litigation, GI and/or its Affiliates shall be entitled to retain any damages, royalties, settlement fees or other consideration resulting therefrom. If necessary, BM shall join as a party to the suit but shall be under no obligation to participate except to the extent that such participation is required as the result of being named party to the suit. BM shall offer reasonable assistance to GI in connection therewith at no charge to GI except for reimbursement of reasonable out-of-pocket expenses, including salaries of BM personnel incurred in rendering such assistance.

BM shall have the right to participate and be represented in any such suit by its own counsel at its own expense. GI shall not settle any such suit involving rights of BM without obtaining the prior written consent of BM, which consent shall not be unreasonably withheld.

d) In the event that GI elects not to initiate an infringement or other appropriate suit pursuant to paragraph b) above, GI shall promptly advice BM of its intent not to initiate such suit, and BM shall have the right to initiate an infringement or other appropriate suit against any third party who at any time has infringed, or is suspected of infringing, any of the Patent Rights or of using without proper authorization all or any portion of the Know-How.

If BM decides in good faith and after consultation with GI to initiate such suit

5.9 Cl

a)

A 73235



In exercising its rights pursuant to this paragraph d), BM shall have the sole and exclusive right to select counsel and, except as provided below, shall pay all expenses of the suit including , without limitation attorney's fees and court costs. Any damages, royalties, settlement fees or other consideration received by BM as a result of such litigation shall be shared by GI and BM pro rata their respective sharing of the costs of such litigation.

If necessary, GI shall join as a party to the suit but shall be under no obligation to participate except to the extent that such participation is required as a result of being a named party to the suit. At BM's request, GI shall offer reasonable assistance to BM in connection therewith at no charge to BM except for reimbursement of reasonable out-of-pocket expenses, including salaries of GI's personnel, incurred in rendering such assistance.

GI shall have the right to participate and be represented in any such suit by its own counsel at its own expense. BM shall not settle any such suit involving rights of GI without obtaining the prior written consent of GI, which consent shall not be unreasonably withheld.

5.9 <u>Claimed Infringement</u>.

a) In the event that a third party at any time brings suit against BM, its Affiliates or sublicensees anywhere in the Territory claiming infringement of its patent rights or unauthorized use or misappropriation of its technology, based on a claim arising out of

the manufacture, use or sale by BM, its Affiliates or sublicensees of Licensed Products, BM shall have the sole and exclusive responsibility for the selection of counsel and the control of the suit, and shall keep GI informed of the current status of the suit.

b) BM shall, after receipt of notification of a third party claim or notice of commencement of any action, suit or proceeding of the type described in paragraph a) above, notify GI of such claim or the commencement of said action, suit or proceeding, enclosing a copy of all papers served. GI may participate in the conduct of the suit at its own expense.

5.10

Article 6. PATENT AND KNOW-HOW LICENSES

6.1 Patent Licenses. Subject to the payment of the royalty provided in Article 7 and the fulfillment of the other terms and conditions of this Agreement, GI hereby grants to BM and its Affiliates an exclusive license in the Territory under the Patent Rights, including the right to grant sublicenses for the sole and exclusive purpose of manufacturing, having manufactured for BM and its Affiliates, using and selling Licensed Products as well as Licensed Compound in the Territory, provided however, that such license insofar as it pertains to the manufacturing of Licensed Compound is subject to the provisions and limitations of Article 8 herein, provided further that the foregoing licenses shall be applicable to COMECON Countries but only to the extent that BM, its Affiliates and/or sublicensees sell, supply or otherwise provide Licensed Products in final, finished form to such COMECON Countries and not any information, Know-How or other data pertaining to the development, manufacture, and production of Licensed Products or Licensed Compound. Licenses granted pursuant to this Section 6.1 shall continue in effect until the expiration of the last Patent Right licensed to BM hereunder.

6.2 royalty p... terms and ... and its A... the Terri... the sole ... manufactu... Licensed ... provided ... the manuf... provision... further t... COMECON ... Affiliate... provide ... COMECON C... data pert... of License...

6.3 sublicense...

7.1

A 73237

A073237

AM-ITC 00119910

6.2 Know-How Licenses. Subject to the payment of the royalty provided in Article 7 and the fulfillment of the other terms and conditions of this Agreement, GI hereby grants to BM and its Affiliates an exclusive license to use the Know-How in the Territory, including the right to grant sublicenses, for the sole and exclusive purpose of manufacturing, having manufactured for BM and its Affiliates, using and selling Licensed Products and Licensed Compound in the Territory, provided however, that such license insofar as it pertains to the manufacturing of Licensed Compound is subject to the provisions and limitations of Article 8 herein, and provided further that the foregoing licenses shall be applicable to COMECON Countries but only to the extent that BM, its Affiliates and/or sublicensees sell, supply or otherwise provide Licensed Products in final, finished form in such COMECON Countries and not any information, Know-How or other data pertaining to the development, manufacture or production of Licensed Products, or Licensed Compound.

6.3 Sublicenses. GI shall be informed by BM of each sublicense granted.

Article 7. PATENT AND KNOW-HOW ROYALTIES

7.1 Royalties

a) BM shall pay to GI *

on all Net Sales made in the Territory by BM, its Affiliates and sublicensees of Licensed Products and Licensed Compound which involve a valid claim under the Patent Rights. Royalties shall be payable on a country by country basis with respect to Net Sales in each country of the Territory where there is a Valid Claim under Patent Rights, and in each country where the Licensed Products or Licensed Compound being sold were manufactured or are to be used in which there is a Valid Claim under Patent Rights.

b) BM shall pay to GI earned royalties of * based on all Net Sales anywhere in the Territory by BM, its Affiliates and sublicensees of Licensed Products or Licensed Compound which embody or utilize any of the Know-How. Royalties shall be payable under this subparagraph b) on a country by country basis for a period of * after *

c) Under no circumstances shall BM be obligated to pay royalties under both paragraphs a) and b) above; only one royalty shall be payable and due regardless how many patent rights are involved.

7.2 Minimum Royalty. Beginning with *

BM shall pay to GI the minimum annual royalty set forth in Schedule D hereto; provided that for the calendar year in which the minimum royalty commencement date occurs, the minimum annual royalty due shall be proportionately adjusted if the minimum royalty period for such year is less than the full calendar year.

In the event that the minimum annual royalties for a calendar year exceed the actual earned royalties for such calendar year, the difference between these amounts shall be due and payable within 60 days after the end of such calendar year.

Amounts by which earned royalties in any such year exceed the minimum royalty for such year shall not be credited against the minimum royalty due in any subsequent year, but may be set off against the minimum royalty due in the preceding year.

7.3 Reports and Payment. BM shall deliver to GI within 60 days after the end of each calendar quarter a written report showing its computation of royalties due under this Agreement upon Net Sales by BM, its Affiliates and its sublicensees during such calendar quarter. All Net Sales shall be segmented in each such report according to sales by BM, each Affiliate and each sublicensee, as well as on a country-by-country basis, including the rates of exchange used to convert such royalties into U.S. dollars from the currency in which such sales are made. For the purpose hereof, the rates of exchange to be used for converting royalties hereunder into U.S. dollars shall be the dollar rates officially in effect in the relevant country of the Territory at the date royalty payments are due and as shown in the royalty report.

BM, simultaneously with the delivery of each such report, shall tender payment in U.S. dollars of all royalties shown to be due thereon.

Any withholding tax shall be deducted by BM, provided that BM shall use its best efforts to obtain exemption from withholding tax to the extent such exemption is available. BM shall advise GI in advance of such withholding possibility in order for GI to assist if necessary in obtaining such exemption.

A 73239

A073239

AM-ITC 00119912

7.4 Certain Foreign Royalties. Where royalties are due to GI hereunder for sales of Licensed Products in a country where, by reason of currency regulations or taxes of any kind, it is impossible or illegal for BM, its Affiliates or sublicensees to transfer royalty payments to GI for Net Sales in that country, such royalties shall be deposited in whatever currency is allowable by the person or entity not able to make the transfer for the benefit or credit of GI in an accredited bank in that country that is acceptable to GI.

7.5 Records. BM shall keep, and shall require all Affiliates and sublicensees to keep, full, true and accurate books of accounts and other records containing all information and data which may be necessary to ascertain and verify the royalties payable hereunder for a period of 7 years from the date of creation of each such record. During the term of this Agreement and for a period of one year following its termination, GI shall have the right at its expenses from time to time (not to exceed twice during each calendar year) to inspect, or have an agent, accountant or other representative inspect, such books, records and supporting data.

7.6 Dominant Patents. The Parties recognize that the undertaking of the Project and the marketing of Licensed Products involves some degree of risks of patent infringement. The parties wish to share such risk in accordance with the provisions of this Section 7.6. Accordingly, if BM, its Affiliates or sublicensees, in order to operate under or exploit the licenses granted under Article 6 of this Agreement in any country of the Territory, must make payments (including without limitation royalties, option fees or license fees) to one or more third parties to obtain a license or similar right in the absence of which the Licensed Products or Licensed Compound could not legally be manufactured or sold in such country, BM may deduct from royalties thereafter payable to GI on Net Sales earned in such country only during the calendar year period in which BM makes such payment *

## Article 8. MANUFACTURING RIGHTS

8.1 Pre-Commercialization Rights. GI and/or its Affiliates shall exclusively manufacture for and supply to BM the entire amount of Licensed Compound required by BM for galenical developments, clinical trials or other non-commercial uses prior to commercialization of Licensed Products. Licensed Compound used for galenical developments, clinical trials or other non-commercial uses prior to commercialization will be supplied by GI to BM as outlined in Schedule F.

A 73240

8.2 Commercial Supply of Licensed ~~Products~~ COMPOUND. As long as BM has not exercised its right to manufacture the Licensed Compound, GI and/or its Affiliates shall supply BM exclusively with all its requirements of Licensed Compound in a quantity agreed upon in a separate supply agreement. The supply price shall not exceed *

If GI shall at any time agree to supply Licensed Compound to any third party outside the Territory on terms and conditions more favorable to such third party than the terms and conditions hereunder, GI shall notify BM of such more favorable terms and BM shall, upon written notice to GI given within 30 days after its receipt of GI's notice, be entitled to substitute the entire terms and conditions contained in such more favorable transaction for the comparable terms and conditions hereof.

8.3 Technical Assistance. GI shall, upon request from BM, make available to BM the Principal Investigator (to the extent available) and members of the technical staff of GI assigned to the Project in order to assist BM in the scale-up of operations and in the start up of BM's commercial production facilities for the manufacture of the requirements of BM and its Affiliates of Licensed Compounds, subject to the manufacturing rights granted to GI pursuant to Section 8. Details of technical assistance shall be agreed upon separately no later than 12 months prior to the date that BM exercises its right to manufacture pursuant to Section 8.1 above.

GI shall provide to BM detailed documentation on the processing conditions it uses for the production of Licensed Compound, following the latest standard applicable to GI's production at that time which shall include the cell line to be used, cell culture medium composition, environmental conditions for cell culture such as pH and temperature, purification processes as well as all specifications and quality control descriptions following the latest GLP-GMP

standard applicable at the date of transfer.

To assist BM in reaching quality control compliance at GI standards, GI shall make available to BM facility design and construction data as well as aseptic techniques and programs for regulating compliance which apply to the production of Licensed Compound.

GI shall not be responsible for assisting BM with matters not specifically related to the manufacturing of Licensed Compounds, such as matters generally practiced in the manufacture of biological materials. GI shall not be required to render more than * man hours of technical assistance to BM hereunder, unless otherwise agreed upon by the Parties.

In rendering such assistance GI shall be reimbursed for all direct and reasonable expenses such as hotel, transportation and meals incurred by GI personnel.

## Article 9. TERMINATION

9.1 Term. This Agreement shall become effective upon full execution and shall continue in full force and effect unless modified or terminated in accordance with any provision thereof for a period of * years as of BM's first commercial sale and/or the last patent to expire or until expiry of the license granted pursuant to Art. 6 whichever is longer.

9.2 Termination for Breach. Each Party shall be entitled to terminate the Agreement by written notice to the other Party in the event that the other Party shall be in default of any of its obligations hereunder, and shall fail to remedy any such default within 60 days after notice thereof by the non-breaching Party. Upon termination of this Agreement pursuant to this Section 9.2, neither Party shall be relieved of any obligations incurred prior to such termination.

BM reserves the right to terminate this Agreement forthwith,

- in the event that the use of the Licensed Product has in the opinion of BM a negative risk/benefit value in clinical use
- or GI shall become bankrupt, insolvent or make any arrangement with its creditors and/or a winding up order is made and/or if the business of GI shall be placed in the hands of a Receiver, Assignee or Trustee whether by voluntary act of GI or otherwise.

9.3 Termination by GI of Exclusivity. In the event that either

a) BM fails to make any required minimum royalty payment within 30 days of the date such payment is due, or

b) BM fails to comply with Section 2.8 of [illegible] Agreement, and

c) BM fails to remedy any such default with[illegible] days after written notice thereof by GI,

then upon written notice provided by GI [illegible]

(i) GI shall receive from BM non-exclusive [illegible] in and to BM's Know-how, technolog[illegible] described in Section 5.2), animal and [illegible] data, and to such other information in [illegible] possession that GI may require in order [illegible] obtain approval of the applicable Govern[illegible] Regulatory Agencies;

(ii) All licenses granted herein by GI to BM [illegible] become non-exclusive; and

(iii) All other terms and conditions of [illegible] Agreement not inconsistent with this Secti[illegible] 9.3, shall remain in effect, provided howev[illegible]

*

9.4 Survival of Obligations; Return of Confidential Information. Notwithstand[illegible] any termination of this Agreement, the obligations of [illegible] Parties with respect to the protection and non-disclosure [illegible] Confidential Information shall survive and continue to [illegible] enforceable. Upon any termination of this Agreement pursuan[illegible] to Sections 9.2, each Party shall promptly return to the other Party all written Confidential Information, and all copie[illegible] thereof, of the other Party.

## Article 10. MISCELLANEOUS

10.1 Product Liability Indemnification.

a) GI agrees to defend BM, its agents, director[illegible] officers and employees at GI's cost [illegible] expense, and will indemnify and hold BM [illegible] harmless, its agents, directors, officers [illegible] employees, from and against any and [illegible] losses, costs, damages, fees or expens[illegible] arising out of or in connection with [illegible] actual or alleged injury, damage or [illegible] consequence occurring to any person as [illegible] result of any negligence of GI in [illegible] manufacture of Licensed Compound whet[illegible] claimed by reason of breach of warranty,

10.2 [illegible] publicity, [illegible] or oral, [illegible] existence [illegible] prior wri[illegible] required [illegible]

10.3 [illegible] rights [illegible] Party wit[illegible] except to [illegible] the busi[illegible] or otherw[illegible]

10.4 [illegible] and inte[illegible] controver[illegible] Agreement [illegible] to arbit[illegible] language [illegible] Commerce [illegible] court. [illegible] exclusiv[illegible] Eac[illegible] giving [illegible] intentio[illegible] Party fa[illegible]

A 73243

negligence, product defect, or otherwise, and regardless of the form in which any such claim is made. In the event of any such claim against BM, or any agent, director, officer or employee by any party, BM shall promptly notify GI in writing of the claim, and GI shall manage and control at its sole expense the defense and the claim and its settlement. BM shall cooperate with GI and may at its options and expense, be represented in any such action or proceeding. GI shall not be liable for any litigation costs or expenses incurred by BM without GI's written authorization.

(b) BM undertakes to indemnify and hold GI harmless from and defend against any and all claims, actions or threat of action based upon or related to or arising from omissions, negligence or any wrongdoing of BM in the performance of this Agreement or the manufacture of the Licensed Compound and the manufacture, sales and distribution of the Licensed Products. BM shall bear the cost arising in connection herewith.

10.2 Publicity. Neither Party shall originate any publicity, news release or other public announcement, written or oral, relating to this Agreement, the Project or the existence of an arrangement between the Parties, without the prior written approval of the other Party except as otherwise required by law.

10.3 Assignment. Neither this Agreement nor any of the rights or obligations hereunder may be assigned by either Party without the prior written consent of the other Party, except to a party which acquires all or substantially all of the business of the assigning Party by merger, sale of assets or otherwise.

10.4 Governing Law. This Agreement shall be governed by and interpreted in accordance with Swiss Law. Any dispute, controversy, or claim arising out of or relating to this Agreement which cannot be amicably settled shall be referred to arbitration held in Zurich/Switzerland in the English language in accordance with the rules of the Chamber of Commerce of Zurich/Switzerland to the exclusion of any other court. The Court of Arbitration shall decide finally and exclusively.

Each Party shall name one arbitrator within 30 days of giving or receiving respectively written notice of the intention to apply to the Court of Arbitration. If either Party fails to designate its arbitrator within the stated

period of time, such arbitrator will be appointed by the President of the Zurich Chamber of Commerce, who shall also appoint the Chairman of the Court of Arbitration as well as two additional arbitrators proposed by the President of the Chamber of Commerce of Zurich/Switzerland, having regard to recommendations made by the previously named arbitrators.

The acceptance of the mandate by the Zurich Chamber of Commerce will be obtained by BM at BM's cost and shall serve as Schedule H of this Agreement.

10.5 Force Majeure. In the event that either Party is prevented from performing or is unable to perform any of its obligations under this Agreement due to any act of God, fire, casualty, flood, war, strike, lockout, failure of public utilities, injunction or any act, exercise, assertion or requirement of governmental authority, including any governmental law, order or regulation or any preliminary injunction permanently or temporarily prohibiting or reducing the level of research, development or production work hereunder or the manufacture, use or sale of Licensed Products; epidemic, destruction of production facilities, riots, insurrection, inability to procure or use materials, labor, equipment, transportation or energy sufficient to meet experimentation or manufacturing needs; or any other cause beyond the reasonable control of the Party invoking this Section 10.5 if such Party shall have used its best efforts to avoid such occurrence, such Party shall give notice to the other Party in writing promptly, and thereupon the affected Party's performance shall be excused and the time for performance shall be extended for the period of delay or inability to perform due to such occurrence.

10.6 Waiver. The waiver by either Party of a breach or default of any provision of this Agreement by the other Party shall not be construed as a waiver of any succeeding breach of the same or any other provision, nor shall any delay or omission on the part of either Party to exercise or avail itself of any right, power or privilege that it has or may have hereunder operate as a waiver of any right, power or privilege by such Party.

10.7 Notices. Any notice or other communication in connection with this Agreement must be in writing and if by mail, by certified mail, return receipt requested, and shall be effective when delivered to the addressee at the address listed below or such other address as the addressee shall have specified in a notice actually received by the addressor.

If t

Gene
87 C
Camb
U.S.
Atte

If t

Boeh
Sand
D-68
Fede
Atte

10.8
constitut
other Par
any purp
employee
its serv
discretic
or omiss
authorit
in any
Party.

10.9
hereto
Agreement
the Part
supersede
thereto.
provisio
signed b
duly aut

10.
are for
consider

10.
this Agr
be unenf
law of
remainin
obligati
is the
held to

If to GI:

Genetics Institute, Inc.
87 CambridgePark Drive
Cambridge, Massachusetts 02140
U.S.A.
Attention: President

If to BM:

Boehringer Mannheim GmbH
Sandhofer Strasse 116
D-6800 Mannheim 31
Federal Republic of Germany
Attention: Geschaeftsfuehrung

10.8 No Agency. Nothing herein shall be deemed to constitute either Party as the agent or representative of the other Party, or both Parties as joint ventures or partners for any purpose. GI shall be an independent contractor, not an employee or partner of BM, and the manner in which GI renders its services under this Agreement shall be within GI's sole discretion. Neither Party shall be responsible for the acts or omissions of the other Party, and neither Party will have authority to speak for, represent or obligate the other Party in any way without prior written authority from the other Party.

10.9 Entire Agreement. This Agreement and the Schedules hereto (which Schedules are deemed to be a part of this Agreement for all purposes) contain the full understanding of the Parties with respect to the subject matter hereof and supersede all prior understandings and writings relating thereto. No waiver, alteration or modification of any of the provisions hereof shall be binding unless made in writing and signed by the Parties by their respective officers thereunto duly authorized.

10.10 Headings. The headings contained in this Agreement are for convenience of reference only and shall not be considered in construing this Agreement.

10.11 Severability. In the event that any provision of this Agreement is held by a court of competent jurisdiction to be unenforceable because it is invalid or in conflict with any law of any relevant jurisdiction, the validity of the remaining provisions shall not be affected, and the rights and obligations of the Parties shall be construed and enforced as if the Agreement did not contain the particular provisions held to be unenforceable.

10.12 Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their successors and permitted assigns.

10.13 Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as a sealed instrument in their names by their properly and duly authorized officers or representatives as of the date first above written.

| Mannheim | Cambridge, |
|---|---|
| BOEHRINGER MANNHEIM GMBH ppa. | GENETICS INSTITUTE, INC. |
| Dr. Hobbins Prof. Dr. Abshagen | Gabriel Schmergel |

A 73247



SCHEDULE A

BENCHMARKS

| Description | Payment (in U.S. $) |
| --- | --- |
| * | |

:STITUTE, INC.

MANNHEIM GMBH

A 73248

A073248 AM-ITC 00119921

SCHEDULE B

TERRITORY

Acknowledged:

GENETICS INSTITUTE, INC.

By: [signature]

BOEHRINGER MANNHEIM GMBH

By: [signature]

emocratic
akia

ion (USS

edged:

S INSTITU

GER. MANNH

A 73249



SCHEDULE C

COMECON COUNTRIES

...mocratic Republic
...vakia

...s

...ion (USSR)

...ed:

...NSTITUTE, INC.

...MANNHEIM GMBH

A 73250

A073250

AM-ITC 00119923

SCHEDULE D

MINIMUM ROYALTY

Acknowledged:

GENETICS INSTITUTE, INC.

By: Gabriel Schmergel

BOEHRINGER, MANNHEIM GMBH

By: ____________

A 73251



SCHEDULE E

*

...sed:

...INSTITUTE, INC.

...MANNHEIM GMBH

A 73252

SCHEDULE F

~~PRE~~-COMMERCIALIZATION SUPPLY OF LICENSED COMPOUND

Acknowledged:

GENETICS INSTITUTE, INC.

By: Gabriel Schmergel

BOEHRINGER MANNHEIM GMBH

By:

A 73253



SCHEDULE G

PRODUCTION SCHEDULE

*

...edged:

...S INSTITUTE, INC.

...ER MANNHEIM GMBH

A 73254