# EXHIBIT 14

4

Dockets.Justia.com





CONFIDENTIAL MATERIAL OMITTED AND
FILED SEPARATELY WITH THE SECURI-
TIES AND EXCHANGE COMMISSION.
ASTERISKS DENOTE SUCH OMISSIONS

DEVELOPMENT AND LICENSE AGREEMENT

Between

BOEHRINGER MANNHEIM GMBH
Sandhofer Strasse 116
D-6800 Mannheim 31
Federal Republic of Germany

(in the following referred to as "BM")


And

GENETICS INSTITUTE, INC.
87 CambridgePark Drive
Cambridge, Massachusetts  02140
U.S.A.

(in the following referred to as "GI")

A 73220

A073220                                                              AM-ITC 00119893

<strong>TABLE OF CONTENTS</strong>

Introduction        ..................................

Article 1.  DEFINITIONS

    1.1     Affiliate    .........................
    1.2     Chugai.............................
    1.3
    1.4                      ..........................
    1.5     Chugai Research Project...............
    1.6     Benchmark    .......................
    1.7     COMECON Countries................
    1.8     Confidential Information.
    1.9     Effective Date  ...................
    1.10    Final Benchmark ...................
    1.11    Know-How   ......................
    1.12    Patent Rights
    1.13    GMP Materials   .................
    1.14    Government Regulatory Agency  .....
    1.15    Improvements  ...................
    1.16    Licensed Compounds   ............
    1.17    Licensed Products    ............
    1.18    Net Sales  ......................
    1.19    Party  ..........................
    1.20    Principal Investigator  .........
    1.21    Project  ........................
    1.22    Research Fee  ...................
    1.23    Sole Technology  ................
    1.24    Territory  ......................
    1.25    Valid Claim  ....................

Article 2.  THE PROJECT

    2.1     General  ........................
    2.2     Inspection  .....................
    2.3     Laboratory Facilities  ..........
    2.4     Patent and Confidential Information Agreements
    2.5     Progress Reports  ...............
    2.6     Disclosure  .....................
    2.7     Flexibility  ....................
    2.8     Commercialization  ..............
    2.9     Completion of Benchmarks  .......
    2.10    Arrangements with Third Parties  ..........

Article
    3.1
    3.2

Article
    4.
    4.
    4.

Article
    5.1
    5.2
    5.3
    5.4
    5.5
    5.6
    5.7
    5.8
    5.9
    5.1

Article
    6.1
    6.2
    6.3

Article
    7.1
    7.2
    7.3
    7.4
    7.5
    7.6

Article
    8.1
    8.2
    8.3

Article
    9.1
    9.2
    9.3
    9.4

i

A 73221

Article 3.    PROJECT FUNDING

    3.1    Research Fee ...................................7
    3.2    Reimbursement of Additional Expenses ...........8

Article 4.    CONFIDENTIAL INFORMATION

    4.1    Treatment of Confidential Information ...........8
    4.2    Release from Restrictions ......................8
    4.3    Publications ...................................9

Article 5.    INTELLECTUAL PROPERTY RIGHTS

    5.1    Sole Technology ................................9
    5.2    Licensee Technology ............................9
    5.3    Joint Technology ...............................9
    5.4    Improvements ..................................10
    5.5    Responsibility for Protection of Technology ...10
    5.6    Right of BM to Prosecute Applications .........10
    5.7    Mutual Assistance .............................11
    5.8    Infringement ..................................11
    5.9    Claimed Infringement ..........................13
    5.10   ...............................................14

Article 6.    PATENT AND KNOW-HOW LICENSES

    6.1    Patent Licenses ...............................14
    6.2    Know-How Licenses..............................15
    6.3    Sublicenses ...................................15

Article 7.    PATENT AND KNOW-HOW ROYALTIES

    7.1    Royalties .....................................15
    7.2    Minimum Royalty................................16
    7.3    Reports and Payment ...........................16
    7.4    Certain Foreign Royalties .....................17
    7.5    Records .......................................17
    7.6    Dominant Patents ..............................17

Article 8.    MANUFACTURING RIGHTS

    8.1    Pre-Commercialization Rights...................17
    8.2    Commercial Supply of Licensed Products ........18
    8.3    Technical Assistance ..........................18

Article 9.    TERMINATION

    9.1    Term...........................................19
    9.2    Termination for Breach ........................19
    9.3    Termination by GI of Exclusivity...............19
    9.4    Survival of Obligations; Return of
           Confidential Information.......................20

ii

A 73222

## Article 10. MISCELLANEOUS

10.1   Product Liability Indemnification............
10.2   Publicity ...................................
10.3   Assignment..................................
10.4   Governing Law...............................
10.5   Force Majeure...............................
10.6   Waiver .....................................
10.7   Notices ....................................
10.8   No Agency...................................
10.9   Entire Agreement............................
10.10  Headings  ..................................
10.11  Severability ...............................
10.12  Successors and Assigns......................
10.13  Counterparts................................

SCHEDULE A       Benchmarks
SCHEDULE B       Territory
SCHEDULE C       COMECON Countries
SCHEDULE D       Minimum Royalty
SCHEDULE E       Bonus Payment
SCHEDULE F       Pre-Commercialization Supply of Licensed
                 Compound
SCHEDULE G       Production Schedule

iii

A 73223

AGREEMENT dated as of October 8, 1985 between GENETICS INSTITUTE, INC., a Delaware corporation, having its principal place of business at 87 CambridgePark Drive, Cambridge, Massachusetts 02140, U.S.A. (hereinafter referred to as "GI"), and BOEHRINGER MANNHEIM GMBH, a corporation having its principal place of business at Sandhofer Strasse 116, D-6800 Mannheim 31, Federal Republic of Germany, (hereinafter referred to as "BM").

INTRODUCTION

GI has and maintains research and development facilities and experienced scientists, research associates and assistants and other personnel which enables it to conduct research and development activities in the area of recombinant DNA technology and the application thereof to the development, production and processing of recombinant DNA and to the production and expression of products using that technology.

BM desires that GI, on behalf of and in collaboration with BM, undertake a research and development project utilizing recombinant DNA technology for producing erythropoietin on a commercially feasible basis for use in humans. In return for certain rights under the patents and Know-how developed by GI, BM will financially support the research and development activities of GI and will pay GI the royalties provided for herein.

GI is willing, for the consideration and on the terms set forth herein, to use its research and development facilities and scientists as well as GI patents and Know-how, research associates and technicians and other personnel to conduct the Project (as defined below).

consideration of the mutual covenants and promises contained in this Agreement and other good and valuable considerations, GI and BM agree as follows:

## Article 1.  Definitions

used in this Agreement, the following terms, whether used the singular or plural, shall have the following meanings:

Licensed

- 1 -

A 73224

1.1    "Affiliate"  means  any  corporation, compapartnership,  joint  venture  and/or  firm  which  controls,
controlled  by  or  is  under  common  control  with  either  Part.
with  either  Party's  shareholders;  without  limiting
generality  of  the  foregoing,  control  shall  mean:

a)    in  the  case  of  corporate  entities,  direc.
indirect  ownership  of  at  least  fifty  percent  (5
of  the  stock  or  shares  entitled  to  vote  for
election  of  directors,  and

b)    in  the  case  of  non-corporate  entities,  direc.
indirect  ownership  of  at  least  fifty  percent  (5
of  the  equity  interest  with  the  power  to  direc.
management  and  policies  of  such  non-corpor.
entities.

1.2  "Chugai"  shall  mean  Chugai  Pharmaceutical  Co.
with  whom  GI  has  entered  into  an  agreement  relating  to
development  of  erythropoietin.

1.3 *

1.4 *

1.5  "Chugai  Research  Project"  shall  mean  the  rese:
program  conducted  by  GI  and  Chugai  pursuant  to  the  terms  of
agreement  dated  as  of  June  29,  1984.

1.6  "Benchmarks"  shall  mean  the  sequential  research
development  steps  of  the  Project,  as  set  forth  in  Schedu
to  this  Agreement.

1.7  "COMECON  Countries"  shall  mean  the  countries
territories  specified  in  Schedule  C  hereto.

1.8  "Confidential  Information"  shall  mean  Know-how
defined  in  Section  1.11  below,  and  any  other  informat.
designated  by  the  disclosing  party  as  confidential
proprietary,  whether  or  not  related  to  the  production
expression  of  Licensed  Compound  and/or  Licensed  Products.

1.9  "Effective  Date"  shall  mean  the  date  on  which
agreement  is  executed  and  completely  signed  by  both  parties.

1.10  "Final  Benchmark"  shall  mean  the  last  of
sequential  research  and  development  steps  of  the  Project
forth  in  Schedule  A  hereto.

- 2 -

A 73225

                                    AM-ITC 00119898

1.11 "Know-How" shall mean all technical information of patentable or otherwise, relating to the expression and production of erythropoietin, the cloning of genes coding for erythropoietin or precursors thereof, and/or procedures and products used in developing such a cloned gene, which information is used by GI in the Project and is required to enable BM to manufacture and/or sell the Licensed Compound or Licensed Product, including without limitation:

a)    such information which is licensed or sublicensed to or obtained by GI including,

(to the extent that GI is entitled to license or sublicense such information to others); and

b)    all inventions, cell sources, cultures, strains, organisms and parts thereof, plasmids, clones, vectors, progeny, derivatives and parts thereof, formulae, methods, procedures, processes, materials, reagents, components, equipment, equipment design, animal studies, clinical or other evaluations, analytical results, and quality control or safety procedures which have been, are or shall be developed, isolated, purified, constructed or improved by GI relating to the production, use or manufacture of the Licensed Compound and/or to the development of cloned genes coding for erythropoietin or precursors thereof.

1.12 "Patent Rights" shall mean all patent rights in the territory and all patents throughout the world based on subject matter used in the Project and required to enable BM to manufacture and/or sell the Licensed Compound or Licensed Product, including any additions, divisions, continuations, continuations-in-part, substitutions, extensions, renewals or reissues thereof or therefore.

1.13 "GMP Materials" shall mean erythropoietin meeting the standards of "good manufacturing practice" and sufficient in quality for use in connection with clinical trials, as agreed upon by the parties separately before conclusion of Benchmark II.

1.14 "Government Regulatory Agency" shall mean the governmental agency in each country in the Territory responsible for reviewing and approving the development or marketing of Licensed Products.

1.15 "Improvements" shall mean any information, whether or not patentable, developed or acquired by either Party during the term of this Agreement which is used by such party in the manufacture of Licensed Compound. With regard to GI,

- 3 -

A 73226

the term "Improvements" shall refer only to infor...
developed or acquired by GI following the completi... ...
Final Benchmark.

With regard to BM, "Improvement" shall mea...
information directly related to the established produc... ...
Licensed Compound at BM's facilities and developed afte... ...
establishment.

1.16 "Licensed Compounds" shall mean any and all ki...
human erythropoietin consisting ✱

which, or the making or us...
which, is covered by a Valid Claim of any of the Patent ...
and/or embodies any Know-how.

1.17 "Licensed Products" shall mean any and all kind...
formulations, mixtures and/or compositions for whatev... ...
which contain Licensed Compound.

1.18 "Net Sales" shall mean the amount inv...
(exclusive of value added taxes) by BM to wholesalers or i...
users of Licensed Products and Licensed Compounds, less c...
lump sum of ✱ to cover all usual deduct...
such as credits for returns, cash, trade or other disc...
transportation charges, allowances, etc.

In case of distribution of the Licensed Product...
Affiliates or sublicensees of BM, Net Sales shall have...
meaning as defined above.

For countries where BM is only represented by unre...
distributors supplied by BM with finished goods, the roya...
shall be calculated on BM's Net Sales to such distribut...

Net Sales shall not include any transfer between BM...
any of its Affiliates or sublicensees for resale but sh...
include the resale from an Affiliate or sublicense... ...
independent third party or use by the Affili...
sublicensee.

Any commercial use of the Licensed Compounds or Lic...
Products by BM, its Affiliates or sublicensees in a comm...
transaction with a third party, in which no invoice is is...
shall be considered a sale hereunder for royalty...
accounting purposes and Net Sales for such use shall be...
average price of arms' length sales by BM, its Affiliate...
sublicensees during the royalty reporting period in which...
use occurs, or if no such sales occurred in such period...
the last period in which such arms' length sales occurred.

1.19 "Party" shall mean GI or BM; "Parties" shall mea...
and BM".

- 4 -

1.20 "Pri...
...cientist, res...
...: any other p

1.21 "Pr...
... the effect...
... Final Ben...
...d performed...
... well as...
...recombinant...
...O.

1.22 "R...
...e Project...
...cordance wi...

1.23 "S...

1.24 "T...
specified in...

1.25 "V...
patent or i...
withdrawn,...
court of...
...unappealable...

2.1 G...
contained i...
Date, to u...
the objecti...
in the comp...

2.2 I...
arrange for...
the Projec...
laboratorie...
in detail...
other Part...
business...
Operations

2.3
Suitable i...
be perform...

2.4
shall re...
scientists...
and techn...
agreement...

A 73227

                                AM-ITC 00119900

o informati...
.ction of th...

ll mean only
production of
.ed after their

id all kinds of

ting or use of
e Patent Rights

nd all kinds of
.r whatever ...

mount invoiced
.salers or fin...
ids, less on...
sual deducti...
.ther discourts

.ed Products ...
shall have ...

ted by unrelat...
is, the royal...
distributor.

r between ... and
resale but ... of
iblicensee ... or
a Affiliate

.unds or the...
s in a com...
nvoice is ...
for rova...
use shall ...
ts Affil...
.iod in which
i such peri...
.los occurred

.ies shall

1.20 "Principal Investigator" shall mean the senior scientist, responsible vice president for process development, of any other person agreed upon between the parties.

1.21 "Project" shall mean the research program commencing on the effective date and terminating with the completion of the Final Benchmark conceived, planned, organized, controlled and performed by GI for development of production technology as well as manufacture of Licensed Compound by means of recombinant DNA following the latest standard of science and art.

1.22 "Research Fee" shall mean the agreed upon cost of the Project to be paid by BM to GI in the manner and in accordance with the schedule set forth in Article 3 hereof.

1.23 "Sole Technology" is defined in Section 5.1 hereof.

1.24 "Territory" shall mean the countries and territories specified in Schedule B and C hereto.

1.25 "Valid Claim" shall mean a claim of an unexpired patent or inventor's certificate which shall not have been withdrawn, cancelled or disclaimed, nor held invalid by a court of competent jurisdiction in an unappealed or unappealable decision.

## Article 2   THE PROJECT

2.1 General. Subject to the terms and conditions contained in this Agreement, GI agrees, as of the Effective Date, to undertake the Project on a best efforts basis, with the objective of completing each Benchmark and/or assisting BM in the completion of each Benchmark, as the case may be.

2.2 Inspection. Each Party shall have the right to arrange for its employees and outside consultants involved in the Project to visit the other Party at its offices and laboratories, and to discuss the Project work and its results in detail with the technical personnel and consultants of the other Party; provided that such visits shall be during normal business hours and shall not unreasonably interrupt the operations of the other Party.

2.3 Laboratory Facilities. GI agrees to furnish suitable laboratory facilities and equipment for the work to be performed in connection with the Project.

2.4 Patent and Confidential Information Agreements. GI will require the Principal Investigator, and all GI associates, research associates and assistants, technicians and technical personnel assigned to the Project to execute an agreement for the assignment of inventions and for the

- 5 -

A 73228

AM-ITC 00119901

A073228

protection of Know-How and Confidential Information in a reasonable form as may from time to time be used by GI for such purpose.

BM shall require all scientific and other employees working on or involved in the Project, to be similarly bound by written agreement.

2.5 **Progress Reports.** Each Party shall provide the other Party with written progress reports summarizing technological, clinical testing and marketing progress of the Project within 30 days after the end of each six month period, starting with January 1, 1986.

For a six months period in which a Benchmark is completed the report of the applicable Party will include a final report on the attainment of such Benchmark.

2.6 **Disclosure.** GI shall disclose all Know-How as well as the production clone in confidence to BM 30 days following the signature of the Agreement or immediately after obtaining them to enable BM to manufacture and produce Licensed Compound as well as Licensed Products.

BM shall disclose in confidence to GI all animal studies, human studies and other tests or submissions to Government Regulatory Agencies arising from the Project, after having obtained such data, results and documents. GI may utilize such information outside the Territory only if agreed upon in writing between the Parties case by case.

2.7 **Flexibility.** In carrying out the research which it will conduct in the course of the Project, GI shall have and maintain sufficient flexibility to shift effort and emphasis within the overall scope of such Project in a manner that will, in the opinion of the Principal Investigator, after consultation with and giving due consideration to the advice of BM, best result in the development of useful technology for the production of the Licensed Compound.

2.8 **Commercialization.** Promptly and diligently after GI's supply of GMP-material in an amount of at least BM shall exert its best efforts, at its own expense, to:

A) undertake and complete galenical development the formulations to be used for clinical trials;

b) conduct all necessary and appropriate animal human testing and clinical trials on the Licensed Products, and control the manner and extent of testing;

c) provide for commercial scale production of Licensed Products;

- 6 -

d) r
z
n
g

e) r
c
c

2.9
completion
Benchmark
of such c
sufficient
such othe
Such othe
Benchmark

2.10
right to
performanc
for the p
provided
comment o
if GI in
Affiliate
commercia
production
Schedule
Appr
withheld.
such exec

3.1
developme
regard to
the amou
Schedule
non-refur
Payn
such Bone

A 73229

d)  prepare, file and prosecute all governmental applications for approvals necessary to produce, manufacture, distribute and market the Licensed Products in the Territory; and

e)  market the Licensed Products in the Territory on a diligent commercial basis after approval by the applicable Government Regulatory Agency.

BM shall provide information to GI upon its reasonable request as to the status of its commercialization efforts under subsections a) through e) above.

2.9  Completion of Benchmarks.  Promptly after the completion of each Benchmark, the Party completing such Benchmark (the "Notifying Party") shall notify the other Party of such completion and shall provide to such other Party sufficient written materials and samples in order to permit such other Party to evaluate completion of such Benchmark. Each other Party shall comment on the completion of such Benchmark within 45 days after receipt of such notice.



2.10  Arrangements with Third Parties.  GI shall have the right to contract with third parties approved by BM for the performance of work in connection with the Project, as well as the production of Licensed Compound for commercial use, provided that BM shall have the opportunity to review and comment on any such proposed contract prior to its execution. If GI intends to contract with third parties who are not affiliates of GI, the production of Licensed Compound for commercial use, then BM reserves the right to take over such production as set forth in this Agreement. In this event, Schedule G does not apply.

Approval of any such contract shall not be unreasonably withheld. GI will provide BM with a complete copy of each such executed contract.

## Article 3.  PROJECT FUNDING

3.1  Research Fee.  In consideration of the research, development and related activities undertaken by GI with respect to the Project, BM shall pay to GI the Research Fee in the amount and in the periodical installments set forth in Schedule A below, all such amounts to be firm and nonrefundable.

Payments for each Benchmark shall be due only in case such Benchmark is satisfactorily completed.

- 7 -

A 73230

3.2  Reimbursement of Additional Expenses.  In the
that the transfer of technology from GI to BM to pro...
License Compound in quality as agreed upon ex...
projected time and cost budget as described in Artic...
then GI shall be reimbursed by BM for its additional exp...
to be agreed upon in writing case by case.  GI shall ...
and accurate records to substantiate all Additional Exp...
invoiced to BM, including the date incurred and the ...
thereof.  Upon request from BM, GI shall permit BM ...
authorized representatives to inspect such rec...
confidence in order to verify the amount of Add...
Expenses invoiced hereunder.

### Article 4.  CONFIDENTIAL INFORMATION

4.1  Treatment of Confidential Information.  Each ...
hereto shall maintain the Confidential Information of ...
other Party in confidence, and shall not disclose, div...
otherwise communicate such Confidential Information to ot...
or use it for any purpose, except pursuant to, and in ord...
carry out, the terms and objectives of this Agreement, ...
hereby agrees to exercise every reasonable precauti...
prevent and restrain the unauthorized disclosure of ...
Confidential Information by any of its directors, offi...
employees, consultants, subcontractors, sublicensees ...
agents.

4.2  Release from Restrictions.  The provisions ...
Section 4.1 shall not apply to any Confidential Inform...
disclosed hereunder which:

a)  was known or used by the receiving Party prior...
    its date of disclosure to the receiving Party, ...
    evidenced by the prior written records of ...
    receiving Party; or

b)  either before or after the date of the disclosure...
    the receiving Party is lawfully disclosed to ...
    receiving Party by an independent, unaffili...
    third party rightfully in possession of ...
    Confidential Information; or

c)  either before or after the date of the disclosure...
    the receiving Party becomes published or gener...
    known to the public through no fault or omission...
    the part of the receiving Party or its Affili...
    or

d)  the receiving Party is required to disclose...
    comply with applicable laws, to defend or prosecu...
    litigation or to comply with governmen...
    regulations, provided that the receiving Part...
    provides prior written notice of such disclosure...

- 8 -

A 73231

tho other Party and takes reasonable and lawful actions to avoid and/or minimize the degree of such disclosure.

4.3 Publications. The following restrictions shall apply with respect to the disclosure in scientific journals or publications by any Party or any employee or consultant of any party relating to any scientific work performed as part of the project:

a) A Party (the "Publishing Party") shall provide the other Party with an advance copy of any proposed publication of results arising from the Project, and such other Party shall have a reasonable opportunity to recommend any changes it reasonably believes are necessary to preserve Patent Rights or Know-How belonging in whole or in part to GI or BM, and the incorporation of such recommended changes shall not be unreasonably refused; and

b) If such other Party informs the Publishing Party, within 30 days of receipt of an advance copy of a proposed publication, that such publication in its reasonable judgment could be expected to have a material adverse effect on any Patent Rights or Know-How belonging in whole or in part to GI or BM, the Publishing Party shall use its best efforts to delay or prevent such publications as proposed. In the case of inventions, the delay shall be sufficiently long to permit the timely preparation and filing of a patent application(s) or application(s) for a certificate of invention on the information involved.

Article 5.  INTELLECTUAL PROPERTY RIGHTS

5.1 Sole Technology. GI shall own the entire right, title and interest in and to all Patent Rights and Know-How developed solely by employees or consultants of GI (hereinafter "Sole Technology").

5.2 Licensee Technology. BM shall own the entire right, title and interest in and to all patents, patent applications and Know-How of BM developed solely by employees or consultants of BM at any time which relate to Licensed Products and/or the Licensed Compound.

5.3 Joint Technology. Unless otherwise agreed in particular instances, the Parties shall own jointly the entire right, title and interest in and to all patent and other rights in any product, method or apparatus conceived, reduced to practice or developed jointly by GI and BM in the course of the Project (hereinafter "Joint Technology").

- 9 -

A 73232

5.4  Improvements.  To the extent that the Part...
develop an Improvement or otherwise acquire the right to c...
a license covering any Improvements, each Party grants t...
other a nonexclusive, non-transferable license, to make, ...
and sell such Improvements solely in connection with ...
manufacture of Licensed Compound for the Territory in ...
Party's and its Affiliates' production facilities.

5.5  Responsibility for Protection of Technology.

a)  Except as otherwise provided in this Agreement, ...
    shall have the responsibility on its own accou...
    to:

    (i)  maintain patent protection in any coun...
         within the Territory on any Sole Technology;

    (ii)  file for, procure and maintain patents in ...
          country within the Territory on such S...
          Technology; and

    (iii)  protect and enforce in the Territory ...
           patents issued on any Sole Technology, sub...
           to Section 5.8 below.

b)  Copies of all substantive communications to and fr...
    United States and foreign patent offices regard...
    applications, patents or certificates of invent...
    on any Sole Technology shall be provided to ...
    promptly after the receipt thereof; copies ...
    proposed substantive communications to such pa...
    offices shall, if practicable, be provided to BM ...
    sufficient time before the due date in order ...
    enable BM to comment on the content thereof.

5.6  Right of BM to Prosecute Applications.  If GI els...
not to seek or continue to seek, use or maintain pate...
protection on any Sole Technology in any country within ...
Territory, BM shall have the right to file, procure, maint...
and enforce in such countries patents on such Sole Technolog...
GI agrees to advise BM of all decisions taken under Sect...
5.5 (a) i)-iii) in a timely manner in order to allow BM ...
protect its rights under this Section 5.6.
      If GI elects not to file a patent application ...
application for a certificate of invention, not to maintai...
patent or certificate of invention, or to abandon a pend...
patent application or application for a certificate ...
invention, GI shall advise BM, and BM shall have the rig...
but not the obligation, to file such application, maint...
such patent or certificate of invention or continue to atte...
to obtain protection on the subject matter disclosed in su...
pending application.  GI shall pay the reasonable expenses ...
such activities for the countries A listed in Schedule B.

5.7  Mu
t: the othe
ments or r
other Party
order to as
the Sole Te
    Each
signed all
patent app
vention o
vention at

5.8  I:
    a

h

- 10 -

A 73233

AM-ITC 00119906

5.7  <u>Mutual Assistance</u>.  Each Party shall make available to the other Party or its respective authorized attorneys, agents or representatives, such of its employees whom the other Party in its reasonable judgment deems necessary in order to assist such Party in obtaining patent protection for the Sole Technology and Joint Technology.

Each Party shall sign or use its best efforts to have signed all legal documents necessary to file and prosecute patent applications or applications for certificates of invention or to obtain or maintain patents or certificates of invention at no charge to the other Party.

5.8  <u>Infringement</u>.

a)  Each Party shall promptly report in writing to the other Party during the term of this Agreement any (i) known infringement or suspected infringement of any of the Patent Rights, or (ii) unauthorized use or misappropriation of Know-How or Confidential Information by a third party of which it becomes aware, and shall provide the other Party with all available evidence supporting said infringement, suspected infringement or unauthorized use or misappropriation.

b)  Except as provided in paragraph d) below, GI shall have the right to initiate an infringement or other appropriate suit anywhere in the Territory against any third party who at any time has infringed or is suspected of infringing, any of the Patent Rights or of using without proper authorization all or any portion of the Know-How. GI shall give BM sufficient advance notice of its intent to file said suit and the reasons therefor, and shall provide BM with an opportunity to make suggestions and comments regarding such suit. GI shall keep BM promptly informed, and shall from time to time consult with BM regarding the status of any such suit and shall provide BM with copies of all documents filed in, and all written communications relating to, such suit.

c)  GI shall have the sole and exclusive right to select counsel for any suit referred to in paragraph b) above and shall, except as provided below, pay all expenses of the suit, including without limitation attorney's fees and court cost.

- 11 -

A 73234

BM, in its sole discretion, may elect within 60 days after the commencement of the litigation, to contribute to the costs incurred by GI in connection with such litigation and, if it so elects, any damages, royalties, settlement fees or other consideration received by GI, its Affiliates or sublicensees as a result of such litigation shall be shared by BM and GI pro rata their respective sharing of the costs of the litigation. In the event that BM elects not to contribute to the costs of such litigation, GI and/or its Affiliates shall be entitled to retain any damages, royalties, settlement fees or other consideration resulting therefrom. If necessary, BM shall join as a party to the suit but shall be under no obligation to participate except to the extent that such participation is required as the result of being named party to the suit. BM shall offer reasonable assistance to GI in connection therewith at no charge to GI except for reimbursement of reasonable out-of-pocket expenses, including salaries of BM personnel incurred in rendering such assistance.

BM shall have the right to participate and be represented in any such suit by its own counsel at its own expense. GI shall not settle any such suit involving rights of BM without obtaining the prior written consent of BM, which consent shall not be unreasonably withheld.

d) In the event that GI elects not to initiate an infringement or other appropriate suit pursuant to paragraph b) above, GI shall promptly advise BM of its intent not to initiate such suit, and BM shall have the right to initiate an infringement or other appropriate suit against any third party which at any time has infringed, or is suspected of infringing, any of the Patent Rights or is using without proper authorization all or any portion of the Know-How.

If BM decides in good faith and after consultation with GI to initiate such suit



5.9  Cl

a)



- 12 -

AM-ITC 00119908



In exercising its rights pursuant to this paragraph d), BM shall have the sole and exclusive right to select counsel and, except as provided below, shall pay all expenses of the suit including without limitation attorney's fees and court costs. Any damages, royalties, settlement fees or other consideration received by BM as a result of such litigation shall be shared by GI and BM pro rata their respective sharing of the costs of such litigation.

If necessary, GI shall join as a party to the suit but shall be under no obligation to participate except to the extent that such participation is required as a result of being a named party to the suit. At BM's request, GI shall offer reasonable assistance to BM in connection therewith at no charge to BM except for reimbursement of reasonable out-of-pocket expenses, including salaries of GI's personnel, incurred in rendering such assistance.

GI shall have the right to participate and be represented in any such suit by its own counsel at its own expense. BM shall not settle any such suit involving rights of GI without obtaining the prior written consent of GI, which consent shall not be unreasonably withheld.

5.9    Claimed Infringement.

a)    In the event that a third party at any time brings suit against BM, its Affiliates or sublicensees anywhere in the Territory claiming infringement of its patent rights or unauthorized use or misappropriation of its technology, based on a claim arising out of

- 13 -

A 73236

the manufacture, use or sale by BM, its Affiliates or sublicensees of Licensed Products, BM shall have the sole and exclusive responsibility for the selection of counsel and the control of the suit, and shall keep GI informed of the current status of the suit.

b) BM shall, after receipt of notification of a third party claim or notice of commencement of any action, suit or proceeding of the type described in paragraph a) above, notify GI of such claim or the commencement of said action suit or proceeding, enclosing a copy of all papers served. GI may participate in the conduct of the suit at its own expense.

5.10



## Article 6. PATENT AND KNOW-HOW LICENSES

6.1 _Patent Licenses_. Subject to the payment of the royalty provided in Article 7 and the fulfillment of the other terms and conditions of this Agreement, GI hereby grants to BM and its Affiliates an exclusive license in the Territory under the Patent Rights, including the right to grant sublicenses, for the sole and exclusive purpose of manufacturing, having manufactured for BM and its Affiliates, using and selling Licensed Products as well as Licensed Compound in the Territory, _provided however_, that such license insofar as it pertains to the manufacturing of Licensed Compound is subject to the provisions and limitations of Article 8 herein, and _provided further_ that the foregoing licenses shall be applicable to COMECON Countries but only to the extent that BM, its Affiliates and/or sublicensees sell, supply or otherwise provide Licensed Products in final, finished form to such COMECON Countries and not any information, Know-How or other data pertaining to the development, manufacture, or production of Licensed Products or Licensed Compound. Licenses granted pursuant to this Section 6.1 shall continue in effect until the expiration of the last Patent Right licensed to BM hereunder.

- 14 -

A 73237

AM-ITC 00119910

6.2 _Know-How Licenses_. Subject to the payment of the royalty provided in Article 7 and the fulfillment of the other terms and conditions of this Agreement, GI hereby grants to BM and its Affiliates an exclusive license to use the Know-How in the Territory, including the right to grant sublicenses, for the sole and exclusive purpose of manufacturing, having manufactured for BM and its Affiliates, using and selling Licensed Products and Licensed Compound in the Territory, provided however, that such license insofar as it pertains to the manufacturing of Licensed Compound is subject to the provisions and limitations of Article 8 herein, and provided further that the foregoing licenses shall be applicable to COMECON Countries but only to the extent that BM, its Affiliates and/or sublicensees sell, supply or otherwise provide Licensed Products in final, finished form in such COMECON Countries and not any information, Know-How or other data pertaining to the development, manufacture or production of Licensed Products, or Licensed Compound.

6.3 _Sublicenses_. GI shall be informed by BM of each sublicense granted.

### Article 7. PATENT AND KNOW-HOW ROYALTIES

7.1 _Royalties_

a)    BM shall pay to GI  ✳                         on all Net Sales made in the Territory by BM, its Affiliates and sublicensees of Licensed Products and Licensed Compound which involve a valid claim under the Patent Rights. Royalties shall be payable on a country by country basis with respect to Net Sales in each country of the Territory where there is a Valid Claim under Patent Rights, and in each country where the Licensed Products or Licensed Compound being sold were manufactured or are to be used in which there is a Valid Claim under Patent Rights.

b)    BM shall pay to GI earned royalties of ✳ based on all Net Sales anywhere in the Territory by BM, its Affiliates and sublicensees of Licensed Products or Licensed Compound which embody or utilize any of the Know-How.  Royalties shall be payable under this subparagraph b) on a country by country basis for a period of   ✳   after ✳

- 15 -

A 73238

AM-ITC 00119911

c)    Under no circumstances shall BM be obligated
to pay royalties under both paragraphs a) and
b) above; only one royalty shall be payable
and due regardless how many patent rights are
involved.

7.2    Minimum Royalty.    Beginning with ✳

BM shall pay to GI the
minimum annual royalty set forth in Schedule D hereto
provided that for the calendar year in which the minimum
royalty commencement date occurs, the minimum annual royalty
due shall be proportionately adjusted if the minimum royalty
period for such year is less than the full calendar year.

✳

In the event that the minimum annual royalties for a
calendar year exceed the actual earned royalties for such
calendar year, the difference between these amounts shall be
due and payable within 60 days after the end of such calendar
year.
Amounts by which earned royalties in any such year exceed
the minimum royalty for such year shall not be credited
against the minimum royalty due in any subsequent year, nor
may be set off against the minimum royalty due in any
preceding year.

7.3    Reports and Payment.    BM shall deliver to GI within
60 days after the end of each calendar quarter a written
report showing its computation of royalties due under this
Agreement upon Net Sales by BM, its Affiliates and its
sublicensees during such calendar quarter.    All Net Sales
shall be segmented in each such report according to sales by
BM, each Affiliate and each sublicensee, as well as on a
country-by-country basis, including the rates of exchange used
to convert such royalties into U.S. dollars from the currency
in which such sales are made.    For the purpose hereof, the
rates of exchange to be used for converting royalties
hereunder into U.S. dollars shall be the dollar rate
officially in effect in the relevant country of the Territory
at the date royalty payments are due and as shown in each
royalty report.
BM, simultaneously with the delivery of each such report,
shall tender payment in U.S. dollars of all royalties shown to
be due thereon.
Any withholding tax shall be deducted by BM, provided
that BM shall use its best efforts to obtain exemption of
withholding tax to the extent such exemption is available; BM
shall advise GI in advance of such withholding possibility in
order for GI to assist if necessary in obtaining
exemption.

- 16 -

A 73239

**7.4** <u>Certain Foreign Royalties</u>. Where royalties are due to GI hereunder for sales of Licensed Products in a country where, by reason of currency regulations or taxes of any kind, it is impossible or illegal for BM, its Affiliates or sublicensees to transfer royalty payments to GI for Net Sales in that country, such royalties shall be deposited in whatever currency is allowable by the person or entity not able to make the transfer for the benefit or credit of GI in an accredited bank in that country that is acceptable to GI.

**7.5** <u>Records</u>. BM shall keep, and shall require all Affiliates and sublicensees to keep, full, true and accurate books of accounts and other records containing all information and data which may be necessary to ascertain and verify the royalties payable hereunder for a period of 7 years from the date of creation of each such record. During the term of this agreement and for a period of one year following its termination, GI shall have the right at its expenses from time to time (not to exceed twice during each calendar year) to inspect, or have an agent, accountant or other representative inspect, such books, records and supporting data.

**7.6** <u>Dominant Patents</u>. The Parties recognize that the undertaking of the Project and the marketing of Licensed Products involves some degree of risks of patent infringement. The parties wish to share such risk in accordance with the provisions of this Section 7.6. Accordingly, if BM, its Affiliates or sublicensees, in order to operate under or exploit the licenses granted under Article 6 of this Agreement in any country of the Territory, must make payments (including without limitation royalties, option fees or license fees) to one or more third parties to obtain a license or similar right in the absence of which the Licensed Products or Licensed Compound could not legally be manufactured or sold in such country, BM may deduct from royalties thereafter payable to GI on Net Sales earned in such country only during the calendar year period in which BM makes such payment ✳

## Article 8. MANUFACTURING RIGHTS

**8.1** <u>Pre-Commercialization Rights</u>. GI and/or its Affiliates shall exclusively manufacture for and supply to BM the entire amount of Licensed Compound required by BM for clinical developments, clinical trials or other non-commercial uses prior to commercialization of Licensed Products. Licensed Compound used for galenical developments, clinical trials or other non-commercial uses prior to commercialization will be supplied by GI to BM as outlined in Schedule F.

- 17 -

A 73240

AM-ITC 00119913

8.2  Commercial Supply of Licensed ~~Product~~ *(CONTINUED)*. As long BM has not exercised its right to manufacture the Licen. Compound, GI and/or its Affiliates shall supply BM exclusive with all its requirements of Licensed Compound in a qu. agreed upon in a separate supply agreement. The supply pri shall not exceed *

If GI shall at any time agree to supply Licensed Comp to any third party outside the Territory on terms a conditions more favorable to such third party than the te and conditions hereunder, GI shall notify BM of such m favorable terms and BM shall, upon written notice to GI a within 30 days after its receipt of GI's notice, be entit to substitute the entire terms and conditions contained such more favorable transaction for the comparable term conditions hereof.



8.3  Technical Assistance.  GI shall, upon request f BM, make available to BM the Principal Investigator (to extent available) and members of the technical staff of assigned to the Project in order to assist BM in the scale of operations and in the start up of BM's commerc production facilities for the manufacture of the requiree of BM and its Affiliates of Licensed Compounds, subject to manufacturing rights granted to GI pursuant to Section Details of technical assistance shall be agreed separately no later than 12 months prior to the date tha exercises its right to manufacture pursuant to Section above.

GI shall provide to BM detailed documentation on processing conditions it uses for the production of Licen Compound, following the latest standard applicable to production at that time which shall include the cell line be used, cell culture medium composition, environment conditions for cell culture such as pH and temperature purification processes as well as all specifications quality control descriptions following the latest GLP-GMP

- 18 -

A 73241

As long a
he Licensed
exclusively
n a quality
supply price

ed Compound
terms and
n the terms
such more
to GI given
be entitled
ontained in
: terms and

standard applicable at the date of transfer.

To assist BM in reaching quality control compliance at GI standards, GI shall make available to BM facility design and construction data as well as aseptic techniques and programs for regulating compliance which apply to the production of Licensed Compound.

GI shall not be responsible for assisting BM with matters not specifically related to the manufacture of Licensed Compounds, such as matters generally practiced in the manufacture of biological materials. GI shall not be required to render more than ✱ man hours of technical assistance to BM hereunder, unless otherwise agreed upon by the Parties.

In rendering such assistance GI shall be reimbursed for all direct and reasonable expenses such as hotel, transportation and meals incurred by GI personnel.

### Article 9. TERMINATION

**9.1  Term.**  This Agreement shall become effective upon full execution and shall continue in full force and effect unless modified or terminated in accordance with any provision hereof for a period of ✱ years as of BM's first commercial sale and/or the last patent to expire or until expiry of the license granted pursuant to Art. 6 whichever is longer.

**9.2  Termination for Breach.**  Each Party shall be entitled to terminate the Agreement by written notice to the other Party in the event that the other Party shall be in default of any of its obligations hereunder, and shall fail to remedy any such default within 60 days after notice thereof by the non-breaching Party.  Upon termination of this Agreement pursuant to this Section 9.2, neither Party shall be relieved of any obligations incurred prior to such termination.

BM reserves the right to terminate this Agreement forthwith,

quest from
or (to the
staff of G:
e scale-up
commercial
quirements
ect to the
ction 8.1
reed upon
n that se
ction 8.1

on on the
: Licensed
: to GI's
l line of
ironmental
ature and
tions are
)-GMP

- in the event that the use of the Licensed Product has in the opinion of BM a negative risk/benefit value in clinical use

- or GI shall become bankrupt, insolvent or make any arrangement with its creditors and/or a winding up order is made and/or if the business of GI shall be placed in the hands of a Receiver, Assignee or Trustee whether by voluntary act of GI or otherwise.

**9.3  Termination by GI of Exclusivity.**  In the event that either

a)  BM fails to make any required minimum royalty payment within 30 days of the date such payment is due, or

- 19 -

A 73242

b)    BM fails to comply with Section 2.8 of the Agreement, and

c)    BM fails to remedy any such default with days after written notice thereof by GI,

then upon written notice provided by GI :: 3

(i)    GI shall receive from BM non-exclusive in and to BM's Know-how, technolog: described in Section 5.2), animal and data, and to such other information in is possession that GI may require in order obtain approval of the applicable Gover: Regulatory Agencies;

(ii)    All licenses granted herein by GI to BM become non-exclusive; and

(iii)    All other terms and conditions of Agreement not inconsistent with this Sec: 9.3, shall remain in effect, provided howe

✳

9.4    **Survival of Obligations;**
**Return of Confidential Information.** Notwithstand any termination of this Agreement, the obligations of Parties with respect to the protection and non-disclosure Confidential Information shall survive and continue to enforceable. Upon any termination of this Agreement purs to Sections 9.2, each Party shall promptly return to the ot Party all written Confidential Information, and all copi thereof, of the other Party.

## Article 10. MISCELLANEOUS

10.1  **Product Liability Indemnification.**

a)    GI agrees to defend BM, its agents, director officers and employees at GI's cost expense, and will indemnify and hold BM harmless, its agents, directors, officers employees, from and against any and losses, costs, damages, fees or expen arising out of or in connection with actual or alleged injury, damage or consequence occurring to any person as result of any negligence of GI in manufacture of Licensed Compound wheth claimed by reason of breach of warranty,

10.2 ublicity. or oral, existence prior wri required

10.3 rights o: Party wit except to the busir or otherw

10.4 and inte controver Agreement to arbit language Commerce court. exclusiv Eac giving intentio Party fa

– 20 –

A 73243

AM-ITC 00119916

2.8 of this

.t within 30
by GI,

by GI to BM

usive right.
hnology las
1 and human
ion in BM's
in order to
e Government

to BM shall

ns of the
this Sectio
ded however.

.ithstanding
.ons of the
.sclosure of
.inue to be
.nt pursuant
.o the other
all copies

director,
cost and
d BM
fficers an
v and a.
r expenses
i with a.
, or other
rson as the
iI in
d whethe
.anty,

negligence, product defect, or otherwise, and regardless of the form in which any such claim is made. In the event of any such claim against BM, or any agent, director, officer or employee by any party, BM shall promptly notify GI in writing of the claim, and GI shall manage and control at its sole expense the defense and the claim and its settlement. BM shall cooperate with GI and may at its options and expense, be represented in any such action or proceeding. GI shall not be liable for any litigation costs or expenses incurred by BM without GI's written authorization.

(b)    BM undertakes to indemnify and hold GI harmless from and defend against any and all claims, actions or threat of action based upon or related to or arising from omissions, negligence or any wrongdoing of BM in the performance of this Agreement or the manufacture of the Licensed Compound and the manufacture, sales and distribution of the Licensed Products. BM shall bear the cost arising in connection herewith.

10.2 Publicity. Neither Party shall originate any publicity, news release or other public announcement, written or oral, relating to this Agreement, the Project or the existence of an arrangement between the Parties, without the prior written approval of the other Party except as otherwise required by law.

10.3 Assignment. Neither this Agreement nor any of the rights or obligations hereunder may be assigned by either Party without the prior written consent of the other Party, except to a party which acquires all or substantially all of the business of the assigning Party by merger, sale of assets or otherwise.

10.4 Governing Law. This Agreement shall be governed by and interpreted in accordance with Swiss Law. Any dispute, controversy, or claim arising out of or relating to this Agreement which cannot be amicably settled shall be referred to arbitration held in Zurich/Switzerland in the English language in accordance with the rules of the Chamber of Commerce of Zurich/Switzerland to the exclusion of any other Court. The Court of Arbitration shall decide finally and exclusively.

Each Party shall name one arbitrator within 30 days of giving or receiving respectively written notice of the intention to apply to the Court of Arbitration. If either Party fails to designate its arbitrator within the stated

- 21 -

A 73244

period of time, such arbitrator will be appointed by
President of the Zurich Chamber of Commerce, who shall
appoint the Chairman of the Court of Arbitration as well
two additional arbitrators proposed by the President of
Chamber of Commerce of Zurich/Switzerland, having regard
recommendations made by the previously named arbitrators.

The acceptance of the mandate by the Zurich Chamber
Commerce will be obtained by BM at BM's cost and shall se
as Schedule H of this Agreement.

10.5 **Force Majeure.** In the event that either Party
prevented from performing or is unable to perform any of
obligations under this Agreement due to any act of God, for
casualty, flood, war, strike, lockout, failure of pub
utilities, injunction or any act, exercise, assertion
requirement of governmental authority, including a
governmental law, order or regulation or any prelimin
injunction permanently or temporarily prohibiting or reduc
the level of research, development or production wi
hereunder or the manufacture, use or sale of License
Products; epidemic, destruction of production faciliti
riots, insurrection, inability to procure or use materia
labor, equipment, transportation or energy sufficient to m
experimentation or manufacturing needs; or any other ca
beyond the reasonable control of the Party invoking
Section 10.5 if such Party shall have used its best effort
avoid such occurrence, such Party shall give notice to
other Party in writing promptly, and thereupon the affec
Party's performance shall be excused and the time
performance shall be extended for the period of delay
inability to perform due to such occurrence.

10.6 **Waiver.** The waiver by either Party of a breach o
default of any provision of this Agreement by the other par
shall not be construed as a waiver of any succeeding breac
the same or any other provision, nor shall any delay
omission on the part of either Party to exercise or a
itself of any right, power or privilege that it has or m
have hereunder operate as a waiver of any right, power
privilege by such Party.

10.7 **Notices.** Any notice or other communication
connection with this Agreement must be in writing and sh
mail, by certified mail, return receipt requested, and sh
be effective when delivered to the addressee at the add
listed below or such other address as the addressee shall
specified in a notice actually received by the addressor.

- 22 -

A 73245

A073245

AM-ITC 00119918

If to GI:

Genetics Institute, Inc.
87 CambridgePark Drive
Cambridge, Massachusetts  02140
U.S.A.
Attention:  President

If to BM:

Boehringer Mannheim GmbH
Sandhofer Strasse 116
D-6800 Mannheim 31
Federal Republic of Germany
Attention:  Geschaeftsfuehrung

10.8 No Agency.  Nothing herein shall be deemed to constitute either Party as the agent or representative of the other Party, or both Parties as joint ventures or partners for any purpose.  GI shall be an independent contractor, not an employee or partner of BM, and the manner in which GI renders its services under this Agreement shall be within GI's sole discretion.  Neither Party shall be responsible for the acts or omissions of the other Party, and neither Party will have authority to speak for, represent or obligate the other Party in any way without prior written authority from the other Party.

10.9 Entire Agreement.  This Agreement and the Schedules hereto (which Schedules are deemed to be a part of this Agreement for all purposes) contain the full understanding of the Parties with respect to the subject matter hereof and supersede all prior understandings and writings relating hereto.  No waiver, alteration or modification of any of the provisions hereof shall be binding unless made in writing and signed by the Parties by their respective officers thereunto duly authorized.

10.10 Headings.  The headings contained in this Agreement are for convenience of reference only and shall not be considered in construing this Agreement.

10.11 Severability.  In the event that any provision of this Agreement is held by a court of competent jurisdiction to be unenforceable because it is invalid or in conflict with any law of any relevant jurisdiction, the validity of the remaining provisions shall not be affected, and the rights and obligations of the Parties shall be construed and enforced as if the Agreement did not contain the particular provisions held to be unenforceable.

- 23 -

A 73246

AM-ITC 00119919

10.12 **Successors and Assigns.** This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their successors and permitted assigns.

10.13 **Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as a sealed instrument in their names by their properly and duly authorized officers or representatives as of the date first above written.

Mannheim                          Cambridge,

BOEHRINGER MANNHEIM GMBH          GENETICS INSTITUTE, INC.
           ppa.

Dr. Robbins    Prof. Dr. Abshagen     Gabriel Schmergel

- 24 -

A 73247



be
:eto

! in
! an
 and

this
:mes
  or

:C.

SCHEDULE A

BENCHMARKS

Description                    Payment (in U.S. $)

::ed:

:NSTITUTE, INC.

MANNHEIM GMBH

A 73248

SCHEDULE A

TERRITORY

✳

Acknowledged:

GENETICS INSTITUTE, INC.

By: ~Galowich Schwarz~

BOEHRINGER MANNHEIM GMBH

By: ~[signature]~

A 73249

AM-ITC 00119922



SCHEDULE C

COMECON COUNTRIES

...ocratic Republic
...vakia

...1

...on (USSR)

...d:

...STITUTE, INC.

...MANNHEIM GMBH

A 73250

A073250

AM-ITC 00119923

SCHEDULE D

MINIMUM ROYALTY



Acknowledged:

GENETICS INSTITUTE, INC.

By: _Gabriel Schmergel_

BOEHRINGER, MANNHEIM GMBH

By:_____

A 73251



SCHEDULE E

Dated:

INSTITUTE, INC.

MANNHEIM GMBH

A 73252

## SCHEDULE F

PRE-COMMERCIALIZATION SUPPLY OF LICENSED COMPOUND



Acknowledged:

GENETICS INSTITUTE, INC.

By: _Gabriel Schmergel_

BOEHRINGER MANNHEIM GMBH

By: _____

A 73253



SCHEDULE G

PRODUCTION SCHEDULE

...dged:

... INSTITUTE, INC.

...ER MANNHEIM GMBH

A 73254

AM-ITC 00119927