EXHIBIT 29

PART ONE

Dockets.Justia.com

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMGEN, INC.,<br><br>          Plaintiff,<br><br>    v.<br><br>F. HOFFMANN-LA ROCHE, LTD.,<br>ROCHE DIAGNOSTICS GMBH, and<br>HOFFMANN-LA ROCHE, INC.<br><br>          Defendants. | Civil Action No. 05-CV-12237 WGY |

**EXPERT REPORT OF DR. LOWE**

**I, JOHN LOWE, M.D.,** declare as follows:

I offer this expert report on whether the claims asserted against Roche from certain of Amgen's United States Patents, as described below, are invalid for obviousness and lack of novelty.

I.    **QUALIFICATIONS**

1.    I am currently the Professor and Chair of the Department of Pathology at Case Western Reserve University School of Medicine in Cleveland, Ohio. I have held this position since March 1, 2005. Prior to March 1, 2005, I was a Professor of Pathology at the University of Michigan Medical School, and was an Investigator of the Howard Hughes Medical Institute. I held the medical school faculty position at the University of Michigan and my position with the Howard Hughes Medical Institute since October 1, 1986. In my prior position at the University of Michigan, I spent approximately 80% of my time and effort in scientific research activities. In

my current position, I spend approximately 40% of my time and effort in scientific research activities.

2.    My past and current scientific research has focused on understanding how a protein modification termed glycosylation contributes to the function of several specific proteins of relevance to the mammalian immune system. These proteins include: (1) the Notch family of cell surface receptors; (2) the proteins that bind to Notch proteins (Notch ligands); (3) the selectins, which are three members of a family of proteins that mediate adhesion of white blood cells to the inside of the blood vessel; and (4) selectin ligands. My role in this research continues to consist of formulating hypotheses, designing experiments, supervising the completion of these experiments by laboratory personnel comprised of PhD students, research technicians, and junior faculty members, interpreting the data forthcoming from these experiments, and helping to compose the manuscripts that report these data and their conclusions.

3.    In addition to my laboratory research responsibilities, I currently administer the Pathology Department at the Case Western Reserve School of Medicine and the University Hospitals of Cleveland. This Department has as its missions the provision of clinical laboratory and surgical pathology services to the physicians and patients at University Hospitals of Cleveland, the teaching of medical students, PhD students, and physicians in training at the Case Medical Center, and basic and applied research in biomedicine.

4.    I am the sole author of four issued United States patents and two issued foreign patents, and a coauthor of five issued United States patents. These patents include claims for novel methods for molecular cloning of genes and cDNAs encoding mammalian proteins that control glycosylation, for DNA and protein sequences derived from such cloning activities, or for the expression of a soluble recombinant molecule whose state of glycosylation is essential to

its possible therapeutic effectiveness.  I am currently a consultant and scientific advisor for Abaron Scientific, a small biotech company in San Diego, California that is seeking to commercialize glycan-related products.  I am also currently a consultant and scientific advisor for Velcura Scientific, a small biotech company in Ann Arbor, Michigan that is seeking to commercialize products that may be used to treat bone diseases.  In the past, I have consulted for several large and small pharmaceutical companies, primarily to provide advice on molecules and mechanisms that are operative in human inflammatory diseases, and on means to modulate these molecules and mechanisms for therapeutic benefit.

5.     I have coauthored more than 135 articles in the scientific literature.  These articles include peer-reviewed publications reporting new scientific discoveries dealing with the genetics of bacterial transposable elements, the molecular cloning and prokaryotic expression of mammalian lipid transport proteins, the molecular cloning of more than a dozen mammalian glycosyltransferase genes and cDNAs, and the study of their structure and expression, and the structure and function of the glycans constructed by the corresponding glycosyltransferases.  A majority of these studies required extensive use of mammalian expression vectors for expressing exogenous mammalian proteins in mammalian host cells.  These proteins included the glycosyltransferases themselves, as membrane-bound or secreted forms, and a variety of secreted recombinant mammalian proteins used as reagents to study the structure and function of mammalian glycans and glycoproteins.

6.     As will be apparent from my curriculum vitae, a major focus of my scientific research has involved the molecular cloning of new mammalian genes using bacterial and mammalian host and vector systems.  This work has also required extensive use of expression of recombinant mammalian proteins in mammalian host cells, including CHO cells and COS cells,

and under circumstances wherein the state of glycosylation may be important, and may be modified by genetic manipulation of the type of glycosylation of the cells in which the protein is expressed. I have specific knowledge of the scientific topics that are germane to my expert report, including genomic and cDNA cloning strategies using restriction endonucleases, DNA ligase, and other DNA and RNA modifying enzymes, DNA purification, DNA sequencing, plasmid construction, use of prokaryotic and eukaryotic host cells for cloning and expressing exogenous proteins, culture conditions for exogenous protein expression, protein characterization, and analysis of glycoproteins. I have been active in these endeavors for more than 25 years. My Curriculum vitae is attached as Ex. A. If called upon to do so, I will go through my Curriculum vitae to discuss the contents, including my research and awards.

7.      In this report, I cite to various articles, patents and documents listed as Exhibit B, and if called to testify, I will discuss the dates which are on the face of these documents. For the purpose of brevity, in this report I may not repeat or discuss the dates on the face of each article, patent and document cited herein.

8.      This report is based on information currently available to me. I reserve the right to continue my investigation and study, which may include a review of documents and information that may yet be produced, as well as deposition testimony for which transcripts are not yet available and that may yet be taken in this action, or any other information provided or adduced in this action, including at trial. Therefore, I expressly reserve the right to expand or modify my opinions as my investigation and study continues, and to supplement my opinions in response to any additional information that becomes available to me, to any matters raised by the Plaintiff, or other opinions provided by the Plaintiff's experts. I also understand that the Court has not interpreted the disputed terms in the asserted claims in this action, and I reserve the right

to modify, supplement or amend any opinion in this Report, or which I may advance in this case, based on the Court's claim construction to the extent appropriate to do so.

9.      Furthermore, I reserve the right to rely upon testimony or other materials generated in further discovery proceedings or presented at trial.  In connection with my testimony, I may rely upon certain graphic or demonstrative exhibits listed herein or attached hereto, and perhaps those that have not yet been prepared, but which are based on documents or testimony identified in this report.

## II.      THE LIN PATENTS

10.      It is my understanding that the patents-in-suit in this litigation (collectively the Lin patents), and the claims asserted from those patents, are United States Patent No. 5,441,868 claims 1 and 2; United States Patent No. 5,618,698 claims 4-9; United States Patent No. 5,756,349 claim 7; United States Patent No. 5,547,933 claims 3, 7-9, 11-12 and 14; and United States Patent No. 5,621,080 claims 3, 4, and 6 and United States Patent No. 5,955,422 claim 1.

## III.      TECHNICAL AND TUTORIAL BACKGROUND

11.      To put my opinions in context, to thus help make my opinions about these claims most clear, it is useful to review the relevant technology and to provide a tutorial on underlying scientific concepts.  In this regard, I will provide an overview of the essential concepts needed to understand the "central dogma" of molecular biology, DNA, genes and gene expression, as well as a discussion of the state of the art of gene cloning and recombinant technology at around the time of the filing dates of the Lin patents.

### B.      Cells and Proteins

12.      All living organisms are made up of cells, which in higher organisms are organized to make up various tissues and organs.  Many of the basic functions of living cells are

carried out by specialized macromolecules called proteins. For example, certain proteins catalyze the many biochemical reactions that direct the functions of cells, whereas some serve as the structural components of cells and tissues, and some proteins, such as hormones, serve as signaling molecules between cells.

13.     Proteins are formed from different combinations of twenty amino acids, which are chemically joined to each other like links on a linear chain to form the full protein molecule. Each amino acid in the protein is held together by a specific chemical bond called a peptide bond. While a typical protein contains 200-300 amino acids, some are much smaller and some are much larger. Most proteins exist in at least one characteristic three-dimensional shape that allows the protein to be functionally active. The primary structure of any protein, its biochemical properties and in large part the specialized function it has in the cell are usually determined primarily by its particular amino acid sequence, or order in which the amino acids are found on the polypeptide chain.

14.     The genetic information that a cell uses to make all of these different proteins is carried in molecules of deoxyribonucleic acid (DNA). The DNA molecule can be pictured as two twisting, paired strands. Each strand of DNA is made up of four chemical units, called nucleotides, strung together in a precise order, just as letters are joined together to make words. There are only four nucleotides defined by their basic chemical entity: adenine ("A"), guanine ("G"), cytosine ("C") and thymine ("T"). The part of a DNA sequence that contains the code for a given protein is referred to as a gene. The precise nucleotide sequence of DNA (the DNA sequence) of a gene determines the amino acid sequence of the protein that the gene encodes and thereby provides a blueprint for that protein.

15.    The chemical make-up of the nucleotides allows only A to pair with T and C to pair only with G.   This strict complementary pairing means that the order (sequence) of nucleotides on one strand of the DNA chain will determine the order (sequence) of the nucleotides on the other strand of the DNA chain.   The genetic information carried in a cell is stored in the sequence of these nucleotide pairs as they are found on the DNA strands that make up the chromosomes.

16.    DNA directs cells to make proteins through a two-step process of transcription and translation.  In the first step, transcription, information is transferred from DNA to a RNA, or ribonucleic acid.   RNA is a long single strand of nucleotides similar to DNA, except RNA contains the nucleotide uracil ("U") in place of thymine ("T"). RNA that codes for a protein is called messenger RNA ("mRNA").

17.    In the second step of protein expression or translation, the nucleotide sequence of the mRNA is translated into the amino acid sequence of the corresponding protein. A structure known as the ribosome reads the mRNA nucleotide sequence and translates it into amino acids. Every three bases in the mRNA forms a unit, which is referred to as a codon.  During translation of the protein, each codon specifies which one of the twenty amino acids is to be added to the growing protein chain by the ribosomal machinery.  Beginning at a start codon, the amino acids are added to the chain one at a time, until the ribosome reaches a special codon on the mRNA which acts as a stop signal, which then terminates the protein chain.   Only two amino acids are specified by a single codon.   For the remaining amino acids, the codons are "degenerate," meaning that the amino acids have more than one corresponding codon.  These amino acids are each represented by between two and six codons.  In sum, the twenty amino acids are specified by a total of 64 different codons.

7

18.     There are several important differences in how proteins are expressed in simpler single cell organisms such as bacteria and in the cells of eukaryotes, such as mammals or other vertebrates. In particular, bacteria and eukaryotes differ in how the DNA blueprint for any gene is first transcribed or copied into messenger RNA. Bacterial cells are an example of a prokaryote, or cellular organism distinguished by the absence of a distinct nucleus. The cell's DNA is therefore directly accessible to the ribosomes, or protein making machinery, which is found in the cytoplasm. During transcription, the ribosomes attach to the mRNA as it is being transcribed and begin making protein.

19.     In bacteria the DNA sequence encoding most bacterial proteins exists as an uninterrupted stretch of DNA. Commonly, the transcribed copy of the coding sequence can serve as a messenger RNA without any further processing. In contrast, in eukaryotic cells, such as mammalian and other vertebrate cells, which are distinguished by the presence of a distinct nucleus, the mRNA encoding any gene must first be transported out of the nucleus into the cytoplasm. Before it does so, the mRNA commonly undergoes multiple processing steps, including "capping" at the beginning of 5' end of the mRNA, polyadenylation at the 3' end of the mRNA, and lastly, splicing of the mRNA transcript.

20.     The last step of splicing represents a most fundamental modification to most eukaryotic mRNAs, which arises due to the difference in how genes are organized in eukaryotic cells. In contrast to bacteria and other prokaryotes, the coding sequence for most eukaryotic proteins is interrupted by stretches of non-coding sequences, referred to as introns. As a consequence, the DNA sequence corresponding to the coding sequence often represents only a small portion of the entire gene. During transcription of eukaryotic genes, the entire DNA sequence is first copied into a long mRNA called the primary transcript which includes both the

8

non-coding intron sequences and the interrupted portions of the sequence corresponding to the coding sequence, referred to as exons. To make an mRNA copy that can be read by the protein making machinery, the introns are all "spliced" or removed from the mRNA to result in a shorter mRNA transcript that contains an uninterrupted coding sequence for the protein.

### C.    Glycosylation

21.    Although the primary structure, or amino acid sequence of all cellular proteins is determined by the gene encoding that protein, the protein may also be subjected to processing within the cell, during translation, or after translation. This additional processing, the end result of which is referred to as a post-translational modification, results in the mature, functional protein. In mammalian or other vertebrate cells, such steps may include folding of the polypeptide chain to form the three-dimensional structure of the protein, and removal of "leader" sequences from the beginning or N-terminal end of the protein. For many proteins, co-translational modification and post-translation modification yields modification of the immature protein with carbohydrate chains, made up of individual sugar residues. This modification is known as glycosylation. Most commonly, the carbohydrate on a mammalian glycoprotein can exist as a branched chain covalently bonded to the protein at asparagine residues, a structure referred to as an N-linked glycan.

22.    Many other types of protein glycosylation are known today, including O-linked glycans. O-linked glycans are comprised of single monosaccharides, linear polymers of monosaccharides, or branched polymers of monosaccharides that modify certain serine or threonine residues on some proteins. A majority of the proteins that are secreted from mammalian cells are glycoproteins. Even though a few glycosylated mammalian proteins do not apparently require glycosylation for function, in general, many glycosylated mammalian proteins

9

will not function correctly without at least some glycosylation, as demonstrated through experiments in which all carbohydrate chains are removed from the protein. (*See* Varki 1993, Table I and references cited).

23.    For many mammalian proteins, glycosylation has a structural role.    The carbohydrate on glycoproteins facilitates proper folding of these proteins in the course of their expression in the cell and acts to stabilize mammalian proteins in a biologically active, functional conformation.    Prior to October 1983,[1] a significant amount of work had been done to characterize the pathway in mammalian cells by which proteins are glycosylated.    Much of this work was done through detailed analysis of glycoprotein processing in CHO cells, a widely used cell line developed from ovaries of Chinese Hamsters.

### D.    Recombinant DNA Technology and Gene Cloning

24.    For many years, one obtained mammalian proteins by isolating or purifying proteins from various human and animal tissues, cells or other biological sources such as blood, plasma or urine.    Beginning in the 1970s, a technology referred to as recombinant DNA technology was developed that allowed one to produce proteins by use of "host cells." Recombinant DNA technology refers to a wide range of techniques for manipulating and analyzing genetic material (DNA and RNA), including the isolation and sequencing of DNA molecules. This technology allowed one to produce large quantities of mammalian proteins without the need for extensive biochemical purification from tissues or cells that expressed the protein only in small amounts.    Instead, this technology allowed one to obtain the same proteins by "cloning" a gene for that protein, that is, either isolating or synthesizing a gene encoding for

---

[1]    I refer to October 1983 as that appears to be the earliest date Amgen suggests for its inventions.  If Amgen suggests a different date, I reserve the right to supplement my report.

10

the protein of interest, and introducing that gene into an appropriate host cell in a form such that the cell would express the encoded protein at relatively high levels.

25.    Prior to October 1983, routine tools in the art that were used in gene cloning included methods for cutting DNA using restriction enzymes, methods for joining or linking together multiple fragments of DNA using another enzyme known as DNA ligase, methods for sequencing large stretches of DNA, and methods for copying a particular DNA molecule through use of small DNA molecules referred to as vectors, which could replicate in an appropriate host cell.

## IV.    THE CLAIMS OF THE LIN PATENTS ARE OBVIOUS OVER THE PRIOR ART

### A.    The Standard for Obviousness and Anticipation

26.    My opinions are based on my scientific expertise which must be considered based on legal principles.  Therefore I set forth the legal framework I am considering.  It is my understanding that the patent laws require, at the time of invention that the claimed subject matter would not have been obvious to one of ordinary skill in the art in the field of the invention, in view of the prior art surrounding the subject matter of the claims.  There is a presumption that the date of invention is no earlier than the date a complete patent application is filed, unless the inventor can prove an earlier date.  It is my understanding that in determining obviousness, in addition to any publication available to the public at the time of filing, among other things one can consider as prior art is any earlier invention by another that an inventor has not either abandoned, suppressed or concealed, and for which from the time the inventor conceived it, the inventor was reasonably diligent in creating a working example.  Such an invention can be combined with other prior art to render a claimed invention obvious.  It is my understanding that among the factors to be considered in determining obviousness are included:

11

(a) the scope and content of the prior art; (b) differences between the prior art and the claims at issue; (c) the level of ordinary skill in the field of the invention; and (d) certain other objective factors.

27.    I have also been advised that the patent laws require, at the time of filing, that the claimed invention must be new, in that there can be no prior art reference or prior use that would anticipate the claim. It is my understanding that the claimed invention will be anticipated if each and every element of the claimed invention is disclosed expressly or inherently in a single prior art reference or prior use, or if there is evidence that the claimed invention already existed in nature. In the specific case of a claimed process or method, I understand the claimed method is anticipated if each step in the claimed process is taught in a single prior art reference or prior use.

### B.    Relative Skill in the Art Around the Time of the Invention

28.    My opinions are based on the understanding of a person of ordinary skill in the art prior to October 1983, the time of Dr. Lin's first isolation of a positive clone containing the EPO gene. When I refer to a person of ordinary skill in the art, I am referring to such a person at that time. One of ordinary skill in the art at that time would have been a person having an MD or a PhD in biochemistry, medicine, genetics, molecular biology, or immunology, for example, or an equivalent thereof, with at least 1-2 years laboratory experience. Ordinary skill in the art at that time would include having experience isolating and otherwise working with mammalian genomic DNA and mammalian RNA and mRNA; recombinant DNA technologies including restriction endonucleases, DNA ligases, and other DNA manipulating enzymes and associated procedures that would include the construction of genomic and cDNA libraries; DNA sequencing; prokaryotic and eukaryotic cloning vectors; prokaryotic and eukaryotic expression vectors; prokaryotic and eukaryotic host cells; technologies required to introduce DNA into

prokaryotic and eukaryotic host cells; techniques for purifying recombinant proteins from bacterial and mammalian host cells transformed with vectors expressing exogenous proteins.

### C.    The Prosecution History of the Lin Patents

29.    My opinion is also informed by my review of the prosecution history of the Lin patents, including my review of specific rejections of pending claims in view of prior art raised by the Examiner, and arguments raised by Amgen in response to those rejections. I note that in its efforts to convince the examiner that its invention was new and non-obvious in view of prior art, Amgen emphasized two arguments. These arguments can be summarized as (1) that none of the prior art describing cloning of genes for other mammalian proteins would have provided one of ordinary skill a reasonable expectation of success in similarly cloning the human EPO gene, and (2) that the skilled scientist prior to October 1983 would not have expected that a functional "obligate" glycoprotein could be expressed in a mammalian cell, such as a CHO cell. I disagree with each of these arguments, which I will address individually in more detail.

## V.    The Prior Art Rendered Cloning of the EPO Gene Obvious

### A.    Prior to October 1983, one of skill would have had a reasonable expectation of success in cloning the EPO gene using a cDNA library

30.    As described below, prior to October 1983 it would have been obvious for the skilled practitioner with access to sufficient quantities of purified human EPO to construct a cDNA library from one of several EPO producing human cell lines and to isolate a human EPO cDNA by screening such a library with an appropriate oligonucleotide probe based on knowledge of the partial amino acid sequence of the protein. Using techniques known in the art and described in the available literature, the skilled practitioner would have had a reasonable expectation of success in obtaining a cDNA clone encoding EPO. Furthermore, it would have

13

been obvious for the skilled practitioner to use the EPO cDNA clone to clone and characterize the human EPO gene.

> (i)     **Techniques available to one of skill in the art prior to October 1983 for use in cDNA cloning**

31.     Much of recombinant DNA technology relies on the technique of DNA cloning, which refers to the process of making identical copies of a portion of DNA.  Using this technique, one can identify and select a single DNA sequence from many other sequences, and then produce identical copies of that sequence in virtually unlimited amounts.  Prior to October 1983, one of skill could employ a variety of routine techniques for manipulating and cloning DNA fragments.

32.     A simple approach for cloning DNA involves introducing the DNA one wants to copy into a bacterial cell.  A common approach prior to October 1983 used a small DNA molecule called a plasmid as a carrier or vector for the introduced DNA.  Plasmids are small circles of DNA, which are capable of independently replicating in a bacterial cell.  During the course of bacterial cell growth and division, the bacterial cell replicates its own DNA.  At the same time, the plasmid DNA, as well as foreign DNA that has been inserted into the plasmid is also replicated, usually many times over, creating tens or hundreds of copies of the plasmid per bacterial cell depending on the nature of the origin of replication of the plasmid.   Most plasmids used for DNA cloning included three features: a replication origin, or DNA sequence allowing the plasmid to replicate independently in the bacterial cell, a sequence serving as a cutting site for a restriction endonuclease enzyme, allowing the plasmid to be cut and opened and a foreign DNA fragment to be inserted into the plasmid, and a "selectable marker" gene, encoding for some selectable property such as antibiotic resistance, allowing one to identify recombinant bacterial cells that take up the plasmid.

14

33.    To clone a desired DNA fragment, purified plasmid DNA is treated with a restriction endonuclease that cuts the DNA sequence of the plasmid, typically in one place. The DNA fragment to be cloned is then inserted into the plasmid using another enzyme called DNA ligase, resulting in a recombinant DNA molecule carrying the fragment of interest. This recombinant plasmid is then introduced into a bacterial cell by treating the bacterial cell so that it will take up foreign DNA and then exposing the bacteria to the recombinant plasmid, a process commonly referred to as transformation.    After taking up the plasmid, the bacteria are then grown in a suitable nutrient liquid, or broth, where the cells will rapidly multiply, doubling about every 30 minutes.    As the bacterial cells divide and double, the recombinant plasmid containing the introduced DNA fragment will replicate, creating multiple copies.    In this manner, many hundreds of millions of copies of recombinant bacteria, each carrying one of more copies of the recombinant plasmid with an introduced DNA fragment may be generated in the course of only a single day. The DNA fragment can then be routinely isolated and purified. The bacterial cells are lysed to release the recombinant plasmid, which is then purified from the bacterial DNA and other bacterial cell components. By cutting the plasmid with the appropriate restriction endonuclease enzyme, the DNA fragment can be recovered from the plasmid and purified by gel electrophoresis.

34.    One of the most important applications of DNA cloning, developed first in the 1970s, was in cloning the DNA for particular genes. Prior to October 1983, scientists were using at least two standard approaches to "clone," or isolate genes from mammalian cells. These two approaches were based on use of two types of large collections of cloned DNA fragments, commonly referred to as DNA libraries. The first approach used genomic DNA libraries, and the second, complementary DNA (cDNA) libraries.

15

35.     A genomic library refers to a collection of cloned fragments of DNA representing the complete genome, or set of genetic instructions found in an organism. Prior to October 1983, a genomic library was often kept as a collection of different clones of bacteria, with each separate clone of bacteria carrying a different DNA fragment from the library in an appropriate DNA carrier or vector, such as a plasmid or a bacteria virus, known as a phage. Methods for constructing such libraries were well described in the scientific literature, including several well known treatises. (*See, e.g.,* Maniatis & Fritsch). Dr. Lin screened a genomic DNA library received from Dr. Thomas Maniatis. (*See* Lin Depo. Tr. (3/28/07) at 137:3-14; AM-ITC 00174527; AM-ITC 00148954).

36.     As a source for the genomic library, one commonly started by extracting all the genomic (chromosomal) DNA from either a tissue sample or culture of cells from the organism. DNA from higher organisms, such as humans, consists of extremely long molecules, which are impractical to work with. To manipulate the genomic DNA, it is first broken into shorter pieces, either by mechanically shearing the DNA, or by cutting it with restriction endonucleases. Such treatment breaks up the mammalian DNA into millions of shorter fragments, each of which can then be cloned as described above. For example, each of these fragments can be inserted into plasmid carrier molecule. The recombinant plasmid is then introduced into bacterial cells under conditions to ensure that no more than one unique plasmid and its progeny are hosted by each bacterial cell. The resulting culture of different recombinant bacterial cells, each carrying a distinct DNA fragment of genomic DNA, makes up the genomic library. Similar approaches are used to create genomic libraries in phage vectors. As described below, the entire genomic library can then be screened to identify individual bacterial clones carrying a DNA fragment containing a particular sequence.

37.     A cDNA library contains cloned DNA copies of the messenger RNA (mRNA) from a particular cell or tissue. As with genomic libraries, cDNA libraries were often kept as a collection of different clones of bacteria, with each separate clone of bacteria carrying a different DNA fragment from the library.  The basic steps that one would have used prior to October 1983 in preparing a cDNA library from mammalian cells can be summarized as follows. First, the messenger RNA (mRNA) from an appropriate cell or tissue is isolated.  Commonly, in isolating mRNA, one takes advantage of the fact that all mRNAs from eukaryotic cells include "poly A" nucleotide repeat ("poly A tail") at the end of the molecule, allowing mRNA to be efficiently separated using chromatographic methods.

38.     Following isolation of mRNA, reverse transcriptase is used to synthesize a DNA strand complementary to each mRNA molecule.  Each of the resulting single-stranded DNA molecules is converted into double-stranded DNA molecules using DNA polymerase.  Such DNA fragments can then be cloned as described above through standard techniques. As with a genomic library, the DNA fragments are inserted into appropriate vectors, such as plasmids.  The plasmid vector is then introduced into bacterial cells under conditions that ensure that no more than one unique recombinant plasmid and its progeny are hosted by each bacterial cell. The resulting culture of bacterial cells, each of which carries a DNA fragment corresponding to the particular messenger RNA expressed in the cell, makes up the cDNA library.  Similar approaches are used to create cDNA libraries in phage vectors.

39.     Using cDNA libraries can often provide a distinct advantage over using a genomic library.  In contrast to a genomic library, which contains DNA fragments representing all of the chromosomal DNA found in an organism, the fragments contained in a cDNA library correspond only to the genes that are expressed by a particular cell or tissue.  Much of the

chromosomal DNA found in mammals does not encode for any protein, but instead corresponds to non-coding sequences, such as introns and regulatory sequences found outside the protein coding regions of genes.  In a genomic library, a substantial fraction of the DNA clones will therefore correspond to such non-coding DNA sequences.  In contrast, the DNA clones in a cDNA library correspond only to coding sequences. Moreover, the DNA clones in a cDNA library will represent only the genes that are actually expressed in a cell or tissue. For these reasons, a cDNA library contains a significantly smaller collection of DNA fragments than a genomic library.  In a typical human cDNA library, the number of unique sequences represented in the library will be anywhere from 20 to 100-fold less than in a genomic library.  And, because a cDNA library will be representative only of those genes expressed in a specific cell or tissue, and will not contain sequences NOT expressed by that cell or tissues, a sequence corresponding to a gene expressed by the cell will be present in the cDNA library at a higher frequency than in a genomic library made from the DNA of the same organism.  In this respect, expressed genes are more easily identified and isolated from a cDNA library than from a genomic library.  I have also reviewed Dr. Lin's testimony where he agrees that screening a cDNA library can be done more easily than a genomic DNA library, for the reasons noted above.  (*See* Lin Depo. Tr. (3/28/07) at 163:10-164:7; AM-ITC 00784965-67; *see also* Lin US Pat. No. 4,703,008 ("'008 patent") File History ("FH"), Paper No. 15, dated 3/19/87).

40.    With both genomic and cDNA libraries, to find a particular clone corresponding to a particular DNA sequence, such as a gene encoding a desired protein, one "screened" the library with an appropriate matching DNA probe.  A typical approach used a probe consisting of a relatively short sequence of DNA bases, commonly referred to as an oligonucleotide.  (Suggs 1981).  Screening refers to using a DNA probe to identify a particular target sequence in the

DNA of the library. Typically, to screen the library, recombinant bacterial colonies are plated or transferred onto a filter membrane. The DNA in the library is first denatured to separate the DNA into two single strands and fix it to the filters, which are then screened by hybridization with an appropriate matching DNA probe. (Maniatis & Fritsch). Appropriate reaction conditions are selected so that if the probe is complementary to a sequence in the library, for example a desired gene, it will hybridize, or bind, to that gene. The particular screening conditions are often referred to in terms of stringency. Under high stringency conditions, a probe will only hybridize to an identical or almost identical target sequence, while lower stringency conditions will allow a probe to hybridize to a partly mismatched sequence. Commonly, probes were radioactively labeled so that when bound to a desired sequence in the library, the desired DNA clone could be identified and isolated from the library.

41.    In many cases, there is no information as to any of the particular nucleotide sequence of the gene. If, however, some portion of the amino acid sequence of the protein is known, one can use such information to synthesize a suitable probe based on that sequence. The starting point for making a suitable probe is therefore purifying a sufficient amount of a desired protein. In 1981 through early 1983, the literature indicated that protein and peptide microsequencing technologies were being used with amounts of protein or peptides in the 500 pmol range, or less, to obtain protein sequence information enabling of the design of degenerate oligonucleotides. (Hewick 1981, Hunkapiller 1983).

42.    Once such amounts are available, routine protein sequencing techniques are used to determine short stretches of the protein's amino acid sequence. By applying the genetic code in reverse, one can deduce all DNA sequences that could correspond to a particular amino acid sequence. From these, one can design complementary probes that can identify bacterial clones in

19

the DNA library corresponding to the desired gene through DNA hybridization. Since some amino acids may be encoded by one of several possible DNA triplets, a concept referred to as codon degeneracy, a number of different oligonucleotide probes are often needed to ensure one has a probe that corresponds exactly to the target DNA sequence, and/or one or more probes that achieve sufficient specificity under an appropriate hybridization stringency to allow identification of the target DNA sequence by hybridization. I agree with Dr. Lin that using degenerate, even fully degenerate, probes is not innovative. For example, Dr. Lin testified at trial in *Chugai* that:

> THE COURT: Is there something innovative about using – this I'm not sure about – the fully degenerate probes as opposed to making –
>
> THE WITNESS: Incomplete.
>
> THE COURT: Yes. – an incomplete set?
>
> THE WITNESS: See, well, it's not so innovative either. . . .
>
> THE COURT: But in your field, as I'm now growing to learn it –
>
> THE WITNESS: Yes.
>
> THE COURT: – is it innovative to decide to use fully degenerate probes rather than making an assumption about what the right nucleotide base is?
>
> THE WITNESS: It's not innovative to use a fully degenerate. It just gives you the better odds of getting the thing that you want; because if you don't use it, basically you are guessing because you don't know what nature – what to do with the particular position – particular nucleotide in the particular position. You don't know. We are guessing all the time if you don't do all that.

(AM-ITC 00113058-60; *see also* Lin Depo. Tr. (3/28/07) 176-83).

**B.    Provided one had a sufficient amount of hEPO protein, one would have had a reasonable expectation of success in isolating cDNA clones for EPO using degenerate oligonucleotide probe screening**

43.    Prior to October 1983, direct screening with a mixed pool of oligonucleotide probes, based on a partial amino acid sequence of a desired protein, had been established as a reliable method for screening genomic and cDNA libraries. As described below, this approach

had been successfully used to isolate clones from both cDNA and genomic libraries using probes with 128-fold or even higher degeneracy. Therefore, once one had sufficient information about the amino acid sequence of a protein to design appropriate probes, such screening methodology provided the skilled scientist with a reasonable expectation of success in cloning the gene for that protein. With sufficient amounts of a protein, one could readily obtain sequence information for any number of different portions of the amino acid sequence using known techniques for protein sequencing. To use this methodology to screen a cDNA library for the erythropoietin gene, one only needed enough information about the erythropoietin amino acid sequence to design a suitable degenerate oligonucleotide probe.

44.     Prior to October 1983, and earlier, technologies for sequencing the amino terminus of an individual specific protein, or peptides derived from such a protein, had developed to the point where protein sequence data enabling the design of suitable degenerate oligonucleotide probes could be obtained with small amounts of protein or peptide. For example, as noted by Hunkapiller (Feb. 1983), "microsequencing . . . may now be considered to involve sequencing less than 0.5 nmol of sample." Thus, prior to October 1983, one could generate amino acid sequence data that would in turn allow the design of degenerate oligonucleotides enabling the screening of a cDNA library for an erythropoietin cDNA. (Hunkapiller 1983).

(i)     **The Availability of Purified EPO and EPO Tryptic Fragments from Eugene Goldwasser was Necessary to Lin's Cloning of the EPO Gene**

45.     The ability of Dr. Lin to obtain a sufficient amount of a purified EPO protein and purified EPO protein fragments from Dr. Goldwasser was necessary and essential to Dr. Lin's cloning of the EPO gene. Without sufficient protein material, it was not possible to obtain protein sequence information necessary to construct oligonucleotide probes for cloning. Until Dr. Lin himself had sufficient correct information regarding portions of the amino acid sequence

21

of human EPO, his attempts to screen libraries all failed due to lack of a probe with sufficient specificity for the target DNA sequence. The lack of correct information about the amino acid sequence of the human EPO protein therefore was the only obstacle to cloning the human EPO gene. In this regard, I have reviewed a number of Amgen documents. (*See, e.g.,* AM-ITC 00414984-85; AM-ITC 00145916-18; AM-ITC 00211739-40; AM-ITC 00874937-45; AM-ITC 00172320-24; AM-ITC 00138784-90; AM-ITC 00239491-99; AM-ITC 00347087-094; AM-ITC 00168239-481; AM-ITC 00212357-64; AM-ITC 00347670-80). For example, the Amgen document at AM-ITC 00138942-45 shows that Lin believed the "Critical Factors" for the EPO Project to include "Obtain more EPO" and "Obtain more amino acid sequences." (*See also* AM-ITC 00050916-22). According to Dr. Lin, Goldwasser's purified urinary EPO was the only source available that was useful for sequencing. (AM-ITC 00841410, AM-ITC 00148961-81, AM-ITC 00113349-50, AM-ITC 00113651-54). These Amgen documents as well as the testimony of Dr. Lin and of Dr. Goldwasser indicate that obtaining a sufficient amount of purified EPO protein from Dr. Goldwasser was necessary to allow Amgen to correctly synthesize nucleotide probes that Dr. Lin used to successfully isolate a DNA clone for human EPO.

46. In particular, Dr. Goldwasser confirmed that without the purified EPO he had supplied Amgen, Dr. Lin could not have cloned the EPO gene:

Q.  Okay. In your Perspective, we're looking at Page 26, you say, since I had the only supply of pure epo in the world or so we thought, they would need my collaboration. Do you see that?

A.  I'm still looking for it. Yes, I see it now.

Q.  Now, you have there in parenthesis or so we thought. What did you mean by that?

A.  You can't make a definitive statement like that. I didn't know what was out in the world at large. Someone may have had some.

Q.  Did you find out that someone did have some, or are you just saying --

A.   No, it's uncertainty.

Q.   So to the best of your knowledge today, you still believe that at the time you were the only one to have the pure epo --

A.   I believe --

Q .   - to the extent you know?

A.   Yes.

Q.   Okay. And you say they would need my collaboration. Why would Amgen need your collaboration?

A.   Because they didn't have any epo upon which to get the information to make a probe or make a series of probes.

_____

Q.   And it was understood that you needed adequate amounts of the pure protein to get the job done ?

A.   If you were going to do it via the nucleotide probes, yes.

Q.   And you had the pure protein?

A.   Yes.

Q.   So you were a pretty important guy?

A.   Then.

_____

Q.   ---right? So while Dr. Lin was working at Amgen, Amgen still needed you?

A.   Yes, they thought they did.

(*See* Goldwasser Depo. Tr. (3/14/07) at 81-82, 94-95, 149-150; *see also* 63, 72-74, 79-81, 146-147, 155-156; 172-74; Ex. 2 at 24-26; *see also* Hood [Rough] Depo. Tr. (4/2/07) at 14-15 (agreeing that Dr. Goldwasser had "the only supply of pure EPO in the world")).

47.   In reference to the "Critical Factors" memorandum drafted by Dr. Lin, noted above, Dr. Lin testified that (*see* AM-ITC 00148971):

Q.   Was it your view in May 1982 that it was critical to obtain more EPO?

A.   Yeah, among other things, yes.

Q.   Among seven other things, correct?

A.    Yes.

Q.    And one of the other seven things was to obtain more amino acid sequences, correct?

A.    Yes.

Q.    And that was in part dependent upon obtaining more EPO, correct?

A.    Yes.

48.    Furthermore, Dr. Lin's trial testimony from *Amgen v. Chugai*, at AM-ITC

00113647-49 reads:

Q.    Isn't it true that the only amino acid sequence information that Amgen obtained was derived from sequencing erythropoietin provided by Dr. Goldwasser?

A.    That's correct.

———————

Q.    And is it not correct that Amgen considered Dr. Goldwasser's consultancy a valuable one?

A.    Oh yes. Sure.

Q.    And one which provided Amgen with competitive leverage over the competition?

A.    That's what we hoped -- what I hoped at the time yes.

Q.    And that's what you believed at the time?

A.    Yes.

———————

Q.    Was it not your understanding that Dr. Goldwasser was not supplying erythropoietin to Amgen's competitors?

A.    I hope he did not, but I don't know. I cannot speak for him. I don't know what he have sent out to other people.

Q.    You hoped he would not do that, though?

A.    That's correct, yes.

(ii)    **Lin's was able to successfully clone the EPO gene only after he received correct sequence information based on Dr. Goldwasser's tryptic fragments**

49.    Until Dr. Lin received the sequence reports from the tryptic fragments Dr. Goldwasser sent Amgen in August 1983, all Dr. Lin's efforts to clone the EPO gene were unsuccessful.  (*See* AM-ITC 00113655-72; AM-ITC 00074296; AM-ITC 00981800; AM-ITC 00168239-481; AM-ITC 00113064-66).  However, as soon as the August 1983 fragments were sequenced, and probes based on them were designed and created, Dr. Lin was quickly able to successfully identify EPO clones.  For example, I have reviewed Amgen documents showing that Dr. Lin did not have the "EpV" and "EpQ" probes he used based on the correct sequence information until September 28, 1983.  (AM-ITC 00347087-94; AM-ITC 00168239-481; Amgen Supp. Response to Interrogatory No. 3).  These probes were then used to screen a genomic library on October 10, 1983.  (*Id.*).  By October 19, 1983, just over one week later, positive clones had been identified and were sent to another Amgen scientist, Dr. Sidney Suggs, to be sequenced.  Dr. Suggs sequenced the clones and on November 3, 1983, confirmed that they contained EPO DNA sequences in agreement with the amino acid sequence derived from the tryptic fragments sent by Dr. Goldwasser.  (*Id.*).

50.    Dr. Lin recognized the importance of obtaining the August 1983 fragments from Dr. Goldwasser.  For instance, in his *Chugai* trial testimony (AM-ITC-00113067) Dr. Lin explains:

Q.    Dr. Lin, did there come a time when you once again received tryptic fragments from Dr. Gene Goldwasser?

A.    Yes.

Q.    And what time was that about?

A.    The end of August 1983.

Q.    Did you make probes which corresponded to those fragments, Dr. Lin?

A.    Yes, I did.

Q.    Were you successful in obtaining the erythropoietin gene with those probes?

A.      Yes, I was.

Later in his *Chugai* trial testimony (AM-ITC 00113687-91) Dr. Lin states:

Q.      Would you agree that your receipt of these tryptic fragments from Dr. Goldwasser in late August 1983 was a turning point in the erythropoietin project?

A.      This is only in hindsight. Because we succeed with these probes, we can only say in hindsight that it's a turning point.

Q.      In hindsight, at least, it was a turning point in your project, right?

A.      That's right.

———————

Q.      Now, Dr. Goldwasser's supply of material to you in August of 1983 was, in fact, critical to your success, wasn't it?

A.      This, again, is only in the hindsight.

I have also read that in his latest Deposition for this case (see Lin Depo. Tr. (3/28/07) at 193:8-20), Dr. Lin again agreed that:

Q       And without the protein from Dr. Goldwasser, you couldn't have gotten the DNA probe sequences; correct?

[objection interposed]

THE WITNESS:  Only in the hindsight you can say that in this respect.

>   **(iii)    The Lin patents would have been obvious if Dr. Goldwasser would have made purified EPO protein or tryptic fragments available to the public**

51.     I have been informed that in determining obviousness, if a claimed invention was derived in part from information or material provided by someone who is not named as an inventor, such material or information is considered as having been available as prior art to the claimed invention.  In my analysis, I therefore have considered whether the claims of Amgen's patents-in-suit would have been obvious assuming the skilled practitioner had available purified EPO protein or tryptic fragments in the quantity that Dr. Goldwasser provided to Amgen.  In my opinion, with such material, it would have been obvious to obtain partial internal amino acid

26

sequences and use such sequence information to screen a cDNA library constructed using mRNA from an EPO producing cell line. Therefore it is my opinion that Dr. Lin did not himself invent the subject matter sought to be patented.

52. Dr. Goldwasser used National Institutes of Health (NIH), i.e., US government, funds to obtain and purify the EPO he sent Amgen. (*See* Goldwasser Depo. Tr. (2/14/07) at 60, 62, 68, 139-40, 163-64). Despite this fact, Dr. Goldwasser provided pure EPO in amounts sufficient to use for sequencing and therefore cloning to Amgen alone. For instance, Goldwasser testified that (AM-ITC 00177616-17 (ITC Hearing Tr. at 47:15-48:16)):

Q.    [D]id you supply any samples of erythropoietin to competitors of Amgen after you had engaged in your consultancy for Amgen?

A.    It depends on whether you mean by competitors, companies?

Q.    I mean companies, yes.

A.    No, I did not.

Q.    Was it understood with Amgen that you would not do that?

A.    I think so.

Q.    And why was it that Amgen did not want you to do that?

A.    It would have been contrary to their best interest.

Q.    And why is that, sir?

A.    For another company to be cloning the gene when they were trying to clone the gene.

Q.    You had supplied those samples to Amgen's competitors, they might have cloned the gene in advance of Amgen?

A.    It's possible.

Q.    And that was the concern, is that right?

A.    Yes.

Q.    So you restricted your provision of samples to the singular commercial entity, Amgen, throughout this period of time so far as you're aware?

A.    With respect to commercial application, yes.

Q.    Yes. As distinguished from research?

A.    Yes.

27

Q.    In that academic community and the like, is that correct?

A.    Yes.

As Dr. Goldwasser later confirmed (Goldwasser Depo. Tr. (2/14/07) at 131):

Q.    Okay.  So isn't it correct that while you gave others bits of pure epo it was in amounts usable to do RIA?

A.    Yes.

Q.    And it wasn't sufficient in amounts to actually sequence the entire protein?

A.    I don't think it was.

53.    I have also reviewed documents and testimony showing that in May 1983, Amgen tried to have Dr. Goldwasser sign a back-dated confidentiality agreement "effective as of the first day of [Goldwasser's] service as a member of the SAB [Scientific Advisory Board] namely March 1980" so that Amgen could have a "new copy" because the original was lost.  (*See* AM-ITC 00138840-48; *see also* Goldwasser Depo. Tr. (2/14/07) at 88-118; AM-ITC 00234881; UCH000000512-513;    UCH000000808-814;    UCH000000804-805;    UCH000000526-528; UCH000003431-441).

### (iv)    Amgen's alleged commercial success and long-felt need cannot be attributed to the patents-in-suit

54.    I understand that Amgen has asserted that the commercial success and long-felt need of the patents-in-suit are indicative of their non-obviousness.  However, upon a more critical analysis, I believe that this is not true.  To begin with, whatever long-felt need existed was solved when Dr. Goldwasser obtained pure EPO in sufficient quantities to sequence.  (*See supra* ¶¶ 43-52).

55.    As discussed above, Dr. Goldwasser and his colleagues had a reliable amount of pure EPO from natural sources.  Thus, Lin's only advantage over his contemporaries was that he

had exclusive access to this material. As a result, Lin was able to design degenerate probes to be constructed based on the tryptic fragments Dr. Goldwasser from this material. This was done as a matter of course, and Lin used these probes in a routine manner to isolate the gene for human EPO. Lin's cloning strategy was obvious and did not "open the floodgates" as Amgen suggests. Instead, the true pioneers which led to satisfying the long felt need of anemia treatment was Dr. Goldwasser and his team, who were able to secure a reliable source of EPO from natural sources.

56.    Therefore, it was not Lin's patents-in-suit that satisfied the long felt need of providing anemia treatment, but, as stated above, the work of Dr. Goldwasser and his colleagues. Amgen admits this much when it stated in responses to interrogatories that "[t]he prior art experiments were seriously hampered by a lack of supply of EPO from natural sources." (Amgen Response to Interrogatory No. 21 at 34, 37 (4/2/07)). To the extent the long-felt need was not solved by Dr. Goldwasser, it is from Amgen's expired '008 patent, as discussed below.

57.    As stated herein, it is my opinion that each of the asserted claims of the patents-in-suit are invalid for obviousness-type double patenting over the previously issued and now expired '008 patent. Amgen's commercial success and long-felt need with respect to EPOGEN® cannot be attributed to the patents-in-suit, because in actuality, Amgen's product had already received FDA approval and had generated substantial sales even before the first patent-in-suit had been issued.

58.    For example, the '868 patent is the first issued patent among the patents-in-suit, with an issuance date of August 15, 1995. Amgen received FDA approval for EPOGEN® on June 2, 1989, and introduced this drug onto the market within 24 hrs. (AM-ITC 00932121). Between 1989 and 1995, Amgen had already generated substantial sales on EPOGEN®, with about $250 M in sales in 1990 and reaching close to $1 billion in 1995. (AM44 1508568). This

commercial success and long felt need was attributed to the isolation and cloning of the EPO gene, which as discussed above, was obvious to one of skill in the art at the time of the Lin inventions. This is confirmed by the fact that once Amgen secured a patent in October 27, 1987 - the '008 patent - which was directed to the isolated and purified DNA sequence, it was able to generate substantial sales and good will in the medical and business community.

59.    Moreover, this '008 patent was successfully enforced by Amgen against competitors in Interference Proceedings (Interference No. 102,096, AM-ITC 0033097) and Federal Court litigation (*Amgen, Inc. v. Chugai Pharms.*, 13 U.S.P.Q.2d 1737 (D. Mass. 1989), *aff'd in relevant part*, 927 F.2d 1200 (Fed. Cir. 1991)), which contributed to Amgen's commercial success in the marketplace.

60.    As discussed herein, none of the asserted claims of the patents-in-suit are patentably distinct from the claims of the now expired '008 patent. Any commercial success and long-felt need that Amgen generated through the sale of EPOGEN® resulted from Amgen's claims to an isolated and purified DNA sequence encoding EPO in the '008 patent, which I also believe to be obvious.

### C.    Prior to October 1983, methods for using highly degenerate oligonucleotide probes to screen libraries were well described in the art

61.    Two primary approaches were available prior to October 1983 to design degenerate probes. One approach was to design relatively long (over 30 nucleotides in length), partly degenerate probes, based on the most likely codons used by the organism. Although more likely to have regions which were not complementary to the gene of interest, such probes would also have complementary sequences within the probe long enough to form hybrids with the sequence of the target gene. Prior to October 1983, numerous reports had also established this

methodology as a useful alternative approach to screen DNA libraries. Alternatively, one could use a set of relatively short oligonucleotide probes, which could be designed to be "fully" degenerate, that is, include every combination of nucleotide sequences that could encode for a particular amino acid sequence. Such a probe set would therefore contain at least one probe corresponding identically to the actual DNA sequence of the gene.

62.    From 1981 through 1983, a succession of successful efforts to clone a number of human genes demonstrated that mixed fully degenerate oligonucleotide probes could be reliably used as a sole means for screening cDNA libraries and isolating clones corresponding to low abundance proteins. One of skill would have had comprehensive information on how to select screening conditions to optimize specific hybridization to a desired clone based on the length and degree of degeneracy. Prior to October 1983, as the Lin patents indicate, such methodology was routine: "More generally, mixed-sequence oligonucleotide probes have been used to isolate protein genes of unknown sequence from cDNA libraries. Such probes are typically mixtures of 8-32 nucleotides, 14-17 nucleotides in length, representing every possible combination for a small stretch (5-6 residues) of amino acid sequence. Under stringent hybridization conditions that discriminate against incorrectly base-paired probes, these mixtures are capable of locating specific gene sequences in clone libraries of low-to-moderate complexity." (Anderson 1983 at 6838, cited in '868 patent at col. 5, ll. 18-34).   As described below, with cDNA libraries, where the library would likely be 100-fold less complex than a genomic library, one would have had a reasonable expectation of success in isolating desired clones by screening with fully degenerate oligonucleotide probes, including highly degenerate oligonucleotide probes of more than 100-fold degeneracy.

63.    Suggs (1981) describes one of the first applications of this approach, which was used to isolate a cDNA corresponding to human $\beta_2$-microglobulin, using a probe designed from the known amino acid sequence for the protein. The authors based this approach on previous results with model systems, indicating that by identifying appropriate hybridization conditions, mixed oligonucleotide probes could be used to screen for target DNA sequences with high specificity. (Wallace 1979, Wallace 1981). Suggs demonstrated the utility of this approach by screening a human lymphoblastoid cell line cDNA library with t8 and 16-fold 15 nucleotide long degenerate probes that together represented all the possible sequences corresponding to amino acid residues 95-99 of human $\beta_2$-microglobulin, and with an 8-fold 11 nucleotide long degenerate probe that represented all possible sequences corresponding to amino acid residues 75-78. Suggs succeeded with this approach in isolating a cDNA corresponding to the human $\beta_2$-microglobulin gene.

64.    Further reports illustrated that by selecting appropriate hybridization conditions, the difference in stability of perfectly matched and singly mismatched oligonucleotides was sufficient to allow one to use oligonucleotide mixtures to directly screen cDNA libraries without any enrichment of mRNA or cDNA preparations. For example, Prochownik (1983) demonstrated that by choosing appropriately stringent hybridization conditions, one could use relatively short oligonucleotides to isolate even low abundance cDNA clones. This study described the successful isolation of cDNA clones human antithrombin III (ATIII), a protein found in human plasma, from a human liver cDNA library. As determined by immunoassay, ATIII was present in liver at very low levels, representing approximately 0.007% of total adult liver protein, and from 5 to 10-fold less abundant in fetal liver.

65.     In the study by Prochownik, an adult liver library was screened for cDNA clones containing ATIII specific sequences using a fully degenerate probe of 17 nucleotides in length. Initial screening of 150,000 bacterial colonies identified 32 positive colonies, 24 of which, representing 0.016% of all colonies screened, remained positive when rescreened under more stringent conditions.  The largest clone was analyzed fully by restriction mapping, and also by DNA sequencing. These analyses demonstrated  that this cDNA corresponded to a nearly full length copy of the ATIII mRNA.   Restriction enzyme analysis, indicating that the positive colonies shared common restriction sites for two enzymes, confirmed the high specificity of screening under stringent conditions. The frequency with which positive colonies were identified in the cDNA library was in reasonable agreement with the relative abundance of the protein in adult liver.   In addition, the authors also screened 50,000 clones from an independently constructed human fetal liver cDNA library.  Positive colonies were identified at approximately half the frequency as that from the adult liver cDNA library. Sequencing as well as restriction enzyme mapping confirmed the cDNA inserts corresponded to ATIII mRNA. Overall, these data therefore confirmed the reliability and specificity of this screening methodology for isolating very low abundance clones from cDNA libraries.

66.     Singer-Sam (1983) described the successful cloning of a human enzyme, the X-linked-phosphoglycerate kinase (PGK), which had been difficult to purify and characterize due to the low levels at which it is expressed in human cells.  To clone the gene, the authors screened 2500 clones from a cDNA library constructed from mRNA of a human adenocarcinoma cell line using a 16 base long 32-fold fully degenerate probe having based on the PGK amino acid sequence.   The probe was selected to correspond to an amino acid sequence with minimal degeneracy away from the N-terminus, resulting in a reverse-translated sequence not extremely

G + C or A + T rich, and a probe length of 14 or more to ensure an acceptable signal to noise ratio in screening. The authors note that such probe length resulted in substantially greater degeneracy than in using a shorter probe. Screening with such a probe identified one positive clone, confirmed by sequencing to correspond to amino acids 120-417 of PKG, demonstrating the high specificity of this approach with a cDNA library.

67.    Prior to October 1983, the literature indicated that as a consequence of screening a cDNA library with a more degenerate oligonucleotide probe, if similar enough sequences existed in DNA encoding for other expressed proteins, the probe could bind to such sequences as well as to the desired target. Singer-Sam teaches that such false positives can be eliminated by secondary screening. To do so one could simply carry out direct sequencing of any clones giving a strongest hybridization signal under high stringency conditions. Alternatively, a more efficient approach would be to use a second probe directed to a different site in the protein. (Singer-Sam 1983 at 805). Such probe sets allowed one to efficiently screen a library for low abundance clones by isolating only those clones from the library that bound to more than one set of probes. (*Id.*).

68.    I have read and agree with Dr. Lin's testimony that using more than one set of probes is not innovative. (*See* AM-ITC 00113058-60 (*Chugai* Trial Tr.); Lin Depo. Tr. (3/28/07) 176-83). For example, in *Chugai*, Dr. Lin testified at trial that:

A.    Related to what I say as screening cDNA library of genomic library with two sets of probes.

THE COURT: May I ask, what's so magical about two? Why wouldn't it even be better at three, four, or five?

THE WITNESS: You are right, absolutely right. If you had three, it's even better because two, you may still – there is a possibility that the region may not give you the good signal or maybe still too many genes . . . .

THE COURT:  Maybe I'm showing a naivite, but what's so innovative about creating a second probe or a third probe?  Is that common sense?

THE WITNESS:  Yes, it's common sense.  It's a logical way to do things.  It's not really – using second set of probe is not so innovative at all, no.  To use two sets of probe, I'm not saying is very innovative about using two sets of probe, no.

69.    I have also reviewed Dr. Goldwasser's testimony that using two probes was known to molecular biologists before Dr. Lin had even arrived at Amgen (*see* Goldwasser Depo. Tr. (2/26/07) at 295-98):

A.    Winston at first asked me to join the SAB of AMGen and be involved in cloning the epo gene.  The basic idea was to determine the AA sequence and use two or more regions with minimal codon redundancy to design probes which would then be used to examine a human DNA library for the epo gene.  Since the first hurdle was the sequence and since I had already arranged to work with Hood on that and since he was on the AMGen SAB, I figured that whatever sequence data we got would be available to AMGen, so I might as well collaborate with them.  I then sent a small amount to Hood at Cal Tech to start getting an N-terminal sequence.  As I understood it, the actual work with the new machine would be done by blank at Cal Tech.  I was invited to the first organizational meeting of the SAB and the board of directors but quickly learned that I was not a member of the SAB but a, quote, major consultant invited to all meetings.  AMGen went through a period of disorganization, finally getting George Rathmann as president.   He quickly brought order to the organization and fired Winston, who had taken the position as VP, director of research.  Do you want me to keep going?

Q.    Well, I'd like to stop you at that point if that's okay.

A.    That's fine.

Q.    You said that when you talked to Winston with Dr. Hood, I'm looking at the part where you just read, you said that there was a concept, the basic concept of using two probes.

A.    Yes.

Q.    When did you first discuss that with anyone?

A.    I have no idea when.

Q.    Well, when you first went to AMGen and had a first meeting with them, was Dr. Lin present?

A.    No.

Q.    Was Dr. Lin working on the project at the time --

A.    No.

Q.    -- to the best of your understanding?

A.    No, he was not.

Q.    So who suggested this use of two probes?

A.    It was in the air.  All molecular biologists were talking about it.

Q.    All molecular biologists were talking about it?

A.    Well, I can't say all.  It was in the air. It was the kind of thing that people talked about.

70.    Woods (1982) describes a particular example of using multiple sets of degenerate probes to efficiently screen a human adult liver cDNA library and isolate several cDNA clones corresponding to the human class III MHC antigen, factor B, a protein found in low abundance in human liver.  Woods used information on the partial amino acid sequence to design two fully degenerate 17-mer probes (one 32-fold degenerate and one 48-fold degenerate), which were used to screen 50,000 clones from the cDNA library. Of these 50,000 clones, the 32-fold degenerate probe positively identified 32 clones, 19 of which also hybridized to the second degenerate probe.  Two of these clones were selected for further analysis, with sequencing confirming that these clones corresponded to the target factor B protein.   The largest clone represented approximately 90% of the sequence coding for factor B.   The result Wood observed was consistent with the notion that the mRNA for these clones was represented in relatively low abundance (at a frequency of about 0.05%), demonstrating the utility of this methodology to isolate proteins and/or transcripts expressed at relatively low levels using a cDNA library.

71.    Prior to October 1983, the utility of using multiple degenerate oligonucleotide probe sets directed to different regions of a protein had therefore been demonstrated for screening cDNA libraries.   These examples confirmed that such an approach would have provided a reasonable expectation of success in identifying rare abundance clones from cDNA libraries.   In this regard, a cDNA library provides an advantage over a genomic library in using

oligonucleotide probes based on known portions of the amino acid sequence. In a genomic library, because of the presence of "introns" or intervening non-coding sequences, the DNA sequence corresponding to any particular internal sequence of amino acids may not necessarily be represented as a contiguous DNA sequence in the library.

72.    Whitehead (1983) demonstrated one could obtain a high degree of specificity using even a highly degenerate probe to screen a cDNA library for a low abundance clone.    The study describes the successful isolation of a cDNA clone for a human protein, complement component C4 from a human liver plasmid cDNA library.    To screen the library, the authors used a fully degenerate mixture of 384 different 23-nucleotide oligonucleotides containing all 384 possible sequences that would code for residues 14-21 of the published amino acid sequence of the human protein.    One hundred sixty five clones from approximately 50,000 screened hybridized specifically to the oligonucleotide pool. Sixteen clones were selected and purified for further analysis. 12 of these 16 clones, including the clone confirmed to correspond to the first 21 amino acids of the C4 protein, contained cDNA inserts that cross-hybridized with each other under high stringency conditions indicating that most of the clones identified by screening contained C4 DNA sequences, despite the complexity of the probe mixture used to screen the library.    The overall frequency of positive clones in the library demonstrated the utility of using a highly degenerate probe to screen low abundance clones.

**D.    It would have been obvious to generate suitable degenerate probes for screening a cDNA library from information about the amino acid sequence of tryptic fragments of the EPO protein**

73.    Example 1 of the Lin patents shows 17 discrete fragments of purified urinary EPO obtained from Dr. Goldwasser.    (*See, e.g.,* '868 patent, cols. 15-16, and Table I; *see also* Lin Depo. Tr. (3/28/07) at 148-56; Goldwasser Depo. Tr. (2/14/07) at 216-21).    These tryptic

fragments, and the amino acid sequences derived therefrom by Dr. Por Lai at Amgen, would have been the same fragments and sequences that the skilled scientist could have routinely generated, given a sufficient supply of EPO protein. For example, Dr. Lin testified that Amgen generated its sequence data using a commercially available gas-phase sequencer manufactured by Applied Biosystems. (*See* Lin Depo. Tr. (3/28/07) at 151-52). The analysis below shows that given such sequence information, one of skill could have within a very short time designed numerous different mixed fully degenerate oligonucleotide probe sets that would have been suitable to screen a cDNA library for EPO cDNA clones. For example, Dr. Lin has testified that it took him "about an hour" to design the fully degenerate oligonucleotide probes that he used. (*See* Lin Depo. Tr. (3/28/07) at 184-85; AM-ITC 00113673). Dr. Lin chose probes based on the established codon table, just as one in the art would know how to do, to match up with the amino acid sequences of the fragments that had the least amount of degeneracy, i.e., the lowest total number of possible codons. (*See* Lin Depo. Tr. (3/28/07) at 154-58, 188-90; Lin Depo. Exs. 11 (codon table), 14 (AM-ITC 00113605-06)). As shown in the following paragraphs, to design fully degenerate probes, one would merely have to go through the amino acid sequence and use the codon table to select all the codons that correlate with each amino acid. This analysis further shows that the following probe sets could have been used for screening a cDNA library without departing from any of the methods taught in the prior art.

74.   Using the sequence of tryptic fragment T38 one could have designed several fully degenerate probe sets suitable for screening a cDNA library, including a 14-mer probe set having 16-fold degeneracy, a 15 mer probe set having 64-fold degeneracy, a 17 mer probe set having 128-fold degeneracy as depicted (illustrating one representative probe from each set):

**Fragment T38**

| EPO amino acid number | 117 | 118 | 119 | 120 | 121 | 122 | 123 | 124 | 125 | 126 | 127 | 128 | 129 | 130 | 131 | 132 | 133 | 134 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| protein sequence | N- Gly | Gln | Ala | Leu | Leu | Val | X | Ser | Ser | Gln | Pro | Trp | Glu | Pro | Leu | Gln | Leu | His |
| putative probe sequence | 3'- C C T | G T T | C G T | G A T | G A T | C A T | | A G T | A G T | G T T | G G T | A C C | C T T | G G T | G A T | G T T | G A T | G T A |
| | | | C | A | A | A | | | A | A | | A | | | A | | A | A G |
| | | | C | C | G | C | | | C | C | | C | | | C | | C | |
| | | | G | G | G | G | | | G | G | | G | | | G | | G | |
| | | | | A A T | A A T | | | T C A | T C A | | | | | | A A T | | A A T | |
| | | | | C | C | | | G | G | | | | | | C | | C | |

| | | | | | |
|---|---|---|---|---|---|
| probe (14mer) | 3'- G T T  G G T  A C C  C T T  G G -5' | | | | x16 degeneracy |
| probe (15mer) | 3'- G T T  G G T  A C C  C T T  G G T -5' | | | | x64 degeneracy |
| probe (17mer) | 3'- G T T  G G T  A C C  C T T  G G T  G A -5' | | | | x128 degeneracy |

75.   Using the sequence of tryptic fragment T35 one could have designed several fully degenerate probe sets suitable for screening a cDNA library, including a 14-mer probe set having 32-fold degeneracy, a 15 mer probe set having 32-fold degeneracy, an 18 mer probe set having 64-fold degeneracy and a 20-mer probe set having 128-fold degeneracy, as depicted (illustrating one representative probe from each set):

**Fragment T35**

| EPO amino acid number | 46 | 47 | 48 | 49 | 50 | 51 | 52 | |
|---|---|---|---|---|---|---|---|---|
| protein sequence | N- Val | Asn | Phe | Tyr | Ala | Trp | Lys | -C |
| putative probe sequence | 3'- C A T | T T A | A A A | A T A | C G T | A C C | T T T | -5' |
| | | A | G | G | G | A | C | |
| | | C | | | | C | | |
| | | G | | | | G | | |

| | | | | |
|---|---|---|---|---|
| probe (14mer) | 3'- C A T  T T A  A A A  A T A  C G -5' | | | x32 degeneracy |
| probe (18mer) | 3'- T T A  A A A  A T A  C G T  A C C  T T T -5' | | | x64 degeneracy |
| probe (15mer) | 3'- A A A  A T A  C G T  A C C  T T T -5' | | | x32 degeneracy |
| probe (20mer) | 3'- C A T  T T A  A A A  A T A  C G T  A C C  T T T -5' | | | x128 degeneracy |

76.   Using the sequence of tryptic fragment T26b one could have designed a 14-mer fully degenerate probe set having 64-fold degeneracy suitable for screening a cDNA library as depicted (illustrating one representative probe from each set):

39

**Tryptic fragment T26b**

| | 155 | 156 | 157 | 158 | 159 | 160 | 161 | 162 |
|---|---|---|---|---|---|---|---|---|
| EPO amino acid number | 155 | 156 | 157 | 158 | 159 | 160 | 161 | 162 |
| protein sequence | N- Leu | Tyr | Thr | Gly | Glu | Ala | Cys | Arg -C |
| putative probe sequence | 3'- G A T | A T A | T G T | C C T | C T T | C G T | A C A | G C T -5' |
| | A | G | A | A | C | A | G | A |
| | C | | C | C | | C | | C |
| | G | | G | G | | G | | G |
| | A A T | | | | | | | T C T |
| | C | | | | | | | C |
| probe (14mer) | | 3'- A T A  T G T  C C T  C T T  C G -5' | | | | | x64 degeneracy | |

77.     Using the sequence of tryptic fragment T27 one could have designed several fully degenerate probe sets suitable for screening a cDNA library, including a 14-mer probe set having 64-fold degeneracy, a 14 mer probe set having 64-fold degeneracy, and a 14-mer probe set having 128-fold degeneracy, as depicted (illustrating one representative probe from each set):

**Fragment T27**

| | 132 | 133 | 134 | 135 | 136 | 137 | 138 | 139 |
|---|---|---|---|---|---|---|---|---|
| EPO amino acid number | 132 | 133 | 134 | 135 | 136 | 137 | 138 | 139 |
| protein sequence | N- Thr | Ile | Thr | Ala | Asp | Thr | Phe | Arg -C |
| putative probe sequence | 3'- T G T | T A T | T G T | C G T | C T A | T G T | A A A | G C T -5' |
| | A | C | A | A | G | A | G | A |
| | C | | C | C | | C | | C |
| | G | | G | G | | G | | G |
| | | | | | | | | T C T |
| | | | | | | | | C |
| probe (14mer) | | | 3'- T A T  T G T  C G T  C T A  T G -5' | | | | x64 degeneracy | |
| probe (14mer) | 3'- T G T  T A T  T G T  C G T  C T -5' | | | | | | x128 degeneracy | |
| probe (14mer) | | | 3'- T G T  C G T  C T A  T G T  A A -5' | | | | x128 degeneracy | |

78.     Using the sequence of tryptic fragment T31 one could have designed a 14-mer fully degenerate probe set having 96-fold degeneracy suitable for screening a cDNA library as depicted (illustrating one representative probe from each set):

**Fragment T31**

| | 144 | 145 | 146 | 147 | 148 | 149 | 150 |
|---|---|---|---|---|---|---|---|
| EPO amino acid number | 144 | 145 | 146 | 147 | 148 | 149 | 150 |
| protein sequence | N- Val | Tyr | Ser | Asn | Phe | Leu | Arg -C |
| putative probe sequence | 3'- C A T | A T A | A G T | T T A | A A A | G A T | G C T -5' |
| | A | G | A | G | G | A | A |
| | C | | C | | | C | C |
| | G | | G | | | G | G |
| | | | T C A | | | A A T | T C T |
| | | | G | | | | C |
| probe (14mer) | 3'- C A T  A T A  A G T  T T A  A A -5' | | | x96 degeneracy | | | |

79.     Using the sequence of tryptic fragment T26a one could have designed a 14-mer fully degenerate probe set having 96-fold degeneracy suitable for screening a cDNA library as depicted (illustrating one representative probe from each set):

**Tryptic fragment T26a**

| EPO amino acid number | | 5 | | 6 | 7 | | 8 | | 9 | | 10 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| protein sequence | N- | Leu | | Ile | Cys | | Asp | | Ser | | Arg | -C | |
| putative probe | 3'- | G A T | | T A T | A C A | | T T A | | A G T | | G C T | -5' | |
| sequences | | A | | C | G | | G | | A | | A | | |
| | | C | | | | | | | C | | C | | |
| | | G | | | | | | | G | | G | | |
| | | A A T | | | | | | | T C A | | T C T | | |
| | | C | | | | | | | G | | C | | |
| probe (14mer) | 3'- | G A T | | T A T | A C A | | T T A | | A G | -5' | | x96 degeneracy | |

80.     In summary, prior to October 1983, the prior art relating to cDNA cloning had demonstrated that with information about the amino acid sequence for different internal portions of a protein, it would have been obvious to one of skill to clone the gene for that protein from an appropriate cDNA library.  Given a sufficient quantity of purified human EPO protein, it would have been obvious to obtain the amino acid sequence of internal tryptic fragments, identify the regions within those fragments with the least degeneracy and then based on that information synthesize degenerate oligonucleotide probes to use in screening a cDNA library.  If the particular probe sets identified a number of "false positive" colonies too large to sequence individually as a means of discriminating between "true" positives and "false" positives, it would have been obvious to use multiple sets of degenerate probes to efficiently screen the cDNA library for the correct cDNA clone.

41

E.   **The prior invention and development of human cell lines producing EPO would have rendered obvious the cloning of a human EPO cDNA from cDNA libraries made from mRNA of such EPO producing cells, and would have rendered obvious the subsequent cloning of the human EPO gene**

81.   I have reviewed publications and other documents from three different scientific groups that describe various EPO producing cell lines that were established from different human tumors.   In addition, I have reviewed the Expert Reports of Dr. Franklin Gaylis, Dr. James Fisher and Dr. Daniel Shouval (which I incorporate herein by reference) regarding their work in developing and characterizing these cell lines, the methods they conceived for doing so and for using these cells as a source of EPO and EPO mRNA.   Based on my review, I note that prior to October 1983, each of these scientists had either publicly described such cell lines in the scientific literature or had conceived of a method for establishing such a cell line which was diligently completed.   In my opinion, one of skill would have found it obvious to use such a cell line to construct a cDNA library and screen that library using degenerate probes as described above to isolate an EPO cDNA clone.

(i)   **The EPO producing human testicular germ cell line developed by Dr. Gaylis and colleagues**

82.   The study by Dr. Gaylis and colleagues describes a human testicular germ cell line (1411-H) that the authors identified as producing significant amounts of human EPO in cultures in which the medium had not been changed for periods greater than 10 days. (Ascensao 1983).   The production of EPO from this cell line was demonstrated by two independent assays: (1) an in vivo assay showing the ability of supernatants from the cells to stimulate erythropoiesis in exhypoxic polycythemic mice, and (2) an in vitro assay showing the ability of the supernatants to stimulate and sustain the formation or erythroid colonies in cultured adult sheep marrow cells. Both in vivo and in vitro activities were completely neutralized by treating supernatants with an

anti-human EPO antibody, confirming the positive result in these assays was due to human EPO present in the supernatants. In addition to the data reported in Ascensao (1983), I have also reviewed additional data from Dr. Joan Egrie at Amgen, confirming the production of human EPO by this cell line through radioimmunoassay. (*See* Egrie Depo. Tr. (3/27/07) at 270-280; AM-ITC 00051976-1135; AM-ITC 00057704; AM-ITC 00057723; AM-ITC 00057735; AM-ITC 00057708-18, AM-ITC 0057689-701; AM-ITC 00057687; AM-ITC 00057688).

83.     In my opinion, I agree that the data described in Dr. Gaylis' report and cited publications confirm the utility of using yolk sac carcinoma cells, such as 1411-H, to generate erythropoietin producing cell lines capable of continuous culture in vitro. Furthermore, the report in American Federation of Clinical Research, documents that by November 30, 1982, Dr. Gaylis had conceived of using the 1411-H cell line as a source of erythropoietin and erythropoietin mRNA (FG 000051–52). I also understand that Dr. Gaylis has indicated that his laboratory had made these cells or supernatant available to others at least as early as November 1982. Finally, as evident from his timely publication of his work, Dr. Gaylis and colleagues did not abandon, suppress, or conceal the work described in his report.

      **(ii)**      **EPO producing renal carcinoma cell cultures developed by Dr. James Fisher**

84.     Fisher and colleagues established primary cultures of human renal carcinoma cells derived from a human renal carcinoma tumor from a patient with erythrocytosis, which had been maintained by serial passage in nude mice. In March 1983, Fisher et al reported the establishment of primary cultures from the serially passaged tumor and described the increased production of EPO from confluent cell cultures. (Hagiwara 1983). Subsequent reports presented additional data confirming production of EPO in primary cultures of these cells through three independent assays, the exhypoxic polycythemic mouse assay in vivo, the fetal mouse liver

erythroid colony-forming assay in vitro and by radioimmunoassay. (Hagiwara 1984). Supernatant from confluent cultures showed a marked increase in EPO levels, reaching approximately 300mU/ml as measured against a human urinary EPO standard obtained from the National Heart, Lung and Blood Institute. The sharply increased production of EPO in confluent primary cultures was consistent with the results of immunostaining of the cells using a rabbit antiserum to human EPO. While very few positively staining cells were detected in exponentially growing cultures, cells in confluent cultures exhibited intense staining by the rabbit anti-human EPO antiserum, which was completely abolished by preblocking the antiserum with a purified fraction of human urinary EPO.

85.     In my opinion, I agree that the data described in Dr. Fisher's report confirm the utility of serial transplantation of tumor cells to generate erythropoietin producing cell lines, capable of growth in vitro. Furthermore, the work and 1983 abstract described in his report demonstrates that, by March of 1983, Dr. Fisher had conceived of, and carried out, a methodology to produce such erythropoietin producing cells. I understand that Dr. Fisher has indicated that as this work was in part publicly funded, Dr. Fisher would have made these cells available as of March 1983. Finally, as evident from his timely publication of his work throughout 1983 and 1984, Dr. Fisher and colleagues did not abandon, suppress, or conceal the work he conducted that he described in his report.

### (iii)     The EPO producing renal carcinoma cell line developed by Dr. Daniel Shouval

86.     In 1981, Dr. Daniel Shouval, established a stable EPO producing cell line, capable of being continuously propagated in cell culture, from a human renal carcinoma. (Sherwood & Shouval 1986). A previous report, summarizing the salient points of the 1986 paper and describing how this cell line was established was presented in April 1983. (Sherwood & Shouval

1983).  A primary tumor culture was first established by serial passage of renal carcinoma tumor cells through nude mice that had been further immunosuppressed by radiation or treatment with rabbit anti-mouse lymphocyte serum.  Cells from these tumors were then established as *in vitro* cultures.  From these cultures, two clonal cell lines were established by limiting dilution.  The clonal RC-1 cell line was stably maintained in culture for over 100 passages, and continuously maintained the capability of producing EPO.  Notably, erythropoietin production continued to increase with successive passage of the RC-1 cells in culture.

87.    Production of erythropoietin in RC-1 cells was confirmed by radioimmunoassay, as well as through an assay of biological activity by the in vitro erythroid colony forming assay using cultured mouse bone marrow cells.  (Sherwood & Shouval 1986 at 166-67).  In agreement with the results reported by Fisher, production of erythropoietin from the cultures, while undetectable in exponentially growing cultures, increased substantially in confluent cultures. Confirmation that the RC-1 cell line originated from the renal cell carcinoma was provided by chromosomal analysis, ultrastructural studies by electron microscopy, as well as through hybridization of DNA from the cell line to a human genomic probe (an intron from the human gamma globin gene).

88.    The production of EPO by RC-1 cells was confirmed by further studies demonstrating the RC-1 cell line produced biologically active erythropoietin *in vivo* in athymic mouse hosts.  (Shouval 1988).  The authors found that RC-1 cells readily produced tumors in athymic mice at relatively small injection frequencies.  Several lines of evidence indicated that these tumors produced substantial levels of biologically active EPO.  Following successful tumor growth, tumor bearing mice developed a significant enlargement of the spleen and liver, a rosy-bluish color that is characteristic of erythrocytosis, along with an apparent congestion of the

45

abdominal and thoracic blood vessels and abdominal organs, and increasing hemoglobin and hematocrit levels correlating with the increase in tumor volume.   Significantly, an almost linear correlation could be determined between tumor volume, tumor weight and hemoglobin and hematocrit levels, up to the  point at which the tumors began to become necrotic.   A corresponding increase in both red cell mass and blood volume further demonstrated the effect of increasing amounts of RC-1 tumor tissue on stimulating production of red blood cells. Moreover, as determined by radioimmunoassay, immunoreactive EPO could be extracted from the nude mouse RC-1 tumors.

89.    In my opinion, I agree that the data described in Dr. Fisher's report confirms the utility of immortalizing human tumor cells to generate erythropoietin producing cell lines capable of continuous culture *in vitro*.  Furthermore, the April 1983 *Clinical Research* abstract documents that Dr. Shouval and his colleague had conceived of using the RC-1 cell line as a source of erythropoietin (Sherwood 1983).   I understand that had someone requested this cell line, or supernatant, prior to October of 1983, Dr. Shouval has indicated that he would have considered the request favorably if the request was for use relating to non-commercial purposes. Finally, as evident from his continued work on the RC-1 cell line and prompt publication of the results of that work throughout 1983-1988, Dr. Shouval did not abandon, suppress, or conceal any of the work described in his report.

### (iv)    EPO cDNA from Human Fetal Liver Cells and Cell Lines

90.    Prior to October 1983, it was well established that erythropoietin is produced by mouse, rat, sheep and human fetal liver cells (Zanzani 1981, Fried 1972, Gruber 1977, Congote 1977).  In fact, it was known that erythropoietin is actively synthesized in cultures of human liver cells. (Congote 1977, Congote 1974).

46

91.    Cells actively making EPO are actively making mRNA from the corresponding gene. Therefore, a person of skill in the art wishing to clone the human EPO gene would be directed to make a cDNA library from fetal liver mRNA. Such a person would succeed given a set of oligonucleotide probes of sequences based on the correct EPO protein sequence, and implementation of cDNA library screening approaches using oligonucleotide probes that were established prior art prior to October 1983.

92.    Indeed, when scientists sought to clone the human EPO gene in the early '80s, they analyzed fetal liver cells for EPO mRNA and obtained a strong signal. (Jacobs 1985). Subsequently, they constructed a cDNA library and proceeded to clone the human EPO gene. (Jacobs 1985). Guided by the same public knowledge, Amgen scientists also made a cDNA library from fetal liver cells in 1982 and screened it with sets of oligonucleotide probes. (AM-ITC 00050918). However, they failed to find the human EPO gene because they used oligonucleotide probes whose sequences were based on the wrong protein sequence (AM-ITC 00050919), as they have acknowledged. (AM-ITC 00784956).

93.    Like the EPO producing cell lines established from human kidney tumors (described above), stable cell lines had also been established from human liver tumors (Aden 1979, Knowles 1980). Two of these lines (HepG2 and Hep3B) had been shown to express an array of liver proteins and in particular alpha-fetoprotein, which is a marker of fetal liver cells. In addition, it was widely known prior to October 1983 that certain patients with liver tumors suffered from erythrocytosis due to overproduction of EPO by their tumor cells. (*See, e.g.,* Okazaki 1979). Accordingly, such information would have made it obvious to screen with EPO antibodies the two human hepatic cell lines which displayed fetal liver characteristics suggesting they might produce human EPO as in fetal liver cells. (Goldwasser US Pat. 4,558,005, Egrie US

47

Pat. 4,558,006). Such EPO producing cells would be a convenient source of EPO human mRNA with antibodies to EPO, as such cells would be expected to produce human EPO and be a rich and convenient source of human EPO mRNA for the purpose of making a cDNA library. Indeed, when tested, these cell lines were found to actively produce EPO mRNA and secrete EPO in their culture media. (Goldberg 1987, Nielsen 1987).

94.    Therefore, a person of skill in the art wishing to clone the human EPO gene would be directed to make a cDNA library from mRNA isolated from fetal liver cells or the HepG2 or HepB3 cell lines. Such a person would succeed, given a set of oligonucleotide probes of sequences based on the correct EPO protein sequence, and implementation of cDNA library screening approaches using oligonucleotide probes that were established prior art prior to October 1983.

## VI.    It Would Have Been Obvious to Express the EPO Gene in Mammalian Host Cells Such as CHO Cells to Produce a Biologically Active Glycosylated Protein

95.    Prior to October 1983, it would have been obvious to a skilled scientist in possession of a DNA sequence encoding human erythropoietin and wanting to express human erythropoietin as a glycosylated recombinant protein to express the coding sequence in one of a number of widely available mammalian host cell expression systems. Such host cell expression systems would have included in particular the same or similar host cell systems described in the asserted Lin patents, the COS (monkey kidney) cell line, and the CHO (Chinese hamster ovary) cell lines, that Dr. Lin used to express recombinant human erythropoietin. These cells were publicly available, and one of skill would have known to select them. (*See* Lin Depo. Tr. (3/28/07) at 50-53, 59-62). For example, with regard to COS cells, Dr. Lin testified (*See id* at 51-52):

THE WITNESS: [F]or research in molecular biology, it's known that COS cell is the quick way to express a gene because if you have a genomic DNA, all you need is transfected -- you don't have to modify the gene much. You transfect it, and it can carry out this -- the synthesis, okay, expression. So COS cell for -- expression in COS cell, it's the quickest way.

BY MS. BEN-AMI: And that was known in 1982?

A     Oh, yes. Of course.

96.     Further, Dr. Lin testified that the use of CHO cells was suggested to him by a curator at the American Type Culture Collection ("ATCC"), a nonprofit repository of biological products, such as cell lines, who suggested its use because of its stability and suitability for commercial production. (*See id.* at 63-67). Dr. Lin obtained the particular DHFR- CHO cell line he used from a professor at Columbia University. (*See id.* at 60 ("Q. Were the CHO cells you obtained publicly available? A. Oh, yes. Yes. Q. From this professor at Columbia? A. That's correct. Yes.").

97.     As discussed above, the CHO cells system in particular had been extensively characterized, and in particular, with respect to the glycosylation and the enzymes involved in that process. In addition, the amino acid sequences serving as recognition sequences to signal the cell machinery to glycosylate at specific residues in a protein were well known in the art. As described below, a substantial body of prior work describing expression of a number of recombinant proteins in mammalian host cells, including human proteins in COS and CHO cells confirmed that such host cells could be used to express functional glycosylated recombinant proteins. Taking into account such data, one of skill would have expected that human glycoproteins would be glycosylated and functional when expressed using the available mammalian host cell expression systems, especially COS and CHO cell systems. In view of this art, one of skill would have had a reasonable expectation that by using such expression systems,

one would express a functional, glycosylated human erythropoietin having *in vivo* biological activity. (*See* Lin Depo. Tr. (3/29/07) at 355-57, 368).

**A.    Lin Adopted Obvious Methods Well Described in the Prior Art to Express the EPO Gene**

98.    Examples 7 through 10 of the Lin patent include data regarding the expression of the human EPO coding sequence in mammalian host cells and assays of the materials produced thereby.  These data were all generated using two mammalian host cell expression systems, which prior to October 1983, were routinely used by the skilled scientist to express mammalian proteins.  Examples 7 through 9 relate to transient expression, using the COS-1 monkey cell line, and Example 10 describes expression from stably transfected DHFR- CHO cell line.

99.    Lin testified that the work in Example 7, relating to expression in COS cells, was done by Dr. Jeffrey Browne, another Amgen scientist.  (*See* Lin Depo. Tr. (3/28/07) at 230-31, 235-36).  To express the EPO DNA in COS cells, a vector had to be chosen and constructed.  (*See* '868 patent at col. 23, l. 14).  Dr. Lin testified that this and the other elements needed for transfection and expression in the COS cell, such as use of the SV-40 gene, were known.  (*Id.* at 233-34).  Indeed, in his testimony, Dr. Lin stressed just how obvious was the work in Example 7:

Q.    Now, did you tell Dr. Browne's group how to do the work that's in example 7?

A.    They already know how to do it.  Any molecular biology – have given a piece of DNA and one to put into a vector, they know what they need to do.  My associate can do it.  They not even require a scientist to do it.

Q.    Okay.

A.    So, I mean, in general, all molecular biology know how to handle all these – all these things, yeah.

100.    Similarly, Dr. Lin testified with regard to the work in Example 8 (*see* Lin Depo. Tr. (3/28/07) at 238-39:

Q.    And now let's get back to example 8.  Who did that work?

A.    (Examining document) I believe this is done by Joan Egrie's group.

Q.    Okay.

      And did you tell her how to do this work that's in example 8?

A.    Molecular biology for doing the radioimmunoassay, they would know how to carry out radioimmunoassay.  I don't have to tell her how to do it, unless she have problem, come to me, or have problem arise -- any problem raise.

Q.    Did you say "raise"?

A.    Yes.

Q.    "Raise."  Sorry.

A .   So for doing the immunoassay, any associate or scientist can do it.

101.    And likewise, regarding the work in Example 9, Dr. Lin stated (*see* Lin Depo. Tr. (3/28/07) at 239-40):

A.    For the in vitro assay – again, I think – I believe it's done by Joan Egrie's group.  For the in vivo assay, I don't know at the time we already set our own in vivo system – it's a system in-house or not.  It could be done by outside consultant.  I think we, at one time – some of the assay was carried out by Peter Dukes' group at the children hospital.

Q.    So did you tell anybody how to do the work that was in example 9?

A.    Oh, we know – how to do this.  I don't have to tell them.  This is individual who – in charge of setting up this assay. They know how to do it.  I don't have to tell them what to do.

Q.    These in vitro and in vivo assays that are described in example 9, those were assays that were commonly known at the time; right?

A.    Yes.

102.    And finally, in reference to the work in Example 10, Lin testified for instance that (*see* Lin Depo. Tr. (3/28/07) at 241-252):

Q.    So now let's look at example 10.  We get to the CHO cells.

      ───────

Q.    So the CHO cells that are being used in example ten, were those CHO cells obtained from the ATCC, or were they obtained from Dr. Chasen?