EXHIBIT 1
(Part 2 of 4)

FRITSCH ET AL. v LIN
Interference Nos. 102,097

preliminary statement was also filed. Lin has opposed these motions and consideration thereof has been deferred to final hearing.

The Federal Circuit decision, on appeal from the District Court decision, was issued during Lin's testimony period and, pursuant to Commissioner's Memorandum and Order dated April 5, 1991, Lin has filed a motion for entry of judgment in favor of Lin. This motion has been opposed by Fritsch et al and has been deferred for consideration at final hearing (Paper No. 157).

The inteference thus comes on to final hearing to consider (1) Lin's motion for entry of judgment; (2) priority; (3) Fritsch et al motions relating to best mode, Section 103 patentability and the inventorship; and (4) Fritsch et al motion to change inventorship. Fritsch et al have not briefed their deferred Motion K regarding Lin's priority benefit and this is not, therefore, an issue at final hearing.

### (G)   Lin's Priority Evidence

Lin accepts, for priority purposes, the District Court's undisputed summary of Amgen's activities as set out at pages 1746-1750 of the District Court decision. The District Court summary of the Lin ("Amgen") position is quoted in Appendix 2.

Additional evidence presented on Lin's behalf included declaration testimony by Dr. Jeff Browne and his assistants, Ralph Smalling and Geri Trail; Dr. Joan Egrie and her assistants, Jeri Lane and Cheryl Bradley; Dr. Peter Dukes and his assistant Curtiss Polk; Dr. Randolph Wall and Dr. Lin himself. These witnesses testified as follows:

14

AM 17 010620
CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AM-ITC 00337666

FRITSCH ET AL. v. LIN
Interference Nos. 102,097

### Dr. Jeffrey Browne

Dr. Browne, an Amgen employee whose education and experience are outlined at LR 7-8 and Lin Exhibit 200, testified (LR 7-31) that he was responsible for the expression of recombinant human EPO (rHuEPO) in 293 cells, COS cells and CHO cells as set out in the District Court decision (LR 10) and that these expressions were carried out at Dr.Lin's request (LR 10). He also confirmed that Dr. Joan Egrie was responsible for conducting radioimmunoassays (RIA) which demonstrated the presence of recombinant human erythropoietin (rHuEPO) in test samples of his culture medium and that Dr. Egrie was responsible for confirming that the expressed product was biologically active in vitro and in vivo (LR 10).

Browne testified as to the expression work which he and his assistants (Ralph Smalling and Geri Trail) did in cultured mammalian cells at Lin's request (LR 10-25) using human and monkey EPO clones obtained from Dr. Lin. Initially, this involved using 293 and COS cells but later CHO cells were used which contained either the human or monkey EPO gene (LR 10, 11).

The first expression vector which was prepared under Dr. Browne's supervision contained Dr. Lin's monkey EPO cDNA clone. This vector was introduced into COS cells. This work was done by Ralph Smalling working under Dr. Browne's direction (LR 11, 12). Culture media from the transformed COS cells was isolated and given to Dr. Joan Egrie on December 7, 1983 to analyze for the presence of EPO. Dr. Egrie reported on December 8, 1983 that the isolates designated H and L, tested positive for recombinant monkey EPO (LR 12).

15

AM 17 010621
CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AM-ITC 00337667

Further expression work using COS cells and Lin's monkey EPO clones was carried out in December, 1983 and January, 1984 (LR 13, 14) and on January 10, 1984, Dr. Browne transfected 293 cells with a plasmid containing Dr. Lin's human EPO genomic clone HE 1, which Dr. Lin had identified as carrying the complete human EPO gene coding sequence. Media was harvested after culturing and sent to Dr. Egrie who as of January 24, 1984 reported the presence of rHuEPO in the samples (LR 14, 15). The results indicated (LR 15) that the cloned fragment provided by Dr. Lin contained the complete coding portion of the human EPO gene (LR 15, Lin Exhibit 206).

Dr. Browne and his assistant Mr. Smalling continued their expression work with the human EPO gene in 293 and COS cells in the period January 9, 1984 to February 14, 1984 sending isolates to Dr. Egrie for assay with positive results reported (LR 16-18). Expression work with CHO cells was also carried out in the period December, 1983 to May, 1984, first with monkey EPO clone and then with the human EPO clone with the results showing in vivo biological activity for the expression products (LR 18-25). Highlights of the expression work Dr. Browne did, or which was done under his direction in the period December, 1983 to May, 1984, included the successful expression of rHuEPO using 293 cells in the period January 10-17, 1984 with Dr. Egrie reporting positive results on January 24, 1984 (LR 26, 27; Lin Exhibits 205, 206). These were the 293 cells transfected with a 5.4 kb BAMHI-HindIII subfragment including Lin's human EPO genomic gene clone HE1 which included the complete coding portion of the human EPO gene. This followed the earlier expression of monkey EPO using COS-1 cells which also were reported favorably by Dr. Egrie on December 8, 1983 (LR 26; Lin Exhibit 204).

16

AM 17 010622
CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

Additionally, in the period April 3, 1984 to May 22, 1984, successful expression of rHuEPO in CHO cells was carried out (LR 24, 26, 27; Lin Exhibits 208, 211, 212). CHO cells were transfected with DNA from these two isolates H3 and B11, both of which contained the complete coding portion of the human EPO gene (LR 23, 24). Isolated samples of culture medium from pools of the H3 and B11 transformed CHO cells were given to Dr. Egrie on May 22, 1984 (LR 25) and she reported on May 24, 1983 that rHuEPO was present in the samples (LR 25, 26, 27).

Dr. Browne described how CHO cells and other mammalian cells (293, COS) synthesized recombinant human EPO and secreted it into the culture medium (LR 28, 29). He also testified that expression in CHO cells or other mammalian cells proceeded via steps (a)(i)(ii)(iii) of the count (LR 28-29). He acknowledged familiarity with the count and confirmed that the expression which he carried out using COS and CHO cells transfected with the DNA sequence encoding EPO from Dr. Lin represented a process exactly according to the count (LF 29, 30). He noted that he was able to express biologically active rHuEPO using the EPO gene clones which Dr. Lin had isolated and provided for expression, successful expression of an in vivo biologically active product being shown by the in vivo results obtained by Dr. Egrie (LR 30).

Dr. Browne's expression work is summarized in Appendix 3.

### Dr. Joan Egrie

Dr. Egrie, an employee of Amgen with the background and experience indicated at LR 38-39 (see also Lin Exhibit 110), testified in detail (LR 38-69) and confirmed that

17

AM 17 010623
CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

she was responsible for the assay and determination of in vivo biological activity of the rEPO expressed by Dr. Browne as referred to in the District Court summary (LR 39, 40). She also testified that in vivo biological activity for the expressed rEPO was determined working with Dr. Peter Dukes of Children's Hospital, Los Angeles (LR 40, 41).

She knew that Dr. Lin had isolated EPO clones in late 1983 (LR 41) and she was aware that Dr. Browne had been asked by Lin to use the clones for expression (LR 41, 42). She extensively discussed (LR 42-65) her assay work on rEPO samples received from Dr. Browne's group. She described the method used for determining in vivo bioactivity of recombinant human EPO expressed in COS and CHO cells (LR 48, 49), noting that the carbohydrate portion of EPO, particularly sialic acid content, affects in vivo activity (LR 49).

Egrie testified as to tests carried out by Dr. Dukes in the period February-March, 1984 showing that COS-cell expressed samples received from Browne's group and identified as E3 and E7 contained in vivo biologically active rHuEPO (LR 49, 50). A further in vivo bioassay on E7 by Dr. Dukes conducted March 26 - March 30, 1984 confirmed the in vivo biological activity for this sample of human recombinant EPO (LR 50-51).

She also testified as to a further experiment which was carried out beginning March 5, 1984 which showed that the COS cell-expressed rHuEPO designated E3 elevated the hematocrit of mice (LR 51, 52). This indicated to Dr. Egrie that the rHuEPO possessed the in vivo biological property of causing bone marrow cells to increase production of reticulocytes and red blood cells (LR 51, 52).

18



AM 17 010624
CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AM-ITC 00337670

Dr. Egrie also testified as to assays done in the period May-June, 1984 on samples of CHO cell-expressed rHuEPO designated H3 and B11 which she received from Dr. Browne's group (LR 53, 54). RIAs and in vitro assays were positive and tests by Dr. Dukes confirmed that these samples (H3 and B11) were active in vivo (LR 54, 55).

Egrie included in her testimony other work on recombinant monkey EPO expressed in COS and CHO cells by Dr. Browne's group which showed that this too was found to be in vivo biologically active. See LR 55-65. Dr. Dukes reported in vivo biological activity for COS cell media samples as early as December 23, 1983 (LR 57-59) and again on March 19, 1984 (LR 58) and for the CHO cell expressed monkey EPO samples in April, 1984 (LR 61-63). It was also shown that the COS and CHO cell-expressed monkey EPO was able to increase red blood cells in the period March 5, 1984 to June 6, 1984 (LR 63-65).

Dr. Egrie also confirmed the testimony of Drs. Browne and Lin that the indicated expression by Dr. Browne's group of in vivo biologically active recombinant using a mammalian host cell transfected with an isolated DNA sequence encoding human EPO involved each of the steps specified in the count (LR 67, 68).

### Dr. Peter Dukes

Dr. Dukes, who is Director of Research, Children's Hospital of Los Angeles with the background and experience noted at LR 76-77 (see also Lin Exhibit 1) testified (LR 76-87) as to test work to determine in vivo biological activity which was carried out under his direction by his assistant Curtis Polk, at Dr. Egrie's request. He summarized his test

19

AM 17 010625
CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AM-ITC 00337671

results which showed in vivo activity for the samples received from Dr. Egrie in the period
December, 1983 to June 1, 1984 with specific reference to Egrie samples H and L
(December, 1983), E3 and E7 (March, 1984), H and L (March, 1984), A and pure A (April,
1984), and H3 and B11 (June, 1984) (LR 85).

The test work by Drs. Egrie and Dukes is summarized in Appendix 4. Of the
samples tested by Dr. Dukes for in vivo biological activity, E3 and E7 were samples of
culture media obtained by expression from COS cells transfected with Lin's human EPO
gene. Samples H3 and B11 were media obtained by expression from CHO cells
transfected with the human EPO gene. The other samples H, L and A were obtained by
expression from COS or CHO cells transfected with the monkey EPO gene. All of these
samples were found to be in vivo biologically active by Dr. Dukes. Accordingly, the Lin
evidence shows the effective carrying out of the process of the count to obtain rHuEPO
with a determination of in vivo biological activity by March, 1984 for the COS cell-
expressed EPO and by June, 1984 for the CHO cell-expressed EPO.


### Dr. Randolph Wall

The declaration evidence of Dr. Randolph Wall, Professor in the Department of
Microbiology and Immunology at UCLA, was also presented by Lin (LR 91-102). This
declaration was earlier filed in the motion period. The declaration includes Dr. Wall's
comments distinguishing the invention at issue from Toole U.S. 4,757,006 and supports
Lin's position on patentability (LR 95-100) and best mode (LR 100, 101).


20

AM 17 010626
CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AM-ITC 00337672

### Dr. Fu–Kuen Lin

Dr. Lin (LR 1-6) confirmed that he was the inventor of the subject matter claimed in his application (LR 1) and that the experimental work on which the invention is based was done by himself or others, including Drs. Browne and Egrie, at his request (LR 1, 2). He specifically confirmed that the expression of EPO in 293, COS and CHO cells was done on his behalf (LR 3). This included expression with the approximately 5.4 kb BamHI-Hind III DNA subfragment within a lambda bacteriophage clone he called HE1 and which carried the complete human EPO coding sequence (LR 3). He confirmed that the expression of in vivo biologically active rHuEPO by culturing mammalian host cells transformed with a DNA sequence encoding EPO was shown to be successful by Dr. Egrie's determination that the expressed rHuEPO was biologically active in vivo (LR 3, 4). He also confirmed that the expression carried out by Dr. Browne and his assistant satisfied all features and limitations of the count (LR 5).

AM 17 010627
CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AM-ITC 00337673

FRITSCH ET AL. v. LIN
Interference Nos. 102,097

### Assistants

Ralph Smalling and Geri Trail, who assisted Dr. Browne, testified in confirmation
of Browne's work (LR 32-36) while Jeri Lane and Cheryl Bradley confirmed Egrie (LR 70-
75) and Curtiss Polk, Dr. Dukes' assistant, confirmed Dr. Dukes testimony (LR 87-90).

#### (H)    The Fritsch et al Priority Evidence

Fritsch et al have alleged a conception of the invention, based on the
concept of a probing strategy in December, 1981.

The evidence presented by Fritsch et al tracks closely with the factual history
recorded by the District Court under the heading "c. Genetics Institute" in its decision
(1750-1752). There is some added evidence amplifying Fritsch et al's alleged diligence
towards isolating the DNA sequence in the period 1981 to 1983. However, this is of no
relevance in view of the Federal Circuit's holding that conception of the purified and
isolated DNA sequence encoding EPO must be simultaneous with its reduction to
practice. No new evidence concerning conception has been presented. As GI's counsel
succinctly stated the issue at trial day 7:

> "there is no way on this God's earth that Dr. Fritsch could make a
> showing that he cloned first." (Tr. 7,125, lines 9-11, A7328)

It is also noted that Fritsch et al have presented no adequate evidence to
establish that the recombinant product they ultimately expressed in the latter half of 1984[10]

---

[10]    Fritsch et al make no claim that they obtained in vivo biologically active recombinant
human EPO before Lin. Their only argument is the alleged prior conception (December
1981) with diligence to a reduction to practice after Lin's reduction.

22

AM 17 010628
CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

had in vivo biological activity as required by the count. Dr. Dukes, who allegedly did
some in vivo testing for Fritsch et al, did not testify as to any results. Fritsch et al have
referred to activity data received from GI's exclusive Japanese licensee (Chugai).
However, this data cannot be relied on as whatever work was done to obtain the data
was done outside the U.S., i.e. in Japan (35 USC 104). Furthermore, no one directly
involved with the Chugai work testified. Accordingly, the in vivo activity requirement of the
count remains unproven by Fritsch et al. Hence, Fritsch et al have not established any
actual reduction to practice.

## III.    ARGUMENT

### (A)    The Fritsch et al Brief Ignores the Federal Circuit Decision

This interference needs to be considered in the context of the law and facts
established by the related infringement litigation which culminated in the Federal Circuit
decision. The Fritsch et al brief at final hearing totally ignores the implications of that
decision and treats Fritsch et al "Issues Presented for Decision" Nos. (1), (3) and (4)
therein as though they had never been the subject of judicial analysis. The Board's
consideration of these "issues" is greatly simplified when one takes into account the
Federal Circuit's decision. Particularly significant in this respect is the determination
referred to earlier that conception of the invention at issue in the litigation (the purified and
isolated DNA sequence encoding human EPO as defined in Lin's '008 patent claim 2 and
host cells including this sequence) requires reduction to practice i.e. that the claimed

23

AM 17 010629
CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AM-ITC 00337675

invention involves simultaneous conception and reduction to practice.  See, for example,
the Federal Circuit decision, 18 USPQ2d at 1021.  See also the District Court's holding:

> if any fact situation triggers the simultaneous conception and reduction to
> practice doctrine, this is it.  (13 USPQ2d at 1760)

Fritsch et al admit that "priority turns upon the first conception of the purified and isolated
gene", and, as conception requires reduction to practice, Fritsch et al have in essence
acknowledged Lin's entitlement to priority in the present proceedings.  Thus the
arguments and evidence presented by Fritsch et al attempting to establish priority by
showing a "conception" prior to Lin's acknowledged earlier reduction to practice of the
purified and isolated EPO DNA sequence, are totally irrelevant.  The same is true with
respect to the Fritsch et al arguments regarding Section 103 patentability of Lin's claims
and Lin's best mode.  These issues were thoroughly considered by the District Court and
Federal Circuit.  Fritsch et al have made no effort in their brief to distinguish the facts
pertinent to the priority and patentability issues (Section 103 and best mode) they present
for final hearing from the facts considered by the District Court and Federal Circuit, and
they clearly cannot do so.

### (B)    Summary of Lin's Position

The Lin position can be summarized as follows:

(i)    The Lin April 25, 1991, motion for judgment should be granted.
The Federal Circuit has decided all of the fundamental issues
between the parties as submitted by Fritsch et al for final

24

AM 17 010630
CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

hearing. The requested inventorship correction is mooted because the subject matter at issue is not patentable to either Fritsch et al as joint inventors or to Fritsch as sole inventor.

(ii)    The Federal Circuit affirmed the District Court opinion that the invention of a purified and isolated DNA sequence encoding EPO required simultaneous conception and reduction to practice. The undisputed findings are that Lin purified and isolated the EPO gene and carried out expression using mammalian host cells transformed with this gene to obtain in vivo biologically active human EPO before Fritsch et al have conceived the gene. The arguments by Fritsch et al that they conceived earlier than Lin, on the basis of their goal for obtaining the isolated EPO gene, whatever its identity, and their proposal of a possible probing method for finding the gene, and that they were diligent in reduction to practice of this proposal, were dealt with and dismissed by the Courts because Fritsch did not conceive a purified and isolated DNA sequence for EPO and a viable method for obtaining it until after Lin.

(iii)   While the count is directed to a process for preparing in vivo biologically active EPO using a mammalian host cell transfected or transformed with an isolated DNA sequence

25

AM 17 010631
CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

encoding human EPO, and the litigation was directed to the purified and isolated DNA sequence and host cells transfected or transformed thereby, it is evident that these are only different manifestations of the same invention as acknowledged by Fritsch et al in their Motion Q herein (and in Motion G in Interference No. 102,096). Clearly, the whole purpose and intent of the purified and isolated DNA sequence encoding human EPO (and host cells transfected therewith) at issue in the litigation was to express in vivo biologically active human EPO. Stated otherwise, the process language of the Lin patent claims at issue in the litigation ("encoding human EPO") is, for all intents and purposes, a description of the present count. One cannot be sure he has the sequence until he has successfully expressed in vivo biologically active human EPO. This involves culturing the transfected cells and isolating the expression product to determine whether or not it has the required in vivo activity. Hence, the priority holding in the litigation is directly on point, notwithstanding the different statutory class of claims involved.

(iv)  Lin's disclosure satisfies best mode requirements. The only arguments advanced by Fritsch et al in this interference are identical to those raised by Fritsch et al in the '096

26

AM 17 010632
CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AM-ITC 00337678

Interference. With respect to those agruments, the Federal Circuit affirmed the District Court ruling that Lin has satisfied best mode requirements.

(v)    The Lin claims are patentable over the prior art for the reasons noted in the District Court and Federal Circuit decisions. The Courts found Lin's EPO purified and isolated DNA sequence and host cells transformed with the same, to be patentable over the same prior art. The Courts' ruling applies with equal force to Lin's process claims.

(vi)   Lin is the inventor of the invention at issue. The inventor of the isolated EPO DNA sequence is clearly the inventor of the process for producing EPO involved in this interference. Fritsch et al admit as much by confirming that "priority turns upon the first conception of the purified and isolated human EPO gene." The process for producing EPO using Lin's purified and isolated gene was done at Lin's request.

(vii)  Fritsch et al should not be permitted to change inventorship or correct their preliminary statement. They have not shown that the original inventorship was inadvertently designated. They have also not proceeded diligently with the proposed amendment.

27

AM 17 010633
CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AM-ITC 00337679

FRITSCH ET AL. v. LIN
Interference Nos. 102,097

### (C)    DISCUSSION OF THE ISSUES

#### (a)    The Lin Motion for Judgment Should Be Granted

The Federal Circuit decision is dispositive of all issues raised by Fritsch et
al for determination in this interference and the decision in res judicata as to those issues.
In re Katz, 167 USPQ 487, 488 (CCPA 1970). Of the five "issues" proposed by Fritsch et
al in their brief at final hearing, issue No. 1 (priority), No. 3 (best mode) and No. 4
(Section 103 patentability), which depend on exactly the same arguments raised in the
'096 interference and previously presented to the Courts, have been finally decided by the
Federal Circuit adverse to Fritsch et al. Issue No. 2 (inventorship change) is mooted by
the Federal Circuit decision as it does not matter whether Fritsch et al are joint inventors
or Fritsch is the sole inventor. The invention at issue is not patentable to either entity
under 35 USC 102(g).

This leaves Fritsch et al issue No. 5 (which challenges Lin's inventorship
under 35 USC 102(f)). However, this is not a real issue, particularly with the Fritsch et al
admissions referred to supra.

Accordingly, the Motion for Judgment by Lin filed on April 25, 1991, and
incorporated herein by reference, should be granted in favor of Lin with a holding that
Lin is entitled to his claims corresponding to the count in interference and that Fritsch et
al are not entitled to their claims corresponding to the count.

In the Commissioner's Memorandum and Order dated April 5, 1991, Lin
was asked to explain why it was appropriate to grant relief prior to the time the "Amgen
decision" (i.e., the Federal Circuit decision) became final and why the decision governs

28

AM 17 010634
CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AM-ITC 00337680

FRITSCH ET AL. v. LIN
Interference Nos. 102,097

the "application v. application" interferences, i.e. the present interference and Interference
No. 102,334. Since then, however, the Court has denied both a petition for rehearing and
a suggestion for rehearing en banc and has issued its mandate.

As to why the Federal Circuit decision should govern in an application v.
application interference, as here, Lin notes that the Courts' findings on the priority
evidence considered in the litigation established that Lin is the prior inventor of not only
the DNA sequence and host cells transformed therewith at issue in Interference No.
102.096, but that he had used this sequence and transformed mammalian host cells to
produce in vivo biologically active recombinant human EPO. Fritsch et al agree that the
conception of the invention is dependent upon the conception of the DNA sequence.
Thus, the litigation directly involved an essential feature of the process, i.e. the purified
and isolated DNA sequence encoding EPO. The findings of the District Court, affirmed
by the Federal Circuit, clearly show that Lin carried out the expression process using the
DNA sequence to produce in vivo biologically active recombinant human EPO before
Fritsch et al even conceived the DNA sequence. Lin submits that the Court findings
establish priority for Lin as to the present count and show that the subject matter at issue
is not patentable to Fritsch et al under 35 USC 102(g) because of Lin's acknowledged
prior work. In the circumstances, the District Court's findings as affirmed by the Federal
Circuit are dispositive of the priority issue, as well as other issues represented by the
present interference, as discussed in the Lin motion for judgment. Since the subject
matter at issue cannot be patentable to Fritsch et al because of Lin's 102(g) standing, the

29

AM 17 010635
CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AM-ITC 00337681

Fritsch et al Rule 608(b) showing stands nullified and Fritsch et al have no valid basis for being in interference.

The decision of the Federal Circuit is manifestly binding on the PTO with respect to issues considered by the Court. In re Katz, supra. See also, for example, Henning v. Hunt, 106 USPQ 307, 313 (CCPA 1955) where the Court stated:

> The appeal, Civil Action 20,023, was taken for the purpose of reviewing the action of the Board of Appeals of the Patent Office, and the court reversed the board's decision, as noted in the above-cited conclusions of law. The court found that Hunt was entitled to the claim forming the count of the interference. The commissioner (and the Patent Office tribunals) cannot question the court's decisions; their failure or refusal to execute it by appropriate action would undoubtedly be corrected by judicial process; the decree of the court is the final adjudication on the question of right. Butterworth v. Hoe. 112 U.S. 50. If the Patent Office tribunals did not follow the court's decision, it would be tantamount to reversing the appellate court.

As noted by the Commissioner in In re Pearne, 212 USPQ 467 (Comm'r Pat & TM 1981), "[in] appropriate circumstances, it may also be proper to consider the effect of any known litigation which the patent may have been involved." Id. at 468. The rationale of the Commissioner was clear:

> the federal courts and the PTO are jointly responsible for the overall administration of the patent system. ...[T]he maximum benefit to the system occurs when the PTO and the federal courts act in harmony. Accordingly, it scarcely seems appropriate for the PTO to relitigate in a reexamination proceeding an issue of patentability which has been resolved by a federal court on the merits after a thorough consideration of the prior art called to its attention in an adversary context. Id. at 4 68-469.

Clearly, the effect of the Federal Circuit decision is that Lin has been determined to be prior to Fritsch et al under 35 USC 102(g) as to the process in issue

30

AM 17 010636
CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AM-ITC 00337682