# Exhibit 5

```
                                     Volume 36, Page 1
 1                 UNITED STATES DISTRICT COURT
 2                   DISTRICT OF MASSACHUSETTS
 3
 4   - - - - - - - - - - - - - - - -
 5   AMGEN INC.,                      :
 6              Plaintiff             :
 7                                    :  CIVIL ACTION
 8       VS.                          :
 9                                    :  NO. 87-2617-Y
10   CHUGAI PHARMACEUTICAL CO.,       :
11   LTD., and GENETICS INSTITUTE,    :
12   INC.,                            :
13              Defendants            :
14   - - - - - - - - - - - - - - - -
15                    CIVIL NONJURY TRIAL
16                      LIABILITY PHASE
17                      DAY THIRTY-SIX
18
19         BEFORE THE HONORABLE PATTI B. SARIS
20                 United States Magistrate
21
22                              Courtroom 9
23                              U.S.P.O. & Courthouse
24                              Boston, Massachusetts
25                              Wednesday, October 18, 1989
```

A 70631

AM-ITC 00117304

1 has the sole and exclusive responsibility for control of
2 the lawsuit?
3 A. I'm not really sure what that means in legal terms.
4 Q. Well, does Chugai control this lawsuit on behalf of
5 itself and Genetics Institute?
6             MR. RICHTER:  I object.
7             MR. LEE:  I object.  Of course.
8             MR. ALLEGRETTI:  I'm attempting to determine,
9 your Honor, whether the willfulness is entirely determined
10 by Chugai and dictated by it or whether it's jointly
11 willfulness by Chugai and GI or it's just GI.
12             MR. RICHTER:  Willfulness of what, your Honor?
13             MR. ALLEGRETTI:  Infringement of the '008 patent.
14             THE COURT:  Sustained.
15 BY MR. ALLEGRETTI:
16 Q. Mr. Schmergel, there has been produced in this case a
17 number of documents by Chugai, and they relate to
18 communications between Chugai and Genetics Institute, and
19 they also relate to internal documents of Chugai.  And I
20 have just a few of them, and I simply want to explore
21 whether you have any knowledge of the subject matter of
22 these documents.  First, let me direct your attention to
23 December of 1983.
24             There was an announcement by GI that it had
25 successfully cloned EPO at that time, correct -- excuse

A 70650

AM-ITC 00117323

Volume 36, Page 21

1   me, by Amgen that it had successfully cloned EPO, correct?
2   A.  I recall a press announcement, yes.
3   Q.  I want to focus your attention to a month immediately
4   following that announcement, which is January of 1984.
5       You were in communication with Chugai at that
6   time with respect to the announcement by Amgen, were you
7   not?
8   A.  Our company was in communication, yes.
9   Q.  And in that respect Mr. Yang was communicating with
10  various people at Chugai, correct?
11  A.  I recall seeing correspondence, yes.
12  Q.  And he indicated that you had -- "you" meaning GI --
13  had heard that Amgen had cloned EPO, and that subject was
14  under discussion with Chugai at that time?
15  A.  Correct.
16  Q.  Who was Mr. Sadahiro at Chugai?
17  A.  Dr. Sadahiro at that time was a senior manager in
18  the -- in one of the technical departments, I think
19  licensing or something like that.
20  Q.  Were you made aware in January of 1984 that
21  Mr. Sadahiro had expressed to Mr. Yang in a communication
22  the view that Chugai assumed that Amgen's first cloning of
23  EPO is certainly patentable?
24  A.  I was aware that we tried to evaluate the significance
25  of the Amgen press announcement.

A 70651

AM-ITC 00117324

Volume 36, Page 22

1  Q. And that, if patentable, the procurement of a patent
2  would seriously damage the commercial interest of the EPO
3  project?
4  A. We were trying to -- as I said, we were trying to
5  understand what the press announcement might mean.
6  Q. Okay.
7  A. Press announcements are not necessarily accurate.
8  Press announcements do not mean that the patent will be
9  issued. It's -- competitor press announcements have to be
10 taken as one input in an overall decision-making process.
11 Q. I will show you, Mr. Schmergel, Plaintiff's
12 Exhibit 320, which is a letter dated January 16, 1984,
13 from Mr. Yang to Mr. Sadahiro at Chugai, with a copy
14 designated to you.
15        Are you familiar with that letter, Mr. Schmergel?
16 A. Yes.
17 Q. I call your attention to the first paragraph of the
18 letter. Mr. Yang states in the second sentence:
19        We came to the conclusion that although we
20        missed the chance to be the first one to clone
21        EPO, we will continue to pursue this project
22        aggressively, for the following two major
23        reasons:
24        And there follows two headings. One is the
25 patent situation and the other on page 2, Item 2, is

A 70652

AM-ITC 00117325

Volume 36, Page 23

1  development of commercializable product.
2          My question to you, Mr. Schmergel, is, Did you
3  reach an agreement with Chugai that any patent procured by
4  Amgen enforceable against the EPO project work would be
5  vigorously resisted?
6  A.  No.
7  Q.  Let me call your attention, Mr. Schmergel, to the last
8  two sentences of Section 1 of the patent situation which
9  appears on page 2, the first full paragraph on page 2.
10 The last two sentences read:
11              It may take several years before the content
12          of the patent is known.  Valuable time could be
13          lost if we wait until all the facts are known.
14          It is correct, is it not, Mr. Schmergel, that a
15 business decision was made to proceed full force with the
16 EPO project and to deal with patents obtained by Amgen
17 when and if they arose?
18 A.  Well, a business decision was obviously reached to
19 proceed with the project, not knowing who might get what
20 patents when.
21 Q.  Would you turn next to the third page of the document.
22 There is a paragraph beginning:
23              Regarding to the specific points in your
24          telex, I have reviewed it with Dr. Fritsch and
25          the management staffs of GI.  Following are

A 70653

AM-ITC 00117326

Volume 36, Page 24

1        Dr. Fritsch's answers.
2            Did you discuss the subject matter of those
3    specific points, 1 through 5, conveyed to Mr. Sadahiro by
4    Dr. Fritsch through Mr. Yang?
5    A.  Most of those paragraphs deal with scientific matters.
6    I would not have discussed them.
7    Q.  In January of 1984 the first paragraph of
8    Dr. Fritsch's answers states that:
9            To clone EPO, Amgen used new sequence
10           information obtained from tryptic fragments of
11           EPO from Dr. Goldwasser.
12           Now, January of 1984 is well prior to the
13    arrangement with Dr. Miyake and the procurement of
14    purified material from him, is it not?
15   A.  For GI, you mean?
16   Q.  Yes, for GI.
17   A.  Yes.
18   Q.  So that before you began your work with purified
19   material obtained from Dr. Miyake that ultimately led to
20   the cloning of EPO at GI, you knew through Dr. Fritsch
21   that Amgen had used sequence information obtained from
22   tryptic fragments of EPO obtained from Dr. Goldwasser, did
23   you not?
24   A.  I can't answer that Dr. Yang is saying that
25   Dr. Fritsch said that.  That's unclear to me.

A 70654

AM-ITC 00117327