## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

---

AMGEN, INC.,

                Plaintiff,

      v.

F. HOFFMANN-LA ROCHE, LTD, a Swiss
Company, ROCHE DIAGNOSTICS GmbH, a
German Company and HOFFMANN-LA ROCHE
INC., a New Jersey Corporation,

              Defendants.

---

Civil Action No. 05-12237 WGY

U.S. District Judge Young

## OPPOSITION TO AMGEN'S MOTION FOR JUDGMENT AS A
## MATTER OF LAW REGARDING ROCHE'S INVALIDITY DEFENSES

Dockets.Justia.com

## TABLE OF CONTENTS

Page

I.     INTRODUCTION ........................................................................................... 1

II.    LEGAL STANDARDS .................................................................................... 2

       A.    Judgment as a Matter of Law Pursuant to Fed. R. Civ. P. 50 is to Be Granted Sparingly
             ....................................................................................................................... 2

       B.    Clear and Convincing Does Not Mean Certain. ............................................ 3

III.   A REASONABLE JURY COULD FIND THAT CLAIM 1 OF THE '422 PATENT
       AND CLAIMS 3, 7-9 AND 12 OF THE '933 PATENT ARE ANTICIPATED ..................... 3

       A.    Anticipation and Prior Invention Under § 102(a), (b) and (g) ....................... 3

       B.    Level of Skill in the Art and the Critical Date .............................................. 4

       C.    '422 Claim 1 and '933 Claims 3, 7-9 And 12 Are Invalid For Anticipation ................. 4

             a.    The Presence Or Absence Of Source or Process Limitations In The Prior Art Is
                   Irrelevant to the Validity of the '933 Patent Claims ........................................ 6

             b.    The Presence Or Absence Of Source Limitations In The Prior Art Is Irrelevant to
                   the Validity of '422 Claim 1 ................................................................ 6

IV.    A REASONABLE JURY COULD FIND THAT THE ASSERTED CLAIMS OF THE
       PATENTS-IN-SUIT ARE OBVIOUS UNDER 35 U.S.C. § 103 ........................................... 7

       A.    Obviousness Under 35 U.S.C. § 103 ............................................................ 7

       B.    Dr. Goldwasser's Protein Renders the Claims-In-Suit Obvious Pursuant to § §
             102(f)/103 .................................................................................................. 8

             1.    The Skilled Worker Could Have Synthesized An EPO Gene Using Goldwasser's
                   Purified Protein Rendering the Claims Obvious ........................................... 10

             2.    Other Available Techniques Render The Cloning Of the EPO Gene Obvious ........ 11

             3.    Expressing The EPO Gene To Make An In Vivo Biologically Active Protein and
                   Pharmaceutical Composition Was Obvious .................................................. 12

             4.    A Person Of Skill In The Art Would Be Motivated To Combine These Elements
                   With A Reasonable Expectation Of Success ................................................. 15

V.     A REASONABLE JURY COULD FIND THAT THE ASSERTED CLAIMS OF
       AMGEN'S PATENTS ARE OBVIOUS PURSUANT TO § 102(G) AND § 103 ..................... 15

i

A.   § 102(g)(2) Art Combined with the Prior Art Can Render Claimed Inventions Obvious Pursuant to § 103 ........................................................................................................ 15

B.   Dr. Goldwasser's Tryptic Fragments Are 102(g)(2) Prior Art And Render The Claims-In-Suit Obvious ................................................................................................................ 16

C.   Dr. Fritsch's Prior Invention Constitutes Invalidating § 102(g) Prior Art................... 16

VI.   SECTION 112 DEFENSES ...................................................................................... 17

A.   A Reasonable Jury Could Find Claims to Human Erythropoietin Invalid For Lack Of Written Description and Indefiniteness ............................................................................. 17

B.   Claim 1 Of The '422 Patent Is Further Indefinite As Lacking Any Identifiable Structure ............................................................................................................................. 19

C.   A Reasonable Jury Could Find That '349 Claim 7 Is Invalid For Non-Enablement Regarding The Limitation to Radioimmunoassay (RIA) ..................................................... 20

VII.  CONCLUSION ......................................................................................................... 20

# <u>TABLE OF AUTHORITIES</u>

Page(s)

## Cases

*Allied Colloids Inc. v. Am. Cyanamid Co.,*
   64 F.3d 1570 (Fed. Cir. 1995) ................................................................. 3

*Amgen v. Chugai,*
   13 U.S.P.Q.2d 1737 (D. Mass. 1989) ....................................................... 4

*Amgen, Inc. v. Hoechst Marion Roussel, Inc.,*
   126 F. Supp. 2d 69 (D. Mass. 2001) .................................................. 7, 20

*Amgen, Inc. v. Hoechst Marion Roussel, Inc.,*
   314 F.3d 1313 (Fed. Cir. 2003) ......................................................... 7, 19

*Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc.,*
   796 F.2d 443 (Fed. Cir. 1986) ................................................................. 4

*Buildex Inc. v. Kason Indus., Inc.,*
   849 F.2d 1461 (Fed. Cir. 1988) ............................................................... 3

*Dystar Textilfarben GmbH & Co. Deutschland KB v. C.H. Patrick Co.,*
   464 F.3d 1356 (Fed. Cir. 2006) ............................................................... 7

*E.I. Du Pont de Nemours & Co. v. Phillips Petroleum Co.,*
   849 F.3d 1430 (Fed. Cir. 1988) ............................................................. 15

*Ecolochem v. S. California Edison Co.,*
   277 F.3d 1361 (Fed. Cir. 2000) ............................................................. 11

*Enzo Biochem, Inc. v. Calgene, Inc.*
   188 F.3d 1362 (Fed. Cir. 1999) ............................................................. 20

*Eolas Tech Inc. v. Microsoft Corp.,*
   399 F.3d 1325 (Fed. Cir. 2005) .......................................................... 3, 8

*Gambro Lundia AB v. Baxter Healthcare Corp.,*
   110 F.3d 1573 (Fed. Cir. 1997) ............................................................... 8

*Holdings, LLC v. Amazon.com, Inc.,*
   430 F.3d 1377 (Fed. Cir. 2005) ............................................................... 4

*In re Kahn,*
   441 F.3d 977 (Fed. Cir. 2006) ............................................................. 4, 7

iii

*In re Marosi,*
   218 U.S.P.Q. 289 (Fed. Cir. 1983) ........................................................ 6

*In re Moeller,*
   117 F.2d 565 (C.C.P.A. 1941) ........................................................ 6

*KSR Int'l Co. v. Teleflex Inc.,*
   127 S. Ct. 1727 (2007) ........................................................ 4, 7

*Meloff v. New York Life Ins.,*
   240 F.3d 138 (2d Cir. 2001) ........................................................ 3

*Morton Int'l. v. Cardinal Chem. Co.,*
   5 F.3d 1464 (Fed. Cir. 1993) ........................................................ 17, 19

*New Railhead Mfg. LLC v. Vermeer Mfg., Co.,*
   298 F.3d 1290 (Fed. Cir. 2002) ........................................................ 18

*OddzOn Prods., Inc. v. Just Toys, Inc.,*
   122 F.3d 1396 (Fed. Cir. 1997) ........................................................ 8

*Pfizer, Inc. v. Apotex, Inc.,*
   480 F.3d 1348 (Fed. Cir. 2007) ........................................................ 3

*PharmaStem Therapeutics, Inc. v. Viacell, Inc.,*
   491 F.3d 1342 (Fed. Cir. 2007) ........................................................ 11

*SmithKline Beecham Corp. v. Apotex Corp.,*
   439 F.3d 1312 (Fed. Cir. 2006) ........................................................ 6

*TI Group Automotive Sys., Inc. v. VDO N. Am., L.L.C.,*
   375 F.3d 1126 (Fed. Cir. 2004) ........................................................ 2

**Statutes**

35 U.S.C. § 102(g)(2) ........................................................ 15

35 U.S.C. § 103 ........................................................ 7

**Rules**

Fed. R. Civ. P. 50(a)(1) ........................................................ 3

## I.  INTRODUCTION

Defendants Hoffmann-La Roche, Ltd, Roche Diagnostics, GmbH, and Hoffmann-La Roche Inc. ("Roche") submit this opposition to Plaintiff Amgen Inc.'s ("Amgen") motion for judgment as a matter of law (JMOL) on the issue of invalidity.[1]  Roche has more than met its burden on this issue and viewing the evidence in the light most favorable to Roche, Amgen cannot demonstrate that Roche has presented merely a scintilla of credible evidence.  In fact, Roche has presented substantial evidence in its case-in-chief on invalidity that would allow a reasonable jury to conclude by clear and convincing evidence that each asserted claim is invalid.

- Claim 1 of the '422 patent and claims 3, 7, 8, 9 and 12 of the '933 patent are anticipated pursuant to §§ 102(a), 102(b) and 102(g):  Credible and unchallenged evidence, including the Baron/Goldwasser clinical trial in 1979, Dr. Essers work in 1973-75, Dr. Eschbach's clinical study in 1984, Dr. Fritsch's work at Genetics Institute) and the Miyake publication fully anticipate every claim limitation, as confirmed by the testimony of Drs. Lowe,[2] Spinowitz, Baron, Goldwasser and Bertozzi.[3]  The phrase "purified from mammalian cells grown in culture" within claim 1 of the '422 patent is a source limitation that does not change the fundamental amino acid structure of "human erythropoietin."  The '933 patent claims are product-by-process claims.  Anticipation by an earlier product disclosure cannot be avoided by claiming the product as produced by a particular process.  It is Amgen's burden of proof to establish structural differences between the prior art's erythropoietin and Amgen's claimed erythropoietin.  Despite this burden, Amgen has presented no evidence of these differences, thus Amgen cannot prevail in its directed verdict motion on these claims as a matter of law.

---

[1]  Exhibit A provides further detail regarding the prior art relied upon by Roche.  In addition, Exhibit B provides claim charts detailing how the art relates to the asserted claims as construed by the Court.

[2]  In light of arguments raised at the September 24 hearing, Roche provides a more detailed explanation of the pertinence of Dr. Lowe's testimony in its "Supplemental Directed Verdict Opposition Regarding Obviousness and the Opinions of Roche's Expert Dr. Lowe Raised By Amgen During the September 24th Hearing," filed concurrently herewith.

[3]  In light of arguments raised at the September 24 hearing, Roche provides a more detailed explanation of the pertinence of Dr. Bertozzi's testimony in its "Supplemental Directed Verdict Opposition Regarding Structural Identity Between Amgen's Product Claims and the Prior Art Raised By Amgen During September 24th Hearing," filed concurrently herewith.

- Claim 1 of the '422 patent and claims 3, 7, 8, 9, 11, 12 and 14 of the '933 patent also would have been obvious to one of skill in the art in light of the prior art studies by Drs. Baron/Goldwasser, Dr. Essers and Dr. Eschbach.[4]

- Each of Amgen's asserted claims is obvious pursuant to 35 U.S.C. § 103, § 102(f)/§ 103 and § 102(g)/§ 103 in light of the prior art. There is substantial evidence that every element of the asserted claims was known in the prior art and one of ordinary skill in the art was motivated to combine these elements, such that the entire claim would have been obvious in the 1983-84 time period. For example, through the testimony of Dr. Lowe alone, more than 20 pieces of evidence were admitted for the jury's consideration of obviousness. Substantial evidence has demonstrated that subject matter crucial to each of these claimed inventions was derived from the work of Dr. Goldwasser, as admitted by Dr. Goldwasser during Roche's case-in-chief, and confirmed by Dr. Lowe. This subject matter, which includes Table 1 of Example 1 of Lin's patent specification, in combination with the prior art would have rendered each of the asserted claims obvious to one of ordinary skill in the art in 1984.[5]

- Claim 1 of the '422 patent, claims 1-2 of the '868 patent, claims 6-9 of the '698 patent, claim 7 of the '349 patent and claims 7-9, 11, 12 and 14 of the '933 patent are invalid for lack of written description and indefiniteness pursuant to § 112 based on the limitation "human erythropoietin," as explained by Drs. Bertozzi and Flavell.

- Claim 7 of the '349 patent is invalid pursuant to § 112 because it lacks enablement regarding its claim limitation of using radioimmunoassay (RIA) to measure the production of human erythropoietin expressed by vertebrate host cells. As confirmed by Dr. Flavell's testimony, RIA cannot distinguish "erythropoietin" from fragments, non-human EPO and other cross-reacting substances.

## II.    LEGAL STANDARDS

### A.    <u>Judgment as a Matter of Law Pursuant to Fed. R. Civ. P. 50 is to Be Granted Sparingly</u>

JMOL should be granted sparingly, and is only appropriate when "'there is no legally

sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'" *TI Group*

*Automotive Sys., Inc. v. VDO N. Am., L.L.C.*, 375 F.3d 1126, 1133 (Fed. Cir. 2004), quoting Fed.

---

[4]   In light of arguments raised at the September 24 hearing, Roche provides a more detailed explanation of the obviousness of '933 claims 11 and 14 in its "Supplemental Directed Verdict Opposition Regarding The Obviousness Of Claims 11 And 14 Of The '933 Patent As Raised By Amgen During The September 24th Hearing" filed concurrently herewith.

[5]   While Dr. Lowe's testimony also presented evidence of prior art predating 1983, Amgen has not presented any evidence that any of the asserted claims is entitled to an invention date prior to the November 30, 1984 filing date of the patents-in-suit. As such, the critical date for determining prior art is November 30, 1984.

R. Civ. P. 50(a)(1).  The risk of an unconstitutional intrusion into the jury's fact-finding role

accounts for the general unwillingness to grant JMOL, which should be used "cautiously and

sparingly."  *Meloff v. New York Life Ins.,* 240 F.3d 138, 145 (2d Cir. 2001).  The Federal Circuit

has especially expressed its disfavor of granting JMOLs of patent validity.  *See, e.g., Eolas Tech*

*Inc. v. Microsoft Corp.,* 399 F.3d 1325, 1335 (Fed. Cir. 2005).  When a party moves for directed

verdict, the non-moving party's "evidence is to be believed and justifiable inferences drawn in

[the non-movant's] favor," with no consideration of credibility or weighing of the evidence.

*Allied Colloids Inc. v. Am. Cyanamid Co.,* 64 F.3d 1570, 1575 (Fed. Cir. 1995).[67]

> ### B.    Clear and Convincing Does Not Mean Certain.

"[U]nder the 'clear and convincing' standard, proof need not be airtight.  The law

requires persuasion, not perfection."  *Buildex Inc. v. Kason Indus., Inc.,* 849 F.2d 1461, 1464

(Fed. Cir. 1988).  "Although an exact definition is elusive, 'clear and convincing evidence' has

been described as evidence that 'place[s] in the ultimate fact finder an abiding conviction that the

truth of its factual contentions are highly probable.'"  *Pfizer, Inc. v. Apotex, Inc.,* 480 F.3d 1348,

1360 n.5 (Fed. Cir. 2007).[8]

## III.    A REASONABLE JURY COULD FIND THAT CLAIM 1 OF THE '422 PATENT AND CLAIMS 3, 7-9 AND 12 OF THE '933 PATENT ARE ANTICIPATED

> ### A.    Anticipation and Prior Invention Under § 102(a), (b) and (g)

A reasonable jury could find that '422 claim 1 and '933 claims 3, 7-9 and 12 are invalid

as anticipated, as Roche presented substantial evidence that each and every element of the claim

---

[6]    *See* Exhibit C for relevant statements of law on JMOL.
[7]    Expert testimony is not required to support a *prima facie* case of invalidity, as discussed in Exhibit E.
[8]    *See* Exhibit C for relevant statements of law on clear and convincing evidence.

is present in a single prior art reference.  *Holdings, LLC v. Amazon.com, Inc.*, 430 F.3d 1377, 1381 (Fed. Cir. 2005).[9]

**B.**    **Level of Skill in the Art and the Critical Date**

The evidence has shown that a person of ordinary skill in the art in the period 1983-84 was someone who has earned a M.D. or Ph.D degree and who has one or two years of post-graduate laboratory research experience.  (Lowe 193:8-12; Bertozzi 1061:19-25; Spinowitz 768:16-19).  It is from this person's understanding and perspective that the prior art and obviousness must be judged.  *In re Kahn*, 441 F.3d 977, 985 (Fed. Cir. 2006).

The date of invention for prior art purposes is the filing date of the application until an earlier date is proved.  *Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc.*, 796 F.2d 443, 449 (Fed. Cir. 1986).  As explained earlier, the filing date of the Lin application is November 30, 1984.[10]  (Lowe 260:1-18; TRX 7).  The 1984 filing date is a later date of invention than in *Amgen v. Chugai*, 13 U.S.P.Q.2d 1737 (D. Mass. 1989), making any findings regarding obviousness in that case irrelevant here due to, *inter alia*, the advances in the prior art during the intervening time period together with the standard for obviousness under the present law.  *See KSR Int'l Co. v. Teleflex Inc.,* 127 S. Ct. 1727 (2007).[11]

**C.**    **'422 Claim 1 and '933 Claims 3, 7-9 And 12 Are Invalid For Anticipation**

Roche presented the jury with substantial testimony and documentary evidence that at least five separate pieces of prior art anticipate '422 claim 1 and '933 claims 3, 7, 8, 9 and 12:

---

[9]  For the same reasons discussed *infra*, these claims also would have been obvious.

[10]  *See supra* n. 5.

[11]  In light of arguments raised at the September 24 hearing, Roche provides a more detailed explanation of its position with respect to the Chugai litigation in its "Supplemental Directed Verdict Opposition Regarding the Estoppel Effect of the Chugai Litigation Raised By Amgen During the September 24th Hearing" filed concurrently herewith.  *See also* D.I. 1070-2.

- Dr. Spinowitz explained that the 1979-1980 Baron-Goldwasser study shows administration of a pharmaceutical composition comprising a diluent. This composition further comprised a therapeutically-effective amount of human EPO because it caused a reticulocyte response, an increase in nucleated red blood cells and a decrease in radio iron (indicating that iron was being used to form new red blood cells) when administered to patients. Therefore, Dr. Spinowitz explained, claim 1 is invalid as anticipated. (Spinowitz 702:12-729:12, 800:1-15; TRX 2049, 2004, 2045).[12]  Dr. Bertozzi agreed that "[c]laim 1 of the '422 patent ... includes Dr. Goldwasser's EPO." (Bertozzi 1020:1-5).

- In the 1984 Eschbach EPO-rich plasma study, discussed by Dr. Spinowitz, Dr. Eschbach infused EPO-rich plasma (a pharmaceutical composition with a pharmaceutically-acceptable diluent) from one human patient into another, and observed an increase in reticulocytes and the movement of iron into new red blood cells (i.e. therapeutic effectiveness). (Spinowitz 743:5-9, 748:18–749:5, 731:12–749:13, 800:1-15).[13]

- Three articles by Dr. Essers published between 1973 and 1975 show that use of EPO-rich human plasma (a pharmaceutical composition with a pharmaceutically-acceptable diluent) in humans resulted in a reticulocyte response, evidencing the stimulation of erythropoiesis by human EPO (i.e. therapeutic effectiveness). (Spinowitz 752:15-762:22, 800:1-15; TRX 2051, 2052, 2053).

- Evidence from Dr. Edward Fritsch of Genetics Institute ("G.I.") demonstrated that G.I. cloned an EPO cDNA, transfected it into COS and CHO cells and expressed high levels of *in vitro* and *in vivo* biologically active human EPO. As Amgen acknowledges, all of this work was completed before November 30, 1984, the effective filing date of Amgen's patents, and thus constitutes prior art under Section 102(g) that was not abandoned, suppressed or concealed since this work was published in February 1985. (*See* Fritsch 350:19-360:21; *see also* TRX PPK, OFD, OHV, QEI, OJC, QEJ, OIC).

- The 1977 Miyake and Goldwasser article shows a pharmaceutical composition comprising a therapeutically effective amount of human EPO diluted in salt water (a pharmaceutically acceptable diluent). (Bertozzi 1006:3-1007:15, 1020:1-5, 1053:5-12, 1055:13-19; TRX 2002).[14]

---

[12] The Baron-Goldwasser study is prior art under Sections 102(a), 102(b), 102(f) and 102(g)(2), as explained in the memorandum attached hereto as Exhibit D.

[13] The jury also heard evidence of another Eschbach study, in which the treatment of sheep with the EPO-rich plasma of other sheep was observed to "completely correct[] the anemia" and that therefore EPO therapy "should be effective in treating the anemia of chronic renal failure in humans." (TRX 2032; Spinowitz 749:15-750:24). While this reference is not anticipatory with respect to human EPO, it is powerful evidence of obviousness, and Dr. Spinowitz testified that claim 1 was in indeed obvious in light of this reference. (Spinowitz 751:17-20).

[14] There is no evidence that Drs. Baron & Goldwasser, Dr. Eschbach, Dr. Essers or Dr. Miyake "abandoned, suppressed, or concealed" their work such that they don't qualify as prior invention prior art under § 102(g). (TRX 2045; TRX 2004; D.I. 1091).

### a. The Presence Or Absence Of Source or Process Limitations In The Prior Art Is Irrelevant to the Validity of the '933 Patent Claims

Recitation of source or process limitations such as "non-naturally occurring" or "product of the expression ... in a mammalian host cell" does not distinguish these product-by-process claims over the prior art unless the source or process imparts unique structure to the product. *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1317 (Fed. Cir. 2006).[15]

"Where a product-by-process claim is rejected over a prior art product that appears to be identical, although produced by a different process, the burden is upon the applicants to come forward with evidence establishing an unobvious difference between the claimed product and the prior art product." *In re Marosi*, 218 U.S.P.Q. 289, 293 (Fed. Cir. 1983); *see also In re Moeller*, 117 F.2d 565, 567 (C.C.P.A. 1941). Here, Amgen has offered no such evidence, and indeed Dr. Bertozzi testified directly to the contrary: "[N]othing distinguishes them. The EPO that comes from mammalian cells in culture is *the same*, the molecules are *the same* as Goldwasser's EPO." (Bertozzi 988:19-21 (emphasis added); *see also* Bertozzi 1027:20-1028:2, 1028:15-18). Indeed, Amgen's own PLA and published articles confirm Dr. Bertozzi's opinions. (Bertozzi 1032:5-1034:17, 1036:20-1037:1, 1041:24-1047:22; TRX 2056-2062). For purposes of this motion, it is therefore irrelevant that the prior art urinary EPO was not "non-naturally occurring."

### b. The Presence Or Absence Of Source Limitations In The Prior Art Is Irrelevant to the Validity of '422 Claim 1

The limitation in '422 claim 1 to "purified from mammalian cells grown in culture" is irrelevant to the patentability of the claim over prior art urinary EPO. This Court has made clear

---

[15] *See* Roche Motions in Limine D.I. 1047 and 1046; *see also* Exhibit C for relevant statements of law on source and process limitations.

that '422 claim 1 is a product claim, not a product-by-process claim. *Amgen, Inc. v. Hoechst Marion Roussel, Inc.*, 126 F. Supp. 2d 69, 150 (D. Mass. 2001). Moreover, the Federal Circuit has affirmed this Court's ruling that '422 claim 1 is a product claim that is "directed to a structural entity that is not defined or limited by how it is made." *Amgen, Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1329 (Fed. Cir. 2003). Accordingly, whether or not the prior art teaches EPO "purified from mammalian cells grown in culture" is of no moment to the patentability of '422 claim 1.[16]

## IV.    A REASONABLE JURY COULD FIND THAT THE ASSERTED CLAIMS OF THE PATENTS-IN-SUIT ARE OBVIOUS UNDER 35 U.S.C. § 103

### A.    Obviousness Under 35 U.S.C. § 103

Roche has presented more than sufficient evidence for the jury to find the asserted claims invalid for obviousness. Under 35 U.S.C. § 103 "[a] claimed invention is unpatentable if the differences between it and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the pertinent art." *In re Kahn,* 441 F.3d at 985.[17] Motivation to combine prior art references for purposes of § 103 "need not be found in the references sought to be combined, but may be found in any number of sources, including common knowledge, the prior art as a whole, or the nature of the problem itself." *See Dystar Textilfarben GmbH & Co. Deutschland KB v. C.H. Patrick Co.,* 464 F.3d 1356, 1361 (Fed. Cir. 2006). As the Supreme Court has recently held in *KSR Int'l Co. v. Teleflex Inc.,* 127 S. Ct. 1727, 1742 (2007),

---

[16]    To the extent this Court decides that a source limitation can confer patentability on a *product* claim if it imparts sufficiently unique structure, it is Amgen's burden to prove that the source limitation imparts structure, and Amgen has not come close to meeting its burden, as discussed above. The only structure claimed by the asserted claims is the amino acid sequence and Amgen has offered no evidence that the claimed product has a different amino acid structure than naturally-occurring EPO.

[17]    *See* Exhibit C for expanded relevant statements of law on obviousness.

> When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp .... any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed.[18]

JMOL for non-obviousness is improper where factual questions remain.  *See Eolas,* 399 F.3d at 1335.  In analyzing the factual issues raised by the non-moving party, the "court must view the evidence in a light most favorable to the non-moving party." *Id.*

**B.     Dr. Goldwasser's Protein Renders the Claims-In-Suit Obvious Pursuant to § § 102(f)/103[19]**

Dr. Goldwasser's purified human EPO, including his tryptic fragments, given to Amgen, constitute subject matter derived from another pursuant to § 102(f) which, in combination with other prior art, render the asserted claims obvious to one of ordinary skill in the art.  The Federal Circuit has held that "subject matter derived from another not only is itself unpatentable to the party who derived it under § 102(f), but, when combined with other prior art, may make a resulting obvious invention unpatentable ... under a combination of §§ 102(f) and 103." *OddzOn Prods., Inc. v. Just Toys, Inc.,* 122 F.3d 1396, 1403-04 (Fed. Cir. 1997); *see also Gambro Lundia AB v. Baxter Healthcare Corp.*, 110 F.3d 1573, 1576 (Fed. Cir. 1997) (another person need only invent *part* of the invention to qualify under § 102(f)).  Prior art pursuant to § 102(f) "does not pertain only to public knowledge, but also applies to private communications between the inventor and another which may never become public." *OddzOn*, 122 F.3d at 1401-2.

---

[18]  Additionally, for purposes of determining whether it would be obvious to combine elements into a claim, a "person of ordinary skill is also a person of ordinary creativity, not an automaton." *Id.*

[19]  In light of arguments raised at the September 24 hearing, Roche provides a more detailed explanation of portions of its §102(f)/§103 defense in its "Supplemental Directed Verdict Opposition Regarding § 102(f) Derivation and Obviousness of Claim 7 of the '349 Patent Raised By Amgen During September 24th Hearing" filed concurrently herewith.

Prior to 1977, Dr. Goldwasser received a large supply of human urine concentrates containing EPO from Dr. Miyake.  (TRX 2002).[20]  Drs. Goldwasser and Miyake then developed, under government grants from the National Institute of Health ("NIH") and the Department of Energy, a purification technique to obtain approximately 8 mg of pure human EPO.  (GW 484:1-485:10, 526:10-13).[21]  Dr. Goldwasser made only very small amounts of this pure EPO available to parties other than Amgen and solely to do radioimmunnoassays.  (GW 527:1-3).  Dr. Goldwasser testified that he did not make amounts of protein sufficient for sequencing available to anyone other than Amgen.[22]  (GW 527:4-11).  In fact, Dr. Goldwasser chose not to make the pure EPO available to competitors of Amgen specifically because he knew it could result in someone other than Amgen cloning the EPO gene first.  (GW 544:5-545:5).[23]

The evidence shows that once one of ordinary skill had Dr. Goldwasser's pure EPO protein, cloning the EPO gene was obvious.  (Lowe 206:23-207:19, GW 531:5-17, 531:24-532:7, 639:11-20).  Dr. Goldwasser testified that he conducted all of the work disclosed in Example 1, Table 1 of the patents in suit, including isolating the human EPO from urine and subjecting it to digestion with trypsin, resulting in the development and isolation of 17 discrete tryptic fragments. (GW 486:22-487:7, 486:9-21, 539:22-540:8, 613:2-9).[24]  Moreover, Dr. Goldwasser testified that without his pure protein Amgen could not have obtained the DNA sequence

---

[20] Prior to receiving this supply of human EPO from Dr. Miyake, Dr. Goldwasser had been unable to obtain enough human EPO from other sources.  (GW 522:23-25).

[21] "GW" refers to the trial transcript of the testimony of Dr. Eugene Goldwasser.

[22] Dr. Goldwasser testified that the amount of EPO needed for RIA was much smaller than that needed for sequencing and that crude EPO could be used for RIA while pure EPO was necessary for sequencing. (GW 527:18-20, 598:12–601:10, 604:10–605:2, 640:8-23).

[23]  Roche introduced substantial evidence that Dr. Goldwasser refused to provide the sequence information obtained from his pure human EPO to those who requested it and was expressly ordered by Amgen not to provide such information to others. (GW 538:23-25, 522:9-1, GW 546:18-21, 560:14-21; TRX 2038, 2044).  Amgen described Goldwasser's pure EPO as "critical to our program and eventual use of EPO as a therapeutic."  (TRX 2041)

[24] Amgen expressly relied on Example 1 to support its claims to human erythropoietin.  (TRX 2009.554).

encoding human EPO.  (GW 539:17-19).  Further, in the period from 1980-1983, Dr.

Goldwasser was the sole source of significant amounts of purified EPO.[25]  (GW 485:12-15,

485:22-486:2, 526:20-22; Lowe 179:1-4).  Accordingly, Dr. Goldwasser's EPO was the key to

Dr. Lin's "inventions" as detailed below.

> **1.     The Skilled Worker Could Have Synthesized An EPO Gene Using Goldwasser's Purified Protein Rendering the Claims Obvious**

Before Dr. Lin had cloned the EPO gene, many other scientists were also working to

make recombinant EPO, "because there was an apparent and obvious need to have sufficient

human EPO to treat patients that had anemias, that had low blood counts for a variety of reasons,

including kidney failure and cancer treatments."  (Lowe 184:17-23, 186:18-25).  Given the

crucial tool, a sufficient amount of purified EPO to sequence, the prior art taught a predictable

step-by-step solution using synthetic methods.  (Lowe 205:17–207:12; *see also* Lowe 369:7-12).

Indeed, "the most logical, straightforward way [to get the EPO gene], was to have the protein

sequence of EPO" and then synthesize the gene using chemical methods available in the prior

art.  (Lowe 188:11-23; *see also* Lowe 178:11-18, 257:12-14).

By 1983, routine techniques were available to obtain accurate protein sequence from

sufficient amounts of protein, including the use of a commercially-available machine for

"microsequencing."  (Lowe 217:23–218:11; TRX 2010).  As the Lin specification expressly

states, when the complete protein sequence is known, the "method of choice" is the manufacture

of synthetic DNA, as disclosed in the Alton WO 83/04053 application.  (TRX 2 cols. 3:22-47,

30:48-63, 37:11-19; TRX 2034; *see also* Lowe 228:19-22).  Admissions in a patent specification

---

[25]  Dr. Goldwasser defined pure EPO to mean that it has no discernible non-EPO present.  (GW 525:14-16).

are binding on the patentee.  *PharmaStem Therapeutics, Inc. v. Viacell, Inc*., 491 F.3d 1342, 1362 (Fed. Cir. 2007).

>    **2.     Other Available Techniques Render The Cloning Of the EPO Gene Obvious**

In 1983, techniques for cDNA cloning had been described in a "widely known" 1982 treatise by Dr. Maniatis which, "akin to a cookbook," taught one of skill in the art "recipes" for isolating and cloning DNA sequences.  (Lowe 164:15-25, 167:16-168:12).  Using this technology, genes encoding several clinically useful proteins had been synthesized or cloned prior to the work by Amgen.  (Lowe 168:20-175:3, 238:15-239:4, 241:4-17, 256:20-257:5; TRX 2021).  Moreover, the 1983 Farber article provides the reasonable expectation of success in isolating EPO RNA from the kidneys.  (Lowe 247:20-24; TRX 2023).  Using the teachings of the prior art, one of ordinary skill in the art would have had a reasonable expectation of success cloning rare mRNAs.  (Lowe 241:15-242:6, 244:13-20; TRX 2022).

In 1983-84, it also would have been obvious to use a genomic library to clone the EPO gene.  (Lowe 255:19–258:12).  For example, a genomic DNA library named after Dr. Maniatis was publicly available and had been widely distributed.  (Lowe 256:3-19).  Examples of using a genomic library to isolate and clone genes, including the human beta-globin gene and human antibody genes, had been published.  (Lowe 256:20–257:5).[26]

---

[26] A reasonable jury could find that the contemporaneous work of Dr. Fritsch further confirms the obviousness of Lin's DNA blueprint.  The Federal Circuit has held that evidence of contemporaneous invention is relevant to the obviousness inquiry.  *See Ecolochem v. S. California Edison Co.*, 277 F.3d 1361, 1379 (Fed. Cir. 2000) ("fact of near-simultaneous invention...is strong evidence of what constitutes the level of ordinary skill in the art.").  Dr. Fritsch testified that he got the first shipment of EPO from Dr. Miyake in April 1984.  (Fritsch 350:21-351:8). As Dr. Lowe explained, based on his review of the evidence, once Genetics Institute had the protein, it took "[a]bout six to eight weeks" to actually clone the gene.  (Lowe 467:25-468:2).  This contemporaneous evidence further supports the conclusion that cloning the gene was obvious if one had enough protein.

### 3. Expressing The EPO Gene To Make An In Vivo Biologically Active Protein and Pharmaceutical Composition Was Obvious

Once one of ordinary skill in the art has the DNA blueprint, it would be obvious by 1984 to use vertebrate cells, including mammalian cells and CHO cells, to recombinantly produce a protein. The prior art was replete with examples of using these types of host cells to recombinantly produce proteins, including human interferon and human interleukin-2. (*See* Lowe 171:8-172:14, 181:23-182:4, 267:11-16, 272:21-273:16, 275:22-276:4, 281:11-16, 287:21-24, 291:3-5, 306:2-12; TRX 10, 2024, 2026-30). Furthermore, CHO cells were widely available from the ATCC, "a publicly accessible cell repository." (Lowe 176:8-14). It would similarly be obvious to grow such host cells under suitable nutrient conditions, as Dr. Lowe explained. (Lowe 182:11-14, 182:21-24, 291:3-11, 304:10-14, 306:2-12). One of ordinary skill would also have known how to perform a radioimmunoassay,[27] which, as Dr. Lowe testified, is a "standard laboratory technique." (Lowe 304:20-25). Moreover, certain non-human transcription control sequences were well-known in the art, and it would have been obvious to use one to control transcription of the EPO gene. (Lowe 305:1-9, 306:1-12). For example, the SV40 viral promoter sequence was a "standard control sequence in wide use at this time." (*Id*.; TRX 2030).

Dr. Lowe explained that "[i]t would be ... straightforward to install the blueprint ... into the cell, and the cell would, by virtue of its inherent abilities, take that blueprint and turn it into ... the product that the blueprint was instructing the cell to do," as shown in the Maniatis cookbook. (Lowe 173:23-174:8, 182:25-183:18, 201:17-25; TRX 10). Once a person of ordinary skill transforms or transfects a cell with the blueprint, "the cell will carry out its inherent function ... and be instructed by that ... gene to make" the protein. (Lowe 174:15-18).

---

[27] As explained by Dr. Flavell, this technique cannot measure human EPO as claimed.

It was known by 1984 that the cell acts like a factory and carries out its normal function to produce a glycosylated protein. (Lowe 172:15-173:10, 181:4-10, 182:2-4; Bertozzi 1016:16-21 *see also* TRX 2012.675-76). Moreover, Dr. Lowe explained that "gene amplification," or "increasing the number of copies ... of that gene," was a widely-known technique for making the "cell factory" more effective in making its proteins. (Lowe 267:18-24, 268:9-12; 306:1-12). Dr. Lowe testified that these methods were well-known by 1984, and were taught, for example, in the Axel patent (TRX 2024) and the Kaufman and Sharp paper. (Lowe 269:19-21; TRX 2025). Similarly, the use of an amplified marker, such as DHFR, was well-known. (Lowe 283:24-284:3; TRX 2029; *see also* Lowe 287:17-288:4, 293:1-8).

Prior to Dr. Lin's "invention," the prior art provided more than a reasonable expectation that the protein expressed by the host cell would have *in vivo* biological activity, which for EPO includes increased production of reticulocytes and red blood cells. (Lowe 181:13-19, 170:19-22, 169:20-22, 169:23-170:5, 170:9-10, 247:25–248:22, 251:15-19, 275:22-276:4, 281:11-16; *see also* Claim Construction Order, D.I. 613; TRX 2023, 2026-30). Moreover, Dr. Lin's expectation of success itself is consistent with the prior art. (Lowe 207:12–208:5, 277:23-25). Before Dr. Lin did any testing to determine the biological activity of EPO, he had an expectation of in vivo activity. (Lowe 261:9-13; 276:23-277:22, 288:22-289:2; TRX 2014.51-61).

By 1984, isolating a glycosylated protein from nutrient media was widely known and involved centrifuging the nutrient media to separate protein from debris and other cells. (Lowe 183:19-184:3, 207:22-208:22).

Once one of skill in the art isolated the glycoprotein from the host cell, it would have been obvious to prepare a therapeutically effective pharmaceutical composition comprising the glycoprotein and a pharmaceutically-acceptable diluent, adjuvant or carrier. Prior to the filing of

the Lin patents, human erythropoietin was demonstrated to be a pharmaceutical composition that was therapeutically effective and also contain a diluent, adjuvant, or carrier. (Spinowitz 711:9-17, 720:7-14, 742:22-743:9; Bertozzi 1006:8-1007:15, 1009:13-1012:14, TRX 2002, 2004, 2032, 2043, 2045, 2049-53). The use of a diluent, adjuvant or carrier was well-known in 1984. (Lowe 296:24-297:2; TRX 2031). Dr. Spinowitz provided many examples, including the Baron-Goldwasser clinical study,[28] the 1984 Eschbach study and the Essers studies. Dr. Bertozzi also testified as to the administration of a pharmaceutical composition containing human EPO to mice described in the 1977 Miyake paper. (Bertozzi 1006:8-1007:15, 1009:13-1012:14; TRX 2002). These studies all used a pharmaceutical composition of human erythropoietin. (Spinowitz 695:19-696:1, 708:7-25, 743:1-9, 753:25-754:8; TRX 2004, 2051-53).

Similarly, "therapeutically effective" pharmaceutical compositions of erythropoietin were well-known in the art.[29] Indeed, the same studies Drs. Spinowitz and Bertozzi discussed regarding "pharmaceutical composition" also demonstrate therapeutic effectiveness.[30] Moreover, the same prior art taught using such pharmaceutical compositions to treat dialysis patients, including using the composition to raise hematocrit in patients.[31] (Lowe 298:16-301:1; Spinowitz 764:14-23, 769:5-10, 771:23-25, 781:7-10, 782:11-18; TRX 2004, 2032, 2051-53).

---

[28]  The Baron-Goldwasser clinical study, and associated documents, are prior art under § 102, as detailed in the memorandum attached hereto as Exhibit D.

[29]  The Court has construed "therapeutically effective" to mean any or all of the effects associated with in vivo biologic activity of natural EPO, including stimulation of reticulocyte response, development of ferrokinetic effects, erythrocyte mass changes, stimulation of hemoglobin C synthesis and increasing hematocrit levels.

[30]  *See* discussion *supra* pertaining to anticipation under § 102. (*See also* Spinowitz 711:3-17, 21-23; 712:2-12, 713:17-19, 719:7-13, 748:18-749:11, 752:19-753:6, 753:25-754:8, 759:8-17, 793:22-794:10; Bertozzi 1006:8-1007:15, 1009:13-1010:2, 1010:25-1011:10, 1011:21-1012:14; TRX 2002, 2004, 2032, 2045, 2049, 2051-53, 2054.2 at AM-ITC 00056316).

[31]  Moreover, as discussed in Roche's "Supplemental Directed Verdict Opposition Regarding The Obviousness Of Claims 11 And 14 Of The '933 Patent As Raised By Amgen During The September 24th Hearing" filed concurrently herewith, the state of the art regarding treatment of dialysis patients to increase hematocrit is sufficient for a reasonable jury to conclude that '933 claims 11 and 14 are invalid for anticipation.

### 4.    A Person Of Skill In The Art Would Be Motivated To Combine These Elements With A Reasonable Expectation Of Success

As discussed previously, motivation to combine can derive from various sources.  Here, the academic and market pressures faced by skilled workers prior to 1984 provided such motivation.  By 1984, scientists other than Dr. Lin were interested and working on cloning the EPO gene to put it in a host cell to make biologically active EPO and use that EPO as a composition to treat chronic renal failure in dialysis patients.  (Lowe 184:17-21, 186:18-25).  In view of this interest and need, the person of ordinary skill in the art would have been motivated to follow the well-established techniques recited in the claims-in-suit with a reasonable expectation of success, save for the fact that no one other than Dr. Lin could get sufficient amounts of EPO for cloning and sequencing.  Accordingly, as Roche's witnesses explained, a reasonable jury could conclude that all of the claims-in-suit are invalid for obviousness.[32]

## V.    A REASONABLE JURY COULD FIND THAT THE ASSERTED CLAIMS OF AMGEN'S PATENTS ARE OBVIOUS PURSUANT TO § 102(g) AND § 103

### A.    § 102(g)(2) Art Combined with the Prior Art Can Render Claimed Inventions Obvious Pursuant to § 103

Pursuant to 35 U.S.C. § 102(g)(2), "[a] person shall be entitled to a patent unless ... another inventor ... establishes ... that before such person's invention ... the invention was made in this country by such other inventor who had not abandoned, suppressed or concealed it."  Courts have made clear that § 102(g)(2) does not require knowledge or use of a prior invention that was publicly accessible at the time the patented invention was made.  *See E.I. Du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.3d 1430, 1437 (Fed. Cir. 1988) ("certain prior

---

[32] *See* Exhibit B for a more complete recitation of the evidence pertaining to the obviousness of the claims-in-suit.

work at issue, solely because it satisfied § 102(g) (i.e. it was reduced to practice and had not been abandoned, suppressed or concealed), could be used for § 103 purposes").[33]

### B.    Dr. Goldwasser's Tryptic Fragments Are 102(g)(2) Prior Art And Render The Claims-In-Suit Obvious

Dr. Goldwasser's tryptic fragments also invalidate the claims-in-suit under §§102(g)/103. As noted, Dr. Goldwasser did all the work with respect to tryptic digestion as referred to in Table 1 of Example 1 of the patents-in-suit. (GW 568:12-13). There is no evidence that he abandoned, suppressed or concealed this information -- in fact, after he gave it to Amgen, making it sufficiently "public" for purposes of § 102(g)(2), Goldwasser timely published this information in the Lai 1986 paper (TRX 2047). Accordingly, as explained above, Dr. Goldwasser's tryptic fragments, when combined with the prior art, render the claims-in-suit invalid for obviousness.

### C.    Dr. Fritsch's Prior Invention Constitutes Invalidating § 102(g) Prior Art

Dr. Edward Fritsch at Genetics Institute cloned an EPO cDNA, transfected it into COS and CHO cells, and expressed high levels of *in vitro* and *in vivo* biologically active human EPO.[34] All of this work was completed before November 30, 1984. Indeed, Amgen concedes that Dr. Fritsch cloned the EPO gene on August 20, 1984, and that he expressed EPO in CHO cells in September 1984 – both before Amgen's filing date.[35] As Amgen has failed to introduce evidence of an earlier invention date for any of the claimed subject matter, Dr. Fritsch's invention stands as prior art for all of the asserted claims.[36] Dr. Fritsch's invention, described in

---

[33] A more complete explanation of the law regarding § 102(g)(2) with an explanation of why Dr. Goldwasser's NIH grant is prior art is attached in an accompanying memorandum as Exhibit D.

[34] *See* TRX QEJ (G.I. EPO Quarterly Report 6/28/84 – 10/15/84; Fritsch 350:19–360:21; *see also* TRX PPK, OFD, OHV, QEI, OJC, QEJ, OIC.

[35] *See* D.I. 1031 at 2.

[36] Amgen requests this Court to take judicial notice of facts found by the Board of Patent Appeals and Interferences in the *Fritsch v. Lin* interferences (*see* D.I. 1031 at 2 n.10, 3 n.11); however, findings made by an administrative

(continued...)

16

an article sent to the journal *Nature* in December 1984, and published in February 1985, was not abandoned, suppressed or concealed.[37]   Accordingly, there can be no dispute that Dr. Fritsch's invention stands as prior art under § 102(g), and thus it renders each of the asserted claims of the '422 and '933 patents invalid as anticipated and/or obvious.

## VI.    SECTION 112 DEFENSES[38]

### A.    A Reasonable Jury Could Find Claims to Human Erythropoietin Invalid For Lack Of Written Description and Indefiniteness

A patent's written description must show that the applicant was in full possession of the claimed subject matter on the application filing date to allow other inventors to develop and obtain patent protection for later improvements and subsequent inventions that build on applicant's teachings.[39]   "Whether a claim is invalid for indefiniteness requires a determination whether those skilled in the art would understand what is claimed when the claim is read in light of the specification."  *Morton Int'l. v. Cardinal Chem. Co.*, 5 F.3d 1464, 1470 (Fed. Cir. 1993).[40]   Dr. Flavell presented evidence that '422 claim 1, '868 claims 1-2, '698 claims 6-9, '933 claims 3, 7-9, 11, 12 and 14 and '349 claim 7 are invalid for lack of written description of the claim term "human erythropoietin."[41]   Dr. Flavell testified that the patent failed to adequately describe the proteins encompassed by the claim term "human erythropoietin," present in all of these

---

body cannot bind this Court  Likewise, this Court should not take notice of the facts set forth in the *Amgen Inc. v. Chugai Pharm. Co.*, 13 U.S.P.Q. 2d 1737 (D. Mass. 1989), because none of the asserted claims (nor any of the patents-in-suit) were involved in that proceeding, and because Roche was not a party.  (*See also* D.I. 838).

[37]  *See* TRX NJT (Jacobs et al, "Isolation and characterization of genomic and cDNA clones of human erythropoietin" (1985)); *see also Dow Chem. Co. v. Astro-Valcour, Inc.*, 267 F.3d 1334 (Fed. Cir. 2001).

[38]  Roche will provide a more detailed explanation of its Section 112 defenses in its "Supplemental Directed Verdict Opposition Regarding Roche's Section 112 Defenses In View Of Dr. Flavell's Recently Completed Testimony" to be filed at a later time.

[39]  *See* Exhibit C for relevant law of written description.  *See also* D.I. 1065, 1066, 483.

[40]  *See* Exhibit C for relevant law of indefiniteness.

[41]  The '349 patent recites "erythropoietin" but Amgen has not contended that this claim is directed to anything other than human erythropoietin.

claims and defined by the Court as "a protein having the amino acid sequence of human EPO, such as the amino acid sequence of EPO isolated from human urine." (Flavell 1214:13-18, 1235:10-14, 1240:1-3, 1240:20-25, 1241:8-13, 1241:24-1242:3, 1251:3-6; Claim Construction Order, D.I. 613, at 15).

"[A]dequacy of the written description (i.e., disclosure) is measured from the face of the application." *New Railhead Mfg. LLC v. Vermeer Mfg., Co*., 298 F.3d 1290, 1295 (Fed. Cir. 2002). Dr. Lin expressly described human EPO as having the specific 166-amino acid sequence of Figure 6 of the specification. Dr. Flavell further testified that Amgen disclosed this 166-amino acid sequence to the public in later publications and in its FDA submissions. (TRX 2047, 2070, Flavell 1227:19-25). From this information, he concluded that one of skill in the art at the time of the patent's filing would have understood "human erythropoietin" to be this 166-amino acid protein. (Flavell 1230:15-20). Even though the patent provides for several "polypeptides of the invention" and "allelic variants" of human EPO, sequences Dr. Flavell testified that these forms are not specifically defined in the patent. (Flavell 1225:14-1226:6; TRX 1, col. 35:15-20).

The Court's claim construction for "human erythropoietin," however, sets forth the amino acid sequence of human EPO as "isolated from human urine" as a specific example of "human erythropoietin." Although EPO from human urine was known at the filing date to have 166 amino acids, today we know this protein to be 165 amino acids in length. Furthermore, Dr. Flavell testified that the Lin patent does disclose a 165-amino acid protein corresponding to monkey EPO. (Flavell 1222:15-20). Based on this evidence, Dr. Flavell testified that, *inter alia*, the example in the Court's claim construction is not described in the patent. (Flavell 1235:10-14). Therefore, he concluded that the patent fails to describe the full scope of polypeptides encompassed within "human erythropoietin."

Accordingly, a reasonable jury could conclude that the patents fail to adequately describe human erythropoietin, and do not establish that Amgen had conceived of or described the "allelic variants" or the 165 amino acid EPO that it now claims. Nor do the patents give adequate notice to a competitor as to "human erythropoietin" within the scope of the claim. Indeed, the Federal Circuit cautioned that "the detailed description in the [Lin specification] indicates that the specificity of Figure 6 is not to be lightly disregarded." *Amgen*, 314 F.3d at 1343.

### B.    Claim 1 Of The '422 Patent Is Further Indefinite As Lacking Any Identifiable Structure

Drs. Bertozzi and Flavell also provided testimony that the term "human erythropoietin" as defined by the Court encompasses an endless possibility of structures that would not signal to one of skill in the art the proper boundaries of this element. (Bertozzi 1154:21-1155:9; Flavell 1244:14-1245:3). Dr. Bertozzi testified that because the Court's definition of "human erythropoietin" is based solely on its amino acid sequence, a countless variety of proteins having different glycosylation patterns (or no glycosylation at all) are encompassed. (Bertozzi 1164:6-14). Dr. Flavell also testified that the patent specification embraces a large number of unspecified "allelic forms" of human EPO that are within the scope of the Court's claim construction. (Flavell 1244:14-1255:11). "Whether a claim is invalid for indefiniteness requires a determination whether [one] would understand what is claimed when the claim is read in light of the specification." *Morton Int'l,* 5 F.3d at 1470.

Moreover, the knowledge of one of skill in the art concerning the "amino acid sequence of EPO isolated from human urine" would have changed from 1984 to today. Other proteins could be isolated from human urine in the future that would have an even different structure, and yet would fall within the Court's claim construction. Accordingly, the exemplar in the Court's

claim construction is nothing more than a moving target that renders claims containing this term

indefinite. *See Amgen, Inc.*, 126 F. Supp. 2d at 155.

## C.    A Reasonable Jury Could Find That '349 Claim 7 Is Invalid For Non-Enablement Regarding The Limitation to Radioimmunoassay (RIA)

The test for enablement is whether one reasonably skilled in the art could make or use the

invention based on the written disclosures of the patent coupled with information known in the

art, without undue experimentation. *Enzo Biochem, Inc. v. Calgene, Inc.* 188 F.3d 1362, 1371

(Fed. Cir. 1999).[42]

Claim 7 of the '349 patent is a dependent claim which incorporates the limitation of host

cells capable of producing erythropoietin at a specific rate "as determined by

radioimmunoassay." Dr. Flavell presented evidence that radioimmunoassay (RIA) involves the

use of antibodies and requires a standard against which to compare results. (Flavell 1261:10-11,

1265:1-8). Standards are important because you measure the amounts of an unknown product

against a known standard. Lin's patent does not provide a known standard against which to

measure the production level of given host cells, nor did Lin's standard correlate with

International Units. (TRX 2065). Dr. Flavell also explained that the antibodies used in an RIA

do not distinguish fully EPO from EPO fragments. (Flavell 1267:19-1268:3, 1269:3-18). The

claim is to a level of erythropoietin but the test measures fragments and they can't be

distinguished by RIA. (*Id.*). A reasonable jury could conclude that based on the evidence, the

patent specification is not enabling.

## VII.    CONCLUSION

Based on the foregoing, Amgen's Motion For Directed Verdict should be denied.

---

[42]  *See* Exhibit C for relevant law on enablement.

DATED:      September 25, 2007

F. HOFFMANN-LA ROCHE LTD,
ROCHE DIAGNOSTICS GMBH, and
HOFFMANN-LA ROCHE INC.


By its attorneys,

/s/ *Patricia A. Carson*
Leora Ben-Ami (*pro hac vice*)
Mark S. Popofsky (*pro hac vice*)
Patricia A. Carson (*pro hac vice*)
Thomas F. Fleming (*pro hac vice*)
Howard S. Suh (*pro hac vice*)
Christopher T. Jagoe (*pro hac vice*)
Peter Fratangelo (BBO# 639775)
Krista M. Rycroft (*pro hac vice*)
KAYE SCHOLER LLP
425 Park Avenue
New York, New York  10022
Tel. (212) 836-8000

and

Lee Carl Bromberg (BBO# 058480)
Julia Huston (BBO# 562160)
Keith E. Toms (BBO# 663369)
Nicole A. Rizzo (BBO# 663853)
BROMBERG & SUNSTEIN LLP
125 Summer Street
Boston, MA  02110
Tel. (617) 443-9292

21

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on the above date.

/s/ Thomas F. Fleming
Thomas F. Fleming
