# EXHIBIT A

# PRIOR ART APPENDIX

## BARON-GOLDWASSER STUDY

*See* EXHIBIT D, Defendants' Memorandum Regarding Baron-Goldwasser Prior Art: Baron-Goldwasser Clinical Study, Baron-Goldwasser IND and Goldwasser Grants. *See also* Defendants' Memorandum Regarding the Relevance of Baron and Goldwasser's Prior Art and Refuting Amgen's Assertions that the Baron-Goldwasser IND and Goldwasser Grants are Not "Printed Publications," Anticipatory or Enabling Under 35 U.S.C. § 102 (D.I. 1091).

## EGRIE ABSTRACT (1984)

Egrie et al, "Characterization of Recombinant Human and Monkey Erythropoietin," Abstract from 10th Annual Fredrick Stohlman Memorial Symposium on Stem Cell Physiology, Boston, MA, October 2, 1984. (TRX NBE)

35 U.S.C. § 102(a) states:

> A person shall be entitled to a patent unless the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent.

This abstract (TRX NBE), presented at the 10th Annual Fredrick Stohlman Memorial Symposium on Stem Cell Physiology on October 2, 1984, clearly reads on or renders obvious the asserted claims. It discusses Egrie's experiments in which human erythropoietin gene is isolated from a human genomic fetal liver library and monkey erythropoietin gene is isolated from a cDNA library prepared from the kidneys of phenylhydrazine-treated monkeys. Both COS-1 and CHO cells were transfected with a vector containing either the human or monkey erythropoietin gene. In both assays, recombinant monkey erythropoietin is shown to be immunologically identical to native monkey sera erythropoietin and recombinant human erythropoietin is immunologically identical to the human urinary erythropoietin standard. The recombinant human and monkey erythropoietin are described as fully biologically active in both in vitro and

in vivo bioassays. Furthermore, injection of recombinant monkey erythropoietin into normal Balb c mice caused a substantial increase in red blood cell mass.

### MIYAKE (1977)

Miyake et all, "Purification of Human Erythropoietin," J. Biol. Chem. 252(15): 5558-64 (1977). (TRX 2002)

35 U.S.C. § 102(a) states:

> A person shall be entitled to a patent unless the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent.

35 U.S.C. § 102(b) states:

> A person shall be entitled to a patent unless the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States.

The 1977 Miyake and Goldwasser article shows a therapeutically effective pharmaceutical composition of human EPO diluted in salt water (a pharmaceutically acceptable diluent). (Bertozzi 1006:3-1007:15, 1020:1-5, 1053:5-12, 1055:13-19; TRX 2002). The article describes the administration of this pharmaceutical composition containing human EPO to mice. (Bertozzi 1006:8-1007:15, 1009:13-1010:2, 1010:25-1011:10, 1011:21-1012:14; TRX 2002). As detailed by Dr. Bertozzi, the article is anticipatory prior art. (*See* Bertozzi 1018:8-15, 1048:2-1050:7, 1052:14-1053:12).

### ESCHBACH (1984)-GOLDWASSER/KUNG (1971)

Eschbach et al, "The Anemia of Chronic Renal Failure in Sheep," Clin Invest 74:434-41 (1984). (TRX 2032)

Goldwasser and Kung, "Purification of Erythropoietin," PNAS 68:697-98 (1971). (TRX 2033)

2

35 U.S.C. § 102(a) states:

> A person shall be entitled to a patent unless the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent.

35 U.S.C. § 102(b) states:

> A person shall be entitled to a patent unless the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States.

In the 1984 Eschbach EPO-rich plasma study, as evidenced through the testimony of Dr. Spinowitz, Dr. Eschbach infused EPO-rich plasma (a pharmaceutical composition with a pharmaceutically-acceptable diluent) from one human patient into another, and observed an increase in reticulocytes and the movement of iron into new red blood cells (i.e. therapeutic effectiveness).  (Spinowitz 743:5-9, 748:18–749:5, 731:12–749:13, 800:1-15).[1]  Dr. Spinowitz explained that the study had confirmed that what they had previously seen in sheep (TRX 2032) would translate to humans.  (Spinowitz 749:6-11, 750:19-751:6).  Indeed, Amgen also relied on Eschbach's sheep study in its IND submission to demonstrate predictability as to the therapeutic effectiveness of its drug product.  (TRX 2054; Spinowitz 794:19-22, 796:23-797:5).

Dr. Lowe explained that the 1984 Eschbach paper (TRX 2032) taught that "Ep[o] therapy should be effective in treating the anemia of CRF in humans."  (Lowe 298:5-11).  "[C]hronic renal failures means that the kidneys have failed, they're unable to perform the filtration functions, and that means that the patients with CRF must be on dialysis."  (Lowe 298:24-299:4).

---

[1] The jury also heard evidence of another Eschbach study, in which the treatment of sheep with the EPO-rich plasma of other sheep was observed to "completely correct[] the anemia" and that therefore EPO therapy "should be effective in treating the anemia of chronic renal failure in humans."  (TRX 2032; Spinowitz 749:15-750:24).  While this reference is not anticipatory with respect to human EPO, it is powerful evidence of obviousness.  (Spinowitz 751:17-20).

3

Furthermore, the Eschbach sheep study (TRX 2032) showed an increase in hematocrit. (Spinowitz 782:11-18).

Additionally, the 1971 Goldwasser/Kung article (TRX 2033) taught that EPO could be used to treat anemia in kidney dialysis patients. (*See* Lowe 301:24-304; Bertozzi 1053:13-1054:10).

**ESSERS (1973, 1974, 1975)**

Essers et al., "Effect of Erythropoietin in healthy subjects and in patients with chronic uremia," Klin. Wschr., 1973, 51:1005-09. (TRX 2051)

Essers et al., "Weitere Untersuchugen zur Wirksamkeit von Erythropoietin bei Patienten mit Nierensuffzienz," 1614-24 (1974). (TRX 2052)

Essers et al, "Effect of Erythropoietin in Normal Men and in Patients with Renal insufficiency," European Dial. and Trans. Proceedings 2: 398-402 (1975).

35 U.S.C. § 102(b) states:

> A person shall be entitled to a patent unless the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States.

Three articles Dr. Essers published between 1973 and 1975, show that use of EPO-rich plasma (a pharmaceutical composition with a pharmaceutically-acceptable diluent) in humans results in increased reticulocyte response, evidencing the stimulation of erythropoiesis (i.e. therapeutic effetiveness). (Spinowitz 752:15-762:22, 800:1-15; TRX 2051, 2052, 2053).

Dr. Spinowitz also discussed clinical studies by Dr. Essers in the early to mid 1970s using an EPO-rich plasma, which Dr. Spinowitz explained is a pharmaceutical composition. (Spinowitz 752:19-753:6, 759:21-24). Dr. Essers' studies showed an increase in reticulocyte response. (Spinowitz 759:15-17, 760:12-15).

## ESCHBACH - FIGURE

Eschbach, "The history of renal anemia (anaemia and erythropoietin)," *Nephrology* 1998 4, 279-87, at 285. (TRX 2032).

35 U.S.C. § 102(a) states:

> A person shall be entitled to a patent unless the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent.

The Eschbach figure illustrates the result of a 1984 experiment in which Dr. Eschbach obtained human plasma from a patient with erythrocytosis secondary to pulmonary disease by means of plasma phoresis. In the figure at issue, Eschbach illustrates the reticulocyte and ferrokinetic response following the infusion of 537 units of human erythropoietin, given in divided doses, separated by three days. (Spinowitz 747:9-18) After the two infusions given in November 1984, Dr. Eschbach concluded that he had seen an increase in reticulocytes in response to this pharmaceutical composition that had contained the EPO-rich plasma; he also observed a ferrokinetic response, iron moving from plasma into red blood cells, in response to the EPO-rich plasma. (Spinowitz 748:16-749:5) Following this response, Eschbach felt that the sheep model results with erythropoietin would be indicative of what would happen in humans. (Spinowitz 749:6-11) "[T]his was a pharmaceutical composition containing human erythropoietin and a pharmaceutically acceptable diluent, carrier, or adjuvant." (Spinowitz 743:4-9)

## GOLDWASSER PROTEIN

35 U.S.C. § 102(f) states:

> A person shall be entitled to a patent unless he did not himself invent the subject matter sought to be patented.

Under this subsection, a person cannot patent an invention derived from another's invention. Derivation under § 102(f) requires demonstration of both "(1) prior conception of the invention by another and (2) communication of that conception to the patentee that is 'sufficient to enable [him] to construct and successfully operate the invention.'" *Int'l Rectifier Corp. v. IXYS Corp.*, 361 F.3d 1363, 1376 (Fed. Cir. 2004).

Dr. Goldwasser's purified human EPO, including his tryptic fragments, given to Amgen, constitute subject matter derived from another pursuant to § 102(f) which, in combination with the prior art, render asserted claims obvious to one of ordinary skill in the art. The Federal Circuit has held that "subject matter derived from another not only is itself unpatentable to the party who derived it under § 102(f), but, when combined with other prior art, may make a resulting obvious invention unpatentable ... under a combination of §§ 102(f) and 103." *OddzOn Prods., Inc. v. Just Toys, Inc.,* 122 F.3d 1396, 1403-04 (Fed. Cir. 1997); *see also Gambro Lundia AB v. Baxter Healthcare Corp.*, 110 F.3d 1573, 1576 (Fed. Cir. 1997) (another person need only invent *part* of the invention to qualify under § 102(f)). Prior art pursuant to § 102(f) "does not pertain only to public knowledge, but also applies to private communications between the inventor and another which may never become public." *OddzOn*, 122 F.3d at 1401-2.

Prior to 1977, Dr. Goldwasser received a large supply of human urine concentrates containing EPO from Dr. Miyake. (TRX 2002).[2] Drs. Goldwasser and Miyake then developed, under government grants from the National Institute of Health ("NIH") and the Department of Energy, a purification technique to obtain approximately 8 mg of pure human EPO. (GW 484:1-485:10, 526:10-13).[3] Dr. Goldwasser made only very small amounts of this pure EPO available

---

[2]  Prior to receiving this supply of human EPO from Dr. Miyake, Dr. Goldwasser had been unable to obtain enough human EPO from other sources. (GW 522:23-25).

[3]  "GW" refers to the trial transcript of the testimony of Dr. Eugene Goldwasser.

6

to parties other than Amgen and solely to do radioimmunnoassays. (GW 527:1-3). Dr. Goldwasser testified that he did not make amounts of protein sufficient for sequencing available to anyone other than Amgen.[4] (GW 527:4-11). In fact, Dr. Goldwasser chose not to make the pure EPO available to competitors of Amgen specifically because he knew it could result in someone other than Amgen cloning the EPO gene first. (GW 544:5-545:5).[5]

The evidence shows that once one of ordinary skill had Dr. Goldwasser's pure EPO protein, cloning the EPO gene was obvious. (Lowe 206:23-207:19, GW 531:5-17, 531:24-532:7, 639:11-20). Dr. Goldwasser testified that he conducted all of the work disclosed in Example 1, Table 1 of the patents in suit, including isolating the human EPO from urine and subjecting it to digestion with trypsin, resulting in the development and isolation of 17 discrete tryptic fragments. (GW 486:22-487:7, 486:9-21, 539:22-540:8, 613:2-9).[6] Moreover, Dr. Goldwasser testified that without his pure protein Amgen could not have obtained the DNA sequence encoding human EPO. (GW 539:17-19). Further, in the period from 1980-1983, Dr. Goldwasser was the sole source of significant amounts of purified EPO.[7] (GW 485:12-15, 485:22-486:2, 526:20-22; Lowe 179:1-4). Accordingly, Dr. Goldwasser's EPO was the key to Dr. Lin's "inventions." Having Goldwasser's protein, one motivated and ordinarily skilled in the art, would have used that protein to obtain protein sequence, use that DNA sequence to clone the

---

[4] Dr. Goldwasser testified that the amount of EPO needed for RIA was much smaller than that needed for sequencing and that crude EPO could be used for RIA while pure EPO was necessary for sequencing. (GW 527:18-20, 598:12–601:10, 604:10–605:2, 640:8-23).

[5] Roche introduced substantial evidence that Dr. Goldwasser refused to provide the sequence information obtained from his pure human EPO to those who requested it and was in fact, expressly ordered by Amgen not to provide such information to others. (GW 538:23-25, 522:9-1, GW 546:18-21, 560:14-21; TRX 2038, 2044). Amgen described Goldwasser's pure EPO reagent as "critical to our program and eventual use of EPO as a therapeutic." (TRX 2041)

[6] Amgen expressly relied on Example 1 to support its claims to human erythropoietin. (TRX 2009.554).

[7] Dr. Goldwasser defined pure EPO to mean that it has no discernible non-EPO present. (GW 525:14-16).

gene that encodes that protein, and made the protein in CHO cells using technologies and techniques in the prior art. (Lowe 206:7-207:11)

**LOWE REFERENCES**

35 U.S.C. § 102(a) states:

> A person shall be entitled to a patent unless the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent.

35 U.S.C. § 102(b) states:

> A person shall be entitled to a patent unless the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States.

35 U.S.C. § 102(e) states:

> A person shall be entitled to a patent unless the invention was described in
>
> (1) an application for patent, published under section 122(b), by another filed in the United States before the invention by the applicant for patent or
>
> (2) a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent, except that an international application filed under the treaty defined in section 351(a) shall have the effects for the purposes of this subsection of an application filed in the United States only if the international application designated the United States and was published under Article 21(2) of such treaty in the English language

35 U.S.C. § 102(f) states:

> A person shall be entitled to a patent unless he did not himself invent the subject matter sought to be patented

35 U.S.C. § 102(g)(2) states:

> A person shall be entitled to a patent unless before such person's invention thereof, the invention was made in this country by another inventor who had not abandoned, suppressed, or concealed it.

35 U.S.C. § 103(a) states:

> A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the

subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

Dr. John Lowe testified to numerous references, which in combination with the Goldwasser protein as § 102(f) prior art, render the asserted claims obvious. Those references and their respective relevance are described below:

**References Establishing That to One of Skill in the Art in November 1984 It Would Have Been Obvious to Obtain a DNA Sequence Encoding Human Erythropoietin Protein**

- Maniatis et al., "Molecular Cloning - A Laboratory Manual," Cold Spring Harbor Laboratory (1982) (TRX 10).

    o In his testimony, Dr. Lowe stated: "The Maniatus manual is, in fact, akin to a cookbook where teaching one skilled in the art how to clone DNA." (Lowe 168:3-5). This book was known by those skilled in the art in the 1983 time period. (Lowe 168:6-9).

    o The Maniatis Manual also describes strategies to overcome the alleged "difficulties" of cloning that Amgen postulates. Using the teachings of Maniatis, one of ordinary skill in the art would have had a reasonable expectation of success cloning rare mRNAs: the "sensitivity of screening these libraries using this method is thereby increased to the level where clones synthesized from extremely rare RNAs can be detected. Easily detected." (Lowe 241:15–242:12).

    o One of ordinary skill in the art in 1983-84 would have had a reasonable expectation that one could obtain a full-length transcript from even long RNAs. (Lowe 244:13-245:1; TRX 2022). The method of injecting isolated RNA from human kidneys into *Xenopus laevis* (frog) oocytes is taught in the Maniatis Manual and the Farber publication, and Dr. Lowe testified that it is "an accepted and I would say widely used technique to study proteins made by many kinds of cells, including mammalian cells." (Lowe 247:20–248:22, 249:21-23; TRX 10; TRX 2023).

    o Dr. Lowe further explained that the concept of screening genomic libraries was well-understood in 1983. (Lowe 255:22-24). These techniques were reported in the Maniatis manual. (TRX 10; Lowe 256:25-257:5).

    o The process of "installing the blueprint" is transformation or transfection, and it was well-known how to carry out this process in mammalian and CHO cells in 1983-84. (Lowe 182:25-183:10). This process was reported

9

    in the Maniatis manual (TRX 10) as well as the scientific literature reporting production of tPA and interferon in mammalian cells noted above. (Lowe 183:8-18). Once you transformed or transfected the cell with the blueprint, Dr. Lowe explained that "the cell will carry out its inherent function, its inherent chemical set of reactions and be instructed by that ... gene to make" the protein. (Lowe 174:15-18, 172:15-173:10, 201:17-25; *see also* Bertozzi 1016:16-21).

- Hunkapiller and Hood, "Protein Sequence Analysis: Automated Microsequencing," Science 219: 650-659 (1983) (TRX 2010).

    o Dr. Lowe explained in his testimony that this review article, summarizing the art of protein sequencing at the time, would teach one of ordinary skill in the art in 1983 that it was possible to obtain the sequence of a protein if one had the protein in small amounts. (Lowe 217:25-218:11, 218:23-219:6).

- Hunkapiller, "New Protein Sequenator with Increased Sensitivity," Science 207(1): 523-525 (1980) (TRX 2018).

    o This article would have informed one of skill in the art at the time of a new approach or method - sensitive in its ability to determine protein sequence. (Lowe 220:24-221:5).

- Goeddel et al, "Expression in Escherichia Coli of chemically synthesized genes for human insulin," PNAS 76: 106-110 (1979) (TRX 2019).

    o This article is a "report of the expression in bacteria Escherichia coli of chemically synthesized genes that encode the two chains of human insulin;" the experiments were done with genes synthesized in a laboratory. (Lowe 229:18-25)

- Gething and Sambrook, "Cell surface expression of influenza haemagglutinin from a cloned DNA copy of the RNA gene," Nature 293: 620-625 (1981) (TRX 2020).

    o This article, which describes the expression of influenza hemagglutinin protein in an animal cell, provides "an example" or "recipe" "of a method to deliver a protein from the inside of the cell, a recombinant protein synthesized by the cell, to the outside of the cell." (Lowe 230:3-13, 230:20-232:20, 235:8-236:5)

- Suggs et al, "Use of Synthetic Oligonucleotides as hybridization probes: Isolation of cloned cDNA sequences from human b2-microglubin," PNAS 78: 6613-17 (1981) (TRX 2021).

    o Dr. Lowe testified that this 1981 article by Suggs describes how scientists used the sequence of the beta-2 microglobulin protein to work backward

10

    with the codon table to design DNA "probes."  (Lowe 238:15-25; TRX 2021).  These synthetic DNA probes were used to screen and clone the β2 microglobulin cDNA from a cDNA library.  (Lowe 238:25–239:4).  This work is cited to and summarized in the Maniatis Manual.  (Lowe 241:4-17).

- Kornblihtt et al, "Isolation and characterization of cDNA clones for human and bovine fibronectins," Proc Natl Acad Sci 80: 3218-3222 (1983) (TRX 2022).

    o This article showed that one of ordinary skill in the art trying to attain cDNA could obtain a full-length transcript.  In the experiment discussed, the scientists cloned a long cDNA from a long RNA.  According to Dr. Lowe, this tells one that it's likely that one would have a reasonable expectation that even with long RNAs at the time that one could generate cDNAs that would correspond to that long RNA and identify them from the library.  (Lowe 244:9-245:9)

- Farber and Zanjani, "Translation of mRNA from Human Kidneys into Biologically Active Erythropoietin Following Microinjection into Xenopus Laevis Oocytes," Clinical Res. 31: 769A (1983) (TRX 2023).

    o Drs. Farber and Zanjani tested human EPO in an *in vivo* mouse assay and showed that EPO stimulated the formation of red blood cells.  (Lowe 252:19-22; 253:2-4; TRX 2023).  Dr. Lowe explained that this experiment tells one of ordinary skill in the art that biologically active EPO production is possible in a frog cell, such that "[mammalian cells] will also be able to synthesize human EPO that's biologically active."  (Lowe 255:8-18).

- WO 83/04053, Alton application (TRX 2034).

    o This application "describes how one would synthesize [a] gene in vitro using as a recipe . . . protein sequence."  (Lowe 228:17-228:22).

*References Establishing That to One of Skill in the Art in November 1984 It Would Have Been Obvious To Express DNA Encoding Human Erythropoietin in a Mammalian Cell Such as CHO to Produce an In Vivo Biologically Active Glycoprotein With a Reasonable Expectation of Success*

- Farber and Zanjani, "Translation of mRNA from Human Kidneys into Biologically Active Erythropoietin Following Microinjection into Xenopus Laevis Oocytes," Clinical Res. 31: 769A (1983) (TRX 2023).

    o Drs. Farber and Zanjani tested human EPO in an *in vivo* mouse assay and showed that EPO stimulated the formation of red blood cells.  (Lowe 252:19-22; 253:2-4; TRX 2023).  Dr. Lowe explained that this experiment tells one of ordinary skill in the art that biologically active EPO production

11

is possible in a frog cell, such that "[mammalian cells] will also be able to synthesize human EPO that's biologically active." (Lowe 255:8-18).

- U.S. 4,399,216 (TRX 2024).

    o The Axel patent, U.S. 4,399,216, published in August 1983 (which Amgen licensed), "teaches ... a variety of means of delivering genes from many organisms, many different kinds of organisms, including humans, into mammalian cells and doing that in a way that could allow one to make lots of, high quantities of the protein that was directed by the gene [the blueprint] that was delivered to the cells." (Lowe 267:11-16; U.S. 4,399,216 (Axel) (TRX 2024)).

- Kauffman and Sharp, "Construction of a Modular Dihydrofolate Reductase cDNA Gene: Analysis of Signals Utilized for Efficient Expression," Mol. Cell. Biol. 2: 1304-1319 (1982) (TRX 2025).

    o According to Dr. Lowe, "[t]his paper provides demonstration methods and reagents that would allow one to amplify genes, transfected gene in mammalian cell." (Lowe 269:19-21).

- 06/438,991 (File History for U.S. 4,966,843) (TRX 2026).

    o The McCormick patent application, (U.S. Ser. No. 438,991 (TRX 2026); *see also* U.S. 4,966,843 (TRX 2027)), dated November 1982, "tells specifically here that the interferons are made in the CHO cells, they're glycosylated, they are substantially identical in structure, properties and conformation to native human interferons and are thereby useful for treatments, treatment of viral and cancer diseases, therapeutic agents." (Lowe 273:11-16).

- U.S. 4,966,843 (TRX 2027).

    o This is the continuation-in-part of the '991 application; as a later-issued patent, any disclosure in this patent overlapping with the prior abandoned '991 application becomes prior art under § 102(e).

- EP 0 088 540 A2 (TRX 2028).

    o A patent application by Biogen dated September 14, 1983, teaches one of ordinary skill in the art that "if you do what's in this disclosure, you will have an expectation...that you make this protein in CHO cells, it will have a biological activity that will allow it to be used as a drug." (Lowe 275:22-276:4; EP 0 088 540 A2 (TRX 2028)).

- File History 06/561,024 (TRX 2014).

    o As evidenced by the statements and claims of this prior abandoned application, Dr. Lin admitted that recombinant human EPO made in mammalian cells, such as CHO cells, would "share the biological activities of naturally-occurring EPO." Accordingly, at the time of the invention an expectation of biological activity would have been obvious. (Lowe 276:23-279:10).

- EP 0 093 619 A1 (TRX 2029)

    o Genentech's tPA patent application, published on November 9, 1983, teaches the cloning and expression of tPA in various cells with the expectation of biological activity. (Lowe 281:11-282:16).

    o The fact that Genentech was conducting clinical trials with recombinant tPA protein was publicly disclosed by at least January 2, 1984, as shown by TRX 0011, "McGraw-Hill's Biotechnology Newswatch" introduced into evidence by Amgen.

- U.S. 4,766,075 (TRX 2030).

    o This U.S. patent shares the same specification as the EP '619 patent above and is prior art under § 102(e).

***References Establishing That to One of Skill in the Art in November 1984 It Would Have Been Obvious to Purify Recombinant Human Erythropoietin for Use in Pharmaceutical Compositions and Treatment of Kidney Dialysis Patients***

- Miyake et al, "Purification of Human Erythropoietin," J. Biol. Chem. 252(15): 5558-64 (1977) (TRX 2002).

    o This publication described the purification of human urinary erythropoiein. (Lowe 179:17-20)

- Eschbach et al, "The Anemia of Chronic Renal Failure in Sheep," Clin Invest 74: 434-441 (1984).

    o This publication describes EPO therapy as effective in treating anemia in humans. (Lowe 298:5-11)

- Remington's Pharmaceutical Sciences, 16th ed. A Osol (ed.) Easton, Pennsylvania, Mack Publishing (1980) (TRX 2031).

    o According to Lowe and based on this publication, creating compositions with diluents, adjuvants, or carriers was known in the art at the time. (Lowe 296:24-297:12).

13

- Goldwasser and Kung, "Purification of Erythropoietin," PNAS 68: 697-98 (1971) (TRX 2033).

    o The 1971 Goldwasser/Kung article (TRX 2033) taught that EPO could be used to treat anemia in kidney dialysis patients. (Lowe 301:24-304:1)

**FRITSCH TESTIMONY DOCS**

35 U.S.C. § 102(g)(2) states:

> A person shall be entitled to a patent unless before such person's invention thereof, the invention was made in this country by another inventor who had not abandoned, suppressed, or concealed it.

Deposition testimony of Dr. Fritsch was read into court on September 7, 2007. In that testimony, Dr. Fritsch revealed various prior art references, detailed below:

- Collaboration Agreement between T. Miyake and Genetics Institute (TRX PPK)

    o Fritsch testified that as a result of this agreement, Dr. Hewick obtained EPO sequence from tryptic fragments and reported the results to him - this information was used to design additional probes for the EPO gene. (Fritsch 350:1-351:19)

- Handwritten Notes (TRX OFD)

    o These notes, dated June 25, 1984, showed the delivery of 18 and 20 mer probes designed by Fritsch, which were used to screen a human genomic library. (Fritsch 351:21-352:9)

- Notebook 193 (TRX OHV)

    o This notebook details the results of experiments in which Fritsch and others cloned at least a large portion of the erythropoietin gene based on the sequence information that was available based on at least three tryptic peptides. (Lowe 353:15-24) This was a genomic clone. (Lowe 353:25-354:1)

- Memorandum from K. Smith to Genetics Institute Distribution List re: EPO clone/Chugai (TRX QEI)

    o According to this memorandum, by Monday, August 20, 1984, Fritsch had confirmation of a full length cDNA EPO clone; clone FL13 contained the entire coding region and leader sequence for EPO. (Lowe 356:9-20)

- Notebook (redacted) (TRX OJC)

    o According to this, on September 24, 1984, Fritsch called and confirmed with Dr. Dukes that he had received mock samples of EPO for his assay. (Lower 356:22-357:18)

- Memorandum from K. Smith to Genetics Institute Distribution List re: EPO clone/Chugai (TRX QEJ)

    o Figure 5 attached to this showed the result of a Western blotting done with COS produced EPO. (Lowe 357:20-358:2)

    o Based on the figure 5 results, Fritsch stated that "[b]ecause the molecular weights of the recombinant protein was the same as the molecular weight of either the natural or iodinated natural erythropoietin, we could conclude that the material was being fully glycosylated to an extent similar to that of natural erythropoietin." (Lowe 359:21-360:4)

- Notebook 316 (Richard Wright), Pt. 2, Genetics Institute (pages 110-207) (TRX QEK)

    o This notebook shows that on September 29, 1984 gels were run containing recombinant EPO as well as the urinary and iodinated urinary EPO that corresponds to the Western from QEJ above. (Lowe 358:3-20)

**PATENT SPECIFICATION AND FILE HISTORY: AMGEN ADMISSIONS**

- 08/487,774 (File History for U.S. 5,547,933) (TRX 2011).

    o Lowe testified that according to the file history of the '933 patent, the PTO determined that the state of the art of protein sequencing at the time of invention was sufficiently well-developed that the sequencing was not an inventive contribution. (Lower 220:24-221:5)

- 07/113,179 (File History for U.S. 5,441,868) (TRX 2012).

    o In the file history, Amgen tells the patent office to consider tPA to be an obligate glycoprotein. (Lowe 288:8-11)

- from '933 patent specification

    o "The art is rich in patent and literature publications relating to 'recombinant DNA' methodologies for the isolation, synthesis, purification and amplification of genetic materials for use in the transformation for host organisms." (col. 2:34-37)

    o "Among the more significant recent advances in hybridization procedures for the screening of recombinant clones is the use of labelled mixed

15

    synthetic oligonucleotide probes, each of which is potentially the complete complement of a specific DNA sequence in the hybridization sample including a heterogeneous mixture of single stranded DnAs or RNAs. These procedures are acknowledged to be especially useful in the detection of cDNA clones derived from sources which provide extremely low amounts of mRNA sequences for the polypeptide of interest." (col. 4:10-19)

- "Because erythropoietin is essential in the process of red blood cell formation, the hormone has potential useful application in both the diagnosis and the treatment of blood disorders characterized by low or defective red blood cell production."  (col. 6:20-24) (citation omitted)

- "Recent studies have provided a basis for projection of efficacy of erythropoietin therapy in a variety of disease states, disorders and states of hematologic irregulariy."  (col. 6:41-43) (citation omitted)

- "It is consequently projected in the art that the best prospects for fully characterizing mammalian erythropoietin and providing large quantities of it for potential diagnostic and clinical use involve successful application of recombinant procedures to effect large scale microbial synthesis of the compound."  (col. 9:9-14)

- "More recently, Farber . . . reported the in vitro translation of human kidney mRNA by frog oocytes."  (col. 9:49-51) (citation omitted)

- "[I]t was held that the results confirm the human kidney as a site of erythropoietin expression, allowing for the construction of an enriched human kidney cDNA library from which the desired gene might be isolated."  (col. 9:59-64) (citation omitted)