Dockets.Justia.com

**EXHIBIT B**

| U.S. PATENT NO. 5,441,868 CLAIM 1 | | |
| --- | --- | --- |
| **Claim Limitations** | **Court's Construction** | **Invalidating References[1]** |
| A process for the production of a glycosylated erythropoietin polypeptide having the in vivo biological property of causing bone marrow cells to increase production of reticulocytes and red blood cells comprising the steps of:<br><br>(a) growing, under suitable nutrient conditions, mammalian host cells transformed or transfected with an isolated DNA sequence encoding human erythropoietin; and<br><br>(b) isolating said glycosylated erythropoietin polypeptide therefrom. | containing the named elements<br><br>cells that have been genetically modified with isolated DNA containing genetic instructions for human erythropoietin or later generations of these cells that have inherited those instructions | Dr. Lowe explained that "[t]here were many examples in the 1970s" where recombinant DNA technology was being used to create recombinant proteins. (Lowe 162:5-163:16).<br><br>Dr. Lowe explained that the 1982 Maniatis Manual ("cookbook") (TRX 10) "describes the recipes ... for doing most, if not all, of this particular technology." (Lowe 164:21-23). This book was known by those skilled in the art in the 1983 time period. (Lowe 168:6-9).<br><br>Dr. Lowe explained that "[p]rior to 1980, the state of biotechnology ... was sufficient that there were several successful examples of expressing therapeutic human proteins [in] recombinant organisms." (Lowe 170:19-22; *see also* Lowe 169:20-22 (1977 Itakura article describing expression of a synthetic recombinant human somatostatin gene); Lowe 169:23-170:5 (1978 Goeddel article describing human insulin); Lowe 170:6-10 (1979 report discussing production of human growth hormone)).<br><br>Dr. Lowe provided additional examples of the expression of recombinant proteins in the 1982-83 time period, including a 1982 report describing the expression of human interferon in a mammalian cell (Lowe 171:5-11), a 1983 report describing expression of human interleukin-2 in mammalian cells (Lowe 171:12-15), and reports on production of human tissue plasminogen activator. (Lowe 171:24-172:14).<br><br>Dr. Lowe explained that to successfully clone a gene, one needed sufficient amounts of the protein, and that the problem at the time was that only Dr. Goldwasser had this protein and he would only give sufficient amounts to Amgen. (Lowe 178:19-179:4; *see also* GW 523:1-4). |

1

[1] This document is not intended to represent the full scope of Roche's evidence on invalidity and the absence of discussion of particular evidence or testimony should not be construed as an admission by Roche that such evidence or testimony is irrelevant.

| U.S. PATENT NO. 5,441,868 CLAIM 1 | | |
| --- | --- | --- |
| **Claim Limitations** | **Court's Construction** | **Invalidating References[1]** |
| | | <ul><li>Dr. Goldwasser explained that he never published the amino acid sequence of EPO prior to 1984. (GW 522:9-12).</li><li>The federal government paid for Dr. Goldwasser's research regarding EPO. (GW 525:3-6, 526:23-25, 538:20-22). Dr. Goldwasser never told the government he was providing government-funded EPO to Amgen for sequencing. (GW 556:3-6).</li><li>Dr. Goldwasser was the "only real source in the world for significant amounts of pure EPO." (GW 526:20-22).</li><li>Dr. Goldwasser testified that if someone had Dr. Hood's gas-phase microsequencer, they could have sequenced the tryptic fragments of EPO. (GW 531:5-532:5).</li><li>Schering-Plough and Biogen sought a consultantcy with Dr. Goldwasser, but he said no and instead decided to work exclusively with Amgen. (GW 532:11-535:21; TRX 2035-2037).</li><li>Dr. Goldwasser understood that Biogen wanted the sequence information in an attempt to clone the gene, but he said no. (GW 546:3-7).</li><li>Dr. Goldwasser disclosed portions of the erroneous sequence of EPO at a 1981 meeting, but was later told by Amgen not to disclose it again and not to correct the errors publicly. (GW 536:4-538:9, 560:10-20; TRX 2038, 2044).</li><li>Dr. Goldwasser testified that without his protein, Amgen could not have sequenced the amino acids and gotten the data. (GW 539:17-19). "Amgen was able to sequence it because [he] gave them the pieces." (GW 540:12-14).</li><li>Dr. Goldwasser did not give the sequence information to anyone else because Amgen did not want him to so that no one else would clone the gene before Amgen. (GW 540:22-23, 544:5-545:5).</li></ul> |

| U.S. PATENT NO. 5,441,868 CLAIM 1 | | |
| --- | --- | --- |
| **Claim Limitations** | **Court's Construction** | **Invalidating References[1]** |
| | | The prior art described three general methods to obtain the EPO gene once one had enough protein to sequence. (Lowe 176:15-25, 177:16–178:3, 188:17-23, 206:7-23). One could create a synthetic EPO gene in a test tube, or alternatively, "clone" the EPO gene, using either a genomic or cDNA library. (Lowe 206:7-23). As Roche has shown, these methods would have required no more than routine laboratory techniques. |
| | | In 1980, a paper published in Science disclosed a method "very sensitive in its ability to determine protein sequence." (Lowe 221:2-5; TRX 2018). By 1983, there were highly developed techniques for automated "microsequencing" as summarized in a review article by Hunkapiller and Hood. (Lowe 210:1-21, 218:1–219:6; TRX 2010). These papers taught one of ordinary skill that it was possible to obtain the EPO protein sequence using sufficient amounts of purified EPO and "straightforward methods." (Lowe 219:3-6, 177:21-24). Similarly, the Patent Office agreed that protein sequencing was non-inventive. (Lowe 225:20-24; TRX 2011). |
| | | Using a protein sequence and the standard "codon table" from any biochemistry textbook, one of skill in the art in 1983 would have known to "work backwards" to obtain a corresponding DNA sequence encoding the protein. (Lowe 177:1–178:22, 206:2–207:11). |
| | | The ITC has found that: "Dr. Lin did not 'choose' to develop the EPv and EPq probes from the amino acid sequence information of fragments 35 and 38. He used fragments 35 and 38 to design his probes because they were among the first fragments to be sequenced.'" (TRX 2012.676). |
| | | Substantial prior art demonstrated that it would have been obvious to make a synthetic gene, including a January 1979 Goeddel article which |

| U.S. PATENT NO. 5,441,868 CLAIM 1 | | |
|---|---|---|
| **Claim Limitations** | **Court's Construction** | **Invalidating References**[1] |
| | | reports expression of "chemically synthesized genes that encode the two chains of human insulin." (Lowe 229:20-25; TRX 2019; *see also* Lowe 169:20-22 (1977 Itakura article describing expression of a synthetic recombinant human somatostatin gene)) |
| | | Dr. Lowe testified that a 1981 article by Suggs describes how scientists used the sequence of the beta-2 microglobulin protein to work backward with the codon table to design DNA "probes." (Lowe 238:15-25; TRX 2021). These synthetic DNA probes were used to screen and clone the β2 microglobulin cDNA from a cDNA library. (Lowe 238:25–239:4). This work is cited to and summarized in the Maniatis Manual. (Lowe 241:4-17). |
| | | The Maniatis Manual (TRX 10) also describes strategies to overcome the alleged "difficulties" of cloning that Amgen postulates. Using the teachings of Maniatis, one of ordinary skill in the art would have had a reasonable expectation of success cloning rare mRNAs: the "sensitivity of screening these libraries using this method is thereby increased to the level where clones synthesized from extremely rare RNAs can be detected. Easily detected." (Lowe 241:15–242:12). Dr. Lin's patent specification admits the same: "mixed synthetic oligonucleotide probes . . . are acknowledged to be especially useful in the detection of cDNA clones derived from sources which provide extremely low amounts of mRNA sequences for the polypeptide of interest." ('868 patent, col. 4:21-32). Likewise, one of ordinary skill in the art in 1983-84 would have had a reasonable expectation that one could obtain a full-length transcript from even long RNAs. (Lowe 244:13-245:1; TRX 2022). |
| | | The method of injecting isolated RNA from human kidneys into *Xenopus laevis* (frog) oocytes is taught in the Maniatis Manual and the |

| U.S. PATENT NO. 5,441,868 CLAIM 1 | | |
|---|---|---|
| **Claim Limitations** | **Court's Construction** | **Invalidating References[1]** |
| | | Farber publication, and Dr. Lowe testified that it is "an accepted and I would say widely used technique to study proteins made by many kinds of cells, including mammalian cells." (Lowe 247:20–248:22, 249:21-23; TRX 10; TRX 2023). |
| | | Dr. Lowe further explained that the concept of screening genomic libraries was well-understood in 1983. (Lowe 255:22-24). These techniques were reported in the Maniatis manual. (TRX 10; Lowe 256:25-257:5). |
| | | Dr. Lowe explained that Fritsch's success in cloning the EPO gene in six to eight weeks after receiving sufficient protein corroborates the obviousness of Lin's "inventions." (Lowe 467:25-468:2). |
| | | Before Dr. Lin did any testing to determine whether EPO would be biologically active, he had an expectation of in vivo activity. (Lowe 261:9-13; 276:23-277:3; 277:19-22; TRX 2014.51-61 ("in vivo and in vitro tests of biological activity to be performed are expected to reveal that the expression produces also share the biological activities of naturally occurring EPO."; "[Claim] 9. A polypeptide according to claim 1 which has the in vivo biological activity of naturally-occurring erythropoietin"). |
| | | Amgen admits that the Farber reference "confirm[s] the human kidney as a site of erythropoietin expression, allowing for the construction of an enriched human kidney cDNA library from which the desired gene might be isolated." ('868 patent, col. 10:23-33). Admissions in a patent specification are binding on the patentee. *PharmaStem Therapeutics, Inc. v. Viacell, Inc.*, 491 F.3d 1342, 1362 (Fed. Cir. 2007). |

| U.S. PATENT NO. 5,441,868 CLAIM 1 | | |
|---|---|---|
| **Claim Limitations** | **Court's Construction** | **Invalidating References[1]** |
| | | The Axel patent, U.S. 4,399,216, published in August 1983 (which Amgen licensed), "teaches ... a variety of means of delivering genes from many organisms, many different kinds of organisms, including humans, into mammalian cells and doing that in a way that could allow one to make lots of, high quantities of the protein that was directed by the gene [the blueprint] that was delivered to the cells." (Lowe 267:11-16; U.S. 4,399,216 (Axel) (TRX 2024)). |
| | | Dr. Lowe concluded that "the use of mammalian cells to do this recombinant DNA technology [was] known" (Lowe 171:19-23) and that there were "several examples published, available to the public demonstrating human proteins made in mammalian cells [that] could be made in the cells and come out of the cell." (Lowe 172:11-14). |
| | | Furthermore, Dr. Lowe explained that growing cells under suitable nutrient conditions was a well-known technique "that would take [him] about five minutes to explain how to do to pretty much anyone," and it was well-known how to do this in 1982. (Lowe 182:8-24). |
| | | The process of "installing the blueprint" is transformation or transfection, and it was well-known how to carry out this process in mammalian and CHO cells in 1983-84. (Lowe 182:25-183:10). This process was reported in the Maniatis manual (TRX 10) as well as the scientific literature reporting production of tPA and interferon in mammalian cells noted above. (Lowe 183:8-18). Once you transformed or transfected the cell with the blueprint, Dr. Lowe explained that "the cell will carry out its inherent function, its inherent chemical set of reactions and be instructed by that ... gene to make" the protein. (Lowe 174:15-18, 172:15-173:10, 201:17-25; *see also* Bertozzi 1016:16-21). This very mechanism was shown in a 1981 publication describing the use of monkey cells to produce an influenza |

| U.S. PATENT NO. 5,441,868 CLAIM 1 | | |
| --- | --- | --- |
| **Claim Limitations** | **Court's Construction** | **Invalidating References[1]** |
| | | hemagglutinin protein. "[T]he report describes the expression of that protein in an animal cell in such a way that that protein basically is made by the machinery of that cell and is expressed on the outside of the cell." (Lowe 230:4-13; Gething & Sambrook, "Cell surface expression of influenza haemagglutinin from a cloned DNA copy of the RNA gene," Nature 293:620-25 (1981) (TRX 2020); *see also* Lowe 268:17-269:2 (referring to U.S. 4,399,216 (Axel) (TRX 2024))). In essence, Dr. Lowe explained, this report "provides an example, a recipe, if you will, of a method to deliver a protein from the inside of the cell, a recombinant protein synthesized by the cell, to the outside of the cell." (Lowe 236:2-5). The recombinant production of somatostatin, insulin, tPA and interferon demonstrates that the process was widely known and used by those of ordinary skill in the art. (Lowe 181:4-10, 182:2-4).<br><br>Dr. Lowe explained that the principle of isolating a glycosylated protein was well-known in the 1983-84 time period, and that all one needed to do was put the nutrient media from the cell into a centrifuge. (Lowe 183:19-184:3).<br><br>Drs. Farber and Zanjani tested human EPO in an *in vivo* mouse assay and showed that EPO stimulated the formation of red blood cells. (Lowe 252:19-22; 253:2-4; TRX 2023). Dr. Lowe explained that this experiment tells one of ordinary skill in the art that biologically active EPO production is possible in a frog cell, such that "[mammalian cells] will also be able to synthesize human EPO that's biologically active." (Lowe 255:8-18).<br><br>The McCormick patent application, (U.S. Ser. No. 438,991 (TRX 2026); *see also* U.S. 4,966,843 (TRX 2027)), dated November 1982, "tells specifically here that the interferons are made in the CHO cells, |

| U.S. PATENT NO. 5,441,868 CLAIM 1 | | |
|---|---|---|
| **Claim Limitations** | **Court's Construction** | **Invalidating References[1]** |
| | | they're glycosylated, they are substantially identical in structure, properties and conformation to native human interferons and are thereby useful for treatments, treatment of viral and cancer diseases, therapeutic agents." (Lowe 273:11-16). A patent application by Biogen dated September 14, 1983, teaches one of ordinary skill in the art that "if you do what's in this disclosure, you will have an expectation...that you make this protein in CHO cells, it will have a biological activity that will allow it to be used as a drug." (Lowe 275:22-276:4; EP 0 088 540 A2 (TRX 2028)). Genentech's tPA patent application, filed November 9, 1983, teaches the cloning and expression of tPA in various cells with the expectation of biological activity. (Lowe 281:11-282:16; European Patent App. 0 093 619 A1 (TRX 2029); *see also* U.S. 4,766,075 (TRX 2030)).<br><br>Accordingly, as Dr. Lowe testified, once a person of skill in the art had Dr. Goldwasser's protein, the steps in claim 1 of the '868 patent would have been obvious. (Lowe 207:12-19, 258:13-259:8, 288:22-289:8). Moreover, a motivation to combine the prior art is present in the Vapnek article (TRX 2062 at p. 2) ("Early studies by Goldwasser and colleagues demonstrated that Epo isolated from human urine was glycosylated and contained sialic acid....On the basis of these data, we chose to produce the recombinant material in a mammalian host cell"). |

| U.S. PATENT NO. 5,441,868 CLAIM 2 | | |
| --- | --- | --- |
| **Claim Limitations** | **Court's Construction** | **Invalidating References** |
| the process according to claim 1 wherein said host cells are CHO cells. | A cell from the ovary of a Chinese hamster | The McCormick application (U.S. Ser. No. 438,991 (TRX 2026); *see also* U.S. 4,966,843 (TRX 2027)), filed in November 1982, taught recombinant production of biologically active human interferon in a CHO cells. (Lowe 272:21-273:16). Similarly, Biogen's EP 0 008 540 application (TRX 2028), published in September 1983, "is another example of expressing a human glycoprotein in mammalian cells, CHO cells" with the expectation of producing a biologically active protein. (Lowe 275:7-276:4). Moreover, Genentech's EP 0 093 619 application (TRX 2029), published in November 1983, taught the use of CHO cells to recombinantly produce tPA. (Lowe 287:21-24). <br><br> The ITC has found that "[t]he CHO cell was chosen as a host cell because it is well-studied and grows well in cell cultures." (TRX 2012.645). Likewise, "[a] CHO cell transfected with the DNA sequence encoding for EPO makes erythropoietin all the time and no signal is needed to begin production of erythropoietin." (TRX 2012.647). <br><br> "Q. Can you tell us what was known of the uses of these Chinese hamster ovary cells that Dr. Lin used? <br> A. Yes. You'll see the word on the time line "CHO," an abbreviation for Chinese hamster ovary cells. These were cells commonly available to anyone in the public domain in that time period. And there are several examples on this time line of the use of CHO cells to make proteins, human proteins, that were modified by sugars." (Lowe 175:19–176:1). <br><br> "Q. And these CHO cells, were these -- can you tell us whether or not these cells were publicly available? <br> A. Yes. So the C-H-O cells or CHO cells were publicly available, they're available from university scientists and they were available |

| U.S. PATENT NO. 5,441,868 CLAIM 2 | | |
|---|---|---|
| **Claim Limitations** | **Court's Construction** | **Invalidating References** |
| | | from a repository known as the ATCC, a publicly accessible cell repository. You call them up, in those days, before the Internet, and you said, Send me the CHO cells, and you send them a check and they send you the cells by Federal Express." (Lowe 176:6-14).<br><br>Dr. Lowe explained that in light of the prior art, claim 2 would be obvious. (Lowe 289:9-15). |

| U.S. PATENT NO. 5,618,698 CLAIM 6 | | |
|---|---|---|
| **Claim Limitations** | **Court's Construction** | **Invalidating References** |
| A process for the production of a glycosylated erythropoietin polypeptide having the in vivo biological property of causing bone marrow cells to increase production of reticulocytes and red blood cells comprising the steps of:<br><br>a) growing, under suitable nutrient conditions, vertebrate cells comprising amplified DNA encoding the mature erythropoietin amino acid sequence of FIG. 6,<br><br>b) isolating said glycosylated erythropoietin polypeptide expressed by said cells. | containing the named elements | Dr. Lowe explained that "[t]here were many examples in the 1970s" where recombinant DNA technology was being used to create recombinant proteins. (Lowe 162:5-163:16)<br><br>Dr. Lowe explained that once the DNA was in the CHO cell, it would carry out its normal function and produce a glycosylated protein. (Lowe 172:15-173:10). Indeed, he stated that the production of glycosylated polypeptides was well-known in the art in the early 1980s. (Lowe 181:4-10). In 1983-84, human beta interferon was created by inserting DNA into a CHO cell and allowing the cell to carry out its normal process. (Lowe 182:2-4). Also, the clot-busting drug, human tPA was also made in this way prior to the filing date of the Lin patents. (Lowe 182:2-4).<br><br>Drs. Farber and Zanjani tested human EPO in an *in vivo* mouse assay and showed that EPO stimulated the formation of red blood cells. (Lowe 252:19-22; 253:2-4; TRX 2023). Dr. Lowe explained that this experiment tells one of ordinary skill in the art that biologically active EPO production is possible in a frog cell, such that "[mammalian cells] will also be able to synthesize human EPO that's biologically active." (Lowe 255:8-18).<br><br>Before Dr. Lin did any testing to determine whether EPO would be biologically active, he had an expectation of in vivo activity. (Lowe 261:9-13; 276:23-277:3; 277:19-22; TRX 2014.51-61 ("in vivo and in vitro tests of biological activity to be performed are expected to reveal that the expression produces also share the biological activities of naturally occurring EPO."; "[Claim] 9. A polypeptide according to claim 1 which has the in vivo biological activity of naturally-occurring erythropoietin"). Similarly the prior art was replete with examples of using vertebrate cells, which include mammalian and CHO cells, to produce biologically active proteins. (Lowe 181:23-182:4, 291:3-14). |

| U.S. PATENT NO. 5,618,698 CLAIM 6 | | |
|---|---|---|
| **Claim Limitations** | **Court's Construction** | **Invalidating References** |
| | | Dr. Lowe explained that the principle of isolating a glycosylated protein was well-known in the 1983-84 time period, and that all one needed to do was put the nutrient media from the cell into a centrifuge. (Lowe 183:19-184:3, 291:16-24). |
| | | The McCormick patent application, (U.S. Ser. No. 438,991 (TRX 2026); *see also* U.S. 4,966,843 (TRX 2027)), dated November 1982, "tells specifically here that the interferons are made in the CHO cells, they're glycosylated, they are substantially identical in structure, properties and conformation to native human interferons and are thereby useful for treatments, treatment of viral and cancer diseases, therapeutic agents." (Lowe 273:11-16). A patent application by Biogen dated September 14, 1983, teaches one of ordinary skill in the art that "if you do what's in this disclosure, you will have an expectation...that you make this protein in CHO cells, it will have a biological activity that will allow it to be used as a drug." (Lowe 275:22-276:4; EP 0 088 540 A2 (TRX 2028)). Genentech's tPA patent application, filed November 9, 1983, teaches the cloning and expression of tPA in various cells. (Lowe 281:11-16; European Patent App. 0 093 619 A1 (TRX 2029); *see also* U.S. 4,766,075 (TRX 2030)). |
| | | The idea behind gene amplification is that "the more copies of the gene that the cell can have, it will be making more of the RNA molecules from that gene. And naturally, if you want to make lots of proteins, ... you would want to have a cell that's making as much as possible of the protein of interest." (Lowe 268:2-9). Dr. Lowe testified that these methods were well-known in the early 1980s. Such methods were taught in the August 1983 Axel patent (TRX 2024). Moreover, a November 1982 article in Molecular and Cellular Biology "provides demonstration methods and reagents that would allow one to amplify genes, transfected gene in mammalian cell." (Lowe 269:19-21; TRX 2025)). |

| U.S. PATENT NO. 5,618,698 CLAIM 6 | | |
|---|---|---|
| **Claim Limitations** | **Court's Construction** | **Invalidating References** |
| | | As explained above, once one of skill in the art had sufficient EPO protein, it was routine to use that protein to find "DNA encoding the mature erythropoietin amino acid sequence of FIG. 6." (Lowe 206:2–207:11, 369:7–370:5, 291:4-292:2).<br><br>Dr. Lowe explained that claim 6, viewed in light of the prior art, would have been obvious. (Lowe 291:25-292:4). Moreover, a motivation to combine the prior art is present in the Vapnek article (TRX 2062 at p. 2) ("Early studies by Goldwasser and colleagues demonstrated that Epo isolated from human urine was glycosylated and contained sialic acid....On the basis of these data, we chose to produce the recombinant material in a mammalian host cell"). |

| U.S. PATENT NO. 5,618,698 CLAIM 7 | | |
|---|---|---|
| **Claim Limitations** | **Court's Construction** | **Invalidating References** |
| The process of claim 6 wherein said vertebrate cells further comprise amplified marker gene DNA. | | Dr. Lowe explained that the tPA patents (TRX 2039, 203) disclose certain kind of "cells called CHO cells that have a mutation and an enzyme gene, called dhfr-CHO cells" which is an example of the amplified marker gene DNA in Dr. Lin's patent.  (Lowe 283:21-284:3).<br><br>Dr. Lowe explained that this claim, viewed in light of the prior art, would be obvious.  (Lowe 292:5-25). |

| U.S. PATENT NO. 5,618,698 CLAIM 8 | | |
|---|---|---|
| **Claim Limitations** | **Court's Construction** | **Invalidating References** |
| The process of claim 7 wherein said amplified marker gene DNA.is Dihydrofolate reductase (DHFR) gene DNA. | | Dr. Lowe explained that the tPA patents (TRX 2039, 203) disclose certain kind of "cells called CHO cells that have a mutation and an enzyme gene, called dhfr-CHO cells" which is covered by this claim. (Lowe 283:21-284:3).<br><br>Dr. Lowe explained that this claim, viewed in light of the prior art, would be obvious. (Lowe 293:1-8). |

| U.S. PATENT NO. 5,618,698 CLAIM 9 | | |
| --- | --- | --- |
| **Claim Limitations** | **Court's Construction** | **Invalidating References** |
| The process according to claims 2, 4 and 6 wherein said cells are mammalian cells. | | Claim 9 is the same as claim 1 of the '868 patent with the added limitation of "amplified DNA." As explained above, gene amplification was well-known in the art in 1983-84. Accordingly, a reasonable jury could conclude that claim 9 is invalid as obvious. (Lowe 293:9-14). |

| U.S. PATENT NO. 5,756,349 CLAIM 7 | | |
|---|---|---|
| **Claim Limitations** | **Court's Construction** | **Invalidating References** |
| A process for producing erythropoietin comprising the step of culturing, under suitable nutrient conditions, vertebrate cells according to claim 1, 2, 3, 4, 5 or 6. | containing the named elements | The Axel patent, U.S. 4,399,216, published in August 1983, "teaches ... a variety of means of delivering genes from many organisms, many different kinds of organisms, including humans, into mammalian cells and doing that in a way that could allow one to make lots of, high quantities of the protein that was directed by the gene [the blueprint] that was delivered to the cells."  (Lowe 267:11-16; U.S. 4,399,216 (Axel) (TRX 2024)).<br><br>Dr. Lowe explained that claim 7 would be obvious to one of skill in the art.  (Lowe 305:24-306:12). |

| U.S. PATENT NO. 5,756,349 CLAIM 1 | | |
|---|---|---|
| **Claim Limitations** | **Court's Construction** | **Invalidating References** |
| Vertebrate cells which can be propagated in vitro and which are capable upon growth in culture of producing erythropoietin in the medium of their growth in excess of 100 U of erythropoietin per $10^6$ cells in 48 hours as determined by radioimmunoassay, said cells comprising non-human DNA sequences which control transcription of DNA encoding human erythropoietin. | | The Axel patent, U.S. 4,399,216, published in August 1983, "teaches ... a variety of means of delivering genes from many organisms, many different kinds of organisms, including humans, into mammalian cells and doing that in a way that could allow one to make lots of, high quantities of the protein that was directed by the gene [the blueprint] that was delivered to the cells." (Lowe 267:11-16; U.S. 4,399,216 (Axel) (TRX 2024)).<br><br>Dr. Lowe explained that "non-human DNA sequences which control transcription" was described in the human tPA patent. (Lowe 305:7-9; TRX 2029, 2030).<br><br>One of ordinary skill would have known how to perform radioimmunoassay, which, as Dr. Lowe testified, is a "standard laboratory technique" (Lowe 304:20-25); however, there were significant problems with using this technique to measure EPO levels which were not resolved by the Lin patent specification, as described by Dr. Flavell. |

| U.S. PATENT NO. 5,547,933 CLAIM 3 | | |
|---|---|---|
| **Claim Limitations** | **Court's Construction** | **Invalidating References** |
| A non-naturally occurring glycoprotein product of the expression in a mammalian host cell of an exogenous DNA sequence comprising a DNA sequence encoding human erythropoietin said product possessing the in vivo biological property of causing bone marrow cells to increase production of reticulocytes and red blood cells. | a glycoprotein (not occurring in nature) that is the product of the expression in a mammalian host cell of a DNA sequence that does not originate in the genome of the host, and which contains the genetic instructions (or a DNA sequence) encoding human erythropoietin.<br><br>A protein having the amino acid sequence of human EPO, such as the amino acid sequence of EPO isolated from human urine | The Axel patent, U.S. 4,399,216, published in August 1983 (which Amgen licensed), "teaches ... a variety of means of delivering genes from many organisms, many different kinds of organisms, including humans, into mammalian cells and doing that in a way that could allow one to make lots of, high quantities of the protein that was directed by the gene [the blueprint] that was delivered to the cells." (Lowe 267:11-16; U.S. 4,399,216 (Axel) (TRX 2024)).<br><br>Dr. Lowe concluded that "the use of mammalian cells to do this recombinant DNA technology [was] known" (Lowe 171:19-23) and that there were "several examples published, available to the public demonstrating human proteins made in mammalian cells [that] could be made in the cells and come out of the cell." (Lowe 172:11-14).<br><br>Drs. Farber and Zanjani tested human EPO in an *in vivo* mouse assay and showed that EPO stimulated the formation of red blood cells. (Lowe 252:19-22; 253:2-4; TRX 2023). Dr. Lowe explained that this experiment tells one of ordinary skill in the art that biologically active EPO production is possible in a frog cell, such that "[mammalian cells] will also be able to synthesize human EPO that's biologically active." (Lowe 255:8-18).<br><br>The McCormick patent application, (U.S. Ser. No. 438,991 (TRX 2026); *see also* U.S. 4,966,843 (TRX 2027)), dated November 1982, "tells specifically here that the interferons are made in the CHO cells, they're glycosylated, they are substantially identical in structure, properties and conformation to native human interferons and are thereby useful for treatments, treatment of viral and cancer diseases, therapeutic agents." (Lowe 273:11-16). A patent application by Biogen dated September 14, 1983, teaches one of ordinary skill in the art that "if you do what's in this disclosure, you will have an expectation...that you make this protein in CHO cells, it will have a |

| U.S. PATENT NO. 5,547,933 CLAIM 3 | | |
| --- | --- | --- |
| **Claim Limitations** | **Court's Construction** | **Invalidating References** |
| | | biological activity that will allow it to be used as a drug." (Lowe 275:22-276:4; EP 0 088 540 A2 (TRX 2028)). Genentech's tPA patent application, filed November 9, 1983, teaches the cloning and expression of tPA in various cells. (Lowe 281:11-16; European Patent App. 0 093 619 A1 (TRX 2029); *see also* U.S. 4,766,075 (TRX 2030)).<br><br>Dr. Lowe testified that when you go through the process described in claim 3 of the '933 patent, as well as claims 1-2 of the '868 patent and 6-9 of the '698 patent, you get a glycosylated erythropoietin polypeptide. (Lowe 295:2-7). This product of the process is a non-naturally occurring glycoprotein which is biologically active in vivo. (Lowe 295:8-12).<br><br>Dr. Bertozzi explained that cells are likely a factory and the machinery in the factory is enzymes, which build trees (i.e. glycosylation) inside the cell depending on the enzymes. (Bertozzi 1016:16-21)<br><br>Before Dr. Lin did any testing to determine whether EPO would be biologically active, he had an expectation of in vivo activity. (Lowe 261:9-13; 276:23-277:3; 277:19-22; TRX 2014.51-61 ("in vivo and in vitro tests of biological activity to be performed are expected to reveal that the expression produces also share the biological activities of naturally occurring EPO."; "[Claim] 9. A polypeptide according to claim 1 which has the in vivo biological activity of naturally-occurring erythropoietin").<br><br>"Non-naturally occurring," which Dr. Lowe testified means "something that's not in nature, necessarily" (Lowe 194:11-15), is merely a source limitation. The law is clear that source limitations cannot distinguish a claim over the prior art unless the source imparts unique structure to the product. *SmithKline Beecham Corp.*, 439 F.3d at 1317; *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d at 1354 |

| U.S. PATENT NO. 5,547,933 CLAIM 3 |||
| --- | --- | --- |
| **Claim Limitations** | **Court's Construction** | **Invalidating References** |
| | | n.20. Amgen bears the burden of proving by "convincing" evidence that the prior art urinary EPO has a different structure than EPO grown in culture. *In re Moeller*, 117 F.2d at 567. Amgen has offered no such evidence, and indeed Dr. Bertozzi testified directly to the contrary: "[N]othing distinguishes them. The EPO that comes from mammalian cells in culture is the same, the molecules are the same as Goldwasser's EPO." (Bertozzi 988:19-21, 999 17:21). |
| | | Moreover, the ITC has found that: "There appear to be no differences in the secondary structure of EPO produced in a CHO cell versus EPO produced in a human kidney cell." (TRX 2012.682). Similarly, the ITC has found that: "Based on extensive testing and carbohydrate analysis, the researchers at Genetics Institute were unable to find any significant differences between the carbohydrate structure of urinary erythropoietin versus recombinant erythropoietin." (TRX 2012.682). The ITC has also found that: "In terms of biological function. i.e., having the same effect on causing red cells to be produced in the body, recombinant EPO and natural EPO are the same." (TRX 2012.683). |
| | | Dr. Bertozzi explained that "Goldwasser's EPO has structures that can all be made according to claim 3. So the product of claim 3 is basically the same as Goldwasser's EPO." (Bertozzi 1018:13-15). Dr. Bertozzi also explained that she reviewed data showing that EPO made by mammalian cells is identical in size (apparent molecular weight) to Dr. Goldwasser's EPO. (Bertozzi 1028:17-25). |
| | | The similarity between Dr. Goldwasser's EPO and EPO made in mammalian cells was established by numerous publications, including:<br>• Amgen's PLA (TRX 2056; Bertozzi 1032:7-1033:1; TRX 2057; Bertozzi 1034:5-17, 1036:20-1037:9)<br>• A 1986 publication by Amgen scientists Egrie, Strickland, Lin and Browne, among others (TRX 2058; Bertozzi 1039:14-18) |

| U.S. PATENT NO. 5,547,933 CLAIM 3 | | |
| --- | --- | --- |
| **Claim Limitations** | **Court's Construction** | **Invalidating References** |
| | | • Another 1986 publication by Amgen scientists Egrie, Strickland, Lin and Browne, among others (TRX 2059; Bertozzi 1042:6-18)<br>• A 1984 presentation by Dr. Egrie (TRX 2060; Bertozzi 1043:23-1044:22)<br>• A 1985 publication by Amgen scientists Egrie, Browne, Lin and Lai (TRX 2061; Bertozzi 1045:23-1046:1)<br>• A 1988 publication by Amgen scientists Vapnek, Egrie, Browne, Lin and Strickland, among others (TRX 2062; 1047:7-14).<br><br>Dr. Lowe explained that based on the prior art, claim 3 of the '933 patent would have been obvious. (Lowe 295:19-23). Moreover, a motivation to combine the prior art is present in the Vapnek article (TRX 2062 at p. 2) ("Early studies by Goldwasser and colleagues demonstrated that Epo isolated from human urine was glycosylated and contained sialic acid....On the basis of these data, we chose to produce the recombinant material in a mammalian host cell").<br><br>Similarly, Dr. Bertozzi testified that claim 3 of the '933 patent covers the prior art EPO. (Bertozzi 1048:2-6). |

**EXHIBIT B**

| U.S. PATENT NO. 5,547,933 CLAIM 7 | | |
|---|---|---|
| **Claim Limitations** | **Court's Construction** | **Invalidating References** |
| The glycoprotein product according to claim 3, 4, 5, or 6 wherein the host cell is a non-human mammalian cell. | | The only difference between claim 7 and claim 3 is the additional limitation to a "non-human mammalian cell." As explained above, the use of mammalian cells for recombinant production of proteins was well-known in 1983-84. Accordingly, as Dr. Lowe explained, a reasonable jury could conclude that claim 7 is invalid for obviousness. (Lowe 300:5-16)<br><br>Dr. Lowe testified that claim 7 would be obvious to one of skill in the art. (Lowe 300:14-16).<br><br>Similarly, Dr. Bertozzi testified that claim 7 is invalid over the prior art. (Bertozzi 1048:8-1049:9). |

| U.S. PATENT NO. 5,547,933 CLAIM 8 | | |
| --- | --- | --- |
| **Claim Limitations** | **Court's Construction** | **Invalidating References** |
| The glycoprotein product according to claim 7 wherein the non-human mammalian cell is a CHO cell. | A cell from the ovary of a Chinese hamster | The McCormick application (U.S. Ser. No. 438,991 (TRX 2026); *see also* U.S. 4,966,843 (TRX 2027)), filed in November 1982, taught recombinant production of biologically active human interferon in a CHO cells. (Lowe 272:21-273:16). Similarly, Biogen's EP 0 008 540 application (TRX 2028), published in September 1983, "is another example of expressing a human glycoprotein in mammalian cells, CHO cells" with the expectation of producing a biologically active protein. (Lowe 275:7-276:4). Moreover, Genentech's EP 0 093 619 application (TRX 2029), published in November 1983, taught the use of CHO cells to recombinantly produce tPA. (Lowe 287:21-24).<br><br>The ITC has found that "[t]he CHO cell was chosen as a host cell because it is well-studied and grows well in cell cultures." (TRX 2012.645). Likewise, "[a] CHO cell transfected with the DNA sequence encoding for EPO makes erythropoietin all the time and no signal is needed to begin production of erythropoietin." (TRX 2012.647).<br><br>"Q. Can you tell us what was known of the uses of these Chinese hamster ovary cells that Dr. Lin used?<br>A. Yes. You'll see the word on the time line "CHO," an abbreviation for Chinese hamster ovary cells. These were cells commonly available to anyone in the public domain in that time period. And there are several examples on this time line of the use of CHO cells to make proteins, human proteins, that were modified by sugars." (Lowe 175:19–176:1).<br><br>"Q. And these CHO cells, were these -- can you tell us whether or not these cells were publicly available?<br>A. Yes. So the C-H-O cells or CHO cells were publicly available, they're available from university scientists and they were available from a repository known as the ATCC, a publicly accessible cell repository. You call them up, in those days, before the Internet, and |

| U.S. PATENT NO. 5,547,933 CLAIM 8 | | |
|---|---|---|
| **Claim Limitations** | **Court's Construction** | **Invalidating References** |
| | | you said, Send me the CHO cells, and you send them a check and they send you the cells by Federal Express." (Lowe 176:6-14).<br><br>Dr. Lowe testified that claim 8 would be obvious to one of skill in the art. (Lowe 300:17-19).<br><br>Similarly, Dr. Bertozzi testified that claim 8 is invalid over the prior art. (Bertozzi 1048:8-1049:9). |

| U.S. PATENT NO. 5,547,933 CLAIM 9 | | |
| --- | --- | --- |
| **Claim Limitations** | **Court's Construction** | **Invalidating References** |
| A pharmaceutical composition comprising an effective amount of a glycoprotein product effective for erythropoietin therapy according to claim 1, 2, 3, 4, 5 or 6 and a pharmaceutically acceptable diluent, adjuvant or carrier. | a composition suitable for administration to humans, containing a diluent, adjuvant or carrier<br><br>A therapeutically effective amount is one that elicits any one or all of the effects often associated with in vivo biological activity of natural EPO, such as those listed in the specification, column 33, lines 16 through 22, stimulation of reticulocyte response, development of ferrokinetic effects (such as plasma iron turnover effects and marrow transit time effects), erythrocyte mass changes, stimulation of hemoglobin C synthesis and, as indicated in Example 10, increasing hematocrit levels in mammals | In order for Drs. Baron and Goldwasser to administer the human erythropoietin, as a pharmaceutical composition to the clinical trial patients, they first requested permission from the FDA in the form of an IND. (Spinowitz 703:13-704:1, TRX 2004). In the IND, where the form asks for the drug's name, the sponsor wrote in "human erythropoietin." (Spinowitz 706:9-11, TRX 2004)). Also, the pharmaceutical composition's name was "human erythropoietin" in the label affixed to the vials containing that contained it. (Spinowitz 707:1-9, IND (TRX 2004)).<br><br>Dr. Spinowitz discussed the Baron-Goldwasser clinical study and explained that Dr. Baron considered his human erythropoietin to be a pharmaceutical composition that suitable for human administration. (Spinowitz 705:20-706:1). He explained that the hormone was diluted in normal serum albumin, which is a diluent. (Spinowitz 707:23-708:1, 708:12-16).<br><br>Dr. Spinowitz noted that in the study, human erythropoietin showed increased reticulocytes, increased numbers of nucleated red blood cells and decreased radio iron. (Spinowitz 711:3-17-23; 712:2-12, 713:17-19; Baron 671:8-21; TRX 2049, 2004, 2045).<br><br>Dr. Spinowitz, using his experience as a clinician treating patients with kidney disease, examined Dr. Baron's data and agreed with Dr. Baron, concluding "there was indeed evidence of a therapeutic response." (Spinowitz 713:17-714:3). Similarly, Dr. Goldwasser drew the same conclusion. (TRX 2045; Spinowitz 718:15-22, 719:7-18). Dr. Spinowitz concluded, after examining the data, that there was an increase in reticulocytes and ferrokinetic effects, among other indicia of therapeutic effectiveness. (Spinowitz 715:19-716:19, 725:17-25; TRX 2045). Indeed, even Amgen relied on this study in its IND to show that EPO had been shown to be therapeutically effective. (TRX 2054; Spinowitz 790:24-791:9, 792:3-5, 792:21-23). |

| U.S. PATENT NO. 5,547,933 CLAIM 9 | | |
|---|---|---|
| **Claim Limitations** | **Court's Construction** | **Invalidating References** |
| | | Dr. Spinowitz also discussed Dr. Eschbach's 1984 EPO-rich plasma study, in which Dr. Eschbach administered a pharmaceutical composition (i.e. the EPO-rich plasma) to patients. (Spinowitz 743:1-9). Dr. Eschbach observed an increase in reticulocytes and the movement of iron into new red blood cells (i.e. ferrokinetic effects). (Spinowitz 748:19-749:5). Dr. Spinowitz explained that the study had confirmed that what they had previously seen in sheep (TRX 2032) would translate to humans. (Spinowitz 749:6-11, 750:19-751:6). Indeed, Amgen also relied on Eschbach's sheep study in its IND submission to demonstrate predictability as to the therapeutic effectiveness of its drug product. (TRX 2054; Spinowitz 794:19-22, 796:23-797:5).<br><br>Dr. Spinowitz also discussed clinical studies by Dr. Essers in the early to mid 1970s using an EPO-rich plasma, which Dr. Spinowitz explained is a pharmaceutical composition. (Spinowitz 752:19-753:6, 759:21-24). Dr. Essers' studies showed an increase in reticulocyte response. (759:15-17, 760:12-15).<br><br>Dr. Lowe explained that a diluent, adjuvant, or carrier are "the components that you add to the protein and maybe put in a vial, stabilizes it, keeps it alive, biologically active." (Lowe 296:2-7). A pharmaceutical reference manual from 1980 shows that creating compositions with diluents, adjuvants or carriers was well known in 1983-84. (Lowe 296:24-297:2; Remington's Pharm. Sci., 16th ed. (1980) (TRX 2031)).<br><br>Dr. Lowe also explained that the tPA patents disclose a therapeutically effective pharmaceutical composition comprising tPA and a pharmaceutically acceptable carrier vehicle. (Lowe 283:4-20; TRX 2029, 2030).<br><br>Dr. Lowe testified that based on the prior art, claim 9 would have been obvious. (Lowe 297:3-6). |

| U.S. PATENT NO. 5,547,933 CLAIM 9 | | |
| --- | --- | --- |
| **Claim Limitations** | **Court's Construction** | **Invalidating References** |
| | | Similarly, Dr. Spinowitz testified that based on the prior art, claim 9 would be invalid as obvious. (Spinowitz 767:21-768:7, 800:18-24).<br><br>Moreover, Dr. Bertozzi opined that claim 9 of the '933 would be invalid as anticipated and obvious over the prior art. (Bertozzi 1049:12-1050:7, 1052:3-1053:12). |

| U.S. PATENT NO. 5,547,933 CLAIM 11 | | |
| --- | --- | --- |
| **Claim Limitations** | **Court's Construction** | **Invalidating References** |
| A method for treating a kidney dialysis patient which comprises administering a pharmaceutical composition of claim 9 in an amount effective to increase the hematocrit level of said patient. | | Dr. Lowe explained that the 1984 Eschbach paper (TRX 2032) taught that "Ep therapy should be effective in treating the anemia of CRF in humans." (Lowe 298:5-11). "[C]hronic renal failures means that the kidneys have failed, they're unable to perform the filtration functions, and that means that the patients with CRF must be on dialysis." (Lowe 298:24-299:4).<br><br>Dr. Baron testified that following administration of his pharmaceutical composition, hematocrit numbers went up. (Baron 672:6-18).<br><br>Dr. Lowe explained that in light of his knowledge and the prior art, claim 11 would be obvious. (Lowe 299:21-300:1).<br><br>Similarly, Dr. Spinowitz testified that based on the prior art, claim 11 would be invalid as obvious. (Spinowitz 768:25-769:10, 801:11-802:1). Dr. Spinowitz explained that the patients in the Baron-Goldwasser study had chronic renal failure and were on dialysis. (Spinowitz 769:14-15; TRX 2004). Moreover, in a study on hamsters, included in the Baron-Goldwasser IND submission, an increase in hematocrit was observed. (Spinowitz 770:17-771:25; TRX 2004). Furthermore, the Eschbach sheep study (TRX 2032) showed an increase in hematocrit. (Spinowitz 782:11-18).<br><br>Dr. Bertozzi also opined that claim 11 would be obvious over the prior art. (Bertozzi 1053:13-1054:16). |

| U.S. PATENT NO. 5,547,933 CLAIM 12 | | |
|---|---|---|
| **Claim Limitations** | **Court's Construction** | **Invalidating References** |
| A pharmaceutical composition comprising an effective amount of glycoprotein product effective for erythropoietin therapy according to claim 7 and a pharmaceutically acceptable diluent, adjuvant or carrier. | a composition suitable for administration to humans, containing a diluent, adjuvant or carrier<br><br>A therapeutically effective amount is one that elicits any one or all of the effects often associated with in vivo biological activity of natural EPO, such as those listed in the specification, column 33, lines 16 through 22, stimulation of reticulocyte response, development of ferrokinetic effects (such as plasma iron turnover effects and marrow transit time effects), erythrocyte mass changes, stimulation of hemoglobin C synthesis and, as indicated in Example 10, increasing hematocrit levels in mammals | In order for Drs. Baron and Goldwasser to administer the human erythropoietin, as a pharmaceutical composition to the clinical trial patients, they first requested permission from the FDA in the form of an IND. (Spinowitz 703:13-704:1, TRX 2004). In the IND, where the form asks for the drug's name, the sponsor wrote in "human erythropoietin." (Spinowitz 706:9-11, TRX 2004)). Also, the pharmaceutical composition's name was "human erythropoietin" in the label affixed to the vials containing that contained it. (Spinowitz 707:1-9, IND (TRX 2004)).<br><br>Dr. Spinowitz discussed the Baron-Goldwasser clinical study and explained that Dr. Baron considered his human erythropoietin to be a pharmaceutical composition that suitable for human administration. (Spinowitz 705:20-706:1). He explained that the hormone was diluted in normal serum albumin, which is a diluent. (Spinowitz 707:23-708:1, 708:12-16).<br><br>Dr. Spinowitz noted that in the study, human erythropoietin showed increased reticulocytes, increased numbers of nucleated red blood cells and decreased radio iron. (Spinowitz 711:3-17-23; 712:2-12, 713:17-19; Baron 671:8-21; TRX 2049, 2004, 2045).<br><br>Dr. Spinowitz, using his experience as a clinician treating patients with kidney disease, examined Dr. Baron's data and agreed with Dr. Baron, concluding "there was indeed evidence of a therapeutic response." (Spinowitz 713:17-714:3). Similarly, Dr. Goldwasser drew the same conclusion. (TRX 2045; Spinowitz 718:15-22, 719:7-18). Dr. Spinowitz concluded, after examining the data, that there was an increase in reticulocytes and ferrokinetic effects, among other indicia of therapeutic effectiveness. (Spinowitz 715:19-716:19, 725:17-25; TRX 2045). Indeed, even Amgen relied on this study in its IND to show that EPO had been shown to be therapeutically effective. (TRX 2054; Spinowitz 790:24-791:9, 792:3-5, 792:21-23). |

| U.S. PATENT NO. 5,547,933 CLAIM 12 | | |
| --- | --- | --- |
| **Claim Limitations** | **Court's Construction** | **Invalidating References** |
| | | Dr. Spinowitz also discussed Dr. Eschbach's 1984 EPO-rich plasma study, in which Dr. Eschbach administered a pharmaceutical composition (i.e. the EPO-rich plasma) to patients. (Spinowitz 743:1-9). Dr. Eschbach observed an increase in reticulocytes and the movement of iron into new red blood cells (i.e. ferrokinetic effects). (Spinowitz 748:19-749:5). Dr. Spinowitz explained that the study had confirmed that what they had previously seen in sheep (TRX 2032) would translate to humans. (Spinowitz 749:6-11, 750:19-751:6). Indeed, Amgen also relied on Eschbach's sheep study in its IND submission to demonstrate predictability as to the therapeutic effectiveness of its drug product. (TRX 2054; Spinowitz 794:19-22, 796:23-797:5).<br><br>Dr. Spinowitz also discussed clinical studies by Dr. Essers in the early to mid 1970s using an EPO-rich plasma, which Dr. Spinowitz explained is a pharmaceutical composition. (Spinowitz 752:19-753:6, 759:21-24). Dr. Essers' studies showed an increase in reticulocyte response. (759:15-17, 760:12-15).<br><br>Dr. Lowe explained that a diluent, adjuvant, or carrier are "the components that you add to the protein and maybe put in a vial, stabilizes it, keeps it alive, biologically active." (Lowe 296:2-7). A pharmaceutical reference manual from 1980 shows that creating compositions with diluents, adjuvants or carriers was well known in 1983-84. (Lowe 296:24-297:2; Remington's Pharm. Sci., 16th ed. (1980) (TRX 2031)).<br><br>Dr. Lowe also explained that the tPA patents disclose a therapeutically effective pharmaceutical composition comprising tPA and a pharmaceutically acceptable carrier vehicle. (Lowe 283:4-20; TRX 2029, 2030).<br><br>Dr. Lowe testified that this claim would be obvious to one of skill in the art. (Lowe 300:20-22). |

**EXHIBIT B**

| U.S. PATENT NO. 5,547,933 CLAIM 12 | | |
| --- | --- | --- |
| **Claim Limitations** | **Court's Construction** | **Invalidating References** |
| | | Dr. Spinowitz testified that in view of the prior art, claim 12 of the '933 would be invalid for obviousness. (Spinowitz 801:2-8).<br><br>Moreover, Dr. Bertozzi opined that claim 12 of the '933 would be invalid as anticipated and obvious over the prior art. (Bertozzi 1049:12-1050:7, 1052:3-1053:12). |

| U.S. PATENT NO. 5,547,933 CLAIM 14 | | |
| --- | --- | --- |
| **Claim Limitations** | **Court's Construction** | **Invalidating References** |
| A method for treating a kidney dialysis patient which comprises administering a pharmaceutical composition of claim 12 in an amount effective to increase the hematocrit level of said product. | | Dr. Lowe explained that the 1984 Eschbach paper (TRX 2032) taught that "Ep therapy should be effective in treating the anemia of CRF in humans." (Lowe 298:5-11). "[C]hronic renal failures means that the kidneys have failed, they're unable to perform the filtration functions, and that means that the patients with CRF must be on dialysis." (Lowe 298:24-299:4). |
| | | Dr. Baron testified that following administration of his pharmaceutical composition, hematocrit numbers went up. (Baron 672:6-18). |
| | | Dr. Lowe testified that this claim would be obvious to one of ordinary skill in the art. (Lowe 300:23-301:1). |
| | | Similarly, Dr. Spinowitz testified that based on the prior art, claim 14 would be invalid as obvious. (Spinowitz 779:4-9). Dr. Spinowitz explained that the patients in the Baron-Goldwasser study had chronic renal failure and were on dialysis. (Spinowitz 769:14-15; TRX 2004). Moreover, in a study on hamsters, included in the Baron-Goldwasser IND submission, an increase in hematocrit was observed. (Spinowitz 770:17-771:25; TRX 2004). Furthermore, the Eschbach sheep study (TRX 2032) showed an increase in hematocrit. (Spinowitz 782:11-18). |
| | | Dr. Bertozzi also opined that claim 14 would be obvious over the prior art. (Bertozzi 1053:13-1054:16). |

| U.S. PATENT NO. 5,955,422 CLAIM 1 | | |
| --- | --- | --- |
| **Claim Limitations** | **Court's Construction** | **Invalidating References** |
| A pharmaceutical composition comprising a therapeutically effective amount of human erythropoietin and a pharmaceutically acceptable diluent, adjuvant or carrier, wherein said erythropoietin is purified from mammalian cells grown in culture. | a composition suitable for administration to humans, containing a diluent, adjuvant or carrier<br><br>A therapeutically effective amount is one that elicits any one or all of the effects often associated with in vivo biological activity of natural EPO, such as those listed in the specification, column 33, lines 16 through 22, stimulation of reticulocyte response, development of ferrokinetic effects (such as plasma iron turnover effects and marrow transit time effects), erythrocyte mass changes, stimulation of hemoglobin C synthesis and, as indicated in Example 10, increasing hematocrit levels in mammals<br>A protein having the amino acid sequence of human EPO, such as the amino acid sequence of EPO isolated from human urine<br><br>obtained in substantially homogeneous form from the mammalian cells, using the word from in the sense that it originates in the mammalian cells, without limitation to it only being directly out of the interior of the cells, which have been grown in the in vitro | In order for Drs. Baron and Goldwasser to administer the human erythropoietin, as a pharmaceutical composition to the clinical trial patients, they first requested permission from the FDA in the form of an IND. (Spinowitz 703:13-704:1, TRX 2004). In the IND, where the form asks for the drug's name, the sponsor wrote in "human erythropoietin." (Spinowitz 706:9-11, TRX 2004)). Also, the pharmaceutical composition's name was "human erythropoietin" in the label affixed to the vials containing that contained it. (Spinowitz 707:1-9, IND (TRX 2004)).<br><br>Dr. Spinowitz discussed the Baron-Goldwasser clinical study and explained that Dr. Baron considered his human erythropoietin to be a pharmaceutical composition that suitable for human administration. (Spinowitz 705:20-706:1). He explained that the hormone was diluted in normal serum albumin, which is a diluent. (Spinowitz 707:23-708:1, 708:12-16).<br><br>Dr. Spinowitz noted that in the study, human erythropoietin showed increased reticulocytes, increased numbers of nucleated red blood cells and decreased radio iron. (Spinowitz 711:3-17-23; 712:2-12, 713:17-19; Baron 671:8-21; TRX 2049, 2004, 2045).<br><br>Dr. Spinowitz, using his experience as a clinician treating patients with kidney disease, examined Dr. Baron's data and agreed with Dr. Baron, concluding "there was indeed evidence of a therapeutic response." (Spinowitz 713:17-714:3). Similarly, Dr. Goldwasser drew the same conclusion. (TRX 2045; Spinowitz 718:15-22, 719:7-18). Dr. Spinowitz concluded, after examining the data, that there was an increase in reticulocytes and ferrokinetic effects, among other indicia of therapeutic effectiveness. (Spinowitz 715:19-716:19, 725:17-25; TRX 2045). Indeed, even Amgen relied on this study in its IND to show that EPO had been shown to be therapeutically effective. (TRX 2054; Spinowitz 790:24-791:9, 792:3-5, 792:21-23). Dr. Spinowitz |

| U.S. PATENT NO. 5,955,422 CLAIM 1 | | |
| --- | --- | --- |
| **Claim Limitations** | **Court's Construction** | **Invalidating References** |
| | culture | concluded that the Baron-Goldwasser study would render claim 1 of the '422 patent invalid for obviousness and anticipation. (Spinowitz 720:7-14).<br><br>Dr. Spinowitz also discussed Dr. Eschbach's 1984 EPO-rich plasma study, in which Dr. Eschbach administered a pharmaceutical composition (i.e. the EPO-rich plasma) to patients. (Spinowitz 743:1-9). Dr. Eschbach observed an increase in reticulocytes and the movement of iron into new red blood cells (i.e. ferrokinetic effects). (Spinowitz 748:19-749:5). Dr. Spinowitz explained that the study had confirmed that what they had previously seen in sheep (TRX 2032) would translate to humans. (Spinowitz 749:6-11, 750:19-751:6). Indeed, Amgen also relied on Eschbach's sheep study in its IND submission to demonstrate predictability as to the therapeutic effectiveness of its drug product. (TRX 2054; Spinowitz 794:19-22, 796:23-797:5). Dr. Spinowitz concluded that this study would render claim 1 invalid by virtue of obviousness. (Spinowitz 751:17-20).<br><br>Dr. Spinowitz also discussed clinical studies by Dr. Essers in the early to mid 1970s using an EPO-rich plasma, which Dr. Spinowitz explained is a pharmaceutical composition. (Spinowitz 752:19-753:6, 759:21-24). Dr. Essers' studies showed an increase in reticulocyte response. (759:15-17, 760:12-15). Dr. Spinowitz concluded that claim 1 is rendered invalid by anticipation and obviousness based on these studies. (Spinowitz 761:15-22).<br><br>Dr. Lowe also explained that the tPA patents disclose a therapeutically effective pharmaceutical composition comprising tPA and a pharmaceutically acceptable carrier vehicle. (Lowe 283:4-20; TRX 2029, 2030). |

| U.S. PATENT NO. 5,955,422 CLAIM 1 | | |
| --- | --- | --- |
| **Claim Limitations** | **Court's Construction** | **Invalidating References** |
| | | Dr. Lowe explained that a diluent, adjuvant, or carrier are "the components that you add to the protein and maybe put in a vial, stabilizes it, keeps it alive, biologically active." (Lowe 296:2-7). A pharmaceutical reference manual from 1980 shows that creating compositions with diluents, adjuvants or carriers was well known in 1983-84. (Lowe 296:24-297:2; Remington's Pharm. Sci., 16th ed. (1980) (TRX 2031)). |
| | | The law is clear that source limitations cannot distinguish a claim over the prior art unless the source imparts unique structure to the product. *SmithKline Beecham Corp.*, 439 F.3d at 1317; *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d at 1354 n.20. Amgen bears the burden of proving by "convincing" evidence that the prior art urinary EPO has a different structure than EPO grown in culture. *In re Moeller*, 117 F.2d at 567. Amgen has offered no such evidence, and indeed Dr. Bertozzi testified directly to the contrary: "[N]othing distinguishes them. The EPO that comes from mammalian cells in culture is the same, the molecules are the same as Goldwasser's EPO." (Bertozzi 988:19-21, 999:17-21). |
| | | Moreover, the ITC has found that: "There appear to be no differences in the secondary structure of EPO produced in a CHO cell versus EPO produced in a human kidney cell." (TRX 2012.682). Similarly, the ITC has found that: "Based on extensive testing and carbohydrate analysis, the researchers at Genetics Institute were unable to find any significant differences between the carbohydrate structure of urinary erythropoietin versus recombinant erythropoietin." (TRX 2012.682). The ITC has also found that: "In terms of biological function. i.e., having the same effect on causing red cells to be produced in the body, recombinant EPO and natural EPO are the same." (TRX 2012.683). |

| U.S. PATENT NO. 5,955,422 CLAIM 1 | | |
|---|---|---|
| **Claim Limitations** | **Court's Construction** | **Invalidating References** |
| | | Dr. Bertozzi explained that "[c]laim 1 of the '422 patent ... includes Dr. Goldwasser's EPO." (Bertozzi 1020:1-4). Dr. Bertozzi also explained that she reviewed data showing that EPO made by mammalian cells is identical in size (apparent molecular weight) to Dr. Goldwasser's EPO. (Bertozzi 1028:17-25).<br><br>The similarity between Dr. Goldwasser's EPO and EPO made in mammalian cells was established by numerous publications, including:<br>• Amgen's PLA (TRX 2056; Bertozzi 1032:7-1033:1; TRX 2057; Bertozzi 1034:5-17, 1036:20-1037:9)<br>• A 1986 publication by Amgen scientists Egrie, Strickland, Lin and Browne, among others (TRX 2058; Bertozzi 1039:14-18)<br>• Another 1986 publication by Amgen scientists Egrie, Strickland, Lin and Browne, among others (TRX 2059; Bertozzi 1042:6-18)<br>• A 1984 presentation by Dr. Egrie (TRX 2060; Bertozzi 1043:23-1044:22)<br>• A 1985 publication by Amgen scientists Egrie, Browne, Lin and Lai (TRX 2061; Bertozzi 1045:23-1046:1)<br>• A 1988 publication by Amgen scientists Vapnek, Egrie, Browne, Lin and Strickland, among others (TRX 2062; 1047:7-14).<br><br>Dr. Lowe testified that based on the prior art, a person of ordinary skill would have found claim 1 of the '422 patent to be obvious. (Lowe 303:22-304:1).<br><br>Similarly, Dr. Spinowitz testified that claim 1 of the '422 patent is invalid as anticipated and obvious over the prior art. (Spinowitz 702:12-17, 761:15-22, 800:1-15).<br><br>Moreover, Dr. Bertozzi testified that claim 1 of the '422 patent would be invalid as obvious over the prior art. (Bertozzi 1055:9-19). |