# EXHIBIT G

Dockets.Justia.com





Docket 100/164-U.S.

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of:          )
                               )
DAVID V. GOEDDEL ET AL.        )        Group Art Unit: 127
                               )
Serial No. 06/483,052          )
                               )        Examiner:  J. Huleatt
Filed: April 7, 1983           )
                               )
For: HUMAN TISSUE              )
     PLASMINOGEN ACTIVATOR     )
_____)

RECEIVED

NOV 1 4 1985

GROUP 120

A M E N D M E N T

Honorable Commissioner of Patents and Trademarks
Washington, D.C.  20231

Sir:

        This is in response to the Official Action mailed 22
April 1985.  The request for extension of time submitted herewith
extends the time for response three months to 22 October 1985.
Please amend this application in the following respects:

In the Specification

        On page 1, line 29, between "quantity" and "material"
insert --of--.

        On pages 4 and 17, relocate the paragraph bridging lines
17 and 23 on page 4 to the location between lines 23 and 25 on
page 17.

On page 5, line 8, replace "remainder" with
--remaining--.

On page 5, replace line 22 with --In practice, through
the use of recombinant DNA technology, one can express--.

*B1*

On page 7, change line 29 to read as follows: --Figure 1
shows a 10% sodium dodecylsulfate polyacrylamide gel
electrophoresis (SDS PAGE) of $^{35}$S-methionine labelled proteins--

*B2*

On page 7, line 30, replace "extracted" with
--secreted--.

On page 8, line 1, before "colonies" insert
--bacterial--.

On page 8, line 15, before "cells" insert --E. coli--.

On page 8, line 24, cancel "transformed".

On page 14, line 6, replace "pBR 322" with  --pBR322--.

On page 14, line 25, correct the spelling of
"prokaryotes".

On page 16, line 20, correct the spelling of "provided".

On page 17, line 9, correct the spelling of "necessary".

on page 17, line 10, replace "resistant" with
--deficient--.

On page 17, line 12, cancel the second occurrence of
"are".

On page 17, line 18, before "trp" insert --lac and--.

On page 17, line 27, replace "wall" with --membrane--.

On page 19, line 4, after "ampicillin" insert --or
tetracycline--.

On page 20, line 29, after "DNA" insert --encoding t-PA--.

On page 21, line 13, after "pg" insert --per cell per day--.

On page 21, lines 15 and 16, after "units" insert --per cell per day--.

On page 22, line 28, replace "acrylamide gel" with --PAGE--.

On page 23, line 7, after "the" and before "electrophoresis" insert --gel--.

On page 27, line 21, replace "for 24°" with --at 24°--.

On page 28, line 26, change "(51)", to --(54)--.

On page 32, line 23, after "<u>infra.</u>", replace "Clone 25E10" with --The cDNA insert of clone 25E10 (plasmid pPA25E10)--.

On page 35, line 13, cancel "the cDNA clone".

On page 35, line 14, replace "RSA" with  --Rsa--.

On page 35, line 29, replace "clone" with --cDNA of --.

On page 35, line 35, replace "clone p25E10" with --plasmid pPA25E10--.

On page 37, line 15, change "asn$_{184}$" (second appearance) to --asn$_{218}$--.

On page 38, line 23, replace "shown" with a comma.

On page 44, line 15, after "1983," insert --corresponding to European Patent Application Publ. No. 117,060,--.

On page 44, lines 19 and 23, replace "pΔRIPA°" with
--pt-PAtrp12--.

On page 44, line 32, after "1981," insert

*B4*

--corresponding to European Patent Application Publ. No.
73,656,--.

On page 45, lines 29 and 31, change "tPA" to --t-PA--.

On page 46, line 4, replace "pEdPAER400" with
--pETPAER400--.

On page 46, line 27, replace "D.1.K.1.b" with
--E.1.K.1.b--.

On page 47, line 23, cancel "a" and after "plasmid"
insert --pETPFR was constructed--.

On page 47, line 24, cancel ", pETPFR, was constructed".

On page 47, line 25, replace "C.1.A." with --E.2.A.--.

On page 47, line 27, after "100/92" insert --, U.S.

*B5*

Serial No. 459,152, filed 19 January 1983, corresponding to

*now U.S. Patent No. 4,713,339 issued December 15, 1987,*

European Patent Application Publ. No. 117,058, incorporated
herein by reference, --.

On page 48, line 10, replace "best" with --most
strongly--.

On page 48, line 12, replace "D.2.C." with
--E.1.K.1.b.--.

On page 55, line 3, in reference 35, replace "(198 )"
with --(1980)--.

In Figure 11, upper left corner, replace "pΔR1PA°" with
--pt-PAtrp12--.

-4-

In the Claims

B6          1.  (amended).  Recombinant human [Human] tissue
plasminogen activator essentially free of other proteins of human
origin.

B7          3.  (amended).  Human tissue plasminogen activator as
produced by recombinant host cells.

            4.  (amended).  Biologically active human [Human] tissue
plasminogen activator in essentially pure form unaccompanied by
protein with which it is ordinarily associated.

            5.  (amended).  Human tissue plasminogen activator
according to Claims 1-4 containing a sequence of a polypeptide
[extending from] preceding the N-terminus of the ordinarily first
amino acid of said human tissue plasminogen activator.

            Please add the following claims:

B8          -- 16.  A cell culture according to Claim 9, obtained by
transforming a mammalian cell line.

            17.  A process according to Claims 14 or 15 wherein the
host cell is a mammalian cell line. --.

-5-

<u>Remarks</u>

An Abstract of the Disclosure is enclosed with this response.

A Notice of Art cited by Applicant PTO-1449, is also enclosed. This form lists those references which have been cited in search reports obtained in various foreign counterparts of the present application. The submission of PTO-1449 does not constitute an assertion that a complete or fastidious search has been made. The more germane of these references deal with the purification to a degree from natural sources of plasminogen activator compounds or plasminogen activator activity. One reference which is considered relevant is European Patent Application Publn. No. 41766 which was published on 16 December 1981. That patent application is based upon the research underlying Reference R cited by the Examiner, namely, Rijken and Collen which appeared in the <u>Journal of Biological Chemistry</u> <u>256</u>, 7035 (1981). Discussion of the patentability of the present invention over that disclosure follows. The remaining references on the enclosed list have either been cited by the U.S. Examiner or are believed to be no more relevant than those already of record and under which rejection has been made. Copies of these references are enclosed for convenience.

Formal drawings also accompany this response. It is noted that Figure 11 has been amended in these formal drawings in

-6-

line with the amendment given above to Figure 11, whose purpose
is to correct the informal drawings in order to conform with the
formal set.

Applicants and their attorney have critically reviewed
the specification and claims. The amendments to the
specification are for the purpose of correcting certain minor
errors, improving textual quality, and correcting certain other
inaccuracies which were inadvertently incorporated into the text
when the application was prepared for filing. For the most part,
these amendments are merely editorial in nature and require no
extensive discussion. For example, on page 17, the addition of a
reference to the lac promoter conforms with Figure 6. On page
19, line 4, the addition of tetracycline resistance as a
selection marker conforms with Figure 9. The addition of "per
cell per day" on page 21 merely continues recitation of these
limitations from the first disclosure on line 12. The amendment
on page 32 clarifies how the plasmid pPA25E10 (see line 31 on
page 32) was prepared by using the cDNA found in a positive
colony which was identified as 25E10 – see Figure 3. The
amendment correcting the glycosylation site on page 37 line 15 is
supported by Figure 12 where the four potential sites are
indicated by the Z–shaped lines extending from the four ASN amino
acids and by Figure 5b. Similarly, the amendments on pages 46,
47 and 48 correctly reference the assay procedure for the
detection of the tissue plasminogen activator, and the correct
vector construction example. There is no Section D.1.K.1.b,

-7-

C.1.A or D.2.C. in the specification.

That plasmid pt-PAtrp12 was intended instead of plasmid pΔRIPA° on page 44, lines 19 and 23, and in Figure 11, can be verified from the text describing the various DNA fragments removed from the three vectors, in conjunction with Figures 5, 6 and 9.

Plasmid pt-PAtrp12 contains the entire DNA sequence encoding t-PA, but lacks the leader sequence, as can be seen from Figure 9. Since the insertion of the DNA sequence encoding the leader could not conveniently be accomplished by direct insertion into pt-PAtrp12, the required vector was constructed from three fragments obtained from plasmids containing overlapping DNA sequences.

Example E.2 describes the preparation of full-length tissue plasminogen activator from transfected CHO cell culture. The vector thus contained the entire coding sequence for the mature molecule and its leader sequence, enabling the production of the mature molecule by secretion, during which the leader amino acid sequence is cleaved away. In the construction of this vector, three fragments supplied the requisite DNA.

The fragment generated from plasmid pPA17 contains 5' untranslated sequences and the coding region for the 35 amino acid leader and first six amino acids of the mature tissue

-8-

plasminogen activator molecule, namely, the "5' terminal t-PA
sequence" as set forth on page 37, lines 2 to 5 and on line 22 on
page 44 of the specification.  The fragment terminates at its
subcut Pst I site which is the first nucleotide (A) of the codon
encoding the amino acid arg at the 7-position of the sequence for
tissue plasminogen activator.  This fragment contains approxi-
mately 200 base pairs, as disclosed in the specification on page
44, line 21 and as also can be seen from Figure 5A.  Plasmid
pPA17, therefore, supplied the DNA encoding the leader and the
first six amino acids of t-PA.

    The approximately 1645 base pair DNA fragment obtained
from plasmid pPA25E10 by digestion with Nar I and Bgl II contains
the DNA coding sequence of t-PA extending from the codon encoding
amino acid 111, plus one nucleotide (C) thus forming the Nar I
site, through part of the 3' untranslated region.  Thus, pPA25E10
supplied the DNA encoding amino acids 111 through 527 of tissue
plasminogen activator.  Figure 9 of the specification illustrates
this.

    The DNA encoding amino acids 7 through 110 was supplied
by the remaining fragment.  By calculation and reference to
Figures 5A and 9, the total number of base pairs for this region
is exactly 310, the number referred to in line 24 of page 44 of
the specification.

    Plasmid pΔRIPA° contains DNA encoding only from amino

-9-

acid 69 of t-PA onwards.  This can be seen from Figure 6 and the specification on pages 33, lines 9 and 10, and 34, lines 8 to 12. Therefore, this plasmid could not be the source for the region of DNA encoding amino acids 7 through 110.  Only plasmid pt-PAtrp12 could be the requisite source.

Plasmid pt-PAtrp12 contains the full length tissue plasminogen activator cDNA.  The 310 base pair fragment generated by the Pst I-Nar I digestion called for in the specification on page 44, line 23, encodes amino acids 7 through 110.  The Nar I site representing amino acid 110 (gly) is clearly shown in Figure 9.  Although the Pst I site at the DNA encoding amino acids 6 and 7 is not explicitly designated in Figures 5A and 9, it is present, as shown below:

```
          5    6    7    8

         ile  cys  arg  asp

         ATC  TGC  AGA  GAT

         TAG  ACG  TCT  CTA

              Pst I
```

Because the pΔRIPAº plasmid could not supply the DNA encoding amino acids 7 through 110, it is plain that what was intended on page 44, lines 19 and 23 was a reference to pt-PAtrp12 which contains, between the specified restriction sites, the required DNA fragment encoding these amino acids.  It,

-10-

and not DNA from pΔRIPAᵒ, when ligated with the 1645 base pair
fragment from pPA25E10, encoding amino acids 111 to 527, and with
the approximately 200 base pair fragment from plasmid pPA17,
encoding the leader sequence and first six amino acids of the
mature tissue plasminogen activator molecule, provided the entire
coding sequence for full length tissue plasminogen activator.
The designation of plasmid pΔRIPAᵒ on page 44 was an error that
was carried over into Figure 11.

　　　　To the extent that the foregoing amendments may not be
considered merely editorial in nature, it is submitted that any
added or corrected information was inherent in the specification
as filed and does not constitute new matter.  It is respectfully
requested that these amendments be entered for the purpose of
clarifying and correcting the specification.

　　　　The amendments to the claims have been made for the
purpose of further clarification of that which Applicants regard
as their invention.  The amendments to Claims 1 and 3 to 5 are
offered in the belief that the Examiner should and will
reconsider and withdraw the restriction requirement.  However,
notwithstanding the fate of the restriction requirement, it is
respectfully requested that these claim amendments be entered for
the above stated purpose.

　　　　The amendment to Claim 1 clearly specifies that the
human tissue plasminogen activator of the present invention is a

-11-

recombinant human tissue plasminogen activator as distinguished
from that protein obtained in the prior art from natural source.
Claim 4 further distinguishes Applicants' product by the phrase
"unaccompanied by protein with which it is ordinarily
associated", thus providing verbal distinctions corresponding to
actual differences from the material of the prior art.
"Biologically active" is added so as to make explicit the very
result that Applicants observed upon isolation and testing of the
human tissue plasminogen activator of the present invention,
viz., activity as a fibrinolytic agent.

Support for the claim amendments is replete in the
specification both explicitly and implicitly.  For example, the
term "recombinant human tissue plasminogen activator" can be
found in the paragraph bridging lines 8 to 14 on page 13, and the
language of amended Claim 4 finds support in the paragraph
bridging lines 11 to 14 on page 11 as well as in the results of
the bioassay procedure given in Tables 1 and 2 on page 43 of the
specification.  Support for new Claims 16 and 17 can be found in
Section B of the specification bridging pages 13 to 17, and in
particular in the paragraph bridging pages 15 and 16, and in the
specifically exemplified use of a Chinese hamster ovary (CHO)
cell line on page 46 of the specification.

Referring now specifically to the Official Action mailed
22 April 1985 (Paper no. 13), the first matter concerns the
propriety of the restriction requirement made under 35 U.S.C.

-12-

112.  The restriction requirement established two groups of
claims: Group I,  Claims 1 to 5 and 11 to 13; Group II,  Claims 6
to 10, 14 and 15.  (It is noted that the Official Action
obviously intended to refer to claims 6 to 10 along with 14 and
15 for the claim Group II.).  This requirement is respectfully
traversed.  However, in order to be responsive, Applicants
confirm the provisional election of Group II.

The claims of the present application cover different
aspects of a single inventive concept.  If a first patent were to
issue on the process claims of Group II, then under 35 U.S.C.
121, no double patenting issue would arise on a patent issuing
later on the remaining subject matter.  However, a later patent
directed to the products of the claims of Group I could
effectively bar the practice of the processes of the claims of
Group II, even though the patent claiming such processes had
already expired.  It is submitted that this situation makes
untenable a holding of divisible subject matter.  The Examiner's
assertion in support of the restriction requirement to the
contrary notwithstanding, there is not, in the prior art, an
alternative process for producing products having the degree of
purity of those claimed in the present invention.

Moreover, a search of the subject matter encompassing
all of the claims would not represent an undue burden on the
Patent and Trademark Office.  In fact, a complete search
sufficient to constitute a full examination of either of the two

-13-

groups as defined in the Official Action would necessarily extend
to all of the claimed subject matter.

It is therefore respectfully requested that the
restriction requirement be reconsidered and withdrawn.

The objection to the specification under 35 U.S.C. 112
is based upon an assertion that certain starting plasmids must be
deposited in order for Applicant to have provided an adequate
disclosure. The underlying assertion, it is respectfully
submitted, is incorrect and therefore the objection is respect-
fully traversed. For each of the plasmids referred to, an
adequate disclosure detailing preparation is provided. The
Examiner's attention is respectfully invited to the specification
on pages 34 to 37 where such disclosure for plasmid pPA17 is
provided, to page 38 where such disclosure for plasmid
pLeIFAtrp103 is provided (Reference 53; which provides a
description of its preparation; see also page 26, lines 29 to
31), page 33 where such disclosure for preparing pdeltaRlSRC is
provided (This plasmid designation is synonymous with pΔRIexsrc,
as can be seen by comparing the text on page 33, lines 18 to 32
with the extreme right portion of Figure 6.) and finally to page
32 where such disclosure for the preparation of plasmid pPA25E10
is provided. (The amendments to page 32 may help to clarify this
for the Examiner.)

In view of this complete disclosure that enables

-14-

construction of the plasmids, and further, in view of the disclosure of the complete DNA sequence encoding t-PA, which enables the construction of any of the foregoing plasmids by known techniques, Applicants maintain that a deposit is unnecessary. Indeed, a number of U.S. patents have issued in this field with very similar descriptions for the preparation of various plasmids, evidencing that the Patent Office does issue patents in this field without a requirement of deposit for recombinant organisms or recombinant plasmids where their production is otherwise enabled.

Applicants submit that the specification of the present application adequately enables, thus making deposit of plasmids unnecessary, given the detailed steps of how to prepare them. In view of these facts it is respectfully requested that this objection be reconsidered and withdrawn.

The claims are rejected under 35 U.S.C. 103 as "being unpatentable over Rijken et al. (R) or Rijken et al. (S) in view of Bollen et al. and Hung et al." This rejection is traversed for the following reasons:

The claims under rejection are directed to the various means for preparing human tissue plasminogen activator via recombinant DNA technology. Applicants were the first to have accomplished and enabled others to accomplish the identification and isolation of a DNA sequence encoding human tissue plasminogen

-15-

activator. This is therefore claimed in Claim 6.  This DNA
sequence was first employed by Applicants to provide replicable
expression vectors, producers in suitable host cells of the
tissue plasminogen activator via expression thereof.  Claim 7
covers such expression vectors.  Claim 8 claims two specific
expression vectors.  Claims 9 and 10 and new Claim 16 relate to
transformation of a host cell, such as a microorganism (e.g. E.
coli) or a cell culture (e.g. CHO line) with expression vectors
thus creating micro factories for producing the human tissue
plasminogen activator product.  Claims 14 and 15 cover this
entire sequence of steps by way of process claims.

        Prior to the present invention, recombinant DNA
technology had not been successfully employed to produce human
tissue plasminogen activator, nor was there any disclosure
sufficient to enable anyone to do so.  Applicants were the first
to produce, and teach the world how to produce, a biologically
functional human tissue plasminogen activator using recombinant
technology.

        None of the cited references, save U.S. Patent 4,370,417
(Hung et al.), contains any relevant disclosure of the use of
recombinant DNA technology.  Hence, they are not directly
applicable as references to the "recombinant claims" elected.
Moreover, to the extent that these references might provide a
disclosure of isolation from a natural source of a plasminogen
activator or of plasminogen activator activity, even the product

claims to this application that relate to recombinant tissue plasminogen activator, distinguish over what these references disclose.

Although Hung et al. profess to disclose the use of recombinant DNA technology to produce a plasminogen activator, the disclosure of Hung et al. is incapable of enabling the production of human tissue plasminogen activator.  The terminology of Hung et al. notwithstanding, that patent disclosure relates only to urokinase.  Urokinase is a protein which has been reported to have plasminogen activator-like activity, but it is clearly a distinct compound, not tissue plasminogen activator.  The tissue plasminogen activator protein of the present invention is structually, chemically and immunologically distinct from urokinase, and does not cross-react with antibodies raised against urokinase.  Further, urokinase has little or no binding affinity for fibrin, a characteristic feature of the human tissue plasminogen activator of the present invention and one which makes tissue plasminogen activator a highly superior product in clinical use.

More importantly, the Hung et al. disclosure is not enabling as to any plasminogen activator.  The Examiner's attention is respectfully directed to the four affidavits filed concurrently with this amendment in the names of Diane Pennica, Margaret Winkler, Herbert Heyneker and Ellson Chen.  These affidavits singly and collectively conclusively demonstrate that

-17-

the Hung et al. disclosure is inoperative even with respect to a method for producing the immunologically distinct urokinase protein. Applicants obtained a culture of the Hung et al. E. coli X1776 containing the purported "expression vector" pABB26. This culture, which is alleged to produce "urokinase", was deposited by Hung et al. in the ARS culture collection, U.S. Department of Agriculture, Peoria, Illinois under accession number B12122. Applicants and their colleagues undertook experiments to determine whether, in fact, the culture produced urokinase or any plasminogen activator activity. The four affidavits referred to summarize the results of these experiments.

The affidavit by Diane Pennica illustrates that the DNA insert of the Hung et al. patent has no restriction enzyme analysis pattern similar to the pattern displayed by either the authentic human tissue plasminogen activator gene or the urokinase gene. The affidavit by Margaret Winkler demonstrates that, in her hands, the material obtainable from the Hung et al. "expression vector" by following the disclosed procedure does not exhibit plasminogen activator activity, in contradistinction to the assertion made in Hung et al. The affidavit by Herbert Heyneker demonstrates that the DNA insert of the Hung et al. patent did not hybridize with probes prepared to detect DNA encoding either authentic human tissue plasminogen activator or urokinase. Finally, the Ellson Chen affidavit conclusively establishes that there is no identity or even similarity by way

—18—

of homology of the Hung et al. DNA insert to either authentic
human tissue plasminogen activator DNA or to human urokinase DNA.
Indeed, the sequence analysis of the Hung et al. DNA insert
indicates that there is no open reading frame in any of the six
possible. This means that there are frequent stop translation
codons scattered throughout the DNA insert so any translation
that were to occur would quickly terminate. It is interesting to
note that the sequence of the DNA insert of the Hung et al.
patent was also compared with a computer databank containing
virtually all of the reported DNA sequences to date, and there
was no homology to any of these. What sort of product, if any,
the DNA insert might encode remains a mystery.

        For all of the the above reasons, Hung et al. must be
eliminated as a basis for the rejection.

        This leaves the three references to Rijken et al. (R),
Rijken et al. (S) and Bollen et al. (T) for consideration.
However, as noted above none of these references provides even a
hint of relevant recombinant DNA technology that could affect the
instant claims. The Examiner's assertion that it "would be
obvious to utilize the methods of Hung et al....to produce a
human tPA made by recombinant techniques" falls as Hung et al. is
merely an erroneous prophetic disclosure.

        The Bollen et al. reference teaches far less than the
Examiner implies that it does. Contrary to the assertion that

-19-

this reference teaches the isolation of mRNA for urokinase, a
fair reading discloses that all that was taught was the
separation of a melange of mRNAs from other RNA present in human
kidney or human fetal kidney cells.  In vitro translation of the
mRNA mixture produced a mixture of proteins, some of which
behaved like urokinase in the assay system employed and were
immunoprecipitated with what were obviously not very specific
antibodies to urokinase.  (See, for example, the last column of
Table 1 which shows that significant amounts of
immunoprecipitable material were obtained even in the control
using globin mRNA.)  Even the authors refer to the allegedly
active material as "putative urokinase" or "urokinase-like
material", indicating considerable uncertainty as to the true
identity of the material.  Be that as it may, the authors give no
clue as to how the desired urokinase mRNA could be separated from
the mixture or how to use the mixture to prepare the cDNA that
would have to be inserted into an appropriate vector before
urokinase could be produced by recombinant techniques.  The most
that Bollen et al. reveal is that human kidney cells contain mRNA
that can be translated in vitro to produce a urokinase-like
material, hardly a disclosure that would render the present
invention obvious.

    The addition of Hung et al. to Bollen et al. provides no
more support to the rejection on obviousness than does a rubber
crutch to a man with a bad leg.  As was previously discussed and
as demonstrated by the accompanying affidavits, the Hung et al.

reference is utterly incapable of enabling the production of any
plasminogen activator.  Combining one reference that gives no
clue as to how one would obtain the requisite DNA with another
reference that demonstrably fails to enable the expression of DNA
encoding any plasminogen activator does not qualify as a patenta-
bility defeating combination.

        Given the knowledge of the existence of a tissue
plasminogen activator, it might be argued that it may have been
obvious to try to produce it by recombinant techniques.  But it
is now well established that obviousness to try is not the
standard of 35 U.S.C. 103.  See for example In re Goodwin, 198
U.S.P.Q. 1 (CCPA 1978) and In re Yates, 211 U.S.P.Q. 1149 (CCPA
1981).  In this respect, the Bollen et al. reference therefore is
of no consequence, just as the Hung et al. patent is of no
consequence, being directed at best to an immunologically
distinct protein the preparation of which cannot be repeated by
following its teachings.

        This leaves for consideration the two Rijken et al.
references.  Again, since these references in no way suggest a
product prepared by recombinant means, the provisionally elected
claims are patentable over these references, directed as these
claims are to recombinant DNA, expression vectors and cultures.
However, even the non-recombinant composition of matter claims of
the present invention are considered to be patentable over these
references for the following reasons:

-21-

Dealing first with Reference S, it is plain from the article itself that the body of knowledge that had existed prior to the Reference S method was voluminous and related to attempts to isolate a plasminogen activator. A large number of plasminogen activators characterized by many different molecular weights had been detected. However, this body of knowledge related primarily to disclosure of detection techniques, not isolation and purification of a plasminogen activator.

The work reported in Reference S went beyond the earlier work in that it represented an attempt to purify a plasminogen activator, i.e., that normally present in human uterine tissue. However, there is no evidence in Reference S that this was done for purposes other than merely increasing the available scientific knowledge of the characteristics of one plasminogen activator from among the many the existence of which had already been suggested and detected or that the material obtained was of sufficient purity to warrant clinical utilization.

Reference R reports the purification of human tissue plasminogen activator to a degree not achieved by Reference S or other prior art. This higher degree of purity made possible the preliminary evaluation of the thrombolytic properties of the purified tissue plasminogen activator.

However, the distinction that the claims of the present invention provide over Reference R is that the present invention

-22-

enables the first preparation of human tissue plasminogen
activator via recombinant means, thus enabling for the first time
the preparation of material which is substantially free of any
proteins with which it is ordinarily associated in its native
state.  Thus, while Reference R produced a much purer human
tissue plasminogen activator composition than Reference S, one
suitable for pharmaceutical testing, it was derived from a native
source, and because of limitations inherent in protein
purification methods, was apparently accompanied by some amount
of contaminants with which it is ordinarily associated.  The
present invention made possible for the first time a distinct
departure from this prior art by enabling the production of a
human tissue plasminogen activator which, because if does not
entail the use of human tissues, is substantially pure with
respect to unrelated proteins of human origin with which the
natural material would ordinarily be associated.

This invention clearly provides material of a purity
unattainable by the prior art and represents an invention which
was neither anticipated nor could be considered obvious from any
of the cited art.

In this regard, attention is specifically directed to
the concurrently filed affidavit of Stuart Builder that
demonstrates that the protein preparation of Reference R is
different from the preparation obtained via the means disclosed
in the present application in that it is associated with some

-23-

unidentified protein that is not found in preparations obtained
in accordance with the present invention.

The Examiner's attention is directed to the recent
decision of the Court of Appeals for the Federal Circuit, In re
Marosi, 218 U.S.P.Q. 289 (Federal Circuit, 1983), where the court
held that the claim language "essentially free of alkali metal"
defined a patentable invention over prior art which had larger
amounts of alkali metal.  In the present application, the prior
art preparation contains at least one protein that is not found
in the composition provided via the recombinant DNA technology of
the present invention, as demonstrated by the Builder affidavit.
The claim language in the present application distinguishes from
and is patentable over the prior art under the holding of In re
Marosi.

The desirability of producing human tissue plasminogen
activator does not ensure its achievability or enable one to
predict with a reasonable degree of confidence that it can be
achieved by "a person having ordinary skill in the art".  The
fact is that there is nothing in the art of record or in the
state of the art at the time the present invention was made that
would have taught anyone how to prepare recombinant tissue
plasminogen activator except in the most general terms that would
constitute the definition of an objective rather than the means
for attaining that objective.

-24-

The principal flaw in the Examiner's rejection, even as applied to the non-elected claims, is that there is no basis in the art of record for predicting with reasonable certainty that human tissue plasminogen activator could be expressed in a recombinant system, that it would be compatible with recombinant host cells, or that bioactive tissue plasminogen activator of a degree of purity enabled by the present invention could be produced by any practical means.

It would have been appreciated by those skilled in the art at the time this invention was made that the expression of human tissue plasminogen activator in transformed cells would be fraught with many potential difficulties. The art of recombinant DNA technology appears to be deceptively straightforward but is inherently unpredictable. A case in point is the Hung et al. patent, which appears to be based only on predictability and is clearly a prophetic disclosure but is, in fact, inoperative.

One of the reasons for not being able to reasonably predict the ability of a recombinant cell to successfully produce by expression a heterologous protein concerns the fate of foreign DNA in a host cell system. For example, it is not predictable that mRNA, if produced at all from such DNA, will be stable or that it will be accurately translated into a full-length protein. Even if it is, one cannot be certain that the protein will not be degraded by enzymes, either within the cell or extracellularly, or that the recombinant cell will properly fold the molecule

-25-

conformationally so that it will exhibit its desired biological
activity.  The human tissue plasminogen activator of the present
invention contains some 527 amino acids, with many potential
cleavage sites and some essential conformational requirements for
biological activity.  Thus, it would certainly have been
unpredictable before the fact that one could obtain by
recombinant DNA technology a biologically active protein such as
the one forming the basis of the present invention.  At the same
time, it is clear that only recombinant DNA technology can assure
that a human tissue plasminogen activator absolutely free of
unrelated proteins of human origin can be obtained.

In the absence of reasonable predictability in this
field, as discussed above, the art of record becomes at most a
mere invitation to experiment.  This is not an acceptable
obviousness standard according to judicial interpretation of
35 U.S.C. 103, as noted above.

The unpredictability in this field is underscored by the
difficulties the Applicants had to overcome before they could
achieve success in producing human tissue plasminogen activator
via recombinant DNA technology.  Numerous endeavors to obtain a
full length cDNA copy of tissue plasminogen activator messenger
RNA (mRNA) by the techniques usually employed resulted only in a
cDNA fragment that was still lacking the sequences encoding the
N-terminal amino acids.  Albeit a biologically active product was
encoded by the cDNA obtained, it was recognized that it was not

-26-

the full length t-PA protein.

In order to overcome this difficulty, a new approach was devised, one that involved the synthesis of numerous DNA oligonucleotide primers and probes and required the isolation of the gene encoding tissue plasminogen activator from the human chromosome. This work is described beginning on page 34 (Example E.1.H.) of the specification. A synthetic oligonucleotide 5' TTCTGAGCACAGGGCG 3' was used for priming the preparation of cDNA from a gel fractionated pool of mRNA's containing t-PA mRNA. The oligonucleotide that was successfully employed was chosen from the nucleotide sequence near the very end of the cDNA cloned in example E.1.F. (pPA25E10; page 31 of specification). Numerous other primers from regions contained in the clone of E.1.F. (not detailed in the specification) were apparently unable to produce cDNA longer than that described in E.1.F. Use of the synthetic oligonucleotide described above (see Example E.1.H.) allowed the synthesis of cDNA encoding the N-terminal region of t-PA beyond this point but then a new source of hybridization probe had to be obtained to identify the clone that contained the full length cDNA. As shown in the specification, in order to confirm that the resultant cDNA was indeed DNA from the N-terminus of t-PA and not some other DNA which fortuitously hybridized with the probe used in the priming, a genomic DNA probe had to be obtained and used. First it had to be determined that t-PA was encoded by a single unique gene and not a family of genes, in the human chromosome. That gene had to be cloned, analyzed by DNA

-27-

sequencing, and a portion from the N-terminal part had to be
obtained and used as a probe.  Applicants could not be sure that
the resultant cDNA obtained by using the oligonucleotide primer
indeed encoded the entire remainder of the N-terminus of t-PA,
particularly in view of the previous numerous failures to obtain
full length DNA.  Fortunately, as can be seen from the
specification (see E.1.H.), the strategy employed did lead to a
successful synthesis of the N-terminal portion of t-PA cDNA gene
and the production of full length t-PA itself.

        Even with the approach that ultimately proved
successful, an enormous effort was still required.  In all, a
total of over 20,000 recombinant clones were produced with a
number of primers and tested with various probes.  (These
numerous failed experiments are not detailed in the
specification.)  As can be seen from the specification,
approximately 1,500 transformants were obtained with the primer
described in E.1.H.  Of these clones, only 18 contained a t-PA
DNA sequence hybridized with the probe obtained from a human
genomic DNA library.  (See specification page 36, line 32.)  Only
seven of these hybridized with the oligonucleotide used as the
primer, and one clone (pPA17) was shown to contain the correct 5'
N-terminal region of tissue plasminogen activator, a signal
leader sequence and an 84 bp 5' untranslated region.  Only by
combining the two clones, pPA25E10 and pPA17 could the entire

-28-

cDNA gene coding for the t-PA gene be constructed.  This work
which resulted in obtaining full length cDNA encoding t-PA is
detailed on pages 34-37 of the specification.

— — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — —

     The results of human clinical trials for human tissue
plasminogen activator reflect enormous success in arresting heart
attacks in progress, underscoring the inference that the lives of
a number of heart attack victims have been saved, and has
prompted such headlines as:

          "New Heart Attack Drug Acclaimed".*

     This success was made possible by the invention of the
present Applicants.


     The significance of the contribution made by the
Applicants of the present invention is best judged not by a
hindsight reconstruction of the prior art, but by the
contemporaneous judgement of those skilled in the relevant art.
Dr. Diane Pennica, one of the coinventors of the present
invention, presented a paper disclosing the work at an
international scientific meeting.  At the end of her
presentation, she received a standing ovation from those present.
Clearly, they didn't believe that the accomplishment was obvious.


*The Miami News, 12 November 1984.


                              -29-

For all of the foregoing reasons, it is respectfully submitted that the present invention represents a significant and patentable advance in the art and that the present application is allowable.  An early notice to that effect is respectfully requested.

                                    Respectfully submitted,

                                    GENENTECH, INC.

                                    By
                                        Walter H. Dreger
                                        Reg. No. 24,190

October 21, 1985
460 Point San Bruno Boulevard
South San Francisco, California 94080
(415) 952-1000; X6764

L007.48b

I hereby certify that this correspondence is being deposited with the United States Postal Service as first class mail in an envelope addressed to: Commissioner of Patents and Trademarks, Washington, D.C. 20231 on 21 Oct. 85

Walter H. Dreger
Name of Applicant, assignee or Attorney/representative

21 Oct. 85
Date of Signature

                                    -30-

Docket 100/164-U.S.

## ABSTRACT OF DISCLOSURE

Human tissue plasminogen activator (t-PA) is produced in useful quantities using recombinant DNA techniques.   The invention disclosed thus enables the production of t-PA free of contaminants with which it is ordinarily associated in its native cellular environment.   Methods, expression vehicles and various host cells useful in its production are also disclosed.

INFORMATION DISCLOSURE CITATION
(Use several sheets if necessary)

| | | |
|---|---|---|
| ATTY. DOCKET NO. | 100/164 | SERIAL NO. 06/483,052 |
| APPLICANT | DAVID V. GOEDDEL ET AL. | |
| FILING DATE | April 7, 1983 | GROUP 127 |

[stamp: MAIL ROOM OCT 28 1985]

## U.S. PATENT DOCUMENTS

| EXAMINER INITIAL | PATENT NUMBER | DATE | NAME | CLASS | SUBCLASS | FILING DATE IF APPROPRIATE |
|---|---|---|---|---|---|---|
| JAH | 4 2 4 5 0 5 1 | Jan. 13, 1981 | Reich et al. | 435 | 212 | |
| JAH | 4 3 1 7 8 8 2 | March 2, 1982 | Horiguchi et al. | 435 | 212 | |
| JAH | 4 3 1 4 9 9 4 | Feb 9, 1982 | d'Hinterland et al. | 424 | 95 | |
| JAH | 3 9 0 4 4 8 0 | Sept. 9, 1975 | Hull et al. | 435 | 212 | |

[stamp: RECEIVED NOV 14 1985 GROUP 120]

## FOREIGN PATENT DOCUMENTS

| | DOCUMENT NUMBER | DATE | COUNTRY | CLASS | SUBCLASS | TRANSLATION YES | NO |
|---|---|---|---|---|---|---|---|
| JAH | 0 0 4 1 7 6 6 | Dec. 16, 1981 | EPC (Collen et al.) | 435 | 212 | | |
| JAH | 1 5 5 1 2 7 5 | Aug. 30, 1979 | UK (d'Hinterland et al.) | 424 | 94.64 | | |
| JAH | 1 4 9 2 9 5 9 | Nov. 23, 1977 | UK (d'Hinterland et al.) | 424 | 94.64 | | |
| JAH | 2 0 9 2 1 5 4 | Aug. 11, 1982 | UK (Sugimoto) | 435 | 215 | | |

## OTHER DOCUMENTS (Including Author, Title, Date, Pertinent Pages, Etc.)

| | |
|---|---|
| JAH | Hoylaerts et al., J.B.C. 257, No. 6, 2912-2919 (1982) |
| JAH | Weimar et al., The Lancet 2, 1018-1020 (November 7, 1981) |
| JAH | Widman et al., Nature 272, No. 5648, 549-550 (March 2, 1978) |

| EXAMINER Jayne A. Hulbatt | DATE CONSIDERED Jan. 15, 1986 |
|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609; Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

Form PTO-FB-A820
also form PTO-1449 )

Patent and Trademark Office- U.S. DEPARTMENT of COMMERCE

FORM PTO-1083

Case Docket No. 100/164-U.S.

In re application of : DAVID V. GOEDDEL ET AL.

Serial No. 06/483,052

Filed: April 7, 1983

RECEIVED

NOV 1 4 1985

GROUP 120

For: HUMAN TISSUE PLASMINOGEN ACTIVATOR

THE COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

Sir:

Transmitted herewith is an amendment in the above-identified application.
☐ Small entity status of this application under 37 CFR 1.9 and 1.27 has been established by a verified statement previously submitted.
☐ A verified statement to establish small entity status under 37 CFR 1.9 and 1.27 is enclosed.
☐ No additional fee is required.
The fee has been calculated as shown below:

EXTENSION FEE FOR RESPONSE WITHIN THIRD MONTH

| (Col. 1) CLAIMS REMAINING AFTER AMENDMENT | | (Col. 2) HIGHEST NO. PREVIOUSLY PAID FOR | (Col. 3) PRESENT EXTRA | SMALL ENTITY RATE | ADDIT. FEE | OR | OTHER THAN A SMALL ENTITY RATE | ADDIT. FEE |
|---|---|---|---|---|---|---|---|---|
| TOTAL | * MINUS | ** | = | x5 = | $ | | x10 = | $ |
| INDEP. | * MINUS | *** | = | x15 = | $ | | x30 = | $ |
| ☐ FIRST PRESENTATION OF MULTIPLE DEP. CLAIM | | | | + 50 = | $ | | + 100 = | $ |
| | | | | TOTAL ADDIT. FEE | $ | OR | TOTAL | $ |

*If the entry in Col. 1 is less than the entry in Col. 2, write "0" in Col. 3.
**If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, write "20" in this space.
***If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, write "3" in this space.
  The "Highest Number Previously Paid For" (Total or Independent) is the highest number found from the equivalent box in Col. 1 of a prior amendment or the number of claims originally filed.

☒ Please charge my Deposit Account No. 07-0630  in the amount of $ 390.00  A duplicate copy of this sheet is attached.

☐ A check in the amount of $_____ is attached.

☒ The Commissioner is hereby authorized to charge payment of the following fees associated with this communication or credit any overpayment to Deposit Account No. 07-0630 . A duplicate copy of this sheet is attached.

☒ Any filing fees under 37 CFR 1.16 for the presentation of extra claims.

☒ Any patent application processing fees under 37 CFR 1.17.

I hereby certify that this correspondence is being deposited with the United States Postal Service as first class mail in an envelope addressed to: Commissioner of Patents and Trademarks, Washington

21 Oct 85

Walter H. Dreger
Name of applicant, assignee or Registered. Representative

Signature

21 Oct 85
Date of Signature

Respectfully submitted,

Walter H. Dreger, Reg. No. 24,190