# EXHIBIT B

```
                                                              Page 533
 1                  UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MASSACHUSETTS
 2
                                              Civil Action
 3                                            No. 97-10814-WGY
 4    * * * * * * * * * * * * * * * *
                                     *
 5    AMGEN, INC.,                   *
                                     *
 6            Plaintiff,             *
                                     *    TRANSCRIPT OF
 7    v.                             *    PROCEEDINGS ON REMAND
                                     *        (Volume 5)
 8    HOECHST MARION ROUSSEL, INC.   *
          and                        *
 9    TRANSKARYOTIC THERAPIES, INC., *
                                     *
10            Defendants.            *
                                     *
11    * * * * * * * * * * * * * * * *
                  BEFORE:  The Honorable William G. Young,
12                              District Judge
13
      APPEARANCES:
14
              DAY CASEBEER MADRID & BATCHELDER, LLP (By Lloyd R.
15    Day, Jr., Esq., David M. Madrid, Esq., Jonathan Loeb,
      Esq., and Robert M. Galvin, Esq.) 20400 Stevens Creek
16    Blvd., Suite 750, Cupertino, California 95014
                  - and -
17            HOWREY, SIMON, ARNOLD & WHITE, LLP (By Edward M.
      O'Toole, Esq.), 321 North Clark Street, Chicago,
18    Illinois 60610-4714
                  - and -
19            DUANE MORRIS, LLP (By D. Dennis Allegretti, Esq.),
      470 Atlantic Avenue, Suite 500, Boston, Massachusetts
20    02210
                  - and -
21            STUART L. WATT, ESQ. and MONIQUE L. CORDRAY, ESQ.,
      Amgen, Inc., One Amgen Center Drive, Thousand Oaks,
22    California 91320-1799, on behalf of the Plaintiff
23
                                          1 Courthouse Way
24                                        Boston, Massachusetts
25                                        October 17, 2003
```

AM670068519                                            AM-ITC 00853186

Page 562

1  A. Tab 5 is, again is a memo I wrote on March 23rd, 1983.
2  It summarized the results related to the EPO research goals
3  in Item No. 5.
4  Q. At the bottom of the first page?
5  A. That's correct.
6  Q. What does it summarize here?
7  A. It says human polycythemic renal tumor was transplanted
8  into seven nude mice in kidney capsule and subcutaneously.
9  Two of them might be bearing tumors. And three renal tumor
10 cells and one liver tumor cell, those are not making
11 measurable amount of EPO. This renal tumor cell line and
12 liver tumor cell lines are the cells that I obtained from
13 ATCC.
14 Q. Okay. So you also implanted those in mice as well?
15 A. Those were injected into nude mice.
16 Q. And in any of those experiments were you able to
17 succeed in getting the cells or the tissue to produce EPO?
18 A. No.
19 Q. Dr. Lin, prior to cloning the EPO gene were you or any
20 members of your team at Amgen ever successful in obtaining
21 EPO producing human cells or tissue sources?
22 A. No.
23 Q. Prior to cloning the EPO gene were you or your team
24 ever successful in obtaining human cells or tissue sources
25 that could be induced to produce --

Page 563

1  A. No.
2  Q. -- EPO?
3      Dr. Lin, were you or your team ever successful in
4  obtaining human cells or tissue sources that could be used
5  to generate a cDNA library?
6  A. No.
7  Q. Now, in this litigation HMR/TKT have asserted that EPO
8  producing human cells and tissues were readily available
9  before 1983. In your experience, before you cloned the EPO
10 gene were EPO producing human cells publicly available?
11 A. No.
12 Q. I want to ask you about the methods described in your
13 patents for detecting EPO protein. And please take a look
14 at Tab 6, which is Trial Exhibit 1.
15     Do you see that?
16 A. Yes.
17 Q. In general, and I just would like a brief and general
18 answer for the Court, in the patents what tests did you use
19 to determine whether you had produced human EPO?
20     MR. HALEY: Object, your Honor; hearsay.
21     THE COURT: What tests did he use. Did he use,
22 that imports that he did them himself, if he knows.
23     Is that how you understand how --
24     THE WITNESS: No, the tests were used in this
25 patent.

Page 564

1      THE COURT: Well, do you know what tests were
2  used?
3      THE WITNESS: Yes, of course.
4      THE COURT: Do you know yourself?
5      THE WITNESS: Yes, of course.
6      THE COURT: You may testify.
7      MR. HALEY: Your Honor, may I be heard?
8      THE COURT: Yes.
9      MR. HALEY: I believe Dr. Lin may be getting ready
10 to testify about tests that others did, not that he did.
11     THE COURT: So long as he himself knows -- well,
12 by knows it means you either did the experiments or you
13 observed them being done, not that your people came and
14 told you about them.
15     Do you understand the difference?
16     THE WITNESS: Only the in vivo experiment that was
17 not done in house; all other experiments I know --
18     THE COURT: And you --
19     THE WITNESS: -- were not, that is done in house,
20 yes.
21     THE COURT: But what Mr. Haley's pressing, and
22 he's right to press it, how do you know that these
23 experiments, the in-house ones, were done?
24     THE WITNESS: I know how they were done.
25     THE COURT: How?

Page 565

1      THE WITNESS: Carried out by the people,
2  procedure-wise, I know.
3      THE COURT: But how do you know?
4      THE WITNESS: Because they are part of the EPO,
5  the EPO team.
6      THE COURT: Well, various things get done in this
7  courthouse that I don't see get done --
8      THE WITNESS: I understand.
9      THE COURT: -- because they're part of my team.
10     THE WITNESS: Sure.
11     THE COURT: But I don't see them being done.
12     THE WITNESS: Oh, I see. I have interaction with
13 the people that working on these assays.
14     THE COURT: And they will you what they've done?
15     THE WITNESS: That's right. The result will --
16     THE COURT: Did you do the assays?
17     THE WITNESS: No, I don't personally do all these
18 assays, no.
19     THE COURT: How are you going to deal with that,
20 Mr. Day?
21     MR. DAY: Well, let me ask some questions, if I
22 may.
23     THE COURT: Fine.
24 Q. First of all, who was the project team leader?
25 A. I'm the project team leader.

9 (Pages 562 to 565)

Page 566

1  Q. How many people worked on this project during this time
2  period?
3  A. Oh, a lot of people. Ten, twenty. I don't know. I
4  cannot count all them.
5  Q. Okay. Physically where were they located?
6  A. They all located at Amgen.
7  Q. In what building?
8  A. In Thousand Oaks. At the time I think we probably have
9  a total of maybe six buildings or so, something like that.
10 Q. Okay. And the people working on the EPO project team,
11 where were they all located?
12 A. Mainly in Building 2.
13 Q. Okay. And where were you located?
14 A. Building 2 and 1. I think Building 2 and 1.
15 Q. And where were you located?
16 A. In Building 2.
17 Q. Okay. And did you interact with members of the team on
18 a daily basis?
19 A. Yeah, regular basis. Yes, we had regular meetings.
20 Yes.
21 Q. Did you assist in the design of the experiments that
22 they all performed?
23 A. This is, some of it is designed by others, some
24 designed by myself because -- you know.
25 Q. Did you review the design?

Page 567

1  A. Depends. Depends. Those that I have to review myself,
2  I reviewed. If not, then it would be the scientists who
3  were in charge of project who would review the design.
4  Q. Okay. And did you supervise the performance of the
5  experiments that are reflected in the patents that you
6  filed?
7  A. The performance of experiments actually carried out by
8  individual, under individual's authority, whoever that,
9  that clinician work for or whatever the scientist is
10 supposed to be doing.
11 Q. And were you supervising the scientists?
12 A. Yes. In a way we had a coordinator for the whole
13 research project.
14 Q. Okay.
15 A. Yes.
16    MR. DAY: Your Honor, I think on that basis I've
17 laid an adequate foundation to establish that he knows what
18 experiments were done.
19    THE COURT: Do you press the objection?
20    MR. HALEY: Yes, your Honor, I do.
21    THE COURT: Sustained. I don't think that's an
22 adequate foundation. We're going to need the people who
23 did them, if you want them for the truth. After all, these
24 things are in the patent from which one can infer, and I
25 have gone over in some great detail the prosecution

Page 568

1  history. Maybe you need more evidence.
2     It's not much of a jump, an inferential jump to
3  infer that the experiments were in fact done and they came
4  up with conclusions that are set forth in the patent. Of
5  course there is an error in the patent which you called it
6  to my attention that things are not perfect.
7     But strictly speaking, on evidence, not an
8  adequate foundation. Sustained.
9  Q. Dr. Lin, in the course of your work as a project leader
10 for the EPO team, did you make decisions about what assays
11 would be performed to characterize the product?
12 A. Yes.
13    MR. HALEY: Objection; leading.
14    THE COURT: Did he make -- I'm going to let it
15 stand.
16 Q. And who was the, who was the individual that was
17 responsible for deciding what set of tests or assays would
18 be performed in order to characterize whether or not the
19 product that you were obtaining was in fact human EPO?
20 A. Yes.
21 Q. Who was the person responsible?
22 A. I am. I am.
23 Q. Now, in the patents there are a set of tests.
24    Well, let me just ask the foundational question.
25 What experiments are recorded in your patent that deal with

Page 569

1  the identification of the EPO protein?
2     MR. HALEY: Your Honor, I object. The patent
3  speaks for itself.
4     THE COURT: It does. So I don't think you need a
5  foundation. Sustained. The patent says what it says.
6  Q. Well, in your opinion as the project leader, if you
7  were managing the project or making decisions, which of the
8  tests reported in the patent were needed to confirm the
9  identity of the protein you produced?
10 A. The identity of erythropoietin that we produced had to
11 be done by RIA, by SDS-PAGE, then followed by width and
12 run, and then N-terminal sequence analysis of the protein
13 that express. And we also check for the in vitro/in vivo
14 activity of the protein expressed so that we know if this
15 protein have activity --
16    MR. HALEY: Object, your Honor; move to strike.
17 A. -- in vivo or in vitro.
18    THE COURT: Wait one second. Grounds?
19    MR. HALEY: It's hearsay again saying we did such
20 and so. The question is --
21    THE COURT: The way I heard him say we had to
22 check. I'm going to let it stand.
23 Q. And, Dr. Lin, which of the tests reported in your
24 specification were needed to confirm the activity of the
25 protein produced?

10 (Pages 566 to 569)