```
 1              UNITED STATES DISTRICT COURT

            FOR THE DISTRICT OF MASSACHUSETTS

 2

                                        Civil Action

 3                                      No. 05-12237-WGY

 4  * * * * * * * * * * * * * * * *

                                  *

 5  AMGEN, INC.,                  *

                                  *

 6           Plaintiff,           *

                                  *  DAILY TRANSCRIPT

 7  v.                            *  OF HEARING IN RE

                                  *  OBVIOUSNESS-TYPE/

 8  F. HOFFMANN-LA ROCHE LTD,     *  DOUBLE PATENTING

    ROCHE DIAGNOSTICS GmbH and    *    (Volume 1)

 9  HOFFMANN-LA ROCHE, INC.,      *

                                  *

10           Defendants.          *

                                  *

11  * * * * * * * * * * * * * * * *

12

13

14           BEFORE:  The Honorable William G. Young,

                      District Judge

15

16

17

18

19

20

21

22

23

                                1 Courthouse Way

24                              Boston, Massachusetts

25                              October 1, 2007
```

```
 1                    A P P E A R A N C E S
 2
              DUANE MORRIS LLP (By D. Dennis Allegretti,
 3      Esq. and Michael R. Gottfried, Esq.), 470 Atlantic
        Avenue, Suite 500, Boston, Massachusetts 02210
 4            - and -
              DAY CASEBEER MADRID & BATCHELDER, LLP (By
 5      Lloyd R. Day, Jr., Esq., David M. Madrid, Esq. and
        Robert M. Galvin, Esq.) 20300 Stevens Creek
 6      Boulevard, Suite 400, Cupertino, California 95014
              - and -
 7            McDERMOTT WILL & EMERY (By Michael Kendall,
        Esq.), 28 State Street, Boston, Massachusetts
 8      02109
              - and -
 9            McDERMOTT WILL & EMERY (By William G.
        Gaede, III, Esq.), 3150 Porter Drive, Palo Alto,
10      California 94304
              - and -
11            MARSHALL, GERSTEIN & BORUN LLP (By Kevin M.
        Flowers, Esq.), 6300 Sears Tower, 233 S. Wacker
12      Drive, Chicago, Illinois 60606-6402
              - and -
13            STUART L. WATT and WENDY A. WHITEFORD, Of
        Counsel, Amgen, Inc., One Amgen Center Drive,
14      Thousand Oaks, California 91320-1789, on behalf of
        the Plaintiff
15
              BROMBERG & SUNSTEIN LLP (By Lee Carl
16      Bromberg, Esq. and Julia Huston, Esq.), 125 Summer
        Street, Boston, Massachusetts 02110
17            - and -
              KAYE SCHOLER LLP (By Leora Ben-Ami, Thomas
18      F. Fleming, Esq., Patricia Carson, Esq.,
        Christopher Jagoe, Esq. and Howard Suh, Esq.),
19      425 Park Avenue, New York, New York 10022, on
        behalf of the Defendants
20
21
22
23
24
25
```

```
 1                    PROCEEDINGS - 2:03 P.M.

 2

 3           THE CLERK:  All rise.  Court is in session, please

 4      be seated.

 5           THE COURT:  All right, I do think I'm prepared to

 6      proceed.  I don't require an opening as to this, and I am

 7      counting the time, but I don't preclude one either.

 8           So, counsel, who's going to take the lead here?

 9           MS. CARSON:  Your Honor, I'm going to take the lead

10      on behalf of Roche.

11           Before we begin, though, just to kind of talk a

12      little bit about the structure, we would like to reserve 45

13      minutes of Roche's time so that we can cross Dr. Lodish who

14      we expect probably to give testimony on behalf of Amgen.

15           THE COURT:  Well, of course you can.  But in a way

16      it's in your hands.  You have two hours of time in a total

17      four hour presentation.  So you proceed as you see fit.

18           MS. CARSON:  And we were assuming that you were

19      giving two hours to Roche and two hours to Amgen.

20           THE COURT:  You're absolutely right.

21           MS. CARSON:  Okay.

22           THE COURT:  But it's your burden, so you go first.

23           MS. CARSON:  So Roche would like to begin by

24      calling Dr. Thomas Kadesch to the stand.

25           THE COURT:  He may be called.
```

1           THE CLERK:  Right up here, sir.

2           MS. CARSON:  Your Honor, before I begin with Dr.

3    Kadesch, I just want to point out that we have two

4    obviousness/double patenting theories, Number 3 and Number

5    4, and we're going to begin with Dr. Kadesch's testimony

6    which is relevant to Theory 4.

7           THE COURT:  Thank you.

8           THE CLERK:  Sir, would you raise your right hand.

9           Do you solemnly swear that the answers you will

10   give to this Court will be the truth, the whole truth, and

11   nothing but the truth, so help you God?

12          THE WITNESS:  I do.

13          THE CLERK:  Please be seated.

14          MS. CARSON:  Your Honor, may I proceed?

15          THE COURT:  Of course.

16          MR. DAY:  Your Honor, I would just like to object

17   that we received no expert report from Dr. Kadesch

18   addressing this subject.  And to the extent that a report --

19          THE COURT:  Well, this is jury waived and I'll be

20   sensitive to that.

21          Well, though, that does raise a question.  How can

22   we get his opinions if there's no report?  I would never

23   have let you do that before the jury.

24          MS. CARSON:  And, your Honor, Dr. Kadesch did put

25   in a total of three expert reports and this was among the

1    issues that he addressed --

2         THE COURT:  Oh.

3         MS. CARSON:  -- in his expert report.

4         THE COURT:  All right, fine.  So long as we have --

5         MS. CARSON:  And we'll be handing you the color

6    coded expert reports.

7         THE COURT:  That's fine.  And you'll hand them to

8    the plaintiffs as well, I'm sure.  Yes.

9              THOMAS R. KADESCH

10             DIRECT EXAMINATION

11   BY  MS. CARSON

12   Q   Good afternoon, Dr. Kadesch.  Would you please introduce

13   yourself to the Court.

14   A   Yes.  My name is Dr. Tom Kadesch.  I am Professor of

15   Genetics at the University of Pennsylvania, and currently

16   serve as the chair of the department.

17   Q   And could you describe what you do in your position as

18   Professor of Genetics at the University of Pennsylvania?

19   A   Well, I've got three major responsibilities.  One is to

20   teach; the second is to run a research lab; and the third is

21   to administer the department.

22   Q   And the research lab that you run, what is the focus of

23   your research?

24   A   The focus of my research is the regulation of gene

25   expression and protein expression.

1  Q   How long have you studied protein expression?

2  A   Well, I've been at the University of Pennsylvania since

3  1984, but I started when I was a postdoctorate fellow at

4  Stanford.

5  Q   Could you please briefly describe your educational

6  background for the Court?

7  A   Yes.  I got B.S. in biochemistry from the University of

8  California at Santa Barbara in 1975.  In 1980 I got a Ph.D.

9  in biochemistry from the University of California at

10  Berkeley.  Then I did post-doctoral work with Dr. Paul Berg

11  at Stanford for three years, and then I started my job at

12  Penn in 1984.

13  Q   And who is Dr. Paul Berg?

14  A   Dr. Paul Berg is a Nobel Laureate.  He won the Nobel

15  Prize around 1980.  Often considered by many to be one of

16  the fathers of recombinant DNA technology.

17  Q   What kind of work did you do in Dr. Berg's laboratory?

18  A   Well, we were very much involved in developing

19  recombinant DNA technology and the ability of that

20  technology to express genes in cells.

21  Q   Now, do you understand that you're providing testimony

22  in this proceeding from the point of view of a person of

23  skill in the art in the 1983-1984 time frame?

24  A   Yes, I do.

25  Q   And what qualifications in your opinion would a person

1   of ordinary skill in the art in that time frame possess?

2   A   Well, somebody of ordinary skill would have a Ph.D. or

3   an M.D. and typically two years of research lab experience

4   in addition to that.

5   Q   And did you consider yourself to be one of ordinary

6   skill in the art in the 1983-1984 time frame in recombinant

7   DNA technology?

8   A   Yes, I did.

9   Q   What opinion are you here today to provide to the Court?

10  A   My opinion has to do with the double patenting issue

11  which is, given the '698 patent, the '349 patent claim 7 is

12  obvious.

13  Q   Now --

14          MR. DAY:  Objection, your Honor; it's outside the

15  scope of his report.

16          MS. CARSON:  Your Honor, red report, Paragraph 12.

17          THE COURT:  Well, I'll tell you we're going to save

18  time here and I'm not going to entertain those objections.

19  But to the extent that it is claimed to be outside the

20  report, counsel will have time enough to set that out in a

21  brief, and I have the reports and I'm not going to, I'm

22  simply not going to consider anything that's not in the

23  report.  That way we'll move along more smoothly.  I will

24  not consider it unless it's here in the report.

25          MR. DAY:  Your Honor, may I be heard for just one

1   second on that.  It's simply not in the report, that's the

2   point.

3            THE COURT:  Oh, I understand that.  I understand

4   that.  So here's what we're going to do.  I'm going to sit

5   here, I'm going to listen to it, I'm going to take notes on

6   it, and then you're going to submit a brief saying, because

7   you have daily copy, the following testimony is not in the

8   report.  And I'm going to then -- and they of course will

9   say, oh, yes, it is, here it is.  And I'm then going to look

10  at those portions of the report and if it's not in the

11  report, I'm not considering it.  I'm capable of doing that

12  and that's how I'll do it.

13           MR. DAY:  Thank you.

14           MS. CARSON:  Your Honor, in view of the way you're

15  proceeding, it's also in yellow Paragraph 8 and blue

16  Footnote 3, Pages 8 through --

17           THE COURT:  Well, they're going to attack it.  It

18  will be your opportunity then to tell me where it is and I

19  will look at it.  But, bottom line, claim 7 of '349 is

20  invalid?

21           THE WITNESS:  Yes.

22           THE COURT:  In view of '698?

23           THE WITNESS:  Yes.

24  Q   Are you aware that the Court --

25           MS. CARSON:  I'm sorry, your Honor, may I proceed?

1          THE COURT:  You may.

2    Q   Are you aware that the Court has provided definitions

3    for certain claim terms in this case?

4    A   Yes.

5    Q   And have you reviewed the Court's definitions in this

6    case?

7    A   Yes, I have.

8    Q   And how did the Court's claim definitions come into play

9    in you coming to your opinions?

10   A   I considered them when I came to my opinions, yes.

11   Q   Now, have you reviewed the '698 and the '349 patents and

12   claims in coming to your opinions?

13   A   Yes, I have.

14   Q   So --

15          MS. CARSON:  TK-9, please.

16   Q   So, let's start by looking at claim 4 of the '698

17   patent, and this is claim 4 that's taken from Trial

18   Exhibit 3.

19          MR. DAY:  Your Honor, I object.  This claim's not

20   in suit.

21          THE COURT:  No, the claim's not in suit, but this

22   is the one that is supposed to be, or I take it that

23   invalidates or aids in invalidating '349 claim 7.

24          MS. CARSON:  That's correct, your Honor.

25          THE COURT:  Yes.

1          MS. CARSON:  This --

2          THE COURT:  I understand.  You may proceed.

3          MS. CARSON:  Dr. Kadesch's opinion was offered

4    before Amgen's response.

5          THE COURT:  I have it in mind.  I'm trying to save

6    you time.

7          MS. CARSON:  Okay.  Thank you.

8    Q    Can you tell me what your understanding of claim 4 of

9    the '698 patent is?

10   A    Yes.  It's a process of producing erythropoietin in

11   vertebrate cells.

12   Q    Now, if we could look at TK-3.

13         And this is -- if you could tell me what your

14   understanding of claim 7 of the '349 patent is?

15   A    Yes.  If you actually read it, a process for producing

16   erythropoietin comprising steps of culturing vertebrate

17   cells.

18   Q    Now, in your opinion, what is the difference between

19   claim 4 of the '698 patent and claim 7 of the '349 patent?

20   A    Well, first of all, claim 7 of the '349 patent is

21   dependent upon claims 1 through 6.  Shown here is claim 1

22   for an example.  And in claim 1 they talk about growing

23   those cells and obtaining, actually measuring the amount of

24   erythropoietin that's produced in those cells.

25         MS. CARSON:  Okay.  So if we could have TK-4.

1   Q   So, Dr. Kadesch, if you compare claim 7 as you've now

2   read it in light of claim 1 of the '349 patent with claim 4

3   of the '698 patent, can you tell me in your opinion what the

4   differences are between these two claims?

5           MR. DAY:  Excuse me, your Honor.  If I understand,

6   you don't wish me to object that these are outside the

7   scope?

8           THE COURT:  I do not.  And your rights against the

9   report are fully saved in the manner that I've said.

10          MR. DAY:  Thank you.

11          MS. CARSON:  May I proceed, your Honor?

12          THE COURT:  You may.

13  Q   So, Dr. Kadesch, if you could look at claim 7 of the

14  '349 patent as you've now read it in light of claim 1 and

15  compare it to claim 4 of the '698 patent, can you tell me in

16  your opinion what the differences are between these claims?

17  A   Well, in this particular case, highlighted in yellow are

18  two aspects or two phrases within the claims.  Basically a

19  process of producing erythropoietin, glycosylated

20  erythropoietin in claim 4 of the '698, and a process of

21  producing erythropoietin, claim 7 in the '349 patent.

22          MS. CARSON:  If we could have TK-5.

23  Q   Again, this is a comparison of the same two claims, if

24  you could continue your discussion.

25  A   Yes.  Both involve the use of vertebrate cells.

1  Q   If we could have TK-6.

2  A   And this basically is to say if you grow those

3  vertebrate cells under appropriate nutrient conditions.

4  Q   And if we could look at TK-7.

5  A   So, in the '698 patent you have, basically, the way in

6  which these, the erythropoietin is produced, promoter DNA,

7  other than the human erythropoietin promoter in claim 4, and

8  nonhuman DNA sequences controlling transcription in claim 1

9  of the '349.

10  Q   Now, the '349 claim 7 which you've been reading in light

11  of claim 1 of the '349 patent recites an amount of

12  erythropoietin.  What is that amount?

13  A   The amount in this case is a value that they describe as

14  a hundred units of erythropoietin using radioimmunoassay.

15  Q   And what is radioimmunoassay?

16  A   It was a standard assay used at the time, one of many

17  assays that are used to measure the amount of protein.

18  Q   And when you say standard, what do you mean by that?

19  A   Well, someone of skill in the art in 1983 or 1984 would

20  have certainly known about the RIA assay, radioimmunoassay.

21  Q   Now, the '349 claim 1 says that these vertebrate cells

22  are making a hundred units of erythropoietin by

23  radioimmunoassay.

24        Do you have an opinion as to whether one of skill

25  in the art, it would have been obvious to one of skill in

1    the art to make that level of erythropoietin using the

2    process that's claimed in claim 4 of the '698 patent?

3    A    Yes, that would have been obvious.

4    Q    And can you explain your opinion?

5    A    Well, the manner in which the Amgen scientists, the

6    process that they used to generate this amount of

7    erythropoietin involved a process called gene amplification.

8    The gene amplification, simply put, is when you put a

9    selected pressure on one gene, if another gene is linked to

10   it, then that other gene will become amplified along with

11   the DHFR gene that's being selected for.  And so this is a

12   way, a very convenient way of increasing the number of

13   copies of the gene in the cell, but any gene that's linked

14   to it, such as erythropoietin, would also be amplified and

15   therefore you would express more of that gene product as

16   well.

17          MR. DAY:  Your Honor, I object and move to strike

18   as irrelevant; not comparing the claim to the claim.

19          THE COURT:  No, overruled; that may stand.  I'll

20   give it such weight as it its due.

21          Ms. Carson, I'll proceed as I have stated.  I have

22   very much in mind their motion to preclude the testimony of

23   this witness in its entirety and their reference to the

24   expert reports here.  Just understand you're going to have

25   to deal with that at some stage.  But you proceed.

1          MS. CARSON:  Thank you, your Honor.

2   Q   Yes, you mentioned amplification.  If you would turn in

3   your book to Exhibit NUK.

4   A   I don't know where it is.  I'm sorry.

5          THE COURT:  It's the penultimate tab in the book.

6   Q   It's all the way in the back, almost the last.

7   A   Okay.

8          MS. CARSON:  Thank you, your Honor.

9   A   Yes, I got it.  Thank you.

10  Q   Can you tell the Court what this is?

11  A   Yes, this is a copy of a manuscript, first page of a

12  manuscript by -- I'm sorry -- by Gordon Ringold.

13         THE COURT:  I don't mind it being put up even

14  though it's not yet in evidence.  I'm reading it here as the

15  presiding officer.

16         MS. CARSON:  Thank you, your Honor.  You can put it

17  back up.

18         THE COURT:  Society trusts us to be able to do

19  this, and I work very hard to retain that trust.

20  Q   Dr. Kadesch, can you tell us what this paper is?

21  A   Yes, this is a paper that was published by Gordon

22  Ringold at Stanford University basically describing what I

23  just told you, namely, that if you take, if you amplify a

24  dihydrofolic reductase gene in cells carried on in plasmid

25  you can co-amplify a gene that's linked to it, in this case,

1    the XGPRT gene, which is a gene produced normally in E.coli.

2    And so, this paper demonstrates that you can amplify the

3    DHFR, the dihydrofolic reductase gene, co-amplify the XGPRT

4    gene, and get higher level expression of the XGPRT gene.

5    Q    And what is the date of this reference?

6    A    1981.

7    Q    And the journal that this appears in, what is your

8    opinion of the Journal of Molecular and Applied Genetics?

9    A    The Journal of Molecular and Applied Genetics is a

10   journal that is composed of peer-reviewed manuscripts.  So

11   to get a manuscript published in that journal it has to be

12   considered by your peers and it has to be considered to be

13   not only scientifically sound but of some impact.

14        MS. CARSON:  Your Honor, I offer NUK into evidence

15   as prior art.

16        THE COURT:  Any objection?

17        MR. DAY:  Yes, I object on relevance rounds, your

18   Honor.  There's nothing about amplification in either of the

19   two claims.

20        THE COURT:  What do you say to that?

21        MS. CARSON:  Your Honor, the claims that are

22   impacted by the double patenting assertions do talk about

23   amplification, but moreover, you can consider for double

24   patenting what was known in the prior art and this is

25   evidence of what was known in the prior art that could be

1    done to achieve the levels that are claimed in claim 7 of

2    the '349 patent.

3           THE COURT:  Well, respectfully, I don't follow.  I

4    don't -- it has nothing to do with amplification.

5           MS. CARSON:  The amplification relates to the

6    levels of expression that are recited in the '349 claims.

7    So, the issue is, if you practice the process of claim 4 of

8    the '698 patent, you may or may not get a hundred units of

9    erythropoietin, but you will certainly get it if you apply

10   the well-known technique that was clearly taught in the

11   prior art and is referenced in the patent specification of

12   amplification.

13          THE COURT:  All right.  I guess I have a problem

14   here, and here's my problem.

15          I am satisfied that the Federal Circuit considers

16   this issue matter of law.  And what I say I do say with

17   respect, they do so in their rather sloppy and undefined

18   view that they state the things are matter of law when what

19   they really mean is that they're matters for the judge to

20   determine.

21          Now, one way to approach this is as simply as

22   matter of construction, which is, which is for me and which,

23   though mentally there are some problems with it, that's how

24   I do a Markman hearing.  So I compare the two claims and I

25   listen carefully to your arguments, I construe the claims of

1    the two patents, and then as matter of law I rule whether

2    one is patentably distinct from the other.  And having done

3    it that way, I'm perfectly content that the Federal Circuit

4    review my ruling de novo.

5         You've asked for an evidentiary hearing on this and

6    in an excess of caution I've given it to you.  And at least

7    in my mind that would permit me in this complex area, where

8    I don't have much guidance from the Federal Circuit on

9    obviousness/double patenting, I'm using the Markman by

10   analogy and what they did in Festo by analogy.  It seems to

11   me I would be helped by getting expert testimony.  And so

12   I'm getting it, for a few hours anyway.  But now you want to

13   introduce actual evidence to bolster that testimony, I take

14   it.  And I think somewhere I should draw the line.

15        I'll hear you.

16        MS. CARSON:  I think that even in a Markman hearing

17   if you were to construe the claims, you still have to

18   consider what that construction would mean to one of skill

19   in the art.

20        THE COURT:  Correct.

21        MS. CARSON:  And what this reference provides is

22   the context as to what one reading the elements of claim 4

23   of the '698 patent would have in their mind as they're

24   reading that because that's the obviousness/double patenting

25   inquiry.

1          THE COURT:  Right.

2          MS. CARSON:  Not do they claim the same thing,

3    that's same invention double patenting.

4          THE COURT:  Well, same invention double patenting

5    is, has the relationship to obviousness/double patenting as

6    anticipation has to obviousness, correct?  It is the

7    epitome --

8          MS. CARSON:  It's the same thing, yes.  They're

9    claiming the same invention.

10         THE COURT:  No, I'm excluding this.  I'm excluding

11   it.  NUK.

12         MS. CARSON:  And just as an additional point on

13   this reference for your Honor's consideration, even under

14   Federal Circuit law prior art can be considered in

15   conjunction with claim construction.

16         THE COURT:  I've construed the claims.  And the

17   record is what it is and I'm stuck with it.  And thus far, I

18   have no reason to reconsider it.

19         MS. CARSON:  Thank you, your Honor.  May I proceed?

20         THE COURT:  Of course.

21   Q   So, Dr. Kadesch, how does this paper by Dr. Ringold --

22   actually let's just back up.

23         MS. CARSON:  So, if we can go back to TK-13.  I'm

24   sorry, back up to TK-7.

25   Q   You walked through these claims individually and pointed

 1    out the similarities between the claims and we talked about

 2    amplification.  When you take everything together, can you

 3    explain to the Court your opinion regarding the obviousness

 4    of claim 7 over '698 claim 4?

 5    A   Yes.  If you look at claim 4, it's for, I mean, to put

 6    it in simple language, it's a process of making

 7    erythropoietin using promoter DNA other than human

 8    erythropoietin promoter DNA.  And claim 1 pretty much is the

 9    same thing, nonhuman DNA sequences.  And as I said, the only

10    difference really is that you decided to measure the amount

11    of erythropoietin you're making in claim 1 in the '349

12    patent as opposed to claim 4 in the '698 patent.

13    Q   So, in your view, is there anything unexpected about the

14    result that's claimed or what's claimed in claim 7 of the

15    '349 patent?

16    A   No, there's nothing unexpected.  It was all in the art,

17    and generating that amount of erythropoietin would have been

18    expected.

19          MS. CARSON:  Roche has no further questions for Dr.

20    Kadesch.

21          THE COURT:  Thank you.  Any questions?

22          MR. DAY:  Oh, I have a few, your Honor.

23          THE COURT:  Go ahead.

24

25

```
 1                      CROSS-EXAMINATION

 2  BY  MR. DAY

 3  Q   Dr. Kadesch, you do not work on EPO, do you?

 4  A   No.

 5  Q   And you've never studied the EPO gene, have you?

 6  A   No.

 7  Q   You've never produced a recombinant EPO protein, have

 8  you?

 9  A   No.

10  Q   You've never conducted experiments relating to the

11  production of a recombinant EPO protein, have you?

12  A   No.

13            MS. CARSON:  Objection; vague.

14            THE COURT:  Overruled.

15  Q   Your peers would not consider you to be an expert

16  regarding processes for production of EPO, would they?

17            MS. CARSON:  Objection.

18  A   No.

19            THE COURT:  Overruled.  Your answer?

20  A   No.

21  Q   You have no experience with CHO cells that have been

22  genetically engineered to produce recombinant protein, do

23  you?

24  A   That's correct.

25  Q   And you've offered no opinions on EPO glycosylation,
```

1    have you?

2    A    No.

3         MS. CARSON:  Objection.

4         THE COURT:  Overruled.

5    Q   By 1984 it was known that EPO was a secreted

6    glycoprotein, correct?

7         MS. CARSON:  Objection; outside the scope.

8         THE COURT:  Overruled.

9    A   I believe that's true.

10        THE COURT:  And my usual approach to scope stands.

11   This is the only time I'm going to hear from this witness in

12   this jury waived proceeding.  Let's get everything he has to

13   say.

14   Q   By 1984 it was known that many secreted proteins like

15   EPO must undergo post-translational modification such as

16   glycosylation in order to be biologically active, correct?

17        MS. CARSON:  Objection; no foundation.

18        THE COURT:  Overruled.

19   A   I believe that's true.

20        THE COURT:  He can answer if he knows.

21   Q   And, for example, it was known that protein misfolding

22   could compromise or even eliminate in vivo biological

23   activity, correct?

24   A   That's correct.

25        MS. CARSON:  Objection; no foundation.

```
 1              THE COURT:  Overruled.

 2    Q    With regard to EPO specifically, the in vivo biological

 3    activity can be compromised due to misfolding or

 4    inappropriate post-translational modifications, right?

 5              MS. CARSON:  Objection; no foundation.

 6              THE COURT:  Overruled.

 7    A    I believe that's true.

 8    Q    In 1984 it was known that misfolding or deglycosylated

 9    EPO may have no biological activity, right?

10              MS. CARSON:  Objection; no foundation.

11              THE COURT:  Overruled.

12    A    I believe that's true.

13    Q    In fact, it was known that changes in glycosylation can

14    reduce or eliminate in vivo biological activity for EPO,

15    correct?

16              MS. CARSON:  Objection.

17    A    I don't know the answer to that question.

18    Q    You do know, however, that the absence or removal of a

19    particular sugar, terminal sialic acid, from the EPO protein

20    will eliminate biological activity, correct?

21              MS. CARSON:  Objection; vague, no foundation.

22              THE COURT:  Overruled.

23    A    I don't know the answer to that question.

24    Q    You had your deposition taken in this case, correct?

25    A    Uh-huh.
```

1   Q   Let me hand you a copy of your deposition.

2           MR. DAY:  Do you want to pass them out, please.

3   Q   If you would turn to Page 276 of your deposition.  I'm

4   going to point you to Lines 13 to 16.

5           MS. CARSON:  I'm sorry, Mr. Day, which lines?

6           MR. DAY:  I said 276, Lines 13 to 16.

7   Q   Question:  Do you have an understanding of the removal

8   of sialic acid when using erythropoietin biologically

9   inactive?

10          Answer:  That's my understanding, yes.

11          So what is the significance of that particular

12  statement?

13          Well, the fact that you can remove sugars and you

14  could not alter the readout of an RIA, but you dramatically

15  inhibit the readout in a bioassay.

16

17          Did you give that testimony, sir?

18  A   Yes, I did.

19          MS. CARSON:  Objection.

20          THE COURT:  Overruled.

21  Q   Now, CHO cells do not naturally produce human

22  erythropoietin, do they?

23  A   They do not.

24  Q   And one of ordinary skill in the art in 1983 or '84

25  would have understood that whenever you take protein outside

1    of its natural environment, that is, you take it outside of

2    the cell that naturally produces that protein, one always

3    has to be aware that a protein, if it's produced in its

4    nonnatural environment, may misfold, correct?

5            MS. CARSON:  Objection; vague, and no foundation.

6            THE COURT:  Overruled.  If he knows.

7    A   One would have to take that into consideration, yes.

8    Q   Okay.  In fact, you're aware that some CHO cells produce

9    biologically inactive recombinant human EPO, aren't you?

10           MS. CARSON:  Objection; no foundation.

11           THE COURT:  Overruled.

12   A   That would be the interpretation of some of the data

13   presented in the patent, yes.

14           MR. DAY:  Thank you.  No further questions.

15           THE COURT:  Anything more for this witness?

16           MS. CARSON:  Just one question, your Honor.

17                   REDIRECT EXAMINATION

18   BY MS. CARSON

19   Q   Dr. Kadesch, if you could look at your deposition

20   testimony that Mr. Day just examined you on on Page 276.

21   And I believe Mr. Day directed your attention to Line 16

22   through 18.

23   A   Yes.

24   Q   Okay.  Can you tell me whether you were discussing EPO

25   generally there, or was that in the context of a specific

1    article that was being marked at that deposition?

2    A   Well, if you look on the previous page it's clear that

3    that was in reference to a particular article that I was

4    reading from.

5          THE COURT:  Just, just so I'm clear, I'm going to

6    back to something as I think it through.  As you understand

7    it, nonnaturally-produced human EPO runs the risk of being

8    misfolded?

9          THE WITNESS:  All proteins run the risk of being

10   misfolded.

11         THE COURT:  All right.  And human EPO produced in

12   the human body runs the risk of being misfolded?

13         THE WITNESS:  That's correct.

14         THE COURT:  I see.  All right.  Go ahead.  If

15   there's nothing else, that's fine.

16         MS. CARSON:  Roche has no further questions.

17         THE COURT:  Nothing else --

18         MR. DAY:  No, sir.

19         THE COURT:  -- Mr. Day?

20         You may step down.

21         (Whereupon the witness stepped down.)

22         THE COURT:  Is that it for Roche's presentation?

23         MS. CARSON:  That's it for Roche's evidentiary

24   presentation.  I would like to take the remainder of the

25   time to present oral argument on both Theory 4 and Theory 3.

1       THE COURT:  I'll, I'll proceed that way.  That's,

2   that's fine.  I understand that.  And I'll give you the time

3   that we've allotted.  And, therefore, Ms. Ben-Ami.

4       MS. BEN-AMI:  I'm just segueing.  Mr. Suh is going

5   to carry the burden on this, your Honor.  I did just want to

6   point out a couple of things to you.

7       I would cite to your Honor the In re Longi case,

8   759 Fed. Circuit 887, 1985 case from the Federal Circuit,

9   applying doubt patenting, obviousness-type/double patenting

10  where specifically prior art references were considered with

11  the claims for the double patenting.

12      And there are cases -- there's also MPEP cites on

13  this I can read to your Honor.  The MPEP Section 804,

14  Paragraphs 8.36, 8.37.  So this was the reason that we were

15  presenting the view that you can look at the prior art.  You

16  take the claims of the, that you're looking at for the

17  double patenting, and you apply the prior art plus the

18  claims, and that is our understanding of the law.  So I

19  didn't want to, you know, let your Honor think that there

20  are not cases that say this.  There are cases that are quite

21  specific out of the Federal Circuit that do say you do

22  consider the prior art.

23      THE COURT:  Happy to receive that specific

24  argument.  And I have no doubt about the authenticity of

25  NUK.  For the moment, I adhere to my ruling.

1          Mr. Suh.

2          MS. CARSON:  Actually, your Honor, before we turn

3     to, Mr. Suh's going to take care of obviousness/double

4     patenting Theory 3, I was going to finish addressing Theory

5     4.

6          THE COURT:  That's fine.  It's one of the

7     advantages of time limits.  I'm comfortable that this will

8     end at a specific time, and let's do the work together.

9          I'll hear you, Ms. Carson.

10         MS. CARSON:  So, your Honor, this Theory 4 again is

11    the assertion that Roche has made from the outset of this

12    litigation, that the '933, the '349 and the '422, those are

13    two product claims and one process claim, are obvious over

14    the process claims of the '868 and the '698 patent.

15         And so, the first thing that I wanted to address --

16    RB-1.

17         Amgen's taken the position that we didn't raise

18    this theory or preserve this theory, and we raised it as

19    early as our amended answer and we maintained it throughout

20    our pretrial memorandum.  So, I wanted to dispense with that

21    right out of the box.

22         The next thing that I wanted to talk to the Court

23    about is, I want to explain why the language of 35 U.S.C.,

24    Section 121 makes it clear that Roche can in fact rely on

25    the '868 and the '698 patents as obviousness/double

1    patenting references against the '933, '422 and '349

2    patents.  And I want to, to illustrate this point, I'm going

3    to look at the language of 35 U.S.C. 121 and then walk the

4    Court as quickly as possible through the prosecution history

5    just to show the Court how these patents came into

6    existence.

7            So if I can have RB-2.

8            35 U.S.C. Section 121 says that a patent that

9    issues on an application with respect to which requirement

10   for restriction has been made, or an application that's

11   filed as a result of such a requirement, shall not be used

12   as a reference either in the Patent and Trademark Office or

13   in the courts against a divisional application.

14           So, the question that we have to ask is did the

15   '868 and '698 patents issue on an application to which a

16   requirement for restriction was made, or did it issue on an

17   application that was refiled as a result of a restriction

18   requirement.

19           And what I want to illustrate to the Court today is

20   that in the case of the '868 and the '698 patents, it did

21   not issue, those patents did not issue on an application

22   that a restriction was made on nor did those patents issue

23   from an application that was filed as a result of a

24   restriction requirement.

25           And so, if we can have RB-3.

1           This is a very complicated family history of the

2     patents-in-suit.  But if you look to the far left side,

3     serial number 675,298, that's your original application that

4     resulted in the '008 patent.  It's on that '298 patent where

5     the restriction requirement happened.  And in that

6     restriction requirement the Patent Office restricted the

7     claims to a series of separate groups.  And so the separate

8     groups that were -- so, this is the application that the

9     restriction requirement was issued in.

10          The '008 patent issued from that application.  So

11     if you look at the statute, you would say that this is a

12     patent that issued on an application in which a restriction

13     requirement was made.  This is your patent, the '008.

14          So, the '008 patent we could not rely on as a

15     reference assuming consonance was maintained, and it's our

16     position that it was not, but your Honor has, has already

17     ruled on that in summary judgment.

18          So, now the question is, is this patent

19     application, which is the application from which the '868

20     and the '698 patent issued, was this application filed as a

21     result of the restriction requirement.  Because that's the

22     other, the other bar to using these patents as a reference,

23     if this application was filed as a result of a restriction

24     requirement.

25          And what I want to walk you through is the fact

```
 1   that this was not filed as a result of a restriction

 2   requirement.  As a matter of fact, the application that gave

 3   rise to the '868 and the '698 patents was voluntarily filed

 4   to encompass process claims that could have been prosecuted

 5   into the '008 patent.

 6            And could I have RB-4.

 7            Now, the Manual of Patent Examining Procedure

 8   explicitly tells you that if the applicant voluntarily files

 9   two or more applications without a restriction requirement

10   35 U.S.C. 121 does not apply.

11            So, if we can go to the next slide which is RB-5.

12            So, the next series of slides that we're going to

13   walk through are going to show you as you walk through the

14   prosecution history and the application that was filed that

15   gave rise to the '868 and the '698 patents that that

16   application was filed voluntarily, directed to claims that

17   could have been prosecuted to result in the '008 patent, and

18   that it was a voluntary decision by Amgen.

19            So, if I could have the next slide.

20            So, this is a time line of how, what we're going to

21   walk through.  The '298 application, that's what resulted in

22   the '008 patent.  This is where your restriction requirement

23   happened.  The claims that were to DNA and the claims that

24   were to process were put into Group II.  They belonged

25   together.  The Patent Office says you get one patent on
```

1   process claims and DNA claims.  So that's the restriction

2   requirement that happened.

3          Amgen prosecuted the DNA and the process claims in

4   Group II like the Patent Office told them to do and at

5   some point they just voluntarily canceled their process

6   claims.  And Amgen actually has explained why they

7   voluntarily canceled their process claims.  They canceled

8   them because they weren't getting them allowed quickly

9   enough, so they decided to take those Group II claims out of

10  the DNA claims and pursue them elsewhere.

11         And I'm going to illustrate this with portions of

12  the file history.  They voluntarily dropped their process

13  claims in 1987, March of 1987.  The '008 patent issues

14  without their process claims.  And then in October of 1987,

15  now they file a new application and now they're going to go

16  back after the process claims again.

17         If I could have the next slide.

18         So, here's the restriction requirement that

19  occurred in the '298 application where the examiner grouped

20  the claims in six different groups and they said that the

21  DNA claims belong with the process claims.

22         And could I have the next slide, please.

23         So claims 61 through 72, these were process claims,

24  along with DNA claims, where Amgen decided to pursue way

25  back when when that restriction requirement was first

1    issued.

2            If I could have the next slide.

3            And this is just a slide to illustrate that claims

4    69 through 72 were directed to a process for production of a

5    polypeptide having all or part of the structural

6    conformation of EPO where you grow under nutrient conditions

7    host cells that have been transformed, et cetera.

8            So these are the process claims that the Patent

9    Office told Amgen belonged with their DNA claims as part of

10   Group II and that they should all be prosecuted together.

11           Can I have the next slide.

12           Now, after prosecuting those claims for a while,

13   along with the DNA claims, Amgen decided to voluntarily

14   cancel these process claims out of the application.

15           And if I could have the next slide.

16           And what Amgen told the Court in the offer of proof

17   that they recently filed, they said, although they initially

18   elected all of the Group II claims, which included DNA host

19   cell and process claims for further prosecution in the '298

20   application, they later canceled those process claims after

21   it became apparent that the PTO would not allow issuance of

22   those claims.  So they were in a hurry, they wanted to get

23   the DNA claims, so they voluntarily pulled the process

24   claims out.

25           Can I have the next slide.  Next slide, please.

1          All right.  So now where we are is -- and it might

2      help to go back very quickly to the time line, which is

3      RB-6.

4          So, where we are on the time line right now is,

5      Amgen has voluntarily canceled their process claims.  The

6      '008 patent issues here.  Now, it's October 1987 and they

7      file the '179 application.  Now, this is the application

8      that we have to focus on.  The question becomes is this

9      application filed as a result of a restriction requirement,

10     because that's the only other way that Amgen could have the

11     benefit of 35 U.S.C. Section 121.

12         So, if we can go to RB-13, please.

13         Okay.  So here is the initial filing of the '179

14     application.  This is the application that we're looking at

15     to find out whether or not it was filed as a result of the

16     restriction requirement.  It was a request for filing in

17     continuation.  Amgen canceled claims 2 through 60.

18         And if we could go to the previous slide just to

19     see what that is.

20         So in canceling claims 2 through 60, these are the

21     original claims that were restricted in the first

22     application, they were left with one DNA claim.  So, they

23     had one DNA claim from Group I.

24         Now, if I could have slide RB-14.

25         However, at the same time -- so you would say,

1    okay, well, they filed this as a result of the restriction

2    requirement, they were going for Group I, not Group II

3    claims.  But that's not what happened.  Because on that same

4    day, the same time that they canceled those claims and left

5    the one DNA claim, they also canceled the DNA claim at the

6    exact same time and they inserted new claims 61 through 64.

7    And those were claims that were directed to processes for

8    producing erythropoietin.

9          So, all they did was, through a series of

10   simultaneous amendments, they now are prosecuting claims in

11   the '179 application that are two, Group II process claims

12   that they should have pursued in the application that led to

13   the '008.

14         So this application was not filed as a result of a

15   restriction requirement.  This application was filed because

16   Amgen decided that they wanted to produce, to pursue process

17   claims later on when they thought they could get them and

18   they could get their DNA claims earlier.

19         This application, these are process claims, they're

20   added to the '179 at the same time that Amgen files the

21   application.  So this application is not filed as a result

22   of a restriction requirement.

23         And the same series of events occurred for the '698

24   application.  They did the exact same thing.  They canceled

25   all the claims except for claim 1, and at the same time they

1    canceled claim 1 and they added process claims.

2         And I realize that this is a complicated series of

3    events and a lot of maneuvers.  But if the Court goes

4    through this file history with the help of the slides that

5    we've handed up, the Court will see that Section 121 does

6    not say that we are prohibited from using the '868 and the

7    '698 patents as a reference against the '933, '349 and the

8    '422 patents.

9         Now, just due to time constraints, I can't go into

10   how if you look at those claims of the '868, it's a process

11   for making glycosylated erythropoietin polypeptide that has

12   the in vivo biologically active.  The '933 claims are

13   product-by-process.  You use the process to get the product.

14   So, it's hard to believe that these claims could possibly be

15   patentably distinct.

16        And really the only question here is, can we use

17   the '868 and the '698 as a reference patent against the '933

18   and the '349 and the '422.  And the answer is a resounding

19   yes.  Yes, we can.  And once the Court gets past that

20   question and recognizes that 121 offers Amgen no protection

21   whatsoever, then it becomes abundantly clear that there's

22   obviousness-type/double patenting going on.  And the

23   evidence is all in the record from Dr. Lowe and now from Dr.

24   Kadesch.

25        THE COURT:  Well, let me ask you -- let me just

1  follow this -- I understand that argument, and let me try to

2  follow it out.

3      You say that there is no way they could get

4  protection, or more narrowly, they should not have the

5  protection of 121.  Therefore, the '698 patent should be

6  construed as matter of law to render the related claims in

7  the patents-in-suit obvious.  As matter of law, right?

8      MS. CARSON:  Well, I think as your Honor pointed

9  out, they say as matter of law but it's an issue for the

10  Court to decide.  Because as Ms. Ben-Ami just pointed out,

11  you can in obviousness-type/double patenting determination

12  consider what was known in the prior art.

13      THE COURT:  Okay.  I appreciate your consistency.

14  And therefore, when we, when we tease out this aspect of the

15  case as I have chosen to try it, a result, the result for

16  which you argue is that I would determine, whether I call it

17  a finding by the judge or whether it's a ruling by the

18  judge, that certain of the claims in issue are obvious by

19  virtue of this prosecution history.  Right?

20      MS. CARSON:  You -- yes, your Honor.  What our

21  argument is is that if you take certain of the claims of

22  either the '698 or the '868 and you look at the asserted

23  claims, those claims are obvious over the claims of the '698

24  and the '868.

25      THE COURT:  Yes.  Let me see here.

1          Well, what is your position as to the '179

2    application?  Is it your position that it contained both

3    claims that were the result of a restriction requirement and

4    claims not subject to any restriction?

5          MS. CARSON:  Your Honor, because everything was

6    done at the exact same time it never actually contained

7    claims that would be to a nonelected invention, because

8    everything happened at the same time.

9          THE COURT:  All right.  But as I -- I see.

10          MS. CARSON:  And, your Honor --

11          THE COURT:  Let me say it back to you to see if I

12    have got it.

13          They filed claims subject to a restriction

14    requirement.  At least claim 1 was.

15          MS. CARSON:  Yes.

16          THE COURT:  All right.  They -- you say claim,

17    claims 2 through 60 were not because it was they who had

18    voluntarily ceased the prosecution of those claims.

19          MS. CARSON:  Claims 62 through 72, or something

20    like that.

21          THE COURT:  All right.  Then they drop all those

22    claims, they drop the one claim that they, is, is subject to

23    a restriction requirement.

24          MS. CARSON:  Right.

25          THE COURT:  They substitute on the same day claims

1    62, inserting 62 through what?

2              MS. CARSON:  Seventy -- 61 to 72.

3              THE COURT:  Sixty-one through 72.  Which you say

4    are not subject with, to a restriction requirement.

5              MS. CARSON:  Right.  They were process claims that

6    belonged to --

7              THE COURT:  Are they consonant with the restriction

8    requirement as the law uses that term?

9              MS. CARSON:  They're dead on in Group II.  They

10   belonged in Group II.  They track the language of what

11   should have been in Group II.  They're process claims.

12   They're what the Patent Office said you should be

13   prosecuting with your DNA claims.

14             And, your Honor, there's a point that I would like

15   to make.  Because if you take -- Amgen can say to you, well,

16   when we filed the '179 we had a claim 1 and that was subject

17   to a restriction requirement, so the '179 and any patent

18   that issued from it should be immunized by 121.

19             THE COURT:  Oh, no, Ms. Carson, whatever my other

20   failures, you've made an argument I understand.  And I'll be

21   asking them about it and we'll hear what their response is.

22             MS. CARSON:  Okay.  Thank you, your Honor.

23             THE COURT:  Now, before we turn to Mr. Suh, I need

24   about five minutes, to change reporters, and I need five

25   minutes.  It seems to me that this would be a good time,

```
 1   because I'm just counting the time, and I don't want to

 2   interrupt your argument.

 3         So we'll take a five minute recess at this time.

 4   We'll recess.

 5         THE CLERK:  All rise.  Court is in recess.

 6         (Recess.)

 7         THE CLERK:  All rise.  Court is in session, please

 8   be seated.

 9         THE COURT:  Mr. Suh?

10         MR. SUH:  Good afternoon, your Honor.

11         THE COURT:  Go right ahead.

12         MR. SUH:  As my colleague, Ms. Carson, explained, I

13   will be dealing with the obviousness-type/double patenting

14   Theory Number 3, which is the theory that's based upon the

15   earlier issue and now expired '008 patent, and that those

16   claims render the asserted claims in the '868 and the '698

17   patents invalid.  And with respect to this theory, your

18   Honor, I don't think there is any dispute anymore that

19   Section 121, the restriction requirement safe harbor,

20   applies.  I believe that Amgen has now agreed to that.

21         And I also wanted to make the point with respect to

22   the 121 restriction requirement that my colleague,

23   Ms. Carson, talked about, that that is still Amgen's burden

24   to prove.

25         THE COURT:  What's Amgen's burden of proof?
```

1          MR. SUH:  To show that the Section 121 safe harbor

2    actually applies as a defense to double patenting.

3          THE COURT:  Oh, I follow that.  All right.

4          MR. SUH:  And the reason why we're giving, as we

5    can call this argument, with respect to ODP Theory Number 3,

6    is because your Honor actually allowed the jury to hear some

7    evidence on ODP Number 3 through Dr. Lowe.

8          THE COURT:  Yes.  And you have every right to rely

9    on the full record that's been prepared in the case.  When I

10   got it in my mind that I was going to determine this myself,

11   I thought that -- I didn't -- it might be confusing to the

12   jury to start striking things out, we're just not going to

13   mention that any further.  Those arguments as they are today

14   are going to be directed to me.

15         MR. SUH:  Yes, your Honor.

16         THE COURT:  But the record is what it is.

17         MR. SUH:  In addition to Dr. Lowe, there were

18   issues that did overlap from what Dr. Lin actually testified

19   yesterday, which actually bear on ODP Theory Number 3.  But

20   before I actually lay that evidence out, I'd like to

21   actually go to the file history, because I think this is a

22   good point where it lays out, again, the fact that there is

23   no restriction requirement issued here.  And I'd like to go

24   to what Ms. Carson published as RV12.

25         Your Honor, this is the 1986 restriction

 1  requirement from the parent applications of all the patents

 2  in suit.  And your Honor, if we look at Group II, that group

 3  is the group whereby the claims of the '008 patent issue,

 4  and that group is also the claims that the '868 patent

 5  claims issued, and the '698.  So those were all within the

 6  same restriction group.  They were never separated out.

 7  That's why there is no 121 issue with respect to the '008 as

 8  opposed to the '868 and the '698.

 9        Now, I think this particular time period is very

10  relevant, late '80s.  I think we should go back 20 years

11  ago, this was before any of the patents in suit had issued.

12  Amgen had their '008 patent, and they were faced with their

13  first commercial and legal challenge with respect to EPOGEN.

14        Amgen sued a company by the name of Genetics

15  Institute in the District of Massachusetts before Judge

16  Saris.  But at the same time, they were involved in a very

17  bitter interference fight in the patent.

18        THE COURT:  Which they win.

19        MR. SUH:  And that's exactly why I think that with

20  respect to ODP Theory Number 3, the things that they

21  actually said in those patent interferences are directly

22  contradictory to their position here today.  And I'm going

23  to go through that with you.

24        THE COURT:  Well, I'm interested in that, because

25  is it not true that if I adopt either of the arguments that

1   you and your colleague, Ms. Carson, have made in this

2   lawsuit, I will be making rulings of law contrary to the

3   agency officers that have looked to these matters?

4        MR. SUH:  Absolutely not, your Honor.

5        THE COURT:  I won't be.  I'm not -- not that that

6   frightens me, or will cause me to stay my hand, but it's

7   something.  So, and you're saying not at all.

8        MR. SUH:  Absolutely not.

9        THE COURT:  That if I adopt the arguments that you

10  and she have made, the record as against some claim that

11  different hearing officers are reaching inconsistent

12  positions as matter of law, won't lie.

13       MR. SUH:  No.  I'll tell you why.  Because our

14  position is that Amgen is judicially estopped because

15  they're trying to actually contradict the findings that

16  these judicial bodies and the Patent Board actually adopted.

17  They argued it, the patent office adopted it, and now they

18  want to change their minds.  I'm going to go through that

19  with you right now.

20       In the late '80s, there were three interferences

21  that Amgen was involved with against Genetics Institute.

22       THE COURT:  Well, Mr. Suh, I want to hear this.  At

23  the same time, if I count the time now, you're at an hour,

24  and Roche is an hour ten minutes out of their two.  So

25  you've got five more minutes before you're into the 45

1    minutes you want to reserve for Lodish.  And much as I could

2    direct, and the like, I'm not likely to.  I'm prepared to

3    use the full four hours.

4         Now, I'm not -- I just want you to figure out how

5    you want to do it.  That's all.

6         MR. SUH:  I understand.  I'll go through this very

7    quickly.

8         THE COURT:  Go ahead.

9         MR. SUH:  Those interference decisions involved

10   three sets of inventions.  One interference was called

11   the '096 interference, and that involved the actual claim.

12   The count of that interference was an actual claim to the

13   now expired '008 patent.  That was claim 2.

14        There was also another interference, and that

15   was -- that involved 102097 interference.  That count was

16   the claim that became the '868 and the '698 patent.  So we

17   have these two separate counts, your Honor.  And that was

18   being contested before the Patent Board.

19        Now, Amgen caught a break in the late '80s because

20   Judge Saris actually came out with a finding which said that

21   Amgen was the first to clone the EPO gene before GI.  So

22   what did Amgen do, your Honor?  It took that district court

23   decision, went to the Patent Board and said, Patent Board,

24   you should recognize this decision.  You should recognize

25   the decision because the count in the interference was to be

 1    '008, and the litigation was also involving the '008.

 2           And to a certain extent that makes sense, but Amgen

 3    didn't stop there because there was another interference and

 4    that involved the '868 claim.  And what Amgen did there was

 5    it said this decision on the '008 claims should also be

 6    used, it should also be dispositive on the '097

 7    interference.

 8           And how did they make that argument, your Honor?

 9    They made that argument by saying that the '008 claims and

10    the claims that became the '868 and '698 patents were the

11    same invention.  And their words were, These are merely

12    different manifestations of the same invention.

13           THE COURT:  Well, why would they ever say that?

14           MR. SUH:  Because they wanted to bootstrap the

15    opinion that Judge Saris made on the '008 and use that as

16    judicial authority in order to win their other interference.

17    And they made those arguments, and they made these arguments

18    in this interference brief, which I'd like to offer into

19    evidence.

20           THE COURT:  Well, I don't know -- why don't I take

21    judicial notice of it.  I'm disposed to receive it.

22           MR. SUH:  And your Honor, this is not only did they

23    make the arguments, and this is answering the question that

24    you asked, they made these arguments and the Patent Board

25    accepted it.  They agreed with them.  They said that for

1   purposes of priority, the '097 interference that dealt with

2   the '698 and '868 patent and the other interference, '008,

3   are identical based upon the arguments that Amgen made.

4        THE COURT:  And so this is rather straightforward

5   argument.  So you say, Having said that, that is a classic

6   judicial estoppel.  They said that, they got the advantage

7   of that before the administrative board, now they can't say

8   something else here.

9        MR. SUH:  Absolutely.  Because that was 20 years

10  ago.  And now what happened in 2004, the '008 patent

11  expired, and in 2006 Amgen sued Roche.  And when we answered

12  that pleading, we said double patenting, '008 patent.  As

13  soon as we said that, they ran away from their statements

14  that they made 20 years ago.  And the arguments that they

15  give are three-fold.  They said, Well, you're really taking

16  those statements that we made out of context.  Well, your

17  Honor, we can provide you the briefs.  We're not taking

18  anything out of context.

19        The other argument that they're making is that,

20  Well, these were really arguments that Genetics Institute

21  was making.  And your Honor can actually take a look at the

22  briefs and see that Amgen actually adopts the position by GI

23  in order to take advantage of Judge Saris' position.

24        So we're not asking you to overturn anything that

25  Judge Saris did.  We're not asking you to overturn anything

 1    that the Patent Board did.  As a matter of fact, those stay

 2    exactly the same.  And it's Amgen that wants to actually go

 3    back and change history.

 4            THE COURT:  I understand the argument.  Is that

 5    Roche's presentation?

 6            MR. SUH:  Yes, your Honor.

 7            THE COURT:  Very well.  Mr. Day, I, again -- I'm

 8    sorry.

 9            MR. SUH:  And, your Honor, may I please move this

10    particular interference brief into evidence?

11            THE COURT:  I'm not accustomed to taking briefs as

12    evidence, but since this is a judicial estoppel claim, I'm

13    going to receive it.  We'll give them letters here, so we

14    don't foul up -- does this have letters?

15            MR. SUH:  Yes.  GUK.

16            THE COURT:  GUK.  I'll consider it in this

17    proceeding.

18            All right, Mr. Day, I'm a little --

19            MR. SUH:  I'm sorry, your Honor, one last thing.

20    May we please also allow you to have judicial notice of the

21    interference decision, which I also have a copy of?

22            THE COURT:  Yes.  Does it have letters?

23            MR. SUH:  Yes, it does.  CAD.

24            THE COURT:  CAD will be considered in this.

25            All right.  Mr. Day, I'm not going to have

 1  arguments about directed findings, but really you can spend

 2  your time as you see fit.  You can either take them on

 3  legally right now, you can call witnesses.  They've reserved

 4  45 minutes, and we'll use it up however.  And you may

 5  proceed as you see fit.

 6       MR. DAY:  Thank you, your Honor.  And before I

 7  begin, I apologize to the Court, but I did misspeak this

 8  morning.  I said that Dr. Varki was our last witness.  I

 9  believe that Dr. Lodish will also be testifying in our case,

10  but very briefly.  He will be our last witness.  I just

11  wanted to bring that to the Court's attention.

12       I'm going to use my time today for argument, your

13  Honor, and we're going to be calling Dr. Lodish as a witness

14  on Thursday afternoon.

15       THE COURT:  And that's fine.

16       MR. DAY:  I think it's probably best simply to

17  follow the order in which Roche has presented its arguments.

18  So I'm going to begin with Theory Number 4.  Is it okay if I

19  refer to these as Theory 4 and Theory 3?

20       THE COURT:  It is.  And a question I wanted to put

21  to your side, since we're going to argue is, I would like to

22  see the legal -- this can be done by brief -- but the legal

23  landscape and gloss that's put on the word "consonance."

24  Because you've got this single application from which

25  various patents flow, and as I understand the law, for them

1   to have any benefit from an earlier restriction, your

2   conduct must be consonant with that restriction.

3           First, isn't that a correct statement of the law?

4           MR. DAY:  Yes.

5           THE COURT:  And, therefore, I'd like --

6           MR. DAY:  So it must maintain consonance.

7           THE COURT:  Fine.  I'd like to see -- and my

8   statement is to both sides.  In the limited time we have,

9   I'd like to see that develop by the decisions of courts

10  either controlling or persuasive.  But now I'll hear your

11  argument.

12          MR. DAY:  I think the two controlling decisions

13  here that your Honor's going to want to look at are Symbol

14  in the Federal Circuit -- let me give you the citation to

15  that case, if I could.  My eyes are shot.  It's Symbol

16  Technologies versus Opticon, 935 F. 2d 1569.  You might want

17  to particularly look at 1579 to 80.  Then, of course,

18  Applied Materials versus Advanced Semiconductor Materials,

19  98 F. 3d 1563, 1567 to 69.

20          And the principle around consonance, just to

21  address the point, since the Court's raised it, the

22  principle around consonance is that the important concept is

23  that the patent, as issued, must have claims that maintain

24  consonance with the original restrictional requirement.  And

25  what Applied Materials establishes is that doesn't mean that

 1   during prosecution you can't amend the claims, it doesn't

 2   mean you can't go in and out of consonance during

 3   prosecution.  That's okay.  It's all right that different

 4   claim sets move in and out of these applications.

 5          What matters is from measuring from the beginning

 6   point, was it an application filed in response to a

 7   restriction requirement; and the endpoint, at the end when

 8   the claims issue, did they maintain consonance as issued.

 9   That's the key thing.  And that's what Applied Materials

10   establishes.  And that's why I commend both of those

11   decisions to the Court.

12          I think that there are a couple of preliminary

13   points that I want to talk about with respect to Theory

14   4 that Ms. Carson made light of, but I don't think are quite

15   as superficially disposed of as Roche would have the Court

16   believe.  First of all, Roche provided no discovery within

17   the time limits for any of these defenses.  They were

18   served, as our brief proffered last week showed, written

19   interrogatories requiring answers by the discovery cutoff

20   set by the Court, April 2nd.  No responses identified these

21   defenses.

22          Secondly, when Roche served their expert reports

23   four days later on their validity defenses, they had one,

24   two, three, four, five expert reports on

25   obviousness-type/double patenting.

1            Could I have Slide D253 up, please?

2            They had five different experts offer initial

3     expert reports on April 6 who covered ODP.  Those are the

4     first five listed:  Lowe, Blobel, Harlow, Kellems,

5     Sofocleous.  Kadesch didn't discuss anything about ODP in

6     his expert report.  All these amended reports, from April to

7     June, and none of them, none of them said anything about

8     this.  And the only thing that we got were two sentences in

9     the last report of Kadesch, two sentences in the last report

10    of Kadesch that said the '698 claim 4 was rendered '349

11    claim 7 invalid for double patenting.  Not

12    obviousness-type/double patenting, double patenting.

13            THE COURT:  But I guess I don't understand here, to

14    this extent.  There's much to what you say about Kadesch,

15    I've looked at that.  And if they want to say something more

16    about that, fine.  But Mr. Suh's argument is entirely -- I

17    mean, he supports it by matters as to which I could take

18    judicial notice, but it's entirely matter of law.  A

19    question of judicial estoppel.  Ms. Carson's --

20            MR. DAY:  As to Theory 3 --

21            THE COURT:  Just hear me so you can deal with it.

22            Ms. Carson's argument, though she put on Kadesch,

23    she doesn't really need Kadesch because there's no doubt I

24    can look at the patents and the prosecution history.  I do

25    that in Markman.  That's for me, however we characterize it,

1    and it's my duty, I think, to do that.

2         So it's not a question of failure to provide

3    evidence.  Rather, it is what I make of the evidence.  She

4    could still win if I disregard Kadesch and disregard Lowe.

5    Even if they say anything about this, and I'm not clear they

6    do.

7         MR. DAY:  No, she couldn't.

8         THE COURT:  At least in my mind she could.

9         MR. DAY:  No, she couldn't.

10        THE COURT:  Why not?

11        MR. DAY:  Because this is an -- this is an

12   affirmative defense of Roche.

13        THE COURT:  She says, though, that you bear the

14   burden of coming within 121.

15        MR. DAY:  121 is simply a safe harbor to the

16   defense.  But it's still a defense of Roche.  And Roche

17   still has to mount the defense, and they have to give us

18   notice of the defense, and they have to make disclosure of

19   the defense in discovery, and they have to give us a reason

20   to believe, before trial, that they're going to try this

21   issue to the Court.

22        THE COURT:  And you say it doesn't even rise to

23   that level.

24        MR. DAY:  That's right.  I'm saying there's a

25   waiver here that the Court should pay attention to because

1    of the Court's strict scheduling orders, and what the Court

2    has required the parties to abide by and adhere to in this

3    case.  What standard does the Court here set for pretrial

4    disclosure of a defense.  That's the issue.

5         And when they don't disclose the defense in their

6    interrogatory responses, and don't disclose the defense in

7    any of their expert reports, they don't disclose the defense

8    in their '282 statement, they don't provide any notice of

9    defense right up until their pretrial brief served on the

10   eve of trial, is that fair notice of a defense that entitles

11   them to raise this?  That's the issue I raise.

12        So let me turn to the issue that Ms. Carson raises.

13        Could I have Slide D255.

14        And that issue is, if the Court decides that, okay,

15   well, we'll skate on that, we'll let them get by with that,

16   and now Mr. Day, you tell me, do you have a safe harbor

17   defense that otherwise takes this out.

18        I'm sorry, did I get D255?  Is that what this is?

19   Well, let me show you what I want.

20        (Whereupon counsel conferred.)

21        MR. DAY:  So this is Section 121 and it's

22   Section -- this is Section 121, verbatim, but I've broken it

23   out logically to help parse the language of the statute so

24   that it's easier to understand what the statute says.

25        The statute says that a patent issuing, and there

 1    are two alternatives, on an application with respect to

 2    which a requirement for restriction under this section has

 3    been made, or, on an application filed as a result of such a

 4    requirement -- that's this case, that's what we're dealing

 5    with here -- shall not be used as a reference either in the

 6    Patent and Trademark Office or in the courts against a

 7    divisional application, or against the original application,

 8    or any patent issued on either of them, if the divisional is

 9    filed before the issuance of the patent on the other

10    application.

11         Could I have 225, please?

12         THE COURT:  I'm following.

13         MR. DAY:  So there are two requirements.  The two

14    requirements are, first of all, that the later-issued patent

15    must arise from an application that was filed as a result of

16    a restriction requirement.  That's what Symbol Technologies

17    and Applied Materials applied to.

18         THE COURT:  Well, she accepts that, and her parsing

19    of the history is that this --

20         MR. DAY:  She wants you to second-guess what

21    happened, right?

22         THE COURT:  Second-guess what happened, she says it

23    was a fast shuffle.  It didn't happen that way.

24         MR. DAY:  No, it happened exactly -- it happened

25    exactly as she said it happened, but that's not a fast

1    shuffle.

2         THE COURT:  That's a fair response.

3         MR. DAY:  Okay.  The way it happened was that

4    Amgen, in response to a restriction requirement, filed an

5    application that contained one single claim that was not in

6    the elected group, just as the patent office requires it to

7    do.  It followed the patent office practice and procedure.

8    It filed one claim, it filed a filing fee for one claim, and

9    then consistent with, just as Applied Materials and Symbol

10   Technologies teaches you, it was free to amend that

11   application all the way until the point of final issuance,

12   so long as the claims that issued out of the final

13   application, so long as the claims that issued maintained

14   consonance.

15        THE COURT:  And -- I just have to ask a basic

16   question.  I understand the word "consonant," and I'll check

17   these cases as to the laws.  That means, in other words,

18   that the claims that ultimately issued fall within the

19   original restriction requirement so that they gain the

20   benefit of Section 121.

21        MR. DAY:  It means so that they fall outside the

22   elected claims within the original restricted -- restriction

23   requirement.  Let me explain.  And I think we're probably

24   saying the same thing, but I'm trying to be as precise as I

25   can be.

1          THE COURT:  And I'm asking.

2          MR. DAY:  Could I have D259, first of all.

3          THE COURT:  Well, they're outside in the sense that

4  they're patentably distinct, but they are within the ambit

5  of the original restriction requirement.  Does that say it?

6          MR. DAY:  Not quite, your Honor.  Let me see if I

7  can work on a phrasing that is accurate and clear.

8          We see here the restriction requirement.  And this

9  is the patent office restriction requirement that was

10  imposed in the original '298 application.  And it defines

11  six groups of claims, and they're numbered there, Roman

12  Numerals.  And the patent office went on at the bottom, it

13  says, "Because these inventions are distinct for the reasons

14  given above and have acquired a separate status in the art

15  because of their recognized divergent subject matter

16  restriction for examination purposes as indicated is

17  proper."  Amgen, you must elect one of these, choose one.

18          Amgen chose Group II.  And as a result of choosing

19  Group II -- could I have D219, please? -- Amgen, on the

20  left, you have the '298 application, the next box to the

21  right is the restriction requirement with the six groups of

22  claims.  Amgen chose for the '008 application, the

23  '298 application, it chose Group II claims, Roman

24  Numeral II, above the '008 and it prosecuted those Group II

25  claims.

1           Amgen then filed two applications in response to

2    the restriction requirement, the '179 and the '178, and both

3    of those applications as filed contained one claim.  Neither

4    of those claims was within Group II.  That's what the law

5    required Amgen to do.  That's why there were applications

6    filed in response to a restriction requirement.

7           That was then Amgen's ticket to ride, if you will.

8    From that point forward, Amgen was free to amend and put

9    whatever claims in and out it wanted to, so long as whatever

10   applications ultimately resulted from that, if the patent

11   issued with claims that abided by the restriction

12   requirements on the left, in other words, so long as the

13   applications issued -- let's take a look at the '933 -- so

14   long as there were no claims in the '933 patent that fell

15   within Group II, it was entitled to the protection of

16   121 against any other application filed as a result of that

17   restriction requirement.

18           THE COURT:  Let me say it back so I understand it.

19   In other words, to be consonant with means that the claims

20   as issued in the patents resulting from the '179

21   application, had to be claims within Groups I, III, IV, V

22   and VI, and not within Group II.

23           MR. DAY:  Precisely.

24           THE COURT:  All right.

25           MR. DAY:  And as long as those claims are within

1    those nonelected groups, they are consonant with the

2    restriction requirement.

3         So what happened is that Amgen filed two

4    applications.  It bought two tickets to ride.  It said,

5    We'll take two tickets to ride, thank you.  Patent Office --

6    could have taken six, could have taken five, doesn't really

7    matter.  Because under Symbol and Applied, it has the

8    freedom, once it buys a ticket to ride, it has the freedom

9    to amend those applications and to divide them or file

10   continuations.  And none of the resulting applications, none

11   of the resulting applications will be subject to ODP on any

12   application that issues as a result of that restriction

13   requirement.  That's what the law means.

14        And so as long as Amgen maintained consonance, it

15   gets the protection of 121.  The '933 maintained consonance,

16   the '422 maintained consonance, the '349 maintained

17   consonance.  The '698 did not and the '868 did not.  Because

18   the '698 and the '868 both included claims that fell within

19   the scope of Group II.  So they don't maintain consonance.

20        Therefore, those claims are not entitled to the

21   statutory safe harbor of 121 protection.  However, as the

22   statute goes on to make clear -- could I have 261, please?

23   Forget -- that's all right, never mind.

24        However, the fact -- the statute goes on to say,

25   "The validity of a patent shall not be questioned for

1    failure of the director to require the application to be

2    restricted to one invention."  That point's not relevant to

3    the point I want to make so let me simply withdraw it.

4          The fact that Amgen did not maintain consonance

5    with the '698 and the '868 does not mean that it cannot

6    establish that the claims are not subject to

7    obviousness-type/double patenting.  And, in fact, during the

8    prosecution, I'll get to this when we address Theory 3, when

9    we get at '868 and '698, in fact, during prosecution the

10   claims were rejected by the examiner for

11   obviousness-type/double patenting and Amgen overcame that

12   rejection which heightens the presumption that these claims

13   are valid.

14         So the point I want to make with respect to Theory

15   4, and I'm happy to close out on that, if I could just come

16   back to, first of all, 225, and I'm going to end with 220.

17   Get that ready, 225.

18         The point I want to make with respect to

19   Section 121 is this Court has already determined as a matter

20   of summary judgment that both the '178 and the '179

21   applications were filed as a result of restriction

22   requirement.  That determination has been made in Amgen's

23   summary judgment.  Roche is asking you to go back and

24   revisit that judgment, and they're asking you now to

25   determine, no, the '179 application was not filed as a

 1    result of a restriction requirement.

 2          And the fact that -- when the claims were filed,

 3    the fact that when the application was filed, that 120

 4    demonstrates that it qualifies for 121 protection.  In order

 5    to secure the protection, the patents at issue must have

 6    maintained consonance.  And only those patents get the

 7    protection of 121.  And that's what Symbol and Applied

 8    Materials and Gerber all establish.

 9          Let me turn, if I could, to Roche's Theory 3,

10    Mr. Suh's argument, if I could, your Honor.

11          The first point to understand about what Roche

12    calls Theory 3 is, okay, let's clear the air here.  Amgen is

13    not arguing that it has a statutory safe harbor protection

14    under 121 reduced claims, instead Amgen's arguing that these

15    claims are patentably distinct, and the patent office has

16    determined on multiple occasions that these claim are

17    patentably distinct.  And indeed it expressly determined

18    that when it allowed the claim to issue.

19          Roche is asking the Court to unwind those decisions

20    and to reverse them.  And what's the background of this?  I

21    want to be clear about some of the factual background that

22    Mr. Suh covered, and some of the factual background that he

23    did not cover.  And to do that, it's probably best to just

24    put up a little bit of a time line.  And I'm going to put up

25    now -- now we can have D255.

1          And let me just explain this time line, because

2     it's going to set the context for the prosecution history of

3     this '868 and the '698 patents.  As you see, the time line

4     goes in sort of a U.  This is Mr. Gottfried's idea, so I can

5     give him full credit.  We start off on the left, and what

6     you see are the original applications in dark blue.  These

7     are the CIPs that were originally filed in December,

8     February, September and ultimately in November 1984.

9          Going down, you see 7/3/86, you see in the yellow

10    box the restriction requirement that we've been talking

11    about.  Then you see the '179 application, which is the

12    application that ultimately resulted in the '868 and will

13    result in the '698 applications as well.  And you see in the

14    1987 to 1988 time period, just before that red box at the

15    bottom which is the interference proceeding, Amgen was

16    seeking allowance of this application in the patent office.

17    It was seeking process claims in the patent office.

18          And the reason it was seeking process claims, and

19    this is important to understand, is that there was, in

20    addition to the GI case that was pending here in the

21    District of Massachusetts, there was a parallel ITC

22    proceeding in D.C.  And in the ITC proceeding, Amgen was

23    seeking to enforce its '008 DNA and host cell claims against

24    the importation by Chugai of recombinant erythropoietin made

25    in Japan and then being shipped into the United States.

1            The ITC held that you cannot stop the importation

2    of product made in Japan because you do not have process

3    claims to the manufacture of erythropoietin.  And you do not

4    have product claims to erythropoietin polypeptides or

5    proteins.  You only have DNA claims and you only have host

6    cells containing DNA.  And neither of those claims give rise

7    to a process claim, which is what is required in order to

8    stop the foreign manufacture and importation of infringement

9    product.

10            So the ITC said your claims, your '008 claims don't

11    extend to, they are patently distinct from and don't cover

12    processes for the production of erythropoietin.  And so

13    Amgen was in the patent office before, in this case, the

14    lower left-hand box there, Examiner Tannenholtz, trying to

15    get process issued, because it needed the process claim in

16    order to stop the importation of the infringing product.

17            Examiner Tannenholtz was resistant to allowing the

18    claims because he was applying a law of a case decision

19    called in re Durden on a theory that, well, the claims would

20    have been obvious.  Ultimately, he was persuaded that the

21    law, the in re Durden, didn't apply, and that the process

22    claims, that is, the claims using a novel starting material

23    in a process to produce a novel product, was not obvious.

24    And he withdrew his rejection.  But when he withdrew his

25    rejection, the claims went into the interference.

1        The patent office in the interference declared

2    three separate interferences.  And by rule, they must

3    declare a separate interference for each separately

4    patentable invention.  They defined three different counts.

5    Each count had to be patentably distinct.  They defined a

6    count to the '008 DNA and host cell claims, they said that's

7    one invention.  They defined a count to the process of

8    making EPO glycoproteins, they said that was a separate

9    invention.  And they defined a count to EPO glycoproteins,

10   the product themselves.  They said that's a third invention.

11   The three interferences were the '096 on the DNA,

12   the '097 on the process, and the '334 on the product.

13       When the third interference was filed, GI filed a

14   brief in the interference.  Mr. Suh alluded to this, but I

15   think mischaracterized Amgen's argument about this and what

16   the brief actually said.  GI filed a brief and they said, We

17   should combine all these interferences into one.  There's

18   really just one invention.

19       This is what GI said.  And in their brief they said

20   the interferences should be combined because the counts all

21   define different manifestations of the same invention.  The

22   motion was denied.  And when the motion was denied, when the

23   third interference was declared, the patent office acting

24   commissioner -- and could I have D228, please? -- the acting

25   commissioner of the Patent and Trademark Office, Jeffrey

1     Samuels, the examiner on the case, Howard Schain, and his

2     supervisor, John Kittle, all signed this document saying

3     while the subject matter of the three interferences is

4     deemed to be patentably distinct, that subject matter is

5     nevertheless related.  Each of these inventions were

6     separate.  The three interferences were maintained as

7     separate counts.  And they denied the motion to combine

8     because the subject matter was patentably distinct.

9          And as I pointed out -- D256, please -- the reason

10    there were three interferences was because under patent

11    office procedures, each count shall define a separate

12    patentable invention.  That's what the Manual Patent

13    Examiners -- the MPEP requires.  And it's not just the MPEP,

14    but it's also by federal regulation.  When there is more

15    than one count, each count shall define a separate

16    patentable invention.  That's why there were three

17    interferences.

18         Okay.  So the first argument that Mr. Suh made to

19    you, that Amgen said that these were different

20    manifestations of the same invention, well, actually that

21    was a statement made by GI.  When GI filed that motion,

22    Amgen opposed the motion and said, Suffice it to say, these

23    are not the same invention, these are separate inventions.

24         Could we have that slide?  Could I have D286?

25         This is what Amgen said in response to GI's

1    argument.  "Fritsch contends on page 866 of its motion, the

2    interference in terms of subject matter are essentially the

3    same and the interference counts are different

4    manifestations of the same invention.  Fritsch has the

5    burden of proof in support of its motion and the allegations

6    made therein.  Since Fritsch does not even attempt to supply

7    any arguments or evidence in support of the bare allegation

8    of same invention, it is apparent that it was not a serious

9    contention.  Suffice it to say that Lin contends that the

10   two counts are not the same invention."  So it's not Amgen

11   that's saying that these are different manifestations of the

12   same invention.

13        There was, in the interference, as Mr. Suh alluded

14   to, another issue.  It was the central issue in the

15   interference.  And that issue was the priority of

16   inventorship; who was the first to invent here, and what

17   happened in the course of the priority of the inventorship.

18   And here again, I need to step back to set the stage.

19        THE COURT:  Is that germane to this?  In a way,

20   I've gleaned that from the skirmishing that's going on,

21   presentation to the jury.

22        MR. DAY:  It's germane to my rebuttal of Roche's

23   argument.

24        THE COURT:  All right.  Well, then I'll hear you.

25        MR. DAY:  Because Roche is taking snippets from

1    interference briefs out of context and using them to create

2    an impression that Amgen took a position that Amgen did not,

3    and that the patent office reached a result that the patent

4    office did not reach.  And I simply want to set the context

5    straight.

6            The issue both in the district court and in the

7    interference was -- of priority inventorship, was defined by

8    Fritsch this way.  Fritsch argued, GI argued that they were

9    the first to invent, recognizing that Lin had cloned the

10    gene before them.  Their argument was, Well, we conceived of

11    a method of obtaining the gene before Lin back in 1982, and

12    we were diligent in reducing it for practice.  And even

13    though we succeeded after Lin, because our conception was

14    earlier in time, we were the first to invent it.

15            So Fritsch's argument was sort of a classic

16    argument that has been applied in many areas of patent law,

17    that the first to invent is the first to conceive followed

18    by diligent reduction to practice.  They argued that they

19    were first to conceive back in 1982, and that in '82, '83,

20    '84, they were diligent, and even though they cloned the

21    gene a year after Lin, they were still ahead of him.

22            This court, the district court, rejected that

23    argument and said in the context of DNA it's simultaneous

24    concept reduction to practice.  And the Federal Circuit --

25            THE COURT:  When you say "this court," that would

1    have been Judge Saris?

2         MR. DAY:  Correct, your Honor.  I mean the District

3    Course of Massachusetts.

4         THE COURT:  But in Judge Saris' case.  Go ahead.

5         MR. DAY:  And obviously she was sitting as a

6    magistrate at the time under this Court's supervision.  I

7    don't mean to suggest your Honor was involved, but I do mean

8    to suggest it was the District of Massachusetts.

9         THE COURT:  I just want reference to the opinion,

10   and I understand.  Go ahead.

11        MR. DAY:  And the Federal Circuit affirmed and

12   established a body of law which I've cited to you in our

13   JMOL about simultaneous conception and reduction to practice

14   and what is required in this area of the law to get to

15   inventorship.

16        So Fritsch, nonetheless, not withstanding this,

17   Fritsch continued to argue this in the interference.

18   Because this was the -- this was their argument, this is

19   what they were trying to ride.  For that reason, Fritsch

20   argued because conception, conception was what he was

21   turning on, Fritsch argued that all of these counts should

22   be determined by his date of his conception because the

23   district court had already found in findings that the patent

24   office was more or less bound by, the district court had

25   already found that Lin cloned the gene first, Lin had

1    expressed the product first, Lin had developed the process

2    for producing the product first, and had shown biological

3    activity.  All his dates were first.  The only way Fritsch

4    could get ahead of any of those dates was to argue

5    conception as the basis for inventorship.

6            And what the Board of Interferences held in the

7    interferences was they asked Fritsch, Do you concede, at

8    final argument, do you concede that inventorship turns on

9    who got the gene first?  And Fritsch made that concession on

10   the basis that, well, conception matters, and if I conceived

11   of it first, I got it.  The Board says, Well, that decides

12   it because Lin was first on everything.  There's no

13   question.  And that's why the interferences were all decided

14   in favor of Lin, because Fritsch could not establish a date

15   of reduction to practice for any of these that was ahead of

16   Lin.

17           Finally, the last thing that comes out of the

18   interferences, and is very important to understand, is that

19   Fritsch had a final argument.  They knew they were going to

20   lose on it, on priority, and so they had a final argument.

21   And the final argument was Lin's inventions were obvious.

22   And they challenged the patentability of Lin's claims on the

23   grounds that they were obvious.

24           That's why it's important to look at the entirety

25   of the record in the interference and the entirety of the

 1    briefs, because you need to understand what arguments Amgen

 2    made with respect to that issue.

 3            And if I could have D310, please.

 4            Fritsch argued that the process count would have

 5    been obvious.  And here's what Amgen argued in response.

 6    "Furthermore, it was not obvious that in vivo biologically

 7    active recombinant human EPO could be made by the claimed

 8    process.  Until Lin obtained the sequence, Browne used it in

 9    expression, and Egrie with Dukes found the product had in

10    vivo biological activity.  The process at best was only a

11    wish."

12            So when you put the entire record in context, and

13    you understand what -- and not just isolated snippets woven

14    together in a very well-crafted way to present the

15    appearance of an argument, when you take the entire record

16    in context and understand what happened in the interference

17    proceedings and what arguments were actually made, what they

18    show you is it wasn't Amgen that was arguing that these

19    counts were all different manifestations of the same

20    invention.  That wasn't Amgen's argument.  Indeed, Amgen

21    argued that these inventions were separate inventions.

22            It wasn't Amgen that argued that once you had the

23    DNA it would be obvious to obtain a process for making a

24    biologically active in vivo erythropoietin.  In fact, Amgen

25    argued exactly the opposite in the interference.  And so

1    these patents came out of the interference in all three

2    cases with priority assigned to Lin.

3            And the prosecution, if we go back to the time line

4    now, please, and that would be 255, 255, and so prosecution

5    resumed after the interference.  And we're looking here at

6    the time line that we were looking at earlier, the bottom.

7    You see the interference is the red bar.  When the

8    interference concluded, all of these, the '008 was clear of

9    the interference, the other applications now went back into

10   examination, and in particular the '179 application went

11   back into examination.  And there was an ODP rejection

12   issued in that case over the '008 claims.  And the examiner

13   said, Okay, you don't have 121 safe harbor protection

14   because these claims are within Group II, and we think

15   they're obvious over the DNA claims.

16           Lin responded to that obviousness rejection.  And

17   Lin made three arguments in response to the obviousness

18   rejection.  The first argument that Lin made was with

19   respect to the ITC proceeding.  He said, Look, the ITC has

20   by virtue of the ITC decision and the Federal Circuit

21   affirmance of that decision, it's already been determined

22   that the '008 claims are patentably distinct from the

23   process claims.

24           Second argument.  The interference, in declaring

25   two separate interferences, one for the DNA and one for the

1    process, the board at the patent office has already

2    determined that these are patentably distinct inventions.

3    But three, three, more fundamentally and more importantly,

4    before the interferences were declared, we met and overcame

5    the examiner's rejection for obviousness.  And the reason

6    that we overcame the rejection was on the basis of the

7    evidence and the argument that we presented.  And the

8    evidence and argument that we presented in the course of

9    that was to show that it would not have been obvious in 1983

10   or '84 to obtain a glycoprotein like EPO whose biological

11   activity in the body, as you just heard from Dr. Kadesch,

12   depends on the sugars.  You just heard from Dr. Kadesch on

13   the stand that if you remove a sialic acid --

14            THE COURT:  Wait a minute.  I'm following, but

15   that -- I have nothing to say about that.

16            MR. DAY:  No, this is the argument Amgen made.  I'm

17   simply recounting the argument Amgen made to the patent

18   office.

19            THE COURT:  All right.  Well --

20            MR. DAY:  I'm simply saying that Dr. Kadesch just

21   now corroborated the argument.

22            THE COURT:  Well, you're saying, Amgen, and I'm

23   going to look at these materials with this in mind, you're

24   saying, and I certainly haven't heard out of your mouth any

25   admission of judicial estoppel.

1          MR. DAY:  No.

2          THE COURT:  All right.  I'm interrupting you, only

3    because --

4          MR. DAY:  I will conclude by 4:00.

5          THE COURT:  Well, I'm going to cut you off with

6    five minutes and let you conclude sometime.  But I'm

7    following it so far, and I just need to plan for tomorrow.

8          So we're changing gears now.  Now we're just

9    talking about how the case is going to proceed tomorrow.

10          Tomorrow we will -- you may put on your additional

11    two witnesses and we'll finish with this witness.  And then

12    you will rest.

13          Now, in a bifurcated proceeding -- or this isn't a

14    fully bifurcated proceeding -- I do not require you to renew

15    your motion for directed verdict.  Under the Rules of Civil

16    Procedure, you will save your rights for judgment not

17    withstanding the verdict if you renew it at the close of all

18    the evidence.  Though, again, candidly, as a case management

19    tool, I expect Roche may make a motion for directed verdict

20    on the portion -- on the infringement portion that may be

21    successful in whole or in part.

22          So you don't lose anything if you renew it

23    tomorrow.  But you may, though I'm not giving you any oral

24    argument, you have to go right on.

25          MR. DAY:  I plan simply to file some papers, your

1    Honor.

2           THE COURT:  That's fine.  So when that happens, I

3    will say the first part's done, and working the break around

4    it so I don't take a break between your two openings, and I

5    doubt that will happen --

6           THE CLERK:  And we have to swear in Francis.

7           THE COURT:  Yes.  We'll take that at the break.  I

8    will give my brief precharge on infringement, and the

9    doctrine of equivalents, then there will be openings.

10          Now, since the burden of proof is on the other foot

11   here, Amgen will open first, then Roche.  You need not spend

12   your time in opening, but you may.  Amgen will call its

13   first witness, and we'll roll right on.

14          MR. FLEMING:  A point of clarification.

15          THE COURT:  Yes.

16          MR. FLEMING:  Under the '422, is the reverse

17   doctrine of equivalents still available for Roche in this

18   case?

19          THE COURT:  No.  I've given -- no.

20          MR. FLEMING:  It wasn't clear, the reverse doctrine

21   of equivalents.

22          THE COURT:  That's interesting now, isn't it,

23   because that's precisely the situation that arose in my

24   original foray jury-waived.  I had granted summary judgment

25   as to infringement on the point.  In the second trial, I

1    considered but rejected TKT's -- I don't know the answer to

2    that.

3            MR. FLEMING:  It would be useful for openings

4    tomorrow.

5            THE COURT:  It would be, wouldn't it?

6            MR. FLEMING:  We, of course, have interpreted it

7    that we still have it.

8            THE COURT:  And I confess to you, Mr. Fleming, I

9    was too quick a reaction.  This is a new case, and only

10   Amgen is bound.  I don't -- boy, I exhaustively looked at

11   that reverse doctrine of equivalents.  I don't think that's

12   much of a hope before the Federal Circuit, but that's not

13   for me to say.

14           MR. DAY:  Your Honor, could I be heard on that?

15           THE COURT:  Yes.

16           MR. DAY:  Just a couple of things.  There is

17   woefully little in Roche's expert reports to address this.

18   And, moreover, if they are going to put on a reverse

19   doctrine of equivalents case, then we should be allowed to

20   tell the jury that the product literally infringes.

21           THE COURT:  Well, we'll -- they only get to that

22   issue if they find the product literally infringes.

23           MR. DAY:  Well, you have found as a matter of

24   summary judgment that the product literally --

25           THE COURT:  I have ruled that --

1          MR. DAY:  Yes, sir.  I stand corrected.

2          THE COURT:  -- the product literally infringes.

3   Oh, I see the point.

4          And I do think that follows, Mr. Fleming.

5          MR. FLEMING:  No, your Honor, because it's

6   typically done in the alternative.  Because the argument is

7   should --

8          THE COURT:  But they're not going to be asked.

9   They're not going to be asked on the jury verdict slip

10  whether claim 1 of the '422 literally infringes.  No

11  reference is going to be made to that at all.  Why?  I've

12  ruled on the point and taken it away from them.

13         If you want a box on whether it infringes by the

14  doctrine of equivalents, because as to the others, as to the

15  others -- the way I expect many of these claims to come out,

16  we're going to put both literal and equivalent infringement

17  to the jury.  And I have to tell them if it literally

18  infringes, you don't have to answer doctrine of equivalents,

19  leave it blank.  If it does not literally infringe, you have

20  to answer doctrine of equivalents.

21         So it does seem to me the logic is I have to tell

22  them, I'll make it as mild as possible, but that it has been

23  determined that as to this one it literally infringes.  So

24  you want to think about that and tell me tomorrow.

25         MR. FLEMING:  First thing in the morning.

1          The second thing is as to the witnesses, now that

2    Amgen has told us that they actually are putting Dr. Lodish

3    on, which is contrary to what we understood, I understand

4    he's going to be short, but they've given us quite an

5    extensive disclosure about him.  Can we get a really

6    meaningful disclosure --

7          THE COURT:  I expect people are going to --

8          MR. FLEMING:  You have now ordered the exchange be

9    followed in good faith.

10          THE COURT:  You're not saying they don't.  I wish

11    they would, but my sovereign remedy for all this is the time

12    limits.  On Thursday, the 18th of October, this case will go

13    to the jury.  That discipline, and it is a necessary

14    discipline in this case, and you're doing fine, is such

15    that --

16          MR. FLEMING:  No, I'm sorry, your Honor.

17    Perhaps --

18          THE COURT:  No, you made it clear.  If they take a

19    lot of time with Lodish, it's their time.

20          MR. FLEMING:  No, sir, that's not my point.  I beg

21    your pardon, I was not clear.  They say they're going to put

22    Dr. Lodish on for invalidity for only a short purpose.  They

23    have given us in their written disclosure --

24          THE COURT:  A bunch of stuff.

25          MR. FLEMING:  He's got a tremendous amount of

 1    reports.  All we're asking for is a fair disclosure.

 2          THE COURT:  Yeah, I wish they would but I'm not

 3    ordering it.

 4          Okay.  I miscalculated the time on this segment,

 5    which doesn't count against the trial, but since I'm going

 6    to entertain more of this on Thursday afternoon, actually I

 7    had neglected Amgen's cross-examination of Dr. Kadesch.  So

 8    Amgen has used up 55 minutes, and Roche has used up one hour

 9    and five minutes.  Actually it's 55 minutes remaining,

10    Mr. Suh.

11          MR. SUH:  Thank you, your Honor.  I wanted one last

12    point.  After we have submitted all the evidence on double

13    patenting, Roche will present its brief on judicial estoppel

14    as well as --

15          THE COURT:  That makes perfect sense.  I don't have

16    to decide anything on Thursday afternoon, and at 4:00 on

17    Thursday afternoon it is highly unlikely I'm going to decide

18    anything.  And, in fact, I backed into this thinking I had

19    to make this decision before the case went to the jury.  I

20    don't think I do.  Having taken it away from the jury, it's

21    my determination.  It will have the consequences that I

22    determine that it has.

23          I thank you all.  We'll recess.

24          MS. CARSON:  Just to expand on what Mr. Suh said,

25    we'll offer briefing on all the issues of double patenting.

USDC - In Re Obviousness-Type Double Patenting Hearing Vol. 1  10/1/2007  2:00:00 PM

1          THE COURT:  Fine.  Nine o'clock tomorrow we'll

2    resume the jury trial.  Thank you.  We'll recess.

3          THE CLERK:  All rise.  Court is in recess.

4          (Adjournment.)

5

6

7              C E R T I F I C A T E

8

9

10         We, Donald E. Womack and Cheryl B. Palanchian,

11   Official Court Reporters for the United States District

12   Court for the District of Massachusetts, do hereby certify

13   that the foregoing pages are a true and accurate

14   transcription of our shorthand notes taken in the

15   aforementioned matter to the best of our skill and ability.

16

17

18

19              _____

20

              _____

21

                   DONALD E. WOMACK

22               CHERYL B. PALANCHIAN

                Official Court Reporters

23                 P.O. Box 51062

              Boston, Massachusetts 02205-1062

24               womack@megatran.com

25