UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| AMGEN INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | |
|  | ) | CIVIL ACTION No.: 05-CV-12237WGY |
| F. HOFFMANN-LA ROCHE LTD; | ) | |
| ROCHE DIAGNOSTICS GmbH; and | ) | |
| HOFFMANN-LA ROCHE INC., | ) | |
|  | ) | |
| Defendants. | ) | |

## DEFENDANTS' SUPPLEMENTAL PROPOSED FINAL JURY INSTRUCTIONS

Defendants, F. Hoffman-La Roche Ltd, Roche Diagnostics GmbH, and Hoffmann-La

Roche Inc., respectfully request that the Court read the attached final jury instructions to the jury

at the conclusion of trial.

Dated: October 10, 2007
      Boston, Massachusetts

Respectfully submitted,

F. HOFFMANN-LA ROCHE LTD,
ROCHE DIAGNOSTICS GMBH, and
HOFFMANN-LA ROCHE INC.

*By their attorneys,*

/s/ *Vladimir Drozdoff*
Leora Ben-Ami (*pro hac vice*)
Patricia A. Carson (*pro hac vice*)
Thomas F. Fleming (*pro hac vice*)
Howard S. Suh (*pro hac vice*)
Christopher T. Jagoe  (*pro hac vice*)
Vladimir Drozdoff (*pro hac vice*)
KAYE SCHOLER LLP
425 Park Avenue
New York, New York 10022
Tel. (212) 836-8000

Dockets.Justia.com

Lee Carl Bromberg (BBO# 058480)
Timothy M. Murphy (BBO# 551926)
Julia Huston (BBO# 562160)
Keith E. Toms (BBO# 663369)
Nicole A. Rizzo (BBO# 663853)
Kimberly J. Seluga (BBO# 667655)
BROMBERG & SUNSTEIN LLP
125 Summer Street
Boston, MA 02110
Tel. (617) 443-9292
jhuston@bromsun.com

# DEFENDANTS' PROPOSED JURY INSTRUCTIONS
## TABLE OF CONTENTS

1  **GENERAL INSTRUCTIONS** ..................................................................................**1**

   1.1  INTRODUCTION ..................................................................................1

   1.2  JURORS' DUTIES ..................................................................................2

   1.3  EVIDENCE DEFINED ..........................................................................3

   1.4  DIRECT AND CIRCUMSTANTIAL EVIDENCE ..................................4

   1.5  CONSIDERATION OF EVIDENCE ......................................................5

   1.6  CREDIBILITY OF WITNESSES ..........................................................6

   1.7  NUMBER OF WITNESSES ..................................................................7

   1.8  OPINION WITNESSES ........................................................................8

   1.9  DOCUMENTS ......................................................................................9

2  **THE PARTIES AND THEIR CONTENTIONS** ......................................**10**

   2.1  THE PARTIES ....................................................................................10

   2.2  SUMMARY OF PLAINTIFF'S CONTENTIONS ..............................11

   2.3  SUMMARY OF DEFENDANTS' CONTENTIONS ............................12

   2.4  SUMMARY OF PARTIES' ISSUES ..................................................13

   2.5  ISSUES ESTABLISHED ....................................................................15

3  **BURDEN OF PROOF** ................................................................................**16**

4  **VALIDITY DEFENSES** ............................................................................**17**

   4.1  PRIOR ART DEFINED ......................................................................18

   4.2  ANTICIPATION ................................................................................19

   4.3  EFFECTIVE FILING DATE AND DATE OF INVENTION ..............22

   4.4  PRIOR PUBLIC USE ........................................................................23

   4.5  PRIOR INVENTION ..........................................................................24

   4.6  PRIOR PUBLIC KNOWLEDGE ........................................................25

   4.7  PRINTED PUBLICATION ................................................................26

   4.8  OBVIOUSNESS ................................................................................27

4.9  OBVIOUSNESS DECISION .................................................................................................29

4.10  SCOPE AND CONTENT OF THE PRIOR ART .............................................................31

4.11  OBJECTIVE FACTORS ...................................................................................................32

4.12  LEVEL OF ORDINARY SKILL IN THE ART ...............................................................33

4.13  FACTORS INDICATING OBVIOUSNESS ....................................................................34

4.14  AMGEN'S ADMISSIONS FROM THE PATENT SPECIFICATION ............................35

4.15  DERIVATION OF INVENTION .....................................................................................42

4.16  EXPERIMENTAL DATA ................................................................................................43

4.17  WRITTEN DESCRIPTION ..............................................................................................44

4.18  ENABLEMENT ................................................................................................................46

4.19  INDEFINITENESS ...........................................................................................................47

5  CONSTRUCTION OF CLAIMS .............................................................................................49

5.1  GENERAL PRINCIPLES .................................................................................................49

5.2  DEPENDENT AND INDEPENDENT CLAIMS .............................................................50

6  INFRINGEMENT ....................................................................................................................51

6.1  GENERAL PRINCIPLES .................................................................................................51

6.2  LITERAL INFRINGEMENT ...........................................................................................52

6.3  INFRINGEMENT OF DEPENDENT CLAIMS ..............................................................53

6.4  MATERIAL CHANGE ....................................................................................................54

6.5  EVIDENCE OF MATERIAL CHANGE OF OTHER PRODUCTS IS RELEVANT TO DETERMINING MATERIAL CHANGE OF CERA AND MIRCERA® (NEW) ...................................................56

6.6  INFRINGEMENT BY DOCTRINE OF EQUIVALENTS ..............................................57

6.7  LIMITATIONS ON DOCTRINE OF EQUIVALENTS – APPLIED ON AN ELEMENT BY ELEMENT BASIS .............................................................................................................................59

6.8  LIMITATIONS ON DOCTRINE OF EQUIVALENTS - PROSECUTION HISTORY ESTOPPEL..........60

6.9  LIMITATIONS ON DOCTRINE OF EQUIVALENTS -- CLAIM ELEMENTS MAY NOT BE READ OUT OF EXISTENCE ....................................................................................................61

6.10  ROCHE'S PATENTS ON MIRCERA® ARE RELEVANT TO THE DOCTRINE OF EQUIVALENTS INQUIRY (NEW) .....................................................................................................62

6.11   LIMITATIONS ON THE DOCTRINE OF EQUIVALENTS – SUBJECT MATTER DEDICATED TO

THE PUBLIC ..................................................................................................................63

6.12   REVERSE DOCTRINE OF EQUIVALENTS ...........................................................64

6.13   SAFE HARBOR EXEMPTION....................................................................................65

6.14   SPECIFIC CLAIM INSTRUCTIONS .........................................................................66

6.15   INFRINGEMENT OF U.S. PATENT NO. 5,441,868 ................................................67

    6.15.1     INFRINGEMENT OF U.S. PATENT NO. 5,547,933 ...................................69

    6.15.2     INFRINGEMENT OF U.S. PATENT NO. 5,618,698 ...................................72

    6.15.3     INFRINGEMENT OF U.S. PATENT NO. 5,756,349 ...................................74

**7**     **UNENFORCEABILITY (INEQUITABLE CONDUCT)** ...........................................**75**

7.1   INEQUITABLE CONDUCT - GENERALLY ...............................................................75

7.2   MATERIALITY.............................................................................................................78

7.3   INTENT ........................................................................................................................80

7.4   BALANCING OF MATERIALITY AND INTENT ....................................................82

**8**     **DELIBERATION AND VERDICT** .........................................................................**83**

8.1   INTRODUCTION...........................................................................................................83

8.2   UNANIMOUS VERDICT ..............................................................................................84

8.3   DUTY TO DELIBERATE ..............................................................................................85

8.4   THE COURT HAS NO OPINION...................................................................................86

# 1   GENERAL INSTRUCTIONS[1]

## 1.1   INTRODUCTION

Ladies and Gentlemen of the jury, you have heard the evidence and arguments in this case and the time has come for you to weigh the evidence, deliberate and reach a verdict.  Now it is time for me to instruct you about the law that you must follow in deciding this case.  I will start by explaining your duties and the general rules that apply in every civil case.  Then I will explain some rules that you must use in evaluating particular testimony and evidence.  Then I will explain the positions of the parties and the law you will apply.  And last, I will explain the rules that you must follow during your deliberations in the jury room, and the possible verdicts that you may return.

Please listen very carefully to everything I say in all of my instructions.  Do not pick out any particular part, but consider the instructions as a whole.  The fact that I instruct you as to all aspects of the case does not mean that I think anything has been proved or not proved.  I must instruct you as to all aspects of the case.

---

[1]     The General Instructions, as well as other substantive Instructions, are adapted from the AIPLA 2005 Model Patent Jury Instructions and the Model Patent Jury Instructions from the District Court of the District of Delaware.

## 1.2  JURORS' DUTIES

You have two main duties as jurors. The first one is to decide what the facts are from the evidence that you saw and heard here in court. Deciding what the facts are is your job, not mine, and nothing that I have said or done during this trial was meant to influence your decision about the facts in any way.

Your second duty is to take the law that I give you, apply it to the facts, and decide whether Amgen's asserted patents are valid, whether defendants have infringed them and whether anyone at Amgen or acting on Amgen's behalf misrepresented, omitted or buried material information before the Patent Office in obtaining the asserted patents, with an intent to deceive the Patent Office.  It is my job to instruct you about the law, and you are bound by the oath that you took at the beginning of the trial to follow the instructions that I give you, even if you personally disagree with them.  This includes the instructions that I gave you before and during the trial and these instructions. All the instructions are important, and you should consider them together as a whole. You are required to apply the law, and to do so you must truly understand it.  If you do not understand any of my instructions, you may ask questions.  During the recess that follows my instructions, you should write out any question about the law that you believe will help you understand the framework in which you are required to weigh the evidence before you, and I will answer them.

Perform these duties fairly.  Do not let any bias, sympathy or prejudice that you may feel toward one side or the other influence your decision in any way.

### 1.3  EVIDENCE DEFINED

You must make your decision based only on the evidence that you saw and heard here in court.  Do not let rumors, suspicions, or anything else that you may have seen or heard outside of court influence your decision in any way.

The evidence in this case includes only what the witnesses said while they were testifying under oath, the exhibits that I allowed into evidence, the stipulations that the lawyers agreed to, and the facts that I have judicially noticed.

Nothing else is evidence.  The lawyers' statements and arguments are not evidence. Their questions and objections are not evidence.  My legal rulings are not evidence.  None of my comments or questions is evidence.

During the trial, I may have not let you hear the answers to some of the questions that the lawyers asked.  I also may have ruled that you could not see some of the exhibits that the lawyers wanted you to see.  And sometimes I may have ordered you to disregard things that you saw or heard, or I struck things from the record.  You must completely ignore anything that was excluded.  Do not even think about them.  Do not speculate about what a witness might have said or what an exhibit might have shown.  These things are not evidence, and you are bound by your oath not to let them influence your decision in any way.

Make your decision based only on the evidence, as I have defined it here, and nothing else.

## 1.4  DIRECT AND CIRCUMSTANTIAL EVIDENCE

Now, some of you may have heard the terms "direct evidence" and "circumstantial evidence."

Direct evidence is simply evidence like the testimony of an eyewitness, which, if you believe it, directly proves a fact.  If a witness testified that he saw it raining outside, and you believed him, that would be direct evidence that it was raining.

Circumstantial evidence is simply a chain of circumstances that indirectly proves a fact. If someone walked into the courtroom wearing a raincoat covered with drops of water and carrying a wet hat that would be circumstantial evidence from which you could conclude that it was raining.

It is your job to decide how much weight to give the direct and circumstantial evidence. The law makes no distinction between the weight that you should give to either one, nor does it say that one is any better evidence than the other.  You should consider all the evidence, both direct and circumstantial, and give it whatever weight you believe it deserves.

## 1.5  CONSIDERATION OF EVIDENCE

You should use your common sense in weighing the evidence. Consider it in light of your everyday experience with people and events, and give it whatever weight you believe it deserves. If your experience tells you that certain evidence reasonably leads to a conclusion, you are free to reach that conclusion. In considering the evidence and drawing conclusions, you must make reasonable inferences but you must not guess or speculate.

## 1.6  CREDIBILITY OF WITNESSES

As the jurors, you have the power to use everything you know about the witnesses who have testified on the witness stand.  You are entitled to consider how they answered questions on both direct and cross examination.  You may decide to believe or disbelieve everything any one of these witnesses has said to you, or you may decide to believe some parts of the witnesses' testimony but not others.

In determining the weight to give to the testimony of a witness, you should ask yourself whether there was evidence tending to prove that the witness testified falsely about some important fact, or, whether there was evidence that at some other time the witness said or did something, or failed to say or do something that was different from the testimony he gave at the trial.

Consider what interest any witness had in testifying as he or she so testified.  Is the witness employed by, an advisor to, friendly with, hostile to, or opposed to one or the other parties in the case?  In a case like this, it is frequent that some witnesses are employed or engaged by the parties, and that alone does not make their testimony implausible or not believable, but you may consider it.

You should remember that a simple mistake by a witness does not necessarily mean that the witness was not telling the truth.  People may tend to forget some things or remember other things inaccurately.  On the other hand, if a witness testifies that he or she does not remember something and you do not believe him or her, you should take that into account when determining the witness's credibility.  If a witness has made a misstatement or an omission, you must consider whether it was simply an innocent lapse of memory or an intentional falsehood, and that may depend upon whether it concerns an important fact or an unimportant detail.

## 1.7  NUMBER OF WITNESSES

One more point about the witnesses.  Sometimes jurors wonder if the number of witnesses who testified makes any difference.

Do not make any decisions based only on the number of witnesses who testified.  What is more important is how believable the witness was, and how much weight you think their testimony deserves.  Concentrate on that, not the numbers.

## 1.8  OPINION WITNESSES

When knowledge of technical subject matter may be helpful to the jury, a person who has special training or experience in that technical field - he or she is called an opinion witness - is permitted to state his or her opinion on those technical matters.  You have heard testimony from several scientific opinion witnesses in this case.  These witnesses are just like any other witness, and, as with any other witness, you may choose to believe some, all, or none of their testimony. You are not required to accept any or all of their opinions.

With respect to an opinion witness, you will have in mind the opinion testified to—the witnesses' conclusions—and what data and analysis that opinion is based on.  I suggest to you that you consider whether you believe the data is accurate and whether the analysis makes sense to you.  If it does, then you decide for yourselves whether the opinions based on those data and analyses persuade you.  Consider whether the opinions follow logically.  Consider how they compare with other evidence in the case.  In short, you may sum up these witnesses' testimony and decide what you believe or what you don't want to believe.

## 1.9  DOCUMENTS

A number of documents have been admitted as exhibits, and they will be made available to you in the jury room while you deliberate.  Like the testimony of witnesses, you may choose to believe some, all or none of what a document says.

# 2  THE PARTIES AND THEIR CONTENTIONS

## 2.1  THE PARTIES

As you now undoubtedly know, the Plaintiff is Amgen Incorporated, hereinafter "Amgen."

The Defendants are F. Hoffmann-La Roche Ltd, Roche Diagnostics, GmbH, and Hoffmann La Roche Inc., whom I will refer to collectively as "Roche."

## 2.2  SUMMARY OF PLAINTIFF'S CONTENTIONS

Ladies and Gentlemen of the jury, in the beginning of the case I explained to you the issues that you must decide.  I will repeat them for you generally now and will give you more detailed instruction on the law that you must follow in reaching your decision in this case.

Plaintiff Amgen contends that Defendant Roche has imported and is currently importing into the United States a pharmaceutical composition, called MIRCERA®, that Amgen alleges infringes its various patents directed to erythropoietin ("EPO"), a protein used to treat anemia and related blood disorders.  As of the filing of this lawsuit and up to today, MIRCERA® has been approved for sale outside the United States and is being used by patients, but it is yet to be approved by the FDA although approval is expected next month, and it is currently not on the market in the United States.  Amgen thus seeks a declaratory judgment that Roche is currently infringing or, upon FDA approval, will infringe claims 1 and 2 of the '868 patent, claims 3, 7-9, and 12, of the '933 patent, claims 6-9 of the '698 patent, claim 7 of the '349 patent.

## 2.3 SUMMARY OF DEFENDANTS' CONTENTIONS

Roche contends that it does not infringe any of the asserted claims of Amgen's patents. Roche also contends that asserting these claims and patents is improper as the patents-in-suit are all invalid, and unenforceable.

With regard to non-infringement, Roche contends that it has not infringed and is not infringing any of Amgen's asserted claims, either literally or under the doctrine of equivalents or due to the reverse doctrine of equivalents. Roche further contends that all allegedly infringing activities cannot constitute infringement as a matter of law as such activities are protected under 35 U.S.C. § 271(e)(1). This provision is often referred to as the "safe harbor provision." It allows otherwise infringing activities to be exempt from liability if said activities are pursuant to clinical trials pursuant to gaining FDA approval.

With regard to invalidity, Roche contends that various asserted claims of the patents-in-suit are invalid because they fail to satisfy the legal conditions for patentability, including anticipation, obviousness, lack of adequate written description, lack of enablement, and indefiniteness.

Additionally, Roche contends that the patents-in-suit are not enforceable, in whole or in part, due to Amgen's wrongful and improper conduct in attaining the patents-in-suit before the U.S. Patent Office.

## 2.4  SUMMARY OF PARTIES' ISSUES

I will now summarize the issues that you must decide, as I instructed you in the beginning of the case, and for which I will provide further instructions on the law to guide your deliberations.  You must decide the following issues:

For the issue of **invalidity,** you must determine:

- whether references in the prior art anticipate any of the asserted claims of the patents in suit

- whether the subject matter of an asserted claim was used publicly more than a year before the patent for the asserted claim was filed (November 30, 1984)

- whether the subject matter of an asserted claim was invented by another before Lin invented the subject matter of the asserted claims which date is November 30, 1984

- whether the subject matter of an asserted claim was known publicly more than a year before the patent for the asserted claim was filed (November 30, 1984)

- whether the subject matter of an asserted claim was patented in the U.S. or a foreign country more than a year before the patent for the asserted claim was filed (November 30, 1984)

- whether Dr. Lin derived all or part of the claimed subject matter from another not named as an inventor on the patents-in-suit

- whether the asserted claims would have been obvious to one of ordinary skill in the art as of November 30, 1984

- whether the asserted claims were enabled at the time of filing, such that one skilled in the field of the invention could make and use the claimed invention as of November 30, 1984

13

- whether the asserted claims were described adequately in the patents-in-suit as of November 30, 1984

- whether the asserted claims were definite such that one skilled in the art could determine the precise limits of the claimed invention as of November 30, 1984

  For the issue of **infringement**, you must determine:

- whether Roche literally infringes the asserted claims of the '933 patent

- whether Amgen has proven that products imported by Roche are not materially changed by subsequent processes from the direct product of the asserted process claims

- whether Roche infringes the asserted claims of the '933 patent by the doctrine of equivalents

- whether the doctrine of equivalents should not apply due to limitations in the prior art, prosecution history estoppel, or subject matter dedicated to the public as I will instruct you about

- whether Roche has proven by the reverse doctrine of equivalents that its products and processes are so different from the asserted claims that they are non-infringing

- whether all of Roche's allegedly infringing activity is protected under the safe harbor exemption

For the issue of **unenforceability**, you must determine:

- whether information material to the Lin patents was misrepresented, omitted, and/or buried from the United States Patent and Trademark Office (USPTO)

- whether any person substantially involved in the prosecution of the Lin patents had the intent to mislead the USPTO

- whether Amgen committed fraud on the USPTO to obtain the Lin patents.

14

## 2.5  ISSUES ESTABLISHED

In this case, I have determined that there are certain issues that have been established and are not appropriately reconsidered as open issues in this case.

I therefore instruct you to consider the following facts as conclusively established:

1.  Recombinant erythropoietin cannot be distinguished from urinary erythropoietin on the basis of glycosylation.[2]

2.  The claims of the patents-in-suit cannot cover analogs beyond the handful disclosed in the specification.[3]

   **[Do not read footnotes, only for Court's consideration.]**
   Because these facts are considered conclusively established, you may not consider any argument, testimony or evidence to the contrary.

---

[2]   *Amgen, Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1341 (Fed. Cir. 2003) ("In its discussion characterizing recombinant glycoprotein products, the specification of the '933 patent does not direct those of ordinary skill in the art to a standard by which the appropriate comparison can be made."); *Amgen, Inc. v. Hoechst Marion Roussel, Inc.*, 126 F.Supp.2d 69, 155-56, 165 (D. Mass. 2001) ("The glycosylation of human urinary erythropoietin is a standardless standard... As a result, making comparisons between the glycosylation of recombinant EPO and that of human urinary EPO is virtually impossible."); ("Dr. Lin's specification falters ... because it fails to enable one of ordinary skill in the art to compare the glycoyslation of the recombinant EPO product with that of human urinary erythropoietin."); *see also* Exhibit A to Defendants' Memorandum of Law in Support of Motion In Limine to Invoke Issue Preclusion as to Findings from Prior Litigation (D.N. 821-2) (quoting numerous additional statements).

[3]   *Amgen, Inc. v. Chugai Pharmaceutical Co., Ltd., 927 F.2d 1200, 1213-14 (Fed. Cir. 1991)* ("Details for preparing only a few EPO analog genes are disclosed" in the patents-in-suit.); ("There may be many other genetic sequences that code for EPO-type products.  Amgen has told how to make and use only a few of them and is therefore not entitled to claim all of them."); ("Considering the structural complexity of the EPO gene, the manifold possibilities for change in its structure, with attendant uncertainty as to what utility will be possessed by these analogs, ... more is needed concerning identifying the various analogs that are within the scope of the claim, methods for making them, and structural requirements for producing compounds with EPO-like activity.  It is not sufficient, having made the gene and a handful of analogs whose activity has not been clearly ascertained, to claim all possible genetic sequences that have EPO-like activity."); *see also* Exhibit A to Defendants' Memorandum of Law in Support of Motion In Limine to Invoke Issue Preclusion as to Findings from Prior Litigation (D.N. 821-2)(quoting numerous additional statements).

# 3   BURDEN OF PROOF

I will instruct you now on the burdens of proof associated with the issues presented to you.  As I instructed you earlier, Amgen bears the burden of proving that Roche has infringed. Amgen must meet this burden by what is called a preponderance of the evidence.  That means that Amgen has to produce evidence which, when considered in light of all the facts, leads you to believe that what Amgen claims is more likely true than not.  To put it differently, if you were to put the plaintiff's and the defendant's evidence on opposite sides of a scale, the evidence supporting the plaintiff's claims would have to make the scales tip on the plaintiff's side.

Additionally, defendant urges that plaintiff's patents are invalid.  A patent is presumed to be valid.  Accordingly, defendant has the burden of proving that the patents-in-suit are invalid by clear and convincing evidence.  Clear and convincing evidence is evidence that shows it is highly probable that the claims are invalid; it is a higher burden than proof by a preponderance of the evidence.[4]

Those of who you are familiar with criminal cases will have heard the term "proof beyond a reasonable doubt."  That burden does not apply in a civil case and you should, therefore, put it out of your mind in considering whether or not the plaintiff or defendant has met its burden of proof.

---

[4]    2007 AIPLA Model Jury Instructions, p.9.

# 4   VALIDITY DEFENSES

Roche contends that the asserted claims of the patents-in-suit are invalid.  Roche has the burden of proving by clear and convincing evidence that each is invalid.

Roche contends that the asserted claims are invalid for the following reasons:

- references in the prior art anticipate the asserted claims of the patents-in-suit

- the subject matter of asserted claims were used publicly one year before November 30, 1984

- the subject matter of asserted claims were invented by another before Dr. Lin invented the subject matter of the asserted claims

- the subject matter of asserted claims were known one year before November 30, 1984

- the asserted claims would have been obvious to one of ordinary skill in the art prior to November 30, 1984

- Dr. Lin derived all or part of the subject matter of the asserted claims to render the rest of the claimed subject matter obvious

- the asserted claims were not fully enabled at the time of filing, such that one of ordinary skill in the art could make and use the claimed invention as of November, 30, 1984 (*See* D.I. 1332)

- the full scope of the asserted claims is not adequately described in the patents-in-suit as of November, 30, 1984

- the asserted claims were indefinite such that one of ordinary skill in the art could not determine the precise limits of the claimed invention as of November, 30, 1984

## 4.1  PRIOR ART DEFINED

Prior art includes any of the following items received into evidence during trial:

1.  any product or method that was publicly known or used in the United States by a person other than Dr. Lin before the date of his alleged invention for each claim, here November 30, 1984;

2.  patents or printed publications by anyone that issued or were published one year before November 30, 1984;

3.  patents, published patents applications, or printed publications by a person other than Dr. Lin that issued or published before the date of his alleged invention for each claim, here November 30, 1984;

4.  any product or method that was in public use or on sale in the United States more than one year before November 30, 1984;

5.  patents filed by a person other than Dr. Lin before November 30, 1984 regardless of when the patent issued;

6.  any product or method that was made by a person other than Dr. Lin before Dr. Lin completed his alleged inventions in the asserted claims, where the product or method was not abandoned, suppressed, or concealed; and

7.  any disclosure to Dr. Lin before Lin's date of invention, by another who is not a named inventor on the asserted claims of the patents.

In this case, prior art includes any of the foregoing items received into evidence during trial.[5]

---

[5]    35 U.S.C. § 102.

## 4.2  ANTICIPATION [6]

A person cannot obtain a patent if someone else already has made an identical invention. Simply put, the invention must be new.  An invention that is not new or novel is said to be "anticipated" by the prior art.  To prove anticipation, Roche must present clear and convincing evidence that shows it is highly probable that each and every element in the claim is present in a single prior art reference.[7]

In this case, Roche contends that the asserted claims of the '933, '698, '868 and '349 patents are anticipated.  Specifically, Roche contends for those claims:

| | 933-3 | 933-7 | 933-8 | 933-9 | 933-11 | 933-12 | 933-14 | 349-7 | 868-1 | 868-2 | 698-6 | 698-7 | 698-8 | 698-9 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Miyake | X | X | X | X | | X | | | | | | | | |
| Gold NIH -1 | X | X | X | X | X | X | X | | | | | | | |
| Goldwasser Trial- | X | X | X | X | X | X | X | | | | | | | |
| Goldwasser IND | X | X | X | X | X | X | X | | | | | | | |
| Gold NIH-2 | X | X | X | X | X | X | X | | | | | | | |
| Gold NIH-3 | X | X | X | X | X | X | X | | | | | | | |
| Goldwasser Protein | X | X | X | | | | | | | | | | | |
| Eschbach | X | X | X | X | | X | | | | | | | | |
| Essers | X | X | X | X | | | | | | | | | | |
| Fritsch | X | X | X | | | | | X | X | X | X | X | X | X |

In determining whether all the elements of the claimed invention is found in the prior art reference, you should take into account what a person of ordinary skill in the art would have understood from his or her examination of the particular item of prior art.  If the prior art reference was properly before the PTO at the time of issuance, a patent nevertheless may be

---

[6]     35 U.S.C. § 102; AIPLA 2005 Model Patent Jury Instructions, 6.0.

[7]     *IPXL Holdings, LLC v. Amazon.com, Inc.,* 430 F.3d 1377, 1381 (Fed. Cir. 2005), (quoting *Brisol-Myers Squibb Co. v. Ben Venue Labs., Inc.,* 246 F.3d 1368, 1373 (Fed. Cir. 2001)).

found to be anticipated on the basis of that reference.[8]  If, on the other hand, the prior art reference was not before the PTO, the presumption of validity of the patent is weakened.[9]

A product-by-process claim covers the product, not the process.  Amgen's product-by-process claims are anticipated if the products of those claims existed in the prior art.  Whether such prior art products were produced by a process different from the process claimed by Lin, or are from a different source, is immaterial when determining the validity of Lin's product-by-process claims.  For that determination, the focus remains at all times on Lin's claimed product and the products of the prior art.[10]

In determining whether the single item of prior art anticipates a patent claim, you should take into consideration not only what is expressly disclosed in the particular item but also what inherently occurred as a natural result of its practice.  This is called "inherency."  A party claiming inherency must prove it by clear and convincing evidence.  To establish inherency, the evidence must make clear that the missing descriptive matter is necessarily present in the reference.  Inherency, however, does not require that a person of ordinary skill in the art at the time of the disclosure or occurrence of the anticipating subject matter would have recognized the inherent disclosure.[11]  Thus, the prior use of the patented invention that was accidental or unrecognized and unappreciated can still be an invalidating reference.

Product by process claims, such as the claims of the '933 patent simply claim a product and if that product is shown to be present in the prior art, the claim is invalid despite the

---

[8]    *IPXL Holdings, LLC. v. Amazon.com, Inc.*, 430 F.3d 1377, 1381 (Fed. Cir. 2005).

[9]    *KSR Int'l Co. v. Teleflex Inc.*, 127 S. Ct. 1727, 1745 (2007).

[10]    *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1317 (Fed. Cir. 2006 ); *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1354 n.20 (Fed. Cir. 2003); *Gen. Elec. Co. v. Wabash Appliance Corp.*, 304 U.S. 364, 373 (1938); *Diamond v. Chakrabarty*, 447 U.S. 303, 309-10 (1980).

[11]    *See Toro Co. v. Deere & Co.*, 355 F.3d 1313, 1321 (Fed. Cir. 2004).

recitation of process steps. A product by process claim is not rendered patentable by the recited process steps. In other words, you cannot patent a car just because you figured out a different way to assemble a car.

Claim 1 of the '422 patent is simply a product claim that recites a source limitation. Recitation of a source, e.g., "mammalian cells grown in culture" does not serve to distinguish the claimed product from products in the prior art unless the claim or patent specification discloses structural features of products obtained from the recited source that are not present in the prior art. In other words, unless the source imparts a new structure that is different from the structure of the prior art products, the claimed product is not patentable over the prior art products.

Since Amgen chose to draft its claims in these formats it is Amgen's burden to prove that the source or process limitations impart a structural distinction over the prior art. Any purported distinction of the claimed product over the prior art must be based on technology for generating the experimental data that was available as of the earliest effective filing date of the patents-in-suit. In this case, that date is before November 30, 1984.

You must keep these requirements in mind and apply them to each kind of anticipation you consider in this case.

### 4.3  EFFECTIVE FILING DATE AND DATE OF INVENTION

The effective filing date of the asserted claims is November 30, 1984.  Amgen's date of invention is the effective filing date -- November 30, 1984.  (*See* D.I. 1332)

If Amgen asserts a date of invention earlier than the date Amgen's application was filed (November 30, 1984) with the Patent and Trademark Office, Amgen must prove such an earlier date of invention by Dr. Lin by proof that is clear and convincing.  The proof must show that Lin conceived the invention at a date prior to Amgen's filing date, that is November 30, 1984, and then reduced the invention to practice, having exercised reasonable diligence from the date of conception to the date of reduction to practice.  Amgen must provide support for the testimony of its witnesses.  The unsupported testimony of Lin's alleged conception, diligence, or reduction to practice prior to the filing date is not enough.  To prove an actual reduction to practice prior to the filing date, you must find evidence that Dr. Lin himself recognized that he possessed an invention that worked for its intended purpose of treating anemia in humans.  In the absence of such proof, the filing date is the only invention date you should consider.

### 4.4  PRIOR PUBLIC USE

Roche contends that claims 3, 7, 8, 9, 11, 12, and 14 of the '933 patent were anticipated because the invention defined in those claims were publicly used in the United States before Lin's date of invention, or one year before November 30, 1984.

Roche contends that such anticipating prior use includes the Baron/Goldwasser clinical trial and the Eschbach human patient trial and the Essers human trial.

An invention is publicly used if it is used by a person who is not under any limitation, restriction, or obligation of secrecy to the inventor.

## 4.5  PRIOR INVENTION

Roche contends that claims 3, 7, 8, 9, 11, 12, and 14 of the '933 patent and claims 1 and 2 of the '868, 6-9 of the '698 and claim 7 of the '349 patent were anticipated because the inventions defined in those claims were invented by another person before Amgen's date of invention.  Roche contends that the asserted claims of the '933 patent were invented earlier by either Drs. Baron, Goldwasser, Eschbach, Essers, or Fritsch.  As to the asserted claims of the '868, '698 and '349 patents, Roche also contends that those claims were invented earlier by the work of Dr. Fritsch.

If the prior invention was abandoned, suppressed, or concealed, it does not anticipate Amgen's patent.  An invention was not abandoned, suppressed, or concealed if the invention was made public, sold, or offered for sale, or otherwise used for a commercial purpose.  A period of delay does not constitute abandonment, suppression, or concealment if the prior inventor was engaged in reasonable efforts to bring the invention to market.[12]

---

[12]    AIPLA Model Patent Jury Instruction 6.5; 35 U.S.C. § 102; *Rosco, Inc. v. Mirror Lite Co.*, 304 F.3d 1373 (Fed. Cir. 2002); *Monsanto Co. v. Mycogen Plant Sci., Inc.*, 261 F.3d 1356 (Fed. Cir. 2001); *Apotex USA, Inc. v. Merck & Co.*, 254 F.3d 1031 (Fed. Cir. 2001); *RCA Corp. v. Data Gen. Corp.*, 887 F.2d 1056 (Fed. Cir. 1989); *E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430 (Fed. Cir.1988); *Kimberly-Clark Corp. v. Johnson & Johnson*, 745 F.2d 1437 (Fed. Cir. 1984); *Gen. Motors Corp. v. Toyota Motor Co.*, 467 F. Supp. 1142 (S.D. Ohio1979), *aff'd in part & rev'd in part*, 667 F.2d 504 (6th Cir. 1981).

## 4.6   PRIOR PUBLIC KNOWLEDGE

Roche contends that the asserted claims of the '933 patent were anticipated because the inventions defined in those claims were publicly known in the United States before Lin's date of invention, by virtue of the work of Drs. Goldwasser, Baron, Eschbach and Essers.

## 4.7  PRINTED PUBLICATION

Roche contends that the asserted claims of the '933 patent were anticipated because the invention defined in those claims were described in a printed publication before Lin's date of invention, or one year before November 30, 1984.  However, a printed publication dated after Amgen's date of invention, or after November 30, 1983, may be used when it describes what a person of ordinary skill in the art knew existed before Amgen's date of invention, or before November 30, 1983.[13]

A printed publication must be reasonably accessible to those members of the public who would be interested in its contents.  It is not necessary that the printed publication be available to every member of the public.  An issued patent is a printed publication.  A published patent application is a printed publication as of its publication date.

For a printed publication to anticipate a patent claim, it must, when read by a person of ordinary skill in the art, expressly or inherently disclose each element of the claimed invention to the reader.  It is Amgen's burden to prove non-enablement of such a reference.  In determining whether the disclosure is enabling, you should take into account what would have been within the knowledge of a person of ordinary skill in the art one year before the application for the patent was filed and/or at the time the invention of the patents were made; you may consider evidence that sheds light on the knowledge such a person would have had.[14]

---

[13]    *In re Killer*, 613 F.2d 819, 824 (C.C.P.A. 1980); *In re Wilson*, 311 F.2d 266, 269 (C.C.P.A. 1962).

[14]    AIPLA Model Jury Instruction 6.4; 35 U.S.C. § 102; *In re Carol F. Klopfenstein*, 380 F.3d 1345, 1352 (Fed. Cir. 2004); *Glaverbel Societe Anonyme v. Northlake Mktg. & Supply, Inc.*, 45 F.3d 1550 (Fed. Cir. 1995); *Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d 1565 (Fed. Cir. ), *clarif. on recon.*, 927 F.2d 1565 (Fed. Cir. 1991); *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560 (Fed. Cir. 1988); *Akzo N.V. v. U.S. Int'l Trade Comm'n*, 808 F.2d 1471 (Fed. Cir. 1986); *In re Hall*, 781 F.2d 897 (Fed. Cir. 1986); *In re Donohue*, 766 F.2d 531 (Fed. Cir. 1985); *Studiengesellschaft Kohle mbH v. Dart Indus., Inc.*, 726 F.2d 724 (Fed. Cir. 1984); *In re Wyer*, 655 F.2d 221 (C.C.P.A. 1981); *In re Donohue*, 632 F.2d 123 (C.C.P.A. 1980); *In re Samour*, 571 F.2d 559 (C.C.P.A. 1978); *In re Coker*, 463 F.2d 1344 (C.C.P.A. 1972); *Deep Welding, Inc. v. Sciaky Bros., Inc.*, 417 F.2d 1227 (7th Cir. 1969); *Phillips Petroleum Co. v. Ladd*, 219 F. Supp. 366 (D.D.C. 1963); *Garrett Corp. v. United States*, 422 F.2d 874 (Ct.

## 4.8  OBVIOUSNESS

Even if a claim is not anticipated by a single prior art reference, you may still find that claim to be invalid for obviousness.  Roche contends that the claims of all of the asserted patents are invalid because the claimed subject matter would have been obvious to one of ordinary skill in the art at the time the invention was made.[15]  Roche bears the burden of proving this defense by clear and convincing evidence.  Each claim must be considered separately.

For obviousness, a person of ordinary skill in the art may combine two or more items of prior art.  The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results.[16]  When a patent simply arranges old elements with each performing the same function it had been known to perform and yields no more than one would expect from such an arrangement, the combination is obvious.[17]  You must consider all of the prior art references and evaluate obviousness from the perspective of one of ordinary skill in the art at the time the invention was filed (not from the perspective of a layman or a genius in the art).  However, "A person of ordinary skill is also a person of ordinary creativity, not an automaton."[18]

Evidence concerning the inventor's expectations regarding his alleged inventions is also relevant to your analysis of obviousness.[19]

---

Cl. 1970); *Honeywell, Inc. v. Sperry Rand Corp.,* 180 U.S.P.Q. 673 (D. Minn. 1973); *Tyler Refrigeration Corp. v. Kysor Indus. Corp.,* 553 F. Supp. 279 (D. Del. 1982).

[15]    *See* 35 U.S.C. § 103

[16]    *KSR Intern. Co. v. Teleflex Inc.,* 127 S. Ct. 1727, 1739 (2007); *see also Leapfrog Enterprises, Inc. v. Fisher-Price, Inc.,* 485 F.3d 1157, 1161 (Fed. Cir. 2007).

[17]    *KSR Intern. Co. v. Teleflex Inc.,* 127 S. Ct. 1727, 1740 (2007) (quoting *Sakraida v. Ag Pro, Inc.* 425 U.S. 273, 282 (1976)).

[18]    *KSR Intern. Co. v. Teleflex Inc.*, 127 S.Ct. 1727, 1742 (2007).

[19]    *Merck & Co. v. Biocraft Labs., Inc.*, 874 F.2d 804, 809 (Fed. Cir. 1989).  *See also Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1371 (Fed. Cir. 2007), *reh'g denied*, 488 F.3d 1377 (Fed. Cir. 2007).

Before determining whether or not Roche has established obviousness of the claimed invention, you must determine the following factual matters:

1.      The scope and content of the prior art relied upon by Roche;

2.      The difference or differences, if any, between each claim of the asserted patents and the prior art; and

3.      The level of ordinary skill in the art at the time the inventions of the asserted patents were made.

4.      Objective factors indicating non-obviousness, including commercial success, long-felt need, failure of others, copying, unexpected results, acceptance of licenses.

Against this background of facts, you will then make your conclusion whether or not the claimed subject matter would have been obvious to a person of ordinary skill in the art at the time the invention was made.[20]

As long as there is a reasonable probability of success in combining two or more prior art references to obtain a particular result, a finding of obviousness is proper.[21]  Many techniques that require extensive time, money, and effort to carry out may nevertheless be routine to one of ordinary skill in the art and do not equate to a conclusion that an expectation of success was unlikely.[22]

---

[20]      AIPLA Model Jury Instruction 7.0; *Graham v. John Deere Co.,* 383 U.S. 1 (1966); *Ruiz v. A.B. Chance Co.,* 234 F.3d 654 (Fed. Cir. 2000); *Arkies Lures, Inc. v. Gene Larew Tackle, Inc.,* 119 F.3d 953 (Fed. Cir. 1997); *Ryko Mfg. Co. v. Nu-Star, Inc.,* 950 F.2d 714, 716 (Fed. Cir. 1991); *Nutrition 21 v. United States,* 930 F.2d 867, 871 n.2 (Fed. Cir. 1991); *Newell Cos. v. Kenney Mfg. Co.,* 864 F.2d 757, 764 (Fed. Cir. 1988); *Structural Rubber Prods. Co. v. Park Rubber Co.,* 749 F.2d 707 (Fed. Cir. 1984); *Orthopedic Equip. Co. v. All Orthopedic Appliances, Inc.,* 707 F.2d 1376 (Fed. Cir. 1983); *Stratoflex, Inc. v. Aeroquip Corp.,* 713 F.2d 1530 (Fed. Cir. 1983).

[21]      *Pfizer v. Apotex, Inc.,* 480 F.3d 1348, 1364 (Fed. Cir. 2007); (*citing In re Corkill,* 771 F.2d 1496, 1500 (Fed. Cir. 1985) *Brown v. Williamson Tobacco Corp. v. Philip Morris Inc.,* 229 F.3d 1120, 1125 (Fed. Cir. 2000); *Merck & Co. v. Biocraft Labs., Inc.,* 874 F.2d 804, 809 (Fed. Cir. 1989); *In re Merck & Co., Inc.,* 800 F.2d 1091, 1097 (Fed. Cir. 1986).

[22]      *Pfizer Inc. v. Apotex, Inc.,* 480 F.3d 1348, 1367-68 (Fed. Cir. 2007); *Velander v. Garner,* 348 F.3d 1359, 1368 (Fed. Cir. 2003).

## 4.9  OBVIOUSNESS DECISION

In determining whether the invention of the asserted patents would have been obvious to a person of ordinary skill in the art, you must presume that person would have known about all relevant prior art.

In examining the prior publication, inventions, etc., you should take into account not only what they expressly disclose, but also anything that inherently occurred as a result of practicing what was expressly disclosed in that prior art.[23]

In determining whether a claimed invention is obvious, you should not attribute the work of other people to the sole listed inventor, Dr. Lin.  For example, you should not consider the work done by Dr. Goldwasser, which is described in Example 1 of the patents-in-suit, as work done by Dr. Lin because Dr. Lin has admitted that work described in Example 1 was done by Dr. Goldwasser.  Also, you should not consider the selection of CHO cells as work done by Dr. Lin because, as you have heard, people outside of Amgen suggested and provided the CHO cells to Dr. Lin.  Further, you should not consider the work done by other Amgen employees as work done by Dr. Lin since the evidence was that this was routine and non-inventive.

In determining the prior publication, inventions, etc., you should take into account not only what they expressly disclose, but also anything that inherently occurred as a result of practicing what was expressly disclosed in that prior art.[24]  Since the evidence shows that this was routine and our incentive.

In a determination of whether a claimed invention is obvious it is proper to consider "the background knowledge possessed by a person having ordinary skill in the art; and the inferences

---

[23]      *In re Napier*, 55 F.3d 610, 613 (Fed. Cir. 1995).

[24]      *In re Napier*, 55 F.3d 610, 613 (Fed. Cir. 1995).

and creative steps that a person of ordinary skill in the art would employ."[25]  It often may be the case that market demand, rather than scientific literature, will provide the motivation to create a particular combination that renders the claimed invention obvious.[26]

When there is a need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, such as the human trials of Drs. Baron, Eschbach or Essers, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp.  If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense.  In that instance the fact that a combination was obvious to try might show that it was obvious and therefore invalid.[27]  All that is required is a reasonable expectation of success, not a certainty.

---

[25]    *KSR Intern. Co. v. Teleflex Inc.*, 127 S.Ct. 1727, 1740-41 (2007).

[26]    *Id.*

[27]    *KSR Intern. Co. v. Teleflex Inc.*, 127 S.Ct. 1727, 1742 (2007).

## 4.10  SCOPE AND CONTENT OF THE PRIOR ART

The prior art that you considered previously for anticipation purposes is also prior art for obviousness purposes.  As with anticipation, you should take into consideration not only what is expressly disclosed in the particular item but also what inherently occurred as a natural result of its practice; for an element to be inherent, it must be proven to necessarily always occur, mere probability is not sufficient.[28]  Remember, however, that for obviousness inquiries, you may consider multiple pieces of prior art simultaneously.

All prior art does not have to be publicly known at the time of Dr. Lin's invention, here November 30, 1984.

You as fact finders must also consider what is known in the law as "non-published prior art," such as what someone may have done in their garage and later disclosed.  This means people working in the field in 1983-1984 may not have been generally aware, but under the law you must assume that "hypothetical person of skill in the art" would have this information.  Such prior art includes:

- information and materials disclosed to Dr. Lin and not to others

- information or materials disclosed to any person

- information in patent applications

- things invented by others prior to Lin's invention

A prior art patent is presumed to teach everything disclosed.  Amgen has the burden of showing otherwise.

---

[28]    *In re Napier*, 55 F.3d 610, 613 (Fed. Cir. 1995).

## 4.11  OBJECTIVE FACTORS

You must also consider, where they exist, and have been demonstrated by evidence from Amgen, certain objective factors including long-felt but unresolved need and failure of others similarly situated as Dr. Lin, which support a finding of non-obviousness.

Amgen must demonstrate a nexus between the evidence offered for the supposed objective factors and each of the asserted claims.  In the absence of such a nexus or evidence of a direct connection to each of the claims, you should give this evidence little weight.

You may also consider whether the claims of another patent, Amgen's expired U.S. Patent No. 4,703,008 (the "'008 patent"), or the Strickland/Lai '016 purification patent and not the asserted claims in this case, were responsible for these objective factors, such as meeting a long-felt need.  If you find that these factors were the result of the '008 patent or the '016 patent, then Amgen cannot rely upon these factors as evidence of non-obviousness.[29]

---

[29]     *Weatherchem Corp. v. J.L. Clark,* 163 F.3d 1326 (Fed. Cir. 1998).

## 4.12  LEVEL OF ORDINARY SKILL IN THE ART

In reaching your determination as to whether or not the claimed invention would have been obvious, you should consider the level of ordinary skill in the pertinent art.  When determining the level of ordinary skill in the art, you should consider all the evidence submitted by Amgen and Roche to show:

1.    the level of education and experience of persons actively working in the field at the time of the invention;

2.    the types of problems encountered in the art at the time of the invention;

3.    the prior art patents and publications;

4.    the activities of others;

5.    prior art solutions to the problems; and

6.    the sophistication of the technology.

Based on the factors listed and the evidence presented, you must determine the level of ordinary skill in the art at the time of the invention.

When you decide the issue of obviousness, you must decide whether or not the invention would have been obvious to one having this ordinary level of skill, an MD or Ph.D. in the fields of molecular biology, biotechnology, protein chemistry or nephrology with two years of laboratory experience.[30]

---

[30]    AIPLA Model Jury Instruction 7.4; *Graham v. John Deere Co.,* 383 U.S. 1 (1966); *Ruiz v. A.B. Chance Co.,* 234 F.3d 654 (Fed. Cir. 2000); *Orthopedic Equip. Co. v. United States,* 702 F.2d 1005 (Fed. Cir. 1983); *Envtl. Designs, Ltd. v. Union Oil Co.,* 713 F.2d 693 (Fed. Cir. 1983).

## 4.13  FACTORS INDICATING OBVIOUSNESS

Additionally, other objective evidence may favor a finding of obviousness.  For example the simultaneous or near simultaneous invention by others of the patented subject matter is a secondary consideration supporting a conclusion of obviousness.  Independent making of the invention by persons other than the inventor at about the same time may be evidence that the invention would have been obvious.[31]  Also, others skilled in the art working toward the same solution to the same problem, or working on a finite number of predictable solutions to the same problem such as Drs. Baron, Eschbach or Essers, is also evidence supporting a conclusion of obviousness.[32]

---

[31]    AIPLA Model Jury Instruction 7.8; *Ecolochem, Inc. v. S. Cal. Edison Co*, 227 F.3d 1361, 1379 (Fed. Cir. 2000); *Monarch Knitting Machinery Corp. v. Sulzer Morat GmbH*, 139 F.3d 877, 883-84 (Fed. Cir. 1998); *Stewart-Warner Corp. v. City of Pontiac,* 767 F.2d 1563 (Fed. Cir. 1985); *Lindemann Maschinenfabrik GmbH v. Am. Hoist & Derrick Co.,* 730 F.2d 1452 (Fed. Cir. 1984); *In re Farrenkopf,* 713 F.2d 714 (Fed. Cir. 1983); *Orthopedic Equip. Co. v. United States,* 702 F.2d 1005 (Fed. Cir. 1983); *Simmonds Precision Prods., Inc. v. United States,* 153 U.S.P.Q. 465 (Ct. Cl. 1967).

[32]    *KSR Intern. Co.,* 127 S.Ct. at 1742.

### 4.14  AMGEN'S ADMISSIONS FROM THE PATENT SPECIFICATION

In conducting your analysis of anticipation and obviousness of the asserted claims, you should also consider the following statements by the Inventor set forth in the specification of the patents.  These constitute binding admissions on Amgen.[33]  The patent specification states the following:

"A focus of microbiological processing for the last decade has been the attempt to manufacture industrially and pharmaceutically significant substances using organisms which either do not initially have genetically coded information concerning the desired product included in their DNA, or (in the case of mammalian cells in culture) do not ordinarily express a chromosomal gene at appreciable levels." '933 patent, TRX 1, Col. 2, lns. 16-22

"Once this is done, the existing machinery for gene expression in the 'transformed' or 'transfected' microbial host cells operates to construct the desired product, using the exogenous DNA as a template for transcription of mRNA which is then translated into a continuous sequence of amino acid residues.  The art is rich in patent and literature publications relating to "recombinant DNA" methodologies for the isolation, synthesis, purification and amplification of genetic materials for use in the transformation of selected host organisms."  '933 patent, TRX 1, Col. 2, lns. 28-37

"More frequently, the goal of transformation is the expression by the host cells of exogenous DNA in the form of large scale synthesis of isolatable quantities of commercially

---

[33]     *PharmaStem Therapeutics, Inc. v. Viacell, Inc.*, --- F.3d ---, 2007 WL 1964863 at *17 (Fed. Cir. 2007) ("Admissions in the specification regarding the prior art are binding on the patentee for purposes of a later inquiry into obviousness."); *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1570 (Fed.Cir.1988) ("A statement in the patent that something is in the prior art is binding on the applicant and patentee for determinations of anticipation and obviousness."); *Sjolund v. Musland*, 847 F.2d 1573, 1577-79 (Fed.Cir.1988) (patent specification admitted that certain matter was prior art, and thus "the jury was not free to disregard [that matter]" and "must have accepted [it] as prior art, as a matter of law"); *In re Fout*, 675 F.2d 297, 300 (CCPA 1982); *In re Nomiya*, 509 F.2d 566, 571 (CCPA 1975).

significant protein or polypeptide fragments coded for by the foreign DNA." '933 patent, TRX 1, Col. 2, lns. 58-62.

"At the risk of over-simplification, it can be stated that three alternative principal methods can be employed: (1) the "isolation" of double-stranded DNA sequence from the genomic DNA of the donor; (2) the chemical manufacture of a DNA sequence providing a code for a polypeptide of interest; and (3) the *in vitro* synthesis of a double-stranded DNA sequence by enzymatic "reverse transcription" of mRNA isolated from donor cells. The last-mentioned methods which involve formation of a DNA "complement" of mRNA are generally referred to as "cDNA" methods. Manufacture of DNA sequences is frequently the method of choice when the entire sequence of amino acid residues of the desired polypeptide product is known. DNA manufacturing procedures of co-owned, co-pending U.S. patent application Ser. No. 483,451, by Alton, et al., (filed Apr. 15, 1983 and corresponding to PCT U.S.83/00605, published Nov. 24, 1983 as WO83/04053), for example, provide a superior means for accomplishing such highly desirable results as: providing for the presence of alternate codons commonly found in genes which are highly expressed in the host organism selected for expression (e.g., providing yeast or E.coli "preference" codons); avoiding the presence of untranslated "intron" sequences (commonly present in mammalian genomic DNA sequences and mRNA transcripts thereof) which are not readily processed by procaryotic host cells; avoiding expression of undesired "leader" polypeptide sequences commonly coded for by genomic DNA and cDNA sequences but frequently not readily cleaved from the polypeptide of interest by bacterial or yeast host cells; providing for ready insertion of the DNA in convenient expression vectors in association with desired promoter/regulator and terminator sequences; and providing for ready construction of genes coding for polypeptide fragments and analogs of the desired polypeptides." '933 patent, TRX 1, Col. 3, lns. 3-37.

"When the entire sequence of amino acid residues of the desired polypeptide is not known, direct manufacture of DNA sequences is not possible and isolation of DNA sequences coding for the polypeptide by a cDNA method becomes the method of choice despite the potential drawbacks in case of assembly of expression vectors capable of providing high levels of microbial expression referred to above.  Among the standard procedures for isolating cDNA sequences of interest is the Preparation of plasmid-borne cDNA "libraries" derived from reverse transcription of mRNA abundant in donor cells selected as responsible for high level expression of genes (e.g., libraries of cDNA derived from pituitary cells which express relatively large quantities of growth hormone products).  Where substantial portions of the polypeptide's amino acid sequence are known, labelled, single-stranded DNA probe sequences duplicating a sequence putatively present in the "target" cDNA may be employed in DNA/DNA hybridization procedures carried out on cloned copies of the cDNA which have been denatured to single stranded form."  '933 patent, TRX 1, Col. 3, lns. 38-57

"Among the more significant recent advances in hybridization procedures for the screening of recombinant clones is the use of labelled mixed synthetic oligonucleotide probes, each of which is potentially the complete complement of a specific DNA sequence in the hybridization sample including a heterogeneous mixture of single stranded DnAs or RNAs. These procedures are acknowledged to be especially useful in the detection of cDNA clones derived from sources which provide extremely low amounts of mRNA sequences for the polypeptide of interest."  '933 patent, TRX 1, Col. 4, lns. 10-19

"In general, the mixed probe procedures of Wallace, et al. (1981), supra, have been expanded upon by various workers to the point where reliable results have reportedly been obtained in a cDNA clone isolation using a 32-member mixed "pool" of 16-base-long (16-mer) oligonucleotide probes of uniformly, varying DNA sequences together with a single 11-mer to

effect a two-site "positive" confirmation of the presence of cDnA of interest." '933 patent, TRX 1, Col. 4, lns. 30-39.

". . . reliable procedures exist for developing phage-borne libraries of genomic DNA of human and other mammalian species origins (see, e.g., Lawn, et al. *Cell*, 15, pp. 1157-1174 (1978) relating to procedures for generating a human genomic library commonly referred to as the 'Maniatis Library. . ." '933 patent, TRX 1, Col. 4, lns. 46-51

"Because erythropoietin is essential in the process of red blood cell formation, the hormone has potential useful application in both the diagnosis and the treatment of blood disorders characterized by low or defective red blood cell production. See, generally, Pennathur-Das, et al., *Blood* 63(5), 1168-71 (1984) and Haddy, *Am.Jour.Ped.Hematol./Oncol.,* 4, 191-196, (1982) relating to erythropoietin in possible therapies for sickle cell disease, and Eschbach, et al. *J.Clin.Invest.,* 74(2), pp. 434-441, (184), describing a therapeutic regimen for uremic sheep based on *in vivo* response to erythropoietin-rich plasma infusions and proposing a dosage of 10 U EPO/kg per day for 15-40 days as corrective of anemia of the type associated with chronic renal failure." '933 patent, TRX 1, Col 6, lns. 20-33

"It has recently been estimated that the availability of erythropoietin in quantity would allow for treatment each year of anemias of 1,600,000 persons in the United States alone." '933 patent, TRX 1, Col. 6, lns. 35-38

"Recent studies have provided a basis for projection of efficacy of erythropoietin therapy in a variety of disease states, disorders and states of hematologic irregularity: Vedovato, et al., *Aeta.Haematol,* 71, 211-213 (1984)." '933 patent, TRX 1, Col. 6, lns. 41-44.

"Another method of purifying human erythropoietin from urine of patients with aplastic anemia is described in Miyake, et al., *J.Biol.Chem.,* Vol 252, No. 15 (Aug. 10, 1977), pp. 5558-5564. This seven-step procedure includes ion exchange chromatography, ethanol precipitation,

gel filtration, and adsorption chromatography, and yields a pure erythropoietin preparation with a potency of 70,400 units/mg of protein in 21% yield." '933 patent, TRX 1,Col 7, lns. 10-17

"The above studies relate, of course, to amino acid sequences of proteins other than erythropoietin, a substance for which no substantial amino acid sequence information has been published.  In co-owned, co-pending U.S. patent application Ser. No. 463,724, filed Feb. 4, 1983, by J. Egrie, published Aug. 22, 1984 as European Patent Application No. 0 116 446, there is described a mouse-mouse hybridoma cell line (A.T.C.C. No. HB8209) which produces a highly specific monoclonal, anti-erythropoietin antibody which is also specifically immunoreactive with a polypeptide comprising the following sequence of amino acids:  $NH_2$-Ala-Pro-Pro-Arg-Leu-lle-Cys-Asp-Ser-Arg-Val-Leu-Glu-Arg-Tyr-Leu-Leu-Glu-Ala-Lys-COOH.  The polypeptide sequence is one assigned to the first twenty amino acid residues of mature human erythropoietin isolated according to the method of Miyake." '933 patent, TRX 1, Col. 8, lns. 41-44

"It is consequently projected in the art that the best prospects for fully characterizing mammalian erythropoietin and providing large quantities of it for potential diagnostic and clinical use involve successful application of recombinant procedures to effect large scale microbial synthesis of the compound." '933 patent, TRX 1, Col. 9, lns. 9-14

"Further, so little is known of the continuous sequence of amino acid residues of erythropoietin that it is not possible to construct, e.g., long polynucleotide probes readily capable of reliable use in DNA/DNA hybridization screening of cDNA and especially genomic DNA libraries.  Illustratively, the twenty amino acid sequence employed to generate the above-named monoclonal antibody produced by A.T.C.C. No. HB8209 does not admit to the construction of an unambiguous, 60 base oligonucleotide probe in the manner described by Anderson, et al., supra." '933 patent, TRX 1, Col. 9, lns. 22-32

"More recently, Farber, et al., *Blood*, 62, No. 5, Supp. No. 1, Abstract 392, at page 122a (1983) reported the in vitro translation of human kidney mRNA by frog oocytes.  The resultant translation product mixture was estimated to include on the order of 220 mU of a translation product having the activity of erythropoietin per microgram of injected mRNA.  While such levels of in vitro translation of exogenous mRNA coding for erythropoietin were acknowledged to be quite low (compared even to the prior reported levels of baboon mRNA translation into the sought-for product) it was held that the results confirm the human kidney as a site of erythropoietin expression, allowing for the construction of an enriched human kidney cDNA library from which the desired gene might be isolated.  [See also, Farber, *Clin.Res.,* 31(4) 769A (1983).]" '933 patent, TRX 1, Col. 9, lns. 49-63

"Illustrating the present invention are cloned DNA sequences of monkey and human species origins and polypeptide sequences suitably deduced therefrom which represent, respectively, the primary structural conformation of erythropoietin of monkey and human species origins."  '933 patent, TRX 1, Col. 10, lns. 65 - Col. 11, lns. 1-2

"Having herein elucidated the sequence of amino acid residues of erythropoietin." '933 patent, TRX 1, Col. 11, lns. 20-21

"The DNA of human species origins was isolated form a human genomic DNA library. The isolation of clones containing EPO-encoding DNA was accomplished through DNA/DNA plaque hybridization employing the above-noted pool of 128 mixed 20-mer oligonucleotide probes and a second pool of 128 radiolabelled 17 mer probes whose sequences were based on amino acids sequence information obtained from a different enzymatic human EPO fragment." '933 patent, TRX 1, Col. 14, lns. 5-12

"A first set of 128-mer oligonucleotides was therefore synthesized by standard phosphoamidite methods." '933 patent, TRX 1, Col. 16, lns. 5-6

"A Ch4A phage-borne human fetal liver genomic library prepared according to the procedures of Lawn, et al. *Cell*, supra was obtained and maintained for use in a plaque hybridization assay." '933 patent, TRX 1, Col. 19, lns. 64-66

"FIG. 6 thus serves to identify the primary structural conformation (amino acid sequence) of mature human EPO as including 166 specified amino acid residues (estimated M.W. = 18,399)." '933 patent, TRX 1, Col. 21, lns. 3-6

"CHO DHFR.sup.- cells (DuX-Bll) CHO K1 cells, Urlaub, et al., Proc. Nat. Acad. Sci. (U.S.A.), Vol. 77, 4461 (1980) lack the enzyme dihydrofolate reductase (DHFR) due to mutations in the structural genes and therefore require the presence of glycine, hypoxanthine, and thymidine in the culture media." '933 patent, TRX 1, Col. 25, lns. 46-51.

## 4.15  DERIVATION OF INVENTION

You may also find the asserted patents to be invalid for derivation of invention if Roche proves that Dr. Lin acquired knowledge of the claimed invention in whole or in part from another, such as from Dr. Goldwasser, or so much of the claimed invention as would have made it obvious to one of ordinary skill in the art.[34]

---

[34]     *Oddzon Products, Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1403-04 (Fed. Cir. 1997); *New England Braiding Co., Inc. v. A.W. Chesterson Co.*, 970 F.2d 878, 883 (Fed. Cir. 1992).

## 4.16  EXPERIMENTAL DATA

Amgen has attempted to introduce experimental data to rebut Roche's evidence that the asserted claims of the patents-in-suit are distinguishable over the prior art Roche has relied upon in its invalidity case.  Before considering this experimental data in your determination of whether a claim is anticipated or obvious in light of the prior art, you first must determine whether the technology for generating the experimental data was available as of the earliest effective filing date of the patents-in-suit, that is, was available before November 30, 1984.  If the technology for generating the experimental data was not available before that date, you cannot consider that experimental data in your determination of anticipation or obviousness.[35]  For example, the evidence is that the Dionex machine and EPO dosing study were not available to one of skill in the art as of November 30, 1984, so you should not consider that data.

When considering properly-generated experimental data, you must determine whether the experimental data shows that the entire scope of the claim is distinguishable from the prior art.  If the experimental data only shows that one example of the claim, for example Amgen's rEPO used for clinical trials, is distinguished from the prior art, but the claim recites a broad category of examples, such as mammalian cells or vertebrate cells, then the experimental data does not show that the entire scope of the claim is distinguished from the prior art.

---

[35]     *In re Merck & Co., Inc.* 800 F.2d 1091, 1097 (Fed. Cir. 1986); *Elf Atochem N. Amer., Inc. v. LaRoche Indus., Inc.*, 85 F. Supp. 2d 336, 343 (D. Del. 2000); *National Research Dev. Corp. v. Great Lakes Carbon Corp.,* 410 F. Supp 1108, 1124 (D. Del. 1975).

## 4.17  WRITTEN DESCRIPTION

A patent must contain a written description of the product or method claimed in the patent.  The written description is the "technologic disclosure of the invention."[36]  Roche can meet its burden of proving that a patent claim is invalid by showing that the patent does not contain an adequate written description of the full scope of the claimed invention.

Roche contends that the asserted claims of the '422, '698, '868 and '349 patents and claims 9, 12, and 14 of the '933 patent are invalid for failure to satisfy the written description requirement.  Roche bears the burden of establishing lack of written description by clear and convincing evidence.

The written description must show that the applicant conceived of and was in full possession of the claimed subject matter on the application filing date.[37]  Roche contends that the only "human erythropoietin" described in the patent is 166 amino acids, and not the currently understood, and claimed 165 amino acid sequence of human erythropoietin isolated from urine. The term "vertebrate cells" as used in the claims is also not adequately described.

To satisfy the written description requirement, the patent must describe each and every limitation of a patent claim, although the exact words found in the claim need not be used.  The written description requirement is not satisfied if a person of ordinary skill in the field, reading the patent application as originally filed, would not recognize that the patent application described the invention as finally claimed in the patent.[38]  The written description requirement is

---

[36]    *Space Sys/Loral, Inc. v. Lockheed Martin Corp.,*  405 F.3d 985 (Fed. Cir. 2005).

[37]    35 U.S.C. §112(1) and (2); 3 Donald S. Chisum, Chisum on Patents §7.04 (2007) internal citations omitted); Northern District of California Model Jury Instruction No. 4.2a (September 20, 2004); *Chiron Corp. v. Genetech, Inc.*, 363 F.3d 1247, 1255 (Fed. Cir. 2004); *Gentry Gallery, Inc. v. Berkline Corp.,* 134 F.3d 1473, 1478-80 (Fed. Cir. 1998); *Moba, B.V. v. Diamond Automation, Inc.*, 325 F.3d 1306, 1319-20 (Fed. Cir. 2003).

[38]    *Purdue Pharma L.P. v. Faulding, Inc.*, 230 F.3d 1320, 1323 (Fed. Cir. 2000) ("... one skilled in the art, reading disclosure, must immediately discern the limitation at issue in the claims.")

also not satisfied if a person of ordinary skill in the art must first make the patented invention before he or she would recognize that the patent application described the invention as finally claimed in the patent.[39]

If Dr. Lin did not conceive of the invention as claimed, then as a matter of law the patent he cannot provide a written description because one cannot describe what one has not conceived. It is admitted that the complete amino acid of human erythropoietin was not known as of November 30, 1984.

If you find that Roche has proved that the specification of the above patents on its face does not contain a complete written description of the invention covered by any of its claims, then you must find that the claim is invalid.[40]

When I construed the claims at issue, I did not make any decision as to whether or not the clams were adequately described.

---

[39]     *New Railhead Mfg. LLC v. Vermeer Mfg.,* 298 F.3d 1290, 1295 (Fed. Cir. 2002).

[40]     AIPLA Model Jury Instruction 9; *Univ. of Rochester v. GD. Searle & Co.,* 358 F.3d 916 (Fed. Cir. 2004); *Turbocare Div. of Demag Delaval Turbomach Corp. v. Gen. Elec. Co.,* 265 F.3d 1111, 1118 (Fed. Cir. 2002); *Enzo Biochem, Inc. v. Gen-Probe Inc.,* 323 F.3d 956 (Fed. Cir. 2002) (en banc); *Purdue Pharma L.P. v. Faulding Inc.,* 230 F.3d 1320 (Fed. Cir. 2000); *Reiffin v. Microsoft Corp.,* 214 F.3d 1342, 1345-46 (Fed. Cir. 2000); *Union Oil Co. of Cal. v. Atl. Richfield Co.* 20 F.3d 989, 996-1001 (Fed. Cir. 2000); *Gentry Gallery, Inc. v. Berkline Corp.,* 134 F.3d 1473, 1478-90 (Fed. Cir. 1998); *Vas-Cath, Inc. v. Mahurkar,* 935 F.2d 1555 (Fed. Cir. 1991).

## 4.18  ENABLEMENT

The specification set forth in a patent must disclose sufficient information to enable or teach one skilled in the field of the invention to make and use the full scope of claimed invention. This requirement is known as the enablement requirement.  If a patent claim is not enabled, it is invalid.  Roche bears the burden of establishing lack of enablement by clear and convincing evidence.

Roche contends that claims 9, 11, 12 and 14 of the '933 patent and the asserted claims of the '422 and '349 patents are invalid for lack of enablement.  Roche contends that these asserted claims are not enabled because they do not enable a sufficiently purified pharmaceutical composition, and do not enable the performance of an RIA assay due to the presence of fragments; and also is not enabled for all "vertebrate cells" as in claim 7 of the '349 patent and claims 6-9 of the '698 patent.  The fact that some experimentation may be required for a skilled person to practice the full scope of the claimed invention does not mean that a patent's disclosure fails to meet the enablement requirement.  Factors that you may consider in determining whether the written description would require undue experimentation include:  (1) the quantity of experimentation necessary; (2) the amount of direction or guidance disclosed in the patent; (3) the presence or absence of working examples in the patent; (4) the nature of the invention; (5) the state of the prior art; (6) the relative skill of those in the art; (7) the predictability of the art; and (8) the breadth of the claims.[41]

---

[41]    AIPLA Model Jury Instruction 8; *Durel Corp. v. Osram Sylvania Inc.*, 256 F.3d 1298, 1306 (Fed. Cir. 2001); *Union Pac. Res. Co. v. Chesapeake Energy Corp.*, 236 F.3d 684, 690-92 (Fed. Cir. 2001); *Ajinomoto Co. v. Archer-Daniels-Midland Co*., 228 F.3d 1338, 1345-46 (Fed. Cir. 2000); *Nat'l Recovery Techs., Inc. v. Magnetic Separation Sys., Inc.*, 166 F.3d 1190, 1195-98 (Fed. Cir. 1999); *Enzo Biochem, Inc. v. Calgene, Inc.*, 188 F.3d 1362, 1371 (Fed. Cir. 1999); *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988); *Spectra-Physics, Inc. v. Coherent, Inc.*, 827 F.2d 1524, 1533 (Fed. Cir. 1987); *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1384 (Fed. Cir. 1986); *Ralston Purina Co. v. Far-Mar Co.*, 772 F.2d 1570, 1573-74 (Fed. Cir. 1985); *Linedmann Maschinenfabrik GmbH v. Am. Hoist & Derrick Co.*,

## 4.19  INDEFINITENESS

The claims of a patent must be sufficiently definite that one skilled in the art could determine the precise limits of the claimed invention.  If a claim is found to be indefinite the claim is invalid.

The amount of detail required to be included in claims depends on the particular invention and the prior art, and is not to be evaluated in the abstract but in conjunction with the patent's disclosure.  Roche contends that the asserted claims of the '422, '933, '698, '868 and '349 patents are invalid for indefiniteness.  You must decide if the claims of these patents, read in light of the disclosure, reasonably apprised those skilled in the art of the proper scope of the invention, and if the language is as precise as the subject matter permits.  If they did not, the claims are indefinite.

Simply because some claim language may not be precise does not automatically render a claim invalid.  If the claim is so broad that one of skill in the art would not recognize all that is covered by the claim, it is indefinite.  In other words, one of skill would not know where to put a fence around the scope of the claims.  You must then determine whether one of ordinary skill in the art would understand what is covered when the claim is read in light of the disclosure.[42]  The primary purpose of this requirement is to ensure that the claims are written in a way that the public is given notice of the extent of the legal protection afforded by the patent so that interested parties can determine whether or not they infringe.[43]

---

730 F.2d 1452, 1463 (Fed. Cir. 1984); *White Consol. Indus., Inc. v. Vega Servo Control, Inc.*, 713 F.2d 788, 791 (Fed. Cir. 1983).

[42]    Delaware Model Jury Instruction 4.1; *Seattle Box Co. v. Indus. Crating & Packing, Inc.,* 731 F.2d 818, 826 (Fed. Cir. 1984).

[43]    *Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.,* 412 F.3d 1291, 1302-03 (Fed. Cir. 2005) (quoting *All Dental Prodx, LLC v. Advantage Dental Prods., Inc.,* 309 F.3d 774, 779-80 (Fed. Cir. 2002).

When I construed the claims at issue, I did not make any decision as to whether or not the claims were definite.

# 5  CONSTRUCTION OF CLAIMS

## 5.1  GENERAL PRINCIPLES

Before you decide the issue of infringement you will have to understand the "claims" of the patents-in-suit and what they require.  It is my job as Judge to determine what the patent claims mean and to instruct you about that meaning.  You must apply the same meanings I give you in the "glossary", to use in determining whether or not the patents are infringed and also in determining whether or not they are invalid.[44]  A copy will be available to you in the jury room if you require them.

You should give the rest of the words in the claims their ordinary meaning in the context of the patent specification and prosecution history.

---

[44]    *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005); *Markman v. Westview Instruments, Inc.,* 52 F.3d 967 (Fed. Cir. 1995) (en banc).

## 5.2   DEPENDENT AND INDEPENDENT CLAIMS

There are two different types of claims in the patents-in-suit.  The first type is called an independent claim.  An independent claim does not refer to any other claim of the patent.  An independent claim is read separately to determine its scope.

On the other hand, a dependent claim refers to at least one other claim in the patent and thus incorporates all the elements of that other claim, plus additional elements.  Accordingly, to determine what a dependent claim covers, you must read both the dependent claim and the claim or claims to which it refers.

For example, claim 1 of the '868 patent is an independent claim.  You know this because this claim mentions no other claim.  Accordingly, the words of this claim are read by themselves in order to determine what the claim covers.

Claim 2 of the '868 patent, on the other hand, is a dependent claim; specifically, claim 2 depends from claim 1.  Accordingly, claim 2 is read to include all elements of claim 1 of the '868 patent plus the additional elements stated in the claim.  Thus, claims 1 and 2 must be read together in order to determine what the dependent claim, claim 2, covers.

# 6  INFRINGEMENT

## 6.1  GENERAL PRINCIPLES

A patent owner may enforce his right to exclude others from making, using or selling the patented invention by filing a lawsuit for patent infringement.  Here, Amgen, the patent owner, has sued Roche, the accused infringer, and has alleged that Roche's product and method for producing its product infringes the following claims in the patents-in-suit: claims 1 and 2 of the '868 patent, claims 3, 7, 8, 9, and 12, of the '933 patent, claims 6-9 of the '698 patent, and claim 7 of the '349 patent.

## 6.2  LITERAL INFRINGEMENT

There are two ways in which a patent claim may be infringed.  First, a claim may be literally infringed.[45]  Second, a claim may be infringed under what is called the "doctrine of equivalents," which I will address shortly.[46]

You must determine literal infringement with respect to the '933 patent claims individually.  A patent claim is literally infringed only if Roche's product includes each and every element in a given asserted claim.[47]  If Roche's product is missing any one of the elements recited in a claim, then you may not find that Roche literally infringes that claim.

Remember, the question is whether Roche's product infringes the claims of the '933 patent, and not whether Roche's product is similar or even identical to a product made by Amgen.[48]  Accordingly, you must be certain to compare Roche's accused product with the claim it is alleged to infringe and not with any product made by Amgen.[49]  For Amgen's product-by-process claims, Amgen must prove that Roche's product possesses the identical structural and functional characteristics as the claimed product and also is made by a process employing each and every one of the steps recited in the claims.[50]

---

[45]    35 U.S.C. § 271; *Cybor Corp. v. FAS Tech., Inc.,* 138 F.3d 1448 (Fed. Cir. 1998) (en banc).

[46]    35 U.S.C. § 271; *Warner Jenkinson Co. v. Hilton Davis Chem. Co.,* 520 U.S. 17 (1997).

[47]    *Terlep v. Brinkmann Corp.,* 418 F.3d 1379, 1384 (Fed. Cir. 2005); *Mass. Inst. of Tech. v. Lockheed Martin Global Telecomms., Inc.,* 251 F. Supp. 2d 1006, 1010 (D. Mass. 2003).

[48]    *Zenith Labs., Inc. v. Bristol-Myers Squibb Co.,* 19 F.3d 1418, 1423 (Fed. Cir. 1994).

[49]    Delaware Model Patent Jury Instructions, 3.9; *Martin v. Barber,* 755 F.2d 1564, 1567, 225 U.S.P.Q. 233 (Fed. Cir. 1985).

[50]    *Scripps Clinic v. Research Found. v. Genentech, Inc.,* 927 F.2d 1565, 1580 (Fed. Cir. 1991); *Atlantic Thermoplastics Co., Inc. v. Faytex Corp.,* 970 F.2d 834, 846-47 (Fed. Cir. 1992).

## 6.3  INFRINGEMENT OF DEPENDENT CLAIMS[51]

To establish literal infringement of a dependent claim, Amgen must prove that Roche's product meets each and every element of the dependent claim.  Asserted dependent claims include claims 7, 8, 9, and 12 of the '933 patent.

If, however, you find that the independent claim from which a dependent claim depends is not literally infringed, then you cannot find that the dependent claim is literally infringed.

---

[51]     AIPLA's Model Patent Jury Instructions 3.6; *Wolverine World Wide v. Nike Inc.,* 38 F.3d 1192, 1199 (Fed. Cir. 1994); *Wilson Sporting Goods v. David Geoffrey & Assocs.,* 904 F.2d 677 (Fed. Cir. 1990); *Wahpeton Canvas Co., Inc. v. Frontier, Inc.,* 870 F.2d 1546, 1553 nn.9&10 (Fed. Cir. 1989).

## 6.4  MATERIAL CHANGE

An imported product made by a patented process does not infringe if: (1) it has been materially changed by subsequent processes; or (2) it becomes a trivial and nonessential component of another product.[52]  The issue for consideration, therefore, is not only what Roche does in Europe, but also what product it actually imports into the United States.

In the United States, one is allowed to import items into the country even if they are derived from a direct product made by a patented process as long as the product is "materially changed" in the course of its conversion into the imported item.[53]  Such importation does not constitute infringement.  Amgen has admitted that there are differences between Roche's MIRCERA and "human erythropoietin" as defined in the patents-in-suit.  Amgen contends that those differences do not constitute material changes.  With regard to whether or not the imported product is "materially changed," Amgen bears the burden of proof.[54]  In other words, Amgen, in its assertion of various process claims, must prove two things:  (1) first that Roche literally practices each and every step of the patented processes; and (2) that any imported product allegedly infringing those claims was not materially changed from the direct product of the process.  Specifically, Amgen has asserted that Roche infringes the process claims of the '868, '698, or '349 patents; thus, if Roche performs any elements of these process claims in Europe, that alone is not an act of infringement.  Amgen must prove that the resulting product is not "materially changed" from the direct product defined by the patented process.  It is for you to decide what the evidence shows the direct product of the process is.  Also, you are to decide if that product is materially changed.

---

[52]    35 U.S.C. §271(g); *Eli Lily & Co. v. Am. Cyanamid Co.,* 82 F.3d 1568, 1572 (Fed. Cir. 1996).

[53]    35 U.S.C. § 271(g); *Eli Lily & Co. v. Am. Cyanamid Co.,* 82 F.3d 1568, 1572 (Fed. Cir. 1996).

[54]    *Genentech, Inc. v. Boehringer Mannheim GmbH,* 47 F. Supp. 2d 91, 108 (D. Mass. 1999).

To determine material change, one must look to the substantiality of the change between the substance that Roche isolates from the cell media, alleged to be the product of the patented process, and compare that to MIRCERA®, the imported product.[55]  In the chemical context, a material change in a compound is most naturally viewed as a significant change in the compound's structure and properties.[56]  It is also possible that additional process steps performed after a patented process can support a finding of material change.  The following factors support a finding of material change:[57]

- that subsequent processes confer an additional, distinct, or valuable property to the alleged product of the patented process

- that subsequent processes confer different properties to the direct product of the patented process, *e.g.,* increased half-life, increased stability, and improved dosing regiments

- that subsequent processes confer significant structural differences to the direct product of the patented processes such as the removal and/or addition of certain atoms or bonds to the molecule

- that subsequent processes applied to the direct product of a patented process are complex and involve multiple steps

Additionally, even if individual steps of subsequent processes involve relatively routine chemical reactions, that does not preclude a finding of material change.[58]

---

[55]    *Eli Lilly,* 82 F.3d at 1568, *Genentech, Inc.,* 47 F. Supp. 2d at 107, *Eli Lilly and Co. v. American Cyanamid Co.,* 896 F. Supp. 851 (S.D. Ind. 1995).

[56]    *Eli Lilly,* 82 F.3d at 1573.

[57]    *Eli Lilly and Co. v. Am. Cyanamid Co.,* 66 F. Supp. 2d 924, 932 (S.D. Ind. 1999).

[58]    *Eli Lilly,* 82 F.3d at 1572-73.

## 6.5   EVIDENCE OF MATERIAL CHANGE OF OTHER PRODUCTS IS RELEVANT TO DETERMINING MATERIAL CHANGE OF CERA AND MIRCERA® (*NEW)*

In considering what constitutes a material change from the direct product of the claimed processes, you may consider evidence showing that other erythropoiesis-stimulating agents (ESAs), such as Aranesp®, which binds to the same EPO receptor, are different enough from the products of the claimed processes that Amgen considers them to fall outside the scope of products produced by Amgen's process claims for producing recombinant erythropoietin.[59]

---

[59]     *See, e.g., Home Diagnostics Inc. v. LifeScan, Inc.*, 120 F. Supp. 2d 864, 868 (N.D. Cal. 2000) (to avoid repetitive litigation, it would be permissible to compare accused product to a product previously found not to infringe); *Amstar Corp. v. Envirotech Corp.*, 823 F.2d 1538, 1545 (Fed. Cir. 1987) (infringement of accursed device may be determined by comparison with device previously found to infringe because "things equal to the same thing are equal to each other"); *Hampshire Paper Co. v. Highland Supply Corp.*, Civ. 02-32-JD, 2002 WL 1676285, *5 (D.N.H. July 18, 2002) (statement by patentee's counsel that if defendant's products were the same as certain prior art products, there would be no infringement, bound patentee).

## 6.6   INFRINGEMENT BY DOCTRINE OF EQUIVALENTS

If you do not find literal infringement of the '933 patent claims you may consider infringement under the "doctrine of equivalents."   The evidence in support of a finding of equivalency must be specific and precise.   Generalized testimony as to an overall similarity between the claims and Roche's product or process will not suffice.[60]  That is to say, you cannot find infringement by the doctrine of equivalents if Roche's product comes close to one of Amgen's claims.   The doctrine of equivalents must be applied to individual elements of the claim, not to the claimed product or process as a whole.[61]

I have referred to the "doctrine of equivalents" before.   In exceptional circumstances, you may find that defendant's products infringe Amgen's asserted '933 claims even if not all of the components or method steps of the claim are present in defendant's product.   You may find infringement in such circumstances if there is specific evidence that for a missing component, or specific method step, in defendant's product, there is evidence of an equivalent component or method step.[62]  This is called the doctrine of equivalents.[63]

The test to determine equivalents of an individual element under the doctrine of equivalents is whether Amgen has provided evidence that the allegedly equivalent element in defendant's product performs substantially the same function in substantially the same way to obtain substantially the same result as the claimed individual element, but if you conclude that

---

[60]    *Texas Instruments Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1567 (Fed. Cir. 1996).

[61]    *E-Pass Techs., Inc. v. 3Com Corp.*, 473 F.3d 1213, 1221 (Fed. Cir. 2007).

[62]    35 U.S.C. § 271(a); *Warner Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17 (1997).

[63]    *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950).

the differences are not insubstantial, you must find no infringement under the doctrine of equivalents.[64]

The question of whether Roche's product is equivalent is to be determined as of the time of the alleged infringement.[65]

You cannot consider the doctrine of equivalents when analyzing whether Roche infringes Amgen's process claims of the '868, '698 and '349 patents.[66]

---

[64]     *Warner Jenkinson Co.*, 520 U.S. at 39-40; *Graver Tank,* 339 U.S. at 608.

[65]     *Amgen v. Hoechst Marion Roussel, Inc.,* 339 F. Supp. 2d 202, 297 (D. Mass. 2004).

[66]     *Genentech, Inc. v. Boehringer Mannheim GmbH,* 47 F. Supp. 2d 91 (D. Mass. 1999).

### 6.7  LIMITATIONS ON DOCTRINE OF EQUIVALENTS – APPLIED ON AN ELEMENT BY ELEMENT BASIS

Each element of a claim is important to the claimed invention. Accordingly, the Doctrine of Equivalents must be applied on an element by element basis, not to the claimed process or product as a whole. Thus, to find that an asserted claim of the '933 patent is infringed under the Doctrine of Equivalents, you must find that each element of the claim that is not infringed literally has an equivalent structure or step in the accused product or process. If any single element of a claim is not present in the accused product either literally or by equivalents, then the claim cannot be infringed.[67]

---

[67]    *E-Pass Tech., Inc. v. 3Com Corp.*, 473 F.3d 1213, 1221 (Fed. Cir. 2007)

## 6.8   LIMITATIONS ON DOCTRINE OF EQUIVALENTS - PROSECUTION HISTORY ESTOPPEL

As you have already heard, during prosecution of patents, the patent applicant often makes arguments and amendments in an attempt to convince the PTO examiner to grant the patent.  The party seeking to obtain a patent may amend his patent claims or submit arguments in order to define or narrow the meaning of the claims to obtain the patents.  Based on the file histories of the patents-in-suit, which have been entered into evidence, each of the asserted claims was the result of amendments which narrowed its scope.  As a result, there is a presumption of no doctrine of equivalents of these claims.[68]   Amgen has submitted *no evidence* rebutting this presumption, such as proof that the alleged equivalent would have been unforeseeable at the time of the narrowing amendment.  *Id.*  As a result, Amgen is not entitled to invoke the doctrine of equivalents of the asserted claims.

---

[68]     *See Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 525 U.S. 722, 740 (2002).

## 6.9  LIMITATIONS ON DOCTRINE OF EQUIVALENTS -- CLAIM ELEMENTS MAY NOT BE READ OUT OF EXISTENCE

The doctrine of equivalents may not be used to eliminate an element from a patent claim. Because of this rule, some claim limitations may be written in such a way as to have no equivalents.  If a claim limitation is written in such a way that applying the doctrine of equivalents would make a claim limitation ineffective, then there are no equivalents for that element.[69]

---

[69]    *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997); *Novartis Pharms. Corp. v. Abbott Labs.,* 375 F.3d 1328, 1339 (Fed. Cir. 2004).

### 6.10  ROCHE'S PATENTS ON MIRCERA® ARE RELEVANT TO THE DOCTRINE OF EQUIVALENTS INQUIRY (*NEW*)

Roche has obtained patents on MIRCERA®.  "The fact of separate patentability is relevant [to your consideration of infringement under the doctrine of equivalents], and is entitled to due weight."[70]  For example, patents could be evidence that MIRCERA performs a substantially different function in substantially a different way to achieve a substantially different result.

---

[70]    *National Presto Indus., Inc. v. West Bend Co.*, 76 F.3d 1185, 1192 (Fed. Cir. 1996).

### 6.11  LIMITATIONS ON THE DOCTRINE OF EQUIVALENTS – SUBJECT MATTER DEDICATED TO THE PUBLIC[71]

When a patent discloses subject matter but does not claim it, the patentee has dedicated that unclaimed subject matter to the public.  If you find that the patent discloses, but does not claim, subject matter alleged to be equivalent to an element of the asserted patent claims, then you cannot find that allegedly equivalent component or step in Roche's product or method to be equivalent to that element of the patent claim.  This is true even if the failure to claim the subject matter was wholly unintentional.

---

[71]     AIPLA's Model Patent Jury Instructions 3.11; *Toro Co. v. White Consol. Indus., Inc.,* 383 F.3d 1326 (Fed. Cir. 2004); *Johnson & Johnston Assocs. Inc. v. R.E. Serv. Co.,* 285 F.3d 1046, 1054-55 (Fed Cir. 2002) (en banc).

## 6.12  REVERSE DOCTRINE OF EQUIVALENTS

The doctrine of equivalents for finding infringement has a counterpart called the reverse doctrine of equivalents which supports a finding of non-infringement.  Therefore, even if Amgen's claims are found to be literally infringed, Roche may still avoid infringement under the reverse doctrine of equivalents.  The reverse doctrine of equivalents is a fairness doctrine that may be applied when a product or process is so fundamentally different from the patented invention that a judgment of infringement would constitute an unwarranted extension of the claims beyond a fair scope of the invention.  This determination is made by considering the original intended scope of the patent and the "spirit and intent" of the claims, keeping in mind the particular context of the patent, the prior art, and the particular circumstances of the case.  A new product or process that uses a new technology that makes a real difference in how the process works or what is produced would not infringe under the reverse doctrine of equivalents (e.g. changes to a drug's biologic or therapeutic effects).[72]  A prima facie (on its face) case of reverse doctrine of equivalents exists where the alleged infringer has a patent on the accused product or process.[73]

---

[72]    *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 339 F. Supp. 2d 202, 283-303 (D. Mass. 2004); *Union Carbide Corp. v. Tarancon Corp.*, 682 F. Supp. 535, 541 (N.D. Ga. 1988), (quoting *SRI Int'l v. Matsushita Elec. Corp. of America*, 775 F.2d 1107, 1116 (Fed. Cir. 1985)); *Precision Metal Fabricators, Inc. v. Jetstream Sys. Co., Div. of Oerlikon Motch Corp.*, 693 F. Supp. 814, 819 (N.D. Cal. 1988), (quoting *Graver Mfg. Co v. Linde Co.*, 339 U.S. 605, 607-08 (1949)); *Brenner v. Recognition Equip. Inc.*, 593 F. Supp. 1275, 1278 (S.D.N.Y. 1984).

[73]    *Jewish Hosp. of St. Louis v. IDEXX Labs.*, 973 F. Supp. 24, 28 (D. Me. 1997).

## 6.13  SAFE HARBOR EXEMPTION

Recognizing that new drugs require extensive clinical testing before being deemed safe enough to enter the market, U.S. law provides what is called a "safe harbor," allowing in the United States activity reasonably related to the development and submission of information to the FDA, the federal agency by which all U.S. drugs must get approval.[74]   The safe harbor includes preclinical studies of patented compounds performed pursuant to obtaining FDA approval.[75]   That being said, the FDA exemption is not strictly confined to such activities, and the safe harbor does not categorically exclude: (1) experimentation on drugs that are not ultimately the subject of an FDA submission; or (2) use of patented compounds in experiments that are not ultimately submitted to the FDA.  If it is reasonable to believe that the experiments at issue will produce the types of information that are relevant to a new drug application, then the FDA exemption applies.[76]

---

[74]      § 271(e)(1); *Integra Lifesciences I, Ltd. v. Merck KgaA,* --- F.3d ---, 2007 WL 2142878 (Fed. Cir. 2007); *Merck KgaA v. Integra Lifesciences I., Ltd.,* 545 U.S. 193 (2005).

[75]      *Merck KgaA,* 545 U.S. at 202.

[76]      *Integra Lifesciences,* 2007 WL 2142878 at *5.

## 6.14  SPECIFIC CLAIM INSTRUCTIONS

Now I will tell you specifically, for every claim that Amgen has asserted against Roche, the elements that I have defined and which Amgen must prove in order for you to find that Roche infringes each claim.  **[Read from glossary]**

## 6.15  INFRINGEMENT OF U.S. PATENT NO. 5,441,868

In order for you to find liability for infringement of claim 1 of the '868 patent, Amgen must prove that Roche's process in producing its MIRCERA® product meets, literally, each of the following elements:

- *A process for producing a glycosylated erythropoietin polypeptide having the in vivo biological property of causing bone marrow cells to increase production of reticulocytes and red blood cells comprising the steps of:*

- *Growing, under suitable nutrient conditions, mammalian host cells*

- *Where the mammalian host cells are transformed or transfected with an isolated DNA sequence encoding human erythropoietin*

- *Isolating said glycosylated erythropoietin polypeptide therefrom*

For purposes of this claim, "comprising" means "containing the named elements," and "mammalian host cells" means "cells that have been genetically modified with isolated DNA containing genetic instructions for human erythropoietin or later generations of these cells that have inherited those instructions."[77]

Further, if you have found that Roche's process meets all of these steps literally, and if any of these steps occurs outside the United States, Amgen must further prove that the product that Roche imports into the United States is not materially changed from the direct product Roche produces from the patented process.  Otherwise, you cannot find that Roche infringes this claim.

---

[77]    Memorandum and Order of July 3, 2007 (DN 613).  Roche reserves its right to object and/or appeal the Court's claim constructions.

In order for you to find that claim 2 of the '868 patent is infringed by Roche's process, all of the previously listed elements of claim 1 must be present, literally, in Roche's process, as well as the following further limitation:

- *The mammalian host cells are CHO cells*

For purposes of this claim, the court has defined a CHO cell as "A cell from the ovary of a Chinese hamster."[78]

Further, if you have found that Roche's process meets all of these steps literally, and if any of these steps occurs outside the United States, Amgen must further prove that the product that Roche imports into the United States is not materially changed from the direct product Roche produces from the patented process. Otherwise, you cannot find that Roche infringes this claim.

---

[78]    Memorandum and Order of July 3, 2007 (DN 613).

## 6.15.1  INFRINGEMENT OF U.S. PATENT NO. 5,547,933

In order for you to find that Roche has infringed claim 3 of U.S. Patent 5,547,933, Amgen must prove that Roche's MIRCERA® product is an identifiable substance that meets literally or under the doctrine of equivalents, every one of the following elements:

- *Non-naturally occurring glycoprotein product of the expression in a mammalian host cell of an exogenous DNA sequence comprising a DNA sequence encoding human erythropoietin*

- *Said product possessing the in vivo biological property of causing bone marrow cells to increase production of reticulocytes and red blood cells*

For purposes of this claim, "non-naturally occurring glycoprotein product of the expression in a mammalian host cell of an exogenous DNA sequence comprising a DNA sequence encoding human erythropoietin" means "a glycoprotein (not occurring in nature) that is the product of the expression in a mammalian host cell of a DNA sequence that does not originate in the genome of the host, and which contains the genetic instructions (or a DNA sequence) encoding human erythropoietin."[79]

In order for you to find that Roche has infringed claim 7 of the '933 patent, Amgen must prove that MIRCERA® is an identifiable substance that meets, literally, or under the doctrine of equivalents, every one of the elements listed for claim 3, plus the following additional element:

- *The host cell is a non-human mammalian cell*

In order for you to find that Roche has infringed claim 8 of the '933 patent, Amgen must prove that MIRCERA® is an identifiable substance that meets, literally or under the doctrine of

---

[79]    Memorandum and Order of July 3, 2007 (DN 613).  Roche reserves its right to object and/or appeal the Court's claim constructions.

equivalents, all the elements listed for claim 3 and claim 7, plus the following additional element:

- *The non-human mammalian is a CHO cell*

For purposes of this claim, CHO cell means "A cell from the ovary of a Chinese hamster."[80]

In order to find that Roche has infringed claim 9 of the '933 patent, Amgen must prove that MIRCERA® ® is a pharmaceutical composition meeting, literally or under the doctrine of equivalents, every element listed for claim 3, plus the following elements:

- *A pharmaceutical composition comprising an effective amount a glycoprotein product effective for erythropoietin therapy*

- *A pharmaceutical composition comprising . . . a pharmaceutically acceptable diluent, adjuvant or carrier*

For purposes of this claim, "an effective amount a glycoprotein product effective for erythropoietin therapy" means an amount "that elicits any one or all of the effects often associated with in vivo biological activity of natural EPO, such as . . . stimulation of reticulocyte response, development of ferrokinetic effects (such as plasma iron turnover effects and marrow transit time effects), erythrocyte mass changes, stimulation of hemoglobin C synthesis and . . . increasing hematocrit levels in mammals."  Further, a "pharmaceutical composition comprising . . . a pharmaceutically acceptable diluent, adjuvant or carrier" means "a composition suitable for administration to  humans, containing a diluent, adjuvant or carrier."[81]

---

[80]    Memorandum and Order of July 3, 2007 (DN 613).

[81]    Memorandum and Order of July 3, 2007 (DN 613).  Roche reserves its right to object and/or appeal the Court's claim constructions.

In order to find that Roche infringes claim 12 of the '933 patent, Amgen must prove that MIRCERA® is a pharmaceutical composition meeting every element of claim 7, literally or under the doctrine of equivalents, plus the following elements:

- *An effective amount of a glycoprotein product effective for erythropoietin therapy*

For purposes of this claim, an "effective amount of a glycoprotein product effective for erythropoietin therapy" is one "that elicits any one or all of the effects often associated with in vivo biological activity of natural EPO, such as . . . stimulation of reticulocyte response, development of ferrokinetic effects (such as plasma iron turnover effects and marrow transit time effects), erythrocyte mass changes, stimulation of hemoglobin C synthesis and . . . increasing hematocrit levels in mammals."[82]

---

[82]    Memorandum and Order of July 3, 2007 (DN 613).  Roche reserves its right to object and/or appeal the Court's claim constructions.

## 6.15.2  INFRINGEMENT OF U.S. PATENT NO. 5,618,698

In order for you to find liability for infringement of claim 6 of U.S. Patent No. 5,618,698, Amgen must prove that Roche's process in producing its MIRCERA® product meets, literally, each of the following elements:

- *Process for the production of a glycosylated erythropoietin polypeptide having the in vivo biological property of causing bone marrow cells to increase production of reticulocytes and red blood cells comprising the steps of*

- *Growing, under suitable nutrient conditions, vertebrate cells comprising amplified DNA encoding the mature erythropoietin amino acid sequence of FIG. 6*

- *Isolating said glycosylated erythropoietin polypeptide expressed by said cells*

For purposes of this claim, "comprising" means "containing the named elements."[83]

Further, if you have found that Roche's process meets all of these steps, and if any of these steps occurs outside the United States, Amgen must further prove that the product that Roche imports into the United States is not materially changed from the direct product Roche produces from the patented process.  Otherwise, you cannot find that Roche infringes this claim.

In order for you to find that claim 7 of the '698 patent is infringed by Roche's process, all of the previously listed elements of claim 6 must be met, literally, in Roche's process, as well as the following further limitation:

- *Said vertebrate cells further comprise amplified marker gene DNA*

Further, if you have found that Roche's process meets all of these steps, and if any of these steps occurs outside the United States, Amgen must further prove that the product that

---

[83]    Memorandum and Order of July 3, 2007 (DN 613).  Roche reserves its right to object and/or appeal the Court's claim constructions.

Roche imports into the United States is not materially changed from the direct product Roche produces from the patented process. Otherwise, you cannot find that Roche infringes this claim.

In order for you to find that claim 8 of the '698 patent, is infringed by Roche's process, all of the previously listed elements of claims 6 and 7 must be met, literally, in Roche's process, as well as the following further limitation:

- *Said amplified marker gene DNA is Dihydrofolate reductase (DHFR) gene DNA*

Further, if you have found that Roche's process meets all of these steps, and if any of these steps occurs outside the United States, Amgen must further prove that the product that Roche imports into the United States is not materially changed from the direct product Roche produces from the patented process. Otherwise, you cannot find that Roche infringes this claim.

In order for you to find that claim 9 of the '698 patent, is infringed by Roche's process, all of the previously listed elements of claims 6, 7 and 8 must be met, literally, in Roche's process, as well as the following further limitation:

- *Said cells are mammalian cells*

Further, if you have found that Roche's process meets all of these steps, and if any of these steps occurs outside the United States, Amgen must further prove that the product that Roche imports into the United States is not materially changed from the direct product Roche produces from the patented process. Otherwise, you cannot find that Roche infringes this claim.

## 6.15.3 INFRINGEMENT OF U.S. PATENT NO. 5,756,349

In order for you to find liability for infringement of claim 7 of U.S. Patent No. 5,756,349, Amgen must prove that Roche's process in producing its MIRCERA® product meets, literally, each of the following elements:

- *Producing erythropoietin comprising the step of*

- *culturing, under suitable nutrient conditions vertebrate cells*

- *which can be propagated in vitro*

- *which are capable upon growth in culture of producing erythropoietin in the medium of their growth in excess of 100 U of erythropoietin per $10^6$ cells in 48 hours as determined by radioimmunoassay*

- *Said cells comprising non-human DNA sequences which control transcription of DNA encoding human erythropoietin*

For purposes of this claim, "comprising" means "containing the named elements."[84]

Further, if you have found that Roche's process meets all of these steps, and if any of these steps occurs outside the United States, Amgen must also prove that the product that Roche imports into the United States is not materially changed from the direct product Roche produces from the patented process. Otherwise, you cannot find that Roche infringes this claim.

---

[84] Memorandum and Order of July 3, 2007 (DN 613). Roche reserves its right to object and/or appeal the Court's claim constructions.

# 7   UNENFORCEABILITY (INEQUITABLE CONDUCT)

## 7.1   INEQUITABLE CONDUCT - GENERALLY

After a patent application is filed, it is assigned to an Examiner, who examines the application and attempts to determine whether or not the application and the claims meet all of the requirements of the patent laws. In conducting his examination, an Examiner should consider the description of the invention in the application, which may involve highly technical subject matter, and search for and consider the prior art. An Examiner has only a limited amount of time and resources available and, therefore, must rely on information provided by the applicant with respect to the technical field of the invention and the prior art.

Because the United States Patent and Trademark Office ("PTO") must rely on the patent application for information, applicants are required to prosecute patent applications with candor, good faith, and honesty. This duty of candor and good faith extends to all inventors named on a patent application, all attorneys and agents involved in preparing and prosecuting the application, and every other person involved with the prosecution of the patent application. Each individual with such a duty must ensure that all material information known to that individual is disclosed to the Examiner. Disclosure must be made in every application.[85] The term "information" can include prior art and factual representations made by each individual to the Examiner. Moreover, the duty of candor and good faith requires more than just disclosing material

---

[85]   37 C.F.R. 1.4(b) ("Since each file must be complete in itself, a separate copy of every paper to be filed in a patent application, patent file, or other proceeding must be furnished for each file to which the paper pertains, even though the contents of the papers filed in two or more files may be identical."); 37 C.F.R. 1.4(c) ("Since different matters may be considered by different branches or sections of the United States Patent and Trademark Office, each distinct subject, inquiry or order must be contained in a separate paper to avoid confusion and delay in answering papers dealing with different subjects."); *A.B. Dick Co. v. Burroughs Corp.*, 617 F.Supp. 1382, 1395 (N.D. Ill. 1985) ("the PTO cannot realistically be thought of as the equivalent (say) of a small law office, in which notice to one person may fairly be deemed notice to all. It is not necessarily true that the PTO Examining Division will have access to proofs filed in the course of an interference.") *aff'd*, 798 F.2d 1392 (Fed. Cir. 1986); *General Electric Co. v. United States*, 206 U.S.P.Q. 260, 278 (Ct. Cl. 1979) ("Even if [the applicant] had reason to believe that the Patent Examiner might review the interference record, it was incumbent upon counsel . . . to call to his attention any evidence which might bear on the issue of patentability of the claims.").

information.[86]    For example, if an applicant knowingly takes advantage of an error by the Examiner, then it would not fulfill its duty of candor and good faith.[87]    Similarly, the mere submission of information does not satisfy the duty of candor and good faith where an applicant buries material information or presents the information in a manner so that the examiner would be likely to ignore it and permit the application to issue as a patent.[88]

Roche contends that Amgen may not enforce its patents against Roche because Amgen engaged in inequitable conduct during the prosecution of its patents.  "Inequitable conduct" refers to the failure to meet this duty of candor and good faith.

Roche contends that information material to the Lin patents was misrepresented, omitted, and/or buried in Amgen's communications with the Examiner; that persons substantively involved in the prosecution of the Lin patents had the intent to mislead the Examiner; and that Amgen committed fraud to obtain the Lin patents.

Roche bears the burden of establishing inequitable conduct by clear and convincing evidence.  To determine whether the Amgen patents were obtained through inequitable conduct, you must determine that Amgen, its representatives, or someone involved in a substantial way with the prosecution of the application, withheld or misrepresented information that was material

---

[86]    Manual of Patent Examining Procedure ("MPEP") § 2001.04 (5th Ed. Rev. 14, Nov. 1992); MPEP § 2001.04 (8th Ed. Rev. 5, Aug. 2006); *Rohm & Haas Co. v. Crystal Chem. Co.*, 722 F.2d 1556, 1571 (Fed. Cir. 1983).

[87]    *KangaROOS USA, Inc. v. Caldor, Inc.*, 778 F.2d 1571, 1576 (Fed. Cir. 1985).

[88]    *See eSpeed Inc. v. BrokerTec USA LLC*, 417 F. Supp. 2d 580, 598 (D. Del. 2006) (submission made amidst more than two thousand pages of materials was a "blizzard of paper" characterized as "consistent with an intent to hide" and supporting a finding of inequitable conduct), *aff'd*, 480 F.3d 1129 (Fed. Cir. 2007); *Golden Valley Microwave Foods Inc. v. Weaver Popcorn Co., Inc.*, 837 F. Supp. 1444, 1477 (N.D. Ind. 1992) (holding duty of candor violated where applicant or attorney discloses reference "in such a way as to 'bury' it or its disclosure in a series of disclosures of less relevant prior art references, so that the examiner would be likely to ignore the entire list and permit the application to issue"), *aff'd*, 11 F.3d 1072 (Fed. Cir. 1993); *Penn Yan Boats, Inc. v. Sea Lark Boats, Inc.*, 359 F.Supp. 948, 965 (S.D. Fla. 1972), *aff'd* 479 F.2d 1328 (5th Cir. 1973);  MPEP § 2001.04 (8th ed. Rev. 5, Aug. 2006).

to the examination of the patent application, and that this individual or individuals acted with an intent to deceive or mislead the Examiner.[89]

---

[89]     AIPLA model jury instruction 11.0; *Bristol-Myers Squibb Co. v. Phone-Poulence Rorer, Inc.*, 326 F.3d 1226 (Fed. Cir. 2003); *GFI, Inc. v. Franklin Corp.*, 265 F.3d 1268 (Fed. Cir. 2001); *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 120 F.3d 1253 (Fed. Cir. 1997).

## 7.2    MATERIALITY

You must first determine whether Amgen withheld or misrepresented any information at all and, if so, whether that information was indeed material. An applicant can be deemed to have withheld or misrepresented information if such information is buried within a series of disclosures of less relevant information or within a lengthy disclosure of information.

Information is material if it establishes, either alone or in combination with other information, that a claim of the patent application would more likely than not meet one of the requirements for a patent, such as the requirements that the invention be new, useful, and non-obvious. Information is material where there is a likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent. Information is also material if it refutes or is inconsistent with the information provided or arguments made by Amgen to persuade the Examiner that the invention is entitled to patent protection. Information is material if the reference "more explicitly and clearly" discloses limitations also found in submitted prior art.[90]

Roche contends that Amgen withheld or misrepresented various facts, declarations, agreements, judicial decisions, publications, experiments, prior art, and studies during the prosecution of its patents with the intent to mislead or deceive the Examiner. Roche contends that the Lin Patents would not have issued but for Amgen's inequitable conduct.

If you determine that there was a withholding, misrepresentation or burial of information and that the information was material, then you must consider the element of intent. If, on the other hand, you find that Roche has failed to prove by clear and convincing evidence that Amgen

---

[90]    *See McKesson Info. Solutions, Inc. v. Bridge Med., Inc.*, 487 F.3d 897, 909 (Fed. Cir. 2007)

or its attorneys withheld or misrepresented any material information, then you must find that there was no inequitable conduct.[91]

---

[91]     Delaware Model Jury Instruction 5.2; AIPLA Model Jury Instruction 11.1(B) (Post-1992 standard); *JP Stevens & Co. v. Lex Tex Ltd.*, 747 F.2d 1553 (Fed. Cir. 1984), *cert. denied*, 474 U.S. 822 (1985).

## 7.3    INTENT

If you determine that material information was withheld, misrepresented or buried to the PTO, you must next determine whether such information was withheld, misrepresented or buried with the intent to deceive or mislead the Examiner.  Intent to deceive the Examiner may be found from direct evidence of such intent.  Such direct evidence is rare, however, and as a result, the law allows deceptive intent to be inferred from the facts and surrounding circumstances.  In determining whether or not there was intent to deceive or mislead the PTO, you should consider the totality of the circumstances, including the nature of the conduct and evidence of the absence or presence of good faith.[92]

Intent to deceive can be inferred from evidence that the applicant could not have made its patentability argument had the information been disclosed.[93]  The materiality of an undisclosed reference may lead to an inference of intent.[94]  Intent to deceive also can be inferred when a party or its counsel fails to correct a representation made to the Examiner, even after learning that it was incorrect.  Intent can also be inferred from evidence that the patentee submitted the material information to other entities, such as the FDA.[95]  Conversely, shielding material

---

[92]    AIPLA Model Patent Jury Instruction 11.2; *Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.*, 326 F.3d 1226 (Fed. Cir. 2003); *GFI, Inc. v. Franklin Corp.*, 265 F.3d 1268 (Fed. Cir. 2001); *PerSeptive Biosystems, Inc. v. Pharmacia Biotech, Inc.*, 225 F.3d 1315 (Fed. Cir. 2000); *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 120 F.3d 1253 (Fed. Cir. 1997); *LaBounty Mfg., Inc. v. United States Int'l Trade Comm'n*, 958 F.2d 1066 (Fed. Cir. 1992); *eSpeed, Inc. v. BrokerTec USA, L.L.C.*, 480 F.3d 1129 (Fed. Cir. 2007).

[93]    *LaBounty Mfg., Inc.  v. United States ITC*, 958 F.2d 1066, 1076 (Fed. Cir. 1992); *Agfa Corp. v. Creo Prods. Inc.*, 451 F.3d 1366, 1379 (Fed. Cir. 2006); *GFI, Inc. v. Franklin Corp.*, 265 F.3d 1268, 1275 (Fed. Cir. 2001).

[94]    *Cargill Inc. v. Canbra Foods Ltd.*, 476 F.3d 1359, 1367 (Fed. Cir. 2007).

[95]    *Bruno Indep. Living Aids, Inc. v. Acorn Mobility Servs., Ltd.*, 394 F.3d 1348, 1354 (Fed. Cir. 2005); *Merck & Co., Inc. v. Danbury Pharmacal, Inc.*, 873 F.2d 1418, 1422 (Fed. Cir. 1989).

information from counsel or other individuals who owe the duty of good faith and candor is also indicative of intent to deceive.[96]  Burying material information also supports intent to deceive.[97]

---

[96]     *Novo Nordisk Pharms., Inc. v. Bio-Technology Gen. Corp.*, 424 F.3d 1347, 1361-62 (Fed. Cir. 2005); *Synthon IP, Inc. v. Pfizer Inc.*, 472 F.Supp.2d 760, 779-80 (E.D. Va. 2007); *FMC Corp. v. Hennessy Industries, Inc.*, 836 F.2d 521, 526 n. 6 (Fed. Cir. 1987).

[97]     *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1184 (Fed. Cir. 1995) ("[B]urying' a particular material reference in a prior art statement containing a multiplicity of other references can be probative of bad faith."); *eSpeed, Inc. v. BrokerTec USA, L.L.C.*, 417 F. Supp. 2d 580, 598 (D. Del. 2006) (the "blizzard of paper is therefore more consistent with an intent to hide than to disclose.").

## 7.4    BALANCING OF MATERIALITY AND INTENT

The more material the withheld, misrepresented or buried information is, the less intent must be shown to reach a conclusion of inequitable conduct.  For example, omitting a highly material piece of information requires less proof of intent, thereby allowing you to infer intent. You must be the judge of this balance.

If you find that Roche has proven by clear and convincing evidence that there was a material withholding or a material misrepresentation of information and that Amgen or its attorneys acted with intent to deceive the examiner, then you must balance these two factors to determine whether or not, in your view, there was inequitable conduct.[98]

---

[98]    Delaware Model Jury Instruction 5.4; *Halliburton Co. v. Schlumberger Technology Corp.*, 925 F.2d 1435, 1439 (Fed. Cir.), *reh'g denied*, 1991 U.S. App. Lexis 4501 (Fed. Cir. 1991).

# 8   DELIBERATION AND VERDICT

## 8.1  INTRODUCTION

That concludes the part of my instructions explaining the rules for considering some of the testimony and evidence.  Now let me finish up by explaining some things about your deliberations in the jury room, and your possible verdicts.

Once you start deliberating, do not talk to the court security officer, or to me, or to anyone else except each other about the case.  If you have any questions or messages, you must write them out and give them to the court security officer, who will give them to me.  I may have to talk to the lawyers about what you have asked, then we will bring you back in here and I will answer as best I can.  Then we will send you back out.

Do not ever write down or tell anyone how you stand on your votes.  For example, do not write down or tell anyone that you are split 5-5, or 8-2, or whatever your vote happens to be. That should stay secret until you are finished.[99]

You should not feel obligated to complete your deliberations today.  If you have not reached a unanimous verdict by ten minutes to 5:00, we will call you back into the courtroom before you are dismissed for the day, and you will continue deliberations tomorrow.

---

[99]      Delaware Model Jury Instruction 7.1

## 8.2  UNANIMOUS VERDICT

Your verdict must represent the considered judgment of each juror.  In order for you as a jury to return a verdict, it is necessary that each juror agree to the verdict.  Your verdict must be unanimous.

It is your duty, as jurors, to consult with one another and to deliberate with a view towards reaching an agreement, if you can do so without violence to your individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors.  In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion, if convinced it is erroneous.  But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the purpose of returning a verdict.  Remember at all times that you are not partisans.  You are judges – judges of the facts.  Your sole interest is to seek the truth from the evidence in the case.

A form of verdict has been prepared for you.  You will take this form to the jury room and when you have reached unanimous agreement as to your verdict, you will have your foreperson fill in, date and sign the form.  Then tell the court security officer that you have reached a verdict, but do not give him the verdict slip. You will then return to the courtroom and your foreperson will give your verdict.

It is proper to add the caution that nothing said in these instructions and nothing in the form of verdict is meant to suggest or convey in any way or manner any intimation as to what verdict I think you should find.  What the verdict shall be is the sole and exclusive duty and responsibility of the jury.[100]

---

[100] Delaware Model Jury Instruction 7.2.

## 8.3  DUTY TO DELIBERATE

Now that all the evidence is in and the arguments are completed, you are free to talk about the case in the jury room.  In fact, it is your duty to talk with each other about the evidence, and to make every reasonable effort you can to reach unanimous agreement.  Talk with each other, listen carefully and respectfully to each other's views, and keep an open mind as you listen to what your fellow jurors have to say.  Try your best to work out your differences.  Do not hesitate to change your mind if you are convinced that other jurors are right and that your original position was wrong.

But do not ever change your mind just because other jurors see things differently, or just to get the case over with.  In the end, your vote must be exactly that – your own vote.  It is important for you to reach unanimous agreement, but only if you can do so honestly and in good conscience.

No one will be allowed to hear your discussions in the jury room, and no record will be made of what you say.  So you should all feel free to speak your minds.

Listen carefully to what the other jurors have to say, and then decide for yourself.[101]

---

[101] Delaware Model Jury Instruction 7.3.

## 8.4   THE COURT HAS NO OPINION

Let me finish up by repeating something that I said to you earlier.  Nothing that I have said or done during this trial was meant to influence your decision in any way.  You must decide the case for yourselves based on the evidence presented.[102]

---

[102] Delaware Model Jury Instruction 7.4.

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).  Pursuant to agreement of counsel dated September 9, 2007, paper copies will not be sent to those indicated as non registered participants.

/s/ Vladimir Drozdoff
Vladimir Drozdoff