Exhibit RHH
Remedy Phase
05-12237-WGY



**Forbes.com**

Companies, People, Ideas

# Amgen's Enemies

Kerry A. Dolan 10.30.06

### Doctors are rebelling against its marketing practices, dissidents think Medicare is too generous to it and competition looms.

In the red-ink-drenched biotechnology sector the success of Amgen takes on a fairy-tale quality. This 26-year-old firm has scored several blockbuster drugs that boost blood-cell production in kidney dialysis and cancer patients. Last year it earned $3.7 billion on revenue of $12.4 billion. The 8,000 employees at its headquarters in Thousand Oaks, Calif. need a shuttle bus to traverse its 194-acre campus.

What's not to like about this happy story? Just three things.

One is that Amgen's patents are expiring, probably too fast for the company to make up the lost revenue with new inventions. Next is that the firm's sharp-elbowed sales tactics could come back to haunt it. It uses leverage from a must-have drug to pressure doctors into also prescribing the Amgen product in a market where there is competition. That strategy has precipitated an antitrust lawsuit by Johnson & Johnson and has backfired at some medical practices whose M.D.s don't like feeling strong-armed.

The third problem is that a dispute is brewing about whether certain Amgen patients are getting more of one costly drug than they really need. The drug in question is Epogen, which stimulates the body to produce red blood cells. Dosing levels have crept up by a factor of four over the past decade, though some doubt that this makes dialysis patients live longer. The higher doses have the side effect of fattening the bank accounts of both Amgen and the clinics that choose the prescriptions. The insurers who pay the bills have taken notice. That group includes Medicare, which spent $1.75 billion on Epogen last year, more than on any other drug.

Amgen also sells Enbrel, a treatment for rheumatoid arthritis and psoriasis, and it has a handful of promising new drugs in its pipeline. But it is still heavily reliant on red blood cell booster Epogen, first approved in 1989 to treat anemia in patients with kidney failure, and Aranesp, a modified version of Epogen approved in 2002 for cancer patients. They account for almost half of Amgen's sales and 60% of its profits, estimates Geoffrey Porges, a senior analyst at Sanford Bernstein. The drugs are a godsend to many of the 335,000 Americans on dialysis and the 1.5 million people in the U.S. weakened by chemotherapy.

J&J competes with Amgen in the cancer market with Procrit, which it makes under a license that Amgen granted long ago. In the kidney-treatment market Amgen's patents may succeed in fending off a competing anemia drug from the Swiss giant Roche, at least in the U.S., where the patents extend to 2012. But in Europe the patents have already expired.

Amgen Chief Executive Kevin Sharer acknowledges the company's significant challenges but says he can address all of them. His biggest concern is that "a very high percentage of our revenue is going to go off-patent within the next product cycle," meaning in seven years, the time it takes to develop a new drug. His response:

Increase research-and-development spending 37% in a year when revenue will rise just 14%. This year Amgen will spend $3.3 billion, nearly a quarter of its revenue, on research. "You've got to run scared all the time," says Sharer, during an interview in his art-filled office overlooking Amgen's campus.

Why is Amgen fighting off competition from J&J? In 1985, to raise funds for clinical trials of Epogen (its clinical name is epoetin), Amgen licensed to J&J all potential uses of the bioengineered hormone except the treatment of anemia in kidney-failure patients on dialysis. In the 1990s J&J's Ortho Biotech unit spent the money it took to win Food & Drug Administration approvals for four different uses. Notably it got the go-ahead in 1993 for what has turned out to be the biggest potential market: treating chemotherapy-associated anemia in cancer patients. For the last five years epoetin, which J&J sells under the brand name Procrit, has been one of the pharma giant's biggest sellers, pulling in $3 billion at its peak in 2002.

Flush with cash from its dialysis patients, Amgen decided to do battle with its own licensee, reclaiming the market it had given away in 1985. The licensing agreement with J&J was exclusive, but Amgen sidestepped that problem by inventing a slightly different, longer-lasting form of epoetin that it named Aranesp. Procrit patients need weekly injections; with Aranesp they can go two to three weeks between injections.

After Aranesp was approved in 2002, it began to nibble away at J&J's hold on the oncology market. By early 2004 Aranesp had a 45% share to Procrit's 55%. To further boost sales of Aranesp, in 2004 Amgen began tying rebates on another of its big-selling drugs, Neulasta, to purchases of Aranesp. Neulasta does for white blood cells (infection fighters) what Epogen does for the red ones (which carry oxygen). And cancer patients undergoing chemotherapy need both kinds of blood boosters. Amgen sold $2 billion of Neulasta last year. Together, Neulasta and Amgen's shorter-acting Neupogen account for 98% of white blood cell booster sales to cancer clinics.

Rebates are common in the drug industry as a reward for big purchasers. Bundling products is also common, with, say, Pfizer giving an insurer or a hospital chain a better price on Lipitor if it also buys the antibiotic Zithromax.

What makes the rebates on anemia drugs different (J&J pays them, too) is that they go into doctors' pockets. Oncology is one of only a handful of disciplines whose practitioners buy drugs and administer them in their offices. Drugs had long been a lucrative sideline for cancer doctors, as they captured the spread between the discounted price that Amgen and J&J billed them and the higher reimbursement Medicare paid them. Drug firms fought for space on the prescription pad by offering ever fatter rebates. Some doctors were getting $2,500 from Medicare for a vial of Neulasta that cost them $2,100.

This cozy deal ended in 2005, when a 2003 federal law took effect setting reimbursement rates on drugs administered in doctors' offices much closer to the price that doctors paid. The final months under the old pricing regime saw a mad scramble for market share, "an Oklahoma land rush," says Sanford Bernstein analyst Geoffrey Porges.

In December 2004 Dr. Peter Eisenberg and his colleagues at California Cancer Care, one of the largest private cancer practices in the Bay Area, got a letter from Amgen. According to Eisenberg it stated that if the practice promised to give Amgen at least a fourth of their epoetin business, they would get the highest-tier rebate on Neulasta. With a smaller commitment on Aranesp the Neulasta rebate would be as low as 4%. For the biggest purchasers the rebate runs as high as 21%, claims J&J in the antitrust lawsuit filed a year ago against Amgen.

Six months later, just as Eisenberg was about to ask Amgen for a $100,000 grant for a university study, Amgen came back with some new math: Up Aranesp's share of epoetin spending to 65% or you'll only be eligible for the lowest rebate tier, says Eisenberg.

California Cancer Care had had a long relationship with Amgen. Its doctors had performed many of Amgen's clinical trials and helped Amgen's sales representatives and middle managers understand how oncologists work in a private practice.

But Eisenberg and his fellow doctors were so upset they cut off their relationship with Amgen and its reps. They buy very little Aranesp now, and their rebate on Neulasta has fallen so much that they lose money when treating patients on Medicare with the drug. They send those patients to the hospital for Neulasta.

"This is not the way one should be making medical decisions," says Eisenberg. "The rebates amounted to hundreds of thousands of dollars a doctor. Call it what you want, but it's a bribe. If they want to play this game, fine. Play it without us."

---

Dr. James R. Cohen, who sees 45 patients a day at his solo private cancer practice in Los Gatos, Calif., loses $275 on every vial of Neulasta he gives to Medicare patients because he also does not buy the amount of Aranesp that would entitle him to a larger rebate. He currently gets $100,000 a year in rebates from Ortho Biotech for his use of Procrit. If Cohen bought Aranesp instead of Procrit, his rebate would be $300,000. "I cannot fathom why it's legal," he says, adding that profit does not drive his medical decisions.

Bruce Feinberg runs Georgia Cancer Specialists in Atlanta, Ga., one of the five largest cancer practices in the country. He stopped buying Aranesp from Amgen a year ago in response to the company's decision to tie Neulasta rebates to Aranesp purchases. Georgia Cancer Specialists has cut back its use of Neulasta by 50% in the last year because it loses money when giving Neulasta to Medicare patients.

Amgen acknowledges that the best discounts are earned by customers who purchase both Aranesp and Neulasta, but it denies that its contract is coercive.

J&J's legal argument is that Amgen violates the antitrust laws by bundling a monopoly product (Neulasta) with a treatment for which there are two options (Aranesp or Procrit). The complaint blames Amgen's practices for the drop in Procrit market share from 55% in early 2004 to 34% in late 2005.

Amgen says the suit has no merit and that J&J's request for an injunction is legal posturing to avoid competing with Aranesp. The case has not yet gone to trial. A loss in court could cost Amgen $400 million or more, figures Sanford Bernstein analyst Porges, although it's quite possible that J&J would settle out of court for more like $100 million.

Another storm brewing for the company has its center in Washington, D.C., where health care watchdogs and lawmakers are taking a second look at what they see as an overly liberal use of Epogen among kidney patients. Since 1973 Medicare has covered most costs for all dialysis patients, no matter their age.

Between 1991 and 2003 the average Epogen dose quadrupled, according to a recent study published in the journal *Health Affairs*. The spread that dialysis centers made on Epogen accounted for roughly 25% of their profits, according to a Morgan Stanley report. There have been no clinical trials to assess the effect of higher doses, although two other studies done on less-sick patients might suggest the higher doses are problematic--one in 1998 for patients with cardiac disease and one last year for chronic kidney disease patients. Both trials had to be halted. The earlier one showed that fatalities went up by 21% among those receiving higher doses.

The federal government is of two minds about dosage. Medicare policy encourages dialysis centers to give high doses of Epogen. The FDA-approved label leans in the other direction.

Dosage is determined by targeting what is called the hematocrit, the percentage (by volume) of red blood cells in blood. A healthy person has a level of 40%. Before epoetin came along, dialysis patients would drop below 30%, making them weak. The FDA label tells doctors to go for 36%. But in April Medicare stated that it would reimburse dialysis centers for epoetin as long as they reduce dosages when hematocrit levels exceed 39%. "There's no science that backs up any of this," says Dennis Cotter, president of the Medical Technology & Practice Patterns Institute, a research firm in Bethesda, Md.

Dr. Barry Straube, Medicare's chief medical officer, defends the Epogen guidelines. Controlling red blood cell levels is a complex and somewhat unpredictable task, he says. "It becomes difficult to micromanage [red blood cell levels] to stay in a very narrow range," says Straube, so Medicare broadened the range for which it reimburses.

But Straube admits that the Medicare decision on epoetin dosing is based on clinical habits and industry-promoted guidelines, not on the results of randomized clinical trials. This, for the drug on which Medicare spends

more money than any other, a drug that has been on the market for 17 years.

Some of the guidelines that Medicare relies on were set by a committee of the National Kidney Foundation, whose work was principally funded by Amgen. "Amgen essentially purchased the pseudoscience that went into raising these hematocrit guidelines in the medical literature," bristles Merrill Goozner, a director at the Center for Science in the Public Interest. As a result, he says, Amgen "is ripping off Medicare."

"Amgen's position is that the FDA label and [Medicare] coverage and monitoring policies are designed to ensure that patients have the best opportunity to benefit from this lifesaving therapy," says Robert Brenner, senior director in nephrology medical affairs at Amgen.

For years, Congressman Fortney (Pete) Stark (D--Calif.), the ranking Democrat on the Ways & Means Health Subcommittee, has introduced legislation, written letters and worked to reduce the amount of money the government pays Amgen. Stark believes that Medicare policy has encouraged overprescribing of Epogen and has been a waste of taxpayer money. Ways & Means Chairman Bill Thomas (R--Calif.) is also asking why Medicare ignored the FDA label for Epogen.

The answer may have something to do with the persuasiveness with which Amgen makes its case in Washington. Amgen spends $5.7 million a year on lobbying, according to the Center for Responsive Politics. Genentech, with half of Amgen's revenue, spends only $1.8 million.

---

"Amgen is pound for pound the most active group in Washington I've ever seen. The bulk of their success in business is the result of their aggressive Washington strategy," says Thomas Scully, who ran Medicare and Medicaid from 2001 to 2004 and is now a partner at investment firm Welsh Carson.

Amgen boss Sharer says his company's Washington, D.C. office is the same size as that of other drug companies Amgen's size. "I don't think you can exist [as a successful drug company] without having an effective presence in Washington," says Sharer.

Perhaps the biggest threat to Amgen's prodigious profits is competition. Roche filed for approval of its anemia drug Cera this year, and several analysts expect approval in the U.S. in 2007. Amgen is trying to block Roche by suing the company for patent infringement. A case filed late last year in federal district court in Boston is pending. But Roche has one U.S. patent that might enable it to beat back the infringement suit and, in any event, it has free rein in Europe.

Affymax of Palo Alto, Calif. has an anemia drug in midstage clinical trials that may need to be given only once every four weeks. FibroGen of South San Francisco has developed an oral tablet that stimulates the body to produce red blood cells; it is also in midstage trials. If approved, the drug could sell for just $1,500 a year, against the $5,000 to $15,000 that Amgen charges annually for Epogen, wrote Morgan Stanley analyst Steven Harr in a report last year.

Amgen's dependence on its anemia franchise and the pitfalls looming before it have not gone unnoticed on Wall Street. Amgen shares had a powerful upward march in the late 1990s but have since flatlined. At a recent $75 they go for 20 times Wall Street's consensus profit estimate for 2006. Genentech's multiple is 41. Under the circumstances, the Genentech price may be the one closer to fair value.

## The End of an Era?

While Amgen is beating J&J in anemia treatment for cancer patients, its stock has mostly stuck in the $50-to-$80 range for six years. Will competition eat away at its profitable anemia franchise?



STOCK PRICE (10/31/01=100) — Genentech, Amgen. Source: FT Interactive Data via FactSet Research Systems.

MARKET SHARE — Worldwide anemia treatment. Johnson & Johnson, Amgen. Source: Bernstein Research.



REVENUES — Estimated 2006: $14.1 bil
- Other drugs
- Enbrel
- White blood cell boosters (Neulasta, Neupogen)
- Anemia drugs¹ (Epogen & Aranesp)

PROFITS² — Estimated 2006: $5.3 bil
- Other drugs
- Enbrel
- White blood cell boosters (Neulasta, Neupogen)
- Anemia drugs¹ (Epogen & Aranesp)

¹Includes worldwide royalties from J&J on Procrit and royalties from other partners. ²Percent of gross profits (before interest and taxes). Source: Geoffrey Porges, Sanford Bernstein.

*Read Forbes Editor William Baldwin's Side Lines On This Story.*

Subscribe to Forbes and Save. Click Here

# Bromberg & Sunstein LLP

## ACCUROUTE ROUTING SHEET

# Email to Self

ED(KSRT-TKHBPXWB-TSTT-PENE-BBXD-KXWDPEYPKXDC)

Created By: sbommelje@bromsun.com
Created On: 1/10/2007 11:38:28 AM
Expires On: (no expiration)
Single Use? No

**Distribution**

**Filing to iManage:**

**Fax:**

**e-Mail:**
SBommelje@bromsun.com  OCR.PDF

**Print:**

ED(KSRT-TKHBPXWB-TSTT-PENE-BBXD-KXWDPEYPKXDC)

Place this Routing Sheet in Front of Hardcopy Document and then Scan or Fax

Exhibit PTW
05-12237-WGY

Westlaw.   NewsRoom

12/7/06 BIOWTDY (No Page)                                                Page 1


12/7/06 BIOWORLD Today (Pg. Unavail. Online)
2006 WLNR 21098896

                              BioWorld Today
             Copyright 2006 Thomson BioWorld, All Rights Reserved.

                              December 7, 2006

                            Volume 17; Issue 234

House    Committee    Probes    EPO    Use , Costs In Dialysis Setting
Aaron Lorenzo,
Washington Editor

WASHINGTON - Congressional members made clear their desire to lower government expenses related to various forms of the anti-anemia drug epoetin alfa in the context of questioning why it's reimbursed at doses beyond that suggested in its FDA label for end-stage renal disease (ESRD), a practice that isn't safe, some charge.

"We have a payment policy that is possibly killing people," said House Ways and Means Committee Chairman Bill Thomas (R-Calif.), addressing his chief concern about the reimbursement of epoetin drugs by the Centers for Medicare & Medicaid Services (CMS). "We're going to continue to look at this area for two fundamental reasons: I'm very much concerned about the health of these patients, and I'm very much concerned about the enormous dollar amounts."

The drugs, mostly Amgen Inc.'s Epogen (epoetin alfa) and to a lesser extent Aranesp (darbepoetin alfa), represent CMS' largest drug expense. Last year's spending on them in the dialysis setting reached $2 billion.

At Wednesday's committee hearing on the matter, Thomas' final as its leader, acting CMS Administrator Leslie Norwalk noted that reimbursement levels should maintain quality in both the interests of patients' health and the Medicare program's financial well-being. "Payment reform is critical to improving ESRD patient care," she said.

But Norwalk also stressed that treatment decisions are best left to physicians' clinical judgment, and that requires dosing flexibility to get patients to achieve and maintain recommended hemoglobin concentration levels between 11 g/dL and 12 g/dL. CMS reimburses providers for higher doses that can boost hemoglobin up to 13 g/dL, in contrast to FDA-approved labels on those drugs that target hemoglobin under 12 g/dL, a disconnect attributed to patient variability in achieving the recommended range.

          © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"That narrow a range, 11 to 12, is difficult," explained Barry Straube, CMS' chief medical officer. Therefore, payment systems should not penalize physicians who adjust dosing up and down to deal with the common hemoglobin level fluctuation in those patients.

Officials from Thousand Oaks, Calif.-based Amgen underscored such thinking, noting that because hemoglobin maintenance is difficult, physicians are not necessarily acting inappropriately when patients' hemoglobin levels temporarily exceed the FDA label target range.

"The payment policy is very clear in what it says," said Joshua Ofman, Amgen's vice president of global coverage and reimbursement. "Providers should target hemoglobin of 10 to 12, which is consistent with the FDA label."

But should hemoglobin hit 13 and a physician doesn't reduce the dose, then the doctor is subject to a payment reduction, he added. That, said Rob Brenner, Amgen's executive director of medical affairs and nephrology, "appropriately reflects the way that anemia is managed."

However, critics charge that increased dosing levels reflect the reality that physicians are reimbursed at a higher rate for higher administrations of the drugs, a recipe for overuse.

"Current CMS policy and industry-sponsored clinical practice guidelines support both high-target hemocrit and high EPO doses," testified Dennis Cotter, the president of the Medical Technology and Practice Patterns Institute in Bethesda, Md. That assumes, he added, that high hemocrit levels improve outcomes, "an assumption that is contrary to clinical trial results."

Consequently, in parallel with the debate on the value of variable dosing, there is a push from Congress to more efficiently pay for ESRD patients and the drugs they use, primarily Epogen.

Just ahead of the committee hearing, the Government Accountability Office released a report recommending that the drug's reimbursement be bundled with other dialysis services that are administered hand in hand with the drugs to promote efficiency.

At present, CMS divides ESRD items and services into two groups for payment purposes, one comprising nursing, supplies, equipment and some lab tests and the other encompassing drugs and newer lab tests. Increasing payments for the latter have long subsidized essentially flat payments for the former.

"Some might say it's our only form of socialized medicine," said Rep. Pete Stark (D-Calif.), the ranking member on the Ways and Means Health Subcommittee. "We should be getting a better deal."

David Walker, the GAO's comptroller general, testified that the current payment method "does not control" incentives that drive overuse.

Echoing that theme, Cotter called it "an income stream" for physicians, but if ESRD reimbursement was viewed as a cost, "it would motivate providers to become much more" cost-effective.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Walker sounded a similar note, saying bundled payments "tend to be more efficient" than paying separately for drugs and dialysis services, he said, adding that "providers cannot prosper by providing extra services."

Walker added that Congress ought to implement a bundling payment system soon rather than wait on a delayed feasibility study still being conducted by CMS, which Norwalk promised to deliver by early summer. Thomas, who said he's "loathe" to legislate payment systems, nevertheless warned Norwalk that "Congress will move if you don't," suggesting that the newly reconfigured body would act quickly next year without waiting for CMS to finish its study.

Amgen's Ofman and Brenner warned against rushing into a bundled payment system before CMS' work is done, though, cautioning that if it were implemented poorly, it could result in harm to patients and cost Medicare more money.

Other suggestions to promote savings for CMS included encouraging subcutaneous injections of Epogen, which adds some patient discomfort but costs less because lower drug doses are needed, and introducing competition into the space, such as encouraging further use of Aranesp or even Procrit (epoetin alfa, from Johnson & Johnson), which is approved in chronic kidney disease patients but not for those on dialysis. The latter suggestion also contemplates another anemia-fighting drug, CERA (continuous erythropoietin receptor activator, F. Hoffmann-La Roche Ltd.), whose planned U.S. introduction is being challenged by Amgen in a patent infringement suit.

On Wednesday, shares in Amgen (NASDAQ:AMGN) gained 83 cents to close at $69.89. n

---- INDEX REFERENCES ----

COMPANY: CAROLINA MANUFACTURERS SERVICE; SANMINA SCI CORP; ROCHE HOLDING AG; HOFFMANN LA ROCHE LTD; AMGEN INC; AMGEN; JOHNSON AND JOHNSON

NEWS SUBJECT: (Legal (1LE33); Social Issues (1SO05); Social Welfare (1SO83); Major Corporations (1MA93); Technology Law (1TE30); Government (1GO80); Economics & Trade (1EC26))

INDUSTRY: (Pharmaceuticals & Biotechnology (1PH13); Healthcare Services (1HE13); Clinical Outcomes (1CL11); Healthcare Services Regulatory (1HE66); Manufacturing (1MA74); Ambulatory Healthcare Practices & Management (1AM98); Healthcare Regulatory (1HE04); Internal Medicine (1IN54); Oncology & Hematology (1ON95); Pharmaceuticals Regulatory (1PH03); Urology (1UR82); Biopharmaceuticals (1BI13); Blood Disorders (1HE58); Dialysis (1DI69); Healthcare (1HE06); Nephrology (1NE51); Healthcare Cost-Benefits (1HE10); Healthcare Economics (1HE56); Ambulatory Care (1AM41); Healthcare Practice Specialties (1HE49))

REGION: (North America (1NO39); California (1CA98); Americas (1AM92); USA (1US73))

Language: EN

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

OTHER INDEXING: (AMGEN; AMGEN INC; CMS; COMMITTEE; CONGRESS; EPO; ESRD; FDA; GAO; GOVERNMENT ACCOUNTABILITY OFFICE; HOFFMANN LA ROCHE LTD; HOUSE COMMITTEE; JOHNSON JOHNSON; MEDICARE; MEDICARE MEDICAID SERVICES; NASDAQ:AMGN; PRACTICE PATTERNS INSTITUTE) (Barry Straube; Bill Thomas; Brenner; Cotter; David Walker; Dennis Cotter; Joshua Ofman; Leslie Norwalk; Norwalk; Ofman; Payment; Pete Stark; Rob Brenner; Thomas; Walker)

Word Count: 1255
12/7/06 BIOWTDY (No Page)
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.