UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action
No. 05-12237-WGY

* * * * * * * * * * * * * * * *
                              *
AMGEN, INC.,                  *
                              *
          Plaintiff,          *  **DAILY TRANSCRIPT**
                              *  **OF PRELIMINARY**
v.                            *  **MATTERS** and
                              *  **JURY SELECTION**
F. HOFFMANN-LA ROCHE LTD,     *     (Volume 1)
ROCHE DIAGNOSTICS GmbH and    *
HOFFMANN-LA ROCHE, INC.,      *
                              *
          Defendants.         *
                              *
* * * * * * * * * * * * * * * *

BEFORE:  The Honorable William G. Young,
              District Judge, and a Jury

1 Courthouse Way
Boston, Massachusetts

September 4, 2007

1            A P P E A R A N C E S

2

3            DUANE MORRIS LLP (By D. Dennis Allegretti,
      Esq. and Michael R. Gottfried, Esq.), 470 Atlantic
      Avenue, Suite 500, Boston, Massachusetts 02210

4                 - and -
            DAY CASEBEER MADRID & BATCHELDER, LLP (By

5     Lloyd R. Day, Jr., Esq., David M. Madrid, Esq. and
      Robert M. Galvin, Esq.) 20300 Stevens Creek

6     Boulevard, Suite 400, Cupertino, California 95014
                  - and -

7           McDERMOTT WILL & EMERY (By Michael Kendall,
      Esq.), 28 State Street, Boston, Massachusetts

8     02109
                  - and -

9           McDERMOTT WILL & EMERY (By William G.
      Gaede, III, Esq.), 3150 Porter Drive, Palo Alto,

10    California 94304
                  - and -

11          MARSHALL, GERSTEIN & BORUN LLP (By Kevin M.
      Flowers, Esq.), 6300 Sears Tower, 233 S. Wacker

12    Drive, Chicago, Illinois 60606-6402
                  - and -

13          STUART L. WATT and WENDY A. WHITEFORD, Of
      Counsel, Amgen, Inc., One Amgen Center Drive,

14    Thousand Oaks, California 91320-1789, on behalf of
      the Plaintiff

15

16          BROMBERG & SUNSTEIN LLP (By Lee Carl
      Bromberg, Esq. and Julia Huston, Esq.), 125 Summer
      Street, Boston, Massachusetts 02110

17                - and -
            KAYE SCHOLER LLP (By Leora Ben-Ami, Thomas

18    F. Fleming, Esq., Patricia Carson, Esq.,
      Christopher Jagoe, Esq. and Howard Suh, Esq.),

19    425 Park Avenue, New York, New York 10022, on
      behalf of the Defendants

20

21

22

23

24

25

1           **THE CLERK:**  All rise.  Court is in session, please

2     be seated.

3           Calling Civil Action 05-12237, Amgen v. Hoffmann-La

4     Roche.

5           **THE COURT:**  Well, good morning.

6           **COUNSEL:**  Good morning, your Honor.

7           **THE COURT:**  Welcome.  I think it makes sense if I

8     go first and then we'll use what time we have to deal with

9     whatever you would like to deal with.

10           Here's, here's how I foresee us proceeding.  There

11     are only two judges impaneling this morning, this session

12     and Judge Zobel.  Because of the length of this case, I have

13     devised a very brief questionnaire which is now being

14     administered to the entire jury panel.  It simply says --

15     and you'll have a copy of it -- it simply says this is a

16     patent case, the name of the parties, and how long we expect

17     it to go, and says if you have some important reason why you

18     ought not serve write it out below.

19           Those will be delivered to me.  I'm not going to

20     consult you on them, though they'll all be matters of

21     record.  People I would excuse for any reason I will excuse,

22     for cause, and we'll make a record of that back in the

23     lobby.

24           Then we'll have 75, we hope, here in the courtroom,

25     and because we don't have all that many seats, we'll be

1    asking those of you who are in the public area to step out.

2    We'll keep the doors open, and you can come back in just as

3    soon as we eat up the jurors that we eat up.

4          However long this takes it takes.  I am -- I have a

5    court meeting this afternoon, but if we're not done by one

6    o'clock we're going to roll right on until we have the jury.

7          If we get the jury in a speedy fashion, we'll

8    begin, the pretrial charge, and then we'll see where we are.

9    Because even though we're going to break this up now, and so

10   there's 15 minutes a side for openings, we're not going to

11   let one side open today and one side open tomorrow.

12         So, that's the schedule for this morning.  Let's

13   see what other matters we ought deal with.

14         First -- well, let's -- first let's deal with Mr.

15   Bromberg's letter where he flags certain of these motions in

16   limine pertinent to validity.  It's Court document 935.

17         **MR. BROMBERG:**  Your Honor, if I may, on that letter

18   there's a late substitution which is number, it's docket

19   number 927, Roche's motion in limine to exclude mention of

20   the grant of summary judgment on the '422 claim 1 --

21         **THE COURT:**  Oh, well, that --

22         **MR. BROMBERG:**  -- on infringement.

23         **THE COURT:**  -- that motion's allowed.  We're not

24   going to have anyone talk about anything the Court has

25   declared valid or invalid.  It's not for the jury.  We're

1 just not submitting that to the jury.

2    **THE CLERK:**  What document did you say?

3    **THE COURT:**  What was the document number so Ms.

4 Smith can make a court note that it's allowed.

5    **MR. BROMBERG:**  The motion is number 927, your

6 Honor.

7    **THE COURT:**  927's allowed.

8    So let's go through these other ones that you

9 flagged, Mr. Bromberg.

10    Docket number 801, Roche's motion to preclude Amgen

11 from contradicting arguments it made in prior administrative

12 and judicial proceedings.

13    Now, these motions, and I've looked at these, these

14 motions raise sort of a general matter.  And the general

15 matter is this.  You all seem to want to not have the jury

16 hear about things you've done earlier.  Well, generally I

17 oppose that.  They're all admissions.  What your experts

18 have said in prior proceedings are admissions.  But that's

19 what they are, admissions.  If they're relevant they come in

20 evidence.  They're not conclusive.

21    So this first motion raises something a little

22 more, 801 raises not simply admissions, it raises judicial

23 estoppel.  Well, this Court pays attention to judicial

24 estoppel.  But having reviewed this, I'm denying it without

25 prejudice.  If you think they're estoped from making an

1      argument, well, fine, raise it at the appropriate time.

2          804, motion in limine to preclude plaintiff Amgen

3      from asserting outcome of prior litigations concerning the

4      validity and infringement.  Generally, that's allowed.  But

5      it's going to be allowed without prejudice.  If someone can

6      show me, and with respect to inequitable conduct, when we

7      get to that stage, maybe there is some relevance to this.

8      But other than that, it's allowed.

9          814, motion in limine to preclude plaintiff from

10     offering into evidence or referencing to the jury the June

11     2001 settlement agreement.  Well, I'm not clear what that

12     is.  Settlement agreements usually are inadmissible.  So 814

13     I'm not clear on.

14         822, motion in limine to preclude Amgen from

15     confusing the jury with statements made in earlier foreign

16     proceedings.  Well, foreign proceedings, they may be

17     admissions if they're, if they're admissions of fact.  I

18     don't see how the jury would be confused.  But foreign

19     proceedings are under a different legal framework.

20         So, again, the motion is going to be denied.  But

21     I'm not going to let anyone confuse the jury, nor is it in

22     your interests to confuse the jury.  And a statement made in

23     a foreign proceeding would have to be held to be relevant.

24         Precluding Amgen from presenting evidence regarding

25     a 1993 settlement agreement, a 1989 decision that, Genetic

 1   Institute.  I don't see how those things are relevant.  And

 2   so, I'm allowing it without prejudice to Amgen asking to

 3   come to the side bar and explaining the particular

 4   relevance.

 5        Now, there's an emergency motion here to dismiss

 6   the counterclaims of invalidity as to claims, this is

 7   Amgen's motion, as to claims 4 and 5.  I don't see how that

 8   claims 4 and 5 are at issue here.  I don't -- I suppose, I

 9   suppose Roche says they're at issue because in their

10   counterclaim they want a declaration that those are invalid.

11        **MS. BEN-AMI:**  Yes, your Honor.

12        **THE COURT:**  Yes.

13        **MS. BEN-AMI:**  May I be heard, very briefly?

14        **THE COURT:**  Remember now, they say they're not

15   suing you on this.

16        **MS. BEN-AMI:**  Yeah, except in the ITC.

17        **THE COURT:**  Well, then why not fight it in the ITC?

18        **MS. BEN-AMI:**  Because we want an Article III Court

19   to decide.  We're here.  All the evidence is the same.

20   Everything is the same.  This Court applies certain laws.

21   The ITC is an administrative agency.  It does not apply the

22   same laws.  We're in this Court.  They chose to be in this

23   Court.  They brought us here.  And having been here, we have

24   a real dispute.  They went into the Federal Circuit on

25   August 7th and said reinstate the ITC case, and therefore

1    there's a case in controversy.

2            **THE COURT:**  All right, for these, for the purposes

3    of today, motion's denied, motion to dismiss, but that's

4    without prejudice to my thinking about it.

5            This matter has just come to my attention.  Subject

6    matter jurisdiction can be recognized at any time, and I

7    will do so if I have to.

8            Now, here's a -- there's another emergency motion

9    to preclude Amgen from advertising in eastern Massachusetts.

10   Denied.

11           And, let's see.  That's about everything I was

12   prepared to do.

13           Mr. Bromberg, you --

14           **MR. BROMBERG:**  I was standing on the advertising

15   motion, your Honor, which just this morning driving in we

16   heard an Amgen spot how Amgen --

17           **THE COURT:**  Well, fine.  I'm going to conduct voir

18   dire on have they heard about this case, do they use the

19   medicines.  It's denied.  We're not preventing anyone from

20   advertising.

21           Now, what else is there to do?  I'm ready to go.

22   I'm just waiting for the jury.  So, if you want to talk,

23   fine.  As soon as we get to the jury, fine, but maybe you

24   would like to reflect and be ready.

25           Anything else we should do?

1          **MR. FLEMING:**  Your Honor, I'm Thomas Fleming.

2          **THE COURT:**  Yes.

3          **MR. FLEMING:**  Your Honor, on the motion with regard

4     to the settlement, the 2001 settlement agreement, which may

5     have not informed your Honor sufficiently, would you like to

6     hear a brief statement of that?

7          Basically, what we would like to do is to not have,

8     certainly there to be any opening about it for now.  And I

9     don't believe there is going to be because while there was a

10    proffered demonstrative for the opening --

11         **THE COURT:**  Then I don't have to deal with it.

12         **MR. FLEMING:**  I just want confirmation of that that

13    they --

14         **THE COURT:**  Anything about that settlement

15    agreement in the opening?

16         **MR. DAY:**  No, sir.

17         **THE COURT:**  Fine.  That takes care of it.

18         **MR. FLEMING:**  And then we'll deal with it

19    substantively at the time when we bring it to the Court?

20         **THE COURT:**  You can, and I can reflect.

21         **MR. FLEMING:**  Thank you, your Honor.

22         (Whereupon the Court and the Clerk conferred.)

23         **THE COURT:**  Oh, Ms. Smith said, Mr. Day, you've got

24    a letter --

25         **MR. DAY:**  Yes, sir.

1          **THE COURT:**  -- of things.  And she's printing it

2    now.  I haven't seen it.  Maybe you've got a copy.

3          **MR. DAY:**  I'm very sorry to hear that you don't

4    have a copy.

5          **THE COURT:**  That's all right.  We're here,

6    electronic filing is doing its magic as we speak.

7          **THE CLERK:**  Thanks.

8          **MR. DAY:**  Thank you.

9          **THE CLERK:**  All right.

10         **MR. DAY:**  Mr. Kendall would like to address the

11   Court on the letter if you --

12         **THE COURT:**  Well, we'll see about addressing.

13   Let's just see.

14         Oh, something else here.  I don't suppose, I

15   don't -- as, as I'm ruminated about the case, and I have, I

16   don't suppose we're going to hear in this first phase of the

17   trial, this validity phase of the trial, I don't suppose

18   we're going to get any witnesses who are going to get on the

19   stand and give us habit and routine practice of patent laws.

20   I would think that would be immaterial, candidly.  So, I'll

21   tell you that.

22         Now, let's see.

23         **MR. FLEMING:**  Your Honor, excuse me, if I may for a

24   second.

25         **THE COURT:**  Yes.

1          MR. FLEMING:  On that point, we do think it would

2     be instructive for the jury during the invalidity phase to

3     hear about issues of routine practice and habit of patent --

4          THE COURT:  Emphatically, no.  They have a patent.

5     The patent -- they have patents.  The patents are presumed

6     to be valid.  You're not trashing the Patent Office.  The

7     law gives them that presumption.  Now, the fact, and it is a

8     fact, that the Patent Office is underfunded and overwhelmed,

9     doesn't as matter of materiality, legal materiality undercut

10    that presumption of validity.  A presumption that you can

11    only overcome by clear and convincing evidence.

12          Now, you'll have your chance to do that, to show

13    anticipation, obviousness, and, in one respect, anyway,

14    written description.  We're not hearing anything about the

15    Patent Office in phase one and we're not hearing anything

16    about the Patent Office in phase two.  Phase three, maybe.

17    Maybe.  We'll see.

18          This is a pretty lengthy letter here.  Here's a

19    seven page letter.

20          MR. KENDALL:  Your Honor, may I help the Court?

21          THE COURT:  It's got one entire page of -- one

22    imagines that you should have raised these things earlier.

23          But, all right, Mr. Kendall, what, of all of these

24    things, all of them, what's the most important thing?

25          MR. KENDALL:  Your Honor, it's probably the

1    schedule at the end, Page 6, which goes to the motions in

2    limine.  We were hoping to get some guidance from the Court.

3            **THE COURT:**  Page 6.

4            **MR. KENDALL:**  And if you want me to address some of

5    those motions, or if the Court wants to look at it.

6            **THE COURT:**  No, I want you to tell me the most

7    important thing, you said it's the schedule.

8            **MR. KENDALL:**  It's the schedule of the motions in

9    limine that we, like Mr. Bromberg's letter, were hoping the

10   Court could resolve before it started trial.

11           For example, we intend to refer to the witness

12   Nancy Spaethe who you've ruled her testimony is admissible.

13   They filed a second motion to exclude her, though did not

14   call it a motion to reconsider.  Given that we were going to

15   reference her in the opening, we just thought that would

16   be --

17           **THE COURT:**  You may, you may refer to her.

18           **MR. KENDALL:**  Thank you very much, your Honor.

19           Then the other thing is the motions in limine that

20   we have here, your Honor.  I don't know if you are prepared

21   to address any of them or if you want me to raise particular

22   ones.

23           **THE COURT:**  Well, let's see what we can -- let's

24   see what we can handle here.

25           **MR. KENDALL:**  I think 845 and 847 may be

1    particularly relevant, your Honor.

2         THE COURT:  They may be.  They may be.  But they're

3    not the easy ones.  The easy ones are 886.  We're not going

4    to get into the duration of Amgen's patent protection.  And

5    991, at least as to its title, I haven't read the motion,

6    its title, we're not going to get any opinions, expert

7    opinions that are not in expert reports.  So those two are

8    easy, those two are allowed.

9         But what you say, exclude them from referencing the

10   profits or revenues from --

11        MR. KENDALL:  They want to tell the jury look at

12   all the money Amgen is making from this product, which is

13   simply not relevant, we maintain.

14        THE COURT:  Yes.

15        MS. BEN-AMI:  That's not what we're arguing, your

16   Honor.

17        THE COURT:  Okay.  Why do we want to get into that?

18        MS. BEN-AMI:  Amgen is arguing secondary condition

19   indicia of nonobvious, your Honor, commercial success.

20        THE COURT:  Right.

21        MS. BEN-AMI:  Amgen needs to prove nexus that the

22   commercial success is tied to the claims-in-suit in this

23   case.

24        THE COURT:  Yes.

25        MS. BEN-AMI:  It is our intention to prove that

1    that is incorrect.  So we must be able to show that there

2    were sales tied to the '008 patent which is expired and that

3    therefore there is not nexus and therefore there's Federal

4    Circuit case law on this point.

5              THE COURT:  That sounds relevant to me.

6              MS. BEN-AMI:  May I ask, your Honor --

7              MR. KENDALL:  May I be heard, your Honor?

8              THE COURT:  Let's stick with Ms. Ben-Ami.  All

9    right.

10              MS. BEN-AMI:  May I just say one word on the

11    duration issue?

12              THE COURT:  Yes.

13              MS. BEN-AMI:  There is still double patenting in

14    this case.

15              THE COURT:  No, there isn't.

16              MS. BEN-AMI:  On the two patents there was no

17    summary judgment.

18              THE COURT:  Well, I suppose so.

19              MS. BEN-AMI:  Yes.  We had this discussion before,

20    your Honor.  I apologize.

21              THE COURT:  Yes.

22              MS. BEN-AMI:  There are two patents; there is

23    double patenting on those two patents.  And for that

24    evidence to come in, I must prove as a matter of fact to

25    prove the elements of the double patenting that the term of

 1   one is longer than the other.

 2            **THE COURT:**  Well, let explain this to you.

 3            **MS. BEN-AMI:**  Okay.

 4            **THE COURT:**  I think your argument on so-called

 5   double patenting is legally flawed.  And while I'm going to

 6   allow you to put on evidence that has not been the subject

 7   of summary judgment, if relevant and material, you're going

 8   to, you're going to run into some trouble with that because

 9   I don't agree with your legal approach to the theory of

10   double patenting.

11            I'm not extending the time of this trial by one

12   minute.  So, I'll obviously follow the rules of procedure.

13   They haven't moved for summary judgment.  And there we are.

14   But, I am troubled that this may be argued in such a fashion

15   as to confuse the jury.  If I think that is so, you can be

16   sure I will forcefully correct it.

17            Now, let's look at 847.  We're not going to mention

18   monopoly --

19            **MS. BEN-AMI:**  No, your Honor.

20            **THE COURT:**  -- or the patents as limiting consumer

21   choice.

22            **MS. BEN-AMI:**  No, your Honor.

23            **THE COURT:**  Yes.  All right.  I knew you wouldn't.

24            Fine.  That's about all I can do.

25            Mr. Kendall.

1      **MR. KENDALL:**  Your Honor, may I just be heard on

2   the issue of commercial success and not obvious as a

3   secondary consideration.

4      **THE COURT:**  Of course.  Go ahead.

5      **MR. KENDALL:**  I believe what their theory is that

6   for the six or seven years before the patents in dispute in

7   this case were issued we made money and so it should all be

8   attributed to the '008 patent.  The point they're missing is

9   we practiced all the inventions at the same time.  We

10  couldn't make a commercially saleable product without

11  practicing the '008 invention with these inventions.

12     **THE COURT:**  The jury can understand that.

13     **MR. KENDALL:**  So for them to claim that, well, all

14  that money is only because a patent was issued as opposed to

15  the inventions were all being practiced is just not logical.

16     **THE COURT:**  It's a jury case.  I've made my ruling.

17     **MS. BEN-AMI:**  Your Honor, may I just ask the

18  Court's indulgence for one minute.

19     Your Honor has made certain decisions and we will

20  of course abide by those decisions.  But we don't have

21  opinions yet.  So --

22     **THE COURT:**  Correct.

23     **MS. BEN-AMI:**  -- I don't know where I'm stepping on

24  your toes.  And --

25     **THE COURT:**  I can't help that.

1        **MS. BEN-AMI:**  No, I understand that.

2        **THE COURT:**  In the sense that I've already

3    criticized, although some people may think it's a

4    magnificent tactical move, that these motions for summary

5    judgment came so late in the case.  You can be sure that I

6    have worked a great deal and will continue.  And so, I can't

7    give advisory opinions.  I don't think double patenting's in

8    the case.  When you get into that, I'm sure my views will

9    become clear.

10        **MS. BEN-AMI:**  And that was what I was going to ask

11    you, if you could just tell me what you think is wrong, then

12    I at least can decide whether I should say something or not.

13        **THE COURT:**  That makes good sense.

14        **MS. BEN-AMI:**  I don't want to be in your way.

15        **THE COURT:**  And there may be -- actually that

16    request makes excellent sense.  And since we have some time,

17    perhaps I ought reflect on what carefully I can say in that

18    regard.

19        **MS. BEN-AMI:**  And I just, because you've never seen

20    this other double patenting part, your Honor, because it

21    wasn't in any summary judgment, there are two process

22    patents, the '868 and the '698, that Amgen admits there was

23    no restriction requirement on.

24        **THE COURT:**  Okay.

25        **MS. BEN-AMI:**  So --

1          **THE COURT:**  Respectfully, Ms. Ben-Ami, I can't

2     follow it.  And you're making sense.  And I'm saying to you

3     now, all right, I'm sorry there aren't opinions.

4          **MS. BEN-AMI:**  No, I appreciate the problem.

5          **THE COURT:**  I've done what can be done in the time

6     allotted given the variety of things I have to do.  But

7     without giving you an advisory opinion, there are some

8     things I probably can say, only sitting here now, I'll take

9     a little recess and at the time before you make openings,

10    I'll tell you.

11         **MS. BEN-AMI:**  And I really appreciate that, your

12    Honor.

13         **THE COURT:**  All right.

14         **MS. BEN-AMI:**  Because I don't want to be saying

15    something contrary to your rulings.

16         **THE COURT:**  I appreciate that.

17         **MR. KENDALL:**  Your Honor?

18         **MR. FLEMING:**  Your Honor?

19         **THE COURT:**  Wait.  Now, Mr. Kendall.

20         **MR. KENDALL:**  There may be two other motions in

21    limine that can be dealt with expeditiously from that chart,

22    your Honor.

23         **THE COURT:**  All right.

24         **MR. KENDALL:**  Motion 839, we just ask that Roche

25    not refer to the fact that we're seeking injunctive relief.

1    That's not relevant to the jury's decision, that there be an

2    injunction hearing, that there could be an injunction phase

3    at the end of the trial.

4           **THE COURT:**  Well, that's what the lawsuit's about.

5           No, I'm a little hesitant to say that, to allow

6    that.  That's denied.  What else?

7           **MR. KENDALL:**  Second, your Honor -- well, your

8    Honor, there's going to be, I think a divergence of opinion

9    at that injunction hearing between us and Roche whether

10   there's --

11          **THE COURT:**  I'm not surprised.

12          **MR. KENDALL:**  Whether there's going to be a

13   compulsory license or whether there's going to be an

14   injunction.  I think it's, that's not an issue that the jury

15   needs to decide.

16          **THE COURT:**  Of course not.

17          **MR. KENDALL:**  It should not -- the remedy should

18   not influence their decision whether there's infringement or

19   not.

20          **THE COURT:**  Correct, and I will tell them.

21          **MR. KENDALL:**  So we think there should just be no

22   reference to the injunction phase.

23          **THE COURT:**  No.  No.  They may wish to know what

24   this is all about.

25          **MR. DAY:**  If I may, your Honor?

1          THE COURT:  Yes.

2          MR. DAY:  When you say that, I assume that what you

3    mean is they need to know that it's your decision what this

4    is all about, because it's the Court's decision as to a

5    remedy in this case.

6          THE COURT:  Oh, I agree with that.

7          MR. DAY:  And they are not here to decide that

8    remedy.  That is not what they're being -- and certainly not

9    something in the validity phase of the case.  It has nothing

10   to do with the validity of these patents.

11         THE COURT:  No, I believe -- this, of course, is

12   the difficulty in having a conversation like this.  But we

13   have no choice.  Here's my position.

14         Jurors should be empowered consistent with the law.

15   And, therefore, they need to know, and I have thought,

16   you've given me this matrix as to the jury verdict, which of

17   course is what I wanted, I find it very helpful, and they

18   need to know what difference this makes in order to do

19   judgment.  And one of the things I have planned to tell them

20   is now, of course, if the patents are invalid then,

21   theoretically, you don't need to reach the issue of

22   infringement; and, if they are not infringed, you don't need

23   to reach this issue of inequitable conduct.  But, ladies and

24   gentlemen, as you will see these matters are complex.  So I

25   need the answers to all of these questions.

```
 1              And though I hadn't thought of saying this, but if

 2     they, the theory of patents, I don't want to use the word

 3     monopoly, the theory of patent protection is that one can

 4     exclude other people for the term of the patent, we're not

 5     going into the term, exclude other people from practicing

 6     the invention.  When I've gotten the answers to all of the

 7     questions that we will give to you, I will, I will have to

 8     hold a proceeding to see whether under the law that is to be

 9     done.

10              Now, that's about what I would say and I would let

11     others say that.

12          MR. DAY:  And that decision is a question of

13     discretion that resides with this Court.  It's not --

14          THE COURT:  I said I will have to do that.

15          MR. DAY:  And that's my point, is that this is not,

16     this is not an automatic consequence of a jury verdict.

17     This is a judgment on an infringement issue on an

18     injunction, your Honor.

19          THE COURT:  Oh, I see after eBay, whether I would

20     exclude or have a license --

21          MR. DAY:  Is a discretionary --

22          THE COURT:  Yes.

23          MR. DAY:  -- judgment by the Court.  And that's the

24     point --

25          THE COURT:  Informed by the law.
```

1          **MR. DAY:**  That's correct, your Honor.  But that's

2    the point that this is not an issue for decision by the

3    jury.

4          **THE COURT:**  No one's going to suggest that it is.

5          **MR. DAY:**  And that's why we believe, because it's a

6    month --

7          **THE COURT:**  That's the point.

8          **MR. DAY:**  Because among the remedies that are

9    available to a patentee --

10         **THE COURT:**  I'm not precluding them from mentioning

11   it.  And if -- and I will say what needs be said.

12         **MR. FLEMING:**  Your Honor?

13         **THE COURT:**  Yes.

14         **MR. FLEMING:**  Just briefly, if I may, and I'm

15   sorry.  On the point on the motion --

16         **THE COURT:**  Oh, don't be sorry.  If you think you

17   can get anything you should press.

18         **MR. FLEMING:**  Thank you, your Honor.  And with your

19   indulgence, I will.

20         On the motion with regard to Nancy Spaeth, she is a

21   particular witness who was first presented as a partial

22   replacement for Dr. Eschbach who your Honor may recall was

23   an expert of Amgen's who fell ill and couldn't testify.

24         At the time that your Honor considered the first

25   motion regarding Ms. Spaethe, we hadn't had an opportunity

```
 1    to depose her and we have now.  And the only reason Amgen
 2    had put her forward we were told was that she had pertinent
 3    relevance on the issue of long-felt need.  However, having
 4    taken her deposition, she is a dialysis patient herself and
 5    told us at her deposition that the only information she
 6    would ever be able to share with the jury would be her
 7    personal treatment as a dialysis patient.  And, therefore,
 8    your Honor, as you can see, she could not possibly address
 9    the bigger issue of the long-felt need, whereas a physician
10    might be able to do that.  However, Amgen's not
11    prejudiced --
12         THE COURT:  Respectfully, I am going to adhere to
13    my ruling.  I'm not able without further reading and
14    reflection to make more refined rulings.  These are motions
15    in limine.  If anyone thinks I'm handling them on the fly,
16    that's because you're telling me that they affect the
17    opening.  And I am transparent.  You see me do what I'm
18    doing.  To the extent I can buy myself any time to talk more
19    reflectively, I will do it.
20         MR. FLEMING:  Your Honor, I can --
21         THE COURT:  I'm sticking to the schedule, that's
22    why.  I have no lack of confidence in answering Ms. Ben-Ami.
23    But I would like to do it intelligently.  And so, I'm going
24    to take a recess.  I think it would be helpful to know that.
25    Spaethe may be called.  We'll see where she goes.
```

1           **MR. FLEMING:**  Just as long as there's no reference

2     to her in the opening, then the dockets are dead.

3           **MR. DAY:**  Your Honor?

4           **THE COURT:**  I'm not going to preclude them from

5     making reference to her.

6           **MS. BEN-AMI:**  I think it's --

7           **THE COURT:**  I've made my ruling.  They can make

8     reference to her.  And I will be -- you know, this is a jury

9     trial.  I'm going to be standing before the jury saying what

10    these lawyers have to say is not evidence of anything.  They

11    weren't there.

12          **MS. BEN-AMI:**  I'm not that --

13          **THE COURT:**  They don't know.  Well, that will

14    depend.  That will depend.

15          It's a trial.  No, just -- when I stand up you

16    don't have to stand up.

17          In all seriousness, in the mores of this Court,

18    we'll stand, once we have the jury impaneled we'll stand for

19    the jury out of respect for the jury as it goes in and out.

20    And if it's jury waived, if I call a recess, and again this

21    is not for me, but for the Court processes, our tradition is

22    to stand.

23          I cannot stay seated here.  I get up and walk

24    around.  And if all you people start standing every time I

25    stand it's going to be very distracting.  So none of that.

```
1              I'm going to stand here.  You will hear me, I hope

2     this morning, say, and I will respect you, and pay respect

3     to you as teachers, but I will say the words:  You don't

4     know.  You weren't there.  It's the evidence.  Take it from

5     the evidence, not the questions.  And when we get to

6     openings, I will say this is going to be a road map or a

7     guidebook for the first part of this case.  And understand

8     the lawyers are telling you what they hope the evidence will

9     show.  You don't take anything from them.  So if they

10    mention Spaethe -- it's like, remember the trial practice

11    books, they're making a promise.  And if they don't fulfill

12    it, at least some commentators think that comes back to

13    haunt them.  That's a risk I'll take, you know.

14             MS. BEN-AMI:  And that's the risk I don't want to

15    take on the double patenting, your Honor.  So I would

16    appreciate any guidance you can give me.

17             THE COURT:  And I appreciate it.

18             Is there anything else profitably we could do now,

19    or shall we recess?

20             MR. DAY:  I think there's one other thing, your

21    Honor.

22             THE COURT:  Sure.

23             MR. DAY:  Because the Court is going to go back and

24    reflect on some of what was heard this morning, I just want

25    to be sure that in the context of what Amgen has put before
```

1    the Court, I draw your attention to, when the Court

2    considers, the motions that we filed this weekend.  Because,

3    as I pointed out, Roche filed a pretrial brief on Friday

4    which they are now asserting another double patenting

5    defense where they are arguing that the '422, '933 and

6    '349 -- please let me just --

7              MS. BEN-AMI:  I'm not saying anything.

8              THE COURT:  Right.  Go ahead.

9              MR. DAY:  -- '349 patents, all of which were

10   decided as a matter of summary judgment, are not subject to

11   double patenting, are barred by double patenting over the

12   '698 and the '868 patents.  As we pointed out in our motion,

13   the Court granted Roche leave to amend their pleading in

14   March to add this defense conditioned on, conditioned on

15   full discovery by discovery cutoff.  They didn't provide any

16   discovery on this.  They refused our 30(b)(6) deposition.

17   They didn't put anything in interrogatory responses on this.

18   It comes up for the first time in their pretrial brief after

19   the Court has granted summary judgment.

20             THE COURT:  Look --

21             MS. BEN-AMI:  I'm not arguing it in my --

22             THE COURT:  No, I'm responding to Mr. Day.  You

23   people are faster on your feet than I am.  I haven't read

24   those things filed in the last few days.  But I do know how

25   to conduct a trial.

 1            Now, my response to Ms. Ben-Ami was the reason

 2     Amgen prevailed in double patenting is, I don't agree with

 3     their approach to the law.  But she's entitled to know --

 4     well, let me not promise too much.  You don't have to

 5     make -- you don't have to write opinions on every motion for

 6     summary judgment.  I've allowed it.  You've briefed it.

 7     They understand your brief.  They understand their brief.

 8     I'm trying to conduct the trial.

 9            Now, factually, what you just stood up and said,

10     they shouldn't be able to argue this because of a principle

11     such as waiver and the like, that the whole object of the

12     Rules of Civil Procedure is to narrow a case for trial.  I

13     understand those things.  But that's wasn't what I was

14     hearing a moment ago, and I will read things as fast as I

15     can.

16            I understand --

17            **MR. DAY:**  Thank you, your Honor.

18            **THE COURT:**  -- you've got a number of deposition

19     excerpts.  Oh, that's -- while I raise that.  Amgen has

20     actually raised a very interesting point.  Let me deal with

21     this.

22            If they put on a deposition and Amgen says we have

23     the live witness, and we want then to put on those, as it's,

24     they've called in essence by the deposition, an adverse

25     witness, if it really is an adverse witness, if it's an

1    Amgen person, we would like to put the person on, not just

2    read other portions of the deposition.  I like that.  That

3    makes good sense to me.  Wait a minute.  I must tell you

4    that makes good sense to me.  Of course, you're limited to

5    what they put on in the deposition as the scope of

6    examination of adverse witnesses is always so limited.  But

7    I like that.  And I don't see any bar to it.

8              **MS. BEN-AMI:**  So, your Honor, to make it --

9              **THE COURT:**  Right.

10             **MS. BEN-AMI:**  This is probably good to tell you.

11   For Dr. Goldwasser, we agree he's going to come live so the

12   deposition --

13             **THE COURT:**  Sure.

14             **MS. BEN-AMI:**  -- doesn't have to be looked at.

15             **THE COURT:**  Thank you.

16             **MS. BEN-AMI:**  But that I think is important.

17             **MR. DAY:**  Your Honor, I just want to respond to

18   your double patenting point.  Because, yes, I did argue

19   waiver, but the reason I brought it up was because it

20   implicates exactly the same legal analysis.  And if the

21   Court is --

22             **THE COURT:**  Well, I --

23             **MR. DAY:**  -- going to reflect I would --

24             **THE COURT:**  Well, I would think so.  And so, I'm

25   going to indicate -- if you'll give me a few minutes -- an

1    outline at least of the legal analysis on double patenting

2    for her guidance.

3         **MR. DAY:**  And the reason I raised it was just for

4    that purpose.  Because if the Court is going to be

5    reflecting on how to explain its reasoning on the legal

6    principles, you need to consider this because it's also

7    implicated by those legal principles.  And I just wanted to

8    bring that to your attention so that you were aware of that.

9    I didn't want you to --

10        **THE COURT:**  Well, I'm going to adhere to the legal

11   principles that I think are applicable.  Also, I will

12   entertain arguments of waiver briefly at the side bar.  I

13   mean, the time has already started running, you know, this

14   is the first day.  So, I would go for the jugular.  The

15   instinct for the capillaries will be a mistake in this case.

16        And I'm not, I'm simply not going to be overwhelmed

17   by paper.  I'm starting.  Witnesses go one by one.  We'll

18   try the case.  I understand generally what the issues are in

19   the case.  And what doesn't get opinions and doesn't get

20   ruled on will all be taken care of in the interest of

21   justice before the jury.

22        Now I'll take a recess.

23        **MS. BEN-AMI:**  Thank you, your Honor.

24        **THE COURT:**  And the recess will include the time I

25   need to go over these concerns about the length of time of

1    the trial.  But when I come back hopefully we'll be ready

2    with the jury.

3            Now we'll recess.

4            **THE CLERK:**  All rise.  Court is in recess.

5            (Recess.)

6            **THE CLERK:**  All rise.  Court is in session.

7            **THE COURT:**  We're at the stage where the

8    questionnaires are completed and the request for excuses are

9    being brought up.  And I thought now was a good time to come

10   back out and address Ms. Ben-Ami's question, now that I've

11   put my hands on the right piece of paper.  I do so reserving

12   my right to issue a full and much more detailed opinion, but

13   in essence here it is:  Roche's argument on invalidity on

14   the basis of double patenting depends essentially on the

15   premise that one-way double patenting, the one-way double

16   patenting test applies, instead of the two-way test.  The

17   Court rules that it is the two-way double patenting test

18   that should be applied here for purposes of obviousness

19   double patenting.

20           The one-way and two-way double patenting tests are

21   related legal tests for determining whether two patents are

22   patentably -- two claims are patentably distinct.  The

23   general rule is the application of the one-way test.  But

24   the federal circuit has recognized special circumstances in

25   which the two-way test is applied, Eli Lilly and Co. versus

1    Barr Laboratories, Incorporated, 251 Fed. 3d 955, Federal

2    Circuit 2001.

3         The two-way test protects patentees, patentees from

4    obviousness double patenting in situations where a patent

5    owner files first for a fundamental invention.  For example,

6    Lin's invention of recombinant EPO and later for a

7    subsequently conceived follow-on invention, for example, Lai

8    and Strickland's '016 EPO purification process, but through

9    no fault of the patent owner, the two applications progress

10   through the patent office at different rates and issue as

11   patents in reverse order of filing.

12        The two-way test guards against the possibility

13   that a claim to a follow-on invention might be used to

14   invalidate an earlier filing but later-issued claim to the

15   fundamental invention on which the follow-on invention is

16   based.  The two-way test ensures that the applicant is not

17   penalized by the rate of progress of the applications

18   through the PTO, a matter over which the applicant does not

19   have complete control.

20        The determination of whether the one-way or two-way

21   test applies is a matter of law.  And in these

22   circumstances, the two-way test applies.  The Court rules

23   that the first requirement of the test is satisfied because

24   it is impossible under 35 U.S.C. Section 112 for Amgen to

25   have filed the '016, claim 10 as part of Lin's November 30,

1    1984 '298 application that gave rise to the patents in suit.

2          All right.  That's my explanation.  Now, yes?

3          **MS. BEN-AMI:**  If we do have a moment, your Honor,

4    I'd like to just try to tell you what I'm saying, and then

5    you can tell me if I'm doing something wrong or you think

6    I'm doing something wrong.

7          What you just read was relating to the issue of the

8    Lin patent on the one hand, and the Lai patent on the other

9    hand.  And I understand exactly what you said and I

10   certainly am abiding by it.  The -- there were three other

11   patents, Lin versus Lin, as you recall.  There was

12   at '008 patent, and the question was whether the three other

13   patents were capable of double patenting, whether there was

14   double patenting.  And Amgen argued there was a restriction

15   requirement and, therefore, there was no double patenting.

16         That is different than what you just read.  It's a

17   different issue.  I'm assuming, your Honor, because I think

18   that would have to be the way this would come out, that your

19   Honor has found there was a restriction requirement on those

20   three.  I have to make that assumption.  That was their

21   argument, so that makes sense to me that that's what you're

22   going to decide.  Fine.

23         I'm arguing about the two patents, the two process

24   patents for which Amgen never said there was a restriction

25   requirement.  There were two other patents, there was no

1    restriction requirement, they don't assert a restriction

2    requirement, and they are continuations off the original

3    application.  So in that instance, where there is no

4    restriction requirement, there is the issue of double

5    patenting.  Candidly, your Honor, the patent office

6    considered this issue and I have a right to say they had it

7    wrong, respectfully, but no one's suggested there was a

8    restriction requirement.

9          So that's the double patenting I'm talking about

10   today.  Not this -- the thing that they filed a motion on,

11   not I have to give you a response to it, none of that.  Not

12   Lai, not the three patents where there was a restriction

13   requirement.  I'm talking about the two process patents

14   where there was no restriction requirement that's part of

15   the '008 going through to the '698 and the '868, and they're

16   not asserting a restriction requirement.

17         So I'm not going to open on this other issue about

18   the -- Mr. Day was talking to you about before.  We're going

19   to have to get that resolved.  If you think there's a

20   restriction requirement there, I'm not going to open on it,

21   I'm not going to say boo about it.  It's not going to come

22   up today and it's not going to come up tomorrow, and it's

23   not going to come up the next day, probably.

24         **THE COURT:**  Let me hear from Mr. Day.

25         **MR. DAY:**  With respect to the '698 and '868 process

1    patents, Ms. Ben-Ami is correct, we did not move for summary

2    judgment under Section 121 with respect to those patents.

3    That does not mean we're not asserting that there isn't a

4    restriction requirement that applies, it simply means we

5    didn't move for summary judgment.  I don't want the

6    mischaracterization of our position to stand.

7         The Court hadn't ruled and hadn't decided the

8    question with respect to the applicability of their

9    obviousness type double patenting defense with respect to

10   those two patents.  That is an issue that still remains in

11   the case.  I agree.

12        The issue that I have framed in response to

13   Ms. Ben-Ami's argument at this point is that on Friday Roche

14   filed a pretrial brief in which they then filed not only

15   with respect to the '698 and the '868, but they argued that

16   the patents on which you had ruled, which expire after these

17   '698 and '868 patents -- I'll stop for one second and

18   clarify the picture.

19        The '008 patent expired in 2004, the process

20   patents '698/'868 expire in 2012, the product patents '933

21   and '422 expire in 2013.  The Court has ruled that under

22   Section 121 they are immune from obviousness type double

23   patenting over the '008 patent.  And the '349 patent expires

24   in 2015, and the Court has ruled on summary judgment, I

25   believe, that that patent also is immune under Section 121

1    from obviousness type double patenting.

2         What Roche argued on Friday was they said that,

3    Well, you haven't ruled that the '868 and '698 are free of

4    double patenting and we are now contending that the '422,

5    the '349, and the '933 patents are double patenting on the

6    process claims, on the '698 and the '868, and bootstrapping

7    that into yet another defense.

8         THE COURT:  But we're talking past here.  I've

9    ruled what I've ruled.  She's correct to assume that, to the

10   extent you have argued, the restriction; I have bought that

11   argument.  She's correct to assume.  It's not what I spelled

12   out, I was trying to be as simple as possible, but she's

13   correct to assume that.  Now, I'm not letting anyone go back

14   over any of that.  That leaves us the issue of the two

15   patents that --

16        MR. DAY:  That have not been addressed.  That have

17   not been addressed.

18        THE COURT:  Correct, have not been addressed.  I am

19   not in a position to rule about any restriction, and I'm

20   not.  As I listen to you, you say it really doesn't make any

21   difference because they'll expire before the valid patents

22   will expire.  I would think it unwise for her to open on

23   that, but I don't have a basis for precluding it.  And I

24   don't.  When we get to the issue or a restriction which you

25   assert, I'll have you know about that.

1          All right, I think I've said enough.  I'll deal

2     with the objections and then we'll send a jury.

3          **MR. DAY:**  Your Honor, before we send the jury in,

4     could I beg the Court's indulgence and ask for a simple sort

5     of directional instruction as to how you would like to

6     handle the strikes?

7          **THE COURT:**  Oh, I've gone over this at pretrial but

8     I'll do it again.  The jury will come in, I will speak.  I

9     will welcome them.  I will ask the questions.  Everyone who

10    answers affirmatively to any question, one by one, we will

11    have them come up here, now that we're in the courtroom.

12    I'll walk it through, probably not the whole battalion, but

13    someone who's going to deal with it should come up as well.

14         The juror will be identified by name.  Ms. Smith is

15    right on top of the numbers, because they're randomized.  I

16    will, myself, inquire further and at that point make a

17    choice, you're excused, you're not excused.  If you differ

18    with that choice, after the person has stepped away and

19    while the other one's coming up, and I'll wave to hold

20    things, you'll speak and say, That juror really should go

21    for cause, or We think you jumped too quickly, Judge, the

22    juror should be in the pool.  And I will rule on that

23    argument.

24         When we're done with that, I will declare the

25    venire indifferent, and physically come up here.  Ms. Smith

1    will fill the box with 12 people, starting second row right

2    hand, right to left, first row right hand, right to left.

3    When the box is filled, I will inquire of each juror where

4    they work, what -- where their spouse works, and just a few

5    words, what they do so you can hear them speak, which I

6    think is helpful.  And also you can take your notes.

7           As soon as that is done, I will ask you to come to

8    the sidebar.  I expect you not to take much time.  I expect

9    you to come to the sidebar.  At the sidebar, since even

10   though we're going to start with Roche, you're the plaintiff

11   here, you will exercise your strikes against that panel, you

12   have six, as many as you want.  And when you've done that, I

13   will turn to Roche and they will exercise their strikes

14   against that panel.  There are no back-strikes.

15          The people who collectively have been stricken,

16   Ms. Smith will excuse.  Those seats will be filled, and I

17   will inquire of those people.  The ones not stricken are

18   then chosen.  Then we come back to the sidebar.  Second

19   round, Roche goes first, then you, and so on, until you are

20   satisfied with your 12-person jury.  I will then designate

21   the foreperson and send the jury out for a recess probably,

22   depending upon what time it is.  That's the answer.

23          **MR. DAY:**  Thank you very much, your Honor.

24          **MR. KENDALL:**  Let me just clarify a couple of quick

25   jury issues, your Honor.

1              **THE COURT:**  Yes.

2              **MR. KENDALL:**  First, we do -- I'll restate for the

3     record our objection to the jury trial.  We just want --

4              **THE COURT:**  You've done that.  Noted.

5              **MR. KENDALL:**  Thank you.  Is it the Court's

6     decision that the jury is going to be a advisory jury?

7              **THE COURT:**  Absolutely not.  These matters are

8     triable as of right to a jury.  I could always fall back to

9     that position but you better win before this jury.

10             **MR. KENDALL:**  Are all matters being tried to the

11    jury?

12             **THE COURT:**  All matters of --

13             **MR. KENDALL:**  Of the three phases?

14             **THE COURT:**  -- on the three phases are being tried.

15    I think there's some sort of issue on obviousness but we're

16    going to put that to the jury and we'll see where we are.

17             **MR. DAY:**  Isn't there an issue on the inequitable

18    conduct?

19             **THE COURT:**  There is an issue on that.  I think,

20    candidly, we'll deal with inequitable conduct when we get

21    there, but generally.

22             **MS. BEN-AMI:**  Can I ask a practical question about

23    what you just said, your Honor, since this is where you're

24    going?

25             **THE COURT:**  You bet your life.

```
 1            MS. BEN-AMI:  You said -- so is Amgen going to get

 2     all six strikes first and then we get all six but then for

 3     the second round, there are no more strikes?

 4            THE COURT:  No, no.  Amgen -- look, 12 people are

 5     sitting in the box, Amgen has six strikes to exercise, and

 6     there are no back-strikes.  So if they want to get any of

 7     those 12 off, they'll strike them.  They'll use three, I'll

 8     look at you, and say -- then you know those three are gone

 9     unless I were to challenge it on the basis of Batson, and I

10     would do that and work that out right then.  Then you've got

11     nine people, you challenge two, five are gone, seven are

12     seated.  Next round, there's a new five, you go first.  On

13     that time you challenge, you've got four, you use up your

14     challenge, four of those are gone, and you're out, and they

15     can challenge more.  There we are.

16            We'll recess.

17            THE CLERK:  All rise.

18            (Recess.)

19            THE CLERK:  Calling Civil Action 05-12237, Amgen

20     versus Hoffman-La Roche.

21            THE COURT:  Well, good morning, ladies and

22     gentlemen.

23            THE JURY VENIRE:  Good morning, your Honor.

24            THE COURT:  My name is Bill Young.  I'm the judge

25     who is responsible for presiding in this session of the
```

1    court.  And those people who are on the outside, you should

2    feel free to come in, fill in these vacant chairs in here,

3    just I don't want people standing in the courtroom.

4         Now, to the prospective jurors, I most sincerely

5    want to welcome you to your period of service as a juror

6    here in the United States District Court for the District of

7    Massachusetts.  I'm going to tell you exactly how we're

8    going to proceed this morning, but before I do that, let me

9    just ask you informally, how many of you come from towns

10   where they have direct town meeting?  Anyone?  Where

11   everyone gets -- thank you.  Thank you so much.

12        That's always my first question and, honestly, I'm

13   always stunned by the response.  Because you people have the

14   experience of direct democracy.  Direct democracy, the

15   people themselves ruling directly.  Now, I don't live in

16   such a town.  But in those towns, everybody who's a resident

17   of the town and 18 years of age or older gets to go to town

18   meeting and everybody gets to vote, whether to buy another

19   fire engine, raise teachers' salaries, close the town dump.

20        In my town, I can go to town meeting.  If the

21   moderator will recognize me, I can speak to some issue

22   before a town meeting, but I can't vote.  I've already voted

23   for those people in my neighborhood, my precinct, who

24   represent me at town meeting.  Representative democracy.

25        Now, this country uses representative democracy

1    more than any other country in the history of the world.  We

2    vote for selectmen, members of the city council, Board of

3    Aldermen, we vote for the mayor, we vote for state

4    representative and senator, governor of the Commonwealth.

5    Next year we'll vote for the entire house of

6    representatives, one-third of the senate of the United

7    States, and the President of the United States.  We will

8    pick them, but they'll do the governing.

9         Except in the judicial branch of government.  In

10   the judicial branch of government, by the very organization

11   of our Constitution the people themselves still rule

12   directly as jurors.  Think about it.  I mean, I know you

13   know this and I'm not going to take a long amount of time

14   but here's a little review.  You know how the Constitution's

15   set up.  Article 1 sets up the Congress of the United

16   States, the legislators, divided into two houses to check

17   each other.  The House of Representatives, which is divided

18   by population -- California has a lot more representatives

19   than Massachusetts does -- the senate divided by states,

20   each state has two senators.  They can check each other.

21        Article 2 sets up the presidency.  A unitary

22   presidency.  The only branch of government on duty 24/7,

23   everyone in the executive branch of government works

24   ultimately for the president of the United States.

25        Article 3, that's us.  I don't expect you to have

1    memorized how Article 3 reads but I can quote the first

2    sentence.  This is what it says in the organization of our

3    government:  The judicial power of the United States shall

4    be vested in one supreme court and such inferior courts as

5    Congress from time to time shall ordain and establish.

6           This is one of those inferior courts.  And then

7    after that sentence, talking about who has the judicial

8    power of the United States, there follow two sentences and

9    they deal with judges, how you pick judges and the like.

10   And then comes this sentence:  "All criminal cases except

11   for impeachment shall be tried by jury."  Now, that's not in

12   the bill of rights, that's in the organization of our

13   government.

14          And when they put that organization out to the

15   people, the people said, Wait one second, we're not sure we

16   go for that.  Where is the right to trial by jury in civil

17   cases?  And so in the Seventh Amendment to the Bill of

18   Rights, I paraphrase here, it says:  All those cases we're

19   trying to juries now, now, 1789, we will try to juries

20   forever.  So make no mistake -- this is not criminal case,

21   by the way, this is a civil case.  There's nothing criminal

22   about it.  It's a civil case.  A private dispute between

23   civil parties.  But your role, that's why I take the time,

24   your role is constitutional.

25          From this large number of people, we are going to

 1    choose the 12 people who will be the judges of the facts in

 2    this case.  The only judges of the facts.  And when we send

 3    you out to decide the facts in this case, make no mistake,

 4    you are constitutional officers.  You see, it's like the

 5    legislature, you are a check on me and I am a check on you.

 6    And I'll tell you about our different roles.  But you are

 7    constitutional officers if you are picked on this case.

 8         When you go to decide this case, you are the equal

 9    of any representative or senator, the Chief Justice of the

10    United States, or the President himself.  You are doing that

11    constitutional role that is set out in the very organization

12    of our government.  So welcome to this calling to exercise

13    this constitutional role.

14         Now, how are we going to do it?  In a moment, I'm

15    going to have Ms. Smith put you on oath.  That is, you're

16    going to swear to answer the questions that I'm going to put

17    to you honestly.  And I haven't got a lot of questions, and

18    they're not terribly personal.  But I'm going to tell you a

19    little bit about this case, going to introduce to you the

20    lawyers here, or most of them who are sitting up here.  I'm

21    going to read to you the list of witnesses we'll have in

22    this case, and naturally I'll say do you know anything about

23    this case, have you heard about this case, do you know these

24    lawyers, have you been involved in any lawsuits.  And I'm

25    going to ask some other questions simply designed to see

 1    whether it's appropriate that you sit as a juror in this

 2    case.

 3         Now, if you think that your answer to any question

 4    that I ask you, any one of the questions I ask you, if you

 5    think your answer would be yes or it could be yes, or maybe

 6    it's yes, perhaps it's yes, I want you to raise your hand.

 7    Don't hesitate to raise your hand.  And then Ms. Smith and I

 8    are watching, we'll see who raises your hand, then when

 9    we're done, all these people who raise their hand, if

10    there's a bunch of you, you don't have to stand but we want

11    you to line up here in this aisle over here and the first

12    person stops there by the railing.

13         You hear about lawyers passing the bar.  There

14    actually is a bar.  That's it.  The lawyers practice their

15    profession up here.  The symbolic bar is that railing right

16    here.  It separates the public from the bar enclosure.

17         Then one by one we'll have you up here.  The

18    lawyers will come up.  And I'll ask you some other questions

19    simply to see whether it's appropriate that you sit as a

20    juror in this particular case.  Now, if I excuse you on this

21    case, I don't want you to think that something's the matter

22    with you or, gee, we don't think he could be fair, we don't

23    want him.  That's not it at all.  It's just we try to be as

24    fair and impartial because what we're doing this morning is

25    picking the judges for this case.  Flat out we're going to

1   pick the 12 people who will judge this case and they will

2   judge it.  Won't be any alternates on this jury.  Everyone

3   will be in there at the decision of this case.

4           Now, if we excuse you, don't think you're going

5   anywhere.  You just go back downstairs and we'll hold you

6   for trial before one of my colleagues in some other

7   courtroom.  This is not the only case in this large

8   courthouse.  We have plenty.  So you just go back

9   downstairs.

10          Now, once we've done that, then we'll pick at

11  random 12 people to sit in the jury box.  And they'll come

12  up and sit, and I will ask each one of those people

13  individually just very briefly, you don't have to introduce

14  yourselves by name, because we'll call you by name, all I

15  want like to know, and I'd like to hear it from you, is

16  where do you work, what do you do there, in just a few

17  words, and if you are married, where does your spouse work

18  and what does he or she do.  That's so we can get to know

19  you a little better.

20          Then when that's done, the lawyers and I will

21  gather over here and some more of you may be excused.  Now,

22  if you're excused at that stage, again, don't hold it

23  against the lawyers.  This is a right that they are given to

24  share in the picking of the judges for their case.  And

25  again, we'll send you back downstairs, and send you out on

1    another case.

2         Once we have the jury, we're ready to go.  Though

3    you'll find that in this court I stop jury trials every day

4    at 1:00.  Now, we're going to keep at this until we've got

5    the jury for this case, but if we've got the jury before

6    1:00 then we'll work up to 1:00, but you'll be let go today

7    and every day until the jury comes to decide the case at

8    1:00 in the afternoon.

9         So with those instructions, I think we're ready.

10   I'll ask Ms. Smith to place the jury out of the venire.

11       **THE CLERK:**  Members of the jury, please stand and

12   raise your right hand.  Repeat after me saying your own name

13   after the pronoun I.

14       (Jury Venire Sworn.)

15       **THE COURT:**  All right.  This is a civil case.  The

16   only reason I mentioned criminal cases is because it says

17   that in the Constitution.  Your rights as constitutional

18   officers depend on the Seventh Amendment to the Bill of

19   Rights.  This is a civil case.  Private companies.  Private.

20   They have a private dispute and under the Constitution they

21   have the right to come into court and have the people decide

22   it.

23       So, this is what we call a patent case.  In this

24   case there are certain -- none of this is disputed that I'm

25   telling you -- there are certain patents.  The plaintiff in

1    this case, Amgen, Incorporated, possesses, owns, has those

2    patents which confer upon it certain rights.  Issues in this

3    case will involve are those patents valid, are those patents

4    infringed, did people behave properly.

5          Amgen has sued a company called F.

6    Hoffman-La Roche, Limited, and claims that La Roche -- I'll

7    shorten it to Amgen and La Roche -- infringes Amgen's

8    patents.  Roche says, No, we don't, and what's more those

9    patents aren't valid.  And Amgen says, Yes, they are.  And

10   it is those factual disputes, and the grounds for those

11   factual disputes that we're going to turn to the jury of the

12   people who will decide what's right here.  That's the type

13   of case that you are being called to sit on.

14         Let me introduce to you the attorneys.  And as I

15   call your name, please stand.  We'll start with Amgen's

16   attorney, Mr. Rusty Day, Mr. David Madrid, they're from the

17   law firm of Day, Casebeer in California.  Mr. Bill Gaede of

18   the law firm of McDermott, Will and Emery.  Kevin Flowers,

19   and Marshall Gerstein Borun.  And Mr. Borun is employed by

20   Amgen.  Thank you, gentlemen.  Please be seated.  Oh, and I

21   should have mentioned Mr. Rob Galvin.  I'm sorry, is

22   Mr. Galvin in the courtroom?  Anyway, an attorney by the

23   name of Rob Galvin.  Now, that's Amgen's lawyers.

24         When we turn to Roche, from the firm of Bromberg

25   and Sunstein here in Boston, Attorneys Lee Carl Bromberg and

```
1    Julia Huston.  From the firm of Kaye Scholer in New York,

2    Leora Ben-Ami, is that "Tatomes" Fleming --

3            THE CLERK:  Thomas.

4            THE COURT:  I can't read this writing, Mr. Fleming,

5    forgive me.  It's a name I'm familiar with; my brother's

6    name is Thomas.  Thomas Fleming.  Patricia Carlson --

7    Carson, excuse me, Howard Suh, "Chasdural Jagde," Vladimir

8    Drozdoff, Christa Rycroft and Matthew McFarlane.

9            Thank you, folks, if you won't be seated.

10           So my first question is do any of you or any member

11   of your family, so far as you are aware, are you related to

12   or acquainted with any of these attorneys?  While we're

13   still talking about attorneys and their clients, have you or

14   any member of your family, so far as you are aware, ever

15   been involved in a lawsuit where you either were -- not any

16   lawsuit -- where you either were a witness or a party, that

17   is the person suing or being sued, which lawsuit involved

18   Amgen, Roche, any of these attorneys, and the attorneys

19   acting as attorneys or acting individually on some personal

20   lawsuit of the attorney?  Anybody involved in any such

21   lawsuit?

22           All right.  Now, Amgen is a publicly-owned company,

23   has shareholders.  So is Roche, only that's incorporated

24   under the laws of Switzerland, so it's a different entity.

25   But do any of you or any member of your family, so far as
```

1    you are aware, do you own stock or any evidence of

2    indebtedness, bonds, debentures, financial interests in

3    Amgen or Roche?  Thank you.

4         Do any of you, have any of you heard, read, or seen

5    anything about this lawsuit, this patent lawsuit?  Right,

6    this is a lawsuit by Amgen against Roche, and Roche

7    countersuing here.  One person.  Anybody else heard, read,

8    seen anything about this lawsuit?  One person.

9         All right.  Let me read to you now the people who

10   may be called as witnesses in this case.  I'm going to read

11   a lot of names here.  That doesn't mean that all of these

12   people are, in fact, going to be called, but I told them to

13   err on the side of including everyone who might be called.

14   So you're going to have to bear with me.

15        Gary Rogers, employed by Amgen.  Amgen is located

16   at One Amgen Center Drive in Thousand Oaks, California.

17   Ralph Smalling lives in Thousand Oaks.  Nancy Spaethe lives

18   on Mercer Island, Washington.  Anne Stern, an employee of

19   Roche.  Thomas Strickland of Amgen.  Helen Torley of Amgen.

20   Axel Ullrich, he's in the Max Planck Institute of

21   Biochemistry in Martinsried, Germany.  Stuart Watt of Amgen.

22   Leslie Benet at the University of California.  Ralph

23   Bradshaw, also at that college, or university.  Carlos

24   Brugnara, Children's Hospital, Boston.  Glenn Chertow,

25   University of California.  Eli Friedman, Downstate Medical

1   Center in Brooklyn.  Eugene Goldwasser at the University of

2   California -- University of Chicago, excuse me, in Chicago.

3   Harvey Lodish of the Whitehead Institute in Cambridge.

4   Stuart Orkin of the Howard Hughes Medical Institute in

5   Boston.  Vladimir Torchilin of Northeastern University.

6   Ajit Varki of the University of California.  Jean Buch of

7   Roche.  Cynthia Dinella of Roche.  Adrienna Farid of Roche.

8   Joanne Franzino of Roche.  And these Roche employees are in

9   Nutley, New Jersey.  Robert Joseph of Roche in Nutley, New

10  Jersey.  Chris Kingma-Johnson -- or excuse me, Iris

11  Kingma-Johnson of Roche in Nutley, New Jersey.  Marcus

12  Knickmeier of Roche, but in Switzerland.  Chrys Kokino of

13  Roche.  Barbara Much of Roche.  Nimish Shah of Roche in

14  Nutley, New Jersey.  Axel Schorle of Roche.  Phillippe Van

15  der Auwera from Basel, Switzerland.  Peter Veng-Pedersen of

16  the University of Iowa.  George Abercrombie of Roche.

17  Pascal Bailon of Florham Park, New Jersey.  Joseph Baron of

18  Chicago.  Sonders Beimfohr of Roche.  Guenter Blobel of New

19  York City.  Jeffrey Borer, an employee of Kaye Scholer.

20  Frank Carillo of Englewood, New Jersey.  Shaun Collard of

21  DaVita Pharmaceuticals.  Sven-Michael Cords, Kaye Scholer.

22  Frank Dougherty of Basel.  Suzann Duncan of Roche.  James

23  Fisher, Kaye Scholer.  Wayne Flintoff of Kaye Scholer.

24  Michael Fromm, Lincoln, Nebraska.  Franklin Gaylis of Kaye

25  Scholer.  Susan Graf of Roche.  Edward Harlow of Kaye

1    Scholer.  Richard Hinson of Roche.  Leroy Hood of the

2    Institute for Systems Biology.  Patrick Horber of Roche.

3    Adrian Katz of Chicago.  John Keefe from Roche.  Kenneth

4    Lieberman of Kaye Scholer.  Lori Martin Hickman of Roche.

5    Michael Mayersohn of Kaye Scholer.  Bruno Reigner of Roche

6    in Switzerland.  Peter Shuepbach of Roche.  Daniel Shouval

7    of Kaye Scholer.  Joachim Vollmar of Kaye Scholer.  Charles

8    Zaroulis of Kaye Scholer.  Alan Erslev.  John Lowe of Case

9    Western University.  Thomas Kadesh of the University of

10   Pennsylvania Medical School.  Robert Langer of MIT.

11   Alexander Klibanov of MIT.  Richard Flavell of Yale.

12   Carolyn Bertozzi of the University of California.  Bruce

13   Spinowitz of New York Hospital in Queens.  Steven Fishbane

14   of Winthrop University Hospital.  William Jorgenson of Yale.

15   Gregory Longmore of Washington University Medical School.

16   Adrienne Farid.

17          Now, do any of you, or any member of your family so

18   far as you are aware, are you related to or acquainted with

19   any of those individuals?

20          Now, let's see here.  This case involves a

21   recombinant DNA technology.  It involves patents in that

22   field of science.  A patent case depends upon the specific

23   claims of the patent.  And I'll get into that in more detail

24   from -- when we're talking to the jury that we pick.  But

25   it's fair to ask, since from these patent materials, whoever

```
 1    owns the patent, various products are on the market, I want

 2    to ask if any of you or anyone in your immediate family is

 3    now or has ever taken a drug, a pharmaceutical composition

 4    called Mircera, M-I-R-C-E-R-A, Procrit, P-R-O-C-R-I-T, or

 5    Epogen, E-P-O-G-E-N.  Thank you.  Thank you.

 6         And just to give you some idea, what these are

 7    supposed to do, among other things, is raise the red blood

 8    cells in your blood.  And that has various -- can be used in

 9    various treatments, apparently.  So with that in mind,

10    anyone have anyone in their immediate family that's taken

11    any of those three pharmaceutical compositions?  Thank you.

12         Have any of you, do any of you have any interest in

13    the outcome of this case?  When I say do you have any

14    interest in it, I don't mean a natural curiosity about what

15    this evidence may show or may not show, I mean do any of you

16    stand to gain or lose anything depending upon how this case

17    comes out?  Thank you.

18         Do any of you -- are any of you sensible of any

19    bias or prejudice whatsoever with respect to this case?  And

20    when I say are you sensible of it, I mean are you aware of

21    any, do you know of any, any bias or prejudice whatsoever?

22         Now, my questions are getting broader and I only

23    have a couple more.  The next question is going to be this:

24    Do any of you know any reason why you do not stand

25    indifferent in this case?  And when I say any reason why you
```

1    do not stand indifferent, I'm trying to search out any

2    feelings you may have going in, before we start the case,

3    any feelings you may have about this case, this patent

4    dispute between Amgen and Roche, but more generally do you

5    have any feelings about patents that I ought to know about?

6    I'll teach you what the law is, but do you have any feelings

7    about them?  Do you have feelings about patent litigation?

8           Do you have feelings about lawyers, lawyers in this

9    type of civil case -- well, no, all right.  You laugh at

10   that, but I need to know if you've got feelings that you

11   think affect your ability to stand indifferent.  Lawyers are

12   nothing more than teachers.  And we will see in a case like

13   this, it's necessary to have these teachers teach us the

14   evidence in the case.  But I'm not here shilling for

15   lawyers.  So if any of you have any feelings about lawyers

16   that are going to affect you in this case, I want to know

17   about it.

18          Do any of you have any feelings about the civil

19   justice system, have you got any feelings about judges,

20   feelings that I should know about going in?  Do any of you

21   know any reason why you do not stand indifferent in this

22   case?  Thank you.

23          Now, my last question is going to be this:  Do any

24   of you have any important reason why you ought not be called

25   to sit as a juror in this case?  Now, we try to make this

```
1    simple, and we try to respect your time.  So already knowing

2    that this case was going to go a while, we gave you a

3    questionnaire.  And some of the people who answered yes to

4    that questionnaire I've excused.  Others of you I didn't

5    excuse, perhaps because I really wasn't sure about the

6    extent of the hardship or for one reason or another.  But

7    now I'm asking you again, and I'm asking you in open court.

8            Here's what I want you to think about.  Before I

9    ask, let me tell you what the schedule is.  And I know

10   exactly what the schedule is.

11           So -- and I'm going to go over it with you right

12   now.  And believe me, this trial is not going to take one

13   day more than the schedule I now announce to you.  However

14   long it takes you to decide it, that's up to the jury.  But

15   we're starting the case today.  We're going to sit all this

16   week.  We're going to sit all next week, except for Thursday

17   the 13th, in light of religious holidays.

18           We are not going to sit the following week.  We're

19   going to take a week off, and you say why, what are you

20   taking the week off for?  Well, there's other religious

21   holidays this week, and in a case this long, I have

22   responsibilities to criminal cases that can't be put off.

23   But you jurors will get the week of the 17th off.

24           Then we're back the 24th of September.  We're going

25   to sit all that week.  We're going to sit the next week.  Up
```

1    to Thursday, the 4th.  Then there's a three-day weekend, but

2    we're going to take longer.  We're going to let you off on

3    Friday, we're going to take the rest of that week off.  Not

4    off, we have plenty of things to do, but you won't have to

5    sit.

6          And then it will -- this case will be given to you

7    Wednesday, the 17th of October, or maybe Thursday the 18th,

8    because of a doctor's appointment.  But it will not go one

9    day longer than Thursday the 18th.  Now, that's the

10   schedule.

11         Here's how it works out each day.  I sit from

12   9:00 in the morning until 1:00 in the afternoon.  On none of

13   those days, except perhaps today, because we're going to

14   stay here until we've got this jury picked, are we going to

15   sit later than 1:00.  1:00 comes, you're out of here.  Every

16   single day.  Now, when we give you the case, we will work

17   all day.  But when we give you the case, then we'll expect

18   you to sit all day, 9:00 to 5:00.  No one's going to be kept

19   into the evening, no one's going to sit on weekends.  But

20   we'll wait for your jury verdict.

21         So that's the schedule.  I don't mean to

22   overemphasize the schedule.  But on a case of this length,

23   you need to know it.  What I want now when I ask the

24   question, I want you to reflect on all the questions I've

25   asked, think about them, and if you would answer yes to any

```
 1   of those questions, if you've already raised your hand,

 2   that's fine.  If you haven't yet raised your hand, if you'd

 3   answer yes to this question, I want you to raise your hand

 4   now.  Do you know any important reason why you ought not be

 5   called to sit on this specific case?  Thank you.

 6           Now, would each of the people, and there's not too

 7   many of you, would each of you who's raised your hand in

 8   response to any question at all, would you line up in this

 9   aisle here.  And the first person can stop there at the bar.

10   Well, I'll take the first person, and just wait until I've

11   interviewed each person.

12           Yes, ma'am, come on up.  Counsel?
```

SIDEBAR CONFERENCE, AS FOLLOWS:

**MR. DAY:**  Your Honor, may I stand over there?

**THE COURT:**  Yes.

INQUIRY BY THE COURT OF THE JUROR

**Q.**  We need your name.

A.  Eileen Ashe, E-I-L-E-E-N, A as in apple, S as in Sam,

H-E.

**Q.**  Yes?  You answered yes?

A.  Yes.  They said downstairs the employer does not have to

pay you?

**Q.**  That's correct, it's not -- we pay $40 a day, that's --

your employer doesn't have to pay you unless you have a

contract or something.

1   A.   I'm not sure if they will.   I live by myself, I support

2   myself, and I can't live on $40 a day.   I have a mortgage.

3   I have car payments.   I'm totally alone.

4   **Q.**   By whom are you employed?

5   A.   I work for Bay -- Massbank.

6   **Q.**   You work for Massbank?   And you don't think that they

7   will pay you?

8   A.   Oh, I'm not sure.

9   **Q.**   We'll ask you to stay and we'll see if it becomes a

10   hardship.   We'll see if you're picked.

11   A.   Okay.

12          **MR. KENDALL:**   Do you have the --

13          **MR. FLEMING:**   Forty-six on the list, your Honor.

14          **THE COURT:**   Thank you.

15          INQUIRY BY THE COURT OF THE JUROR

16   **Q.**   Yes, ma'am.

17          **THE COURT:**   You're going to have to scramble to

18   find the names.   Because --

19   **Q.**   Can we have your name, ma'am?

20   A.   Lisa Hayward.   I mentioned it already, I'm a

21   kindergarten teacher.   Being that this is the first day of

22   school --

23   **Q.**   I know that.   But your union contract, you'll get paid,

24   right?

25   A.   I don't know.

1    **Q.**  I have a son who's a schoolteacher.

2    **A.**  I'm concerned about the back and forth with the young

3    children.

4    **Q.**  I know you are.  That's why they have substitutes.  I

5    need people from all walks of life.  In all honesty,

6    teachers are a prime basis for jury service.  I appreciate

7    what you've said.  You've told me.  You can tell them back

8    at the school you told me.  I'll ask you to stay.

9    **A.**  Okay.

10             **THE CLERK:**  That was Number 14.

11               INQUIRY BY THE COURT OF THE JUROR

12   **Q.**  Can we have your name, ma'am?

13   **A.**  Martha Curtis.

14   **Q.**  Yes.  You answered yes to one or more questions?

15   **A.**  Yes, to the question about Procrit.

16   **Q.**  And someone in your family takes Procrit?

17   **A.**  My father is taking it and I have a friend who also

18   takes it.

19   **Q.**  I think it best that you not sit on this particular case

20   because that's what we're going to be talking about.  I

21   don't need to ask you anymore questions.  Thank you very

22   much.

23             **THE CLERK:**  Twenty-eight.  I can't give them the

24   cards, Judge.

25             **THE COURT:**  No, I understand.

1          **THE CLERK:**  Okay.

2              INQUIRY BY THE COURT OF THE JUROR

3    **Q.**  Can we have your name, ma'am?

4    A.  Paula Burge.  My daughter had lymphoma and she was on

5    Procrit when she was doing her chemotherapy.

6    **Q.**  Given that that's going to be central to this case I'm

7    going to -- I'm excusing people who have actually used

8    something that may involve the claims in this patent.  I

9    thank you very much for your willingness to serve, but we'll

10   excuse you.

11   A.  Thank you.

12         **THE CLERK:**  Number 70.

13             INQUIRY BY THE COURT OF THE JUROR

14   **Q.**  Can we have your name?

15   A.  My name is Peter Kurunczi.  I work for a semiconductor

16   company and I conduct R&D for them.  And right now we're

17   very close to making a very important sale and the outcome

18   of that sale will also affect me financially.

19   **Q.**  That's the why I sit 9:00 to 1:00.  I need people from

20   all walks of life.  I'm going to ask you to stay.  We'll see

21   if you're chosen.

22   A.  Sure.

23         **THE CLERK:**  I haven't found it yet.

24         **MR. FLEMING:**  Thirteen.

25

1            INQUIRY BY THE COURT OF THE JUROR

2    **Q.**  Can we have your name, sir?

3    A.   Jeffrey Nicolich.

4    **Q.**  You answered yes to more than one question.

5    A.   Yes, that's right.  I work for a supplier to Amgen and

6    my company has sold more than a million dollars worth of

7    equipment.  And I've been to most of the sites at Amgen in

8    Cambridge.

9    **Q.**  You think you might favor Amgen?

10   A.   Yes.

11   **Q.**  You did just right to tell us.  You're excused on this

12   case.

13            **THE CLERK:**  Number 39.

14            **THE COURT:**  Go back downstairs.

15            INQUIRY BY THE COURT OF THE JUROR

16   **Q.**  Can we have your name, ma'am?

17   A.   Kathleen Hurley.  I just answered my father took

18   Procrit.

19   **Q.**  Because that may really be involved in this case, I'm

20   excusing people who have taken Procrit.  You did just right

21   to tell us.  Thank you for your willingness to serve.  Go

22   back downstairs.

23            **THE CLERK:**  Number 38.

24            INQUIRY BY THE COURT OF THE JUROR

25   **Q.**  Yes.  Can we have your name?

 1   A.   Jeffrey Monaco.   Jeffrey Monaco.   I work for State

 2   Street Bank.   We're doing a very large product release

 3   second week in October.   I'm going to Europe end of

 4   September for training, to train in four different cities.

 5   **Q.**   I need people from all walks of life.   You've told me.

 6   Your job, of course, is fully protected under the law.   I'm

 7   going to ask you to stay.   Thank you.

 8           **THE CLERK:**   Number 53.

 9             INQUIRY BY THE COURT OF THE JUROR

10   **Q.**   Can we have your name, sir?

11   A.   Michael Pergiovanni.   I am a federal sales manager for

12   my company segment.   Being the end of fiscal year, this is

13   when I make all my commissions.   Also, Amgen's one of our

14   biggest accounts and I've actually done some business with

15   Amgen.

16   **Q.**   You think you may favor them?   Would you be hostile to

17   them?

18   A.   No, I wouldn't be hostile to them.

19   **Q.**   You mentioned it, so do you think you could be impartial

20   and in a case that involves Amgen?

21   A.   I would certainly try.

22   **Q.**   I appreciate that.   That's why I sit 9:00 to 1:00.   So

23   I'll have you out of here every day 1:00 throughout

24   September.   And you've got a week off in September while we

25   do other things.

1    A.   Okay, your Honor.

2    Q.   I'll ask you to stay.

3         THE CLERK:   Number 30.

4            INQUIRY BY THE COURT OF THE JUROR

5    Q.   Could I have your name, sir?

6    A.   Dale Mitchell.

7    Q.   Yes?

8    A.   If I understand this correct, this is like American

9    interest versus foreign interest?

10   Q.   It makes no difference.  It makes absolutely no

11   difference.  They stand equal before the law.

12   A.   But I don't know if they stand equal in my beliefs.

13   Q.   All right.  You did just right to tell us.  You're

14   excused on this case.  Go downstairs.  We'll find a

15   different case for you.

16        THE CLERK:   Did you say your name was Dale

17   Mitchell?

18        THE JUROR:   Yes.

19        THE CLERK:   Thank you.  Seventy-one.

20            INQUIRY BY THE COURT OF THE JUROR

21   Q.   Can we have your name, sir?

22   A.   Sean Fogarty.  I just started a new job.  I have a

23   symposium to go to the third week in September that's an

24   integral part of my job.

25   Q.   Third week of -- what are the dates?

1   A.   September 26th.

2   Q.   We'll be back here then.   It may be, but I need people

3   from all walks of life.   Your job is absolutely secure under

4   the law.

5   A.   Sure.

6   Q.   You've told me.   I'm going to have to ask you to take

7   your chances about getting picked.   You've told me, we'll

8   ask you to stay.

9   A.   Thanks.

10              **THE CLERK:**   Sixty-eight.

11              INQUIRY BY THE COURT OF THE JUROR

12   Q.   Can I have your name, sir?

13   A.   Morning, your Honor.   Robert Rodger.   I'm an attorney in

14   private practice with only one associate, and I think being

15   tied up in court for that long a period of time, she would

16   not be able to handle the volume.

17   Q.   That's why I stop at 1:00.   I need people from all walks

18   of life.   We'll ask you to stay.

19   A.   Thank you, your Honor.

20              **THE CLERK:**   Forty-two.

21              INQUIRY BY THE COURT OF THE JUROR

22   Q.   Can we have your name, ma'am?

23   A.   Christine Kuzmitski.

24   Q.   Yes, Ms. Kuzmitski?

25   A.   I am having eye surgery on September 22nd.

1    Q.   I noted that.  The question is how extensive?  That's a

2    Saturday.  The 22nd is a Saturday.

3    A.   Then it's the 21st.  They said I might be out of work

4    for two weeks.

5    Q.   I see, all right.  I'm going to excuse you.  The reason

6    I didn't excuse you automatically was I thought it was

7    something maybe you would be good to go on the following

8    Monday.

9    A.   Oh, okay.  No.

10   Q.   You're excused from this case.  Go back downstairs.

11            MR. FLEMING:  Thirty-one.

12            THE CLERK:  Thirty-one.  Okay.  Thank you.

13            INQUIRY BY THE COURT OF THE JUROR

14   Q.   Can we have your name, sir?

15   A.   John Moriarty.

16   Q.   Yes, Mr. Moriarty?

17   A.   How are you?

18   Q.   I'm fine.  You answered yes?

19   A.   I answered yes to two.  I probably should have mentioned

20   a third.  I do own some stock in Amgen, not a lot --

21   Q.   But that's the killer right there.  Not killer, but

22   under the rules because you have a financial interest you

23   couldn't sit, just like I couldn't sit.  And no one

24   challenges your impartiality, just like they wouldn't

25   challenge me, but I'd be required to recuse myself and I'm

1  required to excuse you.  And I thank you for your interest

2  in serving.

3  A.  Okay.

4         **THE CLERK:**  Number 32.

5            INQUIRY BY THE COURT OF THE JUROR

6  **Q.**  Could we have your name, ma'am?

7  A.  Dianne Carr.

8  **Q.**  Yes?

9  A.  I'm an English teacher with behavioral kids.  I'm not

10 sure how this is going to impact them with the length of the

11 case.

12 **Q.**  I'm not either.  I read what you had to say.  Under your

13 union -- public school?

14 A.  No, it's a small private school for DCYF.  We get a lot

15 of kids from DCYF.

16 **Q.**  That changes it.  Do you know, will they pay you your --

17 A.  Yeah, I'm salary, I will get paid.

18 **Q.**  You will be paid?

19 A.  Yes.

20 **Q.**  Well, I'm going to ask you to stay.  I know it's a

21 hardship, but that's how -- why they have substitutes.  You

22 did just right to tell me.  The onus is on me, I'm asking

23 you to stay.  You told me.  Thank you very much.

24 A.  Okay.  Thank you.

25        **THE CLERK:**  Number 48.

1           INQUIRY BY THE COURT OF THE JUROR

2    **Q.**  Could we have your name, sir?

3    A.   Bill Hyland.  Mine is a problem of logistics.  I only

4    live here in the summer; November 1st I'm gone.

5           **THE COURT:**  I read that.

6           If the deliberation doesn't go beyond that -- in a

7    way we're running for luck here.  And I'm going to hold you.

8    I'm sensitive to it but, you know, if the deliberations run

9    into November, I cannot promise you they won't, but we are

10   stopping this case, you'll start deliberating on the 17th or

11   18th.

12   A.   Just after November 1st I have no place to live,

13   essentially.

14   **Q.**  We'll run for luck, and we'll -- I may be able to find

15   some funds that would help out.  I can't promise it, but I

16   appreciate your willingness to serve and I think in all

17   likelihood you'll be done by the 1st.  Thank you.

18           **THE CLERK:**  Number 8.

19           INQUIRY BY THE COURT OF THE JUROR

20   **Q.**  Can we have your name, ma'am?

21   A.   My name is Asmeret.

22   **Q.**  That's your last name?

23   A.   First name.

24   **Q.**  Yes.

25   A.   I'm a little understanding English.

1    Q.  Well, my problem here is simply hearing you.  It sounds

2    like you understand it.

3    A.  A little bit.

4    Q.  It's a lawyer's job to make things clear to you.  Are

5    you employed here?

6    A.  No.

7    Q.  You're not employed?

8    A.  (Shaking head up and down.)

9    Q.  What do you do?

10   A.  I'm homemaker.

11   Q.  A homemaker.  But you're an American citizen?

12   A.  Yes.

13   Q.  Yes, all right.  Ma'am, I think I will excuse you for

14   service on this case.  Thank you very much for your

15   willingness to serve.  We'll find another case for you.  Go

16   back downstairs.

17           THE CLERK:  Number 24.

18              INQUIRY BY THE COURT OF THE JUROR

19   Q.  Could I have your name, sir?

20   A.  Yes, sir.  My name is William Seeley.

21   Q.  Yes, Mr. Seeley?

22   A.  I have an old injury of two disks in my lower back.  And

23   for me to sit in one of these hard chairs for four hours

24   straight is going to be nearly impossible.

25   Q.  We frequently deal with people with back problems.

1    A.  Okay.

2    **Q.**  And I'm going to ask you to stay.  Here's what I

3    guarantee you.  We'll sit you, if you're picked, we'll sit

4    you in the second row.  These are the biggest jury boxes of

5    any courtroom in the nation.

6    A.  Oh, I see.

7    **Q.**  You just get up, move around.  Likewise, if you need a

8    pillow or something to make -- the chairs aren't the best

9    but if you need that, just bring it in, no problem with your

10   putting it there.  If you needed a different chair, I'll try

11   chairs from my lobby that are better upholstered.  But there

12   will be no embarrassment to you.  If you're picked as a

13   judge on this case, we'll put you in the second row.

14   Witnesses are here, all the focus is here.  You just get up,

15   move around.  And if you're really uncomfortable and need a

16   break, just tell us.

17          But I appreciate your willingness to serve and

18   you've got my guarantee.  We've got people with back

19   problems all the time.

20   A.  All right, sir.  Thank you.

21          **THE CLERK:**  Number 23.

22          **MR. DAY:**  I thought Mr. Kurunczi, who is Number 13,

23   gave you one reason.  I think he raised his hand several

24   times.  He raised his hand several times.

25          **THE COURT:**  I excused him, didn't I?

1          **MR. FLEMING:**  No.  He was the one who works for the

2     semiconductor.

3          **MR. DAY:**  I think he raised his hand several times.

4          **THE COURT:**  Oh.

5          (Out loud)  Mr. Kurunczi, if you don't mind coming

6     back.

7              INQUIRY BY THE COURT OF THE JUROR

8     **Q.**  The lawyers point out to me, I didn't catch it, did you

9     raise your hand more than once?

10    A.  Uhm-hmm.  My dad takes Procrit.

11    **Q.**  Oh, your dad takes Procrit.  That, respectfully, is a

12    deal-breaker in this case.  So I appreciate your willingness

13    to serve, but we'll send you back downstairs, find a

14    different case for you.  Thank you very much.

15    A.  Okay.

16          (Whereupon the sidebar conference concluded.)

17          **THE COURT:**  I find this panel indifferent.

18    Proceed, Madam Clerk.

19          Oh, I'm sorry.

20    SIDEBAR CONFERENCE, AS FOLLOWS:

21          **MS. BEN-AMI:**  You mentioned several things to the

22    jury but there's another drug called Aranesp, A-R-A-N-E-S-P,

23    that is also at issue in this case, I think.  I don't know

24    if you want to mention that.

25          **THE COURT:**  I will, sure.

1          (Whereupon the sidebar conference concluded.)

2          **THE COURT:**  The lawyers call one thing to my

3    attention.  I should have raised it.  I didn't.  It's

4    another pharmaceutical composition.  Do you or any members

5    of your family take a pharmaceutical composition or a drug

6    called Aranesp, Aranesp?

7          All right.  I find this panel indifferent.

8    Proceed, Madam Clerk.

9          **THE CLERK:**  Juror No. 1, Tran Giau, please come

10   forward and take the first see in the second row.  T-R-A-N

11   G-I-A-U.  Did I pronounce it incorrectly?  This seat right

12   here.  And did I pronounce it incorrectly?

13          **JUROR TRAN:**  Giau Tran.

14          **THE CLERK:**  Giau Tran, okay.  Thank you.

15          **THE COURT:**  Please be seated.

16          **THE CLERK:**  Juror No. 2, Cynthia Walters, please

17   come forward and take the second seat in the second row.

18   Juror No. 3, Anthony Mielcarz, please come and take the

19   third seat in the second row.  Juror No. 4, Marja Lepoer,

20   please come and take the fourth seat in the second row.

21   Juror No. 5, Nancy Anderson, please come and take the fifth

22   seat in the second row.  Juror No. 6, Barbara Miller, please

23   come and take the sixth seat in the second row.

24          Juror No. 7, Virginia Murray, please come and take

25   the first seat in the first row.  Juror No. 8, William

1    Hyland, please come and take the second seat in the first

2    row.  Juror No. 9, Werner Steinmueller, please come and take

3    the third seat in the first row.  Juror No. 10, Donna Dias,

4    please come and take the fourth seat in the first row.

5    Juror No. 11, Jacqueline Harrison, please come and take the

6    fifth seat in the first row.  And Juror No. 12, Nicole

7    Gallant, please come and take the sixth seat in the first

8    row.

9         THE COURT:  Now, folks, we're going to do just what

10   I said.  We're going to go one by one, and you don't have to

11   stand up, you don't have to introduce yourself, but I would

12   like to know very briefly where you work, in just a few

13   words, what do you do there; and if you are married, could

14   you tell us where your spouse works and what he or she does.

15   And we'll start with Mr. Giau Tran.

16        JUROR TRAN:  I work for a computer store in Canton,

17   Mass., transfer stocks, and I'm single.

18        THE COURT:  Thank you.  Ms. Walters?

19        JUROR WALTERS:  I'm single, I work at Narragansett

20   Bay Commission in Providence, Rhode Island, laboratory

21   manager.  And we do the analysis for two wastewater

22   facilities for pretreatment, and we do the analysis for

23   pretreatment department for industries and restaurants.  And

24   we work with EPA for the rivers, we take analysis for the

25   rivers.

 1             THE COURT:  Thank you.  Mr. Mierz?

 2          JUROR MIELCARZ:  "Mielcarz."

 3          THE COURT:  Mielcarz, excuse me, sir.

 4          JUROR MIELCARZ:  I work for General Electric, I'm a

 5   machinist, and I'm single.

 6          THE COURT:  Thank you.  Ms. Lapoer?

 7          JUROR LAPOER:  I'm married.  I work with my husband

 8   at the Museum of Printing in North Andover.

 9          THE COURT:  In what capacity do you work?

10          JUROR LAPOER:  I'm a librarian.

11          THE COURT:  And he?

12          JUROR LAPOER:  He's the executive director.

13          THE COURT:  Thank you.  Ms. Anderson?

14          JUROR ANDERSON:  I'm a software engineer, I work

15   for Shaw's Supermarkets, and I'm single.

16          THE COURT:  Thank you.  Ms. Miller?

17          JUROR MILLER:  I work for Union Hospital in Lynn, a

18   nurse in the emergency department.  And I'm married.  My

19   husband is a mortgage banker.

20          THE COURT:  A mortgage banker?

21          JUROR MILLER:  Yes.

22          THE COURT:  Ms. Murray?

23          JUROR MURRAY:  I am self-employed, my husband and I

24   own the business.  It's large-format printing.

25          THE COURT:  Thank you.  Mr. Hyland?

```
 1              JUROR HYLAND:  I'm a retired surgeon at the Beth

 2    Israel Deaconess Hospital here in Boston, and I'm not

 3    married.

 4              THE COURT:  Mr. Steinmueller?

 5              JUROR STEINMUELLER:  Self-employed roofer, side

 6    waller.  My fiancee is a liquor store manager.

 7              THE COURT:  Thank you.  Ms. Dias?

 8              JUROR DIAS:  Unemployed at the moment.

 9              THE COURT:  When last you worked, ma'am, what did

10    you do?

11              JUROR DIAS:  Executive -- assistant to an executive

12    director at Verizon.  Divorced.

13              THE COURT:  Thank you.  Ms. Harrison?

14              JUROR HARRISON:  I'm single, I work at Stop & Shop

15    Pharmacy -- Stop & Shop Supermarket.  I work as a pharmacy

16    assistant, and a cashier also.

17              THE COURT:  Thank you.  Ms. Gallant?

18              JUROR GALLANT:  I work at Express.  I'm a sales

19    associate, and a cashier.

20              THE COURT:  I should know this.  What's the

21    business of Express?

22              JUROR GALLANT:  It's clothing.

23              THE COURT:  Clothing.  I should know that.

24    Counsel?

25              (Pause in proceedings.)
```

 1

 2              **COUNSEL:**  Can I have one more minute?

 3              (Pause in proceedings.)

 4              **THE COURT:**  Counsel?

 5     SIDEBAR CONFERENCE, AS FOLLOWS:

 6              **THE COURT:**  Who's going to speak?  Mr. Kendall?

 7              **MR. KENDALL:**  We'll strike 2, 6 and 7.

 8              **THE COURT:**  That's Ms. Walters.

 9              **MR. KENDALL:**  Ms. Walters, Number 2.

10              **THE COURT:**  Thank you.  She's excused.

11              **MR. KENDALL:**  Ms. Miller, Number 6.

12              **THE COURT:**  She's excused.

13              **MR. KENDALL:**  And Ms. Murray, Number 7.

14              **THE COURT:**  She's excused.  All right.  Who's

15     speaking for the defense?  Ms. Ben-Ami?

16              **MS. BEN-AMI:**  Number 3, Mielcarz.

17              **MR. DAY:**  I'm sorry, I couldn't hear.

18              **THE CLERK:**  Mielcarz.

19              **MS. BEN-AMI:**  Number 8, the --

20              **THE COURT:**  Hyland, the surgeon, is gone.

21              **MS. BEN-AMI:**  Who won't have a place to live.  And

22     Number 10, Dias.

23              **THE COURT:**  Dias is excused.  That's three.

24              **MS. BEN-AMI:**  That's three.

25              **THE COURT:**  You're both otherwise content?  Very

1    well, those six jurors are excused.

2         (Whereupon the sidebar conference concluded.)

3         **THE CLERK:**  Ms. Walters, Mr. Mielcarz, Ms. Miller,

4    Ms. Murray, Mr. Hyland, and Ms. Dias, you're excused from

5    service on this jury.  Please return to the jury lounge on

6    the second floor.  And thank you.

7         Juror No. 14, Lisa Hayward, please come forward and

8    take the second seat in the second row.  Juror No. 15, Beryl

9    Lynch, please come and take the third seat in the second

10   row.  Juror No. 16, Katelin Kennedy, please come and take

11   the sixth seat in the second row.  Juror No. 17, Joan

12   Giordano, please come and take the first seat in the first

13   row.  Juror No. 18, Mahmood Akhtar, please come and take the

14   second seat in the first row.  And Juror No. 19, Regina --

15   is it Regina Moran or Reginald --

16        **JUROR MORAN:**  Regaldina.

17        **THE CLERK:**  Regaldina Moran, please come and take

18   the fourth seat in the first row.

19        **THE COURT:**  All right.  Now, the same question for

20   the folks that just joined us, starting with Ms. Hayward.

21        **JUROR HAYWARD:**  I'm a teacher in the Cambridge

22   public schools, and my husband is in the Navy.

23        **THE COURT:**  Can you tell us in what capacity he

24   serves?

25        **JUROR HAYWARD:**  He's an electrician on a submarine.

1          **THE COURT:**  Thank you.  Ms. Lynch?

2          **JUROR LYNCH:**  I'm unemployed right now, and I'm

3     single.

4          **THE COURT:**  And when you last worked, ma'am, what

5     did you do?

6          **JUROR LYNCH:**  I was in the diamonds and fine

7     jewelry sales.

8          **THE COURT:**  You were in?

9          **JUROR LYNCH:**  Diamonds and fine jewelry sales.

10         **THE COURT:**  Thank you.  Ms. Kennedy?

11         **JUROR KENNEDY:**  I'm an elementary special ed.

12    teacher.

13         **THE COURT:**  Thank you.  Ms. Giordano?

14         **JUROR GIORDANO:**  I just recently retired from

15    Talbots retailing.  My husband's retired from the CIA.

16         **THE COURT:**  And Mr. Akhtar?

17         **JUROR AKHTAR:**  I'm the manager of high work in

18    transmission lines for NSTAR Electric, which is an electric

19    utility, and my wife is a teacher.

20         **THE COURT:**  Thank you.  Can you tell us what she

21    teaches, what grade level or subject?

22         **JUROR AKHTAR:**  She's an elementary schoolteacher.

23         **THE COURT:**  Thank you.  Ms. Moran?

24         **JUROR MORAN:**  I'm a nurse at Coolidge House, and my

25    husband's a landscaper.

1              THE COURT:  Thank you.  Counsel?

2              (Pause in proceedings.)

3              THE COURT:  Counsel?  Mr. Kendall?

4   SIDEBAR CONFERENCE, AS FOLLOWS:

5              THE COURT:  All right.  Ms. Ben-Ami?  You're first

6    this time.

7              MS. BEN-AMI:  Number 18.

8              THE COURT:  Who is that?

9              MS. BEN-AMI:  Akhtar.

10             THE COURT:  Akhtar Mahmood is Asian American.  Why

11   are you challenging him?

12             MS. BEN-AMI:  Because of his background in

13   engineering.  And we did not challenge the other gentleman

14   who's also of Asian background.

15             THE COURT:  Which one is that?

16             MS. BEN-AMI:  The first person.

17             THE COURT:  He may be excused.

18             MR. KENDALL:  What number is that?

19             THE CLERK:  Eighteen.

20             MS. BEN-AMI:  I wanted to get the number right,

21   Number 17.

22             THE COURT:  Ms. Giordano, she's excused.  You're

23   otherwise content?

24             MS. BEN-AMI:  Content for now.

25             THE COURT:  All right.  One challenge left.  And

1    Mr. Kendall?

2              (Whereupon counsel conferred.)

3              **MR. DAY:**  Excuse me one second, your Honor.  I

4    apologize.

5              **MR. KENDALL:**  Your Honor, we strike 14.

6              **THE COURT:**  Hayward?

7              **MR. DAY:**  That's right, 14.  And 19.

8              **THE COURT:**  The names are more helpful.

9              **MR. KENDALL:**  Hayward and Moran.

10             **THE COURT:**  Moran is -- Moran is African American.

11   And I see in the venire only one other African American.

12   Tell me why you're striking her.

13             **MR. DAY:**  Striking her because she's a nurse, your

14   Honor.

15             **THE COURT:**  Because she's a nurse?

16             **MR. DAY:**  Yes.

17             **THE COURT:**  I thought we have another nurse here.

18             **MR. DAY:**  I think she was stricken.

19             **MS. BEN-AMI:**  She was stricken last round by Amgen.

20             **THE COURT:**  I see.  She may be excused.

21             **MS. BEN-AMI:**  So they've stricken two nurses.

22             **THE COURT:**  Yes.  Very well, she's excused.  And

23   each side has one challenge left.

24             (Whereupon the sidebar conference concluded.)

25             **THE CLERK:**  Lisa Hayward, Joan Giordano, Mahmood

1   Akhtar, and Regaldina Moran, you're excused from service on

2   this jury.  Thank you very much.  Please go down to the jury

3   lounge on the second floor.

4          Juror No. 20, John Dedominici, please come forward

5   and take the second seat in the second row.  Juror No. 21,

6   Edward Stangler, please come and take the first seat in the

7   first row.  Juror No. 22, Mary Eagan, please come and take

8   the second seat in the first row.  Juror No. 23, William

9   Seeley, please come and take the fourth seat in the first

10  row.

11         **THE COURT:**  And now the same question for the folks

12  who have just joined us, starting with Mr. Dedominici.  I

13  mispronounced it, sir, I apologize.

14         **JUROR DEDOMINICI:**  I'm a schoolteacher in

15  Cumberland, Rhode Island, elementary schoolteacher, and my

16  wife is a nurse in Framingham.

17         **THE COURT:**  Thank you.  Mr. Stangler?

18         **JUROR STANGLER:**  I'm an accountant for Graybar

19  Electric Company, and my wife retired last year after 31

20  years with Graybar as a administrative assistant, and she's

21  now home taking care of the children and the house.

22         **THE COURT:**  Thank you.  Ms. Eagan?

23         **JUROR EAGAN:**  I work for a direct mail house and my

24  husband's a Waltham firefighter.

25         **THE COURT:**  Thank you.  Mr. Seeley?

 1          **JUROR SEELEY:**  At present I work at a temporary

 2     agency.  My wife is a positron mission topography

 3     technician.

 4          **THE COURT:**  Okay.  And what do you do for the temp.

 5     agency?  I mean, what's the range of things they send you

 6     out on?

 7          **THE WITNESS:**  Manufacturing, tech. work, some labor

 8     work, maintenance.

 9          **THE COURT:**  Thank you.  All right.  Counsel?

10          (Pause in proceedings.)

11          **THE COURT:**  Counsel?

12     SIDEBAR CONFERENCE, AS FOLLOWS:

13          **THE COURT:**  Mr. Kendall?

14          **MR. DAY:**  Your Honor, we're happy with the jury as

15     it is.

16          **THE COURT:**  Very well.  Content.  Ms. Ben-Ami?

17          **MS. BEN-AMI:**  I just got my number mixed up.

18     Twenty-one, Mr. Stangler.

19          **THE COURT:**  Mr. Stangler, he's excused.  And you're

20     out of peremptories.

21          **MS. BEN-AMI:**  Uhm-hmm.

22          **THE COURT:**  Very well.

23          (Whereupon the sidebar conference concluded.)

24          **THE CLERK:**  Mr. Stangler, you're excused from jury

25     service on this jury.  Please return to the jury lounge on

1    the second floor.

2              Juror No. 25, Nancy Maynard, please come forward

3    and take the first seat in the first row.

4              **THE COURT:**  Now, Ms. Maynard, it seems we're down

5    to you.  Same question to you.

6              **JUROR MAYNARD:**  I'm retired from the telephone --

7    Verizon.  I work temporary at a bar doing --

8              **THE COURT:**  Temporary what?

9              **JUROR MAYNARD:**  I work part-time at a bar, doing

10   takeout orders, answering the phone.  And I also work at a

11   temp. agency occasionally, doing data entry.

12             **THE COURT:**  And when you worked for Verizon, what

13   was your job?

14             **JUROR MAYNARD:**  I was an applications support

15   manager.

16             **THE COURT:**  Thank you.  Counsel?

17   SIDEBAR CONFERENCE, AS FOLLOWS:

18             **MR. DAY:**  We strike, your Honor.

19             **THE COURT:**  You're going to strike her.  Very well,

20   she's excused.

21             Now, I'm going to invite you back, unless you -- on

22   the theory you've got a rush of blood to the brain as to a

23   challenge for cause.

24             **MR. DAY:**  Thank you, your Honor.

25             (Whereupon the sidebar conference concluded.)

1        **THE CLERK:**  Ms. Maynard, you're excused from

2   service on this jury.  Please return to the jury lounge on

3   the second floor.

4        Juror No. 26, David Bush, please come forward and

5   take the first seat in the first row.

6        **THE COURT:**  And Mr. Bush, the same question for

7   you, sir.

8        **JUROR BUSH:**  It's not a simple answer.  I am a tax

9   preparer.  I'm a bookkeeper.  My wife is a night supervisor

10  at a nursing home.

11        **THE COURT:**  Fine.  Counsel?

12  SIDEBAR CONFERENCE, AS FOLLOWS:

13        **THE COURT:**  This is more to treat everyone the

14  same, and hearing no challenges for cause, that's the jury.

15  All right.

16        (Whereupon the sidebar conference concluded.)

17        **THE COURT:**  Now, here's what we're going to do.  We

18  now have the jury.  All you people who are jurors, you

19  should feel free now to go back downstairs to the second

20  floor.  We thank you for your participation in this process.

21  You'll not serve on this particular case.

22        (Whereupon the remaining members of the jury venire

23  left the courtroom.)

24        **THE COURT:**  Now, on this -- and as they go out, the

25  people who are standing in the hall can come in, sit down.

1    And on this jury, I'm going to move some chairs around but

2    you don't have to do it right this instant.  Ms. Anderson,

3    the court appoints you forelady of this jury.  So in a

4    moment I'm going to let you all stretch, you come down, sit

5    here where Mr. Bush is sitting.  Mr. Seeley, would you go to

6    the second floor -- second row where Ms. Anderson's seated.

7    And Mr. Bush, if you would go to where Mr. Seeley is seated,

8    that will work things out fine.

9         Now, before we go on, because what I'm going to do

10   now, I'm going to -- I have some things to say to you and I

11   can start.  I won't finish, but we're going to roll right on

12   to 1:00 so we don't waste any time.  1:00 we'll excuse you.

13        So why don't you all just stand up and stretch.

14   And those movements that I've made in the jury, why don't

15   you move around to those different chairs.

16        Counsel can stand up and stretch, too, because

17   we're going to swear the jury, and I will start.

18            (Pause in proceedings.)

19       **THE COURT:**  It's a public courtroom, now that we

20   have the chairs, we must let the public get in here and get

21   seated.  Because everything we do is public, that's why it's

22   all taken down by the court reporter.

23            (Whereupon the Court and the Clerk conferred.)

24       **THE COURT:**  All right.  Please be seated.  Will the

25   jury please rise.  We're going to swear the jury in.

1           (Jury sworn.)

2           **THE COURT:**  Thank you.  Please be seated.

3           At this time, in this courtroom, there are 13

4    judges.  You 12 men and women are the judges of the facts.

5    You are the only judges of the facts.  That is not my

6    function.  You are going to determine the facts in this case

7    based solely and entirely on the evidence as you see it and

8    hear it right here from the witness stand and on nothing

9    else whatsoever.  No bias.  No prejudice.  No sympathy for

10   anyone.  No desire that anyone be punished or have revenge.

11   Simply the cool, careful sifting of the evidence so that

12   here, in this courtroom, justice truly may be done.

13           You're judges in every sense of the word.  Think of

14   yourselves as judges.  So let's face up to one thing right

15   at the outset.  Amgen's a company, it's incorporated

16   somewhere here in the United States and has its headquarters

17   out there in Thousand Oaks, California.  Roche is

18   incorporated in Switzerland.  That makes absolutely no

19   difference.  None.  They stand at the bar of justice equal.

20   Absolutely equal.  Nothing's going to turn on that.

21   Nothing's going to turn on any basis that has its root in

22   bias or prejudice.  They come voluntarily before the court

23   asking the court fairly and impartially to adjudicate their

24   dispute.  And under the Constitution, that's what they are

25   both equally entitled to.  That responsibility rests not

1    only on me, the judge of the law, but equally and in truth

2    more importantly on you as judges of the facts, the only

3    judges of the facts.

4            Now, as you are judges of the facts, we, the court

5    family, will do everything we can to make the presentation

6    understandable and easy for you to do your vital

7    constitutional function.  Here are some of the things, I

8    want to go over them right now.

9            You're entitled to take notes.  Ms. Smith is

10   passing out notebooks and pens to you right now.  No one

11   will ever look in your notebooks.  They are for you.  When

12   this case is over, you'll have the right to have those

13   notebooks in the jury room.  You'll look at your notes.

14   Remember, your notes aren't evidence of anything, but you

15   can look at them and obviously use them in talking with your

16   fellow jurors.

17           And when this case is done, the notes will all be

18   destroyed by Ms. Smith.  She's the only one who will ever

19   even open the notebooks.  The notebook will be locked up at

20   the end of each day and given to you at the beginning of the

21   following day.  When we take a break in the morning, you can

22   leave your notebooks right there on your chairs.  Nobody

23   goes in the jury box.  That's your space right there.

24           Now, though I let you take notes, nobody says you

25   have to take notes.  It's not some sort of test.  If you're

1    a person who by background, experience, life-informing

2    background, you get your best judgment by watching witnesses

3    very carefully, nobody says you have to take notes.  A juror

4    who takes notes is no better than a juror who does not.  The

5    case is going to go along for a while, I'm going to take

6    breaks during the case, so maybe you want to take notes,

7    keep track of things.  Your notes are just for you.  You

8    have the right to take notes.

9         You have the right to ask questions.  You're the

10   judges of the facts, and if you don't understand something

11   and you think it's important, you have the right to ask a

12   question.  I do have to insist on some formalities, but I

13   make them just as simple as possible.  You have to write

14   your question out, rip it out of your notebook, pass it to

15   the forelady.  Ms. Smith and I are watching, we'll come

16   collect it.  It will be given to me.

17        Now, I'll tell you right now, I might not ask it,

18   and I'll tell you why.  I won't ask it if I can't see, in my

19   own mind, how this witness we're listening to could answer

20   that question of his own or her own knowledge.  Witnesses

21   can only testify to what they know, they themselves know.

22   What they saw, heard, touched, tasted, smelled.  Now, it may

23   be a very interesting question, but I can't see how this

24   witness would know the answer.  So I won't ask it.  Instead,

25   I'll give it to Ms. Smith, she'll put it out on her bench,

1    lawyers can see it, because they've got other evidence,

2    other witnesses, they may address it in another way.

3           Likewise, I won't ask the question if legally I

4    wouldn't let the lawyers ask it.  That's not fair, because

5    legally perhaps it doesn't make any difference.  You may be

6    interested in it, but legally it makes no difference so I

7    won't ask the witness.  Again, I'll give it to Ms. Smith,

8    lawyers get to see it.  They get to see everything that

9    would pass between the jury and the Court.

10          If I do ask it, I'll simply sit here until a time

11   when I think is courteous, and then I'll ask it.  I'll

12   always ask it open-ended, who, what, when.  I may ask some

13   follow-up questions.  I'm still a lawyer, I know how to ask

14   questions.  So I'll ask some questions simply to get at what

15   the witness may have to say.

16          Now, the lawyers, you know, object to the questions

17   that other lawyers ask, and they've got every right to

18   object to a question that I ask, because maybe I haven't

19   thought of something.  Maybe my focus is a little off.  So

20   don't hold it against a lawyer if a lawyer objects.  I'll

21   have to deal with that in the ordinary course.

22          So that's how we'll deal with questions.  You have

23   the right to ask questions about something that's important.

24   Now, these lawyers know what they're doing, they know how to

25   try cases, and they know what evidence they want to place

1    before you.  So I'd hold off until it's something you

2    think's important.  But again, you have every right to ask

3    questions about anything that you think is important.

4         We'll try -- we're going to stick -- I will try as

5    much as I can to stick to absolutely the strictest schedule

6    that I can.  And that means I need you all here before

7    9:00 in the morning.  9:00 in the morning doors need to

8    open, you need to walk in here on the jury box, and we'll

9    sit here for an hour and 45 minutes taking evidence.  Then

10   we will take a half an hour recess.  Ms. Smith's going to

11   take you out to the jury room at 1:00, I think there may be

12   refreshments out --

13        **THE CLERK:**  No, not today.

14        **THE COURT:**  Not today, but on other days we'll have

15   refreshments for you, a cup of coffee, refreshments.  There

16   are magazines and books back there.  Law clerks and I bring

17   them in.  Now, those are for you, they're souvenirs.  If you

18   get into a book or a magazine article, feel free to take it

19   home with you.  My wife will bless you if some of that stuff

20   is cleaned out of there.  But they really are for you.

21        I will try very hard not to waste any time.  So you

22   get a half an hour recess.  11:15 we'll start again.  We'll

23   run to 1:00.  That's three and a half hours of watching the

24   witnesses.  That's plenty of time.  This will be complex

25   material, though it's up to the lawyers to make it

1    understandable for you through their questions and

2    presentations.  That's plenty of time.

3         1:00 on the dot we're stopping.  We're stopping if

4    the witness says only one or two more questions.  We're

5    stopping.  That's my guarantee to you.  You're out of here

6    every day on the dot of 1:00.  But I need you here at 9:00.

7         Now, this time limits that I've put on the trial,

8    I've told you you will get this case no later than the 18th

9    of -- 18th of October.  You will, because in a civil case I

10   can put time limits on them and I've done it.  That's plenty

11   of time to try this case.  They don't get any more time than

12   that.  You know absolutely the last day that this case can

13   be presented to you.  And you also know the days we're going

14   to have off; the 13th, that's Thursday of next week, the

15   whole following week, and then -- let me get it right here.

16   From the 5th of October, that's a Friday, through the

17   Columbus Day weekend and the four days of that week, and

18   then we start again on the 15th.  Now, in there, I believe

19   it's on the 16th, I have a doctor's appointment early in the

20   morning.  So I don't know whether we'll be able to sit on

21   the 16th.  If we do, you'll have it the 17th.  If you don't,

22   we'll have it the 18th.  So that's guaranteed.  You know the

23   days.

24        Other matters, I think it's pretty stuffy in here.

25   And the reason it's stuffy is in order to have the public

1   have access to the courtroom I had those doors open.

2   Usually they should be closed.  And that's fowled up the air

3   conditioning.  If it's stuffy on any other day and you are

4   uncomfortable, please let me know right away.  Some days, of

5   course we'll be getting into the fall, maybe it's too cold

6   in here.  Immediately we will call the building manager,

7   they will at once start twisting dials downstairs.  Nothing

8   at all will happen, but -- and no, the reason for that, for

9   people who know, this is a very big room.  I'll be fine in

10  the afternoon, it just takes time to change the air

11  conditioning.  They do a fine -- it's a modern building,

12  they do a fine job, but sometimes it is stuffy.  So don't

13  hesitate to tell me, we'll do everything we can to take care

14  of it.

15          If you cannot hear -- the acoustics in this

16  courtroom are very good, but if you miss something, raise

17  your hand, I'll have it repeated instantly.  I'll have it

18  repeated.  If you can't see a witness -- I told you that the

19  lawyers practice their profession up close here.  Well, they

20  do.  And sometimes they get in your way.  They'll be asking

21  a witness questions and they'll bore in close on the

22  witness, they've got their back to you, you can't watch the

23  witness.

24          Now, the lawyers aren't the source of evidence

25  here, they don't know, it's the witnesses who are.  So if a

1    lawyer gets in the way of any of you, raise your hand, I'll

2    shoo them off to one side or another, and I should be alert

3    to this.

4           I imagine that they will have exhibits.  They may

5    want to put exhibits in notebooks and give you each a

6    notebook.  I'm not telling them they have to do this,

7    because those are just copies of things you'll have in the

8    jury room anyway.  Fine, but you'll have those notebooks.

9    The notebooks, some cases I've seen, get rather heavy.  You

10   can leave them right here on the chairs and they'll be

11   collected and be on the chairs when you start the next day.

12   I'm not going to lock up their copies of exhibits.  We'll

13   lock up your notes.

14           Now, I have some other things to say, but it's

15   almost 1:00 so let me stop.  We'll start right at

16   9:00 tomorrow.  But I want to stop with some general

17   instructions.  I guess I'll go up here.  I'm the judge of

18   the law, you're the judges of the facts.  So when I'm up

19   here, I'll tell you some law.  And this has to do with your

20   responsibilities.

21           We've heard no evidence yet.  Nothing I've said is

22   evidence of anything.  Nothing the lawyers say is evidence

23   of anything.  I want you to keep your minds suspended

24   throughout this case.  We have to start somewhere in this

25   case, and I'll explain exactly where we're going to start,

```
 1    how we're going to deal with the issues before you.  I'll do

 2    that tomorrow.  But you know the last witness you're going

 3    to hear is as important as the first witness that you hear

 4    tomorrow.  And the first witness is as important as that

 5    last witness.  So you people keep your minds suspended while

 6    the trial's going on.

 7          Second, you'll be excused in just a minute now.

 8    Don't -- and you're free to go.  I need you here before

 9    9:00 tomorrow.  Ms. Smith will tell you the details of

10    getting here and back into the jury room.  But don't talk to

11    anyone about this case.  Now, you say why not, this is going

12    to be a major focus of yours from today through the third

13    week in October.

14          The reason is obvious.  Of course you need to talk

15    to people about your schedule.  Your schedule has now

16    changed.  You're going to have to talk to a lot of people

17    about your schedule.  And the very first question that

18    they're going to ask you, because jury service is a

19    remarkable aspect of American citizenship and not everyone

20    gets in their lifetime to do it, they're going to say,

21    What's the case?  What are you doing?  You must tell them

22    that the judge said you couldn't talk about it.

23          It's not because is secret, that's why I let people

24    watch in the door.  That's why every word is taken down.

25    Everything is public.  But like me, you have a special role.
```

1   You're judges.  Because if you start talking about this

2   case, whoever you're talking to is going to tell you what

3   they think about it.  We're not interested in what they

4   think about it.  They didn't go through this process, they

5   weren't chosen as jurors in this case.

6          Now, when it's over, you have every right to say

7   anything to anyone about the case.  But while it's going on

8   don't talk to anyone about the substance of the case.  Yes,

9   you can talk about the schedule, of course.  I sit 9:00 to

10  1:00, you know exactly the days we're going to sit and the

11  days you don't have to sit.  Unless someone gets sick, I'm

12  not going to change that at all.  So that's fixed.  But not

13  about the substance.

14         Third, don't talk about the case, the substance of

15  the case while it's going on.  Now, that's a little

16  counterintuitive.  Why not?  You're the judges of the case.

17  The reason is simple; keep your minds suspended.  If you

18  start hashing it over among yourselves, inevitably you're

19  going to take a slant on it.  I'm not saying don't talk.  Of

20  course, jury service is communitarian.  None of you asked to

21  be here.  You're all from different walks of life, so get to

22  know each other.

23         The short of it is, don't talk about what's going

24  on in this room.  Not what we look like, not what we say,

25  nothing about the exhibits, nothing.  But anything else you

```
 1    have every right to talk about.  You can talk.  Ms. Smith

 2    once went in to get the jury, they were all sitting around

 3    this big conference table back there, ready to go, utterly

 4    silent.  No, no, no, you can talk.  Just don't talk about

 5    this case.

 6          Last point, and I've added this now to my

 7    instructions, don't start looking us all up on the Internet.

 8    And, in fact, affirmatively don't.  I imagine Amgen has a

 9    Website.  I imagine Roche has a Website.  I imagine maybe

10    these law firms have Websites.  Maybe -- I think you could

11    find my name in there somewhere.  Don't look for it.  You're

12    not interested in any of these, anything that's on the

13    Internet.  You're not -- I doubt that there will be stuff in

14    the papers but if it is, I'm going to tell you keep away

15    from that, anything on the papers or on TV.  Sometimes

16    patent cases get into the business press.  And the reason

17    for all of this is you're only to focus on what -- and

18    that's true of me, too, only to focus on what's evidence in

19    the case.

20          Now, in this session of the court, when -- once

21    we've got a jury, and a jury comes in and out, everyone

22    stands up.  And in a moment, Ms. Smith will have you stand

23    up.  The instructions I just gave you are very important.

24    I'm not going to hash them all over each time we break.  But

25    each and every time we break I'm going to tell you, and it's
```

 1    vital, keep your minds suspended.  Do not discuss the case

 2    either among yourselves nor with anyone else.

 3         The jury may stand in recess until 9:00 a.m.

 4    tomorrow morning.  The jury may recess.

 5              **THE CLERK:**  All rise for the jury.

 6         (Whereupon the jury left the courtroom.)

 7         **THE COURT:**  Please be seated.  Total elapsed time:

 8    Amgen, one hour and 45 minutes; Roche one hour 45 minutes.

 9         We'll recess until 9:00 a.m. tomorrow morning.

10    We'll recess.

11              (Adjournment.)

1        **C E R T I F I C A T E**

2

3            We, Donald E. Womack and Cheryl B. Palanchian,

4    Official Court Reporters for the United States District

5    Court for the District of Massachusetts, do hereby certify

6    that the foregoing pages are a true and accurate

7    transcription of our shorthand notes taken in the

8    aforementioned matter to the best of our skill and ability.

9

10

11

                 /S/ DONALD E. WOMACK
12               _____

13               /S/ CHERYL B. PALANCHIAN
                 _____
14
                     DONALD E. WOMACK
15                  CHERYL B. PALANCHIAN
                   Official Court Reporters
16                      P.O. Box 51062
                 Boston, Massachusetts 02205-1062
17                  womack@megatran.com

18

19

20

21

22

23

24

25