1          UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF MASSACHUSETTS
2
                                        Civil Action
3                                       No. 05-12237-WGY

4   * * * * * * * * * * * * * * * *
                                    *
5   AMGEN, INC.,                    *
                                    *
6           Plaintiff,             *   **DAILY TRANSCRIPT**
                                    *   **OF PRELIMINARY**
7   v.                              *   **JURY INSTRUCTIONS**,
                                    *   **OPENING STATEMENTS**
8   F. HOFFMANN-LA ROCHE LTD,       *   and **THE EVIDENCE**
    ROCHE DIAGNOSTICS GmbH and       *       (Volume 2)
9   HOFFMANN-LA ROCHE, INC.,        *
                                    *
10          Defendants.             *
                                    *
11  * * * * * * * * * * * * * * * *

12

13

14          BEFORE:  The Honorable William G. Young,
                    District Judge, and a Jury
15

16

17

18

19

20

21

22

23
                            1 Courthouse Way
24                          Boston, Massachusetts

25                          September 5, 2007

1               A P P E A R A N C E S

2

3          DUANE MORRIS LLP (By D. Dennis Allegretti,
      Esq. and Michael R. Gottfried, Esq.), 470 Atlantic
      Avenue, Suite 500, Boston, Massachusetts 02210

4               - and -
           DAY CASEBEER MADRID & BATCHELDER, LLP (By

5      Lloyd R. Day, Jr., Esq., David M. Madrid, Esq. and
      Robert M. Galvin, Esq.) 20300 Stevens Creek

6      Boulevard, Suite 400, Cupertino, California 95014
                - and -

7          McDERMOTT WILL & EMERY (By Michael Kendall,
      Esq.), 28 State Street, Boston, Massachusetts

8      02109
                - and -

9          McDERMOTT WILL & EMERY (By William G.
      Gaede, III, Esq.), 3150 Porter Drive, Palo Alto,

10     California 94304
                - and -

11         MARSHALL, GERSTEIN & BORUN LLP (By Kevin M.
      Flowers, Esq.), 6300 Sears Tower, 233 S. Wacker

12     Drive, Chicago, Illinois 60606-6402
                - and -

13         STUART L. WATT and WENDY A. WHITEFORD, Of
      Counsel, Amgen, Inc., One Amgen Center Drive,

14     Thousand Oaks, California 91320-1789, on behalf of
      the Plaintiff

15

16         BROMBERG & SUNSTEIN LLP (By Lee Carl
      Bromberg, Esq. and Julia Huston, Esq.), 125 Summer
      Street, Boston, Massachusetts 02110

17              - and -
           KAYE SCHOLER LLP (By Leora Ben-Ami, Thomas

18     F. Fleming, Esq., Patricia Carson, Esq.,
      Christopher Jagoe, Esq. and Howard Suh, Esq.),

19     425 Park Avenue, New York, New York 10022, on
      behalf of the Defendants

20

21

22

23

24

25

1                           **I N D E X**

2

3    Preliminary Jury Instructions . . . . . . . . . . 100

4    Opening Statement by Ms. Ben-Ami  . . . . . . . . 119

5    Opening Statement by Mr. Day  . . . . . . . . . . 127

6

7    **WITNESS:**            **DIRECT   CROSS    REDIRECT   RECROSS**

8

9    JOHN LOWE

10     By Ms. Ben-Ami    141

11                                          **FOR        IN**
12     **EXHIBITS:**                        **I.D.      EVID.**

13

14       2010 Article, "Protein Sequence Analysis: . 210

15            Automated Microsequencing"

16

17

18

19

20

21

22

23

24

25

1            THE CLERK:  All rise for the jury.

2            (Whereupon the jury entered the courtroom.)

3            THE CLERK:  Court is in session, please be seated.

4         THE COURT:  Well, good morning, ladies and

5    gentlemen.

6            THE JURY:  Good morning.

7         THE COURT:  Thank you all so very much for your

8    efforts to be here on time.  It's terribly important.  And

9    it's obvious, we can't start with ten people and then as two

10   more come in we say, well, let us tell you what's been going

11   on.  And that gets me to a very important point of law that

12   is in my explanation to you as jurors.

13            Your verdict on the questions we're going to ask

14   you at the end of this trial must be unanimous, all twelve

15   of you agreeing.  We're going to ask you yes or no

16   questions.  So all twelve of you would have to agree yes or

17   all twelve would have to agree no.  It cannot be a majority.

18   It can't be an eleven-one majority.  It has to be unanimous.

19   And, therefore, all of you have to see and hear exactly the

20   same things.  So we can't start unless we have you all, and

21   thank you all for your efforts to be here on time.  That's

22   the keynote of a case.  That's what makes them all be

23   doggone sure they'll be ready at 9:00 a.m. ready to go.

24            While I'm explaining some general things, I was

25   done at one o'clock yesterday except for the unanimous

1    verdict business in talking to you about what your function

2    is.  I need to take just a few minutes to explain my

3    function and to explain the lawyers' function, and then I'm

4    going to talk to you about this case, the law in this case,

5    and how we're going to try it.

6            First, my function.  I am the judge of the law.

7    I'm the law teacher here.  You must follow the law the way I

8    explain it to you.  You do not make up your own law.  You

9    can't add to what I say, nor can you subtract from it.  And

10   the reason is obvious.  Patent law is made by the congress,

11   our elected representatives.  I teach it to you so that this

12   patent case is tried the same way as a patent case in the

13   Northern District of California, the Southern District of

14   Alabama, the District of Idaho.  All cases are tried the

15   same way because the law is the same throughout the land.

16   What's different, of course, is what the evidence may be in

17   any particular case.  That's for you.  That's the facts.

18   The facts are for you, not for me.  But the teaching of the

19   law is for me.  And this division between what's my job,

20   because I'm going to sit here very carefully and watch the

21   evidence just the way you are, what's my job and what's your

22   job, I have to keep clear in this case, and I'll explain it

23   to you so that you're clear on what is your job and also

24   what's not your job.

25           Now, what's not your job is the law.  I'll teach

1    the law.  If you have any questions about it ask me.  Same

2    procedure.  Just write it out and say, I didn't understand

3    when you said, I just didn't understand what you were

4    talking about.  My job is to explain it.

5         Now, I'm also the law teacher throughout the trial.

6    And you know enough about trials to know what judges do in a

7    trial.  The lawyers put witnesses -- and that's where we get

8    our evidence, evidence, witnesses and exhibits.  So a

9    witness gets on the stand, the lawyers are asking questions,

10   and a lawyer, another lawyer will object to a question

11   that's being asked.  Question, answer, question, answer,

12   question, objection.  It's perfectly fine for the lawyers to

13   object.  They're not doing anything wrong by objecting.

14   That's part of their job.

15        Now, I will try to be quick.  First I'll try to be

16   accurate, but second, I'll try to be quick.  So I should

17   say, right away, sustained, which means you can't ask that

18   question; or overruled, which means no, we'll see what the

19   witness has to say and the trial will go on.

20        Because these matters are complex and because these

21   are very good attorneys, they may see an argument, they may

22   see an approach to the evidence that I've missed, I

23   understand that, and they then will say something like this:

24   May I approach the bench?  May I approach the side -- may I

25   go to the side bar?

1      Now, it's up to me, and I won't always do it, but

2   most of the time I will because I want to hear them.  And

3   we'll go over here, and you've seen us as you were being

4   picked, we'll go over here and huddle in a little huddle

5   here and we'll whisper.

6      Now, if we do that it's like a timeout -- they

7   could talk back and forth in front of you.  But I like to

8   have a sharp difference between the facts, which are for

9   you, and the rules of evidence which are for me, and I'll

10  tell you candidly we're talking about things like does the

11  17th or the 21st exception to the rule of hearsay apply to

12  this or that question.  You're not interested in that.  I

13  mean, literally you're not interested in it.  And in all

14  honesty, you've got a timeout there.  And I want you to --

15  that's a good time for a stretch break.  Stand right up.

16  Walk around in there.  These are the largest jury boxes of

17  any courtroom in the nation.  Walk around.  But don't talk,

18  because the acoustics are so good that it will distract me

19  as I'm whispering with them over at the side bar.

20      Now, I'll try to be quick over there.  If we get

21  into something that's really technical, in terms of

22  evidence, I'll say to the lawyers, well, just go on, ask

23  them some other question.  And that's one of the work,

24  because we do work full days, that legal talkie-talk I can

25  do in the afternoon with them.  So we won't waste your time;

1    things should just move along relatively smoothly.  That's

2    what I want.

3           I once had a lawyer tell me that he always smiled

4    at the end of a bench conference -- that's what we call

5    these whisper sessions -- hoping that the jury would think

6    that he was winning the case.  Wrong.  The case is not won

7    or lost over there.  You're going to decide the essential

8    facts in this case which will determine the respective

9    rights of the parties.

10          Now a word about the attorneys.  I've already said

11   they're good.  I know it.  They're good.  They are fine

12   attorneys.  They are officers of the Court.  They have the

13   hardest job in the courtroom.  They are teachers.  Think of

14   them as teachers.  That's what in essence a trial lawyer is.

15   They teach their client's view of reality.

16          Now, their clients may have different views of

17   reality, and that's why they've come to court to have you

18   people resolve it.  But their whole goal is to make things

19   understandable to you.  And they are very skilled at it.

20   And I will give them, within the rules of evidence, I will

21   give them free reign.

22          This caution, and I mean them no disrespect.  They

23   are not the sources of evidence here.  It's the witnesses

24   who testify under oath that are the sources of evidence, not

25   the questions of the lawyers, the arguments of the lawyers,

1    those aren't evidence of anything.  These lawyers weren't

2    there when the, if there were inventions, when the

3    inventions were made.  They weren't there when the patent

4    applications were filed and prosecuted with the Patent

5    Office.  They, themselves, are not scientists, though

6    they're very facile with the, with the scientific data we

7    have here.

8         I just want to emphasize to you they're not the

9    sources of evidence.  So a simple example.  It has nothing

10   to do with the case.  If a lawyer says, and sometimes it's

11   proper to ask what we call a leading question, you look at

12   the witness and say:  Now, you were wearing a red hat on

13   that day, weren't you?  Now, that question, you see,

14   suggests the answer.  But the witness says no.  Now, of

15   course, it's up to you whether you believe the witness or

16   not.  That's really for you.  But even if you don't believe

17   the witness that's no affirmative evidence that he was

18   wearing a red hat.  There's got to be evidence here from

19   witnesses, not what the questions may suggest.

20        So those are our respective roles here.  Now let's

21   get into this case.  What is this case specifically about

22   and how are we going to try it.

23        The lawyers and I have organized it to try it in a

24   way that we think is the most understandable for you.  So

25   first, I'm going to give you an overview; then I'm going to

1    tell you why we have broken it down into the three pieces we

2    have; and then, I'm going to give you some specific

3    instructions as to the first piece.  And the second and

4    third, I'll give you instructions as to the second piece and

5    the last third, I'll give you instructions as to that.  But

6    here's the overview.

7        Amgen owns certain patents.  They have received

8    patents from the United States Patent Office because Amgen

9    employees have invented certain things and the Patent Office

10   has given them, has awarded them, given them patents.  No

11   dispute about that.  We're going to look at those patents.

12   We're going to learn things about those patents.

13       Now, a patent -- as a matter of fact, have you got

14   one there?  An original patent?  Let me just come down.

15   Good, there's one.

16       Here's a patent, what it looks like.  The fact it's

17   got seals and ribbons on it makes no difference.  But here's

18   a patent.

19       Now, what the patent law, the way the patent law

20   works is like this.  It's a tradeoff.  And in fact patents

21   are mentioned in the United States Constitution.  The

22   congress specifically called upon in Article I to make laws,

23   to have patents for the good of the Republic.  And the idea

24   of a patent is this.  If you make a genuine invention and

25   you get a patent, if you will teach us, us, genuinely, the

1    world, how to do that invention, how to perform that

2    invention, then for a period of years as declared by

3    congress, you, you, the patent owner, has the exclusive

4    right to practice the invention.  That's the reward for

5    making the invention.  That's the reward for investing time,

6    money, resources, to invent something.  But then you're the

7    only one who has the legal right to practice that invention.

8    But you've got to teach the rest of us how to do it.

9    Because at the end of the patent period we all can do it.

10   And so, science, technology, advances with these useful

11   advances, you have to teach it, teach people how to do it,

12   and then if you have a patent then you have the exclusive

13   right to practice that patent.

14            Now, all patents have what are known as

15   specifications, they may have illustrations, and this is

16   part of the teaching of the patent.  All public.  It's all

17   public.  It's not like a trade secret.  For instance, there

18   are things that give you commercial advantage.  The formula

19   for Coca-Cola I understand is secret and only six people in

20   the world know it.  But you know if someone found out about

21   it fairly, they could make Coca-Cola.  They couldn't call it

22   Coca-Cola, but they could make that.  It's not patented.

23   It's not protected.

24            That's not how a patent works.  Patents by their

25   very nature are public.  And they teach us how to do the

1    invention.  I'm a little too glib when they teach, they

2    teach us.  Because I couldn't do it, and even after having

3    read the patent, and I've looked at the patents in this

4    case, I couldn't do it.  And that's not the standard.

5          Here is the standard.  They have to teach a person

6    skilled in the art.  So we're going to no doubt hear

7    evidence of who constitutes a person skilled in the art.

8    This is recombinant DNA science.  It deals with the genes

9    and the DNA structure of people and deals with proteins and

10   chemistry.  So the patent has got to teach someone of

11   ordinary skill in the art how to practice the invention.

12         At the very end of the patent come the claims.  I

13   don't even know which patent I've been given, but they all

14   follow the same format.  Because at the end -- maybe it's on

15   the last page, next to the last page, but close to the end

16   there will be this sentence.  What is claimed is, and then,

17   in this particular patent there follow 30 different claims.

18         Now, it's the claims that define the reach of the

19   patent.  They don't teach you how to do it, but they define

20   the reach of the patent.  And having defined it, it's what's

21   within the claims that other people cannot practice, without

22   at least getting a license from Amgen or some sort of deal

23   with Amgen.  We want people to practice the invention.

24   Amgen does it, or they license other people to do it.  We

25   want the benefits, if benefits there are, of the invention.

1    But legally, Amgen has the right, once they've got a patent,

2    to practice these 30 claims.

3           So the focus in this case, actually in the second

4    part of this case, the so-called infringement part of this

5    case, is going to be on the claims.  The claims define what

6    is excluded.  So, I guess there's some others.  But that's a

7    patent.  They all look like that.  And Amgen has them.  No

8    one's going to dispute that.  Amgen has them.  They're

9    issued by the United States Patent Office.

10          So Amgen has these patents and Roche wants to enter

11   the United States market.  Now, to do that you don't have to

12   come to court, but there's various administrative agencies

13   and the like, and Roche has a product of their own.  And

14   you'll hear about it, it's not for me to say, but Roche

15   wants to market a pharmaceutical device, or not device, a

16   pharmaceutical composition in the American market.

17          Let me pause here.  We're talking about United

18   States patents.  We're talking about the law within the

19   United States.  It varies in different countries, it varies

20   in Europe and the like.  We're not interested in that.

21   We're interested in the United States.

22          So, Roche with its product, whatever that is, wants

23   to come into the United States.  And just as they are

24   supposed to do under the law, they make application to the

25   regulatory agencies, the government agencies.  We're not

 1   interested in courts here now.  And they say we've got this

 2   product, it does various good things, let us market it in

 3   the United States.  Now, there's nothing secret about that.

 4   They're up front about that.  And Amgen says, and says

 5   legally in its legal papers here, now, here's where the

 6   lawsuit starts, Amgen says that product infringes certain of

 7   the claims in our patents.  In other words, that product has

 8   each of the elements of a specific claim or claim in our

 9   various patents.  And it infringes them.  And therefore they

10   can't do it.  Stop them from doing it.  Amgen comes to this

11   Court making that request.

12         Now, Roche answers that.  Roche says we don't

13   infringe.  That's wrong.  We don't do it.  And that is one

14   set of factual disputes in this case.  Does the Roche

15   composition, process, infringe any particular claim or

16   claims of the patents that everyone admits Amgen has.  Amgen

17   says yes.  Roche says no.

18         But Roche didn't stop there.  Roche says, and you

19   know what's more, some or all of the claims you're suing on,

20   Amgen, those claims are invalid.  They're not valid claims.

21   The patent was wrongfully issued.  And so, those claims are

22   no good and we don't care whether we infringe or not,

23   because the patent, patents as to these claims, anyway, are

24   invalid.

25         And then Amgen says in response you're wrong to

1    that.  These are perfectly valid patents.  Actually,

2    Roche -- Amgen has sued on certain claims on various of its

3    patents and Roche comes back and adds two more claims that

4    Amgen didn't sue on and says, hey, and these are invalid,

5    too.  And Amgen says, well, but they're not even in this

6    case.  We didn't sue on.  Ah, yes, says Roche, but they say

7    you're asserting that in the administrative proceedings,

8    which we're not concerned with, so we want this Court to

9    decide it.  And I've decided, all right, we'll decide it.

10   Now, who will decide it.  You'll decide it.

11          And then Roche says something else.  Roche says,

12   and what's more, Amgen behaved in an inequitable, and that

13   means unfair, unfair manner before the United States Patent

14   Office.  And then even if they're valid patents and even if

15   we infringe them, they can't enforce those patents against

16   us because of their misbehavior.  And Amgen says we

17   certainly did not.  We deny that.

18          Now, those are the major three elements of the

19   case.  Amgen's saying that Roche infringes, Roche saying

20   that on the claims you say we infringe those claims are

21   invalid, and Roche saying that you misbehaved before the

22   Patent Office.

23          So, I've got a case that has three different major

24   groups of issues, and after talking to the lawyers I've

25   decided to try it this way.  Even though Amgen started the

 1  case, sued Roche, we're going to start with Roche's claim

 2  that the patents are invalid.  And we're not going to send

 3  you out to give us a final verdict on that.  We're just

 4  going to try that piece of the case, and when we're done

 5  with that piece, we're going to go on to the next piece,

 6  which is Amgen's claim that if the patents are valid, and

 7  they start out valid, because it's presumed they're valid,

 8  they came from the Patent Office, and if they are, but

 9  you'll get to decide, if they are, Amgen's going to say

10  Roche infringed.  That will be the second part of the case.

11  Did Roche infringe.  Who has to prove that?  Amgen has to

12  prove it.  The first part of the case Roche has to prove,

13  that the patents are invalid.  And we'll leave that out

14  there and we'll do the second part of the case.

15          Now, I could also do this so-called inequitable

16  conduct piece in the first part, but because that's going to

17  be shorter, and because that doesn't involve the technical

18  science, it involves who said what to the Patent Office and

19  what was disclosed and things like that, I'm saving that to

20  the end.  And so what we have here, and I'll try to make it

21  clear, but I'm emphasizing it now, we're going to start out

22  today with Roche making a claim that the patents are

23  invalid.  And then when we're done with that, we're going to

24  deal with the claim that Amgen says that Roche infringed the

25  patents.  And then we'll go back to Roche and Roche is going

1    to say Amgen misbehaved.  And when we're done with all three

2    pieces, we'll send you out to give us a verdict on three.

3         Now, if you're following me you see that depending

4    on how you, you decide on one piece, maybe you wouldn't have

5    to decide the other two.  Because if the patents are invalid

6    who cares whether they infringed.  If the patents are valid,

7    we do, of course, care whether they infringe.  But if they

8    don't infringe, we're not so terribly concerned about the

9    validity.  If the patents are valid, and Roche did infringe,

10   the last thing they have, the last defense they have is,

11   well, Amgen misbehaved and therefore they can't enforce that

12   patent against us.

13        But I think that's the most understandable way to

14   try the case.  But first we're going to hear about the

15   science generally that bears on whether the patents are

16   valid, then we're going to hear about what Roche does, that

17   bears on whether they infringe, and finally, we'll go back

18   and hear about what was told to or said to the Patent

19   Office.

20        Now, everything else I'm going to say now deals

21   just with the first part.  That's the part we're going to

22   start on today.  That's the part I'm going to turn to the

23   lawyers and let them make opening statements on.  You will

24   understand that downstream we're going to get to

25   infringement and then this alleged impropriety before the

1  Patent Office.  I need your answers on three parts, because

2  these are complex cases and we don't want to retry this case

3  before another jury.  If I get something wrong here and some

4  higher court says this is a do-over, I want to get the

5  answers to everything, so when the dust settles these

6  parties know what their rights are and all the facts at

7  issue will be decided by a jury.  Higher courts can turn

8  over what I do.  I'm just one law teacher.  But you're the

9  jury.  You decide the facts and they're decided.

10          So, let's get to this invalidity defense.  There

11  are the patents, I guess.  No doubt Amgen has them.  They

12  are presumed to be valid.  Because the United States Patent

13  Office has issued those patents to Amgen.  But that's not

14  the last word.  A party has the right when there's a case or

15  controversy to come into court to get claims of a patent

16  declared invalid and have a jury of the people decide.

17  That's Roche's right to have you decide the matter.

18          However, because Amgen has these patents, which are

19  presumed to be valid, Roche bears the burden of proving

20  their invalidity by clear and convincing evidence.  That's

21  the standard Roche has to meet, clear and convincing

22  evidence.

23          Now, those words mean exactly what they say.  Roche

24  has to make things clear to you.  If it's not clear to you

25  then you cannot declare the patent invalid.  And having made

1    things clear, Roche has got to present convincing evidence,

2    convincing evidence that the patent is invalid on one of

3    three different grounds.  We're going to go over those

4    grounds.  They've got three different grounds.

5         All right.  The burden of proof that Roche bears in

6    the face of an issued patent is to prove invalidity by clear

7    and convincing evidence.

8         Now, while I'm up, just talking about this burden

9    of proof, that's not the standard that Amgen has to prove on

10   infringement.  Their standard is easier.  What we call a

11   fair preponderance of the evidence, more likely to be true

12   than not true.  So when we get to Amgen's piece, Amgen

13   simply has to show it's more likely than not that Roche,

14   whatever Roche does, infringes one or more of the claims of

15   the Amgen patent.  But we're focusing on the first piece

16   here, and the first piece, Roche has to prove it by clear

17   and convincing evidence.

18        What do they have to prove?  Well, Roche says these

19   patents, or the -- it's not the patent as a whole now,

20   they're specific claims.  Always claims.  The specific

21   claims at issue were anticipated.  That's one thing they

22   say.  And then they say, well, even if they weren't really

23   anticipated, obvious, it was obvious.  And then as to one

24   claim they say the written description was inadequate.  So

25   those are the three types of defenses.  Let me go over each

1    one specifically.

2            First, Roche says as to some or all of the claims

3    that Amgen's suing on they were anticipated by scientific

4    discoveries already out there.  Now, to prove anticipation,

5    by clear and convincing evidence, Roche is going to have to

6    come up with some document, writing, paper, or set of

7    documents which discloses, which teaches each element, each

8    element of a specific claim.

9            Now, if it was already out there in the scientific

10   literature then you can't get a patent on it because it's

11   not you who invented it.  Maybe they didn't even realize

12   what they had.  But it was taught in this specific paper,

13   article, set of documents which was known.  If it was

14   secret, it won't work if someone was off in a garage

15   somewhere and had a secret, it wasn't out there, people

16   didn't know about it.  But if it was actually anticipated,

17   if it was in, and people will talk about the prior art.

18   What do they mean?  They mean what was out there.  That's

19   what we're going to hear, what was out there.

20           Now, it has to be taught, again not to you and me,

21   it has to be taught to one of ordinary skill in the art.

22   Someone who could read the document and understand it and

23   then practice the invention, practice the claim.  That's

24   anticipation.  That's one of the things that Roche says.

25           Amgen denies it.  And then Roche says something

1     else.  They say, well, even if there was no specific

2     document that anticipates, the patent here would be obvious

3     to a person who knew the prior art.  And again the word

4     means what it says.  It would have to be -- the prior art

5     would have to teach enough to a person of ordinary skill in

6     that art that that person could, before the patent was

7     applied for, before the patent application was in the Patent

8     Office and public, that without undue experimentation --

9     undue experimentation is just excessive experimentation --

10    that a person of ordinary skill in the art, knowing that

11    prior art, it would have been obvious to make this

12    invention.  Now, if Roche convinces you of that by clear and

13    convincing evidence the patent's invalid because we don't

14    give patents on stuff that's obvious.  It has to be an

15    actual advance.

16          Then as to one of the claims it's a different type

17    of defense and it doesn't go to all of Amgen's claims, but

18    Roche says, they say as to one of the claims, they say the

19    written description in the patent is inadequate.

20          Now, why is that a defense?  Because you see the

21    tradeoff is you have to teach us how to do the invention.

22    And Roche says even though they have a patent, and even

23    though they said they taught it, no, no, you can't do it, it

24    won't work, based upon what you taught, the written

25    description is inadequate.  It won't do it.  It won't do the

```
 1    job.  And, you know, if you haven't made the full, accurate
 2    disclosure you are supposed to make, if the written
 3    description is in fact inadequate, and Roche proves it by
 4    clear and convincing evidence, then that claim is simply
 5    invalid.  Because the inventor hasn't shared everything with
 6    people who have to, with people of skill in the art who we
 7    expect will be practicing the invention.
 8            Now, those are the defenses on the validity.  We'll
 9    do validity.  They'll be done with validity.  We'll hear
10    first from Roche and its witnesses, then we'll hear from
11    Amgen and its witnesses.  Some people will appear twice in
12    the trial.  And when they both tell me they're done on that,
13    I will say, okay, keep your minds suspended on that, now
14    we're going to talk about infringement.  And then I'll tell
15    you a little more about what they have to prove on
16    infringement in a little more detail, and we'll go right
17    into infringement with Amgen going first and then Roche, and
18    then we'll do the third piece.
19            Now, I think we're ready.  And what's the next part
20    in the trial?  I'm done with my talking, my teaching.  Now
21    it's time to turn to the lawyers.  Now, the lawyers get a
22    chance to make what are known as opening statements on this
23    first piece.  They're going to limit themselves to the first
24    piece, validity.
25            Understand that what the lawyers say now is not
```

1    evidence.  It's like a road map or a guidebook of the

2    evidence you are going to be hearing over the next days on

3    this issue of validity.  Because Roche bears the burden of

4    proof here by clear and convincing evidence, Roche gets to

5    go first.  And I'll also ask Amgen if they want to make an

6    opening.

7            They each get 15 minutes.  It's like a road map or

8    a guidebook of what you're going to hear.  As soon as

9    they're done, the first witness takes the stand and we start

10   hearing evidence.  What the lawyers say now is not evidence.

11   Roche gets to go first because they bear the burden of

12   proof.

13           Ms. Ben-Ami.

14           **MS. BEN-AMI:**  Thank you, your Honor.

15           **MR. FLEMING:**  May I, your Honor?

16           **THE COURT:**  Of course.

17           **MR. FLEMING:**  Thank you.

18           **MS. BEN-AMI:**  And if I can turn.  May I proceed,

19   your Honor?

20           **THE COURT:**  You may, of course.

21           **MS. BEN-AMI:**  May it please the Court, good

22   morning, ladies and gentlemen.

23           **THE JURY:**  Good morning.

24           **MS. BEN-AMI:**  The evidence will show in this case

25   that Amgen's claims in these patents are invalid because

1     they are a right to exclude the public from technology which

2     the public should own.  The evidence will show that Amgen's

3     patent claims asserted here take away from the public,

4     exclude from the public, information technology which the

5     public should own.  It should be free for all of us.  And

6     for that reason these claims will be shown by clear and

7     convincing evidence to be invalid.

8          My name is Leora Ben-Ami, I represent Roche, and I

9     would like to introduce you very briefly to my colleagues.

10    They're sitting at the table, Mr. Fleming, Mr. Bromberg,

11    Mr. Jagoe, Ms. Carson, and our corporate representative,

12    George Johnston, he's the chief patent counsel from Roche in

13    New Jersey.  Roche has been in the United States for well

14    over a hundred years.  He's from New Jersey.  He'll be here

15    every day except for a couple of days when his daughter has

16    to get married.  So, other than that, he will be here.

17         Now, the judge has explained to you your role here

18    and I wholeheartedly agree and accept it.  You are going to

19    be asked to do some very hard work over quite a long period

20    of time.  And I know yesterday you swore that you were going

21    to do your best job.  And we will do our best job to try to

22    explain things to you and to try to give you the facts so

23    that they are clear.

24         To get the information you need to get behind the

25    testimonials, behind the conclusory statements, and act like

1   detectives, understanding, going through the details of the

2   evidence.  For example, the evidence will show that Amgen's

3   product that they will talk to you about is not described in

4   the patents.  You recall the Court just said there's that

5   written description issue.  The evidence will show that the

6   protein, the amino acid sequence in this file, is not

7   disclosed in the patent.

8          Now, your job here I think you already know is

9   extremely important, because this case is about a medicine.

10  Roche's, as the Court has told you, Roche's desire to sell a

11  new medicine.  And I bring that up to you only to tell you

12  that I can't talk about our medicine now.  That's the second

13  phase as the judge just told you.  But it tells you that

14  your job is really important, and I thank you for giving it

15  the attention that I'm sure you're going to give it.

16  Because a patent, these patents as the Court has just told

17  you, are a right to exclude, and in this case a right to

18  exclude a new medicine.  It's a very powerful right and it's

19  a very powerful weapon.  And if it was incorrectly given to

20  Amgen, you collectively, your collective judgment, if that

21  was wrong, it is up to you to invalidate the claims based on

22  the evidence, the facts, and the law the judge will explain

23  to you.

24          So at this point I will simply go through what the

25  guideposts are for you.  And there are three guideposts in

```
 1    the case.  The patents here expired -- I mean, I'm sorry,

 2    were filed in 1984.  And the information prior to that is

 3    the prior art, the state of the art, you're going to hear

 4    about that.  That goes to anticipation and obviousness.

 5    Based on what was in the past should they own these patents.

 6    Then what's described in the patents.  That's the written

 7    description that the Court just talked to you about.  Then

 8    what are the actual claims that they got.  That's what

 9    you're going to have to look at to decide whether they're

10    valid or not.  And I will go through very quickly what the

11    evidence will show.

12            This case is about biotechnology as the Court told

13    you.  And the evidence will show that prior to 1983 the

14    biotech revolution had already occurred.  Medicine,

15    medicine, medicine, medicine, medicine, medicine, medicine

16    had already been made.  The techniques were all available.

17    And in fact there was a manual in 1982 published by

18    professors from Harvard that was a recipe book on how to do

19    all the techniques you needed.  We will show you that book

20    during this case.

21            So, this biotechnology revolution of how to make

22    medicines, using cells as a factory, was already known by

23    those skilled in the art, the evidence will show.  None of

24    that work was done first by Amgen.  They used the

25    information available to the public.  The evidence will show
```

1   there was one piece that was necessary to deal with this

2   medicine.  And what is this medicine?  What Amgen has

3   claimed, I'm not talking about what Roche does, Amgen's

4   claims as they describe it is to a medicine called EPO,

5   which is a drug that your body makes naturally, something

6   that's in all of us.  And they claim, they claim the right

7   to exclude ways of making EPO, medicines including EPO, and

8   they did that using this recombinant technology that was

9   available to the public.  To do that they needed one thing.

10  They needed the EPO itself so that they could uncode the EPO

11  and figure out how to make it.  If you have the protein, the

12  EPO protein, you can cut it up, you can figure out the

13  computer code, if you will, the blueprint to make it, and

14  then you can make it using recombinant DNA technology.

15       The protein, the EPO protein was the key.  And the

16  evidence will show that that EPO protein was not isolated by

17  Amgen, it was not purified by Amgen, it was not created by

18  Amgen.  It was created by Dr. Goldwasser, who was working at

19  the University of Chicago.  He was funded by the United

20  States government, and he isolated and purified human EPO.

21  The evidence will show that scientists were aware that he

22  had done this and everyone who was trying to make or use

23  recombinant DNA technology to make more EPO, said, Dr.

24  Goldwasser, can you share.  And the evidence will show that

25  instead of sharing it with the public, all the companies,

1    Dr. Goldwasser decided that he would give it only to Amgen.

2    This protein, purified protein, that was paid for by

3    government agencies to develop.

4         The evidence will show that the other companies who

5    were trying to do the same thing as Amgen all understood

6    that if you had the protein you would be able to use the

7    already known technology for recombinant DNA, use it into

8    pieces, everything is known, you give me the government

9    paid-for protein, I can make the recombinant EPO.

10   Dr. Goldwasser chose only to give it to Amgen, this

11   government funded protein.  And for that reason that

12   protein, that fragment of that protein, the sequence of that

13   protein, is called derivation prior art.  Amgen was able to

14   do this work because they had the advantage of the

15   government funded protein which no one else had.  And the

16   evidence will show that those skilled in the art, if they

17   were given the protein, too, they could have done it, too.

18   So if the public all had the protein, the public would own

19   it all.

20        So item 1, please.

21        Goldwasser's purified EPO was the key.  And the

22   evidence will show -- could I have Table 1, please.  Thank

23   you.

24        The evidence will show -- I'm going to jump over

25   here.  Can everyone see the screen?  No.  Bad.  So sorry.

1    That's fine.  I'm fine.  Thank you.

2          The evidence will show right here -- excuse me --

3    in Table 1, Example 1, Table 1 it says human EPO is isolated

4    from urine and subjected to tryptic digestion.  That work

5    was not Amgen's work, ladies and gentlemen.  That was

6    Dr. Goldwasser's work.  And this is the reason that Amgen

7    was able to obtain its recombinant EPO.  The evidence will

8    show that everyone else -- I don't want to use this laser

9    because I could knock Ms. Smith's eye out if she comes

10   around.  But that is our first point.

11         Now, can I have No. 1, please.

12         The second part -- is this easier for people to

13   see, or is this?  It's okay.  All right, let's go here.

14         The evidence will show that while Dr. Lin --

15         **THE COURT:**  Five more minutes, Ms. Ben-Ami.

16         **MS. BEN-AMI:**  Yes.  -- filed his application in

17   1984.  He had an application that issued in 1988.  The

18   evidence will show that this patent ended and these patents

19   cover the same thing.  And for that reason one cannot

20   practice this information even though one should be able to.

21   That is called obviousness/double patenting.

22         Now, the third issue -- No. 10, please.  Amgen is

23   going to tell you that its product is different than natural

24   EPO.  Because you shouldn't be able to claim what's in the

25   prior art or what's natural, what's in your body.  You own

1    that.  The evidence will show, however, that previously they

2    admitted that all the structures that are in recombinant EPO

3    are also found in urinary EPO, the EPO that's in your body.

4    So they have now claimed that as theirs, they have claimed

5    EPO that is your natural EPO, and they cannot own what comes

6    out of your body.

7          Next, No. 11.  Moreover, the evidence will show

8    that prior to Amgen using EPO to effect patients,

9    Dr. Goldwasser and his colleague used this urinary EPO which

10   is the same as the recombinant and treated patients.  Since

11   they did it first, Amgen should not be able to claim this

12   work.  That's the anticipation.  If someone else did it

13   first you can't claim it.

14         And finally, No. 12, the evidence will show, as I

15   said, that what Amgen did was describe a protein that is 166

16   amino acids.  And we'll get into that.  They told the FDA it

17   was 166.  And during their patent application process they

18   realized they were wrong.  Years later they realized they

19   were wrong.  They felt the need to tell the FDA.  Because if

20   you're about to give people a medicine you have to describe

21   it correctly.  But they did not change their description in

22   their patent.  So the patent describes not what is in this

23   vial, which is 165, but 166, a different product.  Yet they

24   have claimed coverage of 165, the thing they did not

25   disclose.  The evidence will show that they disclosed

1    something that's 165 in their patent, but is it human EPO?

2    No.  It's monkey EPO.  So they tell the world that monkey

3    EPO is 165, but if you want to make human EPO, it's 166.

4    The evidence will show, therefore, that someone who goes

5    ahead and follows the patent, if they get 165 will think

6    they've done the wrong thing.  Therefore, there's no

7    adequate written description of the actual product that

8    Amgen says they invented.

9               Thank you, your Honor.

10              **THE COURT:**  Mr. Day, do you wish to open now?

11              **MR. DAY:**  Yes, sir.

12              **THE COURT:**  And you may.

13              **MR. DAY:**  May I just set up here for a second, your

14   Honor.

15              **THE CLERK:**  Do you need the lights up?

16              **MR. DAY:**  No, I don't think so.

17              **THE CLERK:**  Okay.

18              **MR. DAY:**  I would like to begin by asking you to

19   step back in time to the early 1980's before the inventions

20   in this case were made.  Shortly before the inventions were

21   made.  As Nancy Spaethe, who will testify later in Amgen's

22   case, will tell you, she was then a young mother who was

23   suffering from kidney failure and could not lead a normal,

24   functional life.  And the reason was because her kidneys had

25   lost their natural ability to stimulate the production of

1    red blood cells in her body.  And as a consequence she was

2    wracked with debilitating anemia, chronic anemia.  She was

3    so weak she can't walk upstairs.  She couldn't consistently

4    work.  She couldn't even play with her children.  Her plight

5    wasn't alone.  There were a hundred thousand other patients

6    at that time throughout the United States who suffered the

7    same disease and their numbers were growing rapidly.

8            Now, as Dr. Eli Friedman, a kidney specialist,

9    specialist, will testify also later in this case, he had

10   been treating patients just like Nancy Spaethe since the

11   mid-1960's.  And as he will tell you, he and every other

12   kidney specialist were stuck.  They could provide temporary

13   relief for these patients by giving them blood transfusions.

14   But those blood transfusions led to ever-greater dependency.

15   They also carried a very serious risk of hepatitis and other

16   horrible viruses.

17           So, for decades scientists searched all over the

18   world for a solution to Nancy Spaethe's problem.  In the

19   1960's they discovered what they thought was a hormone that

20   was naturally produced by the kidneys.  They called this

21   hormone erythropoietin.  EPO for short.  And they discovered

22   or believed at least that this hormone would stimulate the

23   body to produce red blood cells.  That was learned in the

24   1960's.

25           So in the 1970's, many scientists all over the

1    world tried to isolate this hormone from nature, from

2    natural sources.  They tried to get it from blood.  They

3    tried to get it from tissues.  They tried to get it from

4    urine.

5         In the late 1970's, Dr. Gene Goldwasser, who will

6    also testify in this case, he'll come in here and tell you

7    what he did, tell you all about his work, he collected urine

8    from dozens of Japanese patients, over a thousand liters of

9    urine, put it all in a big vat, condensed it down, and he

10   purified from that thousand urine, that thousand liters of

11   urine a miniscule amount of human EPO.  It was a major

12   breakthrough.  And he published his formula for doing it in

13   1977 for everybody to use.  But Dr. Goldwasser's urinary EPO

14   didn't work to solve Nancy Spaethe's problem.  And nobody

15   could obtain enough of the naturally-occurring product to

16   make a useful drug.

17        In 1981, in a startup company called Amgen, a

18   research scientist named Fu-Kuen Lin dreamed, dreamed of

19   making a man-made version of naturally-occurring EPO, a

20   version that would actually work in patients to correct

21   their anemia.  He worked day and night for several years and

22   he encountered one failure after another.  And just as the

23   chorus of doubters grew their largest he made his first

24   invention.  He isolated, discovered and sequenced the human

25   gene for erythropoietin.  It was a monumental breakthrough,

1   one that inspired all of his co-workers and startled his

2   peers around the world.  But that discovery as great as it

3   was, that discovery was not sufficient to achieve his dream.

4   It was just a first step.  Because the DNA was just a tool

5   that Dr. Lin could use to make a part of the

6   naturally-occurring EPO molecule, but it wouldn't make it

7   all.  He still had to discover what more was needed and how

8   to make it.

9           He was operating at the cutting edge of scientific

10  discovery.  Nobody had ever made a man-made version of human

11  EPO.  And there was no clear path forward.

12          So what did he do?  He decided to go down several

13  paths simultaneously.  Like a good scientist, he laid out a

14  course of experimentation that tried several alternatives

15  simultaneously to see which, if any, might lead him to a

16  solution.

17          So he and a team of co-workers genetically

18  engineered three very different types of cells.  They took

19  bacteria, they took yeast, and they took several kinds of

20  animal cells hoping that one of them would lead them to a

21  solution of how to make a man-made version of EPO that could

22  actually function in the body to correct anemia.

23          Surprisingly, they discovered that a human EPO

24  product made in the cells of a Chinese hamster, a small

25  rodent, actually worked to correct anemia.  It would produce

1   red blood cells in a mammal.

2         It was a breakthrough discovery.  A solution to

3   Nancy Spaethe's plight was finally in sight and a miracle

4   drug called recombinant human erythropoietin was born.

5         Two years later when the FDA allowed Amgen to take

6   Dr. Lin's drug and use it in human clinical trials, Nancy

7   Spaethe was among the very first patients to receive the

8   drug.  The results were immediate and astounding.

9   Recombinant EPO restored her ability to produce red blood

10  cells, corrected her anemia, and gave her back a functional,

11  meaningful life.

12        For Dr. Lin's accomplishments and achievements

13  President Clinton awarded Amgen this nation's highest medal

14  for technological achievement.  The most prestigious

15  scientific journal in the United States, Science, named Dr.

16  Lin's recombinant human erythropoietin Molecule of the Year

17  when the FDA approved it.  And the Patent Office awarded Dr.

18  Lin not one, not two, seven separate patents for his

19  inventions.

20        Ladies and gentlemen, my name is Rusty Day.  And

21  it's my very great privilege to introduce you to the

22  inventor, Dr. Fu-Kuen Lin, who's sitting right there.

23        It's also my very great privilege to represent Dr.

24  Lin in this case as well as Amgen.  Now, while Dr. Lin was

25  the sole inventor of each of the inventions claimed in his

1    patents, he'll be the first one to tell you that he did not

2    work alone.  Like any great scientist, he built on the

3    contributions and discovery and collaboration of many

4    others, every one who came before him.  He led a team of

5    remarkable scientists at Amgen who assisted him greatly.

6    People like Joan Egrie and Jeff Browne.  He collaborated

7    with Dr. Gene Goldwasser from Chicago.  And as each of them

8    will come and testify to you, it was Dr. Lin who made these

9    inventions.  It was his insight, his audacity and his

10   ingenuity that made this possible.  And they will also

11   answer for you each of Roche's attacks in this case.

12           Now, as I've indicated, Dr. Lin made several

13   different inventions.  The first step was to isolate a copy

14   of the human gene that encodes erythropoietin.  That was a

15   monumental challenge, one that had stumped some of the very

16   best scientists throughout the world, including Dr. Stuart

17   Orkin at Harvard Medical School, who personally tried to

18   isolate and clone human EPO gene for two years before Lin

19   and failed.  Dr. Orkin will come here and testify to you why

20   Lin's achievement was so amazing.

21           But as amazing as that achievement was, it didn't

22   accomplish the objective.  Because the DNA was just a tool

23   that allowed Lin to make part but not all of the EPO

24   molecule.  In order to accomplish that objective, in order

25   to make an EPO molecule that would actually function in the

1    body to correct anemia, Dr. Lin had to discover what more

2    was needed and how to make it.  And Dr. Harvey Lodish, at

3    MIT, will also come and testify to you why Lin's inventions

4    in making EPO were unprecedented in pathward.

5         Now, as Judge Young has explained to you, it's the

6    job of the Patent Office to investigate and decide whether

7    to grant a patent to an inventor who applies for one.  And

8    as you know, because these patents have already issued, as

9    you know already, the Patent Office has already determined

10   that these patents and the inventions they claim were novel,

11   not anticipated, nonobvious, and patentable.

12        **THE COURT:**  Five more minutes, Mr. Day.

13        **MR. DAY:**  Thank you very much, your Honor.

14        And that determination was made as the evidence

15   will show after years of careful scrutiny in the Patent

16   Office by senior examiners who were trained to examine just

17   these kinds of inventions.  Indeed, in your juror notebooks

18   you're going to have copies of these patents.  Look at the

19   first page and look at the name of the examiner who issued

20   each one of the patents, James Martinelli, a Ph.D. in

21   biology.

22        Incredibly, incredibly, Roche comes into this

23   courtroom and they now ask you to believe that the patent

24   office got it wrong.  Not once.  Every time that they issued

25   a patent to Dr. Lin.  On every claim.  They come in with

1    20/20 hindsight and they tell you that, well, you know what,

2    everything that Dr. Lin did, everything that he did would

3    have been obvious to those of ordinary skill in the art

4    before Lin ever did it.

5         Now, ladies and gentlemen, there are many things

6    wrong with that argument, but let's start with common sense.

7    Before Lin, for decades, there was an urgent, pressing

8    medical need for a drug that would solve Nancy Spaethe's

9    problem.  Scientists all over the world were racing to find

10   that medicine.  And everyone failed.  Companies like Biogen,

11   Genetics Institute, Genentech, Dr. Orkin at Harvard,

12   everyone failed.  They tried.  They were motivated.  They

13   certainly wanted to find the solution.  They failed, until

14   Dr. Lin showed the way.

15        Now, make no mistake, Roche asks you to believe

16   that Dr. Lin invented nothing.  I want to repeat that.

17   Roche asks you to believe that Dr. Lin invented nothing.  I

18   think you'll see as the evidence proves in this case, the

19   truth is very different.  The truth is Dr. Lin did things

20   that no one before him was able to do.  The truth is that

21   the Patent Office examined all of Lin's inventions and

22   determined that each is separately patentable.  The truth is

23   that the Patent Office considered many, if not all, of the

24   arguments that Roche will make to you and rejected them.

25   And the truth is that Dr. Lin's inventions have transformed

1    the lives of hundreds of thousands of patients around the

2    world.

3           Now, because time is short, I cannot address in

4    this opening statement every issue that Roche plans to put

5    before you.  And that's why I ask you to please, please

6    listen carefully to the instructions Judge Young gave you

7    yesterday, to suspend judgment, to listen carefully to the

8    evidence, but to suspend judgment until you hear all of the

9    evidence, all of the evidence that Amgen and its witnesses

10   have to present.  I believe they will demonstrate to you

11   that, contrary to Roche's case, the truth is, the truth is

12   that Dr. Lin's invention, is the inventor of each of these

13   inventions, and they'll demonstrate that the truth is very

14   different than what Roche contends.

15          Members of the jury, I thank you very much for your

16   service in this case.  And I thank you in advance for the

17   care and the attention that I know you're going to apply to

18   decide this case.

19          Thank you.

20          **THE COURT:**  Ms. Ben-Ami, you may call your first

21   witness.

22          **MS. BEN-AMI:**  Thank you, your Honor.  Roche would

23   like to call Dr. John Lowe.

24          **THE COURT:**  He may be called.

25          **MR. DAY:**  Your Honor, may we have a side bar with

```
 1    respect to the demonstrative exhibits to be used --

 2              THE COURT:  Yes.

 3              MR. DAY:  -- in this examination?

 4              THE COURT:  But he may come up.

 5    SIDEBAR CONFERENCE, AS FOLLOWS:

 6              MS. BEN-AMI:  Your Honor, at the same time --

 7              THE COURT:  Wait, wait.  It is on the record.

 8              Okay, now what?  A fine job on the openings by the

 9    way; such a pleasure.

10              Go ahead.

11              MS. BEN-AMI:  We were saying while we're at side

12    bar, can we give the jury, can someone give the jury the

13    agreed upon notebooks?

14              THE COURT:  Assuming you've agreed upon them.

15              MS. BEN-AMI:  Yes, the agreed upon notebooks.  So

16    we don't waste time.

17              THE COURT:  Yes.

18              (Out loud)  A little a heads up here.  The first

19    thing they say, we've agreed upon notebooks for the jury.

20    What they've agreed upon, we won't waste your time.

21    Somebody -- we have battalions of people here -- can pass

22    those notebooks out to you under Ms. Smith's supervision.

23              MS. BEN-AMI:  Thank you, your Honor.

24              THE COURT:  Now, what's the problem?

25              MS. BEN-AMI:  They're objecting.  I don't know,
```

 1    your Honor.

 2         **MR. KENDALL:**  Some of the drawings we object to.

 3    This one, this one I think you ruled on yesterday as to the

 4    time periods and the ODP issues would not be presented that

 5    way.

 6         **MS. BEN-AMI:**  Your Honor, this was an issue, I sent

 7    you a letter on these, as to these two patents, the issue of

 8    double patenting still exists and --

 9         **THE COURT:**  Yes.

10         **MS. BEN-AMI:**  -- I have to prove that the term is

11    different.  The only thing I have to --

12         **THE COURT:**  I agree, and I'm going to let you do

13    this.  It would seem fairly simple to see -- as I see the

14    test here, it is whether the Patent Office caused this

15    sequencing.  If the Patent Office did you're through.

16         **MS. BEN-AMI:**  There's no suggestion it was a

17    restriction requirement that caused this, your Honor, of

18    these two patents.

19         **THE COURT:**  Well, I don't know as he agrees with

20    that.

21         **MR. DAY:**  I don't agree with that.

22         **THE COURT:**  Yes.

23         **MS. BEN-AMI:**  What about on the '868?  Are you

24    saying on the '868 --

25         **THE COURT:**  No, you have to, you have to talk to

1    me.

2              **MS. BEN-AMI:**  I'm sorry, your Honor.

3              **THE COURT:**  The short of it is you may use this.  I

4    think you're very thin on this claim and you deftly just

5    brushed over it.  You may use it.  You go ahead, you try

6    your case.

7              **MS. BEN-AMI:**  I try to be modest, your Honor.

8              **MR. KENDALL:**  On the '698 claims 4 and 5, we are

9    going to withdraw from the ITC that claim.  So we are going

10   to obviate that issue completely after yesterday's

11   discussion.

12             **THE COURT:**  So they're out.

13             **MR. DAY:**  Yes, sir.  We are giving -- first of all,

14   let me speak to this, if I may.

15             **THE COURT:**  Yes.

16             **MR. DAY:**  We believe the covenant we gave Roche

17   covered the ITC, but we will make sure it is --

18             **THE COURT:**  That's the end of that.

19             **MS. BEN-AMI:**  If we could perhaps --

20             **THE COURT:**  They're judicially estopped.  Now, you

21   can be doggone sure after Mr. Day and Mr. Kendall said it

22   that's no longer claimed in the ITC.  I'll have injunctive

23   orders throughout.  We're not getting into it.

24             **MS. BEN-AMI:**  Okay.

25             **MR. KENDALL:**  Second, second, your Honor, this

1    group of claims, they're going to have the witness say

2    obviousness.  But he's not using a legal standard of

3    obviousness.  I think he's using his own colloquial

4    definition to confuse the jury on a legal term of art that I

5    assume you're going to --

6         **THE COURT:**  What's colloquial, what's the

7    colloquial definition?

8         **MR. KENDALL:**  They haven't told us how they're

9    going to use that definition.

10        **MR. DAY:**  If I could --

11        **THE COURT:**  Come on, I'm going to trash this as

12   something that they made up.  That's enough.  We'll see if

13   he's -- have I got his expert report?

14        **MR. DAY:**  Yes.  Well, they should be providing it.

15        **THE COURT:**  You're right, they should.  I want it.

16   You can use it.

17        **MS. BEN-AMI:**  Give the expert report to --

18        **THE COURT:**  You know, I don't intend to have side

19   bar conferences for every expert witness.  These are things

20   to be done in the afternoon.

21        **MR. KENDALL:**  I think Mr. Gaede has an issue, your

22   Honor.

23        **THE COURT:**  I'm also accustomed to one person

24   speaking at the sidebar.  This is not a seminar.  But I'll

25   hear you.

 1          **MR. GAEDE:**  I object to this group of

 2    demonstratives for the following reasons.  It's very short.

 3    We do have a copy of it, but it has to do with the basic

 4    issue that prohibiting patentability shall not be negative

 5    by the manner in which the invention --

 6          **THE COURT:**  These are demonstratives.  They're

 7    demonstratives.  They can use the demonstratives.  I'll

 8    trash demonstratives.

 9          **MR. KENDALL:**  And the final issue on

10    demonstratives, this is attached to his report.  It's not

11    discussed in the text.  So, I understand if it's not in the

12    report it doesn't come into trial.  That's in the report but

13    there's no discussion of it.  He can't narrate it.

14          **THE COURT:**  He can't, he can't -- he cannot narrate

15    it.  What's in the report is in the report.

16          **MS. BEN-AMI:**  Even if it's attached to the report?

17          **THE COURT:**  Of course.  You've got to set out with

18    the exquisite detail of a patent claim everything in the

19    report.  We're not incorporating this stuff by reference.

20    He can say this.

21          **MS. BEN-AMI:**  Well, that's all, that's all, that's

22    all he can say.

23          **THE COURT:**  He can explain it; he can't go beyond.

24          **MS. BEN-AMI:**  No, because all this part is clearly

25    in his report.  He can explain all this, that's just

```
 1    basic --
 2              THE COURT:  No, he can say what's in the report.
 3              MS. BEN-AMI:  Sure.
 4              MR. KENDALL:  Thank you, your Honor.
 5              MR. GAEDE:  Thank you, your Honor.
 6              (Whereupon the sidebar conference concluded.)
 7              THE COURT:  We'll swear the witness.
 8              THE CLERK:  Please raise your right hand.
 9              Do you solemnly swear that the answers you will
10    give to this Court and Jury will be the truth, the whole
11    truth, and nothing but the truth, so help you God?
12              THE WITNESS:  Yes, I do.
13              THE CLERK:  Please be seated.
14              THE COURT:  And the report?  Report to the Court?
15              MS. BEN-AMI:  Your Honor, what I've done with the
16    report is just --
17              THE COURT:  No, I just want it.  I think I can
18    understand it.  I'd best be able to.  Go ahead.
19              And proceed, Ms. Ben-Ami.
20                        JOHN LOWE
21                   DIRECT EXAMINATION
22    BY  MS. BEN-AMI
23    Q   Good morning.  Would you introduce yourself to the jury.
24    A   Yes.  My name is John Lowe.
25              THE COURT:  Won't you -- is that microphone on?
```

```
 1              THE CLERK:  No, it isn't.  Okay, it's on now.

 2     A    My name is John Lowe.  I'm a physician.  I'm trained as

 3     a biomedical scientist.  I'm currently the chairman of the

 4     pathology department at the Case Western Reserve University

 5     Medical School in Cleveland, Ohio.  And I'm a pathologist

 6     and chief, if you will, of the University Hospitals of

 7     Cleveland.

 8              THE COURT:  Sir, feel free to move that mic so

 9     you're sitting comfortably there.  You're like leaning

10     forward.  You arrange that so you're comfortable.

11              THE WITNESS:  Right.  Thank you.

12     Q    Can you describe for the jury what your positions are at

13     the School of Medicine?

14     A    Yes.  So, I'm a professor in the medical school and the

15     chairman of the Department of Pathology.

16     Q    And in your work in the university do you engage in

17     research?

18     A    Yes, I do.

19     Q    Can you briefly describe to the jury what type of

20     research you do?

21     A    Yes.  The research that I do now and have done for more

22     than 20 years involves studying the structure and function

23     and the regulation and control of a series of proteins made

24     by mammals called glycoproteins.

25     Q    And can you describe for us your professional education?
```

1    A    Yes.   So, I earned a bachelor's degree in mathematics

2    from the University of Wyoming in 1976.   I then went to

3    medical school at the University of Utah in Salt Lake City

4    and completed that education with an M.D. degree in 1980.

5    And following that I went to Washington University in St.

6    Louis to do what's called pathology residency training which

7    trained me how to be a pathologist, if you will.   And as

8    part of that training I did two, what are called

9    post-doctoral fellowships which taught me how to do

10   biomedical science and microbiology.

11   Q    So why did you -- you said you have an M.D.?

12   A    I have an M.D.

13   Q    Why did you go into research?

14   A    In medical school I had a very exciting experience in

15   research laboratory working on RIA tumor viruses.   And it

16   was an exciting time in science in the late '70's and it

17   looked like it would be a really fun career to pursue.

18   Q    Now, we have heard from the openings that this case is

19   about work that was done in the 1980's.   In the time of

20   1983, for example, in 1983, what was your background in?

21   A    Yes.   So, in 1983, I had, I was at that point three

22   years beyond my M.D. degree and had done a year right after

23   my M.D. degree in pathology training and had two years of

24   laboratory experience cloning, manipulating genes in a

25   research laboratory.

1    Q    So, based on the work that you have done in your career,

2    can you tell us based on your knowledge of the patents in

3    the case, what areas or work you have been doing during this

4    period around 1983?

5    A    Yes.  So, I, as I indicated, had been cloning and

6    sequencing and manipulating genes in the laboratory.

7    Fundamentally, what we were doing at the time I was doing,

8    my own hands at the time, was basically the same technology

9    that is being used in the patents we're discussing today.

10   Q    Now, during the opening statement, and I believe the

11   Court said that this case is about certain claims and

12   certain patents that are in suit here.

13        Do you recall that?

14   A    Yes.

15   Q    And have you studied those claims in the patents?

16   A    I have studied the patents and the claims, yes.

17   Q    And have you -- do you have any opinions with regard to

18   the validity of the asserted claims in this case?

19   A    Yes.  Yes, I do have an opinion about those.

20   Q    And what is your opinion?

21        MR. DAY:  Objection, your Honor.  This simply calls

22   for a legal conclusion.

23        THE COURT:  Sustained.

24        MR. DAY:  Also, we don't have --

25        THE COURT:  Sustained.  Put in the grounds first.

1          **MS. BEN-AMI:**  Okay.

2          **THE COURT:**  It's simply a matter of discretion as

3    to how to proceed.

4          **MS. BEN-AMI:**  That's fine, your Honor.

5          **THE COURT:**  Do it that way.

6          **MS. BEN-AMI:**  Okay, that's fine.

7    **Q**   Have you --

8          **MS. BEN-AMI:**  May I ask this question, your Honor.

9    I'll proffer it.

10   **Q**   Doctor, are you giving opinions as to all the claims in

11   all seven patents?

12   A    No, I'm not, all the claims in all seven patents.

13   **Q**   So, the claims that we're talking about are only the

14   asserted claims in this case?

15   A    That's correct, yes.

16         **THE COURT:**  And by asserted we're talking about the

17   claim, and if anyone correct me, the attorneys, the -- well,

18   I'll ask the witness.

19         What do you think -- what are you talking about

20   when you say asserted claims?

21         **THE WITNESS:**  Well, the asserted claims as I

22   understand it are the claims that, that Amgen claims are

23   being infringed, fundamentally what we are claiming are

24   obvious.

25         **THE COURT:**  Yes.  Okay.  We're only talking about

1    the claims that Amgen claims are being infringed, to narrow

2    things down, that is the asserted claims.  There may be

3    other claims, but we're talking about the ones that are in

4    this lawsuit.

5            And go ahead, Ms. Ben-Ami.

6    Q    So, do you have a board of one of the claims so we can

7    just --

8            **MS. BEN-AMI:**  I see my colleague, Mr. Drozdoff, has

9    it.

10   Q    Just to give the jury some context, can we show the jury

11   a claim and give them some feel for what we're talking about

12   here?

13           **THE COURT:**  I didn't explain this to the jury but I

14   will.

15           My practice in this courtroom if they do blowups

16   like this is to hold them.  And don't -- I don't want you

17   thinking that I'm helping Roche or I'm helping Amgen.  I'm

18   helping you.  Because in a big courtroom like this, this

19   gets it close to you, there's a pointer here, I think, and

20   the witness is right by the microphone.

21           Well, I don't see the pointer, but there we go.

22           **MS. BEN-AMI:**  I have a laser, your Honor.  I don't

23   know if you want to use that.

24           **THE COURT:**  I'm not doing the pointing.

25           **MS. BEN-AMI:**  Okay.  Don't point it.

 1          **THE COURT:**  All I am is the holder here.

 2          **MS. BEN-AMI:**  Yes.

 3          **THE COURT:**  I'll be the teacher when necessary.

 4     But understand, it's very important, I'm showing no

 5     favoritism, I'll do this for anybody.  There's the pointer.

 6          But you proceed, Ms. Ben-Ami.

 7          **MS. BEN-AMI:**  Thank you.

 8     **Q**   So, Doctor, just, without getting into the details of

 9     the claim -- well, let me back up.

10          Doctor, are you aware that there is a glossary of

11     what certain terms mean --

12     A   Yes, I'm aware --

13     **Q**   -- in this case?

14     A   -- of a glossary, yes.

15          **MS. BEN-AMI:**  And I believe, your Honor, that is in

16     the jurors' notebooks by agreement.

17          **THE COURT:**  Thank you.

18     **Q**   And in giving your opinions in this case today, are you

19     using the terms as defined by the glossary?

20     A   Yes, I am.

21     **Q**   So, just, without getting into what every single thing

22     means, could you walk the jurors through a claim.

23     A   Yes.  So, so, there are two claims that are illustrated

24     on this board, 1 and 2, and we can sort of read through

25     quickly the wording.

1          Claim 1 starts out with the process for the

2   production of.  That means, in simple plain language, a way

3   to make something.  And then the next phrase refers to what

4   you're making.  In this case it refers to something called a

5   glycosylated erythropoietin polypeptide.

6               **MS. BEN-AMI:**  Your Honor, may the witness stand?

7               **THE COURT:**  So long as we can hear him he may.

8               **THE WITNESS:**  I'll speak up.

9               **THE COURT:**  Yes, please do.

10  A   So a glycosylated erythropoietin polypeptide.  So, that

11  is a protein, which we'll learn more about in a minute, that

12  has been modified by a sugar.

13          And then the next phrase refers to having, that's a

14  property that that molecule has, in vivo biologic property,

15  in vivo meaning in a human being, a biological property,

16  something that does something to our bodies, of causing bone

17  marrow cells, and those are the cells in our bone marrow

18  obviously, to increase the production of erythrocytes.

19  Without going further that's just to tell you that that

20  biological activity tells our bone marrow to make more red

21  blood cells.

22  Q   Now, I bring this up, Doctor, because, to show the jury

23  that there are a lot of scientific terms in there, right?

24  A   Yes.

25  Q   And are you prepared to provide the jury with some

1    scientific training so that as we go forward the jury can --

2    A    Yes.

3    Q    -- understand?

4    A    I'll be happy to do that.

5         **MS. BEN-AMI:**  Thank you very much, your Honor.

6    Q    So with that in mind, can you take the board --

7    Mr. Drozdoff has the board -- that is JL25.

8         **THE COURT:**  Now, I'm going to let you see this.

9    But there's a significant difference between the one I just

10   held up and this one.  This one is an actual, I'm assuming

11   the way it was presented to us, this is an actual quote from

12   the patent, a patent, the '868 patent.  We always refer to

13   the last three numbers of the patent.  So here's an actual

14   quote from the '868 patent.  It's evidence.  Now, like all

15   evidence, it's up to you what you believe about it, but

16   there's little doubt that it is the quote from the patent.

17   That's evidence.

18        This isn't.  This is what we call a demonstrative

19   aid.  Now, a demonstrative aid, because the lawyers are

20   engaged in teaching, and indeed have put on the stand a

21   teacher, they're trying to teach you something about

22   something.  And the law says -- because, because so much of

23   this is genuinely teaching.  In order to do justice both

24   sides want you to understand.  So the lawyers, I don't know

25   who made this up, but they made this up to present what they

1    want to present.  And if it fairly and accurately reflects

2    what a witness says, and you can better understand what the

3    witness is talking about, by looking at this demonstrative

4    aid, that's fine.  Some lawyers call them chalks.  Because

5    we used to have a chalkboard, a blackboard in courtrooms,

6    and we would have a fender bender and we would say to the

7    witness go to the board and draw the intersection.

8         Well, the drawing of some pedestrian of an

9    intersection is not evidence, but you see it illustrates the

10   testimony.  And if you understand it better from seeing the

11   drawing, that's fine.  I make this point, one, because I

12   should be precise, you're not going to have this back in the

13   jury room.  Every bit of evidence you're going to have back

14   in the jury room.  Now, that doesn't mean there's -- and

15   there's nothing wrong with this.  It may well be fine.  But

16   it's not evidence.  What he has to say under oath is the

17   evidence.  This illustrates it.  It's a demonstrative aid.

18   We'll see lots of demonstrative aids.  Both sides have them.

19   It's perfectly appropriate.  Just remember, they made them

20   up, they're not evidence.

21        Go ahead, Ms. Ben-Ami.

22        **MS. BEN-AMI:**  Thank you, your Honor.

23   **Q**   So, Doctor, can you explain to the jury what this big

24   blue blob is?

25   **A**   Yes.  So, so this is a diagram of a cell as the label

1   implies.  As you know, cells are the building blocks of our

2   bodies.  They comprise our brain, our skin, our hearts, and

3   our blood cells and so on.  And this is an idealized cell.

4   Not all cells in the body look this simple and

5   straightforward.  But it illustrates the essential

6   components of our cells that will be relevant to this

7   discussion.

8   Q   So what is the white blob within the blue blob?

9   A   So the white blob within the blue blob is an entity

10  within the cell called the nucleus.

11  Q   What are you showing within the nucleus?

12  A   So, within the nucleus there's this spiral structure

13  which is labeled DNA, and fundamentally that corresponds to

14  or represents on this slide our genes, the genes that make

15  us who we are.

16          And by analogy one can imagine that the genes in

17  our cells represent the blueprint that tells our cells how

18  to go about their business.

19  Q   So, where is the blueprint?

20  A   So, the blueprint is right here.  It's labeled gene and

21  DNA, and that's the double stranded spiral.

22  Q   Now, you said that the DNA is the blueprint.  The

23  blueprint for what?

24  A   So, by analogy the blueprint can be viewed as the

25  instruction set that tells the cell what to do.  And

1    fundamentally, one can view a cell in our body as a tiny

2    factory.  A factory that takes the blueprint, the genes, and

3    turns the instructions in that blueprint into products.

4    Q    Where's the factory?

5    A    So the cell is the factory essentially.  And the factory

6    floor, if you will, would be out here in this area which is

7    labeled the cytoplasm.

8    Q    So, in this cell what does the factory make?

9    A    So, in this cell, in any cell in our bodies, a primary

10   product of this factory is something called a protein or

11   otherwise known as a polypeptide.

12   Q    And what is that?

13   A    So a polypeptide essentially is, it's a chemical, if you

14   will, and it's comprised of building blocks called amino

15   acids that are assembled in this factory through a series of

16   very interesting and complicated chemical synthetic steps.

17   Q    Okay.  So, since the Court was kind enough to indicate

18   that the demonstratives do not become evidence, I will give

19   you my string of pearls, temporarily.

20          And can you explain to the jury, using the pearls,

21   what a protein in an idealized fashion is?

22   A    Yes.  So on this diagram, we've got this long structure

23   that has some beads on it.  The beads represent the amino

24   acid resident building blocks, and it's illustrated as a

25   long string that would appear something like this.  But

1    that's not really the final way that this protein exists.

2    The cell has some interesting and complicated machinery that

3    causes a particular protein to fold up into a shape.   The

4    shape is determined in part by those beads, if you will, or

5    the pearls here, that comprise that protein.   So it's not a

6    long string necessarily but it's a shape.

7              THE COURT:   Time for the morning recess.   Is this a

8    good time?

9              MS. BEN-AMI:   Yes, that's fine, your Honor.

10             THE COURT:   Very well.

11             MS. BEN-AMI:   Thank you.

12             THE COURT:   We'll take the morning recess at this

13   time.   Keep your minds suspended.   We're going to have to

14   move that screen there.

15             THE CLERK:   Yes, I am.

16             THE COURT:   Keep your minds suspended because you

17   have not heard all the evidence.   Do not discuss the case

18   either among yourselves nor with anyone else.   You may leave

19   everything right there on your chairs, it will be, no one

20   will touch it, it will be right there when you come back in

21   the courtroom.   And you may stand in recess for one-half

22   hour until 11:15.   The jury may recess.

23             THE CLERK:   All rise for the jury.

24             (Whereupon the jury left the courtroom.)

25             (Recess.)

1              THE CLERK:  All rise for the jury.

2              (Whereupon the jury entered the courtroom.)

3              THE CLERK:  Court is in session, please be seated.

4          MS. BEN-AMI:  Your Honor, thank you.  And just for

5      the record, your Honor, that is JL25 for identification.

6          THE COURT:  Yes.

7          MS. BEN-AMI:  Thank you, your Honor.

8  (BY MS. BEN-AMI:)

9  Q.  Now, Doctor, let's just go back to where we were.

10  Where's the blueprint?

11  A.  So the blueprint for this factor, if you will, is in the

12  nucleus, and it is represented here by the DNA of the gene.

13  Q.  And what does the blueprint do?

14  A.  The blueprint instructs the cell to carry out its

15  function of making proteins.

16  Q.  Would you walk us through from the blue to the red to

17  the beads?

18  A.  Yes.  So we haven't talked about the red squiggles here

19  on the board just yet.  The blueprint, the blue double

20  helix, has a copy made of it called an mRNA, or for short,

21  RNA.  It's a copy of the blueprint.  And that copy is made

22  in the nucleus, and then a version of that copy is moved to

23  the cytoplasm.  And in the cytoplasm, that copy tells the

24  shop floor, if you will, how to carry out the process of

25  making that protein.

1    Q.   What is the assembly line made of?

2    A.   So the assembly line is made of a series of enzymes that

3    carry out chemical reactions.

4    Q.   So now, let's --

5         **MS. BEN-AMI:**   Thank you, your Honor.   For the

6    moment.

7         I do have an easel, your Honor, if that's more

8    helpful?

9         **THE COURT:**   I want you to try your case as you see

10   fit.   If you want to do it with an easel --

11        **MS. BEN-AMI:**   No, I'm happy to have your Honor hold

12   it.   Thank you, your Honor.   And for the record, your Honor,

13   I believe that is JL27, for identification purposes.

14   Q.   Now, you talked about the blueprint and how it goes to

15   the shop drawing and then to the protein.   Can you explain

16   now where is the instruction in the blueprint?

17   A.   Yes.   So just to orient you, we were talking about the

18   process going from your left to your right, here we're

19   talking about the same process, from the nucleus down.   The

20   blueprint is here, and Ms. Ben-Ami asked me to tell you what

21   is the blueprint, essentially.   And the blueprint is a

22   series of three-letter codes within the blueprint that

23   basically represents the instruction set of the blueprint.

24   Q.   Now, you said they were three-letter codes?

25   A.   Yes.

1    Q.   Okay.  Can you show the jury where the code is?

2    A.   Yes.  So the code is illustrated here as an example by

3    one set of three letters called ATG, there's another word

4    here, if you will, a three-letter word, called CGA, and by

5    analogy one can imagine that that blueprint is speaking to

6    the cell or directing the cell in sentences composed of

7    three-letter words.

8         For example, a three-letter word that you might

9    imagine could be assembled by us, using our own language, is

10   something like, "The man pet the cat."  It's a sentence,

11   composed of words, each words -- each word has three letters

12   in it.  And that's analogous to what we see in the code

13   that's in the blueprint of the genes.

14   Q.   Now, how do we know how to read the DNA sentence?

15   A.   So the DNA sentence is made into a copy by a process

16   called transcription, which happens in the nucleus of the

17   cell.  And transcription makes this copy, and that

18   three-letter word at each place in the blueprint, is

19   converted into an analogous three-letter word in the copy.

20   And then that molecule is copied into the product, the

21   intermediate product, the protein, by a process called

22   translation.

23        MS. BEN-AMI:  Can I have JL1 on the screen, please?

24   Thank you, your Honor.

25   Q.   Now, when we're trying to talk about the language of the

1    DNA going to the beads, the proteins, can you tell us what

2    JL1 is, and how it relates?

3    A.   So JL1 is, as indicated on the screen, a codon table.

4    Q.   What's a codon?

5    A.   The codon, again, is that three-letter word that's in

6    the blueprint, in the gene, in the nucleus, and that's the

7    fundamental part of the instructions.

8    Q.   So can you show the jury where a three-letter word is?

9    A.   Yes.  So you may remember that on that slide there was a

10   three-letter word ATG.  And if you're a cell, you'd like to

11   know how ATG is converted into its product.  We use this

12   codon table to figure that out.  We look at the first

13   position and we look for A.  We look at the second position,

14   that was a T, in that word, so now we're in this box.  And

15   now we want to look at the third position and we want to

16   find the G, and that tells us that ATG corresponds to MET,

17   which is a shorthand for an amino acid called methionine.

18   Q.   Can you gives us another example?

19   A.   Another example, that second word that I told you about

20   was, was, I think it was AGT, and we could go into the codon

21   table and find an AGT rather, and that would tell us that

22   the amino acid there is a serine.

23   Q.   So getting back to my pearls, if we just take that

24   example that you just did, could you just make that physical

25   for the jury?

1    A.   Yes.  So that code, the ATG and then the AGT codes for

2    one protein, amino acid residue called methionine, and then

3    the next code, a GT, codes for the second bead, if you will,

4    which is a searing from this table, and so on.  So we have a

5    series of these three-letter codes in the blueprint, and

6    those specify each of these different amino acid residues

7    along this molecule that eventually folds up into a

8    particular shape that is dependent upon the order of those

9    amino acid sequence residents.

10   Q.   Now, beyond the string of pearls, the protein sequence,

11   are there other things, chemical reactions that occur?

12   A.   Yes.  Remember that that string, if you will, that folds

13   up into a shape, that's not its final form typically.  There

14   are other chemical modifications that happen to that string

15   either as it's made or as it's being folded up or even after

16   it's folded up.  And those are called covalent

17   modifications, typically, and an example of those is the

18   modification with sugars as that molecule is being moved

19   through the cell as it's assembled.

20   Q.   So you just said that the proteins are modified with

21   sugars?

22   A.   I did, yes.

23   Q.   And what is that called?

24   A.   That process of sugar-modification is called

25   glycosylation.

1    Q.   So when we look at the claims and we see that term, what

2    does it mean?

3    A.   So when we see the word glycosylation or glycosylated,

4    it will mean that a sugar has modified that protein.

5    Q.   Now, can we go --

6         MS. BEN-AMI:   Can you just bring up the '868 claim

7    again?   I'd just like to now set the stage -- I'll have to

8    move back here, I'm in your way.

9    Q.   I'd just like to set the stage for our discussion today.

10        Having read the patents in this case, can you tell

11   the jury what this field is about, what is the name of the

12   field?

13   A.   Yes.   This field is about, uhm, recombinant DNA

14   technology and biotechnology.

15   Q.   And what do you understand biotechnology recombinant DNA

16   to mean?

17   A.   Yes.   In 1982 to '84, and to a large extent before those

18   dates, biotechnology and recombinant DNA technology referred

19   to using the technology that we learned about the cells to

20   instruct the cells to make proteins that we need to have as

21   medicines.

22        MS. BEN-AMI:   Now, since I've got you here,

23   Mr. Drozdoff, can you give the witness the next

24   demonstrative, please, which is JL28?

25        THE COURT:   Actually, that one you best utilize on

1    the easel because I may have to make rulings, if you don't

2    mind.

3            MS. BEN-AMI:  That's fine, your Honor.  Sure.

4            THE CLERK:  Did you say the first one was JL25?

5            MS. BEN-AMI:  Yes.

6            THE COURT:  Now, again, that's a demonstrative aid.

7    They made that up.  That doesn't mean there's anything wrong

8    with it, but it's a demonstrative aid, it's not taken from

9    evidence.

10           MS. BEN-AMI:  Can -- your Honor, the Amgen lawyers

11   said they can't see.

12           THE COURT:  Then they'll move, just like he's

13   doing.  You can put it there and he can move.  But you can't

14   stand there.

15           MR. DROZDOFF:  Your Honor, may I have the '868

16   board again, if you please?

17           THE CLERK:  Do you need the lights down, still?

18   Are you going to be using the screen?

19           MS. BEN-AMI:  I'm going back and forth.  Thank you.

20           THE CLERK:  That's fine, I want to double-check.

21   Q.  So I'd like to ask you if you could come over to discuss

22   very briefly and generally the history of biotechnology.

23   Remember we're talking about the patent at issue, the area

24   of time is 1983, '84, so we want to talk about what was

25   before 1984.  So can you tell us just what you said right

1   here, the first item?

2   A.   So this, this first item, 1970, is labeled the first

3   complete synthesis of a gene.

4           **THE COURT:**  Keep your voice up, sir.

5           **THE WITNESS:**  Which was a remarkable achievement, a

6   chemical synthesis of a gene in a test tube, earned the man

7   and his group a Nobel Prize.

8           **MR. DAY:**  Your Honor, I think we're going astray

9   here, this isn't in the expert --

10          **THE COURT:**  Yes.  Where is it?

11          **MS. BEN-AMI:**  Supplemental Expert Report,

12  Paragraph 11, third supplemental paragraph --

13          **THE COURT:**  Wait a second.  I thank you for the

14  answer, but I can't go that fast.

15          The third supplemental --

16          **MS. BEN-AMI:**  Paragraph 17 and 18.  And the --

17          **THE COURT:**  I don't seem to have a third.  I have a

18  second.  You've got to give me a third.  Here it is, I'm

19  sorry, forgive me.  I have it.

20          **MS. BEN-AMI:**  I think I double-sided a few, your

21  Honor.

22          **THE COURT:**  That's all right.  Seventeen and 18?

23          **MS. BEN-AMI:**  Seventeen and 18.

24          **COUNSEL:**  Paragraphs.

25          **MS. BEN-AMI:**  Paragraphs.

1        **MR. DAY:**  I'm looking at the same report.

2        **THE COURT:**  Sustained.  He may testify consistent

3    with the language in Paragraph 18, last two sentences,

4    that's there.

5    **Q.**  Can you tell me, during the 1970s, were there techniques

6    of scientists to use recombinant cells to produce commercial

7    quantities of recombinant proteins?

8    A.  Yes, there were.  There were many examples in the 1970s

9    when the technology being developed at universities and in

10   some --

11        **THE COURT:**  You've got to keep your voice up, sir.

12   Now you've stepped away from the microphone, keep your voice

13   up.

14        **THE WITNESS:**  I'll do my best, your Honor.

15        Techniques to ensure that we could instruct the

16   cell to make a protein in the test tube in a culture flask

17   using processes that are inherent in the cells that we are

18   constructing by virtue of a blueprint.

19        **THE COURT:**  As a matter of fact, why doesn't he

20   resume the stand.  Back that up a little bit, because that's

21   just a series of flags when you say certain things happened.

22   And he can see those, he doesn't have to stand by them.

23        **MS. BEN-AMI:**  Oh, okay, your Honor.  I understand.

24        **THE COURT:**  Then he can be by the microphone.  You

25   can use the laser pointer, if you want.

1          **MS. BEN-AMI:**  I'm trying to figure out where your

2     Honor thinks I can put this.

3          **THE COURT:**  I'd just back it up a little bit.

4     Fine.

5          **THE WITNESS:**  Perfect.

6     **Q.**  Can you see that?

7     A.  I can see that very well.

8     **Q.**  Can you tell us what the second item is, just the words?

9     A.  The second item, the first successful DNA cloning

10    experiments.

11    **Q.**  And then what is the third item?

12    A.  The third item is the 1973 report, first recombinant DNA

13    organism produced.

14    **Q.**  Now, what's the fourth item?

15    A.  The fourth item, 1976, methods for making gene

16    "libraries."

17    **Q.**  And let me ask you this, Doctor.  Let me show you what's

18    been preadmitted, your Honor, as Trial Exhibit 10.

19          **THE COURT:**  Thank you.  To save your time, they

20    have allowed you, without wasting any time, I'll speak only

21    once, a whole bunch of exhibits.  That's how they know

22    you'll have all the patents before you, and other things.

23    So those things have letters and she calls it Exhibit 10.

24    It's in evidence.

25          Now, the fact it's -- I don't even know what it is.

1    But the fact it's in evidence doesn't mean that you believe

2    it; it's like the testimony of a witness, you can believe

3    it, but you're the jury, you can disbelieve it, you can

4    believe parts and disbelieve other parts, and it will go

5    with you to the jury room.

6         There will be other exhibits we may have little

7    squabbles about and those they've given letters to.  And so

8    they'll be trying to lay a ground for it and they'll say, I

9    show you Exhibit ZY for identification.  All that means is

10   somebody wants it in, and somebody else wants it out, and

11   I'll have to decide.  And all I decide is whether you can

12   see it or not.

13        I'll try not to interrupt.  Ms. Ben-Ami, that's in

14   evidence, go ahead.

15   **Q.**  Can you tell the jury what this is and how it relates to

16   the time line?

17   A.   Yes.  So this is -- this is a blue binder, if you will,

18   it's a plastic-covered book that is rather thick, and it is

19   a laboratory manual called, "Molecular Cloning" authored by

20   Dr. Maniatis and two other of his colleagues.  We called it

21   the Maniatis manual.  It was published, I believe, in 1982,

22   and it basically describes the recipes, if you will, for

23   doing most, if not all, of this particular biotechnology.

24   And for those skilled in the art in 1982, it's possible to

25   use this book and the recipes in it to carry out experiments

1    that would allow one to --

2         **MR. DAY:**  Your Honor, I'll object at this point.

3    We're going way beyond the expert.  I've given him

4    license --

5         **THE COURT:**  Please, I don't need argument.  You're

6    objecting, it's not in the report.  Where is it?

7         **MS. BEN-AMI:**  It's throughout the report, your

8    Honor.

9         **THE COURT:**  Well, where?

10        **MS. BEN-AMI:**  Okay.  Supplemental Court Report,

11   Paragraph 17.

12        **THE COURT:**  Third?

13        **MS. BEN-AMI:**  Third, yes, your Honor.  You could

14   look through 14 and 16 as well, your Honor.

15        **THE COURT:**  Yes, 14, just a moment.  Well, he may

16   testify consistent with the first sentence of Paragraph 16,

17   the last sentence of Paragraph 14, the reference to the

18   manual in Paragraph 17.  All right.  Those things he may

19   testify to.

20        This isn't rocket science what I'm doing up here.

21   In order to be fair, when you get these opinion experts who

22   are going to give opinions about things, it's up to you

23   whether you believe it, disbelieve it or believe it in part.

24   They have to give each other reports so that they know

25   what's coming.  That's the only fair way to do it.  And

1    according to the rules, the people who are going to give

2    opinions have to stick with their reports.  I'm just making

3    sure we stick with their reports and just don't go on.

4    That's all.

5    Q.  So Doctor, consistent, of course, the expert doesn't

6    have the expert reports, so I will have to point you to the

7    right page.

8              THE COURT:  Well, he may.

9              MS. BEN-AMI:  He may?

10             THE COURT:  If you want.  He need not.  It's up to

11   you.

12             MS. BEN-AMI:  Can we give the expert his reports?

13   Q.  Doctor, could you turn to Maniatis page 226, for

14   example, and show that to the jury?

15             MS. BEN-AMI:  May the expert approach the jury,

16   your Honor, to show them the page?

17             THE COURT:  Yes.

18   Q.  Can you show the jury that page and can you tell the

19   jury what that has to do with the issues in this case?

20   A.  So there's a --

21   Q.  You need to show it to everyone.

22   A.  There's a section in here on page 226 --

23   Q.  You have to speak up, Doctor.

24   A.  -- labeled, "Synthetic --"

25             THE COURT:  I have problems proceeding in this

1   fashion.  He's going to have to be here on the stand where

2   we can all hear him.  Now, they can go look at 226.  Come

3   back up here to the stand and then you may tell us what

4   226 -- you may answer her question, I don't hear an

5   objection.

6          **THE WITNESS:**  Maybe I can leave this with the jury

7   and I can tell them --

8          **THE COURT:**  Well, the lawyers usually conduct the

9   examination, but I'll wait for them to make a request.

10         **MS. BEN-AMI:**  Well, your Honor, may the witness

11  leave the book by the jury?

12         **THE COURT:**  Ms. Smith may pass the book to the

13  jury.

14         **MS. BEN-AMI:**  Thank you, your Honor.

15         **THE COURT:**  The witness may testify.

16  **Q.**  So in 1982 did this book tell scientists about the field

17  of cloning?

18  A.  Yes, it did.

19  **Q.**  And can you just describe for the jury what the word

20  "cloning" means?

21  A.  Yes.  Cloning, of course, has many definitions, but in

22  this context, cloning means making multiple copies of,

23  generally speaking, a gene or a DNA molecule.

24  **Q.**  And in this time period of 1982 in this book, for

25  example, on pages 226 and 227, as reflected in the report in

1   Paragraph 15, did the Maniatis cookbook teach people about

2   this cloning?

3   A.  Yes.  The Maniatis manual is, in fact, akin to a

4   cookbook where teaching one skilled in the art how to clone

5   DNA.

6   **Q.**  And going to yourself, Doctor, in the period 1983, were

7   you aware of this book?

8   A.  I was aware of it and used it pretty much on a daily

9   basis.

10  **Q.**  And based on your knowledge and experience, how

11  well-known was this book?

12  A.  It was widely known --

13          **MR. DAY:**  Objection, your Honor, goes beyond the

14  expert report.

15          **THE COURT:**  Where is it?

16          **MS. BEN-AMI:**  I'll withdraw it.

17          **THE COURT:**  Withdrawn.

18  **Q.**  Now, let's look at some more.  We've looked at the

19  cookbook.

20          In the period prior to the work by Amgen, had DNA

21  technology, biotechnology, been used to make medical

22  proteins?

23  A.  Yes, it had.

24  **Q.**  And can you walk us through the examples on the board?

25  A.  Yes.

```
 1              (Whereupon counsel conferred.)

 2         MR. DAY:  I'm not objecting to anything other than

 3    what's listed on the board.

 4    Q.  So would you first tell us about 1977?

 5    A.  1977 was a report on where a group of scientists had --

 6         MR. DAY:  Objection.  It goes beyond the scope of

 7    his report.

 8         THE COURT:  He may read what's on the board, which

 9    is in the report, and if there's something else in here you

10    may point him to it.

11         MR. DAY:  I don't believe 1970 -- I'm sorry.

12         MS. BEN-AMI:  Lowe report number 1, your Honor,

13    Paragraph 105.

14         THE COURT:  105, the original?

15         MS. BEN-AMI:  Yes, your Honor.

16         THE COURT:  Thank you.

17         MS. BEN-AMI:  Itakura 1977.

18         THE COURT:  He may testify consistent with what's

19    there.

20    Q.  So in 1977, what did Itakura teach?

21    A.  So Itakura, in 1977, published a paper describing the

22    expression of recombinant somatostatin.

23    Q.  Now, in 1978 what protein was made?

24    A.  In 1978 a report from Goddell, et al, recorded the

25    recombinant expression of human insulin in bacteria.
```

1    **Q.**   What is human insulin, Doctor?

2    A.   Human insulin is a protein called a hormone in our

3    bodies that, of course, controls the level of sugar in our

4    blood.  If we don't have enough insulin, we suffer from the

5    consequences of a disease called diabetes.

6    **Q.**  So we've gone through Itakura and Goddell.  In 1979,

7    Doctor, was biotechnology used to make yet another

8    recombinant protein?

9    A.   Yes.  In 1979 a report published indicated that human

10   growth hormone could be made from recombinant organisms.

11   **Q.**  So looking at the period through 1980, based on your

12   knowledge and experience, had biotechnology -- what was the

13   state of biotechnology with regard to making human proteins?

14   A.   The state of biotechnology prior to roughly 1980 --

15        **MR. DAY:**  Your Honor, I'll object for lack of

16   foundation.  The witness has testified that he was not --

17        **THE COURT:**  No, overruled.  Overruled.  He may

18   testify to that.

19        **THE WITNESS:**  Prior to 1980, the state of

20   biotechnology, in my opinion, was sufficient that there were

21   several successful examples of expressing therapeutic human

22   proteins and recombinant organisms.

23   **Q.**  Now, we talked about 1982 and the Maniatis manual, which

24   you just showed the jury, the cookbook.  In 1982 and '83,

25   can you tell us whether more recombinant proteins were made

1   in the field?

2   A.   Yes.   In the period 1982, 1983, there were more examples

3   of recombinant human proteins being made in recombinant

4   organisms.

5   Q.   Now, can you tell us here, the first one you have

6   written is recombinant human interferon.   Can you tell us

7   what that was?

8   A.   Yes.   So that refers to a report in 1982 describing the

9   expression of a molecule called human interferon, I believe

10  it was human interferon beta, there were several, in an

11  animal cell, a mammalian cell.

12  Q.   And then in 1983, can you tell us here what is meant by

13  recombinant human interleukin-2?

14  A.   That's another example in 1983 of a human protein made

15  in mammalian cells using recombinant DNA technology.

16  Q.   Now, you say mammalian cells.   What does that mean?

17  A.   Mammalian cells are cells that are from mammals; humans,

18  apes, mice, hamsters, and that sort of thing.

19  Q.   Now, in Mr. Day's opening, he said that Dr. Lin used

20  mammalian cells to do his work.   Prior to 1983 and '84 was

21  the use of mammalian cells to do this recombinant DNA

22  technology known?

23  A.   Yes, it was.

24  Q.   Now, let's go to the next one, human tissue plasminogen

25  activator?

1    A.   Yes, human tissue plasminogen activator is a protein

2    that normally in our bodies helps us to dissolve clots, and

3    it's now widely used as a therapeutic agent.   A common term

4    for it is "clot-buster."   It's widely used shortly after

5    individuals suffer from the symptoms of a heart attack to do

6    something called recanalize the blocked artery that feeds

7    our heart muscle, which causes a heart attack.

8    **Q.**   So prior to the work that Dr. Lin did, Amgen did, what

9    was the state of the art with regard to making proteins that

10   had been modified with sugars?

11   A.   So prior to 1983, and '84, there were several examples

12   published, available to the public demonstrating human

13   proteins made in mammalian cells could be made and come out

14   of the cell, modify the sugars.

15   **Q.**   Do you have the tutorial board, the cell, maybe -- it's

16   over here.

17          So just very generally, very generally, with these

18   various proteins that were made in the mammalian cells, how

19   did that work?

20   A.   In this case a mammalian cell, and more specific, for

21   instance, Chinese hamster ovary cell, which you heard about

22   in the opening, is going about its business in a tissue

23   culture dish, for instance, making proteins encoded by its

24   own blueprint.   And stated simply, and it's not complicated,

25   frankly, one can obtain the gene from another organism, a

1    blueprint, if you will, and install it into that Chinese

2    hamster ovary cell with standard technologies, and under the

3    proper and very clear conditions illustrated in those papers

4    that I told you about, in 1981 to 1983, those cells will be

5    instructed by that blueprint to make the protein dictated by

6    that blueprint, and using the normal processes that are

7    inherent in that cell, that protein, if it's meant to be

8    glycosylated, it will be subjected to the chemical

9    modifications of that sugar-modification process and be so

10   modified.

11   **Q.**  So you said the tissue culture dish, and let me hand you

12   which is -- what is QBY.

13           **THE CLERK:**  Q?

14           **MS. BEN-AMI:**  B-Y.

15           **MR. DAY:**  This is outside the expert report.  I

16   object.

17           **THE COURT:**  All right.  Where is the reference to

18   it?

19           **MS. BEN-AMI:**  One second, your Honor.  I'll move

20   on, because it's not --

21           **THE COURT:**  It's withdrawn.

22   **Q.**  Now, Doctor, in those instances where the cells were

23   mammal cells, like the CHO cell, what did they do to make

24   the cell make the protein?  What did the prior art teach?

25   A.  Well, the prior art taught one that if you had the

1    blueprint for a particular protein --

2    Q.   And that's here?

3    A.   That would be the gene, or that double-stranded.  It

4    would be technically straightforward to install that

5    blueprint, that gene, if you will, into the cell, and the

6    cell would, by virtue of its inherent abilities, take that

7    blueprint and turn it into its product, the product that the

8    blueprint was instructing the cell to do.  And that would

9    be, in this case, these cases I told you about, a protein.

10   Q.   And what do you mean by it would be inherent?

11   A.   Well, the cell's function, essentially, one of its

12   functions, a major function, is to carry out the process of

13   making proteins from its genes from its blueprint.

14   Q.   So when you put the TPA gene in the cell, what happens?

15   A.   When you put the TPA gene in the cell in a configuration

16   that was standard at the time, the cell will carry out its

17   inherent function, its inherent chemical set of reactions

18   and be instructed by that TPA gene to make TPA.

19   Q.   Now, the technology we've spoken of up to now, all that

20   technology, was any of that invented by Amgen?

21   A.   In my opinion, I'm not aware that any of it was invented

22   by Amgen.

23   Q.   Well, all these references here that are on the board,

24   were any of those references to Amgen?

25   A.   No.

1  Q.  So at the time, 1983, this work had been done by others;

2  correct?

3  A.  Yes.

4  Q.  Now --

5        MS. BEN-AMI:  Can I have JL8, please?

6  Q.  Can you tell us what that time line is?

7  A.  Yes.  This is a time line of a series of events in the

8  course of DNA, recombinant DNA technology from 1980 through

9  1984.

10  Q.  Now, can you tell us what this chart shows about the use

11  of these Chinese hamster ovary cells?

12        THE COURT:  Just forgive the interruption, have in

13  mind the question.

14        That's a demonstrative aid?

15        MS. BEN-AMI:  Yes, your Honor.

16        THE COURT:  Just calling that to the attention of

17  the jury.  That's all.  Go ahead, you may answer the

18  question.

19  Q.  Can you tell us what was known of the uses of these

20  Chinese hamster ovary cells that Dr. Lin used?

21  A.  Yes.  You'll see the word on the time line "CHO," an

22  abbreviation for Chinese hamster ovary cells.  These were

23  cells commonly available to anyone in the public domain in

24  that time period.  And there are several examples on this

25  time line of the use of CHO cells to make proteins, human

1  proteins, that were modified by sugars.

2  Q.  Now, there are other cells.  What are these other cells

3  that you're listing here?

4  A.  So the other cells include CD1 cells, or COS7 cells or

5  COS1 cells.  Those are monkey cells, mammalian cells.

6  Q.  And these CHO cells, were these -- can you tell us

7  whether or not these cells were publicly available?

8  A.  Yes.  So the C-H-O cells or CHO cells were publicly

9  available, they're available from university scientists and

10  they were available from a repository known as the ATCC, a

11  publicly accessible cell repository.  You call them up, in

12  those days, before the Internet, and you said, Send me the

13  CHO cells, and you send them a check and they send you the

14  cells by Federal Express.

15  Q.  Now, in the period up to 1983, '84, what were the

16  methods known to obtain the DNA blueprint?  How do you, in

17  that time period, how -- what was known about getting the

18  DNA that would code for the protein?

19  A.  So how you get the DNA for TPA, for example.  Well,

20  there were a number of methods available at the time.  There

21  were three general methods that I can think of that were

22  laid out in the literature prior to 1982, 1983.

23  Q.  And what were those methods?

24  A.  So those methods include primarily using the protein

25  sequence.

1    Q.   And how would you use the protein sequence at that time?

2    A.   Well, the protein sequence, you may remember, reflects

3    the blueprint, the words in the blueprint.  And it's

4    possible to work backwards from the protein to obtain the

5    sequence or representation of it of the blueprint.

6         **MS. BEN-AMI:**  Can we have the codon table again,

7    please?  Which is JL1.  Thank you.

8    Q.   So if we have a methionine, how do we work backwards to

9    the protein, from the protein to the DNA?

10   A.   If we have a methionine on this string here, and it's

11   right here, and we go to the codon table and we look it up

12   and we find methionine, and this codon table tells us that

13   in the blueprint the three-letter word that specifies that

14   particular amino acid residue, the bead, if you will, is

15   ATG.

16   Q.   Now, in this time period, 1983 to '84, using the protein

17   as a guide, you have the protein, I'm asking you to assume

18   you have the protein as a guide?

19   A.   Yes.

20   Q.   What were the methods to make the DNA blueprint?

21   A.   So having the protein as a guide, in outline, the

22   methods were to obtain the sequence of amino acid residues

23   in that protein one by one using what I believe, in my

24   opinion, were straightforward methods, go to the codon

25   table, design or decipher the DNA code that corresponds to

1    that protein.  And then there were three general methods

2    that would allow one to create or identify or isolate the

3    gene that makes that protein.

4    **Q.**  Now, did you have involvement with this concept of

5    protein sequencing at this time period?

6    A.  I had some involvement, yes.

7    **Q.**  What had you done?

8    A.  I had sequenced two different proteins that I had made,

9    recombinantly, as it turns out, in the laboratory that I was

10   working in.

11   **Q.**  Now, when we consider the case of EPO that's at issue

12   here today, given the techniques that you've outlined, what

13   was the problem, if any, to make recombinant EPO, in your

14   opinion?

15   A.  In my opinion, based on the prior art, as attorneys call

16   it, what was known by virtue of publications, what was

17   necessary is the DNA sequence that instructed the cell to

18   make EPO.

19   **Q.**  And what was needed, if anything, to get the DNA

20   sequence?

21   A.  So the DNA sequence could be obtained if one had the

22   protein in amounts sufficient to sequence the protein.

23   **Q.**  And in the period 1981, '82, '83, based on your view of

24   the evidence, the materials you've seen so far, who had the

25   protein?

1   A.   So the only person to my knowledge that had quantities

2   sufficient, quantities of EPO sufficient for determining the

3   DNA sequence, was Dr. Goldwasser at the University of

4   Chicago.

5   Q.   Now, Dr. Goldwasser of the University of Chicago, in

6   1981, was he, based on your reading, an employee of Amgen?

7   A.   Based on my reading and understanding --

8        MR. DAY:   Objection, your Honor.   It lacks

9   foundation.   This is --

10       THE COURT:   My call.   Would you put the question

11  again?   I'll have that in mind, Ms. Ben-Ami.

12       MS. BEN-AMI:   Based on the evidence he has reviewed

13  or the material he has reviewed at the time, 1981, was

14  Dr. Goldwasser an employee of Amgen.

15       THE COURT:   Well, no, sustained.   On that ground.

16  Sustained.

17  Q.   At the time, 1977, had Dr. Goldwasser published any

18  information regarding the purification of human EPO?

19  A.   Yes.   He has a publication in 1977 describing the

20  purification of human urinary erythropoietin.

21  Q.   At that time, where did he say he was from?

22  A.   At that time he was attributing his affiliation with the

23  University of Chicago.

24  Q.   And in that paper, did he indicate the course of the

25  funding for his work?

1    A.  I recall that he indicated in that paper that the

2    National Institutes of Health had provided him a grant to do

3    that work.

4    **Q.**  Now, can we go back to --

5          **THE COURT:**  I'm amenable to holding it, but you may

6    be more comfortable.  It was just that one with the flags on

7    it, because we got into back and forth.

8          **MS. BEN-AMI:**  I understand, your Honor.  Whatever

9    is more convenient.  I --

10          **THE COURT:**  In your judgment.  You go right ahead.

11          **MS. BEN-AMI:**  I'll probably call upon you again,

12    your Honor.  But let's see what we can do now.

13    **Q.**  So looking at this claim, the '868, claim 1, can you

14    walk through this claim now for the jury, explaining it in

15    terms of that cell model we talked about?

16

17          **MS. BEN-AMI:**  Maybe -- if I could call upon your

18    Honor, since I need to use two boards, and keep the claim up

19    there, and your Honor would be so kind, and I not kill the

20    court reporter.  I'm sorry.

21    **Q.**  So looking at this claim, can you tell the jury what

22    this claim is saying using the picture as a guide?

23    A.  Yes.  So I think we can start with the first couple of

24    words in this claim, those words say, "A process for the

25    production of."  So that is a way to make something.  Now,

1    what are we making?  What is this claim telling us we're

2    going to make?  It's a process for the production of a

3    glycosylated erythropoietin polypeptide.

4    Q.  And at this time, 1983, had -- can you tell us what the

5    state of the art was with regard to making glycosylated

6    peptides, polypeptides?

7    A.  Yes.  So as that time line indicated, there were several

8    publications reporting the production of glycosylated

9    polypeptides, human polypeptides in CHO cells and other

10   mammalian cells.

11   Q.  And the next part is the biological property of causing

12   bone marrow cells, et cetera.

13   A.  Yes.  So having the in vivo biological property, that

14   means -- in vivo means in an animal, in a human being,

15   biological property means what that protein does, of

16   causing, and in this case, it's a specific thing that we're

17   focused on, causing bone marrow cells to increase the

18   production of reticulocytes and red blood cells.

19   Reticulocytes are precursors to red blood cells.

20   Q.  At this time, 1983, '84, can you tell us what the state

21   of the art was with regard to using CHO cells to make

22   proteins that worked biologically?

23   A.  Yes.  So there were, as I mentioned to you, several

24   examples of CHO cells that were used to make human proteins

25   that were glycosylated, and there were examples of proteins

1     that were made that were biologically active.

2     Q.  Can you give us some examples?

3     A.  A good example is human beta interferon.  Another good

4     example is human TPA, the clot-buster.

5     Q.  And then the claim says the growing under suitable

6     nutrient conditions.

7          MS. BEN-AMI:  Yes, your Honor.  Thank you.

8     Q.  Growing under suitable nutrient conditions.  Can you

9     tell us what the state of the art was about growing cells

10    under suitable nutrient conditions?

11    A.  Yes.  Growing CHO cells under suitable nutrient

12    conditions is something that would take me about five

13    minutes to explain how to do to pretty much anyone.  It's a

14    standard procedure that we use in the laboratory.  You take

15    the cells, you put them in a culture dish, plastic dish,

16    they have a funny shape to it, that dish is going to have

17    some nutrient medium.  And put the cells in the dish --

18         MR. DAY:  Your Honor, I object.  This is outside

19    the report.

20         THE COURT:  We'll stop it there.

21    Q.  In 1982, based on the references on CHO cells that are

22    in your report, was it known how to grow CHO cells under

23    suitable nutrient conditions?

24    A.  Yes.

25    Q.  And in 1983 and '84, based on the references in your

1   report, was it known how to transform or transfect mammalian

2   cells, CHO cells?

3   A.  Yes.  So --

4   **Q.**  Can you tell us what the basis is?

5   A.  To define transform or transfect, that's a term that we

6   use to describe the method of installing the blueprint into

7   the cell, or more technically said, putting the DNA into the

8   cell.  And that was something that you could read about in

9   the Maniatis manual, or in the scientific literature in 1982

10  and 1983 and before.

11  **Q.**  And those examples of using CHO cells to make TPA and

12  interferon, in those instances, can you tell us whether or

13  not in those instances the mammalian cells had been

14  transformed or transfected with the protein -- the DNA

15  sequence of interest?

16  A.  Yes.  Those cells had been transfected, or transformed,

17  depending upon which term you prefer, transformed with DNA

18  sequences encoding interferon beta or TPA.

19  **Q.**  Based on the literature that you have in your report, in

20  the time period of 1983, '84, was the principle of isolating

21  a glycosylated protein known or not known?

22  A.  Yes.  It was known.  Stated simply, the definition of

23  isolating is taking the nutrient media from those cells

24  after they've been putting that glycosylated protein in the

25  liquid media, and taking the media and putting it into a

1    device called a centrifuge, which basically spins down or

2    separates away from the liquid part of the media any pieces

3    of the cells or debris, and what you're left with is --

4         **MR. DAY:**  Your Honor, again, I object.  This is

5    beyond the scope of this report.

6         **THE COURT:**  Where is it, or we'll stop it there?

7         **MS. BEN-AMI:**  We can stop it there, just to move

8    on.

9         **THE COURT:**  Stop it there and move on.  Thank you.

10        **MS. BEN-AMI:**  Thank you, your Honor.

11   **Q.**  Now, let's talk about EPO in particular now.  In 1982

12   and '83 was EPO known?

13   A.  Yes, EPO was known from Dr. Goldwasser's publications,

14   including purification, and from other scientists'

15   experiments, known to be a hormone to control our red blood

16   cell production.

17   **Q.**  And based on your review of the literature and the

18   material that you've been provided in this case, how many --

19   strike that.

20        Were scientists interested in cloning the EPO gene?

21   A.  Yes.

22   **Q.**  And why?

23   A.  There was interest in cloning the EPO gene.

24        **MR. DAY:**  I object.  This is outside the scope of

25   the report, why they were interested.

1          **THE COURT:**  They were interested, we'll let that

2     stand.  She can put another question.  It's the why that

3     he's objecting to, and if it's in the report, ask him.

4     **Q.**  At the time of the literature, did the literature speak

5     of a reason to make recombinant EPO?

6          **MR. DAY:**  Objection.  It's outside the scope of the

7     report.

8     A.  Yes.

9          **MS. BEN-AMI:**  Paragraphs 8 and 38 of --

10         **THE COURT:**  Thank you.  Of?

11         **MS. BEN-AMI:**  Supplemental 2.

12         **THE COURT:**  Supplemental 2.

13         **MS. BEN-AMI:**  And based on the evidence that is

14    cited in --

15         **THE COURT:**  Thank you, just one second.  Eight and

16    38.

17         **MS. BEN-AMI:**  Your Honor could look at

18    Paragraph 12 --

19         **THE COURT:**  Yes, he may certainly testify

20    consistent with Paragraph 8.

21         I have this problem, are you basing this on

22    materials or do you know this yourself?

23         **THE WITNESS:**  Your Honor, are you speaking to me?

24         **THE COURT:**  Forgive me for not being precise, and

25    yes, I am.

1          **THE WITNESS:**  Yes, okay.  I do know this myself.

2          **THE COURT:**  You may testify consistent with the

3     report.

4          **THE WITNESS:**  Yes, thank you.

5     **Q.**  So you were living in this world in 1982 and 1983,

6     right?

7     A.  Yes.

8     **Q.**  And in 1982 and 1983, why, as you understood it, were

9     people looking to make recombinant EPO?

10         **MR. DAY:**  Your Honor, I object.  Now we're having

11    him testify as a fact witness.  He's not disclosed as a fact

12    witness.

13         **THE COURT:**  Well, just a minute here.  He may

14    testify.  Overruled.

15         Why?

16         **THE WITNESS:**  So why were -- if you maybe

17    paraphrase and restate your question.

18    **Q.**  So based on what you knew from the era, why were people

19    working on recombinant EPO?

20    A.  Recombinant EPO was a goal that many scientists have to

21    achieve because there was apparent and obvious need to have

22    sufficient human EPO to treat patients that had anemias,

23    that had low blood counts for a variety of reasons,

24    including kidney failure and cancer treatments, for

25    instance.

1    Q.  And what was understood as being the material that was

2    needed to succeed in making recombinant EPO?

3              MR. DAY:  Objection, your Honor.  It's outside the

4    scope of the report.

5              THE COURT:  Where is it?

6              MS. BEN-AMI:  Supplement 2, Paragraph 9, based on

7    the evidence --

8              THE COURT:  Just one second.  Supplement 2,

9    Paragraph 9.

10             MS. BEN-AMI:  First sentence.

11             THE COURT:  Thank you.

12             MR. DAY:  Second supplement?  I'm sorry.

13             MS. BEN-AMI:  Supplement 2.

14             THE COURT:  First sentence, she said, and he may

15   testify consistent with what is contained in Paragraph 9.

16             MS. BEN-AMI:  May I provide the witness with the

17   paragraph so that --

18             THE COURT:  You may give him the report.

19             Now, a witness must testify as to his own

20   knowledge.  One of the reasons she doesn't, as a trial

21   tactic, she doesn't want to give him the report, is to

22   suggest to you, to emphasize to you, he really knows this

23   stuff.  On the other hand, she's got the problem that the

24   way I run a trial, nothing -- you're not going to hear

25   anything that's not in this report in order to be fair.

1          So she can give him the report so you can see he's

2     looking at the report to see what's there, and it's all a

3     balance.  The lawyers can try their case as they see fit.

4     But fair is in the report.  I stick to fair.  It's up to you

5     what you make of this witness.  You believe it, disbelieve

6     it, or believe it in part, it's entirely up to you.  And you

7     may proceed as you see fit.

8          **MS. BEN-AMI:**  I'll try to take it in little bites.

9          **THE COURT:**  As you see fit.

10         **MS. BEN-AMI:**  Thank you, your Honor.

11    **Q.**  In this period of time when people wanted to make

12    recombinant EPO, what was identified as the problem to get

13    the DNA?

14         **MR. DAY:**  Objection, your Honor.  It's outside the

15    scope of the report.

16         **THE COURT:**  I think not.  Overruled.

17         **THE WITNESS:**  The problem to get recombinant EPO --

18    **Q.**  DNA?

19    A.  -- DNA, was you needed the gene.  In order to get the

20    gene, you had to have the protein sequence, stated very

21    simply.  The common way to get the EPO gene, the most

22    logical, straightforward way was to have the protein

23    sequence of EPO.

24    **Q.**  Now, what was, in your opinion, in the field, the

25    understood solution to getting the protein to sequence?

1    A.  There was an obvious source for the protein to sequence,

2    and that source was published in 1987, and in subsequent

3    publications from Dr. Goldwasser's laboratory.

4    Q.  What year was that?

5    A.  First publication of the report of purification of human

6    EPO was 1977.

7    Q.  Now, based on the materials that you have reviewed, did

8    other companies ask Dr. Goldwasser for the protein to

9    sequence?

10   A.  Yes.  I've read documents, seen evidence that other

11   companies had contacted Dr. Goldwasser to obtain protein for

12   sequencing, and it's my understanding that those requests

13   were basically not fulfilled.

14   Q.  They were what?

15   A.  Not fulfilled by Dr. Goldwasser.

16   Q.  So in this period of time, 1983, based on the materials

17   that you have reviewed, which will be authenticated by

18   declaration, did companies tell Dr. Goldwasser why they

19   wanted the protein?

20        MR. DAY:  Objection, your Honor, this is --

21        THE COURT:  Sustained.

22        MS. BEN-AMI:  Your Honor, may I have a quick

23   sidebar?

24        THE COURT:  You certainly may.

25        MS. BEN-AMI:  Thank you, your Honor.

 1   SIDEBAR CONFERENCE, AS FOLLOWS:

 2        THE COURT:  First of all, it's hearsay.  And we're

 3   going to have Goldwasser.  If there's documents, the

 4   documents speak for themselves.  Second, I don't know where

 5   we're going with this.  You tried to make some sort of

 6   alleged impropriety about Amgen and Goldwasser.  Maybe there

 7   is some, but this is the first I'm hearing of it, I have to

 8   say.  Maybe in the other case no one raised it, I don't

 9   know.

10        But I don't know what -- I was troubled by that

11   when I listened to it in your opening because I'm seeing in

12   this case either there was anticipation, documents out there

13   publicly, or it's obvious relative to what was known

14   publicly.  I just don't understand this alleged impropriety.

15   It may be my own improvidence, but I have evidentiary

16   problems so I'm telling you, one, I don't see how he can

17   testify to this.  And even if you get it, I'm unclear and

18   more confused about what the --

19        MS. BEN-AMI:  Sure.  Under the law there is

20   something called 102(f) derivation prior art.

21        THE COURT:  Yes, that's a the first time I've heard

22   that phrase.

23        MS. BEN-AMI:  It's 102(f) in the statute, you can

24   use a 102(f) as a basis for, just like you use 102(a)

25   reference or 102(b) --

1          **MR. FLOWERS:**  D.

2          **MS. BEN-AMI:**  Whatever it might be.  Point one is

3    through Dr. Goldwasser I will connect up and prove that this

4    was derivation prior art.

5          **THE COURT:**  We'll see.  Go ahead.  But I follow.

6          **MS. BEN-AMI:**  Okay.  So once it is derivation prior

7    art, it is prior art that may be considered for obviousness.

8    And what this witness is testifying to under KSR is you can

9    say what was the motivation of everyone at the time, what

10   they understood --

11         **THE COURT:**  Okay.  All right.  Now I've got your

12   argument.  And my problem is the evidentiary basis for it.

13   What's the evidentiary basis for letting this witness

14   testify?

15         **MR. DAY:**  May I --

16         **THE COURT:**  Not yet.

17         **MS. BEN-AMI:**  So I need to connect up with

18   Dr. Goldwasser, but he has read Dr. Goldwasser's testimony.

19         **THE COURT:**  I'm sorry, I'm not doing it that way.

20   You have to finish with him.  We'll see where Goldwasser is.

21   You can put him back on.  There's none of this some day

22   we're going to connect up.  It's not -- you haven't got an

23   evidentiary basis for it so I'm excluding it.

24         **MR. DAY:**  Your Honor, may I?

25         **THE COURT:**  You just won.

1           **MR. DAY:**  I know I did.  There's just one --

2           **THE COURT:**  It's always dangerous to argue when you

3    just won.

4           **MR. DAY:**  I know it is.

5           **THE COURT:**  But go ahead.

6           **MR. DAY:**  There's another reason, that this expert

7    on the stand is a technical expert.  Ms. Ben-Ami is making

8    him into an expert of the facts because she's --

9           **THE COURT:**  I'm not going to allow that anyway,

10   but --

11          **MR. DAY:**  She's asking him to render opinions

12   about --

13          **THE COURT:**  It's gilding the lily.

14          **MR. DAY:**  Thank you.

15          **MS. BEN-AMI:**  Your Honor, as to the Biogen

16   information, we have a declaration of authenticity from

17   those --

18          **MR. FLEMING:**  From the custodian of records of

19   Biogen, your Honor.

20          **THE COURT:**  I say, again, I'm accustomed to one

21   person arguing --

22          **MR. FLEMING:**  I beg your pardon.

23          **THE COURT:**  -- not a battalion.  But that said, so

24   fine, so they're authentic, they speak for themselves.

25          (Whereupon the sidebar conference concluded.)

```
 1              THE COURT:  Proceed.

 2              MS. BEN-AMI:  Thank you, your Honor.

 3   (BY MS. BEN-AMI:)

 4   Q.  Doctor, now that we've gone through the background, can

 5   you tell us, based on your knowledge and experience, who a

 6   person of ordinary skill in the art would be in the period

 7   of 1983, '84?

 8   A.  Yes.  A person of ordinary skill in the art would be

 9   someone who has earned an M.D. or Ph.D. degree, perhaps a

10   D.V.M. or its equivalent, and one or two years of post-M.D.,

11   post-Ph.D. laboratory experience in a laboratory that's

12   doing biological research.

13   Q.  Now, do you have Exhibit 1?  The jury has it in their

14   notebook.  The patent with the full description.

15   A.  Exhibit 1?

16   Q.  Yes.  Do you have it?

17   A.  Yes.

18   Q.  Can you tell the jury what it is?

19   A.  Just move my exhibits around here.  So Exhibit 1 is

20   United States Patent Number 5,547,933.

21   Q.  Have you read that patent?

22   A.  Yes, I have.

23   Q.  And I would ask you, then, to go to column 1, just so

24   the jury can --

25              MS. BEN-AMI:  May I, your Honor, or would your
```

1      Honor care to, just to tell the jury where the column is?

2               THE COURT:  No, you may.

3               MS. BEN-AMI:  Just you have to go all the way to

4      almost the middle.  There are figures in the beginning, and

5      then as we get towards the middle, you'll see it says column

6      1 and column 2, and then there are line numbers that we'll

7      be -- there are line numbers we'll be referring to.  So you

8      would say column 1, line -- I can't see that -- 28, or 25.

9               THE COURT:  What she's doing is a little more

10     detail on how patents are set up.  It's not testimony.  No

11     one disputes any of this, that is how a patent is set up.

12     She may say that to you.

13              MS. BEN-AMI:  So we'll look at column 1 towards the

14     middle, it doesn't have -- well, if you look on the bottom

15     it's got AMITC 0002977 -- oh, yours doesn't have these

16     numbers on it.  I'm sorry folks.  So we get all the way over

17     here, you'll see it says figure 19, figure 20, figure 21.

18     After figure 21.  So look through the figures until you get

19     to column 1, after figure 21.

20     Q.  Okay.  Can you tell the jury what is called -- you see

21     where it says "Background" in column 1?

22     A.  Yes.

23     Q.  Can you tell the jury what that is?

24     A.  So the background, as I understand it, is that it

25     provides, if you will, a summary of what's known about the

1    field that the invention is relating to at the time that the

2    invention is essentially made.

3    **Q.**  So can you look at the first part of the background,

4    let's say from lines 25 to line 30 or so, and can you tell

5    us what is being said there?

6    A.  In column 1.

7           **MR. DAY:**  It's outside the expert report.

8           **THE COURT:**  Where is it in the report?

9           **MS. BEN-AMI:**  Your Honor, I've lost my spot.  It's

10   in the supplemental report, paragraph --

11          **THE COURT:**  Which?

12          **MS. BEN-AMI:**  First.  The one that's just called

13   "Supplement."

14          **THE COURT:**  All right.

15          **MR. DAY:**  I'm sorry, what paragraph?

16          **MS. BEN-AMI:**  Paragraph 11.

17          **THE COURT:**  I'm thrown here.  There's an expert

18   report and that goes up to 249 paragraphs.  There's a second

19   supplemental report that I have.  You're telling me there's

20   just a document called, "Supplemental Report"?

21          **MS. BEN-AMI:**  Yes, your Honor.

22          **THE COURT:**  Don't have it.

23          All right.  And now the paragraph?

24          **MS. BEN-AMI:**  Paragraph 11.

25          **THE COURT:**  He may testify consistent with

1    Paragraph 11, but the sort of general description of the

2    patent is not there.  He's confined to Paragraph 11.

3         **MS. BEN-AMI:**  I've got Supplement 1, Paragraph 11,

4    discussing the state of the art.

5         **THE COURT:**  Just a moment.  Just a moment.  Where

6    is it?  In Paragraph 11.  Yes, he may testify consistent

7    with Paragraph 11.

8         **MS. BEN-AMI:**  I'm going to be going through several

9    parts, your Honor, I thought it would be easier to give you

10   everything at once.

11        **THE COURT:**  Go ahead.

12        **MR. DAY:**  Excuse me, your Honor, but the question

13   had nothing to do with what's in Paragraph 11.

14        **THE COURT:**  My ruling is she can get Paragraph 11

15   in evidence, and that's it until we hear something else.

16        **MS. BEN-AMI:**  Supplement Paragraph 11, Lowe Report

17   1, Paragraph 11.

18        **THE COURT:**  I don't understand.  Lowe Report -- the

19   report itself, 1, Paragraph 11.

20        **MS. BEN-AMI:**  No, Supplement 1.  We've got

21   different supplements.  I'm sorry.

22        **THE COURT:**  Just a moment.  I have a supplemental

23   and now you're telling me -- oh, I see it now.  Here's a

24   Supplement 1 -- no, I have third -- I have one that's called

25   Supplemental, and one that's called Third Supplemental.

 1          **MS. BEN-AMI:**  I'm sorry, your Honor, that's the

 2   Central Expert Report.

 3          **THE COURT:**  The central, that's what I thought.

 4   The Central Expert Report, Paragraph 11.

 5          Well, he may say what's said there but he's not

 6   going to provide it.  That's the whole idea of having a

 7   report.

 8          **MS. BEN-AMI:**  Right.  It goes through, now we go

 9   through the report.

10          **THE COURT:**  Anything that -- what's here in the

11   report he may say.

12          **MS. BEN-AMI:**  So we can look at Paragraph 62.

13          **THE COURT:**  Yes.

14          **MS. BEN-AMI:**  Where he's citing to various parts of

15   the --

16          **THE COURT:**  Yes.  Fine, he may testify to it.

17   **Q.**  In the background of the invention --

18          **MR. DAY:**  Your Honor, I object.  It's simply not

19   set out in the expert report.

20          **THE COURT:**  Now, wait a second.  Now she's pointed

21   me to things.

22          **MR. DAY:**  Yes.

23          **THE COURT:**  Now, I said he's confined to those

24   things.  Now she'll ask her questions, and I have those

25   things in front of me and I'll try to move along smoothly.

1    If you object, simply object and say it's not there and I

2    can see what is there.

3            **MR. DAY:**  Yes, sir.

4            **THE COURT:**  Go ahead.

5    **Q.**  Doctor, is your tutorial which you gave this jury

6    consistent or inconsistent with what is described in the

7    patent as the background of the invention?

8            **MR. DAY:**  Objection, it's not in the report.

9            **THE COURT:**  Sustained, on the ground that you're

10   leading the witness.

11   **Q.**  Can you tell us how Dr. Lin describes the state of the

12   art in his patent?

13           **MR. DAY:**  Objection, it's not in the expert report.

14           **THE COURT:**  Sustained.  But you may read from the

15   patent, that portion of the patent.

16           **MS. BEN-AMI:**  Okay.

17           **THE COURT:**  If you wish.

18   **Q.**  Would you read from the patent the -- under,

19   "Manipulation of genetic materials," lines 25 through lines

20   35?

21           **MR. DAY:**  Your Honor, that's simply not in the

22   report.

23           **THE COURT:**  No, no, she may do that.  The

24   document's in evidence, she may have him read from it.

25           **MR. DAY:**  Fine, thank you.

1          **THE WITNESS:**  So that would be lines, in column 1,

2     lines 25 through 35, in the '933 patent, "Genetic materials

3     may be broadly defined as those chemical substances which

4     program for and guide the manufacture of constituents of

5     cells and viruses and direct the responses of cells and

6     viruses, a long chain polymeric substance known as

7     deoxyribonucleic acid, parenthesis, DNA, closed parenthesis,

8     comprises the genetic material of all living cells and

9     viruses except for certain viruses which are programmed by

10    ribonucleic acids, parenthesis, RNA, closed parenthesis."

11    **Q.**  Now, going to your tutorial, what was known about DNA

12    and what it did?

13    A.  Going to the tutorial, DNA was illustrated to be the

14    blueprint which programmed the cell to go about its

15    function.

16    **Q.**  Now, could you read line 54 through 65 of column 1?

17    A.  Those lines read, "The mRNA in turn serves as a template

18    for the formation of structural regulatory and catalytic

19    proteins from amino acids.  This mRNA translation process

20    involves the operations of small RNA strands, tRNA, which

21    transport and align individual amino acids along the mRNA

22    strand to allow for formation of polypeptides in proper

23    amino acid sequences.  The mRNA message derived from DNA and

24    providing the basis for the tRNA supply and orientation of

25    any given one of the 20 amino acids for polypeptide

1    expression is in the form of triplet codons, sequential

2    groupings of three nucleotide bases."

3    **Q.**  Now, going back to your tutorial, what was known about

4    transcription and translation?

5    A.  Back to the tutorial, the cartoon, the diagram, the

6    illustration demonstrates what was known about transcription

7    and translation, which aligns with and is consistent with,

8    in my opinion, those two paragraphs that I just read to you.

9    **Q.**  Now, would you read in column 2 the line 20 through 22,

10   that sentence?

11   A.  Column 2, line 20 through --

12   **Q.**  Twenty would be -- I'm sorry, until the end of the

13   sentence, it looks like it's 26.

14   A.  Simply put, a gene that specifies the structure of the

15   desired polypeptide product is either isolated from a donor

16   organism or chemically synthesized and then stably

17   introduced into another organism which is preferably a

18   self-replicating unicell unit organism such as bacteria,

19   yeast or mammalian cells in culture.

20          **MS. BEN-AMI:**  I've lost my cell.  Picture.  I'm

21   sorry, your Honor.

22   **Q.**  Going back to the tutorial, at the time of 1983, '84,

23   what was the state of the art about how to get -- put -- how

24   to get the gene of interest?

25   A.  The state of the art back in 1982, '83, to get the gene

1    of interest relied on having a protein, obtaining the

2    sequence of that protein, and using that codon decoding

3    table to create a DNA molecule that either directly made the

4    protein or could be used to isolate the gene that could then

5    be used to make the protein.

6    **Q.**  Could you read the next sentence that is at line 32, it

7    says, "Once this is done"?

8    A.  "Once this is done, the existing machinery for gene

9    expression in the transformed or transfected microbial host

10   cells operates to construct the desired product using the

11   exogenous DNA as a template for transcription of mRNA which

12   is then translated into a continuous sequence of amino acid

13   residues."

14   **Q.**  And based on the information that you've studied on the

15   state of the art, what was known about how the cell would --

16   strike that.

17            Based on your reading of the materials and your

18   knowledge of the state of the art by 1983, '84, once the DNA

19   was put in the cell, what would happen?

20   A.  Once the DNA was put in the cell, arranged in ways that

21   were well-known to those skilled in the art, the cell would

22   carry out its normal business with that DNA.  It would

23   transcribe and translate that DNA, transcribe it into RNA,

24   translate the RNA into protein, and carry out its normal

25   function.

1    Q.  Now, looking on that same column, going up to line 20,

2    could you read that sentence to the jury?

3    A.  Line 20.

4    Q.  It starts with, "A focus."

5    A.  The paragraph reads, or the sentence reads, "A focus of

6    microbiological processing for the last decade has been the

7    attempt to manufacture industrially and pharmaceutically

8    significant substances using organisms which either do not

9    initially have genetically coded information concerning the

10   desired product included in their DNA, or in the case of

11   mammalian cells in culture, do not ordinarily express a

12   chromosomal gene at appreciable levels.

13   Q.  And based on your understanding of the state of the art,

14   looking at all the materials that you have briefly gone over

15   with the jury, was a focus in the art to get

16   pharmaceutically significant substances using recombinant

17   DNA technology?

18          MR. DAY:  Objection.  Outside the scope of his

19   expert report.

20          THE COURT:  Outside the scope of what?

21          MR. DAY:  His expert report.

22          THE COURT:  Yes.  Is it there?

23          MS. BEN-AMI:  It's exactly what he testified in the

24   general concept to before, your Honor.

25          THE COURT:  Where.  I have to see it.  At 62 in the

1  general report?

2          **MS. BEN-AMI:**  It was the entire time line he just

3  went through.

4          **MR. DAY:**  Can we see your Honor?

5          **THE COURT:**  I just want to see it, that's all.

6          **MS. BEN-AMI:**  I have to --

7          **THE COURT:**  Just show me where it is.

8          **MS. BEN-AMI:**  I understand, your Honor.

9          **THE COURT:**  He may testify consistent with

10  Paragraph 62.

11          **MS. BEN-AMI:**  Okay.

12          **THE COURT:**  You can show him 62 if you wish, but

13  you don't have to.

14  **Q.**  I'll hand you your expert report just so you don't go

15  beyond it.  I think that's the easiest way to do it, so that

16  you don't spill over.

17          Consistent with Paragraph 62, was a major focus in

18  the field in this time frame to make recombinant

19  pharmaceutically important compounds?

20          **MR. DAY:**  Object, your Honor, to the question.

21          **THE COURT:**  Overruled.

22  **Q.**  You can answer.  When the judge says overruled --

23  **A.**  Yes.  So -- and I can read from --

24          **THE COURT:**  You can look at it to understand the

25  scope of what you can testify.  If it's true and accurate,

1    you're under oath here, you can tell us.  You don't have to

2    use the exact words but it's got to say what this says.

3              **THE WITNESS:**  Thank you, your Honor.

4    **Q.**  So you just can testify consistent with the report.

5    Don't go into a new topic.

6    A.  All right.  And you'd like me to focus on Paragraph 62.

7    And to paraphrase what I wrote in Paragraph 62, from 1981

8    through 1983 there were a number of efforts made to clone

9    human genes that were not present in substantial amounts.

10   **Q.**  Can you look back at the patent to column 2, line 39

11   through --

12             **THE COURT:**  I just want to be clear what you're

13   saying, excuse me.  Forgive the interruption.  There were a

14   number of efforts to clone human genes that in the

15   natural -- am I getting this right?  It's not for me to

16   say -- that in the natural world were not present in

17   substantial amounts?

18             **THE WITNESS:**  Yes, your Honor.

19             **THE COURT:**  So people were trying to clone this to

20   get substantial amounts --

21             **THE WITNESS:**  Yes.

22             **THE COURT:**  -- of things that our bodies produce in

23   small amounts?

24             **THE WITNESS:**  Exactly.  Yes, your Honor.

25             **THE COURT:**  Go ahead, Ms. Ben-Ami.

1    **Q.** So can we go to line 39 through 41.

2        **THE COURT:** Of the patent.

3    **Q.** Of the patent, column 2.

4    A. Shall I read that?

5    **Q.** Yes, please.

6    A. "The art is rich in patent and literature publications

7    relating to recombinant DNA methodologies for the isolation,

8    synthesis, purification and amplification of genetic

9    materials for use in the transformation of selected host

10   organisms."

11   **Q.** And based on your knowledge and experience in this time

12   frame, 1983, '84, what was the state of the art regarding

13   techniques to make these DNAs of interest?

14   A. To make the DNAs of interest, the state of the art in

15   1983, 1984, could include isolating those DNAs using

16   standard recombinant DNA technologies.

17   **Q.** Now, in your opinion, based on your knowledge and

18   experience, I would ask you to assume a hypothetical.  If

19   one had the EPO protein and one were of ordinary skill in

20   the art at the time, and one were motivated to make proteins

21   that, as the Court questioned, were in small amounts and now

22   you want big amounts, what would one do, based on the state

23   of the art and the skill in the field?

24       **THE COURT:** I just need to understand.  If one had

25   the protein of substance or one had the protein sequence, as

1    he's spelled that out?

2         **MS. BEN-AMI:**  The protein itself, what would be the

3    step-by-step thing one would do.

4         **THE COURT:**  You've got the protein.

5         **MS. BEN-AMI:**  Right.

6         **THE COURT:**  All right.  You may answer.

7         **THE WITNESS:**  You have the protein.  You use

8    methods that were published in the literature to determine a

9    sequence of amino acid residues in that protein.  You go to

10   a standard biochemistry textbook, you look up the codon

11   table.  You use the protein sequence in the codon table to

12   discern, to figure out the DNA sequence that would

13   correspond to that protein.  You may then use that DNA

14   sequence that is derived from the sequence of the protein to

15   clone the gene that encodes that protein, or to create a

16   gene in the test tube that would encode that protein.  And

17   then you would take that gene that you created or that you

18   cloned and you install that protein, that DNA sequence into

19   a CHO cell, and you install it in a way that was standard in

20   the literature that included the sequences that would tell

21   the cell how to make that protein.  And the cell, once

22   receiving that gene, will carry out its normal chemical

23   synthetic processes and make the protein.

24   **Q.**  So based on your knowledge and experience and your

25   review of the prior art and the state of the art, do you

1   have an opinion whether or not, if one had Goldwasser's

2   protein, whether or not an ordinarily skilled person

3   motivated to work in the recombinant DNA field, whether or

4   not that person would -- what would that person have done

5   with that protein?

6   A.   Motivated and ordinarily skilled, that person would have

7   used that protein to obtain protein sequence, used that

8   protein sequence to carry out those steps that I outlined

9   for you a few minutes ago; make the protein in Chinese

10  hamster ovary cells using technologies and techniques that

11  were in the prior art.

12  Q.   So looking at the six -- the '868, claim 1, could you

13  tell us, in your opinion, based on your knowledge and

14  experience, if one had Dr. Goldwasser's protein, based on

15  all the prior art and the stated art, given the

16  consideration of someone of ordinary skill in the art of the

17  time, in your opinion would the steps in this claim have

18  been obvious to a person of skill in the art?

19  A.   In my opinion, yes.

20  Q.   And can you walk us through the claim and give us the

21  basis for your opinion?

22  A.   Yes.  Let's start again with claim 1.  The words, "A

23  process for the production of."  So it's a way, a method to

24  produce something, to make something.  So it's a process,

25  it's a way.  And we're going to produce glycosylated

1   erythropoietin polypeptide.  So that's erythropoietin that

2   has been chemically modified by sugar.  And that protein

3   will have the in vivo biological activity, that is in a

4   human being, will have its normal function of causing the

5   bone marrow cells to produce red cells.

6        Now, the process is as the words say, comprised of

7   some steps.  Those steps include growing under suitable

8   nutrient conditions mammalian host cells.  And we can

9   imagine, in effect, claim 2 says that those host cells are

10  CHO cells.  Growing those cells under suitable conditions,

11  provided that those cells are transformed or transfected

12  with an isolated DNA sequence that encodes human

13  erythropoietin.

14       So in plain language, it says it's a process for

15  taking cells that you've made, or you've installed the human

16  erythropoietin gene into those cells, CHO cells as claim

17  2 says, and growing them under suitable nutrient conditions,

18  I think I told you earlier that that's trivial, in my

19  opinion, and then isolating those glycosylated

20  erythropoietin polypeptide molecules from those cells, and

21  more specifically from the media, the nutrient media that's

22  bathing those cells.

23  **Q.**  I'd like to break that down a little bit.

24       Can you look -- I'd like to ask you some questions

25  first on this notion of taking the protein and cutting up

```
 1    the beads, sequencing the protein so that you know what the

 2    protein sequence is.  Okay.

 3            Would you please refer to Exhibit NJD.

 4    A.  I have Exhibit NJD in front of me.

 5         MS. BEN-AMI:  Can you put it up?

 6    Q.  Could you tell us what this is?

 7    A.  This is a scientific paper, it's published in the

 8    journal called "Science."  The authors of this paper are

 9    Michael W. Hunkapiller and Leroy E. Hood.  And the date of

10    the publication is February 11, 1983.

11    Q.  And do you know what this journal is that it's in?

12    A.  The journal "Science" is, as I think we heard in the

13    opening of Mr. Day, the premier scientific journal in this

14    country.

15         MS. BEN-AMI:  Your Honor, I offer NJD as prior art.

16         THE COURT:  Any objection?

17         MR. DAY:  No objection, your Honor.

18         THE COURT:  It may be admitted, but you people will

19    know what numbers you're up to, so NJD will have what

20    number?

21         THE CLERK:  I can probably tell you, Judge.  Hold

22    on a second.

23         THE COURT:  Surely, we have a letter and numbers --

24         THE CLERK:  2010.

25         THE COURT:  Yes, ma'am.  It is what?
```

 1              **THE CLERK:**  2010.

 2              **THE COURT:**  It's admitted as Exhibit 2010 in

 3      evidence.

 4              (Exhibit marked in evidence.)

 5      **Q.**  Now, Doctor, looking at what has now gone from NJD to

 6      2010, can you tell us what this article has to do with

 7      sequencing proteins?

 8      A.  Yes.  This, the title of this paper is, "Protein

 9      Sequence Analysis," quote -- or colon, "Automated

10      Microsequencing."  And in essence, this is an article that

11      sets out the state of the art, if you will, from many years

12      of prior experimentation in the area of determining protein

13      sequences.  And it is something that I would categorize as a

14      review article.

15              So a review article helps those who are both expert

16      in an area and those who are not expert in an area

17      understand an area.  And review articles typically are

18      written when you've reached a point in the evolution of the

19      field where it's useful to synthesize and summarize

20      everything that's been done so that the experts and the

21      nonexperts can understand what's possible.

22              **MS. BEN-AMI:**  Can we publish this article now, your

23      Honor?

24              (Alarm sounding.)

25              **MS. BEN-AMI:**  Apparently not.

```
 1              THE COURT:  It's ten minutes to 1:00.  It's going

 2    to take too much time.  Ms. Smith will take you first to the

 3    jury room and then she will take you out the fire exit

 4    because we don't go down the elevator, obviously, in a fire.

 5    Collect your belongings.  You are excused until 9:00 a.m.

 6    tomorrow morning.

 7              If -- we're going down the same stairs with

 8    witnesses and lawyers.  Don't talk to them.  Keep your minds

 9    suspended.  Do not discuss the case either among yourselves

10    or with anyone else.

11              Please orderly exit the building.  The stairway is

12    to your right outside the door.  Down the stairway it will

13    take you into the park.

14              We stand in recess until 9:00 a.m.  I should say I

15    want to see counsel at 2:30, 2:30 in the courtroom, to talk

16    about the Priss deposition.  So whoever's up on that, I'd

17    like to work that through.

18              MR. DAY:  Thank you, your Honor.

19              THE COURT:  You're all excused.

20              MS. BEN-AMI:  Is the courtroom going to be open

21    after the fire drill?

22              THE COURT:  If the building is standing, the

23    courtroom will be open.

24              MS. BEN-AMI:  So I can get my materials later.

25    Thank you, your Honor.
```

1          (Adjournment.)

2

3

4                    **C E R T I F I C A T E**

5

6

7          We, Donald E. Womack and Cheryl B. Palanchian,

8   Official Court Reporters for the United States District

9   Court for the District of Massachusetts, do hereby certify

10  that the foregoing pages are a true and accurate

11  transcription of our shorthand notes taken in the

12  aforementioned matter to the best of our skill and ability.

13

14

15

16

17       /S/ DONALD E. WOMACK
         _____

18       /S/ CHERYL B. PALANCHIAN
         _____

19
                 DONALD E. WOMACK
20               CHERYL B. PALANCHIAN
              Official Court Reporters
21                P.O. Box 51062
           Boston, Massachusetts 02205-1062
22            womack@megatran.com

23

24

25