```
 1                UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MASSACHUSETTS
 2
                                        Civil Action
 3                                      No. 05-12237-WGY

 4   * * * * * * * * * * * * * * * *
                                    *
 5   AMGEN, INC.,                   *
                                    *
 6           Plaintiff,             *
                                    *   DAILY TRANSCRIPT
 7   v.                             *   OF THE EVIDENCE
                                    *      (Volume 3)
 8   F. HOFFMANN-LA ROCHE LTD,      *
     ROCHE DIAGNOSTICS GmbH and     *
 9   HOFFMANN-LA ROCHE, INC.,       *
                                    *
10           Defendants.            *
                                    *
11   * * * * * * * * * * * * * * * *

12

13

14            BEFORE:  The Honorable William G. Young,
                       District Judge, and a Jury
15

16

17

18

19

20

21

22

23
                                   1 Courthouse Way
24                                 Boston, Massachusetts

25                                 September 6, 2007
```

1                    A P P E A R A N C E S

2

3          DUANE MORRIS LLP (By D. Dennis Allegretti,
      Esq. and Michael R. Gottfried, Esq.), 470 Atlantic
      Avenue, Suite 500, Boston, Massachusetts 02210

4               - and -
           DAY CASEBEER MADRID & BATCHELDER, LLP (By

5      Lloyd R. Day, Jr., Esq., David M. Madrid, Esq. and
      Robert M. Galvin, Esq.) 20300 Stevens Creek

6      Boulevard, Suite 400, Cupertino, California 95014
                - and -

7          McDERMOTT WILL & EMERY (By Michael Kendall,
      Esq.), 28 State Street, Boston, Massachusetts

8      02109
                - and -

9          McDERMOTT WILL & EMERY (By William G.
      Gaede, III, Esq.), 3150 Porter Drive, Palo Alto,

10     California 94304
                - and -

11         MARSHALL, GERSTEIN & BORUN LLP (By Kevin M.
      Flowers, Esq.), 6300 Sears Tower, 233 S. Wacker

12     Drive, Chicago, Illinois 60606-6402
                - and -

13         STUART L. WATT and WENDY A. WHITEFORD, Of
      Counsel, Amgen, Inc., One Amgen Center Drive,

14     Thousand Oaks, California 91320-1789, on behalf of
      the Plaintiff

15

16         BROMBERG & SUNSTEIN LLP (By Lee Carl
      Bromberg, Esq. and Julia Huston, Esq.), 125 Summer
      Street, Boston, Massachusetts 02110

17              - and -
           KAYE SCHOLER LLP (By Leora Ben-Ami, Thomas

18     F. Fleming, Esq., Patricia Carson, Esq.,
      Christopher Jagoe, Esq. and Howard Suh, Esq.),

19     425 Park Avenue, New York, New York 10022, on
      behalf of the Defendants

20

21

22

23

24

25

1                          **I N D E X**

2  **WITNESS:**          **DIRECT   CROSS    REDIRECT   RECROSS**

3

4  JOHN LOWE, Resumed

5     By Ms. Ben-Ami    217

6                                              **FOR       IN**

7     **EXHIBITS:**                           **I.D.     EVID.**

8

9        2018 Hunkapiller Article . . . . . . . . . 220

10       2011 File History for U.S. 5,547,933 . . . 223

11       2019 Goeddel, et al. Article . . . . . . 229

12       2020 Gething and Sambrook Article . . . . . 230

13       2021 Suggs, et al. Article . . . . . . . 238

14       2022 Kornblihtt, et al. Article . . . . . 244

15       2023 Farber and Zanjani Article . . . . . 246

16       2024 U.S. 4,399,216 . . . . . . . . . . 267

17       2025 Kaufman and Sharp Article . . . . . 269

18       2026 File History for U.S. 4,966,843 . . . 270

19       2027 Patent No. 4,966,843 . . . . . . . . 274

20       2028 European Patent Application 0088540 . 274

21       2029 European Patent Application . . . . . 280

22       2030 Patent No. 4,766,075 . . . . . . . . 281

23       2031 "Remington's Pharmaceutical Sciences" 296

24       2032 Eschbach, et al. Article . . . . . . 298

25       2033 Goldwasser and Kung Article . . . . . 301

1        **THE CLERK:**  All rise.  Court is in session, please

2    be seated.

3        **THE COURT:**  I came out for just a minute and I'm

4    sending Ms. Smith to get the jury and I'll talk until she

5    gets them.

6        You're entitled to know what the total elapsed time

7    is.  Each one of you has ten days.  Roche out of its ten

8    days has used up one day, one hour, five minutes; Amgen has

9    used up two hours, 25 minutes.

10       With respect to conferences.  There won't be any

11   conferences before nine o'clock in the morning.  We start at

12   nine o'clock in the morning.  Conferences are for the

13   afternoon.  I'm here all day, and if you want to talk we can

14   talk.  I'm not going to have another one of these pre-expert

15   conferences at the side bar ever again.  Have it in the

16   afternoon.

17       All right.  I think we're ready.  And good morning.

18       **THE CLERK:**  All rise for the jury.

19       (Whereupon the jury entered the courtroom.)

20       **THE CLERK:**  Court is in session, please be seated.

21       **THE COURT:**  Good morning, ladies and gentlemen.

22       **THE JURY:**  Good morning.

23       **THE COURT:**  Thanks again.  I'm going to thank you,

24   but believe me, it's not by rote.  You set the tone for all

25   these proceedings.  Thank you for your promptness.

1          And if the clerk will remind the witness, we will

2     move right on.

3          **THE CLERK:**  I remind you, sir, you are still under

4     oath.

5          **THE WITNESS:**  Yes.

6          **MS. BEN-AMI:**  May I proceed, your Honor?

7          **THE COURT:**  Please.

8          **MS. BEN-AMI:**  Thank you.

9          May it please the Court.  Good morning, ladies and

10    gentlemen.

11                    JOHN LOWE, Resumed

12               **DIRECT EXAMINATION** (Cont'd)

13    **BY  MS. BEN-AMI**

14    **Q**   Dr. Lowe, back to you.

15          We left off yesterday explaining the techniques if

16    you had the protein what you would do next as reflected in

17    the prior art, and we were at what is now Court Exhibit 2010

18    which was in your book as NJD.

19          Do you have that, sir?

20    A   I have this.

21          **MS. BEN-AMI:**  Mr. Fisher, could you put that up,

22    please.  It's been admitted already, your Honor.

23    **Q**   So would you tell us briefly, would you tell us briefly,

24    Doctor, what is the topic of this paper?

25    A   The topic is the sequence analysis of proteins.

1    Q    And what conclusions do you draw from this paper with

2    regard to the understanding of one skilled in the art in

3    1983-84?

4    A    Yes.  This is a review article that summarizes what is

5    possible at that time in the art of protein sequencing.

6    Q    Now, this paper talks about microsequencing.  What does

7    that mean?

8    A    Microsequencing of proteins means sequencing in small

9    amounts of proteins generally, and this paper has a table in

10   it, amounts of proteins that are in the hundreds of

11   micromoles.

12        **THE COURT:**  Let me ask this question just so I

13   understand what we're doing.

14        You're telling us what you think your opinion is,

15   that a person of skill in the art, which is what we're

16   concerned about here, what that person would get from

17   reading this article which is in evidence and I guess can be

18   argued was out there before these patents.

19        That's what we're talking about?

20        **THE WITNESS:**  Exactly.

21        **THE COURT:**  Go right ahead, Ms. Ben-Ami.  Put your

22   question.

23   Q    So, you were just talking about small amounts of

24   proteins.  Does this have any relevance to the discussion

25   we're having with EPO, the small amount of proteins?

1    A    Yes, it does.

2    Q    Can you explain it for the jury?

3    A    So the relevance is that one skilled, one of ordinary

4    skill in the art in 1983 would read this paper and

5    understand that it was possible to, to obtain the sequence

6    of the protein if you had the protein in small amounts.

7    Q    Now, let me ask you to go to Exhibit NJE.  NJE.

8    A    I have that.

9         MS. BEN-AMI:  And don't put that up yet, please.

10   Q    Can you tell us what this paper is?

11   A    This is a paper published in Science that describes the

12   technology that was developed by a group of scientists to

13   sequence small amounts of proteins.  The title of this

14   article is "New Protein Sequenator with Increased

15   Sensitivity."

16   Q    And what is the date of this paper?

17   A    This is dated February 1980.

18   Q    And can you tell us about the journal that it is

19   published in?

20   A    Yes, this is the journal Science.

21        MS. BEN-AMI:  And, your Honor, I would offer NJE.

22        THE CLERK:  N --

23        MS. BEN-AMI:  -- JE.

24        THE COURT:  NJE.  Any objection?

25        MR. DAY:  No objection.

```
 1              THE COURT:  I hear none.  It will be Exhibit 2011.

 2          MS. BEN-AMI:  Thank you, your Honor.

 3          I'll hand this to the clerk.

 4          THE CLERK:  Thank you.

 5          (Exhibit marked in evidence.)

 6          MS. BEN-AMI:  So with that in mind, could you

 7   present that to the jury, please.

 8              THE COURT:  When you say present that to the jury,

 9   are you asking Ms. Smith to pass it among them or are you --

10          MS. BEN-AMI:  No, I --

11          THE COURT:  -- presenting it on the screen?

12          MS. BEN-AMI:  I'm sorry.

13          THE COURT:  Go at your --

14          MS. BEN-AMI:  Your Honor --

15          THE COURT:  However you want to do it.

16          MS. BEN-AMI:  Your Honor, I understand that last

17   night the file histories were preadmitted, so we're up to

18   2018.

19              THE COURT:  Thank you.  I appreciate the

20   correction.

21          MS. BEN-AMI:  And I will connect that up with

22   Ms. Smith later on.  So we don't need to pass this to the

23   jury.

24   Q   Just looking at it, Doctor, can you tell us what this

25   paper would tell the person of ordinary skill in the art in
```

1   1983-84, in your opinion?

2   A   So, in my opinion, it would tell someone of ordinary

3   skill in the art that there is a new approach, a new method,

4   if you will, that is very sensitive in its ability to

5   determine the sequence of protein.

6   **Q**   Thank you.

7           Now, can you go to Exhibit VI, the Babel 1981

8   article.

9           **MS. BEN-AMI:**  And again please don't bring it up

10  yet.

11  A   Can you restate the exhibit number, please?  I'm sorry,

12  V, did you say VI?

13  **Q**   V, as in Victor, V, as in Victor, I.

14  A   I have this, yes.

15  **Q**   Can you tell us what the date of this paper is?

16  A   So, this paper is published in 1981.

17  **Q**   And where is this published?

18  A   It's in a journal called Biochimica et Biophysica Acta.

19  **Q**   And were you familiar with this journal in 1982, '83,

20  '84?

21  A   Yes.

22  **Q**   Can you tell us whether a person skilled in the art

23  would read such a journal?

24  A   Yes, this is a very high-quality peer review journal.

25          **MS. BEN-AMI:**  And, your Honor, with that in mind, I

1   would offer VI.

2            **MR. DAY:**  We object, your Honor.  It's not --

3            **THE COURT:**  VI.

4            **MR. DAY:**  -- disclosed in the expert report.

5            **MS. BEN-AMI:**  It is disclosed in the expert report,

6   your Honor, in paragraph, which is in the third supplemental

7   expert report where he incorporates the materials --

8            **THE COURT:**  Well, we're going to have a page and a

9   line number.  I'm in the third.

10           **MS. BEN-AMI:**  Paragraph 31.

11           **THE COURT:**  Thank you.

12           **MS. BEN-AMI:**  I'll hand up the other document.

13           **THE COURT:**  Paragraph 31?

14           **MS. BEN-AMI:**  Yes.

15           **THE COURT:**  Of some other report?

16           **MR. DAY:**  Not only of some other report, some other

17  person.

18           **THE COURT:**  Well, no, no, I can read.  I understand

19  it's now the report of some other person.  Yes, that's not

20  adequate disclosure.  It's excluded at this time.

21           **MS. BEN-AMI:**  All right.

22  **Q**   Let's go to NFC.  Can you look at that, your Honor --

23  Dr. Lowe.

24           **MS. BEN-AMI:**  Your Honor, what we did today for the

25  Court's convenience is we have put color coded front pages

1    on it, if that would help, so I can say it's the blue one

2    because there's so many.

3            THE COURT:  Whatever, whatever helps you will help

4    me.

5            MS. BEN-AMI:  Thank you.

6    Q    Let's skip past that and move to the following.

7            Doctor, are you aware that there was a proceeding

8    in the United States Patent Office regarding who should be

9    an inventor of the patents-in-suit?

10   A    Yes, I'm aware of that.

11   Q    And in that proceeding was the issue of sequencing of

12   proteins discussed?

13   A    Yes.

14   Q    I would ask you to go to QD0.

15           MS. BEN-AMI:  Now, your Honor, this has been

16   admitted by agreement last night as 2011.

17           THE COURT:  QD0?

18           MS. BEN-AMI:  QD0.

19           THE COURT:  Okay, QD0 is 2011.

20           (Exhibit marked in evidence.)

21           THE WITNESS:  I'm obviously having trouble finding

22   QD0 in the book here.

23           MS. BEN-AMI:  All right.  Well, since it was

24   admitted may I publish it, your Honor?

25           THE COURT:  You may.

1          **MS. BEN-AMI:**  Can we go to Page 486.

2          **MR. DAY:**  Your Honor, I object.  There's nothing in

3     this expert's report regarding this exhibit.

4          **THE COURT:**  Well, she can put it up there if she

5     wants, he could read from it at least.  But I'll be

6     sensitive to that point.

7          **MS. BEN-AMI:**  I will point out, your Honor --

8          **THE COURT:**  No, don't argue in front of the jury.

9     You may put it up and they can look at it.  It's in

10    evidence.  He may read from it and that's about all we're

11    going to hear, unless what you're going to say is where it

12    is in the report.

13         **MS. BEN-AMI:**  486, please.

14    **Q**    And in this -- have you seen this document before?  Let

15    me hand you my copy.  It doesn't have any markings on it.

16    A    Yes, I have.

17    **Q**    And did you review it and consider it in your expert

18    reports?

19    A    Yes, I did.

20         **MR. DAY:**  Your Honor, again I simply object,

21    there's no reference in the report.

22         **THE COURT:**  No, it seems to be clear on the record

23    it was not disclosed in the expert report and maybe she's

24    going to ask him something that is in the report.

25         **MS. BEN-AMI:**  Well, your Honor --

1          THE COURT:  That may stand.

2          MS. BEN-AMI:  I would ask your Honor to look at the

3     green report, which is the third supplemental report.

4          THE COURT:  Yes.

5          MS. BEN-AMI:  Paragraph 27.

6          THE COURT:  Thank you.  He may testify as to that.

7     He may testify to what's present in it.

8     Q    In the Patent Office proceedings reflected in this

9     document, did the Patent Office consider the issue of

10    whether protein sequencing was invented?

11    A    Yes.  Yes, it did as I recall.

12    Q    And based on your review of the documents as reflected

13    in your expert report, Paragraphs 26, 27, what did the

14    Patent Office, this part of the Patent Office find?

15    A    I'm sorry?

16    Q    What did the Patent Office determine?

17    A    Well, the Patent Office determined as I recall that

18    protein sequencing was in fact relevant to this particular

19    patent application.

20    Q    And what did the Patent Office determine about the state

21    of the art of protein sequencing?

22    A    That the state of the art of protein sequencing was

23    sufficiently well-developed that the sequencing was not an

24    inventive contribution, if you will.

25    Q    Now, let's talk about after you sequence the protein.

1    You testified yesterday that there were three techniques

2    once you had a protein sequence.

3              Do you recall that?

4    A   Yes.

5    Q   So let's go into the first concept.  And I would like to

6    ask you some questions regarding the concept of making

7    synthetic genes through chemistry.

8              So, in your opinion, does the Lin patent disclose

9    that chemical synthesis of genes is known in the art?

10   A   Yes.

11            **MS. BEN-AMI:**  Paragraph 31, third supplemental

12   report.

13            **THE COURT:**  He hadn't objected yet.  But I'll find

14   it.

15            Go ahead with your questions until I have an

16   objection.  Go ahead with your question.

17   Q   Let me ask my question.  Did Lin in his patent

18   specification disclose that chemical synthesis of genes was

19   known?

20   A   Yes.

21   Q   Now, would you look -- do you have the patents in front

22   of you that have been admitted as exhibits already?

23   A   Yes.

24            **MS. BEN-AMI:**  And, your Honor, the witness in his

25   expert report is using the '422 specification, but all the

1    specifications are the same.  So can I let him use the one

2    the jury has in their book?

3            THE COURT:  Again, it's your presentation and, I

4    mean, I don't quarrel with what you say, though you can't

5    testify and if you think they can follow it, that's fine.

6            MS. BEN-AMI:  All right.  So if the jury can look

7    at column 29.

8            May I approach the jury?

9            THE COURT:  Of course you may.  And both counsel,

10   to facilitate things, can do exactly what Ms. Ben-Ami is

11   doing.  Lawyers can come up and say would you look here,

12   column this, page and the like, because it's technical.  And

13   they're not testifying, they can't testify, but they can

14   just point out what's in evidence.

15           MS. BEN-AMI:  So if we recall from yesterday, you

16   have to get to the end of all the pictures and then you get

17   the columns and then you can see the column numbers, there

18   are two columns on each page.  And so we're going to column

19   29.

20   Q   So with that, Doctor, can you tell us, looking at column

21   29, lines 26 going over to column 29, line 38, can you tell

22   us what is being disclosed there by Dr. Lin, just very

23   briefly.

24   A   Yes.  So, it discusses an example, an experiment design,

25   if you will, as it says relates to the total manufacture by

1    assembly of nucleotide basis of two structural genes

2    encoding human EPO.  And there's some technical jargon in

3    there about using preferred codons.  But essentially, this

4    example describes the test tube synthesis of the genes from

5    the amino acid sequence.

6    **Q**   And in the patent does it disclose the art, an art

7    example, prior art example which talks about making chemical

8    genes?

9    A   It does, yes.

10   **Q**   What reference is that?

11   A   I believe there are references in columns, column 2.

12   I'll have to go back and take a peek at this.  But there are

13   references that describe that, the notion that it's possible

14   to synthesize genes that will encode, for example, a human

15   protein.  I would have to look through here to be sure about

16   the references.

17   **Q**   Well, let me ask you, are you familiar with the Alton

18   reference?

19   A   Yes.  So, the Alton reference, which is cited actually

20   in this particular paper, is, is an example of published

21   document that describes how one would synthesize the gene in

22   vitro using as a recipe, if you will, protein sequence.

23   **Q**   Now, would you look at NFE.

24   A   I have NFE.

25   **Q**   And can you tell us what NFE is?

1    A    NFE is a publication dated January of 1979.  It's in a

2    journal called Proceedings of the National Academy of

3    Sciences USA which is a highly regarded scientific journal.

4    Q    And can you give us the date?

5    A    The date is January of 1979.

6         MS. BEN-AMI:  And, your Honor, I would offer this

7    exhibit.

8         THE COURT:  NFE?

9         MS. BEN-AMI:  Yes, your Honor.

10        THE COURT:  Any objection?  I hear none.

11        MR. DAY:  No objection, your Honor.

12        THE COURT:  It may be admitted, Exhibit 2019.  NFE.

13        (Exhibit marked in evidence.)

14        MS. BEN-AMI:  May it be published, your Honor?

15        THE COURT:  It may be published.

16        MS. BEN-AMI:  Can you display it on the screen.

17    Thank you.

18    Q    So, Doctor, in this paper is there a report relating to

19    synthetic genes?

20    A    Yes.  This is the report of the expression in bacteria

21    Escherichia coli of chemically synthesized genes that encode

22    the two chains of human insulin.  And those, those

23    experiments were done using, as the name implies, the title

24    implies, the genes that were synthesized in a test tube in

25    the laboratory.

1    Q    I would like to ask you to look at Exhibit NEU.

2    A    So, I have Exhibit NEU.

3    Q    Can you tell us what that is?

4    A    Yes.  This is a paper published in 1981 that describes

5    the use of animal cells, in this case, monkey cells, that

6    express a piece of the, what's called the influenza

7    hemagglutinin protein.  That's one of the proteins made by

8    the flu virus.  And the report describes the expression of

9    that protein in an animal cell in such a way that that

10   protein basically is made by the machinery of that cell and

11   is expressed on the outside of the cell.

12   Q    And the date of that article?

13   A    1981, in October.

14           MS. BEN-AMI:  We offer Exhibit NEU.

15           MR. DAY:  No objection, your Honor.

16           THE COURT:  I didn't hear the letter designation.

17           MS. BEN-AMI:  NEU, your Honor.

18           THE COURT:  NEU is admitted, Exhibit 2020.

19           (Exhibit marked in evidence.)

20   Q    Now, in this paper NEU, can you explain what the DNA

21   was?

22   A    Yes.  So, this was a, it turns out that this virus is an

23   RNA virus, so these scientists converted that RNA genome

24   into a piece of DNA in the test tube.  And then they

25   installed that piece of DNA into something called an

1    expression vector which is a circular piece of DNA which has

2    within it other DNA sequences that will allow that flu virus

3    gene to be transcribed in the nucleus into RNA and then the

4    RNA, that chalk blueprint, if you will, comes out and goes

5    to the cytoplasm, and then the cell takes that and turns it

6    into that flu protein.

7    **Q**   Can you tell us -- we talked about proteins that had

8    been modified by sugars yesterday.

9    A    Yes.

10   **Q**   What are those called?

11   A    So, those are called glycoproteins.

12   **Q**   And can you tell us if this paper relates in any way to

13   such glycroproteins?

14   A    Yes.  So, this, this protein as it turns out is a

15   glycoprotein normally in the course of the flu virus

16   replication and expression.  And in this experiment that flu

17   protein was properly modified as, as a glycoprotein by

18   those cells.

19   **Q**   Now, in this paper it indicates that the recombinant

20   protein was expressed from the cells at high levels and

21   appeared normal.  Can you tell us what that tells one about

22   how this DNA was constructed and what the result was?

23   A    It tells one that you can make this protein with the

24   technologies that were available today using standard

25   recombinant DNA technologies.  So, if you will, a recipe for

1    expressing a glycroprotein in animal cell.

2    **Q**   Now, Doctor, do you know what a leader sequence is?

3    A    Yes.

4    **Q**   Can you tell us what that is?

5    A    Yes.  A leader sequence is a piece of protein that is

6    typically, but not always, but typically at the front of the

7    protein and it is recognized by the machinery in the cell in

8    such a way that it allows that protein to be moved from the

9    inside of the cell to the outside of the cell.

10   **Q**   Can you look at Page 6 of the reference, which is, which

11   is Page 625 of the paper, in the second, the second full

12   column.  It starts "Furthermore."

13   A    Right.  So the last paragraph in this paper is

14   interestingly important obviously because based on the

15   experiments that were reported here, we can read this.  It

16   says:  Furthermore, it is now feasible to express hybrid

17   proteins at the cell surface by inserting foreign nucleotide

18   sequences into vectors between the HA sequence which code

19   for the hydrophobic signal and the membrane anchoring

20   peptide.

21        That's -- there's a lot of technical jargon in

22   there.  But basically it says that --

23        **MR. DAY:**  Your Honor, I object.  This is not in the

24   report.  I'm letting him read, but the explanation is not in

25   the report.

 1          THE COURT:  He may read, but when we go beyond that

 2    it should be in the report.  And where is it?

 3          MS. BEN-AMI:  Just let me look at the piece of

 4    paper again, and it is the first report, which is the blue

 5    report, Paragraph 113.

 6          THE COURT:  Thank you.

 7          THE WITNESS:  So, to --

 8          THE COURT:  Wait, wait.  Thank you, while I try to

 9    do my job.  Just a moment here.  I do it as fast as I can.

10          Well, well he may testify consistent with what's in

11    his report, but when I look at 113, I don't see it tied to

12    this document.  Could you --

13          MS. BEN-AMI:  If you look on the first paragraph --

14    I'm sorry, your Honor.  If you look in Paragraph 113 --

15          THE COURT:  I am.

16          MS. BEN-AMI:  -- the first reference is right

17    there, that's the --

18          THE COURT:  Gething.

19          MS. BEN-AMI:  Yes.

20          THE COURT:  Gething.  1981.

21          MS. BEN-AMI:  Yes.

22          THE COURT:  That's what this is?

23          MS. BEN-AMI:  Yes.  He may testify consistent with

24    that sentence.

25          MR. DAY:  And this -- what we're looking at here on

1    the board was not referenced in the report nor any

2    explanation given.

3            **THE COURT:**  It's right here.  Gething -- it's

4    Gething.

5            **MR. DAY:**  I'm not talking about the sentence.  I'm

6    talking about the concept that he now wishes to pull out of

7    the article.

8            **THE COURT:**  No, no.  He may testify to the concept,

9    it's here in the report.  All I'm ensuring is that you have

10   notice.  You may examine when it's your turn.

11           Go ahead.  Go ahead, sir.  Now you may talk.  We

12   lawyer people have done our bit.  You may give your answer,

13   consistent with what's in your report.

14           **THE WITNESS:**  Okay.

15           **THE COURT:**  What do you get out of this?

16           **THE WITNESS:**  So, what I get out of this is that

17   this, this provides one of skill in the art at the time a

18   method, a way to deliver, as it says, hybrid proteins,

19   recombinant proteins.

20           **THE COURT:**  No, no, against his objection, I'm

21   going to sustain that.  That's something different than

22   what's in this first sentence.

23           Have you got the report in front of you?  Take a

24   look at it.  See 113, first sentence.  You may testify

25   consistent with that.

1          **MS. BEN-AMI:**  The second sentence also relates to

2     the report.

3          **THE COURT:**  The second sentence also?  Just a

4     moment.

5          **MS. BEN-AMI:**  It says in.

6          **THE COURT:**  Yes.  Thank you.  Yes, it does.  Right.

7     First two sentences, sir.

8     **Q**    So, in that part of your report you're explaining what

9     was actually done.  Would you explain what was actually

10    done.

11    A    Yes.  So what's actually done was a recombinant HA

12    hemagglutinin protein was expressed in monkey cells in a

13    glycosylated form and it made its way out of the cell to the

14    surface of the cell.

15    **Q**    And what does that tell you about how the construct was

16    made?  You've explained how the construct was made in your

17    report.  What does it tell you?

18    A    It tells one how to deliver a recombinant protein to the

19    outside of the cell.

20    **Q**    And what is that way?

21    A    That way is to install, if you will --

22          **MR. DAY:**  Object, your Honor.  This is outside the

23    scope of the report.

24          **THE COURT:**  No, I'm not sure it is.  I'll listen to

25    the answer.  You may, subject to his objection, you may

 1   continue your testimony.

 2   A    It provides an example, a recipe, if you will, of a

 3   method to deliver a protein from the inside of the cell, a

 4   recombinant protein synthesized by the cell, to the outside

 5   of the cell.

 6          **THE COURT:**  I'll let that stand.

 7   **Q**   And so with that in mind, let's go to the next area you

 8   testified about yesterday which was the second method, cDNA

 9   cloning.

10          And just to get back to that, can you remind the

11   jury what cDNA cloning is?

12   A    Yes.  CDNA cloning is, and still is, but was of course

13   at the time a standard approach for cloning genes.  CDNA

14   means copy, complimentary or copy of DNA.  So it's a copy of

15   the RNA.  In that cell the DNA and the nucleus made are a

16   RNA copy.  And in order for cloning purposes, it's not

17   generally possible to clone the RNA molecules, you have to

18   make a DNA copy of that RNA.

19          So, cDNA cloning involves basically taking the RNA

20   molecules out of the cell, turning them into copies, cDNA,

21   and then cloning those cDNA molecules, putting them into

22   bacteria in a way that you have a library of those copies.

23   **Q**   So, you had a board yesterday.  I'm going to roam back

24   behind the monitor.  Let's see if we can find it.  Which was

25   this board.

1              **MS. BEN-AMI:**  Thank you, your Honor.

2    **Q**   And can you just explain that cDNA concept using the

3    board.

4    A   Yes.  So, this RNA copy is directed by the words, the

5    blueprint of the DNA that's in the nucleus.  And to make

6    cDNA, to clone cDNA, one isolates, purifies the RNA from

7    those cells and using some chemical reactions in the test

8    tube converts that single-stranded RNA into basically a

9    copy, a DNA copy, that intertwined double-stranded molecule.

10   So we're going from this direction back to this direction

11   fundamentally.

12   **Q**   So, based on your understanding of the state of the art

13   in your opinion, had cDNA cloning been recognized as a

14   technique by 1983-84?

15   A   Yes, it was a widely recognized, widely used technique.

16   **Q**   And can we look at NXY.  NXY.

17   A   I have NXY, finally.

18   **Q**   Okay.  Can you tell us the date of this paper?

19   A   This is a paper dated in November of 1981.

20   **Q**   And what is the journal?

21   A   This is again Proceedings of the National Academy of

22   Sciences USA.

23   **Q**   And in your opinion based on your knowledge and

24   experience is this a reference that a person skilled in the

25   art in the time 1983-84 would consider?

```
 1   A   Yes.  Yes.

 2            MS. BEN-AMI:  Your Honor, I offer this reference

 3   NXY.

 4            THE COURT:  Any objection?

 5            MR. DAY:  No objection, your Honor.

 6            THE COURT:  Hearing none, NXY is admitted 2021.

 7            (Exhibit marked in evidence.)

 8            MS. BEN-AMI:  Can you present that for the jury,

 9   Mr. Fisher.  Thank you.

10   Q   Doctor, in this paper, can you tell us, if we look at

11   Page 6613.  There's no number on that.  It's the first page

12   of the document on the bottom.  If you look at that, can you

13   tell us what this paper talks about with regard to the use

14   of probes?

15   A   Yes.  So, so this paper reports the isolation of a cDNA

16   copy for the RNA of the gene coding the protein called beta

17   two microglobulin.  The nature of the protein is not

18   particularly relevant, but the method that was used to

19   isolate this cDNA is relevant.  And fundamentally what these

20   scientists did was use the sequence of the protein, the beta

21   two microglobulin, and used that codon table that I told you

22   about yesterday, and worked backward from that codon table

23   to design pieces of DNA that could be identical to the gene

24   sequence, could be identical to the cDNA that would encode

25   that protein.  And they used those synthetic pieces of DNA
```

1    with technologies that were published in that Maniatis

2    manual, for instance, and many other journals to isolate, to

3    clone, if you will, that cDNA encoding beta two

4    microglobulin.

5    Q   Now, can you just tell the jury what these probe things

6    are?

7    A   So, probes are jargon, if you will, that we use in the

8    lab to denote molecule, in this case, a DNA molecule, that

9    you can use to go into a library of these cDNAs and identify

10   the blueprint in that library that would make beta two

11   microglobulin.

12            So, in this library we have copies of every RNA

13   that's made by that cell.  Five, ten thousand different

14   kinds of RNAs.  We only want one of those.  How do we get

15   them.  Well, we have a library that has a copy of each of

16   those RNA molecules.  We have to go into that library and

17   find that one that we want.  And we use these synthetic

18   pieces of DNA that will have a perfect match or close to a

19   perfect match to the blueprint that we're interested in.

20   Q   Did you say library?

21   A   I said library.

22   Q   Can you explain that?

23   A   So, the library again is basically the collection of all

24   of the cDNAs that were made from all of the RNAs in that, in

25   a cell.  And it basically is a copy of all of the blueprints

1     that are in the nucleus of that cell.  And you can think of

2     it as a library basically, a series of books, and every book

3     is corresponding to a different gene.  And we want one book

4     and that book is the book that tells us how to make a beta

5     two microglobulin.

6     Q   Now, I've asked that this particular sentence on the

7     first page be brought in view since it's been admitted into

8     evidence, and I ask you to explain in your opinion what this

9     sentence is saying?

10    A   Yes.  This, this sentence is, it's a distillate.  It's

11    the bottom line, or really it's one of the bottom lines of

12    this particular paper.  Based on what these scientists did

13    and other information in the literature, it says that these

14    probes of the sort that were made in this paper should allow

15    the isolation of cloned DNA sequences for any protein for

16    which the amino acid sequence is available.

17          Stated another way, my own words, if you have the

18    amino acid sequence of any protein, as these authors say,

19    then this method should allow you to isolate the gene that

20    corresponds to that protein.

21    Q   Now, Doctor, do you have the Maniatis book.  210.  Oh,

22    Exhibit 10.  The Maniatis reference?

23    A   I don't have it up here that I know of.

24    Q   I'll give you the original.

25          Could you look at Pages 233 to 234.  Can you tell

1    us what the manual is saying there about using cDNA probes?

2    A    Well, yes, I've got a different numbering here than

3    you're referring to.  I think you're referring to 226.

4    Q    Okay.  Let's look at 226, 227.

5    A    Yes.  So this, this text on these two pages basically

6    summarizes what is in this beta two microglobulin paper.  If

7    you have a protein sequence then here's how you do this

8    experiment.  And of course it's naturally condensed here

9    because those skilled in the art would not want to read all

10   of the gory details.  They would either know them or they

11   would know where to find those details.  But it essentially

12   sets out how to do what was reported in this paper, and in

13   fact this text cites that Suggs paper that we just heard

14   about.

15   Q    Okay.  And in this reference does it talk about rare

16   mRNA's?

17   A    Yes, it does.

18   Q    And can you tell us why this page -- strike that.

19            You rely on this page in your, as support for your

20   opinions, right?

21   A    Yes, I do.

22   Q    Can you tell us in what relation this page has to do

23   with your opinions?

24   A    Yes.  So, a method that wasn't very robust, if you will,

25   could only clone easily cloned genes, genes that were

1    present in many different copies in the cell and in the

2    library, that wouldn't be anything maybe particularly

3    special.  But in this case, it says that the sensitivity of

4    screening these libraries using this method is thereby

5    increased to the level where clones synthesized from

6    extremely rare RNA's can be detected.  Easily detected.

7           So, it tells you that this is, this method is very

8    penetrating, it's very sensitive, would allow one to

9    identify the rare book in the library.  Not books that are

10   present in fifty copies or a hundred copies, but maybe one

11   or two copies, that book in the library, this would allow

12   you to dive into that library and find it.

13   Q   So looking at the Maniatis book, Pages 188 and actually

14   going back to 209, just very generally, can you tell us what

15   the recipe book is teaching to one skilled in the art in

16   your opinion?

17   A   188 to --

18   Q   Around 209.

19   A   -- 209 represents the part of this manual that tells one

20   how to isolate the RNA, purify it, analyze it, and

21   manipulate it in a test tube.

22   Q   And at Pages 209 through 245, that's a big chunk of the

23   book, what does that section in the recipe book teach

24   someone in your opinion to one of ordinary skill in the art

25   about this?

1   A    So, that section of the manual is entitled "Synthesis

2   and Cloning of cDNA."  And it tells one, in recipe form, if

3   you will, how to do what has been done in that paper and

4   other papers, cloning cDNA using the synthetic

5   oligonucleotide type probes that were designed with protein

6   sequence.

7   Q    And if we could look at Pages 309, that grouping 309 to

8   328.  Can you bring that up, 309.

9         Can you tell us what that chunk of the cookbook is

10  telling?

11  A    That's entitled Identification of Recombinant Clones,

12  and that provides an outline for how to probe the library,

13  if you will, anything in the laboratory, how to use these

14  synthetic DNA probes; to go into your library and find the

15  book, if you will, that is of interest to you.

16  Q    Now, I would like you to then look at Exhibit NLP.  NLP.

17  A    I have NLP.

18  Q    Can you tell us the date of this reference?

19  A    This reference is dated June 1983.

20  Q    And the journal is?

21  A    Proceedings of the National Academy of Sciences.

22  Q    And in your opinion, based on your knowledge and

23  experience, would someone of ordinary skill in the art in

24  the period 1983-84 consider this some type of reference they

25  would look at?

1   A   Yes, it is.

2           **MS. BEN-AMI:**  I offer NLP, your Honor.

3           **MR. DAY:**  No objection.

4           **THE COURT:**  NLV is admitted --

5           **MS. BEN-AMI:**  NLP.

6           **THE COURT:**  Thank you.  NLP is admitted, Exhibit

7   2022.

8           (Exhibit marked in evidence.)

9   **Q**   Now, are you aware that Amgen is suggesting that you

10  might not get a full-length transcript if you were trying to

11  get cDNA?

12  A   I'm aware that that's what they argue, yes.

13  **Q**   And in your opinion, would someone of ordinary skill in

14  the art at this time have a reasonable expectation that you

15  would get a full-length transcript?

16  A   I believe that there is a reasonable expectation that

17  one would be able to obtain a full-length transcript.

18  **Q**   Can you give the basis for your opinion?

19  A   Well, one example is this paper.  These folks cloned a

20  long RNA, a long cDNA from a long RNA.

21  **Q**   And what does that tell a person of ordinary skill in

22  the art in your opinion?

23  A   It tells one that it's likely that one would have a

24  reasonable expectation that even with long RNAs at the time

25  that one could generate cDNAs that would correspond to that

1    long RNA and identify those from the library.

2    Q    Now, in this time period 1983-84 -- or yesterday, we

3    talked walked through a number of different proteins that

4    have been made.  Had the technique of cDNA cloning been

5    used?

6    A    Yes.

7    Q    For what?

8    A    Cloning many different kinds of cDNAs for many different

9    proteins.

10   Q    Now, let's look at the third, the third technique you

11   said one could use.

12        I need to go back to one more.  Can you look at --

13   back to the cDNA for one more minute, Doctor.  QDH.

14   A    So I have QDH.

15   Q    Can you tell us what QDH is?

16   A    QDH is a publication called an abstract that describes

17   using RNA isolated from human kidneys to make erythropoietin

18   in frog cells.

19   Q    And in your opinion these -- strike that.

20        Where were these scientists from?

21   A    One of these scientists was at the University of

22   Minnesota and the other was a scientist at the Biogen

23   Research Corporation.

24   Q    What was Biogen at this time?  Were you familiar with

25   this entity?

1    A    I, I understood at the time that Biogen was a biotech

2    company.

3    Q    And are you aware whether this reference is discussed in

4    the Lin patent?

5    A    This reference is cited in the Lin patent.

6    Q    And is it discussed in the background of the patent?

7    A    It is discussed in the background of the patent.

8            **MS. BEN-AMI:**  Your Honor, I would offer this

9    exhibit, which is QDH.

10           **MR. DAY:**  No objection.

11           **THE COURT:**  QDH is admitted, Exhibit 2023.

12           (Exhibit marked in evidence.)

13   Q    Now, I would ask you to look at the background of the

14   invention.  Do you see the reference to this Farber paper on

15   column 9.  So, again, I apologize, I'm looking off a

16   unhighlighted copy so that I can show it to you.  We're

17   looking at column 9 on the bottom.

18           Can you tell the jury where the Farber reference is

19   discussed?

20   A    So, column 9 refers to this reference at the bottom.

21   Q    What line?

22   A    Those would be lines, basically it's line 65 through 67.

23   Q    So it's the bottom of the page?

24   A    The bottom of the page.

25   Q    All right.  Well, where you're looking at that, would

1   you first read in, since this document is in evidence, the

2   sentence --

3           **MS. BEN-AMI:**  Mr. Day would like me to look at

4   something.

5           (Whereupon counsel conferred.)

6   **Q**   I think -- are you looking at the '933 or do you have

7   the '868?

8   A   I'm looking at the '422.

9   **Q**   So that's why the numbers, the lines don't match up.

10  A   Okay.

11  **Q**   Where it says:  See also Farber Clinical Research.

12  Right?  Do you see that?

13  A   And you're on '422 also?

14  **Q**   I'm on the '933.

15  A   Well, I could go right to the '933.

16  **Q**   I think it's the same.

17  A   All right.  Yes.

18  **Q**   Here.  There.  Are you with me?  Bottom.  Okay.

19          So, what does this Farber reference teach?

20  A   The Farber reference teaches that basically to isolate

21  RNA from human kidneys, human kidneys were essentially

22  assumed to be or were known to be or expected to be the

23  source of EPO in our bodies.  Therefore, one expected the

24  RNA that makes EPO to be in the human kidney.  And this set

25  of experiments said isolate the RNA from those human kidneys

 1    and inject that RNA into a frog oocyte.

 2              Now, why would you want to do that.  The answer

 3    is --

 4    Q    Well, why don't we start with what is a frog oocyte?

 5    A    What is a frog oocyte.  Frog oocytes are, basically

 6    they're the product of fertility, if you will, in frogs.

 7    And they're used in the laboratory because they're large

 8    cells.  And so they're easily manipulated.  And they're,

 9    they're a eucaryotic cell, they have a nucleus to them, and

10    so they are likely to and in fact do contain the machinery,

11    much of the machinery that a mammalian cell has to make

12    proteins.  So it's possible, because of the size of these

13    cells, to put a needle into the cell, a tiny needle of

14    course, and directly put down RNA into the cytoplasm of that

15    frog cell and allow the frog cell to carry out its chemical

16    reactions to make a protein, a glycoprotein, and carry out

17    its normal synthetic functions.

18    Q    And in the Farber paper what did you understand the

19    result to be?

20    A    What I understand the result to be is that it was

21    observed that injecting human kidney RNA into this frog cell

22    programmed that frog cell to make human erythropoietin.

23    Q    What does the kidney have to do with this?

24    A    What does the kidney have to do with this?

25    Q    Yes.

1    A    So, again, the kidney is --

2             **MR. DAY:**  Object, your Honor; this is outside the

3    scope of this report.

4             **THE COURT:**  Yes, sustained.

5             **MS. BEN-AMI:**  Well, I'll find the cite, your Honor,

6    and get back to it.

7    **Q**    Could we look at --

8             **THE COURT:**  Of course.

9    **Q**    Let's look, just as we segue in, do you have the

10   Maniatis book again?

11   A    I do have the Maniatis book.

12   **Q**    And would you look at Pages 350 to 352.

13   A    350 to 352.

14   **Q**    What is the topic there?

15   A    The topic here describes how to inject RNA into frog

16   oocytes.

17   **Q**    So, based on your knowledge and experience from

18   reviewing the Maniatis manual and the Farber paper, was, in

19   your opinion, this an accepted technique, an unaccepted

20   technique, radical?

21   A    It was an accepted and I would say widely used technique

22   to study proteins made by many kinds of cells, including

23   mammalian cells.

24   **Q**    Now, can you look at the Lin patent.  I think we have

25   the patent and the jury has a copy, the '933 is Exhibit 1.

1    The jury can look at -- we have one full copy of the patent

2    so it's wherever that is.  And would you look, we're still

3    on that column 9, line 50 through 62.

4         **MS. BEN-AMI:**  If you can bring it up, Mr. Fisher,

5    please.  Then go to lines 50 through 60 through the end of

6    the paragraph.  Through the end of the paragraph.

7    **Q**   Could you just read that to the jury and then you can go

8    into your report?

9    A    Yes.  So, this paragraph refers to the Farber abstract.

10   The recent Abstract 392, at Page 122a (1983) reported the in

11   vitro translation of human kidney mRNA by frog oocytes.  The

12   resultant translation product mixture was estimated to

13   include on the order of 220 milliunits of a translation

14   product having the activity of erythropoietin per microgram

15   of injected mRNA.  While such levels of in vitro translation

16   of exogenous mRNA coding for erythropoietin were

17   acknowledged to be quite low (compared even to the prior

18   reported levels of baboon mRNA translation into the

19   sought-for product) it was held that the results confirm the

20   human kidney as a site of erythropoietin expression,

21   allowing for the construction of an enriched human kidney

22   cDNA library from which the desired gene might be isolated.

23        And then it cites another abstract.

24   **Q**   So, based on your knowledge and experience were there

25   publications that said that the human kidneys could direct

1    the synthesis of biologically active human EPO?

2           **MR. DAY:**  Objection; outside the scope of this

3    report.

4           **MS. BEN-AMI:**  Paragraph 38, line --

5           **THE COURT:**  Of which one?

6           **MS. BEN-AMI:**  The green one.

7           **THE COURT:**  Thank you.

8           **MS. BEN-AMI:**  Of the third supplemental.

9    Paragraph 38.

10          **THE COURT:**  Yes.  Just a moment.

11          **MS. BEN-AMI:**  Bottom of Page 18, your Honor.

12          **THE COURT:**  Yes, he may testify consistent with

13   Paragraph 38.  And why don't you put a question, we'll

14   follow along.

15   Q   So, based on your knowledge and experience, had it been,

16   can you tell us whether or not it had been demonstrated by

17   1983 that human kidneys could direct the synthesis of

18   biologically active human EPO in frog oocytes?

19   A   Yes.  This abstract indicates that.

20   Q   And can you tell us whether there was any disclosure in

21   these abstracts which were in vivo?

22   A   Yes, there were.

23   Q   And what does in vivo mean?

24   A   So, in vivo means in an animal or in a organism.  But in

25   this case it's understood to be in an animal.

1    Q    And what animal was used?

2    A    So, in this particular experiment in the abstract an

3    assay was done of mice.

4    Q    And in the Lin patent is there a bioassay used?

5    A    There is a bioassay used.

6    Q    What bioassay is that?

7    A    There's an in vivo bioassay that is in the mouse.

8    Q    So, using the in vivo assay that's described in the

9    Farber reference, what is disclosed as the result?

10   A    What's disclosed as the result in the Farber --

11         **MR. DAY:**  Your Honor, I'm just simply going to

12   object.  I don't understand the question.

13         **THE COURT:**  I didn't either, and if you could just

14   frame it again or ask it again.

15         **MS. BEN-AMI:**  Sure.  Thank you, your Honor.

16   Q    When the result of what the oocyte does was completed

17   and the material was injected into the mouse, what was the

18   result of the in vivo test?

19   A    The result of the in vivo test was that that product of

20   that experiment as elaborated by those frog oocytes would

21   stimulate the formation of red blood cells in that mouse

22   assay.

23   Q    Now, in that assay, as a result of that assay, as

24   referenced, as the reference indicates, was that an

25   indication of whether or not the material would be

1    biologically active?

2    A    That one could conclude from this set of experiments

3    that the product of that experiment was biologically active

4    in a mouse, in vivo.

5    Q    And the product that was being made that was injected

6    into a mouse contained the messenger RNA from what species?

7    A    So the frog oocytes were programmed by human kidney RNA.

8    Q    So the human kidney RNA is placed into what?

9    A    Into a frog oocyte.

10   Q    Okay.  And so, what is -- where's -- what's the cell

11   factory?  What kind of cell factory is it?

12   A    So, this is a frog cell factory.  So human RNA inside

13   the frog cell.

14   Q    And when the frog cell machinery is doing its job what

15   type of protein is made?

16   A    So, the protein is being made in the frog factory, if

17   you will, and coming out of the frog cell.

18   Q    And -- I'm sorry, go ahead.  No, go ahead.

19   A    And outside of the frog cell that material is then

20   injected into a mouse, and the mouse is assayed for whether

21   or not it is now making more red cells or being stimulated

22   to make more red cells.

23            **MS. BEN-AMI:**  Can I have JL14, please.

24            Again, your Honor, JL14 is a demonstrative.

25            **THE COURT:**  Thank you, and the jury will note it.

1    **Q**    And can you just walk us through what this is showing?

2    **A**    Yes.  So this is, this is a diagrammatic representation

3    of that experiment that we just discussed.  RNA from a human

4    kidney, and this particular abstract is purified, isolated,

5    purified from the cell, and it's put into a pie path, a

6    small pie path that's represented by that syringe and

7    injected into that frog oocyte.  And that frog oocyte then

8    synthesizes, using its normal protein synthetic machinery,

9    human erythropoietin.  And that human erythropoietin then is

10   tested for its ability to be biologically active in two

11   different kinds of assays.  One is an in vitro assay in a

12   tissue Petri dish, or a Petri dish in the laboratory, and

13   the other is an in vivo test where it's injected into the

14   bloodstream of a mouse and the mouse is assayed for whether

15   or not it's stimulated by this product.

16   **Q**    Now, do you understand that in this case Amgen contests

17   whether one would expect that mammal cells would make

18   biologically active EPO?

19   **A**    I'm sorry?

20   **Q**    Do you understand that Amgen says, Amgen asserts that

21   one wouldn't expect that the EPO to be, that would be made

22   in mammal cells would be biologically active?

23   **A**    Yes, I understand that that's contested.

24   **Q**    Do you have an opinion on that?

25   **A**    Yes, I do.

1    Q    And what is your opinion?

2    A    My opinion is that it would be expected that a human EPO

3    would be made as a glycoprotein if expressed in mammalian

4    cell.

5    Q    And what does the, if anything, does the frog experiment

6    tell you about the expectation of whether or not the protein

7    would be biologically active?

8    A    So that this experiment would tell one of ordinary skill

9    in the art, certainly me, that if you can make this protein,

10   a frog cell, which is evolutionary, very distant from

11   mammalian cells, that the machinery which is operative in

12   frog cells that provides a biologically active EPO in a

13   mammalian cell, which would be more closely related to the

14   human cell, will also be able to synthesize human EPO that's

15   biologically active.  If it can be made biologically active

16   in a frog cell, it stands to reason, in my opinion, that

17   it's going to be made as a biologically active glycoprotein

18   in a mammalian cell.

19   Q    Okay.  So let's briefly go into genomic DNA now.

20        **MS. BEN-AMI:**  You can take that down, Mr. Fisher,

21   please.  Thank you.

22   Q    Was the concept of screening genomic libraries

23   understood in 1983?

24   A    Yes.

25   Q    And were there -- let's talk about libraries where you

1    can pull out the genes before.  You have to answer audibly.

2    A    Yes.

3    Q    And were there such libraries for genomic DNA in 1983

4    and '84?

5    A    Yes, there were.

6    Q    Was there one that was reasonably well-known?

7    A    There was a genomic, human genomic library that was

8    well-known referred to in the jargon as the Maniatis

9    library.  It was published, I can't remember the date, but

10   maybe early, late 70's, made in part by a Richard Lawn.

11   Q    You said that it's known as the Maniatis library.

12        Do you still have that blue book?

13   A    I have the blue book.

14   Q    And can you tell the jury that the library with the

15   genes, was that the same Maniatis as the book?

16   A    That is the same Maniatis as the book.

17   Q    Based on your knowledge and experience in that time

18   frame, was that library of all the genes publicly available?

19   A    It was publicly available and widely distributed.

20   Q    Now, can you tell us about whether or not the strategy

21   for fishing out genomic DNA, whether that strategy had been

22   written about in the art prior to 83-84?

23   A    Yes, it had.

24   Q    And can you tell us any examples?

25   A    There were, there are examples that are highlighted or

1    outlined, if you will, in the Maniatis manual.  But there

2    are human beta-globin genes, genes to make hemoglobin RNA

3    cells, those have been cloned from, from this Maniatis

4    library.  Many of the antibody genes that are in our bodies

5    were cloned from this library.

6    **Q**    So, the libraries, given that there weren't libraries,

7    but the techniques were there, do you have an opinion about

8    on what was needed to clone and express the biologically

9    active EPO gene?

10   A    I do have an opinion.

11   **Q**    And what is that?

12   A    So, at this stage of the development of this field in

13   1982, 1983, to state the fundamental block, if you will, was

14   the protein sequence.  I think as I've outlined, if you have

15   protein sequence on a protein, then there are, or if you

16   have the protein, in fact, and there are methods to sequence

17   the protein, to determine the sequence, there are methods

18   to, using the codon table, for instance, to work your way

19   back from the protein sequence to decipher the gene sequence

20   or to create probes that would allow one to pull that gene

21   out from either a genomic library or a cDNA library.  And

22   with a synthetic gene in hand or a cDNA, or the gene itself,

23   then there were many examples of taking those genes,

24   synthetic cDNA or genomic, and putting them into a CHO cell

25   in a way that would allow that cell to carry out its normal

1   chemical processes to make a glycroprotein.  And as we've

2   heard one example, if one programs a frog oocyte, for

3   instance, with EPO RNA, the protein comes out a frog cell

4   and has biological activity in a mouse.  And based on that

5   and based on some other examples that we heard about

6   yesterday of proteins, human glycoproteins, made in CHO

7   cells that were active, glycosylated, one skilled in the

8   art, myself, would expect that one could put these genes

9   into a mammalian cell and obtain active, biologically active

10  EPO.  So, fundamentally, the steps beyond the protein

11  sequence had been described, were defined, and were expected

12  to be possible.

13  Q   So now let's go to the claims in the patent that are in

14  dispute.  Let's go to the '868 claim 1.

15          Looking at that claim, we discussed this briefly at

16  the end before the fire situation yesterday, can you give

17  us, can you tell us whether you have an opinion whether from

18  the standpoint of someone of ordinary skill in the art in

19  1983-84, given knowledge of the scope and content of the

20  prior art, the differences of the prior art in the claim and

21  the knowledge of the person, with plenty of experience, can

22  you tell us whether you have an opinion of whether or not

23  this claim 1 would have been obvious in 1983?

24  A   I have an opinion.

25  Q   What is your opinion?

1    A    My opinion is that this claim would have been obvious.

2    Q    And without going through everything that the prior art

3    has taught us in the last day and a bit, can you summarize

4    the basis for your opinion?

5    A    The basis for my opinion is that if one had the EPO

6    gene, one could make a mammalian cell and program that cell

7    with that mammalian, with that EPO gene to make glycosylated

8    EPO that would have activity in vivo in a mouse.

9    Q    I would like you to look at what is in your binder QDX

10   but in the, what is now admitted as 2014, but you still have

11   it as QDX.

12        Do you understand that Amgen -- well, we just went

13   through that -- Amgen disputes that a person would have a

14   reasonable expectation that the product would be

15   biologically active, right?

16   A    I understood that.

17   Q    Okay.  Have you seen evidence -- or strike that.

18        Have you seen information that, of whether or not

19   Amgen had the expectation that the EPO would be biologically

20   active prior to actually testing it?

21   A    I have seen information to that effect, yes.

22   Q    So looking at what you have as QDX and what is actually

23   2014, could you look at Example 7 in the December '83 Lin

24   application.

25   A    Yes.

1    Q    Now, we're talking about in this case that the

2    applications are from November of '84.  Right?  Can you just

3    look at the front of the patent and walk the jury through,

4    on the front, if every everyone looks at the front --

5    A    We're on the '868 patent.

6    Q    Right.  We're looking at the front of the patent where

7    it explains how all the applications relate to one another

8    on the first page, in incredibly small print.

9          So can you explain how these applications -- just

10   read them just, read it to the jury.

11   A    So, where it says Related U.S. Application Data, it

12   says:  Continuation of Serial Number 675,298, November 30,

13   1984, Patent Number 4,703,008, which is a

14   continuation-in-part of Serial Number 561,024, comma,

15   December 13, comma, 1983, abandoned, and a

16   continuation-in-part of Serial Number 582,185, February 21,

17   comma, 1984, abandoned, and Serial Number 655,841, comma,

18   September 28th, comma, 1984, abandoned.

19   Q    So now if you look at the December 1983 application that

20   has some information that's in the final application, some

21   is different, right?

22   A    Yes.

23   Q    So, in December of 1983 had Dr. Lin actually done any

24   test to determine whether the EPO he made would be

25   biologically active in a human?

1   A    I have found no evidence that he has done that

2   experiment.

3   **Q**    In December of 1983 had Dr. Lin in this application

4   disclosed that he had done any biological testing in any

5   animal to determine whether or not his EPO would be

6   biologically active?

7   A    I have not seen any information that would indicate

8   that.

9   **Q**    Now, in this time period, before he does any testing to

10  determine whether the EPO would be biologically active, does

11  he say whether one would expect it to be biologically

12  active?

13  A    Yes.  Yes.

14  **Q**    So, let's look at that, on Page 45, at the bottom.

15       Can you explain what you take from this section of

16  the application?

17  A    Reading from the word While Example, Example 7

18  illustrates:  While Example 7 illustrates biological

19  properties of microbial expressed monkey EPO in the form of

20  immunological properties, in vivo and in vitro tests of

21  biological activity to be performed are expected to reveal

22  that the expression products also share the biological

23  activities of naturally-occurring EPO.

24  **Q**    So what does this tell you from the standpoint of

25  someone skilled in the art?

```
 1    A    It --

 2              MR. DAY:  Objection, your Honor.  May I have a side

 3    bar?

 4              THE COURT:  Yes, you may.

 5              MS. BEN-AMI:  I'm sorry, your Honor.  I'm sorry.

 6    SIDEBAR CONFERENCE, AS FOLLOWS:

 7              THE COURT:  Yes?

 8              MR. DAY:  The inventor's statements with respect to

 9    the inventor's expectations are not evidence of what one of

10    ordinary skill in the art would expect.

11              THE COURT:  But aren't they relevant to that?

12              MR. DAY:  No, they aren't because the inventor is

13    presumed to be one beyond the ordinary skill in describing

14    his invention, and the fact that the inventor has a vision

15    of what the inventions were to achieve is not evidence of

16    what those of ordinary skill in the art would take away from

17    the, what he has disclosed.

18              THE COURT:  Sounds logically relevant to me.

19              MR. DAY:  He's the inventor.

20              THE COURT:  Yes.

21              MR. DAY:  So you cannot use the statements of --

22              THE COURT:  Have you got any authority for this?

23              MR. DAY:  Yes, I do.  Our Motion Number 24 --

24              THE COURT:  Just pass it up to me.

25              MR. GAEDE:  I'll bring it.
```

1        THE COURT:  Can you do something else while I look

2    at it?

3        MS. BEN-AMI:  I will move on, but I have a bench

4    memo for your Honor because there are four Federal Circuit

5    cases that say it's completely --

6        THE COURT:  You're entitled to persuade me and you

7    go to something else and come back.

8        MS. BEN-AMI:  I'll go on.

9        THE COURT:  I need the help so that I understand

10   what we're doing.

11       MS. BEN-AMI:  Okay.

12       MR. DAY:  Thank you very much, your Honor.

13       (Whereupon the sidebar conference concluded.)

14       THE COURT:  Both lawyers are acting just right

15   here.  They've got an issue.  And so, Ms. Ben-Ami

16   courteously, she's going to go on to something else.  Maybe

17   we'll get back to this, maybe we won't.  Give me a chance to

18   do my legal thing, but we won't waste your time.

19       Go right ahead, Ms. Ben-Ami.  And I thank both

20   counsel.

21       MS. BEN-AMI:  So I'm going to not go any further

22   into this application at all, your Honor.

23       THE COURT:  Right.  But without prejudice to coming

24   back to it depending upon how I rule.

25

1   **BY   MS. BEN-AMI**

2   **Q**   So when we look at the state of the art back in 1983-84,

3   I'll say '83, when we're looking at the state of the art,

4   are you aware of any information on whether the scientific

5   field, those skilled in the art, had an expectation that if

6   you made EPO recombinantly whether or not it would be

7   expected to be biologically active?

8   **A**   Yes.

9   **Q**   Have you considered what people were doing in the field

10  with regard to EPO in formulating your opinion?

11  **A**   Yes, I have.

12  **Q**   And what do you rely on for your opinion?

13  **A**   I rely in part on parts of the process whereby the

14  patents from Amgen were being prosecuted.

15  **Q**   Putting that aside, I would like you to put that aside

16  right now, and I would like you to talk to, to focus you on

17  what others in field were saying about EPO at the time.

18  **A**   Well, I think what others in the field were saying about

19  EPO at the time was that this is, it's a medically important

20  protein that would be useful for treating patients that have

21  anemia of various kinds.

22  **Q**   Are you familiar with a reference by a Dr. Eschbach?

23  **A**   Yes, I am.

24  **Q**   And I'm looking for it right now, but are you aware of

25  what Dr. Eschbach taught in his reference regarding the use

1    of the EPO?

2    A    Yes.   Dr. Eschbach and his colleagues published a paper

3    in the Journal of Clinical Investigation, which is a very,

4    very prestigious journal, where they were seeking to ask if,

5    if erythropoietin would in fact represent effective

6    treatment for individuals that have kidney disease and

7    anemia associated with that kidney disease.

8    Q    And based on that reference did Dr. Eschbach publish a

9    conclusion about the future of using EPO in medicine?

10            **MR. DAY:**  Your Honor, I would object.  I don't

11   recall this being in the expert report.

12            **THE COURT:**  Where is it in the expert report?

13            **MS. BEN-AMI:**  I've been thrown a little out of

14   order, your Honor.  But I will --

15            **THE COURT:**  Yes, and I understand I caused that.

16   So --

17            **MS. BEN-AMI:**  Well, I think I caused it by asking

18   the questions.

19            **THE COURT:**  No.

20            **MS. BEN-AMI:**  But in the interest of being as quick

21   as possible, I'm going to just --

22            **THE COURT:**  Skip that.

23            **MS. BEN-AMI:**  -- keep going and come back to that

24   as well because --

25            **THE COURT:**  Fine.

1          **MS. BEN-AMI:**  -- I'm sure we're going to take a

2     break eventually and I will --

3          **THE COURT:**  We are, at the stated time.

4          **MS. BEN-AMI:**  Okay.

5     **Q**   So let's, let's go into the knowledge of the art that if

6     you used mammalian cells would you get proteins that were

7     biologically active, okay?  So let me ask you to look at

8     Exhibit PR.  PR, the actual '216.

9     **A**   So I have PR.

10    **Q**   Can you tell us what this is?

11    **A**   This is a United States patent.

12    **Q**   And when was that patent filed?  Can you tell us what is

13    its filing date?

14    **A**   It is August 16, 1983.

15    **Q**   And when did it issue?  Well, that's the same -- when

16    was it filed?

17    **A**   Filed February 1980, issued August 1983.

18    **Q**   Do you know who Dr. Axel is?

19    **A**   I do.

20    **Q**   And who is he?

21    **A**   He was and I think still is a professor at Columbia

22    University Medical School.

23    **Q**   And is this, Dr. Axel's work considered the type of work

24    in this field at the time?

25    **A**   Yes, it is.

1          **MS. BEN-AMI:**  I would offer PR, your Honor

2          **THE COURT:**  Any objection to PR?

3          **MR. DAY:**  No objection, your Honor.

4          **THE COURT:**  PR may be admitted, Exhibit 2024.

5          (Exhibit marked in evidence.)

6     **Q**    Now, in the Axel reference does it impact your opinion

7     on what the art was expecting when you made proteins

8     recombinantly?

9     A    Yes, it does.

10    **Q**    What does it teach?

11    A    This patent teaches me a variety of means of delivering

12    genes from many organisms, many different kinds of

13    organisms, including humans, into mammalian cells and doing

14    that in a way that could allow one to make lots of, high

15    quantities of the protein that was directed by the gene that

16    was delivered to the cells.

17    **Q**    Now, what is gene amplification?

18    A    Yes, gene amplification is, as the name implies, the

19    amplification of genes.  And fundamentally it is increasing

20    the number of copies, if you will, of that gene.  Normally

21    in our, in our cells most chromosomes are present in two

22    copies and most of us have two copies of each gene.  This

23    patent teaches a way to engineer a cell, a CHO cell, to have

24    many copies of a gene that one would put into the cell.

25    **Q**    And why is this relevant to the concept of making of

1    commercial interest proteins?

2    A    Yes.  It's usually the case that the more copies in this

3    kind of an approach, the more copies of the gene that the

4    cell can have, it will be making more of the RNA molecules

5    from that gene and more of the protein from that gene.  And

6    naturally, if you want to make lots of proteins, for

7    example, to treat humans, you would want to have a cell

8    that's making as much as possible of the protein of

9    interest.  And so consequently, methods were developed and

10   used to increase the number of copies of a particular gene

11   in that cell so that that cell would be a more effective

12   factory for making a protein.

13   Q    Okay.  Can I have column 7 at the bottom, Mr. Fisher.

14          And I just ask you to read to the jury what this

15   document which is now into evidence tells the world to

16   expect.

17   A    If we go to line 57, the sentence begins:  Specifically,

18   it is anticipated that after inserting a gene or genes for

19   the protein portion of a cellular material such as a

20   glycroprotein, which includes a nonprotein portion, into a

21   eucaryotic cell of the type which normally produces such

22   material, the cell will not only produce the corresponding

23   proteinaceous material, but will utilize already existing

24   cellular mechanisms to process the proteinaceous materials

25   if and to the extent necessary, and will also add the

1   appropriate nonproteinaceous material to form the complete

2   biologically active material.

3   **Q**   Thank you.  Would you turn to NKP.

4   A   I have NKP.

5   **Q**   Can you tell us the date of this reference?

6   A   This reference is dated November of 1982.

7   **Q**   And what is the journal?

8   A   This journal is Molecular and Cellular Biology.

9   **Q**   And is this a journal that was within the field in 1982

10   of a person skilled in the art?

11   A   Yes.

12          **MS. BEN-AMI:**  And I offer NKP.

13          **MR. DAY:**  No objection.

14          **THE COURT:**  NKP admitted Exhibit 2025.

15          (Exhibit marked in evidence.)

16   **Q**   And did you rely on this paper, Doctor?

17   A   Yes.

18   **Q**   For what?

19   A   This paper provides demonstration methods and reagents

20   that would allow one to amplify genes, transfected gene in

21   mammalian cell.

22   **Q**   So let me ask you to go to Exhibit N, the McCormick

23   application.

24          Do you have that, Doctor?  It should be in front

25   since a plain N, not an NQ something.

1   A    Let me take a look here.

2           MS. BEN-AMI:  Do you have an extra copy of that?

3           Mr. Drozdoff has an extra one for us.

4           THE WITNESS:  Thank you.

5   Q    Have you seen this document before?

6   A    Yes.

7   Q    What is it?

8   A    This is a patent application.

9   Q    And what's the date of the application?

10  A    The date of the, the filing date of the application is

11  November 1, 1982.

12  Q    And is this in the field that a person of ordinary skill

13  in the art would consider relevant in 1983?

14  A    Yes, it is.

15          MS. BEN-AMI:  I offer Exhibit N, your Honor.

16          THE COURT:  Any objection?

17          MR. DAY:  No objection, your Honor.

18          THE COURT:  N is admitted, Exhibit 2026.

19          (Exhibit marked in evidence.)

20          MS. BEN-AMI:  And I believe we will have to wait a

21  second to give Ms. Smith a copy because --

22          THE COURT:  Why don't we, why don't we take the

23  recess then at this time.

24          Ladies and gentlemen, we'll take the morning recess

25  at this time.  You've not heard all the evidence.  Please,

```
1    therefore, keep your minds suspended.  Do not discuss the

2    case either among yourselves nor with anyone else.  You have

3    a half an hour recess.  The jury may stand in recess.  I'll

4    remain on the bench.

5              THE CLERK:  All rise for the jury.

6              (Whereupon the jury left the courtroom.)

7              THE COURT:  Please be seated.

8              With respect to the side bar conference, Amgen's

9    objection to the questions put to the witness related to the

10   disclosure of Dr. Lin is overruled and Roche may so inquire.

11   To that extent, motion in limine number 24 is denied.  But

12   it's much broader than that, and I'm only ruling as to the

13   particular questions.

14             I don't give advisory opinions, but there's, the

15   motion also attacks proceedings before some administrative

16   agency or the like.  One would think those are hearsay,

17   unless perhaps they have issue preclusive effect.  But

18   that's far afield.  And I don't rule on it now.

19             I also have this, a bench memo relative to my

20   sequestration order.  My sequestration order stands; it

21   applies to experts.

22             We'll recess for one-half hour.  We'll recess.

23             THE CLERK:  All rise.  Court is in recess.

24             (Recess.)

25             THE CLERK:  All rise for the jury.
```

1          (Whereupon the jury entered the courtroom.)

2          **THE CLERK:**  Court is in session, please be seated.

3          **THE COURT:**  Proceed.

4          **MS. BEN-AMI:**  Thank you, your Honor.

5          **DIRECT EXAMINATION** (Cont'd)

6  **(BY MS. BEN-AMI:)**

7  **Q.**  Doctor, do you have the McCormick application?

8  **A.**  Yes.

9  **Q.**  And 2026 is the exhibit number.  Have you reviewed this

10  application?

11  **A.**  Yes.

12  **Q.**  In what respects do you rely on it for your opinion?

13  **A.**  I rely on it as one example of expressing a human

14  glycoprotein in Chinese hamster ovary cell, or CHO cell, and

15  mammalian cell.

16  **Q.**  Can we go to page 17, the bottom, around line 20 through

17  25.

18  **A.**  Yes.

19  **Q.**  And can you read that to the jury, say, the IFN, right

20  there?

21  **A.**  Right.  "The IFN," IFN stands for interferon, it's a

22  human protein, "produced in CHO cells was found to be a

23  mixture of unglycosylated and glycosylated products and to

24  be substantially identical in structure, properties and

25  conformation to native human interferons, or IFN's."

1    Q.   And it goes on to say what?

2    A.   Goes on to say, "Since these IFN's are secreted into the

3    medium and with no contamination by the host IFN, or

4    endogenous host toxins, the IFN products obtained in

5    accordance with the subject invention would be eminently

6    suitable as therapeutic agents in the treatment of cancer

7    and viral diseases."

8    Q.   Now in your opinion, based on your knowledge and

9    experience, what is this telling the ordinary skilled person

10   about the use of CHO cells and biological activity?

11   A.   It tells specifically here that the interferons are made

12   in the CHO cells, they're glycosylated, they are

13   substantially identical in structure, properties and

14   conformation to native human interferons and are thereby

15   useful for treatments, treatment of viral and cancer

16   diseases, therapeutic agents.

17   Q.   So based on -- well, let me ask you to look at QU.

18   A.   Okay.  I have QU.

19   Q.   And do you see it under item little 63 in the left, can

20   you read that to the jury, please?

21   A.   Yeah.  Item 63 to the left says that, "This is a

22   continuation in part of Serial Number 438991, November 1,

23   1982."

24   Q.   Is this an issued patent?

25   A.   Yes, it is.

1          **MS. BEN-AMI:**  I offer QU, your Honor.

2          **THE COURT:**  No objection to QU?

3          **MR. DAY:**  No objection, your Honor.

4          **THE COURT:**  I hear no objection.

5          **MR. DAY:**  No objection.

6          **THE COURT:**  Yes.  Exhibit 2027.

7          (Exhibit marked in evidence.)

8   **Q.**  So let's go back to -- well, let's continue on.  Let's

9   go to NV.

10  **A.**  NV as in --

11  **Q.**  "Victor."

12  **A.**  Okay.  I have that.

13  **Q.**  Can you tell us what that is?

14  **A.**  This is a European patent application.

15  **Q.**  And what is the date of publication?

16  **A.**  The date of publication is --

17  **Q.**  It's on the left.

18  **A.**  September 14, 1983.

19  **Q.**  And do you know who the applicant is?

20  **A.**  The inventor is Walter Charles Fiers.

21  **Q.**  And it says "Applicant," that's a company, what --

22  **A.**  Applicant is Biogen.

23         **MS. BEN-AMI:**  I offer NV, your Honor.

24         **MR. DAY:**  No objection, your Honor.

25         **THE COURT:**  NV is admitted, 2028.

1          (Exhibit marked in evidence.)

2  **Q.**  So we're talking about whether there's a reasonable

3  expectation of biological activity, and have you relied on

4  this paper?

5  A.  Yes.

6  **Q.**  And for what?

7  A.  This is another example of expressing a human

8  glycoprotein in mammalian cells, CHO cells.

9  **Q.**  And what cell lines -- are there any cell lines of

10  relevance that were used in this paper?

11  A.  There are cell lines of relevance, yes.

12  **Q.**  Such as what?

13  A.  Such as CHO cells.

14  **Q.**  And if we look at the second page, which is actually

15  page 1 of this supplemental application, where it says, "As

16  will be appreciated," can you read that to the jury?

17  A.  "As will be appreciated from the disclosure to follow,

18  the DNA sequences, recombinant DNA molecules and processes

19  of this invention may be used in the production of

20  polypeptides useful in antiviral and antitumor or anticancer

21  and immunomodulation agents and methods."

22  **Q.**  What is this telling the person of ordinary skill about

23  the reasonable expectation that if you make a protein in a

24  CHO cell, whether or not it will be biologically active?

25  A.  That sentence implies and indicates that if you do

1    what's in this disclosure, you will have an expectation,

2    these individuals have an expectation that you make this

3    protein in CHO cells, it will have a biological activity

4    that would allow it to be used as a drug.

5    **Q.**  So with that in mind, let us go to Dr. Lin's

6    application, which is 2014, which, in your book, is QDO,

7    that's where we stopped before.  QDX, I'm sorry.  And we

8    were on page 45, which is image 51.  We only have two sets

9    of numbers and a set of letters.

10          Okay.  Are you there?

11   A.  I am.

12   **Q.**  If you look at the bottom, where it says in vivo, in

13   vitro, this is what Dr. Lin is saying, just to frame it

14   again, before he does any in vivo testing; right?

15   A.  Yes.

16   **Q.**  And what does he say about expectation?

17   A.  To read the text, it says, "While Example 7 illustrates

18   biological properties, of microbially expressed monkey EPO

19   in the form of immunological properties, in vivo and in

20   vitro tests of biological activity to be performed are

21   expected to reveal that the expression products also share

22   the biological activities of naturally-occurring EPO."

23   **Q.**  And what does that tell you about a reasonable

24   expectation that if you make the protein in CHO cells, the

25   EPO will be biologically active?

1    A.   It indicates that the inventor wrote this with the

2    expectation that these products will have a biological

3    activity in vivo.

4    Q.   And looking at page -- at the claims, as were filed in

5    December of 1983, which is page 2 of the claims at the end,

6    which is image 57, if you look at claim 9, can you read that

7    to the jury?

8    A.   Claim 9 says, "A polypeptide according to claim 1 which

9    has the in vivo biological activity of naturally-occurring

10   erythropoietin."

11   Q.   Can you tell the jury, from your review of the records

12   in this case, was Dr. Lin claiming that his EPO was

13   biologically active before he had tested to see whether it

14   was biologically active?

15   A.   That is my understanding, yes.

16   Q.   And how does that, if at all, impact your opinion that

17   it would have been, would or would not have been obvious to

18   expect biological activity?

19   A.   I would assume, I would conclude that if you're going to

20   claim that it's active, that you, even though you don't have

21   in vivo activity, that you're going to expect it to have

22   activity.

23   Q.   And is Dr. Lin's expectation reflected in his patent

24   application consistent or inconsistent with the prior art?

25   A.   It is consistent with the prior art.

1    Q.  So when you take the whole picture together, all the

2    information together, in your opinion, looking at just this

3    claim as an example, where this claim -- I'm sorry, I have a

4    small one, but that way I can actually hold it, it says the

5    claim, the '868 claim, that the product will have in vivo

6    activity, in vivo biological activity, in your opinion,

7    based on the prior art, based on what Dr. Lin said in his

8    application, would a person of ordinary skill in the art

9    expect reasonably whether there would be biological

10   activity?

11   A.  Yes.

12   Q.  In your opinion, would that have been obvious?

13   A.  Yes.

14   Q.  In the 1984 application, the final application, the one

15   that is actually in the patent, is the language from Example

16   7, let's go back to page 45, that language telling the

17   patent office there will be an expectation that it would be

18   biologically active, was that paragraph put into the final

19   application?

20   A.  No.

21   Q.  What happened to it?

22   A.  It's not there.

23   Q.  So looking at the 1984 November application, the

24   examiner is reading that, can he -- does he tell from that

25   whether there was an expectation or not?

```
 1   A.  No.

 2   Q.  But if you go back and look at an earlier application in

 3   1983, what did Dr. Lin say?

 4   A.  The words say it is expected that we will find

 5   biological activity in vivo.

 6   Q.  And to obtain these patents, what did the applicants

 7   during the course of the application process, after

 8   November 1984, what did they tell the patent office?

 9   A.  My recollection is that they told the patent office that

10   we had no expectation of biological activity in vivo.

11   Q.  And is that consistent or inconsistent with the

12   information that they deleted from the November application?

13   A.  Well --

14          MR. DAY:  Objection, your Honor.  It's

15   argumentative.  Deleted, there's no evidence of --

16          THE COURT:  Well, I -- I'm going to sustain it but

17   not necessarily on that ground.  Sustained.

18          MS. BEN-AMI:  I'll just leave that be.

19          THE COURT:  The documents speak for themselves.

20   You may make, if there's any argument to be made, you may

21   make it, but not now.  Ask him questions.

22          MS. BEN-AMI:  Yes, your Honor.

23   Q.  So are you aware that there was an argument or a

24   position, a discussion before the patent office where Amgen

25   said no one would have known that EPO would be biologically
```

1    active because it's an obligate glycoprotein?

2    A.  I'm aware of that discussion.

3    **Q.**  So let's start with this concept.  What, from your

4    understanding of the record, did Amgen mean?  What does

5    obligate glycoprotein mean?

6    A.  That phrase to me means that the biological function or

7    activity of that glycoprotein is dependent upon or requires

8    the sugar modification.

9    **Q.**  Now, let's go to the final history.  Let's get into how

10   that came up to the patent office.  Will you look at NW,

11   please.

12   A.  I have NW.

13   **Q.**  Can you tell us what that is?

14   A.  This is a European patent application.

15   **Q.**  When was it published?

16   A.  This was published in -- forgive me for hesitating --

17   November 9, 1983.  The Europeans flip the dates and --

18          **MS. BEN-AMI:**  Your Honor, I offer NW.

19          **THE COURT:**  NW?

20          **MS. BEN-AMI:**  NW.

21          **THE COURT:**  Any objection?

22          **MR. DAY:**  No objection, your Honor.

23          **THE COURT:**  It may be received, Exhibit 2029.

24          (Exhibit marked in evidence.)

25   **Q.**  Now, this reference was before the patent office, wasn't

1    it?

2    A.  Yes.

3    Q.  And can you tell us very generally what this is about?

4    A.  This patent is about a glycoprotein that we discussed

5    yesterday called tPA, that's the clot-buster protein.  And

6    it's cloning and expression in different kinds of cells.

7    Q.  Now, would you look at QL.

8    A.  I'm looking at QL.

9    Q.  Can you tell us what that is?

10   A.  This is the United States patent.

11   Q.  And when was that filed?

12   A.  This was filed on April 7 of 1983.

13           MS. BEN-AMI:  I offer QL, your Honor.

14           MR. DAY:  No objection.

15           THE COURT:  QL is admitted, Exhibit 2030.

16           (Exhibit marked in evidence.)

17   Q.  Now, can we go back to 2029, I think it is, which is NW.

18   Do you have that, Doctor?

19   A.  Yes.

20   Q.  Let's look at page 1 of the application.

21           MS. BEN-AMI:  Which is slide 2 for you, Mr. Fisher,

22   image 2.

23   Q.  And would you look at lines 22 -- 24 through 30, 31?

24   Would you read that to the jury?

25   A.  Yes. "The present invention arises in part from the

1    discovery of the DNA sequence and deduced amino acid

2    sequence of human plasminogen activator.  This discovery

3    enabled the production of human plasminogen activator via

4    the application of recombinant DNA technology, in turn,

5    enabling the production of sufficient quality and quantity

6    material to initiate and conduct animal and clinical testing

7    as prerequisites to market approval, unimpeded by the

8    restrictions necessarily inherent in the isolation methods

9    here hitherto employed involving production and extraction

10   from existing cell culture."

11   Q.  So what is this telling us about the understanding about

12   whether this tPA would be biologically active?

13   A.  The conclusion I draw from these sentences is that the

14   inventors were expecting to use this material in human

15   beings for clinical use and obviously they're not going to

16   do that unless it's going to have activity.

17   Q.  And let's go to page 50, which is image 51, where it

18   says, "Pharmaceutical Compositions."  Just looking at that

19   section, what does that tell you about the expectation of

20   biological activity?

21   A.  So this section outlines the notion that --

22        MR. DAY:  I'll object, your Honor.  This is outside

23   the scope of his report.  He doesn't address these sections

24   of the patent, your Honor.

25        MS. BEN-AMI:  I'll withdraw, and since it is in

1    evidence, ask him to simply read these lines to the jury.

2              THE COURT:  He may read them.

3              MS. BEN-AMI:  Thank you, your Honor.

4    A.   The title of this section is, "Pharmaceutical

5    Compositions."  It reads, "The compounds of the present

6    invention can be formulated according to known methods to

7    prepare pharmaceutically useful compositions, whereby the

8    human tissue plasminogen activator product hereof is

9    combined in admixture with a pharmaceutically acceptable

10   carrier vehicle.  Suitable vehicles and their formulation,

11   inclusive of other human proteins, e.g., human serum

12   albumin, are described for example in Remington's

13   'Pharmaceutical Sciences' by E.W. Martin, which is hereby

14   incorporated by reference."

15   Q.   That's fine.  Can you continue to "Such compositions"?

16   A.   "Such compositions will contain an effective amount of

17   the protein hereof together with a suitable amount of

18   vehicle in order to prepare pharmaceutically acceptable

19   compositions suitable for effective administration to the

20   host."

21   Q.   Now, can we go to page 46?  And, "Expression and

22   Amplification of the t-PA Sequence," what cells are they

23   using?

24   A.   They are describing the use of a certain kind of

25   mammalian cells called CHO cells that have a mutation and an

1    enzyme gene, called dhfr- CHO cells.

2    **Q.**   What cells -- type of CHO cells did Dr. Lin use?

3    A.   He used dhfr- CHO cells.

4    **Q.**   And can we go to OUX1.  Do you have that?

5    A.   Yes.

6    **Q.**   Can you tell the jury what that is?

7    A.   This is a section of the exhibits beginning with a

8    letter to the Food and Drug Administration from a woman,

9    Sandra Ronspies, who is Senior Director, Regulatory Affairs,

10   Genentech.  It's an application to -- it's called a product

11   license application, asking the FDA to allow Genentech to

12   begin the process of testing tPA.

13             **MS. BEN-AMI:**  I offer OUX, your Honor.

14             **MR. DAY:**  I object, your Honor.

15             **THE COURT:**  To OUX.  May I see it?

16             **MS. BEN-AMI:**  You may need to have a sidebar.

17             **THE COURT:**  Very well, you may come to the sidebar.

18   SIDEBAR CONFERENCE, AS FOLLOWS:

19             **THE COURT:**  Ground of the objection?

20             **MR. DAY:**  This is not prior art, your Honor.  It's

21   a secret filing by Genentech two years after the inventions,

22   to the Food and Drug Administration, never published.

23             **THE COURT:**  All right.

24             **MS. BEN-AMI:**  May I be heard?

25             **THE COURT:**  I'm not foreclosing you, but yes.

```
 1              MS. BEN-AMI:  This is 102(g) prior art, if you have

 2     a conception prior and then you show that you went through

 3     with the work, then that is 102(g) prior art.  I'm using

 4     this to show that this was -- what was in the application

 5     continued on and at that point was biologically active.

 6              THE COURT:  No, sustained.  I'll read it and

 7     reflect on it, but sustained.

 8              MR. DAY:  Also not in the report, your Honor.

 9              THE COURT:  But --

10              MS. FISHMAN:  It is.

11              MR. DAY:  I'm sorry, I misspoke.

12              (Whereupon the sidebar conference concluded.)

13              THE COURT:  OUX sustained for now.  Go ahead.

14     (BY MS. BEN-AMI:)

15     Q.  So Doctor, looking at the application, which is 2029,

16     NW, yes, did Amgen characterize tPA to the patent office in

17     the Lin application?  Did they talk about this application?

18     A.  They did not talk about the application the way that

19     I've been describing it, but it's actually cited in this

20     application.

21     Q.  Now, in the -- when -- the patent office had the

22     application?

23     A.  Yes.

24     Q.  Okay.  Let's go slow.  We talked about this term

25     "obligate glycoprotein" before.  And did Amgen talk about
```

1   tPA and whether that was an obligate glycoprotein?

2   A.  Yes.

3   Q.  What did they say?

4   A.  The documents that I reviewed indicate that Amgen

5   characterized tPA as an obligate glycoprotein.

6   Q.  So I need -- in your reference, NW, which is 2012 -- oh,

7   it's QDM in yours, I'm sorry.  And let's go through what --

8           MR. DAY:  I missed the reference.  What are you

9   referring to?

10          MS. BEN-AMI:  I'm in the -- I'm sorry, it's in

11  the -- previously was QDM, which is now 2012.

12          MR. DAY:  Okay.

13  Q.  Can we go to page 17 of the paper, but let's start at

14  the first page -- the second page.

15          MS. BEN-AMI:  Let's go to the second page, which is

16  image 256.  No, QDM.  There we go.  I thought -- that's the

17  page.

18  Q.  Looking at the top, who is submitting this?

19  A.  This is submitted by examiner -- this is to Examiner

20  Tannenholtz, and my recollection is that it's coming from

21  one of the Amgen -- one of Amgen's attorneys.

22  Q.  Let's look at page 11 at the end, which is image 787.

23          MS. BEN-AMI:  Make that bigger.

24  Q.  There it says?

25  A.  There it says "Michael Borun."

1   Q.   And he is an attorney, it says?

2   A.   My understanding is he is an attorney.

3   Q.   So now let's look at what is said.  Let's go to image

4   273, which is page 18.  273, the image is 273, the page is

5   18, and the sentence that starts, E.P.O. -- E.P.O., European

6   Patent Office.  Not EPO, but E.P.O., European Patent Office.

7   And it has the number.

8        And here, what does Amgen tell the examiner about

9   the Genentech tPA reference?

10  A.   Yes.  So EPO 619 is the European Genentech tPA patent

11  application, and the Amgen attorney says, "This document,

12  like Pennica, et al," that's a paper describing this work,

13  "contains no description of use of mammalian host cell

14  expression systems for tPA production."

15  Q.   Was that statement accurate?

16  A.   No.

17  Q.   Can we go back to the application, which is NW, which is

18  2029.  Now we have a statement that Amgen made to the patent

19  office and what does the application actually say about what

20  cells were used?

21  A.   The application says that the plasmic PETPR, which

22  encodes human EPA, was transfected or introduced into both

23  dhfr- CHO cells and another string of CHO cells by a

24  particular method.

25  Q.   So in the '619 application, was there or was there not a

1  description of the use of mammalian host cell expression

2  systems for tPA production?

3  A.  There was a description of mammalian host cells for tPA

4  production.

5  Q.  And did Amgen characterize tPA like an obligate

6  glycoprotein like EPO or not?

7  A.  No.

8  Q.  Did Amgen tell the patent office whether it considered

9  tPA an obligate glycoprotein?

10  A.  It told the patent office to consider tPA to be an

11  obligate glycoprotein.

12  Q.  Did Amgen tell the patent office that the tPA, like EPO,

13  was being made in CHO cells?

14  A.  I'm sorry?

15  Q.  Did Amgen tell the patent office whether the tPA was

16  being made in CHO cells like Dr. Lin's?

17  A.  It did not tell the patent office that tPA was being

18  made in CHO cells.

19  Q.  So now let's go back to the '868, claim 1, and --

20          MS. BEN-AMI:  I don't mean to hold this right in

21  front of you, but I apologize.

22  Q.  Let's look at the '868, claim 1.  In your opinion, based

23  on your knowledge and experience, given all the material we

24  have looked at, in 1983, '84, would there have been a

25  reasonable expectation of success that if you cloned the EPO

1    gene in a CHO cell you would get biological activity?

2    A.  Yes, in my opinion.

3    **Q.**  And having looked at this claim, claim 1, given the

4    entire scope and content of the prior art you've reviewed

5    and the differences between the claim, and the level of

6    skill, can you tell us, in your opinion, whether or not this

7    claim would have been obvious?

8    A.  In my opinion this claim would have been obvious.

9    **Q.**  And now let's go to claim 2.  How does claim 2 differ

10   from claim 1?

11   A.  Claim 2 differs from claim 1 by narrowing down the

12   mammalian cell host to using a CHO cell.

13   **Q.**  And in your opinion, can you tell us whether you have an

14   opinion about whether this claim would have been obvious?

15   A.  This claim would have also been obvious, in my opinion.

16   **Q.**  So now let's go to the '698, claim 6.

17          **MS. BEN-AMI:**  I'm going to try another placement of

18   the board today, see if that works for everyone.

19   **Q.**  Except for you, Doctor.  So you have the '698 patent?

20          **MS. BEN-AMI:**  Can the jury see this now?  Is this

21   any better?

22   A.  I have the '698 patent.

23   **Q.**  Maybe you can step down, Doctor, so you can see the

24   board also.

25          **THE COURT:**  That hadn't worked well in the past but

1    you may try it.

2         **MS. BEN-AMI:**  Okay.  If he steps down here, your

3    Honor, then I thought I could move the microphone over here,

4    give it a shot.

5         **THE COURT:**  You may give it a shot.

6         **MS. BEN-AMI:**  Thank you, your Honor.

7    **Q.**  Stand on the microphone side.

8    A.  Okay.

9    **Q.**  Now, again, there is a --

10        **MS. BEN-AMI:**  Thank you, your Honor.  I didn't know

11   that moved.

12   **Q.**  There is a glossary the jury has that explains certain

13   words; right?

14   A.  Yes.

15   **Q.**  And you are using the glossary to the extent it provides

16   definitions?

17   A.  Yes.

18   **Q.**  Okay.  So with that in mind, could you explain this

19   claim, claim 6?

20   A.  Claim 6 describes a process for the production of, the

21   method, of to make a glycosylated erythropoietin polypeptide

22   having the in vivo biological property of causing bone

23   marrow cells to increase production of reticulocytes and red

24   blood cells.  So that's this in vivo biological activity, to

25   stimulate the bone marrow cells to make red blood cells.

1   This process involves growing, under suitable nutrient

2   conditions, vertebrate cells.

3   **Q.**  What are vertebrate cells?

4   A.  Vertebrate cells are cells from organisms that have a

5   bony spine.  That would include CHO cells, these are from

6   hamsters, which of course are rodents, and they have a bony

7   spine.  And that's growing the cells under suitable nutrient

8   conditions, vertebrate cells comprising amplified DNA

9   encoding the mature erythropoietin amino acid sequence in

10  Figure 6.  So amplified is that process where you cause the

11  cell to have many copies of the gene.

12  **Q.**  Have you gone through those references already for the

13  jury?

14  A.  Yes, I have.  Yes.

15  **Q.**  So what is the -- go ahead.

16  A.  And Step B, then, is isolating that glycosylated

17  erythropoietin polypeptide expressed by those cells.

18  **Q.**  So, in your opinion, was this concept of isolating the

19  protein considered in the prior art?

20  A.  Yes, it was.

21  **Q.**  In your opinion, what was the state of the art?

22  A.  The state of the art at that time was that it would be

23  obvious and trivial, frankly, to isolate the protein, the

24  glycoprotein from growing these cells.

25  **Q.**  And so looking at claim 6, can you tell us whether or

1    not you have an opinion regarding claim 6 of the '698?

2    A.   Yes.   This process would be obvious.

3    **Q.**   Based on what?

4    A.   Based on what was in the prior art, the literature.

5    **Q.**   Now, let's look at claim 7 of the '698.   How does that

6    further refine claim 6?

7    A.   Claim -- it says the process of claim 6 up here wherein

8    these vertebrate cells contain amplified marker genes of

9    DNA.

10   **Q.**   And what is that?

11   A.   So in this case, the marker gene is a gene called

12   Dihydrofolate reductase.

13   **Q.**   We talked about -- how is it defined in the prior art by

14   initials?

15   A.   Well, DHFR.   So it is that particular method that you

16   can use in DHFR cells with this marker gene to amplify the

17   gene that went into those cells.

18   **Q.**   Did we discuss this when we reviewed the prior art this

19   morning?

20   A.   Yes, we did.

21   **Q.**   In your opinion, based on your knowledge and experience

22   from the standpoint of someone of ordinary skill in 1983

23   looking at the prior art, would this claim or would this

24   claim not be obvious?

25   A.   This claim would be obvious.

1    Q.   And now, claim 8, same question.  Well, this claim just

2    says that the marker is DHFR; right?

3    A.   It does.

4    Q.   And is that what you just talked about with claim 7?

5    A.   It is.

6    Q.   So can you tell us if your opinion is the same or

7    different as to claim 8?

8    A.   This would be obvious as well.

9    Q.   And claim 9?

10   A.   This takes claims 2, 4 and 6, 6 in particular, and talks

11   about using the process when the cells are mammalian cells.

12   Q.   And would using mammalian cells in this case have been

13   obvious?

14   A.   Yes.

15   Q.   Based on --

16   A.   What's being used in the literature, including some of

17   those patents we just discussed.

18   Q.   So now let's go to the next patent, the '933 patent.

19   We're going to get you another board, Doctor.

20   A.   Should I sit down?

21   Q.   No, we'll stay at the board.  No sitting for you.

22        As we go through this, Doctor, these are not all

23   the claims of the patents in suit -- I'm sorry, these are

24   not all the claims in these patents; right?

25   A.   No.

 1   **Q.**  When Mr. Day in his opening said that we were seeking to

 2   invalidate, or Roche was seeking to invalidate all the

 3   claims in seven patents, is that your understanding?

 4   A.  No, that's not my understanding.

 5   **Q.**  Are you giving testimony on all the claims in all the

 6   patents?

 7   A.  No, I'm not.

 8   **Q.**  So look now at the '933.  This claim is written a little

 9   differently; right?

10   A.  Yes.

11   **Q.**  Can you walk the jury through the '933, claim 3?

12   A.  Yes.  So one of the differences is the phrase "a

13   non-naturally occurring glycoprotein product."  So that's --

14   I read that to mean that that's something that is not in

15   nature, necessarily.  "Glycoprotein product of the

16   expression in a mammalian host cell" -- again, that could be

17   these CHO cells -- "of an exogenous DNA sequence comprising

18   a DNA sequence encoding human erythropoietin said product

19   possessing the in vivo biological property of causing bone

20   marrow cells to increase production of reticulocytes and red

21   blood cells."

22   **Q.**  So this is a claim to the glycoprotein product of the

23   expressions.  So what is this telling us?

24   A.  This tells us that it is the product of a cell that has

25   in it an exogenous DNA sequence that encodes human

1    erythropoietin.

2    Q.  In your opinion -- you've gone through the processes

3    already, so in your opinion would the product of the

4    process -- well, let me strike that.

5            When you do the process, what do you get?

6    A.  When you do the process, you get a glycosylated

7    erythropoietin polypeptide.

8    Q.  And so this claim is so you do the process, and at the

9    end you get what?

10   A.  You get a non-naturally occurring glycoprotein which is

11   biologically active in vivo.  It possesses the in vivo

12   biological properties.

13   Q.  Now, there's an issue here about, that Dr. Bertozzi is

14   going to address, regarding glycosylation patterns; right?

15           MR. DAY:  Objection, your Honor.

16           MS. BEN-AMI:  I'm just tying --

17           THE COURT:  I'm going to sustain that.  Sustain

18   that.  We'll ask this witness questions that go to the case.

19   Q.  Doctor, putting aside the issue, I don't want you to

20   opine on the issue about glycosylation patterns, putting

21   that aside, would this claim, in your opinion, have been

22   obvious given the state of the art and the skill?

23   A.  Yes.

24   Q.  Now, looking at claim 9, I have the same question.

25   A.  Yes.  This claim says that we're going to take what was

1    made in 3 and create a pharmaceutical composition.

2    Q.  Now, in 1983, it says diluent adjuvant carrier.  In 1983

3    were such materials -- what are such materials?  Let's start

4    there.

5    A.  Well, they're the components that you add to the protein

6    and maybe put it in a vial, stabilizes it, keeps it alive,

7    biologically active.

8    Q.  And can you look for a second, you can probably get your

9    book there, NUC.  Can you tell -- do you have NUC?

10   A.  I have NUC.

11   Q.  Can you tell us what NUC is?

12   A.  NUC is basically the cover page and some other

13   materials, including the table of contents, of a book called

14   "Remington's Pharmaceutical Sciences."

15   Q.  And looking at the copyright page, which is the third

16   page, the latest copyright is what?

17   A.  The latest copyright on this particular edition is 1980.

18          MS. BEN-AMI:  I would offer this, your Honor, which

19   is NUC, "Remington's Pharmaceutical Sciences."

20          THE COURT:  No objection?

21          MR. DAY:  No objection, your Honor.

22          THE COURT:  NUC is admitted, give it 2031.

23          (Exhibit marked in evidence.)

24   Q.  Based on your knowledge and skill, was creating

25   compositions with diluents, adjuvants or carriers known in

1    the art at the time?

2    A.  Yes.

3    **Q.**  So based on the knowledge and experience, if you come

4    back to claim 9, would that claim, in your opinion, have

5    been obvious or not obvious?

6    A.  It would be obvious.

7    **Q.**  And let's look at claim 11.  Can you explain how that

8    differs from claim 9?

9    A.  Claim 11 claims a method for treating a kidney dialysis

10   patient by giving that patient the pharmaceutical

11   composition claimed in 9 in an amount that would cause that

12   patient to have an increase in their blood count.

13   **Q.**  Now -- I'd now like you to look at that Eschbach paper,

14   NCB.  Can you tell us what this is?

15   A.  Yeah.  This is a paper published in the "Journal Of

16   Clinical Investigation" in August of 1984.

17   **Q.**  And what is, if you look at the first page, when was it

18   submitted?

19   A.  The submission date is July 5, 1983.

20            **MS. BEN-AMI:**  I offer NCB, your Honor.

21            **THE COURT:**  No objection?

22            **MR. DAY:**  No objection.

23            **THE COURT:**  NCD is admitted.

24            **THE CLERK:**  NCB or D?

25            **MS. BEN-AMI:**  "B" as in "boy."

1      **THE COURT:**  NCB --

2      **MS. BEN-AMI:**  I'm sorry, your Honor.

3      **THE COURT:**  -- is admitted as 2032.

4      (Exhibit marked in evidence.)

5  **Q.**  And can you turn to the next page, the second page of

6  the reference, which is 435, and we look at the -- right

7  before the methods section, the last line, could you read

8  that last sentence to the jury?

9  A.  Yes.  That sentence reads, "These results predict that

10  Ep therapy should be effective in treating the anemia of CRF

11  in humans."

12  **Q.**  And in your opinion -- strike that.

13      Could you come back down and look at claim 11?

14  Looking at claim 11, do you have an opinion on whether claim

15  11 would or would not have been obvious?

16  A.  Based on that manuscript and sort of what one would

17  expect, this would be obvious.

18  **Q.**  And why would it be obvious to be a method for treating

19  a kidney dialysis patient?

20  A.  Well, as that sentence says, the results of this paper

21  predict that erythropoietin therapy should be effective in

22  treating the anemia of chronic renal failure in humans.  If

23  you have erythropoietin --

24  **Q.**  What does chronic renal failure have to do with kidney

25  dialysis patients?

```
 1    A.   Right.   So chronic renal failures means that the kidneys

 2    have failed, they're unable to perform the filtration

 3    functions, and that means that the patients with CRF must be

 4    on dialysis.

 5            MR. DAY:   Your Honor, I object.   This is outside

 6    the scope of his report.   Also outside the scope of his

 7    competency.

 8            THE COURT:   No, I think he was just asked to read

 9    it.   Maybe I'm mistaken.

10            MR. DAY:   No, I think he was explaining from his

11    perspective.

12            THE COURT:   Explaining, all right.   We'll stop it

13    there.   Put a question, Ms. Ben-Ami, and I'll be alert to

14    it.

15    Q.   You are a medical doctor; correct?

16    A.   I am.

17    Q.   Can you just tell the jury what CRF is?

18    A.   CRF is an abbreviation for chronic renal failure.

19            MS. BEN-AMI:   I'll leave it at that, your Honor.

20            THE COURT:   And that's fine.

21    Q.   So in your opinion, would claim 11 be obvious or not

22    obvious?

23    A.   It would be obvious, in my opinion.

24    Q.   And in your opinion, Doctor, was it known that chronic

25    renal failure required dialysis?
```

1    A.   Yes.

2    Q.   So now let's look at the next claim.   There are some

3    more '933 claims.   We'll try to go through them as quickly

4    as possible.

5         So you've talked about claim 3.   Now we're looking

6    at claim 7.   And claim 7 is defining claim 3 as how, further

7    refined?

8    A.   Claim 7 further refines the claim to mean the host cell,

9    the cell that's received and amplified the DNA, is a

10   non-human mammalian cell.

11   Q.   What type of cells were known in the art that you've

12   discussed already today?

13   A.   We have CHO cells, for example.

14   Q.   In your opinion -- do you have an opinion about whether

15   claim 7 would have been obvious?

16   A.   That claim would be obvious, in my opinion.

17   Q.   And now claim 8 talks about the cell being a CHO cell.

18   So do you have an opinion about that claim?

19   A.   That claim, in my opinion, would be obvious also.

20   Q.   Okay.   Claim 12, how does that affect the claims?

21   A.   This is, again, a pharmaceutical composition and in my

22   opinion that claim would be obvious also.

23   Q.   And claim 14?

24   A.   Claim 14, again, goes to and claims a method for

25   treating kidney dialysis patients.   And that claim is

1   obvious as well, in my opinion.

2   **Q.**  So let's go to the next patent, the '422.  Can you,

3   Doctor, look at Exhibit NFJ?

4   A.  I have it here.

5   **Q.**  Can you tell us the name of that paper?

6   A.  This paper is entitled, "Purification of

7   Erythropoietin."

8   **Q.**  And what is the journal?

9   A.  This journal is the Proceedings of the National Academy

10  of Sciences, USA.

11  **Q.**  And the date?

12  A.  April 1971.

13          **MS. BEN-AMI:**  I offer NFJ, your Honor.

14          **THE COURT:**  NFJ?

15          **MS. BEN-AMI:**  N, "N" as in Nancy, "F" as in Frank,

16  "J" as in Jane.

17          **THE COURT:**  No objection, NFJ is admitted,

18  Exhibit 2033.

19          **THE CLERK:**  2033, yes.

20          (Exhibit marked in evidence.)

21          **THE CLERK:**  I didn't get 2032.

22          **MS. BEN-AMI:**  You didn't get one?

23          **THE CLERK:**  NCB.

24  **Q.**  Can you look at NFJ, which is now 2033, first paragraph,

25  please.  Now -- well, let's stop.  Do you see "E.

1    Goldwasser"?  Who is he?

2    A.  E. Goldwasser is a biochemist at the University of

3    Chicago at this time.

4    **Q.**  And is this the same Dr. Goldwasser you referred to

5    yesterday?

6    A.  Yes.

7    **Q.**  And in 1971 -- can you look at the first paragraph?

8    Could you read the first and second sentences, please?

9    A.  Those sentences read, "Erythropoietin is the primary

10   inducer of erythrocyte formation in vertebrates.  As such,

11   it is important both for the study of the molecular

12   mechanisms involved in cell differentiation, and for

13   possible therapeutic use in some types of refractory human

14   anemias."

15   **Q.**  Can you look down to the sentence that says "nor"?

16   A.  Yes.

17   **Q.**  And then the -- read that part, the last two sentences.

18   A.  So I'll read those sentences.  "Nor could preparations

19   be considered suitably pure for administration to patients.

20   We are now reporting on the purification of erythropoietin

21   derived from anemic-sheep plasma to a state almost free of

22   impurities."

23   **Q.**  This reference, what is this reference telling you about

24   using EPO?

25   A.  I think that a key phrase here, in my opinion, is it's

1    important to have EPO because of its possible therapeutic

2    use in some types of human anemias.

3    **Q.**  Now let's look at the '422 patent.  And would you walk

4    the jury through this claim?

5    A.  I will read and maybe paraphrase as I go.  A

6    pharmaceutical composition comprising a therapeutically

7    effective amount of human erythropoietin, and a

8    pharmaceutically acceptable diluent adjuvant carrier wherein

9    erythropoietin is purified from mammalian cells in culture.

10   **Q.**  So let's look at that new phrase, purified from

11   mammalian cells grown in culture.  Without going through all

12   the prior art we've just gone through in two days, can you

13   tell us whether the prior art discussed this issue of

14   whether you could purify from mammalian cells grown in

15   culture?

16   A.  In my opinion, the prior art does tell us about

17   purifying human erythropoietin.

18   **Q.**  And were there other human proteins that were made

19   recombinantly prior to 1983 that were purified from

20   mammalian cells grown in culture?

21   A.  Yes.

22   **Q.**  So in your opinion, based on everything you've looked at

23   from the standpoint of a person skilled in the art in 1983,

24   do you have an opinion about this claim?

25   A.  I believe this claim is obvious -- my opinion is that

1    this is obvious.

2    **Q.**  Okay, the last patent, claim.

3           So now this is the '349 claim -- patent, and do you

4    understand that claim 7 is being asserted against Roche?

5    A.  Yes.

6    **Q.**  And claim 7 says it's according to several other claims?

7    A.  Yes.

8    **Q.**  And let's look at claim 1.

9    A.  Yes.

10   **Q.**  Can you explain that claim to the jury very briefly?

11   A.  Claim 1 describes vertebrate cells, cells from animals

12   that have a bony skeleton, which can be propagated in vitro,

13   a tissue culture dish, and which are capable, upon growth in

14   culture, of producing erythropoietin in the medium of their

15   growth in excess of 100 units of erythropoietin per ten to

16   the sixth cells.  So that's telling you that these cells can

17   make -- are capable of making a certain amount of EPO

18   defined as 100 units of erythropoietin per ten to the sixth,

19   per million cells, in 48 hours.

20           And you can say, Well how do you measure this?  How

21   do you know how much 100 units is?  And the claim says as

22   determined by radio immunoassay.  It's a standard laboratory

23   technique.  Said cells comprising non-human DNA sequences

24   which control transcription of DNA encoding human

25   erythropoietin.

1    Q.   So there's a new term there, the non-human control

2    sequence term.  Without going back into all the prior art

3    yet, were these non-human control -- non-human DNA sequences

4    which control transcription, were such sequences known?

5    A.   Yes, they were.

6    Q.   And can you give us any examples?

7    A.   An example would be the human tPA patent, but -- and

8    that used a promoter sequence from a virus called SB40,

9    standard control sequence in wide use at this time.

10   Q.   Now, we talked about this concept of amplification

11   before?

12   A.   Yes.

13   Q.   Can you tell us how -- what amplification has to do with

14   making amounts of protein?

15   A.   Yes.  So as I indicated, amplification of the gene that

16   you put into a cell can allow for that cell to make large

17   amounts, greater amounts of that protein.

18   Q.   So claim 7 is a process for producing EPO comprising the

19   step of culturing under suitable nutrient conditions the

20   cells under these other claims?

21   A.   Yes.

22   Q.   Claim 1, as an example?

23   A.   Claim 1.

24   Q.   Can you tell us whether you have an opinion on claim

25   7 of the --

1    A.   Claim 7 is obvious, in my opinion.

2    Q.   And can you explain why, since it's written a little

3    differently?

4    A.   Because it refers to the vertebrate cells in claim 1,

5    and those cells are -- would be obvious to make, in my

6    opinion, because you would take vertebrate cells, i.e. say

7    CHO cells, for example, put the human DNA sequence encoding

8    erythropoietin, connect it to this non-human DNA sequence

9    directing transcription, put those -- the gene into the

10   cells, amplify the gene, and amplify it until such time as

11   you are making more than 100 units of erythropoietin from

12   ten to the sixth cells in 48 hours.

13         MS. BEN-AMI:  Your Honor, can I have a very brief

14   sidebar?

15         THE COURT:  Yes.

16   SIDEBAR CONFERENCE, AS FOLLOWS:

17         MS. BEN-AMI:  I wanted to let you know, your Honor,

18   that the next topic with this witness is this obviousness

19   type double --

20         THE COURT:  You told Ms. Smith and you did just

21   right.  Here's the thing.  I'm working from Amgen's most

22   recent letter, doesn't mean I agree with it, but it fixes

23   things in my mind and identifies these theories by number.

24   The truth is that you people are on Theory Number 4, ahead

25   of me, ahead of me, that I don't think I can make a

1   principal ruling right now.

2          So what I propose is that -- you can do your Theory

3   Number 3, but that just is the one that we all agree was not

4   given summary judgment and the like.

5          MS. BEN-AMI:  That's the only ones he's doing.

6   He's not doing Theory 4.

7          MR. DAY:  He has no opinions on Theory 4, he never

8   disclosed any his report.

9          MS. BEN-AMI:  That's why he's not doing them.  He's

10  only doing Theory 3.

11         THE COURT:  That's probably as far as we're going

12  to get on this issue today.  On Theory Number 4, you've

13  given me stuff to wrestle with and I will.

14         MS. BEN-AMI:  You have time for that.  That's not

15  coming up tomorrow.  I just wanted to give you this

16  heads-up.

17         THE COURT:  Fine.

18         (Whereupon the sidebar conference concluded.)

19         MS. BEN-AMI:  Your Honor, this is going to take me

20  like a minute to move around to another topic, if the jury

21  wanted to stretch while I was moving around.  I apologize, I

22  have to find new boards.

23  (BY MS. BEN-AMI:)

24  Q.  Doctor, can you look at Trial Exhibit 7.  Do you have

25  that?  Which is the '008 patent.  This is a patent we have

1    not discussed yet.

2    A.  I have the '008 patent here.

3           **MS. BEN-AMI:**  Does the jury have the '008 patent?

4    They have the claim?

5    **Q.**  So if the jury would be so kind to look at

6    the '008 patent claims.

7           Now, Doctor, do you have the '008 patent?

8    A.  I do.

9    **Q.**  Can you look at the first page?

10          **MS. BEN-AMI:**  Could you bring the first page up,

11   Mr. Fisher?  Thank you.

12   **Q.**  What is the expiration date of this patent?

13   A.  The expiration date of this patent is 17 years after the

14   date.

15   **Q.**  And the date of the issuance of the patent is what?

16   A.  October 27, 1987.

17   **Q.**  Who is the applicant?

18   A.  The applicant or assignee is Kiren-Amgen, the inventor

19   is Fu-Kuen Lin.

20   **Q.**  Now, have you considered solely the claims of

21   the '008 patent compared to the claims 1 and 2 of the '868

22   patent?

23   A.  Yes, I have.

24          **MS. BEN-AMI:**  Can I have the board?

25   **Q.**  Now, Doctor, you're going to have to wind around

1    everything to get out.

2         **MS. BEN-AMI:**  Can we have the board as an overhead

3    also, Mr. Fisher?  I can't see this board from here, maybe

4    everyone else has better eyes than I do, but with my

5    contacts I can't see it.  Is that better?

6    **Q.**  Would you tell the jury what's on the left side of the

7    board?

8    **A.**  On the left side are three claims from the '008 patent.

9    **Q.**  Now, just so the jury is clear, the jury has

10   the '008 patent claims, and they don't look exactly like

11   this format, so let's explain how you read the claims.

12   **A.**  So, if we start with claim 25.  Claim 25 --

13   **Q.**  Let's start with claim 27.

14   **A.**  Okay.

15   **Q.**  Claim 27 says?

16   **A.**  Claim 27 claims a cell, a transformed or transfected CHO

17   cell, and it says according to claim 25.  So it's referring

18   to claim 25.

19   **Q.**  What does claim 25 say?

20   **A.**  Claim 25 claims a mammalian host cell, and that host

21   cell is transformed or transfected with a purified and

22   isolated DNA sequence consisting essentially of a DNA

23   sequence encoding a polypeptide having an amino acid

24   sequence sufficiently duplicative of that of erythropoietin.

25   **Q.**  What I'm trying to do, Doctor, is have you walk through.

 1   Do you have the actual claims, Doctor?

 2   A.  Yes.

 3   **Q.**  Not the board, the actual claims?

 4   A.  The actual claims, I do.

 5   **Q.**  You need to explain to the jury how the dependency

 6   works.

 7           So when we look at claim 27, that tells you to

 8   consider all the features that are in claim 25 --

 9           **MR. DAY:**  Your Honor, I'll object to having

10   argument here by counsel.

11           **MS. BEN-AMI:**  Well, you know, your Honor --

12           **THE COURT:**  Well, please.  No, I've heard the

13   question enough.  Break it down.  Sustained.  Perhaps not on

14   that ground, but it's a long question.  Break it into a

15   smaller question.

16   **Q.**  Are you ready, Doctor?

17   A.  I am.

18   **Q.**  So if you look at claim 27, what claim does claim 27

19   refer you to?

20   A.  Claim 27 refers to claim 25.

21   **Q.**  And what claim does claim 25 refer to?

22   A.  Claim 25 refers to several claims elsewhere in the

23   patent, and it refers to previous claims that include claims

24   of a DNA sequence.

25   **Q.**  Well, I'm just asking you for the number.  What number

1    does 25 refer to?

2    A.   It refers to Number 7.

3    **Q.**   Okay.  What does -- so when you read claim 7 --

4    A.   When you read claim 7.

5    **Q.**   What does that tell you?

6    A.   It says, "A purified and isolated DNA sequence

7    consisting essentially of a DNA sequence encoding a

8    polypeptide having an amino acid sequence sufficiently

9    duplicative of that of erythropoietin to allow possession of

10   the biological property of causing bone marrow cells to

11   increase production of reticulocytes and red blood cells and

12   to increase hemoglobin sequences or iron uptake."

13        **MS. BEN-AMI:**  Your Honor, could we have an

14   instruction from your Honor on how to read the dependent

15   claim or -- it's a legal -- that's why I'm having the --

16        **THE COURT:**  All right.  I've said that the area

17   that is excluded by a valid patent is confined to specific

18   claims, and I've said that claims are terribly important in

19   this case.  And that's true.  And so claims, and you know

20   we've now defined them in these different patents at the

21   end.  Claims come in two types:  Independent claims and

22   dependent claims.

23        Usually the independent claims are the

24   lower-numbered ones.  They start out and they say claim

25   this, and so you look at each element of that independent

1    claim, both on -- to test in this phase of the case for

2    obviousness, and to test in the second phase of the case for

3    infringement.

4         Now, a dependent claim depends back on an earlier

5    claim, but it claims, it adds something new, some new

6    element.  So for a dependent claim, let me say it like this,

7    the elements of a dependent claim are the elements, the new

8    elements that are added, plus all the elements of the

9    earlier claim or claims upon which it depends.

10        **MS. BEN-AMI:**  Thank you, your Honor.

11   **Q.**  So when we look at the board here --

12        **THE COURT:**  If you have any questions about that,

13   write them out.  I can say it loudly, but it really isn't

14   too tricky.  If you draw -- now I will be quiet, but let me

15   try again.  If you draw a circle and say this is an

16   independent claim, you look at all the elements in that

17   claim, and you test that against the various legal theories

18   we're asking about.

19        If you are talking about a dependent claim, it's

20   got a little wing off it, that's the new element, but it

21   depends on the earlier claim.  Let's say the earlier claim

22   had five elements.  Now we've got a dependent claim that

23   adds another element, something the person applying for the

24   patent says is new.  So on that dependent claim you've got

25   six elements.  So the dependent claim, you're saying are all

1    six obvious.  And when we get to infringement, are all six

2    infringed.

3            Go ahead.

4    **Q.**  So when we look at the '008 patent, that patent is not

5    asserted in this case, right?  The '008 patent is not being

6    asserted in this case?

7    A.  No.

8    **Q.**  But when we look at what the claims are showing, claim

9    27 -- do you have that, Doctor?  Stand right there.  Claim

10   27 depends on claim 25, right?

11   A.  Yes.

12   **Q.**  Claim 25 depends on claim 24; do you see that?

13   A.  Yes.

14   **Q.**  Claim 24 depends on claim 23; do you see that?

15   A.  Yes.

16   **Q.**  And claim 23 includes what's in claim 7, 8 or 11; right?

17   A.  Yes.

18   **Q.**  So now, in your board, you put all the features

19   together; right?

20   A.  Yes.

21   **Q.**  So now looking at the features of the claims of

22   the '008 patent, and you compare -- I think we need some

23   highlighters.

24           **MS. BEN-AMI:**  Do we have highlighters?

25   **Q.**  Have you compared the claims of the '008 patent to claim

1   1 of the '868 patent?

2   A.  Yes.

3   **Q.**  And I am going to ask you the following question:  In

4   your opinion, do the claims of the '008 patent impact the

5   claims of the '868 patent, Number 1?

6   A.  Yes.

7   **Q.**  In your opinion -- do you have an opinion on whether the

8   claims of the '008 patent render obvious the claims of the

9   '868 patent, Number 1?

10  A.  I do have an opinion.

11  **Q.**  And what is your opinion?

12  A.  My opinion is that the claims, these claims of

13  the '008 patent render obvious these two claims of the '868

14  patent.

15  **Q.**  So can you compare what's actually explicitly stated in

16  the '008 patent claim with claim 1 of the '868 patent --

17  A.  Yes.

18  **Q.**  -- claim?

19  A.  So let's start with what claim 25 is claiming.  It's

20  claiming a mammalian host cell.  And the properties of that

21  cell are that it is transformed or transfected with a

22  purified and isolated DNA sequence consisting essentially of

23  a DNA sequence encoding a polypeptide having an amino acid

24  sequence sufficiently duplicative of erythropoietin.  That's

25  transformed or transfected with the DNA sequence encoding

1   and amino acid sequence duplicative of erythropoietin.  And

2   now that cell has the erythropoietin gene in it, or a

3   sequence encoding erythropoietin, and this mammalian cell is

4   transfected in such a way that it allows possession of the

5   biological property of EPO, which we know is to stimulate

6   red blood cell formation, and in a way that allows the host

7   cell to express the polypeptide in a cell that is capable

8   inherently of glycosylating the protein.

9           Doesn't show up very well.

10  **Q.**  So -- so let's go back to our factory.  And let's try to

11  explain what this claim says.  I'll be the easel today.

12          Can you explain the claim using the tutorial slide?

13  A.  Yes, the claim begins with a mammalian cell, and that

14  would be a mammalian cell.

15  **Q.**  Speak louder, Doctor.

16  A.  That would be the mammalian cell that we're speaking of

17  and it says it's transformed or transfected with a DNA

18  sequence.

19  **Q.**  Where's that?

20  A.  So we will have a DNA sequence, and we transform or

21  transfect the cells with this DNA sequence, we put the DNA

22  sequence into the cells.  What DNA sequence are we putting

23  in the cells?  It's a DNA sequence encoding a polypeptide,

24  having amino acid sequence sufficiently duplicative of

25  erythropoietin.

1          So it's a DNA sequence that is turned into RNA

2     copies, and those RNA copies go to the cytoplasm and they

3     are instructing the chemical reactions in the cytoplasm to

4     make erythropoietin.  And it says further that this is a

5     cell that's transformed and/or transfected in such a way

6     that that erythropoietin has a biological activity.

7     **Q.**  Where is that in the claim?

8     A.   That is "to allow possession of the biological

9     property."

10         **MS. BEN-AMI:**  Could you highlight that, Mr. Fisher,

11    "to allow possession of the biological property"?

12    **Q.**  All right.  So we have a host cell and you've said --

13    what's the -- the first characteristic of the host cell is

14    what?

15    A.   It's transformed and transfected.

16    **Q.**  With what?

17    A.   With the DNA sequence encoding essentially

18    erythropoietin, amino acid sequence that is erythropoietin.

19    **Q.**  And what does that cell with that DNA allow for?

20    A.   The cell with that DNA allows for the expression of a

21    biologically active erythropoietin.

22    **Q.**  And what does the last part mean where it says, "in a

23    manner"?

24    A.   "In a manner," meaning in a way that just allows the

25    cell to carry out its normal biochemical functions with that

1   protein.

2   **Q.**  So where it says in --

3        **MS. BEN-AMI:**  Can you highlight the bottom part?

4   Okay.

5   **Q.**  So where it says --

6        **MS. BEN-AMI:**  There is no place I can stand as an

7   easel that will work for all people.  I am sorry.

8        **MR. DAY:**  How about right over here.  That would

9   work for me.

10        **MS. BEN-AMI:**  That would work for you?

11        **MR. DAY:**  Yeah, thank you.

12        **MS. BEN-AMI:**  I live to serve Mr. Day.  Okay.

13  **Q.**  So the last part, in a manner -- can you explain that

14  part with the factory?

15  A.  Yes, in a manner allowing the host cell to express said

16  polypeptide, which host cell is capable of glycosylating.

17  So essentially in a way that allows the cell to do with that

18  DNA sequencing and protein sequencing code, in a way that it

19  would normally handle a glycoprotein.

20  **Q.**  And is there a specific example of the cell, the type of

21  cell that's going to be the host cell?

22  A.  Yes.  So in claim 27, the host cell is a transfected CHO

23  cell.

24        **MS. BEN-AMI:**  Thank you, your Honor.  You're closer

25  to the microphone.  Appreciate it.

1    Q.  So now would you compare the -- what is described in

2    the '008 claim with the '868 claim?

3    A.  Yes.  So in my opinion, the '868 claim is basically

4    taking what's described in 25, 2 or 27 of the '008 patent

5    and using them to make the protein.  So it's claiming a

6    process, a process for the production of the glycosylated

7    erythropoietin polypeptide that has the in vivo biological

8    properties of EPO, by growing those cells under suitable

9    nutrient conditions, those cells would be mammalian host

10   cells transformed or transfected with an isolated DNA

11   sequence encoding human erythropoietin, and isolating that

12   glycosylated erythropoietin from the cells.

13   Q.  So if you take the '868 claim, which the Court is

14   patiently holding up there behind you, Doctor, can you just

15   take the '868 claim and use it with the tutorial slide?

16   A.  Yes.  So the '868 basically says take the cells that

17   were -- take the cells that were claimed in the '008 patent

18   and grow them, let them do what they normally do.  Let them

19   make the protein that the claims in the '008 patent says

20   they're going to make.

21   Q.  So what's the difference between the claims?

22         MS. BEN-AMI:  Thank you, your Honor.

23   Q.  What's the difference, in your opinion, between the

24   claims?

25   A.  Between claims of '008 and '868?

1    **Q.**  Yes.

2    A.  The '008 patent claims the cells and using the cells in

3    a way that they would normally do to make the protein, and

4    claim '868 basically says take the cell and grow them.

5    **Q.**  And was it known in the art how to grow cells?

6    A.  Yes.

7    **Q.**  So in your opinion, do you have an opinion about whether

8    the claims of the '008 patent render obvious claim 1 of the

9    '868 patent?

10   A.  Yes.  In my opinion the claims of the '008 patent render

11   obvious the claims of the '868 patent, plus the prior art

12   consideration.

13   **Q.**  And when does the '008 -- when did the '008 patent

14   expire?

15   A.  The '008 patent expired in 2004, as I recall.

16   **Q.**  And with this claim, the '868 patent, when does the '868

17   patent expire?

18   A.  My recollection is it expires in 2012.

19   **Q.**  So --

20        **MS. BEN-AMI:**  I'll leave that at that.

21   **Q.**  So let's look at claim 2.  How does claim 2 of the '868

22   impact this?

23   A.  Well, claim 2 specifies that the process that's

24   described in claim 1 is being used with cells that are CHO

25   cells, which were claimed in the '008 patent.

1    Q.  So in your opinion, is there any meaningful difference

2    between the '008 patent claims and the claim 1 and 2 of the

3    '868?

4    A.  No, in my opinion there's not.

5    Q.  Let's do the '698 patent.  So could you color-code

6    the '008 patent, compared to the '698 patent, and tell us

7    what you're color-coding?

8    A.  Yes.  So let me start with the host cell or cells that

9    are claimed by the '008 patent.  So in the '008 patent we're

10   claiming a host cell, and we know from what we saw

11   previously that that includes CHO cells.  And in the '698

12   patent, we're talking about cells, host cells, in this case

13   vertebrate cells.

14   Q.  Okay.  So let's break it down a little bit.  In claim

15   25, we have mammalian host cells; right?

16   A.  Yes.

17   Q.  And you're comparing them in the '698 patent to

18   vertebrate cells; right?

19   A.  Yes.

20   Q.  How do mammalian cells compare to vertebrate cells?

21   A.  Mammalian cells are a subset of all vertebrate cells.

22   Q.  So when someone claims vertebrate cells, does that

23   include mammalian cells?

24   A.  That does include mammalian cells.

25   Q.  So let's go to the next part.

1    A.   So the next part in '008 describes what those mammalian

2    host cells are, they are host cells transformed or

3    transfected with a DNA sequence, essentially encoding

4    erythropoietin.

5    Q.   And that whole first paragraph is now in orange?  Okay.

6    And what is that -- is there a comparative element in the --

7    in the '698 patent?

8    A.   Yes, there is.

9    Q.   Where is that?

10   A.   That is right here.  It says, "DNA encoding the mature

11   erythropoietin amino acid sequence of Figure 6."

12        **MS. BEN-AMI:**  Could that be highlighted,

13   Mr. Fisher, please?  Could you take out the word

14   "amplified," Mr. Fisher, please?

15   Q.   Let's go back to it.  Okay.  So we have the cell and we

16   have the DNA.  What's next?  Let's look at what else is

17   claimed in the '008 and compare it to the '698?

18   A.   So in the '008, again, mammalian host cell that has this

19   DNA sequence, encoding erythropoietin in a way that allows

20   it to possess the biological property of causing red blood

21   cell formation.

22   Q.   And is that feature in the '698 claim?

23   A.   Yes, it is part of the first sentence in that claim,

24   which says polypeptide -- "erythropoietin polypeptide having

25   the in vivo biological property of causing bone marrow cells

1    to increase production of reticulocytes and red blood

2    cells."

3    **Q.**  And where is that?  Could you highlight that?  And could

4    you highlight where that is in claim 25?

5            And looking at the other features in the '698

6    patent, do they compare to any parts of the '008 patent?

7    A.  Yes, they do.

8    **Q.**  And what parts?

9    A.  Parts include "growing under suitable nutrient

10   conditions."

11   **Q.**  And what does the '008 claims tell you about that?

12   A.  The '008 claims basically says -- say in a manner

13   allowing the host cell.

14   **Q.**  What does "to express" mean?

15   A.  "To express" means to do what the cell does, which is to

16   make the protein.  "To express" means to make the protein,

17   to release it from the cells.

18   **Q.**  And you are using the glossary as the Court and we have

19   given to the jury?

20   A.  I -- yes.

21   **Q.**  So how does that relate to using suitable nutrient

22   conditions?

23   A.  Well, suitable nutrient conditions means, basically,

24   doing what everyone in the prior art was doing at the time;

25   growing the cells the way that many, many people had grown

1   cells for many years before this time.

2   **Q.** So the last point, the isolated point, was isolating,

3   again, isolating the protein from the cells described in the

4   art?

5   A.  Yes, it was.

6   **Q.** And now, this claim, the '698, Claim 6 has this term

7   "amplified" in it?

8   A.  Yes.

9   **Q.** Now, we talked about "amplified" earlier today, but in

10  the field, in 1982 and '83, what was known in the field

11  about amplifying?

12  A.  There was a lot known about amplified DNA and the

13  process to amplify DNA.  It was the subject of the Axel

14  patent that we heard about earlier today.  It was the

15  subject of the MCD paper we heard about earlier today.

16  Standard technology.

17  **Q.** So if one skilled in the art were going to take the

18  claimed cell of the '008 patent and use it, based on the

19  technology that was known in the art, in your opinion would

20  claim 6 of the '698 patent be impacted by that cell in the

21  claim 25, plus the prior art?

22  A.  The cell of claim 25 and all that is dependent upon in

23  this particular patent would be useable with the prior art

24  to generate what is described and used in claim 6.

25  **Q.** And in the art where we talked about today where people

1   were making therapeutic proteins, like interferon, tPA, what

2   was the use, if any, of amplification?

3   A.   It was standard.   Amplification of transfected genes was

4   a standard approach used by many companies and scientists to

5   amplify transfected genes for the purpose of increasing a

6   level of expression of the protein.

7   **Q.**   So if you want to make more protein, what do you do?

8   A.   You amplify the gene.

9   **Q.**   So it's 1983 and you want to use the cells to make EPO,

10  what do you do?

11  A.   You refer to the 1982 paper by Kaufman and Sharp and you

12  do what they tell you in great detail to do.

13  **Q.**   So based on the claims of the '008 patent, do you have

14  an opinion on whether or not claim 6 of the '698 patent

15  would or would not have been obvious?

16  A.   The claim 6 of the '698 patent, in my opinion, would be

17  obvious based on the prior art and what you learn from claim

18  25 and other claims in the '008 patent.

19  **Q.**   Do you have claim 7 of the 8 -- sorry, '698 patent?

20  Looking at -- it's on the screen now, Doctor.

21         Looking at claim 7, what feature is added by claim

22  7, as the Court has instructed, with dependent claims?

23  A.   Claim 7 is dependent upon claim 6, and it's saying use

24  claim 6 involving vertebrate cells where the vertebrate

25  cells comprise amplified marker gene DNA.

1    **Q.**  And what does that mean?

2    A.  That means that you use the vertebrate cells, but if

3    they have in them an amplified marker gene DNA.

4    **Q.**  And did the prior art teach such a gene?

5    A.  It does.

6    **Q.**  Can you give us an example?

7    A.  The example is tPA patent, the interferon beta and gamma

8    patents we heard about earlier, the Kaufman and Sharp MCD

9    paper we heard about, all dating prior to 1983.

10   **Q.**  Did the amplified marker have a name or something?

11   A.  The amplified marker is DHFR.

12   **Q.**  And in your -- do you have an opinion on whether

13   the '008 claims impact claim 7 of the '698 patent?

14   A.  The '008 claims together with the prior art, in my

15   opinion, render that claim obvious.

16   **Q.**  Can we look at claim 8 of the '698 patent?  What does

17   that add?

18   A.  That specifies what the nature of the amplified marker

19   gene is, which is DHFR.

20   **Q.**  And can you tell us whether claim 8 would be impacted by

21   the '008 patent claims?

22   A.  It would be, yes.  Claim 8, basically, recapitulates

23   what is claimed in the '008 patent, the use of DHFR

24   amplification.

25   **Q.**  And now, looking at claim 9 of the '698 patent, which

1    says, "Wherein said cells are mammalian cells," can we just

2    come back and look at the board here?

3            So in claim 6, we talked about the cells being

4    what?

5    A.   Vertebrate cells.

6    Q.   Vertebrate cells.  And in claim 9, how are the

7    vertebrate cells or how are the cells further refined?

8    A.   They're refined to be mammalian cells, which are

9    vertebrate cells.

10   Q.   And in your opinion -- so now we're saying the process

11   of claim 6 using mammalian cells; right?

12   A.   Yes.

13   Q.   And do you have an opinion whether this claim as a

14   whole, using mammalian cells, how that compares with claim

15   25 of the '008 patent?

16   A.   Claim 25 of the '008 patent is basically making the

17   claim 6 of the '698 patent obvious, in my opinion.

18   Q.   I'm sorry, I apparently missed asking you the right

19   question about claim 8.  Do you have an opinion on whether

20   claim 8 would have been obvious based on the claims of

21   the'008 patent?

22   A.   Yes.  Claim 8 also would have been obvious based on the

23   claims of the '008 patent.

24   Q.   Now, in your opinion, based on the '008 patent claims

25   and the prior art, do you have an opinion on whether claim

1   9 would have been obvious based on the claims of

2   the '008 patent?

3   A.   It is also obvious, in my opinion, based on the claims

4   of the '008 patent and the prior art.

5   **Q.**   Do you have the '698 patent, which is Exhibit 3?

6   A.   Yes.

7   **Q.**   Can you see the date of issuance of that patent?

8   A.   Yes.

9   **Q.**   What is the date of issuance of that?

10  A.   It's April 8, 1997.

11  **Q.**   So when does this patent expire?

12  A.   This patent would expire in April of 2014.

13  **Q.**   Now, can you look at the first --

14           **MR. DAY:**  Your Honor, I have an objection.  Could

15  we have a sidebar?

16           **THE COURT:**  Well, it's almost 1:00.  We'll let the

17  jury go.

18           **MR. DAY:**  It was a misstatement of fact --

19           **THE COURT:**  Well, you can't testify.

20           **MR. DAY:**  That's why I'd like to have a sidebar.

21           **THE COURT:**  Why don't you confer with Ms. Ben-Ami

22  and maybe it can be corrected easily.  Why don't you confer.

23           **MS. BEN-AMI:**  I'm happy to confer.

24           **THE COURT:**  The alleged mistake.  Among yourselves.

25           **MS. BEN-AMI:**  Yes, I understand.

1           (Whereupon counsel conferred.)

2           **MS. BEN-AMI:**  That's where I was going next.

3    **Q.**  Would you look on the left-hand side on the top where it

4    says "Notice"?

5    A.  Yes, where the asterisk is.

6    **Q.**  Yes.  So can you tell us based on what that says?

7    A.  It says the portion of this, the term of this patent

8    subsequent to August 15, 2012 has been disclaimed.

9    **Q.**  Has the portion from 2004 to 2012 been disclaimed?

10   A.  No.

11          **THE COURT:**  Now it's 1:00.  That takes care of it.

12   That's fine.

13          Ladies and gentlemen, you've not heard all the

14   testimony in the case.  Please, therefore, keep your minds

15   suspended.  Do not discuss the case either among yourselves

16   nor with anyone else.  You may stand in recess until

17   9:00 a.m. tomorrow morning.  The jury may recess, I'll

18   remain on the bench.

19          **THE CLERK:**  All rise for the jury.

20          (Whereupon the jury left the courtroom.)

21          **THE COURT:**  Please be seated.  And you may step

22   down, sir.

23          (Whereupon the witness stepped down.)

24          **THE COURT:**  On reflection, I think that I would be

25   benefited by some oral argument on Theory 4 on obviousness

1     double patenting, and by my schedule, and learning curve, we

2     best do that tomorrow afternoon.  So I'm going to tell you

3     now I'd like that.  I have a few short matters tomorrow

4     afternoon, but as close to 2:00 as I can reach you, I'll

5     entertain oral argument.

6          Total elapsed time stands now, out of each side's

7     ten days, Amgen's used up two hours 25 minutes, and Roche

8     has used up two days, one hour, five minutes.  We'll recess

9     until 9:00 a.m. tomorrow morning.  We'll recess.

10         **MR. FLEMING:**  Your Honor, may I ask you a question,

11    clarification of your order, please?

12         We understand your order regarding sequestration

13    and particularly as it applies to the experts.  There may be

14    some experts who require access to fact witness testimony,

15    for instance, Dr. Goldwasser.  Would they be permitted to

16    review just the fact testimony, transcripts, if it was

17    necessary, for their opinions?

18         **THE COURT:**  Work it out with the other side, and if

19    you can't work it out, I'll have a sharper issue.

20         **MR. FLEMING:**  Thank you, your Honor.

21         (Recess.)

22

23

24

25

1              **PROCEEDINGS - 3:50 P.M.**

2

3         **THE CLERK:**  All rise.  Court is in session, please

4   be seated.

5              Calling Civil Action 05-12237, Amgen v. Hoffmann-La

6   Roche.

7         **THE COURT:**  Good afternoon.  Have we worked this

8   out?

9         **MR. GOTTFRIED:**  Your Honor, unfortunately not.

10        **MR. FLEMING:**  Your Honor, we told them that we were

11  not playing Hood tomorrow, so we don't think that's an issue

12  that your Honor needs to even bother with right now.

13        **THE COURT:**  Well, is it resolved?  Here I am.

14        **MR. FLEMING:**  Your Honor, I'm not sure we're ever

15  going to play Hood.  But I know --

16        **THE COURT:**  Okay, so Hood, we may never play Hood,

17  so it's not an issue.  Do we have an issue?

18        **MR. GOTTFRIED:**  Yes, your Honor.

19        **THE COURT:**  All right.  Understand this.  I'm

20  operating under the procedure familiar to me which you have

21  prepared for and submitted.  I'm familiar with it.  So this

22  is in the nature of a motion for reconsideration.  I've not

23  decided to give oral hearings on this, but here I am, so

24  we'll hear you.  But it's like a motion for reconsideration,

25  because I think I know what I'm doing when I act.

1        All right.  No more than about four minutes a side.

2   And this has to do with Mr. Baron then, and I'll hear you.

3        **MR. GOTTFRIED:**  Yes.  Your Honor, and if I may say,

4   I think the issue may be overlapping between Hood and Baron,

5   for this reason.  I'm not sure the parties did a service to

6   the Court with the way we presented the information to your

7   Honor in that, I don't know that it was clear in the way the

8   objections were presented which party was eliciting the

9   testimony and which party was objecting.

10       **THE COURT:**  I've done the best I could to figure

11  that out, but it has not been clear, but of course you bear

12  the burden of any faults along those lines.

13       **MR. GOTTFRIED:**  Absolutely, and that's, and for

14  that I truly apologize.  But to use Hood, for example, as an

15  example --

16       **THE COURT:**  We're not going to use Hood.  They may

17  never play Hood.  We'll use Baron.

18       **MR. GOTTFRIED:**  Okay, we'll use Baron as an

19  example.  If you, if you look at Page 47, Line 20 through

20  Page 48 through 6, this is the testimony that was elicited

21  by Roche that we, that we designated as a cross designation

22  and they're now objecting to the testimony that they

23  elicited.  So, I don't know if that was clear from what was

24  handed up to the Court.  But you sustained their objection

25  to the testimony that they elicited.  And I believe under

1    relevant case law that's inappropriate.

2         THE COURT:  Yes.  But of course you've waived it

3    because you have not fully briefed it and set it out and

4    made that clear.  That's my ruling.

5         MR. FLEMING:  Your Honor -- yes.

6         THE COURT:  And if you want to brief these things,

7    if you want to give me supplemental briefs that explain

8    everything in great detail, be sure I will read them.  But

9    I'm working.  I'm working as fast as I can.  I'm satisfied

10   with my rulings.  And you would do well to inform me rather

11   than have oral argument on these things.  So if that's the

12   argument, my rulings stand.

13        Anything else?

14        MR. FLEMING:  Thank you, your Honor.

15        MR. GOTTFRIED:  Your Honor, one other question for

16   guidance, because we would like to present these issues to

17   you in the way that you would like them.  We're happy --

18        THE COURT:  Right.

19        MR. GOTTFRIED:  -- to brief them.  But a question

20   procedurally.  If you make a ruling with respect to their

21   designation and we made a counter designation, you sustained

22   our objection to their designation, is it within our rights

23   to withdraw then our counter designation?

24        THE COURT:  Yes.

25        MR. GOTTFRIED:  Okay.

```
 1              MR. FLEMING:  Your Honor, however -- I'm sorry,

 2     your Honor.

 3              THE COURT:  Yes.

 4              MR. FLEMING:  May I?  We oppose their application

 5     bothering you with this.  But to the extent that you have

 6     allowed a piece of testimony, regardless of who designated

 7     it, if they're not going to designate it, we would certainly

 8     adopt it at least in two small instances since your Honor

 9     has already ruled --

10              THE COURT:  Then you have to, in writing, bring

11     that to my attention, just so we can have an orderly

12     procedure.  I'm trying hard.

13              MR. FLEMING:  And I'm not --

14              MR. GOTTFRIED:  We know you are, your Honor.

15              THE COURT:  And nor am I fishing for compliments.

16     And you're trying hard.  And I've followed this out.  And in

17     all candor, I had that same confusion and I tried to sort it

18     through.  But my rulings, and I don't mean to be brusque, my

19     rulings on the procedural ground, you've waived it or, you

20     know, it's been unclear, it's not on any substantive ground.

21     I'll follow the law.

22              MR. GOTTFRIED:  Thank you very much, your Honor.

23              MR. FLEMING:  So we can play the video then

24     pursuant to your rulings?

25              THE COURT:  My rulings --
```

1              **MR. FLEMING:**  Stand.

2              **THE COURT:**  -- stand.  Where I have sustained an

3      objection to one party's designation, another party can

4      withdraw their counter designation.  And if the first party

5      disputes that you've got to bring that to my attention in

6      some fashion and say, well, now since that's the only crumb

7      we're going to get, we want to play that crumb and then they

8      will have to interpose some objection.  I'm perfectly

9      willing -- and I do not fault you for brevity.  I know what

10     802 is.  And I know what at least Article IX generally is.

11     I've found these helpful.  The confusion that has been

12     brought out by this I admit is a problem for the Court.  You

13     bear the burden of that.

14             Thank you.

15             **MR. FLEMING:**  Your Honor?

16             **THE COURT:**  Yes.

17             **MR. FLEMING:**  If we were to identify to you in

18     writing in a letter the two snippets we would like to adopt

19     that they were going to withdraw, could we still get it --

20     we wanted to play Baron tomorrow is the only issue.

21             **THE COURT:**  I am leaving to teach in five minutes.

22     I'll be here at eight o'clock tomorrow morning.  I try to do

23     things in a principled fashion, and the answer is whatever

24     is practicable.

25             **MR. FLEMING:**  The way we look at it, we want to do

1    whatever's convenient for the Court.

2          **THE COURT:**  I'm here, I'm here to serve you.  And

3    that's, that's the truth.  I'm trying to keep your costs,

4    and they're enormous, I'm trying to keep the costs down.

5    But I'll work with what you give me.  It's not my obligation

6    to go and research things beyond what you give me.  Trials

7    are real time events.  With the mountain of things -- you

8    don't have to be sympathetic -- that I have to do, these

9    depositions have come first because we're trying the case.

10   So, I'm getting through them as rapidly and prudentially as

11   I can.  So you do your best.  I'll do my best.

12         Thank you.

13         **MR. GOTTFRIED:**  Thank you, your Honor.

14         **MR. FLEMING:**  Thank you for your time, your Honor.

15         **THE COURT:**  We'll recess.

16         **THE CLERK:**  Court is in recess.

17         (Adjournment.)

18

19

20

21

22

23

24

25

# C E R T I F I C A T E

         We, Donald E. Womack and Cheryl B. Palanchian,

Official Court Reporters for the United States District

Court for the District of Massachusetts, do hereby certify

that the foregoing pages are a true and accurate

transcription of our shorthand notes taken in the

aforementioned matter to the best of our skill and ability.




          /S/ DONALD E. WOMACK
          _____

          /S/ CHERYL B. PALANCHIAN
          _____

               DONALD E. WOMACK
              CHERYL B. PALANCHIAN
             Official Court Reporters
                 P.O. Box 51062
           Boston, Massachusetts 02205-1062
                womack@megatran.com