```
 1              UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF MASSACHUSETTS
 2
                                    Civil Action
 3                                  No. 05-12237-WGY

 4  * * * * * * * * * * * * * * * *
                                  *
 5  AMGEN, INC.,                  *
                                  *
 6           Plaintiff,           *
                                  *   DAILY TRANSCRIPT
 7  v.                            *   OF THE EVIDENCE
                                  *      (Volume 4)
 8  F. HOFFMANN-LA ROCHE LTD,     *
    ROCHE DIAGNOSTICS GmbH and    *
 9  HOFFMANN-LA ROCHE, INC.,      *
                                  *
10           Defendants.          *
                                  *
11  * * * * * * * * * * * * * * * *

12

13

14           BEFORE:  The Honorable William G. Young,
                      District Judge, and a Jury
15

16

17

18

19

20

21

22

23
                              1 Courthouse Way
24                            Boston, Massachusetts

25                            September 7, 2007
```

1              A P P E A R A N C E S

2

3          DUANE MORRIS LLP (By D. Dennis Allegretti,
      Esq. and Michael R. Gottfried, Esq.), 470 Atlantic
      Avenue, Suite 500, Boston, Massachusetts 02210
4              - and -
          DAY CASEBEER MADRID & BATCHELDER, LLP (By
5     Lloyd R. Day, Jr., Esq., David M. Madrid, Esq. and
      Robert M. Galvin, Esq.) 20300 Stevens Creek
6     Boulevard, Suite 400, Cupertino, California 95014
               - and -
7          McDERMOTT WILL & EMERY (By Michael Kendall,
      Esq.), 28 State Street, Boston, Massachusetts
8     02109
               - and -
9          McDERMOTT WILL & EMERY (By William G.
      Gaede, III, Esq.), 3150 Porter Drive, Palo Alto,
10    California 94304
               - and -
11         MARSHALL, GERSTEIN & BORUN LLP (By Kevin M.
      Flowers, Esq.), 6300 Sears Tower, 233 S. Wacker
12    Drive, Chicago, Illinois 60606-6402
               - and -
13         STUART L. WATT and WENDY A. WHITEFORD, Of
      Counsel, Amgen, Inc., One Amgen Center Drive,
14    Thousand Oaks, California 91320-1789, on behalf of
      the Plaintiff
15

16         BROMBERG & SUNSTEIN LLP (By Lee Carl
      Bromberg, Esq. and Julia Huston, Esq.), 125 Summer
      Street, Boston, Massachusetts 02110
17             - and -
          KAYE SCHOLER LLP (By Leora Ben-Ami, Thomas
18    F. Fleming, Esq., Patricia Carson, Esq.,
      Christopher Jagoe, Esq. and Howard Suh, Esq.),
19    425 Park Avenue, New York, New York 10022, on
      behalf of the Defendants

20

21

22

23

24

25

**I N D E X**

**WITNESS:**              **DIRECT**   **CROSS**   **REDIRECT**   **RECROSS**

EDWARD F. FRITSCH, By Deposition

  By Ms. Ben-Ami     350

JOHN LOWE, Resumed

   By Ms. Ben-Ami    365                   462

   By Mr. Day                   368                     474

EUGENE GOLDWASSER

   By Ms. Ben-Ami     480

<table>
<tr><td></td><td></td><td></td><td></td><td></td><td>**FOR**</td><td>**IN**</td></tr>
<tr><td>**EXHIBITS:**</td><td></td><td></td><td></td><td></td><td>**I.D.**</td><td>**EVID.**</td></tr>
</table>

     2034 WO 83/04053  . . . . . . . . . . . . 367

     11   McGraw-Hill's Biotechnology Newswatch  412

     12   Sue and Sutkowski Article  . . . . . . 426

     13   Article  . . . . . . . . . . . . . 444

     14   Lee-Huang, S. Article  . . . . . . . 444

```
 1              THE CLERK:  All rise for the jury.

 2              (Whereupon the jury entered the courtroom.)

 3              THE CLERK:  Court is in session, please be seated.

 4              THE COURT:  Well, good morning, ladies and

 5     gentlemen.

 6              THE JURY:  Good morning.

 7              THE COURT:  I like it that I have to rush to catch

 8     up with you.  Thank you very much.

 9              We're all ready to go, and if Ms. Smith would

10     remind the witness.

11              THE CLERK:  I remind you, sir, you are still under

12     oath.

13              THE WITNESS:  Yes.

14              THE COURT:  And you may continue, Ms. Ben-Ami.

15              MS. BEN-AMI:  May I have a quick side bar, your

16     Honor?

17              THE COURT:  You may.

18     SIDEBAR CONFERENCE, AS FOLLOWS:

19              MS. BEN-AMI:  There are two points.  One was on the

20     documents I asked you to look at.  Ms. Carson will address

21     those.

22              THE COURT:  Sure.

23              MS. CARSON:  Your Honor, the Genentech documents

24     have been proffered into evidence, you were going take it

25     under consideration.
```

1          THE COURT:  Yes, now let me just see since I have a

2    lot under consideration.  This is the one which you say,

3    this is two years later?

4          MR. DAY:  Yes.

5          THE COURT:  Okay.  Here's my problem with that.  I

6    looked at what was proffered yesterday.

7          MS. CARSON:  Yes.

8          THE COURT:  And it may be my own ignorance, but I

9    couldn't see, don't see that that's competent evidence,

10   perhaps in the absence of dates, of knowledge and activities

11   prior to the filing date of the patents-in-suit.

12          Now, this morning I get this.

13          MS. CARSON:  Yes.

14          THE COURT:  And I've got to think about this.  I

15   haven't even read it.  But I will read it.

16          MS. CARSON:  Okay.

17          THE COURT:  And I'll think about it.  I don't know

18   what more I can say.  But based upon what I was shown

19   yesterday, I would not admit it.

20          MS. CARSON:  Can --

21          THE COURT:  The refusal is without prejudice to

22   your coming back.

23          MS. CARSON:  Can I just add something to what Ms.

24   Ben-Ami told you yesterday.

25          THE COURT:  Sure.

1          **MS. CARSON:**  Because she was explaining how it was

2     102(g) prior art.  But it's also being offered because

3     there's two admitted exhibits, now a Genentech patent that's

4     a foreign patent and a U.S. patent.  And Amgen has claimed

5     that those patents are not enabling for what they claim,

6     evidence that actually --

7          **THE COURT:**  Yes, but why is that relevant to this

8     case?

9          **MS. CARSON:**  It's relevant because Amgen has put in

10    issue the enablement of the two references that are prior

11    art.

12         **THE COURT:**  I haven't heard that.  And Mr. Day is

13    shaking his head.  I -- sounds very peripheral to me.  I

14    keep urging you to focus on the, on the arteries, not the

15    capillaries, but --

16         **MS. CARSON:**  Well, with all due respect, your

17    Honor, this is a very critical piece of art that, it's

18    102(g) art so it actually evidences earlier conception.

19         **THE COURT:**  Well, the stack -- I did understand

20    that.  The stack of documents that Ms. Smith brought to me

21    this morning and now are tied in with this bench memo is

22    thicker than what I looked at yesterday.  So maybe there's

23    something in there.  I haven't gone over it.  But the

24    argument so far hasn't persuaded me.

25         **MS. CARSON:**  Well, your Honor, if you would allow

 1   us to give you a, direct you to the data in the documents

 2   that are relevant.

 3           **THE COURT:**  Of course.  I would rather that than

 4   waste time now.  You can do it by Post-Its.

 5           **MS. CARSON:**  Okay.

 6           **MR. DAY:**  Could we have that, too?  I would like to

 7   see it, too.

 8           **THE COURT:**  Of course.

 9           **MS. BEN-AMI:**  So the second issue which is

10   procedural --

11           **THE COURT:**  Yes.

12           **MS. BEN-AMI:**  -- is I need to put into evidence

13   that small bit of Fritsch's testimony so that the witness

14   can rely on it because my impression from prior rulings is

15   you don't want him to rely on deposition testimony unless

16   it's proffered first.  It's very small.  I have to read it

17   in before he continues.

18           **MR. DAY:**  May I speak to that, your Honor?

19           **THE COURT:**  Yes, you may.  I perhaps feel a little

20   different about that because we have Fritsch's testimony in

21   deposition.  Other than that you were going to tie it in

22   through Goldwasser and he's going to be coming live.  And I

23   can't really --

24           **MS. BEN-AMI:**  Okay.

25           **THE COURT:**  -- see -- so my preferred position was

1    to allow you to bring Lowe back and Goldwasser fills in the

2    blank that you're covering.  So, if I'm going to let it

3    in -- and it's brief, it's very brief, right?

4         **MS. BEN-AMI:**  Yes, you've already read through it

5    and done your objections.

6         **THE COURT:**  Why shouldn't I do that since we know

7    what Fritsch is going to say?

8         **MR. DAY:**  Okay, because what Roche is doing, your

9    Honor, is they're trying to relitigate the interference and

10   they're trying to argue through this witness that the

11   interference board got it wrong and that GI invented EPO

12   before Amgen.

13        **THE COURT:**  No, but, we're not hearing anything

14   about who won an interference.

15        **MR. DAY:**  It's not about who won.  Their

16   argument -- they're ignoring, ignoring the holding, ignoring

17   the fact that the Patent Office adjudicated this and

18   determined, they are now arguing that the Patent Office,

19   they're ignoring all of that and they're arguing that GI

20   invented EPO before Lin.  That's their argument.

21        **THE COURT:**  Yes, but why are they foreclosed from

22   arguing that?

23        **MR. DAY:**  Because it's adjudicated.

24        **THE COURT:**  Well, fine, lots of things have been

25   adjudicated.  But they weren't part of it.  I mean, you're

 1   making an issue preclusion argument.  If there are facts,

 2   and certainly it's at issue here whether this was obvious or

 3   anticipated, why aren't they entitled to put on the facts of

 4   that?

 5         **MR. DAY:**  Well, they can bring facts.  But what

 6   they're doing, your Honor, what they're doing --

 7         **THE COURT:**  Well, that's just a way of getting at

 8   the facts.

 9         **MR. DAY:**  Well, then that opens up the entire

10   interference record and that means we can go through the

11   whole thing.

12         **THE COURT:**  I'm not sure, I'm not sure I think

13   that.  But unless there's some other objection, and I've

14   been through Fritsch, they may play Fritsch.  No more than

15   five minutes.  Right?

16         **MS. BEN-AMI:**  It's whatever, it's five minutes.

17         **THE COURT:**  Well, it's no more than five minutes

18   because --

19         **MS. BEN-AMI:**  It's a read-in.

20         **THE COURT:**  All right.  And you can read it.  But

21   you can't get on the stand to read it.  Because you want it

22   to be him, so someone just has to stand out there.  I'll

23   explain what a deposition is.

24         **MS. BEN-AMI:**  Not Dr. Lowe.  I have a reader and

25   a --

```
 1              THE COURT:  I understand that.

 2           MS. BEN-AMI:  Right.

 3              THE COURT:  But they're going to have to be off the

 4   stand.

 5           MS. BEN-AMI:  Oh, okay, that's fine.

 6              THE COURT:  Whereas normally I would put them on

 7   the stand.  But we're still in the direct examination of

 8   Lowe.

 9              You can do it.  I'll explain it and we'll go on.

10           MS. BEN-AMI:  That's fine, your Honor.

11              THE COURT:  Now, one thing I am ready on, there's

12   an Amgen filing on Strickland and you're giving notice

13   you're going to put Strickland on live.  And I didn't make

14   this clear, but you seem to have anticipated, you're

15   withdrawing your counter designations of Strickland and

16   that's how we're going to do it.  If I let you, and I'm

17   going to, if they, if they play the deposition and you are

18   going to counter that arguably direct testimony with your

19   live witness, we're not hearing any counter deposition  --

20   counter designations of that witness on the deposition

21   because you get it twice.  Your tactical choice is to put

22   this live witness on.  She'll then have in essence recross

23   and say, yeah, but that's what you say now.  She can use the

24   deposition, I guess.  Or, you're going to have counter

25   designations of the deposition because that's what the
```

1   witness said at the time he was being deposed.  All right.

2          **MR. DAY:**  And I get to put the witness on after

3   they do the designations?

4          **THE COURT:**  Yes, you get to do -- but none of your

5   designations get played.

6          **MR. DAY:**  I understand that.

7          **THE COURT:**  All right.

8          (Whereupon the sidebar conference concluded.)

9          **THE COURT:**  I'm sorry for that but it's actually

10  going to save time.

11         You can see what's going on here, and what's going

12  on is perfectly appropriate as matter of trial process.  We

13  have a live witness.  This witness has various opinions

14  about things, specifically he's got opinions about what

15  things he says are obvious.  And I've told you, well, that's

16  certainly an issue in this case.  So, you're following what

17  he's talking about.

18         Now, for him to render his opinion he's had to look

19  at a bunch of things, exhibits, and those exhibits are in

20  evidence and you can look at them.

21         The little wrinkle we have this morning, and we

22  were over there talking about how we were going to handle

23  it, is part of the things that he relies on to come to his

24  opinion are not just exhibits but what we call depositions.

25         Now, what's a deposition.  A deposition is a way

 1    you get ready for trial.  And you call the witness to the

 2    lawyer's office, there's a stenographer, much like our court

 3    reporter, and the stenographer swears the witness to tell

 4    the truth, and then, both sides are there and both sides get

 5    a chance to ask this witness questions, under oath.

 6          Now, under certain circumstances depositions can

 7    come in evidence at a trial.  Primarily when we can't get

 8    the witness or where it's a witness for the other side and

 9    the side that wants the deposition wants you to know what he

10    said when he was being deposed.  And so, you can -- how do

11    we get depositions before a jury.  Sometimes they videotape

12    them.  And we all look and here's the person on the

13    videotape and they're talking.

14          Now, there may be objections as to the questions,

15    but those we work out ahead of time and that's part of the

16    work I'm doing up here.  I know what depositions are coming,

17    and because we have a written record, I'm making my rulings.

18    Yes, you can ask that; no, you can't ask that.  And that's

19    part of the work we're doing in the afternoon so this will

20    move along smoothly.

21          So here's where we are.  Roche has a portion of the

22    deposition of a fellow named Fritsch.  A small portion.

23    They want to read that small portion because they want you

24    to hear that and then they want you to ask Mr. Lowe about

25    that.  And I've told them they can do it.  Because if we

1    wait and do it later it will be more confusing.  It's less

2    than five minutes.

3           Now, how are they going to present it to you.

4    They're going to have a reader, and the reader will now

5    raise his or her hand.  Who are you going to have as a

6    reader?  We don't have Fritsch.  So Ms. Ben-Ami is going to

7    be --

8           **MS. BEN-AMI:**  I'm the lawyer.

9           **THE COURT:**  You're the lawyer.

10          **MS. BEN-AMI:**  Yes.

11          **THE COURT:**  Are you playing yourself?

12          **MS. BEN-AMI:**  Yes.

13          **THE COURT:**  Fine.  But you were the lawyer asking

14   the questions of Fritsch.

15          Who's Fritsch?

16          **MS. BEN-AMI:**  He's Dr. Fritsch.

17          **THE COURT:**  All right.  So this gentleman here is

18   Fritsch.  Now, I'm not bringing him up here because I've got

19   Mr. Lowe sitting here.  And I'm not putting this

20   gentleman -- the truth is I don't care what his name is --

21   but I'm not putting him under oath.  All he's doing is

22   reading Fritsch's answers to questions Ms. Ben-Ami, the

23   lawyer, the real lawyer, back there in the deposition, she

24   was asking him in some lawyer's office.

25          I do have one instruction to the reader.  Don't

1    hoke it up.  You just read in a loud and straightforward

2    voice the answers.  All right.

3          **MR. DAY:**  Your Honor, simply for clarity sake, this

4    deposition was not taken in this case.

5          **THE COURT:**  Fine.

6          **MR. DAY:**  I just want to make the record clear.

7          **THE COURT:**  Maybe, maybe in some other case but --

8          **MR. DAY:**  And it was not taken by Ms. Ben-Ami.

9          **THE COURT:**  All right.  That's accurate?

10          **MS. BEN-AMI:**  Yes.  I just said I'm playing the

11   lawyer.

12          **THE COURT:**  You did, and that's my confusion.  So

13   here we've got Fritsch under oath in some other case and

14   we're going to hear what Fritsch has to say, and then we'll

15   be back to Lowe to see what he says about that.

16          And you may stand wherever the jury can see, and

17   here is fine.

18          **MS. BEN-AMI:**  This is Page 1965 of the deposition.

19          EDWARD F. FRITSCH, By Deposition

20   **BY  MS. BEN-AMI:**

21   **Q**   Dr. Fritsch, can you identify Exhibit 188?

22          **MS. BEN-AMI:**  Which is marked in this case as PPK.

23   **A**   This is the final agreement reached with Dr. Miyake.

24   **Q**   And what is the date of this agreement?

25   **A**   The letter is dated May 1st, 1984.

1    Q    Does this refresh your recollection as to when the final

2    agreement was reached with Dr. Miyake?

3    A    Obviously as of this date.

4    Q    Did Dr. Miyake deliver EPO to you as a result of this

5    agreement?

6    A    Yes.

7    Q    When did he deliver the EPO?

8    A    The first shipment came in April 1984.

9         MS. BEN-AMI:  And the next page is 1966.

10   Q    What was done with the first shipment of the material?

11   A    Dr. Hewick obtained additional EPO sequence from tryptic

12   fragments.

13        MS. BEN-AMI:  Page 1967.

14   Q    Did Dr. Hewick report the results of his sequencing the

15   tryptics to you?

16   A    Yes.

17   Q    What did you do with that information?

18   A    Used that information to design additional probes for

19   the EPO gene.

20        MS. BEN-AMI:  1973.

21   Q    What is shown in Exhibit 194?

22        MS. BEN-AMI:  Which is OFD.

23   A    This shows the delivery of the 18 and 20 mer probes that

24   I designed.

25   Q    Would you read into the record the date contained in

```
1   Exhibit 194?

2           MS. BEN-AMI:  Which is OFD.

3   A   June 25th, 1984.

4           MS. BEN-AMI:  Page 1974.

5   Q   What day was the -- what day was the 17 mer probes

6   delivered to you?

7   A   On May 25th, 1984.

8   Q   What did you do with the probes?

9   A   We used these probes to screen a human genomic library.

10          MS. BEN-AMI:  Page 2022.

11  Q   Dr. Fritsch, would you refer to your laboratory notebook

12  193, Exhibit 48 -- which is OHV -- and I would like you to

13  refer to laboratory notebook page 169, which is production

14  page 0002267.  Do you recall the work that's reflected on

15  that page of your laboratory notebook?

16  A   Yes.

17  Q   Can you describe for us the nature of the work that's

18  reflected on that page?

19  A   The top three lines describe the rehybridization of the

20  sub C-lifts with the 20 mer probe that we discussed

21  yesterday.  The rest of the page describes some grids that

22  were prepared of plaque pure phage, the hybridization of

23  those grids with the various probes of 17 mer and three

24  subsets of the 14 mer probe called the AB, CD and EF subsets

25  and with the 20 mer probe and describes the results of the
```

1    hybridization.

2            **MS. BEN-AMI:**   Page 2039.

3    **Q**    Could you look at your laboratory notebook, Dr. Fritsch,

4    number 193, Exhibit 48 -- which is 0HV -- laboratory

5    notebook 173, production page 0002271.  What is the nature

6    of the work that you reported on page 173?

7    **A**    This describes the subcloning from that M13 phage DNA

8    that hybridized with the 14 mer A probe and used that PvuII

9    site that we had discussed previously.

10           **MS. BEN-AMI:**   Page 2040.

11   **Q**    When was the work performed that is recorded on

12   page 193 -- I'm sorry.  173.

13   **A**    That would have been shortly after July 12th, 1984.

14           **MS. BEN-AMI:**   Page 2043.

15   **Q**    Did you come to any conclusion as to the status of your

16   work after the work was reported on page 173 of your

17   laboratory notebook?

18   **A**    Yes.

19   **Q**    When was that?  What was that?

20   **A**    We knew, based on the sequence information, that we had

21   cloned at least a large portion of the erythropoietin gene

22   based on the sequence information that was available based

23   on the fact that we had sequence information on at least

24   three tryptic peptides.

25   **Q**    Was this a genomic clone?

1    A    Yes.

2              **MS. BEN-AMI:**   Page 2075.

3    **Q**    Would you refer to your laboratory notebook

4    Exhibit 48 -- which is 0HV -- page 78, which is production

5    page 0002178.  Dr. Fritsch, are you familiar with the work

6    that's reported on that page?

7    A    Yes.

8    **Q**    When was the work performed that's recorded on that

9    page?

10   A    It was done on July 18th, 24th, 27th and continued

11   during the period of July 28th to 8/3 and also on 8/3.

12   **Q**    With respect to the work done on July 18th, can you

13   describe for us what work that relates to?

14   A    This describes the titrations of the fetal liver library

15   or the various fetal liver libraries and those titrations

16   were carried out by Chris Bassler.

17             **MS. BEN-AMI:**   You have to continue reading on 2076.

18   A    And this titration was in preparation for screening

19   fetal liver libraries.

20             **MS. BEN-AMI:**   2081.

21   **Q**    Dr. Fritsch, can you identify Exhibit 214?

22   A    Yes.

23   **Q**    What are they?

24   A    These are the autoradiograms resulting from the

25   screening of the Ch21A library or at least part of that

1    screening.  Filters 31 through 64.

2         **MS. BEN-AMI:**  2082.

3    **Q**   Did you review these autorads in Exhibit 214 in August

4    of 1984?

5    A   Yes.

6    **Q**   When?

7    A   When I returned on August 6th.

8    **Q**   Would you refer to page 79 of your laboratory notebook,

9    Exhibit 48.  When did you make the entries on that page?

10   A   It was August 6th.

11   **Q**   Did you record on that page any information with respect

12   to Exhibit 214?

13   A   Yes.

14   **Q**   What information was that?

15   A   I recorded the results from my analysis of the films as

16   to which of the potential positives that Mr. Bassler had

17   identified were positives that I believed were real.

18        **MS. BEN-AMI:**  2084.

19   **Q**   Dr. Fritsch, can you identify Exhibit 215?

20   A   These are the films for the remaining part of the Ch21A,

21   library screen, filtering numbers 65 through 112.

22   **Q**   Did you review these autorads in Exhibit 215 in August

23   of 1984?

24   A   Yes.

25   **Q**   When?

1    A    August 6th.

2    Q    Did you draw any conclusions from your review?

3    A    Yes.

4    Q    What was it?

5    A    Of the potential positives that Mr. Bassler had

6    identified, there were three from this set of films that I

7    believed were truly positive.

8         **MS. BEN-AMI:**   2110.

9    Q    Dr. Fritsch, I'm going to place before you Exhibit 5 --

10   which is QEI -- which is a memorandum dated August 16th,

11   1984.  Could you read the first paragraph to yourself.

12   A    Yes.

13   Q    The first paragraph indicates that you would probably

14   have confirmation of a full length cDNA EPO clone by Monday,

15   August 20th.

16        Did you have confirmation by that date?

17   A    Yes.

18   Q    Which clone had been confirmed?

19   A    We knew that the clone FL13 contained the entire coding

20   region and leader sequence for EPO.

21        **MS. BEN-AMI:**   2027 -- 2127.

22   Q    Did you send Dr. Dukes a sample of EPO for his assay?

23   A    Yes.

24   Q    How many samples did you send him?

25   A    We sent two samples, one containing the COS cells that

1    were transfected with the EPO expression plasmid and one

2    mock sample.

3    **Q**   What is a mock sample?

4    **A**   A negative control.  A supernatant from cells that were

5    transfected with plasmid that doesn't contain the EPO gene.

6    **Q**   When did you send the samples to Dr. Dukes?

7    **A**   Sometime prior to September 28th.

8    **Q**   Could you look at your daily diary, Exhibit 55 -- which

9    is 0JC -- production page 0002661.  When did you make

10   entries on that page?

11   **A**   September 24th, 1984.

12   **Q**   Are there any entries on that page related to Dr. Dukes?

13   **A**   Yes.  Where it says call Dukes.

14   **Q**   Why did you call Dr. Dukes?

15   **A**   I was interested in knowing if he had received the

16   samples.

17   **Q**   Had he?

18   **A**   Yes.

19          **MS. BEN-AMI:**  2141.

20   **Q**   Could you refer to Exhibit 12 -- 0EJ -- figure 5.

21   That's production page 0016164.  What is shown in that

22   figure?

23   **A**   This is the result of the Western blotting that was done

24   with the COS produced EPO.

25   **Q**   Who prepared that Western?

1   A    I think it was done by Richard Wright, working for Jas

2   Seehra.

3   Q    Okay, I would ask the reporter to mark as Exhibit 222 --

4   which is OIC -- a copy of the Wright notebook -- and it's

5   QEK -- 316 production numbers 002542 -- I'll say that

6   again -- 0025424 through 25625.

7        And would you look at page 165 in laboratory

8   notebook 316, Exhibit 222 -- OIC -- production page 0025588.

9   Dr. Fritsch, are you familiar with the work that's reported

10  on that page?

11  A    Yes.

12  Q    What is the date of the notebook page?

13  A    October -- the notebook page was signed October 23rd,

14  1984.  The date the gel was run was September 28th, 1984 as

15  shown on the insert that's taped onto the page.

16        **MS. BEN-AMI:**  2143.

17  Q    What gel is referred to?

18  A    This is the gel containing the recombinant EPO as well

19  as the urinary and iodinated urinary EPO that corresponds to

20  the Western shown on production page 16164 of Exhibit 12.

21  Q    Could you refer to that Western in Exhibit 12, which is

22  QEJ.  Would you explain what's shown on this page of figure

23  5 of Exhibit 12.

24  A    What is shown here is a photocopy of a autoradiogram --

25  well, back that up.  It's a photocopy of a photograph of

1   what had been an autoradiogram that contained three samples

2   of erythropoietin that had been separated by polyacrylamide

3   gel electrophoresis.  The arrows marked on the left-hand

4   side refer to molecular weight markers, two particular ones.

5   And each of the three lanes contains a different EPO sample.

6   The first lane contains urinary EPO and it's titled here

7   natural EPO.  This is unlabeled material.  The second lane

8   labeled recombinant EPO contains the COS expressed protein.

9   The third lane labeled 125I natural EPO contained iodinated

10  urinary erythropoietin.  After electrophoresis, these

11  samples had been transferred to nitrocellulose paper and an

12  antibody specific for erythropoietin obtained from

13  Dr. Sherwood was exposed to this filtered paper.  Following

14  exposure and washoff of the unbound antibody, the filter was

15  then exposed to iodinated Staph A protein to detect the

16  bound antibody and then that excess material was washed off

17  and the filter was exposed to autoradiographic film and the

18  three dark bands seen at an identical molecular weight on

19  each of the gels correspond to the signals obtained on that

20  autoradiogram.

21  Q   Did you draw any conclusions based upon the figure 5

22  results at the time?

23  A   Yes.

24  Q   What conclusions did you draw?

25  A   Because the molecular weights of the recombinant protein

 1   was the same as the molecular weight of either the natural

 2   or iodinated natural erythropoietin, we could conclude that

 3   the material was being fully glycosylated to an extent

 4   similar to that of natural erythropoietin.

 5           **MS. BEN-AMI:**  2148.

 6   **Q**   Would you look at page 189 which is Exhibit 48 -- OHV --

 7   production page 0002287.  What's reported on that page?

 8   A    This shows the DNA preparation and the digestion

 9   analysis with the positives picked from the screening and at

10   the bottom indicates which ones were in the correct

11   orientation or the incorrect orientation, and with

12   particular clones we then picked as the correct clones for

13   further work.

14   **Q**   On what days did you perform this work on this page?

15   A    September 3rd, September 4th, 1984.

16   **Q**   Which expression plasmids did you choose to use?

17   A    Shown at the bottom, two of the particular ones numbered

18   51a and 52a were then designated RF -- RKFL13 and RKFL6.

19   **Q**   What was done with expression plasma RF -- RKFL13?

20   A    It was grown up through transfection experiments and

21   then transfected into COS and CHO cells.

22           **MS. BEN-AMI:**  This concludes the reading of

23   Dr. Fritsch.

24           **THE COURT:**  Thank you.

25           Ladies and gentlemen, one thing I must make clear.

1      When I allow a deposition to be read to you, or parts of it,

2      or played to you, if it's a video deposition, that's

3      identical in the eyes of the law to the testimony of Dr.

4      Fritsch were he to be here.  Like any other witness, it's

5      evidence and you may believe that in its entirety, you may

6      choose to disbelieve and disregard that in its entirety, or

7      you may believe parts of it and disbelieve other parts, just

8      as you can with the witness who is live testifying.

9             Now, I need another side bar conference.

10     SIDEBAR CONFERENCE, AS FOLLOWS:

11         **THE COURT:**  I do this to save time.  First of all,

12     I think I've made a mistake.  But probably the best thing to

13     do is not try to correct it now, if ever.

14            One, that was fifteen minutes; it wasn't five.  And

15     we're never doing that again, interrupting a live witness

16     with all this mumbo-jumbo.  And at least these experts --

17     strike that -- at least these excerpts unless tied in are

18     meaningless.

19            Be that as it may, I don't understand what this has

20     to do with this case.  None of these experiments with

21     Genentech were out there.  They're not public.  Right?

22         **MS. BEN-AMI:**  This is evidence of something called

23     102(g) which your Honor has already heard about.

24         **THE COURT:**  Yes.

25         **MS. BEN-AMI:**  Which was if you conceive it,

1    diligent, and then you disclose, it becomes in the eyes of

2    the prior art prior art.  That's what 102(g) is.

3         THE COURT:  Let me say that back to you.  If you

4    conceive it, diligent, and you disclose it as soon as

5    reasonably possible, even though it's after the earlier

6    filed patent -- and I imagine that's what an interference is

7    all about, isn't it?

8         MR. DAY:  It is.

9         MS. BEN-AMI:  Yes, it's not only what the

10   interference is about, whether you actually win the entire

11   claim.

12        THE COURT:  Okay.

13        MS. BEN-AMI:  It's not about whether it's a better

14   patent, if it's obvious or not at all.

15        THE COURT:  On this Amgen won.  I mean

16   historically.  I guess the best I can do -- let me pause.

17        Mr. Day?

18        MR. DAY:  Yes, sir.

19        THE COURT:  Do you agree with this?

20        MR. DAY:  No, I don't.

21        THE COURT:  102(g)?

22        MR. DAY:  No, sir.

23        THE COURT:  If you conceive and you're diligent --

24        MR. DAY:  No, sir.

25        THE COURT:  -- and you disclose it becomes prior

```
 1   art?

 2            MR. DAY:  Absolutely not.

 3            THE COURT:  Well, everyone, it would be helpful to

 4   me --

 5            MR. DAY:  I think we should give you a bench memo.

 6            THE COURT:  Well, it may be in the papers and this,

 7   maybe I have it already.  But I certainly would like it.

 8   We'll see where we --

 9            MS. BEN-AMI:  My second grounds, your Honor --

10            THE COURT:  Yes.

11            MS. BEN-AMI:  There is a second ground.

12            THE COURT:  Sure.

13            MS. BEN-AMI:  Which is, I'm sure Mr. Day's going to

14   argue about it with you, I will mention it to you.

15            THE COURT:  I appreciate it.

16            MS. BEN-AMI:  There is something called

17   simultaneous invention which is a secondary indicia of

18   obviousness.

19            THE COURT:  That somebody else invented it right

20   then.

21            MS. BEN-AMI:  At the same time, the two groups at

22   the time, same stuff, shows that it would work.

23            THE COURT:  I'll think about it.

24            MS. BEN-AMI:  Okay.  But that isn't my last point

25   with this witness so --
```

```
 1              THE COURT:  Well, you may call this witness back

 2    after Goldwasser I thought.

 3              MR. DAY:  Your Honor?

 4              MS. BEN-AMI:  I was hoping not to.

 5              THE COURT:  I understand.  Okay.

 6              MS. BEN-AMI:  But he can cross him on something

 7    else and then bring --

 8              THE COURT:  Well, look, as trial lawyers you know

 9    what's happening.  I'm saying I'm a little at sea about this

10    and we'll just have to see where we go question by question.

11    All right.

12              MR. DAY:  We will submit a memo.

13              MS. BEN-AMI:  Your Honor --

14              MR. DAY:  We will submit a memo.

15              MS. BEN-AMI:  -- am I being precluded or not being

16    precluded?

17              THE COURT:  I am not making a ruling.  I'm giving

18    you a heads up.  I'm at sea about this.  And I'll have to go

19    question by question.

20              MS. BEN-AMI:  I'll go slow.

21              THE COURT:  Oh, you're doing fine in terms of your

22    development.  I'm following that.  And I'm following what

23    you want to do now.  I'm just not at all clear you can do

24    it.  If I -- I don't give advisories, but if you see you're

25    running into trouble, my rulings will be without prejudice
```

1    to further reflection and maybe you'll have to bring him

2    back.  We'll see.  I'll watch and see what you do.

3             **MS. BEN-AMI:**  Okay.

4             (Whereupon the sidebar conference concluded.)

5             **MS. BEN-AMI:**  May I proceed, your Honor?

6             **THE COURT:**  You may.

7             **MS. BEN-AMI:**  Good morning, Doctor.  Good morning

8    ladies and gentlemen.

9                      JOHN LOWE, Resumed

10                    **DIRECT EXAMINATION** (Cont'd)

11   BY  **MS. BEN-AMI**

12   **Q**   Doctor, have you studied materials from a company called

13   Genetics Institute?

14   A    Yes.

15   **Q**   And included in those materials have you studied

16   materials on the work that Dr. Fritsch did with regard to

17   EPO?

18   A    Yes.

19   **Q**   And based on the materials you've studied, can you tell

20   the jury what Dr. Fritsch was able to do?

21   A    Yes.  Dr. Fritsch was able to clone the human EPO gene

22   sometime, depending on how you define finished cloning, but

23   roughly July of 1984.  July, August of '84.

24   **Q**   Now.  Prior to that time what was Dr. Fritsch -- what

25   reagents, if any, was Dr. Fritsch seeking to obtain to do

1    his work?

2    A    Yes.   Dr. Fritsch was, was seeking to obtain protein

3    sequence for EPO so that he could clone the EPO gene.

4    Q    And was he able to get it from Dr. Goldwasser?

5          MR. DAY:   Objection, your Honor.   This is --

6          THE COURT:   Sustained.

7    Q    Was he able to obtain it ultimately, the protein?

8          MR. DAY:   Objection, your Honor.

9          THE COURT:   Sustained.

10   Q    Ultimately was Dr. Fritsch successful?

11   A    Dr. Fritsch was successful in cloning the EPO gene by

12   virtue of obtaining the protein sequence.

13         MR. DAY:   Objection, your Honor; move to strike.

14         THE COURT:   Motion to strike's denied in the

15   exercise of discretion.

16   Q    And when Dr. Fritsch obtained the protein sequence and

17   did his work -- remember yesterday we talked about three

18   different types, synthetic genes, cDNA library, genomic

19   library.   Which one did he do?

20   A    He did the genomic cloning approach.

21         MS. BEN-AMI:   Your Honor, I have to introduce an

22   exhibit that we used yesterday.   And I can, if it pleases

23   the Court, I'll offer the exhibits related to the deposition

24   at another time.

25         THE COURT:   You proceed as you see fit.

1          **MR. DAY:**  I'm sorry, what was that?

2          **THE COURT:**  Well, she's asking I think for

3    guidance, but I'm saying try what you want to try and we'll

4    see where we go.

5    **Q**    Doctor, yesterday you talked about an Alton patent

6    application.  Do you recall that?

7    A    Yes.

8    **Q**    I would just like to ask you to look at Trial Exhibit

9    SB.  Do you have it, Doctor?

10   A    Yes.

11   **Q**    Can you identify that for the jury?

12   A    This is an international patent application.

13   **Q**    And did you discuss that yesterday?

14   A    Yes.

15          **MS. BEN-AMI:**  I would offer Exhibit SB, your Honor.

16          **THE COURT:**  SB.  No objection?

17          **MR. DAY:**  No objection, your Honor.

18          **THE COURT:**  SB is admitted, Exhibit 2039.

19          (Exhibit marked in evidence.)

20          **MS. BEN-AMI:**  And with that, your Honor, I pass the

21   witness.

22          **THE COURT:**  Very well.  Any questions for this

23   witness, Mr. Day?

24          **MR. DAY:**  Oh, I have a few, your Honor.

25          **THE COURT:**  Proceed.

1        **CROSS-EXAMINATION**

2    **BY  MR. DAY**

3    **Q**   Yesterday, Dr. Lowe, you made a point of telling the

4    jury that you were not opining in this case that all of Dr.

5    Lin's claims in this patents are invalid, right?

6    **A**   That's what I said, yes.

7    **Q**   In this case, however, you know that Amgen is asserting

8    15 claims from five separate patents, right?

9    **A**   I haven't counted them up but that sounds about the

10   right number.

11   **Q**   Okay.  And you are opining that each of those 15 claims

12   in each of those five separate patents would have been

13   obvious and is invalid, right?

14   **A**   Yes.

15   **Q**   So, you're opining that in your opinion Dr. Lin's

16   isolation of the EPO DNA in 1983 was obvious, right?

17        **MS. BEN-AMI:**  Objection, your Honor.  That's not

18   the claims.

19   **Q**   You're opining in this case --

20        **THE COURT:**  All right, withdrawn.  Go ahead.

21   **Q**   You're opining in this case, you've offered an opinion,

22   you've told the jury that in your opinion Dr. Lin's

23   isolation of the EPO DNA in 1983 would have been obvious,

24   right?

25        **MS. BEN-AMI:**  Objection, your Honor.  That's not

1    the claims.

2          **THE COURT:**  Well, let's see here.

3    **Q**   It's your opinion, isn't it?

4          **THE COURT:**  Overruled, and he may press the point.

5    A    Would you please restate the question, sir?

6    **Q**   Yes.

7          In this case, you've come before the jury and you

8    have offered them your opinion that in 1983 Dr. Lin's

9    isolation of the EPO DNA was obvious?

10   A   My opinion is that it is obvious if you have the protein

11   sequence of this protein in 1983 to be able to clone the EPO

12   gene.

13   **Q**   Okay.  And you're also opining in this case that Dr.

14   Lin's creation of a recombinant EPO glycoprotein, one that

15   stimulates the production of red blood cells in the body,

16   that also was obvious when Dr. Lin made the invention,

17   right?

18   A   I guess I wouldn't characterize it as Dr. Lin creating

19   the EPO.  I would characterize it as the cells creating EPO.

20   **Q**   Okay.  And your opinion is that that would have been

21   obvious, right?

22   A   My opinion is if you have the protein and clone the gene

23   and put it in a cell the cell will make the protein.

24   **Q**   And, therefore, it would have been obvious to obtain an

25   EPO glycoprotein, a recombinant EPO glycoprotein that

1    actually stimulated the production of red blood cells in the

2    body back in 1983 and '84 when Dr. Lin did it?

3    A   My opinion is that if you had the protein, you get the

4    sequence, clone the gene, put it into the cells and the

5    cells will be expected to make biologically active EPO.

6    Q   Okay.  What if you didn't have the gene?  What if you

7    didn't have the gene?  In your opinion would it then have

8    been obvious to have made a recombinant EPO glycoprotein

9    that would work in the body to stimulate the production of

10   red blood cells?

11   A   Honestly, I haven't considered that, that possibility.

12   It hasn't been part of my expert sort of examination.

13   Q   Okay.  Now, also, in your opinion, Dr. Lin's process for

14   making EPO glycoproteins that stimulate the production of

15   red blood cells using vertebrate cells transformed with EPO

16   DNA, that would have been obvious in 1983 and '84 as well,

17   right?

18   A   I don't consider it Dr. Lin's process.  I consider that

19   a process of nature, if you will.

20   Q   But you know that Dr. Lin claimed in his patent that it

21   was his process, he made a claim to it, right?

22   A   I, I have read the claims of the patents and one of

23   those claims is to a process for isolating this protein.

24   Q   For making and isolating the protein, right?

25   A   The cells make the protein.

1    Q    And that process in your opinion would have been

2    obvious, right?

3    A    The process of taking the media off the cells and using

4    the cells made is obvious.

5    Q    Doctor, please.  I asked you about the process of making

6    an EPO glycoprotein using cells that have been transformed

7    with DNA-encoding EPO, growing those cells up and isolating

8    EPO glycoprotein from them and having the protein produced

9    by that process that actually stimulates red blood cells in

10   animals.  In your opinion, that all would have been obvious

11   in 1983 and 1984, correct?

12   A    In 1983-1984, it would have been obvious to carry that

13   out, that process out, if you had had the gene in your

14   hands.

15   Q    Okay.  And if you didn't have the gene you're not

16   offering an opinion here, right?

17   A    I'm not offering an opinion about what might be possible

18   in a different line of science or investigation.

19   Q    Okay.  So your opinion is based upon, one, it would have

20   been obvious to get the gene, and two, it would have been

21   obvious to use that gene to make a process that would

22   produce a glycoprotein that could then be put in animals and

23   stimulate the red blood cells, right?  All those things

24   would have been obvious?

25   A    I think I made it pretty clear yesterday that you have

1    the protein, you get the sequence, clone the gene, put it in

2    the cells, doing what everyone else is doing at the time,

3    you are expected to get a cell that is expected to make

4    erythropoietin that is expected to be biologically active in

5    human.

6    Q    And when you say expected, you mean that an ordinarily

7    skilled worker would objectively believe that they could

8    predictably accomplish that result by simple, routine

9    application of what everyone how to do?

10   A    That's my opinion, yes.

11   Q    And finally, in your opinion, Dr. Lin's claimed

12   pharmaceutical composition which contains this EPO

13   glycoprotein that is produced from cells that he has

14   claimed, in your opinion, that pharmaceutical composition,

15   which makes such a dramatic difference in people's lives,

16   that would have been obvious in 1983 and '84, too, right?

17   A    Yes.

18   Q    Okay.  And so, in your opinion, Dr. Lin invented none of

19   these things, did he?

20   A    My opinion is that it would have been obvious to do

21   those claims that are under dispute beginning in 1982 and

22   1983.

23   Q    Okay.

24   A    I'm not offering an opinion about whether or not --

25   Q    Right.

1   A   -- Dr. Lin did or did not invent something else.

2   Q   I understand.

3       So the molecule, the molecule that the prestigious

4   American Journal of Science called the Molecule of the Year

5   in 1989 when FDA approved it, that molecule was in your

6   opinion obvious --

7       **MS. BEN-AMI:**  Objection.

8   Q   -- right?

9       **THE COURT:**  Sustained, in that form.

10  Q   The recombinant --

11      **THE COURT:**  I mean, it assumes facts not in

12  evidence.

13      Go ahead.

14  Q   But you're aware that the Journal of Science described

15  recombinant human EPO in 1989 on the cover of its magazine

16  as the Molecule of the Year?

17  A   I'm aware of that only because you said that two days

18  ago.

19  Q   You didn't learn that in your investigation in this

20  case?

21  A   You know, I appreciate that science likes to advertise

22  itself with molecules of the year, but I don't, frankly, pay

23  that much attention to it.

24  Q   Okay.  But what you're saying is that back in 1983-1984,

25  anyone, any ordinarily skilled worker, somebody like you, a

```
 1    medical student, who had been working around in a lab for

 2    two years --

 3    A    I wasn't a medical student.  I had finished my M.D.

 4    Q    Okay.  Were you a resident?

 5    A    I was a resident.  I was a post-doctoral fellow.

 6    Q    Okay.  Working in a lab for two years, anyone like that

 7    back in 1983, just by going to the Maniatis cookbook, could

 8    have done what Lin did?

 9    A    Not just by going to the cookbook, but including that

10    and much of the prior art on which the cookbook was based.

11    Q    And you're also saying the Patent Office when they

12    allowed these 15 claims and these five different patents,

13    they got it wrong every time?

14              MS. BEN-AMI:  Objection; no foundation.

15              THE COURT:  Sus -- well, sustained.  I mean, it's

16    clear the Patent Office did what it did.  And that's,

17    because it did what it did, that allocates who bears the

18    burden of proof, and the burden of proof as to these points

19    is on Roche by clear and convincing evidence.  So, I'm not

20    going to, I'm not going to allow that type of question.

21              MR. DAY:  I understand, your Honor.

22    Q    You're not trained in patent law, are you, Doctor?

23    A    No.

24    Q    And you were never a patent examiner, were you?

25    A    I was not a patent examiner.
```

1   **Q**   But you are a paid consultant for Roche's lawyers,

2   right?

3   A   I'm under an hourly retainer by the law firm, yes.

4   **Q**   And they hired you almost two years ago to testify in

5   this case, right?

6   A   They hired me two years ago to be an individual to

7   provide an expert opinion about various aspects of this

8   case.

9   **Q**   And you're being paid $475 for every hour that you work

10  on the case, right?

11  A   That's my recollection, yes.

12  **Q**   Okay.  Now, when you say that Lin's inventions were

13  obvious you're using a word, obvious, that has a special

14  meaning in the law, right?

15         **MS. BEN-AMI:**  Objection, your Honor.

16         **THE COURT:**  Well, yes, he's not going to be

17  inquired of as to the law.  I'm the -- I have no pride of

18  place, but I'm the teacher of the law here.

19  **Q**   So, understanding that it's the Court's province to

20  teach the jury the law and to say what the law is, would you

21  please tell the jury what you understand the word "obvious"

22  to mean when you use it?

23  A   Sure.  So, obvious to me means that if in 1983 I had

24  decided that it would be important to try to clone the EPO

25  gene, I would phone up someone, look at the literature,

 1   phone up the individual or individuals who might have that

 2   protein and use technologies that were available and

 3   successfully used in the art to clone the EPO gene and

 4   proceed ahead with putting the gene into cells and making

 5   the protein.

 6   **Q**   And you would have predictably succeeded, right?

 7   A   I think there was a high expectation of success at that

 8   time.

 9   **Q**   Okay.  Now, you understand that the examiners in the

10   Patent Office are trained to apply the legal concept of

11   obviousness when they examine patents?

12          **MS. BEN-AMI:**  Objection, your Honor.

13          **THE COURT:**  No, sustained.  We're not -- just as

14   they're not going to get into the operations of the Patent

15   Office, you're not going to get into the operations of the

16   Patent Office.  We take as a fact, and it is a fact, and no

17   one disputes it, the Patent Office granted these patents

18   that involve the claims at issue to Amgen.  That's settled.

19   Amgen was awarded the patents.

20          That's not an end of it, though.  That's why we

21   have this aspect of the case.  Under the law Roche gets a

22   chance to challenge that here in court.  So we'll start with

23   the fact Amgen has the patent.  The law says Roche gets to

24   mount this challenge, but of course it has to prove its

25   points by clear and convincing evidence.

1          Let's come to evidence, the evidence of these

2     various issues, not what the Patent Office did or didn't do.

3          **MR. DAY:**  Okay.

4     Q    Well, in your testimony yesterday --

5          **THE COURT:**  Excuse me, now I am interrupting.  And

6     the reason is, because the jury's the final word, so we'll

7     let the jury have the final word.

8          Go ahead.

9     Q    In your testimony yesterday and the day before you

10    mentioned the interference proceedings that took place in

11    the Patent Office involving these patents, correct?

12    A    I did, yes.

13    Q    And would you tell the jury what a patent interference

14    proceeding is?

15         **MS. BEN-AMI:**  Objection, your Honor.

16         **THE COURT:**  Sustained.  We're not going into that.

17    The proceedings, the outcomes, those things, we'll talk

18    about the, the basic evidence here.  Confine yourself to

19    that.

20         Go ahead.

21         **MR. DAY:**  Your Honor, yesterday, if I may --

22         **THE COURT:**  Please don't argue.  That's my ruling.

23         **MR. DAY:**  Okay.

24    Q    In your testimony before the jury you relied on several

25    prior publications that you said demonstrated that each of

1    Dr. Lin's asserted claims was obvious.

2            Do you recall that?

3    A    Yes.

4    Q    We put up a list of, or one publication after a number

5    on the board and looked at them, Ms. Ben-Ami showed the jury

6    those publications.  Do you recall that?

7            For example, you relied on the Maniatis manual

8    which you called the cookbook.  I think that's Exhibit 10.

9            Would you bring that up, please.  Any chance you

10   could blow up the title and the authors.

11           You pointed to this cookbook, the Maniatis

12   cookbook?

13   A    Yes.

14   Q    And I notice it was also authored by Edward Fritsch,

15   right?

16   A    Yes.

17   Q    He was the person whose deposition we just heard about,

18   right?

19   A    I presume it is.  I don't know if there are two Ed

20   Fritsches doing cloning.  So I presume it probably is.

21   Q    You don't from your own personal knowledge know who that

22   is?

23   A    I've never met Ed Fritsch, no.

24   Q    Okay.  But you said that this was in the prior art and

25   you relied on this publication?

1   A    In part, yes.

2   Q    And you relied on several other publications that you

3   said taught how to isolate genes and make proteins from

4   those genes before Lin's inventions, right?

5   A    Yes.

6   Q    Now, the truth is, Doctor -- by the way, do you have the

7   patents in front of you?

8   A    I do.

9   Q    The truth is that all of the publications that you

10  showed to the jury yesterday were provided to the Patent

11  Office by Amgen during the examination Dr. Lin's patents,

12  right?

13           MS. BEN-AMI:  Objection, your Honor.

14           THE COURT:  No, no.

15           MS. BEN-AMI:  No foundation.

16           THE COURT:  I'm going to let him have that.

17  A    My understanding is that these patents cite the

18  references that were discussed yesterday.

19  Q    Well, you, you reviewed the prosecution histories of

20  these patents, right?

21  A    I have reviewed some of the prosecution histories.

22  Q    Some.  Have you reviewed the entire prosecution history

23  of each patent?

24  A    I believe I have.  But, you know, we're talking about

25  hundreds if not thousands of pages of documents.  So there

1   may have been a nook and cranny here and there that I didn't

2   see.

3   **Q**   Okay.  Well, you're aware that in the prosecution

4   histories of these patents that Amgen submitted to the

5   Patent Office documents called information disclosure

6   statements?

7   A   I'm aware of that, yes.

8   **Q**   And in those information disclosure statements Amgen

9   identified what they told the Patent Office was the most

10   relevant prior art to the inventions?

11   A   I'm aware of that, yes.

12   **Q**   And they provided copies of that art to the Patent

13   Office examiner for him to review; is that correct?

14   A   Thousands of pages of documents.

15   **Q**   Okay.

16   A   Probably.

17   **Q**   All of this art that you showed the jury was given to

18   the Patent Office by Amgen, right?

19   A   And much, much other art, too, to review.

20   **Q**   And the truth is that the Patent Office specifically

21   considered every one of the publications that you --

22             **THE COURT:**  No, no, have in mind my instruction.

23   The fact that it was disclosed -- what the Patent Office did

24   or didn't do is not at issue here.  It's not at issue.

25   Amgen got the patents.  That's enough.  Let's talk about the

1   substance of the testimony.  I'm sustaining it.

2   Q   Well, let's take a look at, I think you introduced

3   yesterday Exhibit 2009.  That's the prosecution history of

4   the '422 patent?

5   A   Give me a moment, let me try to find that.

6   Q   Okay.

7   A   It might have another number, another designation.

8   Q   Okay.  Well, we have it up here on the board.  It's the

9   prosecution history for the '422 patent.  Is that one of the

10  prosecution histories that you reviewed?

11          **MR. DAY:**  What is the --

12          **COUNSEL:**  QDW.

13  Q   QDW, it's in your binders.

14          **MS. BEN-AMI:**  Your Honor, he didn't deal with this

15  subject.

16          **THE COURT:**  Oh.  Overruled.

17          **MS. BEN-AMI:**  He didn't talk about this.

18          **THE COURT:**  Overruled.

19  A   Well, I'll have to look at it on the screen, I can't

20  find it here.

21  Q   Okay.  Well, in this prosecution history is mentioned an

22  information disclosure statement that Amgen filed.  So let's

23  look at pages 558 to 595.  Let's start at 558.

24          If we could just bring up that page.  You were

25  scrolling through 558, 595.  But let's see if you can go to

1    the first page of this, 558.  I think you have to go back.

2    You must have the wrong first page.  There we go.

3          First of all, this is the information disclosure

4    that was filed by Amgen in the prosecution of the '422

5    patent.  Do you see that?

6    A   Yes.

7    Q   And the examiner was James Martinelle, Ph.D., right?

8    A   I see that.

9    Q   Okay.  And if we could back out of this, Richie.  Let's

10   just first go look at the, at the Maniatis reference.  I

11   think that was -- you're going to find the Maniatis

12   reference at page 580 of the prosecution history.  That's

13   the cookbook that you talked to the jury about, right?

14   A   It is.

15   Q   And Amgen put that entire manual in front of the

16   examiner and told him that this was prior art to their

17   invention, right?

18          **MS. BEN-AMI:**  Objection, your Honor.

19          **THE COURT:**  Have in mind my instruction, Mr. Day.

20          **MR. DAY:**  I'm sorry, your Honor.

21          **THE COURT:**  We're not getting into what the Patent,

22   what the Patent Office did or did not do.  But, it is

23   appropriate for you to bring out what was before them.

24   That's true.  But in that form, sustained.

25          **MR. DAY:**  My question, I believe, your Honor, is:

1    **Q**   Amgen put before the Patent Office an information

2    disclosure that specifically brought to their attention the

3    Maniatis reference as prior part to the inventions that Dr.

4    Lin claimed, right?

5    **A**   Well, there were, let's see, I'm counting three, four,

6    eight, eighteen pages out of this book that they

7    were pointed to, and of course I wouldn't know if they

8    actually read those pages.

9    **Q**   Well, you see the signature next to that line in the

10   left there; just the left hand column, the signature?

11   **A**   Yeah.  I guess that's a signature.  I'll take your word

12   for it.

13   **Q**   Do you know, do you know what that means?  Are you --

14   **A**   My understanding is that that means that somebody has,

15   has looked at those pages.

16   **Q**   Who?

17   **A**   In this case, it was Mr. Martinelle.

18   **Q**   The examiner?

19   **A**   The examiner.

20   **Q**   And he's required to indicate that he looked at what he

21   looked at and checked it off, right?

22             **MS. BEN-AMI:**  Objection, your Honor.

23             **THE COURT:**  Yes.  Sustained.

24   **Q**   Now --

25             **THE COURT:**  And let me, just so we're very clear on

1    the line I'm following, all right?  We have a Patent Office.

2    It has its operations.  It does its work.  And at the end of

3    all that work and proceedings about that work Amgen has

4    these patents.

5         Now, when Amgen has these patents that has a legal

6    effect, and I've told you what it is and I'm giving effect

7    to it here.  That means that anyone who challenges the

8    validity of these patents they bear the burden of proof.

9    And it's not burden of proof more likely than not.  It's a

10   burden of proof by clear and convincing evidence.  And I've

11   made that clear.

12        So Roche is the challenger, Roche bears the burden

13   of proof, and Roche is arguing to you or putting evidence

14   before you, which they will argue, is clear and convincing

15   evidence.  I say nothing about that.  That's entirely for

16   you.

17        What I don't want to happen in this trial is have

18   some sideshow about how the Patent Office works.  On the one

19   hand, Amgen will say, well, there's this Patent Office and

20   it has these examiners and these examiners looked at

21   everything, and look, they gave us the patent.  And then

22   Roche will come in with evidence and say, oh, it's

23   underfunded, they don't have enough time, they don't, you

24   know, this is all new science and the like.

25        Now, disregard everything I said.  It has nothing

1    to do with this case.  I'm the source of the law here.  The

2    fact, undisputed, is that Amgen has these patents.  That has

3    a consequence.  It puts the burden on the challenger, by

4    clear and convincing evidence.

5         But as I said before, the jury of the American

6    people is the last word.  The last word.  So what I expect

7    to happen, and what I'm instructing will happen, is let's go

8    to the substance tested by the defenses or the challenges

9    that Roche raises, anticipation, obviousness, as to one

10   claim, lack of written description.  That's what we're going

11   to talk about here.  You may examine as to that, Mr. Day.

12        Go ahead.

13             **MR. DAY:**  Thank you, your Honor.

14   **Q**   Do you have Exhibit 1 in front of you, Dr. Lowe?

15   Exhibit 1 is the '933 patent, I believe.

16   A   I have it.

17   **Q**   Pardon me?

18   A   I have it.  Yes.

19   **Q**   Okay.  And Exhibit 1, which as I said is, I believe the

20   '933 patent, it has on the very first page of the patent, it

21   has a list of references cited.  Do you see that?

22   A   Yes.

23   **Q**   Okay.  And that list carries on, carries on, starts on

24   the left hand column, goes over to the right hand column,

25   but then it also continues on the pages behind, right?

1    These are all the references that the Patent Office was

2    given by Amgen as prior art to the inventions that Dr. Lin

3    claimed, correct?

4    A    That's my understanding, yes.

5    Q    And in the information disclosure that we were looking

6    at before, the exhibits that we talked about yesterday,

7    Exhibit 2021, 2020, 2023, 2024, 2025, 2030, and so on, all

8    of the exhibits we talked about yesterday were in that

9    disclosure to the Patent Office, right?

10   A    Yes.

11   Q    Now, yesterday you testified that Amgen's attorney, Mr.

12   Borun, had mischaracterized a Genentech European patent

13   application relating to tPA -- that's the so-called Goeddel

14   '619 application -- in remarks that he had made to the

15   Patent Office.

16         Do you recall that testimony that you gave?

17   A    I recall that Mr. Borun said that that patent did not

18   disclose the use of mammalian cells to express tPA.

19   Q    Right.  And Ms. Ben-Ami put up on the screen

20   Exhibit 2012 from the prosecution history, Page 231, I

21   believe, and she pointed you to a particular sentence.  If

22   you recall, she put it up like this, and then her graphics

23   fellow blew up one sentence in this, and the sentence that

24   was blown up is in this middle paragraph here.  Right?

25   Pointed you to that sentence and said that Mr. Borun had

1    mischaracterized the reference, right?

2    A    I would have to look at the transcript and look at the

3    words.  But the implication is that Mr. Borun did not fully

4    explain to the patent examiner what those documents actually

5    disclosed.

6    Q    Okay.  Let's back out of that paragraph and let's look

7    at the very next paragraph down below that.  Here, Mr. Borun

8    referred to two other Genentech applications that were filed

9    in Europe and he said that these applications, or

10   publications address the production of tPA in mammalian host

11   cells, but they contain no reference to glycosylation of the

12   recombinant products nor to any successful assays of in vivo

13   biological activity.  Right?

14   A    You know, I don't recall looking at those particular

15   European patent applications.  I may have.  I don't

16   remember.  I would have to --

17   Q    But Mr. Borun told the examiner to look at them because

18   they referenced the production of tPA in mammalian cells,

19   didn't he?

20   A    So he's got confusing information.  He's got two

21   different stories from the Amgen patent attorney.

22   Q    Now, you know, because you have looked at the '619

23   application --

24   A    I have, yes.

25   Q    -- you know that it did not mention the glycosylation of

1    any product produced by CHO cells, right?

2    A    But if you go to that sentence up above.  We're not

3    talking about glycosylation.  We're talking about whether or

4    not those cells express, use a mammalian cell to express a

5    protein, so.

6    Q    Okay.  But you know that the '619 patent did not

7    describe any glycosylation of that product, did it?

8    A    It doesn't, but I don't think that that's particularly

9    relevant actually.

10   Q    Okay.  And you know that the '619 patent also did not

11   demonstrate any in vivo activity of the product that was

12   produced from those mammalian cells, did it?

13   A    You know, if Amgen is, if Genetics -- if Genentech is

14   going to make this stuff to put in humans, and I think we

15   talked about the expectation that it's going to be

16   glycosylated, and it was known in the prior art that it was

17   going to be glycosylated, I'm not sure there would be a need

18   to actually show that in a patent personally.  But it is, it

19   is in fact true that there's no information in the patent

20   about, about those particular issues.

21   Q    There's no information in the patent about glycosylation

22   of the product as produced --

23   A    There's an expectation.

24   Q    There's an expectation.

25   A    That this is part of the natural process of making the

1    glycoprotein in CHO cells.

2    **Q**    Okay, I heard you say that.  But I've asked you a

3    specific question.  There is no description in the patent of

4    any glycosylation of the product that was produced from CHO

5    cells, correct?

6    A    It doesn't change my opinion about the obviousness.

7    **Q**    Yes or no?  Is the answer yes, or is the answer no?

8    A    You know, can I, can I explain a little bit about --

9    **Q**    Is the answer yes or no?  Is there any description in

10   the Genentech patent of any glycosylation of the CHO cell

11   produced product?

12   A    No.

13   **Q**    Is there any demonstration, any experiment or data

14   presented in the Genentech patent disclosure to show that

15   the product produced from CHO cells was active in vivo; yes

16   or no?

17   A    So you want a yes or no answer?

18   **Q**    Yes.

19   A    No, there isn't.

20   **Q**    Now, you rely on Dr. Goeddel's '619 patent application

21   in Europe and there was a corresponding application in the

22   U.S.

23   A    Yes.

24   **Q**    The same, the same application, except this one was

25   filed in the United States.

1    A    Yes.

2    Q    And that application ultimately issued as what's called

3    the Goeddel '075 patent?

4    A    That's my recollection.

5    Q    Okay.  And that also, I believe has been introduced into

6    evidence, I think that's Exhibit 2030; is that correct?  If

7    we could just blow that up.  This is the Goeddel '075

8    patent.

9    A    Yes.

10   Q    Now, you understand that Dr. Goeddel made clear in his

11   patent that he did not believe that his teaching about tPA

12   would allow one of skill in the art to make predictions of

13   successfully making other functional proteins like EPO, did

14   he?

15   A    I'm not aware of that.

16   Q    You're not aware of that.

17        Okay.  Well, let's, let's take a look at -- do we

18   have a copy of the patent?

19        Column 2, line 63 and following.  I'm sorry, my

20   eyes are bad so I have to -- if we could just take -- let's

21   move up a little bit more.  Let's take this whole paragraph

22   starting "Recombinant DNA," just catch the title of this if

23   you would, Richie.  You missed the title.

24        By the way, Genentech is owned by Roche, right?

25        **MS. BEN-AMI:**  Objection, your Honor.  May I have a

 1    side bar?

 2         **THE COURT:**  You may.

 3    SIDEBAR CONFERENCE, AS FOLLOWS:

 4         **MS. BEN-AMI:**  Genentech is not owned by Roche.

 5    Genentech is an independent company.  Roche owns a majority

 6    of the stock, but it is an independent company.  At the time

 7    of this work, Roche did not own Genentech and Mr. Day is

 8    trying to say that if you own stock of the company,

 9    therefore, it can be used against you.  You've already ruled

10    on that with regard to Chugai and the issues on controlling

11    interest and it's not a --

12         **THE COURT:**  Candidly, you started off on a foot

13    different --

14         (Out loud)  We're still in session here.  And while

15    I have no objection to people in the audience standing and

16    stretching, as I've invited the jury to do, you will be

17    quiet in the courtroom.

18         (Continuing at side bar)  What are you doing here?

19    I thought you were going to cross-examine him on the

20    substance of his testimony.

21         **MR. DAY:**  And I'm going to, your Honor.

22         **THE COURT:**  I'm not at all troubled by wide-open

23    cross-examination.  I'm, I'm a fan of wide-open

24    cross-examination.  You put him on, they can have him.

25         But we're not having anything more about the Patent

```
 1    Office, and who cares about the corporate relations here.

 2    It arguably could go to bias, I imagine.

 3             MR. DAY:  Admissions.

 4             THE COURT:  Except -- oh, but they didn't own it

 5    then.  And is it true that if you own a majority of the

 6    stock what Genentech said is an admission against Roche?

 7             MR. DAY:  I would say if you have a controlling

 8    interest --

 9             THE COURT:  I would like to have that briefed.  I'm

10    not so sure that's true.

11             MR. DAY:  And if I may, the relevance of this is,

12    the reason I'm going here is because it shows what those of

13    skill in the art at the time said was and was not

14    predictable.  It goes right to the obviousness opinion that

15    he's rendered here.  He's rendered an opinion.

16             THE COURT:  Oh, no, no.

17             MR. DAY:  That's where I'm going right now.

18             THE COURT:  See, I'm fine with that.

19             MR. DAY:  Okay.

20             THE COURT:  If we have it in evidence.  Let's go

21    there.

22             MS. BEN-AMI:  But he doesn't need to talk about

23    interest --

24             THE COURT:  I'll strike it.

25             MS. BEN-AMI:  -- relationship.
```

1          **MR. DAY:**  I'll withdraw the question.

2          (Whereupon the sidebar conference concluded.)

3          **THE COURT:**  The question's stricken.  We're going

4    to get into the arguably scientific matters.

5          Go ahead.

6  **BY  MR. DAY**

7  **Q**   So we're looking at the disclosure of Dr. Goeddel's '075

8    patent where he's talking about recombinant DNA technology,

9    he's talking about what scientists have learned about that

10   technology at this point in time.  And what I want to draw

11   your attention to is down at the bottom last five or six

12   rows or so beginning with the word "However," and everything

13   up to to the bottom, Richie.

14         Dr. Goeddel wrote in his patent, Dr. Lowe:

15   However, on an individual product basis, the pathway remains

16   somewhat tortious and the science has not advanced to a

17   stage where regular predictions of success can be made.

18   Indeed, those who portend successful results without the

19   underlying experimental basis do so with considerable risk

20   of inoperability.

21         You would agree with that, wouldn't you?

22  **A**   That's his opinion, not mine.

23  **Q**   Okay.  Well, Dr. Goeddel at that point in time was a

24   person who had actually succeeded in cloning a gene for

25   human protein?

1    A    Good for him.

2    Q    Okay.  Now, have you reviewed the prosecution history

3    that followed off of this patent and what Dr. Goeddel told

4    the Patent Office when it challenged the patentability of

5    his claims?

6    A    I don't believe I have.

7    Q    Okay.  You've studied the claims of this patent, haven't

8    you?

9    A    I have.  I've studied some of the claims, probably all

10   the claims.

11   Q    Okay.  And you understand that in this patent Dr.

12   Goeddel received claims only to the DNA, right?

13   A    I would have to look at the claims again, but that's my

14   recollection.

15   Q    You understand that he prosecuted his claims to the

16   recombinant tPA protein in different applications that

17   resulted in later --

18        **MS. BEN-AMI:**  Objection, your Honor.

19   Q    -- patents?

20        **MS. BEN-AMI:**  My prior art argument.  At the side

21   bar please, your Honor?

22        **THE COURT:**  You may.

23   SIDEBAR CONFERENCE, AS FOLLOWS:

24        **THE COURT:**  What's the problem?

25        **MS. BEN-AMI:**  Okay, what Mr. Day is seeking to do

1  is to say that Genentech says they were given a patented

2  process and a patent of DNA and that therefore that proves

3  that you would invalidate the inventions in this case.

4         **MR. DAY:**  No, I'm not.

5         **THE COURT:**  No.

6         **MS. BEN-AMI:**  Let me finish, please.

7         **THE COURT:**  Okay.  Go ahead.

8         **MS. BEN-AMI:**  The other patents are terminally

9  disclaimed over the DNA patent.  And if we get into this

10 then I'm going to get into the terminally disclaimed.

11 Because that would be double patenting otherwise, and you

12 had foreclosed me on that ground.  The evidence should be

13 what's in the prior art and what does it teach, not whether

14 in the Genentech case the Patent Office said that there's a

15 restriction requirement or no restriction requirement or

16 anything like that.

17        **MR. DAY:**  I'm not going to go into any of that.  I

18 have no interest in going into that.

19        **THE COURT:**  Based upon the question, your objection

20 is overruled.  I make no ruling upon what that opens up.

21 We'll see.  Overruled.

22        (Whereupon the sidebar conference concluded.)

23        **THE COURT:**  Overruled.  You may have the question.

24 You may reframe it if you wish.

25        **MR. DAY:**  Thank you, your Honor.

1    Q    Dr. Lowe, are you aware that Dr. Goeddel obtained issued

2    patents on tPA products based upon his '075 application in

3    the United States?

4    A    You know, honestly I just can't remember what he

5    obtained downstream from this --

6    Q    Okay.

7    A    -- in detail.  I mean, I may have looked at these

8    patents at some point.  I don't remember.

9    Q    Okay.  Well, let me hand you and the Court Exhibit AHV.

10            **MR. DAY:**  Your Honor, Amgen would move into

11   evidence Exhibit AHV.

12            **THE COURT:**  Any objection?

13            **MS. BEN-AMI:**  I object, your Honor.

14            **THE COURT:**  Sustained.

15   Q    Were you aware of the statements that Mr. Goeddel, Dr.

16   Goeddel made to the Patent Office when the Patent Office

17   prosecuted these claims?

18   A    No.

19   Q    Okay.  Now, Dr. Lowe, you testified on Wednesday that in

20   1983 you were doing basically the same technology as used in

21   the patents-in-suit?

22   A    Yes.

23   Q    And, in fact, as of '84, however, you had never

24   expressed any recombinant protein in a mammalian cell, had

25   you?

1    A    Using recombinant DNA?

2    Q    Yes.

3    A    No.

4    Q    And you had not expressed certainly any human

5    glycoprotein in a mammalian cell, had you?

6    A    That was not the focus of my research at the time.

7    Q    And as of 1984 you had never constructed a genomic DNA

8    library, had you?

9    A    Not the focus of my research at the time.

10   Q    Okay.  Now, yesterday you testified that claim 25 of the

11   '008 patent, Lin's '008 patent, is a host cell claim and

12   specifically a mammalian host cell claim, correct?

13   A    That's my recollection.

14   Q    Okay.  And this mammalian host cell is transformed or

15   transfected with a particular DNA, right?

16   A    Yes.

17        THE COURT:  Forgive me.  Ms. Smith suggests I may

18   have misheard.  You have no objection to this?  You have no

19   objection to identification AHV?

20        MS. BEN-AMI:  You ruled and it was sustained.  I

21   objected.

22        THE COURT:  No, but you objected, correct?

23        MS. BEN-AMI:  Yes, I did.

24        THE COURT:  All right, I heard correctly.  Forgive

25   the interruption.

1          **MR. DAY:**  Thank you, your Honor.

2     **Q**    This mammalian host cell, we're looking at claim 25,

3     it's a transformed or transfected mammalian host cell

4     according to claim 24, and we're going to -- actually why

5     don't we just -- you made a comparison between this claim

6     and a bunch of other Amgen claims, right --

7     A    Yes.

8     **Q**    -- in the '868 and the '698?

9     A    '698.

10    **Q**    So why don't we just bring up your comparison.  I

11    believe it was JL31, was I believe what you had.  If you

12    could just bring that up, please.

13             This was your graphic yesterday, right?

14             This is the '698.  I want the '868.  I thought that

15    was JL31, or maybe it's --

16             **MR. DAY:**  Excuse me while I resolve these.  There

17    we go.

18    **Q**    You put up claim 25 and then you built a graphic here

19    where you tried to show how claim 25 depended from other

20    claims in the '008 patent and what limitations were

21    incorporated by that dependency?

22    A    Yes.

23    **Q**    Okay.  And so, beginning with this graphic, you showed

24    that claim 25 claimed a mammalian cell, correct?

25    A    Yes.

1    Q    And that mammalian cell is transformed or transfected

2    with, and it's transformed or transfected with a DNA

3    sequence, right?  Is that correct?

4    A    A DNA sequence, that's what it says there.

5    Q    Okay.  And that DNA sequence has particular

6    characteristics as recited in the claim, right?

7    A    Yes.

8    Q    And those characteristics are that DNA must encode an

9    amino acid sequence that is sufficiently duplicative of

10   erythropoietin to have the recited biological activities.

11   Is that right?

12   A    Yes.

13   Q    Okay.  Now, claim 25 also includes the limitations that

14   the host cell is transfected with the DNA in a manner to

15   allow the cell to express a polypeptide, right?

16   A    Yes.

17   Q    And that the host cell was capable of glycosylation.  Is

18   that right?

19   A    Yes.

20   Q    Okay.  So claim 25 of the '008 patent is a host cell

21   that has those characteristics that we've just described,

22   right?

23   A    It is, yes.

24   Q    It refers to a thing and the thing it refers to is a

25   mammalian cell, right?

1    A    It refers to a special mammalian cell.

2    Q    Yes, a very particular one, it has all of these

3    characteristics, right?  Is that right?

4    A    It has all those characteristics.  Yes.

5    Q    Okay.  So, to be clear, claim 25, because it claims a

6    cell, that doesn't claim an EPO glycoprotein, does it?

7    A    I disagree.

8    Q    You disagree.

9    A    I read this claim to mean that this host cell is a host

10   cell, but it's constructed in a way that it's going to carry

11   out its natural biological process to make something that is

12   inherent in that, in that cell.

13   Q    Okay.  So it has the potential to do something; is that

14   right?

15   A    Not the potential.  The claim I think says, in my

16   opinion, not the potential, it is doing it.

17   Q    Well, the claim refers to a cell, right?

18   A    It refers to a cell, but it has all of this

19   characteristic DNA biochemistry, inherent properties that

20   inevitably will provide you with EPO.

21   Q    Okay.  Inevitably?

22   A    Inevitably.

23   Q    In your opinion?

24   A    In my opinion.

25   Q    Okay.  Now, if I went to the pharmacy and I asked the

1    pharmacy to give me a vial of human recombinant

2    erythropoietin and the pharmacist went to the shelf and they

3    pulled off a vial of human recombinant erythropoietin.  You

4    saw one here, Ms. Ben-Ami held it up in her opening

5    statement to the jury.  Do you remember that?

6    A    Yes.

7    Q    That's not a host cell, is it?

8    A    That's not a host cell.

9    Q    That vial?  And there are no host cells in that vial,

10   are there?

11   A    There are no host cells in that vial.

12   Q    What's in that vial is a human recombinant EPO

13   glycoprotein, right?

14   A    Yes.  I understand.

15   Q    Okay.  And that protein is a very, very different thing

16   than a mammalian cell, isn't it?

17   A    It is a different thing than a mammalian cell.  It is

18   different.

19   Q    Now, you, you reviewed the prosecution history in this

20   case, right?

21   A    I reviewed some prosecution documents in these

22   patents-in-suit.

23   Q    And what we're comparing on the board in your graphic

24   here is not a comparison between a mammalian host cell and

25   an EPO glycoprotein.  What we're comparing is a mammalian

1    host cell and a process for producing an EPO glycoprotein.

2    A    Yes.

3    Q    Right?

4         And it's your opinion to the jury that those are

5    the same thing?

6    A    No.  My opinion is that the process is not patentable.

7    It's obvious, because if you have this cell as described in

8    that claim 25, you don't need the claim 1 in the '868 to do

9    what the claim says the cell is going to do by itself.

10   Q    Okay.  And you say in your opinion it was obvious?

11   A    I'm saying that there's nothing to claim in '868 because

12   the cell is going to make the protein.  As the cell is

13   described in the '008 patent claim 25, and the stuff above,

14   the cell will make this, you don't have to do anything

15   special, there's no need to claim claim 1 in the '868

16   patent.

17   Q    Okay.  So, let's look at comparing the '868 claim to

18   claim 25 of the '008, let's look at what's in the '868

19   claim.

20        Can we bring that up, please.  Just leave up what's

21   up there.  We don't need any highlighting.

22        So in the '868 claim, first of all, there's a step

23   of growing cells?

24   A    Yes.

25   Q    That's not in the '008 claim, is it?

1    A    We went over this yesterday.  Growing cells is not

2    something that is patentable, it's obvious.

3    **Q**    In your opinion?

4    A    In my opinion.

5    **Q**    Okay.  And the jury would have to agree with you about

6    that, right?

7    A    It's obviously up to them to decide if I'm telling the

8    truth.

9    **Q**    They would have to agree?

10   A    Or have an opinion that they believe.

11   **Q**    Okay.  And in your opinion -- and also, you'll notice

12   that there's nothing in the '008 claim about isolating the

13   glycoprotein, is there?

14   A    No, there's not.  Because as I think I mentioned

15   yesterday, isolating a protein from the media of those cells

16   is nothing special.

17   **Q**    So in your opinion it's obvious, right?

18   A    In my opinion, it is not patentable.

19   **Q**    It's another obvious step --

20   A    Yes.

21   **Q**    -- in this whole thing?

22   A    It's an inevitable obvious step.

23   **Q**    Okay.  And you understand that in the '868 claim, the

24   process requires the actual production of a glycoprotein

25   that has, that possesses a particular biological activity.

1   A    Yes.

2   Q    Correct?

3         All right.  And there's nothing in the claim 25

4   that requires, in claim 25 of the '008 patent that requires,

5   that requires you to produce a product that has any

6   particular activity, does it?

7   A    I disagree.

8   Q    Okay, you disagree.

9   A    I'll be happy to explain.

10  Q    Well --

11  A    The word possess in claim 25 says the cell is

12  constructed, so that the protein possesses the stuff, is

13  going to have the activity.

14  Q    Well, it says it allows for it, right?

15  A    Well, if I'm allowed to possess something that means I

16  possess it, in my opinion.

17  Q    Okay.  Does it perhaps mean that as opposed to actually

18  possessing it you have the potential to achieve it, but

19  perhaps have not?

20  A    That's not the way that I understand it.

21  Q    If I, if I put you on a football field and I allow you

22  to run to the end of the field, does that mean that you have

23  gotten all the way to the goal line?

24  A    If I possess the ability to run to the goal line and you

25  allow me to do it, I'm going to run to the goal line.

1    Q    Nothing could stop you?

2    A    Possess means I'm going to go.

3    Q    You've got two legs?

4    A    Two legs that work.  Yeah.

5    Q    And nothing could stop you.  You might not get tackled?

6    A    There's always the possibility.  See, in this patent it

7    doesn't say there's something impeding you.  It says it

8    allows the possession of.

9    Q    Okay.

10   A    Now, if the patent said there are linebackers on the

11   field, I would be in trouble.

12   Q    Well, those of skill in the art in 1983 and 1984

13   understood there were linebackers on the field, weren't

14   there?  There are all kinds of things, like Dr. Goeddel said

15   about those who predict success, encounter when they

16   actually try to do the experiment, right?

17   A    That's Dr. Goeddel's opinion.  And my opinion is it's

18   expected.

19   Q    Simple?

20   A    I wouldn't say it's simple.  But I think you have a

21   reasonable expectation when you try to do this you will

22   succeed.

23   Q    Okay.  But in 1983 and 1984 you hadn't done it, had you?

24   A    I was not studying this particular area of research.

25   Q    And you hadn't done it?

1    A    It was not my focus.

2    Q    And you hadn't done it?

3    A    I had not done this in 1982, 1983.

4    Q    Or 1984?

5    A    Or 1984.

6    Q    Or 1985?

7    A    I would have to look at my lab notebooks in 1985.

8    Q    Okay.  Let me also ask you to take a look at the cells

9    that are grown in the '868 patent, and in particular look at

10   the DNA that they contain.  What kind of DNA is contained in

11   the '868 patent cells?

12   A    It is -- I'll read it -- an isolated DNA sequence

13   encoding human erythropoietin.

14   Q    That's a very specific amino acid sequence, right?

15            MS. BEN-AMI:  Objection, your Honor.

16            THE COURT:  No, overruled.  He may, he may ask

17   that.

18   A    Well, I don't know if I would call it specific.  In many

19   ways to have an isolated DNA sequence to encode human

20   erythropoietin.

21   Q    I'm talking about the amino acid sequence.  The amino

22   acid sequence of human erythropoietin is a very specific

23   amino acid sequence, right?

24   A    You know, I don't see the words amino acid sequence in

25   there.  It just says erythropoietin.

1    Q    Okay.  If you look at claim 25 and everything you had

2    depended on there, there's no reference there to DNA

3    encoding human erythropoietin, is there?

4    A    I'm sorry, Mr. Day, would you please say that again.

5    Q    If you look at claim 25 --

6    A    Yes.

7    Q    -- and to the DNA that's referenced there in the cell,

8    there's no reference, it's not limited to, it doesn't

9    require a DNA that encodes human erythropoietin, does it?

10   A    I think in 25 it doesn't use the word human.  But I

11   would have to look at the, you know, the dependent claims up

12   above to see if some of --

13   Q    They're all here.  You put them in.

14   A    Well, I think we paraphrased those.  And maybe we could

15   look at the specific claims in that patent since I don't

16   remember if it said or not.  But it does in fact say in

17   claim 2 human erythropoietin.

18   Q    Yes, but claim 25 isn't dependent on claim 2.

19   A    Well, it, it may not be.  I don't know.  I would have to

20   look at the back and forth.

21   Q    Just take a look, the '008 patent is right in front of

22   you.

23   A    But, in any event, it could include human EPO.  It

24   doesn't say it has to be.

25   Q    Okay.

1    A    It doesn't say it doesn't have to be.  It says

2    erythropoietin.

3    Q    Okay.

4    A    And in my opinion that could include human

5    erythropoietin.

6    Q    It could also include monkey erythropoietin, right?

7    A    It could include frog erythropoietin.

8    Q    And, in fact, Dr. Lin in his patent cloned and disclosed

9    the sequence of monkey erythropoietin, didn't he?

10   A    Yes, he did.

11   Q    Okay.  So, the claim 25, because it doesn't refer to

12   human, is broad enough to cover both human and monkey at

13   least, right?

14   A    Not being a patent attorney, I would have to defer to

15   the legalese here.  But my sense is that it would, it could

16   include many different kinds of erythropoietin.

17   Q    Okay.  Okay.  You testified this morning that GI

18   succeeded in cloning human EPO after they obtained urinary

19   EPO from Dr. Miyake.

20           Do you recall that?

21   A    We heard that testimony, yes, this morning.

22   Q    And we heard some testimony from Dr. Fritsch read into

23   the record from the deposition?

24   A    Yes.

25   Q    Could there be another reason why GI succeeded in

1    cloning the human EPO gene shortly after Dr. Lin succeeded

2    other than the fact that it was simple and obvious to do?

3    A    Anything's possible.

4    Q    Would you agree with me that it's easier to solve a

5    crossword puzzle if you can peek at the answer key?

6    A    I'm not sure Dr. Fritsch had a peek at the answer key.

7    I'm not sure that Amgen was sending them keys by e-mail back

8    in those days about what was being discovered.

9    Q    Did you investigate, Doctor, in this case to find out

10   what GI did learn and didn't learn about what Dr. Fritsch

11   had done?

12   A    I don't know what GI generally and Ed Fritsch in

13   particular knew or didn't know about what Amgen had done,

14   what sort of information was transpired.  I don't know.

15   Q    When Dr. Lin succeeded in isolating and cloning the EPO

16   gene, the scientific press picked up on the story pretty

17   fast, didn't they?

18   A    I don't know.

19   Q    You don't recall that?

20   A    I don't recall what the scientific press was saying at

21   the time about this.

22   Q    Let me show you Plaintiff's Exhibit DZ0, which is a

23   publication from McGraw-Hill's Biotechnology Newswatch.

24        **MR. DAY:**  And Amgen would offer into evidence, your

25   Honor, as Exhibit --

 1          THE COURT:  It would be -- actually I misnumbered

 2    them.

 3          MR. DAY:  -- Exhibit 11.

 4          THE COURT:  I said 38, but really I was misreading.

 5    And the most recent exhibit which I said would be 2039 is

 6    actually 2034.

 7          So you're offering DZO?

 8          MR. DAY:  As Exhibit 11, your Honor.

 9          THE CLERK:  It's already in.

10          MS. BEN-AMI:  It's not in.

11          MR. DAY:  Exhibit 11.

12          THE CLERK:  Oh, on your list.

13          THE COURT:  Yes.

14          MR. DAY:  On our list.

15          THE COURT:  All right.

16          MS. BEN-AMI:  I object, your Honor.

17          THE COURT:  And you object?

18          MS. BEN-AMI:  Hearsay.

19          THE COURT:  Yes, of course it is.  But you don't

20    want it for the truth, you want it for the fact that this

21    was said at that time.

22          MR. DAY:  That's right, your Honor.

23          THE COURT:  All right, and I'm going to accept it

24    that way.

25          Now, this, I keep saying this isn't rocket science.

1    This is a little tricky.  We're trying out obvious, right?

2    And the other issues.  But that's one issue.

3           Now, one of the ways you can get at whether, one of

4    the ways, there are other ways, you can get at whether

5    something was obvious is to see how people reacted to the

6    development, to the step.  If people went around and said

7    ho-hum it's more likely it was obvious under the law.  If

8    people said, wow, this is amazing, it's less likely that it

9    was obvious in light of what happened before.  That's common

10   sense and that's rather straightforward.  And now Amgen

11   wants to put in this newspaper, and if the newspaper is of

12   roughly the appropriate date, I'm going to let you see it.

13   But what's, what's tricky about this legally is, we don't

14   get our data, but we do, in courts we don't get our valid

15   data from newspapers.  What are they?  They're newspapers

16   after all.  But -- so I'm limiting this.  And this -- I'm

17   letting you see this.  I'm letting this one -- it will be

18   2035 in evidence.

19           **THE CLERK:**  No, no, this -- they have separate

20   numbering systems.

21           **THE COURT:**  Oh, this is 11 now.

22           **THE CLERK:**  Eleven.

23           **THE COURT:**  Oh, all right, that's fine.  I can

24   handle that.

25           Evidently, Amgen has its portion of the universe of

```
1    numbers and Roche has its portion.  I can do that.

2         So this, this one is going to have Exhibit No. 11.

3    Actually I breathed a sigh of relief.  I couldn't believe

4    there were really over 2,000 exhibits already marked.  So

5    this is 11.

6         But now here's the point.  I'm letting you see

7    this.  But this is not proof that anything in here is true.

8    It is proof, if you believe it's genuine and you believe the

9    date is accurate and you believe it was published, it is

10   proof that people were saying this.  That's all.  That this

11   is what the newspaper had on that day, that's what people

12   were saying on or about that day.  Not that what they were

13   saying was true.  These other exhibits -- this is the first

14   time I've done this limitation, and I may have to do it

15   again in the case, but I'm not going to take that much time.

16   These other exhibits, however many there are, they're

17   evidence and you can read them.  And like the testimony of a

18   witness, you can say that's true, you're the jury, you can

19   decide I don't believe that, it's not genuine, there's no

20   foundation, or you can say part of it's true and not true.

21   This one, the most you can say is, this 11, yes, this is a

22   newspaper on or about that date of what people were saying,

23   not that anything in here is true.  That's the limitation.

24   Exhibit 11 in evidence with the limitation.

25              (Exhibit marked in evidence.)
```

1          **MR. DAY:**  Thank you, your Honor.

2          And with that in mind, I would like to publish it

3     to the jury, if I may, put it up on the board.

4          **THE COURT:**  You may, of course.

5  **Q**   And in this newsletter from January 2nd, 1984, on the

6     second page of the newsletter the title says:  Amgen claims

7     first in cloning erythropoietin, sees $100-million market.

8          Do you see that?

9  A   Yes.

10 **Q**   And could you read the first -- do you have a copy of it

11    there?

12 A   I do.

13 **Q**   Could you please read for the jury the first paragraph

14    of the news article.

15 A   So the newspaper says:  Citing secret new gene-probing

16    techniques, scientists at Amgen here report the first

17    cloning and quantity expression of erythropoietin (EPO), the

18    elusive human hormone, made mainly in the kidney, that

19    controls red-blood-cell formation.  Molecular biologist

20    Fu-Kuen Lin, who led the project, made the report to a

21    recent meeting of Amgen's scientific advisory board.

22 **Q**   Thank you.

23         And now if you would look over on the second column

24    of the article, you'll see that there's a report about how

25    this was done, some description of how this was done.

1    You'll see that in the -- actually, if we could bring the

2    two paragraphs up, the one before that and the second one.

3    That's it.

4         **THE COURT:**  I see Ms. Ben-Ami rise.  There's the

5    description, but here's a perfect example.  That's not

6    evidence that that's exactly, that is what Amgen was doing.

7    It doesn't portend to prove that at all.  All it proves is

8    people said that.

9    **Q**   That is what --

10        **THE COURT:**  If you believe it.  It's up to you.

11   **Q**   This is what the newspaper was reporting in this time in

12   this publication?

13   A   In a hypothetical.  Let's imagine that Amgen was trying

14   to throw somebody off track.

15   **Q**   Do you have my question in mind?

16   A   What was the question?

17   **Q**   This is what the newspaper was reporting --

18   A   Yes.

19   **Q**   -- about what Amgen was doing?

20   A   Well, not all the newspapers.

21   **Q**   Okay.

22   A   If I was at GI, I would be slightly more worried than I

23   was before I saw this.

24   **Q**   Okay.  But you would be interested in whatever Amgen

25   said about what Amgen had done to succeed, right?

1    A    I take this stuff with a grain of salt.

2    Q    You would?

3    A    Yeah.

4    Q    Okay.  Are you familiar with a company called Chugai?

5    A    Vaguely.

6    Q    And tell the jury what Chugai is?

7    A    Chugai is a company that, it's a Japanese company as I

8    understand it, it's a biotechnology company.

9    Q    Well, you've reviewed the record here.  Who were they?

10   A    So, they were a company that was collaborating with GI

11   as I understand it to clone the EPO gene.

12   Q    Okay.  And you've reviewed documents in this case from

13   various prior proceedings involving Amgen and Chugai and GI?

14   A    I have.

15   Q    Okay.  Let me hand you what's been marked as Amgen

16   Exhibit BAH.  This is an exhibit from those proceedings.  Is

17   this one of the documents that you reviewed in the course of

18   your --

19   A    Well, you know, I couldn't say actually.  I don't know

20   if I did or didn't see this.

21   Q    Okay.

22        **MR. DAY:**  Amgen offers, your Honor, Amgen Exhibit

23   BAH.

24        **MS. BEN-AMI:**  Objection, your Honor.

25        **THE COURT:**  BAH.

 1              **MS. BEN-AMI:**  No foundation.

 2              **THE COURT:**  May I see it.

 3              **MS. BEN-AMI:**  May I have a side bar, your Honor?

 4              **THE COURT:**  Well, let's see if I can rule.  Yes,

 5      sustained on this foundation.

 6              **MR. DAY:**  May I have a side bar, your Honor?

 7              **THE COURT:**  You may.

 8      SIDEBAR CONFERENCE, AS FOLLOWS:

 9              **THE COURT:**  How do you get around the hearsay

10      objection?

11              **MR. DAY:**  I get around it by ancient document, your

12      Honor.

13              **THE COURT:**  Oh.

14              **MR. DAY:**  This document was an exhibit in a

15      proceeding in this courthouse, used as an exhibit in this

16      courthouse and became --

17              **THE COURT:**  Well, I'm less interested in that.

18      It's an ancient document.

19              **MS. BEN-AMI:**  The fact it's an ancient document

20      doesn't prove the truth of any of this, and there's no

21      authentication of this document.  This document was -- this

22      came from Amgen.  This didn't come from --

23              **MR. DAY:**  901(b)(8), authentication.

24              **THE COURT:**  Wait a minute.  All right.

25              **MS. BEN-AMI:**  No, this document didn't come from GI

 1    as I understand it.  It has an Amgen Bates number, not a GI

 2    Bates number.  We had certain documents authenticated by GI.

 3              THE COURT:  Okay.

 4              MS. BEN-AMI:  So --

 5              THE COURT:  Now, wait a second.  He cites a

 6    provision of --

 7              MR. DAY:  Right here, your Honor.  Right here, your

 8    Honor, 9 --

 9              THE COURT:  Thank you very much.  901.

10              MS. FISHMAN:  You need to turn to it.

11              MR. DAY:  (B)(8).

12              THE COURT:  (B)(8).

13              MS. FISHMAN:  Ancient documents.

14              THE COURT:  Well, still -- yes.  But still, they at

15    least raise a challenge to its authenticity.  And I think on

16    this foundation I'm going to sustain it.  But you --

17              MS. FISHMAN:  Your Honor, may I speak to that,

18    briefly?

19              THE COURT:  Yes.

20              MS. FISHMAN:  This document was authentic and --

21    I'm sorry, this document was authentic and admitted in the

22    Chugai proceedings in the district court and cited and

23    relied on in the appendix in the Federal Circuit appeal.

24              THE COURT:  Respectfully, what's that to me?

25              MS. FISHMAN:  It's in the appendix in the Federal

1    Circuit appeal.

2          THE COURT:  No, no.  I have enormous respect for my

3    colleagues, and you might even say I had a piece of Chugai,

4    though I gave it to now Judge Saris.  And I don't know a

5    better judge than Judge Saris.  But, in truth, they weren't

6    a party to it.

7          I have to try this case.  This is without

8    prejudice.  You'll probably get this in.  But that doesn't

9    get it in.  This trial, they have the right to make you turn

10   your corners square and they challenge the authenticity.

11   Because it comes from you, and arguably it could be

12   self-serving, you have to find out how it got there.  But

13   ancient documents will work for you if you do that.  All

14   right.

15         MS. BEN-AMI:  Thank you.

16         MS. FISHMAN:  Your Honor?

17         MR. DAY:  I'm sorry.

18         MS. FISHMAN:  Ms. Ben-Ami?

19         MS. BEN-AMI:  Oh, I'm sorry, I thought I was done.

20   I'm sorry.

21         THE COURT:  They're running more paper up here.

22         MS. BEN-AMI:  I understand, your Honor.  I would

23   like the opportunity to see it.

24         THE COURT:  Really I do like to hear from one

25   person.

 1              **MS. FISHMAN:**  I'm sorry.

 2              **THE COURT:**  But I passed off counsel here.  Now we

 3    have more ammunition, so I'll hear Mr. Day.

 4              **MR. DAY:**  Thank you, your Honor.

 5              We have, as the Court may be aware, perhaps not,

 6    because there's so much paper in this case and I greatly

 7    apologize, there's a motion in limine regarding collateral

 8    estoppel because Roche owns Chugai.  And Chugai --

 9              **THE COURT:**  But they didn't then.

10              **MR. DAY:**  No, but they acquired them.

11              **THE COURT:**  Right.

12              **MR. DAY:**  And as a result of acquiring them they

13    step into their shoes and they are bound by the judgments

14    that have been entered against Chugai.  That can't shake

15    those judgments.

16              **THE COURT:**  That's true.

17              **MR. DAY:**  This was, this was an exhibit in the --

18              **THE COURT:**  I don't know that that follows.  I

19    certainly don't doubt anything counsel says.  I will --

20    someone just pass to Ms. Smith the number of that motion in

21    limine and I'll look at it.  But one assumes you have other

22    things to ask.

23              **MR. DAY:**  And I'll move on.

24              **THE COURT:**  Sustained for now.

25              **MR. DAY:**  Okay.

1          (Whereupon the sidebar conference concluded.)

2          **THE COURT:**  Respectfully, Mr. Day, I'm getting too

3    engrossed in interesting evidence issues.  We're six minutes

4    into the break.  It's time for the break.

5          Ladies and gentlemen, you have not heard all the

6    evidence.  Please, therefore, keep your minds suspended.  Do

7    not discuss the case either among yourselves nor with anyone

8    else.  You may stand in recess for one-half hour.  The jury

9    may recess.

10         **THE CLERK:**  All rise for the jury.

11         (Whereupon the jury left the courtroom.)

12         **MS. BEN-AMI:**  Your Honor, may the witness stand

13   down to have a break?

14         **THE COURT:**  I don't know what you mean.

15         **MS. BEN-AMI:**  Can he leave the bench for the break?

16         **THE COURT:**  Of course he may.  Everyone may.

17         **MS. BEN-AMI:**  He doesn't know that he's allowed to.

18         **THE COURT:**  We'll recess.

19         **THE CLERK:**  Court is in recess.

20         (Recess.)

21         **THE CLERK:**  All rise for the jury.

22         (Whereupon the jury entered the courtroom.)

23         THE CLERK:  Court is in session, please be seated.

24         **THE COURT:**  Proceed, Mr. Day.

25         **MR. DAY:**  Thank you, your Honor.

1      **CROSS-EXAMINATION** (Cont'd)

2    **(BY MR. DAY:)**

3    **Q.**  When we broke, I believe, Dr. Lowe, we were looking at

4    Exhibit BAH.  I'd like you to just read that to yourself,

5    please, not aloud.  I want you to read the first paragraph

6    and first numbered paragraph to yourself.

7              Have you read it?

8    A.  I have.

9    **Q.**  Does that refresh your recollection as to whether you've

10   ever seen this document before?

11   A.  No, it doesn't.  I don't remember seeing this document.

12   **Q.**  Okay.  Did you do anything, in the course of your work

13   for Roche in this case, did you do anything to investigate

14   what information GI learned regarding Dr. Lin's successful

15   isolation and cloning of the EPO gene?

16   A.  I'm sorry, would you --

17   **Q.**  Did you do anything to investigate what information

18   Genetics Institute learned in, oh, December 1983,

19   January 1984, February 1984, regarding the methods and

20   techniques by which Dr. Lin had succeeded in isolating and

21   cloning the EPO gene?

22   A.  I did not investigate that.

23   **Q.**  You didn't investigate that?

24   A.  No.

25   **Q.**  And consequently, you're not familiar with what evidence

```
1    exists in the prior proceedings that bears on that; is that

2    right?

3              MS. BEN-AMI:  Objection, your Honor.

4              THE COURT:  The objection's overruled.  You may

5    have it.

6              MS. BEN-AMI:  Your Honor, may I have a sidebar?

7              THE COURT:  You may.

8    SIDEBAR CONFERENCE, AS FOLLOWS:

9              MS. BEN-AMI:  Your Honor, I apologize, I don't want

10   to have so many sidebars, but he keeps saying prior

11   proceedings, prior proceedings.  There are no prior

12   proceedings that are in evidence in the case.  What he is

13   doing is the, When did you stop being a good wife, which is

14   there's no issue and these questions should not talk about

15   prior proceedings.

16             THE COURT:  I think it's sufficiently neutral and I

17   believe I've corrected it in my charge, but I think there's

18   a limit, accumulation limit, and I don't think we're going

19   there, the more I look into this Genentech -- these

20   Genentech documents, but we'll see.  I think a more narrow

21   focus is the appropriate one under the law.

22             MR. DAY:  I just want to be clear, your Honor,

23   there's a distinction between Genentech and Genetics

24   Institute.

25             THE COURT:  Yeah, I understand that.
```

1          **MR. DAY:**  And the -- I'm not in Genentech, I'm in

2     Genetics Institute.  This was raised on his direct

3     examination.

4          **THE COURT:**  Yeah, I know it was, that's why I let

5     you have that.  Her problem is not with your asking, it's

6     this broad-brush prior proceedings.  I think that's

7     sufficiently neutral.  If I have to issue a corrective

8     instruction, I will.

9          **MR. DAY:**  Thank you, your Honor.

10          (Whereupon the sidebar conference concluded.)

11          **THE COURT:**  Proceed.

12          **MR. DAY:**  Thank you, your Honor.

13     **(BY MR. DAY:)**

14     **Q.**  So, Dr. Lowe, did you do anything to investigate what,

15     if any, information was available regarding what GI had

16     learned about Dr. Lin's successful cloning?

17     A.  No, I did not.

18     **Q.**  Okay.  And consequently, insofar as your knowledge is

19     concerned, you are only aware of what documents have been

20     given to you for your review by Roche in this case?

21     A.  By my -- the attorneys, the law firm, yes.

22     **Q.**  Okay.  You testified on direct examination that a source

23     for urinary EPO was the key to cloning the EPO gene because

24     with that EPO protein, it was straightforward to identify

25     the amino acid sequence of the EPO, and from there to

1   identify the DNA blueprint; is that right?

2   A.   In essence, yes.

3   **Q.**   Now, but you're aware, aren't you, that prior to

4   Dr. Lin's success, at least a portion of the amino acid

5   sequence for human EPO had been available to those skilled

6   in the art; right?

7   A.   I'm aware that people were using an amino acid sequence

8   that had been first reported at a meeting in an oral

9   presentation by, I think, Dr. Goldwasser.

10  **Q.**   When you say an oral presentation, a sequence was

11  actually put up on the board; right?

12  A.   A brief one.

13  **Q.**   And everybody in the room scurried to write down the

14  sequence; right?

15  A.   Right.

16  **Q.**   Because everybody was very interested in learning what

17  the amino acid sequence of EPO was; right?

18  A.   Of course.

19  **Q.**   That took place in 1980 or 1981?

20  A.   You know, I don't recall the exact date, but in that

21  vicinity, yes.

22  **Q.**   And how much of the EPO sequence was published at that

23  point?

24  A.   Well, I would say none of it was published at that

25  point.  I mean, I don't -- I don't know that I'd call that a

1    published sequence.

2    **Q.** Disclosed?

3    A.  Uhm, you could call it disclosed, if you want.  I'd say

4    it was flashed on the screen.  People wrote it down.

5    Hopefully they didn't make any mistakes before it went off

6    the screen.  That's the way I'd characterize it.

7    **Q.** How much of the sequence was put up on the screen?

8    A.  My recollection was that it was either 26 or 28 amino

9    acid residues from the front end of the protein, of the

10   protein.

11   **Q.** So the first 26 or so residues?

12   A.  Yes.

13   **Q.** Beginning at what's called the end terminus?

14   A.  Beginning at what's called the end terminus, the mature

15   protein.

16   **Q.** And you're aware that in 1983 there was, in fact, a

17   publication that disclosed that sequence?

18   A.  I am aware of that publication.

19           **MR. DAY:**  Could I have Exhibit NXV?

20   **Q.** Looking at Exhibit NXV, this is a publication by Sue and

21   Sutkowski in 1983 in the proceedings of the National Academy

22   of Sciences; is that right?

23   A.  Yes.

24   **Q.** You previously identified that as a recognized and

25   authoritative journal?

1    A.  Yes.

2            **MR. DAY:**  Your Honor, Amgen offers into evidence

3    Exhibit NXV as Exhibit 12.

4            **THE COURT:**  No objection?

5            **MS. BEN-AMI:**  No objection.

6            **THE COURT:**  It may be received, NXV, Exhibit 12.

7            (Exhibit marked in evidence.)

8            **MR. DAY:**  And if we could just bring up the

9    right-hand column of Exhibit 12, the second paragraph, full

10   paragraph in the right-hand column.  Second full paragraph.

11   The next one down.  Sorry, I gave you the wrong one, it's

12   the third paragraph.

13   **Q.**  This is where Sue and Sutkowski published to the world

14   what they thought the first 26 amino acids or so of the end

15   terminus, the EPO protein, were?

16   A.  Right.

17   **Q.**  Could you just explain to the jury what this depicts,

18   what these letters are in the second sentence?

19   A.  Right.  Those represent amino acid residues, an amino

20   acid sequence, if you will.

21   **Q.**  And the H2N, what does that represent?

22   A.  That is known in the jargon as the amino terminus, which

23   is the front end of the protein.

24   **Q.**  And the COOH at the end?

25   A.  That's the carboxy terminus, otherwise known as the back

1    end of the protein.

2    **Q.**   So this also not only gives you the sequence but gives

3    you the orientation, what's the front and what's headed

4    towards the back?

5    A.   Absolutely.

6    **Q.**   And it shows here that the first -- that's 26 amino

7    acids; right?

8    A.   I'd have to count them, but I presuming that's correct,

9    sure.

10   **Q.**   Well, for those of ordinary skill in the art that offers

11   26 amino acids, what's the average, what's the minimum

12   length of probe that, in your opinion, is required in order

13   to uniquely hybridize to a copy of the EPO gene's DNA in a

14   genomic library?

15   A.   Well, that's -- I can't be exactly precise to know that

16   because the base composition of that probe would change the

17   length requirements.  But approximately 17; 17 to 20,

18   something like that.

19   **Q.**   Seventeen to 20 what?

20   A.   DNA residues.

21   **Q.**   Nucleotides?

22   A.   Nucleotides.

23   **Q.**   And there are three nucleotides per amino acid?

24   A.   There are.

25   **Q.**   So 17, that would translate into five and two-thirds

1    amino acids; is that right?

2    A.  Yes.

3    **Q.**  And 20, that would translate into six and two-thirds

4    amino acids?

5    A.  Right.

6    **Q.**  So you would need a sequence of anywhere from five to,

7    let's say, seven amino acids, in your opinion, to identify

8    the DNA blueprint that is unique to EPO?

9    A.  It's not enough.

10   **Q.**  Oh, no?  Why not?

11   A.  Well, first of all, you have to presume that you have

12   the correct protein sequence.  And at this time others had

13   strong evidence that one of these residues was not correct,

14   first of all.

15         Second of all, the sequence of the protein, because

16   of the codon degeneracy did not allow one to precisely

17   design the perfect match, you have to design in some

18   indications several possible perfect matches because of that

19   codon table and the degeneracy associated with that table.

20   **Q.**  Oh, so it's not quite so straightforward as taking the

21   amino acid and just translating it into a DNA sequence and

22   then you've got it?

23   A.  It is if you have a good peptide.

24   **Q.**  If you have a good peptide?

25   A.  Sure.

1    **Q.**  Well, you got 26 here, what's wrong with that?

2    A.   Well, I'll give you an example.  The arginine codon,

3    there are six of them.  If you got an arginine in your

4    protein sequence, you're in trouble.  If you got a couple of

5    them, you're in big trouble.  You got a tryptophan or

6    methionine, there's only one codon and you're in good shape.

7    So the sequence itself, the nature of the amino acids in

8    that sequence --

9    **Q.**  Uhm-hmm?

10   A.   -- will allow you to design a good probe or not so good

11   a probe.

12   **Q.**  Okay, well, was this a good sequence for probing?

13   A.   Well, I'd have to look at the codon table and sort of

14   design some probes, but it would be okay, I would say.  Sort

15   of average.

16   **Q.**  Okay.  All right.  Well --

17   A.   Based on the codon degeneracy.

18   **Q.**  Okay.  All right.  Well, it was available to those of

19   skill in the art since 1981, and yet nobody succeeded, with

20   this information in hand, in isolating a clone of the EPO

21   DNA until Dr. Lin did it; how come?

22   A.   Well, you know, Dr. Lin was using probes made from the

23   sequence and he was failing, too.

24   **Q.**  Really?

25   A.   Yeah, that's what I understand.

```
1    Q.  So it wasn't that straightforward?

2    A.  It was straightforward once you got some additional

3    peptide sequence.

4    Q.  Well, what if the additional peptide sequence had a lot

5    of arginines in it, would that be better?

6    A.  Probably not.  You need -- the more sequence you have,

7    the higher the likelihood will be that you'd have a peptide

8    that would help you design probes that would be more likely

9    to succeed.

10   Q.  Okay.

11   A.  So the more protein sequence you have, the higher the

12   likelihood is that you'll succeed.

13   Q.  Okay.  In your direct you used a demonstrative, JL1, to

14   talk about the degeneracy of the --

15        MR. DAY:  Could we bring up JL1?

16   Q.  This was an exhibit that you used with Ms. Ben-Ami to

17   talk about the degeneracy of the code; is that right?

18   A.  Yes.

19   Q.  And what that means is that for any given amino acid, if

20   I have a single amino acid, let's say methionine?

21   A.  Say methionine.

22   Q.  That was the example, in fact, you used, right, because

23   it's simple?

24   A.  It's very simple and it's --

25   Q.  The reason it's simple is because there's only one codon
```

1   for methionine, there's one set of nucleotides and only one

2   set of nucleotides that codes for methionine; right?

3   A.  Absolutely, yes.

4   Q.  But if you take a different amino acid, let's take the

5   first amino acid in EPO, proline, that's the first amino

6   acid in the end terminus; right?  Isn't it?  Do you know?

7   A.  I don't recall, no.

8   Q.  You don't know?

9   A.  I don't remember what the amino acid sequence is of the

10  first 28 amino acids of --

11  Q.  No, I'm just saying about the first amino acid.

12  A.  I don't know what the first one is.  I have to go back

13  and look at it.

14        MS. BEN-AMI:  Objection, your Honor, there's no

15  foundation.

16        THE COURT:  Well, his answer then stands because he

17  doesn't know what the first one is.

18  Q.  Okay.  Well, let me ask you to assume it's proline,

19  okay?

20  A.  Let's assume it's proline, sure.

21  Q.  Proline has four different codons that code for proline.

22  That means that you don't have just one choice, it could be

23  one of four different codons, any one of which might code

24  for that proline; right?

25  A.  Yes.

1   **Q.**  That's the problem that you were referring to about

2   degeneracy?

3   A.  Yes.

4   **Q.**  And when you testified that a skilled worker could take

5   this table, the codon table, and derive the DNA blueprint

6   for a particular amino acid sequence, you didn't mean to

7   suggest, did you, that when you have a long amino acid

8   sequence like EPO that's many different amino acids, that

9   there is -- it's a simple matter to find the one specific

10   DNA sequence that corresponds to those amino acids, did you?

11   A.  I think what I said, certainly implied, is that given a

12   substantial amount of protein sequence, given peptides,

13   those are pieces of that protein where you have an amino

14   acid or two or three where the degeneracy is low, you're

15   liable to be able to make probes that are going to have

16   perfect matches to the gene of interest.

17   **Q.**  Okay.  All right.  Well, let's explore that.

18       You have the Sue and Sutkowski paper in front of

19   you and that told skilled artisans in 1983, '84, what the

20   first 26 amino acids were; right?

21       **MR. DAY:**  We can take down JL1 for now.

22   **Q.**  So let's just take the first two amino acids in that

23   sequence.  The first one is proline, the second one is

24   alanine; right?

25   A.  I think it's alanine, proline in the paper.

1    **Q.**  Did I get it wrong?  I often do.

2    A.  Me, too.

3    **Q.**  All right.  Both of those have four different codons for

4    them; right?

5    A.  Yes.

6    **Q.**  Okay.  So how many different DNA sequences, in fact,

7    could we have -- I think it's -- so we've got the alanine up

8    and we've got the proline up, okay?  How many different DNA

9    sequences are there that could possibly code for just those

10   two amino acids?

11   A.  I have to look at the codon table and decode it for you.

12   I don't have that codon table.

13   **Q.**  Okay.  Let's go back to your codon table and you can

14   tell us.  JL1.

15   A.  So let's look up alanine.

16   **Q.**  Okay.

17   A.  So that's in the column C, okay.

18   **Q.**  Column C, alanine.

19   A.  So there are four codons there.

20   **Q.**  All right, four.  Which other one do you want?

21   A.  Well, I think the second one in that row was -- that

22   sequence, was proline.

23   **Q.**  Right.

24   A.  Maybe another four.

25   **Q.**  Okay.  So now let's go back to --

1          **MR. DAY:**  What's that number, D what?  Thank you,

2      Richard.

3      **Q.**  So how many different nucleotide sequences are there

4      that code for alanine and proline?

5      A.  We've got four for alanine, four for proline, multiply

6      that, that's 16.

7      **Q.**  Four times four; right?  So we have D42.

8          So what we see here is two columns, there's 16

9      different possible sequences that might code for just those

10     two amino acids; right?

11     A.  Yes.

12     **Q.**  So for those two amino acids, we would have to pick

13     which of the 16 is right; we don't know which one in advance

14     is the EPO, actual EPO sequence?

15     A.  We don't.  We don't.

16     **Q.**  Okay.  Let's put one more amino acid on here.

17     A.  Sure.

18     **Q.**  Let's go to the next third amino acid, what's that?

19          **MR. DAY:**  D45.

20     A.  It's another proline.  So things are simple to make the

21     demonstrative.

22     **Q.**  So there are what, four different codons?

23     A.  Four to the third, that's 64.

24     **Q.**  So now there are, just to code for those three amino

25     acids, how many different possible --

1    A.  Sixty-four.

2    Q.  Sixty-four.  Sixty-four different nucleotide sequences.

3    And you don't know which one it is, do you?

4    A.  You don't know.

5    Q.  And if you keep adding amino acids, if you keep building

6    a probe that goes out to, if we -- if it turned out the next

7    one was degenerate to the four, we'd have to multiply this

8    by four, the next one could be degenerate by six, we'd have

9    to multiply that by six?

10   A.  You'd have a ton of different possibilities.

11   Q.  And you wouldn't know which one it is, would you?

12   A.  No.

13   Q.  You wouldn't know which one of those sequences hybridize

14   to something other than the EPO DNA, would you?

15   A.  I may not know that.

16   Q.  It gets pretty complicated, doesn't it?

17   A.  Most people skilled in the art would stop about the

18   second residue because it's too complicated with this.

19   Q.  Now, you testified on Tuesday that, to your knowledge,

20   based upon what you've seen in this case, the only person

21   who had quantities of EPO sufficient for determining the DNA

22   sequence of human EPO was Dr. Goldwasser; right?

23   A.  That's my understanding.

24   Q.  Now, let's be clear.  You have no personal knowledge, no

25   personal knowledge about EPO, do you?

1    A.  I've read a lot of papers about EPO.

2    Q.  You've read a lot?

3    A.  I have a lot of conversations with lots of people about

4    EPO.

5    Q.  Okay.  You had no experience working with EPO at any

6    time before January 1, 1984; correct?

7    A.  I have not done experiments with EPO.

8    Q.  Okay.  And you've never even tried to do experiments

9    with EPO, have you?

10   A.  I've been interested in other things, frankly.

11   Q.  And you've never produced a recombinant EPO

12   glycoprotein, have you?

13   A.  Never tried.

14   Q.  The information that you have about the cloning and

15   expression of recombinant EPO is based upon the publications

16   that you've read after the fact?

17   A.  Yes.

18   Q.  You weren't involved, were you?

19   A.  I was not focusing my research on EPO.

20   Q.  And in particular, you have no personal knowledge

21   whatsoever to bring into this courtroom to tell the jury

22   about who had access to or possession of urinary EPO back in

23   1983 or '84 or years before that?

24   A.  What do you mean by "personal knowledge"?

25   Q.  You have no experience of your own personal involvement

1    where you can tell us from being there on the ground at the

2    time who had access to what?

3    A.  I do rely on others' sworn testimony about what was

4    available and what was not available, but I have no personal

5    knowledge of what Dr. Goldwasser may have had in his

6    freezer.

7    Q.  So you're relying entirely upon what you have read?

8    A.  I read sworn testimony about --

9    Q.  Yeah?

10   A.  -- what's available, yes.

11   Q.  So you have seen some things, and based on that you have

12   arrived at an opinion; right?

13   A.  I absolutely have, yes.

14   Q.  Okay.  Did you perform any independent investigation to

15   determine what sources of urinary EPO there may have been

16   available to those skilled in the art, other than

17   Dr. Goldwasser, prior to 1984?

18   A.  I've done literature searches on Medline to see who did

19   have EPO other than Dr. Goldwasser.

20   Q.  Okay.  So you did a literature search.  Did you see in

21   the literature search references to somebody named Miyake?

22   A.  I did, yes.

23   Q.  Did you call up Dr. Miyake and ask Dr. Miyake who had

24   EPO available in 1983?

25   A.  I'm not sure that would help me, because I'm not sure he

1    would know what was going on, if he's going to tell me the

2    truth.  I have to rely on what's in the prior art, what's

3    published --

4    Q.  Well --

5    A.  -- to make an opinion.

6    Q.  I understand.  But you saw that Dr. Miyake was

7    referenced in the prior art as a person who purified urinary

8    EPO; right?

9    A.  Yes, yes.

10   Q.  Did you think that he might be able to lead you to or

11   identify some things that your Medline search hadn't

12   uncovered?

13   A.  Not really.

14   Q.  Okay.  Did you contact Sylvia Lee-Huang, who also

15   purified urinary EPO in the 1980s?

16   A.  No.

17   Q.  Did you contact Yanagawa in Japan, who had purified

18   urinary EPO?

19   A.  No.

20   Q.  No?  Did you speak with Zanjani at University of

21   Minnesota?

22        MS. BEN-AMI:  Your Honor, I object.  There's no

23   foundation to any of this.

24        THE COURT:  There is none, and sustained.

25   Q.  Doctors Goldwasser and Miyake published their protocol,

1   their recipe, for purifying urinary EPO in 1977; right?

2   A.  Yes.

3   Q.  And the publication that they made was made in a

4   prestigious journal; right?

5   A.  Yes.

6   Q.  It was peer-reviewed?

7   A.  Yes.

8   Q.  They offered empirical evidence in the publication that

9   demonstrated that the process actually worked?

10  A.  Yes.

11  Q.  And they also provided a disclosure that would enable

12  anyone who wished to use that process to purify EPO from

13  urine; right?

14          MS. BEN-AMI:  Objection.

15          THE COURT:  My fault.  Would you ask it again?

16  Q.  They also provided in that disclosure a teaching that

17  would enable anyone who wished to do so the ability to

18  purify EPO from urine; right?

19          THE COURT:  Who's "they?"  And it's my fault.

20          MR. DAY:  The skilled artisan in the field, anyone

21  reading the article.  And they, I'm sorry, is Goldwasser and

22  Miyake in their 1977 publication.

23          THE COURT:  All right.  Overruled.  He may have

24  that question.

25  A.  The paper does report purification procedure for

1   purifying human erythropoietin from urine.

2   **Q.**  And my question was that procedure, based on that

3   publication, could be practiced by anybody who was skilled

4   in the field at that time based on what was disclosed in the

5   article; right?

6          **MS. BEN-AMI:**  Objection, no foundation.

7          **THE COURT:**  Oh, no, overruled.  If he has an

8   opinion, he may give it.

9   A.   It's not enough to have the procedure, you have to have

10  urine in large quantities where the erythropoietin is

11  abundant.

12  **Q.**  Okay.  And in that article, it's Exhibit 2002, I think

13  it's already in evidence --

14         **MR. DAY:**  And perhaps we could just bring up the

15  first page of Exhibit 2002.

16  **Q.**  This is the Miyake Goldwasser publication we're talking

17  about from 1977, in the Journal of Biochemistry, I believe;

18  is that right?

19  A.   Yes.

20  **Q.**  You said that's a peer-reviewed and respected journal?

21  A.   I was on the editorial board of that journal about that

22  time, shortly after this time.

23  **Q.**  1977?

24  A.   I would say shortly after this time, so early '80s, yes.

25  **Q.**  When did you start medical school?

1    A.   Before this time, so --

2    Q.   Okay.

3    A.   I was on the editorial board of this journal, so I know

4    the quality of this journal and the work --

5    Q.   It's high quality; right?

6    A.   It's high quality.

7    Q.   And you said it's not just enough to have the protocol,

8    you also have to have access to the urine; right?

9    A.   Yes.

10   Q.   And Doctors Goldwasser and Miyake described in here just

11   where they got the urine; right?

12   A.   Yes.

13   Q.   They said they got it from Japan, from patients who had

14   aplastic anemia.  They said how much they pooled from

15   those --

16   A.   Yes.

17   Q.   And they said how they concentrated?

18   A.   Yes.

19   Q.   And there wasn't anything that prevented anyone who

20   wanted to get urinary EPO from going to Japan and collecting

21   urine from aplastic anemia patients?

22        **MS. BEN-AMI:**  Objection, your Honor.  No

23   foundation.

24        **THE COURT:**  The document speaks for itself.

25   Sustained.

1    **Q.**  Now, Miyake and Goldwasser were not the only source of

2    EPO purified urine that was available in the art at that

3    time, were they?

4    A.  No.  I'm sure that someone else has published or

5    purified EPO in maybe small amounts from human urine.

6    **Q.**  Okay.

7    A.  It's possible.

8    **Q.**  Okay.  Well, you saw disclosed in Amgen's patent, in the

9    background section of the patent, a description of

10   Dr. Chiba's process for purifying EPO from urine; correct?

11   And that's described in Amgen Exhibit AAG?

12          **MS. BEN-AMI:**  Your Honor, I would like a sidebar.

13          **THE COURT:**  You may have one.

14   SIDEBAR CONFERENCE, AS FOLLOWS:

15          **THE COURT:**  Wait a minute, I want to ask him first.

16   What's the relevance of this?

17          **MR. DAY:**  It's prior art.  This is the art.  This

18   is the state of the art.  He says that, you know, he

19   didn't -- based on the state of the art, the only way you

20   could get urinary EPO was from Goldwasser.  This shows he

21   was wrong, you can get it from a lot of places.

22          **THE COURT:**  Why shouldn't we get it?

23          **MS. BEN-AMI:**  He's talking about it being in the

24   background of the invention.  I wasn't allowed to examine

25   this witness about what was said in Lin's patent and

1    background of the invention.  And if I can't examine, then

2    it's beyond the scope of direct.

3            If he wants to just do the prior art, he can do the

4    prior art -- but he can't say this was in the background.

5    That's all my objection is.

6        **THE COURT:**  In other words, the point is that this

7    is out there but never formally disclosed to the patent

8    office.

9        **MS. BEN-AMI:**  It may have been disclosed, but I

10   wasn't allowed to ask the witness what is disclosed in the

11   background of the invention.  Then he's beyond the scope of

12   direct.

13       **THE COURT:**  I wasn't clear that I had done that,

14   candidly.  Can you show me in the --

15       **MR. DAY:**  In the transcript --

16       **THE COURT:**  In the transcripts where I precluded

17   you?

18           You agree that I did?

19       **MR. DAY:**  No.  In the transcript you let her go

20   through the background section, and read passages.

21       **MS. BEN-AMI:**  Only to read.

22       **THE COURT:**  Well, only to read -- well, of course I

23   did.  Because -- all right.  I'm not troubled by this.  He's

24   opened it up, you may have it on redirect.

25       **MS. BEN-AMI:**  Okay.

1              (Whereupon the sidebar conference concluded.)

2          **THE COURT:**  AAG is admitted, Exhibit 13.

3              (Exhibit marked in evidence.)

4  **(BY MR. DAY:)**

5  **Q.**  And do you have -- also, in addition to Chiba, Sylvia --

6  I'm sorry, Sylvia Lee-Huang had also published a process to

7  purify EPO from urine; correct?

8  A.  Yes.

9  **Q.**  And that's Amgen Exhibit NNA.  Are you familiar with

10  this publication, Doctor?

11  A.  Vaguely.  I haven't reviewed this recently, so --

12  **Q.**  This was published in the journal "Blood" in 1980.  Are

13  you familiar with that journal?

14  A.  I am.

15  **Q.**  Is that a peer-reviewed and respected journal in the

16  field?

17  A.  It is, yes.

18  **Q.**  Okay.

19          **MR. DAY:**  Amgen would offer into evidence, your

20  Honor, Amgen NNA.

21          **THE COURT:**  No objection to NNA?

22          **MS. BEN-AMI:**  No objection.

23          **THE COURT:**  It may be received, Exhibit 14.

24              (Exhibit marked in evidence.)

25  **Q.**  Now, you've also -- we heard this morning, deposition

1    testimony from Mr. Fritsch that was read into the record by

2    Roche's counsel.  Do you recall that?

3    A.  Yes.

4    **Q.**  And in that deposition testimony they began at a

5    point in time, I think they started in May or April of 1984.

6    Do you recall that?

7    A.  Yes.

8    **Q.**  And they began with a passage about Dr. Fritsch

9    contacting -- or contracting with Dr. Miyake to supply

10   urinary EPO?

11   A.  Yes --

12   **Q.**  But, in fact, you know, based upon your review in this

13   case, that GI had worked with Miyake long before that in an

14   effort to get urinary EPO, they had just failed to come to

15   terms on how much they would pay Miyake for the urinary EPO;

16   right?

17             **MS. BEN-AMI:**  Objection, your Honor.

18             **THE COURT:**  Sustained.  This witness can't testify

19   to that.

20   **Q.**  Well, let me ask you, would you please turn to your

21   expert report of May 8th, Paragraph 28.

22             **THE COURT:**  It will be helpful to me -- and when

23   she color coded this, this was very helpful -- what color

24   are we looking at here?

25             **MR. DAY:**  I didn't get a color-coded copy.

```
 1              THE COURT:  Red, thank you.  I'll take help

 2   wherever I can.

 3   Q.  So, Dr. Lowe, would you please read Paragraph 28 of your

 4   May 8 report to the jury?

 5   A.  Yes.  This --

 6              MS. BEN-AMI:  Objection, your Honor.

 7              THE COURT:  Wait a second.  No, sustained.

 8              MR. DAY:  May I have a sidebar, your Honor?

 9              THE COURT:  You may.

10   SIDEBAR CONFERENCE, AS FOLLOWS:

11              THE COURT:  Here's how I come at this.  This is

12   clearly an admission, and it's relevant, but it depends upon

13   hearsay.  Now, experts can give their opinion based upon

14   hearsay, and you let most of his opinions in without any

15   challenge on the basis, but now you want the hearsay.  My

16   problem is simply that this is all hearsay.  He doesn't know

17   what transactions took place, and the like.

18              MR. DAY:  My problem is, your Honor, this morning

19   you allowed Roche to put in a deposition that created the

20   impression that as of April or May 1984 was the first time

21   they contacted Miyake.

22              THE COURT:  You're right.

23              MR. DAY:  And this --

24              THE COURT:  You're right, I did.

25              MR. DAY:  The evidence is to the contrary.
```

1        **THE COURT:**  But can't you prove it with

2   competent -- well, he may know it in the sense that he

3   believes it, and we all believe it, but it has to be a

4   matter of competent proof.  You can't get it out of him.

5        **MR. DAY:**  I need to be able to rebut.  They're

6   creating an impression with this witness that's false before

7   the jury.  His own report rebuts the impression they're

8   creating.

9        **THE COURT:**  Arguably that's so.  I followed that, I

10  drew the impression from the excerpts.  I will allow you to

11  examine this witness to say, Now, you, sir, based upon what

12  you've looked at, you don't believe that was the first time

13  these people talked, do you?

14       **MR. DAY:**  Okay.

15       **THE COURT:**  You don't believe it, and if he says,

16  Well, yes, I do, then you've got it because you can impeach

17  him by the report.  But if he says, consistent with what

18  apparently is the existential reality, that's the most you

19  can get out of this.

20       **MR. DAY:**  I understand.  Thank you.

21       (Whereupon the sidebar conference concluded.)

22  **(BY MR. DAY:)**

23  **Q.**  Do you have your expert report in front of you, sir?

24  **A.**  Yes, I do.

25  **Q.**  I want you to have it so you can refresh your

 1    recollection.

 2            This morning we listened to deposition testimony

 3    read into the record from Dr. Fritsch concerning a point in

 4    time in the spring of 1984, and regarding a contract that he

 5    then entered into with Dr. Miyake to obtain EPO purified

 6    from urine; right?

 7    A.  Yes.

 8    **Q.**  Now, based upon your review of the record in this case,

 9    sir, do you believe that that was the first time that GI had

10    contacted Dr. Miyake in an effort to obtain EPO purified

11    from urine?

12    A.  No.  My understanding is that --

13            **MS. BEN-AMI:**  Objection.

14            **THE COURT:**  No, he -- again, but it's the same

15    limitation that we talked about.

16            Here's the problem.  In order to give his opinions,

17    an opinion witness looks at a lot of stuff.  Then he comes

18    in, he says, I've looked at this stuff and I give you my

19    opinions.  The law allows that because that will help you to

20    decide the case.

21            The fact he's looked at a lot of stuff doesn't make

22    that stuff admissible.  That we go step by step.  Now, this

23    cross-examination is saying to him, Now, based upon the

24    stuff you looked at, you didn't think this was the first

25    time, I guess is the question, and he says, No, I didn't.

```
 1    Now, Mr. Day can follow that up.

 2            But again, this is limited.  This witness wasn't

 3    there when A talked to B and they made a request or they

 4    didn't.  But in order for you to evaluate this witness'

 5    testimony, you are entitled to know what this witness

 6    thinks, what he thinks his opinions are based on.

 7            So it's like the newspaper.  This isn't the truth

 8    that Miyake talked and there was had an agreement with

 9    Fritsch; it is evidence, if you believe it, that this

10    witness understood certain things, and based on that

11    understanding, to the extent it is, he expresses an opinion

12    or opinions.  That's what we're doing.  Mr. Day can have it,

13    but it's limited because this witness wasn't there.  Limited

14    to what he believes.

15            Go ahead, Mr. Day.

16    Q.  Did you, based upon your review, did you believe, did

17    you come to a conclusion that Dr. Fritsch had concluded a

18    year earlier, as of May 1983, that he needed additional

19    sequence information?

20    A.  My understanding was that he did need more sequence

21    information.

22    Q.  And that he came to that understanding a year earlier,

23    as of at least May 1983?

24    A.  Well, I don't know when he came to that understanding,

25    but much, much earlier, yeah.
```

1    Q.  Well, did you understand -- when do you understand that

2    Dr. Fritsch first contacted Dr. Miyake in order to obtain --

3    A.  I'd have to go and reread those documents and the

4    letters and -- to find the date.  I don't remember, off the

5    top of my head.

6    Q.  Well, it's set forth in your expert report, isn't it?

7    A.  It is, but --

8    Q.  You don't rely on that?

9    A.  I do, but I can't have 200 pages of text in my head, I'm

10   sorry.

11   Q.  It's set forth in Paragraph 28, which is right in front

12   of you.

13   A.  So you have a paragraph that you'd like me to look at?

14   Q.  Yeah.

15   A.  Okay.

16   Q.  And so why don't you read that paragraph to yourself.

17   A.  So would you like me to read it out loud or to myself?

18          THE COURT:  He'd like you to, but Ms. Ben-Ami

19   objected and I sustained it.  I imagine he'd still like you

20   to, but nothing's changed.

21   Q.  So I asked you to do it to yourself.

22   A.  So Paragraph 28?

23   Q.  That's right.

24   A.  Okay.  So the back and forth here indicated that the

25   date was May 1983.

1    **Q.**  In May 1983 Dr. Fritsch realized that he needed more

2    sequence information?

3    A.  Well --

4    **Q.**  That's your understanding?

5    A.  At least that early.  For all I know, he knew that in

6    January of '83.

7    **Q.**  Even before, perhaps?

8    A.  Perhaps before.

9    **Q.**  He also knew --

10            **MS. BEN-AMI:**  Objection, your Honor.  This is --

11           **THE COURT:**  And -- no, sustained, to the extent

12   this is all limited.  Mr. Day is eliciting what this witness

13   thought that the situation was and on which his opinions are

14   based.

15           Go ahead, Mr. Day.

16   **Q.**  And your understanding was, based upon what you

17   reviewed, that one of the primary sources for useable

18   amounts of urinary EPO for sequencing was Dr. Miyake?

19   A.  One source was perhaps Dr. -- I don't know how much

20   protein Dr. Miyake had available at the time.  It was enough

21   to do what Fritsch wanted to do.

22   **Q.**  Okay.  And that for financial reasons, GI simply failed

23   to pursue contracting with Dr. Miyake to obtain that urinary

24   EPO at that time; right?

25   A.  Yes --

1          **MS. BEN-AMI:**  Objection.

2          **THE COURT:**  Again, limited.

3          That's what you thought, right?

4          **THE WITNESS:**  Well, that's what the documents say.

5          **THE COURT:**  All right.  Well, we don't know whether

6     they're true.  He looks at documents.  That's what you

7     thought, right?  That's my question.

8          **THE WITNESS:**  Well, that's a piece of evidence that

9     says that the financial issues were contributing to their

10    decision not to pay Dr. Miyake.  Of course, they, in

11    principle, could have gotten it from someone else, I

12    suppose.  Dr. Goldwasser.

13    **Q.**  Now, you also understand that Dr. Miyake, based upon

14    what you've reviewed, you understand that he was independent

15    of Dr. Goldwasser at that time, he --

16    A.  At that time, it's my understanding.

17    **Q.**  So he was an independent source of urinary EPO?

18          **MS. BEN-AMI:**  Objection, your Honor.

19          **THE COURT:**  Again --

20    **Q.**  As you understand it, based upon your review?

21          **THE COURT:**  As limited, I'll let him have it.

22          You thought that he was one source; is that right?

23          **THE WITNESS:**  Am I answering the question about --

24    **Q.**  It's always best to answer the judge's question.

25    A.  Okay.

1    Q.   I'll follow up.   You answer the judge's question.

2         **THE WITNESS:**   Your Honor, would you please restate

3    the question?

4         **THE COURT:**   You thought that Goldwasser was one

5    source for the material?

6         **THE WITNESS:**   Yes.

7    Q.   And you thought that Miyake was another different source

8    for the material; correct?

9    A.   It was another source as well.   The issue of

10   independence or not, I can't speak to.   I don't know if he

11   was independent or not.   And that's a gray scale, of course.

12   Q.   Okay.   Dr. Lowe, if others tried to make the same

13   invention but failed to do so, others who are skilled in the

14   art and have all of the resources and all of the techniques

15   and cookbooks and learning of the art available to them, but

16   they fail, they fail to make the invention, now, that's

17   objective evidence that tends to indicate that the invention

18   was not obvious; right?

19        **MS. BEN-AMI:**   Objection, your Honor.

20        **THE COURT:**   Overruled.

21   A.   Forgive me, but would you ask the question again?   I

22   lost the --

23   Q.   Sure.

24   A.   -- your point.

25   Q.   If others skilled in the art who have access to all the

1   resources and the learning and the knowledge of skilled

2   artisans in the field at the time try and fail to make the

3   invention that the inventor has claimed, that fact that

4   other skilled artisans tried and failed, that's objective

5   evidence that the invention was not obvious; right?

6   A.   I'm not sure I agree with that.  I don't think that's

7   objective evidence.  I would say that just because someone

8   doesn't finish it out doesn't mean it's not obvious to --

9   Q.   Okay.  In your opinion.

10  A.   In my opinion.

11  Q.   Now, before December 1983, okay, you would agree that

12  there was a race to obtain and isolate the DNA for human

13  EPO?

14  A.   The word "race" has been used in this area, yes.

15  Q.   There were many skilled, highly competent,

16  well-resourced scientists trying to get what Dr. Lin

17  isolated and cloned; right?

18  A.   There were -- they had a linebacker there on the field,

19  and that was the inability to get enough protein, to get

20  enough sequence to get the gene to do the rest.

21  Q.   Even though Dr. Miyake was an independent source, back

22  in the spring of 1983, from whom anyone could obtain that

23  EPO, if they wished, all you had to do was pay him?

24        MS. BEN-AMI:  Objection.  No foundation.

25        THE COURT:  Sustained on that ground.

1   Q.   Before 1983 Biogen tried and failed to isolate and clone

2   the DNA for human EPO; right?

3   A.   Yes.

4          **MS. BEN-AMI:**  Your Honor --

5   Q.   In arriving at your obviousness --

6          **THE COURT:**  Are you objecting?

7          **MS. BEN-AMI:**  Yes.  I'm objecting to all this as

8   being nonevidence, the underlying facts.

9          **THE COURT:**  Well, how do you know that about

10  Biogen?

11         **THE WITNESS:**  I only know that based on some

12  documents that I read.

13         **THE COURT:**  Ah, limited, but it may stand.  But

14  she's right to limit it.  He doesn't know if Biogen tried

15  and failed, but he's looked at stuff and that's what he

16  thinks, apparently.  So we'll see what his opinions are

17  based on, because I let you hear his opinions.

18         Go ahead, Mr. Day.

19  Q.   Based on the documents you've reviewed, to the extent

20  that you've reviewed any documents in this case, you also

21  believed that Genentech tried and failed to isolate and

22  clone the gene for human EPO; right?

23  A.   Now, that's Genentech.  I really haven't looked at to --

24  I mean, I don't know what they've done, what they did.  I

25  don't know what they were doing about EPO.

**Q.**  Apropos of Ms. Ben-Ami's objection, what exactly did you

do to investigate who else in the field actually tried to do

what Dr. Lin succeeded in doing?

A.  So it's difficult, if not impossible, to know when

someone has tried and failed.  The way that I look at

someone's efforts to succeed or not is I do a literature

search, because the literature is published, peer-reviewed

generally documented evidence that somebody has done

something.

       Regrettably, no one is going to publish in a

high-quality journal that we tried something and it didn't

work.  And so when I look for evidence of process and

procedure, I look in the peer-reviewed literature.  If you

look in the peer-reviewed literature you see several pieces

of evidence that people tried and succeeded, I don't know

who's out there in the middle of nowhere trying and failing

from that sort of thing.

       Now, I could call people up and I'd say, Did you

know so-and-so, were they trying to do this and trying to do

that?  How would I know if what they were telling me is

accurate?  I have no idea.  So I have to rely on two things.

One is the peer-reviewed literature; and two, are documents

that have been vetted in court, and pieces of paper that fly

back and forth that have been provided to me or that I could

look up on the patent, free patent search thing, and figure

1    that out myself.

2    **Q.**  Okay.  When you say documents that have been vetted in

3    court, did you review the sworn testimony of Dr. Axel

4    Ullrich of Genentech about his attempt and failure to

5    isolate and clone the DNA for EPO?

6              **MS. BEN-AMI:**  Your Honor --

7              **THE COURT:**  No, did he -- it's not evidence of

8    the -- these are sort of like the red hat questions.

9    Appropriate to ask those questions, and appropriate to find

10   out what this witness thinks and upon which he based his

11   testimony, but no evidence that any of that stuff is true.

12             Do you understand the question, Mr. Day's question?

13   Sir?

14             **THE WITNESS:**  Do I?

15             **THE COURT:**  Do you?

16             **THE WITNESS:**  Yes.

17             **THE COURT:**  You may answer.

18   A.  I have not looked at any court proceedings, that I

19   recall, where Dr. Axel is opining on or explaining what he

20   has tried and failed to do.

21   **Q.**  Axel Ullrich, not Dr. Axel.  A different scientist.

22   A.  Axel Ullrich.  I recall some testimony from Axel Ullrich

23   about cloning genes using degenerate probes.

24   **Q.**  Do you remember his testimony?

25             **THE COURT:**  Wait a second.  I need, in view of the

1     nature of your questions, I need to give the jury another

2     caution.

3             It must be obvious to you that this is not the only

4     case in this area of scientific and commercial endeavor.

5     There are other cases.  There are other administrative

6     proceedings within the executive.  There are competitors of

7     Amgen and Roche, some of whom have been referred to here.

8     Now, if those cases govern proceedings in this case,

9     legally, I'll tell you, and we're either not going to hear

10    about it or I'll tell you and I'll tell you how those cases

11    operate.

12            If they don't govern, govern now, as matter of law,

13    proceedings in this case, the truth is we're not terribly

14    concerned about what some other administrative agency or

15    some other jury or some other judge had to say about this.

16    They're not witnesses here.  You 12 men and women are the

17    only judges of the facts in this case.

18            So when lawyers stand up and say, Well, now, in the

19    prior proceedings this or that, maybe you need to hear that

20    in order to know who knew what when, as matter of fact.  But

21    what came out of that proceeding, if anything, what some

22    other judge thought, what some other jury thought, what some

23    other administrative agency thought, we don't care.  You're

24    going to decide this case, nobody else.

25            Go ahead.

1            **MR. DAY:**  Thank you, your Honor.

2    **Q.**  So we were talking about Axel Ullrich, not Dr. Axel.

3    And my question was:  Did you review Dr. Ullrich's sworn

4    testimony regarding his attempts and failure to isolate and

5    clone the DNA for EPO?

6    **A.**  You know, I may have.  What I recall is that there was

7    some testimony about using degenerate oligos and the

8    likelihood that that would allow you to clone EPO.  That's

9    what I recall.

10   **Q.**  Did you do anything to investigate on your own

11   initiative why or what happened to Genentech with respect to

12   their effort?

13   **A.**  No.

14   **Q.**  Do you know what -- who Dr. Axel Ullrich is?

15   **A.**  Vaguely.

16   **Q.**  He was one of the leading, in fact --

17           **THE COURT:**  Well, you can't testify and --

18           **MR. DAY:**  I'm sorry.  I apologize, your Honor.

19           **THE COURT:**  You start off, He was one of the

20   leading -- strike that out.  That's flat out testimony.

21           Go ahead.

22           **MR. DAY:**  I'm sorry, your Honor.  I apologize.

23   **Q.**  Who was he?

24   **A.**  He was a scientist at Genentech.

25   **Q.**  And --

1    A.   Originally.

2    **Q.**   And prior to 1983 what genes did he clone?

3    A.   I can't remember.

4         **THE COURT:**   You're slipping into does he know.   And

5    I'm not so sure he knows anything -- wait a second.   I said

6    that wrong.   I'm not commenting on anybody's testimony in

7    any way.   And I say that with utmost respect to the witness

8    and to counsel here.

9         But there's a difference between knowing something

10   because you looked at stuff, papers, which I'm limiting, and

11   knowing something because you did the experiment or because

12   you knew the person he's talking about.   He's a colleague of

13   mine, I know him.   I practiced with him.   I was present when

14   he gave this or that speech, that type of thing.

15        We have to be careful about what "know" is.   If you

16   know it only because you looked at stuff to get ready to

17   testify here, limited, for the fact that that figuring out

18   what weight you're going to give to this witness' testimony.

19   If he knows something because he was there and he dealt with

20   this person, then that's evidence.   Like any other evidence,

21   you can believe it, disbelieve it, but it's evidence.

22        Go ahead, Mr. Day.

23        **MR. DAY:**   Thank you, your Honor.   I'm just about

24   done.

25   **Q.**   Did you, in the course of your investigation, did you

1    come to have an understanding with respect to Dr. Orkin's

2    efforts to isolate and clone human gene for erythropoietin?

3    A.  Yes, I did.

4    **Q.**  You're aware that he failed?

5    A.  I am aware that he failed.

6    **Q.**  And do you know who Dr. Orkin is?

7    A.  I do.

8    **Q.**  And who is he?

9    A.  He is a professor over here at Harvard, Children's

10   Hospital.

11   **Q.**  And would you consider him one of ordinary skill in the

12   art at the time?

13              **MS. BEN-AMI:**  Objection, your Honor.  No

14   foundation.

15              **THE COURT:**  Overruled.  He may testify.  Did you?

16              **THE WITNESS:**  At the time, 1983, '84, I would

17   presume he was of ordinary skill in the art.

18   **Q.**  How many genes, at that point in time, had he cloned; do

19   you know?

20   A.  I have no idea.

21   **Q.**  And notwithstanding -- strike that.

22              With respect to -- let me just end on this note.

23   Based upon the investigation that you've done in this case

24   and the analysis that you've done, you understand, don't

25   you, that there was no one in the world who succeeded in

1    actually isolating and cloning the human EPO gene before

2    Dr. Lin; right?

3    A.   It's not relevant to my opinion about whether it was

4    obvious to -- he may have been first, but other people

5    succeeded and, in my mind, based on that and other

6    information, first, not first --

7    Q.   I'm asking for your understanding, yes or no.  Do you

8    understand that he was the first or not?

9    A.   He clearly was the first of many.

10            **MR. DAY:**  Thank you very much.

11            **MS. BEN-AMI:**  May I redirect, your Honor?

12            **THE COURT:**  You may.

13                     **REDIRECT EXAMINATION**

14   **(BY MS. BEN-AMI:)**

15   Q.   Doctor, let's now get through this.

16            We're not looking at what was going on in 1981 in a

17   vacuum, we were looking at what had happened by

18   November 1983, right, October/November 1983?

19            **THE COURT:**  Well, that's not a question.  So put a

20   question.

21   Q.   Do you have the Maniatis book?  When was this published?

22   A.   1982.

23   Q.   So when we look at what people were doing prior to 1982,

24   did they have the book?

25   A.   No.

1  Q. So now, in the book, do we have that part of the file

2  history where it says that the Maniatis book was shown to

3  the examiner?  Do you see those pages there?

4  A. Yes.

5  Q. Now, I'd like to ask you to look at pages, such as

6  page 227.

7  A. 227.

8  Q. Now, in the pages Amgen didn't point the examiner to,

9  did Maniatis teach things about finding DNA when the DNA was

10  rare or the RNA was not made that much?

11         **MR. DAY:**  Objection, leading.

12         **THE COURT:**  Sustained, on that ground.  You're

13  leading the witness.

14  Q. Looking -- you've looked at this book; right?

15  A. I have.

16  Q. And in 1982 did this -- can you tell us what this book

17  told people about finding rare proteins RNA?

18         **MR. DAY:**  Outside the scope of the --

19         **THE COURT:**  Overruled.

20  A. This book, among other things, describes approaches,

21  technical approaches to clone genes, as we talked about the

22  other day.  And on these pages, 226, 227, there's a section

23  on using synthetic oligonucleotides to clone genes, clone

24  cDNAs.

25  Q. Now, the page you're looking at, was that page there,

1    was that page in the list that they, Amgen, cited to the

2    examiner?

3    A.   I don't recall that it was on that previous --

4         **MS. BEN-AMI:**  Can you go back, please?

5    **Q.**   It's 227.

6    A.   So 226/227 is the section that refers to synthetic

7    oligonucleotides in the book.

8    **Q.**   Can you tell the jury whether Amgen cited that part to

9    the examiner?

10   A.   It appears that they did not cite it to the examiner.

11   **Q.**   So it's 1983, and let's talk about what people had in

12   1983.  Mr. Day went through with you this notion of

13   degenerate probes, where you have to do two and four and,

14   you know, multiplied, and you multiplied.  Do you recall

15   that?

16   A.   Yes.  Yes.

17   **Q.**   Everyone multiplied.

18        Had that been done before November '83, making

19   degenerate probes?

20   A.   Yes.

21   **Q.**   How much -- can you give the jury some examples?

22   A.   There's an Anderson paper, BPTI cloning.  There's a

23   paper by Suggs where they use these sorts of things, many

24   different papers.

25   **Q.**   So, in your opinion, based on your knowledge and

1    experience, was Dr. Lin the first person to use degenerate

2    probes?

3    A.  No, no, he wasn't the first person to use degenerate

4    probes.

5          **MS. BEN-AMI:**  Can I have Table 1 of the patent,

6    please, 1 of the patent.  We only have one specification,

7    so -- Example 1, Table 1.

8    **Q.**  And as we're looking for that, you talked about the

9    linebacker, the need for the protein, Doctor.  Genetics

10   Institute, based on what you read, right, in 1983,

11   recognized what about the protein?

12         **MS. BEN-AMI:**  Objection, leading.

13         **THE COURT:**  No, no, overruled.  She may tell us.

14   Well, she can't tell us what's in Genetics Institute's mind,

15   but I assume she's asking, as disclosed there, what would

16   one skilled in the art know about the gene.  Is that it?

17         **MS. BEN-AMI:**  No, I was just moving quickly.

18         **THE COURT:**  Withdrawn.  You put a question.

19         **MS. BEN-AMI:**  Let's go back here.  Can you go to

20   the example on the table?

21   **(BY MS. BEN-AMI:)**

22   **Q.**  Now, this table is from Amgen's patent.  And in Amgen's

23   patent, it says, Human EPO was isolated from urine and

24   subjected to tryptic digestion using these fragments; right?

25   Do you see that?

1    A.   Yes.

2    Q.   And that information, was that information disclosed in

3    the prior art, the Sue paper, and whatnot?

4    A.   No.

5    Q.   Who did that information come from, based on your

6    understanding, based on the sworn testimony you've read?

7    A.   Yes.  My understanding is that the peptides that gave

8    those sequences were sent from Dr. Goldwasser to Amgen.  And

9    that Amgen -- this is in the summer of '83, I believe -- and

10   then Amgen sequenced those peptides to produce the data

11   that's in Table 1.

12   Q.   And based on the reading that you've done, and sworn

13   testimony, once these -- this information was sequenced, how

14   long did it take Dr. Lin to make these degenerate probes?

15   A.   I don't know exactly, but a couple of weeks, roughly.

16   Q.   We'll ask Dr. Lin and we'll hear exactly how long it

17   took it to design the probes.

18        So let me ask you this:  Did Biogen -- did

19   Dr. Goldwasser give this material to Biogen?

20   A.   Not that I know.

21        MR. DAY:  Your Honor, I object.  This is outside

22   the scope.

23        THE COURT:  Overruled.  No, it's not, but the same

24   limitation.  He doesn't know.

25        But did you think that Goldwasser gave or sold the

 1    material to Biogen?

 2            **THE WITNESS:**  Not that I know of.  My understanding

 3    is that they didn't have these peptides.

 4    **Q.**  And when Biogen wanted to do this cloning of the EPO

 5    gene, based on your reading, did they ask Dr. Goldwasser

 6    whether or not he would give them the gene -- the protein?

 7            **MR. DAY:**  Objection, leading.

 8            **THE COURT:**  Yes, it is.  Sustained.

 9    **Q.**  Can you tell us, based on your reading, whether or not

10    Biogen sought protein?

11    A.  My understanding is that Biogen was seeking protein to

12    do protein sequencing on EPO.

13    **Q.**  And based on your reading and the sworn testimony, can

14    you tell us whether or not Biogen was given protein by

15    Dr. Goldwasser for cloning?

16    A.  My reading of the documents indicates that they were

17    seeking protein from Dr. Goldwasser, and it was not provided

18    to them.

19    **Q.**  And while Genetics Institute was searching for protein,

20    and it's your understanding, as Mr. Day elicited, when,

21    based on what you've read, did Genetics Institute finally

22    get the protein?

23    A.  Based on some of what we heard this morning, sometime

24    around April or May of '84.

25    **Q.**  And based on your reading, after they got the protein,

1    how long did it take them to actually get the gene?

2    A.   About six to eight weeks.

3    Q.   So based on your reading -- and we have Dr. Fritsch's

4    testimony that's in evidence -- based on that, once Genetics

5    Institute had the protein, what was your understanding of

6    how long it took them to do what Dr. Lin did?

7              MR. DAY:   Your Honor, I object.   This is

8    argumentative and leading.   Just building a lot of

9    narrative.

10             THE COURT:   Yes, but I am going to give her the

11   same latitude I gave you.   Limited to the fact that's what

12   he thinks, based on the stuff he looked at.

13             What did you think?

14             THE WITNESS:   May I have the question repeated,

15   please?

16             THE COURT:   How long did it take them, based upon

17   the stuff you looked at?

18             THE WITNESS:   "Them" meaning Genentech?

19   Q.   Genetics Institute?

20   A.   Genetics Institute.   It took them approximately two

21   months.

22             THE COURT:   That's what you think?

23             THE WITNESS:   That's what I think.

24             THE COURT:   All right.

25   Q.   How long did they work to finally get the protein so

1    that they could do this work?

2    A.   Two to three months.

3    **Q.**   To get -- how long were they in discussions with

4    Dr. Miyake, based on your reading, before they finally got

5    the protein?

6    A.   Well, a couple of years.  I mean, they've been

7    negotiating with Miyake for some time.

8    **Q.**   And when they finally got the protein, what were they

9    able to do with it?

10   A.   They cut it up into pieces and determined the sequence

11   of these peptides, pieces, and made synthetic

12   oligonucleotides, cloned the gene, put it into CHO cells,

13   made biologically active EPO.

14   **Q.**  Based on the reading you had in this case, was Genetics

15   Institute ever given the protein by Dr. Goldwasser?

16   A.   I don't believe they were ever given protein from

17   Dr. Goldwasser.  I've seen no evidence that they have.

18   **Q.**  So in 1983 Mr. Day asked you questions about pulling out

19   the DNA from the library, right?  If you had that sequence

20   of protein, right, the methionine, or the alanine, the

21   proline, whatever the --

22   A.   Yes.

23   **Q.**  Was that the only way to get a DNA sequence, pulling it

24   out of the library?

25   A.   No.

1    **Q.**  What was the other way?

2    A.  So if one had the complete sequence of a protein, EPO,

3    in this case, one could go to the codon table and design a

4    DNA sequence that would instruct the cell to make EPO.

5    **Q.**  And you don't need to know all the possibilities to --

6    in that instance, can you explain how that relates to this

7    degeneracy concept?

8    A.  Yeah.  The degeneracy is of modest concern.  Somewhere

9    organisms prefer to use one codon versus another.  And so

10   all things being equal, you pick a codon that would be, say,

11   more effective in a CHO cell.  But that's stuff that was

12   known at the time.  So you just go to the codon table and

13   design a gene and have the pieces of the gene assembled.

14   **Q.**  And if there are four choices, do you have to make four

15   times or what?

16   A.  No, you pick one.  Pick one that's used --

17   **Q.**  And at this time, October '83, were there machines or

18   did you have to do it by hand, or what was available?

19   A.  There were machines to make the DNA.

20   **Q.**  So if you had the protein sequence in 1983, how

21   difficult was it to make the DNA sequence from it?

22   A.  Well, you make pieces of DNA.

23        **MR. DAY:**  Objection, your Honor.  This is going way

24   outside the scope of cross.

25        **THE COURT:**  This is.  Sustained.

1    **Q.**  The article that Amgen showed you, the --

2         **MS. BEN-AMI:**  Could you leave that back up?  I'm

3    sorry.

4    **Q.**  Amgen showed you an article that they said had 26 amino

5    acids in it?

6    **A.**  Yes.

7    **Q.**  Now --

8         **MS. BEN-AMI:**  Can I have the table again?

9    **Q.**  Can you explain what this table is in the Lin patent?

10   Can you explain this?

11   **A.**  Yes.  So this is a table of the --

12        **MR. DAY:**  Your Honor, this is also outside the

13   scope.  Could have done this on direct.

14        **THE COURT:**  Sustained.  Please, there's no need to

15   argue.  I'm following.  Sustained on that ground.

16   **Q.**  In the Sue and Sutkowski paper, did they have multiple

17   sequences of amino acids or just one?

18        **MR. DAY:**  Objection, leading.

19        **THE COURT:**  It is leading.  And the paper speaks

20   for itself.  But he may interpret the paper.

21        **THE WITNESS:**  So the paper reports --

22        **THE COURT:**  Well, there's no question because I

23   sustained it.  She'll have to try again.

24   **Q.**  You've read the paper; right?

25   **A.**  I have, yes.

1   Q.  How many different pieces of protein sequences were in

2   the paper?

3   A.  One piece.

4   Q.  And would you look at the '933 patent, column 8?

5           MS. BEN-AMI:  And column 8, ladies and gentlemen,

6   of your patent, whatever number you have.  Can I have column

7   8, line 40 to 45?

8   Q.  Now, this is Amgen's patent application.  Can you read

9   to the jury what Amgen says had been disclosed with regard

10  to the amino acid sequence of EPO in the prior art?

11  A.  It says, "The above studies relate of course to amino

12  acid sequences of proteins other than erythropoietin, a

13  substance for which no substantial amino acid sequence

14  information has been published.  In co-owned" --

15  Q.  That's fine.  That's all I wanted you to read.

16          So based on what Amgen's patent said, in your own

17  reading, was there substantial amino acid sequence

18  information published by October '83?

19          MR. DAY:  Objection, leading.

20          THE COURT:  No, overruled.  She may have it.

21  A.  As the words say, there was at that time no substantial

22  amino acid sequence information published.

23  Q.  And that is -- based on your reading, why was Biogen

24  asking Dr. Goldwasser for his help?

25          MR. DAY:  Objection, your Honor.

1              **THE COURT:**  Sustained.

2    **Q.**  Based on your reading, do you recall the context of

3    Dr. Goldwasser's discussions with Biogen?  And if so, how

4    did they affect your opinion?

5    A.  Yes, I --

6              **MR. DAY:**  Objection, your Honor.  It's outside the

7    scope of the cross.

8              **THE COURT:**  Well, I'll let you have the second part

9    of the question.

10             How does your reading about Goldwasser and his

11   interaction with others affect your opinion?

12             **THE WITNESS:**  It affects my opinion in a major way,

13   in that my reading of documents and my understanding of the

14   situation is that Dr. Goldwasser had a fair amount of this

15   protein, but there was one destination, if you will, for

16   enough of the protein sequencing and that destination was

17   Amgen.  Dr. Goldwasser was providing small amounts of

18   protein to other entities in quantities not necessarily

19   sufficient for sequencing, and that would include Biogen, as

20   I recall.

21   **Q.**  And did Dr. Orkin, based on your reading, have

22   significant amounts, can you tell us -- strike that.

23             Did you read about what Dr. Orkin had?

24   A.  I did read about Dr. Orkin's efforts.

25   **Q.**  And can you tell us what protein he had?

1   A.  His efforts, as I recall, were focusing on that amino

2   terminal peptide sequence that was published in the Sue and

3   Sutkowski manual.

4   Q.  In October 1983, was there any information concerning

5   the accuracy or inaccuracy of that sequence?

6   A.  There was.

7   Q.  What was known?

8   A.  The information that I'm aware of suggested that there

9   were errors in that sequence.  I think residue 24, for

10  instance, was incorrect.  And there may have been other

11  errors in that sequence.

12  Q.  Do you have the '008 patent?

13         MS. BEN-AMI:  Can I have the claims of

14  the '008 patent on the screen?

15  A.  I have the 008.

16         MS. BEN-AMI:  No, your Honor, I withdraw that.

17         I pass the witness, your Honor.

18         THE COURT:  All right.  Anything else for this

19  witness?

20         MR. DAY:  Yes.  I have a few things, your Honor.

21                    RECROSS-EXAMINATION

22  (BY MR. DAY:)

23  Q.  Let me hand you what's been marked as Amgen Exhibit GTP.

24  You testified that, redirect examination from Ms. Ben-Ami,

25  that shortly after GI obtained urinary EPO from Dr. Miyake

 1    they succeeded in isolating and cloning DNA for human

 2    erythropoietin; right?

 3    A.  Yes.

 4    Q.  Have you ever seen Exhibit GTP before in the course of

 5    your investigations?

 6    A.  I don't recall I've seen this.

 7    Q.  Remember that we talked a little bit about what

 8    information GI had learned that would help them go forward

 9    with their own cloning efforts, what information they had

10    learned about Dr. Lin's success?

11    A.  Uhm-hmm.

12    Q.  Do you recall that?

13    A.  I recall you asking about that, yes.

14    Q.  In the course of your investigation, did you come to

15    understand that GI had learned that Dr. Lin had succeeded by

16    using urinary EPO that had been supplied by Dr. Goldwasser?

17            MS. BEN-AMI:  Objection, your Honor.

18            THE COURT:  Sustained.  Now this is beyond the

19    scope.  Go ahead.

20    Q.  Did you understand that Dr. -- that GI learned that

21    Dr. Lin had used tryptic fragments such as Ms. Ben-Ami put

22    up on the board here during recross?

23            MS. BEN-AMI:  Objection, your Honor.

24            THE COURT:  No, sustained.  Same grounds.

25    Q.  You said that there was no evidence that Dr. -- that GI

1    obtained any of Dr. Goldwasser's urinary EPO; is that right?

2    A.  I think I said not enough to do protein sequencing.

3    **Q.**  So you're aware that GI obtained urinary EPO from

4    Dr. Goldwasser?

5    A.  I'm aware that they had small amounts from

6    Dr. Goldwasser.

7    **Q.**  How did they obtain it, in your understanding?

8    A.  I presume that they wrote him, phoned him.  I don't

9    really know exactly how they got that.

10   **Q.**  What is your understanding based upon, that they, in

11   fact, got urinary EPO from Dr. Goldwasser and how much did

12   they get?

13            **MS. BEN-AMI:**  Objection.  No foundation.

14            **THE COURT:**  No, overruled.  He may answer.

15            Do you know?

16            **THE WITNESS:**  You know, off the top of my head I

17   don't recall exactly how much.  But what I do recall is

18   seeing Dr. Goldwasser's logbooks of what he was sending out

19   to whom and when, and what amounts.  And I recall an entry

20   in that notebook about, at least one, about sending it to

21   someone at Biogen.

22   **Q.**  I'm talking about Genetics Institute.

23   A.  And Genetics Institute and some other places.

24   **Q.**  And do you recall that -- did you see any evidence that

25   collaborators of Genetics Institute had sent on to him

1   urinary EPO that they had obtained from Dr. Goldwasser?

2           **MS. BEN-AMI:**  Objection.  No foundation.

3           **THE COURT:**  Sustained.  And this does go beyond the

4   scope.

5           **MR. DAY:**  Well, your Honor, he testified --

6           **THE COURT:**  Well, please.  Not having any arguments

7   in front of the jury.  My ruling.

8   Q.  Let me hand you what's been marked as Amgen Exhibit GPZ.

9   This is a November 8, 1982 letter.

10          **MS. BEN-AMI:**  Objection, your Honor.

11          **THE COURT:**  Well, you can't testify to what it is,

12  but I don't know as anything turns on that.

13          **MR. DAY:**  I'm just identifying it.

14          **THE COURT:**  You've got the piece of paper in front

15  of you.

16          Go ahead, Mr. Day.

17          **MR. DAY:**  Thank you, your Honor.

18  Q.  I'd just like you to focus your attention on the

19  handwritten note in the lower right-hand corner.

20  A.  Yes.

21  Q.  And have you seen this document before?

22  A.  Not that I recall.

23  Q.  So this wasn't shown to you by Roche's counsel?

24  A.  Lots of things were not shown to me by anyone, including

25  Roche's counsel.  And I wouldn't necessarily have the

1    wherewithal to track something like this down myself.

2    **Q.**  Okay.  Well, you notice that in the lower right-hand

3    corner there's an indication of where this document came

4    from?

5    A.  Right.

6              **MS. BEN-AMI:**  Objection, your Honor.

7              **THE COURT:**  No, no, so long as he doesn't get the

8    substance.  You see that there.

9              **MR. DAY:**  This was an exhibit --

10             **THE COURT:**  Not what it is.

11             **MR. DAY:**  -- from the interference proceeding.

12             **THE COURT:**  No, no.

13             **MR. DAY:**  I'm sorry, your Honor.

14             **MS. BEN-AMI:**  No, I object.

15             **THE COURT:**  Well, I've told them there's other

16   proceedings, I told them to pay no attention to it.  I'll

17   tell them, the jury, if we need to know about it.  I don't

18   think it's necessary.  Go ahead.

19   **Q.**  Were you aware that GI, from evidence from prior

20   proceedings --

21             **THE COURT:**  No, no, beyond the scope.  Anything

22   else for this witness?

23             **MR. DAY:**  No, sir.

24             **THE COURT:**  Very well.  Anything else for this

25   witness?

 1          MS. BEN-AMI:  No.  May the witness be excused?

 2          THE COURT:  He may be excused.

 3          (Whereupon the witness stepped down.)

 4          THE COURT:  Call your next witness.

 5          MS. BEN-AMI:  Your Honor, we call Dr. Goldwasser.

 6          THE COURT:  He may be called.

 7          MS. BEN-AMI:  I would like to start with him, your

 8   Honor.

 9          (Pause in proceedings.)

10          THE CLERK:  Did somebody go and get Dr. Goldwasser?

11          MR. DAY:  Yes.

12          THE CLERK:  I didn't know if you were waiting for

13   me to go.

14          THE COURT:  This frequently happens, because we

15   have witnesses out in the hall so they don't hear each other

16   testify.  And if he doesn't show up, I'll tell you stories

17   about the courtroom.  Here he is, fine.

18          THE CLERK:  Right this way, Dr. Goldwasser.  Right

19   up here, sir.  You have to maneuver a little bit.  Thank

20   you.

21          And sir, would you please raise your right hand?

22          Do you solemnly swear that the answers you will

23   give to this Court and Jury will be the truth, the whole

24   truth, and nothing but the truth, so help you God?

25          THE WITNESS:  I do.

```
 1              THE CLERK:  Please be seated.  And just speak right
 2    into the mike.
 3                        EUGENE GOLDWASSER
 4                      DIRECT EXAMINATION
 5    (BY MS. BEN-AMI:)
 6    Q.  Good afternoon, Dr. Goldwasser.
 7    A.  Good afternoon.  I have trouble hearing you.
 8    Q.  I recall that from the past and I will do my best.
 9             Doctor, did you receive --
10              THE COURT:  Well, no, I usually start with his
11    name.  You may know him, but we don't.
12              MS. BEN-AMI:  I'm sorry.  I thought everyone knew
13    who this was by now.
14    Q.  But would you state your name?
15              THE COURT:  Would you please state your name?
16              THE WITNESS:  I'm Eugene Goldwasser.
17              THE COURT:  What city and state do you live in?
18              THE WITNESS:  I live in Chicago, Illinois.
19    Q.  And you are being paid by Amgen in these proceedings;
20    correct?
21    A.  Not for this one, no.
22    Q.  You're not being paid as an expert witness?
23    A.  I was told that testimony is not to be paid for.
24    Q.  Are you being paid as an expert in this case?
25    A.  Yes, but not for this time.
```

1    Q.  You mean, not what you're doing right this minute, what

2    you're going to do two weeks from now or three weeks from

3    now?

4    A.  I don't know what I'll be doing then.

5    Q.  Let me see if I can clear this up for you.

6         You have submitted expert reports in this case on

7    behalf of Amgen?

8    A.  Yes.

9    Q.  And you were paid for that?

10   A.  Yes.

11   Q.  Okay.  And you were deposed as a fact witness in this

12   case; right?

13   A.  Yes.

14   Q.  And you were paid for that by Amgen; right?

15   A.  Yes.

16   Q.  And are you being represented by counsel today, an

17   attorney today?

18   A.  Yes.

19   Q.  And who is that?

20   A.  Dr. Flowers.  I don't know whether all of the attorneys

21   that I've been talking with for some months now are

22   representing me, but I'll be glad to tell you them.

23   Q.  So you've been talking to many of the attorneys sitting

24   here on the Amgen side for months?

25   A.  I have.

1    Q.  And, in fact, you have received, over the years, stock

2    from Amgen; right?

3    A.  Yes.

4    Q.  Okay.  And you received payments for giving fact

5    testimony in the past; correct?

6    A.  I'm not sure it was fact testimony.  I -- legal terms

7    are not familiar to me.

8    Q.  Depositions?

9    A.  Yes.

10   Q.  Okay.  So now -- and for your testimony today you have

11   worked with the Amgen attorneys; correct?

12   A.  Yes.

13   Q.  You haven't worked with me?

14   A.  Not since the deposition.

15   Q.  In the deposition I got to ask you questions; right?

16   A.  Yes.

17   Q.  And Amgen's lawyers were representing you; right?

18   A.  Yes.

19   Q.  And but here, before I get to ask you any questions,

20   Amgen's lawyers have worked with you about your testimony;

21   right?

22   A.  Yes.

23   Q.  Okay.  So and you have submitted expert reports in this

24   case saying you're working with Amgen; right?

25   A.  Yes.

1    Q.   Okay.  Fine.  Now, Dr. Goldwasser, there was a time when
2    you worked with a Dr. Miyake; right?
3    A.   I would say he worked with me, but yes.
4    Q.   Okay.  Whoever worked with who, he came to your lab to
5    work with you?
6    A.   Yes.
7    Q.   And you obtained from him urinary -- urine from patients
8    who had a disease; right?
9    A.   It wasn't urine, it was a preparation made from the
10   urine.
11   Q.   Of patients who had a special disease?
12   A.   I don't know whether they all had the same disease.  It
13   was a collection of a large number of patients.
14   Q.   And that, those patients were excreting EPO into their
15   urine?
16   A.   The average, yes, but I couldn't say that each one was.
17   Q.   But among these patients were patients that had a
18   disease; right?
19   A.   Yes.
20   Q.   And what was that disease?
21   A.   Some of them had a severe anemia called aplastic anemia,
22   the cause of which was not known.
23   Q.   Now, when you worked -- when Dr. Miyake worked with you,
24   right, you purified urinary EPO; right?
25   A.   Yes.

1   **Q.**  That work was done under grants by the federal

2   government; correct?

3   A.  Yes.

4   **Q.**  And those grants included grants by the National

5   Institute of Health; correct?

6   A.  Yes.

7   **Q.**  And those grants included grants by the Department of

8   Energy?

9          **MR. FLOWERS:**  I'll object at this time, your Honor.

10  I've been waiting for a nonleading question.  All of this is

11  leading.

12         **THE COURT:**  Please, please, you don't have to

13  argue.  But your objection to this question is sustained on

14  the ground that it's leading.

15         **MS. BEN-AMI:**  Objection, your Honor -- your Honor,

16  can I have a sidebar?

17         **THE COURT:**  You can.

18         **MS. BEN-AMI:**  Yes, sir.

19  SIDEBAR CONFERENCE, AS FOLLOWS:

20         **THE COURT:**  Don't argue, just object.  And I think

21  I made a mistake.  He's adverse to --

22         **MS. BEN-AMI:**  That's was why I was -- he hasn't

23  made a --

24         **MR. FLOWERS:**  He's an expert witness.

25         **THE COURT:**  Fine.  You're paying him.

 1          (Whereupon the sidebar conference concluded.)

 2          **THE COURT:**  My mistake.  Ms. Ben-Ami's questions

 3   were appropriate and she may continue.

 4   **(BY MS. BEN-AMI:)**

 5   **Q.**  So your funding also came in part from the Department of

 6   Energy?

 7   A.  Yes.

 8   **Q.**  Okay.  And you were getting that money, to do this

 9   research, from the government?

10   A.  Yes.

11   **Q.**  You gave -- strike that.

12          In the period of the early 1980s, '81, '82, '83,

13   you understood that you were the sole source of significant

14   amounts of pure EPO; correct?

15   A.  As far as we know, yes.

16   **Q.**  So you, as far as you know, and you had studied EPO for

17   quite a long time, hadn't you?

18   A.  Yes.

19   **Q.**  And you had -- you were pretty well up on what everybody

20   else was doing; you were studying it, right?

21   A.  In the western world, yes.

22   **Q.**  Okay.  All right.  So in the western world, I guess

23   which includes the United States --

24   A.  Yes.

25   **Q.**  -- okay, you were the sole source of significant amounts

```
 1    of human urinary EPO; right?

 2    A.  Yes.

 3    Q.  As far as you knew, right.  And that material was

 4    something that you had obtained through the work that had

 5    been funded by the United States Government?

 6    A.  Yes.

 7    Q.  And you gave parts of that material to Amgen?

 8    A.  Yes.

 9    Q.  And you gave that material to Amgen --

10         MS. BEN-AMI:  Can I have Table 1?

11    Q.  This is, Dr. Goldwasser, do you need a copy of the

12    patent to look at?  Can you see that?

13    A.  Yes, I can.

14    Q.  Okay.  You gave -- let's read Example 1, Table 1.  It

15    says human EPO was isolated from urine.  Do you see that?

16    A.  Yes.

17    Q.  And -- did you do that?

18    A.  Yes.  Did I do what?

19    Q.  What I just asked, that the human EPO was isolated from

20    urine?

21    A.  Yes.  I just said yes.

22    Q.  Yes, that's right.  It was subject to tryptic digestion

23    resulting in the development and isolation of 17 discrete

24    fragments, et cetera; do you see that?

25    A.  Yes.
```

1    **Q.**   You did that work; right?

2    A.   It was done in my lab, yes.

3    **Q.**   Okay.  When I say "you," and I do apologize, and you're

4    being fair, that sometimes when a lab had -- he doesn't

5    actually do it, he has his colleagues do it in his lab.  But

6    it was done in your lab?

7    A.   Yes.

8    **Q.**   And that lab was being funded by the government?

9    A.   Yes.

10   **Q.**   And you gave that material to Amgen?

11   A.   Yes.

12   **Q.**   And that's what Amgen used in their experiments to get

13   the DNA probes for EPO?

14   A.   Among other things, yes.

15   **Q.**   Now, did you give these tryptic -- what's a tryptic

16   fragment?

17   A.   What is a tryptic fragment, is that the question?

18   **Q.**   Yes, sir.

19   A.   It's a fragment of proline that is formed when the

20   enzyme trypsin, which cleaves at particular sites in the

21   protein chain, can be isolated and characterized as those

22   were.

23              **THE COURT:**  All right.  Wait, it's 1:00.

24              **MS. BEN-AMI:**  I'm sorry.

25              **THE COURT:**  You can pick up here.

1          **MS. BEN-AMI:**  Thank you, Dr. Goldwasser.

2          **THE COURT:**  Ladies and gentlemen, it's 1:00.  We're

3    going to suspend, starting again right at 9:00 on Monday

4    morning.

5          The trial is moving right along, as expected, but

6    you have more evidence to hear.  So keep your minds

7    suspended.  Do not discuss the case either among yourselves

8    nor with anyone else.

9          Now, it sometimes happens that on the weekend the

10   press and the electronic media do a week-in-review.  There

11   could be some mention of this case.  I haven't seen anything

12   since we started the trial in the major papers here in

13   Boston.  I'm aware of some stuff in the trade press and the

14   financial press.  I just remind you, if there's any mention

15   of this case, Amgen versus Roche, you're to turn the page,

16   or if it's electronic, turn the channel.

17         And have a good weekend.  Put this out of your

18   mind.  We'll all start again promptly at 9:00 a.m. on Monday

19   morning.  The jury may stand in recess.  I'll remain on the

20   bench.

21         **THE CLERK:**  All rise for the jury.

22         (Whereupon the jury left the courtroom.)

23         **THE COURT:**  Please be seated.  Total elapsed time

24   stands Amgen one day, one hour, 30 minutes; Roche, two days,

25   two hours, out of each party's ten days.  We'll meet again

1    at 2:25 this afternoon and I will entertain brief, five to

2    ten minutes a side, oral argument on Theory Number 4 on

3    obviousness/double patenting.

4           We'll recess until that time.

5           **COUNSEL:**  Thank you, your Honor.

6           **THE COURT:**  We'll recess.

7           (Recess.)

8            **AFTERNOON PROCEEDINGS - 2:33 P.M.**

9

10          **THE CLERK:**  Calling Civil Action 05-12237, Amgen v.

11   Hoffmann-La Roche.

12          **THE COURT:**  Good afternoon, counsel.  While you're

13   coming up, let me both set the parameters of the oral

14   hearing and tell you what some of my concerns are, and my

15   mind is still very much open here.

16          I invited oral hearing on the issue which is

17   characterized in letters to the Court as Roche's

18   obviousness/double patenting theory number four, and both

19   parties, as you have throughout, have been very direct in

20   giving me the data and papers that I need.

21          My concerns in this hearing are procedural and

22   substantive.  First, my procedural concerns.  When this

23   Court acted as promptly as I could on pending motions for

24   summary judgment it was with the idea that I would be aiding

25   the parties, not that people would be happy about it, but I

1    would be aiding the parties by narrowing the evidence in the

2    case and allowing the parties to spend their limited time

3    addressing the live issues.

4         I will tell you I have the sense that while Roche,

5    quite properly, since I did not accompany my rulings with

6    thorough explanations, Roche quite properly pressed for the

7    grounds of the Court's rulings, and I'm fine with that and

8    to the extent I've thought myself able to speak I have tried

9    to be responsive.

10        But I really do have the sense that once Roche

11   heard that they changed their position from matters that

12   were argued, or submitted on brief, anyway, earlier.  It's

13   not judicial estoppel.  You're not precluded from doing

14   that.  Because, of course, you've lost on what was theory

15   number one and you were entitled to press every viable

16   theory.  But I do sense a change in position.  So that's one

17   thing I would like to hear about.

18        The other thing I would like to hear about is this.

19   The more I get into this, the more I am becoming persuaded

20   that the determination of what you fairly facilely call

21   obviousness/double patenting in the sense that it may affect

22   the expiration dates of patents is matter of law, or if not

23   matter of law, it is a matter for the Court.  That's more

24   precise.  It's a matter for the Court.  It's not a matter

25   for the jury.  And I don't see that there's much dispute

1   about that with the, to the extent people are fighting over

2   the expiration date of patents that are out there.

3         But Roche deals with that, and I've read the

4   papers, and Roche says yes, but there's common questions of

5   fact.  And where there's a jury proceeding, and this is one,

6   those facts have to be decided by the jury, and as a

7   conceptual matter I agree with that.  It applies here.  I

8   agree with that.  But I'm not clear where the record appears

9   beyond dispute.  As I understand the law, the record is the

10  prosecution histories, matters that I would have thought

11  were beyond dispute.  I'm not clear how far I allow this to

12  go as an evidentiary matter before the jury.

13        And I think I've said as much as I ought say and

14  I'll hear counsel for seven to ten minutes.

15        Counsel?  First Roche, I think first.

16        **MR. SUH:**  Good afternoon, your Honor.  My name is

17  Howard Suh.  I haven't been before your Honor over the past

18  couple of days in trial.

19        **THE COURT:**  But you're certainly welcome.

20        **MR. SUH:**  Thank you.

21        With respect to, I would like to take your second

22  issue first with respect to the overlap between the issues

23  of law and fact.  And the Court is absolutely right that

24  with respect to the issue of how you framed it, the

25  expiration dates of the different patents, if we could call

1    that the Section 121 restriction requirement issue.  That is

2    an issue of law for the Judge and the Court to decide.  And

3    that is a defense to double patenting that is Amgen's burden

4    of proof.

5            Now, if there is no Section 121 defense, the other

6    part of double patenting is to actually compare the claims

7    of the prior patent to the claims of the latter patent.  And

8    it is in that part of the analysis whereby there are common

9    issues of law and fact.  And it's those aspects --

10           **THE WITNESS:**  Help me out.

11           **MR. SUH:**  Yes.

12           **THE COURT:**  Because best for Roche here, best for

13   Roche, factually, what Amgen is doing here is double

14   patenting which not only results in them not getting a

15   longer patent term but also results in your being able to

16   say that the claims of one patent are within the prior art

17   against which another patent is judged.

18           Have I got that right?

19           **MR. SUH:**  That is correct, your Honor.

20           **THE COURT:**  All right, I understand that.  Now, go

21   ahead.

22           **MR. SUH:**  With respect to your first point

23   regarding whether Roche has changed its position, we don't

24   believe Roche has changed its position.  Because if the

25   Court may recall, it's Amgen, the way this whole issue

1    regarding summary judgment came about is that it wasn't

2    Roche that filed summary judgment on obviousness-type/double

3    patenting in order to invalidate the patents.  It was not

4    Roche.

5              **THE COURT:**  That's true.

6              **MR. SUH:**  It was Amgen who filed summary judgment

7    of no obviousness-type/double patenting.  So we were

8    responding to particular allegations that Amgen actually

9    made in their brief.  And in their brief they limited it to,

10   as we put in our letter, double patenting theory number one,

11   which was to the Y double patent, and double patent theory

12   number two.  That's what they moved on summary judgment on,

13   and I believe that even Mr. Day's letter to the Court

14   acknowledges that fact.

15             With respect to double patenting theory number

16   four, which is why we're here today, I would just like to

17   say that that was actually pled within our answer as an

18   affirmative defense on March 7th, 2007, with no opposition

19   from Amgen.  And we explained our theory in interrogatory

20   responses.  We provided statements within an expert report.

21   One month ago, in the joint pretrial memorandum, we laid the

22   theory out under contested issues of law and fact.

23             So, this idea of waiver, quite honestly, we don't

24   think it's credible.

25             And if I could raise another point, your Honor.

```
 1    Amgen is trying to dispose of this theory on the merits

 2    based upon 121.  Section 121.  That is Amgen's burden of

 3    proof.  And if anyone has actually waived a particular

 4    defense in this case, it's Amgen that hasn't provided their

 5    121 defense based upon the specific affirmative defense that

 6    was pled in this case.  So we feel that Amgen is really

 7    turning the tables with respect to this issue.

 8            THE COURT:  Anything else?

 9        MR. SUH:  No, your Honor, but if you have any

10    questions I would be happy to --

11            THE COURT:  Thank you.  For Amgen, Mr. Day.

12        MR. DAY:  Yes.  I think it's --

13            THE COURT:  Same agenda.  Those are the things that

14    are concerning me.

15        MR. DAY:  I think it's unquestionably a question of

16    law for the Court.

17            THE COURT:  Well, the patent expiration -- and I've

18    taken -- I have expressed concern over Federal Circuit

19    precedent by not distinguishing between matters that are

20    decided by a judge, whether they are law, fact, or mixed

21    questions of law and fact, and matters of law.  So, since

22    I'm trying to be very careful, do you say it's a question of

23    law, straight law?  Or do I make findings -- is it for the

24    Court or is it a matter of law?

25            MR. DAY:  Well, I think it is a matter of law.
```

 1          THE COURT:  All right.

 2          MR. DAY:  I'll be clear, however, that the Federal

 3    Circuit is not that clear.

 4          THE COURT:  Okay.

 5          MR. DAY:  I'm not -- this is, this is an area where

 6    there have been precedents, district court precedents that

 7    suggest it's a mixed question of law and fact.  But the

 8    holdings in the Federal Circuit suggest it's a question of

 9    law and they subject it to de novo review.

10          THE COURT:  Oh, I'm not surprised as to that.  And

11    I'm fine as to that with respect to the expiration dates of

12    patents.  But what about this question of whether I'm going

13    to let Roche, which is, which is a trial question, which I

14    have to address, if I'm going to have a fair trial I've got

15    to jump one way or another and be stuck with it, am I going

16    to let them use any Amgen patents as prior art.  You would

17    say -- actually what would you say, that the Court must

18    decide that?

19          MR. DAY:  I would say, I would say the following,

20    your Honor.  That with respect to the '422 and the '933 and

21    the '349 patents you have already decided that.

22          THE COURT:  As against the '008 I have.

23          MR. DAY:  As against the '008.  And what Roche,

24    what Roche has done is they have -- you've already decided

25    that these three patents are immune from attack by the '008.

1          **THE COURT:**  I have and I stand by it.

2          **MR. DAY:**  Roche says -- and Amgen did not move for

3     summary judgment on '868 and '698 because Amgen candidly

4     acknowledges that those two patents fell within Group II,

5     they were not restricted out, they're not the subject of a

6     restriction requirement.  However, they are patentably

7     distinct.  Even though they weren't restricted out, they're

8     not, they don't benefit from a 121 exemption, but they were

9     patentably distinct and that was made clear in the Patent

10    Office and the Patent Office made that determination.  They

11    rejected them for obviousness-type/double patenting.  They

12    withdrew their objection and allowed the claims to issue.

13    So they recognized they were patentably distinct.  We

14    believe that's a question of law that the Court could get to

15    and decide.  That's not a jury question, that's a question

16    of law, is whether these claims are patentably distinct, do

17    they claim a different invention.

18          **THE COURT:**  That's the key, isn't it?

19          **MR. DAY:**  That's the key.  And you have to make

20    that decision.

21          **THE COURT:**  And you would characterize that as

22    matter of law in the same way that I'm fully familiar with

23    doing claim construction.

24          **MR. DAY:**  Absolutely.

25          **THE COURT:**  Because I'm looking at the same record

 1    and making that determination.

 2         **MR. DAY:**  Absolutely.  And then I would argue that

 3    what we have seen -- and I think you're right, I think

 4    there's been a little bit of shifting here.  I understand

 5    Mr. Suh's argument that Amgen didn't move for summary

 6    judgment on theory four.  I accept that Amgen didn't move

 7    for summary judgment on theory four.  Why didn't Amgen move

 8    for summary judgment on theory four?  Because Roche in

 9    response to the interrogatory, the judge -- I'm sorry, your

10    Honor allowed them to amend their pleading, they added this

11    defense in March, and the order allowing them to amend the

12    pleading said subject to the discovery dates cutoffs.

13    Discovery was cut off in this case on April 2nd.  Roche

14    served their responses to interrogatories on April 2nd.

15    Amgen had asked them for the basis of all their defenses.

16    They said nothing about this.  Nothing.  Amgen had asked for

17    a 30(b)(6).  They didn't give us one.  We moved to compel.

18    The Court said you'll get your answers in interrogatories.

19    We got nothing in interrogatories.  Four days later they

20    served expert reports under the Court's scheduling order

21    where they were required to carry out under their burden of

22    proof all of their invalidity defenses.  They said nothing

23    about this.  That's why Amgen didn't move for summary

24    judgment.  That's why Amgen didn't file any expert reports

25    on this.  That's why Amgen didn't address this question.

 1          **THE COURT:**  Let me ask you this question.  I

 2    know -- I'm not trying to get you to argue against yourself

 3    and I know that you, Amgen's been consistent throughout that

 4    there's no right to a trial by jury.  But in answer to this

 5    question, I'm going to ask you to assume that there is a

 6    right to a trial by jury in these circumstances, let's say

 7    on the things that are usually amenable to trial by jury in

 8    a patent case.

 9          **MR. DAY:**  Yes.

10          **THE COURT:**  And so, making that assumption --

11          **MR. DAY:**  Yes, I will.

12          **THE COURT:**  -- with which you disagree, let me ask

13    you this.

14          If I don't agree with you that this is matter of

15    law, like a Markman construction, then the common question

16    of fact, because it will go to whether these '868 and '698

17    patents are within the prior art, has to be decided by the

18    jury.  Isn't that right?

19          **MR. DAY:**  I don't think so.  And let me break this

20    issue apart because I analyzed it a little bit differently

21    than you did.

22          I accept the assumption.  I accept the assumption

23    that you reject, arguendo, you reject the position that this

24    is entirely a question of law.  Isn't there an issue here

25    for the jury?  What would that issue be?  The issue would be

1    that, okay, even if these, even if these claims claimed

2    different inventions and there is no entitlement under 121

3    to safe harbor protection against this earlier issued claim,

4    would this different invention then have been obvious in

5    light of the earlier issued claim.  That would be perhaps a

6    question of fact for which the jury might have to decide.

7            Now, why does that not apply to argument four?

8    Okay?  That's the issue that we're focused on.

9            **THE COURT:**  I'm following.

10           **MR. DAY:**  Okay?  All right.  Well, with respect to

11   argument four, Roche is pleading, is trying to go to trial

12   on two alternative theories.  On the one hand, Roche is

13   arguing that the '868 and the '698 fall within the same

14   classification, the same group as the '008 patent and

15   therefore is not protected or therefore not protected from

16   ODP over the '008 claims.  The '008 claims being used

17   against them.

18           **THE COURT:**  And that's where I'm talking about

19   shifting.  I understood that part in their brief, and before

20   I ruled I had that in mind.  I thought that was the group we

21   were talking about.

22           **MR. DAY:**  Now, if we go down that path then ipso

23   facto, necessarily as a matter of claim construction and as

24   a matter of law, the other claims or the other patents

25   cannot be, they are insulated by 121 from those claims.  And

1    they cannot be subjected to an 0DP attack even over the '008

2    or over the '828 or the '868 or the '698.

3          So, that's one theory.  They could have that

4    theory.  And if they want to go to trial on that theory,

5    we'll go to trial on that theory.

6          The alternative theory --

7          **THE COURT:**  Except that given my earlier ruling

8    they've lost on that.  They can challenge me on appeal but

9    they've lost on that.

10         **MR. DAY:**  Well, they've lost on the '422 and the

11   '349, and they've lost on the 6 -- the 99 -- '933.  Yes,

12   sir.

13         Now, they want to have their cake and eat it, too.

14   Now, they want to say, well, let's say that the '868, that

15   the '868 and the '698 and the other claims all fall within

16   the same classification.  They're subject to

17   obviousness-type.  The statute 121 doesn't permit that.

18   That's the problem.  Section 121 says that any applications

19   issuing from an application that was filed as a result of a

20   restriction requirement are protected from attack so long as

21   they maintain consonance.  And you've already decided as a

22   matter of law that those claims maintained consonance.

23         **THE COURT:**  I'm with you.  But here's where my mind

24   is.  You started your argument saying that you're not

25   contending that '868 and '698 have a restriction

1    requirement --

2              **MR. DAY:**  That's right.

3              **THE COURT:**  -- from which you --

4              **MR. DAY:**  Over the '008.  Over the '008 --

5              **THE COURT:**  Correct.

6              **MR. DAY:**  -- yes.

7              **THE COURT:**  Rather, you're saying they're distinct,

8    and being distinct on that line of analysis it doesn't,

9    there's no double patenting here.

10             **MR. DAY:**  And that may be a jury issue.  Whether,

11   whether or not those claims -- because the issue then

12   becomes, the issue then becomes, if they're in the same

13   class, the issue then becomes would they have been obvious.

14   Would those claims have been obvious in light of --

15             **THE COURT:**  It's very helpful.  Now, let me say it

16   back to you.

17             What you and I have just been talking to, talking

18   about is because I've required you to start from the

19   principle that there may be factual issues here that are for

20   the jury.  But your prime argument is that these are matters

21   for the Court, and indeed you go further, these are matters

22   of law, like Markman.

23             **MR. DAY:**  Yes, sir.

24             **THE COURT:**  All right, I understand that.  And --

25             **MR. DAY:**  My second, my second argument is, when

1    you asked me to reject that, when you asked me, arguendo,

2    assuming that's not true, Mr. Day --

3              **THE COURT:**  Right.

4              **MR. DAY:**  -- that that's not the case, my second

5    argument, as I just stated, my second argument is if that's

6    not the case and you're not going to decide whether the '868

7    and the '698 are patentably distinct from the '008, you're

8    going to give that issue to a jury because you think that

9    involves questions of fact, that is a very different

10   question than the question they're now trying to raise which

11   is they're now trying to say that the '422 and the '933 and

12   the, excuse me, the '422, the '349 and the '933 are not

13   protected by 121.

14             **THE COURT:**  Right.

15             **MR. DAY:**  And you've already ruled that they are,

16   it's all --

17             **THE COURT:**  I understand that and I've, I've heard

18   enough.

19             Now, what I'm going to do candidly, not candidly,

20   but being candid, we're going to take a recess and I'm going

21   to talk to the law clerk.  I'm going to come back whatever

22   the law clerk and I resolve on.  But I want to pose some

23   questions to you which deal with other matters which are

24   under advisement on which I'm not going to take oral

25   argument, but it will be helpful if I have answers to these

1    questions.

2         The first question deals with the issue of the

3    deposition excerpts that you've given me to work through.

4    And my question is simple.  Have I now received all the

5    additional briefing I'm going to get relative to these

6    depositions, and aided by that briefing shall I go ahead and

7    make my rulings.  But we can wait until I come back on the

8    bench.

9         The second question I have, there are pending,

10   there is pending quite a dispute over the admission of

11   various documents of Genentech.  And I now have had brought

12   to my attention the various motions in limine and briefs

13   relative to that issue.  And my question is, are you ready

14   for a ruling on that, or am I going to hear something else

15   about any of those.  I'm not soliciting anything further.  I

16   simply want to be responsive and not shoot too quickly.

17        So, give me whatever time I need and I'll come back

18   on the bench.

19        We'll recess.

20        **THE CLERK:**  All rise.  Court is in recess.

21        (Recess.)

22        **THE CLERK:**  All rise.  Court is in session, please

23   be seated.

24        **THE COURT:**  On reflection, I do think perhaps I can

25   be modestly helpful, but I need to ask you a question,

1    Mr. Suh, and take your time in answering this question.

2           Any comparison for obviousness is not to the

3    patent, though, it's to the claim claimed.

4           **MR. SUH:**  Yes, that's correct, your Honor.

5           **THE COURT:**  We all agree on that.

6           **MR. SUH:**  Yes.

7           **THE COURT:**  But for shorthand, we have been talking

8    about the numbers of the patents.

9           **MR. SUH:**  That's correct, your Honor.

10          **THE COURT:**  So I want to know, if you're able to

11   tell me now, precisely what claims in the '868 and the '698

12   patents, precisely what claims render the claims of the

13   patents-in-suit obvious.

14          Can you tell me that this afternoon, or do we need

15   to wait the weekend?

16          **MR. SUH:**  Your Honor, I'll be able to do that this

17   afternoon.

18          **THE COURT:**  Go ahead.

19          **MR. SUH:**  Well, if I could just, if I could just

20   consult the claims.

21          **THE COURT:**  Oh, fine.  Then -- I mean, you can do

22   it -- that's fine.

23          **MR. SUH:**  Okay.

24          **THE COURT:**  That's fine.  And as a matter of fact,

25   you may simply do it by an offer of proof and it will get to

1    me that way.

2           **MR. SUH:**   Thank you, your Honor.

3           **THE COURT:**   All right.   I wanted you to go first,

4    but I guess I'm going to go this far.

5           I rule, as follows:   I rule that the issue, the

6    issues about which we have been discussing are in fact

7    matter of law, the same way that claim construction in a

8    Markman hearing is matter of law, for the Court to decide.

9    Therefore, we're not going to hear anything more, we're not

10   going to receive any evidence, further evidence before the

11   jury on the issue of obviousness/double patenting, though we

12   may, you may get such evidence before me.   Also, I must, it

13   seems to me I must be ready to decide the case, to decide

14   the issue as matter of law when Roche rests on invalidity.

15   And I intend to be ready.   But that's not this afternoon.

16          So, I am open to briefs, not oral argument, though

17   I may entertain more oral argument, but I'm open to data

18   which will enable me to, one, make the comparisons that I

19   think need to be made, and two, on patentably distinct, and

20   make an appropriate ruling of law.

21          So you'll make a proffer this afternoon, Mr. Suh.

22   I'll know what the specific claims are.   As a matter of

23   fact, I'm going to leave the law clerk right here, you can

24   do it on the record.

25          **MR. DAY:**   Your Honor, may I be heard for one

1    minute?

2         **MR. SUH:**  And, your Honor, may I be heard for one

3    moment?

4         **THE COURT:**  Of course, and Mr. Suh first.

5         **MR. SUH:**  Yes.  Your Honor, we just want to make

6    clear that this goes to theory number four and not theory

7    number three, which I believe both sides have agreed was

8    still in the case.  This really goes to theory number four

9    which was the subject of Amgen's emergency motion.

10        **THE COURT:**  Yes.  Yes.  Theory number -- it does go

11   to theory number four, but the more I get into it, it seems

12   to sweep as to theory number three as well.  I have to --

13        **MR. SUH:**  We would respectfully disagree, only

14   because we believe that the issue of patentable distinctions

15   is a mixed jury of fact which may not --

16        **THE COURT:**  I know you think that.

17        **MR. SUH:**  Yes.

18        **THE COURT:**  But my present thinking is that it's

19   not, that it is for the Court much as a Markman hearing is

20   for the Court.  And I don't see -- I mean, you're not

21   prejudiced yet because I haven't made my ruling yet.  And as

22   I see the case trying out, I don't think we need anymore

23   evidence on the issue.  But if there is more evidence, the

24   Court, not the Jury, will receive it.

25        **MR. SUH:**  Yes.

1        **THE COURT:**  Then when you rest on validity, I

2   should make my ruling.  And for purposes of, for purposes of

3   this aspect of the case, my ruling will inform you whether

4   this or that Amgen claim on this or that Amgen patent is

5   prior art against which the jury will decide whether the

6   claims in suit are obvious.  We'll -- and then the case will

7   go to a jury verdict and we'll see where we are.

8        Now, I now perceive that there's a second piece of

9   this, that I don't think that Roche has waived.  And that

10  is, once I've done everything I can with the jury, the Court

11  may have to figure out when certain patents expire.  I'm not

12  clear that that's going to make any difference here, but

13  maybe I will and at an appropriate time I shall.

14       Do you see what I'm saying?

15       **MR. SUH:**  Yes.

16       **THE COURT:**  Okay.

17       **MR. SUH:**  Just with one clarification.  You said

18  that the evidence is for the judge and the Court to decide.

19  Would that evidence still be allowed to be presented before

20  the jury --

21       **THE COURT:**  No.

22       **MR. SUH:**  -- with respect to witnesses?

23       **THE COURT:**  No.  No more on obviousness/double

24  patenting, no more about Roche, other Roche -- strike

25  that -- other Amgen patents.  No.  But to me, yes.

```
 1                Your question, Mr. Day?

 2           MR. DAY:  The only question I have, your Honor,

 3    which I was unclear about was, you indicated that you would

 4    make your ruling at the close of Roche's case.

 5           THE COURT:  Well, maybe before, but I can hold off

 6    until then.

 7           MR. DAY:  And if you're doing this as a matter of,

 8    if you're ruling as a matter of law, so it's akin to a JMOL

 9    or -- may I suggest that we file JMOL briefs on this.  Or,

10    alternatively --

11           THE COURT:  What's JMOL?

12           THE CLERK:  Judgment as matter of law.

13           MR. DAY:  Judgment as matter of law.  I'm sorry.

14           THE COURT:  Oh, judgment as -- oh, thank you.

15    Everyone seems to be familiar with these things.  I'm slow.

16           Here's my construct.  I have, I have conceptually

17    problems with Markman.

18           MR. DAY:  Yes.

19           THE COURT:  And conceptually my problem with

20    Markman has always been not that you -- and not that the

21    Federal Circuit and indeed the Supreme Court wasn't

22    perfectly correct in saying to the extent that the

23    governmental right to exclude is out there, it's akin to a

24    statute and it can be interpreted given the prosecution

25    history as a statute.  Judges have always done that as
```

1    matter of law and they'll do that.  I'm fine with that.

2         Where that construct, that theoretical approach to

3    analysis candidly is breaking down in the courts around the

4    nation, including this one, is that the judgment is not the

5    type of judgment that courts are used to making where they

6    are facile and familiar with statutory history.  Because the

7    construction has always to be the construction that the

8    person skilled in the art would give to the language that

9    the patent applicant who is his own lexicographer comes up

10   with.  It's that second link that has caused so many of my

11   colleagues to take evidence on that point, resolve that

12   evidence.  And one imagines, and I don't mean to be cute

13   here, if I had done that in the TKT case, but come to the

14   same conclusion that I reached on a cold record, or on a

15   record of just the prosecution history, counting heads in

16   the Federal Circuit, one thinks I would have been affirmed.

17        My problem has always been the conceptual problem.

18   If they are calling it matter of law, I'm going to treat it

19   as matter of law.  So here.  Not JMOL.  I will, I will

20   receive from the parties further data of an evidentiary

21   type, though it seems to me I should be able to resolve this

22   without testimonial or affidavit-type data.  I should be

23   able to resolve it on the prosecution history.  And that's

24   why my analogy -- lawyers and judges are fond of

25   analogies -- is not to JMOL but to Markman.  And I think

1    that's accurate under the precedence of the Federal Circuit,

2    and I stand to be affirmed or reversed on such an analysis

3    which I'm trying to make clear.

4         **MR. DAY:**  I appreciate the clarification.  But the

5    reason I raised the issue is because, what my confusion is

6    is that Roche has put on witnesses, you have heard a witness

7    construe the claims.  This witness testified today --

8         **THE COURT:**  Yes.  I understand that and I'm not

9    going to interfere with the -- I'm certainly not going to

10   start giving -- I've explained everything as best I know how

11   to the jury.  I'm just going to let this ride.

12        **MR. DAY:**  Oh, I understand that.

13        **THE COURT:**  Now, when this phase of the case is

14   over you will all know how I rule on this issue, and that

15   will give me time to decide whether I need to strike things,

16   whether I need candidly to let someone put on more evidence

17   before the jury.

18        **MR. DAY:**  But my concern is, and this was my, and

19   this is my certain, when you say you're going to resolve

20   this at the close of Roche's case, Amgen has witnesses.

21   Amgen has witnesses on this topic.  They will not be heard.

22        **THE COURT:**  That's right.

23        **MR. DAY:**  And that means the jury has been left

24   with an impression --

25        **THE COURT:**  No.  No, no.  Because they're not going

1        to be able to argue anything from -- let's say you win.

2        Let's say we go where you, where Amgen wants us to go on

3        this issue.  We're never going to hear anything in the

4        closing on obviousness/double patenting and we're never

5        going to hear any arguments about Roche's -- excuse me,

6        Amgen's other patents.  And if I need to give anymore

7        corrective instructions, I'll do it.  And I think you're

8        going to have to be satisfied with that.

9               **MR. DAY:**  I am satisfied with that.  I do

10       understand that now.

11              **THE COURT:**  You can't ride both horses.

12              **MR. DAY:**  No, I understand that now.  I didn't --

13              **THE COURT:**  You can't have a big factual dispute

14       and say, you know, wrong impression or the like.  If it's

15       truly a matter of law, I probably have enough to decide it.

16       And, of course, I can decide it Roche's way.  I could decide

17       it as matter of law that they're not patentably distinct,

18       therefore, these claims are prior art.  Roche will then

19       argue from the claims, that's why I want the claims from

20       Mr. Suh.  If I saw my way clear to one side or the other

21       winning, I wouldn't hold back, I would tell you.

22              All right.  Enough on this.

23              What's the answer to the question about

24       depositions?  Shall I go on and work with them, or am I

25       going to receive something more?

1              Mr. Fleming?

2          **MR. FLEMING:**  Your Honor, thank you.  We -- the

3     parties have agreed in discussion with Ms. Smith to continue

4     to work on the transcripts so they are better for you and

5     clearer for you and we submit them on Monday.

6          **THE COURT:**  Hold off.  That's fine.

7          **MR. FLEMING:**  Your Honor, can I -- and I beg your

8     pardon.  And I heard your ruling and of course we came here

9     today prepared to deal with point four.  And I understand

10    your Honor has not ruled.  But we would like before --

11    because as Mr. Day pointed out, the jury has heard evidence

12    today and the day before.  And of course your Honor doesn't

13    want to have a record where there's prejudice to either side

14    and the jury continues its fair function.  And quite

15    honestly, your Honor, what we have always argued was 121,

16    the restriction requirement was an issue of law and whether

17    it applied or not and your Honor made his ruling and of

18    course we understood.

19             As to the two patents for which there was no

20    restriction requirement, there's complete overlap.  But

21    even, even as your Honor has phrased it in a Markman

22    context, it's viewed from the view of one skilled in the art

23    and has to be viewed that way and there may be scientific

24    data that would be useful to the Court, and you heard some

25    of that as well.

1          **THE COURT:**  Of course.  But the Court --

2          **MR. FLEMING:**  I meant the Court --

3          **THE COURT:**  -- is me.

4          **MR. FLEMING:**  Well, I meant the Court generally,

5     your Honor, and the fact finders particularly, and in this

6     case your Honor has dictated it's a jury because there is

7     overlap of the obviousness.

8          **THE COURT:**  Well, not for things that are for the

9     Court.

10         **MR. FLEMING:**  Allow us to continue some briefing,

11    your Honor, before you decide.

12         **THE COURT:**  Well, of course, because I'm telling

13    you that I'm not going to decide until you have rested on

14    this phase of the case.

15         **MR. FLEMING:**  I understand.  We did have another

16    witness on a discrete, related issue.  I understand, your

17    Honor.  I just wanted you to know that if you had assumed

18    that the evidence was done, I did, I did not want to create

19    that impression by silence.

20         **THE COURT:**  I haven't assumed it.

21         **MR. FLEMING:**  Okay.

22         **THE COURT:**  And if you have to put something before

23    me put it before me but not the jury.

24         Now, what's the answer to the question about the

25    Genentech materials?  Have I got everything or --

1          **MR. FLEMING:**  We would like to submit a very short

2    final submission to you on Monday.

3          **THE COURT:**  Fine.  So Monday will be soon enough to

4    resolve it.

5          **MR. FLEMING:**  Yes, your Honor.

6          **THE COURT:**  Thank you all.  Have a good weekend.

7    Nine o'clock Monday morning.  We'll recess.

8          **THE CLERK:**  All rise.  Court is in recess.

9          (Adjournment.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **C E R T I F I C A T E**

2

3

4          We, Donald E. Womack and Cheryl B. Palanchian,

5     Official Court Reporters for the United States District

6     Court for the District of Massachusetts, do hereby certify

7     that the foregoing pages are a true and accurate

8     transcription of our shorthand notes taken in the

9     aforementioned matter to the best of our skill and ability.

10

11

12

13          /S/ DONALD E. WOMACK
         _____

14          /S/ CHERYL B. PALANCHIAN
         _____

15

16              DONALD E. WOMACK
             CHERYL B. PALANCHIAN

17           Official Court Reporters
                P.O. Box 51062

18        Boston, Massachusetts 02205-1062
              womack@megatran.com

19

20

21

22

23

24

25