```
 1                UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
 2
                                   Civil Action
 3                                 No. 05-12237-WGY

 4   * * * * * * * * * * * * * * * *
                                   *
 5   AMGEN, INC.,                  *
                                   *
 6            Plaintiff,           *
                                   *   DAILY TRANSCRIPT
 7   v.                            *   OF THE EVIDENCE
                                   *   (Volume 5)
 8   F. HOFFMANN-LA ROCHE LTD,     *
     ROCHE DIAGNOSTICS GmbH and    *
 9   HOFFMANN-LA ROCHE, INC.,      *
                                   *
10            Defendants.          *
                                   *
11   * * * * * * * * * * * * * * * *

12

13

14            BEFORE:  The Honorable William G. Young,
                       District Judge, and a Jury
15

16

17

18

19

20

21

22

23                                 1 Courthouse Way
24                                 Boston, Massachusetts

25                                 September 10, 2007
```

```
 1                  A P P E A R A N C E S

 2

 3          DUANE MORRIS LLP (By D. Dennis Allegretti,
        Esq. and Michael R. Gottfried, Esq.), 470 Atlantic
            Avenue, Suite 500, Boston, Massachusetts 02210
 4               - and -
            DAY CASEBEER MADRID & BATCHELDER, LLP (By
 5      Lloyd R. Day, Jr., Esq., David M. Madrid, Esq. and
        Robert M. Galvin, Esq.) 20300 Stevens Creek
 6      Boulevard, Suite 400, Cupertino, California 95014
                 - and -
 7          McDERMOTT WILL & EMERY (By Michael Kendall,
        Esq.), 28 State Street, Boston, Massachusetts
 8      02109
                 - and -
 9          McDERMOTT WILL & EMERY (By William G.
        Gaede, III, Esq.), 3150 Porter Drive, Palo Alto,
10      California 94304
                 - and -
11          MARSHALL, GERSTEIN & BORUN LLP (By Kevin M.
        Flowers, Esq.), 6300 Sears Tower, 233 S. Wacker
12      Drive, Chicago, Illinois 60606-6402
                 - and -
13          STUART L. WATT and WENDY A. WHITEFORD, Of
        Counsel, Amgen, Inc., One Amgen Center Drive,
14      Thousand Oaks, California 91320-1789, on behalf of
        the Plaintiff
15
            BROMBERG & SUNSTEIN LLP (By Lee Carl
16      Bromberg, Esq. and Julia Huston, Esq.), 125 Summer
        Street, Boston, Massachusetts 02110
17               - and -
            KAYE SCHOLER LLP (By Leora Ben-Ami, Thomas
18      F. Fleming, Esq., Patricia Carson, Esq.,
        Christopher Jagoe, Esq. and Howard Suh, Esq.),
19      425 Park Avenue, New York, New York 10022, on
        behalf of the Defendants
20

21

22

23

24

25
```

1                          **I N D E X**

2
   **WITNESS:**           **DIRECT   CROSS      REDIRECT    RECROSS**
3

4  EUGENE GOLDWASSER, Resumed

5     By Ms. Ben-Ami    520                628

6     By Mr. Flowers              581                    643

7  JOSEPH BARON, By Deposition

8     By Ms. Ben-Ami    649

9
                                             **FOR        IN**
10   **EXHIBITS:**                           **I.D.      EVID.**

11      2035 Letter . . . . . . . . . . . . . 534
        2036 Letter . . . . . . . . . . . . . 535
12      2037 Letter . . . . . . . . . . . . . 536
        2038 Letter . . . . . . . . . . . . . 537
13      2039 Letter . . . . . . . . . . . . . 542
        2040 Letter . . . . . . . . . . . . . 549
14      2041 Letter . . . . . . . . . . . . . 551
        2042 Letter . . . . . . . . . . . . . 552
15      2043 Grant Application . . . . . . . . 555
        2044 Letter . . . . . . . . . . . . . 562
16      2045 Grant Application . . . . . . . . 564
        2046 Letter . . . . . . . . . . . . . 567
17      2047 Lai, et al. Article . . . . . . . 574
        2048 Dordal Article . . . . . . . . . 576
18      15   Letter to T.L. Steck . . . . . . . 594
        16   Handwritten Note, 12/7/76 . . . . . 600
19      17   Letter, 11/8/82 . . . . . . . . . 608
        18   Letter, 8/23/83 . . . . . . . . . 611
20      2049 Documents from Dr. Baron . . . . . 648
        2050 Clinical Study . . . . . . . . . 648
21

22

23

24

25

1          **THE CLERK:**  All rise for the jury.

2          (Whereupon the jury entered the courtroom.)

3          **THE CLERK:**  Court is in session, please be seated.

4          **THE COURT:**  Good morning, ladies and gentlemen.

5          **THE JURY:**  Good morning.

6          **THE COURT:**  Again, it's good to see you again, and

7    I thank you for your promptness.  Over the weekend we've

8    lost a juror.  We haven't really lost her, but due to some

9    personal matter that has nothing to do with the case, I've

10   decided to excuse her.  We have enough.  But we can't go on

11   excusing jurors, and I know you'll have that in mind.  I

12   really appreciate your promptness as do we all.

13          We're ready to go; if you'll remind the witness.

14          **THE CLERK:**  I remind you, sir, you are still under

15   oath.

16          **THE COURT:**  Proceed, Ms. Ben-Ami.

17          **MS. BEN-AMI:**  Thank you, your Honor.

18                EUGENE GOLDWASSER, Resumed

19          **DIRECT EXAMINATION** (Cont'd)

20   BY  **MS. BEN-AMI**

21   **Q**   Good morning, Doctor.

22   **A**   Good morning.

23   **Q**   Now, Dr. Goldwasser, you began studying erythropoietin

24   in the 1950's, correct?

25   **A**   Yes.  But could I ask you to speak a bit louder, please.

1    **Q**   Yes.  Was it better last week --

2    A    Yes, it was.

3    **Q**   -- when I was over there?  I will move around then.

4    A    I'm hard of hearing.

5    **Q**   And I'm low of speaking, so together we'll try to work

6    it out.

7              **MR. FLEMING:**  May I, your Honor?

8              **MS. BEN-AMI:**  Thank you, Mr. Fleming.

9              **MR. FLEMING:**  You're welcome.

10   **Q**   And, Dr. Goldwasser, you retired from the university

11   around 2002?

12   A    Yes.

13   **Q**   And the primary focus of your career has been on

14   studying EPO, right?

15   A    Yes.

16   **Q**   So, in fact, you coined the term EPO for erythropoietin,

17   right?

18   A    Yes.  It was a pretty big mouthful without that.

19   **Q**   And that's what we're going to be using as the term

20   today, EPO, not erythropoietin, just for the reasons you

21   just said.

22   A    Good.

23   **Q**   Okay.  Now, part of the work you did on EPO was

24   developing methods so one could measure the EPO, right?

25   A    That's right.

1    **Q**   And one of the methods you invented was an RIA for EPO,

2    correct?

3    A   It's hard to say whether it's invented.  It was

4    developed.

5    **Q**   And RIA -- but you did the work?

6    A   My lab did the work.

7    **Q**   Okay.  And RIA is a radioimmunoassay, right?

8    A   Yes.

9    **Q**   And you and your lab together developed the techniques

10   to use this assay for EPO, correct?

11   A   Yes.

12   **Q**   And one of the things you needed to develop this assay

13   was pure EPO, correct?

14   A   In, in that particular variation of the method, yes, you

15   needed pure EPO.

16   **Q**   And you also developed a method to purify EPO from human

17   urine, correct?

18   A   Yes.

19   **Q**   And you published a method to do so with Dr. Miyake in

20   1977, correct?

21   A   With Dr. Miyake and Mr. Kung.

22   **Q**   And in that article you disclosed a method to purify

23   human urinary EPO, correct?

24   A   Yes.

25   **Q**   And that article does not disclose, does not explain

1    what the sequence of amino acid residues is in human EPO,

2    correct?

3    A    That's correct.

4    Q    So, when you published in 1977 you didn't tell the world

5    what the sequence of human EPO was?

6    A    It couldn't.

7    Q    You didn't know it at the time?

8    A    Yes.

9    Q    Okay.  So, just so it's clear, though, you, prior to

10   1983 you never published, prior to 1984 you never published

11   what the amino acid sequence was of human EPO, correct?

12   A    That's correct.

13   Q    Now, prior to working with Dr. Miyake you had been

14   trying to obtain human EPO from various sources, correct?

15   A    Yes.

16   Q    And you were trying to collect it from patients with

17   anemia in the United States, correct?

18   A    Yes.

19   Q    And there came a point where you realized that there

20   wasn't enough, correct?

21   A    Actually there may have been enough but I didn't collect

22   enough.

23   Q    You were having a problem collecting enough, weren't

24   you?

25   A    Yes.

1   Q    Okay.  And the biggest problem in performing research on

2   EPO during this period of time in the late '70's, early

3   '80's, was getting a supply of human EPO, correct?

4   A    I guess so, yes.

5   Q    Well, it was a rare material at that time, was it not?

6   A    It didn't exist before; that is, in pure form it didn't

7   exist.

8   Q    And the amount that you were able to obtain prior to

9   working with Dr. Miyake was very, very small?

10  A    That was not human EPO.  That was sheep EPO.

11  Q    Okay.  So, to get large amounts of human urinary EPO you

12  joined forces, or Dr. Miyake joined forces with you,

13  correct?

14  A    Well, he wanted to work on the purification and my lab

15  was the predominant lab working on it, so he came to work

16  with me, yes.

17  Q    And what Dr. Miyake did was collect urine in hospitals

18  in a certain city in Japan, correct?

19  A    I don't know that he did the collection.  His, the

20  Department of Medicine in Kumamato City had arranged for

21  citywide collection.  I don't know who did the collecting.

22  Q    But he was running the show?

23  A    Yes.

24  Q    Okay.  And they went to that city because they had a

25  high incidence of people who had a disease where they would

1    excrete EPO, correct?

2    A    Not quite.

3    **Q**    In Japan people tend to have anemias where they excrete

4    EPO more than in the U.S., correct?

5    A    If I can explain my previous answer.  They didn't go to

6    Kumamato, that's where they lived; that was at the

7    University of Kumamato.

8    **Q**    Okay.  But that is where there was a high incidence of

9    people who --

10   A    No.

11   **Q**    -- had -- go ahead.

12   A    Not necessarily.  I don't know what the incidence of

13   that kind of anemia is in Kumamato versus anywhere else in

14   Japan.

15   **Q**    Okay.  There is a fair amount of aplastic anemia, which

16   is a rather severe anemia, in Japan at that time?

17   A    Yes.

18   **Q**    Higher than in the U.S.?

19   A    I don't know of any measurements that were ever made, so

20   I couldn't say.

21   **Q**    Well, you know that Dr. Miyake through this program was

22   able to obtain a large amount of urinary material which you

23   then used to purify out human EPO, right?

24   A    That's correct.

25   **Q**    And you funded him to come work with you, correct?

1    A    The grant I had paid his stipend when he was in Chicago,

2    yes.

3    Q    And that was a grant from the federal government, the

4    government of the United States, the National Institute of

5    Health, correct?

6    A    Yes.

7    Q    And you also paid for the urinary EPO material, the

8    urine, correct --

9    A    No.

10   Q    -- through your funding?

11   A    Not at that time.

12   Q    Later on you did?

13   A    A good deal later, yes.

14   Q    And when you use the term pure EPO you mean that it has

15   no discernible non-EPO present, correct?

16   A    Yes.

17   Q    And you wanted pure EPO, one of the reasons you wanted

18   pure EPO was so that you could sequence the protein,

19   correct?

20   A    That's one of the properties of the protein that I

21   wanted to find out, but there was a lot more I wanted to

22   find out.

23   Q    But that was one of the points you wanted to work on was

24   sequencing the protein, correct?

25   A    Yes.

1    Q    So the purification process that was disclosed in your

2    1977 paper, that work was not paid for by Amgen, was it?

3    A    No.   Amgen didn't exist then.

4    Q    And urine that was collected or brought over to your

5    lab, that was not paid for by Amgen either, was it?

6    A    No.

7    Q    And Dr. Miyake's stipend to work with you was not paid

8    for by Amgen, correct?

9    A    That's correct.

10   Q    Now, after you finished purifying the urinary EPO you

11   received from Dr. Miyake you were left with about eight

12   milligrams of pure EPO, correct?

13   A    Yes.

14   Q    And after you published that you had purified the human

15   EPO scientists began asking you for material, correct?

16   A    Yes.   But they asked me for material even before that.

17   Q    Okay.   But then they were asking you for the pure

18   material, correct?

19   A    Sometimes, yes.

20   Q    And you were the only real source in the world for

21   significant amounts of pure EPO, correct?

22   A    That's correct.

23   Q    And that was based on the work that you did that was

24   funded by the federal government, correct?

25   A    That's correct.

1    Q    And then you made available very small amounts of this

2    EPO for people to do these RIAs, radioimmunoassays, correct?

3    A    Yes.

4    Q    But you did not make available sufficient amount of

5    proteins for anybody else other than Amgen to do sequencing,

6    correct?

7    A    Nobody ever told me they wanted to sequence it.

8    Q    Well, are you saying you did make it available or you

9    didn't?

10   A    I did not make it available, because as I said, nobody

11   ever told me they wanted some for sequencing.

12   Q    Doctor, did Biogen ask you for sequence information?

13   A    Ask me for sequence information?

14   Q    Yes.

15   A    Not that I recall.

16   Q    Well, we'll look through your documents in a minute.  If

17   you don't recall right now, that's fine.

18          Just so we're clear, you need a much smaller amount

19   to do this RIA than to sequence the protein, correct?

20   A    That's correct.

21   Q    And so to sequence the protein you needed a large amount

22   of the government funded pure EPO, correct?

23   A    Yes.

24   Q    And, in fact, you sought a government grant, in part,

25   part of that grant was to sequence human EPO?

1    A    Part of it, yes.

2    Q    So you applied for or received a grant by the United

3    States government to sequence human EPO?

4    A    The grant was for the purification and study of the

5    properties of EPO.

6    Q    Including the primary structure, right?

7    A    That's one of the properties.

8    Q    And the --

9    A    Yes.

10   Q    -- primary structure is the amino acid sequence, right?

11   A    Yes.

12   Q    So that was part of the grant?

13   A    Part of it, yes.

14   Q    Now, there came a point in time when you met at the

15   university with Dr. Hood, correct?

16   A    I don't understand what you mean at the university.

17   Q    At your school.

18   A    I met Dr. Hood first at a meeting in Washington.

19   Q    So there came a point in time when you and Dr. Hood

20   discussed sequencing human EPO, correct?

21   A    Yes.

22   Q    And Dr. Hood had developed a machine that could sequence

23   smaller amounts of protein, correct?

24   A    Smaller than?

25   Q    Smaller than the previous machines.

1    A    Yes.

2    Q    It was a new machine?

3    A    Yes.

4    Q    It was called a microsequencer, right?

5    A    It was called a gas-phase microsequencer.

6    Q    And he started selling that machine, right?

7    A    I don't think Dr. Hood ever sold it.

8    Q    A company sold it?

9    A    A company, yes.

10   Q    So, you and Dr. Hood spoke about using this machine to

11   sequence human EPO, right?

12   A    Yes.

13   Q    And Dr. Hood said, hey, why don't you -- you know, I'm

14   working with this new company, Amgen, right?

15   A    No.

16   Q    No?  How did you first get approached by Amgen?

17   A    One of the organizers of Amgen, Winston Salser, who was

18   a professor at UCLA, was one of the few molecular biologists

19   or biochemists who knew anything about EPO because a former

20   student of mine worked in his lab.  He thought that this new

21   company he was organizing might be interested in the

22   production of EPO for therapeutic purposes.

23   Q    You had already spoken to Dr. Hood about sequencing the

24   urinary EPO before you were contacted by this professor,

25   correct?

1     A    Yes.

2     Q    And you did ultimately learn that Dr. Hood was working

3     with Amgen?

4     A    I learned that Dr. Hood was a member of the scientific

5     advisory board of Amgen which had just been formed.

6     Q    You were never a member of the scientific advisory board

7     of Amgen, correct?

8     A    That's true.

9     Q    Now, you understood that with the microsequencer someone

10    could sequence the amino acid sequence of human EPO,

11    correct?

12    A    No.

13    Q    You did not?

14    A    It was not clear that the method --

15    Q    Did you or did you not, Doctor?

16    A    I said no.

17    Q    Doctor, did you understand or believe that someone in

18    your lab in 1983 could sequence the tryptic fragments of

19    human EPO if they had the machine?

20    A    They could have a better chance at it with such an

21    instrument, but whether they would succeed would be

22    impossible to tell.

23    Q    Doctor, let me hand you -- let me hand you -- I need one

24    for the Court -- your deposition, one of your depositions.

25         MS. BEN-AMI:  Your Honor?

1      **THE CLERK:**  Have you got it?  Okay.

2      **MS. BEN-AMI:**  Thank you.

3   **Q**   Doctor, would you look at Page 32 of your deposition.

4   A   32.

5   **Q**   Yes.  You were asked the question on Page 31:  Do you

6   think someone in your lab in 1983 could have sequenced these

7   tryptic fragments?

8      And your answer was?  Could you read it to the

9   jury.

10     **MR. FLOWERS:**  Counsel, what line are you reading

11  from?

12     **MS. BEN-AMI:**  We're on Page 31, Lines 13 through

13  17.

14  A   "If we had available the gas-phase microsequencing

15  apparatus, yes."

16  **Q**   Were you under oath when you gave that testimony?

17  A   Yes, I was.

18  **Q**   And did you give an honest answer?

19  A   It wasn't a complete answer.

20  **Q**   So when you answered under oath you did not give a

21  complete answer; is that your testimony?

22  A   Well, the direct answer to that question was I thought

23  so, yes.

24  **Q**   Okay.  And on Page 32 you were asked this question under

25  oath:  If the gas-phase microsequencing apparatus was

1    commercially available in 1983, do you think someone in your

2    lab could have sequenced those tryptic fragments?

3           And the answer is what?

4    A   "It seems to me I answered that question before.  I said

5    yes."

6    Q   Did you give that testimony under oath?

7    A   Yes.

8    Q   Now, do you recall communications with a company

9    Schering-Plough?

10   A   Yes.

11          MS. BEN-AMI:  Can I have Exhibit 0KV, 0KR and 0KX.

12          THE CLERK:  OKB, OKR?

13          MS. BEN-AMI:  V, as Victor, 0KR, and 0KX.

14          THE CLERK:  Thank you.

15   Q   Doctor, did you write this letter?

16   A   Yes.

17   Q   Did you write it in April of 1980?

18   A   Yes.

19   Q   This is a letter to Schering-Plough?

20   A   Yes.

21          MS. BEN-AMI:  And can I offer 0KV, your Honor?

22          THE COURT:  You of course can.  Any objection?

23          MR. FLOWERS:  No objection, your Honor.

24          THE COURT:  OKV is admitted.  And so now --

25          MS. BEN-AMI:  I believe it's --

```
 1              THE COURT:  20 --

 2              MS. BEN-AMI:  35.

 3              THE COURT:  -- 35.  Thank you.

 4              (Exhibit marked in evidence.)

 5              MS. BEN-AMI:  Yes.  Can we put that on the screen

 6    now.

 7    Q    And here, Doctor, you are discussing a possible

 8    consultantship with Schering, correct?

 9    A    Yes.

10    Q    And you are discussing their desire for your EPO,

11    correct?

12    A    The letter doesn't say anything about that.

13    Q    Well, let's look at it.  In the first paragraph at the

14    very beginning -- okay.  In this letter it says:  It was a

15    pleasure meeting with you -- I was pleased with our recent

16    meeting and indeed to have the chance to meet Dr. Mach,

17    M A C H.

18              Do you see that?

19    A    Yes.

20    Q    And he was from Biogen, correct?

21    A    I'm sorry?

22    Q    He was from Biogen, correct?

23    A    And the University of Geneva.

24    Q    Now, let me show you OKR.  You wrote this letter,

25    Doctor?
```

1    A    Yes.

2    Q    In April of 1980?

3    A    Yes.

4              **MS. BEN-AMI:**  Your Honor, I would offer 0KR.

5              **MR. FLOWERS:**  No objection.

6              **THE COURT:**  0KR is admitted, Exhibit 2036.

7              (Exhibit marked in evidence.)

8              **MS. BEN-AMI:**  Can you put it on the screen, please.

9    Q    And there it says:  Dear Dr. Lawrason, as we discussed

10   the budget for our first steps in the collaborative venture

11   to develop an erythropoietin gene clone is enclosed.

12             Do you see that?

13   A    Yes.

14   Q    So you understood that Schering along with Biogen wanted

15   to clone the EPO gene, correct?

16   A    Yes.

17   Q    And they were asking you if you would work with them,

18   weren't they?

19   A    Yes.

20   Q    And you ultimately said no?

21   A    Yes.  I said no.

22   Q    Now, let me show you what's been marked as 0KX.  You

23   received that letter?

24   A    Yes.

25   Q    And this letter was in May of 1980?

```
 1    A    Yes.

 2              MS. BEN-AMI:  I offer 0KX, your Honor.

 3              THE COURT:  Any objection?

 4              MR. FLOWERS:  No objection, your Honor.

 5              THE COURT:  It may be received, 0KX, 2037.

 6              (Exhibit marked in evidence.)

 7              MS. BEN-AMI:  Publish it, please.

 8    Q    And there it says that your research proposal with

 9    Schering had been approved, correct?

10    A    Yes.

11    Q    So you had a research proposal with, research proposal

12    with Biogen, and then you decided to stop working with them?

13    A    It was not a full-fledged research proposal.  If you

14    look at the budget on the previous letter you'll see it was

15    for a very limited piece of work.

16    Q    And then you said no?

17    A    I said no and offered to give the money back.

18    Q    You said no because you wanted to work with Amgen?

19    A    That's not quite right.

20    Q    Okay.  You said no and did work with Amgen?

21    A    Yes.

22    Q    Okay.  And then Biogen did not have access to large

23    amounts of your pure EPO for sequencing, correct?

24    A    They never asked for any.

25    Q    We'll get to some more documents.
```

 1          Do you remember in 1983 Dr. Mach asking for protein

 2   sequence information?

 3   A   I don't remember it but it could well have been.

 4   Q   May I hand you what's been marked for identification as

 5   OPT.

 6          **MS. BEN-AMI:**  We've lost Ms. Smith, your Honor, so

 7   I'll just put this here.  Thank you, your Honor.

 8          **THE COURT:**  Thank you.

 9   Q   This is a letter that you sent to Dr. Mach, right?

10   A   Yes.

11   Q   And it's in April 1983, right?

12   A   Yes.

13          **MS. BEN-AMI:**  Your Honor, I offer OPT.

14          **MR. FLOWERS:**  No objection.

15          **THE COURT:**  OPT is admitted, Exhibit 2038.

16          (Exhibit marked in evidence.)

17          **MS. BEN-AMI:**  Can you blow up the first paragraphs.

18   Thank you.

19   Q   Now, here you are responding to a letter from Dr. Mach,

20   right?

21   A   Yes.

22   Q   And you say as to the sequence, the one you sent is the

23   one I showed at a December '81 meeting.  Right?

24   A   Yes.

25   Q   And in December of '81 you showed a partial sequence,

1    correct?

2    A    Yes.

3    Q    And it had an error or two in it, correct?

4    A    I didn't know it at the time, but it did.

5    Q    And you never told people what the error was?

6    A    No.

7    Q    And you never told people what the error was because

8    Amgen didn't want you to?

9    A    That's not quite the whole answer.

10   Q    Well, Amgen told you not to tell people what the

11   sequence was, correct?

12   A    I don't know how much detail you want about that, but I

13   would be glad to explain it.

14   Q    I would like you to answer my question, Doctor.

15        Did Amgen tell you not to disclose the full

16   sequence; yes or no?

17   A    At the time of that 1981 meeting in San Antonio, no.

18   Q    Thereafter?

19   A    After that.

20   Q    They said don't do that again?

21   A    Yes.

22   Q    And they said don't tell people what the errors are?

23   A    I don't recall they ever said that.

24   Q    Well, let's see what they -- what you said, remember in

25   1983.  Unfortunately, it says, I am not free to correct the

1    mistakes because the later sequencing work was done in a,

2    quote, proprietary way.

3              Do you see that?

4    A    Yes.

5    Q    So you're telling Dr. Mach that you cannot tell him what

6    the correct sequence is?

7    A    Yes.  But --

8    Q    Yes or no?

9    A    Yes.

10   Q    All right.  And the proprietary way is because you were

11   with Amgen?

12   A    Not precisely.

13   Q    Well, because Amgen actually pushed the button and ran

14   the machine?

15   A    That's not what I had in mind in that sentence.

16   Q    Okay.  Well, the protein that you're talking about is

17   the one that's funded by the United States government,

18   right?

19   A    Yes.

20   Q    The protein that you're talking about is the one that

21   you received a grant for to sequence, correct?

22   A    Yes.

23   Q    And you did not make that sequence information available

24   to Dr. Mach, correct?

25   A    Yes.

1    Q    And you did not make it available to him when you knew

2    that Biogen wanted it?

3    A    It was not mine to make available.

4    Q    Well, let's think about that.  You were funded by the

5    National Institute of Health to do the work, weren't you?

6    A    Yes.

7    Q    And you took the money, right?

8    A    Yes.

9    Q    And then you gave the protein to Amgen so it was no

10   longer yours to give?

11   A    I gave the protein at first to Lee Hood at Cal Tech, and

12   what was not mine to give was information or data that I had

13   not accumulated.

14   Q    And the only reason Amgen had accumulated it was because

15   you gave them the protein?

16   A    Yes.

17   Q    Without your protein they couldn't sequence and get the

18   data?

19   A    That's true.

20   Q    You gave them the tryptic fragments?

21   A    Yes.

22        **MS. BEN-AMI:**  Can I have Table 1 of the patent.

23   Q    Where it says in Example 1, Table 1 of the Amgen patent,

24   it says human EPO is isolated from urine and subjected to

25   tryptic digestion.  Do you see that?

1    A    Yes.

2             **MR. FLOWERS:**   Objection.

3    **Q**    And that was your work?

4             **MR. FLOWERS:**   Objection, your Honor.  We've been

5    through this on Friday.

6             **THE COURT:**   Overruled.  She may have it.

7    **Q**    That was your work?

8    A    Yes.

9    **Q**    That was the material funded by the United States

10   government?

11   A    Yes.

12   **Q**    And then Amgen was able to sequence it because you gave

13   them the pieces for them to sequence?

14   A    Yes.

15   **Q**    And the work that was done there was paid for by the

16   United States government?

17            **MR. FLOWERS:**   Objection, your Honor; relevance.

18            **THE COURT:**   Yes, sustained on that ground.

19   **Q**    You did not give the sequence information to anyone

20   else?

21   A    It was not mine to give.

22   **Q**    So that's a yes, you did not give it to anyone else?

23   A    Yes.

24   **Q**    Now, I show you 0LI, Doctor.  Have you seen this letter

25   before?

1    A    Yes.

2    Q    And this is a letter from the University of California

3    in Los Angeles?

4    A    Yes.

5    Q    And you received this letter in around July of 1980?

6    A    I don't know when I received it.  The date of the letter

7    is July 29th.

8    Q    You did receive it?

9    A    Yes.

10            **MS. BEN-AMI:**  I offer 0LI, your Honor.

11            **MR. FLOWERS:**  No objection.

12            **THE COURT:**  0LI is admitted, Exhibit 2039.

13            (Exhibit marked in evidence.)

14    Q    And this letter is a proposal for a collaboration,

15    correct?

16    A    Yes.

17    Q    To clone the EPO gene?

18    A    Yes.

19    Q    And it says that the professor -- his name is Koeffler?

20    A    Koeffler.

21    Q    Koeffler.

22            He says that he understands that Lee Hood is going

23    to try to sequence your EPO?

24    A    Yes.

25    Q    And you do not agree to work with him either?

1    A    With Dr. Koeffler?

2    Q    Yes.

3    A    No, I did not.

4    Q    But he was saying I would like the protein sequence

5    information, correct?

6    A    Yes.

7    Q    Now, you understood that you needed adequate amounts of

8    the pure EPO protein in order to get the sequence

9    information, correct?

10    A    Yes.

11    Q    And that was a pretty important piece to cloning EPO,

12    wasn't it?

13    A    By one method, yes.

14    Q    By the method of if you wanted to make a synthetic DNA,

15    right, you would need the amino acid sequence?

16    A    Yes.

17    Q    Or if you wanted to fish it out of a library you would

18    need some amino acid sequence?

19    A    I don't understand exactly what you mean by fishing it

20    out of a library.

21    Q    Okay, we'll move on then.

22         Now, you understood that Amgen wanted to

23    collaborate with you because they didn't have enough EPO on

24    their own to make a probe to get the DNA sequence for EPO,

25    correct?

1          **MR. FLOWERS:**  Objection; lacks foundation.

2          **THE COURT:**  Yes, sustained on that ground.

3     **Q**    You were told by Amgen that they wanted your EPO so that

4     they could use it to do cloning work, correct?

5          **MR. FLOWERS:**  Objection; hearsay.

6          **THE COURT:**  Overruled.  Did Amgen say that to you?

7          **THE WITNESS:**  Yes.

8     **Q**    And part of your collaboration with Amgen was to give

9     them the pure EPO protein?

10    **A**    Yes.

11    **Q**    And you understood that to be important to isolate the

12    sequence of the protein to get the -- strike that.

13          You understood that using the protein you could get

14    the sequence of the protein, right?

15    **A**    Yes.

16    **Q**    And you understood that that would help someone get a

17    clone?

18    **A**    Potentially, yes.

19    **Q**    And without enough protein sequence -- without enough

20    protein to sequence you couldn't get the protein sequence?

21    **A**    Yes.

22    **Q**    So you were a pretty important guy to Amgen, weren't

23    you?

24    **A**    You would have to ask them.

25    **Q**    Well, you understood that?

1    A   I assume so.

2    **Q**   And after you gave the EPO to Amgen you did not give it

3    to any other companies, correct, in amounts to sequence?

4    A   I didn't hear that last sentence.

5    **Q**   After you gave the EPO protein to Amgen you did not give

6    it to any other companies in amounts sufficient to sequence?

7    A   That's true.

8    **Q**   And you understood that Amgen did not want you to?

9    A   Do you want a yes or no answer to that, or do you want

10   an explanation?

11   **Q**   I'm asking you, did you understand from Amgen that they

12   didn't want you to give it to competitors?

13   A   Yes.

14   **Q**   And you understood from them because, that they didn't

15   want you to give it to competitors because it wouldn't be in

16   their best interest?

17   A   Yes.

18   **Q**   And you understood that had you supplied those samples

19   to Amgen's competitors they might have cloned the gene in

20   advance of Amgen?

21   A   I didn't know that.  That's a possibility.

22   **Q**   That was a concern on the part of Amgen, wasn't it?

23   They told you that?

24         **MR. FLOWERS:**  Objection; calls for speculation.

25         **THE COURT:**  Well, actually it's -- he can't testify

```
 1    what was a concern of Amgen.  He's not Amgen.  But then she

 2    also said, they told you that.  That she can ask.

 3              Did they tell you that, that that was their

 4    concern?

 5              THE WITNESS:  Yes.

 6              THE COURT:  All right.

 7    Q   Now, in fact, you understood that Biogen wanted your EPO

 8    in part for sequencing the protein, didn't you?

 9         MR. FLOWERS:  Objection; again calls for

10    speculation.

11    A   I -- I'm sorry.

12              THE COURT:  I'm sorry.  Put your question again.

13         MS. BEN-AMI:  Okay.

14    Q   You understood from your discussions with Biogen that

15    one of the reasons they wanted your EPO was to sequence it?

16    A   I don't recall that they ever proposed to do any

17    sequencing themselves.

18    Q   They wanted to get the sequence information, didn't

19    they?

20         MR. FLOWERS:  Same objection; calls for

21    speculation, your Honor.

22         THE COURT:  Yes, he can't testify to what was in

23    their mind.  He can testify to what they said to him.

24    Q   That's what you --

25         THE COURT:  For the fact that they said it to him.
```

1    Q    That's what they told you?

2    A    You would have to repeat that.

3    Q    Okay.  You understood from your communications with Dr.

4    Mach that his interest in the sequence was in connection

5    with Biogen's attempt to clone the EPO gene, correct?

6              **MR. FLOWERS:**  Same objection.

7    A    That's how I understood it.

8              **THE COURT:**  The objection is overruled; his answer

9    may stand.

10             **MS. BEN-AMI:**  Can I have 00U, please.

11   Q    Now, Doctor, you alluded to something before I would

12   like to go into just a little bit.

13             In 1980 or 1981 you flashed up on the screen a

14   small portion of amino acid sequence for EPO, right?

15   A    Yes.

16   Q    And you flashed it up and you put it down, right?

17   A    I don't remember how long it was up.

18   Q    Okay.  After you did that Amgen expressed to you that

19   they did not want you to disclose amino acid sequence

20   information, correct?

21   A    Yes.

22   Q    You did not have any written contract with Amgen in

23   1980, '81, '82, about keeping secret the amino acid sequence

24   of EPO?

25             **MR. FLOWERS:**  Objection; relevance.

1          **THE COURT:**  Overruled.

2     A    I had signed a confidentiality agreement with Amgen but

3     I don't know the date.

4     **Q**    You signed a confidentiality agreement with Amgen --

5     well, let me -- can I have -- I'm going to hand you what's

6     been marked for identification as OPX.

7          Do you recognize this document, Doctor?

8     A    Vaguely.

9     **Q**    Well, this is a document that you received, didn't you?

10    A    Yes.

11    **Q**    It's from Amgen's lawyers, right?

12    A    I don't know who Alan Mendelson is or was.

13    **Q**    Okay.  It says in it that Amgen, the company, right,

14    wants --

15    A    Yes.

16    **Q**    -- you to sign a contract, right?

17    A    Well, it's ambiguous.  It says they can't find it in the

18    file.  I may well have signed it much earlier and they lost

19    it.  I just don't know.

20          **MS. BEN-AMI:**  Your Honor, I would offer OPX.

21          **MR. FLOWERS:**  No objection.

22          **MS. BEN-AMI:**  And I would move to strike the, the

23    might have, I might have done something.

24          **THE COURT:**  The motion to strike's denied.  But

25    OPX, without objection, is admitted in evidence

1    Exhibit 2040.

2            (Exhibit marked in evidence.)

3    **Q**   Here is a May 1983 document and it says that they want

4    you to sign this contract, right?

5    **A**   Yes.

6    **Q**   And it's not signed, is it?

7            **THE COURT:**   More precisely, the copy appended to

8    the letter is an unsigned exemplar of a contract.  Is that

9    what you are asking?

10           **MS. BEN-AMI:**   That's my first question, your Honor.

11           **THE COURT:**   All right, let's get the answer to

12   that.

13           **THE WITNESS:**   I don't see my signature on it, but I

14   don't know.

15   **Q**   You don't recall ever signing it, do you?

16   **A**   It was a long time ago.

17   **Q**   We haven't been provided with a signed copy, have we?

18           **THE COURT:**   Well, I don't know as he would know

19   that.

20   **Q**   You don't have one in your files?

21   **A**   No.  But that doesn't mean it doesn't exist.

22   **Q**   It doesn't mean it does?

23           **MR. FLOWERS:**   Objection; argumentative.

24           **THE COURT:**   No, no, she -- strike that.  Yes.  It

25   is argumentative.  But evidence is evidence.  If you don't

1     have evidence on a thing you don't have evidence.  There.

2             Go ahead.

3     Q   So let's look at 00U.  This is a letter that you

4     received from Amgen, correct?

5     A   Yes.

6     Q   And this is a letter where Amgen is asking you to work

7     harder, correct?

8             **MR. FLOWERS:**  Your Honor, I'll object that counsel

9     is characterizing and reading from the document before it's

10    in evidence.

11            **THE COURT:**  Yes.  Sustained, on that ground.

12            **MS. BEN-AMI:**  All right.

13    Q   Doctor, did you receive this document?

14    A   You're still talking about this letter?

15    Q   Yes.

16    A   Yes, I received this.

17    Q   And do you remember receiving it in the 1982 period?

18    A   I'm sorry, your voice is too faint for me to hear you.

19            **THE COURT:**  Do you remember receiving it in this

20    1982 period?

21            **THE WITNESS:**  I remember receiving it.  I couldn't

22    tell you when.

23            **MS. BEN-AMI:**  Then I would offer OOU, your Honor.

24            **MR. FLOWERS:**  No objection.

25            **THE COURT:**  It may be received.  00U is admitted

1   Exhibit 2040.

2           **THE CLERK:**  41.

3           **THE COURT:**  I'm sorry.

4           (Exhibit marked in evidence.)

5   **Q**   So you received a letter from Amgen in 1982, right?

6   A   Yes.

7   **Q**   And they were saying in it that things weren't moving

8   fast enough, right?

9   A   Yes.

10  **Q**   And they wanted you to devote your lab to doing work for

11  them?

12          **MR. FLOWERS:**  Objection; lacks foundation.

13  **Q**   They told you they wanted you to work, to devote your

14  lab for work for them?

15          **MR. FLOWERS:**  Objection; lacks foundation.

16          **THE COURT:**  No, I think not.  Overruled.

17          Is that what they told you?

18          **THE WITNESS:**  Well, they're going to ask you to

19  outline what I proposed to be doing.  If that's what's meant

20  by the question then the answer is yes.  I'm not sure that's

21  exactly the same thing.

22  **Q**   Well, let me give you your response and we can walk

23  through that and see if that helps you.

24          00W.  00W is your letter back, right?

25  A   Yes.

```
 1    Q    And you wrote this letter and sent it to Dr. Stebbing,

 2    correct?

 3    A    Yes.

 4             MS. BEN-AMI:  I would offer OOU -- OOW, your Honor.

 5             MR. FLOWERS:  No objection.

 6             THE COURT:  OOW is admitted, Exhibit 2042.

 7             (Exhibit marked in evidence.)

 8    Q    Now, in this letter, let's look at the paragraph that

 9    says, "Let me first."  You first indicate how much work

10    you've done for Amgen, correct?

11    A    Yes.

12    Q    And then if we go to Page 2, on the top paragraph, but

13    it's not the whole paragraph yet.  That's right.

14             You say that the crude EPO in reserve here is

15    getting quite low and I have not yet found another good

16    source.  Correct?

17    A    Yes.

18    Q    And then at the bottom you say:  Among the users of pure

19    epo to be gotten from the present stock, it is important to

20    preserve an amount for future clinical testing; that is a

21    commitment I made a long time ago.  Correct?

22    A    Yes.

23    Q    So that was work that was not for Amgen, correct?

24    A    Yes.

25    Q    Now, if you go to the next page, the paragraph "You're
```

1    concerned," could you highlight that, please.

2           In the middle it says, after the word purification

3    in the third line, it says:  I must point out that while I

4    have done and will continue to do my best to cooperate with

5    Amgen on this problem, I cannot divert my whole lab to one

6    end.  University policy would forbid my doing so but even

7    more importantly, I have roughly $230,000 per year (direct

8    costs) in grants from NIH.  My primary obligation is to work

9    on problems for which I requested those funds and I cannot,

10   in any way jeopardize those grants or the positions of the

11   people funded by them.  It would be clearly -- it would

12   clearly be illegal, or at least unjustifiable, to use all of

13   the epo obtained through NIH funding for either private or

14   corporate gain.  Within the context of our mutual interest

15   in bringing the epo program to fruition, I will continue to

16   collaborate with Amgen, but I cannot make this lab into an

17   Amgen subsidiary funded by NIH.

18           And then at the end you say:  I cannot sell the

19   service of the University.

20           Do you see that?

21   A    Yes.

22   Q    And that was in response to Amgen's request that you

23   focus completely on Amgen?

24   A    Yes.

25   Q    And there you say the government is funding your

1    research to the tune of $230,000 a year?

2    A    Yes.

3    Q    And that's the material you're giving to Amgen?

4         **MR. FLOWERS:**  Objection; lacks foundation.

5    A    Actually --

6         **THE COURT:**  Well, no.  I'm slow and forgive me.

7    But there is an objection here.

8         **MS. BEN-AMI:**  I'll rephrase, your Honor.

9         **THE COURT:**  It's withdrawn.  Go ahead.

10   Q    That money includes the money to sequence the EPO

11   protein?

12        **MR. FLOWERS:**  Same objection; lacks foundation;

13   also relevance, your Honor.

14        **THE COURT:**  Overruled.  She may have it.

15   A    The budget for my research program did not specify any

16   amount for sequencing, and while it was in the proposed

17   research it's hard to say what importance it would have in

18   the overall budget.

19   Q    So in your grant proposal to the NIH where they fund

20   you, right --

21   A    Yes.

22   Q    -- in response to that you say, I'm going to use NIH

23   funds to sequence the protein?

24   A    Yes.

25   Q    And let's just look at that.  Here's PJP.  This is your

1    grant application, Doctor?

2    A    Yes.

3    Q    Were you funded?

4    A    Yes.

5    Q    And it says it's for 1983?

6    A    This is a supplemental, a request for supplemental funds

7    for that, that year, I think.

8    Q    You signed this document?

9    A    Yes.

10         **MS. BEN-AMI:**  Your Honor, I offer PJP.

11         **MR. FLOWERS:**  No objection.

12         **THE COURT:**  No objection?  PJP is admitted in

13   evidence, Exhibit 2043.

14         (Exhibit marked in evidence.)

15   Q    And if you look at the abstract of the research plan,

16   which is on Page 2.  If you could put that up, please.  In

17   the middle it says:  We will continue the study of

18   erythropoietin primary structure, both the protein and

19   carbohydrate portions.

20         Do you see that?

21   A    Yes.

22   Q    And at the time you filed this grant continuance,

23   supplemental grant proposal, with the NIH, in 1983, did you

24   tell the NIH that you were going to keep the sequence

25   information secret?

1    A    No.

2    Q    And you were saying you were going to use the government

3    funds to sequence EPO?

4    A    No.

5    Q    We will continue to study EPO primary structure.  Do you

6    see that?

7    A    Yes.

8    Q    And the primary structure includes the amino acid

9    sequence, correct?

10   A    Yes.

11   Q    And if you look at -- I'm going to have to get you to

12   this page, Doctor.  I'm looking at the page that ends with

13   21 in the production numbers, in the progress report

14   section, in the first paragraph.  In the fourth line it

15   says:  In collaboration with Dr. Leroy Hood, we have started

16   the study of the amino acid sequence.

17            Do you see that?

18   A    Yes.

19   Q    And there you don't tell the NIH that you've now given

20   the materials to Amgen and you're no longer doing the

21   sequencing, correct?

22   A    I don't know about the dates when the material was given

23   to Dr. Hood or when it was given to NIH -- to Amgen.

24   Q    Well, you know you gave Amgen material as early as 1981,

25   right?

1    A    I don't know -- I can't tell you right now whether that

2    was given to Cal Tech or to Amgen.

3    Q    Well, you understood that -- you never in your grant

4    application told the NIH that you were using the protein to

5    give to Amgen for sequencing, correct?

6    A    No.

7    Q    Now, let's look at Page 24 with the production numbers.

8    And I'm looking at the paragraph that says "We will

9    continue."  And there it says:  We will continue our

10   collaboration with Professor Hood in order to get as much

11   sequence information as possible.

12            Do you see that?

13   A    Yes.

14   Q    And you don't mention Amgen?

15   A    I don't know whether Amgen even existed when I wrote

16   that, so I can't be sure.

17   Q    Well, this is a supplement for the period in 1983, isn't

18   it?

19   A    The grant application was submitted in April of 1982.

20   Q    And it's for the period April 1983 to June '85?

21   A    Yes, you have to anticipate a great deal in writing

22   grant proposals.

23   Q    Do you have 239 in front of you.  The letter you wrote

24   to Mr. Stebbing?

25   A    Yes.

1    **THE COURT:**  Actually 2039, correct.

2    **MS. BEN-AMI:**  I'm sorry, 2039, your Honor.

3    **Q**   In the second full paragraph it says:  Let me first sum

4    up what this lab has already contributed to the EPO program

5    at Amgen.  Between January 1981 and April 1982 we sent six

6    different batches, and it goes on.

7        Do you see that?

8    A   Yes.

9    **Q**   So you were giving Amgen material to do its work before

10   you filed this grant application?

11   A   It appears so.

12   **Q**   And if you go back to the grant application, the next

13   paragraph, after the "We will continue," it says the

14   sequence information.  It says:  The sequence information

15   will also be used to prepare a synthetic oligodeoxy

16   nucleotide probe, following the method of Agarwal, for the

17   eventual purpose of isolating the EPO mRNA as an essential

18   prerequisite to preparing the cDNA that can be cloned.

19       Do you see that?

20   A   Yes.

21   **Q**   And so you are telling the NIH that with your government

22   funding you are going to use the sequence information to

23   prepare synthetic probes to clone the EPO gene, correct?

24   **MR. FLOWERS:**  Objection.  Objection, your Honor.

25   **THE COURT:**  Overruled.  She may have the question.

```
 1      The question's not evidence.

 2              Is that the answer?  What's the answer, excuse me.

 3              MR. FLOWERS:  Your Honor?

 4              THE COURT:  Yes.

 5              MR. FLOWERS:  I'm sorry, may we have a side bar on

 6      this, please?

 7              THE COURT:  You may.

 8      SIDEBAR CONFERENCE, AS FOLLOWS:

 9              THE COURT:  Yes?

10              MR. FLOWERS:  Your Honor, what is the relevance of

11      any of these issues on NIH funding?

12              THE COURT:  Yes, actually, that does give me pause.

13              MR. FLOWERS:  Yes.

14              THE COURT:  What's the relevance of this?

15              MS. BEN-AMI:  The relevance of this is to prove the

16      point on 102(g) derivation prior art and it is evidence to

17      prove that those skilled in the art knew that if you had the

18      sequence information as he proposes you can clone the gene.

19              Your Honor, in your opinion --

20              THE COURT:  All right.

21              MS. BEN-AMI:  Let me just -- okay, go ahead.

22              THE COURT:  I'm following that, but you've made

23      that point.

24              MS. BEN-AMI:  Well --

25              THE COURT:  It seems to me you don't need this.  I
```

1    think you've got -- one, I have grave doubts on whether this

2    is relevant; and two, you've got a 403 problem.  Because

3    we're not getting into any arguments about funding or that

4    the government supported this.  That -- you really flagged

5    that in your opening and that gave me pause.

6            Now, I think you have made the point and I imagine

7    I will allow you to argue the point that if you had the

8    sequence it was obvious.  You don't need this document for

9    that.

10           **MR. FLOWERS:**  Your Honor?

11           **THE COURT:**  I'm right on all this, aren't I?

12           **MR. FLOWERS:**  That's correct, your Honor.

13           **THE COURT:**  Thank you.

14           **MR. FLOWERS:**  Your Honor?

15           **MS. BEN-AMI:**  Your Honor, may I make one

16    other point and I will be quiet.  I won't move on.

17           **THE COURT:**  He just conceded something that I

18    think's significant to you.

19           **MS. BEN-AMI:**  Okay.

20           **THE COURT:**  But if you want --

21           **MS. BEN-AMI:**  Oh.

22           **THE COURT:**  It's your time.

23           **MS. BEN-AMI:**  Let's go on.

24           **MR. FLOWERS:**  Your Honor, your Honor, may I ask, we

25    did move on this in a motion in limine which was denied

1    without prejudice, I believe.  Could we get a granting of

2    that motion on an NIH funding issue that --

3              THE COURT:  I make my orders as we go along.  It's

4    moot.

5              MR. FLOWERS:  Thank you, your Honor.

6              (Whereupon the sidebar conference concluded.)

7              THE COURT:  The objection is sustained and move on,

8    Ms. Ben-Ami.

9    BY  MS. BEN-AMI

10   Q    Do you recall that Amgen asked you not to disclose the

11   protein sequence information -- I'm sorry, do you have a

12   drink of water, Doctor?

13   A    Yes.  But that doesn't affect my hearing.

14   Q    My question was, do you recall Amgen telling you that

15   they do not want you to release the protein sequence data?

16   A    The last word was lost.

17   Q    Data.  Data.

18   A    Data.

19   Q    They don't want you to release the --

20   A    Yes.

21   Q    -- protein sequence data?

22             And they told you that -- well, let me, rather than

23   characterize what they told you, let me hand you what's been

24   marked as 0RV.

25             Did you receive this letter, Doctor?

1    A    Yes.

2    Q    And do you know who Mr. Vapnek is?

3    A    Yes.

4    Q    He was an Amgen officer?

5    A    Yes.

6              **MS. BEN-AMI:**  I offer 0RV, your Honor.

7              **MR. FLOWERS:**  No objection.

8              **THE COURT:**  0RV is admitted in evidence,

9    Exhibit 2044.

10             (Exhibit marked in evidence.)

11   Q    And in this letter, Dr. Vapnek is telling you not to

12   report the protein sequence data at this time?

13             **MR. FLOWERS:**  Objection, your Honor.

14             **THE COURT:**  Well, sustained.  The document speaks

15   for itself.  You may ask him if that's what he understood.

16   It's in evidence now, the jury can see it.

17   Q    You understood that Dr. Vapnek was telling you not to

18   disclose the protein sequence?

19   A    He told me that they couldn't afford to release the

20   sequence.  I don't see that there's any command in there

21   that says I shouldn't.

22   Q    It says in the paragraph, I believe you could write the

23   grant in a way which would not require the release of the

24   protein sequence.

25             Do you see that?

1    A    Yes.

2    Q    So at this time you were writing a further document on

3    what you had done with your funding, correct?

4    A    Yes.

5    Q    And you wanted to disclose the protein sequence,

6    correct?

7    A    I'm sorry, your voice is --

8    Q    I'm sorry.  You wanted to disclose the protein sequence?

9    A    I don't recall whether I wanted to or not.  I certainly

10   would like to be able to.

11   Q    And there you say, Dr. Vapnek says to you, I believe

12   that you could write the grant in such, in a way which would

13   not require the, not require the release of the protein

14   sequence.  For example, you could refer to the work in a way

15   such as manuscript in preparation.

16          Correct?

17   A    Yes.

18   Q    So he's explaining to you ways that you could do what

19   you need to do for your grant and still not release the

20   protein sequence information?

21   A    From his suggestion, yes.

22   Q    Let me hand you another document which is PJT.  And this

23   is a grant application you were filing time at that time in

24   August of 1984, correct?

25   A    Yes.

1    **Q**   And that's why you were having this discussion with Dr.

2    Vapnek because you were filing another grant application,

3    correct?

4    A    That's why we were in communication, yes.

5    **Q**   Now, would you go to page -- can I help you because on

6    the Bates number, the production number, it's 64.   That's

7    where I am.

8                On Page 64, which is your slide 20, Mr. Fisher.

9            **MR. FLOWERS:**   I'm sorry?

10           **MS. BEN-AMI:**   Slide 20.   Yes.

11           **MR. FLOWERS:**   Your Honor, she's publishing this

12   before --

13           **MS. BEN-AMI:**   Oh, I'm sorry, I forgot to offer

14   this, didn't I?   I apologize.   I offer PJT.

15           **THE COURT:**   Do you object?

16           **MR. FLOWERS:**   No objection.

17           **THE COURT:**   PJT is admitted Exhibit 2045.   Now it

18   can be put up, and thank you.

19           (Exhibit marked in evidence.)

20   **Q**   So can we look at the Clinical Test of EPO.   Did you

21   write that?

22   A    Yes.

23   **Q**   And did you submit that to the NIH?

24   A    Yes.

25   **Q**   And did you file this document under oath?

```
 1    A   Yes.

 2              MS. BEN-AMI:  Your Honor, could I have a side bar?

 3              THE COURT:  You could.

 4    SIDEBAR CONFERENCE, AS FOLLOWS:

 5              MS. BEN-AMI:  I'm going to ask before I ask a

 6    question, I want to ask you if I can ask a question.

 7              THE COURT:  Sure.  I appreciate it.

 8              MS. BEN-AMI:  My question is:  You understood that

 9    because the EPO was purified with NIH funding you couldn't

10    get into business and sell it?  He has --

11              MR. FLOWERS:  And I would object, I would object on

12    the same grounds.

13              THE COURT:  Yes, I don't see why that's relevant.

14              MS. BEN-AMI:  That's why I asked --

15              THE COURT:  Thank you.

16              MS. BEN-AMI:  -- because I don't want to --

17              THE COURT:  No, that's fine.

18              MS. BEN-AMI:  -- get into it if you don't want me

19    to get into it.

20              I'm just seeing if there's anything else.

21              THE COURT:  I appreciate that.

22              MS. BEN-AMI:  I accept your Honor's ruling and I

23    don't want to do something that I can't.

24              THE COURT:  And while we're up, when do you think

25    you're going to be resting on validity since you say --
```

 1              **MS. BEN-AMI:**  I would say --

 2              **THE COURT:**  -- this week in your letter.

 3              **MS. BEN-AMI:**  Hopefully on Wednesday; otherwise,

 4     Friday morning.  But that begs the question about the double

 5     patenting issue and whether that would be done --

 6              **THE COURT:**  I appreciate it.  When we get to the

 7     break --

 8              **MS. BEN-AMI:**  Right.

 9              **THE COURT:**  -- I'm going to address it.

10              **MS. BEN-AMI:**  I don't know if it's possible to take

11     an early break today, your Honor.

12              **THE COURT:**  It's too early.

13              **MS. BEN-AMI:**  It's too early.  Okay.  All right.

14              (Whereupon the sidebar conference concluded.)

15     **BY  MS. BEN-AMI**

16     **Q**   Dr. Goldwasser, you had the amino acid sequence for

17     human EPO before November 1984, correct?

18     **A**   You asked did I have it --

19     **Q**   Yes.

20     **A**   -- before?  '84?

21     **Q**   November 1984.  You had it before November 1984?

22     **A**   I don't remember when I got all of the information.  I

23     can't give you a date.

24     **Q**   Let me hand you what's been marked as QDI.  Would you

25     look at this, Doctor.  Is this a letter you wrote to Dr. Lai

```
 1   at Amgen along with data?

 2   A   Yes.

 3   Q   And this is a -- did you write this on or around

 4   October 1984?

 5   A   Yes.

 6           MS. BEN-AMI:  I would offer QDI, your Honor.

 7           MR. FLOWERS:  No objection.

 8           THE COURT:  QDI is admitted, I believe it's 2046.

 9           (Exhibit marked in evidence.)

10   Q   Now, Doctor --

11           MS. BEN-AMI:  Can you bring that up please, the

12   first page.

13   Q   Now, at this time you're providing information to Dr.

14   Lai at Amgen?

15   A   Yes.

16   Q   And this is your scratching, your handwriting, correct?

17   A   Let me look at it.  Which particular page are you

18   talking about?

19   Q   You can just look through the handwriting.  A few pages

20   of it.  You can look at 2291, 2292.

21   A   Do you want me to point out wherever I see my own

22   handwriting?

23   Q   No.  This document includes your handwriting?

24   A   91 or 92.  That's not my handwriting.

25   Q   That's not your handwriting?
```

1  A   Sorry?

2  Q   It's not your handwriting?

3  A   It is not my handwriting.

4  Q   Yet it is something that you provided to Amgen?

5  A   I don't know where this came from.

6  Q   This is your signature, isn't it?

7  A   I'm sorry?

8  Q   It's your signature -- I'm sorry, I don't want to yell

9  at you, Doctor.

10 A   My signature on the letter but --

11 Q   Yes.

12 A   -- I don't know where that handwritten piece of paper

13 came from.

14 Q   You were already working on your paper --

15 A   Yes.

16 Q   -- disclosing the amino acid sequence of EPO in late

17 1984, correct?

18 A   Yes.

19 Q   And it wasn't published until 1986, correct?

20 A   Yes.

21 Q   And in that work, this 1984 work that was published in

22 1986, you disclosed that human urinary EPO is 166 amino

23 acids, correct?

24 A   I didn't disclose it.  It was, it had been said to be in

25 the paper by somebody else.

1    Q    Let me refresh your recollection, if I can.  Do you

2    recall a paper called the Lai for Dr. Lai paper, that you

3    worked on?

4    A    Yes.

5    Q    And in that paper of which you are an author you

6    disclosed that the amino acid sequence of the human EPO is

7    166, correct?

8    A    Yes.

9    Q    And that was based on this work that was done in 1984,

10   correct?

11   A    Not all of it, no.

12   Q    At least some of the work was done in 1984?

13   A    Yes.

14   Q    And you were aware that when Amgen sequenced your

15   urinary EPO they determined that it was 166 also?

16   A    They didn't determine that from the sequence.

17   Q    We will get to that with another document.

18            Let me hand you WGY.  This is the paper, the Lai

19   paper --

20   A    Yes.

21   Q    -- that you are an author?

22   A    Yes.

23   Q    And this paper relates to the sequencing of human EPO?

24   A    Yes.

25   Q    And this work was done, including in October of '84?

```
1    A    Yes.

2              MS. BEN-AMI:  Your Honor, I offer this paper, NMK.

3              MR. FLOWERS:  Objection, your Honor.

4              THE COURT:  Objection to NMK?

5              MR. FLOWERS:  Yes, your Honor.

6              THE COURT:  May I see it.

7              THE CLERK:  It's right here.

8              THE COURT:  Oh, I'm sorry.  No.  They're very good.

9    They gave me mine and I didn't pick it up.

10             MS. BEN-AMI:  May I have a side bar, your Honor?

11             THE COURT:  You may.

12   SIDEBAR CONFERENCE, AS FOLLOWS:

13             THE COURT:  What's the objection?

14             MR. FLOWERS:  Your Honor, we actually moved in

15   limine --

16             THE COURT:  Yes.

17             MR. FLOWERS:  -- for the exclusion of this because

18   it's not prior art.

19             THE COURT:  Why not?

20             MR. FLOWERS:  Because it's well after the date of

21   the invention and the filing of the application.

22             THE COURT:  Yes.  Why is it prior art?

23             MS. BEN-AMI:  He just testified that they did the

24   work in October of '84 and the patent was filed in

25   November '84.  So, that tells you under the 102(g) prior art
```

1    and written description issues in the case, it says that

2    when Amgen figured out what they had made it was 166 which

3    goes to the 165/166 written description argument.

4         **THE COURT:**  What do you say to that, the work was

5    done in November '84?

6         **MR. FLOWERS:**  He did not testify that all of the

7    work was done in November.  Much of the work, the evidence

8    is that actually much of the work was done after.

9         **THE COURT:**  Well, why don't you -- I hear that, but

10   suppose it was done in '84.

11        **MR. FLOWERS:**  Well, actually he didn't do the work.

12        **MR. DAY:**  It was done by Amgen, so it's not prior

13   art.

14        **MR. FLOWERS:**  I'm sorry.

15        **THE COURT:**  I really am held by one person arguing,

16   much as you all would like to argue.

17        **MR. FLOWERS:**  I'm sorry, your Honor.

18        **THE COURT:**  Yes.

19        **MR. FLOWERS:**  The work which was done at Amgen

20   cannot be used as prior art against Amgen.

21        **THE COURT:**  That's what Mr. Day said.  So what do

22   you say to that?

23        **MS. BEN-AMI:**  I start by saying Dr. Goldwasser says

24   it's done.  He's not an Amgen employee and he's, there's no

25   evidence he had a contract with them.

```
 1            MR. FLOWERS:  Your Honor, just because it's his

 2   statement on the paper doesn't mean that he did the work.

 3   He hasn't testified that he did the work described in this

 4   paper.

 5            THE COURT:  All right, now I think I have the four

 6   corners of the dispute.  You're going to have to lay further

 7   foundation.  I'll make my rulings.

 8            MS. BEN-AMI:  Okay.

 9            (Whereupon the sidebar conference concluded.)

10            MS. BEN-AMI:  May I proceed, your Honor?

11            THE COURT:  You may.

12   BY  MS. BEN-AMI

13   Q    Doctor, you were never an employee of Amgen?

14   A    That's true.

15   Q    And in October of 1984 you sent this document which is,

16   which was QDI, and it's now 2046, to Dr. Lai, correct?

17            MR. FLOWERS:  Objection, your Honor.  She hasn't

18   authenticated the attachment to this document.

19            THE COURT:  No, it's in evidence.  So it's in

20   evidence.  She's asking if this document, in evidence, was

21   sent.  The letter was sent.  And we'll see what he says.

22   A    The letter was sent.  Some of the information in it was

23   sent.  I don't know anything about some of these pages which

24   do not seem to have come from my office.

25   Q    The letter says here are the methods and the figure.
```

1    A    Yes.

2    Q    Right?

3         And then there's an attachment.  And there is on

4    the third page -- can we see the top of the third page.  It

5    has 78 at the bottom.  It says:  The primary structure of

6    human erythropoietin.  You are writing -- correct?  It says

7    that, right?

8    A    Yes.

9    Q    You are writing the paper on the primary structure of

10   human erythropoietin, correct?

11        **MR. FLOWERS:**  Objection; lacks foundation.

12        **THE COURT:**  No, overruled.

13   A    I'm not writing the whole paper.  I'm commenting on the

14   manuscript that I received, I believe.

15   Q    In the bottom of Page 84 it says supported in part by a

16   grant from the NIH.  Correct?

17   A    Yes.

18   Q    So, the work on the sequencing was not only funded by

19   Amgen?

20        **MR. FLOWERS:**  Objection, your Honor; same as before

21   on the funding issue.

22        **THE COURT:**  You've got to keep your voice up.

23        **MR. FLOWERS:**  I'm sorry, your Honor.

24        **THE COURT:**  No, in this case, it's overruled.

25   Overruled.  You may answer the question.  It says that,

1    doesn't it?

2           **THE WITNESS:**  It says supported in part.  And what

3    part that is is not explicit there.

4    Q    The topic of the paper is the primary structure of human

5    EPO, correct, Doctor?

6    A    Yes.

7    Q    And the primary structure, it means the amino acid

8    sequence, doesn't it, Doctor?

9    A    Yes.

10          **MS. BEN-AMI:**  And with that, your Honor, I would

11   offer NMK.

12          **THE COURT:**  And you preserve your objection, do

13   you?

14          **MR. FLOWERS:**  Yes, your Honor.

15          **THE COURT:**  Overruled.  NMK is admitted

16   Exhibit 2047.

17          (Exhibit marked in evidence.)

18   Q    And in 2047 -- in 2047 -- I think you have it already,

19   Doctor.

20   A    I have that, yes.

21   Q    I'm sorry.

22          You are the senior author, correct?

23   A    I don't know who the senior author is.  I would expect

24   it's Por Lai.

25   Q    Well, you're the last author.

1    A    Yes.

2    Q    Right?

3         And in this paper you disclose that the amino acid

4    sequence of human EPO is 166 amino acids, correct?

5    A    I'm sorry, I didn't hear all of that sentence.

6    Q    I'm sorry.  In your publication you disclose that the

7    amino acid sequence of human EPO is 166 amino acids,

8    correct?

9    A    That's what's in the paper, yes.

10   Q    Doctor, let me hand you another exhibit which is NAM.

11        Doctor, do you recognize this document?

12   A    Yes.

13   Q    And it is a thesis?

14   A    Yes.

15   Q    Of one of your grad students?

16   A    Yes.

17   Q    You reviewed this thesis at the time?  You reviewed this

18   thesis?

19   A    In great detail, yes.

20        **MS. BEN-AMI:**  Your Honor, I would offer NAM.

21        **THE COURT:**  Any objection?

22        **MR. FLOWERS:**  No ob --

23        **THE COURT:**  No?

24        **MR. FLOWERS:**  I'll object as to relevance, your

25   Honor.

1        **THE COURT:**  Overruled.  NAM is admitted,

2    Exhibit 2048.

3            (Exhibit marked in evidence.)

4    **Q**    Would you look at Page 60.

5    A    Page 60 you said?

6    **Q**    Do you have Page 60, Doctor?

7    A    Yes.

8    **Q**    And in Page 60 your grad student says that the results

9    here suggest that deglycosylated EPO may retain its ability

10   to stimulate erythropoiesis.

11           Do you see that?

12   A    Yes.

13   **Q**    And that the issue was how fast it got cleared, went

14   through the body?

15   A    That was a suggestion.

16   **Q**    That's what it says.

17   A    Yes.

18   **Q**    And that document was in 1982.  If you look on the third

19   page, or the third page where it says the University of

20   Chicago, it's dated.

21   A    Yes.

22           **MS. BEN-AMI:**  Can I have one moment, your Honor?

23           **THE COURT:**  You may.

24           **MS. BEN-AMI:**  With the Court's rulings then, your

25   Honor, predicated on those rulings, I will pass the witness.

1          **THE COURT:**  All right, it makes sense then we'll

2     take the recess at this time.  But do you have questions for

3     this witness, or do you want to reserve?

4          **MR. FLOWERS:**  Yes, your Honor, we have questions

5     for this witness.

6          **THE COURT:**  At this time?

7          **MR. FLOWERS:**  Yes.

8          **THE COURT:**  All right.  Well, we'll still take the

9     recess.

10         Ladies and gentlemen, we'll take the recess at this

11    time for only one-half hour.  You've not heard all the

12    evidence.  Please, therefore, keep your minds suspended.  Do

13    not discuss the case either among yourselves nor with anyone

14    else.

15         You may stand in recess for one-half hour until ten

16    minutes after 11:00.  I'll remain on the bench.

17         **THE CLERK:**  All rise for the jury.

18         (Whereupon the jury left the courtroom.)

19         **THE COURT:**  Please be seated, and you may step

20    down, sir.

21         (Whereupon the witness stepped down.)

22         **THE COURT:**  I remain on the bench because I've

23    received a letter from Roche, and since we're in the middle

24    of the trial it seemed prudential to address that letter at

25    once so all the parties could deal with it.

 1          I'm not inviting argument here and I would like to

 2   recess myself, but here's a letter dated this morning,

 3   September 10th, 2007, and I'm going to talk my way through

 4   it based on the subdivisions of that letter.

 5          First, the first subdivision has two paragraphs,

 6   and I'm talking about the first paragraph.  Roche is asking

 7   for guidance as to how I will take testimonial evidence on

 8   the matter of obviousness/double patenting outside the

 9   presence of the jury.

10          Answer?  I'm not clear.  And I'm not clear because

11   when we met last Friday, I said my analogy was to Markman

12   and I wouldn't be taking any evidence; that I would make the

13   determination based upon the patent, or the various patents

14   and the prosecution histories.

15          Since then, I think the proper analogy may be to

16   Festo.  Now, Festo -- I see you're frowning.  Not

17   substantively --

18          **MS. BEN-AMI:**  I'm not frowning.

19          **THE COURT:**  -- not substantively, Ms. Ben-Ami.  But

20   Festo, and I say this with respect, but the decision of the

21   Federal Circuit to call a Festo determination matter of law

22   is simply incomprehensible.  What they mean is, it is for

23   the Court.  But Festo determinations are exquisitely

24   detailed fact finding which they choose to review de novo

25   and call matters of law.  They can do that.  I obey.  But

1   conceptually it's extraordinarily confusing.  So I'm

2   starting out -- trials are real time.  My reference Friday

3   was to Markman.  Maybe that's it.  Maybe that's all we're

4   going to get.  There won't be any evidence.  On the other

5   hand, I may be wrong.  I may come to think -- I'm satisfied

6   it's with the Court, not the Jury -- I may come to think I

7   need evidence.  If I need evidence, I'll have to figure out

8   a time to get evidence.  Friday I said this all will have to

9   be decided before Roche rests on invalidity.  Monday

10  morning, I'm not so sure.  And I'm not so sure for this

11  reason.  If Roche is going to lose on obviousness, but

12  double patenting would save it, the answer is yes as against

13  directed verdict.  But if Roche is going to get to the jury

14  on obviousness, whatever I decide on double patenting, I

15  don't have to give you the answers until a reasonable time

16  prior to your final argument, because I will put in to the

17  prior art whatever needs to be put in.  That's my current

18  thinking.

19       Second, the second paragraph says can reference be

20  made to the '008 patent on the issue of where the profits

21  came from.  The answer is yes.

22       Subparagraph two.  It has a couple of sentences.  I

23  think that I agree with Roche's first sentence there.  I

24  don't have to make any particular rulings there, but as I

25  understand this case, I agree with that first sentence.

```
1              Subparagraph three.  I don't know.  I'm

2    considering.

3              Subparagraph four.  The Goldwasser clinical study

4    is prior art and motions in limine directed to that are

5    allowed.  I've prior held and been upheld.  Prior art.

6              Subparagraph five.  I'm not precluding anything.

7    I'm not precluding Amgen from arguing anything under five,

8    at least as the case is to this detail.

9              Then subparagraph six.  And I've read now Roche has

10   got problems with some of the things I've said to the jury.

11   Those will all be spelled out in the, in the final charge.

12             Roche requested a brief conference to review

13   Roche's defendant -- defenses that properly remain in the

14   case.  Everything remains in the case unless I've knocked it

15   out.  There has to be express orders.

16             Now, the time I may very well knock things out are

17   when Amgen moves for directed verdict at the close of the

18   validity case.  And we've got to figure out how we're going

19   to do that.  If, if they rest on Wednesday, I'm tied up

20   Wednesday afternoon.  So you don't have me Wednesday

21   afternoon.  If they rest early Friday morning, I don't want

22   to take the time to have argument at that time but --

23   because we're going to be on, we're going to be taking time

24   out of Amgen's case, because I'll say to Amgen, go ahead,

25   start putting on your defense.  But if I was going to direct
```

 1   it out that's a waste of time.

 2            The fair way to do it is this.  Amgen's going to

 3   have to start putting on its validity defense but if it's

 4   all directed out in a hearing that afternoon, I'm not going

 5   to give you all that much time for a hearing.  Half an hour

 6   will be enough.  We wouldn't start until 2:30 on Friday

 7   afternoon if that's when it is.  But if I'm going to direct

 8   it all out and Amgen's wasted the morning, well, I'll give

 9   Amgen back the time.

10            All right, that's my current thinking.  We'll

11   recess for 25 minutes.  We'll recess.

12            **THE CLERK:**  All rise.  Court is in recess.

13            (Recess.)

14            **THE CLERK:**  All rise for the jury.

15            (Whereupon the jury entered the courtroom.)

16            THE CLERK:  Court is in session, please be seated.

17            **THE COURT:**  Counsel?  And I didn't catch your name,

18   and I apologize.  I like to call people by name.

19            **MR. FLOWERS:**  Kevin Flowers, your Honor.  Kevin

20   Flowers.

21            **THE COURT:**  Mr. Flowers.  Yes, proceed.

22            **MR. FLOWERS:**  Thank you, your Honor.

23                        **CROSS-EXAMINATION**

24   **(BY MR. FLOWERS:)**

25   **Q.**  Good morning, Dr. Goldwasser.

1    A.   Good morning, Dr. Flowers.

2    Q.   When were you born, sir?

3    A.   I'm sorry?

4    Q.   When were you born?

5    A.   October 14th, 1922.

6    Q.   So you're 84 years old now?

7    A.   Yes.

8    Q.   You were a professor at the University of Chicago for 50

9    years?

10   A.   About that long, yes.

11   Q.   You retired in 2002?

12   A.   2002, yes.

13   Q.   What was your title when you retired?

14   A.   When I retired, I was the Alice Hogge and something or

15   other, I can't remember the name of the endowed

16   professorship, but it was an endowed professor of

17   biochemistry and molecular biology.

18   Q.   You're a professor emeritus now?

19   A.   Yes.

20   Q.   Do you still maintain an office at the university?

21   A.   Yes.

22   Q.   Do you still keep in contact with your scientific

23   colleagues?

24   A.   To some extent, yes.

25   Q.   How many total years of your life did you devote to

1   scientific research?

2   A.   Well, to be very honest about it, virtually my whole

3   life I wanted to be a scientist, since I was about ten years

4   old.

5   Q.   How many years of that research did you devote to the

6   research on EPO?

7   A.   I started working on EPO about 1953 or '4.

8   Q.   And you -- did you continue research on that until you

9   retired?

10  A.   Yes.

11  Q.   And did you accomplish any scientific papers on that

12  topic?

13  A.   Yes, I did.

14  Q.   Approximately how many?

15  A.   I don't keep the number in my mind; 150, 160, something

16  like that.

17  Q.   Did you publish any books?

18  A.   I edited three symposium books and I wrote one

19  biography.

20  Q.   In your research on EPO over the years, did you have any

21  goals for that research?

22  A.   I'm sorry, I can't hear you.

23  Q.   Did you have any goals for the research that you

24  performed on EPO over the years?

25  A.   My overall goal was to understand the chemistry of the

1    formation of red blood cells.  And also had a goal of

2    understanding -- of getting EPO research to a state where it

3    would benefit anemic people with kidney disease.

4    **Q.**  Did your goals change over time, over the years that you

5    were studying EPO?

6    A.  It fluctuated, depending on what kind of funding was

7    available, and which avenue of research seemed to be most

8    productive.

9    **Q.**  Did you have a source of EPO when you first began your

10   research?

11   A.  I thought we did, but it was totally inadequate.

12   **Q.**  So over the course of your research you obtained EPO?

13   A.  Yes.

14   **Q.**  And how did you go about obtaining EPO?

15   A.  Ah, do you mean at the end of it or all through it?

16   **Q.**  At the beginning.

17   A.  At the beginning -- EPO increases in mammals when they

18   are short of red cells.  So the amount in the circulation

19   goes up, could be 10, almost 100 fold in cases.  And so we

20   would make rabbits anemic and then isolate the plasma from

21   the anemic animals and work with it.  When that turned out

22   to be inadequate, we went to sheep, did the same thing.

23          And during that period, it was reported from a

24   number of labs that severely anemic people secreted EPO in

25   the urine, and that became the big source.

1   **Q.** And as you mentioned this morning, you were able to

2   purify human urinary EPO from human urine?

3   A.  Yes.

4   **Q.** And was that the only instance that you were -- was that

5   the only instance in which you were successful in purifying

6   EPO from a natural source?

7   A.  Well, we published a paper claiming the purification of

8   the sheep EPO, but we ended up with such a small amount that

9   it was sort of a curiosity rather than anything else.

10  **Q.** The EPO that you purified from human urine, from your

11  documents that we've seen this morning, you called that

12  urinary EPO.  Was that to designate its source?

13  A.  Yes.

14  **Q.** You were asked some questions by Ms. Ben-Ami about being

15  a sole source of EPO.  Do you recall that?

16  A.  Yes.

17  **Q.** And in 1977 you published a paper we've come to refer to

18  as the Miyake paper, Trial Exhibit 2002.  Do you recall

19  that?

20  A.  Yes.

21          **MR. FLOWERS:**  Could you put up 2002, please?

22  **Q.** And that is the paper that you published in 1977

23  describing your work in purifying human urinary EPO?

24  A.  Yes.

25  **Q.** And I think we could see --

1          **MR. FLOWERS:**  If you could blow that portion in the

2     top left corner.  Sorry, the top left corner of the page.

3     **Q.**  This was published in the Journal of Biological

4     Chemistry.  Do you see that?

5     A.  Yes.

6     **Q.**  Was that a prestigious journal in 1977?

7     A.  Yes.  Still is.

8     **Q.**  And, to your knowledge, was that a journal that was

9     widely circulated among scientists in 1977?

10    A.  Among biochemists, yes.

11    **Q.**  In this paper, did you tell one of ordinary skill what

12    they needed to know in order to purify urinary EPO from

13    human urine?

14         **MS. BEN-AMI:**  Objection, your Honor.  Sidebar.

15         **THE COURT:**  I don't think it's necessary.

16    Sustained.

17    **Q.**  When you published this paper in 1977, what was it you

18    described?

19    A.  We described the method, consisting of seven discrete

20    steps, in purifying human erythropoietin from urine of

21    anemic patients.

22    **Q.**  And were all of those steps required for the

23    purification of human urinary EPO?

24    A.  At that time, yes.

25         **MS. BEN-AMI:**  Objection, your Honor.

 1                   **THE COURT:**  Wait a minute.

 2              **THE WITNESS:**  Oh, I'm sorry.

 3              **THE COURT:**  Sustained.  The answer's stricken.

 4      Come to the sidebar.

 5      SIDEBAR CONFERENCE, AS FOLLOWS:

 6              **THE COURT:**  Let's get the ground rules clear.  He

 7      is an adverse witness.  You may cross-examine him because

 8      they've had -- they put him on as part of their case.

 9      You're strictly confined to what she inquired about, nothing

10      else.  No broad examination.

11              But that's not the problem.  The problem here is

12      that calls for expert testimony.  You haven't designated him

13      as an expert.  I won't let him testify as an expert, even

14      though I'm satisfied he is.

15              **MR. FLOWERS:**  Your Honor, he has been designated as

16      an expert in the case.

17              **THE COURT:**  By you?

18              **MR. FLOWERS:**  Yes, by Amgen, your Honor.

19              **THE COURT:**  Where's his report?

20              **MR. FLOWERS:**  We have his report.  He's being

21      called as a fact witness.  I'm trying to just maintain

22      examination that calls for facts.

23              **THE COURT:**  To that extent, you have it.  You may

24      recall him in your case, as an expert, and put him on.  You

25      may give her the report then.  And you see the line.  He may

1    read, he may read from documents she put in evidence.  If

2    there's a term in the document that needs to be explained,

3    he may explain that.  But he may not testify as an expert.

4    It's relevant, you can get that question, just not today.

5            (Whereupon the sidebar conference concluded.)

6    **(BY MR. FLOWERS:)**

7    **Q.**  Dr. Goldwasser, with the methods described in the Miyake

8    paper that we were just looking at, from 1977, you were able

9    to purify human urinary EPO?

10   A.  Yes.

11   **Q.**  In that paper you described the use of laboratory

12   equipment and reagents?

13   A.  Yes.

14   **Q.**  Were those laboratory equipment, pieces of equipment

15   that you used at that time to do that work, and the reagents

16   you used, publicly available?

17           **MS. BEN-AMI:**  Objection, your Honor.

18           **THE COURT:**  No, overruled.  He may have that.  And

19   the question:  Were those materials, reagents publicly

20   available?

21           **THE WITNESS:**  Yes, they were.

22   **Q.**  After you published this paper in 1977, but before

23   Dr. Lin's work in cloning the EPO gene in 1983, did

24   scientists ever inquire of you about the methods in this

25   paper?

```
 1    A.  Yes.

 2    Q.  And did you answer their questions?

 3    A.  Yes --

 4            MS. BEN-AMI:  Objection, your Honor.  This is --

 5            THE COURT:  No, no, wait a second.  No, overruled.

 6            MS. BEN-AMI:  Your Honor, I do need a sidebar.

 7            THE COURT:  All right.  You may have it.

 8    SIDEBAR CONFERENCE, AS FOLLOWS:

 9            THE COURT:  The problem?

10            MS. BEN-AMI:  I had a very narrow direct in terms

11    of what I asked.

12            THE COURT:  Yes, you did.  I'm really going to try

13    and hold it to him.  But -- hold him to it.  But you put the

14    document in.

15            MS. BEN-AMI:  I didn't put the document in with

16    this witness.

17            THE COURT:  All right.

18            MS. BEN-AMI:  What they're trying to do, your

19    Honor, is say oh --

20            THE COURT:  I understand.  You didn't put the

21    document in.  That makes a difference to me.

22            Why is it within the scope?

23            MR. FLOWERS:  Ms. Ben-Ami, her entire --

24    practically her entire examination of Dr. Goldwasser was to

25    position him as the sole source of EPO in the world.  This
```

1    document shows that it was publicly available.

2            THE COURT:  It's beyond the scope.  You can't try

3    your case in the middle of her case this way.  She gets to

4    call this witness.  She did do a narrow examination.

5            But you can recall him.  That's why I asked you, do

6    you want him now, do you want him later.  If you want him

7    now, you're stuck to just what she asked him.  If he has to

8    explain that, fine.

9            Now, sustained, since she didn't put this document

10   in, through him.

11           MR. FLOWERS:  I don't understand how I can address

12   her argument, in her case --

13           THE COURT:  Maybe you can't now.

14           MR. FLOWERS:  -- that he was the sole source of EPO

15   in the world without having him testify that he wasn't the

16   sole source of EPO in the world.

17           THE COURT:  Ask him.

18           MR. FLOWERS:  No document that he published in the

19   world would show that he wasn't the source.

20           THE COURT:  The document's in evidence.  You may

21   make the argument; you're just not going to get any more out

22   of it from him.  It's unfair to try your case in the middle

23   of her case.  The document's in evidence.  You may make that

24   argument; not today.

25           (Whereupon the sidebar conference concluded.)

1    **THE COURT:**  In view of these rulings, you may wish

2    to recall this witness, but do you want to ask him more

3    questions now?

4    **MR. FLOWERS:**  I would like to ask him more

5    questions now, your Honor.

6    **THE COURT:**  Go right ahead.

7    **(BY MR. FLOWERS:)**

8    Q.  Dr. Goldwasser, Ms. Ben-Ami asked you questions about

9    purified urinary EPO that you had in 1977, some of which you

10   supplied to Amgen.  I'd like to ask you, who owned that

11   purified human urinary EPO?

12   A.  I think --

13   **MS. BEN-AMI:**  Objection, your Honor.

14   **THE COURT:**  Oh, no, overruled.  He may tell us

15   that, what he understands.

16   A.  According to the rules in effect for NIH grants at the

17   time, it was owned by the investigator, me.

18   Q.  What's your basis for saying that?

19   A.  That's how I remember it, the rules in effect then.  But

20   that sometimes --

21   **MS. BEN-AMI:**  Objection, your Honor.

22   **THE COURT:**  No, that may stand.

23   Q.  In your mind, in 1977, continuing through 1983, did you

24   believe that you had the right to determine whether that

25   urinary EPO could be distributed to other scientists?

1    A.  Yes, I did.

2    Q.  Did you believe at the time that it was your decision to

3    make as to who that EPO could be distributed to?

4         MS. BEN-AMI:  Your Honor, may I have a sidebar?

5         THE COURT:  I don't think it's necessary.

6    Overruled.

7         MS. BEN-AMI:  A door's being opened here.

8         THE COURT:  That may be true.  That may well be

9    true.  But he may have the question.

10         THE WITNESS:  Could you repeat it, please?  I get

11   lost in the by-play.

12         THE COURT:  Yes, and that's why I try to keep it

13   out of the hearing of the jury.  I don't want people lost.

14   But his question was:  Do you think you -- it was up to you,

15   do you think it was up to you to decide to whom to give the

16   material, or sell the material, or distribute, that may be

17   it, the material at that time?

18         THE WITNESS:  Yes, it was up to me, except I was

19   not permitted to sell it.

20   Q.  Thank you.  Ms. Ben-Ami asked you some questions about

21   your relationship with Amgen back in that 1980, '81, '82,

22   '83 time frame.  I wanted to follow up on that.

23         In your mind, today, do you believe that there was

24   anything improper about your relationship with Amgen in the

25   1980s?

 1              **MS. BEN-AMI:**  Objection, your Honor.

 2              **THE COURT:**  No, overruled.  He may ask that now.

 3    A.  I do not.

 4    **Q.**  Why?

 5    A.  Before I entered into the consultantship and

 6    collaboration with Amgen, I called someone at NIH to make

 7    sure that NIH had no objection to it.  And I checked with

 8    the Department of Legal Affairs at the University of Chicago

 9    to make sure it was within the university rules.  That left

10    me with the feeling that I wasn't doing anything improper.

11              **MR. FLOWERS:**  Your Honor, may I approach?

12              **THE COURT:**  You may.

13              **MR. FLOWERS:**  Your Honor?

14    **Q.**  Doctor, I've handed you an exhibit, OLP.  Do you

15    recognize this document?

16    A.  Yes.

17    **Q.**  What is it?

18    A.  It's a memo from me to Dr. Ted Steck, who was then

19    chairman of the department.

20    **Q.**  When was this document created?

21    A.  It's dated 1980.

22              **MR. FLOWERS:**  Your Honor, I'd move OLP into

23    evidence.

24              **THE COURT:**  Any objection?

25              **MS. BEN-AMI:**  No objection, your Honor.

1          THE COURT:  OLP is admitted, exhibit -- and now

2     we're in your series, so it would be 15; is that right?

3          MR. FLOWERS:  Fifteen, your Honor.

4          THE COURT:  Exhibit 15.

5          (Exhibit marked in evidence.)

6          THE COURT:  Now, it's perfectly sensible for them

7     to pick out different parts of a numeric universe to mark

8     their exhibits.  And it's simple, and I can follow it.  I

9     just want to emphasize to you, it makes no difference who

10    puts in what evidence.  Evidence is evidence, it's up to you

11    what you make of it.  Which lawyer lays a piece of evidence

12    before you makes no difference.

13         So don't, in a subtle way, let the numbers

14    reinforce that.  That's just not right.  We do this simply

15    for its simplicity in record-keeping.

16         All right.  Go ahead, Mr. Flowers.  This is Exhibit

17    15.

18    Q.  Dr. Goldwasser, you said that this was a note from you

19    to Dr. Steck, who was the chairman of the Biochemistry

20    Department at the University of Chicago in 1980?

21    A.  Yes.

22    Q.  And why did you send him this note?

23    A.  I suppose I had to touch all bases, as the note said.  I

24    needed the dean's approval and I couldn't get the dean's

25    approval without the department's approval.

1    **Q.**  The approval to become a member or become affiliated or

2    associated with Amgen?

3    A.  Yes.

4    **Q.**  Did you receive any objection from Dr. Steck?

5    A.  No.

6    **Q.**  This letter says that if Dr. Steck approved, that you

7    would take it to the dean.  Did you do that?

8    A.  Yes.

9    **Q.**  Did you receive any objection?

10   A.  No.

11   **Q.**  I think earlier you mentioned checking with someone at

12   the NIH.  Did you check with someone at the NIH about the

13   propriety of your relationship with Amgen?

14   A.  I did.

15   **Q.**  And what did you -- what were you told?

16        **MS. BEN-AMI:**  Objection, your Honor.  There's no

17   foundation.

18        **THE COURT:**  Yes, sustained as to what he was told.

19   I mean, it would be hearsay.

20   **Q.**  Did you believe that your relationship with Amgen was

21   proper after speaking with the NIH?

22   A.  Yes.

23   **Q.**  Now, earlier, Ms. Ben-Ami asked you about the urinary

24   EPO, and she said, and I believe you answered, that you

25   purified about 8 milligrams of urinary EPO; is that correct?

1    A.  Yes.

2    **Q.**  Of that total amount of urinary EPO that you purified in

3    1977, what percentage of that did you share with Amgen prior

4    to Dr. Lin's cloning of the gene?

5    A.  I never made that calculation, but I would think it was

6    of the order of 10 to 15 percent.

7    **Q.**  So 10 to 15 percent.  Why didn't you send more of your

8    urinary EPO to Amgen than 10 to 15 percent?

9    A.  There were other things that I needed to do with the

10   EPO.

11   **Q.**  Such as?

12   A.  We were working on its structure.  I had also committed

13   myself to giving a fair amount, or making available a fair

14   amount to the whole community of people doing research on

15   EPO for the purpose of radioimmunoassay.

16           (Whereupon counsel conferred.)

17   **Q.**  At this time, in the early 1980s, Doctor, was Amgen

18   providing funding to your lab?

19   A.  Yes.

20   **Q.**  And the work that you were doing in your lab relating to

21   your association with Amgen, was that -- that was funded by

22   Amgen?

23   A.  Not completely, no.  They -- the amount of funding from

24   Amgen was tiny.

25           **MR. FLOWERS:**  Can we go to 2042?

1          (Whereupon counsel conferred.)

2    **Q.**  So, Doctor, this is the letter from you to Dr. Stebbing,

3    in 1982, that you spoke about with Ms. Ben-Ami earlier this

4    morning, and she took you to a section in this paragraph

5    where it said, It would clearly be illegal or at least

6    unjustifiable to use all of the EPO obtained through NIH

7    funding for either private or corporate gain, and that you

8    would continue to collaborate with Amgen but you cannot make

9    that lab or make your lab into an Amgen subsidiary funded by

10   NIH.

11         Why did you feel the need to tell Mr. -- or

12   Dr. Stebbing --

13   **A.**  Nowell Stebbing was hounding me about sending more EPO

14   to Amgen, and I was digging in my heels, in essence, saying

15   he couldn't run my lab.

16   **Q.**  So Amgen wanted as much as they could get from you?

17   **A.**  Yes.

18   **Q.**  And you refused to provide it?

19   **A.**  Yes.

20   **Q.**  Why did you refuse?

21   **A.**  I had other things to do, and as I think I said in that

22   letter, an obligation to do the research I had proposed to

23   the NIH with the EPO I had.

24   **Q.**  So because you had applied for and received funding from

25   NIH for certain experiments, you felt you had an obligation

1    to complete those experiments?

2    A.   To do the best I could do, yes.

3    **Q.**   And did you?

4    A.   Yes.

5    **Q.**   Did your research grants from the NIH or from the U.S.

6    Government require you to give your urinary EPO to everyone

7    or anyone who might ask for it?

8    A.   No.

9    **Q.**   Was there anything that required you to give or share

10   your urinary EPO with anyone or everyone who asked for it?

11   A.   My concern for advancement in the field required me to

12   do that, but that's only an internal requirement.

13   **Q.**   And did you actually distribute urinary EPO or share

14   your urinary EPO with other scientists in the world in order

15   to promote the advancement of scientific research?

16   A.   Yes.

17   **Q.**   Did the fact that you received research grants from the

18   government, from the NIH, did that prohibit you or otherwise

19   limit you in to whom you could give the urinary EPO?

20   A.   No.

21   **Q.**   And once you had that urinary EPO, you had purified the

22   urinary EPO, you felt that you were the one who could decide

23   who would get some of that urinary EPO?

24   A.   Yes.

25   **Q.**   And did you do that on the basis of trying to advance

1    the science surrounding EPO?

2    A.  Yes.

3    **Q.**  Did you share your urinary EPO with scientists in

4    companies?

5    A.  Yes.

6    **Q.**  Did you share it with scientists in companies other than

7    Amgen?

8    A.  Yes.

9    **Q.**  Did you share your urinary EPO with scientists who were

10   working in universities?

11   A.  Yes.

12   **Q.**  If I can hand you Exhibit FKM.  Doctor, I've handed you

13   Exhibit FKM.  What is this document?

14   A.  It's essentially a log of when, how much, and to whom

15   various preparations of EPO were sent out from our lab.

16   **Q.**  And why was this document created?

17   A.  I just wanted to have a record of it.

18   **Q.**  Was this document maintained under your direction in

19   your laboratory?

20   A.  Yes.

21   **Q.**  And when was this document first created?

22   A.  The first date on there is December of '76, December 7.

23            **MR. FLOWERS:**  Your Honor, I'd offer Exhibit FKM.

24            **MS. BEN-AMI:**  No objection.

25            **THE COURT:**  FKM is admitted, Exhibit 16.

1                    (Exhibit marked in evidence.)

2    **Q.**  So, Doctor, does this log record or contain an entry for

3    all of the EPO that was sent out from your lab?

4    A.  Most of it.  I couldn't swear that everything got

5    included in here.

6    **Q.**  But I see the first, as you said, the first entry on the

7    log is from December 7th, 1976, and the last entry appears

8    to be from May 1996.

9    A.  Yes.

10   **Q.**  This document, was this document your attempt to record,

11   at least significantly, or nearly all of the EPO that was

12   sent out of your lab?

13   A.  That's what we tried to do.

14   **Q.**  And on this first page, the columns are date -- correct

15   me if I'm wrong -- date, preparation, amount sent, SP

16   activity, and to who?

17   A.  Right.

18   **Q.**  Did I get that right?

19           What was SP activity?

20   A.  Specific activities, as it says in parentheses, units

21   per AU, or absorbents unit, which is a measure of how much

22   protein there is in there.

23   **Q.**  And so SP activity, what was that meant to designate?

24   A.  I'm sorry?

25   **Q.**  What was SP, specific activity, meant to designate on

1   this document?

2   A.   The quality of the material, whether it was highly pure,

3   very crude or somewhere in between.

4         (Whereupon counsel conferred.)

5   Q.   At the top of this page on the upper right, it has an

6   asterisk, it says -- pardon me if I'm wrong -- "For NIH

7   distribution"?

8   A.   On what page?

9   Q.   The top of the second page?

10  A.   Yes.

11  Q.   I see some entries below that, in the to-whom column, or

12  the specific activity column, where there are some

13  asterisks.  What did that mean, "For NIH distribution"?

14  A.   I had decided that with many, many people asking me for

15  EPO, I didn't want to be the one to choose who would get it

16  and how to send it out, and just have my labs converted to a

17  clearinghouse.  So I decided to give a reasonable amount of

18  highly purified EPO, in very small amounts, in individual

19  tubes, to my former post-doc Peter Dukes at University of

20  Southern California, who acted as the clearinghouse.  And I

21  asked the particular branch at NIH to set up a subcommittee

22  that would make the decision as to which request would be

23  filled, which denied, so I wouldn't have anything to do with

24  it.

25  Q.   And so, in fact, you sent out highly purified urinary

1    EPO to Dr. Dukes, and it was in individual containers?

2    A.   In tiny tubes, each one containing about .7 of a

3    microgram.

4    Q.   It was your intent that that EPO would be distributed to

5    scientists who requested it?

6    A.   Yes.   But I believe the original condition was that it

7    was to be used for labeling with radioactive iodine to be

8    used in the radioimmunoassay.

9    Q.   So in the RIA?

10   A.   Yes.

11   Q.   And that was your understanding, was that was something

12   that scientists wanted for EPO RIA?

13   A.   It was necessary.

14   Q.   Did you make multiple shipments to Dr. Dukes of the

15   urinary EPO?

16   A.   Yes.   I don't remember how many; about five or six.

17   Q.   Was it your understanding that Dr. Dukes continued to

18   distribute that urinary EPO to other scientists?

19             MS. BEN-AMI:   Objection, your Honor.

20             THE COURT:   Sustained.

21             I'll reverse myself on that.

22             Was that your understanding when you transmitted it

23   to him?

24             THE WITNESS:   Yes.

25             THE COURT:   All right.   I'll let that stand.

1   Q.  How long did that distribution by Dr. Dukes go on, to

2   your knowledge?

3   A.  I don't remember how long.

4   Q.  Did it go into the 1980s?

5   A.  I can't really say.

6   Q.  Going down on this, just on this first page, it looks

7   like there are a number of names.  It's going to be hard to

8   see, but I see Dr. Dukes, of course, then I see what I

9   assume to be Dr. Fried, Dr. Trobough, Dr. Price.  Still on

10  the second page.

11  A.  On the second page, sorry.

12  Q.  Dr. Iscove, Dr. Ogawa.  Do you see those?

13  A.  Yes, uhm-hmm.

14  Q.  Are those scientists to whom you sent urinary EPO?

15  A.  Yes.

16  Q.  If you continue on to the next page, page 3, I see

17  Dr. Garcia, Dr. Golde?

18  A.  Right.

19  Q.  Dr. Devorah --

20  A.  Actually, that's her first name.  She had worked in my

21  lab so she got identified by her first name.  Her name was

22  Potenke.

23  Q.  Call her Dr. P.  Dr. DiSimone, Dr. Dexter, Dr. Eliason,

24  and so forth.

25  A.  Yes.

1   Q.   Do you have any idea how many doctors around the world

2   you distributed urinary EPO to?

3   A.   I never counted them up, no.

4   Q.   If you turn to page 5 of the document, does this show

5   that you were sending any urinary EPO to Amgen?

6   A.   Yes.

7   Q.   Does it also show at the same time you were sending

8   urinary EPO to other scientists?

9   A.   Yes.

10   Q.   Outside of Amgen?

11   A.   Yes.

12   Q.   And that continues on to page 6.  Now we're in 1983,

13   into 1984; is that correct?

14   A.   Yes.

15   Q.   And you continued to send urinary EPO out to other

16   scientists?

17   A.   Yes.

18   Q.   Because they were requesting it from you?

19   A.   Yes.

20   Q.   Was the urinary EPO that you sent out to other

21   scientists from your lab, was that solely for use in RIA?

22   A.   No.

23   Q.   Doctor, if you turn back to page 3 -- I'm sorry to skip

24   around -- I see towards the bottom of that page on the

25   right-hand side, there's a Dr. D.F. Lawrason,

1    Schering-Plough Corporation?

2    A.  Yes.

3    Q.  Why were you sending urinary EPO to Schering?

4    A.  They had asked me for some.  I believe it was to try to

5    immunize some rabbits because they got a very crude

6    preparation of EPO.

7    Q.  If you turn to the next page, page 4, in the upper right

8    there, you see Bernard Mach, University of Geneva?

9    A.  Yes.

10   Q.  You sent out urinary EPO to Dr. Mach?

11   A.  Yes.

12   Q.  I believe earlier you testified he was affiliated both

13   with the university and with the company Biogen?

14   A.  Yes.

15   Q.  Was he affiliated with Schering?

16   A.  My understanding was that Schering-Plough owned Biogen,

17   but I don't know for sure.

18   Q.  Why were you giving urinary EPO to Dr. Mach?

19   A.  He wanted some, actually two different preparations,

20   sent to him.  He wanted some for RIA, and I don't know what

21   the other purpose was, but we sent him crude material as

22   well.

23   Q.  Did he ask you for any urinary EPO for sequencing for

24   use in cloning the gene?

25   A.  Well, the .7 micrograms wouldn't have been sufficient

1     for sequencing, and the other material wouldn't have been

2     suitable for sequencing.

3     **Q.**  So he wasn't asking you for that urinary EPO for

4     sequencing purposes?

5     A.  No, he wasn't.

6     **Q.**  If you move further down the list on this same page, I

7     see an entry, I believe Judy Sherwood, Albert Einstein

8     College of Medicine; is that correct?

9     A.  Yes.

10    **Q.**  And you sent urinary EPO to Dr. Sherwood at the Albert

11    Einstein College?

12    A.  Yes.

13    **Q.**  Are there other entries in the log showing that you sent

14    urinary EPO to Dr. Sherwood?

15    A.  I expect so.  I'd have to look and see.  Yes, there's

16    one in December of '85.

17             **MS. BEN-AMI:**  Your Honor, I would object.  Can I

18    have a sidebar on the dates on this?

19             **THE COURT:**  You may.

20    SIDEBAR CONFERENCE, AS FOLLOWS:

21             **THE COURT:**  Yes?

22             **MS. BEN-AMI:**  Ready?

23             **THE COURT:**  Yes.

24             **MS. BEN-AMI:**  The claimed invention is October '83.

25    The patent was filed in November '84.  If he sent people EPO

```
 1    after Amgen already did its work and filed its patent, it's
 2    not really relevant to this case.
 3              THE COURT:  But isn't the key date November '84?
 4              MS. BEN-AMI:  Yes.  This was '85.
 5              THE COURT:  Say what you said again.  If he's
 6    sending people stuff in '85, it wouldn't be relevant.
 7              MR. FLOWERS:  Your Honor, if that's the objection,
 8    I can withdraw it.  It's not important.
 9              MS. BEN-AMI:  As long as we can stay up to '84, I'm
10    okay.
11              (Whereupon the sidebar conference concluded.)
12              THE COURT:  It's withdrawn, and proceed.
13    (BY MR. FLOWERS:)
14    Q.  To your knowledge, Dr. Goldwasser, was Dr. Sherwood
15    collaborating with any biotech companies in the early 1980s?
16              MS. BEN-AMI:  Objection, your Honor.  Along the
17    same topic.
18              THE COURT:  Yes.  1985, he said.
19              MR. FLOWERS:  I was asking in the early 1980s.  I
20    can be more specific.
21              THE COURT:  Please do.
22    Q.  In the early 1980s, 1982, '83, '84, to your knowledge,
23    was Dr. Sherwood collaborating with any biotech company?
24    A.  I did not know that, no.
25    Q.  I hand you Exhibit GPZ.  Doctor, do you have GPZ?
```

1    A.   Sorry?

2    Q.   Do you have Exhibit GPZ?

3    A.   Yes.

4    Q.   What is this document?

5    A.   It's a note from me to Dr. Sherwood reminding her of a

6    meeting we were supposed to have in Washington.

7    Q.   What's the date of this document?

8    A.   November 8th, 1982.

9            MR. FLOWERS:   Your Honor, I'd offer Exhibit GPZ.

10           MS. BEN-AMI:   I object to the document, your Honor,

11   as to the handwriting.

12           THE COURT:   It's without the handwriting?

13           MR. FLOWERS:   At this time, your Honor --

14           THE COURT:   Well, all right.   It may not be

15   published to the jury, but excising the handwriting in the

16   lower right -- the signature and the addressee, that

17   handwriting may stand -- excising that, it's admitted.   GPZ

18   will be Exhibit 17.

19           (Exhibit marked in evidence.)

20   Q.   Doctor, does this letter indicate that you sent any

21   urinary EPO to Dr. Sherwood in November 1982?

22   A.   It says that I did send it with that letter, yes.

23   Q.   And how much did you send Dr. Sherwood?

24   A.   80 milligrams.

25           MS. BEN-AMI:   Your Honor, I object to the second

1    page as well, which has not been authenticated.

2         **THE COURT:**  Well, now, just a moment.  Yes,

3    sustained, and we won't get into that on this foundation.

4    Just the first page is admitted.

5    **Q.**  Doctor, there is some handwriting in the document, on

6    the document in front of you, in the lower right-hand

7    portion.  Do you recognize the handwriting?

8    A.  No.

9    **Q.**  Dr. Goldwasser, do you remember collaborating with a

10   scientist by the name of Dr. Gisela Clemons?

11   A.  Yes.

12   **Q.**  And who is she?

13   A.  She worked at the Lawrence Berkeley lab in California.

14   She had been a collaborator of Joseph Garcia, and kept on

15   working on RIA and other matters concerning EPO.  After Joe

16   died, she went on with the work by herself.

17   **Q.**  And did you collaborate with Dr. Clemons on EPO

18   research?

19   A.  On what?

20   **Q.**  On EPO research?  I'm sorry.

21        **MS. BEN-AMI:**  Your Honor, I object.

22   A.  I saw her fairly frequently.

23        **MS. BEN-AMI:**  Beyond the scope.

24        **THE COURT:**  It is.  Sustained.

25   **Q.**  Dr. Goldwasser, did you share any of your urinary EPO

1    with Dr. Clemons?

2          **MS. BEN-AMI:**  Objection.

3    A.  I'd have to look on the log to see.

4          **THE COURT:**  In view of that answer, do you press

5    the objection?

6          **MS. BEN-AMI:**  If he was just looking at the log.

7          **THE COURT:**  Well, it may be, and -- but I'm going

8    to let that stand.  It's not evidence he did, it's evidence

9    that he'd have to look at the log.

10   **Q.**  Doctor, let me --

11         **THE COURT:**  It's up to you what you make of it,

12   members of jury.  Go ahead.

13         **MR. FLOWERS:**  I'm sorry.

14   **Q.**  Doctor, let me hand you Exhibit OQP.  Doctor, do you

15   recognize this document?

16   A.  Yes.

17   **Q.**  What is it?

18   A.  It's a small note from me to Gisela Clemons.

19   **Q.**  What's the date on the letter?

20   A.  August 23rd, 1983.

21         **MR. FLOWERS:**  Your Honor, I'd offer OQP.

22         **MS. BEN-AMI:**  I object, your Honor.  It's beyond

23   the scope.

24         **THE COURT:**  No, I think not.  Overruled.  He may

25   have it.  OQP is admitted in evidence, Exhibit 18.

1          (Exhibit marked in evidence.)

2    **Q.**  Doctor, in this letter, from you to Dr. Clemons, in

3    1983, it says, Additionally I'm willing to process the

4    200,000 units of crude EPO per year supplied by your lab and

5    return to you one half of the final product.  This should

6    amount to between .5 and 1 milligram of pure material per

7    year for each laboratory.

8          Do you see that?

9    A.  Yes.

10   **Q.**  So were you willing, in August of 1983, to supply

11   Dr. Clemons with milligram quantities of pure EPO?

12   A.  Depending on whether she supplied me with the raw

13   material, yes.

14   **Q.**  Was the .5 to 1 milligrams of pure material that you

15   were discussing with Dr. Clemons, was that comparable to the

16   amount of EPO that you shared with Amgen before Dr. Lin

17   cloned the gene?

18   A.  Comparable.  I can't give you and exact ratio.

19   **Q.**  And you were willing to supply or share that EPO with

20   Dr. Clemons, even though you were a consultant for Amgen at

21   the time?

22   A.  Yes.

23   **Q.**  In 1982 and 1983, when you were a consultant with Amgen,

24   to your knowledge, were there scientists other than Dr. Lin

25   who were trying to clone the EPO gene?

 1           MS. BEN-AMI:  Objection, your Honor.

 2           THE COURT:  Sustained, as beyond the scope.  You'll

 3    have this witness back.

 4    Q.  Doctor, I put up claim 1 of Dr. Lin's '422 patent on the

 5    board, which is blown up, the claim, but what I want to ask

 6    you, was the urinary EPO that you purified in 1977, was it

 7    purified from mammalian cells grown in culture?

 8           MS. BEN-AMI:  Judge, I object.  It's beyond the

 9    scope.

10           THE COURT:  It is.  Sustained.

11           MS. BEN-AMI:  May it be taken down, your Honor?

12           THE COURT:  It may be.

13    Q.  Dr. Goldwasser, the urinary EPO that you purified in

14    1977, and that you shared with scientists, including those

15    at Amgen, was that urinary EPO from a natural source?

16    A.  From a what?

17    Q.  A natural source?

18    A.  Yes.

19    Q.  It was from human urine?

20    A.  Yes.

21    Q.  It was not from cells?

22           MS. BEN-AMI:  Objection, your Honor.  Beyond the

23    scope.

24           THE COURT:  Sustained on that ground.

25           What's going on here, the rule is this, that

1    there's evidence here that Dr. Goldwasser is associated

2    with, at present, in some fashion -- don't take it from me,

3    and I shouldn't characterize it -- associated in some

4    fashion today with Amgen.  And that's fine.  And that's

5    perfectly appropriate.  And Amgen can call him as a witness.

6    But for whatever reason, Ms. Ben-Ami wanted to call him as a

7    witness as part of her case.  She gets to do that.  She's

8    asked him questions and you've heard the answers.

9           Now, they can't put in their Amgen case in the

10   middle of her case.  Evidently, they're going to have him

11   back.  So I'm just sticking to those things that Ms. Ben-Ami

12   asked him about.  That's all.  Not that what Mr. Flowers is

13   asking is not interesting and may be, and maybe we're going

14   to hear it, but we're going to hear it when we get to Amgen.

15   We're hearing Roche's case now with Amgen examining the

16   witnesses that Roche has called.

17          It looks like Amgen's going to call Dr. Goldwasser.

18   Fine, and I'm not going to do it double.  Mr. Flowers wanted

19   to ask questions now, and he may, but only on subjects that

20   Ms. Ben-Ami asked about.

21          Go ahead, Mr. Flowers.

22          (Whereupon counsel conferred.)

23   **Q.**  Dr. Goldwasser, during her cross-examination,

24   Ms. Ben-Ami pointed you to example 1 in Dr. Lin's patent; do

25   you recall?

1    A.   Yes.

2    Q.   And specifically, she asked you some questions about the

3    tryptic fragments that are set out in Example 1 in Table 1.

4    Do you recall that?

5    A.   Yes.

6    Q.   I want to ask you, other than the tryptic fragments

7    themselves, did you provide anything else that's described

8    in Example 1?

9    A.   Example 1 is only about tryptic fragments.

10   Q.   For example, did you provide any of the protein sequence

11   information for any of the tryptic fragments?

12   A.   No.

13   Q.   You've looked at Dr. Lin's patents; correct?

14   A.   Yes.

15   Q.   Other than the tryptic fragments discussed in Example 1,

16   did you provide anything else described in the patent?

17   A.   No.

18   Q.   Did you design any of the probes that Dr. Lin used in

19   trying to clone the human EPO gene?

20   A.   No.

21   Q.   Did you make any of those probes?

22   A.   No.

23   Q.   Did you do any of the work to clone the EPO gene?

24   A.   No.

25   Q.   Did you do any of the work to clone the monkey gene?

1    A.  Clone what, I'm sorry?

2    Q.  Clone the monkey EPO gene?

3    A.  No.

4    Q.  Did you do any of the work to make the genetically

5    engineered cells that could produce recombinant EPO?

6    A.  No.

7    Q.  Did you do any of the work to make cells that could

8    produce EPO glycoprotein products that were active in the

9    body?

10   A.  No.

11   Q.  Did you make any of the pharmaceutical compositions that

12   are described in Dr. Lin's patents containing EPO that works

13   in the body?

14   A.  No.

15   Q.  Did you tell Dr. Lin how to do any of that work?

16   A.  No.

17   Q.  Why not?

18   A.  I didn't know how.

19   Q.  So when it comes right down to it, as far as what's

20   described in Dr. Lin's patents go, you provided him with

21   some chopped up pieces of urinary EPO?

22   A.  Yes.

23   Q.  And then Dr. Lin and his team did the rest after that?

24       MS. BEN-AMI:  Objection.  No foundation for that,

25   your Honor.

1          **THE COURT:**  Sustained on that ground.

2    **Q.**  To your knowledge, Dr. Lin performed -- Dr. Lin and his

3    team performed all the other work described in his patents?

4          **MS. BEN-AMI:**  Same objection.

5          **THE COURT:**  Sustained.

6    **Q.**  But that's all you gave him was the tryptic fragments,

7    the chopped up pieces of urinary EPO?

8    **A.**  Yes.

9    **Q.**  Doctor, do you still have Exhibit NMA, which is now

10   2047?  It's the Lai paper from 1986?

11   **A.**  NMJ?

12   **Q.**  NMA.

13   **A.**  A.

14   **Q.**  It's the Lai paper?

15   **A.**  Well, this is NMJ.  It's a Lai paper.

16   **Q.**  I believe it is NMK.  I stand corrected?

17   **A.**  Oh, okay.

18   **Q.**  That's it.  It's now Exhibit 2047.

19          Can you tell me, who was Dr. Lai?

20   **A.**  He was a chemist who worked for Amgen at that time.

21   **Q.**  And what did he do?

22          **MS. BEN-AMI:**  Objection, your Honor.

23   **Q.**  To your knowledge, what did he do at Amgen?

24          **MS. BEN-AMI:**  Objection, your Honor.

25          **THE COURT:**  No, overruled.  If he knows, he may

1   tell us.

2   A.  He worked on sequence of EPO, but he probably did a few

3   other things as well.

4   **Q.**  His work on the protein sequence of EPO --

5   A.  Yes.

6   **Q.**  -- that work was done at Amgen?

7   A.  Well, not all of it.  It started at Cal Tech in Leroy

8   Hood's lab.

9   **Q.**  The work that was described in this paper in 1986 on

10  characterizing human EPO, and particularly the protein

11  sequencing that was described in this paper on human EPO,

12  was that work done at Amgen?

13  A.  Except for the tryptic fragments, yes.

14  **Q.**  The protein sequencing was done at Amgen?

15  A.  Well, the sequencing of the fragments, yes.

16  **Q.**  And this paper actually describes sequencing of the

17  protein, the human EPO protein?

18  A.  Yes.

19  **Q.**  And the work on sequencing the human EPO protein was

20  conducted at Amgen?

21  A.  As I said, except for the work that was done at Cal Tech

22  before Amgen got into it.

23  **Q.**  And was this -- was the work described in this paper

24  related to urinary EPO?

25  A.  This was urinary EPO that was being sequenced -- well,

1   that's an interesting question.  I don't see anything --

2   **Q.**  Dr. Goldwasser, if you go to the abstract, it says, We

3   report here the primary structure of human urinary

4   erythropoietin determined by protein sequence --

5   A.   Okay.  I was looking in the methods to see where the EPO

6   came from.  I couldn't find it.

7   **Q.**   It was urinary EPO; correct?

8   A.   Yes.

9   **Q.**   Is it correct that that work in sequencing the urinary

10  EPO began in late 1984?

11  A.   No, it began much earlier than that.

12  **Q.**   The work described in this paper?

13  A.   In this -- well, it -- yes, in that case, restricted to

14  those particular data, yes.

15  **Q.**   So the data in this paper was -- started to be generated

16  in late 1984?

17  A.   Yes.

18  **Q.**  Could you explain to the jury briefly what an amino acid

19  sequence or a protein sequence is?

20  A.   Proteins are made up of subunits called amino acids.

21  There are 20 different kinds.  They're linked end to end,

22  the front end to the back end of each one.  And in the case

23  of EPO, it's 165 amino acids.  Other proteins are smaller

24  and others much larger.  They get over to more than a

25  thousand amino acids per protein.

1          The sequence of amino acids, which of the 20 are in

2     which positions, is fixed by the gene that codes for that

3     particular protein.  In this case, the erythropoietin gene.

4     Uhm, the coding is only to the linear sequences, so it's a

5     piece of string.  But proteins are folded up.  And the final

6     protein which is secreted, or excreted, has a defined shape.

7     It doesn't look like much when the shape is determined, but

8     it is defined and its biological activity rests in some

9     degree on that shape.

10          The folding up of that long string of amino acids

11     from one dimensional to a three-dimensional structure is a

12     complicated process, but it is important in the formation of

13     the protein.  So the sequence, which amino acids are where,

14     largely determines what the three-dimensional structure is

15     like.

16          Is that enough?

17  Q.  That's enough.  Thank you, Doctor.  I think it's enough.

18          This paper was published in the proceedings of the

19     National Academy of Science; is that correct?  I stand

20     corrected yet again.  I should -- I should look at the

21     document.

22          This was published, again, in the Journal of

23     Biological Chemistry?  I'm sorry.

24  A.  Yes.

25  Q.  You said before that was a prestigious journal, widely

1    recognized and relied upon?

2    A.  Yes.

3    **Q.**  Why was it published there?

4    A.  I don't know where the decision was made.  It could be

5    that I suggested that it be published there.  If you're a

6    biochemist, you want your work to be seen by other

7    biochemists.

8    **Q.**  Was the sequencing of human urinary EPO a significant

9    achievement?

10   A.  Was it significant?

11   **Q.**  Yes.

12   A.  Indeed it was, yes.

13   **Q.**  Was the sequence of urinary EPO known before 1985,

14   publicly known?

15   A.  Publicly?  I don't remember when the gene sequence was

16   published, but it could have been inferred from the gene

17   sequence.

18   **Q.**  The work that was done to sequence the urinary EPO as

19   described in this paper, was that work done after Dr. Lin

20   had already cloned the EPO gene, the EPO DNA?

21   A.  I think -- well, I don't know when the work was done.

22   It was published after that, but I can't tell you when it

23   was done.

24   **Q.**  If you could go to the second column on the first page,

25   and the second full paragraph, last sentence, just above the

1    last paragraph.  It says, "In addition, our data for these

2    positions are confirmed by the DNA sequence of the human

3    gene."  And it has two citations to prior publications.

4           Do you see that?

5    A.  Yes.

6    **Q.**  So the protein sequencing work in this, that's reported

7    in this paper, was confirmed using the DNA sequence.

8    A.  Well, it says confirmed, but I think they probably were

9    simultaneous or almost at the same time.

10          (Whereupon counsel conferred.)

11   **Q.**  Can you see that, Doctor?

12   A.  Yes.

13   **Q.**  Does this paragraph reflect that there wasn't very much

14   confidence about the presence of the amino acid at position

15   166?  It says the only two residues which were assigned,

16   based on single determination, are arginine 53 and arginine

17   166?

18   A.  Yes.

19   **Q.**  And it says determination of the C terminal residue was

20   based on sequence analysis and alignment of peptides and

21   confirmed by DNA sequencing?

22          **MS. BEN-AMI:**  I object, your Honor.  This is beyond

23   the scope.

24          **THE COURT:**  Well, I'm going to let that stand, but

25   it seems to me that it is.  But what he's testified to may

1    stand.

2    **Q.**  Doctor, was it the intent to convey that there was --

3    A.  I'm sorry, I can't hear you.

4    **Q.**  Was it the intent to convey in this paragraph a lack of

5    confidence as to the identification of the amino acid at

6    position 166 in EPO?

7    A.  There was a great deal of uncertainty about whether

8    there was an amino acid beyond 165.

9    **Q.**  And was part of the problem with the confidence in that

10   related to lack of confidence, to some degree, in protein

11   sequencing itself?

12            **MS. BEN-AMI:**  Objection, your Honor.

13            **THE COURT:**  Sustained.

14   **Q.**  Dr. Goldwasser, do you still have Exhibit OKV?

15   A.  OKV?

16   **Q.**  It's the April 1980 letter from you to Dr. Lawrason?

17            **THE COURT:**  OKV is in evidence as 2035.

18   A.  OKV, at the very bottom of the pile.

19   **Q.**  This is one of the documents that Ms. Ben-Ami went over

20   with you this morning.  In the middle of this paragraph, in

21   the body of letter, it says, "As far as I know, there is no

22   university impediment to such an arrangement and it could be

23   implemented whenever you wish."

24            Why were you telling Dr. Lawrason that?

25   A.  I think I can recall that when he visited me and

1    proposed this, I told him I couldn't give him an answer, I

2    would have to check and see whether it was consistent with

3    university policy.

4    **Q.**  Did you do so?  Did you do so, sir?

5    A.  I did.  Although it isn't quite as definite in that

6    letter as I probably felt it should be.

7           **MR. FLOWERS:**  Would you put up OKR?  This is

8    formerly Exhibit OKR, it's now 2036.

9    **Q.**  We were discussing the budget for the potential

10   collaboration.  It says, I understand that if the

11   experimental approach requires it, it will be possible to

12   request supplementary funds for this research.  And it says

13   the check should be made out to the University of Chicago.

14   Why did the check have to be made out to the University of

15   Chicago?

16   A.  Because I didn't want it to be made out to me.

17   **Q.**  Why?

18   A.  To be used for research at the University of Chicago,

19   and I didn't want to have to process a check and perhaps pay

20   income tax on it.

21   **Q.**  But you were going to use money you received from a

22   collaboration with companies for the research in the lab?

23   A.  Yes.

24   **Q.**  Was that true with regard to the money that you received

25   from Amgen, in that collaboration?

1    A.   Yes.

2    **Q.**   Now, you said earlier that Biogen and Schering were

3    related, and Ms. Ben-Ami asked you some questions about the

4    termination or the fact that you didn't go forward with the

5    collaboration or the consultancy with Biogen and Schering.

6    What was the ultimate reason you didn't go forward with

7    being a consultant to Biogen?

8    A.   Dr. Lawrason arranged for a number of other consultants

9    to collaborate with them on the problem at Biogen, and they

10   were people I knew and had no respect for their science or,

11   in some cases, their integrity.  I told Dr. Lawrason I would

12   not collaborate with them, he could choose them or me.  He

13   chose them.

14   **Q.**   So it was Biogen's decision?

15   A.   I don't know who made the decision.  It wasn't -- I gave

16   them two alternatives; they chose one of them.

17   **Q.**   Ultimately, you didn't want to work with Biogen because

18   you didn't like their selection of other scientists with

19   whom you would be associated in that consultancy?

20   A.   That's true.

21       **MR. FLOWERS:**  Would you put up OTP, please?  2038.

22   **Q.**   Ms. Ben-Ami asked you some questions about this.  It's

23   now Trial Exhibit 2038, April 26th, 1983 letter from you to

24   Dr. Mach.

25       In the middle of the second paragraph here,

1    Ms. Ben-Ami was asking you some questions about the later

2    sequencing and the use of the word "proprietary."  I think

3    you got cut off in your answer of explanation on this.  What

4    did you mean by the sentence, "I'm not free to correct the

5    mistakes because the later sequencing has been done in a

6    proprietary way"?

7    A.  I'll give you a longish answer to make it factually

8    correct.

9         There's an agreement which most of us in the

10   experimental sciences subscribe to that you don't cite

11   someone else's data, either until it's published or until

12   you get permission from that person.  Those are what I call,

13   in this case, in quotes, proprietary kinds of data.  I did

14   not do the sequencing.  I did not have the authority to give

15   those data to anybody.  They weren't mine to give.  And

16   that's precisely what I meant to Bernard Mach.

17   Q.  Did you have any other consultancy arrangements with

18   other companies during your career, other than your

19   consultancy with Amgen?

20   A.  I had an association with, I can't -- I don't recall

21   ever having been a consultant -- association with Armour

22   Company, some collaborative research with Parke-Davis, some

23   very informal work with Abbott.  I'm sorry, go ahead.

24   Q.  So I take it from your answer you had collaborated with

25   companies prior to your collaboration with Amgen?

1   A.   Yes.

2   Q.   In your experience, when you collaborated with companies

3   or with other scientists, was it understood whether one

4   collaborator was free to disclose the work of the other

5   collaborators without their permission?

6           MS. BEN-AMI:   Objection, your Honor.

7           THE COURT:   Sustained.   Beyond the scope.

8           MR. FLOWERS:   Could I have a sidebar, your Honor?

9           THE COURT:   I don't think it's necessary.

10  Q.   In your experience, did you ever collaborate with other

11  scientists whose work had been funded in part by the U.S.

12  Government?

13  A.   Oh, yes.

14  Q.   And when you worked with other collaborators whose work

15  was funded in part or in whole by the U.S. Government, did

16  you understand that there were any restrictions on whether

17  materials that were generated out of that collaboration

18  could be distributed by those scientists?

19          MS. BEN-AMI:   Objection, your Honor.

20          THE COURT:   Sustained.   Beyond the scope.   You can

21  ask him that question with respect to this study.

22          MR. FLOWERS:   I think I'll stop there, your Honor.

23          THE COURT:   Very well.   Any further questions for

24  this witness?

25          MS. BEN-AMI:   Yes, your Honor.   I would like to

```
 1    have a quick sidebar, personal reasons, if I --

 2    SIDEBAR CONFERENCE, AS FOLLOWS:

 3              THE COURT:  I don't like to prefer one over the

 4    other.  What did you want to say?  You wanted a sidebar, I

 5    wouldn't give it to you.

 6              MR. FLOWERS:  I can let it pass, your Honor.  Thank

 7    you.

 8              THE COURT:  That's wise.

 9              MS. BEN-AMI:  I just would like to raise the fact

10    that Dr. Goldwasser seems to be getting very tired.

11              THE COURT:  He does.  But if he wants to stop, he

12    can tell us.

13              MS. BEN-AMI:  Should we ask him?  I, just in

14    fairness to him, he's 84.

15              MR. DAY:  Excuse me.  He has to leave.  He's here

16    today.  He has an appointment in Chicago tomorrow.  I think

17    he would like to finish.

18              THE COURT:  I think that makes good sense.

19              MS. BEN-AMI:  To do what?  Which one?

20              THE COURT:  Finish.  But I'll ask him if he wants

21    to stop, I'll suggest that, that it's courteous.

22              MS. BEN-AMI:  I experienced this with him before,

23    and --

24              THE COURT:  All right.

25              (Whereupon the sidebar conference concluded.)
```

1          THE COURT:  Sir, all the lawyers are being very

2   courteous to you.  I want to be equally courteous.  We

3   understand that you have an appointment at the University of

4   Chicago tomorrow, and I'm ready to run until 1:00.  At the

5   same time, if you're tired, would like to stop, we could

6   make other arrangements.  Do you want to finish up now?

7          THE WITNESS:  Yes, I do.

8          THE COURT:  Thank you.  No, but I thank counsel for

9   asking, it's very courteous and makes good sense.

10          Ms. Ben-Ami?

11          MS. BEN-AMI:  Thank you, your Honor.

12                  **REDIRECT EXAMINATION**

13   **(BY MS. BEN-AMI:)**

14   **Q.**  Dr. Goldwasser, you said during your cross that you were

15   not allowed to sell your EPO?

16   A.  Yes.

17   **Q.**  Why not?

18   A.  I never inquired.  I always assumed that I was not

19   permitted to.

20   **Q.**  That was your understanding, you couldn't sell?

21   A.  Yes.

22   **Q.**  In return for your work with Amgen, you were given

23   stock?

24   A.  I don't remember whether I was given it or permitted to

25   buy it.

1    **Q.**   Stock options, right?

2    A.   Yes.

3    **Q.**   You were given a large number of stock options in return

4    for your work with Amgen?

5    A.   I think all the collaborators were.

6    **Q.**   But you were the only one that we've seen today who gave

7    Amgen NIH-funded material?

8         **MR. FLOWERS:**   Objection, your Honor.   It's in his

9    report.

10        **MS. BEN-AMI:**   He opened the door.

11        **THE COURT:**   Please.

12        **MS. BEN-AMI:**   I'm sorry.

13        **THE COURT:**   No, he may, but it makes no difference.

14   Sustained.

15        But you were granted stock options from your

16   collaboration with Amgen?

17        **THE WITNESS:**   Yes.

18        **THE COURT:**   All right.   Go ahead.

19   **Q.**   Now, I don't want there to be scientific confusion, so

20   could we bring up what is Exhibit 16, please, Doctor?   You

21   have this big list that you spent a lot of time on.

22   A.   Are you talking about the --

23   **Q.**   The log.

24   A.   The log?

25   **Q.**   Now, you didn't write this log, did you?

```
 1   A.  I'm sorry, I can't listen and look at the same time, so

 2   I'll --

 3   Q.  I'm sorry, let me help you.

 4   A.  I found it.

 5   Q.  Okay.

 6           THE CLERK:  I have an extra copy.

 7           MS. BEN-AMI:  He's found it, so that's fine.  Thank

 8   you.

 9   Q.  You didn't actually write that log?

10   A.  No.

11   Q.  Okay.  So you're just reading what it says?

12   A.  Not just; it was part of my lab function.

13   Q.  But you didn't write it?

14   A.  No, Charles Kung did, at my direction.

15   Q.  Now, in this list, you're giving people EPO to do

16   something called RIA; correct?

17   A.  Yes.

18   Q.  Now, I'm going to use my pearls again as my

19   demonstrative.  To sequence a protein, right, you are

20   cutting off the beads and figuring out what each bead is?

21   A.  Yes.

22   Q.  Right?

23   A.  In a way.

24   Q.  In a way, right?  This is all chemistry, it's not real

25   beads, right?  But we can understand that you, for example,
```

1      took those -- you took the big protein and you cut them into

2      bits, right?  Those were the tryptic fragments; right?

3      A.  Yes.

4      Q.  And when you have a tryptic fragment, you know something

5      about what beads are at either side of the fragment, because

6      it's being cut by trypsin?

7      A.  Except for the two ends, yes.

8      Q.  Okay.  So when you cut the tryptic fragments, say I cut

9      here, at bead number whatever it is, 10, let's make believe,

10     that, that by giving Amgen that, they know something about

11     what the sequence of the fragment is; right?

12           **MR. FLOWERS:**  Objection, your Honor.  Beyond the

13     scope.

14           **THE COURT:**  Yeah, it really is.  Sustained.  And I

15     expect this witness will be back.  Sustained.

16     Q.  Okay.  Let me ask you this question.  RIA, what you were

17     giving the people with the RIA, that does not tell you what

18     the sequence is; right?

19           **MR. FLOWERS:**  Same objection, your Honor.  Outside

20     the scope.

21           **THE COURT:**  Sustained on that ground.  This is

22     redirect.

23           **MS. BEN-AMI:**  I am redirecting on the document that

24     was used in cross, your Honor.

25           **THE COURT:**  I understand you are.

1    **Q.**  So the document you showed the jury was for RIA use;

2    correct?

3          **MR. FLOWERS:**  Objection.  Mischaracterizes the

4    prior testimony.  No foundation.

5          **THE COURT:**  Wait a minute.  Overruled.

6          Now, with this by-play, sir, you may answer that

7    question.  That document relates to RIA use?

8          **THE WITNESS:**  Not solely.

9          **THE COURT:**  Not solely is your answer, and thank

10   you.

11   **Q.**  But not enough to do sequencing?

12         **THE COURT:**  In other words, he didn't distribute

13   enough where he thought the recipient could do sequencing;

14   is that your question?

15         **MS. BEN-AMI:**  That's right.

16   A.  I guess that's right, yes.

17   **Q.**  So this whole list is about doing something other than

18   protein sequencing?

19   A.  Perhaps so, yes.

20   **Q.**  And the only one you gave enough pure EPO to, to do

21   protein sequencing, was Amgen?

22   A.  Yes.

23   **Q.**  And in the patent that you were cross-examined on, in

24   Table 1 -- can I have Table 1?  Because you were

25   cross-examined on it.  You provided that T4A, T4B, all those

1   fragments; right?

2   A.   Yes.

3   **Q.**   And that's where you took the bead of pearls, right, and

4   you cut them up in a special way?

5   A.   Yes.

6   **Q.**   Using special chemicals?

7   A.   Enzyme.

8   **Q.**   Which is a chemical; right?

9   A.   Yes --

10  **Q.**   Okay.   And that -- you gave that material to Amgen?

11  A.   Yes.

12  **Q.**   And then Amgen put it in a machine and pressed the

13  button and got the sequence?

14  A.   It's more than that, but --

15  **Q.**   It says, "Micro sequence analysis using a gas phase

16  sequencer."   Do you see that?

17  A.   Yes.

18  **Q.**   That's what Dr. Lai did; right?

19  A.   It's more than just pushing the button, you have to

20  interpret the data.

21  **Q.**   But they took your fragments and they put them in the

22  machine?

23  A.   Yes.

24  **Q.**   And they got the information out and they interpreted

25  it?

1    A.   Yes.

2    **Q.**   Okay.  And you didn't give those fragments to anyone

3    else?

4    A.   Not that I recall.

5    **Q.**   So then no one else could put the fragments in the

6    machine?

7    A.   No one asked me for them.

8    **Q.**   No one else had them from you?

9    A.   As I said, no one else asked me for them, so they didn't

10   have them.

11   **Q.**   Well, we have whatever we have regarding other people.

12           But let's look at what you actually --

13           **MR. FLOWERS:**  Objection.  Argumentative, your

14   Honor.

15           **THE COURT:**  It is, and strike it out.  Just ask

16   questions.

17   **Q.**   Let's look at -- you had a document that you showed us

18   that you asked the university whether you could be a

19   consultant.  Do you have that document?

20   A.   Yes.  No, I asked the chairman of the department, not

21   the university.  And I didn't ask whether I could be a

22   consultant, I asked -- I was informing him that I had agreed

23   to it.

24   **Q.**   Oh, so you didn't ask whether it was appropriate to be a

25   consultant?

1    A.   I only needed the chairman's approval, that it was the

2    dean that would make the decision as to whether I could or

3    couldn't.

4    Q.   But when you discussed the issue with the university,

5    you didn't say, And, therefore, the protein sequence will be

6    secret; right?

7    A.   No.   I didn't tell him any detail.

8    Q.   Right.   You didn't even tell them the detail that you

9    would be giving them the protein, giving Amgen the protein?

10   A.   I was asking them about university policy with regard to

11   consultantship for commercial companies.

12   Q.   And that's whether you could be a consultant?

13   A.   Yes.

14   Q.   Has nothing to do with giving anybody material?

15   A.   No.

16   Q.   No, it does; or no, it doesn't?

17   A.   It doesn't have anything to do.

18   Q.   So when you went to the university and you said, Can I

19   be a consultant, they said it's a free country, you can be a

20   consultant?

21   A.   I --

22   Q.   I'll rephrase.

23        When you went to the university and had this

24   discussion, they said you could use your mind and be a

25   consultant for someone else; right?

1   A.   They said they did not object; it was not a violation of

2   university policy.

3   **Q.**   But they said nothing about you giving Amgen the

4   protein, because you didn't ask?

5   A.   That's right.

6   **Q.**   And you didn't ask them anything about whether you could

7   keep the sequence information secret?

8           **MR. FLOWERS:**   Objection, irrelevant.

9           **THE COURT:**   Overruled.

10  **Q.**   Would you answer?

11          **THE COURT:**   You may answer.

12  A.   I did not ask anything about any detail.

13          **THE COURT:**   Now, that was a relevance examination,

14  and nothing on obviousness or anticipation or written

15  description is going to turn on whether -- what the nature

16  of these agreements were.   So you'd say, Why didn't you

17  sustain Amgen's objection?   Well, you're entitled to assess

18  the credibility, the believability of this witness about all

19  those things, so I let you hear that.   That's the only

20  reason.

21          Go ahead.

22  **Q.**   You never asked any entity whether or not you could give

23  the protein to Amgen; correct?

24  A.   No.   It was my decision to make.

25  **Q.**   And you never gave the protein in sufficient amounts to

1    any other entity to sequence it?

2    A.  To any --

3    **Q.**  -- other entity to sequence it?

4    A.  No.

5    **Q.**  And you understood that giving the protein to Amgen was

6    a big contribution to cloning the EPO gene?

7    A.  I can't tell you what I understood in 1981.

8    **Q.**  Well, I'm trying to find something, Doctor.  You said

9    the only thing you gave Amgen was the cut-up tryptic

10   fragments of the EPO; right?

11   A.  I didn't say that, no.

12   **Q.**  Oh, you didn't say that.  I misheard.  You gave Amgen

13   other materials; right?

14   A.  Yes.

15   **Q.**  What else did you give them?

16   A.  I gave them materials suitable for using in cell

17   cultures.  I gave them -- I think I gave them some material

18   for the RIA.  I'd have to look through the log again to see

19   precisely what was sent to them.

20   **Q.**  So in the patent, Mr. Flowers said to you, Well all this

21   work that was done in the patent -- I thought he said, and I

22   apologize if I misunderstood it or -- I apologize.  I

23   thought he asked you, other than these tryptic fragments,

24   had you given anything to Amgen for all these experiments in

25   the patent?  And so maybe I misunderstood.  You did give

1    Amgen other materials that were used for the examples in the

2    patent; correct?

3    A.   For one of the examples, yes.

4    **Q.**   Which one was that?

5    A.   The activity in cell cultures.

6    **Q.**   And that was an RIA activity?

7    A.   Well, I don't know what they used for their RIA, I can't

8    tell you that.  I do know that I sent them something to use

9    as a standard for the bone marrow cell cultures.

10   **Q.**   So was that the Cat. 1 standard?

11   A.   Yes.

12   **Q.**   So you did give Amgen your own special Cat. 1 material

13   to use as a standard?

14   A.   It wasn't that special.  I gave it to lots of people.

15   **Q.**   But it was your material; you gave it to Amgen?

16   A.   Yes.

17   **Q.**   Okay.  So it wasn't just the tryptic fragments that you

18   gave to Amgen?

19   A.   Well, Mr. Flowers did not ask me about specific

20   experiments, he asked me about the general pattern of the

21   examples in that patent, and I answered truthfully to both

22   of them.

23   **Q.**   Okay.  But that, I could have gotten confused by your

24   answer, and that's why I'm following up.

25         In an example in the patent they do an RIA, right,

1    and you gave Amgen the standard?

2    A.   Well, I don't know what they used for the RIA and I

3    don't know even know that they used the Cat. 1 preparation

4    for the cultures.   I know I gave them to them, that's all I

5    can tell you.

6    **Q.**   So in any event, the Cat. 1 was yours?

7    A.   Yes.

8    **Q.**   There's a Cat. 1, that's yours?

9    A.   Yes.

10   **Q.**   Now, Mr. Flowers on cross said to you, Well, you know,

11   besides the little tryptic fragment parts, you know, you

12   didn't really -- you were -- you didn't do anything related

13   to what Dr. Lin's work was; right?   Do you recall that?

14   A.   Well, the specific questions, yes.

15   **Q.**   But the fact of the matter was that the whole success,

16   the success of the whole cloning project depended on the

17   sequence of the protein?

18   A.   By that method, yes.   There are other methods to clone

19   genes.

20   **Q.**   The work that Amgen did, that method, the success of the

21   whole project depended on getting the sequence of the

22   protein?

23   A.   I have to take exception to "whole project."   If the

24   project asked about cloning the EPO gene, they could have

25   done another method.

1           (Whereupon counsel conferred.)

2    **Q.**  Doctor, let me hand you your deposition, which is --

3           **MS. BEN-AMI:**  Is this 2607?

4    **Q.**  We're going to go to page 303, and you were being asked

5    about the cloning paper.

6    **A.**  May I look and see what I'm looking at?

7    **Q.**  Sure, absolutely.  Certainly.

8    **A.**  Okay.

9    **Q.**  Are you okay?

10   **A.**  Yes.

11   **Q.**  Okay.  So you were asked a question, "Why was your name

12   on the paper?"

13          And could you read to the jury what your answer was

14   under oath?

15   **A.**  "Because there were a whole bunch of names because the

16   success of the whole project depended on getting the

17   sequence of the protein."

18   **Q.**  So that was your sworn testimony earlier this year;

19   right?

20   **A.**  Yes.

21   **Q.**  And to get the sequence of the protein, you gave Amgen

22   the protein cut up?

23   **A.**  Yes.

24   **Q.**  Do you have Exhibit 2042, Doctor?  It is the letter to

25   Mr. Stebbing.  It says OOW on the top.  That's it.  There we

1    go.

2          Now, in this document you tell Mr. Stebbing -- can

3    I help you?

4    A.  I'll find it.

5    Q.  That's okay.  It's the first -- it's the paragraph that

6    says, "Let me" first.  Do you see that?

7    A.  Yes.

8    Q.  And it says at the bottom of that paragraph that, as far

9    as you knew, Biogen had no access to pure EPO, except a

10   trace for RIA?

11   A.  I see that.

12   Q.  So that was your understanding in 1982, that the only

13   EPO you had given out to them was a trace amount for this

14   RIA thing?

15   A.  No.  I also gave them some crude material.

16   Q.  Okay.  The only pure material you gave them --

17   A.  Yes.

18   Q.  -- was this little bit that could not be used for

19   sequencing?

20   A.  Yes.

21   Q.  And the crude material also couldn't be used for

22   sequencing?

23   A.  Yes.

24   Q.  So you only gave them a little bit and you say there

25   that there was a rumor that Biogen had cloned the gene;

1    right?

2    A.  Yes.

3    **Q.**  And you said you would be astonished because they didn't

4    have enough of the protein?

5    A.  That's what I wrote in the letter, yes.

6    **Q.**  So here you're writing, in 1982, that you understand

7    that Biogen could not have cloned the gene, you would be

8    astonished if they had, because you hadn't given them enough

9    protein?

10   A.  That's not the case.

11   **Q.**  You say there, "I am astonished since they had, so far

12   as I know, no access to pure EPO except a trace for RIA"?

13   A.  I miswrote, because there are methods, and there were

14   then, to clone genes without having to do sequences.

15   **Q.**  Okay.  But this is what you understood at the time?

16   A.  Yes.

17   **Q.**  That's what you wrote.  So what you wrote was, I'm

18   handing this out to people who have Exhibit 16, you're

19   giving people little tiny bits of EPO, right?

20   A.  Yes.

21   **Q.**  But not enough to figure out the string of pearls;

22   right?

23   A.  Right.

24   **Q.**  The only one you gave the string of pearls to in big

25   enough amount to do it was Amgen?

1   A.  Yes.

2           THE COURT:  Anything further for this witness,

3   Mr. Flowers, at this time?

4           MR. FLOWERS:  Just a few questions, your Honor.

5           THE COURT:  Go ahead.

6                   **RECROSS-EXAMINATION**

7   **(BY MR. FLOWERS:)**

8   **Q.**  Dr. Goldwasser, excuse me, in her recross, Ms. Ben-Ami

9   asked you about the special trypsin process for chopping up

10  urinary EPO?

11  A.  Yes.

12  **Q.**  Is there anything special in the early 1980s, 1982, '83,

13  about chopping up a protein like urinary EPO using trypsin?

14  A.  No.

15  **Q.**  Was that a widely known method?

16  A.  Yes.  It was used as far back as the 1950s.

17  **Q.**  What was it used for?  What was it used for?  I'm sorry.

18  A.  For sequencing proteins.

19  **Q.**  Had it been used consistently since the 1950s, in your

20  experience, to chop up proteins so they could be sequenced?

21  A.  Yes.

22  **Q.**  Had you done that for any other proteins before you

23  worked on chopping up the urinary EPO?

24  A.  I don't think so.  I don't recall having done it.

25  **Q.**  She also asked you about these additional materials that

1    you gave Amgen.  You mentioned two things, material for cell

2    culture, and material for RIA.

3    A.  Yes.

4    Q.  And from your answers I took that you don't know whether

5    those materials that you provided to Amgen were actually

6    used in the project described in Dr. Lin's patents?

7    A.  I don't.

8    Q.  The material for cell culture and the material for RIA,

9    are those both urinary EPO?

10   A.  Yes.

11   Q.  Are those purified urinary EPO or crude urinary EPO?

12   A.  For RIA it's pure; for the cell culture it's only about

13   10 percent pure.

14   Q.  So the material for RIA that you sent was just trace

15   amounts, as you were discussing with Ms. Ben-Ami?

16   A.  Yes.

17   Q.  You also mentioned in response to her question that

18   there were other methods for cloning, other than using the

19   chopped up protein and the methods that are described in the

20   patent?

21   A.  Yes.

22   Q.  What were you going to say about that?

23        MS. BEN-AMI:  Objection, your Honor.  Expert

24   testimony.

25        THE COURT:  Yes.  Sustained on that ground.  You'll

1    have the witness back.

2    **Q.**   In response to Ms. Ben-Ami's questions about the success

3    of the whole project depending on the protein, I wanted to

4    ask you a few questions.

5          Success of the project, Dr. Lin's project, to clone

6    the EPO gene, the human EPO gene, that also depended on a

7    few other things, didn't it?

8    A.   Yes.

9    **Q.**   Depended on having a library with that human EPO gene in

10   it?

11   A.   Yes.

12          **MS. BEN-AMI:**   Objection, your Honor.   It's expert

13   testimony.

14          **MR. FLOWERS:**   She opened the door, your Honor.

15          **THE COURT:**   Well, that of course is the question,

16   isn't it.   No, I think the proper management is to sustain

17   this.   You're going to have this witness back.   You may ask

18   that question when he comes back.

19          (Whereupon counsel conferred.)

20          **THE COURT:**   Have in mind, Mr. Flowers, that if he's

21   not done by 1:00, he's here 9:00 tomorrow morning.

22          **MR. FLOWERS:**   Last question, your Honor.

23          **THE COURT:**   Very well.

24   **Q.**   Ms. Ben-Ami asked you some questions about the last

25   sentence there, "So I'm astonished," and so on, access to

1     pure EPO.  In your experience, could Biogen have obtained

2     purified urinary EPO if they had sought it?

3                **MS. BEN-AMI:**  Objection, your Honor.

4                **THE COURT:**  Sustained.  Hypothetical.

5     **Q.**  Did you have any dealings with Biogen in regard to

6     whether they were trying to obtain urinary EPO?

7                **MS. BEN-AMI:**  Objection, your Honor.

8                **THE COURT:**  Sustained.  Asked and answered, I

9     believe.

10                Didn't you say they never asked?

11                **THE WITNESS:**  I did.

12                **THE COURT:**  Asked and answered.

13                **MR. FLOWERS:**  I wanted to find out if he had any

14    dealings with Biogen in regard to other sources, other than

15    Dr. Goldwasser.

16                **THE COURT:**  Of urinary EPO?

17                **MR. FLOWERS:**  Yes.  Other than Dr. Goldwasser.

18                **THE COURT:**  You may ask that.

19    **Q.**  Did you have any dealings, discussions with the folks at

20    Biogen, about whether they were seeking to obtain urinary

21    EPO elsewhere, rather than from you?

22    A.  I didn't have that much contact with the Biogen people

23    to know anything about that.

24    **Q.**  So for all you know, they weren't trying to obtain

25    urinary EPO from anyone else or any other source?

```
 1              MS. BEN-AMI:  Objection, your Honor.

 2              THE COURT:  No, no, sustained to what's in their

 3     mind.  He can testify to what he knows.

 4     Q.  So as far as you know, they weren't undertaking any

 5     effort to obtain urinary EPO from any other source?

 6     A.  I have no knowledge whatsoever what they were doing.

 7              MR. FLOWERS:  I think we're done, your Honor.

 8              THE COURT:  Well, you're done.  Ms. Ben-Ami,

 9     anything further for this witness?

10              MS. BEN-AMI:  No, your Honor.

11              THE COURT:  We're done with this witness.  You may

12     step down, sir.  And thank you.

13              (Whereupon the witness stepped down.)

14              THE COURT:  Call your next witness.  Mr. Fleming?

15              MR. FLEMING:  Your Honor, if I might, a

16     housekeeping matter.  We have replaced, for completeness,

17     the correct copy of Exhibit 2012 in the Court's copy.  We've

18     informed Amgen of that.  I just want the record to reflect

19     that, if we could, your Honor.

20              THE COURT:  Thank you.  Now, I understand you're

21     going to play a deposition next?

22              MR. FLEMING:  Yes.  And the deposition video runs

23     more than the time allowed.

24              THE COURT:  You run it until 1:00.  I'll simply

25     wave, and stop.
```

```
 1            Now, now the next witness, we're going to see this

 2    witness, not just have someone read his answers, by

 3    videotape.  This is a deposition of somebody, we'll find out

 4    who.  And again, I've told you all about depositions.

 5    Deposition testimony is evidence.  You treat it just like

 6    the evidence you hear from the stand, which means you can

 7    believe it all, or disbelieve it all, or believe parts and

 8    disbelieve other parts.  I am going to excuse you right at

 9    1:00, and I've told you I'll stop them at 1:00, but it may

10    be played.

11            MR. FLEMING:  Before we do, there are no objections

12    to these exhibits that are going to be dealt with in this

13    video.

14            THE COURT:  All right.

15            MR. FLEMING:  They are PRJ.

16            THE COURT:  PRJ will be admitted as 2049.

17            (Exhibit marked in evidence.)

18            MR. FLEMING:  And PPH.

19            THE COURT:  PPH, 2050.

20            (Exhibit marked in evidence.)

21            MR. FLEMING:  I think those are the only ones, your

22    Honor.  If I'm mistaken, I'll correct it after the video's

23    played.

24            THE COURT:  After the video, thank you.

25            MR. FLEMING:  Thank you, your Honor.
```

1          JOSEPH BARON, By Deposiiton

2                  **DIRECT EXAMINATION**

3   **Q.**  Could you state your name for the record?

4   A.  Joseph Baron.

5   **Q.**  Let me just start by asking you, did you do a clinical

6   study of some type using EPO prior to 1983?

7   A.  Yes.

8   **Q.**  And did you use EPO, erythropoietin, that was purified

9   from urine?

10  A.  That's correct.

11  **Q.**  And I notice that you also have a Master of Science in

12  Pharmacology?

13  A.  That's correct.

14  **Q.**  So you have both a medical degree and a Master's degree

15  in Pharmacology?

16  A.  That's correct.

17  **Q.**  Okay.  And then in your CV, it indicates that you were a

18  research associate at the National Institute of Health?

19  A.  That's correct.

20  **Q.**  And when did you start working at the University of

21  Chicago Medical School?

22  A.  I worked in two periods.  I had house staff training,

23  '62 through '64, that was interrupted by the two years at

24  the NIH that you referred to.  Then I've been back here

25  since 1966.

1   **Q.** Rather than --

2   A. -- without interruption.

3   **Q.** And do you have a hematology background?

4   A. Yes, I am a hematologist.  I have board certification in

5   hematology as well as oncology.  I do mostly classical

6   hematology, which has to do with subjects such as anemia,

7   coagulation disorders and so forth.

8   **Q.** And your CV says that you have been an assistant

9   professor and an associate professor with tenure here?

10  A. That's correct.

11  **Q.** And included in your research interests on your CV is

12  erythropoiesis?

13  A. That's correct.

14  **Q.** Okay.  Going to the third page of your CV, Doctor, that

15  you have an award, First Outstanding Clinical Service Award,

16  Department of Medicine?

17  A. That's correct.

18  **Q.** Can you tell me what that is?

19  A. It's an award based upon selection by my faculty

20  colleagues for as stated clinical service.  It was the first

21  time it was awarded.

22  **Q.** Doctor, let me hand you what has been marked now as

23  Baron Exhibit 3.  So, Doctor, where did these documents come

24  from?

25  A. These documents were generated by the clinical studies

1    that were performed using the urine erythropoietin that we

2    referred to earlier.

3    **Q.**   That was the erythropoietin that you obtained from

4    Dr. Goldwasser?

5    A.   That's correct.

6    **Q.**   And in response to the subpoena, where did you find

7    these documents?

8    A.   I had them in my possession.

9    **Q.**   Where?

10   A.   In my office.

11   **Q.**   Did you have them in a particular file cabinet or in any

12   specific place in your office?

13   A.   In my office cabinet.

14   **Q.**   In a cabinet, okay.  And have you retained these

15   documents since the clinical work was done?

16   A.   That's correct.

17   **Q.**   When were these clinical studies done?

18   A.   There were two sets of studies, 1979 and 1983.

19   **Q.**   So you've retained these materials since 1979 --

20   A.   That's correct.

21   **Q.**   -- and/or 1983?

22   A.   That's correct.

23   **Q.**   And the work that was done in these studies, was that

24   done at the University of Chicago?

25   A.   Yes, it was.

1    Q.   The materials that you retained that are Baron

2    Exhibit 3, were those materials that were created as part of

3    the clinical study process?

4    A.   That's correct.

5    Q.   And when you were doing the clinical studies, were you

6    doing them as part of your job here at the University of

7    Chicago?

8    A.   That is correct.

9    Q.   So in the course of your employment and as part of your

10   job, you retained these documents?

11   A.   That's correct.

12   Q.   So, Doctor, I'm going to next hand you a document which

13   is Baron Exhibit 4, which is a subset of Baron Exhibit 3,

14   and it bears production numbers, and you can see at the

15   bottom, it says BARON and a number, that's what we call the

16   production number.   BARON 36 through 197.

17        I'd ask you to look at this document and tell me if

18   you've seen it before.

19   A.   Yes.   I believe this is the application made for the IND

20   for the -- to permit us to do the study.

21   Q.   So if we look at page 2, which is --

22   A.   That is page 37.

23   Q.   Yes, I'll use the bottom number.   It says, Clinical

24   Investigation Committee, and then it has date of meeting,

25   February 6, 1979, do you see that?

1    A.   Yes.

2    Q.   Can you tell me what this document is?

3    A.   In order to undertake a study at the University, in

4    addition to any outside permission, I need the permission of

5    the Clinical Investigation Committee of the institution.

6    Q.   Did you obtain that permission to do a study in

7    humans --

8    A.   That's correct.

9    Q.   -- using human erythropoietin?

10   A.   That's correct.

11   Q.   And that was the erythropoietin or EPO obtained from

12   Dr. Goldwasser?

13   A.   That's correct.

14   Q.   So if we go to the next page, which is 38, this

15   indicates an IND number assigned, 16,234.  Do you see that?

16   A.   That's correct.

17   Q.   And it indicates that you were the sponsor.  Do you see

18   that?

19   A.   Yes.

20   Q.   And in March of 1979, did you submit an IND proposal?

21   A.   That's correct.

22   Q.   And that proposal was for a request to do clinical study

23   involving human EPO in patients?

24   A.   That's correct.

25   Q.   And if we look at page 49, this is a letter from the

 1    University of Chicago with your name at the bottom.  Do you

 2    see that?

 3    A.   That's correct.

 4    Q.   And it's dated March 2nd.  And it says in the first

 5    paragraph, I am submitting the enclosed materials for a

 6    physician-sponsored IND for human erythropoietin, paren,

 7    hEPO, closed paren.  Do you see that?

 8    A.   I do.

 9    Q.   Can you tell us what it is?

10    A.   It's basically a cover letter submitted to Dr. Robert

11    Temple at the FDA covering our submission.

12    Q.   Okay.  If you go to page 50, I'm going a little bit out

13    of order here because the documents have different dates on

14    them, so if you look at page 50, can you tell us, this

15    document, the title says Clinical Study of Purified Human

16    Erythropoietin, paren, hEPO, closed paren.  Do you see that?

17    A.   Yes.

18    Q.   Can you tell us what this page is and the document that

19    follows?

20    A.   This is the first page of the submission for the IND.

21    Q.   And following that, can you tell us what this is?

22    A.   I'm sorry, which page are you referring to?

23    Q.   The next one.

24         MR. FLEMING:  Your Honor, this might be an

25    appropriate spot in the --

1          **THE COURT:**  Very well.  We'll suspend at this

2     point.  Thank you.

3          Ladies and gentlemen, you've not heard all the

4     evidence.  Please keep your minds suspended.  Do not discuss

5     the case either among yourselves nor with anyone else.  You

6     may stand in recess until 9:00 a.m. on Tuesday morning, and

7     you may stand in recess.  I'll remain on the bench.

8          **THE CLERK:**  All rise for the jury.

9          (Whereupon the jury left the courtroom.)

10          **THE COURT:**  Please be seated.

11          (Pause in proceedings.)

12          **THE COURT:**  Total elapsed time stands, out of the

13     ten days allocated to each side, Amgen one day two hours, 55

14     minutes; Roche, three days, 35 minutes.

15          We'll recess until 9:00 a.m. tomorrow morning.

16          **MR. FLEMING:**  Your Honor, may I make a request,

17     please?  Your Honor, we have the rule regarding expert

18     witnesses' presence in the courtroom.  What's being played

19     is a videotape of a deposition that the next testifying

20     expert has already read, because he has the transcripts from

21     discovery.

22          **THE COURT:**  Right.

23          **MR. FLEMING:**  We ask that he be able to be present

24     in the courtroom during the remainder of this, after which

25     he'll be called.

1        **THE COURT:**  I see no problem with that, but I'm not

2   making any other exception to my rule by making that.

3        **MR. FLEMING:**  That's all I've asked for now, your

4   Honor.

5        **THE COURT:**  All right.  We'll recess.

6        (Adjournment.)

7

8                  **C E R T I F I C A T E**

9

10

11        We, Donald E. Womack and Cheryl B. Palanchian,

12   Official Court Reporters for the United States District

13   Court for the District of Massachusetts, do hereby certify

14   that the foregoing pages are a true and accurate

15   transcription of our shorthand notes taken in the

16   aforementioned matter to the best of our skill and ability.

17

18

19           /S/ DONALD E. WOMACK

20           _____

21           /S/ CHERYL B. PALANCHIAN
             _____

22               DONALD E. WOMACK
                 CHERYL B. PALANCHIAN
23               Official Court Reporters
                 P.O. Box 51062
24           Boston, Massachusetts 02205-1062
                 womack@megatran.com

25