```
1                UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MASSACHUSETTS
2
                                        Civil Action
3                                       No. 05-12237-WGY

4    * * * * * * * * * * * * * * * *
                                    *
5    AMGEN, INC.,                   *
                                    *
6             Plaintiff,            *
                                    *   DAILY TRANSCRIPT
7    v.                             *   OF THE EVIDENCE
                                    *     (Volume 6)
8    F. HOFFMANN-LA ROCHE LTD,      *
     ROCHE DIAGNOSTICS GmbH and     *
9    HOFFMANN-LA ROCHE, INC.,       *
                                    *
10            Defendants.           *
                                    *
11   * * * * * * * * * * * * * * * *

12

13

14            BEFORE:  The Honorable William G. Young,
                       District Judge, and a Jury
15

16

17

18

19

20

21

22

23                               1 Courthouse Way
24                               Boston, Massachusetts

25                               September 11, 2007
```

```
 1                    A P P E A R A N C E S

 2

 3          DUANE MORRIS LLP (By D. Dennis Allegretti,
       Esq. and Michael R. Gottfried, Esq.), 470 Atlantic
       Avenue, Suite 500, Boston, Massachusetts 02210
 4          - and -
            DAY CASEBEER MADRID & BATCHELDER, LLP (By
 5     Lloyd R. Day, Jr., Esq., David M. Madrid, Esq. and
       Robert M. Galvin, Esq.) 20300 Stevens Creek
 6     Boulevard, Suite 400, Cupertino, California 95014
            - and -
 7          McDERMOTT WILL & EMERY (By Michael Kendall,
       Esq.), 28 State Street, Boston, Massachusetts
 8     02109
            - and -
 9          McDERMOTT WILL & EMERY (By William G.
       Gaede, III, Esq.), 3150 Porter Drive, Palo Alto,
10     California 94304
            - and -
11          MARSHALL, GERSTEIN & BORUN LLP (By Kevin M.
       Flowers, Esq.), 6300 Sears Tower, 233 S. Wacker
12     Drive, Chicago, Illinois 60606-6402
            - and -
13          STUART L. WATT and WENDY A. WHITEFORD, Of
       Counsel, Amgen, Inc., One Amgen Center Drive,
14     Thousand Oaks, California 91320-1789, on behalf of
       the Plaintiff
15
            BROMBERG & SUNSTEIN LLP (By Lee Carl
16     Bromberg, Esq. and Julia Huston, Esq.), 125 Summer
       Street, Boston, Massachusetts 02110
17          - and -
            KAYE SCHOLER LLP (By Leora Ben-Ami, Thomas
18     F. Fleming, Esq., Patricia Carson, Esq.,
       Christopher Jagoe, Esq. and Howard Suh, Esq.),
19     425 Park Avenue, New York, New York 10022, on
       behalf of the Defendants
20

21

22

23

24

25
```

1
<u>**I N D E X**</u>

2
**WITNESS:**          **DIRECT   CROSS    REDIRECT   RECROSS**

3

4   JOSEPH BARON, By Deposition, Resumed

5                     663

6   BRUCE SPINOWITZ

7      By Mr. Fleming   686

8      By Mr. Madrid          802

9
                                          **FOR        IN**

10     **EXHIBITS:**                       **I.D.     EVID.**

11

12        19   Document . . . . . . . . . . . 684

13        2049A Graphs . . . . . . . . . . . . 685

14        2051 Essers, et al Article  . . . . . . . 755

15        2052 Essers, et al Article  . . . . . . . 755

16        2053 Essers, et al Article  . . . . . . . 755

17        2054 Excerpts of Exhibit QDZ  . . . . . . 789

18

19

20

21

22

23

24

25

1          **THE CLERK:**  All rise for the jury.

2          (Whereupon the jury entered the courtroom.)

3          **THE CLERK:**  Court is in session, please be seated.

4          **THE COURT:**  Good morning, ladies and gentlemen.

5          **THE JURY:**  Good morning.

6          **THE COURT:**  Thank you all for being so prompt.  And

7   I don't just say that by rote.  Now, the next thing we're

8   going to do is go on with this deposition, though I think

9   they want to see me at the side bar and I will for just one

10  second.

11         As I watched this, there's something I wanted to

12  say about it.  You naturally will understand that you're

13  seeing excerpts of the deposition.  The deposition goes on

14  for hours and hours.  Because as I watched it suddenly a

15  paper materialized in the fellow's hands.  And it's not --

16  and I just want to emphasize to you, no one's hiding

17  anything from you.  They're just serving up to you those

18  parts to save everybody's time that they are going to argue

19  are pertinent.  So don't think that you're missing anything.

20  The actual deposition went on for hours and hours and now

21  they've picked out those parts they want to play.  So if it

22  jerks a little bit, it's not that anyone's tampered with it,

23  it's the trial preparation.

24         Am I right, you want to come to side bar?

25         **MR. FLEMING:**  Yes, your Honor.

```
1              THE COURT:  You may.

2              MR. FLEMING:  Thank you.

3      SIDEBAR CONFERENCE, AS FOLLOWS:

4              THE COURT:  Okay, now let me go first.  Now, I have

5      today's exchange of letters.  And there's much to what Amgen

6      says here.  This business of filing letters and expecting me

7      to jump on the letters does not commend itself when I'm here

8      all day and I said let's do this stuff in the afternoon.

9              At the same time, matters are complex and I have to

10     manage the trial in a real time basis and I do so, and I

11     don't think Amgen has been prejudiced.

12             So, since you want to take this time, let me tell

13     you a couple of things that I've been thinking.  On the

14     issue of obviousness/double patenting, to the extent that

15     issue remains, I really think that the better vehicle by

16     analogy is Festo, which means I'm going to take evidence

17     jury waived from the Roche people on obviousness/double

18     patenting.

19             Now, there isn't any time to do that this week, any

20     more time, jury waived.  And I expect I will entertain your

21     motion, expected motion, for directed verdict on the

22     defenses on Friday afternoon.  I don't know that it's going

23     to make any difference, obviousness/double patenting is

24     going to make any difference.  We will know that after that

25     motion is argued on Friday.  If it does make a difference,
```

1   that is, if obviousness is generally in the case, I'm not

2   going to have to jump on these things until the case is

3   entirely over.  Since that's so, I'm saying to Roche, if

4   that's the way it plays out, I'm not suggesting it will, I

5   want to hear the arguments, then I'll hear your evidence

6   afternoons when I'm done with my other work in the

7   afternoons until four o'clock.  About four o'clock I run out

8   of steam if I start at 9:00.

9        All right.  Oh, one other thing since now we're

10  talking about what's on my mind.  You've given me back these

11  depositions and you say work on the depositions.  That's

12  fine.  But some of these I've already ruled on.

13       Now, I take it what I have there has my earlier

14  rulings set out.

15       **MR. FLEMING:**  They should, your Honor.

16       **THE COURT:**  Okay.

17       **MR. FLEMING:**  Let me explain to you a little bit

18  what happens so I can -- I apologize for not having a chance

19  to explain it to you.

20       **THE COURT:**  It's your time, it's your time.  You

21  know what my rulings are.

22       **MR. FLEMING:**  That's fine.

23       **THE COURT:**  Now, why did you want to come up?

24       **MR. FLEMING:**  This issue was raised in the letter I

25  received from Amgen at midnight last night so I apologize

1    for having to raise it this morning.

2        We there -- we have a stipulation as to

3    authenticity of party created documents within 901.  We're

4    not disputing that.  We have a group of documents.  I sent a

5    letter to Amgen saying you should agree to admissibility.

6    These are Amgen documents.  Then I got a spattering back of

7    letters, and for the vast majority they won't agree.  Quite

8    honestly, our position is that it's an unreasonable waste of

9    the jury's time to put a custodian on the stand.

10       What I would like guidance from your Honor, the

11   expert today who's going to testify has reviewed and relied,

12   opined on those documents.

13       **THE COURT:**  Can't do it.  I can't, I can't get my

14   mind around it this way.

15       Here's the way to handle it.  I've got a motion

16   session this -- of course, you expect to get to this expert

17   this morning.

18       **MR. FLEMING:**  Yes, sir.

19       **THE COURT:**  You expect to get to him next.  All

20   right.  You've flagged it with me.  If there's anything left

21   of this once I've ruled, I'll deal with it.  We'll, we'll --

22       **MR. FLEMING:**  Your Honor, the only, the only issue

23   that even remains that Amgen is positing is one of

24   relevance.  And the expert, although not showing the

25   document to the jury, if we use, say, one or two sentences

1    about them he can establish for you the relevance and then

2    you could easily make a ruling at the appropriate time.

3            **THE COURT:**  One hopes I can, and thank you.  I

4    cannot handle a trial this way.  To me it's theoretical

5    until I see the expert and hear the questions.

6            **MR. FLEMING:**  Okay.

7            **THE COURT:**  Then I have, I'm as confident as I ever

8    am.  I don't want to waste anyone's time, either.

9            **MR. FLEMING:**  Understood, your Honor.

10           (Whereupon the sidebar conference concluded.)

11           **THE COURT:**  We'll continue playing the deposition

12   from the point we left off.

13           **MR. FLEMING:**  Yes, your Honor.

14           JOSEPH BARON, By Deposition, Resumed

15   **Q**   And following that, can you tell us what this is?

16   A   I'm sorry, which page are you referring to?

17   **Q**   The next page, which is 2 on the top or 51 on the

18   bottom?

19   A   Okay.  And what is the question?

20   **Q**   Can you tell me what this is?

21   A   It's the next page.

22   **Q**   Of the?

23   A   Of the submission.

24   **Q**   Okay.  Which is if you look at the manufacturing

25   section, Number 3?

1    A    Yes.

2    Q    Do you see that?

3    A    Yes.

4    Q    It says under Manufacturing Information, it says 3 --

5    excuse me, C, human erythropoietin h-epo, has been prepared

6    from the urine of patients of aplastic anemia.  Details of

7    the source purification and assay of the material are in the

8    attached reprint by Miyake, et al., paren, J. Biol. Chem.,

9    Journal of Biological Chemistry, 252, paren, 15, closed

10   paren, colon, 5558-5564, comma, 1977.  The final

11   purification and assay of h-epo has been performed in the

12   laboratory of Dr. Eugene Goldwasser at the University of

13   Chicago, paren, comma, Department of Biochemistry.

14            Do you see that?

15   A    I do.

16   Q    And did you write this document?

17   A    I did.

18   Q    How did it come to pass that you worked with Dr.

19   Goldwasser on this project?

20   A    Well, Dr. Goldwasser and I were colleagues, and we

21   actually had laboratories and offices on the same floor of

22   the then Franklin McLean Institute, and I had had an ongoing

23   interest in erythropoiesis, and he of course was the person,

24   the leading figure in that field and had done most of the

25   basic research in terms of the purification and

1    characterization of erythropoietin.  And when it came time

2    to try to do a clinical study of the material that he had

3    prepared, he and I discussed doing that.

4    Q   And what was your role?

5    A   Well, my role was as the principal investigator to

6    organize the study, to get permission to perform the study,

7    and to actually do the study in terms of the administration

8    of the medications, procuring the specimens for analysis for

9    Dr. Goldwasser, and summarizing the results and keeping in

10   touch with the FDA to tell them our progress.

11   Q   How did you actually get the material?

12   A   It was given to me by Dr. Goldwasser.

13   Q   And in doing this study, you obtained certain lab

14   results over time?

15   A   That's correct.

16   Q   As the principal investigator, what did you do with the

17   lab results?

18   A   I didn't actually perform the lab testing.  Those were

19   done either by Dr. Goldwasser or the hospital laboratories.

20   Our job jointly really was to look at the results over time

21   and try to figure out whether the things we were looking for

22   actually took place.

23   Q   Okay.  So you analyzed lab results --

24   A   Yes, that's correct.

25   Q   -- after they were obtained?

1    A    Correct.

2    Q    I thought you said that you didn't actually run all the

3    lab tests yourself.

4    A    I didn't run any of the lab tests myself.  There were

5    two categories of testing.  There were the special studies

6    of erythropoietin levels following administration, which

7    were done by Dr. Goldwasser, and then there were standard

8    laboratory tests such as blood counts and so forth, which

9    were performed by the regular hospital laboratories, the

10   actual results of which were printed and made available as

11   they would ordinarily be for any patient who undergoes

12   testing in the hospital.

13            And then the job of me and my colleagues was to

14   look at that aggregate of material over time and try to

15   figure out what we were seeing in terms of the effect of the

16   drug.

17   Q    Okay.  And my question was, normally in the hospital, is

18   that the way it's done, that the lab techs do the lab tests

19   and then you analyze the data?

20   A    For routine laboratory studies, that's correct.

21   Q    Okay.  So that was consistent with the way the hospital

22   normally works?

23   A    That's correct.

24   Q    Now let me go back a little bit.  If you look at Page 40

25   of Baron Exhibit 4, now we're in 1984.

1    A    Yes.

2    Q    Can you tell me what that document is?

3    A    That document is a letter from me to the agency that

4    granted us permission to do the study summarizing our

5    progress, and it's entitled Progress Report.

6    Q    Now, this is a document that you submitted to the United

7    States Government?

8    A    That's correct.

9    Q    Okay.  And when you wrote this document, did you believe

10   it to be accurate?

11   A    Yes.

12   Q    Would you look at Page 2, please.

13   A    Sure.

14   Q    And do you see where it says, which is Page 41 at the

15   bottom, do you see where it says Roman numeral III,

16   Biological Efficacy?

17   A    Yes.

18   Q    Could you read that paragraph into the record, please.

19   A    Hematologic parameters in the three patients with

20   chronic renal failure were assessed prior to and following

21   erythropoietin administration as outlined in the submitted

22   protocol.  There was no significant increase in the

23   hematocrit observed.  However, each patient showed a mild to

24   modest increase in the reticulocyte number with peaks noted

25   at days 9, comma, 10, comma, and 11 respectively.  Two of

1    the three patients showed increased numbers of nucleated red

2    cells per 1,000 bone marrow cells, and the disappearance of

3    radio iron from plasma was shortened in two of the three

4    individuals.  One of the three patients showed an increase

5    in red cell mass following the treatment program.

6    **Q**   Now, did you write this paragraph?

7    A    I did.

8    **Q**   And was it accurate?

9    A    Yes.

10   **Q**   In this, you said there was no significant increase in

11   hematocrit observed.  Do you see that?

12   A    That's correct.

13   **Q**   And these studies that you did, reticulocytes, iron

14   disappearance and red cell mass, why did you pick those

15   parameters to study?

16   A    Because those are the best ways of monitoring bone

17   marrow function in terms of red cell production.  Some of

18   them are a little more sensitively than simply looking at

19   the hematocrit.  We were looking for signs of early

20   stimulation of bone marrow by the hormone.

21   **Q**   Did you ever discuss these results with Dr. Goldwasser?

22   A    Yes.

23   **Q**   But from a clinical standpoint as a doctor, what was

24   your interpretation?

25   A    My interpretation was that it was not clinically

1   significant.

2   **Q**   When you say clinically significant, you mean it did not

3   impact the patient's health?

4   A   That's correct.

5   **Q**   So when you wrote this, Baron Page 41, which was part of

6   Exhibit 4, was it to the best of your knowledge accurate?

7   A   Yes.

8   **Q**   After 1983, did you want to continue your studies?

9   A   Yes.

10   **Q**   And why did you not continue your studies?

11   A   There was no product available.

12   **Q**   Okay.  Did you ever ask Dr. Goldwasser for more?

13   A   Yes.

14   **Q**   Now, did you ever write a manuscript --

15   A   No.

16   **Q**   -- relating -- okay, you have to let me finish --

17   relating to this work on your clinical study?

18   A   No.

19   **Q**   Did you intend to?

20   A   No.

21   **Q**   Can you go to Page 46 of Baron Exhibit 4, and it's a

22   letter dated October 2nd, 1985.

23   A   Yes.

24   **Q**   Did you write that letter?

25   A   Yes, I did.

1    Q    FDA, okay.  And in this letter it says, we expect that

2    adequate amounts of hormone will be forthcoming within the

3    next several months and that we will be able to continue

4    studies undertaken as described in earlier reports to you.

5    We have not discontinued our study, and we wish to have the

6    IND continue until such time as we will be able to complete

7    the intended investigation.

8    A    That's correct.

9    Q    At this point in 1985, why did you expect that there

10   would be adequate amounts of the hormone?

11   A    This must have been based upon my conversations with Dr.

12   Goldwasser, who was the source of this material.

13   Q    Could you look at what's been marked as Baron Exhibit 5

14   as -- on the bottom here you'll see it says 01006627 on the

15   bottom right, 6627.

16   A    Yes.

17   Q    Okay.  This is a letter from you to the FDA?

18   A    That's correct.

19   Q    And can you tell me what this letter is?

20   A    This is a progress report based upon the treatment of I

21   believe of the first two patients.  Just let me check.

22          No, it's three patients.  This was following the

23   completion of the third patient.

24   Q    Okay.  And if you look at the second paragraph, it says,

25   each of the patients showed some evidence of stimulation of

1    erythropoiesis by one or more of these study parameters.

2            Do you see that?

3    A   Yes.

4    Q   What were the study parameters you meant there?

5    A   It includes the spectrum of things that we talked about

6    on Patient 1, like iron disappearance, bone marrow,

7    nucleated red cells, reticulocyte response, so forth.

8    Q   And did you come to the analysis as the principal

9    investigator that each of the patients showed some evidence

10   of stimulation of erythropoiesis?

11   A   That's correct.

12   Q   And what was that based on?

13   A   The results of the tests that we've talked about.

14   Q   And that was your understanding as a clinician?

15   A   That's correct.

16   Q   And what did you mean by erythropoiesis?

17   A   That refers to the production of red cells.

18   Q   And what did you mean by stimulation of erythropoiesis?

19   A   Evidence of increased red cell production or the

20   potential for that based upon the bone marrow appearance or

21   the iron disappearance or the reticulocyte.

22   Q   Let me hand you what I will mark as Baron Exhibit 6,

23   which bears production number from you Baron 690 to 705.  I

24   would like you to look at this and tell me, if you can, what

25   it is.

1    A    I believe this is the submission that we made to the

2    Institutional Review Board, and it's IRB protocol number

3    listing at the top for in-house approval to do this study.

4    Q    And did you write the document?

5    A    Yes, I did.

6    Q    So looking at the numbers, the hematocrit numbers from

7    6/13 to 6/20 are going up?

8    A    They're higher.

9    Q    Well, they go -- maybe we should read the numbers into

10   the record so it's clear.

11   A    6/13 was 27; 6/16, 27-1/2; 6/18, 31; 6/20, 31; 7/2 was

12   35; 7/7, 33; 7/14, 27.

13   Q    And the hematocrit --

14   A    Those are all hematocrit values.

15   Q    So looking at these values, after the epo is given the

16   numbers do go up for hematocrit, correct?

17            I'll say it again.

18   A    As displayed here, that's correct.

19   Q    And do you know whose handwriting this is?

20   A    It's not mine.  I don't know for sure.  It may be

21   Dr. Goldwasser's, but I don't know.

22   Q    This document is in your file?

23   A    That's correct.

24   Q    So this was a group of documents you kept together for a

25   long period of time?

1    A    Yes.

2    Q    Who was involved in any communications with the FDA

3    concerning your three-patient urinary epo experiment?

4    A    I alone.

5    Q    Can you tell me why was that?

6    A    Because I was the principal investigator.  It was my

7    obligation to report.  The interpretation of the data that

8    went into the report was a joint effort, but I was the

9    correspondent.

10   Q    At the time of the experiment, did you have any views as

11   to the adequacy of how the current modes of treatment were

12   in terms of being able to correct the anemia of chronic

13   renal failure patients?

14   A    Yes.

15   Q    And when you say didn't work --

16   A    They didn't -- whatever was used was not really

17   sufficiently stimulatory to the marrow to maintain patients

18   without needing transfusions.  Some patients responded to

19   androgens to a varying degree as we've talked about before,

20   but often transfusion was needed to maintain stable blood

21   counts.

22   Q    If we can take a look at the preclinical information

23   animal toxicology section of the protocol, which I think

24   you'll find at Page 6662.  So we're looking at Baron

25   Exhibit 5.

```
 1              What was the test material that was used in the

 2      hamster study?

 3      A    The same material that was given to the patients.

 4      Q    And what was that material?

 5      A    It was purified human urinary erythropoietin.

 6      Q    Did you rely on these documents, that is the ones at

 7      6679 to 6752, when you submitted your proposal to do the

 8      three-patient urinary epo --

 9      A    Yes, I did.

10      Q    And why is that?

11      A    Because it was required of me to submit toxicology data.

12      We would have done it on our own even if it weren't

13      required, but it was required.

14      Q    What is that document that appears at 6680 and carries

15      over to 6681?

16      A    This is Dr. Richter's report to me and Dr. Goldwasser of

17      the findings of his study.

18      Q    After you received this report, did you review it?

19      A    Yes, I did.

20      Q    Do you have an understanding of what material

21      Dr. Richter was referring to when he wrote test material?

22      A    Urine -- human urinary erythropoietin.

23      Q    Is that the same material that was given to the three

24      patients?

25      A    That's correct.
```

1    Q    At the time that you were conducting the three-patient

2    epo study, urinary epo study, did you know whether or not

3    humans can vary in their biological response to test agents?

4    A    Yes.

5    Q    And what did you know?

6    A    That they vary in their response.

7    Q    In the context of the three-patient urinary epo

8    experiment, how were the measurements of percentage

9    reticulocyte performed?

10   A    They were performed in conjunction with the rest of the

11   complete blood count, and the way reticulocytes are

12   determined is that you make a stained -- an unstained blood

13   smear and you do what's called a supravital stain where the

14   young red cells that are within three days of release from

15   the bone marrow stain in a special way that distinguishes

16   them from the older red cells.  They're called reticulocytes

17   because they have sort of an irregular staining material

18   called reticulant, and that's the way of identifying those

19   red cells which are young, and the more of those you have

20   the more new red cell production is going on; that is, the

21   greater proportion of young red cells.

22   Q    Is this an observational technique; that is, you have to

23   look at the stain to understand what the counts are?

24   A    That's correct.

25   Q    Who does the observing?

1    A    The laboratory technician.

2    Q    Who makes the determination as to how many retics they

3    see on any given --

4    A    The person who reads the slide.

5    Q    And do they look at any portion of a slide to arrive at

6    that?

7    A    They scan the slide.  They look at several different

8    fields.

9    Q    And do they make a determination of when to start

10   counting and when to stop counting?

11   A    There's a set protocol for how many cells to look at and

12   how much, how many fields to look at.

13   Q    Was there a set protocol followed in the context of the

14   three-patient study?

15   A    To the best of my understanding, yes.  This was standard

16   laboratory procedure.  Nothing out of the ordinary was done

17   of an experimental nature.

18   Q    Why is it that a baseline helps you in finding out if

19   something changed?

20   A    I don't know how to answer that question, but it seems

21   evident to me that you need something to start with to see

22   if you have any impact of what you're doing as a

23   manipulation.

24   Q    And then let's talk about the baseline period in the

25   context of -- I'm sorry, Patient 1.  You said that there

1    were six measurements for the baseline for Patient 1 and

2    that's reflected by Baron 25; is that right?

3    A    We're looking at Patient 1's graph, right?

4    Q    Yes.

5    A    Yes, there's six.

6    Q    Are those six measurements of reticulocytes, were they

7    taken within a two-week period?

8    A    These were taken earlier than that.  There were

9    several -- so these go back over a number of months

10   beforehand.  There was no two-week period.

11   Q    So let me see if I understand you correctly.

12        The six measurements that you're referring to on

13   Baron 25, which is the graph you prepared, do you know

14   whether or not they occurred in the two weeks immediately

15   before the administration of urinary erythropoietin?

16   A    They did not.

17   Q    Now, the next question is, the six measurements that

18   appear in Baron 25 regarding retics, did they occur within a

19   two-week time frame or a different time frame?

20   A    You mean from the beginning, from the first to the last

21   of those?

22   Q    Correct.

23   A    No, longer time period.  The dates are there.

24        They were taken of longer intervals between them,

25   whereas the ones under the study period were taken at the

1    times designated here, approximately every other day.

2    Q    All right.  So there were different time intervals?

3    A    There were different intervals between them, yes.

4    Q    Were some of those measurements taken during the time

5    frame in which the patient was receiving Decadurabolin?

6    A    Yes, they were.

7    Q    How many measurements were taken when the patient was

8    receiving neither the urinary erythropoietin nor the

9    Decadurabolin?

10   A    Four.

11   Q    Now, if we take a look at the baseline, what is the full

12   variation for the absolute retic values in the baseline

13   period for the patients comparing the highest number to the

14   lowest number?

15   A    The highest number -- you're talking about the absolute

16   retic count?

17   Q    Yes, sir.

18   A    The lowest number was 20,000, and the highest number was

19   50, probably close to 60,000.

20   Q    Is that approximately a threefold variation?

21   A    Approximately, yeah.

22   Q    If you look at 211A, which is your plot, if you could

23   take a look at your plot, take a look at the date 6/23.

24        Do you see that?

25   A    Yes.

1    **Q**    Now, is 6/23 June 23, 1980?

2    A    That's correct.

3    **Q**    And was a reticulocyte -- an absolute reticulocyte count

4    measurement taken for Patient Number 3 on June 23, 1980?

5    A    Absolute?

6    **Q**    Yes, sir.

7    A    Yes, it was.

8    **Q**    Now, on your plot, there appears to be a symbol right

9    next to the data point there.

10        Can you tell me what that symbol is?

11    A    It's a question mark.

12    **Q**    Do you know why a question mark is next to that

13    data point?

14    A    Because we weren't sure that it made any sense --

15    **Q**    Okay.

16    A    -- in view of everything else.

17    **Q**    Did you put that question mark on it?

18    A    Yes, I did, not because I knew it was wrong but because

19    I didn't know how to make it fit with everything else.

20    **Q**    When you said in view of everything else, what's the

21    everything else that you're referring to?

22    A    All the other retic values that you see there.

23    **Q**    So if the urinary erythropoietin was having an effect on

24    the patients, then you would have expected the iron to be

25    going into the bone marrow?

1    A   Into the sacrum, which is the bone marrow area.  That's

2    monitored.

3    **Q**   What does the information here with respect to Patient

4    Number 3 reflect as to where the iron was going during the

5    period that Patient Number 3 was receiving urinary

6    erythropoietin?

7    A   It says there was no change.  That's the no delta in

8    between the two, Number 1 and Number 2.

9    **Q**   And is there information with respect to Patient Number

10    3 concerning iron disappearance rate?

11    A   There is.  Again, no change.

12    **Q**   On what did you base your statement to the FDA that

13    you'd observed a mild to modest increase in retics?

14    A   Based upon the data we reviewed on these three patients.

15    **Q**   So the only factor as far as you're aware of that

16    supported your statement to the FDA that there had been a

17    mild to modest increase in retics was your comparison of the

18    baseline retic counts to the retic counts while the patients

19    were on treatment with the urinary epo?

20    A   That's correct.  That's the only way one could make that

21    statement.

22    **Q**   Before you conducted your three-patient experiment what

23    expectations, if any, did you have with respect to how long

24    the urinary erythropoietin would last in the circulation of

25    the three patients?

1    A    Actually the kinetic studies were done secondarily, the

2    second set of patients where one actually looked to see what

3    the peak values were and the disappearance time, so we

4    didn't really have any baseline information to know what in

5    humans would be the disappearance period.  We learned that,

6    of course, by these serial numbers that you have available.

7         We didn't know.  This was an exploration.  It was

8    an early type study with a new agent.

9    Q    Doctor, I'm going to hand you what's been marked as

10   Baron Exhibit 28, a document that bears the Bates numbers

11   29.

12        Can you please take a look at that and tell me if

13   you recognize that.  And the Bates number is 832 for Baron

14   Exhibit 29.

15   A    Yes.

16   Q    Do you know how this document was created?

17   A    This was a summary provided to me by the nuclear

18   medicine department.

19   Q    What does this summary reflect in terms of Patient

20   Number 3's red cell mass?

21   A    It says it was 1002 baseline and 869 afterwards.

22   Q    What does that show in terms of her RBC mass for

23   purposes of the experiment?

24   A    It shows some decline, although I have another set of

25   data on Number 9 that shows there was actually an increase.

1          So I'm not sure why the discrepancy, whether there

2     were two sets reported to me or not.  I don't have primary

3     data for that item on Number 9.

4     Q    Okay.

5     A    Also the hematocrit on that date doesn't fit with the

6     red cell mass estimate here.

7     Q    Are you saying that the hematocrit and the red cell

8     mass --

9     A    They don't fit together; that is, the hematocrit is

10    higher and the red cell mass is lower.  Now, there are

11    things that can modify the hematocrit without affecting the

12    red cell mass, such as volume changes, dialysis, diuretics

13    and so forth, so I can't be certain what that means.

14    Q    So, Dr. Baron, we were talking about Exhibit 34, and can

15    you now confirm for me whether all of the data that appears

16    in the pages of Exhibit 34 pertain to the ferrokinetic

17    studies that were done for Patient Number 3?

18    A    That's correct.

19    Q    And who prepared these documents in Exhibit 34?

20    A    These were prepared by the nuclear medicine people.

21    Q    And were they prepared by the nuclear medicine people at

22    your request?

23    A    Yes, they were.

24    Q    And did you review these documents when you received

25    them from nuclear medicine?

1   A    Yes, I did.

2   Q    When did you get these documents?

3   A    Around the time that these studies were performed.

4   Q    Did you rely on them for purposes of conducting your

5   experiment?

6   A    Yes, I did.

7   Q    Did you keep these documents as part of your ordinary --

8   A    Excuse me, for interpreting my experiments, not

9   conducting them.

10   Q    Did you rely on the documents for interpreting the data

11   relative to the three-patient experiment?

12   A    That's correct.

13   Q    And did you rely -- did you maintain these documents in

14   the ordinary course of your work at the University of

15   Chicago?

16   A    I did.

17   Q    And at the time were you trying to be honest and

18   truthful with the FDA?

19   A    Definitely.

20   Q    And at the time, did you work for Amgen?

21   A    No.

22   Q    Did you work for Roche?

23   A    No.

24   Q    This was your independent view, correct?

25   A    That's true.

1          **MR. FLEMING:**  Your Honor, that completes the

2     playing of the video.

3          **THE COURT:**  That's it?

4          **MR. FLEMING:**  At the break, if your Honor permits,

5     we will submit to you an allocation of time between the

6     expected designations.

7          **THE COURT:**  You can do that.  I've roughly had it,

8     but you go ahead.

9          **MR. FLEMING:**  Thank you, your Honor.

10          **MR. GOTTFRIED:**  Your Honor, Amgen would offer from

11     the Baron designations Baron 9, which is GMH, and Baron 12,

12     which is GLZ.  These documents are all --

13          **THE COURT:**  Don't argue.  Where is it?  Where are

14     they?

15          **MR. FLEMING:**  Your Honor, as to GMH there's no

16     objection.  This is already --

17          **THE COURT:**  Wait just one second.

18          GMH is admitted then as Exhibit, let's see,

19     Exhibit 19.

20          **THE CLERK:**  19.

21          **THE COURT:**  GMH is 19 in evidence.

22          (Exhibit marked in evidence.)

23          **THE COURT:**  And as to GLZ?

24          **MR. FLEMING:**  Your Honor, 2049 is a compilation of

25     all of Dr. Baron's documents.  This is just a three page

1    excerpt from that.  So it's already in evidence and I don't

2    know why this format is any better than that one.

3            MR. GOTTFRIED:  The format that I intend to

4    substitute, your Honor, is actually graphs which are much

5    larger and easier for the jury to read.

6            THE COURT:  Well, I'm --

7            MR. GOTTFRIED:  They were used in the deposition.

8            THE COURT:  I accept everything counsel says and

9    we'll admit GLZ as -- we'll put an A on it.  It's part of

10   exhibit what?

11           THE CLERK:  2049.

12           MR. FLEMING:  2049, your Honor.

13           THE COURT:  2049.  So here's three pages from 2049.

14   We'll call it 2049A.  They say these charts are bigger.

15   You'll have the whole thing, you can take a look.

16           All right, thank you.

17           MR. FLEMING:  Thank you, your Honor.

18           (Exhibit marked in evidence.)

19           THE COURT:  Call your next witness.

20           MR. FLEMING:  Thank you, your Honor.

21           Your Honor, Roche calls Dr. Bruce Spinowitz.

22           THE COURT:  He may be called.

23           THE CLERK:  Sir, would you raise your right hand.

24           Do you solemnly swear that the answers you will

25   give to this Court and Jury will be the truth, the whole

 1   truth, and nothing but the truth, so help you God?

 2          **THE WITNESS:**  I do.

 3          **THE CLERK:**  Please be seated.

 4          **MR. FLEMING:**  Your Honor, at this time I would like

 5   to present to the Court a color coded copy of

 6   Dr. Spinowitz's expert reports.

 7          **THE COURT:**  Fine.

 8          **MR. FLEMING:**  And may I present these to the

 9   witness as well, sir?

10          **THE COURT:**  Of course.

11          **MR. FLEMING:**  And as we've seen, your Honor, we

12   have a binder of exhibits to aid the witness's testimony.

13   May we present that to him?

14          **THE COURT:**  Of course you can.

15          **MR. DAY:**  Counsel, could we have a copy also?

16          **MR. FLEMING:**  Absolutely.

17          **THE COURT:**  Go ahead, Mr. Fleming.

18          **MR. FLEMING:**  Thank you, your Honor.

19                      BRUCE SPINOWITZ

20                  **DIRECT EXAMINATION**

21   BY  **MR. FLEMING**

22   **Q**   Good morning, Dr. Spinowitz.

23   A   Good morning.

24   **Q**   Could you please introduce yourself to the jury and tell

25   them what you do?

```
 1   A    Yes.  My name is Bruce Spinowitz.  I'm a physician

 2   specializing in a branch of medicine referred to as

 3   nephrology.

 4            THE COURT:  I don't know as we've turned that on.

 5            THE CLERK:  Yes, it's on.

 6            THE COURT:  Is that on?

 7            THE CLERK:  Maybe I turned it off by accident.

 8            THE COURT:  No, it's on.  Yes, talk right into it.

 9            MR. FLEMING:  Testing, testing.

10            THE COURT:  Right.  You specialize in nephrology.

11            THE WITNESS:  Nephrology.  It's on now.  Yes.

12   Q    Thank you.

13            Dr. Spinowitz, could you explain to the jury what

14   nephrology is?

15   A    Nephrology is the diagnosis and care of patients who

16   suffer from a broad array of kidney diseases.

17   Q    And how long have you been a nephrologist?

18   A    It's just about 30 years now.

19   Q    And you see patients?

20   A    Yes, I do.

21   Q    And what type of patients do you see?

22   A    As stated, these are patients who have kidney disease.

23   A large part of that is, unfortunately, these patients have

24   chronic kidney disease, many of them progress to the point

25   where they may even need dialysis.
```

1    Q    You used the expression chronic kidney disease.  Could

2    you explain that to the jury, please?

3    A    Well, the kidney is meant to clear the body of poisons,

4    extra fluid that one takes in, and with the progression of

5    the kidney disease, the inability to clear the body of those

6    poisons, fluids, leads to a certain number of consequences.

7    Q    Is there a description that nephrologists use to

8    describe the various stages of chronic kidney disease?

9    A    Yes.  It's important for us as physicians and as

10   patients to be able to in a quick way identify the stage at

11   which a patient, a stage at which the patient is at with

12   respect to that chronic disease, and we've graded those

13   stages 1 to 5, 1 being the least, 5 being the worst, the

14   most severe form of that loss of kidney function.  Some of

15   the patients in Stage 5 do not yet need dialysis, but even

16   within Stage 5 as the disease, as the disease progresses one

17   may very well be on dialysis.

18   Q    Do you treat patients in your practice who are on

19   dialysis?

20   A    Yes.  We use predominantly two methods of dialyzing,

21   cleansing these patients.  One would use a machine called

22   hemodialysis where patients three times a week have their

23   body cleansed of these toxins with a machine.  And there's

24   another form, a form of home dialysis called peritoneal

25   dialysis, where they at home instill clean fluid within

 1     their abdominal cavity, let it sit there for a little while,

 2     let it run out, and in so doing the toxins have left their

 3     body.

 4     Q    About what percentage of your patients are on dialysis?

 5     A    At this point, probably about ten percent.  Ten to

 6     fifteen percent of the patients are on dialysis.

 7     Q    Now, you explained to the jury the scale of severity of

 8     kidney disease from 1 to 5.  Are patients who are in the 1

 9     to 4 range, are they receiving dialysis?

10             MR. MADRID:  Objection; leading.

11             THE COURT:  Sustained, on that ground.

12     Q    Can you explain to the jury which patients within the

13     range of 1 to 5 degree of severity in chronic kidney disease

14     receive dialysis?

15     A    It's the patients in Stage 5 who would be in need of the

16     dialytic, the dialysis therapy.

17     Q    Do you, in addition to your practice and your seeing of

18     patients, do you do any teaching?

19     A    Yes, I do a fair amount of teaching.

20     Q    Could you explain to the jury so they understand a

21     little of your teaching responsibilities?

22     A    Yes.  I have a number of academic appointments, teaching

23     appointments.  One of them is at the Weill Cornell School of

24     Medicine where I am a clinical professor of medicine.  My

25     responsibilities in that respect are teaching doctors in

1    training about medicine, general medicine as well as

2    specifically medicine related to kidney disease.

3            In addition to which I have two other appointments.

4    At the New York Hospital Medical Center of Queens, I'm

5    Associate Chairman of Medicine and Associate Director of

6    Nephrology.  And again the responsibilities are similar.  In

7    that case, I am teaching students who may very well, doctors

8    in training who may very well be passing through that

9    institution.  I instruct interns and residents in medicine

10   and nephrology, and trainees, fellows in nephrology, in the

11   care of patients with kidney disease, much as I received in

12   the mid-'70's.

13   Q    You used the word clinical professor.  What does

14   clinical mean?

15   A    Well, the designation of clinical immediately lets

16   someone know that this is a professor, someone with an

17   academic appointment, who has clinical responsibilities,

18   that is to say, taking care of patients.

19   Q    Have you published in the area of nephrology and kidney

20   disease?

21   A    Yes, I have.

22   Q    Approximately how many publications do you have?

23   A    They number somewhere in the 50 to 60 range, off the top

24   of my head.

25   Q    Okay.  And do you have any other involvement in the area

1    of kidney disease beyond your teaching and your practice?

2    A    Yes.  For many years now, almost approaching the same

3    duration of time that I have been a nephrologist, I've been

4    involved with clinical research relating to the broad areas

5    of nephrology.

6    **Q**    When you say clinical research what are you talking

7    about?

8    A    Well, it can take a number of different forms.  There

9    are concepts or treatments that --

10          **MR. MADRID:**  Your Honor, this is outside the scope

11   of the report.

12          **THE COURT:**  Yes.

13          **MR. FLEMING:**  Your Honor --

14          **THE COURT:**  It sounds like it is.

15          **MR. FLEMING:**  In the blue report in Paragraphs 6

16   and in 27, your Honor.

17          **THE COURT:**  Blue.  Thank you.

18          You want to take a look at these, sir, because you

19   can --

20          **THE WITNESS:**  Yes.

21          **THE COURT:**  -- your testimony is confined to what

22   you said there --

23          **THE WITNESS:**  Yes, your Honor.

24          **THE COURT:**  -- in 6 and 27.  It's the general rule

25   just so both sides know what you're going to say.  That was

1    a background question, but confine yourself to 6 and 27.

2             **MR. FLEMING:**  And, your Honor, may I proceed?

3             **THE COURT:**  You may.

4    **Q**    Okay.  So you see, Dr. Spinowitz, you say in your report

5    that you've conducted clinical research.  And can you

6    explain to the jury some of the clinical research in which

7    you've been involved?

8    **A**    Yes.  Over the years I have evaluated a number of

9    compounds that have been used for the treatment of

10   nephologic conditions, specifically here referring to

11   erythropoietic agents.  And the other paragraph is 27?

12   **Q**    Well, the Court has accepted your description in your

13   report; you're not wedded to the words.

14            **MR. FLEMING:**  Correct, your Honor?  I don't want to

15   give the witness instruction.  But to know he can explain

16   based on his statements in his report to the jury?

17            **THE COURT:**  He may testify to what's in the report.

18            **MR. FLEMING:**  Yes.  Thank you, your Honor.

19   **Q**    So, approximately how many clinical studies have you

20   been involved with in your career?

21   **A**    Oh, probably in excess of 30.

22   **Q**    And have they been involved primarily with the treatment

23   of chronic kidney disease?

24   **A**    Yes, with the exception of perhaps one or two, all have

25   been in the area of kidney disease.

1    **Q**    Have you done any clinical research for Amgen?

2    A    Yes, I have.

3    **Q**    Which products?

4    A    That was Epogen and Aranesp.

5    **Q**    Have you done any clinical research for Roche?

6    A    Yes, I have.

7    **Q**    With what product?

8    A    MERCERA.

9    **Q**    Could you just tell the jury what MERCERA is?

10         **MR. MADRID:**  Objection, your Honor.

11         **THE COURT:**  Yes.

12         **MR. MADRID:**  This is irrelevant.

13         **THE COURT:**  It's irrelevant?  Well, it is to this

14   stage.  So I'm going to sustain it.  But we're going to --

15   see, in this stage, on the alleged invalidity, we're

16   interested in what Amgen did against what background.  In

17   the next stage of the case, we're going to be interested in

18   what Roche is doing and proposing to do as compared to what

19   Amgen's patented claims are.

20         So for now, sustained.  And it's no secret the

21   Roche product is called MERCERA.  So he's somewhat familiar

22   with it.

23         Go ahead.

24         **MR. FLEMING:**  Your Honor, my only question was

25   whether -- may I proceed with the questioning, your Honor?

1          **THE COURT:**  Put another question.

2          **MR. FLEMING:**  Thank you.

3    **Q**   Is MERCERA used in the treatment of chronic kidney

4    disease?

5          **MR. MADRID:**  Objection.

6          **THE COURT:**  No, overruled; he can have that.

7    A   Yes, it is.

8    **Q**   Okay.  And have you done any clinical trials with a

9    product called Procrit?

10   A   Yes, I have.

11   **Q**   So, a clinical trial, a clinical research is the

12   administration of a drug to humans?

13         **MR. MADRID:**  Objection; leading.

14         **THE COURT:**  Sustained, on that ground.

15         **MR. FLEMING:**  Okay.

16   **Q**   Can you explain the general framework of clinical

17   studies to the jury, please?

18   A   Certainly one significant --

19         **MR. MADRID:**  Your Honor, I think this is outside

20   the scope of the report.

21         **THE COURT:**  Where is it?

22         **MR. FLEMING:**  Again, your Honor, in Paragraphs 6

23   can 27.

24         **THE COURT:**  He may testify consistent with those

25   paragraphs, what's in there.

1          **MR. FLEMING:**  Thank you.

2          **THE COURT:**  He can look at them.

3     A    Can you restate the question?

4     Q    Yes.  In clinical practice, in clinical research, does

5     that involve giving medications to patients?

6     A    Yes, it does.

7     Q    Now, the jury heard just now the testimony of Dr. Baron

8     regarding a study he did.

9     A    Yes.

10    Q    Is that a clinical study?

11         **MR. MADRID:**  Objection; leading.

12         **THE COURT:**  What kind of study is that?

13         **THE WITNESS:**  It's a clinical study.

14         **MR. FLEMING:**  Okay.

15         **THE COURT:**  Go ahead.

16         **MR. FLEMING:**  Thank you.

17    Q    And could you explain to the jury generally what Dr.

18    Baron's clinical study involved?

19    A    Yes.  Dr. Baron's clinical study that he referred to

20    that he and his colleague performed at the University of

21    Chicago in 1979 had looked at a pharmaceutical composition

22    and they were looking for evidence of stimulation of red

23    blood cell formation.

24    Q    And what did Dr. Baron's study, what molecule, what drug

25    were they looking at?

1    A    The compound in this case was human erythropoietin.

2    Q    Can you explain to the jury why a doctor would perform a

3    clinical study?

4    A    Well, one would have a rationale or reason for

5    performing that study.

6         MR. MADRID:  Your Honor, I think this is outside

7    the scope.

8         THE COURT:  Where is it?

9         MR. FLEMING:  The yellow report, your Honor,

10   Paragraph 15; and again in the blue report, Paragraph 40.

11        THE COURT:  Did you say 40?

12        MR. FLEMING:  Forty in the blue report, your Honor.

13        THE COURT:  Thank you.

14        MR. FLEMING:  And 15 in the yellow.

15        THE COURT:  You may testify consistent with both

16   those paragraphs, and you can look at them.

17   Q    And could you explain to the jury, Dr. Spinowitz, why a

18   physician would conduct a clinical study?

19   A    Again, a physician would administer a compound with the

20   expectation of sustaining or corroborating that which they

21   think will happen.

22   Q    Based on the response of the humans who receive the

23   medication?

24        MR. MADRID:  Objection, your Honor.  We're still

25   outside the scope.

```
 1              THE COURT:  Sustained.  Well, you're also leading.

 2   Don't lead him.

 3              MR. FLEMING:  I'm sorry, your Honor.  May I put

 4   another question?

 5              THE COURT:  He may testify to what's contained in

 6   those paragraphs.

 7              MR. FLEMING:  Thank you, your Honor.

 8   Q   Can you tell the jury --

 9              THE COURT:  Put the question again.

10   Q   -- the effect of the commencement of a clinical trial?

11   A   One would have a rationale or reason for doing a trial,

12   one would collect the data, and one would interpret the

13   data.

14   Q   Now, Dr. Baron testified regarding a document called an

15   IND.  Did you hear that testimony?

16   A   Yes.

17   Q   Could you explain to the jury what an IND is?

18   A   Well, it's abbreviation for an Investigation of New

19   Drug.  It's essentially an application that one makes to the

20   FDA, the Food and Drug Administration, in order to be able

21   to administer a pharmaceutical compound to humans.

22   Q   Can you explain to the jury why a patient on chronic

23   kidney disease might develop anemia?

24   A   Yes.  It had long been known that patients with chronic

25   kidney disease have anemia, that's been known for a century.
```

1    The cause of that kidney disease is the loss, the absence,

2    the relative absence of a hormone called erythropoietin.

3    That hormone is made in the kidney in the adult.  That

4    hormone is what sends the signal to the bone marrow, the

5    spot where red blood cells are formed, telling the bone

6    marrow to make more red blood cells.  In the presence of

7    kidney failure, the loss of kidney tissue, one has a

8    commensurate loss of the ability to make erythropoietin.

9    **Q**   Are you here to explain to the jury your opinions

10   regarding some of the patents-in-suit?

11   A   Yes.

12   **Q**   Can you tell the jury which of the patents-in-suit

13   you've formed opinions on?

14   A   The specific patents that I have formed opinions about

15   are the '422 patent, those reference the last three numbers

16   of the patent, and the '933 patent.

17   **Q**   Okay.  Can you tell the jury as to the '422 patent which

18   claims of the '422 you analyzed?

19   A   Yes.  I've come to an opinion regarding claim 1 of the

20   '422 patent, and with respect to the 933 patent, it was

21   claims 9, 11, 12 and 14.

22        **MR. FLEMING:**  May we have the '422 patent claim,

23   please.  And that is Exhibit 5 in evidence, your Honor.

24        **THE COURT:**  Thank you.

25        **MR. FLEMING:**  Now, if we can enlarge that for the

1    jury.  Can everyone see that?  Am I blocking anyone?

2    Q    Can you explain to the jury the process by which you

3    analyzed this claim for your opinion?

4    A    Yes.  My approach to this claim was to break the claim

5    down into a number of elements by which I can then evaluate

6    that which was available in the prior art and determine and

7    come to my opinion.

8    Q    Could you show the jury how you did that, how you broke

9    this claim down?

10   A    Yes, I broke it down into a number of components.

11   First, the first would have been, the first is a

12   pharmaceutical composition.  That element tells us that's

13   what we're looking at.  Comprising a -- if you could

14   highlight the next -- a therapeutically effective amount of

15   human, of human erythropoietin.  That's the second element.

16   The third would be a pharmaceutically acceptable diluent,

17   adjuvant, or carrier.  And the last would be wherein said

18   erythropoietin is purified from mammalian cells grown in

19   culture.  So we have four elements to this claim.

20   Q    Okay.  So as I obscure this again myself.

21        After you broke the claim down, what did you do

22   next?

23   A    Well, the way I approached, formulated my opinion was,

24   as one skilled in the art in the period of time around 1983

25   and 1984, I looked at the literature that was available, I

1    relied upon my knowledge of one skilled in the art at that

2    time, in addition to which I reviewed many documents that

3    were supplied by counsel.

4    **Q**    What about for the meanings of the terms?

5    A    Well, for the meanings of the terms, I restricted myself

6    and limited it to the way the Court has defined those terms.

7    **Q**    Okay.   Now, the jury has behind Tab 1 a document we have

8    been referring to as the glossary.

9         **MR. FLEMING:**   Could I have that up on the screen

10   for a second, please, your Honor.   Okay.

11        And I've also put it up on the screen.

12   **Q**    We've referred to this colloquially as the glossary.

13   Are these the definitions that you applied in your analysis,

14   Dr. Spinowitz?

15        **MR. MADRID:**   Objection, your Honor; this is outside

16   the scope of the report.

17        **THE COURT:**   Where is it?

18        **MR. FLEMING:**   The green book, your Honor,

19   Paragraphs 11 through 18.

20        **THE COURT:**   Yes, anything that he has testified to,

21   or anything set forth in his report, 11 through 18, he may

22   now testify to.

23        **MR. FLEMING:**   Thank you, your Honor.

24        Just for the record, your Honor, of course the

25   glossary was created for the ease of the jury; that document

1    didn't exist until the preparation for trial.

2         **THE COURT:**  Well, that's appropriate, and he may

3    have been expecting me to explain that.

4         When a patent issues that, of course, is going to

5    be an issue and it's going to be significant in patent

6    cases.  So the law says that before we get to trial the

7    judge as matter of law has to construe the patent.  And so I

8    have to take the patent language and I have to put it in

9    terms that a person of ordinary skill in the art would

10   understand that patent language to mean.  And also, since I

11   know this is going to be a jury case, I try to put it in

12   language that a jury can understand.

13        Now, I'm required by the law to do that, and in

14   this case I've done it before the trial started.  Now,

15   having done it, I told the lawyers you let the jury see the

16   Court's definitions, the Court's constructions.  For the

17   purposes of this case they're law.  And when we get these

18   people in here who are going to express opinions, all of

19   them, whether they're called by Roche or Amgen, they have to

20   express their opinions in light of what I've already said as

21   matter of law the language means.  And so Mr. Fleming's

22   being appropriately very careful, this is not a document

23   that existed back at the time of the patent application or

24   the patents being issued.  This is a document that they've

25   created based upon my instructions, my constructions of

1    disputed terms in the patent.

2           Now that I've settled that everyone has to follow

3    that in presenting the case to you.

4           Go ahead, Mr. Fleming.

5           **MR. FLEMING:**  Thank you, your Honor.  Thank you for

6    the explanation.

7    **Q**   After you broke down the claim, you looked at the

8    Court's claim construction, what else did you consult?

9    A   As stated, what I had looked at was the literature,

10   documents made available to me, and my understanding as a

11   nephrologist in that period of time, 1983 to 1984.

12   **Q**   Based on those materials, have you come to an opinion

13   regarding claim 1 of the '422 patent?

14   A   Yes, based on that activity it's my feeling that there

15   was prior art, there was an understanding that using these

16   definitions led me to the opinion that claim 1 of the '422

17   patent is invalid by virtue of that prior art.

18   **Q**   So, can you tell the jury which particular pieces of,

19   references of prior art you considered relevant?

20   A    Yes.  There were three pieces of art, prior art, prior

21   to 1983 of '84.  And they were the Baron-Goldwasser study,

22   and you've heard Dr. Baron this morning.  In addition to

23   which there was, there were two other pharmaceutical

24   compositions that were looked at, one by a Dr. Joseph

25   Eschbach, using EPO-rich plasma, and we'll explain that, and

1    the other one was a body of work done by Dr. Essers in the

2    early to mid-'70's, again using EPO-rich plasma in the use

3    of, in treating patients with chronic kidney disease.

4    Q    So starting with the first that you cited, the

5    Baron-Goldwasser study.

6         **MR. FLEMING:**  May we have Exhibit 2004 that's in

7    evidence.  And may we start at Page 46, please.  And could

8    you enlarge that for the jury.

9    Q    And, Dr. Spinowitz, could you explain to the jury how

10   this piece of information within Exhibit 2004 factored into

11   your analysis regarding the invalidity of claim 1 of the

12   '422?

13   A    As you recall before, I told you that when a physician

14   wants to evaluate a pharmaceutical composition he has to

15   file an IND, an Investigation of New Drug with the Food and

16   Drug Administration, the FDA.  This is actually the cover

17   letter by Dr. Joseph Baron sent to the FDA, the Food and

18   Drug Administration, in March of 1979 telling them the

19   contents of the rest of this, this exhibit, that he is

20   asking for just that, a physician-sponsored IND.

21   Q    Why, why did Dr. Baron have to request of the FDA

22   permission to do a study?

23   A    In order to be able to give a pharmaceutical

24   composition, a new drug, a new compound to a human, one of

25   those steps is to ask, to apply to the FDA and gain approval

1    from the FDA to administer that compound.  In addition to

2    which, one would have to submit to your local IRB, your

3    local Institutional Review Board, to get permission to do

4    the same thing.  But the first step is an application to the

5    FDA, the IND.

6    **Q**    So this is for permission to administer Dr. Baron's

7    product to humans?

8            **MR. MADRID:**  Objection; leading.

9            **THE COURT:**  Sustained.  Don't lead the witness.

10           **MR. FLEMING:**  I apologize, your Honor.

11   A    Yes.  So that --

12           **THE COURT:**  The yes -- no, no, the yes is stricken.

13   That's a "Were you wearing a red hat?" type of question.

14   He's not entitled to ask those.  So the answer is stricken.

15   Let's ask more general, not general, but a nonleading

16   question.

17           **MR. FLEMING:**  I will.  Thank you, your Honor.

18   **Q**    So can you explain to the jury your understanding based

19   on a review of these documents and this evidence what Dr.

20   Baron is seeking to do?

21   A    Yes.  So, in the first sentence, let's get to the body

22   of the letter, the first sentence in this cover letter to

23   the FDA is Dr. Baron telling Doctor Temple, the official at

24   the FDA that he's going to be dealing with, is that he's

25   submitting the enclosed materials for a physician-sponsored

1    IND for human EPO.  Therein he states exactly what he

2    expects to administer to these patients.

3    **Q**   What, if anything, is he saying to the FDA in the second

4    paragraph?

5         **MR. MADRID:**  Your Honor, the document speaks for

6    itself.

7         **THE COURT:**  The document does speak for itself.  He

8    may -- there's some confusing language in there.  He may

9    give us a definition of terms if it's in the report.

10   **Q**   Well, in the first sentence of the second paragraph

11   there's the submitted material supports the very high

12   likelihood of safe administration of human EPO to patients.

13        Do you see that sentence, Dr. Spinowitz?

14   A   Yes.

15   **Q**   Okay.  As one of skill in the art, can you explain to

16   the jury what Dr. Baron is communicating in that sentence?

17        **MR. MADRID:**  Objection; speculation, your Honor.

18        **THE COURT:**  No, no.  Well, in that form, maybe.

19        What's that language mean to you?

20        **THE WITNESS:**  Yes.  So -- and actually it's

21   corroborating in the rationale.  His expectation is that

22   when he gives this compound, this human erythropoietin, to,

23   to humans, that his expectation is that it would be safe to

24   give to those individuals; that this was a pharmaceutical

25   compound, composition that was suitable for administration

1     to those individuals.

2              **MR. MADRID:**  Your Honor, this is not in the report.

3              **THE COURT:**  Well, that may stand in the exercise of

4     discretion.

5              **MR. FLEMING:**  Thank you, your Honor.

6     **Q**   If you go forward two pages, please.

7              And can you explain to the jury how this document

8     impacted your opinion regarding claim 1 of the '422 patent?

9     **A**   Well, in this Page 2 where Dr. Baron is stating the name

10    of the drug, human erythropoietin, as he stated in this

11    cover letter.  But he goes a little further and tells the

12    FDA what it is that he will be giving.  If you go further

13    down.  Thank you.  He says a number of things here in this

14    paragraph.  This is manufacturing information.  So, where

15    did he get this human erythropoietin.  And he tells you that

16    the human erythropoietin was prepared from the urine of

17    patients and that this was human erythropoietin that had

18    been purified in the laboratory of Dr. Eugene Goldwasser,

19    his colleague at the University of Chicago.

20    **Q**   What is that information on the bottom in the box?

21    **A**   Go a little further down.  This is actually the label

22    that was affixed to this pharmaceutical composition and told

23    the physicians --

24              **MR. MADRID:**  Objection; foundation.

25              **THE COURT:**  Overruled.

1    A    -- that told the physicians what it was that they were

2    giving to those patients.  It's a label that was affixed to

3    that vial.  It states that it was human erythropoietin.  It

4    tells them that it was for parental use, couldn't be given

5    by mouth, any other route of administration in this case, it

6    was given intravenously.  The investigator was Joseph Baron

7    of the University of Chicago.  And also it says this is a

8    drug that the FDA, the federal, the Food and Drug

9    Administration had said it was okay to give this drug.

10              So that's what this label tells us.

11   Q    If we go to the first sentence of the second paragraph.

12   A    There was another part to this pharmaceutical

13   composition, if you will.  And if you see the first

14   sentence, if that can get highlighted, please.  The hormone,

15   erythropoietin being the hormone, is diluted in normal serum

16   albumin.

17           **MR. MADRID:**  Objection; the document speaks for

18   itself, your Honor.

19           **THE COURT:**  Well, the document does speak for

20   itself.  So why don't you put another question, Mr. Fleming.

21   Q    Could you explain to the jury the scientific terms in

22   this sentence and what they mean to you?

23   A    It says that there was a hormone and it was diluted in

24   normal serum albumin, and that normal serum abumin solution

25   was to be the diluent, if you will, was to be that which the

1    human erythropoietin was suspended in.

2    **Q**   So can we go back to claim 1 of the '422, please.

3            Now, can you explain to the jury then the

4    information and the evidence that you've just read to them

5    how that impacted your opinion about the invalidity of claim

6    1?

7    **A**   Yes.  So, again in keeping with the Court's definition

8    of pharmaceutical composition, this was a pharmaceutical

9    composition that --

10   **Q**   When you are saying this, could you tell the jury what

11   you mean?

12   **A**   The erythropoietin, that was the human erythropoietin

13   that was used in that IND, was a pharmaceutical composition

14   comprising human erythropoietin and a pharmaceutically

15   acceptable diluent in a normal serum albumin adjuvant or

16   carrier.

17   **Q**   And do you have an opinion as to from where the purified

18   human EPO that Dr. Baron used in the study was derived?

19   **A**   Yes, that human erythropoietin was derived from

20   mammalian kidney cells.

21   **Q**   Now, did Dr. Baron actually administer his human EPO

22   pharmaceutical composition to humans?

23   **A**   Yes, he did.

24   **Q**   And did he report on the progress of that work?

25   **A**   Yes, he did.

1      **MR. FLEMING:**  If you can stay within 2004.  And I

2  believe, if I can get the correct page, it's the page with

3  6623, your Honor.

4      **THE COURT:**  All right.

5      **MR. FLEMING:**  Thank you.

6  **Q**  All right.  Now, the jury has seen this as Dr. Baron

7  presented his testimony, it's called Progress Report.  Can

8  you tell the jury what you understand this to be?

9  **A**  Yes.  This was a document that was sent to the FDA in

10  1984, progress report of his IND, and it's directed again to

11  the officials at the FDA.  And as required, he is giving an

12  update, he's giving a progress of the results that he had

13  seen utilizing that pharmaceutical composition comprising

14  erythropoietin and a diluent.

15  **Q**  Could you look at the first two sentences of this letter

16  to the FDA.  And could you tell the jury what those

17  sentences say to you?

18  **A**  So it states that the purified human erythropoietin had

19  been administered intravenously here to five patients since

20  they started the studies.  Three patients with chronic renal

21  failure on hemodialysis, as I told you, were the first to

22  receive the hormone in 1979 and 1980.

23  **Q**  And again chronic renal failure, is that the -- what is

24  that?

25  **A**  Chronic renal failure again is reference to the various

1    stages, in this case, since he's identified those patients

2    as being on hemodialysis, these were the patients in the

3    last stages of Stage 5 as I told you.

4    Q    Is there any conclusions regarding the study that Dr.

5    Baron reports in this letter?

6    A    Yes, there is.  If we can go to the next page of that

7    progress report, I believe Page 2.  And just highlight the

8    section, if you will, Section 3.  And in this section Dr.

9    Baron is going to tell us about the results, he's going to

10   tell us about the biologic efficacy.  This was efficacy,

11   this is data collected --

12        **MR. MADRID:**  Objection, your Honor; this is a

13   narrative.

14        **THE COURT:**  Yes.  Grounds?

15        **MR. MADRID:**  Narrative.  And the document speaks

16   for itself.

17        **THE COURT:**  I think, I think that's so.  Sustained.

18   But you may, but you may put questions, Mr. Fleming.

19        **MR. FLEMING:**  Yes.

20   Q    Of the report that Dr. Baron has given to the FDA was

21   there information in there that was relevant to you in

22   making your analysis of the invalidity of claim 1 of the

23   '422?

24   A    Yes, this is summary data telling me about the biologic

25   efficacy, what happened to those patients.

1   Q    And can you highlight for the jury what information you

2   felt was relevant to your analysis.

3   A    Yes.  So, starting at the beginning, hematologic

4   parameters in the three patients with chronic renal failure

5   were assessed prior to and following erythropoietin

6   administration; that was that pharmaceutical compound.  And

7   he starts, if you would start with -- well, there was no

8   significant increase in hematocrit observed.  However -- if

9   you would just highlight starting from each -- each patient

10  showed a mild to modest increase in reticulocyte number with

11  peaks noted at days 9, 10 and 11 respectively.

12  Q    What does that tell you as one skilled in the art?

13  A    Well, what this is stating is that before he gave the

14  erythropoietin, he had made certain measurements.  Following

15  administration of the erythropoietin he had seen evidence of

16  an increase in reticulocyte number and evidence of

17  therapeutic efficacy.

18  Q    Is there other information contained within this report

19  that you used in coming to your conclusions regarding the

20  invalidity of claim 1 of the '422?

21  A    Yes.  He summarizes some additional results.  He tells

22  us that two of the three patients showed increased numbers

23  of nucleated red blood cells per thousand bone marrow cells.

24  Q    So what are nucleated red blood cells?

25  A    Well, I think you saw evidence in the video, and this

1   states that these are the earliest evidences of an increase,

2   the potential increase in red blood cell formation under the

3   stimulation of erythropoietin.

4   Q   Would you go on, please.

5   A   And the third bit of evidence was the disappearance of

6   radio iron from plasma was shortened in two of the three

7   patients.  This is a long version of what's referred to as a

8   ferrokinetic, ferro being iron, and kinetic referring to

9   movement.  And what this states is that the iron that they

10  had given the patient as a tracer molecule had disappeared

11  faster from the bloodstream, indicating that that iron had

12  been utilized for the formation of red blood cells.

13  Q   Now, we've put before you what's been admitted into

14  evidence as 2049.  It's the large binder.

15  A   Yes.

16  Q   It should say 2049.  On the cover?

17  A   Yes.

18  Q   Can you tell the jury what that large binder is?

19  A   This, this huge mass of documents are actually the data

20  that were made available to me that Dr. Baron had had

21  describing the results, the data that he had collected

22  during the course of that three-patient study.

23  Q   Is that the data that is being summarized in the exhibit

24  that we're looking at in 2004?

25          MR. MADRID:  Objection.

```
 1              THE COURT:  Sustained; you're leading the witness.
 2              MR. FLEMING:  I apologize, your Honor.
 3    Q   Can you tell the jury what data Dr. Baron to your
 4    understanding is summarizing in his letter to the FDA?
 5    A   Yes.  It's this mass of papers that Dr. Baron had
 6    utilized.
 7              MR. MADRID:  Objection; speculation, your Honor.
 8              THE COURT:  No, that may stand.  That's what he
 9    understood it to be.
10    Q   Have you --
11    A   That he had evaluated in order to come to that terse
12    conclusion.
13    Q   Have you reviewed that data that's Exhibit 2049?
14    A   Yes, I have.
15    Q   Can you tell the jury, do you agree with Dr. Baron's
16    conclusions?
17    A   Yes, in my opinion, having reviewed this data, that my
18    opinion is the same as that which Dr. Baron came to, that
19    there was indeed evidence of therapeutic response.
20              MR. FLEMING:  And can we go back to claim 1 of the
21    '422, please.
22    Q   Can you explain to the jury how your review of this data
23    impacted your opinion regarding the invalidity of claim 1 in
24    the '422?
25    A   What you see is one of the, one of the elements of claim
```

```
1   1 is a therapeutically effective amount.  They clearly refer

2   to effective as looking at efficacy.  That was the biologic

3   efficacy that Dr. Baron was referring to.  So, based on that

4   summary and all the data, Dr. Baron had indeed seen a

5   therapeutic effect, and my opinion is that he was correct.

6   Q   Based upon your review of the data from Dr. Baron's

7   study which is 2049, the IND material submitted in 2004, as

8   one of skill in the art, can you tell the jury what your

9   opinion is regarding the validity of claim 1 of the '422?

10  A   Yes.  Based on this data, the IND, the summary, my

11  opinion is that the Baron-Goldwasser clinical study had

12  indeed showed therapeutic effectiveness and is invalid by

13  virtue of obviousness.

14  Q   Now, we talked with the jury regarding the glossary of

15  terms and the Court's definition.

16       MR. FLEMING:  I beg your pardon, your Honor, if I

17  might.

18  Q   And here we've blown up the term therapeutically

19  effective amount.

20  A   May I stand?

21  Q   So, Dr. Spinowitz --

22  A   I don't want to use the pointer anywhere near the Judge.

23       THE COURT:  Go right ahead.  My point is to --

24       THE WITNESS:  Trust me, you don't want me getting

25  that close to you with the laser.
```

 1          **THE COURT:**  -- keep your voice up.  I wasn't

 2     talking about the laser.

 3          **THE WITNESS:**  I'm looking for a pointer.

 4          **THE COURT:**  We had one there.

 5     **Q**   Well, actually let me give you a marker.  And I have a

 6     marker.

 7          **THE COURT:**  Thank you.

 8     **Q**   And can you indicate to the jury, based on your review

 9     of the Baron data, your opinions regarding this particular

10     element of the claim?

11     **A**   Yes.  So, again, in understanding that element, it's

12     important to understand the term therapeutically effective

13     amount.  And the courts have helped us here.  And

14     therapeutically effective amount is one that elicits any or

15     all of the effects often associated with in vivo, in, in a

16     living animal or being, in vivo biologic activity of natural

17     EPO such as, and the Court definition then goes on to tell

18     us what those indications would be.

19          And the first is stimulation of reticulocyte

20     response.  Stimulation meaning that there's an increase in

21     reticulocytes, evidence of reticulocyte formation.

22     **Q**   And did you see that effect in Dr. Baron's data?

23     **A**   Yes, that was precisely what Dr. Baron saw, he stated

24     it, I saw it in the documents, and I agree that there was

25     indeed a reticulocyte response.

1    The next was the development of ferrokinetic

2    effects.  It's that fancy term about iron movement.  And the

3    Court here has given examples of those, plasma iron

4    turnover.  This is that iron disappearance, the iron moving

5    from the bloodstream into the red blood cells.

6    Marrow transit time.  That's another more

7    sophisticated way of looking at a ferrokinetic effect.

8    The next is erythrocyte mass changes.  Mass

9    referring to the number of erythrocytes, red blood cells.

10   Another one, stimulation of hemoglobin C synthesis.

11   A very specialized form of response.

12   And increase in hematocrit levels in mammals.  And

13   includes all mammals.

14   There are a number of important things.  Not only

15   is this definition telling us what to look for, it's telling

16   us that any one of these effects would represent a

17   therapeutic effective amount.  And it's not telling us how

18   many we have to have to see.  So, there are a lot of

19   important points to this definition.

20   **MR. MADRID:**  Objection, your Honor; getting into

21   legal testimony.

22   **THE COURT:**  I will take care of the law.  What he's

23   testified to may stand.

24   **MR. FLEMING:**  Thank you, your Honor.

25   **Q**   Now, we saw Dr. Baron's conclusion regarding

1    reticulocyte count.  Did anyone else form a conclusion

2    regarding this data in those patients that you saw in the

3    materials you reviewed?

4    A    Yes.

5    Q    Who was that?

6    A    Actually his colleague, Dr. Goldwasser, who provided him

7    with the human erythropoietin.

8         **MR. FLEMING:**  Can we have 2045, please.  This is in

9    evidence already.

10   Q    Okay.  Can you tell the jury what this is?

11   A    Yes.  So, this is -- we're going to have to highlight

12   some of these spots for the jury.

13        So, first of all, this is a, this is a grant

14   application.  It's an NIH grant, National Institutes of

15   Health.  It is submitted by Dr. Eugene Goldwasser, Dr.

16   Baron's colleague at the University of Chicago.

17   Q    Now, if we look at the bottom of the page.

18   A    And --

19   Q    What is this?

20   A    Yes, Dr. Goldwasser affixes his signature to this

21   document stating that everything that's in it he assures

22   that it is the truth.  And Dr. Goldwasser signs this and

23   this is submitted in August of 1984.

24   Q    Now, could we go forward in this document to Page 20,

25   please.  And can --

1   A   Yes, if you could just highlight the middle section

2   there.  I think it's clinical, clinical test of EPO.  Thank

3   you.

4           MR. FLEMING:  Can you enlarge that for the jury.

5   Q   Can you tell the jury what part of this information in

6   Dr. Goldwasser's grant application was relevant to your

7   analysis?

8   A   Well, this again is a summary of a very small clinical

9   trial making reference to that Baron-Goldwasser clinical

10  trial of pure human EPO to determine the effect on

11  erythropoiesis in patients with chronic renal disease

12  maintained on dialysis.  He's restating the patients that

13  were observed.

14  Q   Is there anything about reticulocyte count?

15  A   Yes.  And if you go a little further to the middle, each

16  patient -- each patient again.  Thank you.  Could you just

17  highlight each patient.  However -- the middle.  Each

18  patient, however, showed an increase in reticulocyte count

19  with peaks at 9, 10 and 11 days.  Again, referring to the

20  fact that he, too, was of the opinion that they had seen a

21  therapeutically effective response, that increase in

22  reticulocytes.

23          MR. MADRID:  Objection, your Honor.  Misstates

24  the --

25          THE COURT:  Well, you'll have a chance to examine.

1    His testimony may stand.

2    Q   And that's your understanding of one skilled in the art

3    in reading this particular information, correct?

4    A   Yes.

5    Q   If you look at the next sentence, please.  Can you tell

6    the jury what you understand that to mean?

7    A   The first two patients -- if you could just highlight

8    that sentence.  The first two patients had increased

9    erythroid cells in the marrow and an increased plasma iron

10   clearance rate.  Again, this is the information we saw about

11   the early formation of red blood cells, those nucleated red

12   blood cells, and again stating that iron had disappeared at

13   a faster rate after the administration of the human

14   erythropoietin.

15   Q   So, Doctor, in your opinion was Dr. Goldwasser agreeing

16   with Dr. Baron's conclusion?

17   A   Yes, here, too, he's observing yet another evidence of

18   therapeutic responsiveness, this ferrokinetic effect.

19   Q   And again, do you agree with Dr. Baron and

20   Dr. Goldwasser's conclusions regarding this clinical study

21   that they did with recombinant human EPO?

22   A   Yes.

23   Q   Withdrawn.  Withdrawn.

24        Do you agree with the conclusions reached by

25   Dr. Goldwasser and Dr. Baron regarding their clinical study

1    with human urinary EPO?

2         **MR. MADRID:**  Objection; leading.

3         **THE COURT:**  Sustained.

4    **Q**   Tell the jury, if you would, please, your opinion

5    regarding whether you agree or not with Dr. Baron and

6    Goldwasser?

7    A   Yes, as one skilled in the art, having reviewed this

8    information, my opinion is, as Dr. Baron and Dr. Goldwasser

9    had observed, that the results of this study had shown

10   therapeutic effectiveness with a pharmaceutical compound

11   comprising human erythropoietin and diluent obtained from

12   mammalian cells, and this experiment, this evaluation had

13   rendered this claim 1 of '422 invalid by virtue of

14   obviousness and anticipation.

15   **Q**   And again, you said you looked at the individual data in

16   2049 which is Dr. Baron's data?

17   A   Yes.  That opinion comes from review of this data.

18   **Q**   Did you prepare a demonstrative from part of that data

19   to help explain your opinions to the jury?

20   A   Yes.  There's a lot of data in there.

21        **MR. FLEMING:**  Could we have SP-85, please.

22        **THE COURT:**  Now, again, this is a demonstrative aid

23   designed to help you understand the testimony.  It, itself,

24   is not evidence.

25        **MR. MADRID:**  Your Honor, we object to this.

1          **THE COURT:**  Well, I thought these were all worked

2     out ahead of time.  You object to this one?

3          **MR. MADRID:**  Yes, sir.

4          **THE COURT:**  All right, come to the side bar and

5     take it down.

6          **MR. FLEMING:**  Take it down, please.

7     SIDEBAR CONFERENCE, AS FOLLOWS:

8          **THE COURT:**  Mr. Madrid?

9          **MR. MADRID:**  Yes.

10         **THE COURT:**  Just so I'm clear -- well, I take it

11    that this is a copy of, Mr. Fleming, a document in evidence

12    with the superimposed general trend lines.

13         **MR. FLEMING:**  Exactly, your Honor.

14         **THE COURT:**  What's the problem?

15         **MR. MADRID:**  Your Honor, our view is that this

16    misstates the evidence.  These lines overexaggerate the data

17    in here.  And they're also assisting, or associating it with

18    the conclusion of it's therapeutically effective.

19         **THE COURT:**  No, they can have it.

20         **MR. FLEMING:**  Thank you, your Honor.

21         (Whereupon the sidebar conference concluded.)

22         **THE COURT:**  I'm going to let him show you this

23    demonstrative.  The objection was that the lines aren't

24    particularly accurate and the like.  But to say an

25    objection, that's not evidence.  It's designed to help you

1    understand the testimony of the witness.  It's not evidence.

2    If it helps you understand his testimony, fine.  Like any

3    other witness, you may believe everything he's testifying

4    to, you may disbelieve everything he's testifying to, you

5    may believe parts of what he testifies to and disbelieve

6    other parts.  You are the judges of the facts.

7            Go ahead, Mr. Fleming.

8            **MR. FLEMING:**  Thank you, your Honor.

9    **Q**   So if we turn back to this demonstrative.

10           Dr. Spinowitz, can you explain to the jury what you

11   want to help them understand by this demonstrative?

12   A   Yes.  Well, in the left hand panel, I want you to

13   understand this is part of the documents that were reviewed.

14   This was a way for the investigators to get a summary, get a

15   handle on all of this mass of data.  In this case, it's only

16   the data reflecting Patient 1.

17   **Q**   Now, let me stop you for a second.  How many patients

18   again were in the Baron-Goldwasser clinical study?

19   A   Yes, there were a total of three parents that were

20   evaluated.  This is Patient 1, and in fact was the first

21   patient who was given the pharmaceutical composition.

22   **Q**   Okay.  And the figure on the left, excluding the green

23   arrows, is that a page actually out of Dr. Baron's data?

24   A   Yes, that's correct.

25   **Q**   Okay.  Please continue.

1    A    Yes, there's just one item that I would point out.

2    This -- that's the name of the patient and for patient

3    privacy that has been blocked out.

4         **MR. FLEMING:**   Your Honor, just so we're clear on

5    the record, for purposes of patient privacy, we have

6    obscured any reference to the actual names of the patients

7    or any Social Security numbers of anyone involved.

8         **THE COURT:**   Actually the rules of Court require

9    obscuring of Social Security numbers.  But when you're

10   dealing with patients in a health matter that's a general

11   protocol.  Both sides will observe it for individual

12   privacy, that's all.

13        **MR. FLEMING:**   Thank you, your Honor.

14   **Q**    Can you continue, Dr. Spinowitz?

15   A    So there were basically five panels summarizing the data

16   collected regarding Patient 1.  And what you see at the top

17   is this heavy bar, and this was the duration of the

18   administration of that pharmaceutical composition, the human

19   EPO.

20   **Q**    How long did this patient receive the Goldwasser-Baron

21   pharmaceutical composition?

22   A    This patient was treated just ten days.

23   **Q**    And --

24   A    Over the course of ten days.

25   **Q**    Can you recall the length of treatment of the other two

1  patients?

2  A   The second patient was treated similarly over ten days,

3  and the third patient was actually treated with the same

4  amount of treatment but at the end of dialysis, so the

5  treatment was a little bit longer.

6  Q   Please continue.

7  A   So, over the course of this treatment period there was

8  information before the patients received their

9  erythropoietin and after.  And the top panel refers to the

10  nucleated red blood cells.  Those were those early evidence

11  of the potential of the bone narrow --

12          MR. MADRID:  Objection, your Honor.

13          THE COURT:  Yes.

14          MR. MADRID:  There's no discussion in his report

15  with respect to the statements of this document.

16          THE COURT:  Well, no, overruled.  I mean, if the

17  report discusses these terms.  Overruled.

18          MR. FLEMING:  Thank you, your Honor.

19  Q   Please continue, Doctor.

20  A   Thank you.

21          So this was an indication that those nucleated red

22  blood cells had increased, increasing potential for red

23  blood cell formation.

24          Plasma iron half-life.  Here, the number's going

25  down, but that's actually a positive effect; that is to say,

1   the iron is moving out of the blood vessel into the red

2   blood cells.  So a decrease in that number is actually

3   evidence of therapeutic effectiveness.  That was one of

4   those ferrokinetic efficacy points that were in the

5   definition.

6          Red blood cell mass, which is a measure of, it's a

7   means of measuring all of the red blood cells that had

8   increased over the course of the therapy.

9          Absolute reticulocytes.  We certainly saw that.

10  Stimulation of reticulocyte response in the definition had

11  increased.  And this is another way of looking at

12  reticulocytes.  But, the bottom line of these two columns is

13  that there was evidence of stimulation of reticulocyte.

14  Q   So reviewing all of this data for Patient 1, can you

15  tell the jury what your opinion is regarding whether this is

16  evidence of therapeutic effectiveness?

17  A   I think it's, I think it's clear that this patient had

18  therapeutic efficacy by any number of those end points.  Not

19  just one, but in this case a number of therapeutic, evidence

20  of therapeutic efficacy.  And it is my opinion, again, that

21  having been administered this pharmaceutical compound

22  comprising a diluent, that EPO, that human EPO obtained from

23  mammalian cells, in so doing, in my opinion, as Dr. Baron

24  and Dr. Goldwasser stated, my opinion is that claim 1 of

25  '422 is invalid by anticipation and/or obviousness.

1    Q    Now, you've talked about reticulocytes with the jury.

2    Have you prepared a demonstrative to give them a little

3    further explanation as to what that is?

4    A    Yes.  I mean, we've discussed all these terms, but I

5    think there's a graphic that will make you understand it a

6    little bit better what is going on in terms of red blood

7    cell formation.

8              **MR. FLEMING:**  May I have SP-61, please, your Honor?

9              **THE COURT:**  You may.

10             **THE WITNESS:**  Yes, this is a little cartoon with a

11   cutaway.  Obviously, this is a bone with marrow.  The marrow

12   is the place where the red blood cells are made.  And you

13   can see that what's depicted is a number of different cells

14   with an arrow and that's intended to mean that there's a

15   progression in the bone marrow in terms of red blood cell

16   formation.  Initially, those cells which have the capability

17   of producing many, many red blood cells in the blood, start

18   out with a nucleus.  Various stages of those nucleated cells

19   are responsive to EPO.

20   Q    So nucleated means the cell contains a nucleus?

21   A    Yes, that's correct.

22             Under the guidance of erythropoietin, under the

23   stimulation of erythropoietin, those nucleated red blood

24   cells multiply, progress and advance to the point that they

25   will ultimately be a red blood cell.  But there's one unique

1    type of red blood cell called a reticulocyte.  If you

2    notice, the reticulocyte doesn't have a nucleus.  That

3    little blue shading is the fact that there's some

4    reticulant.  I believe Dr. Baron made reference to it.  We

5    can stain for that reticulant.  It's evidence that the red

6    blood cell still has the ability to make a little bit of

7    protein called hemoglobin, which is all that's contained in

8    the red blood cells.  They carry the oxygen to cells and

9    carbon dioxide back to the lungs.  But a reticulocyte is the

10   most immature form of red blood cell.

11   Q    What does it tell, the presence of reticulocytes, what

12   does it tell one skilled in the art?

13   A    Well, we all have reticulocytes since our red cells are

14   being formed new every day.

15        MR. MADRID:  Objection, your Honor; it's outside

16   the scope.

17        THE COURT:  Yes, the since business is stricken.

18   But you may put another question, Mr. Fleming.

19        MR. FLEMING:  Thank you.

20   Q    So when you are talking about reticulocyte count,

21   explain to the jury exactly what you're counting?

22   A    Yes.  So we're counting these very young red blood cells

23   that are now out of the bone marrow but in the blood vessel.

24   We're counting those reticulocytes.  When there's evidence

25   of more reticulocytes, more immature red blood cells, it's

1    evidence that the bone --

2         **MR. MADRID:**  Objection; outside the scope, your

3    Honor.

4         **THE COURT:**  Yes.  Yes.  Where is it?

5         **MR. FLEMING:**  Okay, your Honor.  Excuse me one

6    second, your Honor.

7         The blue report starting at Paragraph 23 and

8    continuing on.

9         **THE COURT:**  And you're following, sir, that you

10   have to stick with this report?

11        **THE WITNESS:**  Yes.

12        **THE COURT:**  That's the only fair way.

13        **THE WITNESS:**  Yes, I am, Judge.

14        **THE COURT:**  Take a look at Paragraph 23 and, 23 and

15   24.  You may testify as to what's contained there.

16        **MR. FLEMING:**  Thank you, your Honor.

17   **Q**   So, is the reticulocyte --

18        **THE COURT:**  Actually 22, I would say, too.  Take a

19   look at that page there.  And you may testify to what you've

20   set out in your report.

21   **Q**   So, Dr. Spinowitz, with regard to reticulocytes and

22   their function with regard to the formation of red blood

23   cells, can you briefly just explain that to the jury in the

24   context of this record?

25   **A**   Sure.  Erythropoietin stimulates red blood cell

1    formation.  Evidence of increased red blood cell formation

2    is an increase in reticulocyte number in the blood vessel.

3    Q    And the presence of an increase in reticulocytes

4    indicates what to one skilled in the art?

5    A    Evidence of increased reticulocytes is evidence of

6    increased stimulation and that stimulation would have been

7    under the direction of EPO, erythropoietin.

8    Q    Now, the jury's heard the term erythropoiesis.  They've

9    heard the term erythropoietic or erythropoietin.  What is

10   erythropoiesis?

11   A    Erythropoiesis is basically a term just to tell you that

12   red blood cell formation is occurring.

13   Q    Now, you've referenced first the Baron-Goldwasser study

14   and you've talked about that.  What was the next study that

15   you found relevant to your analysis regarding the invalidity

16   of claim 1 of '422?

17   A    Yes, the next study that I reviewed is part of prior art

18   was the Eschbach EPO-rich plasma study.

19   Q    And can you tell the jury what that study involved?

20   A    Well, Dr. Eschbach, who was a nephrologist, who had been

21   studying erythropoietin for many years, had conceived of an

22   evaluation by which he would obtain plasma, the liquid

23   portion of our blood, and that plasma would come from

24   another patient, a patient who had an increased, an enriched

25   amount of erythropoietin by virtue of another condition that

1    the patient had.  He harvested that plasma, collected it,

2    processed it, and then ultimately gave it to a patient with

3    chronic renal failure on dialysis.

4    **Q**    So you said EPO-rich plasma.  Can you explain that

5    concept to the jury, please?

6    A    Well, we all, we all have some amount of erythropoietin

7    circulating in our blood at any given time.  If one were to

8    be anemic, have a low blood count --

9             **MR. MADRID:**  Objection; outside the scope, your

10   Honor.

11            **THE COURT:**  Yes.  Where is it in the report?

12            **MR. FLEMING:**  Continuing on --

13            **THE COURT:**  It's withdrawn.  Put another question.

14            **MR. FLEMING:**  Your Honor, I'm sorry, I did not

15   withdraw the question.

16            **THE COURT:**  Oh, all right.

17            **MR. FLEMING:**  I was referring your Honor to the

18   blue report.

19            **THE COURT:**  Yes.

20            **MR. FLEMING:**  Starting at Page 10, Paragraph 28,

21   and continuing on to 29 and 30.

22            **THE COURT:**  I'm sorry.  All right, starting at 28.

23   Yes.  You may testify consistent with what you've set out in

24   your report, sir.

25            **MR. FLEMING:**  And there's also an extensive

1   discussion of this in Paragraph --

2          THE COURT:  Well, don't characterize it; just point

3   me to it.

4          MR. FLEMING:  Of course, your Honor.  Starting on

5   Paragraph 71.

6          THE COURT:  All right.  Yes.

7          MR. FLEMING:  And this is the study -- continuing

8   on in these paragraphs is the study that Dr. Spinowitz was

9   discussing with the jury.

10         THE COURT:  Oh, I'm following that.  And he may

11  testify consistent with his report.

12  Q   Doctor, I'm going to show you now what we've marked as

13  NCF.  And there should be, a copy should be in your book.

14         And consequently a copy will be in your book,

15  counsel, that we've provided to you.

16         Doctor, could you take a look at NCF.

17  A   Yes.

18  Q   Okay.  And can you tell the Court what that is?

19         MR. FLEMING:  Do not put it up yet, please.

20  A   Yes.  This is, this is an original article that appears

21  in the journal Nephrology, and it's written by Dr. Joseph

22  Eschbach.

23         MR. FLEMING:  Your Honor, Roche offers NCF into

24  evidence.

25         THE COURT:  Any objection?

 1              **MR. MADRID:**  We object, your Honor.  Hearsay;

 2      authentication.

 3              **THE COURT:**  All right.  I guess it frames this

 4      issue.  Come to the side bar.

 5      SIDEBAR CONFERENCE, AS FOLLOWS:

 6              **THE COURT:**  You don't seriously object that this is

 7      not in fact an article, do you?

 8              **MR. MADRID:**  No, sir.

 9              **THE COURT:**  All right.  So --

10              **MR. MADRID:**  This witness can't testify to --

11      there's a point of authenticity.

12              **THE COURT:**  But it's authentic.

13              **MR. MADRID:**  Hearsay.  And it's also not prior art.

14              **THE COURT:**  Well, it's not prior art.  And you

15      haven't laid a foundation under hearsay, so why do we need

16      it?

17              **MR. FLEMING:**  Well, your Honor, it is reporting on

18      Dr. Eschbach's study, and it is prior art in the sense that

19      it is, if you turn a few pages it's reporting on Dr.

20      Eschbach's 1984 --

21              **THE COURT:**  Yes, I see this is --

22              **MR. FLEMING:**  -- study.

23              **THE COURT:**  You've tried to get in every scrap of

24      information that does that.  I don't, I don't think that's

25      adequate.  I don't think that's really prior art.  And also

1    I think you've got serious 403 issues where later on people

2    talk about earlier matters.

3              MR. FLEMING:  Can I address that for a second, your

4    Honor?

5              THE COURT:  Briefly.

6              MR. FLEMING:  Yes, under 102(g), this is the prior

7    work of others that has to be not abandoned, suppressed or

8    concealed.  The law acknowledges that there be a later

9    disclosure that describes the prior work.

10             THE COURT:  Oh, oh --

11             MR. FLEMING:  This is Dr. Eschbach describing that

12   work.

13             THE COURT:  We've, we've faced that in the Genetic

14   Institutes matter as to which I have briefs and I'm

15   reflecting on it.

16             All right, I understand that.

17             MR. FLEMING:  It's evidence --

18             THE COURT:  It's Eschbach himself.

19             MR. FLEMING:  It's evidence of his explanation of

20   his work that had been done prior that is now being

21   explained, albeit published at a later time, but it

22   references earlier work.

23             THE COURT:  Uh-huh.

24             MR. FLEMING:  Of course, as any other article, this

25   is --

 1          THE COURT:  Okay, I'm not, for now, for now, I'm

 2     not admitting it, for now.  I'm not foreclosing you, subject

 3     to Mr. Madrid's objections, from inquiring about this

 4     fellow's opinions if he relied upon this, assuming you can

 5     satisfy me that it's reasonable for an opinion that relies

 6     upon a document such as this.  I need to look at this

 7     somewhat more.

 8          MR. FLEMING:  If I can point you directly, your

 9     Honor.

10          THE COURT:  Would you, please.

11          MR. FLEMING:  Of course.  And I apologize for the

12     condition of the copy of course.  But particularly on this

13     page, Page 285, where he's describing his 1984 work in the

14     administration of EPO, he has charts that shows

15     reticulocytes and hemoglobin, he's saying these are the

16     results that I observed when I did this study.  And --

17          THE COURT:  Okay.  Now, Eschbach, just so we can

18     follow, is gravely ill, he's not going to be here.

19          MR. MADRID:  He passed away three days ago, your

20     Honor.

21          MR. FLEMING:  I didn't have a chance to depose him,

22     your Honor.

23          THE COURT:  And I'm sincerely sorry for that.  All

24     right.  So, thank you.  All right.  Thank you very much.

25          MR. FLEMING:  I'll continue with the foundation

1    questions, your Honor.

2              **THE COURT:**  You continue to do --

3              **MR. FLEMING:**  Whatever I think I need to --

4              **THE COURT:**  You need to do what you need to do to

5    try your case.  I do understand this issue and the area.

6              **MR. FLEMING:**  Thank you.

7              (Whereupon the sidebar conference concluded.)

8    **BY  MR. FLEMING**

9    **Q**   Dr. Spinowitz?

10   A    Yes.

11   **Q**   Sticking with NCF, Dr. Eschbach's paper.

12   A    Yes.

13   **Q**   To your understanding, is that the same Dr. Eschbach who

14   performed the study that you were telling the jury about?

15   A    Yes.

16   **Q**   And did you look at the data that's disclosed in NCF in

17   forming your opinions regarding claim 1 of the '422?

18   A    Yes, I did.

19   **Q**   And this is published in Nephrology?

20   A    Correct.

21   **Q**   Is that a type of publication that scientists such as

22   yourself and doctors such as yourself rely upon in forming

23   their opinions and analyses?

24   A    Yes.

25              **MR. MADRID:**  Objection, your Honor.  There's no

1    discussion of the data in the report.

2         **THE COURT:**  Overruled; he may have it.

3    **Q**   And when you looked at the data in the report set forth

4    in NCF as explained by Dr. Eschbach, did that conform with

5    your understanding of the facts which were the basis for

6    your opinions in this case?

7    A    Yes.

8         **MR. FLEMING:**  Your Honor, again we offer NCF.

9         **THE COURT:**  And you maintain your objection?

10        **MR. MADRID:**  Yes, sir.

11        **MR. FLEMING:**  For your Honor's information, I'll --

12        **THE COURT:**  No, don't argue.  Come to the side bar

13   again.

14   SIDEBAR CONFERENCE, AS FOLLOWS:

15        **THE COURT:**  Again, this isn't prior art under

16   anyone's theory.  But it does set forth relevant data in a

17   respected journal, which he says is respected.

18        Why isn't it evidence that on or about these dates

19   these people, Goldwasser is mentioned on the first page, and

20   Eschbach is mentioned, or he says what he did here on this

21   Page 44084, why shouldn't I admit it?

22        **MR. MADRID:**  Your Honor, first of all --

23        **THE COURT:**  But not as prior art.  I wouldn't let

24   anyone argue.  Or as some sort of derivative prior art.

25        **MR. MADRID:**  First of all, this is the date when

1    published; they were never peer reviewed.  This is, this is

2    released in -- the publication comes after the patents.

3              **THE COURT:**  I understand.

4         **MR. MADRID:**  This information -- this witness is

5    being used as a fact witness to testify as to facts that

6    have not been established.  They need to be established by

7    another person.  He's incompetent to testify as to those

8    points.

9              **THE COURT:**  Well, now, Nephrology is an established

10   journal.  And it seems to me there's an adequate foundation

11   that this comes in as, as a learned treatise.  I may --

12   well, let's see.  And the rule on learned treatise, it

13   doesn't come in, but he may read relevant portions of it

14   from the journal and they may direct his attention to these

15   charts.  But that's as far as I'm going.

16             **MR. MADRID:**  May I, your Honor?

17             **THE COURT:**  I think that's a pretty big win for

18   you, but you're not satisfied with it?

19             **MR. MADRID:**  I'll let it stay there, sir.

20             **THE COURT:**  Yes, you will.

21             **MR. FLEMING:**  And just to be clear, I don't want to

22   foul up, what you are saying is you may publish the charts

23   to the jury?

24             **THE COURT:**  No.

25             **MR. FLEMING:**  No.

1      **THE COURT:**  But you may read whatever you want from

2   this in Nephrology, does it say, and if you want to bolster

3   the journal, it's a journal, it's accepted, and you accepted

4   it, and you looked at the charts that were published there,

5   not show it to the jury, and you can do this much better.

6      **MR. FLEMING:**  I understand.  Now I understand what

7   you are saying.

8      One other thing.  Just for the record, your focus

9   on prior art/date of the publication, and I understand your

10  view.  However, we contend that the description of the work

11  which predated --

12     **THE COURT:**  I understand that and I'm wrestling

13  with this Genetics Institute thing.  And while certain

14  things are law of the case, nothing is over until it's over.

15  I understand that argument.  For now, you can get everything

16  you need --

17     **MR. FLEMING:**  Understood.

18     **THE COURT:**  -- it seems to me with this expert, and

19  a fair ruling is the one I've made.  You may do that.

20     **MR. FLEMING:**  Thank you, your Honor.

21     **MR. MADRID:**  Your Honor, may we have an instruction

22  for the jury with respect to the fact that this is not prior

23  art.

24     **THE COURT:**  Yes.

25     **MR. FLEMING:**  Your Honor, your Honor, you haven't,

1      the information that you're allowing me to read may in fact

2      be prior art and you don't want to --

3              **THE COURT:**  I'm not going to go that far.  All

4      right.

5              (Whereupon the sidebar conference concluded.)

6              **THE COURT:**  We're over there scrimmaging around and

7      Ms. Smith says, the most important thing, do you want to

8      take a break now?  And the answer is yes.  We're up to the

9      break and you're entitled to your full break.

10             You've not heard all the evidence.  So keep your

11     minds suspended.  Do not discuss the case either among

12     yourselves nor with anyone else.  You may stand in recess

13     for one-half hour.  I'll remain on the bench.

14             **THE CLERK:**  All rise for the jury.

15             (Whereupon the jury left the courtroom.)

16             **THE COURT:**  Please be seated.  You may step down,

17     sir.

18             (Whereupon the witness stepped down.)

19             **THE COURT:**  I stayed on the bench just to be, I

20     hope, of assistance with respect to these depositions.  I'm

21     through Strickland.  I'm through Lai.  I'm troubled by

22     Miyake.  I, I can rule on the individual objections, but

23     Amgen's general objections trouble me.

24             On this record -- well, I overrule this first

25     business about late disclosure and the like.  That's

1    overruled.  But then it does look to me like Miyake is

2    hearsay, and if it's hearsay, how am I going to get it in?

3    Well, they anticipate it.  And they try to deal with it,

4    Amgen does, 804(b)(1).  On this record, I have no adequate

5    evidence that Miyake is unavailable, and two, I would be

6    interested in argument that if you can establish that he's

7    unavailable, the parties are so similarly situated, and

8    Chugai is in such a position relative to Roche, that the

9    evidence should be admitted.  That's a nice point.

10          I have a motion session this afternoon.  I'll let

11   you argue that at the end of that motion session.

12          **MS. BEN-AMI:**  Your Honor?

13          **THE COURT:**  Yes.

14          **MS. BEN-AMI:**  We're withdrawing Miyake.

15          **THE COURT:**  Thank you very much.  I'm sorry I

16   spoke.

17          What about Molineux and Elliot?

18          **MR. FLEMING:**  They have been withdrawn, your Honor.

19          **THE COURT:**  Thank you.  Good.  I'll take my recess.

20   We'll take our recess, and thank you all very much.  We'll

21   recess.

22          **THE CLERK:**  All rise.  Court is in recess.

23          (Recess.)

24          **THE CLERK:**  All rise for the jury.

25          (Whereupon the jury entered the courtroom.)

1      THE CLERK:  Court is in session, please be seated.

2           **THE COURT:**  Go ahead, Mr. Fleming.

3           **MR. FLEMING:**  Thank you, your Honor.

4           **DIRECT EXAMINATION** (Cont'd)

5    **(BY MR. FLEMING:)**

6    **Q.**  Dr. Spinowitz, when we broke, we were talking about NCF,

7    which was the Eschbach article in the Nephrology

8    publication.  Again, just to remind the jury, is Nephrology

9    a respected publication that nephrologists such as yourself

10   rely upon?

11          **MR. MADRID:**  Objection, misleading.

12          **THE COURT:**  Overruled.  He may have it.  It's a

13   foundation question.

14          **MR. FLEMING:**  Thank you, your Honor.

15   A.  Yes, it is.

16   **Q.**  Now, if you can turn to what's page 285 of the article,

17   which has the bottom production number 44084.

18   A.  Yes.

19   **Q.**  Do you see that?

20   A.  Yes.

21   **Q.**  What is -- and looking at the left-hand column, what is

22   Dr. Eschbach describing there?

23   A.  He's describing the evaluation of a patient with his

24   EPO-rich plasma.

25   **Q.**  And again, could you tell the jury, what is EPO-rich

 1 | plasma?

 2 | A.   Plasma that he obtained from another patient who had

 3 | erythrocytosis, had a lot of red blood cells as a

 4 | consequence of the fact that that patient had a lot of

 5 | erythropoietin.   And he harvested, collected this plasma by

 6 | a methodology called plasma phoresis.

 7 | Q.   Could you read to the jury, from Dr. Eschbach's

 8 | description of his experiment, the information you felt

 9 | relevant in coming to your conclusion regarding the

10 | invalidity of claim 1 of the '422?

11 | A.   Yes, he has --

12 |          MR. MADRID:   Objection, your Honor.   This is not

13 | cited in his report, this question.

14 |          THE COURT:   Where is it?

15 |          MR. FLEMING:   Your Honor, if you look at the blue

16 | report, starting again on Paragraph 71 -- make sure I'm in

17 | the right place -- following from that heading, your Honor.

18 | It's on page 25, it continues on.

19 |          THE COURT:   Yes.   He may have it.

20 |          MR. FLEMING:   Thank you, your Honor.

21 | Q.   So Dr. Spinowitz --

22 | A.   Yes.   So he took this EPO-rich plasma and infused it

23 | into a patient with renal failure, on dialysis, looking for

24 | evidence of response to this plasma that had been enriched

25 | with an additional amount of erythropoietin.

1    Q.  Focusing on the EPO-rich plasma, do you have an opinion

2    as to whether or not that's a pharmaceutical composition?

3    A.  Yes.

4    Q.  And could you tell the jury your opinion?

5    A.  Yes.  So this essentially fulfills the definitions that

6    guided me, supplied by the Court, that this was a

7    pharmaceutical composition containing human erythropoietin

8    and a pharmaceutically acceptable diluent, carrier or

9    adjuvant.

10   Q.  Now, could you read for the jury from Dr. Eschbach's

11   paper, in describing his work, what you believe was relevant

12   to your opinion?

13   A.  Yes.  So he describes the results in a figure of what he

14   saw after he gave two infusions of this EPO-rich plasma to

15   this patient on dialysis with chronic renal failure.

16   Q.  What do you mean by a figure?

17   A.  This is basically a graphic representation of what he

18   had done and what he saw with this dialysis patient.

19   Q.  And what does that graphic representation show to you?

20          MR. MADRID:  Your Honor, I object.

21          THE COURT:  No, overruled.  The way to do a

22   document like this is actually if you had it, you may throw

23   it up, but it's not going to go to the jury.  Or you, if you

24   have a blowup, you may show that.

25          MR. FLEMING:  We'll take just the graph only.

1          **THE COURT:**  Just the graph.  That you can do.

2          **MR. FLEMING:**  Thank you, your Honor.

3          **THE COURT:**  And here's why.  This is -- this is a

4    document we call hearsay.  I mean, Dr. Eschbach's not here.

5    This paper is not in evidence, nor is it going to be in

6    evidence.  But if you believe this witness, it appears in

7    this journal.  And he says the journal is the type of

8    publication upon which nephrologists rely.  And so the law

9    says, well, in those cases he can read excerpts.  And I'm

10   going to let him read excerpts.  But it's not just an

11   excerpt, there's a diagram there.  So I'm going to let you

12   see the diagram.

13         But the law also says, but without Eschbach

14   present, and without being able to examine him, it doesn't

15   become evidence; that is, it doesn't go back to the jury

16   room so you can see it.  You can hear the portions of it on

17   which this witness relied, and he may testify as to his

18   conclusions, the witness, once he's read that, but this is

19   not going to get a number.  It's not going to go back to the

20   jury room.

21         Go ahead.

22         **MR. MADRID:**  Your Honor, may we have an instruction

23   relative to the question of prior art?

24         **THE COURT:**  Yes.  I have reflected on that.

25         This document does not constitute prior art.  We're

```
 1    looking at prior art, what was out there.  This is a paper

 2    that was written later, but it talks about things that you

 3    may want to know about.

 4              Okay.  Go ahead, Mr. Fleming.

 5         MR. FLEMING:  Your Honor, thank you.

 6         THE COURT:  Yes.  So there's the diagram.

 7    (BY MR. FLEMING:)

 8    Q.  Again, we're talking about the work from 1984 that

 9    Dr. Eschbach did; is that correct, Dr. Spinowitz?

10    A.  Yes, that's correct.

11    Q.  And all that work from earlier is described in this

12    paper; correct?

13    A.  That's correct.

14         MR. MADRID:  Objection, speculation.

15         THE COURT:  Yeah, I must strike that.  All that

16    work is described in the paper.

17         MR. FLEMING:  I beg your pardon, your Honor.

18         THE COURT:  Disregard that.  I don't know how he'd

19    know that.  You can read what it says in the publication.

20         MR. FLEMING:  Thank you.

21    Q.  So, Doctor, looking at the left-hand column on page 285,

22    start with the left-hand column, because it relates to this,

23    can you read for the jury what Dr. Eschbach describes

24    regarding that work?

25    A.  What he says is that in Figure 7A -- this was Figure 7A.
```

1    Q.  I'm sorry, just for the benefit of the jury, could you

2    start earlier up and --

3    A.  Sorry.

4         MR. FLEMING:  May I approach the witness, your

5    Honor?

6         THE COURT:  You may.

7         MR. FLEMING:  Thank you.

8    Q.  Just so we're helpful to the jury.  We'll start with --

9    okay.  Please continue, Doctor.

10   A.  So Dr. Eschbach says in this article, "In 1984 we were

11   able to obtain human plasma from a patient with

12   erythrocytosis secondary to pulmonary disease by means of

13   plasma phoresis."

14   Q.  What does that mean?

15   A.  That means that this was a patient, another patient who

16   had a lot of red blood cells as a consequence of having a

17   lot of erythropoietin in the blood.  Dr. Eschbach collected

18   that blood over number of period -- over a period of time.

19        MR. MADRID:  Objection, your Honor.  This is not in

20   the report.

21        THE COURT:  Yes.  And sustained, and it's stricken.

22   You have to follow my instructions.  Just read what's there.

23   What's there.  Read that language that he wants you to read.

24   That's how it gets before the jury.  You're not interpreting

25   it yet.  Read the language.

1          Start him again, Mr. Fleming.

2          **MR. FLEMING:**  Yes, of course, your Honor.  Thank

3   you.

4   **Q.**  Dr. Spinowitz, can you, again, read from NCF, page 285,

5   Dr. Eschbach's description of his work?

6   A.  Yes.  "In 1984 we were able to obtain human plasma from

7   a patient with erythrocytosis secondary to pulmonary disease

8   by means of plasma phoresis."

9   **Q.**  Does Dr. Eschbach go on to describe his work?

10  A.  Yes.

11  **Q.**  Please continue.

12  A.  "Figure 7A, illustrates the reticulocyte and

13  ferrokinetic response following the infusion of 537 units of

14  human erythropoietin, given in divided doses, separated by

15  three days."

16  **Q.**  Now, is what's on the screen displayed to the jury

17  Figure 7A?

18  A.  Yes.

19  **Q.**  And can you look at the bottom graph, and can you

20  explain to the jury what that graph represents?

21          **MR. MADRID:**  Objection.  It's not in the report.

22          **THE COURT:**  Yeah, where is it in the report?

23          **MR. FLEMING:**  It's in the description in

24  Paragraph -- blue report, Paragraph 71 and forward, which is

25  the discussion of the Eschbach work.

1          **THE COURT:**  It may be, but there's no description

2    there, unless you can be more specific, of that diagram.  So

3    we're just going to leave the diagram.

4          **MR. FLEMING:**  Your Honor, Paragraph 72.

5          **THE COURT:**  All right, 72.

6          **MR. FLEMING:**  The second sentence particularly, is,

7    I believe, a description of the lower part --

8          **THE COURT:**  He may testify consistent with the

9    second sentence.  We'll take the -- but take the graph down,

10   they've seen the graph.

11         **MR. FLEMING:**  The graph is what --

12         **THE COURT:**  Don't argue.  That's the order of the

13   Court.

14         **MR. FLEMING:**  Yes, sir.

15         Would you please take down the graph.  Thank you.

16   **Q.**  Dr. Spinowitz, can you explain to the jury what

17   Dr. Eschbach observed regarding the reticulocyte count for

18   the patient to which he gave the EPO-rich plasma?

19   A.  Yes.  After those two infusions given in November of

20   1984, Dr. Eschbach concluded that he had seen an increase in

21   reticulocytes in response to this pharmaceutical composition

22   that had contained the EPO-rich plasma.

23         **MR. MADRID:**  Objection.

24         **THE COURT:**  No, that may stand.

25   **Q.**  Did Dr. Eschbach observe any other response in this

1    patient from the administration of the EPO-rich plasma?

2    A.  Yes.  He, too, observed a ferrokinetic response, iron

3    moving from plasma into the red blood cells, and that was

4    displayed in that figure as well, in response to the

5    EPO-rich plasma.

6    **Q.**  Turning back to the column on page 285 where

7    Dr. Eschbach reports on his work, could you read to the jury

8    his conclusion?

9    A.  Yes.  "Following the response that we observed, we felt

10   that the sheep model results with erythropoietin were

11   indicative of what would happen in humans."

12   **Q.**  Okay.  Thank you, Doctor.

13   A.  Thank you.

14           **MR. FLEMING:**  Can we now go to what's been admitted

15   into evidence as 2032.

16   **Q.**  And, Doctor, could you tell the jury what this exhibit

17   is?

18   A.  Yes.  This is a paper describing a body of work done by

19   Dr. Joseph Eschbach, the same Dr. Eschbach.  The title of

20   the paper is, "Anemia of Chronic Renal Failure in Sheep,

21   Response to Erythropoietin-Rich Plasma in vivo."

22   **Q.**  To your understanding, is this the sheep model that

23   Dr. Eschbach was referring to in NCF?

24   A.  Yes, it was.

25           **MR. MADRID:**  Objection, leading.

 1          THE COURT:  Sustained on that ground.  Disregard

 2     it, and strike the answer.

 3          Don't lead the witness.

 4          MR. FLEMING:  Thank you, your Honor.

 5     Q.  What did you understand Dr. Eschbach to be referring to

 6     as the sheep model in NCF?

 7     A.  Dr. Eschbach had one model, one sheep model with chronic

 8     renal failure, and this is a description of that work that

 9     he's referring to -- that he referred to in the nephrology

10     paper.

11     Q.  Could you explain to the jury how, if at all, the work

12     that's reported in 2032 by Dr. Eschbach impacted your

13     opinion regarding the invalidity of claim 1 in the '422?

14     A.  Yes.  I think, actually, on the second page of that

15     paper, if you can highlight -- it's towards the bottom of

16     this area.

17          MR. FLEMING:  Can we enlarge that for the jury?

18     Q.  And starting from where, Doctor?

19     A.  I think a good place to start is from, "Furthermore,

20     prolonged treatment, completely corrects the anemia.  Based

21     on these in vivo responses, the significance of uremic

22     inhibitors seems minimal and these results predict that Ep,

23     erythropoietin therapy, should be effective in treating the

24     anemia of chronic renal failure in humans."

25     Q.  What do you understand Dr. Eschbach to be explaining

1  here?

2  A.   That based on the data in that paper, his conclusions

3  with this sheep model, treated with EPO, sheep EPO-enriched

4  plasma, that he would predict that, as in the sheep, what he

5  had observed would be what would be seen in humans treated

6  for their anemia with erythropoietin.

7  Q.   Why was that relevant to you as one of skill in the art

8  in doing your analysis regarding the invalidity of

9  claim 1 of the '422?

10  A.   Well, basically this is part of the prior art.   With

11  that prior art, one skilled in the art, armed with this

12  knowledge of --

13         **MR. MADRID:**   Objection, your Honor.   This is

14  speculative.   He's established this --

15         **THE COURT:**   Overruled.   He may testify.

16  Q.   Continue, Doctor, please.

17  A.   One skilled in the art with this knowledge would have

18  known, would have understood that all the elements of

19  claim 1, of '422 were met by this prior art and that would

20  render claim 1 of '422 invalid by virtue of obviousness.

21  Q.   What, if anything, about the results -- withdrawn.

22         The line that Dr. Eschbach writes in 2032 is,

23  "These results predict that erythro, Ep therapy, should be

24  effective in treating the anemia of CRF in humans."

25         Could you explain to the jury, what, if anything,

1    that influenced in your decision about the invalidity of

2    claim 1 of the '422?

3    A.   Well, with this study, he had shown in animals that

4    anemia was corrected, and it was understood to him that

5    erythropoietin therapy in humans would accomplish the same

6    endpoint, the same therapeutic efficacy of correcting the

7    anemia.

8    Q.   What do you understand him to mean by erythropoietin or

9    Ep therapy?

10   A.   In this case, it would have been a pharmaceutical

11   composition that would have erythropoietin.

12   Q.   And "in humans" is referring to what, again, please?

13   A.   "In humans" would have been the chronic renal failure

14   patients that we've been referring to this morning.

15   Q.   Now, we talked about a third study by Dr. Essers,

16   E-S-S-E-R-S.  Could you tell the jury how that data

17   influenced your decision regarding the invalidity of claim 1

18   of the '422 patent?

19   A.   Yes.  In the early to mid-'70s, Dr. Essers, in Germany,

20   had done a number of clinical studies using an

21   erythropoietin-rich plasma.  And she had similarly shown

22   that infusion of that erythropoietin-rich plasma

23   pharmaceutical composition would have a therapeutic

24   response.  What she looked at similarly was an increase in

25   reticulocytes in response to that infusion.  And what she

1    had shown on a number of occasions was just that; that

2    infusion of EPO-rich plasma obtained from humans, given to

3    patients on dialysis, anemic with chronic renal failure,

4    would have a therapeutic response, as evidenced by the

5    reticulocyte increase.  That erythropoietin was obtained, of

6    course, from mammalian kidney cells.

7            And my opinion is that one skilled in the art using

8    that information would have concluded that all of the claims

9    of '422 are rendered invalid by virtue of obviousness.

10   Q.  Now, we're focusing on claim 1 in the '422 for right

11   now; correct?

12   A.  Yes.

13   Q.  And this Essers work that you just described to the

14   jury, where did that take place, do you know, according to

15   the literature?

16   A.  In Germany.

17   Q.  And I put in front of you, in your book, three

18   documents:  GTY, NCJ, and NCL.  Perhaps someone will yell

19   "Bingo."

20           But those three documents, if you would look at,

21   Doctor, please, again, GTY, NCJ, NCL.

22   A.  Yes.

23   Q.  Okay.  Can you explain to the Court what those three

24   references are?

25   A.  Yes.  Basically, they're the three references, three

1  articles that Dr. Essers wrote in '73 through '75 wherein

2  she describes, and ultimately actually reviews and

3  summarizes her information, describing the treatment of the

4  installation of a EPO-rich plasma, a pharmaceutical

5  composition that she had given to these patients, and had

6  described the therapeutic responsiveness, again, in this

7  case, looking at the stimulation of erythropoiesis evidenced

8  by an increase in reticulocytes.

9  **Q.**  And the original language of these documents is what,

10  Doctor?

11  A.  The original papers and figures are in German, but as

12  part of the documents there was a certified translation.

13  **Q.**  And did you review this data in forming your opinions

14  regarding claim 1 of the '422?

15  A.  Yes.  I read the translation, as well as the figures in

16  the original German, which the captions are translated as

17  well.

18  **Q.**  Did you have an opinion as to whether the data was

19  reliable for which to allow you to form an opinion?

20  A.  Yes, yes.  I read through these papers and formulated an

21  opinion regarding those results.

22      **MR. FLEMING:**  Your Honor, at this time I offer GTY.

23      **THE COURT:**  Any objection?

24      **MR. MADRID:**  Objection, your Honor.  There's no

25  authentication.

1          **THE COURT:**  No, overruled.

2          **MR. FLEMING:**  2051, I believe is the next number.

3          **THE COURT:**  GTY is admitted in evidence, 2051.

4          (Exhibit marked in evidence.)

5          **MR. FLEMING:**  The next document, your Honor, is

6     NCJ.  We offer that into evidence.

7          **THE COURT:**  Any objection?

8          **MR. MADRID:**  No, your Honor.

9          **THE COURT:**  Admitted, N --

10         **MR. FLEMING:**  CJ.

11         **THE COURT:**  -- CJ in evidence, 2052.

12         (Exhibit marked in evidence.)

13         **MR. FLEMING:**  And we offer NCL, your Honor.

14         **THE COURT:**  Any objection?

15         **MR. MADRID:**  No, your Honor.

16         **THE COURT:**  2053.

17         (Exhibit marked in evidence.)

18         **MR. FLEMING:**  Thank you, your Honor.

19    **Q.**  Now, if we could turn to 2053, which is formerly known

20    as NCL, and we have that up on the screen.  Could you direct

21    the jury to the portion of this document that has the

22    information upon which you rely?

23    A.  Yes.  First at all, the title of the article is, "Effect

24    of Erythropoietin in Normal Men and in Patients with Renal

25    Insufficiency."

1   Q.   Is renal insufficiency, to you, different from chronic

2   renal failure?

3          MR. MADRID:  Objection.  It's not in the report.

4          THE COURT:  Yes, where is it?

5          MR. FLEMING:  I asked it as a foundation question,

6   your Honor.  It's withdrawn.

7          THE COURT:  Sustained, and it's withdrawn.

8   Q.   So continuing on with your explanation, Dr. Spinowitz,

9   of this Essers article, which is 2053 --

10  A.   Yes.

11  Q.   -- could you direct the jury, please, to the portion of

12  the article?

13  A.   Yes.  There's a figure in this article that demonstrates

14  one of the responses in the patients to the EPO-rich plasma

15  that was infused --

16         MR. MADRID:  Your Honor.  This is not discussed in

17  the report.

18         THE COURT:  Where is it in the report?

19         MR. FLEMING:  Your Honor, in the blue report,

20  starting at Paragraph 66.

21         THE COURT:  Thank you.  All right.  He may testify

22  to what's there, and I'll have it in mind.  Now, why don't

23  you put a question.

24         MR. FLEMING:  Thank you.

25  Q.   If we can turn to the graph that's on the production

1    page with 5311.

2    A.   Yes.   And if you can highlight this figure -- no, sorry.

3    **Q.**   No, the other side.

4    A.   This one.   Thank you.

5              So this is, first of all, for identification --

6         **MR. MADRID:**   Your Honor, this figure is not

7    discussed in the report.

8         **THE COURT:**   Where is the figure, using the language

9    that you used here?   Where is that figure referred to in

10   these paragraphs?   I don't mean specifically, but the

11   document of which it's a part?

12        **MR. FLEMING:**   The documents are referred to on

13   Paragraph 66, your Honor.

14        **THE COURT:**   Well, which one of them?

15        **MR. FLEMING:**   There are three --

16        **THE COURT:**   And which one has this figure?

17        **MR. FLEMING:**   If you can go back to the full page,

18   okay, it's AM-ITC 88, so that would be the last one, your

19   Honor.   Since they're chronological, this is the '75 paper.

20   Do you see the numbers, 885789?

21        **THE COURT:**   I do.

22        **MR. FLEMING:**   It tracks with, inclusive of the

23   number that's in the lower right-hand column, 885790.

24        **THE COURT:**   I see.   Thank you.

25        **MR. FLEMING:**   Thank you.

```
 1              THE COURT:  He may testify consistent with the

 2    report.

 3    Q.  Go ahead, Dr. Spinowitz.  Could you explain the graph to

 4    the jury, please?

 5    A.  Yes.  So what's displayed here is what Dr. Essers did,

 6    infusing that EPO --

 7              MR. MADRID:  Objection, your Honor.

 8              THE COURT:  Yeah, sustained.  Where does it say

 9    that in this report, language that's equivalent to that?

10              You have the report, sir.  Take a look at the

11    report.  You point it out for me, what you're just now

12    trying to say, what Dr. Essers did.

13              MR. FLEMING:  Your Honor, if you look at

14    Paragraph 67.

15              THE COURT:  Yes.

16              MR. FLEMING:  And if you look at the last three

17    sentences.

18              THE COURT:  Yes, he may testify to that.  That's

19    all I'm asking.

20              MR. FLEMING:  This is -- I won't testify, your

21    Honor.

22              THE COURT:  He's telling us what he understands

23    Essers did.  He may testify consistent with the report.

24    Consistent with the report.  It has to be in the report.

25              MR. FLEMING:  I understand, your Honor.
```

1           THE COURT:  Go ahead.

2           MR. FLEMING:  I submit to you in those paragraphs

3      that it is and he'll testify accordingly.

4           THE COURT:  I can read, and I'll listen.  Go ahead.

5      Q.  Dr. Spinowitz, can you explain to the jury what

6      Dr. Essers' conclusions regarding reticulocyte count meant

7      to you as one of skill in the art?

8      A.  Yes.  So Dr. Essers was using reticulocyte response as

9      evidence of stimulation of erythropoiesis.  She had infused

10     that EPO-rich plasma into patients.  In the course of those

11     three papers are described a number of patients.  One of

12     them is displayed here.  And what she saw was --

13          MR. MADRID:  Objection, your Honor.

14          THE COURT:  No, no, that may stand.  Go ahead.

15     A.  Thank you.  And what she saw was an increase in

16     reticulocytes in response to infusion of that EPO-rich

17     plasma.

18     Q.  Now, your conclusion regarding the consideration of

19     Dr. Essers' work, how did that impact your opinion regarding

20     the invalidity of claim 1 of the '422 patent?

21     A.  Yes.  My opinion is that Dr. Essers as well, prior art

22     done before the period of '83/'84, using a pharmaceutical

23     composition containing a diluent, in this case, EPO-rich

24     plasma, had indeed shown evidence of a therapeutic effect --

25          MR. MADRID:  Objection, your Honor.  There's no

1    discussion of diluent in this report.

2         **THE COURT:**  Well, that may stand.  What he's

3    testified to may stand.

4         Now put another question, Mr. Fleming.

5         **MR. FLEMING:**  Yes, your Honor.  As the last

6    question on this subject, I'd like him, because this is in

7    evidence, just to read the legend to the jury.

8         **THE COURT:**  Where it says Figure 3?

9         **MR. FLEMING:**  Yes, sir.

10        **THE COURT:**  He may do that.

11        **THE WITNESS:**  Thank you.

12   A.   "The absolute number of reticulocytes per cubic

13   millimeter of blood of a patient with chronic

14   glomerulonephritis on intermittent hemodialysis after two

15   intravenous infusions of 935 units of erythropoietin."  And

16   the response is as indicated, an increase in reticulocytes.

17   This was a therapeutic, effectively, amount of

18   erythropoietin showing a therapeutic effect.

19        **MR. MADRID:**  Objection, your Honor, move to strike.

20        **THE COURT:**  The motion to strike's allowed.  He

21   asked him to read.  Once he stopped reading, that's

22   stricken.  He has to answer the questions that are put to

23   him.

24   **Q.**   Dr. Spinowitz, if you can, for the record, read in

25   what's written under Figure 3, please.

1              **MR. MADRID:**  Objection, asked and answered.

2              **THE COURT:**  He did that.

3              **MR. FLEMING:**  Your Honor, I wasn't sure what you

4    were striking.

5              **THE COURT:**  No, no, what's Figure 3, what he read

6    in, is in evidence.

7              **MR. FLEMING:**  That's fine, your Honor.  That's what

8    I wanted.

9    **Q.**  Dr. Spinowitz, please tell the jury --

10             **MR. FLEMING:**  Can we have claim 1 of the '422 here,

11   please?

12   **Q.**  Tell the jury, based upon your view of Baron-Goldwasser

13   clinical study, the Eschbach studies, the Essers studies,

14   what is your opinion regarding claim 1 of the '422?

15   A.  As one skilled in the art, with that prior art available

16   to me, I've concluded that claim 1 of the '422 patent is

17   invalid by anticipation and/or obviousness.  All three

18   aspects of that prior art dealt with a pharmaceutical

19   composition with a pharmaceutically acceptable diluent.

20   They all showed a therapeutically effective amount of

21   erythropoietin.  And that erythropoietin, in all those

22   cases, was obtained from mammalian cells.

23   **Q.**  In the case of Dr. Essers' work, did Dr. Essers observe

24   an increase in hematocrit in patients?

25   A.  No, she did not observe an increase in hematocrit.

1    **Q.**  Did that influence your opinion in any way?

2            **MR. MADRID:**  Objection, your Honor.  Not in the

3    report.

4            **THE COURT:**  Where is it?

5            **MR. FLEMING:**  Blue Paragraph 70, your Honor.

6            **THE COURT:**  Seventy?

7            **MR. FLEMING:**  Seven-zero.

8            **THE COURT:**  Thank you.  He may testify consistent

9    with Paragraph 70.

10   **Q.**  Doctor, do you have Paragraph 70 in front of you?

11   **A.**  Yes.

12   **Q.**  Okay.  And then with regard to an increase in

13   reticulocyte count, as observed in Dr. Essers', what did

14   that -- how did that influence your opinion regarding the

15   invalidity of claim 1 of the '422?

16   **A.**  Yes, well, the definition that I worked with, the Court

17   definition, was that what was needed was a therapeutically

18   effective amount.  And therapeutically effective amount is

19   that pharmaceutical composition that would elicit any or all

20   of the effects that I described before.  Dr. Essers did see

21   one of those therapeutic efficacies, that is, stimulation of

22   a reticulocyte response.

23   **Q.**  Doctor, I'd like to refer you now to UA in your book,

24   please.  Could you tell the jury what -- I'm sorry.  I gave

25   you too many papers, I'm sorry.

1   A.  I got it.

2   **Q.**  Could you tell the jury what this is, please?

3   A.  This is an article that appeared in a publication called

4   "Nephron News," in March of 1986, and it's entitled,

5   "Dr. Eschbach's Research to Prove Efficacy of EPO."

6   **Q.**  If you turn to the second page of that article, in the

7   middle column?

8   A.  Yes.

9   **Q.**  Is there a description by Dr. Eschbach of his work?

10  A.  Yes.

11       **MR. MADRID:**  Objection, your Honor.

12       **THE COURT:**  Yeah -- well, sustained on this

13  foundation.  We'll see where we go.

14       **MR. FLEMING:**  My only --

15  **Q.**  Is there a discussion --

16       **THE COURT:**  I assume his objection is hearsay,

17  and --

18       **MR. FLEMING:**  I understand that, your Honor.

19       **THE COURT:**  You see how you're going to have to

20  deal with it.

21       **MR. FLEMING:**  I understand.

22  **Q.**  One of skill in the art, reading this article, would

23  they understand what Dr. Eschbach is describing about his

24  work in the first sentence in the middle column?

25  A.  Yes.

1   **Q.**  And can you explain to the jury what Dr. Eschbach is

2   discussing in that first sentence in the middle column?

3           **MR. MADRID:**  Objection, your Honor.

4           **THE COURT:**  Sustained.

5   **Q.**  Now, did you understand this to be the same Dr. Eschbach

6   whose work we were presenting to the jury?

7           **MR. MADRID:**  Objection, your Honor.

8           **THE COURT:**  Sustained.

9   **Q.**  Doctor, in your experience, would a patient -- would a

10  patient given a human --

11          **THE COURT:**  You turned your back, I didn't hear.

12          **MR. FLEMING:**  I beg your pardon, your Honor.  I'm

13  sorry.  I beg your pardon.

14  **Q.**  In your experience as one of skill in the art, a patient

15  given EPO therapy, would you expect to see an immediate

16  increase in hematocrit?

17  A.  No.

18  **Q.**  Could you explain to the jury why not?

19  A.  It would take a more prolonged period in order to see an

20  increase in hematocrit, but one would certainly early on see

21  evidence of early stimulation of erythropoiesis, some of

22  which were those exact indicators of therapeutic

23  effectiveness that was within the Court's definition.

24  **Q.**  So, for instance, if there was no -- withdrawn.  We'll

25  move on.

1          You said you also reviewed claims of the

2    '933 patent, Doctor?

3    A.  Yes, I did.

4    Q.  And could you tell the jury what claims you looked at?

5    A.  Those were 9, 11, 12 and 14.

6          **MR. FLEMING:**  Can I have SP135, please?

7          And the jurors have the claims in your notebooks,

8    but for ease of reference, we've created a demonstrative

9    that has the claim language.

10   Q.  And, Doctor, could you walk the jury through your

11   analysis of claim 9 with -- regarding your opinions?

12   A.  Yes.  The words change a little bit, but there are

13   similarities to what we've discussed in terms of the

14   elements of '422.  And claim 9 of '933 refers to a

15   pharmaceutical composition comprising an amount of a

16   glycoprotein product effective for erythropoietin therapy --

17   Q.  Let me stop you there.  Now, is that a term that has a

18   similar definition to another term in this case?

19   A.  Yes.  That was -- the similarities there are this, too,

20   is referring to a pharmaceutical composition of human

21   erythropoietin that's suitable for administration to humans

22   in a pharmaceutically acceptable diluent, adjuvant or

23   carrier.

24          **MR. FLEMING:**  Can I have the glossary back, please,

25   which is on Tab 1 in the jurors' notebooks.  And if you

1    could highlight "therapeutically effective"?  Exactly.

2    **Q.**  Doctor, you see the definition for "therapeutically

3    effective amount"?

4    A.  Yes.

5    **Q.**  And that's the definition you applied?

6    A.  Yes.

7    **Q.**  And now, next to it there's another term that has the

8    same definition?

9    A.  Yes.  Similarly to that element that was in the claim 9,

10   effective amount of a glycoprotein product, a product

11   effective for erythropoietin therapy.

12   **Q.**  So, to your understanding, those two terms have the same

13   definition?

14   A.  The same definitions were applied to both those terms in

15   both those claims.

16   **Q.**  Okay.  So could we go back to SP135, please.  There's

17   the "effective amount of a glycoprotein product" term there;

18   correct?

19   A.  Yes.

20   **Q.**  And the definition we just looked at is the definition

21   you applied?

22   A.  Yes.

23              **MR. MADRID:**  Objection, leading.

24              **THE COURT:**  It is leading.  Sustained.  The

25   answer's stricken.

1  Q.  And so can you tell the jury what definition you applied

2  with regard to the term "an effective amount of a

3  glycoprotein product"?

4  A.  Yes.  So the definition of that "effective amount of a

5  glycoprotein product" was the same as the definition for

6  therapeutically effective amount in the claim 1 of the '422.

7

8  Q.  And the last term we talked to the jury about was

9  pharmaceutically acceptable?

10  A.  Diluent, adjuvant or carrier, and that, too, was part of

11  the same element in the pharmaceutical composition of

12  '422 that spoke of the composition of human erythropoietin

13  in a pharmaceutically acceptable diluent.

14  Q.  What type of claim is this, Doctor?

15       MR. MADRID:  Objection, your Honor.

16       THE COURT:  What type of claim is this.  Well, that

17  really is a matter of law, but I don't think there's any

18  dispute.  It is a product claim, and if we have to explain

19  that, I'll explain it.

20       THE WITNESS:  Yes.

21       THE COURT:  Maybe we will, but not now.

22  Q.  Okay.  And so can you tell the jury, do you have an

23  opinion as to the validity of claim 9 of the '933 patent?

24  A.  Yes.  So as one that's skilled in the art with knowledge

25  of all that prior art, my opinion is that claim 9 of the

1   '933 patent is invalid by virtue of obviousness, based on

2   all the prior art that I discussed.

3   **Q.**  Could you just, again, for the jury's clarification,

4   what prior art are you talking about?

5   A.  Specifically, the prior art of the Baron-Goldwasser

6   studies, the Eschbach EPO-rich plasma studies, and Essers'

7   body of work on EPO-rich plasma.

8   **Q.**  Did you review Dr. Goldwasser's grant applications?

9   A.  Yes, I did.

10  **Q.**  And did you consider those as well?

11  A.  Yes, I did.

12  **Q.**  And how did you view or examine this claim, from what

13  perspective?

14  A.  From one skilled in the art as of that period of time,

15  1983/1984.

16  **Q.**  And could you tell the jury what your opinion is as to

17  what that person would be?

18  A.  That would be an individual with a medical degree, an

19  advanced degree, who was trained in these areas.

20          **MR. FLEMING:**  Can we have SP136, please?

21  **Q.**  Now, this is claim 11 of the '933 patent?

22  A.  Yes.

23  **Q.**  And do you have an opinion as to the validity of

24  claim 11 of the '933?

25  A.  I believe that claim 11 is invalid by virtue of

1    obviousness with respect to the prior art that I've

2    discussed.

3    **Q.**  And could you briefly explain to the jury the basis for

4    your opinion?

5    A.   Yes.  Again, looking at the elements of this claim, so

6    now there's an element that's describing this product and a

7    method for treating a kidney dialysis patient, which

8    comprises administering a pharmaceutical composition of

9    claim 9 in an amount effective to increase the hematocrit

10   level of said patient.

11   **Q.**  Could you remind the jury, what type of patients

12   received Dr. Baron and Dr. Goldwasser's urinary EPO

13   composition?

14   A.   Those were patients with chronic renal failure, on

15   dialysis.

16   **Q.**  Now, the other term the jury sees here is "increase the

17   hematocrit."  Do you see that?

18   A.   Yes.

19   **Q.**  Have you prepared a demonstrative -- well, withdrawn.

20          Have you seen any data in the Baron-Goldwasser

21   study regarding this particular element?

22   A.   Yes.  As part of that IND submission, there was a study,

23   a toxicology study, where hamsters, mammals, were infused --

24   were given the same pharmaceutical composition that

25   Dr. Baron had used in the patients, and the effects were

1    observed.

2    **Q.**  Have you prepared a demonstrative to help the jury

3    understand that data?

4    A.  Yes, I have.

5         **MR. FLEMING:**  Can I have SP88A?  86, I'm sorry.

6    SP86A.

7    **Q.**  Could you explain to the jury this demonstrative?

8    A.  Yes.  So this is information that came out of that

9    toxicology study.  It was hamsters that were tested with --

10   **Q.**  Just so the record's clear, you say that "study," are

11   you referring to 2049?

12   A.  Yes.  That was part of the IND submission.

13   **Q.**  Then I'm mistaken.  I referred you to the wrong exhibit.

14   Could you tell the jury the exhibit number?  I have 2004.

15   A.  Yes.

16   **Q.**  Okay.  Could you continue, Doctor?

17   A.  So, Baron had -- what was done was that these were

18   hamsters that were tested with the same Baron pharmaceutical

19   composition human erythropoietin in the diluent, and what

20   was looked at was hematocrit, HCT.  That's a measure of

21   blood cells relative to the liquid portion of blood plasma.

22        And there are eight columns representing eight

23   different hamsters.  The first four hamsters were not given

24   the composition; the last four hamsters were, E through H.

25   And you can see that the hematocrit in the four hamsters

1   that did not receive the composition have hematocrits that

2   range from 44 or even 46, 44, 52, 50.  And the four hamsters

3   that were given the pharmaceutical composition, in contrast,

4   had hematocrits that were much higher, all higher:  65, 69,

5   69.  And there's actually a staple obscuring that, but based

6   on the --

7           **MR. MADRID:**  Objection, your Honor.  Speculation.

8           **THE COURT:**  Yeah, you can't -- the jury will have

9   to draw that conclusion.

10  A.  Well, it's obscured, but the hemoglobin is 19.8.

11  Hemoglobin, when one multiple applies by three, gives you

12  hematocrit which would put it as a number of --

13          **MR. MADRID:**  Objection, your Honor.  It's not in

14  the report.

15          **THE COURT:**  No, I'm going to allow that.  When you

16  multiply that by three it gives you?

17          **THE WITNESS:**  The hematocrit.  And that hematocrit

18  is 60.

19          **THE COURT:**  Thank you.

20  **Q.**  And so how did you incorporate this data into forming

21  your opinions regarding claim 11 of the '933 that it was

22  invalid?

23  A.  Well, what this tells me, and I think was appreciated by

24  Doctors Baron and Goldwasser as well, that their composition

25  could raise hematocrit.

1          **MR. MADRID:**  Objection, your Honor.  Move to

2     strike.  Speculation.

3          **THE COURT:**  Motion to strike's denied.  The weight

4     that will be given to it will be decided by the jury.

5     **Q.**  And the -- from your demonstrative, there's a single --

6     there's a page on the left side of your demonstrative.  Is

7     that taken directly out of the Baron submission which is

8     2004?

9     A.  Yes --

10         **MR. MADRID:**  Objection, leading.

11         **MR. FLEMING:**  Withdrawn, your Honor.

12    **Q.**  Where did the page on the left side of the demonstrative

13    come from, Dr. Spinowitz?

14    A.  This is part of the documents that were available in the

15    Baron study, and part of the IND submission to the FDA.

16    **Q.**  So it's an actual page from that study?

17    A.  Yes, it is.

18         **MR. FLEMING:**  Could we go to SP137?

19    **Q.**  Now, this is claim 2 [sic] of the '933.  Could you tell

20    the jury your opinion regarding claim 12 of the '933 patent?

21    A.  Yes, sir.  In this claim, again, we're dealing with

22    common elements --

23         **MR. MADRID:**  Your Honor, may we have a sidebar,

24    please?

25         **THE COURT:**  We may.

1    SIDEBAR CONFERENCE, AS FOLLOWS:

2            **MR. MADRID:**  Your Honor, we object to the entire

3    opinion that was just delivered with respect to the claim

4    being obvious.  The opinion was given, and we're made to

5    believe that the opinion goes to the entire claim.  It does

6    not address all the elements of the claim.  This witness

7    does not address the insertion of the DNA sequence.  That is

8    an element in the '933 claims.  So he's come forward, he's

9    given an opinion that's obvious and that he doesn't address

10   the elements.

11           **THE COURT:**  Well, I'm going to let it stand.

12   Attacking like this -- be that as it may.  I'm going to let

13   it stand.  It's without prejudice, of course, when we face

14   your motion for directed verdict.  If they're inadequate,

15   it's inadequate.  We have daily copy for a reason.  I have

16   it, too.  And so attacking now, of course, alerts them, but

17   be that as it may.

18           (Whereupon the sidebar conference concluded.)

19           **MR. FLEMING:**  Can we have SP137 back, please?

20   Thank you.

21   **(BY MR. FLEMING:)**

22   **Q.**  So, Doctor, looking at claim 12 of the '933 patent, and

23   could you show to the jury how you broke this claim down?

24   A.  Well, again, similar to what I had done before, the

25   elements of this claim are, again, a pharmaceutical

1   composition comprising an effective amount of a glycoprotein

2   product effective for erythropoietin therapy, very similar

3   to what we had seen before, according to claim 7, and a

4   pharmaceutically acceptable diluent, adjuvant or carrier.

5   Again, I applied the same definitions that we used for the

6   other elements.

7   **Q.** Now~--

8   A.   In the other claims.

9   **Q.** Now, this claim and the other claims of the '933 we

10  looked at have language like "according to claim 7."  Do you

11  see that?

12  A.   Yes.

13  **Q.** The Court explained what a dependent claim was, to the

14  jury.  Do you have an understanding of what a dependent

15  claim is?

16  A.   Yes; that that claim depends on the elements in those

17  other claims.

18  **Q.** So it incorporates those other ones?

19  A.   It incorporates them, right.

20  **Q.** When you did your analysis regarding your opinion on the

21  invalidity of claim 12 of the '933, did you look at the

22  elements in claim 7?

23  A.   Yes, I did.

24      **MR. FLEMING:**  And if we can go back to SP135,

25  please.

1    Q.   135 has similar language according to claim 1, 2, 3, 4,

2    5?

3              MR. MADRID:  Objection.  Outside the scope of the

4    report.

5              THE COURT:  You're going to have to point out where

6    it is in the report.

7              MR. FLEMING:  Well, if -- yes, your Honor, of

8    course.  Your Honor, may I ask you a question for

9    clarification?

10             THE COURT:  Ask your clarification question.

11             MR. FLEMING:  I'm not sure whether he's objecting

12   to the fact it's a dependent claim or the elements.

13             THE COURT:  He's objected and you can point out

14   both to me.  That will save time.

15             MR. FLEMING:  Thank you, your Honor.

16             The green report, your Honor, Paragraph 16 through

17   18.

18             THE COURT:  Thank you.  All right.  I have it in

19   mind and he may testify consistent with it.  And he has it,

20   too.  So put your question.

21             MR. FLEMING:  Thank you.

22   Q.   So, Doctor, focusing on the language according to

23   claim 1, 2, 3, 4, 5, or 6, did you take into consideration,

24   in coming to your conclusion about the invalidity of

25   claim 9 of the '933, the other claims that are referenced

1    there?

2    A.  Yes.

3         **MR. FLEMING:**  Can we have the '933 patent claims,

4    please?  And it's Exhibit 1 in evidence.  And the jury has

5    this one in your books.  And can we have claim 3, please.

6    **Q.**  Doctor, we have put in front of you what's in evidence,

7    it's claim 3 of the '933 patent.

8    A.  Yes.

9    **Q.**  And could you read that claim?

10   A.  "A non-naturally occurring glycoprotein product of the

11   expression in a mammalian host cell of an exogenous DNA

12   sequence comprising a DNA sequence encoding human

13   erythropoietin, said product possessing the in vivo

14   biological property of causing bone marrow cells to increase

15   production of reticulocytes and red blood cells."

16   **Q.**  Did you have this claim in your mind when you were

17   reviewing and analyzing the claims of the '933 patent?

18   A.  Yes, I did.

19        **MR. MADRID:**  Objection, your Honor.  This is

20   outside the report.  There's no discussion of claim 3.

21        **THE COURT:**  Yes, sustained.  There's no discussion

22   of claim 3 in these paragraphs.

23        **MR. FLEMING:**  Your Honor, if you look at

24   Paragraph 18.

25        **THE COURT:**  I am.

1          **MR. FLEMING:**  And the discussion of the claim --

2    Paragraph 18.

3          **THE COURT:**  Right, I have it.  I have it.  Simply

4    states what the Court's construction was with respect to

5    claim 3.  Which can be read.

6          **MR. FLEMING:**  And then simple question to him, your

7    Honor, has he taken into consideration claim 3 in the

8    analysis of the claims on which he's given his opinion.

9          **THE COURT:**  Oh.  You can answer that.  Have you?

10         **THE WITNESS:**  Yes, I have.

11         **THE COURT:**  All right.  Now move on.

12         **MR. FLEMING:**  Okay.  And your Honor, just so the

13   record is clear.

14   **Q.**  Dr. Spinowitz, you've incorporated into your analysis

15   claim 3, for purposes of the '933 patent claim?

16   A.  Yes.

17         **MR. MADRID:**  Objection, your Honor.

18         **THE COURT:**  No, sustained.  I'm very clear.  No

19   incorporation in these reports.  They have to list

20   everything.

21         Now, he does say here that he understands the

22   Court's construction with respect to claim 3, when he's

23   talking about dependent claims 9, 11, 12 and 14.  I don't

24   see any discussion of claim 3.  Move on.

25         **MR. FLEMING:**  Can we look at claim 7 of the '933

1    also, Exhibit 1.

2    **Q.**  Could you read this to the jury?

3    A.  "The glycoprotein product, according to claim 3, 4, 5 or

4    6, wherein the host cell is a non-human mammalian cell."

5    **Q.**  Did you consider claim 7 in coming to your opinions

6    regarding the claims of the '933 for which you offer

7    opinions?

8              **MR. MADRID:**  Objection.  Outside the report.

9              **THE COURT:**  Where's the discussion of claim 7?  Is

10   this the same issue?  Or is there a discussion?

11             **MR. FLEMING:**  One second, your Honor, please.

12             (Whereupon counsel conferred.)

13             **MR. FLEMING:**  We will continue, your Honor.  We'll

14   come back to that.

15             **THE COURT:**  Please.  Thank you.

16             **MR. FLEMING:**  Can I have SP138, please?

17   **Q.**  And can you explain to the jury how you analyzed

18   claim 14 of the '933, regarding your opinions?

19   A.  Yes.  Well, the elements, I think, are similar to that

20   in claim 12, and describe -- I'm sorry, 11 -- "a method for

21   treating a kidney dialysis patient which comprises

22   administering a pharmaceutical composition of claim 12 in an

23   amount effective to increase the hematocrit level of said

24   patient."

25             Again, this element is describing treatment of a

1  kidney dialysis patient with a pharmaceutical composition

2  referenced in 12 in an amount to increase the hematocrit

3  level.

4  **Q.**  And can you tell the jury what your opinion is with

5  regard to claim 14 of the '933 patent?

6  A.  My opinion is, as one skilled in the art, having

7  reviewed that prior art, that all the elements of this

8  claim, claim 14 of the '933, are rendered invalid by virtue

9  of obviousness.

10  **MR. FLEMING:**  And your Honor, to come back to your

11  question regarding the independent claims, if I could refer

12  you to the green report, made by my colleagues,

13  Paragraph 43.

14  **THE COURT:**  Yes, he may give that conclusion.

15  **Q.**  So, Doctor, if you could look at Paragraph 43 in your

16  green report?

17  A.  Yes.

18  **Q.**  And can -- since this relates to the topic we're

19  discussing, would you read it, please?

20  A.  The paragraph?

21  **Q.**  Yes.

22  A.  "Thus, once it was obvious to make recombinant human

23  erythropoietin in --"

24  **MR. MADRID:**  Objection, your Honor.

25  **THE COURT:**  Well, that objection's not timely.

1    It's obvious what he was doing and he may do it.  Denied,

2    because it's not timely.

3              You may read the paragraph.

4              **THE WITNESS:**  I'll start again.

5              **THE COURT:**  You may.

6    A.  "Thus, once it was obvious to make recombinant human

7    erythropoietin in C-H-O, CHO cells, open parentheses,

8    claims 3, 7 and 8, closed parentheses, it is my opinion that

9    these foregoing clinical studies also made it obvious for

10   one of skill in the art to create pharmaceutical

11   compositions with adjuvants, diluents or carriers to treat

12   kidney dialysis patients in an amount effective to increase

13   hematocrit levels, reticulocytes, and red blood cells."

14             **THE COURT:**  Well, you didn't finish.

15   A.  I'm sorry.  "Open parentheses, claims 9, 11, 12 and 14,

16   closed parentheses, period."

17             **THE COURT:**  Mr. Fleming.

18   **Q.**  And for clarification for the jury, could you tell them,

19   again, which claims of the '933 about which you're offering

20   an opinion of invalidity?

21   A.  Claims 9, 11, 12 and 14.

22   **Q.**  Thank you.  And did you take into consideration the

23   paragraph you just read to the jury and the independent

24   claims in coming to your opinion about those claims?

25   A.  Yes.

1     **MR. FLEMING:**  Now, if we can go back to SP138.

2     Thank you.

3     **Q.**  And again, with regard to a method for treating kidney

4     dialysis patients, can you remind the jury which of the

5     references in the prior art you considered involved that

6     element?

7     A.  Baron-Goldwasser, used their pharmaceutical composition

8     in dialysis patient, and Doctors Eschbach and Essers also

9     used their EPO-rich plasma pharmaceutical composition in

10    dialysis patients.

11    **Q.**  And with regard to increasing the hematocrit level of

12    the patient, you told the jury about the study in the

13    Baron-Goldwasser report?

14    A.  Yes.  That demonstrative of the hamsters that were

15    treated with that same pharmaceutical composition indicated

16    that there was an increase in hematocrit level.

17    **Q.**  Now, did any of the other references you discussed with

18    the jury today discuss the increase in hematocrit in an

19    amount?

20    A.  Yes.  The Eschbach sheep model.

21    **Q.**  That was Exhibit 2032?

22    **MR. FLEMING:**  Could we just put it up quickly,

23    2032?

24    A.  Yes.  So this -- this is that article by Joseph Eschbach

25    that we discussed before, "The Anemia of Chronic Renal

1    Failure in Sheep, Response to Erythropoietin-Rich Plasma In

2    Vivo," that was submitted for publication in J. Clin.

3    Invest., which is Journal of Clinical Investigation, that

4    was submitted for publication in July of '83, and actually

5    published in August of '84.

6         **MR. FLEMING:**  And if we go to page 439 of that

7    article.  And if we can enlarge the graph on the bottom,

8    please.

9    **Q.**  And can you explain to the jury, Doctor, what these

10   graphs depict?

11   A.  Yes.  In this -- as part of that body of work,

12   Dr. Eschbach had this sheep erythropoietin-enriched plasma

13   that he infused over now prolonged periods of time to the

14   sheep, and it was actually looking at hematocrit.  And it

15   could be seen that at the end of this infusion, multiple

16   infusions, that he had seen an increase in hematocrit in

17   that sheep after infusing the sheep-enriched plasma with

18   EPO.

19   **Q.**  Doctor, in coming to your opinions about the '933 patent

20   claims, that they're invalid, did you also consider

21   Dr. Goldwasser's grant applications?

22   A.  Yes, I did.

23   **Q.**  And those were Trial Exhibits 2043 and 2045?

24   A.  Yes.

25   **Q.**  Doctor, focusing on the data in Dr. Baron and

1    Goldwasser's clinical trial, did any other entity, to your

2    knowledge, confirm the results that Dr. Baron reported?

3            **MR. MADRID:**  Objection, leading.

4    A.  Yes.

5            **THE COURT:**  Sustained on that ground.  The answer's

6    stricken.

7    **Q.**  Did you see any other evidence, Dr. Spinowitz, from the

8    documents and materials you reviewed, that there was yet

9    even further confirmation on the results of the

10   Baron-Goldwasser study?

11           **MR. MADRID:**  Objection.

12           **THE COURT:**  Sustained, same ground.

13           Is there anything else in there that bore on this

14   issue?

15           **THE WITNESS:**  In the documents that I reviewed,

16   yes.

17           **THE COURT:**  You did see it?

18           **THE WITNESS:**  Yes, I did.

19           **THE COURT:**  What did you see?  Without telling us

20   specifically what it says, identify it.

21           **THE WITNESS:**  Sure.

22           **THE COURT:**  Identify what you saw in there.

23           **THE WITNESS:**  Absolutely.  That was an IND

24   application that Amgen had submitted to the FDA for their

25   investigation.

1          **THE COURT:**  So you looked at that.  Anything else?

2          **THE WITNESS:**  I looked at the rationale --

3          **THE COURT:**  No, but you identified by identifying

4  the IND that Amgen submitted.  Any other document?

5          **THE WITNESS:**  No, that was the document.

6          **THE COURT:**  The other document.  Okay.  Go from

7  there.

8          **THE WITNESS:**  Sorry.

9  **Q.**  Doctor, I'd like to refer you now to what we've marked

10  as Exhibit QDZ.  If you can look at it in your notebook,

11  QDZ?

12  A.  Yes, I've got it.

13  **Q.**  Okay.  Is this the document, the Amgen document you were

14  referring to?

15  A.  Yes.

16  **Q.**  Could you tell the jury what this document is?

17  A.  This is the IND submission of Amgen to the Food and Drug

18  Administration.

19  **Q.**  And do you recognize from the numbers on the bottom

20  whether this is a document that was produced in this

21  litigation?

22  A.  Yes.

23  **Q.**  And did you review this document in coming to your

24  opinions in this case?

25  A.  Yes, I did.

1    **Q.**  Could you direct --

2              **MR. FLEMING:**  Your Honor, we offer QDZ at this

3    time.

4              **THE COURT:**  Any objection?

5              **MR. MADRID:**  Objection, your Honor.

6              **THE COURT:**  I'll hear you at the sidebar.

7    SIDEBAR CONFERENCE, AS FOLLOWS:

8              **THE COURT:**  What's the nature of the objection?

9              **MR. MADRID:**  Mr. Gaede filed with you this morning

10   a bench brief regarding this subject, your Honor.

11             **THE COURT:**  Yes.  It's your witness but I'll hear

12   him.  Go ahead.

13             **MR. GAEDE:**  Yes, your Honor.  Very briefly, this

14   document is not prior art and it does not write to the

15   issue.

16             **THE COURT:**  I just want to see if I'm getting on

17   top of things here.  And the answer is, I am.  All right.

18             **MR. GAEDE:**  Yes, you are.  You'll see that this

19   document, QDZ, is referenced specifically in Exhibit A.

20             **THE COURT:**  It is.  Yes, I see it.

21             **MR. GAEDE:**  Okay.  And this document is generated

22   in approximately 1986, well after the priority date and,

23   therefore, it doesn't qualify as prior --

24             **THE COURT:**  Stop.  Thank you, I've got it.

25             **MR. FLEMING:**  There's no question this was an Amgen

 1    document, and it was submitted to the FDA, and it contains

 2    an admission.  If you look here, it says, "Therapy with" --

 3              THE COURT:  On page 4, wait a second.

 4         MR. FLEMING:  I beg your pardon, 6318 on the

 5    bottom, your Honor, next page.  Paragraph A, "Therapy with

 6    erythropoietin has been shown to be effective in selective

 7    patients with ESRD.  These studies have been small in scale

 8    because of the limited quantities of purified or

 9    semi-purified" --

10              THE COURT:  I can read, and I've read it.  And you

11    say that's a relevant submission.  But isn't the timing of

12    it at issue?

13         MR. FLEMING:  No, your Honor, because let me

14    explain certain things.  The timing is interesting in that

15    this is the IND for their EPOGEN product.  They're arguing

16    to the FDA that there is data in the prior art or the

17    historical art that demonstrates this effect.  It is the

18    Goldwasser-Baron study, on another page the Eschbach

19    studies --

20              THE COURT:  I assume so.

21         MR. FLEMING:  Therefore, it is their confirmation

22    of that data which they now, in this case, want to take a

23    contrary position to.  So it is an admission.

24              THE COURT:  Okay.

25         MR. GAEDE:  Very briefly, there's no connection

```
 1   here to the Baron-Goldwasser study.

 2          THE COURT:  There's no connection here, but isn't

 3   that --

 4          MR. GAEDE:  He can't handle it through this

 5   witness.

 6          THE COURT:  Isn't it a reasonable inference?

 7          MR. FLEMING:  Your Honor, they're --

 8          THE COURT:  Let me stick with him.

 9          That's a reasonable inference, isn't it?

10          MR. GAEDE:  I think it calls for speculation, your

11   Honor.

12          THE COURT:  No, we're not getting the whole

13   document in.

14          MR. FLEMING:  Just that paragraph as confirmation.

15          THE COURT:  Yes, that you looked at that paragraph.

16          MR. FLEMING:  There is another portion here where

17   they cite the Eschbach '84 paper and they talk about that,

18   too.  So when you say the whole document, it's portions that

19   we contend, in the context of this entire document --

20          THE COURT:  Okay, wait a second.  I'm giving you

21   page 1, 6311, I'm giving you 6318, and I'm giving you 6317.

22          MR. FLEMING:  Six and seven sort of slide together.

23   The 6317 here is the bibliography of what's cited here.

24          THE COURT:  This is what you pointed me to.  Now

25   you want this?
```

```
 1          MR. FLEMING:  This is Eschbach, your Honor.

 2          THE COURT:  Wait a second.  Wait second.  But your

 3   rationale is the same, that these are admissions?

 4          MR. FLEMING:  Yes, your Honor.  And you can see, it

 5   says plasma --

 6          THE COURT:  All right.  You've got it.

 7          MR. GAEDE:  Your Honor, may I be heard on one final

 8   point?

 9          THE COURT:  6311 and 6316 through 6318.

10          MR. GAEDE:  Can I be heard on one issue?  There's

11   no citation here to the Goldwasser study on --

12          THE COURT:  I think it's a reasonable inference.

13   Of course you can examine and put on evidence.

14          MR. FLEMING:  Thank you, your Honor.

15          (Whereupon the sidebar conference concluded.)

16          THE COURT:  Now, portions of QDZ are going to be

17   admitted.  And just with these long identifying numbers,

18   I'll read the last four digits.  Pages 6311, 6316 through

19   6318 are admitted in evidence.  The entire document need not

20   be admitted in evidence.

21          And again, I don't want you to think anything is

22   being withheld from you.  It deals with other things, or

23   I've decided it doesn't bear specifically on what we're

24   concerned with.  So you're getting the portion that

25   arguments are going to be made about.
```

1          So, and the number will be 2054, portions of QDZ.

2          **MR. FLEMING:**  It's QDZ, your Honor.

3          **THE COURT:**  QDZ.

4          (Exhibit marked in evidence.)

5          **MR. FLEMING:**  If I might, just for the record, read

6     the entire Bates number of those pages?

7          **THE COURT:**  You may.

8          **MR. FLEMING:**  Thank you.  It is AM-ITC 00056311,

9     6316 through 6318.  Have I said that correctly, your Honor,

10    per your rulings?

11         **THE COURT:**  I think so.

12         **MR. FLEMING:**  May I proceed?

13         **THE COURT:**  You may.

14         **MR. FLEMING:**  May we have the first page of 2055?

15         **THE CLERK:**  2054.

16         **MR. FLEMING:**  Thank you.  Again, the first page of

17    2054.

18    **(BY MR. FLEMING:)**

19    **Q.**  And Dr. Spinowitz, is this a document you reviewed in

20    coming to your opinions regarding the claims --

21    A.  Yes.

22    **Q.**  -- that you've opined are invalid?

23    A.  Yes, it is.

24    **Q.**  And can you tell the jury what this document is?

25    A.  This is a document coming from Amgen, directed to the

1    Food and Drug Administration.  FD-1571 is another way of

2    saying IND.  This was an investigation of a new drug, and

3    this was the form that one uses to make that application.

4    **Q.**  To your understanding, who prepared this document?

5    A.   Amgen.

6    **Q.**  And to whom did they submit it?

7    A.   To the FDA, Food and Drug Administration.

8    **Q.**  And when you say "IND," that's Investigational New Drug

9    application?

10   A.   Yes, it is.

11   **Q.**  Is that the same type of document -- have you seen

12   another type of IND today?

13   A.   Yes, we have.

14   **Q.**  And where was that?

15   A.   That was with reference to the Baron-Goldwasser studies.

16   **Q.**  That's 2004, the exhibit?

17   A.   Yes.

18   **Q.**  So if we can turn first to the page with 6318?

19   A.   Yes.

20         **MR. FLEMING:**  And if we could highlight the second

21   paragraph starting with the word "therapy."

22   **Q.**  Doctor, could you read this sentence to the jury,

23   please?

24   A.   Yes.  Starting with "therapy."  "Therapy with

25   erythropoietin has been shown to be effective in selected

1    patients with ESRD."  That's short for end stage renal

2    disease. "These studies have been small in scale because of

3    the limited quantities of purified or semi-purified

4    erythropoietin available."

5    **Q.**  So let me stop you right there.  Has there been any

6    study that you testified to the jury about that's been a

7    small-scale study?

8    A.  Yes.  The Baron-Goldwasser study certainly is a

9    small-scale study.

10   **Q.**  Has there been any studies that you've spoken to the

11   jury about that have utilized purified erythropoietin as the

12   pharmaceutical composition?

13   A.  Yes.  The Baron-Goldwasser study used purified human

14   erythropoietin.

15         **MR. FLEMING:**  So if we can highlight those first

16   two sentences, please.

17   **Q.**  As one of skill in the art, Doctor, reviewing this

18   document, can you explain to the jury what influence this

19   had on your opinions, this Amgen statement?

20   A.  I think this indicates that Amgen had relied upon that

21   small-scale study --

22         **MR. MADRID:**  Objection, your Honor.  Speculation.

23         **THE COURT:**  Yes, I'm going to sustain that.

24   Sustain that, on this foundation.

25   **Q.**  How did this Amgen statement influence your opinion

1    regarding the invalidity of the claims about which you

2    testified to the jury?

3    A.  I think Amgen, in referring to that small-scale study,

4    has established, has verified the importance of the results

5    of that study.

6         **MR. MADRID:**  Objection, speculation.  Move to

7    strike.

8         **THE COURT:**  The motion to strike's denied.

9    **Q.**  And to you, reading the first sentence, is Amgen

10   agreeing or disagreeing with the conclusions that Dr. Baron

11   and Goldwasser reached regarding their study?

12        **MR. MADRID:**  Objection.  Leading, and speculation,

13   your Honor.

14        **THE COURT:**  It is leading.  You may ask him --

15        **MR. FLEMING:**  Withdrawn.

16   **Q.**  What do you interpret from Amgen's statement in that

17   first sentence in the context of your opinions, Doctor?

18   A.  That Amgen --

19        **MR. MADRID:**  Objection.  Relevance, your Honor.

20        **THE COURT:**  Overruled.

21   A.  That Amgen had shown that therapy with erythropoietin in

22   those small-scale studies had been shown to be effective in

23   selected patients with end stage renal disease.

24   **Q.**  In looking at this Amgen document, did you see reference

25   to any of the other studies that you told the jury about

1    today?

2              **MR. FLEMING:**  And could we go to page 6316?  And

3    can we highlight the middle paragraph starting with, "The

4    effect of plasma."

5    **Q.**  And could you read this to the jury, please?

6    A.  Yes.  So here they're talking about, "The effects of

7    plasma and urinary erythropoietin have been studied in

8    uremic rat" --

9              **MR. MADRID:**  Your Honor, this is outside the scope

10   of the report.

11             **THE COURT:**  Yes.  Where is it?

12             **MR. FLEMING:**  Your Honor, first, it's in evidence.

13   I'm having him read it to the jury.  That's the first step

14   of what I was doing.  Then I'm happy to --

15             **THE COURT:**  He may read from it.  Then you show me.

16   **Q.**  Doctor, can you read to the jury what is in this Amgen

17   document?

18   A.  "The effect of plasma and urinary erythropoietin have

19   been studied in uremic rat and sheep animal models."

20   Continue reading?

21   **Q.**  Please.

22   A.  "The anephric rat has been shown to respond to

23   erythropoietin by increasing marrow red cell precursors.  In

24   other studies, the red cell mass of uremic rats increased to

25   normal levels following erythropoietin administration.  In

1    these studies, it was proposed that erythropoietin could

2    play an important therapeutic role in correcting the anemia

3    of end stage renal disease.  The response of erythropoietin

4    in the chronically uremic sheep has also been studied.

5    Erythropoietin-rich plasma was tested in normal and dialyzed

6    uremic sheep.  The anemia noted in the uremic sheep was

7    corrected after two to six weeks of daily infusions of

8    erythropoietin-rich plasma.  Reticulocytes, plasma iron

9    turnover and red cell mass increased as the dose of

10   erythropoietin-rich plasma was increased."

11   **Q.**  Now, there's a Footnote Number 6 at the end of that

12   paragraph.  And if we can go to the next page.

13   A.  Yes.

14   **Q.**  So in this Amgen submission to the FDA, what did they

15   identify as proof of that statement that ended in Footnote

16   6?

17           **MR. MADRID:**  Objection.  Argumentative.

18           **THE COURT:**  No, no, overruled.

19   A.  They cite their reference that I had shown you before,

20   the Eschbach study that was in J. Clin. Investigation

21   entitled, "The Anemia of Chronic Renal Failure in Sheep,

22   Response to Erythropoietin-Rich Plasma In Vivo," 1984.

23           **MR. FLEMING:**  And can we just, for purposes of

24   clarity, have Exhibit 2032, please?

25   **Q.**  And, Doctor, just for clarity to the jury, is this the

1    article that was being referenced in Footnote 6 of Amgen's

2    document?

3    A.  Yes.  That was the Journal and Clinical Investigation

4    article of 1984.

5    Q.  And to your understanding, in reviewing IND documents,

6    when someone puts a footnote reference next to a paragraph,

7    what is the intendment of that?  What are they trying to do?

8             MR. MADRID:  Objection.

9             THE COURT:  Sustained.  It's not in the report.

10   Q.  How did Amgen's statements regarding the Eschbach study

11   that you testified about influence your opinions in this

12   case as to the invalidity of the claims of the '422 and

13   '933?

14   A.  This information to one of skill -- skilled in the

15   art --

16             MR. MADRID:  Objection, your Honor.  It's not in

17   the report.

18             THE COURT:  Where is it?

19             MR. FLEMING:  Your Honor, starting at the green

20   report, Paragraph 25, and continuing on to 34.

21             THE COURT:  Yes.  He may testify consistent with

22   the report.  Put your question again.

23   Q.  So, if we can go back to 2054, this is the Amgen

24   statement, Doctor.  Do you remember this?

25   A.  Yes.

1   Q.   If we can highlight again Footnote 6 that was cited in

2   this Amgen IND, can you tell the jury how the information

3   that you've read to them from the Amgen IND influenced your

4   opinions in your report?

5   A.   That Amgen --

6          MR. MADRID:   Objection, your Honor.   This document

7   is not referenced in the report in --

8          THE COURT:   Overruled.   He may answer the question,

9   consistent with the report.

10  A.   This reference cited by Amgen in this IND --

11         THE COURT:   Where is the reference in the report?

12  This reference that you've just been talking about, where is

13  it?

14         MR. FLEMING:   Well, the reference itself is in the

15  paragraphs that we've discussed, your Honor.   The green

16  report.

17         THE COURT:   Yes.

18         MR. FLEMING:   Twenty-five through -- focus on

19  Paragraph 34, your Honor.   At the end.   The next to the last

20  line, there's Eschbach et al, 1984.

21         THE COURT:   Thank you.   Now you may answer.

22  Q.   Go ahead, Doctor.

23  A.   Yes.   So, again, Amgen had relied upon this reference to

24  determine the predictability that when erythropoietin

25  were -- was available, that they would see the same kind of

1    response in the human as Dr. Eschbach has seen in the sheep

2    with his EPO-rich plasma.

3    Q.   That's how you interpret the Amgen statements in the IND

4    regarding this report?

5    A.   Yes.

6    Q.   Now, Doctor, the jury has seen the Baron-Goldwasser

7    data.  Could you point to that book again?

8    A.   Here it is.

9    Q.   Have you seen any evidence in this case that Amgen had

10   that data?

11   A.   Yes, I have.

12          **MR. FLEMING:**  May we have -- before you put it up,

13   please --

14          **MR. MADRID:**  Objection, your Honor.  May we have a

15   sidebar, please?

16          **THE COURT:**  You may.

17   SIDEBAR CONFERENCE, AS FOLLOWS:

18          **MR. MADRID:**  Your Honor.

19          **THE COURT:**  Is this addressed in the same bench

20    memo, or is this something else?

21          **MR. MADRID:**  No, I believe this is something

22    separate.

23          **MR. FLEMING:**  This is the document, your Honor.

24          **THE COURT:**  What's the problem with it?

25          **MR. MADRID:**  Your Honor, this information's

1    irrelevant.  It's irrelevant to this portion of the case.

2    What they are doing is offering, through this witness, facts

3    that go to, if they go to anything at all, the inequitable

4    conduct portion of the case.  But your Honor has stricken

5    these allegations from the inequitable conduct case.

6              They did not plead these.  They did not plead this

7    timely.  They did not give us notice of this information

8    relative to the prior art case.  So --

9              **THE COURT:**  What's this have to do with anything?

10             **MR. FLEMING:**  Your Honor, we've just shown the jury

11   that Amgen's statement has summarized the data.  This is

12   evidence to tie up that they actually had the data to which

13   they were summarizing.  They objected to foundation.

14             **THE COURT:**  I'm not going to let them argue to the

15   contrary.

16             **MR. FLEMING:**  Not now.  I'd like to at least show

17   it to the jury.

18             **THE COURT:**  I'm not going to let them argue it to

19   the contrary, am I?

20             **MR. MADRID:**  Yes, sir.

21             **THE COURT:**  All right.  Fine.  You don't need it.

22             **MR. FLEMING:**  Can I tie up, just so we're clear?  I

23   don't want to run afoul of what you're saying.  I want to

24   ask him has he seen evidence from Amgen, documents, that

25   Amgen had the Baron clinical data.

```
 1              THE COURT:  No, they're not going to argue to the

 2     contrary.  He affirms it, Mr. Madrid affirms it.  Let's move

 3     on.

 4              MR. FLEMING:  Okay, your Honor, thank you.

 5              (Whereupon the sidebar conference concluded.)

 6              MR. FLEMING:  May I have one second, your Honor,

 7     please?

 8              THE COURT:  Of course.

 9              (Pause in proceedings.)

10              MR. FLEMING:  Excuse me, your Honor, I apologize.

11     I'm sorry.

12              So could we go back to 2054, please, the Amgen IND,

13     submitted to the FDA.  And if we can go back to page 56318.

14     (BY MR. FLEMING:)

15     Q.  Doctor, could you tell the jury if the statement and

16     conclusions that Amgen drew are consistent with your

17     opinions?

18     A.  Yes, they are.

19     Q.  So just so we're clear now, for the jury, with regard to

20     claim 1 of the '422 patent, can you tell the jury your

21     opinion regarding the validity of that claim?

22     A.  With regard to claim 1 of '422 --

23              MR. MADRID:  Objection, your Honor.  I think this

24     is asked --

25              THE COURT:  Overruled.  He may have it.
```

1    A.  So with regard to claim 1 of '422, as one skilled in the

2    art, reviewing all the prior art that I presented this

3    morning and have gone over with you, I think that all the

4    elements of claim 1 of '422 are included within that prior

5    art.  All of those prior arts dealt with a pharmaceutical

6    composition containing a pharmaceutically acceptable

7    diluent, adjuvant or carrier.  All of those prior arts

8    showed that there was therapeutic effectiveness as defined

9    by the courts.  All of that prior art have contained human

10   erythropoietin that had been derived from mammalian kidney

11   cells.

12         My conclusion, based on prior art, my opinion,

13   based on the prior art, is that that prior art, as viewed by

14   one in skilled in the art, would render claim 1 of '422 as

15   invalid by virtue of anticipation and/or obviousness.

16   Q.  And can you tell the jury your opinion with regard to

17   claim 9 of the '933 patent?

18   A.  Yes.  Similarly, claim 9 of the '933 patent also dealt

19   with the same elements of pharmaceutical composition

20   containing erythropoietin with a diluent that had a

21   therapeutic effectiveness.  And all of the information

22   contained in that prior art led me to conclude, based on

23   that, that claim 9 of the '933 patent was similarly invalid

24   by virtue of obviousness.

25   Q.  And can we go to claim 12 of the '933 patent.  Would you

1    tell the jury your opinion as to that claim, please?

2    A.   Yes.   That claim also dealt with the same type of

3    pharmaceutical composition, a glycoprotein that was --

4    comprised human erythropoietin, a diluent, and had been --

5    that would eventuate in a therapeutic responsiveness.   And

6    all of the prior art had shown all of the elements of that

7    claim.   This is why my opinion is that that claim similarly

8    is invalid by virtue of obviousness.

9    Q.   And I skipped over claim 11 of the '933.   Could you tell

10   the jury your opinion as to that, please?

11   A.   Yes.   Claim 11 dealt with a method for treating kidney

12   dialysis patients leading to increase in hematocrit.   And

13   again, all the prior art that I looked at, Baron-Goldwasser,

14   Eschbach, Essers, all gave their pharmaceutical composition

15   to patients on dialysis.   They saw evidence of therapeutic

16   effectiveness.   And as we discussed with the Eschbach sheep

17   model, the hamster information in the Baron-Goldwasser data,

18   that there was an increase in hematocrit seen when one gave

19   that pharmaceutical composition.

20        Putting it all together, I'm of the opinion, one

21   skilled in the art at that time, that all that information

22   would render that claim, claim 11 of the '933 patent,

23   invalid.

24   Q.   And for the claims of the '933 did you also consider the

25   Goldwasser grant application?

1    A.  Yes, I did.

2    Q.  And finally, as to claim 14 of the '933 patent, can you

3    tell the jury your opinion as to the validity of that claim,

4    please?

5    A.  Again, that was a similar claim to 11.  In this case,

6    there was a dependent claim but, again, it referred to a

7    method for treating kidney dialysis patients.

8    Baron-Goldwasser, Essers, Eschbach, they had -- they were

9    given their pharmaceutical composition, and what was needed

10   was an increase in hematocrit.  That increase in hematocrit

11   was seen in the Eschbach sheep data and in the

12   Baron-Goldwasser data.

13          All that information combined led me to my opinion

14   that claim 14 of the '933 is similarly invalid by virtue of

15   obviousness.

16          MR. FLEMING:  Thank you, Dr. Spinowitz.

17          Your Honor, I pass the witness.  Thank you.

18          THE COURT:  Mr. Madrid?

19          MR. MADRID:  Thank you, your Honor.

20                    CROSS-EXAMINATION

21   (BY MR. MADRID:)

22   Q.  Morning, Dr. Spinowitz.

23   A.  Morning.  Good afternoon.

24   Q.  We're not quite there yet.

25          My name is David Madrid, and I represent Amgen,

1    Inc.

2           Doctor, I'd like to ask you some questions about

3    the experiment that Dr. Baron conducted using a preparation

4    of Dr. Goldwasser's urinary erythropoietin.  Do you

5    understand?

6    A.  Yes.

7    Q.  Now, Doctor, the experiment involved only three chronic

8    renal failure patients; correct?

9    A.  The plan was actually to study more, but that which is

10   described in the summary was three patients.

11   Q.  I'm sorry, three patients; correct?

12   A.  That which is described in the summary is three

13   patients.

14   Q.  Okay.  Now, after the three patients were given urinary

15   EPO, the urinary EPO preparation, there were never any more

16   chronic renal failure patients who received this material;

17   true?

18   A.  They described the results of three patients.

19   Q.  There were never any more chronic renal failure patients

20   who received this material; true?

21   A.  The data I reviewed is reference to those three

22   patients.

23   Q.  Okay.  And no more?

24   A.  The data that I've reviewed describes three patients.

25   Q.  You're not aware of any more patients that were treated

1    with the urinary material; true?

2    A.   I have not reviewed any other documents.

3    **Q.**   So the answer to that is no?

4    A.   The documents support evidence that three patients were

5    treated as part of that IND.

6    **Q.**   Doctor, your understanding, are you aware of any

7    patient, other than the three patients in the three-patient

8    study, who received the urinary EPO material?

9    A.   In the documents I reviewed, there were three patients

10   that were treated as part of the IND.

11   **Q.**   And there were no more?

12   A.   I have the documents.  Those three patients were

13   reported.  That's what I reviewed.

14   **Q.**   Now, Doctor, I want to understand exactly what you

15   relied on in forming your opinions about this experiment.

16   Do you understand?

17   A.   Yes.

18   **Q.**   The only knowledge you have regarding the three-patient

19   urinary EPO experiment comes from your review of the

20   documents and the testimony that was given to you by Roche's

21   lawyers; correct?

22   A.   Yes.  They were present in the IND, the grant

23   submissions by Dr. Goldwasser, and --

24   **Q.**   I'm sorry, Doctor.  I'm just asking you to confirm --

25            **MR. FLEMING:**  Objection, your Honor.  The witness

1    should be allowed to answer this question.

2           **THE COURT:**  No, he framed the question in such a

3    fashion that he may put it.  You may ask him to explain

4    anything, you'll have redirect.

5    **Q.**  Doctor, the only information you looked at with

6    reference to the urinary EPO study, two pieces, documents,

7    testimony given to you by the Roche lawyers; true?

8    A.  Yes.

9    **Q.**  Now, you were not an investigator in this experiment,

10   were you?

11   A.  No, I was not.

12   **Q.**  You have no personal knowledge as to what happened in

13   this experiment, do you?

14   A.  Review of documents and IND allow me to form an opinion

15   regarding those studies.

16   **Q.**  Doctor, you were not present during the experiment;

17   correct?

18   A.  No, I was not in Chicago in '79 through '80.

19   **Q.**  You did not personally witness any of the events in the

20   experiment; correct?

21   A.  As stated, I was not there.

22   **Q.**  Now, this experiment happened 27 years ago?

23   A.  Correct.

24   **Q.**  And the first time you reviewed any data from this

25   experiment is when Roche's lawyers gave it to you?

1    A.   I was presented with all of those documents and reviewed

2    them.

3    Q.   Let me say that again.  The first time you reviewed any

4    data from this experiment was when Roche's lawyers gave it

5    to you; correct?

6    A.   Yes.  But my review of those documents was as one

7    skilled in the art in the period of time '83/'84 and it's

8    with that perspective that I looked at those documents.

9    Q.   I'm sorry, sir.  That's not my question.

10         You looked -- you never saw any of the data

11   regarding the Baron-Goldwasser study before Roche's lawyers

12   gave it to you; true?

13   A.   That's correct.

14   Q.   Now, the three-patient study was the first time

15   Dr. Goldwasser's urinary EPO preparation was ever given to

16   human beings anywhere, anytime in the world; agree?

17   A.   Based on the documents, that was -- the urinary EPO was,

18   the preparation of Dr. Goldwasser's, was given to Dr. Baron.

19   And that's the data that I reviewed.

20   Q.   All right.  But I'm asking your understanding, sir.  You

21   agree with me that as far as you know the three-patient

22   urinary EPO study was the only time anywhere in the world

23   that preparation of urinary material was given to human

24   beings; correct?

25   A.   What I know is that that preparation was given to humans

 1   at the University of Chicago starting in 1979, based on the

 2   documents I have reviewed.

 3   **Q.**   Okay.  But you're not answering my question.  My

 4   question is:  The three-patient study was the only time

 5   anywhere in the world ever that Dr. Goldwasser's urinary EPO

 6   preparation was given to human beings; correct?

 7            **MR. FLEMING:**  Objection, your Honor.  It's beyond

 8   the scope of the direct to the extent he --

 9            **THE COURT:**  Over -- please don't argue.

10            **MR. FLEMING:**  Sorry.

11            **THE COURT:**  I understand, but overruled.

12   A.   I know that Dr. Goldwasser's urinary erythropoietin was

13   given to these three patients.  I have no other knowledge

14   about any other administration of that preparation.

15   **Q.**   You have no knowledge that it was ever given to anyone

16   else other than those three patients; correct?

17   A.   I have knowledge about when it was given.

18   **Q.**   And that's it?

19   A.   Yes.

20   **Q.**   Now, it's your view, isn't it, sir, that before 1984,

21   other scientists would have been interested in learning

22   about the data from the Baron-Goldwasser urinary EPO study;

23   correct?

24   A.   There were a lot of people working in that field.

25   **Q.**   I'm sorry, sir.  Let's -- I tell you what, let's take a

1    look at your blue report.  Take a look at Paragraph 44, the

2    bottom of page 15 of your blue report.

3    A.  I'm sorry, it was page 15?

4    **Q.**  Page 15, blue report, Paragraph 44.

5    A.  Yes.

6    **Q.**  Do you have that?

7    A.  Yes.

8    **Q.**  It's your view that before 1984 other scientists would

9    have been interested in the data from the three-patient

10   urinary EPO study; correct?

11   A.  I believe I said that I believe that most clinicians

12   would have understood the value and utility of such an

13   exploratory study utilizing human erythropoietin.

14   **Q.**  Understood.

15   A.  They certainly would have been interested.

16   **Q.**  They would have been interested prior to '84; correct?

17   A.  I -- you repeat your question, because I'm not sure that

18   I'm answering what you're asking.

19   **Q.**  Sir, is it your view that before 1984 other clinicians,

20   folks not involved in the three-patient experiment, would

21   have been interested in the data from the three-patient

22   experiment, before 1984?

23   A.  What I say is that they would have understood the value

24   and utility.

25   **Q.**  I'm not asking you about your report at this point, I'm

1    just asking for your belief.  Okay?

2    A.  The question, again, is?

3    **Q.**  Is it your view that before 1984 other clinicians would

4    have been interested in the data from the three-patient

5    experiment?

6    A.  Well, I know that that data wasn't made available.  I

7    don't know who it was made available to, and I can't sit

8    here and tell you who would have appreciated that.

9    Certainly, certain clinicians and researchers would have.

10   **Q.**  I'm confused by your answer.

11       Would they be interested in the data or not; yes or

12   no?

13   A.  They would have been able to utilize that information

14   and -- in formulating their approach to things.

15   **Q.**  Okay.  But that's about utilize.  You tell me, would

16   they have been interested in utilizing the data; yes or no?

17       **MR. FLEMING:**  Objection, your Honor.  Asked and

18   answered.

19       **THE COURT:**  No, he may press it.

20       Now, I'll tell the witness, he can frame questions

21   that grammatically can be answered yes or no.  If an honest

22   and a complete answer is yes or no, you have to answer yes

23   or no.  But if that's not complete, in your mind, you can

24   always say, I can't answer it yes or no.  Now, this is his

25   chance to ask questions.  So if you answer that way, you

1   don't run on and say, And by the way, I'd like to tell you

2   this.  You wait for him to frame a different question to get

3   at what he wants.

4        Naturally, you can always say, I don't know, I

5   don't remember, I don't understand.  But if he gives you a

6   question that grammatically can be answered yes or no, and

7   that's a complete and honest answer, you have to answer yes

8   or no.

9        Go ahead, Mr. Madrid.

10       **MR. MADRID:**  Thank you, your Honor.

11  **Q.**  Dr. Spinowitz, none of the investigators involved in the

12  three-patient urinary EPO study ever published in any --

13       **MR. FLEMING:**  Objection, your Honor.  We need a

14  sidebar, based on your prior ruling.

15       **THE COURT:**  Well, let him ask the question first

16  and I'll decide.  Put your question.

17  **Q.**  Dr. Spinowitz, none of the investigators involved in the

18  three-patient study ever published in any medical journal

19  any of the data regarding hematocrit concerning any of the

20  three patients; true?

21       **MR. FLEMING:**  My objection, your Honor, based --

22       **THE COURT:**  I guess I have this question:  Do you

23  know?  I mean, the way I've heard your testimony, you were

24  given a bunch of the data by Roche to which you applied your

25  own knowledge, you read it, you understand what this case is

1  about, you've testified as to some of the stuff you were

2  shown, and you now have come in, given us your opinions.

3  Now, Mr. Madrid says, his specific question on the

4  study, was anything published about hematocrit?  Now, do you

5  know that?  Do you know the answer to that question?

6  **THE WITNESS:**  Well, publications could include the

7  IND, the follow-up information in that IND.  That

8  information was certainly made --

9  **MR. MADRID:**  Objection, your Honor.

10  **THE COURT:**  Do you know?  Is there something that

11  you can point to that you, yourself, know?

12  **THE WITNESS:**  Yes.  I know that, your Honor, that

13  it was -- that it was made available in the follow-up

14  letters to the FDA.  And Dr. Goldwasser made that available

15  in his I -- NIH grant.  And that is information that is

16  available.

17  **THE COURT:**  All right.  That's his answer.  Go

18  ahead, Mr. Madrid.

19  **Q.**  Dr. Spinowitz, the IND that you just referenced from

20  Amgen, that's not a public document, is it?

21  **MR. FLEMING:**  Objection, your Honor.  We do need a

22  sidebar.

23  **THE COURT:**  Well, all right.

24  SIDEBAR CONFERENCE, AS FOLLOWS:

25  **THE COURT:**  Well, I'm going to exercise the

1   judicial office here, so help me out.  It doesn't sound to

2   me like that's public.

3          MR. FLEMING:  It is, your Honor, first of all, is

4   based on the fact that you've already ruled that the

5   Eschbach -- withdrawn -- that the Baron-Goldwasser materials

6   are prior art.

7          THE COURT:  I have.

8          MR. FLEMING:  So by virtue of them being --

9          THE COURT:  Well, the materials, I've ruled that

10  this experiment is prior art.

11         MR. FLEMING:  Of course, yes.  To be clear,

12  however --

13         THE COURT:  It's central to the earlier cases.

14  They're stuck with that.

15         MR. FLEMING:  Now, that problem is, your Honor,

16  that has with it publication.  They want publication to mean

17  I put in an article.  The law does not require that type of

18  publication exclusively.  As doctor said, it was to the NIH,

19  it was to the FDA, government --

20         THE COURT:  What do you say to that?

21         MR. MADRID:  Your Honor, they're arguing that these

22  claims are obvious.  They have put --

23         THE COURT:  And one of them is anticipated.

24         MR. MADRID:  And one of them's anticipated.  They

25  have put at issue how the real world reacted to this

1    investigation, how the investigators reacted to this

2    investigation.  If the investigators themselves thought that

3    this information was conclusive, they wouldn't have

4    published it.  We're entitled to draw that inference in

5    front of the jury, the actions of the investigators relative

6    to what they did with that data.

7         THE COURT:  I'm asking a different question.  The

8    question -- but maybe you don't want an answer to that

9    question.  All you want to do is be able to ask your

10   questions on cross-examination.

11        Why can't he ask those questions?

12        MR. FLEMING:  Because, your Honor, he's created a

13   misimpression in the mind of the jury regarding what is

14   published, as a meaning of law.  You and I can --

15        THE COURT:  And I will settle everyone's hash with

16   respect to that when I'm ready to speak.

17        MR. FLEMING:  And your Honor knows that under the

18   law of 103 --

19        THE COURT:  I may or may not know it.

20        MR. FLEMING:  As we presented to you, and we

21   believe the law suggests to you, and we can cite to you

22   cases like Graham, that one of skill in the art is allowed

23   the knowledge of the prior art materials.  This is a

24   fictional hypothetical person of skill in the art.

25        THE COURT:  Well, now --

1          **MR. FLEMING:**  In addition, your Honor, the means of

2     publication include other than just putting it in a peer

3     review journal.

4          **THE COURT:**  Let's do this.

5          **MR. FLEMING:**  And Dr. Baron said he never intended

6     to publish.  We heard that from his testimony.  So

7     Mr. Madrid mischaracterizes --

8          **THE COURT:**  I'm going to let you have searching

9     cross-examination of this opinion witness.  I expect further

10    briefing by tomorrow on the legal definition of publication.

11         Can you do something else for six minutes?

12         **MR. MADRID:**  Yes, sir.

13         **THE COURT:**  Fine.

14         **MS. BEN-AMI:**  Your Honor, can we --

15         **THE COURT:**  One at a time.

16         **MS. BEN-AMI:**  It's not relevant to anything.

17         Can we talk to your Honor after 1:00 for one

18    second?

19         **THE COURT:**  For one second, yes.  When we do that,

20    have Ms. Krumplitsch come up here.

21         (Whereupon the sidebar conference concluded.)

22         **THE COURT:**  In fairness, I've got a knotty issue.

23    I asked Mr. Madrid to jump to something else in his

24    examination, and courteously, he said that he will.  I'll

25    solve it this afternoon.  We'll go on tomorrow.

1          Go ahead, Mr. Madrid.

2          **MR. MADRID:**  Thank you, your Honor.

3     **(BY MR. MADRID:)**

4     **Q.**  Doctor, I'd like to ask you some questions about the

5     material, the urinary EPO preparation material that was

6     given to the three patients.  Do you understand?

7     A.  Yes.

8          **MR. MADRID:**  Now, could we have projected '422,

9     claim 1?

10    **Q.**  I'd like to direct your attention, Doctor, to the

11    language in the claim that says, "Purified from mammalian

12    cells in culture."

13         Do you see that?

14    A.  Yes.

15    **Q.**  The urinary EPO in Dr. Goldwasser's preparation was not

16    purified from mammalian cells in culture; true?

17    A.  That was purified from mammalian cells, mammalian kidney

18    cells, and this is a product claim, and --

19    **Q.**  I'm sorry, Doctor, you're not answering my question.

20         **MR. FLEMING:**  Objection, your Honor.

21         **THE COURT:**  Well, the comments are stricken but the

22    interruption is appropriate.  And he can press another

23    question.  The comments of the attorney are stricken.

24         **MR. FLEMING:**  Thank you.

25    **Q.**  Doctor, the Goldwasser urinary EPO material given to the

```
 1    three patients was not purified from mammalian cells grown

 2    in culture; true?

 3    A.   I analyzed this claim, taking all of the elements of

 4    that claim, thought that and have the opinion that the

 5    Baron-Goldwasser study satisfies all those elements.  One of

 6    those elements is --

 7    Q.   I'm sorry, sir.  You are not answering my question.

 8               MR. FLEMING:  Objection.

 9               THE COURT:  Well, please.  Please don't comment.

10    And I'm striking it again.

11               MR. FLEMING:  Thank you, your Honor.

12               THE COURT:  But you may ask him a question.

13               Do you understand his question?

14               THE WITNESS:  I think I'm trying to answer it.

15               THE COURT:  Well, your comment is stricken.

16               THE WITNESS:  Sorry.

17               THE COURT:  My question was:  Did you understand

18    his question?  Just understand, that's all.  Do you

19    understand it?

20               THE WITNESS:  As I understand it --

21               THE COURT:  Do you understand it, is my question?

22    Do you?

23               THE WITNESS:  Yes.

24               THE COURT:  Now, we've got that.  Can you answer

25    it?
```

1          **THE WITNESS:**  I think so.

2          **THE COURT:**  Go ahead.  Can you it yes or no?

3          **THE WITNESS:**  I don't know that I can answer it yes

4     or no.

5          **THE COURT:**  There's your answer.

6          **THE WITNESS:**  Thank you.

7     **Q.**  The urinary EPO material that was given to the three

8     patients, sir --

9     A.  Yes.

10    **Q.**  -- that was prepared from urine; true?

11    A.  That was prepared from urine that had erythropoietin

12    that had originated in mammalian kidney cells.

13    **Q.**  So that I'm sure, that material was prepared from urine;

14    correct?

15    A.  I think I've answered that.  That was prepared by --

16    from urine that --

17         **MR. MADRID:**  Your Honor, I move to strike.  This

18    witness is not answering my questions.

19         **THE COURT:**  Well, strike --

20         **MR. FLEMING:**  Your Honor --

21         **THE COURT:**  Just a moment.  I'll strike his last

22    partial answer, and you may press on.  That's stricken.

23    **Q.**  Now, Doctor, the EPO that was in Dr. Goldwasser's

24    urinary EPO preparation was originally produced by cells

25    that were inside the human body; correct?

1    A.  Those were mammalian kidney cells.

2    **Q.**  And those cells were inside the human body when they

3    were producing the EPO that was in Dr. Goldwasser's

4    preparation; correct?

5    A.  Well, again, this entire claim deals with a product, and

6    the product that I --

7         **MR. MADRID:**  I object, your Honor.  This is

8    nonresponsive.

9         **THE COURT:**  Yes, I'm going to sustain it.  Strike

10   the answer.

11        His question simply was:  In the test, the

12   Goldwasser test, the cells producing the EPO were in the

13   human body when they were producing the EPO; is that

14   correct, as you understand it?

15        **THE WITNESS:**  So, again, the purification of that

16   erythropoietin was from cells that were in mammalian kidney

17   cells.

18        **THE COURT:**  Let's stop there, Mr. Madrid, unless

19   you want to ask one more question.  It's 1:00.  Can we stop

20   there?

21        **MR. MADRID:**  Yes, sir.  Thank you, sir.

22        **THE COURT:**  All right.  We'll stop at this time,

23   ladies and gentlemen.  You've not heard all the evidence.

24   Please, therefore, keep your minds suspended.  Do not

25   discuss the case either among yourselves nor with anyone

 1    else.

 2           Now, tomorrow we're going to start at 9:30,

 3    promptly at 9:30.  We'll take a shorter break to stay right

 4    on track.  And we are right on track.  But 9:30 I want to

 5    go, but you'll understand we won't start until 9:30.  I've

 6    given you your instructions.

 7           We'll recess in this case until 9:30 tomorrow

 8    morning.  The jury may recess, I'll remain on the bench.

 9           **THE CLERK:**  All rise for the jury.

10           (Whereupon the jury left the courtroom.)

11           **THE COURT:**  Please be seated.

12           You may step down, sir.

13           (Whereupon the witness stepped down.)

14           **THE COURT:**  Total elapsed time out of the ten days

15    each side has, Amgen has used up two of those days, and

16    Roche has used of four of those days.

17           There's been -- I will talk with counsel for just

18    one moment, but I invite you over here to the sidebar for

19    just a second.

20    SIDEBAR CONFERENCE, AS FOLLOWS:

21           **THE COURT:**  With both sides here, I want to say hi

22    to Ms. Krumplitsch.  Ms. Krumplitsch and I know each other.

23    She was an intern in our session, a very successful one, and

24    I'm just delighted to see you here in the midst of an actual

25    case.

1          **MS. KRUMPLITSCH:**  Thank you, your Honor.

2          **THE COURT:**  I hasten to add she was not an intern

3    on any prior iteration of Amgen, and Amgen has not been

4    discussed during her internship.

5          **MS. BEN-AMI:**  It's not an issue.

6          **THE COURT:**  I understand.  It's very good to see

7    you.

8          **MS. BEN-AMI:**  I clerked.  I used to say hello to my

9    judge, too.

10         I wanted to know, given what you said earlier this

11   morning, whether there is any time that we could --

12         **THE COURT:**  I should have said, the 1st of October

13   and the 4th of October, but remember I'm a little previous

14   because I'm trying to plan all my time.  And I've got to

15   face up to the motion for directed verdict before that,

16   hopefully Friday, Friday at 3:00.  Now --

17         **THE CLERK:**  2:30, you said.

18         **THE COURT:**  I did.  I changed it.  I mistook the

19   day.

20         **MS. BEN-AMI:**  I meant if different, your Honor.  I

21   meant to discuss these in limine motions in advance of the

22   next day so we're not hitting -- you said this morning that

23   we were hitting you with it.

24         **THE COURT:**  If you've got something that you think

25   will come up tomorrow, come to the motion session and

```
 1    I'll --

 2              MS. BEN-AMI:  This afternoon?

 3              THE COURT:  This afternoon.  And I can do that.

 4    I'm going to do all my work except for you, and then I'm

 5    going to get to you.  We can do that each day.  But you're

 6    giving notice that you want to come back this afternoon?

 7              MS. BEN-AMI:  I am.

 8              THE COURT:  Talk with them about what, so they can

 9    deploy and you can deploy and both sides can have the proper

10    people.

11              MS. BEN-AMI:  I didn't understand --

12              THE CLERK:  Shall we say 3:00?

13              THE COURT:  No, come back.  But Ms. Smith is right.

14    I'm ready to go until 4:00.  So why don't -- if we're going

15    to work this out on any sort of frequent basis, guide out

16    her.  I don't want you to waste your time.  I think the

17    motion session will take until 3:00, and she's trying to

18    save you time.  If it goes lickety-split, I don't mind

19    coming back on the bench until 3:00.  If I start at 9:00

20    and -- this is very enjoyable, but demanding -- I'm pretty

21    much shot by 4:00.

22              MS. BEN-AMI:  Understood.  We'll be back here at

23    3:00, then, if that's all right with your Honor.

24              THE COURT:  It will be.

25              MS. BEN-AMI:  Go through some of the issues so it
```

1    can move more smoothly.

2            **THE COURT:**  I'll all for that.

3            **MS. BEN-AMI:**  Thank you.

4            (Whereupon the sidebar conference concluded.)

5            **THE COURT:**  We'll recess.

6            **THE CLERK:**  Court is in recess.

7            (Recess.)

8

9              **AFTERNOON PROCEEDINGS - 3:27 P.M.**

10

11           **THE CLERK:**  Calling Civil Action 05-12237, Amgen v.

12   Roche.

13           **THE COURT:**  Ms. Ben-Ami, we're here because you

14   thought it would help things to go smoothly and I am eager

15   to take up whatever you wish.

16           **MS. BEN-AMI:**  Thank you, your Honor.

17           One of the things I had asked the Court for, I made

18   a motion in limine, and what I'm asking for the Court to

19   consider now is an instruction to the jury on the meaning of

20   product claims.  And for example, your Honor, I have the --

21           **THE COURT:**  You have.  You know, I'm not disposed

22   to give any such instruction at this stage; if I think

23   that's necessary, I will give it.

24           My willingness to meet with you does not mean I'm

25   going to take up valuable Court time having oral arguments

1    on matters that I would not normally give a hearing on.  I

2    will give an instruction, but I'm not disposed to give one

3    now and I don't see the need for giving one now.

4         What else?

5         **MS. BEN-AMI:**  Well, your Honor, the second issue is

6    the issue of the 102(g), what that means, and we tried to

7    put in evidence from the Genentech --

8         **THE COURT:**  Yes, yes, you did.

9         **MS. BEN-AMI:**  -- PLA, et cetera.

10        **THE COURT:**  Yes, that has been carefully briefed

11   and I've found the briefs helpful.  Let me just see here.

12   Just give me one moment.

13        At issue before the Court is Roche's proffer of

14   various documents from Genentech which it claims constitutes

15   prior art under Section 102(g).  The matter has been fully

16   briefed and I've found the briefs helpful and I now am able

17   to make that determination.

18        There is much to what Roche says.  But in order for

19   the Court to admit these documents, the Court would have to

20   make the preliminary finding that what they disclose, and

21   would have to make the finding by clear and convincing

22   evidence, that what they disclose is in fact a practice of

23   prior art.  With the exception of one document, which I

24   think is admissible on other grounds, I cannot make that

25   finding, nor do I.

1          I'm admitting in evidence Exhibit -- well, actually

2     I'm mistaken here because this all has the same number.  I'm

3     admitting so much of Exhibit 0UX as constitutes, and again

4     here's Bates stamps here, as constitutes Pages 3009, 3050,

5     3054, 3059.  The others are excluded.  Roche's rights are

6     saved.

7          What else?

8          **MS. BEN-AMI:**  Your Honor, we also have the Eschbach

9     document that was a similar 102(g) issue this morning, your

10     Honor?  You ruled on it at side bar and said it's a similar

11     issue, I need to reflect on that.

12          **THE COURT:**  I did, and I do.  Why don't you pass

13     the document, a copy of the document up to me again and I'll

14     do it tonight.

15          **MS. BEN-AMI:**  I don't know if we actually have it,

16     your Honor.

17          **THE COURT:**  You can find it.

18          **MS. BEN-AMI:**  We'll look for it.

19          **THE COURT:**  I know you will.

20          **MS. BEN-AMI:**  But if you recall, just to frame it

21     for your Honor, it was the later retrospective of Dr.

22     Eschbach where he said this is what I did in 1984.

23          **THE COURT:**  No, I understand and that argument is

24     becoming now clear to me.

25          Is that it for you?  I see Mr. Day rise.

1          **MS. BEN-AMI:**  No, it's not it for me, your Honor.

2          **THE COURT:**  Go ahead.

3          **MS. BEN-AMI:**  I would like to ask the Court, and I

4     will file a brief, to preclude Amgen from arguing contrary

5     to the Court's claim construction.

6          **THE COURT:**  Well, if you're going to say it at that

7     level of generality of course that's allowed.

8          **MS. BEN-AMI:**  Yes.  Well, this goes back to this

9     issue where the Court has found that these claims have a

10    certain meaning and that --

11         **THE COURT:**  The Court doesn't find; the Court has

12    ruled.

13         **MS. BEN-AMI:**  The court has ruled -- I apologize --

14    as a matter of law that these claims have a certain meaning.

15         **THE COURT:**  Right.

16         **MS. BEN-AMI:**  And that is my point.

17         **THE COURT:**  Well, of course it is, but the devil is

18    in the details.  I need a specific thing.  I'm not going to

19    let anyone argue contrary to the Court's claim construction.

20    And I'm going to adhere to it and I've said that to the jury

21    and I'll say it again.  But entering orders in a vacuum is

22    not helpful.

23         **MS. BEN-AMI:**  I thought that, your Honor, was our

24    motion in limine that I had previously provided to the Court

25    which was the docket number, assuming I have now understood

1     the docket number situation here, it was docket number 1027.

2     I have it as document number.

3                THE COURT:  I'll reflect on it.

4          MS. BEN-AMI:  And that was filed yesterday.

5          THE COURT:  And thank you.  And I'm certainly not

6     opposed to the filing of these motions and they are specific

7     and I will reflect on it.  And also, I think it's not

8     inappropriate to say at this stage in the trial we really

9     would like a decision on the following numbers.

10    Respectfully, you can tell that to Ms. Smith.  She's very

11    faithful about telling me what you tell her.

12               What else shall we do this afternoon?

13         MS. BEN-AMI:  Your Honor, this afternoon as soon as

14    Dr. Spinowitz left the stand, while he was still in the

15    courtroom, he was handed a subpoena by Amgen.  We are not

16    allowed to talk to him because he's on cross.

17         THE COURT:  Well, now, wait a minute.  First of

18    all, that is true in some courts.  It's not true in this

19    court.  I know of no such rule.  I've never -- it's not part

20    of my trial orders.  And it seems to me you can talk to him,

21    and of course they can inquire of him about it.

22         MS. BEN-AMI:  Uh-huh.

23         MR. DAY:  Your Honor --

24         THE COURT:  Mr. Day doesn't agree.  Is this in the

25    federal rules?

1    **MR. DAY:**  We've entered into a stipulation to that

2    effect and we applied it to Dr. Goldwasser while he was on

3    cross-examination.

4           **THE COURT:**  Fine.  I'm not trying --

5           **MR. DAY:**  So we're just trying to reciprocate.

6           **THE COURT:**  If that's, if that's your deal, fine.

7    All right.  Now, I can see the pertinence of what you say,

8    go ahead, Ms. Ben-Ami.

9          **MS. BEN-AMI:**  We had an agreement that you don't

10   prep your witness while he's cross.

11          **THE COURT:**  While he's on cross.

12          **MS. BEN-AMI:**  But --

13          **THE COURT:**  And you're all carrying it out.

14          **MS. BEN-AMI:**  Right.  And that's --

15          **THE COURT:**  And I appreciate that.

16          **MS. BEN-AMI:**  And that's my understanding of how we

17   usually do it, and Mr. Day has agreed.  And I have no

18   problem with that.  But, when the witness walks off the

19   stand and you slap a subpoena in his hand and say guess

20   what, now you can't talk to the lawyers and I'm intimidating

21   you, that I do have a problem with.

22          **THE COURT:**  Wait a minute.  I don't understand what

23   the service of the subpoena, how that changes anything.

24   He's on cross.  And it may be my own ignorance.  He's on

25   cross.  And so, you're not going to prep him for tomorrow's

1     continued cross-examination.  That's your deal.  Then,

2     though I think it's somewhat extraordinary to give a witness

3     a subpoena, he's going to be here, but maybe I don't

4     understand.  They give him a subpoena seeking what?

5          MS. BEN-AMI:  They give him a subpoena, which they

6     won't explain to us, seeking him to come next week when he

7     was never listed as a fact witness in this case by Amgen.

8          THE COURT:  Well, no, maybe -- well, all right.

9     Then that's something to deal with.  But I'm not -- I don't

10    see the intimidation out here.  I can imagine that what

11    they're going to say is that I let him testify as to facts

12    and now they may want him back as to those facts.  I don't

13    know.  But, that's a matter that really I think could be

14    reduced to a brief.

15         But, you're certainly under no more disadvantage

16    than you agreed to.  You just can't prep him for -- for

17    instance, you can't prep him for tomorrow's cross but surely

18    he can show you the subpoena.

19         MS. BEN-AMI:  Can I tell him that I'm talking to

20    the judge about it and we're going to take care of it and,

21    you know, address it with the Court.

22         THE COURT:  I think we're going to take care of

23    it --

24         MS. BEN-AMI:  In terms of addressing it with the

25    Court.

1          THE COURT:  -- seems a little bold.

2          MS. BEN-AMI:  I think this is part of taking care

3     of it.  I don't mean we're going to strike it.  I mean

4     that --

5          THE COURT:  I know.

6          MS. BEN-AMI:  You don't have to go --

7          THE COURT:  That you're going to address that

8     issue, you may talk to him about that and say we're going to

9     address that issue with the Court.

10         MS. BEN-AMI:  And, your Honor, I thank your Honor

11    but --

12         THE COURT:  Because I -- oh, I understand, because

13    that messes up his schedule.

14         MS. BEN-AMI:  He has no idea what's going on.  He's

15    not a lawyer.

16         THE COURT:  Well, he seems to have a pretty good

17    idea of what's going on.

18         All right.  Anything else I should do this

19    afternoon?

20         MR. DAY:  Yes, sir.

21         THE COURT:  Yes.

22         MR. DAY:  We did discuss an agenda for this, among

23    counsel, and I have a couple of things that we did discuss

24    with Ms. Ben-Ami that I would bring up.

25         I understand that Dr. Lin will be called in Roche's

1    case tomorrow.  That's my understanding.  Dr. Lin has been

2    on notice from Roche that he would be called the following

3    day every day of this trial.  September 5th, 6th, 7th, 8th.

4    He's been waiting, waiting, waiting, waiting.  I assume he

5    will go on tomorrow.

6              There are issues in his examination.

7              **THE COURT:**  Yes, there are.

8              **MR. DAY:**  And I would like to raise two.

9              **THE COURT:**  No, no, that's helpful and you've filed

10   motions and they're timely.

11             It seems to me that there is much, as I've

12   reflected, much to what you say about getting his, them

13   getting from Lin his expectations and the like.  On the

14   other hand, Lin can be vigorously cross-examined about what

15   he knew then and what he did then.  And he can be asked, it

16   seems to me, on that basis, and you understand a person of

17   skill in the art would know that and would do that.

18             But I am, without, I'm not ruling on any motion,

19   but going in you're entitled to know my line will be

20   questions which seek his expectancies, you very well

21   expected you would find out, that I think is beyond the

22   pale.

23             What else?

24             **MR. DAY:**  The -- I agree with your Honor.  And

25   the point simply is this, obviousness is an objective test,

```
1    not a subjective test.  His expectancies as an inventor, his

2    subjective belief --

3            THE COURT:  Well, you just, in essence, you just

4    won on that.

5            MR. DAY:  Yes.

6            THE COURT:  But -- so --

7            MR. DAY:  The second thing --

8            THE COURT:  -- you're gilding that lily.  What

9    people thought they were doing and thought was going on,

10   though it's an objective test, is proper evidence and I'm

11   going to give both sides a chance to put that stuff up.

12           MR. DAY:  The second element, your Honor --

13           MS. BEN-AMI:  Can I be heard on the first element,

14   your Honor?

15           THE COURT:  Yes, you may.

16           MS. BEN-AMI:  Your Honor, I have a bench memo

17   that's still in draft.  I can hand it up as is.  But I've

18   got six or seven Federal Circuit cases here that say

19   inventors testimony as to what was well-known with respect

20   to obviousness, what they understood to be within the

21   ordinary skill and what was obvious is relevant.

22           MR. DAY:  Those are all different issues.

23           THE COURT:  I think as far you're talking about, I

24   agree with that, and you may examine as to that, from him.

25           MR. DAY:  And those are different issues than the
```

1    issue I'm raising.

2         **THE COURT:**  All right.  I think -- but I'm happy to

3    get your bench memo.  And, again, I make my best rulings,

4    whatever anyone may think of them, at the time I have a

5    specific question in the crucible of a specific

6    interrogation.  I'm trying to be helpful.  I cannot give

7    advisory opinions.

8         Interestingly, Ms. Ben-Ami, what you just said, I

9    don't hear Mr. Day to disagree with and it is the line to

10   which I will adhere.

11        **MR. DAY:**  The second issue, your Honor, that I want

12   to raise has to do with 103(c).  Section 103(c) of the

13   Patent Act renders irrelevant to the obviousness analysis

14   the work of co-workers where you have a joint research team.

15   And here again, what Roche is going to do tomorrow with Dr.

16   Lin, I believe, is go into the work of Lin's co-workers

17   and --

18        **THE COURT:**  I have, I have your bench memo on that.

19        **MR. DAY:**  I just wanted to raise the issue.  I'm

20   not asking for a prophylactic ruling.  I just wanted to --

21        **THE COURT:**  And I don't propose to give one.  I

22   have it very much in mind.  I understand the law, I think.

23        **MS. BEN-AMI:**  May I be heard on that?

24        **THE COURT:**  Yes, of course you may.

25        **MS. BEN-AMI:**  Thank you.

1          Your Honor, if we go back to the Amgen-Chugai case,

2     with the opinion of Judge Saris, which obviously your Honor

3     was involved in, and you go through, we want to ask Dr. Lin

4     the same things that he was asked there and as Judge Saris

5     asked him there.  That's what we're talking about.  If an

6     inventor says everything else was within the skill of the

7     art so I didn't need to inform anyone of anything, that is

8     evidence, that is an admission that those things were in the

9     state of the art that were obvious.

10         **THE COURT:**  I think that's so.

11         **MS. BEN-AMI:**  So that's -- I'm not sure where the

12    disagreement is then.

13         **THE COURT:**  No, I'm not --

14         **MR. DAY:**  But saying, but saying that within,

15    saying that I didn't have to tell my co-workers how to do it

16    is not the same thing as saying that's within the skill, of

17    those of ordinary skill in the art.  And that's the point of

18    103(c).

19         **THE COURT:**  I don't think it is, but that's the

20    difficulty of addressing the matter absent a specific

21    question.

22         **MR. DAY:**  I understand.

23         **THE COURT:**  But I don't want to be at all hostile

24    to having these conversations.  This is flagged.  I'm glad

25    to know Lin will come up.  I've got the memorandum

1    pertaining to Lin.  I'll have it in mind.  To the extent I

2    have thought through a line to govern interrogation, I've

3    expressed it to you.  It, of course, is subject to actual

4    rulings on actual objections.

5           **MR. DAY:**  And the last issue I would like to raise,

6    if I may, your Honor, is simply to schedule a hearing

7    tomorrow in the afternoon, a brief session tomorrow in the

8    afternoon just to -- not possible?

9           **THE COURT:**  No.

10          **MR. DAY:**  Okay.

11          **THE COURT:**  I'm sorry.

12          **MR. DAY:**  No, I --

13          **THE COURT:**  But it's not possible tomorrow

14   afternoon.

15          **MR. DAY:**  Okay, thank you.

16          **THE COURT:**  But what did you want to talk about?

17          **MR. DAY:**  Well, I wanted to raise the issue that I

18   raised with Dr. Lowe in his cross-examination.  The Court

19   may recall that I tried to cross-examine Dr. Lowe with

20   respect to GI's awareness of Dr. Lin's inventions and what

21   GI learned of Dr. Lin, and I offered in the cross several

22   specifics.  And I offered a basis for admissibility of those

23   exhibits which the Court did not accept, and I simply want

24   to move those exhibits in.  I want to now provide the basis

25   that I think allows those exhibits to go in.

1          THE COURT:  But not tomorrow afternoon.

2          Again, just so we can see our way through the rest

3     of this week, are we still on the idea that invalidity Roche

4     will rest on no later than Friday morning?

5          MS. BEN-AMI:  I have a feeling that Mr. Madrid

6     intends to do a very long cross tomorrow.

7          THE COURT:  Well, that comes out of his time.

8          MS. BEN-AMI:  And that --

9          THE COURT:  But subject to his cross, that's your

10    goal.

11         MS. BEN-AMI:  It has been my goal and continues to

12    be my goal.

13         THE COURT:  All right.

14         MS. BEN-AMI:  I am cutting witnesses and cutting

15    depositions and doing everything I can.

16         THE COURT:  But with all to the good, and I don't

17    mean that in any way disrespectfully.  One of the great

18    things about time limits, that, again, you do focus on the

19    arteries, not on the capillaries.

20         Now, just so we understand the Court's schedule, if

21    you rest, I've said this, but I'll say it again, if Roche

22    rests on invalidity Friday, I'm not inviting it, but it

23    would not surprise me if you have a motion for directed

24    verdict on invalidity.  I will invite you to the side bar as

25    soon as they say rest.  I expect you to go on and use up the

1    rest of the morning, and I am going to schedule an hour's

2    hearing, the better part of an hour, I'm not inviting you to

3    take it, starting at three o'clock on Friday afternoon on

4    that issue.  We'll see where we stand.  If you were to win

5    entirely and invalidity drops out of the case, I'll give you

6    back that time.  Otherwise, you spend the time where you, as

7    you think most persuasive.

8         Well, that's all I wanted to say.  Now, if she

9    doesn't rest until Monday -- let me confer with Ms. Smith.

10        **THE CLERK:**  You're not here Monday.

11        **THE COURT:**  Oh, next week.  But if she doesn't rest

12   until the following Monday, the 24th --

13        **THE CLERK:**  Let's see.

14        **THE COURT:**  -- which will be unfortunate as a

15   matter of case management, but I can't govern it.

16        **THE CLERK:**  We have a sentencing and a plea.

17        **THE COURT:**  All right.  We still ought to have time

18   in the afternoon.

19        **MS. BEN-AMI:**  Yes.

20        **THE COURT:**  We've, we've got to resolve that so

21   everyone knows where they stand.

22        **MR. DAY:**  Yes.

23        **THE COURT:**  And I'll try to do it.  But I don't

24   want to take any time out of the morning; you need all your

25   time for trial presentation.

```
 1              MS. BEN-AMI:  Yes, your Honor.  And I'm a little
 2    concerned about the fact that we're starting half an hour
 3    later tomorrow, only because --
 4              THE COURT:  We're having a shorter recess.
 5              MS. BEN-AMI:  Okay.  Dr. Spinowitz is extremely
 6    observant and he cannot be here on Friday.
 7              THE COURT:  Well, we'll do the best we can.
 8              MS. BEN-AMI:  I'm hopeful that --
 9              THE COURT:  We'll have a shorter recess as I said.
10              MS. BEN-AMI:  Your Honor, can I just hand up what's
11    been previously submitted just so that, since we're talking
12    about it.
13              THE COURT:  You can.  And since there's so much
14    paper it's helpful.
15              Thank you very much, folks.  We'll see you 9:30
16    tomorrow morning.
17              THE CLERK:  I just printed it out for him.
18              THE COURT:  All right, we'll recess.
19              MS. BEN-AMI:  Thank you, your Honor.
20              THE CLERK:  All rise.  Court is in recesses.
21              (Adjournment.)
22
23
24
25
```

1          **C E R T I F I C A T E**

2

3

4          We, Donald E. Womack and Cheryl B. Palanchian,

5    Official Court Reporters for the United States District

6    Court for the District of Massachusetts, do hereby certify

7    that the foregoing pages are a true and accurate

8    transcription of our shorthand notes taken in the

9    aforementioned matter to the best of our skill and ability.

10

11

12

13

14          /S/ DONALD E. WOMACK
          _____

15          /S/ CHERYL B. PALANCHIAN
          _____

16
                   DONALD E. WOMACK
17               CHERYL B. PALANCHIAN
                 Official Court Reporters
18                  P.O. Box 51062
             Boston, Massachusetts 02205-1062
19               womack@megatran.com

20

21

22

23

24

25