1    UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF MASSACHUSETTS
2
                                   Civil Action
3                                  No. 05-12237-WGY

4    * * * * * * * * * * * * * * *  *
                                    *
5    AMGEN, INC.,                   *
                                    *
6            Plaintiff,             *
                                    *  **DAILY TRANSCRIPT**
7    v.                             *  **OF THE EVIDENCE**
                                    *   (Volume 7)
8    F. HOFFMANN-LA ROCHE LTD,      *
     ROCHE DIAGNOSTICS GmbH and     *
9    HOFFMANN-LA ROCHE, INC.,       *
                                    *
10           Defendants.            *
                                    *
11   * * * * * * * * * * * * * * *  *

12

13

14           BEFORE:  The Honorable William G. Young,
                      District Judge, and a Jury

15

16

17

18

19

20

21

22

23
                             1 Courthouse Way
24                           Boston, Massachusetts

25                           September 12, 2007

1           A P P E A R A N C E S

2

3           DUANE MORRIS LLP (By D. Dennis Allegretti,
      Esq. and Michael R. Gottfried, Esq.), 470 Atlantic
      Avenue, Suite 500, Boston, Massachusetts 02210

4               - and -
            DAY CASEBEER MADRID & BATCHELDER, LLP (By

5     Lloyd R. Day, Jr., Esq., David M. Madrid, Esq. and
      Robert M. Galvin, Esq.) 20300 Stevens Creek

6     Boulevard, Suite 400, Cupertino, California 95014
                - and -

7           McDERMOTT WILL & EMERY (By Michael Kendall,
      Esq.), 28 State Street, Boston, Massachusetts

8     02109
                - and -

9           McDERMOTT WILL & EMERY (By William G.
      Gaede, III, Esq.), 3150 Porter Drive, Palo Alto,

10    California 94304
                - and -

11          MARSHALL, GERSTEIN & BORUN LLP (By Kevin M.
      Flowers, Esq.), 6300 Sears Tower, 233 S. Wacker

12    Drive, Chicago, Illinois 60606-6402
                - and -

13          STUART L. WATT and WENDY A. WHITEFORD, Of
      Counsel, Amgen, Inc., One Amgen Center Drive,

14    Thousand Oaks, California 91320-1789, on behalf of
      the Plaintiff

15

16          BROMBERG & SUNSTEIN LLP (By Lee Carl
      Bromberg, Esq. and Julia Huston, Esq.), 125 Summer
      Street, Boston, Massachusetts 02110

17              - and -
            KAYE SCHOLER LLP (By Leora Ben-Ami, Thomas

18    F. Fleming, Esq., Patricia Carson, Esq.,
      Christopher Jagoe, Esq. and Howard Suh, Esq.),

19    425 Park Avenue, New York, New York 10022, on
      behalf of the Defendants

20

21

22

23

24

25

1            **I N D E X**

2

   **WITNESS:              DIRECT     CROSS     REDIRECT     RECROSS**

3

4   BRUCE SPINOWITZ, Resumed

5        By Mr. Madrid              843

6        By Mr. Fleming                        949

7   CAROLYN BERTOZZI

8        By Mr. Jagoe      987

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE CLERK:  All rise for the jury.

 2              (Whereupon the jury entered the courtroom.)

 3              THE CLERK:  Court is in session, please be seated.

 4              THE COURT:  Good morning, ladies and gentlemen.

 5              THE JURY:  Good morning.

 6              THE COURT:  Believe me, this is not by rote.  You

 7    are the people who set the tone here and we are all so

 8    appreciative.  It's good to see you.

 9              Would you remind the witness.

10              THE CLERK:  Sir, I remind you, you are still under

11    oath.

12              THE WITNESS:  Yes.

13              THE COURT:  And I do need to see counsel for one

14    moment.

15    SIDEBAR CONFERENCE, AS FOLLOWS:

16              THE COURT:  After the Court session yesterday

17    Ms. Smith said to Ms. Ben-Ami, this witness ought to start

18    answering questions in accordance with what the judge has

19    instructed, and Ms. Ben-Ami said to Ms. Smith could she tell

20    the witness.  Ms. Smith said yes.

21              I'm behind all that.  I just want you to know.

22              MR. MADRID:  Yes, sir.

23              THE COURT:  Because you told me what your

24    stipulation is.  I have no idea what happened beyond that.

25    But in fairness, that was a communication authorized by the
```

 1    Court with one of the parties, and you should know.

 2                **MR. MADRID:**  Yes, sir.  Thank you.

 3                **MR. FLEMING:**  Thank you, your Honor.

 4                (Whereupon the sidebar conference concluded.)

 5                **THE COURT:**  Proceed, Mr. Madrid.

 6                **MR. MADRID:**  Good morning, your Honor, thank you.

 7                Good morning, ladies and gentlemen.

 8                **THE JURY:**  Good morning.

 9                     BRUCE SPINOWITZ, Resumed

10                **CROSS-EXAMINATION** (Cont'd)

11    **BY  MR. MADRID**

12     **Q**   Good morning, Doctor.

13     A   Good morning.

14     **Q**   Doctor, when you were testifying yesterday you were able

15    to define the term for the jury erythropoiesis when asked by

16    Mr. Fleming.

17                Do you recall that?

18     A    Yes.

19     **Q**   And you gave a simple, direct and quick definition of

20    erythropoiesis, did you not?

21     A    I gave a definition.

22     **Q**   And what you said, and I'm quoting from the trial

23    transcript from yesterday, at Page 729, Lines 8 to 12.

24                Question:  Now, the jury's heard the term

25    erythropoiesis, they've heard the term erythropoietic or

1    erythropoietin.  What is erythropoiesis?

2          Answer:  Erythropoiesis is basically a term just to

3    tell you that red blood cell formation is occurring.

4

5          Do you recall that?

6    A    Yes.

7    **Q**    Now, 15 days ago when I took your deposition I asked you

8    the same question.  Do you recall that?

9    A    Perhaps but --

10   **Q**    And you gave me a different kind of answer.

11         **MR. MADRID:**  Your Honor, I request permission to

12   read from, to play a video from the Spinowitz deposition of

13   August 28th, 2007, at Page 76, Lines 22 to 77, Line 16.

14         **THE COURT:**  It seems to me he can do that.

15         **MR. FLEMING:**  Your Honor, I assume he's going to

16   present the witness a copy of the transcript so the witness

17   can review his testimony.

18         **THE COURT:**  I think that would be required, and

19   thank you.  But if he does that, the answer's yes.

20         Yes, you may, Mr. Madrid, with that qualification.

21         **MR. MADRID:**  Thank you, your Honor.

22         **MR. FLEMING:**  Your Honor, as a matter of procedure,

23   may we have a side bar just to discuss one issue quickly.

24         **THE COURT:**  Quickly.  But give the transcript --

25         **MR. MADRID:**  Yes, sir.

1          **THE COURT:**  -- to the witness.

2   SIDEBAR CONFERENCE, AS FOLLOWS:

3          **THE COURT:**  Yes?

4          **MR. FLEMING:**  We have transcripts of, videos of all

5   these witnesses by deposition, that's certainly not my

6   issue.

7          During the course of a deposition there may be

8   objections that you may or may not have ruled on yet.  There

9   may be some colloquy that the jury should not hear because

10  it's not appropriate for them.

11         **THE COURT:**  I don't think -- you're not playing

12  objections, are you?

13         **MR. MADRID:**  Yes, your Honor, I have -- the

14  objections are part of the colloquy.  And I would like the

15  Court to look at it, you can see if there's an issue with

16  it.  It's a very short segment I'm --

17         **THE COURT:**  How much is it?  I really don't want to

18  slow this down.

19         **MR. MADRID:**  Your Honor?

20         **THE COURT:**  What page is it?

21         **MR. MADRID:**  It's a page and-a-half.

22         **THE COURT:**  Where is it?

23         **MR. MADRID:**  I need to get the page number, sir.

24         **THE COURT:**  All right.

25         **MR. FLEMING:**  Well, your Honor --

1          (Pause in proceedings.)

2          **MR. MADRID:**  Your Honor, the page number is

3    Page 729 -- I'm sorry, Page 76, Line 22.

4          **THE COURT:**  Thank you.

5          **MR. MADRID:**  Turning over to Line 16.

6          **THE COURT:**  Yes, I'm going to allow that and I'm

7    going to say that this is perfectly appropriate to object.

8          **MR. FLEMING:**  In the future your Honor, because

9    the, and this is something innocuous and I understand your

10   ruling, but there may be contexts where it's not so

11   innocuous.

12         **THE COURT:**  I have to rule on what's before me.

13         **MR. FLEMING:**  I understand.

14         **THE COURT:**  If you can work it out -- of course

15   it's impeachment, but I'll work it out.

16         **MR. FLEMING:**  Thank you, your Honor.

17         (Whereupon the sidebar conference concluded.)

18         **THE COURT:**  We don't want to slow this down.  I'm

19   going to let this be played.  But when it's played you'll

20   see that it's Mr. Fleming who was there, he raises some

21   objections and then the answer goes right on.  That's just

22   the way a deposition is supposed to work because the

23   deposition isn't a trial.  First, it's perfectly appropriate

24   for the lawyer to object, just like I've said it's perfectly

25   appropriate for lawyers to object during trial.

1              Second, in order for the deposition to work,

2     because I'm not there, the witness has to answer anyway.

3     Now, in this case, I've allowed you to see what the

4     witness's answer was after the objection.  It's equivalent

5     to the fact that I overruled the objection.  But the truth

6     is, I didn't make any ruling, I wasn't there, and Mr.

7     Fleming doesn't have any particular objection today to your

8     seeing this portion.  If I have to sort out other things I

9     will, but that's not now.

10             So you're going to play a portion of the

11    deposition, brief portion, and you may do it.

12             (Whereupon a portion of the videotape deposition of

13    Bruce Spinowitz was played, as follows:)

14    **Q**   Can you explain to the jury what erythropoiesis is?

15    A    Again, in what context?

16    **Q**   As it occurs in the human body.

17    A    In what system?  In the human body, erythropoiesis --

18             **THE COURT:**  Well, this is -- stop it.  I mean, you

19    can play it, but I expect better production values.

20             **MR. MADRID:**  Yes, sir.  I apologize.

21             **THE COURT:**  You know, we've got to be able to hear

22    him.  And how he answered the question is appropriate, but

23    he's got, he has to be able to be heard giving the testimony

24    at the deposition because the testimony is like testimony at

25    trial.  The whole idea is so you can compare the two, it's

1   evidence, and see what you believe.  So that's too mumbly.

2   Whoever's our technical person, that's too mumbly.

3            Now, is it going to be better?

4            **MR. MADRID:**  Your Honor, what --

5            **THE COURT:**  What?

6            **MR. MADRID:**  May I read from the transcript

7   instead?

8            **THE COURT:**  Oh, fine.  Then let's take him down,

9   and you proceed to examine from the deposition transcript.

10           **MR. MADRID:**  Thank you, your Honor.

11           **MR. FLEMING:**  Your Honor, a point of clarity.

12  Since he's reading the question --

13           **THE COURT:**  We'll drop out the objection.

14           **MR. FLEMING:**  Thank you, your Honor.

15           **MR. MADRID:**  Question:  What is erythropoiesis?

16           Answer:  Erythropoiesis is the --

17           Answer:  So, perhaps if you can give a context of

18  what your question is referring to.

19           Question:  Can you explain to the jury what

20  erythropoiesis is?

21           Answer:  Again, in what context?

22           Question:  As it occurs in the human body.

23           Answer:  In what system?  In the human body,

24  erythropoiesis is the evidence of erythropoietic activity.

25           What is erythropoietic activity?

1        Answer:  Can you be more specific about that?

2        Question:  Sure.  You just used the term

3   erythropoietic activity.  So you tell the jury what you

4   meant by that term, please.

5        Answer:  Any evidence that there was erythropoiesis

6   going on.

7        Question:  What is evidence of erythropoiesis going

8   on?

9        Answer:  That would be very much situational.

10  Q    Now, Doctor --

11       **THE COURT:**  Just -- excuse me, Mr. Madrid.

12       Now, what Mr. Madrid read, because we're having

13  trouble with the video, what he read that the witness said,

14  it's evidence even though he read it.  And like I said, you

15  can compare it with what's said here at trial.

16       Go ahead, Mr. Madrid.

17  Q    Doctor, what did you do in the last 15 days to be able

18  to answer that question that I posed to you what is

19  erythropoiesis?

20  A    Nothing different.

21  Q    And when I asked you two weeks ago at your deposition

22  you couldn't tell me how much Roche's lawyers had paid you

23  to testify in this case.

24       Do you recall that?

25  A    Yes.  I couldn't give you an exact amount as I recall.

1        **MR. MADRID:**  Your Honor, I would like to read from

2    the transcript of Dr. Spinowitz, August 28th, 2007, Page 29,

3    Lines 24 to 30, Line 2.

4        **THE COURT:**  You may.

5        **MR. MADRID:**  Question --

6        **MR. FLEMING:**  Objection, your Honor.  There's no

7    basis for impeachment, and he hasn't shown --

8        **THE COURT:**  Overruled; he may read that.

9        **MR. FLEMING:**  Okay.

10       **THE WITNESS:**  Sir, what page is that?

11       **MR. MADRID:**  That is Page 29, sir.

12       What has been your total compensation?

13       Answer:  I can't recall at this time.

14   **Q**   Doctor, as you sit here today, are you able to tell the

15   jury how much money you've been paid for your work in this

16   case?

17       **MR. FLEMING:**  Objection, your Honor.  There are

18   other portions in the testimony; it mischaracterizes the --

19       **THE COURT:**  And you may -- well, that's right.  If

20   there's something that we need to know by completeness

21   before you ask that point me to it.

22       **MR. FLEMING:**  Your Honor, may I bring -- do you

23   want me to bring it up on redirect or go to side bar?

24       **THE COURT:**  I would prefer it, and of course you

25   may.

1          **MR. FLEMING:**  If you would prefer it, I will do

2     that, your Honor.

3          **THE COURT:**  Very well.  So, of course you have the

4     right to go into it now, his question is:  Do you know today

5     what they paid you?

6          **THE WITNESS:**  To date?

7          **THE COURT:**  To date.

8          **THE WITNESS:**  Yes, to date, again, it's in the

9     range of about 50 some odd thousand dollars.

10    Q    And, sir, isn't it true you never told me $50,000 at the

11    deposition?

12    A    I don't recall, and at the time I may not have

13    remembered an exact number.

14    Q    And isn't it true that you're paid at the rate of $500

15    an hour for your time?

16    A    That's in my expert report, yes.

17    Q    And it's true that you perform clinical trials for

18    Roche, do you not?

19    A    I did perform clinical trials for Roche.

20    Q    And you're currently engaged to perform clinical trials

21    for Roche?

22    A    Yes.  Yes.

23    Q    And as a result Roche pays subsidies to the corporations

24    that you're affiliated with, correct?

25    A    Those studies and the activities are subsidized and

1   there are pass-through payments.  It's a complicated budget.

2   But, yes, the studies and that work is subsidized by Roche.

3   **Q**   And you ultimately receive a portion of those subsidies,

4   do you not?

5   **A**   Some part of that goes to the corporation I work for and

6   obviously that is part of the gross sums that are utilized

7   to make payments to the associates, and I'm one of those

8   associates.

9   **Q**   So you receive a portion of those subsidies as paid to

10  your corporation by Roche, correct?

11  **A**   Some portion of that subsidy for the studies does come

12  to me.

13  **Q**   That's a yes, right?

14  **A**   Yes.

15  **Q**   Now, Doctor, yesterday we were discussing the claim term

16  in the '422, and I would like to direct your attention back

17  to '422 claim 1.

18          Do you understand?

19  **A**   Sure.

20  **Q**   If we could have projected on the screen '422 claim 1.

21  And if we could highlight the language purified from

22  mammalian cells grown in culture.

23          Do you see that?

24  **A**   Yes.

25  **Q**   Do you recall that we discussed that subject yesterday?

1    A    Yes.

2    Q    Now, yesterday you explained portions of the glossary

3    which has been, which has the judge's definitions of various

4    claim terms in the case.

5    A    Correct.

6    Q    Now, I would like to have the glossary projected,

7    please.

8              And I noticed in your testimony yesterday that you

9    didn't discuss the second point that's on this glossary

10   here, the one that has in bold purified from mammalian cells

11   grown in culture.

12             Do you see that?

13   A    Yes.

14             **MR. FLEMING:**   Objection; mischaracterizes his

15   testimony, your Honor.

16             **THE COURT:**   Overruled; he may have it.

17   A    Can you repeat the question, sir?

18   Q    Yesterday --

19   A    Yes.

20   Q    -- you did not, you did not discuss with the jury with

21   reference to this glossary the second entry that starts with

22   the bolded language purified from mammalian cells grown in

23   culture; yes or no?

24   A    I don't specifically recall whether we did it or not.

25   Q    Now, you notice that what's been highlighted there is

1   the language which had been grown in the in vitro culture.

2         Do you see that?

3   A   Yes.

4   Q   Cells grown in culture means grown in vitro, true?

5   A   Yes.

6   Q   And cells grown in vitro means cells which are grown in

7   the laboratory, right?

8   A   Outside of the body.

9   Q   Cells that are grown in the laboratory?

10  A   They may be.  That is one of the places that they may be

11  grown.

12  Q   But the cells are not grown inside the body?

13  A   That's correct.

14  Q   Okay.  And the term in vitro literally means in glass,

15  doesn't it?

16  A   I must say I know that it's outside of the body, but I'm

17  not sure of the Latin derivation.

18  Q   So that could include grown in a test tube, correct?

19  A   With the presumption that vitro refers to glass, I would

20  acknowledge that a test tube could be glass, could be

21  plastic.

22  Q   It would be outside the body, though, certainly, right?

23  A   Yes.

24  Q   Cells grown in a Petri dish would be outside the body?

25  A   Yes.

1    Q    Cells grown in a flask would be outside the body?

2    A    Yes.

3    Q    Cells grown in a bottle would be outside the body?

4    A    Yes.

5    Q    Now, I want to direct your attention back to the

6    three-patient urinary EPO experiment that we discussed

7    yesterday.  Do you recall?

8    A    Yes.

9    Q    And I would like to ask you some questions about the

10   material that was given to the three patients.

11          Do you understand?

12   A    Yes.

13   Q    I'm going to have projected the '422 claim language,

14   please.

15          Now, when I ask you these questions I want you to

16   have in mind the limitation in the claim purified from

17   mammalian cells grown in culture.  Is that clear?

18   A    Yes.

19   Q    Now, the urinary EPO in Dr. Goldwasser's preparation was

20   produced by kidney cells?

21   A    Mammalian kidney cells, yes.

22   Q    And these kidney cells were in the kidneys of human

23   beings who made the urine?

24   A    Yes.

25   Q    And these kidney cells were not growing in a laboratory?

1    A    No, they were not.

2    Q    They were in the body of the aplastic anemia patients in

3    Kumamato City, Japan, from where the urine was acquired,

4    correct?

5    A    I would say correct to the Japan part.  I'm not sure of

6    the city.

7    Q    You reviewed the Goldwasser-Miyake publication in

8    arriving at your opinions, correct?

9    A    Yes.  But I don't recall the city.

10   Q    Now, these kidney cells that produced the urinary EPO

11   were not grown in vitro, were they?

12   A    No.

13   Q    They were grown inside the bodies of the patients?

14   A    Yes.

15   Q    So the urinary EPO was not purified from mammalian cells

16   in culture, correct?

17   A    It was purified from mammalian cells.

18   Q    I'm sorry, that was not my question.

19        The urinary EPO was not purified from mammalian

20   cells in culture; yes or no?

21   A    No.

22   Q    You offer no opinion as to any material in the prior art

23   that came from cells grown in culture, do you?

24        MR. FLEMING:  Objection; mischaracterizes his

25   testimony, your Honor.

1      **THE COURT:**  Well, you know, I'll let him answer the

2   question.  It's sufficiently open-ended.

3   A   Yes.  Well, I believe -- I know I expressed an opinion

4   in my expert reports that as a physician, as a clinician, as

5   a clinical investigator --

6      **MR. MADRID:**  Objection, your Honor; this is

7   nonresponsive.  My question is as to the trial testimony.

8      **THE COURT:**  All right.  As limited, that's fine.

9   So now he may -- whether he changed it or not, he's asking

10  you about your trial testimony.

11     As we have heard in this trial, do you recall

12  expressing such an opinion?

13     **THE WITNESS:**  A lot went on yesterday, I'm sure,

14  your Honor.  And I'm trying to remember whether I touched

15  upon that, which I was about to say, I don't want to

16  mischaracterize my testimony, certainly.

17     **THE COURT:**  So you're not clear?

18     **THE WITNESS:**  I would have to say I can't recall

19  whether I touched upon that yesterday.  I do know I did deal

20  with that in my expert reports.

21  Q   Now, Doctor, yesterday you offered opinions based on the

22  Essers studies.  Do you recall that?

23  A   Yes.

24  Q   And Dr. Essers gave human plasma to her test subjects,

25  correct?

1    A    Well, let me just -- I'm going to say no.

2    Q    Dr. Essers gave EPO-rich plasma to her test subjects,

3    correct?

4    A    Yes.

5    Q    And the EPO-rich plasma was plasma obtained from other

6    patients, correct?

7    A    No.

8    Q    Doctor, the product that Dr. Essers gave to patients in

9    her experiment was a blood product; yes or no?

10   A    That -- I can't answer it as stated.  I don't think it

11   would be scientifically correct.

12   Q    And Dr. Essers -- I'm sorry.

13         Dr. Essers gave human plasma to her test subjects

14   because EPO was not available in a quantity in purity

15   required for therapeutic use, correct?

16         **MR. FLEMING:**  Objection, your Honor; foundation,

17   assumes facts not in evidence.

18         **THE COURT:**  Overruled.

19   A    No, that's not why she did that.

20   Q    Let's go to Exhibit 2051.  This is the Essers 1973

21   publication.  Can we have that projected, please.

22         I would like --

23   A    I'm sorry, you said this was in '73?

24   Q    1973 publication.

25   A    Yes.

1    Q    I would like to look at the top of the page, first line,

2    first paragraph.

3              MR. FLEMING:  Object, your Honor.  Could the

4    witness have a copy of the document in front of him.

5              THE COURT:  I think that's fair.

6              THE WITNESS:  I can't find it, your Honor.

7              THE COURT:  Well, they should help you.

8              THE WITNESS:  Okay.

9              THE COURT:  Where is it?  Show him.

10             MR. MADRID:  We're bringing it out, your Honor.

11             THE COURT:  Okay, fine.

12             MR. MADRID:  I apologize for the delay.

13             THE COURT:  And that's true generally when you want

14   to examine about the documents, let's show the witness so he

15   knows what you're talking about.

16   Q    I hand you Exhibit 2051.

17             MR. MADRID:  May we have 2051 projected, please.

18   Q    And we're looking at the top of the page, first line,

19   first paragraph.

20             Do you see the statement:  Erythropoietin is

21   currently not available commercially in the quantity and --

22             MR. FLEMING:  I'm sorry, I need you to give me a

23   copy.

24   Q    Erythropoietin is currently available in the quantity --

25   I'm sorry, let me start again.  Erythropoietin is currently

```
 1    not available commercially in the quantity and purity

 2    required for therapeutic use.

 3              Do you see that statement?

 4    A    Yes, I do.  Under the methods, yes.

 5    Q    Do you agree with that statement?

 6    A    It's stated.  I can't argue with that.

 7    Q    So, it's true, isn't it, sir, Dr. Essers gave human

 8    plasma to her test subjects because EPO was not available in

 9    the quantity and purity required for therapeutic use?

10    A    This is a method section.  Rationale, which goes to the

11    why, I think is better addressed in the paragraphs that

12    precede that.

13    Q    Doctor?

14    A    And I understood your question to be a rationale

15    question.

16    Q    Doctor?

17    A    The reason why she gave it.

18    Q    You agree with me that Dr. Essers is stating here to the

19    scientific community her belief that erythropoietin is

20    currently not available commercially in the quantity and

21    purity required for therapeutic use?

22    A    That's a statement of fact.

23    Q    And you don't disagree with that statement?

24    A    No, I do not.

25    Q    Now, the EPO in the plasma that Dr. Essers used was made
```

1   in the kidneys of human beings; yes or no?

2   A   Yes.  Essers.  I'm sorry.

3   Q   Yes.

4   A   I was just taking a moment.  You're still talking about

5   Essers?

6   Q   That's correct.  Thank you.

7           And the EPO in the plasma did not come from cells

8   grown in culture?

9   A   That's correct.

10  Q   So Dr. Essers' experiments did not use EPO from cells

11  grown in culture?

12  A   That's correct.

13  Q   Dr. Essers did not use recombinant human EPO?

14  A   No, she didn't.

15  Q   And the same is true for the plasma that Dr. Eschbach

16  used in his single-patient study; isn't that correct?

17  A   That's correct.

18  Q   In that study Dr. Eschbach used plasma for his patient,

19  correct?

20  A   Again, EPO-enriched plasma.

21  Q   Now, Dr. Eschbach's single-patient experiment did not

22  use EPO from cells grown in culture?

23  A   That's correct.

24  Q   And the same is true for sheep plasma that Dr. Eschbach

25  used in his sheep studies, correct?

1    A    That was sheep erythropoietin enriched plasma, yes.

2    Q    And yesterday you talked about a sheep study that Dr.

3    Eschbach conducted.

4            Do you recall that?

5    A    Discussed a number of those --

6    Q    Okay.

7    A    -- Dr. Eschbach studies.

8    Q    And one of them was a study with sheep?

9    A    That's, that's correct.  Sheep with renal failure.

10   Q    Sheep who had been surgically induced to have renal

11   insufficiency, correct?

12   A    That's the method of that model.

13   Q    They did not have human chronic renal failure, correct?

14   A    Well, they're sheep first of all.

15   Q    That's right.

16   A    And the fact of the matter is that patients with chronic

17   renal failure sometimes also have a surgical procedure and

18   unfortunately dialyze some people who have had two kidneys

19   removed because of cancer who are on dialysis.  So, the

20   model is one representative, the sheep model surgically

21   created is representative of patients, some of whom have

22   that type of kidney failure.

23   Q    But at most it's representative, right?

24   A    All patients with chronic renal failure fit into a

25   number of categories and that is one of the categories of

1    chronic renal failure, they go through the same five stages

2    perhaps as they may be having their kidneys removed, some of

3    them, because kidneys are removed, one and-a-half kidneys

4    are removed, progress to chronic renal failure stage 5

5    requiring dialysis.  It certainly is a model that's

6    indicative of the human form of chronic renal failure.

7    **Q**    So let's be clear, Doctor.   What Dr. Eschbach was doing

8    in the sheep studies was that he was taking plasma from one

9    group of sheep and giving it to another group of sheep; yes

10   or no?

11   A    Yes, that was plasma that had been enriched with sheep

12   erythropoietin.

13   **Q**    And the plasma was sheep plasma?

14   A    Yes.

15   **Q**    And the plasma did not contain any human erythropoietin;

16   yes or no?

17   A    No, that contained sheep erythropoietin.

18   **Q**    Now, the EPO in the sheep plasma was not grown from

19   cells in culture?

20   A    No, it was not.

21   **Q**    None of the prior art references upon which you gave

22   your opinion testimony yesterday, the Goldwasser study, the

23   Eschbach single-patient study, the Essers study, the sheep

24   study, none of the prior art involves EPO produced in cells

25   grown in culture, correct?

1    A    Correct.

2    Q    You have not offered a single opinion as to any prior

3    art which possesses the element in the '422 claim purified

4    from mammalian cells in culture; yes or no?

5         **MR. FLEMING:**  Objection; mischaracterizes his

6    testimony, your Honor.

7         **THE COURT:**  No, overruled.  We'll see what he says.

8    A    Again, I'm not recalling every moment of yesterday's

9    testimony.  Certainly my expert opinion, I dealt with how I

10   approached, with my understanding of the law, based on my

11   understanding as a clinical nephrologist, one skilled in the

12   art at the period of time '83, '84, how I approached the

13   claim 1 of '422 that you displayed all of those elements.

14   Q    You have not answered my question.

15   A    I'm sorry.

16   Q    Let me ask it --

17   A    Ask it again.

18   Q    Let me ask it to you again.

19        I want you to have in mind the four pieces of prior

20   art that you told the jury about yesterday.  First, the

21   Goldwasser three-patient experiment; second, the Essers

22   plasma experiment; third, the Eschbach plasma experiment;

23   fourth, the Eschbach sheep plasma experiment.  I want you to

24   have those four pieces of prior art in mind when I ask this

25   question.

1          You have not offered a single, this trial, before

2     this jury, you've not offered a single opinion as to any

3     prior art which possesses the element of claim 1 of '422

4     purified from mammalian cells in culture.  Yes or no?

5          **MR. FLEMING:**  Again, objection, your Honor;

6     mischaracterizes his testimony, and I can explain.

7          **THE COURT:**  Overruled; he may press the point.

8     A    No.

9     **Q**    So your opinion as to '422 claim 1 is not based on the

10    whole claim addressing all of its elements, including the

11    element of purified from mammalian cells in culture?

12    A    That's not true.  My opinion is again expressed in the

13    expert report, and I do have an opinion about the whole

14    claim 1 of '422.

15    **Q**    Doctor, you did not present to this jury a single

16    example in the prior art of erythropoietin produced from

17    mammalian cells grown in culture; yes or no?

18    A    No.

19    **Q**    Your position essentially comes --

20         **THE COURT:**  Well, I'm finding it hard -- your

21    questions are fine.  His questions are you did not do

22    something, yes or no, and you say no, from which I'm

23    assuming that you mean you disagree with him and you did do

24    that.

25         Am I mistaken?

1              THE WITNESS:  I may have lost the double

2     negative --

3              THE COURT:  Yes.

4              THE WITNESS:  -- Judge, though.

5              THE COURT:  So you're agreeing you didn't do that?

6              THE WITNESS:  Yes.  Yesterday.

7              THE COURT:  Yesterday.  Fine.  Thank you.

8              MR. MADRID:  Thank you for the clarification.

9              THE COURT:  No, no problem with the question.  I'm

10    just trying to follow.

11             THE WITNESS:  Thank you.

12    Q    Doctor, you ignore the in culture limitation of the '422

13    claim 1 claim at issue in this case?

14    A    No.

15    Q    Now, I would like to direct your attention now to the

16    '933 patent.

17    A    Yes.

18    Q    Yesterday you gave some testimony with respect to '933

19    claim 3.  Do you recall that?

20    A    Yes.  As a dependent claim.

21    Q    Now, let's take a look at the '933 claim, claim 3.  '933

22    claim 3 states a non-naturally occurring glycoprotein

23    product of the expression in a mammalian host cell of an

24    exogenous DNA sequence comprising a DNA sequence encoding

25    human erythropoietin, said product possessing the in vivo

1    biological property causing bone marrow cells to increase

2    production of reticulocytes and red blood cells.  And the

3    portion that I want to focus your attention on is the

4    portion that's highlighted.

5         Now, Doctor, there was a glossary definition for

6    this language as well, the language that's highlighted there

7    in yellow.  Correct?

8    A    Yes.

9    Q    Can we take a look at the glossary, please.

10        And in the glossary we have defined the term a

11   non-naturally occurring glycoprotein product of the

12   expression in a mammalian host cell of an exogenous DNA

13   sequence comprising a DNA sequence encoding human

14   erythropoietin.

15        Do you see that?

16   A    Yes.

17   Q    Now, yesterday you did not discuss the definition for a

18   nonnaturally-occurring EPO glycoprotein product of the

19   expression in a mammalian host cell of an exogenous DNA

20   sequence, did you?

21   A    Not that I can recall.

22   Q    Now, the definition of the term that I just read to you,

23   the definition states a glycoprotein, open paren, not

24   occurring in nature, close paren, that is the product of

25   expression in a mammalian host cell of a DNA sequence that

1    does not originate in the genome of the host.

2            Do you see that language?

3            **MR. FLEMING:**  Objection, your Honor;

4    mischaracterizes his testimony.  Can I request a side bar

5    for a brief second, please.

6            **THE COURT:**  I think that would be helpful.

7    SIDEBAR CONFERENCE, AS FOLLOWS:

8            **THE COURT:**  I'm more confused about this one.  I'll

9    hear you.

10           **MR. FLEMING:**  Ms. Ben-Ami will be speaking to you,

11   your Honor.

12           **THE COURT:**  Yes.

13           **MS. BEN-AMI:**  Your Honor, the '933 patent is a

14   product-by-process claim.  As your Honor has held it

15   therefore is limited to the product, not process steps.  It

16   isn't anticipated by any identical product.  We have filed

17   motion after motion asking for instructions on this because

18   this is error of law to suggest that you can only anticipate

19   or render obvious a product-by-process claim if you use the

20   same process.  The Scripps v. Genentech case of the Federal

21   Circuit quite clearly, emphatically states that if you've

22   got a product-by-process claim and it's, the product is in

23   the prior art made by a different process, it still

24   anticipates.

25           What is going on here, and I've tried to raise this

1   with your Honor a few times now, is that the witness is

2   being asked an improper analysis.

3         THE COURT:  All right.  What do you say to that?

4         MR. MADRID:  Your Honor, the limitation here is a

5   source limitation.  And the question is if a product is new,

6   that is, if it differs in structure, then the source

7   limitation is perfectly acceptable, perfectly enforceable

8   with respect to prior art as well as with respect to

9   infringement.

10        In this case, we will show, and this is, this is of

11  record, that there are differences between prior art and the

12  claimed invention.  Therefore, the source limitation is

13  perfectly part of the claim as far as distinguishing prior

14  art.

15        THE COURT:  Yes, but, but that depends on it being

16  a new product what you just said.  If it wasn't a new

17  product because it was anticipated by this other product,

18  she's right, isn't she?  I mean, the factual dispute here is

19  whether it's a new product.

20        MR. MADRID:  I will --

21        THE COURT:  If it's a new product then source of

22  limitation is part of it.  If it's the same product, she's

23  right then.  She says we don't care by what process it

24  originates.  Correct?

25        MR. MADRID:  I will say -- I disagree slightly.  I

 1    will say this, your Honor.  The principle that one cannot

 2    patent an old product by a different process is true.

 3              THE COURT:  Yes.

 4         MR. MADRID:  That principle is true.

 5              THE COURT:  Okay.

 6         MR. MADRID:  But that is not the case here.

 7    That's -- the operative principle here is is this a new

 8    product.

 9              THE COURT:  I --

10         MR. MADRID:  And this is very much an issue in the

11    case.

12              THE COURT:  This legal dispute and the factual

13    underpinnings are very much an issue in the case, which if I

14    have not earlier appreciated them, now I appreciate them.

15              I'm going to let the testimony come in.  We'll see

16    how it sorts out.

17         MS. BEN-AMI:  Can I just say one final thing?

18              THE COURT:  Yes.

19         MS. BEN-AMI:  Mr. Madrid is confusing the '422

20    patent versus the '933 patent.  The '422 patent is the one

21    your Honor ruled that there might be a source of limitation

22    that imparted structure.

23              THE COURT:  But I haven't ruled as to '933.

24         MS. BEN-AMI:  '933 by definition in the file

25    history.  And, your Honor, it's a product-by-process claim.

1    It's a pure product-by-process claim.  There's no source

2    limitation.

3          **THE COURT:**  I agree with the first part of it.  I'm

4    not so sure I agree with the legal implications.  Because I

5    -- I see.  In a jury case a factual issue as to whether it's

6    the same process.  Strike that.  The same product.

7          **MS. BEN-AMI:**  Yes.  Yes.

8          **THE COURT:**  And so, actually this is a helpful, a

9    helpful side bar.

10          Here's what I think.  At present, not being bound

11    to it, the law is as to this on the '933 patent.  The jury

12    is going to have to resolve whether the prior art, which I

13    have let in, all right, the so-called prior art, is in fact

14    the same product.  If it is, the source limitation won't

15    save them.  If it's not, the source limitation is part of

16    the limitation and he hasn't -- for one thing, he only said

17    that '422 is anticipated.  So as to this, it's obvious.  So,

18    the role that the source limitation is going to play is

19    going to depend factually on whether the prior art product

20    is the same as the product-by-process.  I shouldn't even say

21    the same.  Renders the product-by-process obvious.

22          My trial management approach is to let this

23    evidence in.  If have I to strike things, I will.  If I

24    resolve things by directed verdict, I will.

25          That's what I'm thinking as I listen to the

1    questions.

2           **MS. BEN-AMI:**  Your Honor, I ask for a standing

3    objection on this as matter of law.

4           **THE COURT:**  I think that's, I think that's fair.

5           **MR. MADRID:**  Understood.

6           **THE COURT:**  And you object to it and you have a

7    standing objection.

8           **MS. BEN-AMI:**  And at some point we would like a

9    charge on product claim to the jury which we have not done

10   yet.

11          **THE COURT:**  We haven't done it yet and we're going

12   to have to do it.  It's now more clear than ever I'm going

13   to have to do it.  But I think it might be confusing at this

14   stage, candidly.

15          **MR. FLEMING:**  Your Honor?

16          **THE COURT:**  Yes.  I'll hear you.

17          **MR. FLEMING:**  One person.  I apologize.

18          **THE COURT:**  Yes.  I know you want this now.  I'm

19   not giving it now.

20          **MS. BEN-AMI:**  Okay, thank you, your Honor.

21          (Whereupon the sidebar conference concluded.)

22          **THE COURT:**  Proceed, Mr. Madrid.

23          **MR. MADRID:**  Thank you, your Honor.

24   **Q**   Now, if we could have the claim language.

25          Okay.  So we have the claim language on the top of

1    the screen here.  We have the glossary definition of the

2    claim language below it.

3              And I want to ask you some questions with respect

4    to that definition of the claim element that we're talking

5    about.

6              Do you understand, sir?

7    A    Yes.

8    Q    Thank you.

9              Now, first of all, when we read through the

10   definition, what we see is the language a glycoprotein not

11   occurring in nature that is the product of the expression,

12   and then there's a footnote.  Can we see the footnote,

13   please.

14             And in the footnote, wherein expression means the

15   glycoprotein is produced in a cell and recovered from the

16   cell culture.

17             Do you see that language?

18   A    Yes.

19   Q    So, you would agree with me that with respect to the

20   Goldwasser material, the Goldwasser urinary EPO preparation,

21   that material was not recovered from cell culture?

22   A    Yes, that erythropoietin not occurring in nature,

23   however, was not obtained from and recovered from cell

24   culture.

25   Q    And you would agree with me, sir, that with respect to

1    the plasma that Dr. Essers used in her experiment that

2    material was not recovered from cell culture?

3    A    Again not occurring in nature as is, but certainly not

4    recovered from cell culture.

5    Q    And you would agree with me, sir, that with respect to

6    the Eschbach single-patient study where he gave that single

7    patient human plasma, that human plasma was not recovered

8    from cell culture; yes or no?

9    A    Again, not occurring in nature as given but not

10   recovered from cell culture.

11   Q    And also the same is true for the sheep plasma

12   experiment where the sheep plasma was given to sheep, that

13   sheep plasma was not recovered from cell culture.  True?

14   A    That's correct.

15   Q    So you would agree with me that the term expression as

16   used in this claim does not apply to any of the prior art

17   that you opined on to the jury yesterday, correct?

18   A    Expressed in mammalian host cell but not fulfilling this

19   whole definition.

20   Q    Now, let's move on in terms of the definition.  The

21   definition goes on and it talks about in a mammalian host

22   cell of a DNA sequence that does not originate in the genome

23   of the host and which contains the genetic instructions for

24   the DNA sequence encoding human erythropoietin.

25            Do you see that language?

1    A    Yes.

2    Q    You would agree with me that with respect to all four of

3    the prior art references that you based your opinions on and

4    you told the jury about yesterday that none of those

5    references involve an exogenous DNA sequence that encodes

6    human erythropoietin?

7    A    The erythropoietin that was used was encoded by that

8    DNA, by a DNA sequence but not fulfilling the entire

9    definition.

10   Q    And it doesn't fulfill the entire definition because it

11   doesn't fulfill the term exogenous, right?

12   A    That's correct.

13   Q    Because exogenous means from outside, correct?

14   A    Yes.

15   Q    And the DNA sequence that was used in the context of

16   those references, the urinary EPO reference, plasma

17   references, that was endogenous, that is, inside, correct?

18   A    Correct.

19   Q    So, Doctor, in your trial testimony yesterday you

20   offered no opinion as to any prior art which possesses the

21   element an exogenous DNA sequence, correct?

22   A    Again, I don't recall everything we went through.  There

23   certainly was an opinion in my expert report dealing with

24   the entirety of that claim and specifically with respect to

25   the claim --

1   Q    I'm sorry, Doctor, we're talking about your trial

2   testimony yesterday.  Your trial testimony.

3   A    My trial testimony yesterday dealt with the prior art in

4   terms of invalidity or obviousness, and I think I dealt with

5   that, and these claims, including this one, in the context

6   of that testimony.

7   Q    But you didn't tell the jury yesterday that all of the

8   prior art references that you suggest rendered Dr. Lin's

9   inventions invalid are missing the limitation an exogenous

10  DNA sequence --

11       **MR. FLEMING:**  Objection.

12  Q    -- correct?

13       **MR. FLEMING:**  Mischaracterizes the record and the

14  testimony.

15  A    No.  Well, again, I'm not sure about the --

16       **THE COURT:**  Well, in view of that answer -- he says

17  no.  He disagrees with that.  So I'll let that stand.

18  Q    Doctor, you're not saying that the urinary

19  erythropoietin that was created by the cells in the kidneys,

20  other bodies, other patients in Japan, was created as a

21  result of the insertion of an exogenous EPO DNA sequence,

22  are you?

23  A    No, I'm not.

24  Q    And you're not saying that for any of the plasma prior

25  art references, either?

1    A    That's correct.

2    Q    Now, I want to return to a subject that we started

3    yesterday.

4         To your knowledge, sir, none of the investigators

5    involved in the three-patient urinary EPO study in this

6    experiment ever published in the medical literature any of

7    the data regarding hematocrit?

8    A    No.

9    Q    And to your knowledge none of the investigators involved

10   in the three-patient experiment ever published in the

11   medical literature any patient data regarding red cells?

12   A    No.

13   Q    And none of them ever published in the medical

14   literature any patient data regarding reticulocytes?

15   A    Not to my knowledge, no.

16   Q    Or ferrokinetics?

17   A    No.

18   Q    Or nucleated red cells?

19        **MR. FLEMING:**  Objection, your Honor.  I don't

20   know -- it's vague, as to specific reference of data.

21        **THE COURT:**  Well, you may examine.  Overruled.

22   Q    In fact, none of the data from the three-patient urinary

23   EPO experiment was ever published in any scientific journal

24   anywhere?

25   A    I don't know whether any summary data ever appeared or

1    in historical data reviewing the history of erythropoietin.

2    None that I can recall.

3    **Q**    Well, you testified --

4    A    Restricted now to medical publications.

5    **Q**    You testified yesterday that in arriving at your

6    opinions with respect to the three-patient study you based

7    that on your review of the materials given to you by Roche?

8    A    Yes, that's correct.

9    **Q**    In all of those materials that Roche gave you, Roche's

10   lawyers, did they give you a single scientific publication

11   that discloses any of the patient data regarding the

12   three-patient study?

13   A    No.

14   Q    Did you ask for one?

15   A    We had a fair number of conversations.  I don't remember

16   whether I specifically asked for that.

17   Q    Did you look on PubMed or any computer database to see

18   if you could find them?

19   A    No, I didn't.

20   **Q**    Now, you're aware that Dr. Katz was one of the

21   investigators in the study?

22   A    Yes.

23   **Q**    And did you ask to see if Dr. Katz gave any testimony in

24   this case?

25   A    I don't recall whether I saw testimony to that effect.

1    **Q**   I looked at your expert reports and in the materials

2    considered section I noticed that you didn't disclose that

3    you had seen Dr. Katz's deposition.

4    **A**   I said sitting here now, I don't recall whether I did or

5    did not see anything about that testimony.

6    **Q**   So you don't know if Roche's lawyers ever showed you the

7    deposition testimony of Dr. Katz?

8    **A**   A lot of documents were shown to me.  They may very well

9    have.  I just can't remember that sitting here now.

10    **Q**   Doctor, I would like to hand you Exhibit FWC.  This is

11    the March 30, 2007 deposition of Adrian Katz.

12            **MR. FLEMING:**  Your Honor, objection.

13            **THE COURT:**  Well, he hasn't done anything yet.

14            **MR. FLEMING:**  Well.

15            **THE COURT:**  He's just shown him a document.  Now,

16    let's go question by question.

17    **Q**   Doctor, I direct your attention to Page 102, Lines 8 to

18    22.

19    **A**   Yes.

20            **MR. MADRID:**  Your Honor?

21            **THE COURT:**  Yes.

22            **MR. MADRID:**  May I have permission to read from the

23    deposition pursuant to Rule 705?

24            **MR. FLEMING:**  Objection, your Honor.

25            **THE COURT:**  No, sustained.

```
 1              MR. MADRID:  Your Honor, may I have a side bar,

 2    please?

 3              THE COURT:  Well, let's see.  Have you ever seen

 4    this?

 5              THE WITNESS:  Judge, I don't think so.

 6              THE COURT:  Well, take a look at it.

 7              THE WITNESS:  Oh.  Sure.  All of it or the specific

 8    Line 8 and --

 9              THE COURT:  Well, let's see if Line 8 on this

10    page --

11              THE WITNESS:  Okay.  Sure.

12              THE COURT:  -- refreshes your memory.

13              THE WITNESS:  It's, it's not jogging my memory.

14              THE COURT:  All right.  So --

15              THE WITNESS:  As I sit, as I sit here now, Judge, I

16    cannot recall.

17              THE COURT:  Sustained.

18              MR. MADRID:  Your Honor, may I have a side bar,

19    please?

20              THE COURT:  You may.

21    SIDEBAR CONFERENCE, AS FOLLOWS:

22              MR. MADRID:  Your Honor, under Rule 705, I'm

23    permitted to explore the bases of this witness's testimony.

24    This witness has based all of his knowledge on the basis of

25    hearsay.  I'm entitled to confront him with other statements
```

1    to show that he did not consider those and ask whether or

2    not that affected his opinion.

3           THE COURT:  Only the last part of what you said

4    is -- generally what you say is right, but your procedure is

5    wrong.  You're not going to get before this jury statements

6    in depositions unless you admit them.  But you certainly can

7    say as a question, as a question now, did you consider that

8    some people think thus and so.  And I will trash that by

9    saying, now, understand that's just a question, it's not

10   evidence of anything.  And you can -- and you may have this

11   and look at it, and you may say did you understand that some

12   doctors say if you have inconclusive results, et cetera, et

13   cetera, did you consider that, and we'll see where we go.

14   But I will caution them those are your questions.  You may

15   not -- that's the line.

16          MR. MADRID:  Thank you, your Honor.

17          MR. FLEMING:  Your Honor, just for the appearance

18   of what's going on, would you instruct Mr. Madrid that he's

19   not to be standing there with the transcript in front of the

20   jury.

21          THE COURT:  No, he may stand there with the

22   transcript and read from it.  And I will trash it

23   appropriately.  That's the balance.

24          (Whereupon the sidebar conference concluded.)

25          THE COURT:  Now, what's this all about?  He's been

1    shown a document.  He looks at it and he says I never saw

2    this document, or at least I don't remember seeing it.  And

3    on this expert report that we've made so much of, he's

4    supposed to list all the things that he looked at and he

5    didn't list this.  So that's some evidence that he never did

6    look at this.

7          All right.  Now, this isn't evidence of anything.

8    We haven't heard from this fellow, whoever he is, and --oh,

9    no, I can read it.

10         **THE WITNESS:**  Sorry, Judge.

11         **THE COURT:**  But since you tell me, all right, we

12   haven't heard from this Katz.  And we don't theoretically

13   know what this is.  He referred to it.  And he may ask

14   questions saying, now, did you know this, to this witness.

15   Did you know that, to this witness.

16         My caution is this.  Whatever this is, it isn't in

17   evidence.  Whoever this Katz is, we don't know, today.

18   Mr. Madrid gets a chance to cross-examine this witness

19   suggesting things.  That's appropriate.  He can say:  What

20   do you think about this red hat?  Well, that wouldn't work

21   that way.

22         But that's my idea.  He may cross-examine the

23   witness.  His questions are not evidence of anything, that

24   Katz said this or that or thinks this or that or whatever.

25   But they are appropriate questions.

1          What we're interested in is what this witness, who

2     you can look at, who you're hearing examined, who Mr.

3     Fleming can ask other questions of, what does he say about

4     matters.

5          So with that approach, go ahead, Mr. Madrid.

6  BY  MR. MADRID

7  Q   Now, Dr. Spinowitz, in reaching your opinions and

8     considering the information that was provided to you by the

9     Roche lawyers, did you consider any information in which the

10    doctor said, "If you have inconclusive results, the

11    literature is not waiting for you to publish your lack of

12    conclusions, so there was -- and there were four seasoned

13    people that were not going to think it's publishable when it

14    isn't."

15         Did you ever consider something like that?

16  A   No.

17         MR. FLEMING:  Objection to this.

18         THE COURT:  No.  I'm going to sustain that in this

19    context.  That's so vague it's not to be helpful.

20  Q   Doctor, did you ever consider the opinions of

21    individuals who thought that the three-patient experiment

22    and the results from the experiments were inconclusive?

23  A   I considered the opinions of Drs. Baron and Goldwasser

24    who were closest to that data.  I considered my own opinion,

25    my own review of the documents.  I considered the weight

1    that Amgen in their IND gave to the prior art, they

2    mentioned all those prior art.  Those are the kinds of

3    things that I considered from a perspective of 1983, '84 in

4    reviewing those prior art references.

5    Q    Now, Doctor, you mentioned that you considered

6    Dr. Goldwasser's views in your testimony, correct?

7    A    I considered Dr. Goldwasser's, what I considered was his

8    grant applications, yes.

9    Q    I would like to hand you what is Exhibit FUR.  This is

10   the deposition of Eugene Goldwasser.  This deposition was

11   taken on February 26th, 2007.

12        **MR. FLEMING:**  Your Honor, objection to this

13   document on the same basis.

14        **THE COURT:**  I have the issue in mind, but so far he

15   hasn't done anything with it.

16   Q    Now, Doctor, I would like to direct your attention to

17   Page 390, Line 7 to 391, Line 14.

18   A    Sorry, Page 390 starting at Line 7?

19   Q    Yes.

20   A    Through 14?

21   Q    Yes.

22   A    And I'm just saying -- this is 2007.  Yes.

23   Q    Correct.

24        Now, I looked at your expert reports and in the

25   materials considered section I noticed that with respect to

1   the depositions taken in this case of Dr. Goldwasser you

2   only considered one of the days of his deposition.  Correct?

3   A   Again, as I sit here now, I did see some of his

4   deposition.  I recall some of his deposition.  I don't

5   recall that there even were multiple days.  I don't want to

6   misstate anything.

7   **Q**   You only considered the deposition testimony that was

8   elicited by Ms. Ben-Ami with respect to Dr. Goldwasser,

9   correct?

10   A   Again, as I sit here now, this deposition, just quickly

11   looking at this page, I believe I saw, and I see

12   Ms. Ben-Ami's name here.

13   **Q**   Doctor, in reaching your opinions, did you ever consider

14   the views of Dr. Goldwasser at the clinical experiment of

15   the three-patient study?

16           **MR. FLEMING:**  Objection, your Honor.

17           **THE COURT:**  Wait a minute.  I'm going to sustain

18   it.  Sustained.

19   **Q**   Doctor --

20           **THE COURT:**  Sustained.  If you want Dr. Goldwasser

21   back, you may call him.

22           **MR. MADRID:**  Thank you, your Honor.  I'll move on

23   to a new topic, your Honor.

24           **THE COURT:**  Very well.

25   **Q**   Directing your attention to the subject of hematocrit.

1    First of all, Doctor, I would like to ask you about just a

2    few of the measurements that were taken in the three-patient

3    urinary EPO study.

4            Do you understand?

5    A    Yes.

6    Q    All right.  Can we have projected '933 claim 11, please.

7            Now, you agree with me that this claim requires an

8    increase in the hematocrit level of the patient, correct?

9    A    Yes, that's one of the elements.

10   Q    And in order to treat chronic renal failure patients who

11   are suffering from anemia, as a treating physician you wish

12   to increase their hematocrit, correct?

13   A    There are many goals.

14   Q    And that's one of them, isn't it?

15           MR. FLEMING:  Objection, your Honor, to the extent

16   he's trying to argue contrary to claim construction.

17           THE COURT:  No.  No, no.  Well, he can't do that,

18   but he can have that question.

19           And that's one of them?

20           THE WITNESS:  Among -- yes.

21           MR. MADRID:  May I have claim 14 of the '933

22   patent, please.

23   Q    You agree with me that claim 14 also requires an

24   increase in the hematocrit level?

25   A    That's what -- that's one of the elements of that claim.

1    Q    Now, yesterday you were sitting in the courtroom

2    watching Dr. Baron's testimony.  Do you recall that?

3    A    Yes.

4    Q    And after that you testified to the jury that you agreed

5    with Dr. Baron's conclusions regarding the three-patient

6    study.

7              Do you recall that?

8    A    Well, I agree with those conclusions as well as my

9    review of all of these documents.

10   Q    But I'm asking you whether you testified that you agreed

11   with Dr. Baron's conclusions; yes or no?

12   A    Well, I think what I testified was that I agreed with

13   Dr. Baron's conclusions, Dr. Goldwasser's conclusions, as

14   stated, in formulating my own opinions.

15   Q    Sir, I'm just talking about Dr. Baron's conclusions.

16   You agree with his conclusions regarding the three-patient

17   study; yes or no?

18   A    I -- sorry, I can't answer that as, as asked.

19   Q    So you disagree with his conclusions?

20   A    No.  That's not what I said.

21   Q    So you agree with his conclusions?

22              MR. FLEMING:  Objection, your Honor.

23              THE COURT:  No.  Sustained.  He said he couldn't

24   answer that yes or no.  And you're taking them as a whole.

25   That's a perfectly appropriate answer.

1          **MR. MADRID:**  May I have Exhibit 19, please.

2   **Q**    Doctor, I would like to hand you a copy of what is

3   Exhibit 19.

4          **MR. FLEMING:**  Thank you.

5          **MR. MADRID:**  You're welcome.

6   **Q**    Now, Doctor, do you recall this exhibit?

7   A    Yes.

8   **Q**    Do you recall that this is Dr. Baron's handwritten

9   summary of the data for each of the three patients in the

10  experiment?

11  A    Well, this is some of that data.

12  **Q**    But this is his handwritten summary, correct?

13  A    I believe he testified that this was his, his

14  handwriting, as I recall.

15  **Q**    And you know that Dr. Baron prepared this handwritten

16  summary after the experiment had concluded for the three

17  patients?

18  A    Well, I don't know when he prepared it.  Clearly it's

19  reflecting three patients.  He may have prepared it

20  sequentially.  I don't know when, when in time he prepared

21  it.  He may -- the answer is I don't know exactly when he

22  prepared it but it includes the three patients.

23  **Q**    Now, I would like to ask you some questions about a

24  portion of this document.

25          Can we please have highlighted the language that

1    says HCT no and there's a triangle.

2           Do you see where that is on the document, sir?

3    A    Yes.

4    Q    HCT no triangle.

5    A    Yes.

6    Q    That's a medical or scientific abbreviation, isn't it?

7    A    That's correct.

8    Q    And that means what?

9    A    Hematocrit.  And no triangle means no delta.  No change.

10   Q    And no delta means what?

11   A    No change.

12   Q    And so Dr. Baron concluded that there was no change in

13   the hematocrit of the three patients as a result of the

14   administration of urinary EPO?

15   A    That's what he writes here.  But I believe he had all

16   that data in his lab all that time.  And there were other

17   documents that I saw actually that figured into my opinion

18   as I reviewed the data.

19   Q    Okay.  But I'm asking you about Dr. Baron's conclusions.

20   Dr. Baron's conclusions is that there was no change in

21   hematocrit for all three of the patients?

22   A    That's what he's stating on this page.

23   Q    Those are the conclusions that you agree?

24   A    This is one of those documents.  I looked at his

25   conclusions, Goldwasser's conclusions, and all the documents

1    in formulating my opinion about the three-patient

2    experiment.

3    **Q**    This is an experiment conducted some 27 years ago,

4    correct?

5    A    Yes.

6    **Q**    You weren't there?

7    A    No, I was not there.

8    **Q**    Dr. Baron was the principal investigator in this study?

9    A    Yes, he was.

10   **Q**    And he wrote these conclusions?

11   A    He, he testified that he wrote this document, yes.

12   **Q**    Now, sir, you're not taking the position that you know

13   something more about the three-patient study than Dr. Baron,

14   the principal investigator here, are you?

15   A    I'm stating that I know what's in these documents and I

16   know what Dr. Baron testified to and I know what he wrote in

17   his FDA follow-ups, as well as what Dr. Goldwasser wrote.

18   Goldwasser wrote his NIH grants.

19   **Q**    The man who conducted the experiment concluded that

20   there was no change in hematocrit as a result of the urinary

21   erythropoietin for all three patients?

22   A    That's what he's stating here.

23   **Q**    You're not saying the opposite, are you?

24   A    I'm not saying that he's not saying that.  He said it

25   here.  And he had all those documents available to him.

1    **Q**   Now, Doctor, I would like to ask you some questions

2    about the reticulocyte measurement.  Do you understand?

3    A   Yes.

4    **Q**   Now, this is another parameter that was measured in the

5    three-patient study, right?

6    A   It was another one of the hematologic parameters

7    involved.

8    **Q**   And to measure the reticulocytes during the experiment a

9    sample of blood had to be taken from the patient?

10   A   That's correct.

11   **Q**   And the sample of blood was taken and was sent to two

12   different labs, right?

13   A   I know that there were results from two different labs.

14   I can't tell you the process by which that happened, or the

15   consistency with which that happened.

16   **Q**   Doctor, I'm going to hand you Exhibit GJB.  This is from

17   March 16, 2007, the Baron deposition transcript.

18          **MR. FLEMING:**  Thank you.

19   **Q**   Might I direct your attention to Page 88, Lines 4 to 15.

20   A   Four through 15?

21   **Q**   Yes.

22   A   Yes.

23          **MR. MADRID:**  Your Honor, I would like to read those

24   lines to the witness, please.

25          **MR. FLEMING:**  I object, your Honor, on the same

1    basis.  We had Dr. Baron's video played.

2         **THE COURT:**  Yes.  Yes.  Come to the side bar.

3    SIDEBAR CONFERENCE, AS FOLLOWS:

4         **THE COURT:**  Under 702, the federal rule is clear

5    that an opinion witness, a so-called expert witness, can

6    base his opinions on hearsay if it's a special type of

7    hearsay upon which people who practice in this skill base

8    their opinions.  I want to give you searching

9    cross-examination, but Goldwasser, anyway, we're going to

10   have him back.

11        Now, why didn't you designate these portions at the

12   time the Baron deposition was played?

13        **MR. MADRID:**  Your Honor, because these portions are

14   critical to statements made in direct examination in our

15   preparation for cross-examination that we could not have

16   anticipated with reference to Dr. Baron.  We're asking this

17   question of a witness who's testifying about his knowledge

18   about what he remembers of his bases or not.

19        **THE COURT:**  Are you going to play these?

20        **MR. MADRID:**  I just simply propose to read it.

21        **THE COURT:**  All right.  Then the line I'm going to

22   have is the following line.  I'm not reading these in

23   evidence now as part of the examination of the

24   cross-examination of this witness.  But you may say to him

25   take a look at that.  You'll do it better, I know.  Did you

1    ever read that?  Did you ever read that?  Did you consider

2    that?  And be specific as to the portions.  Then, when it's

3    your case you may play, or you may read, assuming they're

4    relevant, and this is certainly relevant to this, this

5    reticulocyte measurement that we see here, it's relevant,

6    you may play it in evidence.  Dr. Baron's not here.  We have

7    his, we have his deposition.  That's the way I'll do it.

8              **MR. MADRID:**  Thank you.

9          **THE COURT:**  Now, with Goldwasser, if you want to

10   get into what Goldwasser thinks about these experiments,

11   you've got Goldwasser, you can put him back on the stand and

12   he can tell us what he thinks about his experiments, which I

13   expect you to do at some stage.

14             What's wrong with that?

15         **MR. FLEMING:**  I think your Honor put your finger on

16   the fact that to presume that there would be an opinion from

17   this witness as your Honor has scrupulously kept him to his

18   report.  And to claim to be surprised by the opinions I

19   won't comment on.

20             **THE COURT:**  And you're right of course.

21         **MR. FLEMING:**  All right.  So then, then it begs the

22   question as to why this, if this was, quote, unquote,

23   relevant to the validity case and they had ample time to

24   counter designate, they did not.  And, in any event, your

25   Honor, that ship has sailed.  If at the time in their case

1    they wanted to try to play this --

2         THE COURT:  This -- you say it's a late

3    designation, stuff like that.

4         MR. FLEMING:  In part.  In part I believe the

5    reason they claim that they were surprised.

6         THE COURT:  Okay, I'll cross that -- there's

7    something to that.  I'll cross that bridge when I get there.

8         MR. FLEMING:  But they will not read the --

9         THE COURT:  They will not read any of this or

10   any -- Mr. Madrid, I don't know how much ammunition you

11   have.  Or you'll not read any like data.  But assuming you

12   think you are going to get it in in your case, we'll see.

13   You're running a risk, subject to your objection, you may

14   direct him to data of this sort and say did you consider

15   this, and be specific as to what it is.

16        MR. FLEMING:  A procedural question, your Honor.

17        THE COURT:  Yes.

18        MR. FLEMING:  It's quarter to 11:00.

19        THE COURT:  Yes, it is, but we're going until

20   11:00.

21        MR. FLEMING:  Okay.  I didn't know that.

22        THE COURT:  We'll take a shorter break.

23        MR. FLEMING:  Thank you.

24        (Whereupon the sidebar conference concluded.)

25

1    **BY  MR. MADRID**

2    **Q**   Doctor, I would like to --

3              **THE COURT:**  Wait for the court reporter.

4              **MR. MADRID:**  I'm sorry.

5    **Q**   Doctor, I would like you to take a look at Page 88,

6    Lines 4 to 15.

7    A    Yes.

8    **Q**   Did you consider the information that's at Page 88,

9    Lines 4 to 15 in reaching your opinions?

10   A    This specific information?

11   **Q**   Yes.

12   A    No.  I considered my review of all the data that was in

13   the documents, as well as the information supplied by Dr.

14   Baron and Goldwasser in their IND follow-up and grant

15   requests; as well as other information that I made reference

16   to, specifically the Amgen IND application.

17   **Q**   Doctor, in your reports, in your materials considered

18   section, you state that you considered the entirety of Dr.

19   Baron's deposition transcript, correct?

20   A    I may have, I may have made reference in that report to

21   having read this deposition.

22   **Q**   All right.  Having read --

23   A    But --

24   **Q**   -- having read this deposition, can you tell me if that

25   refreshes your recollection that a sample --

1          **MR. FLEMING:**  Objection, your Honor.

2     **Q**   -- of blood --

3          **THE COURT:**  No, no.  He's not reading from it.

4          **MR. FLEMING:**  Well, he's characterizing it.

5          **THE COURT:**  He may characterize it.  It's not

6     evidence.  We'll see if we ever see anything.  He's asking

7     if it refreshes his recollection.

8          Does that jog your memory?

9          **THE WITNESS:**  Jog my memory with respect to?

10    **Q**   When the reticulocyte counts were taken of the patient,

11    in order to get the counts taken, a sample of blood was

12    taken from the patients and sent to two different labs.

13    **A**   Yes.

14         **THE COURT:**  That's what you recall?

15         **THE WITNESS:**  Again --

16         **THE COURT:**  The procedure that Baron testified to?

17         **THE WITNESS:**  I know they ended up in two different

18    labs.

19         **THE COURT:**  All right.

20    **Q**   And each laboratory analyzed the blood they were given

21    and reported the results back to Dr. Baron?

22    **A**   There were reports in the documents.

23    **Q**   And you listened to Dr. Baron's testimony yesterday that

24    the technicians in the laboratories looked at a smear of

25    blood through a microscope and they made the determination

1    as to whether something was a reticulocyte.

2              Do you recall that?

3              **MR. FLEMING:**   Objection; mischaracterizes the

4    testimony.

5              **THE COURT:**   Sustained, on that foundation.

6    **Q**   Well, Doctor, do you recall listening to the deposition

7    testimony of Dr. Baron yesterday?

8    **A**   Yes, I do.

9    **Q**   And do you recall him discussing the technique by which

10   the technicians involved assessed what was and what wasn't a

11   reticulocyte?

12   **A**   I recall that he discussed staining reticulin and that

13   he relied upon the standard laboratory, laboratory

14   techniques that were done at that time in the hospital.  And

15   he evaluated that data as the principal investigator.  I

16   think that's a fair summary of what he said.

17   **Q**   And the technique that was used for counting

18   reticulocytes, that was a manual technique, correct?

19   **A**   Yes, that's, that's what he stated.  Correct.

20   **Q**   It wasn't done by an automated machine, correct?

21   **A**   No, in 1979 that was, that was still a manual technique.

22   **Q**   After Dr. Baron got the results back from the

23   laboratories he plotted them on a piece of paper.

24             Do you recall that?

25   **A**   I, I know I saw plots.  I don't necessarily know based

1    on handwriting or signatures who did that plotting.  But I

2    may be incorrect as I sit here now.  I know there were

3    plots.

4    **Q**   Doctor, I would like to hand you what is Exhibit 2049A.

5         I'm also going to hand you that exhibit as it was

6    presented in the deposition of Dr. Baron, Exhibit 15.

7         **MR. FLEMING:**  Objection, your Honor.  Just for a

8    point of clarification.

9         **THE COURT:**  Yes.

10        **MR. FLEMING:**  The exhibit that's in evidence of

11   course we have no issue with.  The second exhibit, I'm not

12   sure if counsel's representing that this is in evidence or

13   not.

14        **THE COURT:**  And the second one is the --

15        **MR. FLEMING:**  I'm not sure, your Honor.

16        **THE COURT:**  Are they both in evidence?

17        **MR. MADRID:**  Let's see.

18        **THE CLERK:**  What are the numbers?

19        **MR. MADRID:**  Essentially, your Honor --

20        **THE COURT:**  One looks like a blowup of the other.

21        **MR. MADRID:**  Yes.  One is a blowup of the other.

22        **THE COURT:**  I mean, that's what you're

23   representing, one is a blowup of the other?

24        **MR. MADRID:**  This is Exhibit --

25        **THE COURT:**  Well, what's this?

```
 1              MR. MADRID:  The blowup is Exhibit 20 -- I'm

 2     sorry -- 2049A.

 3              THE COURT:  What I'm holding in my left hand, the

 4     larger piece of paper, is exhibit, say the word.  Letter.

 5     Numbers.

 6              MR. MADRID:  2049A.

 7              THE COURT:  2049A.  And the --

 8              THE CLERK:  That's in.

 9              THE COURT:  -- smaller eight and-a-half by eleven

10     is?

11              MR. MADRID:  Exhibit GLW.

12              THE COURT:  Why do we need a small one?

13              MR. MADRID:  Simply to confirm that these are the

14     same thing.

15              MR. FLEMING:  Your Honor, he may have gotten them

16     transposed.  I think he may have gotten them mixed up.

17              THE COURT:  Talk among yourselves.

18              (Pause in proceedings.)

19     Q   So, Doctor, taking a look at Exhibit 2049A --

20              THE COURT:  We're clear that that's what this is?

21              MR. MADRID:  Yes, sir.  The blowup.

22              THE COURT:  All right.  Yes, proceed.

23              THE WITNESS:  Am I setting this aside?

24              THE COURT:  I would, for the moment.  Okay, you're

25     looking now at 2049A.
```

1          THE WITNESS:  Yes.

2     Q    Doctor, you're relying on this exhibit in reaching your

3     opinion?

4     A    I believe this was one of the documents that were in the

5     Baron documents.

6          MR. MADRID:  Your Honor, I would like to use at

7     this point in my examination a blowup of Exhibit 2049.  This

8     is a chart or a board.

9          THE COURT:  You may do that.

10         MR. FLEMING:  May I just see it.  Is it --

11         THE COURT:  Of course.

12         MR. FLEMING:  Before it's published to the jury.

13         (Whereupon counsel conferred.)

14         MR. FLEMING:  No objection, your Honor; it's a

15    demonstrative.

16         THE COURT:  Mr. Fleming says it's a demonstrative.

17    It is in the sense that it's blown up.  But this one is a

18    blowup of a document that's in evidence.  It will be with

19    you in the jury room.  Again, you can believe it, figure out

20    what it is and then see how it fits.  You can disbelieve it,

21    disregard it, or believe parts of it.  You're the judges of

22    the facts.

23         MR. FLEMING:  Your Honor, with your permission, may

24    I position myself to see this?

25         THE COURT:  Of course you may.

1           **MR. FLEMING:**  Thank you.

2           **THE COURT:**  And all counsel should understand that

3    goes without saying, so long as you don't block the jury.

4           You're welcome to come up here, Mr. Fleming, if

5    that's convenient.

6           **MR. FLEMING:**  Thank you, your Honor.  Excuse me.

7    **Q**   So, Dr. Baron, what I would like to do --

8    A    Dr. Spinowitz.

9    **Q**   I'm sorry, Dr. Spinowitz.

10   A    That's all right.

11   **Q**   Forgive me.

12          What I would like to do is orient you and the jury

13   to the various pieces of information on this exhibit, 2049A.

14          This is the first graphic.  First of all, this plot

15   pertains --

16   A    Could I stand just a second?  I can't see the corner.

17          **THE COURT:**  Of course you may.

18          **THE WITNESS:**  Thank you.

19          **THE COURT:**  But you must keep your voice up, that's

20   the thing to remember.

21          **THE WITNESS:**  Yes.  I certainly will try, how's

22   that?

23   **Q**   Doctor, this plot pertains to Patient Number 3 of the

24   three-patient study, correct?

25   A    That's, that's correct.

1    **Q**   And what we've done here is covered the name of the

2    patient for privacy concerns.

3    A   That's appropriate.

4    **Q**   Now, with respect to --

5    A   Also on this one by the way.

6    **Q**   Doctor, with respect to this graphic, 2049A, Patient 3,

7    the arrows that appear across the top, these signify the

8    dates on which the patient was given injections of the

9    urinary erythropoietin preparation, correct?

10   A   That's correct.

11   **Q**   And with respect to the numbers that appear on the very

12   bottom of 2049A, these are dates, correct?

13   A   That's correct.

14   **Q**   And these dates occur in the year of 1980?

15   A   That's 19 -- yes, this was Patient 3.  I'm not seeing --

16   yes, '80 is there on the first date.

17   **Q**   All right.  And this region here of the graph below,

18   right below the very first arrow, right here, I want to ask

19   you some questions about.

20        But before I do, first of all, the information

21   that's second from the bottom, that has to do with absolute

22   reticulocyte counts, does it not?

23   A   That's correct.

24   **Q**   Okay.  And then as we move across the graph going from

25   left to right, what we're looking at are specific

1    data points where the reticulocyte counts for Patient Number

2    3 were measured, correct?

3    A    That's correct.

4    Q    Now, the period -- the area that I've signaled right

5    here, that I've circled right here, and I'm going to put a B

6    to mark it, this area has to do with the baseline values for

7    Patient Number 3, right?

8    A    They, they represent data points that were collected

9    before the patient was treated with the pharmaceutical

10   composition containing the purified human erythropoietin.

11   Q    So this was a point in time when Patient Number 3 did

12   not have any urinary erythropoietin in their body, correct?

13   A    Well, they didn't have that pharmaceutical composition

14   in their body.

15   Q    They hadn't been injected with it, right?

16   A    That's correct.

17   Q    And we have a value that starts here, there's a little

18   5/13, that's May 13, right?

19   A    Correct.

20   Q    And there's one data point there, there was a

21   measurement taken for retics, correct?

22   A    Yes.

23   Q    And then we have another one at 5/28, and there's

24   another data point a little bit higher.

25           Can you see that?

1    A    That's correct.

2    Q    And then we have a value taken on 6/3, for the retics

3    for that patient.  Do you see that?

4    A    Yes, it shows that it's at the same value.

5    Q    And you consider 6/3 to be part of the baseline period

6    for this patient, correct?

7    A    Yes.

8    Q    Because it was taken on the very first day of the study,

9    correct?

10   A    That's correct.

11   Q    It would have been too soon to be able to evaluate

12   whether the urinary EPO had had an effect on the body of the

13   patient?

14   A    Presumably it had not even been given yet.

15   Q    Okay.  Now, as we progress from left to right, we begin

16   to see some values where these data points are during the

17   period when the urinary EPO is being given to the patient.

18   Agree?

19   A    That's correct.

20   Q    Now, I want to focus your attention first of all on the

21   date out here, 6/23.  That's June 23.  Do you see that?

22   1980.

23   A    That's correct.

24   Q    Do you see the high point on this graphic here?  2049A

25   for, on the date June 23, 1980.  Do you see that?

```
 1   A   Yes.

 2   Q   I'm going to circle that.

 3           Now, this high point is a measurement of the

 4   reticulocyte count for the patient by one of the two

 5   laboratories.  Agreed?

 6   A   The absolute reticulocyte count, yes.

 7   Q   And it happened on June 23, 1980, right?

 8           MR. FLEMING:  Objection; vague as to it happened,

 9   your Honor.

10           THE COURT:  No, the measurement is the way I

11   interpreted it.  The measurements --

12           MR. MADRID:  Yes.

13           THE COURT:  -- happened on that date.  Is that your

14   question?

15           MR. MADRID:  Yes, it is, sir.

16           THE COURT:  Is that how you read the graph?

17           THE WITNESS:  It was a measurement performed on a

18   sample taken on that date.  Sorry.

19           THE COURT:  And I appreciate -- the way you read

20   the graph is, it's not saying that the, the measurement was

21   made on that date, you're saying that the sample was taken

22   on that date and that's the protocol.

23           THE WITNESS:  Well, can I just clarify that a bit,

24   your Honor?

25           THE COURT:  Yes.
```

 1              THE WITNESS:  There are two samples.  And if I'm

 2      not mistaken, the clinical laboratory receives a sample,

 3      excesses that sample, and typically runs those tests on that

 4      day and there may even be a time print that attests to that.

 5              The other laboratory, I don't know, I don't recall,

 6      I think there were documents, and I can't be assured at when

 7      they performed their measurements.

 8              THE COURT:  I appreciate that.  But, just to

 9      understand this document, the horizontal days there -- and

10      it is the horizontal vector, right, that has the days?

11              THE WITNESS:  Correct.

12              THE COURT:  You read that as indicating the days on

13      which the samples were drawn from the patient?

14              THE WITNESS:  Correct.

15              THE COURT:  Go ahead, Mr. Madrid.

16              THE WITNESS:  The vertical vector actually.

17      Q    Dr. Spinowitz, 6/23, top point, we're looking at the day

18      the sample was drawn from the patient and a value that comes

19      back from one of the laboratories, right?

20      A    Yes.

21      Q    Agreed?

22      A    Yes.

23      Q    And right in next to that data point, it's hard to see,

24      perhaps you can see it on the monitor here, there's a

25      question mark.  Do you see that?

```
1    A    All right.  I can't see that.  I agree that there's a

2    mark there.

3    Q    You were in the courtroom yesterday when Dr. Baron

4    testified.  Do you recall --

5    A    Yes.

6    Q    Do you recall him testifying about the question mark

7    next to this data point?

8    A    I don't remember that specific testimony.  I will not --

9    if it was what he said, then yes.

10         MR. MADRID:  Your Honor, may I read from the trial

11   transcript for --

12         THE COURT:  You may.

13         MR. MADRID:  Trial transcript, Baron deposition

14   trial transcript, Page 238, Lines 1 to 17.

15         THE WITNESS:  Can I follow this?

16         MR. MADRID:  If you would like.  I'll read it to

17   you.

18         THE WITNESS:  I'm sorry.

19         MR. FLEMING:  I don't have a copy.

20         THE COURT:  No, this is the trial transcript.

21         THE WITNESS:  Oh, oh, sorry.

22         THE COURT:  But I have a copy.

23         THE WITNESS:  No, that's okay.  I thought he was

24   referring to the deposition.

25         MR. MADRID:  I have copies for everyone.  Dr.
```

```
 1   Spinowitz.

 2              THE WITNESS:  Thank you.

 3              MR. MADRID:  Your Honor.

 4              MR. FLEMING:  Thank you.

 5   Q   Now, looking at the trial transcript from yesterday on

 6   Page 679, Line 10 to 679, Line 17.

 7              Question:  Can you tell me what that symbol is?

 8              Answer:  It's a question mark.

 9              Do you know why a question mark is next to that

10   data point?

11              Answer:  Because we weren't sure that it made any

12   sense --

13              Question:  Okay.

14              Answer: -- in view of everything else.

15              Question:  Did you put that question mark on it?

16              Answer:  Yes, I did, not because I knew it was

17   wrong, but because I didn't know how to make it fit with

18   everything else.

19              Question:  When you said in view of everything

20   else, what's the everything else that you are referring to?

21              Answer:  All the other retic values that you see

22   there.

23              THE COURT:  Are you about done or shall we take the

24   morning recess?

25              MR. MADRID:  We should take the morning recess.
```

1          THE COURT:  Very well.

2          Ladies and gentlemen, we're taking only a 15 minute

3     recess to stay on track.  You've not heard all the evidence.

4     Please, therefore, keep your minds suspended.  Do not

5     discuss the case either among yourselves nor with anyone

6     else.

7          You may stand in recess until quarter after 11:00.

8     We'll recess.

9          THE CLERK:  All rise for the jury.

10         (Whereupon the jury left the courtroom.)

11         MR. FLEMING:  You may step down.

12         (Whereupon the witness stepped down.)

13         (Recess.)

14         THE CLERK:  All rise for the jury.

15         (Whereupon the jury entered the courtroom.)

16         THE CLERK:  Court is in session, please be seated.

17         THE COURT:  Proceed, Mr. Madrid.

18         MR. MADRID:  Thank you, your Honor.  Just for the

19    record, so that I can clarify what we're looking at, your

20    Honor, the blowup here is page 3 of Exhibit 249A.  There are

21    three plots.  This is the third one for Patient Number 3.

22    There was one for Patient Number 2, and one for Patient

23    Number 1.

24         THE COURT:  All right.  He can't testify, but we'll

25    let that stand.  It's not evidence.  Things are what you

1    find them to be.  But that's what he represents, and we'll

2    go along.

3                    **CROSS-EXAMINATION** (Cont'd)

4    **(BY MR. MADRID:)**

5    **Q.**  Now, Dr. Spinowitz, just before the break, we had read a

6    portion of Dr. Baron's deposition which was played at the

7    trial yesterday.  Do you recall that?

8    A.  Yes.

9    **Q.**  Does that refresh your recollection that with respect to

10   June 23, regarding the data point for the sample that has a

11   point higher up, there's a question mark next to it?

12   A.  Yes.  Sorry, yes.

13   **Q.**  Do you understand that Dr. Baron questioned the value

14   that appears from that one laboratory with respect to that

15   sample on 6/23?

16            **MR. FLEMING:**  Objection.  Mischaracterizes

17   testimony.

18            **THE COURT:**  Overruled.  He's asking this witness if

19   that's his understanding, and you may testify.

20   A.  My understanding is that at some point Dr. Baron has

21   testified that he put a question mark there.  I don't know

22   when that was.

23   **Q.**  And he put a question mark there because he didn't know

24   how to make that data point fit with all the other

25   reticulocyte values; correct?

1          **MR. FLEMING:**  Objection, your Honor.

2          **THE COURT:**  Well, you're asking him whether it's

3    correct.  He can't testify as to what's in Mr. Baron's mind.

4    And we've heard by videotape Mr. Baron testify and you've

5    read it, again.  You can ask him what his understanding was.

6          Is that what you understood?  He put a question

7    mark there, because he couldn't match that or make it fit,

8    Mr. Madrid's words?  Is that why you think -- is that what

9    you understood is why he did it?

10         **THE WITNESS:**  No, your Honor.  Again, I don't --

11         **THE COURT:**  Okay.  Your answer's no.

12         **THE WITNESS:**  No.  Sorry.

13         **THE COURT:**  Go ahead.

14   **Q.**  Now, Dr. Spinowitz, I want to make clear, for the

15   record, what we're looking at with respect to these two

16   lines.

17   A.  Two points.  We're talking about the whole line now?

18   **Q.**  The whole line, sir.

19   A.  Sorry.

20   **Q.**  The first line we see connected to the baseline, and

21   extending from left all the way to the right, that goes up

22   to the question mark.  Do you see that?  And then it comes

23   back down, keeps going down.  Do you see that line?

24         **MR. FLEMING:**  Objection, your Honor, to the

25   characterization.

1      **THE COURT:**  You see that line?

2      **THE WITNESS:**  Yes.  Yes.

3   **Q.**  Okay.  Now, the data points that belong to that line are

4   from one laboratory; correct?

5   A.  I -- I would presume so.

6   **Q.**  And I'm going to mark that with blue, and I'm going to

7   put "Lab 1," just so we're clear in my questions.  All

8   right?  Understand?

9   A.  Yes.

10  **Q.**  All right.  Now, there's another line that appears on

11  this exhibit, 2049A, for Patient 3, starting at 6/9, that's

12  June 9, 1980.  Do you see where that line begins?

13  A.  Yes.

14  **Q.**  Okay.  And that line continues and goes a distance and

15  stops at 6/25.  Do you see that?

16  A.  Yes.

17  **Q.**  I'm going to mark that Lab 2.  Do you understand?

18  A.  Yes.

19  **Q.**  And that line and the data points with respect to that

20  line pertain to a second laboratory; correct?

21  A.  Again, I would presume so.

22  **Q.**  That's what you understood when you arrived at your

23  opinions; correct?

24  A.  No.  What I understood when I arrived at my opinions was

25  Dr. Baron's conclusions, summary data, Dr. Goldwasser's, and

1    all the documents that I reviewed.

2    Q.  You understood that Dr. Baron referred to two different

3    labs with respect to reticulocyte values?

4    A.  Yes, his --

5    Q.  Okay.  Now, I want to look at a number of these specific

6    data points.  You would agree with me, sir, that looking at

7    June 6 we see a value on Lab 1, we see a value that is

8    within the range that the patient had at the baseline, when

9    the patient didn't have any urinary erythropoietin in their

10   body; right?

11           MR. FLEMING:  Objection, to the characterization.

12           THE COURT:  No, he can examine him.

13           Is that how you characterize it, within the range,

14   as he described it?  You may answer.

15           THE WITNESS:  Well, there are a number of data

16   points that are displayed at the baseline.  And that point,

17   I mean, I see what it is.  The graph shows what it is.

18   Q.  All right.  Well, let's talk about that baseline.  We

19   look at the baseline, we can see here on May 13, there's a

20   value that begins -- do you see the first value that I'm

21   pointing to on May 13, 1980?

22   A.  Yes, yes.

23   Q.  The next value on 5/28 goes up.  Do you see that value?

24   A.  Yes.  Yes.

25   Q.  We have another value on 6/3/1980.  Do you see that?

1    A.   Yes.

2    **Q.**   These values represent the natural variation of the

3    reticulocytes in this patient; correct?

4    A.   These values represent the numbers that were obtained in

5    the laboratory.

6    **Q.**   Understand.

7    A.   At that time.

8    **Q.**   Well, why is it that these values don't coincide

9    identically, one on top of each other?

10   A.   Those were the values that were obtained from the

11   laboratory.

12   **Q.**   You'd agree with me that they're different?

13   A.   They are different data points.

14   **Q.**   One is higher than the other?

15   A.   Two are higher than the other.

16   **Q.**   Okay.  On one day, there's a lower value, and then on

17   two separate days there's a higher value; correct?

18   A.   Correct.

19   **Q.**   Isn't it true that there is a natural variation to

20   reticulocyte counts in human beings?

21   A.   I don't know that that is scientifically correct.

22   **Q.**   So you're not aware if there's a range, a diurnal

23   variation, in the counts of an individual with respect to

24   the reticulocytes?

25   A.   Well, diurnal refers to within the whole 24-hour period.

1    Q.  Well, let's take the period here.  These are samples

2    taken within a month period; correct?

3    A.  Well, they were only -- there's only three data points,

4    and there are no multiple data points on any given day.

5    Q.  You were in the courtroom yesterday when you heard

6    Dr. Baron testify with respect to the purpose of taking

7    baseline measurements; do you recall that?

8    A.  Establish a baseline.

9    Q.  And the reason why you need a baseline is to compare

10   what the patient looks like before they receive anything, to

11   what the patient looks like after they receive something, to

12   understand whether or not there's been an effect; correct?

13   A.  The baseline is to establish that, and then look at the

14   totality of data.

15   Q.  And you compare the data underneath these arrows to the

16   baseline in order to draw a conclusion as to whether or not

17   there's been an effect; agreed?

18   A.  I look at all the data and come to some conclusion, as

19   well as take a look at the way the investigators express

20   their conclusions.

21   Q.  But you agree that what you have to do is compare the

22   data underneath these arrows with the data from the baseline

23   period?

24   A.  That's the totality of the data, correct.

25   Q.  The comparisons involved; right?

1    A.   You're looking at all of the data that's displayed

2    within the course of this period of time when the patient

3    was getting the erythropoietin composition.

4    Q.   So let's go on.  Let's look at the value here at 6/9,

5    June 9, for the Lab 1.  Here we have another value for

6    reticulocyte count for that patient.  And that value doesn't

7    exceed any of the values in the baseline period when the

8    patient didn't have any urinary erythropoietin; right?

9         **MR. FLEMING:**  Objection to the characterization,

10   your Honor.

11        **THE COURT:**  No, it's a question.  We'll see what

12   the witness says.

13   A.   Actually, it's a little higher than the 5/13, I believe.

14   Q.   Is it higher than the 5/28?

15   A.   No, it's not.

16   Q.   Is it higher than the 6/3?

17   A.   No, it's not.

18   Q.   Okay.  Now let's take a look at the value here for 6/11.

19   Do you see that one?  I'm just circling it right now for

20   June 11.

21   A.   Uhm-hmm, yes.

22   Q.   Question:  Is that value for June 11 for reticulocytes

23   higher than the value that you see for 5/28 or 6/3/80?

24   A.   No, but it's higher than 6/6, 6/9 and 6/11.

25   Q.   I understand that.  But my question had to do with these

1    two values during the baseline period, 5/28 and 6/3.  Is the

2    value for 6/11 higher?

3    A.  The graph is as displayed; no.

4    **Q.**  It's lower, right?

5    A.  Than which numbers were you giving me?

6    **Q.**  I'm giving you 5/28 and 6/3.

7    A.  5/28 and 6/3.  Correct.

8    **Q.**  It's lower, all right.  Let's look at the value.

9    Keeping with the same line now, okay, we're working off of

10   Laboratory 1, same line, June 16.  I'm going to circle that

11   value.  All right.

12        Confirm for me, sir, that the value, the

13   reticulocyte counts in Patient Number 3 for June 16, that

14   that value is not higher than the value for 6/3 or 5/28?

15   A.  It's a little closer, but it looks a little lower, but

16   higher than 6/9 and 6/11.

17   **Q.**  I understand that.  But I didn't ask you about that.  I

18   want to know about 5/28 and 6/3.  Is the value for 6/16

19   higher or lower?

20   A.  Than 5/28 and 6/3?

21   **Q.**  Yes.

22   A.  It appears to be slightly lower.

23   **Q.**  Lower.  Let's go on to the next one, 6/18.  Do you see

24   the value for Lab 1, 6/18, June 18, 1980, Patient Number 3?

25   Higher or lower, for the values that you see on 5/28 or 6/3?

1    A.   Lower than those two; slightly higher than 6/9 and 6/11.

2    Q.   Let's go to 6/23, the one that's circled already, the

3    one with the question mark; higher or lower than the

4    baseline value we see at 5/28 or 6/3?

5    A.   Higher than all the values, actually.

6    Q.   Right.  That's the one with the question mark.  Let's

7    look at 6/25, all right?  I'm circling the value for 6/25

8    with respect to Lab 1, regarding the reticulocyte count,

9    6/25, for Patient Number 3.  Higher or lower for 5/28 and

10   6/3?

11   A.   Higher than -- starting at 6/25, compared to --

12   Q.   Compared to the samples for May 28, 1980, and June 3,

13   1980.

14   A.   Actually higher, I believe.

15   Q.   By how much?

16   A.   Well, that would be very difficult to determine.  I

17   think there -- there may have not -- there may have been --

18   not have been the actual raw data, but it's higher.

19   Q.   Do you think it's statistically significant?

20   A.   I think it's significant.  I think it's higher.

21   Q.   That's not my question.

22   A.   But that's what I opine, so --

23   Q.   Do you think it's statistically significant?

24   A.   I think that this is significant.  They never said it

25   was statistically significant, nor did I.

1    **Q.**   You know what a P value is, sir, don't you?

2    A.   Yes, I know what a P value is.

3    **Q.**   There's no P value calculation with respect to this data

4    point on 6/25?

5    A.   There was no intention of creating P values.

6    **Q.**   There was no statistical analysis done of this data;

7    right?

8    A.   I -- I don't know that.

9             **THE COURT:**   What's a "P value"?

10            **THE WITNESS:**   It was directed to me, your Honor,

11   sir?

12            **THE COURT:**   You're the only one who can testify.

13   And I don't know.

14            **THE WITNESS:**   Sorry.

15            **THE COURT:**   You said you did.

16            **THE WITNESS:**   Yes, I do.

17            **THE COURT:**   So tell us what it is.

18            **THE WITNESS:**   A P value, one does statistics, you

19   collect data, you generate a number.  A P value is stated as

20   point something something, indicating a percentage of

21   assuredness that two groups of data are different.  And very

22   typically in scientific literature, if you achieve a P value

23   less than .05, you say if you repeat this experiment 100

24   times, you're not likely by accident to get this result any

25   more than five times.  And the scientific community accepts

1    that cutoff for what it's worth.

2              That's a P value.  So it's a number.

3              **THE COURT:**  Thank you.  Go ahead, Mr. Madrid.

4    **Q.**  Now, I want to go on to the last data point that appears

5    here.  This is on July 30.  Do you see that data point,

6    July 30?

7    A.  Yes, I do.

8    **Q.**  With respect to Lab 1.  That data point is higher or

9    lower with respect to the data points 5/28 and 6/3?

10   A.  5/28 and 6/3, it might be a little lower, I can't tell.

11   Certainly comparable.

12   **Q.**  Now, let's look at the values for Lab 2, June 9.  I'm

13   going to circle the first one.

14   A.  So we're up to Lab 2 now?

15   **Q.**  Yes.  The value for June 9, that's lower than the values

16   for 5/28 and 6/3, right?

17   A.  That's a little lower, yes.

18   **Q.**  Now, the value on June 6 -- June 13, do you see that

19   value?

20   A.  No.

21   **Q.**  June 13, Lab 2?

22   A.  June 13, I'm not -- I see, the Lab 2, I see the value on

23   June 11th.  I guess in my copy I'm not seeing whether there

24   is or is not a data point, because you've got a confluence

25   of lines and you'd have to go back to the original data to

1   see if there was a measurement on there.

2   **Q.**   Let's go to 6/11 then; you see a data point there?

3   A.   6/11?

4   **Q.**   Yes, for Lab 2?

5   A.   Yes.

6   **Q.**   That point is not higher than the two points we've been

7   comparing in the baseline, 5/28 and 6/3; right?

8   A.   No, it's not higher, higher than 6/9.

9   **Q.**   And let's look at the values at 6/16 and 6/18, on Lab 2.

10  Those values, are they higher or lower than the values at

11  5/28 and 6/30 -- 6/3?

12  A.   Those are higher than those values, as well as the

13  6/9 and 6/11.

14  **Q.**   Are they statistically significant?

15  A.   There was no measurement of statistics, nor did I

16  perform a statistical evaluation of this data.

17  **Q.**   And finally, let's look at the value at 6/25 for line 2.

18  Do you see that?

19  A.   6/25 for line 2.  Yes.

20  **Q.**   That value is lower than the values we saw at 5/28 and

21  6/3; right?

22  A.   It may be slightly higher.  They're comparable, but

23  higher than 6/9, 6/11.

24  **Q.**   Now, Doctor, we're looking at two data sets from two

25  different laboratories regarding a single sample from a

1    single patient; correct?

2    A.   With one proviso.   Two laboratories, yes.   I don't know

3    whether those were the same sample or not.

4    Q.   You reviewed the materials in arriving at your opinion?

5    A.   But in order to -- it could be a split sample; same

6    draw, different tubes.   That's the way it's done in the

7    laboratory.

8    Q.   You agree with me that if you look at the dates 6/9,

9    6/11, 6/16, 6/18, 6/25 -- do you see those, all of those

10   examples there?

11   A.   Which lab are we looking at now, all of them or --

12   Q.   We're looking at both.   And I'll draw a black box around

13   both.   Do you see those?

14   A.   Yes.

15   Q.   On these days, all right, let's start first with 6/9.

16   Same day, same patient, two different values; agree?

17   A.   Correct.

18   Q.   Let's look at 6/11.   Same day, same patient, two

19   different values?

20   A.   Correct.

21   Q.   Let's look at 6/16.   Same day, same patient, two

22   different values?

23   A.   Correct.

24   Q.   Let's look at 6/18.   Same day, same patient, two

25   different values?

1    A.  Correct.

2    Q.  Now, let's go to 6/23.  You can see at 6/23 that there's

3    another value here.  Do you see that?

4    A.  Which one did you circle?  Sorry, I've been looking at

5    the graph.

6    Q.  6/23.  There's an X right there?

7    A.  An X.  I don't know -- I don't know that it's an X.  I

8    see something there.

9    Q.  You reviewed the data?

10   A.  You asked me if it's an X.

11   Q.  I'm asking you a separate question.  You reviewed the

12   data in this study?

13   A.  I reviewed the data.

14   Q.  And you know that, in point of fact, there was a

15   measurement taken in 6/23 that corresponds to exactly where

16   this value is that I've circled in black with regard

17   reticulocyte values, absolute reticulocyte values?

18   A.  There's a data point there.

19   Q.  That's right.  And that data point is lower than the one

20   that has a question mark on it?

21   A.  I thought you asked me if it's an X.

22   Q.  That's a data point; correct?

23   A.  That's correct.

24   Q.  And it's lower than the one that's circled with a

25   question mark?

1    A.  Yes.

2    Q.  And that lower value is lower than the baselines at 5/28

3    and 6/3; correct?

4    A.  Than 5/28 and 6/3?

5    Q.  Yes.

6    A.  That data point may be a little lower, yes.

7    Q.  And on 6/23?

8    A.  Higher than 6/9 and 6/11.

9    Q.  So, Doctor, on 6/23, June 23, Patient Number 3, we've

10   got the same day, we've got the same patient, we got two

11   different values; right?

12   A.  Yes.

13   Q.  One high -- one high?

14   A.  Yes.

15   Q.  One low?

16   A.  Yes.

17   Q.  And, finally, we look here at 6/25.  Same day, same

18   patient, two different values?

19   A.  Correct.

20   Q.  This was all used -- all done using the same

21   methodology, the absolute reticulocyte counting; correct?

22   A.  This was an absolute reticulocyte count.

23   Q.  Doctor, the results here are inconclusive, are they not?

24   A.  No.

25   Q.  The results here show that you get two different results

1    from the same sample?

2    A.  You asked about a conclusion.

3    **Q.**  I'm asking you a separate question.  The results here

4    show that you get two different results from the same

5    sample; right?

6    A.  The results taken in totality on any given day, we went

7    through that.

8    **Q.**  Different question.

9    A.  Ask it again.

10   **Q.**  I'm asking you specifically, as to these data points,

11   let's take 6/23, two different results?

12   A.  Correct.

13   **Q.**  Now, isn't it true that what you see, let's take, for

14   instance, 6/23, what we're seeing in terms of a high and a

15   low, that's the margin of error for this kind of test;

16   right?

17   A.  No.  I -- no.

18   **Q.**  Two different laboratories, they don't get the identical

19   value, do they?

20   A.  You asked about a margin of error.

21   **Q.**  Yeah.  I heard your answer.

22   A.  And the answer was no.

23   **Q.**  I understand that.

24   A.  This doesn't represent a margin of error.  That's not

25   the way I would characterize it.

1    Q.  But what this shows is two different laboratories tried

2    to count the reticulocytes for this patient on a sample

3    taken on that day and they got totally different results;

4    doesn't it show that?

5    A.  They didn't try anything.  They did what they did.  They

6    followed standard procedures, and I believe these data

7    points represent what they got on that day.

8    Q.  Right.  And following those standard procedures, what

9    they ended up with was two different results?

10   A.  We've acknowledged there were two different results.

11   Q.  Right?  One above baseline, question mark, one below;

12   right?

13   A.  One was above baseline, and the other one was, again,

14   looking at it, just very close to baseline.

15   Q.  Doctor, I want to ask you a hypothetical question.

16   A.  Sure.

17   Q.  If you had read that Dr. Goldwasser considered this

18   study to be inconclusive, would that have changed your

19   opinion?

20   A.  No.

21   Q.  If you had read that Dr. Goldwasser considered this

22   study to be a bust, would that have changed your position?

23   A.  I would have looked at all the data, looked at all of

24   what Dr. Goldwasser said, and I believe he said many things

25   at different times, but in '83, '84 I would have given more

1  credence to his incorporation of the data, which I think is

2  reflected --

3  **Q.**  Fine.  I'm asking yes or no.  Change your opinion or

4  not?

5        **MR. FLEMING:**  Objection, your Honor.  Objection,

6  your Honor.

7  A.  The answer's no, it does not change.

8        **THE COURT:**  Well, wait.  In view of the answer you

9  don't press the objection?  He said no.  Right?

10        **MR. FLEMING:**  No, your Honor.

11        **THE COURT:**  You do press the objection?

12        **MR. FLEMING:**  I do as an issue of courtesy to the

13  witness that he be allowed to answer the question without

14  being spoken over, if he could, please.

15        **THE COURT:**  Oh, well, you'll have a chance to

16  examine.  We'll leave it at that.  Go ahead.

17  **Q.**  I want to ask you a hypothetical question.

18  A.  I'm sorry?

19  **Q.**  I want to ask you a hypothetical question.  If you were

20  aware of the fact that Dr. Goldwasser viewed the study as a

21  failure, yes or no, would that have changed your opinion?

22  A.  No.

23        **THE COURT:**  Again, "if you were aware of the fact."

24  I'm not aware of any of those facts.  We haven't heard

25  anything like that from Dr. Goldwasser.  Maybe he'll be back

1    here and maybe people will ask him questions, but so far

2    that's not in evidence.  He said if you assume that, what

3    does he think.  Okay.

4           Just don't take any evidence from what the

5    questions suggest.  No such evidence in the case as we sit

6    here now.

7           **MR. FLEMING:**  Your Honor, may I return?

8           **THE COURT:**  Of course.

9           **MR. FLEMING:**  Thank you.

10   **Q.**  I want to switch subjects.  I want to talk to you about

11   the Essers, the Essers experiment.

12   **A.**  Yes.

13   **Q.**  With respect to the Essers experiment, there was no

14   significant increase reported for four out of the five

15   patients in the 1973 study; correct?

16   **A.**  There was -- I -- I'd have -- can I have that?

17   **Q.**  Yes, sir.

18   **A.**  Can I have the paper?

19   **Q.**  I want to hear your answer first.

20   **A.**  So restate the question.

21   **Q.**  There was no increase, no significant increase in

22   reticulocytes for four out of the five patients studied in

23   the Essers 1973 experiment; correct?

24   **A.**  The -- there were three papers that were considered.

25   Dr. Essers continued her work '73, '74, and then summary

1    data in '75 that may have actually included an additional

2    patient.  And that was the totality of the information I

3    looked at with respect to the Essers paper.

4    **Q.**  '73.  I'm just asking about '73.  No increase in

5    reticulocyte counts for four of the five patients, Essers;

6    correct?

7    A.  Yes.

8    **Q.**  That's right, isn't it?

9    A.  Correct.

10   **Q.**  Okay.  Now, Dr. Essers' EPO-rich plasma did not increase

11   the hemoglobin of any of her subjects; correct?

12   A.  That was correct.

13   **Q.**  And it did not increase the erythrocytes of any of her

14   patients; correct?

15   A.  She had an increase in reticulocytes.

16   **Q.**  Did not increase the erythrocytes for any of her

17   patients; yes or no?

18   A.  Reticulocytes, erythrocytes -- there was an increase in

19   reticulocytes.

20   **Q.**  Did not increase the erythrocytes for any of her

21   patients; agree?

22   A.  Characterize reticulocytes as immature -- as immature

23   erythrocytes.

24   **Q.**  Erythrocytes are red blood cells; right?

25   A.  As are reticulocytes.

1    Q.  All right.  Let's take a look, then, at what Dr. Essers

2    said.  What I'll do instead is read you from your deposition

3    transcript.  You have your transcript in front of you.  I'd

4    like to direct your attention --

5    A.  Can I just locate that?

6    Q.  Yes, sir.  I want to give you which date it is.  It's

7    August 28th, 2007.

8    A.  I've got mine.

9    Q.  Page 247.

10   A.  Correct.

11   Q.  Lines 4 to 15.

12   A.  Four -- yes.

13   Q.  Now, when we -- when I took your deposition about two

14   weeks ago, do you recall being sworn to take an oath to tell

15   the whole truth?

16   A.  Yes.

17   Q.  I want to read you the following questions -- the

18   following question, the following answer, and I want you to

19   tell me whether or not that's true.

20          "QUESTION:  Do you agree that in all six cases that

21   Dr. Essers studied, the hemoglobin and erythrocyte values

22   did not increase as a result of the infusion of the

23   erythropoietin-rich plasma?

24          "ANSWER:  I won't go through it again, but at the

25   end of each of the paragraphs, it states that erythrocyte

1   and hemoglobin values remain unchanged.  I think that was

2   fairly uniform."

3          Do you agree with that?

4   A.  I believe I was reading from Dr. Essers' paper.

5   **Q.**  That's right.  And Dr. Essers reported that erythrocyte

6   count did not increase for any of her patients?

7   A.  Those were the words that was in the -- each of the

8   paragraphs for that, as I believe, were the figures.

9   **Q.**  And you have no basis to disagree with them, do you?

10  A.  That's what Dr. Essers wrote.

11  **Q.**  I want to switch subjects.  I want to talk to you about

12  Dr. Eschbach's single-patient study.  Do you understand?

13  Single-patient study, Dr. Eschbach?

14  A.  Yes.

15  **Q.**  Okay.  You were not involved in that experiment?

16  A.  No, I was not.

17  **Q.**  And to reach your opinions in this case, you had to rely

18  on documents and testimony, correct, regarding that study?

19  A.  Yes.  That was a paper written by Dr. Eschbach.  And

20  testimony, I have to, again, think which testimonies had

21  referred to the Eschbach single-patient study.  I'm sure

22  there were.

23  **Q.**  Now, Doctor, you agree that you have no personal

24  knowledge as to the data on which Dr. Eschbach obtained the

25  plasma that was to be used in a single patient?

1    A.   I know that would have to be before the date of

2    administration.   I know the way he characterized, the way he

3    obtained that EPO-rich plasma.   I believe there were four

4    bleedings, if you will, from patients.   I have a general

5    understanding of the pace at which one would take from a

6    patient --

7    Q.   I'm sorry, I asked about your personal knowledge.   You

8    have no personal knowledge as to the date on which the

9    plasma was obtained; correct?

10   A.   Well, personal knowledge comes from review of the paper

11   and whatever descriptions were in that paper, and the

12   process by which he did that.

13   Q.   And you're relying just on that; right?

14   A.   Yes.

15   Q.   Okay.   And none of that information tells you the exact

16   data on which the plasma was obtained; right?

17   A.   I could only state that it had to be before the date of

18   administration.

19   Q.   But beyond that, you'd be speculating if you said what

20   the date was; right?

21   A.   I would be drawing upon a conclusion based, as a

22   clinician, knowing what it takes to harvest plasma from an

23   otherwise ill patient which had secondary erythrocytosis

24   from lung disease, and the pace at which that could be

25   withdrawn.

1    **Q.**  But you weren't there?

2    A.  I was not there.

3    **Q.**  So you don't know?

4    A.  No.  I looked at the paper and I saw his description of

5    the source of that EPO-rich plasma.  I'm a physician dealing

6    with patients with secondary erythrocytosis with lung

7    disease.  I know the pace at which you can harvest plasma on

8    four separate occasions from such patients.  And, therefore,

9    I don't know the exact data, but I know that it had to be a

10   considerable amount of time before 11/13.  In addition to

11   which there was a composition here.

12   **Q.**  Doctor, yes or no.  You're speculating; right?

13   A.  No.  I'm drawing a conclusion based --

14   **Q.**  Fine.

15          **MR. FLEMING:**  Objection, your Honor.

16          **THE COURT:**  No, his answer's no.  And you may ask

17   him to explain, because he was asked.

18   **Q.**  Now, yesterday you testified that Dr. Eschbach's plasma

19   was a pharmaceutical composition.  Do you recall that?

20   A.  Containing a pharmaceutically accepted diluent, adjuvant

21   or carrier.

22   **Q.**  I'm going to ask you a hypothetical.  Would it change

23   your opinion if you knew that Dr. Eschbach had testified

24   that in his view plasma is not a pharmaceutical composition?

25   A.  No.

1        **MR. FLEMING:**  Objection.  The same caution, your

2    Honor.

3        **THE COURT:**  Yes, same caution.  The jury can

4    follow.  That's not evidence.  But his testimony is

5    evidence, this witness' testimony is evidence.  The question

6    isn't.

7    **Q.**  Doctor, plasma can contain endogenous biochemicals,

8    proteins, and even waste materials that can vary by

9    individuals over time; correct?

10   A.  Plasma contains many things.

11   **Q.**  Doctor, I want to direct you to your 6/13, third report,

12   Paragraph 119.

13   A.  This is a color-coded -- which report are you referring

14   to?

15   **Q.**  Pink.

16   A.  Pink.  Got it.  Page?

17   **Q.**  This is Paragraph 119.

18   A.  Paragraph.  Yes.

19   **Q.**  Isn't it true that plasma contains endogenous

20   biochemicals, waste materials, and other compounds; correct?

21   A.  As stated in the second sentence of that paragraph.  Do

22   I get an opportunity to read the paragraph?

23        **THE COURT:**  He asked you a question.  Take your

24   time before you answer.

25        **THE WITNESS:**  Thank you.  I'd appreciate that.

1          THE COURT:  Talking about a document, you can

2    always take your time.

3          THE WITNESS:  Just in the context, can I just take

4    a look at the previous two paragraphs?

5          (Pause in proceedings.)

6          MR. FLEMING:  Objection, your Honor, as to I've now

7    had a chance to read this as well.  This is beyond the scope

8    of the direct.

9          THE COURT:  Overruled.

10   A.  Yes.

11   Q.  Doctor, plasma can contain endogenous biochemicals,

12   proteins, and even waste materials that can vary by

13   individuals over time; yes or no?

14   A.  Yes.

15   Q.  And some of these biochemicals, proteins, and waste

16   materials can be harmful to patients; right?

17         MR. FLEMING:  Objection, your Honor.  This is

18   beyond the scope.

19         THE COURT:  Well, wait a second.  It doesn't

20   trouble me that it's beyond the scope, though it is.  But at

21   that level of generality, sustained.  I don't know as it's

22   relevant.

23   Q.  Doctor, isn't it true that plasma can contain hepatitis

24   virus?

25         MR. FLEMING:  I'm sorry, I didn't hear that.  And

1    my Livenote isn't --

2          THE COURT:  Is it true that plasma can contain

3    hepatitis virus?

4          MR. FLEMING:  Same objection, your Honor.

5          THE COURT:  Overruled.  You may have it.

6    A.   Whose plasma?  I'd have to know what you're talking

7    about.

8    Q.   You're aware, are you not, sir, that physicians were

9    concerned, before 1984, that blood products such as plasma

10   and blood transfusions could be infected with viruses such

11   as hepatitis?

12         MR. FLEMING:  Objection, your Honor.

13   A.   If --

14         THE COURT:  Overruled.

15   A.   If one had a virus, it would be in the blood plasma.

16   Q.   And if you infuse somebody else with that plasma, they

17   could contract whatever disease from whatever infectious

18   agent was in the plasma; right?

19         MR. FLEMING:  Objection.  Irrelevant, your Honor.

20         THE COURT:  Overruled.  I'll allow a few questions

21   along this line.

22   A.   As a physician in 1983, I would not have infused plasma

23   that was infected with virus into a patient, because there

24   could have been ways to determine that the patient didn't

25   have the virus.

1            **THE COURT:**  Now, let's come to something relevant,

2    Mr. Madrid.

3            **MR. MADRID:**  Yes, your Honor.

4            **THE COURT:**  Get to it.

5    **Q.**  I'd like to hand up Exhibit DDC.

6            **THE CLERK:**  DD, like dog, dog?

7            **MR. MADRID:**  Yes, ma'am.  DDC.

8    **Q.**  Do you recognize this document?

9    A.  Yes.

10   **Q.**  What is it?

11   A.  It's an article entitled, "Transfusion Therapy,

12   Associated Risks and Alternative Approaches."  I don't know

13   how else you want me to characterize it.

14   **Q.**  You're one of the authors on this article?

15   A.  This is a multi-authored -- multi-contributed paper, and

16   I am one of the listed contributors.

17   **Q.**  So you're one of the authors?

18   A.  I'm one of the contributors to this paper.

19   **Q.**  And you listed Exhibit DDC as an original article on

20   your resume; right?

21   A.  One that was multi-authored.

22   **Q.**  It was one of the articles that you mentioned in your

23   testimony yesterday, that you had authored a large number of

24   articles; correct?

25   A.  And this one is a multi-authored article that was listed

1    in my CV.

2    **Q.**  Right.  So this would have been one of them?

3    A.  This is one of those multi-authored articles, yes.

4    **Q.**  Okay.  And you wrote this article as part of a training

5    program for nurses who care for kidney patients?

6         **MR. FLEMING:**  Objection, your Honor.  Move --

7    objection to the article.  Relevance.  And if you need, we

8    could have a sidebar.

9         **THE COURT:**  Well, yeah.  Sustained.  But if there's

10    something relevant there, you may inquire.  Sustained.

11    We're not just going to dance around this article.

12         **MR. MADRID:**  Your Honor, may I have a sidebar,

13    please?

14         **THE COURT:**  Well, I think I know what rulings I'm

15    making, but yes, now you both want it, we'll have it.

16    SIDEBAR CONFERENCE, AS FOLLOWS:

17         **THE COURT:**  What are we going to do here?

18         **MR. MADRID:**  Your Honor, this article's relevant to

19    their contention of obviousness.  It goes to long-felt need.

20    It goes to the recognition of the inventions.  This person,

21    this witness, expressed his views in 1990, shortly after the

22    commercial availability of recombinant human erythropoietin.

23         **THE COURT:**  Saying?

24         **MR. MADRID:**  Saying, that it made a significant

25    difference in the --

1          THE COURT:  Where, where?

2          MR. MADRID:  Start off, recombinant human

3     erythropoietin has emerged as a alternative treatment

4     capable of sustaining reversal of anemia without the

5     associated risk of transfusions.

6          THE COURT:  Thank you.  Okay.  All right.  Now,

7     this is the fellow himself.

8          MR. FLEMING:  Well, actually, your Honor, two

9     things.  I did not go into long-felt need with this witness

10    on direct.  This is a secondary indicia.  It is their

11    burden.  They want to open that door, that's, I guess -- but

12    I didn't do it.  It's beyond the scope.

13         THE COURT:  It's their burden -- well, I hear you

14    saying beyond the scope, but I have said earlier I'm not

15    troubled by that.  I go for wide open cross-examination and

16    I'm entitled to make that choice.  And I've given you fair

17    notice of that.

18         Now, I didn't think it was their burden.  It's your

19    burden on obviousness.  This business about whose burden it

20    is, but, yes, if he goes into it, that's a problem on -- not

21    problem.  If he goes into it, you may go into it with this

22    witness.

23         MR. FLEMING:  The other thing, the testimony at his

24    deposition was that he's not the author or, you know, that

25    he ascribes to everything.  He contributes to a piece of it,

1    albeit his name is on it.

2        **THE COURT:**  Right.  That goes to the weight, not

3    the admissibility.  When people put their names on things,

4    the reasonable inference is that they stand behind it.

5        **MR. FLEMING:**  Your Honor?

6        **THE COURT:**  Wait, wait.  Mr. Madrid?

7        **MR. FLEMING:**  You're not going to allow this into

8    evidence?

9        **THE COURT:**  I hadn't thought so, because so far

10   it's impeaching.  So I hadn't thought I would allow it in

11   evidence, but he may impeach him with it.

12        (Whereupon the sidebar conference concluded.)

13        **THE COURT:**  Proceed, Mr. Madrid.

14   **(BY MR. MADRID:)**

15   **Q.**  Dr. Spinowitz, you were a contributor to this article,

16   DDC, long before you were hired as an expert witness by

17   Roche's lawyers; correct?

18   A.  That's correct.  Sorry.

19   **Q.**  Question:  By 1990, recombinant human EPO had emerged as

20   a treatment capable of sustained reversal of anemic --

21        **MR. FLEMING:**  Objection, your Honor, reading from

22   the document.

23        **THE COURT:**  He is.  The document's not in evidence,

24   but you may put a question to him.

25        **THE WITNESS:**  Can I know where he's reading from?

1      **THE COURT:**  Yes, you can.  Well, I told him he

2    couldn't read, so let's back up.

3           **THE WITNESS:**  Sorry.  Sorry, your Honor.

4           **MR. FLEMING:**  Move to strike the question, your

5    Honor.

6           **MR. MADRID:**  Your Honor, if I may, I'm not reading

7    from the document.  I'm asking this witness a question.

8           **THE COURT:**  Then put your question.

9    **Q.**  My question to you, Doctor, is, by 1990, recombinant

10   human EPO had emerged as a treatment capable of sustained

11   reversal of anemia --

12          **MR. FLEMING:**  Objection, your Honor.  Your Honor,

13   he's reading.

14   **Q.**  -- without the risks of transfusions?

15          **THE COURT:**  He says he's not.  He can memorize it,

16   that's fine.

17          You follow that, what he's saying?  Is that true?

18   By 1990, recombinant human EPO had emerged as -- I can't do

19   it -- as a alternative therapy to minimize the need for

20   transfusions; is that true?

21          **THE WITNESS:**  Yes.

22          **THE COURT:**  All right.  Go from there.

23   **Q.**  Doctor, by 1990, recombinant human EPO had made a marked

24   improvement in the quality of life of end stage renal

25   disease patients?

1   A.   I think it made, based on the data, when patients were

2   looked at in aggregates, patients in general had an improved

3   quality of life.   That would have been very specific

4   measures, quantitations of quality of life.   Any given

5   patient may or may not have had a change in the quality of

6   life.   You'd have to go back to the papers upon which that

7   was based, and the measures of quality of life.

8   Q.   Doctor, isn't it true, in 1990, when you were teaching

9   the nurses to take care of chronic renal failure patients,

10  you told them that the -- that recombinant human EPO had

11  made a marked improvement in the quality of life of the ESRD

12  patients?

13  A.   Again, if that's a direct quote from the paper, I would

14  want to see it.

15  Q.   Sure.   Look at page 457 --

16  A.   And its contents.

17       MR. FLEMING:   Objection, your Honor.   Now he's

18  reading from the document.

19       THE COURT:   Well, it sounds to me like he is, but

20  so he will show the witness a document.

21  Q.   Page 457, abstract, left column, fourth sentence.

22  A.   Oh, this is the abstract?

23  Q.   Yes, sir.

24  A.   Yes.   So now direct me to the -- I'm sorry, the

25  sentence?

1    **Q.**   The fourth sentence.

2    A.   The fourth sentence, sir.  Starting with recombinant

3    human erythropoietin.  Yes, I've read it.

4    **Q.**   By 1990, recombinant human erythropoietin had made a

5    marked improvement in the quality of ESRD patients; yes or

6    no?

7    A.   In the aggregate?

8    **Q.**   Yes.

9    A.   In the aggregate, yes.

10   **Q.**   Now, by 1990, recombinant human EPO had virtually

11   eliminated the need for transfusions in ESRD patients?

12   A.   The data had suggested that it significantly decreased

13   transfusion requirements in the study populations looked at.

14   **Q.**   In 1990, you taught the nurses that take care of chronic

15   renal failure patients that recombinant human EPO had

16   virtually eliminated the need for transfusions in ESRD

17   patients?

18   A.   Well, this was an abstract of a multi-authored paper.

19   That sentence is there.  I would have to look at which part

20   of this was mine to know all of what I taught the nurses.

21   **Q.**   You're not disagreeing with that statement, though, are

22   you?

23   A.   I think I'm trying to characterize it, and that is based

24   on the studies that were available.

25   **Q.**   I'm just asking you, do you disagree with it?

1    A.  Well, then you have to restate the statement.

2    Q.  By 1990 recombinant human EPO had virtually eliminated

3    the need for transfusions in ESRD patients?

4    A.  In 1990, I don't know the penetration, certainly, but

5    the potential was there to decrease significantly the number

6    of transfusions in total that all dialysis patients would

7    require or receive.

8    Q.  Now, Doctor, you're aware that Dr. Goldwasser and

9    Dr. Miyake purified human urinary erythropoietin in 1977?

10   A.  That's correct.

11   Q.  I want to focus you on --

12   A.  I know they reported on it in 1977.

13   Q.  I want to focus you on the 30-year period from 1977 to

14   2007.  Do you have that in mind?

15   A.  Yes.

16   Q.  In that 30 years, you are not aware of a single patient

17   in the entire world whose anemia has been corrected with the

18   urinary EPO preparation of Dr. Goldwasser; right?

19   A.  I am aware of that which I reviewed regarding those

20   three patients, and the therapeutic effectiveness that they

21   noted, and all that's -- was done with those three patients

22   are in these documents, and the summaries that I looked at.

23   Q.  That's not my question.  You're not aware of a single

24   instance in which that urinary EPO preparation ever

25   corrected anemia of chronic renal failure?

1        **MR. FLEMING:**  Objection, your Honor.

2        **THE COURT:**  Overruled.  He may have it.

3        **MR. FLEMING:**  Just the editorialization.  I move to

4    strike.

5        **THE COURT:**  No, he may have it in that form.  The

6    jury's watching.

7    A.  We'd have to define "correction of anemia."

8    **Q.**  How do you define it?

9    A.  Any evidence initially of erythropoiesis, and then if

10   there's further administration of that pharmaceutical

11   composition as evidenced, by sheep, as evidenced now in

12   2007, what can be done, that you would see a increase in the

13   blood count.

14   **Q.**  Doctor, you're not aware of a single instance over the

15   past 30 years in which the urinary erythropoietin eliminated

16   the need for transfusions in humans?

17   A.  Well, in the context of -- all I know is what's in these

18   documents.  And in the context of those experiments, those

19   three patients didn't need a transfusion, didn't receive a

20   transfusion.  That's all I know about the Baron-Goldwasser

21   or the urinary purified erythropoietin of Dr. Goldwasser

22   with respect to patient evaluation.

23   **Q.**  But I want to know, 30 years hence, are you aware of a

24   single instance in which the urinary erythropoietin

25   eliminated the need for transfusions in any chronic renal

1    failure patient; yes or no?

2    A.  No.

3           **MR. FLEMING:**  Objection.

4           **THE COURT:**  Well, no, I -- you mean prior to the

5    filing of this patent application in issue here?

6    **Q.**  What I mean, your Honor, is with respect to the moment

7    that the urinary erythropoietin preparation became available

8    in 1977, to the day we stand here right now, there isn't a

9    single instance, Doctor, that you can point to where any

10   patient has had their transfusion requirement eliminated as

11   a result of that material?

12          **MR. FLEMING:**  Objection, your Honor.

13          **THE COURT:**  Oh, sustained.

14   **Q.**  Doctor, you're not aware of a single instance over the

15   past 30 years in which urinary erythropoietin has made a

16   marked improvement in the quality of life of any patients?

17          **MR. FLEMING:**  Objection, your Honor.

18          **THE COURT:**  Sustained.

19   **Q.**  Doctor, lastly, it's your position that with respect to

20   the sheep plasma, from the sheep experiments, it's your

21   position that that material was a pharmaceutical

22   composition; right?

23   A.  No.  The sheep plasma was, using the Court's definition

24   of the pharmaceutical composition, it would have to be

25   suitable for administration to humans.  So I -- my opinion

1    was restricted to the Court-prescribed definitions of

2    pharmaceutical composition.

3    **Q.**  Directing your attention to your expert report, this is

4    May 7, the green report, Paragraph 30.

5    A.  Green, sorry, I've got a little -- color blind.  Green,

6    correct?

7    **Q.**  Doctor --

8    A.  This was the May --

9    **Q.**  May 2007, Paragraph 30.

10   A.  Yes.

11   **Q.**  Isn't it true that there you expressed the view that

12   these results demonstrate that Dr. Eschbach used a

13   pharmaceutical composition, and what you're referring to

14   there is the sheep plasma as a pharmaceutical composition?

15   A.  Well, there I'm just stating, I think, the thrust of

16   that paragraph was the therapeutically effective amount.

17   And it was to that element that that paragraph is directed.

18   **Q.**  Isn't it true, Doctor, that you have never administered

19   sheep plasma to any patient?

20   A.  That's correct.

21   **Q.**  And you'd never do that?

22   A.  Excuse me?

23   **Q.**  And you would never do that?

24          **MR. FLEMING:**  Objection, your Honor.

25          **THE COURT:**  At that level of generality, sustained.

1          THE WITNESS:  Thank you.

2          MR. MADRID:  May I have Exhibit 232 put up on the

3  board?

4          MR. FLEMING:  I'm sorry, 2032?

5          MR. MADRID:  2032.  Thank you, counsel.

6  Q.  Now, this is the sheep study article that you referred

7  to in your direct testimony yesterday; correct?

8  A.  Yes.

9  Q.  And I notice that you didn't show the jury a sentence

10  that occurs towards the end of the article.

11          MR. MADRID:  Let's go to page 440 of Exhibit 2032,

12  and let's highlight the sentence that starts with the word,

13  "Nevertheless."

14  Q.  Do you see where it says, "Nevertheless, until purified

15  EPO is available, we cannot conclude unequivocally that it

16  was only Ep, or EPO, that produced the erythropoietic

17  changes noted in our uremic sheep."  Do you see that?

18  A.  I see that.

19  Q.  That reflects that other materials were present in the

20  plasma, the sheep plasma that was given to the sheep;

21  correct?

22          MR. FLEMING:  Objection, foundation.

23          THE COURT:  No, overruled.

24          Is that what you draw from that?

25          THE WITNESS:  Well, what I did was I read the

1    entire paper.  This is a discussion.  This is a well thought

2    out paper.  JCI is a major clinical investigation paper.

3    And Dr. Eschbach is expressing the totality of his opinions

4    based on the data in the discussion.  So what I did was I

5    looked at the entire discussion.

6    **Q.**  And, Doctor, you have no basis to disagree with this

7    statement, "Nevertheless, until purified EPO is available,

8    we cannot conclude unequivocally that it was only Ep that

9    produced the erythropoietic changes noted in our uremic

10   sheep"?

11   A.  I have no basis to disagree with all that Dr. Eschbach,

12   and I think he concluded, and I think I gave a fair

13   summary --

14   **Q.**  Thank you.

15          **MR. MADRID:**  Your Honor, I pass the witness.

16          **THE COURT:**  Very well.  Redirect?

17          **MR. FLEMING:**  Thank you, your Honor.

18                    **REDIRECT EXAMINATION**

19   **(BY MR. FLEMING:)**

20   **Q.**  Dr. Spinowitz, Mr. Madrid used this board with you

21   during his cross-examination.  Do you recall that?

22   A.  Yes.  Yes, he did.

23   **Q.**  All right.  How many of the patients that Dr. Baron and

24   Goldwasser had in their study does this represent?

25   A.  This was one of the patients.

1    Q.  And there were -- remind the jury how many there were?

2    A.  There were a total of three that were evaluated.

3    Q.  Okay.

4         **MR. FLEMING:**  Can we have 2004, please?

5    Q.  Now, Dr. Baron had all data from all of the patients;

6    right?

7    A.  Yes, he certainly did.

8    Q.  One last question on this.

9    A.  Sure.

10   Q.  What is this measuring?

11   A.  What --

12   Q.  You talked about -- oh, I have it upside down.  Okay.

13   It was a trick question, Doctor.  You failed.

14        What --

15   A.  It's represents a mirror.

16   Q.  What are the lines that Mr. Madrid used with you

17   measuring?

18   A.  Well, he's connecting the dots.

19   Q.  No, no, what is the measuring?

20   A.  Oh, those are absolute reticulocytes.

21   Q.  Reticulocyte counts?

22   A.  Yes.

23   Q.  Okay.  And if we can go to page 20 of Exhibit 2004,

24   this, again, is the IND, the new drug application that Dr.

25   Baron submitted to the FDA; correct?

```
 1    A.  Yes.  This is the letter that we identified yesterday.

 2    Yes.

 3            MR. FLEMING:  Can we go to page, I believe it's 40,

 4    the February 1984 progress report, please.  The page at

 5    which immediately eludes me.

 6            THE WITNESS:  Thank you.

 7            MR. FLEMING:  But much smarter people than me with

 8    computers can find it for us.  Thank you.  Can we go to the

 9    second page, please?  Okay.  And with the large biological

10    efficacy.  Thank you.

11    Q.  Doctor, could you tell the jury what Dr. Baron told the

12    FDA regarding the data from this patient and the other

13    patients as it concerns reticulocyte count?

14            MR. MADRID:  Objection.  The document speaks for

15    itself.

16            THE COURT:  No, but he may interpret it.

17    Overruled.

18    A.  What he stated, without just spitting it back at you,

19    it's, starting from "however," he stated that each of the

20    patients showed a mild, moderate increase in reticulocyte

21    number.  So that a response was seen in all three of the

22    patients.

23    Q.  And you -- what does that tell you, as one of skill in

24    the art, in coming to your conclusions regarding these

25    claims?
```

1  A.  That, again, within the confines of analysis of the

2  claims, this is one of the therapeutic evidences of

3  therapeutic responsiveness, stimulation of an erythrocyte

4  response -- reticulocyte response.  Sorry, it's getting

5  late.  Sorry.

6  **Q.**  And you're saying each patient showed an increase?

7  A.  That's correct.

8  **Q.**  And again, briefly just tell the jury what, to one of

9  skill in the art, the significance of an increase in

10  reticulocyte count means.

11  A.  An increase is indicative of stimulation.  Increase,

12  went up.  In this case, reticulocytes going up represents

13  stimulations, an increase.

14        **MR. FLEMING:**  Can I have 2045, please.

15  **Q.**  This is the 1984 Dr. Goldwasser grant application;

16  correct?

17  A.  Yes.  That's correct.  The data is from there.

18        **MR. FLEMING:**  Okay.  Can we go forward to -- go

19  forward in the document, please.  We're getting there.

20  Little bit further, please.  Okay.  There it is.

21  **Q.**  The clinical test of EPO.  Again, can you read, now,

22  what Dr. Goldwasser said regarding this data to the NIH in

23  connection with his grant?

24  A.  Well, again, starting with each patient, referring to

25  all three, however, showed an increase in reticulocyte count

1    with peaks at 9, 10 and 11 days.

2    **Q.**   Same data as Dr. Baron had?

3    A.   They were looking at the same data sample.

4    **Q.**   Can you tell me, do you agree with their conclusions

5    regarding the reticulocyte count data?

6    A.   Based on my review of all this data, I agree with both

7    of their conclusions.

8    **Q.**   Anything in the lines, the circles that Mr. Madrid drew

9    change your opinion in any way?

10   A.   Not mine nor theirs.

11   **Q.**   Doctor, as a clinician, someone who treats patients,

12   would you rely on one data point or one piece of

13   information?

14            **MR. MADRID:**   Objection.  Leading.

15            **THE COURT:**   Sustained, on that ground.

16            **MR. FLEMING:**   I'll rephrase, your Honor.

17   Withdrawn.

18   **Q.**   Doctor, as a clinician, looking at patient data, could

19   you explain to the jury how you approach your review of

20   data?

21   A.   Well, nephrologists, because we're looking at laboratory

22   data constantly, patients have lots of blood tests drawn,

23   lots of numbers, I have to look at a totality of data.  I

24   may look at a single point, wonder about it, think about it,

25   but ultimately I make decisions about patients by looking at

1    the totality of the information available to me.  And that

2    means looking at a lot of data.

3    **Q.**  So you look at the totality of the data?

4              **MR. MADRID:**  Objection, leading.

5              **THE COURT:**  Sustained.  Don't lead the witness.

6    The jury heard his testimony.

7              **MR. FLEMING:**  I apologize, your Honor.  Withdrawn.

8    **Q.**  Again, so if you looked at the data such as what's

9    represented here on the board, what, to you, is the

10   significance of this data?  Maybe you want to come down --

11   can you see?  I don't want to hit anyone.

12   **A.**  I looked for 15 minutes, I think I know what's there.

13            Basically what I look at is a trend.  I get a lot

14   of data points, sometimes I graph them, sometimes I just

15   look at them in my head.  Now, actually, with computers we

16   can instantly get trend.  What I do is I get that trend and

17   that's what we look at.  We look at a trend before we make

18   conclusions about patients.

19   **Q.**  Can you show the jury, please?

20            **MR. FLEMING:**  Your Honor, may the witness step down

21   briefly, please?

22            **THE COURT:**  He may.

23   **Q.**  Can you show the jury on this one patient's data where

24   you see a trend?

25   **A.**  Well, there's actually a trend --

1          THE COURT:  Keep your voice up, sir.

2          THE WITNESS:  Sorry.

3     A.   There's actually a trend going here.  There's a trend

4     going here.

5          MR. MADRID:  Your Honor, I object.

6     A.   And this is all during the course --

7          MR. MADRID:  This is outside the scope of the

8     expert report.

9          THE COURT:  Overruled.

10    A.   And this is all during the course of the erythropoietin

11    trial with that pharmaceutical composition of

12    Dr. Goldwasser's.

13    Q.   Looking at this data, what do you conclude from the

14    trends of this patient?

15    A.   That there was a, in this case, a mild increase, but an

16    increase in reticulocyte count, indicating that there was a

17    therapeutic response.

18          MR. FLEMING:  Thank you, Doctor.

19    Q.   Now, Doctor, Mr. Madrid asked you if you did clinical

20    research for Roche.  Do you recall that?

21    A.   Yes.

22    Q.   And you had said that in your direct testimony; correct?

23    A.   Yes, correct.

24    Q.   What's the molecule that you do clinical research on for

25    Roche?

```
 1              MR. MADRID:  Objection, your Honor.  Irrelevant.
 2              THE COURT:  Oh, no, overruled.
 3    A.  Mircera.
 4    Q.  And just briefly, could you tell the jury what that
 5    molecule is?
 6              MR. MADRID:  Objection, your Honor.  Irrelevant.
 7              THE COURT:  Well, it's not relevant to this stage,
 8    but I'm sure we're going to hear more about it.  But you may
 9    tell us very briefly.
10    A.  Mircera is a unique compound that --
11              MR. MADRID:  I object, your Honor.
12              THE COURT:  Yes.  As soon as you say it's a unique
13    compound, they say it infringes.  All I think he's entitled
14    to now, I'll give you the instruction, you're doing clinical
15    research on the competitive drug here; right?
16              THE WITNESS:  I'm -- yes.  Yes, your Honor.
17              THE COURT:  All right.  There's the answer.
18              THE WITNESS:  The -- yes, sorry.
19              THE COURT:  That's sufficient.  For this stage of
20    the case.  But we're going to be back at this.
21              To me, it's logical.  We're doing the part of the
22    case that looked at what Amgen received as a patent, and
23    plays that out against what was known, and technically what
24    we call prior art, and you'll be hearing more about that.
25    That's the first part of the case.  Both sides are going to
```

1    be heard on that.

2         The second part of the case, and we'll get to it,

3    is we want to know what Roche is doing, because the shoe

4    goes to the other foot, goes to Amgen, different burden.

5    Amgen's going to say, Well, what Roche is doing infringes.

6    This fellow is associated with Roche, and he's doing

7    clinical research on the Roche competitive product.

8         We'll get to it.  Not today though.

9         **MR. FLEMING:**  Of course.

10        **THE COURT:**  Go ahead, Mr. Fleming.

11        **MR. FLEMING:**  I wanted it for clarification for the

12   jury.

13        **THE COURT:**  But it's in this area of science,

14   because it's a competitive product.  Go ahead.

15        **MR. FLEMING:**  Thank you, your Honor.

16   **Q.**  And you said you also do clinical research for Amgen?

17   A.  Yes, I do.  I have.

18   **Q.**  And when you did this clinical research, did Amgen

19   subsidize your research?

20   A.  Yes.

21        **MR. MADRID:**  Objection.  Leading.

22        **THE COURT:**  Well, I'm going to allow it.  Don't

23   lead the witness, Mr. Fleming.

24        **MR. FLEMING:**  Absolutely not, your Honor.

25   **Q.**  And were there similarities or differences in the way

1    you received funds for your research from Amgen and Roche?

2             MR. MADRID:  Objection.  Leading.

3             THE COURT:  Overruled.  How did the two compare?

4    How do they pay clinical researchers?

5             THE WITNESS:  We actually create a budget requiring

6    a subsidy for --

7             MR. MADRID:  Your Honor, this is irrelevant.

8             THE COURT:  You didn't object on that ground.  So

9    I'm going to let them hear him.

10            THE WITNESS:  You create a budget for the various

11   activities they've done.  It's a very complex thing.  It

12   involves many individuals, not just myself.  But, basically,

13   we have a standard subsidy for each of the items that we do

14   within a clinical project, and it's the same across the

15   board.

16   Q.  Let's go back to your reticulocyte count for a second.

17   And you showed the jury, again, Dr. Baron's statement and

18   Dr. Goldwasser's?

19            MR. FLEMING:  Can we have 2054, please?

20   Q.  Now, this is the Amgen IND?

21   A.  Yes.  This is the face sheet, I believe it's the face

22   sheet, one of the pages, sir.

23            MR. MADRID:  Objection, your Honor.  This is

24   outside the scope of cross-examination.

25            THE COURT:  Yes.  This does seem to be outside the

1   scope of cross-examination.  Sustained.

2   Q.  Prior to the commencement of the litigation --

3           THE COURT:  Take it down.

4           MR. FLEMING:  Take it down, please.

5   Q.  -- when Amgen was submitting data to the FDA for its

6   product, did they argue anything about reticulocyte count --

7           MR. MADRID:  I object, your Honor.

8           THE COURT:  Sustained.  Outside the scope.

9   Q.  Did you review any data from the documents in this case

10  that were created before the litigation that demonstrated to

11  you that Amgen ever criticized any of the valuable

12  Goldwasser data?

13          MR. MADRID:  Objection, your Honor.  Outside the

14  scope.

15          THE COURT:  Sustained, and it is.  Let's move on,

16  Mr. Fleming.

17          MR. FLEMING:  Of course, your Honor.

18          Can I have claim 1 of the '422, please?

19  Q.  And the jury's seen this and you've given your opinions

20  on this; correct?

21  A.  As I recall, this was the breakdown, the highlighting

22  with the elements that were used when I evaluated and

23  formulated my opinion.

24  Q.  Okay.  Remind the jury, what type of claim is this?

25  A.  This is a product claim.

1    **Q.**  And by "product claim," what do you mean?

2    A.  Well, they're describing a --

3         **MR. MADRID:**  Objection, your Honor.  This is a

4    legal conclusion.

5         **THE COURT:**  Well, it may be, and I'm going to have

6    to instruct about that.  But it is a product claim, and --

7         **MR. FLEMING:**  Your Honor, that's a term of art.  I

8    just thought the jury would like to know that it's --

9         **THE COURT:**  Well, all right.  A product claim is a

10   claim that claims a particular product.  And this is the

11   product that's claimed there.

12        Now, there's another type of claim that we're going

13   to be talking about here and that's a process claim.  A

14   process claim, as the words imply, claims a specific process

15   for doing something.  Then there's a third type of claim, a

16   product by a process where what's claimed is the creation of

17   a product using a specific process.

18        Now, I'm going to have to explain that in more

19   detail, because they're squabbling about all those things.

20   But, in essence, those are the three types of claims.

21        And this one is a product claim.  And the

22   product -- and it reads out as normal English would read --

23   the product is a pharmaceutical composition comprising a

24   therapeutically effective amount of human erythropoietin and

25   a pharmaceutically accepted diluent, adjuvant or carrier,

1    wherein said erythropoietin is purified from mammalian cells

2    grown in culture.

3           Now, after the words "a pharmaceutical

4    composition," the other words, the other, they refer to them

5    as limitations.  You're going to hear more about that in the

6    infringement part of the case.  The rest of it describes the

7    product, the pharmaceutical composition.

8           I think that's enough.  Go ahead, Mr. Fleming.

9           **MR. FLEMING:**  Thank you, your Honor.

10   **Q.**  And explain to the jury your opinions about the prior

11   art in connection with the pharmaceutical composition.

12   Could you just briefly explain that to them?

13   A.  Yes.  My opinion was that based on all the prior art

14   that I had presented and gone over, that I think that all of

15   the elements contained in this claim are invalid by virtue

16   of obviousness and anticipation.  And I considered all of

17   those elements.

18   **Q.**  So let's break this down.  So, let's take the

19   Baron-Goldwasser study first, if we could, all right?  What

20   is the pharmaceutical composition, in your opinion, in the

21   Baron-Goldwasser study?

22   A.  That pharmaceutical composition contained human

23   erythropoietin, as defined by the courts, and a

24   pharmaceutically acceptable diluent, adjuvant or carrier.

25   In that case it was that normal serum albumin.  That was the

1    pharmaceutical composition.  It was suitable for

2    administration to humans by virtue of approval by the FDA

3    and the local and institutional review board.

4    **Q.**  What was the human erythropoietin component of the

5    pharmaceutical composition from the Baron-Goldwasser study,

6    in your opinion?

7    A.  That was the erythropoietin that had been isolated and

8    purified from the urine.

9    **Q.**  And the diluent, adjuvant, carrier, was that present in

10   the Goldwasser-Baron pharmaceutical EPO?

11           **MR. MADRID:**  Objection.  Leading.

12           **THE COURT:**  Sustained.  Don't lead the witness.

13           **MR. FLEMING:**  Yes, your Honor.

14   **Q.**  Did you find a diluent, adjuvant or carrier in the

15   Baron-Goldwasser composition?

16   A.  Yes.

17           **MR. MADRID:**  Objection.  Leading.

18           **THE COURT:**  He can have that.  The next question

19   is, what is it?

20           **MR. FLEMING:**  That is exactly my next question,

21   your Honor.

22   **Q.**  Please tell the jury what it was.

23   A.  To restate that, that was the normal serum albumin that

24   was added to the purified urinary human erythropoietin.

25   **Q.**  And the therapeutically effective amount of that EPO?

1   A.   By the Court's definition, therapeutic efficacy had been

2   seen in those patients.  They all had a mild to moderate

3   increase in reticulocytes.  If you recall, the Court

4   definition said that any or all of those efficacy end points

5   would qualify as therapeutic efficacy, but actually some of

6   the patients had variable other evidences, increase in the

7   ferrokinetics, increase in red blood cell mass, nucleated

8   red blood cells.

9   Q.   And the next part, purified from mammalian cells, where

10  did the Goldwasser-Baron urinary EPO come from?

11  A.   The source of that was the mammalian kidney cells of

12  those patients, unfortunately, with aplastic anemia.

13  Q.   Now, did you consider also the part that says "cells

14  grown in culture" when you did your analysis?

15  A.   Well --

16  Q.   Did you consider it?

17  A.   Yes.

18  Q.   Okay.  Could you explain to the jury how that factored

19  into your analysis of this?

20  A.   On -- well, in two ways.  First of all, as a --

21       MR. MADRID:  Objection, your Honor.  This is not in

22  the report.

23       THE COURT:  Yeah, I'm going to sustain it.

24       MR. FLEMING:  Well, your Honor, may I refer you to

25  the green report?

1        **THE COURT:**  Yes.

2        **MR. FLEMING:**  And I would first refer you to

3    Paragraph 43, which your Honor allowed to be read into the

4    record yesterday.

5        **THE COURT:**  Wait just one second.  Yes, but it's

6    not there.

7        **MR. FLEMING:**  If you could also look at green

8    report, Paragraph 15.

9        **THE COURT:**  And 15.  Wait a second.  No, sustained.

10   But I see the point.

11       **MR. FLEMING:**  But your Honor --

12       **THE COURT:**  Sustained.

13   **Q.**  As to your opinion regarding this product claim, what

14   definition of human erythropoietin did you use?

15   A.  As the Court prescribed, the definition of human

16   erythropoietin as erythropoietin --

17       **MR. FLEMING:**  Could I have the glossary?  Could we

18   enlarge of the definition of human erythropoietin?

19   A.  It's the one --

20   **Q.**  Is that the one?

21   A.  Yes.

22   **Q.**  Could you explain to the jury how you applied this

23   definition to your analysis on -- withdrawn.

24       Can you explain to the jury your application of

25   this definition to your opinion that claim 1 of the '422 is

1     invalid?

2          **MR. MADRID:**  Objection.  Outside the scope of the

3     report.

4          **THE COURT:**  No, he may testify consistent with the

5     report.  Well, no, come to the sidebar.

6     SIDEBAR CONFERENCE, AS FOLLOWS:

7          **THE COURT:**  How slow I am.  All right.  Now I

8     understand what the issue it.  And the issue is a legal

9     issue.  I think, and if you force me to today, I'll tell you

10    I'm ruling against Roche on this.  As I read this, I never

11    thought that you could take the definition of human

12    erythropoietin and read out of this product claim the grown

13    in culture.

14          That's what he's done here.  Now, my approach will

15    be, unless you force me, to just let it go, and address this

16    in the motion for directed verdict, where you can have more

17    thorough briefing.  But now that I understand this

18    particular fight, I never thought you could read that out.

19          **MR. FLEMING:**  Can I offer two points?

20          **THE COURT:**  Sure.

21          **MR. FLEMING:**  Thank you.  So let's start with human

22    erythropoietin.

23          **THE COURT:**  Right.

24          **MR. FLEMING:**  You have defined that as any

25    protein --

1          THE COURT:  I follow.  I know what I defined it --

2          MR. FLEMING:  So that now becomes the thing.  The

3    thing --

4          THE COURT:  But the thing is modified by the --

5          MR. FLEMING:  No, your Honor, your definition, we

6    asked you, remember --

7          MS. BEN-AMI:  No, no, you're wrong.  You're wrong.

8    No.  No.

9          THE COURT:  I understand what you're saying.

10   That's not how I got it.

11         MS. BEN-AMI:  That's not what we're saying either.

12         THE COURT:  Maybe you ought to get together so what

13   you're saying --

14         MR. FLEMING:  I'll defer to Ms. Ben-Ami.

15         MS. BEN-AMI:  That's an oversight.  That's not what

16   we're saying.

17         THE COURT:  Press me downstream, we'll see.

18         MS. BEN-AMI:  We have another witness who's going

19   to go to the last part of the claim and show that purified

20   from mammalian culture is the same structure as urinary EPO.

21   That's what you talked about before.  That's what's

22   happening.

23         THE COURT:  Fine.  This is the great advantage of

24   trying cases.  Not only does the jury learn, I really learn

25   what you're talking about.  I understand the issue.  I,

1   again, I'm transparent, my thinking on the issue is what I

2   just said.  I would let it go.  If you let it go, I'm not

3   letting Mr. Madrid on recross-examination go back over it.

4   His testimony is what it is.  If I have to decide legally

5   what to make of it, there will be a mechanism to do that,

6   and I will do it, as I must, once you've rested, which is

7   not today.

8           **MS. BEN-AMI:**  That's the next witness.

9           **MR. FLEMING:**  Your Honor, give me one second.

10          (Whereupon counsel conferred.)

11          **MS. BEN-AMI:**  I think it's already in.  It's in

12  during his direct.

13          **MR. FLEMING:**  It is.

14          **MS. BEN-AMI:**  But you can -- I mean, he questioned,

15  you can redirect him, I guess.

16          **MR. FLEMING:**  Your Honor, the remainder of that is

17  that there is, in his report, as you allowed me to read

18  yesterday, in the part, the statement that he's relying on

19  opinions of Dr. Lowe as well, who testified, in forming his

20  opinions as well.

21          **THE COURT:**  You can say are you relying upon Lowe.

22  If you'd like to get that out, you may go back and say that.

23  But now I understand this issue.

24          **MR. FLEMING:**  Thank you, your Honor.

25          (Whereupon the sidebar conference concluded.)

1          **MR. FLEMING:**  May I continue, your Honor?

2          **THE COURT:**  I just want to say to the jury, I

3     regret the delay.  I'm learning things as you are, too.  I

4     have to grapple with this case just as you do.  I needed the

5     time.  Thank you.

6          Go ahead, Mr. Fleming.

7          **MR. FLEMING:**  Thank you.

8     **(BY MR. FLEMING:)**

9     **Q.**  Now, when you were on direct, you read a portion of your

10    expert report to the jury, and it was Paragraph 43.  I don't

11    want you to read it again, it's already in the record.

12    A.  Thank you.  Paragraph 43 reads, "Thus" --

13    **Q.**  No, no, I do not want you to read it.

14    A.  Oh, I'm sorry.

15    **Q.**  But I want to direct you to Paragraph 36.

16    A.  Okay.  Sorry.

17    **Q.**  Starts on the bottom of page 13.

18    A.  Yes.

19    **Q.**  Okay.  And my question to you is, as a part of your

20    opinions regarding the invalidity of claims of the '422 and

21    the '933, are you relying upon the opinions of Dr. Lowe?

22         **MR. MADRID:**  Objection, your Honor.

23         **THE COURT:**  Overruled.

24    A.  Yes.

25    **Q.**  And you know Dr. Lowe's already been here and testified

 1   in front of the jury?

 2            **MR. MADRID:**  Objection, your Honor.  Speculation.

 3            **THE COURT:**  Speculation?

 4            **MR. MADRID:**  He wasn't here when the testimony --

 5            **THE COURT:**  Well, I know he wasn't here.  Maybe he

 6   was in the hall.  I wonder what he thought he was doing in

 7   here when he came in.

 8            Put that to one side.  Technically, he's right.

 9   The jury's following this.  You want to make that technical

10   objection, sustained.

11            You're relying on his opinions because you've read

12   his expert report; correct?

13            **THE WITNESS:**  That's correct, your Honor.

14            **THE COURT:**  And you're talking about the opinions

15   in that expert report?

16            **THE WITNESS:**  That's correct, your Honor.

17            **THE COURT:**  Have you read his transcript?

18            **THE WITNESS:**  No.

19            **THE COURT:**  The transcript of the --

20            **THE WITNESS:**  -- of the trial?

21            **THE COURT:**  -- of the trial testimony?

22            **THE WITNESS:**  No, I have not.

23            **THE COURT:**  Thank you.

24            Anything else, Mr. Fleming?

25            **MR. FLEMING:**  A few extra questions, your Honor, if

1    I might.

2    **Q.**  Now, when Mr. Madrid was questioning you about the

3    materials upon which you relied in forming your opinions

4    that you told the jury, he mentioned to you the

5    Goldwasser-Baron study?

6    A.  Correct.

7    **Q.**  He mentioned to you the Essers study?

8    A.  That's correct.

9    **Q.**  He mentioned to you the Eschbach human patient study?

10   A.  Correct.

11   **Q.**  He mentioned to you the Eschbach sheep study?

12   A.  That's correct.

13   **Q.**  Did he not mention to you anything upon which you relied

14   in addition to that?

15   A.  Yes.

16          **MR. MADRID:**  Objection.  Leading.

17          **THE COURT:**  I didn't even understand.  Did he not

18   mention to you anything else -- did you rely on other

19   things?

20          **MR. FLEMING:**  Of course.  Yes, your Honor.

21          **THE COURT:**  That's the question.

22          **THE WITNESS:**  Can I answer that question?

23          **THE COURT:**  Now you understand it.  What else did

24   you rely on?

25          **THE WITNESS:**  Yes.  There was also data, part of

 1    the Baron-Goldwasser IND submission from the hamster study.

 2    **Q.** Did you rely at all on Dr. Goldwasser's grant

 3    application?

 4    A.  Yes.  I looked at those as well.  IND applications, yes.

 5    **Q.** Can I have --

 6          **THE COURT:**  Well, I have this question.  That's

 7    interesting.  Do you need those latter two things or would

 8    your opinion be the same if they were not there?

 9          **THE WITNESS:**  Actually, I think there were -- there

10    were important parts of Dr. Goldwasser's NIH submissions as

11    well as the IND.  Dr. Goldwasser has an extensive array of

12    planned experiments, if you will, that he is asking the NIH

13    to fund him for.  And he actually makes reference to what

14    was known then, to one of skill in the art, regarding the

15    recombinant technology that actually is supported by

16    Dr. Lowe.

17          So it's that other additional information that I

18    think -- that I know helped me in formulating that opinion

19    about obviousness.

20          **THE COURT:**  Yeah.  So if that wasn't out there,

21    considered prior art, you couldn't draw your conclusion

22    about obviousness, or you could?

23          **THE WITNESS:**  No, I still could.

24          **THE COURT:**  You still could, based upon things that

25    Mr. Madrid raised and cross-examined you on?

1           **THE WITNESS:**  And based upon --

2           **THE COURT:**  Is that right?  I just want to be clear

3    on that.

4           **THE WITNESS:**  That, plus based on my knowledge of

5    the state of the art in 1983, '84.  There was a lot going on

6    in recombinant technology.

7           **MR. MADRID:**  Objection, your Honor.  Move to strike

8    the last comment.  It's not in his report.

9           **THE COURT:**  No, that may stand.  Go ahead,

10   Mr. Fleming.

11          **MR. FLEMING:**  Thank you, your Honor.

12   **Q.**  And of course the opinions of Dr. Lowe?

13   A.  Yes.  I thought we established that.

14   **Q.**  Okay.  Now, we were talking about claim 1 of the '422.

15   There were also the claims of the '933 patent as well?

16   A.  Yes, that's correct.

17   **Q.**  And did the materials that you just discussed with his

18   Honor, and you explained to the jury, were all those

19   materials considered by you in forming your opinions about

20   the invalidity of those claims?

21   A.  Yes.

22          **MR. FLEMING:**  So can we have the '933 patent, which

23   I think is Exhibit 1?  And can we have claim 9?  And can we

24   enlarge that?

25   **Q.**  And again, claim 9 says a pharmaceutical composition?

1   A.  Yes, correct.

2   Q.  Okay.  Now, it has the word "glycoprotein" in it.  Do

3   you see that?

4   A.  That's correct.

5   Q.  Do you know what that is?

6   A.  It's a protein.

7           MR. MADRID:  Objection.  Outside the scope.

8           THE COURT:  It is.  Sustained.

9   Q.  Did you -- and again, there's a reference, it says

10  according to claim 3, because this is a dependent claim.

11  Did you consider claim 3 in coming to your opinion regarding

12  claim 9 of the '933?

13          MR. MADRID:  Leading.

14          THE COURT:  What did you consider in coming to your

15  opinion as to claim 9?

16          MR. MADRID:  Your Honor, it's also outside the

17  scope of his report.

18          THE COURT:  He may have it.  Your objection was to

19  form, originally.

20  A.  Actually, I considered a number of things.  All of those

21  claims.  I also considered the description of the

22  pharmaceutical composition in the Miyake paper.

23          MR. FLEMING:  Can we have claim 3, please?

24  Q.  So this is claim 3 that's incorporated into claim 9.

25  Can you explain to the jury --

1          **MR. MADRID:**  Objection, your Honor.  Outside the

2     scope of the report.

3          **THE COURT:**  He hasn't asked the question yet.  Let

4     him ask his question.

5          **MR. FLEMING:**  Thank you, your Honor.

6     **Q.**  Can you explain to the jury, as a clinician, how you

7     incorporated claim 3 into your analysis of the invalidity of

8     claim 9 of the '933 patent?

9          **THE COURT:**  You do object, Mr. Madrid?

10         **MR. MADRID:**  Yes, sir.

11         **THE COURT:**  Sustained.

12    **Q.**  Do you remember, on cross, Mr. Madrid asked you about

13    claim 3 of the '933 patent?

14    A.  Yes.

15    **Q.**  And he asked you about the term "non-naturally

16    occurring."  Do you recall that?

17    A.  Yes.

18    **Q.**  In your opinion, was the Baron-Goldwasser pharmaceutical

19    composition of EPO non-naturally occurring?

20         **MR. MADRID:**  Objection.  Outside the scope of the

21    cross.  I didn't inquire as to non-naturally occurring.

22         **THE COURT:**  Yeah, sustained.  Sustained on that

23    ground.

24    **Q.**  Do you recall on cross-examination whether Mr. Madrid

25    asked you about the element, non-naturally occurring?

1          **MR. MADRID:**  Objection.

2          **THE COURT:**  No, I make those rulings.  I've just

3     made it.

4          **MR. FLEMING:**  Understood, your Honor.  Okay.

5     **Q.**  The purified human urinary EPO of Dr. Goldwasser and

6     Baron's study, could you describe that to the jury for us?

7     A.  That was --

8          **MR. MADRID:**  Objection.  Asked and answered.

9          **THE COURT:**  Overruled.

10    A.  As described in that paper, that was --

11    **Q.**  Which paper?

12    A.  The Miyake paper.  That was isolated from urine -- human

13    urine, from patients who were anemic.  Erythropoietin

14    amounts in the urine were increased.  This was isolation.

15    There was characterization of that protein.  And that's

16    certainly not the way it would have appeared in nature.  In

17    nature would have been in a very different amount.  It would

18    not have been --

19         **MR. MADRID:**  I object, your Honor.  This is outside

20    the scope.

21         **THE COURT:**  That may stand.

22         **MR. FLEMING:**  May he finish the answer, your Honor?

23         **THE COURT:**  He may.

24    **Q.**  Finish, Doctor.

25    A.  It would not have existed in that degree of purity, the

1    way they measure the amount of the active hormone in a

2    certain amount of substance.  And that erythropoietin had

3    come from mammalian kidney cells.

4    **Q.**  Switching topics just for a second, back to the Essers

5    study, the study that was conducted in Germany?

6    A.  Yes.

7    **Q.**  The plasma-rich EPO -- EPO-rich plasma of Dr. Essers, in

8    your opinion, was that a pharmaceutical composition?

9    A.  Yes.  It was, by definition, suitable for administration

10   to humans, and it had erythropoietin in an enriched amount,

11   and it certainly had a diluent, that is the plasma, that

12   they had processed in forming that EPO-rich plasma.

13        **MR. FLEMING:**  Could we leave that back up, please?

14   I'm sorry.

15   **Q.**  So could you explain to the jury your opinion regarding

16   that preparation?

17   A.  Well, that, too, that EPO-rich plasma that had been

18   harvested from a number of patients, pooled, and then

19   administered, that's not the way it appeared in nature.  The

20   way it appeared in nature was --

21        **MR. MADRID:**  Objection, your Honor.  This is

22   getting into matters outside the scope of the report.

23        **THE COURT:**  The objection's not timely.  The

24   question was explain.  He may explain.

25   A.  I believe what I was saying was that the erythropoietin

1    does not appear that way in nature, in such a concentrated

2    amount.

3    **Q.**  And did anyone else --

4    A.  And pooled, I'm sorry.

5    **Q.**  I'm sorry.  Have you finished?

6    A.  And pooled together.

7    **Q.**  Anyone else use an EPO-rich plasma that you reviewed,

8    other than Dr. Essers?

9    A.  Well, Dr. Eschbach.

10   **Q.**  How would you characterize's Dr. Eschbach's --

11          **MR. MADRID:**  Objection, your Honor.  Outside the

12   scope of the report.

13          **THE COURT:**  I don't see that in the report, now,

14   when he makes that objection.  Sustained.

15   **Q.**  Mr. Madrid asked you on direct about whether or not

16   Dr. Baron or Goldwasser had published the results of their

17   study.  I guess he meant in an article.  Do you understand

18   that?

19   A.  Correct.

20   **Q.**  You were here for Dr. Baron's testimony?

21   A.  Yes, I was.

22   **Q.**  Did he say in his testimony about his intentions of

23   whether he wanted to publish that amount?

24   A.  He said that they never planned on publishing that data.

25   **Q.**  Now, Dr. Baron, to your understanding, is not a paid

1    consultant for Amgen, is he?

2    A.  No.

3    Q.  And we heard from Dr. Goldwasser -- we'll move on, your

4    Honor.

5            When Dr. Goldwasser -- withdrawn.

6            Now, Mr. Madrid asked you about an article you had

7    written in 1990, and your opinions about recombinant EPO

8    administration.  Do you remember that?

9    A.  Yes.

10   Q.  Are you aware that -- do you know what an advisory

11   committee is?

12   A.  Yes.

13           MR. MADRID:  Objection.  Leading.  Outside the

14   scope.

15           THE COURT:  Well, it -- no, overruled.  You've

16   opened this up.  He may have it.

17           MR. FLEMING:  Thank you, your Honor.

18   Q.  Do you know what an advisory committee is?

19   A.  Yes.

20   Q.  Can you explain to the jury what an advisory committee

21   is?

22   A.  Well, it's --

23           THE COURT:  Well, in what context?  That's pretty

24   general.  I mean, he opened it up, but I've seen advisory

25   committees on advisory committees.

1              MR. FLEMING:  I will make it very specific.

2              THE COURT:  Please.

3    Q.  An advisory committee acts for the FDA?

4    A.  Yes.

5              MR. MADRID:  Objection.  Leading.

6              THE COURT:  Well, he may have that.

7    A.  That's one of the ways that the FDA gathers information,

8    certainly.

9    Q.  Are you aware that an advisory committee of the FDA is

10   investigating safety issues in connection with Amgen's

11   Epogen product?

12             MR. MADRID:  Objection, your Honor.

13             THE COURT:  Wait, wait, wait.  That's way outside

14   the scope.  Sustained.  Sustained.

15   Q.  Mr. Madrid asked you about plasma and certain issues

16   relating to plasma; do you remember that?

17   A.  Yes.

18   Q.  And he talked about whether it's safe to give plasma

19   from one human to another?

20   A.  Correct.

21   Q.  Are you aware of safety issues in connection with the

22   administration of Amgen's product?

23             MR. MADRID:  Objection, your Honor.  Objection,

24   your Honor.

25   A.  Yes.

```
 1            THE COURT:  Wait a second.  Come to the sidebar.

 2    SIDEBAR CONFERENCE, AS FOLLOWS:

 3            THE COURT:  There's a little squib in today's Globe

 4    saying that Amgen has satisfied those, and resolved those

 5    issues.  But do you think this bears on obviousness?  Not on

 6    obviousness -- well, yeah, on the secondary indicia of

 7    obviousness?

 8            MR. FLEMING:  It absolutely does.

 9            THE COURT:  How so?

10            MR. FLEMING:  Two ways, your Honor.  They want to

11    make the impression that Epogen has met some long-felt need.

12    In doing so, they received the claim.

13            THE COURT:  They certainly do.

14            MR. FLEMING:  That's what they argue.  If they do

15    that, as they would with any reputation, we should be

16    permitted, out of fairness, to show that the opinions of

17    people, including statements by --

18            THE COURT:  Okay.  True.  You're right.  But --

19            MR. FLEMING:  That's why I said to him when he

20    opened the door --

21            MR. DAY:  He's opened the door, and you can walk

22    through it.  But with competent evidence.  This is hearsay

23    as to him.  It's all hearsay.

24            MR. FLEMING:  Well, he's --

25            MR. DAY:  It's also outside the scope of any
```

```
 1    report.  There's no disclosure.

 2         THE COURT:  No, no, no.  One person.  I know you're

 3    all eager.  I really like one person.  And also, I've

 4    grabbed on to something that satisfies me for now.

 5         It's hearsay for him.  I'm hoping to get through

 6    with him, candidly, or we're going to be seeing him in a

 7    week's time.

 8         MR. FLEMING:  I, too, your Honor, would like to

 9    have -- but this issue came up.

10         THE COURT:  The issue came up, and I'm not saying

11    you can't have it.  I'm just saying on this foundation, with

12    this witness, it's hearsay.  There has to be real evidence.

13         MR. FLEMING:  May I?

14         THE COURT:  Right.

15         MR. FLEMING:  He says, already testified, that he

16    has run clinical trials with Epogen and Aranesp, and he has

17    Mircera, we're now talking about that.  So he has firsthand

18    knowledge from his clinical trials.

19         THE COURT:  Ask him about that.

20         MR. FLEMING:  Well, I will.  But he also knows

21    about what's going on --

22         THE COURT:  "Knows about" is hearsay, you see.  I

23    know about, too.  It's sustained.

24         MR. DAY:  Your Honor, may we be heard?  Go ahead.

25         MR. MADRID:  Your Honor, in addition, the
```

```
1   prejudiciality here is absolutely unfair.  None of this has

2   to do with the issue of validity whatsoever.  None of this

3   was in the expert report.  And this witness has no actual

4   information.  No foundation has been laid.

5              THE COURT:  Yeah, and that's why I went with you.

6   But, you know, he flagged this and you had to take this

7   witness on as to the secondary indicia of how swell this

8   stuff was.

9              Now, I -- there is something -- you'll get a chance

10  to brief it, we have a day off.  There is something, and

11  we've got 11 minutes here, so -- or we lose this fellow,

12  because I'm not making him come back on Friday.  He'll have

13  to come back on the 24th, if that's where we are.  I suggest

14  that -- but people have their case to try, so you try it the

15  best you know how.

16             MR. FLEMING:  Will you allow me to ask him about

17  his --

18             THE COURT:  I don't give advisory opinions.  I've

19  ruled on the issue in front of you.

20             MR. FLEMING:  Thank you.

21             (Whereupon the sidebar conference concluded.)

22             MR. FLEMING:  May I continue, your Honor?

23             THE COURT:  You may.

24             MR. FLEMING:  Thank you, your Honor.

25
```

```
 1   (BY MR. FLEMING:)

 2   Q.  Dr. Spinowitz, Mr. Madrid asked you on cross-examination

 3   about whether a particular preparation was a pharmaceutical

 4   composition because of adverse effects.  Do you recall that?

 5   A.  Yes.

 6   Q.  In your opinion, do you observe adverse effects --

 7        MR. MADRID:  Objection, your Honor.

 8        THE COURT:  Wait.  Wait a second.  Let him ask the

 9   question.  Questions aren't evidence.  I'm listening.

10        In your opinion, do you observe adverse effects,

11   what?

12   Q.  -- with the ESAs that are on the market?

13   A.  Absolutely.

14        MR. MADRID:  Objection, your Honor.  Outside the

15   scope.  Relevance.  He's leading.

16        THE COURT:  No.  It's not outside the scope.  It

17   may be relevant.  And we'll confine ourselves to what he,

18   himself, knows.  Sustained -- overruled.

19        MR. FLEMING:  May I have the question read back,

20   your Honor, for the witness?

21        THE COURT:  Has he observed adverse effects from

22   ESPs on the market.  His answer's yes.

23        MR. FLEMING:  ESAs.

24        THE COURT:  ESAs.  Close, but close is not good

25   enough.  ESAs on the market.  His answer's yes.
```

1   Q.   Mr. Madrid talked to you about the advent of recombinant

2   human EPO.  Do you recall that?

3   A.   Yes.

4   Q.   Do you have an opinion as to who pioneered

5   erythropoietin therapy in the early 1980s?

6   A.   Yes.

7             MR. MADRID:  Objection, your Honor.

8             THE COURT:  Sustained.  It's not in the report.

9   That's not in the report.

10  Q.   Did -- from the data you reviewed in connection with

11  your opinions about the validity of the patents, were there

12  erythropoietin therapies administered to humans?

13  A.   Yes.

14            MR. MADRID:  Objection.

15            THE COURT:  Wait, wait.  Wait a second.  There's an

16  objection.

17            THE WITNESS:  Sorry.

18            THE COURT:  Had you finished your question?

19            MR. FLEMING:  I had, your Honor.

20            THE COURT:  Well, I have to sustain it because

21  we're interested in when.  Sustained.

22            MR. FLEMING:  I was trying not to lead.

23  Q.   In the 1983-'84 area, from your review of the materials

24  in this case, was erythropoietin therapy administered to

25  humans?

```
 1    A.  Yes.

 2    Q.  Who, in your opinion, was the first to do so?

 3              MR. MADRID:  Objection.  Outside the scope of the

 4    report.

 5              THE COURT:  Overruled.  It's not.

 6    A.  Dr. Baron, Goldwasser and colleagues.

 7    Q.  Can you explain to the jury your opinion on that?

 8    A.  Yes.  Basically, and let me clarify it, because it

 9    was -- I realize you said first, and actually Dr. Essers had

10    performed her evaluations first.  So, in sequence, they were

11    Dr. Essers, Dr. Baron and Goldwasser, and then Dr. Eschbach.

12    And all three had shown all the elements of the product that

13    is being evaluated in these claims.  They all had

14    pharmaceutical composition --

15              THE COURT:  Well, we're not interested, with

16    respect, to the elements of the product, we're interested in

17    elements of claims here of patents.  So if that's what

18    you're going to testify to, respectfully, we're not

19    interested in that.  Go ahead.

20              THE WITNESS:  Can I give it another shot then, your

21    Honor?

22              THE COURT:  You may give it another shot.

23    A.  Yes.  So what those individuals had shown, that there

24    were pharmaceutical compositions that could affect,

25    therapeutically, in therapeutically effective amounts, show
```

1    evidence of effectiveness as defined by the courts.

2    **Q.**  For chronic renal failure?

3    A.  Those, all those patients, in those three prior arts,

4    were patients who were on dialysis with chronic renal

5    failure.

6            **MR. FLEMING:**  Thank you.  Thank you, your Honor.

7    We pass the witness.

8            **THE COURT:**  Anything else for this witness,

9    Mr. Madrid?

10           **MR. MADRID:**  No, your Honor.  Thank you, your

11   Honor.

12           **THE COURT:**  You may step down.  Thank you.

13           (Whereupon the witness stepped down.)

14           **THE COURT:**  Call your next witness.  If you think

15   it's more effective, we're just bargaining over time here.

16           **MR. FLEMING:**  It's five minutes, your Honor.

17           **THE COURT:**  I'll charge the time to you, if that's

18   how you want to do it.  You'd rather use the five minutes?

19           **MS. BEN-AMI:**  Absolutely.  If it's getting charged

20   to me, I might as well spend it.

21           **THE COURT:**  You might as well.

22           **THE CLERK:**  Who are we calling?

23           **MS. BEN-AMI:**  Dr. Bertozzi.

24           **MR. FLEMING:**  By Christopher Jagoe.

25           **THE COURT:**  I can't resist.  You know how they

1    change teams, as to who has the ball in a football game --

2    strike that out.

3             THE CLERK:  Please raise your right hand.

4             Do you solemnly swear that the answers you are

5    about to give to this Court and Jury will be the truth, the

6    whole truth, and nothing but the truth, so help you God?

7             THE WITNESS:  Yes.

8             THE CLERK:  Please be seated.

9             MR. JAGOE:  May I proceed, your Honor?

10            THE COURT:  Mr. Jagoe, you may proceed.

11                       CAROLYN BERTOZZI

12                    **DIRECT EXAMINATION**

13   (BY MR. JAGOE:)

14   Q.  Good afternoon, Dr. Bertozzi.  Can you please introduce

15   yourself to the Court and to the jury?

16   A.  Sure.  Hello, I'm Carolyn Bertozzi.  I'm a professor of

17   chemistry and biology at the University of California in

18   Berkeley, as well as molecular pharmacology at the

19   University of California-San Francisco, in the Medical

20   Center.

21            THE COURT:  Ma'am, I want to move those books

22   around.  And yank that microphone so it will be comfortable

23   to you.  You don't have to lean over.

24            THE WITNESS:  Can you hear me?

25            THE COURT:  We can hear, but you were leaning over.

1    Shove it over there closest to them, so they can look at you

2    and you can look at them.

3            **THE WITNESS:**  How's that?

4            **THE COURT:**  Whatever's comfortable.  Go ahead.

5    **Q.**  In your role as a professor, do you conduct any

6    scientific research?

7    A.  Yes, I do.

8    **Q.**  In what field do you focus your research?

9    A.  My research is in the field of glycobiology.

10   **Q.**  And what is glycobiology?

11   A.  Well, glyco is the Greek prefix for sugar.  So

12   glycobiology means the biology of sugar molecules.

13   **Q.**  And what are you here to explain to the jury today?

14   A.  Well, I'm here to explain that the EPO that comes out of

15   mammalian host cells is the same as Goldwasser's EPO.

16   **Q.**  So, in your opinion, what, if anything, would allow one

17   to distinguish Goldwasser's EPO from EPO that's purified

18   from mammalian cells grown in culture?

19   A.  Well, nothing distinguishes them.  The EPO that comes

20   from mammalian cells in culture is the same, the molecules

21   are the same as Goldwasser's EPO.

22   **Q.**  What, if anything, would allow you to distinguish

23   Goldwasser's EPO from EPO that's produced by a mammalian

24   host cell?

25   A.  Nothing.  Those molecules are the same.  So molecules

1    coming out of a mammalian host cell, those EPO molecules,

2    are the same as EPO from Goldwasser's sample.

3    **Q.**  And have you reviewed any type of scientific data or

4    experiments that support your opinion?

5    A.   Yes, I have.

6    **Q.**  And are you prepared to explain the basis and those data

7    to the jury and the Court today?

8    A.   Absolutely.

9    **Q.**  Let me just go back a little bit to your background.

10   Can you tell the jury a little bit about your background and

11   your education?

12   A.   Sure.  So I'm originally from Boston.  I was born in

13   Boston, and I grew up in Lexington, Massachusetts, which is

14   just outside.  I did my college training, my undergraduate

15   training at Harvard University.  And at Harvard, I started

16   as a biology major and then became a chemistry major.

17          And then after graduating from college I moved out

18   to California, and that was to the University of

19   California-Berkeley, in the chemistry department.  And so at

20   Berkeley I studied, as a Ph.D. student, sugars, chemistry

21   and biology of sugars.  And after finishing my Ph.D., I then

22   moved to the University of California-San Francisco Medical

23   School, spent about three years at the medical center doing

24   research in glycobiology, again, the biology of sugars.

25          Then after that, I then joined the faculty at UC

1    Berkeley, back where I had done my Ph.D., and I've been

2    there as a professor for about 13 years now.

3    **Q.**   How long have you been studying glycobiology?

4    A.   Well, in total, since I started as a Ph.D. student, I've

5    been studying glycobiology for about 20 years.

6    **Q.**   And other than your professorships, do you hold any

7    other professional positions?

8    A.   Yes, I do.

9    **Q.**   Can you explain, please.

10   A.   For example, I direct an institute, a research institute

11   called The Molecular Foundry.  And this is an institute in

12   which we build molecules, hence the name.  I also am a

13   investigator of the Howard Hughes Medical Institute, and

14   that's an organization that sponsors research in biomedical

15   sciences.

16   **Q.**   Are you a member of any --

17           **THE COURT:**   Sir.  Excuse me, Mr. Jagoe.  Now we've

18   spent the time, I think I'm going to stick to the schedule,

19   as I've told the jury.

20           All right, ladies and gentlemen.  Now it's 1:00.

21   Because of the religious holiday we are not sitting

22   tomorrow, as we told you at the beginning.  We will start

23   again on Friday, promptly at 9:00 a.m.  The usual

24   instruction, and it's important, keep your minds suspended.

25   Do not discuss the case either among yourselves nor with

1    anyone else.

2           I note there may be some mention of these parties,

3    Amgen or Roche, in the paper, not about the case, but it's

4    probably better if there's any mention about the two

5    parties, Amgen and Roche, stay away from that.  Get your

6    information about the case, as you are the judges here, from

7    the testimony here at trial.

8           Have a good day tomorrow, and we'll see you, I know

9    I can count on you, 9:00 Friday morning.  We'll recess until

10   9:00 a.m. Friday morning.  We'll stand in recess.

11          **THE CLERK:**  All rise for the jury.

12          (Whereupon the jury left the courtroom.)

13          **THE COURT:**  I'll remain on the bench.

14          Please be seated.  You may step down, ma'am.

15          (Whereupon the witness stepped down.)

16          **THE COURT:**  Total elapsed time stands, Amgen, two

17   days, two hours, 35 minutes; Roche, four days, 55 minutes.

18          We'll stand in recess until 9:00 a.m. on Friday

19   morning.

20          **MS. BEN-AMI:**  Thank you, your Honor.

21          **THE COURT:**  We'll recess.

22          (Adjournment.)

23

24

25

1          **C E R T I F I C A T E**

2

3

4          We, Donald E. Womack and Cheryl B. Palanchian,

5     Official Court Reporters for the United States District

6     Court for the District of Massachusetts, do hereby certify

7     that the foregoing pages are a true and accurate

8     transcription of our shorthand notes taken in the

9     aforementioned matter to the best of our skill and ability.

10

11

12

13

14          /S/ DONALD E. WOMACK
           _____

15          /S/ CHERYL B. PALANCHIAN
           _____

16

17               DONALD E. WOMACK
                CHERYL B. PALANCHIAN
                Official Court Reporters

18                 P.O. Box 51062
             Boston, Massachusetts 02205-1062

19              womack@megatran.com

20

21

22

23

24

25