```
 1                UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
 2
                                      Civil Action
 3                                    No. 05-12237-WGY

 4   * * * * * * * * * * * * * * * *
                                   *
 5   AMGEN, INC.,                  *
                                   *
 6            Plaintiff,           *
                                   *    DAILY TRANSCRIPT
 7   v.                            *    OF THE EVIDENCE
                                   *      (Volume 8)
 8   F. HOFFMANN-LA ROCHE LTD,     *
     ROCHE DIAGNOSTICS GmbH and    *
 9   HOFFMANN-LA ROCHE, INC.,      *
                                   *
10            Defendants.          *
                                   *
11   * * * * * * * * * * * * * * * *

12

13

14            BEFORE:  The Honorable William G. Young,
                       District Judge, and a Jury
15

16

17

18

19

20

21

22

23                                 1 Courthouse Way
24                                 Boston, Massachusetts

25                                 September 14, 2007
```

1                    A P P E A R A N C E S

2

3          DUANE MORRIS LLP (By D. Dennis Allegretti,
       Esq. and Michael R. Gottfried, Esq.), 470 Atlantic
       Avenue, Suite 500, Boston, Massachusetts 02210

4               - and -
           DAY CASEBEER MADRID & BATCHELDER, LLP (By

5      Lloyd R. Day, Jr., Esq., David M. Madrid, Esq. and
       Robert M. Galvin, Esq.) 20300 Stevens Creek

6      Boulevard, Suite 400, Cupertino, California 95014
                - and -

7          McDERMOTT WILL & EMERY (By Michael Kendall,
       Esq.), 28 State Street, Boston, Massachusetts

8      02109
                - and -

9          McDERMOTT WILL & EMERY (By William G.
       Gaede, III, Esq.), 3150 Porter Drive, Palo Alto,

10     California 94304
                - and -

11         MARSHALL, GERSTEIN & BORUN LLP (By Kevin M.
       Flowers, Esq.), 6300 Sears Tower, 233 S. Wacker

12     Drive, Chicago, Illinois 60606-6402
                - and -

13         STUART L. WATT and WENDY A. WHITEFORD, Of
       Counsel, Amgen, Inc., One Amgen Center Drive,

14     Thousand Oaks, California 91320-1789, on behalf of
       the Plaintiff

15

16         BROMBERG & SUNSTEIN LLP (By Lee Carl
       Bromberg, Esq. and Julia Huston, Esq.), 125 Summer
       Street, Boston, Massachusetts 02110

17              - and -
           KAYE SCHOLER LLP (By Leora Ben-Ami, Thomas

18     F. Fleming, Esq., Patricia Carson, Esq.,
       Christopher Jagoe, Esq. and Howard Suh, Esq.),

19     425 Park Avenue, New York, New York 10022, on
       behalf of the Defendants

20

21

22

23

24

25

1

<u>**I N D E X**</u>

2

**WITNESS:**          **DIRECT   CROSS    REDIRECT   RECROSS**

3

4    CAROLYN BERTOZZI, Resumed

5      By Mr. Jagoe      996

6      By Mr. Day                1062

7

                                        **FOR        IN**
8      **EXHIBITS:**                     **I.D.      EVID.**

9

10      2056 Product License Application - Excerpt 1031

11      2057 Product License Application - Excerpt 1033

12      2058 Egrie, et al. Article  . . . . . . . .1038

13      2059 Browne, et al. Article . . . . . . . .1040

14      2060 Presentation . . . . . . . . . . . .1043

15      2061 Egrie, et al. Article  . . . . . . . .1045

16      2062 Vapnek, et al. . . . . . . . . . . .1046

17

18

19

20

21

22

23

24

25

1          THE CLERK:  All rise for the jury.

2          (Whereupon the jury entered the courtroom.)

3          THE CLERK:  Court is in session, please be seated.

4          THE COURT:  Well, ladies and gentlemen, good

5   morning.

6          THE JURY:  Good morning.

7          THE COURT:  It is genuinely good to see you and

8   thank you for your promptness.  Everything turns on you.

9   We're all ready to go.  And if you would remind the witness.

10         THE CLERK:  I remind you, ma'am, you are still

11   under oath.

12         THE WITNESS:  Yes.

13         THE COURT:  And, Mr. Jagoe, you may continue.

14         MR. JAGOE:  Thank you, your Honor.

15              CAROLYN BERTOZZI, Resumed

16         **DIRECT EXAMINATION** (Cont'd)

17   BY  MR. JAGOE

18   Q   Good morning, Dr. Bertozzi.

19   A   Hi.

20   Q   On Wednesday when we left off you were telling the jury

21   that you were a Professor at UC-Berkeley and at UCSF, and

22   you were about to describe other professional roles that you

23   hold.

24         Could you please now continue with that and tell

25   the jury what other positions you hold, professional

1    positions you hold other than your professorships?

2    A    Sure.  So, in addition to my role in teaching,

3    supervising research, I'm the director of an institute

4    that's called the Molecular Foundry, and that's an institute

5    that focuses on building molecules.  I'm an investigator of

6    the Howard Hughes Medical Institute which is an organization

7    that sponsors biomedical research.  And I'm a member of the

8    National Academy of Sciences.  That's an elected group of

9    scientists whose job it is to basically advise the

10   government with respect to science policies.

11            Those are three examples.

12   **Q**   Have you published any scientific articles related to

13   your research?

14   A    Yes.

15   **Q**   Approximately how many articles have you published?

16   A    My last head count was about 175 articles.

17   **Q**   Has your research been recognized by any awards?

18   A    Yes.

19   **Q**   Can you describe to the jury one or two of the awards

20   that you've received?

21   A    Well, the one that's probably the most recognizable

22   outside of the field is the MacArthur Foundation Fellowship.

23   **Q**   Is that also sometimes referred as the MacArthur Genius

24   Award?

25   A    Yeah.

1   Q    What does that recognize?  What does the MacArthur Award

2   recognize?

3   A    That award, it's given to individuals in recognition of

4   their contributions to their field and their creativity, and

5   not just the sciences but any field.

6   Q    And would you please explain to the jury where you're

7   headed tomorrow.

8   A    Tomorrow I'm headed to Berlin.

9   Q    Why are you going to Berlin?

10  A    I'm going there to receive the Ernst Schering Prize

11  which is --

12  Q    What's that?

13  A    It's a prize for biomedical research, contributions to

14  biomedical sciences.

15  Q    And who awards the Schering Prize?

16  A    Well, that is awarded by the Schering Foundation which

17  is connected to the Schering-Plough pharmaceutical company.

18  Q    Do you have any connections to any pharmaceutical

19  companies?

20  A    Yes, I do.

21  Q    And can you describe what your relationship is to

22  pharmaceutical companies?

23  A    Sure.  I consult for a number of pharmaceutical and

24  biotechnology companies, and typically they call me in to

25  provide advice for glycobiology and for making

1    glycoprotein-based medicines.

2    **Q**    Okay.  So we're back to this term glycobiology and

3    glycoproteins.  Can you remind the jury what glycobiology

4    is?

5    A    Sure.  So, glyco is the Greek prefix for sugar.

6    Glycobiology means the biology of sugar molecules.  And

7    that's what I study in my research.

8    **Q**    Are you familiar with the term glycoprotein engineering?

9    A    Yes.  This is something that we do in my lab.  So

10    glycoprotein is a molecule that has sugar parts as well as

11    amino acid parts and they're all together in one molecule.

12    And glycoprotein engineering, which is what we do, means

13    basically making glycoproteins where we control the

14    structures of the sugar parts.

15    **Q**    And can you also just remind the jury generally what

16    you're here to explain to them in the trial?

17    A    Yes.  I'm here to explain that the erythropoietin

18    glycoproteins that are made by recombinant mammalian cells

19    and mammalian cells in culture have the same structures as

20    the glycoproteins that were found in Goldwasser's

21    erythropoietin purified from human urine.

22    **Q**    And have you formed any opinions regarding the claims of

23    the patents-in-suit?

24    A    Yes.

25    **Q**    And what claims are you providing opinions on?

1    A    I'm providing opinions on the asserted claims of the

2    '933 and the '422 patent.

3    Q    Are you aware that the jurors have a glossary of terms

4    in their notebooks?

5    A    Yeah.  I assume they have it in their notebooks.

6    Q    Have you reviewed the glossary of terms?

7    A    Yes, I have.

8    Q    And have you applied the definitions that are set forth

9    in the glossary?

10   A    Yes.

11   Q    Now, let's first talk about claim 3 of the '933 patent.

12   A    Okay.

13          **MR. JAGOE:**  And if we can have demonstrative CB-3.

14   Q    What kind of claim is claim 3 of the '933 patent?

15   A    Claim 3 would be considered an independent product

16   claim.

17   Q    So as an independent claim how does claim 3 relate to

18   the other asserted claims in the '933 patent?

19          **MR. DAY:**  Objection; outside the scope of the

20   report.

21          **MR. JAGOE:**  We have the reports colored coded

22   again, your Honor.

23          **THE COURT:**  Yes, it would be helpful if I had had

24   them.

25          **MR. JAGOE:**  Blue 87.

1        **THE COURT:**  Thank you.  Have you got these in front

2   of you, ma'am?

3        **THE WITNESS:**  I don't see them.

4        **THE COURT:**  Well, the rule is you can only testify

5   to what you've disclosed in your report and they're going to

6   squabble over that.  So, it will make sense if you've got

7   them, and when he tells me where it is you check it out

8   because -- well, I shouldn't tell you.  They'll, they'll

9   instruct you.

10        **MR. JAGOE:**  Your Honor, I'll point your attention

11   to the blue, paragraphs 87 through 89 and yellow --

12        **THE COURT:**  All right, let's see here.  Well, the

13   problem is you've asked her to define it.  But that's, it's

14   a mixed question of fact and law and I've told you what a

15   product claim is.  A product claim defines a product.  And

16   I've told you the difference between an independent and a

17   dependent claim.  An independent claim you find all the

18   limitations that you're going to test against the prior art,

19   and when we get to infringement you're going to test as to

20   whether they're infringed, you find them all in that

21   particular claim itself.  And we go claim by claim.

22        A dependent claim says, and I imagine she's going

23   to get up here to claims 11 and 14, because the report talks

24   about that, the dependent claims depend on an independent

25   claim but adds something else.  And so you have to go back

1    to the independent claim once you've read the dependent

2    claim in order to see the total description, the total claim

3    limitation.

4          Now, that's law.  How that law relates to what you

5    have before you she can testify to consistent with her

6    report.

7          Go ahead, Mr. Jagoe.

8          **MR. JAGOE:**  Okay.

9    **Q**   Dr. Bertozzi, in analyzing claim 3 of the '933 patent,

10   can you explain to the jury how you view the elements of

11   this claim?

12   **A**   The way that I --

13         **MR. DAY:**  Objection; outside the scope of the

14   report.

15         **THE COURT:**  Where is it?

16         **MR. JAGOE:**  Blue, paragraph 71.

17         **THE COURT:**  Thank you.

18         **MR. JAGOE:**  Yellow, paragraph 2.

19         **THE COURT:**  Just a moment.

20         **MR. JAGOE:**  Red, paragraph 10.

21         **THE COURT:**  All right.  All right, she can testify

22   consistent with, consistent with her report.

23         **MR. DAY:**  May I have a side --

24         **THE COURT:**  Blue 71, but -- well, I'm going to say

25   she can testify consistent with the report.  And you want a

1    side bar?

2           **MR. DAY:**  Yes, sir.

3           **THE COURT:**  We may do it.

4    SIDEBAR CONFERENCE, AS FOLLOWS:

5           **THE COURT:**  Mr. Jagoe, you've done a fine job, but

6    orient me now, why did you put her on?  What's she going to

7    say, bottom line?

8           **MR. JAGOE:**  The bottom line is the elements of the

9    claims that go to mammalian cells grown in culture or a

10   mammalian host cell, makes no difference to the structure of

11   the products that are covered.

12          **THE COURT:**  Okay.  Now, you know, I've been

13   thinking about that.  I don't think they dispute that and I

14   don't see what difference it makes in the case.

15          **MR. JAGOE:**  Well --

16          **THE COURT:**  But that's neither here nor there.

17          **MR. JAGOE:**  I think they're saying that the fact

18   that the products have to be made in a mammalian host cell

19   means they have different structures.

20          **THE COURT:**  No, I haven't heard that and I don't

21   think the existential reality would support that.  But let

22   me ask.

23          **MR. DAY:**  We do believe that.

24          **THE COURT:**  Is that what you are saying?

25          **MR. DAY:**  Yes.

1        **THE COURT:**  Oh, you do.

2        **MR. DAY:**  Absolutely.  We believe that the source

3   and the process limitations are a different structure from

4   the products.

5        **THE COURT:**  The source and process limitations in

6   this claim --

7        **MR. DAY:**  In these claims.

8        **THE COURT:**  Not claim 1 of '422?

9        **MR. DAY:**  Also the other claims.

10       **THE COURT:**  Not claim 1 of '422.

11       **MR. DAY:**  No, in claim 1 of '422.

12       **THE COURT:**  What's the source and process

13  limitation?

14       **MR. DAY:**  The source limitation purified from

15  mammalian cells grown in culture.

16       **THE COURT:**  All right.

17       **MR. DAY:**  May I be heard on my objection, your

18  Honor?

19       **THE COURT:**  If that's what you say.  Now, yes, you

20  may, briefly.

21       **MR. DAY:**  Okay.  The opinion here is an

22  indefiniteness opinion and you granted summary judgment.

23  This is out of the case.

24       **MR. JAGOE:**  Your Honor?

25       **MR. DAY:**  Amgen moved for summary judgment on this

1    and you granted summary judgment.  This is not an opinion in

2    support of their anticipation.  This is an indefiniteness

3    opinion.

4            **THE COURT:**  What do you say?

5            **MR. JAGOE:**  I say that she gave alternative

6    opinions because she was not clear what, what the claim

7    construction was.

8            **THE COURT:**  So you're not saying --

9            **MR. JAGOE:**  I'm not going into indefinite.

10            **THE COURT:**  Fine.  That's all right.  That takes

11    care of that.

12            **MR. DAY:**  This is what the paragraph says, your

13    Honor.

14            **THE COURT:**  That paragraph may deal with it, but I

15    accept his representations and he may continue, consistent

16    with the report.

17            **MR. JAGOE:**  Thank you.

18            (Whereupon the sidebar conference concluded.)

19            **MR. JAGOE:**  Can we please highlight the language of

20    claim 3 of the '933 patent from the beginning up until where

21    it says "Said product."

22    **Q**  Dr. Bertozzi, is this the element of the claim that

23    you're focused on today in the testimony that you're about

24    to give today?

25    A  Yes, it is.

1   Q   And what is it about this element of claim 3 of the '933

2   patent that you would like to tell the jury?

3   A   Well, what I would like to explain is that the human

4   erythropoietin that's produced in mammalian host cells that

5   are programmed with the erythropoietin DNA, those

6   glycoproteins that are produced are the same as the

7   glycoproteins from Goldwasser's erythropoietin.

8   Q   Now, why are you not going to be focusing on the second

9   part of this claim?

10  A   Well, it's my understanding that the in vivo biological

11  activity of Goldwasser's erythropoietin is not a matter of

12  dispute.

13  Q   And what's the basis for your saying that?

14  A   Well, I've seen court documents in which Amgen has

15  admitted that Goldwasser's erythropoietin has in vivo

16  biological activity.

17          MR. JAGOE:  Can we have CB-18 on the screen,

18  please.

19  Q   And can you read that to the jury?

20          First of all -- well, strike that.

21          Is this the admission that you were referring to in

22  your last answer?

23  A   Yes, it is.

24  Q   Can you read this to the jury?

25  Q   It reads:  Amgen admits that both Dr. Lin's claimed

1  recombinant human erythropoietin products and the human

2  urinary erythropoietin preparation purified by Drs. Miyake

3  and Goldwasser as described in Miyake, et al., J. Biological

4  Chemistry, Volume 252, Page 5558 through 5564, 1977, have

5  caused increased hemoglobin synthesis after in vivo

6  administration to mice.

7  **MR. JAGOE:**  Now could we go back to claim 3 of the

8  '933 patent.

9  **Q**  How does that admission relate to the second element of

10  the claim?

11  **A**  Well, the second element of the claim has to do with

12  having in vivo biological activity and basically that

13  admission states that Goldwasser's erythropoietin has the in

14  vivo activity.  So, in other words, that element of the

15  claim is met by Dr. Goldwasser's erythropoietin.

16  **Q**  So, now we're going to focus on that first part where it

17  says product of the expression in a mammalian host cell.

18  Can you explain to the jury how that language

19  defines a product?

20  **A**  Well, that language doesn't define a product.  It

21  basically defines a factory that makes a product.  But the

22  product is not defined by that factory.

23  **Q**  And what is your understanding of the beginning phrase

24  nonnaturally-occurring glycoprotein?

25  **MR. DAY:**  Objection, your Honor; outside the scope.

1          MR. JAGOE:  We have blue paragraph 7, your Honor.

2          MR. DAY:  It's also because, it's outside the scope

3     because of the Court's ruling discussed at side bar.

4          THE COURT:  All right, let me take a look at it.

5          No, I don't see that she's going to testify to

6     these matters of -- sustained.  She's not going to testify

7     to what's in paragraph 7.

8          MR. JAGOE:  We just wanted to establish that she's

9     consistent with the --

10         THE COURT:  No, don't argue.  She's not going to

11    testify to what's there.

12         MR. JAGOE:  Okay.  Can we now have CB-4, please.

13    Q   Dr. Bertozzi, can you explain to the jury what elements

14    of claim 1 of the '422 patent that you'll be discussing

15    today?

16    A   I'm focusing on the statement human erythropoietin

17    purified from mammalian cells grown in culture.

18    Q   And what do you understand that element to mean?

19    A   Well, mammalian cells grown in culture producing a

20    glycoprotein product having the amino acid sequence of human

21    erythropoietin.

22    Q   And in this claim where it says purified from mammalian

23    cells grown in culture, how does that compare to the

24    mammalian host cell that was recited in claim 3 of the '933

25    patent?

1          **MR. DAY:**  Objection, your Honor; outside the scope.

2          **THE COURT:**  Where is it?

3          **MR. JAGOE:**  I'll move on, your Honor.

4          **THE COURT:**  Move on.

5          **MR. JAGOE:**  Can we have Exhibit 2002.

6    **Q**    And, Dr. Bertozzi, do you have a binder of the exhibits

7    in front of you?

8    A    Sorry.

9    **Q**    This is already admitted into evidence.

10          Dr. Bertozzi, have you reviewed this document in

11   coming to your opinions?

12   A    Yes, I have.

13   **Q**    And how does this paper relate to what we've been

14   discussing so far?

15   A    Well, this is a paper published from Mr. Miyake and

16   Dr. Goldwasser in 1977 and it describes the purification of

17   human erythropoietin.  So this is the report that describes

18   what we've been calling Goldwasser's erythropoietin.

19          **MR. JAGOE:**  Could we expand the abstract of the

20   article, 2002.

21   **Q**    Can you read the second sentence of the abstract to the

22   jury.

23   A    The second sentence reads:  The seven-step procedure,

24   which included ion exchange chromatography, ethanol

25   precipitation, gel filtration, and adsorption

1    chromatography, yielded a preparation with a potency of

2    70,400 units per milligram of protein in 21 percent yield.

3    Q    Okay.  Can you explain to the jury in your own words

4    what is being stated there?

5            **MR. DAY:**  Objection, your Honor; outside the scope.

6            **MR. JAGOE:**  Blue 72, Page 25, Line 2, your Honor.

7            **THE COURT:**  Thank you.

8            **MR. JAGOE:**  The sentence starting at the end of

9    Line 2.

10            **THE COURT:**  Yes.  She may so testify.

11   A    Okay.  So, what this describes is a seven-step process

12   by which the human erythropoietin could be taken from urine

13   that was collected from patients that have a rare --

14            **MR. DAY:**  Your Honor, I object.  This is outside

15   the scope of the report.

16            **THE COURT:**  Yes.  Point me specifically where what

17   you are saying is in the report.  Why don't you do it.  Look

18   in 72 here.

19            **THE WITNESS:**  Can you remind me?

20            **THE COURT:**  Blue 72.

21       **MR. JAGOE:**  Blue 72.

22       **THE COURT:**  Yes.

23       **MR. JAGOE:**  On Page 25 at Line 7.

24            **THE COURT:**  Well, that's just a reference.

25   Q    So we're talking about the same reference that's

1    Exhibit 2002, correct?  Dr. Bertozzi?

2    A    Yes.

3    Q    Okay.

4    A    Line -- yes.  Line 8 actually.

5    Q    Okay.  And in the sentence you've cited that reference

6    as an example of what in your expert report?

7    A    This is an example of erythropoietin from the prior art.

8    Q    Dr. Bertozzi, are you familiar with a scientific term

9    called a purification scheme?

10   A    Yes.

11   Q    What is a purification scheme?

12          MR. DAY:  Objection; outside the scope.

13          THE COURT:  Where is her description of

14   purification scheme in the report?

15          MR. JAGOE:  It's in Paragraph 72.  She says that

16   the Miyake --

17          THE COURT:  Well, wait a second.

18          No, she may only testify to what's there.  And

19   what's there is not in evidence, so I shouldn't say.  But

20   she can testify to what's there but that's it.

21   Q    Dr. Bertozzi, does Miyake, does this reference

22   Exhibit 2002 describe a purification scheme for human

23   erythropoietin?

24   A    Yes, it does.

25   Q    Can you point to the jury where in Miyake it describes a

1    purification scheme of human erythropoietin?

2            **MR. DAY:**  Objection, your Honor; it's outside the

3    scope of the report.

4            **THE COURT:**  No, she may point to it, which means --

5            **THE WITNESS:**  Literally?

6            **THE COURT:**  -- she may say this language describes

7    the purification scheme in Miyake and that's as far as we'll

8    go.  But you may tell us where it is.  It's not on the

9    screen.  You can find it in the -- if it is, you can point

10   out to it.

11           **THE WITNESS:**  Well, it's summarized here, so --

12           **THE COURT:**  In what's highlighted?

13           **THE WITNESS:**  Basically in what's highlighted and

14   these are the results.

15           **THE COURT:**  Thank you.

16   **Q**   And what -- where did the Miyake paper describe that it

17   obtained the urine from which it purified the human

18   erythropoietin?

19           **MR. DAY:**  Objection; it's outside --

20           **MR. JAGOE:**  Blue paragraph 60, your Honor.

21           **THE COURT:**  Sixty.  Thank you.

22           Now, what -- now that I have it what's your

23   question?

24           **MR. JAGOE:**  I'm asking her what was the source of

25   the urine described in the Miyake paper, thinking of the

 1   last sentence in the --

 2          THE COURT:  Yes, and you may tell us what's there

 3   in that sentence.  What was the source of Miyake's material

 4   so far as you understand it?

 5          THE WITNESS:  It's from the urine of patients that

 6   suffer from a disorder called aplastic anemia.

 7          MR. JAGOE:  If we could highlight the first

 8   sentence of the Miyake paper.

 9   Q   Do you see, Dr. Bertozzi, it says erythropoietin is an

10   acidic glycoprotein?

11   A   Yes.

12   Q   Can you explain to the jury what a glycoprotein is?

13   A   Yes.

14          MR. DAY:  Object.

15   A   A glyco --

16          MR. DAY:  Objection, your Honor.

17          THE COURT:  Wait.

18          MR. DAY:  Outside the scope.

19          THE COURT:  Do you press it?

20          Where's that defined here?

21          MR. JAGOE:  It's in blue 16, your Honor.

22          THE COURT:  Thank you.  Now, you can tell us what's

23   in blue 16.

24   A   So, a glycoprotein is a molecule that has sugar parts

25   and amino acid parts that are all together in one molecule.

1   **Q**   And when scientists like you refer to sugars, are you

2   talking about the simple table sugar that we put into our

3   coffee?

4   A   Not exactly that.

5   **Q**   So, can you explain what are the simple sugars in terms

6   of scientific definitions?

7   A   Sure.  So, simple sugars, like the table sugar, are

8   building blocks.  That's how we think of them.  And in our

9   bodies these building blocks are put together to make more

10  complex sugars.

11       **MR. JAGOE:**  Can we have demonstrative CB-1.

12  **Q**   What is -- what do you intend to illustrate on

13  demonstrative CB-1?

14  A   Well, these are both chemical structures as well as

15  symbols side by side that we use to denote the simple sugar

16  building blocks.

17  **Q**   So, can you tell us, starting in the upper left-hand

18  corner there's a green square.

19  A   Yeah.

20  **Q**   And next to it there's a funny looking structure.  Can

21  you explain how, what the relationship is there?

22  A   Well, the funny looking structure is the actual chemical

23  structure.

24       **MR. DAY:**  Your Honor, I object.

25  A   But the --

1          **MR. DAY:**  This is outside the scope of the report;

2     there's nothing in it.

3          **THE COURT:**  Yes, where is it?

4          **MR. JAGOE:**  It's blue, paragraph 17, your Honor.

5          **THE COURT:**  Seventeen.  Thank you.

6          Well, there's no tie-in with this demonstrative aid

7     here.  However, she may -- actually the demonstrative aid

8     does define what those chemical structures are, and to the

9     extent they're mentioned in the report she may have

10    reference, we may throw this up on the screen so the jury

11    can see what the symbols are and the jury can see what

12    structures those symbols describe are.  But otherwise she's

13    sticking with the report.

14         Go ahead.

15    Q   Dr. Bertozzi, in your field are the simple sugars

16    represented sometimes as colored geometric shapes?

17    A   Yes.  The colored geometric shapes, that's the standard

18    way that we present the simple sugars.

19    Q   And are simple -- what is the difference between a

20    simple sugar and a complex sugar?

21    A   A complex sugar is what you get if you take these simple

22    sugar building blocks and start linking them together.

23         **MR. JAGOE:**  Can we have demonstrative Exhibit CB-2.

24    Q   And what do you intend to illustrate on Exhibit --

25    demonstrative CB-2?

1    A    Well, these are pictures that describe complex sugars.

2    So, you probably recognize the shapes from the previous

3    picture.  But now the shapes are linked together to form

4    structures that look like trees.  And there are three

5    different kinds of trees that are shown in that picture.

6    Q    And what is it that dictates the structure of the trees

7    on a glycoprotein?

8    A    Well, the trees --

9         **MR. DAY:**  Objection, your Honor; it's outside the

10   scope of the report.

11        **THE COURT:**  Where is it?

12        **MR. JAGOE:**  This is in paragraph 18, blue 18.

13        **THE COURT:**  Yes, she may testify to what's there.

14   Q    So blue 19, Dr. Bertozzi.

15        **THE COURT:**  Yes, she can tell us that.

16   A    Okay.  So, cells are like a factory.  Okay, a cell is a

17   factory.  And the machinery in the factory, that machinery

18   we call enzymes.  So, mammalian cells have enzymes that

19   build these trees inside the cell.  So the trees that the

20   cell makes, those trees are determined by the enzymes of the

21   cells machinery.

22   Q    Okay.  Now, in terms of erythropoietin, how many sugar

23   trees are there on erythropoietin when it's produced in a

24   mammalian cell?

25   A    Erythropoietin, so each erythropoietin molecule, each

1    glycoprotein, has four trees.

2    Q    And are the four trees of erythropoietin on specific

3    amino acid residues in erythropoietin?

4    A    Yes.  So, there are basically two different kinds of

5    amino acids that have these trees growing out of them.  But

6    there are four trees in total.

7    Q    And are you familiar with the term glycoform?

8    A    Yes.

9    Q    Glycoforms?

10   A    Yes.

11   Q    Can you explain to the jury what a glycoform or

12   glycoforms are?

13   A    Yes.  That's a term that we use, glycoforms, and we use

14   that term to describe glycoprotein molecules that differ in

15   their structures because their sugars are different.  So,

16   glycoforms would be like a set, two glycoforms or two

17   molecules, they're both glycoproteins, and the difference

18   between them is all in the sugar parts.

19   Q    And what do you know about the different glycoforms of

20   EPO?  Human EPO?

21   A    Well, we know that erythropoietin is generally made by

22   mammalian cells as a mixture of glycoforms.

23   Q    Now, if human erythropoietin is made in the mammalian

24   host cell and more than one glycoform is produced, is it

25   possible to separate the individual glycoforms into separate

1    flasks or vials?

2    A    Yes, it is.   Chemists and biologists have developed

3    instruments and techniques that allow us to take a sample

4    that has several glycoforms and separate those glycoforms

5    into different bottles.

6    **Q**    Can a, can a single glycoform of EPO be isolated?

7    A    Absolutely.

8    **Q**    Now, I would like to go back now to claim 3 of the '933

9    patent.

10            Based on what you've read in the Miyake paper

11   describing the Goldwasser EPO, how does that material relate

12   to what's being claimed in claim 3 of the '933 patent?

13   A    Goldwasser's EPO has structures that can all be made

14   according to claim 3.   So the product of claim 3 is

15   basically the same as Goldwasser's EPO.

16   **Q**    And what, if anything, does claim 3 of the '933 patent

17   say about specific glycoforms of EPO?

18   A    Claim 3 says nothing about any glycoforms specifically.

19   **Q**    And what, if anything, does claim 3 of the '933 patent

20   say about Amgen's commercial erythropoietin?

21           **MR. DAY:**   Objection, your Honor; it's outside the

22   scope.

23           **MR. JAGOE:**   Yellow 19, your Honor.

24           **THE COURT:**   I'm not so sure I need the report

25   objection here.   I don't understand that question.   So, why

1   don't you ask the question again.

2   **Q**   Is there anything in the language of claim 3 of the '933

3   patent that would limit the claim to Amgen's commercial

4   erythropoietin product?

5   A   No.

6         **MR. DAY:**  Objection, your Honor; it's outside the

7   scope.

8         **THE COURT:**  Well, if that's your objection,

9   overruled.

10        **THE WITNESS:**  Shall I answer?

11        **THE COURT:**  You said no.

12        **THE WITNESS:**  Okay.

13        **THE COURT:**  And it may stand.

14   A   No.   Amgen's commercial erythropoietin is produced in

15   Chinese hamster ovary cells which is one type of mammalian

16   recombinant host cell.  But the claim is not limited to that

17   particular sample of erythropoietin.

18        **MR. JAGOE:**  Can we have claim 1 of the '422 patent

19   again, please.

20        **THE COURT:**  I just remind the jury, in a patent

21   case we talk about the claims.  We're going to have to

22   consider the products that are out there, but the claims

23   define the legal rights of Amgen with respect to other

24   people.  The claims.  That's why we're being so careful

25   about what these claims mean and what they may say.

1    **Q**   Dr. Bertozzi, what is your opinion regarding the

2    relationship between Dr. Goldwasser's EPO and claim 1 of the

3    '422 patent?

4    **A**   Claim 1 of the '422 patent also includes

5    Dr. Goldwasser's EPO.

6            **MR. DAY:**  Your Honor, I object and move to strike;

7    it's outside the scope of the report.

8            **THE COURT:**  The objection is untimely, it may

9    stand.

10           **MR. DAY:**  The way the question was framed I

11   couldn't --

12           **THE COURT:**  Well, that's my ruling.

13   **Q**   Dr. Bertozzi, have you reviewed any type of data or

14   experimental evidence to support your opinions that you have

15   given?

16   **A**   Yes, I have.

17   **Q**   And what types of data have you reviewed to come to your

18   conclusion that Goldwasser's EPO comes within the scope of

19   Amgen's claims?

20           **MR. DAY:**  Your Honor, again I object; it's outside

21   the scope of the report.

22           **THE COURT:**  Yes.  All right, now since you're going

23   back to it, where is it?

24           **MR. JAGOE:**  It's blue 73 through 76.  She talks

25   about the experimental data that's --

1        **THE COURT:**  Wait, wait, wait.

2        **MR. JAGOE:**  Sorry.

3        **THE COURT:**  You don't characterize it.

4        **MR. JAGOE:**  Sorry.

5        **THE COURT:**  But you're doing fine when you give me

6    the numbers.  73 and 76?

7        **MR. JAGOE:**  73 through 76, your Honor.

8        **THE COURT:**  Yes, thank you.

9        **MR. DAY:**  Your Honor, may I have a side bar?

10       **THE COURT:**  You may.

11   SIDEBAR CONFERENCE, AS FOLLOWS:y

12       **THE COURT:**  Once again, these objections that it's

13   outside the report are incredibly annoying but effective,

14   and I'm very strict on it.  And it's simple.  I just look to

15   see if it's there.  But this examination has me somewhat at

16   sea.  Goldwasser is in the prior art.  Your earlier experts,

17   Lowe in particular, but also --

18       **MS. BEN-AMI:**  Spinowitz.

19       **THE COURT:**  -- Spinowitz, have said Goldwasser

20   renders the patents obvious.  And there's this issue of

21   anticipation which I'm very troubled by, but they've said

22   that.  Or one of them has.  Spinowitz has said it.

23       Now, here you're like backing into it.  You start

24   with the claim and then you say Goldwasser's within the

25   claim.  Well, I can see some probative value to that.  But

1    that's confusing.  The claim cannot possibly exclude or deal

2    with Goldwasser because Goldwasser was before the claim.

3    It's prior art.

4              **MR. JAGOE:**  Your Honor?

5              **MR. DAY:**  Your Honor?

6              **THE COURT:**  Wait a minute.  So I'm at sea as to the

7    thrust of your examination and I need you to explain it to

8    me.

9              **MR. JAGOE:**  I would like to, your Honor.

10             If the claim language does not exclude what's in

11   the prior art that means the claim reads on the prior art.

12   That brings in the question of validity.

13             **THE COURT:**  That's another, that's another way to

14   get at it.

15             **MR. JAGOE:**  The reason the claim is not limited to

16   what they make, a commercial product, it's not limited to

17   anything, but what you could make from --

18             **THE COURT:**  I know.  Okay.  So you're saying

19   they're claiming something that's -- she can say it that

20   way.

21             **MR. DAY:**  Your Honor?

22             **THE COURT:**  What's the matter with that?

23             **MR. DAY:**  The reason I objected, it's outside the

24   scope of the report.  The reason I asked to come to side bar

25   is the only opinion she rendered was an obviousness opinion.

```
1      She did not render an anticipation opinion in her report.

2              MR. JAGOE:  Your Honor, on Page 25 --

3              THE COURT:  Excuse me, just a second.  Wait, wait,

4      wait.  Yes.

5              MR. DAY:  So turn to Page 35.

6              THE COURT:  Thirty-five.  Right.

7              MR. DAY:  So the way this report is written, it

8      first addressed the '933 and then she gets into the '422,

9      that Section D.

10             THE COURT:  Right.  I see it.

11             MR. DAY:  If you look at everything that's in her

12     opinion, pharmaceutical composition would have been obvious.

13             THE COURT:  Obvious.  Okay.

14             MR. DAY:  The paragraph after that is obvious.

15             THE COURT:  Yes, but I need to know what they're

16     saying.

17             MR. JAGOE:  We're saying in the '933 she said it's

18     anticipated.

19             THE COURT:  Wait one second.

20             MR. JAGOE:  '933 is --

21             THE COURT:  Anticipated.

22             MR. JAGOE:  Anticipated.

23             THE COURT:  Or made obvious.

24             MR. JAGOE:  Because the urinary EPO of Goldwasser

25     is identical to the recombinant EPO.
```

1          THE COURT:  Well, where in this report does she say

2     what I just heard her say?

3          MR. DAY:  With respect to the '422 claim 1.

4          MR. JAGOE:  With respect to the -- what he objected

5     to was what type of data she derived to get to her opinion.

6          THE COURT:  All right, now oriented, I'm striking

7     that answer.

8          MR. JAGOE:  Wait a minute.

9          MS. BEN-AMI:  Your Honor, if I might, right here,

10    anticipated.

11         MR. DAY:  Yes, in the title.  There's no opinion

12    whatsoever to support it.  None.  Every opinion is

13    obviousness.

14         THE COURT:  Yes.  Yes.  I'm sustaining it.

15    Sustained.

16         (Whereupon the sidebar conference concluded.)

17    BY  MR. JAGOE

18    Q    Dr. Bertozzi, could you explain to the jury what

19    monosaccharide compositional analysis is?

20    A    Yes.  That's a test that's used to understand the

21    structure of a glycoprotein, and what it means is basically

22    taking the glycoprotein apart and figuring out which of

23    those building blocks are present and then counting the

24    number of each of those building blocks.

25    Q    And have you reviewed any monosaccharide compositional

1    analysis data to come to your opinions?

2    A    Yes, I have.

3    **Q**    Are you familiar with a technique known as IEF?

4    A    Yes.

5    **Q**    And can you explain to the jury in your own, in your

6    terms what the technique IEF is used for?

7    A    Yes.  IEF is an acronym and that stands for Isoelectric

8    Focusing.  IEF.  And that is a technique that we also use to

9    understand the structure of a glycoprotein, and what it does

10   is it separates a mixture of molecules into different sets

11   based on their charge.

12   **Q**    Would you be able to illustrate how an IEF experiment

13   works using the easel?

14   A    Sure.

15          **MR. JAGOE:**  Your Honor, may the witness step down

16   and use the easel?

17          **THE COURT:**  She may.

18          **MR. DAY:**  Object, your Honor; it's outside the

19   scope of the report.

20          **THE COURT:**  Yes.  Where is the diagram in the

21   report?

22          **MR. JAGOE:**  There's a description of --

23          **THE COURT:**  No.  No diagrams unless they're

24   disclosed.  So, so the easel man can walk back with the

25   easel.

1          **MS. BEN-AMI:**  Mr. Heckel?  Mr Heckel?

2          **THE COURT:**  Well, certainly it can't stay there.

3          **THE WITNESS:**  That's not a good place.

4          **THE COURT:**  Yes.  We all agree that's not a good

5     place, and no easels because this diagram is not disclosed.

6     But she may do the description if the description's in the

7     report.

8          **MR. JAGOE:**  Can we have CB-21.  This is a

9     demonstrative exhibit.

10         **THE COURT:**  Yes.

11         **THE WITNESS:**  Okay.  So, basically this is meant to

12    describe the technique of IEF.  And basically it starts with

13    what we call a gel.  Literally what that means is we make a

14    thin film out of a material that's a bit like Jell-O.  It's

15    like a thin sheet of Jell-O.  And we take that thin sheet of

16    Jell-O and we orient it up and down.  So now it's a vertical

17    sheet of Jell-O.  But it's a pretty stiff Jell-O so it

18    doesn't ooze, you know, like you may think your Jell-O

19    would.

20         Now, what we do is we put charges at each end of

21    that thin sheet of Jell-O.  So, generally we put a negative

22    charge up near the top and a positive charge down near the

23    bottom.  And now that's set up and we're ready to do the

24    experiment.

25         So next we'll take the mixture of, let's say,

1    glycoforms.  A collection of glycoforms.  And as a mixture

2    we'll put them at the very top of this column all together.

3    And then we turn on the charges.  And the molecules start to

4    move.  And what they'll do is they'll start traveling down

5    the column according to the charges.  But eventually they'll

6    stop moving.  And they stop moving at different positions up

7    and down the column on the basis of their charge.

8            So, at the end of all of that basically what we see

9    physically, when we take a picture of this IEF gel, what we

10   see are bands, like bands, that look like a ladder, like

11   rungs of a ladder, and each band represents a collection of

12   molecules that have the same charge.

13           So, for example, a glycoform with a certain charge

14   might show a band here, but a glycoform with a different

15   charge might show a band here, and you might see several

16   bands that look like a ladder on this picture that you take.

17   **Q**   Have you reviewed any IEF data comparing samples of

18   erythropoietin?

19   A    Yes, I have.

20   **Q**   Based on your review of the erythropoietin IEF data that

21   you have reviewed, what can you say about the glycoforms in

22   Dr. Goldwasser's EPO compared to erythropoietin made in the

23   mammalian host cell?

24   A    What the IEF data that I've reviewed show is that there

25   are glycoforms in Dr. Goldwasser's EPO that are identical to

1    glycoforms from recombinant mammalian host cells, for

2    example, Amgen's EPO.

3    **Q**    Are you familiar with a technique known as SDS-PAGE

4    analysis?

5    A    Yes.

6    **Q**    And can you explain just very briefly what is SDS-PAGE

7    analysis?

8    A    Well, SDS-PAGE, those are just letters and it's another

9    acronym, and that's a technique that we use to determine the

10   size of molecules.

11   **Q**    And have you reviewed any data or experiments comparing

12   Dr. Goldwasser's EPO to EPO made in mammalian cells grown in

13   culture?

14   A    Yes.

15   **Q**    And what conclusion can you draw from the data that

16   you've reviewed?

17   A    My conclusions are that EPO made by mammalian cells in

18   culture is identical in size to Dr. Goldwasser's EPO.

19            **THE COURT:**  What do you mean by identical in size?

20   I haven't heard the word size from the witnesses here.  What

21   does size mean in this context?

22            **THE WITNESS:**  I'm using the word size as a concise

23   way of denoting what the scientists would call apparent

24   molecular weight.  But it has to do with literally the

25   volume that the molecule occupies.

1      **THE COURT:**  Thank you.

2    **Q**   Can you identify what kinds of documents you reviewed in

3    preparing for your opinion, that support your opinion?

4    **A**   Yes.  I have reviewed scientific publications from Amgen

5    scientists, as well as data that was provided in Amgen's

6    Product License Application; some data from research groups

7    outside in the scientific community; and also some data that

8    were in the laboratory notebooks of the Amgen scientists.

9    **Q**   Can you turn in your notebook to Exhibit PXP.  And can

10   you identify PXP, please?

11   **A**   Yes.  This document is Volume 1 from Amgen's Product

12   License Application for recombinant human erythropoietin.

13   **Q**   What is the date on the document?

14   **A**   The date is October 30th, 1987.

15   **Q**   And what is your understanding of who made this document

16   or who prepared this document?

17   **A**   Well, my understanding is that Amgen prepared this

18   document.

19   **Q**   And for what purpose did they prepare this document to

20   your understanding?

21   **A**   My understanding is that this was the document that

22   Amgen submitted to the government when they were seeking

23   approval for their drug.

24       **MR. JAGOE:**  Your Honor, I would like to offer PXP

25   into evidence.

```
1            MR. DAY:  We object, your Honor; it's an incomplete

2      copy of --

3            THE COURT:  Sustained.

4            MR. JAGOE:  Can I have a side bar, your Honor?

5            THE COURT:  You may.

6  SIDEBAR CONFERENCE, AS FOLLOWS:

7            THE COURT:  His objection was it was incomplete.

8      But do you object to --

9            MR. DAY:  I object --

10           THE COURT:  -- a complete one?

11           MR. DAY:  No.

12           MR. JAGOE:  Your Honor, they told us there was no

13     objection to this and I think the --

14           MR. DAY:  Yes, because we thought it was complete.

15           THE COURT:  Well, please.  Since there's no

16     objection.  You may use that one.  I require a complete one

17     before it goes to the jury.  And I mean completely complete.

18           MR. JAGOE:  Just for clarity, your Honor, do they

19     mean all 14 volumes of the PLA?

20           MR. DAY:  No, we mean the complete section with the

21     figures and everything attached.

22           THE COURT:  Yes, I'll accept that.

23           MS. BEN-AMI:  Your Honor?

24           THE COURT:  Yes.

25           MS. BEN-AMI:  Just to let you know, I'm bringing
```

1    over a case for you to read on anticipation and obviousness,

2    just to let you know.

3            **THE COURT:**  Fine.  I'll read it.

4            And you may have it; we'll give it the next number,

5    but you'll settle what complete means.

6            **MR. JAGOE:**  Thank you, your Honor.

7            (Whereupon the sidebar conference concluded.)

8            **THE COURT:**  By agreement we've worked something

9    out.  So the document, after they talk further about it,

10   will be admitted.

11           And what was its letters, Mr. Jagoe?

12           **MR. JAGOE:**  PXP.

13           **MS. BEN-AMI:**  Your Honor?

14           **THE COURT:**  PXP?

15           **MR. JAGOE:**  Yes.

16           **THE COURT:**  And it will be in evidence as 2056.

17           (Exhibit marked in evidence.)

18   **Q**   Did you review this document, Dr. Bertozzi?

19   A    Yes.

20   **Q**   And what was your understanding as to what's disclosed

21   in this document?

22   A    What's disclosed in this document, at least the parts

23   that I focused on, are scientific data that address the

24   structure of EPO produced in recombinant Chinese hamster

25   ovary cells in comparison to the structures of Goldwasser's

1   EPO.

2        **MR. JAGOE:**  Can we please have PXP document 40 on

3   the screen.  If you can blow up the second paragraph,

4   please.

5   **Q**   And, Dr. Bertozzi, would you read the second sentence

6   starting with "This gene."

7   A   Sure.  The sentence reads:  This gene, when inserted

8   into mammalian cells, yields a recombinant product that is

9   immunologically and biologically indistinguishable from

10  naturally derived erythropoietin.

11  **Q**   Okay.  What is your understanding of that statement?

12  A   What that means in a nutshell is that the EPO from CHO

13  cells is indistinguishable or is the same as, by this test,

14  the EPO from Goldwasser's preparation.

15  **Q**   And have you reviewed data in this document?  Have you

16  reviewed the data in this document?

17  A   Yes.

18  **Q**   And what conclusions do you come to when you review the

19  data?

20       **THE COURT:**  I didn't hear the question and it's my

21  fault.

22       **MR. JAGOE:**  I'm sorry.  I asked her what conclusion

23  did she reach in reviewing the data in this document.

24  A   I reached the same conclusion that the Amgen scientists

25  reached, which is that EPO from Goldwasser's prep and EPO

1    from CHO cells are indistinguishable.

2    Q    I would like to turn now to PXR in your notebook.  Can

3    you please identify Exhibit PXR?

4    A    Yes.  This document is Volume 4 from Amgen's Product

5    License Application.

6    Q    And what is the date of this document?

7    A    This document is also dated October 30th, 1987.

8            MR. JAGOE:  I would like to offer PXR into

9    evidence.

10           THE COURT:  Any objection?

11           MR. DAY:  No objection, your Honor.

12           THE COURT:  PXR is admitted Exhibit 2057.

13           (Exhibit marked in evidence.)

14   Q    Is this a document you reviewed and relied on in your

15   opinion?

16   A    Yes.

17   Q    Can you please turn to PXR-4.

18   A    Yes.

19           MR. JAGOE:  If you could blow up the middle

20   paragraph, PXR-4.

21   Q    Dr. Bertozzi, what's your understanding of carbohydrate

22   analysis?

23   A    Well, carbohydrate is another word for sugar, the one

24   you're probably used to seeing on the labels of your food.

25   So carbohydrate analysis means determining the sugar parts

1    of the glycoprotein.

2    **Q**    And what do the -- what does Amgen conclude in its FDA

3    document following the carbohydrate analysis of these

4    materials?

5    A    Well, they analyzed the building blocks of the sugars

6    and they also analyzed the trees on EPO from Goldwasser and

7    EPO from CHO cells, and after making those comparisons they

8    determined that Goldwasser's EPO and EPO from the

9    recombinant CHO cells are the same with respect to their

10   sugars.

11   **Q**    And have you reviewed the carbohydrate analysis

12   presented in this document?

13   A    Yes, I have.

14   **Q**    And based on your expertise what conclusion did you

15   reach?

16   A    I reached the same conclusion as Amgen scientists, which

17   is that they're the same.

18   **Q**    Can you please turn --

19          **MR. JAGOE:**   Can we please have PXR-31 on the

20   screen.   This is Page 789 of this volume of the PLA.   And

21   can we blow up from the top the first paragraph, please.

22   Okay.

23   **Q**    Dr. Bertozzi, can read that statement?

24   A    Sure.   The document reads:   All physical tests performed

25   on both recombinant human EPO and urinary human EPO as

1   discussed in this Section, show these proteins to be

2   indistinguishable, as summarized below.

3   **Q**   And what did you understand the phrase "physical tests"

4   to mean?

5   A   Physical tests are tests of structure basically.

6   **Q**   And have you reviewed physical tests that are presented

7   in this document?

8   A   Yes, I have.

9             **MR. DAY:**  Your Honor, outside the scope.

10            **THE COURT:**  Yes.  Where is it?

11            **MR. JAGOE:**  Paragraph 85, your Honor.

12            **THE COURT:**  Of blue?

13            **MR. JAGOE:**  Blue 85.  And blue 86.

14            **THE COURT:**  Thank you.  Well, it doesn't say she

15   reviewed any physical tests there.  And so, we're not going

16   into that.  However, I note the last sentence of

17   Paragraph 86 which bears directly on the last side bar and I

18   reverse my ruling at that side bar and you may have her

19   testify consistent with Paragraph 86 in light of the prior

20   paragraphs.

21            **MR. DAY:**  Your Honor?

22            **THE COURT:**  No, that's my ruling.  She may testify

23   consistent with what's there.  That was your objection.

24   You'll cross-examine her.

25            **MR. DAY:**  My objection --

1          **THE COURT:**  Go ahead.

2          **MR. DAY:**  My objection was '422 claim 1, your

3    Honor.

4          **THE COURT:**  Oh, so it was.  And not for this one.

5    I'm sorry.

6          **MR. DAY:**  Yes.

7          **THE COURT:**  All right.  That's fine.  But she may

8    testify to what's there.

9          And you're pointing out that this is -- I see.

10   There's a difference.

11         **MR. DAY:**  Yes, sir.

12         **THE COURT:**  I'll stand on what I said before, and

13   of course since she said that here she may testify.  And

14   you'll have your chance to examine.

15         **MR. JAGOE:**  Your Honor, I would also ask that Dr.

16   Bertozzi be allowed to testify consistent with the final

17   sentence in paragraph 84 of the blue report.

18         **THE COURT:**  She may.

19         **MR. JAGOE:**  Okay.

20   **Q**   Dr. Bertozzi, based on the data presented in Amgen's PLA

21   which was given to the FDA, what do you conclude that the

22   data demonstrate?

23   A    The data in the PLA demonstrate that when comparing

24   Goldwasser's EPO and EPO from recombinant CHO cells that the

25   building blocks are the same and the structures of the trees

1   are the same and the size is the same.

2   **Q**   Dr. Bertozzi, have you seen or heard any testimony from

3   Amgen regarding the data in the PLA?

4   **A**   My understanding is that Amgen scientists agree with the

5   data in the PLA.

6   **Q**   But I'm asking you if you have heard or seen any

7   testimony from this case regarding these data in the PLA?

8   **A**   I believe Dr. Strickland gave testimony regarding the

9   data in the PLA.

10          **MR. JAGOE:**   Your Honor, I would like to broadcast

11   an excerpt of the 30(b)(6) testimony of Dr. Strickland.

12          **THE COURT:**   No, we're not doing that.

13          **MR. JAGOE:**   Okay.

14          **THE COURT:**   You've got this witness on the stand.

15   I'm not jumping from witness to witness in view of what's

16   happened in the past.  If you want to put Strickland up,

17   after we're done here, you may; not now.

18          **MR. JAGOE:**   Thank you, your Honor.

19          **THE COURT:**   She's testifying.

20   **Q**   Dr. Bertozzi, can you please turn to NBD in your

21   notebook.  Can you identify NBD, please?

22   **A**   Yes.  This is a scientific publication from Amgen's

23   scientists Dr. Egrie, Dr. Strickland, Dr. Lin, Dr. Browne

24   and several others.  This was published in the journal

25   Immunobiology in 1986.  And the title of the article is:

1    Characterization and Biological Effects of Recombinant Human

2    Erythropoietin.

3    Q    Is this a document that you reviewed and relied on in

4    coming to your opinions?

5    A    Yes, it is.

6         **MR. JAGOE:**  I would like to offer NBD into

7    evidence, your Honor.

8         **THE COURT:**  Any objection?

9         **MR. DAY:**  No objection.

10        **THE COURT:**  NBD is admitted Exhibit, 2058.

11        **THE CLERK:**  Is it NBD or E?

12        **MR. JAGOE:**  D, like David.

13        **THE CLERK:**  Okay, thank you.

14        (Exhibit marked in evidence.)

15   Q    Dr. Bertozzi, what is, to your understanding, what is

16   being compared in this publication by the Amgen scientists?

17   A    My understanding is that in this piece of work, the

18   Amgen scientists compared Goldwasser's EPO, erythropoietin,

19   to erythropoietin from the Chinese hamster ovary cell,

20   recombinant EPO, using a variety of different structural and

21   biological tests.

22        **MR. JAGOE:**  And can we have Page 214, the second

23   page of the document; the very top paragraph.

24   Q    And can you read the first sentence, please?

25   A    Yes.  The first sentence reads:  Natural EPO was

1    purified to apparent homogeneity from the urine of a patient

2    with aplastic anemia using the procedure of Miyake, et al.

3         **MR. JAGOE:**  And can you now go to Page 218 of the,

4    of the document.  Can you blow up the Figure 4.

5    **Q**   Can you explain what is Western analysis in this paper?

6    **A**   Yes.  Western analysis is a way of analyzing the

7    experiment I mentioned before called SDS-PAGE.  So first we

8    do SDS-PAGE and then we visualize the results using what we

9    call Western analysis.

10        **MR. JAGOE:**  And can we just blow up the paragraphs

11   just before Figure 4, please.  And in the middle it says "As

12   seen in Figure 4."  Can you highlight that.

13   **Q**   Can you read that to the jury?

14   **A**   Sure.  The document reads:  As seen in Figure 4,

15   purified recombinant human erythropoietin migrates

16   identically to human urinary erythropoietin with an apparent

17   molecular weight of approximately 36,000 daltons, suggesting

18   that both molecules are glycosylated to the same extent.

19   **Q**   Have you reviewed the data in Figure 4?

20   **A**   Yes, I have.

21   **Q**   And what conclusions did you reach?

22        **MR. DAY:**  Objection, your Honor; outside the scope.

23        **THE COURT:**  Where is it?

24        **MR. JAGOE:**  Blue 73 and blue 116.

25        **THE COURT:**  The witness should look at blue 73 and

```
 1   blue 116, and if the answer to this question is found

 2   therein you may so testify; otherwise, no.

 3            MR. JAGOE:  Let's just -- we'll move on.

 4   Q   Can you turn to Exhibit WV in your binder, please.

 5            THE COURT:  So I take it that question is

 6   withdrawn.

 7            MR. JAGOE:  Withdrawn.

 8   Q   WV?  Do you have WV?  Can you identify it, please, for

 9   the record?

10   A   Yes.  This is another publication from Amgen scientists,

11   Dr. Browne, Dr. Egrie, Dr. Lin, Dr. Strickland, and a few

12   others.  It's published in the Cold Spring Harbor Symposia

13   on Quantitative Biology in 1986.  And the title of the

14   article is:  Erythropoietin:  Gene Cloning, Protein

15   Structure, and Biological Properties.

16   Q   Is this a document that you've reviewed and relied upon

17   in forming your opinions?

18   A   Yes, it is.

19            MR. JAGOE:  I would like to offer WV into evidence,

20   your Honor.

21            MR. DAY:  No objection, your Honor.

22            THE COURT:  WV is admitted in evidence.

23   Exhibit 2059.

24            (Exhibit marked in evidence.)

25            MR. JAGOE:  Can we have WV.2, please, on the screen
```

1    And the paragraph under Experimental Procedures highlighted,

2    blown up.

3    **Q**   Can you read the first sentence into the record.

4    **A**   The first sentence reads:  Human erythropoietin was

5    purified from the urine of aplastic anemia patients as

6    described previously.  Reference to Miyake, et al., 1977.

7    **Q**   And the second sentence.

8    **A**   The second sentence is:  Recombinant human

9    erythropoietin was produced by Chinese hamster ovary cells

10   stably transformed with the human gene and purified to

11   homogeneity from conditioned culture media.

12   **Q**   And what do the Amgen scientists conclude about those

13   two products in this paper?

14           **MR. DAY:**  Your Honor, outside the scope.

15           **MR. JAGOE:**  Paragraph 1 -- blue 117, your Honor.

16           **THE COURT:**  Yes.  Sustained.  It doesn't say what

17   they conclude; it just quotes it there.

18   **Q**   Dr. Bertozzi, in Exhibit WV --

19           **THE COURT:**  No, first sentence.  First sentence.

20   She may testify to that.  And forgive me, ma'am.  What's

21   there in the first sentence is a conclusion?

22           **THE WITNESS:**  Yes.  The conclusion --

23           **THE COURT:**  Then I apologize.

24           **THE WITNESS:**  It's okay.  The conclusion is stated

25   in my report, and I'll just paraphrase that, which is that

1    Goldwasser's EPO and EPO from the CHO cells have the same

2    size when analyzed by SDS-PAGE.

3            **MR. JAGOE:**   Okay, can you blow up the first column

4    of WV.16.  I'm sorry, WV.6.  Just the first paragraph.

5    **Q**   And can you read the first sentence to the jury, please?

6    **A**   Sure.  The first sentence reads:  Human urinary

7    erythropoietin and CHO-cell-derived recombinant human

8    erythropoietin migrate identically in SDS-polyacrylamide

9    gels, indicating that both molecules are glycosylated to a

10   similar extent.

11   **Q**   What does the term glycosylated mean?

12   **A**   The term glycosylated means the amount of sugar that the

13   molecule has.

14   **Q**   And can you read the sentence that starts with the

15   carbohydrate composition?

16   **A**   The sentence reads:  The carbohydrate composition of

17   recombinant human EPO was essentially the same as that of

18   urinary EPO.

19           **MR. JAGOE:**   Can we have PWQ.  If you would go to --

20   don't put it up there yet.

21   **Q**   Could you look at PWQ in your notebook.  Can you

22   identify PWQ?

23   **A**   Yes.  This document reflects a presentation that was

24   given by Amgen's scientists Dr. Egrie and several others at

25   a conference in Boston in 1984.

1    **Q**   Is this a document that you have reviewed and relied on

2    in coming to your opinions?

3    A   Yes, it is.

4         **MR. JAGOE:**  I would like to offer PWQ into

5    evidence.

6         **MR. DAY:**  No objection, your Honor.

7         **THE COURT:**  PWQ is admitted Exhibit 2060.

8         (Exhibit marked in evidence.)

9         **MR. JAGOE:**  Can we have PWQ.5.

10   **Q**   Dr. Bertozzi, what is your understanding of what's being

11   compared in this figure?

12   A   In this particular experiment the Amgen scientists

13   compared EPO that was purified from human urine to EPO

14   produced in a different kind of recombinant mammalian cell.

15   In this case, the recombinant host cell is called a COS

16   cell, or C O S.  Different from the CHO cell, the Chinese

17   hamster ovary.

18   **Q**   What conclusion did Amgen scientists reach regarding

19   this comparison?

20   A   Their conclusion --

21        **MR. JAGOE:**  Can you blow up the bottom; the very

22   bottom of the figure.

23   A   So the conclusion is that COS cells transfected with the

24   human EPO gene produce and secrete fully glycosylated EPO

25   which migrates identically to the human EPO standard.

1    Q    And in your opinion, does the COS cell produced EPO and

2    the urinary EPO standard migrate identically?

3              MR. DAY:   Objection, your Honor; it's outside the

4    scope.

5              THE COURT:   Where is it?

6              MR. JAGOE:   Blue 110.

7              THE COURT:   Overruled.   She may testify to what

8    appears there.

9    A    Can you repeat the question?

10   Q    Let me back up then a little bit.

11             What type of analysis is presented in this figure?

12   A    This is again an analysis of the size of the molecules

13   by SDS-PAGE and visualized using that technique we call

14   Western analysis.

15   Q    Okay.   And did you review the Western analysis that's

16   presented in this paper?

17   A    Yes.

18   Q    And what conclusion did you reach?

19   A    I reached the same conclusion that the Amgen scientists

20   reached, which is that the EPO from human urine has the same

21   size as the EPO produced in COS cells.   So that means they

22   have the same amount of sugar.

23             MR. JAGOE:   If we can have NBF, please.

24   Q    Can you identify NBF, please?

25   A    Yes.   This is a scientific publication from Amgen

1    scientists Dr. Egrie, Dr. Browne, Dr. Lin, and Dr. Lai.  It

2    was published in a journal called Experimental Approaches

3    for the Study of Hemoglobin Switching, and that was in 1985.

4              **MR. JAGOE:**  I would like to offer NBF, your Honor.

5              **THE COURT:**  NBF.

6         **MR. DAY:**  No objection.

7              **THE COURT:**  Any objection?

8         **MR. DAY:**  No objection, your Honor.

9              **THE COURT:**  NBF is admitted, Exhibit 2061.

10             (Exhibit marked in evidence.)

11   **Q**   Dr. Bertozzi, is Exhibit 2061 a document that you

12   reviewed and relied on in coming to your opinions?

13   A    Yes, it is.

14   **Q**   And what is it that you understand that's being compared

15   in this report?

16   A    My understanding is that this report is comparing EPO

17   from human urine, Goldwasser's EPO, with EPO from

18   recombinant cells.

19   **Q**   What type of recombinant cells?

20   A    I believe this is also the COS cell.

21   **Q**   And what conclusion did the Amgen scientists come to in

22   this paper?

23   A    The conclusions in this paper are basically the same as

24   in the previous paper, which is that the EPO from

25   Goldwasser's preparation migrates the same as the EPO

1    produced by the recombinant COS cell.

2         **MR. JAGOE:**  If we can now have --

3    **Q**   I'm sorry, if you could please look at NZV in your

4    notebook.  And can you identify NZV, please?

5    **A**   Yes.  This is another scientific publication, this time

6    from Amgen scientists Dr. Vapnek, Dr. Egrie, Dr. Browne, Dr.

7    Lin, Dr. Strickland, and a few others, and it's published in

8    Therapeutic Peptides and Proteins:  Assessing New

9    Technologies, in 1988.

10        **MR. JAGOE:**  I would like to offer NZV, your Honor.

11        **THE COURT:**  NZD?

12        **MR. DAY:**  No objection, your Honor.

13        **MR. JAGOE:**  NZV.

14        **THE COURT:**  V.  NZV.

15        **MR. JAGOE:**  V as in Victor.

16        **THE COURT:**  Any objection?

17        **MR. DAY:**  No objection, your Honor.

18        **THE COURT:**  It may be admitted, 2062.

19        (Exhibit marked in evidence.)

20   **Q**   Dr. Bertozzi, what is your understanding of what's being

21   discussed and compared in this report?

22   **A**   In this report, the Amgen scientists compared

23   Goldwasser's EPO to recombinant EPO from the Chinese hamster

24   ovary cell.

25   **Q**   And what conclusion --

1          **MR. JAGOE:**  Can we have NZV.9, please.

2    **Q**   And what conclusion --

3          **MR. JAGOE:**  Blow up the discussion.

4    **Q**   What conclusion did the Amgen scientists reach regarding

5    all of the physical measurements that they made on these

6    samples?

7    **A**   Well, the document reads:  In all physical measurements

8    made to date, the natural material cannot be distinguished

9    from the recombinant material.

10   **Q**   Based on all of the physical measurements that you have

11   seen, what conclusion have you reached?

12   **A**   I reached the same conclusion, which is that

13   Goldwasser's EPO is not distinguished from the recombinant

14   EPO from CHO cells.

15   **Q**   So based on your expertise in the field and all of the

16   information you reviewed in Amgen's FDA documents and their

17   scientific publications, what conclusion do you reach about

18   Goldwasser's EPO and EPO made from mammalian host cells that

19   include a gene for erythropoietin?

20   **A**   After reviewing all of the data, my conclusion is that

21   the EPO made in recombinant host cells is the same as

22   Goldwasser's EPO.

23   **Q**   Now, can you please have the -- let me ask you this

24   then.

25          So what is your opinion as to the validity of claim

1    3 of the '933 patent?

2    A    My opinion of claim 3 of the '933 patent is that it is

3    an invalid claim.

4    Q    Why is that?

5    A    Because the language of that claim covers or includes

6    Goldwasser's EPO which is EPO from the prior art.

7              MR. JAGOE:   Now, can we have CB-13, please.

8    Q    Dr. Bertozzi, what is your understanding of claims 7 and

9    8 in relationship to claim 3 of the '933 patent?

10   A    Well, claims 7 and 8 are said to depend on claim 3,

11   which means that they rely on the product that's claimed in

12   claim 3.

13   Q    Okay.  How, how do they, how do they differ?  How do

14   claims 7 and 8 differ from claim 3?

15   A    Well, claim 3 states mammalian host cells.  If you read

16   the language of claim 7 it restricts the type of cell to

17   non-human mammalian host cells.  And then claim 8 further

18   restricts the type of cell now to a single type of cell,

19   which is the CHO cell, or the Chinese hamster ovary cell.

20   Q    Taking into consideration these additional limitations

21   in claim 7 and claim 8, do you have an opinion as to the

22   validity of these claims?

23   A    Yes, I do.

24   Q    What is your opinion?

25   A    My opinion is that these claims, as written, are also

1    invalid.

2    **Q**   Why is that?

3    A   Well, we know from the scientific data that the Chinese

4    hamster ovary cell makes EPO glycoprotein molecules that are

5    identical to molecules from the prior art.  So, by that

6    reasoning claim 8 is invalid.  And claim 7, which states a

7    nonhuman mammalian cell, actually encompasses the CHO cell

8    because the CHO cell is a nonhuman mammalian cell.  So for

9    that reason claim 7 also covers the prior art.

10           **MR. JAGOE:**  Could we have claims 9 and 12 of the

11   '933 patent, CB14.

12   **Q**   And based on the materials that you have reviewed, do

13   you have an opinion as to the validity of claims 9 and 12 of

14   the '933 patent?

15   A   Yes, I do.

16   **Q**   And what is that?

17   A   My opinion is that claims 9 and 12 are also invalid.

18   **Q**   And did you take into consideration the additional

19   language of claims 9 and 12 in coming to your opinion?

20   A   Yes, I did.

21   **Q**   And can you explain how that additional language

22   affected your opinion?

23   A   Well, both claims 9 and 12 require the product that's

24   claimed in claim 3.  And then, in addition, the only other

25   language here relates to taking that product, putting it in

```
 1    salt water, and then basically putting it in a form where it

 2    can be administered to a human.  And in my opinion there's

 3    nothing novel about those additional parts of the claim.

 4    Q   And what about the language where it says effective

 5    amount?

 6    A   An effective amount basically can be defined as in the

 7    glossary of terms that I think everyone has.

 8    Q   And in your opinion is that element met by the

 9    Goldwasser material?

10         MR. DAY:  Your Honor, I object at this point.  I

11    should have objected earlier.  But I object.  It's outside

12    the scope.

13         MR. JAGOE:  It's in blue 90.

14         MR. DAY:  If I could have side bar, I'll explain it

15    to you.

16         THE COURT:  All right, you may.

17    SIDEBAR CONFERENCE, AS FOLLOWS:

18         THE COURT:  I just want to be clear as to what you

19    think you've just gotten from her.  '933 claims 3, 7 and 8

20    are anticipated.

21         MR. JAGOE:  Yes.

22         THE COURT:  And probably obvious.  And 9 and 12 are

23    obvious.  Is that right?

24         MR. JAGOE:  They are obvious, your Honor, but

25    anticipation is just the epitome of obviousness.  And what
```

1    we've got from her --

2         **THE COURT:**  I understand that.

3         **MR. JAGOE:**  What we got in from her is that they're

4    anticipated or obvious.

5         **THE COURT:**  Yes, but you're asking her in your

6    report -- directed verdict is not based on her report.  I

7    thought she just said obvious.  You might want to go over

8    anticipation.

9         But now what's the problem here?

10        **MR. DAY:**  What my objection was, the testimony

11   elicited from the witness was anticipation.  Her opinion in

12   her report is obviousness.  And so, she said that it's not

13   novel.  That would mean that it's anticipated.  And she

14   said, he asked the question do you have an opinion.

15        **THE COURT:**  Yes.

16        **MR. DAY:**  He didn't say an obviousness opinion was

17   coming.  She said it was not novel.  That's an anticipation

18   opinion.  That's not anywhere disclosed in her report for

19   those claims.

20        **MR. JAGOE:**  Your Honor, on Page 89 she says those

21   exact words that she just testified to.  Paragraph --

22        **THE COURT:**  You mean Paragraph 89.

23        **MR. JAGOE:**  Paragraph 89.

24        **THE COURT:**  Yes.  I'm going to let it stand.  All

25   right.  Thank you.

1          (Whereupon the sidebar conference concluded.)

2   **BY  MR. JAGOE**

3   **Q**   Dr. Bertozzi, do you have an opinion as to whether or

4   not claims 9 and 12 of the '933 patent are obvious?

5          **MR. DAY:**  Objection, your Honor; leading.

6          **THE COURT:**  Overruled; he may have it.

7   A   Yes, I do.  In my opinion, those two claims are obvious.

8   **Q**   Why is that?

9   A   Because taking the product that was made according to

10  earlier claims and simply formulating it in a way that would

11  allow one to administer it to a human is basically a

12  straightforward process with ample precedent in the prior

13  art.

14  **Q**   Do you have an opinion as to whether claims 9 and 12 of

15  the '933 patent are anticipated?

16  A   Well --

17         **MR. DAY:**  Objection, your Honor; outside the scope

18  of the report.

19         **THE COURT:**  No, overruled.  He may have it.

20  A   I also believe they are anticipated.

21  **Q**   And why is that?

22  A   Because in 1977, Miyake and Goldwasser demonstrated that

23  one could take human erythropoietin --

24         **MR. DAY:**  Objection, your Honor; this is outside

25  the scope of the report.  There's nothing about this in the

1    report.

2              THE COURT:  No, he may have it.

3              THE WITNESS:  Keep going?

4              THE COURT:  Yes.

5    A    Okay.  As I was saying, in 1977 Miyake and Goldwasser

6    demonstrated that they could take purified human

7    erythropoietin, dissolve it in salt water, and administer it

8    to a mammal, in this case, a mouse, which produced a

9    biological effect as defined in the glossary that we've all

10   been given.

11             So, in my opinion, all the elements of these claims

12   were met by Miyake and Goldwasser's 1977 report.

13             MR. JAGOE:  Could we have claims 11 and 14 of the

14   '933 patent, which is CB-15.

15   Q    Dr. Bertozzi, do you have an opinion as to whether or

16   not these claims are obvious?

17   A    Yes, I do.

18   Q    What is your opinion?

19   A    In my opinion these two claims are obvious.

20   Q    And why is that?

21             MR. DAY:  Objection, your Honor; it's outside the

22   scope of the report.

23             THE COURT:  Yes, where is it?

24             MR. JAGOE:  We have that in the blue report at

25   Paragraphs 89 and 90.

1      **THE COURT:**  Yes, she may testify consistent with

2  those two paragraphs.

3  **Q**   Dr. Bertozzi, can you explain why you think these claims

4  directed to methods of treating are obvious in your opinion?

5  **A**   Well, prior to the patent it had been certainly

6  suggested in the scientific literature that erythropoietin

7  could be used to treat anemia in kidney dialysis patients.

8  There was a report in 1971 by Dr. Goldwasser in which he

9  stated that outright.  And in addition, there was a

10  scientific study by a Dr. Eschbach demonstrating that one

11  could basically treat sheep that were induced to have a

12  similar condition as the human patients, with plasma

13  enriched with erythropoietin.  So that was a scientific

14  demonstration of the possibility of using erythropoietin to

15  treat a kidney dialysis patient.  And both of those reports

16  were prior to the patent.

17      **MR. JAGOE:**  Can we have CB-4, which is claim 1 of

18  the '422 patent, please.

19  **Q**   Dr. Bertozzi, based on your expertise in all of the

20  materials that you have reviewed, do you have an opinion as

21  to the validity of claim 1 of the '422 patent?

22  **A**   Yes, I do.

23  **Q**   Can you explain your opinion?

24  **A**   In my opinion --

25      **MR. DAY:**  I object, with respect to the scope of

1    this opinion.

2              **THE COURT:**  Yes.

3              **MR. JAGOE:**  I'll --

4              **THE COURT:**  We've had a colloquy on this.  And I

5    think the proper way to handle it, you may ask a more

6    precise question.

7              **MR. JAGOE:**  I'll ask a more precise question.

8    Thank you, your Honor.

9    **Q**   Dr. Bertozzi, in your opinion, is claim 1 of the '422

10   patent obvious?

11   A    In my opinion, it is obvious.

12   **Q**   And why is that?

13   A    Well, again, this particular claim basically is a

14   pharmaceutical composition claim and a pharmaceutical

15   composition is simply putting EPO into a form so that it

16   could be injected into a mammal, and in my opinion that was

17   obvious because there was ample precedent in the literature

18   for taking glycoproteins, putting them in salt water and

19   injecting them into animals.

20   **Q**   Dr. Bertozzi, do you have an opinion as to whether or

21   not claim 1 is valid or invalid for anticipation?

22             **MR. DAY:**  Objection, your Honor.

23             **THE COURT:**  Yes, sustained.

24             **MR. JAGOE:**  Your Honor, blue, paragraph 95.

25             **THE COURT:**  No.  Sustained.  Well, 95 now you say.

1    Sustained.  Move on.

2         **MR. JAGOE:**  Thank you, your Honor.

3    **Q**   Dr. Bertozzi, does the Amgen patent, the specification

4    of the Amgen patent describe any data or make any statements

5    about differences between urinary erythropoietin and the

6    recombinant erythropoietin?

7    **A**   Yes.  The patent does make statements comparing those

8    two EPO preparations.

9    **Q**   And have you reviewed -- do you understand the

10   statements that are made in the patent?

11   **A**   Yes, I do.

12   **Q**   And what is your opinion as to the statements made in

13   the Amgen patent regarding these differences?

14   **A**   My opinion --

15        **MR. DAY:**  Your Honor, I object.  The question is

16   hopelessly broad.

17        **THE COURT:**  I didn't understand it.

18        **MR. JAGOE:**  Okay.  Could we have --

19        **THE COURT:**  I don't know as I subscribe to the

20   characterization hopelessly broad.  I just didn't understand

21   it.  So let's put a different question.

22        **MR. JAGOE:**  I'll take it in a little bit smaller,

23   smaller bites.  The question is withdrawn.

24        Can we have Exhibit 1, Page 52 of the exhibit,

25   which is the '933 patent.  And can we highlight and expand

1    column 28 starting at line 33.  Okay.

2    Q    Dr. Bertozzi, do you see at line 37 there's a sentence

3    that, or a statement that starts with "Western blot

4    analysis."

5    A    The sentence doesn't --

6    Q    There's a line --

7    A    -- start there.

8    Q    There's a line that starts with Western blot analysis.

9    A    Sure.  Would you like me to read the full sentence?

10   Q    Yes, please.

11   A    These studies indicated that the CHO-produced EPO

12   material had a somewhat higher molecular weight than the

13   COS-1 expression product which, in turn, was slightly larger

14   than the pooled source human urinary extract.

15   Q    Now, based on the materials that you've reviewed from

16   the FDA documents and the Amgen scientists, is that

17   statement accurate?

18            MR. DAY:  Your Honor, it's outside the scope.

19            THE COURT:  Yes.  Where is it?

20            MR. JAGOE:  It's in the blue report.

21            THE COURT:  Yes.

22            MR. JAGOE:  Paragraphs 120 and 121.

23            THE COURT:  Thank you.

24            No, overruled.  She may have it.  He may have it in

25   that form.  In your view is that accurate?

1           **THE WITNESS:**  The statement made in the patent

2      contradicts the statements made in all of the other Amgen

3      publications.

4      **Q**   And in your opinion which is the more accurate?

5      A    The data that I've seen in all of those Amgen

6      publications, as well as in Amgen's PLA, in my opinion, are

7      the accurate data.

8      **Q**   Now, further down in that same column of the Amgen

9      patent, starting at line 56, there's a sentence at the end

10     of line 56 that starts with "Experimentally."  Can you read

11     that to the jury?

12     A    Experimentally determined carbohydrate constitution

13     values (expressed as molar ratios of carbohydrate in the

14     product) for the urinary isolate were as follows.

15     **Q**   Okay.  You don't have to read the --

16     A    And there's a bunch of numbers and words.

17     **Q**   Dr. Bertozzi, based on what you've read and in your

18     expertise, are those data accurate and correct?

19     A    No.  Those data are incorrect.

20     **Q**   What is your basis for saying those are incorrect?

21     A    Well, I know from my own --

22           **MR. DAY:**  Objection, your Honor; it's outside the

23     scope.

24           **THE COURT:**  Where is it?

25           **MR. JAGOE:**  It's paragraph, blue, paragraph 67.

1          **THE COURT:**  Well, you may put a question to elicit

2     that data, but she started her answer I know from my

3     experience, and that doesn't seem to fit what's in 67.  So,

4     I'll sustain it.  You may put another question if you want

5     that data.

6     **Q**   Dr. Bertozzi, have you seen any testimony from Dr. Lin

7     which would indicate to you whether or not the data in the

8     patent that we're talking about are accurate?

9          **MR. DAY:**  Objection, your Honor.

10         **MR. JAGOE:**  Paragraph 67, blue, your Honor.

11         **THE COURT:**  Yes, I'm looking at Paragraph 67.

12         Well, at that level of generality, sustained.  And

13    you may ask, in a leading question, do you understand what's

14    there in the last sentence.  It's not evidence of anything.

15    We haven't heard from Mr. Lin.  But you may ask it in that

16    form if you wish.

17    **Q**   Dr. Bertozzi, do you understand that Dr. Lin in his

18    deposition has admitted that the carbohydrate analysis in

19    the patent are incorrect?

20    **A**   Yes, I understand that.

21    **Q**   Dr. Bertozzi, other than the two places we've just

22    reviewed, are there any other places in the Amgen patent

23    that describe differences between the sugars on urinary EPO

24    and the sugars on recombinant human EPO?

25         **MR. DAY:**  Objection, your Honor; outside the scope.

1          **MR. JAGOE:**  This is blue, 120 and 121.

2          **THE COURT:**  Yes, she may testify consistent with

3    those paragraphs.

4    **Q**    Do you have an answer to the question consistent with

5    what's in 120 and 121 of your report?

6    A    So, the data in the patent that address differences in

7    sugars between urinary EPO and recombinant EPO from CHO

8    cells are limited to the data that were just discussed, and

9    in those two reports of data Amgen reported differences.

10         **THE COURT:**  It's about time for the break, but are

11   you done, virtually, or shall we take the break?

12         **MR. JAGOE:**  Could we take the break now, your

13   Honor, please?

14         **THE COURT:**  We'll take the break.

15         **MR. JAGOE:**  Thank you.

16         **THE COURT:**  Ladies and gentlemen, you've not heard

17   all the evidence.  Please, therefore, keep your minds

18   suspended.  Do not discuss the case either among yourselves

19   nor with anyone else.

20         We'll stand in recess for one-half hour.  We'll

21   recess.

22         **THE CLERK:**  All rise for the jury.

23         (Whereupon the jury left the courtroom.)

24         **THE COURT:**  Please be seated.

25         I just want to get a heads up as to schedule here.

1    It doesn't look to me like we're going to be done, and I'm

2    not crowding you because you're spending your time as you

3    see fit.

4              I guess this is my question.  Are you going to be

5    done in the presentation of evidence as to any specific

6    defense so we can talk about it this afternoon?

7              **MS. BEN-AMI:**  I don't think so.

8              **THE COURT:**  Or are we -- you don't think so.

9              **MS. BEN-AMI:**  I don't think so.

10             **THE COURT:**  That's fine.  We'll recess.

11             **THE CLERK:**  All rise.  Court is in recess.

12             (Recess.)

13             **THE CLERK:**  All rise for the jury.

14             (Whereupon the jury entered the courtroom.)

15             THE CLERK:  Court is in session, please be seated.

16             **THE COURT:**  Proceed, Mr. Jagoe.

17                    **DIRECT EXAMINATION** (Cont'd)

18   **(BY MR. JAGOE:)**

19   **Q.**  Dr. Bertozzi, when you formed your opinion regarding the

20   obviousness of the claims, from what perspective did you

21   consider the claims to be obvious?

22   A.  Well, in my opinion, the claims are obvious from the

23   perspective of someone who has skill in the art, so somebody

24   with a Ph.D. degree or an M.D. degree, and a couple years of

25   research experience.

1    Q.   And in what time frame did you consider when you were

2    giving your opinions regarding obviousness?

3    A.   Well, basically the 1983-1984 time frame.

4    Q.   Dr. Bertozzi, have you reviewed an IEF gel that's relied

5    on by Amgen's experts and prepared by Dr. Catlin?

6    A.   Yes, I have.

7    Q.   And what does this IEF gel compare?

8    A.   In my recollection, the IEF gel compares various

9    commercial erythropoietin preparations in addition to

10   urinary erythropoietin.

11   Q.   And what did this IEF analysis show?

12   A.   Well, the IEF analysis shows that there are structures

13   in the commercial erythropoietins from recombinant cells

14   that are the same as structures from urinary erythropoietin.

15   Q.   So from that -- from the results of that IEF gel, what

16   do you conclude?

17   A.   My conclusion from that gel is that the structures in

18   the recombinant erythropoietin are the same as structures in

19   human urine.

20             MR. JAGOE:   Pass the witness now.

21             THE COURT:   Mr. Day?

22                     CROSS-EXAMINATION

23   (BY MR. DAY:)

24   Q.   Good morning, Dr. Bertozzi.

25   A.   Hi.

1    **Q.** My name the Rusty Day, and I represent Amgen in this

2    case, as well as Dr. Fu-Kuen Lin.  I want to pick up just

3    where you left off.

4         You mentioned that obviousness is determined as of

5    the date the inventions were made; right?  That's a

6    determination made back in time as of 1983-1984; is that

7    correct?

8    A.  That's correct.

9    **Q.** And it's made based on the state of the art as it

10   existed at that time; right?

11   A.  That's right.

12   **Q.** Not today, not after the inventions were made?

13   A.  That's right.

14   **Q.** Okay.  And it's made by someone who at that time would

15   have been one of ordinary skill in the art; right?

16   A.  Well, there I would disagree.  I think that one can

17   determine what the state are the art is with respect to the

18   literature, but the determination of obviousness with

19   respect to a patent claim should be made at the time.  The

20   obviousness should be determined at the time.

21   **Q.** From the perspective of one who is of ordinary skill in

22   the art at the time; right?

23   A.  Well, I think the determination of obviousness can be

24   made, certainly, as long as someone has the experience to

25   understand what was the state of the art.

1    Q.   Okay.  But when you say it's not just the state the art,

2    but it's the state of a skilled artisan, you have to go back

3    in time and apply the skill of the ordinarily skilled

4    artisan at that time to the state of the art at that time;

5    right?

6    A.   Well, that's not my understanding.

7    Q.   No, it's not your understanding?

8    A.   My understanding --

9    Q.   That's fine.  You answered my question.

10   A.   Well, I can explain what is my understanding.

11   Q.   You can on redirect.  That will be Roche's time.  Okay?

12            In 1984, that's the year you graduated from high

13   school; right?

14   A.   Yeah.  That was my first year in college, Harvard.

15   Q.   And your last year in high school?

16   A.   That's right.

17   Q.   And so you went to college four years after that; is

18   that right?

19   A.   Well, I went to college that year.

20   Q.   And continued for four years?

21   A.   I finished four years after that.

22   Q.   Then you went to graduate school after that?

23   A.   That's right.

24   Q.   And when did you get your Ph.D.?

25   A.   My Ph.D. was awarded in 1993.

1   **Q.**  So that was ten years after the date we're talking

2   about; right?

3   A.  That's right.

4   **Q.**  And then you would have had two years of post-doc

5   training or laboratory training after that?

6   A.  Three, yeah.

7   **Q.**  Okay.  Now, all of your information concerning the prior

8   art preparations of EPO that you've talked about this

9   morning, all of your information is based on what you have

10  read in this case; right?

11  A.  My information for this case is based on what I've read

12  in this case, and some of it relates to the research that I

13  do, so I have some knowledge just as a researcher, yeah.

14  **Q.**  Okay.  That you've acquired since you went to graduate

15  school, got your Ph.D., and worked with other doctors in the

16  field; right?

17  A.  Some of it since then, yeah.

18  **Q.**  Now, you did not personally work with any of these prior

19  art EPO preparations that you testified about here today,

20  have you?

21  A.  No.  I have not personally worked with Goldwasser's

22  erythropoietin, that's true.

23  **Q.**  And I believe you said you're an expert in chemistry and

24  the biology of sugars, what you call glycobiology; is that

25  right?

1    A.   Yes.

2    **Q.**   You're not a physician, are you?

3    A.   Nope, I'm not a physician.

4    **Q.**   You've never studied chronic renal failure, have you?

5    A.   No.

6    **Q.**   And you're not an expert in the anemia of patients who

7    suffer from chronic renal failure, are you?

8    A.   I'm a basic scientist, so I study glycoproteins and

9    sugar molecules.

10   **Q.**   Okay.   Now, in the course of your work as an expert for

11   Roche in this case, you have not performed any experiments

12   comparing recombinant human EPO to any urinary EPO

13   preparation, have you?

14   A.   Do you mean with my own hands?

15   **Q.**   Yeah?

16   A.   Performed experiments?   No.

17   **Q.**   And you haven't had anyone perform any for you, have

18   you?

19   A.   Oh, no.

20   **Q.**   And you're not here to present to the jury the results

21   of any experiments or tests that you have performed or have

22   been performed for you comparing what you call Goldwasser's

23   urinary EPO to any recombinant EPO, are you?

24   A.   Well, what I'm presenting to the jury is a comparison of

25   reported data, so the data that I read about is the evidence

1    that I use to form my opinion.

2    Q.  Okay.  So you're relying upon experiments performed by

3    others sometime in the past and your interpretation of those

4    experiments; right?

5    A.  That's right.

6    Q.  Okay.  Now, I believe you started the day testifying on

7    Wednesday with a dramatic flourish that Goldwasser's urinary

8    EPO is the same as Lin's recombinant EPO; right?

9         MR. JAGOE:  Objection, your Honor, to that

10   characterization.

11        THE COURT:  Well, sustained.  Let's just ask

12   questions.

13        MR. DAY:  Thank you, your Honor.

14   Q.  You stated that Goldwasser's urinary EPO was the same

15   product as Lin's EPO; right?

16   A.  My statement was that Goldwasser's EPO is the same as

17   what's claimed in claim 3 of the '933 patent, and Lin's

18   recombinant EPO from the CHO cell is a small subset of what

19   is claimed.

20   Q.  Okay.  And you also, I think, said that nothing

21   distinguishes Goldwasser's urinary EPO from the product that

22   Lin claimed; right?

23   A.  That's right.

24   Q.  Now, when you say "same," do you mean identical?

25   A.  What I mean are that the structures that are found in

1    Goldwasser's urinary EPO can all be made according to the

2    language of claim 3.  So following the language of claim 3,

3    you can make any structure identical to what's observed in

4    Goldwasser's EPO.

5    **Q.**  Okay.  Well, that really isn't the question, is it?  The

6    question is, did Goldwasser's EPO, as it was made before Lin

7    made his inventions, is that preparation identical,

8    identical to any recombinant EPO?

9    A.  Well, one can make a recombinant EPO to be identical --

10   **Q.**  I didn't ask that, I asked is it identical?

11   A.  Okay.  Well --

12            **MR. JAGOE:**  Objection, your Honor.

13            **THE COURT:**  No, overruled.

14            **MR. JAGOE:**  Can we have a sidebar, please?

15            **THE COURT:**  We may.

16   SIDEBAR CONFERENCE, AS FOLLOWS:

17            **MR. JAGOE:**  Your Honor, these are misleading

18   questions, because the analysis is not to compare two

19   different products into the commercial embodiment of their

20   invention to the prior art, the proper analysis would be

21   compare the claimed language to prior art.

22            **THE COURT:**  Yes.

23            **MR. JAGOE:**  His questions are going to whether or

24   not Dr. Lin's EPO or Dr. Lin's recombinant EPO are the same

25   as Dr. Goldwasser's EPO.

1        **THE COURT:**  What do you say to that?  There's

2   something to that.

3        **MR. DAY:**  I say the comparisons between the prior

4   art products that existed before the invention was made,

5   that's what my question is, and my question with respect to

6   that is, has he shown any evidence or did she come here with

7   any evidence to show that the product that existed before

8   the invention was made is identical to any recombinant EPO.

9   That's my question.

10       **THE COURT:**  Well, that wasn't exactly your question

11  because you said Lin.  But I'm going to let you have this

12  question.  Now, understand, they can get to the jury on

13  cross-examination, as well as on direct examination.

14       **MR. DAY:**  I do understand.

15       **THE COURT:**  Okay.

16       (Whereupon the sidebar conference concluded.)

17       **THE COURT:**  All right.  Put another question.

18       **MR. DAY:**  I will, your Honor.

19  **(BY MR. DAY:)**

20  **Q.**  My question is:  Can you tell us, whether

21  Dr. Goldwasser's urinary EPO, urinary EPO preparation that

22  Dr. Goldwasser purified before Lin's inventions, whether

23  you're here to tell the jury that that product is identical

24  to any recombinant human erythropoietin?

25  A.  Well, any recombinant erythropoietin, as you phrase it,

1    has not been characterized, so we don't know the structures

2    of any recombinant human erythropoietin, explicitly.  The

3    only recombinant erythropoietins that have been

4    characterized have been those products made from Chinese

5    hamster ovary cells and purified a certain way.

6           So, basically, my analysis, as I read the evidence,

7    my analysis was focused on the language of the claim.  And

8    the language of the claim claims an erythropoietin

9    glycoprotein coming from recombinant mammalian cells.

10          So given the breadth of the claim, which covers

11   basically any and all glycoforms of EPO that could be made

12   in mammalian cells, my conclusion is that the claim covers

13   Goldwasser's material.

14   **Q.**  Okay.

15   A.   Now, having said that --

16   **Q.**  That's good enough, Doctor.

17   A.   Well, I need to --

18   **Q.**  That's fine.  You can do that on --

19          **MR. JAGOE:**  Objection, your Honor.

20          **THE COURT:**  No, overruled.  You asked her to

21   explain, she may finish her answer.  Go ahead.

22   A.   So the recombinant erythropoietin from the CHO cell

23   after purification, using the Amgen protocol, that

24   particular subset of recombinant EPO has been characterized,

25   and in that limited material, there are structures that are

1    identical to structures from Goldwasser's erythropoietin.

2    Scientifically, if two structures are identical, they're the

3    same.

4    **Q.**  All right, Doctor.  Let's take that one step at a time,

5    okay?  You said that it's the recombinant EPO that has been

6    produced by CHO cells has been characterized?

7    A.  Yes, it has.

8    **Q.**  Okay.  Taking that product, putting aside whether there

9    are structures in that product that are the same, is the

10   product as a whole identical?

11          **MR. JAGOE:**  Objection, your Honor.

12   **Q.**  Is the product as a whole identical --

13          **THE COURT:**  No, overruled.

14   **Q.**  -- to Dr. Goldwasser's urinary EPO?

15          **MR. JAGOE:**  Objection, your Honor.

16          **THE COURT:**  Overruled.

17   A.  Well, the product --

18   **Q.**  Yes or no, Doctor.

19   A.  It's not really a yes-or-no question.  It can't really

20   be answered yes or no because --

21          **THE COURT:**  And there -- well, then that's your

22   answer.  He gets to ask the questions now.  See, and the

23   lawyer who called you to the stand can ask you to explain

24   any of these things, but perfectly appropriate for you say,

25   if he asks you a question and an honest and complete answer

1    is something other than yes or no, you can say just what you

2    said.

3    **Q.**  Is there anything that differentiates the recombinant

4    human erythropoietin produced by CHO cells, anything, that

5    differentiates it from Goldwasser's prior art urinary EPO?

6            **MR. JAGOE:**  Objection, your Honor.

7            **THE COURT:**  Overruled.

8    A.  Well, the EPO produced by CHO cells is a combination of

9    molecules.  So there are many products in there.  There are

10   many glycoprotein molecules, some of them have no

11   distinction from molecules from Goldwasser's EPO.  That's

12   what I can say.

13   **Q.**  And some of them do?

14   A.  We don't know, and this is just the CHO cell from Amgen,

15   but of course there are hundreds of different types of CHO

16   cells that make different glycoforms, just as different

17   batches of human urine when purified might have different

18   glycoforms, depending on how things are purified.

19   **Q.**  Thank you, Doctor.  I understand that you believe that

20   it would be possible, applying the teaching of Lin's patent,

21   to make a recombinant human EPO that has all of the

22   structures that are -- that were present in Goldwasser's

23   urinary EPO; is that correct?

24           **MR. JAGOE:**  Objection, your Honor.

25   Mischaracterization --

1          THE COURT:  Well, yes, put that question again,

2   would you please?

3   Q.  I understand that you believe it would be possible,

4   using the teaching of Lin's patent --

5          MR. JAGOE:  Objection, your Honor.  She didn't talk

6   about --

7          THE COURT:  Please, please.  You've got to let him

8   finish, but then promptly object.  Go ahead.

9   Q.  -- to make a recombinant EPO that has all of the

10  structures that were present in Goldwasser's urinary EPO; is

11  that correct?

12  A.  You have to say it again, start the --

13         MR. JAGOE:  Objection, your Honor.

14         THE COURT:  The question is:  You believe that it

15  would be possible, using the teaching of Lin's patent, to

16  make a recombinant EPO that has all of the structures that

17  were present in Goldwasser's urinary EPO; is that correct?

18         I overrule the objection.  You can answer it.

19  A.  So, Lin's patent only teaches one particular CHO cell.

20  And using that single CHO cell, I think it would be

21  difficult to recapitulate Goldwasser's EPO.  I think one

22  would have to use more or different CHO cells.

23  Q.  Okay.  But it's your opinion that if you tried, you'd be

24  able to do it; is that right?

25  A.  Yes.

1    Q.  But you haven't come into court with any evidence where

2    you actually tried to show the jury that you successfully

3    made a recombinant human EPO that has all the structures of

4    Goldwasser's urinary EPO, have you?

5    A.  My opinion is based on --

6    Q.  Yes or no, Doctor; have you done that or not?

7    A.  Done what?  What was that?

8    Q.  You have not performed an experiment where you can

9    demonstrate to the jury that you have been able to make a

10   recombinant human EPO that has all of the structures of

11   Goldwasser's urinary EPO, have you?

12            MR. JAGOE:  Objection, your Honor.

13            THE COURT:  No, overruled.  He may have that

14   question.

15   A.  I have not done that experiment.

16   Q.  Okay.  Now, I'd like to ask you some questions about how

17   mammalian cells produce proteins, okay?

18            After the protein chain -- I didn't wear my beads

19   today, so I -- I can't give --

20            THE COURT:  No, no, the comment's stricken.  Just

21   ask questions.

22   Q.  After the protein chain is produced in a cell, the cell

23   will fold the protein into a particular three-dimensional

24   shape; correct?

25   A.  Yes, generally that's true.  For many proteins.

1    Q.  And that occurs within the cell; that's something the

2    cell does, right?

3    A.  Generally, that's true.

4    Q.  Okay.  And mammalian cells can also make a variety of

5    chemical modifications to proteins; correct?

6    A.  Well, there are chemical reactions that take place in

7    the cell that can transform proteins to new molecules,

8    that's true.

9    Q.  Okay.  So, for example, some proteins, like EPO, are cut

10   by proteases or enzymes within the cell at specific places

11   in the protein chain; right?

12        MR. JAGOE:  Objection, your Honor.  This is beyond

13   the scope.

14        THE COURT:  Overruled.

15   A.  So, I don't have the detailed information with respect

16   to what happens to EPO, but there are other proteins,

17   certainly, that can be cut into smaller fragments, that's

18   true.

19   Q.  Okay.  And that's called protein cleavage, right?

20        MR. JAGOE:  Objection on relevance, your Honor.

21   A.  That's not what I would call it.

22        THE COURT:  In view of the answer, do you press the

23   objection?  She answered.

24        MR. JAGOE:  No.

25        THE COURT:  Withdrawn.

1    Q.  Some proteins are modified by the cell to add sugars,

2    and that's what you call glycosylation; correct?

3    A.  That's not quite correct.

4    Q.  No?  You do agree that EPO must be glycosylated in a

5    very specific fashion to retain activity in the body, don't

6    you?

7    A.  Yes.  EPO must be glycosylated in the way that a

8    mammalian cell is glycosylated for it to have its maximal

9    activity, that's true.

10   Q.  Well, when you say in the way that mammalian cells are

11   glycosylated, specifically, what way is that?

12   A.  Mammalian cells glycosylate EPO with four of those trees

13   that I mentioned before, and the trees have a certain range

14   of structures which are common to all mammalian cells.

15   Q.  Okay.  Some proteins are modified by the cell to add

16   sulfate molecules, too; right?

17   A.  Some proteins are definitely reacted with a molecule

18   that's called five prime phospho sulfo, three prime phospho

19   adenosine, and the product of that reaction is a sulfo

20   protein.

21   Q.  Now, do you agree that different cell types can perform

22   these various modifications to proteins differently?

23   A.  Yes.  One can engineer cells to perform any, some, or

24   none of these kinds of modifications, that's true.

25   Q.  Well, you can engineer them, and also even without

1    engineering the cell, cells from different tissues will

2    perform these modifications to a protein differently;

3    correct?

4    A.   There are examples of that, yeah.

5    **Q.**   And cells from different species will perform these

6    modifications to proteins differently; correct?

7    A.   There I cannot think of any evidence of that, but it

8    could be.

9    **Q.**   Well, glycosylation can differ in cells from different

10    species, can't it?

11    A.   It can, yeah, that's true.

12    **Q.**   Okay.  Now~---

13    A.   For example, yeast and insects have very different

14    sugars from mammals, that's true.

15    **Q.**   Okay.  Do you agree that the glycosylation of a protein

16    made in the body, in living tissue in the body, can differ

17    drastically from the glycosylation of that same protein

18    produced by cells from that same tissue grown in culture?

19         **MR. JAGOE:**  Objection, your Honor.

20         **THE COURT:**  Yeah, I'm going to sustain that as

21    irrelevant.  Sustained.

22         **MR. DAY:**  May I have a sidebar, your Honor?

23         **THE COURT:**  You may.

24    SIDEBAR CONFERENCE, AS FOLLOWS:

25         **THE COURT:**  Again, I'm not real worried about wide

1    open cross-examination, but I don't know where you're going.

2           **MR. DAY:**  The relevance is directly to the

3    limitation of cells grown in culture.  I'm pointing out that

4    when you grow cells in culture, it can change the way the

5    protein's produced.

6           **THE COURT:**  Okay.  I'm going to sustain the

7    objection made to that question.  And let's go from there.

8           (Whereupon the sidebar conference concluded.)

9    **(BY MR. DAY:)**

10   **Q.**  Do you agree, Doctor, that glycosylation of a protein

11   which is produced by living tissues on the one hand can

12   differ drastically from the glycosylation of the same

13   protein produced by cells from those same tissues when those

14   cells are grown in culture instead of in a living body?

15   A.  Yes, I would say that there could be changes in the

16   sugars.  Yes.

17   **Q.**  Let's talk a bit about purification.  Now, you agree

18   that changes in the procedures used to purify an EPO

19   preparation could result in the selection of different

20   subpopulations of EPO molecules; right?

21          **MR. JAGOE:**  Objection, your Honor.  It's vague.

22          **THE COURT:**  No, if she can answer it, she may.

23   A.  Well, by definition, purification is a process by which

24   you take a more complex mixture of molecules and basically

25   convert it to a less complex mixture of molecules, and at

1    the very end, it would be homogeneous, one type of molecule.

2    And when you do that, it's usually the case, when it comes

3    to glycoforms, that some of the those glycoforms are

4    disregarded and others might be, therefore, enriched.

5    **Q.** So based upon the purification process, you could end up

6    with one product, let's call it Product A, that has one or

7    more sets of glycoforms in it, and you could end up with a

8    different product, we'll call it Product B, which could have

9    a different set of glycoforms in it; correct?

10         **MR. JAGOE:** Objection, your Honor.  It's vague and

11   it mischaracterizes.

12         **THE COURT:** Well, I think it's hypothetical.  Let's

13   bring it down here to this case, if we can.  Sustained.

14   **Q.** I'm speaking specifically with respect to EPO glycoforms

15   and with respect to the purification processes that are used

16   to purify EPO.  And you would agree, would you not, Doctor,

17   that different purification processes can result in

18   different subpopulations of EPO glycoforms in the end

19   product?

20   A.  Well, that --

21         **MR. JAGOE:** Objection, your Honor.  It's vague as

22   to what purification processes.

23         **THE COURT:** Overruled.  You may answer.

24   A.  My answer is that that would depend on how many

25   different glycoforms were in the starting material, and also

1   on the copy number of each glycoform.

2   **Q.**  Would you also agree that, based upon the reagents used

3   in the purification process, one purification process could

4   damage the product that's purified, whereas, a different

5   purification process might not damage the EPO glycoforms at

6   all?

7          **MR. JAGOE:**  Objection, your Honor.

8   **Q.**  Would you agree?

9          **THE COURT:**  No, I'm going to sustain that.

10  Sustained.  And again, I'm going to need another sidebar.

11  SIDEBAR CONFERENCE, AS FOLLOWS:

12         **THE COURT:**  Now you've explained the relevance, but

13  now the force of Mr. Jagoe's objection that you got the play

14  against your own claim comes, in my mind, to the fore.

15  You're suggesting these various possibilities, but the

16  claims, as I have grasped the claims here, the certain

17  breadth, especially claim 1 of the '422.

18         **MR. DAY:**  Yes.

19         **THE COURT:**  So long as it's obvious when, in light

20  of that claim, their defense can be sustained, so why are we

21  getting into these -- I'm sure there are different

22  purification ways, but they're not in the --

23         **MR. DAY:**  Because I'm showing that the prior art --

24  I'm dealing with the prior art preparation, which they argue

25  in the obviousness or anticipated obviousness.  And I'm

 1   showing that the purification process used to obtain that

 2   product may have altered or changed the product that was

 3   obtained, so that the product that's obtained is not the

 4   same.

 5          THE COURT:  Well, is that so?  Are we going to hear

 6   evidence that that's so?

 7          MR. DAY:  Yes, you are.

 8          MR. JAGOE:  It's not the same as what?

 9          MR. DAY:  I'm simply asking --

10          THE COURT:  That's a good point.  Not the same as

11   what?

12          MR. DAY:  As the claimed invention.

13          THE COURT:  Well, the claimed invention is human

14   erythropoietin --

15          MR. DAY:  Purified from mammalian cells grown in

16   culture.

17          THE COURT:  Right.  All right.

18          MR. DAY:  What I intend to show is, the issue, your

19   Honor, is the prior art product, what is the

20   characterization of the prior art product.  Is the prior art

21   product the same product as that claimed in the invention?

22   That's the issue.  And the evidence will show that --

23          THE COURT:  Well, that is the issue as to

24   anticipation.

25          MR. DAY:  Yes, also --

1          THE COURT:  But, and it is relevant, I suppose, as

2    to obviousness.  All right.  That's helpful.  We'll see

3    what -- all right.

4          MS. BEN-AMI:  Mr. Jagoe wanted to say one further

5    thing.

6          MR. JAGOE:  The claim is not limited to particular

7    purification.

8          THE COURT:  No, it's not.

9          MR. JAGOE:  How the prior art it was prepared or

10   purified is completely irrelevant.  It only matters what the

11   structure of the prior art was.

12         THE COURT:  See, I differ with that.  I think

13   trials really are a search for the truth.  So what people

14   were doing out there makes a difference.  The legal effect

15   of what they were doing is different, depending upon whether

16   the claim is anticipation, which is a more structured legal

17   analysis, or obviousness, which is a more free-form legal

18   analysis.  And that's the line I'm going to try to follow.

19         Sometimes we have these, and I say, when someone

20   speaks, well, don't argue, you just won.  This one, I needed

21   the sidebar.  I've had it.  I'm helped by it.  I'll try to

22   discern the proper course.

23         MS. BEN-AMI:  I know you don't like two people to

24   speak.

25         THE COURT:  I know.  I don't.

1        **MS. BEN-AMI:**  The claims are the purified mammalian

2   cells grown in culture without any finite purification,

3   without any finite --

4        **THE COURT:**  I've read it.  That's true.

5        **MS. BEN-AMI:**  It's not any purification, any

6   cell --

7        **THE COURT:**  I don't differ with him there.

8        **MS. BEN-AMI:**  That's all we're saying.

9        **THE COURT:**  I -- I'm not clear how that guides me

10  on making my rulings.  We'll see.

11       (Whereupon the sidebar conference concluded.)

12       **MR. DAY:**  May I proceed, your Honor?  Thank you.

13  **(BY MR. DAY:)**

14  **Q.**  So, Dr. Bertozzi, do you agree that changes in a

15  purification process can affect the product that's purified?

16  A.  Well, it can certainly affect the mixture of products

17  that are purified, yeah.

18  **Q.**  And in addition to affecting the mixture of products,

19  can it also affect -- can you use reagents that -- if you

20  had a protease in a purification process, it might damage or

21  cut the protein you're trying to purify, is that possible?

22       **MR. JAGOE:**  Objection.  Vague, your Honor.

23       **THE COURT:**  Sustained.

24  **Q.**  You would agree that different purification processes

25  can affect the product that's purified in different ways?

1    A.  Well --

2          **MR. JAGOE:**  Same objection, your Honor.

3          **THE COURT:**  Sustained.  I'm going to permit

4    questions to this witness with respect to what was actually

5    done in proceedings that are characterized as prior art.

6    That you may have, but these are too general.  Sustained.

7          **MR. DAY:**  Okay.

8    **Q.**  Doctor, you understand that in the Goldwasser

9    purification process it was a multistep process?

10   A.  Yes.

11   **Q.**  And the process began by recovering urine from human

12   patients; right?

13   A.  Well, collecting that urine, I presume.

14   **Q.**  And urine has proteases in it, doesn't it?

15         **MR. JAGOE:**  Objection.

16         **THE COURT:**  No, he may have that.  Well, well --

17   human urine has proteases, does it?

18         **THE WITNESS:**  I can't say for sure, but it --

19   possibly, yeah, possibly has proteases.

20   **Q.**  And what step in the purification process did

21   Dr. Goldwasser implement to offset or neutralize the effect

22   of those proteases?

23         **MR. JAGOE:**  Objection, your Honor.  Beyond the

24   scope of the direct.

25         **THE COURT:**  Well, again, that doesn't trouble me.

1    Overruled.  But she didn't say they did.  She doesn't seem

2    to be clear on it.  So I'm going to ask you, you may ask her

3    to assume that they do, in light of -- well, you may ask her

4    to assume.

5            MR. JAGOE:  Can she be given the document to

6    answer, your Honor?

7            THE COURT:  I don't know there is a document to

8    that question.

9    Q.  I'm simply asking, from your review of this record and

10   your literature, you're aware that urine has sialidases in

11   it?

12   A.  I did not perform a detailed analysis of the other

13   components of human urine, but I do have the purification

14   paper, so --

15   Q.  You're --

16   A.  I can read the paper.

17   Q.  You're aware that human urine has sialidases in it,

18   Doctor; yes or no?

19           MR. JAGOE:  Objection, your Honor.

20           THE COURT:  No, overruled.  And she may be asked

21   that question in that form.  Tell us.

22   A.  I don't know if urine has sialidases.

23   Q.  Okay.  Are you aware of any step that Dr. Goldwasser

24   implemented in his purification process to neutralize or

25   offset some of the effects of unwanted elements in urine?

1          **MR. JAGOE:**  Objection, your Honor.  Can she see the

2     paper?

3          **THE COURT:**  Overruled.  He may cross-examine.  The

4     jury is watching what goes on in the courtroom.  If he wants

5     to give her a paper, he may.  He need not.  You may, when

6     you get a chance to inquire further.

7          Put your question, Mr. Day.

8     **Q.**  Can you tell the jury, from your review in this case,

9     your preparation to testify here today, what step in the

10    purification process Dr. Goldwasser implemented -- let me

11    ask you to assume that there are sialidases in urine, okay?

12    With that assumption in mind, can you tell me what step in

13    the purification process Dr. Goldwasser implemented to

14    neutralize and offset the effect of those sialidases on the

15    EPO glycoproteins he hoped to recover?

16         **MR. JAGOE:**  Objection, your Honor.

17         **THE COURT:**  Overruled.

18    A.  I cannot tell you what steps he took without refreshing

19    my memory on the paper.

20    **Q.**  Okay.  I'd like to ask you about some of the analytical

21    techniques that can be used to characterize EPO, okay?  You

22    testified about monosaccharide composition analysis?

23    A.  Yes.

24    **Q.**  And you testified about SDS-PAGE; is that right?

25    A.  Yes.

1    **Q.**  You testified about isoelectric focusing?

2    A.  Yes.

3    **Q.**  And those techniques can be used to study certain

4    aspects of a glycoprotein like EPO; correct?

5    A.  That's right.

6    **Q.**  But they are not the only techniques that can be used to

7    compare one EPO product to another EPO product, are they?

8    A.  They are not the only techniques.

9    **Q.**  Other techniques, which you did not mention, can also be

10   used to compare other aspects of EPO products; correct?

11           **MR. JAGOE:**  Objection, your Honor.  It's vague.

12           **THE COURT:**  Sustained.

13   **Q.**  Well, for example --

14           **THE COURT:**  Let's come to the specifics of this

15   case.

16   **Q.**  For example, you can compare the specific activity of

17   different EPO preparations; correct?

18           **MR. JAGOE:**  Same objection, your Honor.

19           **THE COURT:**  Sustained.  This case.

20           **MR. DAY:**  This is this case.

21           **THE COURT:**  Well, you may think so, but it's not

22   clear to me.  That's the line I'm following.  So we've got

23   to refer to some Goldwasser or Miyake -- we've got to

24   point her to specific things that people are saying are

25   prior art.  Then you may examine.

1  **Q.**  Well, in the literature that you reviewed in this case,

2  in the documents that you reviewed, and the papers of Amgen,

3  and the filings to the FDA, did you see any comparisons

4  presented in those papers in which the specific activity of

5  Goldwasser's urinary EPO was compared to the specific

6  activity of recombinant human EPO?

7  A.  Yes, I did see papers in which specific activities were

8  compared.

9  **Q.**  Okay.

10  A.  And, of course, specific activity does not tell you

11  about primary structure.

12  **Q.**  Well, specifically, activity is a measure of the potency

13  of one product versus another; correct?

14       **MR. JAGOE:**  Objection, your Honor.  It's vague.

15       **THE COURT:**  I'm going to let him have that.

16  A.  That's not quite correct, no.

17  **Q.**  No?

18  A.  And I can explain really what specific activity

19  measures.

20  **Q.**  Okay.  Well, we'll get to that, or your counsel will.

21       Did you see, in the documents you reviewed, apart

22  from Dr. Catlin's experiment, did you see any other analyses

23  or reports on the distribution of different EPO glycoforms

24  within Dr. Goldwasser's urinary EPO, or the prior art

25  urinary EPO, and recombinant human EPO?

1          **MR. JAGOE:**  Objection, your Honor.

2          **THE COURT:**  Overruled.

3     A.  Dr. Catlin's data compared a different prior art sample

4     of urinary EPO, not Dr. Goldwasser's.  Dr. Strickland, from

5     Amgen, compared recombinant EPO from CHO cells to a

6     different sample of urinary EPO called Terry Fox EPO, and I

7     think the other comparisons I've seen have not used

8     Dr. Goldwasser's specific sample, although I would have to

9     go back and refresh my memory on all the papers to be

10    absolutely certain of that.

11    **Q.**  Well, let's stop there for a second.  You referred to a

12    preparation of urinary EPO by Dr. Strickland that you call

13    Terry Fox EPO?

14    A.  In his laboratory notebooks, he referred to it as

15    urinary EPO from Terry Fox.

16    **Q.**  Is that also called Lot 82?

17    A.  That, I don't know.

18    **Q.**  And you say that urinary EPO preparation was different

19    than Dr. Goldwasser's urinary EPO?

20    A.  I only know it was entitled "Terry Fox" in

21    Dr. Strickland's notebooks, but I don't know what that label

22    means.  Whether that is equivalent to Dr. Goldwasser's EPO,

23    I don't know.

24    **Q.**  Now, you have not prepared any IEF comparisons of

25    Dr. Goldwasser's urinary EPO with any recombinant EPO, have

1    you?

2    A.   Me personally?

3    **Q.**   Right.

4    A.   With my hands?  No.

5    **Q.**   Or have anyone do it for you?

6    A.   No.

7    **Q.**   And you're not here to present any to the jury, are you?

8    A.   I'm not presenting any of my data to the jury.

9    **Q.**   Okay.  I'd like to ask you some questions about the

10   urinary EPO preparation that was described in the

11   Miyake-Goldwasser publication.  That EPO product was

12   naturally produced in human kidneys; correct?

13             **MR. JAGOE:**  Objection, your Honor.

14             **THE COURT:**  Overruled.  And again, this is what she

15   understands from reading the paper.

16             But is that what you understood?

17             **THE WITNESS:**  My understanding, from the paper, is

18   that Doctors Miyake and Goldwasser collected urine samples

19   from patients with aplastic anemia, and pooled them, and

20   that was the starting material for his purification.

21   **Q.**   And my question was, your understanding, based on that,

22   is that that EPO was naturally produced in the kidneys of

23   those patients; right?

24             **MR. JAGOE:**  Objection, your Honor.  It's

25   mischaracterizing --

1      **THE COURT:**  Overruled.  Overruled.  You'll ask.

2  Her testimony is what we should be paying attention to.

3          Is that what you understood?

4      **THE WITNESS:**  Well, my understanding of where EPO

5  comes from is that it originates from the kidney, and then

6  those molecules of EPO, presumably, or at least some of

7  them, are eventually filtered into the urine.

8          So, I think it would be a reasonable statement to

9  say that the EPO molecules in the urine from those patients

10  were, at some time in the past, produced by kidney cells.

11  **Q.**  Dr. Bertozzi, you testified that certain statements made

12  by Amgen scientists in their scientific publications support

13  your opinions; right?

14  A.  That's true.

15  **Q.**  And you mentioned, for example, a 1986 article by Joan

16  Egrie and her colleagues that was published in the Journal

17  of Immunobiology?

18  A.  Yes.

19  **Q.**  I think that's now Exhibit 2058.  Formerly NBD.

20      **MR. DAY:**  Could we have that up, please?  NBD.

21      **MR. JAGOE:**  Objection, your Honor.  Can we wait

22  until the witness has a copy?

23      **THE COURT:**  Just one thing, this is in evidence,

24  isn't it?

25      **MR. JAGOE:**  I just noticed the witness was having

1    trouble finding it.

2         **THE COURT:**  They can put it up.  It's in evidence.

3    They can put it up.  We're not going to delay things, but we

4    need to turn the screen for the jury.

5         **THE CLERK:**  Okay.  But it's got letters instead of

6    numbers.  So is it in evidence?

7         **MR. DAY:**  Yes.

8         **THE COURT:**  What are the numbers?

9         **MR. DAY:**  It's 2058.

10        **THE COURT:**  2058, thank you.  Yes, NBD is 2058.

11        **MR. DAY:**  If we could have the second page of this,

12   under the materials and methods, if you could blow up the

13   first paragraph.

14   Q.  This indicates that natural EPO was purified to apparent

15   homogeneity from the urine of a patient; is that right?

16   A.  That is what the document says.

17   Q.  Now, Dr. Goldwasser's EPO was purified from pooled urine

18   from dozens of patients; correct?

19   A.  Let's go back and look at that, and just make sure.  Can

20   you remind me which number that is?

21   Q.  Well, actually, I can't.  But this is Dr. Miyake's

22   paper, right?  You reviewed that?

23   A.  Yes.

24   Q.  And you know from reviewing it before that Dr. Miyake

25   pooled the urine from dozens of patients in Japan, and the

1    EPO purified from many patients, not one; right?

2         **MR. JAGOE:**  Objection, your Honor.  He's

3    testifying.

4         **THE COURT:**  Well, I've cautioned the jury to what

5    the lawyers say is not testimony.  He's asking her whether

6    she recalls that that's what the Miyake paper, which is in

7    evidence, says.  That's all.  And do you recall that?

8         **THE WITNESS:**  Well, he says dozens, and I just

9    don't recall the number, and so I'm going back to look.

10        So, two groups of patients with aplastic anemia of

11   unknown origin in several hospitals.  So there's no

12   statement with respect to the actual number of patients, but

13   it sounds like it was more than one.

14   **Q.**  Okay.  So what we're looking at here in this paper is

15   not Goldwasser's preparation of urinary EPO, we're looking

16   at a different preparation that was made by somebody else;

17   right?

18        **MR. JAGOE:**  Objection, your Honor.  Speculation.

19        **THE COURT:**  He's asking if that's how she

20   interprets the paper.  Overruled.

21        Is that how you interpret the paper?

22        **THE WITNESS:**  Well, I can only tell you what it

23   says on its face, which the jury can read.  So it says from

24   the urine of a patient with aplastic anemia.

25   **Q.**  Okay.

1    A.   And, you know, we don't know what Dr. Egrie specifically

2    meant.  She wrote it, so --

3    Q.   And you're not here to testify to the jury that you know

4    from any personal knowledge that what's reported on in this

5    paper is a preparation of urinary EPO that was made by

6    Dr. Goldwasser, or whether it was made by somebody else, do

7    you?

8    A.   Well, I can only say that it was made using the same

9    procedure that Dr. Goldwasser used, maybe from a smaller

10   volume of urine.

11   Q.   Okay.  Now, you also mentioned -- strike that.

12        You're aware that the various papers that you

13   reviewed, including Dr. Browne's paper, Dr. Vapnek's paper,

14   Amgen's product license application, all found that there's

15   a difference in specific activity between urinary EPO and

16   recombinant human EPO?

17   A.   Well, that's not accurate.  Because in those papers all

18   possible recombinant erythropoietin wasn't studied.  In

19   those particular papers, the Amgen scientists only studied a

20   purified sample of EPO from their CHO cells.  And they

21   compared that purified sample to a standard, which was

22   either, let's call it Miyake's and Goldwasser's EPO or

23   something similarly purified.  So all we can say with

24   respect to their conclusions pertains to the samples that

25   they characterized.

1    **Q.**  Okay.

2    A.  But you're right, for those particular samples, they --

3    Dr. Egrie did report a slight difference in specific

4    activity.

5    **Q.**  A slight difference?  It was two and a half fold, wasn't

6    it?

7    A.  No.

8    **Q.**  Okay.

9          **MR. DAY:**  So could we have Amgen -- I'm sorry,

10   Exhibit 2059.

11   **Q.**  This is the Browne paper that you described in your

12   direct examination.

13   A.  Can you repeat the number?

14   **Q.**  2059, please.

15   A.  Is there an alternative number?

16   **Q.**  WV, I believe.

17         **MR. DAY:**  And can we have page 699 of this?  The

18   upper left-hand -- there we go.

19   **Q.**  So what Dr. Browne reported in this paper is that

20   recombinant human EPO -- you said CHO cell EPO; right?

21   A.  That's right.

22   **Q.**  -- has a constant specific activity of 174,000 units,

23   which is approximately 2.5 times the reported specific

24   activity of urinary EPO, citing the Miyake paper; is that

25   right?

1    **MR. JAGOE:**  Objection, your Honor.  It speaks for

2    itself.

3    **THE COURT:**  It does speak for itself.  He's just

4    calling it to her attention.  But it speaks for itself.

5    That's what the paper says; right?

6    **THE WITNESS:**  That is what the paper says.

7    **MR. DAY:**  Could we have Exhibit 2062, Dr. Vapnek's

8    paper?  And could we have page 247?  And the middle

9    paragraph in that page, "The specific activity."

10   **Q.**  "The specific activity of recombinant EPO is

11   approximately 174."  It reported the same thing; right?

12   **MR. JAGOE:**  Objection, your Honor.  It speaks for

13   itself.

14   **THE COURT:**  Sustained.  It does.  You're asking her

15   to read it.

16   A.  It basically says that the specific activity of

17   recombinant human EPO is approximately 174,000 units per

18   A280.  This compares with a specific activity of

19   approximately 82,720 units per A278, for EPO purified from

20   human urine.

21   **Q.**  And could we go to page 249, please.  I want to look at

22   the paragraph that Mr. Jagoe showed you and I want to go

23   beyond where he highlighted.

24   **MR. DAY:**  If we could just pull up the first full

25   paragraph there underneath, "Discussion."

1       **MR. JAGOE:**  Objection, your Honor.

2       **THE COURT:**  Overruled.

3    **Q.**  Now, Mr. Jagoe showed this to you on your direct

4    examination; correct?

5    A.  Yes, he did.

6    **Q.**  And he asked you to read the second sentence?

7    A.  Yes, he did.

8    **Q.**  So if that sentence refers to the physical measurements

9    made to date, the material cannot be distinguished from

10   recombinant material; right?

11   A.  That is what it says.

12   **Q.**  Would you read to the jury the next three sentences,

13   please?

14   A.  Sure.  The next three sentences read, "The major

15   difference noted for these two proteins is the higher

16   specific activity observed for recombinant human EPO.  We

17   believe that this is due to either the harsh conditions used

18   for purification of EPO from urine, or some modification of

19   the native EPO conformation during clearance and excretion

20   in urine.  Further characterization of urinary EPO should

21   allow us to answer this question."

22   **Q.**  Now, in arriving at your opinions in this case, Doctor,

23   did you consider -- this paper was presented at a symposium;

24   is that correct?

25   A.  This is, I believe, from the Cold Spring Harbor

1    Symposium, yes.

2    **Q.**   Could you tell the jury what the Cold Spring Harbor

3    Symposium is?

4    A.   Well, Cold Spring Harbor is a laboratory, and it's a

5    place of scientific research and discovery.  And it's also a

6    facility that brings scientists together to discuss their

7    research and give presentations.

8         So, scientists will often go there and give

9    lectures.  And then often they are asked to submit a

10   manuscript that summarizes the data that they presented

11   publicly.  And so, presumably, this is one of those written

12   manuscripts.

13   **Q.**   And in arriving at your opinions in this case, did you

14   consider this entire article by --

15   A.   Yes, I did.

16   **Q.**   All right.  Let's look at the back of this.  There's a

17   colloquy among the scientists who attended this symposium.

18   And I'd like to go to page 255, please.

19        **MR. DAY:**   And if you could pull up for us, please,

20   the bottom two paragraphs, the colloquy between Dr. Storring

21   and Dr. Vapnek.

22   **Q.**   Would you read --

23   A.   I'm sorry, repeat the page?

24   **Q.**   255.

25   A.   255.

1    **Q.**  Yes.

2    A.  And this is Exhibit WV?

3    **Q.**  Yes.  I'm sorry, NZU, this is, in your book.  This is

4    Exhibit 262, Dr. Vapnek's paper, Cold Spring Harbor.

5    A.  NZ --

6    **Q.**  I'm sorry, it's not --

7    A.  I see.  I think I have it.

8    **Q.**  I think they might be using NZV.  It's Exhibit 262.  Do

9    you have that?

10        **MR. DAY:**  May I approach the witness, your Honor,

11   to help her?

12        **THE COURT:**  You may.

13        **THE WITNESS:**  I think I have it.

14   **Q.**  Yes.  If you could go to the back, page 255.

15   A.  Yes.

16   **Q.**  You'll see a colloquy here between Dr. Storring and

17   Dr. Vapnek.  Would you read to the jury what Dr. Storring

18   said?

19   A.  Well, literally, just read it?

20   **Q.**  Yeah, just read it.

21   A.  Let's see.  Dr. Storring says, "The clinical studies

22   with this product" --

23        **MR. JAGOE:**  Objection, your Honor.  This is

24   hearsay.

25        **THE COURT:**  It's in evidence, isn't it?

1          **MR. JAGOE:**  It's hearsay within hearsay.

2          **MR. DAY:**  I think it was offered by Roche.

3          **THE COURT:**  No, overruled.  It's in evidence.  The

4     time to make that objection was when it was offered.

5          You may proceed.

6          **THE WITNESS:**  Okay.

7     A.   "The clinical studies with this product to date do not

8     give rise for concern about its safety or efficacy.  But

9     this is one of the first glycoprotein products made by

10    recombinant DNA technology, and was, therefore, subject to

11    the theoretical difficulties of reproducing the carbohydrate

12    structures of the native protein.  It is therefore of

13    interest that the rDNA product and the native form are found

14    to be apparently essentially identical by physicochemical

15    methods but differ considerably in their biological

16    potencies."

17    **Q.**   And what did Dr. Vapnek say; could you read that to the

18    jury, please?

19    A.   Sure.  Dr. Vapnek says, "No, I'm not saying they're

20    identical.  By the methods that we have used, the only

21    difference we can detect is a difference in the specific

22    activity, and it is higher in the recombinant material.  We

23    just have not -- we just have not done that much work with

24    the natural material.  The original material was actually

25    supplied by -- I think he meant Eugene Goldwasser -- at the

1    University of Chicago.  We have been preparing more

2    material, purifying more, in collaboration with Kirin in

3    Japan.  However, we just have not done that much" --

4    something.

5    Q.  Okay.  Thank you.  Now, did you consider this colloquy

6    in arriving at your opinions?

7    A.  Yes, I did.

8    Q.  And let me ask you to also look at page 254.  Oh, by the

9    way, could you tell the jury who Dr. Storring is?

10   A.  I don't know Dr. Storring.

11   Q.  You don't know who he is?

12   A.  I don't know Dr. Storring.

13   Q.  Would you turn to page 254 and halfway down you'll see

14   an entry for Dr. Liu.

15        **MR. JAGOE:**  Objection, your Honor.  It speaks for

16   itself.

17        **THE COURT:**  It does speak for itself.  He may

18   interrogate her about it.

19   A.  Say again, 254?

20   Q.  Yes.  Would you please read to the jury what Dr. Liu

21   said about Dr. Vapnek's presentation?

22   A.  Well, the paragraph that's highlighted on the side says,

23   "Well, let us remember that this protein has 40 percent

24   carbohydrate, and that 40 percent carbohydrate is a big

25   chunk of the molecule.  Moreover, that carbohydrate will not

1    be identical in any way between natural and the rDNA

2    products."

3    **Q.**  And did you consider that statement by Dr. Liu in

4    arriving at your opinions?

5    A.  Well, I disagree with that statement.

6    **Q.**  Would you tell the jury who Dr. Liu is, please?

7    A.  Well, what's his first name?

8    **Q.**  Do you know who he is?

9    A.  I know, off the top of my head, five Dr. Liu's.  I'm not

10   sure which one this is.

11   **Q.**  All right.  We'll move on.

12         I did not hear you address, in your direct

13   examination, the studies that were done by Kung and

14   Goldwasser, comparing urinary EPO with recombinant EPO.  You

15   didn't say anything about those in your direct examination,

16   did you?

17   A.  Which studies are you referring to, specifically?

18   **Q.**  The 1970 -- I'm sorry, the 1997 studies by Kung and

19   Goldwasser, where Dr. Goldwasser compared, you didn't say

20   anything about that in your direct, did you?

21         **MR. JAGOE:**  Objection, your Honor.

22         **THE COURT:**  Well, the jury is watching what she had

23   to say on her direct.  Why don't you ask questions about it.

24   A.  I'm trying to remember --

25         **THE COURT:**  I've sustained it.

1    **Q.**  In your testimony, you mentioned this publication by

2    Dr. Browne that we looked at a little bit before.  It's

3    Exhibit 259?

4         **MR. DAY:**  And if we could bring that up, please.

5    **Q.**  It's WV in your notebook there.  259.  2059, I guess, is

6    the number.  And I'd like to look at Figure 4 in that.  This

7    was an SDS-PAGE analysis -- this is one of the SDS-PAGE

8    analyses that you mentioned; correct?

9    A.  Yes.

10   **Q.**  And this is one of the analyses that you rely upon for

11   your opinion that the publications, the Amgen publications,

12   arrived at a different conclusion than Dr. Lin reported in

13   his patent; correct?

14   A.  Well, the statements made in this publication and others

15   were contrary to the statement made in Dr. Lin's patent.

16   **Q.**  Okay.  All right.  So let's look at the experiment that

17   was done in Figure 4.  Did you study the experiment?

18   A.  Well, I read the material that was provided in the

19   paper.  Of course, what's provided in the paper is a

20   photocopy of the experiment.

21   **Q.**  Okay.  Well, I'm talking particularly about the legend

22   underneath the photocopy of the gel.  Did you study the

23   experimental design that was presented here?

24   A.  Yes.  Well, I see what's reported in the legend.

25   **Q.**  Okay.  So what Dr. Browne did in this experiment was he

1    chopped off the sugar side chains of the N-linked,

2    oligosaccharides, using an enzyme called endoglycosidase F;

3    right?

4    A.   Yes.

5    **Q.**   And then he, after he chopped that off, so he took

6    the -- first of all, as he's explaining down here, this is

7    the product before -- I'm sorry -- this is the product

8    before any enzymatic digestion; right?

9    A.   That's right.

10   **Q.**   Then he takes an enzyme, gives endoglycosidase F, and he

11   chops off the carbohydrates that are attached at the

12   N-linked glycosylation site thought protein; correct?

13   A.   Well, that's not quite accurate, but that enzyme does

14   cleave a linkage that's within those trees, that's right.

15   **Q.**   Okay.   Then he runs the gel again and this is where the

16   product ends up, right here; correct?   After you take off

17   the N-linked oligosaccharides; right?

18   A.   Which lanes are you pointing at?

19   **Q.**   I'm pointing at Lane 2, and I think it's Lane 6?

20   A.   Yes.

21   **Q.**   And he describes that in here; right?

22   A.   Yes.

23   **Q.**   Consequently, what he's looking at here are products

24   that have just the O-linked -- in Lane 2 and Lane 6, he's

25   looking at products that have primarily just the O-linked

1    oligosaccharides attached; correct?

2    A.  Not quite.  Because, again, the way that enzyme works is

3    it leaves a sugar on the N-linked sites.

4    Q.  There's a small sugar attached there?

5    A.  Well, small is a relative term, of course.  The O-linked

6    sugar, of course, is itself fairly small.  So three of those

7    small sugars on the N-linked sites are about the same as the

8    O-linked site.  But a lot of sugar is removed, yes.

9    Q.  Okay.  And then what he did was he digested these

10   products, in Lanes 2 and Lane 6, he digested them with

11   another enzyme called neuraminidase, and that took the

12   sialic acid residues off the O-linked sugars; is that right?

13   A.  Well, that's what -- neuraminidase is an enzyme that

14   cleaves a particular building block off of usually the

15   terminus.

16   Q.  Okay.

17   A.  Yes.

18   Q.  All right.  Now, let's compare that experiment with the

19   experiment that Dr. Lin performed and reported in his patent

20   at column 28, okay?

21           MR. JAGOE:  Objection, your Honor.

22           THE COURT:  He hasn't asked.  He says let's make

23   the comparison.  I don't think there's any objection yet.

24   Well --

25   A.  Can someone hand me --

1        **THE COURT:**  Yes, someone should help her out.

2   **Q.**  Well, you have Exhibit 1, the patent, in front of you, I

3   believe.  And you want to go to column 28.

4        You testified about this on your direct, where

5   Dr. Lin made a comparison -- do you recall? -- an SDS-PAGE

6   analysis of his EPO with Goldwasser's urinary EPO?  Do you

7   recall that?

8   A.  Yes.

9   **Q.**  And what I want to particularly point out is, in this

10  experiment, he performed a different experiment than Browne

11  did, didn't he?

12       **MR. JAGOE:**  Objection, your Honor.

13  A.  Ah, no.

14       **THE COURT:**  In view of the answer, do you press the

15  objection?

16       **MR. JAGOE:**  No.

17       **THE COURT:**  Withdrawn.  All right.

18  A.  We have to compare them side by side.  You know --

19  **Q.**  Well, let's, Doctor, let's --

20  A.  I was going to say no, you can't conclude that, because

21  there are no data provided in the patent, so there's nothing

22  to review.  That description doesn't really provide enough

23  information.

24  **Q.**  Well, Doctor, let's see if we can explain to the jury

25  what the description says.

1    A.   Okay.

2    **Q.**   The first thing that Dr. Lin describes is that

3    neuraminidase was applied to remove the sialic acid from COS

4    1 and CHO recombinant products --

5         **MR. DAY:**   Can we have the graphic that puts these

6    side by side?

7    **Q.**   So we're comparing on the left-hand side here the

8    experiment that Lin performed, and here on the right-hand

9    side we're comparing the experiment that Browne performed,

10   okay?

11        **MR. JAGOE:**   Objection, your Honor.   There's no

12   foundation.

13        **MR. DAY:**   The foundation is in the exhibits.

14        **THE COURT:**   Well, please, please.   Don't argue.

15   He's just made the objection.   These matters are in

16   evidence.   They say what they say.   He -- he's not

17   testifying, though, it's the documents.   Overruled.

18   **Q.**   Now, what we agreed earlier is that what Dr. Browne did,

19   is Dr. Browne first applied endoglycosidase F as the first

20   step in his experiment; correct?

21   A.   That would appear to be the case.

22   **Q.**   And then he used neuraminidase after he did the

23   endoglycosidase F; correct?

24   A.   That's what it appears to say.

25   **Q.**   And what Lin did, in contrast, was he used neuraminidase

1    first, then he applied the endoglycosidase F; that's what he

2    describes, correct?

3    A.   That's not what he describes.

4         **MR. JAGOE:**  He keeps saying Lin did an experiment.

5    There's no foundation --

6         **THE COURT:**  Please.  I understand that.  And

7    insofar as that's set forth, I'll sustain it, if this is

8    going to be the comparison.  I think her answer, though, her

9    answer was that's not what he describes.

10        Do you object to that?

11        **MR. JAGOE:**  No, your Honor.

12        **THE COURT:**  All right.  We'll let that stand.

13   **Q.**   Okay.  Well, let's explore that.  On the left-hand side,

14   you'll see highlighted in yellow "neuraminidase enzyme

15   treatment to remove sialic acid residues in COS 1 and CHO

16   recombinant product of approximately equal molecular weight

17   which were both nonetheless larger than the resulting asialo

18   human urinary extract."  Do you see that?

19   A.   I do.

20   **Q.**   The next step was --

21   A.   I don't think we know that that was the next step.  That

22   sounds like a separate experiment to me.

23   **Q.**   Oh, okay.

24   A.   I don't know.  It's not clear.

25   **Q.**   So you just don't know.

1    A.   Well, you can read it, and I can read it, and we can

2    take it on its face.

3    **Q.**   Okay.

4    A.   "Endoglycosidase F enzyme treatments of the recombinant

5    CHO product," I don't, it doesn't sound like it was

6    pretreated with neuraminidase, "and the urinary extract

7    product resulted in substantially homogeneous products

8    having essentially identical molecular weight

9    characteristics."

10           That's what it says, but, you know, I can't say

11   whether those two steps were performed successively rather

12   than on two independent samples.

13   **Q.**   Okay.

14   A.   Of CHO EPO.  So --

15   **Q.**   Okay.  Well, since you don't know, let me ask you to

16   assume.  Let me ask you to assume that the neuraminidase

17   step was performed before the endoglycosidase F step, okay?

18   So let's explain to the jury, please, if you would, please,

19   the significance of that difference?

20   A.   It doesn't have a significance -- it doesn't have any

21   significance with respect to my analysis.

22   **Q.**   Well --

23   A.   But probably had a significance to the person who

24   performed the experiment.  Since the data aren't provided, I

25   can't look at them.

1   **Q.**  All right.  Well, since you -- let me ask you a

2   question.

3   A.  I can only say what's --

4   **Q.**  Doctor, let me ask you the question.  If the

5   neuraminidase step was performed first, you would agree that

6   the effect of that would be to remove the sialic acid

7   residues from all of the oligosaccharides attached to the

8   glycoprotein; correct?

9   A.  Depending on the type of neuraminidase that was used,

10  yeah, that could happen.

11  **Q.**  Okay.  That's not what Dr. Browne did, is it?

12  A.  Well, once again, it looks like what Dr. Browne did is

13  he basically did a digestion with endoglycosidase F in one

14  experiment, and then following further treatment, first with

15  sialidase and then with O-glycanase to remove the O-linked

16  carbohydrate, after all of those treatments, then he found

17  the recombinant EPO and the urinary EPO migrated to a single

18  band.  That's what the document says.

19  **Q.**  Okay.

20  A.  Would you like me to explain how a scientist would view

21  these data?

22  **Q.**  Well, you said you don't know how the experiment was

23  done, so I'll just leave it --

24  A.  I'm talking the Browne data.

25  **Q.**  Okay.

1    A.  But I can explain to the jury what the Browne data

2    means, because at least we have data to look at.

3    Q.  Well, you can also explain to the jury, can't you, that

4    if the neuraminidase step preceded the endoglycosidased

5    step, that Dr. Lin had cleaved a different part of the

6    carbohydrate off than Dr. Browne had; correct?

7              MR. JAGOE:  Objection, your Honor.  Relevance.

8              THE COURT:  No, overruled.  It's a question.  We'll

9    see what she says.

10   A.  It's not a yes-or-no question.  It depends on which

11   carbohydrate you're talking about.

12   Q.  Well, Dr. Lin cleaved off all the sialic acid residues

13   when he used the neuraminidase as a first step; correct?

14             MR. JAGOE:  Objection.

15   A.  We don't know, it depends on the neuraminidase.

16             THE COURT:  He's objecting, Mr. Day, as to who

17   actually performed this.  He's listed as the inventor, true,

18   but on that foundation, I must sustain it.

19             MR. DAY:  I understand, your Honor.

20             THE COURT:  Go ahead.

21   Q.  So what the patent describes, this is an experiment in

22   which, assuming the neuraminidase step was performed first,

23   all the sialic acid residues on the glycoprotein were

24   removed; correct?

25   A.  That's possible.

1   **Q.**  And in Dr. Browne's experiment, because the

2   endoglycosidase digestion was performed first, some of the

3   sialic acid residues were left on the O-linked chain, and

4   most of all of the carbohydrates, including the sialic acid

5   residues, were removed from the N-linked chains; correct?

6           **MR. JAGOE:**  Objection, your Honor.  Foundation.

7           **THE COURT:**  Well, he may ask her the question.

8   It's cross-examination.  It's only a question.

9           What do you say?  This is the testimony.  What do

10  you say to that?

11      **THE WITNESS:**  That depends on the glycoform.

12  **Q.**  Okay.  You testified concerning portions of Amgen's FDA

13  application for EPO; correct?

14  A.  Yes.

15  **Q.**  And your counsel put in a portion of the product

16  license.  Is that the only part of Chapter 4 that you

17  reviewed?  We're talking about --

18          **MR. DAY:**  What was that exhibit number?

19          (Whereupon counsel conferred.)

20          **MR. DAY:**  2057.  Is this our copy or their copy?

21  **Q.**  Okay.  Let me ask you to take look -- I think you have

22  up there, Exhibit PXR.

23          **MR. DAY:**  What's that Exhibit Number?

24          **THE CLERK:**  2057.

25          **MR. DAY:**  Thank you very much.  2057.  Excuse me

1  one second.  And could we go to page 906 of that.  Could we

2  bring that up, please?  906.  That's 905.  There we go.

3         **THE WITNESS:**  That's it.

4         **MR. DAY:**  And could we just blow up the two

5  left-hand columns -- two right-hand columns, excuse me.

6  Just pull those up.  The two -- well, there's --

7         **THE WITNESS:**  I think you're going to have to take

8  all four.

9         **MR. DAY:**  That's right.  Thank you.

10 **Q.**  Now, what did Amgen present to the FDA in this graphic?

11 **A.**  So, you remember earlier I explained that there are

12 trees on these glycoproteins.  So what Amgen scientists did

13 is they characterized the actual structures of the trees,

14 and that's what's being depicted here, although with a more

15 kind of technical -- technical term, so they don't look like

16 the colored shapes that I showed.

17        What they reported to the FDA was that both the

18 urinary EPO, presumably Goldwasser's EPO, and their EPO from

19 recombinant CHO cells, have the same trees, but that the

20 relative proportions of trees differ between the two

21 different EPOs.

22 **Q.**  And in particular, what they showed was that the -- and

23 you'll have to correct me on my pronunciation, because I'm

24 not a glycobiologist, "lactosamine"?

25 **A.**  "Lactosamine."

1   **Q.**   Lactosamine, thank you.

2   A.   That's pretty good, though.

3   **Q.**   That the lactosamine repeats, that the longer chain

4   sugars at the bottom depicted here, these were the

5   lactosamine repeats; is that correct?

6   A.   A part of it is the lactosamine repeat.

7   **Q.**   And what they depicted in the right-hand part of this

8   was the relative proportion for recombinant human EPO and

9   for urinary EPO; is that right?

10   A.   That's right.

11   **Q.**   And what they showed was that the proportion of these

12   long-chain sugars in the recombinant human erythropoietin

13   was considerably larger, see 30.2 versus, what is that, 6.9,

14   almost five times greater; is that right?

15   A.   Yes --

16          **MR. JAGOE:**   Objection, your Honor.   He's

17   mischaracterizing what this says.

18          **THE COURT:**   Well, in view of her answer, I'm going

19   to let it stand.

20   A.   Well, my answer was that the number does say 6.9.

21   **Q.**   Okay.   And that's approximately five times of -- five

22   fold greater incidents or proportion of these large chain

23   sugars for this particular lactosamine repeat?

24   A.   So, let's see.   That is -- I want to make sure they line

25   up.   One, two, three, four, five, six.   One, two, three,

1   four, five, six.  Yes.  So 6.9 to 30.2, that's about 4.5

2   fold.

3   **Q.**  Okay.  And on the bottom, again, we have about a, oh,

4   seven or eight-fold difference in the other lactosamine

5   repeat, the large chain sugar attached to EPO?

6   A.  That's right.

7   **Q.**  Now, is it possible -- is it possible, Doctor, that that

8   difference accounts for the difference in the potency

9   between urinary EPO and recombinant EPO?

10          **MR. JAGOE:**  Objection, your Honor, on relevance.

11          **THE COURT:**  Overruled.

12   A.  All the evidence I've seen suggests that the difference

13   in specific activity has to do with misfolding of the shape

14   of the protein.  I don't have any direct evidence for a

15   difference in potency being ascribed to that particular

16   tree.  I have seen no evidence that that tree contributes in

17   any significant way to a difference in specific activity.

18   **Q.**  You attribute the difference in specific activity to

19   evidence you've seen of a misfolding of one of these

20   preparations?

21   A.  I have seen Amgen's Dr. Egrie suggest that that's the

22   most likely explanation.

23   **Q.**  A misfolding of what?

24   A.  Basically, the damage of, in this particular case, the

25   urinary material --

1    Q.  I see.

2    A.  -- during purification.  But by damage, I don't mean

3    damage to the, what we call the primary structure.  The

4    actual components aren't damaged, it's just the way that

5    they're twisted up which is damaged.  That was her

6    suggestion.

7    Q.  Now, this is a difference, this is a difference that

8    we're looking at here between recombinant human

9    erythropoietin and urinary EPO; correct?

10   A.  What this suggests is that the mixture of glycoforms

11   that Amgen purified from their CHO cells had different

12   relative amounts of glycoforms compared to the mixture that

13   Goldwasser purified from human urine.  So in other words,

14   all the data suggests that the structures are the same in

15   the two materials, but that the relative proportions are

16   different.  And these data, I would say, concur with that

17   interpretation.

18          So in my opinion, these are evidence that there is

19   a difference in the proportions, yes.

20   Q.  In forming your opinions in this case, you reviewed

21   excerpts from the prosecution histories of the patents?

22   A.  I've seen a few court documents that -- I can't tell you

23   exactly how many.

24   Q.  No, I said the prosecution histories, before the patent

25   office, when Amgen went to the patent office --

1    A.   I see.

2    Q.   -- and asked for the patents.  And you've reviewed the

3    prosecution histories of the '933 patent and the '422 patent

4    in this case?

5    A.   Okay.  Okay.  In that case, what I've seen are pages

6    from Dr. Egrie's laboratory notebook that she gave to the

7    Amgen lawyers who drafted the patent.  And I've seen some

8    other documents, but I can't recall them all right on the

9    spot.

10   Q.   Okay.  Let me withdraw from that and just step back to

11   the product license agreement, the product license

12   application, for a second, that we were talking about.

13   A.   Okay.

14   Q.   Were you aware, in the documents that you reviewed, of

15   any subsequent communications between Amgen and the FDA

16   regarding comparisons between urinary EPO and recombinant

17   EPO?

18   A.   Let's see.  I am aware that the FDA made certain

19   inquiries after submission of the initial product license

20   application, and I have seen a document that I believe was a

21   response to at least one of those inquiries.

22        MR. DAY:  Could we have Exhibit AQS, please?  Your

23   Honor, may I approach the bench?

24        THE COURT:  Of course.  AQS.

25   Q.   Is this the response that you have seen?

1    A.   This does look familiar, yes.

2    **Q.**   And you understand that this was a response that Amgen

3    submitted to the FDA in response to a request from the FDA?

4         **MR. JAGOE:**   Objection, your Honor.   Foundation.

5         **THE COURT:**   On this foundation, this is not in

6    evidence, sustained.

7         **MR. DAY:**   I would offer it under 705, your Honor,

8    as a document that she reviewed and has previously seen and

9    relies upon in her --

10        **THE COURT:**   Sustained.   It doesn't mean you may not

11   inquire as to her views, but the document's not admitted.

12        **MR. DAY:**   I would also offer it, then, your Honor,

13   as a business record, and offer the declaration of Amgen in

14   support of that.

15        **THE COURT:**   Have I got that in front of me?

16        **MR. JAGOE:**   Can we have a sidebar on this, your

17   Honor?

18        **THE COURT:**   We'll see.   Why don't you move on,

19   Mr. Day, while I review this.

20        **MR. DAY:**   Would you like the declaration?

21        **THE COURT:**   I would.   But I can review it while you

22   go on to something else.

23        **MR. DAY:**   I will.

24        **THE COURT:**   Yes.   Thank you.

25        **MR. DAY:**   May I?

1              **THE COURT:**  Yes.

2              **MR. JAGOE:**  Your Honor, could we have a short

3       sidebar, please?

4              **THE COURT:**  I don't know as it's necessary at this

5       time.  He's going to move on to something else.

6    **Q.**  In your -- let me return to the prosecution histories.

7              In your review of the prosecution histories, are

8       you aware of whether Amgen ever informed the patent office

9       that the carbohydrate data which you showed to the jury was

10      inaccurate?

11   A.  I'm not aware of disclosure to the patent office, or I

12      should say to the patent agent, with respect to the

13      incorrect carbohydrate analysis data.  I'm not aware of such

14      a disclosure.  I only say that because the patent itself has

15      not been corrected to this day.  So I'm presuming there was

16      no disclosure.

17   **Q.**  Well, let's take a look at Exhibit 2011.  This is the

18      prosecution history of the '933 patent.

19             **MR. DAY:**  And do you have a copy of that, please?

20      Well, let's just bring up -- this is already in evidence,

21      your Honor, it's Exhibit 2011.

22             **THE COURT:**  Very well.

23             **MS. BEN-AMI:**  Take that down, please.

24             **THE COURT:**  Yes, it may be taken down.  Isn't it in

25      evidence?

1          **MR. DAY:**  It is in evidence, your Honor.  It's part

2     of the prosecution history of the '933 patent, introduced by

3     Roche, Exhibit 2011.

4          **MR. JAGOE:**  Your Honor, can we have a sidebar?

5          **THE COURT:**  I guess we need one.

6     SIDEBAR CONFERENCE, AS FOLLOWS:

7          **MR. FLEMING:**  What was just flashed on the screen

8     was a copy of the decision.  You previously ruled that the

9     decision should not be in evidence.

10         **THE COURT:**  Well --

11         **MS. BEN-AMI:**  Or should not be presented to the

12     jury.

13         **THE COURT:**  Well, you're right, but the document is

14     in evidence.  It's in evidence now.  What are you going to

15     say?

16          You're saying that -- what decision is this?

17         **MR. DAY:**  This is the decision of the interference

18     between Fritsch and Lin as part of the '933 prosecution

19     history.

20         **THE COURT:**  Which came in without objection.

21         **MR. DAY:**  It was offered by Roche.

22         **MR. FLEMING:**  But, your Honor, but your rulings

23     were that with regard to what can be told to the jury about

24     the prior -- you did not want -- you held this, you did not

25     want argument regarding the prior decisions.  And so that

1   even though the final history may be put into evidence --

2           THE COURT:  Well, that's true.  Of course, they're

3   going to see that.

4           MR. FLEMING:  Your Honor, but it may perhaps be

5   argued in closing.  But what we said is the prejudicial

6   value of using this through a witness, particularly when

7   it's not been proven she's seen it, putting that aside, the

8   prejudicial value of saying --

9           THE COURT:  Yeah, I think there's something to

10  that.

11          MR. DAY:  May I be heard?

12          THE COURT:  We're not going to get characterizing

13  it, but as he said, you can use it in closing.

14          MR. DAY:  May I be heard?  They put the witness on

15  the stand and they said that the carbohydrate data was

16  inaccurate, and to her knowledge it's never been corrected.

17  The patent office says right here they understand the data

18  was in error, and it doesn't matter.  They say that right

19  here.  That's the truth.

20          THE COURT:  Wait a minute.

21          MS. BEN-AMI:  No, no.  No.

22          THE COURT:  Wait a minute.

23          MR. DAY:  I think you have it upside down, your

24  Honor.

25          THE COURT:  Now you can see the problem with my

1   glasses here.

2          Here's what we're going to do.  I don't want the

3   decision up there.  But why don't you flash just this column

4   or this language to her, and really this page, and simple

5   say Fritsch versus Lin on it, see if she's familiar with it.

6   If she's not familiar with it, then that's it.  But if

7   you -- I mean, she did just say that, and you're entitled, I

8   think to correct it right away.  But we won't go into the

9   whole decision.  Throw just this page, the one that you've

10  highlighted, and see where you go.  If she's not familiar

11  with it, then we're going to have to move on and you'll do

12  it with another witness.

13         **MR. DAY:**  Could we -- I'm just concerned about

14  corrective instruction, because this was brought out on

15  direct.  And the impression that was created on direct was

16  that Lin never told the patent office his data was false,

17  and that --

18         **THE COURT:**  Well, you can try to correct it with

19  her.  We'll see where we stand.  I don't think I am going to

20  get into the evidence.

21         I do have a question.  Somebody, I've now read this

22  declaration, and it may well be helpful.

23         **MR. DAY:**  To point out which is the specific

24  attachment --

25         **THE COURT:**  Exactly.  Somebody's got to point that

1     out.

2          **MR. FLEMING:**  Your Honor, may I make a point on

3     that?  It's hearsay.  This witness is under their control.

4     If they want to put a witness on to authenticate it, your

5     Honor, they have to do that.

6          **THE COURT:**  There's no problem with authenticating

7     it.  You offered it in evidence.

8          **MS. BEN-AMI:**  No, no.  This is a different

9     document.

10          **MR. FLEMING:**  Different document.  This other one.

11     No, no, I apologize.

12          **THE COURT:**  Oh, okay.  I haven't ruled on it.  I

13     just wanted to make that connection.  Thank you.

14          **MR. FLEMING:**  Okay.  Thank you, your Honor.

15          (Whereupon the sidebar conference concluded.)

16          **MR. FLEMING:**  Your Honor, can I speak with Mr. Day

17     for one second?

18          **THE COURT:**  Of course you may.

19          (Whereupon counsel conferred.)

20          **THE COURT:**  Just so we're clear, and so we can move

21     on, NCV, now that I've reviewed the declaration, is excluded

22     on this foundation.

23          Go ahead, Mr. Day.

24          **MR. DAY:**  I'm waiting for Mr. Fleming, your Honor.

25          **THE COURT:**  All right.

1          **MR. FLEMING:**  Thank you, your Honor.

2          **MR. DAY:**  So could we put up page 311 from

3     Exhibit 2011.

4     **(BY MR. DAY:)**

5     **Q.**  Now, this is a portion of the prosecution history --

6     **A.**  I'm sorry, do I have that exhibit?

7     **Q.**  No, you don't have it in your book, I don't think.

8     You're going to have to look at it on the screen.

9          **THE CLERK:**  She has a screen in front of her.

10    **Q.**  And I want you to focus on the sentence that -- first of

11    all, have you reviewed this portion of the prosecution

12    history?

13    **A.**  This does not look familiar to me.

14    **Q.**  So your counsel didn't --

15         **THE COURT:**  This is a proceeding between Fritsch

16    and Lin.  Did you review that?

17         **THE WITNESS:**  I can't recall reviewing it.

18         **THE COURT:**  Okay.  Well, then we'll see.  We'll try

19    to jog your memory by the language.

20         But if she doesn't recall, you have my instruction.

21    Go ahead.

22    **Q.**  I want to focus your attention on the second sentence

23    that's shown up here, "While Lin concedes that the hexose

24    value reported in his involved application, Example 10, is

25    probably incorrect, he points to the Western blot, SDS-PAGE

1   analysis reported on page 64 of the disclosure as evidence

2   of a difference in carbohydrate composition.  Lin further

3   asserts that the Takeuchi and Sasaki references of record

4   recognize the existence of such differences."

5          Now, does that refresh your recollection of

6   anything that you reviewed in the prosecution history,

7   Doctor, where Lin or Amgen informed the patent office that

8   the carbohydrate composition analyses that were reported in

9   the patent were probably incorrect?

10  A.  No.

11         **MR. JAGOE:**  Please take it down.

12         **THE COURT:**  Yes, it will be taken down.

13  **Q.**  Now, you're aware that there's a test that's used to

14  test for the presence of recombinant EPO in urine; correct?

15  A.  You're probably referring to the isoelectric focusing

16  test?

17  **Q.**  Well, it's commonly called the doping test?

18  A.  That is the nontechnical term.  Right.

19  **Q.**  In fact, it's used to detect athletes who illegally try

20  to boost their performance by taking recombinant EPO; right?

21         **MR. JAGOE:**  Objection, your Honor.  Relevance and

22  foundation.

23  A.  Ah, no --

24         **THE COURT:**  Yeah, sustained as to what's done with

25  athletes.

1    **Q.**  Well, this test is used to detect and distinguish

2    recombinant EPO from human urinary EPO; right?

3              **MR. JAGOE:**  Same objection, your Honor.

4              **THE COURT:**  Sustained on that foundation.  Timing,

5    and I want a relationship to this case.

6    **Q.**  You testified on direct that you reviewed Dr. Catlin's

7    report; correct?

8    **A.**  That's right.

9    **Q.**  And you also testified that you reviewed a gel performed

10   by Dr. Catlin?

11   **A.**  Well, I don't know who performed the gel.  I reviewed

12   Dr. Catlin's report.

13   **Q.**  And the way the IEF test works, that -- Dr. Catlin used

14   the IEF test; correct?

15   **A.**  I don't know who performed the test.  I only know that

16   Dr. Catlin submitted the report.

17   **Q.**  And you know that the report that was submitted was

18   based upon the IEF test?

19   **A.**  The report that's submitted that is the IEF data

20   reproduced as an exhibit.

21   **Q.**  Okay.  And that IEF test can discriminate between

22   recombinant EPO that's injected by a person into their body,

23   and their own naturally occurring EPO; correct?

24              **MR. JAGOE:**  Objection.  Foundation and relevance.

25              **THE COURT:**  Overruled.

1    A.   That is incorrect.

2    **Q.**   That's incorrect; can't do that?

3    A.   What the test can do is detect an enhancement of certain

4    glycoforms of EPO, and so as I mentioned before, the

5    glycoforms of EPO in the commercial EPO preparations come

6    from CHO cells, and they're purified, so there's a limited

7    subset of them in these commercial recombinant EPOs.  And

8    the relative proportions of those glycoforms are different

9    enough from the EPO glycoproteins that are collected into

10   the human urine so that one can see an enhancement of those

11   glycoforms when they're mixed together.

12          So while I would say that the IEF test might detect

13   an augmentation of certain EPO glycoforms from commercial

14   tests, I would not say that that test can discriminate any

15   recombinant EPO from the EPO that's in human urine.  That's

16   the most accurate way of phrasing.

17   **Q.**   You haven't done any tests where you have demonstrated

18   that this IEF test technique that Dr. Catlin applied cannot

19   discriminate between a recombinant human EPO and urinary

20   EPO, have you?

21          **MR. JAGOE:**   Objection, your Honor.  It's vague.

22          **THE COURT:**   Do you understand it?

23   A.   I'm not sure I do.  Can you --

24          **THE COURT:**   All right.  We'll have --

25   A.   Can you repeat it?

1    **Q.**  You haven't presented any test or any empirical evidence

2    to the jury here that shows that you cannot use this test to

3    reliably distinguish between a recombinant human EPO and

4    urinary EPO?

5            **MR. JAGOE:**  Same objection, your Honor.

6            **THE COURT:**  Overruled.  You can answer it if you

7    can.

8    A.  So, of course, what I'm here to do is to provide an

9    opinion based on all the data I've reviewed.  And what I'm

10   not here to do is to come presenting my own experiments to

11   you.

12   **Q.**  Okay.

13   A.  No.

14   **Q.**  Now, if I understand you correctly, Dr. Bertozzi, you

15   recognize that the distribution of glycoforms is different

16   between some recombinant EPOs and Goldwasser's urinary EPO;

17   correct?

18   A.  That's what the data would suggest.

19   **Q.**  And the particular structures and amounts of differing

20   glycoforms in a preparation of EPO, that can be referred to

21   as its glycoform distribution?

22   A.  If you like.  You can discuss it that way.

23   **Q.**  Okay.  And irrespective of the difference in the

24   glycoform distribution between recombinant EPO and

25   Goldwasser's prior art urinary EPO, you say the products are

1    still the same; right?

2    A.   What I said is that claim 3 of the '933 claim basically

3    describes any EPO glycoform made in recombinant mammalian

4    cells.  And what I'm here to tell you is that that claim

5    describes all recombinant EPOs made in mammalian cells, not

6    just a few of them, but all of them, and all of the

7    glycoforms from Goldwasser's EPO are among that group that

8    can be made in mammalian cells.  And some of them, in fact,

9    have been made in mammalian cells.

10   **Q.**   Okay.

11   A.   That's what I'm saying.

12   **Q.**   Can you name one recombinant EPO product, just one, that

13   cannot be detected and distinguished from urinary EPO by

14   means of the EPO doping test?

15   A.   Can you say that again?

16   **Q.**   Can you name one recombinant EPO product, just one --

17   A.   Okay.

18   **Q.**   -- that cannot be detected and distinguished from human

19   urinary EPO by means of the IEF EPO doping test?

20           **MR. JAGOE:**  Objection, your Honor.  Foundation.

21           **THE COURT:**  Overruled.  Overruled.  She may answer

22   if she can.

23   A.   I can draw a structure of an EPO glycoform that wouldn't

24   be distinguished.  In other words, if I took a molecule from

25   the urinary sample, I can find a molecule identical to it

1    from the recombinant sample, put them behind my back, bring

2    them back out again and ask the jury to tell me which came

3    from which sample, and they couldn't tell me because they're

4    the same.  And so those structures could not be

5    distinguished.

6    **Q.**  But that wasn't my question, was it?

7    A.  That's how I interpreted your question.

8    **Q.**  Let me ask the question again, then.  Listen carefully.

9         Can you name one human recombinant EPO product, any

10   one, that cannot be distinguished from human urinary EPO by

11   means of the IEF doping test?

12   A.  I can name many EPO molecules that couldn't be

13   distinguished because they're the same.  So they're in a

14   sample of recombinant --

15   **Q.**  Name one.

16   A.  One.  It's a big structure.  They don't have names.  I

17   mean, they have structures.

18   **Q.**  Name one product.

19   A.  Well, they don't have names, they have structures.  So I

20   would have to actually generate a structure, which I can do,

21   but it will take some time.

22   **Q.**  And you have not come here today to present to the jury

23   a test showing that any human urinary product is identical

24   to -- I'm sorry, that any human recombinant EPO product is

25   identical to urinary EPO, have you?

1    **MR. JAGOE:**  Objection, your Honor.  It's

2    argumentative, and asked and answered.

3    **THE COURT:**  Overruled.  He may have it.

4    A.  Once again, I came here to tell the jury that all the

5    data together show that there are structures made by

6    recombinant CHO cells that are identical to what you find in

7    Goldwasser's EPO.  I didn't come today to show you

8    experiments from my graduate students and post-doctoral

9    fellows.

10   **Q.**  Let me just end by asking you this.  Let me ask you,

11   Doctor, to assume that I have two stacks of money, okay.

12   There are ten bills in each stack, okay.  And in each stack

13   there's $1 bills, there are $5 bills, and there are $10

14   bills.  Okay.  And like you said, I could reach into that

15   stack and out of both stacks I could pull a $1 bill and I

16   could put it behind my back.  And then I could come to the

17   jury and show them the $1 bill, and I could say, You

18   couldn't tell me which stack this came from, could you, it's

19   a $1 bill; right?

20   A.  I'm not going to infer -- I shouldn't -- wouldn't want

21   to put words in the jury's mouth, but --

22   **Q.**  But -- well, could I have exhibit --

23   **THE COURT:**  It's 1:00, Mr. Day.  One o'clock, and

24   we're going to stick to our schedule.

25   All right.  Now, ladies and gentlemen, we'll stop

1    taking testimony at this point.  And move the screen.

2          You know, that because of the Court's schedule,

3    you've get a week off.  Don't worry about that and, in fact,

4    feel free to put all of this out of your mind.  Don't be

5    ruminating about it during the following week.  Because, and

6    studies have shown this, when you get back here on Monday,

7    the 24th of September, with your notes, and we're all here,

8    and it's exactly the same, you'll remember all those things

9    you need to remember as we go on.

10         For now, keep your minds suspended.  Do not discuss

11   the case either among yourselves nor with anyone else.  Now,

12   since we're taking a break, and since the press -- and I'm

13   not seeing things in the press, but this is a general

14   instruction, they may want to sum up what's happened so far.

15   And what's happened so far is we're moving along right

16   according to the schedule that we planned.  But they may

17   want to say something about the case.  You are under your

18   duty as jurors, turn the channel, turn the page.  You're

19   getting all the information about this case right here in

20   this court.

21         And with those instructions, you may stand in

22   recess until 9:00 a.m. Monday, the 24th of September.  You

23   may recess.  I'll remain on the bench.

24         **THE CLERK:**  All rise for the jury.

25         (Whereupon the jury left the courtroom.)

```
 1              THE COURT:  Please be seated.

 2              You may step down.

 3              (Whereupon the witness stepped down.)

 4              THE COURT:  Total elapsed time out of the ten days

 5    allotted to each party:  Amgen has used up three days, 45

 6    minutes; Roche has used up four days, two hours, 45 minutes.

 7              We'll recess.

 8              MS. BEN-AMI:  Your Honor, can I just hand you up

 9    that case?

10              THE COURT:  You certainly may.

11              MS. BEN-AMI:  It's the, just for the record, it's

12    the Federal Circuit e-Bay case.  I did write in handwriting,

13    the injunction issue was reversed, but not --

14              MR. DAY:  Could we get a copy, please, of

15    whatever's been given?

16              THE COURT:  I'll have the clerk stay here a minute.

17    She hasn't done anything wrong, she pointed out the

18    handwriting you might want to look at.

19              Thank you all.  We'll see you on the 24th.

20              MR. DAY:  Thank you, your Honor.

21              (Adjournment.)

22

23

24

25
```

1            **C E R T I F I C A T E**

2

3

4            I, Donald E. Womack, Official Court Reporter for

5    the United States District Court for the District of

6    Massachusetts, do hereby certify that the foregoing pages

7    are a true and accurate transcription of my shorthand notes

8    taken in the aforementioned matter to the best of my skill

9    and ability.

10

11

12

13

14            /S/ DONALD E. WOMACK
         _____
15              DONALD E. WOMACK
             Official Court Reporter
                P.O. Box 51062
16        Boston, Massachusetts 02205-1062
              womack@megatran.com
17

18

19

20

21

22

23

24

25