UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action
No. 05-12237-WGY

* * * * * * * * * * * * * * * *
                                *
AMGEN, INC.,                    *
                                *
          Plaintiff,            *
                                *  **DAILY TRANSCRIPT**
v.                              *  **OF THE EVIDENCE**
                                *  (Volume 11)
F. HOFFMANN-LA ROCHE LTD,       *
ROCHE DIAGNOSTICS GmbH and      *
HOFFMANN-LA ROCHE, INC.,        *
                                *
          Defendants.           *
                                *
* * * * * * * * * * * * * * * *


            BEFORE:  The Honorable William G. Young,
                     District Judge, and a Jury


                                1 Courthouse Way
                                Boston, Massachusetts

                                September 26, 2007

1                    A P P E A R A N C E S

2

3          DUANE MORRIS LLP (By D. Dennis Allegretti,
     Esq. and Michael R. Gottfried, Esq.), 470 Atlantic
     Avenue, Suite 500, Boston, Massachusetts 02210
4               - and -
           DAY CASEBEER MADRID & BATCHELDER, LLP (By
5     Lloyd R. Day, Jr., Esq., David M. Madrid, Esq. and
     Robert M. Galvin, Esq.) 20300 Stevens Creek
6     Boulevard, Suite 400, Cupertino, California 95014
               - and -
7          McDERMOTT WILL & EMERY (By Michael Kendall,
     Esq.), 28 State Street, Boston, Massachusetts
8     02109
               - and -
9          McDERMOTT WILL & EMERY (By William G.
     Gaede, III, Esq.), 3150 Porter Drive, Palo Alto,
10    California 94304
               - and -
11         MARSHALL, GERSTEIN & BORUN LLP (By Kevin M.
     Flowers, Esq.), 6300 Sears Tower, 233 S. Wacker
12    Drive, Chicago, Illinois 60606-6402
               - and -
13         STUART L. WATT and WENDY A. WHITEFORD, Of
     Counsel, Amgen, Inc., One Amgen Center Drive,
14    Thousand Oaks, California 91320-1789, on behalf of
     the Plaintiff

15

16         BROMBERG & SUNSTEIN LLP (By Lee Carl
     Bromberg, Esq. and Julia Huston, Esq.), 125 Summer
     Street, Boston, Massachusetts 02110
17              - and -
           KAYE SCHOLER LLP (By Leora Ben-Ami, Thomas
18    F. Fleming, Esq., Patricia Carson, Esq.,
     Christopher Jagoe, Esq. and Howard Suh, Esq.),
19    425 Park Avenue, New York, New York 10022, on
     behalf of the Defendants

20

21

22

23

24

25

**I N D E X**

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

ELI A. FRIEDMAN, Resumed

| By Mr. Fleming | | 1484 | | 1500 |
|---|---|---|---|---|
| By Mr. Madrid | | | 1485, | |
| | | | 1500 | |

NANCY SPAETHE

| By Mr. Day | 1511 | | | |
|---|---|---|---|---|
| By Ms. Ben-Ami | | 1533 | | |

STUART H. ORKIN

| By Mr. Flowers | 1537 | | | |
|---|---|---|---|---|
| By Ms. Ben-Ami | | 1601 | | |

| EXHIBITS: | FOR I.D. | IN EVID. |
|---|---|---|
| 21   Grant Application . . . . . . . . . | | 1587 |
| 22   Document . . . . . . . . . . . | | 1592 |
| 2097 Notice of Grant Award . . . . . . . | | 1605 |
| 2098 Orkin, et al Article . . . . . . . | | 1619 |
| 2099 Michelson, et al Article . . . . . . | | 1621 |

1          THE CLERK:  All rise for the jury.

2          (Whereupon the jury entered the courtroom.)

3          THE CLERK:  Court is in session, please be seated.

4          THE COURT:  Good morning, ladies and gentlemen.

5          THE JURY:  Good morning.

6          THE WITNESS:  Good morning.

7          THE COURT:  I really don't say this by rote.  Thank

8  you so much for your continuing prompt presence and careful

9  attention.

10         We're ready.  Would you remind the witness.

11         THE CLERK:  I remind you, sir, you are still under

12  oath.

13         THE WITNESS:  Thank you.

14         THE COURT:  Mr. Fleming.

15         MR. FLEMING:  May I inquire, your Honor?

16         THE COURT:  You may.

17         MR. FLEMING:  Thank you, your Honor.

18             ELI A. FRIEDMAN, Resumed

19           CROSS-EXAMINATION (Cont'd)

20  BY  MR. FLEMING

21  Q   Good morning.

22  A   Good morning.

23  Q   Dr. Friedman, yesterday we were talking about Dr.

24  Eschbach and a sheep model that he had done.

25         Do you recall that?

1    A    Yes.

2    Q    Dr. Eschbach also administered EPO-enriched human plasma

3    to a human patient, didn't he?

4    A    Yes.

5    Q    And that was a patient they called Patient 11, correct?

6    A    I don't remember the number.  It was a patient, yes.

7    Q    And that patient after being administered EPO-enriched

8    human plasma by Dr. Eschbach experienced increased

9    reticulocyte counts and ferrokinetic effects, correct?

10   A    Yes.

11          MR. FLEMING:  Your Honor, I have no further

12   questions for this witness.

13          Thank you, Dr. Friedman.

14          THE COURT:  Any redirect, Mr. Madrid?

15          MR. MADRID:  Yes, your Honor.

16          THE COURT:  Proceed.

17                  REDIRECT EXAMINATION

18   BY  MR. MADRID

19   Q    Good morning, Doctor.

20   A    Good morning, Mr. Madrid.

21   Q    I would like to hand you what's been marked as Exhibit

22   CUQ.

23          Doctor, do you recognize Exhibit CUQ?

24   A    Yes, I do.

25   Q    What is it?

1    A    It is --

2              **MR. FLEMING:**   Objection, your Honor; this is beyond

3    the scope of my cross.

4              **THE COURT:**   It seems to be, Mr. Madrid.

5              **MR. MADRID:**   Your Honor, I offer CUQ as, under

6    Rule 801(2)(d)(1)(B), as well as 801.18.

7              **THE COURT:**   Wait a second.   801 --

8              **MR. MADRID:**   As a prior consistent statement.

9              **THE COURT:**   You meant -- I see.   Overruled.   Your

10   rights are saved.

11   **Q**    Doctor, on cross-examination you were asked about the

12   three-patient urinary erythropoietin experiment by Drs.

13   Baron and Goldwasser.

14             Do you recall that?

15   A    Yes, I do.

16   **Q**    Do you have an opinion as to what conclusions, if any,

17   can be drawn from the results of that experiment?

18             **MR. FLEMING:**   Objection, your Honor; that's beyond

19   the scope of my cross.

20             **THE COURT:**   Oh, no, I think not.   He may have it.

21   A    Yes, I do.

22   **Q**    What is your opinion?

23   A    That no conclusions as to the effectiveness of human

24   erythropoietin extracted from urine by the procedure

25   described in correcting the anemia of kidney failure can be

1   drawn; that the workers who prepared the trial of the three

2   patients reached a similar conclusion and decided not to

3   publish their work, which is what you do --

4           **MR. FLEMING:**  Objection, your Honor.

5   A   -- when you try to understand something.

6           **THE COURT:**  Sustained.  Wait a minute.

7           **THE WITNESS:**  Excuse me.

8           **THE COURT:**  Wait a minute.  When he was answering

9   the question and giving his conclusions of what was drawn

10  from that, that will stand.  You figure out what you make of

11  it.  But when he went on to say the workers did this or

12  that, strike all that out because they're not here.  He

13  can't tell you what they thought or did.  Strike it out.

14          Go ahead, Mr. Madrid.

15  Q   Doctor, have you completed your answer with respect to

16  your opinions?

17          **THE COURT:**  Well, he has.  In light of the tenor of

18  the answer, you may ask another question.

19  Q   Doctor, yesterday you testified that the three-patient

20  experiment was never published in a scientific publication.

21          Do you recall that?

22  A   Yes.

23  Q   Do you have an opinion on the significance, if any, as

24  to the lack of any scientific publication regarding the

25  three-patient experiment?

1    **MR. FLEMING:**  Objection, your Honor; beyond the

2    scope.

3    **THE COURT:**  Sustained.

4    **MR. MADRID:**  Your Honor, it's directly within the

5    scope of the direct --

6    **THE COURT:**  Please.  Please.  I've made my ruling.

7    And you may argue it.  But I'm not going to permit that, on

8    this foundation.

9    Anything else for this witness?

10   **MR. MADRID:**  Yes.

11   **Q**  Doctor, do you have an opinion as to whether or not

12   Dr. Goldwasser's grant application was the kind of material

13   scientists in 1983 and '84 would have had access to?

14   **MR. FLEMING:**  Objection, your Honor.

15   **THE COURT:**  Overruled.

16   A   Yes.

17   **Q**  What is your opinion?

18   A   That as chairman of the Food and Drug Administration

19   committee that considered grants, I knew that

20   confidentiality was a key component and I would think that

21   anyone not directly connected with the Food and Drug

22   Administration or on one of its --

23   **MR. FLEMING:**  Objection, your Honor; this is

24   speculation.

25   **THE COURT:**  No, overruled.  There's adequate

 1    foundation.

 2          Go ahead.

 3    A    -- that anyone who was not an employee of the Food and

 4    Drug Administration or asked to serve on their scientific

 5    review panels would have an opportunity of seeing an

 6    application; it was not permitted.

 7    Q    And, Doctor, do you have an opinion as to whether or not

 8    Dr. Goldwasser's grant application is the kind of material

 9    scientists in 1983-84 would have relied upon?

10          **MR. FLEMING:**  Objection, your Honor; beyond the

11    scope of --

12          **THE COURT:**  Overruled.

13          **MR. FLEMING:**  And his report, excuse me, your

14    Honor.

15          **THE COURT:**  Oh.  You say it's not in the report?

16          **MR. FLEMING:**  No, your Honor.

17          **THE COURT:**  Where is it?

18          **MR. MADRID:**  Your Honor, it's at Page 52,

19    Paragraph 89.  It's the last two sentences.

20          **THE COURT:**  Page 52, Paragraph 89.

21          Yes, overruled.  He may, he may testify consistent

22    with the report.

23    A    As an editor of several scientific journals to which

24    this would have been submitted had scientific workers so

25    chosen, it would have been rejected.

1          **MR. FLEMING:**  Objection, your Honor; this is not in

2     his report.

3          **THE COURT:**  Overruled.

4     **Q**   Go ahead, please.

5     **A**   As an editor of scientific journals where this would

6     have been reported, had the workers decided to submit it, I

7     can tell you that it would have been rejected because of

8     inadequate substance, inadequate number of patients, and

9     inadequate basis to reach any conclusions.

10         **THE COURT:**  Well, I've got to strike the because.

11    We'll leave it up to rejected.  There's nothing about why.

12         **THE WITNESS:**  Excuse me, your Honor.

13         **THE COURT:**  Oh, you're going to show me -- oh, no.

14    All right.

15         **THE WITNESS:**  No, I'm saying excuse me for using a

16    word I shouldn't have used.

17         **THE COURT:**  All right.  I just do the best I can.

18         **THE WITNESS:**  So do I.

19         **THE COURT:**  His opinion is out there.  The because

20    I don't see here.  So strike it all out.

21    **Q**   Doctor, do you have an opinion as to the significance of

22    peer review, if any, of the data of the three-patient

23    experiment?

24    **A**   Yes, but that was two questions.

25    **Q**   I'm sorry.

1          Do you have an opinion as to whether or not the

2    data from the three-patient experiment were peer reviewed?

3    A    Yes.

4    **Q**    What is that opinion?

5    A    They were not peer reviewed.

6    **Q**    And do you have an opinion as to the significance of the

7    fact that the data were not peer reviewed --

8    A    Yes.

9    **Q**    -- with respect to the three-patient experiment?

10   A    Yes, I do.

11   **Q**    And what is that opinion?

12   A    I train my fellows and I practice a standard by which we

13   do not accept --

14          **MR. FLEMING:**  Objection, your Honor; it's beyond

15   the scope of his report.

16          **THE COURT:**  Where is it?

17          **MR. MADRID:**  Your Honor, it's in the report at Page

18   48, Paragraph 85, Footnote 78.  It's also in the report at

19   Page 33, Paragraph 61, the last two sentences.

20          **THE COURT:**  He may testify consistent with Footnote

21   78.  I don't see anything about the training you gave people

22   who work with you.  But take a look at that footnote, you

23   may testify consistent with that.

24          **THE WITNESS:**  Thank you, your Honor.

25          **MR. MADRID:**  And may he also testify consistent

1   with Page 32, Paragraph 61, your Honor?

2             **THE COURT:**  Just a moment.  Thirty --

3             **MR. MADRID:**  Thirty-three, I'm sorry.

4             **THE COURT:**  Page 33.

5             **MR. MADRID:**  Paragraph 61, the last two sentences.

6             **THE COURT:**  In response to another question he may.

7   Let's get first the significance of peer review.  You may

8   tell us the significance of peer review.

9             **THE WITNESS:**  Peer review -- and a peer is someone

10  who is equivalent to the scientists submitting the work for

11  consideration for publication.  Peer review means that

12  people qualified to evaluate the work in question do so, and

13  that it is these reviewers, usually two or more, who report

14  to the general editor that the quality is sufficient for

15  publication.  In the absence of peer review saying it's

16  worth publishing, the paper or article is not published.

17  Q   Doctor, you were asked some questions with respect to

18  the work of Dr. Essers yesterday.

19             Do you recall that?

20  A   Yes.

21  Q   Do you have an opinion as to the results of Dr. Essers'

22  work?

23  A   Yes.

24  Q   What is your opinion?

25  A   That the several reports that I reviewed did not show

1    that the preparation that Dr. Essers studied raised either

2    the hemoglobin or the hematocrit in --

3          MR. FLEMING:  Objection, your Honor; this is

4    contrary to the claim construction.

5          MR. MADRID:  Your Honor, it's --

6          THE COURT:  No, we've been over this.  The -- well,

7    what's this all about.  And we have to go back to that

8    definition there -- and throw it up again -- in the

9    glossary.  Now, that -- it's the long one.

10          MR. FLEMING:  Therapeutically effective.

11          THE COURT:  Therapeutically effective.

12          Now, we've got a bunch of patents.  Where those

13   patents use the words therapeutically effective amount or

14   effective amount of glycoprotein product effective for

15   erythropoietin therapy, that's the definition.  And the

16   specifics there are stimulation of reticulocyte response,

17   development of ferrokinetic effects, erythrocyte mass

18   changes, and stimulation of hemoglobin C-synthesis.

19          All right?  Now, wherever the highlighted words

20   therapeutically effective and effective amount, where those

21   words appear in these patents, that's the definition and

22   that's what it means to be therapeutically effective.  Only

23   that.  It doesn't mean you got to get better or feel better.

24   Which you might think when we're talking about

25   therapeutically effective, it might make some sort of

1    difference in how the patient feels.  Well, the law is that

2    having used words they used in the claim that's what it

3    means, those specific scientific effects.

4          Now, his answer uses some different terms.  And

5    right away the lawyer for Roche is up and says he's trying

6    to change the law.  Well, if we were just limited to the

7    patents where the defined terms exist then Mr. Fleming's

8    right.  But those aren't all the patents there.  Not all the

9    claims in issue use those words.  And my construction, my

10   definition, can only apply to the patents that use those

11   terms.  Because there are other patents that don't use those

12   terms, I'll let his testimony stand.  But not as to all of

13   them, because you see the definition.

14         Now, when we get to the end of this case and I

15   explain things, I'm going to try and be as detailed as

16   possible with both the glossary and the specific claims and

17   the specific exhibits that pertain to the specific claims

18   and the like, we'll try to make it just as clear as

19   possible.

20         So, I'm not sustaining the objection, but it's

21   limited to the patents that don't include those words.

22         Go ahead, Mr. Madrid.

23         **MR. MADRID:**  Thank you, your Honor.

24         May I have Exhibit 1, '933 claims 11 and 14,

25   please.

1    Q    Doctor, you see claim and 11 and 14?

2    A    Yes.

3    Q    Do you see the limitation that says in an amount

4    effective to increase the hematocrit level of said patient?

5    Claim 11.

6    A    Yes.

7    Q    Now, Doctor, can you give me your opinion with respect

8    to the results of Dr. Essers' work?

9    A    Yes.

10          **MR. FLEMING:**  Objection, your Honor; this is

11   outside the scope of his report.

12          **THE COURT:**  Where is it?

13          **MR. MADRID:**  Your Honor, it's at Page 45,

14   Paragraph 79, third sentence; Page 45, Paragraph 79, fifth

15   sentence; Paragraph 79, second sentence; Page 46,

16   Paragraph 80, first and second --

17          **THE COURT:**  He may testify, he may testify

18   consistent with those references.

19          **MR. MADRID:**  And paragraph 81.

20          **THE COURT:**  Yes.  I have them before me and he may

21   so testify.

22          You probably should look at Pages 45 and 46.  Since

23   we're talking about Essers, you may so testify.

24          **THE WITNESS:**  Yes, sir.  Could you please help me

25   by restating the question I'm addressing?  I'm sorry, I'm

1    distracted by reading and two sources of instructions.

2    **Q**    Yes, sir.

3            You were asked questions yesterday with respect to

4    Dr. Essers' work.

5    A    Yes.

6    **Q**    The question to you is, do you have an opinion with

7    respect to the results of Dr. Essers' work?

8    A    Yes, I do.

9    **Q**    And what is your opinion?

10           **MR. FLEMING:**  Objection, your Honor.

11           **THE COURT:**  Overruled.

12   A    May I read from my report?

13   **Q**    I think you -- just give your testimony and look at the

14   report and testify consistent with it.

15   A    That Dr. Essers did not demonstrate a effect like

16   clinicians, people who treat patients like me, would have

17   considered indicative of, of showing that the anemia of

18   uremic patients was benefited by the material that she gave.

19   In fact, I thought that and commented in the report that if

20   what she did had changed the hemoglobin, hematocrit, or

21   clinical outcome of her patients, that doctors all over the

22   world would have, since she reported to international

23   societies, would have beaten the path to her door to get

24   this material.

25           **MR. FLEMING:**  Objection, your Honor; this is beyond

1    the scope.

2             THE COURT:  Yes, what doctors would have done,

3    that's stricken.  Let me see this.  Just a second.

4             THE WITNESS:  In Paragraph 80, your Honor --

5             THE COURT:  Wait a second.

6             THE WITNESS:  -- third sentence.  Third line.

7             THE COURT:  Thank you.  I reverse myself.  That may

8    stand.

9             THE WITNESS:  Thank you, your Honor.

10   Q    And, Doctor, you were asked a moment ago with respect to

11   Dr. Eschbach's single-patient experiment.

12            Do you have an opinion with respect to the results

13   of that experiment?

14   A    Yes.

15   Q    What is your opinion?

16   A    That that patient did not have a clinical response that

17   indicated that anemia was improved by the material that

18   Eschbach administered.

19   Q    Doctor --

20   A    May --

21   Q    I'm sorry, go ahead.

22   A    May I continue by saying --

23   Q    Yes.

24   A    -- that same patient in a later trial was given --

25            MR. FLEMING:  Objection, your Honor; this is beyond

1    the scope.

2              THE COURT:  Where is it?

3              MR. MADRID:  We'll move on at this point, your

4    Honor.

5              THE COURT:  Very well.

6    Q    Doctor, do any of the matters that Mr. Fleming called to

7    your attention today or yesterday cause you to change any

8    opinion that you have expressed to the jury in your

9    testimony?

10   A    No.

11             MR. MADRID:  Your Honor, I move into evidence

12   Exhibit CUQ.

13             THE COURT:  Any objection?

14             MR. FLEMING:  Yes, your Honor, object.

15             THE COURT:  Sustained.

16             MR. MADRID:  Your Honor, may we have a side bar?

17             THE COURT:  You may.

18   SIDEBAR CONFERENCE, AS FOLLOWS:

19             MR. MADRID:  My first argument, your Honor, is that

20   this is a prior consistent statement.  The doctor's

21   fundamental position is that --

22             THE COURT:  Yes, no one, no one has suggested that

23   his testimony today is recent fabrication.  You fail on that

24   ground.

25             MR. MADRID:  But may I, your Honor?  What was

1    raised yesterday specifically by Mr. Fleming was a question

2    that, Doctor, you are only involved in this case and it's

3    just you; then, after that question, about how much he was

4    paid.

5              THE COURT:  Yes.

6              MR. MADRID:  Then after that what did he see.

7    These are all questions that go to the consistency of --

8              THE COURT:  No, the words of the rule are recent

9    fabrication.  There's no suggestion he's fabricated

10   anything.  Yes, he's an Amgen witness.  But it goes to the

11   weight to be given.

12             Is there any other?

13             MR. MADRID:  I offer it, I offer it as a learned

14   treatise.  The foundation was laid yesterday as a

15   reputable --

16             THE COURT:  Sustained.

17             MR. FLEMING:  Thank you, your Honor.

18             (Whereupon the sidebar conference concluded.)

19             THE COURT:  That's it for this witness?

20             MR. MADRID:  Yes, your Honor, pass the witness.

21             MR. FLEMING:  Just a few short questions, if I may,

22   your Honor.

23             THE COURT:  Go ahead.

24

25

1    **RECROSS-EXAMINATION**

2  BY  MR. FLEMING

3  Q   Dr. Friedman, the people at the FDA to whom Dr. Baron

4  and Goldwasser's materials were submitted are doctors, are

5  they not?

6  A   Some were and some were not.

7  Q   You know that for a fact?

8  A   Oh, yes.

9  Q   And they're competent, the doctors who reviewed the

10  Baron-Goldwasser work are competent, aren't they?

11  A   I assumed they were and I had no reason to think

12  otherwise.

13  Q   Right.  And you accept that there could be scientific

14  valid data that exists in a report that's not peer reviewed,

15  don't you?

16  A   Yes.

17  Q   And you also understand in Dr. Essers' work that there

18  was an increase in the reticulocytes she reported due to the

19  erythropoietin, correct?

20  A   Due to the plasma containing erythropoietin.

21  Q   She concluded the increase in reticulolyte --

22  reticulocytes, correct, was due to the erythropoietin?

23  A   I'm not sure whether she made that statement or whether

24  she linked the erythropoietin to being in the plasma that

25  was enriched with erythropoietin.

1    Q    Do you have your deposition in front of you?  If you use

2    the smaller one, on the right hand side.

3    A    This one?

4    Q    No, sir.

5    A    This one?

6    Q    Let me help.

7    A    This one.

8    Q    Let me help you.

9    A    Please.

10   Q    Okay.  Two volumes.

11   A    One volume.

12   Q    There should be two.  Okay.  And that's your confusion.

13   I understand that.

14            **MR. FLEMING:**  Could we have the second volume,

15   please.

16   A    That's why I couldn't find it, Mr. Fleming.

17   Q    I acknowledge it, and I apologize.  We're going to be at

18   Page 325.

19   A    Thank you.

20            **MR. FLEMING:**  Could I have clip 57, please.

21   Q    Doctor, at your deposition I asked you this question and

22   you gave me this answer.

23            (The following was played from the videotape

24   deposition of Eli A. Friedman.)

25            Doctor Essers is concluding that the increase in

1    the reticulocytes was due to the erythropoietin?

2           Correct.

3    **Q**   Do you remember giving me that answer, Doctor, under

4    oath at your position?

5    A    I answered, yes, I answered that Dr. Essers reached that

6    conclusion.

7    **Q**   Thank you.

8    A    But you asked me whether I had --

9    **Q**   Doctor, Doctor, is that the truth?

10   A    Is it the truth that she reached that conclusion?

11   **Q**   Yes.

12   A    Yes.

13   **Q**   Thank you.

14          Now, you talked about what is or isn't available to

15   the public from the FDA filing.  Do you know what FOIA is,

16   F O I A?

17   A    No.

18   **Q**   You ever hear of the Freedom of Information Act?

19   A    Yes.

20          **MR. FLEMING:**  Could I have Exhibit 204, please.  If

21   we could go to the last page.

22   **Q**   Doctor, you recognize this as a document being produced

23   by the government in response to a Freedom of Information

24   Act request by the public for a copy of this document?

25          **MR. MADRID:**  Objection, your Honor; relevance.

1          THE COURT:  Yes.  Come to the side bar.

2   SIDEBAR CONFERENCE, AS FOLLOWS:

3          THE COURT:  Okay.  Now, this is re --

4          MR. FLEMING:  Cross.

5          THE COURT:  -- cross.  And you're responding to the

6   redirect where I permitted him to testify that people

7   wouldn't have had access to the --

8          MR. FLEMING:  Precisely.

9          THE COURT:  -- filing.  And your point is that if

10  you made a Freedom of Information Act request you could get

11  it.

12         MR. FLEMING:  That's, yes, that is the point, but

13  among other points relating to that response, yes.  But that

14  is the specific point.

15         THE COURT:  Well, I only go question by question.

16         MR. FLEMING:  Yes, sir.

17         THE COURT:  And why shouldn't I allow that?

18         MR. MADRID:  Because it lacks foundation and it's

19  irrelevant.

20         THE COURT:  It isn't foundation.

21         MR. MADRID:  The date of the document is 2000.

22  They're suggesting nunc pro tunc that something in 2000 has

23  some relevance to this state of the prior art before 1984,

24  and they've not made their foundation.

25         THE COURT:  No, but his point was within the FDA

1   when you make one of these IND's only people in the FDA get

2   it.

3          Now, I'm going to sustain this.  But I'm going to

4   sustain it on the ground that it is not probative of the

5   practices of the FDA back when they were considering the

6   IND, because the timing is off.  The IND is much earlier.

7   The fact that you could get it now and prepare for trial is

8   insufficient.  Now, he may have an answer for that, and if

9   he does, we can get -- what's the answer?

10          **MR. FLEMING:**  I do, your Honor.  The FOIA, the FOIA

11   statutes were in existence.  The fact that I make a request

12   today does not mean I wasn't capable and had the ability to

13   make that request at an earlier time which that issue had

14   arisen.

15          **THE COURT:**  But I'm not clear that, while they're

16   considering it, that they would have -- I grant you the

17   statutes exist.  But I don't know the practice of the

18   agency.

19          **MR. FLEMING:**  Well, your Honor, you cannot allow

20   him to make a statement that it wasn't accessible.  The

21   action of the agency is evident from the documents, your

22   Honor.  They properly made a FOIA request and they produced

23   the materials.

24          **THE COURT:**  Oh, I guess, I guess maybe the way to

25   do it is -- well, I don't know the time.  That's my problem.

 1          **MR. MADRID:**  Your Honor, there's been -- I think

 2     it's a legal point.  There's no point in the foundation laid

 3     that the IND would be known from a FOIA --

 4          **THE COURT:**  Oh, come on.  You made this point.  You

 5     made this point.  And if your objection is no foundation,

 6     I'm going to -- it's relevant.

 7          **MR. FLEMING:**  Thank you, your Honor.

 8          **THE COURT:**  No, it is relevant.  He may have it.

 9          **MR. FLEMING:**  Thank you, your Honor.

10          (Whereupon the sidebar conference concluded.)

11          **THE COURT:**  You may press the question.

12          **MR. FLEMING:**  Thank you, your Honor.  May we have

13     the document back on the screen.

14          **THE COURT:**  Well, it's not in evidence.

15          **MR. FLEMING:**  Yes, it is, your Honor.  It's a piece

16     of 2004.

17          **THE COURT:**  Oh, the IND is in evidence.

18          **MR. FLEMING:**  Yes, your Honor.  And this was

19     attached to it.

20          **THE COURT:**  Forgive me.  Yes.

21          **MR. FLEMING:**  Okay.

22     **Q**   Again, Doctor, my question is, this is a response from

23     the FDA in a request from the public for access to this

24     document, is it not?  2004?

25     A   I need to accept what you say.  I haven't studied the

1    document and I can't have something flashed up and then

2    validated without study.

3    **Q**   As your Honor said, the jury can read it.

4         **THE COURT:**  That is true.

5         **MR. FLEMING:**  Can we have the '933 patent, Exhibit

6    1, please.  And could we go to the claims.  And may I have

7    claim 9 and claim 3.

8    **Q**   Okay.  Doctor, in claim 9, you see the words an

9    effective amount of glycoprotein product effective for

10   erythropoietin therapy.

11        Do you see those words?

12   A   Yes, I see those words.

13   **Q**   And this is one of the patents that you are opining

14   about?

15   A   Opining?

16   **Q**   Giving an opinion.

17   A   Yes.

18        **MR. FLEMING:**  Okay.  Can we have the glossary,

19   please.  And the judge's definition of therapeutic.

20   **Q**   And there's the term effective amount of a glycoprotein

21   product.  Isn't it there, Doctor?

22   A   Yes, it is there.

23   **Q**   And it is in the claims that you were talking about

24   during your redirect, wasn't it?

25   A   As you've shown it to me, yes.

1          MR. FLEMING:  Thank you.  Nothing further, your

2     Honor.

3          THE COURT:  Nothing further, Mr. Madrid?

4          MR. MADRID:  Your Honor, a few questions.

5          THE COURT:  Go ahead.

6                    REDIRECT EXAMINATION

7     BY  MR. MADRID

8     Q    Doctor, do you have an opinion as to whether or not the

9     actual data from the three-patient Goldwasser urinary EPO

10    study was ever submitted to the FDA?

11         MR. FLEMING:  Objection; foundation, your Honor.

12         THE COURT:  Yes, sustained, on that ground.

13    Q    Doctor, you had an opportunity to review the submissions

14    that were given to the FDA regarding the three-patient

15    urinary erythropoietin study, correct?

16    A    Yes.

17    Q    Now, from that review, do you have an opinion as to

18    whether or not any of the actual data were ever communicated

19    to the FDA?

20         MR. FLEMING:  Same objection, your Honor.

21         THE COURT:  Same, same ruling.  Sustained.

22    Q    Doctor --

23         THE COURT:  It's hearsay.  Go ahead.

24    Q    Doctor --

25         MR. MADRID:  First of all, may I have the, from the

1    juror's notebook, may I have the, the definitions of the

2    claim terms, please.  And can you please blow up the

3    paragraph with respect to therapeutically effective amount.

4    I would like you to highlight the last, the second to last

5    sentence "increasing hematocrit levels in mammals."

6    **Q**   Do you see that?

7    A    Yes.

8    **Q**   Doctor?

9    A    Yes, I see that.

10   **Q**   Can you define for the jury what it means to increase

11   hematocrit?

12   A    The hematocrit is the term used for volume of red blood

13   cells as a proportion, as a component of total blood, and

14   it's expressed as percent, usually 45 percent normal in men

15   and about 38, 38 to 43 percent normal in women.  When the

16   hematocrit is low in anemia you attempt to increase it and

17   you measure an increased percent by the number that changes.

18   **Q**   Now, Doctor, if we can return for a moment to the

19   three-patient study.

20          In your preparation of your opinions, did you find

21   any evidence to suggest that the actual data from the study

22   was ever submitted --

23          **MR. FLEMING:**  Objection, your Honor.

24   **Q**   -- to the FDA?

25          **MR. FLEMING:**  It's beyond the scope of the recross.

 1          THE COURT:  It is, and it has an inadequate

 2    foundation.  Sustained.

 3          MR. MADRID:  May I have Exhibit 2501, please.

 4    Q    Now, Doctor, you were asked questions about Dr. Essers'

 5    work a moment ago on recross.

 6          Do you recall that?

 7    A    Yes, I recall it.

 8    Q    And you were asked questions about the issue of

 9    reticulocytes.  Now, I would like to read to you a sentence

10    that's from the abstract of Dr. Essers' work.

11          MR. FLEMING:  Objection, your Honor; leading.

12          THE COURT:  Well, no, if it's in evidence he may

13    read something.  He hasn't asked the question yet and when

14    he asks it, it won't be leading.

15    Q    After infusion of 500 units of erythropoietin into two

16    nondialyzed uremic patients and two chronic intermittent

17    hemodialysis patients there was no significant increase in

18    reticulocytes.

19          Doctor, do you have an opinion as to what that

20    means?

21    A    As defined by the judge and the legal paragraph that you

22    showed me previously, an increase in reticulocytes or

23    ferrokinetics or other variables is a sign that what you

24    have administered was therapeutically effective.  My opinion

25    is that Dr. Essers found in these two patients on

```
 1    hemodialysis that the material that she administered was not

 2    significantly responsible for any change in reticulocytes

 3    that benefited the patient, they did not rise.

 4              MR. MADRID:  Your Honor, no further questions.

 5              THE COURT:  Nothing further, Mr. --

 6              MR. FLEMING:  Nothing further, your Honor.

 7              THE COURT:  You may step down, thank you.

 8              THE WITNESS:  Thank you for your courtesy, your

 9    Honor.

10              (Whereupon the witness stepped down.)

11              THE COURT:  Call your next witness.

12              MR. DAY:  Amgen calls Nancy Spaethe, your Honor.

13              THE COURT:  She may be called.

14              (Whereupon the Court and the Clerk conferred.)

15              MR. DAY:  Your Honor, while the witness is coming

16    in, may I just hand up this opposition that we filed last

17    night -- I don't know if the Court's seen it -- prior to

18    this witness coming up.

19              THE CLERK:  Right up here, ma'am.

20              Ma'am, would you please raise your right hand.

21              Do you solemnly swear that the answers you will

22    give to this Court and Jury will be the truth, the whole

23    truth, and nothing but the truth, so help you God?

24              THE WITNESS:  Yes.

25              THE CLERK:  Please be seated.
```

```
 1                    NANCY SPAETHE

 2                DIRECT EXAMINATION

 3    BY  MR. DAY

 4    Q    Good morning, Ms. Spaethe.

 5    A    Good morning.

 6    Q    Can you just pull the microphone just a little bit

 7    closer to you.

 8    A    (Witness complied.)

 9    Q    That's good.

10         Would you please introduce yourself to the jury?

11    A    My name is Nancy Hewitt Spaethe.  I am a nurse in

12    physical medicine and rehabilitation.  I'm going to have my

13    60th birthday next month.  I'm a mother, a grandmother, and

14    one of the longest surviving kidney patients in the world.

15         MS. BEN-AMI:  Your Honor, could we have a short

16    side bar so that I don't have to interrupt the witness.

17         THE COURT:  Yes, I think that makes --

18         MS. BEN-AMI:  Out of the respect of the witness.

19    SIDEBAR CONFERENCE, AS FOLLOWS:

20         THE COURT:  Actually it's wise that you ask for one

21    and I've read the memoranda that deals with this.

22         My problem with Spaethe is that she's got to have a

23    personal knowledge that she got this erythropoietin.  The

24    memo you just handed up addresses that.  While it is not

25    strictly chronological, we better get to that early on.
```

1          **MR. DAY:**  We will.

2          **THE COURT:**  I'm just trying to respond to

3    Ms. Ben-Ami's request for the side bar.  Because if that

4    foundation is laid, I don't have too many other problems

5    with her testimony.  If she doesn't have personal knowledge

6    then the rest of it is largely irrelevant.

7          Now, that's the line I'm going to follow.

8          **MS. BEN-AMI:**  Obviously, your Honor, if some doctor

9    told her something years later that is hearsay.

10         **THE COURT:**  No, it's not.  It's not hearsay if it

11   was, when told, for the purpose of diagnosis and treatment.

12   If it was told to her that to get ready for this trial or

13   something, of course.

14         **MS. BEN-AMI:**  Or there's a dying declaration right

15   before trial or --

16         **THE COURT:**  No, no.  That goes -- she apparently is

17   a kidney patient.  Now, I grant you it has to be told to her

18   for the purpose of her diagnosis and treatment, not to

19   prepare her for testimony at trial.  And we're going to have

20   to be clear on that.

21         **MS. BEN-AMI:**  Okay.

22         **THE COURT:**  Since we're up here talking about

23   evidence, I came within an ace of saying yesterday that the

24   banana peel example I have learned from your former partner,

25   Milt Kunen, a great lawyer.

 1          **MS. BEN-AMI:**  Your Honor, can I make a formal

 2    objection because I do want to make a formal objection as to

 3    this --

 4          **THE COURT:**  Okay, you have.

 5          **MS. BEN-AMI:**  But can I --

 6          **THE COURT:**  We're not going to take any time now.

 7    You can put it on the record during the break.

 8          **MS. BEN-AMI:**  Okay, that's fine, your Honor.

 9          (Whereupon the sidebar conference concluded.)

10    **BY  MR. DAY**

11    **Q**   Where do you live, Ms. Spaethe?

12          **THE COURT:**  Well, not the specific address.

13    **Q**   Just the city.

14          **THE COURT:**  Since we put it all on line now.  Yes,

15    the city and state will be sufficient.

16    **A**   I work in Seattle, Washington, and I live in Mercer

17    Island.

18    **Q**   Have you ever testified in court before?

19    **A**   No.

20    **Q**   And when did you become a nurse?

21    **A**   I became a nurse in 1981.

22    **Q**   And just very briefly, in general what type of

23    nursing --

24    **A**   Excuse me, '82.

25    **Q**   What type of nursing have you done over your career?

1    A    I was a nephrology and urology nurse in the hospital.

2    For a year, I worked some temporary jobs in pediatrics and

3    OB-GYN.   I worked in internal medicine for a GI physician

4    and a hematologist.   And I currently work in physical

5    medicine and rehabilitation.

6    Q    Over the years have you received any treatment for your

7    kidney disease?

8    A    I have.

9    Q    What treatment have you received?

10   A    I've received dialysis four times, and four transplants.

11   Kidney transplants.

12   Q    You've received four kidney transplants?

13   A    Correct.

14   Q    Ms. Spaethe, I would like to hand you something that's

15   been marked as Exhibit FRA and ask if you recognize that

16   item?

17   A    Yes.   It's a vial of erythropoietin.

18   Q    Can you tell us how you're acquainted with it?

19   A    I've administered this to myself.

20   Q    Has it ever been administered to you by a physician?

21   A    Not by a physician but by a nurse.

22   Q    Over what period of time have you taken this product?

23   A    I started taking it in 1987.

24           MS. BEN-AMI:   Objection, your Honor.

25           THE COURT:   Yes, on that foundation, sustained.

1    We're going to need to know how you know it was that

2    product.

3            Go ahead, Mr. Day, without prejudice, but

4    sustained, disregard that.  And again --

5    Q    Subsequent --

6            **THE COURT:**  -- none of this is a mystery.  We want

7    to know that she has something to do with the matters that

8    are at issue in this case.  So we've got to make sure that

9    she knows herself that she is involved in at least the

10   products that pertain to the patents that we're talking

11   about in this case.  That's what the back and forth is

12   about, and we just want to be clear on that.

13           Go ahead.

14           **MS. BEN-AMI:**  Your Honor, could I have a motion to

15   strike on that.

16           **THE COURT:**  Yes, it's allowed as to the date when

17   she started, and Mr. Day may go back to it.

18   Q    In 1987 were you under the care of a physician?

19   A    I was, yes.

20   Q    And what physician was treating you at the time that --

21   A    My physician was Dr. Millie Tung.  And she sent me to

22   Dr. Eschbach for treatment for my anemia.

23   Q    Okay.  And did Dr. Eschbach treat you for your anemia?

24   A    He did.

25   Q    Okay.  And did Dr. Eschbach ever inform you at any time

 1    with respect to the medicine that he gave to you at that

 2    time for your treatment of anemia?

 3    A    At that time, I knew that I was testing, I was in the

 4    last phase of tests for a drug that would increase my

 5    hematocrit; later I knew that it was EPOGEN.

 6              **MS. BEN-AMI:**  Objection, your Honor.

 7    **Q**   How did you come to know later --

 8              **THE COURT:**  Wait one second.  Wait one second.

 9    Your objection I think is timely.  I'm treating it as a

10    motion to strike.  But I'm going to get the next question

11    before I rule on it.

12              How did you come to know that?  You say you know.

13    How did you come to know?

14              **THE WITNESS:**  It was FDA approved in 1989 and I --

15              **THE COURT:**  Well, that's what that drug was.

16              **THE WITNESS:**  Yes.

17              **THE COURT:**  Okay.  Go ahead.

18              **THE WITNESS:**  And I was told that that's what I had

19    been --

20              **THE COURT:**  By whom?

21              **THE WITNESS:**  Dr. Eschbach.

22              **THE COURT:**  When?

23              **THE WITNESS:**  I don't remember the exact date.

24    Ah --

25              **THE COURT:**  Under what circumstances?

```
 1            THE WITNESS:  I'm sorry, I don't remember.  He told
 2   me and has told me many times over the years, and I spoke
 3   with him last month before he passed away.
 4            THE COURT:  Well, he's told you -- how long was he
 5   your treating physician?
 6            THE WITNESS:  He was not my specific nephrologist.
 7   But he was treating me for my anemia from 1987 to 1989.
 8            THE COURT:  Okay.  But in that period you didn't
 9   know what you were being treated with.  But you know you
10   were being treated and he was doing a study and you were
11   part of it.  Is that right?
12            THE WITNESS:  I may not have known the name then
13   and I may have known the name.  I just don't remember.
14            THE COURT:  I see.  But try my question.
15            THE WITNESS:  Yes.
16            THE COURT:  My question was he treated you over
17   that period because you were some part of a study that he
18   was running, right?
19            THE WITNESS:  Correct.
20            THE COURT:  Okay.  And at that time you weren't
21   clear what you were getting?
22            THE WITNESS:  I knew I was -- I don't know the name
23   of it, but I know I was testing a drug for Amgen that would
24   increase my hematocrit.  And it did.
25   Q    Subsequent --
```

1          **THE COURT:**  I'll let --

2          **MS. BEN-AMI:**  Your Honor, may --

3          **THE COURT:**  No, I'm going to allow the motion to

4     strike that this was the drug for now.

5          You may proceed, Mr. Day.

6     **Q**    Subsequent to the clinical trial but before this year,

7     so, 1989, 1990, after you ended the clinical trial, did you

8     ever discuss with Dr. Eschbach what drug --

9          **MS. BEN-AMI:**  Objection; leading.

10         **THE COURT:**  Yes, sustained.  Come to the side bar.

11    SIDEBAR CONFERENCE, AS FOLLOWS:

12         **THE COURT:**  Well, my, my problem is with the order

13    of the witness here.  Now, she's I guess trying to stay

14    consistent with her deposition testimony.  And when he was

15    treating her, because the study's treatment, she is unclear

16    what she is being treated with and I'm going to let stand

17    what she just testified to.  But you want to make it EPOGEN.

18         Now, the likelihood is that it is EPOGEN.  One

19    imagines you can prove that up some other way.  When you

20    have proved that up then we can hear from her.  But for now,

21    especially against their vigorous objection, I have problems

22    with this.

23         **MR. DAY:**  Let me be clear.  She was in a clinical

24    trial from 87 to '89 and her anemia was arrested.

25         **THE COURT:**  Yes.

```
 1            MR. DAY:  She had a transplant.  The transplant

 2   failed.  She had anemia again.  She was treated again.  And

 3   this time she treated herself and she self-administered it.

 4   She's been on this drug throughout this time period.

 5            THE COURT:  Yes.

 6            MR. DAY:  The clinical trial is --

 7            THE COURT:  Help me out.  When did she start

 8   self-administering herself?

 9            MR. DAY:  Well, I believe she started

10   self-administering in the late '1990's.

11            THE COURT:  Fine.  And --

12            MR. DAY:  She's had it since 1995.

13            THE COURT:  Right.  And if you want to get that

14   from her.  But the problem --

15            MR. DAY:  The diagnosis.  You said diagnosis.

16            THE COURT:  Yes.

17            MR. DAY:  So she, in '89, Eschbach, she got --

18            THE COURT:  Oh, in the '90's.

19            MR. DAY:  Yes.  We informed her right after the

20   clinical trial of what she got, the clinical trial.

21            THE COURT:  No, my problem is, and I'm going to

22   hear Ms. Ben-Ami, my problem is that he, she just told me

23   when he was her treating physician.  Apparently she's, she's

24   an Amgen person.  He's connected with Amgen.  They have

25   business reasons for talking.
```

1              **MR. DAY:**  No.

2          **THE COURT:**  Well, all right.  Then I need all that

3      foundation.  How did she come to go back to Eschbach?  You

4      know, was he in fact then her treating physician?  Now,

5      maybe I've misled her in my questions, but when I asked her

6      what I thought was an open-ended question, she gave me this

7      late '80's period when he treated her.

8              She wants to tell about conversations after he was

9      treating her.  And she's a nurse.  It does seem to me at the

10     time she's starting, self-administering, self-administering

11     it, it really would go to the weight, not to the

12     admissibility.  She's got something that's apparently

13     labeled EPOGEN and she's putting into her body.  I think I'm

14     going to allow her to testify that she thinks that's EPOGEN

15     and the jury can conclude that it is.  So for that later

16     period you're fine.

17             **MR. DAY:**  Yes.

18         **THE COURT:**  It's the earlier period, especially

19     given what she said on her deposition that I don't think

20     she's laid an adequate foundation that in the trial she got

21     EPOGEN.  I imagine she did.  I imagine that can be proved

22     up.  But not through her.  Because no one told her that

23     then.

24             Now, Ms. Ben-Ami, I'll hear you.  If I'm

25     sufficiently with you don't bother.  But if I'm not, what am

1    I missing here?

2         MS. BEN-AMI:  I don't think she can testify to what

3    she took in '87 and '89.  Amgen wants --

4         THE COURT:  So far she can't.

5         MS. BEN-AMI:  Okay.  As to 1995, what is this

6    relevant to?  Because they're putting her on for long-felt

7    need.  In 1995 the only patent had been out for a number of

8    years.  That drug had been out since 1989.  So there's --

9    what is this relevant to?

10        THE COURT:  No, no, he --

11        MS. BEN-AMI:  But today people take EPOGEN.

12   Hemodialysis people take EPOGEN.

13        MR. DAY:  I'm going into her past before 1987.  She

14   has a long history of anemia.

15        MS. BEN-AMI:  This is absolutely, absolutely

16   prejudicial.

17        THE COURT:  Well, of course.  It's intended to be

18   prejudicial.

19        MS. BEN-AMI:  You know, your Honor --

20        THE COURT:  That's another definition of relevance.

21        MS. BEN-AMI:  No, it's not, your Honor.  Because if

22   your Honor had this case come to trial before we were FDA

23   approved, we cannot put on a patient that says that they can

24   take our drug that deters anemia.  Because we're not FDA

25   approved, we're not allowed to do that.  So when you

1  consider the testimony of someone saying I took something, I

2  don't know what it was, but now I'm a motivational speaker,

3  this woman is a motivational speaker, that she's, she works

4  for an organization part-time sponsored by Amgen, and that

5  therefore she took the doctor, they go on the road or

6  whatever, they do whatever they did, you know, this, when

7  you compare that to the fact that this is an imminence case,

8  the actual infringement case, we cannot put up a patient

9  because we're not FDA approved, your Honor.

10       **THE COURT:**  What do you mean, I didn't follow the

11  last thing, imminence case.

12       **MS. BEN-AMI:**  This is a case on imminent

13  infringement.

14       **THE COURT:**  Oh, I see.

15       **MS. BEN-AMI:**  There's -- we can't put up a patient

16  because we're not FDA approved.  So this is --

17       **THE COURT:**  It's not germane to that.  And I think

18  it's sufficiently germane.  It goes to the weight, not the

19  admissibility.  I'll cabin her in.

20       **MS. BEN-AMI:**  It goes to the weight of what?

21       **THE COURT:**  It does go to the weight of long-felt

22  need.  He may have it.

23       (Whereupon the sidebar conference concluded.)

24  **BY  MR. DAY**

25  **Q**   Ms. Spaethe, subsequent to 1987 and 1989, the period of

1   this clinical trial of Dr. Eschbach, subsequent to that

2   time, over what time period have you used EPOGEN?

3   A   Excuse me.  I got a kidney transplant in '89 and it

4   began to fail in 1985 -- in 19, I'm sorry, in 1995.  And

5   prior to its failing I took EPOGEN.

6   **Q**   Who prescribed EPOGEN for you?

7   A   My physician.

8   **Q**   And you say you self-administered since 1995.  You also

9   self-administered EPOGEN?

10  A   Correct.

11  **Q**   Would you please explain to the jury what you understand

12  chronic kidney disease to be?

13          **MS. BEN-AMI:**  Objection, your Honor.

14          **THE COURT:**  Again, we've allowed witnesses to

15  express opinions.  This is -- she's a nurse.  She's a lay

16  witness.  But she, if you believe her testimony, suffers

17  from the condition.  She can tell us what she understands.

18  But understand she's a lay witness.  We could call a

19  nephrologist -- we've seen one -- who treats the condition.

20  And you're getting the views of a patient.  Have that in

21  mind.  But she may tell us.

22          What do you understand it is?

23          **THE WITNESS:**  When the kidney begins, when the

24  kidney fails you're not able to remove the toxins, the waste

25  products and the poisons from your blood that normally would

```
 1   be passed out through the urine, and the toxins build up and

 2   eventually will poison you if you don't go on dialysis.

 3          The other thing that happens when the kidney isn't

 4   working is that the kidney produces a hormone called

 5   erythropoietin.  And that hormone goes to the bone marrow

 6   and stimulates it to make red blood cells.  And the red

 7   blood cells have hemoglobin on them that carry oxygen.  So

 8   when the kidney fails not only do you build up toxins and

 9   poisons in your blood, but you aren't able to make this

10   hormone that helps you make red blood cells and so you

11   become anemic.

12   Q   When were you first diagnosed with chronic kidney

13   disease?

14   A   When I was 11 in 1959.

15   Q   When did you first experience anemia of chronic kidney

16   disease?

17   A   I think I began to experience it before I was diagnosed.

18   Q   What were the symptoms of your anemia?

19   A   I was tired.  I was a relay runner.  I couldn't run my

20   relays as fast.  I couldn't brush my hair.  It was too --

21   very difficult.

22          I'd run a, I won a race skiing, snow skiing, and

23   two years later I couldn't walk from the lodge to the lift.

24          When my children were young it was very difficult

25   to take care of them, to send them to their room when they
```

1    were naughty.  I would get exhausted.

2            It was really hard to climb stairs.  I was short of

3    breath.  I wanted to sleep all the time.  My children were

4    frightened by that.  I, ah, I just -- I was tired.  I was

5    exhausted.  I was short of breath and I was really, really

6    cold.  I bundled up in lots and lots of sweaters.

7    **Q**   Were you able to work?

8    A    Not at that time.

9    **Q**   You mentioned that you've had four kidney transplants?

10   A    Yes.

11   **Q**   Did the transplants correct your anemia?

12   A    The first three transplants corrected my anemia and my

13   hematocrit was around 40.  But this last transplant that I

14   got in 2000, within a couple of years was, my hematocrit was

15   dropping.  And I was becoming really tired.  And I was

16   working full-time at that time and I wanted to be able to

17   continue working.  So I talked to my doctor and he started

18   me back on EPOGEN.

19   **Q**   In 1987 --

20           **THE COURT:**  Who was your doctor at that time,

21   ma'am?

22           **THE WITNESS:**  My doctor at that time was and is

23   currently still my doctor, Cyrus Cryst.

24   **Q**   In 1987 when you participated in Dr. Eschbach's clinical

25   trial, were you receiving any treatment for your kidney

1    disease?

2    A    I was on dialysis.

3    Q    And did your dialysis treatments treat your anemia?

4         MS. BEN-AMI:  Objection, your Honor; leading.

5         THE COURT:  What effect did the dialysis treatments

6    have?  You may answer my question.

7         THE WITNESS:  The dialysis treatments removed the

8    toxins, but they didn't treat the anemia.  In fact, the

9    blood gets left in the kidney that doesn't, not everything

10   comes back to you, it kind of coats the tubing and gets

11   caught in the cracks of the kidney.  So you do lose a little

12   blood each time you dialyze.

13   Q    You said it gets caught in the kidney.  Did you mean the

14   kidney dialysis machine?

15   A    Yes, the dialyzer.  The artificial kidney, yes.

16   Q    Before 1987 did you receive any treatment for your

17   anemia?

18   A    I received blood transfusions.  I took iron.  And at one

19   time I was given a male hormone called Decadurabolin.

20   Q    What do you understand Decadurabolin to be?

21   A    I understand it to be a male hormone.  They thought that

22   since males have higher hematocrits --

23        MS. BEN-AMI:  Objection, your Honor.  I'm sorry.

24        THE COURT:  Yes, sustained.  Sustained.

25   Q    What effect, if any, did Decadurabolin have on you?

```
1    A    My face became discolored.  I grew facial hair.  My

2    voice got deep.  But my hematocrit didn't get better.

3    Q    Did it have any effect on your anemia?

4    A    No.  It didn't improve it.

5    Q    You also mentioned iron.  Did the iron have any effect

6    on your anemia?

7    A    No.  In fact, sometimes we got too much iron.

8    Q    How?

9    A    Because we couldn't use it.

10   Q    You also mentioned blood transfusions.  Did you receive

11   blood transfusions for your anemia?

12   A    In the 1960's and '70's when I was on dialysis we got

13   one or two blood transfusions a month.

14        MS. BEN-AMI:  Your Honor, I apologize.  But when

15   the witness is saying we, could we confine her to what she

16   got.

17        THE COURT:  Yes.  Yes.  I think that's right.  I

18   mean --

19        THE WITNESS:  I will say I.  I'm sorry.

20        THE COURT:  Very well.

21        MS. BEN-AMI:  I'm sorry, your Honor.

22   A    In the 1960's and '70's I got two, one or two

23   transfusions per month.  In the early '80's they were not

24   giving us blood transfusions unless we were really

25   desperate.
```

1          **THE COURT:**  You're talking like a group of --

2          **THE WITNESS:**  I'm sorry.  I'm sorry.

3          **THE COURT:**  Again you're here, you're the witness

4     who can be examined, and you're the one under oath.

5          **THE WITNESS:**  I apologize.  I speak to groups of

6     people about we a lot so I'm --

7          **THE COURT:**  You may, but not here.

8          **THE WITNESS:**  I understand.  Thank you for

9     correcting me.

10         **THE COURT:**  So in the '80's how did your treatment

11    change?

12         **THE WITNESS:**  I didn't get as many blood

13    transfusions because there was a fear that I would get

14    antibodies from those blood transfusions that would keep me

15    from getting another kidney transplant because the

16    antibodies fight anything that's foreign.

17         Also, there were two viruses in the community --

18         **MS. BEN-AMI:**  Objection, your Honor.

19         **THE WITNESS:**  -- that were --

20         **THE COURT:**  Yes.  Yes, sustained.  Sustained.  I'm

21    allowing this testimony under 701, and I'll sustain it at

22    this point.

23         But you go ahead, Mr. Day.

24    **Q**   Did you --

25         **THE COURT:**  Your treatment changed.  And just tell

1   us how did it change, without giving what you think the

2   explanation is.  How did your treatment change in the '80's?

3        **THE WITNESS:**  I got very rare blood transfusions.

4   Q   Did you ever inquire of your physicians why you were

5   receiving less transfusions in the 80's?

6   A   Because the antibody --

7        **THE COURT:**  No, did you?

8   A   Yes, I did.

9   Q   What did your physicians tell you?

10  A   He told us that antibodies in the blood would make it

11  difficult to get a kidney transplant.  He also told us that

12  he didn't want to get these diseases that were in the

13  community.

14       **MS. BEN-AMI:**  Your Honor?

15  A   And they didn't know how to test for them yet.

16  Q   Now, you said us.

17  A   Us.  I'm sorry, I.

18  Q   Are you talking about yourself?

19  A   They didn't want me to get an illness that was out in

20  the community, and they didn't know how to test for these

21  yet in the blood.

22  Q   Did the reductions in transfusions during the 1980's

23  affect your anemia?

24  A   They did.

25  Q   How?

1    A    My hematocrit ran from 11 to 15.

2    Q    And what does that mean in terms of your anemia?

3    A    Well, a normal hematocrit for a woman is around 36, 38.

4    And mine was 15.  And at one time I knew it was 11 and my

5    neighbors had to drive me to the blood bank.

6    Q    How did it affect the symptoms of your anemia?

7    A    How did what affect the symptoms?

8    Q    Having a hematocrit of 11 or 15.

9    A    It was very difficult to function at all.  It was hard

10   to get up off the couch.  It was -- I wanted to sleep all

11   the time.  I was exhausted.  I was short of breath even

12   climbing one or two stairs.  And I was extremely cold.

13   Q    Now, since 1989 you mentioned, this is now going forward

14   after 1989, you participated in a clinical trial in 1987 and

15   1989.

16   A    Correct.

17   Q    You received a product in that trial that was made by

18   Amgen?

19           MS. BEN-AMI:  Objection, your Honor.

20   A    That's correct.

21           MS. BEN-AMI:  Leading.

22           THE COURT:  Sustained.  Don't lead the witness.

23   Q    Did you receive -- I'm sorry.

24           Do you understand who manufactured the product that

25   you received in that trial?

1    A    I knew that Amgen was making the product.

2    Q    Did you understand what the purpose of the product was?

3    A    I understood that the product was to raise my

4    hematocrit.

5    Q    Okay.  Did you have any response to that product?

6    A    I did.

7    Q    What response did you have?

8    A    Within a few weeks, I could run up the stairs.  I didn't

9    have to wear heavy sweaters.  I was not short of breath.  I

10   could play with my children.  We could go to the park.  I

11   could volunteer in their school.  I just -- I could get up

12   and fix dinner and do the laundry without having to take a

13   nap in between.

14   Q    Okay.  Since you began that clinical trial, have you had

15   any transfusions?

16   A    I had one transfusion when I got this kidney transplant

17   in 2000.

18   Q    Since 1987, how frequently have you received blood

19   transfusions?

20   A    Very rarely.

21   Q    Only one?

22   A    Just the one.

23        **MS. BEN-AMI:**  Objection, your Honor.

24        **THE COURT:**  No, I'll let that stand.

25   Q    Before 1987, how long did you experience the effects of

1    chronic anemia?

2    A    About 29 years.

3    Q    Over that entire time period did you ever find an

4    effective treatment for your anemia?

5            MS. BEN-AMI:   Objection, your Honor; leading.

6    A    No.

7            THE COURT:   I'll let that stand, but do not lead

8    the witness.

9    Q    Since 1987, have you found a treatment for your anemia?

10   A    Yes.

11   Q    What?

12   A    EPOGEN.

13   Q    Are you taking -- are you aware of any other treatment

14   that's effective for anemia?

15   A    Aranesp.

16   Q    What do you understand Aranesp to be?

17   A    Aranesp is EPOGEN --

18           MS. BEN-AMI:   Objection, your Honor.

19           THE COURT:   Sustained.   Sustained.   Sustained.

20   A    Aranesp is --

21           THE COURT:   Sustained means you don't answer.

22           THE WITNESS:   I'm sorry.   I haven't been here

23   before.

24   Q    Are you taking EPOGEN today?

25   A    No.

1    Q    What are you taking?

2    A    I'm taking Aranesp.

3    Q    Do you know who makes Aranesp?

4    A    Amgen.

5    Q    And are you being paid by anyone to be here today?

6    A    No.

7              **MR. DAY:**  I pass the witness, your Honor.

8              **MS. BEN-AMI:**  May I proceed, your Honor?

9              **THE COURT:**  You may.

10                      **CROSS-EXAMINATION**

11   **BY  MS. BEN-AMI**

12   Q    Good morning.

13   A    Good morning.

14   Q    My name is Leora Ben-Ami, I represent Roche, and I have

15   very few questions for you, then we'll let you on your way.

16              When you became ill, before you went into this

17   clinical study you did have a kidney transplant at

18   some point, correct?

19   A    Correct.

20   Q    And you also had dialysis, right?

21   A    Correct.

22   Q    And those are the things that save a person's life who

23   has chronic kidney disease, correct?

24   A    Most of the time.

25   Q    But that's what -- EPOGEN is not a replacement for

1    dialysis?

2    A    No.

3    Q    Or for a kidney transplant?

4    A    No.

5    Q    Now, in the year -- there came a point, and you said in

6    1995 or something you took EPOGEN, right?

7    A    Yes.

8    Q    And at that point you and your doctor talked together

9    and came up with a choice for your treatment, right?

10   A    There was only one choice.

11   Q    Okay.  Well, you could have not taken EPO?  EPOGEN?

12   A    Correct.

13   Q    Or you could have risked taking a transfusion, right?

14   A    He would not have given me a transfusion.

15   Q    Okay.  So, the choice you and your doctor made together

16   was to take EPOGEN, right?

17   A    Correct.

18   Q    And then in 2000 the choice you and your doctor made was

19   to take Aranesp, right?

20   A    I think it was about 2002.

21   Q    Okay.  2002.

22   A    Actually I took EPOGEN in 2002 before I went back to --

23   before I took Aranesp.

24   Q    Okay.  So there came a point in time in the 2000's,

25   somewhere, that you and your doctor made another choice, to

```
1    try Aranesp, right?

2    A    Actually I suggested it to him.

3    Q    Okay.

4    A    And he agreed that I could try it, yes.

5    Q    Okay.  So, now you had two choices.  Right?

6    A    Correct.

7    Q    But both those choices are Amgen choices, right?

8    A    Correct.

9    Q    And you don't have any other choice but to use Amgen

10   products right now?

11   A    Correct.

12   Q    So you don't have choice of all the treatment options

13   that might be available to you by others, correct?

14   A    I don't, I don't feel I need anything else.

15   Q    But for you individually that may or may not be true.

16   But you don't have --

17          MR. DAY:  Objection, your Honor.

18   Q    -- choices from other companies?

19          THE COURT:  No, no.

20          MR. DAY:  Objection, your Honor.  I simply move to

21   strike the statement.

22          THE COURT:  The motion to strike's denied; her

23   answer may stand.

24   Q    You don't -- you haven't been given the opportunity to

25   consider other companies' products yet, have you?
```

```
 1   A    No.

 2              MS. BEN-AMI:  Thank you, ma'am.

 3              THE COURT:  Nothing further for this witness,

 4   Mr. Day?

 5              MR. DAY:  Nothing further, your Honor.

 6              THE COURT:  You may step down, thank you.

 7              (Whereupon the witness stepped down.)

 8              THE COURT:  Call your next witness.

 9              MR. DAY:  Amgen calls Dr. Stuart Orkin.

10              THE COURT:  He may be called.

11              THE CLERK:  Sir, there's water in the pitcher for

12   you, with a cup.

13              THE WITNESS:  Thank you.

14              THE CLERK:  And would you raise your right hand.

15              Do you solemnly swear that the answers you will

16   give to this Court and Jury will be the truth, the whole

17   truth, and nothing but the truth, so help you God?

18              THE WITNESS:  I do.

19              THE CLERK:  Please be seated.

20              MR. FLOWERS:  Good morning, your Honor.  Good

21   morning, Doctor.

22              THE COURT:  I've lost your name.

23              MR. FLOWERS:  I was afraid of that.  My name is

24   Kevin Flowers.  I represent Amgen.

25              THE COURT:  Yes, Mr. Flowers, forgive me.  Go right
```

```
 1    ahead.
 2                    STUART H. ORKIN
 3                 DIRECT EXAMINATION
 4    BY  MR. FLOWERS
 5    Q    Good morning, Doctor.
 6    A    Good morning.
 7    Q    Could you please introduce yourself to the jury?
 8    A    I'm Dr. Stuart H. Orkin.
 9    Q    Where do you live, Doctor?
10    A    I live in Brookline, just outside of Boston, Mass.
11    Q    And what do you do for a living?
12    A    I'm a professor at Harvard Medical School and a
13    physician.  So I do research, I teach, and I oversee
14    clinical activities.
15    Q    How long have you been on the faculty at Harvard?
16    A    I've been on the faculty at Harvard for nearly 30 years.
17    Q    And what's your current title at Harvard?
18    A    My current title is the David G. Nathan Professor of
19    Pediatrics at Harvard Medical School.
20    Q    Do you hold any other professional positions?
21    A    Yes.  I'm also chairman of the Department of Pediatric
22    Oncology at the Dana Farber Cancer Institute.
23    Q    What is pediatric oncology?
24    A    Pediatric oncology is the specialty that deals with
25    childhood cancer.
```

1    Q    Before we talk any further about your background, let's

2    talk about why you're here.

3         You've been retained to provide expert consulting

4    in this case, correct?

5    A    Correct.

6    Q    And as an expert consultant you've been asked to provide

7    your opinions about scientific topics?

8    A    Correct.

9    Q    Can you briefly summarize the topics about which you are

10   prepared to testify to the jury?

11   A    I'm prepared to testify regarding cloning of

12   erythropoietin, and specifically the state of cloning

13   activities in 1983, and also my firsthand experience with

14   attempts to clone erythropoietin in that time frame.  And

15   I'll provide opinion as to whether that cloning was simple,

16   predictable, or obvious.

17   Q    Why do you feel that you're qualified to testify about

18   the difficulty cloning EPO back in 1983?

19            MS. BEN-AMI:  Objection, your Honor; leading.

20            THE COURT:  No, it's not leading.  Overruled.

21         The why.  Why do you think you're qualified to

22   testify about that?

23         THE WITNESS:  I believe I'm qualified because in

24   fact my own laboratory starting in 1980 was engaged in gene

25   cloning and we were in fact in my own laboratory trying to

1    clone erythropoietin as well.

2    **Q**   Were you able to clone erythropoietin back in that time

3    frame?

4    A   No, I --

5             **MS. BEN-AMI:**  Objection, your Honor.

6             **THE COURT:**  Sustained.  Don't lead the witness.

7    **Q**   Were you successful --

8             **THE COURT:**  Sustained.

9    **Q**   Were you or were you not successful?

10            **MS. BEN-AMI:**  Objection, your Honor.

11            **THE COURT:**  That's a way of asking it.  How did you

12   do?

13            **MS. BEN-AMI:**  Your Honor, can I --

14            **THE WITNESS:**  Okay.

15            **MS. BEN-AMI:**  Can I --

16            **THE COURT:**  Wait a minute.  Wait a minute.  She has

17   every right to object to the questions whoever asks them.

18   And I'm very respectful of that, of everybody.

19            Do you object to that?

20            **MS. BEN-AMI:**  I only ask that there be the time

21   frame up until 1983, your Honor.

22            **THE COURT:**  We'll for the moment accept that and

23   see what Mr. Flowers does.

24            How did you do up until '83?

25            **THE WITNESS:**  Unfortunately, we failed.

1              **THE COURT:**  Go ahead, Mr. Flowers.

2              **MR. FLOWERS:**  Thank you, your Honor.

3      **Q**   Now, the first Roche witness in this case a couple of

4      weeks ago was Dr. Lowe.  I think I'm pronouncing that

5      correctly.

6              You're aware, aren't you, that Dr. Lowe offered his

7      opinion that it was routine or obvious to clone EPO back in

8      1983?

9              **MS. BEN-AMI:**  Objection, your Honor.  Can I have a

10     side bar, please?

11             **THE COURT:**  You may.  I would sustain an objection

12     to that question.  You may suggest to him.  But the jury's

13     listening to the testimony.  You're not to state the

14     testimony of a prior witness.  So that question wasn't,

15     wouldn't get it.  But if you said if I suggested to you that

16     there's been evidence that thus and so, then you can ask the

17     question.

18             Now, if you reframe it, do you still object?

19             **MS. BEN-AMI:**  I need a quick side bar, your Honor.

20             **THE COURT:**  You may have it.

21             **MS. BEN-AMI:**  I'm sorry.  It will take two minutes.

22             **THE COURT:**  That's all right.

23     SIDEBAR CONFERENCE, AS FOLLOWS:

24             **MS. BEN-AMI:**  Ready, Don?

25             I may have misunderstood the question.  But the

 1   question and response suggested that this witness is not

 2   sequestered according to the rules, that he's not allowed to

 3   read transcripts.

 4        **MR. FLOWERS:**  Your Honor, he's not been reading the

 5   transcripts.

 6        **MS. BEN-AMI:**  Okay.

 7        **MR. FLOWERS:**  He is sequestered.

 8        **MS. BEN-AMI:**  So you said you know that he said

 9   this during the first day of trial.

10        **THE COURT:**  I understand.  I understand.

11        **MS. BEN-AMI:**  That was all.

12        **THE COURT:**  It's taken care of.  Ask it my way.

13        **MR. FLOWERS:**  Your Honor, could I inquire, are we

14   allowed to, am I to just suggest to the witness that Dr.

15   Lowe has testified to certain things in trial?  Because this

16   is an odd situation where they weren't able to, an expert is

17   not able to see --

18        **THE COURT:**  It's not an odd situation at all.  You

19   simply say if I suggest to you that there has been testimony

20   that thus and so.

21        **MR. FLOWERS:**  Okay.

22        **THE COURT:**  We're not interested in how.  I mean,

23   one, you've got daily copy.  If you want to show him that

24   now on the stand, you may do that.  But you can proceed as

25   you see fit.  But you simply can't state the testimony which

1   carries with it perhaps an, in effect, spin and I'll be

2   having objections every second.

3          **MR. FLOWERS:**  Okay.

4          **MS. BEN-AMI:**  I'm trying to avoid that, your Honor.

5          (Whereupon the sidebar conference concluded.)

6          **THE COURT:**  Just so we're clear, we started at

7   9:30, so we're going to go to 11:00, take a briefer recess

8   and stay right on track.

9          Go ahead, Mr. Flowers.

10         **MR. FLOWERS:**  Thank you, your Honor.

11  **Q**   Dr. Orkin, I want to suggest to you that Dr. Lowe has

12  offered his opinion to the jury in this case that cloning

13  the EPO gene in 1983 or 1984 was obvious.  I would like you

14  to proceed with that assumption.

15         I just want to go back and ask you, as part of your

16  expert work in this case you did review Dr. Lowe's expert

17  reports, correct?

18  A   That is correct, I did review his reports.

19  **Q**   And you reviewed the documents that he cited in his

20  reports?

21  A   I have reviewed those documents.

22  **Q**   And did you submit an expert report addressing his

23  opinion regarding cloning?

24  A   Yes, I submitted an expert report and also a rebuttal

25  report.

1    **Q**   Okay.  And those are the two reports, the light blue and

2    yellow reports that you have in front of you?

3    **A**   Correct.

4           **THE COURT:**  I do not have them if that concerns

5    anyone.

6           Go ahead.

7           **MS. BEN-AMI:**  Your Honor, could I just ask which

8    one is which color.

9           **MR. FLOWERS:**  I'm sorry, the blue, the light blue

10   is the rebuttal report.

11          **MS. BEN-AMI:**  Oh.

12          **MR. FLOWERS:**  And the yellow is the supplemental

13   report.

14          **MS. BEN-AMI:**  Thank you, for the record.

15   **Q**   And, again, did you review Dr. Lowe's opinions in those

16   reports regarding cloning the EPO gene back in 1983-1984?

17   **A**   Yes, I did review his opinions in those reports.

18   **Q**   And what did you think about Dr. Lowe's opinion that

19   cloning the EPO gene was obvious back in 1983 or 1984?

20          **MS. BEN-AMI:**  Objection, your Honor; outside the

21   report.

22          **THE COURT:**  Well, that's pretty general.  It

23   wouldn't surprise me if there's disagreement here.

24          But won't you ask a more precise question,

25   Mr. Flowers.

1    **Q**   Dr. Orkin, did you agree, or do you agree -- let me

2    restate it.

3            Do you agree with Dr. Lowe's opinion that cloning

4    the EPO gene in 1983 or 1984 was obvious or routine?

5            **MS. BEN-AMI:**  Objection, your Honor.  Can we have a

6    side bar, this is an important point.

7            **THE COURT:**  We may.

8    SIDEBAR CONFERENCE, AS FOLLOWS:

9            **THE COURT:**  What is it?

10           **MS. BEN-AMI:**  Every opinion that this doctor gave

11   was until 1983.  No 1984.  Every opinion he gave.  So, when

12   they start trying to add -- they are now trying to squeeze

13   in 1984.  And I'm going to object to every question.

14           **THE COURT:**  I'll be alert to it.  That's right,

15   isn't it, Mr. Flowers?  '83?

16           **MR. FLOWERS:**  I know --

17           **MS. BEN-AMI:**  I've gone through this over and over

18   again.

19           **THE COURT:**  Well, I don't impugn it, but I'll give

20   him a chance.  It looks to me like '83.

21           **MR. FLOWERS:**  He has opined -- you can look, it's

22   Paragraph 20, your Honor, first sentence.

23           **THE COURT:**  Right.  Just a moment.  Yes.

24           **MR. FLOWERS:**  Paragraph 20, first sentence, up

25   through December 1983.

1              THE COURT:  Right.

2              MR. FLOWERS:  So the end of 1983.

3              THE COURT:  Well, that's all she's saying, '83.  So

4      let's confine it to '83.  I'll be alert to it.

5              (Whereupon the sidebar conference concluded.)

6              THE COURT:  Put another question, Mr. Flowers.

7      BY  MR. FLOWERS

8      Q    Dr.  Orkin, do you agree with Dr. Lowe's opinion that

9      cloning the EPO gene was obvious or routine by the end of

10     1983?

11     A    No, I do not agree at all.  I believe it was not

12     obvious, it was exceedingly difficult, and I believe given

13     our own experience in the laboratory, we would have

14     succeeded if it had been that simple and obvious.

15     Q    Why do you say that?

16             MS. BEN-AMI:  Objection, your Honor; vague.

17             THE COURT:  Overruled.  He may testify consistent

18     with his report up through '83.

19     A    Because during that period of time, from 1980 until

20     1983, we were actively cloning genes in my own laboratory

21     and had the kind of expertise that I think would have been

22     required.

23             In addition, because I was fortunate to have my

24     laboratory at Harvard Medical School, we have trainees or

25     scientists in the laboratory who are not just average, I

1   would say, I would say they're well above average.  So I

2   thought we had the experience and the expertise to at least

3   have a shot.

4   Q   So, why do you think you failed to clone the EPO gene in

5   that 1980 to the end of 1983 time frame?

6           **MS. BEN-AMI:**  Objection, your Honor; not in his

7   report.

8           **THE COURT:**  Yes, where is it?

9           **MR. FLOWERS:**  It's in the light blue report, your

10  Honor.

11          **THE COURT:**  Yes.

12          **MR. FLOWERS:**  The rebuttal report, Paragraph 38.

13  And then continuing on from 39 through 41.

14          **THE COURT:**  Just a moment.  Well, he may testify

15  consistent with those paragraphs.

16          Overruled.  Proceed.

17  Q   Do you have your expert report there, Doctor?

18  A   Yes.

19          **THE COURT:**  Well, you didn't ask about 41.  So

20  we're not just going into 41 now.  But 38 through 40.

21          Go ahead.

22  Q   So, Doctor, why do you think that you and your lab

23  failed to clone the EPO gene by the end of 1983?

24  A   I think the primary reason was as I sit, as I said in

25  the report, that there was very little known about

1    erythropoietin at that time and we had to make best guesses

2    at various --

3                **MS. BEN-AMI:**  Objection, your Honor.

4    A    -- places along the way.

5                **THE COURT:**  No, no, that may stand.

6    A    And so we attempted various approaches to the cloning.

7    We didn't, we didn't just use one approach.  We used several

8    different approaches, each with its own potential problems,

9    and yet in aggregate we still did not succeed.

10   Q    Let's back up a little bit.  Where did you go to school?

11   A    I was an undergraduate at MIT in Cambridge, and received

12   my medical degree at Harvard Medical School.

13   Q    And after medical school, what did you do?

14   A    After medical school, I entered clinical training and

15   was a pediatric resident at the Children's Hospital here in

16   Boston, and then moved to the National Institutes of Health

17   in Bethesda, Maryland, to receive research training, and

18   then moved back to Boston and completed clinical training in

19   pediatrics, and then specialty training in hematology and

20   oncology.

21   Q    And when did you become a professor at Harvard?

22   A    I first joined the faculty in 1978.

23   Q    Now, what do you as a professor of pediatrics at

24   Harvard?

25   A    As a professor of pediatrics, I'm engaged in training

1    students who are learning to be doctors, training

2    specialists who are learning to be involved in hematology

3    and oncology.  So I teach, I also direct a research

4    laboratory, and participate in committees for the medical

5    school.

6    Q   So how many scientists have you trained over the years?

7    A   I've trained approximately 85 students and fellows.

8    Q   In what subject areas?

9    A   These fellows have worked in general molecular biology

10   or cloning and the study of hematology or blood.

11   Q   And how many scientists are you currently training?

12   A   Currently, I have about 25 such individuals in my own

13   laboratory.

14   Q   I think you mentioned the Dana Farber Cancer Institute.

15   What is that?

16   A   The Dana Farber Cancer Institute is one of the

17   affiliated clinical institutions for the Harvard Medical

18   School, and it's committed to the care of patients with

19   cancer and the study of cancer itself.

20   Q   And what do you do as the chairman of the Department of

21   Pediatric Oncology?

22   A   As chairman of the Department of Pediatric Oncology, I'm

23   responsible for all activities of care and research of

24   childhood cancer.  So, I oversee the clinical activities

25   which involve the Jimmy Fund Clinic, which is the clinic at

1    the Dana Farber that's supported by the Jimmy Fund

2    philanthropy, takes care of children with cancer.  I oversee

3    the care of patients with cancer at the Children's Hospital

4    for which we have a joint arrangement.  And I oversee all

5    promotions, appointments in the department, as well as serve

6    on executive committees for the institution.

7              MS. BEN-AMI:  Objection, your Honor.  I think

8    it's --

9    A   And I'm a trustee of the Dana Farber.

10             MS. BEN-AMI:  I'm sorry.  I'm sorry.

11             THE COURT:  All right, it's objected to.  But I'll

12   let that stand.

13   Q   So a professor at Harvard and chairman at the department

14   at the Dana Farber.  Do you hold any other professional

15   positions?

16   A   I'm also what's called an investigator for the Howard

17   Hughes Medical Institute.

18   Q   And what is that?

19   A   That's a private foundation that supports --

20             MS. BEN-AMI:  Objection, your Honor.  I don't

21   believe this is in the expert report.

22             THE COURT:  Yes, where is it?

23             MR. FLOWERS:  I'll move on.

24             THE COURT:  You'll move on.

25             MR. FLOWERS:  I'll move on, your Honor.

1          **THE COURT:**  Fine.

2     **Q**   How long have you been a research scientist, Doctor?

3     **A**   I've been a research scientist for just about 40 years

4     now.  I published my first work as a senior student at MIT

5     in 1967.

6     **Q**   And what's been the focus of your scientific research?

7     **A**   For the majority of my career the focus has been

8     molecular biology, there's cloning, and the study of blood

9     and blood diseases.

10    **Q**   And what kind of research are you currently working on?

11    **A**   We're continuing the same research, plus also study

12    childhood cancer and mainly leukemia.

13    **Q**   Have you published your research?

14    **A**   Yes, I have.

15    **Q**   Approximately how many articles?

16    **A**   I've published approximately 400 articles, about 300

17    original publications.

18    **Q**   And have you served an editorial role on any journals?

19    **A**   I serve on the editorial board of several journals and

20    review papers widely for many of the journals.

21    **Q**   Other than getting your articles published, have you

22    received any recognition for your research?

23    **A**   Yes, I've received several awards and honors.  I was

24    elected to the National Academy of Sciences in 1991; the

25    Institute of Medicine in 1992; and the American Academy of

1    Arts and Sciences in 1993.  And a recent award in 2005 from

2    the American Association of Medical Colleges, which is the

3    organization of medical schools, I received a Distinguished

4    Research Award at that time.

5    **Q**    So, it sounds like you're pretty busy.

6           You've also been working as an expert consultant in

7    this case?

8    A    Correct.

9    **Q**    Are you being compensated for that work you do?

10   A    Yes, I am.

11   **Q**    Do you do any consulting for any other companies?

12   A    Yes, I do.

13   **Q**    Who?

14   A    Merck Pharmaceuticals.

15   **Q**    Are you compensated for the work that you do for Merck?

16   A    I am.

17   **Q**    So with that let's get back to the question of whether

18   it was obvious to clone the EPO gene by the end of 1983.

19          Can you explain to the jury what the term cloning

20   means?

21   A    Cloning involves the finding, the isolation, and then

22   the copying or the expansion of the number of copies of a

23   gene or piece of DNA that would direct a cell to make a

24   protein.

25   **Q**    So I want you to assume that Dr. Lowe has offered the

1    opinion that cloning means making multiple copies of a gene

2    or a DNA molecule.

3              Would you agree with that definition?

4    A   I would not agree precisely.  That oversimplifies, it

5    only gives it part of the answer.  In addition to copying

6    and expanding the number of copies of a piece of DNA, you

7    have to be able first to find it and isolate it.  And the

8    finding and isolation were parts omitted from that

9    definition.

10   Q   So earlier you said that as a part of your research over

11   the last 40 years you've cloned genes.  Approximately how

12   many genes?

13   A   Several dozen.

14             **MS. BEN-AMI:**  Objection, your Honor.

15             **THE COURT:**  Grounds?

16             **MS. BEN-AMI:**  Not in the report.

17             **THE COURT:**  Where is it?

18             **MR. FLOWERS:**  The light blue report, your Honor,

19   Paragraph 3, which is Page 3, Paragraph 3.

20             **MS. BEN-AMI:**  I don't see it.

21             **MR. FLOWERS:**  The third sentence.

22             **THE COURT:**  Well, many it says there, and here he

23   says several dozens.  I'll let it stand.

24             Go ahead.

25   Q   Doctor, you said earlier you started cloning genes in

1    1980.  What genes did you clone in the early 1980's?

2    A    In 1980, we cloned genes that are part of hemoglobin,

3    carries oxygen in the cell.  We cloned the alpha and

4    beta-globin genes.  These were human genes.

5    Q    Did you clone any cDNAs?

6    A    And then starting about 1982 we cloned a number of

7    cDNAs.  And those included cDNAs for particular enzymes,

8    adenosine deaminase, antithrombin, and also phosphoglycerate

9    kinase.

10   Q    And why do you believe you were successful in cloning

11   those cDNAs in the early 1980's?

12        **MS. BEN-AMI:**  Objection, your Honor; not in his

13   report.

14        **THE COURT:**  Where is it?

15        **MR. FLOWERS:**  Light blue report, your Honor, Page

16   42, Paragraph 82.  Paragraph 82, fourth line, it's talking

17   about --

18        **THE COURT:**  Well, please.  No, I can read.

19        Yes, he may testify consistent with the report.

20        **MR. FLOWERS:**  Also Page 44, your Honor,

21   Paragraph 86.

22        **THE COURT:**  And 86 as well.  You may answer the why

23   question.

24   Q    Doctor, why do you believe that you were successful in

25   cloning those cDNAs in that period leading up to the end of

1    1983?

2    A    We believe we were successful because the particular

3    cDNAs we cloned as proteins were relatively well understood

4    at that time period and we had --

5          MS. BEN-AMI:   Objection, your Honor.

6          THE COURT:   No, overruled.   Go ahead.

7    A    -- and we had sufficient information about where these

8    proteins were produced in the body, which is critical, and

9    they also were produced at relatively large amounts which

10   made the task of finding the cDNAs relatively easy.

11         MS. BEN-AMI:   Objection, your Honor; it's not in

12   his report.

13         THE COURT:   We'll let it stand.

14   Q    So, Doctor, what kinds of techniques were you using to

15   clone genes or cDNAs in 1983?

16   A    In 1983, we were using basically all the available

17   techniques for gene cloning.   In addition to cDNA, we were

18   doing genomic cloning as I mentioned with the globin genes.

19   Plus for the cDNAs we were using various methods which

20   included the use of short DNA probes, so-called

21   oligonucleotide probes.

22         THE COURT:   Mr. Flowers, it's time for the morning

23   recess.   Shall we take the recess now?

24         MR. FLOWERS:   Thank you, your Honor.

25         THE COURT:   We'll take the recess for only 15

1    minutes and stay right on track.

2           Please keep your minds suspended because you have

3    not heard all the evidence.  Do not discuss the case either

4    among yourselves nor with anyone else.

5           You may stand in recess for 15 minutes until 11:15.

6           **THE CLERK:**  All rise for the jury.

7           (Whereupon the jury left the courtroom.)

8           (Recess.)

9           **THE CLERK:**  All rise for the jury.

10          (Whereupon the jury entered the courtroom.)

11          THE CLERK:  Court is in session, please be seated.

12          **THE COURT:**  Proceed, Mr. Flowers.

13          **MR. FLOWERS:**  Thank you, your Honor.

14                  **DIRECT EXAMINATION** (Cont'd)

15   **(BY MR. FLOWERS:)**

16   **Q.**  Dr. Orkin, we were just talking about techniques that

17   you were using back in the 1980 to 1983 time period.  You

18   had mentioned cDNA.  Can you remind us what cDNA is?

19   A.  CDNA is a copy of the messenger RNA in a cell.  The

20   messenger RNA is what instructs the cell to make a

21   particular protein.  So it's just a copy of that into DNA.

22   **Q.**  And you also mentioned genomic DNA.  Can you remind us

23   what genomic DNA is?

24   A.  Genomic DNA is the DNA that's already in your

25   chromosomes in the nucleus, so there's no messenger RNA

1    there.  It's just the DNA within the cell.

2    **Q.**  Now, in your expert report, the blue expert report that

3    you put in in this case, did you talk about how one of

4    ordinary skill went about trying to clone EPO back in 1983?

5    A.  Yes, I did.

6    **Q.**  And did you include any demonstrative exhibits to

7    illustrate that process?

8    A.  Yes.  We have one on cDNA cloning.

9        **MS. BEN-AMI:**  Objection, your Honor.  We need a

10   sidebar.

11       **THE COURT:**  You may.

12   SIDEBAR CONFERENCE, AS FOLLOWS:

13       **MS. BEN-AMI:**  There is no description of this

14   demonstrative in his report, and you wouldn't let Dr. Lowe

15   testify if he didn't have a description.

16       **THE COURT:**  No, I'm not sure I -- that wasn't the

17   line, about a description.  He's not going to be allowed to

18   describe it unless the testimony is in the report.  He may

19   put this up and say, Doctor, what's this?  This is the

20   protein source --

21       **MS. BEN-AMI:**  That's what I was saying.

22       **THE COURT:**  That's all.  I'm going to hold him to

23   this.  If it's not in the report, we're not going to use the

24   demonstrative as a basis for extensive testimony.

25       **MS. BEN-AMI:**  Excuse me.  Okay.  That's all -- that

1    was it.

2              (Whereupon the sidebar conference concluded.)

3    **(BY MR. FLOWERS:)**

4    **Q.**  Dr. Orkin, can you just tell us what this slide shows,

5    generally?

6    A.  This slide outlines the steps to cloning a cDNA in 1983,

7    and it illustrates two aspects of the cloning, which are

8    important.  On the left is shown what's called the

9    preparation of the probe, the oligonucleotide or short DNA

10   probe that would be used to find the cDNA.  And on the other

11   side, is the preparation of what's called the cDNA library,

12   or those are the targets that one wants to search through.

13            So you have a probe and targets, and you need both

14   of those in order to do cDNA cloning.

15   **Q.**  So the steps from top to bottom on the left are the

16   generation of the probes?

17   A.  That's correct.

18            **MS. BEN-AMI:**  Objection, your Honor.  Leading.

19            **THE COURT:**  Yeah, do not lead the witness.  That's

20   stricken.

21   **Q.**  Doctor, starting on the right side, how did one go about

22   creating a target or a library in which to search?

23   A.  In order to make a library of cDNA clones, that is a

24   clone of all the messengers in a cell, one has to first

25   identify a source of tissue in the body or other cells which

1   actually produce the protein.  So that's the first step,

2   find the source of the messenger RNA.

3          And then after one has that source, one can proceed

4   with isolating the messenger RNA, and then making the cDNAs

5   that make up the whole library.  But the -- it's important

6   to emphasize that what one needs here is a source, and you

7   have to be sure that that source actually makes or produces

8   the protein, because if it doesn't --

9          **MS. BEN-AMI:**  Objection, your Honor.  Now we're

10  outside the scope.

11         **THE COURT:**  Yes.  We're certainly beyond the

12  demonstrative.  So I'll stop it there.

13  **Q.**  Doctor, in talking about a source of messenger RNA, was

14  a known source of messenger RNA enriched for the EPO

15  messenger RNA, known by the end of 1983?

16         **MS. BEN-AMI:**  Objection, your Honor.  I do need a

17  sidebar on this.

18         **THE COURT:**  Well, that question is leading, so I'll

19  sustain it.  And we'll see if he can go at it another way.

20  **Q.**   In terms of a source of messenger RNA, Doctor, for

21  making a library, was such a source known for EPO, in 1993?

22         **MS. BEN-AMI:**  I'm sorry.  Objection, your Honor.

23  Legal issue.

24         **THE COURT:**  All right.  I'll hear you.

25

1    SIDEBAR CONFERENCE, AS FOLLOWS:

2           **THE COURT:**  Okay.  He's going to say no, and so

3    what's the issue?

4           **MS. BEN-AMI:**  The issue is, this was the issue of

5    the binding nature of the background of the invention that I

6    made a motion in limine on.

7           **THE COURT:**  Well, I've read -- I have all your

8    Orkin motions.

9           **MS. BEN-AMI:**  This was one with -- made before when

10   you said you denied it until it came up as an issue.

11          **THE COURT:**  Right.

12          **MS. BEN-AMI:**  The background of the invention is

13   binding admission --

14          **THE COURT:**  You've got to get to the point quickly.

15   This is a sidebar.

16          **MS. BEN-AMI:**  Okay.  In this background of the

17   invention, it tells you there's a source of messenger RNA

18   tissue.

19          **THE COURT:**  In the patent, it says that?

20          **MS. BEN-AMI:**  In the background of the invention.

21          **THE COURT:**  Yeah, all right.

22          **MS. BEN-AMI:**  That's a binding admission.  It

23   cannot be contradicted.

24          **THE COURT:**  So how do you deal with that?

25          **MR. FLOWERS:**  It's not a binding admission.

 1   There's not an admission that there was a source of EPO

 2   mRNA, your Honor.

 3          THE COURT:  Let me see the language that we're

 4   talking about.  But we're clear as to the law.  What you say

 5   here in patents are binding admissions?

 6          MR. FLOWERS:  We understand that.

 7          THE COURT:  Right.  All right.  You just say you

 8   didn't say that.

 9          Okay.  Where do they say there is --

10          MS. BEN-AMI:  Here, the reference, 1983, in --

11          THE COURT:  In 10, line what?

12          MS. BEN-AMI:  This is column 10, line --

13          MR. FLOWERS:  We're in two different patents.

14          MS. BEN-AMI:  I'm in the -- I can go to another

15   patent.  What patent --

16          THE COURT:  He's in '933.

17          MS. BEN-AMI:  I can use that one, if that makes it

18   easier.  It says here, "It was held that the results confirm

19   that the human kidney is a site of EPO expression and known

20   for the construction of an enriched DNA kidney cDNA library

21   from which the desired gene may be isolated."

22          THE COURT:  What do you say to that?

23          MR. FLOWERS:  That is only describing what the

24   paper, it was an abstract, your Honor, said.  It says it was

25   held in that abstract.  It's not an admission that that is

```
 1    true.

 2              THE COURT:  Wait a second.

 3              MR. FLOWERS:  The first -- may I, your Honor?

 4              THE COURT:  Yes.

 5              MR. FLOWERS:  The first part is speaking only about

 6    baboon.

 7              THE COURT:  Yeah.  Let me read it.

 8              MR. FLOWERS:  The second part is about human.

 9              THE COURT:  Let me read it.

10              (Pause in proceedings.)

11              THE COURT:  Well, I'll tell you what.  If you press

12    this question, and I'm going to let you, and we'll get his

13    answer, I'm going to, I'm going to put this language in

14    front of them right then and ask him, what do you say about

15    that?

16              MR. FLOWERS:  I can accept that, your Honor.

17              THE COURT:  Well --

18              MS. BEN-AMI:  It's a binding admission, so I don't

19    see if he says he disagrees with it --

20              THE COURT:  I'm not so clear.  It's not whether he

21    disagrees with it, it's -- no, you see, I do think the "it

22    was held" language, I will reveal, and point the jury to the

23    fact that this is pointed out in one of the patents.  And

24    he's entitled to disagree with these papers, but he's going

25    to have to disagree with the paper that they referenced
```

```
 1   right in their patent.  I think that's the fair way to

 2   proceed.

 3            MS. BEN-AMI:  Respectfully, your Honor, I don't

 4   think that's the law but I accept your Honor's decision.

 5            THE COURT:  All right.  Okay.

 6            MS. BEN-AMI:  Oh, your Honor, the Farber reference

 7   isn't in his report.

 8            THE COURT:  Well, it may be -- it may be, but I'm

 9   going to ask him about it.

10            (Whereupon the sidebar conference concluded.)

11            THE COURT:  You proceed, Mr. Flowers.

12            MR. FLOWERS:  Thank you, your Honor.

13   (BY MR. FLOWERS:)

14   Q.  Now, Doctor, by the end of 1983, what was known by one

15   of ordinary skill concerning whether there was a source of

16   EPO messenger RNA that was suitable for making a cDNA

17   library?

18            MS. BEN-AMI:  Objection, your Honor.  Leading.

19            THE COURT:  No, overruled.

20            MS. BEN-AMI:  I object --

21            THE COURT:  On that ground.

22            MS. BEN-AMI:  -- on the legal issue.

23            THE COURT:  Of course your rights are saved as to

24   that.

25            You may answer.  What was known, to your knowledge?
```

1          THE WITNESS:  In 1983, we did not know with any

2     confidence of a source of messenger RNA for cloning

3     erythropoietin cDNA.

4          THE COURT:  All right.  Is that your answer?

5          Now, take a look at this.  This is language out of

6     one of the Amgen patents, Amgen's own patents.  When it says

7     to the patent office, "More recently," and of course this is

8     back in that time period, and it says, so we can both see

9     it, "More recently" then this Farber article is cited, then

10    down here it says "it was held," and doesn't that mean

11    that's what, in essence, they're telling the patent office

12    and they're telling the public, this is what Farber had to

13    say?  Is that a proper reading of that, that language?

14         THE WITNESS:  I believe so.

15         THE COURT:  All right.  So they're saying to the

16    public, in the patent, and they've disclosed it to the

17    patent office, this Farber article says, back in this

18    period, that the results confirm that human -- confirm the

19    human kidney as a site of erythropoietin expression allowing

20    for the construction of an enriched human kidney cDNA

21    library from which the desired gene might be isolated, and

22    then they make another reference.

23         You see that language?

24         THE WITNESS:  Yes.

25         THE COURT:  Isn't that inconsistent with what you

```
 1   just said?

 2             THE WITNESS:  No, I don't believe so.

 3             THE COURT:  Tell me why.

 4             THE WITNESS:  Because, in fact, it's, in order to

 5   be useful as a library to clone to cDNA, the message has to

 6   be represented or present in a sufficient number of copies

 7   that one can be fairly confident one's going to find it.

 8             In the case of this particular abstract, it only

 9   states that there was some produced.  And it actually --

10   there's another qualification in there that it was not

11   produced in a very high level in this assay.  So I think it

12   demonstrates that there is RNA for erythropoietin present in

13   the kidney, but it doesn't actually give one real confidence

14   that from that library it could be isolated.

15             In addition, I would add that this -- I've reviewed

16   that, that abstract.  It's a publication in what's called an

17   abstract.  And abstracts --

18             MS. BEN-AMI:  Object at this point, your Honor.

19             THE COURT:  Since you object, I'll sustain it.

20             MS. BEN-AMI:  And I renew my motion, your Honor.

21             THE COURT:  No, your motion is denied.  His

22   testimony may stand.  Proceed.

23             MR. FLOWERS:  Thank you, your Honor.

24   (BY MR. FLOWERS:)

25   Q.  So, Doctor, by the end of 1983, were you aware of any
```

1  known reliable source of EPO messenger RNA, or mRNA, that

2  could be used by one of ordinary skill to create a cDNA

3  library to clone the EPO gene?

4          **MS. BEN-AMI:**  Objection, leading.

5          **THE COURT:**  Yeah, sustained.  On that ground.

6          **MR. FLOWERS:**  I'm sorry, your Honor, I'll go back

7  to my previous question.

8  **Q.**  Doctor, in 1983, what was known by one of ordinary skill

9  concerning whether there was or wasn't a source of EPO mRNA

10  that was sufficient for making a cDNA library?

11          **THE WITNESS:**  I could answer that, sir?  Okay.

12  A.  In 1983, we had really tremendous uncertainty as what

13  would be a proper source for cDNA library.  Although

14  erythropoietin was thought to be made in the kidney --

15          **MS. BEN-AMI:**  Objection, your Honor.  Report.

16          **THE COURT:**  Yes.  Where is it in the report?

17          **MR. FLOWERS:**  It's in the light blue report, your

18  Honor, page 18, Paragraph 38.

19          **MS. BEN-AMI:**  That's different.

20          **THE COURT:**  Well, well, that's somewhat different.

21  If you frame it in terms of his own efforts, which that

22  paragraph deals with, I will allow it.

23          **MR. FLOWERS:**  Your Honor, may I also induct Orkin

24  supplemental report, the yellow report?  Page 15.

25          **THE COURT:**  Just a moment.  Now, 15 --

1          **MR. FLOWERS:**  Paragraph 18.  Page 15, Paragraph 18,

2     your Honor.  Second to the last sentence.

3          **THE COURT:**  Yes.  He may testify consistent with

4     that.

5     **Q.**  Do you have that, Doctor?  Do you have your report?

6     **A.**  Yes.  So what I said in those reports is that at that

7     time we did not know for sure of a source of erythropoietin

8     messenger RNA that would be useful for cloning cDNA.

9     **Q.**  Moving on in the process of making a library, if you

10    picked a potential source of messenger RNA, what was the

11    next step?

12    **A.**  The next step is taking the messenger RNA and making the

13    cDNA, and that's by using a particular enzyme that copies

14    the message into cDNA.  And this copies all the messages in

15    the cell, or attempt to copy all the messages to make the

16    library.

17    **Q.**  Did that copying process present any potential

18    difficulties in cloning?

19          **MS. BEN-AMI:**  Objection, your Honor.  Leading.

20          **THE COURT:**  Sustained on that ground.  Don't lead

21    the witness.

22          What were the problems with that approach?

23          **THE WITNESS:**  The major problem with that approach

24    is that in 1983, the -- this copying process was not

25    complete all the time.  So, in fact, most of the cDNAs that

1    would be made would be partial or short copies of the

2    messenger RNA and would leave off a portion that -- of the

3    messenger RNA.

4           Now, that's especially important for these very

5    low-abundance or low-frequency messages.

6           **MS. BEN-AMI:**  Objection.  Outside his report now,

7    your Honor.

8           **THE COURT:**  Yes.  Where is that?  "That's

9    especially important," where's that?

10          **MR. FLOWERS:**  Light blue report, your Honor,

11   page 11.  Page 11, Paragraph 25.  Starts about halfway down.

12   "Another obstacle."

13          **MS. BEN-AMI:**  I didn't object --

14          **THE COURT:**  Well, it's -- he's off on a different

15   tack.  He's saying it's especially important, but he may

16   tell us what another obstacle is.  He may testify consistent

17   with his report.

18   A.   Okay.  Well, I'll leave it at that, that most of the

19   copies were short and, therefore, they were not complete

20   copies of the message.

21          (Whereupon counsel conferred.)

22   **Q.**   I believe we have a demonstrative on this.

23   A.   So this is the -- what I was referring to.  This is the

24   process of what's called cDNA synthesis.  And this is what

25   one would like to have happen.  That is, in theory.  So the

1   messenger RNA is what's called a coding sequence, here is

2   shown in the purple.  And the way the enzyme copies the

3   messenger RNA, it starts with what's called a primer, which

4   is in yellow here, and then copies from right to left.

5          And the object is to get a complete copy of the

6   messenger RNA and the cDNA, and then with more biochemistry,

7   one makes this double-stranded, full-length cDNA that goes

8   into the vector to make the library.

9          This is what one would like to do.  I think we have

10  another demonstrative.  But in point of fact --

11         **MS. BEN-AMI:**  Your Honor, do we have a question?

12         **THE COURT:**  There is no question.  And we'll stop

13  it there.

14  **Q.**  So, Doctor, you said on the previous demonstrative, you

15  said that was in theory.  What happened in practice?

16  **A.**  In practice, the enzyme very often stops along the way

17  at these X's and then makes shorter copies of the message.

18  That is partial cDNAs.  And these short cDNAs are missing

19  important information --

20         **MS. BEN-AMI:**  I object, your Honor.

21         **THE COURT:**  No, no, he may finish that sentence.

22  **A.**  -- missing important information.  And also these short

23  copies fill up the library.  So the library has a lot of

24  short copies in it.

25         **MS. BEN-AMI:**  Your Honor, he's citing to something

1    from 1977.

2         **THE COURT:**  You may examine.  That may stand.

3    **Q.**  Doctor, why did that happen?

4    A.  It happens because the enzyme just falls off for

5    large --

6         **MS. BEN-AMI:**  Same objection.

7         **THE COURT:**  Overruled.

8    **Q.**  And how often did this happen, that it fell off and

9    created short copies?

10   A.  In that time frame, in the early 1980s, it happened more

11   often that it fell off than it stayed on.

12        (Whereupon counsel conferred.)

13   **Q.**  So given that, Doctor, when you made a cDNA library in

14   attempting to clone the EPO gene, for example, in 1983,

15   could you be sure whether it contained a complete copy of

16   any given cDNA?

17        **MS. BEN-AMI:**  Objection, your Honor.  Leading.

18        **THE COURT:**  Yes, sustained.  On that ground.

19   **Q.**  What was the status of cDNA libraries at that time in

20   terms of complete cDNAs?

21   A.  So when one has these copies of cDNAs, one puts them in

22   another piece of DNA to make what's called a library.  And

23   because most of these are short, most of the library

24   contains very short clones, and these are not useful in

25   terms of the object here.

 1          **MS. BEN-AMI:**  Objection, your Honor.  Outside his

 2    report.

 3          **THE COURT:**  No, that may stand.

 4    **Q.**  Doctor, if you made a cDNA library, could you know

 5    whether or not the cDNAs were complete?

 6    A.  We knew at that -- I think we could not tell whether it

 7    was complete for any individual one.  And we knew at that

 8    time the majority were not complete, in fact.

 9          **MS. BEN-AMI:**  Objection.

10          **THE COURT:**  That may stand.

11          (Whereupon counsel conferred.)

12    **Q.**  Once you made the cDNAs, I think you said you put them

13    into a vector, what did you do with them?

14    A.  One has to take --

15          **MS. BEN-AMI:**  Objection.  Outside his report, your

16    Honor.

17          **THE COURT:**  Where does it say?

18          **MR. FLOWERS:**  Light blue report, your Honor,

19    page 12, Paragraph 26.

20          **THE COURT:**  You may tell us consistent with

21    Paragraph 26 what you did with them.

22    A.  So what one does is take the cDNAs, puts them in another

23    piece of DNA called a vector, puts them into bacteria, and

24    that allows one to expand the number of DNAs, the library

25    itself.  And then one prepares that --

1    **MS. BEN-AMI:**  Objection, your Honor.  This is what

2    he did.

3    **THE COURT:**  I understand that.  That's what he was

4    asked, What did you do with them?  I'm following it.  And he

5    may finish his testimony consistent with 26.  We're not

6    going beyond 26.

7  A.  So once one has the cDNAs in the bacteria, which is a

8    library, one has to prepare that library for the probe.

9    **THE COURT:**  All right.  That may stand.

10  Q.  Now, Doctor, once you did that, what did you do?

11  A.  At that point, after one's prepared the library for

12   what's called incubation or hybridization with the probe,

13   one has to make the probe.

14   **MS. BEN-AMI:**  Objection.  He keeps saying "one."

15   **THE WITNESS:**  I.

16   **THE COURT:**  Yes.  If that's the ground of a motion

17   to strike, denied.  The jury's watching.  Go ahead.

18  Q.  And then what did you do, Doctor?

19  A.  So on the left side then, I would have to design a probe

20   to use to find the clone in the library.

21  Q.  Why?

22  A.  Because just looking at the bacteria in the clones, one

23   doesn't know one from the next.  You have to have a

24   particular DNA sequence that can match that in the target to

25   pull out the clone you want.

1   Q.   And what was the starting point for making the probes?

2   A.   The starting point for making the probe in this case is

3   purified protein --

4        MS. BEN-AMI:   Objection, your Honor.   Now we're

5   outside.   That's the issue --

6        THE COURT:   I think we're beyond this demonstrative

7   here.   I see no more detail.   We'll stop it there.

8        (Whereupon counsel conferred.)

9   Q.   Doctor, how did you go about designing the probes in

10  1983?

11       MS. BEN-AMI:   Keep going, Doctor, I'm sorry.   Go

12  ahead.

13  A.   Oh, okay.

14       So in 1983, one way to design a probe is to take a

15  short protein sequence, that is an amino acid sequence, that

16  short segment is part of the protein, and use the genetic

17  code then to determine which possible DNA sequences might

18  actually instruct that sequence.

19       (Whereupon counsel conferred.)

20  Q.   What is this, Doctor?

21  A.   This indicates the -- shows the genetic code.   And in

22  this case, it depicts the 20 amino acids that make up

23  proteins, and these are listed in alphabetical order.   And

24  under each amino acid are the three-letter DNA code,

25  so-called codon, which tells the cell to put in the

1    particular amino acid from the messenger RNA.

2    **Q.**  Now, why are there multiple codons underneath each amino

3    acid?

4    A.   There are multiple codons under some of them because of

5    what's called degeneracy of the genetic code.  And that is,

6    a particular amino acid is specified by more than one of

7    these codons.

8    **Q.**  In 1983 could one of ordinary skill have used this kind

9    of codon table or genetic code table to design probes?

10   A.   Yes, one would use this to design a probe.

11   **Q.**  And how did you do that?

12   A.   One would basically look at the amino acid sequence of a

13   portion of a protein, and then just use this information

14   below to construct the potential probe.

15          So if, for example, if I'm allowed to do that, if

16   we had -- this is methionine, and there's only one

17   particular codon, ATG for that.  If we had a string of five

18   of those in a row in a protein, methionine, methionine,

19   methionine, methionine, methionine, the only DNA sequence

20   that could encode that, is ATG, ATG, ATG, ATG, ATG.  That's

21   simple, it's only one.

22          However, most proteins have mixtures of these amino

23   acids.  So if we just took five amino acids here, this one

24   has two possibilities, this one four, this six, this four.

25          **MS. BEN-AMI:**  Objection, your Honor.  We, I think,

 1   are outside his report at this point.

 2            **THE COURT:**  And I think so.  Sustained.

 3            **MR. FLOWERS:**  Could I be heard, your Honor?

 4            **THE COURT:**  Point to me where it's in the report.

 5            **MR. FLOWERS:**  Light blue report, your Honor,

 6   page 37, Paragraph 73.  Also page 23, Paragraph 49.  So

 7   page 23, Paragraph 49.  Page 37, Paragraph 73.

 8            **THE COURT:**  And your second reference, 23?

 9            **MR. FLOWERS:**  Page 23, Paragraph 49.

10            **THE COURT:**  My problem is with the use of the

11   demonstrative, it's not with the substance of the testimony

12   as expressed in the report.  I adhere to my rulings.

13            If you're going to use these demonstratives,

14   everything about the matter of using them has to be in the

15   report.  Sustained.

16   **Q.**  Doctor, when you were trying to clone the EPO gene back

17   in 1983, how many oligonucleotide probes did you use?

18   A.  We would use -- I have to clarify what one means by

19   oligonucleotide probe.  Because of this degeneracy, one has

20   to mix --

21            **MS. BEN-AMI:**  Objection, your Honor.

22            **THE COURT:**  Beg your pardon, what's the ground?

23            **MS. BEN-AMI:**  Report.

24            **THE COURT:**  In the report?  Where is it?

25            **MR. FLOWERS:**  Same reference as before, your Honor.

 1              THE COURT:  Yes.  Oh, no, overruled.  He may

 2     testify consistent with page 23, 24.

 3              MS. BEN-AMI:  He's asking about what he did now.

 4              THE COURT:  That's not -- that's a distinction

 5     without a difference.  Overruled.

 6              You may answer, sir.

 7     A.  Okay.  So because of this degeneracy, one has to try to

 8     make -- one has to make a DNA sequence that matches all the

 9     possibility -- all the possible sequences.  So a probe would

10     be a mixture of many, many different individual DNA probes.

11              I know it's a little confusing, but one has a pot

12     of many different probes.  And we made --

13              MS. BEN-AMI:  I apologize, your Honor, but I really

14     don't see this.

15              THE COURT:  I beg your pardon?

16              MS. BEN-AMI:  I don't see this in his report.  I

17     apologize.

18              THE COURT:  Well, sufficiently there for me.

19     Overruled.

20     A.  So in practice, we made a number of pools of hundreds or

21     even thousands of these probes.

22     Q.  And once you had the probes and the probe sets --

23              (Whereupon counsel conferred.)

24     Q.  -- what did you do with them?

25     A.  Once you had the probe, you then incubate or hybridize

1    the probe to the library.  And the object there is basically

2    to find a needle in a haystack; that is, to find the correct

3    clone versus all the other thousands of clones which are not

4    correct in the library.

5    **Q.**  And so when you put the probes in with the library, what

6    happened?

7    A.   The probe, the piece of DNA seeks out its match or

8    so-called complementary DNA in the library.  And the way in

9    which that occurs is dependent on the conditions one uses in

10   incubation; that is, temperature, salt.

11          So one -- especially because one has a mixture of

12   these probes, you have to get the conditions just right.

13   And it's largely a compromise to get the conditions right so

14   that you can get the right match and not be fooled and get

15   the wrong clone.

16          **MR. FLOWERS:**  I think we have another demonstrative

17   on this, CX25.

18   **Q.**  Doctor, could you walk us through this?

19   A.   So at the top is shown a target and then a probe here,

20   and this is what would be a perfect match, so-called

21   complementary, in the DNA.

22          So, in this instance here, one has a target, and

23   that's the library or the clones that one has, and this is

24   the probe, the oligonucleotide one makes from the protein

25   sequence, and this is only one of thousands or hundreds or

1    even thousands of probes in the mixture --

2         **MS. BEN-AMI:**  Objection, your Honor.  I think he

3    has gone outside.

4         **THE COURT:**  No, so far he hasn't.  I'm watching.

5    A.  And the object, what you'd like to get, is a perfect

6    match here, so-called strong match.  This is a hybrid.

7         What happens with the other probes, the probes that

8    don't have the right sequence, is they sort of bubble out.

9    And this is a weak match.  And if one has the right salt and

10   temperature conditions, you tend to favor this versus this.

11   But it's difficult to know the right conditions, especially

12   when you have these large mixtures.

13   **Q.**  So when you were using the probes to search through a

14   library, how many target DNAs were we talking about in the

15   library?

16        **MS. BEN-AMI:**  Objection.

17   A.  The targets in the library might be --

18        **THE COURT:**  Where's that in the report?

19        **MR. FLOWERS:**  Same reference as before on numbers.

20        **THE COURT:**  Where is that?

21        **MR. FLOWERS:**  I'm looking for it.  Page 12,

22   Paragraph 6.  Page 28, Paragraph 57.

23        **THE COURT:**  All right.  I see a number there in

24   Paragraph 26, he may testify to that.

25        And where's the other?

1          **MR. FLOWERS:**  I'm sorry, your Honor, page 28,

2     Paragraph 57.

3          **THE COURT:**  He may testify to the number of probes

4     that's referred to in your first reference, but there's no

5     numbers there, in 57.

6          So not to waste time, when you -- when you were

7     designing probes to try to search out EPO, how many probes

8     in a set would you have?

9          **THE WITNESS:**  We could have a large number, over a

10    thousand.

11         **THE COURT:**  Go ahead, Mr. Flowers.

12    **Q.**  You mentioned hybridization and condition, salt and

13    temperature.  Could different hybridization conditions

14    affect your ability to identify the correct DNA target?

15    A.  Yes, they would.  If one has what are called stringent

16    conditions, you would tend to favor the match shown at the

17    top, and not favor this one.

18         But again, because you might have a thousand

19    different probes, and each probe has a different sequence,

20    you have to hedge your bets or compromise on the exact

21    temperature and salt.  And one cannot know for sure that the

22    sequence that one has, that's the correct sequence, will

23    actually work under those conditions.

24         **MR. FLOWERS:**  Can we go back to DS1, please?

25    **Q.**  So at this point you've mixed the probes with the

1    library.  What happens then?

2    A.  So then after you mix and incubate in appropriate

3    conditions, you wash the filters, which contain the DNA from

4    the library, and then expose those filters to x-ray film to

5    try to find spots which would indicate you have potential

6    clones.

7    Q.  What do you do once you find the spots?

8    A.  Once you have the spots, you go back to the library, the

9    bacteria, and then try to grow up that particular one and

10   ask is it the right sequence.  And for that, you need DNA

11   sequencing.

12   Q.  Now, so you talked about cDNA cloning.  You also

13   mentioned genomic cloning.  What is genomic cloning?

14   A.  Genomic cloning is basically taking the DNA of a cell

15   and directly cloning it so one doesn't go through any of

16   this messenger RNA copying step.

17   Q.  When you were trying to clone the EPO gene back in the

18   early 1980s, did you use a cDNA approach or a genomic

19   cloning approach?

20   A.  We attempted a cDNA cloning approach because it seemed

21   to be the most likely to succeed.

22   Q.  To your knowledge, which cloning approach did Dr. Lin

23   use in cloning the EPO gene?

24        MS. BEN-AMI:  Objection.  Outside the report, I

25   believe.  I apologize if I'm wrong.  I don't think so.

1          **MR. FLOWERS:**  Pages 4 to 5, your Honor,

2     Paragraph 9.

3          **MS. BEN-AMI:**  I guess, your Honor, I do need to

4     have a sidebar at this point.

5          **THE COURT:**  I don't think we need it.  The

6     objection's going to be sustained as to what Dr. Lin

7     actually did, from this witness, but I suppose you could ask

8     him what did you think he did?

9     **Q.**  Doctor, you've reviewed the patents at issue in this

10    case?

11    A.  Yes.

12    **Q.**  The '933 patent?

13    A.  Yes.

14    **Q.**  And from that, which approach do you understand Dr. Lin

15    to have pursued in trying to clone the EPO gene?

16         **MS. BEN-AMI:**  I do apologize, your Honor, but he

17    doesn't discuss the patents in his report.

18         **THE COURT:**  No, overruled.  He can tell us what he

19    understands.  It's not evidence that's what Lin did, but he

20    can tell us what he understands.

21    A.  My understanding is that Dr. Lin used probes, short

22    oligonucleotide probes, for genomic cloning and not cDNA

23    cloning.  So he did not actually do what's illustrated on

24    this demonstrative.

25    **Q.**  Were you aware of any other scientists in 1983 which

1    were trying to clone the EPO gene?

2    A.  Yes, I was.

3    Q.  And to your knowledge, did any of those other scientists

4    employ the approach of using what you said, short

5    oligonucleotide probes to screen a genomic library?

6         MS. BEN-AMI:  Objection, your Honor.  I don't

7    believe that's in his report.

8         THE COURT:  Yeah, where is it?

9         MR. FLOWERS:  Page 39, Paragraph 76, last part of

10   the paragraph.  Particularly the last sentence, your Honor.

11        THE COURT:  It's limited, of course, to so far as

12   he knows.  But he can tell us, so far as you knew.

13        So far as you knew, what was the status there in

14   1983?

15        THE WITNESS:  So, based on my own experience and

16   what I believe I knew at the time, there were few

17   investigators, if any, who were considering using this mixed

18   or short oligo approach with genomic DNA.  So they were not

19   considering the approach Dr. Lin used.

20   Q.  Would one of ordinary skill in 1983 have had a

21   reasonable expectation of success in cloning the EPO gene

22   using experimental approach described in Dr. Lin's patent?

23   A.  I don't believe so.

24        MS. BEN-AMI:  Objection.  That is leading, your

25   Honor.

1      **THE COURT:**  No.  It may be, but it's overruled.

2   A.  I don't believe so, because we and others were focusing

3   on the cDNA approach because we believed that was the more

4   favorable or likely approach to succeed.  We would have

5   tried the genomic approach if we had thought that it was a

6   good, good method here.

7   Q.  But you didn't try that approach?

8   A.  We did not.

9   Q.  How would you characterize Dr. Lin's work in cloning the

10  human EPO gene in 1983 as it's described in his patent?

11  A.  Be more specific.

12  Q.  In terms of significance, scientific significance?

13      **MS. BEN-AMI:**  Again, your Honor, I don't believe --

14  I think it's Mr. Flowers' timing as to what's in his patent

15  that I'm objecting to.

16      **THE COURT:**  Mr. Flower's what?

17      **MS. BEN-AMI:**  The way he asks his question.  He

18  says, As based on what you read in the patent.  I don't

19  think that's in his report.

20      **THE COURT:**  Yeah, I understand that.  Overruled.

21  Q.  How would you characterize the significance of Dr. Lin's

22  work in cloning the EPO gene in 1983?

23  A.  I believe the approach he used at that time was quite a

24  novel one.  It was not one that, frankly, occurred to us in

25  my laboratory.

1    Q.   Are you familiar with the Maniatis and Fritsch manual

2    that's Trial Exhibit 10 in this case?

3    A.   Yes.

4    Q.   Did the Maniatis and Fritsch manual, Exhibit 10, say

5    anything about employing that approach you just described

6    Dr. Lin described in his patent?

7              MS. BEN-AMI:   Again, your Honor, report.

8              THE COURT:   Sustained.   The document speaks for

9    itself.

10   Q.   Doctor, are you aware of any publications in the period

11   before the end of 1983 that suggested the use of

12   oligonucleotide probes to screen genomic libraries?

13             MS. BEN-AMI:   Objection.   Report.

14             THE COURT:   Yeah, where is it?

15             MR. FLOWERS:   Pages 38 to 39, your Honor,

16   Paragraph 76.

17             THE COURT:   No, sustained.

18             MR. FLOWERS:   I'll move on, your Honor.

19   Q.   Doctor, do you have an opinion about how difficult it

20   was or wasn't to clone the EPO gene for one of ordinary

21   skill in 1983?

22   A.   Yes, I do.

23   Q.   And what is your opinion?

24   A.   My opinion is that it was exceedingly difficult.   If it

25   had been not so difficult, I think we would have succeeded

1    ourselves.

2    **Q.**  What was it about EPO that made it so difficult to

3    clone?

4    A.  As I said before, there was very little known about

5    erythropoietin, really, at the time that we were doing the

6    work.

7    **Q.**  And so what was it that wasn't known about EPO?

8    A.  As I said, we didn't have a good source of messenger RNA

9    for cloning.  It was very low abundance.  And experience

10   with cloning very low abundance products was not as good as

11   it was subsequently.  And there was problems with cDNA

12   synthesis, as I already described, making short cDNA.

13        So it was really a whole multitude of problems.

14   And the difficulty is if one fails at the end, it's very

15   difficult -- it's impossible to know where you went astray

16   along the way.  There are multiple steps involved, and any

17   one of them, if it goes wrong, means the project will fail.

18   **Q.**  Looking at this slide here, EX1, which part of the

19   cloning process was more important in successfully cloning

20   the EPO gene, the making of the probe or the making of the

21   library?

22        **MS. BEN-AMI:**  Objection, your Honor.  It's not in

23   his report.

24        **THE COURT:**  Where is it?

25        **MR. FLOWERS:**  Page 38, Paragraph 75.  Continue on

1    to the next page, 76, Paragraph 77.  Also in the

2    supplemental report.

3              **THE COURT:**  The comparison is not there.

4    Sustained.

5    **Q.**  Doctor, was getting an accurate amino acid sequence for

6    EPO the only obstacle to cloning the human EPO gene in 1983?

7    A.  No, I don't believe it was the only obstacle.  As I

8    mentioned, there were several other difficulties in the

9    cloning beyond that.

10   **Q.**  If you had Dr. Goldwasser's purified urinary EPO in

11   1983, would that have made cloning EPO routine or obvious?

12             **MS. BEN-AMI:**  Objection.  I don't believe that's in

13   his report, your Honor.

14             **MR. FLOWERS:**  Page 39, Paragraph 77, your Honor.

15             **THE COURT:**  Yeah, overruled.  He may testify.

16   **Q.**  Doctor, if you would have had Dr. Goldwasser's urinary

17   EPO in 1983, would that have made cloning the EPO gene

18   obvious or routine?

19             **MS. BEN-AMI:**  I'm going to object again, your

20   Honor.  It only talks about cDNA.

21             **THE COURT:**  Overruled.

22   A.  I do not believe it would have been obvious or routine

23   because, as I mentioned, we had multiple problems along the

24   way, besides just the sequence.

25   **Q.**  So we've been talking about your efforts to clone the

1   EPO gene and we've been talking about your failure.  I

2   wanted to ask you again, what was the level of skill of

3   molecular biology in your lab in 1983?

4   A.  We believe the skill was quite high.  We already had

5   nearly three years of cloning experience, both of cDNA and

6   genomic DNA, in the laboratory.  And because we were

7   fortunate enough to be at the Harvard Medical School, we had

8   trainees, or fellows, and students who were way beyond the

9   ordinary student in the lab, or fellow.  So we think that we

10  had cutting-edge technology at the time.

11  **Q.**  Was your project to clone the EPO gene in the early

12  1980s approved or funded by the NIH?

13  A.  Yes.  Our project was funded in 1980 by the NIH,

14  National Institutes of Health, to do the project.

15  **Q.**  In your binder of exhibits on the desk, you should have

16  a copy of Exhibit GWQ.  Do you have it?

17  A.  Yes, I do.

18  **Q.**  What is that document?

19  A.  This is a grant application from September 1980 to the

20  National Institutes of Health to fund the work.

21  **Q.**  So did you create this document?

22  A.  Yes, I did.

23         **MR. FLOWERS:**  I would offer GWQ in evidence.

24         **MS. BEN-AMI:**  I object, your Honor.  This document

25  is not --

1          THE COURT:  Please, don't argue.

2          MS. BEN-AMI:  Report.

3          THE COURT:  Well, your point is, the document's not

4     referenced in the report?

5          MS. BEN-AMI:  I can fix this, your Honor.

6          THE COURT:  All right.  You can.  So you withdraw

7     it?

8          MS. BEN-AMI:  No, I think there's another copy

9     that's slightly different in his report.  And I don't want

10    to make them go search for that, so we can fix them later.

11    I'm okay with that.

12         THE COURT:  We'll fix them later, subject to my

13    ultimate disposition.  But let's not throw it up on the

14    screen.  But you have it in evidence.

15         MR. FLOWERS:  Thank you.  Thank you for the

16    accommodation.

17         THE COURT:  It will have what number then?

18         THE CLERK:  Is that 21?

19         THE COURT:  Twenty-one.  Exhibit GWY, is it?

20         THE WITNESS:  Q, I think.

21         THE COURT:  GWQ in evidence, 21, as ultimately

22    resolved.

23         (Exhibit marked in evidence.)

24    Q.  So, I'm sorry, Doctor, you said, was this the

25    application that you sent to the NIH?

```
 1    A.   This was the application sent to the NIH.   Actually, our

 2    part was a subpart.   This is a larger application for what's

 3    called a Program Project Grant, which has many different

 4    projects.   But we had one specific project within that.

 5    Q.   And what did your project involve?

 6    A.   Our project actually had two components.   One was a

 7    unrelated project dealing with globin genes, hemoglobin

 8    genes.   And the second project was dealing with

 9    erythropoietin cloning.

10    Q.   Did you succeed in any part of that research project?

11    A.   We succeeded in the alpha globin, or the globin part of

12    the project.   In terms of erythropoietin cDNA cloning, we

13    did not succeed, although we made libraries and a number of

14    things along the way that we said we would do.

15    Q.   When you started that project, how long did you expect

16    it to take to clone the EPO gene?

17    A.   We described to the NIH that we thought it would take

18    about three years to do the project.

19    Q.   And did you characterize the experiments proposed in the

20    application in any way to the NIH?

21    A.   Yes, we did.   Would you like me to read from it?

22    Q.   Please.

23    A.   Okay.   So I'm reading from a section that was called,

24    "Timetable for Molecular Studies of Erythropoietin."   And I

25    said, "The experiments proposed in this section are
```

1    admittedly ambitious."

2    **Q.**  Why did you say that?

3    A.  I said that because we thought this was a major --

4         **MS. BEN-AMI:**  Objection, your Honor.  This is not

5    in his report.

6         **THE COURT:**  Yes.  Where is it?

7         **MR. FLOWERS:**  Page 14 in the blue report, your

8    Honor, Paragraph 31.

9         **THE COURT:**  Sustained.

10   **Q.**  Doctor, what approaches did you use to try to clone EPO

11   back in the 1980 to 1983 time period?

12   A.  We used several different approaches, virtually any of

13   the approaches that we could think of at the time.  The

14   initial application described actually a different possible

15   approach than the one that we discussed with the probe and

16   the targets.  We actually had planned to use antibody to

17   find clones that were actually produced in the protein.  But

18   we investigated that.  We investigated other approaches,

19   such as translating message in vitro, plus the use of

20   oligonucleotide probes.

21        So we used virtually any of the cDNA cloning

22   approaches that were available at that time period.

23   **Q.**  So why did you use the cDNA cloning approach?

24   A.  We used that because, as I said before, we considered it

25   the most favorable and likely approach to succeed.

1    **Q.**  Did any of the approaches that you used work?

2    A.  No.  Regrettably, we did not clone the erythropoietin

3    gene.

4    **Q.**  And was that kind of failure typical for your

5    laboratory?

6    A.  No, it was not.  We had cloned, as I said before, a

7    number of genes starting in 1980 through '83, and

8    subsequently.  And to my knowledge, it's actually the only

9    project that the NIH supported us for that we were virtually

10   unsuccessful at getting to the end product.

11   **Q.**  In your binder, the next exhibit, I believe, is Exhibit

12   GWO.  Can you tell us what this document is?

13   A.  Yes.  This is called the -- this document is another one

14   from the -- to the NIH called, "Application for Continuation

15   Grant."  This means it was the report we sent back after one

16   year of the grant.  So it was a progress report.

17   **Q.**  What's the date of this document?

18   A.  The date of this document is May 1982.

19          **MR. FLOWERS:**  I would offer GWO, your Honor.

20          **MS. BEN-AMI:**  I don't believe this is in his

21   report, your Honor.

22          **THE COURT:**  I can't hear you.

23          **MS. BEN-AMI:**  I'm sorry.  I don't believe this is

24   in his report, your Honor.

25          **THE COURT:**  Where is it?

1            **MR. FLOWERS:**  Light blue report, page 14,

2    Paragraph 31, first sentence.

3            **THE COURT:**  Paragraph 31, say again?

4            **MR. FLOWERS:**  First sentence, your Honor.

5            **THE COURT:**  First sentence, it's the one there in

6    that designation AM-ITC?

7            **MR. FLOWERS:**  The first one, your Honor.

8            **THE COURT:**  The first of those two?

9            **MS. BEN-AMI:**  It's not the right one.

10            **THE COURT:**  Very well, it's withdrawn.  And the

11    document may be admitted.

12            **MS. BEN-AMI:**  No, it's not the right numbers, your

13    Honor.

14            **THE COURT:**  Oh, I thought you said it sounds right.

15            **MS. BEN-AMI:**  No, I said it's wrong.

16            **THE COURT:**  Sorry.  She says that's not it.

17            **MR. FLOWERS:**  He's citing to, in his expert report,

18    he's citing to two pages describing his project within this

19    document.  The two pages that describe his project that he

20    cites to in his expert report are in this exhibit.

21            **THE COURT:**  Where is the document?  All right.

22    Against the objection that it's not referred to in the

23    report, you may have those two pages, if you want.  Is that

24    what you want?

25            **MR. FLOWERS:**  Yes, your Honor.

1              THE COURT:  And they are?

2              MR. FLOWERS:  Bates numbers AM-ITC --

3              THE COURT:  No, let's do GWO.  Less numbers.

4              MR. FLOWERS:  Those are our internal numbers, your

5     Honor.

6              THE COURT:  I don't care.

7              MR. FLOWERS:  It's pages 24 and 25.

8              THE COURT:  Thank you.

9              MR. FLOWERS:  Of GWO.

10             THE COURT:  Thank you.  That's what I want.  Those

11    pages are -- are admitted as Exhibit 22.

12             You're going to have -- since this is double-sided,

13    you're going to have to prepare an exhibit.

14             MR. FLOWERS:  We will, your Honor.

15             THE COURT:  You'll prepare an exhibit, which will

16    be Exhibit 22, two pages of that report.

17             (Exhibit marked in evidence.)

18             MS. BEN-AMI:  I believe it's pages 10 to 11.

19             MR. FLOWERS:  Internal numbering of the document is

20    pages 10 and 11.  They are the 24th and 25th pages of the

21    exhibit.

22             THE COURT:  You'll work it out.

23    Q.  So, Doctor, on these two pages, can we find a

24    description of the work that you did in the first year of

25    your cloning project?

1    A.   Yes, we can.  And specifically, for the erythropoietin,

2    it's on the second of those pages.

3    **Q.**   And what work did you describe on the second page?

4    A.   We described two parts of the work.  And the part that's

5    called B, the top portion, which is expanded there, we

6    talked about approaches to cloning.  And that paragraph

7    dealt with the potential source of messenger RNA for

8    cloning.

9         And as it says there, we tried, we were

10   investigating a number of different sources, including

11   material from kidneys, as well as fetal liver, and we tried

12   to translate that material in a test tube and see if we

13   could detect any output of erythropoietin.  And we were

14   really not successful.

15        But what that paragraph really deals with is just

16   our uncertainty as to the appropriate source for messenger

17   RNA for cloning.  Despite that uncertainty, the next

18   paragraph, which is C, below, which says cloning of cDNAs

19   and their expression in E. coli, this expression states that

20   we were making cDNA libraries from the sources we had or

21   potential sources we had.

22        So this was the first part of the cloning effort.

23   It was to identify a source, or try to identify a source,

24   and then make the cDNA library that we would screen.  Or

25   several.

1    **Q.**   What did you do in the second year of your cloning

2    project?

3    A.   In the second -- we have a report of that, too, if --

4    **Q.**   GWP, the next exhibit?

5    A.   Which is the next -- and in the second year of the

6    grant, we had already made the cDNA libraries and we began

7    to investigate whether we could find an erythropoietin clone

8    in any of those libraries.  And we focused, in the second

9    year, on use of the short DNA probes made from the protein

10   sequence, the so-called oligonucleotide probes with the many

11   mixtures.  What we described was at least at that point we

12   had screened a number of clones and had not yet seen a

13   positive.

14         **MS. BEN-AMI:**  Objection, your Honor.

15         **THE COURT:**  That may stand.

16   **Q.**   The next exhibit in your binder is GTT.  What is this

17   document?

18   A.   The next exhibit is a reapplication to the NIH at the

19   end of that grant period for further research support.  But

20   in this case it was support for a different research

21   project, since by then we knew that others had cloned the

22   erythropoietin gene.

23         **MS. BEN-AMI:**  Objection, your Honor.  This is not

24   in his report.

25         **THE COURT:**  Yeah, we'll stop him at that point.

1    A.   Okay.

2    **Q.**   Doctor, do you know why your effort to clone the EPO

3    gene failed?

4    A.   No.   To this day, we still don't know why we failed.

5    **Q.**   Earlier, you said you were aware of other groups who

6    were attempting to clone the EPO gene back in the early

7    1980s up through the 1983 time period.   What groups were

8    attempting to clone EPO back in that time period?

9            **MS. BEN-AMI:**   Objection, your Honor.   Hearsay.

10           **THE COURT:**   What other -- sustained.

11   **Q.**   To your knowledge, did you know of any groups who were

12   attempting to clone the EPO gene?

13           **THE COURT:**   No, come to the sidebar.

14   SIDEBAR CONFERENCE, AS FOLLOWS:

15           **THE COURT:**   This has to do with Biogen, right?

16           **MR. FLOWERS:**   Yes.

17           **THE COURT:**   You're not going there, in light of

18   their memorandum.   Skip it.

19           (Whereupon the sidebar conference concluded.)

20   **(BY MR. FLOWERS:)**

21   **Q.**   Dr. Orkin, I would put to you that Dr. Lowe has talked

22   about the Maniatis and Fritsch manual, Exhibit 10, as a

23   cookbook or a recipe book for cloning genes in 1983,

24   including the EPO gene.   Would you agree or disagree with

25   that?

 1          **MS. BEN-AMI:**  I object to the characterization of

 2     the prior witness' testimony as being a mischaracterization.

 3          **THE COURT:**  Yes, well, it's not -- again, prior

 4     testimony you've heard -- now, we have to do cases in a

 5     linear fashion, one witness at a time.  And so I'm not going

 6     to allow any witness to say, Now, somebody else said this,

 7     what do you think about that?

 8          No.  He's going to say, and I think he's done it

 9     okay, I put to you that it's been suggested that the Fritsch

10     manual is a cookbook.  What do you think of that?  He did it

11     more elegantly.  But we'll take my crude question, because

12     I'm interested.

13          So what do you think of that?  Is that a cookbook?

14          **THE WITNESS:**  I don't think it was a cookbook at

15     all.  It was a first attempt to compile a collection --

16          **MS. BEN-AMI:**  Objection, your Honor.

17          **THE COURT:**  Grounds?

18          **MS. BEN-AMI:**  Expert report.

19          **THE COURT:**  Yeah, where is it?

20          **MR. FLOWERS:**  Page 41 -- I'm sorry.  I'm sorry,

21     your Honor, page 41, Paragraph 80.  And page 31,

22     Paragraph 61.

23          **THE COURT:**  And your second reference?

24          **MR. FLOWERS:**  Page 31, Paragraph 61.

25          **THE COURT:**  Sustained.  My question, the what do

1    you think of that, is too broad.  He'll have to ask a more

2    precise question.

3              Go ahead, Mr. Flowers.

4              **MR. FLOWERS:**  Can we go to --

5              (Whereupon counsel conferred.)

6              **MR. FLOWERS:**  Go to the last paragraph.  Could you

7    put up the last paragraph?

8    **Q.**  Doctor, what does Exhibit 10, the Maniatis and Fritsch

9    manual, say in that paragraph?

10   A.  This is the preface or introduction to the manual.  And

11   it says -- I'll just read it, "Although molecular cloning

12   seems straightforward on paper, it is more difficult to put

13   into practice.  Most protocols involve a large number of

14   individual steps and a problem with any one of them can lead

15   the experimenter into difficulty."

16             So I take this as somewhat of a disclaimer on the

17   all-purpose usefulness of the book.

18   **Q.**  Is this consistent with your view about cloning back in

19   the 1980 to 1983 time period?

20   A.  Yes.  As someone doing cloning at that point, I think

21   this is an apt description.

22   **Q.**  How would you characterize the state of the art in

23   cloning cDNAs or cloning genes back in 1983?

24   A.  I think I've implied this was the -- just the beginning

25   of the cloning era, and investigators were still learning

1   how to do it and do it better.  So the -- at that time, it

2   was rather primitive to what it is today.  It was really the

3   dark ages compared to what we can do nowadays.

4   Q.  Now, I'll put to you that we've heard that cloning the

5   EPO gene was like looking for a book in a library.  Would

6   you agree with that analogy?

7   A.  I think the analogy --

8        **MS. BEN-AMI:**  Objection.  It's not in his report,

9   your Honor.

10        **THE COURT:**  Where is it?

11        **MR. FLOWERS:**  Sidebar, your Honor?

12        **THE COURT:**  You may.

13   SIDEBAR CONFERENCE, AS FOLLOWS:

14        **THE COURT:**  So we'll take it as a concession it's

15   not there?

16        **MR. FLOWERS:**  Correct, your Honor.  It's not

17   offered in Dr. Lowe's expert reports.  It was only offered

18   as an analogy at trial.  I would just like to get this

19   witness' opinion about that analogy.

20        **THE COURT:**  The record is what it is.  I stick to

21   the reports.

22        (Whereupon the sidebar conference concluded.)

23   **(BY MR. FLOWERS:)**

24   Q.  This is Trial Exhibit 2021, Doctor.  Did you review this

25   paper, the Suggs paper, in the course of your work as an

1    expert in this case?

2    A.  Yes, I did.

3    **Q.**  Does this paper describe the cloning of the complete

4    cDNA for a protein?

5         **MS. BEN-AMI:**  Objection, leading.

6         **THE COURT:**  Sustained.

7    **Q.**  Doctor, I've just blown up the abstract of this paper

8    that's in evidence.  What does this describe?

9    A.  What this abstract describes is that in this paper they

10   used --

11        **MS. BEN-AMI:**  Objection, your Honor.  The report.

12        **THE COURT:**  Yeah, where is this report referred to?

13        **MR. FLOWERS:**  I was just going to have him read

14   this, your Honor.

15        **THE COURT:**  Oh, if you want him to read it, that

16   isn't what you asked him.  So I'll sustain the objection.

17   You may have him read it.

18   A.  Do I have to read it verbatim or paraphrase?

19   **Q.**  Could you just read the last two sentences, please?

20   A.  Okay, I'll read the last two sentences.  "So the clone,

21   in this particular case, has been characterized by blotting

22   nucleotide sequence analysis, the cloned beta two

23   microglobulin sequence contains 217 base pairs of three

24   prime untranslated region of the messenger RNA and 328 base

25   pairs 97 percent of the coding region."

1    Q.   What does that mean, 97 percent of the coding region?

2         **MS. BEN-AMI:**  The report.

3         **THE COURT:**  Sustained.  I mean, I'm perhaps

4    interested to hear what he'd have to say about it, but

5    that's why we have these reports.

6         **MR. FLOWERS:**  I understood experts were allowed to

7    explain technical terms.

8         **THE COURT:**  Well, I've made my ruling.

9         **MR. FLOWERS:**  Thank you, your Honor.

10   Q.   Dr. Orkin, I would put it to you that it's been said

11   that a fundamental block to cloning the EPO gene in 1983 was

12   getting the protein sequence.  Do you agree with that?

13   A.   No, I do not.

14        **MS. BEN-AMI:**  Report.  Report.

15        **MR. FLOWERS:**  Supplemental report, the yellow

16   report, your Honor, Paragraph 13.

17        **THE COURT:**  Yes.  He may testify consistent with

18   Paragraph 13.  Overruled.

19   A.   No, I don't believe that was the only obstacle.

20   Q.   Why do you say that?

21   A.   Because I think, as we've discussed, there were many

22   other problems besides the protein sequence, such as the

23   source of messenger RNA for an adequate library to clone, as

24   well as some of the other technical issues we've discussed.

25   Q.   So based on everything that you've reviewed and

1    discussed today, in your opinion, would one of ordinary

2    skill have had a reasonable expectation of success in

3    cloning EPO back in 1983?

4    A.   No, I don't believe so.

5         **MR. FLOWERS:**  I pass the witness, your Honor.

6         **THE COURT:**  Ms. Ben-Ami?

7         **MS. BEN-AMI:**  Thank you, your Honor.

8                    **CROSS-EXAMINATION**

9    **(BY MS. BEN-AMI:)**

10   **Q.**  Let me just reintroduce myself to you, Doctor.  I'm

11   Leora Ben-Ami, representing Roche in this case.

12        And I want to make sure it's clear what you didn't

13   testify on so that I don't ask you questions about it.  Your

14   opinions end in December 1983; right?  The opinions you've

15   given, 1983?

16   A.   I was actively -- I don't know if I can answer that yes

17   or no.

18   **Q.**  Let me ask it again.  The opinions that Mr. Flowers just

19   asked you about were as of December 1983; correct?

20   A.   Well, I don't think I can -- can I qualify?

21        **THE COURT:**  Well, up to December 1983, I think is

22   what she's asking, they covered the period.  No one says

23   that your life stopped at that point, but so -- because time

24   periods may make a difference, and we've got your report,

25   let me put the question:  The opinions that you've given

1    here, and testimony in this court, cover your reflections

2    about the state of work, and the like, up to and through

3    December of 1983; is that correct?

4            **THE WITNESS:**  That is correct.

5            **MS. BEN-AMI:**  Thank you, your Honor.

6    **Q.**  Do you understand that the patents in this case were

7    filed in '84?

8    A.  I don't --

9            **MR. FLOWERS:**  Objection.  Mischaracterizes the

10   record.  No foundation.

11           **THE COURT:**  No, overruled.  She may ask what his

12   understanding is and he can tell us, if he knows.

13   A.  I've seen patent documents, but I'm not -- it's not

14   affecting my opinion as of December 1983.

15   **Q.**  No, I asked you a very simple question.  Do you know

16   that the patents in this case were filed in November 1984?

17   A.  I don't know that for a fact myself.

18   **Q.**  Okay.  That's all I asked.  Okay.  But your opinions are

19   till the end of '83?

20   A.  Yes.  Although, if I can add --

21   **Q.**  No.  That's my only question for you, Doctor.

22           Now, you also talked to the jury about something

23   called cDNA; right?

24   A.  I did.

25   **Q.**  And genomic DNA; right?

1    A.   Right.

2    Q.   You know that in the background of the patents they're

3    also talking about making a synthetic DNA; correct?

4    A.   I'd have to review that.

5            MR. FLOWERS:   Objection.   Outside the scope of the

6    direct.

7            THE COURT:   Overruled.   And we've been over this

8    point.   Overruled.

9            MS. BEN-AMI:   I can rephrase.

10   Q.   You did not give any opinions about making synthetic

11   genes, correct, just cDNA genomic DNA?

12   A.   I just gave the opinions today on my experience until

13   the end of 1983.

14   Q.   CDNA genomic DNA; right?

15   A.   Correct.

16   Q.   Okay.   Now --

17           MS. BEN-AMI:   Can I have Table 1 of the patents?

18   They will have a Table 1.   Example 1, Table 1.   The jury has

19   this.

20   Q.   You did not receive the tryptic fragments from

21   Dr. Goldwasser that Amgen did; correct?

22   A.   We received nothing from Dr. Goldwasser.

23   Q.   You did not have significant amounts of protein to

24   sequence the EPO fragments; correct?

25   A.   We had no erythropoietin in our hands that we sequenced,

1    right.

2    **Q.**  In fact, you told the NIH that the most likely reason

3    you failed is because you did not have protein sequence;

4    correct?

5    A.  In one of the -- the first -- the second yearly report,

6    we said that that was a likely explanation.  It's not the

7    only one.

8    **Q.**  What did you tell the NIH?

9    A.  We said it's most likely, but not the only.

10   **Q.**  Well, what did you tell the NIH?  Not interpreting that,

11   what did you tell the NIH?

12   A.  We said most likely.

13          **MS. BEN-AMI:**  Let's bring up --

14          (Whereupon counsel conferred.)

15          **MS. BEN-AMI:**  -- FLA-35, which I believe is your

16   progress report.  FLA.

17   **Q.**  Can you read to the jury what you told the NIH when

18   you're explaining your funding?

19   A.  Yes.  It says, "The most likely explanation is that the

20   portion of the amino acid sequence used to construct the

21   oligonucleotide probes, the C-terminal end of the 28 residue

22   sequence is incorrect."

23   **Q.**  And at that time you were not being paid by Amgen;

24   right?

25   A.  No.

1    **Q.**   You were a scientist of the time period --

2          **MS. BEN-AMI:**   I apologize, your Honor.

3          Can you take it down, please?   I thought this was

4    in evidence.

5          Your Honor, I would offer FLA into evidence.

6          **THE COURT:**   Any objection?

7          **MR. FLOWERS:**   No objection, your Honor.

8          **THE COURT:**   And give it the --

9          **MS. BEN-AMI:**   2097, your Honor.

10         **THE COURT:**   2097?

11         **MS. BEN-AMI:**   Yes, your Honor.

12         **THE COURT:**   And the letters were?

13         **MS. BEN-AMI:**   FLA.

14         **THE COURT:**   FLA.   Thank you.   In evidence without

15   objection.

16         (Exhibit marked in evidence.)

17         **MS. BEN-AMI:**   So now we can -- I do apologize for

18   putting it up before.

19   **Q.**   So at this period of time you are explaining to the

20   National Institute of Health what your understanding, your

21   best understanding is of what the problem is; right?

22   A.   It was a possibility.   Yes.

23   **Q.**   I'm -- please answer my question, Doctor.

24         You are telling the NIH what you believe is the

25   most likely explanation; correct?

1    A.   That's correct.  That's what it says.

2    Q.   That's what it says.  And that's because you were using

3    an incorrect amino acid sequence; right?

4    A.   Portions of the sequence were correct.

5    Q.   And portions were incorrect?  Yes?

6    A.   Portions were incorrect, that's well-established.

7    Q.   I'm sorry, Doctor, when you just shake your head, it

8    can't be taken down by the court reporter.

9         So this is your best understanding in this time

10   period; correct, Doctor?

11   A.   As of the time that was written, yes.

12   Q.   And --

13        (Whereupon counsel conferred.)

14   Q.   And this was written by you in 1983?

15   A.   I believe that's correct, it was 1983.

16   Q.   So when you go back in time and we look at what was

17   known really, what's the real thing in time we think, not

18   what we're thinking today, you told the federal government

19   that the most likely explanation was you had the wrong amino

20   acid sequence?

21        MR. FLOWERS:  Objection, argumentative.

22        THE COURT:  No, overruled.

23   Q.   Correct?

24   A.   That's what I said.  And that's what I read, yes.

25   Q.   And that was in 1983?  Yes?

1    A.   Correct.

2    **Q.**   And you understood that this was part of the process of

3    getting the government to give you funding; right?

4    A.   They had already awarded the funding.  This was just a

5    report for continuation purposes.

6    **Q.**   You had to tell the truth in the report; right?

7    A.   We gave our best guess at the time.

8    **Q.**   Your best guess, if you will, as someone far above the

9    skill in the art, in your opinion?

10   A.   A guess.

11   **Q.**   Please answer my question.  You considered yourself

12   highly skilled at this time?

13   A.   We did.

14   **Q.**   And as someone who was highly skilled at the time, you

15   gave the government, under oath, your explanation of what

16   was going on; right?

17   A.   That's what it says.

18   **Q.**   And you said it was most likely that you had the wrong

19   protein sequence; right?

20   A.   That's what it says.

21         **MS. BEN-AMI:**   And can I have Table 1 of the patent,

22   Example 1?

23   **Q.**   And you did not have Dr. Goldwasser's tryptic fragments

24   that Dr. Goldwasser gave to Amgen; correct?

25   A.   I said we didn't have material from Dr. Goldwasser, no.

1    Q.  Now, if we look at page 29 of your -- this document, you

2    there are describing --

3           MS. BEN-AMI:  It's FLA -- it's Exhibit 2097, I'm

4    sorry.

5    Q.  And there you're talking about the work you're going to

6    do in the next period of time; right?

7    A.  Yes.

8    Q.  And you say, "This work is not particularly labor

9    extensive" [sic]; correct?

10   A.  That's what it says, but I have to specify what I was

11   referring to.

12   Q.  Well, that's what it says; right?

13   A.  We had already made the libraries, which is a large bit

14   of the work.  So, in fact, the screening process is not the

15   most labor-intensive.  That's what I meant.

16   Q.  Okay.  So screening is routine?

17   A.  No, I didn't say that either.  It takes less time and

18   doesn't require the same bit of labor to execute it.

19   Q.  Okay.  Now, you had already made the cDNA libraries

20   prior to 1983?

21   A.  We made several.

22   Q.  Okay.  So let me hand you what is FKY, which I believe

23   is the correct Bates number range of the grant that was

24   already put in.  But I think this is the one that was

25   actually in your expert report.

```
1              MS. BEN-AMI:  Now, your Honor, do you want me to

2      offer this separately?  I believe this is the correct copy

3      of the document you said we could fix.

4              THE COURT:  Well, do they agree, is this the fixed

5      copy of what's going to be 22?  Do you agree?

6              MR. FLOWERS:  We have no objection to the admission

7      of the entire document.

8              THE COURT:  Yes.  And we'll make that 22?

9              THE CLERK:  Well --

10             MS. BEN-AMI:  Yes.

11             THE COURT:  Very well.  So that document, FL --

12     what is it?

13             THE CLERK:  FKY.

14             THE COURT:  FKY is now in evidence, Exhibit 22.

15     And you proceed.

16     Q.  Now, if you look at the second page, this is your report

17     in 1982?

18     A.  I think that -- which one are you -- I'm -- what you

19     just handed me, I think, is 1980.  I think we've got the

20     wrong copy.

21     Q.  I'm having trouble reading it also, so let's look at it

22     together.  Is it 1980?

23     A.  No, that's the date it was issued.  The date it was

24     signed was September 1980.

25     Q.  Okay.  1980.  Let's start there.  So we're looking at
```

1    page 123, on the top.  It says 123 on top, Doctor, which is

2    page 118 of the actual internal document number.  And we

3    have a blowout for you there, Doctor.

4         And you're explaining what you're going to do, and

5    there you say, "In fact, by constructing sufficient numbers

6    of independent recombinant plasmid molecules with inserted

7    cDNA from a tissue producing erythropoietin a complete

8    library of the messenger RNA population can be obtained."

9         Do you see that?

10   A.  I see that.

11   **Q.**  And you did that?

12   A.  We don't know for sure we had a tissue producing

13   erythropoietin.  So there's a proviso there.

14   **Q.**  You did make --

15   A.  If you make a library from cells that aren't --

16   **Q.**  Doctor, please.  Doctor, you did make a cDNA library;

17   right?

18   A.  We made cDNA libraries of many different tissues for

19   many different purposes in the lab.

20   **Q.**  In this series of grants you reported you did make a

21   cDNA library?

22   A.  We made several.

23   **Q.**  Okay.

24   A.  Could I answer -- could I --

25   **Q.**  I --

1    A.   Can I qualify why we made several?

2    Q.   No.   I'm asking you, did you make them or not?

3    A.   We made them.

4    Q.   Okay.   Now, in the second part of the page where it

5    says, "Erythropoietin sequences," it says, "Erythropoietin

6    sequences should be especially suited for this approach.

7    First of all, the polypeptide chain of the hormones does not

8    appear to be unduly large."   Do you see that?

9    A.   I see that.

10    Q.   And there, then you say, "Therefore, we can expect to

11    reverse transcribe the entire mRNA into cDNA and obtain a

12    complete copy of the erythropoietin sequence."   Right?

13    A.   That's what it says.

14    Q.   That's what you wrote, and this was part of your funding

15    with the NIH; right?

16    A.   That's what it says.

17    Q.   Now, you showed the jury before a graphic of the

18    messenger RNA not made -- being made completely.   Do you

19    recall that?

20    A.   I do.

21    Q.   You said, Oh, it's going to fall of.   The reverse

22    transcript phase, the little enzyme's going to fall off,

23    you're not going to get a whole complete cDNA; right?

24    A.   That's right.

25    Q.   That's what you said.   But what you told the federal

1    government in 1980, you now told me, right, 1980, was that

2    because of the size of EPO, you can expect to reverse

3    transcribe the entire -- entire means the whole thing,

4    right?

5    A.   Entire means the whole thing.

6    **Q.**   Okay.   The entire messenger RNA into cDNA and obtain a

7    complete copy of the erythropoietin sequence; right?

8    A.   That's what it says.

9    **Q.**   So it's 1980; you're not Amgen's expert, right?

10   A.   No.

11   **Q.**   And you're telling the NIH what a person skilled in the

12   art would expect.   And a person skilled in the art, you tell

13   the NIH, would expect that you would get the full-length

14   cDNA; right?

15   A.   Can I explain why it's written that way?   Or you don't

16   want me to do that?

17   **Q.**   I want you to tell the jury what you told the NIH.

18   A.   I have to -- for the jury to understand the way that's

19   written, they have to understand what a grant application

20   is, and the way one applies for funding from the NIH.

21   **Q.**   Well, the jury has heard a lot about NIH grants in this

22   case already, Doctor.

23   A.   Well, I can explain my point of view, if you'll let me.

24   **Q.**   No, you can go on redirect and have your attorneys take

25   their time if you want to change what the NIH grant says.

1          **THE COURT:**  No, no, no.

2          **MR. FLOWERS:**  Objection.

3          **THE COURT:**  Now, I've allowed a lot of this.  We're

4     not going to argue.  The jury's watching.

5          Go ahead.  Ask questions.

6     **Q.**  You were seeking funding at this point?

7     A.  Yes, that's what the application was.

8     **Q.**  You were obligated to tell the truth under penalty of

9     perjury?

10    A.  We tell the truth to the best of our knowledge.

11    **Q.**  And what you told the NIH in order to obtain funding was

12    that based on your scientific judgment, as a Harvard

13    professor, that the polypeptide of the hormone does not

14    appear to be unduly large and, therefore, we can expect to

15    reverse transcribe the entire mRNA into cDNA and obtain the

16    complete copy of the EPO sequence; right?

17    A.  It says "expect," it doesn't say that's a fact.

18    **Q.**  You understand the question here is what is the

19    reasonable expectation?

20    A.  I'm just telling you what I -- what I meant as I wrote

21    it.

22    **Q.**  Right.  You did expect it?

23    A.  "Expect" doesn't mean it will happen.  That's something

24    you would like to happen.

25    **Q.**  So when you say "expect," you don't mean "expect"?

1    A.   It depends what it means to each person.

2    Q.   Okay.  So whatever it means, the jury can decide what

3    "expects" means?

4    A.   Okay.

5    Q.   Whatever it means, what you, in fact, wrote in 1980 was

6    that as a scientist, you could expect you would get the full

7    cDNA?

8    A.   Eventually.

9    Q.   Okay.  You did not write that the reverse transcript

10   phase is going to fall off and I'm not going to get the

11   complete cDNA?

12   A.   I think --

13   Q.   Correct?

14   A.   If I spent the time looking over the grant, I think it

15   does say in there that most clones are partial.

16   Q.   You're guessing?

17   A.   It said that in the grant.

18   Q.   Doctor, right here --

19   A.   You're picking and choosing the sentences you want.

20   Q.   And your lawyers pick and choose the sentences they

21   want.

22           THE COURT:  No, no, no, no.  Here's the difference

23   between a witness and a lawyer.  Now, the witness can give

24   his answers.  He's under oath.  Now, if he gets

25   argumentative, you draw the conclusions from that about who,

1    you know, who called him, what's he doing here, that type of

2    thing.

3           But a lawyer can't be argumentative, ever, until

4    they get their chance to make argument, and that they will

5    get around October 15th and 16th.  Then we'll hear their

6    arguments.  Not now.

7           Go ahead, Ms. Ben-Ami.

8           **MS. BEN-AMI:**  I apologize, your Honor.

9    **Q.**  Suffice it to say, Doctor, I read the sentence correctly

10   in your report; right?

11   A.  That sentence as written is read correctly.

12   **Q.**  Okay, thank you.  Let's move on.

13          Now, can we look at the next page, page 124.  And

14   we have a blowout again.  And you're talking about the

15   isolation of erythropoietin cDNA recombinant.  Do you see

16   that?

17   A.  I see that.

18   **Q.**  And it says, "Kidney tissue will be utilized to

19   construct a cDNA library"; right?

20   A.  Yes.

21   **Q.**  Then it says, "An alternative tissue that will be

22   explored in depth, however, will be renal carcinoma cells

23   from patients with erythropoiesis.  Dr. Sytkowski has

24   obtained material on two such individuals."

25          Do you see that?

1    A.   Yes.

2    **Q.**   And these were cells that -- from patients who had a

3    disease where they had too much EPO; right?

4    A.   Correct.

5    **Q.**   And then it says, "Since EPO is normally synthesized in

6    minute amounts in the kidney, use of tumor cells producing

7    the hormone may provide cDNA populations containing

8    significantly more erythropoietin sequences."  Right?

9    A.   Correct.

10   **Q.**   Then at the bottom it says, "The techniques for the

11   construction of the respective cDNA libraries are

12   straightforward and presently in common use in our

13   laboratory."  Correct?

14   A.   Correct.

15   **Q.**   "Therefore, we do not anticipate difficulty in this

16   phase of the work."  Correct?

17   A.   That's what it says.

18   **Q.**   In fact, you had been making cDNA libraries in this time

19   period for other proteins?

20   A.   Correct.

21   **Q.**   And the techniques were straightforward; correct?

22   A.   I think if we go back to the discussion we had on the

23   preface, in principle they're straightforward.  In practice,

24   it's not so straightforward.  And we had experience making

25   libraries, that's why we said we think it's straightforward.

1    That doesn't mean that every clone's going to be there.

2    Q.  Well, what you told -- again, it's 1980, it's 1980, and

3    you're telling the NIH what you believe is straightforward

4    as a part of your proposal to get money from the federal

5    government; right?

6    A.  What we're telling the NIH is that we are competent to

7    do the experiments, we believed, that we described.

8    Q.  But in that paragraph, you say the techniques for the

9    construction of respective cDNA libraries are

10   straightforward; correct?

11   A.  Correct.  That's what it says.

12   Q.  And presently in common use in your laboratory; correct?

13   A.  Yes, we were doing it.

14   Q.  "Therefore, we do not anticipate difficulty in this

15   phase of the work"?

16   A.  That was making the libraries.  It didn't say the

17   cloning.

18   Q.  Right, just --

19   A.  Just making the libraries.

20   Q.  We're talking about the libraries right here; right?

21   A.  That's right.

22   Q.  Okay.  Now, you agree that the Maniatis cloning book --

23   you referred to it in your direct; correct?  You agree that

24   it is an authoritative book of the period of 1982, 1983?

25   A.  It was widely used, yes.

1    Q.  You call it authoritative in your expert report, don't

2    you?

3    A.  Yes.  Yes.

4    Q.  Okay.  And in this book it describes making cDNA

5    libraries; right?

6    A.  Yes.

7    Q.  And it describes making cDNA libraries for rare

8    messenger RNAs; correct?

9    A.  Yes, it does.  But it also says there's no general

10   method --

11          MS. BEN-AMI:  Your Honor.  Your Honor.

12          THE COURT:  No, no.  Yes, she's entitled.  You

13   listen to the questions.

14          THE WITNESS:  Okay.

15          THE COURT:  If they, grammatically, they can always

16   be answered yes or no, grammatically.  If you can't answer

17   them yes or no, give her that, I can't answer it yes or no.

18   Then she gets to ask another question to elicit the

19   testimony that she's looking for.

20          Naturally, if you don't remember, you don't know,

21   you can always say that.  But you can't just launch off

22   saying something else.  So the attorneys who called you,

23   they get a chance to ask you questions further.

24          Go ahead.

25   Q.  Let me hand you a document, GUC.  I believe you have

1    seen this before, Doctor, since your name is as one of the

2    authors; right?

3    A.   That's correct.

4    **Q.**   Did you participate in writing this article?

5    A.   I wrote this article, yes.

6    **Q.**   And it was available in the period 1983?

7    A.   I believe it was published in 1983.

8    **Q.**   And do you believe it's a correct article?

9    A.   I believe so.

10          **MS. BEN-AMI:**   I would offer it, your Honor.

11          **THE COURT:**   Any objection?

12          **MR. FLOWERS:**   No objection.

13          **THE COURT:**   It may be received, GUC, admitted in

14   evidence, 2098.

15          (Exhibit marked in evidence.)

16   **Q.**   Now, in this article, you -- this is an article where

17   you cloned a human gene sequence, Doctor?

18   A.   We cloned, that's what it says, cDNA for adenosine

19   deaminase.

20   **Q.**   So you published that you had been able to make a cDNA

21   library and clone the gene; right?

22   A.   That's right.

23          **MS. BEN-AMI:**   And can we have the discussion

24   section?

25   **Q.**   And there you say, "This entirely general method of gene

```
 1    isolation has been successful for a number of messenger RNA
 2    species and obviates the necessity to prepurify messenger
 3    RNA."  Do you see that?
 4    A.  That's what it says.
 5    Q.  And so this is a general method, correct, of gene
 6    isolation?
 7    A.  I have to qualify that.  I can't give a yes or no.
 8    Q.  Okay.  Well, it says it's a general method of gene
 9    isolation?
10    A.  I still can't say yes or no.  If you want me to qualify
11    it and discuss it, I will.
12    Q.  Okay.  Did I read it correctly?  "This entirely general
13    method of gene isolation has been successful for a number of
14    messenger RNA species and obviates the necessity to
15    prepurify messenger RNA"?
16    A.  I can't answer yes or no, I have to give a more of an
17    explanation in order to put it into context.
18    Q.  Doctor, I just asked you if I read it correctly.
19    A.  You read it correctly.
20    Q.  Okay.  If we look above, in this case you had a partial
21    peptide sequence; right?
22    A.  That's what it says.
23    Q.  And you were able to use that as a probe?
24    A.  That's what it says.
25    Q.  Do you agree with it, that you had a partial peptide
```

1   sequence?

2   A.  I agree with it.

3   **Q.**  And you were able to use it as a probe?

4   A.  I agree with that.

5   **Q.**  And you were able to get the messenger RNA?

6   A.  I agree with that.

7   **Q.**  Just looking for the next document for you, Doctor.

8       Let's look at the next one, which is GUA.  And I

9   think you'll be familiar with this one because your name's

10  on it as well.  Can you identify it for the jury, please,

11  Doctor?

12  A.  This is a publication that we had in January 1983

13  describing isolation of full-length cDNA for something

14  called phosphoglycerate kinase.

15  **Q.**  And that's a protein?

16  A.  It's a protein.

17  **Q.**  And this is in the proceedings of the National Academy

18  of Science?

19  A.  That's where it's published.

20      **MS. BEN-AMI:**  I offer it, your Honor.

21      **MR. FLOWERS:**  No objection.

22      **THE COURT:**  GUA is admitted in evidence,

23  Exhibit 2099.

24      (Exhibit marked in evidence.)

25  **Q.**  And here what you're describing is that you had protein

1    and you looked for areas where there wasn't that much

2    degeneracy; right?

3    A.   That's correct.

4    Q.   Now, so let's just have the jury -- let's help the jury

5    understand this, okay?

6         You showed the jury a picture where you said you

7    could have four possibilities or six possibilities for amino

8    acid; right?

9    A.   Correct.

10   Q.   Okay.  And others there are maybe one possibility or two

11   possibilities; right?

12   A.   Correct.

13   Q.   So what you do is you take pieces of the protein and you

14   try to search for areas where the amino acids have the one

15   or two or three possibilities, not the six possibilities;

16   right?

17   A.   Yes.

18   Q.   Is that fair?

19   A.   That's fair.

20   Q.   And that is described in the Maniatis book; right?

21   A.   Correct.

22   Q.   And that's what you did; right?

23   A.   In this particular instance.

24   Q.   Right.  And you only had to make 32 probes; right?

25   A.   In this particular protein.

1    Q.   But in the state of the art in 1982 and 1983, the person

2    skilled in the art knew that you get fragments of protein,

3    if you can, right?

4    A.   Go on.

5    Q.   And you look for the parts where there are not as many

6    possible choices; right?

7    A.   That's correct.

8    Q.   And then that makes it easier to probe; right?

9    A.   It makes it easier, but does not eliminate all potential

10   pitfalls.

11   Q.   It makes it nothing -- it makes it easier than if you

12   tried to take the areas where every amino acid was -- had

13   six differences?

14   A.   Yes, that's correct.

15         THE COURT:   It's 1:00, Ms. Ben-Ami.  We'll stop

16   taking testimony at this time.

17         Ladies and gentlemen, we'll stop taking testimony.

18   You haven't heard all the evidence, but we are on track.

19   Keep your minds suspended.  Do not discuss the case either

20   among yourselves nor with anyone else.  You may stand in

21   recess until 9:00 a.m. tomorrow morning.  9:00 a.m.  The

22   jury may stand in recess.

23         THE CLERK:   All rise for the jury.

24         (Whereupon the jury left the courtroom.)

25         THE COURT:   Please be seated.  You may step down.

1              (Whereupon the witness stepped down.)

2         **THE COURT:**  Total elapsed time, Amgen, four days,

3    two hours, 25 minutes; Roche, six days, one hour, five

4    minutes.

5              I'm going to recess here, but I want to raise two

6    things, and I won't give you a chance to respond, but you

7    can work this out.

8              I've admitted as Exhibit 22 a large document, which

9    I understood contained the two pages I had previously

10   admitted from a document designated GWO.  Ms. Smith, in

11   looking them over, suggests those two pages are not in the

12   larger exhibit.  It may -- I haven't checked it.  Here are

13   the copies we have.  Work this out.

14             I want to say something about this Dr. Baron.

15             You may take those.

16             And the additional deposition designations of

17   Dr. Baron.  If this were a live witness, I'd know exactly

18   what I would do.  He's adverse to Roche -- Baron is who?

19        **MR. DAY:**  He's independent.  He was subpoenaed by

20   Roche.  He's not an --

21        **THE COURT:**  Okay.  So Roche calls him, and -- well,

22   indeed that confirms, if he's independent, that confirms my

23   analysis.  We're not getting anything else from the

24   deposition of Baron.  The time to do that was the time I

25   first went over that.  That doesn't preclude you from

1   calling Baron live.

2          We'll recess until 9:00 a.m. tomorrow morning.

3   We'll recess.

4          **THE CLERK:**  All rise.

5          **MR. DAY:**  Your Honor?  Could I submit something on

6   that?

7          **THE COURT:**  Of course you could.

8          (Recess.)

9

10             **PROCEEDINGS - 3:47 P.M.**

11

12          **THE CLERK:**  All rise.  Court is in session, please

13   be seated.

14          **THE COURT:**  Well, I certainly thank you for the

15   heads up as to what's coming so I could organize myself.

16   In point of fact, I've read the briefs on both of these

17   matters and I think I'm prepared to rule.  But instead of

18   ruling, I'll tell you what I think and if you don't like it

19   you can argue me off it.

20          First, with respect to Browne, on the record that I

21   have here, it doesn't seem to me that they've refused to

22   produce Browne.  So Browne may be called.

23          On the Harlow, that's an interesting issue

24   actually.  But I think, though courts are split on the

25   matter, that Harlow's testimony comes in as an admission.  I

1       think experts, paid experts, forensic experts are agents.

2       Not all the cases say that.  The cases are split on that.

3       But that's what I think.  And so I would be proposed to let

4       that in.

5            I haven't gone over Harlow with respect to specific

6       objections.  In other words, there may be objections as to

7       relevance, as to his competence, as to anything else.  But

8       what's been briefed is, with support, geez, you can't call

9       the other side's expert.  I disagree with that.  You can.

10      Now, of course that opens up, I suppose, anything which by

11      completeness Roche wants to put in from Harlow.

12           Now, that's my thinking.  And I'll hear the

13      parties.

14           **MS. CARSON:**  Your Honor, with all due respect, Dr.

15      Harlow was only offered on the issue of obviousness/double

16      patenting by Roche.  And it's incorrect to say that we, we

17      decided not to call Dr. Harlow.  It wasn't a decision at

18      all.

19           **THE COURT:**  I just don't care whether you decided

20      to call him or not.  And if all he has to say has to do with

21      obviousness/double patenting, I have ruled that that's a

22      matter for the Court and that would be another reason not to

23      let the jury hear it.

24           **MS. CARSON:**  That's exactly what our point is, is

25      that the opinions that are even arguably admissions, okay,

1    are only the opinions and what he was actually asked to do

2    in the scope of his, of his retention by Roche.  And within

3    the scope of that retention if there were admissions in

4    there that are admissible, they're not admissible in front

5    of the jury because the jury is not considering

6    obviousness/double patenting.

7           THE COURT:  I'm with you.  And I think this one

8    time it made sense for me to speak first, because I only did

9    the analysis I just said.  I've got his deposition, right?

10          MS. CARSON:  Yes, your Honor.

11          THE COURT:  And what Amgen wants to put in they've

12   designated, right?

13          MS. CARSON:  They have.  And we have not counter

14   designated because we reserve the right to counter designate

15   pending whether or not --

16          THE COURT:  Okay.

17          MS. CARSON:  -- Amgen would be permitted to

18   introduce his testimony.

19          THE COURT:  He is going to be permitted, if it's

20   relevant.  Now, I'm going to take the deposition home

21   tonight.  I've listened to the business about

22   obviousness/double patenting.  And if that's all there is,

23   I'm not going to let them put it on.  Though I may, though I

24   may receive it as the judge, but I don't need to take any

25   time on that, I can read.

1          Doesn't that suffice?

2          **MS. CARSON:**  Well, I think that there's another

3    consideration here though because there is a split in

4    authority as to whether or not nontestifying experts'

5    opinions can be admitted.

6          **THE COURT:**  I acknowledge it, but there's no

7    controlling authority in the First Circuit and --

8          **MS. CARSON:**  But this is --

9          **THE COURT:**  -- there's my reasoning.

10         **MS. CARSON:**  But with all due respect, this is a

11   special circumstance where it was through no fault of our

12   own that this expert couldn't be called in our case.

13   Because if we were to put Dr. Harlow on there wouldn't be

14   anything that he could say that would be in the scope of his

15   expert report that wouldn't be subject to a relevance

16   objection.  So we couldn't bring Dr. Harlow if we wanted to.

17         **THE COURT:**  Well, then I don't -- you see, your

18   argument makes perfect sense if I agree with your

19   conclusion.  I don't know whether I agree with your

20   conclusion.  I have not looked at the actual deposition.  I

21   will look at it and draw my conclusions.

22         So, I take it you're making this none of it's

23   relevant, and I'll think about that.

24         **MS. CARSON:**  To the issues that are in front of the

25   jury.

1          THE COURT:  To the issues that are in front of the

2     jury.  Yes.

3          MS. CARSON:  And it's inadmissible hearsay to the

4     issues to be --

5          THE COURT:  But you see it's not.  That's the

6     whole point of the split in the authority.  He's your agent

7     for making these statements and, therefore, the statement of

8     an agent made during the course of the agency about the

9     business is admissible.  That's the federal rule.  I

10    recognize there are cases to the contrary.  I think the

11    better reasoned cases would consider him an agent.

12         MR. FLEMING:  Your Honor, there's a -- I beg your

13    pardon.  There's a nuance to your reasoning which I think

14    your Honor just put his finger on.

15         During the course of a deposition -- during the

16    course of trial, as we are painfully aware of from both

17    sides, the expert is limited to the opinions in his report.

18         THE COURT:  Correct.

19         MR. FLEMING:  So what happened at his deposition

20    though, since he's a molecular biologist, skilled in areas

21    beyond double patenting, because we didn't say I direct you

22    not to answer beyond the scope of your report, they may have

23    elicited opinions from him, dehors his report, beyond his

24    report --

25         THE COURT:  Yes.

1       **MR. FLEMING:**  -- that he would never have been

2   permitted to testify had we been able to press him live as

3   an obviousness type/double patenting.

4       **THE COURT:**  But you see --

5       **MR. FLEMING:**  So we have an, almost an abuse of the

6   process, your Honor.

7       **THE COURT:**  No, I disagree.  It's not an abuse of

8   the process.  The process, as Iana obtains to say, is not a

9   game, it is an attempt to get truthful evidence.  Now, if he

10  got, if he expressed opinions that are relevant, even though

11  these aren't the ones that would be put in his report which

12  would be carefully crafted with the lawyers who, who are

13  employing him, then I think that's a view that I may want to

14  put before the jury.

15      **MR. FLEMING:**  Understandably.  But to the point of

16  them being an adoptive admission.  The client has only

17  adopted those opinions which are in his report.  When he's

18  at a deposition and the opinions that are being elicited go

19  beyond that, I think it's not fair to draw that conclusion

20  that it's being adopted.

21      **THE COURT:**  Respectfully, I disagree.  That's not,

22  that's not the federal rule.  The federal rules allow in

23  evidence the statement of any agent, not authorized

24  statements, though there's a specific rule on that, and not

25  as adoptive admissions.  The statement of any agent made

1    during the course of the employment about the employment.

2            Now, if you want to walk away from that, that's

3    fine.  You can bring out, if you want, all those things that

4    you've just been arguing to me, that's not Roche's official

5    position and the like.  But subject to the obviousness --

6    subject to relevance, because if it's irrelevant I'm going

7    to -- and I take it you object.  You've got a general

8    objection to relevance, right?

9            **MS. CARSON:**  Yes.  But, your Honor, if you're going

10   to actually go through the transcript --

11           **THE COURT:**  I guess I am.

12           **MS. CARSON:**  -- it would be, it would be more

13   convenient for you because we have not counter designated

14   yet, or put objections on the transcript, because we filed

15   this motion, if we could take the transcript, put in the

16   counter designations and the objections and then --

17           **THE COURT:**  I'm fine with that.  But I'm trying

18   very hard to be of service to you people.  I can take it

19   tonight and read it.  As a matter of fact, that's what I'm

20   going to do.  You do the same thing that you're

21   suggesting --

22           **MS. CARSON:**  Okay.

23           **THE COURT:**  -- on another copy.  I will have marked

24   up my copy.  It will be easier.  And I'm going to say to

25   you -- as I read it tonight, I'm going to give you a

1    continuing objection, both as to relevance and as to

2    obviousness/double patenting.  And that may cause me to

3    block out certain things.  And if I've done that we'll see

4    what your designations are and how much of their

5    designations I've blocked out.  I'm just trying to move with

6    deliberate speed so that we don't delay things.  But I'm

7    eager to get your counter designations and your objections.

8           **MR. FLEMING:**  First thing in the morning.

9           **THE COURT:**  So tomorrow.

10          **MS. CARSON:**  We'll do that tomorrow.  Thank you.

11          **THE COURT:**  Then my ruling on Browne has been made.

12          **MR. FLEMING:**  And, your, Honor, do you want to hear

13   anything about that at all?

14          **THE COURT:**  I --

15          **MR. FLEMING:**  I suspect you probably don't want to.

16          **THE COURT:**  I do if -- well, the truth is, I don't

17   as a matter of personal reference, but as a judicial

18   officer, and having afforded you the chance to argue, I will

19   hear you with an open mind.

20          **MR. FLEMING:**  Thank you, your Honor.

21          **THE COURT:**  Yes, I do.

22          **MR. FLEMING:**  And I promise to respect that by

23   being extremely brief.

24          **THE COURT:**  Sure.

25          **MR. FLEMING:**  Being the person with whom the

1    communications were had regarding Dr. Browne's testimony, we

2    had, as your Honor can recall, a very compacted schedule and

3    we were trying to schedule a lot of people.  And the

4    practice would be, I would contact Amgen's counsel and say

5    we want Dr. Smith, we need dates for him.  And they would

6    reciprocate, we had an even change.  And we said we want a

7    date for Dr. Browne.  And they're, well, we've got to get

8    back to you and we're not sure we're representing him and

9    I'm not sure when he's available.  And then several days

10   pass, and you probably should serve him with a subpoena.

11   Now we're on the eve of the close of fact discovery, you can

12   imagine the tension.

13       We rush to California, get him served with a

14   subpoena.  We serve him for April 2nd.  I get a phone call,

15   oh, I just see that you served Dr. Browne, it's April 2nd,

16   he's not coming to his deposition.

17       Well, at that point I have one of two options.  And

18   what I say is, we'll, we're not agreeing that we're just

19   extending it and I'm continuing the subpoena.  I hear

20   nothing more about Dr. Browne's availability until his name

21   appears on the trial list and in the pretrial memo we raise

22   the objection.

23           **THE COURT:**  That's true, you didn't produce him.

24           **MR. CURTO:**  Ms. Fishman had the communication, your

25   Honor.

1      **MS. FISHMAN:**  Mr. Fleming and I were the ones who

2   communicated on this issue.  So without getting into the

3   deep details, I was not served with the subpoena or received

4   a copy of it, courtesy copy of it, I didn't know about it

5   until April 2nd which was the date that it was served, which

6   was the date that Mr. Browne contacted us and informed us

7   that he would accept our representation.

8      I contacted Mr. Fleming as soon as I found that out

9   and informed him, obviously, I didn't have enough notice,

10   but that I would be happy to work with him to make alternate

11   arrangements.  He responded promptly by e-mail saying I

12   understand, and that I will let you know, we will coordinate

13   a deposition, we will go forward with the schedule.  And I

14   believe all that's laid out in the communication.

15      **THE COURT:**  Yes.  Well, actually Mr. Fleming has

16   made some headway.  Here's what we're going to do.

17      There's battalions of you.  So, I'm not faulting

18   anyone.  You may of course call Browne, once his deposition

19   has been taken, and you can start taking it tonight, you get

20   no more than seven hours, but you can't do seven hours

21   tonight.  You could take it tomorrow.  And he could be

22   called the next day or whatever.  They can get his

23   deposition, since they want it, and then he can testify.

24      **MS. FISHMAN:**  Your Honor --

25      **THE COURT:**  Right now.

1          **MS. FISHMAN:**  -- may I make one point?

2          **THE COURT:**  Yes.

3          **MS. FISHMAN:**  And not to get crosswise with

4    anything.  But we disclosed Mr. Browne more than two months

5    ago in our pretrial memo, and at no time that I'm aware of,

6    and I've searched my documents pretty extensively, has Roche

7    ever followed up and requested a date for his deposition.

8          **THE COURT:**  Well, they are now.  And --

9          **MS. FISHMAN:**  Okay.

10          **THE COURT:**  -- it's difficult.  If they want to

11    talk to him first, they can talk to him.  Then you can put

12    him on the stand.  The deposition is not to exceed seven

13    hours and he can be called.

14          **MR. GOTTFRIED:**  Your Honor, in light of our case

15    schedule, we would want to make him available either this

16    evening or tomorrow afternoon so we could call him in our

17    case.

18          **THE COURT:**  Absolutely.  And, I mean, I know -- I

19    do the best I can.  He can be made -- if you'll make him

20    available, they're to take it this evening, no more than

21    three hours, because I want him fresh, and another four

22    tomorrow, and then you can call him the next day.

23          **MR. GOTTFRIED:**  On Thursday.

24          **THE COURT:**  Or, or seven hours tomorrow.  It's one

25    seven hour deposition.  But I expect cooperation on getting

1    a court reporter -- in getting a stenographer on short

2    notice so his deposition can be taken.

3            Yes?

4            MR. GOTTFRIED:  Thank you, your Honor.

5            MR. FLEMING:  If I could just say one thing.  I

6    hope this procedure commends itself to the Court because it

7    seems so much more productive for the jury's time to have

8    these discussions about witnesses in the afternoon rather

9    than at side bar in front of the jury.

10           THE COURT:  I must say I've invited it.  And I

11   don't know what more I can do in being transparent.  Ms.

12   Smith and I are talking among ourselves and saying, boy,

13   they're really picking up on it now.  Now I get these bench

14   memoranda that are real time, they have something to do with

15   the case that I'm about to be wrestling with.  And, yes,

16   I've got piles of things which I'm still working through,

17   and you get these odd orders at odd times which means that

18   something's surfaced in my consciousness and I think I'm

19   able to rule on it.  I've said I was available in the

20   afternoon.  But don't think that all of these things warrant

21   oral hearing.  This is about the most you are going to get.

22           MR. FLEMING:  Your Honor, if --

23           THE COURT:  Though I've whetted Mr. Fleming's

24   appetite, because I was going to deny it and now I've given

25   him something.

```
 1              MR. FLEMING:  Well, your Honor, actually what I was

 2      going to do was first to say, I'm not entirely sure of the

 3      process for the afternoons.  This has now been the second

 4      time at three o'clock I've gotten a call from Amgen saying

 5      we want the Court's attention now.  We're going down to

 6      court.  You come down and be there.  Because quite honestly,

 7      my position was to them, we oppose oral argument on these

 8      motions and don't want to impose on the Court.  And I've had

 9      to pull a tie out of mothballs and come down because --

10              THE COURT:  I think then I --

11              MR. FLEMING:  It's the process that gives me pause,

12      your Honor.

13              MR. GOTTFRIED:  We didn't request oral argument.

14              THE COURT:  Wait a second.  It's easily handled.

15      Because you people are both all busy.  You can always know

16      the schedule of the Court from Ms. Smith.  Always.  And

17      since I do start promptly, I tend to wear out at about four

18      o'clock.  So I don't want to hear you after four o'clock.  I

19      have other things to do.  Some afternoons are completely

20      filled; others are not.  Ms. Smith will know.  There's no

21      one better at calculating what it is.  But, the request for

22      a hearing -- this would be the process you are looking for,

23      Mr. Fleming -- must be made, and conference about it between

24      you, prior to one o'clock so that you both can deploy your

25      resources for a potential afternoon discussion.
```

1          MR. FLEMING:  That's all I ask, your Honor.  Thank

2    you.

3          THE COURT:  Yes, that's fine.

4          MR. FLEMING:  I'm not rushing to take my suit out

5    of the laundry.  Thank you.

6          THE COURT:  All right.  We'll recess until nine

7    o'clock tomorrow morning.  That's the order.

8          THE CLERK:  All rise.  Court is in recess.

9          (Pause in proceedings.)

10          THE COURT:  Wait one second here while -- I'm

11    sorry.  I had thought that I could put my hands on the

12    Harlow deposition instantly.

13          MS. FISHMAN:  They were submitted --

14          THE COURT:  The truth is I can't.

15          MS. FISHMAN:  They were on the -- they were filed,

16    I believe in seal in support of the -- I believe I filed a

17    declaration last night with your Honor.

18          THE COURT:  Oh, yes.  Yes.

19          MS. FISHMAN:  That was --

20          THE COURT:  That must be floating somewhere.  I

21    actually opened that one.  Why were they filed under seal?

22          MS. FISHMAN:  Because I believe that Roche --

23          THE COURT:  Or in this confidential fashion --

24          MS. FISHMAN:  There's no Amgen --

25          THE COURT:  -- which there's much too much of.

 1              **MS. FISHMAN:**  Right.  There's no Amgen confidential

 2      information.  But I believe the transcript was marked

 3      confidential, I believe by Roche, but I don't know that for

 4      a fact.

 5              **MR. FLEMING:**  No.  Your Honor, what's happened,

 6      what happened in many of the cases, where the parties have

 7      agreed that a transcript should be confidential it's done, I

 8      think that the reporters have in some instances done it by

 9      default without any direction from the party, and it's just

10      happened that way.

11              **THE COURT:**  Yes.  Well, I'll tell you that I looked

12      at that.  I opened it.  And I saw that it was a deposition

13      transcript.

14              **MS. FISHMAN:**  Correct.

15              **THE COURT:**  And it had Amgen designations on it.

16              **THE CLERK:**  Is this it?

17              **THE COURT:**  No, it's not that.

18              And I thought what is this, there's nothing secret

19      about this.

20              **MS. FISHMAN:**  Right.

21              **THE COURT:**  And I put it back into its envelope.

22      Further your deponent sayeth not.

23              Now, it happens this afternoon I have to leave the

24      courthouse.  So you're going to get your way in any event.

25      Unless I find it back there in chambers, and I'll take a

 1     moment to look, I think I gave it back to the docket clerk

 2     to give back to you on the theory that there was nothing

 3     secret about this.

 4            But, first thing tomorrow morning get me it.  It

 5     wasn't that long as I recall.

 6            **MS. FISHMAN:**  No.

 7            **THE COURT:**  But you may have counter designations.

 8            **MS. FISHMAN:**  Right.

 9            **THE COURT:**  It will be the first thing I do, and

10     thank you.

11            **MR. FLEMING:**  Thank you, your Honor.

12            **MR. GOTTFRIED:**  Thank you, your Honor.

13            **THE COURT:**  We'll recess.

14            I'm sorry.  Sorry.  Here's what I've got that I

15     think you still want to -- oh, wait a second here.  Here it

16     is.  Wonderful.  I have it.  Harlow.  I have it.

17            Now, here's what I'm to be working on.  Katz.

18            **MR. FLEMING:**  Well, there's a motion as to Katz,

19     your Honor.

20            **THE COURT:**  I know it.

21            **MR. FLEMING:**  Oh, I'm sorry.

22            **THE COURT:**  Hood.  And I've ruled on Baron, but of

23     course that gives you pause.

24            **MR. GOTTFRIED:**  Yes.

25            **THE COURT:**  But when I've seen the brief maybe I'll

1    get back.  But now as though it were secret, which it's not,

2    I have Harlow.

3              Thank you all.  Now, we can recess.

4              **MR. GOTTFRIED:**  Thank you, your Honor.

5              **MR. FLEMING:**  Good afternoon your Honor.  Thank

6    you.

7              (Adjournment.)

8

9                    **C E R T I F I C A T E**

10

11

12             We, Donald E. Womack and Cheryl B. Palanchian,

13   Official Court Reporters for the United States District

14   Court for the District of Massachusetts, do hereby certify

15   that the foregoing pages are a true and accurate

16   transcription of our shorthand notes taken in the

17   aforementioned matter to the best of our skill and ability.

18

19

20             /S/ DONALD E. WOMACK
               _____

21             /S/ CHERYL B. PALANCHIAN
               _____

22

23                    DONALD E. WOMACK
                   CHERYL B. PALANCHIAN
                  Official Court Reporters

24                    P.O. Box 51062
               Boston, Massachusetts 02205-1062

25                womack@megatran.com