```
 1              UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF MASSACHUSETTS
 2
                              Civil Action
 3                            No. 05-12237-WGY

 4  * * * * * * * * * * * * * * * *
                                  *
 5  AMGEN, INC.,                  *
                                  *
 6           Plaintiff,           *
                                  *  DAILY TRANSCRIPT
 7  v.                            *  OF THE EVIDENCE
                                  *    (Volume 12)
 8  F. HOFFMANN-LA ROCHE LTD,     *
    ROCHE DIAGNOSTICS GmbH and    *
 9  HOFFMANN-LA ROCHE, INC.,      *
                                  *
10           Defendants.          *
                                  *
11  * * * * * * * * * * * * * * * *

12

13

14           BEFORE:  The Honorable William G. Young,
                      District Judge, and a Jury
15

16

17

18

19

20

21

22

23
                              1 Courthouse Way
24                            Boston, Massachusetts

25                            September 27, 2007
```

1              A P P E A R A N C E S

2

3              DUANE MORRIS LLP (By D. Dennis Allegretti,
      Esq. and Michael R. Gottfried, Esq.), 470 Atlantic
      Avenue, Suite 500, Boston, Massachusetts 02210
4              - and -
              DAY CASEBEER MADRID & BATCHELDER, LLP (By
5      Lloyd R. Day, Jr., Esq., David M. Madrid, Esq. and
      Robert M. Galvin, Esq.) 20300 Stevens Creek
6      Boulevard, Suite 400, Cupertino, California 95014
              - and -
7              McDERMOTT WILL & EMERY (By Michael Kendall,
      Esq.), 28 State Street, Boston, Massachusetts
8      02109
              - and -
9              McDERMOTT WILL & EMERY (By William G.
      Gaede, III, Esq.), 3150 Porter Drive, Palo Alto,
10     California 94304
              - and -
11             MARSHALL, GERSTEIN & BORUN LLP (By Kevin M.
      Flowers, Esq.), 6300 Sears Tower, 233 S. Wacker
12     Drive, Chicago, Illinois 60606-6402
              - and -
13             STUART L. WATT and WENDY A. WHITEFORD, Of
      Counsel, Amgen, Inc., One Amgen Center Drive,
14     Thousand Oaks, California 91320-1789, on behalf of
      the Plaintiff
15
              BROMBERG & SUNSTEIN LLP (By Lee Carl
16     Bromberg, Esq. and Julia Huston, Esq.), 125 Summer
      Street, Boston, Massachusetts 02110
17             - and -
              KAYE SCHOLER LLP (By Leora Ben-Ami, Thomas
18     F. Fleming, Esq., Patricia Carson, Esq.,
      Christopher Jagoe, Esq. and Howard Suh, Esq.),
19     425 Park Avenue, New York, New York 10022, on
      behalf of the Defendants

20

21

22

23

24

25

**I N D E X**

WITNESS:              DIRECT   CROSS      REDIRECT    RECROSS

STUART H. ORKIN, Resumed

   By Ms. Ben-Ami          1646                     1667

   By Mr. Flowers                      1653

FU-KUEN LIN

   By Mr. Day        1677

EVERETT E. HARLOW, JR., By Deposition

   By Ms. Fishman   1783

|                                                    | FOR | IN |
|----------------------------------------------------|-----|-----|
| **EXHIBITS:**                                      | **I.D.** | **EVID.** |
| 23   Amgen Project Proposal Form  . . . . . | 1685 | |
| 24   Goals of Fu-Kuen Lin regarding EPO . | 1698 | |
| 25   Team Meeting Document  . . . . . . . | 1726 | |
| 26   EPO Project Document, 2/2/83 . . . . . | 1740 | |
| 27   Memorandum, 2/15/83  . . . . . . . . | 1743 | |
| 28   Memorandum, 4/5/84 . . . . . . . . . | 1752 | |

```
 1              THE CLERK:  All rise for the jury.

 2         (Whereupon the jury entered the courtroom.)

 3              THE CLERK:  Court is in session, please be seated.

 4         THE COURT:  Well, good morning, ladies and

 5    gentlemen.

 6              THE JURY:  Good morning.

 7         THE COURT:  You'll see we've lost a juror.  I won't

 8    refer to him on the record by name, but he's come down with

 9    a stomach bug.  He hopes to be well tomorrow.  And so,

10    candidly, we were put to a difficult choice.

11              When I say good morning and I thank you for your

12    promptness and attention, I do that virtually every day, and

13    I say it's not by rote, and it's not.  These lawyers and I

14    all watch you as well as you watch what's going on.  We know

15    how invested you are in this case.  I can't begin to tell

16    you how much we all appreciate your time.

17              And so the choice was shall we wait a day, which

18    will mean we'll give the case to you two weeks out on

19    Friday, or shall we stick to the schedule that I've

20    announced and give it to you on Thursday, because that will

21    happen on Thursday.

22              And on balance, since I still have enough jurors,

23    we thought the fairest thing to you was to stick right to

24    the schedule.  So we're sorry that he's under the weather,

25    but we've excused him and now we have ten jurors who will
```

```
 1    decide the case.  But we're going on, and we are right on

 2    track with respect to the schedule.

 3              And if you'll remind the witness, we'll continue.

 4              THE CLERK:  Sir, I remind you, you are still under

 5    oath, and I'll get you some water.

 6              THE WITNESS:  Yes.

 7              THE COURT:  Ms. Ben-Ami.

 8              MS. BEN-AMI:  Thank you.  Good morning, your Honor.

 9    Good morning, ladies and gentlemen.

10                    STUART H. ORKIN, Resumed

11              CROSS-EXAMINATION (Cont'd)

12    BY  MS. BEN-AMI

13    Q   Good morning, Dr. Orkin.

14    A   Good morning.

15    Q   I just have a few more questions for you.

16              It's correct, sir, that if you didn't believe that

17    you had a reasonable chance of success you wouldn't have

18    embarked on the program to clone the EPO gene, correct?

19    A   I would have to qualify.  I can't give just a simple yes

20    or no.

21    Q   Okay.  So I gave you your deposition, and I would like

22    you to look at Page 70.  Can I point it out to you, sir.

23              And you were asked the question on Page 70 of this

24    deposition:  Did you agree with the majority of the site

25    visit committee in 1981 that there was a reasonable chance
```

1    of success in your attempts to clone erythropoietin?

2         And your answer was:  Well, I think if we didn't

3    think there was a reasonable chance of success we would, we

4    never would have embarked on the experiments.  Doesn't mean

5    certainty, though.

6         Is that a fair and accurate statement?

7    A    That's what I said.

8    **Q**    And you were under oath?

9    A    Under oath.

10        **MS. BEN-AMI:**  Now, could we have, I believe it's

11   what was GWO, which is I believe now Exhibit 22.

12   **Q**    Do you have that, Doctor?  GWO?  It's your first year

13   progress report.

14   A    I have it.

15   **Q**    And you, on direct you talked about some things that

16   were in that report, but I would like to direct your

17   attention to something in your report on that day, which is

18   on pages, this was Pages 10 and 11.  And under C when you

19   talked about cloning of cDNAs and their expression in EPO.

20        Do you see that?

21   A    I see that.

22   **Q**    All right.  It says cloning of cDNAs, that's the part

23   I'm focusing on.  And there you say that you're going to

24   clone the EPO mRNA sequences, right?

25   A    Correct.

1    Q    And you say that this is sufficient to generate complete

2    libraries of any tissue mRNA population.  Correct?

3    A    Correct.

4    Q    And complete means entire?

5    A    That's what it says.

6    Q    Now, let's go back to your progress report number two, I

7    believe which is now Exhibit 2097.

8              And can we have a blowup.

9              And there you said that the most likely explanation

10   for your not cloning the EPO gene was that you didn't have

11   the right sequence, protein sequence, right?

12   A    That's what it says.  I think we did that yesterday.

13   Q    Yes.  I was just giving you foundation for the next

14   question.

15             But you stood ready, you and your team stood ready

16   to continue the work if more sequence information became

17   available, correct?

18   A    We didn't say that.

19   Q    Well, you didn't say that in this report; is that what

20   you're saying?

21   A    I can expand on that if you would like.

22   Q    Let's look at the TKT deposition, the other deposition

23   that I gave you.  Page 73.  And I want to, before I ask you

24   to read that, I want to make sure you understood my

25   question.  I'm not asking you did you say that in the

1   document.  I'm asking whether this was just true in your

2   mind.  That had you -- that you were ready to reactivate the

3   program if there was more sequence?

4   A   I still have to qualify that because I can't say yes or

5   no.  There's more to the answer than just a yes or no.

6   Q   Okay.  So let's read what you said under oath in your

7   deposition.  Do you see it?

8        You said there, "I could make a statement," right?

9   And you say there on Page 73:  There was no purified

10  erythropoietin available in his lab, to my knowledge.

11       And you're talking about your colleague there.

12  Correct?

13  A   Correct.

14  Q   Right.  But that was one of -- Question:  But that was

15  one of the aims of the project.  Correct?

16       And your answer is:  Yes, it was.  And I think

17  we -- You know, I can't remember the chronology precisely,

18  but we certainly stood ready to reactivate the project at

19  any time should there be more sequence available.

20       **MR. FLOWERS:**  Objection, your Honor; this is not

21  impeachment.

22       **THE COURT:**  Overruled.

23  Q   You did say that in your deposition?

24  A   I said that.  And I could qualify if allowed to do so.

25  Q   Well, this was the testimony you gave under oath.

1    Correct?

2    A    Correct.   And it's still correct, but I could expand if

3    you would let me.

4    Q    And I appreciate that.   You understand there are time

5    limits for the lawyers in this case?

6    A    I understand, but I would like to give the right answer.

7    Q    And your counsel can ask --

8    A    Okay.

9    Q    -- on his time.

10   A    Fine.

11   Q    Okay?   I'm happy for your explanations on his time.

12        And so you do agree that you stood -- well, we'll

13   just move on.

14        And when more sequences became available you would,

15   your plan would be to make more probes and to screen your

16   libraries, correct?

17   A    We would have taken advantage of any information.

18   Q    If we look at the next page of your deposition you say

19   that's, that would have been the plan.   Right?

20   A    A plan, yes.   Would be.

21   Q    Well, let's just --

22   A    Okay.

23   Q    Let's read it back to the jury.

24   A    What it says is the plan.   Okay.

25   Q    The plan.

1    A    Yes.

2    Q    The plan was that if you could get more sequence you

3    would reactivate the program and do the probing.  Right?

4    A    Right.

5    Q    Okay.  And now can I have Table 1 from the patent.

6         And here we see the sequence information that was

7    not available to you, right?

8    A    We did not have this.

9    Q    And so Dr. Lin had sequence information from

10   Dr. Goldwasser, right?

11   A    Correct.

12   Q    He had the protein you didn't have, right?

13   A    That's correct.

14   Q    That protein was made by Dr. Goldwasser's laboratory,

15   right?

16   A    I presume from what I understand.

17   Q    And in the period 1981 through 1983 you certainly would

18   have liked to have this number of sequence possibilities

19   available to you, wouldn't you?

20   A    Again, I would have to qualify the answer, but I would

21   like to have it, sure.

22   Q    Doctor, again, let's look at your deposition.

23        And just so we're clear, Doctor, when you were in

24   your deposition you understood you were supposed to tell the

25   complete truth, right?

1    A    Correct.

2    Q    And no one could stop you from giving explanations,

3    right?

4    A    That's not entirely correct.

5    Q    Well, there was --

6    A    There were objections.

7    Q    Well, you answered past objections.

8    A    Sometimes.

9    Q    So, here you were giving the complete truth.  And let's

10   look at the bottom of Page 128.

11          MR. FLOWERS:  Objection; argumentative, your Honor.

12          THE COURT:  No, she may have the question.

13   Q    I'm looking at the bottom of Page 128.  And it says:  In

14   your project in 1981 through '83 you certainly would've

15   liked to have had this number of sequence possibilities

16   available to you, wouldn't you?

17   A    Yes.

18   Q    And what's the answer that you said?  Can you read your

19   answer?

20   A    We would, we would've been very pleased to have them.

21   Q    But you did not have the material that Dr. Goldwasser

22   gave to the, from the NIH -- I'm sorry.

23          You did not have the material that Dr. Goldwasser

24   gave to Amgen?

25   A    I didn't have it, yes.

1    Q    And your most likely explanation in the early 1980's to

2    the NIH for failing in your project was because you did not

3    have enough sequencing information?

4    A    We went through that.

5    Q    That's a yes?

6    A    We've been through that.  Yes.

7              MS. BEN-AMI:  No further questions.

8              THE COURT:  Mr. Flowers, anything further?

9              MR. FLOWERS:  Yes, your Honor.

10                    REDIRECT EXAMINATION

11   BY  MR. FLOWERS

12   Q    Good morning, Dr. Orkin.

13   A    Good morning.

14   Q    When you were trying to clone the EPO gene back in the

15   early 1980's, did you have any EPO protein sequence that was

16   derived from Dr. Goldwasser's and Dr. Miyake's research?

17             MS. BEN-AMI:  Objection; leading.

18             THE COURT:  Yes, sustained on that ground.

19   Q    Did you have any protein sequence at that time?

20   A    The protein sequence we used was from, disclosed by

21   Dr. Goldwasser at a meeting of the hematology society.

22   Q    How did you learn of that?  How did you learn of that?

23   A    I was actually present when he presented it.

24   Q    And what did he present?

25   A    He presented sequence of the N-terminus of the protein.

1    Q    What does that mean?

2    A    That means the beginning of the protein.

3    Q    And how much sequence did he disclose at that time?

4    A    He disclosed, I believe 28 amino acids.  I can't

5    remember the exact number.  Something of that order.

6    Q    Did you ever learn whether that sequence was correct?

7    A    After the publication of the sequence we learned that

8    there were a couple of errors in that sequence.

9    Q    Did you learn that any of that sequence was correct?

10         **MS. BEN-AMI:**  Objection, your Honor; leading.

11         **THE COURT:**  Yes, sustained on that ground.

12   Q    Was any of that sequence not an error?

13         **MS. BEN-AMI:**  Your Honor?

14   A    There was --

15         **THE COURT:**  Sustained.

16   Q    So could you describe that sequence further?

17   A    That sequence was 28 amino acids long, and there were,

18   there was one position, I believe there was an error and

19   another a question, something on that order.  But the

20   majority of the sequence was in fact correct.

21   Q    Did you use any of that sequence?

22   A    We had used portions of that sequence to generate these

23   oligonucleotide probes we spoke of yesterday.

24   Q    And what portions did you use?

25   A    We used virtually every portion of that sequence with

```
 1    multiple probes.

 2    Q    Did you use any of those probes to screen cDNA

 3    libraries?

 4             MS. BEN-AMI:  Your Honor, leading.

 5             THE COURT:  Sustained.

 6    Q    How did you --

 7             THE COURT:  Do not lead the witness.

 8    Q    How did you use the probes?

 9    A    As we said yesterday, we generated pools of probes, many

10    thousands in the mixtures to screen libraries.  And after

11    the cloning had been described, or after the sequence had

12    been published, we went back to ask where the sequences that

13    we used from regions that were correct or incorrect in the

14    protein, and we actually found in retrospect that one of the

15    probes we used --

16             MS. BEN-AMI:  Objection, your Honor; outside the

17    scope of his report.

18             THE COURT:  Where, where is it?

19             MR. FLOWERS:  Your Honor, I was responding, asking

20    questions in response to Ms. Ben-Ami's cross.

21             THE COURT:  Where is it in the report?

22             MR. FLOWERS:  It's not directly in the report, your

23    Honor.

24             THE COURT:  Move on.

25             MR. FLOWERS:  Your Honor, could we have a side bar
```

 1    on this?

 2          THE COURT:  You may.

 3    SIDEBAR CONFERENCE, AS FOLLOWS:

 4          THE COURT:  You people have daily copy.  You may

 5    ask her, Ms. Ben-Ami asked you and would you like to explain

 6    your answer, and you answered whatever, would you like to

 7    explain that answer.  Yes, you can.  That's it.

 8          MR. FLOWERS:  Your Honor, Dr. Orkin was identified

 9    as a fact witness in this case and in fact a motion was --

10          THE COURT:  We've had your direct.  We've had your

11    direct.

12          MR. FLOWERS:  Is he allowed to testify as a fact

13    witness at all on redirect?

14          THE COURT:  I don't give advisory opinions.  We'll

15    see.  But that's outside the scope.  That calls -- what

16    you're asking for there calls for expertise.  As a matter of

17    fact, this is so technical that most of this calls for

18    expertise.  So I don't think there's much along that line.

19          Now, something else.  This business about the

20    Harlow deposition.  I take grave umbrage to the fact that a

21    deposition was designated confidential.  And this business

22    of giving me confidential documents stops right now.

23    Everything further in this trial is on the record.

24          (Whereupon the sidebar conference concluded.)

25

1   **BY  MR. FLOWERS**

2   **Q**   Dr. Orkin, yesterday and today Ms. Ben-Ami asked you

3   some questions about this portion of your progress report,

4   the last sentence in particular, the most likely

5   explanation.

6             Do you recall that?

7             **THE COURT:**  Your question is do you recall her

8   asking those questions?

9             **MR. FLOWERS:**  Yes.

10  **Q**   Do you recall her asking you about that?

11  A   Yes.  Yes.

12  **Q**   This says the most likely explanation related to

13  sequence.  Was there any other explanation?

14  A   The other one which I think we touched on yesterday,

15  too, was that we need to use the probe on a target which is

16  a library.  And if the library does not contain the

17  erythropoietin sequence and that is the starting source

18  didn't contain sufficient amounts that we would be able to

19  clone it, we would never succeed.  So the fact that we did

20  not succeed or did not get a positive doesn't really tell us

21  which is the sure answer.

22  **Q**   Now, yesterday Ms. Ben-Ami asked you some questions

23  about this paragraph under Rationale and particularly the

24  third sentence down, starts at the fifth line, in fact, by

25  constructing sufficient numbers, and it goes on.  And at the

1    bottom you said we believe the protein sequence can be

2    isolated.

3            When did you write that?

4    A    This was written in 1980, September 1980, when the grant

5    was -- this is -- let me just -- excuse me, which document

6    are we referring to?  Let me go back.

7    Q    It's this Exhibit 2100.

8    A    In terms of the -- is this GWO or GW -- which?  Okay.

9    Sorry.

10            Yes, this is the original application,

11    September 1980.

12    Q    And had you started working on any cloning project at

13    that point?

14    A    Yes, we had begun.

15    Q    Had you started the EPO project?

16    A    We had done some preliminary work for --

17            **MS. BEN-AMI:**  Objection, your Honor.

18            **THE COURT:**  No, he may have that.

19    A    We had begun preliminary experiments toward that, yes.

20    Q    Now, down below on the same page, where it says

21    erythropoietin sequences should be especially suited.

22            Did you know how long the EPO mRNA was?

23    A    We did not know how long the message was.  It was a

24    guess.  The protein we knew was not terribly large.  So the

25    presumption was the message would not be exceedingly large.

1    However, that is a guess and there are many examples where

2    short proteins have long messages.

3              **MS. BEN-AMI:**  Objection, your Honor; outside of the

4    report, the second part.

5              **THE COURT:**  So much of the answer as begins there

6    are many examples, that's stricken; the rest stands.

7    **Q**   Yesterday with regard to this document when Ms. Ben-Ami

8    was asking you some questions you said it does say in there

9    that most clones are partial.

10             Do you remember that?

11   **A**   Yes.

12   **Q**   Why did you say that?

13   **A**   That was a common knowledge at the time, common

14   experience.

15   **Q**   Does it say that anywhere in this document?

16   **A**   I believe we did but would have to go through it to

17   actually find the position.

18   **Q**   This sentence:  If necessary, we would have to utilize

19   our first recombinant to search for cDNA clones with larger

20   inserts.

21             Why did you write that?

22   **A**   This is a sentence that refers to partial clones.

23   **Q**   What did you mean by that sentence?

24   **A**   That meant that if we were lucky to obtain a first

25   recombinant which is a clone, we might have to search for

1  larger pieces, larger clones, in order to get the whole

2  sequence.

3  **Q**   Did you ever do that?

4  **A**   We never did that because we didn't get the first clone.

5         **MS. BEN-AMI:**  Objection, your Honor.  Now it's

6  outside his report.

7         **THE COURT:**  No, that my stand.

8  **Q**   Now, Ms. Ben-Ami asked you some questions about this

9  passage on Page 118 of the document.  It talks about using

10 tissue from cells producing erythropoietin from kidney

11 tissue and renal carcinoma cells.  She asked you about that

12 yesterday.

13        Do you see where I'm referring to?

14 **A**   Yes.

15 **Q**   Why did you propose to use those tissues or cells?

16 **A**   We proposed using those tissues because, frankly, we

17 were, we didn't know where the erythropoietin message would

18 be present in sufficient amounts to clone it.  So, we

19 proposed using several different sources in order to try to

20 hedge our bets.

21 **Q**   Doctor, could you look at Exhibit 2098, please.  Do you

22 have that?

23 **A**   Yes, I have it.

24 **Q**   What were you trying to do in the work described in this

25 paper?

1   A    This paper was aimed at cloning cDNA for a human enzyme

2   called adenosine deaminase.

3   Q    And Ms. Ben-Ami asked you some questions yesterday about

4   this portion of the paper under discussion that describes a

5   general method.  You said that you wanted to explain.

6         Could you please explain?

7   A    Yes.  What I meant by this is that the method we used,

8   which was the use of these short probes, again cDNA

9   libraries, is general but with the proviso that the cDNA

10  library actually contains the cDNA you want to clone.

11  Because if you don't know it's present you cannot succeed.

12  Q    Doctor, the next paragraph begins with:  We are using

13  the present cDNA clone.

14        What were you describing there?

15  A    Yes.  What I described there is that in this paper

16  published in 1983 the clone actually isolated was a partial

17  clone, it was not a complete clone.  And that we then

18  wanted, that would, the clone we had would permit us to go

19  back to try to get a complete clone.

20  Q    So how much of the clone did you have?

21  A    We didn't have the entire coding region.  We were

22  actually missing some at that time.

23  Q    Doctor, what does this paragraph describe?

24  A    This says that the cDNA we isolated spanned 223 amino

25  acids in a protein, and that we estimated that a hundred

1    were missing.  So we had cloned about two-thirds of the, of

2    what we wanted.  We had not gotten the whole thing.

3    **Q**   It says, it says a hundred amino acids at the end, amino

4    terminal end are not encoded.

5          And the last sentence talks about poly A tract.

6    What is that referring to?

7    A   Yes.  Poly, a poly A --

8          **MS. BEN-AMI:**  Objection, your Honor; outside the

9    scope of his report.

10          **THE COURT:**  And also outside the scope of the

11    cross.  Sustained.

12    **Q**   Do you have 2099, sir?

13    A   I have it.

14    **Q**   Yesterday Ms. Ben-Ami asked you some questions about

15    this article as well.  And she asked you whether you looked

16    for areas of the protein you were trying to clone for the

17    least degenerate sequence.

18          Do you remember that?

19    A   Yes.

20    **Q**   What cDNA, what were you trying to achieve in the work

21    described in this paper?

22    A    In this paper we were trying to clone cDNA for another

23    human enzyme called phosphoglycerate kinase.

24    **Q**   And how much did you know about that protein when you

25    started this project?

```
 1    A    When we began this project we knew a tremendous amount

 2    about the protein.

 3    Q    Could you compare that to what you knew about EPO when

 4    you started this project?

 5              MS. BEN-AMI:  Objection; outside the scope.

 6              THE COURT:  Sustained, on that ground.

 7    Q    What did you know about this protein?

 8              THE COURT:  You have to keep your voice up.  What

 9    did you know about?

10              MR. FLOWERS:  This protein.

11              MS. BEN-AMI:  Objection, your Honor.  I think it's

12    outside the scope.

13              THE COURT:  Yes, it is.  Sustained.

14              MS. BEN-AMI:  And it's not in the report.

15    Q    Do you have the deposition transcript that

16    Ms. Ben-Ami pointed you to from the TKT case?

17    A    Yes, I do.

18    Q    If you could go to Page 70.

19    A    Yes.

20    Q    Do you recall she asked you a question about the answer

21    you gave on this page:  Well, I think if we didn't think

22    there was a reasonable chance of success we wouldn't have

23    embarked on the experiments.

24    A    Correct.

25    Q    What did you mean by that?
```

1    A    What I meant was certainly if we thought the chance was

2    zero we never would have tried.  But we thought that we were

3    experienced and might have a shot at it.

4    Q    Now, could you turn to Page 73.  She asked you about an

5    answer you gave at Lines 16 to 19.

6         Do you see that?

7    A    Yes.

8    Q    Would you please explain what you meant by that?

9    A    What I -- what it says is that we stood ready to, it

10   says we stood ready to reactivate the project at any time

11   should more sequence become available.

12   Q    And what time period were you referring to there?

13   A    This was in the time period 1983.

14   Q    Did you ever reactivate the program?

15        **MS. BEN-AMI:**  Objection; outside the scope, your

16   Honor.

17        **THE COURT:**  No, he may have that.  You may answer.

18   A    Yes.  What I, what I qualified, we certainly would

19   reactivate the part of the project using the cDNA probes if

20   we had more sequence.  However, we also in our progress

21   reports described that we would use, we still had other

22   avenues we were considering to cloning the cDNA at that

23   time.  So we hadn't, so we hadn't entirely given up, but we

24   were prepared to use sequence if it became available.

25   Q    Yesterday Ms. Ben-Ami asked you whether you knew if Dr.

1    Lin's patent applications were filed in 1984.  I wanted to

2    ask you, do you know if Dr. Lin filed his first patent

3    application in 1983?

4    A    I don't in fact --

5              **MS. BEN-AMI:**  Objection; outside.

6              **THE COURT:**  Well, yes, that's not -- sustained.

7    **Q**    Yesterday Ms. Ben-Ami asked you some questions about

8    statements in this document on this page, in particular

9    about conducting sufficient numbers of independent --

10   A    Yes.

11   **Q**    -- recombinant plasmas and so forth.

12             What was your expectation in 1980 about how

13   difficult it would be to clone a human EPO gene?

14   A    We said --

15             **MS. BEN-AMI:**  Objection, your Honor; outside the

16   scope of his report and outside the cross.

17             **THE COURT:**  But you inquired specifically about

18   this.

19             **MS. BEN-AMI:**  I -- I don't want to argue.

20   A    I said in the original application --

21             **THE COURT:**  You may answer.

22   A    -- we said it was, we read it yesterday, that it was

23   admittedly ambitious, which meant it was very difficult.

24   **Q**    What was your expectation in 1981?

25   A    It was --

1          **MS. BEN-AMI:**  Objection, your Honor; outside the

2    scope.

3          **THE COURT:**  Yes, sustained.

4    **Q**    Is there anything Ms. Ben-Ami pointed you to during your

5    cross-examination that changes your opinion about whether

6    cloning the EPO gene in 1983 was obvious?

7    A    It was nothing she pointed to.  We've -- I've certainly

8    thought about this problem in the intervening period.

9          **MS. BEN-AMI:**  Objection; beyond, now we're beyond

10   what's in the report.

11         **THE COURT:**  No, no, he may amplify on it.  Go

12   ahead.

13   A    I've certainly thought about why we failed, and I've had

14   plenty of time to do so since we're almost 20 years later.

15   And in point of fact, even to this day we don't know the

16   precise reason.  Perhaps the probes were defective as she

17   has implied.  But we also feel that we didn't have an

18   adequate source and knowledge of the source from which to do

19   the cloning.  So the combination I think provides ample

20   reason for why we may have failed.

21         **MS. BEN-AMI:**  Objection, your Honor; speculation.

22         **THE COURT:**  No, it may stand.

23   **Q**    You said an adequate source.  An adequate source of

24   what?

25   A    Of the messenger RNA for EPO.

1          MR. FLOWERS:  Thank you.  I pass the witness.

2          THE COURT:  Anything further?

3          MS. BEN-AMI:  Yes, just a little bit, your Honor.

4          THE COURT:  Go ahead.

5                  RECROSS-EXAMINATION

6   BY  MS. BEN-AMI

7   Q   In Your redirect you just spoke about the sequence

8   information you did have, that N-terminal sequence.

9   A   Correct.

10  Q   Right?  And you said Dr. Goldwasser had flashed that up

11  on a screen in 1981?

12  A   I think it was '81.

13  Q   In '80, '81.

14  A   I can't remember the precise date.  Whatever, yeah.

15  Q   But you knew that that sequence was very degenerate,

16  right?

17  A   It was degenerate, yes.

18  Q   Well, it was --

19  A   Yes, it was.

20  Q   -- highly degenerate?

21          MR. FLOWERS:  Objection; outside the scope.

22          THE COURT:  Overruled.

23  Q   Highly degenerate?

24  A   It was degenerate, yes.

25  Q   And just so -- let's remind the jury what that means.

1   A   That means in order to make a probe one has to make many

2   hundreds or perhaps thousands of probes in a mixture.

3   Q   That means when you showed them before that you might

4   only have one choice of the three letters, that's not

5   degenerate, right?

6   A   Correct.

7   Q   And then there are other sequences where the letters,

8   the amino acids can be coded for by six, right?

9   A   Correct.

10  Q   And so when a sequence is highly degenerate you have

11  many, many more possibilities?

12          **MR. FLOWERS:**   Objection; outside the scope of the

13  direct.

14          **THE COURT:**   Overruled.

15  Q   Right?

16  A   Correct.

17  Q   And that's why you were highly discouraged with regard

18  to using that sequence information, correct?

19  A   I don't think that's an accurate statement.  I can't

20  answer yes or no.

21  Q   Okay.  Well, you agree that a person of ordinary skill

22  in the art in 1983 would have been very discouraged by the

23  high degree of codon degeneracy reflected in the amino acid

24  sequence?

25          **MR. FLOWERS:**   Objection; it's outside the scope of

1    the redirect, your Honor.

2           **THE COURT:**  No, overruled.  She may have it.

3    A    You would prefer one that was less degenerate, yes.

4    **Q**    Let's read from your expert report.  Paragraph 49.

5           Now, this expert report is also sworn to under

6    oath, right?

7    A    Right.

8    **Q**    So Paragraph 49, it says:  In designing a probe based on

9    the human EPO protein sequence reported by Sue, et al.

10          Now, that's the Goldwasser sequence, right?

11   A    Correct.

12   **Q**    The '81 sequence, not the material he gave Dr. Lin.

13   A    That's the one that was shown at the meeting.

14   **Q**    Right.  Not the stuff that's in Table 1?

15   A    That's the one shown at the meeting.

16   **Q**    To help the jury, it's not the one that's shown in Table

17   1 of the patent?

18   A    I don't know.  Some of it is shown in Table 1.  I don't

19   know -- portions of it.

20   **Q**    It's not all the information, it's --

21   A    Not all the information.

22   **Q**    Okay.  Just -- so it says in designing a probe based on

23   the human EPO sequence reported by Sue, et al., which is the

24   '81 material, one of ordinary skill in 1983 would have been

25   very discouraged by the high degree of codon degeneracy

1    reflected by the identified amino acids, right?

2    A    Correct.

3    **Q**    Okay.  And you agree with that?

4    A    I agree with that.

5    **Q**    So, the information that you had was old information

6    compared to what Dr. Lin had?

7    A    We had information in '81.

8    **Q**    You had information that was from '81 while Dr. Lin had

9    material that was from '83?

10   A    That's what I understand, but I don't have -- I didn't

11   have knowledge at the time.

12   **Q**    Okay.  Now, you said that it was also possible the

13   reason you failed was because you didn't have the right

14   library.  Right?

15   A    Correct.

16   **Q**    But when you were in the grant proceedings, when you

17   were writing to the NIH, you did not say that was the reason

18   you most likely failed?

19   A    Can I qualify that again or -- I said, we already went

20   through it, and I said most likely, but that is not the

21   only.

22   **Q**    Right.  But the most likely you said was the probe?

23   A    Was a guess.

24   **Q**    Okay.  And you showed the jury that you got a partial

25   sequence, on your redirect, a partial sequence in one

1  instance.  But that partial was 233 amino acids long, right?

2  A  That's right.

3  Q  And so that partial sequence was much bigger than the

4  full length of EPO?

5  A  Yes.

6  Q  So when you were writing in your report we think we can

7  get the full-length of EPO, that's because this gene that

8  you showed the jury on redirect was much bigger and EPO was

9  smaller?

10  A  Only the coding region was smaller.

11  Q  Okay.

12  A  At the time we didn't know anything about the three

13  prime untranslated part.

14  Q  But what you told the NIH was because the EPO was

15  relatively small you believed you would get the full-length?

16  A  Can I qualify and give you -- explain?

17  Q  If you can say yes, then the jury will have the

18  information in the jury room.  They'll have the reports.

19  A  I don't understand.

20  Q  Can you answer yes or no.  You told the government that

21  because of the small size of the EPO protein you believed

22  you would get the full-length coding region, right?

23  A  I think we've already discussed it.  I won't answer yes

24  or no to that.

25  Q  Okay, fine.

1          **MS. BEN-AMI:**  No further questions, your Honor.

2          **THE COURT:**  Nothing further, Mr. Flowers?

3          **MR. FLOWERS:**  Nothing further, your Honor.

4          **THE COURT:**  You may step down, thank you.

5          (Whereupon the witness stepped down.)

6          **THE COURT:**  Call your next witness.

7          **MR. DAY:**  Amgen calls Dr. Fu-Kuen Lin, your Honor.

8          **THE COURT:**  He may be called.

9          **MS. BEN-AMI:**  Your Honor, while he's coming can we

10  have a short side bar?

11          **THE COURT:**  We may.

12  SIDEBAR CONFERENCE, AS FOLLOWS:

13          **THE COURT:**  Yes.

14          **MS. BEN-AMI:**  There is a letter of agreement that

15  we disclose our witnesses and who it's going to be and their

16  order.  The next witness is supposed to be Dr. Strickland.

17  After Dr. Strickland, Dr. Goldwasser, and then Dr. Lin.

18          Now, what they are doing -- we followed the rules

19  on the whole side of the case -- what they're doing now is

20  going completely out of order.  I don't have my exhibits.  I

21  don't have my boxes.  I don't have anything here.  This is

22  just -- we asked them last night is this your order.

23          **THE COURT:**  What do you say to that, Mr. --

24          **MR. GOTTFRIED:**  I called Amgen last night about

25  eight o'clock and indicated it's likely that our next

 1   witness was Dr. Lin.

 2          **MS. BEN-AMI:**  Who did you tell?

 3          **MR. GOTTFRIED:**  I was on the phone with Mr. --

 4          **MS. BEN-AMI:**  Sorry.

 5          **MR. GOTTFRIED:**  -- Heckel and --

 6          **THE COURT:**  Wait.  Wait.  Now, the one -- you

 7   people may have different mores because you don't normally

 8   practice in this Court.  But the one more that I absolutely

 9   insist on is that you talk to me.  If you don't, you may --

10   I've seen it in other courtrooms -- come to blows.  So --

11          **MS. BEN-AMI:**  I apologize, your Honor.

12          **THE COURT:**  That would have been my question.  Who

13   did you tell?

14          **MR. GOTTFRIED:**  I spoke with a Mr. Heckel and a Mr.

15   Fratangelo and there was a third gentleman whose name I

16   can't recall who was on the phone also.

17          **THE COURT:**  Okay.  Where are they?

18          **MS. BEN-AMI:**  I will find them.

19          **THE COURT:**  Well, I mean, Lin is essential here.

20   All right?  Or he was mentioned in the opening.  I think

21   it's obvious he would be called.

22          **MR. DAY:**  May I speak for a second?

23          **THE COURT:**  Yes.

24          **MR. DAY:**  They had us keep Fu-Kuen Lin out here

25   every day for the first two weeks of the trial because they

1   were going to call him the next day.  The next day they were

2   going to call him.  The last day of the first two weeks of

3   trial they told us they weren't going to call him.  So they

4   never called him in their case.

5           THE COURT:  Okay.

6           MR. DAY:  We gave them two days' notice that we

7   were calling him today.  And last night, as Mr. Gottfried

8   said, we told Roche's --

9           THE COURT:  What do you mean two days' notice you

10  were going to call him today?

11          MR. DAY:  No, what we have here, your Honor, is we

12  have an agreement that two days in advance of the trial, at

13  five o'clock, two days in advance of trial, we designate,

14  each side designates who they may be calling next, in no

15  order, just who the witnesses are that may be coming.  The

16  night before we disclose the evidence that's going to be

17  used in the direct, so we disclose exhibits.

18          THE COURT:  All right.

19          MS. BEN-AMI:  This is Mr. Fratangelo, your Honor.

20          THE COURT:  He says he told you they were going to

21  be calling Lin today.

22          MR. FRATANGELO:  They gave me a list of a bunch of

23  people and I specifically asked for the order and was told

24  that, he wouldn't tell us the order, or it was based on how

25  much time Dr. Orkin took or how the day proceeded.  He would

1    not tell me the order.

2           **THE COURT:**  Well, was Lin one of them?

3           **MR. FRATANGELO:**  Lin was one of them in the letter

4    and one of the ones that was disclosed, along with

5    Strickland and several others.

6           **MR. GOTTFRIED:**  Your Honor, may I respond?

7           **THE COURT:**  Wait a minute.  One, these are private

8    agreements among yourselves.  But they're the type of

9    agreements that I would expect competent counsel to enter

10   into.  And having entered into them, I would expect them to

11   be kept generously.

12          Now, with all respect to Mr. Day, I'm not terribly

13   troubled that they didn't put a witness on the stand.

14   That's one of the beneficent effects of time limits, to

15   force you to go for the arteries, not the capillaries, which

16   is apparently your normal instincts.

17          Look --

18          **MR. DAY:**  My point's a little different, your

19   Honor.

20          **THE COURT:**  Yes, it may be.  Yes, it may be.

21          Have we got anybody we can do before Lin?

22          **MR. DAY:**  No, sir, we don't.

23          **MR. GOTTFRIED:**  I'm sorry, your Honor.  I told

24   Mr. Fratangelo and Mr. Heckel that our plan had been to call

25   Dr. Browne.  Dr. Browne is now being deposed this morning.

```
 1   We need your ruling on the protective order for the seven

 2   hours.

 3           THE COURT:  Right.

 4       MR. GOTTFRIED:  And in light of that the most

 5   likely next witness was Dr. Lin.  That's what I said.  The

 6   only uncertainty was -- because our plan had been to call

 7   Browne.

 8           THE COURT:  Here's what we're going to do.  They

 9   can put Lin on.  You don't have to cross-examine him.  For

10   whatever reason, you may.  You can make your choice as to

11   that.  And by the close of business today, that's the end of

12   the day, I want in writing your agreement as to the call of

13   witnesses and I may tweak it, make it into an order if we're

14   going to have fights like this.

15           MS. BEN-AMI:  Can I make a suggestion, your Honor?

16           THE COURT:  Sure.

17           MS. BEN-AMI:  Can they just put Lin on and then

18   I'll cross him out of order.

19           THE COURT:  That was my suggestion.

20           MS. BEN-AMI:  Okay.  I'm okay with that.

21           THE COURT:  Because I think you know enough to

22   object.

23           MS. BEN-AMI:  I do.

24           THE COURT:  And you'll have your boxes and the

25   like.
```

 1              **MS. BEN-AMI:**  No, that's -- I do.  And I'm not

 2     trying to tell you I can't do anything.

 3              **MR. DAY:**  Your Honor?

 4              **THE COURT:**  Yes.

 5              **MR. DAY:**  Excuse me.  I need a ruling on Browne.

 6     Because Browne can only testify tomorrow.  After tomorrow

 7     he's gone.

 8              **THE COURT:**  Well, this business that people are

 9     gone I'm utterly unsympathetic to.

10              (Whereupon the sidebar conference concluded.)

11              **THE CLERK:**  Right this way, sir.

12              Sir, would you raise your right hand.

13              Do you solemnly swear that the answers you will

14     give to this Court and Jury will be the truth, the whole

15     truth, and nothing but the truth, so help you God?

16              **THE WITNESS:**  Yes, I do.

17              **THE CLERK:**  Please be seated.

18                        FU-KUEN LIN

19                  **DIRECT EXAMINATION**

20     BY  **MR. DAY**

21     **Q**   Good morning, Dr. Lin.

22     A   Good morning.

23     **Q**   Would you please introduce yourself to the jury?

24     A   My name is Fu-Kuen Lin.

25     **Q**   Are you the inventor of the patents at issue in this

1    case?

2    A   Yes, I am.

3    Q   What is your educational background?

4    A   I got my B.S. and M.S. degree from National Taiwan

5    University, and I have a Master Degree, both degrees in

6    pathology, Department of Pathology, and my thesis for my

7    master degree was in physiology fungi.  And I also got my

8    Ph.D. degree from University of Illinois at Champaign

9    Urbana, and also from the Department of Pathology.  And I

10   also work in physiology of fungi for my Ph.D. thesis.

11   Q   And when did you receive your Ph.D., sir?

12   A   I received my Ph.D. in 1971.

13   Q   When did you first begin to work with recombinant DNA

14   technology?

15   A   I started in 1979.

16   Q   When did you join Amgen?

17   A   I joined Amgen in August of 1981.

18   Q   What was Amgen like when you first joined the company?

19   A   When I first joined the company there was something like

20   a total of 13 employees altogether, I believe, in this tiny

21   building, a few thousand square foot, and there's only a

22   small working bench, laboratory bench for scientists to

23   work; the rest of the area is under renovation.

24   Q   When did you first begin to work with EPO?

25   A   Soon after I joined Amgen.

1   Q    When you first began to work on EPO what was known about

2   the DNA sequence for EPO?

3   A    Nothing is known about the DNA sequence of human

4   erythropoietin.

5   Q    What was known about how or what produced human EPO in

6   the body?

7          MS. BEN-AMI:  Objection, your Honor.  Your Honor, I

8   think we need a side bar --

9          THE COURT:  Yes.

10         MS. BEN-AMI:  -- at this point.

11         THE COURT:  We may.

12         MS. BEN-AMI:  I'm sorry, Dr. Lin.

13  SIDEBAR CONFERENCE, AS FOLLOWS:

14         THE COURT:  He's an expert, isn't he?

15         MS. BEN-AMI:  No, he's a fact witness.

16         THE COURT:  Yes.

17         MR. DAY:  He's the inventor of the patents.

18         THE COURT:  Fine.  All right.  He's a fact witness.

19  You can ask him what did you know.

20         MR. DAY:  I will.

21         THE COURT:  But that's the difference.  It's all

22  got to be of his own personal knowledge.

23         MS. BEN-AMI:  Can I make one other point, your

24  Honor?

25         THE COURT:  Yes.

1          **MS. BEN-AMI:**  We're back to this, what's the

2    background of the inventions versus what the witness is

3    going to testify to because --

4          **MR. DAY:**  This is all cross-examination, your

5    Honor.

6          **MS. BEN-AMI:**  I'm sorry.

7          **THE COURT:**  Well, all right.  I'll take care of

8    that.

9          **MS. BEN-AMI:**  Okay.  I can --

10         **THE COURT:**  No, he may be, he may be asked.

11         (Whereupon the sidebar conference concluded.)

12   **BY  THE COURT**

13   **Q**    To your knowledge, Dr. Lin, what was known about the

14   DNA -- I'm sorry.

15         To your knowledge, what was known about how or what

16   produced human EPO in the body?

17         **THE COURT:**  No, sustained.  Because we've -- if

18   you're going to ask him --

19         **MR. DAY:**  To his knowledge.

20         **THE COURT:**  -- these questions -- yes.  But it's

21   his knowledge back then, not what he knows now --

22         **MR. DAY:**  That's correct.

23         **THE COURT:**  -- about.  Yes.

24         Back then, sir.

25         **THE WITNESS:**  Yes.

1   Q   When you first began to work on the EPO project -- this

2   is, all of these questions are premised at the time you

3   started at Amgen.

4   A   Sure.

5          MS. BEN-AMI:  Can we have a date for that, your

6   Honor?

7   Q   I think you said you started at Amgen in 1981?

8   A   That's correct.  August '81.

9   Q   All right.  So, at the time that you started at Amgen,

10  to your knowledge, what was known about how or what produced

11  human EPO in the body?

12  A   No, we don't know.

13  Q   To your knowledge, at that time what, if any, genetic

14  libraries were known to contain a copy of EPO DNA?

15         MS. BEN-AMI:  Same --

16         THE COURT:  Same problem.  You've got it were

17  known.  What did he know.  What libraries did he know back

18  then?

19         MR. DAY:  To his knowledge I asked him, your Honor.

20         THE COURT:  Well, no, respectfully you didn't.  It

21  is what was known.  And this witness can't testify to that.

22         MR. DAY:  May I put the question --

23         THE COURT:  All what he thought.

24         MR. DAY:  May I put the question again?

25         THE COURT:  You may.

```
 1   Q    At that time, when you started, to your knowledge, what,

 2   if anything, was known about what genetic libraries

 3   contained a copy of EPO DNA?

 4            MS. BEN-AMI:  Objection, your Honor.

 5            THE COURT:  Overruled.

 6            MS. BEN-AMI:  Objection, your Honor; leading.

 7            THE COURT:  No, no.  Overruled.

 8   A    No.  Nothing is known about any library that contain

 9   human EPO gene.

10   Q    What was your role on the EPO project at Amgen?

11   A    I was the project leader.

12   Q    And over what time period were you the EPO project

13   leader at Amgen?

14   A    Started from the time I joined Amgen, took the project,

15   until the end of '84.  Near the end of '84.

16   Q    What were your responsibilities as EPO project leader?

17   A    I set the objectives for the projects; set the

18   strategies for how to accomplish the objectives; and also

19   the experimental approach to accomplish the project, make

20   the right decision.

21            MS. BEN-AMI:  Objection, your Honor.

22   A    And make sure there are sufficient resources to carry

23   out --

24            THE COURT:  Wait, wait a minute.  When she objects

25   you have to stop.
```

```
 1              THE WITNESS:  Oh, sorry.

 2              THE COURT:  But the objection is overruled and your

 3    testimony may stand.

 4              MS. BEN-AMI:  Your Honor, may I have a side bar?

 5              THE COURT:  You may.

 6              MS. BEN-AMI:  Your Honor, I withdraw that.  Sorry.

 7    BY  MR. DAY

 8    Q    Dr. Lin, did you finish your answer about what your

 9    responsibilities were?

10    A    No, not quite.  I forgot where I stopped, was get

11    interrupted.

12    Q    Okay.  Well, that's what happens.

13              Who was responsible for --

14              MS. BEN-AMI:  Move to strike, your Honor.

15              THE COURT:  The comment's stricken; ask questions.

16    Q    Let me ask you to take a look at Exhibit AWG in your

17    notebook.  There's a notebook of exhibits on your desk

18    there, and it's Tab I in your exhibit notebook.

19              You'll see in the upper right hand corner it says

20    Exhibit AWG.  Are we looking at the same --

21    A    Yes.

22    Q    Who created this document?

23    A    I did.

24    Q    Why did you create this document?

25    A    At Amgen we have such a practice at the time that for
```

 1    any project that we have at the time, the project leader had

 2    to write project objective, whatever the, what underlies the

 3    opportunity for such a project, that will be coming out of

 4    this project, and the tentative feasibility and

 5    difficulties, and any other competitive activity going on

 6    outside in other companies; and also, later the experimental

 7    approach for dealing with the project.

 8    **Q**   When did you create Exhibit AWG?

 9    A   It was in -- it's on January 16, 1982.

10         **MR. DAY:**  Your Honor, I offer Exhibit AWG into

11    evidence.

12         **THE COURT:**  Any objection?

13         **MS. BEN-AMI:**  I object to the extent that it

14    includes hearsay.

15         **THE COURT:**  May I see it.

16         **THE CLERK:**  I gave you a book.

17         **THE COURT:**  Of course you have.  I apologize.

18    AW --

19         **MR. DAY:**  It's Tab 1, your Honor.

20         **THE COURT:**  It's under Tab I.  Thank you.

21         **MR. DAY:**  And we offer it under Rule 803(6),

22    business record.

23         **THE COURT:**  Yes.

24         Let me just be clear, sir.  This is an internal

25    Amgen document, this is what you have to tell your superiors

 1   about what you're doing and then it gets updated as it's

 2   done.

 3            Have I got that right?

 4            **THE WITNESS:**  That's correct.

 5            **THE COURT:**  All right.  The objection is overruled.

 6   It's admitted under 803(6), and it will have the --

 7            **THE CLERK:**  23.

 8            **THE COURT:**  AWG is 23.

 9            **MR. DAY:**  Twenty-three, your Honor.

10            **THE COURT:**  Twenty-three.  AWG is 23.

11            (Exhibit marked in evidence.)

12   Q   What were the objectives when you, in January 1982, what

13   were the objectives of the EPO project?

14   A   To clone the genes.  Basically to isolate the gene for

15   erythropoietin and use the gene to make sufficient quantity

16   of material so it can be tested in the clinical setting for

17   anemia patients.

18   Q   Who were the members of your EPO project team from 1981

19   to 1983, or '84?

20   A   Jeff Browne.  Joan Egrie.  Tom Strickland.  Steve

21   Elliott.  Por Lai.

22   Q   What did Jeff Browne do on the project?  What was his

23   role?

24            **MS. BEN-AMI:**  Objection, your Honor.

25            **THE COURT:**  No, sustained.  But you may say -- he

1    may testify from his own knowledge what he --

2    Q    As the project leader, what did you understand to be

3    Jeff Browne's role on the team?

4    A    He was assigned --

5            MS. BEN-AMI:  Objection, your Honor.

6            THE COURT:  Sustained.  Not what he understood,

7    what did you assign him to do?

8    A    He was assigned to do the tissue culture, cell culture,

9    and doing the gene expression.

10           THE COURT:  And what did you observe him doing, if

11   you did.

12           THE WITNESS:  Yes.

13           THE COURT:  What did you see him do?

14           THE WITNESS:  Oh, what did I see him do?

15           THE COURT:  Yes.

16           THE WITNESS:  I give the material, I order the

17   cells that need to be cultured and give it to him to

18   culture.  And when I have an EPO gene, I gave the gene to

19   him for doing expression in cells.

20   Q    So as the project leader, did you work with these people

21   you just named on a daily basis on the EPO project team?

22   A    Yes, daily basis.  Because at the time we have only two

23   building and all the scientists at the time was in the very

24   small building.  We see very often in the day, many times in

25   the day.

1    **Q**    Were you physically located in the same building?

2    A    Yes.

3            **MS. BEN-AMI:**  Objection, your Honor.  He is

4    leading.  I apologize.

5            **THE COURT:**  Well, that is, but we'll let that

6    stand.  Don't lead the witness.

7    **Q**    And what was Joan, what did you understand to be Joan

8    Egrie's role that you assigned her to do on the EPO project?

9    A    Yes, Joan Egrie was assigned to develop the quality

10   assurance test for the EPO products; such as

11   radioimmunoassay test, in vitro assay, in vivo assay.

12   **Q**    What did you understand Tom Strickland's role to be as

13   you assigned it on the EPO project team?

14   A    He was assigned to do the purification of

15   erythropoietin.

16   **Q**    What did you understand Steve Elliott's role to be on

17   the EPO project team while you ran the project?

18           **MS. BEN-AMI:**  Objection.  That question was asked.

19           **THE COURT:**  No, overruled.  He may testify as he

20   was the project loader.

21   A    Steve Elliott was assigned to do the EPO protein gene

22   expression in yeast system.

23   **Q**    And what did you understand to be Por Lai's role on the

24   EPO project while you were the project leader?

25   A    Por Lai was doing protein sequencing work for me and

 1    also for other people at Amgen.

 2    Q    Who set goals for the individual members of your team?

 3    A    I set goals for them.

 4    Q    Were team members instructed how to accomplish their

 5    goals?

 6              **MS. BEN-AMI:**  Objection.

 7              **THE COURT:**  Sustained.  Don't lead the witness.

 8    Q    What, if any, instructions were given to team members

 9    about how to accomplish their goals?

10              **THE COURT:**  Well, not were given.

11              What instructions did you give to team members,

12    about how to do it?

13              **THE WITNESS:**  Oh.  Yes.  The goals, the big picture

14    they know what they need to do.  I don't need to give them

15    the detailed instruction on a daily basis because they know

16    what they are doing, that's why they were assigned to do

17    that job.  I don't have to give them daily instructions, of

18    the entire instruction.

19    Q    Over what time period did you -- strike that.

20              How many hours a day did you work on the EPO

21    project?

22    A    I normally work ten to fifteen hours, sometimes even

23    longer.  And seven days a week at the time.

24    Q    Who isolated the gene for human EPO?

25    A    I isolate the gene for human EPO.

1    **Q**    When?

2    A    In October of 1983.

3    **Q**    Now, if I suggested to you that isolating the EPO gene

4    simply involved the routine application of known

5    techniques --

6            **MS. BEN-AMI:**  Objection.

7    **Q**    -- in 1983 would you agree?

8    A    No.

9            **MS. BEN-AMI:**  Objection, your Honor.

10           **THE COURT:**  Sustained.

11           **MS. BEN-AMI:**  Motion to strike, your Honor.

12           **THE COURT:**  Sustained.

13   **Q**    Why do you believe you were able to clone the EPO gene?

14   A    Because --

15           **MS. BEN-AMI:**  Objection, your Honor.

16   A    -- I took the approach --

17           **THE COURT:**  Overruled.  He may tell us.

18   A    Because I took approach no one had taken before.

19           (Pause in proceedings.)

20   A    Could I break for, break just for a few minutes?

21   **Q**    Are you all right, Dr.  Lin?

22           **THE COURT:**  Yes, are you all right?

23           **THE WITNESS:**  Yes.

24           **THE COURT:**  All right.  See if you can answer that

25   question.

1          You think that the essential reason that you were

2     able to do it was that you took an approach that no one else

3     had taken.  Is that right?

4          **THE WITNESS:**  That's right, yes.  Because, because

5     I took approach to try to get the gene from human genome.

6          **THE COURT:**  Tell the jury.

7          **THE WITNESS:**  Which is much more difficult.  Sorry.

8          Which was more difficult than try to get the gene

9     from a cDNA library.  Because human genome is so much,

10    encompass hundreds of times more than the cDNA library.  And

11    in the process of developing this process and hybridization

12    condition, we had to use so much radiation -- radio isotope

13    and had to work out the condition that would allow one to

14    develop, to detect the gene in this system without exposed

15    to tremendous amount of radiation, radio isotope, piece of

16    ratio isotope.

17         Even after we have extensive optimization of the

18    hybridization process, even in the, in the screening, just

19    one screening, we had to use more than 10 million, 12, about

20    30 million mer of isotope, it was just in one simple

21    screening.

22         So the process of developing such a, from the

23    hybridization, developing a hybridization we use hundreds

24    and hundreds of million mers of isotope.

25         I'm sorry, that --

1    Q    Let me turn to a different subject.

2    A    Yes.

3    Q    Before you isolated the gene for EPO, what different

4    cloning approaches did you consider using in order to clone

5    the EPO gene?

6    A    I had put in --

7              MS. BEN-AMI:  Your Honor, could we have side bar?

8              THE COURT:  Wait, wait a minute.  I don't think

9    that's necessary.  He may answer.

10             THE WITNESS:  Can I proceed?

11   Q    What different cloning approaches did you --

12   A    I had taken three simultaneous approach to clone the EPO

13   genes.  One is cDNA route, using cDNA strategy.  The other

14   one is genomic strategy.  And I also -- which both of them

15   required sequence of erythropoietin information for making

16   probes.  The other one I use, it was a so-called expression

17   cloning system which does not require the use of EPO amino

18   acid sequence.

19   Q    Very briefly --

20   A    Yes.

21   Q    -- would you explain what the cDNA cloning approach is,

22   in a sentence or two?

23   A    CDNA cloning approach required one to have cell lines

24   that make human cell line or tissue that would be making

25   erythropoietin.  Then this can be used to track for

1    messenger RNA to make library.

2    Q    And very briefly, what is a genomic DNA cloning

3    approach?

4    A    Genomic DNA approach is that you try to get the gene

5    from the human genome, that means a total DNA present in our

6    cells, human body, and which contain all the gene active or

7    not active and many other genomic DNA that are present in

8    the human genome.  And the cDNA only deal with the gene that

9    is active, that is present in the human genome.  And only a

10   small fraction of genes are really active in the cells, in

11   the particular cells.  So that means the cDNA is much, much

12   simpler than the genomic DNA.  And genomic DNA is hundreds

13   time more complicated, complex than the cDNA.

14   Q    And very briefly, could you explain what your expression

15   cloning approach was?

16   A    Expression cloning approach is, you can use -- you don't

17   need a messenger amino acid sequence of EPO.  You basically

18   try to use a messenger RNA.  You have to have cells that are

19   making EPO and use the cell to inject, to express the gene

20   in the particular suitable system, and then you measure for

21   the product by antibody or by in vitro assay.

22   Q    As between the cDNA and the genomic approach which did

23   you prefer?

24   A    I definitely prefer cDNA.  As I explained earlier, it's

25   so much easier.  This hasn't been done before.  Genomic DNA

 1    hasn't ever been done before by using oligonucleotide to

 2    isolate the gene.

 3    Q   So, let's talk about your cDNA approach first, just very

 4    briefly.

 5             Generally, what tools did you need in order to

 6    attempt to isolate a copy of the EPO gene using your cDNA

 7    strategy?

 8             **MS. BEN-AMI:**  Your Honor, I object.

 9             **THE COURT:**  Sustained.  You can modify it by saying

10    at the time you designed your approach what did you think

11    you needed.  Then.  Back then.

12    Q   Back then.  So, I want to refer you back, I want to talk

13    about what you did --

14    A   Yes.

15    Q   -- during the project --

16    A   Yes.

17    Q   -- over the time period 1981 to 1983.  Okay?

18             And during that time period, what tools did you

19    believe at that time that you needed in order to isolate a

20    copy of the EPO gene using your cDNA strategy?

21    A   First thing I need is to have cell line or tissue that

22    making human erythropoietin.  That's what we have to have.

23    Without it we cannot make cDNA.  So we look for this.  Yes.

24    Q   Okay.  So you needed a cell line?

25    A   Or tissues, yes.

1   **Q**   Why did you need the cell line?  To do what?

2   A   The cell line, so that we can extract messenger RNA from

3   these cells and then use this messenger in order to make

4   complimentary DNA.  That's what's called cDNA.  And use this

5   to make a library.  And then one can look for the gene in

6   the library.

7   **Q**   Okay.  So in addition -- so you needed a library.

8   A   Yes.

9   **Q**   That was one thing.

10         Did you have any other tools that you needed?

11   A   Yes.  Yes, of course.  Then you had to, had to have

12   probes that you can fish out what you want.  Fish out the

13   EPO gene from the library.  So the probe would need, say we

14   can make a probe based on the amino acid sequencing,

15   sequence information of erythropoietin.

16   **Q**   In addition to the library and the probe, was there any

17   other tools that were required?

18   A   Yes, of course.  You have a probe, then you have to find

19   out condition that is necessary for probe to work.  And you

20   have to develop a hybridization condition which would make

21   the probe to work in the screening.

22   **Q**   So let's consider the library first, the cDNA library

23   first.  What did you do to create a cDNA library back in

24   1981 to 1984?

25         **MS. BEN-AMI:**  Your Honor, before Dr. Lin gets into

```
1    this, can we have a quick side bar?

2              THE COURT:  We may.

3              MS. BEN-AMI:  Hearsay.

4    SIDEBAR CONFERENCE, AS FOLLOWS:

5              MS. BEN-AMI:  There's lots of things that Dr. Lin

6     is testifying to under the we standard, not the I standard.

7              THE COURT:  Well, there is no we standard.

8              MS. BEN-AMI:  But that's what's happening.

9              THE COURT:  Well, you must object.

10             MS. BEN-AMI:  And --

11             THE COURT:  I've tried to confine the questions

12    every time you've objected.

13             MS. BEN-AMI:  Okay.  So I just, I want to ask that

14    Mr. Day be asking what did he himself do.

15             THE COURT:  He would be wise if he did.

16             (Whereupon the sidebar conference concluded.)

17    BY  MR. DAY

18    Q    So Dr. Lin --

19    A    Yes, could you repeat the question?

20    Q    Sure.  Are you ready?

21    A    Yes.

22    Q    Back in 1981 to 1983, as the project leader of the EPO

23    project team, what did you to create a cDNA library?

24             MS. BEN-AMI:  Objection; hearsay.

25             THE COURT:  No, it's what he did.  What did you
```

1    yourself do, sir?

2              **THE WITNESS:**  Yes.

3              **THE COURT:**  You may tell us.

4              **THE WITNESS:**  Yes.  I look for cells, first thing

5    as I mentioned earlier, that we need to have cells or tissue

6    that making EPO, look for, I try and try and look for it,

7    throughout, for years we, and we could not find anything

8    that could be used, useful for making the cDNA library.

9              **MS. BEN-AMI:**  Objection, your Honor; that was

10   hearsay.

11             **THE COURT:**  I'm sorry, I didn't hear you.

12             **MS. BEN-AMI:**  Hearsay.

13             **THE COURT:**  No.  I'm letting that stand.

14   **Q**   To your knowledge, as project leader was Amgen ever

15   successful in making a cDNA library for human EPO DNA?

16             **MS. BEN-AMI:**  Objection.

17   A   No.

18             **THE COURT:**  Wait a second.  Sustained, and the

19   answer is stricken.

20   **Q**   Were you ever successful in making a cDNA library that

21   contained a copy of the human EPO DNA?

22             **MS. BEN-AMI:**  Leading.

23             **THE COURT:**  Overruled.

24   A    No, I couldn't.  Because I couldn't find any cell that

25   making EPO to start with.  So I couldn't make a cDNA library

1    out of it.

2    **Q**    Okay.  Let me ask you to turn in your notebook in front

3    of you to Tab 2.  It's Exhibit ABB.  Do you have that in

4    front of you?

5    A    Yes.

6    **Q**    Exhibit ABB?

7    A    Yes.

8    **Q**    Do you recognize this document?

9    A    Yes, I do.

10   **Q**    Who created this document?

11   A    I did.

12   **Q**    When did you create this document?

13   A    This is on December 16th, 1982.

14   **Q**    Why did you create this document?

15   A    This document is update EPO project status, and also

16   make mention of what, the things that we are doing and need

17   to be done.

18   **Q**    Was this document created as part of your work on the

19   EPO project at Amgen?

20   A    That's correct.

21        **MR. DAY:**  Your Honor, I would offer Exhibit ABB

22   into evidence.

23        **THE COURT:**  Any objection?

24        **MS. BEN-AMI:**  No objection, your Honor.

25        **THE COURT:**  ABB then is admitted in evidence,

1    Exhibit 24.

2            (Exhibit marked in evidence.)

3    **Q**   Does Exhibit 24, Dr. Lin, describe some of the steps

4    that you took to attempt to build a cDNA library while you

5    worked on the EPO project at Amgen?

6    A    That's correct.

7            **MR. DAY:**  Let me ask, pull up point 5, if we could,

8    please.

9    **Q**   Point 5 refers to a human polycythemia renal tumor to be

10   made available by Dr. Goldwasser.

11           Do you see that?

12   A    Yes.

13   **Q**   Could you, could you explain what that was and what that

14   was to be used for?

15           **MS. BEN-AMI:**  Objection; now that's hearsay.  And

16   expert testimony.

17           **MR. DAY:**  This is his document, your Honor.

18           **THE COURT:**  Just a moment.  I guess -- sustained,

19   only because I didn't understand the question.  Explain what

20   what was?

21           **MR. DAY:**  That renal tumor.

22           **THE COURT:**  Okay.  Why he wanted that renal tumor?

23           **MR. DAY:**  Yes, and what it was to be used for.

24           **THE COURT:**  Yes, he can tell us what he thought

25   then.

```
 1              What did you then think that you wanted that renal

 2    tumor for?

 3         THE WITNESS:  Renal tumor is a kidney tumor.

 4    Polycythemia tumor means that this, this tumor is making a

 5    lot of, individual making a lot of red cells.  So that maybe

 6    there's a chance this, this tumor could be used for, to

 7    contain a lot of EPO-producing cells.

 8         MR. DAY:  Would you please pull up point 6.

 9    Q    Point 6 refers to search for readily available human

10    cells, other than kidney and liver, that make EPO.

11              Could you describe what search you made, Dr. Lin,

12    for cells that actually would produce EPO while you were

13    working on the EPO project at Amgen back in 1981 to 1984?

14    A    At the time without that EPO --

15         MS. BEN-AMI:  Objection, your Honor.

16    A    -- there was --

17         THE COURT:  Yes.  The problem is she's objecting

18    when you use the word we this.

19         THE WITNESS:  Oh.

20         THE COURT:  Or we that.

21         THE WITNESS:  Oh, I'm sorry.

22         THE COURT:  You're the witness.  We can all look at

23    you as you testify.  And really Mr. Day is asking these

24    questions carefully to ask you what you thought.

25              Now, I understand you had a team.  And maybe we'll
```

```
 1    hear from somebody else on the team.  And I understand that

 2    you say you're the project leader.  Fine.  But all your

 3    testimony is what you thought.

 4              THE WITNESS:  Right.

 5              THE COURT:  Not what people told you but what you

 6    thought.  What you were planning, what you knew --

 7              THE WITNESS:  Yes.

 8              THE COURT:  -- back then --

 9              THE WITNESS:  Sure.

10              THE COURT:  -- in 1983.

11              MR. DAY:  And what you did.

12              THE COURT:  So put the question again.  And what he

13    did.

14              THE WITNESS:  Okay, thank you.

15              THE COURT:  What you did.

16    Q    So, would you please describe what search you made --

17    A    Yes.

18    Q    -- back while you were working on the EPO project in

19    1981 to '83, '84, for cells that produced EPO?

20    A    Yes.  I was looking for cell that public available such

21    as those that can be obtained from American Type Culture

22    Collection.  And those we, I obtained cells from the, from

23    human kidney source and cells of human liver source, that

24    those both are tumor cells, and also obtained cells that,

25    that other laboratory was using that is called human
```

1    embryonic kidney cells, which was reported to have produced

2    EPO.  We also tried -- I also tried to obtain that from

3    them.  We did actually obtain it.

4          And of course I also look into many other cells

5    type that was considered to be a possible source of EPO

6    production cells, such as macrophage, pneumonia macrophage,

7    spring microphages, and any other tumor tissue that would

8    come to our attention which may produce erythropoietin.

9    Q   Why did you want these cells?

10   A   Because I need these cell, if I want to make a cDNA

11   library, the first thing I need to have is a cell that

12   making the erythropoietin.

13   Q   And did you ever succeed in finding cells that would be

14   useful for making a cDNA library?

15   A   No.  We looked and looked and looked for a long time.

16   We couldn't find anything.

17          **MS. BEN-AMI:**  Objection again, your Honor.

18   A   I couldn't find anything.

19          **THE COURT:**  Well, you couldn't find anything.  All

20   right, we'll leave it there.

21          **MR. DAY:**  Let me ask you to pull up points 1 and 2

22   on this memo, please.

23   Q   Let me ask you to look at the last sentence of point

24   number 2 here.  You wrote:  I will clone the gene into the

25   plasmids and M15 phage and sequence it.

1          What type of cloning strategy were you referring to

2     here?

3     A    This is a common strategy, the human genomic cloning DNA

4     strategy that I was referring to.

5     Q    Okay.  So, in 1982 why were you pursuing both genomic

6     and cDNA cloning?

7     A    Because I did not know which strategy would work.  So I

8     had to try simultaneous approach.

9     Q    Let's turn to your efforts to isolate the human EPO DNA

10    from a genomic DNA library, if we could.

11         First of all, at that time, back in 1981, '82, '83,

12    what did you understand to be the difference between a cDNA

13    library and a genomic DNA library?

14    A    The cDNA library is made, first you had to have cells

15    that's making the gene of interest, have to have a cell

16    making the protein of interest of whatever the thing you are

17    interested in, and then you, you extract a messenger RNA,

18    messenger RNA transcribed on the DNA, messenger RNA is used

19    to make a complimentary DNA copy and make it into a library.

20         So, as I explained earlier, this, this gene that's

21    making the protein, the so-called protein-producing gene,

22    constitute only a small fraction of the total human DNA in

23    the human genome.

24         And genomic DNA, it's made out of the total DNA

25    that present in the human body.  There's a master blueprint

1    for the whole body, it contain all the gene, active,

2    nonactive, in the other tissues, and also a lot of genomic

3    DNA.  So in this genomic DNA, among the DNA in the human

4    genome is hundreds of times more complex than present in the

5    cDNA.

6    **Q**   So, in 1981 to 1983, in that time period, while you were

7    the project team leader, what tools did you believe that you

8    needed in order to pursue your genomic cloning strategy?

9    A   The tool are to pursue genomic DNA approach, because we,

10   first we need to have a genomic DNA library, human genomic

11   DNA library which hopefully contain the human EPO gene.

12            **MS. BEN-AMI:**  Objection, your Honor.  I object,

13   your Honor.

14            **THE COURT:**  Yes.  So much of the which hopefully

15   that --

16            **MS. BEN-AMI:**  I object.

17            **THE COURT:**  -- is stricken.

18            **MS. BEN-AMI:**  I object to what Mr. Day is doing.

19   He's, he's --

20            **THE COURT:**  It's not evidence of anything.

21            **MS. BEN-AMI:**  Well.

22            **THE COURT:**  And I will caution the jury.

23            Again, I've told you all about demonstrative aids.

24   Now, it's all right for a lawyer to, as he listens to a

25   witness, try to replicate what he thinks is important about

1    the witness's testimony in an outline or the like.  That's

2    all right.  Just the lawyer can't argue and it has to be an

3    accurate replication of what the witness is saying.

4         So he can do that.  Ms. Ben-Ami doesn't like it,

5    saying it's inaccurate.  She may object.  And I'll decide

6    that.  Hopefully without slowing things down.  You just

7    remember this isn't evidence of anything.  It comes from the

8    lawyers.  The lawyers are not the source of evidence.  But,

9    like a demonstrative aid, if it helps you understand and

10   recall what the witness is testifying to, and it's fair and

11   accurate, it's all right to write that way.  Remember, like

12   any other witness, you're the judges, you can believe a

13   witness, can disbelieve a witness, can believe part of what

14   a witness says, and disbelieve another part.

15        Go ahead.  What's written is not problematic for

16   me.  I'm not saying anything about it.

17   Q    So the question --

18        **MR. DAY:**  I'm sorry, your Honor.

19        **THE COURT:**  Go ahead.

20   Q    I would like to just come back to the question that I

21   asked you.  Back in 1981 to 1983, what tools did you believe

22   that you needed in order to pursue your genomic cloning

23   strategy?

24   A    Yes.  First you had to have a human genomic DNA library;

25   then, second, you need to have probes.

1    Q    Anything else?

2    A    And then you had to develop a hybridization condition

3    that would make the probe to work as I explained earlier.

4    Q    Now, in 1981 to 1983 as you were developing your genomic

5    cloning strategy, what did you consider?  What did you,

6    Fu-Kuen Lin, consider when designing probes?

7             MS. BEN-AMI:  Objection; vague, your Honor.

8             THE COURT:  I'm going to ask that it be put again,

9    and it's my fault.  Would you put it again, Mr. Day.

10            MR. DAY:  Sure.

11   Q    In 1981 to 1983 when you were developing your genomic

12   cloning strategy, what did you, Fu-Kuen Lin, consider when

13   designing probes?

14   A    Yes.  To design a probe, one had to consider the length

15   of the probe that you use.

16   Q    I'm sorry, what was that?

17   A    The length.

18   Q    Length?

19   A    Yes.  Because you need certain lengths for the probe to

20   work.  So we had to decide what lengths to use.  And then

21   decide, you know, the so-called degeneracy, to use the

22   degeneracy of the probe, how to, fully degenerated or

23   partially degenerated probe.  And then we have to decide,

24   you know, how many probes that we need, the multiple set of

25   probes that we would need for probing genomic.

1   **Q**   Multiple sets?

2   A   That's correct.

3   **Q**   Now, back in 1981 to 1983 as you were developing your

4   genomic cloning strategy, what choices did you have to

5   consider with respect to -- did you -- I'm sorry, not have

6   to.  What choices did you, Fu-Kuen Lin, consider with

7   respect to the hybridization conditions?

8   A   Yes.  To make the hybridization, in order for hybrid --

9           **MS. BEN-AMI:**  Objection, your Honor.  I --

10          **THE COURT:**  No.  I will sustain it.  He's asking

11   you what did you consider.

12          **THE WITNESS:**  Yes.

13          **THE COURT:**  And you started off by saying to make,

14   you were sort of testifying generally.

15          **THE WITNESS:**  All right.

16          **THE COURT:**  But you may answer his question.

17          **THE WITNESS:**  Sure.

18          **THE COURT:**  What did you consider in that regard?

19          **THE WITNESS:**  I consider for the hybridization

20   condition --

21          **THE COURT:**  Yes, tell the jury.

22          **THE WITNESS:**  -- I consider the condition that had

23   to eliminate, it had to, it had to be allowed a perfect

24   match, nucleotide sequence to match, and that not perfect

25   match would not hybridize.  That means that the 20 mers

1   nucleotides would only hybridize with the 20 nucleotide

2   sequence.  Pair for sequence but not to the 19th or to the

3   18th.  And for the 17th nucleotide long, oligonucleotide

4   long would hybridize only to the 17th but not the 16th or

5   the 15th.  So that they have a specificity.

6          And the other consideration I had, I had is that we

7   had to allow one to eliminate for false positive, and also

8   eliminate false negative.

9   Q    Excuse me.  Let me stop you.  I'm just trying to catch

10  up with you.

11         So you said perfect versus nonperfect matches; is

12  that right?

13  A    That's correct.

14  Q    And then you said eliminate false positives?

15  A    That's correct.

16  Q    Okay.  I'm sorry, I didn't mean to interrupt.

17  A    And also eliminate false negative.  And also had to make

18  sure that the signals-over-noise ratio be increased so that

19  the true hybridization signal would be there, would not be

20  obscured by the background noise.

21         And let me explain the so-called false positive and

22  false negatives.  False positive --

23         **MS. BEN-AMI:**  Objection, your Honor.

24         **THE COURT:**  Yes.  Sustained.

25         **MR. DAY:**  I'll put a question.

1            **THE COURT:**  Sustained as to the explanation.

2    **Q**   Let me come back to the considerations, the design

3    considerations that you spoke about when you were designing

4    the probes in 1981 to 1983.

5            What do you mean by probe length?

6    A   The length means how many nucleotide in the stretch.

7    Say, for example, if it's 17 nucleotides in the stretch,

8    called 17 mers, and if it was 20 nucleotides you use

9    together, that is the lengths, how many nucleotides in the

10   probe.

11   **Q**   And if it were 20 nucleotides long it would be called

12   what?

13   A   Twenty mer.

14   **Q**   Twenty mer?

15   A   Yes.  M E R.

16   **Q**   M E R.

17   A   Yes.

18   **Q**   And what did you mean by probe degeneracy?

19   A   Degeneracy means that there's, for a given sequence of

20   an amino acid there are many, many possible nucleotide

21   sequence for that.  And if it contains all the possible

22   sequences it's called fully degenerate, it contain all the

23   degenerate codons in there.  And if it contain only part of

24   this sequence, is called partially degenerated probes.

25   **Q**   Okay.  And what did you mean by multiple sets?

1    A    Because the way I use the probe, it's come in a big set

2    at a time, 128 at a time, 128 at a time.  And 128 is a set.

3    128 in the other set.  These sets made from different

4    region, a different sequence of a protein.

5    Q    Now, with respect to the hybridization conditions that

6    you were developing in 1981 to 1983, you mentioned perfect

7    versus nonperfect matches.

8         Could you explain what you meant by that insofar as

9    the hybridization conditions were concerned?

10   A    Yes.  Yes.  The perfect match, say if the probe is 20

11   nucleotide long, if it hybridize to a match 20 nucleotide

12   long, also, also all 20 match, that means a perfect match.

13   If it's only -- those that have one match, that means only

14   19 out of 20 that match, then that means a nonperfect match,

15   or 18 out of 20 matches, that is a nonperfect match.

16   Q    And you also mentioned the elimination of false

17   positive.  Would you explain what you meant by false

18   positives?

19   A    In the genomic screening, because of tremendous amount

20   of DNA present in the human genome, it creates a lot of

21   signals that is really not, not EPO gene.  That means it

22   hybridize to DNA sequence other than the EPO gene, not a

23   real one, so the false positive.

24   Q    So what would hybridize to something other than the EPO

25   gene?  The probe?

1          **MS. BEN-AMI:**  Objection, your Honor; expert.

2          **THE COURT:**  Yes, sustained.

3    **Q**   What type of false positives were you concerned about?

4    **A**   The DNA sequence have, it the same part of DNA sequence,

5    but it's not true EPO gene.  Just some sequence that is

6    present in the human genome.

7    **Q**   Okay.  And what did you mean by false negatives?

8    **A**   That means that when you supposed to detect but it's not

9    there.  Because the way you do it, condition is not correct,

10   even if it's there you cannot see it, and you would have

11   this false negative problem.

12   **Q**   And what did you mean by signal-to-noise ratio?

13   **A**   Signals, signal means that, because we use a

14   radioisotope label, which will create black dot in the X ray

15   film, this is, we say this is a signal, the isotope

16   radiation signal.  And the true hybridization hybridize and

17   create a signal.  But in the background also absorb a lot of

18   isotope.  It also create a background.  Therefore, you are

19   going to, it's going to obscure the true hybridization, the

20   true signal.  That means the true, the gene that you will be

21   interested in.  Therefore, you want to increase the true

22   signal, reduce the noise that's nonspecific, that radiates

23   the signal coming out, either from the background or from

24   the gene, whatever it might be.

25   **Q**   Now --

1    A    And then you -- excuse me.  And then you have to, in

2    order for this to work one had to use the right amount of --

3          MS. BEN-AMI:  Objection, your Honor.

4          THE COURT:  Yes.  So much of the answer as begins

5    "in order" is stricken.

6    Q    In 1981 to 1983 as you were developing your genomic

7    cloning approach, what effect did these design choices have

8    on your GDNA strategy?

9    A    When we -- when I change the lengths of the probes or

10   degeneracy of the probe it would all affect the

11   hybridization --

12         MS. BEN-AMI:  Objection, your Honor.

13   A    -- condition.

14         THE COURT:  No.

15         MS. BEN-AMI:  Your Honor?

16         THE COURT:  There was no objection to that question

17   which called for that answer.

18         MS. BEN-AMI:  Can I ask --

19         THE COURT:  It may stand, and it's time to take the

20   morning recess.

21         Ladies and gentlemen, you have not heard all the

22   evidence.  Please, therefore, keep your minds suspended.  Do

23   not discuss the case either among yourselves nor with anyone

24   else.

25         We'll stand in recess for one-half hour until

1    11:15.  We'll recess.

2             **THE CLERK:**  All rise for the jury.

3             (Whereupon the jury left the courtroom.)

4         **MS. BEN-AMI:**  Your Honor, may I be heard for one

5    second?

6             **THE COURT:**  For one second.  Please be seated.

7         **MS. BEN-AMI:**  Yes.

8             **THE COURT:**  This is the Court's recess.  Go ahead.

9         **MS. BEN-AMI:**  I apologize.  I'm only asking that we

10   separate time periods, because we're going '81 to '83.

11   There's a big difference between '83 and '81, and we're

12   getting very indefinite testimony as to time.  That's why

13   I'm objecting.

14            **THE COURT:**  If that's your objection, I'll try to

15   be alert to that.

16        **MS. BEN-AMI:**  Thank you, your Honor.

17        **THE COURT:**  Yes.  Thank you.  We'll recess.

18        **THE CLERK:**  All rise.  Court is in recess.

19        (Recess.)

20        **THE CLERK:**  All rise for the jury.

21

22        (Whereupon the jury entered the courtroom.)

23        THE CLERK:  Court is in session, please be seated.

24        **THE COURT:**  Go ahead, Mr. Day.

25        **MR. DAY:**  Thank you very much, your Honor.

1        **DIRECT EXAMINATION** (Cont'd)

2      **(BY MR. DAY:)**

3      **Q.**  So, Dr. Lin, when we broke, you were back in the 1981 to

4      1983 time frame while you were project leader of the EPO

5      project.  And we were talking about your development of the

6      genomic cloning approach during that time frame.

7              Could you just briefly describe over what time

8      period you developed this genomic cloning approach at Amgen?

9      A.  Shortly after I joined Amgen, and all the way almost to

10     the time that we do the screening of -- do the -- sometime

11     in '83, of early or mid-'83.

12     **Q.**  Early or mid.  So you joined Amgen in August 1991?

13     A.  Yes.

14     **Q.**  And --

15              **MS. BEN-AMI:**  Objection, your Honor.  I think

16     Mr. Day misspoke.

17              **MR. DAY:**  August 1981.  Did I say '91?

18              **MS. BEN-AMI:**  Yes.

19              **MR. DAY:**  Sorry.

20     **Q.**  You joined Amgen in August 1981?

21     A.  That's correct.

22     **Q.**  And from that time until when were you developing your

23     genomic cloning approach?

24     A.  All the way through probably April or June of '83.  I

25     don't know exactly time frame.

 1    **Q.**  Okay.  And looking at the demonstrative that I have

 2    created from your testimony here today, how did -- and I

 3    want to focus on now the probes, and you said there were

 4    different considerations in the design of the probes, and

 5    one you mentioned was the length.

 6    A.   That's correct.

 7    **Q.**  So how did the length of the probe affect your design of

 8    the hybridization conditions?

 9          **MS. BEN-AMI:**  Objection, leading.

10          **THE COURT:**  No, overruled.

11    A.   Yes.

12          **THE COURT:**  Yes.

13    A.   I -- in order for the probe to work in the genomic

14    hybridization --

15          **MS. BEN-AMI:**  Objection, your Honor.  This is

16    now --

17          **THE COURT:**  Yeah, I'm going to sustain that, simply

18    because you start out generally.  Listen to his question.

19          **THE WITNESS:**  Okay.

20          **THE COURT:**  We're back when you were considering

21    the length of the probe.

22          **THE WITNESS:**  Okay, sorry.

23          **THE COURT:**  Now, back then, what were you thinking

24    about how the length of the probe --

25          **THE WITNESS:**  Yes.

 1          THE COURT:  -- would affect the experiments you

 2     were going to conduct?

 3          THE WITNESS:  Sure.  Sure, okay.

 4          The length of the probe would affect the

 5     hybridization in terms of its hybridization temperature or

 6     the condition to be used.  Because the length of the probe

 7     would determine what actual temperature, what is needed for

 8     that particular length.  So you had to -- and, therefore,

 9     you had to accordingly adjust the hybridization condition

10     for such a length.

11          So, for example, longer one, you had to use a

12     higher temperature.  And shorter one, use a lower

13     temperature, for example.  And you had to find out what

14     temperature range to be used can achieve the goal that you

15     want -- what you want to achieve.

16     Q.  How did the degeneracy, whole or partial degeneracy of

17     the probes, affect, in 1981-1983, as you're developing your

18     genomic cloning approach, how did the degeneracy of the

19     probes affect your design choices about the hybridization

20     conditions?

21     A.  Yes.  The degeneracy, as I explain earlier, it was a

22     fully degenerate probes, means contain everything, and you

23     had to take into consideration all the possible sequence

24     present in the probes.  And you had to make adjustment to

25     temperature that you need to accommodate all the possible

1    combination, ambiguities, placed in the probe sequence.  So

2    you had to design accordingly, based on the number of probe.

3            And again, if you use a partial degenerate probes,

4    again because the sequence is no longer is all complete,

5    therefore, you, again, adjust the hybridization condition

6    accordingly, according to what is in there.

7    Q.  Now, you mentioned in the hybridization conditions that

8    one of your concerns at that time was differentiating

9    between perfect and nonperfect probe matches?

10   A.  That's correct.  Yes.

11   Q.  What effect -- I'm sorry -- what did you do to enable

12   you to develop hybridization conditions that would

13   distinguish between perfect and nonperfect probe matches --

14           **MS. BEN-AMI:**  Objection.

15   Q.  -- at that time?

16           **THE COURT:**  Overruled.  What did you do?

17   A.  What I did is I use a fully degenerate set of probes.

18   That means I no longer guess, try to use only part of it, I

19   use the whole things, that contain all the possible sequence

20   in there.  Therefore, there will be one which will be

21   perfect match to the sequence that I want to hybridize.  And

22   so I use the fully degenerate set of probes.

23   Q.  And --

24   A.  And I had to develop a condition with the proper

25   temperature such that only the perfect match hybridized.

1    Those that have one mismatch or two mismatch won't

2    hybridize.  Okay.

3    **Q.**  And what did you do at that time to deal -- I'm sorry --

4    to eliminate the problem of false positives?

5    A.  Yes.  As I explained earlier, that the human genome

6    contain all kinds of DNA.

7              **MS. BEN-AMI:**  Objection, your Honor.

8              **THE COURT:**  No.

9    A.  What I did is to eliminate those, this -- all those DNA

10   which may hybridize to the sequence, but which are not

11   really EPO gene.  I use the probes from two different

12   regions of -- multiple region, in the -- multiple region of

13   the protein sequence, so that I have a chance to eliminate

14   those that really is not EPO gene.

15            Just give you example, we just use a single 20 mer

16   fully degenerate set of probe, it will have -- it will see

17   hundreds of dots.  And you use 17 mer of probe set, you find

18   thousands of dots.  But it's only one is ours.

19            So, therefore, how do you find the one if you don't

20   have a different set of probe?  So that by using two

21   different sets of probe and hybridize, and then compare to

22   the x-ray film, match them, if those dot match by both sets,

23   then there's a potential it's the EPO gene.

24            Okay.  That's how it's done.

25   **Q.**  What did you do in that time frame, 1981, 1982, what did

1    you do as you were developing the genomic cloning approach

2    that you took to eliminate the problem of false negatives?

3    A.  Yes.  False negative is when you have a probe which

4    would not -- fail to identify the true gene.  Then you have

5    a problem.  That means the system will not work.  Then I had

6    to use -- I had -- I developed a model system, use human

7    globin gene, and rabbit globin gene.  I develop a model

8    system that allow me to test the system.  If there's one

9    mismatch or two mismatch, I can detect.

10             And if, in the human, in the genomic library, big

11   run, if it's truly there's a gene there, I had to be able to

12   detect it.  So I had to work out condition step by step and

13   to make sure that if there's one gene in there, I had to be

14   able to see it.  And I use the model system.  Because EPO

15   gene is not known at the time, so I cannot use EPO gene as a

16   model, I have to use something else, to use a test system,

17   make sure that if one gene is present in the human genome

18   library, I had to be able to detect it.

19             So that's how it was developed.

20   Q.  And what model system did you use to develop this?

21   A.  The human globin gene and rabbit globin gene that was

22   used.

23   Q.  And how did you use them to model your approach?

24   A.  I -- most genes, it had only -- use this gene to create,

25   say, one mismatch, two mismatch.  And also I put this gene

1    in the really human genomic background, and just put one

2    gene in there, just one copy of gene in there.  And I want

3    to make sure that the condition I use had to be able to

4    detect this gene.  If it's there, I had to be able to detect

5    it.

6           So this is how it's developed.  And if it's not --

7    and I won't be able to -- I would not be able to detect the

8    rabbit beta globin gene, yes, which is control, that shows a

9    difference in one mismatch, yes.

10   Q.  And what did you use, this model system that you

11   developed, what did you do it for?

12   A.  The whole purpose of developing model system is to

13   really to show that I know this.  The model system developed

14   would allow me to isolate the gene from the human genomic --

15   human genomic environment.  So this is all done in the human

16   genomic -- because no one have ever done -- have ever

17   isolated gene from human genome before.

18           MS. BEN-AMI:  Objection, your Honor.

19           THE COURT:  No, no.  So much of the answer as "no

20   one had," that's stricken.  Put another question, Mr. Day.

21           MR. DAY:  Thank you.

22   Q.  Over what time period -- how long did it take you to

23   develop your model system to test your genomic approach?

24   A.  I mentioned earlier that it start from the time I join

25   Amgen to sometime in spring or June of '83.  Yes.

1    Q.   Okay.  What combination ultimately proved successful to

2    allow you to isolate EPO DNA using your genomic approach?

3    A.   This combination of all this approach, all together,

4    that allow me to isolate the gene from human genome.

5    Q.   And can you be more specific about what combination in

6    particular with respect to the probes and the probe

7    conditions?

8    A.   In terms of the probe design, using fully degenerate

9    probes and using multiple set of probes, and develop

10   hybridization for -- and choose the right names of the

11   probe, because in this case, was 17 nucleotide long and 20

12   nucleotide long.  And I develop a condition that is needed

13   to eliminate all those false positives and false negatives.

14   Q.   Okay.

15   A.   And that will allow the condition to increase the

16   signals, reduce the noise.

17   Q.   I neglected to ask you, what did you do to deal with the

18   signal to noise issue?

19   A.   The signal noise, the issue, it -- because one had to --

20   had to deal in the entire situation, you had to find out

21   what caused the signal, you know.  It had to be proper

22   hybridization condition for the nucleotide to hybridize to

23   the sequence of interest, the one that we're looking for.

24   But then you had to find out if this -- I had to find out if

25   these things would -- the condition I use would cause high

1    background or not.  And this high background could be caused

2    by the intense -- among the isotope use, could be caused by

3    the sequence present in the human genome or in the bacteria.

4    And all this had to be tried, and tried, to find out what

5    cause it and what to reduce it and to make it to work.

6    Q.  To your knowledge, before you successfully isolated the

7    EPO DNA, had anyone used multiple sets of fully degenerate

8    probes to isolate a gene from the human genome?

9           MS. BEN-AMI:  Objection, your Honor.

10          THE COURT:  Sustained.

11   Q.  Are you aware, Dr. Lin, of anyone who had done that?

12   A.  No.

13          MS. BEN-AMI:  Objection.

14          THE COURT:  Sustained.  The answer's stricken.

15   Disregard it.

16   Q.  Dr. Lin, were you here for Roche's opening statement in

17   this case?

18   A.  Yes, I was.

19   Q.  I'd like to show you a statement by Ms. Ben-Ami.

20          MR. DAY:  Could we bring up transcript page 125, 2

21   to 7, please?

22   Q.  Let me simply read this to you from the transcript, if I

23   may.  "The evidence will show right here -- excuse me -- in

24   Table 1, Example 1, Table 1" is referring to your patent,

25   "it says human EPO is isolated from urine and subjected to

1  tryptic digestion.  That work was not Amgen's work, ladies

2  and gentlemen.  That was Dr. Goldwasser's work.  And this is

3  the reason that Amgen was able to obtain its recombinant

4  EPO."

5          Do you agree that Dr. Goldwasser's tryptic digest

6  is the reason that Amgen was able to obtain its recombinant

7  EPO?

8          **MS. BEN-AMI:**  Objection.

9          **THE COURT:**  Sustained.

10 **Q.**  Who performed the amino acid sequencing of EPO fragments

11 supplied by Dr. Goldwasser?

12         **MS. BEN-AMI:**  Objection, your Honor.

13         **THE COURT:**  Do you know yourself --

14         **THE WITNESS:**  Yes, I know.

15         **THE COURT:**  -- who performed it?

16         **THE WITNESS:**  Yes.

17         **MS. BEN-AMI:**  Objection, your Honor.  It's hearsay,

18 your Honor.

19         **THE COURT:**  How do you know?

20         **THE WITNESS:**  Because I know the person is working

21 for the EPO team doing the protein sequencing.

22         **THE COURT:**  And they told you they did it?

23         **THE WITNESS:**  Sure, because I know.

24         **THE COURT:**  Sustained.  Sustained.  He doesn't know

25 himself.

```
 1   Q.  Did you have any -- Dr. Lin, you were the project

 2   leader?

 3   A.  Yes.

 4   Q.  What did you assign Por Lai to do on the project?

 5   A.  The protein sequencing.

 6   Q.  Did you meet with Dr. Por Lai regarding the sequencing?

 7   A.  Yes.

 8   Q.  Did he show you the results of his sequencing runs?

 9        MS. BEN-AMI:  Objection.

10        THE COURT:  Sustained.

11   Q.  What allowed you to sequence the EPO gene?

12        MS. BEN-AMI:  Objection.  Hearsay, and expert.

13        THE COURT:  Yeah, I'll allow you to probe that --

14   probably a poor choice of words -- but not in that -- not in

15   that question.  Sustained.

16   Q.  What do you believe allowed you to isolate the EPO gene?

17        MS. BEN-AMI:  Objection, your Honor.

18   A.  Because --

19        THE COURT:  Yeah --

20   A.  I believe --

21        THE COURT:  Let's try it this way.

22        When did you first think that you'd succeeded in

23   isolating the human EPO gene, you?  When did you think you

24   successfully had done that?

25        THE WITNESS:  In October '83.
```

1      **THE COURT:**  October of 1983.

2      **THE WITNESS:**  '83, that's correct.

3      **THE COURT:**  Now, go back to your state of mind

4   then.

5      **THE WITNESS:**  Yes.

6      **THE COURT:**  Back then, why did you think you'd been

7   successful?

8      **THE WITNESS:**  Because I -- because I took the

9   approach to isolate the gene from the human genomic library

10   that other people have not tried.

11      **MS. BEN-AMI:**  Objection.  Objection.

12      **THE COURT:**  Well, that's what he thought.  He

13   thought they hadn't tried it.  I'll allow that to stand.

14   **Q.**  Now, Dr. Lin, did you personally receive any fragments

15   of EPO from Dr. Goldwasser?

16   A.  Yes, I have.

17   **Q.**  And when did Amgen first receive fragments from

18   Dr. Goldwasser?

19      **MS. BEN-AMI:**  Objection, your Honor.

20      **THE COURT:**  Again, I don't know that he knows, so

21   sustained.  Let's go to his knowledge, his personal

22   knowledge.

23   **Q.**  When did you first receive fragments of EPO from

24   Dr. Goldwasser?

25   A.  I think somewhere around -- sometime early '82, I think.

1    Q.  Okay.  Were those fragments helpful to you in isolating

2    the EPO DNA?

3    A.  No.  We have quite a few sequence problem with those,

4    the fragments --

5         **MS. BEN-AMI:**  Objection, your Honor.  Hearsay.

6    Q.  What did you do with the fragments that you received?

7    A.  The fragment was then sent to the sequencing, that done

8    by Por Lai or by, at one time it was by Carlton Paul.  And

9    then generally some sequence information, and we were not

10   useful --

11        **MS. BEN-AMI:**  Objection, your Honor.

12   Q.  Was the information --

13        **THE COURT:**  Just a moment.  Just a moment.  She's

14   objecting, I must rule on it.

15        No, that may stand.

16   Q.  Now, please take a look at Tab 3 in your notebook, it's

17   Exhibit CLX.  Do you recognize this document?

18   A.  Yes, I do.

19   Q.  What is this document?

20   A.  This is the document that -- about the EPO project team

21   meeting, and dated, document dated November 22nd, 1982.

22   Q.  Who wrote this document?

23   A.  I did.

24   Q.  Did you prepare this document in or about November 1982

25   as a record of an EPO project team meeting?

 1   A.   That's correct.

 2           **MR. DAY:**  Your Honor, I offer Exhibit CLX.

 3           **THE COURT:**  CLX.  Any objection?

 4           **MS. BEN-AMI:**  No objection, your Honor.

 5           **THE COURT:**  CLX is admitted, Exhibit 25.

 6           (Exhibit marked in evidence.)

 7   **Q.**   I'd like to draw your attention, if I could, to Item

 8   Number 2 on Exhibit CLX, which describes a -- first of all,

 9   it says, "Found a CNBr fragment."  What did you mean by

10   "CNBr fragment"?

11           **MS. BEN-AMI:**  Objection, your Honor.  This is

12   hearsay.

13           **MR. DAY:**  He wrote the document.

14           **THE COURT:**  Please, please.  Well, the document's

15   now in evidence.

16           **MS. BEN-AMI:**  May I have a sidebar, your Honor?

17           **THE COURT:**  He may explain it as to what he meant.

18           **MS. BEN-AMI:**  May I have a sidebar?

19           **THE COURT:**  You may.

20   SIDEBAR CONFERENCE, AS FOLLOWS:

21           **MS. BEN-AMI:**  Ready?

22           **THE COURT:**  Ready.

23           **MS. BEN-AMI:**  If the document is in evidence, the

24   document is in evidence, but that doesn't mean the witness

25   can now give hearsay testimony.

```
 1              THE COURT:  That's true.

 2              MS. BEN-AMI:  And the witness is giving hearsay

 3      testimony.

 4              THE COURT:  Well, that's your conclusion.  He's

 5      asked to tell us what he meant when he wrote that.  Now,

 6      there are limitations to it, I grant you, but I'm going to

 7      allow him to testify what he meant back then when he wrote

 8      that language.

 9              MS. BEN-AMI:  It says Lynn, L-Y-N-N, not Lin,

10      L-I-N.

11              THE COURT:  You're saying you challenge whether he

12      wrote it?

13              MS. BEN-AMI:  No, I challenge when it says Lynn did

14      this, it's not him, Lin, it's a woman named Lynn.

15              THE COURT:  No, no.

16              MS. BEN-AMI:  Not that he didn't write it as the

17      project leader.

18              THE COURT:  Maybe I'm focusing on the wrong part of

19      the document.  I'll have it thrown up and have him asked

20      again, and I think I know how to make a ruling.

21              MS. BEN-AMI:  I agree that he said that he wrote

22      the document.

23              THE COURT:  Thank you.  That's helpful.

24              MS. BEN-AMI:  I'm not disagreeing with that.

25              THE COURT:  You say there's internal hearsay.  Oh,
```

1    here's the document.

2         **MS. BEN-AMI:**  See, it says Lynn.  This is the part

3    that he did.

4         **THE COURT:**  Well, I thought this is the -- I see.

5         **MR. DAY:**  This is a meeting that he attended and

6    ran.  He's present, she's present.  He speaks, he records

7    what different people in the meeting says.  He writes the

8    memo.  I asked him what did he mean when he wrote CNBr.

9    That was the question.

10        **THE COURT:**  If that's it, if that's it, now that

11   this is in evidence -- it came in evidence without any

12   objection.  So now --

13        **MS. BEN-AMI:**  Because it's a business record.

14        **THE COURT:**  Well, fine.  But now that it's in

15   evidence, he can write what he understood she was saying, so

16   we can understand the document.

17        **MS. BEN-AMI:**  That's where I guess I disagree with

18   you, your Honor, because it's hearsay.

19        **THE COURT:**  It's overruled.

20        **MS. BEN-AMI:**  Okay.

21        (Whereupon the sidebar conference concluded.)

22        **MR. DAY:**  Could we have the exhibit back up here?

23   **(BY MR. DAY:)**

24   **Q.**  The question, Dr. Lin, was --

25        **MR. DAY:**  May I proceed, your Honor?

1           **THE COURT:**  You may.

2    **Q.**  The question, Dr. Lin, was what did you mean when you

3    wrote CNBr in the first line of this paragraph?

4    A.  CNBr is a chemical agent called -- abbreviation for

5    cyanogen bromide.  It's used to break the --

6           **MS. BEN-AMI:**  Objection, your Honor.

7           **THE COURT:**  So much of it, "it's used to," but he's

8    identified what he believes the reference was to.

9    **Q.**  Now, does this memorandum -- strike that.  Wrapping my

10   tongue around --

11          Does this memorandum record a meeting that you

12   attended?

13   A.  Yes.

14          **MS. BEN-AMI:**  Objection, leading.

15          **THE COURT:**  Sustained, it is leading.

16          What's the memorandum about here, the whole

17   memorandum?  Just --

18          **THE WITNESS:**  It's a EPO project team meeting I

19   preside.

20          **THE COURT:**  Who wrote it?

21          **THE WITNESS:**  I wrote it.

22          **THE COURT:**  And off here on the left, of what they

23   put up, it's a Number 2, and then a lady's name.

24          **THE WITNESS:**  Yes.

25          **THE COURT:**  Who's the lady?

1          THE WITNESS:  She's the individual that also part

2     of the EPO team.

3          THE COURT:  What's her name?

4          THE WITNESS:  Lynn Deogny, in the distribution

5     list.  She's reporting --

6          THE COURT:  She's reporting what?

7          THE WITNESS:  The update about the EPO amino acid

8     sequencing.

9          THE COURT:  And you're writing it down?

10         THE WITNESS:  That's correct.  Yes.

11         THE COURT:  Go ahead, Mr. Day.

12    Q.  And to your knowledge, was information -- strike that.

13         To your knowledge, did you receive any information

14    while you were working on the EPO project team regarding the

15    sequence of fragments that had been provided to you by

16    Dr. Goldwasser?

17         MS. BEN-AMI:  Leading and hearsay.

18         THE COURT:  Well, it is leading, and I think it's

19    hearsay.  So sustained.

20    Q.  Well, let me point you to the sentence, third sentence

21    in the paragraph.  "A tryptic digest Peak 6 was sequenced.

22    It went ten cycles, obtained 7 amino acids with

23    interruption, not useful for probing."

24         Who used that sequence for probing?

25         MS. BEN-AMI:  Objection, your Honor.

```
 1              THE COURT:  Well, you don't, yourself, know who

 2     used that sequence, do you?

 3              THE WITNESS:  No, I cannot use sequence for probing

 4     because --

 5              THE COURT:  No, no.  That's the result.

 6     Q.  No, the question was who used?

 7              THE COURT:  Yes.  Who used it, so far as you know?

 8              THE WITNESS:  Who use it?

 9              THE COURT:  Who did it?

10     Q.  Who tried to use that sequence for probing?

11     A.  No, no one.  I had not --

12              THE COURT:  You don't, yourself, know?

13              THE WITNESS:  No, I did not.

14              THE COURT:  You didn't.  Go ahead.

15     Q.  The question --

16              MR. DAY:  I'm sorry, your Honor, but I believe

17     there's some confusion.

18              THE COURT:  You may try to correct it.

19     Q.  The question is did you attempt to use sequence

20     information from any of those fragments for probing?  Did

21     you, Fu-Kuen Lin?

22     A.  I did not attempt to use it.

23     Q.  Why not?

24     A.  Because --

25              MS. BEN-AMI:  Objection.
```

1          THE COURT:  No, no.  Sustained.

2     Q.  Were you aware of the sequence information?

3          THE COURT:  My problem's with the timing.

4          Back then, did anyone give you sequence information

5     from probing?

6          MR. DAY:  From fragments.

7          THE COURT:  From fragments?

8          THE WITNESS:  Yes.

9          THE COURT:  Who gave them to you?

10         THE WITNESS:  At the time, depends on the time

11    period.  At one time, Carlton Paul, Lynn Deogny --

12         THE COURT:  And what time was that?

13         THE WITNESS:  From '81 up to sometime in '82.  And

14    then later on Carlton Paul resign and Por Lai joined the

15    sequencing group, protein sequencing group.  So then Por Lai

16    provide the information.

17         THE COURT:  So the people on your team was first

18    this Lynn?

19         THE WITNESS:  Deogny, Carlton Paul.

20         THE COURT:  Right, were the two people?

21         THE WITNESS:  That's right.

22         THE COURT:  They were doing the sequencing?

23         THE WITNESS:  That's correct.

24         THE COURT:  And Carlton Paul resigns and Dr. Lai or

25    Mr. Lai comes on the team?

1            THE WITNESS:  That's correct.

2            THE COURT:  And, thereafter, in the period '82,

3    '83, he's giving you the results of sequencing that he does?

4            THE WITNESS:  That's correct.

5            THE COURT:  Now, am I right in thinking you don't

6    find these sequence results useful?

7            THE WITNESS:  That's correct.

8            THE COURT:  Going back to -- we'll take the first

9    period from -- I'm forgetting the name, but the lady and

10   Carlton Paul.

11           THE WITNESS:  Lynn Deogny.

12           THE COURT:  Lynn Deogny.  That period, the first

13   period, why, in your mind now, were the sequencing results

14   they came up with, not useful?

15           THE WITNESS:  Because --

16           MS. BEN-AMI:  No foundation, your Honor.

17           THE COURT:  Overruled.  He can tell us.

18           THE WITNESS:  Because --

19           THE COURT:  What he thought then, he can tell us.

20           THE WITNESS:  That information provide to me the

21   sequence --

22           THE COURT:  Tell the jury.

23           THE WITNESS:  -- the sequence is too short to be

24   useful to make into probe.  Because in order to -- to make a

25   probe, you want to have a sequence, for genomic probing, or

1    even for cDNA probing, you want to have at least something

2    like six amino acid sequence continuously, or seven amino

3    acid sequence continuously.

4         THE COURT:  And later on, you've got Mr. Lai doing

5    it, and he gives you sequence information.  And how did you

6    find that; was that useful?

7         THE WITNESS:  Same thing, when Mr. Lai was doing,

8    we still have the same problem, the tryptic fragments that

9    we obtained from Gene Goldwasser --

10        MS. BEN-AMI:  Objection, your Honor.

11        THE COURT:  No, no, he may tell us what he thought

12   back then.

13        THE WITNESS:  Still did not give any useful

14   information for -- useful sequencing for making probes.

15        MS. BEN-AMI:  Your Honor, I move to strike that it

16   was from Gene Goldwasser.  That is not in evidence.

17        THE COURT:  Motion to strike's denied.  Go ahead,

18   Mr. Day.

19   Q.  Did -- you mentioned that the sequencing were short.

20   Were there any other problems that you encountered with the

21   sequences that were provided to you from the fragments that

22   were provided to you by Dr. Goldwasser, other than the

23   length of the sequence?

24        MS. BEN-AMI:  Objection, your Honor.  Can I have a

25   sidebar, please?

 1          **THE COURT:**  Well, I don't think it's necessary.  We

 2     don't have any direct evidence that he knows, that he

 3     himself knows that what was done about these sequences.

 4     There's some evidence, if you believe it, from this document

 5     that we have here, that Goldwasser provided something, and

 6     this Lynn -- I'm having an Alzheimer's moment, I cannot get

 7     my mind around her last name -- this Lynn used that.

 8          Now, you could conclude that, but it's not for me

 9     to say, it's up to you whether you believe it or not.  So

10     when he says from Goldwasser to him, we don't have any

11     direct evidence.  Maybe you want to ask, Mr. Day, if there

12     was anything that went from Goldwasser to the witness.

13          **MR. DAY:**  I believe I did, your Honor, but I'll ask

14     again.

15          **MS. BEN-AMI:**  I'm objecting.

16          **THE COURT:**  Yes.

17          **MS. BEN-AMI:**  Because the second sentence is about

18     the tryptic digest.  That doesn't say Goldwasser.  The

19     first sentence --

20          **THE COURT:**  I understand that.  I understand that.

21     I have that in mind.

22          Put your question again, Mr. Day.

23     **Q.**  Dr. Lin, did Dr. Goldwasser send you any EPO fragments?

24     A.  Yes.

25          **MS. BEN-AMI:**  Objection as to time, your Honor.

1   A.  He did before.

2          THE COURT:  And when was that?

3   Q.  I asked you before, when was the first time he sent you

4   fragments?

5   A.  Sometime in '82.  I don't know the exact time.  Sometime

6   in '82.

7   Q.  And did Dr. Goldwasser send you tryptic digest fragments

8   of EPO?

9          MS. BEN-AMI:  Objection.

10          THE COURT:  Overruled.

11  A.  Yes.

12  Q.  And did you ask that those fragments be sequenced?

13          MS. BEN-AMI:  Objection.  Indefinite as to time,

14  your Honor.

15          THE COURT:  Yeah, when -- I think you should ask --

16  Q.  The fragments that were supplied to you by

17  Dr. Goldwasser while you were working on the EPO project,

18  the ones that were supplied to you personally, did you ask

19  that they be sequenced by people working on the project at

20  Amgen?

21  A.  That's correct, I did.

22  Q.  And did you receive back sequence information from those

23  fragments?

24  A.  Yes, I did.

25  Q.  Okay.  And prior to the summer of 1983, did you find any

1      of the sequence information that you received from EPO

2      fragments provided to you by Dr. Goldwasser useful for

3      probing your genomic library?

4              MS. BEN-AMI:  Objection, your Honor.  It's leading,

5      it's hearsay.

6              THE COURT:  Overruled.  He may have it.  He may

7      have it.

8              Calls for what you thought back then.  Back then,

9      did you find any of those sequence fragments useful?

10             THE WITNESS:  No.  None of those sequence was

11     useful for making probes.

12     Q.  Let me ask you to look at Tab 4 in your notebook,

13     please.  This is Exhibit CLU.  Do you recognize this

14     document?

15     A.  Yes, I do.

16     Q.  What is it?

17     A.  It's the EPO project updates that I wrote in -- on

18     February the 2nd, 1983.

19     Q.  And did you write this document as part of the work of

20     the EPO project team at Amgen in February 1983?

21     A.  That's correct.

22             MR. DAY:  Your Honor, I move Exhibit CLU into

23     evidence.

24             THE COURT:  Any objection?

25             MS. BEN-AMI:  I do object to this, your Honor.  I'd

1      like a short --

2            THE COURT:  You may.

3      SIDEBAR CONFERENCE, AS FOLLOWS:

4            MS. BEN-AMI:  Your Honor, the third page of this

5      document is unknown handwriting.  I just asked Mr. Day if he

6      knew whose handwriting it was.  This could come out of

7      anybody's --

8            MR. DAY:  I'll ask the witness.  I don't know.  And

9      I'm happy to strike that page.  I don't need that page.

10           THE COURT:  Do you want it stricken?

11           MS. BEN-AMI:  Yes, I do.  Then there's notes and

12     things on it.  There's no indication that this is either

13     Dr. Lin's document -- certainly if it was a business record,

14     it wouldn't have everybody's little notes on it.  It's not

15     the official copy.

16           THE COURT:  We'll allow him to lay a further

17     foundation.

18           MS. BEN-AMI:  It's hearsay within hearsay, your

19     Honor.

20           THE COURT:  Where's the hearsay -- but that's the

21     thing, if he --

22           MR. DAY:  It's right up here.

23           THE COURT:  -- if he establishes that it is a

24     business record, striking these, it seems to me, I don't

25     have a problem.  We'll see what further foundation --

1        **MS. BEN-AMI:**  But your Honor, a business record

2    takes it away from the first level of hearsay.  But when you

3    have hearsay within hearsay, the business record exception

4    does not take away the hearsay within the hearsay.

5        **THE COURT:**  It's probably an ancient document.

6        **MS. BEN-AMI:**  It's still hearsay within hearsay.

7    When a document says --

8        **THE COURT:**  Well, if -- it may be, but where is

9    the --  well, I see, "provided by Gene."

10       **MR. DAY:**  This is written by Dr. Lin.  He can

11   testify about what he wrote.

12       **THE COURT:**  We'll let him lay a further foundation

13   and then I'll see.

14             (Whereupon the sidebar conference concluded.)  14

15   **(BY MR. DAY:)**

16   **Q.**  Dr. Lin, would you look at the third page of the

17   document?  You'll see some handwritten notes there.  Do you

18   recognize that handwriting?

19   A.  No, that's not mine.  This looks like Joan Egrie's

20   handwriting to me.

21       **MS. BEN-AMI:**  Objection, your Honor.

22   **Q.**  It's not your handwriting?

23   A.  No.

24       **MR. DAY:**  Okay.  So Amgen would offer, your Honor,

25   Exhibit CLU without any of the handwriting.  Strike the

1    handwriting, and offer the exhibit without the handwriting.

2            **THE COURT:**  Any objection?

3            **MS. BEN-AMI:**  Objection to the hearsay within

4    hearsay, your Honor.

5            **THE COURT:**  Noted, but overruled.  It may be

6    admitted, as redacted.  CLU will be Exhibit 26.

7            (Exhibit marked in evidence.)

8    **Q.**  Now, you wrote Exhibit 27; is that right, Dr. Lin?

9            **THE CLERK:**  Twenty-six.

10            **MR. DAY:**  Twenty-six.  Thank you very much.

11    A.  Yes.

12    **Q.**  Would you please take a look at Section 2?

13            **MR. DAY:**  And bring up amino acid sequence there.

14    **Q.**  Would you please describe for us what this section of

15    your report refers to?

16            **MS. BEN-AMI:**  Objection, your Honor.  Hearsay

17    within hearsay.

18            **THE COURT:**  Well, yeah, let's back off here.  Who's

19    Gene there?

20            **THE WITNESS:**  Gene Goldwasser.

21            **THE COURT:**  All right.  And put your question

22    again.

23    **Q.**  Would you please describe for the jury what's referred

24    to in this portion of your report?

25            **MS. BEN-AMI:**  I maintain my objection, your Honor.

1    **THE COURT:**  Noted, but overruled.

2    A.  It describe the trypsin digest fragment sent by Gene

3    Goldwasser gave only two peaks, two peaks.  That means two

4    different fragments, gave only three amino acid long, which

5    is -- which are not useful for making probes.

6    **Q.**  With those fragments supplied by Dr. Goldwasser, were

7    you able to isolate the EPO gene?  With those fragments

8    referred to in Exhibit CLU, or Exhibit 26, were you able to

9    use them to isolate the EPO gene?

10    **MS. BEN-AMI:**  Objection, your Honor.  There's no

11    foundation.

12    **THE COURT:**  Sustained on that foundation.

13    **Q.**  Let me move on.  Let me ask you to take a look at

14    Exhibit CPZ, which is Tab 5 in your notebook.

15    Dr. Lin, do you recognize this document?

16    A.  Yes, I do.

17    **Q.**  Does this document have your handwriting on it?

18    A.  Yes.

19    **Q.**  Does it have your name at the top of the document?

20    A.  Yes.

21    **Q.**  What is this document?

22    A.  This is document drafted by Fred Morris.  He's a

23    scientist at Amgen who was doing the EPO project review for

24    the EPO -- for the Amgen management group.  It's called RMG,

25    Research Management Group.

1    Q.  Did you receive and review a copy of this document at

2    Amgen in February 1983?

3    A.  Yes, I did.

4    Q.  Was this a document, to your knowledge, created as part

5    of the business of Amgen?

6              MS. BEN-AMI:  Objection.  No foundation.

7              THE COURT:  Overruled.  You may ask the witness if

8    he knows of his own knowledge.

9    A.  Yes.  Yes, that's correct.

10             MR. DAY:  Your Honor, I offer Exhibit CPZ as a

11   business record.

12             MS. BEN-AMI:  I object, your Honor.  This is a

13   draft.  There seems to be multiple handwritings on it.

14             THE COURT:  Who wrote this?  I'm sorry.

15             MR. DAY:  Fred Morris, your Honor.

16             THE COURT:  You can't testify.  I'll ask the

17   witness.

18             Who wrote this, sir?

19             THE WITNESS:  Fred Morris.

20             THE COURT:  How do you know that?

21             THE WITNESS:  His assignment at Amgen, he talked to

22   me when he was writing this update on the EPO project.

23             THE COURT:  When did you first see it?

24             THE WITNESS:  Oh, this is the draft.  When he

25   finish, he gave the draft to me.

1          **THE COURT:**  He gave this draft --

2          **THE WITNESS:**  Yes.

3          **THE COURT:**  -- to you?

4          **THE WITNESS:**  Yes.

5          **THE COURT:**  It has handwriting on it.  Whose

6    handwriting is it?

7          **THE WITNESS:**  The name is my signature.  The draft,

8    the term "Draft" looks like it's Fred Morris' writing.  And

9    there's some handwriting they have in the subsequent page,

10   page 3, page 4, and page 5, those are all my handwriting.

11         **THE COURT:**  All right.

12         **MS. BEN-AMI:**  Your Honor, I understand there's a

13   final version.  I don't object to that.

14         **THE COURT:**  Please, please.  You need not testify.

15   The draft is offered and admitted.  And you may, of course,

16   inquire about the final version.  It's admitted as

17   Exhibit 27.

18         (Exhibit marked in evidence.)

19   **Q.**  Why was this document --

20         **THE COURT:**  CPZ.

21         **MR. DAY:**  Thank you, your Honor.

22   **Q.**  Why was this document prepared?  What -- why was this

23   document prepared?

24         **MS. BEN-AMI:**  Objection.  No foundation.

25         **THE COURT:**  Sustained.  There isn't any foundation.

1    **Q.**  What role did you play in preparing this document?

2    A.  He was writing a --

3         **MS. BEN-AMI:**  Objection, your Honor.

4    **Q.**  Just answer --

5         **THE COURT:**  No --

6    A.  He was writing --

7         **THE COURT:**  No, no.  Wait.  Wait, I'm slow.

8         You can't tell us what he told you.  So what role

9    did you have, if any, in the preparation of this document,

10   directing that it be prepared, or any role, any role at all?

11        **THE WITNESS:**  Yes.  I provided information that he

12   asked me, that in order for him to know the status of

13   erythropoietin project at the time.

14   **Q.**  Did you review this document?

15   A.  Yes, I did.

16   **Q.**  Did you provide him comments on this document?

17   A.  That's what I did.

18   **Q.**  Did you make comments on your copy of this document?

19   A.  Yes, I did.

20   **Q.**  Let me ask you to turn to page 1, Section 1, which is

21   entitled -- if we could pull up just the title there --

22   "Search for an EPO clone using an oligomer DNA probe to

23   screen" -- thank you -- "a human (fetal liver) lambda phage

24   library."

25        **MR. DAY:**  Thank you very much.  I need a different

1    pair.

2    **Q.**  What amino acid sequence was being used -- I'm sorry,

3    strike that.

4          What type of cloning strategy does this section of

5    the report address?

6          **MS. BEN-AMI:**  Objection, your Honor.

7          **THE COURT:**  I'm going to sustain it in that form.

8    **Q.**  What cloning approach is addressed by this title?

9          **MS. BEN-AMI:**  Objection, your Honor.

10         **THE COURT:**  Overruled.

11   A.   This is genomic DNA cloning approach.

12   **Q.**  Please take a look at page 2 of the memo, bottom

13   paragraph.

14         **MR. DAY:**  If we could bring up the bottom

15   paragraph.

16   **Q.**  And I want to focus your attention, if I could -- I want

17   to focus your attention, if I could, Dr. Lin, at the

18   sentence beginning, "Probes were made," all the way down to

19   the end of the paragraph.

20   A.   Yes.

21   **Q.**  What amino acid sequence was used for these probes?

22   A.   This was from the end terminal amino acid sequence,

23   Number 19 to Number 25.

24   **Q.**  Was that correct EPO sequence?

25   A.   It was incorrect.  It contain incorrect amino acid

1    sequence in there.

2    **Q.**  And what was the result of your probe screening?

3    A.  The result we got -- that's a false positive, that means

4    it's not EPO gene.

5    **Q.**  Now, please turn to page 3 of the exhibit, and I'd like

6    to focus your attention on the middle paragraph, following

7    the heading starting with Roman Numeral II.

8         **MR. DAY:**  Can we bring up the heading first, Roman

9    Numeral II, "Amino acid sequencing of EPO protein."  And

10   could we bring up the paragraph below that, starting with

11   "Por Lai tried to sequence."

12   **Q.**  I want to read to you, if I could, from your

13   memorandum --

14        **MS. BEN-AMI:**  Objection.

15   **Q.**  -- what this says.

16        **THE COURT:**  No, overruled.

17        **MS. BEN-AMI:**  It's just the characterization, your

18   Honor.

19        **MR. DAY:**  Sorry.

20   **Q.**  "Por Lai tried to sequence a cyanogen bromide fragment

21   supplied by Dr. Goldwasser but obtained no sequence due to

22   low signal and high noise.  In addition, there are several

23   other trypsin fragments that have been found and are

24   providing some small fragmented sequence data.  It is clear

25   that more sequencing information must be obtained.  This is

1     critical if new probes are to be constructed so that an

2     unambiguous EPO clone can be identified.  It's also very

3     important that enough material be committed to sequencing

4     that strong sequence signals are seen and mistakes minimized

5     to avoid another waste of valuable time and effort as seen

6     in I.A.  With probes to two separate regions of the EPO gene

7     it seems likely that the correct gene be identified."

8          Dr. Lin, what was your strategy for cloning the EPO

9     gene as described in this section?

10    A.  At the time this started from, the cloning gene was

11    using the partial degenerate set of probes, that means use

12    probes, and probe human genome was one set of probe, and

13    which get the false positive as I describe earlier.

14         So, therefore, the strategy here is try to minimize

15    the false positive so that how can I achieve that, so I

16    could get the -- more amino acid sequence, hopefully that

17    can be used to make probes that I can use to identify the

18    gene to develop -- and also to, at the same time, to develop

19    condition that would minimize the false positive from

20    happening.

21    Q.  And what did you understand "probes to two separate

22    regions of the EPO gene" to mean?

23    A.  Means from a different sequence than what we already

24    have.  We already have an end terminal sequence, which is

25    known to the public, and we like to have a different region

```
1    of the probes.

2         MR. DAY:  Okay.  Now, if you could back out of this

3    and, please, page 3, if we could blow up the handwriting on

4    the left-hand side of this and blow that up as large as you

5    can.

6    Q.  Now, you have a copy of that in front of you.  It's not

7    a very good copy, I readily acknowledge.

8         Who's handwriting is this?

9         MS. BEN-AMI:  Objection, your Honor.

10        MR. DAY:  He already identified it, your Honor.

11        THE COURT:  Please.

12   A.  That's my handwriting.

13        THE COURT:  Oh, I understand.  Yes.  He may so

14   testify.

15   Q.  And could you read as much of this for the jury as you

16   can correctly decipher?

17        MS. BEN-AMI:  I object again, your Honor.

18        THE COURT:  No, overruled.  He may try to read his

19   handwriting.  The document is before the jury.

20   A.  "Tryptic digest, partial acid hydrolysis that would

21   fragment" -- I cannot read the remaining one.

22   Q.  Okay.  To your knowledge, whose idea was it to obtain

23   tryptic fragments, more tryptic fragments, at this time?

24        MS. BEN-AMI:  Objection.  He can only talk about

25   what he knew.  That's what --
```

1          **THE COURT:**  Do you know where the idea of getting

2    tryptic fragments came from?

3          **THE WITNESS:**  Here I just wrote down what I say,

4    tryptic fragments, need to have digest, yes.

5          **THE COURT:**  And where did the idea of getting those

6    digests come from?

7          **THE WITNESS:**  The digest has been done by many -- I

8    mean, protein, chemists normally know what --

9          **THE COURT:**  And you said, We ought to get some.

10         **THE WITNESS:**  Yes.

11         **THE COURT:**  All right.

12   **Q.**  Now, what type of -- please take a look at page 4 of the

13   memo.

14         **MR. DAY:**  And could we bring up Section 3, please,

15   of page 4?

16   **Q.**  The first sentence reads, "Search for EPO mRNA to make a

17   cDNA clone."  What type of cloning approach was being

18   addressed in this portion of the memo?

19   **A.**  The cDNA cloning approach.

20   **Q.**  And please take a look at page 5, Section 4 of the memo,

21   "Antibodies."  What type of cloning approach does this

22   section address?

23   **A.**  For expression cloning.

24   **Q.**  Now, Dr. Lin, I think you testified at the start of your

25   examination that you got the -- you isolated the EPO gene in

1    October 1983?

2    A.  That's correct.

3    Q.  When you finally got the EPO gene, was your work on EPO

4    finished?

5    A.  No, just the beginning.

6    Q.  What work was left to be done?

7         MS. BEN-AMI:  Objection, your Honor.  No

8    foundation.  Hearsay.

9         THE COURT:  Sustained on that --

10   Q.  What work did you believe at that time was left to be

11   done?

12        MS. BEN-AMI:  Objection, your Honor.

13        THE COURT:  Overruled as to that question.

14   A.  A lot of work need to be done.  First, we had to find

15   way to make larger -- find way to make this proteins and

16   also --

17        MS. BEN-AMI:  Objection, your Honor.  It's hearsay.

18        THE COURT:  Overruled.  He can tell us what he

19   thought needed to be done.

20   A.  Develop a system that can make larger amount of this

21   protein.  And also had to be able to make this protein

22   that's in vivo active, and can be produced in larger

23   quantity so they can be used to do the clinical testing.

24   Q.  At that time, what cell types did you believe would

25   produce an in vivo biologically active EPO product?

1          **MS. BEN-AMI:**  Objection, your Honor.

2          **THE COURT:**  Overruled.

3   A.  No, I don't know what cell type, but it was in vivo

4   active molecules, EPO molecule.  No.

5   **Q.**  At that time, who was responsible for answering those

6   questions?

7   A.  I was responsible for finding out a system that would

8   make it to work.

9   **Q.**  Please take a look at Exhibit CHV, which is Tab 6 in

10  your notebook.  What is this document?

11  A.  This document is written by Dan Vapnek.  He was the

12  director of Amgen research, and he wrote this memo to the

13  EPO product team member.

14  **Q.**  Did you receive a copy of this document?

15  A.  Yes, I did.

16  **Q.**  When was the document written?

17  A.  April 5th, 1984.

18  **Q.**  When did you receive it?

19  A.  It was about that time.

20          **MR. DAY:**  Your Honor, I move into evidence Exhibit

21  CHV.

22          **THE COURT:**  CHV.  Any objections?

23          **MS. BEN-AMI:**  Yes, your Honor.  Hearsay.  There's

24  no foundation.

25          **THE COURT:**  Just a moment.

1          **MR. DAY:**  Tab 6, your Honor.

2          **THE COURT:**  Oh, I have it.  I'm looking at it now.

3          Just so I'm clear, who's Vapnek?

4          **THE WITNESS:**  He was the director, research

5    director at Amgen at the time.

6          **THE COURT:**  And when did you first see this

7    document?

8          **THE WITNESS:**  About the time the document was

9    written and sent out.

10   **Q.**  And was it sent to you?

11   **A.**  Yes, of course.

12         **THE COURT:**  Overruled.  CHV is admitted in

13   evidence, Exhibit 28.

14         (Exhibit marked in evidence.)

15         **MR. DAY:**  Can we have Exhibit 28 up, please?

16   **Q.**  The first sentence says, "I have asked Fu-Kuen Lin to

17   head an EPO molecular biology group.  This group will be

18   involved in assessing the various systems (E. coli, yeast

19   and mammalian) used for expression EPO.  The first goal of

20   this group will be to make certain that we have adequate

21   levels of expression of EPO in these three systems so that

22   purification and evaluation of material can begin as

23   previously scheduled."

24         What was the goal of your molecular biology group,

25   at this time, in the spring of '84 when you were appointed

1    head of this group?

2    A.   Yes, to assess the expression system in bacteria, yeast

3    and mammalian cell to see which system would work the best

4    for us to make enough material for clinical test -- for

5    testing to evaluate this material.

6    **Q.**   And over what time period were you responsible for this

7    group?

8    A.   All the way to about the end of '84.

9    **Q.**   Now, which different expression systems, Dr. Lin, which

10   different cell types or expression systems did you pursue or

11   investigate at that time in order to achieve the goal of the

12   group?

13            **MS. BEN-AMI:**   Objection, leading.

14            **THE COURT:**   No.  Which.  Which methods did you

15   consider?  Which methods did you consider, sir?

16   A.   Could you repeat the question for me, please?

17   **Q.**   Yes.  Which expression systems did you explore at that

18   time in order to achieve the goals of the group?

19   A.   We -- I explored all three systems simultaneously,

20   because we don't know which system would work --

21            **MS. BEN-AMI:**   Objection, your Honor.

22   A.   -- out the best, the fastest --

23            **THE COURT:**   Wait a minute.  No, I'll let that

24   stand.

25   **Q.**   Why did you pursue all three simultaneously?

1    A.   Because we don't know which one would work out the best,

2    the fastest, to give us the material to do the evaluation.

3    **Q.**   Why were you pursuing a mammalian expression system?

4    A.   Mammalian cells can put sugars onto the protein.

5    **Q.**   Why were you pursuing bacterial expression systems?

6           **MS. BEN-AMI:**   Objection.

7    A.   Bacterial system can -- it produce protein, EPO protein,

8    but without sugar, but it can be produced in larger quantity

9    in very short time.

10   **Q.**   And why --

11          **THE COURT:**   Wait.   Wait a minute.   There was an

12   objection.

13          Is that what you thought then?

14          **MS. BEN-AMI:**   I'll withdraw it, your Honor.

15          **THE COURT:**   It's withdrawn.   Go ahead.

16   **Q.**   Why, at that time, were you pursuing yeast expression

17   systems?

18   A.   Yeast expression system can also put sugars on the

19   protein, and we were all hoping -- and that also can be made

20   larger quantity than the mammalian cell expression system.

21   And so we were hoping that the things produce --

22          **MS. BEN-AMI:**   Objection to the lead.

23   A.   -- in bacteria and yeast system would also work.

24          **THE COURT:**   The objection is overruled.

25          That's what you thought?

1      **THE WITNESS:**  Yes.

2  **Q.**  Now, who was assigned, in your group -- did you make

3  assignments within your group for different projects?

4  A.  Yes.

5  **Q.**  Who was assigned, within your group, to develop the

6  mammalian cell expression system?

7  A.  Jeff Browne group.

8  **Q.**  Who assigned Dr. Browne to do that?

9  A.  I did.

10  **Q.**  Why?

11  A.  Because he already been doing tissue cultures in the

12  project, in the EPO team, and he has been doing the gene

13  expression for the EPO.  And so he was good candidate to

14  continue on such -- this role.

15      **MS. BEN-AMI:**  Objection.  Hearsay, your Honor.

16      **THE COURT:**  We'll let that stand.  Put another

17  question.

18  **Q.**  During the time that you ran the group or were

19  responsible for the group, did the group ever achieve its

20  goal?

21  A.  Yes.

22      **MS. BEN-AMI:**  Objection.

23  **Q.**  When?

24      **MR. DAY:**  Sorry.

25      **THE COURT:**  Wait.  How do you know the group

1    achieved its goal?

2         **THE WITNESS:**  Our goal was to make -- our goal was

3    to make the in vivo biological active molecules, and so we

4    achieve the goals in May 19 -- achieve the goal in May 1984.

5         **MS. BEN-AMI:**  Objection, your Honor.

6         **THE COURT:**  How do you know that?  That's the

7    question.  You?

8         **THE WITNESS:**  Yes.  I know because the product

9    produced by the system at the time, by mammalian cell

10   system, have some tests in the quality assurance tests to

11   show that it have in vivo biological activity in animal.

12        **MS. BEN-AMI:**  Your Honor -- I'm sorry.  I'm sorry

13   Dr. Lin.

14        May I have a sidebar, your Honor?

15        **THE COURT:**  The testimony may stand.

16        **MS. BEN-AMI:**  May I have a sidebar, your Honor?

17        **THE COURT:**  Yes, you may.

18   SIDEBAR CONFERENCE, AS FOLLOWS:

19        **MS. BEN-AMI:**  Your Honor, one of the reasons I was

20   not happy about this going forward was because I don't have

21   the TKT transcripts with me where you did not allow this

22   witness to testify because it's all hearsay.

23        **THE COURT:**  Uhm-hmm.

24        **MS. BEN-AMI:**  This witness didn't do the in vivo

25   biological tests.  He didn't do the mammalian tests.  He

1    didn't do -- almost everything he's testified to, he didn't

2    do.  He does not have firsthand knowledge of it.  You

3    excluded it all on that basis, and now he's saying, Well,

4    someone told me so I know.  And that's what's happening

5    here.

6              **THE COURT:**  What do you say to that?

7              **MR. DAY:**  I say, first of all, that it's not true

8    because the ruling that you made in TKT, at least what I

9    could see from the brief this morning when it was handed to

10   me before the start of trial, addresses clinical trials.

11   We're not going into clinical trials at all.  In fact, we're

12   done with this subject.  We're moving on to another subject

13   at this point.

14             I'm not asking him to testify about assays.  I'm

15   asking him to testify, in his role as the project leader, as

16   the leader of the group, what the goal of the group was,

17   whether it achieved the goal, when it achieved the goal.

18   That's all I asked.

19             **THE COURT:**  Let's move on.  It would be improvident

20   to start cleaning things up now.  If I find a need to clean

21   up, I will.

22             (Whereupon the sidebar conference concluded.)

23             **MR. DAY:**  May I proceed, your Honor?

24             **THE COURT:**  You may.

25

1    **(BY MR. DAY:)**

2    **Q.**  Dr. Lin, I'd like to ask you some questions about your

3    patent applications.

4    A.  Yes.

5    **Q.**  Would you please look at Tab 7 in your notebook, which

6    is Exhibit 2014.

7           **MR. DAY:**  Could we have that up, please?  2014.

8    **Q.**  Do you have a copy of that in front of you, Dr. Lin?

9    A.  Yes, I do.

10   **Q.**  What is this document?

11   A.  This is a first -- my first EPO patent application,

12   submitted to the patent office.

13   **Q.**  When was this filed with the patent office?

14   A.  December 13, 1983.

15          **MR. DAY:**  Okay.  Could we please take a look at

16   page 337 at the bottom right-hand corner.  If we could pull

17   up that signature box.

18   **Q.**  Is that your signature on this application?

19   A.  Yes.

20   **Q.**  Now, when did you isolate the human EPO gene?

21   A.  In October 1983.

22   **Q.**  And what DNAs did your December 1983 patent application

23   disclose?

24          **MS. BEN-AMI:**  Objection, your Honor.

25          **THE COURT:**  Yes.  The document speaks for itself,

1   so I'm going to sustain that.

2   **Q.**  What was disclosed, to your knowledge, in the patent

3   application with respect to monkey DNA for EPO?

4          **MS. BEN-AMI:**  Objection, your Honor.

5          **THE COURT:**  Sustained.  The patent application is

6   in evidence, and the words used are important, so we've got

7   to go to the actual words.  We'll see where we are there.

8   **Q.**  Please take a look at Examples 6 and 7 in Exhibit 2014,

9   Dr. Lin.  Just take a look at Examples 6 and 7.  You'll find

10  them starting at pages 41 to 43, for Example 6, and 44 for

11  Example 7.

12         Have you looked at those examples, sir?

13  A.  Yes.

14  **Q.**  Do those examples refer to human or monkey EPO?

15         **MS. BEN-AMI:**  Objection, your Honor.  The document

16  speaks for itself.

17         **THE COURT:**  It does, but he may tell us that.

18  A.  Yes, this two example illustrate the expression of

19  monkey EPO cDNA in monkey cells, which Lynn cut one cell.

20  **Q.**  To your knowledge, by December 1983, had Amgen produced

21  any -- expressed any recombinant human EPO?

22         **MS. BEN-AMI:**  Objection, your Honor.

23         **THE COURT:**  To his knowledge back then?

24         **MR. DAY:**  Yes, at that time.

25         **THE COURT:**  Overruled.

1           **MS. BEN-AMI:**  Objection.  Hearsay, your Honor.

2           **THE COURT:**  No, to his knowledge.  He can tell him

3    his knowledge.

4           **MS. BEN-AMI:**  His knowledge is irrelevant on that.

5           **THE COURT:**  That's your position.  Overruled.

6    A.  We had not produced any human EPO yet at that time.

7           **MR. DAY:**  Can we have the next page, 45, following

8    Example 7, bottom paragraph.  Could we blow the whole bottom

9    paragraph up there.

10   **Q.**  And there's a statement in the patent application in

11   that paragraph that reads, and I quote -- by the way,

12   Dr. Lin, before this patent application was submitted, did

13   you participate in drafting and preparing this application?

14   A.  Yes.

15   **Q.**  Did you review it?

16   A.  Yes, I did.

17   **Q.**  There's a statement here that reads, and I quote, "While

18   Example 7 illustrates biological properties of microbially

19   expressed monkey EPO in the form of immunological

20   properties, in vivo and in vitro tests of biological

21   activity to be performed are expected to reveal that the

22   expression products also share the biological activities of

23   naturally-occurring EPO."

24          Now, at that time, were you able to predict whether

25   that would, in fact, prove to be true?

```
 1              MS. BEN-AMI:  Objection, your Honor.

 2              THE COURT:  Overruled.

 3    A.  We were hoping --

 4              MS. BEN-AMI:  Objection, your Honor.  He said "we."

 5              THE COURT:  Overruled.

 6    A.  We were hoping --

 7              THE COURT:  Oh, yes.  It's the "we."

 8    A.  I'm sorry.  I was hoping.

 9              THE COURT:  What did you think?

10              THE WITNESS:  Yes.  I was hoping that the product

11    to be expressed would be also in vitro and in vivo active,

12    but of course I would not know until it's actually --

13              MS. BEN-AMI:  Objection, your Honor.

14              THE WITNESS:  -- experiment has been carry out and

15    has been -- product has been tested.

16              MS. BEN-AMI:  Objection, your Honor.

17              THE COURT:  Yes, I will let that stand, subject to

18    your objection.

19    Q.  Now, does this sentence refer to, in the Example 7, does

20    it refer to monkey EPO or human EPO?

21              MS. BEN-AMI:  Objection, your Honor.  The sentence

22    speaks for itself.

23              THE COURT:  It does speak for itself, but you may

24    confirm the understanding of it.

25              MS. BEN-AMI:  I object, your Honor.  This is his
```

```
 1   present --

 2            THE COURT:  Noted, but overruled.

 3   A.  It's related to the monkey EPO.

 4   Q.  After your initial --

 5            MS. BEN-AMI:  Move to strike, your Honor.

 6            THE COURT:  Overruled.

 7   Q.  After your initial application was filed in

 8   December 1983, did you continue -- did your team continue to

 9   work on the expression of recombinant EPO products?

10   A.  Yes, of course.  We were continuing to express -- try to

11   express -- continuing to express in bacteria system and

12   yeast system and other -- to express it in the other cell,

13   other cell type, other mammalian cells.

14   Q.  Did you revise your original patent application, that

15   is, this December patent application, to add any additional

16   work after this was filed?

17            MS. BEN-AMI:  Objection, leading.

18            THE COURT:  Sustained on that ground.

19   Q.  Okay.  After the original application was filed, what

20   further applications did you file?

21   A.  We have total filed four, including this one, four

22   application.  And there was a second application, was filed

23   in February '84.  February '84.  And there was another

24   filing was done in September '84.  And the final one was in

25   November '84.
```

1    Q.   In general, in your understanding, how did the second

2    application differ from the first application?

3         MS. BEN-AMI:   Objection, your Honor.   The document

4    speaks for itself.

5         THE COURT:   Yeah, the documents do speak for

6    themselves, and that -- that's far too general.   Sustained.

7    Q.   Please take a look at Exhibit 2015.   It's in your

8    notebook.   It's Tab 8, I believe.   And what is Exhibit 2015,

9    Dr. Lin?

10   A.   This is my second patent application.

11   Q.   When was this filed with the patent office?

12   A.   It was on February 21st, 1984.

13   Q.   Okay.   And would you please take a look at page ending

14   with the number 494.   We'll bring that up on the screen.

15   The bottom right-hand corner, is that your signature?

16   A.   That's correct, that's my signature.

17   Q.   And did you review this application before it was

18   submitted to the patent office?

19   A.   Yes, I did.

20   Q.   What additional -- what, if any, additional EPO

21   expression work is disclosed in this application?

22        MS. BEN-AMI:   Objection, your Honor.   The document

23   speaks for itself.

24        THE COURT:   Yes, sustained at that level of

25   generality.   These are significant documents -- well, strike

1    that out.  I have nothing to say about that.

2    **Q.**  To your knowledge, Dr. Lin, does the February 1984

3    application -- strike that.

4           By February 1984, had your team obtained any

5    further data with respect to the expression of recombinant

6    EPO?

7    A.  Yes.  We have --

8           **MS. BEN-AMI:**  Objection.

9           **THE COURT:**  The answer "yes" is sufficient and

10   we'll stop there.

11   **Q.**  What was done with that data?

12          **MS. BEN-AMI:**  Objection, your Honor.  No

13   foundation.

14          **THE COURT:**  Overruled.

15          What was done?

16          **MS. BEN-AMI:**  Objection, your Honor.  It's hearsay.

17          **THE COURT:**  I've made my ruling.  You made your

18   objection, and you'll stand on that.

19   A.  The monkey erythropoietin has been further test --

20   express monkey erythropoietin has been further test in the

21   in vitro and the in vivo system.

22          **MS. BEN-AMI:**  Objection.  Hearsay.

23   A.  And --

24          **THE COURT:**  He may finish.

25   A.  And the human erythropoietin had been -- already been

1   expressed and it's also show the in vitro biologically

2   active.

3   **Q.**  What was done with that data?

4   A.  Data was then --

5          **MS. BEN-AMI:**  Objection.  Hearsay, no foundation.

6          **THE COURT:**  Wait, wait a moment.  The volume of the

7   objection doesn't change anything, but -- and I point that

8   out because I'm going to sustain that one.  Sustained, no

9   foundation.

10  **Q.**  Did you participate in preparing the patent application?

11  A.  Yes, I did.

12  **Q.**  What was done with that data insofar as the patent

13  application is concerned?

14         **MS. BEN-AMI:**  Objection.

15         **THE COURT:**  Sustained.  We'll talk only about him,

16  and we'll be clear as to what he, himself, knows.

17  **Q.**  Okay.  What do you --

18         **MR. DAY:**  I understand, your Honor.

19  **Q.**  What, if anything, did you do with that data insofar as

20  the patent application is concerned?

21  A.  Those additional data was then add to this second

22  filing --

23         **MS. BEN-AMI:**  Objection, your Honor.

24  A.  -- of the patent application.

25         **THE COURT:**  Wait.  Wait a minute.  I will overrule

1    your objection, but stop his answer at that point.  You'll

2    put another question.

3              How do you know that?

4              **THE WITNESS:**  Because I was the project leader, of

5    course I know the progress of the project.

6              **THE COURT:**  And -- all right.

7              **MS. BEN-AMI:**  Move to strike the testimony, your

8    Honor.

9    **Q.**  And how do you know the data --

10             **THE COURT:**  The motion to strike is denied.

11   **Q.**  How do you know the data was added to your patent

12   application?

13   A.  Because it was added -- I know what was added in is

14   further data we have obtained.

15             **MS. BEN-AMI:**  Objection again, leading.

16   **Q.**  Now, Dr. Lin, let me ask you a couple of questions about

17   your patent.  Was there any carbohydrate data reported in

18   your patent?

19   A.  Yes.

20             **MS. BEN-AMI:**  Objection.

21   A.  Yes.

22             **THE COURT:**  Wait a second, it's leading.  Strike

23   the answer.  It's stricken.

24   **Q.**  What, if anything, does your patent report about

25   carbohydrate data?

1          **MS. BEN-AMI:**  Objection, your Honor.

2          **THE COURT:**  No, sustained.  Go to the words, work

3    from there.

4          **MR. DAY:**  Okay.  Let's pull up, if we could,

5    Exhibit 1, Column 28.  And could we have the next paragraph?

6    Not this one, the one that follows.

7          **MS. BEN-AMI:**  Your Honor, I would like to have a

8    sidebar before this line of questioning.

9          **THE COURT:**  You may.

10   SIDEBAR CONFERENCE, AS FOLLOWS:

11         **THE COURT:**  Yes?

12         **MS. BEN-AMI:**  He's now talking about column 28.

13         **THE COURT:**  All right.

14         **MS. BEN-AMI:**  All right.  He's talking about this

15   work on carbohydrates.  He did not do any of this work.

16         **MR. DAY:**  We'll find out.

17         **MS. BEN-AMI:**  Well, he's answering always we, we,

18   I -- we're not getting what he did.

19         **THE COURT:**  I understand.  I understand the

20   objection, and we'll have to find out first, specifically,

21   but I'll allow you to find it out.

22         **MS. BEN-AMI:**  I'd like to see what you handed up to

23   the Court.  I'd like a copy.

24         **THE COURT:**  You've got a copy of that, right?

25         **MS. BEN-AMI:**  Yes.

 1          THE COURT:  And it's in mine, too.

 2          (Whereupon the sidebar conference concluded.)

 3   (BY MR. DAY:)

 4   Q.  What --

 5          MR. DAY:  May I proceed, your Honor?

 6          THE COURT:  You may.

 7   Q.  What personal involvement, Dr. Lin, did you have in

 8   obtaining the data regarding carbohydrate analysis of

 9   recombinant and urinary EPO that was reported in your patent

10   application at column 28 -- this is Exhibit 1 -- column 28,

11   lines, looks like, 51 through 67?

12          MS. BEN-AMI:  Leading, and foundation, your Honor.

13          THE COURT:  Overruled.

14          What involvement did you have?

15          THE WITNESS:  Yes.  I send purified human --

16   recombinant human erythropoietin and also urinary

17   erythropoietin to my friends, colleague, Dr. Yu, to do the

18   combination analysis as described here.

19   Q.  So you had communications with Dr. Yu?

20   A.  That's correct.

21          MS. BEN-AMI:  I renew my objections, your Honor.

22   Q.  Did you have any communication --

23          THE COURT:  Well, there's no substantive questions

24   yet.  All right.  So he sends it off to Dr. Yu.  Go ahead.

25   Q.  Did Dr. Yu communicate back with you about his tests?

1    A.  Yes, he did.

2    Q.  Did you communicate with the patent office regarding

3    these tests?

4    A.  Yes.

5    Q.  Now, would you please take a look at Exhibit CAT --

6    strike that.

7         Before we look at CAT, did there come a point in

8    time before the issuance of your patent where you were

9    informed that Dr. Yu believed that some of the data he had

10   supplied to you was inaccurate?

11        **MS. BEN-AMI:**  Objection, your Honor.  Hearsay, no

12   foundation.

13        **THE COURT:**  Yes, sustained.  And leading, that's

14   the simple basis.  And we'll have to take it step by step.

15        **MR. DAY:**  I will.

16   Q.  When you prepared your patent application, what did you

17   believe about the data supplied to you by Dr. Yu?

18        **MS. BEN-AMI:**  Objection, your Honor.

19        **THE COURT:**  Sustained on that foundation.

20   Q.  At the time that you had prepared -- at the time that

21   you first -- when was this statement first included in your

22   patent application?

23   A.  It was in 1984, just a few days before we filed the last

24   one.

25   Q.  Okay.  And at the time that you -- did you include this

1    data in your patent application?

2         **MS. BEN-AMI:**  Objection, your Honor.

3         **THE COURT:**  Sustained.  You're leading the --

4    **Q.**  Who included the data in the patent application?

5         **MS. BEN-AMI:**  Objection, your Honor.

6         **THE COURT:**  How did the data get in there?

7    **Q.**  To your knowledge?

8         **THE COURT:**  Yes.

9    **A.**  I provide the data for the patent lawyer to put into the

10   last filing.

11        **THE COURT:**  Yu's data, Dr. Yu's data?

12        **THE WITNESS:**  That's correct.

13   **Q.**  And at the time that you provided the data to the patent

14   lawyer to submit to the -- in the patent application, what,

15   if any, belief did you have about the accuracy of the data?

16        **MS. BEN-AMI:**  Objection, your Honor.

17        **THE COURT:**  Overruled.  When you gave it over to

18   your lawyer, how accurate did you think it was?

19        **THE WITNESS:**  As it was presented to me, I thought

20   it was accurate as it is.

21        **THE COURT:**  And you gave it to Amgen's lawyer?

22        **THE WITNESS:**  That's correct.

23   **Q.**  Did you subsequently --

24        **THE COURT:**  No, no, you can't lead the witness on

25   this.  All right?  No leading.

1    **Q.**  Subsequently, what, if any, belief did you have

2    regarding the accuracy of this data?

3          **MS. BEN-AMI:**  Objection.

4          **THE COURT:**  On that foundation, sustained.  We'll

5    have to take it step by step.  Who, where, when, first.

6          **MR. DAY:**  Okay.

7          **THE COURT:**  Details.

8    **Q.**  Subsequent to the submission of your patent application,

9    did you receive any information regarding the accuracy of

10   your -- of this data?  Any further --

11         **MS. BEN-AMI:**  Objection.  Leading, your Honor.

12         **THE COURT:**  It is leading.

13   **Q.**  What, if any --

14         **THE COURT:**  Wait a minute.  It is leading, but I'm

15   going to allow it, in my discretion.

16         You can answer yes or no.  Yes or no, did you

17   receive any data regarding the accuracy of what had been

18   submitted to the patent office?

19         **THE WITNESS:**  Yes, I did.

20   **Q.**  What did you receive?

21         **MS. BEN-AMI:**  Objection.

22         **THE COURT:**  No, sustained.

23   **Q.**  From whom did you receive this?

24   A.   From Dr. Yu --

25         **MS. BEN-AMI:**  Objection.

```
 1              THE COURT:  Overruled.  From whom did you get the

 2     subsequent data?

 3              THE WITNESS:  He called me up.  He said --

 4              THE COURT:  He called you up.  Not what he said; he

 5     called you up.

 6     Q.  And when did he call you up?

 7     A.  I think sometime after we have submit the last filing.

 8     Because when this data was obtained, just two day --

 9              MS. BEN-AMI:  Objection.

10              THE COURT:  No, the "because" is stricken.

11     Q.  After the filing?

12     A.  Yes.

13     Q.  Okay.  Based on your conversation, did you come to have

14     any further belief with respect to the accuracy of the data?

15              MS. BEN-AMI:  Objection, your Honor.

16              THE COURT:  No -- excuse me.  Sustained.

17              As a result of that conversation, what did you do?

18     Not what he said to you, and not what you then thought, what

19     next did you do, you, if anything?

20              THE WITNESS:  This information was later on --

21              THE COURT:  No, not later on.  What did you do

22     next, if anything?  Yu called you?

23              THE WITNESS:  Yes.

24              THE COURT:  The conversation is over.

25              THE WITNESS:  Yes.
```

1          **THE COURT:**  What's the next thing you did

2     concerning these matters?  You?

3          **THE WITNESS:**  Yes.  Yu was going to send

4     information to me.

5          **THE COURT:**  All right.

6          **THE WITNESS:**  I was waiting for him to send the

7     information to me.

8          **THE COURT:**  I see, all right.  And what -- did it

9     come?

10         **THE WITNESS:**  No, it did not come.  Apparently, it

11    did not come.

12         **THE COURT:**  It didn't come.  Back to Mr. Day.

13    **Q.**  So --

14         **THE COURT:**  I don't know what to ask next.  So --

15         **MR. DAY:**  I'm trying not to lead the witness, your

16    Honor.

17         **THE COURT:**  And I won't let you.

18    **Q.**  So what communications have you had with the patent

19    office regarding this data?

20         **MS. BEN-AMI:**  Object -- I'll --

21    **Q.**  Have you, Fu-Kuen Lin --

22         **MS. BEN-AMI:**  Objection, relevance.

23         **THE COURT:**  Yeah, at that level of generality,

24    sustained.

25         **MS. BEN-AMI:**  Your Honor, may I have a sidebar on

1    this issue?

2          **THE COURT:**  You may.

3    SIDEBAR CONFERENCE, AS FOLLOWS:

4          **THE COURT:**  It's so easy when I can punt and just

5    say now let the adversary system work.

6          All right.  I understand that this is a significant

7    matter.  I'll hear you.

8          **MS. BEN-AMI:**  Okay.  First of all, we need to be

9    clear when he says patent office, what part of the patent

10   office.  Because they are trying to suggest that he told

11   something to someone and it's got to be very clear who,

12   what, when, where or why.

13         **THE COURT:**  I think it does, but I'm not --

14         **MS. BEN-AMI:**  And Number 2, this goes to

15   inequitable conduct.  Are we doing inequitable conduct now?

16         **MR. DAY:**  Actually, this does not go to inequitable

17   conduct.

18         **THE COURT:**  Well, why doesn't it?  It sounds like

19   it.

20         **MR. DAY:**  Because on the direct examination of

21   Dr. Bertozzi, Roche created the impression that Dr. Lin had

22   not told the patent office -- this isn't in their

23   inequitable conduct case.  There's no allegation of this as

24   inequitable conduct.

25         **THE COURT:**  I hadn't heard it, but there's

1    something to what she says.

2         **MR. DAY:**  I'm saying it's not in there.  It's not

3    part of their case.

4         **THE COURT:**  All right.

5         **MR. DAY:**  And, for that reason, when they brought

6    it up on the cross of Dr. Bertozzi, I got all over it and I

7    asked her what basis she had.  And I only want to put back

8    in the record the fact that Dr. Lin submitted a declaration

9    to the patent office in the interference division, it was in

10   the interference proceedings, all of which were reviewed by

11   an examiner, that showed --

12        **THE COURT:**  I'm not clear that's so, but --

13        **MR. DAY:**  It's in the prosecution history.  I'll

14   show you where it is.

15        **THE COURT:**  Some day.

16        **MR. DAY:**  I'm not going to do that.

17        **THE COURT:**  I don't think we need this now.

18        **MR. DAY:**  I would just like to get the declaration

19   into evidence.

20        **THE COURT:**  The last declaration.

21        **MR. DAY:**  And that's it, then I'm done.

22        **THE COURT:**  Well, there's no -- here's how I would

23   prefer to handle this.  You don't doubt the authenticity of

24   the declaration, do you?

25        **MS. BEN-AMI:**  Do I doubt that he signed it?  No, I

1        don't doubt that he signed it.

2                **THE COURT:**  That it exists.

3                **MS. BEN-AMI:**  I do certainly doubt that it was

4        provided to the patent examiner in these cases, absolutely

5        100,000 percent.

6                **THE COURT:**  Okay.  Well, that's your position.

7                **MR. DAY:**  That's an argument.

8                **THE COURT:**  Yeah, and of course it is.  Therefore,

9        I think that's adequate for him.  He's also going to say he

10       sent it?

11               **MR. DAY:**  I would just like the jury to understand.

12               **THE COURT:**  No, no, he's going to say he sent that

13       declaration?

14               **MR. DAY:**  Yes.

15               **THE COURT:**  Well, I'm going to get that, and I'm

16       going to get that now, but we're not putting the declaration

17       into evidence.  We're not going to get the substance of the

18       declaration.  We're going to say I show you Exhibit A, B, C.

19               **MS. BEN-AMI:**  So he doesn't come back to

20       authenticate it again.

21               **MR. DAY:**  But, your Honor, my question is how is

22       the jury going to know, then --

23               **THE COURT:**  Because they'll know before the case is

24       over, as we get into it in equitable conduct.

25               **MR. DAY:**  -- that he corrected what Dr. Bertozzi

1    said he didn't do?

2         THE COURT:  I'm buying myself a little time here.

3    You go ahead, have him identify it, and then without leading

4    him, say, What did you do with this?  Leave it alone for

5    now.  I may even let you come back to it on redirect, we'll

6    see what her cross is.

7         MS. BEN-AMI:  My objection on that last part is all

8    he can say, honestly, is he gave it to his patent attorney.

9         THE COURT:  Maybe that's all he can say.

10        MS. BEN-AMI:  We're getting a lot more, that's why

11   I keep objecting.

12        THE COURT:  I'm trying to be alert.  And I

13   understand the issue.  I think this is the way to deal with

14   it.

15        (Whereupon the sidebar conference concluded.)

16   **(BY MR. DAY:)**

17   **Q.**  Dr. Lin, would you please loot at Tab 10, which is

18   Exhibit CAT.  What is this document?

19   A.  This my declaration sent to the patent office.

20        MS. BEN-AMI:  Objection, your Honor.

21        THE COURT:  Yes.  Well, it's the "sent to the

22   patent office."  You look at the document and you can

23   identify it.  It's a declaration; correct?

24        THE WITNESS:  That's correct.

25        THE COURT:  And --

1              **MS. BEN-AMI:**  Move to strike the prior answer, your

2     Honor.

3              **THE COURT:**  I am going to strike the prior answer.

4              Now, and who prepared that declaration?

5              **THE WITNESS:**  I did.

6              **THE COURT:**  And when you say you did, in matters

7     such as this, do you mean that you wrote it out or typed it

8     out or do you mean you consulted with a lawyer and a lawyer

9     gave you a signed document, you've read that, and then

10    signed it?  Which?

11             **THE WITNESS:**  The lawyer --

12             **THE COURT:**  You were dealing with the lawyer?

13             **THE WITNESS:**  Lawyers, yes.  Okay.

14             **THE COURT:**  All right.  So you consult a lawyer,

15    lawyer uses whatever languages lawyers use.  Did you read it

16    once he -- the lawyer prepared it?

17             **THE WITNESS:**  Yes, of course I did.

18             **THE COURT:**  All right.  And thereafter you -- is

19    that your signature on it?

20             **THE WITNESS:**  That's correct.

21             **THE COURT:**  Now, then what happened to it, so far

22    as you, yourself, know?

23             **THE WITNESS:**  Yes.

24             **THE COURT:**  I mean, you gave it to the lawyer?

25             **THE WITNESS:**  That's right.

 1          **THE COURT:**  You mailed it to the patent office?

 2    You hand-carried it to the --

 3          **THE WITNESS:**  No, no.  The lawyer send it out.  I

 4    don't know --

 5          **THE COURT:**  You don't know who sent it.  You gave

 6    it to the lawyer, and the lawyer did whatever?

 7          **THE WITNESS:**  That's correct.

 8          **THE COURT:**  I think that's as far as we're going to

 9    go now.  Go ahead.

10    **(BY MR. DAY:)**

11    **Q.**  Why was the declaration prepared?

12          **MS. BEN-AMI:**  Objection, your Honor.

13    **Q.**  To your knowledge, why did you prepare this declaration?

14          **MS. BEN-AMI:**  Objection, your Honor.

15          **THE COURT:**  No, sustained.

16          **MR. DAY:**  I pass the witness, your Honor.

17          **THE COURT:**  Yes.  And now, consistent with our

18    discussion about witnesses, Ms. Ben-Ami does not have to

19    cross-examine the witness now, she can do it tomorrow.  And

20    so he -- and is that what you prefer?

21          **MS. BEN-AMI:**  Yes, your Honor.

22          **THE COURT:**  All right.  You may step down now.

23          (Whereupon the witness stepped down.)

24          **THE COURT:**  Call your next witness.

25          **MR. DAY:**  Amgen presents the deposition of

1   Dr. Harlow, your Honor.

2        **THE COURT:**  Again, keep your minds suspended about

3   this witness' testimony, because for good and sufficient

4   reason I'm allowing Ms. Ben-Ami to start her

5   cross-examination tomorrow.  So keep your minds suspended.

6   Only Mr. Day has had a chance to ask any questions.  That's

7   true of every witness, but this, I introduce this little

8   break here, and it's fine.

9        **MR. DAY:**  Can we take this off the screen?

10       **THE COURT:**  Keep your minds suspended.

11       **MR. DAY:**  Your Honor, may we have a very brief

12   sidebar on this issue?

13       **THE COURT:**  You may.

14   SIDEBAR CONFERENCE, AS FOLLOWS:

15       **THE COURT:**  If this is to object to the

16   counter-designation.

17       **MR. GOTTFRIED:**  No, it's not.  Your Honor, this is

18   the deposition of Dr. Harlow.  We just wanted you to give an

19   instruction that this is their expert and it's an admission.

20       **THE COURT:**  I'm not going to give it now.  It will

21   be read, and whatever I need to -- it should come out from

22   the deposition.  I'm not giving a special instruction.

23       **MR. FLEMING:**  I'm sorry, one housekeeping matter

24   while we have you here, before the witness goes on.  We saw

25   your protective order ruling.  Amgen's trying to limit the

1  testimony.  We interpreted your ruling as four hours of

2  testimony.

3         THE COURT:  Yeah.  No, no, no.  This has been made

4  clear.  When I speak on the record in court, it's clear.

5  Four hours.

6         MS. FISHMAN:  Your Honor, I'm sorry, on the Harlow,

7  even if it's not an admission, could you introduce him or

8  could we introduce him?

9         THE COURT:  The deposition has to introduce him.

10  No one can testify.  It's a deposition.  He's not here.  So

11  we're going to now play it.  And there we are.

12         MR. DAY:  Excuse me.

13         THE COURT:  When you're unsatisfied, you want more

14  argument.

15         MR. DAY:  It's not that I'm not satisfied.

16         THE COURT:  Well, you are, but I'll hear you.

17         MR. DAY:  Thank you very much, your Honor.

18         When the 30(b)(6) deposition time --

19         THE COURT:  Correct, I did.

20         MR. DAY:  There was no introduction in the snippets

21  of who he was.

22         THE COURT:  Yeah, but that was a stock 30(b)(6).

23  Do you want me to say -- no, you're calling an adverse

24  witness here.

25         MS. FISHMAN:  They don't know that.  They don't

1    know it's a Roche expert.  That's the only point.

2           **MR. DAY:**  Without some introduction.

3           **MS. FISHMAN:**  They don't know who it is.

4           **MS. BEN-AMI:**  Then they could have designated his

5    testimony.  Then they designated his testimony.

6           **MR. DAY:**  There's nothing in a deposition that

7    would call for starting the deposition by saying now you're

8    an expert for Roche who is testifying here --

9           **THE COURT:**  Let's see the -- have we got the --

10   Harlow here?

11          **MS. FISHMAN:**  It's loaded.  Would you like the

12   transcript?

13          **THE COURT:**  Yes.

14          **MS. FISHMAN:**  Let me run and get that.

15          (Pause in proceedings.)

16          **MS. BEN-AMI:**  Maybe everybody's getting their

17   exercise with so many people coming up here, I don't know.

18          **THE COURT:**  Well, for one thing, I don't have the

19   pages I wanted.  I don't have the pages after page number 1.

20   But let's see here.

21          **MS. FISHMAN:**  These are the rulings.  I can get the

22   full deposition, but the designated has nothing that

23   identifies him as a witness on behalf of Roche.

24          **THE COURT:**  Thank you.  No, this is page 6.

25   Where's page -- this is page 1.  Where are the pages between

```
 1    1 and 6?

 2              MR. GOTTFRIED:  This is page 1.

 3              MR. DAY:  Did you hear the Court's question?

 4              MS. FISHMAN:  The full transcript is what you'd

 5    like; is that right?

 6              THE COURT:  Yes.  Look, here's the thing.  Your

 7    time is running.

 8              MR. DAY:  We know that.

 9              THE COURT:  I suggest you play it.  I'm not going

10    to say anything.  And if I can be persuaded to say something

11    later on, you can persuade me.  But this conference is at an

12    end.

13              (Whereupon the sidebar conference concluded.)

14              EDWARD E. HARLOW, JR., By Deposition

15                    DIRECT EXAMINATION

16    (BY MS. FISHMAN:)

17    Q.  Good morning, Dr. Harlow.

18    A.  Good morning.

19    Q.  Would you please state your full name for the record?

20    A.  Edward Everett Harlow, Junior.

21    Q.  Can you please summarize for me the opinions that you

22    offer in your expert report?

23    A.  Yes, I --

24    Q.  You may answer.

25    A.  Yes.  I was asked to examine the claims in suit and find
```

1   out -- and determine whether they were obvious over the

2   claims in the '016 patent and the '008 patent.

3   **Q.**  Did you consider providing an opinion on

4   radioimmunoassay?

5   A.  It wasn't discussed.

6   **Q.**  So it's your opinion that recombinant EPO in mammalian

7   cell culture is unusable?

8   A.  It's unusable in pharmaceutical applications certainly.

9   **Q.**  In your understanding, what is the relevant time frame

10  for determining the obviousness of the patents in suit?

11  A.  December 1983.

12  **Q.**  What if, in December of 1983, one of skill in the art

13  did not have in his or her possession the DNA sequence of

14  EPO?  In that case, how would one of skill in the art have

15  prepared mammalian cell culture supernatant fluid containing

16  recombinant EPO?

17  A.  I haven't been asked to form an opinion on that.

18  **Q.**  Does your opinion about the obviousness of the patents

19  in suit, in light of claim 10 of the '016 patent, assume

20  that one of skill in the art had available to him or her the

21  DNA sequence of EPO?

22  A.  Yes.

23  **Q.**  And if one of skill in the art did not have the DNA

24  sequence of EPO available, do you have an opinion as to

25  whether or not claim 10 of the '016 patent, as of December

1    of 1983, would have rendered obvious the claims of the

2    patents in suit?

3    A.  I have not thought about that, so I don't have an

4    opinion.

5    **Q.**  Is it your opinion that one of skill in the art would

6    have expected that recombinant erythropoietin would have the

7    inherent property of causing bone marrow cells to increase

8    the production of reticulocytes and red blood cells?

9    A.  Yes.

10   **Q.**  And that would be inherent in the recombinant EPO

11   protein?

12   A.  In an EPO protein.

13   **Q.**  In the EPO protein.  And it would be the case both for

14   EPO from a natural source as well as EPO from a recombinant

15   source?

16   A.  I would anticipate it to be, yes.

17   **Q.**  Dr. Harlow, let's talk a little bit about your

18   background.  In what field do you believe your colleagues

19   would recognize you as an expert?

20   A.  Cancer biology, protein signaling, immunochemistry.

21   There might be others, but those would probably be areas

22   that people would -- that I currently would be most

23   well-known for -- that I was currently best known for.

24   **Q.**  What do you mean by "immunochemistry"?

25   A.  Use of antibodies -- anything involving the use of

1   antibodies and immunoassays or immunoprecipitations, Western

2   blots, those sorts of things.

3   **Q.**   Would it include radioimmunoassays?

4   A.   Yes, yes.

5   **Q.**   Would you consider yourself to be an expert in the use

6   of radioimmunoassays?

7   A.   Yeah, I think so.  You know, "expert" is always kind of

8   a difficult term to deal with.

9   **Q.**   Would your colleagues recognize you as an expert?

10   A.   Yeah, I think they would.

11   **Q.**   Would you consider yourself to be an expert in

12   glycoprotein expression?

13   A.   I know a fair amount about it.  It would be a portion of

14   what I was thinking about with signal transduction and

15   cancer biology.  So I know a lot about it.  Again, I'm

16   hard-pressed to understand exactly what an "expert" means in

17   these areas but certainly something I'm quite familiar with.

18   **Q.**   Would you consider yourself to be an expert in

19   glycosylation?

20   A.   No.

21   **Q.**   Well, in your opinion, would one of ordinary skill in

22   the art, before March of 1984, have had a reasonable

23   expectation of success in making a recombinant EPO having

24   the in vivo biological property of causing bone marrow cells

25   to increase their production of reticulocytes and red blood

1   cells?

2   A.   Yes.

3   **Q.**   Why is that?

4   A.   There was extensive literature on the production of

5   active proteins from mammalian cell expression systems.

6   Those proteins were -- could be expected to be glycosylated,

7   or frequently functional.  That's at least one of the

8   reasons why.

9   **Q.**   The opinions that you express about the obviousness of

10   the asserted claims in suit in light of the '008 patent,

11   what is the time frame for your opinion?

12   A.   December 1983.

13   **Q.**   Do you understand what type of biological activity is

14   required for Dr. Lin's claims in suit?

15   A.   I understand at least some of them.

16   **Q.**   Do you understand that the claims in suit require in

17   vivo biological activity in the body?

18   A.   Yes.

19   **Q.**   Are you aware of any recombinant glycoprotein that had

20   been demonstrated to be in vivo biologically active in the

21   body by December of 1983?

22   A.   I don't recall.  I'd have to check.

23   **Q.**   Now, even with the correct DNA sequence, a number of

24   steps must occur before one obtains a functional secreted

25   glycoprotein like EPO; correct?

1    A.   That's correct.

2    **Q.**   You cloned the human p53 gene; correct?

3    A.   That's correct.   That's one of the genes I've cloned.

4    **Q.**   In fact, you were the first to clone the human p53 gene,

5    weren't you?

6    A.   Yes.

7    **Q.**   By July of 1985 you'd isolated the correct DNA sequence

8    that encodes the human p53 protein, right?

9    A.   Uhm-hmm, yes.

10   **Q.**   And in 1985 you tried to produce the recombinant human

11   p53 protein by expressing the p53 DNA sequence in mammalian

12   cells; correct?

13   A.   That's correct.

14   **Q.**   So you did have the correct coding sequence for the p53

15   gene, but there were other DNA sequences that interfered

16   with its expression in a mammalian cell; is that right?

17   A.   That's correct.

18   **Q.**   Okay.   And this was in 1985?

19   A.   This is correct, yeah.

20   **Q.**   So you would have considered yourself to have been above

21   one of ordinary skill in the art by that point in time;

22   correct?

23   A.   Uhm, probably, yeah, that's right.

24   **Q.**   Okay.   And so is it fair to say that while a DNA

25   sequence is necessary to produce a recombinant protein, it

1    is not in and of itself sufficient to produce a recombinant

2    protein?

3    A.   That's certainly true.

4    **Q.**   And was that known by 1983 to 1984?  Was it known that a

5    DNA sequence alone was necessary but not sufficient to

6    produce a recombinant protein to one of ordinary skill in

7    the art by December of 1983?

8    A.   Absolutely.

9         **THE COURT:**  I think this is a good place to stop.

10   We can pick up here.

11        Ladies and gentlemen, what we're going to do is

12   we'll finish playing this, and then we'll have Mr. Lin back

13   on the stand and Ms. Ben-Ami will get a chance to ask her

14   questions, and we'll move right along.

15        We'll start promptly at 9:00 a.m. tomorrow morning.

16   You have not heard all the evidence.  Please, therefore,

17   keep your minds suspended.  Do not discuss the case either

18   among yourselves nor with anyone else.

19        You may stand in recess until 9:00 tomorrow

20   morning.  The jury may recess.

21        **THE CLERK:**  All rise for the jury.

22        (Whereupon the jury left the courtroom.)

23        **THE COURT:**  Please be seated.  Total elapsed time

24   stands Amgen, five days, one hour, 55 minutes; Roche, six

25   days, one hour, 35 minutes.

1          We'll recess until 9:00 a.m. tomorrow morning.

2     We'll recess.

3               (Adjournment.)

4

5

6               **C E R T I F I C A T E**

7

8

9          We, Donald E. Womack and Cheryl B. Palanchian,

10    Official Court Reporters for the United States District

11    Court for the District of Massachusetts, do hereby certify

12    that the foregoing pages are a true and accurate

13    transcription of our shorthand notes taken in the

14    aforementioned matter to the best of our skill and ability.

15

16

17

18          /S/ DONALD E. WOMACK
          _____

19          /S/ CHERYL B. PALANCHIAN
          _____

20

21               DONALD E. WOMACK
               CHERYL B. PALANCHIAN
               Official Court Reporters

22               P.O. Box 51062
          Boston, Massachusetts 02205-1062

23               womack@megatran.com

24

25