```
 1                 UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS
 2
                                        Civil Action
 3                                      No. 05-12237-WGY

 4   * * * * * * * * * * * * * * * *
                                   *
 5   AMGEN, INC.,                  *
                                   *
 6           Plaintiff,            *
                                   *   DAILY TRANSCRIPT
 7   v.                            *   OF THE EVIDENCE
                                   *     (Volume 13)
 8   F. HOFFMANN-LA ROCHE LTD,     *
     ROCHE DIAGNOSTICS GmbH and    *
 9   HOFFMANN-LA ROCHE, INC.,      *
                                   *
10           Defendants.           *
                                   *
11   * * * * * * * * * * * * * * * *

12

13

14           BEFORE:  The Honorable William G. Young,
                      District Judge, and a Jury
15

16

17

18

19

20

21

22

23                                 1 Courthouse Way
24                                 Boston, Massachusetts

25                                 September 28, 2007
```

1              A P P E A R A N C E S

2

3           DUANE MORRIS LLP (By D. Dennis Allegretti,
     Esq. and Michael R. Gottfried, Esq.), 470 Atlantic
     Avenue, Suite 500, Boston, Massachusetts 02210

4              - and -
           DAY CASEBEER MADRID & BATCHELDER, LLP (By

5     Lloyd R. Day, Jr., Esq., David M. Madrid, Esq. and
     Robert M. Galvin, Esq.) 20300 Stevens Creek

6     Boulevard, Suite 400, Cupertino, California 95014
              - and -

7           McDERMOTT WILL & EMERY (By Michael Kendall,
     Esq.), 28 State Street, Boston, Massachusetts

8     02109
              - and -

9           McDERMOTT WILL & EMERY (By William G.
     Gaede, III, Esq.), 3150 Porter Drive, Palo Alto,

10    California 94304
              - and -

11          MARSHALL, GERSTEIN & BORUN LLP (By Kevin M.
     Flowers, Esq.), 6300 Sears Tower, 233 S. Wacker

12    Drive, Chicago, Illinois 60606-6402
              - and -

13          STUART L. WATT and WENDY A. WHITEFORD, Of
     Counsel, Amgen, Inc., One Amgen Center Drive,

14    Thousand Oaks, California 91320-1789, on behalf of
     the Plaintiff

15

16          BROMBERG & SUNSTEIN LLP (By Lee Carl
     Bromberg, Esq. and Julia Huston, Esq.), 125 Summer
     Street, Boston, Massachusetts 02110

17             - and -
           KAYE SCHOLER LLP (By Leora Ben-Ami, Thomas

18    F. Fleming, Esq., Patricia Carson, Esq.,
     Christopher Jagoe, Esq. and Howard Suh, Esq.),

19    425 Park Avenue, New York, New York 10022, on
     behalf of the Defendants

20

21

22

23

24

25

## I N D E X

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

EVERETT E. HARLOW, JR., By Deposition(Cont'd)

|  |  | 1794 |  |  |

FU-KUEN LIN, Resumed

| By Ms. Ben-Ami |  | 1802 |  | 1906 |
| By Mr. Day |  |  | 1890 |  |
|  |  |  | 1907 |  |

JEFFREY K. BROWNE

| By Mr. Gaede |  | 1910 |  |  |

| | | FOR | IN |
| EXHIBITS: | | I.D. | EVID. |

| 2101 Lawn, et al. Article . . . . . . . . | .1839 |
| 2102 American Type Culture Collection . . | .1853 |
| 2103 Wallace, et al document  . . . . . . | .1871 |
| 29   Browne Lab Notebook  . . . . . . . . | .1918 |
| 30   EPO Team Meeting Minutes . . . . . . | .1927 |
| 31   EPO Team Meeting Minutes . . . . . . | .1930 |
| 32   EPO Team Meeting Minutes . . . . . . | .1941 |

1          **THE CLERK:**  All rise for the jury.

2          (Whereupon the jury entered the courtroom.)

3          **THE CLERK:**  Court is in session, please be seated.

4          **THE COURT:**  Good morning, ladies and gentlemen.

5    We're all ready to go.  You'll recall that we're going to

6    continue playing the deposition of Dr. Harlow and we'll be

7    back to Dr. Lin.

8          All right, we may continue from where we left off.

9      EVERETT E. HARLOW, JR., By Deposition (Cont'd)

10   **Q**   As of December 1983, is it your opinion that one of

11   skill in the art had a reasonable expectation of success in

12   producing a recombinant erythropoietin that had undergone

13   proper post-translational modification to achieve an in vivo

14   biologically active protein?

15   A   With the, with the available clone, yes.

16   **Q**   In addition to glycosylation, there are other

17   post-translational modifications that were known in 1983,

18   correct?

19   A   There were.  Yes, there were.

20   **Q**   Do different cells in different cell lines affect

21   post-translational modifications differently?

22   A   Yes.

23   **Q**   And do different proteins require different

24   post-translational modifications?

25   A   Yes.

1    **Q**   Can differences in the post-translational modification

2    of a particular protein affect the in vivo biological

3    activity of that protein?

4    A   Yes.

5    **Q**   Can differences in the post-translational modification

6    of a protein eliminate the in vivo biological activity of a

7    given protein?

8    A   Yes.

9    **Q**   So post-translational modifications can affect

10   conformation of proteins, correct?

11   A   Absolutely, yes.

12   **Q**   And that conformation of a protein can affect its

13   ability to bind to an antibody?

14   A   Yes.

15   **Q**   Would you expect that that conformation or folding could

16   also affect the ability of a protein to bind to a receptor?

17   A   It's imaginable to me, yes.

18   **Q**   Would it be reasonable to expect that changes in

19   conformation would affect the ability of a protein to bind

20   to its receptor?

21   A   Yes.

22   **Q**   Another possibility that you'd offered was that the

23   post-translational modification caused steric hindrance and

24   interfered with the ability of the antibody to recognize the

25   epitope of the E1A protein.  Do you recall that?

1    A    Yes.  I don't recall it, but --

2    Q    It seems reasonable.

3    A    It is quite reasonable.

4    Q    By contrast tPA is not a hormone, correct?

5    A    That's correct.

6    Q    TPA does not bind to or activate a receptor?

7    A    That's correct.

8    Q    TPA is not required to have a specific conformation to

9    bind or activate a receptor?

10   A    Since it doesn't bind a receptor, the answer has to be

11   yes.  There is some logic we'll agree on there.

12   Q    Is tPA required to have a specific conformation to

13   perform its biological activity in vivo?

14   A    I don't know.

15   Q    EPO is made by the body in very specific cells of the

16   kidney, correct?

17   A    That's correct.

18   Q    Do you know what cells make EPO?

19   A    I don't.

20   Q    Do you know if it's known what cells make EPO?

21   A    No, I don't even know that.

22   Q    EPO must travel through the bloodstream to the bone

23   marrow in order to stimulate the production of red blood

24   cells and reticulocytes, correct?

25   A    That's my understanding.

1   Q   So EPO must persist in the bloodstream in order to have

2   in vivo biological activity, correct?

3   A   Yes, persistence being a rather indefinite term; but

4   yes.

5   Q   TPA acts locally as an enzyme to dissolve clots?

6   A   That's correct.

7   Q   If tPA persisted in the body it could cause medical

8   problems, correct?

9   A   That's my understanding, yes.

10   Q   And that was known by December of 1983?

11   A   Again, that's my understanding.

12   Q   So by December of 1983, it had been demonstrated that

13   the removal of terminal sialic acids eliminated in vivo

14   biological activity for EPO, correct?

15   A   That's my understanding, yes.

16   Q   And by December of 1983 it had been reported that

17   deglycosylated EPO lost in vivo biological activity,

18   correct?

19   A   That's my understanding.

20   Q   So therefore by December of 1983 it was known that

21   particular sugars must be added to the EPO protein in order

22   for the EPO glycoprotein to have in vivo biological

23   activity, correct?

24   A   That's correct.

25   Q   Now, recombinant EPO needs to be administered

1    chronically to dialysis patients, correct?

2    A    That's my understanding, yes.

3    Q    Do you know whether tPA is administered chronically?

4    A    I think it is not.

5    Q    Does chronic administration have implications for

6    immunogenicity?

7    A    Yes.

8    Q    And what are those implications?

9    A    Repeated exposure to proteins that might be immunogenic

10   will increase the likelihood that some immune response will

11   be elicited.

12   Q    So the potential for immunogenicity is greater for a

13   chronically administered protein like recombinant EPO than

14   it would be for a protein like recombinant tPA, correct?

15   A    That's my understanding, yes.

16   Q    Dr. Harlow, you're regarded as an expert in antibodies,

17   correct?

18   A    Yes.

19   Q    You are the author of two laboratory manuals on

20   antibodies?

21   A    Co-author, yes.

22   Q    Co-author.  These books are written to assist scientists

23   working at the bench?

24   A    Yes, that's correct.

25   Q    And your expertise extends to radioimmunoassay

1    techniques, correct?

2    A    Yes.

3    **Q**    Now, radioimmunoassay techniques can be used to detect

4    protein antigens if a suitable antibody is available,

5    correct?

6    A    Yes.

7    **Q**    And as of December 1983 an ordinarily skilled artisan

8    would have known how to use a radioimmunoassay to measure

9    the amount of a protein antigen in a solution, correct?

10    A    That's correct.

11    **Q**    Were there EPO antibodies known to one of skill in the

12    art by December of 1983?

13    A    Yes.

14    **Q**    Could those antibodies have been used in a

15    radioimmunoassay to provide information about the quantity

16    or presence of the EPO protein?

17    A    Yes.  Yes.

18    **Q**    Okay.  Could multiple different kinds of

19    radioimmunoassays have been employed to quantify the amount

20    of EPO in a vertebrate cell culture?

21    A    I anticipate yes, it could have.

22    **Q**    What radioimmunoassays were known by 1983 that could

23    have been used for detecting EPO in various cellular

24    fractions, fluids, and media?

25    A    They aren't in my mind at the moment.  I don't know them

1    without going back and --

2    Q    But one of skill would have known what those assays

3    were?

4    A    Yes.

5    Q    And would one of skill have known how to select among

6    those assays an appropriate radioimmunoassay for detecting

7    EPO in various cellular fractions, fluids, and media?

8    A    Yes, I believe they would have.

9    Q    So, it is your opinion that one of ordinary skill in the

10   art could have followed the RIA referred to in the patent in

11   the suit in order to quantify the levels of EPO protein

12   being produced by vertebrate cells?

13   A    Yes.

14   Q    Were you aware of any problems in the art in December of

15   1983 in quantifying or purifying proteins using RIA that

16   were caused by protein fragments?

17   A    It was -- it's a common issue in RIA to consider whether

18   proteins are affected by fragments or full-length proteins,

19   misfolded proteins, other things that might confound an

20   antibody response, antibody recognition.

21   Q    Could one of skill in the art have used an RIA to

22   identify and quantify the recombinant EPO in mammalian cell

23   culture media as of December 1983?

24   A    Yes.

25            MR. DAY:  Your Honor?

1          THE COURT:  Is that it?

2          MR. DAY:  That ends the deposition.

3          THE COURT:  Very well.

4          MR. DAY:  Could we go to side bar?

5          THE COURT:  Dr. Lin may be recalled.

6          MR. DAY:  May we have a short side bar?

7          THE COURT:  We may.

8    SIDEBAR CONFERENCE, AS FOLLOWS:

9          MR. DAY:  I simply would like to renew the motion

10   that we filed with respect to an instruction about Dr.

11   Harlow.

12         THE COURT:  Yes, the motion's denied.

13         (Whereupon the sidebar conference concluded.)

14         THE COURT:  Now, Ms. Ben-Ami, you may proceed.

15         MS. BEN-AMI:  Good morning, Dr. Lin.

16         THE WITNESS:  Good morning.

17         THE CLERK:  Did you remind the witness?

18         THE COURT:  No, I did not, and thank you.  The

19   clerk will remind you, you are under oath.

20         THE CLERK:  Sir, I remind you, you are still under

21   oath.

22         THE WITNESS:  Yes.  Yes, I do.

23         THE COURT:  Now proceed.

24

25

| | |
|---|---|
| 1 | FU-KUEN LIN, Resumed |
| 2 | **CROSS-EXAMINATION** |
| 3 | **BY  MS. BEN-AMI** |
| 4 | **Q**   Good morning, Dr. Lin. |
| 5 | A   Good morning. |
| 6 | **Q**   How are you today? |
| 7 | A   Fine, thank you.  How about yourself? |
| 8 | **Q**   I'm fine, thank you.  I'm just going to put this here. |
| 9 | It's a binder of prior testimony.  If we need it.  Maybe we |
| 10 | don't.  And just, your Honor has a copy and counsel has a |
| 11 | copy. |
| 12 | **MS. BEN-AMI:**  And what I've done, your Honor, for |
| 13 | the record is, we've, as we did for the expert reports, |
| 14 | we've color coded the testimony. |
| 15 | **THE COURT:**  Various testimonies. |
| 16 | **MS. BEN-AMI:**  Yes. |
| 17 | **THE COURT:**  Thank you. |
| 18 | **MS. BEN-AMI:**  Just for ease of use. |
| 19 | **Q**   So, I'll put this away.  I'll just leave this here if we |
| 20 | need it, okay? |
| 21 | A   Okay. |
| 22 | **Q**   And, Dr. Lin, you and I, we've met before, right? |
| 23 | A   Yes. |
| 24 | **Q**   Yes.  And I took your deposition in California some time |
| 25 | ago. |

1    A    That's correct.

2    Q    Correct?

3            And I told you that if you weren't feeling well or

4    there was a problem you should let me know, right?

5    A    Okay.  Yes.

6    Q    And you understand that today --

7    A    Yes.

8    Q    -- if there's a problem you'll let me know, right?

9    A    Sure.  Thank you.

10   Q    You'll let the Court know, right?

11   A    Yes.

12   Q    Okay.  Now, you talked yesterday about making a genomic

13   clone.  Right?

14   A    Yes.

15   Q    Right.  Now, you are aware, Doctor, that only some of

16   your patents are even involved in this litigation, right?

17   A    You mean among the seven patents that I have?

18   Q    Only some of them are involved --

19   A    Yes, that's correct.

20   Q    -- in this litigation, right?

21           So, for example, we have the '008 patent.  And can

22   I have FL demonstrative 1.  No.  Sorry.  FL6.  You can see I

23   must get these contacts changed.

24           But, Dr. Lin, you had this patent -- excuse me --

25   the '008 patent, right?  You remember that patent, right?

1    A    Yes, I do.

2    Q    And this was the first patent that you got, right?  The

3    '008 patent?

4    A    Yes.

5    Q    Okay.  And that patent had a patent life of its normal

6    17 years, right?

7    A    Yes, that's correct.

8    Q    And it has expired, right?

9         **MR. DAY:**  Objection, your Honor; relevance.

10        **THE COURT:**  Well, she only gets that question and

11   then we'll move on.

12        But that one's expired, correct?

13        **THE WITNESS:**  That's correct, yes.

14   Q    And that patent had a claim to the genomic DNA, right?

15   A    Yes.  That's right.

16   Q    And no --

17   A    Which one?  You mean about 11?

18   Q    Yes.

19   A    Okay.

20   Q    And no one's contesting that, right?

21   A    That's correct.

22   Q    Okay.  Now, you also have a patent, the '080 patent.

23        **MR. DAY:**  Objection, your Honor; relevance.

24        **THE COURT:**  Yes.

25        **MS. BEN-AMI:**  Could I have a side bar, your Honor?

```
 1              THE COURT:  You may.

 2    SIDEBAR CONFERENCE, AS FOLLOWS:

 3              THE COURT:  What do you want?

 4         MS. BEN-AMI:  I'll tell you what.  I'm not going to

 5    cast aspersions on what happened yesterday with this witness

 6    had a strong reaction yesterday on the stand.  Right.

 7    Mr. Day said in his opening that we were taking everything

 8    away from Dr. Lin.  We were taking away everything from Dr.

 9    Lin.  Everything.  That's what he said in his opening.

10         MR. DAY:  No, I didn't say that.

11         THE COURT:  Please.  Yes?

12         MS. BEN-AMI:  This man, I think he tried to cry on

13    the stand if that's what he was doing.  I couldn't see

14    exactly.  I think he showed the jury that this concept that

15    he had a genomic clone and that we're taking everything away

16    from him is not correct.

17         THE COURT:  I'll give you a few questions.

18         MS. BEN-AMI:  I'm not going to go crazy.

19         THE COURT:  And you're not going into

20    obviousness/double patenting.

21         MS. BEN-AMI:  Absolutely not.

22         THE COURT:  That's where my mind was.

23         MS. BEN-AMI:  No, no.

24         THE COURT:  A few questions.

25         MS. BEN-AMI:  A few.
```

```
1              MR. DAY:  Your Honor, excuse me, the '080 patent is

2      not in suit.

3              THE COURT:  I understand that.

4              MS. BEN-AMI:  That's my point.

5              THE COURT:  She's got a wholly different point.  I

6      understand.

7              (Whereupon the sidebar conference concluded.)

8              MS. BEN-AMI:  May I proceed, your Honor?

9              THE COURT:  You may.

10     Q    So, Dr. Lin, you have another patent that's called the

11     '080 patent, right?  You know that?

12     A    Let me see.  I don't know what --

13     Q    It's Exhibit 7.

14     A    I don't remember all the number.

15     Q    I appreciate that, Dr. Lin.  So this is Exhibit 7.  But

16     this is another patent you have, right?

17     A    Yes.

18     Q    And from the same work, right?

19     A    Different work.  It's different information that we have

20     in the -- you mean, you mean the patent in terms of --

21     Q    Let me start again.

22     A    Okay.

23     Q    I'll try it again.  I apologize.  And if I'm speaking

24     too quickly or you don't understand me you will let me know,

25     right?
```

1    A    Yes.  Sure.

2    Q    Right.  So the '080 patent has the same description as

3    all the other patents, right?

4    A    What kind of same description?

5    Q    It's the same patent application.  It's got the same

6    columns, the same figures, the same written description as

7    all the other patents.  If you don't know you can say you

8    don't know, it's okay.

9    A    I didn't look at the detail.  In terms of the claim, the

10   claim different, yes.

11   Q    The claims are different.

12   A    Sure.  Yes.

13   Q    But it's from the same original work, right?

14   A    Yes.

15   Q    Okay.  That was my point.  The same original work.

16   A    Yes.

17   Q    It has different claims.  Right?

18   A    Yes.

19   Q    And it's also not at issue in this case, right?

20   A    What's that?

21   Q    It's not being litigated in this case?

22   A    I don't know.  I don't know.  I'm sorry, I don't know.

23   Q    Okay.  So the jury knows which patents are being

24   litigated in this case.  And if you'll accept my

25   representation that it's not being litigated in this case,

1    no one is trying to take that patent away from you, are

2    they?

3    A   I don't know this number, what was in litigation, I'm

4    sorry, I don't know.

5    Q   Okay.  So let's look at something else.  Can I -- you

6    also have in this case, in this case, the '686 patent which

7    is Exhibit 2.  Can I have FL7.

8        Right?  That's a patent that's in this case, but

9    the claim 5, which is the genomic DNA claim, is not being

10   litigated in this case, right?

11   A   Okay.

12   Q   Right?

13   A   That's correct.

14   Q   So that's the claim to your genomic DNA, right?

15   A   I would have to see what is the process being over

16   there.

17   Q   All right.  Well, you see in claim 5 it says the DNA is

18   genomic DNA, right?

19   A   That's correct.

20   Q   And you told the jury yesterday what you did was genomic

21   DNA, right?

22   A   No, what we did was not just genomic DNA.  What the

23   claim patent, whatever the product made out of this gene is

24   not just, had to be a genomic DNA.  Yes.

25   Q   Okay, let me break it down for you.

1    A    Sure.

2    Q    I'm not asking you what the patent claims are.

3    A    Sure.

4    Q    What you told the jury yesterday was that you plucked

5    out the genomic DNA from the gene library, right?

6    A    That's correct.

7    Q    Okay.  That was my point.  And that's -- DNA is in claim

8    5, right?

9    A    Yes.

10   Q    But that claim is not being asserted in this case?  Do

11   you know?

12   A    You're just talking about genomic DNA.  It's not.  Just

13   the term genomic DNA.

14   Q    Right.

15   A    Okay.

16   Q    Okay.  So, when we're talking about the claims that are

17   in this case they're not specific to genomic DNA, right?

18   A    That's correct.

19   Q    Okay.  So then, let's move on here.

20         Now, you were provided with purified EPO protein by

21   Dr. Goldwasser, correct?

22   A    Yes.

23         **MS. BEN-AMI:**  And can I have Trial Exhibit 2041,

24   please.

25   Q    Now, this is a letter -- that's in evidence, your

1    Honor -- it's December 1982, and you received a copy of this

2    letter, correct?

3    A   Could you show the whole copy?  I cannot see the bottom

4    part so I don't know what is it.

5           **MR. DAY:**  Counsel, excuse me, do you have a copy of

6    this exhibit?

7           **THE COURT:**  Well, it's in evidence.  Just designate

8    it by a number.

9           **MS. BEN-AMI:**  Yes.  2041.

10          **THE COURT:**  2041.  Counsel are expected to have

11   copies of the exhibits.

12          **MS. BEN-AMI:**  Yes, we do, your Honor.

13          **THE COURT:**  Proceed.

14   **Q**   If we can go to the second page.  You were cc'd on that,

15   right?  Second page.

16   A   Yes.

17   **Q**   Yes.  Okay.

18          So, looking back on the first page, and the

19   paragraph that says "We were under the impression," the last

20   sentence, it says that you, that Amgen wants the reagents

21   which are critical to Amgen's program.  Right?  This is what

22   Amgen is telling Dr. Goldwasser.

23   A   Where is it?

24          **MR. DAY:**  Objection; lacks foundation.

25          **THE COURT:**  No, he may answer the question if he

1  knows the answer of his own knowledge.

2  Q    You received this letter at the time, Doctor, right?

3  A    Yes.

4  Q    And you knew that Amgen was asking Dr. Goldwasser for

5  more EPO protein because it was critical to the success of

6  the effort?

7  A    Could you just let me read through this.

8  Q    Let me ask you a different question, Doctor.  I don't

9  want to spend too much time reading today.

10         Doctor?

11  A    Yes.

12  Q    I'll ask you a different question.

13  A    Yes.

14  Q    You agree that Dr. Goldwasser's EPO protein was

15  critical, don't you?

16  A    No.  It's helpful, it's among many other things.  But by

17  itself it won't help me a bit.

18  Q    Okay.

19  A    As I already point out yesterday.  But just having EPO

20  alone won't help.

21  Q    Dr. Lin, you previously testified that it was critical,

22  didn't you?

23  A    It's critical among other things.

24  Q    Okay.

25  A    Not just by itself.  Yes.

1   **Q**   So it is critical?

2   A   Yes.  It's not, it's necessary but not sufficient for

3   anything at all.  Okay?

4   **Q**   Okay.  So it's necessary?

5   A   Yes, it's helpful.  It's helpful.

6   **Q**   It's critical?

7   A   Critical among other things is what I have said many

8   times before.

9   **Q**   Okay.  Good.  All right.  So now let's look at

10  Dr. Goldwasser's explanation back to Amgen.  That's 2042.

11         Would you blow up the paragraph that says, "Let me

12  first sum up."  And the sentence that says, "In the results

13  so far obtained, we can see that with some hindsight that we

14  should not have relied on the machine being able to sequence

15  a few hundred picomoles."

16         What's a picomole?

17  A   Which document is this one?

18  **Q**   I'm asking you what's a picomole?

19  A   Ten to the minus twelve mole.

20  **Q**   That's a tiny little bit?

21  A   That's correct.

22  **Q**   And Dr. Goldwasser wrote back to Amgen and said the

23  problem with the sequencing is that you didn't have enough

24  material?

25  A   I don't know what document you're referring to.  Would

1    you tell me which one it is?  I don't even have document in

2    front of me.

3           THE COURT:  Yes, she'll be specific on that.  But I

4    have a question.

5           MS. BEN-AMI:  Yes.

6           THE COURT:  You've told us what a picomole is.

7    What's a mole?

8           THE WITNESS:  A mole is, a mole is, it's units of,

9    in the chemistry, one mole means, say if it's sugar, it's

10   one hundred eighty -- I don't know how to explain this.

11   Since a sugar is 320 gram, considers becoming one mole.

12   Whatever the molecular weight is that you add together that

13   the sugar formula --

14          MS. BEN-AMI:  Let's make believe it's a hundred.

15          THE COURT:  So a mole is a measure of molecular

16   weight?

17          THE WITNESS:  It's actually definition for numbers

18   of molecule in such a unit.

19          THE COURT:  Okay.

20          THE WITNESS:  If one mole, say, for copper is one,

21   have the same molecule number as one mole with sugar, the

22   number of molecules is the same.

23          THE COURT:  I see.

24          THE WITNESS:  Yes.

25   Q    So it's the total -- you add up all the atoms in the

1  molecule?

2  A    That's right.  The number of moles is something like six

3  times ten to the 23 power.  Okay, that means that one mole,

4  no matter what kind of mole you have, one mole is a protein

5  of a sugar or whatever it is, all have the same number, it's

6  a unit definition.

7  Q    Let me see if I can help.

8        So you take -- you count up the number of atoms,

9  right?  Right?

10  A    Molecule.

11  Q    The atoms in the molecule, right?

12  A    No, it's molecule.  It can be atoms or it could be

13  molecule.  It depends.

14  Q    And then you multiply it by this thing called Avagadro's

15  number?

16  A    Yes.

17  Q    And that's that number you just gave us.  And that

18  equals one mole, right?

19        So here is --

20  A    I don't know that what you said is quite correct.

21  Q    All right.  Well, I don't know if what I said was quite

22  correct either, so we'll move on.  And I told you before my

23  knowledge was very rusty.  So we're at 2042.  Right?  You

24  have 2042?

25        Do you have that now?

```
1    A   Yes.  Could I read it first?

2    Q   Well, I really just want to ask you to look at the part

3    that I just pointed up and ask you if you remember --

4    A   No.

5    Q   I haven't asked a question yet, Dr. Lin.  You remember

6    that the problem with the sequencing in the early days was

7    that you didn't get enough of the EPO protein from

8    Dr. Goldwasser?

9    A   That's, that's only one problem.  The sequencing problem

10   is not just getting enough EPO.

11   Q   You didn't do the sequencing, right?

12   A   No, I did not.

13   Q   Okay.  But here's Dr. Goldwasser saying back to Amgen,

14   right, that the problem is that he didn't give them enough

15   material?

16   A   That's what he say.  I have no comment on that.

17   Q   Okay.  And Dr. Goldwasser's material was quite pure,

18   right?

19   A   Yes.

20   Q   Pure?

21   A   Yes.

22   Q   And it was over 90 percent pure, right?

23   A   I don't know the exact number of the purity.

24   Q   Okay.  Can we look at red -- I'll give you the -- now,

25   let's just -- let me just -- I don't want to editorialize.
```

```
 1              It's 2007 now, right?

 2   A    That's correct.

 3   Q    And we're talking about things that happened in 1981,

 4   82, '83, right?

 5   A    That's correct.

 6   Q    And you were asked questions a little bit closer to 1981

 7   and '82 and '83 maybe, you know, and I'm not going to say

 8   anything further, but I want you to look at a transcript

 9   from 1989.  Okay?  And there I'm looking at Page, it's the

10   red transcript, Page 88.

11              That's a different one.  Wait a minute.  You have

12   so many reds.  Here we go.  Still in 1989 though.

13              And can you call that up, please.

14              MR. DAY:  Your Honor, could we have a side bar?

15              THE COURT:  We can.

16   SIDEBAR CONFERENCE, AS FOLLOWS:

17              MS. BEN-AMI:  I'm sorry, here I am.

18              MR. DAY:  Your Honor, I simply object to the

19   process we're following here.  My experience is that you put

20   a question to the witness.  If the witness gives you an

21   answer that you think is contradicted by prior testimony of

22   the witness, you inform the witness and counsel of the

23   citation.

24              THE COURT:  No, no, my only problem is this.  The

25   supposed contrary testimony has been flashed up on the
```

```
1    screen.
2             MS. BEN-AMI:  No, it hasn't.
3             MR. DAY:  But my point --
4             THE COURT:  Well, as I sat here it looked to me
5    like it was.
6             MS. BEN-AMI:  No, that was a document.
7             THE COURT:  Respectfully, I just saw some
8    testimony.
9             MS. BEN-AMI:  Oh, I'm sorry.  I apologize.  I
10   didn't see it go up.
11            THE COURT:  Yes.  And I'm not going to have that.
12            MS. BEN-AMI:  Okay.
13            THE COURT:  Now, you're arguing over the ruling in
14   Queen Carolyn or Queen Charlotte's case.  I always forget
15   which one it was.
16            MR. DAY:  I didn't know it.
17            THE COURT:  The issue -- no, it has to do with the
18   love letters to William the IV's queen.
19            Now, the issue is how much he has to show him of
20   his prior testimony.  And the way I do it is she has to show
21   him only at the time she says and on a prior occasion you
22   said this.  Now, when she does that, you're right, she
23   should say such and such deposition or such and such day of
24   trial or line X to Y, so I may see it so you may know --
25   you've got a copy of this binder?
```

1              **MR. DAY:**  I understand I do but I --

2         **THE COURT:**  Yes.

3              **MR. DAY:**  There was a transcript.  I don't know

4    what he was, he was looking at.

5         **THE COURT:**  Well, all I want is, if I can find it,

6    if I can find it, you can find it.

7              **MR. DAY:**  That's correct.

8         **THE COURT:**  But --

9         **MS. BEN-AMI:**  Don't put it up.

10        **THE COURT:**  The prior statements are never put up

11   unless you offer them.  You see, they have to come in in

12   evidence.  You don't just start flashing them up there.

13        **MS. BEN-AMI:**  Actually, your Honor, because

14   nowadays you're allowed to show video transcript to impeach,

15   you can do this.  But it doesn't matter to me.

16        **THE COURT:**  If you offer it affirmatively, I will

17   admit it.

18        **MS. BEN-AMI:**  Okay.

19        **MR. DAY:**  Yes.  Could I just ask one more question

20   about this?

21        **THE COURT:**  Yes.

22        **MR. DAY:**  There should be a question that elicits

23   an answer.

24        **MS. BEN-AMI:**  I have questions.

25        **MR. DAY:**  Excuse me.

1          **THE COURT:**  Yes.

2          **MR. DAY:**  Can I just finish?

3          **THE COURT:**  I know, but I'm able to follow it.  If

4     I'm able to follow it, then everybody else has to be able to

5     follow it.  I'm -- this is vanilla area.

6          **MR. DAY:**  Yes.

7          **THE COURT:**  Things we do all the time.

8          **MR. DAY:**  Yes.

9          **THE COURT:**  I'm comfortable with her mode of

10    cross-examination, with the one exception that we're not

11    getting into prior allegedly impeaching data up on the

12    screen.  And in addition, I'm just repeating myself, I want

13    page and line numbers.

14         **MS. BEN-AMI:**  Yes, of course, your Honor.

15         **THE COURT:**  If I can find it, then I'm the slowest

16    one in the courtroom.

17         **MS. BEN-AMI:**  I'm sorry, your Honor, that's fine.

18    I will do it that way.

19         (Whereupon the sidebar conference concluded.)

20    **BY  MS. BEN-AMI**

21    **Q**   Okay, Dr. Lin?

22    A    Yes.

23    **Q**   I'm having trouble seeing today so I'm having my

24    colleague help me here.  Thank you.

25         So we are on Page 88 of the transcript of 8-21-89;

1   it's the third red transcript.  Page 88, Line 18.  And you

2   were asked the question:  And how pure was the Goldwasser

3   protein?

4              Right?  You're following with me?

5   A   Yes.

6       **MS. BEN-AMI:**  I'm on Line 18, your Honor.

7   **Q**   And you said:  I think it was pretty pure, yes.  Pretty

8   pure, as far as we knew it was pretty pure.

9              Question:  Along the lines of a hundred percent?

10  Eighty percent?

11             Answer:  I think no, it won't be, because no one

12  can claim a hundred percent.  I would say it was in the

13  range of 90 percent or better.

14             Right?  And that's what I asked you, was it 90

15  percent or better?

16  A   Uh-huh.

17  **Q**   Yes?

18  A   Okay.  That's what it says here.

19  **Q**   Yes.  And you were under oath then?

20  A   Yes.

21  **Q**   And that was in 1989?

22  A   Uh-huh.

23  **Q**   Okay.  And it was certainly pure enough to sequence?

24  A   Yes.  Sure.

25  **Q**   Okay.

1    A    That's correct.

2    Q    Okay.  Now, you were looking for other urinary EPO

3    samples, but the ones you found were not pure enough to

4    sequence, right?

5    A    I don't know other samples that we had obtained had been

6    subject to sequencing or not.  I cannot recall.

7    Q    Okay.  So do you remember that there was, you got a

8    sample from Dow Chemical?

9    A    That's correct, yes.

10   Q    And that sample was not pure enough to sequence, right?

11   A    That's right, it was not pure.

12   Q    Okay.  And you got a sample from Toyobo, T O Y O B O.

13   Do you remember that?

14   A    Toyobo?

15   Q    Yes.

16   A    Yes, I think so.

17   Q    And that wasn't pure enough to sequence either?

18   A    I don't know that was subject to sequencing or not.  I

19   cannot recall.

20   Q    But you remember it wasn't pure?

21   A    That's correct.  Yes.

22   Q    Okay.  And Goldwasser -- so you had the pure, the most

23   pure Goldwasser protein, right?

24   A    Yes.

25   Q    And Goldwasser digested that protein to make the tryptic

1    fragments, right?

2    A    Yes.

3    Q    And that was material that you used for your work,

4    right?

5    A    Yes.

6    Q    Okay.  Now, can I have Table 1 of the patent.  And can

7    we look at fragments 35 and 38.  Those are fragments of

8    protein, right?  EPO protein?

9    A    Yes.

10   Q    And they are in your patent, right?

11   A    That's correct.

12   Q    And those were the fragments, those that were a list of

13   the fragments was provided by Dr. Goldwasser?

14   A    That's correct.

15   Q    And those fragments were sequenced, right?

16   A    That's correct.

17   Q    You did not do that sequencing?

18   A    No.  Someone from the sequencing group did it.

19   Q    Right.  And then you went ahead and wrote -- strike

20   that.

21          And then those -- you did not select which

22   fragments to use for the design of your probes?

23   A    I select, of course I select.  I'm a molecular

24   biologist.  I know what to select.

25   Q    Did you select it or not?

1    A    Well, yes, of course I select whatever the information

2    come to me, I had to make decision what fragment that I can

3    use to make probe or not.

4    Q    Well, let me see if I can refresh your recollection.

5    Didn't Dr. Lai hand you the first two sequence informations

6    and that's what you used?

7    A    Yes.  But I did, of course, whatever, whoever submit

8    information to me, I have to check if the sequencing

9    information is accurate or not.

10   Q    Okay.

11   A    If this probe, if this sequence is useful for making

12   probe or not.  Some regions of the sequence can be used to

13   make probe.

14   Q    Right.  So Dr. Lai did the sequencing?

15   A    Yes.

16   Q    Or Dr. Lai gave you sequence information and said here's

17   the first two, and you said good, let's go.  Yes?

18   A    No, I checked.

19   Q    You checked it.  Okay.

20   A    Yes.  Sure.

21   Q    And then you said good, let's go?

22   A    Yes.  Well.

23   Q    And it took you one hour to design the probes?

24   A    It's not one hour to design the probes.  It take more

25   than one, from beginning to, beginning, the beginning that I

1   joined Amgen to sometime in '83, middle of '83, before I

2   developed the procedure to make use of the probe.  It's of

3   course designed to get in --

4   **Q**   You're not answering my --

5          **MS. BEN-AMI:**  Objection, your Honor.  May the

6   witness be instructed on trying to give a yes or no, if

7   possible.

8          **THE COURT:**  Sir, she's going to ask you questions

9   that grammatically call for yes or no answers.  In other

10  words, she's going to say, are you wearing a -- you're

11  wearing a tie, aren't you?  It will be more complex than

12  that.  But it's a question like that.

13         Now, some of the questions she asks you maybe you

14  can't answer yes or no.  That's fine.  But don't launch off

15  giving her an explanation.  Mr. Day will have a chance to

16  ask you other questions.  If you honestly and completely can

17  answer a question of hers yes or no, you must do that.

18         If you can't, tell her I can't answer it yes or no.

19         **THE WITNESS:**  Sure.

20         **THE COURT:**  Then she gets a chance to come back

21  with a different question that perhaps could be answered yes

22  or no.  This is her chance to ask questions.  You must

23  respect that.  Listen to her questions.

24         Now, naturally, if you don't know the answer or you

25  don't remember, you may always say that.

```
 1              Now, do you understand those instructions?

 2         THE WITNESS:  Right.  Okay.  Because I thought --

 3         THE COURT:  That's it.  You must follow those

 4    instructions.  Don't just volunteer explanations.  Listen to

 5    her question.  If honestly it can be answered yes or no,

 6    that's what you have to do.

 7              THE WITNESS:  Okay.

 8         MS. BEN-AMI:  Okay.

 9    Q    So, Dr. Lin, again, I would like to show you your

10    testimony on August 21st, 1989.  Do you see that?

11    A    Yes.

12         MR. DAY:  Which color?

13         MS. BEN-AMI:  It's the same one we just used, the

14    red.

15    Q    And we're on Page 72.  Right?  And Line 2.  And you were

16    asked the question:  After you received the sequence reports

17    from Dr. Lai, it didn't take you very long to design the

18    probes, did it?

19              Answer.  You said:  No, it did not.

20    A    That's correct.

21    Q    Right?

22    A    That's correct.

23    Q    It took you about an hour was the question?  And your

24    answer was:  Oh, yes, sure.  Sure.

25              Right?
```

```
1    A    That's correct.

2    Q    And that was your testimony you said under oath in 1989?

3    A    Yes.

4    Q    Correct?

5    A    Correct.

6    Q    And you tried to be accurate in 1989?

7    A    That's right.

8    Q    Okay.

9              MR. DAY:  Your Honor, could we also read the

10   testimony from Lines 23 through 25.

11             THE COURT:  On Page 88?

12             MS. BEN-AMI:  72?

13             THE COURT:  I'm sorry.

14             MR. DAY:  Same page, your Honor.

15             THE COURT:  Yes, 72.

16             MR. DAY:  Lines 23 to 25.

17             MS. BEN-AMI:  It's a different question, your

18   Honor.

19             THE COURT:  Well, just a moment.

20             He may read that question and the answer given on

21   the top of the next page.

22             MS. BEN-AMI:  Okay.

23             MR. DAY:  I'm sorry, your Honor, it's 23 to 25.

24             MS. BEN-AMI:  Okay.

25             THE COURT:  Twenty-three to 25 on Page --
```

1          **MR. DAY:**  72.

2          **THE COURT:**  I'm sorry.  That's my problem.  You're

3    okay with that rather.  Go ahead, read it.

4          **MS. BEN-AMI:**  I'm --

5          **THE COURT:**  Yes, read it.

6          **MS. BEN-AMI:**  Question:  It wasn't very long, was

7    it?  It didn't take you very long to find the gene with

8    those probes?

9          Oh, it's been several years since we started.

10          Right?

11   A   Yes.

12   **Q**   Okay.  But I want to try to just put this

13   chronologically for the jury, right?

14          It was only in the summer of 1983 that you got this

15   material from Dr. Goldwasser, right?

16   A   Yes.

17   **Q**   Okay.  And in the summer of -- and let's just put this

18   in context.

19          You lived through this.  The scientific world of

20   recombinant DNA, it was changing a lot from 1981 to 1982 to

21   1983, right?

22   A   Yes.

23   **Q**   So what scientists knew in 1983 was much more than what

24   they knew in 1981, right?

25   A   I don't know how much more they knew.

1   Q   All right.

2   A   I cannot comment on that.

3   Q   Well, let me see if I can help you, Doctor.  Because I

4   think that the jury has seen much of this.

5          This book, the Molecular Cloning book, the

6   Sambrook, Fritsch, Maniotis book, this book came out in

7   1982, right?

8   A   I don't know the year.

9   Q   You had this book, didn't you?

10  A   Yes, I do.  I don't know if I --

11  Q   Okay.  But it came out -- well, this is Dr. Maniotis's

12  copy.  But this came out in -- I don't know what date this

13  came out.  But the record has it, the date this came out in

14  1982.

15         But you know that science was progressing between

16  1981 and 1983, right?

17  A   In which area are you referring to?

18  Q   There was more work done on cloning between 1981 and

19  1983?

20  A   Yes.

21  Q   By scientists throughout the country, throughout the

22  world?

23  A   Okay.  The cloning.  But, I mean the progress, I don't

24  know what you mean by progress.

25  Q   Okay.  So you don't know whether or not --

1    A    Yeah, what do you mean by progress, in what area?

2    Q    Okay.  So if you don't know, fine.  But, we'll go back.

3         In 1983, August of 1983, you get the material from

4    Dr. Goldwasser and the fragments.  And by that time Amgen

5    has this Applied Biosystems sequencing machine, right?

6    A    Yes.

7    Q    Right.  So now they have -- and it's the microsequencing

8    machine, right?

9    A    Yes.

10   Q    Okay.  So now you've got the large amounts of protein,

11   right?

12   A    What, what do you mean by large amount?

13   Q    More than you had before.

14   A    I don't know what -- I don't know the amount.

15   Q    Okay.

16   A    I can't comment on that.

17   Q    All right, if you don't know, you don't know.  Fine.

18   That's fine.  If you don't know please tell me you don't

19   know.

20        So, you have Goldwasser's protein in 1983, August,

21   right?

22   A    You mean these fragments?

23   Q    Yes.

24   A    Yes.

25   Q    You have the microsequencing machine, right?

1    A    That is correct.

2    Q    Dr. Lai gives you fragments 35 and 38, the first two

3    ones he sequences, right?

4    A    Yes.

5    Q    You look at them, and it takes you an hour to design the

6    DNA probe?

7    A    Yes.

8    Q    Okay.  And what you designed -- well, once you designed

9    the probes, that means you wrote them out on a piece of

10   paper, right?

11   A    That's correct.

12   Q    Okay.  And then you didn't actually physically make the

13   DNA probes, right?

14   A    No.  We have a special group which making the DNA probe

15   for me.

16   Q    Right.  You have a group of people because they're

17   making DNA all the time?

18   A    That's correct.

19   Q    That's their job, they're the DNA makers?

20   A    That's correct.

21   Q    Okay.  So there's a group in the company that does all

22   the protein sequencing, there's a group in the company that

23   does all the DNA making, right?

24   A    That's correct.

25   Q    Okay.  So, you design them in an hour and you give them

1   to the DNA makers and they make the DNA?

2   A    Uh-huh.

3   **Q**    Yes?

4   A    Yes.

5   **Q**    Okay.  Now, the probes that you made, the DNA probes

6   that you designed, let me say, you used two sets of probes,

7   right?

8   A    No, actually in the screening, I used three sets of

9   probe altogether.

10  **Q**    Three sets of probes.

11  A    Yes.

12  **Q**    Okay.  Now, using two or three sets of probes you agree

13  is not particularly innovative at that time?

14  A    Let me explain.

15  **Q**    Can you answer yes or no?

16  A    By itself, it really is in combination of everything

17  together, yes.

18  **Q**    So let me -- I would like you to look at your transcript

19  again from 1989.

20            **MS. BEN-AMI:**  And I'm on 8-11, Mr. Day.

21            **MR. DAY:**  Page?

22            **MS. BEN-AMI:**  Page 50 to 51.

23  **Q**    And this is a question by the judge, right?

24  A    Yes.

25  **Q**    It says --

1          **MS. BEN-AMI:**  Page 51, Mr. Day.

2          **MR. DAY:**  Yes.

3          **MS. BEN-AMI:**  Okay.  I think I'm on the wrong cite

4     here.  Oh, let me start here.  We're on the bottom of

5     Page 50, Line 25.  That was the first part.

6     Q   And the question is:  Maybe I'm showing a naivete, but

7     what's so innovative about creating a second probe or a

8     third probe?  Is that common sense?

9          This is 1989.

10    A   Yes.

11    Q   And the answer is:  Yes, it's common sense.  It's a

12    logical way to do things.  It's not really -- using a second

13    set of probe is not so innovative at all.  No.  To use two

14    sets of probe, I'm not saying it was very innovative about

15    using two sets of probe.  No.

16         Right?

17    A   That's correct.

18    Q   Okay.  Now, using fully degenerate probes --

19    A   Yes.

20    Q   -- that had been done before also, correct?

21    A   Yes.

22    Q   And that was not innovative in this time frame of 1983

23    either, right?

24    A   I cannot answer you this.  Let me explain.

25    Q   No, Doctor, please.  You say no, right?  That's your

1    answer?

2         **THE COURT:**   No, he says he can't answer yes or no.

3    **Q**   Okay.  So then let me ask you to look at the same

4    transcript, 1989.  You're being asked by the Court.

5    A    Yes.

6    **Q**   And the question is:  Is it innovative to decide to use

7    fully degenerate probes rather that making an assumption

8    about what is the right nucleo -- let me read it again.  I

9    apologize.  I've been doing this throughout this trial.

10        Is it innovative to decide to use fully degenerate

11   probes rather than making an assumption about what the --

12        **MR. DAY:**   Can you tell me where you're reading

13   from, counsel?

14        **MS. BEN-AMI:**   Line 23.

15        **MR. DAY:**   On what page?

16        **MS. BEN-AMI:**   Page 51.

17        **THE COURT:**   Thank you.

18   **Q**   Okay.  I'm going to get this right this time.

19        Is it innovative to decide to use fully degenerate

20   probes rather than making an assumption about what the right

21   nucleotide basis?

22        Your answer:  It's not innovative to use a fully

23   degenerate.  It just gives you the better odds of getting

24   the things that you want.  Because if you don't use it,

25   basically you are guessing because you don't know what the

1    nature, what to do with a particular position, a particular

2    nucleotide in the particular position.  You don't know.  We

3    are guessing all the time if you don't do all that.

4    A    That's correct.

5    **Q**    So, here you told the Court in 1989 that using

6    degenerate, fully degenerate probes, right --

7    A    Yes, that's correct.

8    **Q**    -- was not so, was not innovative?

9    A    That's correct.  That's right.

10   **Q**    That's all I asked.  Okay.

11          And in the patent, your patent -- do you have the

12   patent?

13   A    Which one?

14   **Q**    Let's take the '933.

15   A    No, I don't have it here.

16   **Q**    You weren't given any patents on your direct?

17   A    No.

18          **MS. BEN-AMI:**  Mr. Day, you have a copy of the

19   patents, right?

20          **MR. DAY:**  Yes.

21   **Q**    This is Exhibit 1.  I think the jury has it in their

22   book.  One of your patents?

23   A    Yes.

24   **Q**    If you look at -- let me try to help you move a little

25   quicker.

```
 1              Can we have column 20, please.  Can you look at

 2   Example 4.

 3   A   Can we close this one.

 4   Q   I don't want to hit you with this.

 5   A   You don't need this, right?

 6   Q   No.  All right, we're going to be very clean.  Okay.

 7              All right.  Right?  So now we're on column 20,

 8   right?

 9   A   Yes.

10   Q   And you talked yesterday about doing hybridization which

11   means that's how you matched the probe to the genomic

12   library, right?

13   A   That's correct.

14   Q   And what you say there that you followed the procedures

15   of Woo, Methods of Enzymology, 1979, right?

16   A   Yes.

17   Q   Except that you used a different filter?

18   A   Yes.

19   Q   That's a newer filter, right?

20   A   That's right.

21   Q   And you used different plates.  That's just the plates

22   where you hold the cells, right?  Those plates?

23   A   No, those are different chemical ingredients, formula.

24   Q   But those are commercial plates, right?

25   A   No, no.  The thing is -- what it says is NZY -- oh,
```

1    plate is a plate, but there's, there's the chemical

2    constitution.

3    **Q**    Oh, okay.  But the plates are commercial plates, right?

4    A    Sure.  Sure.

5    **Q**    Okay.  And the filters are commercial filters?

6    A    Yes.

7    **Q**    Okay.  And you used a genomic library, right?

8    A    Yes.

9    **Q**    And we'll remind the jury, a genomic library has, you

10   cut up all the DNA in the, in the chromosomes, right?  And

11   you put it into little circles of DNA and now you've got a

12   library, right?

13   A    Uh-huh.  That's correct.

14   **Q**    And you used the public library, right?

15   A    That's correct.

16   **Q**    It's a public library.  There was a public genomic

17   library, right?

18   A    That's correct.

19   **Q**    And that was a public library that was made by Dr.

20   Maniotis, right?

21   A    That's correct.

22   **Q**    Dr. Maniotis made a genomic library, a public library,

23   and he gave it out, right?

24   A    That's correct.

25   **Q**    And Dr. Maniotis was one of the founders of Genetics

1    Institute here in Cambridge, right?

2    A    If you say so.  I don't know exactly if he's a founder

3    or not.

4    Q    Well, he and Dr. Fritsch -- the jury's heard

5    Dr. Fritsch -- they made this library, right?

6              **MR. DAY:**  Objection; lacks foundation.

7    A    That's not Fritsch.  Lawn, Dr. Lawn.  I believe it's

8    Dr. Lawn.

9              **THE COURT:**  In view of the answer do you press the

10   objection?

11             Mr. Day, do you press the objection given his

12   answer?

13             **MR. DAY:**  I press the objection it lacks

14   foundation.

15             **THE COURT:**  Overruled.  It may stand.

16   Q    All right.  So, at least Dr. Maniotis you remember,

17   right?

18   A    Yes.

19   Q    Okay.  And so, you used this library, and that library

20   was being given to people so that they could pluck out

21   genes, right?

22   A    Yes.

23   Q    So you used the public library?

24   A    Yes.

25   Q    Okay.  You had tried to make your own library but you

1    weren't successful in making your own library?

2    A   No, I did not try to make my own because I tried to use

3    this library first, yes.

4    Q   Oh, okay.

5    A   If I had --

6    Q   Okay.  That's fine.

7    A   But if I could not get gene out of this library, I would

8    try to make my own library, yes.

9    Q   Okay.  I misunderstood.

10         Let me hand you NMY, just for completeness.  This

11   is -- you just mentioned Lawn, right?

12   A   That's correct.

13   Q   And you've seen this article before?

14   A   Yes.

15   Q   Right?  This is Lawn, Fritsch, Parker, Blake and Dr.

16   Maniotis, right?

17   A   That's correct.

18   Q   And this is the paper that discloses the genomic

19   library, right?

20   A   Yeah, I believe so, yes.

21   Q   Yes.

22         **MS. BEN-AMI:**  So I offer it, your Honor.

23         **THE COURT:**  Any objection?

24         **MR. DAY:**  No objection.

25         **THE COURT:**  No objection?

1        **MR. DAY:**  No objection.

2        **THE COURT:**  It may be received, Exhibit 2100.  NMY,

3   2100.

4        **THE CLERK:**  No, we already have 2100.  2101.

5        **THE COURT:**  I'm sorry.  Thank you.  NMY, 2101.

6        (Exhibit marked in evidence.)

7   **Q**   And it was understood that having published this

8   library -- strike that.

9        You in fact called to get the library, right?

10  A   That's correct.

11  **Q**   You did that yourself?

12  A   Yes.

13  **Q**   Right.  Okay.

14       So now, so now you have Dr. Maniotis's library, the

15  public library, right?

16  A   Yes.

17  **Q**   And you have the sequence information from

18  Dr. Goldwasser's protein, right?

19  A   Yes.

20  **Q**   And it takes you -- and you are using -- this

21  microsequence servant was made in 1983?

22  A   Yes.

23  **Q**   And it gives you the sequence information, right?

24  A   That's correct.

25  **Q**   Okay.  And now it takes you an hour to design the

1   probes?

2   A   Yes.

3   Q   And then you give it to the people who are routinely

4   making DNA probes?  Making DNA?

5   A   That's correct.  To make the DNA probe for me.

6   Q   Yes.  Yes.  Okay.  And then you hybridize them, right?

7   The probes to the plates?

8   A   Yes.

9   Q   You took --

10  A   No.  I mean to the what?

11  Q   The probes to the library.

12  A   Yes.  Okay.  Okay.

13  Q   And your technician did that?  The hybridization?

14  A   Not just my technician.  I also do it, too.

15  Q   Oh, okay.  Okay.  So, now you get your clones, right?

16  You find your clones, right?

17  A   You mean isolate human EPO clone?

18  Q   Right.

19  A   Yes.  Yes.

20  Q   Now, I want to make sure the jury is familiar with what

21  we're talking about.

22          When you, when you say you cloned the gene that

23  means you found it and you put it into a cell so that it

24  would make more copies, right?

25  A   That's correct.

1    **Q**   Okay.  That's different, right, than expressing the

2    protein, right?

3    A    That's correct.

4    **Q**   Okay.  So that we understand.  When you clone the gene

5    you had it in a little circle of DNA, right, in a cell,

6    right?

7    A    Yes.

8    **Q**   And now you had to take the gene out and put it into a

9    different circle of DNA so that it could become part of the

10   factory, the cell factory, right?

11   A    DNA had to be taken out and had to be modified, add

12   something else in there.  And of course had to go through

13   manipulation before you can put into another vector if you

14   want to make the protein out of it.  Yes.

15   **Q**   Okay.  So, just to understand that, you did not do that

16   work?  You did not take the cloned DNA out and put it into

17   the vector?

18   A    Oh, of course I take the DNA out.  I gave the DNA out to

19   the scientist who, Jeff Browne, who was doing the gene

20   expression.

21   **Q**   Dr. Browne is the one who took the DNA and put it into

22   the expression, right?

23   A    Before he cut the DNA, I already analyze a piece of DNA

24   we have so he know where to cut and where to put it in, how

25   to modify it.

1    **Q**   You gave him a piece of DNA?

2    A    Yes.

3    **Q**   Right?

4    A    Yes.

5    **Q**   And then he figured out which expression vector to use?

6    A    Yes.

7    **Q**   You didn't do that work?

8    A    No, I did not do it.  He was assigned to do that.

9    **Q**   Okay.  But now -- then you had to -- when we talk about

10   you take the DNA and you put it into expression vector,

11   that's a circle of DNA which has all the features in it so

12   that the cell can use it to make protein, right?

13   A    That's correct.

14   **Q**   So we have a circle of DNA, right, and you put the gene

15   in, right?

16   A    Yes.

17   **Q**   And the circle of DNA is called the expression vector,

18   or expression plasmid, right?

19   A    Yes.

20   **Q**   Okay.  And it was Dr. Browne who chose the vector to

21   use?  Dr. Browne's group, not you?

22   A    Yes, he was assigned to develop the vector for

23   expression.

24   **Q**   And so, if we look at Example 6 in your patent, when you

25   look at Example 6, that work, all that work was done by

1    Dr. Browne's group, you did not do that yourself?

2    A    Do you mean the expression of monkey EPO gene?

3    Q    Let's look at Example 7.  You didn't do that work?

4    A    That's expression of human EPO gene in COS-1 cell?

5    Q    Right.  You didn't do that work?

6    A    No.  He was assigned to do all the expression work for

7    the project.

8    Q    Okay.

9    A    As I explained it yesterday before, yes.

10   Q    I want to just make clear of what you did, because you

11   are the sole inventor on these patents.  Right?

12   A    Yes.

13   Q    Dr. Browne's not listed as an inventor, Dr. Egrie's not

14   listed as an inventor, Dr. Lai, Dr. Goldwasser, just you?

15   A    Yes.

16   Q    Right.  Okay.  So you didn't do the work in Example 6,

17   right?

18   A    Yes.

19   Q    You didn't do the work in Example 7?

20   A    Yes.

21   Q    The work on the radioimmunoassay, RIA, for example,

22   that's in Example 7, you didn't do that work either, right?

23   A    That's correct.

24   Q    Dr. Egrie's group did that work, right?

25   A    That's correct.

1    **Q**   And you didn't explain to them how to do the work

2    because any molecular biologist at that time would know how

3    to do that work?

4    A   They are good at what they are doing.  That's what --

5    that's why they were assigned to do the job they were doing.

6    So, if they had problems, they would raise the problems in

7    the meeting and we would try to find a solution for it.  If

8    there's no problem we don't have to.  As you probably have

9    seen in the memo before.

10   **Q**   So the answer is you did not give them instructions,

11   right?

12   A   If I had to give --

13   **Q**   You're saying if.  Did you -- you did not give them

14   instructions?

15   A   I just mentioned that if in a meeting, the question,

16   they raised the issue in the meeting, we discussed that in

17   the meeting, it was not what they had to do.  So, in terms

18   of precise instruction, I don't know if I have given or not.

19   In general, I don't have to give them daily instruction.

20   **Q**   And so let's look at your deposition this year.

21   A   Yes.

22   **Q**   March 28, '07.  Page 61.  You did not have to give

23   instructions --

24            **MR. DAY:**  What line?

25            **MS. BEN-AMI:**  I'm asking a question before I do

1    that.

2    **Q**    You did not have to give instructions to anyone to use

3    COS cells, C O S, COS cells first because those who work as

4    a molecular biologist at that time would know this, they

5    would know what to do?

6    A    That's correct.

7    **Q**    Okay.  Everybody in the field would know that?

8    A    The transient expression.

9    **Q**    Yes.  The transient expression.  Okay.

10          And the work in Example 7, right, and the assay in

11   Example 7, none of that work was done by you, right?

12   A    What do you mean by, what assay are you referring to?

13   **Q**    Example 7.  Okay?  You didn't tell Dr. Browne's group

14   how to do the work in Example 7 because any molecular

15   biologist would know how to do that work?

16   A    Yes.

17   **Q**    And your view at that time, all molecular biologists

18   knew how to do, making these vectors and putting them into

19   cells, right?

20   A    Yes.

21   **Q**    And all of them knew at this time how to do

22   radioimmunoassays in your view, right?

23   A    I don't know if I say all molecular biology.  I don't

24   know what I say.  I don't know that I say that all molecular

25   biology know now to do this.  I mean, you're talking about

```
 1    her, I mean, Joan Egrie, who was doing the radioimmunoassay.
 2    Q   So let's look at Example 8 which is the RIA.  Example 8.
 3    I'm sorry, this binder is so big.  But can you look at
 4    Example 8.
 5    A   Yes.
 6    Q   Okay.  We're talking about radioimmunoassay work in
 7    Example 8 now.  Okay?
 8            Let me just ask you a general question.  The
 9    radioimmunoassay work, that's called RIA, right?
10    A   That's correct.
11    Q   Right.  And we see RIA in the bottom there of Example 8.
12    Right?  Doing RIA work was common knowledge at the time,
13    right?
14    A   Yes.
15    Q   And any associate or scientist could do it?
16    A   That's correct.
17    Q   It was commonly employed?
18    A   That's correct.
19    Q   So you didn't -- there's nothing inventive about that?
20    A   That's correct.
21    Q   Okay.  Now, let's look at Example 9.  All right.  And
22    now we're doing, you're doing -- strike that.
23            Now there's an in vitro assay, right?  And that's
24    an assay that's not done in a living thing, right?  Right?
25    In vitro assay for EPO activity?
```

1    A    Yes.

2    Q    That had been published by Dr. Goldwasser in 1975,

3    right?

4    A    I don't know if your statement is correct.  You say

5    that.  It's not in -- these cells are living cells.

6    Q    I'm sorry, it's not in the body?

7    A    Yes.

8    Q    I'm sorry.  Okay.  So it's in cells that are in a dish?

9    A    That's correct.

10   Q    Okay.  So that's the distinction you draw between -- so

11   the jury understands, in vitro is not in the body, right?

12   A    That's correct.

13   Q    In vivo is in the body, right?

14   A    Yes.

15   Q    Okay.  So that in vitro tests in Example 9 is there, and

16   then there's also an in vivo test later on.  Right?  Right,

17   that's called a Cotes test, C O T E S, right?  Do you see

18   that?

19   A    Yes.

20   Q    And those --

21   A    But not a Cotes test.  That's the exhypoxic mouse test.

22   But the name of that is Cotes, this is Dr. Cotes.

23   Q    Okay.

24   A    Cotes.  Cotes.

25   Q    Okay.  Whatever the name of the test was, you agree that

1   those assays were commonly known at the time, right?

2   A   That's correct.

3   Q   Okay.  And now when we look at Example 10.  Let's look

4   at Example 10 together.

5   A   Uh-huh.

6   Q   So now Example 10 is you take, you're taking the human

7   EPO, right, and you need to put it, you want to decide what

8   cell to put it in, right?

9   A   Yes.

10   Q   Now, at the time you knew the best bet for making

11   biologically active EPO was to use mammalian cells, right?

12   A   No, we try all three system because we did not know

13   which system that -- three system means bacterial system,

14   yeast system, and mammalian system.

15   Q   Well, let's just break that down.

16   A   Yes.

17   Q   You knew that human EPO had sugars on it; you told the

18   jury that yesterday.

19   A   That's correct.

20   Q   And you knew that mammalian cells put sugars onto

21   proteins, right?

22   A   That's correct.

23   Q   And you knew that E.coli bacteria didn't?

24   A   Yes.

25   Q   Okay.  So, you knew it was more likely to get the sugars

1    on using mammalian cells than E.coli, right?  Yes or no,

2    Doctor?

3    A    More likely, yes.  It's likely, but it's, but bacterial

4    and yeast cell may be modified to make it work.

5    **Q**    Okay.

6    A    That's why we want to investigate all three, when we, we

7    investigate all three systems simultaneously.

8    **Q**    Because if you could get E. coli to work it would be

9    cheaper to mass produce, right?

10   A    Cheaper and faster.

11   **Q**    Cheaper and faster.

12          But the safest bet of yeast, E.coli, yeast and

13   mammalian, the same respect, the closest to human is

14   mammalian, right?

15   A    How close is to human is one thing.  It's really if the

16   molecule --

17   **Q**    Doctor, I asked you a question and I would like you to

18   answer my question.

19   A    Yes.

20   **Q**    You got bacteria as a choice, you got yeast as a choice,

21   and you have mammalian cells as a choice.  The closest to a

22   human is a mammal, right?

23   A    In terms of you mean the evolution aspect?

24   **Q**    Yes.

25   A    Okay.

1    **Q**   A human is a mammal, right?

2    A   Yes.  Bacteria -- yes, human is a mammal, that's

3    correct.

4    **Q**   Yes, it is a mammal.  Okay.  So --

5    A   But can I explain a little bit?

6    **Q**   No.  I would like to, I would like to refresh your

7    recollection with something.

8           Let me show you what's already been marked in

9    evidence as 2062.

10   A   I was going to explain the mammalian, should I --

11          **THE COURT:**  No, not now anyway.

12   **Q**   Can we go to the second page.

13          **THE COURT:**  Unless Mr. Day asks you.

14   **Q**   This is Page 242.  Now, this is an article, Comparative

15   Studies of Natural and Recombinant Human EPO, right?

16   A   Which?

17   **Q**   You have it.  I just handed it to you, Doctor, right?

18   Do you have it?

19   A   Yes.

20   **Q**   Okay.  And you're one of the authors?

21   A   Yes.

22   **Q**   It's all Amgen, right?

23   A   Yes.

24   **Q**   Okay.  Now, we go to Page 242.  And we look at the

25   second paragraph where it says early studies, on the bottom,

1   early studies, right?  Early studies by Goldwasser and

2   colleagues demonstrated that EPO isolated from human urine

3   was glycosylated and contained sialic acid.

4            I'm reading that correctly, right?

5   A   That's right.

6   Q   And then it says the sialic acid was found to be

7   required for in vivo -- that's in the body, right?

8   A   Yes.

9   Q   -- activity.  And that's a Goldwasser publication,

10  right?

11  A   Yes.

12  Q   He cites it, right?

13  A   That's correct.

14  Q   You cite it.

15           And then on the basis, on the basis of these data

16  we chose to produce the recombinant material in a mammalian

17  host cell.  Right?

18  A   Yes.

19  Q   So you chose mammalian cells on the basis of the public

20  information that human EPO had these sugars on them?

21  A   That's correct.

22  Q   And that's why you chose mammalian cells?

23  A   That's right.  One of the systems that we use.

24  Q   Okay.  So this is a publication --

25  A   Sure.

1   **Q**   -- from 1986, I believe.  Right?

2        And in 1986 you told the world that because

3   Goldwasser had shown that urinary EPO had sugars and sialic

4   acid you chose to produce your recombinant material in

5   mammalian cells.  Right?

6   A   That's correct.

7   **Q**   Okay.  Now, to decide which cell to use you called your

8   friend at the ATCC, right?

9   A   Yes, I did.

10  **Q**   Now, the ATCC is like another library, a cell library,

11  right?

12  A   That's --

13  **Q**   It's a place where they have all these different cells?

14  American tissue?

15  A   Culture collection.

16  **Q**   Yes.  All right.  Can I have the catalog.

17       Let me, let me hand up UW.  UW.  There you go.

18       And so, UW is a catalog, right?

19  A   Yes.

20  **Q**   It's a catalog of cells.  Right?

21  A   Yes.  Catalog of American Type Culture Collection.

22  **Q**   And this is a place where people deposit cell lines,

23  right?

24  A   Yes.  And other stuff.

25  **Q**   Yes.  Then it's made available, you can look it up in

```
 1    the catalog, right?

 2    A    That's correct.

 3    Q    And get your cells, right?

 4    A    Yes.

 5              MS. BEN-AMI:  I offer UW, your Honor.

 6              THE COURT:  Any objection?

 7              MR. DAY:  Lacks foundation, your Honor.

 8              THE COURT:  Well, if limited simply to the fact

 9    that the document existed at that time, any objection?

10              MR. DAY:  No, sir.

11              THE COURT:  Very well.  UW --

12              MS. BEN-AMI:  Your Honor, I think I'll limit UW to

13    the cover page and the page that's relevant.

14              MR. DAY:  Oh, I object to that.  If it's going in,

15    your Honor, I think it's all going in.

16              MS. BEN-AMI:  Oh, okay; it can all go in.

17              THE COURT:  All right.  UW is admitted.  But again

18    I've done this limitation before.  This simply shows that

19    this document was out there at the times we're talking

20    about.

21              So UW is admitted, Exhibit 2102 with that

22    limitation.

23              (Exhibit marked in evidence.)

24    Q    Okay.  So, if we go to Page 49, at the bottom.

25    A    Which one?
```

1    **Q**    Page 49.  You can see it on the screen.  I'm not going

2    to ask you to read it.

3            In the catalog is the CHO cell, CHO-K1, right?  You

4    see CHO-K1?

5    A    Yes.

6    **Q**    Okay, fine.

7            So what you did, you had your, you chose to use

8    mammalian cells because Goldwasser's information said you

9    need to have these sugars, right?

10   A    Uh-huh.

11   **Q**    Right?

12   A    Yes, it says.

13   **Q**    And you called your friend who was the curator of the

14   ATCC, right?

15   A    Yes.

16   **Q**    Okay.  And you told him you wanted a stable cell line.

17   A    That's correct.

18   **Q**    And you told him you wanted a cell that would be

19   suitable for commercial production, right?

20   A    No, I did not.  I only ask for, I think I -- I don't

21   know what I said.  I think I asked him to give me a cell

22   line that would be stable.  In terms of commercial

23   production it's in my own mind.  I don't know if I say that

24   to him or not.  I don't know.

25   **Q**    Okay.  So you --

1    A    I only ask for a stable cell line.

2    Q    Okay.  So your testimony is that you were looking for a

3    commercial cell line and you asked him for a stable cell

4    line?

5    A    Yes.

6    Q    Okay.  So, you had not at this point shown that EPO,

7    human EPO was biologically active in a human being, right?

8    A    Not yet.

9    Q    The recombinant EPO.  No.

10         In fact, by November 1984 when your patent

11   applications are filed you still had not shown that

12   recombinant EPO was biologically active in a human, right?

13   A    Not yet.

14   Q    Okay.  So, you call your friend at the ATCC and you say

15   what kind of cell line should I use for stable production,

16   right?

17   A    No, I asked him do you know of any stable cell line.

18   That's, I think that's what I asked him.  Tell me what's a

19   stable cell line you have in your collection.  I think

20   that's probably what I asked him.

21   Q    And he referred you to a Dr. Cheng, C H E N G, in the

22   mammalian group, right?

23   A    That's correct.

24   Q    And you asked them which cell lines would be very

25   stable, right?

1    A    Yes.

2    Q    Because if you're going to commercially make something

3    you don't want the cells changing left and right, right?

4    A    That's correct.

5    Q    You want to have a nice stable factory, right?

6    A    Yes.

7    Q    Okay.  And they -- and you said, and you were asking him

8    for something very stable because you wanted, for mammalian

9    production, a stable cell line, right?

10   A    That's correct.

11   Q    Right.  And this Dr. Cheng -- I may be mispronouncing --

12   he suggested CHO cells to you, right?

13   A    No, he did -- he say that there are two type of cells

14   that are stable.  It's up to me to decide which cell to use.

15   I only ask him to provide information about what cells are

16   stable for long-term culture.

17   Q    Okay.

18   A    Because they have all this information about how stable

19   the cell line is.  If I had to go through all the catalog it

20   would take a while and he just tell me that there are two

21   cell lines that were very stable.

22   Q    So he suggested CHO cells and one other cell line?

23   A    That's correct.

24   Q    Okay.  So this doctor at the ATCC, he's like their

25   reference librarian for the mammalian section, right?

1    A    Yes.

2    **Q**    Okay.  So the reference librarian in the mammalian

3    section of the library said if you want to use stable

4    mammalian cells you got CHO cells or another cell?

5    A    That's correct.

6    **Q**    Okay.  Fine.  So now you go get CHO cells, right?

7    A    The C H O cells that were used for the gene expression

8    is not this one from the ATCC.  It's a different one that is

9    from a different person, I believe.

10   **Q**    Well --

11   A    From Columbia University.

12   **Q**    Right.  So, there was a fellow at Columbia University

13   who had taken these CHO-K1 cells.  They were CHO-K1 cells,

14   right?

15   A    Yes.

16   **Q**    And he had put in --

17   A    I don't know if it start from CHO-K1 cell or not for his

18   work.  I don't know.  I'm sorry, I cannot answer that.

19   **Q**    Well, let's look at your patent.  What line are we on?

20   Example 10, look at your Example 10, column 25, you'll see

21   that your patent says that the CHO DHFR are CHO-K1 cells.

22           Do you see that?

23   A    Where is that?

24   **Q**    It's highlighted right up there for you, Doctor.  Make

25   it easier.

```
 1    A    Okay.  All right.

 2    Q    So they are K1 cells?

 3    A    You're right.

 4    Q    And they were, added to those cells was something the

 5    jury heard about a long time ago already, something called

 6    DHFR.  Right?

 7    A    That's correct.

 8    Q    The DHFR CHO cells, right?

 9    A    Minus.

10    Q    Negative.  Negative.  That means they don't have DHFR?

11    A    That's correct.

12    Q    So these are cells that are made not to have this DHFR,

13    right?

14    A    Not a DHFR gene, yes.

15    Q    Right.  No genes with DHFR, right?

16    A    Yes.

17    Q    So that should mean they're not making DHFR, right?

18    A    That's correct.

19    Q    Okay.  And these were cells that were publicly available

20    made by these professors, right?  Columbia University?

21    A    Yes.

22    Q    You remember that?

23    A    That's correct.

24    Q    You got them from Columbia University?

25    A    Yes.
```

1   Q    You didn't make them yourself?

2   A    No, I did not.

3   Q    Okay.  And these were cells that were being known at the

4   time so that you could make amplified copies of DNA, right?

5   You could use DHFR as a selectable marker, right?

6   A    That's correct.

7   Q    And this was known at the time?

8   A    That's correct.

9   Q    And you could use it to select and amplify, right?

10  A    That's correct.  It was a proper address.  Yes.

11  Q    Yes.  And this was taught, you didn't invent that?

12  A    No, I did not.

13  Q    That was -- okay.  So you called your friend at the ATCC

14  and he said if you want a stable cell line, CHO or one

15  other, then in the literature you know that this professor

16  at Columbia is handing out these CHO-K1 cells that can be

17  selected and amplified, right?

18  A    That's correct.

19  Q    And you know that you should use mammalian cells because

20  of what Dr. Goldwasser told the world with the sugars?

21  A    Yes.

22  Q    Okay.  So, when we look at this all together, the actual

23  putting together of the probes, you designed the probes,

24  right?

25  A    Yes.

1    Q    But you didn't make the probes?

2    A    You mean physically make them?

3    Q    Yes.

4    A    No, I did not.

5    Q    And you got the genomic library, the public library,

6    from Dr. Maniotis?

7    A    Yes.

8    Q    And you got the cells from Columbia University?

9    A    Yes.

10   Q    And that was based on conversation you had with a

11   mammalian reference librarian at the ATCC?

12   A    Yes.

13   Q    Yes?

14   A    I had to make decision on what to use.

15   Q    One of the two.

16   A    Yes.

17   Q    They told you two.

18   A    Yes.

19   Q    You knew which one was able to amplify and select,

20   right?

21   A    That's correct.

22   Q    And you knew that he would give them to you because he

23   was handing them out all over the place, right?

24   A    I don't know.  I don't know.

25   Q    Well, you know that he was handing them out because he

1   gave them to you, right?

2   A   I think we had to sign a contract or something to get

3   it.

4   Q   But it was being handed out, Doctor?

5   A   Yes.

6   Q   The CHO DHFR cells were being given to people as far as

7   you knew at the time, right?

8   A   I don't know if given out freely or not.  I don't know.

9   I have no idea.

10  Q   But you knew -- it was published, you knew that?

11  A   Yes, that's correct.

12  Q   And you knew that that's how you received them?

13  A   Yes.

14  Q   Okay.  And all the work --

15  A   I did not receive it personally.  I think it's Jeff

16  Browne who asked for it.  Yes.

17  Q   And all the work of making the right expression DNA so

18  that the factory would work, that wasn't done by you, that

19  was done by Dr. Browne's group, right?

20  A   That's correct.

21  Q   The in vitro and in vivo tests that you used had been

22  known in the art before, right?

23  A   Yes.

24  Q   Yes.  The RIA was in common knowledge at the time,

25  right?

1   A   Yes, of course.

2   **Q**   The genomic library was Dr. Maniotis's public library?

3   A   Yes.

4   **Q**   To the extent that there was any purification done, that

5   was not done by you?

6   A   I have done some purification of erythropoietin.   In

7   which particular part of purification are you talking about?

8   **Q**   Well, Dr. Strickland's group was the purification group,

9   right?

10   A   Yes, that's right.   I also have done some purification

11   of EPO, too.

12   **Q**   Now, you talked yesterday about, that you had done work

13   using synthetic probes, right?   Chemically made probes,

14   right?

15   A   Yes.

16   **Q**   You made probes you said, right?

17        It was known in the field before you did it that

18   you could chemically make probes, right?

19   A   That's correct.

20   **Q**   And the length of probes -- people had used probes that

21   were 20 mers long, hadn't they?

22   A   It depends on the time frame, what the purpose they use.

23   At the time, most people use probe lengths of 14 to 17

24   nucleotide long, and many is for the isolation of gene from

25   cDNA.

1  Q   Okay.  You knew Dr. Itakura?  Did you know Dr. Itakura?

2  A   I don't know him, but I know his publication.

3  Q   Okay.  So you knew that there was a group of scientists

4  at the City of Hope Hospital, right?

5  A   Yes.

6  Q   And that Dr. Itakura -- and that's in LA, right?  City

7  of Hope is --

8  A   Yes.

9  Q   That's not far from you?

10  A   I don't know what -- is LA County, I think.  But I don't

11  know what city.

12  Q   It's not too far from you, though, right?

13  A   Yes.

14  Q   And you had a scientist from Amgen, Dr. Suggs, right?

15  A   Yes.

16  Q   You knew him from Dr. Itakura's lab, right?

17  A   That's correct.

18  Q   Okay.  So Dr. Itakura -- let me show you a publication

19  from Dr. Itakura.  That's OAP.

20         And this is a publication in Nucleic Acid Research,

21  right?  You've seen this before, haven't you?

22  A   I don't remember if I have or not.

23  Q   You don't recognize this paper, Doctor?

24  A   I don't recall it, no.

25  Q   Okay.  Well, you see that this is a paper from 1979,

1    right?

2    A    Yes.

3    Q    And you knew that people in this time frame before 1983

4    had done a lot of work on hybridization conditions so that

5    DNA would match up with RNA, right?

6    A    Yes.

7    Q    Okay.  They had taught that you could hybridize to make

8    a perfect match or a not so perfect match, right?

9    A    Yes.

10   Q    Okay.  And they also taught that you could select

11   correct sequences depending on how you optimize the

12   hybridization, right?

13   A    Where does it say?

14   Q    Well, I'm just asking since you --

15   A    I have not read the article so I cannot comment on that.

16   Q    I'm not asking you about the article.  I'm now asking

17   you in general.

18   A    Yes.

19   Q    Okay?

20   A    But where is it?

21   Q    No, I'm not asking you about the article.  Forget about

22   the article.  Okay?

23          By 1983 you knew that scientists such as

24   Dr. Itakura were publishing that technique so that you could

25   avoid false positives and false negatives, right?

1    A    Yes.

2    Q    And there were scientists prior to 1983 who were

3    publishing how you optimize conditions for hybridization?

4    A    Yes.  And that how they optimize depends on the probe

5    they use, how they optimize depends on the condition, the

6    background they face, too.  So it's not just -- there's no

7    general formula for you to optimize it.

8    Q    But this was something scientists were doing in the

9    field, they were doing this as early as 1979, right?

10   A    Yeah, they are not doing it in human genome.

11   Q    But they're doing it --

12   A    Different background, different problem, yes.

13   Q    Well, they're doing it, they're saying what's the right

14   temperature, how do I do this, how do I do that, right?

15   A    As I just explained to you, it depends on the

16   background, what the library you're looking for.  You're

17   looking for a cDNA library.  In this case they're looking

18   for simple phage.  Then nothing else is simple.  If you're

19   looking for things complex without a DNA is a different

20   situation.

21   Q    Doctor, the genomic library --

22   A    Yes.

23   Q    -- that Dr. Maniotis made was so that people could fish

24   out genes, right?

25   A    That's correct.

1    Q    Okay.

2    A    If you had the right procedure to fish it out.   If you

3    don't have the right procedure --

4    Q    If you had the right protein.

5    A    What?

6    Q    If you had the right protein.

7    A    No.   You, I think you --

8    Q    Doctor, are you saying that no one fished out a gene

9    from a genomic library prior to you, ever?

10   A    With a short oligonucleotide probe, no one had ever done

11   that.

12   Q    Okay.   But had anyone fished out a gene from a genomic

13   library before you?

14   A    I cannot answer before me on the condition.   If you have

15   a specific --

16   Q    Doctor?

17   A    -- long DNA sequence you can.

18   Q    Doctor?

19   A    But --

20   Q    Had scientists fished out genes from genomic libraries

21   before you?

22   A    Only if they use long specific oligonucleotide sequence.

23   Q    Okay.

24   A    But not short oligonucleotide sequence.

25   Q    Can I have Table 1, please.

1    A    Yes.

2    Q    And you had available to you all the sequence

3    information.  If you wanted to use all the sequence

4    information you had it all from Dr. Goldwasser.  You had all

5    these fragments from Dr. Goldwasser.

6    A    That's right, yes.  Yes.

7    Q    Not just seven or eight or nine.  You had all of them.

8    A    Do you know how many combination of degeneracy --

9    Q    Doctor, you had them all?

10   A    Do you know that degeneracy exists in every one of these

11   piece.  It's hundreds -- if you want to make even longer

12   than 17 mer.  17 mer or 20 mer, it's always 128 nucleotides.

13   But 20 mer long is 128 or more, it's thousands.  Look at it.

14   You look into every one and calculate the degeneracy.

15           **THE COURT:**  What's a mer?

16           **THE WITNESS:**  How many nucleotide together.

17           **THE COURT:**  How many --

18           **THE WITNESS:**  How many nucleotide together.

19   Q    It's a ligamer, right?

20   A    A ligamer.  It's 70 nucleotide -- 17 together, it's

21   called 17 mer.  If it's 20 nucleotide in the string it's

22   called 20 mer.

23           **THE COURT:**  And its real name is a ligamer but

24   those in the field call them mers?

25           **THE WITNESS:**  Mers, yes.

```
 1    Q    Doctor, Nucleic Acid Research in 1979, that was a very

 2    well respected journal, wasn't it?

 3    A    Yes.

 4              MS. BEN-AMI:  I offer OAP, your Honor.

 5              THE COURT:  Any objection?

 6              MR. DAY:  Yes, I'll object on foundation, your

 7    Honor.

 8              THE COURT:  Yes, sustained.

 9              MS. BEN-AMI:  All right.

10    Q    Doctor --

11              MS. BEN-AMI:  Your Honor, could we take an early

12    break --

13              THE COURT:  We can.

14              MS. BEN-AMI:  -- so that I can try to settle down

15    here so that we can get done.

16              THE COURT:  We can.

17              Ladies and gentlemen, we will take the morning

18    recess, same recess, but we'll take it a little early.  You

19    have not heard all the evidence.  Please, therefore, keep

20    your minds suspended.  Do not discuss the case either among

21    yourselves nor with anyone else.  We'll stand in recess

22    until ten minutes after 11:00.  We'll recess.

23              As the jury's going out, do I have students here?

24    Fine.  And when I leave the bench if you would come right

25    ahead and follow me.
```

```
 1              THE CLERK:  All rise for the jury.

 2              (Whereupon the jury left the courtroom.)

 3              THE COURT:  And the students may come into the

 4      lobby.

 5              (Recess.)

 6              THE CLERK:  All rise for the jury.

 7              (Whereupon the jury entered the courtroom.)

 8              THE CLERK:  Court is in session, please be seated.

 9              THE COURT:  Proceed.

10              MS. BEN-AMI:  Thank you, your Honor.

11                  CROSS-EXAMINATION (Cont'd)

12      (BY MS. BEN-AMI:)

13      Q.  Dr. Lin, yesterday you told the jury that one of the

14      things you did was to create a globin model.  Do you

15      remember that?

16      A.  Yes.

17      Q.  So that you could do some hybridization modeling before

18      you did the actual EPO probing; right?

19      A.  That use the model to develop hybridization condition

20      for finding out perfect match, mismatch, and also for

21      finding out condition to -- in the human genomic background

22      to limit the specific hybridization background.

23      Q.  So you felt that you could make the correlation between

24      globin genes and EPO genes?

25      A.  Used as a model.  As a model.
```

1    **Q.** So the material that you used for that model, the

2    probing sequences and things, that was in the prior art;

3    right?

4    **A.** Excuse me?

5    **Q.** The probes, the DNA probes you used in the model were in

6    the prior art?

7    **A.** The region I use for making the probe, no, it's not in

8    the prior art.

9    **Q.** Okay.  So, let's see.  Let me have OAQ.  Let me hand you

10   OAQ, it's Nucleic Acids Research, 1981; right?

11   **A.** Yes.

12   **Q.** And this is Wallace again?

13   **A.** Yes.

14   **Q.** Johnson, right?

15   **A.** Yes.

16   **Q.** Hirose, Miyake?

17   **A.** Yes.

18   **Q.** Kawashima, and Itakura?

19   **A.** Yes, yes.

20   **Q.** And this is a paper on globin sequences?

21   **A.** Yes.

22   **Q.** Globin DNA; right?

23   **A.** That's right.

24           **MS. BEN-AMI:**  Your Honor, I offer it.

25           **THE COURT:**  Any objection?

1            **MR. DAY:**  Lacks foundation, your Honor, I object.

2            **MS. BEN-AMI:**  It's prior art, your Honor.

3            **THE COURT:**  Overruled.  It may be admitted, OAQ is

4     admitted in evidence, 2103.

5            (Exhibit marked in evidence.)

6     **Q.**  So now let's go to page -- what's on ours as OAQ7, on

7     our slides.  There are the probe sequences in the paper;

8     right?  Right?

9     **A.**  Yes.

10    **Q.**  And you used those sequences; right?

11    **A.**  No.  You remember, I --

12    **Q.**  Did you use those sequences?

13    **A.**  I don't know if this is the sequence I use.  Let me

14    explain again.  Could I --

15    **Q.**  No.

16    **A.**  Because what I did with the model --

17            **MS. BEN-AMI:**  Excuse me, your Honor.  My question

18    was did he use the sequences.

19            **THE COURT:**  Yes, that's simply the question.

20            **THE WITNESS:**  I don't know that.  I don't know

21    this.

22            **THE COURT:**  You don't know whether you used those

23    sequences?

24            **THE WITNESS:**  No, I don't know.

25            **THE COURT:**  That's your answer.

```
 1    Q.   I'm going to try to refresh your recollection.

 2              Do you know a Dr. Suggs?

 3    A.   Yes.

 4    Q.   He worked at Amgen?

 5    A.   Yes, he did.

 6    Q.   I want to show you this page.  Do you recognize SS?

 7    A.   Yes.

 8    Q.   Okay.

 9              MR. DAY:  Can you tell us what page we're looking

10    at, please?

11              MS. BEN-AMI:  I apologize, Mr. Day.  It ends 106 in

12    the Bates numbers.

13    Q.   These were the sequences you used; right?

14    A.   That he use.

15    Q.   He used?

16    A.   This is just document.

17    Q.   And he did the -- that was, right, the material that was

18    used?

19    A.   He did it -- I don't know when he did this.  This is

20    just his --

21    Q.   Well, let me show you this document.  You've seen this

22    before; right?  Right?

23    A.   Yes.

24    Q.   And you see that it says here -- you see that?

25    A.   I recognize in the same region -- let me see.
```

1    Q.  And that it cites these pages.

2         MS. BEN-AMI:  Your Honor, can I have a quick

3    sidebar?  Maybe I could do this in a little more efficient

4    way.

5         THE COURT:  All right.  You can.

6    SIDEBAR CONFERENCE, AS FOLLOWS:

7         MS. BEN-AMI:  This is my problem, your Honor.  I

8    have this page, right, the only copy of it that was produced

9    to us was produced in this EPO time line.  This is all

10   hearsay.  I don't want to introduce the EPO time line.  I

11   want to introduce the page and get him to confirm that Amgen

12   said that this -- that this is the material that he used for

13   their model system.

14        THE COURT:  What does this come from?

15        MS. BEN-AMI:  This comes from the interference.

16        THE COURT:  I understand.  All right.  Well --

17        MR. DAY:  It comes from the Chugai litigation, your

18   Honor, not the interference.

19        MS. BEN-AMI:  I apologize.

20        I want to mark this as one page.

21        THE COURT:  You show him this, and then see if he

22   will agree.

23        MS. BEN-AMI:  Right.

24        THE COURT:  That it was received or was --

25        MS. BEN-AMI:  Right.

1      **THE COURT:** -- in his possession on September 21.

2 If he won't so agree, then it seems to me that you could

3 introduce this redacted -- we don't need to know where it

4 came from, it's an Amgen document.

5      **MS. BEN-AMI:** I don't want to agree that these are

6 all admissions, just this one part.

7      **THE COURT:** You can have a redacted one.

8      **MS. BEN-AMI:** Okay.

9      **MR. DAY:** Your Honor, I object, on lack of

10 foundation.

11      **THE COURT:** We'll see. There's no lack of

12 foundation if he agrees. If he doesn't agree, he says that

13 wasn't it -- these are documents you've produced. They're

14 your documents. It's not -- I haven't got a question about

15 that.

16      **MR. DAY:** It's not a function of whether we

17 produced the document or not, it's what is this evidence of,

18 what are these things? If he -- if no foundation is laid,

19 he has no personal knowledge of what this is --

20      **THE COURT:** I take it these are evidence of the

21 sequences which they had on that date.

22      **MR. DAY:** But that's all an assumption.

23      **THE COURT:** Well, no, more accurately, it's an

24 inference, and it's an inference we're entitled to draw.

25      While we're up, since there's so many of you, I

 1    don't expect you to answer this but you can.  Do you go for

 2    their gambit on Kung?  We won't have to have Kung, we'll

 3    take his deposition --

 4         **MS. BEN-AMI:**  No, no, absolutely not, because

 5    Dr. Goldwasser said that it's not --

 6         **THE COURT:**  Wait a second.  Okay, you won't go for

 7    that.  Will you go if I admit the labels and we forget Kung?

 8         **MS. BEN-AMI:**  No, because it's not really this

 9    crucial evidence.

10         **THE COURT:**  It may be crucial evidence -- just as

11    matter of practicality, having read that declaration, I am

12    disposed to admit the labels, but ignore Kung.  I don't know

13    that I have the authority to do that unless someone allows

14    me to.  But I don't know how long you're going to take, but

15    to accommodate Kung, I will reserve about 20 minutes before

16    1:00 and get Kung on the stand and he can say this.

17         So you think about that and if you come to an

18    agreement while the people who are interrogating are

19    interrogating, you can just write a note and we can let Kung

20    go.  If you don't, we're stopping to let Kung do, subject to

21    your objection, only what is in his declaration.  And I will

22    tell you, if he testifies consistent with the declaration,

23    I'm going to admit the labels.

24         Now, you -- so you figure it out.

25         (Whereupon the sidebar conference concluded.)

```
 1   (BY MS. BEN-AMI:)

 2   Q.  Dr. Lin --

 3           MS. BEN-AMI:  Your Honor, I would offer page 20 of

 4   CML.

 5           MR. DAY:  Objection, your Honor.  No foundation.

 6           THE COURT:  On this foundation, sustained.  But

 7   proceed as we talked about at the sidebar.

 8   (BY MS. BEN-AMI:)

 9   Q.  So, Doctor, you see these sequences; right?

10   A.  Yes.

11           MS. BEN-AMI:  Put it down.  Put it down.  Put it

12   down, please.  Sorry.

13           THE COURT:  Yes.  Thank you.

14   Q.  Okay.  And you see -- would you --

15           MS. BEN-AMI:  Now, your Honor, can I have him read

16   this statement into the record?

17           THE COURT:  Well, well, no, you -- let's start,

18   take a look at the -- you see those sequences, Doctor, that

19   she showed you?  All right.  You see those?

20           THE WITNESS:  Yes.

21           THE COURT:  Now, look at the other page she showed

22   you.  Do you see that page?

23           MS. BEN-AMI:  This page right here.

24           THE WITNESS:  Yes.

25           THE COURT:  Are you familiar with that page at all?
```

1          THE WITNESS:  This page?

2          THE COURT:  Yes.

3          THE WITNESS:  Yes, I have seen this before.

4          THE COURT:  All right.  Now, look at, there's a

5     specific reference there, September 21.

6          THE WITNESS:  Yes.

7          THE COURT:  Read that to yourself.

8          THE WITNESS:  Yes.

9          THE COURT:  You've done that?  And now -- now,

10    is -- without telling us what's there, is that accurate?

11         THE WITNESS:  Yes, of course.

12         THE COURT:  So, and are those the sequences which

13    you got on or about that date or had on or about that date?

14         THE WITNESS:  You mean regarding to this sequence?

15         THE COURT:  Yes, sir.

16         THE WITNESS:  I don't know.  This is different

17    because we're talking about three sets of probe.  This is

18    just a single sequence.  It's just a single sequence only.

19         THE COURT:  That's his testimony.

20    Q.  These are the page numbers, Doctor, that are on this

21    document; right?

22    A.  Page what -- I don't know.

23    Q.  Okay.  Let me try it another way with you, Doctor.  This

24    is -- I'm looking at CNZ.

25         MS. BEN-AMI:  Could we give it to people.

1   **Q.**  I'm looking at CNZ.  This is your notebook; right?

2   A.  I want to look --

3   **Q.**  Look inside, it says Lin; right?  F. Lin Notebook 1983?

4   A.  Okay.  Okay.

5   **Q.**  Okay?

6   A.  All right.  Same one.

7   **Q.**  That's yours?

8   A.  Yes.

9   **Q.**  Okay.  Now, let's look at Bates pages 436; right?  And

10  that talks about the betaglobin?

11          **MR. DAY:**  What page, Counselor?

12          **MS. BEN-AMI:**  436, I said, I'm sorry.

13  **Q.**  Right?

14  A.  Yes.

15  **Q.**  Okay.  Right?  That's from your notebook; right?

16  A.  Yes.

17  **Q.**  And that's the sequence that's on this page, that's

18  page 20 of CML; right?

19  A.  This is different from this.  This is show only one

20  single piece difference, this is shows here using a set,

21  using different degeneracy here.  See, here is a four base

22  for this one, four base here, four base here.  There's none

23  on this here at all.

24  **Q.**  So you're testifying that the page that was attached to

25  the time line was not accurate?

1    A.   Which time line?

2            MR. DAY:  Objection, your Honor.

3            THE COURT:  No, wait a second.  The objection is

4    overruled.  And is that what you're saying?

5            MS. BEN-AMI:  I'm looking at CML1 for

6    identification, your Honor.

7    Q.   You're saying that this entry is not accurate on

8    September 21, '81?

9    A.   No, I'm not saying.  I'm saying that what you try to

10   show me, in this, is same as this, I say it's different.

11   Q.   So is this entry on September 21, '81, accurate?

12           MR. DAY:  Objection.  Lacks foundation.

13           THE COURT:  Overruled.

14   A.   I don't know this one, you have to show me the document

15   attached.  Where's the document attached to it?

16   Q.   I'll come back to it.  All right.

17           So, Doctor, you agree -- let's back up a bit.

18   There came a point in time when you had the EPO gene, the

19   human EPO gene; right?  Right?

20   A.   Yes.

21   Q.   And you had expressed it in a mammalian cell; right?

22   Your company had; right?

23   A.   Yes.

24   Q.   And before you tested it for biological activity, you

25   had the expectation that the EPO that would be made would be

1    biologically active; correct?

2    A.   I was hopeful the thing that we were doing would be

3    biological active, but if it's going to be biological active

4    or not, is had to depends on the result we obtain.  It's not

5    by -- it's not dictate by my expectation.

6    **Q.**   Well, you expected it?

7    A.   Yeah, because as a scientist --

8    **Q.**   Doctor, did you expect it or not?

9    A.   Yes, that's what I expected.

10   **Q.**   You did expect it.  Okay.  And that's before you ever

11   put it in a human?

12   A.   Yes.

13   **Q.**   That's before you ever put it in a mouse?

14   A.   I expect a lot of things when I do experiment because I

15   have these positive thought when I'm doing the experiment.

16   I hope that results going to turn out as I expect, but very

17   often, I also fail, too.

18   **Q.**   So when you say "expect" to the patent office, you don't

19   mean "expect"?

20   A.   No, just expect just like any -- you expect something to

21   happen.  I expect to be call two weeks ago but it never

22   happen.  Even though they told me to be here, it's not even

23   happen to me.

24   **Q.**   But you knew you were going to wind up being here,

25   right, and you are?

1    A.  No, it did not happen, not as I expected.

2    Q.  You're here.  So let's -- let's talk about you filed a

3    patent application under oath to the patent office; right?

4    A.  That's correct.

5    Q.  Okay.  So you understood there that it's more than just

6    a guess, you're telling the patent office things and you're

7    telling them this under oath; right?

8    A.  That's correct.

9    Q.  Okay.  And Mr. Day, in his direct -- let me move this

10   out of your way -- said to you that you only expected that

11   monkey EPO would be active in 1983; remember that testimony?

12          MR. DAY:  Your Honor, I object to the

13   characterization.  I think counsel's testifying.

14          THE COURT:  Well, I'll simply then remind the jury

15   that counsel can't testify.  We'll see what he says.

16          MS. BEN-AMI:  I was waiting for an answer.

17          THE COURT:  Is that right?

18   A.  That was respect to that particular sentence,

19   expectation was refer to the particular sentence relating to

20   monkey expression, monkey EPO gene expression in monkey

21   cells.

22   Q.  So it's December of '83; right?

23   A.  Yes.

24   Q.  You haven't expressed human EPO in any cell yet; right?

25   A.  Could you repeat the question again?

1    Q.   You haven't expressed human EPO in any expression system

2    yet?

3    A.   In what time frame?

4    Q.   December '83.

5    A.   That's correct.

6    Q.   Okay.

7    A.   Yes.

8    Q.   And let's look at the claim.

9         MS. BEN-AMI:  Can I have the exhibit up, please,

10   2014, page 1371?

11        MR. DAY:  Your Honor, I would just request that

12   counsel not lean on the witness.

13        MS. BEN-AMI:  Oh, I'm sorry.  Am I bothering you,

14   Doctor?  I was just trying to point out.  If you're ever

15   uncomfortable, Doctor, please let me know.

16        THE COURT:  No instruction's required.

17   Q.   Doctor --

18        MS. BEN-AMI:  Can we blow out claim 9.

19   Q.   Now, there in claim 9, you indicate that you're claiming

20   a polypeptide according to claim 1 which has the in vivo

21   biologically activity of naturally-occurring EPO.  Right?

22   Right?

23   A.   That's correct.  That's what it say there.

24   Q.   And that's not limited to monkey; right?

25   A.   Let me see claim 1, okay.

1   Q.  Okay.  You've got that on the page before?  Claim 1

2   doesn't say monkey; right?

3           MS. BEN-AMI:  Can you blow up claim 1, please?  And

4   can you blow up claim 6?

5   Q.  So claim 1 is not limited to monkey; right?

6   A.  Let me read through this for a second.

7   Q.  There's no word "monkey" in there, Doctor?

8   A.  Yes, that's correct.  Yes.

9   Q.  No monkey?

10  A.  That's correct.

11  Q.  And claim 6, which is dependent on claim 1, it says, "A

12  polypeptide according to claim 1 possessing part or all of

13  the primary structural conformation of human EPO."  It's

14  including human EPO; right?

15  A.  Yes.

16  Q.  Claim 1 includes human EPO; right?

17  A.  Yes.

18  Q.  And in claim 9 --

19          MS. BEN-AMI:  Can we have claim 9?

20  Q.  There you're saying, "A polypeptide according to

21  claim 1" and that includes human EPO?

22  A.  Yes.

23  Q.  And it says, "Having in vivo biological activity"?

24  A.  Yes.

25  Q.  So you claimed that you had invented a polypeptide with

1    human biological activity before you had done -- even

2    expressed it; correct?  Correct?

3    A.  What's that?

4    **Q.**  Is that correct?

5           **THE COURT:**  Is that correct?

6    **Q.**  I'll ask it again.  I think I may have lost you.  Again,

7    if I'm talking too fast for you, you let me know.

8           In December 1983 --

9    A.  Yes.

10   **Q.**  -- you had not produced human EPO in any cell yet;

11   right?

12   A.  That's correct.

13   **Q.**  Right, and yet you claimed polypeptides with

14   biologically -- in vivo biologically active human EPO;

15   right?

16   A.  Yes.

17   **Q.**  Including human EPO?

18   A.  That's correct.

19   **Q.**  And you claimed that because you had an expectation?

20   A.  Yes.

21   **Q.**  Right?

22   A.  Yes.

23   **Q.**  And that was because Dr. Goldwasser -- well, I'll leave

24   it at that.  Okay.  I'd like to ask you now about -- let me

25   hand you what's Exhibit 2017, which is the file history of

1    the '349 patent.  Okay.  I'm not going to ask you about the

2    whole thing, I'm going to ask you to go to page 23 --

3    A.  Just one second.  Let me get all this out of the way

4    first.

5    Q.  Just for Mr. Day.  Yours is tabbed.

6         MS. BEN-AMI:  It's page 2302 of Exhibit 2017.

7    Q.  And this is the correspondence back and forth with the

8    patent office?

9    A.  What's the number?

10   Q.  Let me help you.

11        MR. DAY:  Twenty-three what?

12        MS. BEN-AMI:  2302.

13        MR. DAY:  I don't have that page.  Are you

14   referring to the exhibit page number, Counsel, or --

15        MS. BEN-AMI:  I'm referring to the Bates number.

16   ATM-ITC 002302.

17        MR. DAY:  I don't have that page in your exhibit.

18   I'm not sure I have it in mine.

19        MS. BEN-AMI:  Mr. Suh will -- do you have it now?

20        MR. DAY:  Thank you.

21   Q.  Right.  And here the patent office asked whether any of

22   the materials that were used in this project had been funded

23   by the Department of Energy; right?

24   A.  I don't know.  Where did it say that?

25   Q.  Well, look at it.  Do you see the checkmark --

1          **MS. BEN-AMI:**  Can we blow it out, please?  The

2     second paragraph, "Accordingly."

3     **Q.**  It says you have to tell the patent office -- "No patent

4     can issue on this application unless the applicant files a

5     statement under oath or in a form provided by declaration

6     stating the full facts concerning the circumstances under

7     which the invention was made and conceived, and the

8     relationship if any of the invention to the performance of

9     any work under contract or any other arrangement with the

10    agencies noted above."  Do you see that?  I've got it.

11         Right?  Do you see that?  And that includes the

12    Department of Energy; right?  And then if we go to 2304, you

13    file a declaration, that's your signature; right?

14    A.  Yes.

15    **Q.**  And can we blow up the first paragraph there?

16         And you say that this invention was made at Amgen;

17    right?

18    A.  That's correct.

19    **Q.**  And then it says, "The invention was made during working

20    hours and with the use of facilities, equipment, materials,

21    funds, information and services of Amgen.  And other

22    relevant facts are," and it's left blank; right?

23    A.  Yes.

24    **Q.**  And you signed it; right?

25    A.  Yes.

1    **Q.**  You did not indicate that the --

2          **MS. BEN-AMI:**  Can I have Table 1 of the patent?

3    **Q.**  You did not indicate there that the human EPO and the

4    tryptic fragments came from Dr. Goldwasser?

5    A.  Do we have the obligation to indicate that or he is

6    our -- he was our consultant.

7    **Q.**  Dr. Goldwasser -- purification of the human EPO material

8    was funded by the NIH and the Department of Energy; correct?

9          **MR. DAY:**  Objection, lacks foundation.  It's

10   irrelevant.

11         **THE COURT:**  We'll ask him if he knows.  Well, no,

12   I'm going to sustain it on the --

13         **MS. BEN-AMI:**  The foundation's already in, your

14   Honor.

15         **THE COURT:**  Well, wait a second.  Wait a second.

16   I'm sustaining the objection to that question in this phase

17   of the case.  Sustained.

18   **Q.**  Did you ever ask Dr. Goldwasser if he had obtained

19   funding from the Department of Energy?

20   A.  No.

21   **Q.**  Did you ever -- did you know whether or not he had

22   funding from the Department of Energy?

23   A.  No.  No.

24   **Q.**  You knew that he supplied the urinary EPO; right?

25   A.  Yes.

1    **Q.**  And you knew he had been funded by the government;

2    right?

3         **MR. DAY:**  Objection, your Honor.

4    A.  I don't know what --

5         **THE COURT:**  The objection is sustained.

6    **Q.**  Did you investigate this declaration before you signed

7    it?

8    A.  Investigate what?

9    **Q.**  Did you figure out the facts or did the lawyers do it

10   for you and just say sign it?

11   A.  The --

12   **Q.**  Let's go back to the dec -- I want to make sure you

13   understand what I'm asking you.

14        This declaration that you signed, right?

15   A.  Yes.

16   **Q.**  Did you do an investigation of where the materials came

17   from before you signed the declaration?

18   A.  You mean -- what material are you talking about, the

19   erythropoietin?

20   **Q.**  Yeah, the EPO material?

21   A.  I only know it's coming from Gene Goldwasser's lab.

22   **Q.**  Did you then do an investigation to find out if he had

23   been funded by the Department of Energy?

24   A.  No.

25        **MR. DAY:**  Objection, your Honor.

```
 1    A.  I don't know.

 2            THE COURT:  Wait a minute, there's an objection.

 3    The answer is -- sustained.  The answer's stricken.

 4    Q.  Doctor, over the years, how much money have you made

 5    from Amgen, based on these patents?

 6    A.  I -- I was employee, so paid by Amgen like any other

 7    scientist work at Amgen.  I don't know how much money I was

 8    paid.

 9    Q.  How much stock were you given?

10    A.  I don't know.

11    Q.  A lot, right?

12    A.  I don't know.

13    Q.  You made tens of millions of dollars?

14    A.  I don't know.

15    Q.  You don't know?

16    A.  I don't know the number.

17    Q.  More than $1 million?

18    A.  Do I want to reveal the number, money, as is the case

19    related to money, you know?

20            THE COURT:  No, it is appropriate for her to ask

21    you those questions.

22            THE WITNESS:  Yes, but I --

23            THE COURT:  And you must answer.  So if you know,

24    you must answer.

25            THE WITNESS:  Yes.  What was the question again?
```

1          **THE COURT:**  The question was, did you obtain over

2    $1 million in stock related to these patents?

3          **THE WITNESS:**  Yes.  Yes.

4          **THE COURT:**  Go ahead, Ms. Ben-Ami.

5    **Q.**  More than that?

6    **A.**  Yes.

7    **Q.**  Much more than that?

8    **A.**  No, I don't know.  I don't know the numbers.

9    **Q.**  In the millions; right?  In the millions?

10   **A.**  Yes.

11         **MS. BEN-AMI:**  No further questions, your Honor.

12         **THE COURT:**  Any redirect?

13         **MR. DAY:**  Yes, just a bit, your Honor.

14                    **REDIRECT EXAMINATION**

15   **(BY MR. DAY:)**

16   **Q.**  Dr. Lin, Ms. Ben-Ami suggested to you that your

17   invention was genomic DNA.  Do you agree that that was the

18   only thing that you invented here?

19         **MS. BEN-AMI:**  Objection, your Honor.

20         **THE COURT:**  Well, he may answer that yes or no.

21   Well, actually, I don't understand the question.  The

22   suggestion was as to another patent.  Are you saying in that

23   patent was that the only invention?

24         **MR. DAY:**  No.

25   **Q.**  Do you agree, Dr. Lin, that genomic DNA is the only

1    thing that you invented as described in these patents?

2         **MS. BEN-AMI:**  I object, your Honor.

3         **THE COURT:**  Overruled.  He may answer yes or no.

4    A.  No.

5         **MR. DAY:**  Can we have '933, claim 3, please?

6    **Q.**  Dr. Lin, this is one of the patents in suit.  And I'd

7    like to focus on the first phrase in the claim, "a

8    non-naturally occurring glycoprotein product of the

9    expression in a mammalian host cell of an exogenous DNA

10   sequence comprising a DNA sequence encoding human

11   erythropoietin."

12        Now, do you understand, sir, whether a patent claim

13   requires one of these elements or all of the elements that

14   are in the claim?

15        **MS. BEN-AMI:**  Objection, your Honor.

16        **THE COURT:**  Sustained.  I mean, that goes as a

17   matter of law.

18        **MR. DAY:**  Okay.

19        **THE COURT:**  And lest we be confused, the -- all the

20   elements of a claim comprise the claim.  So when you test a

21   claim as against the prior art in terms of anticipation, you

22   have to have the prior art that has all the elements of that

23   claim.  Conversely, when we get to infringement, when you

24   test whatever Roche has done or not done against a specific

25   claim, you're going to be asking yourself is every element

1    of the claim present in the Roche product.  If it is, it

2    infringes.  If it's not, it doesn't.

3         Go ahead, Mr. Day.

4    **Q.**  Now, when you isolated the DNA encoding human

5    erythropoietin from a genomic library, was that DNA that you

6    isolated useful only as a genomic clone?

7         **MS. BEN-AMI:**  Objection, leading.

8         **THE COURT:**  Sustained.

9    **Q.**  What other uses could be made of that DNA?

10        **MS. BEN-AMI:**  Objection.  No foundation, it's --

11        **THE COURT:**  Oh, no, overruled.

12   A.  DNA can be made into cDNA, the genomic DNA can be made

13   into cDNA and this DNA can be then make -- to make products

14   that coded by this gene.  In this case, erythropoietin would

15   be the product of the gene expression.

16   **Q.**  Okay.  Before you isolated the DNA encoding human

17   erythropoietin, did you know what, if any, cells would

18   produce a -- and look at the rest of the claim here -- in

19   vivo biologically active EPO glycoprotein?

20        **MS. BEN-AMI:**  Objection, your Honor.  The witness

21   shouldn't be talking about the claims.

22        **THE COURT:**  I didn't hear you?  What?

23        **MS. BEN-AMI:**  The witness is a fact witness.

24        **THE COURT:**  Yeah, he is.  Sustained.

25        **MR. DAY:**  I'll just take the claim down.

1    Q.   Before you isolated the DNA encoding human

2    erythropoietin, did you know which, if any, cell would

3    produce a biologically active in vivo form of

4    erythropoietin?

5              MS. BEN-AMI:   Objection, leading.

6              THE COURT:   Overruled.

7    A.   No.

8    Q.   Ms. Ben-Ami asked you some questions about your genomic

9    cloning.   I want to just go back to the graphic that you

10   helped me build yesterday during your testimony.

11             MR. DAY:   Can you bring this up?

12   Q.   Ms. Ben-Ami asked you, I believe, whether degenerate or

13   fully degenerate probes were, in and of themselves, novel.

14   Do you recall that?

15   A.   That's correct.

16   Q.   And she asked you whether multiple sets of probes, in

17   and of themselves, were novel?

18   A.   That's correct.

19   Q.   Were innovative, I think was the word that she used.

20   What was innovative about your genomic cloning approach, if

21   anything?

22             MS. BEN-AMI:   Objection, leading.

23             THE COURT:   Overruled.

24   A.   It's the combination of all these things put together to

25   make it work in the complex human genomic background, that's

```
 1    what is make it to work.  It's not that each one -- just
 2    like if we go to the moon, for the shuttle to go to the moon
 3    take only a few hours, but it take years of preparation to
 4    get the thing to work.
 5              MS. BEN-AMI:  Objection, your Honor.
 6              THE COURT:  He's using that as an example.  His
 7    example may stand.
 8              MR. DAY:  Can we have patent Table 1, please.  This
 9    will be Trial Exhibit 1, Table 1.
10              THE COURT:  That is only an example.  There's no
11    suggestion in this case that he is, in fact, a rocket
12    scientist.
13    Q.  Looking at Table 1, Dr. Lin, Ms. Ben-Ami asked you about
14    this and she suggested to you that you had all the EPO
15    sequence.  Do you recall that?
16    A.  Yes.
17    Q.  And if you, in fact, had all the EPO sequence, if you
18    had the complete sequence of human EPO, would you be able to
19    build longer probes?
20              MS. BEN-AMI:  Objection.  Calls for speculation.
21              THE COURT:  Sustained.  And also, it calls for
22    expert testimony and you've chosen to present him just as a
23    fact witness.
24              That, I'm just following these technicalities.  I'm
25    expressing no opinion with respect to him at all.  You'll
```

1    size him up and draw your own conclusions.  But if they're

2    called out as, I call them opinion witnesses, we see all the

3    technical requirements that you have to jump through and I

4    follow those.  But if you were there on the ground at the

5    time, then you don't have to follow those, but then you're

6    stuck with testifying to only what you thought then.  That's

7    the line I'm following.

8          Now, here Amgen has called this witness, presented

9    him to you, and they say, Well, you were on the ground at

10   the time, and so on and so forth, and they're entitled to

11   ask, What did you know then?  What did you expect?  What did

12   you do?  But these reflective questions, So how do you think

13   that worked?  How do you think it actually operated?  Why

14   this?  I've been sustaining those.

15         Now, here again, it's a tricky line.  Just so you

16   can follow, that's the line I'm following.  When I follow

17   that line, that's no expression on my part that I don't

18   think he could give the opinions or I think he should give

19   the opinion.  I have nothing to say about that.  It's just

20   that opinion witnesses are one thing, and I know who they

21   are, and fact witnesses are another thing.

22         Now, whether or not what he testifies to is fact,

23   that's entirely for you.  You can believe it, disbelieve it,

24   believe parts of it.

25         Forgive the interruption, and go ahead.

1          **MR. DAY:**  Thank you, your Honor.

2    **Q.**  Looking at Table 1, do you have it on the screen in

3    front of you?

4          **MR. DAY:**  And maybe we can turn this around so the

5    jury can see it here as well, if they wish.

6          **THE COURT:**  Yes, I'm sorry.  We should have done

7    that.  I appreciate it, Mr. Day.

8          **THE CLERK:**  Oh, I'm sorry.  I'll do it.

9          **MR. DAY:**  The last thing I want to do is --

10         **MS. BEN-AMI:**  That's an expensive thing to break.

11         **THE COURT:**  Once this trial is over, we're going to

12   modify this courtroom and we're going to have little screens

13   in the jury box.  We're next in line to get that.  That's

14   about the level of our technology here.  But for now, that's

15   Ms. Smith's job.  I appreciate it, Mr. Day.

16         **MR. DAY:**  Thank you, your Honor.

17         **THE COURT:**  Go ahead.

18   **Q.**  So, Dr. Lin, looking at the figure, the Table 1 in your

19   patent, would you explain what -- let's just look at the

20   very first fragment up there, T4a.  Would you explain what

21   each one of these letters represents?

22         **MS. BEN-AMI:**  Objection.

23         **THE COURT:**  No, overruled.  What he understands at

24   the time.

25         Did you have an understanding at the time what they

1    represented?

2              **THE WITNESS:**  Yes, of course.

3              **THE COURT:**  When you looked at that, what did you

4    think that was?

5              **THE WITNESS:**  A stands for alanine, amino acid.

6    Abbreviation symbol for amino acid.  A stand for alanine, P

7    for proline, R for arginine.

8    **Q.**  Now, at that time when you received this fragment, did

9    you believe that that was a useful sequence for probing?

10             **MS. BEN-AMI:**  Objection.  No foundation.  No,

11   overruled, but sustained as leading.

12             What did you think you could do with that sequence?

13             **THE WITNESS:**  No, because I like to have a sequence

14   at least six amino acid or longer.

15   **Q.**  Why did you want to sequence six amino acids or longer?

16   **A.**  Because for genomic probing, if you don't have -- even

17   have six amino acid that you cannot make a probe that is

18   longer enough to even have some specificity in the probing.

19   But even with six amino acid, give very high background in

20   hybridization.

21   **Q.**  Okay.  I'd like you to look at probe T30.

22             **MR. DAY:**  If you could highlight the letters in

23   T30.

24   **Q.**  Now, you'll see some letters in here, but there's, in

25   here, there are a couple of X's.  Do you see the X-E-A-E-X,

1    there's another X, and another X, and another X.  Would you

2    explain to the jury what those X's represent?

3              **MS. BEN-AMI:**  Objection.

4              **THE COURT:**  Sustained.

5              What did you think those X's back then, did you

6    have some idea back then what --

7              **THE WITNESS:**  Yes.

8              **THE COURT:**  -- that X symbol meant?

9              **THE WITNESS:**  Yes.  No signal coming out for the

10   position.

11   **Q.**  What do you mean no signal coming out?

12   **A.**  They cannot call what it is for the position, what amino

13   acid it is for the position.

14   **Q.**  So at the time, back then, what did you think of T30 --

15             **MS. BEN-AMI:**  Objection.

16   **Q.**  -- as a fragment for use in probing?

17             **MS. BEN-AMI:**  Objection.

18             **THE COURT:**  Overruled.

19   **A.**  Because is all break, the P sequence long, but it break

20   down, break up by X.  Therefore, there's no good region to

21   have even longer than six to be used for making probe.

22   **Q.**  And if you look at T38, you'll see there's an X in the

23   T38 sequence.  What did you think then the X in T38 meant?

24   **A.**  Again, X is again one that they can not assign any amino

25   acid for the position.

1   Q.  Now, did you, at the time, did you review these

2   sequences -- you said you reviewed these sequences for their

3   degeneracy.  Did you come to any conclusion at that time

4   about these fragments, the degeneracy of these fragments?

5            MS. BEN-AMI:  Objection.

6            THE COURT:  Overruled.

7   A.  The degeneracy, when we look at all this fragments and

8   degeneracy for making a 20 nucleotide long, that mean a

9   seven amino acid to use for making probe is way -- always

10  above several hundred, 128 or longer.  The combination,

11  mixture, all the possible degeneracy will be 128 or longer.

12  Q.  How would that -- at the time -- what, if any, effect

13  did you believe that degeneracy would have on --

14           MS. BEN-AMI:  Objection.

15  Q.  -- your ability to use these probes to identify or

16  isolate a copy of the EPO gene?

17           MS. BEN-AMI:  Objection, leading.

18           THE COURT:  Overruled.  Your rights are saved.

19           THE WITNESS:  Excuse me, let me -- could you read

20  back the question -- the answer again?  Just want to see if

21  I make any mistake.

22  Q.  What did you believe at the time --

23  A.  No, no, I want to read back the question, the answer I

24  gave to him when --

25           THE COURT:  Well, I can read the question.  Here it

1    is.  What, if any, effect did you believe that degeneracy

2    would have on your ability to use these probes to identify

3    or isolate a copy of the EPO gene?

4         **THE WITNESS:**  Yeah, I know this question.  I'm

5    talking about the answer I gave to him, the earlier one.  I

6    want to see if I answered properly on that.

7         **THE COURT:**  You said, "The degeneracy, when we look

8    at all these fragments in degeneracy for making a 20

9    nucleotide" -- well, I'm reading from the computer, and it's

10   gone above my ability to read it.  So I could have it read

11   back and you can correct it.  Let's -- you can always

12   correct your testimony.  And I'll ask the court reporter to

13   read that answer back.

14        (Record read as requested.)

15   A.  Okay.  So it's 128 or longer for 20 nucleotide long.

16   That's correct.  Yes.

17   **Q.**  And now, my question, which I'd like you to consider and

18   please answer, is what effect, if any, did you believe that

19   the degeneracy of these fragments would have on your ability

20   to make probes that you could use to identify and isolate

21   the EPO gene in a genomic library?

22        **MS. BEN-AMI:**  Leading.

23        **THE COURT:**  No, "what effect."  Overruled.

24   A.  It would affect a lot because -- because of such a high

25   degeneracy, one have to use such a large mixture to -- to do

1    the hybridization.  There's no one had ever done it before

2    to use --

3            MS. BEN-AMI:  Objection, your Honor.

4    A.  To always the --

5            THE COURT:  No, no.  So much of the answer as "no

6    one had ever," strike all that out.  His question is --

7    Q.  What effect would it have?

8    A.  Affect hybridization, because such a big mixture.  It

9    will cause high backgrounds in the hybridization.  And the

10   other thing is that you have to -- it would high background,

11   and then among the isotope to be used, it's impossible, I

12   mean, I don't know how much, tremendous amount of isotope

13   need to be used.  It's almost impractical to do it.

14   Q.  Ms. Ben-Ami showed you this Maniatis book and asked you

15   if you were familiar with this.  You said yes, you had this,

16   you were familiar with this?

17   A.  Yes.

18   Q.  What is contained in this book about using short

19   oligonucleotide probes to screen a genomic library?

20           MS. BEN-AMI:  Objection, your Honor.

21           THE COURT:  I'm sorry, I was talking to Ms. Smith.

22   I'll ask it to be asked again.

23   Q.  What, if anything, is contained in this book about using

24   short oligonucleotide probes to screen a genomic library?

25           MS. BEN-AMI:  Objection, expert.

1          **THE COURT:**  Yes, either that or the book speaks for

2     itself, so sustained.

3     **Q.**  Well, you -- she asked you about this book; right?

4     A.  Yes.

5     **Q.**  And you had a copy of this book; right?

6     A.  That's right, I did.

7     **Q.**  Did you learn anything from this book about using short

8     oligonucleotide probes to screen a genomic library?

9     A.  No, nothing there.

10    **Q.**  Did you learn anything from this book about the

11    hybridization conditions that were required in your

12    experiments to screen genomic libraries?

13         **MS. BEN-AMI:**  Objection, leading.

14    A.  Nothing.

15         **THE COURT:**  No, sustained as to the last question,

16    and the answer's stricken.

17    **Q.**  What did you learn from this book about screening

18    genomic libraries using short oligonucleotide probes?

19         **MS. BEN-AMI:**  Objection.  No foundation.

20         **THE COURT:**  Overruled.

21    A.  Nothing.

22    **Q.**  What did you learn from this book about the

23    hybridization conditions that would be required in order to

24    perform a screening experiment in a genomic library?

25    A.  Nothing.

1   **Q.**  Ms. Ben-Ami also asked you about the publicly available

2   Maniatis library, the gDNA library.  Before you visited the

3   Maniatis library, did you know whether it contained a copy

4   of the EPO gene?

5   A.  No.

6          **MS. BEN-AMI:**  Objection, leading.

7   A.  No.

8          **THE COURT:**  Yes.  Sustained on that ground.  The

9   answer's stricken.

10  **Q.**  What, if anything, did you know about what was contained

11  in the Maniatis library?

12  A.  The Maniatis library has an estimate, only contain about

13  85 percent of the human gene --

14         **MS. BEN-AMI:**  Objection, your Honor.  Expert.

15         **THE COURT:**  Yes, sustained -- no, wait a second.

16         **MR. DAY:**  I asked what he knew.

17         **THE COURT:**  Overruled.  You may have it.  You

18  may -- that may stand, and you may finish your answer.  I'm

19  sorry.

20  A.  It's estimate to contain only about 85 percent of the

21  gene in the human -- in the gene library, and is also long.

22  The gene, if it's even in the library, could be modified,

23  that means could be deleted, rearranged, okay.

24         **MS. BEN-AMI:**  Your Honor, I object.  It's expert

25  testimony.

1    **THE COURT:**  So much of the answer as begins "it

2    could be deleted," that's stricken, but the rest of it may

3    stand.

4    **Q.**  Dr. Lin, after you isolated the EPO DNA, you were

5    appointed head of the molecular biology group to obtain the

6    expression of a product that could be used in the clinical

7    trials?

8    A.  That's correct.

9    **Q.**  And how many different expression systems did you try?

10   A.  I try three different expression systems:  One is

11   bacteria system, one is yeast system, the other one is --

12   the third one is mammalian expression system.

13   **Q.**  Why did you choose to try bacteria?

14   A.  Yeah, we hope that maybe we can -- because we don't know

15   which one would work the fastest, the best, so we try all

16   system.  Just like when I was doing the cloning, I try

17   several approach.

18        **MS. BEN-AMI:**  Objection, your Honor.

19        **THE COURT:**  That may stand.

20   A.  And we hope that we can modify, if it's -- if it need

21   modification to make it work, we would do modification to

22   make it to work.  That's what we hope for.

23   **Q.**  Why did you try yeast?

24   A.  For the same reason.  We don't know which one would work

25   the fastest.

1    Q.   Why did you try mammalian?

2    A.   We don't know what would work or not either, so we had

3    to try other system all at the same time.

4    Q.   What, if anything, did you believe about which, if any,

5    of these systems would produce an in vivo biologically

6    active form of erythropoietin?

7    A.   Could you repeat the question?

8    Q.   What did you believe about which, if any, of these

9    systems would produce an in vivo biologically active form of

10   erythropoietin?

11            MS. BEN-AMI:   Objection.

12            THE COURT:   Overruled.

13   A.   Yes, we really don't know which system.   Even though

14   early indication mammalian cell may be helpful, would be

15   helpful for glycosylation, but because we don't know

16   definitely what structure requirement is needed for

17   biological -- in vivo biological activity, that's why we try

18   all three systems.

19   Q.   You mentioned that you were an employee of Amgen?

20   A.   That's correct.

21   Q.   When did you retire?

22   A.   In 1998.

23   Q.   1998.   And Ms. Ben-Ami asked you about stock that you

24   received from Amgen.   Do you recall that?

25   A.   Yes.

1    **Q.**  What was the stock awarded for?

2    A.  For the performance as an employee working at Amgen.

3    **Q.**  Over what time period?

4    A.  Since the time I join Amgen.  Every employee, at the

5    time, every employee join Amgen was given stocks.

6              **MR. DAY:**  No further questions.

7              **THE COURT:**  Anything more for this witness?

8              **MS. BEN-AMI:**  Just a few.

9                    **RECROSS-EXAMINATION**

10   **(BY MS. BEN-AMI:)**

11   **Q.**  Just so it's clear, you're still being paid as a

12   consultant for Amgen and you have every year since you've

13   been retired?

14   A.  Yes, I was paid a consultant, correct.

15   **Q.**  You're still a consultant -- you have a contract with

16   them?

17   A.  That's right.

18   **Q.**  Okay.  Now, let's go to Table 1.  You talked about

19   certain of these fragments, but the first two fragments that

20   you were given by Dr. Lai, the fragments Dr. Lai handed to

21   you, the information, were 35 and 38; right?

22   A.  Yes, that's correct.

23   **Q.**  Not 4a or 4b; 35 and 38, right?

24   A.  That's correct.

25   **Q.**  And it took you one hour to design the probes for them;

1   right?

2   A.  Yes.

3   **Q.**  Okay.  Now -- now, let's go to Exhibit 2062, second

4   page, "Early studies."  You said to the jury you did all

5   three simultaneous because you didn't know which one would

6   work, but in 1986 you told the public in a paper that on the

7   basis of Goldwasser's data you chose to produce the

8   recombinant materials in mammalian cells; right?

9   A.  That's correct.  That are made more likely, yes, that's

10  right.  That's correct.

11  **Q.**  Most likely?

12  A.  Yes.

13          **MS. BEN-AMI:**  Thank you.  No further questions.

14                  **REDIRECT EXAMINATION**

15  **(BY MR. DAY:)**

16  **Q.**  I'm sorry, did you say most likely or more likely?

17  A.  No, more likely.

18          **MR. DAY:**  No further questions, your Honor.

19          **THE COURT:**  That's it?  You may step down.  Thank

20  you.

21          (Whereupon the witness stepped down.)

22          **THE COURT:**  Have we agreed how to proceed with the

23  next witness?  Just yes or no.  Well, come to the sidebar.

24  SIDEBAR CONFERENCE, AS FOLLOWS:

25          **THE COURT:**  Ms. Smith wisely wants me simply to

1    show you that I've endorsed these motions as denied by

2    ruling on the specific designations.  It's implicit.

3         **MR. FLEMING:**  We inferred that.

4         **THE COURT:**  This isn't why I asked you to --

5         **MR. FLEMING:**  Dr. Kung had spoken to Amgen.  What

6    we would agree is that every one would be redacted but for

7    the labels, and nothing else comes in.

8         **THE COURT:**  And the labels are in.  That's an

9    agreement, that's fine.

10        **MR. FLEMING:**  We'll prepare a document to give it

11   an appropriate number.

12        **THE COURT:**  That's fine.  So who's going to be next

13   now?

14        **MR. DAY:**  Our next witness will be Dr. Goldwasser,

15   I believe.  Oh, Dr. Browne, I misspoke.

16        **THE COURT:**  Dr. Browne may be called.  And Kung is

17   excused, given this agreement?

18        **MR. DAY:**  Yes.

19        **MR. FLEMING:**  Yes, your Honor, of course.

20        (Whereupon the sidebar conference concluded.)

21        **THE COURT:**  The witness may take the stand.

22        **MR. GAEDE:**  Your Honor, we filed a couple of bench

23   memos this morning.  May we have a sidebar?  It concerns

24   this particular witness.

25        **THE COURT:**  Very briefly.  Let's swear him first.

1          **THE CLERK:**  Sir, would you raise your right hand?

2          Do you solemnly swear that the answers you will

3     give to this Court and Jury will be the truth, the whole

4     truth, and nothing but the truth, so help you God?

5          **THE WITNESS:**  I do.

6          **THE CLERK:**  Please be seated.

7     SIDEBAR CONFERENCE, AS FOLLOWS:

8          **MR. SUH:**  Your Honor, at yesterday's deposition

9     Dr. Browne was asked about a subject matter in this

10    litigation.  He started explaining --

11         **THE COURT:**  I've read these.  I've read these.  I

12    tend not to -- one, they're both denominated bench memos, so

13    they don't call upon me to do anything.  I'll wait, if they

14    even go to the specific claims of the patents in suit.  And

15    the other one is previous litigations.  I'm very hostile to

16    that.  We better not hear --

17         **MR. GAEDE:**  Your Honor, we understand.

18         **THE COURT:**  I need your name again.  Forgive me,

19    sir.

20         **MR. GAEDE:**  Oh, Mr. Gaede, Bill Gaede.

21         **THE COURT:**  Mr. Gaede, sure.

22         (Whereupon the sidebar conference concluded.)

23         **THE COURT:**  The witness is sworn.  Proceed,

24    Mr. Gaede.

25         **MR. GAEDE:**  Thank you, your Honor.

```
 1                    JEFFREY K. BROWNE

 2                 DIRECT EXAMINATION

 3   (BY MR. GAEDE:)

 4   Q.  I'd say good morning, Dr. Browne, but good afternoon.

 5   A.  Good morning.  Good afternoon.

 6   Q.  Could you please introduce yourself?

 7   A.  My name is Jeffrey King Browne.

 8   Q.  Dr. Browne, what is your educational background?

 9   A.  I have an undergraduate degree in biology from the

10   University of California at San Diego.  I, after that, I

11   worked for a year and a quarter at the Salk Institute doing

12   general molecular biology in cell culture.  In 1975 I

13   entered a Ph.D. program at UCLA, and got my degree in

14   molecular biology, a Ph.D., in 1982.

15   Q.  And that was from UCLA?

16   A.  Yes, that's correct.

17   Q.  And did you -- how did you hear about Amgen?

18   A.  While finishing up my Ph.D. thesis at UCLA, I had the

19   opportunity to hear about Amgen forming.  There -- several

20   members of the scientific advisory board from Amgen were at

21   UCLA, and I knew some of them.  And I learned about this

22   scientific advisory board that was being recruited.  They

23   were a very impressive group of renowned scientists.

24          MR. SUH:  Your Honor, narrative.

25          THE COURT:  I'll simply stop it at that point.  Go
```

1    ahead, Mr. Gaede.

2    **Q.**   The scientific advisory board, did you know any of the

3    members of it?

4    A.   Yes, several personally.

5    **Q.**   Were there other reasons that you decided to join Amgen?

6    A.   I had also had the opportunity to meet the first CEO of

7    Amgen, Dr. George Rathmann, and he was a very impressive

8    man.   And it looked like it could be a very exciting,

9    interesting place to work.

10   **Q.**   When did you start?

11   A.   In October of '81.

12   **Q.**   What was the focus of your work when you first joined

13   Amgen?

14   A.   My primary assignment was to develop systems to produce

15   proteins or glycoproteins in mammalian cells.   That is cells

16   derived from mammals.   And most biotechnology work at that

17   point had been done with cells derived from bacteria.

18          **MR. SUH:**  Your Honor?

19          **THE COURT:**  So much of the answer as begins "most,"

20   that's stricken.   Disregard it.

21          Now, here again, just a heads-up, we're going to

22   learn about the background of this fellow and the like, but

23   as a matter of procedure, Amgen's putting him on the stand

24   not to proffer opinions about things, but because, you'll

25   see, and it's entirely up to you, maybe he was somewhere at

1    sometime that was -- has something to do with the case.  And

2    he may tell us what he did, what he saw, what he thought

3    then he was up to.  That roughly will be my line.

4         You may consider anything he testifies to, and

5    consider, like any other witness, if you believe it,

6    disbelieve it or believe parts of it.  Go ahead.

7         **THE WITNESS:**  I'm sorry, your Honor.

8         **THE COURT:**  No, you haven't done anything wrong.

9    You just go ahead, answer the questions honestly, that's all

10   that's asked of you.

11   **Q.**  Did you work on the EPO project in 1982, 1983?

12   A.  Yes, I did.

13   **Q.**  Can you describe for the members of the jury your

14   initial involvement in the EPO project in 1982?

15   A.  In addition to working on establishing systems for

16   producing products in mammalian cells, which we thought

17   might be useful to produce erythropoietin, I also worked

18   with Dr. Lin, assisting him in some of his cloning

19   strategies.

20   **Q.**  Was there a particular cloning strategy you were

21   assisting him with?

22   A.  I worked with Dr. Lin, I assisted Dr. Lin on two

23   different strategies.  One was to identify cells that

24   naturally secrete, produce erythropoietin.  If those cells

25   could be found, it would greatly facilitate cloning.

1     **MR. SUH:**  Objection, your Honor.

2     **THE COURT:**  See, I'm going to sustain the

3  objection.  You answered the question, and then you just

4  slid right on to say -- if those cells could be found

5  something or other.  Sustained.  Disregard it.

6     Listen to his questions, answer the questions fully

7  and completely, but just the questions he asks you.  Go

8  ahead.

9  A.  The second --

10     **THE COURT:**  No, no.  Go ahead, Mr. Gaede.

11  Q.  What was the second area that you worked on in the EPO

12  project in the first half of 1983?

13  A.  The second area or second strategy I was assisting

14  Dr. Lin with was identifying -- was attempting to induce the

15  production of mammalian cells in culture by treating them

16  with various chemicals.

17  Q.  Were either of those strategies that you just described,

18  to your understanding, successful?

19  A.  No, they were not.

20  Q.  The EPO project team, you were a member of the team?

21  A.  Yes, I was.

22  Q.  How did the team interact with each other, that you

23  observed?

24  A.  We met regularly, formally, but we also talked regularly

25  informally.  I worked in the same building, same floor, just

1    a one-floor building --

2    **Q.**  Can I stop you there for a second?  What building was

3    that at Amgen in 1983?

4    A.  Building 2.

5    **Q.**  Can you describe the layout of Building 2 in 1983?

6    A.  It was a single-floor building with several large, open

7    labs, where several scientists would work together in bays

8    in a large, open floor plan.

9    **Q.**  And --

10   A.  I, you know, I literally had to walk by Dr. Lin to get a

11   cup of coffee.

12   **Q.**  And so there was -- was there -- so there was some

13   informal communication?

14   A.  There was -- I constantly had informal communication

15   with my co--

16          **MR. SUH:**  Objection, your Honor.

17          **THE COURT:**  It wasn't timely.  That may all stand.

18   **Q.**  The EPO team meetings, can you describe those?

19   A.  We got together frequently, as I said.  And in these

20   meetings, the progress we made or not made on various

21   programs was discussed and reviewed and we decided --

22          **MR. GAEDE:**  Objection, your Honor.  This is

23   hearsay.

24          **THE COURT:**  Sustained as -- you described the

25   meetings but then you went on to start talking about what

1    was decided.

2    **Q.**  Was there any practice at the meetings in terms of

3    maintaining notes?

4    A.  Yes.

5    **Q.**  Can you describe that?

6    A.  Meeting minutes were maintained.  Different members of

7    the team would write the minutes, you know, for different

8    meetings, and those minutes were distributed.

9    **Q.**  Now, did there come a time when you understood that the

10   EPO gene had been cloned?

11   A.  Yes.

12   **Q.**  When was that, approximately?

13        **MR. SUH:**  Objection, your Honor.  This is hearsay.

14   No foundation.

15        **MR. GAEDE:**  State of mind, your Honor.

16        **THE COURT:**  No, sustained.

17   **Q.**  What was the next -- you described the first two areas

18   that you worked on in the EPO project.  What was the next

19   area that you worked on in the EPO project?

20   A.  After the EPO gene was cloned, my responsibility, given

21   to me by Dr. Lin, was to attempt to express or produce the

22   EPO.  We had the EPO gene, but not the EPO gene protein.  To

23   attempt to produce the EPO gene in mammalian cells in

24   culture.  That is cells --

25        **MR. SUH:**  Objection, your Honor.  This is happening

```
 1    again.

 2              THE COURT:  Yes, we'll sustain it at that point.

 3    Go ahead.

 4    Q.  When was this?  When did you start this work?

 5    A.  In November of 1983.

 6    Q.  And how did you approach your assignment in November of

 7    1983?

 8    A.  I had my first -- I ran my first experiments to -- in my

 9    attempts to produce erythropoietin from -- recombinant

10    erythropoietin from mammalian cells.  My first experiment is

11    in a cell line named LTK minus.

12    Q.  Can you describe what that experiment entailed?

13    A.  Dr. Lin provided me with a clone of the human

14    erythropoietin gene.  It was contained in a large gene

15    fragment named the lambda clone.

16              MR. SUH:  Objection.  This lacks foundation.

17              THE COURT:  Overruled.  That may stand.

18    A.  I --

19              THE COURT:  No, let's stop it there --

20              THE WITNESS:  I'm sorry.

21    Q.  After you had the EPO gene, what was the next step that

22    you performed in this experiment with LTK cells that you

23    described?

24    A.  I attempted to introduce the gene into this LTK minus

25    cells, and then grew these cells, and then I wanted to know
```

1    if the erythropoietin would be produced.

2    Q.  And was that experiment successful?

3    A.  No, it was not.

4    Q.  What did you do after this experiment failed?

5    A.  I discussed the results with others, including members

6    of the scientific advisory board, and I started a second

7    attempt at the first of the year.

8    Q.  Just to go back to that first experiment, to your

9    understanding, what are LTK cells?

10   A.  A mouse L cell.  Fiberglass line, I believe.

11   Q.  So was there a next experiment to make, to try to make

12   EPO?

13   A.  Yes.  My next attempt was started in January of 1984.

14   Q.  Now, do you have the binder there in front of you,

15   Doctor?

16   A.  Yes, I do.

17   Q.  Turn to Tab 4, please., Exhibit AUB.  Do you recognize

18   Exhibit AUB?

19            **MR. SUH:**  Excuse me, your Honor.

20            (Whereupon counsel conferred.)

21   Q.  Do you recognize Exhibit AUB?

22   A.  Yes, I do.

23   Q.  And what is it?

24   A.  It's one of my laboratory notebooks.

25   Q.  And what was your purpose in keeping a laboratory

1    notebook in January of 1984?

2    A.   To maintain a record of the work I did.

3    Q.   All right.  And did you have a practice of recording the

4    data from the work that you did in your laboratory notebook?

5    A.   Yes.

6    Q.   What was it?

7    A.   I tried to record the data of each day's work.

8    Q.   Okay.

9    A.   Each day.

10   Q.   And this is your laboratory notebook?

11   A.   Yes, that's my handwriting.

12          MR. GAEDE:  Your Honor, I'd offer Exhibit AUB.

13          MR. SUH:  Objection, your Honor.  This is hearsay.

14   There are statements here within this lab notebook that

15   constitutes hearsay.

16          THE COURT:  It's overruled.  It may be admitted.

17          THE CLERK:  Let me give you the number.

18          THE COURT:  AUB is admitted in evidence as

19   Exhibit --

20          THE CLERK:  Twenty-nine.

21          THE COURT:  -- 29.

22          (Exhibit marked in evidence.)

23   Q.   This is your original here?

24          MR. GAEDE:  May I approach, your Honor?

25          THE COURT:  You may.

1    **Q.** Is that the original laboratory notebook?

2    A. Yes, it is.

3          **MR. SUH:** Your Honor, under the best evidence rule,

4    we should probably have that notebook into evidence.

5          **THE COURT:** I think there's something to that.

6    That's what we'll mark.

7          **THE CLERK:** I'll give it back to you. I just want

8    to put a sticker on it.

9          **MR. GAEDE:** Protective of it.

10         **THE CLERK:** There you go.

11         **MR. GAEDE:** Thank you.

12   **Q.** There was an experiment in January of 1984. Can you

13   describe the first step of that experiment that you

14   performed, for the jury?

15   A. I received from Dr. Lin a different genetic fragment of

16   the human erythropoietin gene. It had less extraneous DNA,

17   and the gene was contained in a smaller fragment.

18   **Q.** Okay. What was the next step after that?

19   A. To transfect, or that is, put in the gene into these 293

20   cells.

21   **Q.** What did you understand 293 cells to be?

22   A. 293 cells are cells derived from a human embryonic

23   kidney.

24   **Q.** And were you recording the data from this experiment in

25   your laboratory notebook, which is Exhibit 29?

1    A.  Yes, I was.

2    Q.  I'd like to turn your attention to page 27 of the

3    laboratory notebook.

4    A.  I'm sorry, which page?

5            MR. GAEDE:  Your Honor, I wonder if I might trouble

6    you.  Thank you.

7            THE COURT:  And there's a pointer there.

8            THE WITNESS:  Thank you, sir.

9    Q.  Now, that's a copy of page 27 of your laboratory

10   notebook?

11   A.  Yes, sir.

12   Q.  Okay.  What does this page describe?

13   A.  It describes the results of the experiment I just was

14   speaking about.

15   Q.  This was the experiment in the COS 293 cells?

16   A.  No, no, this --

17   Q.  I mean the 293 cells?

18   A.  This was an experiment in 293 cells.

19   Q.  Are the results reported here on this page?

20   A.  Yes, they are.

21   Q.  Can you read the line there that starts "Eureka"?

22   A.  "Eureka, samples positive, mock negative."

23   Q.  What does that mean?

24   A.  Well, the test samples were positive for the presence of

25   recombinant human erythropoietin.  And control samples, ones

1    that had not received the gene from Dr. Lin, were negative,

2    as one hoped.

3    Q.  Why did you write "eureka"?

4    A.  I personally was excited.  This was a milestone for me.

5    I -- it was the first time that --

6         **MR. SUH:**  Objection, your Honor.

7         **THE COURT:**  Overruled.  He may tell us why he was

8    then excited.

9    A.  This was, for me, an important step in the EPO project,

10   to get expression of EPO in a mammalian cell.

11   Q.  The test results that you received here, what did they

12   tell you?

13   A.  They told --

14        **MR. SUH:**  Objection, your Honor.  The document

15   speaks for itself.

16        **THE COURT:**  No.  What did they tell him at that

17   time, sir.

18   Q.  At that time.

19        **THE COURT:**  We're going back to just what did you

20   derive from these test results.

21        **MR. SUH:**  Your Honor, may we have a brief sidebar?

22        **THE COURT:**  I don't think it's necessary.

23   Q.  Go ahead.

24   A.  They told me that the polypeptide portion of

25   erythropoietin had been detected in the cell culture media.

1    The test used in this case was a radioimmuno precipitation

2    assay, an antibody-based test that measured the protein

3    portion of the molecule.

4    **Q.**  Did you perform further experiments after this?

5    A.  Yes.

6            **MR. SUH:**  Your Honor, I really have to make a

7    point.  If we could have a brief sidebar.

8            **THE COURT:**  We could.

9    SIDEBAR CONFERENCE, AS FOLLOWS:

10           **MR. SUH:**  Your Honor, this witness is not a named

11   inventor.  This witness is interpreting lab notebooks, and

12   they're using it to create particular invention dates for

13   this patent.  He's not an inventor.

14           **THE COURT:**  He's a competent witness under 602.

15   You can examine him.  The fact that he's not named as an

16   inventor is not, in my mind, germane.

17           **MS. BEN-AMI:**  May I be heard, your Honor?

18           **THE COURT:**  Yes, you may.

19           **MS. BEN-AMI:**  I apologize.  Conception must be the

20   conception of the inventor.

21           **THE COURT:**  Oh, they may be getting themselves into

22   some problem with that.  But we're going to get the evidence

23   out.

24           **MS. BEN-AMI:**  Okay.

25           (Whereupon the sidebar conference concluded.)

1    **(BY MR. GAEDE:)**

2    **Q.**  Okay.  You were about to describe the next experiment.

3    Can you briefly describe this experiment?  I'll walk you

4    through a couple of steps.  Tell the jury what that next

5    experiment was?

6    A.  My next attempt to produce erythropoietin was to use the

7    cell line named COS cells.

8    **Q.**  And to your understanding, where does a COS cell come

9    from, at that time your understanding?

10   A.  COS cells are derived from a monkey kidney.

11   **Q.**  At this time, what was Dr. Lin's role in your work?

12        **MR. SUH:**  Objection, your Honor.  This is hearsay.

13        **THE COURT:**  Well, sustained on that foundation.

14   Sustained.  And at that conclusory level.  You may ask him

15   what he saw, things like that.

16        **MR. GAEDE:**  Sure.

17   **Q.**  Were you communicating with Dr. Lin at this time?

18   A.  Yes, I was.

19   **Q.**  And what were you discussing with Dr. Lin?

20        **MR. SUH:**  Objection, your Honor.  Hearsay.

21        **THE COURT:**  No, I'll sustain it on that ground.

22   **Q.**  All right.  You were speaking about the COS cell

23   experiment.  What was your first step in the COS cell

24   experiment?

25   A.  To move the erythropoietin gene clone from the plasmid

1    vector that Dr. Lin had given me, to a different plasmid

2    vector which would facilitate and help give higher levels of

3    production of the protein, and would work in COS cells.

4    Q.  And who made that vector you just described?

5    A.  I did.

6    Q.  What was the next step after you made the vector?

7    A.  To transfect, that is to introduce the D in vector, it's

8    a segment of DNA, into the cells, culture the cells, and

9    then determine if erythropoietin was secreted into the

10   media, the fluid in which the cells grew.

11   Q.  All right.  When did you perform this work?

12   A.  The spring of 1984.

13   Q.  This work of making the vector, is that in Dr. Lin's

14   patent?

15   A.  Yes, it is.

16   Q.  Is there a particular example there that describes --

17          MR. SUH:  Objection.  Objection, your Honor.  Lacks

18   foundation.

19          THE COURT:  Sustained.

20   Q.  Okay.  After you had, I believe, cultured the cell and

21   isolated the material, what was the next step in the

22   experiment you were performing in March of 1984 with COS

23   cells?

24          MR. SUH:  Objection, leading.

25          THE COURT:  No, overruled.  "What was the next

1    step."  That's appropriate.

2    A.  Have the material tested for the presence of recombinant

3    human erythropoietin by a variety of assays, so a variety of

4    different tests.

5    Q.  And after you provided the material for testing, what

6    did you do next?

7    A.  I considered the results.

8    Q.  What did you consider the results to show at that time

9    in March of 1984?

10   A.  That biologically active recombinant human

11   erythropoietin had been produced by these COS cells.

12   Q.  What were your interactions with Dr. Lin at this time in

13   March of '84?

14          **MR. SUH:**  Objection.  Objection.

15          **THE COURT:**  Well, I'm not so sure what that is.

16   What were your interactions -- you can ask a more precise

17   question.

18   Q.  Did you speak with Dr. Lin in March of 1984?

19   A.  Yes.

20   Q.  How far away was Dr. Lin's laboratory space from your

21   laboratory space in Building 2 at Amgen in March of 1984?

22   A.  Twenty-five, thirty feet.

23   Q.  What did you speak about?

24          **MR. SUH:**  Objection.

25          **THE COURT:**  Sustained.

1    **Q.**  Were there EPO team meetings at that time?

2    A.  Yes, there were.

3    **Q.**  Did you report the results of your work at the EPO team

4    meetings?

5    A.  Yes, I did.

6    **Q.**  Was there any response to that work?

7              **MR. SUH:**  Objection.

8              **THE COURT:**  Wait one second.  Sustained.  The team

9    meeting reports have been put in evidence.

10   **Q.**  Now, Doctor, I'd like to, if you could, turn to Tab 35

11   in your binder.  This is Exhibit CGQ.  Do you recognize

12   Exhibit CGQ?

13   A.  Yes, I do.

14   **Q.**  What is it?

15   A.  It's one of the EPO team meeting minutes.

16   **Q.**  Did you receive Exhibit CGQ in early April 1984?

17   A.  Yes, I did.

18   **Q.**  What did you do with it?

19   A.  I read it.  I saved it.

20             **MR. GAEDE:**  Your Honor, at this time I'd move

21   Exhibit CGQ in evidence.

22             **MR. SUH:**  Objection, your Honor.  Hearsay within

23   hearsay.

24             **THE COURT:**  All right.  Let me look at it.

25             **MR. SUH:**  And lack of foundation.

1          **THE COURT:**  No, overruled.  It's admitted.  CGU is

2     admitted --

3          **THE CLERK:**  What are the letters?  CDQ or --

4          **MR. GAEDE:**  CGQ.

5          **THE CLERK:**  CGQ.

6          **THE COURT:**  Just one moment.  I'm looking at the

7     wrong document.  Could I be given a copy of the document?

8          **MR. GAEDE:**  I'm sorry, your Honor.

9          **THE COURT:**  What tab is it?

10         **MR. GAEDE:**  Tab 35 in your binder, please.  I also

11    have one right here, if you'd like it.

12         **MR. SUH:**  And your Honor, I renew my objection.

13         **THE COURT:**  It's noted, of course.

14         Overruled.  CGQ is admitted in evidence Exhibit 30.

15         (Exhibit marked in evidence.)

16    **Q.**  On the first page there, the J. Browne, that's you,

17    Doctor?

18    A.  Yes, that's me.

19    **Q.**  Okay.  And could you go to the second page of the

20    exhibit, please.  And there under "Joan Egrie," could you

21    please read the first sentence?

22         **MR. SUH:**  Objection, your Honor.

23         **THE COURT:**  It's in evidence, it may be read.

24    A.  "Human COS cell expressed EPO in the in vivo assay is

25    less active than monkey COS cell expressed material."

1  Q.  Now, could you please turn to Tab 6 in your binder.  And

2  before we do that, go into that, what involvement, if any,

3  did Dr. Lin have in your work at this time in late March,

4  early April 1984?

5       MR. SUH:  Objection.  Lacks foundation, hearsay.

6       THE COURT:  Sustained.

7  Q.  Did Dr. Lin have any role in your work?

8       MR. SUH:  Same objection.

9       THE COURT:  Well, it's at a level of generality.  I

10  think we should go step by step.  You sewed the proximity,

11  you, May say, And on such-and-such a day, you know, where

12  was he?  How frequently did you talk?

13       MR. GAEDE:  Okay.

14       THE COURT:  What sort of instruction -- well, I

15  don't know about that, the substance.  You see what I mean.

16  Q.  How often were you and Dr. Lin communicating in early

17  April 1984?

18       MR. SUH:  Objection.

19       THE COURT:  Overruled.

20  A.  Nearly daily, at least.

21  Q.  And were you discussing your work?

22  A.  Yes.

23       THE COURT:  Sustained.  You're leading the witness.

24  Q.  What communications, if any, with Dr. Lin did you

25  have --

1          **MR. SUH:**  Objection.

2          **THE COURT:**  Sustained, going for hearsay.  They

3     were communicating.

4     **Q.**  Let's go to Tab 6, Exhibit CGU.  Do you recognize

5     Exhibit CGU?

6     **A.**  Yes, I do.

7     **Q.**  What is it?

8     **A.**  It's minutes from a different EPO team meeting.

9     **Q.**  All right.  You recognize this document?

10    **A.**  Yes, I do.

11    **Q.**  And did you receive it in about April 11th, 1984?

12    **A.**  Yes, I did.

13    **Q.**  What did you do with it?

14    **A.**  Read it, reviewed it, saved it.

15    **Q.**  Okay.

16          **MR. GAEDE:**  Your Honor, I'd offer Exhibit CGU into

17    evidence.

18          **MR. SUH:**  Objection, your Honor.

19          **THE COURT:**  Overruled.  Maybe not.

20          What was the practice at Amgen with respect to

21    keeping these records?  Well, let me back off from that.

22          Did Amgen have some sort of practice with respect

23    to keeping these team meeting records?

24          **THE WITNESS:**  Amgen -- you're asking me about

25    Amgen.  Amgen kept the records --

1          **THE COURT:**  Well, you were there, right?

2          **THE WITNESS:**  I was there, yes.

3          **THE COURT:**  That's why I'm asking.

4          **THE WITNESS:**  Amgen kept the records, and those of

5     us who received the records, some of us were more faithful

6     than others at maintaining those records.

7          **THE COURT:**  But at least, your understanding, the

8     practice was they kept the records of each team meeting?

9          **THE WITNESS:**  Yes.  Yes.

10         **THE COURT:**  All right.  Now, and this one, and the

11    other one you were just shown, these are records that, so

12    far as you know, are kept according to that practice?

13         **THE WITNESS:**  Yes, sir.

14         **THE COURT:**  Overruled.  CGU is admitted and the --

15    and it will he Exhibit 31.

16         (Exhibit marked in evidence.)

17         **MR. GAEDE:**  Can we publish the exhibit, please.

18    **Q.**  There under "Discussion," could you read the

19    first sentence, please?

20    A.  "The problem of glycosylation was discussed at length."

21    **Q.**  Was that a topic of discussion at the EPO team meetings?

22         **MR. SUH:**  Objection.

23         **THE COURT:**  Sustained.  Don't lead the witness.

24         **MR. GAEDE:**  Okay.  I'm sorry, your Honor.

25    **Q.**  What issues were discussed?

1          **MR. SUH:**  Objection.

2          **THE COURT:**  Sustained.  Calls for hearsay.

3    **Q.**  Were you aware of any problems of glycosylation in early

4    April 1984 with respect to EPO in connection with your work?

5          **MR. SUH:**  Objection, leading.

6          **THE COURT:**  The work that you did.

7          **THE WITNESS:**  Yes.

8          **THE COURT:**  Just so I'm clear, the work, the actual

9    work, hands-on work that you did, did that involve

10   glycosylation?

11         **THE WITNESS:**  Yes.

12         **THE COURT:**  And tell us how glycosylation was

13   involved in your work at that time.

14         **THE WITNESS:**  My work, I was -- I'm sorry, sir, I

15   was introducing the gene in the mammalian cells under

16   different conditions, different experiments, and testing

17   whether the -- and having tested whether the product,

18   whether recombinant human erythropoietin was made, was it

19   active, was it glycosylated.

20         **THE COURT:**  And what did you find out in that time

21   period relative to what you, not other people, at Amgen,

22   you, with respect to glycosylation?

23         **THE WITNESS:**  When we found out --

24         **THE COURT:**  You say "we."

25         **THE WITNESS:**  I'm sorry, I keep doing that.

1          **THE COURT:**  Everyone does, but I have to follow the

2     rules.  What did you do, find out?

3          **THE WITNESS:**  I found out with the results of the

4     assays that were done in March, April 1984 --

5          **MR. SUH:**  Objection, your Honor.

6          **THE COURT:**  Overruled.  He can tell us what he

7     found out then.

8          **MR. SUH:**  Your Honor, may we have a brief sidebar?

9          **THE COURT:**  No.

10         **MR. SUH:**  I believe the witness is not testifying

11    on what he did.

12         **THE COURT:**  He says he is, and you'll get a chance

13    to ask questions.  So what did you find out?

14         **THE WITNESS:**  The results of the experiments showed

15    me that biologically active recombinant erythropoietin was

16    produced.  And that meant to me --

17         **MR. SUH:**  Objection, your Honor.

18         **THE COURT:**  No, overruled.  But I understand his --

19    and you're under oath, so now to be accurate, what I'm --

20    you had access to experiments done by other people; right?

21         **THE WITNESS:**  May I kind of expand?

22         **THE COURT:**  Yes, you may.

23         **THE WITNESS:**  This was a collaborative program.

24    And I worked in collaboration with scientists, other

25    scientists.

1          THE COURT:  Right.

2          THE WITNESS:  So I would hand off my samples to

3    others for assays, and they would report back to me.  And we

4    worked as a collaborative group.

5          THE COURT:  Now --

6          THE WITNESS:  To be clear.

7          THE COURT:  That's fine.  I will allow you to tell

8    the jury what you derived from the experimentation at that

9    time relative to glycosylation.  What you derived, but not

10   what other people told you about glycosylation.  What you

11   derived from looking at the results as they were set forth

12   scientifically.

13         THE WITNESS:  So as I interpreted the results, is

14   that fair, sir?

15         THE COURT:  It is fair.

16         THE WITNESS:  As I interpreted the results that

17   came to me about the recombinant human erythropoietin that I

18   produced in these cells, I understood it.  I interpreted it

19   to mean that we had biologically active recombinant

20   erythropoietin which must have carbohydrate close enough to

21   the natural to allow it to be biologically active.

22   Q.  Thank you.  Did you continue to perform experiments in

23   mammalian cell expression?

24   A.  Yes, I did.

25   Q.  What was the next set of experiments that you performed?

1   A.  To introduce the EPO gene in a different cell line.

2   Q.  What was that cell line?

3   A.  Chinese hamster ovary cells, or CHO cells.

4   Q.  Why did you try Chinese hamster ovary cells to make EPO

5   in?

6   A.  Chinese hamster ovary cells, cells derived from a

7   Chinese hamster ovary, had some potential advantages, and

8   some -- but also some potential disadvantages for producing

9   recombinant human erythropoietin.

10          MR. SUH:  Objection, your Honor.  This is expert

11  testimony.

12          THE COURT:  Yeah.  No, this is what he thought at

13  the time.  Is it?

14          THE WITNESS:  Yes, sir.

15          THE COURT:  Just what you thought at the time.

16          THE WITNESS:  Yes, your Honor.

17  Q.  So what did you think the potential advantages were to

18  CHO cells at the time?

19  A.  They, and I had previous experience, they had the

20  ability to take up the DNA and stably integrate it, make it

21  a stable part of their DNA, so that any gene product would

22  be produced continuously rather than just for a few days.

23  And secondly, there was a genetic trick available that it

24  would allow me to amplify, increase the number of copies of

25  the EPO gene within the cells and hopefully to increase the

1    rate of production.

2    **Q.**  When did you perform the first set of experiments with

3    CHO cells at Amgen in 1984?

4    A.   The first step that we did, that I did, along with my

5    technicians --

6    **Q.**  When was the time frame, then we'll ask the step.  What

7    was the time frame?

8    A.   The first transfection into CHO cells, the first

9    introduction was in the very end of April 1984.

10   **Q.**  Now, you mentioned that you thought there were

11   disadvantages to CHO cells.  Can you state what you thought

12   in April and May of 1984 were the disadvantages to CHO

13   cells?

14         **MR. SUH:**  Objection, your Honor.  Getting into

15   expert testimony.

16         **THE COURT:**  Overruled.  He may tell us what he

17   thought then.

18         What you thought then.

19   A.   Chinese hamster ovary cells, as I said, were derived

20   from the ovary of a hamster.  That is a very specialized

21   cell type, very different from kidney cells, human kidney

22   cells, from which natural erythropoietin, I thought, came

23   from.  And so I didn't know and I wanted to run experiments

24   to find out if those cells would be able to make, at the

25   carbohydrate on the erythropoietin protein in a manner such

1    that we could obtain biological activity.  And secondly --

2              **MR. SUH:**  Objection, your Honor.  It's narrative.

3              **THE COURT:**  No, overruled, you may continue.

4    A.  And so I said specialized cells, kidney cells versus

5    ovary cells, and two very different species.  My previous

6    work had been to make EPO --

7              **MR. SUH:**  Objection, your Honor.

8              **THE COURT:**  So much of the answer as begins, "My

9    previous work," that's stricken.

10             **THE WITNESS:**  I'm sorry.

11             **THE COURT:**  Disregard it.

12   A.  Uhm --

13             **THE COURT:**  No, no.  Now he'll ask you another

14   question.

15   **Q.**  Okay.  You said there was a second concern you had in

16   April of 1984.  Can you describe your concern in April of

17   1984 with respect to the CHO cells?

18   A.  A hamster is not a primate.  These cells come from a

19   species that it was much further distance --

20             **MR. SUH:**  Objection, your Honor.  We're getting

21   into expert testimony.

22             **THE COURT:**  Yeah, sustained, as "these cells come,"

23   strike that out.

24   **Q.**  So what was the first step in the experiment?

25   A.  The first step in the experiment was to move the gene

1    that I had obtained from Dr. Lin into a new expression

2    vector to allow efficient expression of the gene in these

3    mammalian cells.

4    **Q.**  When was that done?

5    A.  That work was done in the spring of 1984, from February

6    through April.

7    **Q.**  What was the next step in the experiment with CHO cells

8    to make human EPO?

9    A.  The transfection, the introduction of this DNA, which

10   was the genomic gene for EPO, which was now in this new

11   vector, into CHO cells, and that was the one I referred to

12   earlier was done at the very end of April 1984.

13   **Q.**  What was the next step you performed in this experiment?

14   A.  To grow those cells in culture, select those cells which

15   had taken up the gene, and have the media, the cells, have

16   the media, the fluid the cells grow in, tested for the

17   presence of recombinant human erythropoietin.

18   **Q.**  Did you isolate media from the CHO cells?

19   A.  Yes, I did.

20   **Q.**  And did you give that to someone at Amgen?

21   A.  Yes, I did.

22   **Q.**  And what was your purpose in giving it to that person?

23   A.  To determine if there was recombinant human

24   erythropoietin in this culture media.

25   **Q.**  And were results of this test reported back to you?

```
1    A.  Yes, they were.

2              MR. SUH:  Objection.

3              THE COURT:  Sustained, leading.  The answer's

4    stricken.

5    Q.  What happened next in your CHO cell experiment?

6              MR. SUH:  Objection, your Honor.  These questions

7    are --

8              THE COURT:  No, overruled.  To your own personal

9    knowledge.

10   Q.  Own personal knowledge.

11             THE COURT:  What happened next, so far as you

12   yourself know?

13             THE WITNESS:  I'm a little uncertain of the

14   question.  Can I talk --

15             THE COURT:  Then ask a different one.

16   Q.  The media, you collected the media.  What did you do

17   with the media?

18   A.  I had -- I gave it to a colleague for analysis.

19   Q.  All right.  And did you ever receive the results of that

20   analysis?

21             MR. SUH:  Objection.

22             THE COURT:  Sustained.  You're leading the witness.

23   What happened to the results, so far as you know?

24   Q.  What happened to the results?

25             MR. GAEDE:  Thank you, your Honor.
```

1              THE WITNESS:  Thank you, sir.

2     A.   The media was positive --

3              THE COURT:  No, what happened to the results?

4     Where did -- who did they come to?  Where did they go?

5              MR. SUH:  Move to strike, your Honor.

6              THE COURT:  We'll see.

7     Q.   What happened to the results?

8     A.   The results were reported back to all the scientists who

9     were in this collaborative project, myself included.

10             THE COURT:  And when you saw them, what did you

11    think of them?

12             THE WITNESS:  I was gratified that we had taken the

13    next step, that we had demonstrated that CHO cells can

14    produce --

15             MR. SUH:  Objection.

16    A.   -- recombinant human erythropoietin.

17             THE COURT:  No, that -- overruled.

18             THE WITNESS:  I'm sorry, sir.

19             THE COURT:  Overruled, his answer may stand.  Go

20    ahead.

21    Q.   Did work continue with CHO cells in making human EPO at

22    Amgen, to your knowledge, in May, June, July of 1984?

23    A.   Yes, it did.

24    Q.   And this was work you were doing?

25    A.   This is work that I was personally doing with the

1    assistance of my research assistants.

2    Q.   All right.  Now can you turn to Tab 34 in your binder,

3    and this is Exhibit ASB.  Do you recognize Exhibit ASB?

4    A.   This is, yet again, another EPO team meeting minutes.

5    Q.   And was it still your practice in August of -- what was

6    your practice in August of 1984 with respect to attending

7    EPO meetings?

8            MR. SUH:  Objection, leading.

9            THE COURT:  "What was your practice," it's not.

10   Overruled.

11   A.   I attended every meeting I possibly could.

12   Q.   Okay.  And at this time in August, were meeting minutes

13   being prepared?

14   A.   Yes, they were.

15   Q.   And could you let me know if you recognize Exhibit ASB?

16   A.   I do.

17   Q.   What is it?

18   A.   EPO team meeting minutes.

19   Q.   What's the date on these?

20   A.   The date of the meeting is August 22nd, the date of

21   distribution of the minutes is August 27th.

22   Q.   And on the third page there, is that your name, on the

23   distribution list?

24   A.   Yes, it is.

25   Q.   And do you recall receiving this document in August of

1    1984?

2    A.  Yes, I do.

3    **Q.**  What did you do with the document?

4    A.  I read it.  I saved it.

5         **MR. GAEDE:**  Your Honor, we would offer Exhibit ASB

6    into evidence.

7         **MR. SUH:**  Objection, your Honor.  Hearsay, 602, and

8    the witness didn't attend the meeting.

9         **THE COURT:**  Overruled.  It's admitted, ASB in

10   evidence, Exhibit 32.

11        (Exhibit marked in evidence.)

12        **THE CLERK:**  Is it ASB or V?

13        **MR. GAEDE:**  ASB.

14        **THE COURT:**  ASB, as in boy.

15        **THE CLERK:**  Thank you.

16        **MR. GAEDE:**  Could you highlight under mammalian

17   expression, J. Browne?

18   **Q.**  Could you read to the jury the second paragraph there,

19   please, Doctor?

20   A.  "The initial in vivo assay result for human EPO sample 4

21   in 7/27/84 minutes, (RIA from three estimates gave 1800

22   units per ml) is 1204 units per ml, i.e., 67 percent active

23   in vivo."

24   **Q.**  Did your efforts to make EPO in CHO cells continue into

25   the fall of 1984?

1   A.  Yes, they did.

2   Q.  And did there come a time in November of 1984 when your

3   job responsibilities changed?

4   A.  Yes, they did.

5   Q.  Can you describe for the jury what that change in your

6   job responsibilities was?

7   A.  In addition to maintaining my job on mammalian cell

8   expression of EPO, I also assumed the responsibility for

9   taking the product to the next step; that is, developing it

10  to a commercial product, overseeing all aspects of the

11  development of it as a commercial product.  In particular,

12  filing all the documents --

13          MR. SUH:  Objection, your Honor.  There's no

14  question for this.

15          THE COURT:  No, overruled.  He's describing what

16  his work was.

17  A.  And my assignment was to oversee and guide the filing of

18  all the documents necessary with the FDA to obtain

19  approval -- to test and obtain approval for recombinant

20  human erythropoietin.

21  Q.  And as the product team leader, what areas of knowledge

22  did you need to obtain in order to perform your job

23  functions?

24  A.  Well, I had to oversee and approve all aspects of the

25  production process in order so we could submit the data to

1   the FDA and oversee and participate in the clinical trials.

2   And again, for submission to the FDA.  And just was involved

3   in all aspects of all filings with the FDA.

4   **Q.**  How were you involved in Amgen's clinical -- in the

5   first clinical trial for Amgen for recombinant human

6   erythropoietin?

7           **MR. SUH:**  Objection.  Leading, lacks foundation.

8           **MR. GAEDE:**  I'll withdraw the question.

9           **THE COURT:**  Sustained, not on the fact that it's

10  leading, but it does lack foundation.

11  **Q.**  Did Amgen perform a clinical trial with recombinant

12  human EPO, to your knowledge?

13  **A.**  Yes, several.

14  **Q.**  Okay.  When was the first one?

15  **A.**  In the late fall of 1985.

16  **Q.**  What was your involvement in that first clinical trial?

17  **A.**  I helped design the clinical trial.  I helped review

18  the -- and analyze the data from that clinical trial.  I

19  helped write up the reports for publication in scientific

20  literature.  And I helped write up the reports for

21  submission to the FDA.

22  **Q.**  Were you an author on the publication for that clinical

23  trial?

24  **A.**  Yes, I was.

25  **Q.**  Can we -- it's already in evidence, Exhibit 20, at tab

1    24 in your binder.

2          Do you recognize Exhibit 20?

3    A.  Yes, I do.

4          **MR. SUH:**  Your Honor, may we have a brief sidebar

5    with respect to this exhibit?

6          **THE COURT:**  You may.

7    SIDEBAR CONFERENCE, AS FOLLOWS:

8          **MR. SUH:**  Your Honor, this whole line of

9    questioning with respect to clinical trials is not relevant.

10   We don't think this witness has ever established that the

11   patents in suit were even covering this particular study.

12   So, therefore, we don't see the relevance of this line of

13   questioning.

14         **THE COURT:**  What is the relevance?

15         **MR. SUH:**  This person is not an inventor.

16         **THE COURT:**  What is the relevance of this?

17         **MR. GOTTFRIED:**  Your Honor, we're first showing the

18   clinical trial results leading to the approval of EPOGEN --

19   it's foundational -- by the FDA.

20         **THE COURT:**  Foundational to what?

21         **MR. GOTTFRIED:**  In terms of the efforts that went

22   into leading up to the approval of EPOGEN by the FDA.

23         **THE COURT:**  Why is that relevant?

24         **MR. GOTTFRIED:**  Because EPOGEN is the commercial

25   embodiment covered by the scope of claims.  We've made an

1    offer of proof and submitted it to --

2              THE COURT:  Are you going to challenge that?

3              MR. SUH:  Yes.

4              THE COURT:  If you're going to challenge it,

5    they're entitled to prove it, aren't they?

6              MR. SUH:  It hasn't been proven.  There's no

7    assumption that that's actually been made with this

8    particular witness.  It lacks foundation.

9              THE COURT:  Well, I'll have to listen to the

10   questions.  I can only go question by question.

11             MR. SUH:  That's my exhibit.

12             MR. GAEDE:  Oh, I'm sorry.  That's yours.

13             (Whereupon the sidebar conference concluded.)

14   (BY MR. GAEDE:)

15   Q.  You're the Jeffrey K. Browne there on the article?

16   A.  Yes, that's me.

17             MR. GAEDE:  And could we please go to Figure 3 on

18   page 4 of the article.

19             THE COURT:  I guess I'm not clear.  Is this

20   received in evidence?

21             MR. GAEDE:  Yes, it is.

22             THE COURT:  Oh, very well.

23             MR. GAEDE:  Exhibit 20, your Honor.

24             THE COURT:  Thank you.

25   Q.  Did you participate in creating Figure 3?

1    A.  Yes, I did.

2    **Q.**  And what does this figure show?

3    A.  This figure shows --

4         **MR. GAEDE:**  Objection, your Honor.

5         **THE COURT:**  Sustained.  Not what he happens to know

6    now, but when he participated in creating it, what was he

7    trying to show, given the knowledge back then, whenever this

8    article came out, that he was setting forth.

9         What did you think you were setting forth at the

10   time you participated in that article?

11        **THE WITNESS:**  I was trying to communicate to the

12   scientific community the results of the Phase I, II,

13   clinical trial in summary form.

14   **Q.**  And what did you understand those results to be at that

15   time?

16        **MR. SUH:**  Objection, your Honor.

17        **THE COURT:**  Overruled.

18        **THE WITNESS:**  May I explain the graph, the graph?

19        **THE COURT:**  He didn't ask, so -- instead, he asked

20   what did you understand the results to be, back at that

21   time.  You may testify to that.

22   A.  I understood from the results of this graph that a

23   recombinant human erythropoietin at the two highest dosage

24   groups was able to fully correct the anemia of chronic renal

25   failure, taking the patients from hematocrit of 40, half the

1   normal hematocrit, to -- a hematocrit of 20, half the normal

2   hematocrit, to a hematocrit of 40, a normal hematocrit,

3   fully curing their anemia chronic renal failure.

4          **MR. SUH:**  Objection.

5          **THE COURT:**  The business about "fully curing,"

6   strike that out.  Disregard that.

7          You're not a nephrologist, are you?

8          **THE WITNESS:**  I am not a nephrologist.  Very close

9   to a nephrologist.

10         **THE COURT:**  Very close to it.  Strike it out, with

11  all respect.

12         We'll stop taking testimony at this time and I want

13  you to have a good weekend.  Keep your minds suspended.  Do

14  not discuss the case either among yourselves nor with anyone

15  else.

16         Because we're up to the weekend -- and I do want

17  you to have a good weekend, we're right on track here.

18  There may be, I'm not seeing any, but there may be some

19  report in the press, either the electronic or the print

20  press.  If there is, you stay away from it entirely because

21  the whole integrity of all our investment in these

22  proceedings would then be at issue.  I know I can trust on

23  you.

24         We'll see you right here 9:00 Monday morning.  Have

25  a good weekend.  The jury may recess.  I'll remain on the

 1    bench.

 2         **THE CLERK:**  All rise for the jury.

 3         (Whereupon the jury left the courtroom.)

 4         **THE COURT:**  Please be seated.  You may step down,

 5    sir.

 6         (Whereupon the witness stepped down.)

 7         **THE COURT:**  So ends the 13th day of trial in this

 8    case.  The total elapsed time, out of the ten days allotted

 9    to each party, is Amgen's used up six days and Roche has

10    used up seven.

11         Now, I say this really in a spirit of cooperation.

12    I assume that you want the last day to be devoted to

13    arguments and charge.  So that means that there's a half a

14    day gone from each of your calculus right there of what's

15    left.  We're not done the validity defenses yet, and we have

16    infringement to go.  Don't think I'm changing these times.

17         The case, now maybe Roche is to the jury on its

18    validity defenses and we have the repost there, we'll see

19    when all -- when the record's in.  So far we have no

20    evidence of infringement, not a bit, so Amgen's going to

21    have to put in some evidence of infringement.  Mention was

22    made of inequitable conduct.  We'll see if we ever get

23    there.

24         You people are burning up your time at a rate that

25    is, I think, excessive.  But I've been very careful to lay

1    out all the times, and lay them out well in advance, and I'm

2    sticking to them.  This case goes to the jury on the

3    Thursday, the 18th of October.

4            We'll recess until Monday.  We'll recess.

5            **THE CLERK:**  All rise.  Court is in recess.

6            (Adjournment.)

7                      **C E R T I F I C A T E**

8

9

10           We, Donald E. Womack and Cheryl B. Palanchian,

11   Official Court Reporters for the United States District

12   Court for the District of Massachusetts, do hereby certify

13   that the foregoing pages are a true and accurate

14   transcription of our shorthand notes taken in the

15   aforementioned matter to the best of our skill and ability.

16

17

18           /S/ DONALD E. WOMACK

19           _____

20           /S/ CHERYL B. PALANCHIAN

21           _____

22               DONALD E. WOMACK
             CHERYL B. PALANCHIAN
             Official Court Reporters
             P.O. Box 51062
23       Boston, Massachusetts 02205-1062
             womack@megatran.com

24

25