1            UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF MASSACHUSETTS
2
                                    Civil Action
3                                   No. 05-12237-WGY

4    * * * * * * * * * * * * * * * *
                                    *
5    AMGEN, INC.,                   *
                                    *
6            Plaintiff,             *
                                    *   **DAILY TRANSCRIPT**
7    v.                             *   **OF THE EVIDENCE**
                                    *     (Volume 14)
8    F. HOFFMANN-LA ROCHE LTD,      *
     ROCHE DIAGNOSTICS GmbH and     *
9    HOFFMANN-LA ROCHE, INC.,       *
                                    *
10           Defendants.            *
                                    *
11   * * * * * * * * * * * * * * * *

12

13

14           BEFORE:  The Honorable William G. Young,
                      District Judge, and a Jury
15

16

17

18

19

20

21

22

23
                            1 Courthouse Way
24                          Boston, Massachusetts

25                          October 1, 2007

1              A P P E A R A N C E S

2

3          DUANE MORRIS LLP (By D. Dennis Allegretti,
    Esq. and Michael R. Gottfried, Esq.), 470 Atlantic
    Avenue, Suite 500, Boston, Massachusetts 02210
4              - and -
          DAY CASEBEER MADRID & BATCHELDER, LLP (By
5   Lloyd R. Day, Jr., Esq., David M. Madrid, Esq. and
    Robert M. Galvin, Esq.) 20300 Stevens Creek
6   Boulevard, Suite 400, Cupertino, California 95014
               - and -
7          McDERMOTT WILL & EMERY (By Michael Kendall,
    Esq.), 28 State Street, Boston, Massachusetts
8   02109
               - and -
9          McDERMOTT WILL & EMERY (By William G.
    Gaede, III, Esq.), 3150 Porter Drive, Palo Alto,
10  California 94304
               - and -
11         MARSHALL, GERSTEIN & BORUN LLP (By Kevin M.
    Flowers, Esq.), 6300 Sears Tower, 233 S. Wacker
12  Drive, Chicago, Illinois 60606-6402
               - and -
13         STUART L. WATT and WENDY A. WHITEFORD, Of
    Counsel, Amgen, Inc., One Amgen Center Drive,
14  Thousand Oaks, California 91320-1789, on behalf of
    the Plaintiff
15
          BROMBERG & SUNSTEIN LLP (By Lee Carl
16  Bromberg, Esq. and Julia Huston, Esq.), 125 Summer
    Street, Boston, Massachusetts 02110
17             - and -
          KAYE SCHOLER LLP (By Leora Ben-Ami, Thomas
18  F. Fleming, Esq., Patricia Carson, Esq.,
    Christopher Jagoe, Esq. and Howard Suh, Esq.),
19  425 Park Avenue, New York, New York 10022, on
    behalf of the Defendants

20

21

22

23

24

25

1                    **I N D E X**

2

WITNESS:              DIRECT   CROSS    REDIRECT   RECROSS

3

4    JEFFREY K. BROWNE, Resumed

5        By Mr. Gaede    1953              1984

6        By Mr. Suh              1972

7    LEROY E. HOOD, By Deposition

8                        1984

9    EUGENE GOLDWASSER, Recalled

10       By Mr. Flowers   1995             2016

11       By Ms. Ben-Ami          2013

12   CARLO BRUGNARA

13       By Mr. Madrid    2018             2075

14       By Mr. Fleming          2044               2079

15   THOMAS W. STRICKLAND

16       By Mr. Flowers    2085

17

18

19

20

21

22

23

24

25

1          THE CLERK:  All rise for the jury.

2          (Whereupon the jury entered the courtroom.)

3          THE CLERK:  Court is in session, please be seated.

4          THE COURT:  Good morning, ladies and gentlemen.

5          THE JURY:  Good morning.

6          THE COURT:  Thank you so much.  You really have set

7     the tone for these proceedings.  And we are all prepared,

8     and if you'll remind the witness that he's under oath.

9          THE CLERK:  Sir, I remind you, you are still under

10    oath.

11         THE WITNESS:  Yes, ma'am.

12         THE COURT:  Mr. Gaede, please continue.

13         MR. GAEDE:  Thank you, your Honor.

14              JEFFREY K. BROWNE, Resumed

15         **DIRECT EXAMINATION** (Cont'd)

16    BY  MR. GAEDE

17    Q    Dr. Browne, on Friday we were finished on the first

18    clinical trial.  What was the next step in the EPO project?

19    A    There was a subsequent clinical trial.

20    Q    When was that, approximately?

21    A    In '86, '87.

22    Q    And were you involved in that clinical trial?

23    A    Yes.  As with the first, I helped design and analyze the

24    data and write up results for publication.

25         MR. SUH:  Objection, your Honor; hearsay.

1          **THE COURT:**  No, that may stand.  But put another

2    question.

3    **Q**   You said you reviewed results on the trial.  When did

4    you review results on the trial?

5    **A**    In 1987, in preparation for writing up our product

6    license application.

7    **Q**   Okay.  You had testified earlier that you had regulatory

8    responsibilities as head of the EPO product team.  Can you

9    please describe those for the jury?

10   **A**   I was involved in all aspects of the regulatory filings,

11   including preparing the product license application.  I

12   wrote many parts of it and I reviewed every part of it.

13   **Q**   You keep referring to -- you've referred to the product

14   license application.  What is the specific product license

15   application that you're referring to?

16   **A**   For recombinant human erythropoietin.

17   **Q**   Were you involved in the preparation of Amgen's product

18   license application for recombinant human erythropoietin?

19   **A**    Yes, I was.

20   **Q**   And what role did you play in the preparation of the

21   product license application?

22   **A**   I reviewed all of it and I wrote the first draft of

23   several sections.

24   **Q**   Can you describe in more detail the effort that you

25   observed going into preparing the product license

1    application?

2              **MR. SUH:**  Objection.

3              **THE COURT:**  I'm not sure -- he may tell us what he

4    observed, not what people told him.

5              **MR. GAEDE:**  Exactly, your Honor.

6              **THE COURT:**  Overruled.  What did you observe?  What

7    did you actually see?

8              **THE WITNESS:**  I, and many of my colleagues, were

9    sequestered for 93 days in a motel and I, along with my

10   colleagues, worked on preparation of the product license

11   application.  As I mentioned, I wrote several sections and I

12   reviewed everything.

13   **Q**   When was the product license application submitted to

14   the Food and Drug Administration to your knowledge?

15   A    On October 30th, 1987.

16   **Q**   And that was for what product again, sir?

17   A    Recombinant human erythropoietin whose tradename is

18   EPOGEN.

19   **Q**   Did the FDA approve EPOGEN?

20   A    Yes, it did.

21   **Q**   And when did it do that to your understanding?

22   A    June 1989.

23   **Q**   And after approval what did Amgen do with EPOGEN?

24   A    Commercialized the product.

25   **Q**   Do you recognize this, Doctor?

1    A    Yes, I do.

2    **Q**    What is it?

3    A    It's a vial of EPOGEN, or recombinant human

4    erythropoietin.

5    **Q**    Now, were you familiar with the contents of a vial of

6    EPOGEN in 1989?

7    A    Very.

8    **Q**    Why were you familiar with the contents of a vial of

9    EPOGEN in 1989?

10            **MR. SUH:**  Objection, your Honor; relevance,

11    foundation.

12            **THE COURT:**  Yes, sustained.  I don't see why this

13    is relevant.

14            **MR. GAEDE:**  Your Honor, may I have a side bar,

15    please?

16            **THE COURT:**  You may.

17    SIDEBAR CONFERENCE, AS FOLLOWS:

18            **THE COURT:**  What's the relevance?  I just don't

19    know what we're doing here.

20            **MR. GAEDE:**  Your Honor, they're claiming that the

21    product EPOGEN is not within the scope of the claims so

22    we're giving some description of the product EPOGEN that was

23    commercialized in 1989.

24            **THE COURT:**  They're claiming that the project --

25            **MR. GAEDE:**  The product, the Amgen product.

1              THE COURT:  Is not within -- are you claiming that?

2         MR. GAEDE:  Yes.

3         MR. SUH:  We're claiming that this particular

4    witness did not provide that foundation during his

5    deposition.

6         THE COURT:  All right.  Well, wait a minute.  Wait

7    a minute.  All right.  I understand that.

8         MS. BEN-AMI:  Your Honor?

9         THE COURT:  So then it would seem to me they can

10   have it.  You've got the deposition.  I'll be alert to it.

11        MS. BEN-AMI:  But this is going to call for expert

12   testimony.

13        THE COURT:  Well, it may and I'll be alert to that.

14        MS. BEN-AMI:  Because you have to compare the

15   claims.  There's no expert who's compared the claims.

16        THE COURT:  I think I know the line.

17        MS. BEN-AMI:  Okay.

18        (Whereupon the sidebar conference concluded.)

19        MR. GAEDE:  Excuse me, Mr. Reporter, can you read

20   the last question back, please.

21        (Whereupon the question was read by the court

22   reporter.)

23        MR. SUH:  Objection; foundation.

24        THE COURT:  Overruled; he may tell us why, or how

25   come -- we'll put it that way.  How come you're familiar

1   with that in 1989?

2        **THE WITNESS:**  I was still the product team leader

3   and I was responsible for all aspects of the product

4   development, including manufacture.

5   **BY  MR. GAEDE**

6   **Q**   And to your understanding what was in a vial of EPOGEN

7   in 1989?

8   A    Recombinant human erythropoietin.

9   **Q**   Now, can you turn your attention, please, to Trial

10  Exhibit 2056.  This is at Tab 32 in your binder.  And

11  specifically, I would like to turn your attention to the

12  summary, Page 1 in Exhibit 2056.

13       Do you recognize that page?

14  A    Yes, I do.

15  **Q**   Can you please read that description there on the first

16  full paragraph.

17  A    Recombinant human erythropoietin (rHuEPO) is a 165 amino

18  acid glycoprotein manufactured by recombinant DNA

19  technology.  It has a molecular weight of 30,400 daltons.

20  RHuEPO is produced by mammalian cells into which has been

21  inserted the human erythropoietin gene.  The product

22  contains the identical amino acid sequence of

23  naturally-derived erythropoietin produced by the kidneys.

24  Both recombinant erythropoietin and natural forms of

25  erythropoietin stimulate erythropoiesis.

1    **Q**    Now, the document makes reference to cells.  Based on

2    your understanding and experience as product team leader, do

3    you have an understanding of what cells were used to make

4    the recombinant human EPO?

5           **MR. SUH:**  Objection.

6    **A**    I know that --

7           **THE COURT:**  Sustained.

8    **Q**    The cells that were used to make the recombinant human

9    EPO, do you know where they came from?

10          **MR. SUH:**  Same objection.

11          **THE COURT:**  Oh, no, that's different.  The first

12   called for expert testimony, opinion testimony.  This just

13   says where they come from.

14          If you know of your own knowledge.  Do you know?

15          **THE WITNESS:**  Yes, I do.

16          **THE COURT:**  Where did they come from?

17          **THE WITNESS:**  They came from the master working

18   cell bank that I made.

19   **Q**    Okay.  And what's your understanding of a master working

20   cell bank at the time that you created it?

21          **MR. SUH:**  Objection, your Honor; lacks foundation.

22          **THE COURT:**  No, overruled; he may tell us.

23   **A**    A master working cell bank is the banks supply of cells

24   used to initiate each round, each lot of manufacture of

25   recombinant human erythropoietin.

1   **Q**   And you created the master working cell bank?

2   **A**   I, along with my colleague, created the master working

3   cell bank.

4   **Q**   When did you create it?

5   **A**   Initiated that work in the fall of 1984; it was

6   completed in January of 1985.

7   **Q**   And how did you create the master working cell bank?

8   **A**   I followed the FDA guidelines and I, which were to

9   isolate clones of the cells I was working with, and I did

10  that --

11           **MR. SUH:**   Objection, your Honor.

12           **THE COURT:**   That may stand, the guidelines, what he

13  thought the guidelines were.   It's not evidence that those

14  were actually the guidelines, but that's what he thought

15  they were.

16           Go ahead.

17  **A**   I isolated purified single cells by doing a procedure

18  called limiting dilution cloning.   I did that twice, two

19  rounds of limiting dilution cloning.   And then I grew up the

20  cells.   There were millions and millions of cells, all

21  derived from a single clone.   And then these were

22  distributed in small aliquots in hundreds of vials which

23  were stored in liquid nitrogen.

24  **Q**   The first part of the step you described about isolating

25  the cells, did you discuss those cells in your testimony on

 1   Friday?

 2            **MR. SUH:**  Objection; leading.

 3            **THE COURT:**  You are leading the witness.

 4   Sustained.

 5   Q   These cells that you isolated in the first step, what

 6   was the source of those cells?

 7            **MR. SUH:**  Same objection.

 8            **THE COURT:**  Oh, no.  Overruled.  If you know of

 9   your own knowledge.

10   A   I do, sir.

11            They were the cells that I, the CHO cells that I

12   transfected with the genomic human EPO gene that Dr. Lin

13   isolated.

14   Q   What role, if any, did you have in the preparation of

15   Dr. Lin's patent application?

16   A   I wrote the initial draft of most of Example 10 and also

17   of Example 6 and 7.

18   Q   And what do those examples that you wrote describe?

19            **MR. SUH:**  Objection, your Honor.

20            **THE COURT:**  Sustained.  They speak for themselves.

21   Q   Can you show us in Example 10 of Dr. Lin's patent

22   sections that you wrote?

23   A   Yes, I can.

24   Q   All right.  If we could look, please, to the '933

25   patent, Trial Exhibit 1, please.  And if we could turn to

1    column 25, please.

2    A    What tab number, please?

3         **MR. SUH:**  Objection, your Honor.

4    Q    Tab 5.

5         **MR. SUH:**  May we please have a side bar.  This

6    witness is not an inventor of the patent.

7         **THE COURT:**  What?  Didn't hear.

8         **MR. SUH:**  The witness is not an inventor of this

9    patent.

10        **THE COURT:**  He's not a listed inventor.  He may

11   answer these questions.  Overruled.  I mean.  We'll see what

12   questions he's asked.  He was simply asked to tell us what

13   he wrote.

14        **THE WITNESS:**  I wrote the initial draft of Example

15   10 starting there in the middle of column 25, extending

16   through all of column 26, onto the next page in column 27,

17   and through the top two paragraphs in column 28.

18   Q    Now, in the first -- in the second full paragraph there

19   in column 28 where it makes reference to the culture fluid.

20   Could you please read that first sentence?

21   A    Culture fluid from CHO pDSVL genomic human EPO cells

22   prepared amplified by stepwise 100 nanomolar methotrexate

23   were subjected to three assays.

24   Q    Did you write that sentence?

25   A    Yes.

1   Q    And what was your understanding of the cells that are

2   being described in that sentence?

3        MR. SUH:  Objection, your Honor; the document

4   speaks for itself.

5        THE COURT:  Sustained, on that foundation.  It may

6   call for opinion evidence.  Are you asking him what cells is

7   he describing there?

8        MR. GAEDE:  Yes, that he made.

9        THE COURT:  Well --

10       MR. SUH:  Objection.

11       THE COURT:  -- strike out what you say.  We'll try

12  it this way.

13       What cells are you describing there?  When you

14  wrote that, what cells are you describing?  First line.

15       THE WITNESS:  Okay.  Those cells were, I

16  transfected the human erythropoietin gene into CHO cells and

17  I, and my colleagues, went through a series of methotrexate

18  amplifications up to 100 nanomolar methotrexate.

19  Q    And what did you then do with those cells?

20  A    I used those cells as the source of the master working

21  cell bank that I made.

22  Q    Doctor, could we please turn to Tab 19 in your binder,

23  please.  This is Exhibit AQS.

24       MR. SUH:  Objection, your Honor.  I think we're

25  going to require a side bar with respect to this document.

1    You previously excluded this.

2         THE COURT:  I'll decide whether we require one, but

3    you may have one.

4    SIDEBAR CONFERENCE, AS FOLLOWS:

5         THE COURT:  What's the issue?

6         MR. SUH:  Your Honor, this particular document was

7    already previously excluded by your Honor.  This document

8    was also specifically requested during discovery and they

9    never gave us a copy.

10        THE COURT:  What is the document?

11        MR. SUH:  We don't even know what it is.

12        THE COURT:  Yes.

13        MR. SUH:  And as a matter of fact, this is the way

14   it was produced to us.  I think this witness is going to be

15   trying to interpret something about this.

16        THE COURT:  Wait one second.  You're obviously

17   ready to argue this, and you say, at first, you requested

18   it.

19        MR. SUH:  That's right.

20        THE COURT:  And he --

21        MR. SUH:  In the course of discovery.

22        THE COURT:  And they --

23        MR. SUH:  They never produced it during the course

24   of discovery.

25        THE COURT:  You're looking at some March 19th

1   letter.

2            MR. SUH:  Yes.

3            THE COURT:  They wouldn't produce it.

4            MR. SUH:  They haven't produced it during

5   discovery.

6            MR. GAEDE:  What haven't we produced?

7            THE COURT:  They obviously produced something

8   because you have it.

9            MR. SUH:  No, we actually asked for a clean copy of

10  it.

11           THE COURT:  All right.  But you have something.

12           MR. SUH:  Right.  What we received was this.

13           THE COURT:  Yes.  Which you can't read.

14           MR. SUH:  Which you can't read.

15           MR. GAEDE:  Yes.  So we did produce a document.

16           THE COURT:  Well, I'm not sure.

17           MR. GAEDE:  This is the document.

18           THE COURT:  Then what he's looking at is a lot

19  different.

20           MR. GAEDE:  This is the request that came in.

21  Their request came a few days ago.  We did give a clean copy

22  of this right here.

23           THE COURT:  The page that they couldn't see.

24           MR. SUH:  That's not --

25           MR. GAEDE:  They also --

```
 1              MR. SUH:  That's not what we received.

 2              THE COURT:  Yes.  This looks a lot different than

 3    yours.

 4              MR. GAEDE:  No, right here.

 5              MS. BEN-AMI:  Show him your copy.

 6              THE COURT:  See?  See this?

 7              MR. GAEDE:  Yes.

 8              THE COURT:  This is 9548.  What's this?

 9              MR. GAEDE:  This is the same document.  This is

10    just a clean copy of it that we were able to locate.

11              THE COURT:  When?

12              MR. GAEDE:  It was e-mailed to them.

13              THE COURT:  When?

14              MR. GAEDE:  Thursday night.

15              MS. BEN-AMI:  Thursday night.

16              MR. SUH:  Not during discovery, your Honor.

17              THE COURT:  Well, yes, not during discovery.

18              MR. SUH:  We were never able to ask him in

19    deposition about that.

20              THE COURT:  Yes, I'm going to preclude him from

21    answering this.

22              MR. GAEDE:  Your Honor, is it possible -- there's

23    no question that these two pages were produced.  May I

24    inquire as to these two pages?

25              THE COURT:  I don't know.  I haven't -- the
```

 1   document's not coming in evidence.  But we're not getting

 2   the obscured thing in evidence.  And the two pages, I'm not

 3   introducing them as evidence, but I'm not precluding your

 4   inquiry about what he did.

 5         **MR. SUH:**  If I may, your Honor, what Mr. Gaede is

 6   asking is even worse because the first two pages are based

 7   upon interpretations of that gel.  So it's as if he's trying

 8   to get in --

 9         **THE COURT:**  All right.  I'm not precluding his

10   inquiry.  We're not getting into that document.

11         **MR. SUH:**  Okay.

12         (Whereupon the sidebar conference concluded.)

13         **MR. GAEDE:**  Thank you, your Honor.

14   **Q**   Now, Doctor, I believe you testified that EPOGEN was

15   approved by the FDA?

16   **A**   Yes.

17   **Q**   When was that again?

18   **A**   In June of 1989.

19   **Q**   And what happened with EPOGEN right after it was

20   approved?

21   **A**   It was commercialized.

22   **Q**   Do you have any knowledge about those initial shipments?

23   **A**   Yes, I do.

24   **Q**   Can you describe your involvement at that time?

25   **A**   I helped box up, along with many of my colleagues from

1   throughout the company, the initial shipments of the

2   product.

3   **Q**   Why were you involved in boxing up the product?

4   A   I was aware there was a pent-up demand and --

5          **MR. SUH:**  Objection, your Honor.

6   A   -- I wanted to help facilitate --

7          **THE COURT:**  Overruled.  He may finish his answer.

8   A   -- I wanted to help facilitate getting it out the door

9   to the patients.

10  **Q**   Okay.  Doctor, can you turn to Tab 9 in your binder,

11  please.  This is Exhibit FLW.

12         Do you recognize it?

13  A   Yes, I do.

14  **Q**   What is it?

15  A   It's a memo, internal memo of Amgen I received.  It's an

16  announcement that the publication --

17         **MR. SUH:**  Objection, your Honor.

18         **THE COURT:**  Yes, it's an internal memo of Amgen.

19  We'll stop it there.

20         **MR. GAEDE:**  All right.

21         **THE WITNESS:**  Sorry, sir.

22  **Q**   Did you receive a copy -- well, did you receive a copy

23  of this memo in about November 27th, 1990?

24  A   Yes, I did.

25  **Q**   And are you a carbon copy on this memo?

1    A    Yes, I am.

2    Q    What did you do with the memo once you received it?

3    A    I read it and saved in.

4    Q    And to your understanding, was this memo distributed as

5    part of the normal course of business during the EPO project

6    at Amgen?

7    A    Yes.

8             MR. GAEDE:  Your Honor, I would offer it into

9    evidence.

10            THE COURT:  Any objection?

11            MR. SUH:  Objection, your Honor.

12            THE COURT:  Wait a minute.  Let me see it.  This is

13   19?

14            MR. SUH:  Yes.  Actually Tab 9.

15            MR. GAEDE:  Tab 9, your Honor.

16            THE COURT:  Tab 9.  I'm sorry.

17            MR. GAEDE:  In the binder, Exhibit FLW.

18            THE COURT:  Thank you.

19            No, sustained.  FLW may remain for identification,

20   but it's not an exhibit.

21            MR. GAEDE:  All right.

22   Q    Doctor, can you turn to Tab 10 in your binder, please.

23   Do you recognize this article?

24   A    Yes, I do.

25   Q    What is it?  It's Exhibit DIR.

1        **MR. SUH:**  Objection, your Honor.

2        **THE COURT:**  Well, he may identify it.  What is it?

3   A   It's an announcement of --

4        **THE COURT:**  No, no.  Not -- just what type of

5   document is it?

6        **THE WITNESS:**  It's a article in a trade journal.

7        **THE COURT:**  Thank you.

8   Q   Do you recall reading this article when it was

9   published?

10  A   Yes, I do.

11  Q   Is this a copy of the article?

12  A   Yes, it is.

13       **THE COURT:**  No, I'm not, I'm not admitting it.  So

14  let's move on; we need not waste time on it.

15       **MR. GAEDE:**  Your Honor, may we have a side bar

16  briefly on this issue?

17       **THE COURT:**  You may.

18  SIDEBAR CONFERENCE, AS FOLLOWS:

19       **THE COURT:**  All right, what possible --

20       **MR. GAEDE:**  My colleague, Mr. Curto, will handle

21  this, your Honor.

22       **THE COURT:**  Well, you know, just understand the

23  mores of the Court which I honor in the breach and you are

24  both violating them right and left.  But usually it's one

25  lawyer for one witness.  And there's a reason for that.

1          **MR. GAEDE:**  Okay.

2          **THE COURT:**  That limits the testimony to the

3    ability of that one lawyer.  When I have to face a battery

4    of lawyers the principal bureaucracy allows these skilled

5    arguments.  Nevertheless --

6          **MR. GAEDE:**  I'm happy to handle --

7          **THE COURT:**  No, I'm happy to hear him since you

8    serve him up.

9          What possible exception is there to this?

10         **MR. CURTO:**  Absolutely.  Your Honor, this isn't

11   hearsay really.  This is the only authenticated publication

12   at the time.  In the TKT case, same issue, this came in

13   absent the hearsay rule.

14         **THE COURT:**  Sustained.  It's not relevant that it

15   was a publication at the time unless you get to the

16   substance.

17         **MR. GAEDE:**  It's relevant to the issues of the

18   secondary factors.

19         **THE COURT:**  Now, with his careful argument, you

20   raise yet another.  Its prejudicial effect far outweighs the

21   probative value.  That's all of these type of documents.

22   Let's move on.

23         (Whereupon the sidebar conference concluded.)

24   BY  MR. GAEDE

25   Q    Doctor, when did you leave Amgen?

1    A    In early 1988, January 1988.

2    Q    And during the time --

3    A    '98.  I misspoke.  January '98.

4    Q    During the time you were at Amgen what forms of

5    compensation did you receive there?

6    A    Salary, employee stock options like all employees, and

7    later years bonuses.

8    Q    And did you exercise any of your stock options?

9    A    Yes, I did.

10   Q    How did you do that?

11   A    I purchased them.

12   Q    Now, approximately how many shares of Amgen stock, if

13   any, do you still own?

14   A    Between 56 and 57,000 shares.

15   Q    And are you being paid for your testimony here today?

16   A    No.

17            **MR. GAEDE:**  Thank you.

18            **THE COURT:**  Mr. Suh, you may inquire.

19            **MR. SUH:**  Thank you, your Honor.

20                          **CROSS-EXAMINATION**

21   BY  **MR. SUH**

22   Q    Dr. Browne, Mr. Gaede just asked you about how many

23   shares you currently own of Amgen stock.  You've made money

24   selling Amgen stock over the years; isn't that correct?

25   A    That's correct.

1    Q    And you've made somewhere between 10 and $20 million

2    from selling Amgen stock over the years; isn't that correct?

3    A    That's correct.

4    Q    Okay.  Now, on Friday I think you testified that you

5    received your Ph.D. in molecular biology from UCLA in 1982?

6    A    That's correct.

7    Q    And later on that year you started at Amgen, correct?

8    A    No, I started at Amgen in 1981.

9    Q    In 1981.  Okay.

10   A    I finished my thesis work in 1981 but the degree was

11   awarded in 1982.

12   Q    Okay.  So, you received your degree in '82, and starting

13   in '83, I believe you said November, you were given the

14   responsibility of trying to express the EPO gene in

15   mammalian cells, correct?

16   A    In October-November, yes.

17   Q    Okay.  So about a year, a little more than a year you

18   were a post-doc and you were given this responsibility of

19   expressing the EPO gene in mammalian cells?

20   A    No, sir.  Two years.

21          MR. GAEDE:  Objection, your Honor; lacks

22   foundation.

23   Q    After you graduated --

24          THE COURT:  Wait a minute.  This is

25   cross-examination.  He's entitled to test this.  But we're

1    entitled to get the chronology straight from the witness.

2         Won't you give us the chronology of this period,

3    very briefly.

4         **THE WITNESS:**  I started in October of '81.

5         **THE COURT:**  At Amgen?

6         **THE WITNESS:**  At Amgen.  Working as a full-time

7    employee.  And it was October of -- October-November of '83,

8    a full two years later, that I started working on expressing

9    the erythropoietin gene.

10   **Q**   But it was only a year after you received your Ph.D.,

11   right?

12   A    No, not correct.

13   **Q**   A year and-a-half?

14   A    As I mentioned, I completely completed all my thesis

15   work in '81.  Due to the technicalities of the award dates

16   it was awarded at the end of the subsequent quarter.

17   **Q**   You didn't receive your Ph.D. until '82?  That was my

18   question.

19   A    Until March.

20   **Q**   Okay.  March of 1982, correct?

21   A    That's correct.

22   **Q**   Okay.  And in November of '83 --

23        **THE COURT:**  You've got to -- you're blocking the

24   witness.

25        **MR. SUH:**  I'm sorry, your Honor.

1           THE COURT:  I'll hold that if you want, or you can

2    leave it there if you want, but don't block the jury.

3    Q    And in November of '83 you started the project of

4    expressing the EPO gene in mammalian cells.  And on Friday

5    you showed the jury this particular notebook page of yours,

6    right?

7    A    Correct.

8    Q    And it's January 24?

9    A    January of 1984.

10   Q    I'm sorry, January 24 of 1984.

11   A    No.

12   Q    Oh, that says January '84?

13   A    Okay.  The experiment we're starting here was initiated

14   on January 10.

15   Q    Okay.

16   A    These are the results recorded on January 24th.

17   Q    And you've highlighted a certain section, it said

18   eureka, sample positive plus sign.  Right?

19   A    Correct.

20   Q    So about two months after you started this particular

21   project of EPO you expressed EPO in 293 cells, right?

22   A    About three months afterwards.

23   Q    All right.  And these particular results were confirmed

24   by an RIA?

25   A    That's correct.

1   Q   Okay.  And an RIA doesn't test in vivo biological

2   activity, correct?

3   A   It does not test --

4   Q   Okay.

5   A   -- in vivo biological activity.

6   Q   Do you see -- when you did this particular work, two,

7   three months, you didn't employ anything particularly

8   innovative or new beyond one of skill in the art, correct?

9          MR. GAEDE:  Objection, your Honor; calls for a

10   legal conclusion.

11          THE COURT:  Overruled; he may answer.

12   A   I'm not sure how to answer that.  I did what I did.

13   Q   Okay.

14   A   I transfected the cells.

15   Q   So you did what you did.  But you're not an inventor to

16   the patent, correct?

17   A   That's correct.

18   Q   Okay.  And do you see on this particular notebook page,

19   it says witnessed and understood by me?  Do you see that?

20   A   Yes.

21   Q   Now, Dr. Lin is the inventor of the patents-in-suit,

22   correct?

23   A   That's my understanding.

24   Q   You knew that.

25          He didn't sign that, did he?  It's left blank.  And

1    next to it, it says invented by and recorded by.  That's

2    left blank as well, right?

3    A    That's correct.

4    Q    And when you did this work in about two or three months

5    after you started, Dr. Lin didn't teach you how to express

6    these cells in, express the protein in 293 cells, right?

7    A    Teach me.  I don't understand.

8    Q    Did he give --

9    A    He asked me to see if I could.

10   Q    He asked you.  But did he provide you any specific

11   guidance as to how to actually go through the conditions of

12   expressing the protein in these cells?

13   A    Specific guidance.  He was well aware of the techniques

14   I was going to use.

15   Q    But my -- I'm sorry.  My question was, did he -- do you

16   recall, sitting here today, any specific guidance that he

17   gave you?

18   A    It was try to express the erythropoietin gene.

19   Q    He said do what you do, correct?

20   A    Something to that effect.

21   Q    Thank you.

22         Now, on Friday I believe Mr. Gaede also showed you

23   what's been admitted as TRX31, Tab 6 of your binder.

24         MR. SUH:  Can you please put that up on the screen.

25   Q    Okay.  And I believe Mr. Gaede focused you on the

1    discussion section of this particular document.  And I also

2    recall that you were using this discussion section and

3    interpreting it with respect to biological activity.

4           Dr. Browne, do you see the second sentence where it

5    says Joan Egrie reported that mEPO produced in CHO cells

6    migrates in Western gels.  Do you see that?

7    A    I see that.

8    Q    M, M stands for monkey, doesn't it?

9    A    That's correct.

10   Q    Okay.  And the next sentence, that's also talking about

11   monkey EPO, right?  Not human recombinant EPO, correct?

12   A    That's correct.

13   Q    Okay.  And when it's actually talking about hEPO, human

14   EPO, it says urinary, correct?

15   A    I -- that's correct.

16   Q    That's not EPO being produced in CHO cells, correct?

17   A    We were discussing the problem with glycosylation.

18   Q    Doctor, Doctor, that's not EPO being produced in CHO

19   cells, correct?

20   A    That's correct.

21   Q    That's Goldwasser's urinary EPO, correct?

22   A    Correct.

23   Q    Okay.  Now, with respect, with respect to recombinant

24   human EPO, recombinant human EPO being produced in CHO

25   cells, there's no data in this discussion section at all, is

1    there?

2    A    There's the next line regarding the issue.

3    Q    Regarding the issue.  But experiments haven't been

4    carried out yet and there's no data on recombinant CHO

5    cells, EPO produced in CHO cells, correct?

6    A    Yes, there is.  Not in this paragraph, but there is data

7    on recombinant CHO cells.

8    Q    That's not my question.

9    A    No, I mean COS cells, not CHO cells.

10   Q    When you were interpreting this particular discussion

11   section on Friday, you were interpreting it without any data

12   on recombinant human EPO, correct?

13   A    Not correct.  I was interpreting it -- I was asked about

14   what my understanding was with the problem of glycosylation.

15   Q    Is there any data in this particular paragraph on

16   recombinant human EPO?

17            THE COURT:  Where you stand, Mr. Suh --

18            MR. SUH:  I'm sorry.

19            THE COURT:  -- you block the jury from watching the

20   witness.  Now, I really do require that they watch the

21   witness, that's where the testimony is.

22            Go ahead, Mr. Suh.

23            MR. SUH:  I'm sorry.

24   Q    Is there any data in this discussion on recombinant

25   human EPO?

1   A   Yes.  There's a reference that, in that next line about

2   the problem.  There isn't --

3   Q   Where is --

4   A   The first two lines do not refer to human.  The next --

5   but they do refer to an example of the problem that we

6   faced.

7   Q   I'm asking about data of recombinant human EPO.  The

8   next sentence talks about serum EPO from a polycythemic

9   patient, correct?

10  A   No.  You skipped a line.  It may be that the, it may be

11  that carbohydrate composition of EPO differs depending on

12  the cell line used for expression.  We were worried about --

13  Q   Okay.  That particular sentence, you consider that data?

14  A   I didn't say it was data.

15  Q   But my question --

16  A   I said it was an example of the problem.

17  Q   I'm sorry.  My question was about data.  Correct?

18  That's not data, is it?

19  A   No, that's not data.

20  Q   Thank you.

21        Now, Mr. Gaede showed you this particular vial of

22  EPOGEN.

23  A   Or showed me a vial from that box.

24  Q   Right?

25  A   Right.

1   Q    This box.

2        You said that you were involved in various stages

3   of FDA approval of this particular recombinant human

4   product?

5   A    I was involved in the approval of recombinant human EPO,

6   EPOGEN.

7        **MR. SUH:**  If we could go back to TRX1, which is the

8   '933 patent.

9   A    The tab number, please?

10  Q    Let's see.

11  A    Tab 5.  I've found it.

12  Q    Tab 5.  You've found it.  Okay.

13       Now, Mr. Gaede asked you some questions about your

14  role involved with developing the master working cell bank,

15  right?

16  A    Correct.

17  Q    And you said that you were involved in doing two

18  limiting dilution steps, correct?

19  A    That's correct.

20  Q    Okay.  Now, the purpose of doing these two limiting

21  dilution steps is to create a homogeneous population of

22  cells, correct?

23  A    It's to isolate a single cell.

24  Q    To make it homogeneous because that's what the FDA

25  requires based upon some of these guidelines that you were

1    discussing, right?

2    A    They required that it come from a single cell.   A

3    genetic clone.

4    Q    Okay.   Genetically homogeneous, correct?

5    A    Correct.

6    Q    Okay.   And then when you were going through the '933

7    patent and you were telling the jury that you had written

8    the first draft of certain sections -- can we go to column

9    25 and column 26, please.   -- you said that, starting from

10   Example 10 you wrote the first draft, all of the lower

11   column of 25 and all of 26, correct?

12   A    That's correct.

13         MR. SUH:   Can we please blow up on column 26,

14   starting around line 66 to the bottom.   Column 26, yes.   If

15   we could blow that up, please.

16   Q    Dr. Browne, would you please read that first sentence?

17   A    Cells in the culture described immediately above are

18   genetic, are a genetically heterogenous population.

19   Q    So the cells that are actually being described in

20   Example 10, the work preceding it, it wasn't a homogeneous

21   population of cells, correct?

22   A    They hadn't been proven to be a homogeneous population.

23   Q    And you also said that you had written a particular

24   sentence, and I believe that's at the top of page -- column

25   28.

```
 1              Can we please go to that.

 2              Starting from culture fluids from CHO pDSVL -- you

 3      read that into the jury, correct?  You read that to the

 4      jury?

 5      A    That's correct.

 6      Q    And these culture fluids, that doesn't contain a

 7      homogeneous population of cells, correct?

 8      A    They are the cells described here in Example 10, cells

 9      that were transformed by me and amplified by me.

10      Q    But they're not, they're not a homogeneous population as

11      required by the FDA, correct?

12      A    I don't know yet.  I haven't proven to the FDA by doing

13      the steps that --

14      Q    And that's why --

15      A    -- they are homogeneous.

16      Q    And that's why you wrote in your patent application --

17      I'm sorry, not your patent application, Dr. Lin's patent

18      application, that the cells in the culture described

19      immediately above are genetically heterogenous, correct?

20      A    That's correct.  Because we didn't know yet.

21              MR. SUH:  Thank you very much.  I pass the witness.

22              THE COURT:  Nothing further, Mr. Gaede?

23              Go ahead.

24              MR. GAEDE:  One quick point on redirect, your

25      Honor.
```

```
 1              THE COURT:  Very well.

 2                    REDIRECT EXAMINATION

 3    BY  MR. GAEDE

 4    Q    Doctor, could you please turn to Tab 35 in your binder.

 5    And could we please have Exhibit 30.

 6              You do recognize this --

 7              MR. SUH:  Objection, your Honor; beyond the scope.

 8              THE COURT:  Sustained, on that ground.

 9    Q    Dr. Browne, you were questioned about Exhibit 31, the

10    April 11th, 1984 meeting minutes that you looked at on

11    cross-examination.  Was the in vivo biological activity of

12    human EPO to your understanding described in another meeting

13    minute?

14              MR. SUH:  Objection, your Honor; leading.

15              THE COURT:  Sustained.  It is leading.  And it's

16    leading for something beyond the scope.  Move on.

17              MR. GAEDE:  Thank you, your Honor.  We pass the --

18              THE COURT:  Is that it?  All right.  No, that's

19    courteous.  You have nothing further?

20              MR. SUH:  No, nothing further.

21              MR. GAEDE:  Nothing further.

22              THE COURT:  You may step down.

23              (Whereupon the witness stepped down.)

24              THE COURT:  Call your next witness.

25              MR. DAY:  Amgen calls Dr. Gene Goldwasser.
```

```
1              THE COURT:  He may be called.  He may be recalled.

2              MR. DAY:  I'm sorry, I misspoke.  I guess we're

3    going to do the video of Dr. Leroy Hood.

4              THE COURT:  That may be done.  It may be played.

5    Go ahead.

6                   LEROY E. HOOD, By Deposition

7    Q   Would you state your name for the record, sir?

8    A   Leroy E. Hood.

9    Q   And are you currently, sir, the president and direct of

10   the Institute for Systems Biology?

11   A   Just the president for the Institute of Systems Biology.

12   Q   That's located here in Seattle?

13   A   It is.

14   Q   Is it an independent research institute, sir?

15   A   It is.

16   Q   You did eventually serve on the Scientific Advisory

17   Board at Amgen, correct?

18   A   I did.

19   Q   Were you paid as a member of the Scientific Advisory

20   Board?

21   A   I was.

22   Q   Were you paid some kind of a salary or fee or consulting

23   fee?

24   A   There was a consulting fee.

25   Q   Did you also receive from time to time stock options?
```

1   A    We did.

2   Q    Back in that time frame that we're discussing, '79, '80,

3   Dr. Hood, did you give any attention to the issue of cloning

4   erythropoietin?

5   A    Erythropoietin was picked as one of the major efforts

6   that Amgen was interested in pursuing, and in that context

7   as a member of the SAB, I certainly did think about

8   strategies and how one might go about it.

9   Q    Do you recall whether that was a true statement at the

10  time, that Dr. Goldwasser had the only pure -- only supply

11  of pure EPO in the world?

12  A    To the best of my recollection, I think at that time

13  Eugene Goldwasser had the only purified EPO that I knew

14  about.

15  Q    To your recollection is that an accurate statement, sir?

16  A    So I would answer the question in the following way:  As

17  I said, I probably gave 30 or 40 or 50 lectures over that

18  two or three-year period of time, '78, '79, '80 and so

19  forth, where I in general lectures talked about exactly the

20  same kind of strategy to many different people.  I had many

21  people come up after my lectures and say, eureka, we have a

22  small amount of protein, it would be terrific if you could

23  sequence it and clone it for us.  And I would say of those

24  many offers in the end, very, very few were actually

25  realized.  So I cannot recall outlining specifically to

1    Eugene Goldwasser in particular this kind of strategy, but I

2    can say I talked about it many times in general.

3         The other thing I'll say is the general strategy

4    that was discussed in those lectures and Eugene has outlined

5    here was a strategy that again worked for abundant genes.

6    It didn't necessarily work for those that were present in

7    very low levels, as was EPO, and that required considerable

8    more thought and considerable more strategy.  And that

9    strategy was developed in part with Amgen and developed in

10   part by Amgen as they went on to clone really the first of

11   the rare message genes, at least to my knowledge that was

12   cloned.  You have to remember the context of the discovery

13   of these processes and their applications, and they're very

14   different from today when PCR makes almost anything

15   instantaneously accessible.

16        So I would say that what I almost certainly didn't

17   emphasize in a great deal of detail, because I didn't go

18   into that, that detail, was the challenge that the rare

19   message genes did present.

20   **Q**   I understand you to be talking to the period around

21   1980, '81, and you now had your microsequencer which enabled

22   the sequencing of proteins at a much faster rate than had

23   previously been possible.

24   A   Much more sensitive rate.

25   **Q**   Much more sensitive rate.  Okay.  Still a lot of elbow

1    grease.

2    A    Absolutely.

3    Q    And that the -- and so you, you made a number of public

4    statements, lectures, about the way to use this machine for

5    scientists who were interested in cloning genes.  And the

6    first step was to do the sequence and the next step would be

7    to design probes, and then the final step would be to use

8    the probes in a DNA library to obtain exemplars of the DNA

9    sequence of interest, and then you would be ready to go into

10   your recombinant DNA technology.  Is that a fair statement?

11   A    What I would say is one, one has to add purification of

12   the protein to the list of things that you had there.  But

13   what I would say, too, is that is the characterization of

14   genes that had abundant levels of messenger RNA and that one

15   would search through then a cDNA library with the

16   appropriate probes to find those corresponding genes.  What

17   I did emphasize was, as described, that strategy would be

18   unlikely to work for genes that are present in low

19   abundance.

20   Q    Well, we're talking about '80, '81.

21   A    So in 1981, I founded a company called Applied

22   Biosystems, and the first product that Applied Biosystems

23   made was the gas-liquid phase protein sequencer.  We had

24   designed it so well that they had almost no work to do so

25   that within six months they were selling instruments and

1    were actually in the black.

2          So instruments of this type were certainly

3    available early to mid 1982, I would guess.  Although,

4    again, I don't have direct recollection of when the

5    instruments were to be, to be generated and everything, and

6    sold.

7    Q    And were the -- is it fair to say that Amgen was ahead

8    of the competition because it had access to the

9    microsequencer that had been developed at your lab?

10   A    What I think is fair to say is that, one, the cloning of

11   rare message genes is very difficult, and two, that

12   determining the amino acid sequence of the corresponding

13   protein is a necessary but not sufficient step, and in that

14   one stage they were certainly to my knowledge ahead of the

15   competition at that time.

16   Q    Dr. Hood, you had said a few minutes ago that you had

17   provided to Amgen a protein microsequence for at least a

18   portion of the EPO gene; is that correct?

19   A    What, what certainly was true is that there was an

20   interaction between Eugene Goldwasser, Amgen and ourselves

21   where purified material was sequenced at Cal Tech --

22   Q    And would that be --

23   A    -- and the N-terminal sequence was made available to

24   Amgen and its scientific advisors.

25   Q    Okay.  So as part of that collaboration between

1      Goldwasser and your lab and Amgen --

2      A    Right.

3      Q    -- the microsequence for the N-terminal of EPO was

4      provided to Amgen; is that correct?

5      A    Correct.

6      Q    And it turned out that Dr. Goldwasser actually presented

7      it at a meeting publicly, didn't he?

8      A    That, that was my understanding.

9      Q    Did that N-terminal sequence prove to have some errors

10     in it?

11     A    It did.

12     Q    Did it provide an effective basis for designing a probe

13     for the DNA sequence of EPO?

14     A    To the best of my knowledge it did not.

15     Q    Now, if you have the machine, this great machine that

16     you invented with some other folks, do you also need a

17     skilled protein biochemist to operate that machine?

18     A    You know, again, one has to think about the context of

19     the time, and that is when we developed this new approach to

20     automated sequencing and developed a new instrument there

21     was some training that was necessary to be able to

22     understand how to make the instrument work and so forth.

23     But it was, it was the kind of training that one could take

24     a reasonable technician and confer the skill upon them.

25     Q    Well, what work did he do, Dr. Hood, that made the

1    cloning possible?

2    A    The analysis and interpretation of the data that was

3    gathered by people that were technicians and things like

4    this, and the development of the general strategy with the

5    SAB and so forth.

6    Q    Well, the general strategy I thought you told me was

7    something that you had lectured about around the country?

8    A    Yeah, but you've got to listen carefully, because I said

9    the general strategy I lectured to about the country had to

10    do with messages that were abundantly present, and I was

11    very clear about how to do that.  What I did not speak to

12    was the issue of low abundance messages.  And that is

13    something that Amgen in cloning EPO essentially cloned the

14    first low abundance messenger, and they invented the

15    techniques that were effective for doing that, particularly

16    if you didn't have access to cDNAs.

17           So while we put forth general features that were

18    helpful like, gee, you ought to get internal sequences and

19    more probe sites, we did not put together, as Lin did, the

20    entire integrated strategy and interpret the information in

21    a way that was appropriate and ultimately led to the

22    successful cloning of this project.

23           To my knowledge, this was the first, if -- one of

24    the first, if not the very first, rare message gene that was

25    cloned, and it required, it required a different strategy

1   than people like myself talked about for the abundant

2   messenger RNAs.

3   **Q**   Okay.  And to your knowledge, sir, did -- well, who to

4   your knowledge was involved in designing the DNA probes that

5   were used as part of the cloning of the EPO molecule?

6   A   Well, I think the project leader Lin was involved in

7   doing this and the other things that were necessary.

8   **Q**   Anybody else?

9   A   I can't answer that question because that was not

10   something I was involved with.

11   **Q**   Now, I think you stated earlier, Dr. Hood, that the work

12   that Dr. Lai performed in doing protein sequencing was

13   trivial.  Do you stand by that testimony, sir?

14   A   I wouldn't say trivial, I would say routine.

15   **Q**   So you're changing your testimony earlier this

16   morning --

17   A   Not at all.  You asked me to look at the document that

18   said he sequenced peptides, and I said that's a routine kind

19   of process, not an inventive one.  I was responding to data

20   that you'd given me, new data that you'd given me.

21   **Q**   In addition to what we've already discussed, do you have

22   an understanding whether or not your interactions with

23   Goldwasser concerning erythropoietin were confidential to

24   Amgen?

25   A   My understanding from day one and the context in which

1    the project was discussed was that this was one of Amgen's

2    major projects, that the information was confidential to

3    Amgen, and the understanding was both that Goldwasser and

4    then I had agreed to that.

5    **Q**   And what was the basis for that understanding?

6    A    The basis was that the project was discussed and

7    developed for Amgen and that at each stage Amgen was

8    intimately involved in the kind of integration of Eugene's

9    efforts regarding purification with our efforts on the

10   N-terminal microsequencing.

11   **Q**   And as of 1983 before Amgen cloned and expressed the EPO

12   protein in a functional way, did you have an understanding

13   whether or not that any recombinantly-produced EPO would be

14   biologically active in vivo?

15   A    No one would know the answer to that.

16   **Q**   And before Lin cloned and expressed EPO in the Chinese

17   hamster ovary cell, did anyone know whether or not Chinese

18   hamster ovary cells would be an appropriate host for

19   expressing EPO?

20   A    To the best of my knowledge they did not.

21   **Q**   Earlier today you discussed cloning using your

22   microsequencing technique, using that as a tool to clone

23   mammalian genes.  Was the obtaining protein sequence via

24   microsequencing the only route that was available in the '81

25   to '84 time frame for cloning genes from mammalian proteins?

1   A    No.   There were other strategies that could be

2   considered.

3   Q    What were those strategies?

4   A    Well, I don't remember all the ones we talked about, but

5   there was the possibility of putting DNA in vectors and

6   again putting them into cells in which they could be

7   expressed and then attempting to select for expression.   So

8   cloning by expression is another, another real possibility

9   for doing this kind of thing.

10  Q    Were these subjects of discussion at your Scientific

11  Advisory Board meetings?

12  A    What, what I can say is the Scientific Advisory Board

13  discussed in general terms the various approaches that

14  needed to be used in cloning the EPO gene.   What I can also

15  say is at least I had no direct interaction with Lin on the

16  strategies he used for taking the general advice of getting

17  multiple amino acid sequences and making probes to the stage

18  where he was ultimately successful in getting the EPO clone.

19  Q    So you had no interaction with Dr. Lin on that?

20  A    That's correct.

21  Q    So you don't know if he devised those strategies, do

22  you?

23  A    I don't directly know that.

24          **THE COURT:**   That's that?   All right.

25          **MR. DAY:**   That's it, your Honor.

1          **THE COURT:**  Dr. Goldwasser may be recalled.

2          **MR. DAY:**  Thank you, your Honor.

3          **THE CLERK:**  And I remind you, sir, you are still

4     under oath.

5          **THE WITNESS:**  Yes.

6          **THE COURT:**  Proceed, Mr. Flowers.

7          **MR. FLOWERS:**  Thank you, your Honor.

8                    EUGENE GOLDWASSER, Recalled

9                      **DIRECT EXAMINATION**

10    **BY  MR. FLOWERS**

11    **Q**   Good morning, Dr. Goldwasser.

12    A   Good morning.  Could you please speak a bit louder.

13    **Q**   I will, sir.

14          I want to ask you a few questions about the

15    three-patient experiment that's been referred to here as the

16    Baron-Goldwasser study or experiment.

17          Do you know what I'm referring to by that?

18    A   Yes, I do.

19    **Q**   What was your role in that experiment?

20    A   I supplied the pure human urinary EPO that they used.

21          **MS. BEN-AMI:**  Objection, your Honor; expert report.

22          **THE COURT:**  No, overruled.

23    A   My lab did the immunoassays that were done on the serum

24    from those patients.  And I discussed the whole array of

25    questions and problems with Drs. Baron and Miyake.

1    Q    Why did you allow your urinary EPO to be used in that

2    experiment?

3    A    Well, I thought it would be important, or it was

4    important in that a clinical trial would finally confirm

5    that basis on which we had been working on EPO for many

6    years that anemia, especially the anemia of kidney disease,

7    was due to lack of EPO and could be corrected by using

8    exogenous EPO or giving it to the patients.

9              I also wanted, I suppose this sounds a bit strange,

10   I wanted to partake in the glory of a successful clinical

11   trial in something I had been working on for so long.

12   Q    Have you ever seen the results of that experiment?

13   A    I have.

14   Q    Have you ever reviewed those results?

15   A    I have.

16   Q    When did you first review the results?

17   A    Shortly --

18              **MS. BEN-AMI:**  Objection, your Honor; expert report.

19              **THE COURT:**  No, no.  When, he may tell us when.

20   When did you first review those results?

21   A    Shortly after all the data had been accumulated, Dr.

22   Baron gave me a summary of all of the data and I looked at

23   that.

24   Q    At that time, were you able to draw any conclusions from

25   the results of the experiment?

```
 1              MS. BEN-AMI:  Objection, your Honor.  Could I have

 2    a side bar?  This is --

 3              THE COURT:  Well, where's that in the report?

 4              MR. FLOWERS:  Paragraph 24, your Honor.  Page 24,

 5    Paragraph 66.

 6              MS. BEN-AMI:  Your Honor, I need a side bar.

 7              THE COURT:  All right.

 8    SIDEBAR CONFERENCE, AS FOLLOWS:

 9              THE COURT:  Just so you know where I'm coming from,

10    here are the rules and I'm going to try to follow it with

11    him.

12              One, you called him as an adverse witness.  They

13    have the right to recall him as part of their case.  He may

14    testify as to factual matters without regard to this report;

15    he may only give expert testimony within his report; and

16    three, he may not be asked any question in form or substance

17    to which he has already given testimony.  Now, those are my

18    ground rules.

19              What's the problem?

20              MS. BEN-AMI:  My issue is unrelated to that.

21              THE COURT:  I understand but --

22              MS. BEN-AMI:  Yes.

23              THE COURT:  -- you need to know that.

24              MS. BEN-AMI:  I wanted to advise your Honor of

25    something so you would be sensitive to it.  This witness
```

1    submitted grant documents to the NIH where he swore under

2    pain of criminal penalty that they were true.  He's going to

3    be asked now whether or not in effect the statements he made

4    were true.  And I believe, your Honor, that Amgen is

5    representing him, Amgen's lawyers are representing him and

6    there's a conflict, and that this fellow needs to know that

7    this is a criminal issue.

8         **THE COURT:**  No, I'm not going to give him any

9    instruction.

10        **MS. BEN-AMI:**  Well, I don't expect you to do that

11   right in front of the jury or something but obviously --

12        **THE COURT:**  I'm not doing it, but you've pointed it

13   out and counsel may be sensitive to their ethical

14   obligations.

15        (Whereupon the sidebar conference concluded.)

16        **THE COURT:**  You'll have to give me that report

17   reference again.  Did you say Page 26?

18        **MR. FLOWERS:**  Page 24.  Your Honor, Paragraph 66.

19        **THE COURT:**  Just a moment.

20        **MR. FLOWERS:**  Also Page 25, Paragraph 67.

21        **THE COURT:**  He may testify consistent with his

22   report.

23   BY  **MR. FLOWERS**

24   **Q**   Dr. Goldwasser, when you reviewed those results of the

25   three-patient experiment were you able to draw any

```
 1    conclusion from those results at the time?

 2    A    Yes.  The first conclusion, just looking at those

 3    preliminary data or partial data, was that the experiment

 4    did not show anything conclusive; that one could not draw

 5    any conclusions from it, from the data.

 6    Q    Why do you say that?

 7    A    There were too few numbers, too few samples that were

 8    taken to --

 9         MS. BEN-AMI:  Objection, your Honor; report.

10         THE COURT:  He may testify consistent with those

11    paragraphs, and I think he is.

12         MS. BEN-AMI:  I don't see that, your Honor.

13         THE COURT:  He'll stick to those paragraphs.  Go

14    ahead.

15    Q    Do you have -- do you have Paragraphs 66 and 67 of your

16    expert report?

17    A    Yes.

18    Q    I just want to make sure.

19    A    I can read it or I can say it.

20         To go back, the data were inconclusive because

21    there just weren't enough measurements made, there weren't

22    enough patients studied, there wasn't a long enough time of

23    administration, I think.

24         MS. BEN-AMI:  Objection, your Honor; it's outside

25    the scope of his report.
```

1          **THE COURT:**  Overruled; that may stand.

2     A    And the methods are not very precise so that small

3     differences --

4          **MS. BEN-AMI:**  Objection, your Honor.

5     A    -- have to be treated --

6          **THE COURT:**  Overruled.

7     A    -- statistically, but there weren't enough numbers to do

8     any statistical study.

9     Q    Dr. Goldwasser, in your exhibit binder there on the desk

10    you should have Exhibit 2045.  If you could go to that,

11    please.

12         Are you there?

13    A    Yes.

14    Q    What is this document?

15    A    It's an application called grant application to the

16    National Institutes of Health for, still one more grant to

17    support the research in my laboratory.

18    Q    What's the date of this document?

19    A    It was signed the 31st of August, 1984.

20    Q    Could you to Page 19 of the grant application, please.

21    A    Yes.

22    Q    What part of the grant application is this page?

23    A    This is part of what was called the progress report in

24    grant applications.  If there had been a previous grant this

25    summarized the results of the previous research.

1    **Q**    Do you see in the middle of the page halfway down

2    there's a paragraph entitled "Clinical test of epo"?

3    A    Yes.

4    **Q**    What did this paragraph relate to?

5    A    It is a brief summary of the results of that

6    three-patient clinical test.

7    **Q**    Did you write this paragraph?

8    A    Only a little bit of it.  I sort of cribbed it from the

9    report Dr. Baron gave me of the clinical trial.

10    **Q**    Now, about eight lines down in that paragraph there's a

11    sentence that says "There was no significant change in

12    hematocrit in any patient."

13          Why did you write that?

14    A    Because that was the observation made, that there was no

15    data showing any change in hematocrit in the patients.

16          **MS. BEN-AMI:**  Objection, your Honor; hearsay.

17          **THE COURT:**  No, I'm going to let that stand.

18    **Q**    Dr. Goldwasser, that sentence goes on to say, "Each

19    patient, however, showed an increase in reticulocyte count,

20    with peaks at 9, 10 and 11 days."

21          Do you see that?

22    A    Yes.

23    **Q**    Why did you include that in this passage?

24          **MS. BEN-AMI:**  Objection, your Honor; outside the

25    report.

```
 1              THE COURT:  Yes, where is it?

 2              MR. FLOWERS:  This is factual testimony, your

 3    Honor.

 4              THE COURT:  Overruled.  Strike that.  Sustained.

 5    Q    What was the basis at the time --

 6              THE COURT:  No, move on.

 7    Q    A few lines further down it says:  These fragmentary

 8    data need to be reinforced with more extensive and extended

 9    studies.

10              Did you believe that to be accurate at the time?

11              MS. BEN-AMI:  Objection.

12    A    Yes.

13              THE COURT:  Overruled; that may stand.

14    Q    Why?

15              MS. BEN-AMI:  Objection.

16              THE COURT:  Sustained.  Come to the side bar.

17    SIDEBAR CONFERENCE, AS FOLLOWS:

18              THE COURT:  I'm not going to allow you to do this.

19    I've had two types of witnesses here.  I've had expert

20    witnesses and I've had fact witnesses.  And I have drawn the

21    lines as I thought fair and just.  You can't have an expert

22    witness who's also a fact witness and not put it in the

23    expert report.  It's just not fair.  I'm not allowing it.

24              And so, I allowed you to question where did you get

25    those cells because that's straight facts.  But with other
```

1     fact witnesses, who happened to be experts, I have allowed

2     them, and I'll stick with my ruling, to express what they

3     thought at the time.  You designated Goldwasser as both.  So

4     we're not going into his mental processes unless it's in the

5     report.

6              **MR. FLOWERS:**  Your Honor?

7              **THE COURT:**  Yes.

8              **MR. FLOWERS:**  I'm actually addressing the issue

9     that Ms. Ben-Ami raised at the last side bar in terms of the

10    veracity of statements in his grant application.  This is

11    the document she was talking about in terms of swearing

12    under oath.

13             **THE COURT:**  Yes.

14             **MR. FLOWERS:**  I'm just addressing that.

15             **THE COURT:**  Well, fine.  If she crosses him then

16    I'll give you a little latitude.

17             (Whereupon the sidebar conference concluded.)

18    **BY  MR. FLOWERS**

19    **Q**   Dr. Goldwasser, the last sentence in this paragraph

20    says:  We plan to continue these studies but not as part of

21    this proposal.

22             Were you at that time seeking funding under this

23    grant application to continue the clinical study?

24             **MS. BEN-AMI:**  Objection; report.

25             **THE COURT:**  No, no, overruled.

1    Were you at that time seeking that funding?

2    **THE WITNESS:**  No.  This proposal has nothing to do

3    with any clinical trials.

4    **MS. BEN-AMI:**  Objection, your Honor; outside the

5    report.

6    **THE COURT:**  That may stand.

7    **Q**   Sir, could you go to Page 31 of this application,

8    please.

9    Dr. Goldwasser, what is this page?

10   **A**   It's a page of literature cited in the body of the

11   proposal.  Those papers which were used to supply

12   information are cited, the methods we proposed to use were

13   cited and those papers we published as a result of this

14   grant were cited.

15   **Q**   Now, why are the papers that were published as a result

16   of the grant listed here?

17   **MS. BEN-AMI:**  Objection.

18   **THE COURT:**  Sustained.

19   **Q**   Dr. Goldwasser, is there a paper in this list that

20   relates to the three-patient experiment?

21   **MS. BEN-AMI:**  Objection.

22   **A**   No.

23   **THE COURT:**  I will overrule, overrule that and

24   allow his answer to stand.

25   **Q**   At the time did you consider whether to include a paper

1    about the three-patient experiment in this grant

2    application?

3            **MS. BEN-AMI:**  Objection.

4    A   No, I had not.

5            **THE COURT:**  You have to wait.

6            **THE WITNESS:**  I'm sorry.

7            **THE COURT:**  Overruled, and your answer "No, I had

8    not" can stand.

9    Q   At the time did you attach any importance to publishing

10   papers about your work?

11           **MS. BEN-AMI:**  Objection, your Honor.

12           **THE COURT:**  Sustained.

13   Q   To your knowledge, have the results of the three-patient

14   study ever been published?

15           **MS. BEN-AMI:**  Objection, your Honor.

16           **THE COURT:**  Overruled.

17   A   No, it has not.

18   Q   Now, you've been retained as an expert in this case,

19   correct?

20   A   I'm sorry, I didn't hear you.

21   Q   You've been retained as an expert witness in this case?

22   A   Yes.

23   Q   And are you being compensated for the time you've spent

24   working as an expert witness in this case?

25   A   Yes.

1   **Q**   What have you done as an expert witness in this case?

2   **A**   I've read a lot of documents and reports.  I've prepared

3   an expert witness report, I think is what it's called.  And

4   I've discussed matters pertaining to this case with the

5   attorneys.

6   **Q**   Are you prepared to offer an expert opinion to the jury

7   today?

8   **A**   Yes.

9   **Q**   And what is that opinion?

10   **A**   I can offer an opinion on the purification of

11   erythropoietin.

12   **Q**   Do you have an opinion about purifying recombinant

13   erythropoietin or EPO from mammalian cells grown in culture?

14   **A**   Yes.

15   **Q**   And what is your opinion.

16   **A**   It was relatively easy to do.

17   **Q**   And what do you base that opinion on?

18   **A**   On my experience and my study of the literature.

19   **Q**   And what is it about your experience and your study of

20   the literature that allows you to draw that opinion?

21   **A**   Well, my lab, my people in my lab and myself purified

22   human urinary EPO according to one of the methods described

23   or mentioned in the patent, the so-called seven-step method.

24   We studied and later on applied the other method mentioned

25   in the patent, the C4 method, both of which were easily

1    capable of producing pure EPO.

2    **Q**   When you say mentioned in the patent, what patent are

3    you talking about?

4    A    I don't know the number of it, but the Lin patent.  But

5    I can't tell you the number.

6    **Q**   You said -- you mentioned the seven-step method.  Was

7    that method published?

8    A    Yes.

9    **Q**   Where?

10   A    In the Journal of Biological Chemistry.

11   **Q**   When?

12   A    1977.  I can't tell you the month though.

13   **Q**   Is that the Miyake, Goldwasser and Kung paper?

14   A    Yes.

15   **Q**   If I were to suggest to you that Dr. Flavell has said

16   that Dr. Lin's '933 patent or Dr. Lin's patents contain only

17   a very simple short purification step which would give a

18   partially enriched product that you could not give to a

19   human would you agree with that?

20   A    I would not.

21           **MS. BEN-AMI:**  Objection, your Honor; report.

22           **THE COURT:**  Yes, where is that in the report?

23           **MR. FLOWERS:**  It's a topic discussed at Page 38,

24   Paragraphs 89, 90 and 91.

25           **THE COURT:**  89, 90 and 91.

 1          He may testify consistent with the last two

 2    sentences of 91.

 3          **MS. BEN-AMI:**  Your Honor, could I have a side bar

 4    on that, please, regarding the referencing?

 5          **THE COURT:**  You may.

 6    SIDEBAR CONFERENCE, AS FOLLOWS:

 7          **MS. BEN-AMI:**  I'm sorry, I didn't see Mr. Flowers

 8    there yet.

 9          Yes.  This declaration is not evidence in this

10    case.

11          **THE COURT:**  Yes.  Well, the declaration may not be,

12    but it's the type of thing that one would rely upon, isn't

13    it?

14          **MS. BEN-AMI:**  No.  I mean, it wasn't that.

15          **THE COURT:**  Okay.

16          **MS. BEN-AMI:**  Research wasn't even done in this

17    case.

18          **THE COURT:**  I understand.  And you're going to have

19    to lay that further foundation and hope you get it.

20          **MR. FLOWERS:**  Your Honor, Dr. Goldwasser hasn't

21    mentioned that declaration.  He's talked about his own

22    experience, his understanding.

23          **THE COURT:**  But you are trying to get him -- you

24    are trying to get him to say this, these two sentences.

25          **MR. FLOWERS:**  No, your Honor.

1          **THE COURT:**  What do you want from him?

2          **MR. FLOWERS:**  I'm simply asking him what he's

3     already testified to about his experience and what's

4     disclosed in Dr. Lin's patent.  I'm not limiting it to

5     what's, what's, the specific documents that are referred to

6     here.  He's talked about his experience.

7          **THE COURT:**  He just said he disagreed with someone.

8          **MR. FLOWERS:**  With Dr. Flavell who testified simply

9     that you couldn't --

10         **THE COURT:**  Correct.  And so I thought you were

11    trying to get the basis for his disagreement.  The basis is

12    set forth in these two sentences.

13         **MR. FLOWERS:**  Dr. Flavell at trial didn't refer to

14    these experts.  He simply gave an overall conclusion and

15    we're simply offering the overall conclusion from

16    Dr. Goldwasser as rebuttal.

17         **THE COURT:**  Well, then you've got it.  You don't

18    have to ask him the why.  He disagrees.

19         (Whereupon the sidebar conference concluded.)

20  **BY  MR. FLOWERS**

21  **Q**   Dr. Goldwasser, what types of EPO have you worked on in

22    your career?

23  **A**   Well, since the beginning I've worked on rabbit, mouse,

24    rat, sheep, pidgeon, and human.

25  **Q**   I want to ask you some questions about the sheep EPO

1    that you worked on.

2          Were you able to purify sheep EPO?

3    A    Yes.

4    Q    And when did you do that?

5    A    In the late 1960's, I think.  The paper was published

6    in '71.

7    Q    After you purified the sheep EPO what kinds of things

8    were done with that sheep EPO?

9          **MS. BEN-AMI:**  Objection, your Honor; report.

10         **THE COURT:**  Yes.

11         **MR. FLOWERS:**  Page 9, Paragraph 30.

12         **THE COURT:**  All right, just a second.

13         Yes, he may testify consistent with that paragraph

14   to his own knowledge.  If he knows what was done, he may

15   tell us.

16   A    The small amount of pure material we had, we studied for

17   its chemical and physical properties and that was about all

18   we could do, and its biological activity.  The bulk of the

19   material which was sent out from our lab went to people who

20   had applied for it to the subcommittee that did that, and I

21   don't know what they did with it.  And there was one

22   preparation that Dr. Clifford Gurney had that he used on

23   himself.

24   Q    And who was Clifford Gurney?

25   A    He was a member of the hematology --

1          **MS. BEN-AMI:**  Objection, your Honor.

2          **THE COURT:**  No, he may tell us who he was.

3    A    He was a member of the hematology section of the

4    Department of Medicine at the University of Chicago, and a

5    colleague of mine.

6    Q    You said that Dr. Gurney used the sheep EPO on himself.

7    What did you mean?

8    A    He had it infused or injected into one of his veins.

9          **MS. BEN-AMI:**  Objection, your Honor.

10         **THE COURT:**  Overruled.

11   Q    Were you present when he did that?

12   A    Yes, I was.

13   Q    Could you describe what happened?

14   A    It was in a small laboratory, actually the laboratory of

15   the director of the institute.

16         **MS. BEN-AMI:**  Your Honor, I object when it goes

17   beyond the report.

18         **THE COURT:**  Yes, it seems to.  Let's move on.

19         **MR. FLOWERS:**  Your Honor, Paragraph -- Page 25,

20   Paragraph 68.

21         **THE COURT:**  Just a moment.  Twenty-five, six and

22   eight.

23         **MR. FLOWERS:**  Page 25, Paragraph 68, your Honor.

24         **THE COURT:**  Sixty-eight.  Thank you.

25         **MR. FLOWERS:**  About two-thirds of the way down,

1    your Honor.

2          THE COURT:  Yes, he may testify in accordance with

3    the last full sentence on that page.

4    Q   What did you observe when Dr. Gurney used the sheep EPO

5    on himself?

6    A   Very quickly after the injection he started to shake in

7    an uncontrolled fashion.  It looked very serious to me.

8    Someone called a physician.

9          MS. BEN-AMI:  Objection, your Honor.

10         THE COURT:  Yes.  Well, those are his observations.

11   Let's move on.

12   A   And --

13         THE COURT:  No, no.

14         THE WITNESS:  Oh, I'm sorry.

15         THE COURT:  You've told us your observations.

16         THE WITNESS:  Okay.

17         THE COURT:  Move on was to Mr. Flowers.

18   Q   Based on what you saw, Dr. Goldwasser, what effect, if

19   any, did the sheep EPO have on Dr. Gurney?

20         MS. BEN-AMI:  Objection.

21   A   None that I could detect.

22         THE COURT:  That may stand.

23         MR. FLOWERS:  No further questions at this time,

24   your Honor.

25         THE COURT:  Very well.  Ms. Ben-Ami?

1      **MS. BEN-AMI:**  Yes, your Honor, just briefly.

2      **THE COURT:**  Go ahead.

3                    **CROSS-EXAMINATION**

4  **BY  MS. BEN-AMI**

5   **Q**   Dr. Goldwasser, good morning again.

6   A    Good morning.

7   **Q**   I have just a few questions for you.

8        You talked to the jury today about this 1984

9   report.

10  A    Yes.

11  **Q**   And I thought you said on your direct that you only

12  looked at the data after everything had been completed.  All

13  the study had been completed.

14  A    I think that's right, yes.

15  **Q**   So I would like to show you another document which is

16  already in evidence.  It's 2088.  Here you go.

17       And if you look at that, Doctor, if you look all

18  the way at page, Bates number 906.  I gave you a little

19  sticker there to save time.

20       Can we go to Page 906.

21  A    Is that the number at the bottom right hand corner?

22  **Q**   Can I help.  Yes, if you don't mind, I'll help you and

23  we'll move quicker.  Here you go.

24       And that is your actual grant application, right,

25  in 1979?

1    A    Yes.

2    Q    Okay.  You signed that, right, in 1979?

3    A    Yes.  No, I didn't sign it.

4    Q    Oh.

5    A    Cedric Chernick signed it.

6    Q    Okay.  But this is your grant application, right?  It

7    says Eugene Goldwasser on it?

8    A    Yes, it does.

9    Q    Okay.  So, if we could turn to Page 920.  And here --

10   can I have that page, please.  920.  Can we blow that out

11   for the jury to see.

12        So this is in 1979, right?  And you are describing

13   here for the NIH the work that was done, the initial work

14   that was done in the clinical study, right?

15   A    I'll have to read it first and I'll see.

16   Q    Okay.  And while you're reading it can we highlight the

17   second paragraph.  Okay?

18   A    Yes.

19   Q    And there in the second paragraph you actually tell the

20   NIH data that there was a twofold increase in marrow

21   nucleated erythroid cells, a threefold increase in

22   circulating reticulocyte concentration, an increase in total

23   red cell mass of 22 percent or greater, and a significant

24   decrease in plasma iron half-life.  Right?

25        MR. FLOWERS:  Objection; lacks foundation as to

1    what he told.

2            **THE COURT:**  Overruled.

3    A    Yes.

4    Q    And that's the data you provided to NIH?

5    A    In this application, yes.

6    Q    In 1979, right?

7    A    Yes.

8    Q    And you understood that you needed to be -- well, strike

9    that.

10           And this is information you provided to the NIH in

11   1979 based on your review of the data?

12   A    I didn't hear your last sentence.

13   Q    I'm sorry.  This is the information you provided to the

14   NIH in 1979 based on your review of the data?

15   A    Based on the summary of the data that Dr. Baron gave me,

16   these are averages.

17   Q    And you had the data available to you?

18   A    The primary data?  I don't think I had it available

19   then.

20   Q    Okay.  So you told this to the NIH?

21   A    That's the average for the first patient, yes.

22   Q    Okay.

23           **MS. BEN-AMI:**  Thank you.  No further questions,

24   your Honor.

25           **THE COURT:**  Nothing further for this witness?

1      **MR. FLOWERS:**  Just a couple questions, your Honor.

2                  **REDIRECT EXAMINATION**

3   **BY  MR. FLOWERS**

4   **Q**   Dr. Goldwasser, you just referred to whether you had

5   seen the primary data by the time that this Exhibit 2088,

6   the grant application, was put in.

7             What did you mean by primary data?

8   **A**   The actual numbers done, obtained from the various tests

9   that were done in the clinical chemistry lab.

10  **Q**   And was there any importance to looking at the primary

11  data?

12      **MS. BEN-AMI:**  Objection.

13      **THE COURT:**  Wait a minute.  Sustained.

14  **Q**   At the time did you consider it important to look at the

15  primary data?

16      **MS. BEN-AMI:**  Objection.

17      **THE COURT:**  Sustained, with my earlier explanation.

18             Go ahead.

19  **Q**   Dr. Goldwasser, at the time that this grant application

20  was put in, how many patients had been studied in that

21  experiment?

22  **A**   The 1979 one?

23  **Q**   Yes.

24  **A**   One.

25      **MR. FLOWERS:**  Pass the witness, your Honor.

```
 1              THE COURT:  Nothing further?

 2              MS. BEN-AMI:  Nothing further.

 3              THE COURT:  You may step down, thank you.

 4              (Whereupon the witness stepped down.)

 5              THE WITNESS:  Call your next witness.

 6              MR. DAY:  Amgen calls Dr. Carlo Brugnara.

 7              THE COURT:  He may be called.

 8              THE CLERK:  Sir, would you raise your right hand.

 9              Do you solemnly swear that the answers you will

10      give to this Court and Jury will be the truth, the whole

11      truth, and nothing but the truth, so help you God?

12              THE WITNESS:  Yes, I do.

13              THE CLERK:  Please be seated.

14              MR. FLEMING:  Your Honor, may we have a side bar on

15      this witness?

16              THE COURT:  If it has to do with the motion

17      previously filed, that motion is denied, though I'm

18      sensitive to it.  And I take it there's a report for this

19      witness.

20              MR. MADRID:  Yes, there is, your Honor.

21              THE COURT:  I should have it.

22              MR. MADRID:  I'll bring it up.

23              THE COURT:  Please do.  And then proceed,

24      Mr. Madrid.

25              MR. MADRID:  Thank you, your Honor.
```

1    CARLO BRUGNARA

2    **DIRECT EXAMINATION**

3    **BY  MR. MADRID**

4    **Q**    Good morning, sir.  Would you please introduce yourself

5    for the jury?

6    A    My name is Carlo Brugnara.

7    **Q**    What is your occupation?

8    A    I'm a Professor of Pathology at Harvard Medical School.

9    I'm a practicing clinical pathologist at the Boston

10   Children's Hospital where I am the director of the

11   hematology laboratory, and I'm the associate director of the

12   clinical labs at Children's Hospital.

13   **Q**    Can you please describe your association with Harvard

14   Medical School?

15   A    After graduating from the University of Rome in Italy in

16   1979 and doing my internship there, I got a fellowship at

17   Harvard Medical School since, from 1982.  And subsequently I

18   trained at Brigham and Women's Hospital in Boston in both

19   laboratory medicine from '86 to '89 and in blood bank and

20   infusion medicine.  And I was also the assistant medical

21   director of the blood bank at Brigham and Women's Hospital

22   until 1992 when then I moved to Children's Hospital.

23   **Q**    How long have you held your positions at Children's

24   Hospital?

25   A    Fifteen years as the director of hematology lab and ten

1    years as associate director of the labs.

2    **Q**    What are your responsibilities as the director and

3    associate director of these laboratories?

4    A    Well, at Children's Hospital we see something like

5    17,000 inpatients every year and more than 450,000 patients,

6    outpatients a year.  So we're responsible for the laboratory

7    testing for that.  So I'm responsible for selecting the

8    proper tests and the proper instruments to run that tests in

9    the lab, and responsible to be sure that the test is done

10   properly and accurately by doing all the proper quality

11   control and all the regulatory requirements needed to run

12   some of these tests.  And I consult daily with clinicians

13   about which tests they took and how they have to interpret

14   the test.

15           And then I do a lot of teaching, because residents,

16   fellow, any kind of medical students that go to the hospital

17   and go to the lab, you know, we do some teaching for them.

18   **Q**    What clinical research experience, if any, do you have?

19   A    I've done research in the field of anemia, sickle cell

20   anemia, and iron deficiency anemia in kids, and I've done a

21   lot of research on the use of the laboratory in assessing

22   how recombinant human EPO works when it's given to patients.

23   **Q**    How many scientific articles have you published?

24   A    I've published approximately 130 articles and another 40

25   chapters in books, reviews.

1    Q    What editorial experience, if any, do you have?

2    A    I'm now the editor in chief of the American Journal of

3    Hematology.  It's a scientific journal on blood diseases.

4    And we get something like 800 manuscripts submitted every

5    year and we go through and at the end basically I decide

6    which one gets published or not, and we're now publishing

7    maybe 20, 25 percent of those.

8    Q    Now, sir, in connection with this case what patents, if

9    any, have you reviewed?

10   A    The '422 and the '933, Lin's patent, Dr. Lin's patent.

11   Q    Which patent claims, if any, did you review?

12   A    Claim 1 for the '422 and claim 9, 11, 12 and 14 for

13   '933.

14   Q    What definitions, if any, of the claim terms did you

15   use?

16   A    I used the definition of the Court.

17   Q    And for this case have you considered any experiments?

18   A    Yes.  So, I considered the experiments performed by

19   Dr. Baron and Goldwasser on three patients with urinary

20   material; the experiment on the hamster with the urinary

21   material; and the experiments of Dr. Essers that were

22   published; and the single experiment by Dr. Eschbach in a

23   single patient; and the experiments published by Dr.

24   Eschbach on sheep.

25   Q    What did you do to study these experiments?

```
 1    A    Well, first of all, you have to put yourself into, put

 2    myself into --

 3              MR. FLEMING:   Objection; beyond the scope of the

 4    report.

 5              MR. MADRID:   Your Honor --

 6         THE COURT:   I don't know whether it is, but why

 7    don't we get a reference so I can look at it.

 8              MR. MADRID:   Page 11, Paragraph 34.

 9         THE COURT:   Thank you.

10         MR. MADRID:   And then there's a whole series of

11    pages I can relate to, your Honor.

12         THE COURT:   Well, let's start with 11, 34.

13              When a witness comes in and the parties want them

14    to offer opinion, I always refer to them as opinion

15    witnesses.   They slip into this lingo of expert witnesses.

16    Well, that's for you.   All you know is, if I let them offer

17    their opinions, they've offered their opinions.   And when at

18    the end of a trial I come to charge you, I will make

19    reference to the opinion witnesses, and I'll say, now, a

20    bunch of people have offered their opinions here.   Like any

21    other witnesses, you may believe those opinions, but

22    equally, you may disregard those opinions and disbelieve

23    them, and I will caution you that you want to look to see

24    what the opinion witness's opinion is based on.

25              Now, you've heard it now and you'll hear it at the
```

1    end of the case.

2         But just so we go along smoothly, the rule is that

3    when an opinion witness is going to offer opinions, we first

4    must need an expert report.  And I -- an opinion witness

5    report.  And I take those very strictly.  Because that tips

6    the other side off properly as to what you're going to say.

7         So, in offering opinions, you have to stick to this

8    report.  So they've given it to you and I suggest you'll

9    want to look at -- and where were you, Page 11?

10        **MR. MADRID:**  Yes, your Honor.  First of all, with

11   respect to person of ordinary skill in the art, Page 11,

12   Paragraph 34, the entire paragraph.  With respect to setting

13   claims definition, Page 10, Paragraph 32, all of it.

14        **THE COURT:**  All right.

15        **MR. MADRID:**  Page 10, Paragraph 33, all of it.

16   With respect to analyzing the data from the experiments,

17   Page 6, Paragraph 16, Exhibit B.

18        **THE COURT:**  You know, you can read it.  I can't

19   follow it and we can only go at my pedestrian speed, I'm

20   sorry.

21        Given that, it will be smoother if you look at

22   what --

23        **THE WITNESS:**  Yes.

24        **THE COURT:**  -- you said in your report.  Now,

25   you're stuck -- well, you're not stuck with that, but you've

1    got to stick to that report.  That's what Mr. Fleming's

2    objection was about.

3             Now your question again, Mr. Madrid.

4             **MR. MADRID:**  Yes.  Thank you, your Honor.

5             **THE WITNESS:**  May I have --

6             **THE COURT:**  You've done nothing wrong.

7             **THE WITNESS:**  Can I have a glass?

8             **THE COURT:**  You certainly can.

9             **THE WITNESS:**  Sorry.

10            **THE COURT:**  You certainly can.

11   **Q**   Dr. Brugnara, what did you do to study these

12   experiments?

13   A   So, I put myself in the position of being a person of

14   ordinary skills at the time of that invention, 1983, '84,

15   and I interpret that as an M.D. with at least two years of

16   experience and, after graduation.

17            Then I look at the claims and the definition of the

18   Court about therapeutic effective amount.  And then I look

19   at all the data that I was provided with from the clinical,

20   from the clinical study.  And I analyze the data, I make

21   tables, summaries.  I look at the expert reports from Dr.

22   Spinowitz, and which there were four of them, and I look at

23   the deposition of Dr. Goldwasser, Baron and Katz.  And then

24   I did a lot of research on my own looking through books and

25   textbook, papers, and Internet to really get all --

1        **MR. FLEMING:**  Objection, your Honor; that's beyond

2   the scope of his report.

3        **THE COURT:**  Yes, where is it about going to these

4   sources?

5        **MR. MADRID:**  That would be Page 6, Paragraph 16,

6   Exhibit B.

7        **THE COURT:**  Just a moment.  Page 6, Paragraph 16

8   and in Exhibit B.  Thank you.

9        Well, nothing about the Internet.  So pass that.

10  You looked -- however, you did, you looked at this stuff

11  that's listed here in Exhibit B, right?

12       That's a question to you, sir.

13       **THE WITNESS:**  Yes.  Yes.

14       **THE COURT:**  Yes.  Go ahead.

15  **Q**   As a result of your analyses, Doctor, do you have any

16  opinion as to whether the preparations used in the

17  experiments that you just listed anticipate or render

18  obvious any of the patent claims you studied?

19  **A**   Yes, I do.

20  **Q**   What is your opinion?

21  **A**   That none of the claims of the patent in question is

22  either anticipated or rendered obvious by the experiments

23  that I reviewed.

24  **Q**   Now, you mentioned that you studied the Goldwasser

25  three-patient urinary EPO experiment.  Can you briefly

1    describe for the jury your understanding of the design of

2    that experiment?

3              **MR. FLEMING:**  Objection, your Honor.

4              **THE COURT:**  He may testify to his understanding to

5    the extent it's set forth in the report.

6    A    The, the investigator represented to the FDA that they

7    were going to do a very careful investigation of a variety

8    of laboratory parameters before the test material was being

9    used, and they were going to take several measurements in

10   the prior two weeks before the test material.  Then, they

11   were going to repeat some of those measurements during the

12   time that the patients were getting the test material.  And

13   then they were going to compare the before and during to

14   see, first of all, was there any change, and if there was

15   any change was that caused by the urinary materials.  So

16   that's my understanding of the design.

17   **Q**    Doctor, you mentioned test materials.  What did you mean

18   by test materials?

19   A    The urinary preparation.

20   **Q**    What analysis, if any, did you do of the data from the

21   three-patient urinary EPO experiment?

22   A    Well, again, I put myself in the person of ordinary

23   skills in the art.  Then -- this is such a small study

24   because there are only three patients.  And so, when you

25   look at the data, you have to look at all the data, you

1    can't just pick and choose, you have to look at all the data

2    and you have to look at the data as a whole, it has to make

3    sense as a whole.  And then when you look at the data, you

4    have to look at whether there is a consistent, coordinated,

5    progressive uniform pattern of response in all three

6    patients.  I want to explain --

7         **MR. FLEMING:**  Objection, your Honor; this is

8    contrary to claim construction.

9         **THE COURT:**  Wait one minute.  No, overruled.  He

10   says he's telling us what he's looking for.  Claim

11   construction stands.

12        **MR. FLEMING:**  Thank you, your Honor.

13   A    So I'm looking for consistencies, the data can't just

14   jump up and down, they have to be consistent one with the

15   other, coordinated with other biologists so we know how

16   things can change in one direction and other things --

17        **MR. FLEMING:**  Objection, your Honor; this is beyond

18   the scope of his report.

19   A    -- change in the opposite.  Sorry.

20        **THE COURT:**  No, we'll stop it there.

21        Now, it's time for the break.  Shall we -- are you

22   going to be done with this witness in about five minutes on

23   direct?

24        **MR. MADRID:**  I would estimate ten minutes, your

25   Honor.  We'll do our best.

1          **THE COURT:**  We'll take the break.

2          Ladies and gentlemen, you've not heard all the

3    testimony.  Please, therefore, keep your minds suspended.

4    Do not discuss the case either among yourselves nor with

5    anyone else.  You may stand in recess for one-half hour

6    until 11:15.  We'll recess.

7          **THE CLERK:**  All rise for the jury.

8          (Whereupon the jury left the courtroom.)

9          (Recess.)

10         **THE CLERK:**  All rise for the jury.

11         (Whereupon the jury entered the courtroom.)

12         THE CLERK:  Court is in session, please be seated.

13         **THE COURT:**  Continue, Mr. Madrid.

14         **MR. MADRID:**  Thank you, your Honor.

15              **DIRECT EXAMINATION** (Cont'd)

16   **(BY MR. MADRID:)**

17   **Q.**  Dr. Brugnara, after you analyzed the data from the

18   three-patient experiment, what general conclusion, if any,

19   did you draw?

20   A.  They make contradictory, inconclusive.  You can't draw

21   any conclusion about the fact of the urinary test material.

22         **MR. MADRID:**  Can we have projected claims '933, 11,

23   14.

24   **Q.**  Do you see where it's highlighted, "Effective to

25   increase the hematocrit level of said patient"?  Do you see

1    that, Doctor?

2    A.  Yes.

3    **Q.**  Do you have an opinion as to whether or not the urinary

4    EPO preparation in the three-patient experiment caused any

5    increase in the hematocrit of any of the three patients?

6         **MR. FLEMING:**  Objection.  Beyond the scope of the

7    report.

8         **THE COURT:**  Yes.  Where is it in the report?

9         **MR. MADRID:**  Page 28, Paragraph 63, sentences 1 to

10   3 and last sentence.  It's also at page 28, Footnote 55.

11   It's also at page --

12        **THE COURT:**  He may testify consistent with what's

13   set forth there, sir.  You might want to look there, 28,

14   Paragraph 63.

15        **THE WITNESS:**  Sorry.

16   A.  So, the only really consistent uniform pattern of this

17   study is that the hematocrit did not increase.  Did not.

18   **Q.**  Now, if we could move on to '422 claim 1, and have

19   projected '422 claim 1.  You see there are highlighted the

20   words "therapeutically effective amount of human

21   erythropoietin"?

22        Doctor, what definition did you rely on for the

23   term "therapeutically effective amount"?

24   A.  The court definition.

25        **MR. MADRID:**  Could we have the glossary for

1    "therapeutically effective amount"?  Thank you.

2    **Q.**  Now, based on the Court's decision, what is your

3    understanding as to whether or not the three-patient urinary

4    EPO experiment demonstrated a therapeutically effective

5    amount of human erythropoietin?

6            **MR. FLEMING:**  Objection, your Honor.

7            **THE COURT:**  No --

8            **MR. FLEMING:**  Also beyond the scope of the report.

9            **THE COURT:**  Oh, no, that's in the report.  He may

10   testify consistent with the report and consistent with the

11   construction that I have placed on that language.

12           You may answer.

13   A.  My opinion is that the urinary material did not

14   constitute a therapeutic effective amount.

15   **Q.**  And why is that?

16   A.  Well, the -- this is such a small experiment, and when

17   you look at the natural variability of these parameters, how

18   the things that we measure change in the patient from time

19   to time, and you look at such a small number of patients,

20   relatively, small --

21           **MR. FLEMING:**  Objection.  Beyond the scope of his

22   report, your Honor.

23           **THE COURT:**  No, he may so testify.  Go ahead.

24   A.  So when you look at this variability, so the things move

25   up and down this way, and then you look at the data, none of

1   the data falls outside of that, to really to be sure that

2   you have an effect.  If all this thing change by nature this

3   way, unless it's up here, you can't really draw any

4   conclusion about the effect.

5        And in addition, the -- you can't pick and choose.

6   You have few data, you can't just pick one and say, Okay,

7   make a conclusion based on one when the other experiment,

8   the other patient, has not changed.  And the other patient,

9   that same parameter changes in the opposite direction.  So

10  you can't pick and choose.

11       And the other thing that is important, the

12  experiments --

13       **MR. FLEMING:**  Objection.  This is beyond the scope

14  of his report, your Honor.

15       **THE COURT:**  I don't know that it is because he

16  didn't say anything yet.  "And the other thing," he said.

17  So he may start.  I'll strike it if it's beyond.

18  A.  There was not a control for outside effects, that's the

19  other problem with this study.

20       **THE COURT:**  Proceed.

21  Q.  Now, Doctor, we've had an opportunity to talk about

22  hematocrit.  Let's talk about reticulocytes.  If we could

23  put the glossary up and highlight where it says "Stimulation

24  of reticulocyte response."

25       Now, based on your review of the three-patient

1    experiment, what is your view as to how reticulocytes were

2    counted in that experiment?

3    A.   The reticulocyte were count manually.  What that means

4    is the technologist has to sit in front of the microscope

5    and look at the cells and decide, counting a thousand cells,

6    is this reticulocyte or is this not a reticulocyte.

7         So there is a very high degree of subjectivity.

8    Because I see in the lab, two people looking at the same --

9         **MR. FLEMING:**  Objection.  Beyond the scope of his

10   report.

11        **THE COURT:**  Yes, what you've seen in the lab,

12   that's stricken.

13        **THE WITNESS:**  I'm sorry.

14        **THE COURT:**  Put another question, Mr. Madrid.

15        **MR. MADRID:**  Your Honor, the subject was addressed

16   in the report.  I can give you the cite references.

17        **THE COURT:**  I stand on my ruling.  Put another

18   question.

19   **Q.**  Doctor --

20        **MR. MADRID:**  Your Honor, if I may, I'd like to set

21   up the Exhibit 2049A, page 3.  This is a board that we used

22   earlier.  May I approach?

23        **THE COURT:**  Yes.  I don't know as they can see

24   that.  Do you want me to hold it?

25        All right.  Go ahead.

1          **MR. FLEMING:**  Objection, your Honor.  There's

2    nothing in the report about using this board as a

3    demonstrative.

4          **THE COURT:**  Well, but it's in evidence and we see

5    what questions there are.  And your questions come from what

6    portion of the report?

7          **MR. MADRID:**  Your Honor, my questions are going to

8    come from page 33, first of all, this specific exhibit is

9    referenced in Footnote 65; page 34 Footnote 69, page 43

10   Footnote 92, then there's a series of topics where this is

11   discussed at length with respect to Patient 3, page 32, if

12   you look at Paragraph 73, 74, 75.

13         **THE COURT:**  He may testify consistent with those

14   paragraphs.

15   **Q.**  Before we go there, Doctor, what effect, if any, does

16   manual counting have on the results, manual counting of

17   reticulocytes?

18   A.  The results have a wide range --

19         **MR. FLEMING:**  Objection, your Honor.  That's not in

20   the report.

21         **THE COURT:**  Where is that said?

22         **MR. MADRID:**  Yes, your Honor.  Manual counting is

23   addressed at page 35, Paragraph 78, all of that paragraph.

24         **THE COURT:**  Just a moment.  Yes.

25         **MR. MADRID:**  It's also addressed --

1    **THE COURT:**  That may stand, and he may continue.

2    Put another question.

3    A.  So I said that measurement has very large, wide -- very

4    large range of error because it's very subjective.  And then

5    so the -- to see an effect, you have to be able to have

6    numbers that fall outside of that big variation that is just

7    due to the error of the measurement.

8    **Q.**  Doctor, in forming your opinions, did you use this

9    chart, Exhibit 2049A, specifically page 3, from Baron's

10   three-patient data?

11   A.  Yes, I did.

12   **Q.**  And can you please explain to the jury what you found

13   regarding the reticulocyte measurements for Patient 3?

14   A.  Yes.  I'm not sure if I need to, I'd like to remind the

15   jury, these are the dates of the study.  These are dates in

16   which some things happened.  And these are, the arrows, is

17   when the urinary test material was injected into the

18   patient.  So first thing is the baseline.  As I told you

19   before, that very important study of at least six

20   measurement in the first two weeks to really careful study

21   how is this patient behaving before the test track.  This

22   was not done here, there are only two measurements.

23          Then if you look at this one, you see that there

24   are two different set of data for each day.  The

25   reticulocyte count was measured on the same blood sample of

1    the same patient by two different labs.  As you see here,

2    none of the points is matching.  And so you have in this

3    day, in which one lab gives much lower volume than the other

4    one.  And in this day here, you have the other lab giving a

5    very high volume.  This was even questioned by Dr. Baron

6    himself, who put a big question mark here.  And the other

7    one gives a very, very low volume.

8        So when you look it over, you see this is the

9    problem with the retic count, is the variability, the range

10   of error.  So to really have a significant effect, you have

11   to be outside of that range, because this is just noise.

12   This is the variability of the assay due to the fact that

13   there's not a very good and precise assay.

14   Q.  Doctor, what, if anything, did you conclude regarding

15   the reticulocyte counts for patients 1 and 2 in the

16   three-patient experiment?

17   A.   In Patient 1, again, the two labs had very different

18   results during the same day.  And there is an additional set

19   of even discrepant counts from a third entity.  In Patient

20   2, there's really no change.  The value are close enough,

21   but it's just very, very flat.  It's like this one here,

22   this is the hematocrit in this patient.  And this is flat.

23   You see, there is no change.  So it's the same for Patient

24   2.

25        So when you look at the data together, and look at

1    the whole picture, you see that there is no real significant

2    change.  It's just within the noise of the imprecision of

3    the assay.

4    Q.  Doctor, what other measurements, if any, did you look at

5    regarding the three-patient study?

6    A.  I did look at the ferrokinetic effects that are listed

7    there, and the erythrocyte mass changes.

8    Q.  What is your understanding as to what the data showed

9    regarding erythrocyte mass?

10   A.  So erythrocyte mass, that is called red cell mass in the

11   study, is a way to quantifying how many cell sites in a

12   given subset.  The top number of cells.  It's done by

13   injecting radioactive material and counting.  And the data

14   are inconsistent, because in one patient that measurement

15   that is supposed to go up when the bone marrow is stimulated

16   by erythropoietin, in one patient it goes down.  In the

17   other patient, in Patient Number 1, it moves up a little

18   bit.  In Patient Number 2, the results are completely

19   inconsistent.  They are widely different numbers.

20          And so you're left with the notion that you can't

21   draw any conclusion because the data all over the place.

22   Q.  What is your understanding as to what the data shows

23   regarding ferrokinetics?

24   A.  So iron is necessary to build the red cells.  To make

25   the hemoglobin, to make blood, you have to have iron.

1    Scientists for many years have studied how iron moves.

2    Because iron is in the blood, in the plasma, and has to move

3    out there and get into the bone marrow to become part of the

4    red cells.  And there are a variety of studies to that all

5    with reactive substances.

6         So the investigator specifically said that they

7    were -- I'm going to highlight it here -- they were going to

8    measure this plasma iron turnover, that this measuring how

9    the iron gets out of the plasma.  But what they did

10   actually, they did not measure that because they did not

11   measure a very important component that is actually measure

12   how much higher it was in the plasma.  So the numbers they

13   got cannot be interpreted.  They did not measure the marrow

14   transit time, but they measure how much of this radioactive

15   material go into the red cells at one single point.

16        The data are inconsistent because in one patient it

17   goes up a little bit, and in the other one it goes down

18   significantly.  So you can't, again, draw any conclusion

19   because they are inconsistent and contradictory.

20        **MR. MADRID:**  May I have '422, claim 1, please.

21   **Q.**  Do you see where it says, "Pharmaceutical composition

22   comprising a therapeutically effective amount of human

23   erythropoietin," Doctor?

24        **MR. MADRID:**  May I also have the glossary, please?

25   **Q.**  And you see, "A composition suitable for administration

1    to humans."

2           Doctor, do you have an opinion as to whether or not

3    a person of ordinary skill in the art in 1983, '84 would

4    have considered the urinary EPO preparation used in the

5    three-patient experiment to be a pharmaceutical composition?

6           **MR. FLEMING:**  Objection, leading.

7           **THE COURT:**  Overruled.

8    A.  Yes, I do.

9    **Q.**  What is your opinion?

10   A.  A person of ordinary skills in the art would have not

11   considered that preparation to be a composition suitable for

12   administration to humans.

13   **Q.**  Why is that?

14   A.  Because the urinary material had effects that were very

15   different from those of erythropoietin.  First of all, when

16   it was given to hamsters, the urinary material induce very

17   significant increase in the white cell count in the hamster,

18   this test animal, laboratory animal.  And we know that

19   erythropoietin does not increase --

20          **MR. FLEMING:**  Objection, your Honor.  This is

21   beyond the scope of his report.

22          **THE COURT:**  This business about, "We know that

23   erythropoietin" --

24          **THE WITNESS:**  I'm sorry.

25          **THE COURT:**  I'll strike that.  You can ask another

1    question.  You may ask a question.

2    **Q.**  Well, Doctor, what is your opinion with respect to the

3    significance of the data regarding white blood cell count in

4    the hamsters?

5    A.  The increase in the white cell count in the hamster is

6    not -- not the one that you see with --

7            **MR. FLEMING:**  Objection, your Honor.

8            **MR. MADRID:**  Your Honor, this is at page 56,

9    Paragraph 110, the fourth, fifth and sixth sentence.

10           **THE COURT:**  Thank you.  No, overruled.  He may

11   testify consistent with the report.  Go ahead.

12   A.  So as I said, preparation of human erythropoietin that

13   contain human EPO purified from mammalian cells in culture,

14   do not increase the white cell count.  And so that means

15   there's either contamination, a toxic effect --

16           **MR. FLEMING:**  Objection.  This is beyond the scope

17   of his report.

18           **THE COURT:**  Overruled.  He may testify.

19   A.  Or something else that we don't understand.  But it's

20   very troublesome and worrisome about that.  So that's one

21   thing.

22           Then when this preparation was given to the

23   patient, the investigator noted that the appearance of this

24   break down products.  It means that when the molecules was

25   given to this patient, it fell apart, this break down

1    products in the circulation.  And third, that the time that

2    this molecule stays in the circulation is called the

3    halflife.  I mean, how much can you measure in the

4    circulation was very, very short.  It was being removed very

5    fast from the circulation, much, much faster than the EPO.

6         And that the final is that this preparation had no

7    effect in all the experiments that were done, couldn't

8    really show any significant effect.

9         **MR. MADRID:**  Now, could we have the '422 claim and

10   highlight the language, "Wherein said erythropoietin is

11   purified from mammalian cells in culture."

12   **Q.**  Dr. Brugnara, do you have an opinion as to whether or

13   not the person of ordinary skill in the art would have

14   considered the urinary EPO preparation in the three-patient

15   experiment to be human erythropoietin purified from

16   mammalian cells in culture?

17        **MR. FLEMING:**  Objection, your Honor.

18        **THE COURT:**  Overruled.

19        **MR. FLEMING:**  Calls for a legal opinion --

20        **THE COURT:**  No, no, what's legal is what the

21   construction is.  He can give his view as to how this

22   matches.  Or doesn't.

23        You may answer.

24   A.  Yes, I do.

25   **Q.**  What is your opinion?

1    A.   Sorry, I just block on the question that you asked.

2    Q.   Let me reput the question.

3         Dr. Brugnara, do you have an opinion as to whether

4    or not the person of ordinary skill in the art in 1983 or

5    '84 would have considered the urinary EPO preparation that

6    was used in the three-patient experiment to be human

7    erythropoietin purified from mammalian cells in culture?

8    A.   A person of ordinary skill in the art in 1983 and '84

9    would have not considered this urinary preparation to be

10   erythropoietin purified from mammalian cells grown in

11   culture, since it was purified from urine.

12   Q.   Now, Doctor, do you have an opinion as to whether or not

13   a person of ordinary skill in the art in 1983, '84 would

14   have considered the urinary EPO preparation used in the

15   three-patient experiment to anticipate or render obvious the

16   '933 claims 9, 11, 12 and 14?

17   A.   Yes, I do.

18   Q.   What is your opinion?

19   A.   That a person of skills in the art would have not

20   considered the urinary preparation to anticipate or render

21   obvious the claims in '422 and '933.

22   Q.   Why is that?

23   A.   Because this material, as I said before, increases the

24   white cell count in the hamster, has a very, very short

25   halflife, isn't normal, yields breakdown products, and has

1    no biological effect.

2    Q.  Now, Doctor, do you have an opinion as to whether or not

3    a physician of ordinary skill in the art in 1983, '84 would

4    have been willing to continue to administer in humans the

5    specific urinary EPO preparation that was used in the

6    three-patient experiment?

7         MR. FLEMING:  Object.  This is beyond the scope of

8    his report.

9         MR. MADRID:  Your Honor, it's on page 56,

10   Paragraph 111, second sentence.  It's also addressed at

11   pages 57 and 58, Paragraph 14, last sentence.

12        THE COURT:  Overruled.  He may testify.

13   A.  A person of ordinary -- a physician of ordinary skills

14   in the art in 1983 and the Institutional Review Board --

15        MR. FLEMING:  Objection, your Honor.  Now it's

16   beyond the scope of the report.

17        THE COURT:  Yes.  Physicians you're asked about,

18   and stick to physicians.

19   A.  Would have been extremely reluctant, if not opposed to

20   use any more of this urinary preparation to human, and would

21   have been extremely concerned about the nature of the

22   preparation and the suitability, whether it was suitable to

23   be administered to humans.

24   Q.  Doctor, do you have an opinion as to whether or not an

25   Institutional Review Board in 1983, '84 would have been

1  willing to allow anyone to continue to administer this

2  urinary EPO preparation to humans?

3         **MR. FLEMING:**  Objection, your Honor.  Institutional

4  Review Board again.

5         **THE COURT:**  Yes, sustained.

6         **MR. MADRID:**  Your Honor, that's in the report.

7         **THE COURT:**  Point it out.

8         **MR. MADRID:**  It's at pages 57 to 58.  Look

9  specifically at Paragraph 114, the last sentence.

10        **THE COURT:**  Thank you.  This is overruled.  He may

11 so testify.

12 A.  I sit on the Institutional Review Board for ten years,

13 so an Institutional Review Board would have been extremely

14 reluctant, if not opposed, to have any more of this studies

15 being done with patients.

16 **Q.**  Now, Doctor, you mentioned you reviewed the Essers and

17 Eschbach experiment.  What test material do you understand

18 those experiments did involve?

19 A.  So those experiment use plasma from sick patients.

20 **Q.**  And do you have an opinion as to whether or not a person

21 of ordinary skill in the art in 1983, '84 would have

22 considered the plasma preparations used in the Essers and

23 the Eschbach single-patient experiment to be a

24 pharmaceutical composition?

25 A.  Yes, I do.

1    **Q.**   What is your opinion?

2    A.   That the person of ordinary skill would have not

3    considered that plasma preparation and those experiments to

4    be from a pharmaceutical composition.

5    **Q.**   Why is that?

6    A.   I work in the blood bank at Brigham and Women's

7    Hospital, and plasma is a blood product.  It's given to

8    people for medicinal purposes.  It's kept in the blood bank.

9    Pharmaceuticals are kept in the pharmacy.  They're two

10   different things.

11        Plasma has a variety of components in there.  It

12   changes from patient to patient.  We can't ensure the

13   composition of that material.  When you give it to patient,

14   it's gone.  We know that viral diseases, like HIV, hepatitis

15   and other infectious disease --

16        **MR. FLEMING:**  Objection, your Honor.

17        **MR. MADRID:**  That's at page 63, Paragraph 124,

18   Paragraph 129.

19        **THE COURT:**  It may stand.

20   A.   So viral illnesses have been transmitted via blood

21   products.  So they are two very different things.  And so

22   plasma is not a pharmaceutical composition.

23   **Q.**   Now, Doctor, do you have an opinion as to whether or not

24   the plasma preparations used by Doctors Essers and Eschbach

25   used a diluent, adjuvant or a carrier?

1    A.  The plasma preparation used by Dr. Essers and Eschbach

2    did not use a diluent, adjuvant or carrier.

3              **MR. MADRID:**  Your Honor, I pass the witness.

4              **THE COURT:**  Mr. Fleming?

5                        **CROSS-EXAMINATION**

6    **(BY MR. FLEMING:)**

7    **Q.**  Good morning, Dr. Brugnara.  My name is Tom Fleming.

8    I'm an attorney representing Roche.  I want to ask you a few

9    questions about your testimony.

10             Doctor, would you agree with me that basing a

11   medical judgment on less than all the data or information is

12   not sound science?

13   A.  What did took place, the judgment on all the data.

14   **Q.**  But would you agree with me that basing a medical

15   judgment on less than all the data or information available

16   is not sound science; do you agree with that?

17   A.  You have to consider all the data.

18   **Q.**  I'm going to put in front of you what's been marked as

19   Exhibit 2049, which is all of the clinical data from the

20   Baron-Goldwasser study, okay.

21             Now, Doctor, you did not consider all of this

22   clinical data, did you, when you were coming to your

23   opinions?

24   A.  Of course I did.  I wrote in the -- my opinion is based

25   on part of that study, and I say specifically in the opinion

1    that I reserve the right to --

2    Q.   Doctor, listen to me.  You did not consider every page

3    of that clinical data when you came to the opinions in your

4    report; correct?

5    A.   I did consider portion of that and --

6    Q.   Portion.  Portion.  Doctor, listen to me, please.  Did

7    you consider every page of the data, yes or no?

8    A.   I consider and I kept considering until today all the

9    pages.  I read all of these.

10   Q.   Doctor, these are the pages that are cited in the back

11   of your report.  Could we look together at Exhibit B,

12   Doctor.  Let's look at Exhibit B.  Okay?  And let's show the

13   jury that there are only excerpted pages from the Baron

14   documents; correct?

15   A.   Yes.

16   Q.   Right.  So you didn't cite all of the pages in the

17   document, did you?

18   A.   I did not.

19   Q.   And these are the subset of the pages from all of that

20   clinical data that you reviewed; correct?

21   A.   Those are the ones that I quoted in the report.

22   Q.   That's the one you looked at.

23          MR. MADRID:  Objection, your Honor.  I move to

24   strike the comments.

25          THE COURT:  The comments are stricken.

1    Q.   Doctor, do you remember when you were first retained by

2    Amgen to work in this case?

3    A.   I think after Dr. Eschbach became ill, so was, I

4    believe, May.

5    Q.   Let me show you a document and see if I can help refresh

6    your recollection.  So first, Doctor, could you look at the

7    last page of that document and tell me if that's your

8    signature?

9    A.   It's signed and dated on July 2, 2007.

10   Q.   So that's your signature?

11   A.   Yes.

12   Q.   And you signed it on what date, please?

13   A.   July 2nd, 2007.

14   Q.   And that's your signature to the undertaking to work in

15   this case; correct?

16   A.   I believe so, yes.

17   Q.   I'm sorry, is that yes?

18   A.   Yes.

19   Q.   Okay.  So July 2nd of 2007 is when you signed the

20   undertaking to work on this case.  Do you remember the day

21   you signed the expert report that you talked to the jury

22   about?  If I told you it was July 19th of this year, would

23   that refresh your recollection?

24   A.   Probably.

25   Q.   Okay.  So you signed the undertaking on July 2nd and you

1    submitted an expert report a couple of weeks later based on

2    your review of part of the Baron-Goldwasser clinical data;

3    is that correct, Doctor?

4    A.   Yes.

5    **Q.**   Yes, thank you.  And then you went on vacation for a few

6    weeks to Italy; right?

7    A.   In August.

8    **Q.**   And then after you came back from vacation, then we had

9    a chance to talk to you at your deposition; correct?

10   A.   I don't remember when it was.

11   **Q.**   You don't remember August?

12   A.   End of August.

13   **Q.**   Okay.  So now you know that the Baron-Goldwasser study

14   was done in 1979 and 1980; correct?  In 1979 and 1980 was

15   Dr. Baron, in your opinion, one of skill in the art?

16   A.   I really don't know his CV so I can't really -- I don't

17   know when he graduated.  I don't know if I can make a

18   assumption, if he was a clinical investigator and -- in a

19   study.

20   **Q.**  He was a clinical investigator, he was a medical doctor;

21   correct?  And he'd been treating patients; correct?  You

22   have to answer verbally.

23   A.   Si -- yes.

24   **Q.**  And he was also the one who was actually treating the

25   patients in 1979 in his study; correct?

1    A.   Correct.

2    **Q.**   And 1979, you were still in medical school; correct?

3    A.   I graduated from medical school in 1979.

4    **Q.**   In that year, '79, you just graduated from medical

5    school.

6           Now, you didn't talk to Dr. Baron about his

7    clinical trial study; did you?

8    A.   Personally talk to him, no.

9    **Q.**   No.  All you did is you read some pages from a

10   transcript; correct?

11   A.   I read his deposition.

12   **Q.**   Right.  Did you watch the video of the deposition?

13   A.   I did not watch the video.

14   **Q.**   You did not.  The jury saw that; correct?

15           **MR. MADRID:**  Objection.

16           **THE COURT:**  Well, the comment's stricken.

17           **MR. FLEMING:**  It was a question, your Honor, but

18   I'll withdraw it.

19   **Q.**   You didn't talk to Dr. Goldwasser either about the

20   clinical trial, did you?

21   A.   I did not talk to Dr. Goldwasser.

22   **Q.**   No.  Even though he's a paid Amgen expert just like you

23   are, you never spoke to him; correct?

24   A.   I never spoke to Dr. Goldwasser about a study.

25   **Q.**   Were you sitting in the hall together, down the hall,

1    with Dr. Goldwasser?

2    A.  Yes.

3    **Q.**  You were sitting together with him, right, and you were

4    coming in here to criticize his results from his clinical

5    trial and you never spoke to the man about that?

6             **MR. MADRID:**  Objection, your Honor.

7             **THE COURT:**  Oh, sustained.  Sustained.

8    **Q.**  So you never spoke to Dr. Goldwasser regarding your

9    opinions about his work on --

10            **THE COURT:**  No, no, sustained.  There's a

11   sequestration order in this case.  I don't think that's a

12   fair question.  Sustained.

13   **Q.**  Did at any time prior to the trial, before the order

14   went into place, did you ever talk to Dr. Goldwasser about

15   his clinical trial?

16   A.  I did not.

17   **Q.**  Now, you didn't look at any of the slides from the

18   reticulocyte counts from the Baron-Goldwasser study, did

19   you?

20   A.  I didn't even know they had slides.

21   **Q.**  You didn't look at them, Doctor, yes or no?

22   A.  At the slides?

23   **Q.**  Did you look at any -- before you gave your opinion

24   about --

25            **MR. MADRID:**  Objection.

1    Q.  -- reticulocytes, did you look at any of those slides?

2            MR. MADRID:  Objection.  Lacks foundation.

3            THE COURT:  Overruled.

4    Q.  Yes or no, Doctor, did you look at the slides?

5    A.  That as far as I know, there are no slides, so I did not

6    look at slides.

7    Q.  Did you ask Dr. Baron if there were any slides?  No?

8    A.  We don't keep slides of reticulocyte for twenty years.

9    Q.  Did you ask Dr. Baron if he had those slides that you

10   criticized?

11   A.  No.

12   Q.  You're not a nephrologist, right, Doctor?

13   A.  No.

14   Q.  Dr. Baron's a nephrologist, isn't he?

15   A.  I believe so.

16   Q.  Right.  Nephrologists treat patients; correct?

17   A.  Yes.

18   Q.  You do not directly treat patients, do you?

19   A.  I don't, but I work with nephrologists so I interpret

20   the results from --

21   Q.  Doctor, you need to answer my question, please.  You do

22   not directly treat patients; correct?

23   A.  I do not directly treat patients, that's right.

24   Q.  And you've never administered EPOGEN to a patient, have

25   you?

1    A.   EPOGEN to a patient, not in a clinical -- in a clinical

2    study, but not to a patient.

3    **Q.**  Not to a real kidney disease patient, right, you did

4    not?  No?

5    A.   No.

6    **Q.**  Thank you.  And you're not a molecular biologist;

7    correct?

8    A.   I'm not.

9    **Q.**  And in 1983 and '84 you never cloned a gene; correct?

10   A.   Not in 1983, '84.

11   **Q.**  But you're here to say to this jury that there are no

12   significant findings and no noteworthy observations from the

13   clinical trial data of Dr. Goldwasser and Dr. Baron;

14   correct?

15   A.   Data inconsistent, contradictory, not reliable, yes,

16   that's what I'm saying.

17   **Q.**  That no competent scientist can draw any conclusions

18   from that data; that's your opinion, correct?

19   A.   That, when you look at all the data and you look at all

20   the studies as a whole, you can't draw any conclusion.  If

21   you pick and choose, you can draw any conclusion you want,

22   but that's not science.

23       **MR. FLEMING:**  Could we have 2088, please.  Could we

24   go forward?

25   **Q.**  This is Dr. Goldwasser's NIH grant application, the jury

1    just saw it.

2          **MR. FLEMING:**   Could we go forward, please?

3    **Q.**   Did you look at that, Doctor?

4          **MR. FLEMING:**   Go back to the front page, please.

5    **Q.**   Did you review this document?

6    **A.**   I did.

7    **Q.**   From 1979?

8    **A.**   This is 1988.

9    **Q.**   No, no, sir, look at the date.  Oh, this is 1988.  Keep

10   going, please.  Thank you.  Okay.  And you looked at that

11   document from 1988?

12   **A.**   I did.

13   **Q.**   Okay.  Now, this is Dr. Goldwasser's grant from 1979.

14   Did you look at this, Doctor?

15   **A.**   Yes.

16   **Q.**   You did, from 1979?

17   **A.**   I believe -- my living room is full of papers.  I have

18   pile of paper, nowhere to put them.  I believe I saw it.  If

19   you show me more, then I can tell you.

20   **Q.**   Page 131.  Dr. Goldwasser just testified that this was

21   the conclusion he drew from the first patient; do you see

22   this?

23          **MR. MADRID:**   Objection.  Your Honor, stating the

24   testimony.

25          **THE COURT:**   I think that's fair.  You may put the

1    question.

2         **MR. FLEMING:**  Thank you, your Honor.

3         **THE COURT:**  The jury's watching.

4    Q.  Did you review this data before you came to your

5    opinions, Dr. Brugnara, that's on page 131 of 2088?

6    A.  These are the data from Patient 1.

7    Q.  Did you look at the data that's disclosed here by

8    Dr. Goldwasser in this grant application?  Did you see this

9    page?

10   A.  I believe I did but, you know, I mean -- I saw 2 billion

11   pages.  The data about the increase in red cell mass, I

12   remember that.  And the plasma, this data I remember.

13   Q.  Right.  So, first of all, if you look at the last line

14   in the first paragraph, it talks about a patient that was

15   given pyrogen-free human erythropoietin with FDA approval.

16   Do you see that?

17   A.  I see that.

18   Q.  And with FDA approval, that means that the government

19   decided it was safe to give this pharmaceutical composition

20   to patients; correct?

21   A.  No.

22   Q.  When you file an IND, don't you have to ask permission

23   from the FDA in order to give a product to a human?

24   A.  Yeah, but the FDA never gives them approval.

25   Q.  Do you not have to have that IND approved before you can

1   give a pharmaceutical composition to a human?

2   A.  You never get an approval letter from the FDA.  They

3   don't answer you in a month, you can go ahead.  I have an

4   IND, I know it.

5   Q.  Did you ask Dr. Goldwasser when he said that they gave

6   this pharmaceutical composition to humans with FDA approval,

7   did you ask him what he meant?

8   A.  No.  That's what Dr. Goldwasser wrote.  I mean, first, I

9   wasn't supposed to talk to him.  And second, that's how he

10  phrases.  But again, the FDA does not approve IND.

11  Q.  Dr. Goldwasser was there in '78 and 1980?

12  A.  But the FDA does not approve IND.

13  Q.  The jury can see what Dr. Goldwasser concluded.

14          MR. MADRID:  Objection.  Move to strike.

15          THE COURT:  Wait a minute, the comment's stricken,

16  but you'd --

17          MR. FLEMING:  Thank you, your Honor.

18  Q.  We continue on to the next paragraph.  Dr. Goldwasser

19  concluded, among other things, that it was a two-fold

20  increase in marrow nucleated erythroid cells.  Do you see

21  that?

22  A.  I see that.  Do you want me to comment on that or no?

23  That measurement was not --

24          THE COURT:  Wait, wait, wait, wait, wait.  You

25  asked, I take it, a rhetorical question, Do you want me to

1   comment on that or not?  Really he doesn't want you to

2   comment, we'll take it.

3           **THE WITNESS:**  Sorry.

4           **THE COURT:**  What he wants you to do is answer his

5   questions, which he frames as yes-or-no questions.  You

6   don't have to answer them yes or no, but then, if an honest

7   and complete answer is neither yes nor no, say that I can't

8   answer it yes or no.

9           **THE WITNESS:**  Thank you.

10          **THE COURT:**  You said, Do you want me to explain.

11  Probably he won't, and he gets to ask the questions.  When

12  he's done, Mr. Madrid gets a chance to ask other questions.

13          **THE WITNESS:**  Okay, sorry.

14          **THE COURT:**  That's not just a comment, those are

15  the rules of court, you have to follow that, and we'll go

16  along smoothly.

17  **Q.**  Dr. Brugnara, this is Dr. Goldwasser speaking to the

18  NIH; you understand that, right?

19  A.   In his writing for the grant to the NIH.

20  **Q.**  Have you ever written a grant to the NIH?

21  A.   I have NIH funding from 1986, so NIH-funded for more

22  than 21 years.

23  **Q.**  When you write something to the NIH, they make you sign

24  an oath that what you're saying is truthful; correct?

25  A.   You sign the front page of the grant.

1    Q.   It's saying what you put in here is the truth; correct?

2    A.   It's the truth as you see it.

3    Q.   The truth as you see it, but the truth nonetheless;

4    correct?

5    A.   It's your interpretation of the data.

6    Q.   So let's look at Dr. Goldwasser's interpretation of the

7    data.  He says there was a two-fold increase in marrow

8    nucleated erythroid cells; correct?  That's what he says?

9    A.   He says what he says.  I don't agree with that.

10   Q.   So you disagree with Dr. Goldwasser who, in '79, wrote

11   this to the NIH; correct?

12   A.   Yes, I do.

13   Q.   Was Dr. Goldwasser one of skill in the art in 1979,

14   1980?

15   A.   Absolutely.

16   Q.   Okay.  But he's drawing a conclusion from his data,

17   isn't he?

18   A.   Like all scientists do, you look at the data and you

19   draw conclusions.

20   Q.   Doctor, he -- Doctor, yes or no.  Could Dr. Goldwasser,

21   looking at this document, draw a conclusion from his data;

22   yes or no?

23   A.   This is Dr. Goldwasser conclusions.

24   Q.   Thank you.  Let's go on to the next item, a three-fold

25   increase -- let me ask you another question.  Marrow

 1    nucleated erythroid cells, those are the precursor cells to

 2    reticulocytes; correct?

 3    A.   Those are precursor cells of the mature cells in

 4    reticulocytes.

 5    **Q.**   Those are the cells that exist in the bone marrow, do

 6    they not?

 7    A.   They exist in the bone marrow.

 8    **Q.**   So in order to get and determine whether you have

 9    nucleated red blood cells, you have to go into the bone and

10    extract out a sample and test it; correct?

11    A.   Yes.  It's a very painful procedure and you don't really

12    do it all that much because it's very hard for the patient.

13    **Q.**   But it was done here and Dr. Goldwasser drew a

14    conclusion from it; correct?

15    A.   This is one patient.

16    **Q.**   Okay.  And then he went on to say there was a three-fold

17    increase in circulating reticulocytes; correct?

18    A.   That's what he said.  That's not what I say.

19    **Q.**   That's not what you say, I understand.  We've heard what

20    you say.

21         Let's look at what Dr. Goldwasser wrote to the NIH

22    under oath before there was a lawsuit together, please.

23    Now, he said, and that increase --

24         **MR. MADRID:**  Objection, your Honor.  I move to

25    strike that last comment.

1          **THE COURT:**  Well, the comment's out but he may read

2     from the document.

3     **Q.**   The circulating reticulocyte concentration increase

4     meets the Court's definition of therapeutically effective,

5     doesn't it?

6     A.   Does not.

7     **Q.**  You disagree with the Court, too.

8          **THE COURT:**  No, no, please.

9          **MR. FLEMING:**  Oh, I'm sorry, your Honor.

10    Withdrawn.

11         **THE COURT:**  The comment --

12         **MR. FLEMING:**  Withdrawn.  I'll continue.

13    **Q.**  The next item is he concludes there's an increase in the

14    total red cell mass of 22 percent; is that correct?

15    A.   That's not correct.

16    **Q.**  He doesn't -- an increase in the total red cell mass at

17    22 percent or greater and a significant decrease in plasma

18    iron halflife; right?

19    A.   The plasma iron halflife was not actually measured, so

20    that conclusion's not correct.

21    **Q.**  Wasn't measured by Dr. Goldwasser?  He has from 22 --

22    225 minutes to 157 minutes.  Are you doubting his

23    measurement?

24    A.   That's the clearance rate, the halflife of the

25    radioactive iron, it's not the plasma iron.

1    Q.  So you disagree with the way Dr. Goldwasser classified

2    plasma iron halflife, too; correct?

3    A.  Just stated different than the study.

4    Q.  You state it differently.  The plasma iron halflife is a

5    ferrokinetic effect, isn't it?

6    A.  Plasma iron turnover is a measurement.  That's what they

7    were supposed to do in the study, but they didn't do it.

8            MR. FLEMING:  Can we go to 2004, and the page 6641.

9    And the jury has seen this.  This is Dr. Baron's progress

10   report in 1984 to the FDA.  Can we go to the second page.

11           (Whereupon counsel conferred.)

12   Q.  Now, Dr. Baron's submitted his progress data to the FDA;

13   you saw that, didn't you, Doctor?

14   A.  In, I believe in 1984, so there was three and a half

15   years after he completed the -- did the study, yes.

16   Q.  That's after he's had all of the patients done; correct?

17   A.  He did the three patients.

18   Q.  In fact, there were five patients, weren't there?

19           MR. MADRID:  Objection.  Lacks foundation.

20           THE COURT:  Overruled.  Well, the question's not

21   evidence of anything.  And we'll see what the witness says.

22   A.  There were two normal subjects who got EPO -- who got

23   the urinary preparation.  Those were not patients.

24   Q.  So there were two normal subjects and three dialysis

25   patients who received Dr. Goldwasser and Dr. Baron's

1    pharmaceutical composition; correct?

2    A.   That's correct.

3              MR. MADRID:   Objection.

4              THE COURT:   No, overruled, the answer may stand.

5    Q.   And isn't it true from your review of the data you saw

6    in that clinical trial that none of those patients suffered

7    an adverse effect?

8    A.   As far as I know, I don't know how hard they look for

9    adverse effect.   There is no report of any acute or chronic

10   event that is related to the administration of this

11   compound.   But I don't know how hard they look for, so --

12   Q.   All right.   So you think Dr. Baron and Dr. Goldwasser

13   saw somebody sick and just didn't pay attention to it, is

14   that it?   Is that what you're trying to tell this jury?

15   A.   That's not what I say.   I say depending on what you look

16   for and how long of a time you look for side effects.

17   Q.   There was no acute and no chronic side effects from the

18   administration of Dr. Baron and Dr. Goldwasser's human EPO

19   pharmaceutical composition; correct?

20   A.   The urinary test material did not seem to have acute or

21   chronic side effect.

22   Q.   Thank you.   So now, looking at the report, go to the

23   second page, please.

24              I'm having trouble.   There we go.   On the

25   biological efficacy, you saw this document, Dr. Baron now

1    reporting to the FDA about his data; correct?

2    A.  I did.

3    Q.  And it says, "Two of the three patients showed increased

4    numbers of nucleated red blood cells"; right?

5    A.  That's what he said.

6    Q.  Right.  And he says that each patient showed a mild to

7    modest increase in reticulocyte, that was his conclusions

8    from the data; correct?

9    A.  That the conclusion that's -- it's not my conclusion.

10   Q.  We heard your conclusions, Doctor.  Is this not

11   Dr. Baron's conclusion to the FDA at the time before the

12   lawsuit about what he observed from the data?

13   A.  First, there's no data here, so this is just what he

14   thinks about the data, which none has been shown to the FDA,

15   as you see here.  It's not a single piece of data.

16   Q.  In your opinion?  That's your opinion, right?  That's

17   your opinion?

18   A.  There's no data on reticulocyte here.

19   Q.  And then he goes on and he talked about the disappearing

20   of radio iron from plasma; correct?

21   A.  Again, that measurement was not done properly.  It

22   doesn't mean anything.  I looked at very large number of

23   papers in my report to show that measurement was not done

24   properly.  You can't draw any conclusion.

25   Q.  That's your opinion.  We see the opinions of the people

1    who were there who treated the patients; correct?

2            **MR. MADRID:**  Objection, your Honor.  Lacks

3    foundation.

4            **THE COURT:**  That last "we see," that's not really a

5    question.  Put another question.

6            **MR. FLEMING:**  Yes.

7            **THE COURT:**  I'll sustain the objection.

8    **Q.**  The jury -- the documents we're showing the jury here

9    are the conclusions of Dr. Baron and Dr. Goldwasser, who

10   were the actual scientists who were treating and seeing

11   these patients; correct?

12   **A.**  Those are the conclusion of Dr. Baron and Goldwasser.  I

13   look at all the data and I reach different conclusions.

14   **Q.**  So, so far you disagree with Dr. Goldwasser; correct?

15   **A.**  But that's part of science.  That's the beauty of

16   science; you can disagree, of course.

17   **Q.**  Dr. Brugnara, yes or no, you disagree with

18   Dr. Goldwasser?

19   **A.**  In some of the things that Dr. Goldwasser reported, I

20   respectfully disagree.

21   **Q.**  And you disagree with Dr. Baron; correct?

22   **A.**  Yes.

23   **Q.**  But Dr. Baron and Dr. Goldwasser weren't the only

24   entities that had all of the clinical data, were they?

25   **A.**  I'm not sure what you mean.

1    Q.   Okay.  Are you aware that Amgen had all of that clinical

2    data from Dr. Baron and Dr. Goldwasser?  Are you aware of

3    that?

4    A.   No, I have no knowledge.

5    Q.   You have no idea.

6    A.   No idea.

7    Q.   Okay.  Could we look at 2054, please.  This is an IND

8    submitted by Amgen to the FDA, and again, you know what an

9    IND is; right?

10   A.   Yes.

11   Q.   When you submit an IND to the FDA, you want to be as

12   honest as you can be; correct?

13   A.   Of course.

14   Q.   Of course.  Thank you.

15          MR. MADRID:  Objection, your Honor.

16          THE COURT:  The comment -- the added comment is

17   stricken.

18          MR. FLEMING:  And if you highlight the middle

19   paragraph, please.

20   Q.   It says, "Therapy with erythropoietin has been shown to

21   be effective in selected patients with ESRD."

22          Did Amgen show you this document that they

23   submitted to the FDA when you were coming to your opinions,

24   Dr. Brugnara?

25   A.   I have seen this document.  When I saw it, I don't

1    remember.

2    **Q.**  Did you see it before you made opinions?

3    A.   It doesn't really matter when I saw, before or after.

4    It doesn't really change my mind.

5    **Q.**  So you disagree, too -- withdrawn.

6           When someone uses the word "effective" with the

7    FDA, they're talking about efficacious; correct?

8           **MR. MADRID:**  Objection, your Honor.

9           **THE COURT:**  Overruled.  He may have that.  The

10   witness may give us his understanding.

11   A.   I'm not sure what they mean with effective, because

12   effectiveness is related to a certain parameter.  So whether

13   that's hematocrit is resolution of anemia, is it

14   transfusion, or whatever.  So it's a statement like this,

15   it's impossible to interpret.

16   **Q.**  And when you saw it, did you ever ask anybody at Amgen,

17   What did you mean when you told the FDA that Goldwasser and

18   Baron's study proved that it was effective?  Did you ask

19   them?

20          **MR. MADRID:**  Objection, your Honor.  It misstates

21   the testimony and the evidence.

22          **THE COURT:**  Well, just a moment.  Overruled.

23          Did you ask, did you ask them?

24   A.   Can you repeat that question, please?

25   **Q.**  Of course.  Did you ever ask anyone at Amgen, the people

1    who are paying you, what they meant when they wrote the word

2    "effective" regarding the Baron and Goldwasser study?

3    A.  I did not.

4    **Q.**  You did not.  Now, you talked about Dr. Eschbach's

5    study, and that was Patient 11, correct, the single human

6    patient study?

7    A.  Yes.

8    **Q.**  That's what's called Patient 11; correct?

9    A.  I believe so.

10   **Q.**  Yes.  And did you recall that Dr. Eschbach reported an

11   increase in reticulocytes and an increase in ferrokinetic

12   effects after he administered his pharmaceutical composition

13   EPO to that patient?

14   A.  The papers actually review, and Eschbach only puts a

15   figure there that has the single patient in which you see

16   increase in reticulocyte and a change in ferrokinetic.

17   **Q.**  And that was the conclusion Dr. Eschbach drew about the

18   patient to whom he gave his EPO pharmaceutical composition;

19   correct?  There was an increase in reticulocytes?

20   A.  I'm not sure what specifically Dr. Eschbach concluded

21   from that paper.  The data are, again, a single patient

22   showing some changes.

23   **Q.**  And there was an increase in reticulocytes for that

24   patient; correct?

25   A.  The reticulocyte count go -- went up from 1 to something

1    like 2.5 percent.

2    **Q.**  And then there was -- it changed ferrokinetic effects as

3    well, correct, for Patient 11 of Dr. Eschbach?

4    A.  That's in the -- yes, there was a small -- there was a

5    change in that.

6    **Q.**  In the ferrokinetic effects?

7    A.  In ferrokinetic.

8    **Q.**  Dr. Eschbach went on and was hired by Amgen to do its

9    clinical trial, wasn't he?

10   A.  I'm not sure whether he was hired by Amgen.  He was one

11   of the leading investigators.

12   **Q.**  Can I have -- let's look at some of the data from the

13   Baron-Goldwasser study that you didn't look at in your

14   report.  And as we start with --

15       **MR. MADRID:**  Objection, your Honor.  Move to

16   strike.

17       **THE COURT:**  Yes, the comments are stricken.  And to

18   counsel --

19       **MR. FLEMING:**  Withdrawn.

20       **THE COURT:**  And to counsel -- wait a minute.  Just

21   ask questions.  That's an order.

22       **MR. FLEMING:**  Yes, sir.

23       **THE COURT:**  Disregard the lawyer's comments.  He

24   wasn't there, he doesn't know.  He's not under oath.

25   Witnesses give the testimony.

1          Go ahead.

2    **Q.**  Dr. Brugnara, you weren't also there at the time of the

3    Baron-Goldwasser study, were you?

4    A.  Where?

5    **Q.**  At the University of Chicago when Dr. Baron was

6    conducting his clinical trial?

7    A.  I was not.

8    **Q.**  No.  And you weren't there at the time that Dr. Eschbach

9    was giving his pharmaceutical EPO composition to his

10   patient, were you?

11   A.  When was that?

12   **Q.**  1984.

13   A.  So that was after the invention was made.  Yes, I wasn't

14   there.

15        **MR. FLEMING:**  Your Honor, move to strike.

16   **Q.**  Dr. Brugnara --

17        **THE COURT:**  Overruled.

18   **Q.**  Did you do an analysis as to when Dr. Eschbach gave his

19   pharmaceutical composition EPO to the patient?

20   A.  It was given the --

21   **Q.**  Doctor, did you do an analysis to draw your own

22   conclusion?

23   A.  The data -- the date is on the figure is 10/11/84,

24   something like that.  If you look at the figure, it has the

25   dates, two dates.

1   Q.  11/10/84, which in European is November 10th of 1984;

2   correct?

3   A.  I don't remember the numbers.  If you show me the

4   figure, I'll show you the numbers.

5   Q.  Oh, October 11th, 1984.  Thank you.

6           MR. MADRID:  Objection, your Honor.

7   Q.  So let's --

8           MR. MADRID:  He's leading the witness.

9           THE COURT:  Well, there is no question.  Let's have

10  a question.

11          MR. FLEMING:  Thank you, your Honor.

12          Could we have 2049, 904.

13  Q.  Now, Doctor, you didn't review this part of the

14  Baron-Goldwasser clinical trial; correct?

15  A.  This is just a summary of the data.

16  Q.  Doctor, you did not review this data, did you?

17  A.  I see this data.

18  Q.  You didn't cite it in your report.  Are you telling the

19  jury now you've seen this data and you didn't cite it in

20  your report?

21  A.  I look at all this material for the last two or three

22  months, so --

23  Q.  But you didn't cite it in your report, so now you're

24  here to tell the jury something different?

25          MR. MADRID:  Objection, your Honor.  Argumentative.

1    A.   This is a summary.

2         **THE COURT:**   No, no, overruled, and the answers

3    given may stand.

4    **Q.**   Let's look at the summary together.   The next to the

5    last graph is absolute reticulocytes; correct?

6    A.   I'm not -- which one?

7    **Q.**   Next to the bottom.

8    A.   You have to tell me which patient is this.

9    **Q.**   Right there.

10   A.   Which patient is this?

11   **Q.**   This is Patient Number 1, right?   Do you agree with

12   this?

13   A.   Is this Patient 1?   I just want to be sure, for the

14   record.

15   **Q.**   Do you know?

16   A.   I can't -- it's most likely, but I just want to be sure.

17   **Q.**   You're the one giving the evidence, Doctor, so tell me

18   if you know whether this is Patient Number 1 or not.

19   A.   It's most likely Patient 1.

20   **Q.**   And this is a chart that was drawn by Dr. Baron himself;

21   correct?

22   A.   I'm not sure who drew this chart.

23   **Q.**   And if we look at this section that's highlighted, this

24   is absolute reticulocytes; correct?

25   A.   Yes, it says absolute reticulocytes.

1    **Q.**  And it's increasing, is it not?

2    A.  Can't say that.

3    **Q.**  Looking at a line that goes up, you can't tell this jury

4    that that's increasing?

5    A.  I spend a lot of time explaining to the jury that

6    there's a huge variation --

7    **Q.**  Doctor, yes or no.  Can you tell the jury that looking

8    at that line, which is tilted up, whether that's increasing

9    or not; yes or no?

10   A.  You can ask -- I can't answer that question with a yes

11   or no, plus the data not complete.

12           **THE COURT:**  Wait, wait.  Oh, your answer was,

13   because "the data not complete."  That's an appropriate

14   answer.

15           **THE WITNESS:**  Sorry.

16   **Q.**  Now, the boxes on the left side --

17           **MR. FLEMING:**  Your Honor, can I have a --

18   **Q.**  The boxes over here, those are the baseline

19   measurements; correct?

20   A.  The baseline measurements were not done, as I told you.

21   They only did two of the six.  So I don't know whether they

22   plotted -- that's the investigation, but there's an

23   incomplete baseline.  It's not what there was supposed to

24   be.

25   **Q.**  Doctor, yes or no, can you tell the jury whether that

1    box is the baseline measurement or not?

2    A.   It's not the baseline measurement they were supposed to

3    do.

4    Q.   It's not.  Now, nucleated red blood cells, right, we

5    talked about this?  And this is showing an increase, is it

6    not?

7    A.   I can't answer that question yes or no.

8    Q.   You can't answer it.

9         This is iron halflife; correct?  And that's showing

10   a decrease; correct?

11   A.   Can't answer that question yes or no.

12   Q.   Can't answer yes or no.

13        This is red blood cell mass; correct?

14   A.   Yes.

15   Q.   And it's showing an increase, during the administration

16   of the EPO composition; correct?

17   A.   You can't draw any conclusion.

18   Q.   And you say that because upon your two-week review of

19   portions of the clinical trial, you decided you can't draw

20   any conclusions from this data at all; is that right?

21   A.   No, because they are selective in showing data, and not

22   showing other data.  So you're picking and choosing.  That's

23   not science.

24   Q.   Well, Doctor, you picked and chose which documents you

25   were going to tell the jury about, didn't you?

1    A.   I read all of these pages.  What I include in my report

2    is what I write at that time, and then I continue to read

3    it.

4    Q.   Doctor, this is all that's in your report.  Is that all

5    of the pages there, Doctor; yes or no?

6    A.   This is all the pages.

7    Q.   These are the pages cited in your report, Doctor.  Are

8    these all the pages that are in the clinical trial data; yes

9    or no?

10   A.   I assume so.

11   Q.   You never saw the patients in the Baron-Goldwasser

12   study, correct, you never spoke to them?

13   A.   I didn't.

14   Q.   You never spoke to Dr. Eschbach regarding his Patient

15   11, did you?

16   A.   Dr. Eschbach is ill, so I don't --

17   Q.   Doctor, prior to this trial, did you ever speak to

18   Dr. Eschbach regarding his Patient 11; yes or no?

19   A.   I did not speak to Dr. Eschbach.

20   Q.   And Dr. Eschbach was one of skill in the art, was he

21   not?

22   A.   At what time?

23   Q.   1983, '84?

24   A.   Yes.

25   Q.   And, Doctor, isn't it also true that it takes some time

1    for a patient to have this hematocrit increase, several

2    weeks, in fact; correct?

3    A.  No.

4    **Q.**  You disagree with that, too?

5    A.  It just --

6    **Q.**  If I tell you that Dr. Eschbach wrote that it takes at

7    least three weeks for a patient's hematocrit to increase on

8    EPO therapy, you'd disagree with that?

9    A.  Really depends on the conditions.  So, no, depends on

10   the patient.  The response of each patient is different.

11   And depends on how much you're using.  So --

12   **Q.**  But you don't treat patients, do you?

13   A.  I work with physicians on treating patient.  I do not --

14   **Q.**  You don't treat patients, do you?

15   A.  No.

16   **Q.**  Now, the reticulocyte counting that was done for

17   Dr. Baron and Dr. Goldwasser was done by the lab at the

18   University of Chicago; correct?

19   A.  There were two labs and then there were additional sets,

20   so there were at least between three and four entities

21   counting reticulocytes.

22   **Q.**  Do you remember Dr. Baron testifying that the

23   reticulocyte counts for his study was done by the lab at the

24   University of Chicago; do you remember that?

25   A.  There are two labs --

1    **Q.**  Doctor, yes or no.  Do you remember that Dr. Baron

2    testified that the reticulocyte counts in his study were

3    done by the University of Chicago lab?  Do you remember; yes

4    or no?

5            **MR. MADRID:**  Objection, your Honor.

6            **THE COURT:**  He wasn't here when he testified.

7            **MR. FLEMING:**  He's had his deposition transcript,

8    your Honor.

9            **THE COURT:**  So, from reviewing that, do you have a

10   memory about it?

11           **THE WITNESS:**  I don't have a memory.

12   **Q.**  And you never reviewed the protocol that the University

13   of Chicago labs employed in doing those reticulocyte counts;

14   correct?

15   A.  Was not -- didn't see it.

16   **Q.**  You didn't see it.  And you never spoke to Dr. Baron

17   about his conclusions as to the reticulocyte counts;

18   correct?

19   A.  I have not spoke to Dr. Baron.

20   **Q.**  And you never spoke to Dr. Goldwasser; correct?

21   A.  No.

22   **Q.**  And you never asked Amgen about their conclusion about

23   that data, did you?

24           **MR. MADRID:**  Asked and answered, your Honor.

25           **THE COURT:**  Yes, sustained on that ground.

1          **MR. FLEMING:**  Pass the witness, your Honor.

2          **THE COURT:**  Anything further, Mr. Madrid?

3          **MR. MADRID:**  Yes.

4                    **REDIRECT EXAMINATION**

5     **(BY MR. MADRID:)**

6     **Q.**  Dr. Brugnara, how do you work with clinicians?

7          **MR. FLEMING:**  Objection.  Beyond the scope.

8          **THE COURT:**  No, overruled.  You may answer that.

9     A.  Work with clinicians every day because they call us to

10    ask questions about what type of test we take and order, and

11    they ask us how to interpret some of these tests.

12         **MR. FLEMING:**  Objection.  Move to strike as

13    hearsay.

14         **THE COURT:**  No, it's not offered for the truth but

15    for the nature of the communications.  It may stand.

16    **Q.**  Doctor, how often do you work with clinicians?

17    A.  Daily.

18    **Q.**  Now, in your testimony a moment ago, you mentioned

19    Paragraph 16 of your report, and you couldn't complete your

20    answer.  What were you going to say?

21         **MR. FLEMING:**  Objection, your Honor.

22         **THE COURT:**  Well, again, don't you characterize it.

23         But you looked at Paragraph 16, was it, of his

24    report?  What were you going to explain there?

25         **THE WITNESS:**  That I wanted to say that in that

1    paragraph, it's specifically stated that I reserve the right

2    to supplement my opinions and continually to work on these

3    documents.

4    Q.  And, Dr. Brugnara, you have in front of you Exhibit --

5         MR. FLEMING:  Objection, your Honor.  This is

6    beyond the scope.

7         THE COURT:  Well, I don't know that this question

8    is.  We'll wait until it's asked.

9    Q.  Dr. Brugnara, you have in front of you Exhibit 2049 that

10   Mr. Fleming put in front of you.  This document here.  Did

11   you have an opportunity to review that?

12   A.  I did.

13   Q.  Is there anything in 2049 that changed any of your

14   opinions?

15        MR. FLEMING:  Objection, your Honor.

16        THE COURT:  No, no, overruled.  You may have that

17   question.

18        Is there?

19   A.  I went through this report at least twice, page by page,

20   and there's nothing in this set that changes any of the

21   things that I wrote from this document, in my opinion.

22   Q.  Dr. Brugnara, you were asked about the IND process.  Can

23   you explain the IND process for the jury?

24        MR. FLEMING:  Objection, your Honor.

25        THE COURT:  Sustained.

1   **Q.**   Doctor, do you have an opinion as to whether or not the

2   Eschbach single-patient study is prior art?

3         **MR. FLEMING:**   Objection, your Honor.   Calls for a

4   legal conclusion.

5         **THE COURT:**   It does.   Sustained.

6   **Q.**   Doctor, do you have an understanding as to when the

7   plasma was infused into the single patient by Dr. Eschbach?

8   A.   It was infused at the end of 1984.

9   **Q.**   Do you have an understanding of that time relative to

10  Dr. Lin's invention?

11        **MR. FLEMING:**   Objection, your Honor.

12        **THE COURT:**   Sustained.

13  **Q.**   Doctor, do you have an opinion as to whether or not

14  nucleated red cells in any of the three patients, in the

15  three-patient experiment, increased as a result of the

16  urinary test material?

17  A.   The data's inconsistent, contradictory, because this is

18  a very subjective measurement.   And so you have, in one

19  patient, it clearly went down, Patient 2.   In Patient 3, the

20  count was not done properly because they only counted 300

21  cells.   And we have no idea to knowing -- to know if the

22  physician were actually blinded so that they knew -- when

23  you count the cells, you're not supposed to know whether

24  they're preimposed so you can make a judgment without

25  knowing that this was --

1          **MR. FLEMING:**  Objection, your Honor.  Beyond the

2     scope of his report.

3          **THE COURT:**  I'll let that stand.

4          **MR. MADRID:**  Now, can I have Exhibit 2095?  That

5     would be Baron 905, page 95, please.

6     **Q.**  Now, Doctor, you were asked a number of questions with

7     respect to this exhibit to which you could not explain yes

8     or no.  Could you explain what your understanding is with

9     respect to what's presented here on Baron 905?

10         **MR. FLEMING:**  Objection, your Honor.

11         **THE COURT:**  He may give us his understanding of

12    what's presented there.  He was examined on it.

13         What is your understanding?

14    A.  This is a selective summary of data.  It does not

15    include all the data.  It went through, I know at least

16    three, if not four reticulocyte count.  These data, you get

17    other data in which the number is right here.  So this data,

18    like the one I show you from Patient 3, that are all over

19    the map for all these measurements.  So you can't draw any

20    conclusion because he is selectively only showing one set of

21    data and not showing all the other ones that I found in all

22    these pages, and they contradict that measurement.

23         So there's data in which this is flat, like this.

24    Q.  Out of all the matters that Mr. Fleming raised to you,

25    is there anything there that changes any of your opinions

1    that you've given here today?

2    A.  No.

3         MR. MADRID:  No further questions, your Honor.

4         THE COURT:  Nothing further?

5         MR. FLEMING:  One quick one, your Honor.  Sorry, I

6    have to do that.

7                   **RECROSS-EXAMINATION**

8    **(BY MR. FLEMING:)**

9    **Q.**  Dr. Brugnara, let's look again at your expert report and

10   let's look at Exhibit B.  Turn to Exhibit B, please.  Can I

11   help you?  It's Exhibit B, right here.  Okay.  Read to the

12   jury what you titled Exhibit B.

13   A.  "Brugnara documents considered."

14   **Q.**  "Brugnara documents considered," right.  Let's go,

15   documents from Baron production; correct?

16   A.  Yes.

17   **Q.**  Okay.  Tell the jury now, look at them, is every page in

18   this clinical trial --

19        MR. MADRID:  Objection, your Honor.

20   **Q.**  -- disclosed in your report; yes or no, Doctor?

21        MR. MADRID:  Objection, your Honor.

22        THE COURT:  No, he may answer the question as to

23   what's stated in the report.

24        MR. FLEMING:  Thank you, your Honor.

25        THE COURT:  What's stated there in the report?

1    What's stated there?

2              **THE WITNESS:**  Can you repeat the question?

3    **Q.**  Of course.  Is every page in this clinical trial study

4    listed in your report under "Brugnara documents considered,"

5    yes or no?

6    A.  No.

7              **MR. FLEMING:**  Thank you.

8              **THE COURT:**  Nothing further?  You may call your

9    next witness.

10             **MR. MADRID:**  Thank you.

11             (Whereupon the witness stepped down.)

12             **MR. DAY:**  I'm going to call Tom Strickland, and

13   while the witness is approaching, may we have a brief

14   sidebar?

15             **THE COURT:**  You may.

16   SIDEBAR CONFERENCE, AS FOLLOWS:

17             **THE COURT:**  Just so we're clear, this is the first

18   time we've seen Strickland live, right?

19             **MR. DAY:**  That's right.

20             **THE COURT:**  All right.

21             **MR. DAY:**  Your Honor, last Friday we asked for a

22   ruling on a motion that's been pending for some time to move

23   into evidence two exhibits.  We called --

24             **THE COURT:**  Oh, I know.

25             **MR. DAY:**  We were calling today Ian Crawford, and

1    your Honor granted a motion in limine on that.

2         **THE COURT:**  Correct, I did.

3         **MR. DAY:**  So we're not calling him.  I wanted to

4    see if we can get these into evidence.  I want to point out

5    the relevance of these documents to you.

6         **THE COURT:**  Go right ahead.

7         **MR. DAY:**  In this January 11th communication from

8    Chugai to GI, business partners, they asked for information

9    about how they had cloned the gene.  And in this response to

10   this telex dated January 11th, 1984, GI provides what they

11   understand about what they learned about how they had cloned

12   the gene.

13        And Roche has argued in this case that GI's cloning

14   of the EPO gene demonstrates the obviousness of Lin's

15   invention, but this shows that GI had inside information,

16   that they had learned about how Lin had done it and they

17   repeated what Lin did.

18        **THE COURT:**  Where is the evidence?  You think

19   there's evidence of record now that GI, prior the filing of

20   the patent application, had cloned --

21        **MR. DAY:**  No, not prior to the filing, but Roche is

22   arguing that.

23        **THE COURT:**  That subsequent to the filing, it

24   renders it obvious?

25        **MR. DAY:**  That's what Roche is arguing.  I'm merely

1    pointing -- I'm not saying I believe there's evidence to

2    that effect --

3         **THE COURT:**  I don't know as there is adequate

4    evidence to that effect, to tell you the truth.

5         **MR. DAY:**  But they will argue in closing, based on

6    record that has been made, is the fact that GI, they put in

7    Fritsch's deposition, they put in when he cloned it, and

8    they will argue that because he cloned it so quickly after

9    Lin, that that demonstrates what Lin did was obvious.

10        **THE COURT:**  That it was obvious.  Okay.

11        Now, a couple of things.  I'm not giving any

12   advisory opinion.  You've got, or you will, at the close of

13   all the evidence, renew your motion for directed verdict.

14   I'm not so sure they have enough, but we'll hear.  And,

15   therefore, in fairness, I have to face up to this.

16        These are hearsay.  How are you going to get around

17   it?

18        **MR. DAY:**  We got around these.  First all, these

19   are business records.  We submitted the declaration of Ian

20   Crawford, who was the counsel --

21        **THE COURT:**  I know.  I don't think that's adequate.

22   That's why I denied it.

23        **MR. DAY:**  He authenticated what these were.

24        **THE COURT:**  You say that.  I don't think so.  You

25   say this is a declaration.  That is not an adequate

1    affidavit, substitute to make a business record.  So

2    Crawford's not a person under Article 9 --

3         MR. DAY:  It also shows it's an ancient document,

4    your Honor.

5         THE COURT:  Oh, well, an ancient document.  All

6    right.

7         MR. DAY:  The date of these is 1984.

8         THE COURT:  Okay.  What do you say to it being an

9    ancient document?

10        MS. BEN-AMI:  I don't know what these documents

11   even are.  I have no idea.  These are somebody's drafts of

12   something not produced in this case.  If they want to know

13   what Dr. --

14        MR. DAY:  They were produced in this case.

15        THE COURT:  Wait a minute.  Wait a minute.  Aren't

16   they ancient?

17        MS. BEN-AMI:  They could have been created

18   yesterday for all I know.  How do I know what they are?

19   They're saying these are documents related to -- these are,

20   I would really like --

21        THE COURT:  Here's what we're going to do.  Looks

22   to me like they're ancient.  I don't know that they're

23   relevant at all.  Because I don't know whether we're getting

24   into anything that Genetics Institute did, whenever it did

25   it.  But it looks to me like they're ancient.  So I don't

1    think I need any testimony on this from Crawford or anyone

2    else.  If it's alive, maybe I'll put them in at the end.

3    Not now.

4            MR. DAY:  All right, your Honor.

5            THE COURT:  And not in evidentiary matter.

6            MR. DAY:  I just wanted to be sure --

7            MS. BEN-AMI:  I would like the opportunity to be

8    heard later when it's time.

9            THE COURT:  You will.

10           MS. BEN-AMI:  That's all.

11           THE COURT:  Yes.

12           MR. DAY:  I just wanted to be sure that we move

13   during our phase of the trial because we're coming to the

14   end.

15           THE COURT:  Mercifully.  And I think that -- I mean

16   no disrespect.

17           MR. DAY:  I want to preserve my rights.

18           THE COURT:  Of course.  So noted.  Your rights are

19   preserved.  That's how we're going to proceed.

20           MR. DAY:  Thank you.

21           (Whereupon the sidebar conference concluded.)

22           THE CLERK:  Sir, would you raise your right hand.

23           Do you solemnly swear that the answers you will

24   give to this Court and Jury will be the truth, the whole

25   truth, and nothing but the truth, so help you God?

1        **THE WITNESS:**  Yes.

2        **THE CLERK:**  Please be seated.

3        **THE COURT:**  Proceed, Mr. Flowers.

4              THOMAS W. STRICKLAND

5              **DIRECT EXAMINATION**

6    **(BY MR. FLOWERS:)**

7    **Q.**  Good morning, Doctor.

8    A.  Good afternoon.

9    **Q.**  Correct.  Doctor, could you introduce yourself to the

10   jury, please?

11   A.  Yes.  My name is Thomas Wayne Strickland.

12         **THE COURT:**  Sir, it would be best if you pull that

13   mike over.  You should be comfortable.  The mike should

14   move.  There we go.

15   **Q.**  What do you do for a living, sir?

16   A.  I work at Amgen as a research scientist in their

17   Colorado facility.

18   **Q.**  And when did you start working at Amgen?

19   A.  In 1984.

20         **COURT REPORTER:**  Excuse me, could I have a moment,

21   please?

22         (Pause in proceedings.)

23   **Q.**  Doctor, I'm going to hand you a document that bears on

24   its first -- or outside cover the Bates number AM 87013484.

25   I'd ask you --

1          **MR. JAGOE:**  Objection, your Honor.  We haven't been

2     notified of this exhibit.

3          **MR. FLOWERS:**  This is the original document that

4     corresponds to Exhibit CBP.

5          **THE COURT:**  Well, well, strike out -- he's talking

6     to the lawyers.  That's not testimony that it's an original

7     of anything.  We've got a thing here.  We'll find out about

8     it, but he may inquire.

9          **MR. JAGOE:**  My objection is we haven't been told it

10    would be used.

11         **THE COURT:**  Please.  I understand what the

12    objection is.  He may inquire.

13    **Q.**  Doctor, what is the book I've just handed you?

14    A.  It's one of my Amgen laboratory notebooks.

15    **Q.**  I'd like to hand you another book, bears on the front

16    cover AM 87009846.  Can you tell us what that is?

17         **MR. JAGOE:**  Same objection, your Honor.

18         **THE COURT:**  Overruled.

19    A.  Yes, it's one of my Amgen laboratory notebooks from

20    1993.

21    **Q.**  I hand you a book that bears the Bates number AM

22    87000249 on the front cover, ask you what this is?

23         **MR. JAGOE:**  Objection, your Honor.  Could we please

24    at least have him identify the lettered exhibit?

25         **MR. FLOWERS:**  That corresponds to CFA, your Honor.

1        **THE COURT:**  Thank you.

2   A.   This is one of my Amgen laboratory notebooks from 1991.

3   Q.   I'll hand you a book that's got on its front cover the

4   Bates number AM 87010472, this corresponds to Trial Exhibit

5   CFC.  What is that?

6   A.   It's one of my Amgen laboratory notebooks from the 1989,

7   1990 time period.

8   Q.   And finally, I'll hand you a book that bears on its

9   front cover the Bates number AM 87010387, this corresponds

10  to Trial Exhibit CDA.  What is that, Doctor?

11  A.   It's one of my Amgen laboratory notebooks from the 1990

12  to 1995 time frame.

13  Q.   Now, with regard to those five lab notebooks that you

14  have in front of you, did you have a purpose in keeping

15  those laboratory notebooks at the time?

16  A.   Yes.  It was to record the experimental protocols and

17  experimental results that were -- that I generated in the

18  laboratory.

19  Q.   And did you have a practice at Amgen regarding when you

20  recorded that work in the laboratory notebook?

21  A.   Yes.  As soon as possible, after the experiment was

22  completed, all of the data was in, so that it was a complete

23  experiment.

24  Q.   Did you follow that practice with each of those five

25  laboratory notebooks?

1      A.  Yes.

2                **MR. FLOWERS:**  Your Honor, I would offer, first of

3      all, CBP.

4                **MR. JAGOE:**  Objection, your Honor.

5                **THE COURT:**  Let me see CBP.

6                **THE WITNESS:**  Was that the first one?

7                **MR. FLOWERS:**  Yes.

8                **THE COURT:**  Overruled.  We make this Exhibit 2109A.

9                **THE CLERK:**  It's Amgen's, so --

10               **MR. JAGOE:**  Can we have a sidebar, your Honor?

11               **THE COURT:**  I know it is, but it relates -- you

12     want a sidebar?

13               **MR. JAGOE:**  Yes.

14               **THE COURT:**  All right.  You want to give me the

15     stack?

16     SIDEBAR CONFERENCE, AS FOLLOWS:

17               **THE COURT:**  This is the one we're talking about.

18     What's the matter with this?

19               **MR. JAGOE:**  In the front of the notebook it

20     indicates that the business policy of Amgen is to have all

21     pages witnessed and signed.  All the pages in this notebook

22     are not witnessed and signed.  He hasn't established that

23     it's been kept in the ordinary course of business.

24               Secondly, there's a number of data --

25               **THE COURT:**  Well, that goes to the -- I think that

1    goes to the weight, not the admissibility.  Go ahead.

2         **MR. JAGOE:**  Secondly, within these notebooks there

3    is information that was coming from outside of Amgen from

4    people like Dr. Dukes, Dr. Goldwasser.  There are things

5    pasted in there from commercial brochures.  The business

6    record exception does not allow those specific things to be

7    used for the matter, to prove the truth of the matters

8    asserted in them.

9         **THE COURT:**  You may be right.  If we get into

10   something like that, you may point it out.

11        **MR. JAGOE:**  I think there should be an instruction

12   they're coming in, but not for the truth of the matter of

13   everything that's cited within them.

14        **THE COURT:**  No.  It seems to me that that's

15   something -- for one thing, this whole thing is in already.

16        **MR. JAGOE:**  This is from a previous trial.

17        **MR. FLEMING:**  From another case.

18        **MR. FLOWERS:**  This was the TKT.  This is the

19   sticker applied during the TKT case, your Honor.

20        **THE COURT:**  I'm sorry.

21        **MR. FLOWERS:**  This would come in as Amgen 33, your

22   Honor.

23        **THE COURT:**  I see.  Are you done with your

24   objections?  Are you done with your objections?

25        **MR. JAGOE:**  Yes.

1          THE COURT:  So what do you say about the material

2     that's in here that Amgen didn't generate?

3          MR. FLOWERS:  This is the same situation as we had

4     with Dr. Browne and his laboratory notebooks, your Honor.

5     The hearsay within hearsay objection that was raised there,

6     I think it's the same situation here, if we deal with some

7     information in this book that they would claim as hearsay,

8     then we can deal with that at the time.  But this comes in

9     as a business record.

10         THE COURT:  No, no.  The business record objection

11    does not allow you to put in things like commercial

12    pamphlets into your record and say, Well, that's a business

13    record.  It's a business record, and the whole exception is

14    because of the regularity of the record-keeping.  The

15    business of signing, that just goes to the weight.  And the

16    lab notebooks are quintessential, regularly-kept records.

17         But these notebooks have in them other things.

18    Now, the other things may be other things that he put in

19    them as the one who made this lab notebook as part of the

20    regularity.  But we don't know that generally, and I'm just

21    asking how you argue it?

22         MR. DAY:  Okay.  Your Honor, if I may address that,

23    please, on behalf of Amgen?

24         THE COURT:  Yes.

25         MR. DAY:  The laboratory notebook -- excuse me a

1    second, Mr. Flowers.  The laboratory notebook, as kept in

2    the ordinary course, all kind of work is sent in and out of

3    the laboratory and it's recorded and brought back in just

4    like a transaction book or an order book in any kind of

5    business.  And so if, for example, a gel was sent out to

6    be --

7            THE COURT:  Oh, you see, I'm with you there.  But

8    if there's some sort of commercial pamphlet, I haven't seen

9    one, thumbing through it, and that's why I thought I would

10   dodge it by saying if they have a particular objection,

11   we'll deal with it.  I think that's probably the best way.

12           I'm going to admit it, but without prejudice to

13   Roche pointing out that something doesn't fit within that

14   routine.  So this one will be --

15           MR. FLOWERS:  Amgen 33, your Honor.

16           THE COURT:  Amgen 33.

17           THE CLERK:  Oh, okay.  You changed your mind.

18           THE COURT:  Based upon their arguments.

19           MR. FLEMING:  I apologize, I ask your indulgence to

20   make one quick comment.

21           THE COURT:  Right.  You may.

22           MR. FLEMING:  Your Honor, sometimes in these

23   notebooks there are entrants who are not the witness on the

24   stand.  And we have absolutely no ability to cross-examine.

25   He's going to say, This is my notebook, I had other people

1    make entries, I've got materials from outside of Amgen that

2    I put in here, and now you should take them all as true.

3    This can't be the witness who can lay that foundation.

4         **THE COURT:**  Well, we'll see when we get to

5    specifics.

6         Why -- I guess I'm a little confused as to why a --

7    what you've identified here as 249, which apparently comes

8    from 91, what you've identified as 472 which comes from 89,

9    and which you identified as 387 which comes from 90, why are

10   these relevant?

11        **MR. FLEMING:**  Interesting questions.

12        **MR. FLOWERS:**  Because these are recordations of

13   work that Dr. Strickland did to analyze prior art urinary

14   EPO against recombinant EPO.

15        **MR. DAY:**  What's relevant, your Honor, is they

16   contain experiments that he performed which will be relied

17   upon by expert witnesses to come in this case.

18        **MR. JAGOE:**  This is exactly my point, your Honor.

19   This witness didn't work at Amgen until 1984.  We just heard

20   on the stand the prior art urinary EPO was made by

21   Dr. Goldwasser in 1977.  These notebooks say this is from

22   Dr. Goldwasser, Dr. Goldwasser told me this is his urinary

23   EPO.

24        **THE COURT:**  I'll be alert to it.  But I think these

25   others, we'll simply keep them marked for identification,

1    and they may become admissible because they pertain to

2    something that's germane, you may seek to admit them.

3            So whether these will remain -- oh, I see they have

4    our letters on them, right?

5            THE CLERK:  No, those letters are from the previous

6    trial, Judge.

7            MR. FLEMING:  There are no letters on these at all,

8    your Honor.

9            MR. FLOWERS:  These correspond to the paper copies

10   that were exchanged for the other side, with letters.

11           THE COURT:  I'm not troubled by your alleged lack

12   of production.  I like original things.  So what do we do,

13   give these new letters or have these substitute for the

14   prior letters?

15           MR. DAY:  What they contain, your Honor, is they

16   contain original gels relied upon by --

17           THE COURT:  I'm all for originals.  What we'll do

18   is these will be referred to by the original letters that

19   were retained.  But only one of them is admitted, and I'll

20   go question by question.  I can't --

21           MR. FLEMING:  One quick -- consistent with what you

22   just said, as to the one you have admitted, there has been

23   no establishment that every entry in that notebook wholesale

24   is relevant.

25           THE COURT:  So you say, and I've preserved your

 1   rights in that regard.

 2           **MR. FLEMING:**  Thank you, your Honor.

 3           (Whereupon the sidebar conference concluded.)

 4           **THE COURT:**  Go ahead, Mr. Flowers.

 5   **(BY MR. FLOWERS:)**

 6   **Q.**  Dr. Strickland, you have before you what's been entered

 7   as Trial Exhibit 33, which is laboratory notebook 2295 on

 8   its cover.  Could you turn in that notebook to the pages 72

 9   to 83, please?  And could you tell us what's described on

10   those pages?

11           **MR. JAGOE:**  Objection, your Honor, call --

12           **THE COURT:**  Sustained.  The documents speak for

13   themselves.

14   **Q.**  Did you make the entries on these pages?

15   **A.**  Yes.

16   **Q.**  And what were you entering?

17           **MR. JAGOE:**  Objection, your Honor.

18           **THE COURT:**  No, he may tell us generally what he

19   was entering.

20           What were you doing there?

21           **THE WITNESS:**  We were doing some experiments to

22   answer a question that the FDA had asked of Amgen.

23           **MR. JAGOE:**  Objection, your Honor.

24           **THE COURT:**  No, overruled.  That may stand.

25           Go ahead, Mr. Flowers.

1          **THE WITNESS:**  I hadn't finished.  Should I continue

2     or --

3          **THE COURT:**  We'll let him ask another question.

4     **Q.**  So, Dr. Strickland, I think that's why you were

5     performing experiments.  What experiments were you actually

6     performing?

7     A.  They were isoelectric focusing experiments to compare

8     the behavior of urinary and recombinant EPO using that

9     experimental test.

10    **Q.**  And once you completed those experiments, were you able

11    to draw any conclusions about the results?

12         **MR. JAGOE:**  Objection, your Honor.  Expert

13    testimony, and lack of firsthand knowledge of the

14    experiments.

15         **THE COURT:**  Well, this witness not proffered as an

16    expert; right?

17         **MR. FLOWERS:**  That's correct, your Honor.

18         **THE COURT:**  He can tell us what he thought then.

19         Once you had those in your notebook, or once the

20    experiments were done, what did you then think as to the

21    results?

22         **THE WITNESS:**  Yes.  The conclusion was that urinary

23    EPO and recombinant EPO had different electrical charges,

24    and that the source of these charges was due to --

25         **MR. JAGOE:**  Objection, your Honor.  It's asking for

1    expert testimony as to the source.

2         **THE COURT:**  Overruled.  He may tell us what he

3    thought then.

4         **THE WITNESS:**  The source of the different

5    electrical charges was due to a difference in the sugar

6    chain part of the EPO molecule.

7    **Q.**  I just want to make sure, who did these experiments?

8    **A.**  I did them, and my research associate, Ken Aoki, who

9    reported to me.

10   **Q.**  Did you write your conclusions anywhere in the lab

11   notebook?

12   **A.**  Yes.

13   **Q.**  And where would we find them?

14   **A.**  The best one's probably on page 77.

15   **Q.**  And what did you write there?

16   **A.**  It's right below -- yeah, starting there, with, "Since."

17        **MR. JAGOE:**  Objection, your Honor, it speaks for

18   itself.

19        **THE COURT:**  It's in evidence, he may read it.

20   **A.**  "Since recombinant human EPO and urinary EPO have the

21   same isoelectric points, following N-glycanase sialidase

22   treatment, the greater acidity of native urinary EPO must be

23   due to a difference in the carbohydrate moieties of

24   recombinant human EPO and urinary EPO."

25   **Q.**  Doctor, after you saw the results of these experiments,

1    what, if anything, did you do with them?

2    A.  Well, the -- I drafted a response for the FDA question,

3    and Amgen sent that response to the FDA.  And the results

4    were also included in my declaration to the patent office.

5    Q.  Now, in your binder in front of you with exhibits, you

6    should have Exhibit CEW.  Do you have it?

7    A.  Yes.

8    Q.  What is that document?

9    A.  This is a poster presentation that we presented at a

10   scientific conference.

11   Q.  And when you say "poster," what do you mean?

12   A.  Well, at some scientific conferences they have sessions

13   where you would take these individual figures on the pages

14   and you'd put them up with push pins on a big board.  And

15   there would be a whole room of these posters.  And other

16   scientists would come by and you'd have the results up there

17   and you would discuss the results with the other scientists

18   so you could all look at the data being displayed on the

19   poster.

20   Q.  Who created this poster?

21   A.  I did, and the co-authors on the poster.

22   Q.  And when did you create this poster?

23   A.  In February and March of 1992.

24   Q.  Was creating a poster like this part of your regular job

25   responsibilities at Amgen at the time?

1    A.   Yes.

2    **Q.**   And was this poster created and maintained as part of

3    the regular business activities at Amgen?

4    A.   Yes.

5            **MR. JAGOE:**   Objection, your Honor.   This is

6    leading.

7            **THE COURT:**   Well, he was.   But there's no timely

8    objection.   I'll be alert to it.

9            **MR. FLOWERS:**   Your Honor, we would offer CEW.

10           **MR. JAGOE:**   Your Honor, we object.

11           **THE COURT:**   CEW is what?   Where is it?

12           **MR. FLOWERS:**   CEW behind the tab in the binder.

13           **THE COURT:**   Yes, I have it.   Thank you.

14           Forgive me, this is my fault.   Tell me what these

15   are?

16           **THE WITNESS:**   These are the figures from a poster

17   presentation.   So we would take each of those figures and

18   they'd be printed out, and we would put them up with push

19   pins on a board.   And then --

20           **THE COURT:**   To show people?

21           **THE WITNESS:**   Yes, at a scientific conference.   So

22   there would be a whole room filled with these, and people

23   would walk from one to the other and just discuss the

24   results.

25           **THE COURT:**   And I see writing here, and that

1    writing relates to a specific poster; is that right?

2         THE WITNESS:  Yes.  So those would be the figure

3    legends for several of those figures.

4         THE COURT:  And when was this?  When did you have

5    this presentation?

6         THE WITNESS:  1992.

7         THE COURT:  No, sustained.

8    Q.  Dr. Strickland, when did you create the information

9    that's contained in the poster?

10        MR. JAGOE:  Objection, your Honor.  Calls for

11   hearsay.

12        THE COURT:  No, I think not.  Overruled.

13   A.  In the last half of 1991 and up until March of 1992.

14   Q.  And how was that information created?  Where did it come

15   from?

16   A.  Well, it was created from experiments that we did in the

17   laboratory.

18   Q.  And how long after the experiments were done in the

19   laboratory did you enter that information into the posters?

20        MR. JAGOE:  Objection.  Leading, your Honor.

21        THE COURT:  No, no.  "How long."  Overruled.

22   A.  For some of the experiments it could have been several

23   months.  But for the majority of the experiments, we only

24   got the data a month or six weeks before the poster was

25   presented.

1   Q.  And did you have a practice of entering such information

2   into posters at Amgen?

3   A.  Yes.  It was one of the regular things that we did.  If

4   we were going to a scientific conference and wanted to

5   present data, then this was a common way to present it.

6   Q.  Was there a policy at Amgen regarding that practice?

7           MR. JAGOE:  Objection, your Honor.

8   A.  A policy --

9           MR. JAGOE:  Objection, your Honor.

10          THE COURT:  No, no.  It's foundation.  He may have

11  it in that form.

12  A.  Well, there's a policy to retain the posters after --

13  for a certain length of time.  But I didn't quite

14  understand, the policy regarding entering the data into the

15  posters?

16  Q.  And creating the posters and presenting the posters.

17          MR. JAGOE:  Objection, your Honor.  Leading.

18          THE COURT:  Yes, sustained on that ground.  Put

19  another question.

20  Q.  Was there a policy at Amgen regard the creation of such

21  posters?

22          MR. JAGOE:  Objection, leading.

23          THE COURT:  Overruled.  Foundation.

24  A.  Well, there were certainly policies that you had to have

25  the poster approved by the legal department, and things like

1   that.  I'm sorry, I'm not quite getting your question.

2   **Q.**  Let me ask a more fundamental question.  Why did you

3   create the poster as part of your work at Amgen?

4            **MR. JAGOE:**  Objection, leading.

5            **THE COURT:**  No, "why."  Overruled.  You may answer.

6   A.  Well, it was part of our work as scientists to share

7   scientific information with other scientists.  So this is

8   the recording of experimental results for the purpose of

9   sharing it at a conference with other scientists, and they

10  would share their scientific results with us.  And everyone

11  would benefit from that.

12  **Q.**  Were the results in this poster, the information in this

13  poster, were those results or information recorded anywhere

14  else?

15  A.  What was -- certainly they were first reported in

16  laboratory notebooks, because that's -- you know, we would

17  do the experiment, record it in a laboratory notebook, and

18  then certain data would be included in the poster.

19  **Q.**  And the experiments that were described in the poster,

20  excuse me, in the poster, what samples did you use in those

21  experiments, what kinds of samples?

22           **MR. JAGOE:**  Objection, your Honor.  Lack --

23           **THE COURT:**  Yes, sustained.  Against that

24  objection, sustained.

25           **MR. FLOWERS:**  Your Honor, I would again offer CEW

1    as a business record.

2            **MR. JAGOE:**  We object, your Honor.

3            **THE COURT:**  Sustained.

4            **MR. FLOWERS:**  Could I have a sidebar, your Honor?

5            **THE COURT:**  You may.

6    SIDEBAR CONFERENCE, AS FOLLOWS:

7            **THE COURT:**  He was wise to stop making his

8    argumentative objections, because when he objected

9    generally, I don't understand the relevance of any of this.

10   Who cares about, in this phase of the case, experiments they

11   did in the '90s?

12           **MR. FLOWERS:**  Again, these were experiments

13   conducted using the prior art to EPO, and these are going to

14   be relied upon on other witnesses, expert witnesses, in our

15   case.

16           **THE COURT:**  Fine.  I'm not terribly troubled by the

17   authenticity, but I'm not admitting them now.  If what we're

18   doing is setting up for the next witnesses, I'm okay.  But

19   we can get him off the stand pretty quick.

20           Is he the last witness on your side in this phase?

21           **MR. DAY:**  No, he's not the last.  Our last witness

22   is an expert, that will be Ajit Varki.

23           **THE COURT:**  He's going to be here next.  This is

24   next to last.

25           **MR. FLEMING:**  So you're not calling Dr. --

1              **THE COURT:**  Please, please.  Always talk to me.

2              **MR. FLEMING:**  I beg your pardon, your Honor.

3              **MR. JAGOE:**  One more thing about the CEW --

4              **THE COURT:**  You won that.

5              (Whereupon the sidebar conference concluded.)

6  **(BY MR. FLOWERS:)**

7  **Q.**  Doctor, in your binder you should have Exhibit 2011.

8  Before I do that, before we go to that, could you turn back

9  to CEW, please?  Would you turn to the page which has 715 in

10 the lower right.  What does this represent?

11             **MR. JAGOE:**  Objection, your Honor.

12             **THE COURT:**  No, he may identify it.  It's not in

13 evidence.

14 A.  This is a map of the sugar chains of a urinary EPO

15 sample from Dr. Goldwasser's lab.

16             **MR. JAGOE:**  Objection, your Honor.  He has no

17 foundation.  Move to strike that.

18             **THE COURT:**  It's not in evidence, I've allowed him

19 to identify it.  I won't strike it.  We'll see if it ever

20 gets in evidence.

21 **Q.**  Doctor, if you turn to the next figure, page bearing, in

22 the lower right, 716 is the last of the Bates number, what

23 does this figure represent?

24             **MR. JAGOE:**  Same Objection, your Honor.

25             **THE COURT:**  I assume you're going to be able to

1    tell us.  Before you do, how do you know that?

2          **THE WITNESS:**  Well, I know it as I'm sitting here

3    because the figures are labeled.

4          **THE COURT:**  You know it because you've read the

5    labels?

6          **THE WITNESS:**  And I know it because I did the

7    labeling of these materials.

8          **THE COURT:**  And you labeled the materials when,

9    after you did the experiment?

10         **THE WITNESS:**  Well, I'm speaking of labeling, I

11   meant putting the radioactive label on them so that these

12   experiments could be performed.  So that I know that the

13   urinary EPO's from Dr. Goldwasser's lab because we had --

14         **THE COURT:**  How -- I guess that really is, I think,

15   probably why they're objecting.  How do you know that

16   those -- you, yourself, that those materials which you later

17   put the label on it through the experiment, and later

18   labeled it the normal way, how do you know this came from

19   Dr. Goldwasser's lab?

20         **THE WITNESS:**  Well, this particular sample in

21   particular, I had the label from the vial from

22   Dr. Goldwasser's lab, and --

23         **THE COURT:**  You had the label on the vial?

24         **THE WITNESS:**  Yes, and Dr. Goldwasser said that --

25         **THE COURT:**  No, no.

 1              **MR. JAGOE:**  Objection, your Honor.

 2              **THE COURT:**  I see.  No.  It's my fault.  We have to

 3      follow the legal rules.

 4              **THE WITNESS:**  Okay, sorry.

 5              **THE COURT:**  As soon as you start saying, And

 6      Dr. Goldwasser said, that is what we call hearsay.  And so I

 7      can't hear it or let the jury hear it.  But that's your

 8      basis, you had conversations with Dr. Goldwasser and you saw

 9      a label on a vial?

10              **THE WITNESS:**  Yes, your Honor.

11              **THE COURT:**  I strike the preceding answer.

12              And it's 1:00, and time to recess.  And, ladies and

13      gentlemen, we are right on track.  I'm told that this is the

14      penultimate witness, one more witness on the first phase,

15      then we're in the second phase of the case.  So keep your

16      minds suspended.  Do not discuss the case either among

17      yourselves nor with anyone else.  We'll start right at

18      9:00 tomorrow morning, and we will stand in recess in the

19      jury case until that time.  I'll remain on the bench.

20              **THE CLERK:**  All rise for the jury.

21              (Whereupon the jury left the courtroom.)

22              **THE COURT:**  Please be seated.  And you may step

23      down, sir.

24              (Whereupon the witness stepped down.)

25              **THE COURT:**  Total elapsed time stands Amgen, six

1    days, two hours 35 minutes; Roche, seven days, 55 minutes.

2          We'll resume again at 2:00 p.m. for the jury-waived

3    evidentiary presentation on obviousness/double patenting,

4    which in total will take four hours, which will not count

5    against your times for the trial.

6          We'll recess until 2:00.  We'll recess.

7          (Recess.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               **C E R T I F I C A T E**

2

3

4        We, Donald E. Womack and Cheryl B. Palanchian,

5 Official Court Reporters for the United States District

6 Court for the District of Massachusetts, do hereby certify

7 that the foregoing pages are a true and accurate

8 transcription of our shorthand notes taken in the

9 aforementioned matter to the best of our skill and ability.

10

11

12

13

14           /S/ DONALD E. WOMACK
           _____

15           /S/ CHERYL B. PALANCHIAN
           _____

16

17              DONALD E. WOMACK
           CHERYL B. PALANCHIAN
           Official Court Reporters

18               P.O. Box 51062
       Boston, Massachusetts 02205-1062

19            womack@megatran.com

20

21

22

23

24

25