```
 1                UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
 2
                                        Civil Action
 3                                      No. 05-12237-WGY

 4    * * * * * * * * * * * * * * * *
                                      *
 5    AMGEN, INC.,                    *
                                      *
 6            Plaintiff,              *
                                      *   DAILY TRANSCRIPT
 7    v.                              *   OF THE EVIDENCE
                                      *     (Volume 15)
 8    F. HOFFMANN-LA ROCHE LTD,       *
      ROCHE DIAGNOSTICS GmbH and      *
 9    HOFFMANN-LA ROCHE, INC.,        *
                                      *
10            Defendants.             *
                                      *
11    * * * * * * * * * * * * * * * *

12

13

14            BEFORE:  The Honorable William G. Young,
                       District Judge, and a Jury
15

16

17

18

19

20

21

22

23                                    1 Courthouse Way
24                                    Boston, Massachusetts

25                                    October 2, 2007
```

1                    A P P E A R A N C E S

2

3          DUANE MORRIS LLP (By D. Dennis Allegretti,
       Esq. and Michael R. Gottfried, Esq.), 470 Atlantic
       Avenue, Suite 500, Boston, Massachusetts 02210

4               - and -
           DAY CASEBEER MADRID & BATCHELDER, LLP (By

5       Lloyd R. Day, Jr., Esq., David M. Madrid, Esq. and
       Robert M. Galvin, Esq.) 20300 Stevens Creek

6       Boulevard, Suite 400, Cupertino, California 95014
                - and -

7          McDERMOTT WILL & EMERY (By Michael Kendall,
       Esq.), 28 State Street, Boston, Massachusetts

8       02109
                - and -

9          McDERMOTT WILL & EMERY (By William G.
       Gaede, III, Esq.), 3150 Porter Drive, Palo Alto,

10      California 94304
                - and -

11         MARSHALL, GERSTEIN & BORUN LLP (By Kevin M.
       Flowers, Esq.), 6300 Sears Tower, 233 S. Wacker

12      Drive, Chicago, Illinois 60606-6402
                - and -

13         STUART L. WATT and WENDY A. WHITEFORD, Of
       Counsel, Amgen, Inc., One Amgen Center Drive,

14      Thousand Oaks, California 91320-1789, on behalf of
       the Plaintiff

15

16         BROMBERG & SUNSTEIN LLP (By Lee Carl
       Bromberg, Esq. and Julia Huston, Esq.), 125 Summer
       Street, Boston, Massachusetts 02110

17              - and -
           KAYE SCHOLER LLP (By Leora Ben-Ami, Thomas

18      F. Fleming, Esq., Patricia Carson, Esq.,
       Christopher Jagoe, Esq. and Howard Suh, Esq.),

19      425 Park Avenue, New York, New York 10022, on
       behalf of the Defendants

20

21

22

23

24

25

**I N D E X**

**WITNESS:**          **DIRECT   CROSS    REDIRECT   RECROSS**

THOMAS W. STRICKLAND, Resumed

   By Mr. Flowers    2111

   By Mr. Jagoe              2146

AJIT VARKI

   By Mr. Day         2170

   By Ms. Ben-Ami           2244

<table>
<tr><td></td><td></td><td>FOR<br>I.D.</td><td>IN<br>EVID.</td></tr>
<tr><td colspan="2"><b>EXHIBITS:</b></td><td></td><td></td></tr>
<tr><td>34</td><td>EPO Log Excerpt . . . . . . . . . .</td><td></td><td>2114</td></tr>
<tr><td>35</td><td>Strickland Lab Notebook Excerpts . . .</td><td></td><td>2138</td></tr>
<tr><td>36</td><td>Strickand/Rogers Presentation Excerpt</td><td></td><td>2144</td></tr>
<tr><td>37</td><td>Strickland Lab Notebook Excerpts . . .</td><td></td><td>2146</td></tr>
<tr><td>2105</td><td>'298 Patent . . . . . . . . . . .</td><td></td><td>2156</td></tr>
<tr><td>2011A</td><td>Copy of Exhibit 2011 . . . . . . . .</td><td></td><td>2201</td></tr>
</table>

```
 1                THE CLERK:  All rise for the jury.

 2                (Whereupon the jury entered the courtroom.)

 3                THE CLERK:  Court is in session, please be seated.

 4                THE COURT:  Good morning, ladies and gentlemen.

 5                THE JURY:  Good morning.

 6                THE COURT:  And good to see you all.  Glad you're

 7      here at nine o'clock.  They're ready.  Let's go.

 8                THE CLERK:  And I remind you, sir, you are still

 9      under oath.

10                THE WITNESS:  Yes.

11                   THOMAS W. STRICKLAND, Resumed

12                   DIRECT EXAMINATION (Cont'd)

13      BY  MR. FLOWERS

14      Q   Good morning, Dr. Strickland.

15      A   Good morning.

16      Q   In your binder of trial exhibits you should have Trial

17      Exhibit 16.  It's the EPO sent-out log for Dr. Goldwasser's

18      laboratory.

19      A   Yes.  Yes.

20      Q   Would you go to Page 6 of that log, please.

21                   Dr. Strickland, would you please read --

22                MR. JAGOE:  Objection, your Honor; 602.

23                MR. FLOWERS:  It's an admitted trial exhibit, your

24      Honor.

25                Mr. JAGOE:  No firsthand knowledge of this witness.
```

1      **THE COURT:**  Well, let me see the document.

2      Who wrote this what he's asking you to read?

3      **MR. FLOWERS:**  It's an admitted trial exhibit, your

4  Honor.  I'm just asking him to --

5      **THE COURT:**  I am listening.  I heard you say that.

6      Who wrote this?

7      **THE WITNESS:**  Charles Kung.

8      **THE COURT:**  Yes.  No, he may read what was written.

9  He's just been asked to read it.  He may read it.

10  **Q**   Dr. Strickland, could you please read what this entry in

11  Dr. Goldwasser's EPO log says under date?

12  A   October 10, 1984.

13  **Q**   And could you read what this entry in Dr. Goldwasser's

14  EPO log says under EPO prep?

15      **Mr. JAGOE:**  Objection, your Honor, for

16  characterizing the document in the question.

17      **THE COURT:**  Yes, sustained.  Just point him to it

18  and ask him to read it.

19  **Q**   Could you read what it says under EPO prep, please.

20  A   M dash 7 dash 72 dash 2, and then alpha EPO in

21  parentheses.

22  **Q**   Could you read what it says under units.

23  A   586 microliters.  Then in parentheses approximately 200

24  micrograms.  A278 equals 0.290.

25  **Q**   Could you read what it says under to whom?

```
1    A    Por Lai.

2    Q    Do you know Por Lai?

3    A    Yes.

4    Q    Who is Por Lai?

5    A    At this time he was a research scientist at Amgen.

6              MR. FLOWERS:  Your Honor, these are the two labels

7    that we --

8              MR. JAGOE:  Objection, your Honor.

9              THE COURT:  No.  Yes, you cannot characterize what

10   they are.

11             MR. FLOWERS:  This is the document that was agreed

12   admitted, admissible.

13             Mr. JAGOE:  Objection, your Honor.

14             THE COURT:  No, no, please.

15             Mr. JAGOE:  Could we have a side bar?

16             THE COURT:  Please.

17             MR. FLOWERS:  Could we have a side bar, your Honor?

18             THE COURT:  Everyone wants a side bar.  I thought I

19   could do it without one but I can't.  Let's do it.

20   SIDEBAR CONFERENCE, AS FOLLOWS:

21             THE COURT:  Yes, what's the matter with this?

22   What's the matter with this?

23             Mr. JAGOE:  There's nothing the matter with it.

24   The witness has testified what he knows about, not how his

25   counsel is going to characterize it as this was admitted
```

1    because they decide to put the witness on the stand.

2              **THE COURT:**  I understand that.

3              **Mr. JAGOE:**  And I don't want him to characterize

4    the document in the question, leading the witness and

5    telling the witness what this is.

6              **THE COURT:**  I don't either, but he may proceed.

7              **MR. FLEMING:**  Your Honor, this needs to have a

8    number.

9              **THE COURT:**  It doesn't have a number?

10             **MR. FLOWERS:**  That's what I was going to --

11             **THE COURT:**  The number is?

12             **MR. FLEMING:**  What's your next number?

13             **MS. WHITEFORD:**  34.

14             **MR. FLOWERS:**  Amgen 34.

15             **THE COURT:**  Well, it's not Amgen 34.  It will be

16   Exhibit 34.  And I'll mark this.  And I'll tell Ms. Smith

17   when she returns.

18             **MR. FLEMING:**  Thank you, your Honor.

19             **THE COURT:**  Thank you.  Shall we put it in front of

20   the witness?

21             **MR. FLOWERS:**  Yes.  Thank you, your Honor.

22             (Whereupon the sidebar conference concluded.)

23             (Exhibit marked in evidence.)

24             **THE COURT:**  I'm showing you what's been marked as

25   Exhibit 34.  Do you understand that this is a portion of the

1    whole page, the portion that they want to show to the jury;

2    you understand that?

3              **THE WITNESS:**  Yes, your Honor.

4              **THE COURT:**  Put your questions.

5    **BY  MR. FLOWERS**

6    **Q**   Dr. Strickland, could you please read what's written in

7    the green box there.

8    **A**   200 --

9              **MR. JAGOE:**  Objection, your Honor.

10   **A**   -- micrograms.

11             **THE COURT:**  Overruled; it's in evidence, he may

12   read it.

13   **A**   Alpha EPO M dash 7 dash 72 dash 2.

14   **Q**   Dr. Strickland, have you ever seen what's in Trial

15   Exhibit 34, the green box?

16             **Mr. JAGOE:**  Objection; leading.

17             **THE COURT:**  No, overruled; he may have it.  But I

18   don't understand the question.  You mean has he ever seen

19   the substance?  Has he ever seen that entry before?  What?

20             **MR. FLOWERS:**  Has he ever seen that green box with

21   that writing before?  I'm trying not to characterize it,

22   your Honor.

23             **THE COURT:**  No, I understand.  No objection to

24   that.  You may answer.

25   **A**   Yes.

1   Q   Your answer?

2   A   Was yes.

3   Q   I'm sorry.

4       Where have you seen that?

5   A   On a vial of urinary EPO, and also this label is pasted

6   into my laboratory notebook.

7   Q   Could you turn to -- could you pick the notebook that

8   has 4790.  Do you have it?

9   A   Yes.

10  Q   Could you turn to Page 79, please.  What is this

11  document first of all?

12  A   This is one of my Amgen laboratory notebooks.

13  Q   And what is on Page 79?

14  A   Well, it's the --

15      **Mr. JAGOE:**  Objection, your Honor; it's calling for

16  hearsay.

17      **THE COURT:**  No, overruled.  He may tell us.

18  A   It's the start of some experiments using urinary EPO.

19  Q   And what's entered on that Page 79?

20      **MR. JAGOE:**  Objection, your Honor; it speaks for

21  itself.

22      **THE COURT:**  It does.

23      **MR. JAGOE:**  It's not in evidence.

24      **THE COURT:**  Oh, I was mistaken there.  This is not

25  in evidence?

1          **MR. FLOWERS:**  Not yet, your Honor.

2          **THE COURT:**  All right.

3          **MR. FLOWERS:**  I'm trying to establish relevance.

4          **THE COURT:**  All right.  Well, I'm going to sustain

5     it.  I can look and see what's there.

6          **Mr. JAGOE:**  And move to strike.

7          **THE COURT:**  He didn't answer.  Go ahead.

8     **Q**   Regarding Page 79, does that reflect anything that you

9     did?

10    **A**   Yes.

11    **Q**   What did you do?

12    **A**   I received the urinary EPO samples.  I --

13         **MR. JAGOE:**  Objection, your Honor.

14         **THE COURT:**  Overruled.  The question was what did

15    you do and he's telling us.

16    **A**   I pasted the label from the samples in my notebook and I

17    started a series of experiments using those samples.

18    **Q**   And can you describe how you received the samples?

19    **A**   Well, a researcher at Amgen, Tsutomu Arakawa, gave me

20    the vials containing the urinary EPO samples.

21         **MR. JAGOE:**  Objection, your Honor; there's no

22    foundation.

23         **THE COURT:**  Treated as a motion to strike, the

24    motion to strike is denied.

25    **Q**   Could you describe the vials for us that Dr. Arakawa

1   gave you?

2   A   Well, they were small plastic vials that were frozen;

3   the liquid in them was frozen.

4   Q   And what did you understand those vials to contain?

5           MR. JAGOE:  Objection, your Honor.  The

6   relevance --

7           THE COURT:  Please.  No, sustained.

8   Q   Did you do anything with the material that was in the

9   vials?

10  A   Yes.

11  Q   What did you do with it?

12          THE COURT:  Well, I'll allow -- actually I think I

13  misspoke.  I'll allow the witness to say what he, having

14  gotten it from Dr. Arakawa, what he understood was in them.

15  I won't allow him to say where he thought it came from or

16  the like.  But he got them, that was in evidence.  He may

17  tell us what he thought was in them.  In fact, I'll ask it.

18          What did you think was in there?

19          THE WITNESS:  Urinary EPO samples.

20          THE COURT:  Now go from there, Mr. Flowers.

21  Q   You were starting to tell us what you did with the

22  material in the vials.

23  A   Yes.  I performed some tests on the material, and I

24  also, with the remaining material, I, I made smaller

25  portions, we call it making aliquots, and then froze those

1    aliquots into small portions so that if in the future I did

2    experiments, I would only thaw a small portion and not have

3    to freeze and thaw the entire volume.

4    Q    Now, that process of making the aliquots, did you record

5    that process anywhere?

6    A    Yes.

7    Q    Where did you record it?

8    A    In this laboratory notebook.

9    Q    And where would we find it?

10   A    It's on the next page, Page 80.

11   Q    Where is it recorded on that page?

12   A    It's at the bottom of the page.

13   Q    And what did you do that you recorded?

14   A    I recorded that I made the aliquots and placed them in a

15   plastic box at minus 70 Celsius in the freezer, and that I

16   put, I have two labels here, and these are the labels that I

17   put on the smaller containers.

18   Q    Did you create the labels?

19   A    Yes.

20   Q    And these are new labels on the aliquots?

21   A    Yes.

22            MR. JAGOE:  Objection, your Honor.

23            THE COURT:  Sustained.

24            MR. JAGOE:  Leading.

25            THE COURT:  You're leading the witness.

1    **Q**   What did you put --

2          **THE COURT:**  Strike it.

3    **Q**   What did you put on the new labels?

4    **A**   Well, the designation for the sample, either beta

5    urinary EPO or alpha urinary EPO, some information about the

6    sample, and then the date that they were put in the freezer.

7    **Q**   Now, what label did you use for the material from the

8    vial that originally had the green label?

9          **MR. JAGOE:**  Objection, your Honor; foundation.

10         **THE COURT:**  Overruled.

11   **A**   The one that says alpha urinary EPO.

12   **Q**   And why did you, why you call that alpha urinary EPO?

13   **A**   That was my understanding of what was in the vial that

14   had the green label.

15   **Q**   Now, you also said you did a series of experiments with

16   the material?

17   **A**   Yes.

18   **Q**   What experiments did you conduct with that material?

19   **A**   I ran an absorbance spectrum, did a SDS-PAGE experiment,

20   and isoelectric focusing experiment.

21         **MR. JAGOE:**  Objection, your Honor.  Can I have a

22   side bar, please?

23         **THE COURT:**  Let him finish his answer.

24   **A**   Radioimmunoassay, and in vivo bioassay.

25         **THE COURT:**  And do you want a side bar now?

1        **Mr. JAGOE:**  Yes.

2        **THE COURT:**  You do?

3        **MR. JAGOE:**  I would, yes.

4        **THE COURT:**  Yes, we may.

5   SIDEBAR CONFERENCE, AS FOLLOWS:

6        **MR. JAGOE:**  Your Honor, this is the same situation

7   we had with Dr. Catlin.  This witness is not speaking from

8   his personal, firsthand knowledge.  In the notebooks it

9   clearly says that these are experiments run by other people.

10  It says that they're run by RIA.  What he just testified to

11  was run by someone else.

12       **THE COURT:**  Well, I think you might want to

13  cross-examine on that.

14       **MR. JAGOE:**  I don't think that he should be allowed

15  to testify to what he thinks.  He doesn't have firsthand

16  knowledge.

17       **THE COURT:**  When he says he ran the experiments he

18  ran these experiments.  He's under oath.  He's asked the

19  question.  That's his answer.

20       **Mr. JAGOE:**  The foundational question should be did

21  you run them with your own hands.  He's speaking from

22  witnesses and technicians that --

23       **THE COURT:**  I don't require such foundational

24  questions.  You may cross-examine.

25       **MR. FLEMING:**  Thank you.

1          (Whereupon the sidebar conference concluded.)

2     **BY  MR. FLOWERS**

3     **Q**   Dr. Strickland, why did you run those experiments that

4     you just described?

5               **MR. JAGOE:**  Objection, your Honor.

6               **THE COURT:**  Overruled.

7     A   I ran them to ensure that the sample was still integral,

8     that it wasn't degraded in any way since it had been

9     produced some years earlier.

10    **Q**   And did you --

11              **Mr. JAGOE:**  Objection, your Honor; no foundation.

12              **THE COURT:**   Treated as a motion to strike, denied.

13    You may examine the witness.

14    **Q**   Did you record the results of those experiments

15    anywhere?

16    A   Yes.

17    **Q**   Where did you record them?

18    A   In this laboratory notebook.

19    **Q**   And where would we find the results for the SDS-PAGE

20    experiment described?

21    A   On the top of Page 81.

22    **Q**   Would you go there.  Are you there?

23    A   Yes.

24    **Q**   And what did you do in this experiment at the top of

25    Page 81?

1    A    Well, I loaded recombinant EPO samples and alpha urinary

2    EPO samples to the SDS-PAGE.

3    Q    And where did you get the recombinant EPO sample that

4    you ran in this SDS-PAGE?

5            Mr. JAGOE:  Objection.

6    A    It was --

7            Mr. JAGOE:  Leading.

8            THE COURT:  No, where did you get -- now, of your

9    own knowledge now, not what people told you or what labels

10   were on it, let's take it first, how did it come into your

11   hands?

12           THE WITNESS:  Well, the production, the EPOGEN

13   production facility would give me samples from each lot that

14   they produced.  And so I would -- they would save the sample

15   for me.  I would go over to the plant and pick it up.

16           THE COURT:  The EPOGEN production facility of who?

17   Amgen?

18           THE WITNESS:  Amgen.

19           THE COURT:  Go ahead, Mr. Flowers.

20   Q    Dr. Strickland, looking at this SDS-PAGE picture at the

21   top of Page 81, what samples did you run with different

22   lanes on this SDS-PAGE?

23   A    Well, starting from the left hand side, if you call the

24   first one lane one, in lane one and three were samples of

25   the EPOGEN, and in lanes two and four are samples of the

1    alpha urinary EPO.

2    **Q**   Now, there's a picture at the bottom of the page.

3    What's the picture at the bottom of the page?

4           **Mr. JAGOE:**  Objection, your Honor; foundation.

5    It's not in evidence; 602.

6           **THE COURT:**  I know it's not, but he may identify

7    it.  What is it?

8           **THE WITNESS:**  It's an isoelectric focusing gel.

9    **Q**   And who performed the isoelectric focusing gel?

10   A    My research associate, Ken Aoki.

11   **Q**   And how did he come to run that IEF gel?

12   A    I gave him the samples and asked him to perform it.

13   **Q**   And what samples did you give to Dr. Aoki?

14   A    Mr. Aoki.  The recombinant EPO sample and the alpha

15   urinary EPO sample.

16   **Q**   And where did you get that recombinant EPO sample?

17   A    It was from one of Amgen's commercial production, EPOGEN

18   production lines.

19   **Q**   And that IEF gel at the bottom of Page 81, can you tell

20   us what you, what was run in each lane?

21          **MR. JAGOE:**  Objection, your Honor.

22          **THE COURT:**  Well, the document's not in evidence.

23   Sustained.

24          **MR. FLOWERS:**  Your Honor, I would offer this

25   original laboratory notebook into evidence at this time.

```
 1            Mr. JAGOE:  Objection, your Honor.

 2            THE COURT:  Sustained.

 3   Q   When did you receive the results back from Doctor --

 4   from Mr. Aoki?

 5            MR. JAGOE:  Objection, your Honor; foundation.

 6            THE COURT:  Overruled.  Yes, when.  You may, you

 7   may answer.

 8   A   September 9th, 1991.

 9   Q   Did you draw any conclusions from the results that you

10   received back from Mr. Aoki?

11            MR. JAGOE:  Objection, your Honor.

12            THE COURT:  Sustained.  Come to the side bar.

13   SIDEBAR CONFERENCE, AS FOLLOWS:

14            THE COURT:  Now, against this determined opposition

15   you've got a problem here it seems to me.  First of all, he

16   can't testify as an expert.  Second, the item here is what

17   he says it is, or I'm prepared to accept that.  But, he

18   didn't run this experiment.  So he only knows what's in each

19   lane because Aoki told him.  And absent that, I don't think

20   an expert can rely on hearsay.  A lay witness can't rely on

21   hearsay even to give the opinion back then -- excuse me --

22   which I've allowed your witnesses to do.  So, I think you're

23   up against it.

24            Can you suggest a way around it?

25            MR. FLOWERS:  Yes, your Honor.  He actually
```

1    instructed Mr. Aoki as to how to run that gel.

2              THE COURT:  I'm sure he did.

3              MR. FLOWERS:  And so if I could ask him whether he

4    instructed him to run that, and if he understood that the

5    instructions were followed at the time by seeing the

6    results.

7              THE COURT:  How could he know that?

8              MR. FLOWERS:  He received a actual result back from

9    Mr. Aoki.

10             THE COURT:  Of course.  The point is, what's

11   relevant here is the relationship of these various samples

12   in the various lanes.  That's what's relevant.  That's

13   what's substantive.  That's where you're going.

14             MR. FLOWERS:  And, your Honor, I'm not going to --

15             THE COURT:  Strickland said --

16             MR. FLOWERS:  -- ask him that.

17             THE COURT:  You're not?

18             MR. FLOWERS:  No.  We're trying to get this

19   laboratory notebook into evidence, your Honor, and

20   yesterday --

21             THE COURT:  But it identifies what was run in each

22   lane --

23             MR. FLOWERS:  Correct.

24             THE COURT:  -- doesn't it?

25             MR. FLOWERS:  Dr. Varki will testify what that

1    means.  We're not going to ask this witness to testify what

2    that means.

3              THE COURT:  Varki's an expert, right?

4              MR. FLOWERS:  Exactly.  Yes.

5              THE COURT:  He can rely on hearsay.  And he may

6    talk about, not the specific hearsay, but he may talk about

7    the conclusions from experiments run at Amgen.

8              MR. GOTTFRIED:  That's a business record which is

9    contemporaneous which tells how the experiment was done.

10             THE COURT:  Yes, by someone with personal

11   knowledge.  803(6).  And you're missing the personal

12   knowledge given these objections.  It looks like it was a

13   contemporaneous record.

14             MR. FLEMING:  It's in the regular course of

15   business.  He keeps these lab notes by Aoki.

16             THE COURT:  I don't see how you can do it.  That's

17   my ruling.

18             MR. FLEMING:  Thank you, your Honor.

19             (Whereupon the sidebar conference concluded.)

20   BY  MR. FLOWERS

21   Q   Dr. Strickland, was Mr. Aoki given any instructions as

22   to how to run the gel?

23   A   He was, he was given instructions as far as which

24   samples to load on the gel.

25   Q   And where did he get those instructions?

1    A    From me.

2    Q    I want to go back and ask you about the aliquots of the

3    alpha urinary EPO material that you talked about earlier.

4         Did you ever do anything with those aliquots?

5         **MR. JAGOE:**  Objection, your Honor; leading, move to

6    strike the comments.

7         **THE COURT:**  What did you do with the aliquots?

8    That's my ruling.

9         **THE WITNESS:**  Well, further experiments.

10   Q    What further experiments did you do?

11   A    Well, other SDS-PAGE experiments, and sugar chain

12   mapping experiments.

13   Q    Did you record the results of those experiments

14   anywhere?

15   A    Yes.

16   Q    Where?

17   A    In my laboratory notebooks.

18   Q    Did you record any of those results in this laboratory

19   notebook 4790?

20   A    Yes.

21   Q    And where did you record the results in this laboratory

22   notebook?

23   A    It's from Page 85 through 96.

24   Q    If you could turn to Page 91.  What did you record on

25   this page of your laboratory notebook?

1          **MR. JAGOE:**  Objection, your Honor.  It's the same

2     issue we just had at side bar.

3          **THE COURT:**  The document's not in evidence.

4     Sustained.

5     **Q**   Dr. Strickland, did you record what's on Page 91 of your

6     laboratory notebook?

7          **THE COURT:**  Whose handwriting is this on that page?

8     Or is it handwriting?

9          **THE WITNESS:**  There's no handwriting, your Honor.

10         **THE COURT:**  Okay.  What's on that page just

11    generally, a couple of graphs, right?

12         **THE WITNESS:**  Yes, your Honor.

13         **THE COURT:**  Okay.  Let's go from there.

14    **Q**   Where did those graphs come from?

15    **A**   I generated them.

16    **Q**   How did you generate them?

17    **A**   I plotted radioactivity data in a graphing program on

18    the computer and printed them out.

19         **THE COURT:**  Radioactivity from what, these aliquots

20    that he's asking about?

21         **THE WITNESS:**  Well, they're from the sugar chains

22    of the aliquots.

23         **THE COURT:**  All right.

24    **Q**   Can you describe what you did in this experiment?

25         **MR. JAGOE:**  Objection, your Honor; foundation.

1          **THE COURT:**  No, overruled.  He can tell us what he

2     did.  What he did.

3          **Mr. JAGOE:**  What he did.

4          **THE COURT:**  Yes, what he did.  That's the question.

5     A    Yes, I used an enzyme to remove the sugar chain from the

6     EPO molecule from recombinant and urinary EPO.  Then I

7     placed a radioactive label on that sugar chain.  Another

8     researcher at Amgen ran them on a --

9          **Mr. JAGOE:**  Objection, your Honor.

10         **THE COURT:**  Yes.  No, he, he may -- yes, it goes

11    beyond the question.  But I would just as soon get the

12    information.

13         So another researcher ran them on what?

14         **THE WITNESS:**  On the Dionex instrument that, it

15    separates the sugar chain according to their structure.  She

16    gave me the, the fractions.  We collected small aliquots as

17    the liquid came out the bottom of the column.  And I counted

18    them for, determined the radioactivity in each fraction and

19    then made the graphs shown on these pages.

20    Q    Okay, if you could turn to Page 92, the next page.

21         Now, what's on this page?

22    A    This is the sugar chain maps of the recombinant and

23    alpha urinary EPO.

24    Q    And who created these?

25    A    I did.

1    **Q**   Now, what's the graph at the top?

2    **A**   It's the, the sugar chain map of the recombinant human

3    EPO.

4              **MR. JAGOE:**  Objection, your Honor.

5              **THE COURT:**  No, overruled.  He may tell us.

6    **Q**   And where did you get the recombinant EPO that was used

7    in that experiment?

8    **A**   Amgen EPOGEN production lot.

9    **Q**   Now, what's the graph at the bottom?

10   **A**   It's the sugar chain map of the alpha urinary EPO.

11             **Mr. JAGOE:**  Same objection, your Honor; he said

12   another --

13             **THE COURT:**  Treated as a motion to strike, it's

14   denied.

15   **Q**   Dr. Strickland, was this the only Dionex sugar chain

16   mapping plan experiment that you conducted with the

17   aliquots?

18   **A**   No.

19   **Q**   What other experiments did you perform with the

20   aliquots?

21   **A**   Well, there were other sugar chain mapping experiments

22   and also other SDS-PAGE experiments.

23   **Q**   Did you record the results of those experiments

24   anywhere?

25   **A**   Yes.

1    Q    Could you look at the laboratory notebook 5668 which

2    corresponds to Exhibit CEY.

3              What is that document?

4    A    It's one of my Amgen laboratory notebooks.

5    Q    Who made the entries in that notebook?

6    A    I did.

7    Q    Did you make those entries as part of your regular job

8    duties at Amgen?

9    A    Yes.

10   Q    And what kind of information did you record in the

11   notebook?

12   A    Well, the experimental protocol and experimental results

13   from operations I did in the laboratory.

14   Q    And was there a relationship between when you did -- did

15   you have a practice as to how long after you did the work

16   that you recorded the information about them?

17             MR. JAGOE:  Objection, your Honor; foundation.

18             THE COURT:  No, overruled.  He may tell us if he

19   had a practice.  That's a yes or no, did you have a

20   practice?

21             THE WITNESS:  Yes.

22             THE COURT:  What was your practice?

23             THE WITNESS:  To record it as soon as possible

24   after performing the experiment or when the experimental

25   results were available.

1    Q   Did you follow that practice in regard to the

2    information in this laboratory notebook?

3    A   Yes.

4    Q   Was this notebook kept and maintained in the ordinary

5    course of Amgen's business?

6           Mr. JAGOE:  Objection, your Honor; leading.

7           THE COURT:  Overruled.  He may have it.  It's

8    foundational.

9    A   Yes.

10   Q   Would you go to Page 37, please.  What's shown on this

11   page?

12   A   This is the start of a series of experiments for sugar

13   chain mapping on the Dionex instrument.

14   Q   And what samples did you use in this experiment?

15          MR. JAGOE:  Objection, your Honor; foundation.

16          THE COURT:  Overruled.  If he knows of his own

17   knowledge, he may tell us.

18   A   The alpha urinary EPO, beta urinary EPO, and recombinant

19   EPO.

20          MR. JAGOE:  Objection, your Honor.  It's not in

21   evidence; he's reading it.

22          THE COURT:  Overruled.

23   Q   And what was the alpha urinary EPO that you used?

24          Mr. JAGOE:  Objection, your Honor.

25   Q   Where did you get it?

```
1              THE COURT:  He may tell us.

2    A   It was from one of the aliquots that I mentioned

3    earlier.

4    Q   And where did you get the recombinant EPO that you used

5    in this experiment?

6    A   In Amgen's EPOGEN production lot.

7    Q   Who performed this experiment?

8    A   I did.

9    Q   And what did you do in this experiment?

10   A   It's similar to the previous experiment.  I removed the

11   sugar chains from the EPO using an enzyme, placed the

12   radioactive label on this sugar chain.  I gave that sample

13   to Dr. Gary Rogers, a colleague at Amgen.  He ran it on the

14   Dionex instrument.

15             MR. JAGOE:  Objection, your Honor.

16             THE COURT:  No, overruled.  He may tell us.

17   A   And he, he gave me a printout of the results that he

18   obtained.

19   Q   Did you do anything with the printout?

20   A   Yes.

21   Q   What did you do with it?

22   A   I pasted it into my laboratory notebook.

23   Q   This laboratory notebook?

24   A   Yes.

25   Q   Where did you paste it?
```

1    A    On Pages 50 to 52.

2         THE COURT:  Let me ask a question about that.  The

3    graphs on Pages 50 to 52, is that how the instrument itself

4    graphs things?

5         THE WITNESS:  Yes, your Honor.

6         THE COURT:  In other words, there's no

7    interpretation of that by your lab assistant, he just runs

8    the experiment, it prints that graph out, you take it, paste

9    it in your notebook.

10         Have I got that right?

11         THE WITNESS:  Yes.  There is interpretation on

12    here, but that's, that was handwritten in by me.

13         THE COURT:  By who?

14         THE WITNESS:  By me.

15         THE COURT:  Yes.  And, again, just so we're clear,

16    and the jury may get to see this, the interpretation are

17    these brackets at the top of the spikes; is that right?

18         THE WITNESS:  Yes, your Honor.

19         THE COURT:  All right.

20    Q    Dr. Strickland, did you draw any conclusions about this

21    experiment at the time?

22         THE COURT:  At the time.

23    A    Yes.

24    Q    And what were your conclusions about this experiment at

25    the time?

1          **MR. JAGOE:**  Objection, your Honor.

2          **THE COURT:**  Overruled; he may tell us what he

3     thought at the time.

4     A    Well, that the sugar chains of alpha urinary EPO contain

5     up to three sulfates per sugar chain, while the sugar chains

6     of recombinant human EPO contained at most one sulfate per

7     sugar chain.

8     **Q**    And did you record that anywhere?

9     A    Yes, it's recorded in the notebook.

10    **Q**    Okay.  And where is it recorded in the notebook?

11    A    On the figures.

12    **Q**    On Pages 50 through 52?

13    A    Yes.

14    **Q**    Did you do anything else with that data?

15    A    Yes.

16    **Q**    What did you do with it?

17    A    It was used as part of the poster presentation --

18          **Mr. JAGOE:**  Objection, your Honor.

19          **THE COURT:**  No, overruled.

20    A    -- that we were speaking about yesterday.

21          **MR. FLOWERS:**  Your Honor, at this time I would like

22    to move in Pages 50 through 52 of this laboratory notebook,

23    5668, which is CEY.

24          **MR. JAGOE:**  Objection, your Honor.

25          **THE COURT:**  Overruled.  Those two pages may be

 1   admitted.  They'll have the next numbers, which is 35.

 2            **MR. FLOWERS:**  Pages 50 through 52.

 3            **THE CLERK:**  Did you say CEY?

 4            **MR. FLOWERS:**  It was originally from CEY.

 5            **THE CLERK:**  Thank you.

 6            **MR. FLOWERS:**  It was originally marked CEY.

 7            **MR. JAGOE:**  Your Honor, could I have a side bar?

 8            **THE COURT:**  You may.

 9   SIDEBAR CONFERENCE, AS FOLLOWS:

10            **THE COURT:**  Mr. Flowers?

11            **MR. FLOWERS:**  I'm sorry, your Honor.

12            **THE COURT:**  Me first.

13            **MR. FLOWERS:**  Yes, sir.

14            **THE COURT:**  Here's the reason.  What this is is

15   primary data.  And I believe it's relevant.  The graphs

16   weren't relevant without the interpretation of someone else.

17   Here, the handwritten is this man at this time.  And the lab

18   notebooks are kept in the ordinary course of business.

19            Now, I think I'm making myself clear.  Do we need

20   this?

21            **Mr. JAGOE:**  I had two points.  First of all, the

22   labeling of this sample was only done by Dr. Rogers, not by

23   this witness.  We didn't lay foundation that these are

24   labeled correctly.  There's no personal knowledge that

25   they're labeled correctly.

1          THE COURT:  Yes, but he testified he thought that's

2     what they were.

3          MR. JAGOE:  He testified that these graphs were

4     pasted in.

5          THE COURT:  Yes.

6          MR. JAGOE:  He didn't testify that the labels --

7          THE COURT:  That tells you what sources he had.

8     Isn't that a description?

9          MR. JAGOE:  Mr. Rogers, only Mr. Rogers knows that

10    this is correct.

11         THE COURT:  It's sufficient.  It's sufficient.  All

12    right.

13              (Whereupon the sidebar conference concluded.)

14              (Exhibit marked in evidence.)

15         THE COURT:  You may, of course, cross-examine on

16    that point, counsel.

17              Proceed.

18    BY  MR. FLOWERS

19    Q    Dr. Rogers -- Dr. Rogers.

20              Dr. Strickland, we have Pages 50 and 52, what is

21    now Trial Exhibit 35 on the screen.  You said earlier that

22    you recorded your conclusions about the experiment on these

23    pages.

24              Could you tell us where on these pages you recorded

25    your conclusions?

```
 1   A    Well, they're in the brackets that are above the groups

 2   of peaks here.  Like this bracket.  And so that's one.  One

 3   group of peaks where I concluded there's no sulfate, and

 4   this group of peaks, one sulfate, this group of peaks, two

 5   sulfates, and this group of peaks, three sulfates.  And

 6   that's in the alpha urinary EPO.

 7        And in the recombinant EPO there's only peaks that

 8   have no sulfate and one sulfate.

 9   Q    Thank you.

10        Now, you said you recorded results from these

11   experiments in the poster we talked about yesterday?

12   A    Yes.

13   Q    In your binder you should have Exhibit CEW.  Where in

14   Exhibit CEW would we find the results from this experiment?

15        MR. JAGOE:  Objection, your Honor; leading.

16        THE COURT:  No, where?  Overruled.

17   A    In Figures 4 through 6.

18        MR. FLOWERS:  Your Honor, at this time I would

19   offer, again offer CEW, the poster into evidence.

20        MR. JAGOE:  Objection, your Honor.

21        THE COURT:  May I see it, again.

22        This labeling of what this is and the labeling over

23   here, where did that come from?

24        THE WITNESS:  Well, this was just typed in.

25        THE COURT:  But where did the data that was typed
```

1   in here, where did you get that?

2          THE WITNESS:  Well, it came from the Dionex

3   instrument, and it had a, this one had a flow-through

4   radioactivity detector.  So as it flowed through the

5   detector it would send the data to a computer and then it

6   plotted the data.

7          THE COURT:  I see.  And I take it that at the time

8   it's the same thing, the instrument read that out?

9          THE WITNESS:  Yes, your Honor.

10          THE COURT:  And up here?

11          THE WITNESS:  That would just be typed in by --

12   because we knew what sample we put on that run.

13          THE COURT:  How did you know?

14          THE WITNESS:  Well, because we knew what sample we

15   started with, and as you proceed through the experiment you

16   would label, always label the tube as to which sample it was

17   so you would keep them straight.

18          THE COURT:  But you didn't do the labeling; is that

19   right?

20          THE WITNESS:  Well, I did the labeling of the

21   initial tubes.  When, when I started the experiment there

22   were several steps.

23          THE COURT:  Who did the labeling of this, if you

24   know?

25          THE WITNESS:  This particular figure, Dr. Gary

1    Rogers put that label on there.

2              **THE COURT:**  Yes.

3              **THE WITNESS:**  But -- oh, sorry.

4              **THE COURT:**  No.  And where did he get the material

5    from which he labeled this?

6              **THE WITNESS:**  I gave it to him.

7              **THE COURT:**  All right.  Yes, it's admitted.

8              **MR. JAGOE:**  Could we have a side bar, your Honor?

9              **THE COURT:**  You may.

10   SIDEBAR CONFERENCE, AS FOLLOWS:

11             **THE COURT:**  That goes to the weight, not the

12   admissibility.

13             **MR. JAGOE:**  Going back a page it clearly says Gary

14   Rogers ran that experiment.  Only he knows if he checked the

15   material correctly.  All he knows is that he took the --

16             **THE COURT:**  No, no.  There may be some, there may

17   be some truth to that.

18             **MR. JAGOE:**  This witness --

19             **THE COURT:**  The problem is -- wait.  This witness

20   gave him the material, instructed him, it's a fair inference

21   instructed him to run the experiment.  They run the machine

22   through.  You've got to assume then, because these are

23   things done in the regular course of business, that the

24   labeling put on those was put on erroneously.

25             You may inquire as to that.  You may inquire as to

1    the extent of his knowledge.  But I am entitled to draw

2    reasonable inferences in making my preliminary findings as

3    to whether to admit something.

4         **MR. FLEMING:**  Your Honor?

5         **THE COURT:**  I'm admitting it.

6         **MR. FLEMING:**  I beg your pardon.

7         **THE COURT:**  Yes.

8         **MR. FLEMING:**  That may have been true and I

9    understand your logic with regard to the notebook.  But this

10   document is not a notebook.  This is an abstract that was

11   put up that many people had hands in.  Yesterday you kept

12   that out for the reason that you weren't satisfied with the

13   foundation.

14        **THE COURT:**  Yes.

15        **MR. FLEMING:**  They're trying now to readmit it.

16        **THE COURT:**  I understand all this.

17        **MR. FLEMING:**  I think your concerns from yesterday

18   are still valid here.

19        **THE COURT:**  No.  Today, I am satisfied.  It's

20   admitted.

21        **MR. GOTTFRIED:**  Yes, your Honor.

22        **THE COURT:**  Oh, I'm sorry.

23        **MR. JAGOE:**  This document comes under a hearsay

24   objection.  It's not a business record of Amgen.

25   Dr. Goldwasser is not an Amgen employee.  They haven't

 1    established that this poster meets any of the exceptions to

 2    the hearsay rule.  If you're going to admit this as a

 3    business record, they haven't established that.

 4              THE COURT:  Yes, I think they have.

 5              (Whereupon the sidebar conference concluded.)

 6   BY  MR. FLOWERS

 7    Q    Dr. Strickland, I want to back up and go back to that

 8    laboratory notebook 4790 we were looking at earlier.

 9              And I'm going to go back to what you were

10    describing on Pages 85 to 96.  And I want to take you to --

11              Mr. JAGOE:  Could I have the exhibit number?

12    Exhibit number?

13              MR. FLOWERS:  CFA.

14              THE COURT:  Yes, we -- I finished the bench

15    conference, you know, we never marked the page you wanted

16    marked, and that's my fault.  It will be 36 in evidence.

17              THE CLERK:  And what page is it?

18              THE COURT:  Again, what page is it, Mr. Flowers?

19              MR. FLOWERS:  Your Honor, we would move 85 through

20    96.

21              MR. JAGOE:  Objection, your Honor.

22              THE COURT:  Wait a minute.  Wait a minute.  Wait

23    one moment.  We're talking about the, what was at the side

24    bar, that's one page.

25              MR. FLOWERS:  I'm sorry.  CEW.

1          **THE COURT:**  CEW.  Thank you.

2          **THE CLERK:**  But CEW is many pages.

3          **MR. FLOWERS:**  Yes, it's --

4          **THE COURT:**  No, it's -- let me see it.  We were

5     looking at what was marked Figure 4.  Figure 4 comes in.

6          **MR. FLOWERS:**  We were discussing Figures 4 through

7     6, your Honor.

8          **THE COURT:**  Well, maybe we were, but I was

9     referring to Figure 4.  So 4, 5 and 6.  You may have those.

10    Are in evidence as 35.

11         **THE CLERK:**  36.

12         **THE COURT:**  Thirty-six.  Excuse me.  You're going

13    to have to redact it because you've got a Figure 7 on the

14    back.

15              4, 5, 6 in evidence.

16              (Exhibit marked in evidence.)

17         **MR. FLOWERS:**  Thank you, your Honor.

18    **Q**    Dr. Strickland, back to laboratory notebook 4790.  Do

19    you have that?

20    **A**    Yes.

21    **Q**    Pages 85 through 96.  If you would go to Pages 91 and 92

22    in particular.  Who created those figures?

23    **A**    I did.

24    **Q**    Who created the handwriting on those figures on Page 92?

25    **A**    That's my handwriting.

 1          **MR. FLOWERS:**  Your Honor, we would move in CFA

 2    Pages 85 through 96.

 3          **MR. JAGOE:**  Objection, your Honor.

 4          **THE COURT:**  Let me see them.

 5          All right, now what's pasted in here on 87?  Just

 6    tell me what that is?

 7          **THE WITNESS:**  This is from a scintillation counter

 8    that determines radioactivity.  So this is the printout from

 9    an instrument.

10          **THE COURT:**  And all the handwriting's yours?

11          **THE WITNESS:**  Yes, your Honor.

12          **THE COURT:**  And on 95, what's this?

13          **THE WITNESS:**  That's a printout of a spreadsheet

14    from a, that I generated on the computer.

15          **THE COURT:**  And the labels that are atop the sheet,

16    how did you derive those?  How were they derived?

17          **THE WITNESS:**  Well, they were derived from what I

18    know I started the experiment with and then each, at each

19    stage I would label it, either recombinant human EPO or

20    urinary EPO.

21          **THE COURT:**  And is -- would your testimony be the

22    same for what you've called Dionex of labeled EPO?

23          **THE WITNESS:**  Yes, your Honor.

24          **THE COURT:**  Yes.  Eighty-five through 96 admitted

25    in evidence.  And they'll be Exhibit 37.

1        **Mr. JAGOE:**  My objection is noted, your Honor?

2        **THE COURT:**  It is; your rights are saved.

3        (Exhibit marked in evidence.)

4        **MR. FLOWERS:**  No further questions at this time,

5    your Honor.

6        **THE COURT:**  All right.  Counsel?  Any questions?

7        **MR. JAGOE:**  Yes, your Honor.

8        **THE COURT:**  Proceed.

9                    **CROSS-EXAMINATION**

10   **BY  Mr. JAGOE**

11   **Q**   Dr. Strickland, you didn't run the Dionex experiment

12   described on Page 85 through 96 with your own hands, did

13   you?

14   **A**   The only part I didn't do with my own hand --

15   **Q**   Yes or no?  Yes or no?

16   **A**   I can't answer it yes or no.

17   **Q**   Did you run the entire experiment with your own hands?

18   **A**   No.

19   **Q**   Did someone named Pat Derby run the Dionex column?

20   **A**   Yes.

21   **Q**   And you're not Pat Derby, right?

22   **A**   No, I'm not.

23   **Q**   And Pat Derby may have misapplied the samples that you

24   gave her, correct?

25   **A**   I don't know.

1    Q    You don't know.

2         You don't know if she entered the samples correctly

3    when she ran the column, do you?

4    A    Well, I know that the results are consistent with other

5    results --

6    Q    No, do you know --

7    A    -- that we have seen.

8    Q    Did you see her, did you see her load the samples onto

9    the column?

10   A    No.

11   Q    Dr. Strickland, you started at Amgen in April of 1984,

12   right?

13   A    Yes.

14   Q    And prior to April of 1984 you hadn't done any research

15   with erythropoietin, right?

16   A    That's correct.

17   Q    Now, you weren't continuously employed at Amgen since

18   1984, were you?

19   A    No.

20   Q    There came a time when you left the employment of Amgen,

21   right?

22   A    Yes.

23   Q    And after you left the employment of Amgen you were

24   hired back as a consultant to create data for litigation,

25   correct?

1    A    Yes.

2    Q    And you created that data on the instructions or the

3    requests of Amgen's counsel, right?

4    A    Yes.

5    Q    And the one particular counsel that asked you is

6    Mr. Watt, who's sitting over here, right?

7    A    Yes.

8    Q    And data that you correct -- data that you created at

9    the request of Mr. Watt has been used in other litigations

10   for Amgen, right?

11   A    I don't know.

12   Q    You don't know.  That's your understanding, though,

13   isn't it?

14   A    I don't have an understanding.

15   Q    Now, back when you were a scientist for Amgen in the

16   early '80's one of the jobs that you had was to purify

17   erythropoietin, right?

18   A    Yes.

19   Q    And you never reported to Dr. Lin while you were at

20   Amgen, did you; yes or no?

21   A    Not as a supervisor, but he was the project team leader.

22   Q    Did you ever report to Dr. Lin?

23   A    In a manner.

24   Q    I'm going to show you your deposition.  Do you remember

25   I took your deposition earlier this year, Dr. Strickland?

1    A    Yes.

2    Q    If you look at Page 66 of the deposition that I just

3    handed you, which is your deposition from March 9th, 2007.

4          Are you there?

5    A    Yes.

6    Q    At Line 5 I asked you:  Did you ever report to Dr. Lin?

7          And what answer did you give me?

8    A    No.

9    Q    And you were under oath when you gave that answer in

10   March of 2007, right?

11   A    Yes.

12   Q    Now, you don't consider yourself just a pair of hands

13   for Dr. Lin, right?

14   A    No, I do not.

15   Q    And the work you did on the purification of

16   erythropoietin from mammalian cells grown in culture was

17   more than routine work, right?

18   A    Yes.

19   Q    In fact, you received a patent for your work on the

20   purification of erythropoietin from mammalian cells grown in

21   culture, correct?

22   A    Yes.

23          **Mr. JAGOE:**  And can we have 2001.201.  Sorry,

24   2011.2 -- Exhibit 2011, Page 201.

25   Q    This is your patent on the purification of human

1    erythropoietin, isn't it, Dr. Strickland?

2         **MR. FLOWERS:**  Objection, your Honor; beyond the

3    scope of this fact witness.

4         **THE COURT:**  Overruled.  And we have been over this

5    time and time again.  You have your rights.  You, of course,

6    can say that to save your rights.  But you know what I'm

7    going to do with these beyond-the-scope objections.  And I

8    will tell you, I think it's a waste of time.

9    A    Yes.  It's Dr. Lai and myself.

10   **Q**    And not Dr. Lin, right?

11   A    No, Dr. Lin, no, is not an inventor on this patent.

12   **Q**    And the method that's claimed for the purification of

13   human erythropoietin in your patent is what Amgen uses to

14   purify the erythropoietin that it used in its clinical

15   trials, right?

16   A    The method that's in some of the claims of this patent.

17   **Q**    In claim 10 in particular, right?

18   A    I don't recall the claim number.

19        **Mr. JAGOE:**  Can we have claim 10 of the patent,

20   please.  The whole thing.

21   **Q**    The steps in this claim 10 are what Amgen uses to

22   produce its GMP lots of human erythropoietin; isn't that

23   correct, Dr. Strickland?

24        **MR. FLOWERS:**  Objection; relevance.

25        **THE COURT:**  Could you ask the question again.  Wait

1    a second.  Just a second.

2           Overruled.  You may answer.

3    A    This is part of the method that Amgen uses to produce

4    its GMP material.

5    Q    And GMP material is what Amgen, is the description of

6    the material that Amgen used in its clinical trials of human

7    erythropoietin, right?

8    A    I didn't catch one word that you said earlier in your

9    question, I'm sorry.

10   Q    GMP, what does GMP mean?

11   A    Good manufacturing practices.

12   Q    And that's what Amgen uses to purify human

13   erythropoietin for its clinical trials, right?

14           **MR. FLOWERS:**  Objection; relevance.

15           **THE COURT:**  Overruled.

16   A    That's what Amgen did use to produce EPOGEN for its

17   clinical trials.

18   Q    So when the materials in your notebooks and your

19   documents that refer to recombinant human erythropoietin,

20   it's really referring to the one specific type of

21   recombinant human erythropoietin that's purified by your

22   patented method, right?

23   A    Well, the samples that are in my notebook were, that I

24   refer to as recombinant EPO, were purified according to this

25   procedure.

1    **Q**    Now, prior to 1984 you had no contact with

2    Dr. Goldwasser at the University of Chicago, right?

3    A    That's correct.

4    **Q**    So you have no firsthand knowledge of how many different

5    batches of human erythropoietin that Dr. Goldwasser purified

6    in the 1970's, right?

7    A    No firsthand knowledge.

8    **Q**    And you don't have any firsthand knowledge of how

9    Dr. Goldwasser stored the materials in his lab, the human

10   erythropoietin materials in his lab, from the periods of

11   1977 to 1984, right?

12   A    That's correct, no firsthand knowledge.

13   **Q**    You have no firsthand knowledge how Dr. Goldwasser

14   treated any of his samples in his lab, right?

15   A    Yes, no firsthand knowledge.  I've never been to

16   Dr. Goldwasser's lab.

17   **Q**    And you have no firsthand knowledge that you or anyone

18   at Amgen ever tested Dr. Goldwasser's actual human

19   erythropoietin that he purified in the 1970's, right?

20   A    Well, I have an understanding that --

21   **Q**    No, I want to know if you have firsthand knowledge that

22   you are actually testing his material?

23   A    As close to firsthand knowledge as I can get.

24   **Q**    So that's a no?

25        Now --

1          **MR. FLOWERS:**  Objection; argumentative.

2          **THE COURT:**  The --

3          **MR. FLOWERS:**  Move to strike.

4          **THE COURT:**  Well, the attorney's comment is

5    stricken; disregard it.

6    **Q**   The last question I asked you, the answer is no, you

7    have no firsthand knowledge, right?

8    **A**   And I answered as close to firsthand knowledge as I can

9    get.

10   **Q**   And that means you do not have firsthand knowledge,

11   right?

12         **MR. FLOWERS:**  Objection; argumentative.

13         **THE COURT:**  Overruled.

14   A   Well, I know that samples that I --

15         **Mr. JAGOE:**  Objection, your Honor.

16   A   -- assayed --

17         **Mr. JAGOE:**  Objection, your Honor.

18   A   -- came from Dr. Goldwasser's lab.

19         **Mr. JAGOE:**  Would you ask him to answer my

20   question.

21         **THE COURT:**  No, that's -- where the samples came

22   from is obviously a big deal here.

23         Well, strike that out.  Strike that out.  I get

24   carried away.

25         It app -- the accurate answer, and I have no idea

1   about any of this stuff, and that's why I must be cautious.

2   I'm absolutely firm as to what is my part of this trial.

3   But I must be equally diffident as to what is your part of

4   the trial.

5        My improper big deal comment was derived from the

6   fact that they seemed to be fighting a lot about this.  So,

7   he volunteers where certain samples first came from.  He may

8   think that.  But on this record, that's not established that

9   he knows it.  Strike it out.  We'll see where they come

10  from.  Not established that he, himself, his own eyes, ears,

11  smell, touch, taste.  And I have to be strict, he cannot

12  testify to what other people told him.  So, he, himself,

13  there's no evidence that he knows it.  Now, when the trial's

14  over we're going to talk about reasonable inferences and the

15  like and logical deductions.  And you are the judges of all

16  this.  But he didn't say that he, himself, knows.  So strike

17  that out.

18       Go ahead, Mr. Jagoe.  And please disregard my

19  comment.

20  **Q**   I'll hand you a document --

21       **THE COURT:**  It was improper.

22  **Q**   I'll hand you a document that's marked for

23  identification as Exhibit RO.

24       Can you identify Exhibit RO, Dr. Strickland?

25  **A**   Yes.  It's a patent that was, that I'm the inventor on.

1  **Q**   And you're the sole inventor on Exhibit RO?

2  A   Yes.

3  **Q**   And was RO a patent that was given for your work at

4  Amgen?

5  A   Yes.

6  **Q**   Does this patent deal with human erythropoietin?

7  A   Yes.

8           **MR. JAGOE:**  Your Honor, I would like to offer RO

9  into evidence.

10          **THE COURT:**  Any objection?

11          **MR. FLOWERS:**   Objection; relevance, your Honor.

12          **THE COURT:**  Yes, I think you'll have to come to the

13  side bar.

14 SIDEBAR CONFERENCE, AS FOLLOWS:

15          **THE COURT:**  Why is it relevant?

16          **MR. JAGOE:**  Because it shows that human

17 erythropoietin can have a variety of, a big range of

18 specific activities.  It shows human erythropoietin can

19 exist in different distributions of isoforms.  It shows

20 that --

21          **THE COURT:**  And why -- I'll accept all that.  Why

22 is that relevant?

23          **MR. JAGOE:**  Because Amgen makes the argument that

24 human erythropoietin is defined by specific, specific

25 activity.  The argument that human erythropoietin is defined

1    by specific distribution.

2            **THE COURT:**  It sounds relevant.  It may --

3            **MR. FLOWERS:**  I don't see how a patent from 1999 is

4    relevant to the prior art issues that are here on validity.

5            **THE COURT:**  Well, you know, I'm finishing reading

6    the depositions in the next phase of the case.  And it does

7    seem to me to be relevant.  I'm going to let it in.

8            **MR. FLEMING:**  Thank you, your Honor.

9            (Whereupon the sidebar conference concluded.)

10           **MR. JAGOE:**  We offer RO --

11           **THE COURT:**  Wait for the court reporter.

12           **MR. JAGOE:**  Sorry.

13           **THE COURT:**  RO is admitted.  It will be

14   Exhibit 2104.

15           **THE CLERK:**  5.

16           **Mr. JAGOE:**  5.

17           **THE COURT:**  5.  Thank you.

18           (Exhibit marked in evidence.)

19   **Q**   Dr. Strickland, your patent, which is 2015, which is

20   U.S. Patent 5,856,298, is it all right if I refer to it as

21   the '298 patent for you?

22   A   Yes.

23   **Q**   Okay.  In your '298 patent you report on certain

24   characteristics of human erythropoietin produced as

25   described in Dr. Lin's patent, correct?

1    A    I believe so.  I don't know where you're reading from.

2         **Mr. JAGOE:**  Can we have column 8, lines 63 to the

3    end, please.

4    Q    You see there recombinant erythropoietin is produced as

5    described by Lin?

6    A    Yes.

7    Q    And that's a reference to Dr. Lin's patents, right?

8    A    Yes.

9         **MR. JAGOE:**  Now, if we can have Table 2 of your

10   '298 patent which is on column 13.  Can we have that blown

11   up and expanded.

12   Q    Now, in Table 2 of your '298 patent you report that the

13   specific activity of different isoforms of human EPO are

14   different, right?

15   A    That's correct.

16   Q    So, each isoform on the left hand column represents a

17   type of human erythropoietin purified from mammalian cells

18   grown in culture, right?

19   A    Well, it represents a sub-fraction of the EPO produced

20   by mammalian cells.

21   Q    And purified from mammalian cells grown in culture,

22   right?

23   A    Yes.

24   Q    Each, each isoform is a fraction of a glycoprotein which

25   is the product of a Chinese hamster ovary cell, right?

1          **MR. FLOWERS:**  Objection; calls for expert

2     testimony.

3          **THE COURT:**  Overruled.

4     A   Yes, each, each isoform is a glycoprotein and it was

5     produced by a Chinese hamster ovary cell.

6     Q   So human erythropoietin produced by a Chinese hamster

7     ovary cell and purified in mammalian cells grown in culture

8     can have a specific activity from anywhere from 200,000 to

9     18,000 units per absorption unit at 280, right?

10         **MR. FLOWERS:**  Objection; calls for expert

11    testimony.

12         **THE COURT:**  Overruled.

13    A   Yes, that's what this table reports.

14    Q   For example, for the jury to understand, isoform number

15    8, which is human erythropoietin purified from mammalian

16    cells grown in culture, has a specific activity of 70,600

17    units per absorption unit, right?

18         **MR. FLOWERS:**  Objection; counsel's testifying.  The

19    document speaks for itself.

20         **THE COURT:**  The document does speak for itself.

21    But he's not testifying, he's asking whether a document is

22    properly interpreted that way.  Is it?

23         **THE WITNESS:**  Yes, using the units in that column

24    from 8 to 80, where it says, which he's highlighted there,

25    units per milligram polypeptide from 8 to 80.

1    Q    So human erythropoietin purified from mammalian cells

2    grown in culture can have a specific activity of

3    approximately 70,000 units per A280, right?

4    A    Sub-fraction of it can.

5    Q    Now, you report in your patent that isoforms of human

6    erythropoietin can be mixed in a variety of ratios to get a

7    distribution of isoforms if one desires, right?

8         MR. FLOWERS:  Objection; the document speaks for

9    itself.

10   A    I don't recall that.

11        THE COURT:  Overruled.  Well, that's his answer.

12   Q    Okay.  Let's, let's look at column 6, lines 54 through

13   56.  And can you read for the jury the sentence starting up

14   at line 4.

15   A    For example, a mixture of isoforms 9, 10 and 11 could

16   have the isoforms present in a variety of ratios such as 1

17   to 1 to 1, 2 to 3 to 1, or 20 to 20 to 1.

18   Q    And those are just samples of distributions of isoforms

19   that one could have, right?

20   A    That one could produce using the isolated isoforms.

21   Q    And you can have many other distributions of isoforms if

22   you desired, correct?

23        MR. FLOWERS:  Objection; calls for expert

24   testimony.

25        THE COURT:  Overruled.  Is that right?

1    A    Once you have the purified isoforms you could mix them

2    in, in different ratios.

3    Q    To obtain different distributions of isoforms, right?

4    A    Yes.

5            **Mr. JAGOE:**  Can we look at Figure 3 of your '298

6    patent which is on sheet five at the beginning of the

7    patent.

8    Q    Figure 3 is a picture of an IEF gel, right, Dr.

9    Strickland?

10   A    Yes.

11   Q    And each column of Figure 3 represents a sample of human

12   erythropoietin purified from mammalian cells grown in

13   culture, right?

14   A    Yes.

15   Q    And each, each column of Figure 3 represents human

16   erythropoietin that's the product of a Chinese hamster ovary

17   cell, right?

18   A    Yes.

19   Q    And each column of Figure 3 has a different distribution

20   of EPO isoforms, right?

21   A    Yes, that appears to be the case.

22   Q    And the first column we have isoform mixture, there are

23   four isoforms depicted?

24   A    There's four that are labeled there.

25   Q    Four that are labeled there.

1          And in figure, or in column 6, the ones that are

2     labeled 14 and 15, those are more acidic isoforms than the

3     ones that are in the first column, right?

4     A   Well, actually there is some 14 in the first column, you

5     just can't see it on this figure.

6     Q   Okay.  So when you don't see them, you don't see a band

7     on IEF, it doesn't mean that there's none of that isoform

8     present, right?

9          **MR. FLOWERS:**  Objection; calls for expert

10    testimony.

11         **THE COURT:**  Overruled.

12    A   Well, we're not seeing it here because of the

13    reproduction and because it's there in a small amount.

14    Q   So when you don't see it, it doesn't mean, when you

15    don't see it in a picture or a reproduction it doesn't mean

16    it's not there, right?

17    A   Well, in this particular case.

18    Q   That could be true in other cases?

19         **MR. FLOWERS:**  Objection; calls for speculation.

20         **MR. JAGOE:**  Withdrawn.  Withdrawn.

21         **THE COURT:**  Withdrawn.

22    Q   Now, Dr. Strickland, the Chinese hamster ovary cells

23    that Amgen uses to produce its clinical, used to produce its

24    clinical trial material of human erythropoietin are not the

25    only type of Chinese hamster ovary cell that can be used to

1    produce human erythropoietin, right?

2         **MR. FLOWERS:**  Calls for expert testimony.

3    A    I don't know.

4    Q    Well, let's look at --

5         **THE COURT:**  Wait a second.

6    Q    -- your patent, at your '298 patent at column 62 --

7    sorry, column 7, line 62 through column 8, line 2.

8         Can you read to the jury starting with the

9    sentence, "In another embodiment."

10   A    In another embodiment of the subject invention, the

11   erythropoietin used to produce the isoforms is made in CHO

12   cells that have -- that are transfected with a functional

13   beta-galactoside alpha 2,6 sialyltransferase gene to give

14   incorporation of sialic acid in alpha 2,6 linkage to

15   galactose.

16   Q    And you incorporate by reference an article by Lee in

17   the Journal of Biological Chemistry in 1989, right?

18         **MR. FLOWERS:**  Objection; the document speaks for

19   itself.

20         **THE COURT:**  In that case the document does speak

21   for itself.

22   Q    Did you incorporate into your patent an article from the

23   JBC in 1989 by Lee, et al.?

24   A    Yes.

25   Q    And can you tell the jury what you said in your patent

```
 1    for, what you were, what you were incorporating that

 2    reference for?

 3            MR. FLOWERS:  Objection; the document speaks for

 4    itself.

 5            THE COURT:  It does, but he may point us to the

 6    language.

 7    Q   Would you read starting here where it says for

 8    disclosure --

 9            THE COURT:  Now, you're confusing the two.  You

10    asked him what the patent says about the article, then you

11    told him what to read.  Those are different.  Are you asking

12    him or telling him?

13    Q   I'm asking you what you said, what your patent, what you

14    wrote in your patent after you referenced the Lee, et al.

15    article from 1989.

16            THE COURT:  All right.  You may tell us.  It's just

17    the language that follows that article, the reference to

18    that article.

19    A   Yes, that's what I was just going to read what was

20    there.

21    Q   All right, why don't you read that to the jury then.

22    A   For a disclosure of techniques for creating modified CHO

23    cells or other mammalian host cells.

24    Q   Now, these CHO cells that are transfected with this

25    other type of gene are not the same as the CHO cells that
```

1    Amgen uses, used to produce its clinical trial human

2    erythropoietin material, right?

3    A    That's correct.  That Amgen clinical trial and

4    commercial material does not have this gene in it.

5    Q    And the sugar structures on human erythropoietin made

6    with these Chinese hamster ovary cells would have some type

7    of different sugar structure than the human erythropoietin

8    in Amgen's clinical trial material, right?

9         **MR. FLOWERS:**  Objection; calls for expert

10   testimony, and speculation.

11        **THE COURT:**  Overruled.

12   A    It's possible.

13   Q    But that's what you're telling -- that's what you're

14   saying in your '298 patent, correct?

15        **MR. FLOWERS:**  Objection; document speaks for

16   itself, your Honor.

17        **THE COURT:**  No, he's asking for his interpretation.

18   He may have it.

19        Is that what you're saying there?

20        **THE WITNESS:**  Well, that perhaps the addition of

21   this gene could lead to the addition of that linkage, the

22   alpha 2,6 linkage.

23   Q    Then you would have, you would have human erythropoietin

24   produced in a Chinese hamster ovary cell that had a 2,6

25   sugar linkage, right?

1    A    If, if this approach were to work.

2    Q    Now, were you being honest when you filed your patent

3    application that led to the '298 patent?

4    A    Yes.

5    Q    Now, over the years you have made over a million dollars

6    off of Amgen stock, right?

7    A    Yes.

8    Q    And you still own or have options to buy more Amgen

9    stock, right?

10   A    Yes.

11   Q    And you own approximately 10,000 shares of Amgen stock,

12   right?

13   A    Yes.

14   Q    And so, if Amgen stock goes up one dollar today you'll

15   stand to gain quite a bit of money, right?

16            **THE COURT:**  If you sell.

17   A    Yes.

18   Q    And if Amgen stock goes down your net value would go

19   down, right?

20   A    If I were to sell.

21   Q    A significant amount.

22   A    You can do the math.

23   Q    So can the jury.

24            **MR. FLOWERS:**  Objection; move to strike.

25            **MR. JAGOE:**  I have no more questions, your Honor.

1          THE COURT:  All right.  Nothing further for this

2    witness?

3          MR. FLOWERS:  Just a couple of questions, your

4    Honor.

5          THE COURT:  Go ahead.

6    BY  MR. FLOWERS

7    Q    Dr. Strickland, Mr. Jagoe was asking you some questions

8    about this '298 patent, which is Exhibit 2105.  I'm going to

9    ask you, when did that patent issue?

10   A    January 5th, 1999.

11   Q    Was that after Dr. Lin filed his patent application?

12   A    Yes.

13   Q    He was asking you some questions about Table 2 in this

14   patent, and in one of your answers you talked about a

15   sub-fraction of the recombinant EPO having a certain

16   specific activity he was pointing to.

17          I wanted to ask you, what did you mean by a

18   sub-fraction?

19   A    Well, it's just a portion of the, the EPO forms that are

20   made by the cell.  So, you know, there's several forms made

21   by the CHO cells.  So if you can isolate just part of that,

22   it would be a sub-fraction.

23   Q    You also referred in your answer to an isoform.  What

24   were you referring to?

25   A    Well, we use isoforms at Amgen to refer to --

1          **Mr. JAGOE:**  Objection, your Honor.

2          **THE COURT:**  No, that's a little different.

3          What were you referring to in your testimony?

4          **THE WITNESS:**  I use isoform to refer to EPO form

5    that would have a different charge, a different electrical

6    charge.

7    **Q**   And how, if at all, does that relate to glycosylation of

8    EPO?

9          **MR. JAGOE:**  Objection, your Honor; expert

10   testimony.

11         **THE COURT:**  Overruled.

12   A    Well, the isoforms are caused by different carbohydrate

13   structures.  The different electrical charges are, are --

14   they have different electrical charges because they have

15   different carbohydrate structures.

16   **Q**   Now, Mr. Jagoe was asking you some questions about

17   Figure 3 in this patent.  He was asking you about the lane

18   on the right hand side of this figure and he was asking you

19   about isoform 15.

20         Have you ever seen an EPO preparation that had an

21   isoform of 17 or 18 or 19?

22         **MR. JAGOE:**  Objection, your Honor.

23         **THE COURT:**  No, sustained.  That's beyond the

24   scope.

25   **Q**   You talked about the sub-fraction in your answers and

1    you were shown an isoform and asked you about how that

2    related to glycosylation.  Does that relate to glycoforms?

3            MR. JAGOE:  Objection, your Honor.

4            THE COURT:  Sustained.  That's beyond the scope.

5    Q   You were shown isoform 5.  What does that mean about the

6    sub-population of EPO molecules?

7            MR. JAGOE:  Objection, your Honor.

8            THE COURT:  Overruled.  You opened it up.

9            Mr. JAGOE:  I don't think I talked about isoform 5.

10           THE COURT:  That's what you may think.  I must make

11   the rulings here.

12   A   What the sub-population -- I don't quite understand the

13   question.

14   Q   You were shown isoform 5.

15   A   Yes.  The specific activity of.

16   Q   And you were asked questions about isoform 5.  What does

17   that relate to in terms of the sub-population of EPO

18   molecules?

19   A   Well, it's a sub-population of what the cells make and

20   so that it would have five negative charges on its

21   carbohydrate chain.  Chains.

22   Q   Would all the molecules in a sub-population be the same?

23           Mr. JAGOE:  Objection, your Honor.

24           THE COURT:  No, overruled.  He may have that.

25   A   No.

1          **MR. FLOWERS:**  No more questions, your Honor.  Thank

2    you.

3          **THE COURT:**  Nothing further for this witness, is

4    there?

5          **MR. JAGOE:**  Nothing further, your Honor.

6          **THE COURT:**  You may step down, thank you.

7          (Whereupon the witness stepped down.)

8          **THE COURT:**  Call your next witness.

9          **MR. DAY:**  Amgen calls Dr. Ajit Varki, your Honor.

10         **THE COURT:**  And I was told and I told you that this

11   was the penultimate witness.  Well, after we let you go

12   yesterday they said, well, no, it's the antepenultimate

13   witness, which means this is the second to last witness, the

14   one coming, and then after him there will be another one,

15   and then this phase the case will be done.

16         But we're right on track.  It comes to you the 18th

17   of October.  They all know that.

18         **THE CLERK:**  Sir, would you raise your right hand.

19         Do you solemnly swear that the answers you will

20   give to this Court and Jury will be the truth, the whole

21   truth, and nothing but the truth, so help you God?

22         **THE WITNESS:**  I do.

23         **THE CLERK:**  Please be seated.

24         **MR. DAY:**  Do we have copies of the expert reports

25   for Dr. Varki, and also for the Court and for counsel.

1          (Pause in proceedings.)

2          **MR. DAY:**  May I proceed, your Honor?

3          **THE COURT:**  Yes.

4                    AJIT VARKI

5                **DIRECT EXAMINATION**

6    BY  **MR. DAY**

7    **Q**   Good morning, Dr. Varki.  Would you please introduce

8    yourself to the jury?

9    A    My name is Ajit Varki.

10   **Q**   And what is your current employment?

11   A    I'm a professor, distinguished professor of medicine and

12   cellular molecular medicine at the University of California,

13   San Diego.

14   **Q**   And do you hold any other positions at the University of

15   California, San Diego?

16   A    Yes.  I'm also the founding director and co-director of

17   the Glycobiology Research and Training Center at UC-San

18   Diego, and also the associate dean for physician scientist

19   training.

20   **Q**   Do you have an advanced degree?

21   A    Yes, I have a medical degree.

22   **Q**   Are you a practicing physician?

23   A    I was a practicing physician until 1992, but I still

24   hold a medical license and have board certification in

25   medicine, oncology, that is, cancer, hematology, that is,

1    blood diseases.  But in 1992 I was appointed chief editor of

2    the Journal of Clinical Investigation and that got me so

3    busy that I got out of practice.  But I still meet medical

4    students and go to medical conferences.

5    Q    Do you also train medical students?

6    A    Yes, I do.

7    Q    Now, what is your principal field of scientific study?

8    A    My principal field of scientific study is glycobiology,

9    which is the study of these glycans or sugar chains that are

10   found on proteins and cell surfaces.

11   Q    When did you begin your study of glycobiology?

12   A    In the late 1970's, around 1979 I began research in this

13   field.

14   Q    And what have been your specific interests within the

15   field of glycobiology?

16   A    So, I happened to be very fortunate in the late 1970's

17   and early 1980's to discover the first known biological

18   significance of the sugar chains.  In those days the field

19   wasn't even called glycobiology.  Nobody knew much about

20   these sugar chains.  And what really was remarkable was that

21   I found that a small difference in a sugar chain had a huge

22   impact on the biology of certain types of proteins.  And

23   since then, I've actually emphasized in my research this

24   idea which is held up that --

25        **MS. BEN-AMI:**  Objection.

1              **THE COURT:**  Yes, I think that we've had enough.

2     And --

3              **MR. DAY:**  It's covered in his report.

4              **THE COURT:**  That's not the point.  From this

5     question, I think that's enough.  Since then, we'll stop it

6     there.

7              And your question.  Put a question.

8              **MR. DAY:**  Yes.

9     **Q**   Have you studied glycosylation of N-linked and O-linked

10    sugars in particular?

11    A    Yes.  A lot of my research has had to do with N-linked

12    and O-linked research sugar chains and sialic acids and

13    sulfates.

14    **Q**   Approximately how many scientific articles have you

15    authored during the course of your career?

16    A    I've authored over 150 peer-reviewed scientific articles

17    and over a hundred book chapters, invited reviews and so

18    forth.

19    **Q**   Are you the author of any books?

20    A    Yes.  I'm the executive editor, the originator of the

21    major textbook in glycobiology, the principal textbook,

22    which is called Essentials of Glycobiology.

23    **Q**   Is this a copy of your textbook?

24    A    Yes.

25    **Q**   Have you received any honors or awards in the field of

1    glycobiology?

2    A    Yes.  I've been fortunate to receive the two top honors

3    in the field, the Karl Meyer Award and the International

4    Glycoconjugate Award.

5    Q    Have you ever testified in court before?

6    A    No.

7    Q    Dr. Varki, what will you be testifying about today?

8    A    So, I'm here to offer a response to Dr. Bertozzi's

9    opinions regarding, first that the Goldwasser EPO is

10   identical to the EPO produced in mammalian cells in culture,

11   and secondly, that the claims in the '933 and '422 patents

12   are anticipated and obvious.

13   Q    What, if any, conclusions have you reached concerning

14   Dr. Bertozzi's opinions?

15   A    I disagree with her conclusions.  I conclude that the

16   prior art urinary Goldwasser EPO is not identical to the EPO

17   described in the Lin patents; and I also disagree that the

18   claims in '933 and '422 are either anticipated or obvious.

19   Q    Dr. Varki, in your opinion, is Goldwasser's urinary EPO

20   identical to EPO produced by mammalian cells grown in

21   culture?

22             MS. BEN-AMI:  Leading, your Honor.

23             THE COURT:  Yes, sustained.  You are leading.

24   Q    Now, Dr. Varki, what, in your opinion, is the comparison

25   between Goldwasser's urinary EPO and the EPO produced by

1   mammalian cells grown in culture?

2   A    They are not identical.

3   **Q**    Why not?

4   A    EPO produced by mammalian cells in culture which many of

5   us tend to refer to as recombinant EPO, is produced in a

6   cultured cell in a dish and therefore ends up being very

7   different from what is made in the human body.

8   **Q**    And what is the basis for your opinion?

9   A    So, there are many reasons why this difference occurs.

10  First, the cell type in which the molecule is made results

11  in a marked difference in the glycosylation of the addition

12  of the sugar chains.  Secondly, in order to put a DNA into a

13  cell one has to select certain types of cells which have

14  been modified, so you end up with more differences.

15              **MS. BEN-AMI:**  Objection; report.

16              **THE COURT:**  No.  Oh, where is that in the report?

17              **MR. DAY:**  Blue, blue 82, your Honor.

18              **THE COURT:**  Thank you.  No, I don't, I don't see it

19  in blue 82.

20              You put another question.  Put another question.

21              **MR. DAY:**  It's, your Honor, if I may, the fourth

22  sentence.

23              **THE COURT:**  If I'm looking at blue 82, it's charts.

24              Sustained.  At that point.

25              **MR. DAY:**  Paragraph 82.  I'm sorry, your Honor,

1   Paragraph 82.

2           **THE COURT:**  Oh.

3           **MR. DAY:**  My mistake.

4           **THE COURT:**  No.  No, no, no.  It's clear that

5   you're going by paragraph.  It's my mistake, and I

6   apologize.

7           **MR. DAY:**  And I was referring to --

8           **THE COURT:**  Too much back and forth.  You may have

9   it consistent with 82, but you put another question.

10          **MR. DAY:**  And I specifically was referring to the

11  fourth sentence there.

12          **THE COURT:**  Understand.

13  Q   What's the basis for your opinion that you expressed,

14  that you just stated regarding the differences that exist

15  between Goldwasser's purified urinary EPO and EPO produced

16  from mammalian cells grown in culture?

17  A   In addition to the points I mentioned about the cell

18  type and the need to put it in special cell types in

19  culture, the environment in which the cells are grown can

20  really have a marked effect on how the molecules are

21  glycosylated; and furthermore, the environment in which the

22  product enters can have a further impact.  So, for all of

23  these reasons, the products can end up being very different.

24  Q   Dr. Varki, what evidence have you, have you reviewed in

25  this case in arriving at your opinions?

1    A    I've reviewed all of the evidence in Dr. Bertozzi's

2    reports and additional evidence.

3    Q    In your opinion, does the evidence support Dr.

4    Bertozzi's opinions?

5           MS. BEN-AMI:  Objection; leading.

6           THE WITNESS:  Yes, sustained, on that ground.

7    Q    In your opinion what, if any, evidence supports Dr.

8    Bertozzi's opinions?

9           MS. BEN-AMI:  Objection.

10          THE COURT:  No, he may have it.  If your objection

11   is leading, sustained.  Or, rather, overruled, I'm sorry.

12          You may testify.  What evidence supports her

13   conclusions?

14          THE WITNESS:  The evidence that she uses is based

15   on limited analysis of SDS-PAGE and IEF.

16   Q    And in addition to that, what evidence do you rely upon?

17          MS. BEN-AMI:  Your Honor, could I have a side bar

18   at this point, please?

19          THE COURT:  All right.

20          MS. BEN-AMI:  On a legal issue.

21          THE COURT:  Yes.  All right.

22   SIDEBAR CONFERENCE, AS FOLLOWS:

23          THE COURT:  Yes?

24          MS. BEN-AMI:  Yes.  Your Honor, this is a legal

25   issue meaning the only thing in the patent that's different

1    is SDS-PAGE and then they take both the sugars.  You'll

2    remember that.

3                 **THE COURT:**  Yes.

4                 **MS. BEN-AMI:**  This witness wants to say 20 years

5    later there's new technology by which he can draw all these

6    conclusions as a matter of law.  You can't look at new

7    technology, later technology to prove up that there is a

8    difference claimed.  This witness is not --

9                 **THE COURT:**  Well, there is a difference claimed,

10   correct?  By reference to SDS-PAGE.

11                **MR. DAY:**  By reference to the source.

12                **MS. BEN-AMI:**  The only, the only test is SDS-PAGE.

13                **THE COURT:**  The source grown in culture, right.

14                **MS. BEN-AMI:**  No, I'm sorry.  I'm not being clear.

15   He's --

16                **THE COURT:**  No, I understood what you said.  Maybe

17   it will sharpen it.

18                So what's the answer to that?

19                **MR. DAY:**  The answer, your Honor, is, first of all,

20   there is a bench memo that we filed this morning, but I want

21   to be very clear.  He arrives at the difference between the

22   claim in the prior art and the source limitation.  And the

23   law is very clear that when products are different you may

24   use a source limitation even though you can't fully

25   characterize or differentiate what the difference is.  And

 1   later evidence to prove that inherent difference that

 2   results from the source is admissible.  It's admissible both

 3   for purposes of, as they have offered it, they've offered

 4   later evidence to try and prove the identity and we can

 5   offer later evidence to prove that the product produced by

 6   the source is necessarily and inherently different.  Because

 7   the issue --

 8           THE COURT:  All right.

 9           MR. DAY:  -- is the source limitation.

10           THE COURT:  No, no, now, now I understand --

11           MS. BEN-AMI:  Okay.

12           THE COURT:  -- after hearing you both.

13           What do you say to that?

14           MS. BEN-AMI:  Well, what I say is the only way that

15   a source limitation can impart structure is based on the

16   tests that are in the patent at the time of the invention.

17   You cannot say -- let's imagine a wheel.  In 1984 I say two

18   things were different where they were the same.  They're

19   shown to be the same.  Let's imagine that they know this.

20           THE COURT:  I'm following.

21           MS. BEN-AMI:  Okay.  And 20 years later they get a

22   claim, because at the time of the invention there is no

23   difference, it's 20 years later, they figure out a way to

24   show there's a difference.  If the patent would be invalid

25   in 1984, based on the technology then, it can't suddenly

1    become valid 20 years later.

2              **THE COURT:**  No.

3              **MS. BEN-AMI:**  And that's why the law says --

4              **THE COURT:**  If I accepted this.  All right.

5              **MR. DAY:**  May I respond?

6              **THE COURT:**  It's been well argued.  It's not

7    necessary because I'm going to let you have it.  But the

8    matter is a significant matter that I will address, I will

9    have to address in the charge.  But I'm going to let him --

10   on the legal issue, I most generally agree with Mr. Day.  It

11   seems to me if the existential fact is that the source

12   limitation imparts a difference, when the source limitation

13   is called out we are entitled to use all the data we have to

14   understand what that difference in fact is.

15             I don't agree, Ms. Ben-Ami, in your hypothetical

16   example.  The matter is significant and I will have to

17   reflect on it, but I need to make a ruling and that's my

18   ruling.

19             **MS. BEN-AMI:**  So is your Honor allowing this

20   witness then to rely on all the evidence that was excluded

21   between Dr. Strickland's testimony?

22             **THE COURT:**  I can't make advisory opinions.  We'll

23   see.

24             **MS. BEN-AMI:**  Oh.

25             (Whereupon the sidebar conference concluded.)

```
 1   BY  MR. DAY

 2   Q   Dr. Varki, on what evidence do you rely as a basis for

 3   your opinion?

 4   A   Perhaps the most compelling evidence and the easiest to

 5   understand is the EPO doping test.

 6        MS. BEN-AMI:  Objection, your Honor.

 7   Q   Would you please --

 8        THE COURT:  Well, I'll give you a continuing

 9   objection as to the matters we just discussed --

10        MS. BEN-AMI:  Different objection, your Honor.

11        THE COURT:  -- at side bar.  Yes.  This is

12   something else?

13        MS. BEN-AMI:  Yes, your Honor.

14        THE COURT:  All right.  And something other than

15   whether it's in the report?

16        MS. BEN-AMI:  Yes, your Honor.  This is something

17   very excluded.

18        THE COURT:  Well, I'll hear you at the side bar.

19   SIDEBAR CONFERENCE, AS FOLLOWS:

20        MS. BEN-AMI:  This is the Catlin test.

21        MR. DAY:  No, this actually is not.  The Catlin

22   test --

23        MS. BEN-AMI:  There is no evidence regarding

24   Goldwasser material, allegedly Goldwasser material, any EPO

25   doping test.
```

1          **MR. DAY:**  Your Honor?

2          **THE COURT:**  Please.  Where are we going here?

3     There's something to what she says.

4          **MR. DAY:**  No, actually there isn't, your Honor, and

5     let me explain.  You ruled, first of all, with respect to

6     Catlin, you ruled that you thought there was an adequate

7     foundation for its authenticity but its relevance was

8     something to be developed by an expert.  And I am now

9     developing the relevance of Catlin's testimony and that gel

10    with respect to this expert.  I'm trying to lay a

11    foundation.  These questions are all foundational.  But,

12    secondly, beyond Catlin's testimony, there is in addition

13    learned treatises and publications regarding the use of the

14    test to distinguish between urinary EPO and recombinant EPO,

15    and this witness will lay the foundation to establish why

16    that's relevant to the claimed invention and why that

17    establishes that Goldwasser's EPO necessarily cannot

18    anticipate the claims of the invention.

19         **THE COURT:**  I'm going to let him go question by

20    question.

21         **MS. BEN-AMI:**  All right.  And, your Honor, I did

22    not hear your Honor ever say that you were allowing the

23    Catlin testing in.

24         **THE COURT:**  I hadn't allowed it in.

25         **MR. DAY:**  He didn't say he allowed it in.

 1              **THE COURT:**  And I have not.  And I'm not sure I

 2    will yet.  Nevertheless, he's an expert.  I did say that I

 3    thought it was authentic and it may be the type of material

 4    upon which he can rely to give opinions.

 5              **MS. BEN-AMI:**  Your Honor, it may be authentic in

 6    the sense that it existed, but Catlin didn't do the leg work

 7    and in this case --

 8              **THE COURT:**  Oh, I understand.

 9              **MS. BEN-AMI:**  -- each lane, which lane is which is

10    of critical importance.

11              **THE COURT:**  Oh, it may be.

12              **MS. BEN-AMI:**  There's no other authentication for

13    that.

14              **THE COURT:**  And now, and this is a guide, the

15    federal rules make clear that an expert who gives his

16    opinion is not thereby entitled to set forth the hearsay

17    upon which that opinion is based.  And I will be very strict

18    on that.

19              **MS. BEN-AMI:**  Thank you, your Honor.

20              (Whereupon the sidebar conference concluded.)

21    **BY  MR. DAY**

22    **Q**    Let's begin again if we could, Dr. Varki.

23    A    Yes.

24    **Q**    On what evidence do you rely as a basis for your

25    opinion?

```
1    A    I rely on multiple lines of evidence, including the EPO

2    doping test, the differences in half life, and the many

3    different types of biochemical comparisons between the

4    Goldwasser EPO and the EPO from mammalian cells in culture.

5    Q    And when you say the EPO doping test, could you just

6    briefly explain what that test is?

7    A    Yes.  Basically, even though --

8         MS. BEN-AMI:  Objection, your Honor.

9         THE COURT:  Overruled.

10   A    Even though this EPO is originally created, produced in

11   mammalian cells in order to treat patients who are anemic,

12   one can use the same material to increase one's blood count

13   above normal.  It's not a very safe thing to do but --

14        MS. BEN-AMI:  Objection, your Honor; report.

15        THE COURT:  Well, I'll strike out it's not a very

16   safe thing to do.  But we'll let that stand.

17        Put another question, Mr. Day.

18   Q    Would you please explain what the EPO doping test is?

19   A    So, elite athletes have used EPO to increase their

20   ability to win big events in the Olympics, Tour de France

21   and so on.  And the EPO --

22        MS. BEN-AMI:  Objection, your Honor.

23        THE COURT:  Well, I'm going to sustain that.  It's

24   sustained.  Go ahead.

25        MR. DAY:  It's contained in the expert report, your
```

 1   Honor.

 2           THE COURT:  It may be.

 3           Let me ask you this.  This EPO doping test, this is

 4   a test that's been developed well after the patents that

 5   we're talking about here?

 6           THE WITNESS:  Yes.

 7           THE COURT:  All right.  And you've told us that you

 8   think the EPO doping test is one that is, upon which you use

 9   to form your opinions?

10           THE WITNESS:  One of them.

11           THE COURT:  One of them.  All right, I think we

12   have enough on that.  Move on.

13           MR. DAY:  And could we just have the witness

14   explain what the analytical technique is that's used in the

15   EPO doping test?

16           THE COURT:  He may do that.  We're not getting into

17   athletes and that sort of business.  We'll focus on this

18   case.

19           What's the technique?

20           THE WITNESS:  The technique that's used is

21   isoelectric focusing which can differentiate the normal

22   urinary EPO --

23           MS. BEN-AMI:  Objection, your Honor.

24           THE COURT:  No, overruled.

25           THE WITNESS:  It can differentiate the normal

1    urinary EPO very effectively from any doping that's done by

2    anyone using any recombinant EPO they get hold of.

3    **Q**    You also mentioned half life differences.  Could you

4    explain just generally and briefly what you're referring to

5    there?

6    **A**    Yes.  Half life simply is a sophisticated way of saying

7    if you put something into the body how long does it last.

8    And there was, in the early work that was done with the

9    Goldwasser EPO, it disappeared very rapidly from human

10   blood.  In contrast, the EPO produced from mammalian cells

11   in culture lasts a very long time.

12          **MS. BEN-AMI:**  Objection, your Honor.

13          **THE COURT:**  No, that may stand.

14   **Q**    Then you mentioned other analytical techniques.  What

15   other analytical techniques or evidence do you rely upon in

16   support of your opinion?

17   **A**    So, the three techniques are SDS-PAGE which Dr. Bertozzi

18   emphasized but which is a rather insensitive technique;

19   isoelectric focusing, which is a somewhat more

20   discriminatory technique, which Dr. Bertozzi mentions

21   briefly; and Dionex HPLC Separation, a very good way of

22   looking in detail which I mentioned in my expert report,

23   rebuttal report, which Dr. Bertozzi does not comment on.

24   **Q**    So, let's take SDS-PAGE first.  What is SDS-PAGE

25   analysis?

1    A    So, SDS-PAGE analysis is a classic old-fashioned way to

2    take a group of protein molecules and put them, for example,

3    like at the end of a gel and have them move down and they

4    tend to separate according to their approximate molecular

5    weight.  But it's only an approximate technique.

6    Q    What do you understand to be Dr. Bertozzi's opinion

7    concerning SDS-PAGE comparisons between Goldwasser's urinary

8    EPO and EPO produced by mammalian cells grown in culture?

9           **MS. BEN-AMI:**  Objection, your Honor.

10          **THE COURT:**  Sustained.  The jury's heard it.  It's

11   not for this witness to characterize what she testified to.

12   But you may ask him questions as to what his view is.

13          **MR. DAY:**  Okay.

14   Q    Well, let me suggest, if I may, that Dr. Bertozzi stated

15   that there was no difference between urinary EPO and EPO,

16   Goldwasser's urinary EPO and EPO produced from mammalian

17   cells grown in culture.  Let me suggest that to you.

18          Do you agree or disagree with Dr. Bertozzi's

19   opinion?

20   A    I disagree.

21          **MS. BEN-AMI:**  Objection.

22          **THE COURT:**  He disagrees.  And that's -- we're

23   going to do something special now, Mr. Day.  And if you

24   wouldn't mind suspending because we're almost to the break,

25   but we have something to do.  So, I've interrupted you and

1    you may take your seat.  We'll leave the witness right there

2    though.

3              (Naturalization Proceeding Not Transcribed.)

4         **THE COURT:**  The jury may recess.  I'll ask Ms.

5    Smith to take the jury out.

6         I understand I have students here and they're

7    welcome to come forward and come back into the lobby.  We'll

8    stand in recess for one-half hour.

9         We'll recess.

10        **THE CLERK:**  Remain standing for the jury.

11        (Whereupon the jury left the courtroom.)

12        (Recess.)

13        **THE CLERK:**  All rise for the jury.

14        (Whereupon the jury entered the courtroom.)

15        THE CLERK:  Court is in session, please be seated.

16        **MR. DAY:**  May I resume, your Honor?  Thank you.

17        **THE COURT:**  Proceed.

18                  **DIRECT EXAMINATION** (Cont'd)

19   **(BY MR. DAY:)**

20   **Q.**  Dr. Varki, when we stopped you had mentioned that you

21   disagreed with Dr. Bertozzi's opinions regarding SDS-PAGE.

22   Would you explain why you disagreed, please?

23        **MS. BEN-AMI:**  Object as to the characterization,

24   your Honor.

25        **THE COURT:**  Overruled, and he may explain it,

1    consistent with his report.

2    A.   SDS-PAGE is an old-fashioned, relatively insensitive

3    technique for detecting differences between molecular size

4    of glycoproteins.  So I have reviewed several SDS-PAGE

5    analyses of urinary Goldwasser EPO compared with EPO made in

6    mammalian cells in culture.  Some of them you can clearly

7    see the difference with the urinary EPO, not only

8    Goldwasser, but of other sources, is different.  There are

9    also some where resolution is poor and it's hard to see the

10   difference.

11           In science, if you have a method and the method

12   sometimes shows --

13           **MS. BEN-AMI:**  Objection, your Honor.  Report.

14           **THE COURT:**  Yes, where is that?

15           **MR. DAY:**  Blue 138, your Honor.

16           **THE COURT:**  Thank you.  And I understand you're

17   referring to paragraphs?

18           **MR. DAY:**  Yes, Paragraph 138; 137, 138.

19           **THE COURT:**  Overruled.  He may have it.

20   **Q.**  Please proceed.

21   A.   I can actually read what I wrote.  "Even if other

22   SDS-PAGE experiments failed to provide sufficient resolution

23   to observe this difference, it does not mean that it's not

24   present."  In other words, you believe the result that shows

25   the difference when you have a poor method like that.

1   Q.   So you said you've review these SDS-PAGE gels.  What, in

2   your opinion -- strike that.

3         Have you reviewed the SDS-PAGE data that is

4   reported in the Lin patent specification?

5   A.   Yes, I have.

6         MR. DAY:  Could we have up Exhibit 1, column 28,

7   please.

8   Q.   We see, and this is from the Lin patent --

9   A.   Yes.

10  Q.   -- that's in evidence, Exhibit 1, column 28.  And you'll

11  see a reference here to western blot analysis and SDS-PAGE.

12  Did you review the gels on which this data's based?

13  A.   Yes.

14  Q.   And what, in your opinion, do those SDS-PAGE data show?

15        MS. BEN-AMI:  Objection, your Honor.  There's no

16  foundation.  What gels?

17        THE COURT:  Overruled.  He may tell us.

18        MS. BEN-AMI:  It's hearsay, your Honor.

19        THE COURT:  Oh, no foundation for those --

20        MS. BEN-AMI:  Yes.

21        THE COURT:  Yeah, yeah, sustained as to his -- as

22  to what those things may actually show.  He may give us his

23  opinions.

24  A.   As --

25        THE COURT:  No, no.

1          **THE WITNESS:**  Sorry.

2          **THE COURT:**  I sustained it.  He'll put another

3     question.

4          **THE WITNESS:**  Okay, sorry.

5     **Q.**  What, in your opinion, do you believe the SDS-PAGE gels

6     show?

7          **MS. BEN-AMI:**  Objection, indefinite.

8          **THE COURT:**  Overruled.

9     A.  As stated in the patent, these studies indicated that

10    the CHO-produced EPO material had a somewhat higher

11    molecular weight than the COS-1 expression product.  So here

12    we're talking about the two major mammalian cell lines,

13    which, in turn, was slightly larger than the pooled source

14    human urinary extract, which is the Goldwasser product.

15    Then they go on to --

16         **MS. BEN-AMI:**  Objection, your Honor.

17         **THE COURT:**  Overruled.

18         **MS. BEN-AMI:**  Your Honor, it's not in --

19         **THE COURT:**  Please.

20         **MS. BEN-AMI:**  Your Honor, may I have a sidebar?

21         **THE COURT:**  It's not necessary at this time.  Let's

22    see with respect to another question.  Go ahead.

23    **Q.**  What other SDS-PAGE data, if any, did you review?

24    A.  I reviewed some from Amgen publications and some from

25    the Strickland lab notebooks.

1    **Q.**  What, in your opinion, do those SDS-PAGE data show?

2          **MS. BEN-AMI:**  Objection, your Honor.  Not in

3    evidence.

4          **THE COURT:**  Sustained.  On that ground.

5    **Q.**  Now, have you reviewed any of the publications cited by

6    Dr. Bertozzi?

7    **A.**  Yes.

8    **Q.**  Did you review the gels in those publications?

9    **A.**  Yes.

10   **Q.**  And you mentioned that you'd also reviewed some gels in

11   Strickland's lab notebooks?

12   **A.**  Yes.

13   **Q.**  What, in your opinion, considering all of the SDS-PAGE

14   data that you've reviewed, what, in your opinion, does the

15   SDS-PAGE data that you've seen demonstrate?

16         **MS. BEN-AMI:**  Objection, your Honor.  Again --

17         **THE COURT:**  Sustained.  He may tell us what his

18   conclusions are.

19   **Q.**  What, in your opinion, does that data demonstrate?

20         **THE COURT:**  No, that's not the same question.

21   Sustained.

22         What conclusions did you draw from reviewing this

23   data?

24         **THE WITNESS:**  My conclusions were that when

25   SDS-PAGE is done in an optimal fashion, one can see the

1    differences in urinary erythropoietin of Goldwasser and

2    other urinary erythropoietins in comparison with

3    erythropoietin produced in mammalian cells in culture.

4    **Q.**  To your knowledge, did Dr. Bertozzi -- strike that.

5            Let me suggest to you that Dr. Bertozzi has

6    testified that she relied upon certain Amgen publications.

7    Are you familiar with that?

8    A.  Yes.

9            **MS. BEN-AMI:**  Objection, your Honor.

10           **THE COURT:**  No, overruled.  The question's not

11   evidence.  Don't -- and --

12           **MS. BEN-AMI:**  Your Honor, there's a sequestration

13   order.

14           **THE COURT:**  There may be, and this is a way to put

15   a question to a witness.

16   **Q.**  Have you reviewed the same publications that you

17   understand Dr. Bertozzi relied upon in her expert report?

18   A.  Yes.

19   **Q.**  Do you have an opinion concerning Dr. Bertozzi's

20   reliance on those publications?

21           **MS. BEN-AMI:**  Objection.

22           **THE COURT:**  Overruled.

23   **Q.**  Do you have an opinion concerning Dr. Bertozzi's

24   reliance on those publications?

25   A.  Yes.

```
 1    Q.   What is your opinion?

 2              MS. BEN-AMI:  Objection.

 3    A.   My opinion is --

 4              THE COURT:  Overruled.  Your rights are saved.

 5              You may give us your opinion.

 6    A.   My opinion is that some of those gels do not show

 7    differences, but that does not mean the difference does not

 8    exist.

 9    Q.   To your knowledge, did Dr. Bertozzi also rely upon

10    statements made by Amgen in its product license

11    application --

12    A.   Yes.

13    Q.   -- to the FDA?

14              And have you reviewed Amgen's product license

15    application?

16    A.   Yes.

17    Q.   Do you agree with her opinion regarding Amgen's product

18    license application?

19              MS. BEN-AMI:  Objection, your Honor.

20              THE COURT:  Overruled.  You may answer that yes or

21    no.

22    A.   No.

23    Q.   Why not?

24              MS. BEN-AMI:  Objection, your Honor.

25              THE COURT:  Overruled.
```

1    A.   Because in that same PLA there are statements about

2    differences.

3    Q.   What differences?

4         MS. BEN-AMI:   Objection, report.

5         THE COURT:   Where?

6         MR. DAY:   It's in Paragraph, of the blue report,

7    your Honor, 213 and 214.

8         THE COURT:   Overruled.   He may -- she -- he may

9    testify consistent with the report.

10   A.   As I said here, Bertozzi omits the statement elsewhere

11   in the PLA where Amgen makes explicit that there are

12   differences in specific activity, and she -- the PLA goes on

13   to describe that.   In 214, I say, "Similarly, Dr. Bertozzi

14   ignores the statements in the PLA that suggest that there

15   may be structural differences between urinary EPO and the

16   recombinant EPO.   Amgen specifically identified the presence

17   of different sialic acid linkages in urinary EPO."

18   Q.   Now, you mentioned that another analytical technique is

19   isoelectric focusing?

20   A.   Yes.

21   Q.   What is isoelectric focusing?

22   A.   Isoelectric focusing is a method that can better

23   separate different forms of proteins than SDS-PAGE.

24   Basically, you put your protein, instead of making it run

25   down one track, you put it in a field where there is a

1    positive charge at one end and a negative charge at the

2    other end.  So the molecules will then separate out with the

3    most negative molecules going towards the positive pole, and

4    the most positive molecules going towards the negative pole.

5    And then you come back and detect them.

6    **Q.**  In the study of glycoproteins, what is IEF used for?

7    **A.**  IEF is used to find out, at a limited extent, the number

8    of glycoforms of the protein.

9          **MS. BEN-AMI:**  Objection.  Report, your Honor.

10         **THE COURT:**  Yeah, where is it?

11         **MR. DAY:**  Yellow, 14.

12         **THE COURT:**  Well, I'm going to sustain that.  You

13   direct him to the penultimate sentence in --

14         **MR. DAY:**  Let me reframe the question.

15         **THE COURT:**  Yeah.

16   **Q.**  What, in your opinion, does an IEF analysis reveal about

17   EPO products?

18   **A.**  So --

19         **MS. BEN-AMI:**  Objection, your Honor.  No

20   foundation.

21         **THE COURT:**  Overruled.

22         **THE WITNESS:**  May I proceed?

23         **THE COURT:**  You may.

24   **A.**  As I say in 14, "All differences seen between EPO

25   samples in IEF analyses are necessarily due to differences

1   in EPO structure."  Because there's no evidence of major

2   differences in the protein --

3          **MS. BEN-AMI:**  Objection, your Honor.  That was

4   outside.

5          **THE COURT:**  That may stand.

6   **Q.**  You may continue.

7          **THE COURT:**  Go ahead.

8   A.  Differences are likely to be in the glycan, the sugar

9   part of the molecule.  Indeed, as discussed in my initial

10  report, all of the comparative IEF experiments I've analyzed

11  have revealed that there are marked differences in the

12  glycosylation patterns between urinary and recombinant EPO.

13  **Q.**  What, if any, IEF data have you considered?

14  A.  I have considered several sources of IEF data, including

15  those from the EPO doping tests.

16         **MS. BEN-AMI:**  Objection, your Honor.

17         **THE COURT:**  No, overruled.  He may tell us what

18  he's considered.

19  A.  The gels done by Dr. Strickland, and several others,

20  such as the Storring and Ganes Das papers, and so on.

21  **Q.**  Okay.  What, if anything, have you concluded from the

22  IEF experiments that you've reviewed?

23         **MS. BEN-AMI:**  Objection, your Honor.

24         **THE COURT:**  He may tell us his conclusions.

25  A.  My conclusion is essentially what I just read; that all

1    of these comparative IEF experiments I've analyzed have

2    revealed that there are marked differences in glycosylation

3    patterns between urinary and recombinant EPO.

4    **Q.**  Would you please take a look at Trial Exhibit 2011 at

5    page 184.  It's Tab 13 in your notebook.  So if you turn to

6    Tab 13.

7        **MS. BEN-AMI:**  Your Honor, can I have a sidebar at

8    this point?

9        **THE COURT:**  You may.

10   SIDEBAR CONFERENCE, AS FOLLOWS:

11       **MS. BEN-AMI:**  I'm sorry.  I was trying to get you a

12   copy of the exhibit.

13       **THE COURT:**  Okay.

14       **MS. BEN-AMI:**  This is a declaration of

15   Dr. Strickland where he says in the declaration it's on

16   information and belief.  It's hearsay.

17       **MR. DAY:**  Well, your Honor, this is a declaration

18   where Dr. Strickland performed a gel.  He previously

19   identified on the stand the gel that he had performed and

20   submitted to the patent office.  And we have a motion that

21   is pending before the Court to substitute a legible copy of

22   the declaration.  I'm going to ask Mr. Gottfried to --

23       **THE COURT:**  Yes, let's deal with that first.  I

24   understand this.  Why shouldn't I add -- not substitute, but

25   add this copy from Amgen's -- I've looked at it.  It's the

 1    same as the document that's in evidence.

 2          **MS. BEN-AMI:**  I apologize, I missed --

 3          **THE COURT:**  He says that this goes to that, or is

 4    supported by their position, is the document that's in

 5    evidence, that's admitted.  They now have the original that

 6    Amgen kept and you can see the SDS-PAGE data better.  Why

 7    shouldn't I add that to the record?

 8          **MS. BEN-AMI:**  I don't believe it was produced to

 9    us.

10          **MR. GOTTFRIED:**  It was attached to the deposition

11    in March.

12          **THE COURT:**  But what was marked was the copy, not

13    the legible --

14          **MR. DAY:**  No, the original.

15          **MR. GOTTFRIED:**  No, the legible copy is right here.

16          **THE COURT:**  The original one was produced?  Yeah,

17    all right.

18          **MS. BEN-AMI:**  This one, I don't know.

19          **THE COURT:**  Does anyone know about it?

20          **MR. JAGOE:**  I don't know if the original copy of

21    this looked like the original notebooks.

22          **THE COURT:**  I'm adding it as the same number with

23    an A after it.

24          Now, having said that, I think the way to deal with

25    this is my general rule, you can see it from my rulings, you

1    haven't asked him this yet, that's up to you whether you

2    want to, maybe you don't because I'm prepared to infer it,

3    it seems to me that the experiments on which this witness is

4    relying are the type of data that a person in the field

5    would rely on to advance science.  Not to testify, but to

6    advance science.

7         So that satisfies the requirement of 702, and

8    that's why I'm forcing you to conclusions rather than what

9    the SDS-PAGE study show.  To the extent you can get them in

10   evidence -- the dust hasn't settled, but it's settling -- to

11   the extent you can get them in evidence, they tend to

12   corroborate or weaken, whatever, but you -- it seems on the

13   foundation I've heard that Amgen can largely get where it

14   wants to go as to the conclusory statements without the

15   admission of other evidence.  Which doesn't mean I'm not

16   going to admit what I should admit, and exclude what I

17   should exclude.

18        But I'm not going to prevent him from testifying

19   because there are these questions about the authenticity, or

20   the source -- I won't say authenticity -- the source of

21   things in lab notebooks.  I'm going to let him testify.

22   And, depending upon your cross-examination, if you go into

23   some of these, we'll see, I'll have to revisit that.  But

24   otherwise I'll keep it out.  That's what experts do all the

25   time.

1          MS. BEN-AMI:  But he's testifying that this is

2     Goldwasser EPO.

3          THE COURT:  Oh, no, no.

4          MS. BEN-AMI:  He has testified to that already.

5     When I objected, you said overruled.  That's what he said.

6     He testified that this is something that is --

7          THE COURT:  If he did, I haven't heard it and I'm

8     going to strike it out.  All right.

9          MR. DAY:  And of course, Bertozzi did as well.

10         THE COURT:  Well, fine.  I don't -- maybe -- it did

11    seem to me that Bertozzi did.  But you're hot on this, and

12    so far I've maintained that line.  I intend to keep

13    maintaining it.

14         MS. BEN-AMI:  What I was saying with this document

15    is this is hearsay, this document.

16         THE COURT:  And I'm saying fine, that doesn't --

17    the fact he relied on it doesn't get it in evidence, and

18    should not be put up on the board, but his conclusions are

19    probably going to come in.  Because it's the type of

20    document --

21         MR. DAY:  It is in evidence.

22         THE COURT:  Well, that may be.  That's fine.  You

23    can't put up anything that's not already in evidence.

24         MS. BEN-AMI:  But it's -- this is in evidence as

25    being part of the file history.  It's still hearsay within

1    hearsay because this says, I didn't run these, it's all on

2    information and belief.  To go and say this is an accurate

3    portrayal of something --

4          **THE COURT:**  It's in evidence.  We can't now go back

5    and revisit it.  I didn't hear any objection to reducing

6    it -- to accepting the file histories.  That means --

7          **MS. BEN-AMI:**  It is only in as part of the file

8    history.  It's not in separately.

9          **THE COURT:**  I grant you that, but no specific

10   objection was ever made.  The document came in without

11   objection.  That's the record.

12          (Whereupon the sidebar conference concluded.)

13         **THE COURT:**  We've admitted a document which is --

14   well, it's up to you to figure out what it is, but we're

15   calling it 211A, and you'll want to see 211.  I think it's

16   undisputed, 211 is a copy of something, 211A is the

17   original.  Take a look at them both.  The argument at the

18   sidebar was certain things are clearer in 211A, and I've let

19   you see them.  211's already in evidence.

20         **THE CLERK:**  211?

21         **MR. DAY:**  2011A, sorry.

22          (Exhibit marked in evidence.)

23   **(BY MR. DAY:)**

24   **Q.**  Dr. Varki, let me hand you what's been now introduced as

25   Exhibit 211A and ask if you've reviewed that document

 1    before?

 2            MS. BEN-AMI:  Objection.  Report, your Honor.

 3    A.  This is a declaration --

 4            THE COURT:  Wait a second, there's an objection.

 5    Is this document referred to in the report?

 6            MR. DAY:  I believe it's referred to in blue,

 7    Paragraph 132.

 8            THE COURT:  Thank you.  Yes.  You may continue.

 9    Q.  Have you seen this declaration before, sir?

10    A.  Yes.

11    Q.  Let me -- and have you reviewed the gels that are in

12    this declaration?

13    A.  Yes.

14            MS. BEN-AMI:  Objection, your Honor.  It doesn't

15    say that in his report.

16            THE COURT:  No, he may testify.  Let me give a

17    curative instruction here.  And now this goes back to where

18    I misspoke about what was important, and I'm not suggesting

19    anything's important.

20            Dr. Bertozzi and the present witness, Dr. Varki,

21    they're so-called opinion witnesses.  And they looked at a

22    bunch of stuff in order to give their opinions.  And by and

23    large I have allowed Dr. Bertozzi's opinions and I probably

24    am going to allow most of Dr. Varki's opinions, and you'll

25    decide what you make of them.

1          It may be important to you, I'm not saying it is,

2     but it may be important to you the source of certain EPO

3     that was analyzed.  That may be, or may not be.  It may be

4     that she and he, and I don't suggest either one's done

5     anything wrong, but slipped into their answer, in answering,

6     the EPO from Dr. Goldwasser.

7          Now, I'm telling you, and I'm now ruling, because

8     I've thought about the evidence, these are opinion

9     witnesses.  They weren't there.  They didn't look at the

10    labels or receive documents or talk to anyone who was there

11    at the time back in the early 1980s, so neither one of them

12    know.  And the way I've proceeded, and the way I intend to

13    proceed is I'm letting you hear their opinions about things.

14    It will be up to you to decide whether they are, in fact,

15    qualified to give those opinions and know what they're

16    talking about, and it will be up to you to decide whether

17    you believe it, disbelieve it or don't believe it.

18         But certain of their opinions necessarily probably

19    assumes certain things, and that's perfectly appropriate.

20    But if we want someone to tell us where EPO came from, it's

21    got to be what we call a fact witness, or it's got to be

22    documents from back then from which you can draw that

23    conclusion.

24         I've said enough, hopefully not too much, and you

25    may go ahead.  So neither of these people are going to say

```
1    this EPO came from Goldwasser.  If that gets in there, I
2    mean to strike it out because they personally don't know
3    that.  They may be assuming that, and making comparisons and
4    the like, but they don't know.  We'll see if other evidence
5    either has told you or may tell you during the course of the
6    trial.
7              Go ahead, Mr. Day.
8         MR. DAY:  Thank you very much, your Honor.
9    (BY MR. DAY:)
10   Q.  Let me just clarify that foundation.  Dr. Varki, do you
11   have any personal knowledge whatsoever about whether or what
12   the samples shown on this -- whether the samples shown on
13   this gel are what they are labeled?  Do you have any
14   personal opinion?
15   A.  I have no personal firsthand knowledge, no.  I was not
16   there.
17   Q.  Okay.  So you're here as an expert?
18   A.  Yes.
19        THE COURT:  And again, just to follow, this is
20   something that's in evidence.  What's in evidence is in
21   evidence.  I'm not taking anything back on that.  My
22   comments only had to do with these opinion witnesses.
23              Go ahead.
24   Q.  Now, Dr. Varki, did you, as part of your review in this
25   case, did you examine this gel?
```

```
 1    A.  Yes.

 2    Q.  And let me ask you if you would, please, what you

 3    understand, and it's simply your understanding, you have no

 4    personal knowledge about this gel, but what do you

 5    understand this gel to represent?

 6    A.  So, this gel is on page 12 to 15 of Dr. Strickland's

 7    declaration where he says that he's comparing Amgen's

 8    recombinant EPO with urinary EPO provided by Goldwasser.  He

 9    says that he received it from Dr. Goldwasser.

10         MS. BEN-AMI:  Objection.

11         THE COURT:  Well, what he said, strike all that

12    out.  He's assuming it, though.  He's assuming that.  He's

13    making that assumption.  All right, go ahead.

14    Q.  And would you simply identify what you understand to be

15    the different samples that are recorded on this gel?

16    A.  So this is --

17         MS. BEN-AMI:  Objection.

18    A.  -- would be recombinant EPO from --

19         MS. BEN-AMI:  Objection.  Report, your Honor.

20         THE COURT:  No, no.

21         MR. DAY:  Paragraphs --

22         THE COURT:  The label is whatever it is.  It's

23    evidence.  But you're not to say what it is.  You can say, I

24    assumed it was because the label says it.  So you're

25    assuming that; right?
```

1          **THE WITNESS:**  Sure.

2          **THE COURT:**  If you don't know -- go ahead.

3  **Q.**  If you could make clear in your answer you're assuming

4  this?

5  A.  I'm assuming this is recombinant EPO from Amgen.  I'm

6  assuming this is recombinant EPO from Amgen treated with an

7  enzyme called sialidase, which removes all the sialic acids

8  which have negative charge.

9  **Q.**  Excuse me.  Just for the clarity of the record, when you

10  say "this," referring first to lane 1, you're assuming is

11  what?

12  A.  Assuming it is recombinant human EPO from Amgen.

13  **Q.**  Okay.  If you could use the numbers.

14  A.  Lane 2 describes recombinant human EPO from Amgen that

15  Dr. Strickland states in the notebook was treated with

16  sialidase.

17          **MS. BEN-AMI:**  Objection.

18          **THE COURT:**  No, he's assuming it.  He may so

19  testify.

20  **Q.**  What do you assume is in lane 3?

21  A.  Lane 3 is urinary -- assumed to be urinary EPO,

22  according to the notebook, from --

23          **MS. BEN-AMI:**  Objection.

24  A.  -- Dr. Goldwasser.

25  **Q.**  And what do you assume is in lane 4?

```
 1            THE COURT:  The objection's overruled.
 2   A.  And this has been treated with sialidase, exactly like
 3   lane 2.
 4            MS. BEN-AMI:  Objection to that, your Honor.
 5            THE COURT:  I'm sorry, how do you know that?
 6   You're assuming that from the labeling?
 7            THE WITNESS:  From seeing the notebook and the
 8   record of the experiments.
 9            THE COURT:  All right.  That's what you think,
10   having looked those documents over?
11            MS. BEN-AMI:  Objection, your Honor.  It's not in
12   his report.
13            MR. DAY:  It's at Paragraph 132, 133.
14            MS. BEN-AMI:  We need to get the specifics.
15            THE COURT:  No, that may stand.
16            MS. BEN-AMI:  The notebook part is what I'm
17   objecting to, your Honor.
18            THE COURT:  I understand.  That may stand.
19            MR. DAY:  Excuse me, your Honor.
20   Q.  What do you understand -- what do you assume lane 4 to
21   be?
22   A.  I assume lane 4 to be a duplicate of lane 2, exactly the
23   same treatment of recombinant EPO.
24   Q.  In your opinion, what conclusions do you draw based on
25   Dr. Strickland's IEF gel in his declaration in
```

1    Exhibit 2011A?

2            **MS. BEN-AMI:**  I object to the foundation of that

3    question.

4            **THE COURT:**  Overruled.  What conclusions did you

5    draw having looked those things over?

6    A.  My conclusion is that when you treat the recombinant EPO

7    in lane 2 with sialidase, there's a huge shift of the

8    material down to the bottom of the isoelectric focusing gel.

9    So that, in fact, it's lost, and a lot of it's negative

10   charge.  And lane 4, assuming it's the same as lane 2,

11   confirms that.  Dramatic difference is that when you do the

12   same with the --

13           **MS. BEN-AMI:**  Objection, your Honor.  Report.

14           **THE COURT:**  Yeah, where is that?

15           **MR. DAY:**  Same paragraphs, your Honor.

16           **THE COURT:**  Yes, yes, 133.  Overruled.  You may

17   have it.

18   A.  Perhaps I should read from the report.  "The gel, shown

19   below, clearly shows the residual negative charges found in

20   urinary EPO, but not in recombinant EPO.  This can be seen

21   because the recombinant EPO becomes so basic that they

22   almost run off the bottom of the gel, while the urinary EPO,

23   although now less acidic than undigested EPO control, lost

24   negative charge but retained considerable negative charge.

25   This experiment shows, and I'm assuming, this is

1   Goldwasser's urinary EPO, contains chemical structures

2   bearing an additional negative charge, other than sialic

3   acid, that are missing in the recombinant EPO."

4   **Q.**   What is sialidase?

5   A.   Sialidase is an enzyme that will clip off sialic acids

6   from the surface of these proteins.

7   **Q.**   What is neuraminidase?

8   A.   The word neuraminidase is an older term for the same

9   thing, sialidase.

10   **Q.**   Now, Dr. Varki, you also mentioned, I believe, a Dionex,

11   I think you said HPLC anion exchange chromatography?

12   A.   Yes.

13   **Q.**   What is the Dionex procedure?

14   A.   The Dionex procedure at the level of the SDS-PAGE is

15   simply look at how fast the protein moves.  At the level of

16   the IEF, you separate out these proteins with the individual

17   sugar chains giving different patterns.  At Dionex you go

18   one step further and clip off the sugar chains.  Since each

19   one of them has four sugar chains, you collect all the sugar

20   chains and then separate them out.

21         So this is a highly discriminatory matter to really

22   tell what's going on.  And now you're looking at the actual

23   sugar chains.

24   **Q.**   What Dionex tests have you reviewed in this case?

25   A.   I have reviewed work reported in the notebooks of

1    Dr. Strickland and Dr. Rogers from Amgen, and also a poster

2    they presented at Keystone that was apparently based on that

3    data.

4    **Q.**   Based on the Dionex data that you've reviewed, what, if

5    any, conclusions have you reached about Dr. Goldwasser's

6    urinary EPO and recombinant EPO?

7    A.   Looking at the Dionex data, now drilling down into a

8    more careful analysis, one sees that the difference is even

9    more dramatic between urinary EPO and -- the assumed urinary

10   EPO and the assumed recombinant EPO.

11   **Q.**   Would you please take a look at Trial Exhibit 36, which

12   is Figures IV to VI of the keystone poster.

13   A.   The tab, please?

14   **Q.**   It's in Tab 5, I believe, in your notebook.

15          **MS. BEN-AMI:**   Objection, your Honor.  This is not

16   in his report.  Dates are very important here, your Honor.

17          **MR. DAY:**   The blue report, Paragraph 147.

18          **THE COURT:**   147?

19          **MS. BEN-AMI:**   May I have a sidebar on this, your

20   Honor?  Dates are important.

21          **THE COURT:**   I assume you always think it's

22   important when you ask for the sidebar.  And you may have

23   one.

24   SIDEBAR CONFERENCE, AS FOLLOWS:

25          **THE COURT:**   Isn't this the issue of the -- here.

1      **MS. BEN-AMI:**  It says he looked at a 1994 report.

2  This is a 1992 report.

3      **THE COURT:**  Do you see what she's proffered?  It

4  seems that the dates are wrong here.

5      **MR. DAY:**  May I show you, your Honor?  It starts on

6  147, goes down and reproduces the figures right out of the

7  poster in his report that he's referring to.

8      **THE COURT:**  And these are the same figures I've now

9  introduced in evidence.

10     **MR. DAY:**  Yes, sir.

11     **MS. BEN-AMI:**  I don't know what a '94 is, this is a

12  '92 report.

13     **THE COURT:**  That's an appropriate question.  What's

14  she talking about?  And you've -- and you see, when you

15  refer down and you've given the citation, she's just saying

16  that your citation is wrong.

17     **MR. DAY:**  Uhm-hmm.

18     **THE COURT:**  114.

19     **MS. BEN-AMI:**  It's a different document.

20     **MR. DAY:**  So it's a typo.

21     **MS. BEN-AMI:**  I don't know that.

22     **MR. DAY:**  Well, I think you do because you have the

23  Bates numbers --

24     **THE COURT:**  Please, you must talk to me.

25     **MR. DAY:**  I'm sorry, your Honor.

1          THE COURT:  They're not saying that's 1994.  I

2     don't think anything turns on it.  But I'll be alert to it.

3          MS. BEN-AMI:  Your Honor, it doesn't have a Bates

4     number on it.  He said this is the same Bates number.  I

5     don't see a Bates number on it.

6          THE COURT:  But his position is that what's in the

7     report is a typo.  I'm not going to allow him to testify

8     beyond the report, typo or no.  But he doesn't need that.

9     He's got the -- where he wants to go is to these charts, and

10    the charts are admitted in evidence.

11         (Whereupon the sidebar conference concluded.)

12   (BY MR. DAY:)

13   Q.  Dr. Varki, do you have Paragraph -- I'm sorry, do you

14   have Exhibit 36 -- Tab 5, Exhibit CEW in front of you?

15   A.  Yes.

16   Q.  Now, would you turn to the second and third page.  It's

17   a page of abstracts.

18   A.  Yes.

19   Q.  And you'll notice a handwritten date at the top of that

20   page?

21   A.  Yes.

22   Q.  What year is on that page?

23   A.  1992.

24   Q.  Okay.  Now, if you look in your report, sir?

25   A.  Yes.

1   **Q.**  You'll see at Paragraph 147 in your report?

2   A.  Yes.

3   **Q.**  You refer to a date?

4   A.  Yes.

5   **Q.**  What date's written there?

6   A.  It says 1994.

7   **Q.**  Do you know which date is correct, whether it was 1992

8   or '94?

9           **MS. BEN-AMI:**  Objection, your Honor.

10          **THE COURT:**  No, no, we're not getting into that.

11  The report is what it is.  We're not getting into that.

12  Skip over it.

13          **MR. DAY:**  Thank you, your Honor.

14  **Q.**  Let me return to Figures IV and VI, if I could, please.

15  A.  Yes.

16  **Q.**  What do you understand these figures to be?

17  A.  IV and VI are comparison of the Dionex separation of the

18  sugar chains from urinary EPO, assumed urinary EPO, and that

19  from the recombinant EPO that came from the mammalian cells

20  in culture, assumed to come from there.

21  **Q.**  So could you identify what we have on the board

22  presented here now, which is which?

23  A.  Yes.  On the left side you have urinary EPO, and on the

24  right side you have the EPO from mammalian cells in culture.

25  **Q.**  Have you prepared a demonstrative depicting the results

1   of this comparison?

2   A.  Yes.

3           MR. DAY:  Could we have demonstrative AV8, please?

4           MS. BEN-AMI:  Can I have a report cite, please?

5           MR. DAY:  Yes, blue, 149.

6           MS. BEN-AMI:  Rather than object, your Honor, can I

7   ask for a cite?

8           MR. DAY:  Blue 149.

9           MS. BEN-AMI:  It might be faster that way.

10          THE COURT:  That's an appropriate way, exactly.

11  Just like a deposition.  That's a good suggestion.

12          MS. BEN-AMI:  So I don't have to keep objecting.

13          THE COURT:  Precisely.

14  Q.  Would you please explain, in your opinion, what this

15  demonstrative shows?

16          MS. BEN-AMI:  I apologize.  Is this supposed to be

17  this demonstrative made smaller?

18          MR. DAY:  Yes.

19          MS. BEN-AMI:  I have no objection, your Honor.

20  A.  So these are two different samples of what I'm told are

21  Goldwasser EPO, where the sugar chains were released --

22  Q.  Could you -- when you say "these," could you talk about

23  the upper-right --

24  A.  Sorry, Figure IV and Figure V are two slightly different

25  fractions of the assumed Goldwasser urinary EPO in which the

1    sugar chains have been displayed sort of like a fingerprint.

2    In Figure 6 you are seeing the same analysis done of the

3    sugar chains from the recombinant human EPO from the

4    mammalian cell lines in culture.

5    Q.  Based on these data, what, if any, conclusions have you

6    reached about Dr. Goldwasser's urinary EPO and EPO produced

7    by mammalian cells in culture?

8    A.  This further confirms and extends the dramatic

9    difference between the two examples shown here of the

10   assumed urinary EPO and the assumed recombinant EPO.

11   Q.  What does it show about them?

12   A.  Well, one does not have to be an expert to see that

13   they're very different.

14        MS. BEN-AMI:  Objection.  It's outside the report,

15   your Honor.

16        THE COURT:  Wait a minute.  Say again, the

17   paragraph?

18        MR. DAY:  Paragraph 151, blue, and 155.

19        THE COURT:  Overruled.  The answer may stand.

20   Q.  Would you please explain what conclusions, if any, you

21   draw based upon this comparison?

22   A.  So, the first conclusion one can draw is that the types

23   of sugar chains present on the upper two panels, IV and V,

24   of urinary EPO are quite, quite different from that on the

25   recombinant human EPO.  The second conclusion is difficult

```
 1    to see in this figure but, in fact, even in the case where

 2    you have these three peaks in the recombinant EPO, they

 3    actually do not overlap if you directly overlay them.  So

 4    that the difference --

 5              MS. BEN-AMI:  Objection.  Report, your Honor.

 6              MR. DAY:  Paragraph 155 and 151, your Honor.

 7              THE COURT:  Overruled.  He may continue.  So the

 8    difference, sir?

 9    A.  As I stated, if one compares, and this was done by

10    expanding blowups, as I describe in the report, if one

11    compares the recombinant sample of Figure VI to blots to

12    Figure IV, which is the urinary EPO, and to V, which is the

13    urinary EPO, it is very clear that essentially none of the

14    peaks observed in the urinary EPO can be precisely aligned

15    with the peaks observed in recombinant EPO.

16              Since Dionex columns are a very reproducible

17    technique, and in this case you have two urine samples run

18    at the same time, these small differences that are detected

19    by the sensitive technique are quite notable.  And I go on

20    to be more specific in the report.

21    Q.  Would you explain what each of these peaks is?

22    A.  So each of these peaks is a separate kind of sugar chain

23    with different structures, different sialic acids.

24              MS. BEN-AMI:  Objection to foundation, your Honor.

25              THE COURT:  No, overruled.
```

1   A.  Based on my experience, looking at such, these are

2   individual different sugar chains with different degrees of

3   structure, like different structures and different amounts

4   of sulfate residues or sialic acid residues.  And there's

5   further evidence upon treatment with this material of

6   sialidase.

7   Q.  How are these peaks distributed on a -- what we're

8   looking at is called a Dionex chromatograph?

9   A.  Right.

10  Q.  How are these peaks distributed on that chromatograph?

11  A.  These are coming off the columns.  So the earliest ones

12  that come off, you see this time line here after 300

13  minutes, these are coming off early, and these are coming

14  off late.

15       So the peaks in the recombinant EPO come off very

16  early, and the peaks in the urinary EPO, you can see the

17  last majority of them come off late.  And even the ones that

18  come off early, as I mentioned, when you carefully align

19  them, do not overlap with the ones in the recombinant EPO.

20  Q.  In the context of a Dionex chromatogram like this, what,

21  in your opinion, is the significance of peaks that come off

22  early versus peaks that come off late?

23  A.  Peaks that come off late are likely to have more sugars.

24  As you can see, these are probably two branches, three

25  branches, and four branches.  But when they start coming off

1   so late, it usually implies that there's a much bigger

2   difference, such as negative charge, such as sialic acid or

3   sulfate esters.  So this is consistent with the isoelectric

4   focusing.

5   **Q.**  Have you reviewed any experiments -- have you reviewed

6   any other IEF experiments comparing urinary EPO to other

7   recombinant EPO proteins?

8   A.  Yes.

9   **Q.**  What experiments compare urinary EPO to other

10  recombinant proteins?

11          **MS. BEN-AMI:**  Objection, your Honor.

12          **THE COURT:**  Overruled.

13  A.  The EPO doping test studies, the studies done by

14  Dr. Catlin and several others, such as the Storring and

15  Ganes Das papers.

16  **Q.**  What is your opinion -- what, in your opinion, is the

17  significance, if any, of the clinical test for EPO doping?

18          **MS. BEN-AMI:**  Objection, your Honor.  EPO doping.

19          **THE COURT:**  Sustained.

20  **Q.**  What, in your opinion, is the significance of the

21  analytical method employed in the EPO doping test with

22  respect to the issues on which you are rendering opinions

23  here?

24          **MS. BEN-AMI:**  Same objection.

25          **THE COURT:**  Different ruling.  Overruled, he may

```
1    have that.  We're only interested in the method, not what

2    it's used for.

3    A.  The method compares whole urinary EPO from normal humans

4    seeking to find if there is something else in there that

5    should not be there.  One is taking whole urinary EPO and

6    looking by the same IEF technique, the earlier technique I

7    described, comparing this with, in normal individuals, in

8    the paper referred to, with patients who are getting

9    recombinant EPO, and with those who are misusing EPO.  And

10   the --

11           MS. BEN-AMI:  Objection, your Honor.

12           THE COURT:  Well, I'll let that stand.  Go ahead.

13   Q.  What, in your opinion, is the significance of a

14   comparison with whole urine?

15   A.  So --

16           MS. BEN-AMI:  Objection, your Honor.  Can I have a

17   sidebar at this point, please?

18           THE COURT:  You may.

19   SIDEBAR CONFERENCE, AS FOLLOWS:

20           THE COURT:  Yes.

21           MS. BEN-AMI:  The question in this case is

22   Goldwasser's EPO; right?

23           THE COURT:  Correct.

24           MS. BEN-AMI:  Versus the claims in the patent?

25           THE COURT:  Correct.
```

 1          **MS. BEN-AMI:**  He's now talking about, as he just

 2     said -- I wrote it down -- normal EPO from healthy patients,

 3     which there's a --

 4          **THE COURT:**  I understand the point.

 5          What are we doing here?

 6          **MR. DAY:**  It's a source limitation, so he's

 7     comparing the source.  And if he can show, if it's shown

 8     that there is in recombinant EPO structures that are nowhere

 9     present in urinary EPO, any urinary EPO, they cannot be in

10     Goldwasser's EPO.  And so the acid test, if you will, is to

11     look at whole urine and ask is there -- is there any

12     difference between recombinant EPO and whole urinary EPO.

13     And in particular, is there a difference where there are

14     structures in recombinant EPO that are not found, not

15     present in urinary EPO.

16          **MS. BEN-AMI:**  There is --

17          **MR. DAY:**  If there are, they cannot be, by

18     necessity, in Goldwasser's EPO.

19          **THE COURT:**  Why not?

20          **MR. DAY:**  Because Goldwasser's EPO is obtained from

21     urine.  Its source is urine.  This is a difference that goes

22     to the source by which the product is obtained.

23          **THE COURT:**  Why don't you just ask him that, rather

24     than this about people who are misusing.  I know we're

25     beyond that.

1          **MR. DAY:**  I'm not trying to get that.

2          **THE COURT:**  Why don't you just ask him what you

3    just asked him.  That I'll allow.

4          **MS. BEN-AMI:**  But your Honor --

5          **THE COURT:**  Yeah?

6          **MS. BEN-AMI:**  This is this scientific leap that's

7    not in this man's report.

8          **MR. DAY:**  It is in his report.

9          **MS. BEN-AMI:**  It is not in his report that sick

10   people in Japan who were excreting urine had the same urine

11   EPO as healthy people.  There's no showing of that at all in

12   this case.  And there is no reason that -- he can laugh, but

13   scientifically, if somebody is taking a group of patients

14   who are sick, you don't know that.  And he doesn't have that

15   in his report.

16         **THE COURT:**  You don't know what?

17         **MS. BEN-AMI:**  That the urinary EPO from sick

18   patients is identical to the urinary EPO from healthy

19   patients.

20         **THE COURT:**  I thought from what I've learned here

21   that it wouldn't be, because one supposes, if they're sick

22   with renal problems, they are naturally generating higher

23   degree of erythropoietin than a healthy person.

24         **MS. BEN-AMI:**  That can be true.  It also can be

25   true that they're glycosylated slightly differently.  We

1    don't know.  There's no correlation.  And there's nothing in

2    this guy's report that says, I can correlate prior-art

3    sick-patient EPO to healthy-patient in 2004 EPO.

4              **THE COURT:**  Here's what I'm going to do.  What's

5    the citation in the report?  I'm going to look at the

6    report, and then -- this has been helpful -- we'll go

7    question by question.

8              **MR. DAY:**  Okay.

9              **THE COURT:**  What's the citation that I should be

10   looking at?

11             **MR. DAY:**  I understand.  107, your Honor, in the

12   blue report.

13             **THE COURT:**  107.

14             **MR. DAY:**  And the paragraphs around there, but 107

15   is it.

16             (Whereupon the sidebar conference concluded.)

17             **THE COURT:**  All right.  Now, ask your question,

18   Mr. Day.

19             **MR. DAY:**  Yes.

20   **(BY MR. DAY:)**

21   **Q.**  What, in your opinion, Doctor, is the significance of an

22   analytical technique that compares whole urine with

23   recombinant EPO?

24   A.  So --

25             **MS. BEN-AMI:**  Objection.

```
 1            THE COURT:  Well, let me try a couple of

 2   preliminary questions.  And maybe I'll allow you to answer

 3   that question.

 4            I'm going to be charging the jury that one of the

 5   things they have to do in this case is compare the

 6   Goldwasser study to certain of the claims of the patent.  He

 7   asked you a question -- if I understand -- let's see if I

 8   understand his question.  His question is if you compare the

 9   EPO derived from claims in the patent to --

10            MR. DAY:  Whole urine.

11            THE COURT:  -- whole urine, what do you find out, I

12   guess?

13            MR. DAY:  Why is that a relevant comparison.

14            THE COURT:  So I'll let you -- why is that -- in

15   other words, I'm going to tell the jury -- I'm being simple

16   here -- compare Goldwasser to the claims of the patent.

17            MS. BEN-AMI:  Objection, your Honor.

18            THE COURT:  Wait a second.  Whether or not I do it,

19   that's what I'm thinking about now.  I'm going to say that,

20   and you're asked to compare whole urine to the claims of the

21   patent.  What does that tell us about comparing the claims

22   of the patent to Goldwasser?  You may answer that.

23            THE WITNESS:  I understand.  Since the Goldwasser

24   material was purified from whole urine --

25            THE COURT:  The material he assumes is Goldwasser
```

1    material.

2         **THE WITNESS:**  He assumes is Goldwasser, it can only

3    contain things that were present in urine.  So if whole

4    urine does not contain things that are present in

5    recombinant EPO, then it is relevant, because Goldwasser

6    could only have purified something that is present in whole

7    urine.

8         So if the data shows that there are material in

9    recombinant EPO that's not present in whole urine, it could

10   not possibly have been present in Goldwasser urine.

11        **THE COURT:**  So even though the people that --

12   you're assuming this, and we'll assume -- that the people

13   from whom Goldwasser got his human urine were themselves

14   sick, and had renal problems and the like, you're saying but

15   they were human beings.  And so if I have, today, I haven't

16   heard that these sophisticated tests were present back then,

17   but if you've got today some sophisticated test that show

18   you everything in human urine of normal people, or even sick

19   people, and you take that and compare that to the

20   recombinant urine as described in the claims of the patent

21   that are grown in culture from different sources, if there's

22   something in the claim urine that's not present in human

23   urine, then it's got to have come from somewhere else other

24   than a human being?

25        **THE WITNESS:**  Correct.  And that's what -- that's

1    the relevance of these studies that --

2            THE COURT:  Okay.  I'm following that.  Go from

3    there, Mr. Day.

4            MR. DAY:  Okay.

5            MS. BEN-AMI:  Your Honor, I would like to interpose

6    an objection to several of those points.

7            THE COURT:  Well, I've been clearly open to

8    objections.  I really don't think they're timely.

9            MS. BEN-AMI:  Well, I objected to your questions,

10   your Honor.

11           THE COURT:  I understand.  But it's not -- you

12   didn't do it timely, so we're going to let it stand.

13   Q.  Now, Doctor, I simply want to talk about the analytical

14   technique.  I don't want to talk about blood doping or --

15   just the analytical technique.  I'm going to call it the

16   clinical test for urinary EPO, if I may.  Okay?

17   A.  Okay.

18   Q.  First of all, how does the clinical test for urinary EPO

19   work?

20   A.  It works using isoelectric focusing.

21           MS. BEN-AMI:  Objection.

22           THE COURT:  Overruled.

23   Q.  And was isoelectric focusing, as a technique, available

24   in 1984?

25   A.  Yes.

1          **MS. BEN-AMI:**  Report, please.

2          **THE COURT:**  119.  Isoelectric focusing.

3          **MR. DAY:**  Blue 119, your Honor.

4          **THE COURT:**  Thank you.

5          **MS. BEN-AMI:**  Okay.

6          **THE COURT:**  Proceed.  Was it?

7   **Q.**  Are you aware of any publications discussing the

8   clinical test for urinary EPO?

9   A.  Yes.

10  **Q.**  Would you please turn to Tab 6 in your binder, Exhibit

11  GUR.

12  A.  Yes, I have it.

13  **Q.**  Do you recognize this document?

14  A.  Yes.

15  **Q.**  Would you simply describe what it is?

16  A.  It is a brief communication in the journal "Nature,"

17  describing the clinical test for EPO doping.

18  **Q.**  Is Nature recognized to be a reliable authority in

19  science?

20  A.  It's probably the most premier journals in science.  I

21  read it every week.

22  **Q.**  In your opinion, does the analysis in this publication

23  use Goldwasser's urinary EPO?

24  A.  No.

25  **Q.**  Why, then, is it relevant to your opinion?

1      **MS. BEN-AMI:**  Objection.  Report, your Honor.

2      **THE COURT:**  Yeah, where?

3      **MR. DAY:**  Blue, 107.

4      **THE COURT:**  He may testify consistent with the

5  report.

6  A.  I state here this assay looks at all forms of EPO that

7  are present in an individual's urine.  Therefore, the data

8  shows all the forms of urinary EPO produced by the body that

9  are detectable.  Because it is not possible to purify an

10  isoform that's not present in the starting material, I

11  considered these results to be a reasonable indicator of all

12  forms of EPO that could have been present in any prior art

13  urinary EPO.  And the test also makes routine comparisons

14  with recombinant EPO.

15      **MR. DAY:**  Your Honor, I would move Exhibit GUR into

16  evidence under 803(18), learned treatise.

17      **MS. BEN-AMI:**  Your Honor --

18      **THE COURT:**  GUR may be read, but it won't be

19  received in evidence.  Sustained.  Because that's the

20  limitation in that section of the federal rule.  In other

21  words, he may read from it.  You may put it up on the

22  screen.  That's all.

23      **MS. BEN-AMI:**  I object, your Honor.  Under learned

24  treatise it should not be published.  Under the rule.

25      **THE COURT:**  That's what published means.

1          **MS. BEN-AMI:**  It should not be published.

2          **THE COURT:**  Oh, well, that's within my discretion.

3    Overruled.

4          **MR. DAY:**  May we publish the gel?  If we could just

5    blow up the gel that's depicted in GUR.

6          **THE COURT:**  Here's what the fight is here.  Again,

7    I have to follow the rule.  The rule, we don't have the

8    author of whatever this is.  And but he says, Well, it comes

9    out of Nature, that magazine, and that's really the

10   magazine.  It's up to you what you make of his testimony.

11   But he's said that.

12          So under the rule, if -- I'm allowed or they're

13   allowed to read what's said in the magazine or in the

14   learned treatise.  The title of Gray's Anatomy comes from a

15   medical book, "Gray's Anatomy," which is the basic medical

16   book on the anatomy of the human being.  When we teach

17   learned treatises, we use that as an example.

18          Well, he's said that the magazine and the articles

19   in the magazine are learned treatises.  But lest they have

20   too powerful an impact on the jury, we don't make them

21   exhibits and we don't send them back to the jury room.

22          Now, Ms. Ben-Ami properly says, Well, wait a

23   second.  If you throw it up on the screen, you're giving it

24   that same effect.  I just don't think so.  You're entitled

25   to see what's said in the magazine.  This is the only time

1    you're going to see it, during his testimony.

2         Go ahead, Mr. Day.

3    **Q.**  Doctor, would you please explain the gel that has been

4    depicted from the Exhibit GUR?

5    A.  So this is an isoelectric focusing similar to what I've

6    been describing.  Lane A is a urine preparation used as a

7    standard.  Lane B and D are two other recombinant

8    erythropoietins from other manufacturers.  Lane D is total

9    human urine.  Lane E and F are examples of patients who are

10   being given recombinant EPO.  You can see that in lane F the

11   urinary EPO has practically disappeared, and the reason is

12   that the recombinant EPO has suppressed the natural

13   production.

14        In this case, the patient is getting less EPO,

15   recombinant, so you can still see some of the urinary EPO.

16   G and H are two examples of cyclists who were stripped of

17   their medals because of --

18        **THE COURT:**  No --

19        **THE WITNESS:**  I'm sorry.  I'm sorry.

20        **THE COURT:**  I think that's a red herring about

21   cyclists.

22        **THE WITNESS:**  I was just reading from the --

23        **THE COURT:**  You may be, but I just as soon you not.

24   We are concerned with what the science shows.  And this

25   business about medalists and cyclists --

1          **THE WITNESS:**  I'm sorry.

2          **THE COURT:**  It's not this case.  We're not dealing

3    with any cyclists or medalists in this case.  We're not

4    going to be.

5    **Q.**  Have you prepared a graphic to help you explain your

6    conclusions about this gel?

7    A.  Yes.

8          **MR. DAY:**  Could we have AV44, please.

9          **THE COURT:**  Now, this, of course, since we're

10   jumping from image to image, this, of course, is something

11   he prepared for the trial.  Demonstrative aid.  He prepared

12   it.  It's not evidence of anything, but if it helps you to

13   understand his testimony, you may consider it.  That's all.

14   **Q.**  So would you explain the demonstrative that you

15   prepared?

16   A.  So the lower part is the same gel, IEF gel that I just

17   showed.  The upper part just explains what I explained about

18   each lane.  Effectively, these, the last four are four

19   humans who have received recombinant EPO.  In this case, the

20   individuals received a lower amount.  These are -- all four

21   are individuals, either patients or others who have received

22   recombinant EPO.

23        And you can see that it is very easy to tell apart

24   the recombinant EPO with these bands way up here, from the

25   urinary EPO, even total urinary EPO that must encompass

1    everything that was in Goldwasser's EPO.

2         **MS. BEN-AMI:**  Objection.  No foundation, your

3    Honor.

4         **THE COURT:**  Overruled.  But when he says

5    Goldwasser's EPO, he's assuming that's what he's looked at

6    is Goldwasser's EPO.  I think the jury can follow that.

7    I've told them he doesn't know personally.

8    **Q.**  What conclusions do you draw, based on the data

9    presented in this -- in Exhibit GUR?

10   A.  Again, that total urinary EPO does not contain many

11   glycoforms that are contained in recombinant EPO.  And that

12   the original EPO purified from urine must be some subset of

13   what one sees in lane D.

14   **Q.**  Now, you also mentioned --

15        **MR. DAY:**  Could we take down this demonstrative,

16   please?

17   **Q.**  You also mentioned an IEF experiment performed by

18   Dr. Catlin?

19   A.  Yes.

20   **Q.**  Just in general, what do you understand Dr. Catlin's

21   experiment to be?

22        **MS. BEN-AMI:**  Objection, your Honor.

23        **THE COURT:**  Yeah, sustained, to what -- sustained.

24   He's looked at the experiment.  He doesn't need to

25   characterize it.

1        You have looked at it, right?

2            **THE WITNESS:**  Yes.

3            **THE COURT:**  All right.

4   **Q.**  What, in your opinion, is the analytical significance of

5   the experiment performed by Dr. Catlin with respect to the

6   opinions that you are rendering here?

7            **MS. BEN-AMI:**  Objection, your Honor.

8            **THE COURT:**  Overruled.

9            **MS. BEN-AMI:**  Your Honor --

10           **THE COURT:**  I'm going to let him testify.

11  A.  Dr. Catlin's gel is similar to what you just saw except

12  he looks at a lot more recombinant EPO samples from around

13  the world.

14           **MS. BEN-AMI:**  Objection, your Honor.

15           **THE COURT:**  Well, that's what you think he did,

16  isn't it?

17           **THE WITNESS:**  Yes.

18           **THE COURT:**  You're assuming that?

19           **THE WITNESS:**  I'm assuming.

20           **THE COURT:**  That's what he's doing.

21           I'll let that stand as an assumption.  Assuming

22  that, put your question.

23  **Q.**  And in clarifying your assumptions, do you assume he

24  looked at anything else?

25  A.  Yes.  He also looked at total urine --

1          **MS. BEN-AMI:**  Objection, your Honor.

2          **THE COURT:**  Well, you assume he did.

3   A.   I assume he looked at total urine, and I assume that he

4   looked at something important, which is the total product

5   from recombinant mammalian cells in culture.

6          **MS. BEN-AMI:**  Objection, your Honor.  No

7   foundation.

8          **THE COURT:**  No, overruled.  He can makes those

9   assumptions.

10  A.   And assuming that he looked at those things, was -- am I

11  supposed to describe the result?

12         **THE COURT:**  He hasn't asked yet so we'll stop it

13  there.

14         **THE WITNESS:**  Okay.

15  Q.   Why, in your opinion, is it significant that he looked

16  at recombinant product in cell culture?

17         **MS. BEN-AMI:**  Objection, your Honor.

18         **THE COURT:**  Overruled.

19  A.   By looking at everything that comes out of the mammalian

20  cells in culture and comparing it, assuming he had that, and

21  assuming that he had totally human urine, one can see every

22  possible thing that could have been present in from those

23  mammalian cells in culture.

24         **MS. BEN-AMI:**  Objection, your Honor.  Report.

25         **THE COURT:**  Yes, where does it say --

1        **MR. DAY:**  Blue, 166, your Honor.

2        **THE COURT:**  Thank you.

3        **MR. DAY:**  It's also 161.

4        **THE COURT:**  Just a moment.

5        **MR. DAY:**  And 170 as well, your Honor.

6        **THE COURT:**  Just a moment.  No, sustained.  He's

7   not here to testify what Dr. Catlin did.  Sustained.

8        **MS. BEN-AMI:**  Move to strike the testimony.

9        **THE COURT:**  Motion to strike's denied.  He can give

10  us his ultimate conclusion, which is expressed in 161,

11  third sentence.

12        **MR. DAY:**  Could I also refer the Court to 170?

13        **THE COURT:**  I've looked at 170 and my ruling holds.

14  You can have that third sentence, and that's it.

15  A.  161, third sentence says, "Dr. Catlin's experiment

16  compares the following categories of samples: urine from" --

17        **THE COURT:**  Wait a second.  I didn't count that.  I

18  think you're the fourth sentence.  "I find."  If you want to

19  read.

20  **Q.**  It's Paragraph 161.  What did you conclude, based upon

21  your review of Dr. Catlin's experiment, Dr. Varki?

22  A.  I'm sorry, we're in the blue.

23  **Q.**  Blue report, Paragraph 161, third sentence.

24  A.  "I find that Dr. Catlin's results convincingly reinforce

25  my conclusions based on the data discussed above."

1          **THE COURT:**  Move on.

2     **Q.**  I'd like to ask you some questions about Dr. Lin's

3     patent claims.

4     **A.**  Yes.

5     **Q.**  Have you examined claim 1 of the '422 patent?

6     **A.**  Yes.

7     **Q.**  Let me just ask you to read for the jury what you

8     understand claim 1 of the '422 patent to be?

9          **MS. BEN-AMI:**  Objection, your Honor.  Can I have a

10    report cite, please?

11         **MR. DAY:**  Yes.  It's blue report, 43, red report,

12    14.

13         **THE COURT:**  He may give us his understanding

14    consistent with my construction.

15    **Q.**  Can you simply read the claim to the jury?

16    **A.**  "A pharmaceutical composition comprising a

17    therapeutically effective amount of human erythropoietin and

18    a pharmaceutically acceptable diluent, adjuvant or carrier,

19    wherein said erythropoietin is purified from mammalian cells

20    grown in culture."

21    **Q.**  In your opinion, Doctor, which, if any, limitation of

22    '422 claim 1 distinguishes the claimed product from

23    Goldwasser's urinary EPO?

24         **MS. BEN-AMI:**  Objection.  Leading, and report.

25         **THE COURT:**  Overruled.  Which?

1          **MS. BEN-AMI:**  Report.

2          **MR. DAY:**  Paragraph 15, red.

3          **MS. BEN-AMI:**  It's not there.

4          **THE COURT:**  No, I differ.  He may testify

5    consistent with Paragraph 15.

6    **Q.**  Dr. Varki, so, in your opinion, which, if any,

7    limitation of '422 claim 1 distinguishes the claimed product

8    from Goldwasser's urinary EPO?

9          **MS. BEN-AMI:**  I object again, your Honor.  The

10   paragraph doesn't say that.

11         **THE COURT:**  Overruled.

12   A.  The fact that it's purified from mammalian cells grown

13   in culture.

14   **Q.**  And how, in your opinion, does that limitation

15   distinguish the claimed product over Goldwasser's urinary

16   EPO?

17         **MS. BEN-AMI:**  Again, your Honor, nothing in the

18   report.

19         **THE COURT:**  Overruled.

20         **MR. DAY:**  Red report.

21         **THE COURT:**  Overruled.  Proceed.

22   A.  I've already given a lot of evidence that the material

23   purified from mammalian cells grown in culture is very

24   different structurally from the material I've been assuming

25   is Goldwasser EPO.  So I think that indicates that it cannot

1    be -- it does not contravene -- it is not the same as the

2    Goldwasser EPO.

3    **Q.** Have you reviewed claim 3 of the '933 patent?

4    A. Yes, I have.

5    **Q.** In your opinion, which, if any, limitation of '933

6    claim 3 distinguishes the claimed products from Goldwasser's

7    urinary EPO?

8    A. The statement that is, "Expression in a mammalian host

9    cell of an exogenous DNA comprising a DNA sequence," et

10   cetera.

11   **Q.** And how, in your opinion, does that limitation

12   distinguish over Goldwasser's urinary --

13   A. I indicated that the material produced in this manner is

14   going to have a very different structure from the Goldwasser

15   EPO.

16   **Q.** Have you reviewed claims 7 and 8 of the '933 patent?

17   A. Yes.

18   **Q.** In your opinion -- let's focus on claim 7.

19        **MR. DAY:** Can you bring up 7 and 8, please, have

20   them both up?

21   **Q.** Claim 7 is the glycoprotein product according to

22   claim 3, 4, 5 or 6, wherein the host cell is a nonhuman

23   mammalian cell.  In your opinion, which, if any, limitation

24   of '933 claim 7 distinguishes the claimed product from

25   Goldwasser's urinary EPO?

1    A.   In the first place, this is a dependent claim on

2    claim 3, and I've already indicated why claim 3 appears

3    valid.  And secondly, it says a nonhuman mammalian cell.

4    **Q.**  And how, in your opinion, does that limitation

5    distinguish over Goldwasser?

6    A.   The nonhuman mammalian cells often, and in the case of

7    the material I looked at, contain a nonhuman sialic acid

8    called Neu5Gc.

9    **Q.**  And is that present in human -- in EPO that is produced

10   by human origin cells?

11            **MS. BEN-AMI:**  Objection, your Honor.

12            **THE COURT:**  Sustained.  Leading the witness.

13   **Q.**  How does that distinguish over Goldwasser's urinary EPO?

14            **MS. BEN-AMI:**  Objection.  Report.

15            **THE COURT:**  Where is it?

16            **MR. DAY:**  Red, Paragraph 13; blue, Paragraph 236

17   and 16.

18            **THE COURT:**  Yes.  He may testify consistent with

19   the report.  Overruled.

20            **MS. BEN-AMI:**  Your Honor, there's nothing about

21   Goldwasser.

22            **THE COURT:**  He may testify what's -- as to what's

23   in the report.

24   A.   Number 16 from blue, Opinion 3, "Because human

25   glycoproteins do not contain N-glycolylneuraminic acid

1    attached to glycoproteins, Goldwasser's urinary EPO derived

2    from humans is structurally different from recombinant EPO

3    from non-human mammalian host cells, which do add the sialic

4    acid."

5    Q.  In your opinion, looking at claim 8, which reads, "The

6    glycoprotein product according to claim 7, wherein the

7    nonhuman mammalian cell is a CHO cell," which, if any,

8    limitations of '933 claim 8 distinguish the claimed product

9    from Goldwasser's urinary EPO?

10   A.  Claim 7 is dependent on claim 3, which I've already

11   suggested appears valid.  Furthermore, it says it's a CHO

12   cell.

13   Q.  And how, in your opinion, does that distinguish over

14   Goldwasser?

15   A.  So sialic acids, besides different types, can also be

16   attached in different ways.  And there's a particular kind

17   of sialic acid linkage called alpha 2-6 linkage, which is

18   not made by CHO cells but has been repeatedly found in

19   urinary EPO.

20   Q.  Would you please look at '933, claims 9, 11, 12 and 14.

21   Now, have you also reviewed these claims?  I'm not going to

22   read all of them.

23   A.  Yes.

24   Q.  Let me suggest to you that Dr. Bertozzi opined in this

25   matter that claims 9, 11, 12 and 14 were obvious.  Do you

1    agree with those opinions?

2    A.  No.

3            **MS. BEN-AMI:**  Objection.

4            **THE COURT:**  Overruled.

5    **Q.**  Why not?

6            **MS. BEN-AMI:**  Report.

7            **MR. DAY:**  Paragraphs, blue, 245 to 248.

8            **THE COURT:**  Well, he may testify consistent with

9    those paragraphs, but that's it.  He's not to go beyond

10   that.

11           **THE WITNESS:**  Can you repeat the numbers again,

12   please?

13           **THE COURT:**  245 to 248, sir.

14           **THE WITNESS:**  Right.  I'll just read selectively.

15   Dr. Bertozzi does not argue these claims are anticipated.

16   She makes no suggestion that the EPO pharmaceutical

17   compositions or methods of treatment were available before

18   Dr. Lin's inventions.

19           Second, Dr. Bertozzi's conclusion absolutely

20   depends on her argument that the product claims are

21   anticipated.  Since I've demonstrated above that recombinant

22   EPO is a new product that was unavailable before Lin's

23   invention, the claims directed to this new use must have

24   been non-obvious.

25   **Q.**  Do you have an opinion whether or not the methods

1    claimed in '933, claim 11 and '933, claim 14 would have been

2    obvious in 1983 or 1984?

3    A.   No.

4    **Q.**   Do you have an opinion?

5    A.   I'm sorry, I have an opinion.

6    **Q.**   What is your opinion?

7              **MS. BEN-AMI:**  Report.

8              **MR. DAY:**  248.

9              **THE COURT:**  Wait a minute.  Wait a minute.

10             **MR. DAY:**  Blue, 248, your Honor.

11             **THE COURT:**  Wait.  It's there -- yes.  The

12   objection is to the report.  Overruled, he may testify

13   consistent with the report.

14   A.   In 1983 and 1984, that is before Dr. Lin's inventions,

15   and I'm reading here, "There was no reasonable expectation

16   of success in preparing pharmaceutical compositions of

17   recombinant EPO, or using them to treat kidney dialysis

18   patients as required by claims 11 and 14.  I am not aware of

19   any use before Dr. Lin's invention of EPO product to

20   increase the blood count, hematocrit of any anemic patient.

21   The literature that Dr. Bertozzi cites is completely

22   speculative, indicating a hope or a wish to treat patients

23   with anemia, but no reasonable expectation of success."

24   **Q.**   Do you have an opinion whether or not it would have been

25   obvious in 1983 or '84 to obtain in vivo -- could we take

1    these claims down, please? -- in vivo biologically active

2    human erythropoietin using mammalian host cells transformed

3    with the DNA encoding human EPO?

4            **MS. BEN-AMI:**  Objection, report.

5            **MR. DAY:**  Paragraph 252, blue report.

6            **THE COURT:**  Yes, he may testify consistent with

7    that paragraph.

8    A.   In my opinion, 1983, '84, the time when I had started my

9    own research lab and was working on such matters, it would

10   not have been obvious to one of ordinary skill in the art.

11   In fact, not to me at the time.

12           **MS. BEN-AMI:**  Objection.  That's not in his report.

13           **THE COURT:**  Yeah, the comment about him personally

14   is out.

15   A.   Okay.  How to predictably obtain --

16   **Q.**  Dr. Varki, we're simply asking you for your opinion.

17   A.   Okay.

18   **Q.**  Go ahead.

19           **THE COURT:**  Well, it's your opinion.

20           **THE WITNESS:**  Yes, my opinion --

21           **THE COURT:**  But the reference point is to one of

22   ordinary skill in the art, knowing what that person would

23   know in the '83, '84 time period, not knowing what we know

24   now about these other tests, and the like.

25           **THE WITNESS:**  Yes.

1    **Q.**  Let me stop you.  At that time, were you personally

2    involved in doing this kind of work?

3    A.  Yes, very much.

4            **MS. BEN-AMI:**  Objection.

5            **MR. DAY:**  257 of the expert report.

6            **MS. BEN-AMI:**  Vague.

7            **THE COURT:**  No, overruled.  His answer may stand.

8    **Q.**  And based upon both your experience and your opinion,

9    what is your opinion about whether one of ordinary skill in

10   the art in 1983 or '84 would have had a reasonable

11   expectation of successfully producing an in vivo

12   biologically active EPO glycoprotein in mammalian cells

13   grown in culture?

14   A.  At that time it would have been really difficult to

15   predict what might have happened in terms of producing any

16   biologically active glycoprotein in a mammalian host cell

17   transformed with DNA.  And so until such a successful

18   experiment was actually carried out, and I'm reading here,

19   there's simply insufficient knowledge, insufficient examples

20   of any prior success to guide anyone with skill or ordinary

21   skilled artisan with any reasonable expectation of

22   successfully obtaining something from this approach.

23   **Q.**  Dr. Varki, we've, in the course of your testimony here

24   today, we've looked at a number of experiments:  The IEF

25   gels, SDS-PAGE gels, Dionex gels.  In your opinion, are such

1    experiments, as you've relied upon here, the type of

2    experiments that scientists in your field routinely use or

3    rely upon in order to arrive at conclusions about scientific

4    questions?

5    A.  Yes.

6              **MS. BEN-AMI:**  Objection, report.

7              **THE COURT:**  Overruled.  You may have that.

8              **MR. DAY:**  I pass the witness.  No further

9    questions, your Honor.

10             **THE COURT:**  Ms. Ben-Ami?

11             **MS. BEN-AMI:**  Yes, thank you, your Honor.

12                     **CROSS-EXAMINATION**

13   **(BY MS. BEN-AMI:)**

14   **Q.**  Good afternoon, Doctor.  My name is Leora Ben-Ami.  I'm

15   one of the lawyers representing Roche.  I did not take your

16   deposition; right?

17   A.  No.

18   **Q.**  No.  So we're just meeting for the first time.

19             So let's start by looking at the claim of the '422

20   patent, because you have done a lot of comparisons today

21   between what you assume to be Dr. Goldwasser's EPO on the

22   one hand; right?

23   A.  I've been instructed that I should always say assumed.

24             **THE COURT:**  Well, it's not just a matter of

25   semantics, you don't know yourself, do you, where that EPO

1  came from?

2       **THE WITNESS:**  I agree.

3  **Q.**  Okay.  So I'm just trying to -- it's not a trick

4  question.  On the one hand, you were comparing what you

5  assumed was Dr. Goldwasser's EPO; right?  Yes?

6  A.  Yes.

7  **Q.**  And on the other hand, you were comparing it to

8  something you kept calling recombinant EPO purified from

9  mammalian cells grown in cultures; right?

10  A.  Right.

11  **Q.**  Okay.  So let's look at this claim.  You see, it says

12  the EPO is purified from mammalian cells grown in culture;

13  right?  You see it?

14  A.  Right.

15  **Q.**  You know you have to answer audibly for all questions?

16  A.  I see it.

17  **Q.**  How many different mammalian cells fit within the claim?

18  A.  Any mammalian cell that you can grow in culture.

19  **Q.**  How many are there?

20  A.  I know of probably 30 or 40 cell types in the human

21  body.  And if you take all mammals, of which there are

22  probably several thousand, it would be a huge number of

23  possibilities.

24  **Q.**  So this claim doesn't say compare -- this claim isn't

25  limited to one particular preparation of recombinant EPO, is

1    it?  It covers all mammalian cells grown in culture, right,

2    that have these features; right?  You agree with me?

3    A.  Agree.

4    **Q.**  So how many different mammalian cells does it cover?

5    A.  I'm sorry, I can't give you -- I don't think biology

6    today we know how many types of mammalian cells there are.

7    We're still searching.

8    **Q.**  So how many -- so it's indefinite at this point?  You

9    don't know how many?

10   A.  Well, all the major cell types in mammals are known.

11   **Q.**  But how many different mammalian cells are covered by

12   claim 1 of the '422 patent?

13   A.  Any mammalian cell.

14   **Q.**  And how many different, total different mammalian cells

15   is included?  And by that, I mean not just human or cow --

16   I've got two mammals, there; right?

17   A.  Right.

18   **Q.**  I always -- I always have to be careful.

19           But within the different mammals, there are

20   different cell types; right?

21   A.  No.  Most mammals I'm aware of have the same cell types,

22   mostly.

23   **Q.**  No, but I mean, you could have a kidney cell versus a

24   liver cell?

25   A.  Yes.

1    Q.  You -- okay.  So you take all the mammals, and all the

2    various cell types that can be grown in culture.  How many

3    different ones are there that would fit this claim, claim 1,

4    '422?

5    A.  I would need time to look up some books and make a

6    calculation.

7    Q.  Give me your best opinion right now, Doctor.  Can you?

8    A.  I'd say if there are 30 cell types in each mammal, maybe

9    a few thousand mammals, so I'd say 30,000, something like

10   that.

11   Q.  Thirty thousand.  And then those mammalian cells, they

12   can be changed; right?  Because let's take, as an example,

13   Dr. Lin's CHO cell that he talked about.  That was mutated

14   with that DHFR thing; right?

15   A.  Correct.

16   Q.  And so we have the 30,000 mammalian cells, and included

17   in that now we can add how many different mutations can be

18   made to them; right?  You still consider them mammalian

19   cells; right?

20   A.  I'd consider them mutated mammalian cells.

21   Q.  Well, you agree that these claims include mammalian

22   cells that have been mutated?

23   A.  Yes.  Yes.

24   Q.  Okay.  So how many cells are there now that are covered

25   by this claim in the '422 patent?  When you consider all the

1    different mammals, all the different cell types, all the

2    mutations that can be done to them, how many different cells

3    does this claim cover?

4    A.  You have to specify the type of mutations you're

5    referring to.

6    **Q.**  Any one that still allows the mammalian cell to be grown

7    in culture.  So not ones that completely kill them no matter

8    what.  Okay?  Because if they're completely dead, they can't

9    be grown in culture; right?

10   A.  Right.

11   **Q.**  So putting the ones that kill the cell aside, all the

12   mutations that can exist in all these mammalian cells, and

13   they can still be grown in culture?

14   A.  I think it depends on the definition of the word

15   "mutation."

16   **Q.**  It's infinite, isn't it?

17   A.  I don't think it's infinite, no.

18   **Q.**  Okay.  It's how many, then?

19   A.  One would have to define what you mean by mutation.  Are

20   you talking about single-base permutations?  Are you talking

21   insertion mutagenesis?

22   **Q.**  Any mutations, so long as they can still be grown in

23   culture.  Because the claim just says mammalian cells grown

24   in culture; right?

25   A.  Yes.

1    Q.   It doesn't say only some, only the others, it says

2    mammalian cells grown in culture; right?

3    A.   Yes.

4    Q.   So what's the number?

5    A.   I really don't think I could make an estimate without

6    knowing the types of mutations they're referring to, and

7    knowing which mutations would allow -- many mutations kill

8    cells or make them grow volume in culture.  It's very rare

9    to find a cell that can actually grow well in culture and

10   produce a recombinant product.

11          So now if you're talking about a cell line that can

12   actually produce something in culture, that's something that

13   biotechnology has taken a lot of time and difficulty to find

14   a few cells you can grow in culture that will actually

15   produce enough so you can actually give somebody a

16   treatment.

17   Q.   Okay.  So we're at 30,000 plus some mutations?

18   A.   No.  If you're defining it as producing material like

19   erythropoietin, I'd say far, far, far, far fewer.

20   Q.   Okay.

21   A.   Because they have to grow in culture and be able to

22   produce material in sufficient quantity and survive.

23   Q.   How many different selectable markers are there in

24   mammalian cells that have been used?

25   A.   Oh, probably -- effectively, probably half a dozen or so

1   maybe.

2   Q.  Okay.  So you have 30,000 times six?

3   A.  No.  The bulk of the cells would not be suitable to this

4   kind of work.

5   Q.  Okay.  So let's just keep it at the 30,000 for a minute.

6   Now, we're -- now, the EPO here is purified from the

7   mammalian cells grown in culture; right?

8   A.  Correct.

9   Q.  And there are many, many, many, many different

10  purification techniques, aren't there?

11  A.  To purify EPO --

12  Q.  No, just purification techniques in general?

13  A.  You mean for proteins?

14  Q.  Yeah.

15  A.  Yeah, there's a reasonable number of them.

16  Q.  You can tweak it this way or tweak it that way,

17  depending on what you want?

18  A.  It depends on what you mean by methods.  There are

19  methods that you can slightly vary every day, and if you add

20  them up, you can say many, or if you look just at the broad,

21  take the textbook of protein methods, there's probably, I

22  don't know, 20, 25 methods.

23  Q.  But how you put those little steps together can change

24  what comes out; right?

25  A.  Yeah.  That's what we do.

1    Q.  Okay.  So if you take all the possibilities of how you

2    purify, how many different possibilities are there in this

3    claim?

4    A.  It would depend on what cells were able to produce, what

5    you needed, which would be limited, and the types of

6    purification you use, which would be limited because you

7    have to get active material and get it clean, which is not a

8    trivial task.

9    Q.  Okay.  So you looked at, based on your assumption, you

10   looked at only CHO cell recombinant EPO?

11   A.  No.

12   Q.  COS cell?

13   A.  Yes.

14   Q.  Two?

15   A.  More.  BHK cells.

16   Q.  Three?

17   A.  Yes.

18   Q.  Three.  Three out of 30,000?

19   A.  No.  There are several recombinant products where they

20   don't tell you what mammalian cell line they're using.  They

21   just said, "Made in Mexico."  And that's all you know about

22   it.

23   Q.  And that's what you're relying on, made in Mexico;

24   right?

25   A.  No.  I know that it's been used to treat patients.  So

1    there are --

2    **Q.**  You don't know that, Doctor; you're making that

3    assumption?  You don't even know what that product is;

4    correct?

5    A.  I am making the assumption that Dr. Catlin ran a gel --

6         **MS. BEN-AMI:**  I move to strike, your Honor.

7    **Q.**  You are making an assumption --

8         **THE COURT:**  Wait, wait.  You're going on.  If you

9    seriously made the motion -- no, it's your question.  I'm

10   going to let it stand and you may press it.

11   **Q.**  You are making an assumption about the products; you

12   don't know how the products are actually made?

13   A.  I don't know how the products are made, no.  I don't

14   work in that specific field.  The details of exactly what

15   methods are used for each company is not something I follow.

16   **Q.**  So when we talk about this claim, it's not limited to

17   CHO cells; right?

18   A.  This particular claim is not, no.

19   **Q.**  And it could include human cells; right?

20   A.  In this particular claim, yes, humans are mammals.

21   **Q.**  I'm glad we agree on that.

22        **THE COURT:**  Well, the comment's stricken.

23   **Q.**  So you didn't do any evaluation comparing anything to

24   human cells that make EPO; right?

25   A.  I'm trying to think.  No, I don't think in any of the

1    gels I looked at there was material from human cells, at

2    least assumed material as listed by the experimenter.

3    **Q.**  But you know that human cells can be used to grow things

4    in culture; right?

5    A.  Yes.  It's a risky business to do that, but people try

6    it.

7    **Q.**  Well, 293 human cells?

8    A.  Yes.

9    **Q.**  They're used, right?

10   A.  Recently been used, yes.  There's a fear that they may

11   introduce diseases into humans.

12   **Q.**  Well, Dr. Lin used 293 cells, didn't he?

13   A.  293 cells, back then, I'm not sure.  I know he used COS

14   cells.  I don't think they were around at the time.

15   **Q.**  Dr. Lin used 293 cells, didn't he?

16   A.  I don't know.

17   **Q.**  Have you read his first patent application?

18   A.  Yes.

19   **Q.**  It talks about 293 cells that he used in there, doesn't

20   it?

21   A.  I'm not sure.  You may be right.

22   **Q.**  Well, 293 cells are human cells; right?

23   A.  Yes.

24   **Q.**  So your comparison, just so we're clear, is to a

25   selected number of mammalian cells under certain

1    purification conditions versus what you assume to be

2    Goldwasser's protein; right?

3    A.   Correct.

4    **Q.**   So you didn't compare the Goldwasser material to the

5    claim, claim 1?

6    A.   The Goldwasser material, as if you define it in that

7    broad sense of being all mammalian cells in culture, no.

8    That's an impossible task.

9    **Q.**   Okay.  Now, when you purify a protein, you can change

10   its charge; is that correct?

11   A.   I don't believe the way we normally purify proteins, you

12   wouldn't.

13   **Q.**   You can't?

14   A.   If you do a proper protein purification, you shouldn't

15   change its charge.

16   **Q.**   But you know that you can purify protein so you change

17   the charge; right?

18   A.   Well, if you do it badly, you could.

19   **Q.**   And can you -- let's talk about nutrient conditions for

20   a second.  Depending -- mammalian cells grown in culture,

21   right, that means that you have to feed them; right?

22   A.   Right.

23   **Q.**   And does their -- their glycosylation can be dependent

24   by what you feed them; correct?

25   A.   Can be.  That's one of the factors.

1    Q.  So in these cells in claim 1, depending on what you feed

2    them, you may get different glycosylations; right?

3    A.  Feeding them, if you feed them in standard media,

4    usually the nutrients don't change the glycosylation as

5    much.  Much more so the pH and the temperature and other

6    conditions.

7    Q.  So tell me all the other things that change the

8    glycosylation when they're grown in culture?

9    A.  Temperature, pH, nutrients, flow conditions, et cetera.

10   Q.  So all those variables change the glycosylation.  You

11   didn't compare all those variables because you didn't

12   compare claim 1 to Goldwasser's EPO, did you?

13   A.  I did not compare claim -- I compared examples of

14   assumed purified EPO from various mammalian cells grown in

15   culture with what I assumed was Goldwasser's EPO.

16   Q.  Right.  But you understand that you can change the

17   temperature, change the pH, change the flow, you said?

18   A.  Yes.

19   Q.  Change the nutrients and you'll get different

20   glycosylation; right?

21   A.  Yes.  This is one of the issues that biotech companies

22   have to deal with, to make sure their products are reliable.

23   Q.  Claim 1 doesn't say use --

24        **THE COURT:**  It's 1:00.  Is this a good time?

25        **MS. BEN-AMI:**  Oh, perfectly fine.

1          **THE COURT:**  We're going to stop because it's 1:00.

2     Now, tomorrow we'll start promptly at 9:30, take a shorter

3     break.  We're right on track.  Keep your minds suspended.

4     Do not discuss this case either among yourselves nor with

5     anyone else.  You may stand in recess until 9:30 tomorrow

6     morning.  The jury may recess.  I'll remain on the bench.

7          **THE CLERK:**  All rise for the jury.

8          (Whereupon the jury left the courtroom.)

9          **THE COURT:**  Please be seated.  You may step down,

10    sir.

11         **THE WITNESS:**  Thank you.

12         (Whereupon the witness stepped down.)

13         **THE COURT:**  Total elapsed time stands Amgen, seven

14    days one hour 40 minutes; Roche, seven days -- wait a

15    second -- one hour 50 minutes.

16         Thank you.  We'll recess until 9:30 tomorrow

17    morning.  We'll recess.

18         (Adjournment.)

19

20

21

22

23

24

25

1           **C E R T I F I C A T E**

2

3

4           We, Donald E. Womack and Cheryl B. Palanchian,

5    Official Court Reporters for the United States District

6    Court for the District of Massachusetts, do hereby certify

7    that the foregoing pages are a true and accurate

8    transcription of our shorthand notes taken in the

9    aforementioned matter to the best of our skill and ability.

10

11

12

13

14           /S/ DONALD E. WOMACK
             _____

15           /S/ CHERYL B. PALANCHIAN
             _____

16
                     DONALD E. WOMACK
17                  CHERYL B. PALANCHIAN
                   Official Court Reporters
18                    P.O. Box 51062
              Boston, Massachusetts 02205-1062
19                 womack@megatran.com

20

21

22

23

24

25