```
1                 UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
2
                                      Civil Action
3                                     No. 05-12237-WGY

4    * * * * * * * * * * * * * * * *
                                    *
5    AMGEN, INC.,                   *
                                    *
6              Plaintiff,           *
                                    *   DAILY TRANSCRIPT
7    v.                             *   OF THE EVIDENCE,
                                    *   PRELIMINARY JURY
8    F. HOFFMANN-LA ROCHE LTD,      *   INSTRUCTIONS and
     ROCHE DIAGNOSTICS GmbH and     *   OPENING STATEMENTS
9    HOFFMANN-LA ROCHE, INC.,       *   ON THE ISSUE
                                    *   OF INFRINGEMENT
10             Defendants.          *      (Volume 16)
                                    *
11   * * * * * * * * * * * * * * * *

12

13

14             BEFORE:  The Honorable William G. Young,
                        District Judge, and a Jury
15

16

17

18

19

20

21

22

23
                              1 Courthouse Way
24                            Boston, Massachusetts

25                            October 3, 2007
```

1                    A P P E A R A N C E S

2

3           DUANE MORRIS LLP (By D. Dennis Allegretti,
       Esq. and Michael R. Gottfried, Esq.), 470 Atlantic
       Avenue, Suite 500, Boston, Massachusetts 02210

4               - and -
            DAY CASEBEER MADRID & BATCHELDER, LLP (By

5      Lloyd R. Day, Jr., Esq., David M. Madrid, Esq. and
       Robert M. Galvin, Esq.) 20300 Stevens Creek

6      Boulevard, Suite 400, Cupertino, California 95014
                - and -

7           McDERMOTT WILL & EMERY (By Michael Kendall,
       Esq.), 28 State Street, Boston, Massachusetts

8      02109
                - and -

9           McDERMOTT WILL & EMERY (By William G.
       Gaede, III, Esq.), 3150 Porter Drive, Palo Alto,

10     California 94304
                - and -

11          MARSHALL, GERSTEIN & BORUN LLP (By Kevin M.
       Flowers, Esq.), 6300 Sears Tower, 233 S. Wacker

12     Drive, Chicago, Illinois 60606-6402
                - and -

13          STUART L. WATT and WENDY A. WHITEFORD, Of
       Counsel, Amgen, Inc., One Amgen Center Drive,

14     Thousand Oaks, California 91320-1789, on behalf of
       the Plaintiff

15

16          BROMBERG & SUNSTEIN LLP (By Lee Carl
       Bromberg, Esq. and Julia Huston, Esq.), 125 Summer
       Street, Boston, Massachusetts 02110

17              - and -
            KAYE SCHOLER LLP (By Leora Ben-Ami, Thomas

18     F. Fleming, Esq., Patricia Carson, Esq.,
       Christopher Jagoe, Esq. and Howard Suh, Esq.),

19     425 Park Avenue, New York, New York 10022, on
       behalf of the Defendants

20

21

22

23

24

25

<u>**I N D E X**</u>

Preliminary Jury Instructions on Infringement . . . 2353

Opening Statement by Mr. Day  . . . . . . . . . . 2366

Opening Statement by Ms. Ben-Ami  . . . . . . . . 2373

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| AJIT VARKI, Resumed | | | | |
|   By Ms. Ben-Ami | | 2261 | | 2296 |
|   By Mr. Day | 2301 | | 2283 | |
| HARVEY LODISH | | | | |
|   By Ms. Ben-Ami | | 2332 | | |
|   By Mr. Day | | | 2351 | |
| HARVEY LODISH, Recalled | | | | |
|   By Mr. Galvin | 2381 | | | |

| EXHIBITS: | FOR I.D. | IN EVID. |
|---|---|---|
| 38   E-mail from Haselbeck to Escrig  . . .2386 | | |

1            **THE CLERK:**  All rise for the jury.

2            (Whereupon the jury entered the courtroom.)

3            **THE CLERK:**  Court is in session, please be seated.

4            **THE COURT:**  Good morning, ladies and gentlemen.

5     Thank you for your promptness.  We're ready to go.  And if

6     you would remind the witness.

7            **THE CLERK:**  Sir, I remind you, you are still under

8     oath.

9            **MS. BEN-AMI:**  May I proceed, your Honor?

10           **THE COURT:**  You may.

11           **MS. BEN-AMI:**  Thank you.

12           Good morning, your Honor.  Good morning, Dr. Varki.

13           **THE WITNESS:**  Good morning.

14           **MS. BEN-AMI:**  Good morning, ladies and gentlemen of

15     the jury.

16                   AJIT VARKI, Resumed

17              **CROSS-EXAMINATION** (Cont'd)

18    BY  MS. BEN-AMI

19    **Q**    Doctor, I want to talk to you about the '933 patent for

20    a minute.

21    A    Yes.

22           **MS. BEN-AMI:**  Can I have slide AV-15, please.

23    **Q**    Now, this is claim 3.  I would like to go to -- there

24    are claims in the '933 patent that are further limited to

25    CHO cells, right?

1    A    Correct.

2    Q    Okay.  So let's talk about CHO cells.

3         You agree that there's more than one CHO cell out

4    there, right?  More than one type?

5    A    Yes, I'm aware of a few strains of CHO cells.

6    Q    Well, you know the jury has seen from 1983 this catalog

7    from the ATCC?  You know what the ATCC is, right?

8    A    Of course.

9    Q    And today the ATCC's catalog, if you will, is online,

10   right?

11   A    Yes.

12   Q    Okay.  So would it be consistent with your knowledge

13   that today there are over a dozen different CHO cell lines

14   in the ATCC website?

15   A    I don't follow that particular topic.

16   Q    You don't know how many different CHO cell lines are

17   being used for purification, for cloning, for any of these

18   things?

19   A    I know that there are several, but I don't know how many

20   there are on the ATCC catalog.

21   Q    Well, are you aware that there are over a dozen?

22   A    That's probable, yeah.

23   Q    Two dozen?

24   A    I've not looked at the ATCC catalog.

25   Q    Well, whether it's in the ATCC catalog or not, how many

1    do you think there are based on your knowledge and

2    experience, today?

3    A    You're probably in the right range.

4    Q    Okay.  Dozen, two dozen?

5    A    Maybe.

6    Q    And there are more that can be made every day because

7    people can put in new genes or different things to them,

8    right?

9    A    They're still CHO cells.

10   Q    Yes.  But, that's what I'm saying.  What I'm saying,

11   what I'm asking you is, every day there are new CHO cell

12   lines being made, right?

13   A    Every day?

14   Q    Okay, I'll withdraw that.

15        You know that scientists continue to make new CHO

16   cell lines?

17   A    Not very commonly these days but -- because there are

18   sufficient number of lines for people to use.  But if the

19   scientists wanted to, they might try to make a cell line.

20   Q    And claim 8, right, doesn't limit us to any particular

21   CHO cell line, right?

22   A    Claim 8?

23   Q    Because it's a CHO cell.

24   A    Correct.

25   Q    Okay.  Now, you didn't do an evaluation of all the CHO

1    cell lines that are out there today, did you?

2    A    Evaluation of CHO cell lines?

3    Q    Right.

4    A    No.

5    Q    And you didn't do an evaluation of what glycosylation

6    all the various CHO cell lines would have where they make

7    EPO, right?

8    A    No, I did look at several gels spanning many, many

9    products from, made mostly in CHO cells from all over the

10   world, and all of them had a very similar IEF profile, very

11   different from the urinary profile.

12   Q    You did not answer my question, Doctor.

13   A    Okay.

14   Q    I apologize.

15   A    Please restate it.

16   Q    First of all, you have no firsthand knowledge about any

17   of the things you just testified to.  You did not do those

18   tests, right?

19   A    I did not do them personally.

20   Q    You didn't do them at all?

21   A    No, I did what I normally do in science which was --

22   Q    Yes or no, did you do those tests you just told the jury

23   about?

24   A    With my own hands?

25   Q    Yes.

1    A    No.

2    Q    Not in your own lab?

3    A    No.

4    Q    You didn't have anything to do with running those tests,

5    right?

6    A    No, that's true of most of the science I look at.

7    Q    And what those experiments were done, whether those

8    samples were expired or not, you don't know that, either?

9    A    When I see data from a reputable scientist, this is how

10   science works.  We review reputable data from reputable

11   scientists.

12   Q    But you know that Dr. Catlin tested samples that were

13   expired, right?

14   A    May have been, yes.

15   Q    Oh, okay.  So let's go back.

16   A    Expired is a pharmaceutical statement, not a biological

17   statement.

18   Q    They're expired by four years?

19   A    Unlikely that the glycosylation would change.

20   Q    Well, that's not my question.  You know that he used

21   expired samples; correct or not?

22   A    Expired in terms of --

23   Q    Correct or not?

24   A    -- if given to humans.

25   Q    Okay.  Fine.

1          So, now you agree that there are, you did not do an

2    analysis of every CHO cell line that exists; yes or no?

3    A    I did not do any analysis myself.

4    Q    Thank you.

5          You didn't review an analysis of every CHO cell

6    line existing today, correct?

7    A    Probably a dozen.

8    Q    You did not review every CHO cell line existing today.

9    You can't tell the jury how many there are.

10   A    No.

11   Q    And this claim includes glycoprotein products for any

12   CHO cell, right?

13   A    Correct.

14   Q    Under --

15   A    It's dependent on 7.

16   Q    Right.  Under any condition of culturing, right?

17   A    Correct.  It's dependent on 7.

18   Q    Which is -- can we have 3 on there, too -- which is

19   dependent on 3.  Right?  So it says -- so, if we look at

20   that it doesn't tell you how it's supposed to be purified,

21   right?

22          Let's go back to the other one, please.

23          It doesn't tell you how it's supposed to be

24   purified, right?

25   A    No, these claims don't talk about purification.

1    Q    It doesn't tell you what the approximate pH is?

2    A    There's no mention of pH in these claims.

3    Q    Temperature.  Right?  You have to answer audibly, sir.

4    A    No, there's no temperature in those three claims.

5    Q    Right.  So it can be variable?

6    A    Within limits or you wouldn't get any product.

7    Q    Within the limits of making a protein it can be

8    variable, correct?

9    A    In that very difficult field, yes.

10   Q    Okay.  Now, you agree that in 1983-84 the glycosylation

11   of urinary EPO was not well-developed, correct?

12   A    By developed you mean analyzed?

13   Q    Yes.

14   A    Yes, the techniques were limited in 1983-84.

15   Q    Okay.  So let's talk about that.

16        In the patents, the only testing there is for

17   glycosylation is this SDS-PAGE and then they take off the

18   sugar and look at it again, right?

19   A    Right.

20   Q    That's -- the other data is wrong, right?

21   A    The composition, if that's what you are referring to.

22   Q    That's wrong?

23   A    There are difficulties in that data, yes.

24   Q    That means they're wrong?

25   A    They're not completely wrong.

1    Q    They're not completely right?

2    A    They have contaminants.

3    Q    They're not right?

4    A    No, they're not completely wrong.  Completely right.

5    Q    Okay.  So, I want to make-believe now, I'm going to ask

6    you to assume you're a person in 1984 at the time of the

7    filing of the patent.  In 1984, this Dionex thing you looked

8    at, that didn't exist in 1984, for sugars, right?

9    A    No, it was available in '88.

10   Q    '88, '89.  All right.  '88.

11          So a person skilled in the art, if they want to

12   figure out in 1984 whether the sugars are different or not,

13   they can't look at a Dionex column, right?  Because it

14   doesn't exist.

15   A    Yeah, it doesn't exist.

16   Q    Okay.  And there's no IEF data at all in the patent, is

17   there?

18   A    IEF is available but not in the patent.

19   Q    It's not in the patent.  So it was excluded by the

20   inventors in their disclosure?

21   A    I don't believe they had the data at the time to put it

22   in the disclosure.

23   Q    Okay.  But they didn't put any IEF data in their

24   disclosure, right?

25   A    It was not in the patent.

1    **Q**    It's not in the patent.

2            So, the person skilled in the art just gets to look

3    at those columns where the SDS, where they go.  And you

4    agree that in some of the articles you saw the SDS, they

5    migrate the same, right?

6    A    We're talking about the patent, not the articles.

7    **Q**    In some of the articles they migrate the same?

8    A    In some of the articles the reproduction is such that

9    you cannot be certain.  In the patent they very clearly

10   state that it migrates differently.

11   **Q**    For one, for one thing -- well, let's strike that.

12           So you agree that there are some articles that say

13   the migration is indistinguishable, correct?

14   A    Indistinguishable means that the scientist cannot tell.

15   **Q**    Yes or no?  Indistinguishable, that's what the articles

16   say?

17   A    Yes.

18   **Q**    Okay.  And there's no IEF data in the patent, right?

19   A    Right.

20   **Q**    And the Dionex that you showed the jury yesterday, no

21   one in 1984 could consider it, it didn't exist?

22   A    Yes.

23   **Q**    Now, can we have the gel that you showed the jury

24   yesterday, Exhibit 2011A.

25           This is the copy that was actually produced to us,

```
 1   it doesn't look the same as the one you showed to the jury

 2   yesterday.

 3              THE COURT:  Well, you --

 4        MR. DAY:  Objection, your Honor.

 5              THE COURT:  -- can't testify.  You can't testify.

 6        MS. BEN-AMI:  Okay.

 7        MR. DAY:  I move to strike, your Honor.

 8              THE COURT:  Well, I said the lawyers' comments

 9   aren't evidence anyway.  But there's a document.

10   Q    Okay.  So let's look at this document.  There's a --

11   where it says uEPO, right, that's been, urinary EPO that's

12   been treated with chemicals, right?

13   A    No, no chemicals were used.

14   Q    Well, what's the sialidase?  That's an enzyme, right?

15   A    That's an enzyme, yes.

16   Q    Okay.  So that's what I mean.

17   A    It looks like catalysis.

18   Q    It's a chemical that cuts things up, right?

19   A    No.  It's an enzyme.  Enzyme protein.

20   Q    Okay.  It's an enzyme protein that cuts things off?

21   A    Cuts sialic acids off, correct.

22   Q    Okay, fine.

23        So, this is not a comparison of urinary EPO itself

24   to recombinant EPO itself, is it?

25   A    It's comparison of both treated with sialidase.
```

1   **Q**   Is it -- I'm asking you a very specific question.  I

2   would like you to give me a very specific answer, if you

3   can.

4           This is not a comparison of urinary EPO itself

5   compared to recombinant EPO itself, correct?

6   A   Untreated?

7   **Q**   Yes.

8   A   No, there is no comparison in this particular

9   experiment.

10  **Q**   Thank you.

11          Now, in this experiment there is a control which is

12  recombinant EPO, correct?

13  A   Correct.

14  **Q**   But there is no urinary EPO control, is there?

15  A   Not in this particular experiment.

16  **Q**   Right.  So, there's no control to show whether or not

17  the urinary EPO, untreated, was a good sample or not in this

18  gel?  Correct or not?

19  A   Not in this particular experiment.

20  **Q**   So, in this experiment -- this is the experiment you

21  showed the jury, right?

22  A   One of them.

23  **Q**   This is the experiment I'm talking about.  And in this

24  experiment there is no control so that you can see whether

25  this batch of urinary EPO is a good batch or not, in this

1    gel, right?

2    A    In the notebook it says where it came from, that's all I

3    have.

4    Q    But did you -- I'm asking you about this gel.  You're a

5    scientist.  You can answer this question, right?

6    A    I answer, I answer questions by seeing what I see in a

7    notebook.

8    Q    Okay.  There is no control on the gel, you agree with

9    that?

10   A    In this experiment, yes.

11   Q    And in this experiment, on this gel, there's no proof

12   one way or another whether the urinary EPO that was used was

13   a good batch or not, right?  Yes or no?

14   A    On the picture you're showing me it says urinary EPO.

15   But you have to look at the whole notebook to get the whole

16   story.

17   Q    But it says urinary EPO that's been treated by that

18   protein, right?

19   A    Yes.

20   Q    So there's no urinary EPO that's untreated by the

21   protein on this gel?

22   A    I already said that, agreed with that.

23   Q    Okay.  And there's no control to show that the urinary

24   EPO, untreated, was a good batch, on this gel?

25   A    On this gel there isn't.

1    Q    Okay.  And this experiment was done many years after

2    1984, wasn't it?

3    A    A few years later, yes.

4    Q    Now, you agree that in 1983 there was very little known

5    about sulfation?

6    A    I disagree.

7    Q    You agree that sulfation is extremely difficult to

8    study, it has been poorly studied?

9    A    I received my first NIH grant on sulfation in 1983 and

10   did an extensive discussion of what there was.

11   Q    Dr. Varki, the sulfation difference that takes place on

12   the carbohydrate -- okay, let's just move on.

13          Let's talk about the 2000 paper.  What's the

14   number?

15          You talked about a gel that was run in 2000.  Do

16   you remember that, the EPO doping gel?

17   A    Published in 2000, yes.

18   Q    Right.  And that was a new technology at that time?

19   A    The technology was not new; the idea was new.

20   Q    The idea was new.  So this was why it was published

21   because it was new?

22   A    Because doping was a big issue, that's why.

23   Q    Okay.  So let's -- can I have that picture put up,

24   please.

25          You agree that in this study there are urinary and

1    recombinant EPOs which have some glycoforms in common,

2    correct?

3    A    I disagree.

4    Q    Do you have your expert report?  Do you have your expert

5    report?

6    A    Blue one?

7    Q    It's your rebuttal report.

8    A    Right.  First rebuttal.

9    Q    It's blue.  I would like you to look at Paragraph 111.

10   A    I have it.

11   Q    Okay.  And there you say -- we're looking at the same

12   thing, right?

13   A    Yes.

14   Q    And there you say:  As can be seen by comparing the

15   first lane (S), which has a mixture of recombinant EPO and

16   Aranesp product and the second lane (QCN), which has normal

17   urine it is -- well, let me strike that.  I'll ask you a

18   different question.

19        Based on the evidence that you've seen, including

20   this evidence and the evidence that you relied on from Dr.

21   Catlin, you conclude that urinary and recombinant EPO each

22   have some glycoforms in common and some that are different.

23   That's what you say in your expert report, correct?

24   A    In my first expert report, before I reviewed all the

25   evidence.

1    Q    Okay.  So, in your first expert report when you looked

2    at the evidence you said that some of the glycoforms are the

3    same?

4         **MR. DAY:**  Your Honor, I object.  This expert

5    report's referring to a different gel.

6         **THE COURT:**  Well, you can't testify.  And the

7    objection is overruled.  We'll see what his answer is.

8    Q    You looked at information you had from Catlin and

9    information from this paper, right, and you said there were

10   some glycoforms that were the same?

11   A    I said that Catlin's group confirmed Lasne's

12   conclusions.

13   Q    That?

14   A    Catlin's group confirmed Lasne's conclusions.

15   Q    This is Lasne up here, right?

16   A    Yes.  Catlin's group confirmed Lasne's conclusions.  Not

17   my conclusions.

18   Q    Right.  Right.  So, Catlin's group confirmed Lasne's

19   conclusions that urinary and recombinant EPO each have some

20   glycoforms in common, right?

21   A    Lasne's conclusions.

22   Q    But --

23   A    Not mine.

24   Q    Right.  So you're saying Catlin and Lasne both concluded

25   this?

1    A    With their knowledge and ability at the time.

2    Q    So you disagree with the person who developed the EPO

3    doping test, right?

4    A    Yes, I disagree with that specific statement by them.

5    Q    Okay.  As well as Doctor, what you heard from Dr.

6    Catlin?

7    A    I don't disagree with the technique.  I disagree with

8    the statement about glycoforms being in common.

9    Q    Okay.  So you just -- you disagree with these other two

10   scientists?

11   A    No, I don't.  I disagree with the very specific point

12   you said about glycoforms in common.

13   Q    You agree that those two scientists said there are

14   glycoforms in common?

15   A    They thought there were glycoforms in common.  That was

16   their best interpretation not having the knowledge.

17   Q    Okay.  So you disagree with them.  That's all I'm

18   asking.

19   A    I disagree that that specific point.

20   Q    Okay.

21   A    Not with their technique or their approach or their

22   general conclusion.

23   Q    Now, can I have -- let's just go then to the Dionex test

24   which is CEV.

25        You showed the jury a test that you said by that

1    test you could see that there were differences, right?  The

2    Dionex test?

3    A   Yes.  Major differences.

4    Q   So let me show you Exhibit 37.  Could I have Exhibit 37,

5    please.

6         This is in evidence because it has a number.  I

7    will give you a copy.  And I would like you to look at Page

8    89.  That is Doctor -- it says it's Doctor -- Dr. Strickland

9    testified about it.  Page 89 on the top which is Bates

10   number 6073.

11   A   This is not the one I showed, but this is --

12   Q   Yes, it's not --

13   A   I've seen this.

14   Q   It's not one you showed, right?

15   A   Right.

16        **MS. BEN-AMI:**  Can we have that up on the screen.

17   It's Exhibit 37, Page 6073.  Okay, can I have the Elmo on,

18   Mr. Fisher?  Can I just have the Elmo on?  Are we not --

19   Q   This is the actual information, isn't it?  This is the

20   actual data that was run?

21   A   This is the pad response, which is a very different

22   measurement.

23   Q   This is what comes out of the machine?

24   A   This is the pad response to the material that was spiked

25   into the sample.  It's not the material being analyzed.

1    Q    Okay.  The material that you showed the jury, the Dionex

2    material you showed the jury, that was based on a computer

3    program that was manipulated, wasn't it?

4    A    Not at all.  It's the actual raw data.

5    Q    Did you look at Mr. Rogers' notebook?

6    A    Yes.

7    Q    And he says there that he was having trouble plotting

8    the data, doesn't he?

9    A    That's just a plotting problem.  When you take the raw

10   radioactivity-- and I don't see what it has to do with what

11   you just showed me.

12   Q    Let me show you CEV.  There you go.  And let's look at

13   Page 6198.  It's on the bottom 6198.  All right.  And on the

14   top --

15   A    Yes.

16   Q    -- it says spent good deal of time trying to find way to

17   present data satisfactorily.  Did not like the DX means of

18   presenting time spill.

19           Right?  Do you see that?

20   A    Yes.

21   Q    So he didn't like the way it was coming out of the DX

22   machine, right?

23   A    Not at all.  He was -- read the next sentence.  He says

24   he wanted to perform spill corrections for 3H and S35.

25   Q    It says also.  Also wanted to.  That's a separate

1   thought, also?

2   A   That's the way he analyzed this data.  It's a pretty

3   appropriate way.

4   Q   Okay.  So that means it's not what comes out of the

5   machine, it's subject to the person interpreting it?

6   A   No.  The material that comes out of the machine must be

7   corrected in this fashion if you want to study radioactivity

8   properly.

9   Q   So it must be corrected by someone's thought process?

10  A   No.  There's a standard accepted way, which I've done

11  many times, to correct this data and that's what they did.

12  Q   All right.  It says, the next paragraph, finally found

13  SigmaPlot on -- oh, it says tried transferring to MAC.

14          And that didn't work, right?

15  A   Memory problem.  MACs, MACs didn't have a lot of memory

16  in those days.

17  Q   And then it says finally found a SigmaPlot on the PC

18  that works nicely.  Right?

19  A   Found a graphic program that could handle the amount of

20  data to present it properly.

21  Q   And when they did all that they said that the major

22  peaks eluted together, co-eluted, the urinary and the

23  recombinant.

24          Let me show you another document.  Let me show

25  you --

1    A    Right on the very next page it shows a massive

2    difference.

3    Q    Doctor, there was no question.

4         **MS. BEN-AMI:**  I move to strike.

5    A    I'm sorry.

6         **THE COURT:**  Motion to strike is allowed; disregard

7    it.  Listen to the questions.  Mr. Day will have a chance to

8    ask other questions.

9         **THE WITNESS:**  Sorry.

10   Q    If you look on NXQ which you testified about, right?

11   The poster?

12   A    The poster, yes.

13   Q    All right.  In the abstract in the last sentence it

14   says:  The major radioactivity peak in the uEPO profile

15   co-elutes with the major sulfonated RH -- human EPO

16   oligosaccharides suggesting that uEPO also contains sulfated

17   oligosaccharides.

18   A    They're talking about one out of a hundred peaks and

19   they're talking about no peaks.

20   Q    Is that what it says?

21   A    Yes.

22   Q    It's the major peak, right?  That's what it says?

23   A    The word major usually is the tallest one.  It's like

24   saying this is the tallest tree in the forest.

25   Q    Okay.  So, you told the jury yesterday that none of the

1    peaks were the same, right?

2    A    Yes.

3    **Q**    And here they're saying the major peak is the same?

4    A    This is the statement in an abstract.  I analyzed the

5    data.

6    **Q**    Okay.  But this is a statement in an abstract made by

7    Amgen?

8    A    Yes.

9    **Q**    The people who ran the test?

10   A    Yes.

11   **Q**    So you --

12   A    It's an abstract.

13   **Q**    -- disagree with them, too?

14   A    I disagree with their interpretation of that data

15   because they didn't line it up properly like I did.

16   **Q**    Okay.  So you disagree with the person who developed the

17   EPO study on the fact that the --

18   A    No, I disagree only about the glycoform statement.

19   **Q**    Right.  That's what -- let me ask my question.

20   A    Sorry.

21   **Q**    You disagree with the scientist who developed the EPO

22   doping study and Dr. Catlin on the fact that the glycoforms,

23   that there is an overlap of molecules between urinary EPO

24   and recombinant EPO, you disagree with them on that?

25   A    I disagree with their analysis of that specific data.

1    **Q**    And you disagree with the Amgen scientists who were

2    there at the time who said that the urinary EPO and the

3    recombinant EPO, the major peaks, were the same?

4    A    Not peaks.  A single peak, because they got co-elution.

5    **Q**    You disagree with them?

6    A    I don't disagree with the scientists about the

7    experiment or the overall conclusion.  I disagree with that

8    single statement where they said that a single major peak

9    did not co-elute.

10   **Q**    Their interpretation of their data?

11   A    Of one peak in that data.

12   **Q**    Okay.  The major peak of their data.  That's how they

13   characterize it?

14   A    That's what you say.  In the abstract we can only allow

15   a hundred words.

16   **Q**    So you disagree with the Amgen statements about their

17   data, that statement about their data?

18   A    Specifically the single peak.

19   **Q**    You disagree with the EPO doping paper on the fact that

20   there are overlapping glycoforms?

21   A    That's not a fact.

22   **Q**    You don't disagree with them?  You agree with them?

23   A    You said it's a fact.  It's not a fact.  It's their

24   opinion while looking at their data.

25   **Q**    So you disagree with those three groups of scientists on

1    those points?  On those points?

2    A    Specifically on those two very, very minor points.

3            MS. BEN-AMI:  No further questions, your Honor.

4            THE COURT:  Any redirect?

5            MR. DAY:  Just a little bit, your Honor.

6                      REDIRECT EXAMINATION

7    BY  MR. DAY

8    Q    If we could have -- I'm going to put Exhibit 2011A on

9    the Elmo, the overhead projector, and just look at the gel

10   that Ms. Ben-Ami asked you to look at.

11           In your opinion, what structures -- based on this

12   experiment where sialidase is used as a digest, once the

13   urinary EPO and recombinant EPO are digested with sialidase

14   and they are compared, what structures in your opinion are

15   being compared on this gel?

16           MS. BEN-AMI:  Objection; report.

17           THE COURT:  Where is it?  Where is it?

18           MR. DAY:  133, your Honor, to 135.  And 135.

19           THE COURT:  Red?  I'm sorry?

20           MR. DAY:  Blue, your Honor.

21           THE COURT:  Blue.  Well, where specifically in

22   there does it say, say what structures he's comparing?

23   Where can I draw that from?

24           MR. DAY:  Paragraph 130, your Honor.  I'm sorry, I

25   didn't have the report.

1    **THE COURT:**  Yes.  All right, 130.

2    No, you can get what's in 130 and 133, but you are

3    going to have to reframe your question.

4    **MS. BEN-AMI:**  Your Honor?

5    **THE COURT:**  No, that one I sustained.  He may put

6    that on the screen, leave it there.

7    **Q**   What in your opinion accounts for the difference

8    observed in the IEF gels that you studied in this case?

9    **MS. BEN-AMI:**  Same objection, your Honor.

10   **THE COURT:**  Overruled.  You may tell us.

11   A   So, may I read from my report?

12   **THE COURT:**  You may.

13   A   So, Here, Dr. Strickland compares Amgen's recombinant

14   EPO to urinary EPO provided by Goldwasser, quote, received

15   from E. Goldwasser, prepared in 1976 and procedure of

16   Miyake.

17   **THE COURT:**  And again I would caution, that is your

18   assumption that that's Goldwasser?

19   **THE WITNESS:**  Absolutely.

20   **THE COURT:**  All right, your assumption.  And go

21   ahead.

22   A   So Strickland subjected both samples to treatment with

23   sialidase, which removes the sialic acids from the ends of

24   the glycans.  So, in other words, he's stripped off the

25   sialic acids and ran the gel.  And as shown in the gel,

1    there was a lot of residue of negative charge in the urinary

2    EPO.  In other words, it didn't go down to the bottoms, a

3    lot of negative charge is left behind.  The positive pole is

4    down here.

5           So, the conclusion is that this experiment shows

6    that Goldwasser's -- assumed to be Goldwasser's based on the

7    notebook -- urinary EPO contains chemical structures bearing

8    negative charge, other than sialic acid, that are lacking

9    from recombinant EPO.  So the striking difference is

10   explained in that fashion.

11   Q   Would you look at Paragraph 130 of your report.

12   A   Yes, I have 130.

13   Q   And what in your opinion accounts for that difference?

14   A   As I state:  Additional sulfation in the glycans of

15   urinary EPO as compared to recombinant EPO is the most

16   likely explanation for the differences observed in the IEF

17   test.

18   Q   Ms. Ben-Ami asked you questions about Exhibit 37.  I

19   believe she gave you a copy of Exhibit 37, and in particular

20   she asked you to look at Page 89.

21   A   Yes, I have it.

22   Q   And she asked you to compare what's at the top and the

23   bottom.

24   A   Yes.

25   Q   And these pages are labeled in the upper right hand

1    corner.

2              This document's in evidence, correct?

3              **MS. BEN-AMI:**  Yes.

4    A    Correct.

5    Q    If you look in the upper right hand corner, if you could

6    just blow that up, it says -- at the top of the graph.

7    Right in the top of the Y axis, can you read what that says?

8    A    Millivolts.

9    Q    Okay.  And what's to the, just to the right of, next to

10   2, not there, but -- that's it, right there.  What does that

11   say?

12   A    Recombinant EPO.

13   Q    Okay.  Down here on the bottom, what does it say in the

14   same place in the bottom graph?

15   A    Alpha uPOE.

16   Q    Okay.  Now, Ms. Ben-Ami asked you whether this page

17   showed a comparison between recombinant EPO and urinary EPO,

18   and you referred her to the pad analysis but you didn't get

19   to explain.

20             Could you please explain what is going on here?

21   A    This profile has nothing to do with the actual

22   comparison being done.

23             **MS. BEN-AMI:**  Report, your Honor.

24             **MR. DAY:**  This was opened on cross.

25             **THE COURT:**  Yes, in that specific point you asked

1    him that.  So, he may explain his answers to you.

2    A   So, when you have two radioactive samples and you run

3    them on this, this method, you sometimes add in some

4    extraneous material just to make sure that everything is

5    running okay.  And that extraneous material is what is

6    detected by the pad response.  It's not radioactive.  It's

7    not the real thing being compared.  So this is just a way

8    from the notebook of saying, look, these two runs ran

9    similarly.  They can be compared.  The real data is, then

10   they collect these fractions and actually count the

11   radioactivity.  That's the data that must be compared if you

12   want to compare urinary.

13            So this is just saying that the top is the run that

14   was used for recombinant EPO.

15            MS. BEN-AMI:  Objection, your Honor; there's no

16   firsthand knowledge of this.

17   Q   In your opinion --

18            THE COURT:  He's giving his explanation based upon,

19   you may test the basis of it, but that's, he's giving his

20   explanation through his answers.

21            But, you, yourself, didn't do it, did you?

22            THE WITNESS:  No, I didn't do the experiment.

23   Q   But you've reviewed these lab --

24   A   These notebooks, yes.  Very carefully actually.  Because

25   when I first saw this I was a little surprised, too, and I

1    just turned the page and said, oh, what about this, this

2    looks similar.  And then went back and looked at it and it

3    became obvious, it's very clearly documented in the

4    notebook.

5         **MS. BEN-AMI:**  Objection, your Honor.

6         **THE COURT:**  The objection is overruled.  Well, so

7    much of the answer as clearly documented in the notebook,

8    that's stricken.  That's up to the jury.  But the rest of it

9    may stand.

10   **Q**   In your opinion, what was documented in the notebook?

11   **A**   My opinion was documented in this particular page is not

12   the comparison, it is the internal, what is called an

13   internal standard.  You run something just to make sure that

14   there's nothing funny about, in fact, it actually

15   strengthens the real data, because it says that there was

16   nothing, both ran exactly.  And this is a common way that

17   scientists use to --

18        **MS. BEN-AMI:**  Objection, your Honor; now he's

19   outside.

20        **THE COURT:**  Yes.  We'll stop it there.

21   **Q**   And in your opinion, which page in Exhibit 37 shows the

22   actual comparison?

23   **A**   Let's see.  Probably Page Number 92 would be a good one.

24        **MS. BEN-AMI:**  Objection, your Honor; now we're

25   outside.

1          **MR. DAY:**  Paragraph 152 of the report and

2     responding to the question.

3          **THE COURT:**  Please.  He may point us to the page.

4  **Q**   Which page, Doctor, in your opinion shows the actual

5     comparison between the Dionex analysis of recombinant EPO

6     and urinary EPO?

7  A    This one, 92.

8  **Q**   Page 92.  Thank you.

9          **MS. BEN-AMI:**  Did you pass?

10         **MR. DAY:**  No.

11         **MS. BEN-AMI:**  Oh, I'm sorry.

12 **Q**   Ms. Ben-Ami also asked you some questions about Exhibit

13    CEV, and I believe she asked you about Pages 83 to 84 of

14    CEV.

15         **MS. BEN-AMI:**  Objection; it's not in evidence.

16         **THE COURT:**  Yes, please take that down.

17         **MR. DAY:**  Please don't put that up.

18         **THE COURT:**  Thank you.

19 A    You're referring to the numbers at the bottom of the

20    page, right?  Bottom right number?

21 **Q**   I'm referring, I think the page is in the, it's in the

22    internal corner of the page.  At the top of the notebook.

23    Page 83.

24 A    I'm sorry.

25 **Q**   You have to take this binder clip, you have to take the

1    binder clip off because it's obscuring the page number.

2    A    Okay, now I see it.  Sorry.  Eighty-three and 84.  Yes.

3    Q    Did you review this experiment?

4    A    Yes.

5    Q    In your opinion, was there any manipulation of the data

6    in this experiment?

7              MS. BEN-AMI:  Objection, your Honor; report.

8              THE COURT:  Sustained on the ground that you're

9    leading the witness.  And you can ask another question and

10   refer to the report in asking it.

11   Q    Ms. Ben-Ami suggested to you on cross-examination that

12   the representation of the data that was depicted in this

13   experiment was in some way manipulated by interpretation of

14   the experimenters.

15             Based upon your review of the data in this expert

16   report, do you have an opinion based upon your review of the

17   data in the, as recorded in the notebook whether this data

18   was manipulated in any way?

19             MS. BEN-AMI:  Objection.

20             THE COURT:  Is there anything in the report about

21   this?

22             MR. DAY:  It wasn't raised until cross-examination,

23   your Honor.

24             MS. BEN-AMI:  Your Honor?

25             THE COURT:  Wait a minute.  I don't need argument.

1    No, overruled.  You may tell us.  What's your opinion?

2         THE WITNESS:  If by manipulation is meant that

3    there is some deliberate attempt to change the result, no,

4    there was no manipulation.  The difficulty seems to have

5    been with dealing with so many, so many different

6    radioactive peaks and the, and the memory limits of the MAC

7    IIsi and the program that they tried to use.  So they

8    finally found that SigmaPlot on a PC worked well and they

9    were able to do the standard corrections that people do.

10        THE COURT:  Well, but they did, given the machinery

11   and computers that they had at that time, they ran the

12   experiment, which meant they put data into the machines.  Am

13   I right on that?

14        THE WITNESS:  Into the computer?

15        THE COURT:  Again, you understand the experiment

16   better than I.

17        THE WITNESS:  They basically counted the

18   radioactivity as it came off the column.

19        THE COURT:  All right.  But, but they had different

20   computers to calculate that, correct?

21        THE WITNESS:  A scintillation counter would have

22   gotten radioactivity out of each peak, correct.

23        THE COURT:  Okay.  That machine, a scintillation

24   counter --

25        THE WITNESS:  Yes.

 1          THE COURT:  -- did its trick, whatever that is.

 2          THE WITNESS:  There shouldn't be a problem there.

 3          THE COURT:  Okay.  All right.  Now, when you get

 4     that that doesn't simply translate into these graphs that

 5     I've admitted in evidence?

 6          THE WITNESS:  No.  You simply have to -- it's like

 7     plotting a graph.  It's so much date.  And, I mean, I

 8     suppose in the old days when I did it as a post-doc, I would

 9     do it by hand.  Very laborious.

10          THE COURT:  I see.  Now I follow.

11          THE WITNESS:  It's just a way -- it's just

12     plotting.

13          THE COURT:  You get, you get data.  But when you

14     look at it you don't see the peaks.

15          THE WITNESS:  It's just a string of numbers.

16          THE COURT:  A string of numbers.  And you have to

17     take that string of numbers and run that through a computer

18     which plots it out.

19          THE WITNESS:  Yes.  This is the era when the

20     computing mechanism had just become available where you

21     didn't have to do it by hand or graph paper.  So they were

22     trying to plot it out properly.

23          THE COURT:  All right.  So they tried to do that,

24     and on some of the computer programs they use it doesn't --

25     I shouldn't say it doesn't work.  They get something that

1      they don't think makes sense, right?

2              **THE WITNESS:**  Not -- it sounds like they had

3      significant memory problems and time-scale problems.  Yes.

4              **THE COURT:**  They had some problems?

5              **THE WITNESS:**  Yes, they did.

6              **THE COURT:**  And then just reading now --

7              **THE WITNESS:**  Yes.

8              **THE COURT:**  -- because the document's in

9      evidence --

10             **THE WITNESS:**  Yes.

11             **THE COURT:**  -- and it comes from back then --

12             **THE WITNESS:**  Yes.

13             **THE COURT:**  -- and the jury will look at it.

14             **THE WITNESS:**  Yes.

15             **THE COURT:**  So then what do they do?

16             **THE WITNESS:**  They finally found a SigmaPlot on PC,

17     that program could handle the data.

18             **THE COURT:**  All right.  So they find a program that

19     they think at least will handle the data.

20             **THE WITNESS:**  Right.

21             **THE COURT:**  And they use it.

22             **THE WITNESS:**  Yes.

23             **THE COURT:**  And from there on they apply a standard

24     correction?

25             **THE WITNESS:**  Yes.

1          THE COURT:  And having done that -- and you're

2     familiar with that standard correction?

3          THE WITNESS:  Oh, yes, it's very time consuming.  I

4     do the same thing.

5          MS. BEN-AMI:  Objection, your Honor.

6          THE COURT:  Noted.  When I say you're familiar with

7     that program?

8          MS. BEN-AMI:  What they did.

9          THE COURT:  I note the objection.  And I think I'll

10    deal with it by saying -- you're making that assumption of

11    what --

12         THE WITNESS:  Yes.

13         THE COURT:  -- they did.

14         THE WITNESS:  Yes.  Yes.

15         THE COURT:  All right, with that modification as

16    part of the record, I'll overrule the objection.

17    Q    And just --

18         THE COURT:  And back to you, Mr. Day.

19         MR. DAY:  Thank you very much, your Honor.

20    Q    Just finally, Dr. Varki, Ms. Ben-Ami questioned you

21    about the Lasne paper and whether you agreed or disagreed

22    that there were glycans in common between urinary and

23    recombinant EPO.  Do you recall those questions?

24         And first of all, in your opinion, do urinary and

25    recombinant EPO have glycans in common?

1           **MS. BEN-AMI:**  Objection, your Honor.

2           **THE COURT:**  In the report?

3           **MR. DAY:**  151, your Honor.  Blue.

4           **THE COURT:**  Thank you.  He may testify consistent

5     with 151.

6     A   So, the question is about the Lasne gel which is a

7     somewhat reasonable resolution gel run with IEF.

8           **MS. BEN-AMI:**  Objection, your Honor.

9           **THE COURT:**  Yes, I don't see that.  Sustained.

10    Strike it out.  You may testify consistent with --

11          **THE WITNESS:**  Okay.

12          **THE COURT:**  -- 151.

13    A   Okay.  So, with 151, which is about the Dionex, one

14    finds that when one carefully lines up the data there are

15    hardly any of the sugar chains that are held in common

16    between the urinary, assumed urinary and assumed recombinant

17    EPO.  And so, this result, as I say here, further refutes

18    Dr. Bertozzi's conclusion that --

19          **MS. BEN-AMI:**  Objection, your Honor.

20          **THE COURT:**  Yes.  That goes beyond the question.

21    Q   What is the basis, Doctor, for your disagreement with

22    the Lasne conclusion about whether there are glycans in

23    common?

24    A   So, the basis of my disagreement is simply that at the

25    resolution they looked at, they saw bands that were running

1    somewhat close to each other.  When I looked more carefully

2    at that kind of data, especially in some of the gels that I

3    observed, there are significant differences.  And that's the

4    sort of thing when you first look at it you may say, oh,

5    that's close enough, and my colleagues the same.  But when

6    you look at this kind of level of detail you find that

7    there's hardly anything really in common.

8              **MR. DAY:**  Thank you.  No further questions.  I pass

9    the witness.

10             **THE COURT:**  Anything further?

11             **MS. BEN-AMI:**  Yes, your Honor.

12                       **RECROSS-EXAMINATION**

13   BY  **MS. BEN-AMI**

14   **Q**    Lasne actually had the gels, right?  They had the gels?

15   **A**    They had, yes, gels.

16   **Q**    You don't have the gels, you're looking at pictures,

17   right?

18   **A**    Yes.

19   **Q**    Okay.  So they had the real data to look at?

20   **A**    Usually you put the best data you can in the paper.

21   **Q**    Doctor --

22             **MS. BEN-AMI:**  Your Honor, can I have an instruction

23   that the witness answer my questions?

24             **THE COURT:**  Yes.  Now, have in mind my instruction.

25             **THE WITNESS:**  Okay.

```
 1            THE COURT:  She knows what she's doing.  She's

 2   asking questions that grammatically can be answered yes or

 3   no.  Now, if an honest and complete answer is yes or no, you

 4   have to answer yes or no.  If it's not, tell her you can't

 5   answer it --

 6            THE WITNESS:  Okay.

 7            THE COURT:  -- yes or no.  And always you can say,

 8   I don't remember, I don't know.  But you can't just talk --

 9            THE WITNESS:  Sure.

10            THE COURT:  -- in answer to her questions.

11            THE WITNESS:  I'm sorry.

12            THE COURT:  Listen to them.  That isn't advice,

13   that's the Court's order.

14            Go ahead.

15   Q   Lasne had the actual data, correct?

16   A   Correct.

17            MS. BEN-AMI:  Can I have AV-17.

18   Q   This is a picture that Mr. Day just -- he showed you the

19   actual lab notebook.  This is a reproduction of it.  Right?

20   He just showed the jury this?

21   A   Correct.

22   Q   And these peaks, you say they don't line up; is that

23   your testimony?

24   A   These particular peaks, my testimony and my report was

25   about the Rogers and Strickland data, similar data that was
```

1    published in the poster and in the --

2    Q    You just testified on this data.

3    A    This is not the data I testified on yesterday.

4    Q    No.  Mr. Day just showed it to you.

5    A    Mr. Day showed this to me to explain whether or not this

6    was, he asked me was it the same as the other thing that

7    looks so similar, which was not the result.

8    Q    And you said this was the result?

9    A    I said that was the result.

10   Q    And this is the result, right?

11   A    It is the result.

12   Q    And those peaks match up?

13   A    No, if you put them on top of each other they don't.

14   Q    Well, the jury I guess has the evidence.

15        So, that's your interpretation of this data, right?

16   A    If you put it in high resolution to the next few pages

17   they don't.

18   Q    Okay.  This is the page you testified to, Mr. Day showed

19   it to the jury as the result, right?

20   A    He showed it --

21   Q    Doctor, I'm again --

22   A    Yes.

23   Q    This is what you just showed the jury in your redirect;

24   yes or no?

25   A    Mr. Day put it up, yes.

1   Q   And you testified about it, right?

2   A   I said that this --

3   Q   Yes or no?

4   A   -- is the data.

5   Q   Yes, yes or no?

6   A   I did testify about it.

7   Q   That's all I asked you.

8       So let's look at CEV again.  And you don't know

9   where the sulfations are on urinary EPO, right?

10  Molecularly?

11  A   In terms of the exact position --

12  Q   Yes.

13  A   -- of the molecules?

14  Q   Yes.

15  A   Nobody knows that.  It's never been analyzed at that

16  level.

17  Q   So let's look at CEV.  Do you have that?  That's this

18  one.

19      This is Doctor, Mr. Rogers, Dr. Rogers, his book.

20  And at Page 6203 --

21      **MR. DAY:**  This is outside the scope of the

22  redirect.

23      **THE COURT:**  Yes.  Sustained.

24      **MS. BEN-AMI:**  Your Honor asked the witness

25  questions about what Mr. Rogers did.

```
 1              MR. DAY:  I didn't.

 2              THE COURT:  No, but I did.  And this is the result.

 3   And she may have it.  I'll reverse myself.  Overruled.

 4   Q    You're at 6203.  Do you see it?

 5   A    Correct.

 6   Q    And it says there:  Really looking at negative charge.

 7   Not clear if is SO4 or possibly something else.

 8              Do you see that?

 9   A    Yes.

10   Q    That's what he wrote, SO4 is the sulfation?

11   A    Yes.

12   Q    And then at the bottom he says:  Could be a long time

13   working all this out, exclamation, exclamation, right?

14   A    Yes.  He says many questions to be found on this.

15              MS. BEN-AMI:  Thank you.  No further questions.

16              THE COURT:  Nothing further for this witness?

17              MR. DAY:  Nothing further, your Honor.

18              THE COURT:  You may step down.

19              (Whereupon the witness stepped down.)

20              THE COURT:  Is that it, or are you calling one more

21   witness?

22              MR. DAY:  Amgen calls Dr. Harvey Lodish, your

23   Honor.

24              THE COURT:  He may be called.

25              THE CLERK:  Sir, would you raise your right hand.
```

1              Would you stand, please.

2         **THE WITNESS:**  Sure.

3         **THE CLERK:**  Do you solemnly swear that the answers

4    you will give to this Court and Jury will be the truth, the

5    whole truth, and nothing but the truth, so help you God?

6         **THE WITNESS:**  I do.

7         **THE CLERK:**  Please be seated.

8                    HARVEY LODISH

9                **DIRECT EXAMINATION**

10   **BY  MR. DAY**

11   **Q**   Good morning, Dr. Lodish.

12   A    Good morning.

13   **Q**   Would you please introduce yourself to the jury?

14   A    Yes.  I'm Harvey Lodish and I live in Brookline,

15   Massachusetts.

16   **Q**   And what do you do for a living, sir?

17   A    I'm professor of biology and professor of bioengineering

18   at the Massachusetts Institute of Technology.  I'm also a

19   founding member of the Whitehead Institute for Biomedical

20   Research where my research lab is located.

21   **Q**   And when did you join the faculty of MIT?

22   A    In 1968.

23   **Q**   What are your principal responsibilities at MIT?

24   A    I direct a research lab of some 30 scientists, M.D.'s,

25   Ph.D.'s, graduate students, undergraduates.  I also teach

1    two undergraduate courses.

2    Q    What subjects do you teach?

3    A    I teach a required undergraduate course in cell biology,

4    and I teach an upper level course in biotechnology.

5    Q    Excuse me just one second.  I'm having a little

6    technical problem.

7         Have you also written a textbook on molecular cell

8    biology?

9    A    Yes.  That is the fifth edition of Molecular Cell

10   Biology.  It's the English language version.  It's been

11   translated in seven foreign languages.

12   Q    When did this -- when did you first publish this book?

13   A    The first edition was 1986, and the sixth edition was

14   just published a few months ago.

15   Q    And who uses your textbook?

16   A    It's used by students throughout the world;

17   undergraduates who study molecular --

18          MS. BEN-AMI:  Objection, your Honor.

19          THE COURT:  Who uses it?

20          Yes.  Sustained as to relevance.  Sustained.

21   Q    Dr. Lodish, what research experience, if any, have you

22   had in producing recombinant human glycoproteins?

23   A    Extensive.  Beginning in the early 1980's we were

24   cloning, that is, isolating the genes for a number of

25   important mammalian glycoproteins and expressing them in

1   recombinant cells.  And this is research that we continue to

2   the present day.

3   **Q**   When you say we, to whom are you referring?

4   A   I'm referring to my research lab of 30 or so people

5   under my direction.

6   **Q**   And how many -- strike that.

7          What research experience, if any, have you had

8   working with erythropoietin?

9   A   Extensive.  In 1987, we reported results of several

10  years of work where we isolated, or, as we say, cloned the

11  gene for the EPO receptor.  That is the protein that's on

12  the surface of the bone marrow cells that binds the hormone

13  erythropoietin.  This is the hormone.  This is the receptor.

14  It binds the hormone and then sends signals into the inside

15  of the cell to become red blood cells.  And we continue to

16  work on this receptor and EPO binding and its signaling

17  properties to the present day.

18  **Q**   How many scientific articles have you published?

19  A   Over 500 in peer-reviewed journals.

20  **Q**   And how many relate to EPO?

21  A   Well over 50.

22  **Q**   Have you received any awards or recognition for your

23  scientific research?

24  A   Yes.  Let me mention, in 1987 I was elected to the

25  United States National Academy of Sciences; in 1999, to the

1    American Academy of Arts and Sciences in Cambridge.  I

2    received an honorary doctorate degree from Kenyon College,

3    my undergraduate institution.  And in 2004 I served as

4    president of the American Society for Cell Biology.  It's an

5    international organization of 11,000 research scientists.

6    **Q**   Dr. Lodish, would you please tell the jury why you're

7    here this morning?

8    A   Sure.  I'm here to respond to comments or opinions

9    raised by Roche's expert, Dr. Flavell, concerning the

10   definiteness of the term human erythropoietin in Lin's

11   patents, and also the written description of human

12   erythropoietin in the patents.

13   **Q**   And what did you do to acquaint yourself with Dr.

14   Flavell's opinions?

15   A   Lots.  I read his report in great detail.  I was

16   familiar with many of the papers he cited in his report

17   because I read them when they were published.  I re-reviewed

18   these papers.  I of course --

19         **MS. BEN-AMI:**  Objection, your Honor.

20   A   -- read the --

21         **THE COURT:**  Overruled.  He may tell us what he did.

22   A   I read many papers.  I first read and analyzed the

23   patents in great detail, and many other documents that were

24   shown to me.

25   **Q**   Dr. Lodish, if I suggest to you that Dr. Flavell offered

1    the opinion that Dr. Lin's patent did not adequately

2    describe the claim term human erythropoietin, would you

3    agree or disagree with that opinion?

4    A    I disagree.  It's more than adequately described.

5    Q    Let's look at the Court's definition of the claim term

6    human erythropoietin.

7         **MR. DAY:**  Could we have the jurors glossary,

8    please.  And the term human erythropoietin.

9    Q    The Court has -- let me simply read what the Court has

10   defined human erythropoietin to mean:  A protein having the

11   amino acid sequence of human EPO, such as the amino acid

12   sequence of EPO isolated from human urine.

13        Referring to '422 claim 1.  Do you see that?

14   A    Yes.

15   Q    If I suggest to you that Dr. Flavell has offered the

16   opinion that the Court's claim construction requires a 165

17   amino acid human EPO, would you agree or disagree?

18        **MS. BEN-AMI:**  Objection; mischaracterization.

19        **THE COURT:**  Sustained.  Sustained.

20   Q    In your opinion, does the Court's claim construction

21   require any particular length of amino acid sequence for

22   human EPO?

23   A    No, it clearly does not.  There's no specified length of

24   amino acids in the claim construction.

25   Q    Now, where in your opinion does the patent describe

```
1    human erythropoietin?

2    A   Oh, it's described in many places.  Figure 6 of the

3    patent describes the deduced amino acid sequence of human

4    erythropoietin; and importantly, Example 10 in the patent

5    describes how using this EPO DNA, introducing it into

6    mammalian cells, growing them, these cells will produce,

7    that is, release into their growth medium human EPO.  And

8    the term human EPO is used throughout to indicate each of

9    these steps.

10          MR. DAY:  Now, could we see Example 10.  Page 1 of

11   Example 10.

12          THE WITNESS:  Yes.  Excuse me.

13   Q   Do you have a copy of --

14   A   I do.  And --

15          MR. DAY:  Do we have exhibits there?  Let me just

16   give Dr. Lodish a copy of this Exhibit 1.

17          MS. BEN-AMI:  Can I have the binder?

18          MR. DAY:  We're not using any exhibits.  Just trial

19   exhibits.  Would you like a copy?

20          MS. BEN-AMI:  Oh, that's okay, you're just -- I'll

21   take it.  I'll add it to my collection.  Thank you, Mr. Day.

22          MR. DAY:  Okay.  Sure.

23   Q   How, in your opinion, Dr. Lodish, would a skilled

24   worker in 1984 have understood Example 10 to describe human

25   EPO?
```

```
 1              MS. BEN-AMI:  Objection; report.

 2              MR. DAY:  Paragraphs 23 and 31 of the red report.

 3              THE COURT:  I don't have --

 4              MR. DAY:  I'm sorry, your Honor.

 5              THE COURT:  -- the report.

 6              THE WITNESS:  Actually I don't either.

 7              THE COURT:  It would be wise if the witness had

 8    one.

 9              THE WITNESS:  Yes.  Thank you.

10              THE COURT:  Twenty-five and 33?

11              MR. DAY:  I said 29 to 31, I believe, your Honor.

12              THE COURT:  Thank you.

13              MR. DAY:  Of the red report.

14              THE WITNESS:  Oh, I'm sorry, Paragraphs 29.

15              THE COURT:  Yes.

16              THE WITNESS:  Excuse me.

17              THE COURT:  I made the same mistake yesterday.  But

18    he refers by paragraphs and that makes sense.

19              THE WITNESS:  Yes.

20              THE COURT:  And you may testify consistent with

21    those paragraphs.

22              THE WITNESS:  I'm sorry, could you repeat the

23    question, please?

24    Q   Yes.  How, in your opinion, would a skilled worker in

25    1984 have understood Example 10 to describe human EPO?
```

```
 1    A    It describes the way one makes human EPO from the human

 2    EPO DNA.  And as you see in the yellow highlights, Lin at

 3    several stages of this, as it were, recipe for making human

 4    EPO refers to both the DNA and the cells that make it and

 5    the recovered protein.

 6            Could we have the next page?

 7        MR. DAY:  Could we have this blown up a little bit,

 8    please.

 9        THE WITNESS:  No, no, it's a little higher.

10        THE COURT:  Let's go back, let's go back to the

11    first page.

12        THE WITNESS:  Yes.

13        MR. DAY:  Just take the first paragraph of

14    Example --

15        THE WITNESS:  Yeah.  Well, let's --

16        MS. BEN-AMI:  Wait.  Could I have a question, your

17    Honor.

18        MR. DAY:  First we're going to get the graphic up

19    so we can see it.

20        THE COURT:  Well --

21    Q    My question, Dr. Lodish --

22        THE COURT:  -- I do, I do have to control the trial

23    and I will to this extent.

24            Mr. Day, you take your next step and we'll see if

25    there's an objection, whatever it may be.
```

1          **MR. DAY:**  Thank you, your Honor.

2  **Q**   How would one of skill in the art in 1983-84 understand

3  Example 10 to describe human EPO?

4  **A**   Well, by the fact that he uses the term human EPO in

5  many places in Example 10 to describe the protein that he is

6  mentioning.

7          Just as one example, because I can read it with my

8  glasses --

9          **MS. BEN-AMI:**  Objection, your Honor; report.

10         **THE COURT:**  We'll stop it there and he may ask

11  another question.

12         **THE WITNESS:**  Okay.

13  **Q**   Could we see the -- well, in your opinion, where in

14  Example 10 does Dr. Lin describe human EPO?

15         **MS. BEN-AMI:**  Objection, your Honor; report.

16         **THE COURT:**  Overruled.

17  **A**   I have highlighted the places in Example 10 where he

18  describes human EPO.

19  **Q**   And how would one of skill in the art understand Dr. Lin

20  to be using that term in Example 10?

21  **A**   Well --

22         **MS. BEN-AMI:**  Objection, your Honor; report.

23         **THE COURT:**  No, where is it?

24         **MR. DAY:**  Paragraphs 29 to 31, your Honor.

25         **THE COURT:**  That was red, correct?

1          **MR. DAY:**  Yes, sir.

2          **THE WITNESS:**  Yes.

3          **THE COURT:**  He may testify consistent with those

4    paragraphs.

5    A    Yes.  He demonstrated the use of human cells to make

6    human EPO.  For instance, in this line he says culture

7    fluids from the CHO cells.

8          **MS. BEN-AMI:**  Objection, your Honor; report.

9          **THE COURT:**  No, he may have that.

10   A    Okay.  Culture fluids.  These are the CHO cells that are

11   expressing the recombinant human EPO.  That's what the HuEPO

12   stands for.  Contained recombinant human EPO.  And then he

13   goes on to describe some of the properties of this,

14   immunological properties, and here he talks about units of

15   human EPO that were made from these various samples.  This

16   is one of many places I could cite.

17         **MS. BEN-AMI:**  Your Honor, can I have a side bar,

18   please?

19         **THE COURT:**  You may.

20   SIDEBAR CONFERENCE, AS FOLLOWS:

21         **MS. BEN-AMI:**  This witness is going way outside of

22   his report.  The witness doesn't cite to these things.  The

23   witness doesn't talk about these things.

24         **THE COURT:**  It seems to me that, and I am

25   following, it's within the ambit of the report.  I'll try to

1    stop him on your objection.

2              (Whereupon the sidebar conference concluded.)

3    **BY  MR. DAY**

4    **Q**    Dr. Lodish, looking at Paragraphs 24 to 25 of your

5    expert report, how many amino acids does human EPO have?

6              **MS. BEN-AMI:**  Objection; indefinite as to time.

7              **THE COURT:**  Yes, sustained.  Can you be more

8    specific?

9    **Q**    How many amino acids does the human EPO produced in

10   Example 10 have?

11             **MS. BEN-AMI:**  Objection, your Honor; no foundation.

12   May I have another side bar, your Honor?

13             **THE COURT:**  Overruled.  Overruled.  You may answer.

14   **A**    In Example 10, which is recombinant human EPO made by

15   CHO cells, it has 165 amino acids.

16             **MS. BEN-AMI:**  Objection, your Honor.

17             **THE COURT:**  Overruled.

18   **Q**    And today what is known about how many amino acids human

19   EPO has?

20   **A**    It can have either 166 or 165.

21   **Q**    How are these two forms of human EPO generated?

22             **MS. BEN-AMI:**  Objection, your Honor.

23             **THE COURT:**  Grounds?

24             **MR. DAY:**  Paragraphs 24 and 25.

25             **THE COURT:**  I haven't heard the grounds.

```
 1              MS. BEN-AMI:  The grounds are it's not in his

 2    report and it's --

 3              THE COURT:  Okay, let's --

 4              MS. BEN-AMI:  And there's other grounds.

 5              THE COURT:  Where is it in his report?

 6              MR. DAY:  It's in Paragraphs 24 and 25 of his red

 7    report, your Honor; it's also in Paragraph 30 of the yellow;

 8    and it's in Paragraph 70 of the blue.

 9              THE COURT:  Wait a second.  Twenty-four and 25 of

10    the red.

11              MR. DAY:  Twenty-four and 25 of the red.

12              THE COURT:  He may testify consistent with what's

13    there.

14              MS. BEN-AMI:  Your Honor, I object because of the

15    time frame.

16              THE COURT:  No.  Overruled.  And the question is

17    what's known now.  Right?

18              MS. BEN-AMI:  That's the point.

19    Q    How are these two --

20              THE COURT:  I understand that's the point.

21    Q    How are --

22              THE COURT:  You may have it.

23    Q    How are these two points of human EPO generated?

24    A    Sure.  All cells expressing human EPO, certainly all

25    mammalian cells, make the same long polypep --
```

1          **MS. BEN-AMI:**  Your Honor; the report.

2          **THE COURT:**  He may testify consistent with the

3    report.  I don't see that language.  So let's stick with the

4    report.

5    A   Okay.  All cells make 166 amino acid peptide.

6          **MS. BEN-AMI:**  Objection, your Honor.

7          **THE COURT:**  Sustained.  I don't see that.

8    **Q**   Dr. Lodish, why don't you simply read Paragraphs 24 and

9    25.

10   A   Excuse me.  The human EPO produced in Example 10 of Dr.

11   Lin's patents has the 1 to 165 amino acid recited in Figure

12   6.

13         **MS. BEN-AMI:**  And I object at that point to the

14   hearsay.

15         **THE COURT:**  You may.  He may testify.  As an

16   opinion witness he may give his opinion.

17         Go ahead.  You may continue.

18   A   Okay, thank you.

19         This is because the CHO cells used to produce EPO

20   possess the appropriate enzymes or enzymes to recognize and

21   cleave arginine 166 from EPO.

22         May I insert a note of explanation or should I

23   continue?

24   **Q**   You should just continue.

25   A   Continue.  Thank you.

```
 1              This reaction occurs as the consequence of

 2     expression in a vertebrate cell line.  The efficiency of the

 3     carboxy-terminal cleavage is inherent in and dependent on

 4     the particular cell expressing EPO.  The CHO cells of

 5     Example 10 in the patent are highly efficient at the

 6     cleavage of the carboxy-terminal arginine.  Thus, the

 7     specification inherently demonstrates 165 amino acid EPO.

 8     In other words, if a person skilled in the art followed

 9     Example 10, they would --

10              MS. BEN-AMI:  Objection, your Honor; legal issue.

11              THE COURT:  No, he can give us his opinion.  Go

12     ahead.

13     A    In other words, if a person skilled in the art followed

14     Example 10, they would be in possession of a 165 amino acid

15     human EPO.

16              Paragraph 25.  On the other hand, not all --

17     Q    Thank you.

18     A    -- host cells cleave arginine as efficiently as CHO

19     cells.  For example, Roche's EPO produced in human host

20     cells --

21              MS. BEN-AMI:  Objection, your Honor.

22              THE COURT:  Wait a minute.  It's not relevant to

23     this portion of the case.

24              MR. DAY:  We'll stop there, your Honor.

25              THE COURT:  Though I overruled it, we will stop
```

 1   there.

 2   Q   Could you go to the next sentence, however, referring to

 3   the publication by Goto.

 4   A   Of course.  I'm sorry.  Likewise, Goto et al. report

 5   that baby hamster kidney cell-produced EPO retains the

 6   carboxy-terminal arginine 166.

 7   Q   Now, would you explain in simple terms what you just

 8   read to the jury in your report?

 9   A   Sure.  In simple terms, all cells produce EPO once --

10        **MS. BEN-AMI:**  Objection, your Honor.

11        **THE COURT:**  Overruled.

12   A   Okay.  All cells produce EPO 166, that is, a chain of

13   amino acids, starting at position 1 with alanine and ending

14   in arginine at 166.  So that is the 166 EPO protein.  And

15   all mammalian cells to my knowledge do that.

16        Some cells, but not all, as I've just read, have an

17   enzyme, that is, a kind of machine that cuts off that last

18   amino acid, discards it.  So what remains is the first 165,

19   that is what we call EPO 1 to 165, and that is the EPO, the

20   human EPO that those cells secrete into their medium.

21   Q   Thank you.

22        Dr. Lodish, in your opinion, what techniques were

23   available at the time of Dr. Lin's inventions to determine

24   the last amino acid sequence of human EPO, that is, at the

25   carboxy-terminus.

1    A    Yes.

2              MS. BEN-AMI:  Objection, your Honor; relevance.

3              THE COURT:  No, overruled.

4    A    The techniques were very imprecise and really were not

5    suitable to determining that.

6    Q    In your opinion, what cells are known to make a 165

7    amino acid human EPO?

8              MS. BEN-AMI:  Objection; time.

9              THE COURT:  Sustained, on that found.

10   Q    As of today?

11             THE COURT:  As of today.

12   A    Yes.  As I read from my report, many cells are known to,

13   including these BHK, or baby hamster kidney cells.

14   Q    165.

15   A    Oh, I'm sorry, 165.  I apologize.  CHO cells, for

16   instance, will do that.  HeLa cells will make a mixture of 1

17   6 --

18             MS. BEN-AMI:  Objection; report, your Honor.

19             THE COURT:  No, the objection is overruled.  It's

20   untimely.  Go ahead.

21             Well, no, that's not right.  Where is it in the

22   report?

23             MR. DAY:  Paragraph 25, your Honor.

24             THE COURT:  About this type of cells.  Twenty-five

25   of red?

1          **MS. FISHMAN:**  Of the red report.

2          **THE COURT:**  Thank you.

3          **MR. DAY:**  Footnote 16 of the red report, Paragraph

4     25.

5          **THE WITNESS:**  I'm sorry, can I answer or not?

6          **THE COURT:**  No, no, you've got to wait for me.

7          **THE WITNESS:**  I'm sorry.  I apologize.

8          **THE COURT:**  I'm the slowest one, having picked up

9     Dr. Varki's red report.  But we will get there.  And I

10    apologize.

11         **MR. DAY:**  Paragraph 25, your Honor, Footnote 16.

12         **THE COURT:**  Yes, I'm looking at it.  Yes, he may so

13    testify.  Yes.  Continue your answer.

14    **Q**   You were talking about HeLa cells.

15    **A**   I am talking about that footnote, which is HeLa cells

16    will make a mixture of 165 and 166.  In other words,

17    sometimes they remove the last arginine, sometimes they

18    don't.  And other cells as I read in my report, BHK, or baby

19    hamster kidney cells, when expressing the human EPO DNA will

20    make 166 and secrete it.

21    **Q**   How do the amino acid sequences of the 165 human EPO and

22    the 166 human EPO compare to one another?

23    **A**   Sure.  The amino acid sequence, amino acid by amino

24    acid, of the 165 protein is identical to the sequence of the

25    first 165 amino acids of the 166 protein.  The only

1    difference is the 166 protein has an additional amino acid,

2    this arginine, which is present at its C-terminus, or, as it

3    were, at its end.

4    Q    What, if anything, in your opinion is known today about

5    the biological activity of 165 or 166 amino acid human EPO?

6            MS. BEN-AMI:   Objection, your Honor; report and

7    relevance.

8            MR. DAY:   Paragraphs 211 to 214 of the blue report,

9    your Honor.

10           THE COURT:   No, he may testify.  Well, no, as a

11   matter of fact, I'm going to change that.  We may get

12   testimony on this point but not in this phase of the case.

13   Sustained.

14   Q    You mentioned -- we've been talking so far about Example

15   10 and the product produced in Example 10.

16   A    Yes.

17   Q    You also mentioned Figure 6 --

18   A    Yes.

19   Q    -- of the patent.

20           MR. DAY:   Could we have Figure 6 displayed to the

21   jury, please.  This is from Trial Exhibit 1.  Figure 6 in

22   the patent.

23           THE WITNESS:   Could we have Figure 6B, please?

24   Thank you.

25   Q    How, in your opinion, would a skilled worker in 1983 or

```
 1    1984 have understood Figure 6 to describe human EPO?

 2              MS. BEN-AMI:  Objection, your Honor; report.

 3              MR. DAY:  Paragraphs 14 and 15 of the red report,

 4    your Honor.

 5              MS. BEN-AMI:  Your Honor?

 6              THE COURT:  Well, obviously, he's not going to make

 7    all the references there.  But overruled, he may answer that

 8    question.

 9    A    Thank you.  Excuse me.

10              Well, Figure 6 describes first of all the DNA

11    sequence of the human EPO gene.  And that is this series of

12    A's, G's, G's and C's just running from left to right in

13    rows.  And one skilled in the art at the time, and Dr. Lin

14    did, could deduce from this DNA sequence, the sequence of

15    the EPO protein.  And what is indicated above certain of

16    these three base units, these are the triplets, or, as it

17    were, codons.  Here is a GCC that specifies the first amino

18    acid, alanine.

19    Q    Are you referring -- could you distinguish between which

20    row you're referring to?

21    A    I'm sorry.  Yes.  I'm -- my hand is not quite steady.

22              Here is the DNA sequence at the bottom.

23    Q    That's the bottom row?

24    A    Right.  That's the bottom row.  And then above it in

25    three letter code, ALA stands for alanine.  And the plus 1
```

1    above the alanine specifies that it's the first amino acid

2    in this ultimately 166 protein.

3            Thank you.

4            And just reading along you can see the sequence,

5    the deduced amino acid sequence from the DNA and the correct

6    deduced amino acid sequence of the EPO polypeptide.

7            If we could jump to Figure 6E, which I believe is

8    the last one.  Could you blow it up, please.  A little

9    bigger.  Thank you.  Thank you.  That's fine.

10           Again, you see now we're talking at the end or the

11   carboxyl-terminus of the EPO protein.  Again, the DNA

12   sequence that specifies other amino acids, and it ends in

13   this AGA, which specifies the arginine at 166, which is the

14   one that may or may not be cleaved off when the protein is

15   made.

16   **Q**   Do you have an opinion whether one, whether or not Dr.

17   Lin's patent adequately describes human erythropoietin to a

18   person skilled in the art as of 1983-1984?

19   A    Yes.  More than adequately describes it both by example,

20   the Example 10, and also by sequence, which is this Figure

21   6.

22   **Q**   Now, Doctor, I would like you to assume that Roche's

23   counsel made this statement during opening statement.

24           **MR. DAY:**  And I'm referring to Transcript Page 127,

25   2 to 6.

1          **MS. BEN-AMI:**  Your Honor, I object.

2          **THE COURT:**  No, no, overruled.  He may put a

3    question.  The question's not evidence.

4    **Q**    The statement, the statement from the transcript,

5    opening by counsel, reads:  So they tell the world that

6    monkey EPO is 165, and if you want to make human EPO it's

7    166.  The evidence will show, therefore, that someone who

8    goes ahead and follows the patent, if they get 165, will

9    think they've done the wrong thing.

10         Do you agree or disagree with that statement?

11         **MS. BEN-AMI:**  Objection; report, your Honor.

12         **THE COURT:**  Where is it in the report?  No, I'm

13   going to sustain that.

14         **MR. DAY:**  Okay.

15   **Q**    How in your opinion, Doctor, would a skilled --

16         **THE COURT:**  We'll take it down.

17   **Q**    How, in your opinion, Doctor, would a skilled worker

18   following Dr. Lin's teaching know whether or not they had

19   obtained human EPO?

20         **MS. BEN-AMI:**  Report, your Honor.

21         **THE COURT:**  Where is it?

22         **MR. DAY:**  Paragraphs 14 to 24.  I'm sorry, 14 --

23         **THE COURT:**  The red?

24         **MR. DAY:**  -- and 24 of the red report, your Honor.

25         **THE COURT:**  Fourteen and 24 of red.

1          No, I'm going to sustain that.  Where does it say,

2     where does he give an opinion as to whether the person would

3     know, the person of ordinary skill.  He talks about what

4     would happen.

5          **MR. DAY:**  Twenty-eight, your Honor.

6          **THE COURT:**  Twenty-eight.  Thank you.  Oh.  No.  He

7     may testify consistent with the references, especially

8     consistent with the first paragraph of 28.  The first

9     sentence of Paragraph 28.

10          **THE WITNESS:**  I'm sorry, could you repeat the

11     question, please?

12     **Q**    Just so we don't stray, why don't you simply read

13     Paragraph 28, please.

14     A    Sure.  In summary --

15          **MS. BEN-AMI:**  Your Honor, I object to reading the

16     entire paragraph.

17          **MR. DAY:**  Well, then --

18          **THE COURT:**  I am -- yes, I'm not going to have it.

19     He may read the first sentence.

20     **Q**    Let me repeat the question.

21     A    Okay.

22     **Q**    Dr. Lodish, in your opinion, would a skilled worker

23     following Dr. Lin's teaching know whether or not they had

24     obtained human EPO?

25     A    Yes, of course.  By following Lin's --

1        **MS. BEN-AMI:**  Objection; there's no question.

2    A    The answer is yes.

3    Q    What's the basis for your opinion?

4        **THE COURT:**  The answer may stand.  You may tell us.

5    A    Thank you.

6        What Dr. Lin did is put the human EPO DNA into a

7    recombinant mammalian cell and showed that what the cells

8    produce was human EPO and not something else.  And one

9    skilled in the art would have been able to verify that by

10   purifying the EPO that was produced as Dr. Lin describes in

11   his patent, and literally determining the position of the

12   sequence of amino acids in the protein, that is, the amino

13   acids at position 1, 2, and so on, and compare it to the

14   sequence of human EPO as in the patent.  The patent also

15   discloses the sequence of monkey EPO.  They're similar but

16   differ at many amino acid positions.  And one skilled in the

17   art would have --

18       **MS. BEN-AMI:**  Objection, your Honor; report now.

19       **THE COURT:**  Yes.  Yes, we'll stop it there.

20       **MR. DAY:**  We'll stop it there.

21       **THE COURT:**  Very well.

22   Q    Finally, Dr. Lodish, do you have an opinion whether or

23   not the claim term human EPO as used in Dr. Lin's patents is

24   definite?

25   A    Yes, I do have an opinion.

1    Q    And what is your opinion?

2    A    It quite certainly is definite.  One of skill in the art

3    reading the patent would understand very clearly what human

4    EPO is and what is within the fence of the patent defining

5    human EPO and what would be out.

6              **MS. BEN-AMI:**  Objection, your Honor.

7              **MR. DAY:**  Red report, Paragraph 28, your Honor.

8              **THE COURT:**  Twenty-eight.

9              **MR. DAY:**  Twenty-eight.  Overruled.  Had you

10   finished your answer?

11             **THE WITNESS:**  No.

12             **THE COURT:**  You may finish.

13   A    It was as precise as the subject matter allows.  And one

14   skilled in the art would have no difficulty in knowing what

15   was in the definition of human EPO, the fence, as it were,

16   of the patent and what was outside that.

17             **MR. DAY:**  Thank you very much.  No further

18   questions.  I pass the witness.

19             **THE COURT:**  Very well.  We'll take the recess at

20   this time.  A short recess today, 15 minutes.  You've not

21   heard all the evidence.  Please, therefore, keep your minds

22   suspended.  Do not discuss the case either among yourselves

23   nor with anyone else.  We'll stand in recess for 15 minutes.

24   We'll recess.

25             **THE CLERK:**  All rise for the jury.

1        (Whereupon the jury left the courtroom.)

2        **MS. BEN-AMI:**  Your Honor, before the openings could

3    we have a side bar?

4        **THE COURT:**  Oh -- please be seated.  Yes, I think

5    we'll need a side bar.  As a matter of fact, let's do it

6    right now because this will give you more of a run-up.

7        Come to the side bar.

8    SIDEBAR CONFERENCE, AS FOLLOWS:

9        **MS. BEN-AMI:**  Mr. Day?

10       **THE COURT:**  Yes.  Well, I'll go first, but I may be

11   wide of the mark and I don't mean to stir up trouble where

12   there is none.

13       First of all, by -- we'll understand that I'm not

14   going to notify the jury of my ruling on anything even if we

15   get into reverse doctrine of equivalents and I've got a way

16   of stating that blandly.  So my rulings are not going to be

17   mentioned.

18       On the other hand, Amgen has a bench memo in there

19   that says, well, look, you've decided this human EPO

20   business and you can't let them now argue that MERCERA is

21   not human erythropoietin.  I have, implicit in my ruling I

22   have decided what is human erythropoietin.  But, I don't

23   think I'm at a stage to foreclose you of making arguments

24   and I'm not going to.

25       When I come to charge the jury, I'm not going to

1    say anything about reverse doctrine of equivalents for the

2    good and sufficient reason that that's an affirmative

3    defense and we'll see whether we ever get to the jury on

4    that, though theoretically it's possible.

5            Now, these may not be helpful because they're just

6    ruminations.

7            Why did you want to talk about the openings now?

8            **MS. BEN-AMI:**  I wanted to talk about what you were

9    going to charge the jury with first.

10           **THE COURT:**  Oh, I'm going to charge the jury

11   generally on, as to infringement, I'm going to take a step

12   back and make mention of the fact that you people produce a

13   product called MERCEA and you sell it overseas and it's

14   perfectly lawful for you to sell it.  I'm not going to

15   mention any of the overseas adjudication.  It's perfectly

16   lawful for you to do it.  That you want to sell it in the

17   U.S. and you've come to the FDA to ask for it.  They've made

18   a, started this case saying that were you to do that it

19   would infringe, and that really is what brings us here, and

20   we have heard the counterclaims.

21           And I will say, this is a good time to say it, that

22   if it's found that you infringe it will be up to me whether

23   to stop you from doing it, but that has a lot of different

24   considerations and I'll think about it.

25           And then I will focus them on infringement and

1    infringement by the doctrine of equivalents and go claim by

2    claim every element of the claim.  I'll say the fact that

3    you have other things in there, if you have everything

4    that's in the claim it infringes.  Doctrine of equivalents,

5    I'm going to talk about function-way-means, and there we

6    are.

7         MS. BEN-AMI:  How about 271(g) since that is highly

8    relevant to the process claims.

9         THE COURT:  I can't do it that way.

10        MS. BEN-AMI:  Okay.

11        THE COURT:  You forgive me, what is it that you

12   want me to say?

13        MS. BEN-AMI:  You need to say, I believe, your

14   Honor, that for the process claims the issue is not just

15   whether the starting material infringes, because the

16   question is whether the final material is materially

17   changed.

18        THE COURT:  Yes, I will reflect on that.

19        MR. DAY:  That's a disputed question of law.

20        THE COURT:  It may be.  And I said I would reflect

21   on it.  I appreciate her flagging it.  I don't, I don't know

22   that I'll -- you know, this is my precharge.

23        MS. BEN-AMI:  I understand.

24        THE COURT:  And it doesn't necessarily control the

25   reception of evidence.  And I would just as soon not make

```
1    any mistakes.  But you flag it.

2               But let me ask you.

3          MS. BEN-AMI:  Yes.

4          THE COURT:  You're not going through reverse

5    doctrine of equivalents, are you?

6          MS. BEN-AMI:  Well, this is the problem.  I don't

7    believe we literally infringe, but if they find we literally

8    infringe specifically in their minds we can go through

9    reverse doctrine of equivalents, it's all part and parcel so

10   there's no --

11         THE COURT:  No, it's --

12         MS. BEN-AMI:   No, in order to --

13         THE COURT:  If the doctrine is alive, it's got to

14   be markedly, a marked advance or a marked difference.  I'll

15   go back and see what I said in my decision.

16         MS. BEN-AMI:  Well, actually there's case law that

17   says if you own a patent it's prima facie evidence of a

18   reverse doctrine of equivalents, your Honor.

19         THE COURT:  Yes.  Well, I would like -- I would

20   like to have you flag that.  We're not getting into, or at

21   least I'm not mentioning your patents.  We'll see if

22   anything comes out about that.

23              So there's my answer.

24         MR. DAY:  Can we have just a couple of other

25   guideposts on the openings, your Honor.  Because there's
```

1    been some change of graphics and there have been some

2    disputes back and forth.  The graphics -- Amgen intends in

3    its opening to put up two exhibits that we have asked for

4    preadmission, they are admissions by Roche, they're internal

5    Roche documents.

6            THE COURT:  Yes, I read that.  And the way you're

7    throwing things up at me now is helpful.  That's my first

8    work of the day is to go through that.  And I have endorsed

9    it saying on your representations I'm satisfied the

10   documents are authentic.  I'm satisfied that they're

11   admissions.  I'm making no rulings on relevance.  Because on

12   that listing I haven't got a sufficient basis to make a

13   ruling.  They may well not object.  But they're going to

14   object to these two?

15           MR. FLEMING:  Yes, your Honor.

16           THE COURT:  On the ground of relevance?

17           MR. FLEMING:  Yes.

18           THE COURT:  I don't know how I can deal with it

19   unless --

20           MR. DAY:  I can show you the exhibits.

21           THE COURT:  Yes, regretting that I have had this

22   conference, because I would like a break, but let's see

23   them.

24           Yes.  Why isn't that relevant?

25           MR. FLEMING:  Your Honor, it's not relevant to your

1  claim construction and isn't relevant to the claim terms.

2  And your Honor instructed the jury that their analysis is

3  comparing the product to the claim terms.

4          **THE COURT:**  Correct.

5          **MR. FLEMING:**  This doesn't do this.  This is just

6  jargon that doesn't have any relevance to the claim terms,

7  your Honor.

8          **THE COURT:**  No, it's relevant.  They may use it.

9          What's the other one?

10         **MR. DAY:**  This is from the license application to

11 the FDA.

12         **THE COURT:**  They may have it.

13         **MR. FLEMING:**  Your Honor, there is --

14         **THE COURT:**  It's not conclusive.  But they may have

15 it.

16         **MR. FLEMING:**  Your Honor, there's further

17 statements in that that they have chopped that has cropped

18 quotes.

19         **THE COURT:**  I will, I will call -- when he throws

20 it up, I'll make that caution.

21         **MS. BEN-AMI:**  Based on what you have said, your

22 Honor, under the doctrine of equivalents, which Amgen is

23 applying in this case, in the alternative, the patent is

24 also prima facie evidence of the doctrine of equivalents and

25 I do intend to mention the fact --

1          **THE COURT:**  That --

2          **MS. BEN-AMI:**  -- that we have our own patents.

3     It's under the National Presto case, doctrine of

4     equivalents.

5          **MR. FLEMING:**  They have this slide, your Honor.

6          **MS. BEN-AMI:**  The National Presto case, doctrine of

7     equivalents.  I could give you reverse doctrine of

8     equivalents, but doctrine of equivalents is their burden of

9     proof.

10         **THE COURT:**  Yes, I'm going to let them do it but

11    caution everyone that openings aren't evidence of anything.

12         **MR. FLEMING:**  Your Honor, one last thing.

13         **MS. BEN-AMI:**  I am going to the last one.

14         **MR. FLEMING:**  This is one expert report.

15         **THE COURT:**  Are you going to his last thing or your

16    last thing, and then we'll take a recess.

17         **MS. BEN-AMI:**  I'll do his last thing.

18         **THE COURT:**  His last thing.

19         **MR. DAY:**  And so, your Honor, we do object to that.

20         **THE COURT:**  What's this?

21         **MR. FLEMING:**  That is a graphic created by an

22    testifying expert who will testify as to the structure of a

23    molecule.

24         **MR. DAY:**  We have stricken all --

25         **MR. FLEMING:**  The relevance, your Honor --

```
 1              MR. DAY:  Over their objection, we have stricken
 2      all of our demonstrative graphics from experts.
 3              THE COURT:  Well, that doesn't mean they have to.
 4              MR. DAY:  We understand that but --
 5              THE COURT:  I'm going to caution them and in my
 6      charge I will say --
 7              MS. BEN-AMI:  If they aren't going to use graphics
 8      then we won't use graphics.
 9              THE COURT:  All right, that takes care of that.
10              MS. BEN-AMI:  You don't want us --
11              THE COURT:  And that's the last thing.  Thank you.
12      We'll recess.
13              (Whereupon the sidebar conference concluded.)
14              (Recess.)
15              THE CLERK:  All rise for the jury.
16              (Whereupon the jury entered the courtroom.)
17              THE CLERK:  Court is in session, please be seated.
18              THE COURT:  Proceed, Ms. Ben-Ami.
19              MS. BEN-AMI:  Thank you, your Honor.
20                          CROSS-EXAMINATION
21      (BY MS. BEN-AMI:)
22      Q.  Good morning, still, Dr. Lodish.
23      A.  Good morning.
24      Q.  We've met before; right?  You have to answer audibly,
25      sir.
```

1   A.  I'm sorry?

2   **Q.**  You have to answer with words.  You just shook your

3   head.  I said we've met before --

4   A.  I'm sorry, I apologize.  Yes, we have met before at my

5   deposition.

6   **Q.**  It's common for many witnesses to shake their head, and

7   you know that the reporter needs to get it taken down;

8   right?

9   A.  Yes, I'm aware of that.  Thank you.

10  **Q.**  And you know that, you've been an expert several times

11  for Amgen in the past, haven't you?

12  A.  I'm sorry, is that a question?

13  **Q.**  Haven't you?  That's a question.

14  A.  I have testified for Amgen in one previous case, yes.

15  **Q.**  And an arbitration?

16  A.  And in an -- no, I did not testify in the arbitration.

17  No.

18  **Q.**  You were hired as an expert for Amgen?

19  A.  I was an expert for Amgen in the case.  I was deposed in

20  the case.  I assume you're referring to the Aranesp

21  arbitration.

22  **Q.**  Okay.

23  A.  I was deposed but I never testified.

24  **Q.**  Okay.  So you've been working on various cases with

25  Amgen since, or matters for Amgen since the late 1990s?

```
 1    A.  Not continuously, no.  I worked on the arbitration

 2    case --

 3    Q.  I don't want you to list them.

 4    A.  I'm sorry.  No.  Not continuously since the 1990s, no.

 5    Q.  Off and on?

 6    A.  Off and on for many companies, yes.

 7    Q.  And you're being paid today at $800 an hour?

 8    A.  That's correct.

 9    Q.  And you have a grant from Amgen for your research?

10    A.  I have a small research support agreement from Amgen

11    that roughly supports one of my postdoctoral fellows out of

12    30 in my laboratory, or 30 scientists in my laboratory, I

13    should say.

14    Q.  You said previously that about 12 percent of your budget

15    was funded by Amgen; correct?

16    A.  That is incorrect.  It's actually 6 percent of my

17    laboratory budget.  I rechecked that.

18    Q.  So you were wrong in your prior testimony?

19    A.  I was trying to figure out what my lab budget was from

20    my head.

21    Q.  Six to 12?

22    A.  I know the precise figure.  It is 6.3 percent of my

23    total lab budget of $2.3 million comes from Amgen.

24    Q.  Okay.  And that is your only for-profit grant?

25    A.  Currently it is.  I have in the past --
```

1    **Q.**  Thank you, sir.

2    A.  Okay.

3    **Q.**  Just so -- we have to save time.

4         **MS. BEN-AMI:**  Can I have the '933 patent

5    specification, please?

6    **Q.**  Now, this, you know this is the written description that

7    comes from the patents in suit; right?

8    A.  It is in the patent, yes.

9    **Q.**  Okay.  And this description, for the jury, is column 21

10   of the patent that they have in their binder, and it says,

11   "Figure 6 thus serves to identify the primary structural

12   conformation (amino acid sequence) of mature human EPO as

13   including 166 specified amino acid residues," and it goes

14   on; right?  You're aware of that?

15   A.  Of course.

16   **Q.**  And this is defining -- sorry, this is identifying the

17   amino acid sequence of mature human EPO as including 166

18   amino acids; that's what it says, correct?

19   A.  No.

20   **Q.**  It says, "Figure 6 thus serves to identify."  Do you see

21   that?

22   A.  Yes.

23   **Q.**  "The primary structural conformation (amino acid

24   sequence) of mature human EPO as including 166 specified

25   amino acid residues."  That's what it says?

1   A.  Well, we may disagree as to the meaning of the word

2   "primary."  That is, primary can mean, among other things,

3   the primary amino acid sequence that the cells make, which,

4   as I've testified --

5           MS. BEN-AMI:  Move to strike, your Honor.  I didn't

6   ask him this question.

7           THE COURT:  I'm not going to strike, in the

8   exercise of discretion, but you didn't ask him that question

9   and I'll instruct him.

10          You listen to the questions you're asked.

11          THE WITNESS:  Okay.

12          THE COURT:  Answer those questions.  Don't

13  volunteer.

14          THE WITNESS:  Thank you.

15          THE COURT:  If the questions can be answered yes or

16  no, answer them yes or no.  You can always say, I can't

17  answer it yes or no.  Then she gets a chance to frame

18  another question.  And Mr. Day will have another chance to

19  ask you questions.

20          THE WITNESS:  I see.

21          THE COURT:  Naturally, you can testify, I don't

22  remember, or, I don't know.  You may always say that.  Now,

23  this is not advice, this is the Court's order.  So follow

24  the order and we'll go along smoothly.

25          THE WITNESS:  Thank you.

1        **THE COURT:**  But that may stand.  Go ahead,

2    Ms. Ben-Ami.

3    **Q.**  This language here says, "Mature human EPO."  Do you see

4    that?

5    A.  Yes.

6    **Q.**  Figure 6 is identifying the amino acid sequence of

7    mature human EPO.  That's what it says?

8    A.  It says the primary amino acid sequence of mature human

9    EPO.

10   **Q.**  And a mature protein is a protein that is fully

11   processed in terms of its amino acid sequence; correct?

12   A.  Not necessarily.

13   **Q.**  Well, here is a glossary that you provided to the Court

14   in a prior case, which is FYC, if my contacts are working

15   correctly.  And this is a glossary related to EPO; right?

16   And I'd like you to look at page 30.  Page 30, Doctor.

17   A.  Excuse me.

18   **Q.**  Can I help you?

19   A.  No, no.  Actually, I'd appreciate it if you could step

20   back a little bit.  Thank you very much.

21   **Q.**  Oh, sure.

22   A.  Uhm, Paragraph 30.

23   **Q.**  Yes -- no, page 30.

24   A.  I'm sorry.

25   **Q.**  Where it says, "Mature protein."

1    A.   Right.  And that is --

2    Q.   I didn't ask you a question, Doctor.

3    A.   I'm sorry.

4    Q.   There you gave a glossary to the Court that says,

5    "Mature protein:  A protein that is fully processed in terms

6    of its amino acid sequence."  Correct?

7    A.   You've read it correctly, yes.

8    Q.   That is what you told the Court mature protein means;

9    correct?

10   A.   Correct.

11   Q.   And in the language of the patent, it says, "Mature

12   human EPO", right, as including 166 amino acids; right?

13   A.   It says it's the primary structural conformation, that

14   is the initial primary --

15   Q.   Doctor, it doesn't say "initial," it says, "Primary

16   structural conformation, paren, amino acid sequence."

17   That's what it says.

18   A.   I --

19   Q.   That's what it says, Doctor?

20   A.   I see what it says.  We disagree as to the meaning of

21   the word "primary."  And there are --

22   Q.   No, sir.

23        THE COURT:  Listen to my instruction.  If you

24   disagree as to the meaning of the word and leave it there,

25   she'll ask questions.

1          **THE WITNESS:**  I'm sorry.

2    **Q.**  So if we take your definition of primary protein, and we

3    insert the word "EPO" for protein, you say mature protein,

4    colon, a protein that is fully processed in terms of its

5    amino acid sequence.  And now that if protein is now EPO,

6    it's an EPO that is fully processed in terms of its amino

7    acid sequence.  That's your definition in your glossary;

8    correct?

9    A.  It is the correct definition of "mature protein."

10   **Q.**  In your glossary?

11   A.  The definition in the --

12   **Q.**  Doctor, in your glossary?

13   A.  In the glossary, that is the correct definition.

14   **Q.**  Now, can we look at the Court's -- the glossary, please.

15          Let's break this down.  The amino acid sequence of

16   EPO isolated from human urine was not known by

17   November 1984; correct?

18   A.  That is correct.  The complete sequence was not known;

19   part of it was known.

20   **Q.**  So the amino acid sequence of EPO isolated from human

21   urine was not known in 1984; right?

22   A.  The complete sequence was not known, that's correct.

23   **Q.**  So you're a person in November of 1984, I'd like you to

24   assume that; right?  And that person, when they want to say

25   what is the amino acid sequence of EPO isolated from human

1    urine, there's no description of that, is there?

2    A.   As I testified, the technology did not allow that

3    complete a description.  The technology was developed

4    only --

5    Q.   Doctor, I asked you a very simple question.  And I would

6    ask you to answer it, please.

7    A.   Could you repeat the question?

8    Q.   In November 1984 --

9    A.   Yes.

10   Q.   -- a person would not be able to determine, based on the

11   prior art and the disclosure of Dr. Lin, what the amino acid

12   sequence of EPO isolated from human urine was; correct?

13   A.   That is correct, yes.

14   Q.   Thank you, Doctor.  Now, in November 1984, reading the

15   disclosure, the words of the Lin patent, the description in

16   Figure 6 says 166 amino acids; correct?

17   A.   The description which you just had on the board said it

18   was the primary amino acid sequence of the mature protein,

19   which is 166, yes.

20   Q.   The fully -- okay.

21        And the patent doesn't teach you, doesn't say, And

22   then one might be clipped off; correct?  There's no words in

23   the patent that say one might be clipped off?

24   A.   That is correct.  There was --

25   Q.   Yes or --

1    A.   No, you're correct, I said.

2    **Q.**   And if one is clipped off from 166 to 165, that's a

3    fragment of 166, isn't it?

4    A.   It's a -- I would not call it a fragment, no.

5    **Q.**   Well, it is a part of 166?

6    A.   It is the major part of 166.   It is a functional human

7    EPO.

8    **Q.**   Okay.

9         **MS. BEN-AMI:**   Move to strike the last part of the

10   answer.   It wasn't in response to my question.

11        **THE COURT:**   Motion to strike is denied, that may

12   stand, in the exercise of my discretion.   But have my

13   instructions in mind.

14        **THE WITNESS:**   I do.   Thank you, your Honor.

15   **Q.**   165 is only a part of 166; correct?

16   A.   I'm not sure I understand what you mean by "part."

17   **Q.**   Okay.

18   A.   It is the largest -- we don't usually think of a process

19   protein as a part of another protein, no.   I don't like that

20   language.

21   **Q.**   Okay.   Let's look at Figure 6 at the end.

22   A.   I'm sorry?

23   **Q.**   We're going to put something up on the board or on the

24   screen for you.

25   A.   Thank you.

1           **MS. BEN-AMI:**  Can I have Figure 6?

2   **Q.**  The product that is made in the cell, in your opinion,

3   is 166 before it becomes 165; correct?

4   A.   That is what I testified, yes.

5   **Q.**  So you have this string of beads, in whatever folding

6   they're in, and it's 166, and then one is chopped off, in

7   your opinion?

8   A.   In my opinion and, in fact, in some cells --

9           **MS. BEN-AMI:**  Your Honor, please.

10          **THE COURT:**  No, no.  Now, look.  Now, look.

11          **THE WITNESS:**  I apologize.

12          **THE COURT:**  Well, that's not good enough.

13          **THE WITNESS:**  Okay.

14          **THE COURT:**  This is obvious.  She asked you your

15  opinion, and you gave it.  You said, In my opinion.  That's

16  an answer to the question.  And then in disregard of my

17  order, you went ahead and said, In fact, and started to

18  volunteer data that would support an argument.

19          It's all stricken.  The jury's instructed to

20  disregard it.  And the conduct's inappropriate.

21          **THE WITNESS:**  I'm sorry.

22          **THE COURT:**  Now, on matters that are confusing, I

23  have to bend a little bit and I do.  But once I've made

24  orders, I'm not a potted plant, my job is to control the

25  trial.  Now, my orders must be carried out.  Do you

1    understand?

2              **THE WITNESS:**  I do.  Thank you.

3              **THE COURT:**  Very well.  The opinion may stand, the

4    rest is stricken.

5    **Q.**  So 165 is a part, a fragment of 166, isn't it?

6    A.  I would not call it a fragment, no.

7    **Q.**  How about 164; is that a fragment, if you have one to

8    164?

9    A.  I'm uncomfortable with the term "fragment" as you use

10   it.  No.

11   **Q.**  So you agree that 165 is not the total sequence,

12   correct, disclosed in Figure 6; right?

13   A.  I'm sorry, I -- I'm confused by your question.  Forgive

14   me.  What do you mean by the total sequence --

15   **Q.**  The total amino acid sequence that is shown in Figure 6

16   is 166 amino acids, Doctor; right?

17   A.  The patent discloses 166, correct.

18   **Q.**  And so the product that you're talking about is less

19   than the full protein that is disclosed in Figure 6;

20   correct?

21   A.  It has 165, yes.

22   **Q.**  So it is less than it; right?

23   A.  It is less than the 166.  I'm comfortable with that.

24   **Q.**  Thank you.  Now, the protein that you're talking about,

25   166, let's talk about 166 for a minute.  That protein has

1    never actually been given to people; right?

2    A.   I don't know.

3    **Q.**   As far as you know?

4    A.   As far as I know, it has not been given to people.

5    **Q.**   So we don't know whether in a person it works the same

6    or differently than 165 because it's never been tested?

7    A.   It's been tested in -- okay.

8    **Q.**   In humans --

9    A.   In humans, it has not been tested, correct, as far as I

10   know.

11   **Q.**   Thank you.  Now, there are instances where you can do an

12   experiment and because you don't do the conditions correctly

13   or you make a mistake, the cell may produce a fragment;

14   correct?

15   A.   I am unaware of any fragments of EPO being produced by

16   recombinant cells.

17   **Q.**   I didn't ask you that question either, Doctor.  I asked

18   you whether there are instances where people don't follow

19   experiments exactly.  How's that?

20   A.   Okay.  Perhaps, yes.

21   **Q.**   And there are instances where people don't have

22   available the exact nutrient conditions that someone used,

23   so they substitute them; right?

24   A.   It could happen, yes.

25   **Q.**   They might, because of -- years later, they might have

1    to use certain different ingredients; right?

2    A.  Perhaps, yes.

3    **Q.**  So, and the EPO that you've seen that was sequenced to

4    be 165, that was Amgen's GMP EPO; right?

5    A.  I've seen sequences of many EPO's at 165.  I'm not aware

6    which, if any, were actually Amgen's GMP, the result of

7    Amgen's GMP.  Many people have recorded the sequence of EPO.

8    **Q.**  Doctor --

9    A.  Okay.

10   **Q.**  And 165 was first reported by Genetics Institute; right?

11   A.  I'm not sure who first reported it.  It was reported by

12   many groups.

13   **Q.**  Well, it was first reported in the Recny paper by

14   Genetics Institute?

15   A.  I don't have in my mind the chronology.  It was

16   certainly reported by many groups.

17   **Q.**  Now, you said that people in 1984 could not sequence the

18   end of the protein, the C-terminal.  Is that what you said?

19   A.  I used the word accurately sequenced.

20   **Q.**  Well, I have a group of books here from the time

21   frame -- you know the biochemistry book, Lehninger?

22   A.  I'm certainly aware of it, yes.

23   **Q.**  And you know the book Morrison and Boyd; right?

24   A.  I'm not aware of that book, but I take it --

25   **Q.**  You're not aware of Morrison and Boyd as the standard

1    organic chemistry book in the '80s?

2    A.  Uhm, actually no.

3    Q.  We'll just stick with those two.

4         And they teach how to sequence the carboxy terminus

5    of a protein; correct?

6    A.  I don't know.  I haven't --

7    Q.  Well, you testified that you couldn't do it in 1984.

8    Did you look at the textbooks?

9    A.  I'm aware of the literature of the difficulty of

10   sequencing the carboxyl terminus.

11   Q.  I asked you -- again, Doctor --

12   A.  I did not look at textbooks.

13        MS. BEN-AMI:  Objection, your Honor.

14   A.  I did not look at textbooks.

15        THE COURT:  Wait a minute, she's objected.  My

16   turn.  What you've testified to may stand.  Now listen to

17   her question and do not volunteer.

18        MS. BEN-AMI:  Can we go back to the definition of

19   human EPO, please?

20   Q.  You see it says a, "Protein having the amino acid

21   sequence of human EPO"?

22   A.  Correct.

23   Q.  Does that include an amino acid sequence of 164 amino

24   acids?

25   A.  No.

1    **Q.**   So does it include 167?

2    A.   No.

3    **Q.**   Does it include any changes to the amino acid sequence

4    beyond what's in Figure 6?

5    A.   The -- in figure -- I can't answer it yes or no.  Can I

6    explain?

7    **Q.**   Does it include changes to the amino acids of Figure 6?

8    A.   It encompasses allelic variation, as spelled out in the

9    specification.

10   **Q.**   In your opinion?

11   A.   That's in the specification.

12   **Q.**   And do allelic variations occur over time?  That's a

13   mutation in the gene?

14   A.   They occur over time during evolution of humans.

15   **Q.**   So the allelic variations that might have been

16   discovered by 1984, there could be more than that discovered

17   after 1984?

18   A.   I'm unaware of any allelic variations.

19   **Q.**   You're not aware of any?

20   A.   No.

21   **Q.**   But the patent says that it's covering them?

22   A.   That is correct.

23   **Q.**   You are not an expert in the field of protein

24   sequencing; correct?

25   A.   I've done many protein sequences in my laboratory, and

1    also with my own hands.

2         MS. BEN-AMI:  Can I have the deposition, please?

3    Q.  You know that in your deposition, you testified, "I am

4    not an expert in amino acid sequencing"; right?

5         MR. DAY:  Objection, your Honor.  Can we have a

6    citation and copy of the deposition that's going to be used?

7         MS. BEN-AMI:  First, I'm just asking him if he

8    knows, your Honor.  If he knows.  Then I don't have to spend

9    the time.

10        THE COURT:  No, but you made some reference about

11   his being an expert.  Now, that's what alerts me.  Why don't

12   you put your question again.

13   Q.  You understand that previously you testified that you

14   are not an expert in amino acid sequencing per se; correct?

15        MR. DAY:  Object, your Honor.

16        THE COURT:  No, no, I do want that reference.

17        MS. FISHMAN:  What page and line, please?

18        MS. BEN-AMI:  I have to get over here to go back

19   there.  Thank you.

20        We're on page 147.

21   Q.  All right.  Ready?  Dr. Lodish, page 147, you were asked

22   the question:

23        "What technology was later developed to determine

24   whether the C-terminal was removed?

25        "ANSWER:  It was very high-quality carboxy

1    peptidases.  It was, and I still believe is, an enzymatic

2    reaction where you subject the protein --"

3            You go on, and you say, "And I believe it required

4    sensitive devices --"

5            And then you say, "I'm not an expert in this

6    field."

7            "QUESTION:  In amino acid sequencing?

8            "ANSWER:  I am not an expert in amino acid

9    sequencing, per se, correct."

10           **THE COURT:**  Now, reading from the deposition,

11   that's evidence, compare it with his testimony.

12   **Q.**  Do you see that?

13   **A.**  Yes.

14   **Q.**  Did you give that testimony under oath?

15   **A.**  I did.

16   **Q.**  That was in July of this year?

17   **A.**  Yes.  Excuse me.

18   **Q.**  Now, you know there came a point in time when Amgen went

19   ahead and sequenced its commercial preparation of EPO;

20   correct?

21   **A.**  I'm not aware of those specifics, to be honest.

22   **Q.**  Well, you know that Amgen told the FDA prior to getting

23   approval that its protein was 165 amino acids?

24   **A.**  I'm sorry, I am unaware of any submissions Amgen made to

25   the FDA.

1          **THE COURT:**  And there's an example, it's the

2     testimony that's the evidence, not what the questions may

3     suggest.

4     **Q.**  Are you aware whether Amgen knew that its protein was

5     165 amino acids before the patents in suit were issued?

6     A.  I have no knowledge of that.  I don't know.

7     **Q.**  You don't know whether or not Amgen knew that its

8     product was 165 amino acids before the mid-1990s?

9     A.  I'm unaware of the date in which Amgen knew.  I simply

10    don't know.

11    **Q.**  You aren't aware?

12    A.  I am not aware.

13    **Q.**  So as far as you know, at the time Amgen -- strike that.

14          At any time, did Amgen seek to amend its patent

15    applications to say that the mature amino acid sequence was

16    165 amino acids?

17    A.  I don't know.

18          **MR. DAY:**  Objection.  Foundation.

19          **THE COURT:**  Overruled.  His answer may stand.

20    **Q.**  You do agree that in this definition of human EPO it

21    includes looking at the amino acid sequence; correct?

22    A.  Yes.

23    **Q.**  And you do agree that there is no disclosure in the

24    patent that the 166 of Figure 6 is clipped to 165; correct?

25    A.  That is correct, yes.

1          MS. BEN-AMI:  Thank you.  No further questions.

2          THE COURT:  Anything further?

3          MR. DAY:  Just very briefly, your Honor.

4                    REDIRECT EXAMINATION

5  (BY MR. DAY:)

6  Q.  Ms. Ben-Ami asked you some questions about whether a 166

7  amino acid sequence EPO had ever been given to humans; do

8  you recall?

9  A.  She did.

10  Q.  What, if anything, is known about the biological

11  activity of a 166 amino acid human EPO?

12          MS. BEN-AMI:  Objection, your Honor.  Beyond the

13  scope.

14          THE COURT:  Sustained, it is.

15  Q.  Doctor, what experience do you personally have with

16  sequencing proteins?

17  A.  As I may have mentioned, I've done it myself many times

18  with my own hands.

19          MS. BEN-AMI:  Report, your Honor.

20          THE COURT:  No.

21          THE WITNESS:  I'm sorry, what's --

22          THE COURT:  Wait a second, this calls for me to

23  act.

24          No, overruled.  He may tell us his experience.

25          What experience do you personally have with

 1    sequencing proteins?  We're not asking for the substance.

 2              **THE WITNESS:**  No.

 3              **THE COURT:**  We're just asking for your experience.

 4    What is your experience?

 5    **(BY MR. DAY:)**

 6    **Q.**  And over what time period, sir?

 7    A.  It started when I was a postdoctoral fellow in 1976,

 8    when I first sequenced some, as it were, bacterial proteins.

 9    Over the years my laboratory has relied extensively on --

10              **MS. BEN-AMI:**  Objection, your Honor.

11              **THE COURT:**  No, sustained.  We are not interested

12    in the laboratory.  Any other experience that you've had?

13              **THE WITNESS:**  Continuously -- well, in the mid-'70s

14    to early '80s, I personally was sequencing proteins.

15              **MR. DAY:**  Thank you.

16              No further questions, your Honor.

17              **THE COURT:**  Nothing further?

18              **MS. BEN-AMI:**  Nothing further.

19              **THE COURT:**  You may step down.

20              (Whereupon the witness stepped down.)

21              **THE COURT:**  Subject to my ruling on outstanding

22    motions on the first phase of the case, Amgen rests,

23    correct?

24              **MR. DAY:**  Yes.  May we have a sidebar before we

25    formally rest?

1          **THE COURT:**  You may.

2    SIDEBAR CONFERENCE, AS FOLLOWS:

3          **MR. DAY:**  Thank you, your Honor.

4          Amgen renews its motion for judgment as a matter of

5    law we filed in motion this morning while we were in trial.

6          **THE COURT:**  The motion is denied without hearing,

7    and without prejudice to its reconsideration at the close of

8    all the evidence.  I'm going to carefully review it.  If

9    there's something in that motion that would cause me to have

10   an oral hearing, I'll give you notice and I'll identify the

11   specifics that interest me.

12         **MS. BEN-AMI:**  I have to make a motion also, your

13   Honor.

14         **THE COURT:**  You may.

15         **MS. BEN-AMI:**  Your Honor, I'd like to make a motion

16   for directed verdict on these issues to the extent that

17   Amgen has the burden of proof on these issues, including the

18   nexus of secondary considerations to the claims in suit.

19         **THE COURT:**  Right.

20         **MS. BEN-AMI:**  And in terms of Amgen's burden to

21   prove that the source limitation has, in parts, structure --

22         **THE COURT:**  I understand.

23         **MS. BEN-AMI:**  You don't want me to list them all?

24         **THE COURT:**  There's no requirement to list them

25   all.  It's denied without prejudice under the same

```
 1    circumstances.  Should you file a written memorandum, I'll

 2    give it the same treatment.  If anything sparks my interest,

 3    I will tell you what, and we'll have an oral hearing.

 4         MS. BEN-AMI:  Can I ask a question about the

 5    openings, your Honor?

 6         THE COURT:  Yes.

 7         MS. BEN-AMI:  I am not opening on the '422, just to

 8    let Mr. Day know.

 9         THE COURT:  And who is?

10         MS. BEN-AMI:  No, no.  Under '422, is the one

11    you've already decided.  I'm going to open, but not on '422.

12    So that's not an issue.  I wanted to know whether I can

13    split my opening in terms of part now and part when I do my

14    case?

15         THE COURT:  No.

16         MS. BEN-AMI:  I didn't think so, but someone

17    suggested it.

18         THE COURT:  So are you going to open?

19         MS. BEN-AMI:  I am going to open, your Honor.

20         (Whereupon the sidebar conference concluded.)

21         THE COURT:  Court's in session.

22         The first phase of the case in now concluded.

23    We're not yet asking you any questions about that phase, and

24    you have to keep your minds suspended, and you have to keep

25    that in mind.
```

1              We're now turning to the second phase of the case,

2    the infringement phase.  The second phase of the case, the

3    shoe is on the other foot; the burden of proof rests on

4    Amgen.  Amgen claims that Roche's product infringes the

5    claims of Amgen's patent, having made a charge which Roche

6    denies.  Having made that charge, Amgen, Amgen now, has to

7    prove it.  Amgen.

8              The burden of proof, however, in this second phase

9    of the case is different.  You recall that in the first

10   phase of the case, because Amgen does have the patents,

11   which Roche is saying are invalid in whole or in part, Roche

12   had the burden of proof, and it was proof by clear and

13   convincing evidence.  Roche put on its proof, Amgen put on

14   its proof, and they've both rested.

15             This is the second phase of the case.  Amgen is

16   saying -- and the comparison is different.  In the first

17   phase of the case, we looked at the claims, always the

18   claims.  We looked at the claims of the Amgen patents, and

19   we made a comparison to what was known, or being done, or

20   published prior to the patent applications by Amgen being

21   filed.  This phase of the case we look at the claims of

22   Amgen's patent.  Same claims.  We're going to hear the same

23   claims, we're going to look at the same glossary, the

24   interpretation of -- that I have put on them, which is law

25   in this case, and we're going to compare those claims to

1    what Roche is doing.

2         Haven't heard any evidence about that in the first

3    phase.  Now, in this phase, we're going to hear about it,

4    what Roche is doing.  Amgen says that what Roche is doing

5    will infringe their patents.  Roche says, We don't infringe.

6         The burden of proof is on Amgen.  But in this phase

7    of the case, it's a different burden of proof.  It's proof

8    by a fair preponderance of the evidence.  And what that

9    means, on those things which I'm going to tell you that

10   Amgen has to prove, Amgen has to show you that those things

11   are more likely to be true than not true.  More likely to be

12   the case than something else.  If something else is more

13   likely true, Amgen hasn't proved it.

14        If, on all the evidence, that you believe that

15   evidence tends equally but to two equal, but opposite

16   conclusions, Amgen hasn't proved it.  But so long as on all

17   the evidence, you believe that evidence tends more likely

18   than not to establish the proposition that Amgen has to

19   establish, and you come to believe that unanimously, then

20   Amgen has proved that point by a fair preponderance of the

21   evidence.  This is not who puts on the most evidence, this

22   is what persuades you.

23        This is a good time in the case to step back and

24   think just a little bit about this case.  Because the

25   case -- what I'm going to say now will touch on facts, but I

1    don't think these facts are disputed at all.

2           Roche has a product.  It's called Mircera.  Roche

3    is producing that product overseas, in Europe.  Selling the

4    product in Europe, perfectly lawfully, and we're not

5    concerned about that.  That's under the patent laws of the

6    European Union, I think, but I don't know and we don't care.

7           Roche would like to sell that product in the United

8    States of America.  And they have made application just like

9    they're supposed to, application, because it's a medical

10   product, to the Federal Drug Administration saying, Let us

11   sell our product in the United States.

12          The Federal Drug Administration, as we're sitting

13   here on this case, they're doing their thing, which they're

14   supposed to do, and we're not concerned with that.  Whether

15   that is approved or disapproved, makes no difference to this

16   case.

17          Amgen, of course, knows that Roche wants to bring

18   its competing product into the United States, and made

19   application to the FDA.  And, so Amgen, believing that the

20   competing product infringes, starts this cause of action.

21   And having -- and says, Your product infringes.

22          And in every case, you ask for the Court to do

23   something for you.  Well, in this case, no one's asking for

24   money, because Roche -- no one's saying we've been damaged

25   by what Roche did.  What they're asking for is what we call

1    an injunction.  They're asking for a court order, which I --

2    they're asking me to say to Roche, Stop, whatever the FDA

3    does, you can't sell your product in the United States.

4            But before they get that, they'd have to show that

5    the product, Mircera, compared to their claims, infringes.

6    Well, Roche, when the lawsuit starts, they don't sit still,

7    they come right back and say, Well, we don't infringe.  And

8    what's more, these claims are invalid.  And there's our

9    case.

10           So I've tried now, I've put before you the

11   alleged -- Amgen, of course, says of course they're valid.

12   I've put before you the alleged invalidity case.  And now

13   we're turning to infringement.  And you're entitled to know

14   what will happen or may happen when all the dust settles.

15   Because we're going to ask you about both, even though,

16   depending upon how you come out, maybe I don't need the

17   answers to both.

18           And I'm going to tell you, frankly, why I'm trying

19   the case this way.  We don't want to do it again.  No one

20   can second-guess what you, a jury of the American people,

21   do.  There are courts higher than me, properly so, where

22   three judges sit together and they can reverse me if I make

23   a mistake as to the law.  And I've said right and clearly on

24   the record, it's tricky and I -- you've got to follow me,

25   I'm the one who explains the law in this courtroom, and I do

1    it with all the confidence I can muster, but with a due

2    humility that maybe I'm not entirely right.  And if I'm

3    wrong on anything, we want answers to everything.

4            So we're going to ask you about invalidity.  We're

5    going to ask you about infringement.  Now we get to

6    infringement.  But you're also entitled to know what happens

7    if Amgen, in essence, wins across the board, the patents are

8    valid, the patents are infringed, or claims are.  Then,

9    under the law, we don't ask the jury any more.  But I have

10   something more to do.  It's not a foregone conclusion that I

11   will stop Roche from doing what it wants to do.  I have to

12   think about whether I will grant an injunction.  I can then.

13   I can say, Roche, even if the FDA lets you come into the

14   United States, the order of this Court is that it's

15   infringed and you may not.  And they'll have to obey that.

16           One of the things I have to consider is, is that in

17   the public interest.  Now, I express no opinion on that, nor

18   can I, we're not there yet.  But you need -- I think, in

19   fairness, you ought to know what's really going on, what's

20   really happening.  And for the reason that those matters, if

21   we get that far, are all going to be tried to me, under the

22   law that has to be tried to me, I will wrestle with, Gee,

23   you know, is one product better than the other?  What are

24   the costs of these products?  What was good for the consumer

25   in the United States?  How much does it take to research and

1    develop these products?

2           All of that we may get to in this case.  But it's

3    going to be after October 18th, and you're not going to be

4    asked about it.  I tell you all that just to be fair.  You

5    ought not be deciding things in the dark.  That's what the

6    dispute, in part, is about.

7           And we'll get now to what your function is.  I've

8    told you about the claims of invalidity.  Now I'm going to

9    tell you about the claims of infringement.  What -- there

10   are two types of infringement:  What we call literal, or

11   direct infringement; and what we call infringement by the

12   doctrine of equivalents, which is a big name, but I will

13   explain it.

14          Let's talk about literal infringement first.  Many

15   times during the course of the trial we've thrown up a

16   specific claim term, a claim term that's in suit.  And I've

17   told you there are different types of claim terms.  There

18   are product terms, there are process terms, there are

19   product-by-process terms.  And I may have to tell you more

20   about that.  But for now, you've looked at those products

21   and you have seen that it says Amgen claims, and I'll say

22   six, and then it describes something.  And everything that

23   it describes we call an element of that claim, or we call a

24   limitation on that claim.

25          For Amgen to win, and you go claim by claim for

1    literal infringement, you would have to find that by a fair

2    preponderance of the evidence the Roche product includes

3    each and every one of those elements.  Now, I'm holding up

4    my hand with five, just as an example.  Let's say a claim

5    has five different elements.  That means that the Roche

6    product has to have present those same five elements.

7          Now, it may be that the Roche product has a lot

8    more, has other elements, or accomplishes a different end in

9    a different way.  But if it has those elements, it

10   infringes.  All right.  But let's say that it has four of

11   them, and nothing else, but it's missing just one of those

12   elements.  One is missing, there can be no literal

13   infringement then.  All right.

14         And we can anticipate already some of the things

15   you're going to hear.  By giving you this example, I don't

16   mean to call it out, but we're talking, Why are we getting

17   evidence about whether it's 165 or 166?  And why did I jump

18   in and say, Well, look at my definition, that is the

19   definition?  Or why have we had evidence in the first part

20   of the case about whether the Amgen claim describes about

21   reticulocyte levels and the like?  Because those are

22   specific elements.  Those are the things you're going to

23   compare to the Roche product.

24         If the Roche product has all of them, it infringes,

25   whether there are others or not.  If the Roche product is

1   missing even one of them, it doesn't infringe.  That's

2   literal infringement.  And we will ask you literal

3   infringement.

4          But we will also ask you about infringement by the

5   doctrine of equivalents.  Now, what does that mean?  The law

6   prohibits someone who is doing something -- let me start

7   another way.  The law protects -- I'll start it that way --

8   the law protects the patent holder against those who

9   infringe, and also protects the patent holder from those who

10  come so close to infringing in their own product, that the

11  change is with complete insignificance or insubstantiality.

12  But right away there's a tension, and the tension is this:

13  The law says that in return for giving you, Amgen, that

14  power to exclude others, you must teach the public how to do

15  it.  And we heard about that.

16         Now, if they've done that, and if the patent is

17  valid, that encourages a design-around, it encourages

18  improvements, it encourages the advance of science.  That's

19  the whole theory behind the patent law.  So it is perfectly

20  acceptable, indeed it is a goal of the patent law, to

21  encourage others to make a better product, so long as it

22  doesn't infringe.  Which means you can look at a patented

23  product, you can say, Here's this patented product, but we

24  can use this different process, if it's a process, a

25  different process that doesn't infringe to accomplish a

1     similar goal.  Not only is that lawful, that's encouraged.

2          So when I begin talking about equivalents, which go

3     beyond the patent claims, the law poses very strict limits

4     on such equivalents.  And here they are:  In order for there

5     to be infringement by the doctrine of equivalents, Amgen has

6     to prove, because by definition, not each of the claims is

7     present then in the Roche product, it's got to prove that

8     the equivalent accomplishes the, substantially the same goal

9     in substantially the same way, using the same means,

10    substantially the same means.  I was wrong when I said

11    "goal," it should be "function."  It accomplishes

12    substantially the same function, in substantially the same

13    way, using substantially the same means.

14         And when we ask you, we're going to be asking you

15    as to these claims, are they infringed by the doctrine of --

16    strike that -- are they infringed, literally, yes, no.  If

17    your answer's yes, you won't have to answer doctrine of

18    equivalents.  If your answer's no, you go on and say, Well,

19    if they're not literally infringed, are they infringed by

20    the doctrine of equivalents?  Yes, no.  That's how the jury

21    verdict slip will look.

22         Now, with that charge, and recognizing who bears

23    the burden of proof here, we're ready to hear the opening

24    statements in this phase of the case.  Amgen goes first,

25    so --

```
 1            MS. BEN-AMI:  Your Honor, I need to make a motion.

 2            THE COURT:  Yes, I'll hear you.

 3    SIDEBAR CONFERENCE, AS FOLLOWS:

 4            THE COURT:  What is it you want me to say?

 5            MS. BEN-AMI:  Well, first of all, doctrine of

 6    equivalents, you have to show that the element is

 7    equivalent, not don't look at the claimed product.

 8            THE COURT:  I'll make that correction.

 9            MS. BEN-AMI:  That's Number 1.  Number 2, we

10    believe that there is no doctrine of equivalents under

11    Festo.  That's a formal objection.

12            THE COURT:  Of course, understand.

13            MS. BEN-AMI:  Number 3, I do believe, your Honor,

14    that you -- there needs to be a charge that what Roche does

15    in Europe is not the issue here.  It's what Roche brings

16    into the United States.

17            THE COURT:  I will say that.  I thought I did.

18            MS. BEN-AMI:  271(g).

19            THE COURT:  I will say that.

20            MS. BEN-AMI:  It doesn't matter if we make EPO in

21    Europe.

22            THE COURT:  I understand that.  This is, again,

23    you've got a jury trial on a declaratory judgment case.  So

24    we're going to compare the claims to what, in fact, you do.

25    You may be doing them in Europe, but --
```

1          **MS. BEN-AMI:**  Oh, no, that's not my point.

2          **THE COURT:**  Yes, I said what you do in Europe is

3    lawful in Europe.  So I don't want you to think that.  The

4    question is, if you do it in the United States, the question

5    is, does it infringe.  Now, I've said that.  What else do

6    you want me to say?

7          **MS. BEN-AMI:**  They have process claims, your Honor,

8    and they're alleging that the process of making the EPO is

9    infringed.  Under 271(g), there's no infringement unless --

10         **THE COURT:**  Show me where in your proposed charge

11   on this phase of the case that you want me to say that.  I'm

12   going to charge them again.  I think this is adequate.

13         **MS. BEN-AMI:**  I'm happy to go over it tonight and

14   see if I -- I don't think it matters for the opening.

15         **THE COURT:**  I don't think it does either, but I'll

16   make those corrections.

17         (Whereupon the sidebar conference concluded.)

18         **THE COURT:**  The lawyers -- I'm going to ask you to

19   step back so I can see the jury.

20         The lawyers, quite properly, want me to get the law

21   straight going in.  And that I must be deferential to them.

22   I've told you they are teachers not only of the evidence,

23   but they're teachers to me as to the law.  There's two

24   things, if I haven't made it clear, I want to make clear.

25         First of all, what Roche is doing in Europe is not

```
 1    at issue in this case directly.  I've told you, it's lawful

 2    what they do in Europe.  Don't think they're somehow

 3    violating the laws of the European Union.  No one suggests

 4    they are, and everything I've heard, it's lawful there.

 5    We've got to assume that what they're doing in Europe, they

 6    do in the United States under the United States patent laws.

 7    So we're going to probably hear evidence, Now, in your

 8    manufacturing facility in Germany or wherever, you're doing

 9    this, and you do exactly this.

10          There's no suggestion that what they do over there

11    is wrong, but you've got to assume, if they were to do it

12    here, or in the case of a product patent, they were to bring

13    that product in here, would that infringe?  That's what

14    we're talking about.  So we need to get the evidence.

15          Also, when I talked about doctrine of equivalents,

16    just like literal equivalents, it's the element of the

17    claim.  Each element of the claim is tested, as I explained,

18    under doctrine of equivalents.  It's not just the whole

19    claim is tested, it's each element is tested to see if there

20    is an equivalent, as I've explained it to you.

21          Now, Mr. Day, you may -- oh, and another thing we

22    talked about at the sidebar.  They're going to throw up

23    stuff.  They're going to throw up demonstrative aids.

24    They're going to say to you in their opening, Now, this is

25    going to be evidence.
```

1          Now, maybe it will, and maybe it's not.  Perfectly

2     appropriate for them to do it.  But the fact they throw it

3     up in their opening doesn't mean it's evidence.  It's

4     evidence when I tell you it has a number and you get to look

5     at it.  And after all, you're the judges of the evidence,

6     whether you believe it or disbelieve it.

7          Now, Mr. Day, and thank you.

8          **MR. DAY:**  Thank you very much, your Honor.

9          I want you to imagine that someone invents a key, a

10    key that fits a very special lock.  You put this key in that

11    lock and turn the key, and you get a miraculous effect.  Now

12    imagine someone else comes along and they attach a plastic

13    key chain to the key.  The key chain doesn't turn the lock,

14    the key chain doesn't cause the miraculous effect, but that

15    person says, Because I attach this key chain to this lock, I

16    get to use the key without the owner's permission.

17         This is a very important day for Amgen.  Roche

18    wants to use and sell Dr. Lin's patented inventions without

19    Amgen's permission.  And they say they can do so because

20    they attach a polyethylene glycol polymer to Dr. Lin's

21    patented EPO product.  Today, Amgen gets to tell you why

22    that's wrong.

23         I want to start by discussing with you what Roche

24    is doing.  In Germany, Roche is using Dr. Lin's patented EPO

25    production process to produce Dr. Lin's patented recombinant

1    human erythropoietin.  Roche then attaches to that patented

2    product a molecule called polyethylene glycol, or peg, for

3    short.  And they call the combination peg-EPO, or now they

4    call it Mircera.  And Roche wants to import that product and

5    sell it into the United States.

6         Now, Roche uses the very same patented cells that

7    contain the very same EPO DNA isolated by Dr. Lin in the

8    very same EPO production processes to make the patented EPO

9    product that Dr. Lin invented.  And they want to ask you to

10   let them infringe Amgen's patents so they can import this

11   product into the United States.

12        Now, there's one thing wrong with that.  The

13   product they import contains Dr. Lin's patented EPO product.

14   And the only reason this combination has any therapeutic

15   effect is because it contains Dr. Lin's patented EPO

16   product.  Without that patented EPO product, peg doesn't

17   have the therapeutic effect.

18        Amgen will show that peg-EPO, and the processes

19   that Roche uses in Germany to make its recombinant human EPO

20   that it uses to produce peg-EPO, infringe each asserted

21   claim of Dr. Lin's patents.  Now, as you've seen, Dr. Lin's

22   asserted patents include EPO product claims, EPO process

23   claims, pharmaceutical composition claims, and method of

24   treatment claims.

25        Later today, Dr. Harvey Lodish, who you saw this

1       morning, will walk you through each of Amgen's patent

2       claims.  And using Roche's own documents, and particularly

3       Roche's own license application to the FDA, he will explain

4       how peg-EPO infringes each asserted claim.

5               Amgen will show that Lin's patented EPO product is

6       the essential component of peg-EPO.  Without it, there's no

7       therapeutic effect.  And Amgen will also show that without

8       Lin's patented EPO product, this product doesn't work.  For

9       the process claims, Amgen will show that the addition of peg

10      to Dr. Lin's patented recombinant EPO does not materially

11      change the product of Dr. Lin's patented processes.  And for

12      the method of treatment claims, Amgen will show that Roche

13      plans to induce others to use this product in the United

14      States to practice the patented methods.

15              Now, Roche will, of course, deny that they

16      infringe.  Roche will tell you that peg-EPO is a

17      fundamentally different molecule with a brand-new name,

18      Mircera.  They will deny that peg-EPO contains Lin's

19      recombinant human EPO.  And they will tell you that they

20      have materially changed the recombinant human EPO that's

21      contained in peg-EPO when they attach their key chain to it.

22              But, as you will see in the next few days, the

23      truth is very different.  Roche's own documents, and

24      particularly its regulatory application and submission to

25      the FDA, tell the true story.  And as you will see, Roche

1    initially called this product peg-EPO.  That was Roche's

2    name for it.  But more recently, you will also see that

3    Roche has told its employees to stop using that name.  It

4    doesn't sound good, does it?  It's now changed the name to

5    CERA, or Mircera.  But I think we all know that changing the

6    name can't change the essential truth of what the product

7    contains.

8           So how do we know what Mircera contains?  How do we

9    know that it contains recombinant human erythropoietin?

10   Well, we know because Roche's director of Mircera

11   preclinical development, a fellow that was responsible for

12   bringing this product through its preclinical development,

13   Dr. Haselbeck, admits that it contains EPO.  This is an

14   internal e-mail, and perhaps you can -- I apologize if it's

15   not too legible, perhaps you can see it over here on the

16   screen.  This is an internal Roche e-mail sent by

17   Dr. Haselbeck commenting on a presentation being prepared

18   for public display by Roche.

19          And what Dr. Haselbeck wrote was in the highlighted

20   part, "I guess the only drawback in using this slide might

21   be that one recognizes that EPO is one part of CERA."  Why

22   is that a drawback?  Because Roche doesn't want you to know

23   that EPO is one part of CERA.

24          How do we know that the EPO in peg-EPO is not

25   materially changed?  Well, we know that because Roche told

1    the FDA that Mircera has the identical amino acid sequence

2    and the identical glycosylation as recombinant human EPO.

3            Here's Roche's BLA application.  This is their

4    license application submitted to the FDA.  This is what they

5    described their product as to the FDA.  And in the

6    highlighted portion, as they're describing the product, what

7    did they say?  "Both EPO starting material and RO" -- and

8    this is their code name for their product, this is the

9    international code name, as you will learn, for CERA or

10   Mircera, or peg-EPO, "have the identical amino acid sequence

11   and composition of the carbohydrate moiety."

12           Roche will tell you they don't infringe because

13   there are differences, they will say, between peg-EPO and

14   EPO.  Roche --

15           **THE COURT:**  Five more minutes, Mr. Day.

16           **MR. DAY:**  Thank you very much, your Honor.

17           Roche will point out, for example, that CERA has a

18   different molecular weight; that when they attach this

19   polymer to recombinant human erythropoietin and you weigh

20   the whole thing, it weighs more.  Roche will tell you that

21   peg-EPO has a different half-life; when you attach this

22   polymer to recombinant human EPO, it lasts in the body

23   longer.  Roche will tell you that it has a different binding

24   affinity; that when you attach this binder, it doesn't bind

25   as efficiently to the receptor.  And Roche will tell you

1   that when you attach this polymer, the molecule has a

2   different size.

3          All of that's true.  But none of it matters.

4   Because it's the patent claims that matter.  It is the

5   claims that define Dr. Lin's inventions.  And the relevant

6   question for you, ladies and gentlemen, is whether peg-EPO

7   meets every limitation of a claim.

8          So let's take one claim, for example, '933,

9   claim 3 and put the claim against everything Roche tells you

10  and ask yourself, does any of it matter?  Is there anything

11  in the claim that talks about the molecular weight of human

12  EPO?  Or of the product of the expression of mammalian cells

13  transformed and transfected with this DNA?  Is there

14  anything in the claim that tells you about different

15  half-lives or the length of the half-life?  Is there

16  anything in the claim that talks about binding affinity or

17  the size?  None of those limitations are in the claim.  And

18  that's why none of these differences matter.  They're all

19  red herrings.

20         Roche will tell you that peg-EPO stays in the body

21  longer than EPO.  But there's nothing surprising about that.

22  Scientists have known for years that when you pegylate a

23  molecule, it achieves exactly that effect.  Roche will also

24  tell you that peg-EPO is patented, but that also proves

25  nothing.  The fact that peg-EPO is patented does not give

1    Roche the right to infringe Dr. Lin's patented inventions

2    without Amgen's permission.

3           At the start of this trial, ladies and gentlemen, I

4    suggested to you that common sense and truth should be your

5    guide.  I ask you, why has Roche spent weeks attacking

6    Amgen's patents if peg-EPO does not infringe those patents?

7    The answer is obvious.  Roche knows it infringes.  If

8    urinary EPO --

9           **MS. BEN-AMI:**  Objection, your Honor.

10          **THE COURT:**  No, no, he's making his opening.  It's

11   not evidence of anything.

12          **MR. DAY:**  If urinary EPO is the same product as

13   recombinant EPO, why doesn't Roche pegylate

14   naturally-occurring EPO and sell it?  The answer to that

15   question is also obvious.  They aren't the same product.

16   And Roche knows it.

17          After you've heard all the evidence, I will ask you

18   to return a verdict of infringement.  And once again, ladies

19   and gentlemen, I thank you very much for your considerable

20   time and the attention each of you have put into the

21   decision of this matter.  Thank you.

22          **THE COURT:**  Ms. Ben-Ami, do you wish to open now or

23   reserve?

24          **MS. BEN-AMI:**  I think I'll do that now, your Honor.

25          **THE COURT:**  You may.

1          **MS. BEN-AMI:**  Good afternoon.  You may remember

2     many weeks ago that I said in my opening on validity that we

3     weren't going to get to talk about Roche -- what Roche was

4     doing for some time.  And I was right about that, because

5     it's taken some time.

6          And you might have wondered during this time, what

7     is Roche doing?  Because you have not had the complete

8     picture of this case.  You might have said, Boy, Roche must

9     want to sell EPOGEN.  No.  This is about a different drug.

10    And it's not about key chains; it's about chemistry.  And

11    it's not about locks in doors; it's about patients.

12         The evidence will show that Mircera, that the

13    active ingredient CERA, is a new and different molecule and

14    a new and different drug.  It is available to patients in

15    Europe.  It is about to be approved by the United States

16    FDA, presumably, based on its pattern in the FDA, in

17    November, right after this trial.

18         You have learned from Nurse Spaethe, Amgen put up a

19    patient.  I can't do that yet, because I'm not FDA-approved.

20    Amgen put up a patient, and what did that patient tell you?

21    The only choice for patients in this country right now is

22    Amgen.  Patients have no choice.  Roche has developed a new

23    and different drug, which, if approved by the FDA, and

24    allowed by you and this court, will give patients choice for

25    new treatments.

1          You heard on the first day, and you heard again

2     that a patent gives Amgen the right to exclude, but only if

3     it is valid and infringed.  And that's why we're spending

4     time on validity and infringement.  Because only if this

5     patent is valid and infringed do patients have the

6     possibility of not getting this drug.  And it -- the finding

7     on validity and the finding on infringement are up to you.

8     What will the evidence show.  This is not about a key chain.

9     This is about chemistry.

10          The evidence will show that the drug that Roche is

11    making allows the patient to receive 12 shots a year instead

12    of 156 shots a year.  The evidence will show that this drug,

13    which is a different drug than EPO, provides patients, who

14    are suffering with a different treatment, once a month

15    versus 156 a year.

16          Can I have Slide 21, please?

17          And the United States patent office has found that

18    Roche's CERA is patentably new and different than EPO, and

19    awarded Roche a patent on its new and different drug.  The

20    FDA has characterized CERA as a new chemical entity.

21          Can I have 23, please?

22          And this is also part of the BLA.  Mircera shows a

23    different activity at the receptor level.  It works

24    differently in the body with a lower association and faster

25    dissociation.  It has a reduced specific activity in vitro,

 1    and increased activity in vivo, and it has an increased

 2    half-life.  Mr. Day said, Oh, don't pay any attention to

 3    those facts.  But CERA is not EPO.  The half-life is

 4    different compared to EPO.

 5          And Amgen has spent the last three weeks telling

 6    you it owns EPO.  Now, right up front, Roche is telling the

 7    FDA that there has been a change to the chemistry of the

 8    product because there is different bond and that changes the

 9    product.  And there are many changes.

10          Can I have 22, please?

11          Mr. Day said, Well, don't worry about the fact that

12    it's a different drug, and don't worry about the fact that

13    it has a different half-life and it works different in the

14    body.  Look at the claims.  Well, look at the claims, ladies

15    and gentlemen.  All the claims require that the product or

16    the process be made in a mammalian cell.  It's a process for

17    producing a protein and getting it from a cell.  It's a

18    product that is made in a cell.  CERA is not made in a cell.

19          Can I have 9, please?

20          CERA requires chemical reactions which are done

21    through chemistry.  It is not coming out of a cell.  And

22    Amgen's expert, Mr. Lodish, Dr. Lodish, said so in his

23    expert report.  You cannot make CERA in a cell.  If we've

24    talked about anything in this case for the last weeks, it's

25    about things being made in cells.

1              Can I have 15, please?

2              This concept of pegylation, it is a chemical

3     reaction, it is not a biological process.  Cells do not make

4     peg anything.  They cannot make CERA.  And Mr. Day said, Who

5     cares about it?  It's no different, who cares?  The evidence

6     will show that Amgen, wanting to make a new and better

7     product, tried to make a pegylated product for just this

8     year and they failed.  They were unable to get a better

9     product.  They failed and, therefore, to stop this better

10    product, this new product, they sued Roche.  And Roche has

11    the patent.  They could not do it, so they sued.

12             Now, 17, please.  Well, let's go to 1, please.

13             CERA, CERA is the active ingredient.  Mircera is

14    the trade name.  There's no -- nothing mysterious or

15    sinister about this.  EPOGEN is, they say it's EPO, we don't

16    know that, but they say it's EPO but they call it EPOGEN.

17    Drugs all have trade names.  CERA has a different physical

18    structure compared to EPO.  It has a different charge.  You

19    heard Dr. Varki talking about oh, charges this, that, those

20    are things that he thinks make things different.  Different

21    structure, different charge.  Thousands more atoms.  Greater

22    molecular mass.  Greater molecular weight.  Different shape.

23    Different size.  Different ability to bind at the receptor.

24             Dr. Lodish tried to explain this just a few minutes

25    ago.  He said, you know, EPO, how does -- he said he had

1    done work on the receptor.  EPO has to bind to this receptor

2    and, therefore, that's how it works.  CERA does not bind the

3    same to the EPO receptor because it is a different molecule.

4    It has a different binding affinity.

5           Can I have 18, please?

6           These are more of the differences for CERA.  The

7    half-life, what does that mean?  How long this different

8    molecule stays in the body.  It is materially different,

9    materially different than EPO because it stays in the body

10   longer and, therefore, allows you to have once-a-month

11   dosing.  It's a changed chemical molecule.  So, unlike EPO,

12   which is approved for 12 shots a month, it is going -- it is

13   being requested for approval, and approved in Europe, for

14   once-a-month dosing.

15          Its binding affinity, how it binds to the EPO

16   receptor, is much lower.  And you might say to yourself,

17   Well, if it's not binding as well, that's bad.  That sounds

18   bad.  But counterintuitively, it's good.  Because it's an

19   invention.  Even though it binds worse, or less, it works

20   longer because it's able to signal and keep on working.

21          It is a fundamentally different molecule.  It is

22   made through chemistry.  You will not find CERA made in any

23   cell anywhere.  Can't be made in a cell.  Must be completed

24   through chemistry.  It provides patients with the first

25   non-Amgen choice.  And it is considered a new chemical

1    entity.

2              **THE COURT:**  Four more minutes, Ms. Ben-Ami.

3              **MS. BEN-AMI:**  Can I have 3?

4              **THE COURT:**  Go ahead.

5              **MS. BEN-AMI:**  I meant Number 3.  I'll take the

6    four from you.

7              Amgen will tell you, they're trying to tell you

8    that, Oh, it's just an attachment.  Wrong.  This is not

9    about key chains and keys, this is about chemistry.  And I'm

10   going to have to ask you to pay attention to the chemistry

11   again.  Because in chemistry, you don't glue attachments on,

12   there's no such thing.  The only way you change a molecule,

13   in chemistry, is through chemical modification.  You have to

14   delete things, modify things.  You cannot get EPO out of

15   CERA.

16             And so I had this analogy for you to help you

17   understand.  Somebody may have grape juice, right?  That

18   grape juice has to undergo a chemical reaction and it

19   becomes red wine.  It's through a deletion of a hydrogen

20   coupled with, in chemical modification, with an oxygen and a

21   hydrogen, two little atoms.

22             Red wine is not grape juice.  They are two

23   different things.  Because, in chemistry, even a small

24   chemical change creates a new molecule.  We all know that

25   you might be able to drink both grape juice and red wine,

 1    but they're not the same thing.  They may both be -- they

 2    have different reactions in your body.  They are different

 3    chemical entities.

 4             So you need to pay attention to the chemistry.

 5    Because you will find, as you listen to this case, that CERA

 6    has different chemical bonds, is different chemically, is

 7    different biologically, is different medically.  It is not

 8    made by cells.  It does not meet these claims.  And it has

 9    been materially changed.  And it is the first true new

10    choice for patients.

11             Thank you, your Honor.

12             **THE COURT:**  You may call your first witness.

13             **MR. DAY:**  Amgen calls Dr. Harvey Lodish, your

14    Honor.

15             **THE COURT:**  He may be recalled.

16             **MR. DAY:**  Your Honor, I believe you have his expert

17    reports.

18             **THE COURT:**  I do, and thank you.

19             **MR. DAY:**  That's the complete --

20             **THE COURT:**  Yes, and thank you.

21             **THE CLERK:**  Sir, I remind you, you're still under

22    oath.

23

24

25

1          **THE WITNESS:**  Yes.

2          **MR. GALVIN:**  Good morning, your Honor, ladies and

3     gentlemen of the jury.  My name is Rob Galvin, and I

4     represent Amgen.

5          **THE COURT:**  Proceed, Mr. Galvin.

6               HARVEY LODISH, Recalled

7                **DIRECT EXAMINATION**

8     **(BY MR. GALVIN:)**

9     **Q.**  Dr. Lodish, would you please tell the jury why you're

10    back this afternoon to testify?

11    A.  Yes.  I'm here to discuss infringement of Amgen's

12    patents by Roche's Mircera product.

13    **Q.**  And in -- have you formed any opinion with respect to

14    Roche's Mircera product?

15    A.  Oh, yes, I have.

16    **Q.**  In arriving at your opinions, did you conduct an

17    investigation?

18    A.  An extensive investigation.

19    **Q.**  How did you go about your investigation?

20    A.  Well, first, I, of course, familiarized myself with the

21    Amgen patents and the details of the claims in them.

22    Second, I learned a great deal about Roche's product and how

23    it was made, mostly through what is called the BLA, or

24    Biological Licensing Application that Roche provided to the

25    federal government, and many other documents and

1    publications at the same time.

2    **Q.**  You mentioned a BLA.  What is your understanding as to

3    what a BLA is?

4    A.  My understanding -- it's a Biological License

5    Application.  It's a very large document that a

6    pharmaceutical company must submit to the Food and Drug

7    Administration --

8         **MS. BEN-AMI:**  Objection, your Honor.

9    A.  -- before they're --

10        **THE COURT:**  Grounds?

11        **MS. BEN-AMI:**  It his understanding, I'm not --

12        **THE COURT:**  Oh, you're giving us your

13   understanding, not the requirements of the code of federal

14   regulations, correct?

15        **THE WITNESS:**  Correct.

16        **THE COURT:**  You may give us your understanding.

17   A.  It is a document that a pharmaceutical company is

18   required to submit to the Food and Drug Administration

19   before they administer the drug to patients, and it contains

20   a great deal of information about the chemical nature of the

21   drug, how it's manufactured, how it's purified, how it's

22   packaged for administration, information about physicians

23   and other caregivers who might actually use the drug.

24   **Q.**  In coming to your opinions, Dr. Lodish, what

25   definitions, if any, did you use for the terms in the

1    claims?

2    A.   Yes, when appropriate, the Court's claim construction.

3    **Q.**   Based upon your investigation and review of Roche's

4    submission to the FDA, what is your understanding as to what

5    peg-EPO is?

6    A.   Sure.  Peg-EPO is a conjugate of --

7            **MS. BEN-AMI:**  Objection, your Honor.

8            **THE COURT:**  Grounds?

9            **MS. BEN-AMI:**  Report.

10           **THE COURT:**  Where is it?

11           **MR. GALVIN:**  Blue report, your Honor, Paragraph 80.

12           **THE COURT:**  Yes, he may testify consistent with

13   Paragraph 80.

14   A.   Yes.  It is a molecule of recombinant human EPO linked

15   to a molecule of an inert, that is an inactive substance

16   called polyethylene glycol.  So the peg stands for

17   polyethylene glycol, or as I'll refer to it, peg-EPO.

18   **Q.**   Based upon your investigation, do you have an

19   understanding as to whether or not Roche has referred to

20   peg-EPO by any other names?

21   A.   Yes.  They referred to it by several other names.

22   Currently, I believe, it's called CERA.  They also use a

23   code number which is RO followed by a string of digits that

24   I don't have in my mind.

25   **Q.**   Do you have an understanding of what the term "Mircera"

1    refers to?

2    A.   Yes.  My understanding is that Mircera refers to a

3    pharmaceutical composition, that is something that would be

4    administered to patients, that contains peg-EPO.

5    Q.   And according to Roche's BLA, Dr. Lodish, what

6    ingredients are used to make peg-EPO?

7    A.   EPO, that is recombinant human EPO, produced by

8    mammalian cells grown in culture, cells that are expressing

9    the human EPO gene, and then a chemical derivative of

10   polyethylene glycol that is purchased, it's commercially

11   available.  They react the two together to make this

12   chemical conjugate.

13   Q.   And Dr. Lodish, if you refer -- you should have a binder

14   with some documents in it.  If I could refer you to Tab 8 in

15   the binder?

16   A.   Yes.  Here we go.

17   Q.   Which is Exhibit EZL, marked for identification.

18   A.   Uhm-hmm.

19   Q.   Do you recognize Exhibit EZL?

20   A.   Yes, I do.

21   Q.   What is it?

22   A.   It's an e-mail from Anton Haselbeck to a Caesar Escrig,

23   both, I gather, employees of Roche.

24          MR. GALVIN:  Your Honor, I offer Exhibit EZL.

25          MS. BEN-AMI:  Objection, your Honor.  No

```
 1    foundation.

 2              THE COURT:  May I see the document?  It appears

 3    where here now?

 4              MR. GALVIN:  Tab 8, your Honor, Exhibit EZL.

 5              THE COURT:  No, overruled.  Well, come to the

 6    sidebar, let's --

 7    SIDEBAR CONFERENCE, AS FOLLOWS:

 8              THE COURT:  I guess I don't understand the lack of

 9    foundation here.  Now, it appears undisputed that the

10    document is --

11              MR. GALVIN:  I'm sorry, your Honor, it's Tab 8.

12              THE COURT:  Oh, excuse me.  Yes, this one was

13    thrown up.  It's a Roche document.  It's an admission.

14              MS. BEN-AMI:  I agree that it's authenticated, I

15    don't think there's foundation.

16              THE COURT:  Well, I just don't understand when you

17    say "foundation."  It's a Roche document.  I look at it,

18    it's an admission.  It deals with relevant material.

19              MS. BEN-AMI:  Fine, your Honor.

20              (Whereupon the sidebar conference concluded.)

21              THE COURT:  All right.

22              MR. GALVIN:  Your Honor, do we have an exhibit

23    number?

24              THE COURT:  Yes.  It is admitted, and it's

25    Exhibit 38, I'm sorry.
```

```
 1              MR. GALVIN:  Thank you, your Honor.

 2              (Exhibit marked in evidence.)

 3              MR. GALVIN:  Looking at Exhibit 38, could we

 4     highlight the "from" line at the top?

 5     (BY MR. GALVIN:)

 6     Q.  Do you see the name Anton Haselbeck, Dr. Lodish?

 7     A.  Yes.

 8     Q.  Do you have an --

 9              MR. GALVIN:  If we could highlight the

10     first sentence of the e-mail.

11     Q.  "I think the fit needs to be the same to emphasize that

12     the binding region is still the same; the main difference

13     obviously is the size which prevents strong binding and

14     uptake."

15              Do you see that sentence, Dr. Lodish?

16     A.  I do.

17              MR. GALVIN:  And now if we could highlight the last

18     sentence.

19     Q.  "I guess the only drawback in using this slide might be

20     that one recognizes that EPO is one part of CERA."

21              Do you see that sentence, Doctor?

22     A.  I do.

23              MS. BEN-AMI:  Objection.  Report.

24              THE COURT:  Well, so far we're not outside the

25     report.  He simply looks at the document and he sees it.
```

1    Q.   Let me now put a question to you, Dr. Lodish.  Do you

2    have an opinion whether or not CERA or peg-EPO contains

3    human erythropoietin?

4    A.   I do have an opinion.

5    Q.   What is your opinion?

6    A.   And the opinion is that peg is a part of EPO -- excuse

7    me, EPO -- strike that.  EPO is a part of peg-EPO.  Indeed,

8    it is the essential or functional compound of peg-EPO.

9    Q.   Dr. Lodish, based upon your investigation, where do you

10   understand Roche makes peg-EPO?

11   A.   In Germany.

12   Q.   And what is your understanding as to where Roche gets

13   the EPO that it uses to make peg-EPO?

14   A.   It's manufactured in Germany from the use of cultured

15   mammalian cells.

16   Q.   And what does Roche refer to in its BLA as the name for

17   its recombinant human EPO?

18   A.   They call it variously neorecormon or epoetin data.

19   They use it synonymously with recombinant human EPO.

20   Q.   What's your understanding, based upon your

21   investigation, as to how Roche makes recombinant human EPO?

22   A.   Simply put, they introduce a human EPO gene, that is a

23   DNA that codes for EPO --

24            MS. BEN-AMI:  Objection, your Honor.  Report.

25            THE COURT:  Where is it?

```
 1              MR. GALVIN:  Blue report, Paragraph 80 through 91

 2   in the section entitled, "Roche's manufacturing process."

 3              THE COURT:  He may testify consistent with his

 4   report.

 5   A.  Yes.  Roche introduces a DNA that codes for human EPO

 6   into a Chinese hamster ovary cell.

 7              THE COURT:  Well, now, just a moment.  What are you

 8   basing this on?  I mean, where are you deriving this from?

 9              THE WITNESS:  In, if I can get my reading glasses,

10   in Paragraph 83.

11              THE COURT:  I'm sorry, I was unclear.  It's almost

12   1:00, but let me ask you this.  I have no -- I am satisfied

13   that what he's called upon you to testify is in your report.

14              THE WITNESS:  Yes.

15              THE COURT:  My question is more fundamental.

16   You're talking about what Roche does.  Since you're called

17   by Amgen, you weren't over there watching them do that.  How

18   do you know that's what they do?

19              THE WITNESS:  Oh, I'm sorry.  This is --

20              THE COURT:  The fault is mine.  But how do you

21   know?

22              THE WITNESS:  How do I know?  This is described in

23   great detail in the Roche BLA.  And this opinion is derived,

24   myself, from reading these sections of the BLA.

25              THE COURT:  So you take that document, you read it,
```

1    and interpret it, and that document is the basis for the

2    conclusions that you're about to give us?

3              **THE WITNESS:**  That is correct.

4              **THE COURT:**  All right.  That's a good place to

5    stop.

6              We'll stop taking testimony at this time, ladies

7    and gentlemen.  Please keep your minds suspended.  Do not

8    discuss the case either among yourselves nor with anyone

9    else.  We'll stand in recess until 9:00 a.m. tomorrow

10   morning.  We'll recess.

11             **THE CLERK:**  All rise for the jury.

12             (Whereupon the jury left the courtroom.)

13             **THE COURT:**  Please be seated.  You may step down,

14   sir.

15             (Whereupon the witness stepped down.)

16             **THE COURT:**  Total elapsed time stands Amgen, seven

17   days, three hours 25 minutes; Roche, eight days, five

18   minutes.

19             We'll stand in recess until 9:00 a.m. tomorrow

20   morning.  We'll recess.

21             (Adjournment.)

22

23

24

25

1                    **C E R T I F I C A T E**

2

3

4          We, Donald E. Womack and Cheryl B. Palanchian,

5    Official Court Reporters for the United States District

6    Court for the District of Massachusetts, do hereby certify

7    that the foregoing pages are a true and accurate

8    transcription of our shorthand notes taken in the

9    aforementioned matter to the best of our skill and ability.

10

11

12

13

14          /S/ DONALD E. WOMACK
            _____

15          /S/ CHERYL B. PALANCHIAN
            _____

16

17                    DONALD E. WOMACK
                   CHERYL B. PALANCHIAN
                   Official Court Reporters
18                     P.O. Box 51062
                Boston, Massachusetts 02205-1062
19                  womack@megatran.com

20

21

22

23

24

25