1                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MASSACHUSETTS
2
                                         Civil Action
3                                        No. 05-12237-WGY

4    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
                                         *
5    AMGEN, INC.,                        *
                                         *
6            Plaintiff,                  *
                                         *   **DAILY TRANSCRIPT**
7    v.                                  *   **OF THE EVIDENCE**
                                         *      (Volume 17)
8    F. HOFFMANN-LA ROCHE LTD,           *
     ROCHE DIAGNOSTICS GmbH and          *
9    HOFFMANN-LA ROCHE, INC.,            *
                                         *
10           Defendants.                 *
                                         *
11   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

12

13

14            BEFORE:  The Honorable William G. Young,
                      District Judge, and a Jury
15

16

17

18

19

20

21

22

23
                                 1 Courthouse Way
24                               Boston, Massachusetts

25                               October 4, 2007

1              A P P E A R A N C E S

2

3              DUANE MORRIS LLP (By D. Dennis Allegretti,
      Esq. and Michael R. Gottfried, Esq.), 470 Atlantic
      Avenue, Suite 500, Boston, Massachusetts 02210

4              - and -
               DAY CASEBEER MADRID & BATCHELDER, LLP (By
5      Lloyd R. Day, Jr., Esq., David M. Madrid, Esq. and
      Robert M. Galvin, Esq.) 20300 Stevens Creek

6      Boulevard, Suite 400, Cupertino, California 95014
               - and -
7              McDERMOTT WILL & EMERY (By Michael Kendall,
      Esq.), 28 State Street, Boston, Massachusetts

8      02109
               - and -
9              McDERMOTT WILL & EMERY (By William G.
      Gaede, III, Esq.), 3150 Porter Drive, Palo Alto,
10     California 94304
               - and -
11             MARSHALL, GERSTEIN & BORUN LLP (By Kevin M.
      Flowers, Esq.), 6300 Sears Tower, 233 S. Wacker
12     Drive, Chicago, Illinois 60606-6402
               - and -
13             STUART L. WATT and WENDY A. WHITEFORD, Of
      Counsel, Amgen, Inc., One Amgen Center Drive,
14     Thousand Oaks, California 91320-1789, on behalf of
      the Plaintiff

15

16             BROMBERG & SUNSTEIN LLP (By Lee Carl
      Bromberg, Esq. and Julia Huston, Esq.), 125 Summer
      Street, Boston, Massachusetts 02110

17             - and -
               KAYE SCHOLER LLP (By Leora Ben-Ami, Thomas
18     F. Fleming, Esq., Patricia Carson, Esq.,
      Christopher Jagoe, Esq. and Howard Suh, Esq.),

19     425 Park Avenue, New York, New York 10022, on
      behalf of the Defendants

20

21

22

23

24

25

**I N D E X**

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

HARVEY LODISH, Resumed

    By Mr. Galvin    2394              2527

     By Ms. Ben-Ami          2501              2531

LESLIE Z. BENET

    By Mr. Day      2534

|  |  | FOR | IN |
|---|---|---|---|
| **EXHIBITS:** |  | **I.D.** | **EVID.** |

    52    Roche BLA . . . . . . . . . . . .2400

    53    Roche BLA . . . . . . . . . . . .2400

    54    CERA Continuous Erythropoiesis

          Receptor Activator . . . . . . . . .2467

    55    Mircera document . . . . . . . . . .2478

    56    Pages from IND . . . . . . . . . .2495

1          **THE CLERK:**  All rise for the jury.

2          (Whereupon the jury entered the courtroom.)

3          **THE CLERK:**  Court is in session, please be seated.

4          **THE COURT:**  Good morning, ladies and gentlemen.

5          **THE JURY:**  Good morning.

6          **THE COURT:**  We know you're all ready and thank you.

7     They're all ready.  Continue, Mr. Galvin.

8          **THE CLERK:**  And I remind you, sir, that you are

9     still under oath.

10         **MR. GALVIN:**  Thank you, your Honor.

11                    HARVEY LODISH, Resumed

12              **DIRECT EXAMINATION** (Cont'd)

13    BY  MR. GALVIN

14    **Q**   Dr. Lodish, do you have an opinion as to whether or not

15    Roche's manufacturing process of the EPO in peg-EPO or

16    Mircera satisfies all of the limitations of '868 claims 1

17    through 2, '698 claims 6 through 9, and '349 claim 7?

18    A    Yes, I do.

19    **Q**   What is your opinion?

20    A    That Roche's --

21         **MS. BEN-AMI:**  Objection, your Honor; compound.

22         **THE COURT:**  No, overruled.  He may have it.

23    A    That Roche's manufacturing process satisfies all the

24    provisions of all of those claims.

25    **Q**   Dr. Lodish, do you have an opinion as to whether or not

1    Roche's peg-EPO product satisfies all of the limitations of

2    '933 claims 3, 7, 8 and 12?

3    A   I do.

4    Q   What is your opinion?

5    A   And that it satisfies all of the conditions of the

6    claims.

7    Q   Do you have an opinion, Dr. Lodish, as to whether or not

8    the administration of Roche's Mircera product to kidney

9    dialysis patients satisfies all the limitations of '933

10   claim 14?

11   A   I do.

12   Q   And what is your opinion?

13   A   That it does satisfy all the limitations of that claim.

14   Q   Do you have an opinion as to whether or not the EPO in

15   peg-EPO or Mircera is materially changed from the EPO

16   product of the processes claimed in '868 claims 1 through 2,

17   '698 claims 6 through 9, and '349 claim 7?

18   A   I do.  It is not materially changed.

19   Q   Are you prepared to explain to the jury today the bases

20   for your opinions?

21   A   Yes, I am.

22   Q   Before we begin with that, Dr. Lodish, if you could turn

23   in your binder to Tab 1.  EBA-1.

24   A   Yes.

25   Q   Do you recognize EBA-1?

1    A    Yes, I do.

2    Q    What is it?

3    A    It is a part of the BLA that describes aspects of the

4    production of peg-EPO or Mircera.

5    Q    If you could please turn to Tab 3 in your binder.

6    A    Yes.

7    Q    EAZ-1.

8    A    Yes.

9    Q    Do you recognize EAZ-1?

10   A    Oh, yes.

11   Q    What is it?

12   A    And this is another part of the Roche BLA.  Or

13   Biological Licensing Application.

14            **MR. GALVIN:**  Your Honor, I offer EBA-1 and EAZ-1 as

15   Roche admissions.

16            **MS. BEN-AMI:**  Your Honor, may I have a side bar on

17   this issue?

18            **THE COURT:**  You may.

19   SIDEBAR CONFERENCE, AS FOLLOWS:

20            **MS. BEN-AMI:**  Your Honor, while I know you normally

21   want one person to talk, this goes to the confidentiality

22   issue which Ms. Huston has been handling.

23            **THE COURT:**  She may talk.

24            **MS. BEN-AMI:**  I'm stepping out.

25            **MS. HUSTON:**  Good morning, your Honor.

1          Independently of the question of the documents

2    being admitted into evidence, we would just like to clarify

3    with the Court that the mere admission of the documents will

4    not make them nonconfidential such that they may not be

5    disclosed to the wide world simply because the jury gets to

6    see them.

7          **THE COURT:**  I'm with that.  I mean, I agree with

8    that to make it clear.  But I like proceedings to be public.

9    So I don't know who's in the courtroom.  And I'm not

10   disposed to close the courtroom.  I'm not disposed to treat

11   the document differently in the sense that they can flash it

12   up on the board.  That said, a copy of the document that the

13   clerk will have is only for the jury and will not be

14   disclosed, and when this case is over, the copies of all the

15   documents that have come in the clerk's possession may be

16   returned in the ordinary course.

17         **MS. HUSTON:**  That's fine, your Honor.  I believe

18   that the testimony of the witnesses will be at such a level

19   of generality that it wouldn't implicate disclosure of trade

20   secrets, but should Amgen seek to publish something that is,

21   on that off chance we would simply ask for a side bar to

22   address it in the context at the time.

23         **THE COURT:**  You know I'm a sucker for side bars.

24         **MS. BEN-AMI:**  And, your Honor -- there's a separate

25   issue.

1                **THE COURT:**  All right.

2              **MS. BEN-AMI:**  Under the doctrine of completeness,

3  they're putting in parts, I would like to be able to put in

4  the parts, other parts as well of the document.

5                **THE COURT:**  Do you want the whole thing in, the

6  entire thing in now?

7              **MS. BEN-AMI:**  I think that we pick parts that each

8  side needs, just put that in.

9                **THE COURT:**  Well, I think since you're being

10  cautious that is fine.

11              **MR. GALVIN:**  Your Honor, we proposed to put the

12  whole section in, and because of these issues of trade

13  secret claims we put excerpts.  We would be happy to put the

14  entirety --

15               **MS. BEN-AMI:**  I think just --

16                **THE COURT:**  I know.  And so -- but now you're

17  designating and they're designating and then you may want to

18  counter designate.  I urge you to work that out.  But this

19  is how I'll handle the document.

20              **MS. BEN-AMI:**  Thank you, your Honor.

21             **MR. GALVIN:**  Your Honor?  Yes, your Honor, I'm

22  sorry.  So we can publish the pages from the --

23                **THE COURT:**  This, in court, this is to be treated

24  just like any other document, not to heighten it or lessen

25  it.  My instructions on the record are instructions really

```
 1    for the conduct of the clerk, and I will see that we do

 2    that.

 3              MS. BEN-AMI:  Thank you, your Honor.

 4              MR. GALVIN:  Thank you, your Honor.

 5              (Whereupon the sidebar conference concluded.)

 6              THE COURT:  The documents, the documents are

 7    admitted Exhibits 38 and 39.  And give me the letters again,

 8    Mr. Galvin.

 9              MR. GALVIN:  Your Honor, I believe the next exhibit

10    was 39.

11              THE COURT:  Oh, I've missed 38?  All right, 39 and

12    40.

13              MR. GALVIN:  Oh, I'm sorry.  52.

14              THE COURT:  All right.

15              THE CLERK:  It's 52 and 53.

16              THE COURT:  Thank you.

17              THE CLERK:  And what are the letters again?

18              MR. GALVIN:  The letters are EBA-1 and EAZ-1.

19              THE COURT:  EDA-1.

20              THE CLERK:  EB.

21              MR. GALVIN:  EB, like in boy.

22              THE COURT:  EBA-1 and?

23              MR. GALVIN:  EAZ.

24              THE COURT:  EAZ.  And we'll assume that they agree

25    to the admission of all these documents to get us up to 52
```

```
 1    and 53 and that I haven't been asleep while the trial is

 2    going on.

 3              All right.  Proceed, Mr. Galvin.

 4              MR. GALVIN:  Your Honor, just for the record, I

 5    believe it's EAZ-1.

 6              THE COURT:  EAZ.  That's how I marked it.

 7              (Exhibits marked in evidence.)

 8    BY  MR. GALVIN

 9    Q    Dr. Lodish, let me show you this board with claims from

10    the '933 patent -- I mean, I'm sorry, from the '868 patent.

11    And I would like to ask you about, starting with '868 claim

12    1, the first part of '868 claim 1, the phrase "A process for

13    the production of glycosylated erythropoietin polypeptide."

14              Do you see that?

15    A    Of course.

16    Q    Based upon your investigation, what is the basis for

17    your opinion that Roche satisfies this limitation?

18    A    Well, clearly Roche practices a process for the

19    production of a glycosylated EPO polypeptide and that's

20    described in the BLA.

21    Q    Let me show you Exhibit 52 from Roche's BLA, at Page

22    4659.

23    A    Yes.  Oh, it's on the screen.

24    Q    And if we could highlight the heading number 1,

25    Description of the Epoetin Beta (EPO) Molecule.
```

```
 1              Do you see that?

 2    A    Yes.

 3    Q    And let me read for you the second sentence.  The third

 4    sentence:  The protein is N-glycosylated at positions Asn24,

 5    Asn38, Asn83, and O-glycosylated at position Ser126.

 6              Do you see that?

 7    A    Yes.

 8    Q    How does this portion of the BLA relate to your opinion?

 9         MS. BEN-AMI:  Objection, your Honor.  Mr. Galvin,

10    could you cite me to the --

11         THE COURT:  I didn't hear.  Objection, and then I

12    didn't hear the rest.

13         MS. BEN-AMI:  Report.  I -- just what part of the

14    report he's on.  I don't see it in the report.

15         MR. GALVIN:  The blue report, the blue report at

16    Exhibit V at Page 4, the document is cited; and blue report

17    at Page 30 for glycosylation.

18         MS. BEN-AMI:  I'm sorry, I was on Page 65 already.

19              I would object.  It's not tied together in the

20    report.

21         THE COURT:  No, overruled.  You may answer.

22    A    What this states very clearly, the phrase N-glycosylated

23    and O-glycosylated mean attachment of sugars to either an N,

24    which is an asparagine residue, or O, which is the serine

25    residue.  So there are three asparagine residues in the
```

1    protein.  They're actually indicated here by these branches

2    with circles at the end.  They're attached to three

3    asparagines.  And where's the little -- ahh, there it is.

4    That little structure attached to serine is the O-linked

5    carbohydrate.  It says very clearly that their protein is a

6    glycosylated, that is, containing sugar, erythropoietin

7    polypeptide.

8              **MR. GALVIN:**  If we could have highlighted the

9    caption Figure 1 Amino Acid Sequence and Primary Structure

10   of EPO.

11   **Q**   What do you understand, Dr. Lodish, to be the primary

12   structure of human EPO?

13   **A**   It's the amino acid sequence of the protein.

14   **Q**   Do you have an opinion as to how the amino acid sequence

15   of the EPO contained in Roche's peg-EPO product compares, if

16   at all, to the amino acid sequence of natural EPO?

17   **A**   It is identical.

18   **Q**   I would like to show you Page 5616 from Roche's BLA,

19   Exhibit 52.

20   **A**   Six --

21   **Q**   It's up on the screen.

22   **A**   Oh, thank you.  Yes.

23   **Q**   And read to you the following sentence:  Epoetin beta

24   (EPO) cDNA codes for a 166 amino acid polypeptide.  All EPO

25   products analyzed so far -- either from human urine or

1    recombinant production -- only contain 165 amino acids,

2    missing the last arginine residue.

3              Do you see that?

4    A    Yes.

5    Q    And how does that sentence relate to the opinion you

6    just gave?

7              MS. BEN-AMI:   Objection, your Honor; the report on

8    this point, and relevance.

9              THE COURT:   Yes, where is it?

10             MR. GALVIN:   The document, your Honor, is cited at

11   blue Exhibit V at 4, the claim chart that Dr. Lodish

12   attached.

13             THE COURT:   Blue, Exhibit V.

14             MR. GALVIN:   V.

15             THE COURT:   At 4.

16             MR. GALVIN:   Page 4.

17             MS. BEN-AMI:   Is that V as in victor?

18             MR. GALVIN:   V as in victor.

19             THE COURT:   Oh, I'm sorry.

20             MS. BEN-AMI:   I heard B.

21             THE COURT:   No, no, sustained.  Sustained.  Ask

22   another question.

23   Q    Dr. Lodish, turning to the next limitation in '868 claim

24   1, "having the in vivo biological property causing bone

25   marrow cells to increase production of reticulocytes and red

```
 1    blood cells."

 2              Do you see that limitation?

 3    A    Yes.

 4    Q    What is the basis for your opinion that Roche satisfies

 5    this limitation?

 6    A    It's described quite clearly in the BLA that Roche's

 7    recombinant erythropoietin satisfies this condition.  It

 8    causes bone marrow cells to produce red blood cells.

 9    Q    If we could turn to the next limitation of '868 claim 1

10    under, next to (a).

11    A    Yes.

12    Q    "Growing, under suitable nutrient conditions, mammalian

13    host cells."

14              Do you see that?

15    A    Yes.

16    Q    What is the basis for your opinion that Roche performs

17    this step?

18              MS. BEN-AMI:  May I have a report cite, please?

19    A    May I answer?  The basis for --

20              MS. BEN-AMI:  Your Honor, your Honor, I asked

21    Mr. Galvin for a cite, and without one, I have to object.

22              THE COURT:  Yes, I appreciate proceeding that way.

23    She's asking you for a cite, give her the cite.  We'll see

24    if she objects.  It will be smoother.

25              MR. GALVIN:  Blue at Paragraph 158.
```

1              THE COURT:  Thank you.

2              THE WITNESS:  I'm sorry, could you repeat the

3      question?

4              THE COURT:  We need to wait.

5              THE WITNESS:  Oh, I'm sorry.  I'm sorry.

6              THE COURT:  Proceed.  You may have it.

7      Q    What is the basis for your opinion that Roche performs

8      this step?

9      A    It says so very clearly in the BLA.

10             MR. GALVIN:  May we please have Roche's BLA

11     Exhibit 52 at Page 4667.  If we could highlight the first

12     sentence.

13             THE WITNESS:  Yes.

14     Q    And could you read the first sentence, Dr. Lodish?

15     A    Yes.  Epoetin beta is produced by the recombinant CHO

16     cell line DN2-3 alpha 3 in suspension culture.

17     Q    And how does that sentence relate to your opinion?

18             MS. BEN-AMI:  Objection, your Honor.  Could I have

19     a side bar?

20             THE COURT:  Sustained.

21             MR. GALVIN:  Blue at Paragraph 82, your Honor, the

22     document and this page is specifically discussed.

23             THE COURT:  Blue at 82?

24             MR. GALVIN:  Yes.

25             MS. BEN-AMI:  I still would like a side bar, your

1   Honor.

2       **THE COURT:**  Just a moment.  It's not necessary.

3   Sustained.

4   **Q**   Dr. Lodish, what significance, if any, does this

5   sentence have to your opinion?

6       **MS. BEN-AMI:**  Objection, your Honor.

7       **THE COURT:**  Yes, sustained.  And we'll have the

8   side bar.

9   SIDEBAR CONFERENCE, AS FOLLOWS:

10      **THE COURT:**  Here's the problem, Mr. Galvin.  Your

11  examination makes perfect sense.  I allowed you to have the

12  general question and now you're going claim by claim and

13  indeed element by element and you should.  The problem is

14  that's not what his report does.  And it's the relationship

15  that's missing.

16      Now, the best, it's for you to try your case, but I

17  would accept questions that say take a look at this in the

18  claim, what does Roche do in this respect.  And then he gets

19  it from the report and you can make your argument.

20      Now, I'm -- but unless he's actually going to

21  relate and then you go back -- this is an excellent chart,

22  but the chart doesn't make the relationship.  An expert

23  report has to tell me what he's going to say.  I don't have

24  to interpolate two documents.  I'm not going to do it.

25      Now, while we're over here, just so we're clear,

1    Amgen files this strident memo that says your opening,

2    Ms. Ben-Ami, was way out of line.  And while the memo is

3    strident, I think it was.  Way out of line.  But the way I

4    try cases is I expect real time in the courtroom.  Had they

5    objected, I would have corrected you in the midst of your

6    opening.  So I'm not now going to jump back and highlight

7    the thing.  Here's how we're going to do it.

8            I'm going to charge first in this case.  And I'm

9    going to emphasize what the jury's role is and what my role

10   is, and having charged first then I'm vested in my charge.

11   Nobody's going to argue contrary to my charge.

12           That's how I'm handling that motion.

13           **MR. DAY:**  Thank you, your Honor.

14           **THE COURT:**  All right.

15           (Whereupon the sidebar conference concluded.)

16   BY  MR. GALVIN

17   Q   Dr. Lodish, what cells does Roche use to make the EPO in

18   peg-EPO?

19   A   It's a CHO cell line called DN2-3 alpha 3.

20   Q   And from what animal was that cell line derived?

21   A   It was derived from a CHO, or Chinese hamster ovary

22   cell.

23   Q   In your opinion are CHO cells mammalian cells?

24   A   Yes, of course they are.

25   Q   Let's turn to the next limitation, '868 claim 1,

1    "transformed or transfected with an isolated DNA sequence

2    encoding human erythropoietin."

3    A    Yes.

4    Q    Do you see that?

5         What is the basis for your opinion that Roche's

6    mammalian host cell meets this limitation?

7         MS. BEN-AMI:  Objection, your Honor.

8         THE COURT:  Overruled.

9    A    It says so very clearly in the BLA, it describes exactly

10   the DNA sequence that they transform -- excuse me, transfect

11   into the cell.

12   Q    And what is that DNA sequence?

13   A    It's a DNA sequence --

14        MS. BEN-AMI:  Objection.

15        THE COURT:  Overruled.  You may answer.

16   A    It is a DNA sequence described in great detail in the

17   BLA that contains the human EPO coding sequence, the

18   sequence of DNA that codes for each amino acid in human EPO.

19   It contains a, what we call a promoter, a virus that causes

20   the cell to copy this adjacent EPO gene into messenger RNA.

21   It also contains a third element called DHFR, dihydrofolate

22   reductase gene.  That's a marker gene that I assume we'll

23   come to late that allows one to select for cells,

24   transforming, transfected cells that have high copy numbers

25   of that DNA and thus make more EPO.

```
 1            Those are the principal components of the vector.
 2    There are others.
 3            MR. GALVIN:  If we could have Exhibit 52, Roche's
 4    BLA at Page 4723.  And if we could highlight the sentence
 5    that begins, "The DHFR cell line."
 6    Q   Let me read this for you, Dr. Lodish.  Do you see the
 7    sentence:  The DHFR cell line DUKX-B11 was used as the host
 8    system for expression of recombinant human EPO.
 9            Do you see that?
10    A   Yes.
11    Q   Now, let's look at Exhibit 1.
12            MS. BEN-AMI:  Objection, your Honor; report.
13            THE COURT:  Overruled at this point.  I'll be
14    alert.
15    Q   And this is from the '933 patent at column 25.  What is
16    your understanding as to the CHO cell line Dr. Lin reported
17    using in his patent?
18            MS. BEN-AMI:  Objection, your Honor; relevance.
19            THE COURT:  Overruled.
20    A   It's the same cell line.
21            THE COURT:  That's what you understand?
22            THE WITNESS:  That is what I understand, correct.
23    Q   If we could go back to Roche's BLA Exhibit 52, at Page
24    4723.
25            Do you see the sentence -- could you read for the
```

1   jury the sentence that begins "High level expression of

2   EPO."

3   A   Yes.  High level expression of EPO is achieved by

4   transformation of the DHFR negative CHO cells with a vector

5   expressing both EPO and DHFR cDNAs, and subsequent gene

6   amplification by selection in increasing levels of the DHFR

7   inhibitor methotrexate (MTX, an inhibitor of DHFR).

8          MR. GALVIN:  And if we could turn to Page 4722 of

9   Roche's BLA.  And if we could highlight the first sentence

10  in that, actually both sentences in that call-out.

11  Q   Dr. Lodish, could you read for the jury this portion of

12  the BLA?

13  A   Sure.  The Epoetin beta, parentheses, EPO, coding

14  information within the cDNA probe used is encoded in 579

15  nucleotides, coding for a 27 amino acid leader peptide and a

16  166 amino acid protein.  This is further processed into a

17  165 amino acid protein by removal of one C-terminal amino

18  acid.

19  Q   And could you please explain your understanding as to

20  how the 166 amino acid residue is removed in Roche's

21  production --

22          MS. BEN-AMI:  Objection, your Honor; report.

23          MR. GALVIN:  Blue at Paragraphs 210 through 214.

24          MS. BEN-AMI:  210 through 214 did you say?

25          MR. GALVIN:  Yes.  The last sentence of --

1          **MS. BEN-AMI:**  Objection, your Honor.

2          **THE COURT:**  Wait one second.  I didn't hear him.

3     The last sentence of?

4          **MR. GALVIN:**  The last sentence of Paragraph 210.

5          **MS. BEN-AMI:**  I would ask your Honor to look at

6     Page 84 also, the heading.

7          **THE COURT:**  And Page 84.  Just a moment.

8          No, he may testify consistent with Paragraph 208

9     through 214.

10         **MS. BEN-AMI:**  Your Honor?

11         **THE COURT:**  That's my ruling.

12         **THE WITNESS:**  I'm sorry, could you repeat the

13    question?

14    **Q**   Could you explain how the 1 --

15    A    Oh, the 165 is formed.  Yes.

16         It's essentially what I testified to yesterday.

17    All cells, including CHO cells, take this EPO DNA, make

18    messenger RNA, and then use it to synthesize this 166

19    amino --

20         **MS. BEN-AMI:**  Objection, your Honor.

21         **THE COURT:**  No, overruled; he may have it.

22    A    -- 166 amino acid peptide.  And then in CHO cells, of

23    those I said yesterday, not all cells, that last amino acid,

24    the arginine, is cut off by the cellular machinery resulting

25    in the 165.

```
 1              THE COURT:  As I understand it here, and looking at
 2     these paragraphs, you agree there are some differences but
 3     you say they're insubstantial?
 4              THE WITNESS:  I'm sorry, differences between what?
 5              THE COURT:  I'm looking at your --
 6              THE WITNESS:  Differences between 1 6 --
 7              THE COURT:  Look above 208 there.  Paragraph 208.
 8     Don't take anything from me.
 9              THE WITNESS:  No, no, no, no, no.  This is the blue
10     book at --
11              THE COURT:  I'm not asking you.  I'm telling the
12     jury not to take anything from me.
13              THE WITNESS:  Okay.  This is the blue book at
14     Paragraph 208?
15              THE COURT:  Correct.
16              MR. GALVIN:  Your Honor, may we have a side bar?
17              THE COURT:  I don't think so.  Now, there's a
18     caption --
19              THE WITNESS:  I'm sorry, I may be in the wrong one
20     because --
21              THE COURT:  There's a caption above that.  See that
22     caption?
23              THE WITNESS:  I may be in the wrong place.  Is this
24     on Page 84?
25              THE COURT:  Yes, it's around there.  Or
```

 1    specifically, I'll direct you to the caption, yes, on Page

 2    84, entitled E.  See that caption?

 3            **THE WITNESS:**  I'm on the wrong page.  I'm terribly

 4    sorry.

 5            **THE COURT:**  It's Page 84, bolded, there's a caption

 6    there.

 7            **THE WITNESS:**  The differences between --

 8            **THE COURT:**  No, don't -- I didn't ask you to read

 9    it.  I just, I just point you to it.  And then I put my

10    question.

11            **THE WITNESS:**  I see.  Yes.

12            **THE COURT:**  I'm saying, so you're saying, if we go

13    over to, on what I'm going to let you testify, Paragraph 208

14    to 214, you're saying there are some differences here but

15    they're insubstantial.  Is that correct?

16            **THE WITNESS:**  That is correct.  Yes.

17            **THE COURT:**  All right.  You go ahead --

18            **THE WITNESS:**  I'm sorry.

19            **THE COURT:**  -- Mr. Galvin.

20    **Q**   Dr. Lodish, what is the amino acid link -- amino acid

21    sequence of the EPO produced by Roche's cells?

22    A   It is --

23            **MS. BEN-AMI:**  Objection.

24            **THE COURT:**  Overruled.

25    A   It is the amino acids 1 to 165 which are described very

1    clearly in the Lin patent.  It's the same amino acid

2    sequence amino acid by amino acid.

3            **MS. BEN-AMI:**  Objection, your Honor.  I move to

4    strike the last part of that.

5            **THE COURT:**  Overruled; it may stand.

6    **Q**   If you go back to claim 1 of the '868 patent, Dr.

7    Lodish.

8    A   Uh-huh.

9    **Q**   The reference to isolated DNA sequence encoding for

10   erythropoietin.

11   A   Yes.

12   **Q**   What do you understand it to mean when a c -- let me

13   withdraw that.

14           What do you understand it to mean when a cDNA clone

15   is isolated?

16           **MS. BEN-AMI:**  Objection, your Honor.  This is the

17   claim glossary.

18           **THE COURT:**  Well, I'll listen to his answer.

19   Overruled.  He's got to adopt the construction that has been

20   placed upon the language, and I expect he will.

21           Go ahead.

22   A    Yes.  Yes.  Essentially, cDNA is a DNA copy of a

23   messenger RNA.  And typical cells will contain messenger

24   RNAs for hundreds if not thousands of different proteins.

25           **MS. BEN-AMI:**  Objection, your Honor.

1          **THE COURT:**  Overruled; that may stand.

2     A    And these messenger RNAs are then copied by the

3     experimentalist into DNA.  And what one has then is a

4     collection of DNAs each of which corresponds to one

5     messenger RNA or one different protein that's made by the

6     cell.  And to isolate, or equivalently to clone a cDNA,

7     means going into that collection of DNAs, one can imagine it

8     as a library, it is a library, and picking out the one DNA,

9     the one book from the thousands in the library that has the

10    gene you want, in this case, the EPO, or erythropoietin

11    gene.  That's what we mean by isolating a DNA from a

12    collection of irrelevant DNAs.

13    Q    Do you have an opinion, Dr. Lodish --

14         **MS. BEN-AMI:**  Objection.  Your Honor, that's not in

15    the report.

16         **THE COURT:**  Well, treating it as a motion to

17    strike, the motion to strike's denied.

18    Q    Dr. Lodish, do you have an opinion as to whether or not

19    after cloned human EPO DNA is inserted into a plasmid vector

20    it is still isolated DNA?

21         **MS. BEN-AMI:**  Objection; report.

22         **THE COURT:**  Where is it?

23         **MR. DAY:**  Red, at Paragraphs 122 and 123.

24         **THE COURT:**  He may testify consistent with those

25    paragraphs.

1    A   Yes, it is still isolated, that is, it is not

2    contaminated by DNAs that code for other proteins that are

3    irrelevant.

4         **MS. BEN-AMI:**  I object, your Honor.

5    A   So it's the same isolated DNA.

6         **THE COURT:**  Overruled; that may stand.

7         **MR. GALVIN:**  If we may see from Exhibit 52 Page

8    4728 of Roche's BLA.

9         **THE WITNESS:**  Thank you.

10   **Q**   Dr. Lodish, could you read the highlighted portion of

11   Page 4728 from Roche's BLA?

12   A   Sure.  Following identification of a genomic EPO clone,

13   a cDNA clone was isolated from human fetal liver cDNA

14   library using a fragment of the genomic clone as a probe.

15   **Q**   And, Dr. Lodish, what is your understanding of the DNA,

16   the DNA encoding EPO that was inserted to produce Roche's

17   cells?

18   A   It clearly was an isolated DNA, and here they describe

19   the isolation of that DNA from a library, that is,

20   collection of DNAs from fetal liver that correspond to

21   hundreds if not thousands of irrelevant proteins.

22   **Q**   And what did that DNA encode?

23   A   That DNA encodes human EPO.

24   **Q**   If we turn to the next limitation of '868 claim 1 which

25   states "isolating said glycosylated erythropoietin

1    polypeptide therefrom."

2    A    Uh-huh.

3    **Q**    What is the basis for your opinion that this limitation

4    is satisfied by Roche's process?

5    A    The isolation steps are clearly defined in the Roche

6    BLA.

7    **Q**    And could you describe for the jury what steps Roche

8    performs to isolate the glycosylated EPO polypeptide?

9    A    Sure.

10          **MS. BEN-AMI:**   Objection, your Honor; report and

11   claim construction.

12          **MR. GALVIN:**   Blue report at Paragraph 90 and 158.

13          **THE COURT:**   He may testify consistent with

14   Paragraph 90, and he's required to stick to the claim

15   construction which is law of the case.

16   A    Yes.   The cells are growing in, the Roche cells are

17   growing in suspension culture, that is, the cells are

18   surrounded by a nutrient medium that contains sugars,

19   vitamins, other things that the cells need to grow.   The

20   recombinant human EPO is secreted from these cells.   And the

21   cells are growing in large vats, thousand liter, that's

22   250 gallons, roughly.   And the first thing they do is filter

23   the cells away because all of the EPO is in the growth

24   medium.   So they go through a filtration step.   And then in

25   this large vat of growth medium they concentrate the

1    recombinant EPO, and then use standard biochemical

2    procedures to purify it away from other contaminants.

3              **MS. BEN-AMI:**  That last sentence, your Honor, I

4    object, in light of the claim construction.

5              **THE COURT:**  No, overruled.

6              **MR. GALVIN:**  Your Honor, may I approach the

7    witness?

8              **THE COURT:**  You may.

9    **Q**   Now, Dr. Lodish, looking at claim 1 of the '868 patent,

10   is it your opinion that all of the limitations of claim 1 of

11   the '868 patent are satisfied by Roche's process for making

12   EPO?

13   **A**   Yes.  For all the reasons I've just explained.

14   **Q**   And may I make a mark next to claim 1?

15   **A**   Please check it off.

16             **MS. BEN-AMI:**  Objection, your Honor.

17             **THE COURT:**  Overruled.

18   **A**   Make a check.

19             **THE COURT:**  He may -- look, I had a -- I teach a

20   course, that's why we start late on Wednesdays.  And my

21   students are watching this.  They're lawyers.  And they're

22   saying we're watching the World Series of civil litigation.

23             Well, I didn't say that.  A younger lawyer said

24   that.  So here's what this is.

25             You know why he's here.  He's here to testify as to

 1    infringement claim by claim.  We'll see what he says.

 2    Naturally, it's up to you whether you believe it, disbelieve

 3    it, or believe it in part.  He gives opinions.  That's why

 4    we've got the report.  Again, the opinions I've already told

 5    you, and I'll tell you at the end of the case, any opinion

 6    witness, listen to what they say, but also listen to what

 7    it's based on.

 8          Now, they think it gives added pizazz to check off

 9    each claim.  Fine.  So you know, I think you ought to know

10    what's going on.  That's what's going on.  It's not

11    inappropriate.  But it's not testimony.  It's a lawyer doing

12    a check.  Fine.  Go ahead, check away.

13          And, you know, I interrupt simply out of honor to

14    you.  I think you -- it's not inappropriate.  It may be

15    effective advocacy.  The course is about how to do this, how

16    to try cases.  This is fine.  I just don't want any

17    confusion.  I want to keep so conscious what evidence is.

18    Checks on a demonstrative aid aren't evidence of anything.

19    But, they may recall to your attention that that's what this

20    fellow's opinion is.  We'll see what Ms. Ben-Ami has to say

21    on cross-examination.  And two weeks from today the case

22    will be in your hands.

23          Go ahead, check away.

24       **MR. GALVIN:**  Thank you, your Honor.

25    **Q**   Dr. Lodish, do you have an opinion whether the

1    limitations of claim 2 of the '868 patent are satisfied?

2    A    Yes, clearly as I've testified the O cells are CHO cells

3    and therefore every, since everything else in claim 2 is the

4    same as in claim 1, the claim, the requirements of claim 2

5    are also satisfied.  So, please check that.

6    **Q**    One final question on '868 claim 1, Dr. Lodish.

7              Do you have an opinion whether or not the

8    product -- do you have an opinion as to whether or not

9    Roche's importation of Mircera results in importation into

10   the United States of the product of the processes recited in

11   '868 claims 1 and 2?

12            **MS. BEN-AMI:**  Objection, your Honor; report.

13            **MR. GALVIN:**  Blue at Paragraph 162, your Honor.

14            **MS. BEN-AMI:**  Your Honor?

15            **THE COURT:**  Overruled; he may testify.

16            **THE WITNESS:**  Yes.

17            **THE COURT:**  At that level of generality you may

18   testify.

19   A    Yes.  Roche, as I understand it, is importing peg-EPO of

20   which EPO, recombinant human EPO, the product of the process

21   of this claim.  Recombinant human EPO is the essential

22   component of peg-EPO and, therefore, yes, they are importing

23   into the United States the product.

24            **MS. BEN-AMI:**  I object, your Honor.

25            **THE COURT:**  Yes, strike out the business about

1   what's the most important part of it.  There's nothing about

2   that there.

3          **THE WITNESS:**  Okay.

4          **THE COURT:**  And that will be my ruling.

5          **MR. GALVIN:**  Thank you, your Honor.

6   **Q**   Dr. Lodish, let's now turn to the '698 claim at issue.

7   And my first question to you, Dr. Lodish, are there any

8   terms in the '868 claim 6 that you've already discussed

9   today?

10  **A**   Yes.  The first part of the claim process for production

11  of a glycosylated erythropoietin polypeptide, we talked

12  about that.  Having the in vivo biological property of

13  causing bone marrow cells to increase production of

14  reticulocytes and red blood cells, I believe we discussed

15  that.

16  **Q**   And, Dr. Lodish, if I may put brackets around that

17  language?

18  **A**   Please.

19  **Q**   Anything else that you discussed?

20  **A**   We've talked about growing under suitable nutrient

21  conditions.

22         **MS. BEN-AMI:**  Your Honor, I object to the -- is

23  this the lawyer testifying now?

24         **THE COURT:**  No, no.

25         **THE WITNESS:**  No, this is me.  I'm sorry.

1          **THE COURT:**  You really can't play all the roles.

2     You can tell him to check things and he'll check them.  But

3     I am a little jealous of doing my bit part here.

4          **THE WITNESS:**  I'm sorry.

5          **THE COURT:**  Overruled.  The testimony is that of

6     the witness.

7     A    And I've already testified to the fact that Roche

8     isolates the glycosylated erythropoietin polypeptide

9     expressed by these cells.  So certainly (b) is there.

10    **Q**    May I --

11    A    Please bracket off (b), yes.

12    **Q**    So looking then at the remaining language in '868 claim

13    6, "vertebrate cells."

14    A    Yes.

15    **Q**    In your opinion does Roche use vertebrate cells to make

16    EPO?

17    A    Yes.  As I've already testified, they use CHO cells

18    which are vertebrate cells.

19    **Q**    And turning to the phrase "amplified DNA encoding the

20    mature erythropoietin amino acid sequence of Figure 6."

21    A    Yes.

22    **Q**    Do you see that?

23         If we could have Figure 6B of Dr. Lin's patent on

24    the screen which we showed the jury yesterday.

25         Where does the DNA sequence encoding the mature

1    erythropoietin amino acid sequence of Figure 6 begin?

2         **MS. BEN-AMI:**  Objection, your Honor; the report.

3         **THE COURT:**  Where, where in the report?

4         **MR. GALVIN:**  Your Honor, blue, Exhibit V, at

5    Paragraph 117, identifies the sequence.

6         **THE COURT:**  Wait a minute.

7         **MS. BEN-AMI:**  Objection, your Honor.

8         **THE COURT:**  Wait just a minute.  Exhibit V is it?

9         **MR. GALVIN:**  Exhibit V as in victor.

10        **THE COURT:**  V again.  No, sustained.  Move on.

11   **Q**   Dr. Lodish, what is your understanding of the DNA

12   sequence that encodes the mature erythropoietin -- let me

13   withdraw that.

14        Dr. Lodish, what definition of the term DNA

15   encoding the mature erythropoietin amino acid sequence of

16   Figure 6 did you apply in rendering your opinions?

17        **MS. BEN-AMI:**  Objection; report.

18        **THE COURT:**  Where?

19        **MR. GALVIN:**  Exhibit V, your Honor.

20        **THE COURT:**  Sustained.

21        **MR. GALVIN:**  Under the section, your Honor, if I

22   may be heard, proposed claim construction.

23        **THE COURT:**  You certainly can't be heard in front

24   of the jury.

25        **MR. GALVIN:**  May I have a side bar?

1           THE COURT:  You may have a side bar.

2    SIDEBAR CONFERENCE, AS FOLLOWS:

3           MR. GALVIN:  Your Honor, DNA encoding nutrients.

4    These are definitions he applied to this prior construction.

5           THE COURT:  Well, fine.

6           MR. GALVIN:  This 1 through 166.

7           THE COURT:  Yes, you can argue it.  This fails the

8    standards of an adequate report.  References to V are always

9    going to be sustained.

10          MR. GALVIN:  Your Honor, he also identified --

11          THE COURT:  You can have him read from documents.

12   That doesn't have to be in the report.  You can't use the

13   report this way to get it.

14          (Whereupon the sidebar conference concluded.)

15          MR. GALVIN:  May we have, please have Exhibit 52,

16   Roche's BLA at 4735 on the screen.

17   Q   And, Dr. Lodish, could you read the title of Figure 2?

18   A   Sure.  It's Nucleotide and Amino Acid Sequence of an EPO

19   Fetal Liver cDNA.

20   Q   And could you read the description under the figure?

21   A   Sure.  As I understand it the line --

22          MS. BEN-AMI:  Objection.

23   A   I'm sorry, do you want me just to read the legend under

24   the figure?

25   Q   Yes.

1  A    I'm sorry.  Well, it says 27 amino acid leader, 166

2  amino acid mature product.

3  Q    If we turn to Page 4736 of Roche BLA, Exhibit 52.

4  A    Yes.

5  Q    And what does the figure, heading say for Figure 2?

6  A    It says it's the Nucleotide and Amino Acid Sequence of

7  an EPO Fetal Liver cDNA, continued.

8  Q    And, Dr. Lodish, what is your opinion or understanding

9  about what this document shows?

10          **MS. BEN-AMI:**  Objection, your Honor; report.

11          **THE COURT:**  Yes, the opinion you say is only in

12  Exhibit V, correct?  Correct?

13          **MR. GALVIN:**  Paragraph 156, your Honor.

14          **THE COURT:**  Oh, 156.

15          He may testify in light of 156 starting with the

16  second mention of the word Roche in the first sentence.

17  A    Well, to answer the question --

18          **MS. BEN-AMI:**  There's no cite, your Honor.

19          **THE COURT:**  What?

20          **MS. BEN-AMI:**  There's no cite to this exhibit in

21  this paragraph.

22          **THE COURT:**  I understand that.  And I'm not sure

23  that the question can be answered the way you phrased it

24  given the way he started here.

25          Let's -- you put another question, Mr. Galvin.

1    **Q**   Dr. Lodish, is it your opinion that Roche's DN2-3a3

2    cells contain amplified -- contain DNA encoding mature

3    erythropoietin amino acid sequence of Figure 6?

4            **MS. BEN-AMI:**  Leading, your Honor.

5            **THE COURT:**  Sustained on that ground.

6    **Q**   What is your opinion, Dr. Lodish, regarding whether

7    Roche's DN2-3 alpha 3 cells contain DNA encoding the mature

8    erythropoietin amino acid sequence of Figure 6?

9    **A**   They contain it.  They contain a DNA with this sequence,

10   and as one can see starting -- perhaps if you could

11   highlight the nucleotide, the --

12           **MS. BEN-AMI:**  Objection, your Honor.  He's using

13   the exhibit; it's not in his report.

14           **THE COURT:**  Yes.  Sustained.

15   **Q**   If we could just put the exhibit down now and just

16   answer the question, Doctor.

17   **A**   Yes.  It contains a sequence of nucleotides that encode

18   the amino acids of human EPO starting at position 1, the

19   first alanine, and ending at position 166, the last

20   arginine.

21   **Q**   Now, returning to the term, the claim term amplified in

22   claim 6 of the '698 patent.

23   **A**   Yes.

24   **Q**   What is the basis for your opinion that Roche's cells

25   contain amplified DNA encoding the mature erythropoietin

1    amino acid sequence of Figure 6?

2    A    They describe this again in the BLA.

3    **Q**    And based upon your review of the BLA, what is your

4    understanding of how Roche amplifies the EPO DNA?

5              **MS. BEN-AMI:**  Same objection, your Honor; report.

6              **THE COURT:**  Grounds?  Where is it?

7              **MR. GALVIN:**  Blue at Paragraph 86, and blue at 156.

8              **THE COURT:**  Yes, he may testify consistent with

9    those two paragraphs.  Again, the 156, starting with the

10   second mention of Roche in the first sentence.

11   A    The DNA vector that they introduce into the cell

12   contains the human EPO gene --

13             **MS. BEN-AMI:**  Objection, your Honor.

14             **THE COURT:**  Overruled; he may continue.

15   A    Thank you.  -- contains the human EPO gene, it contains

16   elements that cause the gene to be copied into RNA, and it

17   contains a marker gene called DHFR.  And DHFR is an enzyme

18   that is inhibited by a drug called methotrexate.

19             **MS. BEN-AMI:**  Objection, your Honor.

20             **THE COURT:**  Overruled; he may continue to testify.

21   A    They transform the cells and select cells that have this

22   DNA molecule inserted into the chromosomal DNA.  By adding,

23   increasing amounts of this drug methotrexate, they can

24   select over a period of weeks cells that have increased copy

25   numbers of the DNA encoding this DHFR enzyme, conveys

1    resistance to the drug.

2              **MS. BEN-AMI:**  Objection, your Honor.

3              **THE COURT:**  No, overruled.

4    A   And because the DHFR DNA, the marker DNA, is part of the

5    same DNA molecule as the EPO DNA molecule, when you select

6    for CHO cells that have enhanced numbers of this marker DNA,

7    the DHFR gene, you concomitantly select for cells that have

8    high levels of the EPO gene.  And --

9              **MS. BEN-AMI:**  Objection; now we're outside the

10   report, your Honor.

11             **THE COURT:**  Well, now I think you ought to ask

12   another question.

13             **THE WITNESS:**  Okay.

14             **THE COURT:**  I don't necessarily agree with that.

15             Go ahead.  Mr. Galvin, put a question.

16   **Q**   Dr. Lodish, based upon your understanding of the Roche

17   BLA --

18   A   Yes.

19   **Q**   -- sections that you reviewed, do you have an opinion

20   whether there are increased number of copies of the EPO gene

21   in Roche's cells?

22             **MS. BEN-AMI:**  Report, your Honor.

23             **MR. GALVIN:**  Paragraph 87.

24             **THE COURT:**  Overruled.

25   A   Yes, I do.  The BLA states very clearly that these have,

1    I forget the exact number, but it's probably around a

2    hundred copies of the EPO gene.

3           **MR. GALVIN:**  If we could see Roche BLA Exhibit 52

4    at 4987.

5    **Q**   Do you see the sentence, Dr. Lodish:  Upon further

6    selection with increasing levels of the drug methotrexate

7    (MTX, an inhibitor of DHFR), the co-integrated DHFR and EPO

8    sequences were amplified to high copy number.

9           Do you see that?

10   **A**   I see that, yes.

11   **Q**   And is that one of the bases for your opinion --

12   **A**   It is.

13   **Q**   -- Dr. Lodish, that you testified about?

14          **MS. BEN-AMI:**  Objection, your Honor.

15          **THE COURT:**  Sustained.  You're leading the witness.

16   Don't lead the witness.  The answer is stricken.  This is a

17   are you wearing a red hat question.  He can't answer those

18   questions on direct examination, and you know that,

19   Mr. Galvin.

20          **MR. GALVIN:**  I'm sorry, your Honor.

21          **THE COURT:**  Ask an appropriate question.

22   **Q**   How does, how does this quote from Roche's BLA relate to

23   your opinion?

24          **MS. BEN-AMI:**  Objection.

25          **THE COURT:**  Well, he may --

1              MS. BEN-AMI:  It's the report, it's Exhibit V

2      again.

3              THE COURT:  I'm sorry, I didn't hear.

4              MS. BEN-AMI:  It's Exhibit V again, your Honor.

5              MR. GALVIN:  Paragraph 86, your Honor.

6              THE COURT:  No, he may, he may have -- he may read

7      from it.  And let's see.

8              MR. GALVIN:  Pages --

9              THE COURT:  Wait one minute.  Yes.  Overruled.  He

10     may have it.  How does that relate, sir?

11             THE WITNESS:  How does that relate to my opinion?

12     It supports my opinion.  It shows directly that they're

13     selecting cells with increased amounts of this drug

14     methotrexate, and this selects for cells that have amplified

15     numbers of both the dihydrofolate reductase marker gene and

16     the EPO gene, they're co-integrated, which means they're

17     linked together on the same DNA molecule.

18     Q    Dr. Lodish, in your opinion, how does Roche's process

19     for making EPO compare with all of the limitations of the

20     claim 6 of the '698 patent?

21     A    It clearly meets all of the limitations.

22     Q    Do you have an opinion as to whether or not Roche's

23     importation of Mircera results in the importation into the

24     United States of the product of the process recited in '698

25     claim 6?

```
 1    A   Yes.

 2              MS. BEN-AMI:  Objection, your Honor.  Your Honor,

 3    please, I need to object here.  This is not in the report.

 4              THE COURT:  Yes, where is it?

 5              MR. GALVIN:  Blue at Paragraph 162, your Honor.

 6              THE COURT:  162.

 7              MS. BEN-AMI:  Your Honor, I need a side bar, if

 8    possible.

 9              THE COURT:  I need a side bar, too.  So let's have

10    it.

11    SIDEBAR CONFERENCE, AS FOLLOWS:

12              THE COURT:  You need to let me go first.

13              MS. BEN-AMI:  Okay.

14              THE COURT:  Since this is a declaratory judgment

15    action, I've sort of assumed and since we have litigated

16    whether the imminence of Roche's production run supports a

17    declaratory judgment action, and Amgen won on that, we have

18    the case in controversy so that satisfies the constitution

19    and we're going to resolve it here.

20              So, I'm not going to tell the jury anything

21    about -- I hadn't thought I was -- about importation.

22    Because the question to me in this phase is does it infringe

23    directly under the doctrine of equivalents, conceivably

24    reverse doctrine of equivalents, end.

25              But your line of questioning now is making me think
```

1    that maybe you have to prove in this case something about

2    importation.  So I want to hear Amgen.  I didn't think you

3    had to prove anything in --

4             MR. DAY:  May I speak to that?

5             THE COURT:  Yes.  I'm missing something and I think

6    maybe that it gives weight to things Ms. Ben-Ami has been

7    arguing.

8             Go ahead.

9             MR. DAY:  Okay.  Under Section 271(g) of the Patent

10   Act, 35 U.S.C. 271(g) --

11            THE COURT:  One she's been mentioning frequently.

12            MR. DAY:  As has Amgen --

13            THE COURT:  Well, all right.

14            MR. DAY:  -- in our summary judgment brief.

15            THE COURT:  Okay.

16            MR. DAY:  And under 271(g) your Honor, in a process

17   claim, so we're looking at a process claim, if you --

18            THE COURT:  And this is the materially changed --

19            MR. DAY:  Correct.

20            THE COURT:  -- business.  And so that's going to

21   have to be in my charge because if they're importing

22   something that's materially changed they're okay.

23            MR. DAY:  So the imminence, let me deal with, just

24   with the imminence, then with the statute -- because you

25   have asked about do we have to prove importation.  No, we do

1    not have to prove that importation imminent.  It's a

2    declaratory judgment action.

3              THE COURT:  Yes, but --

4         MR. DAY:  The application for BLA satisfies that

5    because they're seeking permission to import the product

6    into the U.S.

7              THE COURT:  But my point is they don't have to

8    prove it before this jury because I've already resolved it.

9         MR. DAY:  That's correct.  So now the second

10   question is, when the product is manufactured overseas there

11   are 271(g), then you must establish that the product of the

12   process is not materially changed before it is imported into

13   the United States.

14             THE COURT:  Wait.

15        MR. DAY:  That's the question.

16             THE COURT:  Say that to me again.  Because it ties

17   in with things Ms. Ben-Ami's arguing.  You have to prove --

18             MR. DAY:  The product --

19             THE COURT:  -- the product from the process.

20        MR. DAY:  -- of the process.

21             THE COURT:  The product of the process.

22        MR. DAY:  If it is not materially changed before it

23   is imported into the United States.

24             THE COURT:  Materially changed to something that

25   doesn't infringe.

1          **MR. DAY:**  So, for example --

2          **THE COURT:**  That's a question.  Is that material

3     changed?

4          **MR. DAY:**  So the question is if the product of the

5     process is materially changed before it's imported into the

6     United States then it doesn't infringe under 271(g).

7          **THE COURT:**  Even if the process over -- now I've

8     got it.  If the process overseas would be infringing if

9     conducted in the United States, if the product of the

10    process is materially changed.

11         **MR. DAY:**  Yes.

12         **THE COURT:**  Prior to the importation.

13         **MR. DAY:**  Yes.

14         **THE COURT:**  There's no infringement.

15         **MR. DAY:**  That's right.

16         **THE COURT:**  But if it's not -- okay.

17         Ms. Ben-Ami, now I understand some of things that

18    you've been arguing about, and I apologize.

19         **MS. BEN-AMI:**  That's okay.  This is a moving

20    process.

21         **THE COURT:**  Indeed it is.  All right.  So having

22    that in mind, what's the objection here?

23         **MS. BEN-AMI:**  The first objection is that I keep

24    objecting about what's in the report, your Honor.  I don't

25    want to argue about every little nit in this report, but he

1    never testified that this, this process, the direct product

2    of this process is being imported into the United States in

3    his report.

4              **THE COURT:**  No.

5         **MS. BEN-AMI:**  He's just done that on the '868

6    patent which I was objecting to.

7              **THE COURT:**  Okay.

8         **MS. BEN-AMI:**  Now he's doing it on the '698 patent.

9    And he cites to the '868 patent.

10             **THE COURT:**  I see.  All right.

11        **MR. DAY:**  Excuse me, may I --

12             **THE COURT:**  Wait a minute.  Wait a minute.

13        **MS. BEN-AMI:**  And --

14             **THE COURT:**  Wait a minute.  Well, let me say

15   something about the trial administration.  His testimony is

16   not going to be sufficient to establish, since you've got to

17   establish importation of imminence, his testimony is not

18   going to get that.

19        What do you say to the fact that he's going to a

20   different, he's going to a different patent to support the

21   testimony?  That's what she says.

22             **MR. DAY:**  His testimony makes a different point.

23   He's not making the point that Ms. Ben-Ami is making.  His

24   testimony is that the product that is being imported

25   infringes because the product that is being imported

 1    contains the product of the process that is claimed, it's

 2    manufactured by infringing the process -- let me finish,

 3    just a second, your Honor.

 4            THE COURT:  Yes.

 5            MR. DAY:  That it's being imported, the product

 6    that's being imported, since the product of the process and

 7    that product has not been materially changed.  That's what

 8    the statute says.

 9            THE COURT:  Well, where does he say that, what you

10    just said.  Where's that?

11            MR. GALVIN:  Your Honor, it's not the importation,

12    this section is the manufacturing process for all of the

13    asserted process claims.

14            THE COURT:  Where is it?

15            MR. GALVIN:  Page 60, section --

16            MS. BEN-AMI:  I'm sorry, I can't hear or see.

17            MR. DAY:  Page 66.

18            MS. BEN-AMI:  Thank you.

19            THE COURT:  Roche's manufacturing process.

20            MR. GALVIN:  Then the last paragraph, 162 says

21    that --

22            MS. BEN-AMI:  Page 62?

23            THE COURT:  Where does he talk about, where does he

24    talk about that it's not materially changed.

25            MR. GALVIN:  That is in Paragraph 168.  Again, it's

```
 1      a section --

 2              THE COURT:  168.  Is not materially change.

 3              MS. BEN-AMI:  In his report he says I agree it's

 4      been changed, but I don't think it's material.  Now he's

 5      saying it's not been changed at all.  And that's not in his

 6      report, your Honor.

 7              THE COURT:  Well, is he saying it's not changed at

 8      all?  He's not, I didn't think.  Because I picked up on

 9      this, though it was sort of ignorance.

10              MR. DAY:  Your Honor, let me characterize, if I

11      may, okay and I'll let Mr. Galvin speak directly to what the

12      testimony will be.

13              THE COURT:  Yes.

14              MR. DAY:  If you have a process for

15      manufacturing -- I'm going to make an analogy.  If you have

16      a process for manufacturing an automobile engine --

17              THE COURT:  This is too long an argument for a side

18      bar.

19              MR. DAY:  -- and put it in a car and import the

20      car.

21              THE COURT:  Yes.

22              MR. DAY:  Now having a car with an automobile

23      engine does materially change the --

24              THE COURT:  I understand that's the image you want

25      to convey.
```

 1          I don't think he's done any particular harm.  I'm

 2   not going to allow them to either argue actual importation.

 3   And where he said not materially changed, I'm not going to

 4   let him walk away from some changes because that's what the

 5   report says.  And so if I've missed the question, I've

 6   missed it.  But in the great wash of questions, it's not

 7   going to make any difference.  Because if I have to, I will

 8   charge consistent with the report.

 9          **MS. BEN-AMI:**  I just wanted you to understand why

10   I'm objecting, your Honor.

11          **THE COURT:**  No, no, I appreciate that.  And now I

12   understand a number of things better and I appreciate it.

13          **MR. FLEMING:**  Thank you, your Honor.

14          **THE COURT:**  You may proceed.

15          (Whereupon the sidebar conference concluded.)

16          **THE COURT:**  Proceed, Mr. Galvin.

17   BY  **MR. GALVIN**

18   **Q**   Dr. Lodish, do you have an opinion as to whether or not

19   Roche's importation of Mircera results in the importation

20   into the United States --

21          Dr. Lodish, do you have an opinion whether or not

22   the Mircera product contains the product of the process

23   recited in '698 claim 6?

24          **MS. BEN-AMI:**  Objection; report, your Honor.

25          **THE COURT:**  No, overruled.  He may have it.

1    A    It does.

2    Q    I'm turning to claim 7 of the '698 patent, Dr. Lodish.

3    What is your opinion about '698 claim 7 with respect to

4    Roche's process?

5    A    Roche's process satisfies all of the requirements of

6    claim 7.  As we've described, these vertebrate cells

7    comprise amplified marker gene DNA, that is, the

8    dihydrofolate reductase gene.

9    Q    And what is your opinion regarding whether Roche's

10   process satisfies the limitations of claim 8?

11   A    Again, the marker gene is the DHFR, dihydrofolate

12   reductase gene DNA.  All the other claim requirements are

13   satisfied, it clearly satisfies claim 8.

14   Q    And what is your opinion regarding whether Roche's

15   process satisfies claim 9?

16   A    It does.  Because it's going back to claim 6, the cells

17   that are employed on mammalian cells, Chinese hamster ovary

18   cells.  So, if you would like to you may check it.

19   Q    In the interest of time I will move on, Dr. Lodish.

20   A    Okay.  Thank you.

21   Q    Turning to '349 claim 7, Dr. Lodish.

22   A    Yes.

23   Q    What is the basis for your opinion that '349 claim 7 is

24   satisfied?

25        MS. BEN-AMI:  Your Honor, I think at this point we

```
 1    need a side bar.

 2            THE COURT:  You may have one.

 3    SIDEBAR CONFERENCE, AS FOLLOWS:

 4            MS. BEN-AMI:  I know you got hit with a list of

 5    motions this morning.  The one I want to relate to that he

 6    is claiming, there is no evidence that is admissible in this

 7    case that there is an RIA determination of Roche's product.

 8    There's no evidence.  And --

 9            THE COURT:  The RIA.

10            MS. BEN-AMI:  This claim says determined by RIA.

11            THE COURT:  Yes.  Okay, now I understand what that

12    is.

13            MS. BEN-AMI:  And so, he is relying on a different

14    test, ELISA, and by law if it says determined by RIA, it

15    means determined by RIA.

16            THE COURT:  Okay.  All right, I understand that

17    argument.

18            MR. GALVIN:  Your Honor, Dr. Lodish will testify

19    that the ELISA and RIA tests are comparable and reach the

20    same results.  He will offer that opinion.

21            THE COURT:  Yes.

22            MR. GALVIN:  He will also --

23            THE COURT:  And that's in here.  Okay, you got to

24    start there.  I don't fault you for going from the general

25    or the resultant and then working back.  Given this
```

1    objection, I want to hear the foundation, and thank you.

2         **MS. BEN-AMI:**  Your Honor, as matter of law if the

3    claim says determined by RIA, you cannot read the claim

4    limitation out of a claim.  You cannot say I would like to

5    read something else.  It's a claim limitation.  It says

6    determined by RIA.  It doesn't say determined by any test.

7    The claim limitation --

8         **THE COURT:**  Yes.  Well, all right.  I follow that.

9    But then aren't you going to succeed on that in your motion

10   for a directed verdict?

11        **MS. BEN-AMI:**  Okay.

12        **THE COURT:**  Say this is all they can do.  I'm --

13        **MS. BEN-AMI:**  Assuming --

14        **THE COURT:**  Assuming, as I must, that I'm persuaded

15   by argument, and the record supports it, this is a waste of

16   time for them.  If you can persuade me.  But first, the

17   foundation.

18        **MR. GALVIN:**  Yes, your Honor.

19        (Whereupon the sidebar conference concluded.)

20   **BY  MR. GALVIN**

21   **Q**   If we focus first on claim 7, the phrase a process for

22   producing erythropoietin.

23        Dr. Lodish, what is your basis for your opinion

24   that Roche satisfies that claim term?

25   **A**   Well, clearly the BLA describes a process for producing

1   recombinant human erythropoietin.  Spelled out many, many

2   places.

3   **Q**   And the next phrase in claim 7, step of culturing, under

4   suitable nutrient conditions, vertebrate cells.  What.

5        Is the basis for your opinion that Roche satisfies

6   that limitation?

7   A   Again, they describe in great detail in the BLA how they

8   culture these vertebrate cells in suspension culture in

9   these large thousand-gallon bioreactors.

10  **Q**   And do you see the reference according to claim 1, 2, 3,

11  4, 5 or 6?

12  A   Yes.

13  **Q**   What is your understanding as to how claim 7 relates the

14  these other claims?

15  A   Well, the cells must satisfy the requirements of at

16  least one of claims 1 through 6.

17  **Q**   Okay.  Let's then look at claim 1 which is up on the

18  board, vertebrate cells which can be propagated in vitro.

19  A   Yes.

20  **Q**   Why in your opinion does Roche's process satisfy this

21  limitation?

22  A   Well, clearly they're using Chinese hamster ovary cells

23  that are vertebrate cells, and in vitro is simply a word

24  meaning outside the body, in glass is the original meaning

25  of the word, but basically outside the body in culture

1    dishes.  And clearly as we discussed these cells can be and

2    are propagated in vitro.

3    **Q**   The next limitation of '349 claim 1 states:  Capable

4    upon growth in culture of producing erythropoietin in the

5    medium of their growth in excess of 100 U of erythropoietin

6    per ten to the six cells in 48 hours as determined by

7    radioimmunoassay.

8          Do you see that limitation?

9    A   Yes.

10   **Q**   Based on your investigation, what information, if any,

11   contained in Roche's BLA do you understand to be relevant to

12   your opinion relating to this limitation?

13   A   The Roche BLA contains very specific numbers of how much

14   recombinant human EPO their cultures produce over periods of

15   time --

16         **MS. BEN-AMI:**  Objection, your Honor.

17   A   -- that is --

18         **MS. BEN-AMI:**  This is inconsistent with what he

19   just read.

20         **THE COURT:**  Just a moment.  Yes, but it doesn't do

21   it by radioimmunoassay, does it?

22         **THE WITNESS:**  I'm sorry, are you asking me a

23   question?

24         **THE COURT:**  I am.

25         **THE WITNESS:**  Roche's BLA measures EPO by a very

 1    similar assay which is ELISA.

 2              THE COURT:  Did you hear my question?

 3              THE WITNESS:  It does not use radio -- okay.

 4              THE COURT:  Did you hear it?

 5              THE WITNESS:  Yes.

 6              THE COURT:  Okay.

 7              THE WITNESS:  I'm sorry.

 8              THE COURT:  Do you understand it?

 9              THE WITNESS:  Could you repeat it?

10              THE COURT:  Do you understand my question?

11              THE WITNESS:  Could you repeat it, please?  I may

12    not have.

13              THE COURT:  But Roche does not use

14    radioimmunoassay, does it?

15              THE WITNESS:  No, it does not.  Excuse me.

16              THE COURT:  Thank you.  Go ahead, Mr. Galvin.

17              MR. GALVIN:  If we could display Exhibit 52 from

18    Roche's BLA at 5073.

19    Q    And looking at this section that begins "Without MTX,"

20    how does this section, quoted section from Roche's BLA

21    relate to your opinions?

22              MS. BEN-AMI:  Object, your Honor, for the same

23    foundational reasons.  It's a continuing objection for the

24    same foundational reasons.

25              THE COURT:  I understand and I'll give you a

1    continuing objection.  But I'll allow the answer to the

2    question.

3    A   What it spells out in --

4         MS. BEN-AMI:  Objection.  This part is not cited in

5    his report, your Honor.

6         MR. GALVIN:  Your Honor, blue at Paragraph 150.

7         THE COURT:  Overruled; he may testify consistent

8    with that.

9    A   What it describes is the amount of EPO measured in

10   micrograms, that is, millions of a gram, per ten to the six.

11   That's shorthand for million cells per day.  So it's a

12   stated amount of EPO that the cells made growing in culture.

13   Q   And what is your understanding of what micrograms refers

14   to?

15   A   It's a measure of mass, that is, weight of the EPO, that

16   is, the number is in --

17        MS. BEN-AMI:  Objection; this is outside his

18   report, your Honor.

19        THE COURT:  Yes.  Where is it?

20        MR. GALVIN:  Blue at Paragraph 150.

21        THE COURT:  He may testify consistent with 150.

22   A   Yes.

23        MS. BEN-AMI:  He's not talking about this --

24        THE COURT:  Please.  That's my order.  He can

25   testify consistent with 150.

1    A    A microgram is a millionth of a gram.

2              MS. BEN-AMI:  Objection, your Honor.

3              THE COURT:  No, that will stand.

4    A    And it's simply stating how much mass of EPO this

5    million cells makes over a period of time in culture.

6    Q    Based upon -- if we could go and highlight the last

7    sentence.

8              Using the value of 3.7 micrograms of EPO per ten to

9    the six cells per day, what is your understanding of how

10   many micrograms of EPO per ten to the six cells for 48 hours

11   would be produced by Roche's cells?

12             MS. BEN-AMI:  And object for the same foundational

13   reason, your Honor.

14             THE COURT:  I'll give you a continuing objection on

15   that.  But your objection is overruled and he may testify.

16   A    Well, simply put, if it's 3.7 micrograms of EPO per

17   million cells per day, it would be double that, or 7.4

18   micrograms of EPO per million cells for 48 hours, which is

19   the claim term.

20   Q    What, if anything, more would you need to perform your

21   analysis to determine whether or not Roche's cells produced

22   100 units of erythropoietin per ten to the six cells in 48

23   hours?

24             MS. BEN-AMI:  Objection, your Honor.

25             THE COURT:  Where's that in the report?

1          **MR. GALVIN:**  Blue, at Paragraph 150.  And Footnote

2     7.  37.

3          **THE COURT:**  Wait one second.  150.

4          **MR. GALVIN:**  Yes.

5          **MS. BEN-AMI:**  What footnote are you --

6          **THE COURT:**  Sustained.  You're withdrawing it?

7          **MS. BEN-AMI:**  No, I asked a question.

8          **THE COURT:**  Sustained.  Go ahead.

9     **Q**   Dr. Lodish, based upon your review of the BLA, is it

10    your understanding that Roche produced, provides a value for

11    the biological activity of EPO?

12    A   Yes.

13         **MS. BEN-AMI:**  Objection, your Honor; leading.

14         **THE COURT:**  Yes, sustained, and the answer is

15    stricken.

16    **Q**   What information, if any, does Roche's BLA provide

17    regarding the biological activity for the EPO produced by

18    Roche's DN2-3 alpha 3 cells?

19    A   It contains --

20         **MS. BEN-AMI:**  Report.  Report.

21         **THE COURT:**  Overruled.  It's there.

22    A   It contains a number which allows one to convert

23    micrograms to international units, which is another measure

24    of EPO that is spelled out in the patent.

25    **Q**   If we could turn to Exhibit --

1          MS. BEN-AMI:  Your Honor, could I have a side bar,

2     please?

3          THE COURT:  Not at this point.

4     Q    If we could turn to Exhibit 52, BLA 5581.

5          Based upon this reference in the BLA, can you

6     identify the biological activity you were referring to?

7          MS. BEN-AMI:  Again, your Honor.  It's --

8          THE COURT:  You object to that question?

9          MS. BEN-AMI:  I object but --

10         THE COURT:  Overruled.

11    A    This is the number 207,700, this is international units

12    or units, and it's normalized to a milligram which is a

13    thousandth of a gram.

14    Q    And what would that value be in micrograms?

15    A    It would be one-one-thousandth of that, or 207

16    international units per microgram.

17    Q    Using these two values, have you performed a calculation

18    to determine the number of international units of EPO per

19    ten to the six cells for 48 hours produced by Roche's DN2-3

20    alpha 3 cells?

21         MS. BEN-AMI:  Your Honor, I need a side bar.

22         THE COURT:  You may have it.

23    SIDEBAR CONFERENCE, AS FOLLOWS:

24         MS. BEN-AMI:  The report, and this is the purified

25    material.  This is not the --

1          THE COURT:  Please talk to me.

2          MS. BEN-AMI:  I'm sorry, this is not the material

3    coming out of the cells.  This is the purified material.

4    This is absolutely misleading this jury.

5          THE COURT:  What do you say?

6          MR. GALVIN:  Your Honor, the material is the

7    purified material.  But the step is isolating the

8    glycosylated --

9          MS. BEN-AMI:  And, your Honor --

10         MR. DAY:  May I speak?  May I speak?

11         THE COURT:  No, I don't think we're going to

12   continue.  I have to say I think you're in serious trouble

13   on this claim.  But, no, I'm going to let him.

14         MS. BEN-AMI:  But the --

15         THE COURT:  And you can correct it.  If he's that

16   far off base it seems to me that will significantly affect

17   his credibility.

18         MS. BEN-AMI:  Your --

19         THE COURT:  I'm very troubled by this

20   radioimmunoassay, I'll tell you.

21         (Whereupon the sidebar conference concluded.)

22   BY  MR. GALVIN

23   Q    So, Dr. Lodish, using these two values, are you able to

24   calculate the number of international units of EPO per ten

25   to the six cells for 48 hours?

1    A    Yes, I'm able to calculate that number.

2    Q    And what was the result?

3    A    The result was in round numbers 1,500 units of EPO per

4    million cells in 48 hours.

5              THE COURT:  This is the purified substance, right?

6              THE WITNESS:  No.  This is the amount of EPO that

7    is in the culture medium of the cells as determined by these

8    assays.  It's a measure, your Honor, of how much the cells

9    are producing in a particular period of time.

10             THE COURT:  Go ahead, Mr. Galvin.

11   Q    Based upon your understanding of Roche's BLA, what

12   technique, if any, did Roche use to measure the rate that

13   their cells produce EPO?

14   A    They used an assay called ELISA to measure the amount of

15   EPO in the culture fluids.

16   Q    And do you have any experience using or interpreting

17   results from ELISA tests?

18   A    Extensive experience.

19   Q    And do you have any experience using or interpreting

20   results from radioimmunoassay tests?

21   A    Again, extensive experience.

22   Q    And based upon your experience and review of Roche's

23   documents, do you have an opinion as to what the results

24   would be if radioimmunoassays were used to measure the rate

25   of production of Roche's cells rather than ELISA?

1      **MS. BEN-AMI:**  Object to this question, your Honor.

2      **THE COURT:**  Overruled.

3   A   They would be very similar, if not identical.

4   Q   And why do you say that?

5   A   Because --

6      **MS. BEN-AMI:**  Objection, your Honor.

7   A   -- both assays use --

8      **THE COURT:**  Overruled.  Go ahead.

9   A   I'm sorry.  Both assays use an antibody to measure the

10  amount of radio -- excuse me, both assays use an antibody to

11  EPO which binds specifically to EPO to measure how much EPO

12  is in the culture fluids.  In a radioimmunoassay one uses

13  radioactive tracers to monitor how much antibody is bound to

14  EPO.  In ELISA, it's a similar assay except one uses an

15  enzyme attached to the antibody as a measure.

16      The reason I say the results are equiv --

17      **MS. BEN-AMI:**  Objection.

18      **THE COURT:**  I think we'll stop it there and have

19  another question.

20      **THE WITNESS:**  Okay.

21  Q   And based on the technique that is used in RIA and the

22  technique that is used in ELISA, what is the basis for your

23  conclusion that the tests would lead to comparable results?

24      **MS. BEN-AMI:**  Objection.

25      **THE COURT:**  Overruled.

1    A    Both assays use a purified standard of erythropoietin as

2    an internal control.  So one is measuring the reactivity of

3    an unknown substance to the reactivity of a known amount of

4    EPO, and it's very simple then to calculate how much EPO

5    there is in this unknown sample.  And since they're both

6    antibody-based assays, use similar antibodies, the results

7    should be very similar if not identical, as they are.

8    Q    Dr. Lodish --

9         MS. BEN-AMI:  Objection, your Honor, to the last

10   sentence.

11        THE COURT:  Well, I thought you said here in your

12   report they're not identical, are they?

13        THE WITNESS:  They're very similar, correct.

14        THE COURT:  Well, that's not identical, is it?

15        THE WITNESS:  No.

16        THE COURT:  All right.

17        THE WITNESS:  I'm sorry.

18        THE COURT:  Go ahead, Mr. Galvin.

19   Q    In this case, Dr. Lodish, have you reviewed any

20   materials relating to radioimmunoassay tests performed with

21   Roche's cells?

22   A    I have.

23   Q    What have you reviewed?

24   A    These were experiments done on Roche's cells.  They were

25   cultured by Dr. Richard Kolodner who's a professor at

1  University of California at San Diego, and the culture

2  fluids were assayed by Dr. McClellan who's a professor at

3  the University of Chicago, and I've reviewed both.

4  **Q**   Do scientists in your field rely on the results of

5  radioimmunoassay in their work?

6      **MS. BEN-AMI:**  Objection, your Honor.  May we have a

7  side bar to this, please?

8      **THE COURT:**  You may.

9  SIDEBAR CONFERENCE, AS FOLLOWS:

10      **THE COURT:**  Anticipating, assuming the full

11  protocol on this experiment has been disclosed to you, he

12  can give us his opinion based on those results.  But he

13  can't give us the results.  That's how 702 works.

14      **MS. BEN-AMI:**  So all he can say in my opinion --

15      **THE COURT:**  Based on these results from these

16  experiments, based on those results, I think the conclusion.

17  But the rest is hearsay.  He can't get that.  He cannot get

18  the hearsay in.

19      **MS. BEN-AMI:**  Okay, your Honor, I understand what

20  you're saying.  But I think that type of ruling puts defense

21  in an impossible situation.

22      **THE COURT:**  That's 702.  It's clear.  You can

23  examine with respect to it.  But they can't get the hearsay

24  in.

25      **MS. BEN-AMI:**  Once I examine then they can.

1      **THE COURT:**  Once you examine they can, to the level

2   of completeness, I guess.  You're right.  702 says that.

3   I -- 702 has the force of a statute.  I'm required to follow

4   it.  He's relying on things like this.  You'll have your

5   expert.  I can't make up my own rules.

6      **MS. BEN-AMI:**  I don't -- well, I object, your

7   Honor.  I don't think that's right.

8      **THE COURT:**  Noted.

9      (Whereupon the sidebar conference concluded.)

10  **BY  MR. GALVIN**

11  **Q**   Dr. Lodish, based upon your review of the data from the

12  radioimmunoassay test, do you have an opinion as to whether

13  or not the tests performed on Roche's DN2-3a3 cells

14  establish that Roche's cells produce erythropoietin in the

15  medium of their growth in excess of 100 U of erythropoietin

16  per ten to the six cells in 48 hours as determined by

17  radioimmunoassay test?

18      **MS. BEN-AMI:**  Objection.

19      **THE COURT:**  Sustained.  He can't testify to what

20  the test results are.  He can testify to what his opinion

21  is, after he's looked them over.

22  **Q**   After reviewing the test, the radioimmunoassay tests

23  performed by Dr. McClellan, do you rely on those tests in

24  support of your opinion?

25  **A**   Yes, I do.

1          **MS. BEN-AMI:**  Objection.

2          **THE COURT:**  That he may have.

3  **Q**   And based upon your review of Dr. McClellan's test as

4  well as the information in Roche's BLA, do you have an

5  opinion whether or not Roche's cells are capable upon growth

6  in culture of producing erythropoietin in the medium of

7  their growth in excess of 100 U of erythropoietin per ten to

8  the six cells in 48 hours as determined by radioimmunoassay?

9          **MS. BEN-AMI:**  Objection.

10         **THE COURT:**  Overruled.

11  A   I have an opinion, and the cells do.

12  **Q**   Turning to the last limitation of '349 claim 7 which

13  states "said cells comprising non-human DNA sequences which

14  control transcription of DNA encoding human erythropoietin."

15  A   Yes.

16  **Q**   What is the basis for your opinion that Roche satisfies

17  this limitation?

18  A   This non-human DNA sequence is described in the BLA as a

19  component of the vector, the DNA molecule that they

20  introduce into their CHO cells.

21  **Q**   And what is the name of the component in Roche's cells

22  that satisfies this limitation?

23  A   Its name is the adeno, adeno 2, I believe, major late

24  promoter, or MLP.

25         **MR. GALVIN:**  May we have Exhibit 52 at BLA4722.

1    Q    And under the fragment, next to fragment 6, could you

2    read what this states.

3    A    Yes.  It says Adenovirus Type 2.  That would be under

4    the heading the source of the DNA.  And it says:  Adenovirus

5    major late promoter element necessary for transcription of

6    the EPO cDNA.  The element is active in combination with the

7    SV 40 enhancer.

8    Q    And how does this relate to your opinion?

9    A    Well, this is the DNA sequence, it's a promoter sequence

10   that instructs the cell's RNA synthesizing machinery to copy

11   the adjacent segment of DNA, in this case, the EPO gene,

12   into messenger RNA that will in turn make EPO protein.  So

13   it is a nonhuman, adenovirus is nonhuman, DNA sequence that

14   controls transcription of the DNA encoding human EPO.

15   Q    What is your opinion regarding whether or not Roche's

16   process for making EPO satisfies all of the limitations of

17   '349 claim 1?

18   A    As I trust I've spelled out in detail, it satisfies all

19   the requirements of claim 1.

20   Q    And what is your opinion whether or not Roche's process

21   for making EPO satisfies all the limitations of claim 7?

22   A    Well, it certainly does because the cells are grown

23   under suitable nutrient conditions, they're vertebrate

24   cells, and they're vertebrate cells that satisfy the

25   requirements at least of claim 1.

1    Q   Do you have an opinion as to whether or not Roche's

2    Mircera product contains the product of the process of claim

3    7 of the '349 patent?

4         **MS. BEN-AMI:**  Again, your Honor, I object, on the

5    report and what we've previously discussed.

6         **THE COURT:**  Noted, but overruled.

7         **THE WITNESS:**  I may answer?

8         **THE COURT:**  You may.

9    A   Yes.  Mircera clearly contains the product of this

10   process that is recombinant human EPO.

11   Q   Dr. Lodish, what is your understanding -- changing

12   subjects -- of what peg is?

13   A   Peg is a shorthand name for a substance called

14   polyethylene glycol.  It is a polymer that is a collection

15   of small units.  Each of the individual units is ethylene

16   glycol, which is a component of antifreeze.  And chemists

17   link these together to form long, repeating molecules called

18   polyeythelene glycol.

19   Q   Do you have an opinion as to what role, if any, peg

20   plays in stimulating red blood cell production?

21   A   It plays no role whatsoever.  It's an inert, that is,

22   inactive molecule biologically and does not interact with

23   EPO receptors or bone marrow cells and has no effect on red

24   cell production.

25   Q   Do you have an understanding as to whether or not other

1     proteins have been pegylated before peg-EPO?

2               **MS. BEN-AMI:**  Objection, your Honor.  Side bar,

3     please.  We have a prior ruling on this.

4               **THE COURT:**  You may have a side bar.

5     SIDEBAR CONFERENCE, AS FOLLOWS:

6               **THE COURT:**  Yes?

7               **MS. BEN-AMI:**  You during discovery asked for

8     discovery from Amgen about other peg products.

9               **THE COURT:**  And they wouldn't give it.

10              **MS. BEN-AMI:**  Right.

11              **THE COURT:**  No, I know and I'm reading briefs about

12    it.

13              Now, why are we asking about this?

14              **MR. GALVIN:**  This is a general question, gives

15    background.

16              **THE COURT:**  Yes.  Sustained.

17              (Whereupon the sidebar conference concluded.)

18    **BY  MR. GALVIN**

19    **Q**   Dr. Lodish, I would like to ask you some questions about

20    the structure of peg-EPO.

21              **MR. GALVIN:**  May we have Exhibit 53 of Roche's BLA.

22    Page 4027.

23    **Q**   Dr. Lodish, what do you understand the chemical

24    structure that is depicted on Roche's BLA at 4027 to

25    represent?

1    A    Well, as they say it's, RO is their tradename or

2    commercial name for peg-EPO.  And it's the chemical

3    structure of the molecule.  On the right, E P O signifies

4    EPO, or human erythropoietin.

5         MS. BEN-AMI:  Objection, your Honor.  If he's just

6    saying it's his opinion, I'm not objecting.

7         THE COURT:  I understand.  And that is your

8    opinion?

9         THE WITNESS:  It is my opinion.  I'm sorry, I'm

10   expressing -- it is my opinion reading the document that the

11   E P O specifies EPO.  This chemical structure is the

12   chemical structure of a polyethylene glycol.  The CH2CH2O

13   are the ethylene glycol sub-units, and there are n of them,

14   which is 681 linked together.  And then this is a small

15   piece of the molecule which allows it to be connected by a

16   single chemical bond to EPO.  And what I understand the

17   brackets to mean with the subscript m is the number of these

18   chains that are attached to EPO.  And here they specify that

19   m is 1, that is, peg-EPO has one of these polyethylene

20   glycol chains attached to one EPO protein.

21   Q    Approximately how many chemical bonds, if any, do you

22   understand there to be between the glycosylated EPO

23   molecule -- well, let me withdraw that.  Sorry.

24        Approximately how many chemical bonds do you

25   understand there to be in a glycosylated EPO molecule

1    without pegylation?

2    A    It's well over 4,000 different chemical bonds.

3    Q    And after the peg is attached, how many chemical bonds

4    do you understand to be formed between the EPO and peg

5    molecules?

6            **MS. BEN-AMI:**  Objection, your Honor.

7    A    One.

8            **THE WITNESS:**  Grounds?

9            **MS. BEN-AMI:**  I'll withdraw it.

10           **THE COURT:**  Withdrawn.

11   A    It says here that there's one.

12   Q    Based on your investigation, how many atoms on the EPO

13   molecule do you understand to be affected, if at all, when

14   peg attaches to EPO?

15   A    Two atoms.

16   Q    Turning to BLA4029.  If we could have Figure 1.

17           Based upon your investigation of Roche's BLA, where

18   do you understand peg can attach to EPO?

19   A    It can attach at any one of nine locations.  It can

20   attach to nitrogen atoms on lisine residues that are

21   abbreviated in one letter code K.  There are eight lisines

22   each of which is potentially a site to which a peg could

23   bind.  Peg can also bind to the nitrogen atom on the alanine

24   residue, that is, the first amino acid of the protein.  So

25   in total there are nine possible sites.

1    **Q**    What do you understand to be the major pegylation sites

2    of EPO?

3    A    As Roche spells out in their BLA, the major site is this

4    alanine residue and then two of the eight lisine residues.

5    **Q**    What significance, if any, in your opinion does the

6    location where peg attaches to the EPO molecule have?

7    A    Well, it --

8            **MS. BEN-AMI:**  Objection; report.

9            **MR. GALVIN:**  Blue at Paragraph 105.

10           **MS. BEN-AMI:**  Objection.

11           **THE COURT:**  Yes, overruled.

12           **MS. BEN-AMI:**  Your Honor?

13   A    Well, if peg attached to a lisine or to an alanine that

14   was somewhere near the site that EPO used to bind to its

15   receptor, looking at EPO as a key --

16           **MS. BEN-AMI:**  Again, your Honor.  It's not in his

17   report.

18           **THE COURT:**  Have in mind the paragraph to which Mr.

19   Galvin --

20           **THE WITNESS:**  I am.

21           **THE COURT:**  All right.

22           **THE WITNESS:**  I should not --

23           **THE COURT:**  Stick to it.

24           **THE WITNESS:**  I will stick to the words.

25   A    If peg were attached to a site in EPO that were at or

1    near the site or the region of the protein that was

2    necessary to bind to the receptor, the presence of the peg

3    would destroy or inhibit that interaction.

4              **MS. BEN-AMI:**  Objection.  Same objection.

5              **THE COURT:**  No, that testimony may stand.

6    **Q**   What effect, if any, Dr. Lodish, do you understand the

7    attachment to peg to have on the amino acid sequence of EPO?

8    **A**   It has no change at all.  It's the same amino acid

9    sequence of EPO before and after peg is added.

10   **Q**   What effect, if any, do you understand the attachment of

11   peg to have on the carbohydrate structure of EPO?

12   **A**   It has no effect whatsoever.  The peg does not interact

13   with the carbohydrate chains.

14             **MR. GALVIN:**  May we have Exhibit 53, Roche's BLA,

15   at 4027.

16   **Q**   And we have highlighted the first sentence on this

17   paragraph, two-thirds down:  Both EPO starting material and

18   R00503821 have the identical amino acid sequence and

19   composition of the carbohydrate moiety.

20             Do you see that sentence, Dr. Lodish?

21   **A**   Yes, I do.

22   **Q**   What do you understand that sentence to mean?

23   **A**   It means what it says.  Another way of saying it is that

24   in addition to peg, does not affect the amino acid sequence

25   of the EPO and it does not affect the composition of the

1  attached sugar chains.

2       **MR. GALVIN:**  If we could highlight the next

3  sentence that follows that begins "RO0503821 differs."

4  Q    What is your understanding of that statement in Roche's

5  BLA?

6  A    Simply put, it describes the chemical nature of this

7  single bond that is formed between a peg molecule and the

8  EPO molecule either at a lisine residue or at this

9  N-terminal alanine, the N-terminal in that group.  The

10 statement of the nature of this chemical bond.  Single bond.

11 Q    In your opinion, how, if at all, does the attachment of

12 peg to the EPO affect the three-dimensional structure of the

13 EPO molecule?

14 A    There's no affect at all in the three-dimensional

15 structure of EPO.

16 Q    Dr. Lodish, could you please turn in your binder to

17 Tab 4.

18 A    Yes.

19 Q    BEG.  Do you recognize BEG?

20 A    Yes.  It is -- should I describe what the document is?

21 Q    What is it?

22 A    It's titled "CERA Continuous Erythropoietin Receptor

23 Activator."  It's a Roche document and --

24      **MS. BEN-AMI:**  Objection.  Objection; no foundation.

25      **THE COURT:**  Is this document in evidence?

```
 1              MR. GALVIN:  Your Honor, I offer BEG.

 2              THE COURT:  BEG.  Any objection?

 3              MS. BEN-AMI:  Yes, there's an objection, your

 4    Honor.

 5              THE COURT:  May I see it.  It's attached to his --

 6    yes, BEG.  It's not.

 7              MS. BEN-AMI:  I'm sorry.

 8              MR. GALVIN:  Tab 4, your Honor.

 9              THE COURT:  Thank you.

10              MS. BEN-AMI:  Your Honor, may --

11              THE COURT:  He's offering this.  Do you object to

12    this?

13              MS. BEN-AMI:  I do.

14              THE COURT:  All right.

15              MS. BEN-AMI:  I think I need a side bar to explain

16    it to you.

17              THE COURT:  All right.

18    SIDEBAR CONFERENCE, AS FOLLOWS:

19              MS. BEN-AMI:  Your Honor, I don't know what these

20    blue things are.  I don't know if they're attached or not to

21    this document.

22              THE COURT:  Yes.

23              MS. BEN-AMI:  There's no evidence this was written

24    by Roche.  There are outside scientists who do these things

25    and there's no evidence that this was written by Roche.
```

1          **THE COURT:**  Yes.  But isn't it an adoptive

2     admission?  It's for your investors.

3          **MS. BEN-AMI:**  People who are to invest in Roche.

4     Investment companies do these things themselves.  This

5     doesn't mean that Roche, that Roche created the information

6     in this document.

7          **THE COURT:**  But you produced it.

8          **MS. BEN-AMI:**  I believe it was produced by Roche,

9     yes.

10          **THE COURT:**  Yes.

11          **MS. BEN-AMI:**  But that doesn't --

12          **THE COURT:**  No, no.

13          **MS. BEN-AMI:**  That's a third-party document.

14          **THE COURT:**  It may be.  And so what do you say to

15     that?

16          **MR. GALVIN:**  Your Honor --

17          **THE COURT:**  They're very sticky on authentication,

18     but I have to follow the rules.

19          **MR. GALVIN:**  Your Honor, if the only thing is

20     production, I have some problems with this.  It has the

21     Roche logo here.

22          **MS. BEN-AMI:**  But that doesn't -- an outside person

23     can put a Roche thing on it.

24          **THE COURT:**  Not without your thought.  Not without

25     your acceptance I mean.

```
 1            MS. BEN-AMI:  Your Honor, there's no foundation for
 2    this.  This is discovery in this case.  They have an RO
 3    productivity number on this document.  I don't normally
 4    object to something like this, but I don't believe that this
 5    is a Roche document.
 6            THE COURT:  Well, have you, have you got -- have we
 7    got any basis for suggesting that it is an outside investor?
 8            MS. BEN-AMI:  It has, I believe it has information
 9    for Dr. MacDougall who is an outside person.
10            THE COURT:  Where is that?
11            MS. BEN-AMI:  Okay.  Looking at the second page for
12    example, turn to the second page, your Honor, Page 6069,
13    John Michalidis, Business Director of Roche.
14            THE COURT:  Just a moment.  6069.
15            MR. GALVIN:  Right here, your Honor.
16            THE COURT:  Yes.  Yes.
17            MS. BEN-AMI:  See here.  This, this is an outside
18    employee.  He talks about CERA making -- this is what
19    they're going to do.  These were all outside people who are
20    doing clinical trials.  But every -- all these doctors who
21    do the clinical trials, they do it for Roche, they work for
22    Amgen, they work for Glaxo, they work for anybody.
23            THE WITNESS:  It's in, but good enough.  It may be
24    admitted.
25            (Whereupon the sidebar conference concluded.)
```

1          THE COURT:  BEG may be admitted in evidence

2     Exhibit 54.

3               (Exhibit marked in evidence.)

4          MR. GALVIN:  Could you call Exhibit 54 onto the

5     screen.

6     Q    Do you see where it says "CERA Continuous Erythropoiesis

7     Receptor Activator," Dr. Lodish?

8     A    Yes.

9     Q    And if we turn just to the next page in the document.

10    Under the heading agenda, do you see the name John

11    Michalidis, Business Director of Roche?

12    A    Yes.

13    Q    And do you see the Roche corporate logo in the top right

14    hand corner?

15    A    Yes.

16    Q    If we could turn to Page 073.  What is your

17    understanding --

18          MS. BEN-AMI:  I do object, your Honor, because it's

19    part written by Roche, there's another party shown.

20          THE COURT:  Please.  That all remains to be

21    established.  Overruled.  It's admitted.

22    Q    What is your understanding of the depiction of the

23    structure of EPO and CERA on Exhibit 54?

24    A    Yes.  This is the EPO structure, it's not a good

25    reproduction, but this would be the three-dimensional

1    structure of, the known three-dimensional structure of human

2    EPO, the attached carbohydrate chains which have no fixed --

3              **MS. BEN-AMI:**  Objection; report, your Honor.

4              **THE COURT:**  Where is it?

5              **MR. GALVIN:**  Blue at Paragraph 99.

6              **THE COURT:**  Yes.  Yes.  He may testify.  Overruled.

7    Overruled.

8              But it's time for the break.  So we'll get the

9    answer, then we'll take the break.

10   A    The simple answer is this is a three-dimensional

11   structure of recombinant human EPO.  It's depicted exactly

12   the same way as the EPO part of peg-EPO, or CERA.

13             **THE COURT:**  All right.  We'll take the morning

14   recess at this time.  Someone give Ms. Smith, since you put

15   stuff up here, Mr. Galvin, give her a hand clearing away for

16   the jury.

17             You've not heard all the testimony.  Please,

18   therefore, keep your minds suspended and do not discuss the

19   case either among yourselves nor with anyone else.

20             Now, we'll wait for counsel to get out of your way.

21   And we'll stand in recess for one-half.  We'll recess.

22             **THE CLERK:**  All rise for the jury.

23             (Whereupon the jury left the courtroom.)

24             (Recess.)

25

 1              THE CLERK:  All rise for the jury.

 2              (Whereupon the jury entered the courtroom.)

 3              THE CLERK:  Court is in session, please be seated.

 4              THE COURT:  Counsel, I need a sidebar.

 5    SIDEBAR CONFERENCE, AS FOLLOWS:

 6              THE COURT:  This is just for the management of the

 7    case, and because we've had some colloquy about this.  I

 8    originally thought that where Roche doesn't use

 9    radioimmunoassay, that made a big difference and had

10    something to do with literal infringement, and I was making

11    checkmarks in my notes.  And then I looked at the claim, and

12    I say, No, no, it's only they've got to have a product which

13    can be -- produce this much erythropoietin, measured, and of

14    course you've nailed that place down.  You have measured it.

15              But now I have an evidentiary problem, and I simply

16    want you to know what it is.  This fellow didn't do these

17    experiments.  Other people did these experiments.  This

18    fellow has no value added.  I think I know how 702 works,

19    and I will follow 702, but his opinion is just -- his

20    opinion is nothing more than repeating hearsay.  So you've

21    got to prove up these experiments, at least one of them, or

22    you're not going to get to the jury on this point.

23              MR. DAY:  Thank you, your Honor.

24              (Whereupon the sidebar conference concluded.)

25              THE COURT:  Proceed, Mr. Galvin.

1          MR. GALVIN:  Thank you, your Honor.

2               DIRECT EXAMINATION (Cont'd)

3    (BY MR. GALVIN:)

4    Q.  Dr. Lodish, have you prepared a colored demonstrative

5    based upon Roche's picture of CERA that we see here in

6    Exhibit 54?

7          MS. BEN-AMI:  Objection, no foundation.

8          THE COURT:  Well, that question is yes or no.  Have

9    you?

10         THE WITNESS:  Oh, yes.

11         MR. GALVIN:  May we have demonstrative HL896?

12         THE COURT:  Remember, this is only a demonstrative.

13   It's the Amgen folks who made it up.  That doesn't mean

14   there's anything the matter with it.  The colored one isn't

15   evidence.  Only the testimony of the witness is the

16   evidence.

17         All right.  Is this in the report?

18         MR. GALVIN:  Yes, your Honor.

19         THE COURT:  Where is it?

20         MR. GALVIN:  The graphic is at blue Exhibit R at

21   17, a copy of the graphic.

22         THE COURT:  Just one moment, R 17.

23         MR. GALVIN:  R, Slide 17.

24         THE COURT:  Thank you, I see it.

25   Q.  Dr. Lodish, could you please describe what is depicted

1    on this slide?

2    A.   Sure.   It is the same three-dimensional structure of the

3    EPO polypeptide that's in Roche's that we just saw.   It's

4    colored yellow.   We're, in a sense, looking at the

5    protein --

6         **MS. BEN-AMI:**   Objection.   Report, your Honor.

7    There's no --

8         **THE COURT:**   No, no.   This falls within the ambit.

9    I really don't think that's timely.   All he's doing is

10   describing.   You may have it.

11   A.   Right, it's the rigid three-dimensional structure of the

12   EPO polypeptide as determined from several biochemical

13   analyses.   It depicts the location of the four sugar

14   residues, the blue.   And I stress, sugar residues, unlike

15   proteins, don't have a fixed orientation, a fixed structure,

16   so they're actually moving around a bit in space.

17        And then attached, although you can't see it at a

18   single point, is this very long, flexible polyethylene

19   glycol chain.

20   **Q.**   Based upon your review of Roche's documents, are you --

21   do you have an understanding as to whether Roche has created

22   computer models depicting the three-dimensional structure of

23   peg-EPO?

24   A.   Yes, they have.

25        **MS. BEN-AMI:**   Objection.   No foundation.

1          **THE COURT:**  Well, he only -- he doesn't know of his

2   own knowledge, but as an opinion witness, he may look at

3   what has been produced.

4          Have you looked at something which suggests --

5          **THE WITNESS:**  Oh, I'm sorry, I didn't know you

6   were -- yes, I have.  In fact, this document that we just

7   had on the screen is Roche's depiction of the

8   three-dimensional structure peg-EPO, which is, except for

9   the colors, identical to mine.

10  **Q.**  Have you reviewed other Roche depictions of the

11  three-dimensional structure of peg-EPO?

12  A.  Yes, in several other documents.

13  **Q.**  And based upon your review, what is your -- how -- what

14  is your understanding of how Roche illustrates the structure

15  and shape of the EPO in peg-EPO?

16          **MS. BEN-AMI:**  Objection --

17          **THE COURT:**  Sustained.  Let's look at a Roche

18  document.

19          **MR. GALVIN:**  If we could have Exhibit 54.

20  **Q.**  Dr. Lodish, based upon your review of Exhibit 54, how

21  does Roche illustrate the structure and shape of the EPO in

22  peg-EPO?

23          **MS. BEN-AMI:**  Again, your Honor, I object.  There's

24  no foundation.

25          **THE COURT:**  Overruled.

1   A.   Although it's hard to see because of the coloring, the

2   shape and three-dimensional structure of the EPO in peg-EPO

3   is the same as the EPO.

4          **THE COURT:**  You may have a continuing objection as

5   to the foundation for the use of this document.  Your rights

6   are saved.

7          Go ahead.  Go ahead, Mr. Galvin.

8   **Q.**  Dr. Lodish, let's turn to '933, claim 3.  I'd like you

9   to focus on the first limitation in '933, claim 3, "a

10  non-naturally occurring glycoprotein product of the

11  expression in a mammalian host cell."  Focusing on that part

12  of the claim --

13  A.   Uhm-hmm.

14  **Q.**  -- what is your basis for your opinion that Roche's

15  product satisfies this limitation?

16  A.   Well, clearly the EPO, the recombinant human EPO that

17  they're using to make peg-EPO, is a non-naturally occurring

18  glycoprotein.  It does not occur naturally in nature.  And

19  it is the product of expression in a mammalian host cell,

20  the CHO cell.

21  **Q.**  Dr. Lodish, is the peg in peg-EPO expressed from a

22  mammalian host cell?

23  A.   No, it's not.

24  **Q.**  What significance, if any, does that have as to your

25  opinion that Roche's product satisfies the limitations of

1   '933, claim 3?

2          **MS. BEN-AMI:**  Objection.  Report, your Honor.

3          **THE COURT:**  Where is it?

4          **MR. GALVIN:**  Paragraph 129, blue.  And also 123 and

5   124.

6          **THE COURT:**  He may testify consistent with those

7   paragraphs.

8   A.   The EPO in peg-EPO -- I'm sorry, could you repeat the

9   question?

10  **Q.**  Sure.  What significance, if any, does the fact that the

11  peg in peg-EPO is not expressed from a mammalian host cell

12  have on your opinion?

13  A.   It does not change my opinion at all.  The EPO that is

14  this non-naturally occurring glycoprotein is, of course, the

15  active ingredient in the peg-EPO.

16  **Q.**  Moving to the next phrase, "of an exogenous DNA sequence

17  comprising a DNA sequence encoding human erythropoietin"?

18  A.   Yes.

19  **Q.**  What is your basis for your opinion that Roche's product

20  satisfies that limitation?

21  A.   As I've already testified, Roche's cells are generated

22  by transfecting, that is incorporating into the cells.

23  Exogenous means from outside the cell.  So it's bringing in

24  a DNA from the outside of the cell into the inside of the

25  cell.  And this would be the exogenous DNA.  And as I

1    described, this is a sequence, comprising a DNA sequence

2    encoding that is specifying the order of amino acids in

3    human erythropoietin.  So clearly that part is satisfied.

4    **Q.**  And what is the basis for your opinion that the Roche

5    product satisfies the limitation that said product

6    possessing the in vivo biological property of causing bone

7    marrow cells to increase production of reticulocytes and red

8    blood cells?

9    A.  As I have already testified, it's stated many places in

10   the BLA.

11   **Q.**  So what is your opinion regarding whether or not all the

12   limit allegations of '933, claim 3, are satisfied by the EPO

13   in Roche's peg-EPO product?

14   A.  They're clearly satisfied.

15   **Q.**  Dr. Lodish, what is your opinion regarding '933,

16   claim 7?

17   A.  It's the same.  All of the requirements of claim 3 are

18   included in claim 7.  And it specifies here that the host

19   cell is a nonhuman mammalian cell.  Chinese hamsters, like

20   all hamsters, are mammals.  They're clearly not human.  So

21   that is satisfied.

22   **Q.**  And what is your opinion regarding claim 8?

23   A.  Well, again, Chinese hamster ovary cells, CHO cells, are

24   derived from these hamster cells.  It's clearly a nonhuman

25   mammalian cell.  So, in summary, all of the claims here are

1    satisfied.

2    **Q.**   I'd like to turn to '933, claim 12.  And focusing on the

3    claim term "pharmaceutical composition," what is the basis

4    for your opinion that Roche's Mircera product is a

5    pharmaceutical composition?

6    A.   Well, it states in the BLA that Mircera is a

7    pharmaceutical composition intended for human use.

8    **Q.**   Dr. Lodish, if you could turn to Tab 6 in your notebook,

9    which is marked for identification as Exhibit GXF?

10   A.   Uhm-hmm.

11   **Q.**   Do you recognize GXF?

12   A.   Yes, I do.

13   **Q.**   What is it?

14   A.   It is a Roche document that is entitled, "Information

15   for Patients and Caregivers, Mircera."

16          **MR. GALVIN:**  Your Honor, I offer GXF.

17          **MS. BEN-AMI:**  I object, your Honor.  I'd like a

18   sidebar.

19          **THE COURT:**  Very well.

20   SIDEBAR CONFERENCE, AS FOLLOWS:

21          **THE COURT:**  Grounds?

22          **MS. BEN-AMI:**  The grounds is this cannot prove

23   inducement to infringe, because for inducement to infringe,

24   you must have a direct infringer.

25          **THE COURT:**  Are you trying to get to the jury on

1    inducement to infringe in this declaratory judgment case?  I

2    was confused by that.  It seems to me that if you win on

3    infringement, as to any of these claims, and you're still

4    alive as to validity, I'm in a position then to move to the

5    remedy -- subject to Festo, depending on how things work,

6    I'm ready to move to the remedy phase of the case

7    jury-waived.

8            I just don't understand this infringement.  This

9    has not been a case which has, Look at what they did.  This

10   has just been a straight-up case saying, Look at the prior

11   art and the patents, now look at the patents and what Roche

12   is doing, arguably, overseas.  Because I'm past that.  Past,

13   it in the sense that I'm going to use a matrix much like it

14   was Amgen gave me at the beginning of the case.  It said the

15   various claims, valid, infringed.  Where are we going here?

16        **MR. GALVIN:**  Your Honor, I'm offering this for in

17   support of proof of infringement of '933, claim 12, which is

18   a claim to a pharmaceutical composition.  We also do have a

19   theory of infringement with respect to claim 14, which is

20   the method of treatment.  We're not there yet.  But we do

21   assert --

22        **THE COURT:**  You're not really on this inducement to

23   infringe, this is simply a Roche document which supports

24   your claim of infringement?

25        **MR. GALVIN:**  For claim 12.

```
 1              THE COURT:  That's enough, isn't it?  Looks to
 2     me --
 3              MS. BEN-AMI:  It's not in his report.  It's not in
 4     this witness' report, but they can still put it in as what
 5     it is.
 6              THE COURT:  Correct, they can.
 7              (Whereupon the sidebar conference concluded.)
 8              THE COURT:  GXF is admitted in evidence,
 9     Exhibit 55.
10              (Exhibit marked in evidence.)
11              MR. GALVIN:  If you could highlight the paragraph
12     under, "What is Mircera?"
13     (BY THE CLERK:)
14     Q.  It states, "What is Mircera?  Mircera is a product that
15     acts like the natural hormone human erythropoietin, which is
16     produced mainly by healthy kidneys.  Erythropoietin ensures
17     that enough red blood cells are produced by the body to
18     satisfy oxygen supply to all tissues."
19              Do you see those sentences, Dr. Lodish?
20     A.  Yes, I do.
21              MR. GALVIN:  And if we can put up the paragraph
22     under, "What is Mircera used for?"
23     Q.  It states what -- "Mircera is used to treat anemia in
24     patients with chronic kidney disease who may or may not be
25     on dialysis."  Correct, Dr. Lodish?
```

1    A.  Correct.

2         **MR. GALVIN:**  And if we can go and highlight the

3    sentence under, "How does Mircera work?"

4    **Q.**  It states, "When you are taking Mircera, your healthcare

5    provider will check the effect of the medicine with regular

6    blood tests.  Your blood tests may be referred to as

7    hemoglobin and/or hematocrit by your healthcare provider.

8    If these tests show an increase in the number of red blood

9    cells, then Mircera is working."

10        That's what it states; correct?

11   A.  Correct.

12   **Q.**  Now, Dr. Lodish, what is your opinion regarding whether

13   or not Mircera contains an effective amount of a

14   glycoprotein product effective for erythropoietin therapy

15   according to claim 7?

16   A.  I'm sorry, is there an objection?

17        **MS. BEN-AMI:**  No, there isn't.

18        **THE WITNESS:**  Oh, I'm sorry.  Okay.

19   A.  Clearly, my opinion is that Mircera is intended for this

20   purpose, and it's stated very clearly in the document that

21   you just read.

22   **Q.**  What is the basis for your opinion that Mircera has a

23   pharmaceutically acceptable diluent, adjuvant or carrier?

24   A.  It describes in the BLA that the Mircera, the substance

25   used for injection, contains, among other things, water,

1    which is, of course, a diluent.

2    Q.  So what is your opinion regarding whether or not Mircera

3    satisfies all the limitations of claim 12 of the '933

4    patent?

5    A.  It clearly does.  It is a pharmaceutical composition.

6    It comprises an effective amount of a glycoprotein effective

7    for erythropoietin therapy.  And that was what is spelled

8    out there, or what was spelled out there, and it has a

9    pharmaceutically acceptable diluent.  It also has other

10   things, but -- it's a diluent.  So it satisfies it.

11   Q.  And let's turn to claim 14 of the '933 patent.

12   A.  Uhm-hmm.

13   Q.  Do you see the reference to the word "patient" at the

14   end of that claim in brackets?

15   A.  Yes.

16   Q.  Do you have an understanding as to why that is in

17   brackets?

18   A.  Yes.  It's a typographical error and was corrected by

19   the patent office at a later date.

20        MR. GALVIN:  Could we see the Certificate of

21   Correction for '933, claim 14, from Exhibit 1, page 68?

22   Q.  Where it says -- do you see where it says, "Claim 14,

23   column 40, line 9, 'product' should be 'patient'"?  Do you

24   see that, Dr. Lodish?

25   A.  Yes.

1    **Q.**  Based upon your review of Roche documents, what

2    understanding do you have as to the type of patient for whom

3    Roche is seeking approval to sell Mircera?

4             **MS. BEN-AMI:**  Objection, your Honor.

5             **THE COURT:**  Overruled.  Who do you think they've --

6    what's the demographic that they think is germane here?

7    What do you think?

8             **THE WITNESS:**  You're asking me?

9             **THE COURT:**  I am asking you.

10            **THE WITNESS:**  Oh, it's quite clearly stated in this

11   document that we just had on the screen, as well as many

12   other documents, that it's intended for therapy of patients

13   with anemia, including kidney dialysis patients who have

14   anemia.

15   **Q.**  Do you have an opinion whether or not Mircera can

16   increase a patient's hematocrit level?

17   **A.**  Yes, it --

18   **Q.**  What is your opinion?

19   **A.**  It does.  Hematocrit is a medical term for simply the

20   level of red blood cells in the blood.  It's the fraction of

21   blood that is occupied by red blood cells.  So, clearly,

22   increasing the hematocrit would increase the amount of red

23   blood cells.

24   **Q.**  Do you have an opinion as to whether or not use of

25   Mircera, in accordance with the Roche instructions in the

```
 1    BLA that you have reviewed, would satisfy all of the
 2    limitations of the '933, claim 14?
 3    A.  Yes --
 4            MS. BEN-AMI:  Objection, your Honor.
 5            THE COURT:  Overruled.  He may testify.
 6    A.  Yes, it clearly would satisfy all the limitations of
 7    claim 14.
 8    Q.  Dr. Lodish, I'd like to ask you some questions relating
 9    to the doctrine of equivalents.
10    A.  Yes.
11    Q.  You offered an opinion that peg-EPO literally satisfies
12    all the limitations of '933, claim 3?
13    A.  Correct.
14    Q.  But I want you to assume --
15    A.  Could we perhaps have the claim back on?
16    Q.  Sure.
17            MS. BEN-AMI:  I would like the last question and
18    answer stricken, your Honor.
19            THE COURT:  The last -- he didn't finish this one.
20    You want the one before it?
21            MS. BEN-AMI:  It's leading.
22            THE COURT:  No, denied, or overruled.  Denied is a
23    motion to strike.  That may stand.
24    Q.  Now, Dr. Lodish, I want you to assume, for purposes of
25    this question, that it were found, contrary to the opinion
```

1   you've offered, that peg-EPO did not literally satisfy

2   claim 3 because the peg portion of Roche's peg-EPO product

3   is not expressed by cells.

4          Do you have that assumption in mind?

5   A.  I do.

6   **Q.**  Based upon that assumption, do you have an opinion

7   whether or not peg-EPO would be equivalent to the product of

8   '933, claim 3?

9   A.  Yes.  I have an opinion --

10         **MS. BEN-AMI:**  Objection.

11         **THE COURT:**  Overruled.

12  **Q.**  What is your opinion?

13         **MS. BEN-AMI:**  Your Honor, report.

14         **THE COURT:**  Where is it in the report?

15         **MR. GALVIN:**  Blue, at Paragraphs 215 through 222,

16  your Honor.

17         **THE COURT:**  He may testify consistent with his

18  report.

19         **MS. BEN-AMI:**  Your Honor, may I have a sidebar,

20  your Honor?

21         **THE COURT:**  You may.

22         **THE WITNESS:**  I'm sorry, may I testify?

23         **THE COURT:**  I said you may, but now we have a

24  sidebar.  I guess I'm going to talk first.

25

1    SIDEBAR CONFERENCE, AS FOLLOWS:

2         **MS. BEN-AMI:**  This is the issue we discussed

3    yesterday.  You have to compare an element of the claim with

4    an element of the product for the doctrine of equivalents.

5    Here all they're doing is taking a general statement.

6    They're not saying, This element of the claim, if it's not

7    literally, compares to this element of Mircera, and here's

8    the claim, here's the element, here's the analysis for that

9    claim element.  The federal circuit has said a generalized

10   doctrine of equivalents approach, is not the law.

11        **THE COURT:**  She's right on that.  And so what she's

12   saying is this is not at a significant -- significantly

13   refined level of detail.

14        **MR. GALVIN:**  Your Honor, we did disclose this.  It

15   identifies this precise issue, whether the attachment of peg

16   would render it not a product of the asserted claims.  And

17   there was a discussion it was written in this format so it

18   could apply to more than one claim.  We are now putting it,

19   posing it in the legally appropriate context, which is one

20   limitation, '933, claim 3.

21        **MS. BEN-AMI:**  May I be heard?

22        **THE COURT:**  Yes.

23        **MS. BEN-AMI:**  I don't see any statement that says

24   this is the claim element they're referring to.  This is the

25   analysis I'm doing.  It just says peg-EPO, and the claimed

1    products as a whole.  There's no element-by-element

2    analysis.  There's no claim terms mentioned.

3            THE COURT:  That is what the federal circuit

4    requires.

5            MR. GALVIN:  I understand, your Honor.

6            THE COURT:  All right.

7            MR. GALVIN:  The testimony, I believe it's

8    sufficiently disclosed in Paragraph 215 where it states,

9    "Assuming that the peg-EPO is not the erythropoietin recited

10   in the asserted claim," which is a defined term, it includes

11   '933, claim 3.

12           THE COURT:  No, I think she's right.  I think she's

13   right.  Sustained.

14           MR. DAY:  Your Honor, this is effectively a motion

15   in limine.  The question is can we elicit the evidence, and

16   if the evidence is insufficient to make out the defense,

17   then a JMOL will be granted.

18           THE COURT:  Well, you can elicit the evidence

19   consistent with this.  What you can't do is have him relate

20   it claim-to-claim because they're not put on notice of that.

21           MR. DAY:  So all we're asking is that we elicit the

22   testimony consistent with his report, you rule on whether

23   it's consistent with his report.

24           THE COURT:  I'm going to.  You can have what's in

25   these, but I -- and then you're entitled to make a record,

1   and it's your time, but I don't think you're going to be

2   able to meet the federal circuit test if you stick to this

3   report, and you must.

4          MS. BEN-AMI:  And, your Honor, before I do my

5   cross, I might have to ask you a question because I don't

6   want to go outside where you let me go.  So I'm going to

7   need a sidebar before I cross.

8          THE COURT:  Why don't you do it now.

9          MR. DAY:  If we can do a sidebar on Roche's time,

10  your Honor.

11         MS. BEN-AMI:  That's why I asked.

12         THE COURT:  That's fair.

13         (Whereupon the sidebar conference concluded.)

14  (BY MR. GALVIN:)

15  Q.  Dr. Lodish, if I were to suggest to you that Roche says

16  it materially changes the product of Dr. Lin's processes for

17  making EPO because its purification process removes

18  contaminants and selects for certain isoforms, would you

19  agree?

20         MS. BEN-AMI:  Objection, your Honor.

21         THE COURT:  No, overruled.

22  A.  I would disagree.

23  Q.  Why not?

24  A.  Well, simply put, recombinant human EPO is unchanged by

25  removing impurities.  Separating different glycoforms,

1   simply means separating different kinds of recombinant human

2   EPO with different lengths or sizes of carbohydrate chains,

3   but what remains still is glycosylated recombinant human

4   EPO.

5   **Q.** Dr. Lodish, if I were to suggest to you that Roche says

6   that attaching peg to EPO materially changes the product of

7   Dr. Lin's processes, would you agree?

8        **MS. BEN-AMI:** Objection for that reason, your

9   Honor.

10        **THE COURT:** Noted, but overruled.

11   A.  I would disagree.

12   **Q.** Why?

13   A.  Well, simply put, changing or adding peg to EPO does not

14   change either the structure of EPO or perhaps --

15        **MS. BEN-AMI:** Report. Report, your Honor, at this

16   point.

17        **MR. GALVIN:** Blue at --

18        **THE COURT:** Overruled. You may finish it.

19   A.  Yeah, attaching peg to EPO neither changes the

20   three-dimensional structure of EPO, nor, more importantly,

21   perhaps, its biological function of binding to the

22   erythropoietin receptors on bone marrow cells, stimulating

23   them to produce red blood cells, and in the body,

24   stimulating these bone marrow cells to make more red blood

25   cells. It's the same function in substantially the same

1    way.

2    **Q.** Dr. Lodish, if I suggested to you that Roche says that

3    the attachment of peg to recombinant human EPO changes its

4    amino acid sequence, would you agree?

5    A.  I disagree.

6    **Q.** Why?

7    A.  Well, simply put, adding the polyethylene glycol chain

8    to an alanine or a lysine, does not change the identity of

9    that amino acid as an alanine or a lysine.

10   **Q.** Dr. Lodish, I'd like to ask you some questions about

11   your understanding of the function and utility of EPO

12   compared to peg-EPO.

13   A.  Yes.

14   **Q.** What is your understanding as to how EPO increases

15   production of reticulocytes in red blood cells in the body?

16          **MS. BEN-AMI:**  Objection, your Honor.  Relevance.

17          **THE COURT:**  Yes, sustained.

18          **MR. GALVIN:**  Relevant to the materially changed

19   issue, your Honor.

20          **THE COURT:**  All right.  I'll reverse myself.

21   Overruled, you may have it.

22          **MS. BEN-AMI:**  Your Honor, may I have a sidebar with

23   this?

24          **THE COURT:**  You may.

25          **MS. BEN-AMI:**  Well, I think I can fix it without a

1    sidebar.

2           Mr. Galvin, can I talk with you a second?  I think

3    we can fix it.

4           (Whereupon counsel conferred.)

5           **MS. BEN-AMI:**  Okay.  I think we worked that out,

6    your Honor.

7           **THE COURT:**  Proceed, Mr. Galvin.

8    **Q.**  Dr. Lodish, what is your understanding as to how epoetin

9    beta, Roche's EPO product, increases production of

10   reticulocytes in red blood cells?

11   A.  It binds to what we call erythropoietin receptors,

12   molecules that are on the surface of a class of bone marrow

13   cells.  The binding sends signals to the inside of the cells

14   that tells the cells to divide, actually several times, over

15   a period of two days, and to produce important proteins that

16   are necessary for red blood cell function.

17          And more generally, by binding to the receptors on

18   this bone marrow cell, it causes the production of the great

19   granddaughters of these cells, as it were, perhaps 30 to 50

20   red blood cells from this original cell.

21   **Q.**  And what is your understanding as to how peg-EPO

22   stimulates red blood cell production?

23   A.  It does so in precisely the same way; it binds to

24   precisely the same erythropoietin receptors or binding

25   proteins on the surface of these same bone marrow cells.  It

1    sends, and we know this from experiments, the same signals

2    to the inside of the cell that instructs these cells to

3    divide several times to produce the same red blood cell

4    proteins, and to have the offspring of these cells become

5    red blood cells.  In short, it works the same way.

6         **MR. GALVIN:**  If we could have demonstrative HL754,

7    please.

8    **Q.**  Does this illustrate your testimony?

9    A.   It does.  Would you like me to explain it?

10   **Q.**  Briefly.

11   A.   Briefly.  Yes.  Here is the progenitor cell.  This is

12   not a red cell, but its offspring will become red cells.  It

13   has actually many erythropoietin receptors, EPO, by binding

14   to these receptors, and you see it here -- perhaps you can't

15   see the white arrows.  Those denote the signals sent to the

16   inside of the cell.  This cell is stimulated to divide.

17   There are actually several cell divisions here.  Red cell

18   proteins are made.  And in the end, multiple red cells,

19   usually 30 to 50, are produced from this one progenitor

20   cell.

21   **Q.**  Dr. Lodish, what is your understanding of how EPO and

22   the EPO receptor interact?

23   A.   I see.  Very tightly, and very specifically.

24   **Q.**  What do you mean by that?

25   A.   Well, by specifically, I mean EPO binds -- if I can use

1    an analogy of a key into a lock, it binds such that,

2    literally, the receptor touches the EPO hormone at many

3    sites, very specifically, and binds that hormone.  It will

4    not bind to a hormone with a slightly different shape.  And

5    thus, by specificity, EPO binds only to this receptor, the

6    erythropoietin receptor on these cells, it doesn't bind to

7    receptors for hundreds of other hormones that are in the

8    human body.

9         Similarly, the EPO receptor binds only the hormone

10   EPO, or erythropoietin, and it will not bind any of the

11   hundreds of other hormones in the body.  So it's a literally

12   one-on-one, highly-specific lock into -- I'm sorry,

13   key-into-lock interaction.

14   **Q.**  Dr. Lodish, in your opinion, what effect, if any, does

15   the attachment of peg to EPO have on the -- on binding with

16   the EPO molecule, on binding with the EPO receptor?

17   A.  If it has an effect, it's very marginal.

18   **Q.**  Would you turn to Tab 5 in your binder?  GXC-1.

19   A.  Yes.

20   **Q.**  Do you recognize GXC-1?

21   A.  Yes, I do.  It is an Investigational New Drug

22   Application, or IND, for Mircera.

23        **MR. GALVIN:**  Your Honor, I offer GXC-1 as a Roche

24   admission.

25        **THE COURT:**  Any objection?

1      **MS. BEN-AMI:**  One second, your Honor.  I do object,

2    your Honor, it's not in his report.

3      **MR. GALVIN:**  Paragraph 106, blue, your Honor.

4      **THE COURT:**  106, blue.

5      **MS. BEN-AMI:**  It wasn't on their trial exhibit list

6    as a direct --

7      **THE COURT:**  Well, be that as it may -- and that's

8    the grounds of the objection?

9      **MS. BEN-AMI:**  No, I have a couple of grounds.  One,

10   they only have --

11     **THE COURT:**  Well, please, don't argue.  Do you want

12   to be heard on it?

13     **MS. BEN-AMI:**  Very briefly, your Honor.

14     **THE COURT:**  Very well.

15   SIDEBAR CONFERENCE, AS FOLLOWS:

16     **THE COURT:**  It's not on your trial exhibit list?

17     **MR. GALVIN:**  It is, your Honor.

18     **MS. BEN-AMI:**  They just added it.

19     **MR. GALVIN:**  We made a shorter version of it in

20   response to Roche's objections of the larger document.

21     **THE COURT:**  What do you object to?

22     **MS. BEN-AMI:**  The only two pages in his report are

23   the first two pages.

24     **THE COURT:**  I'm unclear.  Are you objecting to the

25   first two pages or --

1          **MS. BEN-AMI:**  No, the rest I'm objecting to

2    because --

3          **THE COURT:**  Okay.  But you're not objecting to the

4    first two pages?

5          **MS. BEN-AMI:**  Right.

6          **MR. GALVIN:**  Your Honor, 646 is specifically cited

7    in his report.  646, it's -- which is this document, this

8    page.

9          **THE COURT:**  What's the ground of the objection?

10         **MS. BEN-AMI:**  Well, then, if that page --

11         **THE COURT:**  Assuming they've laid a foundation for

12   it, laid an evidentiary propriety foundation, why shouldn't

13   I allow this in as an admission?

14         **MS. BEN-AMI:**  Whatever pages that are in his report

15   I'm not objecting to.

16         **THE COURT:**  Whatever pages to which he makes

17   reference in his report?

18         **MR. DAY:**  Your Honor, the whole document is an

19   admission by Roche.

20         **THE COURT:**  It may be, but he's not able to testify

21   about it unless it's in his report.

22         **MR. DAY:**  That's a different objection.  That has

23   nothing to do with the admissibility, your Honor.

24         **THE COURT:**  I agree to that.

25         **MS. BEN-AMI:**  Well --

1           THE COURT:  And it would seem to get in as an

2      admission, but I'm only going to let him testify about any

3      pages that are referred to in his report.

4           MS. BEN-AMI:  I think this is a different situation

5      because it's not on their exhibit list.  And I know they

6      don't to hear me saying here's an exhibit not on their

7      exhibit list.

8           THE COURT:  I blew past that because of

9      Mr. Galvin's representations.  And they are?

10          MR. GALVIN:  It was cited in his report.

11          THE COURT:  No, start with the exhibit list.

12          MR. GALVIN:  It was on the exhibit list.  We had

13     created a smaller version, we had a longer part of the IND.

14     They objected, we were putting in too much of the IND.  We

15     created GXC.

16          MS. BEN-AMI:  I'll take his representation, subject

17     to correction.

18          THE COURT:  Fine.

19          MS. BEN-AMI:  Can I have my exhibit back, your

20     Honor?  Thank you.  I keep losing them to you.

21          (Whereupon the sidebar conference concluded.)

22          THE COURT:  What are the letters?

23          THE CLERK:  GXC.

24          THE COURT:  The pages that are GXC are admitted in

25     evidence, Exhibit 56.

```
 1              Let me just put a caution here.  I don't think
 2    anyone disputes this.  These are some pages -- well, I can't
 3    testify at all.  I don't think they dispute that these are
 4    some pages from an IND.  An IND is much longer than this.
 5    They're trying not to add pages, so you're getting some of
 6    the pages.  Don't think that anything's being withheld from
 7    you.  You're getting what's appropriate in evidence in this
 8    case.
 9              Go ahead, Mr. Galvin.
10         MR. GALVIN:  If we may have the exhibit on the
11    screen.  I'm sorry, what is the number, your Honor?
12         THE COURT:  GXC will be Exhibit 56.
13         (Exhibit marked in evidence.)
14         MR. GALVIN:  Thank you, your Honor.
15    Q.  Dr. Lodish, what is your understanding of what an
16    Investigational New Drug Application is?
17    A.  Yes, it's an application that a pharmaceutical
18    manufacturer makes to the Food and Drug Administration
19    before they administer it to patients as part of clinical
20    trials.
21         MR. GALVIN:  If we could turn to page 646 on
22    Exhibit 56.  And if we could highlight the paragraph.
23    Q.  I'm going to read the second sentence under the
24    background to you.  "The pharmacological action of RO503821
25    is identical to that of erythropoietin beta in binding
```

1    surface receptors of erythroid progenitor cells to trigger

2    proliferation, maturation, and terminal differentiation of

3    colony-forming units."  Do you see that sentence,

4    Dr. Lodish?

5    A.  I do.

6    **Q.**  Dr. Lodish, how does that sentence relate to your

7    opinion?

8    A.  It's entirely consistent with it.  Proliferation is

9    another word for cell division.  Maturation and terminal

10   differentiation are just other words for making the proteins

11   that are important for red cell production, actually

12   becoming red cells.  And colony-forming units is a technical

13   term for the erythroid progenitors in the bone marrow that

14   have these EPO receptors.

15          So it's saying the same thing I just said in

16   slightly more technical language.

17   **Q.**  And what is erythropoietin beta?

18   A.  Epoetin beta is Roche's trade name, as I understand it,

19   for their recombinant human EPO.

20   **Q.**  What is a binding affinity, Dr. Lodish?

21   A.  Binding affinity is a measure of the tightness of

22   interaction of the hormone to the receptor.  In technical

23   terms, it's the energy required to pull the hormone off of

24   the receptor.

25   **Q.**  And how do the binding affinities of EPO and peg-EPO

1    compare?

2    A.   My understanding from the Roche documents is that the

3    binding affinity of pegylated or peg-EPO to the EPO receptor

4    is slightly less than that of EPO to the EPO receptor.

5    Q.   Based upon what measurements?

6    A.   Well, it was based on two measurements.  One is the rate

7    at which the hormone binds to the receptor; and the second

8    is the rate at which it comes off the receptor.

9    Q.   Do you have an opinion as to what effect, if any, a

10   difference in binding affinity has on the way the EPO in

11   peg-EPO works?

12   A.   I have an opinion, yes, and it's based not only on

13   analysis of the binding affinity, but on experiments that

14   they bind to the EPO receptor in the same way and they

15   certainly stimulate the same signals to the inside of the

16   cell.

17   Q.   Based upon your investigation, what, in your opinion,

18   causes the difference in binding affinity between EPO and

19   peg-EPO?

20   A.   Again, it's my opinion, based on the experiments in

21   Roche's BLA, the difference that they report is the rate at

22   which peg-EPO or EPO bind to the receptor.  Once they bind,

23   they come off at the same rate.  That is the data in the

24   Roche BLA.

25   Q.   And what significance, if any, does that effect have to

```
 1    you?
 2    A.   Simply put, the fact that once you get the hormone onto
 3    the receptor, it comes off at the same rate, means it's
 4    interacting in a very similar or identical way to the
 5    receptor itself.
 6              MS. BEN-AMI:  Objection, report.  The last part.
 7              THE COURT:  Where is it?
 8              MR. GALVIN:  Paragraph --
 9              THE COURT:  Oh, it's the business about identical.
10    You don't mean identical there?
11              THE WITNESS:  I meant very similar there.  Yes.
12              THE COURT:  Thank you.
13    Q.   Dr. Lodish, do you have an opinion whether or not the
14    EPO in peg-EPO is a trivial and nonessential component of
15    the peg-EPO?
16              MS. BEN-AMI:  Objection, leading.
17              THE COURT:  Yeah, you -- no, in the exercise of
18    discretion, I'm going to allow it.
19    A.   EPO is by no means a trivial compound in peg-EPO.
20    Q.   Why?
21    A.   It is the active ingredient.  In fact, it's the only
22    ingredient in peg-EPO, the only part of peg-EPO that
23    stimulates red cell production.
24              MR. GALVIN:  Pass the witness, your Honor.
25              THE COURT:  Ms. Ben-Ami?
```

```
 1            MS. BEN-AMI:  Yes.  Could we have that quick

 2    sidebar?

 3            THE COURT:  Yes, we can.  Sorry.

 4    SIDEBAR CONFERENCE, AS FOLLOWS:

 5            MS. BEN-AMI:  On this inducement claim, there has

 6    to be direct infringement.

 7            THE COURT:  I think inducement's out, based upon

 8    what he said.  We're just going on infringement, doctrine of

 9    equivalents and, conceivably, reverse document claims.

10    Right, Mr. Galvin?

11            MR. GALVIN:  We are still pressing, there's

12    adequate evidence in the record to support declaratory

13    judgment that there will be future inducement, not that

14    there's been current inducement.

15            THE COURT:  No.

16            MR. DAY:  Under the --

17            THE COURT:  Look.  If you lose on infringement -- I

18    see.  This is an anchor-to-windward on the theory that you

19    lose on infringement across the board, right?

20            MR. GALVIN:  No, sir.

21            MR. DAY:  No.

22            MR. GALVIN:  It's only limited to claim 14 of the

23    '933 patent.  We're not asserting the inducement claim with

24    respect to the other claims.

25            MR. DAY:  May I explain?
```

1        THE COURT:  In claim 14 we have to find

2   infringement.

3        MR. DAY:  May I explain, your Honor?

4        THE COURT:  Yeah.

5        MR. DAY:  What we're doing here, in the context of

6   an application for approval to market the drug, is they are

7   seeking a label that will induce physicians to use their

8   drug to treat patients to raise their hematocrit.  So we're

9   seeking a declaratory judgment that the license application

10  that they have filed is imminently seeking to induce

11  infringement.

12       THE COURT:  Okay.  Maybe the simple way -- I'll do

13  this by agreement, if I can.  The simple way to do this is I

14  think that's a red herring, candidly, and if, when all the

15  dust settles, they haven't won enough and they want that,

16  I'll treat that jury-waived, and you can attack it.  But

17  we're not going to have any more of that in this case and

18  it's not going to go to the jury.  Are you okay with that?

19       MS. BEN-AMI:  Claim 14's out?

20       THE COURT:  For the jury.

21       MS. BEN-AMI:  I'm fine with that.

22       THE COURT:  But I'm not directing against them.

23  They didn't want a jury to begin with.  And I have problems

24  akin to 403.  But I'm not directing against them, and I'm

25  not counting it against anyone's time because I think it

1    will be mooted by the verdict.  You'll all go on to bigger

2    fish once the verdict is in.  So you oppose that?

3              **MR. DAY:**  I'm sorry?

4              **THE COURT:**  You oppose that?

5              **MR. DAY:**  Yes.

6              **THE COURT:**  Since I said it's going to the jury,

7    you want it all to go to the jury?

8              **MR. DAY:**  Well, it's not that we want -- I just

9    want to be sure I understand what you're doing.  You're

10   taking this issue away from the jury of whether or not Roche

11   will imminently induce --

12             **THE COURT:**  Infringement of that particular claim.

13             **MR. DAY:**  -- infringement of the two method claims,

14   the method-of-treatment claims?

15             **THE COURT:**  She's okay with that.

16             **MS. BEN-AMI:**  Yeah, because they're all dependent

17   on other claims.

18             **MR. DAY:**  Okay.

19             **THE COURT:**  Okay.  All right.

20             (Whereupon the sidebar conference concluded.)

21             **THE CLERK:**  Proceed.  Ms. Ben-Ami.

22             **MS. BEN-AMI:**  Thank you, your Honor.

23                       **CROSS-EXAMINATION**

24   **(BY MS. BEN-AMI:)**

25   **Q.**  Good afternoon, Dr. Lodish.

```
 1    A.  Good afternoon.

 2            MS. BEN-AMI:  Good afternoon, ladies and gentlemen,

 3    your Honor.

 4    Q.  What is a molecule?

 5    A.  It is a collection of atoms linked together by covalent

 6    chemical bonds.

 7    Q.  Is it the smallest unit of a -- of that collection?

 8    A.  I don't understand the question.

 9    Q.  Well, let's take water.  What's a molecule of water; one

10    unit of H2O?

11    A.  No, a molecule of water is a single atom of oxygen

12    linked in two single covalent bonds to two atoms of

13    hydrogen.

14    Q.  And a molecule of CERA includes all the atoms of CERA or

15    peg-EPO, as you call it; right?

16    A.  An atom -- I'm sorry, a molecule of CERA -- I'm just

17    trying to understand -- contains all the atoms of EPO in --

18    I'm not sure I understand the question.  Please forgive me.

19    Q.  Let's move on, Doctor.  I'll admit it's my fault.  I

20    apologize.  We'll do something else.

21            Okay.  Let's talk about the '349 patent.

22    A.  Okay.

23            (Pause in proceedings.)

24            THE WITNESS:  Can someone put it up there so I can

25    see it?
```

1          **THE COURT:**  Do you want me to hold it?

2          **MS. BEN-AMI:**  Sure, that would be great, your

3    Honor.  It's a big one.  I think we're all safer if I stay

4    away from the boards.

5    Q.  This claim requires a determination by radioimmunoassay.

6    You see those words; right?

7    A.  I do.

8    Q.  An ELISA is not a radioimmunoassay?

9    A.  An ELISA is not a radioimmunoassay; correct.

10   Q.  Then you talked about some other work that you looked at

11   by certain doctors, right, about RIA's?

12   A.  Are you referring to the work I talked about concerning

13   Dr. Klodner and Dr. McLawhon?

14   Q.  Yes.

15   A.  Okay.

16   Q.  They're not here; right?

17   A.  They're not here.

18   Q.  They were both paid by Amgen to be experts in this case;

19   right?

20   A.  I do not know what, if any, relationship they had with

21   Amgen's experts in the case.

22   Q.  Okay.  They're not here to show us their data; right?

23   A.  That is correct.

24   Q.  So the only thing we can look at is an ELISA test;

25   right?

1    A.   No.   I relied --

2    **Q.**   No.   The only thing we can look at as actual information

3    rather than your opinions is an ELISA test?

4    A.   Well, I'm not -- I can't answer the question because I'm

5    not sure whether Dr. McLawhon's report, which has all of

6    this data in it --

7    **Q.**   So if you can't answer, then --

8    A.   Then I can't answer it, I'm sorry.

9    **Q.**   Okay.   An ELISA test is not a radioimmunoassay; right?

10   A.   It's a different test, I agree.

11   **Q.**   Okay.   Now --

12          **MS. BEN-AMI:**   Thank you, your Honor.

13   **Q.**   Doctor, you, yourself, have never pegylated a molecule;

14   correct?

15   A.   I have not.

16   **Q.**   And you're not a doctor, a medical doctor?

17   A.   I am not a medical doctor.

18   **Q.**   You don't treat patients with EPO?

19   A.   No, certainly not.

20   **Q.**   Now, let's look at the '933 patent.

21   A.   Okay.

22   **Q.**   Let's see if we can get it on the overhead instead.

23   It's Trial Exhibit 1.

24          **MS. BEN-AMI:**   Can we have claim 3?

25   **Q.**   This claim is to a product of the expression in a

1   mammalian host cell; right?

2   A.   That is correct.

3   **Q.**   And it's a claim to a product of the host cell; right?

4   A.   Yes.   It's a claim to a glycoprotein product of

5   expression in a mammalian host cell.   I agree with you.

6   **Q.**   And what you call peg-EPO and what we call CERA does not

7   come out of a mammalian cell; correct?

8   A.   The EPO comes out --

9   **Q.**   You're not answering my question.   There's a molecule

10  peg-EPO; right?

11  A.   Correct.

12  **Q.**   That molecule peg-EPO does not come out of a mammalian

13  cell; correct?

14  A.   The peg-EPO itself is not made in a mammalian cell;

15  that's correct.

16  **Q.**   And that is the product that is the CERA in Mircera, the

17  peg-EPO; right?

18  A.   I believe so, yes.

19  **Q.**   And that's the product that has been called the active

20  ingredient in the BLA; right?

21  A.   No, I disagree.

22  **Q.**   Do you know what's been called the active ingredient in

23  the FDA materials?

24  A.   In the BLA, I recall several places where EPO is

25  called -- is defined, in perhaps not the same words, as the

1    active ingredient in peg-EPO.

2    **Q.**  The jury will have the document.  You -- you know that

3    during this reaction process, Roche purifies out any

4    unreactive EPO; right?

5    A.  I am not sure I have a clear recollection of that in the

6    BLA.  They might.

7    **Q.**  The product that is -- may some day be imported into

8    this country, maybe, maybe not, but maybe, is not a product

9    that is made in a mammalian host cell; correct?

10   A.  The product -- assuming you're talking about importing

11   peg-EPO and not EPO; is that correct?

12   **Q.**  Right.

13   A.  Peg-EPO, is, I said, I agree with you, peg-EPO, per se,

14   is not manufactured in a mammalian host cell.

15   **Q.**  And it is not recovered from a cell culture; correct?

16   Peg-EPO is not recovered from a cell culture; right?

17   A.  Peg-EPO, in the strict sense, is not recovered from a

18   cell culture.  Of course the EPO is, but that --

19   **Q.**  You're --

20   A.  Okay.  I apologize.

21   **Q.**  There's a starting material and an ending material;

22   right, Doctor?

23   A.  Well, EPO's the starting material; correct?

24   **Q.**  Then there's a chemical reaction; right?

25   A.  That's correct.

1    **Q.**  Then there's an end result?

2    A.  Which is peg-EPO, yes.

3    **Q.**  So we'll call it peg-EPO?

4    A.  Okay.

5    **Q.**  You understand there's more than one thing that's called

6    peg-EPO; right?  Let me ask you a different question, I'll

7    withdraw it.

8         When you use the term "peg-EPO," someone can make

9    hundreds of thousands of different kinds of peg-EPO, can't

10   they, by attaching different pegs to different places on the

11   carbohydrate, on the amino acids, all over the place; right?

12   A.  My understanding of peg-EPO is what's described in the

13   Roche BLA.

14   **Q.**  So whenever you use the term "peg-EPO," you're talking

15   solely about the Roche product; is that fair?

16   A.  That's fair, yes.

17   **Q.**  Okay.  So you agree a mammalian cell cannot make

18   peg-EPO?

19   A.  A mammalian cell, per se, cannot produce peg-EPO, that's

20   correct.

21   **Q.**  And you agree that all the claims in the '933 patent

22   that we've talked about today require that the product be

23   made in a mammalian host cell?

24   A.  And I've testified --

25   **Q.**  Yes or no?

1   A.   Yes.

2   Q.   Now, let's look at the '698, claim 6.  This is a process

3   for making something in a cell; right?

4   A.   That is correct, for making glycosylated EPO

5   polypeptide.

6   Q.   In a cell?

7   A.   Yes.

8   Q.   It gets taken out of the cell; right?  That's the last

9   part, "isolated."  Do you see the isolated part?

10  A.   No, I wouldn't agree with your last statement.

11  Q.   Okay.  Fine.  It is a process for making something in a

12  cell; right?

13  A.   It is a process for making the EPO receptor in a cell,

14  of course it is, yes.

15  Q.   You said EPO receptor --

16  A.   I'm sorry, I misspoke, then.  It's a process for making

17  glycosylated erythropoietin polypeptide in a cell, yes.

18  Q.   And CERA, or peg-EPO, as you call it, is not made in a

19  cell?

20  A.   It's made in a chemical reaction from the EPO.  That's

21  correct.

22  Q.   It's made in a chemical reaction, not in a cell?

23  A.   Yes, I think we all agree to that.

24  Q.   And looking at the '868 claim, you see the '868 claim?

25  A.   Uhm-hmm.

1   Q.  Again, it's a process for making something in a cell;

2   right?

3   A.  It is.  It's for making glycosylated EPO polypeptide.

4   Q.  Right.  And peg-EPO is not made in a cell; right?

5   A.  It's made -- strictly speaking, correct, yes.

6   Q.  And none of the claims that we have looked at in this

7   two, three hours this morning are for products made anywhere

8   else other than in a cell; right?  The '933, the '868, the

9   '349, the '698, all in a cell; right?

10  A.  That is correct.

11  Q.  And peg-EPO is not made in a cell; right?

12      MR. GALVIN:  Objection, your Honor.  Asked and

13  answered, and also --

14      THE COURT:  Overruled.  She may press the point.

15      MR. GALVIN:  May we have a sidebar?

16      THE COURT:  I don't believe it's necessary.

17  Q.  Correct?

18  A.  I'm sorry, could you repeat the question, please?

19      MS. BEN-AMI:  Could you read the question back to

20  the witness, please?

21      THE COURT:  You can pose it again.

22  Q.  All the claims we looked at today, this morning, up

23  until now, all those claims have a requirement that the

24  product be made in the cell; correct?

25  A.  That is correct.

1    Q.  And the product that Roche someday may import, peg-EPO,

2    is not made in a cell; correct?

3              MR. GALVIN:  Objection, relevance.

4              THE COURT:  Overruled.

5    A.  As I've -- the answer's yes, it is made -- the peg-EPO

6    is made from EPO in a chemical reaction.

7    Q.  Now, let's talk about the chemical reaction.

8    A.  Okay.

9    Q.  There's a change -- in making what you call peg-EPO,

10   there's a change to either a lysine amino acid or an alanine

11   amino acid; right?

12   A.  Can you please clarify what you mean by "change to"?

13   Q.  Is the side group of the lysine changed by the chemical

14   reaction in making peg-EPO?

15   A.  The nitrogen-hydrogen bond is replaced by a nitrogen-peg

16   bond.  And in that sense, yes, it is changed.

17   Q.  So when we take the lysine amino acid, we'll use that,

18   there could either be an alanine or a lysine; right?

19   A.  Fine.

20   Q.  True?

21   A.  Yes, it could either be a lysine or an alanine.

22   Q.  When we take -- let's use lysine as an example.  There

23   is a change to the chemical structure of the lysine amino

24   acid because of the chemical reaction; correct?

25   A.  It is a small change, but you're correct, yes.

1   Q.  So it is that resulting product, there is no 100 percent

2   identical EPO lysine in that spot?

3   A.  It is still a lysine.

4   Q.  Is it identically -- is it identical chemically, atom

5   for atom, with the EPO precursor?

6   A.  The lysine has a single bond change.  We call it

7   pegylated lysine.

8   Q.  You didn't answer my question.

9   A.  I'm sorry.  Perhaps you should restate it.

10   Q.  You just said there was a change to the lysine; right?

11   A.  I said one chemical bond, the bond between the nitrogen

12   and the hydrogen atom, was replaced by a chemical bond

13   between the nitrogen and the polyethylene glycol.

14   Q.  In making that change, that chemical change, there is a

15   deletion of a hydrogen?

16   A.  Which is the smallest atom, yes, that's correct.

17   Q.  There --

18   A.  It's not a deletion, it's a removal.  You don't delete

19   an atom.

20   Q.  Okay.  There is a removal of something?

21   A.  Yes.

22   Q.  Right?  And if it's removed, it can't be identical;

23   true?

24   A.  If it is removed it cannot be identical -- please

25   clarify your question.  It -- I hate to ask what is "it,"

1    but I'm afraid I must.

2    **Q.**  Doctor, lysine that's being chemically reacted?

3    A.  Yes, okay.

4    **Q.**  That lysine has from it removed an atom; correct?

5    A.  And replaced by another, correct.

6    **Q.**  By a different one?

7    A.  Yes.

8    **Q.**  One atom is replaced by another?

9    A.  Yes.

10   **Q.**  The hydrogen is replaced by what?

11   A.  By a bond to a carbon atom.

12   **Q.**  So a hydrogen is replaced by a carbon atom?

13   A.  Correct.

14   **Q.**  So, therefore, the side chain on the lysine,

15   pre-pegylation and post-pegylation, is not identical?

16   A.  And I think you said it correctly.  It's still the

17   lysine pre- and post-pegylation.

18   **Q.**  You're not answering my question.

19          **MS. BEN-AMI:**  Your Honor?

20   A.  Yes, I am.

21          **MS. BEN-AMI:**  Can the witness answer my question?

22          **THE COURT:**  The jury has to draw the conclusion

23   whether he's answering it or not, and take action

24   accordingly.  You may press the point.

25   **Q.**  Dr. Lodish, the hydrogen on the lysine is removed;

1    correct?

2    A.  Yes, we agree.

3    **Q.**  A different atom is substituted; correct?

4    A.  A carbon atom is substituted, yes.

5    **Q.**  A hydrogen is not the same as a carbon; right?

6    A.  I think we can agree on that, yes.

7    **Q.**  Therefore, the two side chains are not identical;

8    correct?

9    A.  The two side chains are not chemically identical.

10   **Q.**  Therefore, they are not the same; correct?

11   A.  They are the same lysine residue.

12   **Q.**  Are the two side chains the same or not?

13   A.  I said they were not.

14   **Q.**  Therefore, they're not identical?

15   A.  They are not identical, but they're still lysines.

16          **MS. BEN-AMI:**  Okay.  Move to strike the second part

17   of the answer, your Honor.

18          **THE COURT:**  Motion to strike's denied.

19   **Q.**  Dr. Lodish, the EPO molecule before pegylation is

20   changed by the chemical process of pegylation?

21   A.  I'm sorry, can you speak up?  I'm having trouble hearing

22   you.

23   **Q.**  Dr. Lodish, the EPO molecule, the EPO molecule before

24   pegylation is changed by the chemical reaction; correct?

25   A.  It is changed very slightly, but it is changed.  I

1    agree.

2    **Q.**  So when you look at the final product, there is no

3    100 percent identical EPO in there; correct?

4    A.  According to my calculations, it's 99.75 percent

5    identical.

6    **Q.**  So that means "correct"?

7    A.  It is not absolutely identical, I'll give you that, yes.

8    **Q.**  So it is not identical to the product that comes out of

9    the cell?

10   A.  It has one bond changed.  We've discussed it.

11   **Q.**  And that's not even considering the pegylation part?

12   A.  I'm sorry, what do you mean not considering the

13   pegylation part?

14   **Q.**  Well, I mean, the actual --

15   A.  What do you mean by that?  Excuse me.

16   **Q.**  So total CERA, the peg-EPO, compared to the EPO, right,

17   the peg-EPO compared to the EPO, the peg-EPO is twice as big

18   as the EPO; it's not one atom?

19   A.  I think I understand what you're saying and I may agree

20   with you.  Can you just clarify what you mean by peg-EPO is

21   twice as big as EPO?  Do you mean molecular weight?

22   **Q.**  Sure.

23   A.  Yes.  Peg-EPO has a higher molecular weight than EPO, or

24   molecular mass, because it has this extra polyethylene

25   glycol attached to it.

1    Q.   So it's not just that there's been a change in the EPO

2    side chain, there's also -- that change in the EPO side

3    chain creates one molecule which is peg-EPO; right?

4    A.   Side chain -- can you say the question again?  I think

5    it's incorrect, but I'll do my best to answer it.

6    Q.   Okay.  Doctor, the chemical reaction we just talked

7    about, that changes the side chain, right?

8    A.   Fine.

9    Q.   You said it changes a hydrogen, removes a hydrogen, adds

10   a carbon; right?

11   A.   Correct.

12   Q.   But attached to that carbon is a big molecule; right?

13   A.   Correct.  And we've depicted it, yes.

14   Q.   Okay.  So now the end result is not a separate peg and a

15   separate EPO, it is one molecule joined throughout by

16   covalent bonds; correct?

17   A.   Joined -- there is -- one molecule -- yes, I think

18   you're right.  It's one molecule that is joined by covalent

19   bond, that would be the definition of a molecule.  Yes.

20   Q.   Thank you.  So peg-EPO is a molecule which includes all

21   the atoms of the peg-EPO; right?

22   A.   I think you just said a tautology.  Peg-EPO contains all

23   the molecules of peg-EPO; is that what you meant to say?

24   Q.   If that's what I said, then, I certainly didn't mean it.

25   I thought I said "atom," but let's try it again.

1          Peg-EPO is one molecule; right?  It's not an EPO

2    molecule and a peg molecule separate?

3    A.   It's the two molecules linked together in a covalent

4    bond.

5    Q.   And then they become one molecule?

6    A.   They become one molecule; that is correct.

7    Q.   So they're no longer a separate EPO molecule and a

8    separate peg molecule; right?

9    A.   They're linked together by a single covalent bond.

10   Q.   Which is just how the alanine is linked to the next

11   amino acid, by a covalent bond; right?

12   A.   In fact, the linkage of peg to EPO is exactly the same

13   chemical bond that links alanine and any other amino acid to

14   every other amino acid in a protein.  It's the same amide

15   bond.

16   Q.   Okay.  So when you say one covalent bond, that's how

17   people make these -- how atoms get connected, right, by

18   covalent bonds?

19   A.   Sure, yes.

20   Q.   Right?

21   A.   Yes.  The answer's yes, naturally.

22   Q.   So when you say one covalent bond, that's how each of

23   those amino acids is connected to each other; right?

24   A.   In a protein, amino acids are connected to each other in

25   the linear polypeptide by covalent amide bonds.  That is the

1    definition in the sense of a polypeptide, yes.

2    **Q.**   Okay.  So not only do we have the molecule going long

3    this way, in one direction, we have a chemical modification

4    that is making the molecule twice as big by molecular

5    weight; right?

6    A.   Yes, I agree with that.  The peg-EPO is twice as big as

7    EPO.  I have no problem with that.

8    **Q.**   And you say that the molecule is still a lysine, in your

9    opinion; right?

10   A.   I'm sorry --

11   **Q.**   A lysine that's chemically modified is still a lysine?

12   A.   We call it a modified lysine, a pegylated lysine, yes.

13   We call it a modified lysine.

14   **Q.**   You agree a modified amino acid is a different amino

15   acid?

16   A.   No.  One skilled in the art always uses modified -- I

17   mean, the "term modified amino acids," "glycosylated amino

18   acids," it's a kind of modification.

19   **Q.**   Correct or incorrect?  You disagree with me?

20   A.   I disagree with you, yes.

21   **Q.**   You disagree with my question, that's fine.

22           And so here's your book, which is NNZ.  And you

23   call this an authoritative text, don't you?

24   A.   I do, yes.

25   **Q.**   You wrote it; right?

1    A.   I wrote much of it, not all of it, but I did write most

2    of it.

3         **MS. BEN-AMI:**  So with that in mind, your Honor, I'd

4    like to be able to publish a portion of it.

5         **THE COURT:**  If by that you mean under the treatise

6    rule, you may treat it that way, yes, and put it up there on

7    the screen.

8         **MS. BEN-AMI:**  I have a demonstrative, HLC-3, which

9    is that page.

10   **Q.**  And there, on this page, you talk about there are 20

11   natural amino acids; right?

12   A.   No.  I think it's important, if you can zero in on the

13   legend to Figure 2-14, it says, and I quote, "The 20 common

14   amino acids used to build proteins."

15   **Q.**  Yes.

16   A.   That's what's depicted there.

17   **Q.**  Right.  And the next sentence says, "The side chain, R

18   group, determines the characteristics of each amino acid."

19   Do you see that?

20   A.   Absolutely.

21   **Q.**  And in the chemical reaction for making peg-EPO, the

22   side chain for the lysine is changed; right?

23   A.   And then we call it modified; that is correct.

24   **Q.**  But -- answer my question.  In your book, it says, The

25   side chain determines the property, the characteristic

1    properties of each amino acid; right?

2    A.  Yes, yes.

3    **Q.**  And in peg-EPO, the side chain has been changed;

4    correct?

5    A.  As we discussed, it has, to the lysine.  We're talking

6    about the lysine.

7    **Q.**  Or the alanine; true?

8    A.  No, not in the alanine.

9    **Q.**  Okay.  Let's stick with the lysine, then.

10   A.  Okay.

11   **Q.**  In that lysine, you agree that the R group is changed?

12   A.  Slightly, but yes, it is changed.  I agree with that.

13   **Q.**  And in your book --

14           **MS. BEN-AMI:**  Can I have HLC-6?

15   **Q.**  -- you say, "Although cells use 20 amino acids, shown in

16   Figure 2-14," we just went through that --

17   A.  I'm sorry, where are you?  Oh, yes, I see.  Yes.  Excuse

18   me.  Okay.

19   **Q.**  All right?

20   A.  Yes.

21   **Q.**  You say, "Analysis of cellular proteins reveal that they

22   contain up to 100 different amino acids."  You use the word

23   "different," correct?

24   A.  That is correct.

25   **Q.**  So when you chemically modify an amino acid, you say it

1    is a different amino acid, in your book?

2    A.  I do not.  And may --

3    **Q.**  Doctor, do you use the word "different amino acid"?

4    A.  No.  Please read the next sentence.

5    **Q.**  I'll read the next sentence, but I want you to stay on

6    this sentence first.  Because I like the next sentence, too.

7              **THE COURT:**  Well, the comment's stricken.  The

8    comment about what you like or dislike is stricken.  But for

9    now, we'll stay on your sentence -- I shouldn't call it your

10   sentence -- the sentence you have identified.

11   **Q.**  The sentence you wrote, Dr. Lodish?  You wrote this?

12   A.  "Analysis of cellular proteins revealed that they have

13   100 different amino acids."

14   **Q.**  And the different amino acids, you call, are chemically

15   modified amino acids; right?

16   A.  I use the term "chemically modified amino acids."

17   **Q.**  And here you say chemically modified amino acids account

18   for this difference; right?

19   A.  I like the term "chemically modified amino acids."

20   **Q.**  And you say chemically modified amino acids are

21   different amino acids?

22   A.  That's not the term we're using, no.  I disagree.

23   **Q.**  Well, when you're referring to different amino acids,

24   the other 80, right?  One hundred is, right, the 20 minus,

25   right, is 80 left?

1    A.   Perhaps, yes.  Okay.

2    **Q.**   Right?  The other 80 that you're calling different amino

3    acids are chemically modified amino acids; right?

4    A.   Yes, they are chemically modified amino acids.

5    **Q.**   And you characterize them as being different than the 20

6    natural ones?

7    A.   I didn't say they have a different identity.  You're

8    reading the word identity --

9    **Q.**   I'm just asking you, did you call them different in your

10   book?

11   A.   No.

12   **Q.**   You didn't -- when it says "different," it doesn't say

13   the word --

14   A.   No.  Can I refer you to this table, perhaps?

15   **Q.**   Doctor, did you say they are different amino acids in

16   your book?

17   A.   I did not say the identity was different, which is what

18   you're implying, no.

19   **Q.**   Okay.  Am I reading these words right, that there are

20   100 different amino acids, right there?

21   A.   I disagree on the way you're reading it, I'm sorry.

22   **Q.**   I'm just asking you a question, Doctor.  Does your

23   textbook say that, "Although there are 20 amino acids shown

24   in Figure 2-14 in the initial synthesis," do you see that?

25   A.   Yes.

1    **Q.**   And lysine is one of them; right?

2    A.   Lysine is one of them, yes.

3    **Q.**   Then it says, "Analysis of cellular proteins reveal that

4    they contain up to 100 different amino acids"; right?

5    That's what it says; right?

6    A.   I'm reading it as well as you are, please.

7    **Q.**   Then it says, "Chemical modifications account for the

8    difference"?

9    A.   And that is correct.

10   **Q.**   And the 80 different amino acids are chemically modified

11   amino acids; right?

12   A.   As is described in the table, that's correct.  Excuse

13   me, in the figure, yes.

14   **Q.**   And the word you use in your book is "different"; that's

15   the word you use?

16   A.   Yes.  And apparently we disagree on the word, the

17   meaning of the word "different."

18   **Q.**   Okay, fine.  Now --

19            (Pause in proceedings.)

20   **Q.**   Doctor, you said that EPO binds to the EPO receptor;

21   right?

22   A.   Yes.

23   **Q.**   We talked about that before?

24   A.   Of course.

25   **Q.**   And things other than EPO bind to the EPO receptor;

1    correct?

2    A.   I'm aware of a few non-natural components, yes.

3    Q.   Yes.   Something like Aranesp binds to the EPO receptor;

4    right?

5    A.   Aranesp is a version of EPO, it's a mutant form of EPO,

6    and it binds to the EPO receptor.

7    Q.   It's got different amino acids than EPO; right?

8    A.   A few, but they do not affect the binding; that's

9    correct.

10   Q.   So you agree that a molecule that has different amino

11   acids, some different amino acids, can bind to the EPO

12   receptor; right?

13   A.   Sure.   In the case of Aranesp that's true.

14   Q.   So there's an example of a molecule that has some

15   different amino acids and it binds to the EPO receptor;

16   right?   That's an example?

17   A.   It is, yes.

18   Q.   And there are small molecules that also bind to the EPO

19   receptor; right?

20   A.   No.

21   Q.   No?   The antibodies bind to the EPO receptor?

22   A.   An antibody's not a small molecule.

23   Q.   I asked you a different question.

24   A.   I'm sorry, could you repeat the question?

25   Q.   The first question I asked you was small molecule

1    mimetics.  Do you know what that is?

2    A.  I certainly do.

3    **Q.**  Probably better than I do.  Are you aware of any that

4    bind to the EPO receptor?

5    A.  A small molecule, I am not, no.

6    **Q.**  How about, are there antibodies that bind to the EPO

7    receptor?

8    A.  There are antibodies that bind to many proteins,

9    including the EPO receptor, sure.

10   **Q.**  So the mere fact that something binds to the EPO

11   receptor doesn't tell you that it's EPO; right?

12   A.  I would agree with that.

13   **Q.**  And let's take the example of Aranesp.  You agree that

14   that doesn't have the same amino acid sequence as EPO;

15   right?

16   A.  It does in the binding sites to the receptor.

17   **Q.**  It doesn't have the same amino acid sequence of EPO;

18   right?

19   A.  Not the exact same, no, I agree with you.

20   **Q.**  Right.  And it still does the same signaling pathway as

21   EPO; right?

22   A.  Exactly.

23   **Q.**  So the fact that something makes the signaling pathway

24   of the EPO receptor doesn't mean that it's identical to EPO,

25   does it?

1    A.   Something --

2    Q.   I'll say it again.  The fact that a molecule binds to

3    the EPO receptor and starts the signaling pathway using the

4    EPO receptor does not mean that molecule has the amino acid

5    sequence of EPO?

6    A.   As we've been talking about it this morning in the

7    patent.  The amino acid sequence of EPO.  Yes, there are

8    variations of that sequence that are still functional in

9    binding to the receptor and triggering red cell production,

10   including Aranesp.

11   Q.   So the fact that something binds to the -- the fact that

12   a molecule binds to the EPO receptor does not tell you it

13   has the amino acid sequence or that it's identical to EPO;

14   right?

15   A.   That would be correct, yes.

16   Q.   And the fact that a molecule binds to the EPO receptor

17   and then triggers this function doesn't mean that the

18   molecule has the amino acid sequence or is identical to EPO;

19   right?

20   A.   Strictly speaking, that would be correct, yes.

21   Q.   Now, you showed the jury a picture this morning; right?

22   You did a picture of EPO, and you colored it, and you had --

23   A.   I'm sorry, I showed several pictures.

24   Q.   Okay.  You remember you showed a color picture to the

25   jury that had EPO, I think it was blue and yellow, and then

1    you had peg-EPO and you made the peg gray, and you made the

2    EPO blue and yellow, so it looked like they were the same?

3    A.   Right.  That was a coloration we did of the Roche

4    figure.  Is that the one you're speaking about?

5    Q.   Well, it's a coloration that you did?

6    A.   It's a coloration we did, copying the Roche figure, yes.

7    Q.   I'll assume that, that that's your testimony.

8    A.   Yes.

9    Q.   All right.  You drew in the peg, that's not an x-ray

10   crystallography, a true structure of the peg, is it?

11   A.   No, peg has no true fixed three-dimensional structure.

12   Q.   So you just drew one in that -- right, you drew one in?

13   A.   No.  In that figure, we used Roche's depiction of peg.

14   Q.   You're making that assumption it's Roche's depiction?

15   A.   Whatever it was, we used it.  I didn't change that

16   depiction.

17   Q.   So as a scientist, though, you know that, in fact, that

18   peg doesn't have that fixed structure?

19   A.   I agree with you completely, and I believe I stated that

20   in my testimony.  It does not have a fixed structure and

21   it's in constant motion.

22   Q.   It's in constant motion all around the molecule?

23   A.   Correct.

24   Q.   And you also agree that the carbohydrate part of that

25   picture is not done through x-ray crystallography; right?

1   A.   Right.   And I believe I mentioned that in my testimony.

2   It's an artist depiction.   We know the location of the

3   carbohydrates.   They're in constant motion, but it doesn't

4   have a fixed structure.

5   Q.   It's an artist rendering; right?

6   A.   The carbohydrates are an artist rendering, yes.   It's

7   the peg.

8   Q.   The part that you call the EPO amino acid sequence is

9   based on an analysis of a mutant EPO; correct?

10   A.   It is based on the only three-dimensional structure that

11   we have, which has a few amino acids changed in EPO, and I'd

12   be happy to discuss them.

13   Q.   So those are not identical to the amino acid sequence of

14   EPO; right?

15   A.   They're very close, but they are not identical.

16          MS. BEN-AMI:   I may be done, your Honor.

17          (Whereupon counsel conferred.)

18          MS. BEN-AMI:   No further questions, your Honor.

19          THE COURT:   Anything further, Mr. Galvin?

20          MR. GALVIN:   Yes, your Honor, just a bit.

21          THE COURT:   Proceed.

22                    **REDIRECT EXAMINATION**

23   **(BY MR. GALVIN:)**

24   Q.   Dr. Lodish, Ms. Ben-Ami asked whether you can make

25   peg-EPO in a mammalian cell.   What makes the EPO that's

1    contained in peg-EPO?

2    A.   The EPO --

3              **MS. BEN-AMI:**  Objection, your Honor.  Leading.

4              **THE COURT:**  Overruled.

5    A.   The EPO in peg-EPO is made by a mammalian cell grown in

6    culture.

7    **Q.**   Can Roche's peg-EPO product be made without a mammalian

8    cell?

9              **MS. BEN-AMI:**  Objection, your Honor.

10             **THE COURT:**  Can it --

11   **Q.**   Can Roche's peg-EPO be made without a mammalian cell?

12             **THE COURT:**  There's an objection?

13             **MS. BEN-AMI:**  There's a report --

14             **THE COURT:**  Yes.  Where's that in the report?

15             **MR. GALVIN:**  I'll move on, your Honor.

16             **THE COURT:**  Yes, fine.

17   **Q.**   Ms. Ben-Ami asked you questions regarding the atom that

18   is removed from EPO when the peg attaches?

19   A.   Yes.

20   **Q.**   In your opinion, does the removal of that atom change

21   the amino acid sequence?

22   A.   No.

23   **Q.**   Why?

24   A.   Because it's the same amino acid before and after and,

25   as I testified, in particular, the linkage between alanine

1    and peg, say, at the beginning of the protein, it's the

2    identical linkage that alanine would have to other amino

3    acids inside the protein.  And despite that linkage or not,

4    we still call it alanine.  It's what one skilled in the art

5    calls amino acids.  It's the same amino acid.  And -- okay.

6    **Q.**  And you made a reference in your response to Ms. Ben-Ami

7    to the figure that you were referring to in the textbook

8    page she showed you?

9    A.  Yes.

10        **MR. GALVIN:**  If we could have the exhibit, the

11   demonstrative, HCL -- HLC-6, that was up?

12   **Q.**  Is there something you want to point out in the figure?

13   A.  Well, yes.  These are -- gosh, could perhaps you blow it

14   up?  My eyes aren't very good.  I want to read the legend.

15   A.  Oh, I'm sorry, it's on my screen.  It says, "Common

16   modifications of amino acid side chains and proteins," and

17   the point here is to emphasize acetyl lysine, which we call

18   a modified lysine, or acetyl lysine.  The linkage between

19   that carbon atom and the lysine, that N atom, is precisely

20   the same linkage that peg would have to that lysine.

21        So in this textbook, we call this molecule acetyl

22   lysine.  It's still lysine.  We call it lysine.  If it were

23   pegylated, and this atom were replaced by a long

24   polyethylene glycol chain that stretched all the way out, we

25   would still call it pegylated lysine, but it doesn't change

1    the identity of lysine.  That's what one skilled in the

2    art --

3              **MS. BEN-AMI:**  Objection, your Honor.  Now we're

4    going beyond the report.

5              **THE COURT:**  He may conclude his answer.

6    A.  Okay.  Just let me stop.

7              **THE COURT:**  One skilled --

8              **THE WITNESS:**  Oh, I'm sorry, one skilled in the

9    art.

10             **THE COURT:**  Would know that?

11             **THE WITNESS:**  Would know that, yes.

12   **Q.**  Dr. Lodish, in your opinion, is the removal of the atom

13   a material change to the molecule?

14   A.  No.

15             **MR. GALVIN:**  If we could have Exhibit 53 of Roche's

16   BLA, page 4027.

17   **Q.**  After the pegylation reaction, how does Roche describe

18   the amino acid sequence of the RO503821?

19             **MR. GALVIN:**  If we can highlight the last Paragraph

20   only?

21   A.  Yeah.

22   **Q.**  First sentence --

23   A.  Well, I can read it.  It's just the last sentence

24   beginning "Both."  It says, "Both EPO starting material and

25   RO0503821 have the identical amino acid sequence and

1    composition of the carbohydrate moiety."

2         **MR. GALVIN:**  Thank you.  No further questions, your

3    Honor.

4         **MS. BEN-AMI:**  Could I have the textbook again,

5    please?

6                    **RECROSS-EXAMINATION**

7    **(BY MS. BEN-AMI:)**

8    **Q.**  So, Doctor, you said that the acetyl lysine, you were

9    using that as being akin to, like, a pegylated lysine;

10   right?

11   A.  It is, as I testified, it is the same chemical reaction

12   between the C double bond O in the acetate group, and the C

13   double bond O in the pegylated version that you have.

14   **Q.**  And the acetyl lysine, you're adding like three, four

15   atoms?

16   A.  Yes.

17   **Q.**  And in the case of adding the whole peg, you're adding

18   5,000 atoms?

19   A.  However many, I don't know.

20   **Q.**  A lot?

21   A.  I'd have to count them.

22   **Q.**  Thousands?

23   A.  I don't know the number of atoms.

24   **Q.**  So when you're adding -- well, strike that.

25            When you're modifying the lysine so that it now

1   includes five more or four more atoms, you call it a

2   different amino acid, in your book?

3   A.  No, I call it acetyl lysine.  That's what the table

4   says.

5   **Q.**  And acetyl lysine is one of the 80 different amino

6   acids, isn't it?

7   A.  It's a lysine.

8   **Q.**  So -- that you call -- all lysines are not created

9   equal, then, are they, Doctor?

10  A.  Acetyl lysine is a kind of lysine, as we discussed.  It

11  is different chemically from lysine, but it still has the

12  identity of a lysine residue.

13  **Q.**  And you call it a different amino acid?

14  A.  No, I call the acetyl lysine.

15       **MS. BEN-AMI:**  Thank you, your Honor.  No further

16  questions.

17       **THE COURT:**  Nothing further for this witness?

18       **MR. GALVIN:**  No, your Honor.

19       **THE COURT:**  You may step down.

20       (Whereupon the witness stepped down.)

21       **THE COURT:**  Call your next witness.

22       **MR. DAY:**  Amgen calls Dr. Les Benet, your Honor.

23       **THE COURT:**  He may be called.  As he's being

24  called, I'd like a sidebar, please.

25

1    SIDEBAR CONFERENCE, AS FOLLOWS:

2         **THE COURT:**  We're not just going to use up time

3    going back over validity?  They object to this.  We're not

4    going to use up time going back over validity?  They object

5    to this.  You rested on validity.

6         **MR. DAY:**  No opinions on validity.  It's just

7    infringement.  All his opinions are -- in Roche's opening

8    statement -- this has nothing to do with validity -- they

9    made comparison between peg and EPO.  That's all he's here

10   for, to offer his opinions about pegylated EPO and EPO,

11   period.

12        **MS. CARSON:**  Your Honor, this witness is not even

13   appropriate to testify on any form of infringement.  He

14   never even reviewed the patent before offering his first

15   opinions.  It's not referenced in his patent, and he didn't

16   even attach the patent as something he considered.

17        **THE COURT:**  But he's not going to go directly, I

18   guess, to infringement.  He's going to give us scientific

19   knowledge.

20        **MR. DAY:**  That's correct.

21        **THE COURT:**  It's been disclosed.  I'll go question

22   by question, but I'll be alert both to the motion in limine

23   and to your argument.

24        (Whereupon the sidebar conference concluded.)

25        **MR. DAY:**  May I proceed, your Honor?

1        THE COURT:  Yes, Mr. Day.  Proceed.

2        MR. DAY:  Good morning, Dr. Benet.  Would you

3  please introduce yourself to the jury?

4        THE WITNESS:  I'm Les Benet.  I'm a professor of

5  Biopharmaceutical Sciences and Pharmaceutical Chemistry at

6  the University of California, San Francisco.

7        MR. DAY:  And, your Honor, I believe we need to

8  swear the witness.

9        THE CLERK:  Oh, you do.  Sorry.

10        THE COURT:  Mr. Day, thank you.  And that shows

11  that you all have gotten ahead of us here.

12        THE CLERK:  Please stand and raise your right hand.

13        Do you solemnly swear that the answers you will

14  give to this Court and Jury will be the truth, the whole

15  truth, and nothing but the truth, so help you God?

16        THE WITNESS:  I do.

17        THE COURT:  Thank you, Mr. Day.  I apologize.

18        MR. DAY:  Thank you, your Honor.

19                    DIRECT EXAMINATION

20  (BY MR. DAY:)

21  Q.  What is your educational background?

22  A.  I graduated from the University of Michigan with a

23  bachelor's in English in 1959.  And in 1960, I graduated

24  with a Bachelor of Science in Pharmacy from the University

25  of Michigan.  In 1962, with a Masters of Science in

1    Pharmaceutical Chemistry from the University of Michigan.

2    And then went to the University of California, San

3    Francisco.  Three years later I received a Doctorate degree

4    in Pharmaceutical Chemistry from the University of

5    California, San Francisco.

6    **Q.**  And since you received your Ph.D., what have you done?

7    A.  Following my Ph.D., I went to work at -- as a faculty

8    member at Washington State University for a period of four

9    years before I was recruited back to UCSF as a faculty

10   member, and have been there since 1969.

11         For a 20-year period, 1978 to 1998, I served as

12   chairman of the department at UCSF, and I am now a -- just a

13   professor of Biopharmaceutical Sciences and Pharmaceutical

14   Chemistry at UCSF.

15   **Q.**  What professional organizations have you been involved

16   with, sir?

17   A.  Well, I've been involved with many, so I'll only talk

18   about the ones where I had leadership position.  I served as

19   the president of the Academy of Pharmaceutical Sciences.  I

20   served as a founder and first president of the American

21   Association of Pharmaceutical Scientists.  That's the

22   largest organization of its kind in the world, and now it

23   has 13,000 members.

24         I served as the Chairman of the Board of

25   Pharmaceutical Sciences for the International Pharmaceutical

1    Federation.  And I served as President and Chairman of the

2    Board of the American Association of Colleges of Pharmacy.

3    Q.  Have you received any awards or honors in recognition of

4    your work in your field?

5    A.  I've been very fortunate and received quite a number of

6    honors.  In 1987, 20 years ago now, I was elected to

7    membership in the Institute of Medicine of the National

8    Academy of Sciences in the United States.  In 1995, I

9    received the Rawls-Palmer Progress in Medicine Award, the

10   American Society of Clinical Pharmacology and Therapeutics.

11   In 2004, in Kyoto, Japan, I received the Pharmaceutical

12   Sciences Research Achievement Award from The World Congress.

13   And, in the same year, I received The Career Development --

14   Career Achievement Award in Oral Drug Delivery, the

15   Controlled Release Society.  And in 12 days from now, I will

16   be the Distinguished Clinical Research Lecturer at the

17   University of California, San Francisco.

18   Q.  Have you published any books or articles in the area of

19   Pharmaceutical Sciences?

20   A.  Yes.  I have more than 480 publications and seven books,

21   and they've been quite influential because I'm listed as one

22   of the most highly cited pharmacologists in the world.

23   Q.  Have you served on the editorial boards of any journals?

24   A.  Many.  I founded The Journal of Pharmacokinetics and

25   Biopharmaceutics and served as its editor for about 20

1    years.  I served as the Associate Editor of Pharmacology and

2    Therapeutics.  And I served on many editorial boards.  And

3    today I serve on five editorial boards of journals,

4    primarily in the area of pharmacology and pharmaceutical

5    sciences.

6    **Q.**  Have you served as a consultant in any organizations?

7    **A.**  Yes.  I consult for, one time or another, almost all of

8    the major pharma and the small pharma and the biotechnology

9    companies.  And with respect to the present case, I was a

10   member of the Roche Biosciences Scientific Advisory Board

11   for a four-year period --

12            **MS. CARSON:**  Objection, your Honor.  The report.

13            **THE COURT:**  Well, I'll stop him there.

14   **Q.**  You served as a consultant?

15   **A.**  Served as a consultant for Amgen.

16   **Q.**  Pardon?

17   **A.**  For Amgen.

18   **Q.**  Have you served as a consultant to the FDA?

19   **A.**  I've also served as a consultant --

20            **MS. CARSON:**  Objection.  Not in the report.

21            **MR. DAY:**  Blue, Paragraph 9.

22            **THE COURT:**  Blue 9.  No, sustained, move on.

23   **Q.**  Based on your education and experience, what do you

24   believe to be your area of expertise?

25   **A.**  My area of expertise is pharmacology, both basic science

1    and clinical.

2    **Q.**  What is the study of pharmacology?

3    A.   Pharmacology is the study of drugs, and from its

4    sources, its appearance, its chemistry, its uses, and its

5    actions.  And we generally talk about two aspects of

6    pharmacology, sort of two legs.  One leg is how the drug

7    works on the body.  We call that pharmacodynamics, the word

8    meaning pharmaco, drug; dynamics, action.  And the other leg

9    is how the body acts on the drug.  And we call that

10   pharmacokinetics:  Pharmaco, drug; kinetics, processes or

11   speed.

12        And both of those processes are an important

13   component of how we give a drug to a patient and how a

14   patient responds to a particular drug.

15   **Q.**  Why are you here today?

16   A.   Well, I'm here today to offer an opinion, from a

17   pharmacological point of view, that there are no meaningful

18   or material differences between CERA and EPO in terms of its

19   action and use in the body.  And that opinion is based in

20   part on, one of the reasons, is that CERA functions as a

21   pro-drug for EPO.

22            **THE COURT:**  As a what for EPO?

23            **THE WITNESS:**  As a pro-drug, P-R-O.

24            **THE COURT:**  A pro-drug.

25   **Q.**  What do you mean by pro-drug?

1    A.   Well, pro-drug is when you take a active chemical and

2    you modify it, an active drug and you modify it chemically.

3    Like adding peg would be a chemical modification, and you

4    make a new compound.  And that drug then has the

5    characteristics that it will sometimes be inactive and

6    sometimes be less active outside of the body, but once you

7    put it into the body, you will get the activity of the

8    parent drug that you --

9         MS. CARSON:  Objection, your Honor.  This is not in

10   the report.

11        THE COURT:  Well, we'll stop it there.

12        MR. DAY:  Red Paragraph 4, your Honor.

13        MS. CARSON:  And I --

14        THE COURT:  Well, I said we'll stop it there.  He

15   may ask another question.

16   Q.   Why, in your opinion, is it significant that peg-EPO

17   acts like a pro-drug?

18        MS. CARSON:  Objection.  Again, not in the report.

19        MR. DAY:  Blue Paragraph 30, your Honor.

20        THE COURT:  Thank you.

21        Sir, opinion witnesses have to testify consistent

22   with the report disclosed to the other side.  You have it

23   before you.

24        MR. DAY:  30D, your Honor, Subparagraph D.

25   Page 13.

1      **THE COURT:**  That's what he's asking you about, and

2   you may testify consistent with that paragraph.

3   **Q.**  The question is:  Why, in your opinion, is it

4   significant that peg-EPO acts like a pro-drug?

5   A.  Because acting like a pro-drug, basically, what you are

6   doing is changing the characteristics of the drug in terms

7   of its pharmacokinetics so that the time course of the drug

8   in the body will change to be able to maximize the potential

9   positive benefits of that drug in terms of preventing its

10  elimination and keeping the drug there for a significant

11  period of time where it may be eliminated otherwise.

12      And so frequently many drugs --

13      **MS. CARSON:**  Objection, your Honor.  Not in the

14  report.

15      **THE COURT:**  Yes, I think you're beyond D now.

16  He'll ask another question.

17  **Q.**  Why, in your opinion, are pro-drugs created?

18  A.  Pro-drugs are --

19      **MS. CARSON:**  Objection, relevance.

20      **THE COURT:**  No, overruled.  He may testify

21  consistent with the first sentence in the paragraph.

22  A.  So pro-drugs are --

23      **MR. DAY:**  It's also, your Honor, it's in red

24  Paragraph 4 for this question.

25      **THE COURT:**  Yes, I'll let him testify.

1    **Q.**  So why, in your opinion, Dr. Benet, are pro-drugs

2    created?

3    A.  Pro-drugs are created to overcome the problems with a

4    drug in terms of its pharmacokinetic characteristics in the

5    body, usually because the drug, they have difficulty being

6    absorbed or because the drug may be eliminated more readily.

7          So in this particular case, what we've done is

8    change the half-life of the drug so that it will remain in

9    the body for a longer period of time.  And that's what the

10   CERA pro-drug of EPO does.  EPO stays in the body for a

11   longer period of time.

12   **Q.**  What is the basis for your opinion that pegylation can

13   be used to create a pro-drug?

14          **MS. CARSON:**  Objection.  Outside the report.

15          **MR. DAY:**  Red Paragraph 5, your Honor.

16          **THE COURT:**  Red 5?  No, sustained.

17   **Q.**  What is the basis for your opinion that peg-EPO acts

18   like a pro-drug?

19   A.  Well, there are three characteristics that peg-EPO has

20   that are related to the characteristics that we would

21   generally discuss, or one of ordinary skill in the art would

22   expect from a pro-drug.  And the peg-EPO CERA maps these

23   three.

24          The first is that the compound, the pro-drug, will

25   break down in the body to the parent drug and the component

1    that is used to make the pro-drug.  So it's a breakdown of

2    the drug in the body.

3            The second --

4    Q.  Excuse me.  What does that mean in the context of

5    peg-EPO?

6    A.  It means --

7            MS. CARSON:  Objection, beyond the scope.

8            MR. DAY:  Red, Paragraph 9.

9            THE COURT:  Overruled.  He may testify consistent

10   with Paragraph 9.

11   Q.  As to the -- you mentioned there were three

12   characteristics of the pro-drug.  The first characteristic

13   was that the drug will break down in the body.

14           MS. CARSON:  Objection, your Honor.  May I have a

15   sidebar?

16           THE COURT:  Overruled, you may answer.

17           MS. CARSON:  May I have a sidebar?

18           THE COURT:  Not now.

19   Q.  What does that mean in the context of peg-EPO?

20   A.  It means that there is evidence from Roche and there is

21   evidence that has been presented to the FDA and elsewhere

22   that --

23           THE COURT:  Well, you don't know that yourself?

24   You're here to give your views.  You've looked at a lot of

25   stuff, I take it, before you give your views, but I have

```
 1    problems when you start saying, Well, there's evidence of

 2    this and there's evidence that.

 3              THE WITNESS:  I'm sorry.

 4              THE COURT:  I'm much more comfortable when you say,

 5    Based upon what I've looked at, I think this or that,

 6    consistent with what you have disclosed in your report.

 7    Because you're here, the jury can look at you, both sides

 8    can ask you questions.

 9              Do you see the difference?

10              THE WITNESS:  I do, your Honor.  Thank you very

11    much.

12              THE COURT:  What's in the stuff you looked at,

13    we've got to get that into evidence some other way, or we'll

14    just listen to what you have to say.  But you don't describe

15    that stuff.

16              Now, let's answer that question, and that will be

17    about it for today.

18    A.   In my opinion, in terms of looking at the information

19    that was provided, there is evidence that, both in animals

20    and in humans --

21              MS. CARSON:  Objection, your Honor.

22    A.   -- CERA breaks down and --

23              MS. CARSON:  Beyond the scope.

24              THE COURT:  No, you may answer.

25    A.   CERA breaks down in the body and that you can find the
```

1   component of, especially the peg component, in the body.

2          THE COURT:  All right.  We'll stop taking testimony

3   at this time.  You may step down, sir.

4          (Whereupon the witness stepped down.)

5          THE COURT:  Ladies and gentlemen, now, of course,

6   there's going to be another significant break.  But as you

7   saw after the first break, you can follow this.  It comes

8   back.  And you know where we are.  We've heard the whole

9   piece having to do with are these patents valid, which Roche

10  bears the proof on, clear and convincing evidence.

11         They're all ready.  They're already standing there.

12  But they don't have to stand until you leave.

13         Now, we're in the piece on which Amgen bears the

14  burden of proof by a fair preponderance of the evidence,

15  does what Roche is doing infringe any specific claim that's

16  here in suit.  We have four more days of trial, which we

17  will come back to on the --

18         THE CLERK:  Fifteenth.

19         THE COURT:  -- 15th of October.  Now, the 15th and

20  16th are full trial days, 9:00 to 1:00.  Seventeenth, by

21  then we'll be winding up the evidence.  I've got a couple of

22  hours in there, we'll start at 11:15, run to 1:00 but I need

23  that time.  Then on Thursday the 18th, the case will come to

24  you.

25         Now, those -- there's two parts of the case that

1    are different than evidence.  That's the day the lawyers

2    will argue to you.  They get a chance to argue to you the

3    conclusions they want you to draw.  And then I have to --

4    maybe I'll do it first, but together, I will explain the law

5    to you really in great detail.  The case will be yours by

6    lunchtime on the 18th.  We are right on track.

7          Now, given the fact we're taking a break, plus the

8    fact we're much closer to the end now, and so the likelihood

9    that there might be some press about the progress of this

10   case is increased, and though I haven't seen any.  And I

11   trust you to turn the channel if anything comes on T.V.,

12   anything in the paper, you're to pass it by.  You're getting

13   all the evidence that you're supposed to have in this case

14   right here, and the whole integrity of the proceedings

15   depends on that.

16         So for now, keep your minds suspended.  Do not

17   discuss the case either among yourselves nor with anyone

18   else.  Have a great Columbus Day weekend.  Go about your

19   business next week.  The following Monday, we start the four

20   days that wraps this case up and puts it in your hands.

21         You may stand in recess in this case until Monday,

22   the 15th of October at 9:00 a.m.  The jury may recess.

23         **THE CLERK:**  All rise for the jury.

24         (Whereupon the jury left the courtroom.)

25         **THE COURT:**  Please be seated.  Total elapsed time

1    stands Amgen eight days, two hours, 45 minutes; Roche, eight

2    days, 45 minutes.

3            We'll stand in recess in this case until 2:00 p.m.

4    when we'll resume on the jury-waived portion.  We'll recess

5    until that time.

6            (Adjournment.)

7

8

9                    **C E R T I F I C A T E**

10

11           We, Donald E. Womack and Cheryl B. Palanchian,

12   Official Court Reporters for the United States District

13   Court for the District of Massachusetts, do hereby certify

14   that the foregoing pages are a true and accurate

15   transcription of our shorthand notes taken in the

16   aforementioned matter to the best of our skill and ability.

17

18

19           /S/ DONALD E. WOMACK
             _____

20           /S/ CHERYL B. PALANCHIAN
             _____

21

22                DONALD E. WOMACK
                 CHERYL B. PALANCHIAN
23               Official Court Reporters
                   P.O. Box 51062
24          Boston, Massachusetts 02205-1062
                womack@megatran.com

25