1

                    UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF MASSACHUSETTS

2

                                        Civil Action
3                                       No. 05-12237-WGY

4      * * * * * * * * * * * * * * * * *
                                        *
5      AMGEN, INC.,                     *
                                        *
6               Plaintiff,             *
                                        *   **DAILY TRANSCRIPT**
7      v.                               *   **OF HEARING IN RE**
                                        *   **OBVIOUSNESS-TYPE**/
8      F. HOFFMANN-LA ROCHE LTD,        *   **DOUBLE PATENTING**
       ROCHE DIAGNOSTICS GmbH and       *     (Volume 2)
9      HOFFMANN-LA ROCHE, INC.,         *
                                        *
10              Defendants.            *
                                        *
11     * * * * * * * * * * * * * * * * *

12

13

14              BEFORE:  The Honorable William G. Young,
                                District Judge

15

16

17

18

19

20

21

22

23
                                   1 Courthouse Way
24                                 Boston, Massachusetts

25                                 October 4, 2007

1              A P P E A R A N C E S

2

3              DUANE MORRIS LLP (By D. Dennis Allegretti,
       Esq. and Michael R. Gottfried, Esq.), 470 Atlantic
       Avenue, Suite 500, Boston, Massachusetts 02210
4              - and -
               DAY CASEBEER MADRID & BATCHELDER, LLP (By
5      Lloyd R. Day, Jr., Esq., David M. Madrid, Esq. and
       Robert M. Galvin, Esq.) 20300 Stevens Creek
6      Boulevard, Suite 400, Cupertino, California 95014
               - and -
7              McDERMOTT WILL & EMERY (By Michael Kendall,
       Esq.), 28 State Street, Boston, Massachusetts
8      02109
               - and -
9              McDERMOTT WILL & EMERY (By William G.
       Gaede, III, Esq.), 3150 Porter Drive, Palo Alto,
10     California 94304
               - and -
11             MARSHALL, GERSTEIN & BORUN LLP (By Kevin M.
       Flowers, Esq.), 6300 Sears Tower, 233 S. Wacker
12     Drive, Chicago, Illinois 60606-6402
               - and -
13             STUART L. WATT and WENDY A. WHITEFORD, Of
       Counsel, Amgen, Inc., One Amgen Center Drive,
14     Thousand Oaks, California 91320-1789, on behalf of
       the Plaintiff
15
               BROMBERG & SUNSTEIN LLP (By Lee Carl
16     Bromberg, Esq. and Julia Huston, Esq.), 125 Summer
       Street, Boston, Massachusetts 02110
17             - and -
               KAYE SCHOLER LLP (By Leora Ben-Ami, Thomas
18     F. Fleming, Esq., Patricia Carson, Esq.,
       Christopher Jagoe, Esq. and Howard Suh, Esq.),
19     425 Park Avenue, New York, New York 10022, on
       behalf of the Defendants

20

21

22

23

24

25

# I N D E X

WITNESS:              DIRECT   CROSS    REDIRECT    RECROSS

HARVEY LODISH

  By Mr. Day        81                 120

  By Ms. Ben-Ami            104


|          |         | **FOR** | **IN** |
|          |         | **I.D.** | **EVID.** |

**EXHIBITS:**

  A1   1974 Goldwasser Paper  . . . . . . . . .93

  A2   Post-translational modifications . . . 116

       of proteins

```
 1                    PROCEEDINGS - 2:03 P.M.

 2

 3              THE CLERK:  All rise.

 4              Court is in session, please be seated.

 5          THE COURT:  All right, we're in Amgen's part of

 6   this proceeding and if they have anything more.  Or actually

 7   we had Dr. Lodish on the stand, didn't we?

 8          MR. DAY:  We did, and I think we're going to -- we

 9   did not on Tuesday but we're going to now, your Honor.  I

10   would like to call Dr. Lodish, if I may.

11              THE COURT:  He may be called.

12          MR. DAY:  Also, the way the time worked out, your

13   Honor, I would like, because Roche wanted to reserve time

14   for Dr. Lodish's cross but ended up with an hour, I would

15   like to reserve 15 minutes of my time, if I may.

16              THE COURT:  Well, they reserved -- so that's an

17   hour.  That's fine.  All right.

18              MR. DAY:  Thank you.

19              THE CLERK:  I remind you, sir, that you are still

20   under oath.

21              THE WITNESS:  Yes.  Thank you.

22                          HARVEY LODISH

23                      DIRECT EXAMINATION

24   BY  MR. DAY

25      Q   Good afternoon, Dr. Lodish.
```

```
 1    A    Good afternoon, Mr. Day.

 2    Q    And would you please just simply state your name for the

 3    record?

 4    A    Yes.  My name is Harvey Lodish.

 5    Q    Okay.  Dr. Lodish, I would like you to assume that by

 6    1983-1984 the state of the art had progressed to the point

 7    before Dr. Lin that it included an isolated DNA sequence

 8    encoding human EPO.

 9    A    Yes, I understand that.

10    Q    Okay.  So put aside Lin's inventions.  I want you to

11    assume that the state of the art before Lin included an

12    isolated EPO DNA sequence.  All right?

13    A    Correct.

14    Q    In your opinion, what, if any, expectation would an

15    ordinarily skilled worker have had in 1983-84 regarding

16    their ability to produce an in vivo biologically active

17    recombinant EPO if they had access to a copy of the EPO DNA

18    to work with?

19         MS. BEN-AMI:  Your Honor, this is a point of order,

20    and I apologize, Mr. Day.

21         I should not object based on reports at this

22    proceeding even if it's on Area 3?

23         MR. DAY:  I believe that was the procedure we

24    followed on Tuesday, your Honor.

25         THE COURT:  I think that, I think that makes some
```

1    sense because I can sort that out.  I'm going to hold them

2    to the reports, but that can be a subject of argument.

3              **MS. BEN-AMI:**  Yes.  And I don't want to interrupt

4    if I shouldn't interrupt.

5              **THE COURT:**  Right.  And by not objecting you have

6    not waived that objection, and that applies to both sides,

7    and thank you.

8              **MS. BEN-AMI:**  Thank you.

9    A    So, should I answer the question?

10   **Q**    Please.

11   A    Simply put, with the EPO DNA in hand one would have no

12   reasonable expectation of success in generating a

13   recombinant mammalian cell to make an EPO protein with in

14   vivo biological activity.

15   **Q**    And what are the bases for your opinion?

16   A    Well, simply put, we didn't know any of the

17   post-translational modifications that might have been

18   important for EPO's function.  We had no idea which cultured

19   cells, if any, might make these, or introduce these

20   modifications to the EPO.  And finally, no one in this 1983

21   time frame had produced a recombinant glycoprotein with in

22   vivo bioactivity.

23   **Q**    Okay.  Now assume that the state of the art did not

24   include access to the EPO DNA.

25   A    Okay.

1   **Q**   Would that difference affect your opinion?

2   A   No, it would make what was already unlikely even more

3   unlikely.

4   **Q**   All right.  Okay.  Well, let's go back now and suspend

5   the assumptions.

6            Would you please discuss the state of the art

7   before Dr. Lin's inventions?

8   A   The state of the art on EPO?

9   **Q**   Yes.  And what I would like to understand is, in your

10   opinion, what was known about EPO before Dr. Lin's

11   inventions?

12   A   Ahh.  Yes.  We knew it was a glycoprotein.  We knew it

13   circulated in the blood.  We knew it stimulated red cell

14   production by certain bone marrow cells.  We had really no

15   knowledge of the details of the carbohydrate structure, but

16   there was some evidence that the carbohydrates were going to

17   be important.  That was about it.  That is, there was a huge

18   amount that we didn't know back then.

19   **Q**   Okay.  All right.  So for purposes of all the questions

20   I'm going to -- strike that.

21            What research experience have you had, if any,

22   studying post-translational modification of proteins by

23   cells?

24   A   Extensive experience beginning in the early 1970's where

25   we were studying the biosynthesis and modifications of --

1    **Q**   Excuse me, I'm asking you personally, not we.  I'm

2    asking you personally.

3    A    Personally, in my lab?

4    **Q**   I'm asking about you, Harvey Lodish?

5    A    Me, Harvey Lodish, did them with certain glycoproteins

6    beginning in 1972 to 1975, and others in my lab have

7    continued this work.

8    **Q**   Okay.  Now, have you published in this area during that

9    time frame?

10   A    Published extensively, perhaps 50 papers on biosynthesis

11   and modification of recombinant glycoproteins.

12   **Q**   Can you briefly describe how a secreted protein is made

13   by a cell?

14   A    Yes, I can.  And it would be helpful if I could have

15   these graphics.  Thank you.

16          The first stage in secretion of a, first stage of

17   production of a secretory protein is essentially the same as

18   the production of any protein.  When there's a DNA sequence,

19   DNA that encodes amino acids of the protein, a messenger RNA

20   and a protein is being made.  What is seen here is the

21   purple messenger RNA, the ribosome, which is the protein

22   synthesizing machine.

23   **Q**   That's the green?

24   A    That's the green --

25   **Q**   Globule?

1    A    Right.  This, one could imagine, is walking along the

2    messenger RNA, three nucleotides at a time, incorporating

3    one amino acid after another into the protein, and that

4    chain of amino acids emerges from the bottom site of the

5    ribosome.  And for proteins that are going to be secreted

6    from cells, they're made with what we call a leader sequence

7    or single peptide, around 20 amino acids at the very

8    beginning.  And this directs the protein --

9    Q    Is that what's depicted in the blue?

10   A    That's the blue.  Yes.  Thank you.

11   Q    And what's the yellow?

12   A    The yellow is the rest of the protein.

13   Q    Okay.

14   A    And what this does is direct the protein synthesizing

15   apparatus to push the newly made protein to the inside of

16   this compartment, a numbering outlying compartment, that we

17   call the rough endoplasmic reticulum.  And a lot of

18   important events to secretory proteins occur inside, what we

19   say the lumen of the rough endoplasmic reticulum.

20            Could we have the next slide, please.

21            What's shown here is that this leader or signal

22   peptide is first cut off, because it's done its job of

23   directing the newly made protein into the endoplasmic

24   reticulum.  In translation, that is, synthesis of the

25   protein continues.

1            The next slide, please.

2            The entire protein finds itself in this lumen or

3       cavity, the endoplasmic reticulum.  And many important

4       things happen here.  First of all, the protein folds.  And

5       there are many modifications that facilitate protein

6       folding.

7            And then in the next slide, what you see is

8       schematically glycosylation or addition of sugar residues,

9       and as we'll discuss, this is a multi-step process that we

10      will, I trust, come to in some detail.

11           Finally, the protein moves in the rough endoplasmic

12      reticulum, it's not shown here, to another part of the cell

13      called the golgi, further chemical modifications take place,

14      and then ultimately, as shown in the next slide, the

15      protein, the glycosylated protein is secreted from the cell.

16   **Q**   In your opinion, what was known as of 1983-84 about the

17      types of post-translational modifications that occur within

18      cells?

19   A    In that time frame we knew of perhaps 50 different

20      post-translational, that is, chemical modifications that

21      different cells introduce to different proteins that were

22      important for the functions of those specific proteins.

23   **Q**   Could we have 256, please.

24   A    Yes, there's a -- yes.  And what is listed here are

25      several of them because they're particularly relevant to

1    EPO, but there are, as I said, perhaps 45 or 50 that are not

2    listed here.

3         One is proteolytic cleavage, that is, cutting the

4    polypeptide chain.  EPO, like other secreted proteins, has

5    the leader sequence cut off and then as we discussed this

6    morning it has or sometimes has the C-terminal arginine cut

7    off.

8         Glycosylation takes place in two stages.  First, a

9    large sugar chain is added to the protein and then at a

10   later stage it undergoes significant modification.  So this

11   is two types of modifications concerning carbohydrates.

12        Protein folding comprises a lot of steps and there

13   are many cell specific, we call them chaperones, that

14   facilitate the process.  And a particular modification

15   that's important for folding is called disulfide bonding.

16   **Q**   In your opinion, what was known as of 1983-84 about

17   protein folding and disulfide bond formation?

18   A   We knew -- and perhaps I could have the next overhead --

19   we knew that disulfide bonds were a very important

20   stabilizing force in allowing secreted proteins to fold

21   properly.

22        What one sees schematically here is a disulfide

23   bond, this SS, that brings in together two C or sistine

24   residues that are far apart in the primary sequence.  But it

25   brings them together and links them together, and then this

1   is an important stabilizing force in the three-dimensional

2   structure of a protein.

3   **Q**   In your opinion, what was known in the state of the art

4   as of 1983-84 regarding the differences, if any, in these

5   post-translational modifications that are made by different

6   cell types?

7   A   Yes.  It was known, and there were many examples, that

8   different cells and cells from different species introduce

9   different post-translational modifications to proteins and

10   that the same protein made in different cells could have

11   different post-translational modifications.

12   **Q**   In your opinion, what was known as of 1983-84 about

13   glycosylation?

14   A   A great deal, in part I'm pleased to say from our own

15   work.  And this figure, it's actually two parts, the left

16   part is a direct copy of a figure in my 1981 review article

17   called "Post-translational modifications of proteins."  And

18   for ease of reference, I've taken the same structures and

19   coded them with these symbols where each symbol describes a

20   very specific sugar.  They're all related to glucose or

21   blood sugar, but they're different chemically.

22   **Q**   In your --

23   A   I'm sorry.

24   **Q**   In your opinion, what was known as of 1983-84 about how

25   different cell types would glycosylate a particular protein?

```
1    A   Yes.  What was known then is that all eucaryotic cells,

2    that is, plants, animals, yeasts -- no, I'm sorry, please go

3    back.  Yeah.

4         What they would do is add the same 14 sugar residue

5    to an asparagine, that is, an N in a protein.  So this first

6    step of adding the sugar chain is as we say ubiquitous.  It

7    happens in a lot of eucaryotic cells.

8    Q   So that's the sugar chain in the upper left hand column?

9    A   That's this sugar chain in the upper left of the figure

10   that has three glucose, nine mannose, and two of what is

11   called N-Acetyl glucosamine.

12        Now, what happens next is cell-specific,

13   specie-specific, and varies among different proteins.  Down

14   in the lower right hand corner is what yeast cells do to

15   this same common sugar.  And it's quite apparent that they

16   remove several sugar residues and then add back others.

17             MS. BEN-AMI:  Your Honor -- excuse me.

18             THE WITNESS:  Yes.

19             MS. BEN-AMI:  We just had -- are we talking about

20   still 1983-84?

21             THE WITNESS:  This is all, this is 1983-84, and

22   this is my 1981 review article.

23             MS. BEN-AMI:  Thank you.

24             THE WITNESS:  And these structures are taken

25   directly from that.
```

1    **Q**    In fact, what's on the left hand side of this graphic?

2    A    Well, it is, as I trust I mentioned, is copied directly

3    from this 1981 review article.  This is the direct figure,

4    this is simply the same thing in color coding, it's easier

5    to follow.

6         And what is shown in the top right and the lower

7    left are two of the perhaps thousands of ways that mammalian

8    cells can modify the same core sugar.  Again, different

9    cells make different modifications.  And I think it's quite

10   apparent that this structure on one type of secreted protein

11   would be very different from this structure on another, or

12   perhaps one could have both in the same protein.

13        And just for reference, these sugars at the end are

14   sialic acids which are known to be particularly important in

15   sugar structure and function.

16        **MR. DAY:**  Could we have the next graphic, please.

17   **Q**   And in your opinion, what was known as of 1983-84 about

18   how different cell types would glycosylate a particular --

19   A    Yes.

20   **Q**   -- protein?

21   A    Different cell types would glycosylate proteins quite

22   differently.  And I mentioned several thousand possible

23   structures.  Here I've depicted five which just by

24   inspection result in quite different carbohydrate chains

25   attached to the same asparagine.

1    **Q**   Okay.  Now, let's turn to the subject of EPO in

2    particular.

3    A    Sure.

4    **Q**   What, in your opinion, was known as of 1983-84 about the

5    particular post-translational modifications required to make

6    human EPO?

7    A    All that was known was that EPO was, excuse me, was a

8    glycoprotein, that it had attached sugar chains.  There was

9    evidence both that a specific sugar, sialic acid, was

10   important for in vivo biological activity, and the sugars as

11   a whole were important for in vivo biological activity.

12   Outside of that, nothing else was known about the sugar

13   structures.

14   **Q**   Okay.  Up until that point in time what information was

15   available about the sugar structures?

16   A    There were really two major papers.  One by Dr.

17   Goldwasser in which he removed sialic acid from EPO, I

18   believe it was urinary EPO, and he showed that this resulted

19   in a loss of in vivo bioactivity, that is, activity in

20   animals, but it retained activity in cell culture.

21        **MR. DAY:**  Your Honor, I believe on your bench is a

22   white notebook which are the graphics that you're looking

23   at, and also a black notebook which has some exhibits.

24        **THE COURT:**  Thank you.

25   **Q**   And I'm going to ask Dr. Lodish if you would look at Tab

1    1, please.

2    A    Yes.

3    **Q**    Which is Exhibit D0K.

4    A    Yes.

5    **Q**    And if you would describe for the Court what Exhibit 1

6    is?

7    A    Well, this is the Goldwasser paper, 1974, in the Journal

8    of Biological Chemistry.

9    **Q**    Okay.  And could you --

10            **MR. DAY:**  Your Honor, Amgen would offer into

11   evidence Exhibit D0K.

12            **THE COURT:**  Any objection?

13            **MS. BEN-AMI:**  No, your Honor.

14            **THE COURT:**  D0K is admitted in this proceeding.

15   Have we --

16            **THE CLERK:**  We haven't admitted anything yet.

17            **THE COURT:**  You haven't admitted anything?

18            **THE CLERK:**  No.

19            **THE COURT:**  So we'll call these A and then a

20   number.  This will be A1 in the jury waived proceeding.

21   D0K, A1.

22            **MR. DAY:**  Thank you, your Honor.

23            (Exhibit marked in evidence.)

24   **Q**    And would you look at Exhibit 3 and please describe for

25   the Court what Exhibit 3 -- or, I'm sorry, not Exhibit 3,

1    but Tab 3 in your notebook is.

2    A    Yes.  It's a paper that describes the removal, or the

3    consequences of removing sialic acid, this one sugar from

4    erythropoietin.  Perhaps I could just read --

5              **MS. BEN-AMI:**  Excuse me.

6    **Q**    No.  I'm just asking you to identify it.

7              **MS. BEN-AMI:**  Mr. Day?

8              **MR. DAY:**  Yes.

9              **MS. BEN-AMI:**  Could you tell me what exhibit you're

10   talking about?

11             **MR. DAY:**  It's DMD, Tab 3 in the notebook.  Excuse

12   me.

13             **MS. BEN-AMI:**  It's DM --

14             **MR. DAY:**  DMD.

15             **MS. BEN-AMI:**  Thank you.

16             **MR. DAY:**  Your Honor, Amgen would offer Exhibit DMD

17   into evidence.

18             **THE COURT:**  Any objection?

19             **MS. BEN-AMI:**  I don't think there's a foundation

20   for this document laid.

21             I think this is already in evidence actually, your

22   Honor.  I believe we put this into evidence now that I see

23   what it is.

24             **THE COURT:**  Then it's not a problem.

25             **MS. BEN-AMI:**  It's not a problem.

 1           **THE COURT:**  So I take it -- I won't clutter the

 2    record, but there's agreement this may be admitted once you

 3    check.

 4           Go ahead.

 5           **MR. DAY:**  Thank you.

 6           **THE COURT:**  And he may testify from it in this

 7    aspect if you want that.

 8           **MR. DAY:**  Thank you, your Honor.

 9    **Q**   So let's return to Exhibit A1 which was Dr. Goldwasser's

10    paper.

11           And could we bring up the abstract for Exhibit A1.

12    A   Yeah.

13    **Q**   And what in your opinion, Dr. Lodish, was significant

14    about Dr. Goldwasser's paper, Exhibit A1?

15    A   Well, I think two things are significant.  First of all,

16    as they point out in the abstract, desialation, or removal

17    of the sialic acid, results in complete loss of biological

18    activity when it is assayed in vivo.  So that points out

19    that sialic acid is important for in vivo bioactivity.

20           What I believe is equally important is the next

21    sentence that says when the assay is done in vitro

22    asialoerythropoietin has full activity, that is,

23    erythropoietin without sialic acid.  And I think that points

24    out that the requirements for specific carbohydrate

25    entities, here, sialic acid, are very different with respect

1  to in vitro bioactivity and in vivo bioactivity.  Sialic

2  acids on EPO are important for activity in animals but not

3  in cell culture assays.

4  **Q**   In your opinion, based on the state of the art as of

5  1983-84, what, if anything, would these publications, that

6  is, the Goldwasser publication and the Dordal publication --

7  A   Correct.

8  **Q**   -- that we've just referred to, Exhibit A1 and DMD,

9  what, if anything, would these publications have taught an

10  ordinarily skilled worker about the glycosylation of human

11  EPO?

12  A   What they would have taught one is that there would be

13  great uncertainty in which cells, if any, might produce

14  recombinant EPO with the requisite sialic acids and other

15  carbohydrate chains; that is, great uncertainty in the

16  ability to make recombinant EPO with carbohydrate chains for

17  in vivo biological activity.

18       **MR. DAY:**  And, your Honor, Ms. Ben-Ami kindly noted

19  for me that Dordal is Exhibit 2048, in evidence.

20       **THE COURT:**  Thank you.

21  **Q**   In your opinion, Dr. Lodish, as of 1983 what was known

22  regarding the effect of differences in glycosylation on

23  protein function?

24  A   A great deal was known.  It was known the effects on

25  immune reactions of the protein; it was known that these

1    differences in carbohydrates were known to affect the

2    half-life of proteins in blood or other biological fluids;

3    and it was known to affect the activity of proteins,

4    particularly the ability to bind to other proteins.

5    Q    In your opinion, what was known as of 1983-84 regarding

6    the effect of glycosylation on immune response?

7    A    Well, it was known very clearly that certain

8    carbohydrate chains could be immunogenic in man.  And

9    perhaps the best example, which was known well before 1983,

10   is the human A-B-O blood groups.  And simply put --

11   Q    What does this graphic depict?

12   A    Yes.  What this graphic depicts schematically is --

13          MS. BEN-AMI:  Could we have this identified in the

14   record since it just popped out.

15          MR. DAY:  Yes.  It's Lodish Graphic 314.

16          MS. BEN-AMI:  Thank you.

17   A    What this depicts schematically are the sugars that are

18   attached to proteins on N cells of individuals who are Type

19   O, Type A, or Type B.  And individuals with Type O produce

20   on their proteins in the cells this very specific five sugar

21   oligosaccharide.  Individuals with Type A have exactly the

22   same oligosaccharide with the addition of one particular

23   sugar.  Individuals of Type B are identical to Type O, but

24   differ with the addition of yet a different sugar.  And

25   briefly put, these differences are the basis of blood typing

1    and blood transfusion.  If one administers a protein or a

2    cell from a Type A individual into a Type O it's rejected.

3    It's destroyed.  And this is all due to these relatively

4    small differences in carbohydrate structure.

5    **Q**   And when was this known?

6    A   This was known certainly in the late 70's, well into the

7    early '80's.

8    **Q**   You also mentioned that carbohydrate differences can

9    affect stability in circulation?

10   A   Yes.  And that was also well-known in due part to our

11   own work.  I believe I have a graphic on that.  Yes.

12           **MS. BEN-AMI:**  Can we have that identified for the

13   record?

14           **MR. DAY:**  Yes, it's 435.

15   A   435.  It's the same one I had up before.  And it just

16   shows that some oligosaccharides cause the protein to be

17   relatively stable in the serum or blood or animals.  Some,

18   with these particular arrangements of sugars, cause the

19   glycoprotein to bind to proteins either on liver cells or on

20   certain blood cells and cause them immediately to be removed

21   from circulation and destroyed.

22           So, what's quite apparent from here is that from

23   this graphic that differences in the sugar chains attached

24   to the same protein can either cause rapid clearance or, in

25   this case, another example of an immune response.

1    **Q**   Before Dr. Lin's inventions, Dr. Lodish, what cell

2    types, if any, were known to perform the post-translational

3    modifications required to make an in vivo biologically

4    active human erythropoietin?

5    A   Well, only the cells then and still largely unknown in

6    the kidney that actually manufacture the human EPO.

7    **Q**   So, I want you to please assume that in 1983-84 a

8    skilled worker wanted to produce an in vivo biologically

9    active human EPO glycoprotein.

10   A   Yes.

11   **Q**   Make that assumption.

12          In your opinion what effect, if any, would a

13   difference in cell type have under a likelihood of success?

14   A   Well, different cells would modify the protein

15   differently, and particularly glycosylation, it would induce

16   a great uncertainty as to which, if any, cell type one

17   should pick.

18   **Q**   What do you understand Dr. Lin's claims to require with

19   respect to biological activity?

20          **MS. BEN-AMI:**  Objection.

21   A   The claims in the patent --

22          **MS. BEN-AMI:**  May I speak?

23          **THE COURT:**  Yes, you may.

24          **MS. BEN-AMI:**  Yes.  He's just said all the claims

25   and we're only talking -- I don't know what we're talking

1    about at this point.

2              **THE COURT:**  I don't either.  Sustained.

3    **Q**   What do you understand Dr. Lin's '933 claims-in-suit to

4    require with respect to biological activity?

5    **A**   In vivo.

6              **MS. BEN-AMI:**  Objection, your Honor.

7              **THE COURT:**  Well, the documents speak for

8    themselves and I'm --

9              **MS. BEN-AMI:**  So a point of clarification.  What we

10   have here today is a Group III invalidity/double patenting,

11   which is only to the two process patents, the '868 and the

12   '698.  Right?  And Group IV --

13             **MR. DAY:**  Your Honor, I can clear this up.  We

14   don't need to take time with an objection.

15             **THE COURT:**  Go ahead.

16             **MR. DAY:**  And I think if I can just get

17   straightforward answers from Dr. Lodish.

18   **Q**   What do you understand --

19             **MS. BEN-AMI:**  I can't.

20   **Q**   What do you understand the '933 claims to require in the

21   way of in vivo biological activity?

22   **A**   They require in vivo biological activity.

23   **Q**   And what activity do you understand the '868 claims to

24   require?

25   **A**   Can you refresh my memory which is the '868?

1   **Q**   Process claims.

2   **A**   They also -- I believe they also require in vivo

3   biological activity.  Yes.

4   **Q**   In your opinion, what, if anything, is the difference

5   between in vivo and in vitro activity?

6   **A**   It's huge.  In vitro means activity in cultured cells of

7   biochemical assays.  And there are many examples, including

8   some that I've given, where proteins or drugs are active in

9   cell culture assays and are simply not active at all in the

10  whole animal.

11  **Q**   Okay.  Let me ask you to take a look at a graphic that

12  was used by Dr. Lowe in his testimony in this proceeding.

13  It's JL8.  This is a demonstrative.

14        **MS. BEN-AMI:**  Your Honor, I would object to this

15  because of the sequestration order, and the exhibit is not

16  in his report.

17        **MR. DAY:**  It actually was attached to his report

18  which is why it was entered into evidence, or why it was

19  used at trial.

20        **THE COURT:**  All right.

21        **MS. BEN-AMI:**  I don't believe so.  I think it was

22  modified.

23        **THE COURT:**  I'll hear his testimony.

24  **Q**   Which, if any, of these references have you reviewed?

25  **A**   I've reviewed all of them extensively.

1    **Q**   And did you review them in conjunction with your work as

2    an expert in this case?

3    A    Oh, no.  I mean, these were important papers that were

4    published in the early 1980's and I read them when they were

5    published.

6    **Q**   And in your expert reports did you also address --

7    A    I reviewed them in my expert reports.

8    **Q**   And did you address them in your expert reports?

9    A    I did.

10   **Q**   Okay.  What recombinant proteins are discussed in the

11   references that are cited here by Dr. Lowe?

12   A    Well, leaving aside a few vital proteins, the key ones I

13   believe are the Interferon-alpha, Interferon-gamma,

14   Interleukin II, and tPA, or Tissue Plasminogen Activator.

15   **Q**   Okay.  And as of 1983-1984 what biological activity, if

16   any, had been reported for each of these recombinant human

17   glycoproteins?

18   A    The only activity reported for any of these proteins was

19   in vitro biological activity.

20   **Q**   What, in your opinion, would one skilled in the art have

21   concluded from these prior art publications regarding the

22   likelihood of success in producing an in vivo biologically

23   active recombinant human erythropoietin as of 1983-1384?

24   A    Again, I would regard this as very unlikely.  Certainly

25   no one at the time had made a recombinant glycoprotein with

1    in vivo biological activity, a glycoprotein of any sort.

2    Q    And what about an EPO glycoprotein?

3    A    And an EPO glycoprotein would certainly be uncertain.

4    That is, one -- I'm not making myself clear.  One would have

5    very little likelihood of success of making an EPO

6    glycoprotein in any cell with in vivo biological activity.

7    Q    Dr. Lodish, in your opinion, would an ordinarily skilled

8    worker in 1983-84 have had a reasonable expectation of

9    successfully producing an in vivo biologically active EPO?

10   A    No, one would not.

11   Q    I want you to assume that the DNA encoding EPO was

12   transformed or transfected into host cells in a manner that

13   would allow the host cell to express the DNA.

14   A    Okay.

15   Q    Would that fact change your opinion?

16   A    No, it would not.

17   Q    Why not?

18   A    Well, simply put, the cells would make the EPO

19   polypeptide, but there would be huge uncertainty as to

20   whether any particular cell could introduce the requisite

21   post-translational modification so that the protein would

22   have in vivo biological activity.

23   Q    What if the cells into which the EPO DNA were

24   transformed or transfected were CHO cells.  Would that

25   change your opinion?

1    A    No, it would not.

2    Q    As of 1983-1984, why not?

3    A    Simply put, we did not know what post-translational

4    modifications were required for EPO, glycosylation in

5    particular, and we had no idea whether CHO cells could

6    introduce that requisite post-translational modification.

7              **MR. DAY:**  I have no further questions.  I pass the

8    witness, your Honor.

9              **THE COURT:**  Ms. Ben-Ami, I'm sorry.  I'm conflating

10   the two proceedings.  I know Ms. Carson's going to examine

11   Dr. Benet.  You go ahead.

12             **MS. BEN-AMI:**  She's the tall one.  Thank you, your

13   Honor.

14                        **CROSS-EXAMINATION**

15   **BY  MS. BEN-AMI**

16   Q    Dr. Lodish, you agree that when Dr. Lin filed his

17   applications in November 1984 -- November 1984, right?  Are

18   you with me?

19   A    Is that the correct date?  I thought it was 1983.  I may

20   have the dates wrong.

21   Q    The one that led to all these patents that are in suit

22   now.

23   A    Okay.  You'll have to explain.  Because I'm aware that

24   there were four successive filings and I'm honestly not sure

25   which one's which.

1    **Q**   Well, whenever -- you know we're talking about four or

2    five patents-in-suit in this case, right?

3    A   Yes.

4    **Q**   Okay.  So, when Dr. Lin filed the patent applications

5    that are related to these cases, he had not treated or given

6    his EPO to any patients, right?

7    A   Okay.  I'm not sure -- I'm going by my recollection --

8    that in the first of the submissions he had not yet treated

9    patients.  He had the DNA.

10   **Q**   In any of the patent applications, including 1984, he

11   didn't have -- had not treated a human being?

12   A   A human being, I'm -- I don't know whether he's treated

13   a human being.

14   **Q**   It's not disclosed in the patents that he's treated a

15   human being?

16   A   I believe you are correct in that the patents disclose

17   treatment of animals, not human beings.  I believe so.

18   **Q**   So, at the time Dr. Lin filed his patent applications he

19   could not know for sure whether he would get an immuno -- an

20   immune response in humans, correct?  Because he hadn't

21   tested it, in your opinion.

22   A   If he hadn't tested it in humans, he would not have been

23   able to determine whether it was immunological --

24   immunogenic or not, that's correct.

25   **Q**   Yet he claimed products for use in humans, correct?

1    A    He claimed, and again I'm going on memory, he claimed

2    pharmaceutical compositions.  I don't think the claims in

3    the patent, and again I'm going on memory, specifically

4    required administration to humans.

5    Q    Do you recall that the '422 patent as construed by the

6    Court require that they be suitable for human

7    administration?

8    A    Could you show me the claim of the '422.  I'm not

9    disputing it.  I just --

10   Q    If you don't remember it.  It is -- the record --

11   A    I don't remember the specifics of the '422.

12   Q    It is what it is.

13   A    Okay.

14   Q    So, you agree that one skilled in the art in 1984, if

15   they had EPO DNA in hand, would have been able to express

16   the EPO protein functionally in any number of mammalian

17   cells, correct?

18   A    Wait, 1984 is after Lin's inventions, is that correct?

19   Q    No.  I need a patent for the witness.

20        Let me show you what's been marked as Exhibit 7,

21   the '008 patent.  Just as an example.  Just let me help you

22   here.

23   A    Okay.

24   Q    Dr. Lodish, look here.  Do you see the filing date?  It

25   says November '84?

1        **MR. DAY:**  Can you show us where you're pointing,

2   counsel.

3        **MS. BEN-AMI:**  Where, right there, where it says

4   filed November 30th, 1984.

5   A   Yeah, I see it.  I see a lot of earlier dates.  Okay.

6   Q   Okay.  So I'm going to ask you to just use that as the

7   date, November 30th, 1984.  Okay?

8   A   Okay.  So he's already done all of his experiments.

9   Just, I'm just trying to understand the time frame in which

10  you're asking the question, that's all.

11  Q   I don't want you to consider any of his experiments.

12  I'm just asking you to put yourself in the place of someone

13  skilled in the art in 1984.

14  A   Who knows of Lin's inventions or who does not?

15  Q   Who does not know of Lin's inventions.

16  A   At all?

17  Q   Okay, let me ask you a question.

18  A   Okay.

19  Q   In your opinion, what, if any, effect does the

20  disclosure of the EPO gene sequence by Dr. Lin in Figure

21  6 --

22  A   Yes.

23  Q   -- have on the ability of the ordinary skilled person in

24  the field to make and use cells capable of producing EPO?

25  A   I can answer that in two sentences if you would let me.

1    Q    Yes.

2    A    Essentially, one could make EPO in many procaryotic

3    yeast mammalian cells.  Making the protein would be

4    straightforward.  When you say use, you'll have to explain

5    to me use for what.

6    Q    Once one would have, at this time period, once one had

7    the cloned DNA in hand, a person skilled in the art could

8    have, without any difficulty, expressed the protein

9    functionally in any number of mammalian cells, correct?

10   A    No.

11        **MS. BEN-AMI:**  Can I have the transcript of TKT.

12   Q    Now, you testified in the TKT case, right?

13   A    I certainly did.

14   Q    And this is the actual daily transcript in front of this

15   Court, right?

16   A    I take your representation.  I have no reason to doubt

17   it.  Yes.

18   Q    Okay.  So would you look at Page 123, Lines --

19   A    Yes.

20   Q    -- 12 through 22.

21        **MS. BEN-AMI:**  Do we have any full size copies, or

22   can we -- your Honor, I know we don't normally put this on

23   the screen.  But I -- can we do that just for legibility at

24   this point?

25        **THE COURT:**  Absolutely.

```
 1              MS. BEN-AMI:  Since there's no jury.

 2              THE COURT:  This is jury waived.

 3              MS. BEN-AMI:  Because I think I gave Dr. Lodish the

 4      same tiny mini-script.

 5      A   I can read it.  That's all right.  Yes.

 6      Q   All right.  So we're on Line 12.

 7      A   Yes.  I see it.

 8      Q   What in your opinion -- in your opinion what, if any,

 9      effect does the disclosure of the EPO gene sequence by Dr.

10      Lin, in Figure 6, have on the ability of those of ordinary

11      skill in the field of molecular and cellular biology to make

12      and use cells capable of producing EPO?

13              Answer:  It was revolutionary.  Basically, having

14      the DNA sequence, the hard part, I should stress, is getting

15      the clone DNA.

16              And this is the part I was asking you about.

17      A   Okay.

18      Q   Once one had the clone DNA in hand, one skilled in the

19      art, specifically myself or people in my laboratory, could

20      have, without any difficulty, expressed the protein

21      functionally in any number of mammalian cells.

22              Do you see that?

23      A   I see that very clearly, yes.

24      Q   And you gave that testimony in the TKT trial?

25      A   I did.
```

1    Q    So, Mr. Day asked you to assume that the person had the

2    DNA sequence in hand, right?

3    A    Correct.

4    Q    And your testimony is once you had the DNA sequence in

5    hand a person skilled in the art, without any difficulty,

6    could express the protein functionally in any number of

7    mammalian cells, correct?

8    A    That is the testimony.  Yes, that is what I said.

9    Q    And you were under oath?

10   A    Oh, yes.

11   Q    And you were talking about the same patents that are the

12   patents in this case?

13   A    But I was not talking, I did not --

14   Q    Doctor.

15   A    Okay.  I'm sorry.

16   Q    Now, you gave testimony in another case, the Columbia

17   case, you gave testimony in a deposition, I believe.

18   A    I did.

19   Q    Now, in that case, once again, in that case, I believe

20   you were talking about the Axel patent.

21        Do you remember that?

22   A    Very much so, yes.

23   Q    And that was a patent that existed in, it was from 1980?

24   A    I believe so, in that period, yes.

25   Q    So that's three, four years before the patents in this

1    case.

2    A    Right.

3    Q    So, in that case, Doctor, you had an expert report?

4    A    I did, yes.

5    Q    Let me, just for ease, hand you a copy in case you need

6    it.

7            And there you were testifying on the concept of

8    double patenting, right?

9    A    Yes, I was.

10   Q    You were giving expert reports at that time, right?

11   A    Yes.

12   Q    And that was a case in front of Judge Wolf in this very

13   district, right?

14   A    I never met the judge, but it was, I believe in a court

15   in Boston, yes.

16   Q    Okay.  Now, I ask you, Doctor, you agree that the Axel

17   patent accurately reflects the state of the art as of

18   1980, '81, correct?

19   A    Yes, I accept that.

20           **MS. BEN-AMI:**  And do we have the Axel patent for

21   the witness?

22           This doesn't have a number on it, it's just for

23   reference, so perhaps we may give it a number.  And it is

24   2024, already in evidence.

25   Q    And in this case, in the Columbia case you were

1    testifying that there was double patenting, right?

2    A    Well, I was testifying concerning the obviousness of

3    certain claims in patents over others, yes.

4    Q    Now, I would like you to look at Paragraph 9 of your

5    report on Page 4.  Got it?

6    A    Uh-huh.

7    Q    And there you are quoting from the specification of the

8    Axel patent in 1980, right?

9    A    That is correct.

10   Q    And in your report you put in italics a certain portion

11   of the specification.  Column 7, lines 31 to 58.  I think we

12   have a demonstrative.  Can I have that -- is that a

13   demonstrative.  HL7.

14              This is your copy of your report, right?

15   A    Excuse me.

16   Q    You can look on the screen right in front of you, I

17   think it's easier for you.  Right?

18   A    Correct.

19   Q    And you quote from the Axel patent, right?

20   A    Right.

21   Q    And you say:  It is anticipated that after inserting a

22   gene or genes for the protein portion of the cellular

23   material such as a glycoprotein, which includes a nonprotein

24   portion into a eucaryotic cell type which normally produces

25   such material, a cell will not only produce the

1    corresponding proteinaceous material but will utilize

2    already existing cellular mechanisms to process the

3    proteinaceous materials if and to the extent necessary, and

4    will also add the appropriate nonproteinaceous material to

5    form the complete biologically active material.

6         Do you see that?

7    A   Right.  Just to be specific, this is the quote from the

8    Axel patent, those are not my words.

9    Q   This is what you're quoting.

10   A   Correct.

11   Q   Right?  And so you're quoting in the Axel patent where

12   it says it's going to make biologically active material,

13   including glycoproteins?

14   A   Right.  It does not --

15   Q   And the next sentence there, which is your opinion,

16   right, it says, you say, in your expert opinion, to the

17   Court in Massachusetts:  These statements reflect the

18   understanding of persons skilled in the art at the time of

19   the invention.  Right?

20   A   Correct.

21   Q   And that was 1980-81, right?

22   A   Uh-huh.

23   Q   So this is saying that you can make glycoproteins which

24   are biologically active in 1980-81?

25   A   And I said that a cell transformed with a gene that

1    encoded a glycoprotein would produce a glycoprotein.  I did

2    not say, nor could I have said, that the glycoprotein would

3    have in vivo, and I stress in vivo, biological activity.

4    Q   Can we go back to the -- the part you quoted said

5    complete biologically active material.

6         Can we blow that up, please.  You put that in

7    italics, right?

8    A   We did.

9    Q   It's in your report in italics.  I didn't change it.

10   A   Right.

11   Q   Right, it's in your report in italics?

12   A   And complete does not necessarily mean at all in vivo

13   biologically active.  There are many substances that --

14   Q   My --

15   A   I'm sorry.

16   Q   You wrote this to a Court in this district in 1980

17   talking about the state of the art as reflected by Dr.

18   Axel's patent, correct?

19   A   Right.

20   Q   And you said these statements reflect the understanding

21   of persons skilled in the art at the time of the invention

22   in 1980, '81?

23   A   Right.  And --

24   Q   Thank you.

25   A   Right.  Okay.

1    **Q**   And you wrote a paper, Doctor, that is Exhibit D0 --

2    DSB.  Can I have that, please.  That's not in evidence.

3              Oh, okay, it's in your binder.

4    A    Oh, yes.

5    **Q**   And I would like you to look at the last page.

6              **THE COURT:**  For clarity, this is Exhibit 2048 in

7    evidence.

8              **MS. BEN-AMI:**  2048.  No, that's not it.  No, your

9    Honor, I think this is --

10             **THE COURT:**  DSB?

11             **MS. BEN-AMI:**  DSB?  I don't believe it was admitted

12   into evidence yet.

13             **THE COURT:**  Well, unless I'm missing something

14   that's the one where Mr. Day said you courteously gave him

15   the number.

16             **MS. BEN-AMI:**  No, that was the thesis.

17             **MR. DAY:**  That was DMD.

18             **THE COURT:**  Oh, thank you.  I stand corrected.  And

19   the document's not in evidence.

20             **MS. BEN-AMI:**  We're, apparently we're not sure if

21   it's in evidence.

22             **THE CLERK:**  I don't have it in my --

23             **THE COURT:**  All right.

24             **MS. BEN-AMI:**  And I would offer it in evidence for

25   this portion of the case, your Honor.

1          **THE COURT:**  Any objection?  I hear none.  DSB will

2     be admitted A2 in this portion of the case jury waived.

3          (Exhibit marked in evidence.)

4     **Q**    And, Doctor --

5          **MS. BEN-AMI:**  Did we give this to the witness?

6     **Q**    Do you have it in your binder?  Do you have your binder?

7          **THE COURT:**  I have it here.

8     **Q**    This is your '81 paper.  Thank you.

9     A    Okay.

10    **Q**    Tab 2 my colleague suggests.

11         This is your review paper, "Post-translational

12    modifications of proteins."

13    A    I wrote it myself.  Yes.

14    **Q**    And on the last page in the last sentence before

15    conclusions, do you see that?

16    A    Uh-huh.

17    **Q**    It says:  If the complex N-linked oligosaccharide is

18    essential for function or stability of a protein there may

19    be no real alternative at present to the use of cultured

20    mammalian cells.

21         Do you see that?

22    A    Yes.  That is a perfectly correct statement.

23    **Q**    And so in the 1981, '82, '83, '84 time period, if you

24    wanted to be, most likely to be successful to get the right

25    glycosylation you would use mammalian cells, right?

```
1    A    What this statement was stating -- this was in contrast

2    to yeast cells, which were known to put a totally different

3    sugar on, and this was a warning to people working in the

4    field at the time that one needed to use in general

5    mammalian cells, that yeast cells simply weren't going to

6    work.

7    Q    So in 1981 that was known?

8    A    Yes.

9    Q    You taught it?

10   A    I taught it.  Many people didn't listen to me, but I

11   taught it.

12   Q    Okay.  But it is in the prior art for the person of

13   ordinary skill?

14   A    It is in the prior art not to use yeast cells, yes.

15   Q    Okay.  And so, you agree that the person skilled in the

16   art in 1983-84, looking at all the prior art, would say the

17   best choice is mammalian cells?

18   A    Some.  Many.  Yes.  Mammalian cells in general.

19   Q    Now, can we go to the graphic that you showed that was

20   Dr. Lowe's time line.  Where you said it was Dr. Lowe's time

21   line.

22         There are several examples here on this time line,

23   JL6 -- JL8, I'm sorry, of recombinant proteins being made in

24   CHO cells, correct?

25   A    That is correct.
```

1    Q    And if we look at that, we see as early as 1982 there is

2    human interferon being made in CHO cells, correct?

3    A    Yes.

4    Q    And that is a recombinant protein, right?

5    A    As I remember the paper, this is recombinant interferon

6    that is in vitro, activity in cell culture.  But it is a

7    recombinant interferon, that's correct.

8    Q    And it's being made in CHO cells?

9    A    Right.

10   Q    And do you know if human interferon made in CHO cells in

11   fact has biological activity?

12   A    It has biological activity as was shown in this paper in

13   cell culture assays.  I have no idea whether it's

14   biologically active in humans or in experimental animals.

15   Q    You don't know that human interferon made by CHO cells

16   is sold by Biogen?

17   A    I don't follow this literature.  Certainly in the 1982

18   period, or even somewhat later, it had not been tried in an

19   animal.

20   Q    Well, let's just --

21   A    Okay.

22   Q    I asked you a pretty straightforward question.

23   A    I don't know where Biogen and what cells Biogen makes

24   for their use, no.

25         THE COURT:  Now, Ms. Ben-Ami, I need a recess.

1                MS. BEN-AMI:  Okay.

2                THE COURT:  We're going to recess for about ten

3       minutes.  Just so everyone understands their limitations,

4       this is not an invitation to take all this time, but you've

5       got then, when I come back on the bench at five after,

6       you've got until 2:30.  That will give Mr. Day, and he is

7       entitled, to what he has reserved, and I'm going to stop at

8       least hearing from you on this at five minutes of 4:00

9       because I've got some things that I need to raise with you

10      before we recess.

11               MS. BEN-AMI:  So when do you want us back, your

12      Honor, I'm sorry.

13               THE COURT:  I want you back at 3:05.

14               MS. BEN-AMI:  Thank you, your Honor.

15               THE COURT:  We'll recess until that time.  We'll

16      recess.

17               THE CLERK:  All rise.

18               (Recess.)

19               THE CLERK:  All rise.  Court is in session, please

20      be seated.

21               THE COURT:  Proceed, Ms. Ben-Ami.

22               MS. BEN-AMI:  Thank you, your Honor.

23               Your Honor, I have some documents I would like to

24      offer in as admissions, but I don't know that we need the

25      witness on the stand for that.

```
 1              THE COURT:  Well, then why don't we finish with the

 2    witness.  Why don't you need him to --

 3              MS. BEN-AMI:  The witness is finished then.

 4              THE COURT:  All right.  Well, then you're done now.

 5              MS. BEN-AMI:  Subject to my putting in -- I don't

 6    think we need him to put those documents in.

 7              THE COURT:  Fine.  Any redirect, Mr. Day?

 8              MR. DAY:  Sure, your Honor, just a couple of

 9    questions.

10                      REDIRECT EXAMINATION

11    BY  MR. DAY

12    Q    Dr. Lodish, Ms. Ben-Ami pointed you to your transcript

13    testimony in the TKT case at Page 123.

14    A    Excuse me.

15    Q    And you notice just before the section that she talked

16    about at Line 6 you were asked the question:  What have you

17    --

18    A    Excuse me, let me just get to the page.

19    Q    123 --

20    A    Yeah.  Yeah.

21    Q    -- at Line 6 you were asked:  What have you done to

22    familiarize yourself with the Lin patent?

23    A    Right.

24    Q    What was the context in which you were asked questions

25    and answering questions at this portion of the transcript?
```

1    A    This was with the specification of the Lin patent in

2    hand; that is, I was relying on all the information that was

3    contained in the claims and in the specification of the Lin

4    patent.

5              MS. BEN-AMI:  Objection, your Honor.

6              THE COURT:  No, overruled; that may stand.

7    Q    And you were also asked some questions about an expert

8    report that you gave in connection with the Columbia

9    University patent litigation, it was regarding the Axel

10   patent?

11   A    Yes.

12   Q    Okay.  And do you recall, sir, what the inventions were

13   that were claimed in the Axel patent that you were opining

14   on?

15   A    Oh, yes.  They were regarding cotransformation and

16   coamplification of various recombinant DNAs.

17   Q    Okay.  And did the claims in that case include any

18   claims to glycoprotein products having in vivo biological

19   activity?

20   A    None whatsoever.

21             MR. DAY:  I have no further questions, your Honor.

22             THE COURT:  Nothing further for this witness?

23             MS. BEN-AMI:  No.

24             THE COURT:  You may step down, thank you.

25             (Whereupon the witness stepped down.)

 1            THE COURT:  And that's Amgen's presentation in this

 2     phase?

 3            MR. DAY:  No, sir, your Honor.  I reserved time

 4     and --

 5            THE COURT:  Well, so you had.  And I'm just trying

 6     to be efficient.  Shall we -- do you want to argue or do you

 7     have anymore evidentiary presentation, what?

 8            MR. DAY:  Well, I believe Roche is going to go, I

 9     believe what the Court said was that Roche would go until

10     3:30 and then Mr. Day would go until --

11            THE COURT:  Well, I was just dividing up the

12     remaining time.  Mercifully, we might do better than that.

13     But, in any event, it makes sense, if what you're going to

14     do is argue, it makes sense to sort through these documents

15     and then hear that argument.

16            MR. DAY:  Yes, I believe Roche has some argument

17     they want to make and then I think --

18            THE COURT:  Yes.  I'm with that.  Then -- fine,

19     let's turn to Ms. Ben-Ami and let's get your exhibits and

20     I'll hear you.

21            MS. BEN-AMI:  Okay.  So, your Honor, I just wanted

22     to offer QHX.

23            THE COURT:  QXH.  Any objection?

24            MR. DAY:  Can you tell us what they are?

25            MS. BEN-AMI:  They're from the ITC proceedings.  I

```
 1   think these are documents that your Honor can take judicial

 2   notice of because they're records from a legal proceeding.

 3           MR. DAY:  Your Honor, I'm sorry, this is the first

 4   time I've seen what they're offering here.  We haven't had a

 5   prior disclosure about this.

 6           THE COURT:  Well, let me see them.  And you're

 7   offering these as admissions?

 8           MS. BEN-AMI:  Yes, your Honor.

 9           MR. DAY:  I also notice they're not signed.

10           MS. BEN-AMI:  They're produced by Amgen, your

11   Honor.  And the other one is QHW.

12           MR. DAY:  I believe also, if I understand

13   correctly, these were not on your exhibit list.  So this is

14   the first I'm seeing these, your Honor.

15           THE COURT:  Well, it may be.  And like I've done

16   elsewhere, I have them, I don't need to rule on their

17   admissibility now.  I will look at them.  You can frame

18   arguments based on them.  If I need them, I'll have to make

19   a ruling and face up to the evidentiary issue; if I don't, I

20   don't.

21           MS. BEN-AMI:  Yes.  Thank you, your Honor.  Just

22   for the record, they are on the exhibit list; they're part

23   of a document on the exhibit list.

24           THE COURT:  Which is, so they can check it.

25           MR. DAY:  Yes, could we just have --
```

```
 1              MS. BEN-AMI:  The interference file.  We'll provide

 2      them with the -- we'll work it out.

 3              THE COURT:  Fine.  Yes.

 4              MS. BEN-AMI:  So I'm going to hand the floor back

 5      over to Mr. Suh to make arguments.

 6              THE COURT:  Yes, Mr. Suh.

 7              MR. SUH:  Good afternoon, your Honor.

 8              I want to take this time to just briefly go over

 9      what Amgen's expert, Dr. Lodish, just testified this

10      afternoon.  He said that once one had the clone for the EPO

11      gene, and that is ostensibly what's been claimed in the '008

12      patent.

13              THE COURT:  You're going to have to fall back a

14      little bit and orient me.

15              MR. SUH:  Yes.

16              THE COURT:  I've been puzzling about this

17      afternoon's proceedings.

18              MR. SUH:  Exactly, your Honor.  And I will, I

19      believe --

20              THE COURT:  Well, let me tell you what my

21      puzzlement is.

22              MR. SUH:  Yes.

23              THE COURT:  I assume that I'm listening to this so

24      I can make an informed ruling on patent

25      distinguishability --
```

1          **MR. SUH:**  Yes.

2          **THE COURT:**  -- vel non.

3          **MR. SUH:**  That's right.

4          **THE COURT:**  Have I at least got that right?

5          **MR. SUH:**  That's correct, your Honor.

6          **THE COURT:**  All right.  Now, with that in mind I'll

7     hear you.

8          **MR. SUH:**  Okay.  And what Roche pointed out in the

9     cross-examination of Dr. Lodish was that once you actually

10    had the clone of the EPO gene that's, and that's what's

11    claimed in the now expired '008 patent, one of skill in the

12    art, including Dr. Lodish, based upon what he said in the

13    TKT testimony, he said that you could express that protein

14    functionally in any number of mammalian cells.  That is what

15    was claimed in the '868 and the '698 patents which are

16    currently in suit.

17         He also testified, not testified, but he submitted

18    an expert report in the Columbia case whereby he relied upon

19    what one of skill in the art would have known in 1981.

20    That's two, three years even before the filing date of the

21    patents-in-suit.

22         **THE COURT:**  Let me ask you this, and I haven't

23    checked.  I did know, now Chief Judge Wolf, had that case.

24    He never -- that case finally settled; isn't that right?

25         **MR. SUH:**  That's what I understand, your Honor.

1        **THE COURT:**  Did he write any memoranda on this

2    subject, published or unpublished?  I have not asked him,

3    it's not our practice to.

4        **MS. BEN-AMI:**  I can answer that, your Honor.

5        **THE COURT:**  Yes.

6        **MS. BEN-AMI:**  Because I was involved.

7        **THE COURT:**  Yes.  I mean, we don't discuss cases

8    among ourselves; maybe legal issues but --

9        **MS. BEN-AMI:**  What happened in that case, your

10   Honor, is that there was a reexam filed as well and that

11   Columbia gave all the defendants a covenant not to sue them

12   again, and it was all dismissed at the end of the day.

13       **THE COURT:**  But my point --

14       **MS. BEN-AMI:**  He did not write an opinion.

15       **THE COURT:**  -- because I respect my colleague, he

16   never wrote a memorandum, whether it amounted to a final

17   judgment, is he on record as giving any analysis that maybe

18   I ought to look at?

19       **MS. BEN-AMI:**  No, your Honor.

20       **THE COURT:**  Thank you.

21       **MR. SUH:**  And, your Honor, if I could just -- if I

22   could also talk about another point that Dr. Lodish

23   testified to.

24       In opening arguments a few weeks ago, Mr. Day

25   argued that one of the reasons why it was unexpected to have

1   an in vivo biologically active protein once you got the

2   clone was because Amgen undertook simultaneous projects of

3   trying to express the gene in yeast, in bacteria, and in

4   mammalian cells.  I think Rusty Day said, as any good

5   scientist knew, because they didn't know, they had to try

6   all these different alternatives.

7          Well, Dr. Lodish just admitted that in 1981 he

8   wrote a paper that said don't use yeast because that's going

9   to give you the wrong glycosylation.  We heard from Dr.

10  Lin's testimony a few days ago, he said don't use bacteria,

11  because that's not going to give you any glycosylation.

12         Now, let's talk about what Dr. Lodish did not

13  actually do for you, your Honor.  And as your Honor pointed

14  out this is supposed to be a hearing with respect to

15  obviousness-type/double patenting based upon the claims of

16  the '008 patent.

17         And, your Honor, if I could please give you a copy

18  of the '008 patent.  And, your Honor, let's look at, let's

19  look at claim 24 of the '008 patent.  All right, claim 24 is

20  a transformed or transfected host cell according to claim 23

21  which host cell is capable of glycosylating said

22  polypeptide.  Dr. Lodish explained that the glycosylation

23  step is all post-translational.  This is what the '008

24  patent claims.

25         **THE COURT:**  The glycosylation step is what?

1        **MR. SUH:**  The glycosylation step is all

2    post-translational.  All right.  And claim 24 actually

3    depends upon claim 23.

4            Can I see claim 23.

5            Claim 23 is to a procaryotic or eucaryotic host

6    cell transformed or transfected with a DNA sequence

7    according to claim 7 in a manner allowing the host cell to

8    express the polypeptide.  This is in the '008 patent, your

9    Honor.  It's talking about glycosylation and expression of

10   the gene.

11           Now, let's go to claim 7 which claim 24 and 23

12   depend upon:  A purified and isolated DNA sequence

13   consisting essentially of a DNA sequence encoding a

14   polypeptide having an amino acid sequence sufficiently

15   duplicative of that of EPO to allow possession of the

16   biological property causing bone marrow cells to increase

17   production of reticulocytes and red blood cells, and to

18   increase hemoglobin synthesis or iron uptake.

19           What is that, your Honor?  That's in vivo

20   biological activity.  Amgen is telling this Court that these

21   claims do not make in vivo biological activity obvious.

22   It's right there in the claim.

23           Now, on Monday, Mr. Day spent considerable amount

24   of time rebutting my argument with respect to what I said

25   were admissions that Amgen said in the interference

1     proceedings.  And just to remind ourselves, Amgen made these

2     particular arguments in the interference proceedings because

3     it wanted to take advantage of Judge Saris' district court

4     decision.  And Judge Saris said that Lin had cloned the EPO

5     gene before party Fritsch, Genetics Institute.  And what it

6     did is that it took that district court decision and it said

7     that with respect to the interference that dealt with the

8     '008 patent, this decision by Judge Saris controls.

9          But they didn't stop there.  They couldn't control

10    themselves.  They said that this particular decision should

11    also control the '868 interference.  Because what they did

12    is that they adopted Fritsch's position by saying that those

13    two counts were the same manifestation -- merely different

14    manifestations of the same invention.

15         Now, just as I predicted, on Monday Mr. Day said

16    no, hold on.  Amgen didn't say that.  You're taking all of

17    this out of context.  In fact, Mr. Day said that what I was

18    saying were just isolated snippets woven together in a very

19    well-crafted way.  I think he's giving me a little too much

20    credit there, your Honor.  I'm just laying out the facts.

21    And if we actually go through the interference, we'll see

22    exactly what Amgen said.

23         Can we go to RA-60, please.

24         This is what Mr. Day showed you.  Right?  That it

25    was Fritsch that said it was the same invention and not GI.

1    But Mr. Day didn't tell you the date of this particular

2    document.  This document was two years before the end of the

3    interference, in 1989.

4           Let's go to RA-55.

5           This is a time line of events in the '097

6    interference.  August 1989, Amgen submits an opposition and

7    it says the two counts are not the same invention.

8           Well, look what happens a few months later.  Judge

9    Saris issues her opinion, December of '89.  Immediately

10   Amgen submits a motion to terminate the interferences.  Not

11   just the '008 interference, the '097, '097 interference.

12          Can we go to RA-56.

13          This is, this is their motion to terminate.  And

14   you see the underlined portion.  That's not -- that's

15   Amgen's original emphasis.  Okay?  All of the underlines.

16   It said it is submitted that the federal court decision --

17   that's Judge Saris' decision -- is fully dispositive of the

18   real issues of the subject interferences.  The count of

19   interference '096 is the same as claim 2 of the '008 patent.

20   Clearly Lin's entitled to priority on the record as to this

21   patent.

22          Now, here's, this is where it gets good.  The same

23   is true with regard to the counts of interference '097,

24   since if Lin was first to invent a host cell containing a

25   DNA sequence in a manner allowing the host cell to express

 1    rEPO -- that's the '008 patent -- he is of necessity the

 2    first to invent the process of making rEPO using such list.

 3         Let's look at what else did he say.  The district

 4    decision should be controlling in the '097 interference.

 5    Those are the '868 claims.  The Court assessed the priority

 6    evidence regarding the DNA sequence used to make EPO and the

 7    reduction to practice of the sequence -- that's the '008 --

 8    necessarily and inherently includes the use of that sequence

 9    to make EPO according to the count of the '097.

10         So here, Amgen is not, is not saying that the

11    counts are different.  This isn't, this isn't Genetics

12    Institute making this argument.  This is Amgen.

13         And if we could just spend a little time going over

14    what it means to actually adopt a party admission.  It

15    doesn't matter whether party Fritsch first said that these

16    were different manifestations of the same invention.  What

17    matters is whether Amgen adopts it, takes, takes advantage

18    of that particular statement and uses it.  Just as I'm

19    sitting here -- just as I'm standing here before you, your

20    Honor, and I am saying that these are Amgen's admissions,

21    Roche is now adopting that decision.  And if I can convince

22    you that the patents are invalid, I can't then go back to

23    another court and say something different.

24         **THE COURT:**  And you suggest that's what they're

25    doing here?

1          **MR. SUH:**  Yes, absolutely.

2          Let's go to, let's go to RA-57.

3          By this point in 1991, Judge Saris' decision has

4    been confirmed by the Federal Circuit.  So what does Amgen

5    do?  It actually petitions the commissioner to terminate the

6    interferences.

7          **THE COURT:**  About five more minutes, Mr. Suh.

8          **MR. SUH:**  Okay.  And here again they're not trying

9    to say that the interferences are different.  As will be

10   evident, the interferences are intimately related, so much

11   so that common papers are filed in the proceedings and the

12   presentation of evidence has been consolidated.  Look at the

13   last sentence.  The same Fritsch, et al. applications is

14   involved in all three interferences.  And it's noted that

15   the counts that Fritsch is, in urging the combination of the

16   interferences, has characterized these interferences as

17   different manifestations of the same invention.  See,

18   they're adopting that particular statement.

19         Now, finally, let's go to TRX GUK, which is the

20   interference brief that I handed up.  You know, rather than

21   provide you with a Power Point presentation, because I don't

22   want Mr. Day, I don't want Mr. Day to say that I'm actually

23   taking isolated snippets, let's actually go to the actual

24   brief.

25         Can we go to Page 24.  Page 24.  Summary of Lin's

1    position.  This is a summary of their argument.

2              **MR. DAY:**  What is this, counsel?

3              **MR. SUH:**  GUK.  This is actually the arguments that

4    they provided, final arguments to the Court.  And the next

5    page --

6              **MR. DAY:**  I'm sorry, I --

7              **MR. SUH:**  It's GUK.  We gave it to you on Friday.

8              Let's look at Roman Numeral III.  And we're going

9    to read this line by line.  While the count is directed to a

10   process for preparing in vivo biologically active EPO using

11   a mammalian host cell.  See, that's the count of the '097

12   which corresponds to the '868 patent.  While that's the --

13   while the count is to the '868 -- the next page, please --

14   and the litigation was directed to the purified and isolated

15   DNA sequence in host cells transfected or transformed

16   thereby -- that's the '008 patent claims -- it is evident

17   that these are only different manifestations of the same

18   invention as acknowledged by Fritsch, et al.

19             And I, I agree.  They do say that this was

20   Fritsch's original statement.  But they're using it.

21   They're adopting it.

22             Look at what else they say.  Clearly the whole

23   purpose and intent of the purified and isolated DNA

24   sequence, the '008 patent claims, at issue in the

25   litigation, was to express in vivo biologically active EPO.

1    The '868 claims.

2           The next sentence, please.  Stated otherwise, the

3    process language of the Lin patent claims, at issue in the

4    litigation, is for all intents and purposes a description of

5    the present counts.  They're saying that the '008 patent

6    claims actually have process limitations that correspond to

7    the '868 patent.

8           I just want to conclude with this, this point, your

9    Honor.  Yesterday when I heard Mr. Day's opening argument on

10   infringement, I believe he used the analogy of a key.  He

11   said that this particular key opened a special lock which

12   opened up miraculous inventions.  And he said the key was

13   the patents-in-suit.  Well, I sat there and that sounded

14   very familiar because Amgen's attorneys have used that

15   argument before.  But that argument was actually used and

16   they said the key was not the patents-in-suit, the key was

17   to the '008 patent DNA claims.

18          RA-45.  This is what they told the United Kingdom.

19   They said:  Whether termed a guidebook to the peak, a

20   blueprint, keys to the --

21          **MR. DAY:**  Your Honor, I'll object.  This is not in

22   evidence.

23          **MR. SUH:**  This is argument, your Honor.

24          **THE COURT:**  Well, it is argument.  But, I mean,

25   you're making reference to statements that aren't in

```
 1    evidence, they're not of record.

 2              MR. DAY:  It's also --

 3              THE COURT:  It seems to me somewhat inconsistent

 4    with the position that you have taken that statements that

 5    you made to authorities in Europe ought not be termed

 6    admissions because the legal system is different.

 7              MR. SUH:  Sure.

 8              THE COURT:  And largely I've adopted that.

 9              MR. SUH:  Okay.  Then we don't need to use that.

10              THE COURT:  All right.  About another minute.

11              MR. SUH:  Okay.

12              THE COURT:  I think I understand the argument.

13              MR. SUH:  And, your Honor, this really goes to the

14    idea of a judicial estoppel.

15              THE COURT:  Oh, I know the phrase to put on it.

16              MR. SUH:  Right.  And there's two requirements for

17    judicial estoppel in the First Circuit.  And the first

18    requirement is there has to be real inconsistency.  And I

19    think that I've shown that inconsistency.

20              THE COURT:  And the second is you have to have an

21    advantage from it in the prior litigation.

22              MR. SUH:  Well, an advantage -- the judicial body

23    has to actually adopt it, and then there has to be that

24    advantage.

25              THE COURT:  I have it in mind.
```

1          All right, Mr. Day.

2          **MR. SUH:**  So with that, your Honor.

3          **THE COURT:**  Thank you.

4          **MR. DAY:**  Thank you.

5          Could we have Exhibit GUK back up, Page 26, the

6   record you cut off with, Mr. Suh.  If you could blow that up

7   at 26.  And just show us where you ended.  Actually if you

8   could go up a little bit.  I don't think we had the sentence

9   there that said "One cannot,' so just everything above "One

10  cannot."

11          Now -- that's fine.  Leave it there.

12          Yes, Mr. Suh is taking snippets out of context.

13  Because when he quoted this he ended -- do we have a laser

14  pointer here?

15          Your Honor may have noticed that he ended right

16  here with the present count.  He didn't -- he cut off right

17  here and he didn't show you the next sentence.  Now let's

18  get the next, the bottom part of this paragraph blown up and

19  on the screen, please.

20          "One cannot be sure he has the sequence until he

21  has successfully expressed in vivo biologically active human

22  EPO.  This involves culturing the transfected cells and

23  isolating the expression product to determine whether or it

24  has the required in vivo activity.  Hence, the priority

25  holding in the litigation is directly on point,

1    notwithstanding the different statutory class of claims

2    involved."

3            Now, could I have slide 352, please.  Can we switch

4    over?  Thank you very much.

5            What we're looking at on the left here is the GI

6    brief, the final brief filed in the '097 interference.  This

7    is the process count.  This is Amgen's brief, final brief in

8    the '097 interference.  And this is the Board of Patent

9    Appeals and the interferences ruling on priority in the '097

10   process count.

11           Notice what GI argued.  Accordingly, as in the '096

12   interference -- that's the DNA case -- priority turns upon

13   the first conception of the purified and isolated EPO gene.

14   That was GI's position.

15           What was Amgen's position.  For priority of the

16   '097, the findings of the district court, affirmed by the

17   Federal Circuit, clearly show that Lin carried out the

18   expression process using the DNA sequence to produce in vivo

19   biologically active recombinant human EPO before Fritsch, et

20   al. even conceived of the DNA sequence.

21           Could I have slide 296, please.

22           In Amgen's brief it set out this table showing the

23   findings of the district court.  And what those findings

24   were is when Lin cloned the EPO gene; when Amgen confirmed

25   the gene sequence, October 1983; when Lin cloned monkey EPO,

1    October '83; when Amgen expresses human EPO gene in 293 and

2    COS cells, '84, January; when Amgen determined the

3    biological activity for recombinant human EPO, 1984,

4    February; when Amgen determined in vivo biological activity

5    of recombinant human EPO, March 1984; when Amgen expresses

6    human EPO gene in CHO cells; and then finally, after all of

7    that, in July 1984, when Fritsch identified two clones.

8         All of these findings were set forth in Judge

9    Saris' opinion, and it's these findings -- if we could go

10   back to 293, please.  Or, I'm sorry, 352.

11        That's what Amgen's referring to when it says the

12   findings from the district court, affirmed by the Federal

13   Circuit, clearly show that Lin carried out the expression

14   process using the DNA sequence to produce in vivo

15   biologically active human recombinant EPO before Fritsch

16   even conceived of the DNA sequence.  That was Amgen's

17   position.

18        Now, let's look at what the Board ruled, even more

19   importantly.  What was the priority decision based on.  Was

20   it based on what Amgen argued, or was it based on what

21   Fritsch argued.  It was based on what Fritsch argued.  And

22   it was based on the findings, applying what Fritsch argued

23   to the findings of the district court.  With regard to the

24   issue of prior inventorship in particular, we note that

25   Fritsch conceded at the final hearing that priority in each

```
1    of the related interferences turns on isolation of the EPO

2    gene.

3            THE COURT:  But -- well, that's an interesting

4    argument.  You're not saying that you've shifted ground

5    here.  What you're saying is then that it wasn't based on

6    your arguments that you prevailed below but rather on GI's

7    arguments.

8            MR. DAY:  I'm making two -- no, I'm making two

9    points, your Honor.

10           THE COURT:  All right.

11           MR. DAY:  I'm making the point that Amgen always

12   and consistently argued that these were separate counts,

13   separate inventions, that the priority of its invention for

14   the process turned on the fact that it conceived and reduced

15   a practice the process before Fritsch necessarily because it

16   actually achieved in vivo expression before Fritsch even

17   cloned the gene.  That's what I'm pointing out.

18           I'm pointing out that the Board of Patent Appeals

19   said priority, Fritsch conceded the priority turned on the

20   cloning and the findings of the district court determined

21   that Fritsch had not even cloned the gene before Amgen had

22   done any of this.

23           THE COURT:  So your argument is no estoppel,

24   working backwards, because, one, the Board of Patent Appeals

25   didn't depend, for this part of the analysis, on your
```

1    argument, and two, no estoppel because your argument's been

2    consistent throughout.

3            **MR. DAY:**  That's right.

4            **THE COURT:**  All right.

5            **MR. DAY:**  Now, if I could, I would like to pick up

6    where I left off on, now I can't remember if it was Monday

7    or Tuesday.

8            I would like slide 408 up, please.

9            You were talking about a time line.  And I had, at

10   the point where I ended my argument, we had gone past the

11   interference and I pointed out there was an

12   obviousness-type/double patenting rejection by the examiner

13   in the '868 prosecution in August 1984.  And so we're in

14   this time line.  We're just past the interference and we're

15   here in August 1984, and I pointed out that the examiner had

16   issued a obviousness-type/double patenting rejection.

17           Could I have 409, please.

18           This is that rejection by the examiner rejecting

19   under the judicially created doctrine of

20   obviousness-type/double patenting over the '008 claims.

21   This is exactly the argument Roche is making in this case,

22   with respect to the '868 and the '698.

23           410, please.

24           Amgen responded to this.  Amgen responded to this

25   by, as I pointed out, previously pointing out that the Board

1    of Patent Appeals, they had determined that these were

2    patentably distinct inventions, the process of the DNA, but

3    in addition, by referring back to the position that Amgen

4    had taken to overcome the obviousness rejection prior to the

5    interference and incorporating by reference that argument.

6          And in that argument -- could I have, please,

7    411 -- Amgen pointed out what it pointed out in that prior

8    argument.  And what Amgen had pointed out in that prior

9    argument was that the DNA, that the DNA that was contained

10   in the '008 claims was necessary to obtain a protein that

11   had the amino acid sequence that would be required in order

12   to obtain an in vivo biologically active EPO.  But it wasn't

13   sufficient.  Because in addition to the DNA, you also needed

14   to have a cell that was properly selected and engineered

15   which would actually produce a carbohydrate structure on

16   that protein and secrete a protein that had the correct

17   carbohydrate structure and post-translational modifications

18   to function in the body in vivo.  And that that was

19   unexpected and beyond a reasonable expectation of those of

20   skill in the art at the time.  Because it was uncertain and

21   unpredictable what cell would do that and how it would do

22   it.  And that was the argument that Amgen made to overcome

23   the prior obviousness rejection and it was incorporated here

24   by reference to overcome the ODP rejection.  And that's in

25   the prosecution history.

1           Could I have D412, please.

2           And here's what Amgen argued.  A method would have

3    to be devised whereby an appropriate array of glycosylation,

4    including sialic acid terminal residues and, possibly,

5    penultimate galactose residues would be provided on a

6    polypeptide with requisite amino acid sequence homology to

7    erythropoietin.

8           Based on the teaching of Goldwasser and Dordal,

9    that Dr. Lodish testified earlier, it was known in the art

10   that if you didn't have this correct array the product would

11   not be in vivo biologically active.  But nobody knew how to

12   get that array before Lin did it.  And it was unpredictable

13   which, if any, cells would put that on a human protein.  And

14   that was Amgen's argument to the examiner.

15          Could I have D420, please.

16          But Amgen did more than that.  Could I have the

17   Sytkowski declaration.

18          And I would like to hand up to the Court, if I may,

19   this is Trial Exhibit 2012.  It's an excerpt from Trial

20   Exhibit -- do we have just three?  Could I have one more?

21   It's an excerpt from Trial Exhibit 2012.  2012 is the

22   prosecution history of the '868 patent.  And I'm handing to

23   the Court a declaration that was submitted in conjunction

24   with Amgen's response to this obviousness-type/double

25   patenting rejection.

1          I have up here on the first page of 2012, and if

2     you go to Page 1058 of Exhibit 2012, in evidence, you'll see

3     here a declaration by Dr. Arthur John Sytkowski.  Why is

4     this important?

5          Could we just go back, please, to the --

6          Why is this declaration important?  This

7     declaration, part of the prosecution history --

8          **MR. SUH:**  Your Honor, objection.  For the same

9     reason why you didn't allow me to bring up the issue

10    regarding foreign litigation, this declaration was submitted

11    in a foreign proceeding.

12         **MR. DAY:**  No, it was submitted in the U.S. Patent

13    Office in the prosecution of this case and it's a trial

14    exhibit.

15         **THE COURT:**  It being a trial exhibit, I will hear

16    his argument.

17         **MR. DAY:**  This was presented to the examiner.  And

18    the reason it's relevant, your Honor, is because this is a

19    declaration that was filed on behalf of Roche and the Roche

20    parties in Europe arguing against the patentability of

21    Amgen's claims and laying out arguments that you will find

22    very reminiscent in this case.

23         **THE COURT:**  But --

24         **MR. DAY:**  Amgen --

25         **THE COURT:**  -- that, that is about where I draw the

1    line.  Because I don't care whether they argued it in --

2            **MR. DAY:**  No.  What you hear is and what's very

3    relevant is, those arguments were taken and presented by

4    Amgen to the examiner so the examiner could consider them in

5    conjunction with an obviousness-type/double patenting

6    rejection of Amgen's claims.

7            **THE COURT:**  That I consider relevant.

8            **MR. DAY:**  That's what happened.

9            **THE COURT:**  All right.  But I don't care about that

10   Roche has grabbed them and submitted them in Europe.

11           **MR. DAY:**  That's simply --

12           **THE COURT:**  It adds nothing.

13           **MR. DAY:**  That's just contextual.

14           **THE COURT:**  Well, I'm excluding it and don't rely

15   on it in any respect.

16           **MR. DAY:**  And all I ask you to do is to read

17   Amgen's response that it submitted this to the Patent

18   Office, and then I ask you to consider what was in here that

19   the examiner considered when the examiner withdrew the

20   obviousness-type/double patenting rejection.  I'm simply

21   going to show very quickly in these slides, I'm going to

22   give you a tour of what's in this declaration.

23           **THE COURT:**  Briefly, in about four minutes.

24           **MR. DAY:**  Okay.  And faster than that, I believe.

25           The first thing that's in here is the argument that

1    Dr. Goldwasser withheld EPO from everyone else and that

2    prevented everyone else from cloning the EPO gene.  That

3    argument was put in this declaration in front of the

4    examiner.  The examiner had it and considered it.

5           The next thing that's in here -- next slide,

6    please -- the next thing that's in here is the contention,

7    well documented in this declaration with all of the

8    references that Dr. Lowe relied upon at trial here, that the

9    expression of the EPO DNA sequence in COS and CHO cells

10   would yield biologically active EPO, that that was one, that

11   was reasonably expected by those of skill in the art at the

12   time and it rendered the claims obvious and the claims

13   should not be patentable.

14          Next slide, please.

15          Also put into this declaration was Genentech's tPA

16   work and everything that Genentech did with tPA, including

17   expressing it in CHO cells, and laying out the argument why

18   that rendered these claims obvious.

19          Next slide, please.

20          And there were additional examples put in in this

21   declaration of production of recombinant proteins in CHO

22   cells using the methods subscribed in the contested patent

23   saying that all of this argument, this is a brief as to why

24   the claims were obvious and should not be allowed.  And

25   Amgen took it and gave it to the examiner so that the

1    examiner was fully informed.  The examiner withdrew the

2    rejection and allowed the claims to issue because the

3    examiner was persuaded that it was not obvious and it was

4    not reasonably expected by those of skill in the art that

5    you would be able to produce a recombinant protein.

6         **THE COURT:**  But just as a procedural matter,

7    because procedure does count.  I understand that as

8    argument.  But I'm not bound by what the examiner did.  I

9    have the judicial duty to make an informed and prudential

10   decision on this point --

11        **MR. DAY:**  Yes.

12        **THE COURT:**  -- myself.  But you're arguing as

13   matter of persuasion, look, we, Amgen, ourselves, gave this

14   which in effect amounts to a brief --

15        **MR. DAY:**  Against interest.

16        **THE COURT:**  -- against interest to the examiner and

17   nevertheless he said there was no obviousness/double

18   patenting.

19        **MR. DAY:**  And let me take my argument two steps

20   further.

21        **THE COURT:**  I understand the argument.

22        **MR. DAY:**  Next, next slide, please.

23        The patent was allowed by examiner James Martinell.

24   And he also was the examiner on the '698.  Both, both

25   process patents that are attacked by Roche in Theory 3 for

1    obviousness-type/double patenting, the same examiner on both

2    patents.  He's the one that allowed the '868.  He also

3    allowed the '698.

4              Next slide, please.

5              And in both patents, the '008 patent is cited as

6    prior art.  He considered in both patents whether the claims

7    of the '868 and the '698 were patentable over the '008

8    patent.

9              Next slide, please.

10             On cross-examination Dr. Lowe has admitted that all

11   of the references he's relied upon were before the Patent

12   Office.

13             Next slide, please.

14             And indeed, here are all the references that Dr.

15   Lowe relied upon showing where they are in the prosecution

16   history, that is, they're cited on the face of the patent

17   and they're also in the information disclosures.  Every

18   reference, every different protein that Dr. Lowe relied upon

19   was before the Patent Office.

20             Next slide, please.

21             And consequently, where the asserted grounds for

22   invalidity were reviewed by the PTO, as this Court has

23   previously held, the challenger has the added burden of

24   overcoming the deference that is due to a qualified agency

25   presumed to have done its job properly.

 1              Next slide, please.  Okay.  Could we go back to --

 2     let me skip that.  I want to go now, if I could, and just

 3     address slide 842, please.  8402.

 4              **THE COURT:**  Well, very briefly.

 5              **MR. DAY:**  Do I have time?

 6              **THE COURT:**  You have time, but there are some other

 7     things I want to raise that have nothing to do with this.

 8     But go ahead.

 9              **MR. DAY:**  Okay.  I --

10              **THE COURT:**  I think I understand the argument.

11              **MR. DAY:**  I appreciate -- and I will be as succinct

12     as I can.

13              **THE COURT:**  Please.

14              **MR. DAY:**  The 8402, please.  8 4 -- I'm sorry, 402,

15     please.  8402.

16              Now, you saw Mr. Suh, Mr. Suh, excuse me, walk

17     through the '008 patent claims and he argued that what the

18     '008 patent claims cited is a biologically active EPO

19     polypeptide.

20              Well, that's not quite right.  These claims have to

21     be read carefully.  And that's why double patenting is a

22     question of law and a question of claim construction because

23     we trust courts to read the claims correctly and properly.

24              Claim 7 in the '008 patent claims a DNA sequence

25     and it's defined by what it encodes.  And what it encodes is

1    a polypeptide whose amino acid sequence is sufficiently

2    duplicative of the amino acid sequence of human

3    erythropoietin to allow for the possession of in vivo

4    biological activity.  That says nothing about whether the

5    polypeptide in fact has biological activity, because we know

6    that more than an amino acid sequence is needed to produce

7    that activity.

8         We look at claim 23.  Claim 23 recites a

9    procaryotic or eucaryotic host that's transformed or

10   transfected with that DNA.  And so, it refers to three

11   different cell types very broadly, and they must have that

12   DNA, which is defined by reference to the polypeptide that

13   it encodes.

14        Claim 24 further defines, further delimits what

15   cells are covered.  Now we're down to cells capable of

16   glycosylating.  Those are eucaryotic.  So bacteria cells are

17   excluded from the class.

18        And then we get down to the last definition, claim

19   27, and that's a CHO cell.  Nothing in these claims requires

20   the production of a polypeptide.  Nothing refers to the

21   production of a polypeptide.

22        Let's look at the '868 claims now and compare them

23   to this and see what's the difference.

24        In the '868 claims, you claim first of all a

25   process for the production of something very different than

1    a DNA.  You're producing a glycosylated erythropoietin

2    polypeptide.  And that polypeptide must have a very specific

3    activity.  It must have the in vivo biological activity of

4    causing bone marrow cells.  And the process -- of producing

5    red blood cells.  And the process includes two steps.

6    Growing certain cells and isolating, what, the polypeptide.

7    And that's why this is a patentably distinct invention.

8            Let's go to the next slide, please.

9            So what's different between the '868 claims and the

10   '008 claims.  One thing that's different is the '868 claims

11   a process.  The '008 claims a DNA.  The '868 claims a

12   process for the production of a glycosylated polypeptide.

13   That's an entirely different animal, structure, than the

14   DNA.

15           The '868 claim required that that polypeptide have

16   a very certain, very specific function in the body and it

17   must perform that function in vivo, in the body.  And that

18   is it must stimulate bone marrow cells to produce red blood

19   cells.  The '008 claims don't require that at all.  And it

20   must be produced in quantities that are sufficient to be

21   isolatable.  That's why this is a different patent.

22           **THE COURT:**  Yes.  Have I got these?

23           **MR. DAY:**  Do you have these slides?

24           **THE COURT:**  Yes.

25           **MR. DAY:**  Yes, they're in the notebook which I

1    believe has been -- well, I hope has been --

2         **THE COURT:**  Thank you.  Thank you all on this and

3    I'll take it under advisement.

4         Now, I have some things that I want to do.  The

5    next time we meet will be --

6         **THE CLERK:**  October 15th.

7         **THE COURT:**  Well, that's when we try.  I thought we

8    were going to meet during that week we were down for a

9    portion of that --

10        **THE CLERK:**  Oh the 10th.

11        **THE COURT:**  On the 10th, yes.

12        The next time we meet is the afternoon of the 10th.

13   Do we have the whole afternoon?

14        **THE CLERK:**  Yes.

15        **THE COURT:**  Yes.  At 2:00 p.m. on the 10th of

16   October.

17        Now, I want some things -- I want to talk about the

18   case as a whole and I want to talk about the charge and

19   we'll use what time we have together to deal with various

20   matters that hopefully cooperatively we can work out putting

21   the case to the jury.  But I want some things by then and

22   here's what I want.

23        I want a list of each of those exhibits claimed to

24   anticipate any of the claims that are in suit here.  I think

25   that's only Goldwasser.  But you may differ on that.  I

1    would like you to agree, but if you don't agree, I'll

2    resolve it.

3          Then I want a list of all the exhibits which

4    constitute prior art in this case, all the trial exhibits

5    which constitute prior art.  Now, there may be a bunch of

6    exhibits that bear on the state of the knowledge, but

7    they're not prior art.  Prior art has to be prior.  And I

8    expect that you'll agree on that.  Agree -- well, yes, I

9    expect you to agree.  If you don't, I'll resolve it.  Maybe

10   not that afternoon, but I'll resolve it.  Because I want to

11   give those two lists to the jury.

12         Then I want a breakdown by -- this is simple, and I

13   should be able to do this myself, but the adversary process

14   being what it is, I'll ask you to do it.  I want you to

15   break down, and I expect you to agree, the claims-in-suit

16   and identify them claim by claim as product claims, process

17   claims, or product-by-process claims, which now has some

18   significance here.

19         Now, that's one thing to get ready.

20         Second, on October 2nd, I acted on Amgen's motion

21   to admit exhibits in evidence, document 1217, and I did that

22   without careful scrutiny of Roche's objections.  And now I

23   have scrutinized those objections and in reconsideration

24   I've made some changes.  You may have the key document back.

25   The document now has two columns.  The right most column in

```
 1    ink was my initial assay; the left column in pencil is my

 2    current view and the, and the order of the Court.

 3              Ms. Smith will be the guardian of the document.

 4         THE CLERK:  You can't copy it.  You can't

 5    distinguish ink from pencil.

 6         THE COURT:  I can't help that.  You interpret it to

 7    them.

 8         THE CLERK:  Okay.

 9         THE COURT:  They'll understand.

10              Let's see here.  I have docket, docket 1313 which

11    is Amgen's motion to provide additional documents from the

12    interference proceeding.  I propose to admit those in the

13    jury waived proceeding, so we'll take that's allowed in the

14    jury waived proceeding.

15              I have Amgen's motion to correct the file history

16    of the '868 patent by adding a document that was missing.

17    And I will allow that.

18         THE CLERK:  What number, what number is that?

19         THE COURT:  That's document number 1311.

20              Mr. Suh?

21         MR. SUH:  Your Honor, we understand that was just

22    filed about an hour ago.  Can we just have -- can we just

23    look at what they added in?

24         THE COURT:  Of course.  Well, of course you can.

25         MR. SUH:  Thank you.
```

 1              **THE COURT:**  And since I'm trying hard to keep up to

 2      be helpful to you, and you see that I am willing to revisit

 3      my rulings if I think they're unfair.

 4              All right.  Now, we've got over a week and

 5      inevitably there will be the avalanche of paper that will

 6      greet me --

 7              **MR. DAY:**  Your Honor?

 8              **THE COURT:**  Wait, wait one second.

 9              **MR. DAY:**  Sorry.

10              **THE COURT:**  -- greet me on my return.  Time is

11      running out, at least for the jury.  And we'll discuss

12      things on the 10th.

13              Yes, Mr. Day?

14              **MR. DAY:**  I just had one request.

15              **THE COURT:**  Yes.

16              **MR. DAY:**  That I think would be most helpful to get

17      the Court what the Court wants and has asked for.  And that

18      would be to simply set a structure for getting it done.  And

19      the structure I would propose is that, because you've asked

20      for a list of anticipating references and prior art

21      references, if we could stage this so that Roche would

22      provide that to Amgen by Monday and Amgen would respond

23      promptly by Tuesday, that would facilitate getting to a

24      resolution of what, if any, disagreements there are so we

25      can present it in an orderly manner.

1           **THE COURT:**  That makes sense.

2           Ms. Ben-Ami, that crowds it right up there.  And

3    mercifully, though I would love you to be here, I understand

4    that you are otherwise engaged.  Is that okay?

5           **MS. BEN-AMI:**  As long as it's like the evening of

6    that Monday so that --

7           **MR. DAY:**  That's fine.

8           **THE COURT:**  Close of business, five o'clock.

9    Evening may be a late evening.

10          And, Ms. Ben-Ami, to you, I wish you a wonderful

11   celebration.

12          **MS. BEN-AMI:**  Well, thank you, your Honor.

13          **THE COURT:**  It's very meaningful and I hope it is a

14   wonderful time.

15          **MS. BEN-AMI:**  Thank you very much, your Honor.

16          **THE COURT:**  All right, we'll stand in recess in

17   this case until we meet, not with the jury, at two o'clock

18   on the 10th of October.

19          **MR. FLEMING:**  Your Honor, I apologize, one quick

20   question before --

21          **THE COURT:**  Yes.

22          **MR. FLEMING:**  Since Ms. Ben-Ami won't be there.

23          **THE COURT:**  Right.

24          **MR. FLEMING:**  And I know your Honor talked about

25   the fact that you wanted to have a preliminary charging

1    conference on the 10th.

2            **THE COURT:**  Yes.

3            **MR. FLEMING:**  And we would be prepared to address

4    that of course.  Do you anticipate having a discussion or an

5    argument on any other issue so that we might at least have

6    her input before we come, since she won't be available that

7    day.  Of course we will present you the materials you asked

8    for.

9            **THE COURT:**  Yes.  It's the end of a long and tiring

10   day.  And while I would like to give you a brilliantly

11   decisive answer, I can't.

12           **MR. FLEMING:**  Thank you, your Honor.

13           **MS. BEN-AMI:**  Thank you, your Honor.

14           **THE COURT:**  We'll recess.

15           **THE CLERK:**  All rise.  Court is in recess.

16           (Adjournment.)

17

18

19

20

21

22

23

24

25

1        **C E R T I F I C A T E**

2

3

4        I, Donald E. Womack, Official Court Reporter for

5    the United States District Court for the District of

6    Massachusetts, do hereby certify that the foregoing pages

7    are a true and accurate transcription of my shorthand notes

8    taken in the aforementioned matter to the best of my skill

9    and ability.

10

11

12

13

14        /S/ DONALD E. WOMACK
         _____
15             DONALD E. WOMACK
            Official Court Reporter
                P.O. Box 51062
16       Boston, Massachusetts 02205-1062
              womack@megatran.com
17

18

19

20

21

22

23

24

25