1                   UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MASSACHUSETTS
2
                                            Civil Action
3                                           No. 05-12237-WGY

4      * * * * * * * * * * * * * * * *
                                     *
5      AMGEN, INC.,                  *
                                     *
6              Plaintiff,            *
                                     *   **DAILY TRANSCRIPT**
7      v.                            *   **OF THE EVIDENCE**
                                     *   and **MOTION HEARING**
8      F. HOFFMANN-LA ROCHE LTD,     *      (Volume 18)
       ROCHE DIAGNOSTICS GmbH and    *
9      HOFFMANN-LA ROCHE, INC.,      *
                                     *
10             Defendants.           *
                                     *
11     * * * * * * * * * * * * * * * *

12

13

14             BEFORE:  The Honorable William G. Young,
                        District Judge, and a Jury

15

16

17

18

19

20

21

22

23
                                    1 Courthouse Way
24                                  Boston, Massachusetts

25                                  October 15, 2007

1              A P P E A R A N C E S

2

3          DUANE MORRIS LLP (By D. Dennis Allegretti,
      Esq. and Michael R. Gottfried, Esq.), 470 Atlantic
      Avenue, Suite 500, Boston, Massachusetts 02210
4              - and -
           DAY CASEBEER MADRID & BATCHELDER, LLP (By
5      Lloyd R. Day, Jr., Esq., David M. Madrid, Esq. and
      Robert M. Galvin, Esq.) 20300 Stevens Creek
6      Boulevard, Suite 400, Cupertino, California 95014
               - and -
7          McDERMOTT WILL & EMERY (By Michael Kendall,
      Esq.), 28 State Street, Boston, Massachusetts
8      02109
               - and -
9          McDERMOTT WILL & EMERY (By William G.
      Gaede, III, Esq.), 3150 Porter Drive, Palo Alto,
10     California 94304
               - and -
11         MARSHALL, GERSTEIN & BORUN LLP (By Kevin M.
      Flowers, Esq.), 6300 Sears Tower, 233 S. Wacker
12     Drive, Chicago, Illinois 60606-6402
               - and -
13         STUART L. WATT and WENDY A. WHITEFORD, Of
      Counsel, Amgen, Inc., One Amgen Center Drive,
14     Thousand Oaks, California 91320-1789, on behalf of
      the Plaintiff
15

16         BROMBERG & SUNSTEIN LLP (By Lee Carl
      Bromberg, Esq. and Julia Huston, Esq.), 125 Summer
      Street, Boston, Massachusetts 02110
17             - and -
           KAYE SCHOLER LLP (By Leora Ben-Ami, Thomas
18     F. Fleming, Esq., Patricia Carson, Esq.,
      Christopher Jagoe, Esq. and Howard Suh, Esq.),
19     425 Park Avenue, New York, New York 10022, on
      behalf of the Defendants

20

21

22

23

24

25

1                         **I N D E X**

2     Motion Hearing . . . . . . . . . . . . . . . 2755

3
      **WITNESS:**          **DIRECT    CROSS     REDIRECT    RECROSS**
4

5     LESLIE Z. BENET, Resumed

6        By Mr. Day        2603                2640

7        By Ms. Carson              2626                  2644

8     VLADIMIR TORCHILIN

9        By Mr. Gaede      2649                2729

10       By Ms. Ben-Ami            2678                  2734

11       By Mr. Gaede                         2735

12    ADRIENNE FARID

13       By Mr. Galvin     2737

14
                                       **FOR       IN**
15    **EXHIBITS:**                     **I.D.    EVID.**

16

17       57   Buckman Report No. 1012588 . . . . . .2611

18       58   Structure of RO0503821 . . . . . . . .2661

19       59   Patient Informed Consent Form  . . . .2672

20       60   Memo, 11/10/99 . . . . . . . . . . . .2738

21       61   E-mail, 11/4/99  . . . . . . . . . . .2740

22       62   Peg-EPO PDP outline  . . . . . . . . .2743

23       63   Report No. 1005851 . . . . . . . . . .2744

24

25

1      **THE CLERK:**  All rise for the jury.

2      (Whereupon the jury entered the courtroom.)

3      **THE CLERK:**  Court is in session, please be seated.

4      **THE COURT:**  Good morning, ladies and gentlemen.

5      **THE JURY:**  Good morning.

6      **THE COURT:**  Welcome to the last phase of this

7  trial, the last segment of the trial.

8      It truly is so good to see you all.  And I want to

9  say how much I, we'll start with me and the Court's staff,

10  and I know I speak for all the attorneys and the litigants,

11  appreciate the attention and the diligence that you are

12  showing to this action.  We are all deeply in your debt.

13      Because you have been so prompt, we're all ready to

14  continue, and if you would remind the witness.

15      **THE CLERK:**  Sir, I remind you, you are still under

16  oath.

17      **THE WITNESS:**  Yes.

18      **THE COURT:**  And, Mr. Day, I know the jurors know

19  this, but why don't you start by asking the witness again

20  just to identify himself and then roll right on.

21      **MR. DAY:**  Yes.

22      LESLIE Z. BENET, Resumed

23      **DIRECT EXAMINATION** (Cont'd)

24  BY  MR. DAY

25  Q   Please, Dr. Benet, would you introduce yourself to the

1    jury?

2    A   Yes.  I'm Les Benet, Professor of Biopharmaceutical

3    Sciences and Pharmaceutical Chemistry at University of

4    California-San Francisco.

5              **THE COURT:**  Proceed, Mr. Day.

6    **Q**   Dr. Benet, in your opinion, from a pharmacological

7    perspective, how does Roche's peg-EPO compare to recombinant

8    human EPO?

9    A    In my opinion, from a pharmacological perspective,

10   Roche's peg-EPO, CERA, and EPO, do not differ in kind.

11   There is no -- they do not differ in kind.  The

12   pharmacokinetics of CERA do not differ in kind from the

13   pharmacokinetics of EPO.  The pharmacodynamics of CERA do

14   not differ in kind from the pharmacodynamics of EPO.

15   **Q**   What did you review in reaching your opinion?

16   A    I reviewed the documents that Roche submitted to the

17   FDA, and internal Roche documents and Roche presentations.

18   **Q**   Now, you mentioned pharmacokinetics.  What do you mean

19   by pharmacokinetics?

20   A    Pharmacokinetics is the study of what the drug does to

21   the body; the disposition of the drug in the body.

22   **Q**   Do you have a graphic that --

23   A    Yes, I have a graphic, if we could put that up.

24             **MS. CARSON:**  Objection, your Honor.

25             **THE COURT:**  Again, you're familiar with my

1   instructions as to these.  This isn't evidence.  It may help

2   you understand his opinion.

3           **MS. CARSON:**  Objection, your Honor.  This is not in

4   his expert report.

5           **THE COURT:**  Yes.

6           **MR. DAY:**  It's simply, it's simply an articulation

7   of what's in Paragraph --

8           **THE COURT:**  It may be.  Take it down.

9           **MR. DAY:**  Paragraph 14, your Honor.

10          **THE COURT:**  Yes.  And he may testify consistent

11  with Paragraph 14.

12          **MR. DAY:**  Okay.

13          **THE COURT:**  He may testify.

14          **MR. DAY:**  All right.

15  A    Pharmacokinetics often is called ADME.  Absorption is

16  the A, which is the study of how the drug gets into the body

17  and to its site of action.  The D part is distribution, that

18  is a study of where the drug is in the body once it's

19  administered.  The M part is metabolism, and that is the

20  modification of the drug molecule by the body components to

21  change that molecule.  And the E part is excretion, the

22  elimination, how the drug, the study of how the drug gets

23  out of the circulation.

24          All of those four components are important in

25  making a decision about how the dose of a drug will be given

1    to the --

2              **MS. CARSON:**  Objection, your Honor; beyond the

3    scope of the report.

4              **MR. DAY:**  Blue, Paragraph 14, last sentence.

5              **THE COURT:**  Yes, he may testify.

6    A    -- of how, the dose of a drug being administered to a

7    patient or a particular patient population.

8    Q    Dr. Benet, what conclusions did you reach about the

9    pharmacokinetics of peg-EPO and EPO?

10   A    Based on the four parameters that I discussed,

11   absorption, distribution, metabolism and excretion, I

12   conclude that there is no difference in kind between the

13   pharmacokinetics of EPO and the pharmacokinetics of CERA.

14             If we look, for example, at the absorption, Roche

15   has submitted documentation to the FDA that says that the

16   absorption of EPO and of CERA are the same.  There is a

17   report of Roche submitted to the FDA that shows that the

18   drug is distributed in comparable--

19             **MS. CARSON:**  Objection; foundation.

20             **THE COURT:**  Yes.  He may not go into the basis at

21   that level of detail unless the document is in evidence; if

22   it's in evidence he may.  He stated his conclusion.

23   Q    What is your opinion about the distribution?

24   A    The distribution is, Roche has presented evidence to the

25   FDA that there's comparable distribution --

1            **MS. CARSON:**  Same objection; no foundation.

2            **THE COURT:**  Yes.  Sustained.

3            Your conclusion is that in terms of distribution

4     that they're the same, right?

5            **THE WITNESS:**  Yes.

6            **THE COURT:**  All right.

7     **Q**   What is your conclusion --

8            **THE COURT:**  Move on.

9     **Q**   -- with respect to metabolism?

10    **A**   My conclusion is that they are the same.  That adding

11    EPO to, adding peg to the EPO can change the half-life of

12    the CERA product, but there is no material difference in

13    terms of the metabolism of the products, they're both

14    metabolized in the same way.

15    **Q**   And what is your opinion with respect to excretion?

16    **A**   The excretion of both products is the same.

17            **MS. CARSON:**  Objection; not in the report.

18            **THE COURT:**  Where is it?

19            **MR. DAY:**  Red report 3, blue report, 30c and d,

20    your Honor.

21            **THE COURT:**  Overruled; that may stand.

22    **Q**   Now, on what evidence do you base your conclusions?

23    **A**   My evidence is based -- my conclusions are based on the

24    evidence of the data that Roche submitted to the FDA, as

25    well as internal documents, and as well as presentations

 1    that Roche made.

 2    **Q**    Now, last week, or a week ago before we broke, you

 3    offered the opinion that CERA acts like a pro-drug.

 4             Do you recall that?

 5    A    I do.

 6    **Q**    What is the basis for your opinion that CERA acts like a

 7    pro-drug?

 8    A    Well, there are --

 9             **MS. CARSON:**  Objection; asked and answered.

10             **MR. DAY:**  Actually --

11             **THE COURT:**  Overruled.  He may have it.

12    A    There are three components that I base my opinion on why

13    CERA is a pro-drug of EPO.

14             The first of those opinions relate to biological

15    activity.  The biological activity of EPO and CERA are the

16    same as presented as, as presented to the FDA and as you

17    would expect for a pro-drug.

18             The second is that when you add the peg to the EPO

19    you change the half-life, and that's why you make a

20    pro-drug, to maximize the characteristics of that drug.  But

21    there are no material changes in how the active EPO is

22    absorbed --

23             **MS. CARSON:**  Objection; not in the report.

24    A    -- distributed or metabolized.

25             **MS. CARSON:**  You say this is not in the report?

1        **MR. DAY:**  Red, Paragraph 3a, your Honor.

2        **THE COURT:**  3a?

3        **MR. DAY:**  3a.

4        **THE COURT:**  You know, regrettably, my copy starts

5   with Paragraph 4.

6        **THE CLERK:**  Here, here, Judge.

7        **THE COURT:**  Oh, here we are.  Thank you.

8        **MR. DAY:**  It's Paragraph 3a.

9        **THE COURT:**  Yes, I don't doubt it.  I have --

10       **MR. DAY:**  My copy's copied on the red.  You might

11   have --

12       **THE COURT:**  Just let me see it.  I see.  I have it.

13       **MR. DAY:**  Sorry about that.

14       **THE COURT:**  Yes, he may testify as to the -- he may

15   testify.

16   A    Could you repeat the question?

17   Q    Yes.  What was the second basis for your opinion that

18   CERA acts like a pro-drug?

19   A    The second basis of the opinion was that when the peg is

20   added to the EPO there is a change in half-life of the

21   active component EPO, but there is no material difference in

22   kind --

23       **MS. CARSON:**  Objection; not in the report.

24       **THE COURT:**  Overruled.

25   A    -- in terms of the EPO absorption, distribution,

1    metabolism, and excretion in the CERA product.  And so this

2    supports my opinion that --

3    Q    And what's the third basis for your opinion?

4    A    Oh, I'm sorry.  The third basis is that the EPO and the

5    peg separate in the body from the parent CERA which is

6    typical of a pro-drug.

7    Q    What is the basis for your opinion that peg and EPO

8    separate in the body after administration?

9    A    I have looked at documents from Roche in terms of things

10   that have been submitted to the FDA and internal documents.

11            MS. CARSON:  Objection; foundation.

12            THE COURT:  No, at that level of generality he may

13   so testify.

14   Q    Would you please look at Exhibit GXD which is in your

15   notebook there, Tab 2.

16   A    I have it.

17   Q    And without going into the substance of the document,

18   would you please tell the jury how this document informed

19   your opinion?

20   A    Well, this is one of the documents that, of many that I

21   reviewed in the Roche submission that served as the basis of

22   my opinion and it served as the basis for my opinion that

23   CERA in the body broke down to its component parts, EPO and

24   peg.

25            MR. DAY:  Your Honor, I offer into evidence Exhibit

1    GXD.

2              **THE COURT:**  Any objection?

3              **MS. CARSON:**  No objection, your Honor.

4              **THE COURT:**  GXD is admitted in evidence, and the

5    next number in this series will be?

6              **MR. DAY:**  57, your Honor.

7              **THE COURT:**  57.  GXD, 57 in evidence.

8              (Exhibit marked in evidence.)

9    **Q**   Dr. Benet, what information in Exhibit 57 do you rely on

10   in forming your opinion that CERA separates into peg and EPO

11   in the body?

12   A   Well, this document as you can see down at the bottom is

13   from Roche's BLA.  This is their Biologic License

14   Application.  This is what they must submit to the FDA in

15   order to get approval to carry out studies in man.  Okay.

16   And this is the pharmacokinetic portion of the BLA of this

17   license agreement.  And this is the portion of the document

18   that tells you what happens to CERA after --

19             **MS. CARSON:**  Objection, your Honor; not in the

20   report.

21             **MR. DAY:**  Red, Paragraph 9.

22             **MS. CARSON:**  Your Honor, could we have a side bar,

23   please?

24             **THE COURT:**  Yes.

25

1    SIDEBAR CONFERENCE, AS FOLLOWS:

2              **THE COURT:**  Yes?

3              **MS. CARSON:**  Your Honor, there's no suggestion of

4    the BLA process in this paragraph.

5              **THE COURT:**  I don't understand.  We're not getting

6    into the BLA processes.

7              **MS. CARSON:**  He's starting to discuss --

8              **THE COURT:**  I didn't think so.  You thought -- he

9    says as disclosed in the report, which doesn't offend me.

10   Because there are references to the BLA, and then I expect

11   to see something that's here in Paragraph 9.  We'll stick to

12   Paragraph 9.

13             **MS. CARSON:**  Thank you, your Honor.

14             (Whereupon the sidebar conference concluded.)

15   **Q**   The question, Dr. Benet, is which information in Exhibit

16   57 do you rely on to form your opinion?

17   A    There's information in this document that shows that

18   when studies in rats, when rats are administered CERA that,

19   and they look at the urine following that dosing, they find

20   CERA in the urine, but they find more of the peg, the

21   breakdown product from CERA --

22             **MS. CARSON:**  Objection, your Honor.

23   A    -- in the urine of rats.

24             **MS. CARSON:**  Not in the report.

25             **THE COURT:**  Overruled; it may stand.

1    A    That they found more of the CERA -- they found more of

2    the peg in the urine of rats than they find the CERA, which

3    supports my opinion that this data --

4            MS. CARSON:  Objection; not in the report.

5            MR. DAY:  Paragraph 9, your Honor.

6            THE COURT:  Yes.  He may testify consistent with

7    Paragraph 9.

8            You understand the protocol that I follow here, so

9    you might want to take a look at Paragraph 9.  But you may

10   testify consistent with that paragraph.

11   Q    Red, it's the red report, Doctor.

12           Now, would you please look at Page 22 of the

13   exhibit and read the fourth bullet.

14   A    Page -- the fourth bullet says:  Both RO0503821 and a 30

15   kilodalton peg were excreted in the urine.  RO0503821 is

16   Roche's code name for CERA.  And the 30 kilodalton peg is

17   the component that they added to EPO in making CERA.

18           MS. CARSON:  Objection, your Honor; not in the

19   report.

20           THE COURT:  Overruled; it may stand.

21   Q    Dr. Benet, what in your opinion is the significance of

22   this observation?

23   A    Well, this observation that shows that there is a

24   breakdown of --

25           MS. CARSON:  Objection; not in the report.

1          **MR. DAY:**  It's the red report, your Honor,

2    Paragraph 9, particularly the last sentence.

3          **THE COURT:**  Yes.

4          **MR. DAY:**  The last two sentences.

5          **THE COURT:**  He may testify consistent with the last

6    two sentences.

7    A   This, this data shows that the peg-EPO is broken down in

8    the body to its components, and we see the peg in the urine,

9    which is in accord with my opinion that CERA is a pro-drug

10   that breaks down to its component parts in the body.

11   Q   Dr. Benet, would you please look at Exhibit EYV which is

12   Tab 1 in your notebook.  Is this a document that you rely

13   upon in support of your opinion?

14   A   This is the document, yes.

15   Q   Okay.  Now, without going into the substance of the

16   document, would you please tell the jury how this document

17   informed your opinion?

18   A   Again, this document provides information that CERA is

19   broken down in the body --

20         **MS. CARSON:**  Objection, your Honor.

21   A   -- to its components.

22         **MS. CARSON:**  This is not in his --

23         **THE COURT:**  Yes, sustained.  But not on that ground

24   necessarily.  Sustained.  The document's not in evidence.

25   Q   I'm not asking you what the document contains.  I'm

1    asking you how the document informed your opinion?

2    A    Okay.  This --

3            MS. CARSON:  Same objection, your Honor.

4            THE COURT:  Well, that would have to be it's not in

5    his report.  But --

6            MR. DAY:  Paragraph --

7            THE COURT:  -- it is --

8            MR. DAY:  Paragraph, Paragraph 11 of the red

9    report, your Honor.

10           THE COURT:  Well, he may have the first sentence

11   but that's it.

12           MS. CARSON:  Your Honor, could we have a side bar,

13   please?

14           THE COURT:  Yes.

15   SIDEBAR CONFERENCE, AS FOLLOWS:

16           THE COURT:  Do you challenge that Chugai is Roche's

17   subsidiary?

18           MS. CARSON:  Yes.

19           THE COURT:  Okay.  All right.

20           MS. CARSON:  Yes, that's really the basis for the

21   objection.

22           THE COURT:  I don't have that evidence yet, and so

23   I'm not going to let him testify to that.  Won't you ask a

24   leading question.

25           MR. DAY:  As a second -- it's not just that it's a

1    subsidiary, which it is, it's over 50 percent owned by

2    Roche.  But in addition to that, it's a co-venturer, it's

3    joined Roche in the development of this drug.

4         **THE COURT:**  Have I got evidence to that effect in

5    this case?

6         **MR. DAY:**  I believe you do, your Honor.  I believe

7    it's --

8         **THE COURT:**  I'm not clear that I do.

9         **MS. CARSON:**  Your Honor, this has been fully

10   briefed and actually Amgen just withdrew their motion to

11   have this exhibit admitted into evidence.

12        **THE COURT:**  Yes.  Yes.

13        **MS. CARSON:**  But this is actually --

14        **THE COURT:**  I'm only going to, I'm only going to

15   let him say that my opinion that peg is separated from EPO

16   once CERA is internalized into a cell is supported by the

17   Chugai data that I looked at.

18        **MR. DAY:**  And, and this is human data.

19        **THE COURT:**  All right, I'll let him have that.

20        **MS. CARSON:**  Objection, your Honor.  The data

21   that --

22        **MR. DAY:**  Actually it's human data.  There's human

23   data that --

24        **THE COURT:**  He may think it is.  You may

25   cross-examine.  Of course there's risks to that.

1          **MS. CARSON:**  Of course.  Thank you.

2          (Whereupon the sidebar conference concluded.)

3     **BY  MR. DAY**

4     **Q**   Dr. Benet, does Exhibit EYV contain test results for

5     CERA that you rely on?

6     **A**   Yes, it does.

7     **Q**   What type of test results?

8     **A**   It looks for CERA.

9          **MS. CARSON:**  Objection, your Honor.

10         **THE COURT:**  Sustained.  Sustained.  Have in mind

11    the side bar.  That's it with respect to this document.

12    **Q**   Does it contain human results?

13    **A**   Yes, it does contain human results.

14         **MS. CARSON:**  Objection, your Honor.

15         **THE COURT:**  Well, you think it does.  I mean, the

16    document's not in evidence.  You assume that it contains --

17         **THE WITNESS:**  In my opinion -- I'm sorry, sir.

18         **THE COURT:**  I'm going to let him have that.

19         **THE WITNESS:**  In my opinion the document contains

20    human data.

21    **Q**   Okay.  And what, if any, reliance do you place on this

22    document in support of your opinion?

23         **MS. CARSON:**  Objection, your Honor.

24         **THE COURT:**  No, he may have it without

25    characterizing the document.

1    A    This document supported my opinion that CERA in the body

2    breaks down to EPO and --

3          THE COURT:  I'm sorry, finish your answer, and

4    forgive me.

5    A    -- and peg.

6          THE COURT:  All right.  Now, the jury doesn't have

7    this, but I looked at it and it looks like some sort of

8    Power Point presentation.  Now, do you rely upon Power Point

9    presentations in forming your opinions as to these matters?

10   Not you, do scientists such as yourself rely upon

11   Power Point presentations in forming your opinions about

12   these matters?

13         THE WITNESS:  Well, this is, yes, this is an

14   internal document in Roche.

15         MS. CARSON:  Objection, your Honor.

16         THE COURT:  Well, you think it's an internal

17   document and you think somehow it's related to Roche and so

18   you would say yes.

19         THE WITNESS:  I do, yes.

20         THE COURT:  All right, I'll let it stand.

21         MR. DAY:  Your Honor, if I could simply point the

22   Court to Page 2 of the document.

23         THE COURT:  Of the document?

24         MR. DAY:  Yes.

25         THE COURT:  I have it.

1          **MR. DAY:**  No. 1.

2          **THE COURT:**  I have it.

3          **MR. DAY:**  And No. 6.

4          **THE COURT:**  I have it.  My ruling stands.

5          **MR. DAY:**  Thank you.

6   **Q**   Dr. Benet, in your opinion what is the significance of

7   the studies that you have looked at of the rat and human

8   data?

9          **MS. CARSON:**  Objection, your Honor; not in the

10  report.

11         **THE COURT:**  Where is it?

12         **MR. DAY:**  Paragraphs 9 and 11.

13         **THE COURT:**  Of red?

14         **MR. DAY:**  Yes, sir.

15         **THE COURT:**  Well, 11 we've been over.  Take, take a

16  look at 9.  If there's anything in 9 you haven't already

17  said, sir, you may say it.

18         **THE WITNESS:**  Well, I haven't said some of the

19  things in 9.

20         **THE COURT:**  And now you may.

21         **THE WITNESS:**  Thank you.

22         So, as specifically as set forth in the study

23  included in the --

24         **THE COURT:**  Now, this study we're talking about is

25  the application by Roche?

1          **THE WITNESS:**  That's correct.

2          **MR. DAY:**  Exhibit 57.

3          **THE WITNESS:**  That's right.

4          **THE COURT:**  Thank you.  Go ahead.

5          **THE WITNESS:**  So, this is the study, I'll

6    just point out that in the multi, multiple-dose rats,

7    greater amounts of peg than CERA were found in the urine.

8    That's what I stated previously.  But what I haven't stated

9    is that one of ordinary skill in the art would not expect to

10   find these levels of peg, free peg, as compared to peg

11   attached to EPO in the urine, unless peg and epoetin beta

12   were somehow separated in the body.  It is my opinion that

13   this separation occurs following CERA's internalization into

14   a cell.

15   **Q**   Dr. Benet, in your opinion what is the significance, if

16   any, of a difference in half-life between peg-EPO and EPO?

17   **A**   Well, the difference in half-life between peg-EPO and

18   EPO refers to the speed in which the drug is eliminated.

19   Now, as long as the drug stays in the body --

20         **MS. CARSON:**  Objection; not in the report.

21         **THE COURT:**  Where is it?

22         **MR. DAY:**  Paragraph 18 of the blue report, your

23   Honor.

24         **THE COURT:**  Blue.  Yes, he may, he may testify

25   consistent with Paragraph 18.

1    Q    Go ahead, Dr. Benet.

2    A    Provided -- I'll just read from Paragraph 18.  Provided

3    that a drug's half-life --

4              MS. CARSON:  Objection, your Honor.

5              THE COURT:  Overruled.  You can't have it both

6    ways.  If you want him to stick to the report, he can stick

7    to it and he may read from it if that is, today, and under

8    oath his opinion.

9              Go ahead.

10             THE WITNESS:  Thank you.  Provided that a drug's

11   half life is sufficient so that the product may reach its

12   desired location and have the opportunity to act as

13   intended, half-life does not generally affect the product's

14   actual effect on the body.

15   Q    I would like to turn now to your opinion about the

16   pharmacodynamics.  We've been talking about

17   pharmacokinetics.  I want to talk about the pharmacodynamics

18   of EPO and peg-EPO.

19             First of all, what do you mean by pharmacodynamics?

20   A    Pharmacodynamics is the study of what the drug does to

21   the body.  And particularly it's related to how a drug

22   interacts with its intended receptor.  And in this

23   particular case with EPO, it relates to how the drugs

24   interact with the EPO receptor in the bone marrow.

25   Q    In your opinion, how do peg-EPO and EPO interact with

1    the bone marrow receptor?

2         **MS. CARSON:**  Objection; not in the report.

3         **THE COURT:**  Where is it?

4         **MR. DAY:**  It's in blue, Paragraphs 31a to c, 32a to

5    f, and in particular it's in blue report, 32d, third

6    sentence.

7         **THE COURT:**  He may testify consistent with what's

8    set forth there.

9    **Q**   In your opinion, Dr. Benet, how do peg-EPO and EPO

10   interact with the bone marrow receptor?

11   **A**    In my opinion, they act in the same way because they

12   interact with the same EPO receptor.  They act to the same

13   receptor, they act in the same way, and they give the same

14   result of increasing the production of reticulocytes and red

15   blood cells.

16   **Q**   And what evidence do you rely on to support your

17   opinion?

18   **A**    This is evidence in documentation that is provided in

19   the Roche submission to the FDA.  And this supports my

20   opinion that CERA acts like a pro-drug in its, acts like a

21   pro-drug in the body which is consistent with my opinion.

22        **MS. CARSON:**  Objection; not in the report.

23   **Q**   Would you please take a look --

24        **THE COURT:**  Overruled; that may stand.

25   **Q**   Would you please take a look at Exhibit EWW which is

1    Tab 3 in your notebook.

2            And again, without going into the substance, would

3    you explain to the jury whether and how this document

4    informed your opinion?

5            **MS. CARSON:**  Objection; this document wasn't

6    disclosed.

7            **THE COURT:**  Well, I'll need a side bar then, or do

8    you want to move on?

9            **MR. DAY:**  No, this is the last document, your

10   Honor.

11           **THE COURT:**  All right.  We'll have a side bar.

12   SIDEBAR CONFERENCE, AS FOLLOWS:

13           **MS. CARSON:**  Your Honor, we have an agreement to --

14           **THE COURT:**  Wait a minute.  You say it wasn't

15   disclosed?

16           **MR. DAY:**  It was disclosed, on October 2nd.

17           **THE COURT:**  All right.

18           **MR. DAY:**  Prior to his testimony.

19           **MS. CARSON:**  It was never disclosed to be used with

20   Dr. Benet.

21           **MR. DAY:**  Yes, in a letter from Renee DuBord Brown

22   to Tom Fleming.

23           **THE COURT:**  Well --

24           **MR. DAY:**  Here's the letter.  October 3rd.  Right

25   up here.  EWW.  All right, thank you.

1              (Whereupon the sidebar conference concluded.)

2    **BY  MR. DAY**

3    **Q**    The question was, would you please explain, without

4    going into the substance of the document, whether and how it

5    informed your opinion?

6    A    This document provided evidence --

7              **MS. CARSON:**  Objection.

8    A    This document was --

9              **MS. CARSON:**  It's not in evidence.

10   A    Sorry.  Excuse me.  This document led to my opinion that

11   there was no difference in the mechanism of action between

12   CERA and EPO.

13             **MR. DAY:**  Your Honor, I would offer Exhibit EWW.

14             **MS. CARSON:**  Roche objects.

15             **THE COURT:**  There's no doubt it's a Roche document?

16   I'm a little unclear on that.  But I'll accept your

17   representation.  It's a Roche document?

18             **MS. CARSON:**  There's no indication that it is a

19   Roche document.

20             **THE COURT:**  Well, what's your position?

21             **MS. CARSON:**  That it's not.

22             **THE COURT:**  Oh.

23             **MR. DAY:**  It was produced to us by --

24             **THE COURT:**  Please.  Please.  That's enough.  Come

25   to the side bar.

1    SIDEBAR CONFERENCE, AS FOLLOWS:

2          **MS. CARSON:**  Your Honor, this, if you would look at

3    the --

4          **THE COURT:**  No, I am looking but it's his burden.

5    Let's hear from him.

6          How do we get this to be a Roche document?

7          **MR. DAY:**  It was produced to us by Roche, your

8    Honor.  So it's a business record of Roche.

9          **THE COURT:**  Well, it's not -- I don't need to have

10   it as a business record.

11         **MR. DAY:**  I understand that all of these, all of

12   these individuals that are listed here and all of these

13   people involved, all of these are Roche employees.  Everyone

14   that's listed here, and this is a joint agency.

15         **THE COURT:**  Including this one.

16         **MR. DAY:**  She's with Foote Cone & Belding.  She's

17   an agent working with Roche in the development of CERA, a

18   contractor for them.

19         **MS. CARSON:**  Your Honor, there's no evidence that

20   that --

21         **THE COURT:**  Is that an accurate representation

22   there?

23         **MS. CARSON:**  Your Honor, there's no evidence in the

24   report --

25         **THE COURT:**  Wait a minute.  Is that an accurate

1    representation?  The fact that -- he hasn't put it in the

2    record yet.  I mean, you're officers of the Court.  Is this,

3    is this Roche's document?  Is it what it purports to be?

4         **MS. CARSON:**  I couldn't tell you because I don't

5    know who Wendy Salerno is because we're not aware that this

6    had been disclosed.  We hadn't undertaken an investigation.

7         **THE COURT:**  All right, I'm not going to admit it

8    now.  You're going to check all that out.

9         **MS. CARSON:**  Yes, your Honor.

10         **THE COURT:**  As an officer of the Court make

11    representations, and I'll, if it's a Roche document I'll

12    admit it.

13         **MS. CARSON:**  Okay, thank you, your Honor.

14         **MR. FLEMING:**  Thank you, your Honor.

15         (Whereupon the sidebar conference concluded.)

16         **MR. DAY:**  I have no further questions.  I pass the

17    witness.

18         **THE COURT:**  Wait for the court reporter.

19         **MR. DAY:**  I'm sorry.

20         **THE COURT:**  Fine.  You have no further questions.

21         Ms. Carson, any questions?

22                    **CROSS-EXAMINATION**

23    BY  **MS. CARSON**

24    **Q**   Good morning, Dr. Benet.

25    **A**   Good morning, Ms. Carson.

1    Q    We met before in San Francisco back in June, correct?

2    A    We did, the first deposition.

3    Q    Dr. Benet, you've provided testimony to the jury here

4    today that CERA is like a pro-drug, correct?

5    A    Yes.

6    Q    And you admit that CERA is not what you would call a

7    classic pro-drug, correct?

8    A    It is not a classic pro-drug.

9    Q    Okay.  So you're just telling the jury today it's like a

10   pro-drug?

11   A    It is a pro-drug, but it is not like a classic, it is

12   not a classic pro-drug.  It is a pro-drug.

13   Q    It's a pro-drug but it's not a pro-drug, correct?

14   A    No.  It is a pro-drug.

15   Q    But it's only like a pro-drug is what you told the jury?

16   A    It is like a pro-drug, but I believe it is a pro-drug.

17   Q    Doctor, you were deposed previously in this case?

18   A    I was.

19        **MS. CARSON:**  Can I have Dr. Benet's first

20   deposition.

21   Q    Dr. Benet, I'm going to give you your deposition --

22   A    Okay.

23   Q    -- transcript from June.

24        And, Dr. Benet, if you could turn to Page 290 of

25   the transcript that I just provided to you.

1    A    There is no Page 290.

2    Q    Now you have both volumes.

3            And if you could look at Page 290 in this

4    transcript.  And there you were asked a question at Line 5.

5    Do you see that?

6    A    Yes.

7    Q    And there you stated that it was not a classic pro-drug,

8    correct?

9    A    I did.

10   Q    Okay.  Was that true and accurate testimony at the time?

11   A    It was.

12   Q    Now, Dr. Benet you've testified as an expert in

13   approximately eleven different cases in the fast four years,

14   correct?

15   A    That's correct.

16   Q    And you're getting paid by Amgen for your time here

17   today; is that correct?

18   A    No.

19   Q    In your expert report don't you report that you get paid

20   $1,500 an hour for trial testimony?

21   A    No, I do not.

22   Q    If we could get a copy of your expert report.

23           Dr. Benet, in the expert report that I've just

24   provided to you from June, if you could look on Page 5 under

25   Paragraph 12.

1   A    That's -- I am.  I see it.

2   Q    And you state there:  My fees for time spent on this

3   matter are $600 per hour for consultation, $1,200 per hour

4   for deposition and deposition preparation, and $1,500 per

5   hour for trial and trial preparation.

6             Did I read that correctly?

7   A    You did.

8   Q    Thank you.

9   A    But that wasn't what you asked me.

10  Q    Now, Dr. Benet, you didn't offer an opinion today on

11  whether or not, or when you testified previously on whether

12  or not CERA meets each and every limitation of the asserted

13  claims of the Amgen patents, correct?

14  A    That's correct.

15  Q    And, in fact, nowhere in your expert reports do you

16  discuss the actual patents that are in suit or refer to in

17  the patents in suit in this case, correct?

18  A    I don't recall that I don't mention that them at all.

19  Q    And when Mr. Day asked you just today what you rely on

20  in coming to your opinions you did not identify the patents,

21  correct?

22  A    I did not identify the patents.

23  Q    Now, Dr. Benet, one of the reasons that you explained to

24  the jury today as, as support for your opinion that CERA is

25  a pro-drug is your belief that the molecule is broken apart

1    into the starting materials of EPO and peg; is that correct?

2    A    That's correct.

3    Q    But you have no data at all to support that hypothesis,

4    it's just a guess, correct?

5    A    That's not correct.

6    Q    And if you could look at the deposition from July.  I

7    think I already gave it to you.  That's on Page 350.

8              And, Dr. Benet, you were asked at your deposition

9    starting at Line 3:  How do you know where the cleavage

10   between peg-EPO and CERA takes place?

11             And you answered:  I said I didn't know, it was a

12   hypothesis.

13             Did you give that testimony?

14   A    I gave that testimony at that time but --

15   Q    Thank you.

16   A    -- I have information now that's different.

17   Q    Thank you.

18             Now, let's turn to, because you say you have

19   information now that's different, and I believe you are

20   referring to the Exhibit EBC-1 which has been marked as

21   Trial Exhibit -- I'm sorry, what was the number?

22          **MR. DAY:**  Fifty-seven?  The rat study?

23   Q    -- 57.

24   A    Which?  I'm sorry?

25   Q    This is the rat study that you referred to during your

1    direct testimony.  It's in your book, I believe at Tab 2.

2    A    Yes.  But you said that you believe I'm referring to

3    that and I wasn't.

4    Q    Okay.  So let's turn to the rat study then.  Because

5    this is a study that you cited as support for your opinion

6    that CERA is cleaved into peg and EPO, correct?

7    A    That's correct.

8    Q    Now, this, I believe you said this is a study that Roche

9    submitted to the FDA, correct?

10   A    It's in their BLA.

11   Q    And in this study, Roche looked to see if whether or not

12   they could detect free EPO in the rats that were

13   administered the CERA drug, correct?

14   A    That's correct.

15   Q    And, in fact, if you look at, and I'm going to use the

16   Bates numbers, Bates Page 7485.  And I'm looking under 6.11.

17   A    Yes.

18   Q    The third paragraph.

19        You see there that Roche actually, the Roche

20   scientists incorporated special sensitivity procedures to

21   make, ensure that if there was any free EPO they could

22   detect it.

23        Do you see that?

24   A    That's what it stated, but that's not correct.

25   Q    Now, if you could turn your attention to Page 7486.  And

1    in this study under Page, under 7.1, the analysis of the

2    urine samples in the first paragraph, it states:  No

3    nonpegylated epoetin beta was detected in any of the urine

4    samples, including the samples from the multiply-dosed rats.

5            Do you see that?

6    A    I do.

7    Q    And this is a statement that Roche made to the FDA in

8    this study?

9    A    Yes.  But their analytical method was not sensitive

10   enough to measure the EPO.

11           **MS. CARSON:**  I move to strike.

12           **THE COURT:**  Yes.  You're volunteering here.  She

13   gets to ask the questions.  We'll strike out the but.

14   Mr. Day will have a chance to ask other questions.

15           **THE WITNESS:**  Thank you.

16   Q    Now, if you could also direct your attention to Page

17   7487.  And actually turn your attention to 7490.

18           And here, Roche has conclusions that they delivered

19   to the FDA, correct?

20   A    That's correct.

21   Q    And in that summary of conclusions based on this study,

22   Roche reports, and I'm looking at the first bullet,

23   RO503821 -- that's CERA, correct?

24   A    That's correct.

25   Q    -- remained intact in the serum, correct?

1    A    That's the first bullet, yes.

2    Q    And, in fact, if you look at the fifth bullet, Roche

3    told the FDA that although several different analytical

4    approaches were utilized, no unconjugated human epoetin beta

5    was detected in any serum, urine, or bone marrow samples

6    examined.

7              Do you see that?

8    A    I see that.

9    Q    And this is what Roche reported to the FDA based on the

10   study that you're relying on.

11   A    This is --

12   Q    Correct?

13   A    -- what's in their conclusion.

14   Q    Now, you agree, don't you, that CERA attaches to the EPO

15   receptor as an intact molecule?

16   A    The evidence appears to suggest that.

17   Q    And it's through that binding to the receptor that CERA

18   exerts its effect, correct?

19   A    Binding to the EPO receptor is how peg-EPO exerts its

20   effect.

21   Q    And that effect is to stimulate the synthesis of red

22   blood cells?

23   A    Yes.

24   Q    And you also agree that CERA has a different binding

25   affinity for the EPO receptor, correct?

1    A    I do.

2    Q    And you also agree that CERA is a different chemical

3    than EPO, correct?

4    A    CERA is a different chemical.  It's a conjugate of EPO.

5    Q    But it's a different chemical, correct?

6    A    Different chemical.

7    Q    Now, you rely on the rat study to support your opinion

8    because you say that there a report of free peg

9    detected, correct?

10   A    Correct.

11   Q    Did you undertake any study to evaluate the purity of

12   the material that was administered to the rats?

13   A    No.

14   Q    And you know that the rats were administered eight

15   milligrams of the dose?

16   A    Yes.

17   Q    And it's a substantially high dose, correct?

18   A    Yes.

19   Q    So if there was free peg contaminant in the material

20   that they were overdosed with you would expect to see that

21   in your immunogen?

22   A    I wouldn't expect to see more than the peg-EPO.

23   Q    But you didn't undertake any investigation to find out

24   whether there was free peg in the material administered,

25   correct?

1    A    I did not carry out these studies.

2    Q    Now, Dr. Benet, you opined that CERA is like a pro-drug,

3    correct?

4    A    Yes.

5    Q    And you also testified that pro-drugs are designed to be

6    better drugs than the parent drugs as you call them,

7    correct?

8    A    To maximize the pharmacokinetic characteristics of the

9    drug.

10   Q    In fact, during your direct before the break you said

11   that it was to address problems with parent drugs?

12   A    Yes.  In many cases.

13   Q    And you do agree that CERA has better characteristics

14   than EPO?

15   A    Better?  No.  I agree that CERA has a longer half-life.

16   Q    If you could direct your attention -- well, you agree

17   that CERA has useful characteristics --

18   A    I agree that CERA has useful characteristics.

19   Q    -- as compared to EPO?

20        Useful characteristics as compared to EPO?

21   A    No.  I said that there is both positive and negatives in

22   my expert report.

23   Q    So if you could direct your attention to, this would be

24   your deposition testimony from June 4th.

25        **MR. DAY:**  Page?

1          **MS. CARSON:**  Page 197.

2     A    One hundred what?

3     **Q**    197.  Starting at Line 7.

4     A    At Line 7?

5     **Q**    Yes.  And there you were asked:  And is it your view

6     that CERA has no better characteristics than EPO?

7          And you responded:  No, I think it has some very

8     useful characteristics.

9          Do you see that?

10    A    Yes.

11    **Q**    And one of the useful characteristics that you

12    identified was longer half-life?

13    A    Yes.

14    **Q**    Now, Doctor, you're aware that CERA allows for less

15    frequent dosing of patients as compared to EPO?

16    A    I am.

17    **Q**    And you agree that less frequent dosing is a valuable

18    addition for patients as compared to EPO?

19          **MR. DAY:**  Your Honor, I object.

20          **THE COURT:**  Overruled.

21          **MR. DAY:**  May we have a side bar?

22          **THE COURT:**  You may.

23    SIDEBAR CONFERENCE, AS FOLLOWS:

24          **THE COURT:**  Now, I think that they get this to the

25    materially changed issue.  I've pretty well worked up my

1    charge, and I will tell you that with modifications that

2    Roche has suggested, you, the charge that Amgen has

3    suggested is the template that I'm working from now.  So

4    I've been over Amgen's suggested charge on this materially

5    changed issue and by and large I find it satisfactory.  That

6    said, I think they're entitled to argue this.  Why is that

7    wrong?

8           **MR. DAY:**  Well, we filed a motion in limine which

9    the Court granted that excluded any testimony with respect

10   to the benefits or alleged benefits of CERA safety or

11   otherwise, including dosing.  That was granted by the Court.

12          **THE COURT:**  Well, then I think, I think it went too

13   far.  Because I think they're entitled -- the question of

14   whether this is a material change or not, whether you have

15   to use the Amgen process to get there is all in my mind

16   grist for this jury.  I'm not going to allow any comparison

17   between the Roche project and the, product and the Amgen

18   product.  And perhaps that's what I was thinking but --

19          **MR. DAY:**  But that's what this is.  That's what

20   this --

21          **THE COURT:**  No, it's not.  The comparison is going

22   to be in the assumed importation --

23          **MR. DAY:**  Yes.

24          **THE COURT:**  -- of Mircera and the process claims of

25   the patent what you get if you follow the process claims of

1    the patent.  And you're going to get in the charge this

2    business that if your stuff is in and you can't get to the

3    end without using your stuff, it's materially changed.  I'm

4    going to let them have this.

5          MR. DAY:  I understand that.  But then here's my

6    quandary which I -- what you seem to be saying is that if

7    the product is not materially changed from the product as

8    claimed, and you're not going to allow product-to-product

9    comparison, that's exactly what they're doing.  There's

10   nothing in the product claim that relates to this.  They're

11   making a product-to-product comparison and they're taking,

12   extending half-life.

13         THE COURT:  The point is, as I understand

14   chemistry, if in fact their process materially changes the

15   product --

16         MR. DAY:  Right.

17         THE COURT:  -- such that, such that -- let's assume

18   they infringe your process, something that their draft jury

19   verdict virtually concedes and I need to ask them about

20   that.  But it's all lawful over there in Europe.  And then

21   let's assume that by the stuff that they put on there that

22   works a material change.  They win on infringement.  That's

23   the law.

24         MR. DAY:  If it's a material change in the product

25   of the process.

 1          THE COURT:  Correct.

 2          MR. DAY:  And so then the question becomes whether

 3   not whether they add structure to it, not whether they put a

 4   car around an engine.

 5          THE COURT:  But whether they change --

 6          MR. DAY:  The engine.

 7          THE COURT:  -- whether they change the structure,

 8   right.

 9          MR. DAY:  The engine.

10          THE COURT:  Yes, that's true.  I think this is

11   circumstantial evidence of that.  They may have it.

12          (Whereupon the sidebar conference concluded.)

13          THE COURT:  You may inquire, Ms. Carson.

14   BY  MS. CARSON

15   Q    So, Dr. Benet, you agree with me that CERA allows for

16   less frequent dosing of patients as compared to EPO?

17   A    I do.

18   Q    And you would agree with me that that would be a benefit

19   to patients to have less frequent dosing, correct?

20   A    It's hard to answer yes or no to this, your Honor.

21          THE COURT:  And you may always answer in that

22   fashion.  It's a perfectly appropriate answer.  Then don't

23   volunteer.  She gets a chance to ask another question.

24   That's the way it's supposed to work.

25   Q    You can't answer yes or no?

1   A   I can't answer yes or no.

2   Q   But you agree that it would be a valuable addition to

3   some patients to have less frequent dosing?

4   A   I do.

5   Q   Now, Dr. Benet, you referred to the binding of CERA to

6   the EPO receptor.  Is it your view that any drug that binds

7   to the EPO receptor is EPO?

8   A   No.

9   Q   And does CERA demonstrate different kinetics than human

10  EPO?

11  A   It does.

12  Q   And is CERA cleared differently than human EPO?

13  A   There's a different half-life.

14  Q   Does CERA have a different volume of distribution than

15  human EPO?

16  A   Yes.

17  Q   And CERA has a longer half-life as compared to human

18  EPO, correct?

19  A   Yes.

20          **MS. CARSON:**  No further questions.

21          **THE COURT:**  Any redirect?

22          **MR. DAY:**  Yes, sir.

23                  **REDIRECT EXAMINATION**

24  BY  MR. DAY

25  Q   Dr. Benet, do you personally receive any compensation in

1   connection with your work in this case?

2   A   I do not.  All of my fees are paid to the university,

3   the Regents of the University of California that go to

4   support research at the university.

5   **Q**   And does any of it personally benefit you?  Do you get

6   any money in your pocket?

7   A   I do not get any money in my pocket from my

8   participation in this trial, or any lawsuit that I

9   participate in.

10  **Q**   Ms. Carson asked you some questions about less frequent

11  dosing and whether it was a benefit to patients and you said

12  that you couldn't answer yes or no.

13          In your opinion, what are the implications of the

14  extended half-life?

15          **MS. CARSON:**  Objection; beyond the scope.

16          **THE COURT:**  No, no, overruled.

17          **MS. CARSON:**  Not in the report.

18          **MR. DAY:**  It's in Paragraphs 30c and 31d.

19          **THE COURT:**  And it's not beyond the scope.

20  A   I raised in my expert reports and in the deposition

21  right after the portion that Ms. Carson had me, read to me,

22  that the balance, the trade-off with a longer half-life is

23  more variability.  When you give a drug less frequently that

24  means you're going to have more --

25          **MS. CARSON:**  Objection; beyond the scope of his

1    report.

2          **THE COURT:**  Overruled.

3    A   -- that means you're going to have more variability in

4    that drug.  And variability is the enemy of therapeutics.

5    That's what causes problems with drugs not working.  So

6    anything that you do that increases variability trades off

7    against an advantage being able to dose the drug less

8    frequently.

9    **Q**   And when you say variability, would you explain to the

10   jury what you mean by variability?

11         **MS. CARSON:**  Objection; beyond the scope of his

12   report.

13         **MR. DAY:**  It's Paragraph, blue, Paragraph 30d and

14   31c, your Honor.

15         **THE COURT:**  He may testify consistent with his

16   expert report.

17   A   When you give the drug less frequently that means you

18   have to get higher levels initially and lower levels at the

19   end of that dosing interval.  That means you have

20   significant variability in the amount of EPO in the body

21   reacting with the receptor during that dosing interval.  As

22   opposed to the more frequent administration where you get

23   peaks and troughs that are closer together and therefore

24   you're going to have essentially much similar concentrations

25   and you will have less variability in response.  So any time

1    you make a drug with a longer half-life you always are going

2    to have more variability.

3    Q    And in your opinion does peg-EPO increase the

4    variability of patient exposure?

5         MS. CARSON:  Objection; beyond the scope of his

6    report.

7    A    In my expert --

8         THE COURT:  Wait.  Wait.  Is it in the report?

9         MR. DAY:  The paragraphs I cited, your Honor,

10   Paragraph 30d and 31c.

11        THE COURT:  You may so testify.

12   A    Yes, in my expert report, I testified that the data was

13   available from the Roche study showing there was more

14   variability from the CERA than there was from EPO.

15   Q    And what is the effect of that variability?

16        MS. CARSON:  Objection; beyond the scope of his

17   report.

18        THE COURT:  Overruled.

19   A    The effect of that variability is that an individual

20   patient has significant differences over time that can

21   change how they respond potentially in a toxic range and a

22   lack of efficacy.  Toxic range in a time, lack of efficacy

23   from the dose.

24        MS. CARSON:  Objection, your Honor.  This is not in

25   the report.

1        **THE COURT:**  But it may stand.

2        **MS. CARSON:**  Move to strike.

3        **THE COURT:**  It may stand.

4        **MR. DAY:**  No further questions, your Honor.

5        **THE COURT:**  Anything further for this witness?

6        **MS. CARSON:**  Yes, just a couple.

7                **RECROSS-EXAMINATION**

8   **BY  MS. CARSON**

9   **Q**  Dr. Benet, you're not a medical doctor, are you?

10   A  That's correct.

11   **Q**  And wouldn't you agree with me it would be up to the

12   doctor to decide what's best for the patient on a balance of

13   variability versus less frequent dosing?

14   A  I made that statement in my expert report.

15       **MS. CARSON:**  Thank you.  No further questions.

16       **THE COURT:**  Nothing further for this witness?

17       **MR. DAY:**  Nothing further, your Honor.

18       **THE COURT:**  Subject to the matter of the documents

19   which we'll have to discuss, the lawyers and I, is that

20   Amgen's case on infringement?

21       **MR. DAY:**  No, sir.

22       **THE COURT:**  Proceed.

23       (Whereupon the witness stepped down.)

24       **MR. DAY:**  Amgen calls Dr. Torchilin.

25       **THE COURT:**  He may be called.

```
 1              MR. DAY:  Your Honor, may we have a brief side bar

 2      as he's coming to the witness stand?

 3              THE COURT:  We may.

 4      SIDEBAR CONFERENCE, AS FOLLOWS:

 5              THE COURT:  Yes?

 6              MR. DAY:  Your Honor, in light of your rulings

 7      about material change and the evidence --

 8              THE COURT:  Right.

 9              MR. DAY:  -- that may be submitted by Roche, Amgen

10      had previously subpoenaed Dr. Spinowitz.  The Court quashed

11      the subpoena.

12              THE COURT:  Yes.

13              MR. DAY:  Dr. Spinowitz was subpoenaed because he

14      has done a study that has been published in which he has

15      shown that epoetin alfa can be dosed on a once-a-month basis

16      and once every two weeks just like CERA with the same effect

17      on patients.  We subpoenaed him because he published that

18      study after his expert report.  We showed it to him in his

19      deposition.  He authenticated it.  It really isn't on the

20      infringement case.  It's the evidence of studies done

21      comparing extended doses for epoetin alfa and shows that

22      there's no material change in the patient outcome.

23              THE COURT:  And so what do you want me to do?

24              MR. DAY:  Well, we would like to, the subpoena's

25      been quashed because the Court was acting on a relevance
```

1    determination, that now has been reversed, and we would like

2    to have the subpoena re-served and we would like to be able

3    to call him to testify.

4            **MS. BEN-AMI:**  First of all --

5            **THE COURT:**  Why shouldn't I do that?

6            **MS. BEN-AMI:**  First of all, they don't give you a

7    reason.  Second of all, this is not in Dr. Torchilin's

8    report.  This has nothing to do with Dr. Torchilin.  We

9    should be working with Dr. Torchilin now.

10           Third of all, it's not even Amgen's EPO or Roche's

11   EPO.  It's a different product.  It's not even the same

12   product.

13           **MR. DAY:**  Epoetin alfa, your Honor.

14           **THE COURT:**  That to me seems to go to the weight.

15   The subpoena may be re-served.

16           While we're up, Roche seems to have changed its

17   position as to the verdict slip and we'll take its current

18   position.  I rather like Roche's verdict slip here.  And

19   whoever's going to do this, I want you to revise this.

20   We'll hear what Amgen has to say.  But we'll revise this as

21   I've marked.  But also on the invalids here, I want the

22   grounds of invalidity as to each claim.  In other words, you

23   have to have bigger boxes so it says invalid and

24   anticipated, obvious, lack of enablement, written

25   description, indefinite.  But it varies from claim to claim.

```
 1    You should be able to agree upon the variation.

 2           So saying -- also, if we're going to do it this way

 3    doctrine of equivalents is going to work for the, it's going

 4    to work for the source process claims putting --

 5           MR. FLEMING:  That's not the right form, your

 6    Honor.  That's just not the right form.

 7           MS. BEN-AMI:  He's edited it, Tom.

 8           THE COURT:  Yes, this is 10-12.

 9           MR. FLEMING:  No, that, being the author, your

10    Honor, if I could tell you what we did consistent with our

11    discussion Wednesday.  May we go to the infringement page,

12    please.  Yes.

13           THE COURT:  Yes.

14           MR. FLEMING:  Okay.  Maybe I'm -- that's the page

15    on infringement.

16           THE COURT:  Yes.

17           MR. FLEMING:  Okay.  There are no boxes here

18    because of the fact that --

19           THE COURT:  Because you claim --

20           MR. FLEMING:  All these are process claims.

21           THE COURT:  You claim --

22           MR. FLEMING:  There's no DOE.  That's what we

23    talked about.

24           THE COURT:  They say there is.  I think there is.

25           So, revise this.  And make them a copy.  But what I
```

1   specifically want here on invalidity, not invalid, I want a

2   bigger box because you want them to check off, they're going

3   to go invalid, what they're going invalid for.  And it

4   varies claim to claim.  The only claim -- certain claims are

5   in this anticipated.  The only claim and, enablement as to

6   the only claim, and one of these here.  This one.  Claim 7.

7   '349, for example --

8          MR. FLEMING:  Your Honor, we just discussed this on

9   Wednesday with you, you had noted that both sides submitted

10  a form to you which only required the selection of the basis

11  of validity.  You noted the fact that you said that you

12  would be inclined to allow the jury to go that way, however,

13  you would charge them in detail.

14         THE COURT:  I --

15         MR. FLEMING:  In terms of the form.

16         THE COURT:  But now I want it in the form.  I'm

17  just asking you to do the form.

18         MR. FLEMING:  Your Honor?

19         THE COURT:  Not now.

20         MS. BEN-AMI:  Not now.

21         (Whereupon the sidebar conference concluded.)

22         Do you solemnly swear that the answers you will

23  give to this Court and Jury will be the truth, the whole

24  truth, and nothing but the truth, so help you God?

25         THE WITNESS:  I do.

1          **THE CLERK:**  Please be seated.

2          **THE COURT:**  Proceed.

3                    VLADIMIR TORCHILIN

4                  **DIRECT EXAMINATION**

5     **BY  MR. GAEDE**

6     **Q**    Good morning.  Would you introduce yourself to the

7     members of the jury, please?

8     **A**    My name is Vladimir Torchilin.

9     **Q**    And are you currently employed?

10    **A**    Yes, I am.

11    **Q**    Where do you work?

12    **A**    Northeastern University here in Boston.

13    **Q**    What is your current job title?

14    **A**    I'm the chairman for the Department of Pharmaceutical

15    Sciences and professor over there, and I'm also Director for

16    the Center for Pharmaceutical Biotechnology and

17    Nanomedicine.

18    **Q**    Do you hold any postgraduate degrees?

19    **A**    Yes, I do.

20    **Q**    And what are those degrees in?

21    **A**    Excuse me?

22    **Q**    What are those degrees in?

23    **A**    It's Ph.D., Doctor of Science in Physiologically Active

24    Compounds.

25    **Q**    And when did you receive your Ph.D.?

1    A    I got it from the Moscow State University.

2    Q    And when was that?

3    A    1971.

4    Q    And what research did you to after you received your

5    Ph.D.?

6    A    I was mainly involved in studies of interaction between

7    polymers and proteins including protein to polymer

8    conjugates.

9    Q    And how long have you conducted research on polymer

10   protein conjugates?

11   A    Actually I still do conduct research.

12   Q    Okay.  So how long have you been doing that kind of

13   research?

14   A    Thirty-eight years.

15   Q    All right.  And have you received any awards for your

16   research?

17   A    Yes.  A few.

18   Q    Can you describe a few of them for the members of the

19   jury, please?

20   A    Still back in the Soviet Union, I got so-called Lenin

21   Prize, which is the highest scientific award in the former

22   USSR.  While living in the States, I was elected to the

23   European Academy of Science and got awards from American

24   Association for Pharmaceutical Scientists and Pharmaceutical

25   Congress, and some fellowships and so forth.

1    Q    Let's backtrack for a moment.  What is a protein polymer

2    conjugate?

3    A    Usually the term conjugate is used to describe a

4    chemical compound in which components do preserve their

5    original properties.

6         **MS. BEN-AMI:**  Objection, your Honor; not in the

7    report.

8         **THE COURT:**  Yes.  Where is it?

9         **MR. GAEDE:**  Yes, your Honor.  First report, blue,

10   Paragraphs 9, 20 and 21.

11        **THE COURT:**  Sir, we follow a protocol here that

12   your testimony has to be disclosed in complete detail to the

13   other side before you testify.  And the way to make sure

14   that that's done is to have you stick to your report.  So,

15   hopefully not too frequently, but we may get objections that

16   what you're saying isn't in your report.  Mr. Gaede is going

17   to say, oh, yes, it is, I imagine, and he's going to give us

18   a reference.

19        And now since I'm talking, I forget what reference

20   he gave us.

21        **MR. GAEDE:**  Yes, your Honor, I'm --

22        **THE COURT:**  But when he does it, we'll both look at

23   it, and usually I will say stick to your report.  So it's a

24   good idea if you have the report and we're talking about a

25   subject and it's all there in related paragraphs, have it

1    open before you so you can stick to it.

2              And, Mr. Gaede, the reference is?

3         **MR. GAEDE:**  Yes, your Honor, I'm focusing

4    specifically on Paragraphs 20 and 21.

5         **THE COURT:**  Twenty and 21.  He may testify

6    consistent with 20 and 21.

7         **MS. BEN-AMI:**  Move to strike his prior answer, your

8    Honor.

9         **THE COURT:**  No, his prior answer may stand.

10        **THE WITNESS:**  So the conjugate is a compound, it

11   being a polymer and protein, which with both components to

12   the great extent that is your protein.

13        **MS. BEN-AMI:**  Objection, your Honor; not in the

14   report.

15        **THE COURT:**  Overruled; that may stand.

16   **Q**   Yes, have you prepared a demonstrative of a protein

17   polymer conjugate, specifically one for peg-EPO?

18        **THE COURT:**  Is the demonstrative in the report?

19        **MR. GAEDE:**  Yes, your Honor.

20        **THE COURT:**  Fine.  Fine.  I just -- you're held to

21   the demonstratives that are set forth in the report.  But go

22   right ahead.

23   **Q**   Can you please describe what is shown here?

24        **MS. BEN-AMI:**  Objection, your Honor.  Can we have a

25   side bar?

1          **THE COURT:**  Where's the description in the report?

2          **MS. BEN-AMI:**  It's a validity report, your Honor.

3          **MR. GAEDE:**  Your Honor, the entire report describes

4    peg-EPO.

5          **THE COURT:**  No, no, no.  You may throw that up if

6    that's been disclosed to them in the report.  But he'll have

7    to testify consistent with the report.

8          If you want to relate the two, the relationship

9    should be in the report.

10          **MR. GAEDE:**  We'll move on, your Honor.

11          **THE COURT:**  Very well.

12   Q    What is a polymer?

13   A    A polymer is a chemical compound which consists of many

14   repeating identical units.

15   Q    And what is polyethylene glycol?

16   A    It's a polymer of ethylene glycol, or oxyethylene, you

17   can call it both ways.

18   Q    And that's also known as peg?

19   A    Yes.  Peg is abbreviation for polyethylene glycol.

20   Q    And how long has peg been used to conjugate proteins?

21          **MS. BEN-AMI:**  Objection, your Honor.  Can I have a

22   side bar?  This is prior rulings.

23          **THE COURT:**  Overruled.  No, I don't think it's

24   necessary.

25   Q    How long has peg been used to conjugate proteins?

1    A    Probably since early '70's.

2    Q    And what was the purpose of attaching polymers to

3    proteins to make these protein polymer conjugates?

4    A    The usual task is to increase the longevity of

5    biologically active protein in the body.

6    Q    What happens to the structure of the protein when it is

7    conjugated with a polymer?

8         **MS. BEN-AMI:**  Objection, your Honor; based on your

9    prior ruling.

10        **THE COURT:**  Overruled; he may have it.

11   A    Nothing usually is supposed to happen because we would

12   like to preserve activity of this very protein.

13   Q    Why, why does one want to preserve the activity of the

14   protein?

15   A    Just to keep useful biological properties in the body

16   for a longer period of time.

17   Q    And based on your experience and review of the

18   literature, how many proteins have been conjugated with

19   polymers over the years?

20        **MS. BEN-AMI:**  Objection, your Honor; time.  As of

21   today?  Object to relevance.

22        **THE COURT:**  Yes.  Let's see -- I think I understand

23   your objection better now, Ms. Ben-Ami.

24        Let me work it out this way.  You can object to my

25   questions, anyone can.

```
 1              I'm getting the sense that pegylation as a process

 2      has been around for some time.

 3              THE WITNESS:  Correct.

 4          THE COURT:  And to accomplish certain things, and

 5      you just told us what it was to accomplish.  Correct?

 6          THE WITNESS:  Right.

 7          THE COURT:  All right.  Okay, now my instruction.

 8      Let's come to pegylation of EPO compounds.  That's enough

 9      background.

10          MR. GAEDE:  Okay.

11          THE COURT:  Just EPO compounds.  We can talk about

12      pegylation, but only EPO compounds.

13      Q   Now, have you formed an opinion here?

14      A   Yes, I believe I did.

15      Q   And what materials did you review in forming your

16      opinion?

17      A   Quite a few patents; other documents issued by Roche; a

18      lot of literature related to the subject; and like almost 40

19      yours of my own experience on top of that.

20      Q   The '698 patent which is Tab, Tab 8 in your binder, have

21      you reviewed that patent?

22      A   Yes, I did.

23      Q   And have you also reviewed the '868 patent?

24      A   Yes, I did.

25      Q   And have you reviewed the '349 process patent?
```

1    A    Yes, I did.

2    Q    Now, do you have an opinion whether the EPO that is

3    produced by the process of these claims that are asserted

4    against Roche materially, is materially changed by

5    pegylation?

6          **MS. BEN-AMI:**  Objection; no foundation.

7          **THE COURT:**  Overruled.

8          **MS. BEN-AMI:**  Your Honor, may I have a side bar on

9    this issue?

10         **THE COURT:**  You may.

11   SIDEBAR CONFERENCE, AS FOLLOWS:

12         **MS. BEN-AMI:**  This will be short.  This is a short

13   one.  This witness doesn't go through the claims and say EPO

14   is made by the process.  He makes the assumption that EPO is

15   made by the process.

16         **THE COURT:**  Correct.

17         **MS. BEN-AMI:**  And then goes forward from there.

18         **MR. GAEDE:**  Right.  But that wasn't the question.

19         **THE COURT:**  Wait a minute.  The question -- you

20   could do just one of these questions, now, you've assumed.

21         **MR. GAEDE:**  Yes.

22         **THE COURT:**  Yes.

23         **MS. BEN-AMI:**  That's fine.

24         **THE COURT:**  Then go from there.

25         **MS. BEN-AMI:**  Okay.

1          **MR. GAEDE:**  Fine.

2          (Whereupon the sidebar conference concluded.)

3          **THE COURT:**  The objection is sustained and the

4    answer -- we actually can save some time.  Put the question

5    we discussed, Mr. Gaede.

6    **BY  MR. GAEDE**

7    **Q**    Doctor, does your opinion assume that the EPO has been

8    produced by the process of the claims that we've just looked

9    at?

10   A    Yes.

11   **Q**    Okay.  And given that assumption, do you have an opinion

12   whether the EPO that is used to make Mircera is materially

13   changed by pegylation?

14   A    Yes, I have my opinion.

15   **Q**    And what is that opinion?

16   A    My opinion is that pegylation does not materially change

17   EPO because its structure and properties, including the

18   basic utility, remains exactly the same of the initial EPO.

19   And certainly my opinion is that EPO is not a material

20   component of pegylated EPO.

21   **Q**    Now, Dr. Torchilin, can you explain to the ladies and

22   gentlemen of the jury why the EPO used to make Mircera is

23   not materially changed by pegylation from the EPO that you

24   have assumed is produced by the process claims?

25   A    Because the most essential features, which is the

1    extraction of the product, is not changed; the biological

2    activity of this protein is not changed, it does exactly the

3    same, increases erythropoiesis, number of red blood cells

4    and hemoglobin; and its basic use remains exactly the same,

5    to treat anemia, to increase number of red blood cells.

6    Q    And do you have an opinion as to whether Roche's

7    pegylation and subsequent purification and vialing of

8    peg-EPO materially changes that EPO?

9    A    No, I don't believe it materially change this EPO

10   because vials, putting it in vials cannot change anything.

11   Purification just increases the quantity of active method

12   per unit of volume of weight.  And purification as I just

13   said doesn't change structure properties of biological

14   activity.

15   Q    To your understanding, what are the two starting

16   materials that Roche uses to make the peg-EPO conjugate?

17   A    Yes.

18   Q    To your understanding, what are they?

19   A    Yes.

20   Q    And what, can you describe for the members of the jury

21   what you understand to be the starting materials that Roche

22   uses to make the peg-EPO conjugate?

23            **MS. BEN-AMI:**  Objection; report, your Honor.

24            **MR. GAEDE:**  Yes, your Honor.

25            **THE COURT:**  Where is this in the report?

1              **MR. GAEDE:**  Yes.  92, your Honor.

2              **THE COURT:**  Paragraph --

3              **MR. GAEDE:**  First report, Paragraph 92.

4              **THE COURT:**  He's telling us now what he assumes

5    Roche uses.  Is that right?

6              **MR. GAEDE:**  Yes.

7              **THE COURT:**  All right.

8              **MS. BEN-AMI:**  Your Honor, I object.  It's not in

9    the --

10             **THE COURT:**  Wait a minute.

11             **MS. BEN-AMI:**  Is that blue 92?

12             **MR. GAEDE:**  Blue 92.

13             **THE COURT:**  Yes, he may testify consistent with

14   that.

15   A   So one component is recombinant erythropoietin, EPO,

16   which is, which uses as far as I understand following the --

17             **MS. BEN-AMI:**  Objection, your Honor.

18   A   -- procedures developed by Amgen.

19             **THE COURT:**  On.

20   A   And the other --

21             **THE COURT:**  Wait a minute.  Oh.  So far as he's

22   introducing the procedure developed by Amgen, I'm striking

23   it out.  And I instruct you, she -- he didn't ask you that.

24   He just said -- well, the question is where does Roche get

25   the materials that it uses in its process.

1              Isn't that the question, Mr. Gaede?

2         **MR. GAEDE:**  Yes, your Honor.  Yes.

3         **THE COURT:**  Okay.  Stick to that.  Whatever you may

4    think about some overlap with Amgen, he didn't ask you about

5    that.  Just where do they get their stuff.  Forgive my

6    glibness but it's about the limit of my -- no, strike that.

7              Where did they get their stuff?  Where do you think

8    they got their stuff from looking over these documents?

9    That's the question.  Roche.

10        **THE WITNESS:**  Yeah.  So, recombinant human EPO is

11   produced by Roche and --

12        **MS. BEN-AMI:**  Objection; report.

13        **THE COURT:**  No, overruled; that may stand.

14   A   And activated peg used to conjugate is commercially

15   available on the market.

16        **THE COURT:**  The peg is commercially available on

17   the market?

18        **THE WITNESS:**  Yes.  Correct.

19   Q   Now, with our limited time available, I would like to

20   look at to the regulatory documents that you reviewed.

21             Could you please turn to Tab 1 in your binder,

22   Exhibit EAZ-2.

23        **MR. GAEDE:**  And, your Honor, EAZ-1 has already been

24   submitted into evidence as Exhibit 53.

25        **THE COURT:**  Now, you want me to look where?  In a

```
 1  binder?

 2          MR. GAEDE:  Yes, I think the binder is right up

 3  there to your left, your Honor.  That, in that binder there,

 4  I believe.

 5          THE COURT:  Yes, I have it.  All right, thank you.

 6  Under Tab 2?

 7          MR. GAEDE:  Tab 1.

 8          THE COURT:  Tab 1, thank you.

 9          And you're asking him to look at Tab 1.

10          MR. GAEDE:  Yes.

11  Q   Do you recognize Exhibit EAZ-2?

12  A   Yes, I do.

13  Q   What is it?

14  A   It's a page from Roche document.

15  Q   And do you recognize the second and third page as well?

16  A   Yes, I do.

17  Q   Okay.

18          MR. GAEDE:  Your Honor, I would move these into

19  evidence as Roche document admissions.

20          THE COURT:  No objection to this, is there?

21          MS. BEN-AMI:  No objection, your Honor.

22          THE COURT:  It may be received.  EAZ-2 is admitted

23  in evidence, it will be Exhibit 58.

24          (Exhibit marked in evidence.)

25          MR. GAEDE:  Now, can we turn to where it says the
```

1   RO503821 molecule has the following chemical structure.

2   Highlight that language.  No, third paragraph please.  And

3   then that chemical formula that's there.  That's fine.

4   Q   Now, does this formula in any way support your opinion

5   that the EPO used to make Mircera is not materially changed

6   by pegylation?

7   A   Yes, it does.

8   Q   How so?

9           **MS. BEN-AMI:**  Report, your Honor.

10          **THE COURT:**  Yes, where is it?

11          **MR. GAEDE:**  Yes, your Honor.  Third report,

12   Paragraphs 20 and 21.

13          **THE COURT:**  What color?

14          **MR. GAEDE:**  Oh, red report.  Sorry, your Honor.

15          **THE COURT:**  Red.  Red, 20 and 21.

16          **MR. GAEDE:**  Paragraph 20 and 21.

17          **THE COURT:**  Just a moment.

18          **MR. GAEDE:**  You'll see there at the bottom of 20

19   there's a --

20          **THE COURT:**  Please.  Please.

21          **MR. GAEDE:**  Okay.

22          **THE COURT:**  I can read.  He may testify, consistent

23   with these two paragraphs.

24          **THE WITNESS:**  Thank you.

25   Q   Go ahead, Doctor.  Do you have the question in mind?

1    A    No.

2    Q    Okay.  How does this formula support your opinion that

3    the EPO used to make Mircera is not materially changed by

4    pegylation?

5    A    So, this chemical structure, which you can find in

6    Roche's BLA, which is Biological License Application,

7    clearly show that using, by using EPO, which is

8    erythropoietin, separated from NH group by a single chemical

9    bond, it convenes a message that peg-EPO, chemical structure

10   of EPO is in fact, EPO remains unchanged, and this is a

11   classical example of conjugate, two parts connect as a

12   single bond and both bonds remain together.

13   Q    Could we go to the next paragraph.  And the first

14   sentence there that says both EPO starting material and

15   RO0503821 have the identical amino acid sequence and

16   composition of the carbohydrate moiety.

17        Does that language in any way support your opinion

18   that the EPO used to make Mircera is not materially changed

19   by pegylation?

20        MS. BEN-AMI:  Objection as to the second part.  I

21   don't see the second part in his report.

22        MR. GAEDE:  Your Honor, blue report, Paragraphs 49

23   and 58.

24        THE COURT:  Just a moment.  Forty-nine and -- yes,

25   he may so testify.

1   A   Yes, it's exactly what I said, because it says

2   essentially the same.  That identical amino acid sequence

3   and composition of carbohydrate moiety which relates to the

4   structure.  The structure is the same.

5   **Q**   Let's take a look at the third page of what has been now

6   admitted into evidence as Exhibit 58.  This is at control

7   number ITC-BLA 4317.

8          And the second sentence there that says, quote:

9   For R0503821, the influence of the carbohydrate structure

10  was not evaluated in detail since the carbohydrate structure

11  of RO0503821 is defined by the epoetin beta EPO starting

12  material.

13         How, if at all, does that language support your

14  opinion?

15  A   Well, it's exactly the same way, it looks like the

16  scientist from Roche saw it the way I do.

17         **MS. BEN-AMI:**  Objection, your Honor.  This is not

18  in his report.

19         **THE COURT:**  Yes, it looks like a scientist at

20  Roche, strike that out.  You may tell, consistent with the

21  report, what your conclusion is.

22  A   Yes, the carbohydrate structure of RO and so forth,

23  which is peg-EPO, is defined by EPO.  So it's unchanged by

24  pegylation.  And it remains unchanged as compared to EPO

25  starting materials.  So the essential structural properties

1    remain the same.

2    Q   Now, let's turn to the second page of Exhibit 58,

3    please.  And there at the bottom there's a paragraph that

4    says:  The mode of action for R0053821 is described by the

5    following key mechanism, colon:  Receptor binding and the

6    stimulation and production of erythroid progenitor cells in

7    the bone marrow.

8            How, if at all, does that language support your

9    opinion?

10   A   It clearly tells that the biological activity of

11   pegylated EPO is defined by EPO and it remains the same.

12   Receptor binding and stimulation of erythroid progenitor

13   cells in the bone marrow.

14   Q   Now, to your understanding what part of the EPO protein

15   is modified when a peg is conjugated to it?

16   A   It's not actually the protein, it's some amino groups in

17   side chains of some amino acid residue in protein are

18   modified.

19   Q   Now, what, if anything, is typically removed from the

20   protein when the peg is conjugated to the EPO to your

21   understanding?

22   A   Well, as any chemical modification, when the new bond is

23   formed a certain atom should be removed from the group to

24   which chemical connection is done, and in this case is just

25   single hydrogen atom which is eliminated so that a molecule

1    can be formed between polymer and protein.

2    **Q**    And is the epoetin's amino acid sequence affected by the

3    removal of this hydrogen?

4         **MS. BEN-AMI:**  Objection; leading.

5         **THE COURT:**  Sustained on that ground.

6    **Q**    How, if at all, is the EPO amino acid sequence affected

7    by the deletion of this hydrogen?

8    **A**    It is not affected at all.

9    **Q**    So let's focus back on the peg part of the conjugate.

10   How does the peg part contribute to the size of the

11   conjugate?

12   **A**    Since peg is a sizable molecule, so the net size of the

13   conjugate is bigger than size of initial EPO.

14   **Q**    And how does the peg contribute to the clearance of the

15   peg conjugate?

16   **A**    It's typical for pegylated protein, it appears to slow

17   down.

18        **MS. BEN-AMI:**  Objection.  I object.

19        **THE COURT:**  I didn't hear the grounds.

20        **MS. BEN-AMI:**  It's outside of peg-EPO.  Whenever he

21   goes to all pegylation, I object.

22        **THE COURT:**  Yes, I understand.  And I'm going to

23   stick with it.

24        I have earlier said here, and I'm going to stick

25   with it just so you know the line, you apparently know

1    things about what pegylation does generally.  This case

2    involves EPO.  So, all of your answers deal with pegylation

3    of EPO compounds.

4              **THE WITNESS:**  Okay.

5              **THE COURT:**  Now, you can do that --

6              **THE WITNESS:**  Sure.

7              **THE COURT:**  And the jury will understand that.

8    We're talking about EPO here.  Now, we're talking about

9    pegylation of EPO and that may make a difference.  But only

10   EPO compounds.  Not pegylation of other chemical compounds.

11   That's what we're talking about.  That's -- his answers are

12   confined to that.

13             Put your question, Mr. Gaede.

14   **BY  MR. GAEDE**

15   **Q**   How does the peg, if at all, contribute to the clearance

16   of the peg-EPO conjugate?

17   **A**   It slows down the clearance of EPO.

18   **Q**   Now, Doctor --

19             **MR. GAEDE:**  Your Honor, I have to ask a couple of

20   foundational questions and then I'll --

21             **THE COURT:**  I'll try to be following.

22             **MR. GAEDE:**  Okay.

23   **Q**   So, Doctor, what is an analog?

24   **A**   Usually this term is applied to protein which is

25   obtained by replacement or deletion of one of amino acid

1    residues by type of mutation of DNA, which is responsible

2    for synthesis of this protein.

3    **Q**   And, Doctor, what is chemical modification and

4    derivatization of a protein?

5    **A**   Chemical modification is usually the reaction which

6    targets some side chains in amino acid residues.

7    **Q**   Now, in your understanding and opinion is Mircera a

8    chemically modified protein?

9           **MS. BEN-AMI:**  Objection; leading.

10          **THE COURT:**  Sustained on that ground.

11   **Q**   Doctor, how, if at all, is Mircera a chemically modified

12   protein?

13          **MS. BEN-AMI:**  I would think that would be leading,

14   and foundation as well, your Honor.

15          **THE COURT:**  Yes.  Well, let's see.

16          **MR. GAEDE:**  I'll withdraw it.

17          **THE COURT:**  It's withdrawn.  Then try again.

18          **MR. GAEDE:**  Yes.

19   **Q**   In your opinion is Mircera a chemically modified

20   protein?

21          **MS. BEN-AMI:**  I object, your Honor.

22          **THE COURT:**  Overruled; he may have that.

23   **A**   Yes, Mircera is EPO chemically modified.

24   **Q**   And in your opinion is Mircera an analog?

25   **A**   No.  In no way.

1    Q    Okay.  Now, Doctor, I would like to turn to Tab 2 in

2    your binder which is Exhibit EDI.  Do you recognize Exhibit

3    EDI?

4    A    Yes, I do.

5    Q    And what is it?

6    A    It's a so-called patient informed consent form.

7    Q    And by who?  Whose name is on here?

8    A    It's made by Roche.

9         MR. GAEDE:  I would move Exhibit EDI into evidence,

10   your Honor.

11        MS. BEN-AMI:  I object to this document, your

12   Honor.

13        THE COURT:  Sustained.

14        MR. GAEDE:  Your Honor, I would request a side bar.

15        THE COURT:  You may have it.

16   SIDEBAR CONFERENCE, AS FOLLOWS:

17        THE COURT:  My problem has nothing to do with the

18   fact it's an admission or it's authentic.  I just don't

19   understand the relevance.

20        MR. GAEDE:  Oh, well, there's statements in here

21   about RO503281 peg-EPO and EPO that relate to the issues of

22   material, that relate to the material, the material change,

23   particularly right in this area here.

24        THE COURT:  What's the objection?

25        MS. BEN-AMI:  This is not the actual patient

1   consent form.  This is a draft of something.  And a draft is

2   not an admission.  They haven't tied this up with the final

3   BLA.  This is not in the BLA.

4              THE COURT:  Yes.  Yes.

5              MR. GAEDE:  See this version of a Roche document.

6   The specific ones with the patients' names on them were not

7   produced to us.

8              MS. BEN-AMI:  But the one in the BLA was produced,

9   your Honor.

10             MR. GAEDE:  Well, we can use the earlier Roche

11  document as well.

12             THE COURT:  Not if they're -- wait a second.  Well,

13  a draft is not an admission.  It's a corporate defendant.

14  If there's a version in the BLA, you can use that because

15  they showed that to third parties.  Sustained.

16             MR. FLEMING:  Thank you.

17             (Whereupon the sidebar conference concluded.)

18  BY  MR. GAEDE

19  Q   Would you please turn to Tab 6 in your binder.  And do

20  you recognize this document?

21  A   Yes, I do.

22  Q   And what is this?

23  A   It's patient informed consent form used by Roche.

24             MR. GAEDE:  Your Honor, I would offer Exhibit EDH-1

25  into evidence.  You'll note there's a protocol number on

```
 1    this one.

 2              MS. BEN-AMI:  Objection, your Honor.

 3              THE COURT:  Just one moment.  Have I got it in

 4    front of me?

 5              THE CLERK:  I gave you a binder of exhibits.

 6              THE COURT:  Yes.  Yes.  But, is it a tab in this?

 7              MR. GAEDE:  The protocol itself?  No, your Honor.

 8              THE COURT:  Well, I haven't seen --

 9              MR. GAEDE:  Oh, Tab 6.  The document's at Tab 6.

10    The patient consent form that references the specific

11    protocol.

12              THE COURT:  Yes.  Do you object to this?

13              MS. BEN-AMI:  I do, your Honor.  May we have a side

14    bar?

15              THE COURT:  We may.

16    SIDEBAR CONFERENCE, AS FOLLOWS:

17              MS. BEN-AMI:  Ready?

18              THE COURT:  What's the problem with this?

19              MS. BEN-AMI:  This one is for lung cancer.  This

20    case, we're not seeking approval for lung cancer.

21              THE COURT:  Well, that doesn't trouble me if it's

22    the same, if this is the same language and you make the

23    admission here.  This was sent to third parties.  This goes

24    to the weight, not the admissibility.  They may have it.

25              (Whereupon the sidebar conference concluded.)
```

1              **MR. GAEDE:**  Your Honor, I would offer --

2              **THE COURT:**  Wait for the court reporter.

3              **MR. GAEDE:**  Excuse me.

4              **THE COURT:**  EDH-1 is admitted in evidence.

5              **MR. GAEDE:**  Thank you, your Honor.

6              **THE COURT:**  Exhibit 59.

7              (Exhibit marked in evidence.)

8    **Q**   Now, Dr. Torchilin, could you turn your attention to the

9    second page of EDH-1.

10   **A**   Okay.

11   **Q**   And specifically the language there on the third and

12   fourth paragraphs.

13             **MR. GAEDE:**  Could you please highlight those.

14   **A**   Okay.

15   **Q**   And how, if at all, does the language there in the third

16   paragraph support your opinion?

17   **A**   It tells me that this new experimental drug, which is

18   pegylated EPO, is similar to human erythropoietin, like

19   currently available drugs which reference to erythropoietin,

20   it increases number of red blood cells and hemoglobin levels

21   in the blood, which mean the biological activity are the

22   same.

23   **Q**   All right.  Now, in the next paragraph is there a

24   statement about how peg-EPO compared to EPO in patients?

25             **MS. BEN-AMI:**  Your Honor, could I have a report

 1   cite?

 2           THE COURT:  Yes, if you would be so good.

 3           MR. GAEDE:  Paragraph 68 of the first report, your

 4   Honor, the blue copy.

 5           MS. BEN-AMI:  I object to the question based on

 6   that paragraph.

 7           THE COURT:  Overruled; he may have it.

 8           MS. BEN-AMI:  Your Honor, could we look at

 9   Paragraph 68.

10           THE COURT:  Say again the paragraph?

11           MS. BEN-AMI:  Sixty-eight is the paragraph.

12           THE COURT:  Sixty-eight, blue.

13           MR. GAEDE:  It also ties with Paragraph 66, your

14   Honor; same language.

15           THE COURT:  He may have it.

16   A   Yes, it clearly tells that there is no difference in

17   activities between pegylated EPO and EPO because they both

18   stimulate red blood cell production compared to currently

19   available therapy, which is EPO, which tells that there's no

20   change.

21   Q   So to wrap this up.  How does conjugated peg to

22   recombinant human EPO affect, if at all, amino acid sequence

23   of the human EPO that Roche uses?

24   A   It does not affect amino acid sequence in any way.

25   Q   And how, if at all, does it affect the carbohydrates of

1    the EPO that Roche uses?

2    A    It does not affect it in any way.

3    Q    And how does conjugating the peg affect, if at all, the

4    receptor binding site that it binds to, that EPO binds to?

5    A    As follows from the documents we just saw, it does not

6    affect binding.

7    Q    And how does conjugating the peg to EPO affect, if at

8    all, the biological activity of the EPO that Roche uses?

9    A    The biological activity remains exactly the same.

10   Q    Now, final question, Dr. Torchilin.  What is your

11   opinion regarding whether EPO is a trivial component of

12   Mircera?

13   A    No, it is not.

14            **MR. GAEDE:**  Thank you.

15            **THE COURT:**  I think we're close to the break, and

16   you want to ask questions.

17            **MS. BEN-AMI:**  No, we can -- it doesn't matter.

18            **THE COURT:**  Unless you're going to ask less than

19   seven minutes of questions, I think we better take the

20   break.

21            **MS. BEN-AMI:**  We might as well take the break.

22            **THE COURT:**  We'll take the break.

23            All right, ladies and gentlemen, you've not heard

24   all the evidence.  Please, therefore, keep your minds

25   suspended.  Do not discuss the case either among yourselves

1   nor with anyone else.  You may stand in recess for one-half

2   hour until about 13 minutes after 11:00.

3         The jury may stand in recess.  I'll remain on the

4   bench.

5         **THE CLERK:**  All rise for the jury.

6         (Whereupon the jury left the courtroom.)

7         **THE COURT:**  Please be seated.  You may step down.

8         (Whereupon the witness stepped down.)

9         **THE COURT:**  There's a number of motions that I'm

10  going to rule on now.  There's only one of any overarching

11  significance and that I want to explain a moment.

12        I'm not taking argument now.  I'm going to recess.

13  But at five minutes of 1:00, I'll want some information from

14  you.

15        First of all, here's the motions I'm prepared to

16  rule on.

17        Document 1333, Plaintiff Amgen's motion to preclude

18  Roche from offering additional evidence in argument

19  regarding the Genetics Institute.  Allowed.

20        Amgen's, document 1341, Amgen's motion and

21  supporting memorandum requesting that this Court try Roche's

22  inequitable conduct defenses.  That's allowed.  I've noted

23  and in fact I've had a chance to review the decision from

24  the Northern District of Illinois.  It goes the other way.

25  No doubt about that.  But I disagree.  I'm trying

```
1    inequitable conduct.

2         Now, that has this effect on the course of the

3    trial.  I would expect now, if you're serious about

4    inequitable conduct, that you want to put on evidence about

5    inequitable conduct, we could get this case to the jury on

6    Wednesday because I'll hear inequitable conduct on Thursday

7    while we're waiting for the jury deliberations.  But, if you

8    really want to press on and exhaust your time, because we're

9    not giving you any more time for inequitable conduct, then

10   fine.  But I need to know what to tell the jury at one

11   o'clock.  So, I will call on you at five minutes to 1:00

12   with respect to that.

13        Document 1383, Amgen's motion in limine to preclude

14   Roche from undermining, et cetera, concerning inequitable

15   conduct, that's denied as moot.

16        Document 1382, Amgen's motion in limine to preclude

17   Roche from arguing to the jury that Amgen committed

18   inequitable conduct, denied as moot.

19        Amgen's motion in limine No. 8, docket 841, to

20   exclude Roche from relying on comparisons between Mircera

21   and Aranesp, that's allowed.  Comparisons claim to Mircera.

22        Roche's motion in limine to preclude Amgen from

23   introducing Vladimir Torchilin related to pegylation of

24   non-EPO compounds, document 1371, that's denied as moot

25   because I've so instructed him.
```

 1              Document 1375, defendants' motion for clarification

 2     about Markush Groups and clarification.  Yes, it does

 3     preclude the defendants from arguing noninfringement as to

 4     claims 9 and 12 of the '933 patent.

 5              Roche's -- Amgen's motion, I don't have the number,

 6     to preclude Roche from introducing testimony of

 7     Dr. Longmore, that's denied.

 8              1376, I've acted on that.

 9              Let's see.  1388, Amgen's motion for corrective

10     instruction regarding Roche's patent.  I'm not giving any

11     corrective instruction now.  I'm going to have to talk about

12     that in the charge, and I'm prepared to.

13              1392, Amgen's motion to preclude Roche from

14     offering evidence regarding Amgen's efforts to pegylate

15     molecules, that's allowed, the references to the claims and

16     Mircera.

17              All right.  We'll resume about 13 after 11:00.

18     We'll recess.

19              **THE CLERK:**  All rise.  Court is in recess.

20              (Recess.)

21              **THE CLERK:**  All rise for the jury.

22              (Whereupon the jury entered the courtroom.)

23              THE CLERK:  Court is in session, please be seated.

24              **THE COURT:**  Ms. Ben-Ami?

25              **MS. BEN-AMI:**  Thank you.

1

## CROSS-EXAMINATION

2 **(BY MS. BEN-AMI:)**

3  **Q.**  Good morning, Doctor.

4  **A.**  Good morning.

5          **MS. BEN-AMI:**  Good morning, ladies and gentlemen of

6  the jury.

7  **Q.**  Doctor, you and I have met before?  You have to answer

8  in words, please.

9  **A.**  Say it again?

10  **Q.**  You need to use words.

11  **A.**  Yes, excuse me.  Yes, we did.

12  **Q.**  Yes.  And when you were deposed you had been prepared

13  for your deposition by Amgen's lawyers; right?

14  **A.**  I don't understand what you mean "prepared," but we

15  discussed.

16  **Q.**  You met with Amgen's lawyers and talked about your

17  deposition before you gave your testimony?

18  **A.**  Yes.

19  **Q.**  And before you gave your expert reports, before you

20  submitted your expert reports, those were all reviewed by

21  Amgen's attorneys also; right?

22  **A.**  This was how they were prepared, it was exchange of

23  information and editorial piece, yes.

24  **Q.**  And so today you were also prepared by Amgen's lawyers;

25  right?

1   A.   I'm not sure I understand what does it mean "prepared."

2   We discuss, yes.

3   **Q.**   And you discussed your testimony for trial?

4   A.   Yes.

5   **Q.**   And you are here today as a paid expert by Amgen;

6   correct?

7   A.   As?

8   **Q.**   You're a paid expert by --

9   A.   Yes, I am.

10  **Q.**   Right?   You're paid, all right.

11          And you've given testimony today that about CERA.

12  You know what CERA is; right?

13  A.   Yes.   It is pegylated EPO.

14  **Q.**   You understand that you gave testimony that in your

15  opinion CERA is not materially different than EPO; right?

16  A.   Yes.   Correct.

17  **Q.**   That's your opinion?

18  A.   It's my opinion.

19  **Q.**   Right.   But you are not a medical doctor, are you?

20  A.   I am not.

21  **Q.**   So you can't give this jury an opinion from the

22  perspective of a doctor treating patients, can you?

23  A.   No, I cannot.

24  **Q.**   And this is -- CERA is the active ingredient in Mircera;

25  correct?

1   A.   Correct.

2   Q.   We're talking about a drug that is going to be given to

3   patients; correct?

4   A.   Yes.

5   Q.   And whether that drug is materially different than EPO

6   is something that a doctor, a medical doctor, will have to

7   decide in his opinion; correct?

8        **MR. GAEDE:**   Objection, your Honor.   Lacks

9   foundation.

10       **THE COURT:**   Overruled.

11       **MS. BEN-AMI:**   Well, I'll withdraw and ask a

12   different question, your Honor.

13  Q.   The decision of which drug to give a patient, which is

14  better for a patient, is something for the doctor, the

15  medical doctor to decide?

16       **MR. GAEDE:**   Objection, your Honor.   Violation of

17  the Court's' motion in limine.

18       **THE COURT:**   Overruled.

19  Q.   Doctor --

20  A.   Can you please repeat the question?

21  Q.   The decision of whether the drugs are materially

22  different from a medical perspective is a medical doctor's

23  opinion?

24  A.   I'm not sure that materially change is correct here.

25  Decision to give this drug or not, yes, it's up to the

1    doctor.  But I doubt the doctor --

2         **MS. BEN-AMI:**  May I have an instruction for the

3    witness to answer yes or no, if possible?

4         **THE COURT:**  Yes.  Now, we sort of talked about this

5    when Mr. Gaede was asking questions.  Now she's giving you

6    questions, appropriately.  And she frames her questions

7    grammatically so that they could be answered yes or no.

8    Now, if an honest and complete answer is either yes or no,

9    you have to answer yes or no.  Mr. Gaede will have a chance

10   to ask you other questions if he wants you to explain.

11        Now, if you can't answer yes or no, if that's not

12   an honest and complete answer to her question, you can

13   always say, I can't answer it yes or no.  It can't be

14   answered yes or no.  But don't then volunteer what you

15   happen to think about what's going on.

16        **THE WITNESS:**  Okay.

17        **THE COURT:**  You give her a chance to frame another

18   question.  She now has the right to ask questions to see

19   what you'll say in answer to her questions.  Mr. Gaede will

20   have a chance to ask you some more open-ended questions

21   after she's done.

22        Now, obviously, if you don't know or don't

23   remember, you may always say that.

24        **THE WITNESS:**  Okay.  Thank you.

25        **THE COURT:**  But that's an order.  You have to

 1    follow those instructions.

 2            Go ahead, Ms. Ben-Ami.

 3            **MS. BEN-AMI:**  Thank you, your Honor.

 4    **Q.**  You can't give an opinion about whether there's a

 5    material change from the perspective of a patient, can you?

 6    A.  I cannot answer this question.

 7    **Q.**  And you agree that CERA is a new chemical entity?

 8    That's the question.  You agree that CERA is a new chemical

 9    entity?

10    A.  Yes, that's correct.

11    **Q.**  And that chemical entity was not disclosed in any of

12    Amgen's patents; correct?

13            **MR. GAEDE:**  Objection, your Honor.  Relevance.

14            **THE COURT:**  Overruled.  Overruled.  She may have

15    it.

16    A.  This name was not.

17    **Q.**  Pegylation wasn't described in any of the patents?

18    A.  Yes, correct.

19            **MR. GAEDE:**  Objection, your Honor.  Violates the

20    phasing order of --

21            **THE COURT:**  Overruled.

22            **MR. GAEDE:**  -- approved in this trial.

23            **THE COURT:**  Overruled.  She may have it.

24            Now, look, everyone's back and forth here.  I

25    should say something about patents.  The test here, both as

1    to validity and as to infringement, is going to drive you to

2    looking at the claims of the patents in suit, Amgen's

3    patents.  And on the validity side, you're going to be

4    looking to see whether Roche has proved, Roche has proved by

5    clear and convincing evidence that any of those claims are

6    either anticipated, obvious, lack an adequate written

7    description, indefinite, or are not enabled.  Those are all

8    the ones I can think of.  And I will be explaining all of

9    those in a few days to you.  Whether Roche has proved that,

10   based upon prior art, things that were known before the

11   application for a patent was filed by Amgen.

12          That's the first phase.  We're done with that.  Now

13   we're in the infringement phase.  The infringement phase,

14   Amgen bears the burden of proof by a fair preponderance of

15   the evidence that what Roche actually does, what Roche is

16   doing, Mircera, their product, the product they are applying

17   to be allowed to market here in the United States, whether,

18   if that's allowed by the FDA, whether that's going to

19   infringe any of these same claims if done in the United

20   States.  So the comparison in this phase of the case is

21   between the specific claim with the specific limitations of

22   the claim, and Mircera.

23          Now, you've seen a Roche patent.  It's in evidence

24   here.  Roche apparently has a patent on something.  Now,

25   don't be confused by that.  If -- I'm not -- I can't talk

1    about the evidence, and yet I have to make some assumptions.

2    If you have Amgen's patented product or Amgen's patented

3    process, and Roche adds something to it, and we've seen

4    little squiggly lines about pegylation and the like.  And if

5    that addition is itself novel, it's new, it's an advance

6    over the prior art, they could get a patent on that.  No

7    problem with that.

8         Now, I haven't looked at that Roche patent but it

9    may be that that Roche patent has to do with the addition.

10   That still doesn't mean that Roche can use Amgen's patented

11   process.  Just like Amgen, that's not for this case,

12   couldn't use Roche's alleged improvement.  So, don't just

13   assume that because Amgen has a patent that there's

14   something wrong with -- strike that -- that Roche has a

15   patent, there's something wrong with Roche's own validity of

16   its patents.  You don't make that assumption.  And,

17   likewise, you don't make the assumption that Roche can't

18   prove infringement because -- strike that -- that Amgen

19   can't prove infringement because Roche has a patent.  It

20   doesn't work that way.

21        Now, what -- I'll be explaining all this again in a

22   very few days.  But Roche, on the evidence on this case,

23   Roche does whatever it does, its processes are over there in

24   Germany.  The American patent laws don't apply in Germany.

25   And so whatever Roche does over there in Germany on the

1    record we have, that's lawful.  They can do it.  They can

2    keep on doing it in Germany, and indeed in the countries of

3    the European Union, and I don't know where.  The only

4    question we're going to ask you is whether, once they've

5    done their process and they've got this product Mircera, can

6    they, if the FDA will approve it, can they market that

7    product in the United States?

8            Now, on the -- this is why we get into the

9    difference between product and process claims.  On a product

10   claim, you've got, in the '933 patent primarily, you've got

11   claims to specific products.  That's what the claim sets

12   out.  We claim a pharmaceutical combination -- a

13   pharmaceutical composition.  That's a product.

14           Then in the '898, but some of the others, it will

15   be clear on the verdict slip, all that Amgen claims is a

16   process.  So as to that, Amgen has something else to prove

17   because there's no evidence that Roche is going to be doing

18   their process in the United States.  Even if the FDA gives

19   them the go-ahead, we don't have a situation here where

20   there's going to be some sort of Roche manufacturing plant

21   out in Leominster making the product.  That's not the way

22   it's going to work.  The process is going to be practiced

23   over there in Europe, where it's perfectly lawful, perfectly

24   lawful.  And then the product, Mircera, if the FDA tells

25   them they can do it, is going to be marketed in the United

1  States.   That's what Roche wants to do.

2       Well, says Amgen, that will infringe our process

3  claims.   And so here's the additional thing that Amgen has

4  to prove.   Of course, they have to prove to each element of

5  their process claim is found in the Roche process over there

6  in Germany, and they have to prove that the product that

7  will be coming into the United States is not materially

8  changed from the product produced by the process of the

9  Amgen claim that you're looking at.   Because if it is

10  materially changed, no infringement.

11      So Amgen has to prove no material change on the

12  process claims.   In addition to every element for direct

13  infringement, it has to prove no material change in the

14  ultimate product after the process.

15      This witness has talked to that.   Mr. Gaede has

16  asked him questions, this witness has talked about it, and

17  other witnesses.   Now, Ms. Ben-Ami gets her chance.   She is

18  going to ask him questions, I imagine, about whether the

19  Mircera product is materially changed from the product that

20  would be produced by the process of the specific process

21  claims.

22      Go ahead, Ms. Ben-Ami.

23      **MS. BEN-AMI:**   Your Honor, may I have a sidebar?

24      **THE COURT:**   You may.

25

```
 1   SIDEBAR CONFERENCE, AS FOLLOWS:

 2           MS. BEN-AMI:  Your Honor, I object to your

 3   instruction to the jury on the patent as being incorrect as

 4   matter of law.  The patent is relevant evidence under the

 5   doctrine of equivalents, the reverse doctrine of

 6   equivalents, and material change.  The federal circuit has

 7   said that it's prima facie evidence.

 8           THE COURT:  I didn't say it wasn't relevant, I said

 9   they shouldn't get confused about it.  But I'm satisfied.

10   Your rights are saved.

11           (Whereupon the sidebar conference concluded.)

12           THE COURT:  Go ahead, Ms. Ben-Ami.

13   (BY MS. BEN-AMI:)

14   Q.  So, Dr. Torchilin, now that the jury has been instructed

15   on what material change means, let's walk through it step by

16   step.  You agree that CERA is a new and different chemical

17   entity than EPO; correct?

18   A.  It is new entity but it includes EPO.

19           MS. BEN-AMI:  I object, your Honor.  I ask this

20   witness to answer my questions, if he can, yes or no.  I'll

21   spend my whole day here going through his deposition.

22           THE COURT:  Noted.  I will so instruct him.  I

23   have.

24           Have in mind that you could have answered that

25   question yes or no.  Here's why she's quarreling with you.
```

1   You said that you agreed that it was new and different, and then

2   you volunteered, But it includes.  She opposed that.  She

3   has the right to.  We'll find out if any further is needed

4   when Mr. Gaede asks you further questions.  Don't volunteer.

5   Just see whether you can honestly and completely answer her

6   questions as she poses them.

7          **THE WITNESS:**  Can I ask you a question, your Honor?

8          **THE COURT:**  Sure, so long as the jury hears it.

9          **THE WITNESS:**  Yes.  It was difficult for me to

10  answer this very question because I thought two questions in

11  one.  What should I do in this case?

12         **THE COURT:**  Say, Can't be answered yes or no.

13         **THE WITNESS:**  Assuming that both questions are in

14  one?

15         **THE COURT:**  Yes, that's right.  So long -- if you

16  can't answer it completely and honestly by a yes or a no,

17  say that.

18         **THE WITNESS:**  Okay.

19         **THE COURT:**  Now she'll go forward.

20  **Q.**  Yellow report, Dr. Torchilin, your second expert report.

21  The lawyers helped you write this report; right?  Amgen's

22  lawyers?

23         **MR. GAEDE:**  Objection, your Honor.  I object to the

24  use of this second expert report by Ms. Ben-Ami.

25  Ms. Ben-Ami --

1    **THE COURT:** Overruled.

2    **MR. GAEDE:** It relates to invalidity issues.

3    **THE COURT:** Overruled.

4    **MR. GAEDE:** Thank you, your Honor.

5    **THE COURT:** Well, one would imagine it would.  Oh,

6 I see what you mean.  No, no, overruled, but we'll see where

7 we go as to specific questions.

8 **Q.** Let's look at -- well, you didn't answer my question.

9 **A.** Can you please repeat it?

10 **Q.** My question was:  You worked with the lawyers on this

11 second report?

12 **A.** Yes, correct.

13 **Q.** The Amgen lawyers?

14 **A.** Yes, correct.

15 **Q.** Now, let's look at Paragraph 66 of your second report.

16 You can look at mine, if you'd like, it's right here.  Got

17 it.

18 **A.** I don't want to lose mike.  Yes.

19 **Q.** I'm going to read that first sentence to you.  I want

20 you to tell me if I'm reading it correctly.  Your report

21 says, in Paragraph 66, "Dr. Langer's report states that

22 conjugating peg to EPO results in a new chemical entity,"

23 and then you cite his report, "from an elementary

24 composition (atomic) standpoint I do not disagree."

25    Is that what you said in your report?

1    A.  Yes.

2    Q.  So you agree that it is a new chemical entity; correct?

3    A.  Correct.

4    Q.  And you agree that CERA is made by a chemical reaction;

5    correct?

6    A.  Correct.

7    Q.  And you call it a derivative; right?

8    A.  It's one of the possible names, yes.

9    Q.  Something that is a derivative is something that's been

10   changed from something else; right?

11   A.  Correct.

12   Q.  So it's been changed?

13   A.  Yes, it was.

14   Q.  And a molecule of CERA is different than a molecule of

15   EPO; correct?

16   A.  Yes, correct.

17   Q.  Now, to modify, to do this chemical reaction,

18   Dr. Torchilin, one modifies an amino acid; correct?

19   A.  Yes, correct.

20   Q.  So the jury understands, this is a chemical reaction;

21   right?

22   A.  Yes.

23   Q.  And in this chemical reaction, the jury has seen amino

24   acids, pictures of what an amino acid is, there is a side

25   chain or a radical on each amino acid; right?

1    A.  Yes, correct.

2    Q.  And that amino or side chain is where the chemical

3    reaction is; right?

4    A.  Yes.

5    Q.  And in that chemical reaction, there is a deletion to

6    that side chain; correct?

7    A.  Yes, deletion of one hydrogen at --

8    Q.  And the answer is "yes" to my question?

9    A.  Yes.

10   Q.  So, therefore, it is no longer identical to EPO?

11   A.  Incorrect.

12   Q.  It is missing a hydrogen, Doctor?

13   A.  Yes, I understand.

14   Q.  So if it's missing something, is not identical, Doctor?

15   A.  Not exactly.

16   Q.  It's not exactly identical?

17   A.  Yes.

18   Q.  And then there's a new side chain created by the

19   pegylation reaction; right?

20   A.  Yes, correct.

21   Q.  And that side chain now includes all those ethylene

22   oxides; right?

23   A.  Yes.

24   Q.  So now that side chain is not this little lysine side

25   chain, it's this big side chain; right?

1    A.  Yes, it is.

2    **Q.**  How much bigger is the side chain then?

3    A.  In what respect?  In size?

4    **Q.**  Thousands of molecules?

5    A.  In size, probably like the number of oxide residues in

6    peg.

7    **Q.**  Thousands of atoms bigger; right?

8    A.  Thousands of atoms bigger, yes.

9    **Q.**  And, in fact, when there is this chemical reaction

10   between the lysine, as an example, and the chemical reaction

11   with the peg, activated peg, there is no full amino group on

12   the lysine anymore?

13   A.  Yes, correct.

14   **Q.**  That is correct.  So EPO has a full amino group on the

15   lysine; right?  Whoops, sorry.  Right, you said just now --

16   A.  Yes.

17   **Q.**  Before pegylation reaction, there's a full amino group;

18   right?

19   A.  Correct.

20   **Q.**  Lysine, right?

21   A.  Correct.

22   **Q.**  After the pegylation reaction there's no full amino

23   group anymore; correct?

24   A.  One of amino groups of many amino groups in lysine, yes.

25   **Q.**  The one that's reactive?

1    A.   One which is reactive, right.

2    Q.   So if I look at that lysine molecule, that residue,

3    after the pegylation reaction, it looks different?

4    A.   Yes, it looks different.

5    Q.   It's not the same lysine that's made by the cell, is it?

6    A.   It's not the same amino group in the lysine.

7    Q.   That's made by the cell?

8    A.   That's made by the cell.

9    Q.   And you agree that there are some quantitative

10   differences between the carbohydrates of CERA and EPO;

11   correct?

12   A.   Can you please repeat the question?

13   Q.   Yes.  You agree that there are some slight quantitative

14   differences between the carbohydrates in CERA as compared to

15   EPO?

16   A.   Maybe yes, maybe no.

17            MS. BEN-AMI:   May I have the third report?

18   Q.   I'd like to look at your red report, Doctor.   This is

19   another report you wrote with the Amgen attorneys; right?

20   A.   Correct.

21   Q.   Let's look at Paragraph 37.

22   A.   Yes.

23   Q.   You see there in Paragraph 37, you're reading the BLA;

24   right?

25   A.   Yes.

1    **Q.**  And you say, "The 'slight quantitative differences'

2    identified by the Mircera BLA were a slight decrease in the

3    amount of sialic acid, and tetraantennary and lactosamine

4    structures in peg-EPO compared to EPO"; right?  That's what

5    you say there; right?

6    A.  This is what I quote from BLA, it's not me who said it.

7    **Q.**  Okay.  So the BLA does say that there are carbohydrate

8    differences; right?

9    A.  Without any support for this statement.

10            **MS. BEN-AMI:**  Your Honor, again.

11           **THE COURT:**  I'll strike it.  He has my instruction

12   in mind.  It's stricken.

13   **Q.**  The BLA, you showed the BLA to the jury but you didn't

14   read them the sentence where it says that there are

15   differences in the carbohydrates; correct?

16   A.  I was not asked to.

17   **Q.**  Okay.  The Amgen lawyers didn't ask you?

18   A.  Probably.

19   **Q.**  So now I'm asking you.  The BLA says that there are

20   differences in the carbohydrate structures between EPO and

21   CERA; yes or no?

22           **MR. GAEDE:**  Objection, your Honor.  It assumes

23   facts not in evidence.

24           **THE COURT:**  Overruled.  She may have it in that --

25   A.  It's not what's said here.  It said slight quantitative

1   difference.

2   **Q.**  Slight means some; right?

3   A.  Yes.

4   **Q.**  So it says there are some?

5   A.  Yes.

6   **Q.**  Big or little.  You say little; right?

7   A.  No, they say little.

8   **Q.**  Okay.  There are slight differences between the

9   carbohydrates of EPO and CERA; right?

10  A.  Correct.

11  **Q.**  And that means they're not the same; right?

12  A.  I cannot answer this question.

13  **Q.**  Okay.  So if something's different you can't say that

14  it's not the same?

15  A.  No.  I cannot volunteer.  I can't explain.

16  **Q.**  It does say in the BLA that there are slight

17  differences; you agree with that?

18  A.  Yes, it does.

19  **Q.**  In the carbohydrate; right?

20  A.  Yes, it does.

21  **Q.**  Now, you would not call CERA a pro-drug, would you?

22  A.  I probably not, but I can assume --

23          **MS. BEN-AMI:**  Objection.

24  **Q.**  I asked you yes or no.  Would you, in your scientific

25  opinion, call CERA a pro-drug?

1    A.  I can, but I probably wouldn't.

2    Q.  You would not use that term for CERA?

3    A.  I would not use this term myself.

4    Q.  And you, in your opinion, having looked at all the

5    evidence, it is your opinion that once this chemical

6    reaction occurs between the peg reagent and the EPO reagent,

7    and there's a new molecule, the peg and the EPO do not

8    detach from each other; correct?

9    A.  I would show it this way.  I would show this way.

10   Q.  Doctor, again --

11        MS. BEN-AMI:  Your Honor -- I asked him the

12   question, your Honor.

13        THE COURT:  Yes.  Can you answer her question?

14   A.  Can you please repeat your question?

15   Q.  Once the chemical reaction occurs to create CERA, the

16   EPO and the peg, as you call them, do not detach from each

17   other; correct?

18   A.  No.

19   Q.  No, I'm incorrect or --

20   A.  Yes, you are incorrect.  They can be detached.

21   Q.  Excuse me.  You answered my question.

22        MS. BEN-AMI:  Can I have the deposition of June 18?

23   Q.  I'd like you to look at the June 18 deposition at

24   page 16.

25        MR. GAEDE:  Your Honor?  I think there are other

1   parts of the deposition that need to be read as well,

2   inconsistency.

3         **THE COURT:**  Maybe.  You can make that request.

4   She's inquiring now.

5   **Q.**  So we're on page 16, lines 14 and on.  And I asked you

6   this long-winded question, which I will reread.  And I said:

7         "QUESTION:  Well, you said it's a difficult

8   question, and I didn't mean it to be difficult.  So I will

9   try a different question.  Is it your testimony or opinion

10  that before the CERA molecule gets to the EPO receptor that

11  peg is separated from the EPO?

12        "ANSWER:  What does that -- what does it mean,

13  separated?

14        "QUESTION:  They detach?

15        "ANSWER:  No.  Pegylated EPO is a molecule in which

16  EPO moiety is chemically bound with peg moiety and they do

17  not detach from each other."

18        Did you give those questions and answers?

19  A.  Can you read further?

20  **Q.**  Did you give those questions and answers?

21  A.  Yes.

22        **MR. GAEDE:**  Your Honor, I would ask that page 26 at

23  line 25 be read as well.

24        **THE COURT:**  Well, fine, just a moment.  Twenty-six,

25  line --

1          **MR. GAEDE:**  Line 25.  Going on to page 27.

2          **THE COURT:**  Just a moment.  I'm reading it.

3          Not now.  You may renew your request when the

4     witness is back to you.  Go ahead.

5          **MS. BEN-AMI:**  Okay.

6     Q.  You have no evidence that the EPO is cut from the peg in

7     the body; correct?

8     A.  It might, but I don't.

9     Q.  You have no evidence that the EPO is cut from the peg in

10    the body; correct?

11    A.  Correct.

12    Q.  And EPO has a different clearance rate than CERA; right?

13    A.  Yes.  Correct.

14    Q.  And the hydrodynamic size of CERA is different than EPO;

15    right?

16    A.  Yes.  Correct.

17    Q.  The diffusion coefficient of EPO is different than CERA;

18    right?

19    A.  Yes.

20    Q.  The virial coefficients are different; right?

21    A.  Yes.

22    Q.  And they -- and it's your opinion if you crystallized

23    them they would appear different; correct?

24    A.  Most probably.

25    Q.  And because the ethylene oxides get surrounded by water

1    in the body, the peg, what you call moiety, behaves as if it

2    were five to ten times larger than another molecule of

3    comparable mass; correct?

4    A.   About that, yes.

5    **Q.**   The molecular weights of CERA and EPO are different?

6    A.   Yeah, because it's a conjugate.

7    **Q.**   The molecular weights of CERA are different than EPO;

8    correct?

9    A.   Yes, correct.

10   **Q.**   You agree that pegylated EPO, the CERA molecule, has a

11   reduced in vitro activity and reduced binding to the EPO

12   receptor as compared to EPO?

13   A.   In vitro, you said?  Not in vivo?

14   **Q.**   In vitro activity.

15   A.   Yes.

16   **Q.**   That's where it's been studied; right?

17   A.   Yes, in vitro.  Yeah.

18   **Q.**   So in vitro activity, pegylation -- strike that.

19          In vitro activity is ten times less, right, between

20   CERA and EPO?

21   A.   Kinetics is, yes, but not activity.  The activity is

22   always the same.

23   **Q.**   Okay.  Let's look at your report.  First report,

24   Paragraph 87, page 33.

25   A.   What page?

1   **Q.**   Thirty-three.  Ready?  No.  This is your report.

2   Page 33.  Do you want to look at mine?

3   A.  Okay.

4   **Q.**   Blue report, first sentence.  You wrote, "Pegylating EPO

5   also has reduced in vitro activity."  You used the word

6   "activity," right?

7   A.  Yes, correct.

8   **Q.**   "(About 10 fold less) and reduced binding to the EPO-R

9   receptor (about 100 fold less) than EPO."  Did you write

10  that?

11  A.  Yes.

12  **Q.**   And you did swear under penalty of perjury that what you

13  said in your report was accurate; correct?

14  A.  Yes, correct.

15  **Q.**   And the on-constant and off-constant for CERA are

16  different than for EPO; correct?  The K-on and K-off?

17  A.  Yes.

18  **Q.**   They're both different for EPO?

19  A.  Okay.

20  **Q.**   And that means the binding onto the receptor is

21  different and the binding off of the receptor is different?

22  A.  Kinetics of the binding is different, not binding

23  itself.

24  **Q.**   The kinetics of binding onto the receptor is different

25  between CERA and EPO; right?

1    A.   Correct.

2    **Q.**   And the kinetics of the getting off the receptor is

3    different between CERA and EPO?

4    A.   Correct.

5    **Q.**   And you would agree that pharmacokinetics are an

6    important attribute of a biological molecule; correct?

7    A.   If it's used as a drug, yes, correct.

8    **Q.**   Okay.   So for a drug, the pharmacokinetics are an

9    important attribute of a drug?

10   A.   Yes.

11   **Q.**   And the pharmacokinetics are all these K-ons, K-offs;

12   right?

13   A.   Yes, correct.

14   **Q.**   Clearance, half-life; is that a pharmacokinetic?

15   A.   Yes.

16   **Q.**   So the pharmacokinetic of half-life between CERA and EPO

17   is different; right?

18   A.   Yes.

19   **Q.**   And the pharmacokinetic of the binding affinity, the on

20   and off kinetics, those are different; right?

21   A.   Yes.

22   **Q.**   And those are important attributes for a drug; correct?

23   A.   Important attributes, yes.

24   **Q.**   You said an important attribute?

25   A.   Yes.

1    **Q.**  And you would agree that an important feature of a

2    medicine, a drug, is its ability to persist in the body;

3    correct?

4    A.  It is important.  Not every time is good, but it is

5    important.

6    **Q.**  And you agree that pegylation increases the half-life,

7    like 15 to 20 fold, as compared to EPO?

8    A.  Yeah, this is what pegylation does.

9    **Q.**  In this instance?

10   A.  In this --

11   **Q.**  We're talking about this instance?

12   A.  In this instant, too.

13          **MS. BEN-AMI:**  Your Honor, I move to strike his

14   testimony in general or other compounds.  We're talking

15   about this compound.

16          **THE COURT:**  Yes.  So much of the testimony as

17   relates to other non-EPO compounds is stricken.  Confine

18   yourself just to EPO, whether it's clear in her questions or

19   Mr. Gaede's questions, that's what this case concerns.

20   We're talking about EPO compounds, nothing else.  And you

21   understand that?  You understand that?

22          **THE WITNESS:**  Yes.

23          **THE COURT:**  Yes, fine.

24   **Q.**  And you agree that there is a substantial, substantial

25   change in the pharmacokinetics between EPO and Roche's CERA

1   product; correct?

2   A.   Correct.

3   **Q.**   And you agree that the pharmacokinetic improvement has

4   an effect on the patient taking CERA; correct?

5   A.   I would say changes, not necessarily improvements.

6   **Q.**   Let's look at your deposition.  Let's look at

7   page 282 of your deposition.  You were being defended by

8   Mr. Gaede --

9   A.   Of which one?

10  **Q.**   The white one.  You were being defended by Mr. Gaede in

11  that deposition; right?  He was there; right?

12  A.   Yes.

13  **Q.**   You had a lawyer; right?

14  A.   Yes.

15  **Q.**   Okay.  So let's look at page 282.  And there I asked --

16  A.   282.

17  **Q.**   You went too far.  Oh, I'm sorry.  262.  That is my

18  problem.

19  A.   Yes, okay.

20  **Q.**   On pages -- lines 10 through 12 --

21          **MR. GAEDE:**  I'm sorry, what cite are we at?

22          **MS. BEN-AMI:**  262, lines 10 through 12.

23  **Q.**   "QUESTION:  Would you agree that the pharmacokinetic

24  improvement has an effect on the patient, correct?"

25  A.   Yes.

1    **Q.**  And your answer was, "Absolutely"?

2    A.  Yes.

3    **Q.**  And you were under oath; right?

4    A.  Sure, I don't see any contradiction.

5    **Q.**  So the pharmacokinetics are an improvement that have an

6    effect on the patient?

7    A.  In this case when we are talking about improvement, yes.

8    In general case, we have to know --

9    **Q.**  But we're talking about this case, Doctor.

10   A.  Okay.

11   **Q.**  Right?  We're talking about this case; right?

12   A.  Okay, fine.

13   **Q.**  And you agree that when CERA is made and the lysine is

14   reacted with the peg, that creates a change in the charge?

15   A.  It might create a change in the charge, not necessarily.

16   **Q.**  Let's look at your first report, page 42.

17   Paragraph 110, third sentence.  You say, "The change of

18   amine to amide reduces the positive charge on the protein at

19   the site of pegylation."  Right?  "The change of amine to

20   amide reduces the positive charge on the protein at the site

21   of pegylation."  Right?

22          **MR. GAEDE:**  Objection, your Honor.  This is a

23   question about other proteins, and Ms. Ben-Ami says --

24          **THE COURT:**  She may cross-examine him as to this.

25   She may have it.

1    **Q.**   Dr. Torchilin, is there a change --

2    A.   Yes.

3    **Q.**   -- in the lysine residue between an amine to an amide

4    when there's pegylation?

5    A.   Are we talking about EPO?

6    **Q.**   Yeah.

7    A.   Or --

8    **Q.**   Right?  It goes from an amine to amide; right?

9    A.   To amide, yes.

10   **Q.**   Yes.  So in this case, when the peg is chemically

11   reacted with the lysine, you get a change from an amine to

12   an amide; right?  Those are different chemicals; right?

13   A.   Those are different chemical groups, yes.

14   **Q.**   And that change reduces the positive charge on the

15   protein at the site of pegylation; correct?

16   A.   Yes.

17   **Q.**   And the pegylation reaction affects the microenvironment

18   of the different amino acid residues in CERA; correct?

19   A.   It could.

20   **Q.**   Now, when you use the term "amino acid sequence," you

21   mean it to mean the order of amino acids; correct?

22   A.   Yes.  It's what everyone means.

23   **Q.**   Well, I'm only asking about your opinion.  You don't

24   know what everyone knows; right?

25   A.   Yes.

1    **Q.**  You only know what you know; right?

2    A.  I know what community accepts.

3    **Q.**  So when you consider whether the amino acid sequence is

4    the same or not, you consider whether the DNA has been

5    changed; correct?

6    A.  I'm not sure I understand your question.

7    **Q.**  You say that the amino acid sequence is the same if the

8    DNA has coded for the same order of amino acids?

9    A.  Yes, correct.

10   **Q.**  Okay.  But an amino acid can be changed after it's made

11   by the DNA; correct?  I'll ask you a different question.

12   You look confused.

13          After the DNA has done its job and there is the

14   amino acid sequence, there can be a chemical change to the

15   amino acid residue; correct?

16   A.  It can change -- it can be post-translation and

17   modified, which is not amino acid sequence change.

18   **Q.**  Okay.  It is an amino acid change, though?

19   A.  It's a change in the side group of amino acids, yes.

20   **Q.**  It is a change in the structure of the amino acid

21   residue, isn't it?

22   A.  It might be.

23   **Q.**  Well, if we put this big peg thing on by a chemical

24   substitution and we remove the hydrogen, it is a different

25   structure at that site; correct?

1    A.   At this very site we have removed hydrogen amide bond,

2    all other changes are distant from EPO part.

3    Q.   Okay.  So I'm only talking about the part where it's

4    changed.  Where it's changed, there is a different chemical

5    structure?

6    A.   Yeah, in a single group of many hundreds, there is a

7    change, yes.

8    Q.   Okay.  So wherever it's been pegylated, there is a new

9    chemical structure?

10   A.   Yes, amine replace with amide.

11   Q.   So there's no longer amine, there's an amide?

12   A.   Correct.

13   Q.   And there's no hydrogen; that's gone?

14   A.   Correct.

15   Q.   And it's been substituted with a carbon molecule?  A

16   carbon molecule next, now; right?

17   A.   Yes.

18   Q.   So carbon versus hydrogen; right?

19   A.   Yes.

20   Q.   And along with that carbon is a whole bunch of other

21   atoms; right?

22   A.   Yes.

23   Q.   So they are not the identical chemical entities at that

24   site; right?

25   A.   Correct.

1    Q.  And if you look at what we just described to the jury,

2    that long residue, you cannot find that in any cell;

3    correct?

4    A.  You mean pegylated moiety --

5    Q.  Whether it's by pegylation or any other way, that

6    structure does not exist in a cell?

7    A.  No, pegylated moieties do not exist in cells.

8    Q.  That lysine with that carbon and all those ethylene

9    oxide residues, they don't --

10   A.  They do not exist in cell, yes.

11   Q.  So it is a non-natural amino acid at that point?

12   A.  No, incorrect.  This is a modified amino acid.

13   Q.  Is it an amino acid that's found in nature with all

14   those changes?

15   A.  What amino acid are you talking about?

16   Q.  The entity that has the amide bond and all the ethylene

17   oxides?

18   A.  This is EPO which has --

19   Q.  No, I'm talking about the residue.

20   A.  It does not exist on its own, it's part of amino acid

21   sequence of EPO.

22   Q.  That residue, that residue?

23   A.  It's part of amino acid sequence of EPO.

24   Q.  Is that residue that's now part of the amino acid

25   sequence of EPO, that residue, as you characterize it, that

1   residue, does that residue exist in nature?

2   A.  Residues do not exist at all, they are part of amino

3   acid sequences.

4   Q.  So that amino acid sequence, as you take it, take that

5   identical structure, now we've got the whole structure,

6   right, with the amine changed to an amide, the carbon

7   replacing the hydrogen, all the ethylene oxides, does that

8   compound exist in nature?

9   A.  Yes, I already said pegylated molecules do not exist in

10  nature.

11  Q.  So it's not identical to what's made in nature?

12  A.  The whole conjugate is not identical.

13  Q.  And that part where the lysine's been chemically

14  modified doesn't exist in nature?

15  A.  This I just don't know.  Maybe it does.

16  Q.  To the best of your knowledge, based on your

17  understanding as a scientist, you've never seen it existing

18  in nature?

19  A.  Exactly, I never saw it myself, which doesn't mean much.

20  Q.  Doesn't mean much, is that what you said?

21  A.  Yes, because it still might exist.

22  Q.  Okay.  But that's your knowledge?

23  A.  Yes.  That's my knowledge.

24  Q.  Is it fair to say that when you chemically change a

25  lysine, as in the case of CERA, that the amino acid is now a

1   non-protein amino acid?

2   A.  I don't know, I doubt.

3   Q.  You are aware that others in the scientific community

4   have called such chemical modifications to make those

5   residues non-protein amino acids?

6   A.  I know, I personally do not.

7   Q.  But you know that other scientists, when they see this

8   chemical reaction, this chemical modification, they say the

9   amino acid is now a non-protein amino acid?

10  A.  I'm confused.  Are we talking about EPO or amino acid?

11  Q.  We're talking about --

12  A.  It's not amino acid which is modified, it's EPO.

13  Q.  When an amino acid is chemically modified in a

14  non-natural way, are you aware that scientists in the field

15  then call that amino acid a non-protein amino acid?

16          MR. GAEDE:  Your Honor, again, I object.  Outside

17  the scope of relevance as defined by Roche.

18          THE COURT:  Yeah, are we talking about EPO

19  compounds here?

20          MS. BEN-AMI:  Yeah, we're talking about the amino

21  acids that are in EPO.

22          THE COURT:  All right.

23          MR. GAEDE:  The question was not --

24          THE COURT:  Please.  Yes, understood, but just so

25  we're focused now, he can answer.

1          **MS. BEN-AMI:**  But this is foundation to that, your

2     Honor.

3          **THE COURT:**  I'm letting you have the question.

4          **MS. BEN-AMI:**  Okay.

5     A.  As I said before, some people might call it this way.  I

6     do not.  I call it modified amino acids.  And many more

7     people would call it my way.

8     **Q.**  Okay.  In your opinion?

9     A.  In my opinion.  Certainly.

10    **Q.**  Are you familiar with the Meister book?

11    A.  Yes, I am.

12    **Q.**  And that was a famous book, in your opinion, a famous

13    book?  Right?

14    A.  It's good book, but a lot of books of this caliber.

15         **MR. GAEDE:**  Your Honor, same objection.  Outside

16    the scope.

17         **THE COURT:**  No, overruled.  In view of his answer,

18    she may have it.

19    **Q.**  You testified before that it's a famous book on

20    biochemistry on amino acids, haven't you?

21    A.  Yes.

22    **Q.**  Right?  This is the book; right?

23    A.  I don't see it from there.

24    **Q.**  There you go.

25         **MS. BEN-AMI:**  Do we have an exhibit number for the

1    book?

2    A.  Yes, this is same book.

3         **MS. BEN-AMI:**  MPZ, your Honor.

4    A.  Published 45 years back.

5         **THE COURT:**  And for identification, it's marked

6    what?

7         **MS. BEN-AMI:**  MPZ, your Honor.

8         **THE COURT:**  MPZ.  Thank you.

9    **Q.**  Would you look at the third -- would you look at page V,

10   the third sentence?

11   A.  Page?

12   **Q.**  V.

13        **THE COURT:**  In the introduction here, in what's

14   call the preface.

15        **MS. BEN-AMI:**  Right.

16   A.  No, I --

17   **Q.**  It says there --

18        **MR. GAEDE:**  Your Honor, I object.  It's hearsay.

19        **THE COURT:**  Well, it's ancient, isn't it?  And

20   overruled.

21   **Q.**  There in the preface, it says, "Thus, about 100 new

22   amino acids have been discovered and more than this number

23   of amino acid analogs have been synthesized and studied."

24        Do you see that?  I underlined it for you.

25   A.  Yes, I see it.

```
 1    Q.  So Meister, in this famous book, says that when you

 2    chemically change an amino acid, you're making an analog;

 3    correct?

 4            MR. GAEDE:  Objection, your Honor, that's hearsay.

 5            THE COURT:  Overruled.  In that -- strike that.

 6    Sustained in that form.  Both as to the characterization,

 7    but you can modify the question.

 8    Q.  Doctor, you've looked at this book?

 9    A.  Yes.

10    Q.  You were deposed on this book; right?

11    A.  Yes.

12    Q.  And you know that this famous book says that --

13            THE COURT:  I've got problems with that.  I think

14    the word "famous" came from you.

15            MS. BEN-AMI:  He agreed.

16            THE COURT:  Well, well, why don't you press that.

17    Q.  Doctor, those were your words, that it's a famous book,

18    yes?

19    A.  Yes, I do not disagree.

20            THE COURT:  I stand --

21            THE WITNESS:  It was her word but I did agree.  So

22    that's fine.

23            THE COURT:  All right.  Go ahead.  I was troubled

24    by "famous," now let's see where we go.

25            MS. BEN-AMI:  That's why I said it's a learned
```

1    treatise.

2         **THE COURT:**  Okay.

3    **Q.**  In this book it says when you chemically change an amino

4    acid it's an analog; correct?

5         **MR. GAEDE:**  Objection, your Honor, hearsay.  She's

6    not reading from the book.

7         **THE COURT:**  I understand she isn't.  She's

8    cross-examining this witness.  If that's what he gets from

9    the book, he may testify.  He's here, we can watch him.

10   Overruled.

11   **A.**  This is what is said in the book published 45 years

12   back, and a lot of knowledge and understanding change since

13   that time.  And almost nobody, except maybe few exceptions,

14   will use this terminology, our day, but it's --

15   **Q.**  Today?  You said today?

16   **A.**  Yes, our day.  But it's famous book, it's a good book,

17   everyone knows about it.

18   **Q.**  And this book was written before the patents in suit;

19   right?

20   **A.**  Yes, long before.

21   **Q.**  But the patents in suit weren't written today, they were

22   written in 1984; right?

23   **A.**  Well, much more was understood about --

24   **Q.**  Doctor, were they written in 1984 or not?

25   **A.**  Yeah, they were -- in '80s.

1   **Q.**  Certainly, in this book, when you make a chemical

2   modification, it doesn't say it's the same amino acid, does

3   it?

4   A.  I have to read the whole book to find out if that's

5   true, but people call it --

6   **Q.**  Well, it was an analog, right?

7   A.  He calls it analog.  Other people would not.

8   **Q.**  You know Dr. Meister was a very famous person in

9   science; right?

10  A.  Yes.

11          (Whereupon counsel conferred.)

12  **Q.**  You looked at Dr. Lodish's book?

13  A.  I believe I did.

14          **MS. BEN-AMI:**  Can I have T10?

15          **MR. GAEDE:**  Do you have a copy, Ms. Ben-Ami, of the

16  exhibit?

17          **MS. BEN-AMI:**  The jury has seen this before.

18          **THE COURT:**  Well, I allowed it to be put up there

19  but it's not an exhibit.

20          **MR. GAEDE:**  Objection, your Honor.  It has to be

21  taken down.

22          **THE COURT:**  No, I've allowed them to see what

23  purports to be a learned treatise, to see it, but it's not

24  evidence -- strike that -- it is not to be sent to the jury

25  room.  It is evidence.  She may use it.

1    Q.  You said just now that you have seen Dr. Lodish's book;

2    right?

3    A.  Yes.

4    Q.  And here, written many years later, Dr. Lodish also says

5    that when you chemically modify an amino acid it's a

6    different amino acid; right?

7              MR. GAEDE:  Objection, your Honor.  Misreading the

8    statement out of the book.

9              THE COURT:  Overruled.  We'll see what he says.

10   What she says is not evidence.  It's what the witness says

11   and what the jury gets from reading it, if they can, but I

12   can't at this distance.

13   A.  Well, I can read it because it's exactly what I'm

14   saying.  It says that chemical modification of amino acids,

15   and this is how I call it, it's chemical modification of

16   amino acid residues.

17   Q.  And chemical modification of amino acids account for

18   this difference?

19   A.  For difference between amino acids, exactly.

20   Q.  So what this book is saying, by Dr. Lodish, is that

21   chemically modified amino acids are different than the

22   natural amino acids; correct?

23             MR. GAEDE:  Objection, your Honor.  Hearsay.

24   A.  No, this is not what is said here.  It's said here that

25   chemical modification of amino acids accounts for

1    difference.  Never calls it analogs or amino acids.  So it

2    uses exact terminology I'm talking about.  Absolutely.

3             **THE COURT:**  Wait, wait a minute.  I'm a little bit

4    behind, but in view of the answer do you press the

5    objection?

6             **MR. GAEDE:**  No, your Honor.

7             **THE COURT:**  You do not.  Withdrawn.

8    **Q.**  It says although cells use the 20 amino acids shown in

9    Figure 2-14, in the initial synthesis of proteins, analysis

10   of cellular proteins reveals that they contain upward to 100

11   different amino acids; do you see that?

12   A.  Yes.

13   **Q.**  The 80 -- so there's 20 to start with; right?

14   A.  Yes.

15   **Q.**  And then there's 80 more; right?

16   A.  Yes.

17   **Q.**  And then those 80 different amino acids are because of

18   chemical modification; right?

19   A.  Yes, they can be produced by chemical modification,

20   exactly.

21   **Q.**  And they're different amino acids than the ones that are

22   not chemically modified?

23   A.  Derivatives if you --

24   **Q.**  They're different, yes or no?

25   A.  Yes, they are different.

1    **Q.**  Now, you agree that if you -- a person -- strike that.

2          **MS. BEN-AMI:**  Your Honor, I need to have a sidebar

3    before I go into this, because I wasn't sure about one of

4    your rulings.

5          **THE COURT:**  Yes.

6    SIDEBAR CONFERENCE, AS FOLLOWS:

7          **MS. BEN-AMI:**  I wasn't clear from one of your

8    rulings.  Are you saying that I cannot put in evidence that

9    Amgen was not able to make peg-EPO after they received their

10   patent?

11         **THE COURT:**  Yes.  Yeah, because it has nothing to

12   do with the case.  We're playing the claims against your

13   product.

14         **MS. BEN-AMI:**  I believe, your Honor, under the

15   doctrine of equivalents that is incorrect.  And I am

16   pressing my objection.  You're telling me I'm overruled.

17         **THE COURT:**  I am, and your rights are, of course,

18   saved.

19         **MS. BEN-AMI:**  I didn't want to waive it.  I would

20   be doing this otherwise.

21         **THE COURT:**  I appreciate it.  You made it clear.

22         (Whereupon the sidebar conference concluded.)

23   **(BY MS. BEN-AMI:)**

24   **Q.**  You agree, Doctor, that the chemistry that Roche uses to

25   make CERA was not known prior to 1985; correct?

1          **MR. GAEDE:**  Objection, your Honor, relevance.

2   Phasing of the case.

3          **THE COURT:**  She may have that one question.

4   Overruled.

5   A.  I don't know.

6          **THE COURT:**  He doesn't know.

7   Q.  Would you look at your deposition, Volume 2?

8          **MR. GAEDE:**  Press the objection, your Honor.

9          **THE COURT:**  No, she may have that one question, and

10   we'll see if he so testifies.

11          **MS. BEN-AMI:**  Page 362, line 25.

12   A.  362?

13   Q.  Purple one.  362, line 25.

14          "QUESTION:  Well, let me ask you this first.  Did

15   you consider whether or not the specific reagent that Roche

16   uses to make its CERA was available in the art in 1985 in

17   forming your opinions?

18          "ANSWER:  In 1985 this chemistry was not used

19   for -- I mean, in general this chemistry was not used.

20          "QUESTION: The chemistry that Roche uses was not

21   used?

22          "ANSWER:  Not only Roche, the chemistry based on

23   N-oxysuccinimide esters was not used prior to 1985."

24          Is that your testimony?

25   A.  Yes.  It doesn't mean that it was not known.  Those are

1   different statements.

2   **Q.**  So it wasn't used?

3   A.  It wasn't used, yes.

4   **Q.**  Now, your testimony is basically that CERA and EPO have

5   the same biological activity because they both make red

6   blood cells; right?

7   A.  Not only.  In part, yes.

8   **Q.**  But you know that Amgen uses a different definition of

9   biological activity; correct?

10  A.  Did we give any definition biological activity so far?

11  **Q.**  Well, you said in your direct that molecules have the

12  same biological activity because they both bind to the EPO

13  receptor and the EPO receptor works; right?

14  A.  They do bind to the same receptor.  This binding results

15  in the same biological effect, yes.  So they make us more

16  close to what biological activity is, correct.

17  **Q.**  But you know that what Amgen considers what biological

18  activity is, they include the in vivo half-life?

19          **MR. GAEDE:**  Your Honor, objection.

20  A.  You're asking for my opinion.

21          **MR. GAEDE:**  Objection, your Honor.

22          **THE COURT:**  Overruled.

23          **MR. GAEDE:**  Relevance, not tied specifically --

24          **THE COURT:**  Overruled.  He may -- do you press the

25  objection in view of his answer?  Actually, that's a

1    misplaced comment.  It's overruled, and she may press it.

2    Q.  Let me hand you what has been marked as DAX for

3    identification purposes.

4         **MR. GAEDE:**  Your Honor, I object to this.  This

5    document relates to a different protein, NESP, that you just

6    ruled was outside the scope.

7         **THE COURT:**  Well, she can hand it back.  Let's see

8    if there's any question.

9    Q.  Would you look at page 4.  And this is the only part of

10   the document I'm going to ask you about.

11        This is a document written by Amgen; correct?

12   A.  By scientists from Amgen.

13        **MR. GAEDE:**  Objection, your Honor, hearsay.

14        **THE COURT:**  Well, if he knows, he can give the

15   testimony, but I don't know -- have you ever seen this

16   before?  Sir, you?

17        **THE WITNESS:**  I cannot recall.  Maybe.

18        **MS. BEN-AMI:**  It's in his report.

19        **THE WITNESS:**  Yeah, might be seen.

20        **THE COURT:**  It's referenced in his report?

21        **THE WITNESS:**  Then I saw it.

22        **THE COURT:**  Yes.  All right.  Thank you.  Put your

23   question.

24   Q.  Amgen, when talking about biological activity, says that

25   it was a clinical need that would be addressed by creating a

1  molecule with enhanced in vivo bioactivity to allow for less

2  frequent dosing to patients, correct?

3         **MR. GAEDE:**  Again, objection, your Honor.

4         **THE COURT:**  Sustained, in view of my earlier

5  rulings.  Sustained.

6         **MS. BEN-AMI:**  Your Honor, can I have a sidebar on

7  this issue?

8         **THE COURT:**  You can.

9  SIDEBAR CONFERENCE, AS FOLLOWS:

10        **THE COURT:**  We're simply not interested in what

11  Amgen did or didn't do.

12        **MS. BEN-AMI:**  I'm not asking that question.  I want

13  you to be clear what I'm asking.  I'm not asking about NESP

14  at all.  All I'm doing is this witness is saying he defines

15  biological activity solely as being activity at the receptor

16  site.  And what I'm saying is Amgen uses in vivo bioactivity

17  to include half-life and effect on less frequent dosing.

18        **THE COURT:**  Why don't you then say, But you

19  understand that Amgen itself doesn't do that, do they?  Read

20  this.

21        **MS. BEN-AMI:**  That's what I thought I was doing.  I

22  wasn't asking him anything about NESP.

23        **THE COURT:**  I didn't understand that, and since

24  it's in his report, we'll see if he takes it that way.  But

25  we're not introducing this document, but you can inquire of

```
 1    him.
 2              MR. GAEDE:  Your Honor, I object that the statement
 3    here is related to NESP.  It's not in the claims.
 4    They're --
 5              THE COURT:  You'll have redirect.
 6              (Whereupon the sidebar conference concluded.)
 7    (BY MS. BEN-AMI:)
 8    Q.  So looking at page 4, in the top, all I'm asking you is
 9    this:  Do you agree that when Amgen is characterizing
10    bioactivity, they consider less frequent dosing to be a
11    factor in bioactivity?
12              MR. GAEDE:  Objection, your Honor.
13              THE COURT:  Overruled.  Is that how you read that,
14    sir?  You, yourself?
15              THE WITNESS:  What is written by two scientists
16    from Amgen, I don't know if it -- is that the point of Amgen
17    as a company, but this is what they wrote here.  And if I
18    would be there, I would force them to rewrite this sentence.
19    Q.  You disagree with what these two scientists wrote at
20    Amgen?
21    A.  The way they wrote it.
22    Q.  These two scientists are Joan Egrie and Jeffrey Browne?
23    A.  Yes.
24    Q.  So you disagree with how Dr. Browne, who the jury met,
25    characterizes what in vivo bioactivity means?
```

1    A.  I would just use different terminology.

2              **MR. GAEDE:**  Objection, your Honor.

3              **THE COURT:**  No, overruled.  His answer may stand.

4    **Q.**  You agree that CERA satisfies a clinical need for

5    enhanced in vivo bioactivity to allow for less frequent

6    dosing in patients; correct?

7              **MR. GAEDE:**  Objection, your Honor.

8              **THE COURT:**  Overruled.

9              **MR. GAEDE:**  Your Honor, may I have a sidebar?

10             **THE COURT:**  I don't think that's necessary.  He may

11   answer.

12   A.  Since we decided that I am not an M.D., I cannot comment

13   on medical patients.

14             **THE COURT:**  That's his answer.

15   **Q.**  In your deposition --

16             **MS. BEN-AMI:**  I'm sorry?

17             **THE COURT:**  That's his answer.

18             **MS. BEN-AMI:**  Yes.

19   **Q.**  Can I have your deposition?  Look at your deposition,

20   Volume 2, which is the purple one.  Okay.  In this it talks

21   about --

22             **MR. GAEDE:**  What page?

23             **MS. BEN-AMI:**  471.

24   **Q.**  "QUESTION:  Now on this page, next paragraph that

25   carries over there's a sentence.  It says, 'It was

1    anticipated that this clinical need could be addressed by

2    creating a molecule with enhanced in vivo bioactivity to

3    allow for less frequent dosing in patients.'  Do you see

4    that?"

5              And your answer is, "Yes, I do."

6              **MR. GAEDE:**  Objection, your Honor.  Objection, your

7    Honor.

8              **THE COURT:**  Wait a minute.  Wait a minute.  There's

9    an objection.  Overruled.  She may have it.

10   **Q.**  "QUESTION:  Do you have an opinion whether or not CERA

11   satisfies that clinical need that's being discussed here?

12             "ANSWER:  I don't like the word 'bioactivity,'

13   because again, bioactivity is not anything you can enhance

14   or decrease.  Bioactivity is a physiological response to a

15   certain factor, and the value of this response or longevity

16   of this response already belongs to another field which is

17   pharmacokinetics and pharmacodynamics.  But if you replace

18   'bioactivity' with 'extended residence time in the body,' I

19   would agree with that."

20             So there you're saying you don't like the word

21   bioactivity; right?

22   A.  Yes.

23   **Q.**  Right.  But --

24             "QUESTION:  But CERA satisfies this?

25             "ANSWER:  From what I know -- from what I know, it

1    does."  Right?

2    A.  After we -- correct, yes, I do agree.

3    Q.  So you agree that CERA satisfies the clinical need for a

4    molecule that allows for less frequent dosing in patients?

5          MR. GAEDE:  Objection, your Honor.

6          THE COURT:  Overruled.  He may be pressed on that.

7    A.  For better pharmacokinetics.

8          COURT REPORTER:  I'm sorry, I didn't hear that

9    answer.

10          MS. BEN-AMI:  "For better pharmacokinetics."

11   Q.  That's what you said, Doctor?

12   A.  Yes.

13   Q.  And but you agree that CERA satisfies that clinical

14   need?

15   A.  I assume it does.

16   Q.  And you said, "From what I know, it does"?

17   A.  Exactly.  That's what I assume it does from what I know

18   it does.

19   Q.  Do you agree, Doctor -- you agree that for CERA having

20   the pharmacokinetics that are different than EPO -- strike

21   that.

22          You agree that CERA has better pharmacokinetics

23   than EPO; correct?

24   A.  It has different pharmacokinetics than EPO.

25   Q.  It has better pharmacokinetics; correct?

 1   A.  If you need to keep it in the body longer, yes, correct.

 2   Q.  Let's look at your deposition.  Page 258, it's the first

 3   one.  First one, 258.

 4   A.  258, I'm sorry.

 5           MR. GAEDE:  258?

 6   Q.  I'm sorry.  258.

 7   A.  Uhm-hmm.

 8   Q.  Line 20, right?

 9           "QUESTION:  Given the fact that the CERA stays in

10   the body longer, doesn't that mean that CERA would have a

11   longer clinical effect" --

12           MR. GAEDE:  Your Honor, I'm sorry, I object.  This

13   is not -- no inconsistency.

14           THE COURT:  Overruled.  She may have it.

15   Q.  Well, in this document you say, "So if I have to

16   understand the question, does pegylated EPO has a better" --

17   the word "better" is there; right?

18   A.  Yes.

19   Q.  -- "pharmacokinetics than EPO, my answer is yes."  Is

20   that correct?

21   A.  Yes.

22   Q.  "It certainly does."  Right?

23   A.  Yes.

24   Q.  You say that?

25   A.  Yes.

```
 1   Q.  So CERA does have better pharmacokinetics than EPO;
 2   correct?
 3   A.  If it results in better longer clinical effect, it does.
 4   Q.  And then you say that's why it's a good drug?
 5   A.  Yes.
 6   Q.  Right?
 7   A.  Yes.
 8   Q.  So CERA has better pharmacokinetics than EPO; correct?
 9   A.  Correct.
10        MR. GAEDE:  Objection, your Honor.
11   Q.  And that's why it's a good drug; right?
12   A.  Yes.
13        THE COURT:  Overruled.  Is that it for this
14   witness?
15        MS. BEN-AMI:  I believe so, your Honor.  Just let
16   me check my notes.
17        THE COURT:  Of course.
18        MS. BEN-AMI:  Thank you, your Honor.
19        THE COURT:  All right.  Mr. Gaede?
20        MS. BEN-AMI:  I had one more question, your Honor.
21        THE COURT:  Oh, I'm sorry.  I don't mean to go too
22   quick.
23   Q.  You agree that that pharmacokinetic improvement had an
24   effect on the patient; correct?
25   A.  Can you repeat, please?
```

1   Q.   You agree that that pharmacokinetic improvement has an

2   effect on the patient; correct?

3   A.   According to what I know, yes.

4           **MS. BEN-AMI:**  No further questions, your Honor.

5           **THE COURT:**  Mr. Gaede, anything further?

6           **MR. GAEDE:**  Yes.

7                        **REDIRECT EXAMINATION**

8   **(BY MR. GAEDE:)**

9   Q.   In considering your opinions, did you consider the

10  pharmacokinetics of Mircera?

11  A.   Yes, sure, I did.

12  Q.   Now, Ms. Ben-Ami also talked about the size,

13  hydrodynamic radius.  Did you consider those factors in

14  formulating your opinion as well?

15  A.   Sure, I did.

16  Q.   And why didn't those change your opinion?

17          **MS. BEN-AMI:**  Objection, your Honor.

18          **THE COURT:**  Overruled.

19  A.   Because it doesn't change the most important

20  characteristics of a substance:  Its structure, its

21  biological function, and its utility.  The changes in

22  pharmacokinetics do not relate to either of those

23  parameters.  So this is why, despite they might be good or

24  bad, it does not execute a material change, in my opinion.

25          **MR. GAEDE:**  Could we look at Exhibit 58, please, in

1    Roche's BLA submitted to the FDA.  Could we show that first

2    page, please?  It's in evidence.

3    **Q.**  Now, Doctor, based upon your review of this page, did

4    Roche tell the FDA that the amino acid sequence of EPO was

5    changed by the pegylation?

6    A.  Quite opposite.  It exactly say that identical amino

7    acid sequence.  And by the way, this exactly the way I see

8    it.

9    **Q.**  Now, could we -- all right.

10          And as you read this, did Roche tell the FDA that

11   it had a non-natural amino acid sequence?

12          **MS. BEN-AMI:**  Objection, leading.

13   **Q.**  In Mircera?

14          **THE COURT:**  Yeah, sustained.  You are leading the

15   witness.

16          **MR. GAEDE:**  Okay.

17   **Q.**  What, if anything, does this section here tell you about

18   whether there's a non-natural amino acid in Mircera?

19   A.  Nothing.  As I said, it's not an accepted terminology

20   anymore.  So it's modified amino acid, so it is modified,

21   but amino acid sequence is exactly the same.

22   **Q.**  And as we look here, do we see a non-natural amino acid,

23   that term used, as you read that section?

24          **MS. BEN-AMI:**  Leading.

25          **THE COURT:**  Sustained on that ground.

1    Q.  Now, just a couple other questions.

2         You were asked to read from your second report and

3    you were asked to read the first two sentences of the report

4    at Paragraph 66.  But Ms. Ben-Ami didn't ask you to read the

5    third sentence.  Could you please read that, that whole

6    paragraph, to the members of the jury, Paragraph 66 of your

7    second report?

8    A.  Yes.

9    Q.  Please read it.

10   A.  The whole paragraph?

11   Q.  Yes, the whole paragraph.

12   A.  "Dr. Langer's report states that conjugating peg to EPO

13   results in a new chemical entity.  From an elementary

14   composition (atomic) standpoint, I do not disagree.

15   However, for the reasons stated in my First Expert Report, I

16   disagree that the pegylation of EPO materially changes the

17   EPO protein."

18   Q.  Now, I'd like to turn to your third expert report, the

19   red one.  Ms. Ben-Ami had you read from your first one about

20   charge in general, but I'd like you to please read from your

21   third expert report, at Paragraph 8, and what you're

22   specifically addressing, peg-EPO, and I'd like you to read

23   the last three sentences, please?

24        MS. BEN-AMI:  I object to this, your Honor.

25        THE COURT:  Sustained, in that characterization.

1    He can't testify as to what's being addressed, and while I

2    certainly follow the doctrine of completeness, I think

3    you've gone too far there.  Sustained.

4    **Q.**  Did you, in your opinions, address specifically whether

5    the pegylation of epoetin beta by Roche changed the charge

6    of one amino group in that protein?

7    A.  Yes, I did.  And I addressed it in my expert report.

8    **Q.**  Yes.  And is Paragraph 8 in your third expert report

9    where you address that?

10   A.  Yes.

11   **Q.**  And --

12           **MS. BEN-AMI:**  I'm going to object to this, your

13   Honor.

14           **THE COURT:**  Well, you didn't object to that

15   question.

16   **Q.**  And in your opinion, does pegylation affect any net

17   change in charge for the amino acid that is pegylated in

18   EPO?

19           **MS. BEN-AMI:**  Objection.

20           **THE COURT:**  The objection's overruled.  He may

21   testify.

22   A.  Not physiological conditions.

23   **Q.**  And also in that section that we looked at in the BLA,

24   did you see any mention of charge in that section?

25   A.  No, because --

1          **MS. BEN-AMI:**  Objection, your Honor.

2          **THE COURT:**  Wait.  Wait a minute.  That's beyond

3     the scope.  Sustained.

4     **Q.**  I wanted you -- there was the further testimony in your

5     deposition that Ms. Ben-Ami did not read.

6          **MR. GAEDE:**  Your Honor, I'd like to read that

7     section now, it's page 26, line 25.

8          **THE COURT:**  You may read that, and continuing over

9     into the -- the answer on 27, and that's it.

10          **MR. GAEDE:**  Right, to line 19.

11          **THE COURT:**  Yes.

12     **Q.**  "Okay.  That's fine.  And I just want to make sure that

13     we're clear about one thing.  In your opinion, in the body

14     is CERA cleaved so that you get the activated peg molecule

15     and the original EPO beta?

16          "ANSWER:  I don't know that, but I cannot exclude

17     it.

18          "QUESTION:  Do you have any proof -- do you have

19     any proof that there is such cleavage?

20          "ANSWER:  I don't have any proof, but I have a

21     general scientific knowledge which tells me that since the

22     bond between peg and EPO in pegylated EPO is an amide bond,

23     and in the body there is a pretty strong so-called

24     amidolytic activity, which means that there is a whole

25     family of enzymes which are called 'amidases,' and those

1    amidases specifically cleave amide bonds.  So despite those

2    amidases, in the process of evolution, they are designed,

3    they are created -- appear to cleave a certain specific

4    bond -- I'm trying to be on the scientific side --

5    somehow --"

6            **MR. GAEDE:**  Thank you, Doctor.

7            **THE COURT:**  Nothing further?

8            **MS. BEN-AMI:**  I do.

9            **THE COURT:**  Go ahead.

10           **MS. BEN-AMI:**  Your Honor, it will be quick but it

11    was raised on redirect.

12                      **RECROSS-EXAMINATION**

13    **(BY MS. BEN-AMI:)**

14    **Q.**  In your deposition, the purple one, on page 424, you

15    were asked the following question and you gave the following

16    answer; correct?  Question -- it's right here.

17           "Listen to my question.  My question is, after

18    pegylation reaction at position 45, do you agree that that

19    position will not be positively charged at physiological

20    pH?"

21           What did you say?

22    **A.**  "Yes, I do."

23    **Q.**  So at physiological pH, it's not positively charged?

24    **A.**  It was not charged before, it is not charged after, so

25    there was no change in the charge, yes.

1    **Q.**   After it is not positively charged?

2    A.   Exactly.

3    **Q.**   Fine.  Now, can we put up the BLA, that part that

4    Mr. Gaede just asked you?  Exhibit 58.  Can we blow this,

5    "Both EPO" and the second sentence.  You don't like -- let's

6    read the second sentence.

7         "RO0503821," that's CERA; right?

8    A.   It's a question?  Yes.

9    **Q.**   "Differs from erythropoietin"; right?  It says that?

10   A.   Yes.

11   **Q.**   "Through integration of an amide bond between either the

12   N-terminal amino group or the epsilon amino group of lysine,

13   predominantly lysine 52 and lysine 45 and methoxy

14   polyethylene glycol-succinimidyl butanoic acid."  That's a

15   mouthful.  You see that?

16   A.   Yes.

17   **Q.**   So it says the molecules differ because of a change from

18   an amine bond to an amide bond; correct?

19   A.   Yes.

20   **Q.**   Thank you.  No further questions.

21   A.   This does not change amino acid sequence.

22        **MS. BEN-AMI:**  No further questions.

23                  **REDIRECT EXAMINATION**

24   **(BY MR. GAEDE:)**

25   **Q.**   Does that sentence change your opinion that --

1         **MS. BEN-AMI:**  Objection.

2    **Q.**  -- Mircera has an identical amino acid sequence?

3         **THE COURT:**  Wait a minute.  My "wait a minute" was

4    actually to you, Ms. Ben-Ami.  He may ask the question.  Put

5    your question.

6         **MR. GAEDE:**  Yes.

7    **Q.**  Is that sentence that Ms. Ben-Ami just read to you, does

8    that change your opinion that Mircera contains the identical

9    amino acid sequence as EPO?

10   A.  Not at all.

11        **THE COURT:**  No further questions for this witness?

12   Is that right, no further questions?  You may step down.

13        (Whereupon the witness stepped down.)

14        **THE COURT:**  Subject to the documents we have to

15   work through, is that Amgen's case on infringement?

16        **MR. DAY:**  No, sir.  Amgen also calls Adrienne

17   Farid.

18        **THE COURT:**  She may be called, or he may be called.

19        **THE CLERK:**  Would you raise your right hand,

20   please?

21        Do you solemnly swear that the answers you will

22   give to this Court and Jury will be the truth, the whole

23   truth, and nothing but the truth, so help you God?

24        **THE WITNESS:**  Yes.

25        **THE CLERK:**  Please be seated.

```
 1                        ADRIENNE FARID

 2                     DIRECT EXAMINATION

 3    (BY MR. GALVIN:)

 4    Q.  Good afternoon, Dr. Farid.

 5    A.  Good afternoon.

 6    Q.  We've not met before, have we?

 7    A.  No.

 8    Q.  My name is Rob Galvin.  I represent Amgen.

 9         Would you please state your full name?

10    A.  Adrienne Rayfield Farid.

11         THE COURT:  Ma'am, pull that mike a little closer

12    to you.

13         THE WITNESS:  Okay.

14         THE COURT:  So it picks up you.

15         THE WITNESS:  Okay.

16         THE COURT:  That's fine.

17    Q.  And you work for Roche; right?

18    A.  Yes, I do.

19    Q.  And you've worked for Roche since 1995?

20    A.  Yes.

21    Q.  In 1999 you were a project manager for peg-EPO?

22         MS. CARSON:  Objection, your Honor.

23         THE COURT:  Sustained.  Leading the witness.

24         MR. GALVIN:  Your Honor, Ms. Farid is a Roche

25    witness, adverse witness.
```

1          **THE COURT:**  I mistook that, forgive me.  And the

2    form is appropriate.

3          Is that true?

4          **THE WITNESS:**  In 1999 I had a role in the project

5    team for the development project that would become CERA.

6    **Q.**  And your title was project manager for peg-EPO; correct?

7    A.  My title was principal scientist, and pharmaceutical and

8    analytical R&D department.  I had a role as a local project

9    leader for the CERA global project team.

10   **Q.**  Let me hand you what's been marked for identification as

11   GXY.  Do you recognize GXY?

12   A.  Yes, I recognize this.

13         **MR. GALVIN:**  Your Honor, I offer GXY as a Roche

14   admission.

15         **THE COURT:**  No objection, is there?

16         **MS. CARSON:**  No objection.

17         **THE COURT:**  GXY is admitted, Exhibit 60 in

18   evidence.

19         (Exhibit marked in evidence.)

20         **MR. GALVIN:**  If we could highlight the paragraph

21   under the "Announcement, Adrienne Farid"?

22   **Q.**  This is a November 10th, 1999 memo; correct?

23   A.  Yes.

24   **Q.**  And it states, "It's a pleasure to announce Adrienne

25   Farid as NCD project manager for peg-EPO with immediate

1    effect"; correct?

2    A.  It's stated on this memo.

3    **Q.**  Now, you worked with a Dr. Anton Haselbeck at Roche;

4    right?

5    A.  Yes.

6    **Q.**  And Dr. Haselbeck was the preclinical science leader for

7    peg-EPO; correct?

8    A.  Uhm --

9           **MS. CARSON:**  Objection, no foundation.

10          **THE COURT:**  Overruled.  The question isn't

11   testimony, we'll see if the answer is.

12   A.  Tony Haselbeck held a variety of roles in the CERA

13   discovery and development process.

14   **Q.**  Was one of his roles as the preclinical team leader or

15   science leader?

16   A.  One of his roles was, at some point, was the preclinical

17   team leader for the Penzberg Group.

18   **Q.**  And you worked with Pascal Bailon?

19   A.  Yes.

20   **Q.**  And Mr. Bailon was the Roche scientist responsible

21   for -- primarily responsible for making the peg-EPO molecule

22   now known as CERA; correct?

23   A.  Pascal ran the research lab and actually was the

24   inventor of the CERA molecule.

25   **Q.**  Let me hand you what's been marked for identification as

```
 1    Exhibit EZH.  Do you recognize Exhibit EZH as an e-mail that

 2    you -- as an e-mail dated November 4th, 1999 from Pascal

 3    Bailon?

 4    A.  Okay, yes.

 5              MR. GALVIN:  Your Honor, I offer Exhibit EZH.

 6          THE COURT:  No objection?

 7          MS. CARSON:  No objection.

 8          THE COURT:  EZH may be admitted, Exhibit 61.

 9          THE CLERK:  Sixty-one.

10          (Exhibit marked in evidence.)

11    Q.  The subject line on this e-mail is, "Description of

12    peg-EPO"; correct?

13    A.  That's the -- one would read the subject line as,

14    "Description of peg-EPO."

15    Q.  So the answer is yes?

16    A.  Yes.

17    Q.  At the top of the second page of the exhibit, there is a

18    statement, "Peg-EPO RO50-3821 is comprised of human

19    erythropoietin which is mono-pegylated."  Do you see that?

20    A.  I see that.

21    Q.  On the same page, a little bit farther down, Dr. Bailon

22    provided a chemical structure for peg-EPO; correct?

23    A.  It looks to me like this --

24          MS. CARSON:  Objection, no foundation.

25          THE COURT:  No, overruled.  If she's capable of
```

1    interpreting it, she may.

2    Q.  And my question, Dr. Farid, was just in Mr. Bailon's

3    e-mail, he provided a chemical structure for peg-EPO;

4    correct?

5    A.  I don't --

6            MS. CARSON:  Objection.  The document speaks for

7    itself.

8            THE COURT:  The document does.  We're getting her

9    interpretation.

10           Do you know?

11           THE WITNESS:  I don't see a chemical structure of

12   what we referred to as peg-EPO as the abbreviation of the

13   CERA molecule.  I see starting material structures here.

14   Q.  Do you see at the top on the screen, "Peg-EPO has the

15   following chemical structure"?

16   A.  Yes.

17   Q.  And then there are a series of letters, C's and H's,

18   under it; correct?

19   A.  Right.

20   Q.  And this is an attachment to the e-mail that Mr. Bailon

21   sent you on November 4th, 1999; correct?

22   A.  Yes, it is.

23   Q.  Could we turn to the last page of the exhibit?  If we

24   could highlight the phrase, "Both EPO and peg-EPO have

25   identical amino acid sequence and composition."

1        Do you see that sentence?

2   A.  I see the sentence.

3   **Q.**  And this was also contained in the e-mail that

4   Mr. Bailon sent to you in November 1999; correct?

5   A.  Yes.

6   **Q.**  And if you continue on to the next sentence, it states,

7   "The only difference in the composition of native and

8   modified proteins is due to the formation of an amide bond

9   between the amino group of EPO and the peg molecule at the

10  point of attachment."

11       Do you see that?

12  A.  I see that.

13  **Q.**  And that was included in Mr. Bailon's description of

14  peg-EPO to you in 1999; correct?

15  A.  That's included in the e-mail.

16  **Q.**  Let me show you what's been marked for identification as

17  Exhibit FBG.  If you look at Exhibit FBG, your name is in

18  the top right-hand corner; correct?

19  A.  Yes, it is.

20       **MR. GALVIN:**  Your Honor, I offer Exhibit FBG as a

21  Roche admission.

22       **THE COURT:**  Any objection?

23       **MS. CARSON:**  As a Roche document, we have no

24  objection.  Not necessarily as a Roche admission.

25       **THE COURT:**  We're not taking the characterization

1    from him, but where it's no objection, makes it admissible.

2    FBG in evidence as Exhibit 62.

3              (Exhibit marked in evidence.)

4              **MR. GALVIN:**  Thank you, your Honor.

5    **Q.**  Dr. Farid, at the top there's a reference to a peg-EPO

6    PDP.  What was "PDP" an abbreviation for?

7    A.  I believe product development plan.

8    **Q.**  And in the second paragraph under the heading

9    "characterization," there's a sentence that states, "Results

10   indicate that the integrity of the EPO molecule including

11   its glycosylation is maintained through the peg modification

12   reaction and purification procedure."

13             Can you see that sentence?

14   A.  I see that sentence.

15   **Q.**  And if you look at the next sentence, it states,

16   "Experiments to date indicate that peg modification does not

17   affect the EPO sequence, disulfide bonding or carbohydrate

18   structure."

19             Do you see that sentence?

20   A.  Yes.  That the -- I believe at the time that this was

21   written these results were communicated.

22   **Q.**  You see that sentence in this document; correct?

23   A.  Yes, I see it.

24   **Q.**  Let me show you what's been marked for identification as

25   Exhibit EPH.  Do you recognize -- let me just withdraw that.

1          This document is entitled, "Long-lasting forms of

2     polyethylene glycol conjugated erythropoietin peg-EPO";

3     correct?

4     A.  Yes.

5     Q.  And you were listed as one of the authors on this

6     document; correct?

7     A.  Yes.

8              MR. GALVIN:  Your Honor, I offer Exhibit EPH.

9              THE COURT:  Any objection to EPH?

10             MS. CARSON:  No objection, your Honor.

11             THE COURT:  EPH is admitted, Exhibit 63.

12             (Exhibit marked in evidence.)

13    Q.  Dr. Farid, is Exhibit 63 a regulatory document?

14    A.  It states on it that it's a regulatory document, but I

15    can just clarify for your understanding that it's --

16    "regulatory document" means it may or may not be used for

17    regulatory submission.

18    Q.  And this document is dated August 17th, 2001?

19    A.  Yes, it is.

20    Q.  And you reviewed and signed this report; correct?

21    A.  Yes.

22    Q.  And you believed it to be true and accurate when you

23    reviewed and signed it in August 2001; correct?

24    A.  Uhm, yes, that would be represented by my signature.

25    Q.  If we turn to R001556170, in the report, Exhibit 63,

1    under the heading, "EPOsf," your report says that the EPO

2    used to make peg-EPO is, quote, The product of a cloned

3    human EPO gene inserted into and expressed in the ovarian

4    tissue cells of the Chinese hamster CHO cells; correct?

5    A.  You've -- I don't -- I can't answer your question as yes

6    or no.  It's very general, what you've asked me.

7    Q.  Does the sentence, "It is the product of a cloned human

8    EPO gene inserted into and expressed in the ovarian tissue

9    cells of the Chinese hamster CHO cells" appear in your

10   August 2001 report?

11   A.  Yes, that sentence appears.

12   Q.  And if we turn to page 177 of your report, at the top,

13   first sentence, your report states, "Amino acid analysis has

14   indicated that EPOsf and peg-EPOsf have identical amino acid

15   sequence and compositions (data not shown)."  That's what it

16   says; correct?

17   A.  Uhm, it -- it says that in the document.  However, I

18   can --

19   Q.  That's all you need --

20   A.  -- explain.

21   Q.  Counsel for Roche will ask you to give an explanation.

22        And your report goes on to state on the same page,

23   that next sentence, "The only difference in the composition

24   of native and modified proteins is due to the formation of

25   an amide bond between EPO and the peg molecule at the

1    point of attachment."  Correct?  That's what it says?

2    A.  I see that sentence.

3    Q.  And if we turn to Figure 3 of your 2001 report, there is

4    a figure entitled, "Synthesis of peg-EPO."  Correct?

5    A.  Yes.

6    Q.  And the bottom left, that begins, "CH3O" shows the

7    chemical formula for peg-EPO; correct?

8    A.  Uhm, I cannot answer that as yes, no.  So my answer is

9    no.

10   Q.  And can you answer what the letters EPO at the bottom of

11   the page represent?

12   A.  Uhm, in this figure, which is basically a very

13   oversimplified representation, the EPO here would refer to

14   the starting material.  Because the peg modification of EPO

15   actually causes amino acid structures to be changed, not

16   only the N-terminus.  So this is kind of a cartoon but not

17   an actual representation of what the CERA molecule looks

18   like.

19   Q.  And it is the figure that was contained in the -- in

20   your regulatory report dated August 21 -- August 17th, 2001;

21   correct?

22   A.  Yes, I see the figure in the paper.

23   Q.  Now, at Roche, was the research and development

24   committee sometimes referred to as the RDC?

25   A.  Yes, that's right.

1    **Q.**  Did you help prepare presentations for RDC meetings?

2    **A.**  I have helped prepare presentations for RDC meetings,

3    but to be honest, I don't recall specifically at this time.

4    **Q.**  Did you ever attend any RDC meetings in your career at

5    Roche?

6    **A.**  Yes, I've attended RDC meetings.

7    **Q.**  Now, Dr. Farid, the EPO used to make CERA is expressed

8    in recombinant cells; correct?

9          **MS. CARSON:**  Objection.  No foundation.

10          **THE COURT:**  If she knows, she may answer.

11    **A.**  Yeah, I would -- I'm really not an expert in that area,

12    so I would prefer not to answer.

13    **Q.**  While you worked on CERA at Roche, you also worked on an

14    alternative to CERA called SEP, S-E-P; correct?

15          **MS. CARSON:**  Objection.

16          **THE COURT:**  Overruled.  We'll give him a few

17    questions.

18    **A.**  I did also work, I wouldn't call it alternative to CERA,

19    as you stated.  I worked on a project called synthetic

20    erythropoietin, yes.

21    **Q.**  And SEP stands for synthetic erythropoiesis protein?

22    **A.**  Yes.

23    **Q.**  The SEP protein was not expressed in recombinant cells;

24    correct?

25          **MS. CARSON:**  Objection, no foundation.  Irrelevant.

```
 1            THE COURT:  Yeah, I'm troubled with the relevance

 2    here.  You may have that question.  But the next one, the

 3    relevance better be glaringly apparent or we're stopping.

 4            Yes, you can answer that one.

 5    A.  The synthetic -- the SEP project did not utilize

 6    erythropoietin-like molecules that were produced in

 7    cell-based techniques.

 8    Q.  SEP had a different amino acid sequence than the EPO

 9    used to make CERA?

10            MS. CARSON:  Objection, relevance.

11            THE COURT:  Sustained.

12            MR. GALVIN:  Your Honor, may I have a sidebar?

13            THE COURT:  You certainly may.  And you may step

14    down, ma'am.

15            (Whereupon the witness stepped down.)

16    SIDEBAR CONFERENCE, AS FOLLOWS:

17            THE COURT:  Now, you people are going on as if

18    there's no end here.  There is.  If you want 45 minutes for

19    closing, and if you're going to give me an hour, and I may

20    need more than an hour, but since we've got that day with

21    two hours, there's a little play in there, but I'm not

22    giving you any extra time.  Functionally, you've got

23    approximately an hour left on your feet.  An hour.

24    Understand that.

25            Okay.  Now, what I want to know is you very much
```

1    want to put on inequitable conduct to the jury last, I won't

2    let you.  Your rights are, of course, saved.  So I want to

3    know -- and in answer to my question you have to understand

4    what the schedule is.  I was mistaken when I have to go to

5    the doctor's.  I have to go tomorrow, not Wednesday.  So we

6    start tomorrow at 11:00 and we go until 1:00.  Wednesday,

7    forget my class, we're starting at 9:00 because I want to

8    see if I can't get it to the jury on Wednesday, with the

9    idea that then maybe we'll get a verdict by the close of

10   business on Friday.

11          So I'm transparent.  That's what I want to do.

12          Now, there's no more time for equitable --

13   inequitable conduct, but my mind is open on it, and I'll

14   give you Thursday, if that's what you want to do.  On the

15   other hand, if you want to run out the clock wrestling about

16   infringement, well, then I won't tell them anything about

17   Wednesday.  That's what we're talking about.  Whether it

18   goes to the jury on Wednesday.

19        **MS. BEN-AMI:**  So let me be clear about this, your

20   Honor.  I think if you do -- you have taken inequitable

21   conduct from the jury, I don't see any reason why then the

22   time, just like you took double patenting away from the

23   jury --

24        **THE COURT:**  No, no, that wasn't their proposal.  No

25   one's getting any more time on inequitable conduct.  That

```
 1    was the deal.  I'm not going back on that.  It's not a time

 2    to argue.  I want to know what you want to do.

 3              MS. BEN-AMI:  So I believe we have how many hours

 4    left?

 5              MR. FLEMING:  We should still have at least four

 6    and a quarter hours left by --

 7              THE COURT:  You probably do.  Amgen's ahead of you,

 8    but of course you're going to take 45 minutes out of that

 9    for your closing argument.

10              MR. FLEMING:  When we spoke on Wednesday, and I

11    know you didn't endorse anything, but what we explained was

12    there were seven hours between Monday and Wednesday.

13              THE COURT:  It's a 20-day trial.  I know how many

14    hours there are, and I know what my score is.  You're at

15    approximately eight days -- I'll announce it precisely.

16    They're at nine -- I think you're at eight days two hours

17    and 30 minutes as of 1:00 today.  They're at nine days one

18    hour.  So that leaves you, total, three and a half hours,

19    four and a half hours from -- but out of that, comes 45

20    minutes for closing, and half of my hour charge, which may

21    be longer than that.  So you're effectively looking at three

22    and a quarter, let's say.

23              MR. DAY:  Your Honor --

24              THE COURT:  Wait a minute, I'm with them.  Tell me

25    what you want to do.  Is it going to the jury on Thursday,
```

1    and you're going to run up all this time on infringement, or

2    is it going to the jury on Wednesday?

3           Now, even if we have arguments and charge, I won't

4    take the whole day and I'll give you perhaps the first hour

5    on Wednesday.

6        **MS. BEN-AMI:**  My concern is that if I save half an

7    hour for inequitable conduct, does that put us at giving it

8    to the jury on Wednesday?  I can't do the math.

9        **THE COURT:**  If you save a half an hour for

10   inequitable conduct --

11       **MS. BEN-AMI:**  -- to the Court on Thursday, does

12   that get it to the jury on Wednesday?  I just can't do the

13   math right here.

14       **THE COURT:**  I think so, because I've got the two

15   hours tomorrow.  We've got two hours tomorrow, plus we have

16   an hour on Wednesday.  There's three hours.  It doesn't

17   quite do it, but it does it.

18       **MS. BEN-AMI:**  I think we might get to the point of

19   you at least doing your charge.  I'm not sure, with the

20   math -- we need to do the math together.  So my answer to

21   you, your Honor, is I'm going to save some small amount of

22   time, whether it's half an hour or an hour, on inequitable

23   conduct.

24       **THE COURT:**  Now, let me ask Mr. Day a question.  Is

25   this your -- this adverse witness is your last witness,

1    right?

2         **MR. DAY:**  Yes.

3         **THE COURT:**  Last live witness.  Can we -- you're

4    not hurt if I entertain their motion for directed verdict

5    this afternoon, where I have a little time, before you've

6    formally rested because you've shot as much as you want?

7    And Mr. Day is nodding.  And for the argument, we would

8    assume, without ruling, as I did before, that the documents

9    you want in evidence are all in evidence, the ones in the

10   most recent binder.

11        Okay.  I'm going to tell them maybe Wednesday.

12        **MR. DAY:**  Your Honor, I just beg your indulgence on

13   one issue, and that's your time allocation.  I know you're

14   very reluctant to hear this but let me just, if I may.  When

15   we had the charging conference, I believe I had the same

16   understanding that Mr. Fleming had, but perhaps not.

17        I understood, coming away from the charging

18   conference, that the time remaining for both parties was

19   that they were two hours ahead, that we had three and a

20   quarter hours --

21        **THE COURT:**  The transcript is what it is.  I'm

22   telling you you're burning up time as though there's no end.

23   There's an end.

24        **MR. FLEMING:**  Thank you, your Honor.

25        (Whereupon the sidebar conference concluded.)

1          **THE COURT:**  Here's what that's all about.  It may

2     be we can give you the case on Wednesday.  Not Thursday, but

3     on Wednesday.  I can't promise.  I wanted to promise, but I

4     can't promise.  And that's fair.  That's fair.  Because they

5     have to calculate what's left in their time.  So this is my

6     responsibility, not their responsibility.

7          Also, I've made a mistake in my personal life.  I

8     told you that we were going to start late on Wednesday.

9     That's my mistake.  We're going to start late tomorrow.  And

10    Wednesday we'll start right at 9:00.  I know we've been

11    starting at 9:30 on Wednesday but I now know the schedule

12    anyway very clearly.

13         So here's the schedule, so we're clear.  Tomorrow,

14    Tuesday, don't need to be here until 11:00.  That's my

15    responsibility, I've told you.  I've had the doctor's

16    appointment.  I was mistaken as to the day.  So it's

17    Tuesday, tomorrow.  We will work 11:00 to 1:00, no break,

18    right through.  I'll tell you tomorrow whether you're

19    getting the case on Wednesday.

20         So if you're getting the case on Wednesday, you'll

21    understand we need you all afternoon.  We won't be holding

22    court and talking to you all afternoon, but you will

23    commence your deliberations lunchtime Wednesday.  On the

24    other hand, maybe that crowds the parties too much, and I'm

25    not going to do that.  Fair is fair.  Maybe we will do what

 1    I originally told you, that we'll get you the case on

 2    Thursday.  So I will tell you that, we'll work Wednesday,

 3    finishing up, and we will give you the case then on

 4    Thursday.  It's no longer, and it may be shorter, but I

 5    have -- I'm not going to foul up your afternoons, but if

 6    you're looking to do something early Wednesday morning, I am

 7    fouling that up.  Because we're starting at 11:00 tomorrow.

 8    And we will start at 9:00 on Wednesday.  And if it is

 9    Thursday, 9:00 on Thursday.  And at the latest, by 1:00 on

10    Thursday this case is in your hands.

11          For now, you have not heard all the evidence.

12    Please, therefore, keep your minds suspended.  Do not

13    discuss the case either among yourselves nor with anyone

14    else.  You may stand in recess until 11:00 a.m. tomorrow

15    morning.  The jury may recess.  I'll remain on the bench.

16          **THE CLERK:**  All rise for the jury.

17          (Whereupon the jury left the courtroom.)

18          **THE COURT:**  Please be seated.  Total elapsed time

19    stands Amgen, nine days one hour; Roche, eight days two

20    hours 30 minutes.  We'll recess in this case and we'll have

21    argument on Roche's expected motion for directed verdict on

22    validity at 3:00 p.m. this afternoon.  We'll recess until

23    that time.  Not on validity, infringement, excuse me.  We'll

24    recess.

25          (Recess.)

1

2                    **PROCEEDINGS - 3:03 P.M.**

3

4          **THE CLERK:**  All rise.  Court is in session, please

5    be seated.

6          Calling Civil Action 05-12237, Amgen v. Hoffmann-La

7    Roche.

8          **THE COURT:**  I contemplate no more than 15 minutes a

9    side.  This is an argument on Roche's expected motion for a

10   directed verdict at the close of the plaintiff's evidence of

11   infringement.  And so I will hear Ms. Ben-Ami first.

12         Have you got anything in writing today?  I am, as I

13   did before, and I will take it under advisement because

14   Amgen has not formally rested.

15         **MS. BEN-AMI:**  I have something that I -- is that

16   ready to go?  I think we need to just finalize it.  We can

17   get it to you by the end of today?

18         **THE COURT:**  I'm transparent.  Nothing's going to

19   happen this afternoon, but I would like something in

20   writing.

21         **MS. BEN-AMI:**  Yes.

22         **THE COURT:**  I'll hear you.

23         **MS. BEN-AMI:**  We'll have something in writing.

24         So, your Honor, as a formality we do move for a

25   directed verdict on all of Amgen's claims of infringement,

1    both literally, doctrine of equivalents, and to the extent

2    that there is any equivalent reverse doctrine of

3    equivalents, on that as well.

4         I would like to focus the Court on the '349 claim.

5    This is -- Mr. Fleming insisted on holding the charts and

6    that was the rub.

7         Your Honor will recall this.  This is the --

8         **THE COURT:**  '349, section 7.

9         **MS. BEN-AMI:**  Yes.

10        **THE COURT:**  I have it very much in mind.

11        **MS. BEN-AMI:**  Determined by RIA.

12        In this case, there has been no proof whatsoever of

13   any test determining what the amounts are by RIA.  Now, this

14   is a very particular claim.  Because it doesn't say just

15   this amount of EPO in 48 hours and it doesn't just say as

16   determined by any assay and it doesn't just say as

17   determined by any immunoassay.  It says determined by

18   radioimmunoassay, which is a very, very specific test.  And

19   having made that claim limitation in the patent for this

20   particular claim, Amgen needs to prove by a preponderance of

21   the evidence that, determined by this particular specific

22   method, the claims make this amount of EPO.  So, you know,

23   Amgen has many different patents and they have many

24   different claims.  But this patent with this claim is very,

25   very specific.

```
1              And the only evidence that Amgen proffered was

2      evidence about a different test called an ELISA test.  And

3      this claim doesn't say ELISA test.  This says

4      radioimmunoassay.  The opinion of Dr. Lodish that, you know,

5      he just says, well, it could be or it might be or I think

6      they're similar, doesn't meet Amgen's burden.  Because this

7      isn't a claim that says it even just makes EPO and determine

8      that by radioimmunoassay.  These claims talk about a very

9      specific amount of EPO.  And given that there's a very

10     specific amount of EPO, you have to use the actual test

11     because different tests give different amounts.

12             So, I think that I will just rest with that except

13     to say Amgen says in TKT they're allowed to put in evidence

14     of an ELISA test.  But in TKT, Dr. McGowan testified, and he

15     did do RIA tests.  Those similar tests are not in evidence

16     in this case.  So, in TKT you did have RIA tests, in this

17     case you do not.

18             My second point would be that Amgen has not met its

19     burden on the doctrine of equivalents as to any claim in

20     this case.  On the doctrine of equivalents, your Honor, we

21     had a side bar on this issue, and on the doctrine of

22     equivalents, your Honor, I mentioned to you Federal Circuit

23     law, which at that time your Honor said you had recalled,

24     which said that to prove doctrine of equivalents you must

25     say this is the element of the claim that we are going to
```

1    assume, recognizing that Amgen thinks there's literal

2    infringement.

3            **THE COURT:**  Let me ask you to pause for just one

4    second.  Let me speak with the clerk.

5            (Whereupon the Court and the Clerk conferred.)

6            **THE COURT:**  Go ahead.

7        **MS. BEN-AMI:**  The law on the doctrine of

8    equivalents quite simply is you have to say, assuming this

9    element of the claim is not there literally, is there an

10   equivalent to that element of the claim.  You cannot take

11   the claim as a whole, you have to do an element-by-element

12   analysis under the doctrine of equivalents.  And this is

13   Lemelson v. U.S., it's just one of many cases, 752 F.2d

14   1538, is a Fed. Circuit case, 1985.

15           And then you have to say are the differences

16   insubstantial.  And generally speaking, we use the

17   function-way-result test.  Here, there was no statement,

18   assume that this element is not met and then tell us why

19   there's a doctrine of equivalents to that element.  And that

20   is a -- it's a very specific test in the Federal Circuit,

21   and it's, and indeed, the concept that Amgen proffered to

22   your Honor, which is, well, we just did it in a big bulk all

23   together, is the test that the Federal Circuit has

24   specifically rejected.  You cannot take the whole claim and

25   compare it to something else and say, well, they're pretty

1    much the same.  That's just not allowed under Federal

2    Circuit law.

3            I would cite to your Honor also the Genentech v.

4    Wellcome case, which is 29 F.3d 1555, Fed. Circuit, 1994,

5    that says under the doctrine of equivalents you can't say

6    that anything that acts like a protein, just because it has,

7    for example, biological activity, therefore, it's an

8    equivalent.  And that case is a very important case.  That's

9    the tPA case.  I've cited that to you before.  Because it

10   specifically says there that changes in binding affinity and

11   in half-life are material changes.  We'll get to that.

12           But on the doctrine of equivalents, my first point

13   is as a matter of law they have not put in the proper

14   evidence for the doctrine of equivalents.

15           Second, as matter of law, I raise again Festo.

16           **THE COURT:**  But, wait a minute.  I think you're

17   previous on Festo.  Because if you look at my most recent,

18   my most recent Amgen opinion, which went up and was reversed

19   on other grounds, there's a whole discussion of prudentially

20   how Festo should work out.  And prudentially how Festo works

21   out, I never have to reach that unless the jury finds

22   equivalents, infringement by equivalents.  If they find

23   infringement by equivalents, you can understand I will, it's

24   all matter of law, so we're not concerned about time limits

25   or evidentiary presentation, in your motion then for

1    judgment notwithstanding the verdict you will, as one of the

2    many sections, if they go equivalents, of course I have to

3    reject your first argument to get there, but that's the time

4    to raise it.  It's just previous.  I haven't even thought

5    about Festo in this case.

6          Now, unless I'm missing something, if I determine

7    to put equivalents to the jury, unless I'm missing

8    something, I think you would save time to go on to something

9    else.

10         **MS. BEN-AMI:**  Well, the one point I would make,

11   your Honor, is this.  That Amgen had the burden in this case

12   to -- we've put in the evidence that there were narrowing

13   amendments.  They were in the file wrappers.  That's already

14   in evidence.  Amgen had the burden of proof to put in

15   evidence rebutting the presumption that there were narrowing

16   amendments that precluded the doctrine of equivalents.

17   That's their burden.  And they had to put in proof that

18   there was an unforeseeability, et cetera.

19         **THE COURT:**  No, respectfully, the answer to that is

20   no.  I have said, as boldly as I know how, that this is one

21   of those strange areas where the Federal Circuit has

22   declared that something is matter of law when

23   quintessentially it is matter of fact for the judge.  But

24   the record upon which this judge will make the determination

25   is, as you say, before me.  I'm not going to be reopening

1    the record to receive anymore evidence.  But -- and I don't

2    say I would do the same thing as I did in TKT.  Necessarily

3    you're not bound and my mind must be open.  But once there's

4    a verdict that says you've infringed by the doctrine of

5    equivalents, and only then will I be hearing both sides'

6    arguments from the undisputed record.  So move on.

7         **MS. BEN-AMI:**  I will move on, your Honor.

8         So, then let's go to the '933 patent.  And, your

9    Honor, we believe based on the record, in the most favorable

10   light to Amgen at this point, there can be no literal

11   infringement for these claims.  These claims are

12   product-by-process claims.  And product-by-process claims

13   you will recall, we've discussed this before, it's where

14   someone claims that they can't historically, where someone

15   claims that they can't define the product other than by the

16   process and then they get a product.  And in a

17   product-by-process claim you must infringe by having the

18   identical product.  It must be identical.

19   And we heard today from Dr. Torchilin and we heard

20   a week or so ago from Dr. Lodish, and both those Amgen

21   experts said that, even using their term, the EPO part of

22   CERA, we don't agree there's an EPO part, but what they call

23   the EPO part, they have both admitted it's not identical to

24   what comes out of the cell.  They have both admitted that

25   there's a deletion of a hydrogen and a substitution with a

1    carbon.  Both of them have admitted it.  And I can't cite

2    you to Dr. Torchilin's testimony, obviously, because I don't

3    have the transcript.

4         But can I have No. 77.  Yes.  So if you look here,

5    this is Dr. Lodish's testimony.  And Dr. Lodish is saying

6    that the nitrogen and hydrogen bond is replaced by a

7    nitrogen peg bond.  That hydrogen is gone.  And you may

8    recall that I spent time with him saying, you are saying

9    they are not identical, the EPO part is not identical, to

10   EPO that comes from a cell.

11        Put aside the peg part.  Put aside that.  As

12   Amgen's characterizing it.  And I'm saying this most

13   favorable to Amgen, because we look at this as one molecule.

14   But even if you look at that, what they call the EPO part

15   and you look at that lisine, there is a deletion.  Dr.

16   Lodish testified to it and Dr. Torchilin testified to it

17   today again.  I asked him, I said:  Are you saying there's a

18   deletion?  He says yes.  And he also said there is a

19   difference in the carbohydrate structure.  He characterizes

20   it as slight.  The BLA says it's slight.  But it's there.

21   And for literal infringement it has to be the identical

22   product of the process.

23        So even if you go with Amgen's it's-in-there

24   philosophy, it's not all in there.  And both Amgen experts

25   on this point admitted this.

```
 1              THE COURT:  Go back one slide, the one you put
 2      before, yes.
 3              MS. BEN-AMI:  To the claims, please.
 4              THE COURT:  The claims you think are vulnerable on
 5      this, 3, 9 and 11.
 6              MS. BEN-AMI:  It's all the '933 claims, your Honor,
 7      that are in this case.
 8              THE COURT:  You think all of them?  You just threw
 9      up 3, 9 and 11.
10              MS. BEN-AMI:  That's just my example.  Here they
11      are.  Because they all depend one from the other.  And if
12      you --
13              THE COURT:  I follow.
14              MS. BEN-AMI:  As your Honor knows --
15              THE COURT:  I follow.
16              MS. BEN-AMI:  -- if you miss one element of one
17      they all go down.  So let's go look at it.
18              This is a product --
19              THE COURT:  That may not be necessary.  I just
20      wanted to understand --
21              MS. BEN-AMI:  Right.
22              THE COURT:  -- the scope of your argument.  And you
23      have about a minute left, so sum up.
24              MS. BEN-AMI:  Well, your Honor, I would also say to
25      your Honor that as a matter of law based on this case, this
```

1    Monsanto v. Syngenta case, for the process claims, this case

2    tells you that where you do part of the process before the

3    issuance of the patent there can't be infringement.  And for

4    both process claims, parts of the process were done before

5    the issuance of the relevant patents, and under this case

6    there can't be infringement because of the time issue.

7         Finally, your Honor, I would say there are many

8    more issues, we'll put them in briefs for you, but I would

9    say this.  Your Honor heard today from Dr. Torchilin that

10   there is a material change between EPO and CERA.  He said it

11   very loud and clear.  He said there is a substantial

12   difference in pharmacokinetics, better pharmacokinetics, and

13   that it affected the outcome for patients and that's --

14        **THE COURT:**  Respectfully, I understand the

15   argument.

16        Mr. Day.

17        **MR. DAY:**  Thank you, your Honor.

18        Well, I see two arguments that I should respond to,

19   '349 claim 7 and the '933.  I'm happy to respond to the

20   others if the Court would like us to.

21        **THE COURT:**  Use your time as you see fit.  I'm

22   going to take the matter under advisement.

23        **MR. DAY:**  Well, let me dispose first of all then of

24   the doctrine of equivalents.  Where claims literally

25   infringe there's no need to prove the doctrine of

1   equivalents.  This is a motion for directed verdict.  That

2   means that Roche needs to come forward on a claim-by-claim

3   basis and show with specificity what claim element is

4   missing, and it's as to that claim element that Amgen then

5   would have proof of infringement under the doctrine of

6   equivalents.

7        THE COURT:  Well, if you put all your -- that's

8   true.  But I contemplate a jury verdict that would give

9   literal infringement and then would give doctrine of

10  equivalents infringement.

11       MR. DAY:  Correct.

12       THE COURT:  Now, if I buy this argument, you're to

13  the jury on, unless she wins on one of these other

14  arguments, you're to the jury on literal infringement but

15  not as to doctrine of equivalents.  I just take that --

16       MR. DAY:  Well, but my point is --

17       THE COURT:  -- out.

18       MR. DAY:  -- that Roche has no particularized

19  showing where there's a deficiency of proof with respect to

20  any claim or any claim element.

21       THE COURT:  No.

22       MR. DAY:  So when --

23       THE COURT:  You're right.  Except that, except

24  that, I must tell you her argument depending upon Lemelson

25  does resonate with the Court.  And one of the curious things

1    is, and I said I've been working from your proposed charge,

2    and I do appreciate it, you've taken my charge in Read v.

3    Powerscreen.  And that was a pretty good charge.  And also I

4    said in Read v. Powerscreen if ever there was a case for,

5    not to the jury, if ever there was a case for infringement

6    by the doctrine of equivalents this is the case.

7           Now, if you look at the subsequent history of that

8    case, in nothing more than a memorandum decision, they

9    didn't even write a decision, they said reverse.  Why?

10   Because the proponent did not go element by element to point

11   out the similarity of the function, the means and the

12   result.

13          **MR. DAY:**  And in that --

14          **THE COURT:**  So that, I must tell you that argument

15   resonates with me.

16          **MR. DAY:**  And with all due respect, in this case

17   Amgen has done that and Dr. Lodish did that.  And we think

18   the evidence that's in the record is more than substantial

19   to carry that burden.

20          **THE COURT:**  All right.

21          **MR. DAY:**  So, if I turn to the '349 claim.  The

22   '349 claim -- let me first of all be very clear that the

23   Supreme Court and the Federal Circuit do not require direct

24   evidence of infringement.  Circumstantial evidence of

25   infringement is just as solid and just as good evidence of

1    infringement as direct evidence of infringement.  And that

2    means there need not be proof in this case of an experiment

3    performed using RIA.  The jury from circumstantial evidence

4    may infer that Roche's product and Roche's process meet the

5    claim limitation from the evidence it's presented.

6          THE COURT:  Even without expert testimony on

7    the point?

8          MR. DAY:  Well, they have expert testimony on the

9    point.  And they have expert testimony on the point in three

10   respects, your Honor.  The first evidence they have is from

11   Dr. Lodish with respect to the ELISA results where he goes

12   through Roche's BLA and he points out how the ELISA is an

13   equivalent test to an RIA, it uses a very specific antibody

14   just like RIA, it has an internal control just like RIA, and

15   it calculates the quantity, the amount of product just like

16   RIA.  And in his experience and in his understanding it

17   comes to an equivalent result.  And you can transfer that

18   result, and he calculated how to do that.  And the argument

19   that Roche makes about going to in vivo assay is a red

20   herring.  All you have to do is look at Goldwasser's 1977

21   paper where he used an in vivo assay to calibrate a

22   radioimmunoassay.  So this is a red herring.

23          That's one leg of the circumstantial evidence.  The

24   second leg is that Dr. Lodish also opined that he reviewed

25   RIA results and relied upon them.  And the third leg of his

1    opinion is, or the third leg of the evidence put before the

2    Court is that Roche practices the very same process, they

3    use the very same cells, transformed with the very same DNA,

4    amplified in the very same way, stepwise amplification, and

5    it's a very reasonable inference drawn from that that when

6    you put all of those things together that, yes, they

7    infringe the claims, particularly where the evidence shows

8    on the basis of the ELISA results that the rate at which or

9    the level at which they're producing is 15 times greater

10   than what is required as a minimum amount.  That's with

11   respect to '349.  And I would simply point the Court to the

12   Supreme Court's decision in Michalic, cited in our papers,

13   and also to the Federal Circuit decision in Liquid Dynamics

14   about the power and the weight to be given to circumstantial

15   evidence.

16          Let me turn to the '933 claims for a second.  And

17   do we have the -- could you put the '933 claim up.  That's

18   okay.

19          It's a nonnaturally-occurring glycoprotein product

20   for the expression of an exogenous DNA encoding human

21   erythropoietin in a mammalian cell.  It's the product of the

22   expression.  There is no particular structural limitation

23   imposed upon that product because it is a product-by-process

24   claim.

25          So, what's the significance of a product-by-process

1   claim.  Where you have a product -- where I disagree --

2       **THE COURT:**  Let me just ask you this.  You do agree

3   that these claims in '933 are product-by-process --

4       **MR. DAY:**  Yes, sir.

5       **THE COURT:**  -- claims.

6       **MR. DAY:**  Yes, I do.

7       They're also limited by source.  They're limited

8   both as a product of process and they're limited by source.

9   Nonnaturally-occurring is a source limitation as the Federal

10  Circuit has determined and the product of the expression is

11  a product-by-process limitation.

12      Where I disagree with Ms. Ben-Ami is that one need

13  not have the identical product to infringe.  Because it is a

14  product by process and it does not exclude the addition of

15  structure and it doesn't exclude the performance of

16  additional processes.  And that's the teaching of Amstar and

17  that's the teaching of Samsung, both cited to you, to the

18  Court in our papers.

19      In fact, could I have the Amstar.  I wish I had

20  numbers on them.  I'm sorry.  Here we go.

21      Seminal case by Judge Markey, Chief Judge Markey in

22  the Federal Circuit, shortly after the circuit was formed:

23  Modification by mere addition of elements or functions,

24  wherever made, cannot negate infringement without disregard

25  of the long-established hornbook law.

1           An accused product or process cannot escape

2    infringement by the mere addition of elements or functions

3    beyond those claimed.

4           The avoidance of infringement merely through the

5    addition of elements not recited in the claims would stand

6    the law of infringement on its head.

7           And why would it stand the law of infringement on

8    its head?  In the example I've repeatedly given the Court,

9    if I invent a process for producing an engine and that

10   process is used to produce an engine and someone takes that

11   engine and drills a couple of holes in it and bolt straps it

12   into a car and ships it into the U.S. in a car, the fact

13   that they attached an automobile body around the car does

14   not obviate their infringement of my claim to the engine or

15   of my claim to the process of producing the engine.

16          Let me turn to Samsung.

17          Dow Chemical -- I'm sorry, Sumitomo.  Dow Chemical

18   v. Sumitomo:  An accused method does not avoid literally

19   infringing a method claim simply because it employs

20   additional steps.  The process described by the claim is

21   clearly part of a larger process that may encompass

22   preliminary or subsequent steps.

23          In such cases, an accused process does not avoid

24   infringement by additional steps, regardless of whether such

25   steps were extraneous or mere colorable variations.

1          And all Roche points to here is the performance of

2     additional steps.  And that's why it does not take them out

3     from infringement.

4          The last point -- I know the Court's time is

5     short -- the last point I want to address.  I haven't had a

6     chance to read the Monsanto case that Ms. Ben-Ami handed up

7     to you.  But I think I understand what she's arguing.  She,

8     if I understand correctly, is arguing that you cannot

9     infringe a process claim where a step of the process was

10    performed before the patent issued.  I won't quibble with

11    that.  I'll assume arguendo that's the law.

12         The claims here have two steps, growing cells and

13    isolating EPO.  Both steps are performed currently.  No step

14    of the claims -- if we could have -- it's not this claim.

15    If we could have '698 claim 6 or '868 claim 1 or '349 claim

16    7.

17         **THE COURT:**  Your, your point is that Monsanto must,

18    and I haven't read it either, deal with the situation where

19    in fact the alleged infringing result is of a process that

20    started prior to the patent application.

21         **MR. DAY:**  The steps of the process.  One step of

22    the process must have been performed --

23         **THE COURT:**  Prior.

24         **MR. DAY:**  -- to claim the process, must have been

25    prior to the issuance.

1          THE COURT:  And your point is --

2          MR. DAY:  Both steps are performed.

3          THE COURT:  -- that the Mircera that they want to

4     put on the market now is from stuff grown and isolated

5     after.

6          MR. DAY:  So, for example, let me, let me show my

7     example right here.  This is '698 claim 6.  A process for

8     the production of glycosylated EPO having the enabled

9     biological activity to increase, comprising the steps of.

10    Two steps.  First step, growing, under suitable nutrient

11    conditions, vertebrate cells comprising amplified DNA

12    encoding the mature erythropoietin amino acid sequence.

13         THE COURT:  Well, now, let's, actually throwing

14    that up raises a question I want to ask you that hasn't been

15    raised.

16         Both that claim, claim 6, and claim 4 of the '698

17    patent refer to the amino acid sequence of Figure 6.

18         MR. DAY:  Yes.

19         THE COURT:  Isn't it the case, in light of the

20    affirmance by the Federal Circuit of this Court's approach

21    to the matter in the TKT case, that you cannot on claims

22    that reference Figure 6 have literal infringement because

23    Figure 6 has 166 --

24         MR. DAY:  No, that's wrong.

25         THE COURT:  -- places.  Well, take -- you have

1    three minutes left.

2            **MR. DAY:**  I'll be happy to take --

3            **THE COURT:**  Help me out on that because it seems to

4    me you may be stuck as a matter of issue preclusion.

5            **MR. DAY:**  No.  No.  Because the Court, the Court

6    will recall the Federal Circuit affirmed this Court's

7    finding on remand that TKT infringed this claim with a 165

8    EPO.

9            **THE COURT:**  Oh, correct, under the doctrine of

10   equivalents.

11           **MR. DAY:**  No, not under the doctrine of

12   equivalents, under the doctrine of literal infringement.

13           **THE COURT:**  I'll review it.

14           **MR. DAY:**  And the reason is because you have to

15   read the claim.  The claim says DNA, not, not amino acid

16   sequence.  It says DNA.  The question is whether Roche's

17   cells comprise a DNA that encodes the mature erythropoietin

18   amino acid sequence of Figure 6.  Dr. Lodish showed you that

19   it does, that their cells contain that DNA.  They use that

20   DNA in those cells, amplified, and then they infringe

21   because they grow those cells under suitable nutrient

22   conditions and they isolate polypeptide expressed by the

23   cells.  Whatever polypeptide the cells express, and there's

24   no limitation about what that structure is, infringes.

25   That's what this case held in TKT and that's what the

1    Federal Circuit affirmed.

2              **THE COURT:**  Thank you.  I'll go back and look.

3              There's one more thing that I want to do here and

4    it has to do with the jury verdict.  And I was talking

5    quickly at the side bar, and everything I said I stand by.

6    But, I would like to take a look at Amgen's proposed jury

7    verdict, and actually there's things there I like better.

8    So let's, let's assume that everything is in the case, that

9    I don't knock anything out based on these arguments

10   tomorrow.

11             I would like a jury verdict slip that conforms to

12   the Amgen approach with the following changes.  Strike out

13   all this business about, if you go one way it's for Roche

14   and if you go the other way it's for Amgen.  That does not

15   commend itself to me.

16             **MR. DAY:**  Is that the sentence, your Honor, you're

17   referring to or --

18             **THE COURT:**  Yes, that's the sentence --

19             **MR. DAY:**  Okay.

20             **THE COURT:**  -- I'm referring to.

21             **MR. DAY:**  Yes.

22             **THE COURT:**  Also -- but I like, I like your matrix

23   on Page 2 where you've highlighted validity, who must prove,

24   Roche, burden of proof, clear and convincing.  But I want to

25   reverse the columns.

1          **MR. DAY:**  Yes.

2          **THE COURT:**  So that valid is first, because of

3     course you have the presumption of validity.  Invalidity is

4     second, and all the grounds of invalidity that pertain to

5     the specific claim are set out briefly.  Don't go valid and

6     invalid, just leave blanks.  I like checks.

7          Then over on the, what's Page 3, I like the 2A, I

8     like 2B.  I just don't want circling boxes.  I like the

9     checks business.  But here the columns should be reversed.

10    You bear the burden of proof.

11         **MR. DAY:**  Yes.

12         **THE COURT:**  So the first column should be not

13    infringed and in both literal and under the doctrine of

14    equivalents.

15         Let me see a verdict slip that looks like that

16    tomorrow.  And we can strike out Page 4 because I've decided

17    that's now for the Court.

18         (Whereupon the Court and the Clerk conferred.)

19         **THE COURT:**  Ms. Smith didn't hear me say that on

20    invalidity I wanted the grounds detailed as they relate to

21    each claim, but I do want that.

22         **MR. DAY:**  Yes.

23         **THE COURT:**  All right, I just would like to see

24    that format.  We'll work from it.  And so we'll recess then

25    until eleven o'clock.

 1          **MR. FLEMING:**  Your Honor, may I broach one subject

 2    with you, please.

 3          **THE COURT:**  You may.

 4          **MR. FLEMING:**  And I'll do it briefly.  This has to

 5    do with the Dr. Spinowitz issue.

 6          **THE COURT:**  Yes.

 7          **MR. FLEMING:**  Amgen told you that Dr. Farid was

 8    their last witness and they're going to rest.  There's still

 9    this issue about Dr. Spinowitz.

10          **THE COURT:**  You know, an hour's going to take care

11    of it.  They only have an hour.

12          **MR. FLEMING:**  Well, your Honor, he's a practicing

13    physician --

14          **THE COURT:**  He may be.

15          **MR. FLEMING:**  -- and he's being pulled away from

16    his patients.

17          **THE COURT:**  He may -- I'm supremely unsympathetic

18    to that --

19          **MR. FLEMING:**  Understood.

20          **THE COURT:**  -- given --  yes.

21          **MS. BEN-AMI:**  Your Honor, it's just that if we

22    bring him, if we can get him and he comes, they need to put

23    him on.  That's -- this shouldn't be an effort to drag Dr.

24    Spinowitz here and then they don't put him on.  That's

25    the point.

1          THE COURT:  I will be extremely disappointed if

2    they don't put him back on and spend some time with him.

3    And they only have a limited amount of time.  So they're

4    going to have to work that out with you.

5          Eleven o'clock tomorrow morning.  We'll recess.

6          MR. FLEMING:  Thank you.

7          MR. DAY:  Thank you.

8          THE CLERK:  All rise.  Court is in recess.

9          (Adjournment.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    **C E R T I F I C A T E**

2

3

4          We, Donald E. Womack and Cheryl B. Palanchian,

5    Official Court Reporters for the United States District

6    Court for the District of Massachusetts, do hereby certify

7    that the foregoing pages are a true and accurate

8    transcription of our shorthand notes taken in the

9    aforementioned matter to the best of our skill and ability.

10

11

12

13

14          /S/ DONALD E. WOMACK
            _____

15          /S/ CHERYL B. PALANCHIAN
            _____

16

17                  DONALD E. WOMACK
                  CHERYL B. PALANCHIAN
                  Official Court Reporters
18                   P.O. Box 51062
            Boston, Massachusetts 02205-1062
19              womack@megatran.com

20

21

22

23

24

25