1          UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF MASSACHUSETTS
2
                                    Civil Action
3                                   No. 05-12237-WGY

4    * * * * * * * * * * * * * * * *
                                   *
5    AMGEN, INC.,                  *
                                   *
6            Plaintiff,            *
                                   *   **DAILY TRANSCRIPT**
7    v.                           *   **OF THE EVIDENCE**
                                   *   (Volume 19)
8    F. HOFFMANN-LA ROCHE LTD,     *
     ROCHE DIAGNOSTICS GmbH and    *
9    HOFFMANN-LA ROCHE, INC.,      *
                                   *
10           Defendants.           *
                                   *
11   * * * * * * * * * * * * * * * *

12

13

14           BEFORE:  The Honorable William G. Young,
                      District Judge, and a Jury

15

16

17

18

19

20

21

22

23
                              1 Courthouse Way
24                            Boston, Massachusetts

25                            October 16, 2007

1                    A P P E A R A N C E S

2

3          DUANE MORRIS LLP (By D. Dennis Allegretti,
    Esq. and Michael R. Gottfried, Esq.), 470 Atlantic
    Avenue, Suite 500, Boston, Massachusetts 02210
4               - and -
           DAY CASEBEER MADRID & BATCHELDER, LLP (By
5    Lloyd R. Day, Jr., Esq., David M. Madrid, Esq. and
    Robert M. Galvin, Esq.) 20300 Stevens Creek
6    Boulevard, Suite 400, Cupertino, California 95014
                - and -
7          McDERMOTT WILL & EMERY (By Michael Kendall,
    Esq.), 28 State Street, Boston, Massachusetts
8    02109
                - and -
9          McDERMOTT WILL & EMERY (By William G.
    Gaede, III, Esq.), 3150 Porter Drive, Palo Alto,
10   California 94304
                - and -
11         MARSHALL, GERSTEIN & BORUN LLP (By Kevin M.
    Flowers, Esq.), 6300 Sears Tower, 233 S. Wacker
12   Drive, Chicago, Illinois 60606-6402
                - and -
13         STUART L. WATT and WENDY A. WHITEFORD, Of
    Counsel, Amgen, Inc., One Amgen Center Drive,
14   Thousand Oaks, California 91320-1789, on behalf of
    the Plaintiff
15
           BROMBERG & SUNSTEIN LLP (By Lee Carl
16   Bromberg, Esq. and Julia Huston, Esq.), 125 Summer
    Street, Boston, Massachusetts 02110
17              - and -
           KAYE SCHOLER LLP (By Leora Ben-Ami, Thomas
18   F. Fleming, Esq., Patricia Carson, Esq.,
    Christopher Jagoe, Esq. and Howard Suh, Esq.),
19   425 Park Avenue, New York, New York 10022, on
    behalf of the Defendants

20

21

22

23

24

25

# I N D E X

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

ADRIENNE FARID, Resumed

   By Mr. Galvin   2783

GREGORY LONGMORE

   By Mr. Fleming  2789              2858

   By Mr. Galvin         2846

ADRIENNE FARID, Recalled

   By Ms. Carson   2862

THOMAS C. BOONE, By Deposition

   By Counsel      2875

<table>
<tr><td></td><td>FOR<br>I.D.</td><td>IN<br>EVID.</td></tr>
<tr><td><b>EXHIBITS:</b></td><td></td><td></td></tr>
</table>

   64   E-mail, 8/7/2001 . . . . . . . . . .2783

   65   E-mail, 2/18/02  . . . . . . . . . .2785

   66   E-mail, 5/29/02 . . . . . . . . . .2786

   2106  Summary of Clinical Pharmacology
         Studies . . . . . . . . . . . . . .2804

   2107  BLA Sections 11 and 12  . . . . . .2807

   2108  BLA Section:  Study 2010  . . . . .2807

   67   Project Update May 2001  . . . . . .2850

   68   E-mail, 6/22/06 . . . . . . . . . .2856

   2109 U.S. Patent 6,583,272  . . . . . . .2866

1          **THE CLERK:**  All rise for the jury.

2          (Whereupon the jury entered the courtroom.)

3          THE CLERK:  Court is in session, please be seated.

4          **THE COURT:**  Good morning, ladies and gentlemen.

5          **THE JURY:**  Morning.

6          **THE COURT:**  I knew I could count on you.  We're all

7    ready to go.

8          Remind the witness.

9          **THE CLERK:**  I remind you, ma'am, you're still under

10   oath.

11         **MS. BEN-AMI:**  Your Honor, can we have a sidebar?

12         **THE COURT:**  You may.

13   SIDEBAR CONFERENCE, AS FOLLOWS:

14         **MS. BEN-AMI:**  Dr. Spinowitz is in the courtroom, he

15   was subpoenaed at 1:00, or 12:00 --

16         **THE COURT:**  Fine.  He's the next witness on.

17         **MS. BEN-AMI:**  They've now said they're withdrawing

18   him after he came up here.

19         **MR. DAY:**  We told them that last night.

20         **MR. FLEMING:**  Yeah, midnight.

21         **MS. BEN-AMI:**  I want sanctions, your Honor.

22         **THE COURT:**  All right.  It will be after the trial.

23   All right, I'll hear you.  It will be after the trial.

24         **MS. BEN-AMI:**  Is he released?

25         **THE COURT:**  He's now released, gone, finished.

1          (Whereupon the sidebar conference concluded.)

2          **THE COURT:**  Continue, Mr. Galvin.

3          **MR. GALVIN:**  Thank you, your Honor.

4               ADRIENNE FARID, Resumed

5          **DIRECT EXAMINATION (Cont'd)**

6   **(BY MR. GALVIN:)**

7   **Q.**  Good morning, Dr. Farid.

8   A.  Good morning.

9   **Q.**  I'll show you what has been marked as Exhibit GXM.  Do

10  you recognize GXM as an e-mail from Sonja Pumpluen to a

11  number of people, including you, dated July 24th, 2001,

12  middle of the page?

13  A.  Okay, yes.  Yes.

14         **MR. GALVIN:**  Your Honor, I offer Exhibit GXM.

15         **THE COURT:**  Any objection?

16         **MS. CARSON:**  No objections, your Honor.

17         **THE COURT:**  It may be received, you'll have to

18  remind me of the next number.  It is?

19         **MR. GALVIN:**  Sixty-four.

20         **THE COURT:**  Sixty-four in evidence.  Thank you.

21         (Exhibit marked in evidence.)

22         **MR. GALVIN:**  If we could have 64 on the screen,

23  please.  If we could highlight the e-mail from Ms. Pumpluen.

24  **Q.**  In her e-mail she wrote to you on July 24th, 2001, "I

25  was just informed that the name 'peg-EPO' should not be

1    mentioned in the documentation if possible."

2            Do you see that sentence in her e-mail to you from

3    2001?

4    A.  Yes, I see the sentence.

5    Q.  Okay.  Let me hand you another which has been marked for

6    identification as Exhibit FGN.  Do you recognize FGN as a

7    February 15th, 2002 e-mail from a Dianne Buckman?

8    A.  Yes.

9            MR. GALVIN:  Your Honor, I offer Exhibit FGN.

10           THE COURT:  Any objection?

11           MS. CARSON:  Objection, your Honor.  Sidebar.

12           THE COURT:  Yes, I'll hear you.

13   SIDEBAR CONFERENCE, AS FOLLOWS:

14           THE COURT:  What's this?

15           MS. CARSON:  Your Honor, our objection to this is

16   that the naming of the product is completely irrelevant to

17   any issue in this case.

18           THE COURT:  What is the relevance of this?  I

19   didn't see any.

20           MR. GALVIN:  Your Honor, it's that they have

21   removed use of the term "peg-EPO" from their documents and

22   that peg-EPO --

23           THE COURT:  This business about apologize for

24   forgetting to ask Seth to remove any reference to peg-EPO?

25           MR. GALVIN:  Yes.

1          **THE COURT:**  He may have it for that.

2          (Whereupon the sidebar conference concluded.)

3          **THE COURT:**  FGN is admitted in evidence,

4     Exhibit 62.

5          **MR. GALVIN:**  Sixty-five?

6          **THE COURT:**  I thought 62.

7          **MR. DAY:**  65, your Honor.

8          **THE COURT:**  65, the other one was 64?  Thank you.

9          (Exhibit marked in evidence.)

10         **MR. GALVIN:**  If we could have Exhibit 65 on the

11    screen.

12    **Q.**  In her e-mail to you dated February 15, 2002, there is a

13    reference where she wrote, "I just want to let you know that

14    the service does not cost us anything and to apologize for

15    forgetting to ask Seth to remove any reference to peg-EPO.

16    The searches were done before we were requested not to use

17    the term peg-EPO and he has agreed to remove any reference

18    to it."

19         Do you see that section in Ms. Buckman's e-mail to

20    you of February 15th, 2002?

21         **MS. CARSON:**  Objection, your Honor.

22         **THE COURT:**  Sustained, the document speaks for

23    itself.  We all can read it.

24    **Q.**  Let me show you Exhibit GXJ.  Do you recognize Exhibit

25    GXJ as an e-mail you received from Anton Haselbeck?

 1             MS. CARSON:  Objection, your Honor.

 2             THE COURT:  Overruled as to whether she recognizes

 3   it.

 4   A.  Yes.

 5             MR. GALVIN:  I offer Exhibit GXJ.

 6             MS. CARSON:  Objection, your Honor.  May we have a

 7   sidebar?

 8             THE COURT:  Overruled.  You may.

 9   SIDEBAR CONFERENCE, AS FOLLOWS:

10             THE COURT:  This is the same issue.

11             MS. CARSON:  It's completely irrelevant to any

12   issue in this case.

13             THE COURT:  You may think so.  I don't.  Overruled.

14             (Whereupon the sidebar conference concluded.)

15             THE COURT:  GXJ is admitted, Exhibit 66.

16             (Exhibit marked in evidence.)

17             MR. GALVIN:  Can we have Exhibit 66 on the screen?

18   **(BY MR. GALVIN:)**

19   **Q.**  Dr. Haselbeck told you, "Could you make sure that

20   C.E.R.A. is used from now on only and the previous names

21   must not be used at all."  Correct?

22   A.  Yes.  I'd like to comment.

23             MS. CARSON:  Objection, your Honor.  It speaks for

24   itself.

25             THE COURT:  It does speak for itself and they'll

1  get a chance to ask you questions, so you just answer his

2  questions for now.  That it?

3           **MR. GALVIN:**  I pass the witness, your Honor.

4           **THE COURT:**  Ms. Carson, any questions for this

5  witness or do you wish to reserve?

6           **MS. CARSON:**  Your Honor, if we could have quick

7  sidebar.

8           **THE COURT:**  I don't think we need it.  My question

9  was do you want to question her now or in your case?

10           **MS. CARSON:**  We'll reserve.  Thank you.

11           **THE COURT:**  Reserve.  You may step down.  Thank

12  you.

13           (Whereupon the witness stepped down.)

14           **MR. DAY:**  That's Amgen's case, your Honor.

15           **THE COURT:**  Thank you.  Come to the sidebar.

16  SIDEBAR CONFERENCE, AS FOLLOWS:

17           **MR. DAY:**  Subject --

18           **THE COURT:**  Subject, yes, go ahead.

19           **MR. DAY:**  Subject to the motion to admit documents,

20  your Honor.

21           **THE COURT:**  To admit documents, and that's fair,

22  and I will go over that.

23           The motion for directed verdict is allowed in part

24  and denied in part.  It's allowed as to patent '349,

25  claim 7, evidence is inadequate.  That's out of the case in

1    its entirety.

2         I'm very sympathetic -- sympathetic's not the word.

3    This business about function, way, result, question by

4    question, element by question, element, I'm very sympathetic

5    to that.  We're going to the jury on that.  We'll unwind

6    that after we get a jury verdict, if we need to.

7         I had this question, has nothing to do with the

8    directed verdict.  I don't want to waste your time.  Suppose

9    we get a mixed verdict here, Amgen wins some stuff, Roche

10   wins some stuff, but when the dust all settles, some claim

11   is valid and infringed.  If that's so, what happens to the

12   antitrust counterclaims?  Are they gone in their entirety

13   because of that result?  You might be briefing that when you

14   get a time.

15        **MS. BEN-AMI:**  Your Honor, on the '933 patent,

16   claim 9, they never put in any evidence.

17        **THE COURT:**  You've made your argument.  That's my

18   ruling.  You can renew it after the verdict.

19        (Whereupon the sidebar conference concluded.)

20        **MR. FLEMING:**  Yes, your Honor.

21        **THE COURT:**  You may proceed, Mr. Fleming.  Call

22   your first witness.

23        **MR. FLEMING:**  Roche calls Dr. Gregory Longmore,

24   your Honor.

25        **THE COURT:**  He may be called.

1          **MR. FLEMING:**  He's outside, your Honor, we'll bring

2    him in promptly.  Your Honor, I don't think I shouted loud

3    enough, so let me go get him.

4          **THE CLERK:**  Sir, would you raise your right hand?

5          Do you solemnly swear that the answers you will

6    give to this Court and Jury will be the truth, the whole

7    truth, and nothing but the truth, so help you God?

8          **THE WITNESS:**  I do.

9          **THE CLERK:**  Please be seated.

10                    GREGORY LONGMORE

11              **DIRECT EXAMINATION**

12    **(BY MR. FLEMING:)**

13    **Q.**  Could you introduce yourself to the jury, please, and

14    tell them what you do?

15    A.  My name is Dr. Greg Longmore, and I work at Washington

16    University in St. Louis, where I'm an associate professor in

17    the Department of Medicine and Cell Biology.  I'm also a

18    consulting physician at the Barnes-Jewish Christian

19    Hospital, which is a teaching hospital, Washington

20    University.

21    **Q.**  So, Doctor, you're a medical doctor?

22    A.  I am.

23          **MR. FLEMING:**  Your Honor, if I may approach, I'd

24    like to hand the witness a set of his expert reports and one

25    set for the Court as well.  Take one for myself.

1    Q.   Now, Doctor, as a physician, what types of treatment of

2    patients are you involved in?

3    A.   So I'm a consultant hematologist, and so as that, I work

4    with other physicians to aid in their diagnosis and

5    treatment of patients with blood disorders, in particular

6    with anemia, and specifically in patients with anemia

7    associated with chronic kidney disease.

8    Q.   How long have you been doing this?

9    A.   I have been a physician practicing hematology for

10   approximately 17 years.

11   Q.   And have you actually prescribed and been involved in

12   the administration of ESA's or erythropoietic stimulating

13   agents to patients?

14   A.   Yes, I have, both in the management of, treatment and

15   recommendation of treatment plans for other physicians.

16   Q.   So you're familiar how erythropoietin works in the human

17   body?

18   A.   I am.

19   Q.   Doctor, what other clinical responsibilities do you

20   have?

21   A.   I also teach.  I teach medical students, medical

22   residents, research clinical fellows.  And I also teach in

23   the graduate school where I teach Ph.D. students in cell

24   biologies, in topics such as hormone receptor interactions

25   and how that works.

1    Q.  Doctor, could you tell the jury a little bit about your

2    educational background, please?

3    A.  My undergraduate degree was obtained in Western Ontario,

4    in Canada, which I did a degree in chemistry and

5    biochemistry with honors.  And then I went to graduate

6    school, University of Toronto, also in Canada, where I

7    received a Master's in Science and Biochemistry.  Then I

8    went to McGill University, where I did my medical degree.

9    That's in Montreal, also Canada.  Subsequent to that, I came

10   to Boston, Harvard Medical School, where I did my clinical

11   training, where I did medical residency and specialty

12   clinical fellowships in hematology and oncology at Harvard.

13   And after that I returned to the laboratory where I did a

14   post-doctoral research fellowship with Massachusetts

15   Institute of Technology.

16   Q.  And when were you at Harvard?

17   A.  I was there from '83 to '93.

18   Q.  Doctor, have you published any articles relevant to the

19   subject matter of this case?

20   A.  Yes.

21   Q.  Now, Doctor, what are you here to tell the jury about

22   today?

23   A.  So I'm here to offer my opinion that why CERA does not

24   infringe any of the asserted Amgen claims.

25   Q.  Let's turn right to that, please.  If we could have the

1    '868 patent claims.  Do you recognize these as being among

2    the asserted claims of the patents in suit?

3    A.  Yes.

4    **Q.**  Could you tell the jury, what is your opinion regarding

5    these claims of the '868 patent?

6    A.  It's my opinion that Mircera, or CERA, CERA which is the

7    active component of Mircera, is not the product of this

8    process claim.  And, furthermore, is materially changed from

9    the product in this process claim.

10   **Q.**  So could you start with telling the jury, show the jury,

11   you should have a laser pointer on your desk --

12   A.  I have.

13   **Q.**  -- what terms within these claims you focused on?

14   A.  So first I focused on Point 1A which describes a process

15   for the production of a glycosylated erythropoietin

16   polypeptide in mammalian host cells.

17   **Q.**  And what is your opinion regarding that term?

18   A.  Mircera is not the product of this process.  Simply put,

19   Mircera cannot and is not made in mammalian cells.

20   **Q.**  And did you focus on -- withdrawn.

21          Do you have any other opinions regarding these

22   claims?

23   A.  Yes.  Another part in this claim I focussed on was Part

24   B and 1, which is isolating said glycosylated erythropoietin

25   polypeptide therefrom.

1    **Q.**  And what is your opinion regarding that element?

2    A.  So I take this to mean that the process ends here and

3    this ends with the isolation of a crude extract in which

4    cells are removed and you're left with a crude isolate.

5    **Q.**  And what is your opinion about whether Mircera meets

6    that element?

7    A.  Mircera is not a crude isolate and, therefore, does not

8    infringe in this process.

9    **Q.**  Are you familiar with the consult of epoetin beta?

10   A.  Yes.

11   **Q.**  Do you have an opinion as to whether epoetin beta meets

12   this element?

13   A.  Epoetin beta also is not a crude isolate and, therefore,

14   does not infringe in this process.

15   **Q.**  Could you tell the jury why?

16       **MR. GALVIN:**  Objection, your Honor.  Report.

17       **MR. FLEMING:**  Your Honor, blue report,

18   Paragraph 104, and 105.  Also in the red report, Paragraphs

19   13, 4, and 7 and on.

20       **THE COURT:**  Now, there's a protocol here, that's

21   why he's -- and probably the lawyers have explained it, but

22   I'll explain it.  You have to stick to the report because

23   that's the only fair way that the other side will be on

24   notice of the opinions you're going to give.

25       **THE WITNESS:**  Okay.

1          THE COURT:  I'm very strict about that.  So it may

2   happen that they'll jump up and say what you're about to say

3   or what the question calls for is not in the report.  The

4   repost to that is what Mr. Fleming says, he says look at a

5   specific paragraph.  Now, we look at those.

6          MR. FLEMING:  103 through 105.

7          THE COURT:  We look at those paragraphs.  You may

8   testify in accordance with those paragraphs.  You're not

9   required to read it, but other opinion witnesses have

10  sometimes fallen back on reading it, but everything you say

11  must be there in the report so they'll know what -- the

12  other side will know what questions to ask you.

13         THE WITNESS:  Okay.

14         THE COURT:  Go ahead.  You may answer his question.

15  Why?

16  A.  Can you repeat the question, please?

17  Q.  Yes.  I've asked you your opinion.  I've asked you about

18  your opinion as to why the epoetin beta is not the crude

19  isolate that you say is the product of this process.  Could

20  you tell that to the jury, please?

21  A.  Yes.  In my opinion, epoetin beta is not a crude

22  isolate.

23  Q.  Why is that?  Why do you have that opinion?

24         MR. GALVIN:  Objection, your Honor.

25         THE COURT:  Overruled.  He may testify in

1    accordance with the report.

2         **MR. FLEMING:**  Thank you, your Honor.

3    A.  Simply put, one would never give a crude isolate to a

4    patient; whereas, epoetin beta as a drug is given to

5    patients frequently and, therefore, cannot be the product of

6    this process.

7    **Q.**  Doctor, you said that epoetin beta was a starting

8    reagent in the synthesis of CERA; correct?

9    A.  That's correct.

10   **Q.**  You can use the crude isolate of this product in the

11   reaction to synthesized CERA?

12   A.  No.  In fact, the efficiency of the chemical reaction

13   wouldn't allow the chemistry to work.  And so you could not

14   make CERA from the crude isolate or the product of this

15   process.

16   **Q.**  And, Doctor, again, tell the jury, do you have an

17   opinion as to whether Mircera infringes these claims?

18   A.  No, in my opinion, Mircera is materially different from

19   the product of this process.

20   **Q.**  Now, Doctor, we'll talk about claim 2 of '868 patent.

21   Do you have an opinion as to that claim?

22   A.  Yes.  Claim 2 is a dependent claim on claim 1.  And so

23   for all the same reasons, that is to say that Mircera is not

24   a crude isolate, that it cannot infringe claim 2.

25        **MR. FLEMING:**  Can we have the claims of the

1    '933 patent, please?

2         **MR. GALVIN:**  Objection, your Honor.  Can we have a

3    sidebar on the motion in limine?

4         **THE COURT:**  You may.

5    SIDEBAR CONFERENCE, AS FOLLOWS:

6         **THE COURT:**  While we're up, Mr. Galvin, the verdict

7    slip you proposed with the changes I've made there looks

8    like it's good enough.  Give us, now, of the -- over the

9    number of motions in limine you filed, what one are we

10   talking about now?

11        **MR. GALVIN:**  Isolate, your Honor.  Dr. Longmore's

12   offered opinions about terms limited to crude isolate.  We

13   have briefed the opinion.

14        **THE COURT:**  Oh, you have.  The motion's denied, he

15   may testify.

16        **MR. FLEMING:**  Your Honor, just for the record, I'm

17   sorry.  Since you brought up the verdict slip --

18        **THE COURT:**  You won that.

19        **MR. FLEMING:**  No, no, not about that.  I say thank

20   you.

21        **THE COURT:**  You don't have to say that.

22        **MR. FLEMING:**  I understand that.

23        As to the verdict slip, though, we wish to know --

24   Roche objected to the form of verdict slip.  We think there

25   are some issues that may cause confusion.  We ask the

```
 1    ability at some later time to raise the issue with you

 2    again.

 3              THE COURT:  You people seem able to brief things.

 4              MR. DAY:  Your Honor --

 5              MR. FLEMING:  Thank you, your Honor.  Can we

 6    continue with the witness?

 7              THE COURT:  It's their time.

 8              (Whereupon the sidebar conference concluded.)

 9              THE COURT:  Now you may continue.

10              MR. FLEMING:  Thank you, your Honor.

11    (BY MR. FLEMING:)

12    Q.  Dr. Longmore, ladies and gentlemen, claims of the '933

13    patent.  Doctor, did you analyze these claims in connection

14    with forming your opinions in this case?

15    A.  Yes, I did.

16    Q.  And can you briefly tell the jury, do you have an

17    opinion as to whether Mircera infringes these claims of the

18    '933 patent?

19    A.  My opinion, it does not.

20    Q.  We're focused on claim 3.

21    A.  Yes.  This is a product claim.  And in point 3, it

22    claims that the product is a non-naturally occurring

23    glycoprotein product in a mammalian host cell of a DNA

24    sequence encoding human erythropoietin.

25              So, quite simply, as I pointed out, CERA is not
```

1   made in cells, and cannot be made in cells and, therefore,

2   doesn't infringe this claim.

3   **Q.**   Okay.  And do you have an opinion as to whether epoetin

4   beta infringes this claim or not?

5   A.   Also, epoetin beta does not infringe this claim.

6   **Q.**   Doctor, looking, continuing on, we have the dependent

7   claims 7, 9, 11, 12 and 14.  Do you have an opinion as to

8   those particular claims as well?

9   A.   Yes.  So all claims listed, 7, 9, 11, 12, 14, are

10   dependent claims upon claim 3.  And for the same arguments

11   that I pointed out for claim 3, that is it cannot be made in

12   a cell, it does not infringe these claims either.

13   **Q.**   Thank you.  Doctor, now, you use the term "materially

14   changed."  Can you explain to the jury the bases on which

15   you came to that analysis?

16   A.   Yes.  So my conclusion that CERA's materially changed

17   from epoetin beta is based on a number of medical and

18   biological studies.

19   **Q.**   Have you prepared a demonstrative to assist the jury in

20   understanding your testimony?

21   A.   Yes, I have.

22          **MR. FLEMING:**  May I have 32A, please?

23          **MR. GALVIN:**  Your Honor, can we have a sidebar?  We

24   have an objection on this.

25          **THE COURT:**  Is that in the -- is it in the report?

1          **MR. FLEMING:**  It certainly is, your Honor.

2          **THE COURT:**  You may have, and I'll allow it to be

3    put up.  Let's see what foundation he uses.

4          **MR. FLEMING:**  Thank you, your Honor.

5    **Q.**  Doctor, you assisted in preparing this demonstrative?

6    A.  Yes, I did.

7    **Q.**  Could you tell the jury the sections of this

8    demonstrative about which your testimony concerns?

9          **THE COURT:**  No, no, let's not go that way.

10         See this column that says EPO?

11         **THE WITNESS:**  I do.

12         **THE COURT:**  What do you mean by that?  Now, this is

13    only a demonstrative aid.  The idea, you hope, will help the

14    jury understand your testimony.

15         So what are you referring to when you say EPO?

16         **THE WITNESS:**  So this is a chart that's comparing

17    epoetin beta.  So EPO in this chart --

18         **THE COURT:**  Where do you get epoetin beta?

19         **THE WITNESS:**  Where do you get it?

20         **THE COURT:**  I mean, from what?  From what process?

21         **THE WITNESS:**  It's made by Roche.  The one drug

22    that I used to compare is the Roche neorecormon.  Epoetin

23    beta is used to contrast with Mircera in this table.

24         **THE COURT:**  Come to the sidebar.

25

1    SIDEBAR CONFERENCE, AS FOLLOWS:

2            **THE COURT:**  I had thought he was going to say that

3    the first column is the product of the claimed process.

4            **MR. FLEMING:**  Let me take you there, your Honor, if

5    I may.

6            **THE COURT:**  He's got to take me there.

7            **MR. FLEMING:**  I understand.  This is how I

8    understand his testimony to play out.  Amgen has asserted

9    that epoetin beta, the starting material used to create

10   CERA, one of the starting materials used to create CERA, is

11   the product of the process.  That's their contention.

12           **THE COURT:**  Then you've got to lay that foundation.

13           **MR. FLEMING:**  And I have --

14           **THE COURT:**  Absent that, don't put it up until you

15   have.

16           **MR. FLEMING:**  I will ask him that question that he

17   understands that's the contention.

18           **THE COURT:**  That's my only problem.

19           **MR. GALVIN:**  Your Honor, I have two objections to

20   the demonstrative.  One is it cites data that is hearsay,

21   that's not in the record --

22           **THE COURT:**  It cites it but it's not evidence.  And

23   just as I've used learned treatises, they can see that, if

24   he's going to testify to it.

25           **MR. GALVIN:**  And the second objection, your Honor,

```
 1    it has a reference to treatments per month.  And we were

 2    denied access to Roche's discovery on what is --

 3            THE COURT:  Knock out treatments per month, the

 4    dosing.

 5            MR. FLEMING:  It's the same concept, your Honor.

 6            THE COURT:  Well, it may be.  Knock it out.

 7            MR. DAY:  Your Honor, excuse me.  I apologize for

 8    chiming in here, but I believe that when we had Catlin's

 9    gel, the jury was not allowed to see it on the grounds of

10    hearsay.

11            THE COURT:  I'm letting them see it if they knock

12    out the treatments per month.

13            MR. FLEMING:  Your Honor, it's a proficient time to

14    address this quickly with you.  You admitted portions of the

15    BLA, and you said within purposes of completeness and Roche

16    could also have submitted portions of the BLA.  All the data

17    he's going to testify from, come from portions of the BLA,

18    which I will be showing him and asking you to admit into

19    evidence.

20            THE COURT:  Then you'll have to go in a different

21    order.  I appreciate expedition.

22            MR. FLEMING:  That's all right, your Honor.

23            THE COURT:  You can't put up treatments per month

24    until I have the BLA in, and I have --

25            MR. FLEMING:  That's fine, your Honor.
```

1        (Whereupon the sidebar conference concluded.)

2   **(BY MR. FLEMING:)**

3   **Q.**  Doctor, now, you talked about medical and biological

4   properties in your demonstrative about which you're offering

5   your opinions; correct?

6   A.  Yes.

7   **Q.**  Could you explain to the jury what you mean by that,

8   please?

9   A.  So the medical properties that I reviewed are what are

10  called pharmacokinetic and pharmacodynamic properties.

11  Pharmacokinetic properties, to start with, is the response

12  the body has to a given drug.  So in other words, it's how

13  the body clears or gets rid of the drug.  And one simple way

14  to measure that is through the serum half-life of the drug.

15  **Q.**  What is half-life, Doctor?

16  A.  So half-life is a measure of how much time it takes to

17  remove half the drug that's in your body.

18  **Q.**  Now, Doctor, have you seen data to support your

19  opinions?

20  A.  Yes, I have.

21  **Q.**  And where did you see that data?

22  A.  I saw that in the Roche BLA documents that I reviewed.

23  **Q.**  I'm going to show you what's been marked as PGQ-1, which

24  are excerpted pages.

25          **MR. FLEMING:**  Your Honor?

1    Q.   Doctor, if you could look through that and just briefly

2    describe to the Court what that is?

3    A.   This is a summary of the clinical pharmacology studies

4    performed by Roche and submitted in their BLA.

5    Q.   And is this data upon which -- among the data upon which

6    you base your opinions?

7    A.   Yes, this is some of the data which I reviewed.

8              MR. FLEMING:   Your Honor, we offer PGQ-1.

9              THE COURT:   Any objection?

10             MR. GALVIN:   Your Honor, I object.   Could we please

11   have a sidebar?

12             THE COURT:   Yes, we can.

13   SIDEBAR CONFERENCE, AS FOLLOWS:

14             THE COURT:   Now, the test is whether these portions

15   of the BLA so relate to the portions that you put in under,

16   I believe, Rule 106 that's appropriate that they be

17   admitted.   They don't lose their hearsay status because you

18   used part of them as admissions.   But fair is fair.   And

19   they're going to tell me they relate.

20             MR. FLEMING:   Yes, your Honor, they do.

21             THE COURT:   So why don't they relate?

22             MR. GALVIN:   Your Honor, two reasons.   The doctrine

23   of completeness is fairness.   These are not -- the BLA is

24   literally a room full of documents of different reports.

25   This is not a case where they're submitting pages that

 1    were -- that we didn't submit that are right next to it, in

 2    front or behind of it, this is a completely different range

 3    on a different subject.  The BLA is written essentially as a

 4    brief.

 5           THE COURT:  I know what the BLA is.  So they're not

 6    immediately adjacent.  Why do they relate to things that

 7    they've raised?

 8           MR. FLEMING:  They put in evidence from the BLA

 9    according to the absence of material change and the factors

10    to consider, and these are the medical and biological

11    properties that prove it.

12           THE COURT:  I agree.  You may have it.

13           MR. FLEMING:  Thank you.

14           (Whereupon the sidebar conference concluded.)

15           THE COURT:  Exhibit PGQ-1 is admitted in evidence.

16           MR. FLEMING:  2106, I believe, is the next number.

17           THE COURT:  Thank you, that's what Ms. Smith

18    advised.  2106.  Proceed.

19           (Exhibit marked in evidence.)

20           MR. FLEMING:  Thank you, your Honor.

21    (BY MR. FLEMING:)

22    Q.  And in the interest of time, now, Doctor, I'm going to

23    hand you three other sections that are marked PEM, PGF and

24    PHJ-1.  Okay.

25           MR. FLEMING:  PEM, PGF, and I have one more for

 1   you, Ms. Smith.

 2   **Q.**  Doctor, could you tell the jury, are these other

 3   sections of the BLA that you -- the data from which you

 4   relied upon in forming your opinions?

 5   A.  Yes, they are.

 6            **MR. FLEMING:**  Your Honor, we offer PEM as 2107 --

 7            **MR. GALVIN:**  Objection, your Honor.

 8            **THE COURT:**  But is the argument the same?

 9            **MR. FLEMING:**  Yeah, the argument's the same, your

10   Honor.

11            **THE COURT:**  Well, no, he gets to tell me what his

12   argument is.

13            **MR. FLEMING:**  I thought you meant from me.

14            **THE COURT:**  Let me see it.  Let's have your full

15   offer so we don't have to do this more than once.  PEM?

16            **MR. FLEMING:**  PGF, PHJ-1.

17            **THE COURT:**  PGF and PHJ-1.  Let me see.  Just a

18   moment.

19            **MR. GALVIN:**  May we have a sidebar, your Honor?

20            **THE COURT:**  Just a moment.  You may have a sidebar.

21   SIDEBAR CONFERENCE, AS FOLLOWS:

22            **THE COURT:**  Wait a minute.  If I give you PGF and

23   PEM, this seems rather lengthy and --

24            **MR. FLEMING:**  It's only a small portion of it that

25   I particularly direct him to, your Honor.

 1              THE COURT:  Well, what's that?

 2              MR. FLEMING:  We'll start with page 29 of the

 3    document.

 4              THE COURT:  Just a moment.

 5              MR. FLEMING:  I'm sorry, 28 and 29.

 6              THE COURT:  Twenty-eight and 29, right.  And that's

 7    what you want, 28 and 29?

 8              MR. FLEMING:  Yes, and of course the discussion of

 9    that particular study carries on.

10              THE COURT:  Well, it carries on.

11              MR. FLEMING:  It goes on as a study.  It's the data

12    underlying in.

13              THE COURT:  He may rely on it, but it goes too far.

14    Why shouldn't we admit these?

15              MR. GALVIN:  First, PHJ is a clinical trial.  This

16    is a clinical trial that is discussing safety and dosing

17    information relating to the administration of Mircera.  They

18    did not provide, Roche, given your prior orders, they

19    shouldn't be allowed to submit PHJ-1.

20              THE COURT:  You've seen this.  You've seen this for

21    months.

22              MR. DAY:  But we were precluded, your Honor, from

23    putting in any evidence until yesterday with respect to

24    this.

25              THE COURT:  Maybe so.

```
 1              MR. GALVIN:  Secondly, PGF is a standalone report

 2     developed by some Roche scientist --

 3              THE COURT:  I've admitted it.  PEM?

 4              MR. GALVIN:  PEM, again, it's discussing efficacy

 5     studies, Phase III studies.  We had limited discovery on any

 6     clinical trial or safety information.  We don't have ability

 7     to cross-examine.  There's no Roche witness we can

 8     cross-examine on this.

 9              (Simultaneous speakers.)

10              THE COURT:  One at a time.  And I'm going to let

11     them have it.  But I'm going to exclude PHJ.

12              MR. FLEMING:  Can I just have these two pages?  Can

13     I show at least this page to the jury?

14              THE COURT:  No.

15              MR. FLEMING:  Just to show it to them?

16              THE COURT:  No.  He may testify based on his

17     conclusions drawn from that, but you may not.

18              MR. FLEMING:  Okay.  Thank you, your Honor.

19              (Whereupon the sidebar conference concluded.)

20              THE COURT:  PEM is admitted, it will be 2107.  PGF

21     is admitted, 2108.  PHJ-1 is excluded.

22              (Exhibits marked in evidence.)

23              MR. FLEMING:  Thank you, your Honor.  May I

24     continue?

25              THE COURT:  You may.
```

1    **(BY MR. FLEMING:)**

2    **Q.**  Dr. Longmore, you were talking about the half-life

3    issue.  Can you explain to the jury, as a medical doctor,

4    the significance of half-life issue?

5    A.  So the longer the half-life is of any drug, the shorter

6    the dosing, or you can increase the dosing interval.  In

7    other words, you don't have to give it as often because the

8    drug is around the body longer.

9    **Q.**  Now, if we can go to Exhibit 2106, which is PGQ?

10   A.  Yes.

11        **THE COURT:**  Let me interrupt here.  Just so we keep

12   our eye on the ball.  We're not sliding over here in this

13   witness' testimony as to whether the product of the claimed

14   process, which is what you're concerned with, the product of

15   the patented, claimed process is as good as, better than,

16   equivalent to the Mircera.  Not your business.  Depending

17   upon the verdict, it may become my business.  But it's not

18   your business.

19        What we are -- what you will be concerned with, and

20   the reason that I'm allowing this, is only this:  Does the

21   Mircera, which they want to introduce into the United States

22   as a result of the process that they're lawfully practicing

23   over in Europe -- no one doubts that, lawful over there in

24   Europe.  Does the product, Mircera, as they want to bring it

25   into the United States, is that materially changed from the

1    process, the process in Europe, were you to find that the

2    process in Europe infringes the process claims of the

3    patent.

4           So, don't confuse the two.  One is entirely for

5    you, the second part, I have nothing to say about it.  The

6    comparison of the treatment in patients, not your business

7    in this case.

8           **MR. FLEMING:**  Your Honor, may I continue?

9           **THE COURT:**  You may.

10   **Q.**  Doctor, you remember talking about pharmacokinetics, and

11   we're focusing on the behavior of CERA in the human body; is

12   that correct?

13   A.   That's correct.

14   **Q.**  Look at Table 9.  Did you consider Table 9 in forming

15   your opinions regarding the patent discussed with the jury?

16   A.   I did, I reviewed this table.

17   **Q.**  Could you tell the jury how you used this information in

18   coming to your opinion, please?

19          **MR. GALVIN:**  Objection, outside the report.

20          **THE COURT:**  Where is it?

21          **MR. FLEMING:**  Your Honor, it is on Paragraphs, of

22   the blue report, 171, 172, 168, and the table specifically

23   talked about in those paragraphs as well.

24          **THE COURT:**  The reference is to this table that you

25   put up there?

1           **MR. FLEMING:**  Yes, your Honor.

2           **THE COURT:**  He may have it.

3           **MR. FLEMING:**  Thank you, your Honor.

4    Q.  Doctor, could you tell the jury how you used the data in

5    this Table 9 of Exhibit 2106 in coming to your opinions,

6    please?

7    A.  Yes.  This is the table that's comparing the half-life

8    of the various erythropoietic stimulating agents.  So if you

9    look at row 2, this column is measuring the half-life in

10   hours, and this row 2 is epoetin beta.  As you can see,

11   after an intravenous dose, the half-life is 8.8 hours in the

12   body.  If you compare that to RO0503821, which is Mircera,

13   you can see the half-life is dramatically prolonged after an

14   intravenous dose to 134 hours, 15 to 20 times longer.

15   Q.  What does this tell you about how the body handles

16   Mircera?

17   A.  So what this tells me, medically the body is handling or

18   metabolizing or clearing Mircera in a significantly

19   different way.

20   Q.  How did this impact your opinion regarding whether CERA

21   was materially changed from any product of the claim

22   processes?

23   A.  This is such a significant medical difference it led me

24   to conclude that Mircera is materially changed from epoetin

25   beta starting material.

1    **Q.**  If you can pick up PEM, which is 2107, trial exhibit.

2    A.  Yes.

3    **Q.**  And if you go to Paragraph 11.

4    A.  That's the starting paragraph?

5    **Q.**  Yes.

6    A.  Okay.

7    **Q.**  Could you tell the jury how this information impacted

8    your opinions?

9         **MR. GALVIN:**  Objection, your Honor.  Outside the

10   report.

11        **THE COURT:**  Where is it?

12        **MR. FLEMING:**  Your Honor, it's in Paragraph, blue

13   report, 168, 171 and 72, and 178.

14        **THE COURT:**  He may so testify consistent with the

15   report.

16        **MR. FLEMING:**  Thank you, your Honor.  Thank you.

17   A.  These are the clinical studies that I reviewed in

18   analyzing the data.  These are the Roche clinical studies,

19   up to 16 different studies, including over a thousand

20   patients that were in the BLA.  And these were the studies I

21   used to look at the pharmacokinetic and pharmacodynamic

22   properties of the drug in comparison to epoetin beta.

23   **Q.**  And how did the study, the data, and the results of

24   these studies impact your opinion?

25   A.  As I showed in the table, all other studies that I've

1    looked at had the same result, and that is that Mircera has

2    a significantly longer half-life in the body compared to

3    epoetin beta.

4         **MR. FLEMING:**  Your Honor, now may I present them

5    with the table from 32A?

6         **THE COURT:**  No.  You got his testimony but that's

7    it.

8         **MR. FLEMING:**  Thank you.

9    **Q.**  Now, you talked about pharmacodynamics.  Can you tell

10   the jury what you mean by that, Doctor?

11   A.  Yes, very simply, pharmacodynamics is the effect the

12   drug has on the body.  So for an erythropoietic stimulating

13   agent, that would be the increase in reticulocytes or red

14   blood cell count or hemoglobin.  It also takes into account

15   the duration of the response, and how long an active drug

16   remains in the body.

17        **MR. FLEMING:**  Staying with PEM, which is 2107, can

18   I have Paragraph 11.2.2?

19   **Q.**  Doctor, could you explain to the jury how this

20   information influenced your opinion regarding Mircera?

21   A.  So, in this summary you can see from the first sentence

22   that the pharmacodynamic results showed a potent, a

23   dose-dependent, and importantly a long-lasting

24   erythropoietic response after both an intravenous and a

25   subcutaneous administration of Mircera.

1   **Q.**  As a medical doctor, Dr. Longmore, what significance

2   does that have to your opinion?

3   A.  This is very significant.  So when you couple this

4   potent, long-lasting response with the prolonged half-life,

5   this allows you to give this drug on a much, much,

6   infrequent dosing schedule.

7   **Q.**  Now, Doctor, you talked about pharmacodynamics and

8   pharmacokinetics.  Do they have any relationship to

9   biological activity?

10  A.  Yes, they can.

11  **Q.**  Can you explain to the jury how, please?

12          **MR. GALVIN:**  Objection, outside the report.

13          **MR. FLEMING:**  Your Honor, Paragraph 215 in the blue

14  report.  Also, specifically, first let me refer you to

15  Paragraphs 75 and 76.

16          **THE COURT:**  He may testify.

17          **MR. FLEMING:**  Thank you, your Honor.

18          **THE COURT:**  Consistent with the report.

19          **MR. FLEMING:**  Thank you, your Honor.

20  **Q.**  Could you continue, Dr. Longmore.  Tell the jury how

21  pharmacokinetics and pharmacodynamics impact your opinion on

22  biological activity?

23  A.  So a prolonged half-life and a longer-acting effect can

24  be manifest as altered biologic activities.  For example, if

25  a receptor was to interact -- I'm sorry, the drug was to

 1   interact differently with the receptor, you could have an

 2   altered pharmacokinetics and dynamics and, therefore, an

 3   altered response in the patient.  And so --

 4            MR. GALVIN:  Objection, your Honor.  That's not in

 5   the report.  Move to strike.

 6            THE COURT:  Where is it?

 7            MR. FLEMING:  Your Honor, it's Paragraphs 215, 75,

 8   and 76.

 9            MR. GALVIN:  215 is about -- objection.

10            THE COURT:  I can read.  Slowly, but I can read.

11            All right.  215 doesn't get it.  Where is it?

12            MR. FLEMING:  Your Honor, 75, 76, and I would also

13   refer you to Paragraph 156.

14            THE COURT:  No, his answer's stricken.  The last

15   answer's stricken.  Disregard it.

16   Q.  Okay.  Doctor, if you could look in your report, your

17   blue report, on page 26?

18   A.  Yes.

19   Q.  Okay.  And tell the jury, do you have an opinion, does

20   pharmacokinetics and pharmacodynamics impact in vivo

21   biological activity?

22            MR. GALVIN:  Objection, leading.

23            THE COURT:  Sustained.

24   Q.  Doctor, looking at page 26 of your report, can you tell

25   the jury what your opinion is, whether pharmacokinetics and

1    pharmacodynamics have an impact on biological activity?

2    A.  They do.  And can I read from this?

3    **Q.**  Yes, you can.

4    A.  So if I read on Paragraph 75, "Although at the level of

5    red blood cell progenitor cell, EPO mediates its effects by

6    binding the EPO receptor, the overall biological effect of

7    EPO in the body is a consequence of many different

8    biological processes in the body that define the ultimate

9    clinical effect."

10   **Q.**  And again, just for the jury's benefit, can you explain

11   what you mean by that sentence?

12   A.  So that --

13            **MR. GALVIN:**  Objection.  Outside the report.

14            **THE COURT:**  No.  He may -- well --

15            **MR. GALVIN:**  He's asking for an explanation of the

16   report.

17            **THE COURT:**  Yes, he is.  Sustained.  The report is

18   what it is.

19   **Q.**  Doctor, could you read the next sentence in

20   Paragraph 76, please?

21   A.  So again, I'm reading from the report, "The biological

22   activity of a drug is described in terms of its

23   pharmacokinetics and pharmacodynamics."

24   **Q.**  And did you analyze the pharmacokinetics and

25   pharmacodynamics of Mircera in coming to your opinion?

```
 1    A.  I did.

 2    Q.  And did you analyze the pharmacokinetics and

 3    pharmacodynamics of CERA with regard to its biological

 4    activity?

 5             MR. GALVIN:  Objection, leading.

 6             THE COURT:  Can he analyze, the answer is yes or

 7    no.  You can?  Did you so analyze?

 8             THE WITNESS:  Did I so -- yes.

 9    Q.  And what did you conclude, as a medical doctor,

10    regarding those parameters and Mircera?

11             MR. GALVIN:  Objection.  Outside the report.

12             THE COURT:  Where is it?

13             MR. FLEMING:  Your Honor, that's 171 to 173, 168,

14    191 and 213.

15             THE COURT:  He may testify consistent with those

16    paragraphs.

17             MR. FLEMING:  Thank you, your Honor.

18    A.  So in my conclusion, the significant differences in

19    pharmacodynamics and pharmacokinetics and biological

20    differences all lead me to conclude that Mircera is

21    materially changed or different from the starting material

22    epoetin beta.

23    Q.  Now, I want you to take a look at PHJ-1.

24    A.  I don't --

25    Q.  Okay.  Let me present you with a copy.
```

1    A.  I have PHJ-1.

2    **Q.**  Okay, good.  If you look at pages 28 and 29, please.

3    A.  Yes.

4    **Q.**  Did you review this information and data in coming to

5    your conclusions regarding Mircera?

6    A.  Yes.

7    **Q.**  Can you explain to the jury how this information

8    impacted your opinions?

9           **MR. GALVIN:**  Objection.  It's not in evidence.

10          **THE COURT:**  Objection, what?

11          **MR. GALVIN:**  Objection, the document's not in

12   evidence.

13          **THE COURT:**  The document isn't in evidence, but it

14   doesn't need to be in order for him to form conclusions on

15   it.

16          Is this a type of thing -- now, what is that

17   document?

18          **THE WITNESS:**  These are, again, documents on

19   clinical studies.  These are Phase III clinical studies in

20   humans.

21          **THE COURT:**  Which, so far as you understand, Roche

22   submitted to the FDA as part of its BLA, its license

23   application?

24          **THE WITNESS:**  Yes.

25          **THE COURT:**  Now, in your -- in the practice of your

1    profession, are you accustomed to relying -- forget

2    testifying in court now -- are you accustomed to relying on

3    that type of data in forming your opinions?

4            **THE WITNESS:**  Yes.  These are important clinical

5    studies that you would do in any submission to the FDA.

6            **THE COURT:**  Doctors like you do that?

7            **THE WITNESS:**  Rely on these, read these documents?

8            **THE COURT:**  Yes.  And rely on them?

9            **THE WITNESS:**  Yes.

10           **MR. FLEMING:**  Your Honor, I offer PHJ.

11           **THE COURT:**  No, no.  The document isn't admitted,

12   but he may testify about it.

13   **Q.**  Doctor, so explain to the jury the study that's being

14   discussed at PHJ at page 29, please.

15   A.  So this --

16           **MR. GALVIN:**  Objection.

17           **THE COURT:**  Sustained.  No, no, sustained.  His

18   conclusions, yes.  The rest is hearsay.  I didn't admit it.

19   **Q.**  Based on your review of the data that's in PHJ, and the

20   study discussed on page 29, could you tell the jury, as a

21   medical doctor, your opinion regarding whether Mircera

22   infringes any of these asserted claims?

23           **MR. GALVIN:**  Objection.

24           **THE COURT:**  Well, he already has but I'll allow him

25   to testify.  Do you think it does?

```
 1              THE WITNESS:  These studies, does it affect my

 2   decision?

 3              THE COURT:  That isn't the question he asked.  He

 4   asked the ultimate question.  Do you think that Mircera

 5   infringes any of these claims in suit?

 6              THE WITNESS:  No, I don't.

 7   Q.  How do these studies impact your decision?

 8              MR. GALVIN:  Objection.

 9              THE COURT:  Overruled.

10   A.  These studies that I reviewed show --

11              THE COURT:  No, no, it's tricky.  You're not going

12   to get the studies in.  How do they affect your opinion?  I

13   will allow you to say things like, They confirm my opinion,

14   They reinforce my opinion, They undercut my opinion, though

15   I don't expect you to say that.  Do you see what I mean?

16              THE WITNESS:  Yeah.

17              THE COURT:  We can't get into the studies.  You're

18   here, they're watching you.  How do the studies impact your

19   opinions, sir?

20              THE WITNESS:  These studies add more convincing

21   data that Mircera is materially changed from epoetin beta.

22   Q.  Now, Doctor, what is the dosing regimen involved in the

23   study that you analyzed?

24              MR. GALVIN:  Objection.

25              THE COURT:  Sustained.
```

1   **Q.**  Doctor, have you formed an opinion as to how the

2   properties of Mircera, the pharmacokinetics or

3   pharmacodynamics impact the dosing regimen for Mircera?

4   A.  Yes.

5   **Q.**  Could you tell the jury what that is?

6   A.  As I mentioned, this prolonged serum half-life and

7   long-lasting effect on the body would allow physicians to

8   give Mircera at a much less frequent dose.  And the studies

9   I've reviewed --

10          **MR. GALVIN:**  Objection.

11          **THE COURT:**  We'll stop it at that point.

12   **Q.**  Doctor, could you tell the jury your opinion, based upon

13   your review of the pharmacodynamic and kinetic material,

14   what that dosing improvement would be?

15          **MR. GALVIN:**  Objection.

16   A.  My conclusion --

17          **THE COURT:**  His conclusion, he may testify to his

18   conclusion.

19   A.  -- is that Mircera can be given up to as -- as

20   infrequently as once a month to maintain a safe and good

21   hemoglobin response.

22          **MR. GALVIN:**  Objection, your Honor.

23          **THE COURT:**  That may stand.  The jury is cautioned

24   that you're --

25          **THE WITNESS:**  I'm sorry.

1          THE COURT:  No, I'm just talking to the jury.  I'm

2     cautioning them that the factual issue to you is material

3     change from the product of the claimed, the Amgen claimed

4     process.  You see, for all we know, Amgen has made

5     improvements in whatever it was they claimed, and life goes

6     on.  We're talking about a comparison between patent claims

7     and Mircera.  That's your business.  I'm limiting you to

8     that.  The more general medical and business and competitive

9     thing isn't in this case.

10          Go ahead, Mr. Fleming.

11          MR. FLEMING:  Thank you, your Honor.

12     Q.  Let me focus you, Doctor, on the medical properties of

13     Mircera.  Based on the data that you reviewed, compared to

14     what you said was the crude isolate product of the asserted

15     claims, how do the medical properties, and pharmacodynamic

16     properties of Mircera create that difference, in your mind?

17          MR. GALVIN:  Objection, leading.

18          THE COURT:  No, overruled.  You may tell us how.

19     A.  All the medical studies lead me to conclude that Mircera

20     is materially changed from epoetin beta.

21     Q.  And could you tell the jury why, under what bases?

22     A.  The basis of prolonged, medically speaking, from the

23     basis of a prolonged serum half-life, or how the body

24     handles Mircera, and the response of Mircera in the body in

25     that it has a longer lasting and potent response.

1          For those two reasons, medically speaking, in my

2     opinion, Mircera is materially changed from epoetin beta.

3     Q.  Now, Doctor, the discussions in the documents that you

4     reviewed and entered into evidence regarding hemoglobin

5     concentration, do you recall that?

6     A.  Yes.

7     Q.  Did you review data regarding CERA and the hemoglobin

8     concentration?

9     A.  Yes.

10    Q.  Is hemoglobin concentration important to you as a

11    medical physician?

12    A.  Yes.  It's one of the pharmacodynamic responses you

13    would measure in the clinical trials.

14    Q.  And what data regarding hemoglobin concentration and

15    CERA did you see?

16    A.  The data I saw showed that Mircera gives a stable and

17    safe rise in the hemoglobin level.

18          MR. GALVIN:  Objection.

19    Q.  How did that impact your opinions?

20          THE COURT:  There's an objection, but it's

21    overruled.  And the how question may be asked.

22          MR. FLEMING:  Thank you.

23    Q.  How did that impact your opinion, the stable and safe

24    increase in hemoglobin with Mircera?

25    A.  That data further substantiates my conclusion that

 1   Mircera is materially changed from epoetin beta, as it is

 2   different.

 3   **Q.**  Doctor, have you seen any data regarding variability of

 4   hemoglobin with the administration of CERA?

 5   A.   I've seen that variable assessed in studies.

 6   **Q.**  Have you seen any concern at all regarding variability

 7   with the administration of CERA?

 8         **MR. GALVIN:**  Objection, your Honor.  May we have a

 9   sidebar?

10         **THE COURT:**  We may.

11   SIDEBAR CONFERENCE, AS FOLLOWS:

12         **MR. GALVIN:**  Two objections.  This reference to

13   variability is irrelevant to the issue in this case.  It

14   also goes to issues of safety that this Court has excluded.

15         **THE COURT:**  Yes.  What is it relevant to?

16         **MR. FLEMING:**  Based on that, you should strike the

17   deposition -- the trial testimony of Dr. Benet, who

18   testified yesterday that there was variability between

19   Mircera and EPO in administration.  He raised it as a

20   potential safety concern.  They raised this with their

21   witness, based on the fact it wasn't even in his report.

22         **MR. DAY:**  That was elicited on cross.

23         **THE COURT:**  I will strike it.  I'll strike it, and

24   I'll sustain the objection.

25         **MR. FLEMING:**  Strike the Benet --

1          **THE COURT:**  I'll strike that.

2          **MR. FLEMING:**  Thank you, your Honor.

3          (Whereupon the sidebar conference concluded.)

4          **THE COURT:**  Here's what that's about.  When we get

5     into variability, that's actually -- I'm not going to

6     emphasize it, because I'm striking it out.  We're not going

7     to get into variability.  Apparently, variability is one of

8     the things that medical doctors are concerned with when

9     they're dosing a patient.  We did touch on it yesterday with

10    Dr. Benet, I think when Roche was asking questions.  It

11    makes no difference who was asking questions.  But he was,

12    Benet, Dr. Benet, was permitted to say a little bit about

13    variability.

14          So now, of course, Mr. Fleming wants this witness

15    to say something about variability.  Variability is a

16    medical issue.  It doesn't bear on the comparison that

17    you're being asked to make.  So I'm sustaining Mr. Galvin's

18    objection to asking this witness about variability, and I'm

19    striking out whatever Dr. Benet had to say about

20    variability.  The rest of his testimony stands, and like any

21    witness, you can believe it, disbelieve it, believe parts of

22    it.  Variability is out, whether it comes from Benet, and it

23    won't come from this witness, because we're moving on.

24          Go ahead.

25          **MR. FLEMING:**  Thank you, your Honor.

1  **(BY MR. FLEMING:)**

2  **Q.**  So, Doctor, you've talked to the jury about binding

3  affinity, too, as another parameter that you analyzed;

4  correct?

5  A.  Yes, one of the biological parameters I analyzed.

6  **Q.**  If you could look at PGF that's in front of you.

7  A.  Yes, I have it.

8  **Q.**  And if we can turn to, in that report, to Figure 3?

9  A.  Yes.

10  **Q.**  Did you review this information in connection with

11  forming your opinions, Doctor?

12  A.  Yes.  This is one of the many in vitro or biologic

13  studies I reviewed.

14  **Q.**  And can you explain to the jury how this impacted your

15  opinion?

16  A.  This study is a competitive binding study that measures

17  and contrasts the relative binding affinities, or how the

18  drugs would interact with EPO receptor.  The way it's done

19  is you are competing away bound erythropoietin, or in this

20  case epoetin beta, that is already on cells by adding in

21  epoetin beta on the left, or Mircera on the right.  And the

22  way you measure this is at the halfway point of these

23  curves, which is a displacement, is the value you compare.

24          And so you can see with the epoetin beta, it only

25  takes about one unit -- it's an animal -- one unit to

1    displace half the bound epoetin beta.  Whereas, for CERA, it

2    takes 100 fold more CERA to displace the same amount of

3    bound epoetin beta.  It's greater than 100 units.

4         So this to me indicates that the interactions

5    between Mircera and the receptor are substantially different

6    than the interactions between epoetin beta and the receptor.

7    **Q.**  And how does that impact your opinion about whether

8    Mircera infringes these claims?

9    A.  This difference is significant.  And so, for me, it

10   leads me to conclude that from a biological perspective

11   they're materially different.

12   **Q.**  Is this the only study about binding affinities you

13   looked at?

14   A.  No.  I reviewed other studies.  And in all instances,

15   those studies also revealed that the binding affinity --

16        **MR. GALVIN:**  Objection.  Hearsay.

17        **THE COURT:**  Not what the studies revealed.  You

18   were doing very well -- strike that.  Strike that.  I had a

19   comment on his understanding of the rules of evidence.  I

20   have nothing to say about what you get from this witness.

21        But you were following my instructions well.  And

22   you seem to have the concept.  What the studies say, we're

23   not to hear about unless they're in evidence.  What you

24   conclude from the studies is appropriate.  Your conclusions,

25   because they may cross-examine you.

1          **THE WITNESS:**  Okay.

2          **THE COURT:**  I was not evaluating the witness.  It

3     would be improper if I did so.  Don't think I was.

4     **Q.**  Doctor, did those other studies confirm your opinions

5     regarding Mircera that you expressed to the jury?

6          **MR. GALVIN:**  Objection.

7          **THE COURT:**  Sustained.  Leading the witness.

8     **Q.**  How did those other studies inform your opinion

9     regarding Mircera?

10    A.  The other studies I reviewed led me to conclude that

11    Mircera binds to the EPO receptor in a different manner than

12    epoetin beta.

13    **Q.**  Could you look at your blue report on page 66, so that

14    we have no misunderstanding of what the rules are?

15    A.  Page 66 or Paragraph 66?

16    **Q.**  Page 66.  And it's the sentence, the last sentence in

17    Paragraph 150.

18    A.  Yes.

19    **Q.**  So your opinion regarding CERA binding to the receptor

20    have any impact on your opinions regarding biological

21    activity?

22    A.  Yes.

23    **Q.**  Can you tell the jury what your opinions are?

24    A.  The different binding affinities are an indication of

25    and can be translated into different in vivo biological

1    responses.

2    **Q.**  And when you say in vivo biological responses, what do

3    you mean; how it works in the body?

4    A.  No, I mean its response in humans.

5            **MR. FLEMING:**  And can I have the claims of the '698

6    patent.  Let's see.

7    **Q.**  Doctor, these are the claims of the '698 patent.  Have

8    you reviewed these claims in forming your opinions?

9    A.  I have.

10    **Q.**  Can you tell the jury what your opinion as to whether

11    Mircera infringes claim 6 of the '698 patent?

12    A.  So this is another process claim for the production of a

13    glycosylated erythropoietin in vertebrate cells.  As I

14    mentioned for the '868 claim, Mircera is not the product of

15    this process, and does not infringe, as it is not and cannot

16    be made in cells.

17    **Q.**  And the dependent claims, 7, 8 and 9?

18    A.  Seven, 8 and 9 are dependent claims to claim 6.  As I

19    pointed out already for claim 6, Mircera is not the product

20    of this process.  And in addition, Mircera is materially

21    different from the product of this process.

22    **Q.**  And Doctor --

23    A.  And, therefore, does not infringe claims 7, 8 and 9.

24    **Q.**  Doctor, have you formed any opinions regarding Mircera

25    under the doctrine of equivalents?

1    A.   Yes.

2    **Q.**   Could you tell the jury what your opinion is?

3    A.   Yes.   Under the doctrine of equivalents, I don't think

4    Mircera infringes.   The medical and biological differences

5    in Mircera compared to the product of the claim are

6    substantial and significant, so they can't be considered

7    equivalent.

8         **THE COURT:**  Now, understand, again -- forgive me

9    for interrupting, but there's a lot of concepts here and I

10   have them very much in mind because either tomorrow or the

11   next day I have to make sure they're all properly taught to

12   you.

13        For these process claims, the first question I'm

14   going to ask you is, is the product of the Roche process,

15   Mircera, materially changed from the claimed processes in

16   the patents?   Amgen has to prove by a fair preponderance

17   that it's not, not materially changed.   So if you come to

18   believe that Amgen is right, you go on to consider literal

19   infringement and then to consider infringement by the

20   doctrine of equivalents.

21        However, if Roche -- strike that -- if Amgen has

22   failed to convince you by a fair preponderance of the

23   evidence, when you compare the patented process claims with

24   Mircera, that it is not materially changed, end, Roche wins.

25   You check no on both of the columns of literal infringement

1   and doctrine of equivalents.

2         So this witness now has shifted.  He's been giving

3   us his opinion on material change.  Now he's off on

4   something else.  He's talking about even if you think the

5   Roche Mircera is not materially changed from the claimed

6   process, but you think that the Roche Mircera does not

7   literally infringe those process claims, he's now giving you

8   the opinion that it also does not infringe under the

9   doctrine of equivalents.  They're different standards.

10        Go ahead.

11        **MR. DAY:**  Your Honor, may we have a sidebar?

12        **THE COURT:**  Not now.

13        **MR. FLEMING:**  Thank you, your Honor.

14  **Q.**  Doctor, it has been suggested that mere interaction with

15  the EPO receptor can suggest the structure of or identity of

16  a molecule.  Do you agree with that?

17  A.  I do not.

18  **Q.**  It's been suggested that the interaction with the EPO

19  receptor and stimulation of red blood cells tells you

20  anything about the structure or the identity of a molecule.

21  Do you agree with that?

22  A.  I do not.

23  **Q.**  Can you tell the jury why?

24  A.  Just because a protein, drug or compound interacts with

25  the erythropoietin receptor does not mean that that is

1    erythropoietin.

2    Q.  Are you familiar with an antibody?

3    A.  I'm familiar with antibodies, yes.

4    Q.  Do antibodies interact with the EPO receptor?

5           MR. GALVIN:  Objection.

6    A.  Indeed they do.

7           THE COURT:  You object?

8           MR. GALVIN:  Yes, leading.

9           THE COURT:  Where is it in the report?

10          MR. FLEMING:  Your Honor, the objection was

11   leading.

12          MR. GALVIN:  And it's not in the report.

13          THE COURT:  I'll take that outside the report.

14   Move on.

15   Q.  Doctor, have you ever heard of a peptide mimetic?

16          MR. GALVIN:  Objection.  Outside the report.

17          THE COURT:  Where is it?

18          MR. FLEMING:  Excuse me one second, your Honor,

19   I'll show you exactly where we have it.  Paragraph 167, blue

20   report, your Honor.

21          THE COURT:  Yes.  No, sustained.

22          MR. FLEMING:  Your Honor, it's also 165 and 166,

23   Paragraph 166, the first two sentences.

24          THE COURT:  Well, you may ask him that but you

25   haven't.  Sustained.

1   **Q.**  Doctor, reading from your report, isn't it true that

2   binding of the EPO receptor doesn't speak to whether

3   molecules are the same or similar?

4           **MR. GALVIN:**  Objection, leading.

5           **THE COURT:**  Sustained.  Don't lead the witness.

6   You can read from the report if you want.

7           **MR. FLEMING:**  Thank you very much.

8   **Q.**  Doctor, could you look at the first two sentences of

9   Paragraph 166 of your report?

10  A.  Yes, I see them.

11  **Q.**  Okay.  Could you read those first two sentences to the

12  jury, please?

13          **MR. GALVIN:**  Objection.

14          **THE COURT:**  Overruled.

15          **MR. GALVIN:**  Hearsay.

16          **THE COURT:**  Overruled.

17  A.  "Even EPO from others species such as mice or monkeys

18  can bind and activate the human EPO receptor.  Dr. Elliott,"

19  an Amgen employee, "has testified that binding of EPO from

20  other species 'doesn't speak to whether the molecules are

21  the same or similar molecules.  And, in fact, they are

22  not.'"

23          **MR. GALVIN:**  Objection.  Move to strike.

24          **THE COURT:**  Motion to strike's denied.

25          **MR. FLEMING:**  Your Honor, now if we could look at

 1   Paragraph 160 and 161.

 2   A.  Yes.

 3        MR. FLEMING:  I'm talking to his Honor for one

 4   second.

 5        THE COURT:  Put your question.

 6   Q.  So, Doctor, looking at Paragraphs 160 and 161.

 7   A.  Uhm-hmm.

 8   Q.  Let's focus on Paragraph 162.

 9   A.  Yes, I see it.

10   Q.  162 discusses an antibody?

11   A.  It does.

12   Q.  And the fact of binding to the EPO receptor, Doctor,

13   does that suggest that a molecule is the same or similar to

14   another molecule, in your opinion?

15        MR. GALVIN:  Objection.

16        THE COURT:  Where specifically is it in these

17   paragraphs?

18        MR. FLEMING:  Your Honor, it starts at 160 and

19   starts with the first sentence --

20        THE COURT:  Oh, I see.  He may testify consistent

21   with 162, which deals with this.

22        MR. FLEMING:  Thank you.

23   Q.  Go ahead, Doctor.

24   A.  Do you want me to read or just --

25   Q.  I'd like you to answer the question.

1    A.   So because a protein binds to the EPO receptor, it does

2    not mean that it is erythropoietin.

3    **Q.**   Or same or similar to?

4    A.   Or same or similar to it.   And this, and what I'm

5    talking about in my expert report, is that antibodies will

6    actually bind to the erythropoietin receptor and activate

7    it.   And they're clearly distinct from epoetin beta or

8    erythropoietin.

9            **MR. FLEMING:**   Your Honor, could we have a quick

10    sidebar?   I want to make it clear that I'm --

11            **THE COURT:**   You could.

12            **MR. FLEMING:**   My next almost last questions are

13    consistent --

14   SIDEBAR CONFERENCE, AS FOLLOWS:

15            **MR. FLEMING:**   These series of questions, your

16    Honor, go to the reverse doctrines of equivalents.

17            **THE COURT:**   About which we've heard nothing so far.

18            **MR. FLEMING:**   So far being the operative point of

19    that, your Honor.   So I wanted to make sure that I'm not

20    running afoul of anything that you believe you've outlined

21    on.   I don't think we are, but --

22            **THE COURT:**   Oh, no, you're not running afoul.   It

23    doesn't mean you get to the jury on it simply because you're

24    going to ask him questions about it.

25            **MR. DAY:**   Your Honor, I requested a sidebar earlier

 1   because I --

 2            THE COURT:  You did, and you were out of order.

 3   One witness per -- one lawyer per witness.  I've been lax on

 4   that, I know.  I shouldn't be.  This business of battalions

 5   of people jumping up is wrong.  That's a charge.  You're

 6   getting that charge.  You're going to have to talk me off

 7   that.

 8            MR. DAY:  I apologize, your Honor.

 9            (Whereupon the sidebar conference concluded.)

10            MR. FLEMING:  May I continue, your Honor?

11            THE COURT:  You may.

12            MR. FLEMING:  Thank you.

13   (BY MR. FLEMING:)

14   Q.  Doctor, are you familiar with the concept of reverse

15   doctrine of equivalents?

16   A.  Yes.

17   Q.  Do you have an opinion for the jury regarding Mircera

18   under the concept of reverse doctrine of equivalents?

19            THE COURT:  Well, now, are you sure you want to ask

20   that?  Because we've never heard about that and I'll tell

21   the jury about it, if you want me to.

22            MR. FLEMING:  Your Honor, I'd just like to elicit

23   his opinion.

24            THE COURT:  Try my question.  You want that

25   opinion, you're going to get a charge before you get that

1    opinion.  Do you want it?

2         **MR. FLEMING:**  Your Honor, not knowing what you're

3    going to say, you've put me in a perilous position.

4         **THE COURT:**  That may be.  You've asked for it.

5         **MR. FLEMING:**  If we can have a sidebar.

6         **THE COURT:**  You bet your life.

7    SIDEBAR CONFERENCE, AS FOLLOWS:

8         **THE COURT:**  Because it's an admission of

9    infringement, that's what --

10        **MS. BEN-AMI:**  It's not.

11        **THE COURT:**  You may think so.  Now I'm down to the

12   stage where I have to teach, and I'll teach.  If I'm going

13   to tell them that if it infringes a defense is that even

14   though it literally infringes, it is so strikingly

15   different, and you'll bear the burden on it if you get to

16   the jury.  I will tell them that you bear the burden.  Fair

17   preponderance, but you bear the burden.  They don't have any

18   burden to show no reverse doctrine of equivalents.  And so I

19   meant to cause you to bet your life on it.

20        **MR. FLEMING:**  Understood.

21        **MS. BEN-AMI:**  I apologize, your Honor, I still

22   don't understand.  Because it's an assumption.

23        **THE COURT:**  I'm sorry.

24        **MS. BEN-AMI:**  You said assume there's literal

25   infringement.  If you assume that there's literal

1    infringement, do you believe that it's so strikingly

2    different, whatever the standard is.

3              **THE COURT:**  Right.

4              **MS. BEN-AMI:**  So you say, I'm making an assumption,

5    which is what every witness in this case has done on various

6    issues.

7              **THE COURT:**  Understand.  I'm going to tell them

8    that now.

9              **MS. BEN-AMI:**  So it's not an admission of anything.

10             **THE COURT:**  Oh, well, all right.  It, in that

11   sense, I shouldn't have used the word "admission."  I agree.

12   You're right.

13             **MS. BEN-AMI:**  All we're saying, it's a different --

14             **THE COURT:**  Do you want the charge or not?

15             **MS. BEN-AMI:**  I think so, yes.  If it's literally

16   infringed, it doesn't --

17             **MR. GALVIN:**  Your Honor?

18             **THE COURT:**  I've heard enough.

19             (Whereupon the sidebar conference concluded.)

20             **MR. FLEMING:**  Based on the sidebar --

21             **THE COURT:**  "We'd ask you to continue," he said.

22             Here's what that eruption was.  So far we haven't

23   heard anything about a legal doctrine called the reverse

24   doctrine of equivalents.  And, technically, it isn't the

25   reverse doctrine of equivalents at all.  It isn't a doctrine

1    of equivalents.  But there may be, in the law, it's really

2    not clear whether there is in the law or not, but that's up

3    to me, I've got to figure that out.  And I'm going to let

4    them put on evidence anyway.

5            I've been very clear about who has to prove what.

6    First part of the case, Roche has got to do the pleading --

7    proving on validity by clear and convincing evidence.

8    Second part of the case, Amgen's got to do the proving by a

9    fair preponderance of the evidence.  And that's how it's

10   worked.  Amgen has put in its case.  Now we're hearing the

11   Roche case.

12           In defense -- but Roche doesn't have anything to

13   prove so far, they're just defending against the Amgen

14   proof.  Now, on reverse -- I shouldn't even call it the

15   doctrine of equivalents, because here's the theory:  That

16   something can literally infringe, it actually can violate

17   the patent.  It has every element of the patented claim.

18   And yet, it can be allowed to go forward.  You can say that

19   it doesn't infringe because it is so strikingly different,

20   so novel in and of its own concept, that it is both

21   deserving of a patent and it's a striking breakthrough.

22           Now, who has to prove that?  If we start letting

23   this witness testify to that, Roche has got to prove that.

24   And understand, you'll never get there.  You'll never have

25   to evaluate this part of the testimony, and any other

```
 1    witness who wants to testify on the so-called reverse

 2    doctrine of equivalents, until you've already decided Roche

 3    infringes, literally infringes, violates the patent.

 4           And so far, Roche has been saying, Oh, no, we don't

 5    violate the patent.  But this is on the assumption, they're

 6    saying, But if we do, our stuff is so -- and this is a

 7    different standard.  This is not the materially changed

 8    standard.  This is not whether it is so close in function

 9    and way and means to be a violation of the doctrine of

10    equivalents.  This would have to assume, Yeah, we violated,

11    but our stuff is so strikingly different, so novel, so --

12    the approach so independently patentable that you ought not

13    hold Amgen to have infringed.

14           Now, we'll see -- I have to charge you at the end

15    of the case.  We'll see whether I will charge you this again

16    or whether this piece will drop out of the case.  But I

17    don't know.  They're entitled to put on the evidence, and

18    they may.  Go ahead, Mr. Fleming.

19           MR. FLEMING:  Thank you very much, your Honor.

20    (BY MR. FLEMING:)

21    Q.  Doctor, you have told the jury that it's your opinion

22    that Mircera does not literally infringe the asserted claims

23    of the Lin patents; correct?

24    A.  That's correct.

25    Q.  And you hold to that opinion?
```

1    A.  Yes, I do.

2    **Q.**  Now, I want you to assume, only assume that it were.  Do

3    you believe that Mircera infringes under the reverse

4    doctrine of equivalents?

5            **MR. GALVIN:**  Objection, your Honor.

6            **THE COURT:**  Overruled.

7    **Q.**  Can you tell the jury why?

8    A.  I do not.  And in my opinion --

9            **THE COURT:**  Wait a minute, you lost -- oh, you

10   thought -- go ahead.

11   A.  I do not.  I do not.

12           **MR. FLEMING:**  Your Honor, let me ask.

13   **Q.**  Do you agree -- withdrawn.

14           Is it your opinion that the reverse doctrine of

15   equivalents takes Mircera out of infringement of the claims

16   if you assume there's literal infringement?

17           **THE COURT:**  I understand that question and you may

18   answer it.

19           **MR. GALVIN:**  Objection.  Vague.

20           **THE COURT:**  Overruled.

21           **MR. GALVIN:**  Vague as to claims.

22           **THE COURT:**  Overruled.

23   A.  Can you repeat the question now?

24           **THE COURT:**  Yes.  And I'll repeat it, since then

25   I'll understand it.  I want you to be specific with respect

1    to claims of the claims that are disputed here.  Because I'm

2    going to be telling the jury pay attention to the claims.

3           He's asking you to assume, though your opinion, he

4    says, is to the contrary, assume that what Roche does in its

5    process or in its product literally infringes one or more of

6    those claims now.  And tell us which claims.  Then do you

7    think, as you understand the -- what we call the reverse

8    doctrine of equivalents, that defense is available and

9    proved by Roche on this record?  Can you do that?

10          **THE WITNESS:**  I think so.

11          **THE COURT:**  You may.  Claim by claim, if you can.

12   Go ahead.

13          **THE WITNESS:**  So if I get -- I mean, it's my

14   opinion they don't infringe under the doctrine of reverse

15   equivalents.  That Mircera does not.  And I'll take claim

16   '933 as an example.

17          **MR. FLEMING:**  Put '933 up, please.

18          **THE WITNESS:**  So, in my opinion, Mircera is so

19   fundamentally distinct from the product of this claim, that

20   it would be unfair to say that it infringes.  And so, as a

21   result, I don't think it infringes under the doctrine of

22   reverse equivalents.

23   **Q.**  Doctor, you're aware that Roche has a patent, the

24   '272 patent on its Mircera product; correct?

25          **MR. GALVIN:**  Objection.  Lacks foundation.

```
 1              THE COURT:  Sustained in that specific form.  But

 2    go ahead.

 3    Q.  Are you aware of any patents that Roche owns that cover

 4    the Mircera product, Doctor?

 5    A.  Yes.

 6              MR. GALVIN:  Objection.

 7    Q.  Is it the '272 patent?

 8    A.  Yes.

 9              THE COURT:  The objection's overruled.  Yes, and

10    the patent's in evidence.  Go ahead.

11    Q.  And did you factor in the fact of Roche's patent on

12    Mircera in coming to your conclusion regarding

13    noninfringement under the reverse doctrine of equivalents?

14              MR. GALVIN:  Objection.

15              THE COURT:  Sustained.

16              MR. GALVIN:  Not --

17              THE COURT:  Sustained.  Sustained.

18    Q.  Did you consider that fact in forming your opinion?

19              THE COURT:  No, sustained.  Move on.

20    Q.  So when you say it's so fundamentally changed that it

21    would be unfair to consider it within the scope of the

22    claims, Doctor, what do you in essence mean, as a physician?

23              MR. GALVIN:  Objection.  Vague as to claim.

24              THE COURT:  Overruled.  He's to tie it to claims,

25    I've told him that.  Go ahead.
```

1    A.   In my opinion, Mircera is not the product -- it's so

2    fundamentally different from the product in this claim, as I

3    pointed out, is not and cannot be made in a cell.

4    Q.   Do any of the medical or biological properties that you

5    told the jury about impact your decision?

6             MR. GALVIN:   Objection.   Outside the report.

7             THE COURT:   Yeah, where is it?

8             MR. FLEMING:   Your Honor, it's in Paragraphs 220,

9    221, 222.

10            THE COURT:   Just a moment.

11            MR. FLEMING:   And if you'd look at 220, your Honor,

12   the last two sentences, as a starting place.

13            THE COURT:   Yes.   Well, he has so testified.

14            MR. FLEMING:   I just wanted to tie that prior

15   testimony into this concept, your Honor, so the jury

16   understands the relevance of the evidence hereto.

17            THE COURT:   Well, put a question and I'll rule on

18   it.

19            MR. FLEMING:   Yes.

20   Q.   The medical and biological properties and differences of

21   Mircera that you've told the jury about, Doctor, do they

22   apply to your analysis and opinions under the reverse

23   doctrine of equivalents?

24            MR. GALVIN:   Objection, leading, outside the

25   report.

1          **THE COURT:**  He may have it.  It is not outside the

2     report.  He may have it.

3     A.  Yes.

4          **THE COURT:**  Your answer's yes?

5          **THE WITNESS:**  Yes.  May I read from the report,

6     make it simpler maybe?

7          **THE COURT:**  He's asking the questions.

8     A.  So --

9          **THE COURT:**  No, he's asking the questions.

10    **Q.**  If you look at the second sentence of Paragraph 221,

11    Doctor?

12    A.  It begins, "For instance"?

13    **Q.**  Could you read that, please?

14         **THE COURT:**  No, he may not.

15    A.  You want the one that starts with, "This determination,"

16    or that starts --

17    **Q.**  Paragraph 221.

18    A.  221, sorry.

19    **Q.**  Second sentence.

20         **THE COURT:**  Just a moment.  Let's see.  Yes, you

21    may read that.

22    **Q.**  Please read that.

23    A.  "These differences as described above, include at least

24    a different molecular weight, a different type of

25    interaction with the EPO receptor characterized by a low

1    affinity, different half-life, different rates of clearance,

2    different dosing intervals, with the result that a single

3    monthly dose of CERA can provide continuous stimulation of

4    erythropoiesis, which any of the claimed recombinant human

5    EPO products lack."

6    **Q.**  Now, Doctor, referring you to Paragraph 222?

7    A.  Yes.

8    **Q.**  There's reference there to U.S. Patent 6,583,272?

9    A.  The Bailon patent, yes.

10   **Q.**  This is Roche's patent on Mircera?

11   A.  Yes.

12              **MR. GALVIN:**  Objection.

13              **THE WITNESS:**  Sorry.

14              **THE COURT:**  Well, I'll let that stand so he can

15   follow.  Yes.

16   **Q.**  Did you consider this as part of the evidence in

17   forming --

18              **THE COURT:**  Sustained.  We're not trying out some

19   sort of patent interference here.  We're not.

20              **MR. FLEMING:**  Not, your Honor --

21              **THE COURT:**  Well, that's my ruling.

22              **MR. FLEMING:**  Okay.

23   **Q.**  Can you read the first sentence in Paragraph 222?

24              **THE COURT:**  No, you may not.

25              **MR. FLEMING:**  Okay.

1    Q.  But that is the patent you were talking about covering

2    Mircera, the '272 patent?

3            MR. GALVIN:  Objection.

4            THE COURT:  He may have that.  And your answer's

5    yes; correct?

6            THE WITNESS:  Yes.

7            THE COURT:  Thank you.  All right.  That it for

8    this witness?

9            MR. FLEMING:  Thank you, your Honor.  Thank you,

10   ladies and gentlemen.  No further questions at this time.

11           THE COURT:  Yes.  Mr. Galvin, any questions for

12   this witness?

13           MR. GALVIN:  Yes, your Honor.

14                        **CROSS-EXAMINATION**

15   **(BY MR. GALVIN:)**

16   Q.  Dr. Longmore, you spend only about 20 to 30 percent of

17   your time each year treating patients, and the rest of the

18   time your time is spent doing research; correct?

19   A.  Yes, but my treatment -- my practice is a focus on

20   patients with blood disorders and anemia.

21   Q.  You don't have a private clinical practice anymore;

22   correct?

23   A.  I see patients in the hospital every year.

24   Q.  Dr. Longmore, my question was just you don't have a

25   private clinical practice anymore; correct?

1    A.  No.

2    Q.  And currently you're attending -- you're an attending

3    physician at hospital for two months out of the year;

4    correct?

5    A.  Consulting attending physician; yes.

6    Q.  And you're not a nephrologist, a kidney specialist;

7    correct?

8    A.  That's correct.

9    Q.  Both recombinant human EPO and CERA can stimulate red

10   blood cell production in the bone marrow; correct?

11          MR. FLEMING:  Objection, vague.

12          THE COURT:  Overruled.

13   A.  Can you repeat the question?  I'm sorry.

14   Q.  Both recombinant human EPO and CERA can stimulate red

15   blood cell production in the bone marrow?

16          MR. FLEMING:  Objection, your Honor.  Can we have a

17   sidebar, please?

18          THE COURT:  I don't see the necessity for it.

19   Overruled.

20   A.  Yes.

21   Q.  And both recombinant EPO and CERA can increase

22   hematocrit levels when administered to patients; right?

23          MR. FLEMING:  Objection on the phrase "recombinant

24   human EPO."

25          THE COURT:  Overruled.

1    A.  They do.

2            THE COURT:  Well, wait a second.  What do you mean

3    by "recombinant human EPO"?  Do you mean the -- what do you

4    mean?  When you're using that term, since we have to be

5    careful about terms, what's your starting point here?

6            MR. GALVIN:  Epoetin beta.

7            THE WITNESS:  You're referring to epoetin beta in

8    all these questions?  Okay.

9            THE COURT:  And you understood that?

10           THE WITNESS:  I took that to be what he meant.

11           THE COURT:  Thank you.  And he may proceed on that

12   basis.

13   Q.  Have you ever successfully treated a patient's anemia by

14   injecting a patient with just peg?

15           MR. FLEMING:  Objection.  Relevance, your Honor.

16           THE COURT:  Overruled.

17   A.  No, that's not a treatment for anemia.

18   Q.  And you do not claim in your report that peg, by itself,

19   can stimulate red blood cell production in the bone marrow;

20   right?

21   A.  As I pointed out, that is not a treatment.  No one would

22   inject patients with peg.

23   Q.  Pharmacodynamics refers to what effects the drug has on

24   the body; correct?

25   A.  Yes.

```
 1    Q.  Do you agree that the part of peg-EPO primarily

 2    responsible for its pharmacodynamic effect is epoetin beta?

 3              MR. FLEMING:  Objection, your Honor, vague,

 4    mischaracterizes --

 5              THE COURT:  Overruled.

 6    A.  No, I don't agree.

 7    Q.  If you could turn to Tab 19 in front of you, Exhibit

 8    GXN.

 9    A.  I'm sorry, in the book you want me to look at, this huge

10    thing?

11    Q.  Tab 5, I'm sorry.  Tab 5, GXN.

12    A.  GXN?

13    Q.  Yes.

14    A.  Okay, I've got it.  Just a second, let me clear up some

15    space.  Okay.

16    Q.  It's titled, "Research" --

17              MR. FLEMING:  Objection, your Honor, foundation.

18    This document's not in evidence.

19              THE COURT:  No, it's not in evidence so we won't

20    hear him read from it.

21    Q.  Dr. Longmore, do you see the title of the slide -- of

22    the presentation?

23              MR. FLEMING:  Objection.  Characterization, your

24    Honor.

25              THE COURT:  Yeah, well, can you identify this
```

1  document?  Have you ever seen it before?

2           **THE WITNESS:**  It looks like a slide show.  I don't

3  recall.

4           **MR. GALVIN:**  Your Honor, I offer Exhibit GXN.

5           **THE COURT:**  Any objection?

6           **MR. FLEMING:**  Objection, your Honor.

7           **THE COURT:**  Overruled, it may be admitted.

8           **MR. FLEMING:**  Objection.  Sidebar.

9           **THE COURT:**  I don't see the need.  It's overruled,

10  and it's admitted.  GXN is admitted in evidence, Exhibit 67.

11           (Exhibit marked in evidence.)

12  **Q.**  Dr. Longmore, if you could turn to page 830 on the

13  document.

14  A.  830.  So it starts 806?

15  **Q.**  4305830.

16  A.  Yes, I'm getting there.  Okay.

17  **Q.**  And do you see the legend at the bottom of the page,

18  "Roche Confidential"?  Do you see that?

19  A.  Seventeenth of May, 2001, Roche confidential.  Yes.

20  **Q.**  And do you see the sentence in the second paragraph

21  under, "The chances of clinical success" --

22           **MR. FLEMING:**  Objection, your Honor.

23  **Q.**  "The efficacy of peg" --

24           **MR. FLEMING:**  Excuse me.  Objection, your Honor, we

25  need a sidebar on this.

1    **THE COURT:**  Let me see it.

2    **THE CLERK:**  GXN?

3    **THE COURT:**  I have it.

4    **MR. FLEMING:**  Your Honor, focus on the word

5    "efficacy."

6    **THE COURT:**  Wait a minute.  If I want a sidebar,

7    I'll call you for it.

8    **MR. FLEMING:**  I beg your pardon, I thought you had.

9    **THE COURT:**  No, it's not CERA.  You may use it.

10   **MR. GALVIN:**  Can we have it up on the screen again?

11   Q.  Do you see this sentence, "The efficacy of peg-EPO will

12   not be a major issue because the part of peg-EPO primarily

13   responsible for its pharmacodynamic effect is epoetin beta,

14   which has demonstrated its efficacy in thousands of patients

15   over the last ten years"?

16   A.  Yeah, I see it.  I see that statement, yes.

17   Q.  And do you agree with Roche's research and development

18   committee report?

19   A.  Are you asking do I agree with this sentence?

20   Q.  Yes?

21   **MR. FLEMING:**  Objection, your Honor, foundation.

22   **THE COURT:**  Overruled.  You may have it.

23   Do you agree with that?

24   **THE WITNESS:**  No, I don't.

25   Q.  And epoetin beta is a form of recombinant human EPO made

1    by Roche; correct?

2            **MR. FLEMING:**  Objection.

3            **THE COURT:**  Overruled.  Well, well, sustained.  I

4    don't know that he knows of his own knowledge.

5            You assumed that, didn't you?

6            **THE WITNESS:**  I'm sorry, what was the question

7    again?

8            **THE COURT:**  Epoetin beta is a form of recombinant

9    human EPO made by Roche, did you make that assumption?  From

10   what you've testified, I don't know that you went out there

11   and checked --

12           **THE WITNESS:**  No, I assumed, yes.

13           **THE COURT:**  You assumed that?

14           **THE WITNESS:**  Yes.

15           **THE COURT:**  Go ahead.

16   **Q.**  Dr. Longmore, EPO must bind and fit into a specific site

17   on the EPO receptor; correct?

18           **MR. FLEMING:**  Objection, your Honor.

19           **THE COURT:**  Overruled.

20   A.   EPO binds to the EPO receptor, yes.

21   **Q.**  And CERA must also bind and fit into a specific site on

22   the EPO receptor; right?

23   A.   CERA --

24           **MR. FLEMING:**  Objection.

25           **THE COURT:**  Overruled.

1    A.   CERA interacts with the EPO receptor, yes.

2    Q.   If you turn to Tab 6 in your book, Exhibit EZD.

3              MR. GALVIN:   Your Honor, I offer Exhibit EZD.

4              MR. FLEMING:   Objection, your Honor.

5              THE COURT:   Just a moment.   Tab 6.

6              I will need a sidebar on this.

7    SIDEBAR CONFERENCE, AS FOLLOWS:

8              THE COURT:   Now, look, time is getting short.   And

9    I'm not going to have sidebars to go over things that I've

10   already gone over.   Because now at the very end, I think I

11   largely know the landscape.   But, of course, here the fact

12   that this was produced by Roche is not an adequate

13   authentication.   A slide show all fits in, and so it's

14   overwhelming circumstantial evidence that that's their

15   project, that I admitted it as an admission.   What do you

16   think this is?

17             MR. GALVIN:   They've stipulated to the authenticity

18   of documents produced from their files, your Honor.

19             THE COURT:   Fine.   I have no problem with that.

20   They're not going back on that.   But, for instance, they

21   have a motion to reconsider EWW or something, saying now

22   they've checked it out, some independent agency.

23             Right, this is an authentic document that came from

24   their files.   It's not good enough unless you can show me

25   something more.   Because I can't tell from this -- I've been

 1   liberal on this to both sides, but I can't tell what this

 2   is.  Sustained.

 3          MR. FLEMING:  Thank you, your Honor.

 4          (Whereupon the sidebar conference concluded.)

 5          MR. GALVIN:  Can we have Exhibit 38 on the screen?

 6   Which should also be in your binder at Tab 3, I believe.

 7   And if we could highlight the e-mail from Cesar Escrig.

 8   **(BY MR. GALVIN:)**

 9   **Q.**  In 2004, Caesar Escrig, of Roche, wrote to

10   Dr. Haselbeck.  "In the animation included in the slide" --

11          **MR. FLEMING:**  Objection.  Relevance, your Honor.

12          **THE COURT:**  It's in evidence, he may read it.  It's

13   his time, and time is running out.  Go ahead.

14   **Q.**  "In the animation included in the slide, both molecules,

15   EPO and CERA have a perfect fit with the EPO-R."

16          **MR. FLEMING:**  Objection.  It speaks for itself,

17   your Honor.

18          **THE COURT:**  Overruled.  He may read it.

19   **Q.**  "In order to be accurate, should the CERA/EPO-R look

20   different than the EPO/EPO-R in order to stress that the

21   interaction with the receptor is different?"

22          **MR. GALVIN:**  Could we continue on with the

23   document, Dr. Haselbeck's rely?

24   A.  Now, what's that referring to?

25   **Q.**  Top of the screen.

1   A.   Oh, at the top of the page?

2   **Q.**   Yes.   Dr. Haselbeck responded, "I think the fit needs to

3   be the same to emphasize that the binding region is still

4   the same; the main difference obviously is the size which

5   prevents strong binding and uptake."

6           Do you agree with Dr. Haselbeck that the binding

7   region of EPO and CERA is the same?

8           **MR. FLEMING:**   Objection.   Mischaracterizes the

9   document.

10          **THE COURT:**   Overruled.

11  A.   So you're referring to the response at the top of the

12  page?

13  **Q.**   My question was whether you agree or not with

14  Dr. Haselbeck that the binding region of EPO and CERA is the

15  same?

16  A.   I disagree.

17  **Q.**   Okay.   Let's look at Exhibit ETO, which is Tab 7 in your

18  binder.

19          **MR. GALVIN:**   Your Honor, I offer ETO.

20          **THE COURT:**   ETO, Tab 7?

21          **MR. GALVIN:**   Yes, your Honor.

22          **THE COURT:**   Just a moment.

23          **MR. FLEMING:**   Objection, your Honor.

24          **THE COURT:**   Yes, overruled.   ETO is admitted in

25  evidence, Exhibit --

1    **THE CLERK:**  Sixty-eight.

2    **THE COURT:**  Seventy-eight?

3    **THE CLERK:**  Sixty-eight.

4    **THE COURT:**  Thank you.  Sixty-eight, it's admitted.

5    (Exhibit marked in evidence.)

6  **Q.**  Exhibit 68, this is a September 22, 2006 e-mail from

7  Michael Jarsch to Anton Haselbeck; correct?

8    **MR. FLEMING:**  Objection.  Foundation, your Honor.

9  A.  It doesn't --

10   **MR. FLEMING:**  The document speaks for itself.

11   **THE COURT:**  The document does speak for itself.

12 You may not testify.  He's got it.  Why don't you say, Do

13 you see what it says there, and then put your question.

14 A.  I see the document.

15 **Q.**  Okay.  If we could look at the portion of the e-mail

16 where Dr. Jarsch wrote, "The combination of data and

17 considerations lead to a" --

18 A.  Where is that in the -- where are you pointing to?  This

19 is the response?

20 **Q.**  This is the third subbullet.

21 A.  Under the response?

22 **Q.**  Yes.

23   **MR. FLEMING:**  Objection to the characterization of

24 who wrote what, your Honor.

25   **THE COURT:**  Overruled.  The jury will draw their

1    own conclusions.  Questions are not evidence.  He may press

2    the point.

3    **Q.**  It states, "The combination of the data and

4    considerations lead to a binding model where the large CERA

5    molecule needs considerably longer to fit properly to the

6    receptor mainly due to the large molecular mass."  And it

7    continues, "However, when the CERA molecule has eventually

8    bound to receptor, this interaction is presumably similar to

9    that of epoetin as expressed by the similar dissociation

10   rate."

11           Do you agree with Dr. Jarsch's proposed binding

12   model for CERA?

13   A.  So this is a Jarsch response, so they -- who posed the

14   question?  I'm not following.  This is a Haselbeck question

15   and a Jarsch response in this e-mail?

16   **Q.**  Do you agree with the statement that is displayed on the

17   screen from Exhibit 68?

18   A.  So --

19   **Q.**  My question is just do you agree or not?

20   A.  There is no structural data that I know of that shows --

21   **Q.**  Doctor --

22           **MR. GALVIN:**  Your Honor, may I have an instruction?

23           **THE COURT:**  Yes.  You can either answer his

24   question yes or no, say I can't answer it yes or no, or say

25   I don't know or I don't recall.  But those are the choices

1    you have.  They have a chance to ask you other questions.

2         **THE WITNESS:**  Okay.  Sorry, can you just repeat the

3    question again?

4    **Q.**  Do you agree with the statement on Exhibit 68 that I

5    just read to you and that's displayed on the screen?

6    **A.**  I disagree.

7    **Q.**  Thank you.

8         **MR. GALVIN:**  No further questions.

9         **THE COURT:**  Any redirect?

10        **MR. FLEMING:**  Very briefly, your Honor.

11                    **REDIRECT EXAMINATION**

12   **(BY MR. FLEMING:)**

13   **Q.**  Doctor, do you see patients in your practice?

14   **A.**  I do.

15   **Q.**  And you treat and advise on treatment of patients?

16   **A.**  I do.

17   **Q.**  You advise and treat patients that suffer from anemia?

18   **A.**  Mostly they have hematologic disorders.  So most of my

19   practice would be patients that have anemia.

20   **Q.**  And you observe those patients and study those patients

21   with respect to the administration of ESA's; correct?

22        **MR. GALVIN:**  Objection, leading.

23        **THE COURT:**  Yeah, sustained on that ground.

24   **Q.**  What type of medications are these patients given for

25   which you observe their treatment?

1   A.   I treat patients with erythropoietin-stimulating agents

2   such as Epogen or Procrit, the two that are available to me.

3   Q.   Doctor, you testified to the jury on direct regarding

4   binding fit; correct?

5   A.   Yes, sir.

6   Q.   In your opinion, is there a difference in binding

7   affinity at the EPO receptor for Mircera from epoetin beta?

8   A.   A very significant difference.

9   Q.   How many fold?

10   A.   In the competitive binding study that I showed you,

11   there was a 100 fold difference in binding affinity between

12   these two molecules.

13   Q.   And as a medical physician, what does that tell you

14   regarding how that molecule behaves in the human body?

15         MR. GALVIN:   Objection.  Outside the scope.

16         THE COURT:   No, overruled.  You may have it.

17         MR. FLEMING:   Thank you.

18   A.   So it's a very significant difference.  And the lower

19   binding affinity, coupled with the long half-life, and the

20   long-lasting effect you see in vivo, in part, is explained

21   by the receptor interaction being such a low affinity.  It

22   allows for more drug, more active drug to remain in the body

23   for longer periods of time and, therefore, allows you, as a

24   clinician, to give this dose less frequently to patients.

25   And, therefore, you get less injections.

1    **Q.**  Thank you.

2              **MR. FLEMING:**  Can I have Exhibit 68, please?  And

3    the bullet point that was just being read from, the third

4    bullet point.

5    A.  Sorry, should I pull this up?

6    **Q.**  No, you can look up on the screen, if you would, Doctor.

7    The last sentence?

8    A.  Oh, that I was asked?

9    **Q.**  Yes.  It says, "This interaction is presumably"?

10   A.  Yes.

11   **Q.**  All right.  And your information, Doctor, and your

12   testimony is based on data you reviewed in the BLA?

13             **MR. GALVIN:**  Objection, leading.

14             **THE COURT:**  Sustained, on that ground.

15   **Q.**  What data and from where did the data come upon which

16   you base your opinions regarding binding, Doctor?

17   A.  So I reviewed all the Roche BLA data, and other articles

18   in the literature, scientific articles.  And I think, as

19   pointed out, that this sentence says there's a presumed

20   similarity.  That's no proof of it.  As I was trying to

21   point out, to my review of the data, there is no solid

22   structural data that shows the interaction of CERA with the

23   EPO receptor.  And lacking that, one cannot make a

24   comparison in how CERA would interact with the receptor to

25   any other protein or molecule, be it an antibody or a

1    peptide that interacts with the EPO receptor.

2    **Q.**  Now, Doctor, you said that, in your opinion, CERA was a

3    product of a chemical reaction; right?

4    A.   That's true.

5    **Q.**  As a product of a chemical reaction, how would you

6    describe CERA to the jury?

7               **MR. GALVIN:**  Objection.  Outside the scope.

8               **THE COURT:**  Sustained, it is.

9               **MR. FLEMING:**  No further questions, your Honor.

10   Thank you.

11              **THE COURT:**  Nothing further for this witness?

12              **MR. GALVIN:**  No, your Honor.

13              **THE COURT:**  You may step down.

14              **THE WITNESS:**  Thank you.

15              (Whereupon the witness stepped down.)

16              **THE COURT:**  Call your next witness.

17              **THE WITNESS:**  Okay to just leave these things?

18              **THE COURT:**  You may.  Thank you.

19              **MR. FLEMING:**  Your Honor, at this time Roche will

20   recall Dr. Farid.

21              **THE COURT:**  She may be recalled.

22              **THE CLERK:**  I remind you, ma'am, you're still under

23   oath.

24              **THE WITNESS:**  Yes.

25              **THE COURT:**  And Ms. Carson, you may proceed.

1          ADRIENNE FARID, Recalled

2          **DIRECT EXAMINATION**

3    **(BY MS. CARSON:)**

4    **Q.** Dr. Farid, earlier this morning Mr. Galvin showed you a

5    series of e-mails about the use of the term "peg-EPO."  What

6    is your understanding of the term "peg-EPO"?

7    A.  Peg-EPO is a very nonspecific term.  So it refers to a

8    number of, any number of molecules that would have peg and

9    EPO.  And we used it actually as an abbreviation of the

10   starting materials in our work.

11   **Q.** Now, were you personally involved in the naming of the

12   CERA molecule?

13   A.  I was on the project team for CERA, so I was involved,

14   yes.

15   **Q.** And can you describe how Roche named the compound that's

16   now known as CERA?

17   A.  Yes.  When a specific compound is identified, a Roche

18   number actually is assigned to it.  That's the first naming.

19   And then a sort of a common name is assigned, and then a

20   generic name.  After we would apply to international naming

21   authorities, a generic name would be assigned.

22   **Q.** And what was the Roche number for Mircera?

23   A.  RO503821.

24   **Q.** And do you know what the trade name for CERA is?

25   A.  Is Mircera.

1    Q.  And how were Roche employees made aware of the new names

2    as they came about for CERA?

3           MR. GALVIN:  Objection.  Lacks foundation.

4           THE COURT:  No, overruled.

5    A.  They're informed in the project team, and then by e-mail

6    sent out to the larger group, so that the appropriate name

7    can be used in regulatory filings and reports.

8    Q.  Now, yesterday you referred to Dr. Bailon as the

9    inventor of CERA; correct?

10   A.  Yes.

11   Q.  I'd like to show you what's been marked as Exhibit RU.

12   And can you tell me if you recognize this document?

13   A.  Yes.  This is the CERA patent.

14          MS. CARSON:  And your Honor, I'd like to offer into

15   evidence Exhibit RU.

16          MR. GALVIN:  Objection, your Honor.  Can we have a

17   sidebar?

18          THE COURT:  Come to the sidebar.

19   SIDEBAR CONFERENCE, AS FOLLOWS:

20          THE COURT:  What's the relevance of this?

21          MR. FLEMING:  Your Honor, it was just

22   established --

23          THE COURT:  Have in mind I just reprimanded

24   Mr. Day, and I think I must be stricter because you're

25   getting ahead of me.

1              Ms. Carson, what's the relevance of this?

2         MS. CARSON:  It's definitely relevant to the

3    reverse doctrine of equivalents.

4         THE COURT:  No.  And point of fact, it's not.  This

5    is not a patent interference.  One imagines that this

6    distinguishes over the prior art, and it may very well be

7    that out on the pegylation, you've done something very

8    special.  But it is simply not germane to the doctrine of --

9    the reverse doctrine of equivalents.

10        MS. CARSON:  But this is a patent --

11        (Whereupon counsel conferred.)

12        MS. CARSON:  But this is a patent that's on the

13   actual product that's at issue here.

14        THE COURT:  I agree.

15        MS. CARSON:  It's germane to the properties of that

16   product which goes to the material changes.

17        MR. GALVIN:  Your Honor, there's also a lack of

18   foundation, that that's been established, that this is

19   covering the product.  She's not laid that foundation.

20        THE COURT:  Oh, well, but if it is, you have no

21   problem?

22        MR. GALVIN:  No, we have a hearsay objection,

23   relevance --

24        THE COURT:  This is the document which itself has

25   legal significance.  It would come in under 806(c) as a

1    government publication, if nothing else, unless its

2    reliability is so questioned.  And I don't see how you can.

3            But doesn't it -- help me out here because on this

4    I've been with you.  Doesn't this distinguish over your

5    patents?  Your patents are in the prior art here, aren't

6    they?

7            MR. GALVIN:  Our patents are in the prior art.

8            THE COURT:  Of course they are.  And you, this

9    patent, so far as you're concerned, is consistent with your

10   patent rights in this case?

11           MR. GALVIN:  Correct.

12           THE COURT:  All right.  And you'd bear quite a

13   burden of convincing me the other, and in my charge I'm

14   going to make that clear.  So you might help me out on what

15   this patent covers.  But you make it clear that this is the

16   patent on Mircera, and you'll get it in.

17           (Whereupon the sidebar conference concluded.)

18           THE COURT:  Go ahead, Ms. Carson.

19   (BY MS. CARSON:)

20   Q.  Dr. Farid, you were the project manager on the project

21   that led to the development of CERA; correct?

22   A.  Yes.

23   Q.  And in connection with that, did you perform certain

24   tests and on molecules that was ultimately became CERA?

25   A.  Yes.  My lab was responsible for clinical testing.

1    **Q.**  And is any of the work that you did on the CERA molecule

2    reported in this patent?

3    A.  Yes.  In looking at it, actually, the -- it's --

4    exhibit -- I'm sorry, Example 8 was work that would have

5    been conducted in my laboratory.

6    **Q.**  And so, to your understanding, the work that's reported

7    in this patent relates to the molecule CERA?

8    A.  Yes.

9         **MR. GALVIN:**  Objection.  Lacks foundation.

10        **THE COURT:**  Well, overruled.  Her answer may stand.

11        **MS. CARSON:**  Your Honor, based on that foundation,

12   I'd offer RU into evidence.

13        **THE COURT:**  RU may be admitted in evidence, and it

14   will be exhibit?

15        **THE CLERK:**  2109.

16        (Exhibit marked in evidence.)

17        **THE COURT:**  And let me explain something here.

18   When I said to the lawyers we're not trying a patent

19   interference here, that's another whole different proceeding

20   that's usually conducted before the patent office where

21   different people claim that two patents, both of them issued

22   by the patent office, overlap, or they claim the same thing.

23   And that's not the way the patent scheme works or the patent

24   laws work.

25        So I want you to understand why I'm admitting this.

1    Apparently, apparently, it's up to you whether you believe

2    it, this is a Roche patent on something that Roche did, and

3    like the Amgen patents, it's presumed to be valid.  It's

4    presumed to be an advance over what went before.

5         But no one suggests there's any conflict between

6    what Roche patented and what Amgen had already patented,

7    which is the matter in dispute in this case.  No one

8    suggests a difference -- no one suggests a conflict.  So why

9    am I letting you see this?  I'm letting you see it because

10   it's some evidence of what the chemical composition and the

11   properties of Mircera are.  And so you can see it for that

12   purpose.

13        But it doesn't make it any more likely or less

14   likely that Roche has or has not infringed the Amgen patent.

15   Roche can get a patent on its improvement, but it may have

16   to deal with Amgen if it uses the Amgen product or process

17   in order to get to its improvement.  That's all for you to

18   decide.  But just don't think that there's some conflict

19   because Amgen's got a patent and Roche has a patent.  The

20   patents don't conflict.  They don't conflict.

21        I'll leave it there.  Go ahead.

22        **MS. CARSON:**  Thank you, your Honor.

23   **(BY MS. CARSON:)**

24   **Q.**  Dr. Farid, I'd like to turn to an exhibit that was

25   marked by Mr. Galvin yesterday, TR61.

1          **MS. CARSON:**  Can you put that up?

2    **Q.**  And on the second page, the next page, Mr. Galvin

3    directed your attention to the last paragraph on this page.

4    Can you please explain your understanding of what's being

5    said in this document?

6          **MR. GALVIN:**  Objection.

7          **THE COURT:**  Well, she's not an opinion witness.

8    She may define the terms as she understood them in -- was

9    she a party to this document?  She wasn't.

10         **MS. CARSON:**  This is a e-mail that was received by

11   Dr. Farid that Mr. Galvin inquired about yesterday.

12         **THE COURT:**  Oh, all right.  Then I'll sustain his

13   objection, but let's ask this question.

14         When you got this, what did you think?

15         **THE WITNESS:**  I think the content that's important

16   to see is in the second sentence, saying the difference in

17   the composition due to formation of new amide bonds, is an

18   important addition to the first sentence, indicating that

19   the amino acid order is retained.

20   **Q.**  And does this indicate to you that there is a change in

21   the amino acids?

22   A.  Yes.

23         **MR. GALVIN:**  Objection.

24         **THE COURT:**  Yes, sustained.  You're leading the

25   witness.  Don't lead the witness.

1    **Q.**  At the time that you received this document, did you

2    have any understanding, one way or the other, as to whether

3    or not there was any alteration in the --

4    A.  Yes, based on what we knew about the molecule, there is

5    modification of a few of the lysine residues in EPO beta as

6    compared with CERA.

7          **MR. GALVIN:**  Objection, move to strike as expert

8    opinion.

9          **THE COURT:**  No, motion to strike's denied.  She's

10   giving us her understanding of things back when this was

11   sent.

12   **Q.**  Now, Dr. Farid, you became project manager of the

13   project to develop CERA in 1999, November 1999?

14         **MR. GALVIN:**  Objection.

15         **THE COURT:**  Sustained.  You're leading the witness.

16   **Q.**  At the time that you became the project manager for --

17   to develop CERA, was the project ongoing?

18   A.  Yes.  When I became involved, there was already work

19   going in the research laboratory.

20   **Q.**  And can you describe how you familiarized yourself with

21   the work that had been done to date?

22   A.  Well, as becoming a member of the project team, I

23   reviewed documents and data emerging on the discovery

24   effort.

25   **Q.**  And based on that review, what was your understanding of

1   the work that had been done to date on the project to

2   develop CERA in 1999?

3           **MR. GALVIN:**  Objection.

4           **THE COURT:**  Overruled.  She may tell us what she

5   knows of her own knowledge.

6   A.   What I -- at that time, I felt like this was -- I

7   assessed this as actually a challenging discovery project,

8   and there were so many variables that needed to be evaluated

9   in order to come up with a molecule with an improved profile

10  for anemia treatment.

11  **Q.**   And can you describe what your understanding of those

12  variables was at the time you became project leader?

13  A.   So, for example, this was still in the discovery effort,

14  numerous, for even just the synthesis of the molecule,

15  numerous peg options, peg chain links, reaction chemistries,

16  reaction to different amino acids, the difficulty of

17  modifying a glycoprotein versus an unglycosylated protein,

18  reaction conditions, and so forth.

19  **Q.**   Now, after you became project leader in 1999, can you

20  describe the work that was involved in developing CERA?

21          **MR. GALVIN:**  Objection.

22          **THE COURT:**  Overruled.  You may tell us of your own

23  knowledge what you oversaw or you were participating in.

24  You may tell us what you did.

25  A.   Okay.  So my laboratory was actually responsible for

1   chemical, biochemical testing, which we do with new drugs in

2   order to fully understand the molecule and then show purity

3   and stability and consistency.  So from the perspective of

4   my laboratory, we actually had to come up with new

5   methodology and new techniques to work on the candidate that

6   became CERA, because of the precedent really wasn't there

7   for this kind of molecule.

8   **Q.**  And when was the application for approval by the FDA

9   filed for CERA?

10  A.  In April of 2006, I believe.

11  **Q.**  So approximately how many years went into this project?

12  A.  So from discovery, over eight years of development,

13  discovery and development work.

14  **Q.**  Dr. Farid, as the former CERA project leader, how do you

15  feel about the impending approval of CERA by the FDA?

16          **MR. GALVIN:**  Objection.

17          **THE COURT:**  Sustained.

18          **MS. CARSON:**  No further questions.

19          **THE COURT:**  Do you have any questions for this

20  witness, Mr. Galvin?

21          **MR. GALVIN:**  No, your Honor.

22          **THE COURT:**  You may step down.  Call your next

23  witness.

24          (Whereupon the witness stepped down.)

25          **MR. FLEMING:**  Your Honor, at this time, Roche would

```
 1    be like to play the video of the 30(b)(6) Amgen witness,

 2    Dr. Boone.

 3              MR. GALVIN:  Your Honor, may we have a sidebar?

 4              THE COURT:  We may.  We may.

 5    SIDEBAR CONFERENCE, AS FOLLOWS:

 6              THE COURT:  Okay.  You're not going to be ready to

 7    give this case to the jury tomorrow, are you?

 8              MS. BEN-AMI:  No.

 9              THE COURT:  No.

10              MS. BEN-AMI:  Well, halfway through tomorrow, yes.

11    But not at 9:00, no.

12              THE COURT:  I'll give you an hour tomorrow.

13              MS. BEN-AMI:  We have time, your Honor.

14              THE COURT:  Well, you say we have time.

15              MS. BEN-AMI:  No, we have our time.

16              THE COURT:  You have your time.  You have an hour

17    and ten minutes left, reserving the time that you wanted to

18    argue inequitable conduct.  They've got 40 minutes left, and

19    they seem today to be alert to that fact.

20              MS. BEN-AMI:  Yes.

21              THE COURT:  So I can't do it, that's too late in

22    the morning, but with breaks and the like.  So we're just

23    going to have to use up that hour and ten minutes and 40

24    minutes tomorrow.  All right.

25              MS. BEN-AMI:  I have a suggestion for your Honor,
```

1   at 1:00, when we're done.  If you want to have a suggestion

2   from me, I'm happy to give you one.

3           **THE COURT:**  Give it to me now.

4           **MS. BEN-AMI:**  Okay.  The suggestion is to do the

5   charge tomorrow and do the closings on Thursday.  Or do the

6   charge tomorrow and do the closings in the afternoon.  You

7   already told the jury they had to be here in the afternoon,

8   so you get started Wednesday afternoon.

9           **THE COURT:**  No, that's late in the afternoon.  I

10  like them to start -- but that's possible.

11          What do you think to that, about that?

12          **MR. DAY:**  I'm sorry?

13          **THE COURT:**  Do the charge tomorrow, late morning,

14  and give it to them Thursday morning?  They'll have it

15  midmorning.

16          **MR. DAY:**  My preference, your Honor, would be to

17  have the closing arguments immediately before it goes to the

18  jury.

19          **THE COURT:**  Yes, but that's going to happen, but

20  that will be Thursday morning.

21          **MR. DAY:**  That would be --

22          **THE COURT:**  I'll give the charge tomorrow.

23          **MR. DAY:**  That would be fine with us.

24          **MS. BEN-AMI:**  At least we keep some time, keep

25  it --

 1              THE COURT:  That's what we'll do.

 2              MR. DAY:  Your Honor, you asked us to revise that.

 3              THE COURT:  I did.

 4              MS. BEN-AMI:  Can we play the tape now?

 5              THE COURT:  Let's play five minutes of the tape.

 6              MR. GAEDE:  Your Honor, excuse me.  We filed an

 7      objection to the tape.

 8              THE COURT:  All right.  That's way we came over

 9      here.  I thought I had ruled on --

10              MR. GAEDE:  Yesterday you ruled that all references

11      to Amgen's peg-EPO programs were irrelevant and all --

12      there's only a little bit left.  All Mr. Boone testifies

13      about is Amgen's peg-EPO program and, therefore, it should

14      not be admitted on the grounds of relevancy, consistent with

15      your ruling of yesterday.

16              THE COURT:  That may be so, but we've adopted a

17      protocol where you give me these and I rule on them.  Now,

18      all the arguments have to be in at that time.  You've waived

19      it.

20              MR. FLEMING:  Thank you, your Honor.

21              THE COURT:  So it may be played.

22              MS. BEN-AMI:  Let's play it.

23              (Whereupon the sidebar conference concluded.)

24

25

1          THOMAS C. BOONE, By Deposition

2              **DIRECT EXAMINATION**

3   **Q.**  Good morning, Mr. Boone, can you please state your name,

4   for the record?

5   A.  Thomas Charles Boone.

6   **Q.**  And who is your current employer?

7   A.  Amgen.

8   **Q.**  And how long have you been employed at Amgen?

9   A.  Over 25 years.

10  **Q.**  And have you been employed continuously?

11  A.  Yes.

12  **Q.**  For that 25-year period?

13  A.  (Witness nods head.)

14  **Q.**  Do you understand that you're appearing here today as a

15  designee on behalf of Amgen in this case under Rule 30(b)(6)

16  with respect to certain designated topics?

17  A.  Yes.

18  **Q.**  And what topics do you understand that you are here to

19  testify about?

20  A.  I'm here to testify about expression in mammalian cells

21  in the early 1980 time frame, and also 19 -- I think it's

22  1985 to 1995, and work on pegylation of EPO.

23  **Q.**  And you're a 30(b)(6) witness, so you have to answer

24  based on all of the knowledge available to Amgen, so when

25  you say not to your knowledge, not to Amgen's knowledge; is

1    that right?

2    A.   Yes, I can say that.

3    Q.   Okay.   So Amgen has never made a commercial product that

4    contains peg-EPO; correct?

5    A.   That is correct.

6    Q.   Okay.   Has Amgen ever done clinical testing of any

7    peg-EPO?

8    A.   I don't believe Amgen has.

9    Q.   And just so we're clear, you're speaking on behalf of

10   Amgen?

11   A.   Correct.

12   Q.   So Amgen has not ever done clinical testing on any

13   peg-EPO?

14   A.   That is my belief that Amgen, I representing Amgen, has

15   not done clinical testing on peg-EPO.

16   Q.   Has Amgen ever conducted any research directed toward

17   peg-EPO?

18   A.   Yes.

19   Q.   So it should be:   Was Amgen ever able to demonstrate in

20   an animal model that EPO modified with peg would increase

21   the serum half-life of that substance compared to EPO?

22   A.   To the best of my knowledge, it was never tested for

23   serum half-life.

24   Q.   Isn't it true that Amgen found progressive loss of in

25   vivo activity with increasing pegylation of CHO-EPO amino

1  groups?

2       **THE COURT:**  We'll stop after this answer, just so

3  we're clear.

4  A.  There was data to suggest progressive loss of in vivo

5  activity with increasing pegylation of CHO-EPO amino groups

6  with the assay that was used to detect in vivo activity, but

7  it was a short-term assay, so not very reliable.

8       **THE COURT:**  Okay.  Here's where we are.  You can

9  see I'm getting antsy up here to see if they'll finish,

10  because I was shooting for tomorrow.  And we won't, and

11  that's fair.  That's fair.  Everyone gets a chance to put on

12  all the evidence they're entitled to put on.

13       But I have been keeping time, and in terms of the

14  presentation of the evidence, they're going to run out of

15  their times to present evidence before 11:00 tomorrow.  Now,

16  tomorrow I said we'll start right at 9:00, and we will.  And

17  what we've decided to do, in addition to the work that you

18  all are doing and the work the lawyers are doing so

19  carefully to present matters to you, the lawyers are

20  presenting matters to me and I'm getting ready to explain,

21  to teach you the law that you must apply in this case.  And

22  so what we've agreed to do is we'll finish up the testimony

23  tomorrow, sometime before 11:00.  We'll take a break.  Then

24  I will come back and I will charge you.  I will give you all

25  the law you need to have in order to resolve the factual

```
 1    questions.

 2           Now, that will take a while.  It probably won't

 3    take an hour and 45 minutes, but that will take a while.

 4    We'll show you the verdict slip so you'll know exactly what

 5    we're asking you.  And one of the things I was going to tell

 6    you, I'll tell you now.  Just as soon as I'm done talking,

 7    the court reporter's going to type all that up so that you

 8    cannot only hear me teach you, but you'll have it in writing

 9    with you in the jury room.

10           Now, the best way to do that would be to do that

11    all on one day.  But it makes some sense for you to think

12    about what I've taught you as to the law overnight, because

13    we're not going to give it to you tomorrow.  We don't expect

14    you to be here tomorrow afternoon.  We could sort of grind

15    our way through, and I'll displace what I have in the

16    afternoon, but giving you the case in the middle of the

17    afternoon and saying I'm going to let you go home at five,

18    that doesn't make sense.

19           So then Thursday morning we will start with the

20    arguments of the attorneys.  That's part of the case.

21    That's an important part of the case.  They have nothing to

22    say about the law.  I'm jealous of the law.  The law comes

23    from me.  But they'll have heard exactly what I said.  Then

24    they'll be able to say, Yes, we've proved this, No, they

25    haven't proved that, Look at the evidence.  That will take
```

1    about an hour and a half.

2              At the end of that, I have just a few minutes, and

3    I will explain to you how you all deliberate together to --

4    in hopes that you will reach a unanimous verdict.  So,

5    approximately, the break time on Thursday, while you're all

6    fresh, the case is yours.  So Thursday we need you here all

7    day, and for however many days the deliberations take.

8              Tomorrow we'll be stopping -- we may stop before

9    1:00.  We'll be stopping once I'm done explaining the law to

10   you.

11             Now, we're close to the end, but we're not at the

12   end.  So keep your minds suspended.  Do not discuss the case

13   either among yourselves nor with anyone else.  You may stand

14   in recess until 9:00 a.m. tomorrow morning.  The jury may

15   recess.

16             **THE CLERK:**  All rise for the jury.

17             (Whereupon the jury left the courtroom.)

18             **THE COURT:**  Please be seated.  I thank, and I'm

19   just using Amgen to help the Court.  It looks to me that

20   like this draft verdict slip matches what I asked for.  I'm

21   going to -- however, it doesn't match substantively what

22   Roche thinks is going to the jury.  And I'll have to work on

23   that tonight.  And if you can resolve it, let me know.  But

24   if you can't resolve it, I'll -- I will take care of it.

25             When all the evidence is in, renewed motions for

1    directed verdict are in order, and we will assume that they

2    are made to set you up for verdict -- judgment not

3    withstanding the verdict.  I have to say, trying to keep on

4    top of my reading here, that Roche's pressing for directed

5    verdict on '933, claim 9, I find intriguing, and maybe I

6    ought to hear something in writing from Amgen on that point.

7    Other than that, I think I am letting the case go to the

8    jury.

9         The disagreement that I see is a disagreement over

10   what defenses are alive with respect to each claim.  I don't

11   necessarily agree with either party, but I will look at my

12   notes.  If you can agree as to it, it will be helpful, and

13   give me a joint.

14        Ms. Smith -- I've been making endorsements here

15   with respect to one motion.  This is as to document 1433.

16   It has to do with Trial Exhibit 212A, which is the '868 file

17   history.  In reconsideration, Trial Exhibit 212A is ruled

18   inadmissible.

19        Total elapsed time stands at this instant at:

20   Amgen, nine days, one hour, 25 minutes; Roche nine days, 35

21   minutes.  We'll stand in recess until 9:00 a.m. tomorrow.

22        **MR. FLEMING:**  Your Honor, I'm sorry, one quick

23   question, if I may, on the verdict form.

24        **THE COURT:**  Yes.  I'm not having argument on the

25   verdict form.

 1          **MR. FLEMING:**  I'm not arguing, your Honor, I wanted

 2     to present you what I thought was a form that had the

 3     listing on the side of --

 4          **THE COURT:**  I've already got this.  And your

 5     listing doesn't match with their listing, and so I note

 6     that.  Oh, I've got this very much in mind.  This is

 7     something that if you can resolve it, give me a form.  I

 8     like the Amgen approach to it better, but give me -- you

 9     think, Roche thinks, that various defenses are alive to

10     certain of the claims more broadly than the form that Amgen

11     gave me.  I express no opinion on that today.

12          If you resolve it, give me a joint form today or

13     first thing tomorrow.  If you don't resolve it, I'll resolve

14     it at the time the renewed cross motions for directed

15     verdict are made, and we'll be ready to go.

16          We'll recess until 9:00 a.m. tomorrow morning.

17     We'll recess.

18          **THE CLERK:**  All rise.  Court is in recess.

19          (Adjournment.)

20

21

22

23

24

25

1                    **C E R T I F I C A T E**

2

3

4          I, Cheryl B. Palanchian, Official Court Reporter

5    for the United States District Court for the District of

6    Massachusetts, do hereby certify that the foregoing pages

7    are a true and accurate transcription of my shorthand notes

8    taken in the aforementioned matter to the best of my skill

9    and ability.

10

11

12

13

                   /S/ CHERYL B. PALANCHIAN
14          _____
                    CHERYL B. PALANCHIAN
15                 Official Court Reporter
                       P.O. Box 51062
16           Boston, Massachusetts 02205-1062
                   womack@megatran.com
17

18

19

20

21

22

23

24

25