```
 1                 UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MASSACHUSETTS
 2
                                        Civil Action
 3                                      No. 05-12237-WGY

 4    * * * * * * * * * * * * * * * *
                                      *
 5    AMGEN, INC.,                    *
                                      *
 6            Plaintiff,             *
                                      *    DAILY TRANSCRIPT
 7    v.                             *    OF THE EVIDENCE and
                                      *    JURY INSTRUCTIONS
 8    F. HOFFMANN-LA ROCHE LTD,      *      (Volume 20)
      ROCHE DIAGNOSTICS GmbH and     *
 9    HOFFMANN-LA ROCHE, INC.,       *
                                      *
10            Defendants.            *
                                      *
11    * * * * * * * * * * * * * * * *

12

13

14            BEFORE:  The Honorable William G. Young,
                        District Judge, and a Jury
15

16

17

18

19

20

21

22

23
                                  1 Courthouse Way
24                                Boston, Massachusetts

25                                October 17, 2007
```

```
 1              A P P E A R A N C E S

 2

 3          DUANE MORRIS LLP (By D. Dennis Allegretti,
        Esq. and Michael R. Gottfried, Esq.), 470 Atlantic
        Avenue, Suite 500, Boston, Massachusetts 02210
 4              - and -
            DAY CASEBEER MADRID & BATCHELDER, LLP (By
 5      Lloyd R. Day, Jr., Esq., David M. Madrid, Esq. and
        Robert M. Galvin, Esq.) 20300 Stevens Creek
 6      Boulevard, Suite 400, Cupertino, California 95014
                - and -
 7          McDERMOTT WILL & EMERY (By Michael Kendall,
        Esq.), 28 State Street, Boston, Massachusetts
 8      02109
                - and -
 9          McDERMOTT WILL & EMERY (By William G.
        Gaede, III, Esq.), 3150 Porter Drive, Palo Alto,
10      California 94304
                - and -
11          MARSHALL, GERSTEIN & BORUN LLP (By Kevin M.
        Flowers, Esq.), 6300 Sears Tower, 233 S. Wacker
12      Drive, Chicago, Illinois 60606-6402
                - and -
13          STUART L. WATT and WENDY A. WHITEFORD, Of
        Counsel, Amgen, Inc., One Amgen Center Drive,
14      Thousand Oaks, California 91320-1789, on behalf of
        the Plaintiff
15
            BROMBERG & SUNSTEIN LLP (By Lee Carl
16      Bromberg, Esq. and Julia Huston, Esq.), 125 Summer
        Street, Boston, Massachusetts 02110
17              - and -
            KAYE SCHOLER LLP (By Leora Ben-Ami, Thomas
18      F. Fleming, Esq., Patricia Carson, Esq.,
        Christopher Jagoe, Esq. and Howard Suh, Esq.),
19      425 Park Avenue, New York, New York 10022, on
        behalf of the Defendants
20

21

22

23

24

25
```

**I N D E X**

Jury Instructions . . . . . . . . . . . . . . . 2982

**WITNESS:**          **DIRECT**   **CROSS**   **REDIRECT**   **RECROSS**

THOMAS BOONE, By Deposition, Resumed

                    2893

RICHARD FLAVELL, Recalled

   By Mr. Fleming   2894                2925

   By Mr. Galvin          2917

ALEXANDER M. KLIBANOV

   By Ms. Ben-Ami   2929

   By Mr. Gaede          2963

|  |  | **FOR I.D.** | **IN EVID.** |
|---|---|---|---|
| **EXHIBITS:** | | | |
| 2119 | Roche BLA Excerpt . . . . . . . . . | | .2900 |
| 2111 | "Mapping of the Active Site of | | |
| | Recombinant Human Erythropoietin". | | .2956 |
| 69 | Investigator Brochure . . . . . . . | | .2972 |

 1            **THE CLERK:**  All rise.  Court is in session, please

 2     be seated.

 3            **THE COURT:**  Good morning, counsel.  Two things

 4     warranted my coming on the bench before we start.  And I

 5     don't expect to hold a hearing on this, I'm just going to

 6     announce things.

 7            First, I see that there's an article in the New

 8     York Times today about this case and I intend to inquire of

 9     the jurors whether they've seen it.  If any juror has, we'll

10     send the jury out and then individually I will inquire of

11     the responsive juror about the propriety of continuing with

12     that juror.

13            The jury verdict form, I have and I've reviewed

14     Roche's most recent objections thereto.  And, in fact, the

15     form has to be revised in a variety of respects, and I'm

16     going to give copies of the proposed form as it now stands

17     to each side.  I'm going to tell you how I want it revised,

18     and then Amgen can do the revision and I want it by, say,

19     11:15 because I'm going to make reference to it in my

20     charge.

21            What's, what's wrong with the form is that it needs

22     considerably more daylight, that is, Roche is to the jury on

23     more issues than this form admits.  And so, I'm going to go

24     over each claim and I'm going to -- you can give each one --

25            **THE CLERK:**  Right.

1        **THE COURT:**  Though what I'm giving you is not in

2   final form.  I've made some notes on it, and they should be

3   obvious when I read this out.  But when you're following it,

4   these are the defenses as to which Roche gets to the jury on

5   each of the claims in suit.  They are less than the defenses

6   that Roche has proposed they're to the jury on.  And to that

7   extent, we will understand that's a result of my further

8   reflection on the motion for directed verdict, and the

9   defenses I don't read are out of the case and everyone's

10  rights are saved.  The same is true when I get to

11  infringement, I have some things to say, too.

12        All right.  The '422 patent claim 1, obviousness,

13  written description and indefiniteness.  That's accurate.

14        The '933 patent.  The '933 patent.  Let's see here.

15  '933.  Claim 3, anticipation, obviousness, indefiniteness.

16  Claim 7, anticipation, obviousness, indefiniteness.  Claim

17  8, anticipation, obviousness, indefiniteness.  Claim 9,

18  anticipation, obviousness, written description,

19  indefiniteness.  Claim 11, anticipation, obviousness,

20  indefiniteness.  Claim 12, anticipation, obviousness,

21  written description, indefiniteness.  Claim 14,

22  anticipation, obviousness, written description,

23  indefiniteness.

24        '868.  '868.  Obviousness, indefiniteness.  Claim

25  6.  Of 8 -- wait a second here.

1          **MR. FLEMING:**  Claim 1, your Honor.

2          **THE COURT:**  I'm sorry.  Claim 1.  Let me start

3    again.  Claim 1 of '868, obviousness, indefiniteness.  Claim

4    2, obviousness, indefiniteness.

5          '698, obviousness, indefiniteness.  Claim 7,

6    obviousness, indefiniteness.  Claim 8, obviousness,

7    indefiniteness.  Claim 9, obviousness, indefiniteness.

8          Now, I know you took out, because I told you to,

9    Amgen did just what I said, but it's a mistake.  The fact

10   that I've taken it out of the infringement case doesn't take

11   it out of the validity case.  So, we have to build back in

12   Patent Number '349 claim 7.  And when we do that obviously

13   there needs to be a valid box and then there needs to be an

14   invalid box.  And they are to the jury on the following:

15   Obviousness, written description, indefiniteness,

16   nonenablement.  So I'm going to need a nonenablement column

17   back in there.

18         Go over to the next page.  The next page now is

19   Amgen.  Again, reflecting on the, reflecting on the motion

20   for directed verdict made by Roche, on further reflection,

21   claim 9 of the '933 patent's out as matter of directed

22   verdict.  Amgen's rights are saved.  Other than that, I'm,

23   I'm satisfied with that page.

24         I will say a few things.  That would seem to rule

25   out the defense of reverse doctrine of equivalents.  And I'm

1    not doing that.  But I need a chart -- I need a verdict slip

2    to talk to the jury about, and if we are to the jury on that

3    claim when you rest this morning, I will cover it in my

4    charge.

5         Likewise, though I don't want the verdict slip

6    changed, I'm going to need to know for the '868 and the '698

7    patents, if the jury's verdict is in essence in Roche's

8    favor for noninfringement, to give an adequate review, I'm

9    going to need to know whether that's because Amgen has

10   failed to prove no material change, or whether Amgen has

11   failed to prove that the process in fact infringes either

12   directly or by the doctrine of equivalents.  And I'm going

13   to tell the jury that they will so indicate by, when we get

14   to those process patents by putting an M rather than a

15   checkmark, M meaning material change.

16        One, oh, one thing I do want on that last page of

17   the verdict slip.  I want you to separate the process

18   patents from the '933 product patent.  Move the two process

19   patents down a little bit.  I think that instruction's

20   sufficient.

21        I have Amgen, and I've carefully reviewed it, their

22   claim that definiteness is matter of law.  I'm putting it to

23   the jury.  We can unravel that downstream.

24        Let's see if we have the jury and we'll get under

25   way.

1          While we're waiting for the jury some other things

2     that I should say.  One, I'm working from the Roche

3     submission -- you're agreed as to the little definition of

4     what's a product claim and what's a process claim and a

5     product-by-process claim, and so I want to give them that

6     page.

7          I'm working from the Roche submission, and I have

8     very much in mind the Amgen oppositions to it, I want to

9     give them a sheet of paper, I won't do it this morning, I

10    will make reference to it in my charge, a sheet of paper of

11    anticipatory prior art and prior art.

12         **THE CLERK:**  All rise for the jury.

13         (Whereupon the jury entered the courtroom.)

14         **THE CLERK:**  Court is in session, please be seated.

15         **THE COURT:**  Good morning, ladies and gentlemen.

16         **THE JURY:**  Good morning.

17         **THE COURT:**  Thank you all for being so prompt.

18    Welcome to the last day of evidentiary presentation in this

19    case.  And before we start, there is a matter that I should

20    bring to your attention.  I've given you general

21    instructions, but today I noted that in the business section

22    of the New York Times there's an article about this case.

23         Anyone seen that article?  Raise your hand.  All

24    right.  And what we need to do is we need to follow a

25    protocol here and we will.  Will the juror who's seen the

1    article, will you stay and come up here, and the rest of

2    you, you're excused very briefly, this will just take a

3    moment.

4              THE CLERK:  All rise for the jury.

5              (Whereupon the unaffected members of the jury left

6    the courtroom.)

7                  **INQUIRY BY THE COURT OF THE JUROR**

8              THE COURT:  Please be seated.  And just for the

9    record, can we have your name, ma'am?

10             JUROR EAGAN:  Sure.  It's Beth Eagan.

11             THE COURT:  Yes, Ms. Eagan.  Now, no one's, even

12   though I put you up here in the witness stand, no one's

13   suggesting you've done anything wrong.  I just, I must

14   follow this protocol.

15             JUROR EAGAN:  Okay.

16             THE COURT:  So you answered yes.  And that answer

17   and the other answers you're going to give me are under your

18   oath as a juror.

19             You say you saw it.  Just tell me what you saw?

20             JUROR EAGAN:  I just saw the article.  I did not

21   read it.

22             THE COURT:  Do you remember anything about the

23   headline?

24             JUROR EAGAN:  No.

25             THE COURT:  But you knew it referred to Amgen or --

```
 1              JUROR EAGAN:  Right.

 2          THE COURT:  -- Roche or something like that?

 3          JUROR EAGAN:  Exactly.  So that's when I knew.  I

 4    didn't read it.

 5              THE COURT:  And I thank you.

 6          Does seeing the article and knowing that there's

 7    that press interest so it would appear there in the

 8    newspaper, does that affect you in any way in your ability

 9    to be completely fair and impartial in this case?

10              JUROR EAGAN:  None whatsoever.

11          THE COURT:  Thank you very much.  Would you rejoin

12    your fellow jurors and we'll go on.

13              JUROR EAGAN:  Okay.

14          (Whereupon the juror left the courtroom.)

15          THE CLERK:  Shall I bring them in?

16          THE COURT:  Please.

17          (Pause in proceedings.)

18          THE CLERK:  All rise for the jury.

19          (Whereupon the jury entered the courtroom.)

20          THE CLERK:  Court is in session, please be seated.

21          THE COURT:  One thing I should have said to the

22    juror who responded affirmatively, and I'll make it a

23    general instruction.  Don't say anything to your fellow

24    jurors, even though you didn't read it and you just saw that

25    it was there, don't say anything to them about it,
```

1   obviously, and you don't, other jurors, you don't talk to

2   her about the fact that it was in the paper.

3          But, so we understand, I'll just repeat.  It's in

4   the paper.  Now, it may be in other papers.  It could get on

5   TV.  You're to do exactly what the juror who I inquired did.

6   If you see anything that relates to this case, or really

7   more generally, relates to these companies, these are

8   companies, Amgen, Roche, turn the channel, turn the page in

9   the newspaper.  You're on your oath to do that.  Because

10  we're coming down to the key time in the case, it's obvious,

11  the time in which people are most interested because they're

12  interested in what your verdict may be.

13         Those are my instructions.  We're ready to go.  We

14  were watching a deposition.  We'll pick up where we left

15  off.

16         **MR. FLEMING:**  Thank you, your Honor.

17         THOMAS BOONE, By Deposition, Resumed

18  **BY  COUNSEL**

19  **Q**   Based on the assays that Amgen ran at that time, was

20  Amgen able to predict the in vivo activity of CHO-EPO

21  PEGylate on its amino groups?

22  A   Can you clarify what you mean by in vivo activity?

23  **Q**   The ability of a substance to increase reticulocytes and

24  red blood cells in a body.

25  A   Based on your definition of in vivo activity, I would

```
 1   say that the assays that Amgen run -- ran at that time were

 2   not very predictable.

 3   Q    Was Amgen able to predict from the structure of its

 4   PEG-EPO whether or not the compound would be in vivo active?

 5   A    No, we were not able to predict from the structure.

 6             MR. FLEMING:   Your Honor, that concludes the video.

 7             THE COURT:   Fine.   Call your next witness.

 8             MR. FLEMING:   Your Honor, at this time Roche would

 9   recall Dr. Richard Flavell.

10             THE COURT:   He may be recalled.

11             MR. FLEMING:   And, your Honor, I'll hand up a copy

12   of his reports.

13             THE COURT:   Thank you.

14             MR. FLEMING:   And with your permission place a copy

15   by the witness stand.

16             THE CLERK:   Sir, I remind you, you are still under

17   oath.

18             THE WITNESS:   Yes.   Thank you.

19                  RICHARD FLAVELL, Recalled

20                     DIRECT EXAMINATION

21   BY  MR. FLEMING

22   Q    Good morning, Dr. Flavell.   Would you please remind the

23   jury where you work and what you do, please?

24   A    Certainly.   Yes, I'm the Chairman and Professor of

25   Immunobiology at Yale University School of Medicine.
```

1    **Q**    Now, Doctor --

2           **MR. FLEMING:**  Can we have, please, the '868 patent

3    claims, please.

4    **Q**    Doctor, can you tell the jury, do you have an opinion as

5    to whether Roche practices the process of the '868 patent

6    claims?

7    A    Yes, I do.

8    **Q**    And tell the jury what your opinion is, please?

9    A    My opinion is that Roche does not infringe this patent,

10   this claim.

11   **Q**    And --

12   A    These claims.  The two claims.

13   **Q**    Thank you, Doctor.

14          I'm sorry, they do not infringe?

15   A    Do not.

16   **Q**    Thank you.

17          Can you tell the jury what term within the patent

18   claims -- excuse me -- you focused on in coming to your

19   analysis, please?

20   A    Certainly.  I focused on the term where it says

21   "mammalian host cells transformed or transfected with an

22   isolated DNA sequence."

23   **Q**    And in your opinion does Roche follow that process?

24   A    No, it does not.

25   **Q**    What, what -- and why not?

1           **MR. GALVIN:**  Objection, your Honor.  May we have a

2   brief side bar on claim admission?

3           **THE COURT:**  You may.

4   SIDEBAR CONFERENCE, AS FOLLOWS:

5           **MR. GALVIN:**  Your Honor, our motion was Motion

6   Number 6 that Dr. Flavell's opinion will be inconsistent

7   with the --

8           **THE COURT:**  It will not be, or I will see that it's

9   not.  Overruled.

10          **MR. FLEMING:**  Thank you, your Honor.

11          (Whereupon the sidebar conference concluded.)

12          **MR. FLEMING:**  May I proceed, your Honor?

13          **THE COURT REPORTER:**  Excuse me, counsel.

14          **THE COURT:**  Not faster than the court reporter.

15  But you may.

16          **MR. FLEMING:**  It seems to be my shortcoming, I

17  apologize.

18          May I now proceed?

19          **THE COURT:**  You may.

20  **BY  MR. FLEMING**

21  **Q**   Dr. Flavell, so this is the claim term that you had

22  analyzed?

23  **A**   Correct.

24  **Q**   Okay.  And can you tell the jury on your analysis of

25  this claim term how you reached the conclusion that Roche

1   does not infringe these claims?

2   A    Certainly, yes.  The key phrase is "isolated DNA

3   sequence."  This is a requirement of the claim and Roche

4   does not employ an isolated DNA sequence.

5   Q    Doctor, what transformation methodology did Roche

6   employ?

7   A    Roche employs a method known as protoplast fusion.

8   Q    Is that similar or different from isolated DNA?

9   A    No, it's completely different.

10  Q    Have you prepared a demonstrative to help the jury

11  understand this concept?

12  A    Yes.

13          **THE COURT:**  Is it in the report?

14          **MR. FLEMING:**  Yes, your Honor, it was.

15          **THE COURT:**  Very well.

16          **MR. FLEMING:**  May we have RF-14, please.

17  Q    So, Doctor, could you explain to the jury what this

18  demonstrative suggests?

19  A    Certainly.  Well, what we have to imagine here is that

20  this is a bacterium, it's been converted into a thing called

21  a protoplast.  We don't have to worry about what that is.

22  And then, this is the host cell, this is the mammalian cell,

23  or say the CHO cell, for example, and these two things have

24  been smushed together like this so that the contents of this

25  bacterium are transferred, the whole contents of this

1   bacterium are transferred into that host cell.  And that's a

2   huge mixture of everything that the bacterium contains,

3   proteins, carbohydrates, everything else, nucleic acids.

4   Q    And how long have scientists known about protoplast

5   fusion transformation?

6   A    It's something of the order of 17 years; around 1980 it

7   was done.

8   Q    And, again, tell the jury, is protoplast fusion

9   technology for transformation similar or different from

10  isolated DNA?

11  A    No, it's completely different.

12  Q    So, based on your analysis of -- let me ask you this

13  question.  How do you know that Roche employs this

14  protoplast fusion transformation technology, Doctor?

15          MR. GALVIN:  Objection; outside the scope.

16          THE COURT:  Overruled.

17  A    This is document -- I'm sorry, will you repeat the

18  question, please?

19  Q    Yes.  How do you know that Roche employs the protoplast

20  fusion transformation technology to inform you in coming to

21  your opinion of noninfringement?

22  A    Yes, certainly.  This is documented in Roche documents,

23  for example, the BLA.

24  Q    Doctor, I'm going to hand you what's been marked as QIU.

25          MR. FLEMING:  Your Honor?

1    **Q**   And I have one page tabbed, Doctor, and I would ask you

2    to turn there.

3              And could you tell the jury what that page is that

4    you're looking at?

5    **A**   Yes.  This page is referring to the way that the host

6    cell is transformed.  Remember, that's exactly what we were

7    just talking about.  And you can see that from the first

8    sentence, and I'll read --

9              **THE COURT:**  Well, wait a minute.  This isn't in

10   evidence.

11             **MR. FLEMING:**  Not yet.

12   **Q**   So, Doctor, is this --

13             **MR. GALVIN:**  Objection, your Honor; this exhibit

14   wasn't disclosed as an exhibit for --

15             **THE COURT:**  It's part of the BLA.

16             **MR. FLEMING:**  Of course.

17             **MR. GALVIN:**  It wasn't disclosed that he would be

18   using it.

19             **THE COURT:**  Overruled.  And I'll let you have that

20   page.  You're offering it?

21             **MR. FLEMING:**  Yes, I'm offering that in, your

22   Honor.

23             **THE COURT:**  Part of the BLA.  It's admitted.  The

24   next number will be 2 0, or 2 1 --

25             **MR. FLEMING:**  2119, I believe, your Honor.

1        **THE COURT:**  2119, that page, in evidence.

2              (Exhibit marked in evidence.)

3        **MR. FLEMING:**  Okay.

4        **MR. GALVIN:**  Your Honor, could we just clarify what

5    the page number is.

6        **THE COURT:**  It is --

7        **MR. FLEMING:**  It is Page 337, your Honor.

8        **THE COURT:**  And at the bottom it says 4987?

9        **MR. FLEMING:**  It does, your Honor.

10       **THE COURT:**  Right.

11       **MR. FLEMING:**  And, I'll put a copy on Ms. Smith's

12   desk for her.

13             Can we have it up on the screen, please.

14   **Q**   And, Doctor, could you direct the portion of this page

15   that's 2119 in evidence that you relied upon.

16   A    Certainly.  Is it possible to blow it up?  It might be

17   easier for the jury.  If not, I can do it with this.  Thank

18   you.

19             So, as I said, in the first sentence you can see

20   that it's talking about how the gene was introduced into the

21   CHO cells.  It says here by transformation.  So that's the

22   subject we're talking about.  And if you go further down

23   here it says, to accomplish this, the expression plasmid was

24   introduced into CHO cells by protoplast fusion.  That's the

25   method.

1    Q    And, Doctor, just to be clear, you said the protoplast

2    fusion technology has existed since around 1980?

3              MR. GALVIN:  Objection.

4              THE COURT:  Yes, sustained.  Don't lead the

5    witness.

6              MR. FLEMING:  Withdrawn.  I apologize.

7              THE COURT:  You've asked him that already.  Let's

8    move on.

9    Q    I just wanted to get the clarification.  What year,

10   please, Doctor?

11   A    It was done --

12             MR. GALVIN:  Objection.

13   A    -- in about 1981.  And it was actually done by a friend

14   of mine, Walter Schaffner, who I'll see next week.

15   Q    Thank you.

16             So based upon the --

17             THE COURT:  Overruled, the objection.  That may

18   stand, though we really don't care that he'll see him next

19   week.

20             THE WITNESS:  It will be nice for me though.

21             MR. FLEMING:  May I continue, your Honor?

22             THE COURT:  You may.

23             MR. FLEMING:  Thank you, your Honor.

24   Q    And, Doctor, based on this information regarding Roche's

25   use of protoplast fusion transformation technology, what is

```
 1    your opinion regarding the process claims of the Lin patent?

 2    A    I'm sorry, could you repeat the question?

 3    Q    Yes.  Based on your review of this evidence regarding

 4    Roche's use of protoplast fusion technology for

 5    transformation, what is your opinion regarding infringement

 6    of the Lin process patents?

 7         MR. GALVIN:  Objection as to claim; not specified

 8    in the claim.

 9         THE COURT:  It may not be.  And to the extent you

10    can specify it as to claim, I'm going to ask you to do that.

11    But otherwise, I will receive the opinion.

12         What is your opinion?

13    A    So my opinion is that Roche does not infringe those

14    claims of those patents.

15    Q    Okay.  And the claim --

16         MR. GALVIN:  Objection; outside the scope of the

17    report to the extent it's beyond '868.

18         THE COURT:  Overruled.

19    Q    Can you tell the Court -- so we've looked at the '868

20    patent, correct?

21    A    Yes.

22         THE COURT:  Well, wait one second.  Yes.  You're

23    really limiting that opinion to the process claims, '868 and

24    '698; isn't that right?  I mean, because you're talking --

25    your opinion goes to this issue of material change; isn't
```

```
 1    that right?

 2              THE WITNESS:  This relates to process claims in

 3    order to, product-by-process claims.

 4              MR. GALVIN:  Objection, your Honor.

 5              THE COURT:  That's his opinion.

 6              MR. GALVIN:  May I have a side bar?

 7              THE COURT:  I don't think it's necessary.

 8              MR. GALVIN:  It's outside the scope of the report

 9    if he's offering an opinion on '698.

10              THE COURT:  All right, where is it in the report?

11              MR. FLEMING:  Your Honor, it's at Paragraph 73 of

12    the yellow report.

13              THE COURT:  Thank you.  Just a moment.

14              MR. GALVIN:  It's '868, your Honor.

15              THE COURT:  Yes.  Sustained.  His opinions go to

16    these process claims.  Those are in the '868 and the '698

17    patents, and the three -- no, this -- those two patents for

18    this purpose.

19              MR. FLEMING:  May I continue, your Honor?

20              MR. GALVIN:  Your Honor?

21              THE COURT:  What?

22              MR. GALVIN:  His report only says '868, it does not

23    say '698.

24              THE COURT:  It may.  That's my ruling.

25    Q    Now, Doctor, just so the jury understands --
```

1          **MR. FLEMING:**  And can I have the '868 claims back

2    again, please, for a second.

3    **Q**   You told the jury this is a process claim, correct?

4    A    That is -- that's correct.  It says a process for.  So

5    you can see it's a process claim.

6    **Q**   Just to be clear, it is your opinion that Roche in the

7    use of protoplast fusion transformation does not practice

8    this process, correct?

9          **MR. GALVIN:**  Objection.

10         **THE COURT:**  Sustained.  Don't lead the witness.

11   **Q**   Tell the jury your opinion on noninfringement regarding

12   these process claims?

13   A    Certainly.  Roche does not infringe this claim because

14   it does not perform this process.

15   **Q**   Now, Doctor, what type of DNA was used to transform

16   Roche's cells?

17   A    They use cDNA.

18   **Q**   Now, I want to move on to a different topic, please.

19         Doctor, are you familiar with the term obligate

20   glycoprotein?

21   A    Yes, I am.

22   **Q**   In your opinion, is CERA, the active ingredient in

23   Mircera, an obligate glycoprotein?

24         **MR. GALVIN:**  Objection, your Honor.  May we have a

25   side bar, your Honor, on our motion.

```
 1              THE COURT:  You may.
 2    SIDEBAR CONFERENCE, AS FOLLOWS:
 3              THE COURT:  Just a moment.  What tab is it?
 4              MR. GALVIN:  It is Tab 7.
 5              THE COURT:  Seven.
 6              MR. GALVIN:  The issue, your Honor, is he's
 7    offering an opinion based on construction that the term in
 8    '933 requires an obligate glycoprotein that's not in the
 9    claim or in your construction.
10              THE COURT:  Well, it's not the claim, but maybe it
11    has to be.  It's not, it's not excluded either.  We'll see
12    if the jury has anything to say about it.
13              MR. FLEMING:  Thank you, your Honor.
14              THE COURT:  Overruled.
15              (Whereupon the sidebar conference concluded.)
16              MR. FLEMING:  May I continue, your Honor?
17              THE COURT:  You may.
18              MR. FLEMING:  Thank you.
19    Q    Doctor, can you tell the jury your opinion as to whether
20    CERA, the active ingredient in Mircera, is an obligate
21    glycoprotein?
22    A    It is not.
23    Q    Can you tell the jury why?
24    A    Well, the reason is because it's been shown
25    experimentally by Roche, they did this study, that if you
```

1    take off the sugars --

2             MR. GALVIN:  Objection, your Honor.

3             THE COURT:  Sustained.  He can't testify to some

4    study done by someone else.

5             MR. FLEMING:  Your Honor, we understand and I'll

6    withdraw that question and I'll take it in a different

7    direction.

8             THE COURT:  Very well.

9    Q    What about CERA -- we're not talking about studies -- in

10   your opinion makes it not an obligate glycoprotein?

11   A    If you remove the sugars it remains active, it still

12   functions in the body.

13   Q    And how does that differ from an obligate glycoprotein?

14   A    An obligate glycoprotein means if you take off the

15   sugars it doesn't function in the body.

16   Q    Okay.  So an obligate glycoprotein has to have sugars in

17   order to function in the body; am I correct or not?

18            MR. GALVIN:  Objection.

19            THE COURT:  Sustained.  Don't lead the witness.

20            MR. FLEMING:  Okay.

21   Q    How necessary are the sugars present on an obligate

22   glycoprotein to your opinion?

23            MR. GALVIN:  Objection.

24            THE COURT:  Overruled.

25            MR. GALVIN:  Outside the scope.

1          **THE COURT:**  Overruled.

2     A    I'm sorry, could you repeat the question?

3     Q    Yes.  How necessary to an obligate glycoprotein function

4     are the presence of the sugars?

5     A    They're absolutely essential.

6     Q    And your opinion is without those sugars will CERA

7     function?

8          **MR. GALVIN:**  Objection.

9          **THE COURT:**  Overruled.

10    A    It functions perfectly well.

11         **MR. FLEMING:**  Now, could we have the '933 claim.

12    Q    Okay.  And if I look at claim 3, there's the term

13    glycoprotein product.  Do you see that?

14    A    I do.

15    Q    Is that the term you focused on in coming to your

16    opinion?

17    A    That is the term I focused on, yes.

18    Q    Okay.  And why do you say -- what is your opinion

19    regarding what is the product -- withdrawn.

20         What type of claim is claim 3?

21    A    Claim 3 is a product-by-process claim.

22    Q    And what type of product is required in this process?

23         **MR. GALVIN:**  Objection.

24         **THE COURT:**  Overruled.

25    A    The product that is required is an obligate

1    glycoprotein.

2    **Q**   How do you know that?

3    A    I know that because in the patent history Amgen argued

4    successfully that this is what it meant.

5         **MR. GALVIN:**  Objection, your Honor.

6         **THE COURT:**  That's his interpretation.  They have

7    the patent history and you may make an appropriate argument.

8    But the documents are in evidence and that's the conclusion

9    he's drawn.

10   **Q**   It's easier to call it POW and it's POW.  But I'm going

11   to hand you, Doctor, POW which has been marked for

12   identification.

13        **MR. FLEMING:**  Your Honor.

14   **Q**   And, Doctor, could you identify this document for the

15   jury, please?

16   A    Yes, this is a Roche document studying CERA --

17        **MR. GALVIN:**  Objection, your Honor.

18   A    -- and glycosylation.

19        **THE COURT:**  No, he's identifying it.  That's what

20   he says it is.

21        **MR. FLEMING:**  Your Honor, I offer POW.

22        **MR. GALVIN:**  Objection.

23        **THE COURT:**  Sustained.

24   **Q**   Doctor, did you rely on POW in coming to your opinions

25   regarding whether CERA was an obligate glycoprotein or not?

1    A    Yes, I did.

2    Q    And did you rely on testimony regarding this document

3    POW in coming to your opinion that CERA was not an obligate

4    glycoprotein?

5    A    Yes, I did.

6         THE COURT:  Well, what testimony?  Testimony here

7    in the trial or in some deposition or what?

8         THE WITNESS:  It's in my report.  Discussion of

9    this precise document.

10        MR. FLEMING:  It's pretrial, your Honor.

11        THE COURT:  Okay.  So you looked at some --

12        THE WITNESS:  Yes.

13        THE COURT:  -- deposition testimony?

14        THE WITNESS:  I looked at testimony, yes.

15        THE COURT:  Or in some other proceeding or

16   something?

17        THE WITNESS:  That's correct.  Yes.

18        THE COURT:  Now, as a scientist, is that what

19   scientists in your line of work, scientists now, not people

20   who testify, is that what they do to draw conclusions about

21   what, how these glycoproteins function?  Is that what you

22   base your opinion on?

23        THE WITNESS:  Well, certainly, because this is

24   exactly what we're talking about, this is an experiment

25   which directly addresses the question that comes to --

1        THE COURT:  All right.  So you looked at -- well,

2   when you say this is an experiment, let's confine it to

3   this.  I can take a look at this.

4        THE WITNESS:  Sure.

5        THE COURT:  You've looked at this.  And this is

6   some sort of Roche document.  I'm not going to admit it in

7   evidence.  But you say this is the type of document that

8   you, in your area of work, look at to draw conclusions about

9   how these glycoproteins work, right?

10       THE WITNESS:  Yes, it's experimental evidence.

11       THE COURT:  Okay.  And you say that's what

12   scientists in your area do?

13       THE WITNESS:  Yes.

14       THE COURT:  All right.  So relying on this, not

15   some sort of testimony somewhere; we'll see what his

16   opinions are.

17       MR. FLEMING:  Your Honor, rather than admitting it

18   into evidence, can I show the one page of the document?

19       THE COURT:  You may not.

20   Q    And, Doctor, you found data sufficient in that document

21   POW for you to draw your conclusions that CERA is not an

22   obligate glycoprotein?

23       MR. GALVIN:  Objection.

24       THE COURT:  Sustained.  Don't lead the witness.

25       MR. FLEMING:  Understood, your Honor.

1   Q    Doctor, did you find sufficient data in that document --

2          THE COURT:  That's leading.

3          So when you looked at that what was your

4   conclusion?

5          THE WITNESS:  Well, what I conclude is that you

6   take off the sugars and the molecule is still active.  There

7   are a couple of columns there, it's very clear.

8          THE COURT:  Well, strike out there's a couple of

9   columns there because that's not in evidence.

10          THE WITNESS:  Sorry.

11          THE COURT:  But that's your conclusion.

12          THE WITNESS:  That's my conclusion, yes.

13          THE COURT:  All right, fine.

14  Q    And when you're talking about the molecule that's not an

15  obligate glycoprotein, what molecule are you referring to?

16  A    I'm talking about CERA.

17  Q    And based upon your analysis, does CERA satisfy the

18  elements of claim 3?

19  A    No, it does not.

20  Q    And therefore does it infringe?

21  A    No, it does not.

22  Q    And as to the dependent claims, does it infringe?

23  A    No, for the same reason it does not infringe any of

24  those claims.

25  Q    In your opinion, will CERA have activity in the body in

1    the absence of any sugar residue?

2    A   Yes, it will in my opinion.

3            **MR. GALVIN:**  Objection.

4            **THE WITNESS:**  Sorry.  I didn't mean to interrupt.

5            **MR. GALVIN:**  Outside the report.

6            **THE COURT:**  Where is it?

7            **MR. FLEMING:**  It's at Paragraph 73, your Honor.

8    And also Paragraph 65.

9            **THE COURT:**  That may stand.

10   **Q**   Let's move on to another topic at this point, Doctor.

11           Doctor, are you -- do you have an opinion as to

12   whether there are other commercially viable non-infringing

13   processes to the Lin patents?

14   A   Yes, I do.

15   **Q**   And can you tell the jury, have you reviewed any

16   documents to form that opinion?

17   A   Yes, I have.

18   **Q**   Doctor, I'm going to hand you what's been marked as NHX.

19   Sorry.

20           **MR. FLEMING:**  Ms. Smith.

21           **THE CLERK:**  Is that AHF?

22           **MR. FLEMING:**  N, as in Nancy, H, as in hairless, X.

23   It's the only way I can remember it.

24   **Q**   Doctor, do you recognize that document?

25   A   Yes, I do.

1    **Q**    And can you tell the -- identify it for the jury,

2    please?

3    A    Yes, certainly.  This is a scientific publication in the

4    Journal of Science, it's one of the very prestigious

5    journals, and it describes expressing erythropoietin in

6    yeast.

7    **Q**    And can you read the title of the document, please?

8    A    Certainly.

9              **MR. GALVIN:**  Objection.

10             **THE COURT:**  You're going to offer this?

11             **MR. FLEMING:**  I'm offering it -- I was going to

12   have him read the title and offer it, your Honor.  I would

13   offer NHX.

14             **THE COURT:**  As a learned treatise?

15             **MR. FLEMING:**  Yes, your Honor.

16             **MR. GALVIN:**  Objection, your Honor.

17             **THE COURT:**  I'll receive it as a learned treatise,

18   which means you can put it up there but it doesn't go to the

19   jury.

20             So, NHX is received under that exception to the

21   rule against hearsay, and you may deal with it as I've just

22   described.

23             **MR. FLEMING:**  Thank you, your Honor, I will.  Can

24   we go to the next page, please.

25   **Q**    Doctor, again we have an article entitled "Humanization

```
 1    of Yeast to Produce Complex Terminally Sialylated

 2    Glycoproteins."

 3            That's a mouthful for me.  Can you explain to the

 4    jury what this article discusses?

 5            MR. GALVIN:  Objection.

 6    A    Sure.

 7            MR. GALVIN:  Outside the report.

 8            THE COURT:  Yes, where is it?

 9            MR. FLEMING:  Paragraph 134, your Honor.

10            THE COURT:  134.

11            MR. FLEMING:  Of the yellow report, I apologize.

12            THE COURT:  The yellow.  Thank you.

13            MR. GALVIN:  Your Honor, I also object to an

14    explanation of the learned treatise as opposed to just

15    reading it.

16            THE COURT:  Well, he may testify consistent with

17    134, but he may not explain the article.  The article's

18    there.  Because it is outside the report.

19            So let's take it down if you're going to ask him

20    about 134.  I see the citation there.  That's -- you've had

21    enough of the article.  Now, what's his conclusion?

22            MR. FLEMING:  Your Honor, with all due respect,

23    from Paragraph, Lines 15 through the end of Paragraph 134.

24    The article, the name Hamilton, et al. refers to the

25    article.
```

1          THE COURT:  No, I understand that.

2          Well, he may read or testify to the sentence that

3    begins "For example."  Let's start there.

4          MR. FLEMING:  Very good, your Honor.  Thank you.

5    Q    Doctor, would you look at the yellow report in front of

6    you.

7    A    Certainly.

8    Q    Turn to Page 65.  And do you see Paragraph 134?

9    A    Yes, I do.

10   Q    Okay.  If you would look at Line 15.

11   A    Yes.

12   Q    Across, the sentence starting "For example."

13   A    Yes.

14   Q    Is that discussing -- and I believe for identification

15   we were looking at NHX, correct?

16   A    Correct.

17   Q    Okay.  And is the Hamilton article discussed there, that

18   NHX?

19   A    It's exactly that same article, right.

20   Q    So can you start reading the sentence with "For example"

21   to the jury.

22          MR. GALVIN:  Objection.

23          THE COURT:  He may read it.

24   A    It says here:  For example, Hamilton, et al., I think,

25   described the creation of yeast cells that express and

1    secrete glycoproteins having humanlike glycosylation

2    patterns.  Meaning the sugars, the proteins are like sugars

3    that we make.

4    Q   Can you continue with the next sentence, please.

5            THE COURT:  No, I said he could read one sentence.

6            MR. FLEMING:  Okay.

7            THE COURT:  Now, he may testify as to the others if

8    you want him to read it.  But the other sentences, as I read

9    this, don't purport to summarize that article.

10           MR. FLEMING:  Understood, your Honor, and if I can

11   continue with the witness.

12           THE COURT:  You may.

13   Q   So, Doctor, what you just said regarding NHX is the

14   expression of what protein?

15   A   It specifically addresses the expression in that article

16   of erythropoietin.

17   Q   In what type of host cell?

18   A   In yeast cells.

19   Q   And --

20   A   Yeast, of course, you know baking and this kind of

21   thing, it's a kind of yeast.

22   Q   And is that a glycosylated or not recombinant human EPO?

23           MR. GALVIN:  Objection.

24           THE COURT:  Overruled.

25   A   That is a glycosylated EPO, and it's glycosylated the

1    same as we do it in our bodies.

2    Q    And based on your review of that article and your

3    explanation, do you have an opinion as to whether what was

4    discussed in Hamilton, the NHX article, was a commercially

5    viable means of producing recombinant EPO?

6    A    It certainly would be a commercially viable way of doing

7    it, yes.

8    Q    Now, Doctor, are you aware of any other processes that

9    are non-infringing that could be used to make an ESA EPO

10   product?

11   A    Yes.  For example, the process that Roche itself uses is

12   noninfringing and makes EPO.

13        MR. FLEMING:  Thank you, your Honor.  I have no

14   further questions.

15        THE COURT:  Any questions for this witness, Mr.

16   Galvin?

17        MR. GALVIN:  Yes, your Honor.

18                    CROSS-EXAMINATION

19   BY  MR. GALVIN

20   Q    Good morning, Dr. Flavell.

21        You mentioned that EPO can be made in yeast cells.

22   Does Roche use yeast cells to make the EPO that it uses to

23   make Mircera?

24   A    No, it does not because, of course, it doesn't infringe

25   the patents in --

1    **Q**   Doctor, could you --

2         **THE COURT:**  No, no, no.  Now, look, you've been

3    here before.  Listen to your answer.  No, it does not you

4    said, and then you launch off because you say it doesn't

5    infringe.  Well, with all respect, sir, you're not going to

6    decide that.  These people are going to decide that.  And

7    your volunteering that is improper.

8         **THE WITNESS:**  Okay.

9         **THE COURT:**  And I have given these instructions

10   before, and don't take me as testy.  But I expect my orders

11   to be carried out.  Listen to what he asks you.  If what he

12   asks you can be honestly, accurately answered yes or no,

13   you've got to answer yes or no.  He's a skilled lawyer.  He

14   knows how to ask the questions.  He's asking yes or no

15   questions.

16        Now, you're not helpless.  If an honest, accurate

17   answer is not yes or no, say I can't answer it yes or no.

18   And, naturally, if you don't know the answer or you don't

19   remember you may always say that.  But those are the

20   instructions for witnesses.

21        This is an order.  If you start volunteering little

22   zingers like that, I'm going to strike it out because you

23   have no right to do that.  You give your testimony.  These

24   jurors will make the decision.

25        Now, are you clear on that?

1          **THE WITNESS:**  Absolutely.

2          **THE COURT:**  Very well.  Go ahead, Mr. Galvin.

3          **MR. GALVIN:**  Thank you, your Honor.

4     **Q**   I would like to ask about your opinion regarding the

5     '868 limitation, the isolated DNA sequence encoding human

6     erythropoietin.  The term "isolated DNA sequence" only

7     appears in '868 claim 1, correct?

8     **A**   If you would like to put up the claims, I can answer

9     that.

10    **Q**   You didn't offer any opinion in your expert report that

11    '698 claim 6 --

12         **MR. GALVIN:**  Could we have '698 claim 6 on the

13    screen.

14    **Q**   -- the '698 claim 6 contains the word "isolated DNA,"

15    correct?

16    **A**   If you would like to put up the --

17    **Q**   Sure.

18         **MR. GALVIN:**  Could we have '698 claim 6.

19    **Q**   The word "isolated DNA sequence" does not appear in '698

20    claim 6, correct?

21    **A**   I'm sorry, which question were you asking me?  I think

22    the previous question was different.

23    **Q**   The term "isolated DNA sequence encoding human

24    erythropoietin" does not appear in '698 claim 6, correct?

25    **A**   No, it does not.

1   Q    Okay.  In your opinion the term "isolate" has no special

2   meaning to a molecular biologist when applied to DNA,

3   correct?

4   A    I don't understand your question, I'm sorry.

5   Q    The term isolate has no special meaning to a molecular

6   biologist when applied to DNA; that's your opinion, correct?

7   A    You said isolate?  I don't understand.

8   Q    Isolate.

9         Dr. Flavell, would you please turn to your report,

10  your yellow report, Paragraph 70.

11  A    Isolate's a noun.  That's the problem I'm having.

12  Q    Could you turn to Paragraph 70 of your report, the

13  yellow report.

14  A    7 0?

15  Q    7 0.

16  A    Okay.

17  Q    And let me read to you the second sentence in Paragraph

18  70 of your report.

19            MR. FLEMING:  Objection, your Honor.

20            THE COURT:  Overruled.  He may read from the report

21  in cross-examining this witness.

22  Q    "In my experience as a molecular biologist the term

23  'isolate' has no special meaning when applied to either

24  proteins or DNA."

25        That is the sentence that appears in Paragraph 70

1    of your report, correct?

2           **MR. FLEMING:**  Objection, your Honor;

3    mischaracterizes the document.

4           **THE COURT:**  Overruled.  You'll have a chance for

5    redirect.

6    A   No, that's not what it says.

7           **THE COURT:**  And that -- now, there's an example.

8    That's an appropriate answer.  Don't volunteer things.

9           Go ahead.

10   **Q**   As of 1983 there were four widely accepted methods for

11   transferring DNA into a mammalian cell, correct?

12   A   Could you please repeat that?

13   **Q**   As of 1983 there were four widely accepted methods for

14   transferring DNA into a mammalian cell, correct?

15   A   Well, if you would like to show me the four methods,

16   I'll comment on them.

17   **Q**   My question was, do you agree that there were four

18   widely accepted methods for transferring DNA into a

19   mammalian cell as of 1983?

20   A   I would like you to point me to the four methods and I

21   can comment on them.

22   **Q**   Do you believe that there were four widely accepted

23   methods for that as of 1983?

24   A   I have already answered your question.  I would like you

25   to point to the four methods and then I'll comment on them.

1    **Q**    Let's turn to Paragraph 17 of your report.

2    Paragraph 17, Dr. Flavell.  You wrote:  As of nineteen

3    ninety -- as of 1983 there were four widely accepted methods

4    for transferring genetic information into a mammalian host

5    cell.

6           That's what you said in your report, correct, sir?

7    A    This is what it says here, yes.  It says --

8    **Q**    Dr. Flavell, you've answered my question.  Thank you.

9           Now, it's your opinion that Dr. Lin's '868 claims

10   are only directed to one of those methods, DNA-mediated gene

11   transfer, correct?

12   A    Yes, that is correct.

13   **Q**    Now, let's look at '868 claim 1.  The words

14   "DNA-mediated gene transfer" do not appear in the claim,

15   correct?

16   A    DNA-mediated gene transfer uses isolated DNA, and that's

17   the whole point.

18   **Q**    Dr. Flavell, I just asked you, do the words

19   "DNA-mediated gene transfer" appear in claim 1?

20   A    Do the words DNA-mediated gene transfer?  They do not,

21   but there are many ways of --

22   **Q**    Dr. Flavell, thank you.

23   A    I'm sorry, but there are many ways of saying the same

24   thing.

25   **Q**    Dr. Flavell --

 1          **MR. GALVIN:**  Your Honor, may I have an instruction,

 2    please.

 3          **THE COURT:**  Yes, the "But there are" is stricken;

 4    disregard it.  Mr. Fleming will have a chance to ask other

 5    questions.

 6    **Q**   Now, Dr. Flavell, would you please turn to Paragraph 193

 7    of your report.  And at Paragraph 193 you wrote --

 8    **A**   Just a moment.  Excuse me, I haven't reached the

 9    paragraph.

10    **Q**   Paragraph 193, I'm sorry.

11    **A**   Yes.  But I'm not there.  Okay.

12    **Q**   Okay.  Do you have it in front of you now?

13    **A**   No.

14    **Q**   Page 91.

15    **A**   Now I do.  Thank you.

16    **Q**   Paragraph 193, you wrote:  Dr. Lodish offers his

17    opinion --

18          **MR. FLEMING:**  Objection, your Honor.  Objection.

19    He's reading some other witness's comments into the record

20    to this witness.

21          **THE COURT:**  What are you reading from, the report?

22          **MR. GALVIN:**  Yes, your Honor.

23          **THE COURT:**  He may read from the report.  You'll

24    have a chance to examine.

25          **MR. FLEMING:**  No, your Honor, he's reading some

1    other, he's characterizing another witness's --

2        **THE COURT:**  If it's in the report he may read it.

3    And if you need to read other parts for completeness, you

4    may do it, that's fair.  But it's his report.  He may

5    cross-examine using the witness's own report.

6        Overruled.

7    Q    You wrote in your report at Paragraph 197, quote, 193:

8    "Dr. Lodish offers his opinion that Roche scientists

9    recognize that the EPO in CERA is unchanged."

10       **MR. FLEMING:**  Objection, your Honor.

11   Q    "I disagree."

12       **MR. FLEMING:**  This is hearsay.

13   Q    "The document" --

14       **THE COURT:**  Overruled.  This -- the jury

15   understands that this isn't Lodish testifying.  This comes

16   from this witness's report.  It's not substantive evidence

17   because it is a question.  We're going to hear now what the

18   witness has to say.  And, of course, he has to read the next

19   sentence where this witness in his report says I disagree.

20       Okay.  Now, we've read that.  Now, generally he may

21   read from the report.

22       Go ahead, Mr. Galvin.

23   Q    And you continue:  "I disagree.  The document relied

24   upon to reach this erroneous conclusion was an email from

25   February 2004 at which time Roche lacked any knowledge about

1    CERA's structure."

2         So you said in your report, Dr. Flavell, that Roche

3    lacked any knowledge about CERA's structure in

4    February 2004, correct?

5    A    I made this statement which you just read.

6    Q    Thank you.

7         MR. GALVIN:  And may we have on the screen, please,

8    Exhibit 56 in evidence, Roche's Investigational New Drug

9    Application.  And can we highlight the date of submission,

10   December 4th, 2001, in the top right corner.

11   Q    Now, in 2001, Dr. Flavell, Roche filed for permission

12   from the FDA to begin giving CERA to patients as part of its

13   clinical trials, correct?

14   A    This is what that says, yes, that's correct.

15   Q    And it's your opinion that at the time that Roche began

16   giving CERA to patients as part of its clinical trials Roche

17   lacked any knowledge about CERA's structure, correct?

18         MR. FLEMING:  Objection, your Honor.

19         THE COURT:  Sustained.  Sustained.

20         MR. GALVIN:  No further questions, your Honor.

21                    REDIRECT EXAMINATION

22   BY  MR. FLEMING

23   Q    Doctor, let's stay on Paragraph 193 for a second and

24   let's read from there what they didn't want the jury to hear

25   which is --

```
 1              THE COURT:  No, no, on.

 2              MR. FLEMING:  Withdrawn, your Honor.  Withdrawn.

 3              THE COURT:  Well --

 4              MR. FLEMING:  Withdrawn.

 5              THE COURT:  -- withdrawn, but of course they've

 6    heard it.  It's improper.

 7              MR. FLEMING:  Your Honor --

 8              THE COURT:  These little zingers are improper.

 9    You'll get a chance to argue to the jury tomorrow morning.

10    Let's keep the arguments for tomorrow morning; now we're

11    taking evidence.

12    Q    Can we look at --

13              THE COURT:  Go ahead.

14    Q    -- Line 11 of Paragraph 193, Doctor.

15    A    Okay.

16    Q    And continuing on to Line 12 starting with the word,

17    "Like the comments."  Do you see that?

18    A    Yes.  Yes, I do.  Starting with the words "The

19    document."

20    Q    No, the next line, Line 12, starting with the words,

21    "Like the comments."

22    A    "Like the comments" -- excuse me, I'll read it.  I

23    apologize.  "Like the comments regarding structure, this

24    statement is wrong because the results of later experiments

25    that Roche eagerly awaited demonstrated that this uptake
```

1    occurs with CERA."

2    Q    And when you were talking about structure you were

3    talking --

4              MR. GALVIN:  Objection, your Honor.

5              THE COURT:  Wait a minute.  Let him put his

6    question first.

7              MR. FLEMING:  Thank you, your Honor.

8    Q    When you were talking about structure you were talking

9    about X-ray crystal structure, correct?

10             MR. GALVIN:  Objection.

11             THE COURT:  Sustained.  Don't lead the witness.

12   Q    What type of structure were you referring to?

13   A    I was referring to X-ray crystallography structures.

14             MR. FLEMING:  Thank you, your Honor.  No further

15   questions.

16             THE COURT:  Nothing further for this witness?

17             MR. GALVIN:  No, your Honor.

18             THE COURT:  You may step down.

19             (Whereupon the witness stepped down.)

20             THE COURT:  Call your next witness.

21             MS. BEN-AMI:  Roche calls its final witness, I

22   believe, Dr. Klibanov.

23             THE COURT:  He may be called.

24             MS. BEN-AMI:  Your Honor, can we get a time here?

25             THE COURT:  Come to the side bar.

```
1    SIDEBAR CONFERENCE, AS FOLLOWS:

2              THE COURT:  You better be done by 11:00.  Because

3    of the article, I didn't start out at 9:00.  But out of your

4    hour and ten minutes, let's see, your side has used up 25.

5    And so out of their 40 minutes they have used up 15.

6              MS. BEN-AMI:  Twenty-five.

7              MR. GAEDE:  Your Honor, if I may, we looked at the

8    time, Mr. Galvin was done before --

9              THE COURT:  I'll keep the time, thank you very

10   much.

11             MR. GAEDE:  I'm just -- I'm sorry, your Honor.

12             THE COURT:  I'm keeping the time fairly.

13             MR. GAEDE:  Thank you, your Honor.

14             THE COURT:  It takes into account excessive side

15   bars and the like.

16             MR. GAEDE:  Thank you, your Honor.

17             THE COURT:  I'm the timekeeper.

18             MR. GAEDE:  Yes, your Honor.

19             THE COURT:  Keep that in mind.

20             MR. GAEDE:  Thank you, your Honor.

21             MS. BEN-AMI:  Twenty-five minutes.

22             (Whereupon the sidebar conference concluded.)

23             THE WITNESS:  Good morning, your Honor.

24             THE CLERK:  Sir, would you raise your right hand.

25             Do you solemnly swear that the answers you will
```

 1    give to this Court and Jury will be the truth, the whole

 2    truth, and nothing but the truth, so help you God?

 3              **THE WITNESS:**  I do.

 4          **MR. GAEDE:**  Your Honor?

 5          **THE CLERK:**  Please be seated.

 6          **MR. GAEDE:**  I'm sorry, a point of clarification on

 7    the time issue, if we could, very quickly.

 8          **THE COURT:**  It's not necessary.  Move on.

 9                   ALEXANDER M. KLIBANOV

10                 **DIRECT EXAMINATION**

11  **BY  MS. BEN-AMI**

12    **Q**    Good morning, Doctor.

13    A    Good morning.

14    **Q**    Are you ready?

15    A    Yes.

16    **Q**    Could you introduce yourself for the jury?

17    A    My name is Alexander M. Klibanov.

18    **Q**    And what do you do, Doctor?

19    A    I'm a Professor of Chemistry and Bioengineering at MIT

20    here in Cambridge across the river.

21    **Q**    When did you become a professor at MIT?

22    A    About 28 years ago.

23    **Q**    What do you teach?

24    A    I have taught numerous courses over those 28 years in

25    biological, organic, general chemistry, and many others.

1   **Q**   As part of your work do you do research?

2   A   Yes, of course.

3   **Q**   Could you very briefly explain to the jury what type of

4   research you do?

5   A   My research deals with chemistry of proteins, enzymes,

6   drug delivery, drug development, things of this sort.

7   **Q**   Doctor, have you published any of your work in

8   scientific journals?

9   A   Yes, I over the years have published more than 260

10  publications in scientific journals.  I have also edited

11  three books.

12  **Q**   Do you have any patents?

13  A   Yes, I have 16 issued United States patents to my name.

14  **Q**   Can you tell us whether you have ever served as an

15  editor in journals?

16  A   Yes, as a matter of fact, currently I'm on the tutorial

17  boards of eight different scientific journals.

18  **Q**   And, Doctor, have you received any awards or honors?

19  A   I've been fortunate enough to be recognized for my

20  professional achievements.  I received a number of national

21  and international awards.  I would just mention election to

22  the United States National Academy of Sciences, which is

23  considered among the highest professional honors that can be

24  given to an American scientist.

25  **Q**   Now, Doctor, we're at the last stages of the issues of

1    infringement in this case, so let's get right to it.

2          Do you understand that in this case Amgen is

3    asserting that Roche uses the processes of certain claims in

4    Amgen's patents to make epoetin beta?

5    A    Yes.

6    Q    With that assumption in mind, what are your opinions

7    or -- strike that.

8          Do you have any opinions with regard to whether

9    there are differences between CERA, Roche's CERA, and

10   epoetin beta?

11   A    Yes.  In my opinion, from the chemical standpoint and

12   from the molecular standpoint, CERA is profoundly different

13   from epoetin beta.

14   Q    And, Doctor, we'll go through it in detail, but today

15   what claims are you talking about?

16   A    I'm talking about, we're going to talk about asserted

17   claims of three patents, one product patent and two process

18   patents.

19   Q    Now, are you familiar with the Court's claim

20   construction, the jury has the glossary in the book.

21   A    Yes, of course.

22   Q    And have you, in reaching your opinions have you taken

23   into account the Court's claim construction?

24   A    Yes, of course.

25   Q    So would you, with that in mind, would you briefly

1  provide your ultimate opinion to the jury.

2  A    My ultimate opinion is that CERA does not infringe the

3  asserted claims of Amgen patents.

4  Q    And why is that?

5  A    The reason it doesn't is because CERA is not produced in

6  the cell as Amgen patents require and that CERA is

7  materially different from epoetin beta.

8  Q    Now, if I were to suggest to you, let me suggest to you

9  that Amgen has suggested that when you say peg dash EPO it

10  means there's a peg molecule and an EPO molecule attached to

11  each other.

12       Do you have that assumption in mind?

13  A    Yes.

14       MR. GAEDE:  Objection, your Honor, leading; outside

15  the scope of the report.

16       THE COURT:  Well, well, just does he have it in

17  mind.  We'll let him answer that.  She can put another

18  question.

19       You have those things in mind?

20       THE WITNESS:  Yes, your Honor.

21       THE COURT:  Now your question.

22  Q    Would you agree or disagree with that from a scientific

23  standpoint?

24       MS. BEN-AMI:  And I have red, Paragraph 36, red,

25  Paragraph 367, 368, and blue, 28.

1        **THE COURT:**  There's a protocol here in order to be

2    fair.  You had to prepare a report.

3        **THE WITNESS:**  Yes, sir.

4        **THE COURT:**  Each side has it.  You've got to stick

5    to that report.  They may quarrel about that.

6        **THE WITNESS:**  Yes, sir.

7        **THE COURT:**  I have to ultimately decide.  And so

8    she's making reference to specific paragraphs where she

9    thinks the answers to the question that she's putting to you

10   are found.  The other side may say objection, not in the

11   report.  I'll check and then I'll rule.

12       You have the reports in front of you.

13       **THE WITNESS:**  Yes, your Honor.

14       **THE COURT:**  It's wise to keep track of what you

15   said in the report because I'm not letting you say anything

16   that's not in there, in order to be fair.

17       **THE WITNESS:**  Yes.

18       **THE COURT:**  Now, put your question, Ms. Ben-Ami.

19   **Q**   My question again was, is the notion that there's a peg

20   molecule and an EPO molecule attached together, can you tell

21   us in your opinion whether that is scientifically correct or

22   incorrect?

23       **MR. GAEDE:**  Objection, your Honor; outside the

24   scope of these two paragraphs.

25       **MS. BEN-AMI:**  I mentioned --

```
 1              THE COURT:  Overruled.  She may have it.
 2   A    Such kind of analogies are incorrect.  In chemistry, it
 3   is wrong and misleading to use these mechanical analogies.
 4   They simply do not apply in chemistry.
 5   Q    So, let's take a general example.
 6              MS. BEN-AMI:  Your Honor, there will be a bit of
 7   tutorial in this --
 8              THE COURT:  There's nothing that's not going to be
 9   in the report.
10              MS. BEN-AMI:  No, it's all in the report.
11              THE COURT:  Well, that's it.
12              MS. BEN-AMI:  Okay.
13              THE COURT:  I mean, your time is running, do what
14   you want.  But it's got to be in the report.
15              MS. BEN-AMI:  Absolutely.  Everything's in the
16   report.
17   Q    Let's take a molecule A dash B.
18              MS. BEN-AMI:  Red, 36.
19   Q    Do you have it in mind?
20              MR. GAEDE:  Your Honor?
21              THE COURT:  Well, she hasn't asked the question
22   yet.
23              MR. GAEDE:  Yes.
24              MS. BEN-AMI:  Red, 36.
25   Q    A dash B, can you tell the jury from a scientific
```

1    perspective, does A dash B contain A or B?

2    A    It does not.

3             MR. GAEDE:   Objection, your Honor; outside the

4    scope of relevance as ordered by the Court in the motions in

5    limine.

6             THE COURT:   No, overruled.

7             MS. BEN-AMI:   Can he answer, your Honor?

8             THE COURT:   Except I just don't understand A dash

9    B.   What sort of notation is that?

10            THE WITNESS:   It's just when you, instead of giving

11   a specific atom or group of atoms you generalize them by A

12   dash B.

13            THE COURT:   So A atom, B atom?

14            THE WITNESS:   Or A is group of atoms and B is group

15   of atoms, yes, your Honor.

16            THE COURT:   I see.   And so her question is -- put

17   the question again.

18   Q    From a scientific --

19            THE COURT:   I'm at least following it

20   substantively.

21            MS. BEN-AMI:   I'm sorry.

22   Q    From a scientific perspective, when a scientist sees A

23   dash B, can you tell us, with the dash between the A and B,

24   whether there's a separate A and a separate B?

25   A    The answer is there's no separate A and no separate B

1    when a chemist looks at the structure like that.

2         **THE COURT:**  Okay, let's just get the -- I mean,

3    we're searching for the truth here and I want to get some

4    idea of what you're saying.

5         So, a molecule of water, H20, which is about my

6    level, two atoms of hydrogen and one atom of oxygen.  What

7    you just said is that molecule of water is different from

8    the two atoms of hydrogen standing alone and the one atom of

9    oxygen standing alone.

10        **THE WITNESS:**  Exactly, your Honor.  It's absolutely

11   different.

12        **THE COURT:**  And you would say that even when the

13   chemical structure is vastly more complex and the like?

14        **THE WITNESS:**  Exactly, the same, exactly, the same

15   principle applies.

16        **THE COURT:**  Now, let's see if we can't come to this

17   case.

18        **MS. BEN-AMI:**  Okay.

19   **Q**   So now let's take peg dash EPO.  All right?  What would

20   be the proper way to view this molecule?

21        **MS. BEN-AMI:**  Red, 357, 367, 368.

22   A    The proper way to view this molecule will be as, as a

23   single molecule, not as something that consists of several

24   parts or components, it is a single molecule that should be

25   viewed as a whole where everything affects everything else

1    within this single molecule.

2    Q    So, you're talking about now how scientists understand

3    these abbreviations when they read them, right?

4    A    And specifically a chemist --

5         MR. GAEDE:  Objection, your Honor.

6    A    -- abbreviation.

7         MR. GAEDE:  Outside the scope of the report; calls

8    for hearsay; relevance.

9         THE COURT:  Put the question again.

10        MS. BEN-AMI:  I'll ask a different question.

11        THE COURT:  A different question.  Withdrawn.

12        MS. BEN-AMI:  Just to move it along.

13   Q    Are you familiar with a book called Morrison and Boyd?

14   A    Yes, of course.  I use it in my teaching.

15   Q    And can we have that.

16        Doctor, let me -- what's the exhibit number?  It's

17   NRF.

18        And in your opinion, Doctor, is this a reliable

19   text?

20   A    Yes, it's a very authoritative textbook in organic

21   chemistry.  As I said, I use it in my own teaching at MIT.

22        MS. BEN-AMI:  Your Honor, I would offer it as a

23   learned treatise.

24        THE COURT:  You can use it as a learned treatise.

25        MS. BEN-AMI:  And can we go to NRF dot 4.  And we

1    have a demonstrative which is AK-42.  It's just, it's a

2    blowout of that page, your Honor.

3           **MR. GAEDE:**  Objection, your Honor.  This was not

4    disclosed to us.

5           **MS. BEN-AMI:**  Yes, it was.

6           **THE COURT:**  Where is it?

7           **MR. GAEDE:**  In his report.

8           **THE COURT:**  Well --

9           **MS. BEN-AMI:**  The sentence is disclosed at red,

10   Paragraph 40.

11          **THE COURT:**  She may use the document which is

12   referenced.  All we can do is see it.  And he may testify

13   consistent with Paragraph 40.  That's sufficient limitation.

14          Go ahead.

15   **Q**   Can you read this sentence to the jury?

16   A   Yes.  This sentence says:  These crude pictures and

17   models are useful to us only if we understand what they are

18   intended to mean.

19          And the reference to these crude pictures and

20   models --

21          **MR. GAEDE:**  Objection, your Honor.

22   A   -- is reference to --

23          **THE COURT:**  No, wait a second.

24          **MR. GAEDE:**  Move to strike.

25          **THE COURT:**  And I'm going to sustain that.  Well, I

1    stopped it.

2              Go ahead, Ms. Ben-Ami.

3         **MS. BEN-AMI:**  Okay.

4    **Q**   What, as a scientist, does this tell you about how to

5    view these chemical model pictures?

6         **THE COURT:**  Take a look at 40 and 41 because you

7    have to stick within that.  And 39.

8         **MS. BEN-AMI:**  And 40.  And 55.

9         **THE COURT:**  But, you may testify to all those

10   matters.

11   **A**   It tells me that pictures of the type that show carbons

12   and hydrogens or A dash B or peg dash EPO should be

13   understood only --

14        **MR. GAEDE:**  Objection, your Honor.

15   **A**   -- in the context in which they are intended to be

16   given.

17        **MR. GAEDE:**  Objection, your Honor.

18        **THE COURT:**  Overruled.  His testimony may stand.

19   **Q**   Have you prepared a demonstrative -- which is in the

20   report, your Honor -- to teach the jury a little bit about

21   the structure of organic molecules and how structure relates

22   to properties?

23   **A**   The basic principle of chemistry --

24   **Q**   I just asked you first, have you prepared demonstrative?

25   **A**   Yes, I have.  Yes.

 1              **MS. BEN-AMI:**  So can I have AK-3 and then we'll

 2   teach.

 3              **MR. GAEDE:**  Again, your Honor, object.

 4              **THE COURT:**  Well, the "And then we'll teach,"

 5   that's stricken out.  She'll ask questions.

 6              Overruled.

 7              **MR. GAEDE:**  The further objection is that there's

 8   no description of this specific demonstrative in the report.

 9              **THE COURT:**  Well, then he won't give us one except

10   what's in the report.  But we may look at it.

11              **MS. BEN-AMI:**  Paragraph 66, your Honor, of the red

12   report.  Sixty-seven, your Honor, of the red report.

13   Forty-nine in the red report.

14              **THE COURT:**  He may so testify.

15   **Q**   What are you depicting here, Doctor?  What's your point?

16   **A**   I'm depicting here two different chemical molecules that

17   are familiar to all of us.  On the left hand side what is

18   depicted is molecule of aspirin.  We all know aspirin is

19   something we take when we particularly have a headache.  And

20   the molecule depicted there is the active ingredient in

21   aspirin.

22              What I have on the right hand side is an organic

23   molecule called acetic acid which is also familiar to all of

24   us because it is the active ingredient in vinegar that we

25   use as a salad dressing.

1    **Q**    Now --

2            **MR. GAEDE:**  Your Honor?

3    **Q**    -- you have a box here.

4            **MR. GAEDE:**  Your Honor?

5            **THE COURT:**  Overruled.  She may proceed.

6            **MR. GAEDE:**  May we have -- relevance.  Side bar,

7    please?

8            **THE COURT:**  No.  It's not necessary.  She may

9    proceed.

10   **Q**    What is -- what are you showing in the yellow box on the

11   left?

12   **A**    What I show in the yellow box is the atoms that the

13   Court can see vinegar and aspirin, if you will, share in

14   common.  And yet despite sharing a number of atoms, the same

15   atoms here and there, nobody would say that there is vinegar

16   in aspirin, as our everyday experience reveals.

17           **MS. BEN-AMI:**  Now, can I have AK-4.

18   **Q**    And this also is in your expert report.

19   **A**    Yes.

20           **MS. BEN-AMI:**  And that is red, 66, 67, Page 22,

21   Lines 13 dash 23 dash 4.

22           **MR. GAEDE:**  Your Honor, objection to this line of

23   questioning.

24           **THE COURT:**  Overruled.  She may have it.

25   **Q**    What are you depicting here, Doctor?

1    A    What I am illustrating on this transparency is that even

2    a very minor, seemingly minor, one atom change in the

3    molecule, can result in dramatic changes in the properties

4    of the molecule.  On the left hand side, I have the acetic

5    acid, the component --

6    Q    Doctor, do you have a laser pointer?

7    A    Sure.

8         **THE COURT:**  I hear the objection.  I better, I

9    better caution the jury.

10        When we start going from vinegar to a deadly

11   poison, that may be gilding the lily a little bit with all

12   respect, sir.  I'm letting him testify to his point about

13   the chemistry.  But once we're done with this, we're coming

14   to this case.  Because this acetic acid and aspirin and

15   vinegar have nothing to do with this case, except as

16   illustrative of his testimony about how chemical

17   interactions are understood.

18        So you get a few questions on this, but it's

19   pressing the envelope to go from vinegar to a deadly poison,

20   which has nothing to do with this case.  A couple of

21   questions, Ms. Ben-Ami, and then let's get to this case.

22   Q    Well, what's the point, what point are you conveying

23   here, Doctor?

24   A    The point I'm trying to convey here is that one of the

25   fundamental principles of chemistry is that structure begets

1    function, meaning that you change a structure, you change

2    function.  Typically meaning the properties.  Typically, the

3    larger the change in structure, the greater will be the

4    change in properties.

5           What this slide shows is, however, that even a very

6    small, a minimal change in structure can result in dramatic

7    changes in function.  For example, in this case, just a

8    single atom, this hydrogen atom is replaced with another

9    atom, which is fluorine, and instead of vinegar we get the

10   poisonous compound.

11          **THE COURT:**  Now to this case.

12          **MS. BEN-AMI:**  Now we're up to amino acids, your

13   Honor.

14   **Q**   Okay, let's look at --

15          **THE COURT:**  We'll see what he has to say.

16   **Q**   -- AK-6.  Can you tell us what this is?

17   A    This slide shows a group of organic compounds called

18   amino acids which are the building blocks of proteins such

19   as EPO, for instance.

20   **Q**   And what is that R that is shown there?

21   A    What is shown here is there are basically two, that

22   there are a number of groups of atoms in amino acids, that

23   is, there's this central carbon atom, there's an amino group

24   here, there's a carboxyl group, there's a hydrogen, and

25   there is also a vitally important group of atoms which is

1    called the side chain.

2    **Q**   Why is the side chain important?

3    **A**   Because for the 20 amino acids, so-called standard amino

4    acids, that all natural proteins are built of, the only

5    thing that differs is the side chain.  Everything else is

6    the same.  It is the side chain that distinguishes one amino

7    acid from another.

8    **Q**   How many different amino acids are there?

9    **A**   There are several hundred amino acids found in nature,

10   but the proteins that we're all made of contain only 20

11   so-called standard amino acids.

12   **Q**   And what distinguishes one amino acid from another?

13   **A**   Only the nature of the side chain, only the R Group.

14   **Q**   Now, can we look at AK-8.

15          **MS. BEN-AMI:**  Also in the report, your Honor.

16   **Q**   Can you tell us what, what level of difference there

17   needs to be for one amino acid to be different from another?

18          **MR. GAEDE:**  Your Honor, renew my objection on

19   relevance grounds.

20          **THE COURT:**  Yes, sustained.  I think we have the

21   concept.  Let's get to something more germane to this case.

22          **MS. BEN-AMI:**  Your Honor, I would like a side bar

23   on this for one second.

24          **THE COURT:**  You may.

25          **MS. BEN-AMI:**  Because it is highly germane.

 1          THE COURT:  You may.

 2    SIDEBAR CONFERENCE, AS FOLLOWS:

 3          THE COURT:  I rather like this.  It is in the

 4    report.  My problem is what's the value added of this step?

 5          MS. BEN-AMI:  Okay.  What we're trying to show --

 6          THE COURT:  Because, you see, I have a concept, you

 7    argued this concept from day one and you're going to get it

 8    out of this witness.  But let's get there.

 9          MS. BEN-AMI:  Oh, I understand I'm trying to show

10    this jury that when you change the side chain you create a

11    different amino acid.

12          THE COURT:  Why don't you because --

13          MS. BEN-AMI:  I want to say that that is accepted

14    in the art.  It's not us making it up, it's accepted in the

15    art.  That's all.  One, just one -- I mean, it's much more

16    probative if it's accepted in the art.

17          THE COURT:  I'll give you three.

18          MS. BEN-AMI:  Okay.

19          (Whereupon the sidebar conference concluded.)

20    BY  MS. BEN-AMI

21    Q   So can you explain what you're depicting here with

22    tyrosine and phenylalanine?

23    A   I'm showing examples of two out of those 20 standard

24    amino acids.

25    Q   Go ahead.  What's the difference between them?

1    A    Yes.   The Jury and the Court can see that as far as the

2    upper portion of the molecule it is exactly identical in two

3    of them.   So the only difference is in the side chain, in

4    this, what I believe has been called the R Group.

5    **Q**    Now, in this example there's how many differences -- how

6    many different atoms between tyrosine and phenylalanine?

7    A    There is a single atom that is different, just this

8    extra oxygen atom.   And that is what distinguishes tyrosine

9    from phenylalanine, and that is what is responsible for

10   their very different properties.

11   **Q**    And based on your knowledge and experience as a

12   professor and scientist, would it be proper scientifically,

13   would it or would it not be proper scientifically to say

14   that phenyalanine is in tyrosine?

15           **MR. GAEDE:**   Objection, your Honor; relevance.

16           **THE COURT:**   She may have that question, then we're

17   getting to the materials in this case.

18           You may answer.

19   A    It would be totally improper and in fact not a single

20   freshman chemistry student that I have ever taught would say

21   anything like that.

22   **Q**    Okay.   So now let's get to the '933 patent.   AK-28,

23   please.

24           Do you have an opinion about what this claim is

25   directed to?

1    A    Yes, I do.

2    Q    What is your opinion?

3    A    My opinion is that this claim is directed to what is

4    highlighted on this slide which is a glycoprotein product of

5    the expression in a mammalian host cell.

6    Q    Do you have an opinion whether CERA, the active

7    ingredient in Mircera, infringes this claim?

8    A    I have an opinion.

9    Q    What is your opinion?

10   A    My opinion is that it does not.

11   Q    Why?

12   A    It does not because CERA is not produced, is not a

13   product of expression in a mammalian host cell or any other

14   cell for that matter.

15   Q    In your opinion, based on the current state of science,

16   could CERA be made in a mammalian cell?

17   A    As far as we know today, it cannot be made in any kind

18   of a living cell.

19   Q    Now, let's look at AK-29.

20          Looking at the other claims, and we have 7, 8, 9,

21   12, do you have an opinion about those claims?

22   A    Yes, I do.

23   Q    What is your opinion?

24   A    My opinion, once again, is that these claims are not

25   infringed by CERA.

1    Q    Why?

2    A    These claims are dependent from the claim that was shown

3    on the previous slide and they have the same limitations as

4    the claim shown on the previous slide.  And therefore, since

5    the other one was not infringed, these cannot possibly be

6    infringed either.

7    Q    You just said they all have the same limitation.  What

8    limitation are you talking about?

9    A    The limitation is that they are products of the

10   expression in the mammalian host cells.  All the dependent

11   claims also require that it be a product of the expression

12   in a mammalian host cell.  And CERA is not.

13   Q    Let's talk about pegylation.

14            Can you describe for the jury the chemical reaction

15   that Roche uses to produce CERA?

16            **MS. BEN-AMI:**  And that's red, 123, 124, 129,

17   Exhibit 53.

18   A    CERA is produced by Roche as a result of an irreversible

19   chemical reaction, so-called pegylation reaction, whereby

20   epoetin beta is chemically bonded to a very large entity, to

21   a number, basically an entity consisting of thousands of

22   different atoms.  That is the pegylation reaction, and as a

23   result of this reaction a strong, irreversible covalent,

24   meaning very strong bond, is formed in this new molecule

25   called CERA.

```
 1   Q    Now, there are lots of bonds in CERA.  Are all the bonds

 2   equally strong?

 3             MR. GAEDE:  Objection, your Honor; outside the

 4   scope of the report.

 5             MS. BEN-AMI:  Red, 68, 71, Page 24, Lines 5 through

 6   9.

 7             MR. GAEDE:  Excuse me, again, what paragraphs?

 8             MS. BEN-AMI:  Red, 68, 71.

 9             MR. GAEDE:  Red, 68 and red, 71 --

10             THE COURT:  Through 71, I take it.

11             MR. GAEDE:  -- do not --

12             THE COURT:  Well, just a moment.  Don't -- he may

13   testify consistent with Paragraphs 68 and 71.  You might

14   take a look at them, sir.

15             And put your question again, Ms. Ben-Ami.

16             MS. BEN-AMI:  Okay.

17   Q    I'll just make it more specific.

18             Besides covalent bonds, are there any other

19   chemical interactions in CERA?

20             MR. GAEDE:  Objection, your Honor; outside the

21   scope of these paragraphs.

22             THE COURT:  Overruled.

23   A    Yes, there are.

24   Q    What kind of bonds are those and how do they compare to

25   covalent bonds?
```

```
 1    A    In addition to covalent bonds there are also so-called

 2    nonconvalent bonds that are much weaker than covalent bonds,

 3    but nevertheless play a vital role in maintaining the

 4    properties, the function of the chemical molecules.

 5    Q    Now, once the chemical reaction occurs what has happened

 6    to the epoetin beta starting material?

 7    A    Epoetin beta ceases to exist as such.  It no longer

 8    exists as such.

 9    Q    And what do you mean by that?

10    A    I mean that that compound that we refer to as epoetin

11    beta is no longer there.  Instead, there is a new compound

12    with new set of properties.

13    Q    Now, where on the epoetin beta does the chemical

14    reaction take place?

15    A    There are nine potential reaction sites on epoetin beta.

16    Eight of them are side chains of lysine residues, and the

17    last one is the alfa amino group of the N-terminal alanine

18    residue.

19    Q    So do you have a demonstrative on the chemical reaction?

20    A    Yes, I do.

21         MS. BEN-AMI:  I'm going to use a board now, your

22    Honor, and a slide.  Both in the expert report.  Can I have

23    AK-6 again.

24    Q    So we've got AK-6, a generalized amino acid.  And I

25    would like you now --
```

1       **THE WITNESS:**  You probably can't see it.

2       **THE COURT:**  No, I can't see it, but I'm not the

3   fact finder in this case.  I respect those who are the fact

4   finders.  And I'll peek around if I want to see it.

5       **MS. BEN-AMI:**  Okay.  And for that reason, Doctor,

6   don't use the laser pointer.

7       **THE COURT:**  Well, yes.  No, he has that.

8       **THE WITNESS:**  Thank you, your Honor.  Okay.

9   **Q**   So what are you showing on the left hand side?

10  **A**   On the left hand side, I'm showing one of those residues

11  that can in fact be pegylated upon pegylation of the epoetin

12  beta.  And specifically I'm focusing on that R Group, or the

13  side chain, if you will, of lysine.

14  **Q**   So let's just look at the generalized amino acid.  Do

15  you see the -- I'm sorry -- do you see the orange on the

16  slide of the generalized amino acid?

17  **A**   Yes.

18  **Q**   Where is that on the left hand side figure?

19  **A**   The R Group that is shown there, it's the circle, the

20  side chain, the R.  But this is the side chain, that R Group

21  in the case of lysine residues --

22  **Q**   Okay.

23  **A**   -- in epoetin beta.

24  **Q**   And where's the amino group?

25  **A**   This is the amino group which is a part of that side

1    chain.

2    Q    And what does that plus tell you?

3    A    It tells me that this amino group in this case is

4    positively charged.

5    Q    And it says there lysine side chain at physiological pH.

6    What are you saying there?

7    A    Yes.  When epoetin beta is dissolved in water the

8    physiological pH inside our blood, inside our bodies, for

9    example, in the blood --

10            MR. GAEDE:  Objection, your Honor; outside the

11   scope of the report.

12            THE COURT:  I think -- put another question.  We'll

13   let that stand but stop him there, and put another question.

14            MS. BEN-AMI:  We'll keep going and we'll get back

15   to it.

16            MR. GAEDE:  Your Honor, one brief -- there's a

17   dispute over the amount of time left and I wonder if we

18   could have a one minute side bar, a thirty second side bar

19   to --

20            THE COURT:  There's a dispute over what?

21            MR. GAEDE:  The amount of time left.

22            THE COURT:  We'll -- I'm keeping the time.

23            MR. GAEDE:  I understand.

24            THE COURT:  I'm keeping the time.  She has some

25   time left.

1           Go ahead.

2   **Q**   What are you showing on the right side, Doctor?

3   A   On the right side, I show what happens to that amino

4   acid residue upon pegylation, in other words, how that amino

5   acid residue in CERA is different from what it was in

6   epoetin beta.  So this is epoetin beta, this is CERA.

7   **Q**   And that's the right hand side of the demonstrative?

8   A   That's correct.

9   **Q**   What happened to the positive charge?  And I am --

10  A   The positive --

11  **Q**   I am at blue, Paragraph 20, and blue, Paragraph 23.

12  A   The positive charge disappears as a result of this

13  pegylation reaction.  It is no longer there.

14  **Q**   Is there any -- go ahead.

15  A   It is no longer there in CERA.

16  **Q**   Is there anything else that disappears?

17  A   Two hydrogen atoms also disappear in that they are no

18  longer, the same hydrogen atoms are no longer present in

19  CERA.

20  **Q**   And is there any difference in bonds?

21  A   There are new bonds, in fact, hundreds of new bonds that

22  now exist in CERA that did not exist in epoetin beta.

23  **Q**   Based on the chemical reaction which creates CERA, in

24  your opinion, are all the amino acids that are in epoetin

25  beta in CERA?  Yes or no?

1    A    No.

2    Q    Why not?

3    A    Because there is one amino acid that existed in epoetin

4    beta that is no longer in CERA, and likewise, there is one

5    amino acid residue present in CERA that was absolutely not

6    in epoetin beta.

7    Q    And just finishing up on this, do you see where it says

8    681, Doctor?

9    A    Yes.

10   Q    What does that mean to get to the scientific -- getting

11   to the scientific shorthand, what does 681 mean?

12   A    In scientific shorthand it means that the group of atoms

13   that is shown in the brackets here is repeated on average

14   681 times.  Which means that there are thousands of new

15   atoms that are present in CERA that are absent in epoetin

16   beta.

17   Q    So if we drew the whole thing, how big would this be?

18   A    It would probably take the walls of this entire

19   courtroom.

20   Q    Okay.  So, just as a shorthand it's depicted this way?

21   A    That's correct.

22   Q    And as a scientist --

23        MR. GAEDE:  Objection, your Honor.

24        THE COURT:  Yes.  Well, sustained.  You can't lead

25   the witness.  I think we have the point.

1          **MS. BEN-AMI:**  All right.

2          **THE COURT:**  Let's move on.

3          **MS. BEN-AMI:**  Thank you, your Honor.

4   **Q**   Let me hand you --

5          **THE WITNESS:**  Thank you, your Honor.

6   **Q**   -- Exhibit NBP.  Let me hand you a binder.

7          Does the Court have a binder?

8   **A**   Thank you.

9   **Q**   Sure.  Can you identify for us NBP?

10  **A**   I'm sorry?

11         **THE COURT:**  What tab is it?

12         **MS. BEN-AMI:**  NB, as in boy, P.

13         **THE COURT:**  Oh, I see it.  I'm sorry.  Forgive me.

14         **MS. BEN-AMI:**  I'll give you another copy of it.

15         **THE COURT:**  No, no, I have it.

16         **MS. BEN-AMI:**  I'll give the witness another --

17  **Q**   You don't have it?

18  **A**   No.

19  **Q**   All right.  You have it now?

20  **A**   Yes, I do.

21  **Q**   Can you identify it for the jury?

22  **A**   This is a scientific paper coming from Amgen -- the

23  first author is Steve Elliott -- entitled "Mapping of the

24  Active Side of Recombinant Human Erythropoietin" published

25  in journal called Blood, in 1997.

1          **MS. BEN-AMI:**  I would offer it, your Honor, as an

2    admission.

3          **THE COURT:**  Any objection?

4          **MR. GAEDE:**  Objection, your Honor.

5          **THE COURT:**  Overruled.  It may be admitted.  It

6    will be 2111.  It's in evidence.

7          (Exhibit marked in evidence.)

8    **Q**   Have you reviewed this article?

9    A   Yes, I have.

10   **Q**   And does it relate to your opinion in any way?

11   A   Yes, it does.

12   **Q**   Can you tell the jury why?

13         **MS. BEN-AMI:**  That is blue, 10 and blue, 37.

14   A   Because this article from Amgen confirms that lysine in

15   epoetin beta that I was showing on the left hand side of the

16   board that his Honor was holding is indeed positively

17   charged.

18         **MR. GAEDE:**  Objection, your Honor.

19   A   The physiological pH.

20         **MR. GAEDE:**  Outside the scope of the report in

21   those paragraphs.  Move to strike.

22         **THE COURT:**  Where is it?  Where he says it

23   confirms --

24         **MS. BEN-AMI:**  Blue, 10, blue, 37.

25         **THE COURT:**  Blue, 10.

1          MS. BEN-AMI:  And blue, 37, red, 162.

2          THE COURT:  Just a moment.

3          MS. BEN-AMI:  Line 12, 13, your Honor.

4          THE COURT:  On blue, 10.

5          MS. BEN-AMI:  Blue, 10.  And Paragraph 37, blue,

6   37.

7          THE COURT:  No, it may stand.  It may stand.

8   Q    Now, is there any -- does this article inform your

9   opinion on the issue of the relevance of the charge to

10  receptor binding in any way?

11         MR. GAEDE:  Same objection, your Honor.

12         THE COURT:  Where is it?

13         MS. BEN-AMI:  It is Paragraph 37, the next to last

14  line.

15         MR. GAEDE:  No --

16         THE COURT:  Blue?

17         MS. BEN-AMI:  Blue.

18         THE COURT:  Thank you.

19         MR. GAEDE:  No reference to charge.

20         THE COURT:  Just a moment.

21         MS. BEN-AMI:  It's at --

22         THE COURT:  Take a look at Paragraph 37 there.  You

23  may testify consistent with that paragraph.  But there is no

24  reference to charge there.

25         MS. BEN-AMI:  Okay.  And also Paragraph 10, blue,

```
 1    Paragraph 10, lines -- where it says "Furthermore."  Those

 2    two tie in together.

 3             THE COURT:  They do, and he may testify consistent

 4    with the report.  Neither one has, says charge.

 5             MS. BEN-AMI:  Yes.  May I point that out to your

 6    Honor?

 7             THE COURT:  He may testify consistent --

 8             MS. BEN-AMI:  May I point out the word to your

 9    Honor?

10             THE COURT:  You may.  Where is it?  Well, give me

11    the line.

12             MS. BEN-AMI:  Do you have a line number?  It's

13    Line 13, first word.

14             THE COURT:  I stand corrected.  He may so testify,

15    and thank you.

16             MS. BEN-AMI:  Thank you, your Honor.

17             THE COURT:  You may testify.

18             THE WITNESS:  Thank you, your Honor.

19             Would you be good enough to repeat your question,

20    please?

21  Q    I hope so.  I'll probably ask you a different one.

22             What does this paper tell you about the charge of

23    lysine and its relationship to binding of EPO?

24  A    It tells me, first of all, that lysine is positively

25    charged, and second of all, that that positive charge is
```

1    important for the interaction with the receptor; hence, if

2    it's not there, the interaction with the receptor will be

3    very different.

4    Q    And in your opinion, given the reaction with CERA, does

5    CERA bind to the receptor the same or differently than from

6    EPO?

7    A    It binds to the receptor but in a very different way.

8    Q    Now, in your opinion are there structures of CERA,

9    structures within CERA which affect its properties as

10   compared to epoetin beta?

11   A    Yes, there are a number of extra atoms found in CERA

12   that are absent, thousands, actually, extra atoms present in

13   CERA not present in epoetin beta that, of course, affect the

14   structure and hence the properties of the whole molecule.

15   Q    Now, how does this new side chain that we just saw,

16   this, this new side chain, how does that affect the CERA

17   molecule?

18   A    It affects the CERA molecule in that the molecule of

19   CERA is materially changed compared to the molecule of

20   epoetin beta.

21   Q    Now, in your opinion, based on your knowledge and

22   experience, looking at the CERA molecule as a whole, does

23   the, can you tell us whether the molecule as a whole is

24   interacting -- strike that.  I'll start again.

25        Let's talk about receptor binding now.

1    A    Yes.

2    Q    How do the interactions of EPO beta versus CERA differ

3    or the same?

4    A    They are different.  They must be different.

5    Q    Do you know about the difference in the kinetics?

6    A    We know that the kinetics of binding are different, yes.

7    Q    And in what way?

8    A    We know that the binding affinity of CERA to the EPO

9    receptor is --

10        **MR. GAEDE:**  Objection, your Honor.

11        **MS. BEN-AMI:**  Red, 157, 158.

12        **MR. GAEDE:**  Lacks foundation.

13        **MS. BEN-AMI:**  It's already admitted into evidence,

14   2108.

15        **THE COURT:**  Overruled.

16   Q    Doctor, please continue.

17   A    The binding of CERA to the EPO receptor is very

18   different from the binding of epoetin beta to the EPO

19   receptor in terms of the affinity -- in fact, the difference

20   is up to a hundred fold -- and also in the way that binding

21   occurs and takes place.

22        **THE COURT:**  You've got about five more minutes if

23   you're going to not go into some other portion of the case.

24        **MS. BEN-AMI:**  I understand.

25        **THE COURT:**  Very well.

1          **MS. BEN-AMI:**  Can we have AK-27.

2     **Q**   As a scientist, can you explain what this means to you?

3     **A**   What is shown there is an excerpt from the Roche BLA,

4     and what this particular excerpt deals with is the

5     difference between EPO, meaning epoetin beta in this case,

6     and CERA.

7          And there are two sentences here.  The first one

8     says that epoetin beta and CERA have the identical amino

9     acid sequence in composition of the carbohydrate moiety, and

10    then the very next sentence says that CERA differs from

11    erythropoietin through integration of an amide bond between

12    either the N-terminal amino group or the epsilon-amino group

13    of lysine -- that's that positively charged group that I

14    talked about -- predominantly lysine 52 and lysine 45 and

15    methoxy peg succinimidyl butanoic acid.

16         So it basically says that the amino acid sequence

17    is the same except for the difference that is specified in

18    the second sentence.

19         **MS. BEN-AMI:**  Can I have AK-19.

20    **Q**   Doctor, in your opinion, is CERA materially changed from

21    epoetin beta?

22    **A**   Yes, it is.

23    **Q**   And can you tell us what you've depicted here in AK-19?

24    **A**   What I depicted here is a number of phases of conversion

25    of epoetin beta to what we now call Mircera.  And these

1    include purification, chemical reaction, subsequent

2    purification, and finally, formulation that leads to Roche's

3    product Mircera.

4         MS. BEN-AMI:  Can I have -- strike that.

5    Q    So, in your opinion, can you just lay out for the jury

6    why Mircera is materially changed?

7    A    Each of the phases shown on this slide, purification,

8    first purification, chemical reaction, second purification,

9    formulation, each one of them produces a new substance that

10   is materially different from the starting material which was

11   epoetin beta.  Therefore, it follows that all four of these

12   steps, which is what Roche follows, most certainly produce

13   something, in this case, Mircera --

14        MR. GAEDE:  Objection, your Honor.

15   A    -- which is materially different from epoetin beta.

16        THE COURT:  That may stand.  That's it, isn't it?

17        MS. BEN-AMI:  Your Honor, I just need to offer some

18   additional pages of the BLA.

19        THE COURT:  That can be done at some other time.

20        All right.  And your rights to do that are saved;

21   we'll take care of that.

22        All right, do you have any questions?

23        MR. GAEDE:  I do, your Honor.

24        THE COURT:  Proceed.

25

1          **CROSS-EXAMINATION**

2     **BY  MR. GAEDE**

3     **Q**     Doctor, in the slide that you used here, you would agree

4     that each molecule of epoetin beta as it goes through the

5     first purification process that the covalent structure of

6     the molecule is unchanged, correct?

7     A     Well, first of all, there is no each molecule of epoetin

8     beta.  Epoetin beta is a mixture of certain isoforms.  It's

9     not a single molecule, sir.

10    **Q**     Okay.  So, the mixture of isoforms, you would agree that

11    each isoform is not covalently changed, correct?

12    A     No, it is covalently changed in that the ionization

13    state changes.

14    **Q**     That's right.  You're talking about there might be a

15    change of one hydrogen atom at the end of the, at one of the

16    ionization groups, correct?

17    A     That there is a change in ionization state, that's

18    correct.

19    **Q**     But there's no other change to the covalent structure,

20    correct, that you know of, correct, sir?

21    A     There may be other covalent changes as well.

22    **Q**     You're not aware of any, are you?

23    A     I have some ideas on what that might be.

24    **Q**     Sir, yes or no, you don't know of any other changes,

25    please?

1    A    I know of no evidence other than the change in

2    ionization state, which is an important change, which would

3    manifest itself.

4    Q    Okay.  Now --

5              **MR. GAEDE:**  You can take that down.  Thank you.

6    Q    You mentioned vinegar and acetic acid.  What's the

7    utility of vinegar?

8              Excuse me, I'm just going to grab one of the boards

9    here, too.

10   A    Vinegar may have a number of different utilities.  It is

11   frequently used to be added to salad.

12   Q    What's the utility of acetic acid?

13   A    Acetic acid is a multi-functional, multi-purposeful

14   chemical reagent that is used for many purposes, many

15   utilities.

16   Q    It's not added to salad, is it?

17   A    I beg your pardon?

18   Q    To your knowledge?

19   A    I beg your pardon?

20   Q    It's not added to salad to your knowledge, is it?

21   A    No.  In fact, vinegar is a solution of acetic acid in

22   water, so it is added to salad.

23   Q    What about aspirin, is that added to salad to your

24   knowledge?

25   A    Only if you have, if you're not only hungry but also

1    have a headache at the same time.

2    Q   That's right.  We don't typically add aspirin to salad,

3    do we, Doctor?

4    A   We do not, and that's exactly the point that I was

5    making.

6    Q   Now, the starting material that Roche uses to make

7    CERA --

8              THE COURT:  Do you want this up?

9              MR. GAEDE:  Yes, I will in one second there.

10   Q   That starting material, that's epoetin beta, that's one

11   of the starting materials, correct?

12   A   That's correct.

13   Q   And epoetin beta is produced from cells, correct?

14   A   Not necessarily.

15   Q   But in this case what Roche does to your understanding,

16   they produce epoetin beta in cells, correct?

17   A   That's my understanding, yes.

18   Q   Okay.  Now, you testified -- let me ask you another

19   question.

20              It's true, Doctor, that you didn't even consider

21   the question of whether there's any property or

22   characteristic of epoetin beta that was not materially

23   changed in your opinion by the subsequent processes that

24   Roche performed on the epoetin beta, correct?

25   A   No.

```
 1              MS. BEN-AMI:  Object, your Honor; vague.

 2              THE COURT:  Overruled.  He may have it.

 3    Q    Isn't that correct?

 4    A    No.

 5              MR. GAEDE:  Your Honor, deposition.  I'm sorry,

 6    your Honor, I was about to -- I'll bring, come right back

 7    after that, if I could.

 8              The deposition, please.  First day.

 9              MS. BEN-AMI:  Your Honor, could I move because I

10    don't know what --

11              THE COURT:  You can move.

12              MS. BEN-AMI:  Thank you, your Honor.

13              MR. GAEDE:  I'm sorry, your Honor.  You can please

14    put that down.  Let me just get this question and we'll

15    bring it back up.

16              THE COURT:  All right.  You may stand over here;

17    anywhere where you can see, Ms. Ben-Ami.

18              MR. GAEDE:  Let me move on.  I'm sorry, your Honor,

19    could you bring that back up.

20    Q    Now, you testified about all of the atoms that are here

21    on the side chain.  That's the peg, right?

22    A    That's not the peg.  I mean, that's what is -- it's a

23    peg which is attached to butanoic acid.

24    Q    Okay.  And there's a single covalent bond there between

25    the nitrogen and that carbon there, correct?
```

1    A    Between that carbon and this nitrogen there is a

2    covalent bond, yes.

3    Q    That's right.  And as you testified, in epoetin beta

4    normally there's two or three hydrogen atoms there, correct?

5    A    In epoetin beta, right here.

6    Q    Yes.

7    A    Physiological pH, there are three actually.

8    Q    But in order for the pegylation reaction to occur that

9    NH2, that has to be an NH2, correct?

10   A    It's a predominant reaction, but it could also be NH3.

11   It's a less dominant reaction.

12   Q    All right.  Now, how many other atoms are there in

13   epoetin beta?

14   A    Other atoms compared to what?

15   Q    In epoetin beta, how many atoms are there in epoetin

16   beta?

17   A    In epoetin beta it has a molecular weight of about --

18   there are hundreds of thousands of different atoms as there

19   are in this CERA side chain.

20   Q    So in epoetin beta there are hundreds of thousands of

21   atoms?

22   A    Epoetin beta has hundreds, or actually thousands of

23   atoms as does the side chain of CERA.

24   Q    Right.  And what's the molecular weight of epoetin beta?

25   A    It's approximately 30,000.

1    Q    30,000 what?

2    A    30,000 daltons.

3    Q    Okay.  And what's a dalton?

4    A    A dalton is a measure of atomic weight.

5    Q    That's right.

6    A    One hydrogen atom has atomic weight of one dalton.

7    Q    So, the weight overall of epoetin beta is 30,000

8    daltons, correct?

9    A    That's right.  And it doubles when CERA is formed.

10   Q    Excuse me.  Please answer my question, sir.

11        Now, if I remove one hydrogen atom from epoetin

12   beta, what's the molecular weight of epoetin beta?

13   A    The molecular weight of epoetin beta if you remove one

14   hydrogen atom will be approximately 30,000 minus one.

15   Q    All right.  So, if I remove one hydrogen atom from

16   epoetin beta it's one over 300, 30,000 as a percent,

17   correct?

18   A    If you were to do what you are just saying, yes.

19   Q    All right.

20   A    It's not what's happening here though.

21        **MR. GAEDE:**  Thank you, your Honor, if we could

22   remove the graphic now.

23        Yes, your Honor, if we could go back to --

24   Q    Now, let me put the question to you again, Doctor.

25   Isn't it true that you haven't specifically considered the

1    question --

2         **MS. BEN-AMI:**  Can I have a cite, please?

3    **Q**   -- whether there is any property or characteristic of

4    epoetin beta that was not materially changed in your opinion

5    by the subsequent processes that Roche performed on the

6    epoetin beta?

7         **THE COURT:**  Page and line number?

8         **MS. BEN-AMI:**  Does the witness --

9         **MR. GAEDE:**  Yes, your Honor.

10        **MS. BEN-AMI:**  -- have a copy, your Honor?

11        **THE COURT:**  He doesn't need a copy, necessarily.

12   But I don't see that he has one.

13        **MR. GAEDE:**  Page 58.  Copy of his deposition,

14   please.  Page 58, Line 19.  Another copy, please.

15        **THE COURT:**  Just so we can follow with the times,

16   we're going to run up close to 11:00 because he's going to

17   be out of time then.  I know how much time is left and they

18   do, too.  And we'll take the break then.

19        We'll try to get it all in by 11:00, but it won't

20   be beyond 11:00 because that's all the time that remains.

21   **Q**   So there's the question at Page 58, Line 19 over through

22   Page 59 at Line 7.

23   **A**   Yes, sir.

24        **MR. GAEDE:**  Could we play that clip of his

25   deposition, please, your Honor?

1          **THE COURT:**  You may.

2          **MR. GAEDE:**  Can you play that.

3          (Whereupon the following excerpt was played from

4     the videotape deposition of Alexander M. Klibanov.)

5     **Q**   Is there any property or characteristic of epoetin beta

6     that was not materially changed in your opinion by the

7     subsequent processes that Roche performed on the epoetin

8     beta?

9     A   I mean, I haven't considered that question.  I've been

10    specifically asked to consider, among others, the question

11    of whether Mircera has been materially changed compared to

12    erythropoietin or an epoetin beta and I considered the facts

13    available to me and I arrived at the affirmative answer to

14    this question.  The question that you asked me, I have not

15    been asked to consider and I haven't considered it.

16         **MR. GAEDE:**  Thank you.

17    **Q**   Now, Doctor, how many hydrogen atoms are there in

18    epoetin beta?

19    A   Probably several hundred, if not more.

20    **Q**   Now, let's take a look at Exhibit EES.  Do you recognize

21    Exhibit EES?

22    A   Yes.

23    **Q**   What is it?

24    A   It's a Roche's Investigational New Drug Application,

25    also called IND.

1    **Q**    And attached to it, what is attached to it?

2    A    Beg your pardon?

3    **Q**    What is attached to it?  If you would look at the fourth

4    page of the exhibit entitled Investigator Brochure.

5    A    There are a number of documents that are attached to it.

6    **Q**    Do you recognize the document attached to the

7    Investigator Brochure with Roche on it?

8    A    Which specific document are you referring to?

9    **Q**    Starting at the one, two, three, four, fifth page,

10   Investigator Brochure.

11            **MS. BEN-AMI:**  Your Honor, I would only object that

12   this appears to be a compilation, not a single document.

13   It's unclear.

14            **THE COURT:**  I have your objection in mind but he

15   hasn't offered it yet.

16            **MS. BEN-AMI:**  I understand.

17            **THE COURT:**  So long as the witness can follow, I'm

18   going to let him go forward.

19            **THE WITNESS:**  I still, I'm sorry, your Honor, I

20   still don't understand what --

21            **THE COURT:**  I think -- is this the page you want

22   him to look at?

23            **MR. GAEDE:**  Yes.

24            **THE COURT:**  All right.  Yes.

25            **THE WITNESS:**  Thank you, your Honor.

1    **Q**   Do you recognize this document, the Investigator

2    Brochure?

3    A    I have seen it at some point, yes.

4         **MR. GAEDE:**  Your Honor, I would offer Exhibit EES

5    into evidence.

6         **MS. BEN-AMI:**  My objection stands, your Honor.  My

7    objection is to the compilation and --

8         **THE COURT:**  Well, I'm going to admit it subject to

9    working out -- you're offering the complete document?

10        **MR. GAEDE:**  Yes.  It's the submission to the FDA.

11        **THE COURT:**  Well, I hear your representation and we

12   may have to work that out just how many pages, but you

13   proceed.

14        **MR. GAEDE:**  All right.

15        **THE COURT:**  It will be admitted in this form and

16   we'll sort out the pages that are actually the IND.

17        EES is admitted in evidence, and the next number

18   is?

19        **THE CLERK:**  69.

20        **THE COURT:**  69 in evidence.

21        (Exhibit marked in evidence.)

22   **Q**   Now, Doctor, you recognize -- if you would turn your

23   attention to Page 13 of the Investigator's Brochure.

24   A    Yes, sir.

25   **Q**   Now, Investigator Brochures to your understanding, those

1    are given to the doctors that are performing clinical trials

2    with Mircera, correct?

3            **MS. BEN-AMI:**  Objection; no foundation.

4    A   I don't know.  This document actually dated 2002 as it

5    said on the index page.

6    **Q**   Doctor, yes or no?

7            **THE COURT:**  Wait, wait, wait.  I've been very

8    strict on that.  He started his answer I don't know.  That's

9    a perfectly appropriate answer.  He doesn't know.

10   **Q**   Doctor, can you turn there on Page 13 in the last

11   paragraph, and there in the first sentence, isn't it true

12   that Mircera is simply a new formulation of epoetin beta?

13   A   No, not necessarily.

14   **Q**   Doctor, if you would please turn to Page 16.

15   A   Yes, sir.

16   **Q**   Now, if you would go to the third, or second full

17   bullet.  It says, "Based on the inert nature of the attached

18   peg moiety."

19           Do you see that?

20   A   Yes, I see that.  I would like to read the entire

21   sentence there.  Yes, sir.  I see that.

22   **Q**   And do you disagree with what's written here?

23   A   No, as I understand what's written there, I do not

24   disagree with that.  No.

25   **Q**   And isn't it true that the peg moiety is inert?

```
 1    A    As I understand it, it is, yes, it is inert in the

 2    chemical sense, not in terms of the lack of activity of --

 3    Q    Doctor, please answer my question yes or no.

 4    A    I cannot answer this question with yes or no, sir.  I

 5    would have to explain, your Honor.

 6    Q    Doctor, peg administered without the epoetin beta would

 7    not cause erythropoiesis, correct?

 8    A    I don't know.

 9    Q    You have no data that it would, correct?

10    A    I have seen no date one way or another.

11    Q    But epoetin beta administered without the peg attached

12    to it will cause erythropoiesis, correct?

13    A    I don't subscribe to the notion of attached.  I don't

14    understand the state, the question that you're asking.

15    Q    Let me restate the question.  If epoetin beta is given

16    without any other structure attached to it, made part of it,

17    it will cause erythropoiesis, correct?

18    A    There are no attachments and no parts in chemistry, sir.

19    Q    If we take the epoetin beta that Roche makes and sells

20    in Europe and we administer that to a patient, it will cause

21    erythropoiesis, won't it, sir?

22    A    Yes.

23    Q    Okay.  Now, let's go to Page 18 very quickly.  And if we

24    could go down to the fourth paragraph.  Right there it says

25    Ro 50-3821.  And there again, you agree, right, that epoetin
```

1    beta and Roche's peg-EPO share an identical amino acid

2    sequence and composition as represented to doctors, correct?

3            **MS. BEN-AMI:**  Objection; no foundation for that

4    statement.

5            **THE COURT:**  No, overruled.  He's asking him the

6    question.

7            **MS. BEN-AMI:**  Right.  It's the characterization.

8            **THE COURT:**  It may be.  I'm letting him ask the

9    question.

10   A    As I understand these terms here, I agree.

11   Q    Okay, thank you.

12   A    Which my understanding may be different from yours.  In

13   fact, I know that it is.

14   Q    Doctor, please just answer my question.  We have very

15   little time.  I'm sure you disagree with me.  We disagreed

16   in your deposition with each other, didn't we?

17           **THE COURT:**  That comment is stricken; your comment

18   is stricken.

19           **MR. GAEDE:**  Thank you, your Honor.

20           **THE COURT:**  You just ask the questions in the

21   remaining eight minutes.

22   Q    All right.  Just a couple of quick questions, Doctor.

23   You're a chemist, correct?

24   A    Yes.

25   Q    You have never worked with EPO, have you?

1    A    I have.

2    Q    Now, in the past four years you've testified as an

3    expert either at trial or by deposition 15 times, correct?

4    A    About.

5            MR. GAEDE:  Thank you, Doctor.

6            THE COURT:  Very well.

7            MS. BEN-AMI:  Can I ask one question, your Honor?

8            THE COURT:  No, because you're out of time.

9            So, you rest, subject to the documents that we've

10   talked about.

11           MS. BEN-AMI:  Roche rests subject to the documents.

12           THE COURT:  Subject to the documents.  And again,

13   subject to documents, Amgen rests, correct?

14           MR. DAY:  Yes, sir.

15           THE COURT:  Thank you.  All right, now at least I

16   understand the timing, and here's what it's going to be.

17           We're going to take a full half an hour now.  This

18   is your morning recess.  The only other thing we're going to

19   do is my explanation of the law, my charge to you.  And if

20   that stops us before one o'clock you'll be let go at that

21   time.

22           Now, because we have Mr. Womack here, tomorrow when

23   you come in, we will have my charge completely written out

24   for you and you'll have it in your possession, because

25   that's the teaching of the law.

1           So here's the schedule from here on in.  We'll take

2    a recess.  I'll come back, we'll come back from the recess,

3    and at that time I will instruct you as to the law that you

4    must follow in arriving at a fair and a just verdict in this

5    case.

6           Forgive me, sir, I've launched right in and left

7    you sitting there.

8           **THE WITNESS:**  That's fine.

9           **THE COURT:**  They're done with you and you're

10   excused.  You may step down.

11          **THE WITNESS:**  Thank you, your Honor.

12          (Whereupon the witness stepped down.)

13          **THE COURT:**  And when that's done, you must keep

14   your minds suspended because you haven't heard the lawyers

15   make their arguments.  They are entitled to argue to pull

16   all this evidence together and argue the conclusions that

17   they want you to draw from the evidence.

18          So, I'll instruct you.  They may not be satisfied

19   with my instructions.  They may think I've made a mistake as

20   to the law.  They may think I've left something out.  What

21   we're going to do is, you don't have to be here, I'm going

22   to go over that with them this afternoon.  And to the extent

23   I agree that I have to correct something or I have to tell

24   you something more, I'll do that tomorrow morning.  So

25   tomorrow morning, nine o'clock, maybe we'll start right in

1    with them arguing, and maybe not.  Maybe we'll start and

2    say, well, now I've got to correct this and that.

3          Then they'll argue, then I have a few words about

4    how you deliberate together.  So we are on track.  We

5    estimate that the case will be in your hands about this, a

6    little later, because we'll take a break here, even though

7    we're not going the whole morning, a little later than this,

8    between, say 11:30 tomorrow morning the case will be in your

9    hands.

10         Now, tomorrow lunch is on us.  Us meaning the

11   Court.  Cafeteria food.  We bring it right to the jury room.

12   And tomorrow, and for however long it takes for you to

13   arrive at a verdict, we need you from 9:00 in the morning

14   until 5:00 in the afternoon.

15         But for now, you have not heard all the evidence --

16   strike that.  You have heard all the evidence.  But you have

17   not -- one, I've got to sort out some exhibits, but you

18   haven't heard their arguments and you haven't heard my

19   instructions as to the law.  Both are important parts of the

20   case.  And so keep your minds suspended and do not start

21   talking about the case at this time.

22         The jury may stand in recess.  I'll remain on the

23   bench for a minute.

24         **THE CLERK:**  All rise for the jury.

25         (Whereupon the jury left the courtroom.)

1          THE COURT:  Please be seated.

2          Before we take the recess, I have to be in Judge

3  Sorokin's courtroom at 11:00 for a probation matter, but let

4  me just say the following.

5          Amgen has done exactly what I asked them to do and

6  in fact has given me two options.  I did misspeak with

7  respect to '349 claim 7 this morning.  And so, the more

8  accurate depiction is the one set forth in option 1 which,

9  as to '349 claim 7, has obviousness and nonenablement as the

10  defenses.

11          Now, with respect to the charge.  When I come back

12  on the bench I'm -- well, strike that.  I'm going to come

13  back on the bench before we bring the jury in to allow you

14  orally to make your motions, I take it cross-motions for

15  directed verdict.  I will not entertain argument.  I'm not

16  clear whether I have anything to say about them at that time

17  or not, but I may.  Once that's done, without argument, the

18  jury comes back in, I will instruct them.

19          When I'm done instructing them, we'll see what time

20  it is.  But if there is not time before the luncheon recess

21  for you to take objections to the charge, you have not

22  waived anything, and in fact, I think it makes some sense to

23  put that discussion off to about three o'clock in the

24  afternoon.  That way you'll be able to reflect on it and

25  make objections to it.

```
 1              THE CLERK:  2:30 probably.

 2              THE COURT:  Ms. Smith says 2:30.  I'll be ready at

 3      2:30.

 4              All right, I must recess and I'll be back without

 5      the jury to at least entertain your written or oral motions

 6      for directed verdict.

 7              We'll recess.

 8              THE CLERK:  All rise.  Court is in recess.

 9              (Recess.)

10              THE CLERK:  All rise.  Court is in session, please

11      be seated.

12              THE COURT:  Do I understand that the parties renew

13      at the close of all their evidence their several motions for

14      directed verdict?  We'll start with Amgen.

15              MR. DAY:  That, and in addition, we make a couple

16      of additional motions, your Honor.

17              THE COURT:  Well, there's only one you have to make

18      now.  That's the one.  I'm trying to protect you as to that.

19      And I'm going to start.  I mean, what other motions at this

20      stage?

21              MR. DAY:  At this stage, in addition to what we

22      have previously moved on, we move for a directed verdict

23      that Roche has failed to establish its defense of reverse

24      doctrine of equivalents.

25              THE COURT:  Oh, I understand that.  Of course.
```

1      **MR. DAY:**  And with respect to that, we also, at the

2  close of today's proceedings, we would renew our motion in

3  particular with respect to Roche having failed to establish

4  or raise issue with respect to noninfringement of the '698

5  process.  Materially change remains an issue in the case,

6  but literal infringement to the process, no evidence was put

7  on by Roche to counter Amgen's evidence.

8      **THE COURT:**  Except the fact that you bear the

9  burden of proof.  All right.

10      **MS. BEN-AMI:**  Yes, your Honor, we renew our motions

11  for directed verdict on all issues.

12      **THE COURT:**  Okay.  Now, Roche's motion for directed

13  verdict is denied.  Amgen's motion for directed verdict is

14  allowed in part and denied in part.

15      Let me be specific.  This business about somehow

16  literal infringement is established by their non-production,

17  a matter on which I express no opinion, is flat wrong,

18  denied.  They -- you bear the burden of proof.  They can

19  disbelieve your witnesses.  However, it is allowed as to the

20  reverse doctrine of equivalents.  The reverse doctrine of

21  equivalents is out.  Don't anyone mention it or argue it,

22  and I do not intend to in my charge.

23      Second, there's been Fritsch and Genentech.  I've

24  endorsed the most recent motion for clarification.  I don't

25  mean to be glib.  Fritsch is out, don't argue.

```
 1              All right.  Bring the jury in.

 2              In all -- well, in all other respects, Amgen's

 3      motion is likewise denied, and that sets you up for the

 4      motions for judgment not withstanding the verdict.

 5              MR. DAY:  Your Honor, while the jury's coming in,

 6      may I mention to your Honor, we have provided you in a JMOL

 7      on the prior art a checklist that goes down --

 8              THE COURT:  Oh, you have, and I have it, because I

 9      have to go over those charts, which I haven't done yet.

10              MR. DAY:  We've done it item by item, and we have

11      in the court each item of our reference there, and we've

12      given a checklist.

13              THE COURT:  I think what I have will be sufficient

14      to sort out prior to your closing arguments tomorrow.

15              THE CLERK:  All rise for the jury.

16              (Whereupon the jury entered the courtroom.)

17              THE CLERK:  Court is in session, please be seated.

18              THE COURT:  All right, ladies and gentlemen.  We

19      come now to that part of the case where I charge you, I

20      explain to you the law that you must follow in arriving at a

21      fair, impartial, and just verdict in this case.  Let me just

22      say a word about the mechanics of the charge, to start.

23              As I told you before you went out for the recess,

24      when I'm done here, you will be excused.  Then tomorrow --

25      and in the afternoon, we'll talk about whether I got
```

```
 1    something wrong or should add something.  And if I decide

 2    that I should make any corrections, I will make those

 3    corrections first thing tomorrow morning.

 4          So keep your minds suspended.  Even though I'm

 5    done, the matters are complex.  And while I'm careful to be

 6    sure of what is mine and what is yours, I have no pride of

 7    place, I can always correct myself and be better.  And if I

 8    need to correct it, I'll correct it tomorrow morning.

 9          In the meantime, our truly brilliant court

10    reporters are going to reduce my charge here today to

11    writing.  You'll have it tomorrow morning, and you'll have

12    the corrections virtually, if any there are, virtually as

13    you go in to deliberate.

14          The judge's charge is like a law school class.  In

15    other words, I'm going to teach you now all the law that you

16    need to know to have a legal framework within which you, and

17    you alone, you are going to answer the questions that we put

18    to you, the factual questions which are for you in this

19    case.

20          Like any class, you may ask questions.  In fact, I

21    encourage you to ask questions about my legal charge.  It

22    must be formal in the sense that you have to write it out,

23    and so hold off on it, at least until tomorrow, or at any

24    time during your deliberations.  If you don't understand

25    something about the law, by all means, write out a question.
```

1    We'll have you back here in the courtroom, I will answer the

2    question, send you back out, and you can continue your

3    deliberations.

4         You are asked to do justice in this case.  You're

5    required to follow the law.  Since you're required to follow

6    the law, you must understand what the law is.  And if you

7    don't understand it, it's my job to explain it and explain

8    it more, and explain it in more detail.  So have no question

9    that this is interactive.  You must follow what I tell you

10   the law is, but you are encouraged, indeed, to ask questions

11   about it.

12        I want to start with your function.  And, in

13   essence, I say much the same thing as I said at the

14   beginning of the trial, because it's all true.  You ten men

15   and women are the judges of the facts in this case.  You are

16   the only judges of the facts.  That is not my function.  And

17   I, as well as the lawyers, and their clients, must respect

18   your judgment as to the facts.  You will determine the facts

19   in this case solely and entirely on the evidence as you have

20   seen it and heard it right here in this courtroom.

21        Now, that's terribly important, because now that we

22   get to the end of the case, and we're not going to give it

23   to you today, we'll give it to you tomorrow, we may expect

24   more commentary in the press about this case.  Stay away

25   from it, just like the juror who saw something did exactly

1    right and went on.  Stay away from it.  You people are

2    special.  You are the judges of the facts.

3           Now, your verdict must be unanimous as to each of

4    the questions we're going to ask you.  And generically,

5    I've -- I'll show you the verdict slip very soon.  But

6    generically, I've set it up like a matrix and I've given you

7    each of the claims.  Everything plays off the claims, are

8    they valid, are they infringed, and so for each one, we say

9    invalid/valid, not infringed/infringed.  And you'll put a

10   checkmark for one or the other.

11          I'll tell you who has to prove what, I'll remind

12   you of that.  I'll remind you of what they have to prove.

13   But when you come to put checkmarks on this verdict slip,

14   you all have to agree.  You all have to agree one way and

15   you all have to agree the other.  Certain things, we say

16   why, and we give you the different examples.  For instance,

17   if you're going to find any claims of this patent invalid,

18   you check invalid, then you tell me why, and I set out the

19   various defenses that pertain to the various claims, and you

20   check all the ones that you think have been proved, in that

21   case, by clear and convincing evidence.

22          I'm also going to tell you how you handle this

23   issue of material change that pertains to the process

24   claims.  So I'll give you all those instructions.  My point

25   now is, when you come to put pen to paper on the single

1    verdict slip -- we'll pass out verdict slips to you today,

2    and you may keep them until it's time for you to deliberate,

3    but then don't make notes on them, because then we're going

4    to collect them and only send in one for the forelady to

5    fill out your unanimous verdict, then she signs her name on

6    it.

7           So the verdict has to be unanimous.  And that means

8    you all genuinely have to agree.  It's not eight of you

9    thinking one thing, and two of you thinking something else,

10   and then, well, it's eight, or nine, and whoever thinks the

11   other thing goes along.  That's not a verdict.  The verdict

12   must be unanimous, unanimous as to each issue that we give

13   you, based entirely on the evidence, without any bias or

14   prejudice or sympathy.

15          Okay.  That's your function.  Now, my function

16   here, and I've already said this, is to teach you the law.

17   So I've told you what the charge is.  As I've already said,

18   you have to follow the law the way I explain it to you.  But

19   I want to give you some cautions on that.  I have to charge

20   you as to every issue that's possibly in the case.  That

21   doesn't mean that I think anything is proved or not proved.

22   I have no opinion, none, on the disputed issues of fact in

23   this case.  I have no opinion.  So don't think that because

24   I'm explaining in detail this or that that I think it's

25   proved or I think that it's not proved.  Also, don't grab

```
 1    hold of one thing I say here now and say, Aha, the case

 2    turns on this or that.  No, listen to my charges -- my

 3    charge in its entirety.  It attempts to build for you orally

 4    this legal framework within which you, and you alone,

 5    determine what the facts are.

 6             I'm going to tell you, as I said, who has to prove

 7    what.  I'm going to tell you what they have to prove, what

 8    the level of proof is.  You can't ignore that.  You can't

 9    say, Well, no, really I don't care whether they show us this

10    or that, I still think whatever.  You may not do that.  If I

11    say someone has to prove something, then you have to come to

12    believe that thing at the level of proof that I have pointed

13    out before you could find a verdict that way.

14             You can't -- at the same time, you can't add to the

15    burden of proof.  You can't say, Well, I really expected

16    them to show us this, and because they haven't, they haven't

17    proved it.  No, no, no.  If I tell you something has to be

18    proved, I'll tell you who has to prove it, I'll tell you

19    what the degree of proof is, and I'll tell you what they

20    have to prove.  Stick to that.  Don't add to it; you can't

21    subtract from it.

22             Let's, before I pass out the verdict slip, let's

23    step back a minute.  Because I want you to focus on what's

24    at issue in this case and what your role is.  When we give

25    you this matrix, and you know what the major issues are,
```

1    we're going to ask you whether Roche has proved, by clear

2    and convincing evidence, that any of the claims in these

3    patents are invalid.  Now, of course you understand they

4    start valid.  Amgen has these patents.  The patent office

5    granted the patents.  They start with a presumption that

6    they're valid.

7         So Roche bears the burden of proof, and it's proof

8    by clear and convincing evidence, of showing that any of the

9    particular claims are invalid.  But that's certainly

10   possible.  The patent office can get it wrong.  And you are

11   the jury.  You're the final word on that.  Likewise, on

12   infringement, you know that part of the case, that part of

13   the case Amgen has to prove, and they have to prove it by

14   this fair preponderance of the evidence.

15        Now, we ask you, we're going to ask you as to each

16   specific claim that's in dispute, and you should understand

17   that you have to take each specific claim separately, and

18   you have to tell us whether that claim is valid or invalid.

19   That will be on the first page of the verdict slip.  And the

20   second page, you're going to have to tell us, is that claim

21   not infringed or infringed.  Though Roche has to prove the

22   first page, and Amgen has to prove the second page.

23        Now, if you have thought through carefully, you

24   already know that why are we asking you the answers to both

25   questions?  Because, theoretically, if a claim's invalid,

```
1    we're not really concerned about whether it's infringed.
2    And likewise, if it's valid, but not infringed, then Roche
3    hasn't done anything wrong, even though the claim is valid.
4    Here's why:  We've spent, you've spent, we've all spent a
5    lot of time trying this case.  We only want to try it to one
6    jury.  You people.  Everyone, every court in the land, the
7    courts higher than this court have to respect the jury
8    verdict.  You are, when I send you out there tomorrow to
9    deliberate, you truly are constitutional officers.
10            So I need answers to all the questions I might
11   have.  Because though they get a chance to try to correct
12   anything they disagree with, ultimately, whoever's
13   dissatisfied here gets a chance to go to a higher court.
14   That court doesn't touch what you did, because you're
15   constitutional officers.  But if I get it wrong as to the
16   law, they can say I should have taught it differently, for
17   example.  And we don't want to have a do-over.  We want to
18   have a final verdict.  So that's why.  Don't worry about
19   that.  Don't question that.
20            At the same time, even before I get into the
21   substance here, if any of these claims is valid, and that
22   same claim is infringed, both valid and infringed, then I've
23   got to decide, I've got to decide what the remedy will be.
24   In essence, Amgen has won on that claim, and I have to
25   decide whether Roche has got to stop doing what it's doing,
```

1    or whether I'm going to work out some sort of monetary

2    arrangement that will allow them to, but they'll have to pay

3    Amgen, or a variation on both of those.

4          Don't you concern yourself with that.  It would be

5    improper for you to say, Well, if we find this way, then the

6    judge will have to consider thus and so.  I'm telling you it

7    because I don't want anything to be hidden.  But I'm telling

8    you that's not -- we didn't call you here to do that.

9          You may even ask why, why didn't you?  You're

10   asking us all the other questions.  And the reason is that

11   under -- this is real constitutional law under the Sixth

12   Amendment.  These patent cases get tried to juries because

13   the Sixth Amendment says so.  And the way the Sixth

14   Amendment reads, if -- I'm being glib, but it says all those

15   cases we're trying to juries now, when the Constitution came

16   into effect in 1789, we'll always try them to juries.  And

17   patent cases were tried to juries.  Back then there were

18   patent cases.  But this part of what a judge does about it,

19   if it's found valid and infringed, that's never been tried

20   to a jury.  It isn't tried to a jury now.  And so that will

21   be my responsibility, and don't you worry about it.

22          In this case, a logical verdict could go all for

23   Roche.  A logical verdict could go all for Amgen.  A logical

24   verdict could go some parts for Roche and some parts for

25   Amgen.  And you're going to have to wrestle with that, and

1    we will all respect what you do.  But I want you to truly

2    understand the setting, and now put that out of your mind.

3    You do your job; I'll do my job.

4          So, I keep saying you have to focus on the

5    evidence.  So I want to say a few words now about the

6    evidence in this case.  The evidence in this case is largely

7    of three different types.  And I'll start with the testimony

8    of the witnesses, not because it's more important, but

9    because it comes to my mind first.  And here's where we --

10   when I talk about the evidence, I have to emphasize what

11   your powers are because your powers are extraordinarily

12   broad.

13         I tell you that with respect to every witness who

14   testified here, you have the power to believe that witness'

15   testimony in its entirety; and equally, you have the power

16   to disbelieve and disregard that witness' testimony in its

17   entirety, as though the witness never took the stand.  And

18   between those two extremes, you can believe part of what a

19   witness testified to, and you can disbelieve other parts.

20   You're not prevented from reaching a verdict because one

21   witness got up here and testified to one version or gave one

22   opinion, and another witness, also under oath, got up here

23   and testified to a different version of the same scientific

24   area and gave a different opinion.  As you are reasonable

25   men and women, you are entitled to sum up those witnesses'

1    testimonies and to decide what you believe, which of those

2    you believe.  What has the -- what's the most likely true,

3    what's plausible, what makes sense, as you are reasonable

4    men and women.

5           Now, in doing that, in doing that, you may use

6    everything you know about these witnesses.  How did these

7    witnesses present, both on direct and cross-examination?

8    What was the opportunity of the particular witness to

9    perceive, to comprehend, to understand, to recall

10   adequately, to explain those things about which the witness

11   testified?  Ask yourself, too, is the witness' testimony

12   backed up, corroborated, lawyers say, by other evidence in

13   the case, the documentary evidence, the evidence from other

14   witnesses, the earlier statements by that same witness on

15   deposition?  Or does that other evidence, does it undercut

16   it?  Does it take away from it?  Does it make the evidence

17   less believable?

18          You're entitled to take into account the

19   relationship or independence of any witness with one side or

20   the other in this case.  Did that color the witness'

21   testimony?  Do any of the witnesses stand to gain or lose

22   anything, depending upon how the case comes out?  Did that

23   color the witness' testimony?  You can sum that up.

24          Now, certain of these witnesses, I'll call them

25   opinion witnesses, have been allowed by me to give their

1    opinions.  And you've seen the restrictions I've put on

2    them.  And it's not me, the rules of court say this.  They

3    have to come up with opinions, reports, before the trial.

4    The other side has to have those reports.  I'm about as

5    strict as they come in making the witnesses stick to the

6    reports, because I think that's fair.

7         Now, even after we've gone through all that

8    protocol, you may believe every opinion a particular witness

9    has offered here in this case, but equally you may disregard

10   and pay no attention to any opinion that's been offered, if,

11   in fact, you don't believe it.  You are the judges of these

12   witnesses.  Opinion witnesses as well as any other witness.

13        Now, with opinion witnesses, I suggest that what

14   you want to do is you want to focus on what -- upon what is

15   the opinion based?  What's that opinion resting on?  What

16   does -- why does that opinion witness give the opinion that

17   he or she gave in this case?  What's the foundation of the

18   opinion?  Is it found in the exhibits?

19        Witnesses aren't just stuck with the exhibits,

20   they're entitled to rest their opinions on other sources

21   which people practicing in that field of scientific endeavor

22   would rest opinions on.  So you may accept such an opinion,

23   but generally I want you to think of what -- what's the

24   opinion resting on?  Do you believe that?  If you believe

25   that, it makes it more likely that the opinion makes sense.

1          The opinion witnesses come to different opinions.

2   As you are reasonable men and women, you can sort that out.

3   That's our system.  We rely upon you.

4          Also, we have deposition testimony.  You've

5   received it in a variety of different ways.  The fancy way,

6   they play it up on the board and you see the person

7   testifying and you could read what he's saying on deposition

8   underneath.  The less fancy, but in the law, equally

9   appropriate way, one person reads the witness' answers,

10  while a lawyer reads the questions.  The point is that what

11  witnesses said on depositions, that's evidence, just like

12  the evidence given here in court.  The law makes no

13  distinction between that deposition evidence and the

14  evidence given here in court.

15         And some deposition testimony was read on

16  cross-examination, read by the lawyer, but the answers read

17  by the lawyer, that's evidence.  So you can do a variety of

18  things with that evidence.  You can believe it, you can

19  disbelieve it, and you can use it to compare to the live

20  testimony of the witnesses.  Does that make the live

21  testimony more likely or less likely?  Does it affect the

22  credibility of the witness?

23         Then we have all these exhibits.  And you're going

24  to get them in the jury room tomorrow.  Your power with

25  respect to exhibits is just the same.  You'll want to look

1    over the exhibits.  And when you look at the exhibits, you

2    have the right to believe everything that's in an exhibit.

3    Equally, you have the power to disbelieve and disregard

4    everything that's in a particular exhibit if you don't think

5    it makes sense, if you don't think it's credible, if you

6    don't think it's believable.

7         Now, there's no real issue in the case that the

8    exhibits they're going to give you are genuine things.  In

9    other words, no one's saying that an exhibit was flimflammed

10   or it's a fake.  That isn't an issue in this case.  And

11   don't you worry that you're getting duplicate copies, that

12   we don't have the original of a document.  That's perfectly

13   appropriate.  Don't waste any time on that.  But you're the

14   judges of the exhibits.  You can believe them, you can

15   disbelieve them, you can believe some of them and disbelieve

16   others of the exhibits.

17        I'm going to come back to this, but I might as well

18   say it now.  I want, tomorrow, to give you two lists of

19   exhibits.  One list is going to call out from the larger

20   mass of exhibits those exhibits which the -- which -- it's

21   Roche who would contend this, because it has to do with the

22   validity part, which Roche contends are -- anticipate,

23   that's one of the defenses that Roche bears the burden of

24   proof on, anticipate a claim or claims that are in dispute.

25   So I'm going to list them out, that those are anticipated,

1    so Roche says.  That doesn't mean you have to believe it.

2    You can believe it, you can disbelieve it, but I want you to

3    know which ones they are.

4         And then there's a larger list of what Roche says

5    is prior art, things that were out there prior to the filing

6    of the patent application here.  And, again, that's -- it's

7    a list, and I want to pick those things out from that list

8    so you'll understand what Roche contends is prior art.

9    Doesn't mean I think it's prior art.  Doesn't mean that I

10   think anything about anticipation.  But that's where you

11   look with respect to these matters.

12        Then there's all the other exhibits that we have

13   given you which you can use for whatever purpose.  They may

14   tell you something.  They may help explain the prior art.

15   They may tell you something about material change, all the

16   other issues in the case.  But we'll give you those two

17   lists, the list that Roche contends anticipate, and the list

18   of prior art, stuff that was out there.

19        Again, you have the right to believe any exhibit,

20   disbelieve any exhibit, believe parts of an exhibit, and

21   disbelieve other parts.

22        All right.  Now, first of all, figure out what you

23   believe.  Now, you have the power also to draw what are

24   known as reasonable inferences, logical deductions, common

25   sense.  Don't check your common sense at the door to the

1    jury room.  Just the reverse; I charge you to apply your

2    common sense to this case to the end that justice may be

3    done.

4         Now, I want to give you a simple example that has

5    nothing to do with this case, because while you can apply

6    your common sense, you're not to in there engage in

7    guesswork, speculation, maybe, perhaps, possibly, even

8    probably.  The burdens of proof in this case, the burden of

9    proof of clear and convincing evidence on Roche, and fair

10   preponderance on Amgen, both of them go beyond that.  You

11   may draw the reasonable commonsense inferences from the

12   evidence you believe, and nothing more.

13        And here's my example:  A lady testifies that she's

14   walking along a country road and she looks out and she sees

15   a field of barley.  Also, she sees that the barley is lying

16   down in an irregular course through that field.  That's the

17   testimony.  And you believe it.  Now, from that testimony,

18   standing alone, you can believe something went through that

19   field.  Because if it had been a windstorm, all the barley

20   would be knocked over.  No, something went through the

21   field.  That's the reasonable inference.  But if that's the

22   only evidence you have on the point, you can't tell what it

23   was, adult, child, animal of some sort, big or small,

24   somebody on a dirt bike.  You need more evidence to tell you

25   what it was that went through the field.

1          So, yes, reasonable, commonsense inferences, but no

2     guesswork and no speculation.

3          Now, I think it's a good time, because we're going

4     to get into the specifics, to pass out the jury verdict

5     slips and to look them over.  Now, the lawyers and I have

6     worked together to make this just as straightforward as we

7     possibly can, to make -- they have deep disagreements, but

8     they've all been very cooperative in trying to make this

9     understandable.  So let's just step back, before I get into

10    the specifics, and look at this verdict slip as a whole.

11         The first page is just the title.  So you go to the

12    second page.  The second page is the piece that Roche has to

13    prove by clear and convincing evidence.  Roche makes an

14    attack on these various claims of the various patents.  The

15    patents are Amgen's.  The patents are presumed to be valid.

16    So if Roche fails in its burden of clear and convincing

17    proof, you would put a checkmark, the default position is

18    that the claim is valid.  Amgen has the patent.  Unless

19    Roche proves by clear and convincing evidence it's invalid,

20    it's valid.

21         So that's the first column.  Then the second column

22    on the other side of the dark line is suppose Roche does

23    prove it by clear and convincing evidence, then you put a

24    check, invalid.  You can't put checks on both the valid and

25    invalid side for a claim.  Work it across as to each claim.

1    And then, as I said, if you check invalid, I'm going to want

2    to know why, which of the defenses -- and I'm going to go

3    over each one -- cause you to believe that the claim is

4    invalid.  Any one of them will do, which we've left open

5    there, a white box.  But you want to check every one as to

6    which you are satisfied by clear and convincing evidence.

7    Because I need from you the most information I can get.

8           But you see that not all the defenses apply to all

9    of the claims.  Don't worry about that.  Don't speculate

10   about that.  It actually just makes your job simpler.

11   You're not to wonder about those matters.  You focus on what

12   is before you.

13          Now, let's jump over to the third page.  The third

14   page is Amgen's page.  Amgen has to prove infringement,

15   either direct infringement -- here it's written literal

16   infringement, or infringement by the doctrine of

17   equivalents, one or the other, and they've got to prove it

18   by a fair preponderance of the evidence.  And again, for

19   each claim you're going to tell us, again, the default

20   position here is it's not infringed.  If Amgen doesn't prove

21   it by a fair preponderance of the evidence, first column,

22   it's not infringed.

23          Now, take a look here.  If you were to find,

24   however, that Amgen had proved a particular claim was

25   literally infringed, you put a check there in the infringed

1    column, and you can stop.  However, if, under literal

2    infringement, Amgen fails to prove by a fair preponderance

3    of the evidence infringement, you would put a check not

4    infringed.  But then you do have to go over to the second

5    theory that Amgen has, that infringement by the doctrine of

6    equivalents.  But you only get over into infringement by the

7    doctrine of equivalents if Amgen fails to prove literal

8    infringement.

9         Jump down, there's sort of a blank space in the

10   middle of the page.  The bottom two patents, those are the

11   patents which are process claims.  Those are the patents to

12   which this back and forth has gone on as to whether the

13   Roche product, Mircera, is materially changed.  Amgen has to

14   prove by a fair preponderance of the evidence that the Roche

15   product is not materially changed.  And then if they prove

16   that, they've got to go on to show that, in fact, the Roche

17   product infringes either directly or by the doctrine of

18   equivalents.

19        If you find noninfringement down here as to -- we

20   always read the last three letters, as the '868 and the '698

21   patents, if you find noninfringement, I want to know why.

22   And if the reason is you find that Roche has failed to prove

23   that it's not -- strike that -- Amgen has failed to prove

24   it's not materially changed and you think it is materially

25   changed, put an M, rather than a checkmark, put an M, and

1    I'll know why you thought what you thought.

2           Now, again, when you come to look this over

3    carefully, you will see that the specific claims that are

4    listed on the last page are different than the claims listed

5    on the second page.  There's significant overlap but there's

6    some difference.  Don't you worry why.  Again, that's not a

7    concern of yours.  You don't worry about that.

8           So much for the verdict slip.  Now, one last thing

9    before I get into the specifics here.  And it's an important

10   thing and I feel compelled to say.  I'm going to say a

11   couple of words about something that's not evidence and I

12   want you to pay careful attention to it.  And you say what's

13   he talking about?  Why's he talking about something that's

14   not evidence?  The first thing is a compliment.  I say this

15   to the attorneys, and I say this to all the attorneys.  It

16   has been a distinct privilege to preside over a case so

17   well-tried, so ably tried, tried with a sense of

18   responsibility to the Court, the clients whom you represent.

19   To the extent they have representatives here today, they

20   severally may be proud of what you have done on their

21   behalf.  I don't say that in every case.  I say it in this

22   case.

23          Having said it, you disregard it.  You see, in no

24   way, shape, manner or form is that going to bear on your

25   verdict.  Tomorrow they get a chance to make closing

1   arguments.  They'll argue their hearts out.  They weren't

2   there.  They don't know.  They're teachers.  They're good

3   teachers.  But you're going to decide the case based upon

4   the evidence.  If they're teaching, their arguments help

5   you, persuade you, that's what they're intended to do.  And

6   that's fine.  I just don't want you acting in any way

7   because you respond positively or negatively to the lawyers

8   as a person.  That's just not fair.  If the way this

9   examination has gone on, some of it has grated you, you say,

10  Oh, you know, I'm disturbed by how they are behaving.

11  That's up to me.  That's my responsibility.  And I'm here to

12  tell you they've tried a fine case.

13          But if -- even if it's grated on you, put it out of

14  your mind and look beyond that to the evidence.  And

15  likewise, if any lawyer or lawyers, the way their manner or

16  behaviors has particularly commended itself to you, well,

17  you've seen an example of good lawyering, but don't give

18  them anything special for it.  Don't.  It's all based on the

19  evidence.

20          The second thing, if you think that I think

21  anything at all about this case, anything at all -- and I

22  haven't been silent.  When it's been necessary to make --

23  give you legal guidance and legal instruction, I've jumped

24  right in and, to the best of my ability, I've done it in

25  what I hope is a fair way.  If you think because I jumped in

1    and I said something or the way I'm saying something here

2    now I think that this one or that one has the better of this

3    or that position, I most earnestly instruct you to disregard

4    it.

5         And I tell you as honestly as I know how, I have no

6    view about this case.  It has been a privilege to preside

7    over this case, but the truth is I don't talk to Ms. Smith

8    or Ms. Palanchian or any of the court family about, you

9    know, who's having the better of it or anything like that.

10   Just as I've told you not to discuss the case, the only

11   thing I discuss with my law clerks are legal business.  And

12   the honest thing is, I don't have any view about this case.

13   I will wait eagerly, as they will, to see what your verdict

14   is.  I don't have a view about it.  I didn't have a view

15   going in, I don't have a view now.  So don't take any clues

16   from me.  I have none to give you.  My job is to teach you

17   the law and that's all.

18        Let's get to it.  Now, let's start with the second

19   page, the page that's Roche's page where Roche has to do the

20   proving.  Now, on this page the standard of proof that Roche

21   has to meet is clear and convincing evidence.  That evidence

22   is evidence which produces, in your mind, an abiding

23   conviction that the truth of the factual contentions at

24   issue is highly probable.  That's what Roche has to do on

25   this page.  Roche has to make things clear to you.  It's not

1    clear, you cannot declare a particular claim invalid.  Roche

2    has got to present convincing evidence that the particular

3    claim, and go claim by claim, that the claim is invalid.

4    Convincing evidence leaves you with an abiding conviction

5    that the truth of the factual contention is highly probable.

6         All right.  Let's say a word about patents here.

7    And this applies to both pages.  We're just going to talk

8    about patents generally first.  Now, in -- you've seen these

9    patents.  You will have them as exhibits.  You know how

10   patents work.  Patents have various pages of specifications,

11   the attempt to describe the invention, and teach people how

12   to practice it, and then at the end they have various

13   claims, claims, the numbered claims.

14        Once a patent issues from the patent office, the

15   holder of that patent has, for the statutory period, not

16   forever, has, for the statutory period, the right to exclude

17   other people from practicing the claimed invention.  So

18   there are two steps in dealing with any patent case.  The

19   first step is to determine what the claim that you are

20   dealing with, what would that claim mean to a person skilled

21   in the particular art.  The standard is not what does it

22   mean to you and me, the standard is the test of whether you

23   have explained yourself sufficiently and people can

24   understand what the patent means, and what's excluded and

25   what's included, that's all with reference to a person

1    skilled in the art.

2          And the witnesses have testified as to their

3    understanding of what it means to be a person skilled in the

4    art.  But patent cases are tried not to those people just

5    skilled in the art, that would be unconstitutional.  We have

6    to go to the jury of the people.  And we have.  And so it's

7    my job to explain to you what the patent claims mean to a

8    person skilled in the art.  The glossary that you have in

9    your notebook is my explanation.  That's law.  That's given

10   to me as law.  I'm supposed to do it.  I've done it.

11         Now, how did we create that glossary?  Well, you

12   start a patent case, one of the things you do is, you talk

13   to the lawyers and say, Well, what's really in dispute here?

14   And they wrestle back and forth, and we hold hearings, and

15   that's where we came up with that glossary.  But as the

16   trial has worked out, there may be other things that you --

17   from the claims now, that you need explained to you.  Ask

18   questions about those things.  If you don't understand what

19   a claim means, by all means, ask a question.  It's legal.

20   It's matter of law.  That's not a dispute that the various

21   opinion witnesses can dispute about.  What the language

22   means is for me.  It's how the law works.  I must discharge

23   it.

24         So don't wing it if you don't understand what a

25   claim means, ask me.  I'll answer.  I've given you the ones

1    that they told me were most likely to be disputed, I've

2    given you the answers on those, as best -- and if I haven't

3    done it well enough, say, What did you mean what you said

4    this?  And I will explain.

5           All right.  Now, a word about claims.  Now, they've

6    talked about this, but I need to go over it.  There are two

7    types of claims on one axis.  There are independent claims

8    and dependent claims.  An independent claim is a claim that

9    sets forth all the claim limitations that apply to that

10   claim in the claim itself.  We claim, and then it sets out

11   clause by clause.  Now, each one of those clauses is a

12   limitation.  And it works the same way.  The meaning that is

13   given to that claim is the same meaning when Roche is

14   attacking it, saying it's invalid, as when Amgen is

15   attacking back at Roche and saying it's infringed.  It

16   doesn't change in meaning.

17          So you have to figure out what the meaning is.  And

18   then you're looking at each claim element or claim

19   limitation in an independent claim.  But to make patents

20   shorter, so they don't have to run on for page after page,

21   you have dependent claims.  And a dependent claim makes

22   reference by number to one of the earlier independent

23   claims, and adds further elements or limitations.

24          So, let's talk about that in terms of validity and

25   then I'll anticipate in terms of infringement.  In terms of

1    validity, to come to anticipation, you would have to find

2    that each element of a specific claim was present in the

3    prior art.  So let's say you have an independent claim and

4    you do think each element of that claim is out there in the

5    prior art, it's all disclosed in the prior art.  You could

6    say that's anticipated.  But then let's get to a dependent

7    claim, and the dependent claim says as claimed in claim 1

8    plus three other limitations.  Suppose those limitations are

9    not present in the prior art.  Well, then each one has to be

10   present.  So the independent claim could fall, but the

11   dependent claim, theoretically, could survive because it has

12   limitations, it has elements that aren't anticipated.

13          Now, let's talk about the same hypothetical in

14   terms of infringement.  Let's say there is, in Mircera,

15   satisfies -- let's say, and of course I'm just giving you

16   examples.  I don't think anything's proved or not proved.

17   Let's say that each element of a specific claim is found in

18   Mircera.  And Mircera violates -- not violates, it infringes

19   that claim.  Of course, if even one element is missing, the

20   Roche product, Mircera, doesn't infringe that claim.  But

21   now let's say that the first, the independent claim is

22   infringed, but the dependent claim, which depends on it, and

23   adds three more elements, you have to go back to the

24   independent claims, take all of those elements, plus the

25   other three.  If any one of the, even though the independent

1    claim is infringed, if any one of the added elements in the

2    dependent claim is not infringed, no infringement.

3         So one of the things you have to work out is, is it

4    an independent or a dependent claim.  Remember to add all

5    the limitations of the claim to which the dependent claim

6    refers in figuring out both validity and infringement of a

7    dependent claim.

8         But that's not the only distinction between claims.

9    There is a distinction between product claims and process

10   claims.  A product claim claims a product, a thing.  This

11   monitor on the witness stand, maybe that's patented or maybe

12   there's a variety of patents that apply to it.  The product,

13   the thing, the monitor.  A process claim claims a process

14   for making a thing.  The law recognizes that you can have

15   process claims as well.

16        Looking at -- and it's best, it's best understood,

17   I'm going to give you a page tomorrow that sets forth the

18   specific claims, but it's best understood looking at the

19   third page.  The third page, the '933 patent, that's --

20   those are product claims.  The '868 and '698 patents below

21   the space there, those are process claims.

22        So having in mind the different types of claims,

23   let's move into this issue of validity.  I told you that

24   under the law, each of these claims is presumed to be valid.

25   And before it could be found invalid, Roche has to prove the

1    invalidity by clear and convincing evidence.  Now, one way

2    they do that is they will be pointing you to and arguing to

3    you what was out there in the prior art.  What was known at

4    the time this supposed patented invention was made by Lin

5    and others at Amgen.  What was known?  What did people know?

6    That's what we call a prior art.  And I'll have some

7    specific things to say about prior art.

8        But one thing to think about is, ask yourself

9    whether that specific prior art reference was disclosed to

10   the patent office.  You see, when you apply for a patent,

11   Amgen has to tell the patent office, Amgen has to tell them,

12   Here's the prior art, here's what -- here's the prior art

13   and here's how we distinguish what we've done over the prior

14   art.  Why we've invented something that's not out there in

15   the prior art.  One of the things you want to think about

16   is, you want to look and see what Amgen themselves told the

17   patent office.  Because you're entitled to consider, then,

18   that the patent examiner considered those things that were

19   told to the patent office, and nevertheless issued the

20   patent.

21       What does it take to have a valid patent?  That

22   the -- in order to have a patent, Roche is going to have to

23   prove that those things that -- the patent office issued the

24   patent, it doesn't meet the requirements of the patent laws.

25   Roche has to prove it because the patent's issued.  And

1    these requirements are that the invention be new, useful,

2    not obvious.

3            A patent must have additional elements to be valid.

4    It must provide a complete written description of the

5    invention.  Now, that description doesn't have to be in the

6    specific claim.  You take the patent as a whole, though

7    you're going to go claim by claim, because the

8    specifications are where you find that.  Also, the claims of

9    the patent must be sufficiently definite.  And in order to

10   knock out specific, you go claim by claim, and Roche's

11   attack has to be evaluated against each specific claim.

12           Now, let's talk about what prior art means in the

13   law.  That which came before the date of invention, and here

14   that's the patent application, that's referred to as prior

15   art.  In order to be prior art, it must have been publicly

16   available without restriction to the segment of the public

17   that was most likely to make use of the prior art's

18   contents.  Private or secret knowledge, such as knowledge

19   confidentially disclosed within a small group, is not part

20   of prior art because it's not part of the general knowledge

21   in the field.

22           Now, here's what is prior art.  Anything that was

23   publicly known or used in the United States by someone other

24   than the inventor before the inventor made the invention.

25   Anything that was in public use or sale in the United States

1    more than one year before the application of the patent was

2    filed.  Anything that was patented or described in a printed

3    publication anywhere in the world before the inventor made

4    the invention or one year before the application for the

5    patent was filed.  Anything that was described in a patent

6    that issued from a patent application filed in the United

7    States or foreign countries before the inventor made the

8    invention.

9         Now, art that is dated after the patent application

10   date, that's not prior art, but I've admitted a number of

11   such exhibits so you can better understand the -- and

12   consider, what, in fact, was prior art.  Likewise, Amgen has

13   an earlier patent called the '008 patent.  For these

14   purposes of these proceedings, Amgen's own '008 patent is

15   not prior art.  Work by Amgen employees on these -- the

16   particular inventions claimed, that doesn't count as prior

17   art, it's within Amgen.

18        Now, with those descriptions, and I'm going to give

19   you all the documents that constitute prior art -- strike

20   that -- I'm going to give you all the documents that are

21   claimed to constitute prior art.  It's up to you whether, in

22   fact, it is.

23        Now, the first of Roche's defenses, specific

24   defenses to certain of these claims is that these claims

25   were anticipated by the prior art.  And that means that

1    within the prior art there is a writing or there is an

2    invention, an actual thing or an actual process that was out

3    there, known, public, that has every single element of a

4    particular claim.  When we say that, we say that the claim

5    was anticipated by the prior art and no patent should

6    have -- no patent should have issued on that claim because

7    it was out there, somebody else was either doing it or had

8    described it in a publication.

9         Another way to analyze it is this:  Take a look at

10   the Amgen patent claim that you're talking about.  If you

11   would find that that claim makes infringing something that

12   was in the prior art, the claim's no good.  You don't -- you

13   can't take from the publicly available knowledge and make

14   the publicly available knowledge infringing.  That's another

15   way of deciding whether the, what's claimed to be

16   anticipatory prior art, in fact, anticipates.

17        A claim is anticipated only if each and every

18   element as set forth in the claim is disclosed either

19   expressly or inherently in a single prior art reference.  To

20   establish that an element of a claim is inherent in the

21   prior art reference, even if not explicitly set forth, the

22   evidence must make it clear that the missing descriptive

23   matter is necessarily present in the thing described in the

24   prior art and that it would be recognized to have been

25   present in the prior art by persons of ordinary skill in

1     that art at the time of Amgen's invention.

2          A mere possibility or probability that the missing

3     element is present in a prior art embodiment is not

4     sufficient to prove that it was inherently present.  In

5     order for you to conclude that something not expressly

6     described in a prior art reference was present in that prior

7     art, at the time of the invention, it must be necessarily

8     present.  That is, it must necessarily and naturally result

9     from the operation of the prior art reference as taught by

10    the reference.

11         The prior art reference to anticipate must also

12    enable one to practice the claimed invention.  That is, if

13    you followed what was in the prior art, you'd have this,

14    what was in this allegedly anticipated prior art, you could

15    practice this invention, you'd have what is claimed.  It

16    would work.  Actually do it.

17         Now, that's anticipation.  Now let me move on to

18    obviousness.  That's another.  Anticipation is a subset of

19    obviousness.  If you find any claim to be anticipated, by

20    definition it's obvious.  Obvious is broader.  In order to

21    be obvious, the claimed invention as a whole would have to

22    be objectively obvious to a person having ordinary skill in

23    the art at the time the invention was made and a motive to

24    make the invention.  You have to determine whether each

25    asserted claim would have been obvious, obvious or not, on a

1    claim-by-claim basis.

2         Roche has to prove obviousness as of the date of

3    the patent application filing by clear and convincing

4    evidence.  You may consider, you should consider the

5    following things in making this assessment of obviousness:

6    The scope and content of the prior art; the differences

7    between the claimed invention and the prior art; the level

8    of ordinary skill in the art; evidence of nonobviousness,

9    such as evidence of the commercial success of the products

10   covered by the patent claims or made by the patented

11   process; evidence of a long-felt but unmet need for this

12   invention; evidence that others tried but failed to

13   accomplish the result achieved by the invention; whether

14   unexpected results were achieved by the invention;

15   contemporaneous expression of a surprise or a claim by those

16   skilled in the art following the invention; that other

17   people took licenses to this patented process or claim; the

18   attempts to copy the invention by others.

19        A patent comprised of several elements is not

20   proved obvious merely by demonstrating that each of its

21   elements was separately known in the prior art.  For an

22   invention to be obvious, a person of ordinary skill in the

23   art must have had some reason at the time to combine the

24   prior art references in a way that would result in the

25   claimed invention.

1          The test of obviousness is not whether it would be

2     obvious to try to make the invention, but rather where

3     the -- whether successful practice of the claimed invention,

4     actually doing it, would have been obvious to a person of

5     ordinary skill in the art at the time.

6          All right.  That's obviousness.  Now, moving on to

7     written description.  Here, in the verdict slip this is the

8     defense we call inadequate description.  Inadequate

9     description, and you remember the trade-off for a patent,

10    you have to teach the world how to do it.  An inadequate

11    written description can be analogized to a recipe.  If you

12    have a recipe for a cake, and that is your -- the

13    specifications in the patent, and that recipe is inadequate

14    to make the cake, it won't do it, you can't practice the

15    claimed invention, then that particular claim falls because

16    it's inadequately described in the patent.

17         Now, the patent doesn't have to describe every

18    particular detail.  The standard is only what would have

19    been known to one skilled in the art.  So the patent has to

20    be able to be practiced by one with skill in the art without

21    a lot of experimentation.  That's the whole idea.  The

22    patent has to teach you how to practice this particular

23    claim.  So the recipe has to be sufficiently detailed that

24    if you follow the recipe, you can practice the art.

25         The laws don't require any particular form of

1    written description.  They don't require that the exact

2    words found in the claim be found in the specification.  But

3    the specification as a whole has got to adequately convey to

4    one skilled in the art that the inventor, in fact, possesses

5    the claimed invention at the time he filed the patent

6    application, and describes it so others in the field can

7    practice that invention.

8         Now, let's, though the next one after inadequate

9    description is indefiniteness, indefiniteness is a slightly

10   different concept, and I'm going to jump over indefiniteness

11   to the last one that's listed there.  It's nonenabled.  And

12   that applies only in one instance, but you see it down there

13   on the bottom right-hand corner.

14        The idea of enablement is that the recipe is fine,

15   it's sufficient, the written description is fine to make the

16   invention, but it doesn't work.  When you follow this

17   recipe, inadequate description, you can't make it with that

18   recipe.  Nonenablement, oh, you can make it, but it doesn't

19   work.  You can bake a cake, but it won't rise.  That's the

20   idea.  It won't work.  It's not enabled.

21        So, a claim is said to be enabled when the

22   specification of the patent provides enough detail to teach

23   or enable persons skilled in the art of the invention to

24   make and use the claimed invention without undue

25   experimentation.

1            Now, this business of undue experimentation, again,

2    doesn't have to describe every blessed step, but you have

3    to -- and you're judging it by what one skilled in the art

4    would know.  So you consider, after you follow this recipe,

5    the quantity of experimentation necessary; the amount of

6    direction or guidance presented; the presence or absence of

7    working examples; the nature of the invention; the state of

8    the prior art; the skill of those objectively now engaged in

9    the prior art; the predictability or unpredictability of the

10   art; and how broad these claims are, how sweeping they are.

11   Are they claiming things that are not, in fact, invented?

12   You consider that with respect to enablement.

13           Now back to definiteness.  Definiteness serves a

14   different end.  Definiteness protects the inventor.  The

15   requirement of definiteness protects the inventor and it

16   protects everybody else.  Definiteness means that the patent

17   claims have to be drawn with sufficient definiteness so that

18   a person of ordinary skill in the art would know what is

19   claimed and not infringe it.  Would know what to stay away

20   from.  Not that Amgen would know or Amgen would bring a

21   lawsuit or something like that.  No, no, this is an

22   objective test to a person of ordinary skill in the art.  Is

23   the particular claim sufficiently definite that the -- that

24   that person of ordinary skill in the art would know, I can

25   do this, but I can't go over the line and do that once the

1    patent has issued.

2          And the claims must be specifically definite

3    because, as we've seen here, it's perfectly lawful to do a

4    work-around.  It's perfectly lawful to make an improvement.

5    The whole idea is to advance science.  So you can't just

6    make claims out there that are indefinite and by their very

7    nature give rise to lawsuits, because the people who think

8    objectively now that they're outside the claims suddenly

9    it's claimed that the claim reaches so far.

10         Now, remember, the patent office -- this is where I

11   started and this is where I'll end -- the patent office

12   granted a patent here.  So the patent office, it's presumed

13   that these patents, each of these claims you're talking

14   about, are valid in light of all these considerations.

15   Roche has every right, you see their evidence here, they've

16   said, No, they're not.  They're invalid.  Now, Roche bears

17   the burden of proof by clear and convincing evidence.  And

18   it's you who will decide.  If Roche has borne that burden by

19   clear and convincing evidence, and any one of these defenses

20   or more than one renders a specific claim invalid, you

21   should say so and you should tell me which defense and how

22   many of the defenses apply.  However, if they've not, the

23   claim is valid, and you put your check in column 1.

24         Moving on now to the last page, and let's start

25   with the concept of infringement.  And really we'll start up

1        here with the '933 patent, because I'm going to suggest to

2        you I want a different analysis with respect to the process

3        patents, though there's a significant overlap.  But the '933

4        patent are product patents.  And you -- and we know, it

5        isn't disputed, Roche is not selling Mircera today, so even

6        if you declare that there is infringement, we're not talking

7        about damages.  Roche has nothing then to pay to Amgen.  I'm

8        simply going to have to find out if it's valid and

9        infringed, whether Roche can go on, and on what terms.

10       There's -- no money turns on the outcome, at least presently

11       no money turns on the outcome of this litigation.

12              But for these purposes, I want you to assume that

13       Mircera is, in fact, being marketed in the United States.

14       Because I've already ruled, in order that we could have this

15       trial, I've already ruled that Roche is close enough and

16       they intend, assuming they can do it properly, if they get

17       the proper clearance from the FDA, and if they are

18       determined not to infringe or the patents are invalid,

19       they're going to go ahead and market Mircera, the product.

20       So where the comparison on page 2 has been between a

21       specific Amgen claim and the prior art, whether anticipatory

22       or just prior art, now over here on page 3 the comparison is

23       between that same claim and Mircera.

24              So, for the product, first the product claims.  For

25       the product claims, in order to infringe, its Amgen who has

1    to do the proving now.  And Amgen has to prove by a fair

2    preponderance of the evidence, and that means more likely to

3    be true than not true, if something else is more likely

4    true, Amgen hasn't proved it.  If on all the evidence you

5    believe, and you believe it, but that evidence tends equally

6    to two equal but opposite conclusions, Amgen hasn't proved

7    it.  So long as on all the evidence you believe, you believe

8    that Amgen has proved a specific point more likely to be

9    true than not, you may say that that's been proved by a fair

10   preponderance of the evidence.

11        And here's what Amgen has to prove, claim by claim.

12   They have to prove does Mircera, does that product include

13   in its product, does it include each element, each and every

14   element of the specific claim?  If only one element is

15   missing, Amgen hasn't proved it.  Each and every element of

16   the specific claim.

17        Now, it is the law that if the Roche Mircera

18   includes each and every element of the specific claim, but

19   it includes a lot of other things as well, it still

20   infringes.  And here is a basic conceptual point in this

21   case.  I do not resolve it.  I leave it for you to resolve.

22   Amgen says, Well, sure, they call their stuff peg-EPO and

23   they've been changing the names and various things, Roche is

24   saying this, now, but it's our stuff with these add-ons that

25   do different things.

1              Now, if that's your conception, you could find that

2    each and every element of a specific claim is present, and

3    it has to be, if only one is missing, Amgen hasn't proved

4    it, you could find then that Mircera literally infringes

5    that claim.  But that's not the only concept in play here.

6    Roche people say that the very fact of the pegylation, the

7    combination, changes it.  It's not the same thing.  It's

8    something new and different.

9              Now, I've told you, the simple fact that Amgen has

10   a patent on something that they do does not make it any more

11   or less likely which of those conceptions is better.  Though

12   I've let the patent in evidence, you can look at it, see

13   what it says.  But I do suggest to you, that concept is

14   fundamental here.  Because if it's something else, if it

15   truly is something else, then Amgen hasn't proved that each

16   element of its material is present in Mircera.  I'll leave

17   that for you.  They're going to argue that.

18             Now, let's say, still sticking up here with '933,

19   let's say that you find that a particular element or

20   elements is missing.  That means that that particular claim

21   is not literally infringed.  And if that happens, you go on

22   to Amgen's fallback position.  And Amgen's fallback position

23   is, Well, even if it's not literally infringed, it's

24   certainly infringed by the doctrine of equivalents.

25             So I have to talk about the doctrine of

1    equivalents.  Amgen has the same burden of proof on the

2    doctrine of equivalents, fair preponderance of the evidence.

3    And here's what Amgen has to prove, and they have to take

4    each claim, claim by claim, and they have to take each

5    element of the specific claim.  And so they take their

6    claim, and they look at Mircera.  And they have to prove by

7    a fair preponderance of the evidence that as to that element

8    of the specific claim, the Mircera project does

9    substantially the same thing using substantially the same

10   means for doing it to achieve substantially the same end.

11        Now, the doctrine of equivalents is an equitable

12   doctrine, what we call a fairness doctrine.  It prevents

13   people from making a trivial or insubstantial change in a

14   patented product, but it's substantially the same product or

15   the same process.  And the doctrine of equivalents then is

16   designed to catch that.

17        If you find literal infringement as to any of these

18   claims, literal infringement, you check the box infringed,

19   don't go to the doctrine of equivalents.  If you find no

20   literal infringement, check not infringed, then go over to

21   the doctrine of equivalents and tell me how you rule.  It

22   can be not infringed/not infringed; it can be not

23   infringed/infringed under the doctrine of equivalents.  But

24   it's redundant and actually it's confusing to say infringed

25   literally, infringed under the doctrine of equivalents.  It

1    doesn't make sense.  It's inconsistent.  If it's literally

2    infringed, that's it, end.

3         Now, let's jump down to the process claims.

4    Everything I've said about the product claims applies to the

5    process claims, but that's not where I want you to start.  I

6    want you to start on something that I've already talked

7    about, and that is -- I have to use different words because

8    I have to use the words of the statute.  The question is

9    whether the -- whether the process -- strike that -- the

10   question is whether the product of the process has been

11   materially changed.

12        Now, let's back up so we know where we are here.

13   '868 and '698 are process claims.  They claim a process for

14   doing something.  Now, it's easy for me to say on the

15   products claims, assume that Mircera's being sold in the

16   United States because it's really undisputed, Roche wants to

17   sell it in the United States.  But there isn't any evidence

18   in this record, that would be another case, and it hasn't

19   happened yet, and we have no evidence that it ever will

20   happen.

21        For now, Mircera wants to sell its -- strike

22   that -- Roche wants to sell its Mircera, which it will make

23   in Europe, and ship over here and sell it.  It's not going

24   to make it here.  So the process by which it makes Mircera,

25   for all we know in this case, don't speculate about

1    anything, because that is all we know, it's going to be made

2    in Europe.  It's lawful in Europe.  Our law doesn't reach

3    out there.  They have their own patent laws.  What Roche is

4    doing is lawful in Europe.

5           And so because our Congress recognizes we have a

6    global economy, they pass laws about how that works.  If --

7    let's assume, I'm not saying it's so, but let's assume it,

8    let's assume that what Roche is doing in Europe, which is

9    lawful in Europe, would be infringing in the United States

10   if they did it in the United States.  They're not, but let's

11   assume that.  That's the same analysis I've already given

12   you.

13          Now, this process, of course, leads to a product,

14   Mircera.  That's what Roche wants to sell.  So the law says

15   that if the process used overseas, if that process leads to

16   a product which is not materially changed, when it comes to

17   the United States and the process, if done in the United

18   States would infringe, the product infringes.  But if the

19   process followed by Roche overseas, lawful overseas, even if

20   it includes Amgen's patented process, technically, not

21   technically, but for these purposes, let's say it infringes

22   a particular process claim, but before Roche -- the process

23   ends up in Mircera, that Mircera is materially changed.

24   It's a different set of words, materially changed from the

25   product that would be produced by the patented process, the

1    claimed process.  If it's materially changed, there's no

2    infringement.

3          Now, it's Amgen who has to prove, by a fair

4    preponderance of the evidence, not materially changed.  Not

5    Roche who has to prove materially changed.  Roche has put on

6    evidence of that, but -- and it's up to you what you

7    believe.  But just to understand who bears the burden of

8    proof here, it's Amgen.

9          So, again, this conceptual problem is a real

10   problem, and I give it to you.  The process, even if it

11   includes other steps, and this and that, may still infringe,

12   even though it's lawful over there.  The question, though,

13   is slightly different.  It's this:  Does the product of the

14   patented process, is that product, does the Roche approach

15   materially change its product Mircera?  If it does, there

16   can't be any infringement either directly or by the doctrine

17   of equivalents.

18         And to tell me that, the verdict slip doesn't make

19   this clear, but I do the best I can, and now I'm explaining

20   it all to you.  When you get to the process claims, ask

21   yourself first that materially changed question.  Amgen

22   bears the burden of proof to prove by a fair preponderance

23   of the evidence that it's not materially changed.  If that's

24   so, go on and find out whether the process then, if there's

25   no material change, infringes.

1              And just check, as I've told you, either it's not

2      infringed or it's infringed.  And if it's not infringed, go

3      on to the doctrine of equivalents and check there.  Not

4      infringed, or infringed under the doctrine of equivalents,

5      just the way I explained it.

6              But if Amgen has failed to prove that the product

7      of the Roche European process is not a material change from

8      its own patented process in a particular claim, then there

9      can be no infringement.  And what I want you to do is, I

10     want you not just to check not infringed, put an "M" in that

11     column.  Then I'll know what your reasoning was.  Then you

12     don't have to go any further, that's your explanation.  The

13     "M" is for materially changed, under the statute, and that

14     would be a valid verdict.

15             Now, I'm not telling you anything about how the

16     verdict slip should come out.  I'm simply giving you the

17     guidance so that you may make those informed choices.

18             What do I mean by a material change?  Again, a

19     material change is not just some trivial or insubstantial

20     change.  It's some actual significant change.  You are

21     entitled to consider whether the item would work without

22     Amgen's patented process.  Would it do what it's supposed to

23     do absent Amgen's patented process?

24             Now, with those instructions, I think those are

25     sufficient for today.  We're right on 1:00.  If I have any

1    additions or corrections, I'll give them to you tomorrow.

2    But tomorrow we're going to be prepared for closing

3    arguments, and then the case will be in your hands tomorrow.

4    You can keep those verdict slips, but don't make notes on

5    those because we're going to collect them before we --

6    before you go in to deliberate.

7            You have not heard the arguments of counsel and

8    those arguments are terribly important.  When I say the

9    lawyers weren't there and they don't know, I'm not putting

10   them down.  That's the truth.  But these are complex

11   matters.  The lawyers are skilled in summing up.  You'll

12   want to hear how they argue.  Just don't take anything

13   directly from them, it's got to be backed up by the

14   evidence.  We'll do that tomorrow.

15           Keep your minds suspended.  Do not discuss the case

16   either among yourselves nor with anyone else.  And in view

17   of what I'm hearing, watch out for any articles in the

18   newspaper or on TV.  The whole integrity of the process

19   depends on you.  9:00 a.m. tomorrow morning.  We'll stand in

20   recess.

21           **THE CLERK:**  All rise for the jury.

22           (Whereupon the jury left the courtroom.)

23           **THE COURT:**  Please be seated.  2:30 this afternoon

24   we can go on with the discussion of these matters.  And

25   we'll recess until that time.  We'll recess.

```
 1              (Recess.)

 2

 3                  PROCEEDINGS - 2:30 P.M.

 4

 5        THE CLERK:  All rise.  Court is in session, please

 6   be seated.

 7        THE COURT:  Good afternoon.  Let's just take care

 8   of a preliminary matter first.  Amgen's got this motion

 9   anent, what it calls antitrust witnesses in the hearing

10   we're going to have Friday on inducement.  I -- that

11   commends itself to me.  Why shouldn't I let those witnesses

12   go now?  I mean, we may get to them, but not until Friday.

13        MR. FLEMING:  Quite honestly, the procedure for

14   Friday is, as far as we're concerned, a bit up in the air.

15   We asked Amgen what kind of evidentiary presentation they

16   actually intended to make.  The only thing that's been

17   disclosed to us so far is depo designations, which I assume

18   your Honor could take marked transcripts and wouldn't need

19   to have a formal --

20        THE COURT:  I certainly would prefer that, and I

21   hope I've demonstrated that, in fact, I read them.

22        MR. FLEMING:  As we well know, your Honor.  We

23   would submit to you that that would be a more efficient way

24   to do it for the Court.

25        THE COURT:  I favor that.  And in any event, I will
```

1  take the matter under advisement to await the jury's

2  verdict.

3        **MR. FLEMING:**  One of the claims, given your ruling

4  on claim 9, has now been mooted, so it's really only

5  claim 11, is it?

6        **MS. BEN-AMI:**  Fourteen.

7        **MR. FLEMING:**  There's only one claim.  If Amgen

8  doesn't intend to make any live-witness presentation, we

9  would rather just submit it to you, your Honor, since you're

10  going to take it under advisement anyway.

11        **THE COURT:**  I want to get to the charge but that

12  makes good sense.  Shouldn't we do it that way, Mr. Day?

13        **MR. DAY:**  We think it's claims 12 and 14, your

14  Honor, and submitting it on the papers would be fine.

15  There's both documentary evidence and there's deposition

16  testimony that we would submit on Friday in support of our

17  case that Roche induces infringement for those claims.

18        **THE COURT:**  But just as a practical matter, always

19  trying to think practically, unless I have a jury verdict by

20  that morning, I must stay my hand until I have a jury

21  verdict.  Because the inducement is an added piece.  I'll

22  have to have a valid infringed claim.  And if I do, then

23  I'll have to resolve the inducement piece.

24        **MR. DAY:**  Almost.  But as I pointed out to the

25  Court, the two claims that are at issue here, these

1    method-of-use claims, have a limitation that is not

2    contained in the wider claims.  Therefore, the validity of

3    these claims is a different issue than is -- because they

4    have an added limitation.

5         THE COURT:  You did point that out before and I had

6    hoped to duck that, but --

7         MR. FLEMING:  And your Honor --

8         THE COURT:  To be honest.

9         MR. FLEMING:  If it's not infringed as a predicate,

10   then it doesn't really matter at all.

11        THE COURT:  It seems to me we'll see how that works

12   out.  In any event, for Friday, we -- see if you can't agree

13   tomorrow, because you've got a half an hour on inequitable

14   conduct, which is Roche's half an hour.  That, I'm surely

15   going to take under advisement.  Then if you could agree and

16   tell me by the close of business tomorrow, we'll just wait

17   for the jury on Friday.

18        One last thing on the jury.  And I'm going to tell

19   them this before they go.  Let's say we don't get the

20   verdict by the close of business Friday.  Now, I am -- we're

21   not going to stop deliberations, and I am going to the

22   judicial conference, which is just outside of Portsmouth,

23   which may make it more difficult for me to answer questions.

24   But I've decided that I could work that out with you or

25   through Ms. Smith, with you, at a distance.  Then I'll come

1    back and take the verdict.  And I have a magistrate judge

2    standing by if there should be any emergency.  So --

3         **MR. FLEMING:**  Your Honor, if I could, one

4    housekeeping matter.  When we left with the evidence, there

5    were some documents that still needed to be submitted to

6    close the record on --

7         **THE COURT:**  Yes.

8         **MR. FLEMING:**  And what I'd like to do at this time,

9    and I have copies -- excuse me, Mr. Day -- I'd like to

10   present to Ms. Smith, your Honor, Roche offers EAZ10, EBA10,

11   PEW, PV, as in Victor, H.

12        **THE COURT:**  All right.  Do you object to some or

13   all of these?

14        **MR. DAY:**  Yes, we do, your Honor.

15        **THE COURT:**  All right.  I'll take it under

16   advisement.

17        Let's move to the charge.  We'll start with Roche.

18   I'm not taking more than an hour.  I pray, earnestly, it

19   won't take an hour.  And I will -- I'll hear Roche.

20        **MS. BEN-AMI:**  Okay.  Ms. Carson and I will do this.

21   The first one is --

22        **THE COURT:**  Wait one second.  Let me just -- you're

23   going to have to give me a moment because I have a written

24   charge and I left it back in chambers.

25        **THE CLERK:**  I'll go get it.

1        THE COURT:  Well, I'll go with you.  We'll recess

2   for a moment.  We'll recess for just a moment.  We'll

3   recess.

4        THE CLERK:  All rise.

5        (Recess.)

6        THE CLERK:  All rise.  Court is in session, please

7   be seated.

8        THE COURT:  I'm sorry.  I'm perfectly amenable to

9   dividing it up, too.

10       So Ms. Ben-Ami, go ahead.

11       MS. BEN-AMI:  Our first objection, your Honor,

12  relates to your charge on what is prior art.  Your Honor did

13  not charge on 102(f) and 102(g) prior art.

14       THE COURT:  What is it that you want me to say?

15       MS. BEN-AMI:  I would like you to read to the

16  jurors what 102(f) and 102(g) prior art is.  I believe you

17  were reading pretty much what the statute said.

18       THE COURT:  Yes.

19       MS. BEN-AMI:  And then you stopped.

20       THE COURT:  Well, let's go to what I have from you

21  on that subject.  Where is it -- it would be more helpful to

22  me, I think, if you point me to your proposed instruction

23  that I didn't give, assuming that I didn't.

24       MS. BEN-AMI:  It's our page 24.

25       THE COURT:  Thank you.  That's prior public use.

1          MS. BEN-AMI:  Twenty-four, primary invention.

2          THE COURT:  Well, just a moment.  That's not -- oh,

3    my page 25.

4          MS. BEN-AMI:  My page 24.

5          THE COURT:  All right.  I have it.  What's the

6    primary -- oh, Goldwasser?

7          MS. BEN-AMI:  Goldwasser.  Goldwasser, Genentech.

8    Not GI.  Not GI.

9          THE COURT:  Yes.  Goldwasser.  All right.

10          MR. DAY:  Your Honor, we certainly --

11          MS. BEN-AMI:  And also --

12          THE COURT:  Well, it may help.  Yes, you go along

13    with that, right?

14          MR. DAY:  No, we don't.

15          THE COURT:  Well --

16          MR. DAY:  We certainly don't go along with Fritsch,

17    and we certainly don't go along with Genentech.

18          THE COURT:  I don't go along with Fritsch and

19    Genentech either, but Goldwasser I do.  So knowing that, I

20    should give at least a version of this, and I am disposed

21    to.  Let's move on.  As to Goldwasser, and I'll mention

22    Goldwasser.

23          MS. BEN-AMI:  We should discuss Genentech, then,

24    your Honor, because I don't understand your Honor's ruling.

25    Genentech is different than Genetics Institute, right.

1    Obviously.  Genentech is the prior art that was submitted to

2    the patent office by Amgen where they told the patent office

3    that the CHO cells were not used.

4         So that's what I'm talking about when I say

5    Genentech.  It's just the CHO cell tPA stuff.  And that's

6    102(g) prior art.

7         **THE COURT:**  Well, I don't have to charge them

8    anything further.  I let you argue that.

9         **MS. BEN-AMI:**  Exactly.  I'm not asking you to

10   charge on any particular art.

11        **THE COURT:**  I'm disposed to allow you to argue

12   that.

13        **MS. BEN-AMI:**  Okay.

14        **THE COURT:**  Go ahead.

15        **MS. BEN-AMI:**  And then derivation is 4.15, which is

16   page 42.

17        **THE COURT:**  Just a moment.

18        **MS. BEN-AMI:**  I don't know if -- are we working off

19   the same numbering system?

20        **THE COURT:**  It looks like we're not.

21        **MS. BEN-AMI:**  Because I have on the docket sheet,

22   docket, it's page 47 out of 93, if you're looking at the

23   top, Docket 1343.

24        **THE COURT:**  Yeah, well, I don't have it.  Maybe you

25   want to -- or at least I don't have it in front of me at

```
 1    this time.  I thought I had the most recent one.  So why

 2    don't I take yours.  All right.  Fine.

 3              MS. BEN-AMI:  That's derivation.

 4              THE COURT:  No, I'm not giving that.  You can argue

 5    it.  Move on.

 6              MS. BEN-AMI:  Your Honor, this is Goldwasser.

 7              THE COURT:  You may argue it.  I'm not calling it

 8    out.

 9              MS. BEN-AMI:  Well, the problem I have, your Honor,

10    is you gave a specific charge that secret prior art is not

11    prior art, and that is contrary to the law in the federal

12    circuit under 102(f), on the Odds On products case, and it's

13    102(f), 103 prior art.

14              MR. DAY:  Secret prior art, your Honor, is not

15    prior art, and that's why the instruction on --

16              THE COURT:  Yes, wait.  But I should acknowledge

17    Mr. Day.  Mr. Day, shouldn't I give this?

18              MR. DAY:  No.

19              THE COURT:  I'm not.  Go ahead.

20              MS. BEN-AMI:  Your Honor, I believe that is a

21    significant error.  I'll move on.

22              THE COURT:  Your rights are saved.

23              MS. BEN-AMI:  I don't understand how that could be.

24              But, next, your Honor, I'd like to talk about the

25    infringement charge on material change on the process
```

1    claims.

2             **THE COURT:**  Yes.

3             **MS. BEN-AMI:**  I'm going out of order, but I'm

4    trying to get you to what I think are the most fundamental

5    first.

6             **THE COURT:**  And I'm very grateful.

7             **MS. BEN-AMI:**  You said to the jurors today that

8    they don't need to consider literal infringement if there's

9    material change.

10            **THE COURT:**  I didn't say that.

11            **MS. BEN-AMI:**  I'm sorry, your Honor.

12            **THE COURT:**  I said they should start -- well, they

13   should start by considering material change.  If material

14   change goes your way, they can stop.  That's accurate.

15            **MS. BEN-AMI:**  No, it's not accurate, your Honor.

16   We need to have both resolutions in the case, because if

17   there's no literal infringement of the process, then

18   actually it doesn't matter if it's materially changed.

19            **THE COURT:**  Yes, but if it's materially changed,

20   who cares if there's a literal infringement because that

21   would be -- that would save you -- I understand the logic

22   there, but it seems to me they should start with material

23   change.  If you win on material change, they can stop and we

24   don't need to know whether there's literal infringement in

25   this case, given the way it's been tried.

1      **MS. BEN-AMI:**  Respectfully, your Honor, I don't

2   think that's correct because for appeal purposes we do need

3   both.

4      **THE COURT:**  Yeah.

5      **MS. BEN-AMI:**  And for -- and because of the fact

6   that Amgen is still trying to drag us into the ITC, we need

7   that.

8      **THE COURT:**  I try my case.  I'm satisfied.

9      **MR. DAY:**  Your Honor, may I be heard?

10      **THE COURT:**  You're with her?

11      **MR. DAY:**  I am.

12      **THE COURT:**  You know, I -- the logic seems to me

13   why should we make it more complex so that you, in other

14   fora, can argue different positions?

15      **MR. DAY:**  It's not a function of other fora, your

16   Honor, it's a function of the statute.  271(g) requires, as

17   a prerequisite, a finding that the product is made by a

18   patented process overseas.  That's the first step.  The

19   statute lays out in statutory language the analysis that

20   must be followed.

21      **THE COURT:**  All right.  If you agree, I'll alter

22   that.

23      **MR. DAY:**  The first analysis should be, is it

24   literally infringed, then the question is was it materially

25   changed.

1          THE COURT:  I will so charge.

2          MS. BEN-AMI:  Then with regard to material change,

3     your Honor, you said -- and I wrote these down as notes, so

4     I'm not saying that you said this exactly.  It's my note

5     that the jury is entitled to consider whether it would work

6     without the process.

7          THE COURT:  I did.

8          MS. BEN-AMI:  I do not know what that charge means,

9     your Honor.

10         THE COURT:  Well, I do.

11         MS. BEN-AMI:  I would object to it.  It's not in

12     the statute.

13         THE COURT:  Noted.  I'm adhering to it.  What else?

14         MS. BEN-AMI:  On written description, your Honor, I

15     believe that your Honor kind of merged written description

16     and enablement together.  Your analogy, your recipe, if you

17     follow the recipe and it works, that's enablement, that's

18     not written description.  You can have enablement where

19     someone following the recipe can do it and still not have

20     written description.

21         THE COURT:  I agree.

22         MS. BEN-AMI:  But the --

23         THE COURT:  The recipe analogy works.  The

24     inadequate description is where the recipe won't tell you

25     how to do it.  If you follow what you have, because the

1    recipe doesn't tell you how to do it, that's a lack of

2    written description.  However, if you follow the recipe and

3    it doesn't work, the cake won't rise, that's a lack of

4    enablement.  That's how I charged.  That's an accurate

5    statement of the law.

6         **MS. BEN-AMI:**  I respectfully disagree, your Honor,

7    with regard to product claims.  It cannot be true for

8    product claims.

9         **THE COURT:**  I'm satisfied with it.  Move on.

10        **MS. BEN-AMI:**  There's also no doctrine of

11   equivalents under 271(g), your Honor.  I would object on

12   that.

13        **THE COURT:**  Well, I have grave doubts about that,

14   but I have grave doubts about doctrine of equivalents, and

15   I'm not taking back my rulings already made.  That will be

16   as matter of law once we get a verdict.

17        **MS. BEN-AMI:**  I think that's my list for the

18   beginning, and Ms. Carson's going to continue.

19        **THE COURT:**  No, that's fine.  That's very helpful,

20   I thank you.

21        **MS. CARSON:**  Your Honor, I tried to organize this

22   according to certain categories, because what I'm discussing

23   with you are statements that you made in the context of you

24   were discussing prior art, obviousness that we felt were

25   inaccurate or should not have been in there.

1          First, on the prior art, work by Amgen can be

2    considered in connection with obviousness.  And that relates

3    to your instruction about the work of Lin's coworkers not

4    being considered.  And I would direct you to the Omark

5    Industry case, 672 F. 2d 362.

6          **THE COURT:**  All right.  Let me -- agree with that,

7    Mr. Day?  I took that business that I read, I took that from

8    your proposed charge.  You say that's wrong?

9          **MR. DAY:**  I think you read the instruction

10   correctly.

11         **THE COURT:**  I think so, too.

12         **MR. DAY:**  I think the law is correctly stated.

13         **THE COURT:**  I think so, too.  I adhere to it.

14         **MS. CARSON:**  Your Honor, in addition, work by Amgen

15   can be considered anticipation.  We do have a reference by

16   Joan Egrie.  It's a different inventive entity, and under

17   the statute, prior art, even if it is Amgen, a different

18   inventive entity, it can be considered as prior art.  So,

19   again, we feel that that instruction was incorrect.

20         **THE COURT:**  I note that.  I have yet to go over in

21   detail the lists that you've supplied me, and I'm very

22   grateful to have those.  And I will do that.  So by the

23   first thing tomorrow morning, you'll have my marked-up

24   lists.  And as Amgen did today, you revise those lists as I

25   revise them.  If I leave Egrie in there, then I've bought

1    this argument that it's separate inventive entity and you

2    can argue it, it's not part of Amgen.  I'll think about it.

3    But that's how I'll handle it.

4         **MR. DAY:**  Your Honor, could I simply note, as you

5    consider that, Section 103(c) makes it very clear that

6    because she was under a common obligation of assignment,

7    it's not prior art.

8         **MS. CARSON:**  Your Honor, that's only relevant to

9    obviousness, and I'm speaking about anticipation.

10        **THE COURT:**  All right.  Thank you.

11        **MS. CARSON:**  In addition, under KSR, the

12   specification which would be the '008 patent, this relates

13   to your instruction on the '008 patent, the specification

14   can be considered for obviousness and also admissions in the

15   specification.  This is under the Pharmastem case that we've

16   been discussing, which can also be considered for

17   obviousness.

18        **THE COURT:**  I, again, the specific language came

19   from an Amgen submission.  Do you think the Court's correct

20   on this point, Mr. Day?

21        **MR. DAY:**  I believe the Court is correct, your

22   Honor.

23        **THE COURT:**  I'm sticking with it.  Go ahead.

24        **MS. CARSON:**  Your Honor, we object.

25        **THE COURT:**  Noted.  Noted.  I understand you

1    object.

2         **MS. CARSON:**  Again, I was referring to the binding

3    admissions in the background of the specification as being

4    binding under Pharmastem.

5         **THE COURT:**  I adhere to the charge.

6         **MS. CARSON:**  Also, you referred to prior art as

7    being general knowledge, and that's really not a requirement

8    of prior art.  It doesn't have to be general knowledge.  We

9    feel that you misstated the standard.

10        **THE COURT:**  No, I think I've adequately covered the

11   point.

12        **MS. CARSON:**  In addition, you mentioned the

13   question of whether or not the prior art had been before the

14   patent office.  And we put in the bench memo, to the extent

15   that that would imply to the jury that it provides a

16   heightened burden for us, that's --

17        **THE COURT:**  I didn't say anything about heightened

18   burden.  I said they could consider that fact.  And we're

19   not going to charge the jury on Chevron deference.  I'm

20   satisfied with how I handled that.

21        **MS. CARSON:**  Turning to the obviousness charge,

22   obvious to try under KSR may be considered, and I believe

23   that your instruction instructed otherwise.

24        **THE COURT:**  It did instruct otherwise.  And do you

25   think I'm in error on that, Mr. Day?

```
 1              MR. DAY:  No, not in the context of the instruction

 2       you gave, your Honor.

 3              THE COURT:  I'm satisfied with the instruction.

 4       Move on.

 5              MS. CARSON:  In addition to the obviousness

 6       instruction, motivation to combine, that is a factor that's

 7       not required under KSR and I believe that your instruction

 8       said it was required.  We object to that.

 9              MR. DAY:  Again, I believe it's correct because I

10       believe KSR does say there must be a motivation to combine.

11       The motivation can be found in the art or it can be found --

12              THE COURT:  I'm satisfied with the charge.

13              MS. CARSON:  In addition, you instructed the jury

14       on secondary considerations.  In this case, Amgen's put in

15       no evidence of secondary considerations aside from arguably

16       two.  They have demonstrated absolutely no nexus between

17       those secondary considerations and their Epogen product.

18              THE COURT:  Well, everyone is to stick to the

19       evidence.  I'm going to stick with the charge, there's no

20       need to correct that.  But if you go beyond the evidence, I

21       will correct you.

22              MS. CARSON:  Your Honor, then we would ask if you

23       would include a charge that relates to the need to -- for

24       Amgen's burden to demonstrate nexus between the claims of

25       the patent and their alleged secondary considerations.
```

```
 1                THE COURT:  I'm satisfied with the charge.

 2                MS. CARSON:  Again, your Honor, we object to that.

 3                THE COURT:  Of course, noted.

 4                MS. CARSON:  For the -- turning now to the

 5      anticipation charge, in charging anticipation you mentioned

 6      a recognition requirement.  The recognition requirement is

 7      no longer required under the law for --

 8                THE COURT:  I mentioned the recognition

 9      requirement?

10                MS. BEN-AMI:  I'll do it.

11                Your Honor, you know that you said that something

12      can be inherent for anticipation, a feature can be inherent.

13      And then you described what inherency was and you said

14      whatever you said.  Then you said and it had to be

15      recognized by people skilled in the art.

16                About three years ago, the federal circuit took

17      that out of the law and said there does not need to be

18      recognition by the art for an inherent feature.  And I have

19      been through this in Judge Zobel's courtroom for quite a bit

20      of time.  There's a whole body of law.

21                THE COURT:  What is it that you would want me to

22      say now, given the posture that the case is in?

23                MS. BEN-AMI:  I think you just have to delete that

24      sentence from the charge.

25                THE COURT:  Without correcting it tomorrow, just
```

1    delete it?

2         **MS. BEN-AMI:**  I think that if you're giving the

3    jury -- you can just say to the jury, There is no

4    requirement that for inherency it has to be recognized by

5    the art, and strike it out of your written charge.

6         **THE COURT:**  What do you say to that, Mr. Day?

7         **MR. DAY:**  I'm not sure I understand the sentence of

8    the charge that's being stricken.  Let me just --

9         **THE COURT:**  If we look at it, I think she roughly

10   has me correct here.

11        **MS. CARSON:**  Your Honor, somebody just handed me

12   page 89, starting at line 15 on the rough.

13        **THE COURT:**  Page 89 of what?

14        **MS. BEN-AMI:**  He's got a copy of something.

15        **THE COURT:**  I have a copy of the charge.

16        **MS. BEN-AMI:**  Do you have this copy?  So that we're

17   working off the same document?

18        **THE COURT:**  No, but I'm happy to receive it.

19        **MR. DAY:**  I don't have that copy either.

20        **THE COURT:**  Let's see.

21        **MS. BEN-AMI:**  We're just trying to work off the

22   same page.

23        (Whereupon counsel conferred.)

24        **THE COURT:**  Oh, "And that it would be recognized to

25   have been present in the prior art by persons of ordinary

```
 1    skill in that art, at the time of Amgen's invention."

 2              You want that out?

 3         MS. CARSON:  That's incorrect under federal circuit

 4    law now.  There is no recognition requirement.

 5         THE COURT:  You want that out.

 6         MR. DAY:  We believe that's correct, your Honor.

 7         THE COURT:  Well, I'll pause for a moment.  Why do

 8    you think that's correct, in light of this presentation

 9    here?  I mean, again, I took it from your proffer, but what

10    Ms. Carson is saying does resonate with me.

11         MS. CARSON:  I direct you to Schering versus Geneva

12    Pharms., the Cruciferous Sprouts case, Toro.  There's been a

13    series of cases.

14         THE COURT:  Mr. Day?

15         MR. DAY:  We're talking about the difference

16    between anticipation and obviousness.  For purposes of

17    obviousness, it must be recognized.  And so this

18    instruction, this charge, you have, if I'm reading from the

19    charge that was handed to me by Roche's counsel, you have

20    this in the context of anticipation.

21         THE COURT:  And that's a mistake.

22         MR. DAY:  But it must be put back then in the

23    context of obviousness.

24         THE COURT:  I'll make the correction.

25         MS. BEN-AMI:  Your Honor, we disagree that that's
```

1    the law on obviousness.

2          **MR. DAY:**  We have a brief on file on this, your

3    Honor.

4          **THE COURT:**  I'll -- the point is a complex one,

5    I'll reflect on it.  And thank you.  Go ahead, Ms. Carson.

6          **MS. CARSON:**  As to the question of whether or not

7    inherency and obviousness, in re Napier.

8          Also, in connection with the anticipation

9    instruction, we would ask the Court to include the

10   instruction that there's a presumption that a prior art

11   patent is enabled, and that's in the Amgen-TKT case.  Also,

12   that --

13         **THE COURT:**  Why is that germane here?

14         **MS. CARSON:**  Because we are relying on prior art

15   patents.  It's the Genentech '075 patent as prior art.

16         **THE COURT:**  Well, of course there's a presumption

17   that it's -- I don't have to tell them that.  Because I did

18   say generally that it's presumed that the patent, any issued

19   patent, I was referring to the patents here, but the clear

20   indication is any issued patent has all the attributes.

21   That's what goes with the presumption of validity.  So it's

22   presumed it's enabled, adequate written description,

23   definiteness, obvious, or nonobvious, and not anticipated.

24         **MS. CARSON:**  Your Honor, just in the context of

25   this case, it's Amgen's burden, because there is presumption

1      of enablement for a prior art patent, to demonstrate that

2      it's not enabled.

3              THE COURT:  No, that would be confusing and

4      unnecessary to this case.

5              MR. DAY:  May I speak to that, your Honor?

6              THE COURT:  No.  You'll get a chance in just a few

7      minutes because she's about done.

8              MS. CARSON:  Also, we would like instruction that a

9      public use or reduction to practice is enabled by

10     definition, and that in re Epstein 32 F. 2d.

11             THE COURT:  But these are just general principles

12     of law that have no application here.

13             MS. CARSON:  What this relates to is the idea that

14     the Goldwasser study would be presumed to be enabled, it's a

15     prior art.

16             THE COURT:  Oh, the Goldwasser is not presumed to

17     be enabled.  And I'm drawing no such presumption.  I don't

18     think that's a proper statement of the law.

19             MS. CARSON:  I'm sorry, I misstated that.  It was

20     reduction to practice is presumed to be enabled.  And that I

21     would direct you to in re Epstein.

22             THE COURT:  I disagree with that as a statement of

23     the law.  I'm not giving that.

24             MS. CARSON:  A few more things.  Also on

25     infringement, Roche's patent is evidence of noninfringement

1    under the doctrine of equivalents, and also relevant as

2    evidence of material change.  And we put in a bench memo on

3    that.

4         **THE COURT:**  You know, that's not good enough.

5    Respectfully.  This Roche patent business, I have a real

6    concern it's a red herring here unless you convince me that

7    somehow we're not trying out some interference here.  Roche

8    has a patent, it's presumed valid.  It covers whatever it

9    covers.  I haven't seen anything.  It's all very well for

10   you to say you put in a bench memo.  You put in, and so does

11   Amgen, about a dozen a day.  And you're putting in so many

12   that you have now fallen back to separately giving the Court

13   a little folder of the important ones that you'd really like

14   me to look at.

15        I have read most everything.  I'm not getting into

16   a fight between the Roche patent and the Amgen patent.  No

17   such interference has been demonstrated to this Court.  It

18   neither adds nor detracts from the issues in this case.

19   It's there, it says what it says.

20        **MS. CARSON:**  But your Honor, under National Presto,

21   it does add something to the case because it's evidence that

22   we don't infringe under the doctrine of equivalents, and

23   also it's evidence of material change.

24        **THE COURT:**  No, I --

25        **MS. CARSON:**  And that's the law.

1           **THE COURT:**  Well, fine for you to say that.  I'm

2      not persuaded of it.  We'll go to Mr. Day.  If you have

3      other things to put on the record, we can put them on the

4      record, but I've got to address the other issues of

5      including --

6           **MS. CARSON:**  I do have additional items.

7           **THE COURT:**  Fine, but those proffers can be made,

8      you can either file a brief or you can say it to the court

9      reporter.

10          Mr. Day?

11          **MR. FLEMING:**  Your Honor, just a statement that

12     while we try to work within your instructions as to the

13     verdict form, based in part on the motion filed this morning

14     by Roche, we object to the form of the verdict form.

15          **THE COURT:**  You do, and you properly have.  Your

16     rights are saved.  I have settled the verdict form in light

17     of that objection, and aware of it, and I'm stuck with it.

18          **MR. FLEMING:**  Understood, your Honor.  I wanted to

19     make sure that was clear.

20          **THE COURT:**  I'm stuck with it.  You have waived

21     nothing that's been asserted of record.

22          Mr. Day, objections to the charge?

23          **MR. DAY:**  Your Honor, we have very few.  The first

24     one -- we have three important ones I'd like to raise with

25     the Court.  I'll be as brief as possible.

1          The first one has to do with materially changed

2     charge, which I believe, in a rough transcript that we had,

3     appears at pages 129 to 139 of the transcript.

4          **THE COURT:**  Yes, thank you.

5          **MR. DAY:**  You've addressed one of our concerns

6     which was the order of proof.

7          **THE COURT:**  And that I'll correct.

8          **MR. DAY:**  That was literal infringement first, then

9     material change.

10         **THE COURT:**  I will correct it.

11         **MR. DAY:**  The second concern that we have is with

12    respect to the comparator.  And what I would like to simply

13    illustrate for the Court, to explain what the issue is --

14    can you bring this up?

15         **THE CLERK:**  It's all right.  It's on now.

16         **MR. DAY:**  And zoom out.  That under 271(g), the

17    question is whether the product of the process is changed in

18    the imported product.  And the Court began the instruction,

19    if you go back and look at your instruction, you began the

20    instruction by referring to what I will -- I'm sorry, what I

21    will point to as the bottom comparison, was the product of

22    the process changed in the product in which it was imported.

23         But the Court ended its instruction by referring to

24    the top comparison, does the imported product materially

25    differ from the product of the process.  And this is the

1    engine-in-the-car analogy that I've twice given the Court.

2    The question is was the engine materially changed when a car

3    was built around it, or does the car materially differ from

4    the engine.

5            THE COURT:  Actually, I think I've got it, Mr. Day.

6    And, in fact, I think this is one of the fundamental issues

7    in this case.  It's a conceptual issue, and as I read 271(g)

8    and its legislative history, I think it is a triable issue

9    of fact for this jury how they conceive this.  You conceive

10   it one way, and your experts support that.  Ms. Ben-Ami

11   conceives it another, her experts support that.  I'm leaving

12   that to the jury.

13           MR. DAY:  I understand.

14           THE COURT:  I'm not going to change it.  Now,

15   here's the problem, though.  I'm just talking now as a

16   judge, we're talking about the charge, my responsibilities

17   as a judicial officer.  I'm going to allow both of you to

18   argue your conceptions.  I've stated the law, but you can

19   argue your conceptions.  It may very well be that the jury

20   will ask a question about this which requires further

21   construction of the law.  If I'm forced to that, I'll do it.

22   But I'm satisfied with the charge.  I think I got the idea

23   across.  I'll read it again, but I'm satisfied.  What else?

24           MR. DAY:  And I'm happy to proffer a curative

25   charge for the Court to look at, if it wishes.

1          THE COURT:  I'm happy to receive anything like

2     that.  And, you know, things aren't over until they're over.

3     I have about five minutes of -- well, I'll make this one

4     change I've agreed to.  I have another one to think about,

5     this -- well, this business about taking out recognition,

6     I'll do that, query whether I'll put it in obviousness.

7          Oh, you have it right here.  I'm happy to look at

8     it.  Let's move on.

9          MR. DAY:  Okay.  The third -- the second part of

10    the materially changed instruction that Amgen objects to,

11    your Honor, is the Court did not give an instruction with

12    respect to a change in the basic structure and utility of

13    the product of the process, and we believe that

14    instruction's required both by the statute and the case law.

15    You'll see that recited in our curative instruction.

16         We believe there should be an instruction that a

17    material change, as a matter of law, requires a change -- is

18    a change in the basic utility or structure.  And we think

19    Lilly supports that.  Now --

20         THE COURT:  I see the language.

21         MR. DAY:  Okay.  The second --

22         MS. BEN-AMI:  I would object to that, your Honor.

23         THE COURT:  I want to come back to you on that, but

24    I know what he's talking about.

25         MR. DAY:  The second issue that we would like to

1    raise with the Court is the obviousness instruction, and we

2    believe that there were three elements of the obviousness

3    instruction that the Court did not give, which we would like

4    the Court to give.

5            And the first one is, and again, I have a curative

6    instruction I'm happy to hand up to the Court.

7            THE COURT:  I'm happy to receive it.

8            MR. DAY:  Just to frame what we think was missing

9    from the instruction, which should be added to the

10   instruction, but there are three elements to this that we

11   think are missing.  The first element is an instruction on

12   hindsight.  And we think it's very important, especially KSR

13   makes this very clear, that the orientation of the

14   obviousness analysis by the jury is not a hindsight

15   analysis.  They need to be instructed not to apply

16   hindsight.

17           The second instruction that we believe is

18   important --

19           THE COURT:  You handed up something else.

20           MR. DAY:  Did I not hand up obviousness?

21           THE COURT:  You handed up something called,

22   Infringement and Improvements to Patented Invention.

23           MR. DAY:  Did I hand up the wrong one?

24           THE COURT:  I think I should give the hindsight

25   business.

1          **MR. DAY:**  I'm sorry, your Honor.

2          **THE COURT:**  Yeah, I'm disposed to give the

3    hindsight.

4          **MS. BEN-AMI:**  Your Honor, I object to what's

5    written here.  If your Honor says you're not supposed to use

6    hindsight, I don't have a problem with that, but to have a

7    long-winded charge that says --

8          **THE COURT:**  No one's going to be long-winded.

9          **MS. BEN-AMI:**  I'm sorry, your Honor, but all --

10   your charge is taken out of the statute, which is what's

11   controlling.  And in KSR, the supreme court said all these

12   bells and whistles that the federal circuit has put on are

13   wrong, you need to use the statute.

14         **THE COURT:**  I am disposed to saying, In deciding

15   obviousness you should avoid using hindsight, and leave it

16   at that.

17         **MR. DAY:**  The second element of the obviousness

18   instruction that we believe was missing, but is an important

19   one, your Honor, is this objective belief or expectation of

20   the inventor is irrelevant.  The inventor is presumed to be

21   one of super skill in the art.

22         **THE COURT:**  I'm satisfied with the charge.

23         **MR. DAY:**  The third one is, we do not believe the

24   Court gave a fundamental element of the obviousness

25   instruction, which is a reasonable expectation of success.

```
 1    And I provided the language that I believe the law requires.

 2              THE COURT:  Where is that?

 3              MS. BEN-AMI:  I don't see it.

 4          MR. DAY:  Time was short, so I apologize if it's

 5    not in here.  In our -- I can give you the simple sentence,

 6    your Honor, from our proposed instruction.

 7              THE COURT:  Yes, right.

 8          MR. DAY:  I'll read it to you, if I may.

 9              THE COURT:  Yes.  And go to your proposed

10    instructions.  What number -- how can I find it?

11          MR. DAY:  It's on page 45 of Amgen's proposed

12    instructions.

13              THE COURT:  Uhm-hmm.

14          MR. DAY:  And -- I'm sorry, actually it is in this

15    page, your Honor.  It's the very first sentence.

16              THE COURT:  All right.  Just one second.

17          MR. DAY:  "In making that determination."  This is

18    all the objective analysis that KSR requires.

19              THE COURT:  Oh, I think I've covered that concept.

20          MR. DAY:  Oh, believe me, your Honor, excuse me,

21    it's not about whether the analysis is objective, it's about

22    objectively, then, did one of ordinary skill in the art have

23    a reasonable expectation of success.

24              THE COURT:  I think I've covered the concept in the

25    charge that I gave.  I'll reflect on it, but I think I've
```

1    covered it.

2              **MR. DAY:**  If you would reflect on it, please.

3              **THE COURT:**  I would.  Okay.

4              **MR. DAY:**  The last -- this is the last thing that

5    we have, your Honor.

6              **THE COURT:**  Yes.

7              **MR. DAY:**  Is that at page 124 of our transcript,

8    you gave an instruction in the context of indefiniteness.

9    And if I may simply read what our transcript has you saying,

10   then I will point out what we object to.

11             This is at page 124, line 6 I'm reading.  "And the

12   claims must be specifically definite because as we've seen

13   here, it's perfectly lawful to do a work-around, it's

14   perfectly lawful to make an improvement."

15             And that concept in general is fine, except it

16   ignores the concept and the principle of dominance, patent

17   dominance.  And it is not lawful to make an improvement that

18   practices the invention.  And for that reason, and I

19   proffered that instruction first, I guess, I handed up to

20   you, we believe that it's important that the Court address,

21   insofar as Roche has put their patent into this case,

22   they've made their patent an issue.  The fact that they have

23   a patent -- they can have a patent.  But the fact that

24   they've made an improvement does not give them license to

25   practice the patented invention of another.

1    **THE COURT:**  I think that one sentence, it's not

2    lawful to make an improvement that practices the patented

3    invention, I'll say that.

4         Ms. Ben-Ami, based upon what I've indicated I might

5    say, problems with that?

6         **MS. BEN-AMI:**  On which point, your Honor?  On the

7    improvement?

8         **THE COURT:**  On any of them, before we call it a

9    day.

10        **MS. BEN-AMI:**  I do not believe, your Honor, that

11   you should be telling the jury that you cannot make an

12   improvement over someone else's patent.

13        **THE COURT:**  I'm not going to say that.

14        **MS. BEN-AMI:**  Then I think that the charge was

15   correct as it was.

16        **THE COURT:**  Well, all right.  Here, I think maybe

17   the efficient way to do this, though, I didn't mean to cut

18   Ms. Carson off, she may continue to put things on the record

19   with the court reporter and I'll look at them.

20        Tomorrow morning, the first thing that will happen

21   is I will make a few corrections.  When I do that, I will

22   invite you to the sidebar.  You don't have to object,

23   because I'm not trying to give anyone the fast shuffle.  I

24   would invite you to the sidebar.  You need not reiterate any

25   objections made on the record at this more extended hearing,

1    but since I'm only going to make a few corrections, make

2    your objections to those corrections as the jury sits in the

3    box.  Then my expectation would be, because they will be

4    only a few, that we'll take a ten-minute recess, then you

5    get to argue, Ms. Ben-Ami, Mr. Day gets to argue, an hour

6    and a half without a break, and really I only have about

7    five minutes of how they deliberate together, and the case

8    is theirs.

9            Now, that will take us the better part of two

10   hours.  If I give you the revised lists of what is

11   anticipatory prior art and what is prior art, can Roche do

12   what Amgen did with the -- I mean, Mr. Fleming's nodding.

13   I'm working off your draft.

14           **MR. FLEMING:**  Yes, your Honor, I'm sure we can.

15           **THE COURT:**  I've got to cross off the argument

16   stuff, but I want them to have a list.  He's saying he can

17   do it.

18           **MS. BEN-AMI:**  I always listen to him.

19           **THE COURT:**  Really, I thank you all.  Very helpful.

20   Let me go to work on these matters as you will resume --

21           **MR. DAY:**  Your Honor?

22           **THE COURT:**  Oh.

23           **MR. DAY:**  I had two things that were preliminary

24   before we got into this.

25           **THE COURT:**  Go ahead.

 1          **MR. DAY:**  The first one was that Amgen had moved

 2   documents into evidence for the infringement case on which

 3   we need a ruling in order for the closing argument.

 4          **THE COURT:**  Yes.  So you do.  I am not overwhelmed

 5   by the paper, but I'm close to being overwhelmed by the

 6   paper.  So if you will recall them to Ms. Smith when I

 7   recess, I will be able to make that ruling.  Go ahead.

 8          **MR. DAY:**  And the second thing is, I believe, if I

 9   understand correctly, that we will not be having a hearing

10   on Friday on the inducement, that that's going to be taken

11   on papers?

12          **THE COURT:**  That's how I understood it.  And since

13   there will be time available after I send the jury out, if

14   there's any issue about that, we can resolve it.  But you

15   have raised tomorrow we'll give Roche its half hour on

16   inequitable conduct, and I will take it under advisement.

17          **MR. DAY:**  I believe, your Honor, not to quibble,

18   but I believe Amgen has about ten minutes left of its time.

19          **THE COURT:**  That's not a quibble, and I think Amgen

20   does have that amount of time.

21          **MR. DAY:**  And I just want to clarify, because I

22   live on the West Coast, I'm trying to understand the

23   implications.  The jury will be deliberating on Monday if

24   there's no verdict on Friday?

25          **THE COURT:**  That is correct.  And Tuesday as well,

1    and Wednesday as well.

2           **MR. DAY:**  I understand.  I just needed clarity.

3           **THE COURT:**  Monday and Tuesday, I will not be in

4    the courthouse, which means we will not bring them in at the

5    beginning of the morning to start the deliberations.  I will

6    deputize Ms. Smith simply to tell them they may start.  She

7    will be -- I'll be available over the phone.  She and I will

8    try to work it out.  If there's a real emergency, a

9    magistrate judge here will be able to handle it.

10          It's my case, my responsibility.  I propose to come

11   back for the verdict if they have returned a verdict.

12          **MR. FLEMING:**  Your Honor, I'd like to share

13   Mr. Day's quibble.  By our calculation, Roche had somewhere

14   north of 40 minutes, but we would ask you only to recognize

15   us having 40 minutes for the inequitable conduct section.

16          **THE COURT:**  I think you have 30, but I don't care.

17          **MR. FLEMING:**  The last point is, since tomorrow

18   morning will be fairly involved with a lot of intensity and

19   focus, we would ask if it's possible, if the Court's

20   schedule would permit the presentation of the inequitable

21   conduct evidence sometime closer to the afternoon, perhaps

22   2:00?

23          **THE COURT:**  That makes perfect sense.  That's

24   practical.  Of course you will, you have a lot to put in

25   final argument, the case is being tried to the jury.  All

1    day tomorrow is for you.  When we're done, we're done.

2    We'll resume at 2:00 on inequitable conduct.

3           **MR. FLEMING:**  Thank you, your Honor.

4           **THE COURT:**  Now, one thing I should say, this is

5    just before we recess.  This is not a warning.  Well, yes,

6    it is.  But I know that you'll pay close attention to it.

7           Now, I've worked hard on this charge, I will make

8    such corrections as in my mind are appropriate under the

9    law, and I will receive your objections and I may correct

10   myself further.  Once we've settled the charge tomorrow

11   morning, we'll take that ten-minute recess.  And nobody puts

12   a spin on my charge.  At all.  Perfectly appropriate to say,

13   As Judge Young has explained to you X, but the X had better

14   be real X, not X minus or X plus, because I'm not waiting

15   for an objection, I will interrupt.  You don't want that.  I

16   mean, that's the whole purpose I charged first, so I can

17   make sure you focus on the issues in this case and no other

18   issue.

19          For that reason, I have my -- and you've asked

20   about it, and I think everyone understands, but I want it

21   understood, if I think we're getting into immaterial

22   aspects, immaterial now, that aspect of relevance, I will

23   not hesitate to correct you.  We're here to try a patent

24   case.  They're going to try that patent case.  I've been

25   very forthcoming about the setting in which the patent case

1    stands.  We're trying just the patent case, nothing else,

2    and of course I welcome vigorous argument.

3           **MR. FLEMING:**  Since I've made a commitment to you

4    by my nodding that I'm going to get you the documents you

5    want before the jury retires, I assume you don't want them

6    before --

7           **THE COURT:**  No, before the jury retires.

8           **MR. FLEMING:**  When would you expect they would be

9    available?

10          **THE COURT:**  Eleven, say, between --

11          **MR. FLEMING:**  No, available to us, so I can start

12   the --

13          **THE COURT:**  First thing tomorrow morning, as soon

14   as I get in here.

15          **MR. FLEMING:**  And these forms will have simply the

16   exhibit number and the descriptions as they were in Roche's

17   list?

18          **THE COURT:**  I'm going to take your draft.  I have

19   Amgen's opposition.  It will probably take me into the

20   evening, because I want to go back and look at actual

21   documents.

22          Well, we're going to recess.  First thing I'm going

23   to do is rule on documents.  So, Mr. Day, if you'll square

24   that away with Ms. Smith, we'll find them here.  I've got

25   Roche's.  I need Amgen's.  I'll make my rulings, I'll give

1    them to Ms. Smith, they can be incorporated into the record.

2    Then I want three things, but you've given them to me.  I

3    want the charge about -- not charge, I want the little box

4    about product and process.  I simply want that box by

5    agreement, I want that picked out and put on a piece of

6    paper.

7          Then, as I requested, you gave me anticipatory

8    documents.  Amgen disagrees, but I have to settle that.  And

9    the list isn't going to expand, your risk is it's going to

10   contract.  All I'm going to do is cross out the

11   argumentative stuff, cross out the exhibits that I rule

12   cannot be used for that purpose, and give you the list.  You

13   collapse it down as I've drafted it.  Then there's another

14   list of prior art.  And I talked about it in the --

15        **MR. FLEMING:**  Your Honor, I'm with you.  I

16   completely understand.

17        **THE COURT:**  Exactly the same thing.  When I come

18   sometime around 11:00 to give my five minutes about how they

19   deliberate together, I'm going to say, Here's a little chart

20   of what's product and process claims, here's a chart of what

21   they claim are anticipatory exhibits, here's a chart of what

22   they claim are prior art.  Thank you very much.  This is how

23   you deliberate together.

24        **MR. FLEMING:**  My own question to your Honor --

25        **THE COURT:**  When are you going to get it?

1          MR. FLEMING:  That was my first question.

2          THE COURT:  I thought I answered it.  As soon as I

3   get here.  Ms. Smith gets here before I do.  When I get

4   here, she will have it.  You will have it, it will be before

5   9:00, but I'm not promising a particular time.

6          MR. FLEMING:  Understood.  My only comment to you

7   was I think it might be helpful, since those two lists break

8   out subsets of the exhibits, that we could have binders

9   prepared that match those lists separately from the admitted

10  exhibits.

11         THE COURT:  This is a good idea, I think.

12         MR. FLEMING:  Thank you, your Honor, that's all.

13         THE COURT:  Thank you.  Thank you all.  Very

14  helpful.  We'll recess.

15         THE CLERK:  All rise.  Court is in recess.

16         (Whereupon the Court left the Bench and the

17  following proceedings transpired.)

18         MS. CARSON:  For the written description, we would

19  request instruction that every claimed element must be

20  described and in the inventor's possession.  And

21  particularly for DNA, you need to describe DNA by structure

22  in order to meet the written description requirement.  And

23  for that, we cite to the Eli Lilly case, 82 F.3d 1568, Fed

24  Circuit 1996.

25         In addition, we would request product-by-process

1    instruction on anticipation, that you can anticipate a

2    product-by-process claim even if the product in the prior

3    art is not made by the same process.  And for that,

4    Amgen-TKT.

5         Also, just points of clarification that we'd like

6    to be provided to the jury is that the art that is listed on

7    our list for anticipation can also be considered for

8    obviousness.  So the Court told the jury that they'd be

9    getting two separate lists, and it should be made clear that

10   things that are on the anticipation list can also be

11   considered for obviousness.

12        The Court also mentioned in the context of the

13   Amgen patents that they were by Lin and others, and Lin is

14   the sole inventor.  We'd like a correction there.

15        I -- when the Court boiled down the infringement

16   case to the point about human EPO and whether or not it's in

17   there, we'd like the Court to make clear that that's not the

18   sole dispute that's in this case.  The Court also made it

19   very clear that a patent is presumed valid unless Roche

20   proves otherwise, and we'd like a balanced instruction that

21   Roche is presumed not to infringe unless Amgen proves

22   otherwise.

23        We also object to the Court's offer to further

24   construe the claims since the evidence is now closed, and we

25   believe that would be prejudicial to Roche.  And as an

1    example, the definition of the term "isolation" has been

2    disputed here.  So we would object to further construction

3    of the claims for the jury during their deliberations.  Or

4    further explanation or construction of the construction that

5    has already been done during deliberations.

6          Also, we'd like the jury to be instructed that if

7    an independent claim is not infringed, there can necessarily

8    be no infringement of a dependent claim.  And the clear and

9    convincing standard that was described by the judge, we

10    believe that by discussing an abiding conviction, there

11    should be a clarification.  That was an improper statement

12    of the standard and that it should be clarified that that is

13    not beyond the reasonable doubt standard.  And for that, I

14    would refer the Court to Docket Number 1343 at page 6, which

15    would be our proposed instruction on the burden of proof,

16    Instruction Number 3.

17          Also, we'd like an instruction that admission by an

18    attorney that's read into the record -- a response to a

19    request for admission read into the record by counsel is

20    evidence.

21          **MR. CASEBEER:**  Amgen objects to those instructions

22    as being inappropriate or unnecessary or both.

23          (Adjournment.)

24

25

1                  **C E R T I F I C A T E**

2

3

4           We, Donald E. Womack and Cheryl B. Palanchian,

5    Official Court Reporters for the United States District

6    Court for the District of Massachusetts, do hereby certify

7    that the foregoing pages are a true and accurate

8    transcription of our shorthand notes taken in the

9    aforementioned matter to the best of our skill and ability.

10

11

12

13

14           /S/ DONALD E. WOMACK
         _____

15           /S/ CHERYL B. PALANCHIAN
         _____

16

17              DONALD E. WOMACK
            CHERYL B. PALANCHIAN
            Official Court Reporters

18               P.O. Box 51062
         Boston, Massachusetts 02205-1062

19            womack@megatran.com

20

21

22

23

24

25