1          UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF MASSACHUSETTS
2
                                        Civil Action
3                                       No. 05-12237-WGY

4   * * * * * * * * * * * * * * * *
                                    *
5   AMGEN, INC.,                    *
                                    *
6          Plaintiff,              *
                                    *   **DAILY TRANSCRIPT**
7   v.                              *   **OF FURTHER JURY**
                                    *   **INSTRUCTIONS** and
8   F. HOFFMANN-LA ROCHE LTD,       *   **CLOSING ARGUMENTS**
    ROCHE DIAGNOSTICS GmbH and      *      (Volume 21)
9   HOFFMANN-LA ROCHE, INC.,        *
                                    *
10         Defendants.             *
                                    *
11  * * * * * * * * * * * * * * * *

12

13

14         BEFORE:  The Honorable William G. Young,
                    District Judge, and a Jury

15

16

17

18

19

20

21

22

23
                               1 Courthouse Way
24                             Boston, Massachusetts

25                             October 18, 2007

1                  A P P E A R A N C E S

2

3       DUANE MORRIS LLP (By D. Dennis Allegretti, Esq. and Michael R. Gottfried, Esq.), 470 Atlantic Avenue, Suite 500, Boston, Massachusetts 02210

4         - and -

5       DAY CASEBEER MADRID & BATCHELDER, LLP (By Lloyd R. Day, Jr., Esq., David M. Madrid, Esq. and Robert M. Galvin, Esq.) 20300 Stevens Creek

6 Boulevard, Suite 400, Cupertino, California 95014

        - and -

7       McDERMOTT WILL & EMERY (By Michael Kendall, Esq.), 28 State Street, Boston, Massachusetts

8 02109

        - and -

9       McDERMOTT WILL & EMERY (By William G. Gaede, III, Esq.), 3150 Porter Drive, Palo Alto,

10 California 94304

        - and -

11       MARSHALL, GERSTEIN & BORUN LLP (By Kevin M. Flowers, Esq.), 6300 Sears Tower, 233 S. Wacker

12 Drive, Chicago, Illinois 60606-6402

        - and -

13       STUART L. WATT and WENDY A. WHITEFORD, Of Counsel, Amgen, Inc., One Amgen Center Drive,

14 Thousand Oaks, California 91320-1789, on behalf of the Plaintiff

15

16       BROMBERG & SUNSTEIN LLP (By Lee Carl Bromberg, Esq. and Julia Huston, Esq.), 125 Summer Street, Boston, Massachusetts 02110

17         - and -

18       KAYE SCHOLER LLP (By Leora Ben-Ami, Thomas F. Fleming, Esq., Patricia Carson, Esq., Christopher Jagoe, Esq. and Howard Suh, Esq.),

19 425 Park Avenue, New York, New York 10022, on behalf of the Defendants

20

21

22

23

24

25

**I N D E X**

Further Jury Instructions . . . . . . . . . . . 3072

Closing Argument by Ms. Ben-Ami . . . . . . . . 3091

Closing Argument by Mr. Day . . . . . . . . . . 3114

```
 1              THE CLERK:  All rise for the jury.

 2         (Whereupon the jury entered the courtroom.)

 3              THE CLERK:  Court is in session, please be seated.

 4         THE COURT:  Well, good morning, ladies and

 5    gentlemen.

 6              THE JURY:  Good morning.

 7         THE COURT:  And really on behalf of everyone

 8    participating in the case, we cannot thank you enough for

 9    your care, the obvious attention that you are giving to

10    these matters, for your promptness.  You ten men and women

11    have set what is truly the outstanding tone of this entire

12    proceeding, and we thank you a great deal.

13              Now, as you might expect there are a few things

14    that I should correct and a couple of additions I should

15    make.

16              First, here is the charge from yesterday.  I'll

17    give it to Ms. Smith and when you recess she'll give you the

18    charge and you have it.  Now, have in mind I'm going to

19    correct it in a couple of particulars.

20              Second, you informally asked, but it's a good

21    question, are you going to see the expert, I stay away from

22    expert, I like to use the word opinion witnesses, but they

23    call them experts, some of them think they are experts, it's

24    all up to you anyway, are you going to see those reports.

25    No.
```

1          The reports are not evidence.  The reports under

2    the rules of procedure serve the function that you have seen

3    them serve in this Court.  They have to show the other side

4    the reports before trial so the other side knows what's

5    coming and can prepare cross-examination and prepare an

6    expert to meet what's coming, and then that opinion witness

7    has to send back a report.  But they're not evidence.

8          You've seen the people testify.  And like any other

9    witnesses, I have told you, you may believe everything they

10   say; but equally, you may disbelieve and disregard

11   everything they say; you may believe parts of what they say,

12   disbelieve other parts.  And I cautioned you, and I think

13   it's appropriate, with respect to opinion witnesses, always

14   check to see what that opinion rests on.

15         Now, here are my few additions and corrections.

16   And we can follow it best if we follow the verdict slip

17   because I'm just going to pick out the portions where I must

18   make an addition or correction.

19         So let's look at the second page.  That's the page

20   that Roche has to prove by clear and convincing evidence,

21   and let's look at the specific defense of anticipation.

22         Now, one way that anticipation could occur is if

23   there was a prior invention by someone else.  And Roche is

24   going to argue to you that in the '933 patent those claims,

25   and in the '422 patent claim 1, were anticipated because the

1    invention defined in those claims was invented by Goldwasser

2    before Amgen's date of invention.  Roche therefore must show

3    by clear and convincing evidence either, one, before Amgen's

4    date of invention, Goldwasser reduced to practice a product

5    or method that includes all of the elements of the specific

6    claim that you're looking at; or, two, that Goldwasser was

7    the first to conceive of that invention and that he

8    exercised reasonable diligence in later reducing the

9    invention to practice.

10         In addition, Roche must show that Goldwasser's

11   invention was sufficiently developed that one skilled in the

12   art would have recognized that it would work for its

13   intended purpose.

14         If Goldwasser made a prior invention, but he

15   abandoned, suppressed or concealed it, then it doesn't

16   anticipate Amgen's patent or the specific claims of the

17   patent.

18         An invention is not abandoned, suppressed or

19   concealed if the invention was made public, sold or offered

20   for sale or otherwise used for a commercial purpose.  A

21   period of delay does not constitute abandonment,

22   suppression, or concealment if the prior, well, it says

23   prior inventor, we'll say if Goldwasser here, if you think

24   he's the prior inventor, was engaged in reasonable efforts

25   to bring the invention to market.

1          Still on anticipation.  When I was explaining

2   anticipation yesterday, I said that the particular

3   anticipatory reference, that is, what's out there, we're

4   going to give you a list of those things which Roche claims

5   are anticipatory references, documents or, well, documents,

6   but documents which may explain the existence of a product

7   or something, I said that that had to be recognized to have

8   been present in the prior art by persons of ordinary skill

9   in that art at the time of Amgen's invention.  And you'll

10  see that in the charge.  That's wrong with respect to

11  anticipation.  Where that language should come is under --

12  same page -- the defense of obviousness.

13         Now, for obviousness, obviousness is a little

14  easier to prove.  It's still by clear and convincing

15  evidence, but it's a little easier for Roche to prove,

16  because anticipation means this invention is anticipated as

17  I've just told you by Goldwasser's doing it, or the specific

18  elements of, all the elements of a particular claim are

19  found there in one of those anticipatory references when

20  judged by a person of ordinary skill in the art.  But, I

21  was -- that person doesn't have to recognize, just look at

22  it and recognize that it exists in the prior art.

23         Well, then we come to obviousness.  Now,

24  obviousness, it doesn't all have to be there, and you look

25  at the prior art as a whole, and we're going to give you a

1    list of all those things that are prior art, the exhibits

2    which are prior art.  Now, I'm not -- the other exhibits are

3    there, and look at them, because they may tell you or

4    explain or amplify on what was understood before Amgen's

5    patent application as prior art.  But there's a specific

6    list of things that constitute prior art, that's what's out

7    there, and they'll be arguing from that.

8         Now, with respect to that that does have this

9    recognition requirement.  It has to be recognized by a

10   person of ordinary skill in the art that the Amgen invention

11   is in fact obvious from the references taken individually or

12   collectively.

13        Remember, now, this idea of obviousness, that's to

14   be judged back at the time of invention, not by any

15   hindsight with what we know today.  Go back there to the

16   early '80's.  It has to have been obvious at that time and

17   Roche has to prove it by clear and convincing evidence.

18        Go to the last page, the page that Amgen has to

19   prove.  And Amgen has to prove it by a fair preponderance of

20   the evidence.  And we go back to the concept of material

21   change as it applies to the process patents, the claims in

22   the two patents at the bottom of that page.  And I told you

23   yesterday to start with the concept of material change and I

24   told you to put in M if certain things worked out.

25        Well, they both agree that that's wrong.  I thought

1    that was simple logically.  So I thought you should start

2    there.  But that's not what the law requires.  So even

3    though I said it, strike it out, I'm going to try it again.

4         Everything I told you was accurate, but the order

5    of your analysis must be different.  Here is the proper

6    order as required by the law.

7         Again, go claim by claim.  And we're talking about

8    the two process patents, '868 and '698, on the bottom of the

9    third page.  So you're going claim by claim.

10        The first thing you should do is analyze whether

11   Roche's European -- and lawful over there in Europe --

12   European process infringes, first literally infringes,

13   literally infringes what is claimed to be the process in a

14   particular claim.  Do the infringement analysis first.  If

15   your answer on the infringement analysis is that Amgen has

16   not proved literal infringement, put a check in the not

17   infringed column.

18        And then, just as you must throughout this entire

19   page, move over to the doctrine of equivalents analysis.

20   Again, you compare the claimed process in the patent with

21   Roche's European process, which, of course, is lawful in

22   Europe, and see whether the two processes, whether the Roche

23   European process infringes under the doctrine of

24   equivalents.  If it does not, put a check in the not

25   infringed column and you're done.

1          Now suppose that on either literal infringement or

2     infringement by the doctrine of equivalents you come to

3     conclude that in fact the lawful European process, if it

4     were being done here in the United States, does infringe.

5     That's when we get to material change.  And here's what you

6     analyze.  You look at the product that would be produced by

7     the claimed process, the claim, the Amgen claimed process.

8     We're not looking at any improvements that may have happened

9     later or the current state of Amgen's marketing.  We haven't

10    heard anything about that, and that's not relevant, because

11    we start with the claim.  But you look at the product that

12    would be produced by that process.  The patented process.

13    Then you look at the product that's produced by the lawful

14    in Europe, but infringing here in the United States, Roche

15    process.  If the Roche product is materially changed from

16    the product of the claimed process, Amgen has lost.  That

17    product can be imported into the United States and it does

18    not infringe.  Amgen has to prove no material change.  And

19    that's what you compare.  If Amgen fails to prove that, if

20    the product of the European process, which is infringing, is

21    materially changed, then Roche fails and you say not

22    infringed, but I want to know why, give me an M rather than

23    a checkmark.

24          On the other hand, if the product of the European,

25    lawful there, but infringing here, process is not materially

1   changed from the Amgen claimed process which produces a

2   product, if there's no material change, you may say that in

3   fact the Roche process infringes and you check infringement,

4   either by literal infringement or by the doctrine of

5   equivalents.

6        That's my correction.  Those are my corrections.

7   Now, I may have left something out, we had a conference

8   yesterday afternoon, we're not going to take a conference

9   now, but the lawyers get a chance to tell me if I have made

10  any further mistakes or if they need some further correction

11  based upon what I've told you here this morning, and I'll

12  see them at the side bar.

13  SIDEBAR CONFERENCE, AS FOLLOWS:

14       **THE COURT:**  Mr. Fleming?  Your rights are saved as

15  to everything that went on yesterday, but that's the

16  supplementary charge.

17       **MR. FLEMING:**  Your Honor, one thing in a few small

18  respects, your Honor.  And I just wanted to make clear that

19  of course we continue to object to the Markman --

20       **THE COURT:**  That's why I spoke first.

21       **MR. FLEMING:**  I understand.

22       **THE COURT:**  All the prior objections on both sides

23  are reserved.

24       **MR. FLEMING:**  Again --

25       **THE COURT:**  What about this charge?

1          **MR. FLEMING:**  -- starting with the 102(g) charge, I

2     followed you all the way through, and I don't think it's a

3     matter of what you said, it's more how you said it.  The

4     analysis under material change would be the product to be

5     imported, which is Mircera, and so they need to compare the

6     product of the claimed process to Mircera.

7          **THE COURT:**  Yes, I'm satisfied with the charge.

8     Anything else?

9          **MR. FLEMING:**  Yes, your Honor.  With regard to your

10    discussion of 102 --

11         **MS. BEN-AMI:**  (G).

12         **MR. FLEMING:**  -- I'm sorry, 102(g), right, I think

13    that with regard to applying the recognition requirement to

14    the obviousness position --

15         **THE COURT:**  You had already said that you disagreed

16    with that, but I've decided to do that.

17         **MR. FLEMING:**  And I understand.

18         **THE COURT:**  But your rights are saved.

19         Okay.  Mr. Day?

20         **MR. DAY:**  Three things, your Honor.

21         **MR. FLEMING:**  Of course there's the doctrine of

22    equivalents in the 271(g) --

23         **THE COURT:**  And you certainly have not waived that.

24         **MR. DAY:**  Three things, your Honor.  Yesterday I

25    had understood you to say that in connection with the

1   statement that you had made about improvement as perfectly

2   lawful, that you would add a statement unless of course the

3   improvement is patented, unless it infringes the patent.

4       **THE COURT:**  I did say I would say something like

5   that, and I will.

6       **MR. DAY:**  I didn't hear anything on that.

7       The second thing, I believe that you said the '422

8   anticipation was initially in this case.  It's not.  It was

9   resolved by summary, by JMOL before trial.

10      **THE COURT:**  No, no.  No, no.  Oh, anticipation,

11  you're absolutely right.

12      **MR. DAY:**  Of the '422 claim 1.  I believe you, I

13  think that was --

14      **THE COURT:**  I did.  I was mistaken.  I'll correct

15  that.

16      **MR. DAY:**  The third thing is that you did make a

17  statement that obviousness is easier to prove, but I don't

18  think that's a correct statement of law.

19      **THE COURT:**  No, I'm stuck with what I've said.

20      **MR. FLEMING:**  Your Honor, may I make a comment.

21  We're not going to argue anticipation.

22      **MS. BEN-AMI:**  No, we're not going to argue

23  anticipation.

24      **MR. FLEMING:**  It's not in the verdict form.

25      **MS. BEN-AMI:**  It's not.  I don't -- we've decided

1   we're not going to, that's --

2           **MR. DAY:**  I would just ask that it be mentioned as

3   to why, I think it makes --

4           **THE COURT:**  All right, I will.

5           **MS. BEN-AMI:**  It doesn't matter.

6           **THE COURT:**  I will give a blow by.

7           **MR. FLEMING:**  The presumption was you weren't going

8   to do that because that's when I put up the chart and you

9   said you could --

10          **MR. DAY:**  Actually that's not --

11          **THE COURT:**  I've gone over my charge and I'm going

12  to say something.

13          **MR. FLEMING:**  Thank you, your Honor.

14          (Whereupon the sidebar conference concluded.)

15          **THE COURT:**  I just made a slip of the tongue here,

16  and then there is one other thing I said I was going to say.

17          Go back to Page 2.  And I got talking about what

18  Goldwasser did, whether or not it anticipates, and I had

19  made mention of the '422 patent.  That's wrong.

20  Anticipation is not before you on the '422 patent.  Slip of

21  the tongue on my part.

22          I also said, and this I didn't touch on, I was

23  talking about, now I'm over on the third page and we're

24  talking about infringement generally.  And I was saying that

25  one of the whole ideas of the patent process is the person

1    who's claiming the patent has got to have something novel

2    and patentable, but also that person has to teach us all how

3    to do it, and teach us with the requisite amount of

4    definiteness, has to give us a written description from

5    which we could follow it, and then it has to, when we do

6    follow it, it's got to work, and I went over that in detail.

7           And on the definiteness business, I was saying one

8    of the reasons for that definiteness requirement, of course,

9    is we expect people, we encourage people to design around

10   the patented process, design something else to make a better

11   mousetrap in light of what they know of the patented

12   process, and I said in fact we want people to improve upon

13   the patented process.  Yes, true.  But you can't infringe in

14   your improvement.  That's all.  We want the person to do it,

15   but if the patent is valid that excludes what is

16   specifically claimed.

17          Are the supplemental, saving your prior objections,

18   are the supplemental instructions satisfactory, Mr. Fleming?

19          **MR. FLEMING:**  Yes, your Honor.

20          **THE COURT:**  And Mr. Day?

21          **MR. DAY:**  Yes, sir.

22          **THE COURT:**  All right.  Ladies and gentlemen,

23   you're welcome to start reading over that charge, though I

24   have said, I've made these corrections and we'll get that to

25   you later in the morning.  But don't start talking about the

1    case now.

2           This is, this is hard for them.  This is the

3    highest calling of the attorney what we're going to see now,

4    to stand up in front of the jury and to argue the client's

5    cause.  So, a ten minute recess, because I'm going to give

6    them hopefully an uninterrupted hour and-a-half, 45 minutes

7    a side.  The information is going to come to you very fast

8    so we need to take a break now, for no more than ten

9    minutes, and then, while they get themselves ready to make

10   final arguments.

11          Keep your minds suspended.  Do not discuss the case

12   either among yourselves nor with anyone else.  But you may

13   have that charge.

14          (Whereupon the Court and the Clerk conferred.)

15          **THE COURT:**  Actually Ms. Smith makes a good

16   suggestion.  We'll make copies so you can each have one.

17   And so, you won't be looking at it now, we'll be making the

18   copies.  But before you start deliberating, you'll each have

19   a copy and that's a good suggestion.

20          You may stand in recess for ten minutes.  I'll

21   remain on the bench.

22          **THE CLERK:**  All rise for the jury.

23          (Whereupon the jury left the courtroom.)

24          **THE COURT:**  Please be seated.

25          I stay on the bench only because, Ms. Ben-Ami, you

 1   had an issue about closing and --

 2          **MS. BEN-AMI:**  Yes, your Honor.

 3          **THE COURT:**  Yes.

 4          **MS. BEN-AMI:**  I understand you ruled on something

 5   this morning.  I formally object to it.  I object to not

 6   being allowed to argue 102(f) as a basis for prior art.  You

 7   told me yesterday that I could.  But given that --

 8          **THE COURT:**  I'm not clear on the reference.  You've

 9   got to --

10          **MS. BEN-AMI:**  You said I cannot point out that

11   Goldwasser's protein was paid for by the government.

12          **THE COURT:**  That's correct, I did, and I stand on

13   it.

14          **MS. BEN-AMI:**  And the fact of the matter is to

15   prove 102(f) derivation, I need to show that it was not paid

16   for by Amgen.

17          **THE COURT:**  I stand on my ruling.

18          **MS. BEN-AMI:**  Now, given that ruling, I have two

19   pages that I would like to show you which go to a

20   different point but are related, and I don't want to step on

21   your toes because I know you won't let me.  They go to the

22   fact that the Department of, that Amgen was specifically

23   asked whether everything was paid for by Amgen or whether

24   there was funding by the Department of Energy.  I use that

25   document for a different purpose.  You can see all my notes

1    so you can see it.  The point is you are telling the jury

2    that if the Patent Office considered everything they can

3    take that into account.

4              **THE COURT:**  I did.

5              **MS. BEN-AMI:**  And this document shows that -- and

6    you know, when it's Mr. Day's turn, I don't get a wraparound

7    in this case so I don't get to say anything, and you know

8    he's going to say that the Patent Office had all the

9    information.  Here is a document in the middle of the

10   process that says we want to know this information.  And

11   they weren't told.  And that is relevant to a different

12   concept.

13             **THE COURT:**  Here's, here's what I don't understand

14   here.  The question as I've charged the jury, and indeed the

15   questions that, as I understand the law, don't have

16   equitable aspects to them.  I'm going to hear the

17   inequitable conduct aspect, and so I simply don't

18   understand, granted the matter's in evidence and you should

19   be able to argue any reasonable inference from what's in

20   evidence, but here you're saying -- it would have to bear on

21   validity.

22             **MS. BEN-AMI:**  It does bear on validity.

23             **THE COURT:**  Tell me how.

24             **MS. BEN-AMI:**  It bears on validity because the

25   examiner is asking is there any of this work that's paid for

1    by anyone else.  Because if it is paid for by the Department

2    of Energy it's prior art.  It's prior art.

3           Now, Mr. Day's going to get up, and I guarantee

4    this, your Honor, he's going to say look at this patent,

5    look at all these references, Goldwasser, Miyake, blah,

6    blah, blah, it's all in there and the examiner saw it all.

7    Well, the examiner didn't see it because he asked.  If he

8    had seen it he wouldn't ask.

9           **THE COURT:**  Well, I -- what's your response,

10   Mr. Day?

11          **MR. DAY:**  I don't know what you're looking at, your

12   Honor, so I really don't have --

13          **MS. BEN-AMI:**  That has my notes on it, your Honor,

14   so --

15          **THE COURT:**  Well, well, you showed them to me.

16          **MS. BEN-AMI:**  Well, no one can read my handwriting

17   anyway so --

18          **THE COURT:**  I don't think that, and I don't think

19   they're so --

20          **MS. BEN-AMI:**  Brilliant.  No, they're not the most

21   brilliant notes ever.

22          **THE COURT:**  Respect --

23          **MR. FLEMING:**  Leora, what number is that?

24          **THE COURT:**  I did not impugn their cogency.  It's

25   just I don't think that they're central.

1          **MS. BEN-AMI:**  It doesn't matter.

2          **THE COURT:**  That's right, it doesn't matter.

3          **MS. BEN-AMI:**  It doesn't matter.

4          (Pause in proceedings.)

5          **MR. DAY:**  This is exactly the issue you excluded,

6     your Honor.

7          **THE COURT:**  No, no, she wants -- oh, she's still

8     fighting.  It's not exactly the issue.

9          **MR. DAY:**  But the title --

10          **THE COURT:**  It's sort of a mirror of it.  Or it's

11     certainly related to it.  I've allowed your motion that

12     she's not to get into the funding of Goldwasser.  And the

13     reason for that is that seems to go to some sort of

14     equitable concern, and we didn't go anywhere with that.  And

15     I don't see the materiality of that.  Now she's arguing

16     under 102(f) --

17          **MS. BEN-AMI:**  Yes, your Honor.

18          **THE COURT:**  -- is it?  She's arguing that in the,

19     in the prosecution history this question was asked,

20     undisputed that the question did, was asked, and Amgen made

21     some response, and she, I assume, wants to argue that that

22     response was inaccurate.  Correct?

23          **MS. BEN-AMI:**  Inaccurate and therefore the examiner

24     didn't know.

25          **THE COURT:**  And that's --

```
 1           MS. BEN-AMI:  And therefore --

 2           THE COURT:  And you're arguing that to show that

 3    that's circumstantial evidence that we ought not pay too

 4    much heed to his expected argument look at everything the

 5    examiner knew.

 6           MS. BEN-AMI:  Exactly.

 7           MR. DAY:  Let me -- may I respond, your Honor?

 8           THE COURT:  Yes.  Why shouldn't she be allowed to

 9    do that?

10           MR. DAY:  For several reasons.  First of all, read

11    the title of the slide.  The title of the slide is her

12    argument.  Second of all, government funding doesn't make it

13    prior art.  That's not what makes it prior art.  The

14    question is whether the government has any rights in this.

15    That's the issue.  And the issue is whether Amgen received

16    any Department of Energy funding, whether Amgen knew of any

17    Department of Energy funding.  There's no evidence in this

18    case that Amgen received any Department of Energy funding or

19    knew of any Department of Energy funding.

20           So what we're doing is we are making an equitable

21    argument.  If there's any issue here, it all goes to

22    inequitable conduct.  It has nothing to do with the issues

23    before this jury.

24           THE COURT:  Yes.  I agree.

25           MS. BEN-AMI:  Your Honor?
```

1          **THE COURT:**  Yes.  Yes.

2          **MS. BEN-AMI:**  The Goldwasser-Miyake paper --

3          **THE COURT:**  Which is in.

4          **MS. BEN-AMI:**  -- it's prior art.  But derivation

5     says when you are given something that you didn't pay for

6     yourself, it's not part of your company, it is prior art.

7     And the tryptic fragments, Table 1, is prior art.

8          **THE COURT:**  I'm not --

9          **MR. DAY:**  This has nothing to do with that.

10         **THE COURT:**  Wait a minute.  I'm not saying you

11    can't argue that.  You can't use these demonstratives.

12         **MS. BEN-AMI:**  Your Honor, I object then to him

13    being allowed to say the Patent Office knew it all.

14         **THE COURT:**  That's a reasonable inference and he

15    may say it.  We'll recess.

16         **MS. BEN-AMI:**  But I can't show that they didn't.

17         **THE COURT:**  Now, with respect, Ms. Ben-Ami, that's

18    not an accurate characterization I take of the record.  I've

19    made my rulings.  You argue in light of my rulings.

20         We'll recess for ten minutes.  We'll recess.

21         **THE CLERK:**  All rise.  Court is in recess.

22         (Recess.)

23         **THE CLERK:**  All rise for the jury.

24         (Whereupon the jury entered the courtroom.)

25         **THE CLERK:**  Court is in session, please be seated.

1          **THE COURT:**  All right, ladies and gentlemen, as I

2     told you, we come now to the attorney's chance to argue

3     directly to you.  And I mean it when I said, this is the

4     highest calling of the attorney, it's the epitome of what we

5     think of when we think of counsel, to stand up on behalf of

6     a client, in front of a jury, the constitutional officers of

7     the American people, and argue your client's cause.

8          Now, I know that you're going to give these

9     attorneys the same courteous and careful attention that

10    you've given all the witnesses and that surely you've given

11    me.

12         I do have one caution.  What the attorneys say now,

13    and it's a frank attempt to persuade you, and that's

14    perfectly appropriate, but what they say now is not evidence

15    of anything.  So if your memory of the evidence is

16    different, or when you get back and reflect on the evidence,

17    your understanding of the evidence is different than what is

18    argued to you now, your memory governs.

19         Now, under the rules of Court, since Amgen brought

20    this case, Mr. Day gets a chance to speak to you last and

21    first we'll speak, we'll hear from Ms. Ben-Ami.  When she's

22    done, we're not going to recess, but we'll just take a

23    stretch break because we need to change our court reporters.

24         So now Ms. Ben-Ami.

25         **MS. BEN-AMI:**  Thank you, your Honor.  May it please

1    the Court.

2           Good morning, ladies and gentlemen.  And first on

3    behalf of my client, Roche, I really would like to thank you

4    for all the hard work you've done and all the patience

5    you've had.  This has been a very long trial with some very

6    big breaks.  And I know it's very hard to try to remember

7    things from one break to the other and keep going.  But, if

8    you just walk through the evidence when you get back to the

9    jury room.  I want you to look at the evidence.  You don't

10   need to take my word for this.  I want you to look at the

11   evidence in this case.  And I believe in many courts, and

12   perhaps in this court, you can ask for the transcripts of

13   the witnesses.  You can't have their expert reports, but you

14   may be allowed to ask for the transcripts.  And if that's

15   the case, they won't have the side bars in them and they

16   won't have the objections in them, so it will be much faster

17   reading than maybe what happened here.  That may help you.

18          So I thank you for your patience.  You have many

19   choices to make over the next few days, or however long it

20   takes you.  You need to choose whether these patent claims

21   are valid or invalid.  You need to choose if there's

22   infringement or not.  So I ask you to be patient and go

23   through the evidence.  Because the evidence in this case,

24   when you take away all the noise and you get down to the

25   bottom line, you will see that we do not infringe and that

1    these, these patent claims are invalid.

2         Now, I started you in this case, I think it was

3    September 4th, somewhere around there, and I told you at

4    that beginning that you weren't going to hear about Roche's

5    product for a very long time.  And I think I, unfortunately,

6    kept my word on that, because only in the last two days have

7    you heard from Roche's witnesses on its product.

8         But what you heard was clear.  You heard about

9    CERA.  You heard both from Amgen's witnesses and Roche's

10   witnesses that it's a new drug, that it's a patented drug,

11   that it lasts longer in the body, that it's not made in

12   cells, and that it works differently in the body.  In short,

13   ladies and gentlemen, CERA doesn't infringe any of the

14   claims of these patents.  It is a new, innovative, different

15   drug.

16        Now, the Constitution, the Constitution of the

17   United States, created the patent system to encourage

18   innovation, not to discourage innovation.  Designing around

19   someone's old patents is perfectly acceptable, it's

20   encouraged.  Learning from the prior art, it's encouraged.

21   And when you make an invention and you have your 17 years of

22   exclusivity it's supposed to then become public, just like

23   the '008.

24        But here, we have a second group of patents, filed

25   at the same time, which now exist, not until 2004, like the

1    '008, but until 2015.  And that is stifling innovation.

2           **MR. DAY:**  Your Honor?

3           **THE COURT:**  No, she may argue the issues in the

4    case.  The patent laws draw the balance between protecting

5    inventorship and not, avoiding stifling innovation.  You

6    don't have anything to say about that.  You just have to

7    follow the law based on the evidence.

8           Proceed, Ms. Ben-Ami.

9           **MS. BEN-AMI:**  Invalid patents stifle innovation.

10   That's what I'm saying.  If a patent's invalid and somebody

11   can walk around and say I'm going to threaten you with this,

12   that stifles innovation.  Because you can look around you.

13   Look at this courtroom.  It's expensive to be a defendant in

14   a patent case.  It's expensive to go ahead and try to stand

15   up to these patents and say no, they're invalid.  So just

16   waving this around stifles innovation, and if it's invalid,

17   that's wrong.

18           Now, Roche here is not trying to sell EPO.  You

19   heard yesterday from Dr. Klibanov that Roche has been

20   selling EPO lawfully for many, many years.  Mr. Gaede

21   brought that out in cross.  It's an old drug.  It's not what

22   we're talking about here today.  It was invented in the

23   '80's.  In fact, it's in your body.

24           We're talking about a different drug.  A drug

25   that's not natural, it's not made in your body.  It's a new

1    drug, has different properties, and it took over eight years

2    to develop.  And Dr. Longmore, Roche's expert medical doctor

3    on infringement, who is the only medical doctor who

4    testified on infringement, Amgen didn't have a medical

5    doctor testify, told you that it is medically materially

6    different than EPO.  So you might -- it might be easy for

7    Roche to just say let's deal with infringement and get out

8    of here.  But that's not your job.  The judge has explained

9    this to you.  I won't tell you what he told you.  That's his

10   job.  It's not good enough, though, because invalid patents

11   stifle innovation.

12           And you now have the evidence.  You're going to

13   have to do more hard work.  But you have the power, if you

14   believe these patents are invalid, to stop this stifling of

15   invention and stop keeping from the public what the public

16   should own.  That is your power.  Because these patents take

17   from the public what the public should own.  They are

18   overbroad and they claim too much.

19           Can I have 94, please.

20           Now, looking at the verdict form, what you are

21   being asked to do is to find these claims invalid and then

22   to check off the reasons that they're invalid.  That's how

23   the verdict form works.  And I think the best way to help

24   you is to actually not make a lot of argument, walk you

25   through the evidence, because I think that's what will help

1     you the most.

2            Can I have 119, please.

3            Now, I will tell you right now, I don't get a

4     second chance to talk to you.  The Court just said Mr. Day

5     goes last.  I don't get to say, well, he's wrong about this

6     or he's wrong about that.  It's the way the system works.

7     So I need you to say, well, what would Ms. Ben-Ami say about

8     that.  You know, how come it wasn't brought out during trial

9     and this is only a new argument or, you know, what's going

10    on here.  Why, why don't I get a chance to respond.  But

11    that's the way it is.

12           So I want to leave you with this thought.  Amgen's

13    going to tell you the Patent Office saw everything, knew

14    everything.  Just don't worry about it, the Patent Office

15    did it.  That's not your job.  The Patent Office did not see

16    the correct pages of the Maniotis book.  If you go back and

17    remember, I believe it was during Dr. Lowe's

18    cross-examination, or direct examination.  And ask for his

19    transcript.  Read his transcript.  It was pointed out they

20    gave the examiner the wrong pages of the Maniotis book.

21           They didn't give the examiner all that

22    Goldwasser-Baron study, those 500 pages of documents showing

23    that Goldwasser did the work first.  They didn't give a

24    correct analysis of the Genentech work showing that it used

25    CHO cells.  They said to the examiner, you know,

1    Mr. Examiner, there's just Genentech's stuff and it shows

2    that you can make glycoproteins that work but it wasn't in a

3    mammalian cell, when in fact it was in a mammalian cell.

4    They didn't tell the examiner what they were really claiming

5    was 165 amino acids, not 166.

6          You might say to yourself, well, how does that

7    happen.  How can you just do this.  All these patents were

8    issued by only one examiner.  You know, it's not like there

9    were 25 different people who allowed this.  One person did

10   it all.  He works on something, then he goes to something

11   else, then he comes back and then he works on something

12   else.  One man.  He can make a mistake.  He can have so much

13   paper in front of him that he is buried.  And you know it is

14   hard to pull out one sentence here or one sentence there of

15   a document.  So if you dump a lot of stuff on the examiner,

16   you know he's not going to see it all.  And what is a

17   patent?  How do you get a patent?  The only one who gets to

18   talk to the examiner is Amgen.  Roche doesn't get to talk to

19   the examiner.

20         So I was trying to think of how to explain this to

21   you.  It's like this.  You've been here for six weeks -- I

22   don't remember -- at trial.  Imagine -- and you've seen

23   witnesses, you've seen them on direct, and then you've seen

24   them say something completely different on cross.  Right?

25   You've seen an Amgen witness say one thing, a Roche witness

1    say another thing.

2         Now, let's imagine a different trial.  Let's

3    imagine a trial where only Amgen gets to put on witnesses.

4    Do you think you'll hear all the information?

5         Let's imagine yet a different trial.  A trial where

6    only Amgen gets to put on witnesses and only their direct

7    examination, there's no cross.  Do you think you get the

8    same information?  That's how the Patent Office works.  They

9    get written documents, only one side.  There's no

10   opportunity to cross-examine.  There's no expert witnesses

11   for anybody else.  And that's why the patent law, the law

12   says patents can be invalidated by a jury of our peers who

13   can look at all the evidence.

14        The examiner never saw these witnesses.  He never

15   saw these documents in context.  And that's why you are

16   empowered to do your job today.  Because you are seeing

17   things that the examiner did not see.  And you are getting

18   explanations the examiner did not get.

19        Now, Amgen's also going to tell you that Amgen's

20   patents fulfilled a long need, that they helped people.  But

21   the simple fact of the matter is, they have never shown you

22   that it was these patents and these claims that are what

23   helped people.  They never put on a witness and said here's

24   my Amgen product and it's covered by this claim or this

25   claim or this claim.  And you remember, Amgen had the '008

1     patent that issued in 1987.  They sold billions of dollars

2     of drugs with the '008 patent.  That's the patent that

3     fulfilled the long need and had commercial success.  These

4     are continuation patents that are broader than that patent

5     and therefore invalid.

6              Also, you remember Dr. Lin.  He was very emotional

7     at times.  This case is not about saying that Dr. Lin

8     receives nothing.  He's received many millions.  But that he

9     receives nothing in patents.  He had that '008 patent for 17

10    years.  And Roche never came into the United States and

11    Roche never tried to say his patent was invalid.

12             Can I have No. 14.

13             You can see right here, Dr. Lin told you what was

14    so special to him was that he made genomic DNA.  Right?

15    That's what he said.  That was special to him.  And the '008

16    patent has claims to genomic DNA.

17             You heard yesterday from Dr. Flavell, Roche doesn't

18    use genomic DNA.  Even for its EPO beta that it makes in

19    Europe.  It uses cDNA, not the thing that Dr. Lin could

20    make, the thing he couldn't make.

21             And you'll look at the '868 patent.  There's a

22    claim there to genomic DNA, too.  No one's questioning

23    whether that claim is valid or not.  It's not asserted in

24    this case.  What's asserted in this case are claims that are

25    broader than what Dr. Lin even said was what he really did.

1    And that's why they're invalid.

2              Now, you have your verdict form, I hope.  Can we go

3    back to the verdict form, which is 94, just for one second.

4              I'm going to discuss with you now the last three

5    defenses and then I'll do the first two.  The first two

6    relate to prior art.  The last three relate to what's in the

7    patent.  And they're very intertwined so I want to go

8    through it with you together as a grouping.

9              Now, can I have 133, please.  Am I blocking anybody

10   by standing here?  No.

11             The Court explained to you that there is a concept

12   of indefiniteness.  And I don't want to mischaracterize the

13   Court's jury instruction, so I ask you to please read it.

14   But a claim is indefinite if you can't tell where it begins

15   and ends, what's in and what's out.

16             To get a patent fairly, you have to look at it in

17   1984 when it was filed and say would a person in 1984 have

18   the right description.  Would a person in 1984 be enabled.

19   Would a person in 1984 see that these claims were definite.

20   Here, the claims are indefinite.  And they are indefinite

21   because they claim human EPO and it's not definite what that

22   is.

23             Dr. Lodish, Amgen's expert, and you can go read his

24   cross-examination, Dr. Lodish admitted that in 1984 no one

25   knew what the amino acid sequence was of human EPO.

1          Can I have 125.

2          This is what I'm talking about.  This claim has

3    been defined as a protein having the amino acid sequence of

4    human EPO, such as the amino acid sequence of EPO isolated

5    from urine.

6          So now put yourself in 1984.  All right?  You have

7    a Ph.D. and a couple of years of experience after that.

8    After all this science maybe you feel like you have a Ph.D.

9    But it's 1984.  And you say to yourself, I need to

10   understand what this claim means because I want to make EPO,

11   but I don't want to make Amgen's.  Okay?

12         You say okay, what's the amino acid sequence of EPO

13   isolated from urine.  Well, Dr. Lodish told you nobody

14   knows.  It's not in the prior art and it's not in the

15   patent.  So nobody knows.  So how do you figure out whether

16   you're in or out of this claim?

17         Then it says, well, protein having the amino acid

18   sequence of human EPO.  So human EPO is a protein having the

19   amino acid sequence of human EPO.  Well, it's 1984.  Do you

20   know what the amino acid sequence of human EPO is?  What

21   does the patent tell you?

22         Can I have 68.

23         It tells you that the amino acid sequence of human

24   EPO is 166.  1 to 166.  Clear as a day.

25         Can I have 67.  Explicit.  Human EPO, 166.  So you

1    say, well, Ms. Ben-Ami, what are you arguing about, human

2    EPO is 166, it's clear as a bell.  But you know Roche makes

3    something that's 165 and then one's changed, it's 164.

4    Amgen says because urinary EPO is 165 they can cover 165.

5             Now, is there a description of human EPO in this

6    patent other than 166?  There's no dispute that there's no

7    description of urinary EPO.  Dr. Lodish, Amgen's expert,

8    admitted it.  Is there a description of 165?

9             I encourage you to go back to the jury room and

10   read the patent.  I want you to read the patent.  Read the

11   patent.  Search endlessly.  You will never find a

12   description of human EPO other than 1 to 166.

13            So today, or in 1999, Amgen says, boy, there could

14   be competition out there, so let me try to get a patent that

15   covers other things than what I described, than what I did.

16   That's why the patent's invalid.  Because this patent

17   discloses only one thing as 165.  And I don't know if you

18   remember what it is.  But it's up there.  Monkey.  And this

19   claim is to human EPO.  Monkey EPO is not human EPO.  We may

20   be close, but we're not the same.

21            What Roche is making that Amgen wants to cover is a

22   variety of things that are different than 1 to 166.  There

23   is no written description of the language that is in the

24   '422 claim 1, and it is indefinite.

25            Can I have 125 again, please.

1          Look at that definition and that claim language.

2     November 1984, the amino acid sequence of EPO isolated for

3     human urine is unknown.  It is without dispute in this case.

4     It's not an argument.  It's undisputed.  The only sequence

5     disclosed for human EPO is 166.

6          In 1987, another company discovered that human EPO

7     could be 165.  And in 1999 Amgen claimed it as its own.

8     That's not right.  It's not described.  You can all go read

9     the patent.  It's not described.  And you know what?  You

10    don't need to have a Ph.D. to be able to see whether it says

11    165 or 166.  165 is monkey.  166 is human.

12          And therefore, because this fence they've now put

13    around, maybe it's 165 today, maybe it's 164, maybe tomorrow

14    when somebody makes 163, it will be 163.  Is it described in

15    1984?  No.  If you claim more than you describe your claim

16    is invalid.  And if there is one patent, ladies and

17    gentlemen, that you absolutely must invalidate, it is this

18    '422 patent because this patent doesn't even claim

19    recombinant DNA.  This patent claims natural cells, the '422

20    patent.  Go back and look at '422 claim 1.  It says that,

21    purified from mammalian cells grown in culture.  It doesn't

22    say recombinant cells.  It doesn't say with foreign DNA.

23    Any cells.  Your cells.  Tumor cells.  Any cells.  It's not

24    even what Lin invented.  That's why the patent's invalid.

25    And that's why it's stifling innovation because it is being

1    claimed to cover things that Lin did not do or know.

2         Amgen's going to tell you, oh, it's in there, it's

3    in there, if you do the experiment maybe you'll get it,

4    maybe you won't.  Not good enough.  They tell you it's,

5    Figure 6 is 166.  And then they say maybe you'll get 166,

6    maybe you'll get 165.  He didn't know.  He knew it was 166.

7    That's what he claimed.  That's what he should have claimed.

8    That's what he should have covered.  This patent is invalid,

9    that '422 patent.  Because you can't do that.  You can't

10   take what other people teach you later and claim it.  And

11   that was only disclosed in 1987 by someone else.  And then

12   they claimed it.  That's wrong.

13        I'm going to talk about the '349 patent very

14   briefly.  132.

15        There's one thing I want you to focus on.  And one

16   thing also -- only.  This is the claim for EPO, the

17   erythropoietin determined by radioimmunoassay.  And this

18   claim is not enabled.  The judge told you if it doesn't

19   work, you follow the recipe, it doesn't work, it's not

20   enabled.  This is undisputed evidence, there's no evidence

21   to the contrary, this claim can't work and it can't work

22   because this radioimmunoassay picks up fragments.  It can't

23   tell you whether it's EPO or an EPO fragment.  And that's

24   what Dr. Flavell told you.  It's undisputed.  They couldn't

25   put somebody up on the stand to say the opposite.  It's not

1    enabled because you can't determine that it's EPO by RIA,

2    because the RIA doesn't tell you whether it's EPO.  It could

3    be something else.

4         Now, let's go to the prior art.  The prior art.

5    146.  You will have a list, I believe, of what we assert is

6    prior art.

7         I would like you to look at the Egrie reference.

8    Amgen published its work before it filed its patents and

9    therefore the patents are invalid.  That's the law.  The

10   invention date as the Court has instructed you is the date

11   of the filing of the patent.  It's November 1984.  And Amgen

12   filed --

13        Can I have 149.  This is Exhibit 2079.  And I would

14   ask you to go back and read it in the jury room.  2079.

15   When you look at 2079 you will see that in October of '84,

16   almost two months before they filed the patent application,

17   they disclosed the work.  And if you publish it before it's

18   invalid.  Now, they had already filed things for the '008.

19   But these patents, these continuations were filed later.

20   It's a very simple point.  It covers everything.  It's got

21   everything in it.

22        Let's look at 123.

23        All the other claim elements.  We have Goldwasser,

24   we have Miyake, we have Essers, we have Eschbach.  All of

25   these arts taught you that people were using urinary EPO and

1   giving it to patients and that anticipates the product

2   claims.  The product claims are to a product, not how

3   they're made.  They're made to a product.

4           So let's look at 19.

5           Amgen admitted that the Miyake paper -- that's

6   Miyake and Goldwasser.  Remember Miyake and Goldwasser?

7   They gave their stuff to hamsters.  And they said, yes, it

8   increased hemoglobin.  So they gave a composition.  We know

9   it was suitable for humans because then they gave it to

10  humans.  Composition.  Gave the human EPO.  Had the right

11  effect.  Claims to that are invalid because they were done

12  before by someone else.  Very simple.  You can't take away

13  from the public what the public already was taught.  Miyake,

14  Goldwasser, they did this already.  And now Amgen says no,

15  no, I own it.  They're taking away from the public what the

16  public should own.  And then Goldwasser and Dr. Baron, you

17  saw this videotape, they did a clinical study.

18          Can I have 26.

19          They did it in humans.  And it worked.  Use your

20  glossary.  That's the Court's construction.  Look at

21  therapeutically effective.  All these factors are

22  therapeutically effective.  And you only need one.

23          27, please.  Hematocrit went up.

24          So what does Amgen say?  They had this evidence.

25  They had it when they were doing their own work.  Dr.

1    Goldwasser gave it to them.  That's undisputed.  What do

2    they say?  They hire a doctor who looks at --

3           Can I have 30, please.

4           You remember Mr. Fleming, he had that big, all the

5    data, and there was a doctor and he said he only looked at

6    this little bit of data.  And he said, oh, looking at a

7    little bit of data, I don't know if it worked or not.  Is

8    that a fair scientific test to you, not to look at all the

9    data?  Goldwasser looked at all the data.  Baron looked at

10   all the data.  What did they find?

11          24.  Dr. Baron, as verified by Dr. Spinowitz.  Dr.

12   Baron told the FDA it worked.  He didn't work for Amgen.  He

13   didn't work for Roche.  He's reporting his results.

14          No. 23.  Dr. Goldwasser.  He tells the same thing.

15   It worked.  They're telling you it didn't work.  But Baron

16   said it worked.  Goldwasser said it worked.  And amazingly

17   enough -- 25 -- Amgen said it worked.  Before there was any

18   litigation, before they realized that it might invalidate

19   their patents.  That's how you know when the truth comes

20   out, right?  Before they realize that it might hurt them in

21   the litigation, people say things that sometimes are the

22   truth.

23          What do they say?  It worked.  Now they're telling

24   you it didn't work.

25          It's clear, Baron told the FDA, Goldwasser told the

1    government, and Amgen told the government that it worked.

2    That's clear and convincing evidence.  Because these are

3    three independent entities.  They all said the same thing.

4    They all looked at the data.  And all the evidence you have

5    to the contrary is a fellow who looked at it for two weeks,

6    looked at five percent of the information and says, oh, I'm

7    not sure about that.

8         So Amgen, that's not good for Amgen because they

9    said it worked.  So what do they say.  Oh, urinary EPO is

10   not the same as human EPO.  This is an interesting concept

11   because they claim the amino acid sequence that's the same

12   as urinary EPO.  But now they're saying urinary EPO is not

13   the same as human EPO.  I don't understand that.

14        They try to tell you there's different sugars.

15   They're talking out of both sides of their mouth here.

16        What do they say?  119.  They say, oh, the sugars

17   are different.  Do you remember the sugars are different.

18   Oh, yeah.

19            I'm sorry, 113.

20        But they had to admit that most of their data on

21   the sugars, they told you it's wrong.  They admitted it's

22   wrong.  It's still in the patent though.

23        36.  And they say, oh, well, if you do these tests

24   they show they're different.  But here we have the evidence.

25   Look at the evidence.  Exhibit 2060.

1          35.   Exhibit 2058.   These are Amgen documents where

2    they're saying they're the same.   They're publishing that

3    they're the same.   You know what to believe.   This is clear

4    and convincing evidence.

5          So we have to go to obviousness very briefly.   I

6    have to ask you to go back and read Dr. Lowe's testimony.

7    It was three days.   I can't recap the whole thing for you

8    here.   But I will tell you this.

9          Can I have Table 1, which is 39.

10          You have a very fundamental issue here.   And this

11    is the issue for you decide.   You know this table, this work

12    was done by Dr. Goldwasser.   And he was not an Amgen

13    employee.   And every single witness has said that you needed

14    Goldwasser's protein to make this invention.   The evidence,

15    clear as a bell, says the only reason someone else didn't do

16    it is because Goldwasser only gave this protein to Amgen.

17    And if you had the protein, remember Dr. Lowe, if you have

18    the protein you would make the DNA and everything else is

19    easy.   And you know it's in these books.   Remember the

20    books?   Lin went to the public library, was told what cell

21    to use, he used these documents, and he did exactly what the

22    book said to do.

23          Fifty-six.

24          And he said the techniques he used they weren't

25    innovative at all.   He admitted it.   It took him one hour to

1    design those probes, because they had all been done before.

2    And yet now the claims cover people until 2015.  This was

3    done years before.

4              Forty-seven.

5              Remember Dr. Lowe.  You probably forgot about him

6    at this point.  But remember Dr. Lowe.  He told you exactly

7    how it works.  Please go back and read his testimony.

8              So I have very few minutes left.  And I want to

9    talk to you about infringement.  Dr. Flavell told you

10   yesterday that for the process claims --

11             Can I have 136.

12             Remember that picture?  He told you there's no

13   literal infringement of the process claims because Roche

14   used a different process, not isolated DNA, but protoplast

15   fusion, to make its initial process.  If you look at claim

16   6, claim 6 says that you have to use the mature DNA and

17   that's for 166, and then take out the 166, and Roche takes

18   out 165.

19             Then look at what has happened to the product.

20             Can I have 1 -- No. 10.

21             Read Dr. Torchilin's cross-examination.  Because he

22   admitted over and over again that this is a different drug.

23   It is a new chemical entity.  That's their expert.  And he

24   said it's a different size, it's a different structure.

25   Just read his cross-examination.

1          Every expert admitted that CERA is not made in a

2    cell, which every claim in this patent requires.  All these

3    patents require.  Made in mammalian cells, made in mammalian

4    cells, made in CHO cells.  CERA is not made in any cell.

5          114.  And Amgen's entire case rests on this one

6    sentence in this one document where they read to you and it

7    says, oh, it's got the same amino acid sequence.  Well,

8    ladies and gentlemen, when you read half a sentence you only

9    get half the story.  Read the next sentence.  Dr. Farid

10   explained it to you.  Dr. Klibanov explained it to you.  It

11   starts with the same order and then it's changed.

12          And -- 100.  You don't need to believe me.  Dr.

13   Lodish and Dr. Torchilin both testified that there is a

14   deletion in the molecule.  It is not simply an addition.

15   Dr. Klibanov told you this is a new molecule, but there is a

16   deletion.  So when you look at that '933 patent for

17   infringement, and it says I claim the glycoprotein that's

18   expressed by the cell, even putting aside the pegylation,

19   there is a deletion.  Both their experts admitted it.  It's

20   a change in a bond and a deletion.  And if, the judge said

21   even one element is missing there is no literal

22   infringement.

23          But there's more.  Can I have 115.

24          Roche does not have the same amino acids as Amgen

25   claims because Roche through its pegylation process created

1    a new, nonprotein, nonnatural amino acid.  And Dr. Klibanov

2    went through that with you yesterday.  He explained it to

3    you.  The charge is different.  The side chain is different.

4    It's not found in nature and it's not found in a cell.  So,

5    there is no infringement.

6          And how material is the change.  You don't need to

7    get -- you could get to it anyway, but there's no literal

8    infringement.  But how material is the change.

9          No. 13.  Go back and read Dr. Torchilin.  Better

10   pharmacokinetics, better for the patient.  That's their

11   expert.  That's their expert.

12         Seventy-eight.  These are old pictures.  Dr.

13   Longmore didn't have a haircut.

14         Look at Dr. Longmore.  The only medical doctor you

15   heard from.  What did he tell you?  This longer half-life

16   has an effect on patients.  It is materially, materially

17   changed.  And he's an M.D. who treats patients.  So their

18   own experts said that it's better.  He says it's materially

19   changed.  It changes how it works in your body.  It is not

20   EPO.  It is not that drug they made in 1984.  It wouldn't

21   work differently if it was the same drug.

22         Can I have 3, please.

23         Different amino acid sequence.  Interacts with the

24   receptor differently.  Lasts ten times longer.  Taken once a

25   month instead of three times a week.  Double the molecular

1    weight.   Different charge.   How can they be the same?

2            Stifling innovation.   That's what this case is

3    about.

4            Look at those differences.   Pegylation isn't in

5    this patent.   Pegylation is nowhere to be found.   Roche

6    spent eight years developing a second-generation product, a

7    better product.

8            Can I have 95.

9            And these patents have been used against it, to

10   spend all this money.   And you know why we're here.   You

11   have the ability to decide.   This is your choice to decide.

12   Are we infringing or are we not.   Is this a new drug or is

13   it not.   Are these patents valid or are they not.

14           You know what you need to do here, ladies and

15   gentlemen.   Because this is different, different as can be.

16   And this is the way I would ask you to go ahead and fill out

17   your form.   Because it works differently in the body.   It

18   does different dosing.   It's got different charge.   It has

19   deletions.   It's got different amino acids because of the

20   change.   It's just not what Amgen did.   But Amgen wants to

21   stop us.   Thank you.

22           **THE COURT:**   All right, let's take a brief stretch

23   break and let the court reporters change.

24           (Whereupon there was a change in court reporters.)

25           **THE COURT:**   We'll be in order.   Please be seated.

1    Mr. Day?

2         **MR. DAY:**  Thank you very much, your Honor.  And

3    thank you, ladies and gentlemen, for your considerable

4    attention and your interest.  This has been a long haul, but

5    we are down to the end.  And I think that as we come to the

6    end, I want to suggest to you that there are four truths,

7    four truths that decide this case.

8         Now, as Judge Young has made very clear to you,

9    you're the judges of the truth.  You're constitutionally

10   empowered.  You have a charter, and that charter is to get

11   to the truth.  You're not chartered to make choices.  You're

12   chartered to apply the law to the truth.  And we trust that

13   our citizens who listen and apply their common sense are the

14   best judges of the truth, and that's why we entrust this

15   decision with you.

16        There are four truths here.  The first truth is

17   that before Dr. Lin's inventions, there was a pressing need

18   that had gone for decades unmet; desperately ill patients

19   all over the country looking for some cure to their anemia.

20   The truth is that that need was met as a result of the

21   inventions of Dr. Fu-Kuen Lin.  The inventions.  Not one

22   invention, not two inventions; seven different inventions.

23   All patented.

24        He invented tools that enabled him to make a new

25   molecule, a recombinant form of human erythropoietin, which,

1    when administered to patients, when that protein, that

2    glycoprotein is given to patients, it cures and corrects

3    their anemia.

4         What were the tools that he invented to accomplish

5    this?  He developed means to isolate the DNA from our bodies

6    that encodes that protein.  He found that DNA, and he took

7    that DNA, and he developed cells that could use that DNA and

8    could be grown in a process that can be conducted in a

9    factory to produce a miraculous drug that never before

10   existed, a recombinant form of human erythropoietin, which,

11   when give to people, corrects their anemia.

12        What's the third truth?  The third truth is that

13   Roche wants to take and use all of Dr. Lin's inventions to

14   make a drug they call Mircera.  They call it an improvement.

15   They say they have a patent on it.  They say they've added

16   pegylation to EPO.  None of that matters.  What matters is

17   they are taking and using Dr. Lin's inventions without

18   permission.

19        And what's the fourth truth?  The fourth truth is

20   that Mircera will not work and cannot be made without

21   Dr. Lin's inventions.  Take away the EPO and you have

22   nothing but an inert polymer with no therapeutic effect.

23        Those truths decide this case.  And the question is

24   has Roche shown you anything in this case, anything that

25   takes away from those truths?

1          Now, the Court has instructed you with respect to

2    the issues of validity, that the patents are presumed to be

3    valid.  So as constitutional officers, let's talk for a

4    moment about how do you get to the truth in this case?

5    What's the process that you follow, as instructed by the

6    Court?

7          You presume the patents are valid.  And you look to

8    Roche and you say, Roche, where is your evidence?  Where is

9    your clear and convincing evidence that elicits in me an

10   abiding conviction that it is highly probable, highly

11   probable that Lin didn't do these things, that Lin didn't

12   make these inventions, that someone before Lin made these

13   inventions, that Lin did not describe, in his patent, the

14   recipe for making human EPO?  Where is the clear and

15   convincing proof of that, Roche, that elicits in me an

16   abiding conviction that it's highly probable that you're

17   right, that that is the truth, the Patent Office got it

18   wrong?

19          How do you get at that truth?  As citizens of this

20   country, you do what we all do; you apply your common sense,

21   your reason, your logic, your experience, your judgment,

22   your discernment.  What did you see and hear?  What evidence

23   came before you?

24          Now, the Court has instructed you that you are to

25   go back in time to 1983 and 1984, and you are to put

1    yourselves in the shoes of one of ordinary skill in the art

2    at that time.  Now, that's not -- that's not a carpenter.

3    That's not an airline pilot.  That's someone who worked in

4    this field at that time.  What did they know and what could

5    they do?

6           When you make that judgment, you don't get to apply

7    a hindsight bias.  What's a hindsight bias?  Well, it

8    doesn't look like the Red Sox are going to make it to the

9    series today.  Doesn't look like that.  A week ago it sure

10   did, right?  A week ago they were up by one and things were

11   looking great.  Now they're down three to one, things don't

12   look so great.  Well, we have a hindsight bias about what

13   the future holds for the Red Sox that we didn't have a week

14   ago.  You have to strip that all away.

15          So as constitutional officers, to get to the facts

16   here, how do you do that?  What evidence do you weigh and

17   consider?  What's the best way to get back to what was the

18   truth in 1983, '84?  I suggest to you, ladies and gentlemen,

19   the best way to get to the truth of what happened in 1983,

20   '84 is to talk to the people who were there.

21          Who were the witnesses that came into this

22   courtroom who actually tried with their own hands to do the

23   work that's described in these patents?  Who was the patient

24   that could tell you what it was like to suffer from anemia

25   without a cure?  Nancy Spaethe.  Who was the doctor that

 1    told you he had looked for decades for a cure for his

 2    patients, only to find miraculously that Lin's recombinant

 3    EPO provided that cure?  Eli Friedman.

 4         Who was the Harvard professor that told you that he

 5    was pretty hot stuff, he'd been cloning genes for seven,

 6    eight years, never had a failure, pretty good, thought he'd

 7    clone EPO and failed?  Stuart Orkin.  Who was the inventor

 8    that came and sat in this chair and answered every question

 9    that Roche had to ask about the work, who explained his

10    invention to you, explained what was new and what was

11    different, why it was so perilous, given the radiation

12    hazard, and yet why it was so difficult to do what he did?

13    Fu-Kuen Lin.  Who was his coworker that came and described

14    how that DNA was taken and put in cells to express a whole

15    new molecule and develop a process that could produce that

16    molecule in abundance so it could be safely and commercially

17    administered to people?  Jeffrey Browne.

18         Who was the glycobiologist who came and explained

19    to you what the significant differences are between

20    recombinant human erythropoietin and all the products of the

21    prior art?  Why, structurally, because you make this protein

22    in an industrial process under controlled conditions where

23    the environment is very different than your human body or

24    your urine, you get a molecule that has a very different

25    structure?  Ajit Varki.

1           And who was the MIT professor who came in and

2      explained to you why the description in the patent informed

3      all of those of ordinary skill in the art exactly how to use

4      what Lin taught and get what Lin described as human EPO?

5      Laid out the entire recipe.  Take this DNA that encodes

6      human erythropoietin, put it in these cells, grow them up,

7      you'll get a product and the product of that expression is

8      what?  What's it say in the patent?  Column 28, 26, 27, over

9      and over again, 14 times, the product of that expression is

10     called human erythropoietin.

11          Now, you can listen to those witnesses.  They were

12     there.  They were on the ground.  Ask someone, let's say you

13     want to learn what does it take to hit a home run in the

14     World Series?  What's it take?  Well, you can go to a minor

15     leaguer.  He's got a bat, he's got cleats, he has a

16     baseball, and he's read, "The Art of Baseball."  Or you can

17     go talk to Manny Ramirez.  Who knows what it takes?

18          Roche brought in four witnesses to talk to you.

19     Dr. Lowe, what was he doing in 1983, '84?  Finishing medical

20     school.  Had never cloned a gene, never worked with a

21     genomic library, but he read Maniatis and, boy, he could do

22     it.  Anybody could do it.  It was simple.  Stuart Orkin must

23     have been a fool.

24          Carolyn Bertozzi, she was in high school in '83,

25     '84.  Never worked with EPO until this case when she read

1     all about it.  Did she come in and elicit in you a clear and

2     abiding conviction that any prior art product is identical?

3     Did she show you any experiment?  Did she prove that to you?

4          You're constitutional officers here, and you're

5     setting a standard for what it takes to prove something true

6     in this country.  Is it speculation and guesswork?  Or is it

7     proof?  That's your role as jurors, to make those decisions.

8     You have to weigh the evidence.  You have to consider the

9     credibility of the witnesses.  You have to consider the

10    opportunity that you have had to personally observe and

11    weigh and hear what each witness had to say.  And then you

12    have to judge, What was their perspective?  Were they

13    standing on that corner when the car went through the

14    intersection or were they back in Dallas and they simply

15    read about it in the newspaper ten years later?  Who are you

16    seeing and listening to in this case?  Ask that question.

17    Not only in the validity case, but also in the infringement

18    case.

19         Let me take you through my slide show.  You

20    remember Nancy Spaethe, she told you before recombinant EPO

21    there was nothing available, and she struggled with anemia

22    for over 20 years.  You remember Eli Friedman, a

23    nephrologist from Brooklyn who has treated patients for 44

24    years, and came and testified here about what it was like

25    before and what it was like after, and what a miraculous

1    change Dr. Lin's inventions made in the treatment of

2    desperately ill patients all over the country.

3           You remember Stuart Orkin.  The Court asked him,

4    "So, how did you do up until 1983 trying to clone the EPO

5    gene?

6           "THE WITNESS:  Unfortunately, we failed.  My

7    opinion is that it was exceedingly difficult.  If it hadn't

8    been so difficult, I think we would have succeeded

9    ourselves."

10          And why?  Because he had the best resources and he

11   had the best people and he had the best lab.  That's what he

12   told you.

13          And you remember Dr. Fu-Kuen Lin, who ran the

14   project at Amgen, cloned the gene, and supervised all of the

15   work that was done to turn this into a commercially viable

16   product, to develop the process for making human recombinant

17   EPO, and for inventing a new recombinant form of EPO that

18   actually works in the body to cure anemia.  He began working

19   on the EPO project at Amgen in 1981.  And he spent two and a

20   half years trying multiple approaches until he developed a

21   pioneering approach to isolate the EPO gene.

22          Remember, he talked, he didn't just use one

23   approach, he tried every approach he could think of.  He

24   tried expression cloning.  Remember, he said, I didn't need

25   the protein sequence to do expression cloning.  He tried

1    cDNA cloning.  Remember, he said, I needed to get a source

2    of message in order to do cDNA cloning.  I had to find cells

3    that produced a lot of EPO in order -- I looked all over the

4    country, I couldn't find them.  And then he tried his last

5    choice, gDNA cloning.  Why was it his last choice?  Because

6    it was the hardest.

7           You know, my brother's a fisherman, and he fishes

8    off the jetties and he fishes off the boats.  But ten years

9    ago he got pretty bold and he decided he'd start going surf

10   fishing.  He'd wade out into the surf with his fly rod.

11   There are not a lot of people out there, but you know what

12   he discovered out there?  He discovered that the bass run

13   just beyond the surf line.  And he's had the best time of

14   his life out in the ocean all by himself.  No one else is

15   out there with his surf rod.  He had the audacity to do

16   something others couldn't do.  What did he discover?

17   Something that nobody knew was out there; blues, running

18   just beyond the surf line.  That's what Lin did.

19           "Why do you believe you were able to clone the EPO

20   gene?

21           "Because I took an approach no one had taken

22   before."

23           No one had the audacity to wade into the difficult

24   waters in the deep, dark sea that Lin went into.  You go

25   into the genome and it's a real morass, you may never get

1      out.  And no one else wanted to try, including Stuart Orkin.

2           Remember, we talked about all the variables that he

3      had to resolve.  One of the big problems about EPO, going

4      into the genome, was that the EPO amino acid sequence was so

5      degenerate, that means that there took so many different

6      probes, so many different possible nucleotide sequences

7      could encode that protein, that you had to have hundreds of

8      probes.  You couldn't just take one; you had to have

9      hundreds of probes for any given piece of the sequence.  And

10     the more probes you put in, that created a big risk of false

11     positives.  Because each of those probes, there's only one

12     that's right.  And the other 160 that are wrong can all

13     hybridize to something else, and then you've got to go

14     figure out what's this mess.  That's the problem of false

15     positives.  And that's why you don't want to use gDNA

16     cloning, because it greatly increases the risk of false

17     positives.

18          "What was innovative about your genomic cloning

19     approach, if anything?"

20          Remember, Ms. Ben-Ami just told you, there was

21     nothing innovative about this.  And she pointed to testimony

22     where Dr. Lin said it wasn't innovative to use fully

23     degenerate probes, that had been done before.  What was

24     innovative?  "It's the combination of all these things put

25     together to make it work in the complete -- in the complex

1    human genomic background, that's what is make it to work."

2         That's what was innovative, putting it all together

3    and getting a solution out of it, not giving up after

4    failure after failure after failure, working and working

5    until you get it right.

6         What did you learn from Maniatis?  Nothing, because

7    there's nothing in Maniatis that tells you how to do that.

8    Nothing.

9         What did Orkin say about Lin's work?  "I believe

10   the approach he used at that time was quite a novel one.  It

11   was not one that, frankly, occurred to us in my laboratory."

12        And what about Dr. Leroy Hood, the inventor of the

13   protein sequenator, the microsequencer you can take a

14   machine and put little pieces of protein in and get a

15   sequence out?  What did he say about Lin?  "To my

16   knowledge" -- you saw him by deposition.  He did not appear

17   here live.  "To my knowledge, this was the first, if -- one

18   of the first, if not the very first, rare message genes that

19   was cloned and it required, it required a different strategy

20   than people like myself talked about for the abundant

21   messenger RNAs."

22        This was a pioneering breakthrough because EPO was

23   so difficult to clone you had to develop a whole new

24   approach to get to it.  And Lin was the only person that did

25   that.  And as a result, he was awarded seven different

1    patents by the U.S. Patent Office.  He was awarded patents

2    on the DNA.  He was awarded patents on cells that

3    incorporate the DNA into which you place the DNA.  He was

4    awarded patents on processes that use those cells to produce

5    erythropoietin.  And he was awarded patents on the

6    recombinant human protein that is produced by that process

7    or by those cells.  And the Patent Office determined that

8    each of those was patentably distinct.

9         Now, let me stop here for just one second.  I want

10   to just clarify a couple of facts to you about this patent.

11        Ms. Ben-Ami said the same examiner issued every

12   patent.  I urge you to go back and look at the prosecution

13   histories of these.  You'll find them at trial exhibits

14   2011, 2012, 208 -- that's 2008, 2011 -- 207, 209.  Scores of

15   different examiners worked on these.  Just thumb through

16   them.  There wasn't one examiner, there were scores of

17   examiners who examined these patents not once, they examined

18   these patents over a period of 13 years.  And the examiner

19   who issued them, Martinell, is a Ph.D. in biology, as you

20   will see in these prosecution histories.  These patents were

21   given the most rigorous, thorough examination of any patents

22   in the Patent Office.  That's what those prosecution

23   histories will show you.  Just look at them.

24        And one more thing.  Ms. Ben-Ami said that the

25   Court has instructed you what the invention did.  The Court

1    hasn't given you an instruction on that.  When you read this

2    patent, and you look at the dates of the filing in here,

3    you'll see a date that says filed, up here, but then you

4    have to go down here to see when the applications were

5    filed, the original application for this patent.

6         **MS. BEN-AMI:**  Your Honor, I object.  That's

7    contrary to your instruction.

8         **THE COURT:**  Yes.  If I have to say something

9    further on that, I will.  Let's move on, Mr. Day.  Go ahead.

10        **MR. DAY:**  When you look at the patent and you look

11   at the date of the application --

12        **MS. BEN-AMI:**  Your Honor, I object.

13        **THE COURT:**  No, sustained.  Move on, Mr. Day.

14        **MR. DAY:**  So what did Goldwasser do?  Ms. Ben-Ami

15   tells you that, Well, Goldwasser provided the solution here.

16   What did Goldwasser do?  What do you know from this?  Well,

17   you know in 1997 he taught the world how to purify EPO from

18   urine.  He took his recipe and he published it.  That's what

19   he did.  He testified that he taught others how to do this,

20   not just by his publication but by going to other labs.  And

21   he made that EPO that he purified available to others.

22   That's what Goldwasser did.  He obtained permission to

23   collaborate with --

24        **MS. BEN-AMI:**  Objection, your Honor, based on your

25   ruling.  Your Honor --

1          **THE COURT:**  No, he may argue it.

2          **MR. DAY:**  He checked with the University of

3    Chicago.  They told him that he could collaborate with

4    Amgen.  He gave his urinary EPO to other scientists.  Here's

5    the log, in evidence, Trial Exhibit 16, that shows you that

6    he handed it out freely.  He didn't charge anybody.  He gave

7    it to the NIH and he gave it to other scientists.  Just take

8    a look at that.

9          He also told you that no one but Amgen asked him

10   for urinary EPO to sequence.  Yeah, there were people he

11   didn't want to work with because he didn't trust their

12   integrity, but that doesn't mean he refused to work with

13   anyone who asked.  And what, at the bottom, did he tell you?

14   He told you that he did not know how to do any of the work

15   that Lin did.  He's not the inventor on these patents.  He's

16   a supplier.  He's a supplier of information and tools that

17   Lin used, just like all the other tools that Lin used, to

18   make his inventions.

19         You know, I think you're all familiar with a

20   Picasso painting about the civil war in Spain, Guernica.

21   Picasso painted it in half an hour.  The paints he used, he

22   didn't make the paints.  The canvas, he didn't make the

23   canvas.  The paint brushes, he didn't make the paint

24   brushes.  Roche's argument to you is paint brushes, those

25   are known in the art.  Paint, that was known in the art.

1    Canvases, that was known in the art.  Picasso did this all

2    in half an hour.  It would have been obvious.  No, it was

3    brilliant.  It was an act of inspiration.

4          Lin didn't do this in half an hour, as you all

5    know.  He took two and a half years to do this, at great

6    personal sacrifice over an extraordinary amount of time.

7          I want to jump through to just a couple of other

8    points then.  I want to address obviousness.  The Court's

9    given you an instruction on obviousness.  You are to follow

10   it.  Roche's expert admitted that all of the evidence that

11   he showed you was given to the Patent Office.  The Patent

12   Office saw all this and reviewed it.

13         Was Lin's claim process obvious?  Well, you have to

14   look and ask yourself, Do any of these prior art references

15   read on every limitation of the claims?  Goldwasser never

16   isolated EPO DNA sequence.  He didn't do that.  So if you

17   take the '868 claim or the '698 claim and talk about a

18   process, Goldwasser had no process for making EPO that used

19   an isolated EPO DNA sequence, and nobody else did.

20         Was his product obvious?  Well, Goldwasser, you

21   know, Goldwasser had urinary EPO and Roche tells you that it

22   was the key.  But the problem is that urinary EPO is not the

23   same product, and it's -- the same product that's claimed.

24   Because the claim requires that this be a product of the

25   expression of an exogenous DNA from a -- in a cell.

1    Goldwasser didn't do that.

2         What did Goldwasser do?  Let me just jump through

3    what Goldwasser did.  On the left, Goldwasser purified EPO

4    from human urine, from patients.  Lin invented an industrial

5    process to make manmade EPO.  And to do that, he had to use

6    the EPO DNA.  And what did Varki tell you?  He told you that

7    urinary EPO was different from EPO produced by mammalian

8    cells grown in culture because the cell types differ, the

9    environment differs, the cells that make it differ, and the

10   environment in which it's excreted is different.  And all of

11   that changes the protein.

12        The patent explains that difference.  Lin found

13   that difference and he showed it to you in the patent,

14   column 28.  That difference is also confirmed by IEF

15   analyses that show, in the top bands, what we see here are

16   two recombinant EPOs.  On the right we see urinary EPO.  All

17   natural EPO.  Every species of urinary EPO.  And notice, it

18   is not the same as recombinant.  And on the left, you see a

19   purified urinary EPO.  Clearly distinct products.

20        Strickland showed you his IEF gel where he compared

21   Goldwasser's urinary EPO on the top to Lin's recombinant EPO

22   on the bottom, on IEF.  Clearly different products.  And

23   then Varki came in and Varki explained to you how the Dionex

24   analysis of urinary EPO, Goldwasser's EPO on the top, has

25   significantly different sugars, a lot more of them, plus

1    sulfates that Lin's product doesn't have.  Lin's is cleaner,

2    and more effective.  And he showed you or told you, at

3    least, that none of those bands overlap.  There's no

4    identity between the products at all.

5         What did Dr. Bertozzi tell you?  She looked at some

6    of the evidence, SDS-PAGE, but she didn't look at IEF or

7    Dionex, didn't even comment on it.  She didn't perform any

8    experiments to show that they're the same.  That's not clear

9    and convincing evidence, ladies and gentlemen, that raises

10   an abiding conviction in anyone that these patents are

11   invalid.  And that's why, when you get to the verdict form,

12   your answer on anticipation for the '933 is valid.  And your

13   answer on obviousness for the '422 patent, EPO purified from

14   mammalian cells grown in culture, the '933 patent, a

15   non-naturally occurring EPO glycoprotein product of the

16   expression of a cell transformed with a DNA, and all the

17   process claims, is valid.

18        Let me just talk now about -- I'm going to jump

19   ahead here and talk for a moment about inadequate written

20   description.  The Court's instruction is that written

21   description can be analogized to a recipe.  Dr. Lin

22   adequately described his inventions because his patent

23   provides the recipe for making human EPO.  Just read the

24   patent.  The patent describes the complete DNA sequence for

25   human EPO, and the sequence of amino acids it encodes, and

 1     it gives you a recipe to use that to make a variety of cells

 2     capable of producing human EPO.  And it successfully shows

 3     you how to make that product.

 4          Roche claims the patent only describes human EPO as

 5     166 amino acids.  That's their claim, okay?  They argue

 6     that.  But they ignore the Court's definition.  Human EPO:

 7     A protein having the amino acid sequence of human EPO such

 8     as the amino acid sequence of EPO isolated from human urine.

 9     And what did the judge say about that definition to you?  He

10     said, and I quote, "That definition doesn't say anything

11     about 165 or 166."  That's their definition, not the

12     Court's.

13          The patent specification defines the product of

14     Example 10 as human erythropoietin.  Go and read Example 10,

15     here's what you'll see:  Culture fluids from CHO cells

16     contained recombinant human EPO with immunological

17     properties.  It goes on and talks about a representative

18     production of human EPO, and another representative

19     production of human EPO.  When you take Lin's inventions and

20     you follow his process, the product of the expression of

21     those cells is human EPO.  That's why the claim, '422,

22     claim 1, requires human EPO purified from mammalian cells

23     grown in culture.  And it's described right here.

24          And Dr. Lodish told you, with respect to

25     definiteness, that the Court's, applying the Court's

1    instruction on definiteness, that the claim is quite

2    certainly definite.  One of skill in the art reading the

3    patent would understand very clearly what human EPO is, and

4    what is within and outside the fence.

5          Let me talk now about infringement.

6          Can you bring up -- thank you.

7          This is what you need to know to decide the

8    infringement case.  Mircera contains Lin's patented EPO

9    glycoprotein.  Amgen says it does; Roche says it doesn't.

10   We'll see.

11         The EPO glycoprotein in Mircera is produced using

12   Lin's patented processes.  Again, Amgen says it does, their

13   FDA filing says it does, Roche says here it doesn't.

14         The EPO glycoprotein in Mircera is not materially

15   changed, and you'll see why.  And Mircera won't work without

16   the product of Lin's patented processes.

17         Amgen's evidence are all of Roche's admissions as

18   submitted to the FDA in their license application, in their

19   IND, and all of their internal regulatory reports and

20   e-mails where, before this litigation, they candidly said to

21   one another and to the FDA that the product they called

22   peg-EPO, not CERA, contained epoetin beta, unchanged.

23         Amgen's experts, Dr. Lodish, Dr. Benet,

24   Dr. Torchilin.  Who did Roche bring to this case?  Did you

25   see Roche's inventor come and testify on the stand,

1    Mr. Bailon?  Did he come in and answer Amgen's questions?

2    Did you see Dr. Haselbeck, the clinical development leader,

3    the preclinical development leader responsible for bringing

4    this product along come in and testify?  Did you see any

5    witness from Roche that Amgen didn't call?  Amgen called

6    Dr. Farid, not Roche.

7            Did you see Roche put on any fact witness to tell

8    you what their product was?  No.  You saw three paid

9    experts -- Dr. Klibanov who testified 15 times as a paid

10   expert in the last four years -- come in and tell you

11   Roche's story.  Why did you see paid experts and not Roche's

12   employees?  Because Roche's employees, if they told you the

13   truth, would have to tell you what Roche had said to the

14   FDA, what Roche had said internally.  They didn't want you

15   to hear that.  And so they hired three experts to come in

16   here instead.

17           They've told one story to the FDA, ladies and

18   gentlemen, and they're telling you a different story here.

19   So let's look at that.  Internally, this is how Roche

20   depicts CERA, and they show that CERA simply attaches to

21   EPO.

22           All right.  Well, let's look at that.  We have

23   peg-EPO on the left, we have Lin's patented EPO glycoprotein

24   on the right.  Amgen's '933, claim 3, claims a non-naturally

25   occurring glycoprotein product of the expression in a

1    mammalian host cell.  The glycoprotein is produced in a

2    mammalian host cell.  What does Roche do?  They produce that

3    glycoprotein in a mammalian host cell, using the same cells,

4    same process as Lin, and then they attach something to it

5    synthetically.  And they tell you that the combination can't

6    be made in a cell.

7        Don't be fooled.  The Court has instructed you it

8    is the law that if Roche's Mircera includes each and every

9    element of the specific claim, but it includes a lot of

10   other things as well, it still infringes.  The fact that

11   Roche takes the product of the expression of a cell, Lin's

12   EPO glycoprotein, and synthetically adds to it a peg, does

13   not free it from infringement.

14       So what are Roche's arguments?  Not expressed from

15   cells, that's what I heard this morning.  I just showed you

16   why that's wrong.

17       Not an obligate glycoprotein.  Well, ladies and

18   gentlemen, look at this claim.  A non-naturally occurring

19   glycoprotein.  Nothing in here about obligate.  It's not a

20   limitation of the claim.  You can't avoid infringement by

21   supposing limitations in the claim that are not there and do

22   not exist.  Nothing in the claim requires an obligate

23   glycoprotein.  That's not a defense.

24       Doesn't contain EPO.  Peg-EPO doesn't contain EPO,

25   that's what you were told, over and over again, by Roche's

1    experts.  Well, let's see if it does or it doesn't.

2         This is what Dr. Klibanov ended on.  This was his

3    note:  Epoetin beta no longer exists in Mircera.  That's

4    what he came here to tell you.  But, internally, what did

5    Roche say?  May 2001 in their internal regulatory document,

6    "The part of peg-EPO primarily responsible for its

7    pharmacodynamic effect is epoetin beta which has

8    demonstrated its efficacy in thousands of patients over the

9    last ten years."  Roche seems to think it contains epoetin

10   beta.

11        Roche's 2001 regulatory report admits that peg-EPO

12   contains an EPO glycoprotein:  The amino acid analysis has

13   indicated that the EPO have identical, and peg-EPO, have

14   identical amino acid sequence and compositions.  The only

15   difference in the composition of the native and modified,

16   modified protein, is due to the formation of an amide bond

17   between EPO and the peg molecule at the point of attachment.

18        This fundamentally new molecule that Dr. Klibanov

19   talks about was unknown to Roche.  Roche's product

20   development plan admits that the integrity of the molecules

21   maintained after pegylation.  They're doing everything they

22   can do to avoid making a change to EPO because it's the EPO,

23   it's the EPO that makes their product therapeutically

24   effective.  The last thing they want to do is change that.

25        "The results indicate that the integrity of the EPO

 1   molecule, including its glycosylation, is maintained through

 2   the peg modification reaction.  Peg modification does not

 3   affect the EPO sequence, disulfide bonding, or carbohydrate

 4   structure."  Hurray.  It works.

 5          Roche told the FDA that peg-EPO was a form of EPO

 6   with the identical action.  "Mircera is a mono-pegylated

 7   form of epoetin beta, a recombinant human erythropoietin."

 8   That's the truth.  It rings over and over again in Roche's

 9   own documents and in what they told the FDA.  That's why

10   they didn't bring their fact witnesses here.  That's why you

11   heard from three paid experts.

12          Roche told FDA that peg-EPO was one peg chain bound

13   to one EPO molecule.  This is, again, from Roche's BLA.

14   Roche told you that both the EPO starting material and

15   Mircera have the identical amino acid sequence in a

16   composition of the carbohydrate moiety.  Now, Ms. Ben-Ami

17   says, I ignore this last sentence.  Right?  And but --

18          THE COURT:  Five more minutes, Mr. Day.

19          MR. DAY:  I'm sorry, your Honor?

20          THE COURT:  Five more minutes.

21          MR. DAY:  I'm sorry?

22          THE COURT:  Five more minutes.

23          MR. DAY:  Thank you, your Honor.

24          Let's look at the last sentence.  "Mircera differs

25   from erythropoietin through integration of an amide bond

 1    between either the N-terminal amino group of the epsilon

 2    amino group of lysine, predominantly Lys 52 and Lys 45, and

 3    methoxy polyethylene glycol."  So they added a lot more

 4    fancy words into what they said previously, which is that,

 5    We attach peg through an amide bond on lysine.

 6         What don't they say here, ladies and gentlemen?

 7    That's the question for you in deciding infringement.  What

 8    don't they say here?  They don't say that the lysine

 9    disappears.  They don't say they changed the amino acid.

10    They don't say they have a new amino acid.  They still call

11    it a lysine.  Don't they?  They don't say that they changed

12    the amino acid sequence.  They still have the same amino

13    acid sequence, don't they?  And they don't say that they

14    changed the carbohydrates.  They do everything they can to

15    minimize the change.  And the reason is so that they can

16    preserve the value of EPO, which is safe and therapeutically

17    effective.

18         When they realized they were running into trouble,

19    they told their employees, Hey, let's stop calling this

20    thing peg-EPO.  I know that's what we've been calling this

21    for three years, but that's just a little too edgy.  Let's

22    call it CERA.  And the head of preclinical admitted that

23    even though they call it CERA, EPO's one part of it.  We

24    just don't want the world to know.

25         Roche uses Lin's '698 process to make glycosylated

1    EPO in Germany.  Dr. Flavell came in and he said, Well, you

2    know, this protoplast fusion, that's the way you stick the

3    EPO DNA in the cells different.  There's nothing in this

4    claim that talks about an isolated DNA.  '698 doesn't use

5    the word.  That argument doesn't apply to the '698 claims.

6         '868 claim uses the word "isolated."  The word is

7    in there.  What does isolated mean in that context?  It

8    means that the EPO DNA, the EPO DNA has been isolated so

9    that you can put that EPO DNA into a cell.  The way they put

10   it into the cell, through protoplast fusion, is they put it

11   in through a bacteria.  The way Amgen puts it in is Amgen

12   hooks it up with a whole bunch of other DNA, called a

13   vector, and inserts the vector.

14        But what does Roche say they do?  Not what does

15   Flavell say, what does Roche say, in their regulatory

16   documents, they do?  "Following identification of a genomic

17   EPO clone, a cDNA clone was isolated from human fetal liver

18   cDNA library using a fragment of the genomic clone as a

19   probe."

20        They isolate the EPO DNA and insert it into the

21   cells as well.  And that's the only way you can get it to

22   work.  The fact that they use one method as opposed to

23   another, let's go back to the claim.  The claim says nothing

24   about the method by which you insert the DNA, it merely says

25   that you must have isolated the EPO DNA and inserted that.

```
1    Whether you use protoplast fusion, whether you use

2    induction, any other kind of method, doesn't matter.

3    There's no limitation in the claim.  And that's why, as

4    Dr. Lodish said, they infringe both the '698 claims, which

5    doesn't have that limitation, and the '868 claims, which do.

6         Do they materially change?  Well, the Court has

7    given you the instructions, and the laws says that if the

8    process used overseas leads to a product which is not

9    materially changed when it comes to the U.S., if done in the

10   U.S. it would infringe, the product infringes.  What do they

11   do?  They use the process that Amgen invented to make EPO

12   glycoproteins, they attach peg to it.  And the EPO that's

13   attached, is that materially changed?  Not at all.

14        THE COURT:  Sum up, Mr. Day.

15        MR. DAY:  I will, your Honor.

16        And so the question for you, ladies and gentlemen,

17   is what are you going to compare?  Are you going to compare

18   the peg, or are you going to compare the EPO?  The EPO is

19   not materially changed and that's the only reason their

20   product works.  Dr. Klibanov --

21        THE COURT:  No, now, sum up.  You're about out of

22   time.

23        MR. DAY:  Okay.  All right.

24        THE COURT:  Sum up, your last sentence.

25        MR. DAY:  I will, your Honor.
```

1          The Court has instructed you that if peg-EPO will

2    not work without EPO, it is not materially changed.

3          **MS. BEN-AMI:**  Objection to the instruction, your

4    Honor.

5          **MR. DAY:**  You may consider -- let me correct

6    that --

7          **THE COURT:**  My instructions govern.

8          **MR. DAY:**  The Court's instructions govern.  You may

9    consider in deciding whether it's materially changed,

10   whether peg-EPO will work without the EPO.  And you know

11   from Dr. Longmore, who told you, peg is inert, you don't

12   give peg to patients, and without peg-EPO -- without EPO,

13   peg-EPO doesn't work.

14         **THE COURT:**  Thank you.

15         **MR. DAY:**  Thank you very much.  Thank you very

16   much, ladies and gentlemen.

17         **THE COURT:**  All right.  Take that down, and just a

18   few minutes now about how you deliberate together.

19         Let me talk about the mechanical things first.  And

20   we'll start, a mention was made in closing argument that you

21   should ask for transcript.  Now, here's the Court's protocol

22   with respect to it.  Thanks to the enormous skill of

23   Ms. Palanchian and Mr. Womack, we can give you transcript.

24   But if you send out a message saying, Give us the whole

25   trial transcript, I won't do it.  Your requests for

```
1    transcript have to be the product of deliberation.  I've let

2    you take notes.  They've given you notebooks.  You've got to

3    be more discrete.  Tell me what person or persons that you

4    want, not just the whole trial transcript.

5           But if you ask for transcript, that's a question

6    that I do not have to get the parties together.  I'm telling

7    you right now, I'll send the transcript right in, just as

8    was described, because I've told them the protocol.  It

9    won't have the stuff you shouldn't hear -- not you

10   shouldn't, it won't have the legal mumbo jumbo that we did

11   at the sidebar.  Everything that the witness testified to,

12   direct, cross, redirect, you can have.  But be selective.

13   Pick your witnesses.  We'll send it in as part of the

14   service while you are deliberating.

15          What will happen when I send you out is that you'll

16   have one copy of the verdict slip.  Ms. Smith will collect

17   the others.  You'll have -- each of you has a charge and we

18   have the -- what I told you this morning, to correct the

19   charge, that's all being prepared now.

20          Have I got those lists that I made mention?  If

21   someone would pass those up to me.  I do want to mention

22   them.

23          Now, a word -- then, once we've sent you out with

24   those things, Ms. Smith will come back in here and she'll

25   sit down with the lawyers.  I think they've done this
```

1    already, but she'll sit down with the lawyers and she'll go

2    over all the exhibits which you are supposed to have.  And

3    we will -- she'll bring them back, as many cartons as there

4    are, so that you have the exhibits.

5         Now, as soon as I send you out, you can start

6    deliberating.  But she'll bring in all the exhibits, then

7    everyone will leave you alone.

8         There will be a court security officer, he's back

9    there, he'll be outside the door here in the little alcove

10   area.  If you need to communicate with the Court, you write

11   out your question, give it to him, and he'll let us know and

12   we'll settle up in here, we'll bring you back in, I'll

13   answer your question, send you back out.

14        Now, let me say a word about the schedule and about

15   communicating with the Court.  I've told you to be prepared

16   to stay all day.  Lunch is ordered for 12:30, and so we'll

17   go along.  A few minutes before 5:00, if you've not reached

18   a verdict, we'll bring you back in here.  I have some

19   special instructions to give you in that event, and that's

20   routine.  So you'll have to come back in, but we won't keep

21   anyone here after 5:00.

22        If we go into deliberations tomorrow, you come in

23   in the morning, but you don't start deliberating.  That room

24   stays locked, though we let the cleaning people in there to

25   get -- well, actually, they're under Ms. Smith's

1    supervision, to get the papers out of there and the food and

2    the like, and clean it up.  But that room will be locked

3    from now on because all the exhibits are in there.  Your

4    notebooks will stay in there.  If you draw charts or

5    anything, no one's to see them.  So we'll keep that room

6    locked.

7         So when you come in tomorrow morning, don't start

8    deliberating.  Don't continue your deliberations.  Because

9    formally I will bring you in court, I will ask you on oath

10   whether you have spoken to anyone outside of your fellow

11   jurors after I let you go this afternoon, assuming the

12   deliberations go tomorrow.  And then the deliberations go

13   through tomorrow.  I'll talk about how you deliberate, and a

14   verdict, in a moment.  If you're not through with your

15   deliberations on Friday, we'll stop again, you come back

16   Monday, Tuesday, Wednesday, so on.

17        Why do I sketch out that many days?  Once you're --

18   once you start your deliberations, you're in charge.  And so

19   however long or short they go, that's up to you.  But I have

20   my duties day by day.  Once I've sent you out, I go right on

21   with the other matters I have to do.  And Monday and Tuesday

22   I have to be at a judicial conference in Portsmouth, New

23   Hampshire.  Now, I'm supposed to be there.  It's not going

24   to delay you because if you haven't reached a verdict,

25   you'll be here deliberating.

```
 1              I have told you you may ask me questions.  I

 2     mention that -- and so you may, any day.  I mentioned the --

 3     my own schedule as a judicial officer because if you can

 4     frame those questions today and tomorrow, it will just be

 5     faster.  If I have to do it from New Hampshire, what will

 6     happen is I'll be on the phone with the lawyers and figuring

 7     it out, what Ms. Smith is going to tell you as the answer.

 8     If we're all right here, I can do it.  Just works better,

 9     that's all.  Then whenever -- I'll come to the verdict in a

10     moment.  But I wanted you to know that.

11              Now, I've asked them to put together some things

12     and so they have.  And we'll -- I think we'll make copies

13     for all of you here of these things.  Let me just look at

14     them.  One of the things I asked them to put together, and

15     they did, is a claim chart.  And they've done it.  It has to

16     do with the claims you'll be considering.  And there's no

17     dispute over this.  They've named out which they call

18     product claims, and which they call process claims, and

19     which they call product by process claims.

20              Then they've put together a list of those claims

21     that -- strike that -- of those exhibits which Roche

22     alleges -- this is just to make it simple, it doesn't mean I

23     agree or I disagree.  This is what Roche alleges are the

24     trial exhibits which are anticipatory prior art.

25     Anticipation is one of those defenses that Roche has urged
```

1   upon you which they must prove by clear and convincing

2   evidence.  So here is the alleged prior art which is alleged

3   to anticipate.

4        Then I asked them to put together a longer list,

5   and they've done it, of what constitutes prior art.  And

6   they've done that.  And you may take this -- take it in this

7   case that the list that I give you, this -- these are the

8   exhibits which constitute the prior art in this case, and

9   you may consider them on the issue of anticipation, though

10  it's not contended that any one of these specific references

11  anticipates, but you need to know what was going on, and you

12  may consider them also on the issue of obviousness.  And

13  there's -- those are the lists I said I would give you.

14       There's other exhibits.  Those exhibits, like any

15  other exhibits, and like these, you can decide whether you

16  believe them, disbelieve them, believe them in part.  But

17  the other exhibits, you look to see what they tell you about

18  all the issues in the case, even though some of them may

19  have come later in historic time.

20       Now, just a few words about how you deliberate

21  together.  Madam Forelady, as forelady of the jury, you

22  don't do all the talking, nor do you keep your mouth shut.

23  And I'm talking to all of you, because all of you will

24  deliberate.  You deliberate together.  Deliberations of the

25  jury are the deliberations of all ten of you talking

1    together about the issue.  And I suggest to you that you go

2    claim by claim, issue by issue as to that claim, and then go

3    to the next claim, and so on.

4         But I mean all together.  Not six or seven of you

5    talking about the case and the others watching planes land

6    and take off at Logan.  You sit around that table.  It's the

7    only place in the courtroom, only place in the courthouse we

8    have those lovely conference tables that everyone can sit

9    around.  You can all see each other as you discuss.

10   Remember, your verdict must be unanimous.  Unanimous.  That

11   means you all agree.

12        It's probably not a good idea to take a straw vote

13   on any issue right as you start talking about it.  It

14   wouldn't be a good idea to say, Well, we have this claim,

15   how many of you think this is infringed, or how many of you

16   think this is valid or invalid?  And the reason that I

17   suggest -- I can only suggest -- that you not do that is

18   that if you do that before you've talked it through, you may

19   think, because you're on your oath as jurors, that you're

20   bound, you're required to stick to your initial reaction.

21        Now, if you have any strong view about any aspect

22   of this case, by all means adhere to it.  No going along

23   just so the deliberations may be over.  You've got to agree.

24   But jury deliberations are just that.  They're

25   deliberations.  And so if the views of your fellow jurors,

 1    who have seen and heard the same evidence as you, who are

 2    under the same oath as you are to do justice in this case,

 3    if those views, in fact, persuade you, it's perfectly

 4    appropriate that your views evolve and change over the

 5    course of the jury deliberations.

 6         You'll have your notebooks in there.  Your

 7    notebooks are for you.  You're certainly entitled now -- you

 8    no longer have to keep your minds suspended.  Now you will

 9    be discussing the case among yourselves.  And of course you

10    may use your notebooks to refresh your recollection.  Just

11    don't pass your notebooks around to your fellow jurors.

12    Just like the arguments of the lawyers aren't evidence of

13    anything, your notebooks aren't evidence of anything.

14    They're your notebooks, personal to you.  As a matter of

15    fact, no one will ever see them.  Ms. Smith will destroy

16    them when the case is over.  They're to refresh your

17    recollection so you can discuss matters with your fellow

18    jurors.

19         Now, each day of deliberations, if they go more

20    than one day, is a 9:00 to 5:00 day.  Nothing in the

21    weekend, just like I told you at the beginning.  When you

22    reach a verdict, tell the court security officer.  Don't

23    give him the verdict slip, but tell the court security

24    officer.

25         And let me tell you a few things about the logic of

```
1    a verdict.  Page 2, I need answers as to whether, as to each

2    of these claims, you find that the claim is valid, Roche has

3    proved it, or it's invalid.  Don't check both valid and

4    invalid in the same claim.  It's not logical, I don't

5    understand it.  If invalid, I need to know the grounds.  Any

6    one will do, but it can be all the defenses that Roche has

7    persuaded you.

8         Third page, where Amgen has to do the proving, all

9    right, I need to know, first, as to literal infringement, I

10   need to know if it's not infringed, Amgen hasn't done the

11   proving, or it's infringed.  If it is not infringed, stop

12   there.  If you find any particular claim infringed by the

13   literally infringed, stop, you don't have to go to the

14   infringement by the doctrine of equivalents.  That's a

15   fallback.  That's a second analysis.  But if a claim is not

16   literally infringed, you do go over to the right-hand

17   columns and decide whether it is infringed by the doctrine

18   of equivalents.

19        Now, on the two process claims, you do exactly the

20   same thing.  And if you find no infringement, either

21   literally or by the doctrine of equivalents, stop.  But if

22   on either ground you find -- you would find infringement,

23   then you hit the issue of materially changed.  And if it

24   is -- if you, your ultimate result is noninfringement

25   because of material change, I want an "M" so that I will
```

 1      know that.  Again, logically, you can't find both

 2      noninfringement and infringement.

 3           When you have reached a unanimous verdict as to

 4      each of the claims, the forelady signs in two places.  And

 5      we did this because this really is two phases.  The first

 6      phase that Roche has to prove by clear and convincing

 7      evidence, the validity phase.  The second phase, which Amgen

 8      has to prove by a fair preponderance of the evidence, the

 9      infringement phase.  I'll need the forelady's signature on

10      each page.  When you've got the verdict filled out, tell the

11      court security officer but don't give it to him.  He'll tell

12      Ms. Smith.  We'll all gather.

13           Now, I'll tell you, if that isn't until the first

14      part of next week and I'm up in Portsmouth, New Hampshire,

15      I'm coming back.  Because I'll be here when the verdict is

16      received.  So, and what is it?  It's an hour.  We may have

17      to keep you waiting an hour, but I'll be tooling on down

18      here to be here to accept your verdict.

19           So, you come into the courtroom, and there's only

20      one verdict slip, the forelady has it.  We always follow

21      this procedure, and it's an important one.  Ms. Smith says

22      to you, Ladies and gentlemen, have you agreed upon a

23      unanimous verdict?  Now, if you're back here with a verdict

24      slip, I'm assuming it's unanimous, so I assume you're going

25      to say yes.  She'll say, Pass the verdict slip.  And it gets

1    passed.  Of course they all watch.  I look at it.  Now, I

2    look at it just to see that it's logical, and I've already

3    told you the various logical outcomes.

4         I should say, if you find any claim invalid because

5    it is anticipated, it is also invalid because it is obvious.

6    Those two.  However, it's also a logical verdict if a claim

7    is not anticipated, it could still be invalid because it's

8    obvious.

9         So I just look to see if it's logical, you made

10   logical sense here.  If I think it is, I give it back to

11   Ms. Smith, and I say, The verdict is in order, it may be

12   recorded.  And she asks you all to stand up.  It's the one

13   time in the whole trial where you stand.  Now, we all stand

14   for you because we respect the jury.  But now, you all stand

15   up and we sit here.  And she'll say, Ladies and gentlemen of

16   the jury, listen to your verdict as the Court records it.

17   And then she'll read out, Patent Number such-and-such, Claim

18   Number such-and-such, and she'll simply read what the

19   checkmarks show.  And if there's an "M," she'll read

20   materially changed.  As you -- and it will take a few

21   minutes because we've asked you a number of questions.

22        If, as you stand there listening to her, you, each

23   one of you, are satisfied with the consciousness of your

24   duty faithfully performed, you will have done what's

25   required of you as jurors.  The word "verdict" comes from

two Latin words and they mean "to speak the truth."  And

that is what is asked of you at this time in this case, to

speak the truth.

     Very well.  The jury may retire and commence its

deliberations.

          **THE CLERK:**  All rise for the jury.

          (Whereupon the jury left the courtroom.)

          **THE COURT:**  Please be seated.

     Now, we're going to recess now until 2:00 this

afternoon where, for 50 minutes, we're going to go on with

the inequitable conduct part of the case.

     Let me say, in the absence of the jury, let me

repeat my most sincere appreciation for the skill, the

advocacy that has been shown, and respect for the Court

which has been shown by all the attorneys.  It's been a

distinct privilege to preside over the jury portion of this

case, and I very much appreciate it.

     Now, when I leave the bench, Ms. Smith is here, go

over with her the exhibits so we're absolutely clear that

what's going to the jury is right.

     I cannot resist two comments.  These are more in

the nature of trial practice comments, and they're both

directed to Mr. Day.

     Mr. Day, I don't know that the analogy to the Red

Sox not getting to the World Series is a wise argument to

1   this jury.  And my father is a fisherman, and it is

2   well-known in the prior art that the bass are out there

3   beyond the surf line.

4          We'll recess.

5          **THE CLERK:**  All rise.  Court is in recess.

6          (Recess.)

7          **THE CLERK:**  All rise for the jury.

8          (Whereupon the jury entered the courtroom at 4:56

9   p.m.)

10         **THE CLERK:**  Court is in session, please be seated.

11         **THE COURT:**  Well, ladies and gentlemen, I'm about

12  to discharge you.  I have the following juror question.  I'm

13  simply going to follow the formal form for handling jury

14  questions so you can hear it, but I've authorized Ms. Smith

15  to do this routinely since we're ready.

16         But the formal form, if you were to ask me a

17  substantive question about what something meant, is as

18  follows.

19         I have the following question:  Request transcript,

20  Dr. Richard Flavell, 9-24-07.

21         Is that the question, Madam Forelady?

22         **THE FORELADY:**  It is, your Honor.

23         **THE COURT:**  Is that the question, ladies and

24  gentlemen of the jury?

25         **THE JURY:**  Yes.

1          **THE COURT:**  To that question I make this answer.

2     Yes.  You'll have it tomorrow morning.

3          Now, just as we told you, you're going to be

4     excused until 9:00 a.m. tomorrow morning.  What's different

5     about this instruction is, I no longer can tell you to keep

6     your minds suspended, and because of that fact the remainder

7     of the instruction is especially important.

8          You've been deliberating since 11:30 this morning.

9     You know things about this case which the rest of us do not

10    know and no one else has any right to know, and no one is to

11    influence you in any respect, any respect, about this case.

12    The case is to be decided upon the evidence and your jury

13    deliberations and nothing else.

14         Now, so important is that that tomorrow morning,

15    before you start, when you come in don't start deliberating,

16    but right at nine o'clock we'll have you come in, I will

17    remind you, you are on oath as jurors, and I will ask you as

18    jurors:  Have you heard, read or seen anything of substance

19    about the case?  Have you discussed the case with anyone?

20    Has anyone discussed the case with you?  That's terribly

21    important to the integrity of these proceedings.

22         Now, having said that, it is routine these days

23    that jury deliberations take longer than an afternoon.  And

24    so I give these instructions all the time.  I've never been

25    a juror.  I've been called four times to serve but always

1    been excused.  I've always reported, but I've always been

2    excused.  But from my experience, I think the best advice I

3    can give you is go home, put this out of your mind.  It will

4    all be fresh tomorrow.  You can come back fresh and continue

5    your deliberations.

6          So with those instructions you may be in recess

7    until 9:00 a.m. tomorrow morning.

8          The jury may recess.

9          **THE CLERK:**  All rise for the jury.

10         (Whereupon the jury left the courtroom.)

11         **MR. FLEMING:**  Good evening, your Honor.

12         **MS. BEN-AMI:**  Thank you, your Honor.

13         **THE COURT:**  Good evening.

14         (Adjournment.)

15

16

17

18

19

20

21

22

23

24

25

1                   **C E R T I F I C A T E**

2

3

4          We, Donald E. Womack and Cheryl B. Palanchian,

5   Official Court Reporters for the United States District

6   Court for the District of Massachusetts, do hereby certify

7   that the foregoing pages are a true and accurate

8   transcription of our shorthand notes taken in the

9   aforementioned matter to the best of our skill and ability.

10

11

12

13

14          /S/ DONALD E. WOMACK
            _____

15          /S/ CHERYL B. PALANCHIAN
            _____

16

17                  DONALD E. WOMACK
                  CHERYL B. PALANCHIAN
                 Official Court Reporters

18                   P.O. Box 51062
            Boston, Massachusetts 02205-1062

19               womack@megatran.com

20

21

22

23

24

25