```
 1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF MASSACHUSETTS
 2
                                            Civil Action
 3                                          No. 05-12237-WGY

 4    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
                                              *
 5    AMGEN, INC.,                            *
                                              *
 6              Plaintiff,                    *
                                              *    DAILY TRANSCRIPT
 7    v.                                      *    OF HEARING IN RE
                                              *    INEQUITABLE CONDUCT
 8    F. HOFFMANN-LA ROCHE LTD,               *       (Volume 1)
      ROCHE DIAGNOSTICS GmbH and              *
 9    HOFFMANN-LA ROCHE, INC.,                *
                                              *
10              Defendants.                   *
                                              *
11    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

12

13

14              BEFORE:  The Honorable William G. Young,
                                District Judge
15

16

17

18

19

20

21

22

23
                                    1 Courthouse Way
24                                  Boston, Massachusetts

25                                  October 18, 2007
```

1                    A P P E A R A N C E S

2

3          DUANE MORRIS LLP (By D. Dennis Allegretti,
     Esq. and Michael R. Gottfried, Esq.), 470 Atlantic
     Avenue, Suite 500, Boston, Massachusetts 02210
4               - and -
           DAY CASEBEER MADRID & BATCHELDER, LLP (By
5    Lloyd R. Day, Jr., Esq., David M. Madrid, Esq.,
     Robert M. Galvin, Esq. and Christian E. Mammen,
6    Esq.) 20300 Stevens Creek Boulevard, Suite 400,
     Cupertino, California 95014
7               - and -
           McDERMOTT WILL & EMERY (By Michael Kendall,
8    Esq.), 28 State Street, Boston, Massachusetts
     02109
9               - and -
           McDERMOTT WILL & EMERY (By William G.
10   Gaede, III, Esq.), 3150 Porter Drive, Palo Alto,
     California 94304
11              - and -
           MARSHALL, GERSTEIN & BORUN LLP (By Kevin M.
12   Flowers, Esq.), 6300 Sears Tower, 233 S. Wacker
     Drive, Chicago, Illinois 60606-6402
13              - and -
           STUART L. WATT and WENDY A. WHITEFORD, Of
14   Counsel, Amgen, Inc., One Amgen Center Drive,
     Thousand Oaks, California 91320-1789, on behalf of
15   the Plaintiff

16         BROMBERG & SUNSTEIN LLP (By Lee Carl
     Bromberg, Esq. and Julia Huston, Esq.), 125 Summer
17   Street, Boston, Massachusetts 02110
                - and -
18         KAYE SCHOLER LLP (By Leora Ben-Ami, Thomas
     F. Fleming, Esq., Patricia Carson, Esq.,
19   Christopher Jagoe, Esq. and Howard Suh, Esq.),
     425 Park Avenue, New York, New York 10022, on
20   behalf of the Defendants

21

22

23

24

25

# **I N D E X**

**WITNESS:**             **DIRECT    CROSS    REDIRECT    RECROSS**

MICHAEL F. BORUN

    By Mr. Suh          5                    38

    By Mr. Madrid                33                    42


                                              **FOR        IN**

**EXHIBITS:**                                **I.D.      EVID.**


    A10   Motion V by Lin to Substitute Count  . .42

```
 1              PROCEEDINGS - 2:00 P.M.

 2

 3         THE CLERK:  All rise.  Court is in session, please

 4    be seated.

 5         THE COURT:  Proceed, Ms. Ben-Ami.

 6         MS. BEN-AMI:  We have a change of players, your

 7    Honor.

 8         THE COURT:  Oh, Mr. Suh, forgive me.  And you may

 9    proceed.

10         MR. SUH:  Thank you, your Honor.  Roche calls

11    Mr. Michael Borun.

12         THE COURT:  He may be called.

13         MR. MADRID:  Your Honor, before we get started,

14    Amgen has made a motion for the admission of various

15    documents.

16         THE COURT:  They have and I've taken it under

17    advisement.  I don't have to get to it until after I've

18    heard what Roche has to say.  Roche has the burden of proof.

19         It occurs to me, you say these are not hearsay,

20    they're all for the state of mind.  I want to see what maybe

21    is even an issue before I can deal with it with respect to

22    relevance.

23         MR. MADRID:  Thank you.

24         THE COURT:  If you want to argue it will cost you

25    your time; if you want to submit on these papers, I'll get
```

1    to it.

2              Let's let the witness get on the stand.

3              **THE WITNESS:**  Good afternoon, your Honor.

4              **THE COURT:**  Good afternoon.

5              **THE CLERK:**  Please raise your right hand.

6         Do you solemnly swear that the answers you will

7    give to this Court will be the truth, the whole truth, and

8    nothing but the truth, so help you God?

9              **THE WITNESS:**  I do.

10             **THE CLERK:**  Please be seated.

11                   MICHAEL F. BORUN

12                 **DIRECT EXAMINATION**

13   **BY  MR. SUH**

14   **Q**   Good afternoon, Mr. Borun.

15   A    Good afternoon.

16   **Q**   We've met before, haven't we?

17   A    Yes, we have.

18   **Q**   And I took your deposition about two months ago,

19   correct?

20   A    Yes.

21   **Q**   Okay.  And you were the prosecuting attorney for what

22   we've been calling colloquially as the '868 patent, correct?

23   A    I believe so.

24   **Q**   Okay.  And you were also the prosecuting attorney for

25   what we've been calling as the '008 patent as well, correct?

1 A Yes.

2 Q Okay.

3 A If that's --

4 Q And the '008 patent, that's expired, correct?

5 A Yes.

6 Q Okay.  And you're also counsel of record in this case,

7 correct?

8 A Yes, I am.

9 Q Okay.  And you've represented Amgen in legal proceedings

10 throughout the world, correct?

11 A I have given advice to Amgen about various proceedings.

12 Q In Australia, in South Africa, et cetera, correct?

13 A Australia, South Africa, and Europe.

14 Q Yes.  And you were counsel of record in the Fritsch v.

15 Lin interferences in the late '80's, early '90's, before the

16 patent board, correct?

17 A Yes, I was.

18 Q As a matter of fact, you gave oral arguments in the

19 Fritsch v. Lin interferences, correct?

20 A Concerning the priority issues, yes.

21 Q And you've been a practicing patent lawyer for more than

22 30 years, right?

23 A That's true.

24 Q Okay.  Now, the '179 application -- actually, we have

25 binder, a couple of binders there in front of you, and if

1    you could please go to Exhibit 2012.  It's already been

2    admitted into evidence.

3    A    Okay.

4              **THE COURT:**  And I take it that's the protocol we'll

5    follow, if it's in evidence in the case already, we'll use

6    the number.

7              **MR. SUH:**  Yes.

8              **THE COURT:**  Letters if it's for this proceeding.

9              **MR. SUH:**  Yes.  Thank you, your Honor.

10   **Q**    You'll see that this is the '179 application, correct?

11   A    Yes.

12   **Q**    And that's the application that's according to the '868

13   patent?

14   A    Yes.

15   **Q**    Okay.  And the '179 application was also the parent

16   application to the '698 patent, correct?

17   A    I don't recall that, but if you represent that that's

18   true, I'll agree with you.

19   **Q**    Okay.

20   A    Subject to correction later.

21   **Q**    And the '179 application was also the parent application

22   for the '349 patent?

23   A    Again, I'll agree with you subject to correction if I'm

24   linking that.

25   **Q**    Sure.  And the '422 patent.

1    A    And the '422 patent.

2    Q    The '422 patent.

3    A    The '422 patent.  I think you're correct, yes.

4    Q    Okay.  All right.

5              Now, in the course of prosecuting the '179

6    application, which is the parent applications to those

7    various patents-in-suit, do you recall that the pending

8    claims were rejected in part based upon a Genentech EPO

9    application on tissue plasminogen activator?

10             **MR. MADRID:**  Your Honor, I object.

11             **THE COURT:**  Why?

12             **MR. MADRID:**  Counsel's heading into subject matters

13   outside the scope of the pleading.

14             **MR. SUH:**  Your Honor --

15             **THE COURT:**  Overruled.  Overruled.  He may have it.

16   You may answer the question.

17   A    Okay.  Do you have a document that I could use to --

18   Q    Sure.

19   A    -- refresh my recollection?

20   Q    Sure.  Why don't we go to -- if you go to Exhibit 2012.

21   A    Yes.

22   Q    And there's some bold letterings on the bottom, bold

23   numbers.

24   A    I see them, yes.

25   Q    If you go to 2012.214, there's an Applicant's Second

1   Preliminary Amendment.  And if you go to 233, the last page

2   of this amendment, that's your signature, right?

3            **THE COURT:**  I'm at 214, and you go to the last page

4   of this amendment, that's his signature.

5            **MR. SUH:**  Right.  233.

6            **THE COURT:**  On what, on what page?

7            **MR. SUH:**  On 233.

8            **THE COURT:**  Thank you.

9            **MR. SUH:**  You're welcome.

10  A   Yes, that's my signature.

11  **Q**   Okay.  And if we go to 231 --

12  A   Yes.

13  **Q**   -- on the second full paragraph, there's a reference to

14  EPO 093 619.  Do you see that?

15  A   Yes, I see that.

16  **Q**   Okay.  And if we could briefly go to what's in your

17  binder as Exhibit 2029.  And this has also been entered into

18  evidence.

19  A   Page 229?

20  **Q**   Oh, I'm sorry.

21  A   Or 2029?

22  **Q**   2029.

23  A   Yes.  I have it.

24  **Q**   This is, this is the application that's being referenced

25  in your amendment, correct?

1   A    That's correct.

2   Q    Genentech application?

3   A    Yes.

4   Q    Okay.  If we could go back to the, to your second

5   preliminary amendment that you submitted in the '179

6   application.

7   A    Yes.

8   Q    The first page which is at 214.

9   A    I have it, yes.

10  Q    Do you see the first paragraph, it states:  Consistent

11  with the February 18th, '88 favorable Decision on Petition

12  to Make Special.

13          Do you see that?

14  A    Yes.

15  Q    What's a Petition to Make Special?

16  A    It's a request for expedited proceedings in the Patent

17  Office on a patent application.

18  Q    Okay.  So you requested expedited review of this

19  application because of an allegation of actual infringement,

20  correct?

21  A    I recall that, yes.

22  Q    And that actual infringement was, you allege was being

23  done by Genetics Institute, correct?

24  A    I don't recall it was Genetics Institute.  I thought it

25  was --

1    **Q**    Chugai?

2    A    -- someone else.

3    **Q**    Okay.

4    A    In Washington, State of Washington.

5    **Q**    Well, when you submitted that Petition to Make Special,

6    do you recall that you made a statement saying that you took

7    substantial steps to review the prior art?

8    A    I believe that, that I said words to that effect, if not

9    those words precisely.

10   **Q**    Because that's -- so you tell the Patent Office, in

11   exchange for expedited review you say that you're going to

12   take extra time in reviewing the prior art, correct?

13           **MR. MADRID:**  Objection; vague.

14           **THE COURT:**  Overruled.

15   A    Can I have the question back, please?

16   **Q**    Sure.  Actually if you go to 2012, the '179 application,

17   and if you go to Page 126, using the same bold numbering.

18   A    Yes, I see that.

19   **Q**    All right.  That's the Declaration Accompanying the

20   Petition to Make Special, correct?

21   A    That's correct.

22   **Q**    And if you go to the last page, that's 132.

23   A    Okay.

24   **Q**    That's your signature, right?

25   A    Yes, it is.

1    Q    If you go to the page right before it, 131.  Do you see

2    in the middle of the first paragraph, it says:  I've taken

3    what I believe to be substantial steps to acquire knowledge

4    of the prior art pertinent to the claims pending.

5           Do you see that?

6    A    Yes, that's consistent with my earlier answer.  Yes.

7    Q    Okay.  All right.

8    A    That I had used words to that effect.

9    Q    All right.  Now, let's go back to your second

10   preliminary amendment and the '179 application, and in

11   particular I want to go to Page 231 where, where --

12   A    Yes.

13   Q    -- you're referencing the Genentech tPA prior art.

14   A    Yes.

15   Q    Okay.  It says:  This document, like Pennica, et al.

16   contains no description of use of mammalian host cell

17   expression systems for tPA production.

18           Do you see that statement?

19   A    I realize that that's -- I see the statement and I

20   realize that that was an incorrect statement.

21   Q    That's an incorrect statement.  Right?

22   A    Yes.

23   Q    As a matter of fact, that particular patent application

24   actually shows production of tPA in Chinese hamster ovary

25   cells, correct?

1    A    Right.  That's right.

2    Q    And it has examples of mammalian cells other than

3    Chinese hamsters, right?

4    A    I'm not sure.  I could look through the exhibit.

5    Q    But it does show, but it does show --

6    A    2029.

7    Q    -- production of tPA in Chinese hamster ovary cells,

8    right?

9    A    There's an example where the representation is made that

10   tPA product was produced in these cells.

11   Q    Okay.  And Chinese hamster ovaries, that's a mammalian

12   cell, correct?

13   A    That is a mammalian cell.

14   Q    All right.  And, in fact, the next sentence says:  The

15   only clear mention of such systems was entirely speculative

16   and appears in the Summary of the Invention at Page 7.  And

17   you say this is the only mention of mammalian host cell

18   systems and you said it was speculative.

19         Do you see that?

20   A    Yes.

21   Q    Okay.

22   A    And I said earlier that was a mistake.

23   Q    That's wrong, too, right?

24   A    Yes.  It's consistent.

25   Q    Okay.

1    A    And incorrect.

2    Q    Okay.  And in this particular application you

3    specifically asked the Patent Office to expedite review

4    because of an allegation of actual infringement by another

5    party?

6    A    Yes.

7    Q    Okay.  Now, let's, let's move on to the same

8    application, and this time if you would go to 2012.1023.

9    It's in the same application.  And if you go to Page 1033.

10   A    1033?

11   Q    Yes, sir.

12   A    I have that page.

13   Q    That's your signature, right?

14   A    Yes, it is.

15   Q    You signed this particular amendment?

16   A    On or about October 7th, 1994, yes.

17   Q    Okay.  And if you go Page 1026.  Do you see that in this

18   particular amendment you're trying to overcome a

19   obviousness-type/double patenting rejection based upon the

20   '008 patent?  It's right there in subheading B.

21   A    Oh.  Okay.

22   Q    1026.

23   A    Apparently there was an obvious-type/double patenting

24   rejection.  I see that.

25   Q    Do you recall making these arguments sitting here today?

1    A    Yes.

2    Q    Okay.  Now, you start talking about decisional

3    authorities on that page.  And then if you skip to 1028.

4    A    Okay.

5    Q    Subheading 2.  It says that the subject matter of the

6    patent claims has already been determined to be patentably

7    distinct from claims 1 through 6 of the '008 patent.

8         Do you see that?

9    A    I see that, yes.

10   Q    Okay.  And in support of that particular argument that

11   the patents were, the claims were patentably distinct, you

12   drew attention to the Fritsch v. Lin interference

13   proceedings, correct?

14   A    I drew attention to the Patent Office's position in

15   invoking the three, or declaring the three separate

16   interferences, yes.

17   Q    Okay.  And you were counsel of record in those

18   interference proceedings, correct?

19   A    I was.

20   Q    Okay.  And you recognize that in making this argument

21   you drew attention to the fact that there was an

22   interference dealing with the '008 patent claim?

23   A    Yes.

24   Q    And an interference dealing with the pending claims of

25   the '868 patent?

```
 1    A    The pending claim -- well, I'm not sure, I'm not sure

 2    the '868 patent claims are the same as the claims that were

 3    pending in the process interference.

 4    Q    Well, do you see --

 5    A    Or is the product interference.

 6    Q    Well, do you see on the second line of this particular

 7    paragraph?

 8    A    Yes.

 9    Q    I'm sorry, if you go to the next page, 1029.  It says --

10    just go to 1029.  Okay.  First paragraph.

11    A    Yes.

12    Q    Second, second sentence, it says:  On the other hand,

13    all pending claims of the present application were

14    designated as corresponding to the Count in Interference

15    No. 097.

16    A    Yeah, I got that.  Yes.

17    Q    And so there was a count that corresponded to the claims

18    of the '868 application and there was a count that

19    corresponded to the '008 patent, correct?

20    A    Yes.  The '008 patent had issued.

21    Q    Yes.

22    A    And the 102,097 interference had to do with pending

23    applications, yes.

24    Q    That's right.  That's right.  Because the claims are not

25    issued by that point.
```

1    A    Right.

2    Q    Right.  And here you're arguing to the Patent Office

3    that the '008 patent claims and the '868 pending claims

4    should be considered different because of those interference

5    proceedings, right?

6    A    Because of the determination of the Patent Office that,

7    you know, the assistant commissioner, the group director,

8    and the examiner in the, in the '334 interference had

9    indicated that all three subject matters of the three

10   interferences were directed to separately patentable subject

11   matter and subject to different proofs on priority,

12   patentability and the like.

13   Q    But you didn't tell the Patent Office that you argued to

14   the patent board that the pending claims of the '868 patent

15   and the '008 patent claims were the same invention, correct?

16        **MR. MADRID:**  Objection, your Honor;

17   mischaracterizes the testimony.  Also, I believe --

18        **THE COURT:**  No, no, I'm following.

19   A    I'm -- the pending claims of the '868 --

20   Q    The count of the '097.

21   A    The count of the '097, yes.

22   Q    Right.  As we just established, corresponded to the

23   pending claims of the '868 application, you argued before

24   the patent board that that count and the count that

25   corresponds to the '008 patent were the same invention?

1   A    No, I did not.

2   Q    You did not?

3   A    No.

4   Q    Okay.  I would like to show you Exhibit GUK.  This, this

5   is the '097 interference final brief by Senior Party Lin.

6   A    That's correct.

7   Q    Right?

8        And this corresponds to the count that -- this has

9   to do with the count that deals with the pending claims of

10  the '868 patent application, correct?

11  A    This has to do with the count in the, in the '097

12  application which was a process count, yes.

13  Q    Right.  A process count.  And your name is on the cover

14  of this document --

15  A    Yes.

16  Q    -- right?

17  A    Yes.

18  Q    You --

19  A    I participated in this.

20  Q    You participated and you reviewed this particular

21  document?

22  A    I did.

23  Q    All right.  I want to direct your attention to Page 25

24  of this document.

25  A    I have it.

1   Q    Okay.  And Page 25, this is actually the third argument

2   under the Summary of Lin's Position on this brief that you

3   wrote.

4          Do you see that?

5   A    That's not on Page 25.

6   Q    Page 24, there's a subheading Summary of Lin's Position.

7          Do you see that?

8   A    Oh, it starts on the bottom of 25.

9   Q    Right.

10  A    And continues over to 26.  Yes.

11  Q    Okay.  So, let's look at -- let's take this line by

12  line.  Point (iii).  It says:  While the count -- and that's

13  the count to the process claims -- is directed to a process

14  for preparing in vivo biologically active EPO using a

15  mammalian host cell transfected or transformed with an

16  isolated DNA sequence encoding, and the litigation was

17  directed to the purified and isolated DNA sequence and host

18  cells transfected or transformed thereby.  And that

19  litigation deals with litigation involving the '008 patent,

20  correct?

21  A    Yes.

22  Q    Okay.

23  A    That's the, the Amgen v. Chugai Boston litigation.

24  Q    Right.  So you're saying that, while the count to the

25  process for making in vivo biologically active protein and

```
 1    the litigation involving the '008 patent, it is evident that
 2    these are only different manifestations of the same
 3    invention as acknowledged by Fritsch.
 4          Do you see that?
 5    A   That's correct.
 6    Q   That's the argument you made to the patent board, right?
 7    A   That's, that's the characterization of Fritsch's
 8    argument in Motion Q and in Motion G, yes.
 9    Q   And you adopted that position, correct?
10    A   We adopted that position for the purpose of
11    demonstrating --
12    Q   Sir?
13    A   -- whether or not you took Fritsch's position --
14    Q   Okay.
15    A   -- or Amgen's position which was at the, it was
16    different statutory subject matter.
17    Q   But you relied upon that position?
18    A   We --
19    Q   You relied upon that position, right?  You adopted it?
20    A   We, we argued --
21    Q   You argued --
22    A   -- that whether you adopt Fritsch's position or you
23    adopt Amgen's position, we win either way.
24    Q   Okay.  And let's look at -- well, let's look at the next
25    sentence.  It says:  Clearly, the whole purpose and intent
```

```
1    of the purified and isolated DNA sequence encoding human EPO

2    at issue in the litigation -- that's the '008 patent -- was

3    to express in vivo biologically active human EPO.

4              That's not Fritsch's statement, that's, that's an

5    argument you made, right?

6    A    That's a statement of the reason why the research was

7    done in the first place.  The EPO gene was not -- a lot of

8    money wasn't spent on cloning the EPO gene as scientific

9    curiosity; it was in the hope that a process could be

10   performed on it to produce an in vivo biologically active

11   product.

12   Q    Okay.

13   A    The Patent Office position was that those are separate

14   inventions --

15   Q    Sir?

16   A    -- and separate priority and separate patentability

17   considerations.

18             MR. SUH:  Your Honor, could we have an instruction

19   that the witness answer the questions.

20             THE COURT:  Listen to the questions now.

21             THE WITNESS:  Sure.

22             MR. SUH:  Okay.

23             THE COURT:  Even though this is jury waived, he's

24   framing questions appropriately that grammatically, anyway,

25   can be answered yes or no.
```

1          **THE WITNESS:**  Okay.

2          **THE COURT:**  And you know this, and you know I'm

3     going to follow this protocol.  So just launching off and

4     saying what you want to say, one, it's not very persuasive,

5     but two, it violates my order.

6          Listen to his question.

7          **THE WITNESS:**  Okay.  Your Honor, I would only say

8     that I am being accused of fraud and --

9          **THE COURT:**  Well, that doesn't -- listen to me.

10          **THE WITNESS:**  Yes, your Honor.

11          **THE COURT:**  Yes, you are.  That doesn't excuse

12     anything.  We investigate it in a quiet, respectful,

13     thorough way.  The rules of evidence and of procedure apply

14     to you as well as anyone else.  And yes, you are.  But you

15     can't volunteer.

16          Now, if you don't know the answer, you don't

17     remember, you may always say that.  And you may always say

18     it can't be answered yes or no.  Mr. Madrid's going to have

19     a chance to examine you.

20          Go ahead, Mr. Suh.

21          **MR. SUH:**  Thank you, your Honor.

22     **Q**   Mr. Borun, in part of your answer you said that in vivo

23     biological activity was only a hope, was only an

24     expectation.  So let's look at the next sentence that you

25     wrote.  It says:  Stated otherwise, the process language of

```
1    the Lin patent claims at issue in the litigation -- the '008

2    patent -- (encoding human EPO) is, for all intents and

3    purposes, a description of the present count.

4            Do you see that?  Do you see that, sir?

5    A   I see the words and you're -- yes, I see the words.

6    Yes.

7    Q   That doesn't, that doesn't say anything about how

8    there's an expectation or about a hope.  You're arguing that

9    the process, the '008 patent actually has process language

10   which corresponds to the count of the '097, correct?  That's

11   what you said?

12   A   I see the statement but -- yes, I see the statement.

13   Q   Okay.  You see that statement.  And then you say:  One

14   cannot be sure he has the sequence until he has successfully

15   expressed in vivo biologically active human EPO.

16           Do you see that sentence?

17   A   I see that argument, yes.

18   Q   So you're arguing to the Patent Office that you don't

19   even know whether you have a sequence until you express it.

20   That's what you argue, right?

21   A   That statement was made, yes.

22   Q   There's no statement there with respect to an

23   expectation or a hope, right?

24   A   Yes.  And, in fact, it does refer to an expectation

25   because it refers to success.
```

1    **Q**    Okay.

2    A    And that assumes --

3    **Q**    But that's --

4    A    -- performing, performing an event --

5    **Q**    That's not what that sentence says, though, right?   It

6    says you don't know you actually have the sequence until

7    after you express it.   Isn't that what that statement says?

8         Mr. Borun, isn't that what that statement says?

9    A    That's what that statement says.

10   **Q**    Okay.   And you told the Patent Office when you were

11   examining, when you were prosecuting the '179 application,

12   which is the parent applications to four of the

13   patents-in-suit, that this interference proceeding actually

14   supported the patentable distinction between the pending

15   claims and the '008, correct?

16   A    That the declaration of the interference and the

17   position of the Patent Office that these are separate

18   patentable inventions supports the conclusion of separate

19   patentability.

20   **Q**    Okay.   You didn't tell the Patent Office, when you were

21   talking about this interference, you didn't tell the Patent

22   Office that you didn't know, you couldn't know what the

23   sequence was until after you had expressed it, right?

24   A    That argument never came up.

25   **Q**    You never showed the Patent Office the brief that you

1    wrote to the patent board, correct?

2    A    The Patent Office reviewed that brief --

3    **Q**    It did?

4    A    -- in the context of review of the proceedings.  After

5    the interference was concluded, the entire record of the

6    interference proceeding, including the arguments in the

7    brief --

8    **Q**    Okay.

9    A    -- and the decisions was reviewed by the examiner.

10   **Q**    I dis -- I'll let your, I'll let your attorney try to

11   see and find out whether this brief was part of the file

12   history.  But it wasn't -- I won't testify.

13   A    I didn't say it was part of the file history.  I said it

14   was part of the interference record which was reviewed by

15   the examiner.

16   **Q**    If we could go to the next page of the, actually in the

17   '179 application, 1031.  Okay?

18   A    Yes, I have that page.

19   **Q**    All right.  Midway through the first full paragraph --

20          **THE COURT:**  Could I have a reference here.  The

21   '179 application, what page?

22          **MR. SUH:**  Yes.  It's 2012.1031.

23          **THE COURT:**  Thank you.

24   **Q**    Do you see in the middle, it says:  Attached here as

25   Appendix E is August 18th, '94 declaration of Arthur

1    Sytkowski.  Do you see that?

2    A    Yes.

3    Q    Okay.  So you attached the Sytkowski declaration in

4    support of the argument to overcome the '008 patent, double

5    patenting issue?

6    A    No, I attached that in support of the argument to

7    overcome a rejection premised on the expectation of success

8    at getting an in vivo biologically active human

9    glycoprotein.

10   Q    You showed the Sytkowski declaration to the Patent

11   Office, correct?

12   A    Pardon?

13   Q    You showed the Sytkowski declaration to the Patent

14   Office?

15   A    I showed the Sytkowski declaration for purposes of

16   showing what was argued against patentability in Europe

17   and --

18           **MR. SUH:**  Your Honor?

19   A    -- I attached --

20           **THE COURT:**  Sustained.  We'll stop him there.  Go

21   ahead.

22   Q    Let's go to the declaration which is actually 2012.1058.

23   A    I have it, yes.

24   Q    And subheading 2, there's a question there:  Did Dr.

25   Goldwasser carry out his research with public funds?

1              Do you see that?

2    A    I see that.

3    Q    Okay.  And on the next page there is a, it starts, it's

4    actually the second sentence, it starts with

5    Dr. Goldwasser's subproject.  Do you see that?  It's about

6    five lines down.

7    A    I see that, yes.

8    Q    And it says:  Dr. Goldwasser's subproject of this grant

9    was entitled "Studies of Erythropoiesis in Vitro."  In

10   addition, this grant support the article indicates that the

11   work was performed in the Franklin McLean Memorial Research

12   Institute which was described as, quote, operated by the

13   University of Chicago for the United States Energy Research

14   and Development Administration under contract EY-76, et

15   cetera.

16              Do you see that?

17   A    I see that, yes.

18   Q    Okay.  So you knew that Dr. Goldwasser's work on

19   purifying urinary EPO and making tryptic fragments was

20   supported by the Department of Energy, correct?

21   A    No.

22   Q    You didn't know?

23   A    When?  What are you -- right, as I sit here right now, I

24   don't know that, and I never knew it before.

25            **THE COURT:**  Well, he's suggesting this says that.

1          **THE WITNESS:**  If it's --

2          **THE COURT:**  And that he wants me to draw the

3     inference that you knew it from the nature of this document

4     and how it came into being.

5     **Q**   You submitted this document to the Patent Office, didn't

6     you?

7     **A**   Yes.  And these are representations made by Dr. --

8     **Q**   Okay.

9     **A**   -- Sytkowski.

10    **Q**   And you reviewed, you reviewed the document before you

11    submitted it to the Patent Office, right?

12    **A**   I don't recall reviewing this section.

13    **Q**   You don't, you don't recall reviewing things you submit

14    to the Patent Office?

15         **MR. MADRID:**  Objection, your Honor; misstates the

16    testimony.  He said this section.

17         **THE COURT:**  I understand.  I'm listening.  It

18    doesn't misstate the testimony.  It's a broader question,

19    which he'll now answer.

20         **THE WITNESS:**  Can I have the question back?

21         **THE COURT:**  You don't recall reviewing documents

22    you submit to the Patent Office?

23         **THE WITNESS:**  I generally review documents I submit

24    to the Patent and, Patent Office.

25    **Q**   But not this one?

1    A    I don't recall reviewing this section when I submitted

2    it to the Patent Office in 1994.

3    Q    Okay.  1994.  And this was in connection to the '179

4    application.  You were also -- I think we established you

5    also prosecuted the '349 patent, correct?

6    A    I'm done, I'm done with this?

7    Q    Yes.

8    A    Okay.  The '349 --

9    Q    I'm just going to connect to something I'm going to ask

10   you about.

11   A    Okay.

12   Q    You prosecuted the '349 patent, right?

13   A    I believe I was involved in the prosecution of the '349

14   patent, yes.

15   Q    Do you recall in the course of prosecuting the '349

16   application, the Patent Office specifically asked whether

17   work in the Lin patents, whether any of the work was done in

18   conjunction with involvement by the Department of Energy?

19   A    I believe there was a request for information as to

20   whether or not the inventions were made using funds of the

21   Department of Energy, yes.

22   Q    Okay.  Could we go to 2017.  And this is -- there's a

23   binder, sir.  I believe that's the --

24   A    Okay.

25   Q    -- the prosecution established here of the '349 patent.

1   There's some numbers on the bottom as well.  And if you

2   could go to 2017.130.

3   **Q**   Yes.

4   A   Oh, I'm sorry, I started looking in 2013 and I'll have

5   to get to 2017.

6   **Q**   Let me see if I can help you.

7   A   That's all right, I can get it.  Yeah, I got it.

8   **Q**   All right.

9   A   2017.139.

10  **Q**   .1 3 0, sir.

11  A   130.

12  **Q**   It's actually right here up on the screen.

13  A   I have it, yes.

14  **Q**   And that's -- this is a response that you made during

15  the prosecution of the '349 patent, and you made this

16  response, right?

17  A   I prepared this response to the requirement for a

18  statement.  The requirement for a statement is on Page 129.

19  **Q**   That's right.  Right before.

20  A   And the statement itself in response is on 131.

21  **Q**   Mr. Borun, I want to --

22      **THE COURT:**  Five more minutes, Mr. Suh.

23      **MR. SUH:**  Yes.  Thank you.

24      **THE COURT:**  Just so you know.

25      **MR. SUH:**  Thank you, your Honor.

1    Q   It says:  This is in response to the notice mailed July

2    '95 informally requiring a statement setting forth the full

3    facts concerning the circumstances under which the invention

4    of the above-identified application was made and conceived

5    and the relationship (if any) of the invention to the

6    performance of any work under any contract or other

7    arrangement with the Department of Energy.

8             You wrote that, right?

9    A   Yes.

10   Q   Okay.  And on the next page you submitted Dr. Lin's

11   signed statement.

12   A   Yes.

13   Q   Right?  And -- actually -- yeah.  It's a little hard to

14   read, but in the right hand column it says, there's a check

15   there, it says the invention was not made or conceived in

16   the course of or in connection with the United States Energy

17   Department.  Correct?

18             You submitted this statement, right?

19   A   Dr. Lin's inventions were not made or conceived in the

20   course or in connection with the terms of the Atomic Energy

21   Commission or Energy Research and Development

22   Administration --

23   Q   Of the Department of Energy, right?

24   A   -- of the Department of Energy contract, yes.

25   Q   And you submitted this?

1    A    Yes.

2    Q    Okay.  Can we go to the patent.  The '933.

3    A    Well, yeah, Dr. Lin signed it and I submitted it.

4    Q    Okay.  Let's go to Table 1.  Do you see Example 1 in

5    Table 1?  Dr. Goldwasser did all of this work, right?

6    A    No.

7    Q    Well, he did, he did the tryptic fragments in Table 1,

8    right?

9    A    I don't believe so.

10   Q    We have the record at trial.

11         But you see that it says human EPO was isolated

12   from urine.  Dr. Lin didn't do that.  Dr. Goldwasser did

13   that, right?

14   A    I believe that's true.

15   Q    Okay.  And subjected to tryptic digestion resulting in

16   17 fragments.

17         Dr. Goldwasser did that, right?  Not Dr. Lin?

18   A    I believe these tryptic digests were by Dr. Lai.

19   Q    That's what you believe.

20            MR. MADRID:  Objection; move to strike.

21            THE COURT:  Well, his comment is stricken.

22            MR. SUH:  Your Honor, if I could just reserve a

23   couple of minutes.

24            THE COURT:  You have three minutes.  You're done

25   with this witness?

1      MR. SUH:  Yes.  Thank you.

2      THE COURT:  Do you wish to examine this witness or

3  reserve, Mr. Madrid?

4      MR. MADRID:  Sir, I wish to examine this witness.

5      THE COURT:  You may.

6                    CROSS-EXAMINATION

7  BY  MR. MADRID

8  Q   Good afternoon, Mr. Borun.

9  A   Good afternoon.

10 Q   Would you please take a look at that Exhibit 2012 at

11 Page 231.

12 A   I have it.

13 Q   Now, can you look at the paragraph below the paragraph

14 Mr. Suh showed you.

15 A   Yes.

16 Q   Now, at the time you wrote this document, what did you

17 mean to convey to the Patent Office in this paragraph?

18 A   That none of the Genentech work reflected in vivo

19 biological assays such as were reflected in the rabbit

20 assays of the Collen reference earlier mentioned.

21 Q   And why was that important at that time to you?

22 A   Because the issue was whether or not there was a

23 reasonable expectation of success for obtaining a human

24 glycoprotein that required glycosylation or biological

25 activity in a biologically active form.

1    Q    I would like you to take a look at Exhibit 2012, Page

2    355 and Page 391.  And I would like to ask you what these

3    documents are?

4    A    2012.355 is a copy of the, of another Genentech patent

5    application that's referred to on the page we were just

6    discussing.

7    Q    And Page 391?

8    A    Actually 392.  That's the same, yes.  Another published

9    Genentech patent application relating to tPA that does not

10   show in vivo biological activity.

11   Q    Did you submit copies of these to the Patent Office?

12   A    Yes, I did.

13   Q    Why did you do so?

14   A    Because they came up in the search that I described

15   earlier in, in the document that includes Page 231.

16   Q    And after the submission of Exhibit 2012 at Page 231,

17   did you ever make another representation to the Patent

18   Office about the Genentech '619 application?

19   A    Yes, I did.  And it was in the context of the Sytkowski

20   declaration which Mr. Suh was describing to me, or, excuse

21   me, interrogated me about.  In that Sytkowski declaration,

22   Sytkowski was arguing that it would be reasonably expected

23   to get an in vivo biologically glycoprotein product for EPO

24   based on the tPA work.  I attached as Exhibit F to that

25   submission, I think it's --

1    Q    Which page are you referring to?

2    A    It's in the thousands.   Okay.

3    Q    Is it 2012.1080?

4    A    That's it.   2012.1080 is a table that I prepared for

5    Europe, and I also submitted to the Patent Office, which

6    addressed the publications cited in Dr. Sytkowski's

7    declaration, and it notes that human tPA was referred to in

8    Exhibit 20A and B which, which I cross-referenced to

9    reference capital B4 in information disclosure statements,

10   and I indicated that a glycoprotein product was produced, it

11   was a human glycoprotein, and it was an obligate

12   glycoprotein, but that no in vivo biological activity was

13   found.

14   Q    Now, Mr. Suh went over with you a statement that you

15   indicated was incorrect --

16   A    Yes.

17   Q    -- with respect to tPA.

18        When did you first learn that that statement about

19   the '619 application was incorrect?

20   A    I realized it was incorrect for the first time in the

21   course of my deposition this March.

22   Q    Now, Mr. Borun, you were asked some questions with

23   respect to patentably distinctness regarding applications

24   that were before the interference board.

25   A    Yes.

1  **Q**   At the time did you have any awareness as to whether the

2  Patent Office had made a determination as to whether or not

3  those applications and claims thereto were patentably

4  distinct?

5  A   The Patent Office made a determination that the, in the,

6  the subject matter of the '096 and '097 interferences were

7  patentably distinct in the context of an initial restriction

8  requirement between product and DNA and process claims.

9  Then when the '334 interference was declared, they provided

10  still another statement of patentable distinctness between

11  the DNA and process claims, as well as the product claims.

12  And this was provided in the context of Amgen asking to get

13  its product and process claims issued earlier so that they

14  could be enforced.  And the assistant commissioner and the

15  group director and the primary examiner participated in

16  sending out a notice saying these are related subject

17  matters, but each count is patentably distinct, each subject

18  matter is patentably distinct, and you have to put each one

19  at risk of loss on issues of priority and patentability.

20  **Q**   Now, you were asked questions about a statement in the

21  interference brief regarding different manifestations of the

22  same invention.

23          Do you recall that?

24  A   Yes.

25  **Q**   Did you write that brief?

1    A    I didn't write the brief, but I, I saw it before it was

2    filed.

3    Q    What was your understanding of the statements that you

4    were asked about by Mr. Suh?

5    A    In the remarks that I volunteered to Mr. Suh, I now

6    reiterate that the statement was there to represent

7    Fritsch's position that everything was a single invention

8    and there should be only one interference, and Amgen's

9    position, which was consistent with the Patent Office,

10   demand for separate inventions, it correlated and it said

11   whether you do it Fritsch's way or our way we win because of

12   the record established before the Court in Massachusetts, in

13   the Amgen/Chugai district court litigation.

14   Q    Mr. Borun, with respect to your testimony on direct, at

15   the time you were involved in the prosecution of the

16   applications leading to the patents-in-suit, what was your

17   understanding as to whether or not you fulfilled your

18   obligation to disclose all material information to the

19   Patent Office?

20   A    I believe I disclosed everything that I needed to

21   disclose and in a timely and faithful and accurate manner.

22   Q    And with respect to your testimony on direct at the time

23   you were involved in the prosecution of the application

24   leading to the patents-in-suit, what was your understanding

25   as to whether or not you made any misrepresentation to the

```
 1    Patent Office?

 2    A    Until March of this year when the assertion, the

 3    assertions in that one document were pointed out to me, I

 4    did not believe that I had ever misidentified any, any

 5    publication or misstated any material fact to the Patent

 6    Office.

 7    Q    Do you believe that you submitted full and correct

 8    disclosure regarding the '619 application and work with

 9    Genentech?

10    A    I believe I did.  It was there to establish that nobody

11    had gotten an in vivo biologically active obligate

12    glycoprotein.

13              THE COURT:  You have about two or three minutes,

14    Mr. Madrid.

15              MR. MADRID:  Thank you, your Honor.  I'll reserve

16    the time.

17              THE COURT:  Very well.  Anything -- you don't have

18    to ask this witness anything, but you have three minutes

19    left, Mr. Suh.

20              MR. SUH:  Thank you, your Honor.

21                      REDIRECT EXAMINATION

22    BY  MR. SUH

23    Q    Mr. Borun, I just want to clear something up with

24    respect to the interferences.  You mentioned in answering

25    Mr. Madrid's statement something about a '334 interference.
```

1   You were involved in that interference as well, weren't you?

2   A   Yes, I was.

3   Q   Okay.  I would like to show you QEC.  It's a Motion V by

4   Lin to Substitute a Count.

5            I believe you were telling the Court that, that you

6   were making this argument that there was this, there was no

7   reasonable expectation to have in vivo biological activity

8   of the protein.  And that was an argument that you made in

9   the '179 application, correct?

10  A   Could I have the question back, please, I'm sorry, I was

11  looking at the document.

12  Q   Sure.

13           In the '179 application you made the argument to

14  the Patent Office that the claims should be patentable and

15  not obvious because there was nothing in the prior art which

16  supported the reasonable expectation of in vivo biological

17  activity?

18  A   In the '179 application --

19  Q   Right.

20  A   -- there was no reasonable expectation that the claimed

21  process could be performed to obtain an in vivo biologically

22  active process.

23  Q   Right.  Looking at this QEC document, it's a Motion to

24  Substitute a Count.  I want to direct your attention to just

25  the first page.  It says:  The proposed count is identical

1    to the first four lines of the present count but differs by

2    omitting features which are inherent or otherwise

3    non-essential for proper definition of the invention at

4    issue.  The omitted portion reads:  Said product possessing

5    in vivo biological property.

6         **THE COURT:**  You have about time for two questions,

7    Mr. Suh.

8    **Q**   All right, next page, sir.

9    A   Yes.

10   **Q**   The first paragraph, it says:  Of the omitted features,

11   the in vivo biological property is inherent in EPO.  It says

12   see Miyake.

13        Do you see that?

14   A   Yes.

15   **Q**   All right.  So you argued before the interference that

16   EPO, once you had EPO, it was inherent to have in vivo

17   biological activity, correct?

18   A   Well, this was an argument that was submitted --

19   **Q**   Correct.

20   A   -- by my co-counsel.

21   **Q**   Mr. Borun, isn't that correct?

22   A   May I have the question back?

23        **THE COURT:**  Yes.

24   **Q**   You argued in the interference that once you had EPO,

25   the in vivo biological activity was inherent?

```
 1    A    No, an argument was made by Mr. Kokulis, my co-counsel,

 2    for simplifying the count --

 3              MR. SUH:  Your Honor, I just asked the question.

 4              THE COURT:  Yes.  Well, he certainly doesn't have

 5    to say yes.  His answer is no.

 6              MR. SUH:  That's right.

 7              THE COURT:  That exhausts the time.  And I think in

 8    the exercise -- you offer this, I take it?

 9              MR. SUH:  Yes.

10              THE COURT:  Yes, I'm going to accept it.  It will

11    have the next -- what's the next number for purposes of this

12    portion of the record?

13              MS. RYCROFT:  A10.

14              MR. SUH:  A -- I'm sorry?

15              MS. RYCROFT:  A as in alpha.

16              MR. SUH:  Alpha 10, your Honor.

17              THE COURT:  That's a numbering system I'm not

18    familiar with.  Why are we into letters?

19              MS. RYCROFT:  We've been using it for the

20    obviousness/double patenting phase.

21              THE COURT:  Oh, you've got a series -- now, here's

22    a number and letter person.  So, for the obviousness/double

23    patenting business you started with A and then put numbers

24    on it?

25              MS. RYCROFT:  I believe that that is what the
```

```
 1    parties did on October 4th, your Honor.

 2              THE COURT:  I'm fine with that.  And so this will

 3    be A10 for the purpose of that.

 4              (Exhibit marked in evidence.)

 5              THE COURT:  All right, Mr. Madrid, you have time

 6    for about three questions and you may ask them.

 7              MR. MADRID:  Thank you, your Honor.

 8                       RECROSS-EXAMINATION

 9    BY  MR. MADRID

10    Q   Mr. Borun, you were about to say something about your,

11    explain your understanding about Exhibit QEC.  Would you

12    please do so?

13    A   This document was submitted by co-counsel in an attempt

14    to amend the count, not to separate the count from the

15    other, from any other count, but to amend the count in the

16    '334 interference, to delete certain phrases.  And the

17    purpose as stated here is that the proposed, the proposed

18    count would be, would make it easier and better, better

19    suited to meet the applicant's proofs.  That request was

20    denied.  And the count proceeded with those limitations.

21              I could explain why Mr. Kokulis did this and what

22    that phrasing meant, but that would be a reconstruction of,

23    you know, my opinion of what it meant.

24    Q   Now, you agree with me that, you don't know that in vivo

25    activity is inherent until after you achieve it, correct?
```

```
 1              MR. SUH:  Objection; leading.

 2      A    That's correct.

 3              THE COURT:  Yes.  Sustained.

 4              MR. MADRID:  Your Honor, he was called as an

 5      adverse witness.

 6              THE COURT:  He may have been.  But in the exercise

 7      of discretion, I'm going to sustain that.  That's about it,

 8      isn't it?

 9              MR. MADRID:  Yes, sir.

10              THE COURT:  All right, thank you.

11              MR. MADRID:  I would highlight to the Court that in

12      our motion to introduce documents for completeness under

13      Rule 106 --

14              THE COURT:  Right.

15              MR. MADRID:  -- we have documents that directly

16      pertain to the interference documents that Mr. Suh --

17              THE COURT:  I now know what I'm going to do here.

18      So, thank you.

19              MR. MADRID:  Thank you.

20              MR. SUH:  Your Honor, I just want to make one

21      point, your Honor.  And that is that we would like to submit

22      briefs --

23              THE COURT:  I didn't -- wait a second.  You people

24      did this under the time limits that you had earlier agreed

25      to.  So now you'll hear me.
```

1                **MR. SUH:**  Yes.

2            **THE COURT:**  First we have to figure out what the

3     record is on which I'm going to act.  I will announce it to

4     you.  The record is the entire trial record, trial record,

5     everything the jury has heard, both orally -- you may step

6     down, sir.

7            **THE WITNESS:**  Okay.  Thank you, your Honor.

8            (Whereupon the witness stepped down.)

9            **THE COURT:**  -- both orally and by exhibits,

10    supplemented by this oral testimony and such exhibits as I

11    have up to this point allowed.

12            The motion of Amgen to introduce a whole raft of

13    exhibits is denied without prejudice to resubmitting a

14    motion directed precisely to what you wanted to argue,

15    Mr. Madrid.  All this business about, oh, they shouldn't be

16    arguing things they didn't plead, all these anchors to

17    windward about what might happen, we see what's happened,

18    and I'm going to give it serious consideration.

19            So I will entertain a motion to look at so much of

20    these documents within the scope of what you proffered,

21    Amgen proffered today, as pertain to the issues raised by

22    the testimony, and that's it, because the trial record is

23    what it is.

24            Now, this will never be as clear in my mind -- I'm

25    not saying it is -- but it will never be as clear in my mind

1    downstream as it is now.  Now is the time I've been working

2    on this case, all aspects of the case.  So I invite you to

3    make your arguments in writing, without a 20 page

4    limitation.  My intention -- there are, there are three

5    pieces of this case as to which I've got to act.

6    Inequitable conduct, obviousness/double patenting, and this,

7    what we're going to address, I hope on a written record,

8    with respect to inducement.

9          **MR. SUH:**  Inducement.

10         **THE COURT:**  Now, obviousness/double patenting is a

11   legal matter, and whatever the verdict of the jury, I will

12   get to it in a careful and prudential way.  Inducement, I've

13   heard Amgen's argument and I've got to wrestle with that

14   notwithstanding the jury's verdict, and I will of course

15   read everything you give me tomorrow.  I'm not so sure

16   that's right, but I suppose what you'll give me will be

17   supported by briefs and I will do my duty, again with all

18   deliberate speed.

19         This, inequitable conduct, I take under advisement

20   in part -- well, I take under advisement.  But I'm not going

21   to wait.  My hope is that on the day that the jury verdict

22   is returned, I can at least in a conclusory fashion set

23   forth my factual findings on this issue reserving my right

24   to supplement.  So if you want to proselytize me, you've got

25   to do it in writing now.

 1          And I think we're done today.  Nine o'clock

 2     tomorrow either you will, or 9:30, you've been talking to

 3     Ms. Smith, either you'll give me the documents I'm going to

 4     have --

 5          MR. FLEMING:  Your Honor, our expectation is just

 6     to submit to you briefs and documents --

 7          THE COURT:  Fine.

 8          MR. FLEMING:  -- in support thereof.

 9          THE COURT:  That's fine.

10          MR. MADRID:  Your Honor, we, Amgen moves for

11     judgment as a matter of law and will submit a written brief

12     as quickly as possible on that subject.

13          THE COURT:  Well, I'm not sure the nomenclature is

14     proper in a --

15          MR. MADRID:  Under Rule 52(c).

16          THE COURT:  I understand, in a jury waived case.

17     And in any event, it all collapses into one, because now

18     I've heard the evidentiary presentation as to this subject.

19     I've decided it's my duty to resolve it and I've invited

20     briefs.  So, of course, you think that they have failed in

21     their burden.  And I will hope for a brief.  But brief or no

22     brief, unless, unless I'm at sea, I intend to express myself

23     factually following the jury verdict.  I may not be able to.

24     But I intend to.

25          MR. FLEMING:  Your Honor, is it the Court's

1    preference to have briefing or proposed findings and

2    conclusions?

3              THE COURT:  Either.  You're trying to proselytize

4    me.  Either or both.

5              MR. FLEMING:  Thank you, your Honor.

6              MR. DAY:  Your Honor, with respect to the

7    inducement, we agree with Roche, we will submit evidentiary

8    submissions in writing tomorrow morning.  We would propose

9    that Amgen, awaiting the verdict, if the verdict is

10   returned, with infringement, that we then submit proposed

11   findings of fact on the two inducement counts, claims.

12             THE COURT:  I'm fine with that.  That was not under

13   the time limits given the way I backed into it.  My entire

14   goal will be efficiently to bring this phase of the case to

15   a close if --

16             MR. DAY:  And so we would propose to submit --

17             THE COURT:  Right.

18             MR. DAY:  -- proposed findings within three days

19   following the verdict so that you can have them.

20             THE COURT:  I'm not particularly pressing.  But

21   does that sound all right, from the Roche side?

22             MR. FLEMING:  From three days -- we do disagree as

23   to the number of claims that were made, that will sort

24   itself out, but the timing is fine, your Honor, thank you.

25             THE COURT:  Fine.  Again, I thank you all very

1    much.

2            Now, you understand what my practice is.  I'm going

3    to bring the jury in here close on five o'clock to give them

4    appropriate instructions.  I'm going to bring the jury in at

5    9:00 a.m. tomorrow morning to see that they have not had any

6    extraneous influences, and that will be my practice Friday.

7    If its goes Monday and Tuesday, under my supervision, Ms.

8    Smith will have the care of the jury.  We're not bringing

9    them into the courtroom on those days.  If there's an

10   emergency, Magistrate Judge Bowler will take care of it.  I

11   intend to come back and take the verdict.

12           So just -- you don't have to be here but you're

13   welcome.

14           **MR. FLEMING:**  Your Honor, we would like to have

15   attorney presence in your courtroom while the jury is

16   deliberating.

17           **THE COURT:**  That's -- what I'm saying is it's up to

18   you.

19           **MR. FLEMING:**  Thank you.

20           **THE COURT:**  Fine.  Oh, but about a question now.  I

21   should have said this, but it must be clear.  I expect you

22   to be within about five minutes of Ms. Smith gathering you

23   if you want to be consulted on a question.

24           **MS. BEN-AMI:**  We understand.

25           **MR. FLEMING:**  We understand.

1  **THE COURT:**  I'm sure you all do.  It's my intention

2  to consult you in person or by phone, but you've got to be

3  close by.

4  Thank you all.  We'll recess then in this case

5  awaiting the verdict of the jury.  We'll recess.

6  **THE CLERK:**  All rise.  Court is in recess.

7  (Adjournment.)

8  **C E R T I F I C A T E**

9

10

11  I, Donald E. Womack, Official Court Reporter for

12  the United States District Court for the District of

13  Massachusetts, do hereby certify that the foregoing pages

14  are a true and accurate transcription of my shorthand notes

15  taken in the aforementioned matter to the best of my skill

16  and ability.

17

18

19

20

21  /S/ DONALD E. WOMACK
   _____

22  DONALD E. WOMACK
   Official Court Reporter

23  P.O. Box 51062
   Boston, Massachusetts 02205-1062

24  womack@megatran.com

25