```
 1              UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MASSACHUSETTS
 2
                                     Civil Action
 3                                   No. 05-12237-WGY

 4   * * * * * * * * * * * * * * * *
                                   *
 5   AMGEN, INC.,                  *
                                   *
 6           Plaintiff,            *
                                   *   DAILY TRANSCRIPT
 7   v.                            *   OF THE EVIDENCE
                                   *   and MOTION HEARING
 8   F. HOFFMANN-LA ROCHE LTD,     *     (Volume 9)
     ROCHE DIAGNOSTICS GmbH and    *
 9   HOFFMANN-LA ROCHE, INC.,      *
                                   *
10           Defendants.           *
                                   *
11   * * * * * * * * * * * * * * * *

12

13

14           BEFORE:  The Honorable William G. Young,
                      District Judge, and a Jury
15

16

17

18

19

20

21

22

23                                   1 Courthouse Way
                                     Boston, Massachusetts
24

25                                   September 24, 2007
```

```
 1              A P P E A R A N C E S

 2

 3              DUANE MORRIS LLP (By D. Dennis Allegretti,
        Esq. and Michael R. Gottfried, Esq.), 470 Atlantic
 4      Avenue, Suite 500, Boston, Massachusetts 02210
                - and -
 5              DAY CASEBEER MADRID & BATCHELDER, LLP (By
        Lloyd R. Day, Jr., Esq., David M. Madrid, Esq. and
 6      Robert M. Galvin, Esq.) 20300 Stevens Creek
        Boulevard, Suite 400, Cupertino, California 95014
 7              - and -
                McDERMOTT WILL & EMERY (By Michael Kendall,
 8      Esq.), 28 State Street, Boston, Massachusetts
        02109
                - and -
 9              McDERMOTT WILL & EMERY (By William G.
        Gaede, III, Esq.), 3150 Porter Drive, Palo Alto,
10      California 94304
                - and -
11              MARSHALL, GERSTEIN & BORUN LLP (By Kevin M.
        Flowers, Esq.), 6300 Sears Tower, 233 S. Wacker
12      Drive, Chicago, Illinois 60606-6402
                - and -
13              STUART L. WATT and WENDY A. WHITEFORD, Of
        Counsel, Amgen, Inc., One Amgen Center Drive,
14      Thousand Oaks, California 91320-1789, on behalf of
        the Plaintiff
15
                BROMBERG & SUNSTEIN LLP (By Lee Carl
16      Bromberg, Esq. and Julia Huston, Esq.), 125 Summer
        Street, Boston, Massachusetts 02110
17              - and -
                KAYE SCHOLER LLP (By Leora Ben-Ami, Thomas
18      F. Fleming, Esq., Patricia Carson, Esq.,
        Christopher Jagoe, Esq. and Howard Suh, Esq.),
19      425 Park Avenue, New York, New York 10022, on
        behalf of the Defendants
20

21

22

23

24

25
```

1
## I N D E X

2

WITNESS:                DIRECT   CROSS     REDIRECT    RECROSS

3

4   CAROLYN BERTOZZI, Resumed

5     By Mr. Day                1138                    1178

6       By Mr. Jagoe                      1149

7   JOAN C. EGRIE, By Deposition

8     By Ms. Ben-Ami    1181

9   RICHARD FLAVELL

10     By Mr. Fleming    1202

11     By Mr. Madrid           1273

12

13   EXHIBITS:                              FOR      IN
                                            I.D.     EVID.

14

15       2063 Lin, et al. Article  . . . . . . . . .1183

16       2064 Memorandum . . . . . . . . . . . . . .1186

17       2065 Memorandum . . . . . . . . . . . . . .1189

18       2066 Memorandum . . . . . . . . . . . . . .1190

19       2067 Memorandum . . . . . . . . . . . . . .1193

20       2068 Presentation . . . . . . . . . . . . .1194

21       2069 Memorandum . . . . . . . . . . . . . .1195

22       2070 IND 1571 Epogen Volume 2 . . . . . . .1196

23       2071 Egrie Laboratory Notebook  . . . . . .1198

24       2072 Letter . . . . . . . . . . . . . . . .1200

25       2073 Goldwasser and Sherwood Annotation . .1271

1          THE CLERK:  All rise for the jury.

2          (Whereupon the jury entered the courtroom.)

3          THE CLERK:  Court is in session, please be seated.

4          THE COURT:  Good morning, ladies and gentlemen.

5          THE JURY:  Good morning.

6          THE COURT:  It's good to see you all, and we deeply

7     appreciate how prompt you are and you're all ready to go.

8     Because you're all ready to go, we're all ready to go.

9          And the witness is here.  And let me, ma'am, remind

10    you, you are still under oath.

11         THE WITNESS:  Yes.

12         THE COURT:  Now, let me -- and you may continue,

13    Mr. Day.

14         MR. DAY:  Thank you very much, your Honor.

15              CAROLYN BERTOZZI, Resumed

16         CROSS-EXAMINATION (Cont'd)

17    BY  MR. DAY

18    Q   Dr. Bertozzi, you agree that Dr. Goldwasser's urinary

19    EPO preparation was a mixture of different EPO glycoforms,

20    don't you?

21    A   Yes, I do.

22    Q   I would like to ask you about the SDS-PAGE analysis that

23    you discussed with Mr. Jagoe during your direct testimony.

24         Do you recall, Doctor -- I'm sorry, do you agree,

25    Doctor, that if Dr. Goldwasser's urinary EPO and an EPO

1    product purified from mammalian cells grown in culture

2    migrated identically, not SDS-PAGE, do you agree that that

3    fact by itself would not prove that the two products have

4    the same glycosylation?

5         MR. JAGOE:  Objection, your Honor; relevance and

6    foundation.

7         THE COURT:  Overruled.  I mean, if she can answer.

8    A    Well, I guess the best answer I could give is if you

9    ignore all the other data, then based solely on those data,

10   one couldn't draw a conclusion, one would have to consider

11   all of the data.

12   Q    One would have to consider other data as well; is that

13   correct?

14   A    In order to conclude that the structures of EPO made in

15   CHO cells are the same as the structures in Goldwasser's EPO

16   one needs a collection of data.

17   Q    So, to focus on the question I asked precisely.

18        Do you agree that if Dr. Goldwasser's urinary EPO

19   and EPO produced from CHO cells migrated identically on

20   SDS-PAGE, that one skilled in the art such as yourself could

21   not by that fact alone conclude that the two products had

22   the same glycosylation?

23        MR. JAGOE:  Objection; foundation, and vague.

24        THE COURT:  Overruled.  She may answer, if she can.

25   A    I would say what one can conclude is that --

1    **Q**   No, could you answer my question --

2    A   -- they have the same amount of sugar.

3    **Q**   Excuse me, Doctor.  Could you answer my question and

4    then explain.

5         Could one conclude based on the SDS-PAGE analysis

6    that I described that those two products had the same

7    glycosylation?

8    A   You know, you're asking me to ignore things I know --

9    **Q**   No, I'm not asking you to ignore --

10   A   -- which is difficult.  I have to put myself in a

11   position of ignorance to answer that question.

12   **Q**   No, I'm not asking you to ignore anything.  I'm asking

13   you for your scientific expertise to inform the jury what

14   conclusion can be drawn on the basis of SDS-PAGE data alone?

15   A   Yes, I can tell you what can be drawn in general.  So,

16   SDS-PAGE, just as a little refresher, is the technique that

17   scientists use to determine the size of molecules.  So, if

18   one performed solely an SDS-PAGE experiment comparing EPO

19   from CHO cells and Goldwasser's EPO from the prior art, what

20   one would be looking at were their relative sizes.  And

21   since we know that they are glycoforms of each other, if the

22   sizes are the same, what we can conclude is that they have

23   the same amount of sugar.  That's what can be concluded.

24   **Q**   Could you conclude that they have the same carbohydrate

25   structures?

1    A    SDS-PAGE data alone do not provide actual structural

2    information.

3    Q    Okay.

4    A    That's true.

5    Q    Is it possible in your opinion, Dr. Bertozzi, for two

6    EPO products to migrate identically on SDS-PAGE and yet

7    still be very different products?

8         MR. JAGOE:  Objection; it's an incomplete

9    hypothetical, vague.

10        THE COURT:  Can you answer that question?

11   A    Could you, I'm sorry, pose it again, please?

12   Q    Yes.  Is it possible in your opinion for two EPO

13   products to migrate identically on SDS-PAGE and yet still be

14   very different products?

15        MR. JAGOE:  Same objection, your Honor.

16        THE COURT:  Overruled.  If she can answer.

17   A    Well, the -- do you mean two EPO molecules?

18   Q    No.  Two populations of EPO molecules.

19   A    Two groups of EPO molecules.

20   Q    Two EPO products.  You testified that --

21   A    An EPO product is a glycoprotein.  So you're saying you

22   have two glycoproteins migrating the same?  And the question

23   is do they have the same structures?

24   Q    Well, let's take your --

25   A    Is that what you are saying?

1    **Q**    Sure, let's take that question.

2    **A**    If two EPO glycoproteins have the same migration on that

3    SDS-PAGE experiment, what we can conclude is that they have

4    the same amount of sugar.

5    **Q**    Can you conclude that they have the same amino acid

6    sequence?

7    **A**    Well, we're starting with the hypothetical that they're

8    EPO glycoproteins.  And if they're human EPO, then basically

9    they have the amino acid sequence of human EPO.  And so, if

10   those two EPOs migrate the same then basically they have

11   different, they have the same amount of sugars.

12   **Q**    What if you don't know whether they're human EPO or not,

13   you just know that they're EPO --

14          **MR. JAGOE:**  Objection.

15   **Q**    -- and they migrate identically on SDS-PAGE.  Can you

16   tell from that fact alone that they are the same product?

17          **MR. JAGOE:**  Objection; relevance.

18          **THE COURT:**  Overruled.  You may answer.

19   **A**    Well, the only, the only EPO that I've analyzed in any

20   detail is human EPO.  So, I can't really comment on any

21   other EPO.

22   **Q**    Okay.

23   **A**    But limiting my analysis to human EPO, I would say if

24   they migrate the same, what one can conclude is they have

25   the same amount of sugar.  And if they're different

1    glycoforms that have the same amount of sugar, they can

2    migrate the same.

3            **MR. DAY:**  Okay.  Could we have Exhibit 2061, please

4    pulled up on the screen.

5    **Q**   This was one of the documents, one of the Amgen

6    publications that you discussed in your direct examination

7    with Mr. Jagoe, and this was a comparison of recombinant

8    monkey and human EPO.

9            Do you recall?

10   A   Yes.

11   **Q**   And I would like you to take a look, please, at, I think

12   it's Page 343 of the exhibit.

13   A   Could you tell me the exhibit number?

14   **Q**   2061.  Let me hand you another copy of it.  I'll just

15   hand you a copy, it will make it easier for you.

16           **MR. DAY:**  Your Honor, may I hand you a copy.

17   **Q**   Now, in this paper, Amgen compared monkey EPO, which you

18   know has a different amino acid sequence than human EPO,

19   correct?

20   A   I haven't analyzed monkey EPO.

21   **Q**   Okay.  They compared monkey EPO with human EPO.

22           **MR. DAY:**  Could we pull up the paragraph in the

23   middle, please.  Yes.

24   **Q**   As shown in Figure 2:  When equal aliquots of control

25   and anemic monkey sera were subjected to Western analysis,

1    the monoclonal antibody identified a specific band with a

2    molecular weight of 34 daltons in the anemic but not the

3    control monkey sera.  The monkey sera EPO migrated

4    identically to the human urinary EPO standard.

5            Doesn't that show, Doctor, that using SDS-PAGE you

6    can get two products that migrate identically and yet still

7    have very different products?

8    A   Well, I can't answer the question because I haven't

9    analyzed monkey EPO.

10   Q   Okay.  I would also like to ask you about the IEF

11   analyses that you discussed with Mr. Jagoe during your

12   direct examination.

13           In your opinion, Doctor, is it possible for two EPO

14   glycoforms to migrate identically on an IEF gel and yet have

15   different carbohydrate structures?

16   A   Okay, just a brief recap.  So, IEF is the technique that

17   separates molecules based on charge.  And in the case of

18   EPO, there are often glycoforms that have different charges.

19   So they separate into what looks like a ladder.  And the

20   question is if two molecules have the same charge, migrate

21   identically on IEF, do they necessarily have the same

22   carbohydrate structure?

23   Q   Yes.

24   A   That's the question?

25   Q   Yes.

1    A    What IEF tells us is the molecules have the same charge.

2    And that means that they may have the same carbohydrate

3    structure.  But it's possible that the carbohydrate

4    structures have different linkages, but the charge is the

5    same.  That's possible.

6    **Q**    IEF does not provide information regarding their

7    carbohydrate structure, does it?

8    A    IEF only provides information with respect to charge.

9    **Q**    Would you please take a look at your expert report from

10   April 6.  Do you have that in front of you?

11   A    I think so.  Is that -- do you know the color?  Is it

12   blue?

13   **Q**    No, I don't know the colors.  It's the blue report, I

14   guess.

15   A    There's no date.  I'm picking up the blue one.  I think

16   this is the one.

17   **Q**    If you would turn to Paragraph 107.

18   A    It is the blue one?

19   **Q**    Yes.  Turn to Paragraph 107 of your report.

20   A    Yes.

21   **Q**    Okay.  In Paragraph 107 in the middle of the paragraph

22   where you're describing the significance of IEF profiles you

23   wrote, and I quote:  The IEF profile simply provides

24   information regarding the net charge of the glycoforms.  It

25   does not provide information regarding their carbohydrate

1    structures.

2            Correct?

3    A    Right.  That's what I just said.  Thank you.

4    Q    So, if one IEF band from Dr. Goldwasser's urinary EPO

5    migrates to the same position as an IEF band from EPO

6    purified from mammalian cells grown in culture, you agree,

7    don't you, Doctor, that you cannot know based on that fact

8    alone if the glycoforms in those two bands have the

9    identical structure?

10           **MR. JAGOE:**  Objection; vague, foundation.

11           **THE COURT:**  Overruled.

12   A    Well, again, I can't forget what I know, and based on

13   all the data that I know --

14   Q    Well, I'm asking you about the IEF.  And I'm asking you

15   as a scientist --

16   A    Uh-huh.

17   Q    -- to tell the jury what you know is possible to

18   interpret from IEF data alone.

19   A    Well, if one ignores all the other data and focuses only

20   on the one experiment of IEF, then one would conclude that

21   there are glycoforms of CHO EPO that have the same charge as

22   glycoforms from urinary EPO, Goldwasser's EPO.  And combined

23   with the other data, I can tell you with statistical

24   certainty that the molecules have the same structures.

25   Q    Well, that's not the question I asked, is it, Doctor?

1    So let's --

2    A   But that's the truth.

3    Q   -- let's focus -- well, when you say that's the truth,

4    we'll explore that.  But I would like you to answer the

5    question I asked.

6    A   Well, I guess --

7    Q   Focusing on IEF gels alone --

8    A   So with --

9    Q   Excuse me, Doctor.

10   A   I understand.

11   Q   Let me finish the question.

12          Focusing on IEF gels alone, when you take one

13   product, Dr. Goldwasser's urinary EPO, and you run it on the

14   gel and you take another product, EPO purified from

15   mammalian cells grown in culture, and you see two bands that

16   migrate to the same position, you cannot tell from that fact

17   alone that the glycoforms in those two bands have the

18   identical structure, can you?

19   A   You have to pretend that there are no other data to draw

20   that conclusion.  So, under that pretense, then, yes, all

21   you can conclude is that the charges are the same with no

22   conclusion regarding the carbohydrate structures.

23   Q   Okay.  Now, in your direct testimony Mr. Jagoe asked you

24   about an IEF gel prepared by Dr. Catlin.

25          Do you recall that?

1    A    Vaguely.

2    Q    And the IEF gel to which you referred was Exhibit L in

3    Dr. Catlin's report, correct?

4         MR. JAGOE:  Objection, your Honor; foundation.

5         THE COURT:  Well, no, he's asking the question:  Is

6    that right?

7    A    I think it was Exhibit L.

8    Q    Okay.  Well, let me --

9    A    It was an exhibit in Dr. Catlin's report.

10   Q    Okay.  Well, let me ask you to take a look at your

11   expert report, in your June 5th, which, I guess, is the

12   yellow expert report, take a look at Paragraph 33 and 34.

13   A    Yes.

14   Q    This is the expert report that you wrote, correct,

15   Doctor?

16   A    That's right.

17   Q    And does that refresh your recollection that the gel you

18   were referring to is Exhibit L, Doctor?

19   A    It is L, yes.

20   Q    Exhibit L.  And let me hand you a copy of Exhibit FTM

21   which we've marked for identification.  This is Dr. Catlin's

22   report.

23        Would you look at Exhibit L.  And would you

24   identify for me whether Exhibit L is in fact the gel that

25   you were referencing in your direct testimony in this case?

1    A    It does appear to be.

2              **MR. DAY:**  Your Honor, I would offer Exhibit L into

3    evidence.

4              **MR. JAGOE:**  Objection, your Honor.

5              **THE COURT:**  Yes, sustained, on this foundation.

6              **MR. DAY:**  No further questions.

7              **THE COURT:**  Any redirect for this witness?

8              **MR. JAGOE:**  Yes, your Honor.

9              I'll move this back here so I don't block the

10   screen.

11                    **REDIRECT EXAMINATION**

12   **BY  MR. JAGOE**

13   **Q**    Good morning, Dr. Bertozzi.

14   A    Hi.

15   **Q**    On cross-examination you testified that it's important

16   to your opinions to rely on all the data that, the

17   collection of all the data.  Can you explain to the jury why

18   it is important to rely on data from different techniques to

19   support your opinion?

20   A    Well, basically what's at issue here is whether the EPO

21   from CHO cells has the same structure as Goldwasser's EPO.

22   And EPO has different properties that we can characterize

23   using different techniques.  I think it's important to look

24   at different techniques, and also performed in different

25   laboratories.  That way we get a more objective view of what

1    the structures are.

2           So, the techniques that were used were analysis of

3    the building blocks, remember the colored shapes, the

4    triangles and the squares, and by that analysis CHO EPO and

5    Goldwasser's EPO have the same components.

6           The next analysis was to look at the trees, how the

7    building blocks are put together.  And by that analysis the

8    CHO EPO and Goldwasser's EPO have the same trees.

9           We know they have the same size.  We just discussed

10   that, the SDS-PAGE analysis.  And there are certainly

11   molecules in both samples that have the same charge.

12          So, using all of these data together one can

13   actually do a calculation to determine the likelihood that

14   the structures from the CHO EPO are the same as those in

15   Goldwasser's EPO, and I've done those calculations.

16          **MR. DAY:**  Your Honor, I object; it's outside the

17   scope of the expert report --

18          **THE COURT:**  Overruled.

19          **MR. DAY:**  -- as well as the cross.

20          **THE COURT:**  Overruled.  She may finish her

21   explanation.  Overruled.

22          Go ahead, finish your explanation.

23   A   Well, without going through any gory details, the

24   calculations demonstrate to me that it's statistically

25   impossible not to have the same structures, the structures

 1    must be the same, and that's the basis of my opinion.

 2    **Q**   And, in fact, your calculation and your opinion were

 3    based on all of the data of different techniques that you've

 4    reviewed?

 5    A    That's right.  I didn't ignore any of the data that, you

 6    know, was more or less convenient.  I just took all the data

 7    together in drawing my conclusions.

 8         **MR. JAGOE:**  Can we have CB26 on the screen.

 9    **Q**   And I would just like to refresh your memory and the

10    jury's memory of the language of the claims.

11         Now, claim 1 of the '422 which you're offering

12    opinions on says human erythropoietin wherein said

13    erythropoietin is purified from mammalian cells grown in

14    culture.  Correct?

15    A    Yes.

16    **Q**   Now, in terms of chemistry, in chemical terms, what is

17    human erythropoietin purified from mammalian cells grown in

18    culture?

19         **MR. DAY:**  Again, your Honor, it's outside the scope

20    of the cross, and also outside of the scope of the expert

21    report.

22         **MR. JAGOE:**  Your Honor, I --

23         **THE COURT:**  That seems to be outside the scope.

24         **MR. JAGOE:**  I believe it's within the scope of the

25    cross, and if we could have a side bar I can explain.

1          **THE COURT:**  All right, you may.

2     SIDEBAR CONFERENCE, AS FOLLOWS:

3          **THE COURT:**  Yes?

4          **MR. JAGOE:**  On cross-examination he asked many

5     open-ended questions which weren't linked in any way to the

6     language of the claims, and I want to point out to the jury

7     that what's claimed here are human EPO molecules, not any

8     type of collection of molecules, not any type of specific

9     distribution of molecules.

10          **THE COURT:**  All right.  I understand that.

11          **MR. DAY:**  I didn't ask any questions about chemical

12    structure of erythropoietin.  I asked questions about all of

13    her comparisons to the prior art.

14          **THE COURT:**  I think he should be allowed some

15    latitude.  I'm going to give it.

16          Now, while we're up here, this business about

17    Catlin, I'm denying the motion to take him out of order now

18    and we're going to take his deposition.  You can get him

19    back here even if we have to do it in the infringement case.

20    And if this Dr. V, I haven't got the name, if his testimony

21    turns on Catlin's testimony, I put him off, then when we

22    rest in this portion of the case, we can rest subject to

23    their calling him, subject to your calling him.  But you can

24    call him, just when he gets back.

25          **MR. FLEMING:**  Thank you, your Honor.

1          (Whereupon the sidebar conference concluded.)

2          **THE COURT:**  Yes, on reconsideration you may have

3     the question, but you'll have to ask it again, Mr. Jagoe.

4     **BY  MR. JAGOE**

5     **Q**   Dr. Bertozzi, in terms of chemistry, what is human

6     erythropoietin purified from mammalian cells grown in

7     culture?

8     A    Human EPO from mammalian cells grown in culture is

9     chemically the same as Goldwasser's EPO purified from human

10    urine.

11    **Q**   In chemistry, when we speak, when chemists speak of the

12    smallest particle of a substance that contains the physical

13    and chemical properties of the substance, what is that

14    referred to?

15    A    A molecule.

16          **MR. DAY:**  Objection, your Honor; it's outside the

17    scope of the cross and the expert report.

18          **THE COURT:**  No, she may testify that the answer is

19    a molecule.  Correct?

20          **THE WITNESS:**  It's a molecule.

21          **THE COURT:**  That may stand.

22          **THE WITNESS:**  I think we probably all learned that

23    at one point.

24          **THE COURT:**  Wait.  There's objections.  I'll take

25    molecule and that's it.

1              Go ahead.

2         **MR. JAGOE:**  Okay.

3    **Q**   In the '422 patent, is there any description of the

4    molecules of human erythropoietin purified from mammalian

5    cells grown in culture?

6    A    There's no description of the structures of these

7    molecules.

8    **Q**   And how does the number of different EPO molecules that

9    can be purified from mammalian cells grown in culture

10   compare to the different molecules in Amgen's CHO cell

11   produced erythropoietin?

12        **MR. DAY:**  Your Honor, again I object.  It's outside

13   the scope of cross and the expert report.

14        **THE COURT:**  Yes.  Where's this in the report?

15        **MR. JAGOE:**  I believe it's discussed in yellow 19,

16   but I think it was also, this is redirect to his

17   cross-examination questions.

18        **THE COURT:**  Well, just a moment.  Well, sustained.

19   This is redirect.  Sustained.

20             You may inquire as to what Mr. Day inquired of.

21   **Q**   Dr. Bertozzi, how, if at all, could a scientist

22   determine based on the information in the patent whether or

23   not an EPO molecule has the structure of an EPO molecule

24   purified from mammalian cells grown in culture?

25        **MR. DAY:**  Again, your Honor, it's outside the scope

1   of both the cross and the expert report.

2        THE COURT:  Overruled; he may have it.

3   A   Well, the patent says nothing of the actual structures

4   of the human EPO.  You can read the claims of course.

5   There's no mention of any particular glycoform or set of

6   glycoforms or limit on the glycoforms.  It's just all the

7   glycoforms made in mammalian cells, which is a huge universe

8   of glycoforms far in excess of what Amgen has produced just

9   from the one CHO cell.

10  Q   From what kind of cells were Dr. Goldwasser's EPO

11  molecules produced and purified?

12  A   Mammalian cells.

13  Q   And how do the EPO molecules produced in human kidney

14  cells in the body and filtered out in urine compare to the

15  structure of EPO molecules purified from mammalian cells

16  grown in culture?

17        MR. DAY:  Your Honor, it's outside the scope.

18        MR. JAGOE:  Your Honor, at --

19        THE COURT:  Overruled; he may have it.

20  A   Well, in that description there's no difference.  So,

21  EPO, human EPO produced from mammalian cells in culture will

22  have the same glycoforms as those that are produced from the

23  human kidney, which is just a mammalian cell.  The term

24  mammalian cells is a broad term, it encompasses all

25  mammalian cells.  So, basically human EPO from mammalian

1    cells is the same thing as human EPO that's produced in the

2    human body.

3    **Q**   Dr. Bertozzi, on cross-examination you were asked some

4    questions about specific activity.  Do you recall that?

5    A    Yeah, generally.

6    **Q**   And you wanted to give an explanation of, or definition

7    of specific activity.

8             Could you define specific activity, please?

9    A    Yes.  Specific activity is basically a way of saying

10   from a set of molecules, let's say you have ten molecules,

11   how many of those ten are actually active.  Okay?  So there

12   might be ten molecules in the bottle, but if only five of

13   them are active and the other five are damaged then the

14   specific activity is like 50 percent.  Okay.  So it's how

15   many are active compared to the total number.

16   **Q**   How does the particular glycoform of human

17   erythropoietin relate to specific activity?

18             **MR. DAY:**  Your Honor, it's outside the scope.

19             **THE COURT:**  Yes.  Sustained.

20             **MR. JAGOE:**  Your Honor --

21             **THE COURT:**  Sustained.

22             **MR. JAGOE:**  Can we please have Exhibit 2062.

23   **Q**   And, Dr. Bertozzi, this is one of the Amgen publications

24   that you had previously discussed, and Mr. Day asked you to

25   read a response at the end of this paper by Dr. Vapnek at

 1    206.15.

 2           Could we have that.  At the very bottom of the

 3    page.

 4           Mr. Day asked you to read Dr. Vapnek's response

 5    regarding specific activity, certain preparations of human

 6    erythropoietin.  And he didn't allow you to read the

 7    complete response of Dr. Vapnek which carries over onto the

 8    next page.  So would you please --

 9           **MR. DAY:**  I object to the characterization.

10           **THE COURT:**  Yes.

11           **MR. JAGOE:**  Okay.

12           **THE COURT:**  Really answers should be longer than

13    questions, Mr. Jagoe.

14           **MR. JAGOE:**  I'm sorry.

15           **THE COURT:**  Strike all that out.  He's going to ask

16    you to read something.  Now, he will tell you what he wants

17    you to read.  Tell her what you want her to read.

18    **Q**   I would like you to read the final two sentences of Dr.

19    Vapnek's response.

20    **A**   I think -- you mean starting with "However"?

21    **Q**   Yes.

22    **A**   "However, we just have not done that much with the

23    natural material.  It could be that that difference would go

24    away if we did several batches."

25    **Q**   Now, what is your understanding of how the specific

1    activity relates to specific batches of human

2    erythropoietin?

3            **MR. DAY:**  Your Honor, it's outside the scope of the

4    cross and the expert report; there's nothing about this.

5            **THE COURT:**  Yes, where is this?  Where in the

6    report?

7            **MR. JAGOE:**  Your Honor, Mr. Day asked her to read

8    this response about specific activity --

9            **THE COURT:**  Yes.

10           **MR. JAGOE:**  -- on cross-examination.

11           **THE COURT:**  Yes.

12           **MR. JAGOE:**  I would just like to have a complete

13   record of --

14           **THE COURT:**  Well, please.  You have -- you can have

15   her read from other parts of it if you want reading.

16   Otherwise, sustained, if that's the response.  Sustained.

17           **MR. JAGOE:**  Can we please have Exhibit 2057.

18   **Q**   Dr. Bertozzi, can you remind the jury what Exhibit 2057

19   is?

20   A    This is Amgen's Product License Application for

21   recombinant human EPO that was submitted to the government

22   to seek approval of their drug.

23   **Q**   And can you please look at --

24           **MR. JAGOE:**  Can we please have on the screen

25   2057.209.  Can you blow up the text, please.

1    **Q**   Okay.  Can you read what is the legend for Figure 9.E-15

2    of Amgen's PLA?

3    A   On the screen:  Specific activity of purified bulk

4    recombinant human EPO.  Shown are the specific activities of

5    each of the first 16 lots of purified bulk recombinant human

6    EPO measured by both the mouse exhypoxic polycythemic in

7    vivo bioassay and radioimmunoassay and expressed as units

8    per absorbance 280 and as units per milligram of

9    glycoprotein.

10            **MR. JAGOE:**  Okay.  Can we now have the next page of

11   this exhibit.  Can we blow up the --

12   **Q**   Now, I would like you to focus on the lot number 516

13   which is close to the bottom of the list.

14            What is the specific activity of Amgen's CHO cell

15   produced recombinant EPO in lot number 516?

16   A   Well, there were two different specific activities

17   given, one for an in vivo bioassay, that's activity in a

18   mouse; the other is the specific activity for an in vitro

19   assay that has to do with how another protein binds to the

20   EPO.

21            I can read the numbers.

22   **Q**   What is the specific activity for the in vivo bioassay

23   expressed in absorbance units?

24   A   The units per absorbance, 280 is 101,272.

25   **Q**   And what is the specific activity in units of, in units

1    per milligram?

2    A    That looks like 75,296.

3    Q    Okay.  At the bottom of the table what is the range of

4    different specific activities for Amgen's different lots of

5    CHO cell produced EPO?

6    A    Well, what I'm looking at is a range from 101,000,

7    roughly, to 217,000.

8    Q    And how do these lots of CHO cell produced EPO relate to

9    the glycoprotein products claimed in the '933 and the '422

10   patents?

11            MR. DAY:  Objection, your Honor; it's outside the

12   scope of the report and the cross.

13            THE COURT:  Yes, sustained.

14            MR. JAGOE:  Can we have Exhibit 2002 on the screen,

15   please.

16   Q    Can you remind the jury what 2002 is, Dr. Bertozzi?

17   A    Yes.  This is Dr. Miyake and Dr. Goldwasser's 1977

18   publication on purification of human EPO from urine.

19            MR. JAGOE:  Can we have Table 4 expanded on 2002.4.

20   Q    Can you tell the jury what the specific activity in

21   terms of units per absorbance is for Dr. Goldwasser's

22   Fraction II?

23   A    Well, units per absorbance, Fraction II looks to be

24   128,620 units.

25   Q    And what is the specific activity for Dr. Goldwasser's

1    Fraction IIIA?

2    A    Fraction IIIA has a specific activity of 93,940 units.

3    **Q**    Okay.  Can you explain to the jury what Fractions II and

4    IIIA are?

5           **MR. DAY:**  Objection, your Honor, it's outside the

6    scope; lacks foundation.

7           **THE COURT:**  Yes.  Well, I'm not so troubled by the

8    foundation, but sustained on the earlier ground.

9           **MR. JAGOE:**  Could I have a side bar on this,

10   please?

11          **THE COURT:**  You could.

12   SIDEBAR CONFERENCE, AS FOLLOWS:

13          **MR. JAGOE:**  On cross-examination he asked several

14   questions comparing Goldwasser EPO to the one batch of the

15   recombinant EPO implying that that was a limitation in the

16   claim that could distinguish Dr. Goldwasser's from the

17   claims.

18          **THE COURT:**  It's not.  So, I'm not troubled by

19   that.

20          **MR. JAGOE:**  I want to explain to the jury that

21   Dr. Goldwasser's EPO has specific activity and the range of

22   recombinant EPO that Amgen itself produced as a commercial

23   batch.

24          **MR. DAY:**  It should have been in the expert report.

25          **THE COURT:**  Well, I think that's true.  It should

```
 1    have been.  And I really do think -- this is really redirect

 2    now.  You may be able to bring that out but not with this

 3    witness.

 4          MR. FLEMING:  May I -- I know.  I apologize.

 5    But --

 6          THE COURT:  Not really.

 7          MR. FLEMING:  I do, sincerely.

 8          THE COURT:  Oh, all right.

 9          MR. FLEMING:  I apologize.  And I thank you for

10    your indulgence.

11          There was a significant line of questioning as your

12    Honor might remember on specific activity during the cross.

13          THE COURT:  Yes.  Oh, yes.

14          MR. FLEMING:  The implication of that questioning

15    was that the differences in specific activities suggests

16    differences in molecules.  And the data from the actual

17    claims as your Honor told them that Mr. Jagoe is trying to

18    demonstrate shows that in fact that specific activity for

19    the molecules is compared.

20          THE COURT:  Why, why, if that's so, why isn't that

21    in her report?  One, it's not.  And two, the existential

22    facts, because you've got the existential facts, you can

23    argue from them.

24          MR. FLEMING:  Part of the theory, your Honor, is

25    what these, at least concepts of all of these structural
```

1     differences.  You can remember back to the summary judgment

2     argument where your Honor asked Mr. Day what are the

3     structural differences and which was perhaps unanswered, but

4     anyway it's coming out late, and at the time of this report

5     your Honor, some of these arguments are late emerging, we

6     have to be able to respond to it on an evidentiary basis.

7              **THE COURT:**  Yes, I -- no, sustained.  This is

8     redirect.  I'm not precluding you from getting into the data

9     which is of record it seems to me.  You may argue from it

10    but this witness --

11             **MR. FLEMING:**  Can we ask what conclusion she draws

12    from the data?

13             **MR. DAY:**  It's not in the report.

14             **THE COURT:**  It's been asked, and also that's not in

15    the report.  And to say now there's now arguments doesn't

16    get it.

17             All right.  That's my ruling.

18             (Whereupon the sidebar conference concluded.)

19             **MR. JAGOE:**  Could we go back to Exhibit 2057.

20    Could we have 2057.93, please.  Can you expand the first

21    paragraph.

22    **Q**   Dr. Bertozzi, can you read the sentence in the middle of

23    the paragraph where it starts with the four-step column

24    chromatography procedure.

25    A    Yes.  The four-step column chromatography procedure

1    consists of 1) an anion exchange column which fractionates

2    based on molecular charge; 2) a reversed phase column which

3    separates on the basis of hydrophobic properties; 3) a

4    second anion exchange column used to concentrate and remove

5    ethanol; and 4) a gel filtration column which fractionates

6    on the basis of molecular size.

7    **Q**   And, Dr. Bertozzi, is it -- how does what's described

8    there relate to the lots of purified CHO cell produced that

9    we looked at in the previous figure?

10            **MR. DAY:**  Objection, your Honor; it's outside the

11   scope of the cross and the expert report.

12            **THE COURT:**  Overruled.

13   A    Well --

14            **MR. DAY:**  Your Honor, may I have a side bar?

15            **THE COURT:**  No.  Go ahead.

16            **THE WITNESS:**  Shall I proceed?

17            **THE COURT:**  You may.

18   A    So, this describes the purification process used to take

19   the crude EPO produced by the CHO cells and get it into a

20   more pure form where it can be packaged and sold as the

21   drug.

22            And during each step of this purification some

23   glycoforms are lost, others are enriched, and there's no way

24   to duplicate this exactly for each batch of EPO.  So, after

25   running through all that, with each batch, each batch ends

1    up slightly different in terms of its glycoform

2    distribution, and that might reflect the difference in

3    specific activities that are seen.

4           **MR. DAY:**  Your Honor, I object and move to strike.

5           **THE COURT:**  Noted.

6           **MR. DAY:**  It's outside the scope.

7           **THE COURT:**  Motion to strike's denied; that may

8    stand.

9           **MR. JAGOE:**  Could we now expand the next paragraph

10   just below this.  And can you read the second sentence of

11   this paragraph, please.

12          **MR. DAY:**  Your Honor, again, I object.  It's

13   outside the scope of anything --

14          **THE COURT:**  She may -- he may have her read from

15   it.  We'll see where we're going.

16   A   Okay, the document reads:  The first anion exchange

17   column achieves the greatest degree of purification and also

18   eliminates recombinant human EPO of low biological activity

19   from higher activity recombinant human EPO which is further

20   purified.

21   **Q**   Dr. Bertozzi, in your opinion what would the specific

22   activity of the recombinant EPO be if this purification

23   procedure were not undertaken?

24          **MR. DAY:**  Your Honor, I object.  It's outside the

25   scope of any report expert and the cross.

1          **THE COURT:**  Yes, sustained.  Sustained.

2     **Q**   Dr. Bertozzi, is this purification procedure that's

3     described in Amgen's PLA described anywhere in Dr. Lin's

4     '422 or '933 patent?

5          **MR. DAY:**  Objection, your Honor; it's outside the

6     scope.

7          **THE COURT:**  Overruled; he may have that.  He may

8     have that.

9     A    I'm sorry, can you repeat it?

10         **THE COURT:**  Is this described in Dr. Lin's patents,

11    this procedure you just read to us?

12         **THE WITNESS:**  I don't know that the exact procedure

13    is described in Dr. Lin's patents.  There's nothing about

14    specific activity enrichment.

15         **MR. JAGOE:**  Can we have from Exhibit 2011 Page 201.

16    Can you expand the --

17         **MR. DAY:**  Your Honor, I object.  We have no notice

18    that this exhibit was to be used.

19         **THE COURT:**  Well, is it an exhibit in evidence?

20         **MR. JAGOE:**  Yes, it is, your Honor.

21         **MR. DAY:**  And, your Honor, may I have side bar,

22    because this has been excluded by summary judgment.

23         **THE COURT:**  Please.  Please.  But you may have a

24    side bar.

25

```
 1    SIDEBAR CONFERENCE, AS FOLLOWS:

 2              MR. DAY:  We have a --

 3              THE COURT:  Wait a minute.  The simple thing is,

 4    the simple argument is it's beyond the scope.  Why isn't it

 5    beyond the scope?

 6              MR. JAGOE:  It's not beyond the scope because he

 7    asked several questions about how purification of

 8    Dr. Goldwasser's EPO differed from purification of Amgen's

 9    CHO cell recombinant EPO.  He asked that openly and I want

10    to show that the purification procedure that Dr. Goldwasser

11    used has no effect on the specific activity and that the

12    purification procedure of the products that he asked to be

13    the comparator are nowhere described in Dr. Lin's patents.

14    And it can't be a limitation to Dr. Lin's patents.

15              THE COURT:  This patent is -- is this a

16    patent-in-suit?

17              MR. JAGOE:  This is Amgen's patent.

18              THE COURT:  You just threw up a patent.

19              MR. JAGOE:  Yes, the patent claims that, the

20    purification procedure that Amgen uses to make its

21    commercial EPO.

22              THE COURT:  Is that in suit here?

23              MR. JAGOE:  That patent is not in suit, but it's

24    claimed in another patent.  It means it's not claimed by Dr.

25    Lin.  And she has that in her report, Paragraph 108.
```

1          **THE COURT:**  I'll tell you this is what happens when

2     you take a week's break between the bulk of the cross and

3     the continuation.  But that's instructive to me.

4          **MR. DAY:**  May I be heard?

5          **THE COURT:**  Yes.

6          **MR. DAY:**  First of all, I didn't ask questions

7     about the difference between Goldwasser's purification

8     technique and Amgen's purification technique.  I asked

9     questions about Goldwasser's purification technique.

10          **THE COURT:**  All right.

11          **MR. DAY:**  Secondly --

12          **THE COURT:**  All right.  So you did ask questions of

13     Goldwasser.  About Goldwasser's purification --

14          **MR. DAY:**  Purification technique.

15          **THE COURT:**  -- technique.  Now --

16          **MR. DAY:**  I didn't ask anything about whether his

17     purification technique affected specific activity of his

18     product; didn't ask those questions.  I simply asked what

19     she understood about, her understanding about what steps

20     there were to remove sialidases.

21          **MR. JAGOE:**  The implication of the question --

22          **THE COURT:**  Thank you.

23          **MR. JAGOE:**  The implication of the question is that

24     because Dr. Goldwasser used a specific purification

25     technique it must be somehow outside the scope of the

1    claims.  That's not true.  The claims are not limited to any

2    type of --

3              **THE COURT:**  Wait a minute.  Wait a minute.  I've

4    just heard his representation which I recall, it seems to

5    me, accurately that's what he examined.

6              Now, I'm not going to allow him to argue in closing

7    any comparison to Amgen's technique, either that they're

8    different or that they're the same.  So, why do we need to

9    go any further on this?

10             What is the relevance of Dr. Goldwasser's

11   purification technique to these claims?

12             **MR. DAY:**  The relevance --

13             **THE COURT:**  Well, wait a minute.  Well, I can't go

14   back.  You've just heard my order.  I'm not going to let

15   Amgen argue that the Amgen purification technique is

16   different than the Goldwasser purification technique.

17   That's it.

18             **MR. JAGOE:**  Okay.

19             **THE COURT:**  All right.

20             (Whereupon the sidebar conference concluded.)

21             **MR. JAGOE:**  Can we please have Exhibit R -- no,

22   strike that.

23   **Q**   I would like to hand you, Dr. Bertozzi, Exhibit R0.  Can

24   you identify Exhibit R0, please, Dr. Bertozzi?

25   A   Yes.  This --

 1              **MR. DAY:**  Objection, your Honor; it's outside the

 2      scope.

 3              **THE COURT:**  Sustained on that ground.

 4              **MR. JAGOE:**  Your Honor, I can explain at side bar

 5      how it's within the scope.

 6              **THE COURT:**  All right.

 7      SIDEBAR CONFERENCE, AS FOLLOWS:

 8              **MR. JAGOE:**  I've taken --

 9              **MR. DAY:**  Excuse me, counsel.

10              **MR. JAGOE:**  I thought you were here.

11              **THE COURT:**  Yes.

12              **MR. JAGOE:**  I've taken Table 2 of the patent,

13      column 13, Table 2 of the Amgen patent, which is admissible

14      as it's an Amgen admission, there's a listing of different

15      human EPO glycoforms and their specific activity.

16              **THE COURT:**  All right.

17              **MR. JAGOE:**  He asked a series of questions

18      implicating that specific activity is, specific activity is

19      a structural determinant that would distinguish from

20      Goldwasser's EPO from human EPO of the claims.

21              **THE COURT:**  Why don't you ask her whether the

22      specific activity is a structural determinant.

23              You know, the scope limitations are, quite frankly,

24      a forcing mechanism to make people put into their direct

25      examination the bulk of what they have to say.  Now, his

1    cross-examination, despite Mr. Fleming's argument to the

2    contrary, doesn't come as a surprise to the Court and you

3    people are far more versed in this case than I.

4         Now, when you launch off into some document we've

5    never seen, I'm not telling you you can't prove this

6    document up, I'm saying it's beyond the scope, at some stage

7    there has to be an end of the examination of a witness.

8         I frankly am surprised that we're taking this much

9    time on validity.  Almost half the trial time has now been

10   used up on validity and we have infringement to do.  I'm

11   assuming then that inequitable conduct is going by the

12   boards.  Don't think that anyone's getting one minute more

13   of testimony than what we agreed here.  And understand that

14   out of the ten days has to come my charge, that will take an

15   hour, and I've given you 45 minutes for closings.  It's

16   sustained; beyond the scope.

17        (Whereupon the sidebar conference concluded.)

18        **THE COURT:**  Let me jump in with a question here.

19   And this doesn't have to do with what he's talking about,

20   but it's something I thought of during the week's break and

21   I just wanted to ask you.

22        Early on in the cross-examination by Mr. Day he

23   asked, he suggested to you a definition of the person of

24   ordinary skill in the art, and legally that makes a

25   difference to what I'm going to tell the jury.

1          Now, if I told you that the person of ordinary

2     skill in the art that I'm going to be telling the jury about

3     is that person of ordinary skill in the art, having the

4     knowledge that a person of, it's tautological, forgive me,

5     ordinary skill in the art would have back when the

6     patents-in-suit were applied for.  Would any of your

7     opinions given so far change?

8          **THE WITNESS:**  Let me know if this is what you're

9     getting at, I guess.

10          **THE COURT:**  It's not a very good question, and I

11     apologize.

12          **THE WITNESS:**  So my opinions -- you know, today I

13     consider myself one of skill in the art, so give me that

14     much.  And my --

15          **THE COURT:**  Respectfully, I can't say aye or nay.

16     But, fine, we're certainly listening to your opinions.  And

17     you know all the things that a scientist knows today.  All

18     right.

19          Now, I'm going to be telling the jury, all right,

20     in figuring out whether these patent claims that we're

21     skirmishing about here, whether they were anticipated --

22          **THE WITNESS:**  Yes.

23          **THE COURT:**  -- and also whether they were obvious.

24     That obviousness is to a person of ordinary skill in the

25     art --

1          THE WITNESS:  At that time.

2          THE COURT:  -- at that time.  Now --

3          THE WITNESS:  Yes.

4          THE COURT:  Do you understand what I'm asking, give

5     me that much.

6          THE WITNESS:  Yes, I think so.

7          THE COURT:  Okay.  Now, if I tell you that, my

8     general question, really to save time, would any of the

9     opinions you've given, either when Mr. Jagoe's asking

10    questions or when Mr. Day's asking questions, would they

11    change?

12         THE WITNESS:  No.

13         THE COURT:  All right, fine.  That's my question;

14    that's what I wanted to know.

15         Go ahead, Mr. Jagoe.

16  BY  MR. JAGOE

17  Q   Dr. Bertozzi, in your opinion, what, if any, difference

18    is there in specific activity between human erythropoietin

19    that's claimed by Amgen's patents and Dr. Goldwasser's prior

20    art human erythropoietin?

21         MR. DAY:  Objection, your Honor; it's outside

22    the --

23  A   There's no difference.

24         THE COURT:  Overruled.  It's not, and her answer

25    "There's no difference" may stand.

1   Q   Dr. Bertozzi, what, if any, difference is there between

2   the distribution of glycoforms in Dr. Goldwasser's human

3   erythropoietin compared to the human erythropoietin that's

4   claimed in Amgen's product claims?

5   A   They're the same.  There's no difference.

6   Q   Dr. Bertozzi, in your opinion, what, if any, difference

7   is there in the proportion of sugar structures on

8   Dr. Goldwasser's human erythropoietin as compared to human

9   erythropoietin that's recited in and claimed in Amgen's

10  product patent claims?

11  A   Well, the product claims recite no specific distribution

12  or collection of glycoforms.  So what the patent claims is

13  any and all glycoforms of human EPO, which includes

14  Goldwasser's EPO.

15  Q   Dr. Bertozzi, in your opinion, are there more CHO cells

16  that would come within the scope of Amgen's claims other

17  than the CHO cell that Amgen uses to produce its commercial

18  erythropoietin?

19          MR. DAY:  Objection, your Honor; it's outside the

20  scope of cross and the report.

21          THE COURT:  Sustained.

22  Q   Dr. Bertozzi, on cross-examination you were asked

23  certain questions about sulfate molecules.

24          Do you recall that?

25  A   Generally, yeah.

1    Q    And did you consider sulfation of EPO molecules in

2    forming your opinions?

3         MR. DAY:  Objection, your Honor; it's outside the

4    scope of the cross.  I --

5         THE COURT:  Sustained.

6         MR. JAGOE:  Your Honor, I can point you to

7    transcript page --

8         THE COURT:  No, no.  No, no.  I know where he asked

9    about it.  And there I've been hoist by my own petard.

10   Fine.

11        Where is it in her report?

12        MR. JAGOE:  The report, it's in blue 75, blue 101,

13   and yellow 26.

14        THE COURT:  Just a moment.  We're talking about

15   EPO, cell participation of EPO molecules, that's what you're

16   asking?

17        MR. JAGOE:  Sulfation, your Honor.  Whether EPO

18   molecules --

19        THE COURT:  Sulfation.

20        MR. JAGOE:  Sulfation, yes.

21        THE COURT:  Sulfation of EPO molecules.

22        MR. JAGOE:  Yes.  Line, Page 26, Line 19.

23        THE COURT:  Wait a second.  Thank you.

24        Yes, she may testify consistent with what's there

25   on Paragraph 75.

1          MR. DAY:  Your Honor?

2          THE COURT:  And if there's a mention of it in 101,

3   she may testify as to sulfation insofar as it's disclosed

4   there.

5          MR. DAY:  Your Honor, if I may?

6          THE COURT:  No, you may not.

7          MR. DAY:  It's outside the scope of the cross.

8   There's nothing in the cross.

9          THE COURT:  Overruled.  You may testify.

10  Q   Dr. Bertozzi --

11         THE COURT:  After looking at the report.  Take a

12  look at Line 19.  Consistent with what's there on Line 19.

13         THE WITNESS:  Is there a question, I'm sorry?

14  Q   Yes.  My question is --

15         THE COURT:  Yes.  Did you consider the sulfation of

16  EPO molecules?

17         THE WITNESS:  Yes, I did.

18  Q   Dr. Bertozzi, if some of Dr. Goldwasser's EPO molecules

19  were sulfated, would that affect your opinions on the

20  validity of the claims of the '933 and the '422 patent?

21  A   No.

22         MR. DAY:  Objection, your Honor.

23         THE COURT:  Sustained.  The answer is stricken,

24  disregard it.

25         MR. JAGOE:  Your Honor, could Dr. Bertozzi be

1    allowed to testify consistent with yellow 26?

2              THE COURT:  Paragraph?

3              MR. JAGOE:  Paragraph 26.

4              THE COURT:  Are you about done with this witness?

5              MR. JAGOE:  After this question, your Honor.  And

6    yellow 27.

7              THE COURT:  So you want yellow 26 and 27 and you're

8    through?  Is that -- with this witness?

9              You may have 26.  You may testify consistent with

10   what's there on Paragraph 26.

11   Q   Dr. Bertozzi, if some of Dr. Goldwasser's EPO

12   molecules --

13             THE COURT:  No, no, there's nothing there about Dr.

14   Goldwasser's EPO molecules.  She may testify consistent with

15   what's there.  And that's your last question.

16             MR. JAGOE:  Paragraph 27, your Honor?

17             THE COURT:  I didn't give you 27.  I gave you 26.

18             MR. JAGOE:  Sorry.

19   Q   Dr. Bertozzi, other than a -- is there any reliable

20   scientific evidence that urinary, that erythropoietin

21   isolated from human urine is sulfated?

22             MR. DAY:  Objection, your Honor; it's outside the

23   scope of the cross.

24             THE COURT:  He may have that one question.  You may

25   answer yes or no.

1    A    I'm sorry, say it again?

2    Q    Is there any reliable scientific evidence that human

3    erythropoietin isolated from urine is sulfated?

4    A    There's no direct evidence.  There's indirect evidence

5    suggesting it could be.

6         **THE COURT:**  And now your last question, Mr. Jagoe.

7    Q    Dr. Bertozzi, the statement in the '933 patent regarding

8    the migration of the CHO cell produced EPO and the COS cell

9    produced EPO, in your opinion, is that consistent or

10   inconsistent with the statements in Amgen's publications

11   that we have looked at in your examination so far?

12   A    The statement in the patent contradicts the statements

13   in the publications.

14        **MR. JAGOE:**  Thank you, your Honor.

15        **THE COURT:**  Any recross, Mr. Day?

16        **MR. DAY:**  I have two questions, your Honor.

17        **THE COURT:**  Go ahead.

18                    **RECROSS-EXAMINATION**

19   BY  **MR. DAY**

20   Q    Dr. Bertozzi, you testified on redirect that you had

21   done a statistical analysis.  Show me in your expert report

22   where that is, please?

23   A    It's not in my expert report.

24   Q    I didn't think so.

25        **THE COURT:**  Well, the comment's stricken; disregard

1    it.

2    Q   You also referred to Amgen's PLA, Exhibit 257, during

3    recross -- redirect.  Do you recall that?

4    A   Yes.

5    Q   That's a product application for Amgen's commercial

6    product EPOGEN; is that right?

7    A   It's an application for recombinant human

8    erythropoietin.

9    Q   That Amgen filed with the FDA to seek approval to market

10   and sell its commercial product EPOGEN in the United States,

11   correct?

12          **MR. JAGOE:**  Objection; foundation, your Honor.

13          **THE COURT:**  No, overruled.

14   A   My understanding is it was submitted to the FDA.

15   Q   And approved by the FDA for permission to sell Amgen's

16   commercial product EPOGEN in the United States; is that

17   right?

18          **MR. JAGOE:**  Objection; beyond the scope, your

19   Honor.

20          **THE COURT:**  Oh, no.

21          **MR. JAGOE:**  And no foundation.

22          **THE COURT:**  Overruled; he may have it.

23   A   I don't know that it directly relates to the sales and

24   marketing term EPOGEN, only that it's for recombinant human

25   erythropoietin.

1    Q    The commercial product that Amgen sells in the United

2    States?

3              MR. JAGOE:  Objection, your Honor.

4              THE COURT:  Overruled.

5    A    I told you my understanding of it.

6              MR. DAY:  Thank you.  No further questions.

7              THE COURT:  Nothing more for this witness?

8              MR. JAGOE:  No, your Honor.

9              THE COURT:  You may step down, thank you.

10             (Whereupon the witness stepped down.)

11             THE COURT:  Call your next witness.

12             MS. BEN-AMI:  Your Honor, at this point we have a

13   deposition to read.

14             THE COURT:  Very well.  Are you going to read it or

15   play it?

16             MS. BEN-AMI:  This one is on paper.

17             THE COURT:  All right.  Do we have a reader?

18             MS. BEN-AMI:  We do.

19             THE COURT:  The reader is welcome to come up and

20   sit here in the witness stand, and I'll give her the unusual

21   instructions.

22             Respectfully, we do not care who this reader is.

23   She's one of the Roche attorneys.  And we welcome her to the

24   witness stand, but we don't put her under oath because she's

25   just reading the answers of someone else.

1           Come on up.

2           **MS. CARSON:**  Thank you, your Honor.

3           **THE COURT:**  And as you are an officer of the Court,

4    I do have the standard instruction for you.  Don't hoke this

5    up, just read the answers clearly and so we understand.

6           **MS. CARSON:**  Yes, your Honor.

7           **THE COURT:**  Go ahead.

8           (Whereupon the Court and the Clerk conferred.)

9           **MS. BEN-AMI:**  Your Honor, I've handed up to your

10   Honor the deposition of Joan C. Egrie, March 27th, 2007.

11              JOAN C. EGRIE, By Deposition

12   **BY  MS. BEN-AMI**

13   **Q**   Question:  Can you state your name and address for the

14   record, please?

15          **THE COURT:**  Well, we don't really want the

16   addresses now that we've gone online, that's a standard

17   thing, for your privacy and the witnesses privacies.  Back

18   in the deposition they asked this lady, whoever she was, to

19   state her address.  But I'm -- because I do this with every

20   witness, and also with juror information, we don't give out

21   addresses.

22          So, in your answer, given the question, just read

23   the answer so we know who's being deposed.

24   A   Yes.  My name is Joan Christine Egrie.

25          **MS. BEN-AMI:**  Your Honor, do you want me to read

1    the page numbers into the record?

2          **THE COURT:**  No, no.  The copy I have is marked and

3    I assume that Amgen's is marked and you just --

4          **MS. BEN-AMI:**  I'm reading both sides.

5          **THE COURT:**  Yes.  Despite the usual you just go

6    right along.

7          **MS. BEN-AMI:**  Thank you, your Honor.  So --

8          **THE COURT:**  You don't need to say question either,

9    so it's more realistic.

10          **MS. BEN-AMI:**  Okay.

11   **Q**    When did you start working at Amgen?

12   A    In September 1981.

13   **Q**    So, do you have any financial arrangement with Amgen or

14   the lawyers, for your testimony today?

15   A    No.

16   **Q**    So, you're not being paid for your time today, by Amgen?

17   A    Not by Amgen.

18   **Q**    Are you being paid by the lawyers?

19   A    I received a check with the subpoena.

20   **Q**    Yeah.  Other than that, are you being paid by the Amgen

21   lawyers?

22   A    No.

23   **Q**    Okay.  And you're not charging Amgen for your time

24   today, your time yesterday or today?

25   A    No.

1    **Q**   Doctor, I'm handing you a document the court reporter

2    marked, which bears the Amgen-ITC number 557594 through 633.

3           **MS. BEN-AMI:**  Which in our record is NNR.

4    **Q**   And I would like you to look at the first page and tell

5    me if you recognize the first page?

6    A   I recognize what it is.

7    **Q**   This says it's a UCLA symposia application form.

8           Do you see that?

9    A   Yes.

10   **Q**   And can you turn to page 348 of the article.

11          **MS. BEN-AMI:**  Your Honor, before we continue, I

12   would like to offer NNR.

13          **THE COURT:**  Any objection?

14          **MR. GAEDE:**  Your Honor, object on lack of

15   foundation, and also hearsay.

16          **MS. BEN-AMI:**  Would your Honor like a copy?

17          **THE COURT:**  Please.  Please.  I don't have

18   arguments in front of the jury.

19          **MS. BEN-AMI:**  No, I asked if your Honor wanted a

20   copy.

21          **THE COURT:**  One's been handed up to me, I think.  I

22   have it.

23          No, it's an admission.  Overruled.  NNR is admitted

24   as Exhibit 2063 in evidence.

25          (Exhibit marked in evidence.)

 1              **MS. BEN-AMI:**  Thank you, your Honor.

 2   **Q**   Can you turn to page 348 of the article.

 3              Now, there, you write in the first full

 4   paragraph -- I'll start again.

 5              There, you write in the first full paragraph,

 6   quote, To confirm that the material in the COS one-cell

 7   conditioned media was that, that was -- let me start that

 8   again.  I apologize, your Honor.

 9              There, you write in the first paragraph, quote, To

10   confirm that the material in the COS one-cell conditioned

11   media that was immunoreactive in the RIA, was indeed EPO and

12   not some fragment of EPO.  And to determine the extent of

13   glycosylation, the expressed protein was characterized by

14   western analysis.

15              Do you see that?

16   A   Yes.

17   **Q**   You have been handed Exhibit 11, which, hopefully, I've

18   gotten right, is ITC number 61675 through 706.

19              **MS. BEN-AMI:**  Which is, in our record PV, as in

20   victor, B as in boy.

21   **Q**   Do you see that you are on the To list on the first

22   page?

23   A   Yes.

24              **MS. BEN-AMI:**  I would offer that, your Honor.

25              **THE COURT:**  Any objection?

```
 1              MR. GAEDE:  Yes, your Honor.  We object on, first,
 2     lack of foundation, also relevance, and request a short side
 3     bar on this issue.
 4              THE COURT:  You may have one.
 5     SIDEBAR CONFERENCE, AS FOLLOWS:
 6              THE COURT:  Why is it relevant?
 7              MS. BEN-AMI:  This is a document explaining what
 8     the EPO standards were that were used, what it was picking
 9     up and not picking up.
10              THE COURT:  Yes.
11              MR. GAEDE:  This is with respect to the RIA,
12     correct?
13              MS. BEN-AMI:  It does, it relates to the issues
14     that are central in the case on the RIA, yes.
15              MR. GAEDE:  So the issue -- first of all, you've
16     already ruled that there is no indefiniteness on the RIA
17     issue with respect to the '349; that was granted in Amgen's
18     motion for summary judgment.
19              Secondly, they have not put in issue written
20     description with respect to the RIA.
21              And then, third, with respect to the enablement, it
22     was not timely disclosed.  This will be an issue coming up
23     with Dr. Flavell's testimony later on.
24              THE COURT:  Wait a minute.  You've lost me here.
25              MR. GAEDE:  Yes.
```

```
 1                 THE COURT:  The stupid question which I must ask is

 2       what's the RIA?

 3                 MR. GAEDE:  The radioimmunoassay.  And the issue

 4       that they're alleging is that the last, they're trying to

 5       say that '933 claim 7 is not enabled because of the RIA

 6       issue, and that issue was not put properly in contention in

 7       this litigation, it was late disclosed, and this was never

 8       put in interrogatory responses.

 9                 THE COURT:  So that's really what the fight is

10       about, isn't it?

11                 MR. GAEDE:  That is what the fight is about.

12                 THE COURT:  All right.  Now, I understand that

13       fight.  We'll get there when we get there.  Overruled.

14                 (Whereupon the sidebar conference concluded.)

15                 MS. BEN-AMI:  So that was --

16                 THE COURT:  Wait for the court reporter.

17                 MS. BEN-AMI:  I'm sorry.  Sorry.  Are you ready?

18                 THE COURT REPORTER:  Yes.

19                 MS. BEN-AMI:  And, your Honor, PVB is offered as --

20                 THE COURT:  And admitted as Exhibit 2064.

21                 (Exhibit marked in evidence.)

22                 MS. BEN-AMI:  And can I --

23       Q    Next page, 678, is that a letter from you to Dr. Suzuki

24       and Saito?

25       A    Yes.
```

1    **Q**    And here, it's September, 1984, and it says that you

2    have been using lot 82, human urinary EPO as a standard for

3    your in vitro bioassay, and plan on using it for your

4    in-house in vivo bioassay, as well.

5            Do you see that?

6    A    Yes.

7    **Q**    So prior to the end of 1984, were you using lot 82 as a

8    standard, as well as CAT-1?

9    A    I used CAT-1 in the RIA.  I don't recall what standard

10   was used in the in vitro bioassay.

11   **Q**    Is it correct that in September of 1984, CAT-1 was no

12   longer available from either NIH or Dr. Goldwasser?

13   A    I don't know if that -- I can't say, today, whether that

14   was true or exactly how I may have meant this.

15   **Q**    Did you write, quote, CAT-1 is no longer available from

16   either NIH or Dr. Goldwasser?

17   A    Those are the words on the page.

18   **Q**    And did you send that to Amgen's joint developer or

19   joint venturer, Kirin, correct?

20   A    Yes.  But the context is not here.

21   **Q**    I'm going to hand you another document.  This is bearing

22   AM-ITC 00550986 through 551044.

23           **MS. BEN-AMI:**  And in our case it's CBX, your Honor.

24   **Q**    Let's take it a page at a time.  Have you seen the first

25   page before?

1   A    Or something that looks like it, yes.

2   Q    Do you know whose handwriting this is?

3   A    Someone from Kirin.

4   Q    Do you recall having conversations but not the

5   substance?

6   A    I can't remember the issues, over and above that we all

7   wanted there to be a plentiful supply of a common standard.

8           **MS. BEN-AMI:**   I would offer this; it is CBX, your

9   Honor.

10          **MR. GAEDE:**   Your Honor, objection; hearsay, lacks

11   foundation.

12          **THE COURT:**   There's an adequate foundation.

13   Sustained.

14          **MS. BEN-AMI:**   Then we will not put it up, your

15   Honor.

16   Q    Do you recall seeing a document that looks like 986?

17   A    Something like it.

18   Q    Doctor, the court reporter has handed you a memo from

19   George Rathmann to Dan Vapnek, cc'd to Jeff Browne, yourself

20   and Tom Stickland, on erythropoietin biological activity.

21          It bears production numbers AM-ITC 558618 through

22   20620.

23          Do you recall receiving this document?

24          **MS. BEN-AMI:**   In ours it is CPJ.

25   A    Yes.

```
 1              MS. BEN-AMI:  I would offer CPJ, your Honor.

 2              THE COURT:  Any objection?

 3              MR. GAEDE:  Your Honor, the same objection that was

 4     made at the side bar, relevance grounds --

 5              THE COURT:  Noted.

 6              MR. GAEDE:  -- and the issues we discussed.

 7              THE COURT:  Thank you, and I appreciate your

 8     framing it that way.

 9              Overruled.  CPJ is admitted, Exhibit 2065.

10              (Exhibit marked in evidence.)

11     Q    And there, it says, I think we should be absolutely

12     fastidious in reporting specific activity in arbitrary

13     (Amgen) units, until we can establish an excellent

14     correlation with international units.

15              What were arbitrary (Amgen) units?

16     A    Not international units.

17     Q    Well, what did it mean by units?  Units of what?

18     A    Erythropoietin.

19     Q    Units based on activity?

20     A    Units based on standards.

21     Q    Well, it says arbitrary (Amgen) units, so what standard

22     was that?

23     A    Well, that would have depended on the assay.

24     Q    And he was saying that Amgen should report specific

25     activity in arbitrary Amgen units, which -- how would a
```

1    person know what that unit is?

2    A    Well, I can't say why he chose those words.  I believe

3    all he meant is not to refer to results of an assay as

4    international units.

5    Q    Okay.  And was that because there had not yet been

6    established an excellent correlation between Amgen units and

7    international units?

8    A    In the in vivo bioassay performed by Dr. Dukes, there

9    was a lack of parallelism with titer P, number 2.

10   Q    Now, Exhibit 19 is a memo dated December 3, 1984, and

11   it's from yourself and Jim Fenno.

12        It's a summary of erythropoietin clinical panel

13   meeting, and it bears production numbers AM-ITC 557514

14   through 7527.

15        MS. BEN-AMI:  Which is OST, your Honor.

16   Q    Do you recognize this document?

17   A    Yes.

18   Q    And did you author this document, in part?

19   A    Yes.

20        MS. BEN-AMI:  I would offer it, your Honor.

21        MR. GAEDE:  No objection, your Honor.

22        THE COURT:  Thank you.  OST is admitted,

23   Exhibit 2066.

24        (Exhibit marked in evidence.)

25   Q    Would you look at page 5, which is Bates number 518.

1              Now, I'm looking at the Section B, dose.

2              Do you see that?

3    A    Yes.

4    Q    Second paragraph says, We still have no firm data

5    indicating an effective optimum dose level.

6              Quote, Furthermore, each patient is likely to

7    require individual optimization of dose due to differences

8    in possible uremic inhibitors of erythropoiesis, age,

9    health, et cetera.  As a guideline, Dr. Goldwasser's

10   clinical EPO trial and Dr. Anderson's sheep models suggest a

11   dose of approximately 1,000 units per 70 kilograms may be

12   efficacious.

13             Do you see that?

14   A    Yes.

15   Q    Who said that?

16   A    I have no idea.

17   Q    Was that said at the meeting?

18   A    I don't know.

19   Q    So this -- sorry.

20             Was this your summary of what the conclusions were

21   from the meeting?

22   A    I don't believe there were conclusions from this

23   meeting.

24   Q    Okay.  Doctor, you've been handed a memo from October,

25   1990, which indicates that you are the author.

1              AM-ITC 7 -- I'm sorry -- 573885 through 73892.

2              Have you seen this before?

3    A    Yes.

4         **MS. BEN-AMI:**  And this is OYF, your Honor.  And I

5    would offer OYF.

6         **THE COURT:**  Any objection?

7         **MR. GAEDE:**  Your Honor, objection on relevance

8    grounds; a different issue, though, than we discussed at

9    side bar and would request a short side bar.

10        **THE COURT:**  Yes.

11   SIDEBAR CONFERENCE, AS FOLLOWS:

12        **THE COURT:**  Yes, why is this relevant?

13        **MS. BEN-AMI:**  This shows that they had the

14   Goldwasser clinical materials which we needed to prove --

15        **THE COURT:**  Yes.  All right.

16        **MR. GAEDE:**  I --

17        **THE COURT:**  It shows they had Goldwasser's clinical

18   materials.  That's certainly relevant.

19        **MR. GAEDE:**  The reason why we're objecting is that

20   what this shows is Goldwasser's EPO formulation.  That's an

21   area that's an inequitable conduct allegation that has not

22   been permitted in this case.

23        **THE COURT:**  Yes.  Overruled.

24        **MR. GAEDE:**  Therefore, that's not relevant.

25        **THE COURT:**  I wouldn't let them argue things that

1    are not permitted.  But this tends to show that --

2            **MR. GAEDE:**  Okay.

3            **THE COURT:**  -- they had Goldwasser clinical

4    material, and they may have it.

5            **MR. GAEDE:**  Okay.

6            (Whereupon the sidebar conference concluded.)

7            **THE COURT:**  OYF is admitted, it's Exhibit 2067 in

8    evidence.

9            (Exhibit marked in evidence.)

10   **Q**   What is HSA?

11   A    Human serum albumin.

12   **Q**   And the first -- did you write this --

13           Strike that.  I'm sorry.

14           And the first -- you did write this, didn't you?

15   A    I believe so.

16   **Q**   And it said, Gene Goldwasser sent the following

17   materials which relate to his use of albumin in preventing

18   EPO absorption to surfaces and in formulating EPO for use as

19   a therapeutic.  Do you see that?

20   A    Yes.

21   **Q**   And was that an accurate statement?

22   A    I believe so.

23   **Q**   And are the attachments that are in this -- on this

24   document, Exhibit 22 -- which has just been admitted as

25   2067 -- attachments to your memo?

```
 1   A    It looks that way.

 2   Q    Exhibit 26 appears to be -- well, rather than

 3   characterizing it, it has Bates number AM-ITC 1052117

 4   through 127.

 5            MS. BEN-AMI:  QDF.

 6   Q    Can you look at Page 52120 and tell me if you have seen

 7   this page before?

 8   A    Yes.

 9            MS. BEN-AMI:  I offer it, your Honor.

10            THE COURT:  Any objection to QDF?

11            MR. GAEDE:  Your Honor, inadequate foundation laid

12   for the entire document.

13            THE COURT:  Overruled.  It's admitted as

14   Exhibit 2068.  QDF.

15            (Exhibit marked in evidence.)

16   Q    And the next sentence says, Recombinant human EPO dose

17   response is identical to human urinary EPO standard.

18            Do you see that?

19   A    Yes.

20   Q    Was that accurate?

21   A    I believe so.

22   Q    And what was the human urinary EPO standard that's

23   referred to here?

24   A    CAT-1.

25   Q    And that's Dr. Goldwasser's EPO.
```

1    A    Yes.

2    Q    Have you seen this western analysis before?

3    A    Yes.

4    Q    And the conclusion says, COS cells transfected with

5    human EPO gene produce and secrete fully glycosylated EPO

6    which migrates identically to the human standard.

7         Do you see that?

8    A    Yes.

9    Q    Was that accurate?

10   A    I believe so.

11   Q    And what was the human EPO standard referred to there?

12   A    Crude erythropoietin from Dr. Goldwasser.

13   Q    Doctor, you've been handed Exhibit 28, which is a

14   March 26th, 1985, document from Jay Fenno to a bunch of

15   people, including you.  Subject:  Erythropoietin pre-IND

16   meeting, office of biologics 3/15/85.

17        MS. BEN-AMI:  Which is AOU, your Honor.

18   Q    Were you at such a meeting?

19   A    I believe so.

20        MS. BEN-AMI:  I offer it, your Honor.

21        THE COURT:  Any objection to AOU?

22        MR. GAEDE:  No objection, your Honor.

23        THE COURT:  No.  AOU is admitted, Exhibit 2069 in

24   evidence.

25        (Exhibit marked in evidence.)

 1    **Q**    Doctor, you've been handed Exhibit 29, which is -- would

 2    you agree that this is part of Amgen's IND?

 3              **MS. BEN-AMI:**  And this is PDV.

 4    **A**    I don't know.

 5    **Q**    Did you ever see Amgen's IND?

 6    **A**    I believe so.

 7    **Q**    Okay.

 8              **MS. BEN-AMI:**  Your Honor, I would offer PDV.

 9              **THE COURT:**  PAV?

10              **MS. BEN-AMI:**  PD, as in David, V as in Victor.

11              **THE COURT:**  PDV.  Any objection?

12              **MR. GAEDE:**  Yes, your Honor, objection; lack of

13    foundation.

14              **THE COURT:**  All right.  I need to see it.  May I

15    see it.

16              No, overruled.  It's admitted.

17    **Q**    Let's look at --

18              **MS. BEN-AMI:**  Oh, I'm sorry.

19              **THE COURT:**  PDV is admitted, 2070.

20              (Exhibit marked in evidence.)

21    **Q**    Let's look at 596154.  I'm sorry.  6154.  6154.

22              **MS. BEN-AMI:**  Clearly I am reading this.

23    **Q**    I always mix the numbers.  It's hard.

24              There's too many numbers to keep -- it says there,

25    in the first full paragraph, The results of these

1    experiments indicates that the recombinant human EPO and the

2    human urinary erythropoietin are indistinguishable by the

3    parameters of biological and immunological activity that can

4    be measured by these assays.

5            Do you see that?

6    A    Yes.

7    Q    Was that accurate?

8    A    We believed it to be when we wrote it, for the samples

9    that we used for the comparison and for the assays in which

10   they were done.

11   Q    So did you have other information that said that they

12   were -- that the recombinant human EPO and the urinary EPO

13   were different biologically and immunologically, that you

14   did not provide to the FDA?

15   A    No.

16   Q    And then it says, at the end, The recombinant human EPO

17   migrates identically to the pure human, the pure -- strike

18   that -- the pure urinary hormone with an apparent molecular

19   weight of approximately 36,000 daltons.

20           Do you see that?

21   A    Yes.

22   Q    Was that accurate?

23   A    We believed that the two materials that were shown on

24   the western migrated similarly, yes, to the same extent.

25   Q    Did you have evidence to the contrary that was not shown

 1   to the FDA?

 2   A   No.

 3   Q   Doctor, you've been handed a laboratory notebook,

 4   Exhibit 31.

 5           **MS. BEN-AMI:**  Which is CBZ, as in zebra.

 6   Q   Can you confirm that it's your lab notebook?

 7   A   Yes.

 8           **MS. BEN-AMI:**  It's your notebook.  I'm sorry.

 9           I would offer it, your Honor.

10           **MR. GAEDE:**  No objection, your Honor.

11           **THE COURT:**  It may be received.  CBZ is admitted in

12   evidence, Exhibit 2071.

13           (Exhibit marked in evidence.)

14   Q   Can you look at page 38 of the notebook.

15           Do you see in the middle under Sample 17, 18, 19,

16   it says, F. Gaylis A.

17           Do you see that?

18   A   Yes.

19   Q   What does that refer to?

20   A   It refers to samples Franklin Gaylis.

21   Q   And what does the A refer to?

22           Where it says A and there's -- and then B, C, D.

23           Can you tell me what the A, B, C, D are?

24   A   Oh, there were four different samples.

25   Q   And they were samples of what?

1    A    Culture supernatent.

2    Q    They were samples of culture supernatent from cells that

3    produced EPO?

4    A    From his cells, the cells he was working with.

5    Q    That produced EPO?

6    A    I believe the assay was to determine if they did.

7    Q    And what was the result?

8    A    It appears as though three of the four samples reacted

9    with the antibody in the assay.

10   Q    Does that mean that based on your assay, you showed that

11   three of the four samples were producing EPO?

12   A    It would suggest that they were maybe producing EPO,

13   three of the four.

14   Q    You have been handed Exhibit 33, which is a January 13,

15   1984, letter to Dr. Gaylis.

16        **MS. BEN-AMI:**  Which is CEG.

17   Q    Did you write that?

18   A    Yes.

19        **MS. BEN-AMI:**  I would offer it, your Honor.

20        **MR. GAEDE:**  Your Honor, same objection on the first

21   grounds of relevance that we've articulated at the side bar.

22        **THE COURT:**  Thank you.  But overruled.  It may be

23   admitted.

24        **THE CLERK:**  2072.

25        **THE COURT:**  Thank you.  CEG is Exhibit 2072.

```
 1              (Exhibit marked in evidence.)

 2    Q    And do the results show that the supernatent contained

 3    EPO?

 4    A    The results showed that the antibody recognized material

 5    in his culture as supernatant.

 6    Q    And those were antibodies raised for EPO?

 7    A    That's correct.

 8              MS. BEN-AMI:  That concludes the reading, your

 9    Honor.

10              THE COURT:  Thank you.  Call your next witness.

11              MS. BEN-AMI:  Mr. Fleming will call the next

12    witness, your Honor.

13              THE COURT:  Yes.  Mr. Fleming.

14              MR. FLEMING:  Thank you, your Honor.  I'm sorry.

15              Roche calls Dr. Flavell.

16              THE COURT:  He may be called.

17              MS. BEN-AMI:  Your Honor, we will have to bring him

18    in.

19              THE COURT:  Yes, that's fine.

20              (Pause in proceedings.)

21              THE COURT:  Well, I see more papers coming but I

22    don't see any witness.

23              MS. BEN-AMI:  Your Honor, the witness is on the

24    right.

25              THE WITNESS:  Oh, I'm sorry.  I'm in the wrong
```

```
 1    place.

 2              THE CLERK:  You snuck up on me.

 3              THE COURT:  Come right around here.  It's perfectly

 4    all right.

 5              THE CLERK:  Sir, would you raise your right hand.

 6              Do you solemnly swear that the answers you

 7    give to this Court and Jury will be the truth, the whole

 8    truth, and nothing but the truth, so help you God?

 9              THE WITNESS:  I do.

10              THE CLERK:  Please be seated.

11              THE COURT:  They built this courtroom so that that

12    looks symmetrical.  I don't use it, but now I've discovered

13    a use for it.

14              THE WITNESS:  Sorry about that.

15              THE COURT:  Quite all right.

16              Mr. Fleming.

17              MR. FLEMING:  Your Honor, may I approach the

18    witness to provide him with a set of binders?

19              THE COURT:  You may.

20              MR. FLEMING:  Thank you.  And at the same time may

21    I provide your Honor with a set of his reports?

22              THE COURT:  Thank you.

23

24

25
```

```
 1                    RICHARD FLAVELL

 2                  DIRECT EXAMINATION

 3   BY  MR. FLEMING

 4    Q    Good morning, Dr. Flavell.

 5    A    Good morning.

 6    Q    Would you please introduce yourself to the jury and tell

 7   them what you do?

 8    A    Yes.  My name is Richard Flavell.  It's spelled

 9   F L A V E L L.  The first letter is an F.  And my job is

10   that I'm the chairman and I'm a professor in the Department

11   of Immunobiology at Yale University School of Medicine.  And

12   I am also an investigator of the Howard Hughes Medical

13   Institute.

14    Q    Could you explain to the jury, Doctor, what

15   immunobiology is?

16    A    Yes.  Immunobiology is the study of the immune system.

17   So, the immune system protects us against infection.  That's

18   what its function is.  And we study how that works and how

19   it protects us, how we get over diseases like colds or this,

20   that and the other and what goes wrong, because the immune

21   system is responsible for problems like rheumatoid

22   arthritis, Type 1 diabetes, and multiple sclerosis.  Those

23   are all what we call autoimmune diseases.  About five

24   percent of the population gets those and we actually study

25   those because we're trying to figure out now how they work
```

1    and how to stop them happening.

2    **Q**    What types of work have you focused on in your career?

3    A    I've done a variety of things.  I started off as a

4    biochemist.  I was, my Ph.D., I obtained my Ph.D. and

5    bachelor's in biochemistry and I worked in genetics.  My

6    earlier interests were in understanding how the genes for

7    proteins like blood proteins work, like hemoglobin, for

8    example.  We tried to understand what a gene is, because at

9    that time, as you can see, I'm not that young anymore, so in

10   those days we didn't know what a gene was and we tried to

11   study that, and the one that we picked was one for, this

12   blood protein, hemoglobin.

13   **Q**    For reference for the jury, when you say in those days,

14   what time period are you talking about?

15   A    Yes, I'm talking about the mid to late '70's and the

16   early '80's.

17   **Q**    And what is hemoglobin?

18   A    Yes.  So, hemoglobin is the protein that carries the

19   oxygen around our bodies.  It's the reason that red blood,

20   red blood, you know, blood is red actually, there's little

21   cells, red blood cells, which have hemoglobin, carries the

22   oxygen from our lungs to use it in the body.

23   **Q**    And what did you study about hemoglobin?

24   A    Well, we studied first of all --

25           **MR. MADRID:**  Objection, your Honor.  Objection,

 1   your Honor; outside the scope of the report.

 2        **MR. FLEMING:**  Your Honor, the green report,

 3   Paragraph 75.

 4        **THE COURT:**  Thank you.  Now, sir, in these

 5   proceedings I've been very strict at limiting witnesses who

 6   are going to give opinions to what they've shown to the

 7   other side in their various reports, and I assume that you

 8   have been given a copy of your reports.  If not, they'll

 9   give you one right now.

10        Yes, I'm going to sustain it in that form.  But you

11   may surely inquire as to the subject of 75.

12        **MR. FLEMING:**  Thank you, your Honor.

13        **THE COURT:**  But that question is sustained.

14        So when they say it's not in the report, first I'll

15   check, and if I say you can testify consistent with the

16   report, it makes, you don't have to read it, but the idea

17   that's set out there, specifically set out, you can express

18   that idea to the jury.

19        **THE WITNESS:**  Very good.

20        **THE COURT:**  Go ahead, Mr. Fleming.

21   **Q**   And your work with hemoglobin, did it involve a specific

22   disease?

23   **A**   Multiple diseases where people had mutated genes, people

24   had a problem with their genes.  So that, for example, I'll

25   give you, one example, where the protein hemoglobin has just

1    one little change in it and that causes a terrible disease

2    called sickle cell anemia where people's red blood cells

3    don't work anymore.  That's just as a result of a single

4    amino acid change in the protein.  And many others like

5    this, lots of these diseases of blood production.

6    Q    Could you explain to the jury some of your other

7    professional activities?

8    A    Certainly, yes.  Well, in addition to being responsible

9    for the department, I'm on many, of course, committees at

10   Yale doing a variety of things.  I'm on the advisory panels

11   for institutes across the world, you know, like in places

12   like the Netherlands.  And just recently I was asked to do

13   one in Australia actually, this is last week.  So you go to

14   these institutions.  You have to judge their research.

15        I'm also an editor of scientific journals.  This is

16   what, you know, determines whether a paper is good or not.

17        And finally, I've helped a lot with judging grants,

18   people's request for funds.

19   Q    Okay.  How does that compare with your work on the

20   editorial review board?

21   A    Well, it's a lot harder work, because it's a lot harder

22   to get a grant than it is to get a paper these days.  It's

23   all the process of so-called peer review, judging someone's

24   work.

25   Q    Have you won any professional awards?

1   A    Yeah.   I'm a member of a lot of things over the years.

2   I'm a member of -- I became a member of the European

3   Molecular Biology organization in the mid '70's.   I became a

4   Fellow of the Royal Society -- that's the British equivalent

5   of the National Academy of Sciences -- in the early '80's.

6   And I became a member of the National Academy here a few

7   years back, several years ago.   I can't remember exactly.

8   And just last year I became a member of the Institute of

9   Medicine, which is like the medical equivalent of the

10   National Academy of Sciences.

11        And then, you know, I got some, I got some prizes

12   and things over the years.   I got one for being what's

13   called the Colworth Medal which is for the most promising

14   British biochemist under the age of 35, and you can tell

15   that's not recent.

16   **Q**   Have you published, Doctor, yourself?

17   A   Yes.   Yes.   Many papers.   I have something over 600

18   papers.

19   **Q**   Now, Doctor, could you tell the jury which of the

20   patents that are in suit you've come here to give opinions

21   about?

22   A    Yes.   I'm here to give opinions on the '349 patent, the

23   '933 patent, and the '422 patent.

24   **Q**   So if we start with the '933 patent, Doctor.

25        **MR. FLEMING:**   And can we have the '933 patent which

1    is in the jury's books; it should be Exhibit 1.  Can we have

2    the face page, please.

3    **Q**   And could you tell the jury, please, Doctor, which of

4    the claims of the '933 patent you're here to talk about?

5    A    There's several of the claims.  If I could possibly see

6    them.

7    **Q**   Could we go to the last page, please, of the '933.

8    A    It's very small.

9    **Q**   Okay.  All right.  So if we start with claim 9.

10   A    Yes.

11   **Q**   Are you here to give an opinion about claim 9, Doctor?

12   A    Yes, I am.

13   **Q**   Can you tell the jury the bases for your opinion about

14   claim 9?

15   A    Yes, I believe that claim 9 is invalid based upon what

16   is called the lack of written description and what is called

17   indefiniteness.

18   **Q**   Could you explain to the jury what you mean by lack of

19   written description?

20   A    Sure.  Yes.  So, in a, in a patent you obviously claim a

21   material of some kind.

22        **MR. MADRID:**  Objection, your Honor; it's calling

23   for a legal conclusion.

24        **THE COURT:**  No, overruled.  If he strays I'm

25   confident that I can be the judge in the case.

```
 1            You may answer.

 2            THE WITNESS:  Thanks.

 3   A    So, in a claim of a patent you're obviously claiming a

 4   substance, something's something, and in order to --

 5            THE COURT:  Not always.

 6            THE WITNESS:  No, a process.

 7            THE COURT:  Right.  And there are product claims,

 8   process claims, and product-by-process claims.  I'm not

 9   asking.

10            THE WITNESS:  That's a definition.

11            THE COURT:  It's my area.  I'm telling you.  But,

12   you can tell us what a product claim is as you understand

13   it.

14            THE WITNESS:  Yes.  So, for example -- well, we

15   will talk about the product erythropoietin, and the point

16   I'm trying to bring across is that you have to describe what

17   you're claiming.  That would be true for all of the things

18   that the judge mentioned, in fact, right?  A process, you

19   have to describe that as well.  And if it's not adequately

20   described so that somebody else knows what it is then the

21   patent is not valid obviously because you don't know what is

22   claimed.

23            MR. FLEMING:  Now, could we go to claim 11.

24   Q    And we'll go into this in more detail, but just for the

25   jury's information, Doctor -- well, that's claim 12.  And,
```

1    I'm sorry, why don't we stick with claim 12 for a second.  I

2    apologize.

3            Now, Doctor, do you have an opinion as to claim 12?

4    A   Yes, I do.

5    **Q**   All right.  Could you tell the jury?

6    A   For the same reasons as I'm mentioned, I believe the

7    claim is invalid, lack of written description, and it is

8    indefinite.

9            **MR. FLEMING:**  May we have claim 14, please.

10   **Q**   And do you have an opinion about this claim, Doctor?

11   A   Yes, I do.  This claim is also indefinite and lacks

12   written description.

13   **Q**   Now, if we go back to claim 9, please.

14           Can you explain to the jury the process you

15   employed in coming to your conclusions regarding the

16   invalidity of the claims of the '933?

17   A   Yes.  So, I read, I read the claims and then I looked to

18   the definitions of the terms used.

19   **Q**   Okay.  Well, first, in terms of claim 9, could you tell

20   the jury what you focused on, if anything?

21   A   Certainly.  Yes.  So if you look at the claim, it says

22   it's a pharmaceutical composition.  So that's something

23   that's usable for that process, that purpose.  Containing an

24   effective amount means all the glycoprotein product,

25   effective for erythropoietin therapy.

1    **Q**    Doctor, I'm going to hand you a laser pointer --

2    A    Okay.

3    **Q**    -- so that the picture quality is a little bit better.

4    A    Oh, there's one here.  I got it.  Yeah, I got it.  Thank

5    you.

6    **Q**    Okay.

7    A    Okay.

8    **Q**    You have it?

9    A    Yes, I got it.  I'm sorry about that.

10            So, comprising an effective amount of a

11    glycoprotein product effective for erythropoietin therapy.

12    And this is according to claims 1, 2, 3, 4, 5 or six.  And

13    so we need to go to these claims to understand what's being

14    meant by that.

15            **MR. FLEMING:**  Could we have claim 3 together with

16    claim 9, please.

17    A    And so what is described here as you can see is, it's --

18    I'm sorry, it's a bit of a mouthful here --

19    nonnaturally-occurring glycoprotein product of the

20    expression in a mammalian host cell of an exogenous DNA

21    sequence -- that means a gene -- comprising a DNA sequence

22    encoding, and this is the key point, human erythropoietin.

23            And then it says that that product has to possess

24    the biological properties of causing what you want, which is

25    blood marrow cells to produce reticulocytes and red blood

 1   cells.

 2           **THE COURT:**  You misread it, it's bone marrow cells.

 3           **THE WITNESS:**  I'm sorry, yes.  Yes, I'm sorry.  I

 4   was paraphrasing, excuse me.  Causing bone marrow cells to

 5   increase production of reticulocytes, these are the

 6   precursors of red blood cells -- and red blood cells.

 7           **THE COURT:**  It's time for the break.  Is this a

 8   good time to take the break?

 9           **MR. FLEMING:**  Very good, your Honor.

10           **THE COURT:**  We'll take the morning recess at this

11   time.

12           Ladies and gentlemen, you've not heard all the

13   evidence.  Please, therefore, keep your minds suspended.  Do

14   not discuss the case either among yourselves nor with anyone

15   else.

16           The jury may recess for one-half hour.  I'll remain

17   on the bench for a moment.

18           **THE CLERK:**  All rise for the jury.

19           (Whereupon the jury left the courtroom.)

20           **THE COURT:**  Please be seated.

21           You might step -- you may step down.

22           (Whereupon the witness stepped down.)

23           **THE COURT:**  Please be seated.

24           I just want to raise this with you.  I've revised

25   my schedule.  I can sit on the 10th of October.  That's the

1    Wednesday of that week.  I don't propose to change anything

2    with the jury, because I would have to ask them anyway and

3    that puts them at sixes and sevens.  But I can sit on the

4    10th and I can see good reason to meet on the 10th, without

5    the jury, to handle odds and ends and the like, including a

6    charge conference, even though we have the last two or three

7    days of the trial to go on that following week.

8            Now, Ms. Ben-Ami -- no, no, no.  If you can't do it

9    on the 10th and if that doesn't commend itself, I just

10   thought that we had agreed to suspend the whole week because

11   you had reserved, as I recalled it, the days at the end of

12   the week.

13           Now, if you have set up for the Wednesday, I'm

14   sticking to my schedule and you only have to say it will

15   foul you up.

16           **MS. BEN-AMI:**  I think, your Honor, depending on

17   what your Honor wants to do it may not be a problem because

18   my colleagues can handle it.

19           **THE COURT:**  Sure.

20           **MS. BEN-AMI:**  That's why I kind of --

21           **THE COURT:**  And I don't know.  But I thought it

22   would make sense to make myself available to you for a

23   variety of reasons.  I said the afternoons of the 1st and

24   the 4th to deal with any evidentiary presentation by

25   obviousness/double patenting.  Maybe there's something more

```
1    on that that could be done on the 10th.  But also we're

2    getting pretty close then.  I think it would be a good time

3    to discuss the charge.

4         I don't have an agenda candidly.  I simply would

5    think it might assist to make myself available to you for a

6    portion of that day.

7         MS. BEN-AMI:  I think, your Honor, something like a

8    charging conference?

9         THE COURT:  Yes.

10        MS. BEN-AMI:  I don't believe I have to be here for

11   that.

12        THE COURT:  Yes.  This doesn't have to be decided

13   today.  It's just here I am.  I thought of this.  I'm

14   telling you I'm available on the 10th.  But I don't intend

15   to change the jury's schedule.  They all understand their

16   schedule and they're all doing fine.

17        MS. BEN-AMI:  Okay.

18        THE COURT:  So think about that and we can talk

19   about it some other time.

20        MS. BEN-AMI:  All right.

21        THE COURT:  Do you think you'll rest today?

22        MS. BEN-AMI:  Yes.

23        THE COURT:  On, on --

24        MS. BEN-AMI:  Yes.

25        THE COURT:  -- the defenses?
```

1          **MS. BEN-AMI:**  Yes.

2          **THE COURT:**  Fine.  All right.  We'll recess for

3    one-half hour.  We'll recess.

4          **THE CLERK:**  All rise.  Court is in recess.

5          (Recess.)

6          **THE CLERK:**  All rise for the jury.

7          (Whereupon the jury entered the courtroom.)

8          THE CLERK:  Court is in session, please be seated.

9          **THE COURT:**  Proceed, Mr. Fleming.

10         **MR. FLEMING:**  Thank you, your Honor.

11              **DIRECT EXAMINATION** (Cont'd)

12   **(BY MR. FLEMING:)**

13   **Q.**  Dr. Flavell, back to where we were before the break, you

14   were explaining for the jury your opinions regarding claims

15   9 and 3 of the '922 patent, and again just remind the jury

16   what are your opinions regarding these claims, please?

17   A.  Yes.  So my opinion is that these claims are invalid,

18   based upon lack of written description and indefiniteness.

19   **Q.**  Let's focus on this concept of written description,

20   first.  And again, remind the jury what your understanding

21   is in applying that concept to this claim.

22         **MR. MADRID:**  Objection.

23         **THE COURT:**  No, sustained.  Asked and answered.

24   But, we don't need to take time, the explanation is

25   straightforward.  In return for the right to exclude that

1    the patent gives you, you have to teach others.  That's the

2    exchange.  You have to teach others how to do it.  So we

3    talk about indefiniteness, written description.  That's what

4    we're talking about here.

5           Now, Roche, if it is indefinite, if it doesn't

6    work, follows the patent, but it won't do it, then it could

7    be indefinite or it could fail of an adequate written

8    description.  Roche bears the burden of proof by clear and

9    convincing evidence.  That's what he's talking about.  He's

10   expressing his view and we'll see.

11          Go on.

12          **MR. FLEMING:**  Thank you.  May I continue, your

13   Honor?

14          **THE COURT:**  Of course.

15          **MR. FLEMING:**  Thank you.

16   **Q.**  Doctor, so you focus the jury on the term human

17   erythropoietin?

18   A.  Yes.  That's what I mentioned before the break.

19   **Q.**  And again, just so the jury could see, we're talking

20   about, in claim 3, human erythropoietin; is that correct?

21   A.  Yeah.  I apologize, I'll use this thing.  So here we go,

22   encoding human erythropoietin.

23   **Q.**  Okay.  So in coming to your conclusions, what did you do

24   next in your analysis?

25   A.  So the first thing that I do is to look at the

 1   definition of human erythropoietin.  What is that.

 2          **MR. FLEMING:**  Can I have the glossary, please?

 3   This is Tab 1 in the jury's notebook.

 4   A.  So human erythropoietin is defined as, "a protein having

 5   the amino acid sequence of human EPO such as the amino acid

 6   sequence of EPO isolated from human urine."

 7   **Q.**  What is the next thing you did in your analysis?

 8   A.  So the next thing that I did is to compare this

 9   definition and then to look in the patent for where I could

10   find that.

11   **Q.**  And where in the patent did you look first?

12   A.  Well, the key feature of this definition is that the

13   amino acid sequence is the defining term.  Right?  So, I

14   mean, maybe -- does the jury know what amino acids -- I

15   don't know whether you've had good descriptions of that in

16   the past.  I'm sorry, I wasn't here.

17   **Q.**  What did you first look at in the patent?

18   A.  What I first looked at in the patent is sequences, in

19   order to find whether I could find a sequence of amino acids

20   that corresponds to human erythropoietin.

21   **Q.**  And did you find any sequences in the patent?

22   A.  Yes, I did.  In Figure 6, for example, there's a

23   sequence, so maybe we could look at that.

24          **MR. FLEMING:**  Could we go to Exhibit 1, '933

25   patent, Figure 6.

1    **Q.**  And, Doctor, while we're waiting for that, could you

2    tell the jury what perspective you used when you were

3    analyzing this issue of invalidity?

4    A.  Well, the perspective I use is to look in the patent for

5    a sequence that corresponds to that of the definition.  And

6    the question is, is it there or not.  That's that issue of

7    description; is it described in the patent.

8    **Q.**  And with what eyes are you looking at that?

9    A.  Yes, very -- I'm looking at that from the point of view

10   of what we call a person skilled in the art.  That's a

11   scientist, and at the time of 1984, when the patent was

12   filed, and that would be somebody has a Ph.D. or an M.D., a

13   few years experience in research.  And they will then look

14   at the patent and they need to make these judgments to be

15   able to see these things.

16   **Q.**  And did you do your analysis as you would have one of

17   skill in the art do it?

18           **MR. MADRID:**  Objection, leading.

19   A.  Yes.

20           **THE COURT:**  Sustained.  Don't lead the witness.

21           **MR. FLEMING:**  Sorry.

22           **THE COURT:**  The answer's stricken.

23   **Q.**  When you did your analysis, explain to the jury again

24   what perspective you put?

25   A.  So the perspective is that of the so-called person

1    skilled in the art.  The person I just described, a

2    scientist that's done that work at some point.

3    **Q.**  Now, could you tell the jury what's shown here now on

4    the screen from Exhibit 1, which is Figure 6E?

5    A.  Yes.  This is, the whole figure is quite long.  This is

6    Figure 6E.  And what it is is a sequence of the gene for

7    erythropoietin, that's what -- these are these DNA letters

8    here.  I'm sure you've had lessons on this.  CCA, that's DNA

9    language, as it were.  CTC, this is all the DNA sequence

10   which continues down the way to the end.

11   **Q.**  Did you prepare a demonstrative to help the jury

12   understand your analysis?

13   A.  Yes, I did.

14        **MR. FLEMING:**  Could I have RF9, please.  Can you

15   get the -- it all on the screen at one time.  Thank you.

16   **Q.**  Doctor, could you explain to the jury what RF9

17   describes?

18   A.  Certainly, yes.  Well, you can see again this is the

19   same Figure 6E, but to make it simpler, make it easier for

20   you to see, I've just added a box here.  And let's go over

21   this.

22        So, again, I was describing that you have this DNA

23   sequence here.  CCA, et cetera.  But if you look above the

24   DNA, you see a PRO, which stands for "probe."  That's the

25   amino acid building blocks of the protein, PRO stands for

1    proline, it's an abbreviation.  And if you look at this one

2    here, it says LEU for leucine, and so on.  It goes through

3    all the way to the end.  And this number here, where you see

4    the number 130, that's the 130th position in erythropoietin.

5            So, should I maybe explain?

6    **Q.**  Well, you have a protein sequence and you have an amino

7    acid under the 130, what does it tell one skilled in the

8    art?

9    A.  Sure.  So what this says is that at that position of the

10   protein erythropoietin is a leucine, that amino acid -- you

11   probably remember there are 20 amino acids.  This is the one

12   that's pretty much always there.

13   **Q.**  There's a red box on the demonstrative.  Can you explain

14   to the jury what you mean to convey by that box?

15   A.  Certainly.  So if you go to -- all the way to the end of

16   the protein, you could see that the very last amino acid is

17   here number 166.  It's called ARG, that stands for arginine.

18   **Q.**  Now, there's something to the right of that.  It looks

19   like OP, and then it has the sequence TGA.  Can you tell the

20   jury what that is?

21   A.  Certainly.  Yeah, I think that OP is a typo, actually.

22   It should be "stop."

23   **Q.**  What's the significance of that, Doctor?

24   A.  Sure.  When you make a protein inside the cell, there's

25   a signal to say don't make anymore.  Stop there.  Don't

1    continue.  And that is the stop signal, TGA.  It's a -- it's

2    on the actual -- the transcript of the DNA.  So this is not

3    converted into protein.  It just tells the cell stop, don't

4    go any further.

5          So this is the very last one, and that one here is

6    the signal to tell you to don't go any further.

7    Q.  So looking at this figure in Exhibit 1, which is the

8    '933 patent, what did you conclude regarding the amino acid

9    sequence disclosed?

10   A.  So what I concluded is that the patent describes this

11   protein as a protein of 166 amino acids in length, as you

12   can see here, and that this protein is human erythropoietin.

13   Q.  Now, in terms of amino acids, could you, again, briefly

14   just remind the jury how they interact with proteins?

15   A.  Yeah, sure.  Proteins are like -- the way we,

16   scientists, commonly say, like it's like beads on a string.

17   So if you imagine string, beads, those beads are the amino

18   acids.  And they start with Number 1, and they go all the

19   way through till the end.

20          Now, this particular drawing has 166 of those

21   beads.  And the point to remember about a protein is that

22   the sequence is the critical thing.  It determines what the

23   protein is, what it does.  It's very, very, very important.

24   It's the most important thing.  So Number 1 is always

25   Number 1, Number 2 is Number 2, of that protein.  You could

1    pick another protein, it will be completely different.

2         So this is erythropoietin.  You know, I mentioned

3    hemoglobin.  That will have a completely different sequence.

4    But, again, it will always have the same one, normally in

5    the same place.  Number 1's always the same thing.  But when

6    you have a sick one, like I said, then it's different.  But

7    apart from that, it's very, very constant.  And that

8    determines how the protein works.

9    Q.  And, again, what did you conclude from reviewing the

10   patent regarding the amino acid sequence for human EPO?

11   A.  So, what I concluded is the patent describes human

12   erythropoietin as this protein of 166 amino acids, and you

13   could see all those other residues, but of course we don't

14   need to go through every one of them today.

15   Q.  And the size is?

16   A.  The size is 166 amino acids.

17   Q.  Did you find anywhere else in the patent a discussion

18   about the size of human erythropoietin?

19   A.  Yes.

20        MR. FLEMING:  And can we go to column 35 of

21   Exhibit 1 of the '933 patent.  And if you would highlight

22   starting around line 13, and then enlarge that section right

23   there, please.

24   Q.  Okay.  Doctor, can you tell the jury what, if anything,

25   you found relevant in this section?

1    A.   Certainly.  Well, if I -- I'll read it.  I'm trying to

2    make clear what I meant.  If you just go to that point here,

3    rather than just reading -- well, maybe I should read the

4    whole thing, this paragraph.  "While the deduced sequences

5    of amino acid residues of mammalian EPO provided by the

6    illustrative examples essentially define the primary

7    structural conformation of mature EPO" --

8    Q.   Let me stop you there.  What is primary structural

9    conformation?

10   A.   Primary structure is the sequence.  So that's exactly

11   what I was talking about.

12   Q.   The amino acid sequence?

13   A.   The amino acid, excuse me.

14   Q.   Please continue.

15   A.   "Of mature EPO, it will be understood that the specific

16   sequence of 165 amino acid residues of monkey species

17   EPO" -- so what this is saying, and in the patent there's a

18   description of monkey erythropoietin, or monkey EPO, that is

19   actually described as 165 amino acids.  It's shorter than

20   the human one described in the patent.

21   Q.   What are you looking for, Doctor?

22   A.   I'm looking here for this description here, 165 amino

23   acid residues of the monkey species EPO in Figure 5.

24   Q.   And continuing on?

25   A.   And continuing on, it says, "And the 166 residues of

1    human species EPO."  And that's in Figure 6.  That's the one

2    we just went over.

3    **Q.**  So what did you conclude from this?

4    A.  I conclude from this that the patent describes, for

5    human EPO, a protein of 166 residues, while it describes a

6    different thing for monkey, that's 165 residues.  So human

7    is 166.

8    **Q.**  And, now, there's additional language in that sentence

9    saying, "does not limit the scope of useful polypeptides,"

10   and the next section talks about the allelic forms.  Do you

11   see that?

12   A.  That's right, yes.

13   **Q.**  What does the patent talk about with regard to allelic

14   forms?

15   A.  Well, the patent is including in the description and the

16   mention various other forms, naturally occurring allelic

17   forms of EPO.  And what that means is that's forms that

18   have, at a particular position, a different amino acid.  You

19   may have noticed when I said they're almost always the same,

20   but I did say almost.  And the reason I said almost is in

21   some people, you could have a different one, sometimes.

22   Sometimes it's something that makes you sick because it

23   doesn't work, sometimes not.  So that's what I mean by

24   allelic forms.

25   **Q.**  Based on what the patent talks about concerning allelic

1    forms, did it change your opinion about the human EPO being

2    166?

3              MR. MADRID:  Objection, leading.

4              THE COURT:  Sustained on that ground.

5    Q.  What did the discussion in the patent about allelic

6    forms influence your opinion regarding the claims in '933?

7    A.  Yes, what I think this means is -- and there's an

8    example described actually in the patent, where you have a

9    position you may have a different amino acid.  Let's imagine

10   it's position 6, just for the sake of argument.  I'm just

11   inventing that, so it's not a specific one in the patent.

12   But 6 could be, in most people, one thing, in other people

13   the other.

14             MR. MADRID:  Your Honor, I object.

15             THE COURT:  Wait a minute.  Well, I'll stop it

16   there.  Put another question.

17             MR. FLEMING:   Thank you, your Honor.

18   Q.  Did it change your opinion regarding the size of the

19   human EPO protein?

20             MR. MADRID:  Objection, leading.

21             THE COURT:  How did it affect your opinion

22   regarding the size of the human EPO?

23             MR. MADRID:  Your Honor, the question's also

24   outside the scope.

25             THE COURT:  Of the report?

1          **MR. MADRID:**  Yes, sir.

2          **THE COURT:**  I see.  And where is it, Mr. Fleming?

3          **MR. FLEMING:**  Your Honor, there's a discussion at

4     green, Paragraph 77.  But first, if I might -- I beg your

5     pardon.  Let me refer you to the red report, Paragraph 19.

6     You should have a line version, your Honor, so it starts at

7     the bottom --

8          **THE COURT:**  Yes, I do, and I'm looking at it.

9          He may testify consistent with Paragraph 19, except

10    for the penultimate sentence in that paragraph.

11         **MR. FLEMING:**  Understood, your Honor.

12         **THE COURT:**  Which is out.  Go ahead.

13    A.  Maybe you could repeat the question.

14    Q.  Again, based on what's discussed in the patent, did it

15    have any impact on your opinion regarding the size of the

16    human EPO protein discussed in this patent?

17    A.  No, it did not.  Because what we're talking about here

18    is changes in the particular amino acid, in one position,

19    not of the length of the protein.  It's nothing to do with

20    that.

21    Q.  And, again, remind the jury, the length of the protein

22    discussed for human EPO in this '933 patent?

23         **MR. MADRID:**  Objection, your Honor.  This is

24    outside the scope, and as to the leading.

25         **THE COURT:**  No, you may have it.

1    A.   So, sorry, I have to ask you to repeat it.  I apologize.

2    Q.   Again, sorry for the interruption.

3         The size of the protein, in your opinion, discussed

4    in the '933 patent.

5    A.   The size of the protein as described and discussed in

6    the patent is 166 residues for human species EPO.

7    Q.   Okay.

8    A.   That's as you see here in green.

9    Q.   Did you review other materials that confirmed your

10   opinion?

11   A.   Yes, I did.

12        MR. FLEMING:  Can we have -- there was an

13   Exhibit 2047 in evidence, please.

14   Q.   And, Doctor, can you explain to the jury briefly what

15   Exhibit 2047 is, and how it impacted your decision -- your

16   opinions, excuse me?

17   A.   Yeah.  This is a scientific paper now which has been

18   published in a journal.  So this has been through a

19   peer-review process.  It's called the Journal of Biological

20   Chemistry.  And as you can see, it says, "The Structural

21   Characterization of Human Erythropoietin."  And what this is

22   is the description of the sequence of human erythropoietin.

23   And the people that do this work, as you can see here, are

24   from Amgen.  This is what I call members of the Amgen EPO

25   team.  As you can see, it's Dr. Goldwasser, who's a

 1    collaborator.

 2         **MR. FLEMING:**  If you can go to the second page of

 3    this publication, if we can enlarge the last section, right

 4    above -- exactly there, please.

 5    **Q.**  Doctor, can you explain to the jury how this impacted

 6    your opinion regarding the claims of the '933?

 7    **A.**  Yes.  So if you look at this sequence and work your way

 8    all the way to the end, so it's the same basic principle of

 9    the sequence I was showing you a little bit earlier.

10    **Q.**  Where you have the pointer now, what are those?

11    **A.**  I'm sorry, the pointer?

12    **Q.**  The LEU, the --

13    **A.**  Yes -- I apologize, I interrupted you.

14    **Q.**  Could you tell the jury what those are?

15    **A.**  Sure.  These are, again, those amino acid abbreviations.

16    So remember, LEU stood for leucine, and it goes on and on.

17    Each of these is an amino acid.  These are the beads on the

18    string again.

19    **Q.**  What are the numbers above them, the 150, 160?

20    **A.**  If you look at 150 here, it says ARG.  And 150, that's

21    the 150th amino acid of human erythropoietin.  If you go all

22    the way down to the -- here, there's 160.  If you work your

23    way to the end, you can count it -- one, two, three, four,

24    five -- so the last one is 166, and it's that same arginine,

25    or ARG, that I described to you from the patent.

1  Q.  And how did this influence your opinion, Doctor?

2  A.  So what this says is that Dr. Lai and his colleagues

3  from Amgen publish and conclude that human erythropoietin is

4  actually at 166 amino acids in length.

5  Q.  Did you look at any other documents, Doctor, in forming

6  your opinion?

7  A.  Yes.

8  Q.  And if you can turn now to what's been entered into

9  evidence this morning as Exhibit 2070.

10  A.  This one here?

11  Q.  Yes.  Give you this one here.

12       Can you tell the jury briefly what this document

13  is, 2070?

14  A.  Yes, certainly.  This is the part or whole -- no, can't

15  be whole of it -- part of the IND filing for Amgen.  An IND

16  is when you ask permission to do a clinical trial.

17  Q.  And what part of this document, Doctor, did you find

18  relevant?

19  A.  What's relevant is the Figure 4B-7.

20  Q.  Can you read the bottom numbers of the document so we

21  can reference it for the jury?  Is it 596042?

22  A.  Yeah, that's right.

23  Q.  And what, if anything, in this chart did you find

24  informative in coming to your opinions about the '933 claim?

25       MR. MADRID:  Objection.  Outside the scope of the

1      report.

2            THE COURT:  Where are we going to find it in the

3      report?

4            MR. FLEMING:  It is in the green report, your

5      Honor.

6            THE COURT:  All right.

7            MR. FLEMING:  Oh, beg your pardon, I stand

8      corrected.  Red, Paragraph 16, your Honor.

9            THE COURT:  Thank you.  Yes, he should -- he may

10     testify consistent with Paragraph 16 with the exception of

11     the sentence that begins "However" in that --

12           MR. FLEMING:  Understood, your Honor.

13           THE COURT:  Go ahead.

14           MR. FLEMING:  Thank you.

15           Could we throw up the lower section, please.

16     Q.  And this document, Doctor, again, could you point to the

17     jury the part that you found relevant to your analysis?

18     A.  Certainly, yes.  So if you look, it's very -- it's

19     basically identical to the sequence that I just showed you,

20     which is the sequence of erythropoietin.  The last line is

21     here, there's Number 150 again.  There's Number 160 again.

22     If you work your way down to the end -- one, two, three,

23     four, five, six -- that's that same arginine.  If you just

24     highlight that.  It's a little unclear, but that's the 166th

25     residue.

1           So what this means is that --

2           MR. MADRID:  Your Honor, I object.  This is outside

3      the scope.  He's testifying 166.

4           THE COURT:  Yes.  He should confine himself to that

5      paragraph to which you --

6           MR. FLEMING:  We'll stop the answer there.

7           THE COURT:  We'll stop it.

8  Q.  Doctor, are you aware of any Amgen statements as to

9      what's described in the Lin patents as to the size of the

10     human erythropoietin?

11 A.  In this document it's described that it's 166 amino

12     acids in length.

13 Q.  Now, looking at all those documents that we just

14     discussed with the jury, what conclusion did you come to?

15 A.  So, the conclusion I drew is that both in the patent

16     and -- which was filed late 1984, and several years later,

17     Amgen described erythropoietin as a 166 amino acid protein,

18     and that the description in the patent of human

19     erythropoietin is as a 166 amino acid protein, just like

20     I've been showing you figures of.

21          MR. FLEMING:  Can we go now back to the glossary

22     that the jury has in their notebook, and can we enlarge the

23     human erythropoietin definition.

24 Q.  And the section here, Doctor, that starts "such as"?

25 A.  That's right, yes.

1   Q.  Can you tell the jury what's known today regarding that

2   section?

3   A.  So what this means is like the amino acid sequence of

4   EPO, isolated from human urine.  What we now know is that

5   this is a protein that is not 166 amino acids, it's a

6   protein that's 165 amino acids.  So it's shorter.

7   Q.  And that's under the definition of what term in the

8   claim?

9   A.  Yes, this is defining the term in this case, with

10  respect to claim 1 of the '422 patent, but it actually

11  applies to all claims that have the term human

12  erythropoietin in it.

13  Q.  And what is your conclusion now, based on that piece of

14  information?

15  A.  Yes.  Well, so the problem I have is that if when I go

16  to the patent, I find a definition of the protein, and what

17  is claimed in the patent is for a protein of 166 amino

18  acids, but what I'm seeing here is the definition of the

19  human erythropoietin is actually for a different protein,

20  it's got 165 amino acids.

21  Q.  So explain to the jury, then, how you came to your

22  opinion regarding the lack of written description.

23  A.  Certainly.  Yes.

24  Q.  What is described in the patent?

25  A.  So what is described in the patent --

1    **Q.**  For human erythropoietin.

2    A.  Yes, sorry, I'll repeat that.  So what is described in

3    the patent for human erythropoietin is a protein that is 166

4    amino acids in length.

5    **Q.**  And what is claimed in the patent or what does the claim

6    of the patent include?

7    A.  Well, the claim, what's claimed in the patent is this:

8    It's human erythropoietin and it is defined as a protein

9    having the amino acid sequence of EPO isolated from human

10   urine.  And as I just mentioned, this is a protein of 165 --

11        **MR. MADRID:**  Objection, your Honor.  I object.  May

12   we have a sidebar, please?

13        **THE COURT:**  Yes.

14   SIDEBAR CONFERENCE, AS FOLLOWS:

15        **THE COURT:**  Okay.  I've read your briefs on both

16   sides on this fellow.  What's the problem?

17        **MR. MADRID:**  The trouble I'm having, he's

18   distorting the Court's claim construction by limiting it to

19   specific 165 --

20        **THE COURT:**  Well, if he is, I'm going to prevent

21   it.  And I'm trying to be alert to that.  He's not saying

22   anything as claimed or construed, he's simply saying the

23   patent says this, it's not adequate, it's not an adequate

24   description.  I'm sticking with the claim construction which

25   says "such as," and you'll have a chance to cross-examine

 1   him.

 2          I believe Mr. Fleming knows, but I'll make it

 3   clear, I'm sticking to that construction.  He's not to say

 4   anything contrary to that construction, nor is he to define

 5   the patent term any way other than the Court's defined it.

 6   But he may --

 7          **MR. FLEMING:**  In answer to your question, I don't

 8   believe he said anything, because he said --

 9          **THE COURT:**  The Court is with you on this one.

10          **MR. FLEMING:**  Thank you.  So I'll shut up.

11          (Whereupon the sidebar conference concluded.)

12          **THE COURT:**  I think you should put the question

13   again.

14          **MR. FLEMING:**  Thank you, your Honor.

15   **(BY MR. FLEMING:)**

16   **Q.**  So, Doctor, just so we can be clear on this tricky

17   subject.

18          **MR. MADRID:**  Objection.  Objection, your Honor.

19   Move to strike.

20          **THE COURT:**  Strike out the comment.  You'll be the

21   ones who decide what's tricky or not tricky.

22   **Q.**  Explain to the jury, Doctor, based on the evidence you

23   just described, your opinion regarding the written

24   description of claim 9 of the '933 patent?

25   **A.**  What is described in the patent is a protein of 166

1    amino acids.  What the claim defines here, according to this

2    term, is a protein which is 165 amino acids.

3              **MR. MADRID:**  Objection, your Honor.

4              **THE COURT:**  Yes, sustained.  Sustained.  Strike

5    that out.  The Court has defined the language from the

6    patent.  Throw up the glossary there.

7              **MR. FLEMING:**  It is there, your Honor.

8              **THE COURT:**  Oh, yes, so it is.  There's the

9    glossary.  And that's how the Court's defined it.

10             **MR. FLEMING:**  Your Honor, with two questions, I

11   think I can show there's absolutely no inconsistency.

12             **THE COURT:**  Well, strike out your comment.  Just

13   understand that that's a matter of law.  I have to explain

14   what the language means.  I'm striking his answer.  We'll

15   see what these questions reveal.

16             Go ahead.

17   **Q.**  Okay.  So part of the glossary term for human

18   erythropoietin that you're focusing on for now is starting

19   with "such as"; is that right?

20   A.  That's correct.

21   **Q.**  And "such as," you said before, means "like"?

22   A.  Yes.

23   **Q.**  How would you classify, then, that portion of the

24   glossary definition?

25   A.  What that is, is a protein which as we now know is 165

1    amino acids.  That's what human urinary erythropoietin is.

2    **Q.**  Because of the "such as," you're not saying it's --

3              **MR. MADRID:**  Objection, leading.

4              **THE COURT:**  Yes, sustained on that ground.

5    **Q.**  What is the "such as" in your analysis?

6    A.  The "such as" means as an example, and so-called

7    exemplar.

8    **Q.**  So, again, your opinion regarding written description is

9    based on what term?

10   A.  My opinion regarding a written description is based on

11   the term human erythropoietin, and the protein that's

12   described in the patent is described as a protein of 166

13   amino acids, and this definition is a protein of 165 amino

14   acids.

15             **MR. MADRID:**  Your Honor, I object.  It's

16   irrelevant.  Move to strike.

17             **THE COURT:**  Well, here's the problem.  And in a

18   case like this, the line between what you're asked to do and

19   what I am required to do is very important.  And in all

20   fairness, the word having been used, it's tricky.  I have to

21   be very careful not to get into what you're being asked to

22   do, because under the Constitution, you're the only ones who

23   can do it.  At the same time, I have to do everything that

24   I'm supposed to do.  I have to do that.  I'm sworn to do

25   that the best I know how.  And having done it, you have to

1    take what I've done as the law.

2          So now let's come down to cases, this case, what

3    we're talking about here.  There's no dispute that the

4    patent, in various claims, the claim we're talking about

5    here, uses the term "human erythropoietin."  So before we

6    got you in here, we've held hearings so I would define the

7    term.  "Construe" is what we say.  My job.

8          So I've construed it.  And there I say human

9    erythropoietin, quote, and here's the definition, "A protein

10   having the amino acid sequence of human EPO such as the

11   amino acid sequence of EPO isolated from human urine."

12   You've got to take that as the definition of human

13   erythropoietin as that term exists in the patent.  That's

14   the end of my job.

15         Now, when you look at the specifications of the

16   patent, which have been thrown up there, you're going to see

17   a sequence that has 166 amino acids.  He's giving evidence.

18   Now, with evidence, you can believe it, disbelieve it, you

19   can believe parts of it, you can disbelieve other parts.

20   And he's saying, Well, look, really it's 165.  We know that

21   now, or -- and I shouldn't characterize what he says.  You

22   take what he says from him.

23         And based upon his understanding that it's 165, he

24   says this patent fails adequately to describe, in its

25   written description, and to enable, to help other people

1    make this claimed product.  Those are his opinions.  It's up

2    to you whether you believe them, disbelieve them, or believe

3    them in part.  We haven't heard Amgen's witnesses on this.

4            That's for you.  I don't say anything about that.

5    What I do say, now that I'm pressed, is that definition

6    doesn't say anything about 165 or 166.  It says what it

7    says.  He'll give you his views.  Apparently they are that

8    it's 165.  He says, Well, look at the patent, it says 166,

9    they're off.  I'm paraphrasing.  Don't take anything from

10   me.  And I want to be completely fair to his testimony.  He

11   says what he says.  That's evidence.

12           My point, and my interruption is only to point out

13   I never defined anything as 165 or 166.  That's how I

14   defined it.  That's the law.  It's up to you from there on

15   in.

16           Go ahead, Mr. Fleming.

17           **MR. FLEMING:**  Thank you, your Honor.

18   **Q.**  Dr. Flavell, looking at the definition of human

19   erythropoietin, the "such as" part, you applied this

20   definition during your analysis; correct?

21           **MR. MADRID:**  Objection, leading.

22           **THE COURT:**  I'm going to let him have it.

23   **A.**  Yes, I did.

24   **Q.**  And to the "such as" part, did you view that as the word

25   "including"?

1          **MR. MADRID:**  Objection, leading.

2          **MR. FLEMING:**  Withdrawn.

3  **Q.**  How did you view the word "such as"?

4  **A.**  I viewed that word as for example, in other words,

5  including such proteins.

6          **MR. MADRID:**  Your Honor, this is outside the scope.

7          **THE COURT:**  Well, it's untimely.  It may stand.

8          **MR. FLEMING:**  Thank you.

9  **Q.**  And did you find a description of a 165 amino acid

10  protein in the patent?

11          **MR. MADRID:**  Objection, leading.

12          **THE COURT:**  Where in the patent, if anywhere, is a

13  description of a 165 sequence?  This is patent '933.  Where?

14          **THE WITNESS:**  Am I to answer your question?

15          **THE COURT:**  My question trumps his when I --

16          **THE WITNESS:**  I think you're in charge, yes.

17          It is not described anywhere.  There's nowhere in

18  the patent that describes a human erythropoietin of 165

19  amino acids.

20  **Q.**  Is that the basis of your opinion?

21  **A.**  That's correct.  There's no written description of that

22  protein.

23  **Q.**  So could we go now -- you talked about claim 9.

24          **MR. FLEMING:**  Can we go to claim 11 of the '933

25  patent, again in Exhibit 1.

1    **Q.**   Okay.  And you see claim 11 depends on claim 9?

2    **A.**   That's right.  Yes.  So when you look at claim 11, it

3    describes a method for treating this disease.  A critical

4    thing is administering a pharmaceutical composition of

5    claim 9.  So we have to go to claim 9 to see what is -- what

6    that is.

7         **MR. FLEMING:**  We can move those both down to the

8    bottom, please.

9    **Q.**  And, again, that claim 9 brings us where?

10   **A.**  So claim 9 brings us here to -- it says, "A

11   pharmaceutical composition comprising an effective amount of

12   a glycoprotein effective for erythropoietin therapy."  So

13   now we have to go further to these claims, 1 through 6, so

14   maybe 3, for example.

15   **Q.**  Okay.

16        **MR. FLEMING:**  Can we bring up claim 3 now?

17   **A.**  So here's claim 3.  I'm sorry about this, but you're

18   going then from claim 11 to claim 9 to claim 3 to get to my

19   point here, which is that here we now see that what is being

20   claimed here is something which is obtained from a DNA

21   sequence encoding human erythropoietin.  So this is back to

22   that protein I've been talking about.  So you go from 11 to

23   9 to 3, to understand what the material is.

24   **Q.**  And again, could you tell the jury what your opinion is

25   as to claim 11?

1    A.   Yes.   So, I mean, claim 11 is invalid for the reasons I

2    described earlier, because in this case, for lack of written

3    description.

4    Q.   That's the 165, 166?

5    A.   That's right, for the same reason, because it defines

6    human erythropoietin and, as I said, it's not described in

7    the patent that that is a protein of 165.

8    Q.   Can we go to claim 12, please?

9    A.   Sure.

10   Q.   Okay.   Now, claim 12 brings you where in terms of what

11   other claim?

12   A.   So this is, again, a pharmaceutical composition

13   comprising an effective amount of this product effective for

14   erythropoietin therapy.   And then we have to go to claim 7

15   to see what that is.

16   Q.   Okay.   So will you do that, please?

17   A.   And then I'm afraid we have to go one step further.

18   This says the glycoprotein product according to claims 3, 4,

19   5 or 6.

20   Q.   Okay.   And you've already described to the jury your

21   opinions about claim 3?

22   A.   Correct, yes.

23   Q.   How does that impact your opinion regarding claim 12?

24   A.   So what that means is that this claim 12 is also invalid

25   for the same reason; for the lack of written description.

1    **Q.**  Okay.

2         **MR. FLEMING:**  And can we just have claim 8 for a

3    second, please.

4    **Q.**  Now, claim 8 brings you back to claim 7?

5    **A.**  Yes.  Same thing.

6    **Q.**  And just explain to the jury your opinion regarding

7    claim 8.

8    **A.**  Yes.  So claim 8's invalid for the same reason as I was

9    just describing.  Claim 8 takes us to claim 7, claim 7 takes

10   us to claims 3 through 6, claim -- we went through claim 3.

11   Claim 3 talks about human erythropoietin.  And as I

12   mentioned, it's not described in the patent.  So, therefore,

13   it's not valid.

14   **Q.**  Okay.  Now, do you have any -- withdraw.  Let me ask you

15   another question.

16        Are you offering any opinions regarding any claims

17   of the '422 patent?

18   **A.**  Yes, I am.

19   **Q.**  And what claim would that be?

20   **A.**  Well, go to claim 1, for example.

21        **MR. FLEMING:**  Can we have claim 1 of the '422?

22   **Q.**  Okay.  And can you explain to the jury, first tell the

23   jury your opinion regarding claim 1 of the '422.

24   **A.**  Certainly.  So just as I was saying, this claim also is

25   invalid for the same reason as I was describing a little bit

1    earlier.

2    **Q.**  And what was that?

3    A.   The reason is because it lacks written description.

4    **Q.**  And can you tell the jury what terms of this claim you

5    analyzed to come to that conclusion?

6    A.   Certainly.  So here again, what we're talking about here

7    is a pharmaceutical composition which has in it -- I'm

8    sorry, I'm paraphrasing, I hope that's okay -- has in it,

9    human erythropoietin.  And what -- as we've just discussed,

10   human erythropoietin is defined as 165 amino acids.  We now

11   know --

12            **MR. MADRID:**  I object.

13   A.   -- it isn't.  It's not --

14            **THE COURT:**  Wait.

15            **THE WITNESS:**  I'm sorry.

16            **THE COURT:**  No, overruled.  That may stand.

17   **Q.**  Continue, Doctor.

18   A.   So human erythropoietin is defined as 165 amino --

19            **THE COURT:**  No, no.  No, no.  That -- now, I catch

20   it.  No, it's not defined.  I defined it.  Let's be very

21   clear.  You may think that it's 165.  You have every right

22   to tell the jury that, and the jury will draw whatever

23   conclusions it wants to draw.  It's defined -- throw it up

24   there again.

25            **MR. FLEMING:**  The glossary, please.

1      **THE COURT:**  "Human erythropoietin:  A protein

2    having the amino acid sequence of human EPO such as the

3    amino acid sequence of EPO isolated from human urine."  As I

4    have emphatically told the jury, I'm not making this 165,

5    166 distinction if it's the distinction.  All that's for the

6    jury.  I don't have a quarrel with what he says it is.  When

7    he launches off and says, As it's used in the patent, or, As

8    it's defined.  He can't do that.  My job.  I've done it.

9        But in response to another question by Mr. Fleming,

10   you may give your opinion about these things consistent with

11   your report.

12     **MR. FLEMING:**  Thank you, your Honor.  May I

13   continue?

14     **THE COURT:**  Go ahead.

15     **MR. FLEMING:**  Stay back at the glossary, please.

16   Q.  Just what does one of skill in the art today understand

17   about the term "such as amino acid sequence of EPO isolated

18   from human urine"?

19   A.  What that person of skill in the art understands is that

20   this human erythropoietin is, for example, the amino acid

21   sequence of EPO isolated from human urine.  And as I

22   mentioned a little bit earlier, that that sequence, the

23   sequence of amino acid -- of human urinary erythropoietin

24   is, in fact, a protein of 165 amino acids.

25   Q.  That's what they understand today?

1    A.   That's what they understand today, yes.

2    Q.   And based upon applying this definition, tell the jury

3    your opinion regarding claim 1 of the '422?

4    A.   Yes.   So my opinion is that that claim is not valid

5    because that protein that I just described, this 165 amino

6    acid long protein, is not described in the '422 patent.

7    Q.   Do you have any other opinions regarding this claim?

8    A.   Yes.   Yes, I do.

9    Q.   Can you tell the jury what that is?

10   A.   Well, there's a second problem with it, which is that it

11   is indefinite.

12   Q.   And can you tell the jury how you apply that concept in

13   doing your analysis?

14   A.   Yes, certainly.   So, if I imagine I'm this person of

15   skill in the art, this is the scientist, looking at the

16   patent, and looking at what's claimed, you imagine

17   there's -- you have human erythropoietin inside a fence, and

18   you have to -- I'm trying to avoid it.   Right?   I'm trying

19   not to get into that area because I want to do something

20   which is not blocked by that fence.   So I have to know

21   what's inside it.   And I have to know what erythropoietin is

22   claimed here so that I can avoid it and do something else.

23        And the trouble is, the way the patent is, I just

24   can't do that because it's too indefinite.   For example,

25   there's a discussion of allelic variance in the patent but

1    it doesn't tell us which ones they are.  And I don't know if

2    I had a particular allelic variant whether it would be

3    covered or not.  That's indefinite.

4    **Q.**  So looking back to the glossary now, again, are you

5    applying this term?

6    A.  Yes, certainly.  So here we're talking about the first

7    part of this.  So a protein having the amino acid sequence

8    of human EPO.  So the question is, well, what is that?  Is

9    it -- if I had an allelic variant, would it be such a

10   protein or not?  And the patent doesn't tell me.  It's just

11   not -- it's not made clear.

12   **Q.**  And so your conclusion based upon that is --

13   A.  My conclusion is that these claims are invalid because

14   they are so-called indefinite.

15   **Q.**  You don't know where to put the fence?

16   A.  That's right, exactly.  I'm sorry, I should -- so, is

17   the fence here, is it there, is it a very precise definition

18   of three things?  Is it 300 things?  I can't tell.

19          **MR. MADRID:**  Objection, your Honor.  Move to

20   strike.  That's outside the scope.

21          **THE COURT:**  That may stand.

22          **MR. FLEMING:**  Thank you, your Honor.

23   **Q.**  We're taking about claim 1 of the '422, and just so the

24   jury's clear, with regard to the claims of the '933 patent

25   that we just looked at in detail, do you have an additional

1    opinion regarding those claims, Claims 3, 7, 8, 9, 11, 12?

2    A.  Yes.  So, just to save you time, my opinion on those all

3    is exactly the same.  And for the same reasons as I've just

4    described; indefiniteness.

5    Q.  So the claims are?

6    A.  Invalid, I'm sorry.

7    Q.  Okay.  Let's move forward.

8         Have you looked at the Lin patent with regard to

9    the term "purification"?

10   A.  Yes, I have.

11   Q.  And in your view, does the Lin patent discuss techniques

12   for purification?

13        **MR. MADRID:**  Objection, leading.

14        **THE COURT:**  It is.  Sustained.

15   Q.  Did you look at Example 10 of the '933 patent?

16   A.  Yes, I did.

17        **MR. FLEMING:**  And can we have Example 10 of the

18   '933?

19   Q.  Now, Doctor, you've reviewed materials supplied by the

20   parties in this case in connection with coming to your

21   opinions?

22   A.  Yes, I have.

23   Q.  And in your review of those materials, did you look to

24   see whether the material in Example 10 was ever administered

25   to a human?

1          **MR. MADRID:**  Objection, leading.

2          **MR. FLEMING:**  Withdrawn.

3   **Q.**  Did you look, in your review of your materials, to see

4   what, if anything, was ever done with the materials in

5   Example 10?

6   A.  Yes, I did.

7   **Q.**  And can you tell the jury what you discovered?

8   A.  To my understanding, this material was not ever

9   administered to a human being.

10  **Q.**  Does the patent talk about this being administered to

11  anything?

12         **MR. MADRID:**  Objection, leading.

13  **Q.**  What, if anything -- withdrawn.

14         What, if anything, does the patent disclose about

15  the materials of Example 10?

16         **MR. MADRID:**  Objection, your Honor.  Outside the

17  scope.

18         **THE COURT:**  Where is it?

19         **MR. FLEMING:**  The blue report, your Honor,

20  Paragraphs 45 and 53.

21         **THE COURT:**  He may testify consistent with those,

22  but that doesn't support that particular question.  Reframe

23  the question.

24         **MR. FLEMING:**  Okay, your Honor.

25         **THE COURT:**  Well, yes, it does.  Look at 53.  Look

1    at 53.

2              **MR. FLEMING:**  Yes.

3              **THE COURT:**  Do you see, there is apparently

4    something in these patents about purification, isn't there,

5    sir?

6              **THE WITNESS:**  There's a description of a partial

7    purification, that's right.

8              **THE COURT:**  Yes.  All right.  So there's your

9    answer.  Go from there, Mr. Fleming.

10             **MR. FLEMING:**  Okay.

11   **Q.**  And in your opinion, is there sufficient description of

12   purification in the '933 patent?

13             **MR. MADRID:**  Objection, leading.

14             **THE COURT:**  How good is it?

15             **THE WITNESS:**  How good is the description?

16             **THE COURT:**  Yes.

17             **THE WITNESS:**  The description is of a, a very

18   simple, short purification step which would give a, let's

19   call it a partially enriched product.

20   **Q.**  In your opinion, is it enough to give to a human?

21             **MR. MADRID:**  Objection, leading.

22             **THE COURT:**  Sustained.

23   **Q.**  In your opinion, what, if applying that single step,

24   could you do with the material after that?

25   **A.**  You certainly could not give that to a human.

```
 1              MR. FLEMING:  Can we have what's already in

 2    evidence as '016 patent?  And I have it as formerly QD.  Why

 3    don't you take everything down until you find it.

 4    Q.  If you could turn to it in your book first, Doctor.

 5    A.  I'm sorry, which --

 6    Q.  If I can help you.

 7    A.  Yes.

 8    Q.  Here we go.

 9    A.  Thanks.

10    Q.  Okay?

11    A.  Yes.

12    Q.  And could you tell the jury what that is, please,

13    Doctor?

14    A.  Certainly.  This is a subsequent patent on the

15    purification of erythropoietin, and its two inventors are

16    Dr. Lai, that we talked about a little earlier, and

17    Dr. Strickland.

18    Q.  Is Dr. Lin involved in this work, in your opinion?

19    A.  No, he is not.

20    Q.  Are purification steps described in this subsequent

21    patent disclosed in the '933 patent?

22              MR. MADRID:  Objection, leading.

23              MR. FLEMING:  Withdrawn.

24              MR. MADRID:  Also object on the grounds of

25    irrelevance, your Honor.
```

1          THE COURT:  No, we'll let him go forward a bit.

2          MR. FLEMING:  Thank you.

3     Q.  Dr. Flavell, can you tell the jury, did you find

4     anything from the '016 patent in your review of the Lin

5     patents?

6     A.  No.  What is described here is a much more rigorous

7     detailed purification of erythropoietin so that it's now, I

8     would think, close to being safe to be used for human

9     beings.  A multistep purification.

10    Q.  And, again, from what's disclosed in the Lai patent, did

11    you find that disclosure in the Lin patents?

12    A.  No, absolutely not.

13    Q.  So let's go forward to the '349 patent.  Do you have an

14    opinion regarding the '349 patent, Doctor?

15    A.  Yes, I do.

16    Q.  Can you tell the jury --

17          MR. FLEMING:  Well, first, can we see claim 7 of

18    the '349?  And -- okay.

19    Q.  And this is a demonstrative, but it depicts the terms of

20    the claims, Doctor.  Could you explain to the jury your

21    analysis of claim 7 of the '349 patent?

22    A.  Certainly.  So this is claiming a process for producing

23    erythropoietin comprising the steps of culturing under

24    suitable nutrient conditions vertebrate cells according to

25    these other claims, claims 1, 2, 3, 4, 5, or 6.  So we need

1   to go to those claims in order to see what that's about.

2   Q.   What do we see at the end of claim 1?

3   A.   So here we have claim 1, and now we can see that it's

4   vertebrate cells which you grow in culture capable of

5   producing erythropoietin.  And so this means that we have

6   the same issues that I was discussing earlier about --

7         MR. MADRID:  Objection, your Honor.  This is

8   outside the scope.

9         THE COURT:  I think I'll stop it there and allow

10  you to ask another question.

11        MR. FLEMING:  Thank you.

12  Q.   Will you tell the jury the last two words of claim 1?

13  A.   Yes.  The last two words, as you see here, it says

14  "encoding human erythropoietin."  Sorry, I said three words.

15  Q.   Could you tell the jury your opinion, in view of that

16  claim term, of claim 1 -- of claim 7 of the '349 patent?

17        MR. MADRID:  Objection.  Relevance, your Honor.

18        THE COURT:  Yes.  Yes, sustained.

19        MR. FLEMING:  Your Honor, I can discuss it with you

20  at sidebar, or I can ask another question.  Let me try

21  another question, your Honor.

22        THE COURT:  Your witness.

23  Q.   Doctor, when you were giving your opinions regarding the

24  lack of a description and definiteness of the '933 claims,

25  what term you were analyzing?

1    A.   I was analyzing the term human erythropoietin.

2    **Q.**   Do you find that term in claim 7 of the '349 patent?

3    A.   Yes, by its dependence on claims 1, et cetera.  You see

4    in claim 1 it says human erythropoietin right there.

5    **Q.**   Okay.  And can you tell the jury, based on your analysis

6    of that claim term, what your opinion is regarding

7    claim 7 in the '349 patent?

8              **MR. MADRID:**   I object, your Honor.  This is going

9    to be irrelevant.  Claim limitation is not -- is different.

10             **THE COURT:**   No, overruled.

11             **MR. FLEMING:**   Thank you, your Honor.

12   **Q.**   Doctor, could you please tell the jury your opinion of

13   claim 7 of the '349 patent in lieu of the term human

14   erythropoietin?

15             **MR. MADRID:**   Your Honor, may we have a sidebar?

16             **THE COURT:**   You may.

17   SIDEBAR CONFERENCE, AS FOLLOWS:

18             **THE COURT:**   It's a dependent claim, using the

19   defined term.

20             **MR. MADRID:**   My concern is, there's clearly jury

21   confusion here.  The limitation is, DNA sequence encoding

22   human erythropoietin.  They're taking human erythropoietin

23   outside of that limitation and suggesting that the

24   definition of human erythropoietin renders the patent

25   invalid.  It's a different limitation.  We're talking about

1   two totally different limitations.  One's human

2   erythropoietin protein --

3            THE COURT:  Let me see if I can say that back to

4   you.  My construction was in a -- had to do with a claim,

5   various claims, that -- well, now supply it.

6        MR. MADRID:  Your construction had to do with

7   claims regarding a protein, they saw on the board '422.

8            THE COURT:  Yes, that's the first word, a protein.

9        MR. MADRID:  A protein.

10            THE COURT:  Right, okay.

11        MR. MADRID:  Here we're looking at a claim

12   limitation that is as to a nucleic acid, an entirely

13   different molecule, a DNA sequence encoding erythropoietin.

14   These are two different things.

15            THE COURT:  What do you say to that?

16        MR. FLEMING:  Okay, your Honor, let's look at the

17   claim.  It is a process for producing erythropoietin.  So

18   what is erythropoietin?  An erythropoietin is known, which

19   is contained in a vertebrate cell, which is propagated or

20   capable of growth of producing erythropoietin, which has --

21   that is to human erythropoietin.  So it's the same term.

22   It's the same product.  And it suffers from the same

23   deficiency of lack of written description and

24   indefiniteness.  Because the erythropoietin that's been

25   described in this claim as being the product of these cells

1    is human erythropoietin, which is the term you defined.

2           THE COURT:  And but I didn't define it with respect

3    to this claim, did I?  You agree to that?

4           MR. FLEMING:  I'm not entirely sure, your Honor,

5    because the term can only have one meaning throughout the

6    patents.

7           THE COURT:  It would seem that's so.

8           MR. FLEMING:  It can only have one meaning, if this

9    is the protein --

10          THE COURT:  I'm going to let him have --

11          MR. MADRID:  Your Honor, may I point out one other

12   point?

13          THE COURT:  Yes.

14          MR. MADRID:  The claim is directed to

15   erythropoietin, not human erythropoietin.  It's spelled

16   straight out there.

17          THE COURT:  Wait a second.

18          MR. FLEMING:  It says erythropoietin.

19          THE COURT:  Yes, all right.

20          MR. MADRID:  Claim 7 is the production of

21   erythropoietin.  Claim 7 is what's at issue.

22          THE COURT:  Wait a second.  I'm going to let him

23   have it.  It goes to the weight, not to the admissibility.

24          (Whereupon the sidebar conference concluded.)

25          MR. FLEMING:  May I continue, your Honor?

1              THE COURT:  You may.

2              MR. FLEMING:  I'll just wait for the court

3     reporter.

4     (BY MR. FLEMING:)

5     Q.  So, Doctor, again, focusing on the claim term human

6     erythropoietin in claim 7 of the '349 patent, please tell

7     the jury your opinion regarding this claim?

8     A.  Yes.  My conclusion is that this claim is invalid for

9     the -- on the basis of lack of written description, and also

10    indefiniteness in the same way I've described earlier.

11    Q.  The 165, 166?

12    A.  Exactly.  Exactly the same arguments because it's the

13    same issue.  It's the same word, human erythropoietin, and

14    it's exactly the same conclusion.

15    Q.  Now, Doctor, do you have any other opinions regarding

16    this claim?

17    A.  Yes, I do.

18    Q.  And can you tell the jury what those opinions are?

19    A.  Yeah.  There's an additional problem with this claim,

20    which is it's what is called not enabled.  Should I perhaps

21    explain?

22    Q.  If you would, please.

23              MR. MADRID:  Your Honor, I object.  May we have a

24    sidebar on this topic, please?

25              THE COURT:  You may.

```
 1

 2   SIDEBAR CONFERENCE, AS FOLLOWS:

 3          MR. MADRID:  This was just filed, so I apologize

 4   for the time on this, your Honor.  We're about to enter into

 5   an area where there's been no proper disclosure of this

 6   argument.

 7          THE COURT:  It's got to be in the report, that's my

 8   protection.

 9          MR. FLEMING:  It is in the report.

10          MR. MADRID:  But my ground is, your Honor, that

11   they did not disclose this in their interrogatory responses.

12   We have interrogatory responses requesting the basis of

13   their invalidity charge.  And nowhere do they say --

14          THE COURT:  I hear your conclusion, but I mean, you

15   have to --

16          MR. MADRID:  Yes.  The interrogatories are set

17   forth in a footnote to this.

18          THE COURT:  Where is it?  I mean, that's your

19   ground.

20          MR. MADRID:  Yes.  We're bringing it forward.

21          THE COURT:  Well, no, no.

22          MR. MADRID:  If I can -- so these are the

23   interrogatories.

24          THE COURT:  Okay.

25          MR. MADRID:  Right here is the language.
```

1          **THE COURT:**  All right, thank you.

2          **MR. MADRID:**  We received no disclosure that they --

3          **THE COURT:**  Yeah, that's in his report.  Not in his

4     interrogatory answers.  Here's what we're going to do.  He

5     can have it.  I can strike it.  I'm going to deal with the

6     motion for directed verdict.

7          **MR. FLEMING:**  Thank you, your Honor.

8          (Whereupon the sidebar conference concluded.)

9          **MR. FLEMING:**  May I continue, your Honor?

10         **THE COURT:**  You may.

11         **MR. FLEMING:**  Thank you.

12    **(BY MR. FLEMING:)**

13    **Q.**  Dr. Flavell, can you tell the jury your opinion of

14    nonenablement of claim 7 of the '349 patent?

15    A.  Yes.  So this claim 7 is dependent on these other

16    claims.  So if I may go to claim 1 because --

17    **Q.**  First tell the jury the basis of your opinion.

18    A.  Yes, I apologize.  Well, the basic issue with enablement

19    is that this person I mentioned, the person of skill in the

20    art, has to be able to go to the patent and they have to be

21    able to do what the patent tells you you should do to

22    perform that invention.  So the --

23         **MR. MADRID:**  Objection, your Honor.  I object.

24    This is a legal matter --

25         **THE COURT:**  Well, it is a legal matter.  I'm going

1   to let him go on.  I can correct it.  Go ahead.

2          **MR. FLEMING:**  Thank you, your Honor.

3   **Q.**  Please continue, Doctor.

4   A.  Sure.  So this person, you know, this fictitious,

5   imaginary person, has to go and do this and look at the

6   patent, and then they would go to the lab and they would do

7   it.  Now, if they can't do that because it takes huge

8   amounts of additional experimentation because the

9   information just isn't in there, then the patent's not valid

10  because they can't pull it off, they can't get it done.

11         **MR. MADRID:**  Your Honor, I object.

12         **THE COURT:**  No.  I've allowed him to testify

13  concerning legal matters.  They are for me, so I guess I'll

14  do it.

15         Enablement means that it's got to teach you how to

16  do it.  If it doesn't teach you how to do it without an

17  undue excessive amount of experimentation, then it has not

18  supplied the -- what is required for the trade-off, the

19  trade-off being teach the world how to do it and then for a

20  statutory period you get to exclude other people.  That will

21  be a legal definition, take it from me.

22         And with that definition, put your questions,

23  Mr. Fleming.

24         **MR. FLEMING:**  Thank you, your Honor.

25  **Q.**  So, Doctor, looking at claim 7, can you concisely tell

1    the jury what led you to your conclusion of invalidity?

2    A.   Certainly.  Well, we have to go from claim 7 to these

3    dependent claims, so let's go to 1, because that's right

4    there.  And what the patent is telling us is that these

5    cells have to be shown to be capable of producing

6    erythropoietin in the medium of their growth in excess of

7    this amount, 100 U -- "U" stands for units, that's a measure

8    of amount -- of erythropoietin per ten to the six cells,

9    that's a million cells, in 48 hours.  I'm sorry, this is

10   really confusing language for a nontechnical person, but --

11             MR. MADRID:  I object, your Honor.  Move to strike.

12             THE COURT:  No, no, he may editorialize to that

13   extent.  Go ahead.

14             THE WITNESS:  I'm just trying to help you.  Please,

15   cut me off anytime if it's going over.

16             THE COURT:  I don't hesitate.  Go ahead.

17   A.   This is the key part:  "As determined by

18   radioimmunoassay."

19   Q.   Could you stop for a second?

20   A.   Yes, sure.

21   Q.   Tell the jury, what is a radio --

22             THE COURT:  Before we do that, because I've lost

23   this, what patent are we talking about?

24             MR. FLEMING:  '349, your Honor.

25             THE COURT:  You understand that, '349, claim 7?

1              **THE WITNESS:**  Yes.

2              **THE COURT:**  Thank you.

3              **MR. FLEMING:**  As depends on claim 1.

4              **THE COURT:**  Now his question.

5     **Q.**   What is a radioimmunoassay?

6     A.   Let's explain what an assay is first.  It's a

7     measurement, how to measure something.  So you assay -- you

8     could assay anything you like, but in this case, we want to

9     assay erythropoietin.

10    **Q.**  Have you created a demonstrative to help the jury

11    understand this?

12    A.   Sure.  Yes, I have.

13             **MR. FLEMING:**  Can I have RF19, please?

14             **MR. MADRID:**  I object, your Honor.  This is not in

15    the report.

16             **THE COURT:**  Is it?

17             **MR. FLEMING:**  Yes, your Honor.  It was attached as

18    an exhibit to his report, as a demonstrative, and disclosed.

19             **THE COURT:**  May I see it?  Which one?  Where is it?

20             **MR. FLEMING:**  It was attached to the green report,

21    your Honor, demonstratives that we produced, and an

22    attachment to that I have separately for you.

23             **THE COURT:**  Well, it's been produced to you,

24    Mr. Madrid?

25             **MR. FLEMING:**  As late as last night, too, your

1    Honor.

2            **MR. MADRID:**  Your Honor, it's not in the report but

3    it was produced to us last night.

4            **MR. FLEMING:**  As part of the exchange.

5            **THE COURT:**  I'm going to let you have it.

6            **MR. FLEMING:**  Thank you, your Honor.

7            Can we have RF9 back on the screen, please?

8    **Q.**  Doctor, can you briefly explain to the jury what this

9    demonstrative is helping them to understand?

10   A.   Certainly.  So what we use in a radioimmunoassay, first

11   of all, it's what we call antibodies.

12           **MR. MADRID:**  I object.  There's no explanation of

13   this demonstrative in the report.

14           **THE COURT:**  Yes.  Where is this in the report?

15           **MR. FLEMING:**  Your Honor, it is disclosed at the

16   green report, Paragraphs 41 and 45.

17           **THE COURT:**  Wait a second.

18           **MR. FLEMING:**  I'll start you there with the subject

19   matter.

20           **THE COURT:**  He may testify consistent with 41 and

21   45.

22           **MR. FLEMING:**  Thank you, your Honor.

23   **Q.**  Go ahead, Doctor.

24   A.   As I was just saying, this is what we're -- what one

25   uses in radioimmunoassay.  It says immunoassay because it

 1    uses components of the immune system, which is what I work

 2    on.  Antibodies are what we make when we get infected.  So

 3    if you get a cold or something, you can make antibodies.

 4              MR. MADRID:  Objection, your Honor.

 5              THE COURT:  That's not in the report, so we're

 6    not -- so take a look at the report, and it's not the 45,

 7    it's the first -- it's what?

 8              MR. FLEMING:  Forty-one, your Honor.

 9              THE COURT:  Take a look at 41, sir.  You may

10    testify consistent with 41.

11    Q.  And I would refer you to 40 as well.

12    A.  Thank you very much.

13    Q.  There we go.  Take mine.

14    A.  So what I say in 40 is, I'll quote it literally,

15    "Antibodies are proteins synthesized by an animal," that's

16    like us --

17              MR. MADRID:  Objection, your Honor.

18              THE COURT:  No, he may have that.

19    A.  -- "in response to the presence of a foreign substance

20    called an antigen," which could be a virus, if you get a flu

21    or something like that.

22              MR. MADRID:  Objection.

23    Q.  Looking --

24              THE COURT:  He may -- that may stand.

25              MR. FLEMING:  Thank you, your Honor.

1    **Q.**  Look to Paragraph 41.  What's happening in this test

2    tube, Doctor?

3    A.  Yeah.  So in this case, the antibodies are made against

4    erythropoietin.  So that's -- this -- an antibody, they're

5    like Y-shaped proteins, and they have on the end here, a

6    binding side.  What's good about antibodies is they stick

7    very tightly to what they're --

8          **MR. MADRID:**  Objection.

9          **THE COURT:**  Sustained.  This is well beyond what's

10   disclosed.

11         **MR. FLEMING:**  Not in Paragraph 41, your Honor.

12         **THE COURT:**  I don't see anything about well beyond

13   and how antibodies work.  He may tell us what's in

14   Paragraph 41.

15         **MR. FLEMING:**  Forty-one.  Okay.

16   A.  If I can only use that paragraph, I don't want to make a

17   mistake.

18   **Q.**  Let's actually move on to RF20, please.

19         **THE COURT:**  I have to follow the law, sir, that's

20   what I do.

21   **Q.**  Doctor, can you explain to the jury what you have here?

22   A.  I'm sorry, just to be sure, which 41 am I looking for?

23   Just so -- I'm trying to not stray off.

24         **THE COURT:**  Is there a green 41?

25         **MR. FLEMING:**  Yes, your Honor.

1      **THE COURT:**  Yeah, it's green 41.

2      **THE WITNESS:**  Okay, down here.

3      **THE COURT:**  They don't seem to have given you a

4    color-coding.

5      **THE WITNESS:**  May I borrow yours?

6      **THE COURT:**  You certainly may.  Someone might give

7    me another one.  Go ahead.

8      **THE WITNESS:**  I'm sure they will.

9      **THE COURT:**  So am I.

10     **MR. FLEMING:**  I apologize, your Honor.

11     **THE COURT:**  Go right ahead.

12   A.  Right.

13   **Q.**  Now, referring to RF20, Doctor, in green Paragraph 41,

14   can you tell the jury what's happening in this test tube?

15   A.  Yes, absolutely.  So here we have the anti EPO antibody.

16   It will stick to the EPO.  And in this tube is two things,

17   two kinds of EPO.  One is radioactive.  And the reason it's

18   radioactive, is you can --

19     **MR. MADRID:**  It's outside the scope, your Honor.

20     **THE COURT:**  Sustained as to the reason.  Go ahead.

21   **Q.**  So you said two types of EPO?

22   A.  Yes, two types of EPO.  The antibody will bind to both

23   of them, and it doesn't know which is which, it just binds

24   the same.

25   **Q.**  Where does it bind?

1    A.   Where does it bind?   The antibody binds to a specific

2    target on the EPO called an epitope, which is a small part

3    of EPO or any other protein.   And what then is done in the

4    assay is the antibody is collected.   And so what you do is

5    you collect the material, in other words, the EPO that is

6    bound to the antibody, you collect it like you bring it to

7    the bottom of the tube, then you throw out everything else,

8    and you count how much --

9         **MR. MADRID:**  Objection.

10   A.   -- of this radioactive stuff --

11        **MR. MADRID:**  Objection, your Honor.

12   A.   -- has been collected.

13        **THE COURT:**  Well, let's cut to the chase.   So once

14   you've done that, what do you find out?

15        **THE WITNESS:**  Right.   So let's imagine we don't

16   have any of the added EPO there, then you just get a lot of

17   radioactivity there because you have one, two, three, four

18   antibodies, they combine two each, so you get eight down the

19   bottom and they're all radioactive.   If you understand me.

20   So these things have two binding sites.

21        And so now if we add the blue ones, which are the

22   added EPO --

23        **MR. MADRID:**  Objection, your Honor.

24        **THE WITNESS:**  Sometimes an antibody will bind the

25   blue one, sometimes it will bind the orange one.

1          **MR. MADRID:**  Objection, your Honor.

2          **THE WITNESS:**  So when you bring it down to the

3     bottom, we only still have four molecules of antibody, and

4     so what we end up with is less radioactivity at the bottom

5     because it's been competed out by the blue stuff.  The blue

6     ones are nonradioactive.  And that's what we're trying to

7     figure out, how many blue ones did we add to that tube.

8          **MR. MADRID:**  Your Honor, I object and move to

9     strike.

10          **THE COURT:**  Well, I'll take the motion to strike

11     under advisement but let it stand for now.

12          Is that about it, Mr. Fleming?

13          **MR. FLEMING:**  Yes, your Honor, on this

14     particular -- I'd like to leave the diagram up just for a

15     second so now he can explain his opinion of nonenablement of

16     claim 7.

17          **THE COURT:**  Where are we going to find the opinion?

18          **MR. FLEMING:**  We will find the opinion in

19     Paragraph 67 in the green report, your Honor.

20          **THE COURT:**  Very well.  You may so testify.

21     **Q.**  So, Doctor, can you give the jury your opinion regarding

22     claim 7 of the '349 patent based upon your discussion of

23     radioimmunoassay?

24          **MR. MADRID:**  Your Honor, for the record, I renew my

25     objection.

1          **THE COURT:**  Noted.  Your rights are saved.  I've

2     taken matters under advisement.

3     A.  Yes, so I'm sorry, I'll have to have you repeat the

4     question.  I'm sorry.

5     **Q.**  Yes.  Based on your discussion -- I'll get out of the

6     way -- of radioimmunoassay, can you tell the jury your

7     opinion regarding claim 7 of the '349 regarding

8     nonenablement?

9     A.  Yes.  So my opinion is that this claim is not enabled

10    because you cannot measure erythropoietin by this assay.

11    And I'll explain that if --

12    **Q.**  Yes, please do.

13    A.  So I think I have another --

14    **Q.**  Demonstrative?

15    A.  Demonstrative, which I think will make it clear.

16          **MR. FLEMING:**  Can I have RF9, please?

17    **Q.**  And what did you purport to demonstrate here for the

18    jury, Doctor?

19    A.  Yes.  So here we're now looking, it's the same materials

20    we're looking at, here's the antibody, there's the EPO, and

21    the problem is that EPO, of course, binds through its

22    epitope, that's a little bit of the protein here.  And if

23    you break that protein into a fragment, as you can see,

24    there's a chunk missing from this one, it will still bind to

25    the antibody.

1           So if you collect this material in the bottom of

2     that tube, you don't know what -- whether what you collected

3     is a fragment or a whole EPO molecule.  Now, this fragment

4     is not useful.

5           MR. MADRID:  I object, your Honor.

6           THE COURT:  Sustained at the point where he starts

7     "this."  The rest of it may stand.

8     Q.  How do you know these fragments exist, Doctor?

9           MR. MADRID:  Objection, your Honor.

10          THE COURT:  Yes.  Where is there anything about

11    fragments?

12          MR. FLEMING:  Oh, your Honor, we start with the

13    green report, Paragraphs 33 through 35.

14          THE COURT:  Thank you.  Just a moment.

15          MR. FLEMING:  Sorry.

16          MR. MADRID:  Your Honor, I object.  This is

17    regarding other legal theories, not on enabling.

18          THE COURT:  I understand that.  No, he may testify

19    consistent with Paragraph 35.

20          MR. FLEMING:  Thank you.

21    Q.  Continue, Doctor, please.

22          THE COURT:  Well, he may testify consistent with

23    Paragraph 35.

24    Q.  Do you have 35 in front of you, Doctor?

25    A.  Yes, I do.

1   **Q.** Can you continue your testimony, please, consistent with

2   that paragraph?

3   A.  Certainly.  So, actually, 35 is exactly what I was

4   saying, but I was adding more words to try and make it

5   clearer for you all.  So -- uh-oh, the battery's going.

6   Perhaps not.  Excuse me.

7          So the issue here is that the assay will measure

8   what's -- what the antibody binds to.  And you can see here

9   it's bound to fragment.  There it's bound full-length

10  erythropoietin.  And so using that assay, I cannot know --

11          **MR. MADRID:**  I object.  It's outside the scope.

12          **THE COURT:**  No, he may testify consistent with

13  Paragraph 35.

14  A.  Well, sir, using that assay, the person skilled in the

15  art, they cannot know what they're measuring.  Are they

16  measuring these fragments or are they measuring --

17          **MR. MADRID:**  I object.

18  A.  -- these full-length erythropoietins?

19          **THE COURT:**  That may stand.

20          And it's for that reason you think that claim 7 is

21  invalid, as it's not enabled?

22          **THE WITNESS:**  Correct.

23          **THE COURT:**  Move on.

24          **MR. MADRID:**  Your Honor, for the record, I object.

25          **THE COURT:**  Yes.  Your objection to my question,

1    which was leading, was appropriate, but I'm going to

2    overrule it and let's move on.

3    **Q.**   Have you seen any documents in this case that discuss

4    this process?

5           (Whereupon counsel conferred.)

6    A.   Yes, I have, in answer to that question.

7    **Q.**   I'd like to direct you to what's DOR in your notebook.

8    DOR in your notebook.

9           **MR. FLEMING:**   Do we have another copy?

10   A.   It must be -- this is P.

11   **Q.**   Hopefully they're in alphabetical order.

12   A.   Hopefully they are.

13   **Q.**   They are.

14   A.   Thank you.

15   **Q.**   Certainly.  And can you identify DOR for the jury,

16   please, Doctor?

17   A.   Yes.  This is a scientific paper produced by

18   Dr. Goldwasser and one of his colleagues.

19   **Q.**   What's the date of this paper?

20   A.   It's 1981, so it's about three years before the patent

21   was filed.

22   **Q.**   And what publication is it in?

23   A.   This is in the British Journal of Haematology.  And what

24   it's about is radioimmunoassay erythropoietin, exactly what

25   we're talking about.

1    **Q.**  Thank you.

2              **MR. FLEMING:**  Your Honor, I offer DOR.

3              **THE COURT:**  Any objection?  Actually, there is the

4    general objection.

5              **MR. MADRID:**  Yes, sir.

6              **THE COURT:**  But other than what we have discussed?

7              **MR. MADRID:**  Yes, sir.  No objection.

8              **THE COURT:**  Your rights are saved, but subject to

9    that, DOR is admitted.  It will be Exhibit 2073.

10             (Exhibit marked in evidence.)

11             **MR. FLEMING:**  Can we go to the second page, please

12   and the paragraph starting, "The RIA."

13   **Q.**  Doctor, could you explain to the jury how 207 --

14             **MR. FLEMING:**  I apologize?

15             **THE CLERK:**  Three.

16             **MR. FLEMING:**  Thank you.

17   **Q.**  -- how Exhibit 2073 influenced your opinion regarding

18   claim 7 of the '349?

19             **MR. MADRID:**  Objection, outside the scope.

20             **THE COURT:**  Yes.  Where is it in the report?

21   Where's that?

22             **MR. FLEMING:**  It is in the green report, your

23   Honor, Paragraph 34.

24             **THE COURT:**  Sustained.

25   **Q.**  Doctor, if you look at 2073 in evidence, starting with

1    the line, "We have found," could you read that to the jury,

2    please?

3    A.  Certainly.  It says -- oh, thank you.  It has, "We have

4    found that several sera from patients with anemia

5    accompanying renal disease, chronic renal disease, had the

6    expected low titers when assayed in mice."  What titers

7    means is measurements.  "But that the titers" or

8    measurements "by the RIA," the radioimmunoassay, "were

9    considerably higher than those by bioassay."

10           So this is a paradox that he's trying to address in

11   this scientific paper.

12           **MR. FLEMING:**  Can we go to the next sentence,

13   please?

14   A.  So then, as you see here highlighted, "Preliminary

15   experiments indicate that this discrepancy is probably due

16   to the presence of immunologically reactive fragments,"

17   meaning fragments combined to the antibody "of

18   erythropoietin appreciably smaller than the native hormone."

19           So this is exactly what I was talking about a

20   couple minutes ago.

21   **Q.**  To one skilled in the art, what is this explaining?

22   A.  So what this says is that EPO fragments exist, and if

23   you use the RIA, you cannot tell the difference between the

24   fragments and the full-length protein.

25   **Q.**  Is that a problem?

1    A.  Yes, it's a fundamental problem.

2            **MR. MADRID:**  Objection.

3    **Q.**  How does that influence your opinion regarding

4    claim 7 of the '349 patent?

5    A.  So what it tells me, in my opinion, is if I draw from

6    that, is that that claim is invalid for lack of enablement.

7    **Q.**  Because of what?

8    A.  Because of the fact you cannot measure the amount of

9    erythropoietin by the assay that's -- it says we have to

10   use.  And the claim --

11   **Q.**  Because of the presence of what?

12   A.  Because of the presence of these erythropoietin

13   fragments that could be present in the sample.  And then if

14   you can't measure it, you cannot get what the claim is

15   telling you to do, which is to get a specific amount of

16   erythropoietin.

17   **Q.**  Thank you, Doctor.

18           **MR. FLEMING:**  Your Honor, I pass the witness.

19           **THE COURT:**  Mr. Madrid?

20           **MR. MADRID:**  Yes, your Honor.  Thank you.

21                      **CROSS-EXAMINATION**

22   **(BY MR. MADRID:)**

23   **Q.**  Good afternoon, Doctor.

24   A.  Good afternoon.

25           **MR. MADRID:**  Could I have '422, claim 1, please?

1          I'd like to look at the juror handbook, Tab 1,

2     D145, please.

3     **Q.**  Doctor, you understand that the Court has defined the

4     term "human erythropoietin"; correct?

5     A.   Yes.

6     **Q.**  And that term appears in '422, claim 1?

7          **MR. MADRID:**  May I have '422, claim 1, please?

8     **Q.**  Now, Doctor, Dr. Lin cloned the human EPO gene; correct?

9     A.   That's correct.

10    **Q.**  And the human EPO gene codes for a protein having the

11    amino acid sequence of human erythropoietin; correct?

12         **MR. FLEMING:**  Objection.  Foundation.

13         **THE COURT:**  Overruled.

14    A.   The gene encodes -- I'm sorry, could you repeat the

15    question?

16    **Q.**  The human EPO gene codes for a protein having the amino

17    acid sequence of human erythropoietin; correct?

18         **MR. FLEMING:**  Objection.  Foundation, your Honor.

19         **THE COURT:**  Overruled.  If he understands it, he

20    may answer it.

21    A.   The gene encodes -- it was described to encode a protein

22    which is actually 166 amino acids, as claimed by Dr. Lin.

23    That's what he said it does.

24    **Q.**  Okay.  Well, I know you want to say that, but my

25    question is different, okay.  My question is this, Doctor:

1   The human EPO gene codes for a protein having the amino acid

2   sequence of human erythropoietin; correct?

3   A.  Well, no, that's not actually true.  The gene codes a

4   pre-protein, it encodes a protein which has a leader

5   sequence of 27 amino acids, and it encodes, covalently

6   attached to that, a protein of 166 amino acids.  That's what

7   it encodes.

8   **Q.**  Human EPO gene also encodes the functional region of the

9   protein, correct, 1 to 165?

10          **MR. FLEMING:**  Objection.  Vague, foundation.

11          **THE COURT:**  Overruled.

12  A.  The gene encodes the pre-protein.  Subsequently, the

13  machinery of the cell processes it in order to generate

14  human erythropoietin.

15  **Q.**  And you would agree with me that included within the

16  human EPO gene is the functionally -- the functional gene

17  portion that encodes the protein -- let me withdraw that

18  question.

19          You would agree with me that what is encoded within

20  the human EPO gene is the functional protein for human

21  erythropoietin within it?

22  A.  Well --

23  **Q.**  Correct?

24  A.  I'm sorry, I interrupted you.

25          The gene encodes a lot of things, right?  It

```
 1    encodes a pre-amino acid segment, it encodes --

 2    Q.  Sir, I'm not asking about a lot of things.  I'm just

 3    asking about the functional protein portion.

 4    A.  Now, the gene encodes the precursor --

 5              MR. FLEMING:  Objection, your Honor.  We need a

 6    sidebar, please.

 7              THE COURT:  All right.

 8    SIDEBAR CONFERENCE, AS FOLLOWS:

 9              THE COURT:  Yes.  Now what?

10              MS. BEN-AMI:  The Federal Circuit has said that

11    Figure 6 defines 1 to 166, and you cannot say, therefore, it

12    defines 1 to 165, and 1 to 164, 1 to 163.

13              THE COURT:  But the Federal Circuit has said what

14    it said, but just as -- where you are going to get some

15    mileage on this is when you come to literal infringement.

16    That's where they had the occasion to say what they've said.

17    And that's where Amgen's stuck.

18              MS. BEN-AMI:  But your Honor found summary judgment

19    of the literal infringement on the '422 patent.

20              THE COURT:  The what?

21              MS. BEN-AMI:  You found infringement of the

22    '422 patent.

23              THE COURT:  So I did.  So -- I don't find anything.

24    It's improper for me to find it.  I ruled it.

25              MS. BEN-AMI:  I apologize.
```

1          **THE COURT:**  As matter of law.

2          **MS. BEN-AMI:**  I apologize.

3          **THE COURT:**  Subject to de novo review.

4          **MS. BEN-AMI:**  But your Honor having found that --

5          **THE COURT:**  Having ruled it, but --

6          **MS. BEN-AMI:**  I'm sorry, having ruled on it, the

7    claim means the same thing for infringement as for validity.

8          **THE COURT:**  Correct.

9          **MS. BEN-AMI:**  The Federal Circuit has held that

10   when you disclose an amino acid sequence of 166, that is not

11   a disclosure of 165.

12         **THE COURT:**  No, no.  I think you're reading --

13   respectfully, you're reading more into the language.  Just

14   like I have allowed you to get all this before the jury,

15   they push back with respect to this.  I mean, since I've

16   been over this round in an earlier case, I know what I

17   think, but I'm -- and I have explained it as best I know

18   how, both on the issues of the infringement and on the

19   issues of the defensive issues, enablement and written

20   description, and the like.

21         None of that binds you.  In our case, I have -- I

22   guess you get this far.  In our case, I have ruled on the

23   undisputed record before me that claim 1 of the '422 patent

24   is infringed by Roche.  I did not, just so we're clear here,

25   rule that the patent was valid and there's no defenses to

1    the patent and the like.  It is a problem because I didn't

2    give you a full opinion, but so we're clear on that.

3            Now, I will let you have Flavell.  They can push

4    back.

5            Now, since we're here, is he your last witness?

6            **MS. BEN-AMI:**  Yes.  The only thing we have after

7    that is we have --

8            **THE COURT:**  Well, what else?

9            **MS. BEN-AMI:**  -- documents that need to be admitted

10   into evidence.

11           **THE COURT:**  But we can talk about those this

12   afternoon?

13           **MS. BEN-AMI:**  Yes.  But except I need you for one

14   minute at 1:00.  I need you for one minute at 1:00.

15           **THE COURT:**  I have a meeting, but you have one

16   minute.

17           **MS. BEN-AMI:**  One minute.  Just one minute.

18           (Whereupon the sidebar conference concluded.)

19           **THE COURT:**  Go ahead, Mr. Madrid.

20           **MR. MADRID:**  Thank you, your Honor.

21   **(BY MR. MADRID:)**

22   **Q.**  Dr. Flavell, you understand that Dr. Lin, in his work,

23   inserted a DNA sequence encoding human erythropoietin into a

24   plasmid; correct?

25           **MR. FLEMING:**  Objection, foundation.

1          **THE WITNESS:**  In his words, did you say, or his

2     work?

3          **THE COURT:**  In his work.

4     **Q.**  In his work, sir.

5          **THE COURT:**  And overruled.  Can you answer it?

6     A.  I believe he inserted the gene for human erythropoietin

7     into a plasmid.

8          **MR. MADRID:**  May I have Figure 4 of Exhibit 1,

9     please?

10          **MR. FLEMING:**  Object as beyond the scope, your

11     Honor.

12          **THE COURT:**  I'm not troubled by it being beyond the

13     scope, and --

14          **MR. FLEMING:**  It also lacks foundation in terms of

15     what it involves.

16          **THE COURT:**  Well, I -- no, no.  He may inquire

17     concerning this.  And the witness may answer if he knows.

18     But just so we're clear, this is a diagram that's taken,

19     it's Figure 4 in the '933 patent, one of the patents in

20     suit, so we can follow along.

21          All right.  So we've shown the witness this Figure

22     4, but we haven't asked him any questions about it yet.

23          Go ahead, Mr. Madrid.

24     **Q.**  Dr. Flavell, this is one of the plasmids into which

25     Dr. Lin inserted the human EPO gene; correct?

1          **MR. FLEMING:**  Objection, foundation.

2          **THE COURT:**  Overruled.  If you know, you may

3    answer.

4    A.  What I need is the legend for the figure, just to

5    explain.  I mean, a figure has a legend which describes

6    symbols.  I think I understand the symbols, but I'd rather

7    have the legend so I can really --

8          **MR. MADRID:**  May I approach, your Honor?

9          **THE COURT:**  Of course.

10   **Q.**  This is Exhibit 1, and you can see the legend of the

11   figures.

12   A.  Do you have the column, so I can find it quickly, or --

13   **Q.**  Column 13.

14   A.  Okay, thank you.

15         **MR. FLEMING:**  Your Honor, for the record, I move to

16   strike.  There's no evidence that Dr. Lin did any of this.

17         **THE COURT:**  Please.  Overruled.  It's the patent

18   that's in evidence.

19   A.  Well, the legend actually doesn't say what the picture

20   is, but --

21   **Q.**  Well, Doctor, you reviewed the patent in coming to your

22   four expert reports totaling 188 pages; correct?

23   A.  Yes, I did.

24   **Q.**  All right.  So my question to you is, isn't it true that

25   this is one of the plasmids into which Dr. Lin inserted the

1    human EPO gene, in this region right here with the label

2    gHuEPO; correct?

3    A.  Well, you said it incorrectly, but I'll correct it for

4    you.  What it is is the result of an insertion --

5    **Q.**  Okay.

6    A.  -- into the parental plasmid, which is the DHSFR, et

7    cetera.  What I interpret this to be, without having a

8    comprehensible legend, what I think that is, is the human

9    genomic erythropoietin gene inserted into that plasmid.

10   **Q.**  And Dr. Lin took this plasmid, which has a name, pDSVL

11   gHuEPO, took that plasmid and he inserted that plasmid into

12   Chinese hamster ovary cells; correct?

13         **MR. FLEMING:**  Objection, your Honor.

14   A.  That's correct.

15         **THE COURT:**  Well, I'm going to let the answer

16   stand.  The patent's in evidence.  He is set forth as the

17   inventor on the patent.  That permits Mr. Madrid to ask

18   these questions as he does.  Whether he did each specific

19   step I don't know is significant.  Amgen owns this patent.

20   Go ahead.  And -- go ahead.

21   **Q.**  Dr. Flavell, you understand that -- you understand that

22   in the patent Dr. Lin reported that the CHO pDSVL gHuEPO

23   cells expressed and secreted human erythropoietin into

24   culture fluids?

25   A.  You're referring to the cells that were transfected with

1    this gene.  The human erythropoietin gene encoding

2    precursor, when put into the cell, the result is the

3    secretion of erythropoietin measured by a couple of assays,

4    that's right.

5    **Q.**  Result is the secretion of human erythropoietin?

6    **A.**  It's --

7        **MR. FLEMING:**  Objection, your Honor.  He's

8    mischaracterizing the record.

9        **THE COURT:**  Overruled.  It's cross-examination.

10   I've warned the jury that questions aren't evidence of

11   anything.  The testimony is what he says.

12       Is that right?

13       **THE WITNESS:**  Yes.  I just need to hear the

14   question again, please.

15   **Q.**  The result, after inserting the plasmid name pDSVL

16   gHuEPO, into the CHO cells, the result was that those CHO

17   cells secreted human erythropoietin into the culture fluids;

18   correct?

19       **MR. FLEMING:**  Objection, your Honor.  This is

20   beyond the scope of the direct.

21       **THE COURT:**  Overruled.

22   **A.**  The result is described in an example in the patent.

23   Now, as human erythropoietin is defined here, we basically

24   don't know what the result is in the way that you're

25   describing it.  We know that he obtained something which was

1    active in a radioimmunoassay, and he obtained something that

2    was active by an in vivo assay.

3    Q.  I just want an answer to my question.  My question is --

4         MR. FLEMING:  Objection, your Honor.  I move to

5    strike.

6         THE COURT:  The motion to strike -- there's no

7    question.

8         MR. FLEMING:  The editorial comment.

9         THE COURT:  The comment, yes, I'll strike his

10   comment.  Now he'll put a question.

11   Q.  My question, sir, is after Dr. Lin inserted the plasmid

12   that we just saw into the CHO cells, those CHO cells

13   secreted human erythropoietin into the culture fluids,

14   didn't they?

15   A.  The answer is there's no direct evidence that that's the

16   case.

17   Q.  Setting aside the evidence, you agree with me, you agree

18   with me, you agree with me that he -- that what resulted

19   with those cells was a secretion of human erythropoietin?

20        MR. FLEMING:  Objection, your Honor.

21   A.  I'm sorry, I'm a scientist.  I can't set aside the

22   evidence.  That's what we live off.

23   Q.  All right.  Let's take a look at the evidence.

24        THE COURT:  Do you press the objection?

25        MR. FLEMING:  I withdraw the objection.

1          **THE COURT:**  I think not.

2     **Q.**  Isn't it true, sir, that in Example 10 of Dr. Lin's

3     patent, he reports achieving human erythropoietin in that

4     example no less than eight times?  Let's take a look.

5     A.  May I go to the example?

6     **Q.**  Sure.  Let's look at Example 10.

7     A.  Sure.  Column number, to save time?

8     **Q.**  Look at column number 26, look at column number 27, look

9     at column number 28.

10    A.  Okay.  So you're asking me how many times he said he got

11    erythropoietin?

12    **Q.**  He reported in the patent that after he inserted the CHO

13    cell containing the human erythropoietin, after he inserted

14    the plasmid sequence containing the human erythropoietin

15    gene into the CHO cell, he reported that he had obtained

16    human erythropoietin, that's what was being secreted into

17    the culture fluids; correct?

18    A.  That is his claim, yes, but he didn't show any evidence

19    that it's, in fact, the case.

20    **Q.**  Now, Doctor, you understand that Dr. Lin reported that

21    he subjected the CHO pDSVL gHuEPO cell culture fluids to

22    three different assays, radioimmunoassay, in vitro assay, as

23    well as in vivo assay; do you recall that?

24    A.  Yes, I do.

25    **Q.**  And each one of those assays showed that, in fact,

1    Dr. Lin had achieved the secretion of human erythropoietin

2    into the culture fluids?

3    A.   Well, as I explained to you before, the radioimmunoassay

4    cannot measure human erythropoietin.   If he was making bits

5    and pieces of erythropoietin there, he would have got the

6    same result.

7           On the other assays, we don't know what proteins

8    are bioactive to give a positive result on those assays.   So

9    they have erythropoietin activity, as defined by those

10   assays, but it's a whole other thing from saying they have

11   erythropoietin, human erythropoietin, as defined in the

12   actual case that we're discussing today.

13   Q.   Doctor, my question was:   Isn't it true that Dr. Lin

14   reported that he had tested the cell culture fluids of these

15   CHO cells which had the human EPO gene, and he tested them

16   in three different tests, in each of those tests he reports

17   stating that, in fact, they show human erythropoietin being

18   produced?   Right?

19   A.   So I'll have to go to the number of cases you say.   But

20   if what you're asking me is did he say he did it, I think

21   that's true.

22   Q.   Yes.   That's right.   And --

23           MR. FLEMING:   Objection, your Honor.   Move to

24   strike.

25           THE COURT:   The "that's right" is stricken.   Just

1    ask questions, Mr. Madrid.

2           **MR. MADRID:**  Yes, your Honor.

3    **Q.**  Now, you also understand, sir, that Dr. Lin didn't stop

4    there in characterizing what was produced by these cells,

5    correct, he did additional tests?

6           **MR. FLEMING:**  Objection, foundation.

7           **THE COURT:**  The witness can answer if he knows.

8    A.  Well, I have to go back and read the example, but maybe

9    it would be easier if you point me to what you're --

10   **Q.**  Well, for example, you understand that Dr. Lin also

11   reported that he determined the immunoassay sequence of the

12   front portion of the protein that was produced by these

13   Chinese hamster ovary cells, and that amino terminus

14   corresponded to the amino terminus of the product that is

15   set forth in Figure 6; do you recall that?

16          **MR. FLEMING:**  Objection.  Foundation, your Honor.

17   A.  Yes.

18          **THE COURT:**  Overruled, and the answer may stand.

19   **Q.**  And we have Exhibit 1, you see.  Isn't -- what we're

20   looking here, on the screen, isn't this, in fact, Dr. Lin's

21   report of having done additional characterization work of

22   the product that was secreted by the cells into which he

23   inserted the human EPO gene?

24   A.  Well, what that means is there's some material in what

25   was being made that had the amino acid sequence that starts

1    with the sequence of the urinary erythropoietin that had

2    been previously sequenced.  It doesn't tell us very much

3    about the protein that's being made.  It just tells us that

4    the first few amino acids are the same.  That's a whole

5    different thing from saying that it's human erythropoietin

6    as it's being talked about in this case.

7    **Q.**  But you agree with me that that is, in fact, additional

8    evidence of characterization of the product being produced

9    by those cells that, in fact, you are producing human

10   erythropoietin, it's additional evidence?

11          **MR. FLEMING:**  Objection.  Vague, and foundation,

12   your Honor.

13          **THE COURT:**  Overruled.  The question isn't

14   evidence, but we'll see what the answer is.

15   A.  So my answer is, it is additional evidence of the nature

16   of the material that's being made.  And what it says is what

17   I just said, which is it has the same amino acids in the

18   beginning of the protein.  There's additional evidence

19   beyond what we talked about a little earlier, but it doesn't

20   tell us what that protein is beyond that.

21   **Q.**  It has the same initial amino acids of human

22   erythropoietin, doesn't it?

23   A.  Yes.  But an end terminal fragment would have exactly

24   the same amino acid.  So if that was broken into a piece of

25   25 amino acids, you still would get the same sequence.  So

1    we have to have those caveats.

2    Q.   But we agree that to the extent that there's amino

3    terminal information, it's in the patent, and that amino

4    terminal information is identical to the amino terminal of

5    what is known to be human erythropoietin; you agree on that?

6    A.   That piece of information is the same.

7    Q.   Okay.  Now, despite the three tests that I just talked

8    about, radioimmunoassay, in vitro, in vivo, despite those

9    three tests, as well as despite the amino acid sequence

10   information we just talked about, it's your belief that no

11   one can conclude that Dr. Lin described the protein having

12   an amino acid sequence of human erythropoietin; that's your

13   position?

14   A.   My position is that there's no evidence that Dr. Lin

15   produced the protein human erythropoietin, as we've talked

16   about this morning, which is very specific protein, right?

17   It's a protein of 165 amino acids in length.  There's no

18   evidence whatsoever that he did that, that's correct.

19   Q.   Now, you're familiar with Dr. Goldwasser's work, are you

20   not, regarding erythropoietin?

21   A.   Yes.

22   Q.   And you're familiar that in 1977 Dr. Goldwasser

23   published that he obtained human erythropoietin; do you

24   recall that?

25   A.   Yes, I do.

1    **Q.**  In fact, you've looked at Dr. Goldwasser's 1977

2    publication which you've just been handed, which is

3    Exhibit 2002; correct?

4    A.  Yes, that's correct.

5    **Q.**  Now, in that publication, Dr. Goldwasser put forth two

6    tests to support his claim that he had achieved human

7    erythropoietin?

8         **MR. FLEMING:**  Objection, your Honor.  Beyond the

9    scope.  I didn't use this document with the witness.

10        **THE COURT:**  Overruled.

11   A.  So the question is, did he use two tests?

12   **Q.**  He used two tests, in vitro and in vivo; isn't that

13   right?

14   A.  I believe it's correct.  Yes, I would need to just take

15   a quick look, if that's okay with you.

16   **Q.**  Take a look at page 558, first sentence, in the

17   experimental procedures section, and look at 5562, second

18   column, first full paragraph, last sentence.

19   A.  I'm sorry, and the second quote you were just giving?

20   **Q.**  The second quote is page 5562, second column, first full

21   paragraph, last sentence.

22   A.  Thanks very much.

23   **Q.**  That will be the reference to in vitro.

24   A.  Second paragraph on 5562, you said?

25   **Q.**  Yes, sir -- second column.

1    A.   Second column.

2    **Q.**   Yes.   First full paragraph, last sentence.

3    A.   That seems to be just describing a protein.

4    Purification -- I see what you mean.   On assay by the in

5    vitro method, you mean?

6    **Q.**   Yes, sir.

7    A.   "We found that biological activity coincident with the

8    single band of stained protein, Figure 6."   What he is

9    saying here is he has an assay, an in vitro assay, which I

10   think is this iron incorporation assay, and that he's

11   finding activity there, and he roughly localizes where it is

12   on a gel.

13   **Q.**   Dr. Goldwasser did not disclose any radioimmunoassay

14   data to support his claim that he achieved human

15   erythropoietin, did he?

16   A.   No, I think that -- well, at that time, of course, since

17   there was no standard, that would have been impossible, I

18   think.

19   **Q.**   That's right.   And he didn't --

20           **THE COURT:**   The "that's right" is stricken.   And

21   having interrupted, it's 1:00, Mr. Madrid.   Shall we pick up

22   here tomorrow?

23           **MR. MADRID:**   Yes, sir.   Thank you.

24           **THE COURT:**   Very well.

25           Ladies and gentlemen, we'll stop taking testimony

1    at this time.  You've not heard all the evidence.  Please,

2    therefore, keep your minds suspended.  Do not discuss the

3    case either among yourselves nor with anyone else.  We'll

4    start promptly 9:00 a.m. tomorrow morning.  The jury may

5    stand in recess until that time.  The jury may recess.  I'll

6    remain on the bench.

7              **THE CLERK:**  All rise for the jury.

8              (Whereupon the jury left the courtroom.)

9              **THE COURT:**  Please be seated.  You may step down,

10   sir.

11             (Whereupon the witness stepped down.)

12             **THE COURT:**  Total elapsed time stands Amgen, three

13   days, one hour, 20 minutes; Roche, five days, two hours, ten

14   minutes.

15             Now, since we have the full, but for some exhibits,

16   the full Roche defensive case on invalidity, shall we not

17   discuss directed verdict this afternoon, once I am done with

18   the sentencing that I -- that will -- the people are here

19   today from the Sentencing Commission.  Some of them will be

20   coming up and watch me sentence.  And -- fine.  And

21   afterwards, they may have some questions, so I need a little

22   time for them.  Let's say 2:30, quarter of 3:00.  Shouldn't

23   we do that?

24             **MR. DAY:**  That will be fine, your Honor.

25             **MS. BEN-AMI:**  I think we should discuss it.  The

```
 1    evidence isn't closed, but we should discuss it.

 2              THE COURT:  I don't have to rule.

 3              You had a minute.  I'll hear you.

 4         MS. BEN-AMI:  We understood your Honor to rule that

 5    Amgen could not take the deposition of Dr. Catlin?

 6              THE COURT:  I did.

 7         MS. BEN-AMI:  Thank you, your Honor.

 8              THE COURT:  Yes.  I did.

 9         MR. DAY:  Could not take?

10              THE COURT:  Could not take his deposition.  He'll

11    be back.  There will be time.  You can wait.

12              That's my ruling.  We'll recess.

13              (Recess.)

14

15

16         AFTERNOON PROCEEDINGS - 3:00 P.M.

17

18         THE CLERK:  All rise.  Court is in session, please

19    be seated.

20         THE COURT:  Good afternoon.  I'm sorry to keep you

21    waiting, but we have representatives from the Sentencing

22    Commission here.  Sentencing's a hot topic and they were

23    kind enough to give me some of their time.

24              Now, as Ms. Ben-Ami properly said when we recessed,

25    the defense has not rested on the affirmative defenses of
```

1    invalidity, and I'm not sure what's the most efficient way

2    to proceed.  Shall we put in evidence now, if there's no

3    opposition, the final documents?  We've heard all the

4    affirmative testimony, subject to Mr. Madrid stumbling

5    disastrously, and there being some other affirmative

6    testimony we haven't heard, we've seen Roche's best case, I

7    think.  So shall we talk about that and put the documents in

8    tomorrow morning?

9            And, Ms. Ben-Ami, I'll ask you that question.

10           **MS. BEN-AMI:**  Well, I think there are a few

11   different things.  There are some admissions that we wanted

12   read into the record.

13           **THE COURT:**  Yes.

14           **MS. BEN-AMI:**  So those would have to go in.  There

15   are documents obviously -- I don't have a problem if we have

16   a discussion, your Honor, if you have something on your mind

17   and you want to address it.  You know, I want to know what

18   we're doing tomorrow and the next day and the next day just

19   like you do.

20           **THE COURT:**  Fine.

21           **MS. BEN-AMI:**  But as a matter of protocol, I think

22   to save time in front of the jury, if we could deal with the

23   documents it would be helpful even if we have to officially

24   admit them in front of the jury.

25           **THE COURT:**  No, we don't have to officially admit

1    them in front of the jury.  And this hour, because I'm not

2    going to spend more than that, doesn't count.

3          So let's, let's put in the admissions or documents

4    or whatever there is.  Obviously, you have to read the

5    admissions.

6          **MS. BEN-AMI:**  Right.

7          **MS. CARSON:**  Your Honor, we have submitted a motion

8    for reading in a series of admissions and it's document

9    docketed 1067 and the --

10         **THE COURT:**  Okay, let's -- all right, is there any

11   objection to these admissions?

12         **MR. DAY:**  I don't know if there is or there isn't,

13   your Honor.  I wasn't expecting this afternoon.  I thought

14   we were here for something else.

15         **THE COURT:**  Yes.  Well, it's the rest of their

16   case.

17         **MR. DAY:**  Your Honor?

18         **THE COURT:**  Yes.

19         **MR. DAY:**  I'm also not sure that we have seen them.

20         **THE COURT:**  This was filed on the 13th, so you have

21   seen them.

22         **MR. DAY:**  I think Mr. Curto's here to address them.

23         **THE COURT:**  All right.  Wait a second.

24         **MR. CURTO:**  Your Honor, there are objections to

25   some of these admissions, certainly, and some of the

 1    evidence that they want to put in, if we want to go through

 2    it piece by piece, we can do that.

 3              THE COURT:  Well, have you responded to this

 4    motion?

 5              MR. CURTO:  We have not responded to the motion,

 6    your Honor.

 7              THE COURT:  Why don't you do that by tomorrow and

 8    then I can, I can deal with it on a written record.

 9              MR. CURTO:  Okay.

10              THE COURT:  Can you do that?

11              MR. CURTO:  Yes.

12              THE COURT:  Thank you.

13              Now, how about documents?

14              MS. CARSON:  We also have a motion to admit

15    exhibits into evidence and the exhibits fall into two

16    different categories.  One is a category of all prior art

17    documents.

18              THE COURT:  Let's, let's see that motion.

19              MR. GOTTFRIED:  I don't think --

20              THE COURT:  Again, I'm sure I've seen -- beg

21    pardon?

22              MR. GOTTFRIED:  I don't think we've seen that, your

23    Honor.

24              THE COURT:  Well, let me see it.  This one doesn't

25    have a filing date and I don't know that we have.

1          **MS. CARSON:**  No, it has not been filed.

2          **THE COURT:**  It has not.  Okay, we haven't seen it.

3          **MS. CARSON:**  But we did give Amgen notice of these

4     last night by letter.

5          **THE COURT:** Yes.  All right.  Well, I don't

6     think -- it would make no sense to deal with it now.  But I

7     would like to get a response to this tomorrow, if I could.

8     Can I do that?

9          **MR. GOTTFRIED:**  Yes.

10         **THE COURT:**  Fine.

11         **MR. GOTTFRIED:**  I'm sorry.  Thank you.

12         **THE COURT:**  Now, for purposes of our discussion, we

13    will assume, but we need only assume, I'm not going to make

14    any rulings, that the admissions and the exhibits are all in

15    evidence.  So now we have Roche's affirmative case.

16         Now, what I --

17         **MS. BEN-AMI:**  One other thing, your Honor.

18         **THE COURT:**  What?

19         **MS. BEN-AMI:**  There is testimony by Dr. Strickland

20    as a 30(b)(6) witness, that also needs to be read in.  Those

21    are technically admissions because 30(b)(6) testimony is --

22         **THE COURT:**  Well, we don't need to argue it.  So

23    there's deposition testimony.

24         **MS. BEN-AMI:**  It's very short.

25         **THE COURT:**  All right.  And I've ruled on the

1    deposition of Strickland, I know.

2              **MS. BEN-AMI:**  Yes.

3              **THE COURT:**  Okay.  Ms. Ben-Ami I want you to tell

4    me, go patent by patent, claim by claim, and then defense by

5    defense, or someone on your team, tell me what you think you

6    are to the jury on.  In other words, patent '422 claim 1,

7    anticipated, obvious, whatever.  You tell me.  Somebody tick

8    those off for me so I have a matrix that I understand we can

9    talk about.

10             **MS. BEN-AMI:**  Well, I'll do the best I can, your

11   Honor, because I was expecting that Amgen would be making a

12   directed verdict on what it chose to make a directed verdict

13   on.

14             **THE COURT:**  Oh, no, no, no.  We need to know what

15   you think you're to the jury on and then I'll let them

16   attack that.

17             **MS. BEN-AMI:**  Okay.  Subject to someone correcting

18   me --

19             **THE COURT:**  Please.

20             **MS. BEN-AMI:**  -- I'll start with the '422 patent.

21             **THE COURT:**  Yes.

22             **MS. BEN-AMI:**  Claim 1.

23             **THE COURT:**  Yes.

24             **MS. BEN-AMI:**  Which is the only claim at issue,

25   '422 claim 1.

```
 1                    THE COURT:  Right.

 2                    MS. BEN-AMI:  We have anticipation.

 3                    THE COURT:  Yes.

 4                    MS. BEN-AMI:  We have obviousness.

 5                    THE COURT:  Yes.

 6                    MS. BEN-AMI:  We have written description.

 7                    THE COURT:  Yes.

 8                    MS. BEN-AMI:  We haven indefiniteness.

 9                    THE COURT:  Yes.  Okay.

10                    MS. BEN-AMI:  Did I miss anything?  Okay.

11          The '933, we have a bunch of claims, your Honor.

12                    THE COURT:  Yes.

13                    MS. BEN-AMI:  Do you want me to cite them to you?

14                    THE COURT:  I do.

15                    MS. BEN-AMI:  Okay.  We have the '933 claim 3.

16                    THE COURT:  Right.

17                    MS. BEN-AMI:  Claim 7.

18                    THE COURT:  Right.

19                    MS. BEN-AMI:  Claim 8.  Claim 9.  Claim 11.  Twelve

20          and 13.

21                    THE COURT:  Yes.

22                    MS. BEN-AMI:  Okay.  And 14.  Not 13.  Twelve and

23          14.

24                    THE COURT:  Twelve and 14.  Thank you.

25                    MS. BEN-AMI:  They're going faster than I can put
```

1    flip my charts.

2          So on those claims we have anticipation,

3    obviousness, written description, and indefiniteness.

4          **THE COURT:**  Right.

5          **MS. BEN-AMI:**  Okay.  On the '349 patent, your

6    Honor, that is, there's one claim actually in dispute which

7    is claim 7.

8          **THE COURT:**  Yes.

9          **MS. BEN-AMI:**  It depends on 1, 2, 3, 4, 5 or 6.

10          **THE COURT:**  No, but it's dependent claim 7.

11          **MS. BEN-AMI:**  Right.  But it's only --

12          **THE COURT:**  We've been having testimony about it

13    and I understand.

14          **MS. BEN-AMI:**  Right.  On that claim we have written

15    description, nonenablement --

16          **THE COURT:**  Wait a second.  On that one, written

17    description and enablement.

18          **MS. BEN-AMI:**  -- obviousness and indefiniteness.

19          **THE COURT:**  All right, wait a second.  Enablement

20    and obviousness.

21          **MS. BEN-AMI:**  Obviousness, correct.

22          **THE COURT:**  Thank you.  That's it?

23          **MS. BEN-AMI:**  I've got two more patents.

24          **THE COURT:**  Go right ahead.

25          **MS. BEN-AMI:**  And we're putting aside the issue of

1    double patenting?

2         **THE COURT:**  We are.

3         **MS. BEN-AMI:**  All right.

4         **THE COURT:**  Though, if that all breaks for you then

5    that may be a ground of your arguing to the jury

6    obviousness.  But you're right in characterizing it for our

7    discussion this afternoon.  We're putting that aside.

8         **MS. BEN-AMI:**  Right.

9         **THE COURT:**  Because I don't need to decide that

10   today since that, I've ruled, is matter for the Court to

11   decide.

12        And I take it that you think you're to the jury as

13   to obviousness on what I've let you say to the, let your

14   witnesses say to the jury.

15        **MS. BEN-AMI:**  Yes, your Honor.

16        **THE COURT:**  I understand.

17        **MS. BEN-AMI:**  Okay.

18        **THE COURT:**  Go right ahead.

19        **MS. BEN-AMI:**  So now we're on the '868 patent.

20        **THE COURT:**  Yes.

21        **MS. BEN-AMI:**  Which is, you may recall, your Honor,

22   one of the process patents.

23        **THE COURT:**  I understand.

24        **MS. BEN-AMI:**  A process patent.  We have claim 1.

25        **THE COURT:**  Yes.

1          MS. BEN-AMI:  And we have claim 2.  And that's it.

2          THE COURT:  Thank you.  And the defenses

3     established are?

4          MS. BEN-AMI:  Obviousness.

5          THE COURT:  Right.

6          MS. BEN-AMI:  I'm checking.  I know we have

7     obviousness.  Yes.  And we have written description and

8     indefiniteness on that as well on the claims with human EPO.

9     Human erythropoietin, I'm sorry.

10          THE COURT:  Right.

11          MS. BEN-AMI:  And then we have the '698 patent.

12          THE COURT:  Right.

13          MS. BEN-AMI:  And as of this moment, your Honor,

14     you ruled out our ability to argue about claims 4 and 5.

15     So, I'm -- your Honor, whatever I'm saying, I'm accepting

16     all your rulings and saying based on all your rulings this

17     is what I understand is left.

18          THE COURT:  Right.

19          MS. BEN-AMI:  Okay.

20          THE COURT:  And so, in effect, while you reserve

21     your rights, you understand you're not getting to the jury

22     on those.

23          MS. BEN-AMI:  I understand --

24          THE COURT:  Unless I should get a rush of blood to

25     the brain.

1          **MS. BEN-AMI:**  I understand that you've told me what

2     you've told me and I have to accept the Court's orders.

3          **THE COURT:**  Yes.  And you've always done it

4     respectfully and with elan.

5          So that's it, right?

6          **MS. BEN-AMI:**  It's the 6 9 -- I'm sorry, your

7     Honor.  It's the '698 patent, which is claim 6.

8          **THE COURT:**  Okay.  But beyond that, claim 6.

9          **MS. BEN-AMI:**  Claim 7.

10         **THE COURT:**  Yes.

11         **MS. BEN-AMI:**  Claim 8.  Claim 9.

12         **THE COURT:**  Six, 7, 8, 9.

13         **MS. BEN-AMI:**  Yes.  And I believe we have

14    obviousness and written description on that.

15         **THE COURT:**  Thank you.

16         **MS. BEN-AMI:**  And I thank my colleagues for helping

17    me.

18         **THE COURT:**  All right.  Now, let's just divide up

19    the time, though we don't have to.  I think it would be most

20    help -- well, I want you to argue as you think will be most

21    persuasive, naturally.  But I guess, I guess what might be

22    most persuasive, Mr. Day, or the Amgen folks, whoever wants

23    to argue, I would like to know of this aggregation of claims

24    and defenses what are the quick kills here?  What in your

25    mind is clearly out on the record as I'm taking it, which

```
 1    would include these admissions and exhibits, though I

 2    haven't ruled on them.

 3              MR. DAY:  I'll do my best, your Honor.

 4              THE COURT:  Thank you.

 5              MR. DAY:  Let me start with -- you call them quick

 6    kills, I'll call them low lying fruit.

 7              '933 claims 11 and 14.  Method of treatment claims

 8    all require treatment of dialysis patients elevating

 9    hematocrit.  There's been no evidence whatsoever that any

10    prior art composition had the ability to or would teach one

11    of ordinary skill in the art how to make a composition that

12    had the ability to elevate hematocrit in patients.

13              THE COURT:  Well, doesn't Goldwasser?

14              MR. DAY:  No.  There's no evidence whatsoever in

15    this record that Goldwasser elevated hematocrit of any

16    patient.  And so those are just low lying fruit claims,

17    they're out of the case as far as I can see.

18              THE COURT:  Yes.  Yes.

19              MR. DAY:  I think that -- and I'm going to have

20    broader arguments that address all of these claims, but I'm

21    trying to respect your request.

22              '349 claim 7.  Insofar as the obviousness of that

23    claim is concerned, there is the minimum limitation as to

24    the amount of erythropoietin that's produced by the cells in

25    that process and they must be at least a hundred units.
```

1           THE COURT:  Yes, but I'm slow.  What claim now are

2      you under?

3           MR. DAY:  '349 claim 7.

4           THE COURT:  '349 7.  Right.

5           MR. DAY:  It's a process claim.  And as to that

6      process claim, the only obviousness reference cited against

7      that claim was Farber.  That was, that was a reference that

8      was disclosed in the patent.  It's actually in the patent.

9      It was obviously considered by the Patent Office.  And in

10     Farber, what was done was oocytes expressed something, some

11     mixture of RNAs which gave an assay result that was 500

12     times less than what Lin's claimed cells produce.  And

13     that's hardly an obviousness reference for mammalian cells

14     that can be grown in culture and sustainably produce the

15     level of mammalian cells.  So that's also out on that

16     ground.

17          Let me turn to the broader arguments, I think.

18     With respect to the 112 defenses, because we have not yet

19     heard the end of Dr. Flavell's testimony, I would

20     respectfully not argue the written description or

21     indefiniteness at this point.  We do have a memorandum in

22     support of our motion for judgment as a matter of law which

23     you will receive in the morning.

24          THE COURT:  I don't mean to compromise anyone what

25     they think is tactically most effective.  I had the time

```
 1    this afternoon.  And so you can make your tactical choices
 2    correctly.  When Roche rests that's the time I want that
 3    memoranda.  I don't promise additional oral argument.  Just
 4    understand that.
 5              MR. DAY:  I appreciate that.
 6              THE COURT:  Go right ahead.
 7              MR. DAY:  And then -- but there is one last, I
 8    would say low lying fruit that I think is important.  And
 9    that is, you may recall that Roche has made an argument
10    challenging the inventorship of these patents, challenging
11    derivation under 102(f).  They claim that Lin derived the
12    patents from Goldwasser.  I think Goldwasser's testimony put
13    an end to that.  I think that claim can be dismissed as
14    well, their 102(f) defense, that these inventions were
15    derived.
16              Let me get to the two fundamental arguments that I
17    would like to make today, and they principally address
18    Roche's obviousness case and they affect all of the claims
19    insofar as Roche is arguing obviousness.  And in my
20    judgment, as I understand Roche's case, they have two legs
21    to their obviousness case.  I'm going to call them Dr. Lowe
22    and I'm going to call them Dr. Bertozzi.  They have two
23    lines of argument that they've advanced at trial for why
24    Lin's claims would have been obvious.
25              I'm going to begin with Dr. Lowe first.  And Dr.
```

1    Lowe's opinions and the case that Roche has built around Dr.

2    Lowe's opinions requires first and foremost a determination

3    that the isolation and cloning of the EPO gene would have

4    been obvious.  Dr. Lowe admitted as much.  He said he hadn't

5    frankly considered the circumstance in which the gene was

6    not in the possession of those skilled in the art.  So he,

7    his entire opinion is predicated on, first his opinion that

8    it would have been obvious to clone, isolate and clone the

9    EPO gene, and then with that gene in hand it would have been

10   obvious to do everything else claimed in all of the other

11   patents.  So he has sort of a two-step obviousness opinion.

12        And there's been, I believe, a failure of proof on

13   the part of Roche to substantiate that, and let me explain

14   why.

15        First of all, the record is clear that Dr. Lowe

16   cited no references, nothing, that was not previously before

17   the Patent Office.  And in that circumstance Roche carries a

18   heightened burden under American Hoist where all of the

19   references have been disclosed and considered by the Patent

20   Office.  Their burden to come forward with clear and

21   convincing evidence is even greater.

22        But the second thing, and this is the, this is the

23   fundamental point with respect to the isolation of cloning

24   of EPO gene, is as a matter of law, as a matter of law

25   Roche's proof fails.  And the law that the Court needs to

1    review in this regard is the Federal Circuit's decision in

2    In re Deuel.  And that case is reported, your Honor, at 51

3    F.3d 1552, In re Bell, 991 F.2d 781, and of course the Amgen

4    V. Chugai case, 927 F.2d 1200.

5           What's the law with respect to the obviousness of

6    inventions that claim a chemical composition such as a DNA

7    sequence encoding EPO.  Well, the law is, as laid out in

8    these cases, and when you read these cases you'll see they

9    are factually spot on, they're directly analogous to the

10   circumstances here, the law is that in order to make out an

11   obviousness case there must be in the prior art a

12   composition that is structurally similar to the claimed

13   structure.  It's not that there is a process that gets you

14   to that structure.  It's not that there is a motivation to

15   get to that structure.  There must be in the prior art a

16   structure.

17          So what did you have in Deuel.  In Deuel you had a

18   prior art, amino acid sequence of a protein, claims to the

19   DNA encoding that protein, that prior art sequence was known

20   and published, it was an N-terminal sequence, claims to the

21   DNA encoding that were rejected by an examiner and they were

22   rejected on the grounds that, well, Maniatis taught a method

23   of cloning genes, with this amino acid sequence in hand, it

24   would have been obvious and straightforward to one of

25   ordinary skill in the art to isolate and clone a DNA

1    encoding the protein sequence.

2            The Federal Circuit reversed.  The Federal Circuit

3    said this didn't even rise to a prima facie showing of

4    obviousness, on a much lower standard, not clear and

5    convincing evidence, this is, this is a prima facie showing

6    to the Patent Office.  Because the law requires in the

7    context of chemical structures, where the invention that's

8    claimed is a chemical structure like a DNA sequence, it

9    requires that there be in the prior art a DNA sequence that

10   leads one to the claimed sequence.

11           And the Court explained this reasoning at great

12   length in Deuel, explained it in Bell, and explained it in

13   Amgen v. Chugai as to why to make out a case of obviousness

14   it is insufficient to argue that, well, going from one

15   structure, a protein structure, applying known methods and

16   techniques, you could get to a very different structure, a

17   DNA structure, would be obvious, you can't do that as a

18   matter of law.

19           Now, you might ask yourself has this case survived

20   KSR.  And the answer to that question, your Honor, is

21   answered by the Federal Circuit in Takeda Chemical v.

22   Alphapharma, decided this summer, after KSR, upholding and

23   applying Deuel, notwithstanding the holding in KSR.  And the

24   basis is that there must be in the prior art an objective

25   basis, that is, a preexisting chemical structure that

1      provides the starting ground to move to the claimed

2      invention.

3              You may recall, I'm sure you do, that in the Amgen

4      v. Chugai case the issue was that when it comes to a DNA

5      sequence there can be no conception until you actually

6      possess the DNA.  You must be able to articulate the

7      structure.  You must have a conception of the chemical

8      structure that comprises the invention, not just some idea

9      of a method as to how you might get it.  You must actually

10     have a conception of that structure.  That is the foundation

11     of these cases.  That is what these cases are holding is

12     that in order to have, to make a prima facie case of proof

13     of obviousness for a chemical composition such as a DNA, you

14     must show in the prior art a structure, a conception of a

15     structure, a known structure, that would lead one to the

16     structure that's claimed.  And for that reason, for that

17     reason and that reason alone, all of the evidence that was

18     presented here by Dr. Lowe fails as a matter of law to make

19     out a case of obviousness.

20             And because Roche has failed to prove that it would

21     have been obvious, put aside the fact that this was all

22     previously considered by the Patent Office, everything he

23     cited was all considered, all rejected, put aside that, as a

24     matter of law, Roche has failed to make out their case of

25     obviousness.

1          Of course I saw today, this morning the Court

2     rejected a motion in limine by Amgen with respect to

3     collateral estoppel.  And I simply want to point out that

4     with respect to that that in this case, Chugai was a party

5     to the prior litigation in this Court in which the

6     nonobviousness of Lin's inventions was upheld in this Court

7     and affirmed on appeal.

8          **THE COURT:**  Well, that wasn't the ground of my

9     ruling.  It was Roche's relation to Chugai.  I remember the

10    litigation and I remember the hearing.

11         **MR. DAY:**  And so the point is that under, and as

12    this will be fully briefed in our JMOL, under the applicable

13    First Circuit law, not only their acquisition of Chugai, but

14    their acquisition of Boehringer Mannheim, which is GI's

15    partner and acquired the cells that are used by Roche to

16    make EPO from GI, binds Roche as a joint venturer and as a

17    successor in interest to that judgment.  That's a second

18    reason.

19         **THE COURT:**  Well, I think I understand your point.

20         Go ahead.

21         **MR. DAY:**  Let me talk about Dr. Bertozzi's opinions

22    and why Dr. Bertozzi's opinions fail to establish a prima

23    facie case of obviousness or anticipation of Lin's '422 and

24    '933 claims.

25         Unlike Dr. Lowe, whose opinions apply to every

1    claim-in-suit, so Dr. Lowe is offering an opinion about the

2    obviousness of gene cloning that affects every claim, and

3    then from there, once he has that gene in hand he offers a

4    secondary opinion of obviousness that affects all of the

5    process and cell claims, and the product claims, Dr.

6    Bertozzi's opinions are narrower.  Her opinions are focused

7    on the product claims, the '422 patent and the '933 patent.

8    She does not offer any opinions with respect to the '349,

9    the '868 or the '698 patents.  So insofar as there's any

10   proof in this record of obviousness for those patents it's

11   limited to Dr. Lowe.

12           But as to the product claims, Roche lays on a

13   second argument coming from Dr. Bertozzi with respect to the

14   obviousness in these claims.  And the first thing to

15   understand, the most important sort of foundational point to

16   understand is what do the claims require.  And I'm going to

17   begin, if I may, with '422 claim 1 and '933 claim 3.

18           Let me begin with the language first of all of '422

19   claim 1.  I think I can quote it from memory.

20   Pharmaceutical composition comprising a therapeutically

21   effective amount of human erythropoietin and an adjuvant, et

22   cetera, purified from mammalian cells grown in culture.

23           Well, the first thing to understand about the claim

24   in terms of what the claim requires is a pharmaceutical

25   composition comprising a therapeutically effective amount of

1   EPO.  That means that there must be sufficient EPO molecules

2   in there to elicit a therapeutically effective reaction.

3   It's a population of molecules.  This is not a single

4   molecule.  This is a composition of billions and billions

5   and billions of EPO molecules.

6        Same thing with respect to '933 claim 3.  '933

7   claim 3 claims a glycoprotein product that is a

8   nonnaturally-occurring erythropoietin glycoprotein product

9   of the expression from a mammalian cell that has an

10  activity, and the activity is to cause bone marrow cells to

11  increase the production of red blood cells and

12  reticulocytes.  That again is a population.  That product

13  requires a population of molecules.  A single EPO molecule

14  cannot have that activity, in vivo.

15       So, both claims are claiming, are requiring a

16  population of molecules.  That's the first point.  And it's

17  an important one.  Why?  Because Dr. Bertozzi readily

18  acknowledges that such populations of EPO molecules are a

19  heterogeneous mixture, that is, a mixture of different

20  glycoforms.  So, we have to look at the composition of the

21  total composition of the glycoforms that comprise that

22  product.  And as Dr. Bertozzi acknowledged, these glycoforms

23  vary from composition to composition.

24       What else did Dr. Bertozzi tell us in her

25  testimony?  She told us that she has made comparisons

1    between Dr. Goldwasser's prior art urinary EPO, which itself

2    is a mixture of glycoforms, she admitted that this morning,

3    and one commercial product, Amgen's commercial embodiment of

4    Dr. Lin's invention, EPOGEN.  I asked her several times on

5    cross-examination last week if she had compared it with any

6    other commercial embodiment.  She hadn't.  So she's made one

7    comparison, and as to that comparison, what Dr. Bertozzi

8    acknowledges is that the mixture of glycoforms in Amgen's

9    product, in the commercial embodiment that Amgen sells,

10   differs from Goldwasser's.

11        Okay, you say, well, all right, that's one product.

12   But your claims claim products, EPO products produced from

13   mammalian cells.  That's not just your embodiment.  That's

14   correct.  That's correct.  It includes embodiments other

15   than Amgen's.

16        The burden falls to Roche by clear and convincing

17   evidence to come forward and prove what Dr. Bertozzi

18   speculated about; namely, that there would be an embodiment

19   falling within those claims that would have the identical

20   distribution of glycoforms as Dr. Goldwasser's.

21        So, let's ask ourselves, from an evidentiary

22   perspective, recognizing that Roche bears the burden of

23   proof here to come forward with a prima facie case of

24   nonobviousness, what did they come forward with?  They put

25   on the stand an expert who was not one of ordinary skill in

1    the art at the time, so she's not testifying from personal

2    knowledge about the state of the art at the time.  She's

3    testifying from synthetic knowledge assembled by her reading

4    of the art.  Did she offer any evidence whatsoever showing

5    what the state of the art was in 1983 or 1984 that would, A,

6    tell you what the composition, what the mixture of

7    glycoforms was in Goldwasser's urinary EPO?  No, she said

8    she didn't know what the mixture was.  And she didn't

9    present any characterization of that mixture.

10         Did she offer any contemporaneous evidence, a

11   single publication, any evidence whatsoever to show that

12   those of ordinary skill in the art knew what Goldwasser's

13   glycoform distribution was, knew how to make a recombinant

14   EPO that would have the identical distribution of

15   glycoforms, how one would go about that, why they would have

16   a reasonable expectation of successfully doing that on an

17   objective record.  No.  No evidence of that whatsoever.

18         **THE COURT:**  But this, when ultimately I have to

19   make my ruling, this, this is a motion for directed verdict.

20         **MR. DAY:**  Yes.

21         **THE COURT:**  I have to take everything Roche's way.

22   And while you can criticize me for asking the question

23   myself, I was confused by the portion of her testimony where

24   she purported to explain what a person of ordinary skill in

25   the art would have known.  So I asked her myself.

1            **MR. DAY:**  Yes.

2            **THE COURT:**  And she gave an opinion.

3            **MR. DAY:**  Yes.

4            **THE COURT:**  And I think you're stuck with that.

5            So your point now is, if I go back to the basis of

6    that opinion, it either is nonexistent or insufficient.

7            **MR. DAY:**  Yes, I'm not stuck with it for that

8    reason.  I certainly acknowledge these words were spoken in

9    open court.  I don't disagree with that.  But the purpose of

10   a JMOL is to test whether the nonmoving party has come

11   forward with evidence sufficient to make out a prima facie

12   case.

13           **THE COURT:**  Correct.

14           **MR. DAY:**  And in this context where the burden of

15   proof is by clear and convincing evidence to show that those

16   of ordinary skill in the art at the time of the invention

17   had a reasonable expectation of making the invention that is

18   claimed, an expert who herself was in high school at the

19   time, and offers no corroborative contemporaneous evidence

20   to establish that, A, anyone knew what the glycoform pattern

21   of Goldwasser's EPO was, B, anyone knew what the glycoform

22   pattern of Lin's EPO was, C, had the means to take Lin's

23   invention and duplicate the glycoform population, the

24   distribution of glycoform, offers no evidence whatsoever, no

25   contemporaneous corroborative evidence.

1        **THE COURT:**  But haven't I captured your argument

2   when I say your argument is that her opinions are either

3   unsupported or supported by evidence that's legally

4   insufficient.

5        **MR. DAY:**  Yes, sir.

6        **THE COURT:**  Okay.

7        **MR. DAY:**  Yes.

8        **THE COURT:**  All right, I understand.  Just a few

9   more minutes because --

10        **MR. DAY:**  Yes.

11        **THE COURT:**  -- in our discussion I want to give

12   Ms. Ben-Ami 20 minutes.

13        **MR. DAY:**  And I just want to be clear why they're

14   unsupported, what it is that's missing, and what it is

15   that's insufficient.  I just want to be sure I'm clear that

16   the Court clearly understands what I'm arguing is missing,

17   what's insufficient.

18        And what I'm arguing is missing and insufficient in

19   order to come forward with a prima facie case of obviousness

20   is that if we have an acknowledgment that the evidence

21   establishes and she agrees that the one commercial

22   embodiment that exists that she's compared has a different

23   distribution of glycoforms.  But it's her opinion, stated in

24   open court, that one could overcome that difference.  Where

25   is the corroborative evidence, contemporaneous evidence as

1    of the date of the invention to establish that those of

2    skill in the art possessed a reasonable expectation of

3    succeeding in doing that, and, and, where was the motivation

4    to do that, where was the motivation to make a product that

5    admittedly had less specific activity, had not been shown to

6    increase the hematocrit level.

7              **THE COURT:**  All right.

8              **MR. DAY:**  Why would you do that.

9              **THE COURT:**  I understand.

10             Ms. Ben-Ami, or whoever, do you want to respond to

11   these arguments?

12             **MS. BEN-AMI:**  Well, I would like to respond to all

13   the arguments, your Honor.  But I start with some things

14   that I think are standard.

15             **THE COURT:**  Are what?

16             **MS. BEN-AMI:**  Are standard.

17             **THE COURT:**  Yes.

18             **MS. BEN-AMI:**  The burden on JMOL your Honor knows.

19   You don't need an expert opinion as your basis to prove

20   invalidity.  You need to look at all the evidence in the

21   case, including the specification.  And I've told you

22   repeatedly in motions that the background of the invention

23   in this case has admission after admission on what the state

24   of the art was, including that people were motivated to go

25   ahead and make recombinant EPO, that cDNA libraries would

1    work, that all that --

2         **THE COURT:**  You don't think, you don't think that

3    you need expert testimony to get to the jury on the issue of

4    obviousness and indeed on all these issues?

5         **MS. BEN-AMI:**  As a matter of law, no.  As a matter

6    of law, you do not.  But we have it.  But you don't need it,

7    legally.

8         **THE COURT:**  And you'll -- when I get your

9    memorandum --

10        **MS. BEN-AMI:**  Sure.

11        **THE COURT:**  -- you'll explain that law.

12        **MS. BEN-AMI:**  Sure.

13        **THE COURT:**  Go ahead.

14        **MS. BEN-AMI:**  Absolutely.  But let's, let's

15   start -- let me start with his low hanging fruit since he

16   seems to think it's hanging very lowly there.

17        The method of treatment claims.  The

18   Goldwasser-Baron study, they gave the medication to

19   hamsters, mice, whatever it was, and it raised the

20   hematocrit.  So there is evidence, Dr. Spinowitz testified,

21   that that prior art clearly showed a raise in hematocrit.

22   Dr. Baron's videotaped deposition similarly showed that.

23   Dr. Baron indicated in fact that there was data in the human

24   clinical study that there was a rise in hematocrit.  That is

25   evidence of record.  The data is now in evidence that there

1    was a rise in hematocrit.

2         The idea that having this stuff and then saying

3    would it be obvious to give it to kidney patients, kidney

4    disease patients, has been testified to by Dr. Spinowitz.

5    It is in the Eschbach art, the Essers art, the Goldwasser

6    art, it's all over the art, including in the background of

7    the invention where they say that's what people are

8    motivated to do, that's what's in the prior art, that's why

9    I'm doing this.  And that is a binding admission on Amgen.

10        What's in the background of the invention said this

11   is what's in the art is a binding admission on Amgen.  So,

12   there's plenty of evidence on that claim.

13        On the '349 patent, the evidence was from Dr. Lowe.

14   He clearly testified about amplification and selection.  So,

15   Mr. Day indicated that while he didn't hear anybody say

16   anything about that, well, Dr. Lowe testified in full about

17   the '349 claim 7 and that the technique of using CHO cells

18   with the DHFR for selection and amplification would give you

19   those levels obviously.  That's why that technology was

20   developed.  That technology was done by scientists at

21   Columbia.  This is all of record, and I point out that much

22   of what Mr. Day told you was not in the record, including

23   that EPOGEN is the commercial embodiment of the claims.

24   That's in evidence.  So, those facts are in evidence

25   already.  His testimony is in evidence.

1        Now, on this, I did not understand what Mr. Day

2   said on 102(f), Dr. Goldwasser said whatever.  I think the

3   evidence is absolutely crystal clear that the Goldwasser

4   protein and tryptic fragments was given to Amgen and Amgen

5   didn't do it itself.  That is 102(f) prior art to be

6   considered for 103 obviousness.

7        So let's be clear what we're talking about.  When

8   you have derivation prior art it becomes a piece of prior

9   art.  Just like every other piece of prior art it was proven

10  up, it was paid for by the NIH and the DOE.  He didn't have

11  a written contract with Amgen.  He gave it to them.  It's in

12  their patent where they say they did it themselves, and the

13  reality is that they didn't.  And, the evidence in record

14  now says that had he been listed as an inventor the

15  University of Chicago and the government would have had

16  rights to that patent.  These patents-in-suit.  That is all

17  evidence that's in the record.

18       So, let's talk about this issue of general

19  obviousness.  I will address these cases Mr. Day has spoken

20  about in writing to your Honor.  But I will point out the

21  following.  These patents are not to a DNA.  I'll say that

22  again.  These patents are not claiming a DNA.  That was the

23  '008 patent.  That's the patent that claimed a DNA sequence.

24  These patents, while in my opinion and the opinion of my

25  witnesses completely obvious based on the '008 patent, are

1    not per se claims to a DNA sequence.

2         And the fallacy of what Mr. Day says can be borne

3    out by the patent background which admits as a binding

4    admission that if you had the entire protein sequence you

5    can make a synthetic DNA, obviously.  That's in the

6    background of the invention.  It is a binding admission.  We

7    keep forgetting that these are binding admissions.  They're

8    not just plain admissions.  They are binding under case law

9    in the Federal Circuit.

10        So, what did Dr. Lowe testify to?  He said if

11   someone had Dr. Goldwasser's protein, 102(f) derivation

12   prior art, now that hypothetical person of skill in the art

13   has the information, he has the protein, he gets the

14   sequence, he's got it.  Everything else is done.

15        If you go back and read the background on this

16   patent you will see, you will see, and I will show you again

17   later on, but you will see, if you look at the background of

18   that invention, that it says this.  It says the problem is

19   that up until now no one had enough protein.  That's what it

20   says.  The problem is no one had enough protein to get the

21   sequence.  The solution is guess what, we got the protein.

22   Oops, we forgot that that was from Dr. Goldwasser.  There's

23   complete evidence.

24        I would also point out, your Honor, that the Chugai

25   claim, which was to DNA, has a different invention date than

1    the patents-in-suit here.  Based on the record that we have

2    at this point, the invention date for these claims, all of

3    them, is November 1984, not 1983.  And, therefore, that is

4    the standard of what must be considered.

5          So putting aside what Mr. Day pointed you to,

6    remember, we put in, you were angry at me because I

7    interrupted witness to put it in, the --

8          **THE COURT:**  I'm never angry.  I simply try to

9    control the courtroom, that's all.

10         **MS. BEN-AMI:**  Well, I was wrong about how long it

11   was.

12         **THE COURT:**  I say that not to interrupt.  But in

13   all honesty, if I'm angry you'll know it.  I'm not angry in

14   this case.  I am delighted by vigorous advocacy and I

15   respect all counsel.

16         But go ahead.

17         **MS. BEN-AMI:**  I was trying to remind you of which

18   deposition it was.  I think we're there.  If you remember

19   Dr. Fritsch's deposition, the evidence came in, it was

20   verified by Dr. Lowe, but the underlying evidence is in,

21   that prior to November 1984, Genetics Institute cloned the

22   DNA sequence.  That is prior art, 102(g) prior art DNA to

23   DNA to these claims.  DNA to DNA.

24         So the case law that Mr. Day spoke about, which I

25   believe is completely inapplicable to these claims because

1    they are not DNA claims, nonetheless is irrelevant because

2    we have prior to November 1984 someone else cloned the gene,

3    the DNA.  As a matter of law, given that the invention date

4    is later that is prior art.

5            Now, if we look at this whole issue about this

6    source limitation.

7            Where was that case I that I had before?  Someone

8    took my case.  Thank you.

9            I think we have got to get to the law on this, your

10   Honor, because I think there is confusion.  At least in the

11   arguments I'm hearing there is confusion.

12           It is Amgen's burden to show that the source

13   limitation imparts structure.  We have several cases that we

14   have cited to you and will cite to you, but it is Amgen's

15   burden.  Because imagine the opposite.  Everyone could put

16   something in a claim and then just say, well, you shoot it

17   down, you shoot it down.  That's not the way it works.  A

18   source limitation, unless it imparts structure, has no

19   applicability.  The only applicability of a source

20   limitation is to the extent it imparts structure.

21           And I would ask your Honor to look at Footnote 20

22   of the, I believe this is the first Federal Circuit TKT

23   decision, it's the 314 F.3d one, in Footnote 20 the Court

24   said:  We note also that on remand when considering

25   obviousness and anticipation, issues relating to, it says

1    the '080 and the '422, the district court should be

2    cognizant of the rule that a claimed product shown to be

3    present in the prior art cannot be rendered patentable

4    solely by the addition of a source or process limitation.

5    You compare the product to the product.

6            THE COURT:  Give me the specific cite again.

7            MS. BEN-AMI:  It is the Federal Circuit case, it's

8    314 F.3d 1313, Fed.Cir. 2003, it's Footnote 20.

9            THE COURT:  Thank you.

10           MS. BEN-AMI:  Now, what does that mean?  It means

11   that you compare products.  And what it means in terms of --

12   first of all, let's take the more straightforward issue of

13   anticipation.  It doesn't matter -- you don't have to be one

14   skilled in the art to consider anticipation.  The case law

15   is that a person who is skilled puts themselves back into

16   the time of the invention.  It doesn't mean that you have to

17   be the individual of ordinary skill.

18           THE COURT:  No, you don't need to belabor that.

19           MS. BEN-AMI:  All right.

20           THE COURT:  I agree that with that entirely.  He

21   did argue that there has to be corroboration and he says

22   your evidence is inadequate on that.  But I have no problem

23   with her expertise.

24           MS. BEN-AMI:  So let's start with anticipation.

25   The inherent features of the Goldwasser protein are the

1   inherent features of the Goldwasser protein.  And if you

2   look at the features of the protein they are what they are.

3   Whether they're shown today, yesterday or ten years ago, 20

4   years ago or 30 years ago.  The structure is the structure.

5   The inherency in anticipation exists.  And in fact inherency

6   in obviousness exists as a matter of law.  So, you can't say

7   I can't look at evidence later at all.  The patent, what you

8   do look at, is you say what are the tests that are in the

9   patent.  What are the tests that are in the patent to

10  suggest that there's an alternate structure.

11          And there's case law on this which is very

12  important.  I believe the SmithKline case.  Or let me see if

13  I can get that for you, your Honor.  Yes, it's the, it's

14  the -- the SmithKline case is 439 F.3d.  And I'll hand that

15  to you, your Honor, as I have many people helping me.

16          That case and the cases that follow, In re Marosi,

17  In re Moeller, those cases, they say that Amgen has the

18  burden of proving that the purified from mammalian cell

19  source limitation imparts a unique structure.  We need to

20  look at that.

21          Moreover, in the SmithKline case, I think it's the

22  same case, your Honor, it says look to the tests that are in

23  the patent.  Look to the tests that are in the patent.  What

24  is the test that's in the patent?  The test in the patent is

25  only the SDS-PAGE test.  That's the test that's in the

1   patent.  The test that's in the patent says, because this

2   is, they got it wrong, but this is what they put in their

3   patent, we separate out -- they did these tests that Dr. Lin

4   later found out were wrong about the average carbohydrate

5   composition.  Forget about those.  Those are wrong.  The

6   only other test data they have for showing that the urinary

7   EPO and the recombinant EPO are different, the only test,

8   the other test is the SDS-PAGE test, and then they take off

9   the sugar and they show the amino acid sequence migrates

10  together.

11          So, the evidence that says no, there's SDS-PAGE,

12  evidence that shows they don't migrate differently, that

13  evidence is the evidence that says, looking just at that

14  evidence it says, okay, we know that when you take off the

15  sugars they're the same.  We also now know, by clear and

16  convincing evidence, that they migrate together to begin

17  with.

18          So, if you look at this patent and the tests they

19  apply the case is closed.  Because that evidence clearly

20  shows it.

21          But now let's look at the third piece of evidence.

22  Let's look at what the law actually is telling us to do.

23  The claims are not to Dr. Lin's Example 10 versus

24  Goldwasser's urinary EPO.  The claims are to a very large

25  number of compounds.  Because they claimed a lot to cover a

1    lot.  If you claim a lot to cover a lot, that's where you're

2    stuck.  All mammalian cells, all purification processes, all

3    of them, not even only recombinant cells.  If you look at

4    the '422 claim, purified from mammalian cells grown in

5    culture, not recombinant.  It can be tumor cells.  It can be

6    anything.  All mammalian cells, all purification processes.

7    All.

8         Mr. Day just told you that, you know, look at

9    populations and look at -- Dr. Bertozzi explicitly stated if

10   you change the purification, you change the populations.

11   You enrich for some, you get rid of others.  That's what she

12   said.  And I will point out, your Honor, that in neither the

13   '422 claim 1 nor the '933 claims at issue here are to the

14   average of the population.  Those claims you already, I

15   believe, invalidated.  The average composition claims.  The

16   average carbohydrate composition claims.

17        So now Amgen is saying, well, we're not bound by

18   the fact that you found that to be indefinite in the prior

19   case because these are different claims, but now we want you

20   to look at the averages, the populations.  No, no, no, no.

21   These claims are to polypeptides.  And the Goldwasser

22   polypeptides according to Dr. Bertozzi, based on her

23   knowledge and experience, reading, understanding the science

24   and the art, she says if you compare that to all mammalian

25   cells, all CHO cells, all purification techniques, it's in

1        there.  That's all that's needed to be proven.  It's not a

2        comparison of commercial embodiments.  That is an incorrect

3        analysis on the part of Amgen.  The law says you compare the

4        prior art to the claims.

5               And for the product-by-process claim the only thing

6        you do is compare the product of the process, not the steps

7        of the process, the product of the process to the prior art.

8               And for the '422 claim, it's a pure product claim.

9        And she compared the prior art to the product claim.  She

10       said based on her knowledge and experience, based on Amgen's

11       admissions, based on the same testing, SDS-PAGE, then you

12       can look at other things as well if you want.  But the fact

13       of the matter is, it's Amgen who's looking at things that

14       are not in the patent specification, not Roche.  Amgen's

15       bringing up things like specific activity and circular

16       dichroism and all this other stuff.  None of that's in their

17       patent.  None of it.  Not a bit.

18              So the evidence of record is you say what kind of

19       tests did the patents consider?  That's the kind of test you

20       can.  The evidence of Dr. Bertozzi is unequivocal, that if

21       she didn't look at anything the day after November 1984, her

22       opinion remains the same because of her understanding of the

23       science.

24              So, your Honor, I think if you consider the claims

25       of the patents rather than the mistaken analysis that Amgen

1    would like to engage in, there's overwhelming evidence,

2    overwhelming evidence that Goldwasser's product fits within

3    these claims.

4         **THE COURT:**  All right.  Thank you.  Thank you both.

5         Now, this has been very helpful, and in an effort

6    to be equally helpful, let me tell you just as a practical

7    matter how we're going to proceed.

8         Roche has not rested on its defenses.  Both

9    parties, doubtless, will submit the briefs on the, that they

10   want to submit, on the admissibility of the remaining data.

11   And that's where I'll start.

12        Now, Mr. Madrid is not prolix but he is thorough.

13   And so, in my calculus I'll have enough time while he

14   cross-examines to make my rulings on the admissibility of

15   the remaining documents.  When he's done, when we are done

16   with these witnesses, I will either have made an endorsement

17   that can be passed out to you or we'll have a side bar

18   conference, and then whatever else needs be put in, whatever

19   else I allow to be put in will be put in.

20        Amgen -- rather, Roche then will rest in front of

21   the jury.  At that time -- on the issue of validity.  At

22   that time, I will receive briefs.  And, aided by this

23   argument, I may be able to rule on something, but the great

24   likelihood is that I will not be.  That, of course, is my

25   prerogative in a case of this complexity because Amgen gets

1    a second bite as Roche will get a bite at the close of all

2    the evidence to renew their motion and I will be in a better

3    position to entertain that at that time.

4           So, on the likelihood that Roche will remain

5    standing on some, if not all, of these claims -- these

6    defenses to the various claims, Amgen can go ahead and put

7    on its affirmative case and life will go on.

8           As I reflect on the written briefs, I may be able

9    to shorten matters.  I don't make rulings as a case

10   management issue, but it's foolish to spend time on matters

11   that can appropriately be resolved as a matter of law and as

12   soon as I'm confident I will do that.  And I think that will

13   be sufficient so we can see our way forward for a while

14   anyway.

15          All right, that said, I do thank you.  We'll recess

16   until 9:00 a.m. tomorrow morning.

17          **MS. BEN-AMI:**  Your Honor, we did file a motion in

18   limine regarding Amgen's first witness.

19          **THE COURT:**  What's the name?

20          **MS. BEN-AMI:**  Spaethe.  Spaethe.

21          **THE COURT:**  Spaethe?

22          **MS. BEN-AMI:**  Yes.

23          **THE COURT:**  Yes.  I'll look at it.

24          **MS. BEN-AMI:**  Thank you.

25          **THE COURT:**  We'll recess.

1          **THE CLERK:**  All rise.  Court is in recess.

2          (Adjournment.)

3

4

5                    **C E R T I F I C A T E**

6

7

8          We, Donald E. Womack and Cheryl B. Palanchian,

9    Official Court Reporters for the United States District

10   Court for the District of Massachusetts, do hereby certify

11   that the foregoing pages are a true and accurate

12   transcription of our shorthand notes taken in the

13   aforementioned matter to the best of our skill and ability.

14

15

16

17           /S/ DONALD E. WOMACK

18           _____

19           /S/ CHERYL B. PALANCHIAN
             _____

20                 DONALD E. WOMACK
                   CHERYL B. PALANCHIAN
21             Official Court Reporters
                   P.O. Box 51062
22         Boston, Massachusetts 02205-1062
                womack@megatran.com

23

24

25